IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, EL PASO DIVISION

| | |
|---|---|
| DANIEL VILLEGAS, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 3:15-CV-386 |
| | ) |
| CITY OF EL PASO, ALFONSO MARQUEZ, | ) |
| CARLOS ORTEGA, SCOTT GRAVES, JOE LAREDO, | ) |
| KEMMITT BELLOWS, EARL ARBOGAST, LINK | ) |
| BROWN, JOHN SCAGNO, UNKNOWN EMPLOYEES | ) |
| OF THE CITY OF EL PASO, | )    JURY DEMAND |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff, DANIEL VILLEGAS, by his undersigned attorney, complains of Defendants, CITY OF EL PASO, ALFONSO MARQUEZ, CARLOS ORTEGA, SCOTT GRAVES, JOE LAREDO, KEMMITT BELLOWS, EARL ARBOGAST, LINK BROWN, JOHN SCAGNO, UNKNOWN EMPLOYEES OF THE CITY OF EL PASO, and states as follows:

### Introduction

1.    Based entirely on a series of what a court has called "completely unreliable" statements illegally and coercively induced by Defendants from 16-year-old Daniel Villegas and three other teenagers, Plaintiff was wrongly convicted and spent nearly two decades in prison for a double murder that he did not commit.

2.    The Defendants used violence, threats of violence, and false promises of leniency to coerce Mr. Villegas and the three other teenagers to make false statements.

3.    The illegal and coercive methods used by Defendants to obtain these four false statements and secure Mr. Villegas' wrongful conviction were part of what the El Paso County District Court recently called a "pattern and practice of using illegal and coercive interrogation tactics both in this investigation and others."

4.    The same court explained that the statements induced by Defendants that caused Mr. Villegas' nearly two-decade long wrongful imprisonment "contained details that are demonstrably false and factually impossible."

5.    In addition to coercing false statements implicating Mr. Villegas, Defendants withheld exculpatory evidence pointing to two other individuals as the real perpetrators of the crime.

6.    Mr. Villegas was vindicated 20 years after his false confession when, in December 2013, the Texas Court of Criminal Appeals agreed with the "strong" recommendation of the El Paso County District Court to vacate his convictions.

7.    This lawsuit seeks to redress the violation of Mr. Villegas' constitutional rights, obtain compensation for the

damage Defendants inflicted upon him, and bring these injustices to light so that similar misconduct never occurs again.

## Jurisdiction and Venue

8.   This action is brought pursuant to 42 U.S.C. § 1983 and Texas law to redress Defendants' tortious conduct and the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

9.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.  Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to this complaint occurred in this judicial district.

## Parties

10.  Plaintiff Daniel Villegas is a 38-year-old resident of El Paso, Texas. Mr. Villegas has two children, including a daughter who was born prior to his wrongful conviction, and from whom he was separated during the almost twenty years of his wrongful incarceration. He has been employed in the construction industry since his release from prison.

11.  At all times relevant hereto, Defendants Alfonso Marquez, Carlos Ortega, Scott Graves, Joe Laredo, Kemmitt Bellows, Earl Arbogast, Link Brown, John Scagno, and unknown employees of the City of El Paso (hereinafter "Defendant Officers") acted under color of law and in the scope of their employment.  In addition, Defendant John Scagno was, at all

3

relevant times hereto, Chief of the El Paso Police Department, and had supervisory authority over the other Defendant Officers. All are sued in their individual capacities.

12.  Defendant City of El Paso is a Texas municipal corporation.  The City of El Paso is or was the employer of each of the Defendant Officers, who were police officers in the El Paso Police Department at all times relevant hereto.

## The Crime

13.  Around midnight on April 10, 1993, 18-year-old Robert England, 17-year-old Armando Lazo, 17-year-old Jesse Hernandez and 18-year-old Juan Medina left a party and were walking together along Transmountain Drive in El Paso, Texas. When they reached Electric Street, an individual discharged multiple shots at them from the passenger side of an unknown vehicle, which immediately fled the scene.

14.  Jesse and Juan were not struck by the bullets. Robert, however, was shot in the head and killed. His body was found approximately 148 feet from six .22-caliber bullet casings grouped together on Electric Street. Armando was also shot, but made his way to the front door of a neighboring home, where he collapsed and eventually died. No shell casings were found other than the group of six clustered together.

15.  The survivors, Jesse and Juan, both gave statements to the police after the shooting. They explained

4

that, minutes before the shooting, they saw a car approach them and then drive past them as they walked along Transmountain Drive. After the group turned onto Electric from Transmountain, the car returned with its lights off and parked across the street. Juan heard one of the occupants call out "Come here," and Jesse heard one yell "Que putos." Shots rang out, and both Jesse and Juan fled. They did not know that Armando Lazo and Robert England had been shot until after they returned and spoke with police at the scene.

16.    Neither Jesse nor Juan was able to identify the individuals in the car or even the number of occupants. Each told police the car looked like a Monte Carlo, but Juan told the police the car's color was "goldish" while Jesse stated it was "maroon and red." Police never located the car used in the shooting.

17.    The senseless nature of this crime and the tragic death of the two innocent teens put fear into the community, and details related to the shooting were widely reported in the local media.

### Defendants' Misconduct

18.    Defendants Marquez, Graves, Arbogast, and Laredo were all assigned to investigate the Lazo and England murders.

19.    After giving an initial statement describing the little he observed to police on April 10, 1993, surviving victim

5

Jesse Hernandez was picked up by Defendant Marquez on April 12, 1993 and brought to the police station.

20.   At Defendant Marquez's request, Jesse wrote down his description of the circumstances of the shooting on a legal pad. Marquez took the pad, threw it at the 17-year-old, and told him to "cut the bullshit." Marquez lied and told Jesse that Juan Medina had implicated Jesse as the perpetrator. Marquez threatened Jesse that he would go to jail and get the electric chair if he did not confess.

21.   Even though he was a victim of the shooting, not its perpetrator, Jesse later testified that the interrogation by Defendant Marquez was so coercive that he began to believe he might have killed his friends. He stated "I was thinking . . . if Juan is saying that I killed my friends, you know, maybe I did it." Defendant Marquez, using lies and threats, convinced Jesse that "[m]aybe [he] blacked out."

22.   Jesse nearly succumbed to Defendant Marquez's coercive interrogation and came close to falsely confessing. Jesse stated that "[i]f he [Marquez] had really kept on – because I really wanted to get out of there, I would have signed anything. I would have said yeah."

23.   Ultimately, Jesse did not confess, so Defendant Officers moved onto other vulnerable targets in their efforts to secure a confession at any cost.

24.   On April 15, 1993, Defendant Ortega and other Defendant Officers travelled to Chaparral, New Mexico and brought 15-year-old Michael Johnston and 14-year-old Jacob Jauregi back to El Paso for questioning in the double murder investigation.

25.   Michael was kept in handcuffs in El Paso police custody for eight hours overnight, from 7 p.m. until 3 a.m. Despite his mother's request that police not interrogate her son until she had contacted a lawyer, Defendants Marquez, Arbogast and Ortega coerced the 15-year-old to falsely confess.

26.   Defendant Officers obtained Michael's false confession by threatening to take him to jail to be subjected to inmate assault and sexual abuse. They screamed so loudly at the boy that he could feel their spit on his face. They threatened Michael that if he did not confess, he would get the electric chair, but if he did confess, he would get off easy. Indeed, Defendant Marquez threatened that he would turn on the switch himself at the execution if Michael did not confess. Michael later explained that these illegal and coercive tactics led him to falsely admit to committing the crime.

27.   Jacob Jauregi also falsely confessed his involvement in the shootings after being subjected to a similarly coercive interrogation by Defendant Officers.

28. Despite the inculpatory statements obtained from both Michael Johnston and Jacob Jauregi, charges were not pursued against either boy. Police determined that Defendant Officers induced false confessions because the information provided by Michael and Jacob during their interrogations did not match the circumstances of the crime.

### Defendants Frame Mr. Villegas

29. Unable to obtain usable confessions from Jesse, Michael, or Jacob, the Defendants were now desperate to pin the crime on someone in the face of mounting public pressure to solve these high-profile murders.

30. On April 21, 1993, Defendant Officers contacted 17-year-old David Rangel, who is Mr. Villegas' cousin. Police first falsely told David that they wanted to speak with him about a telephone harassment complaint. However, after Defendants Graves and Arbogast brought him to the police station, Defendants Marquez and Laredo instead interrogated David about the Lazo and England murders.

31. Marquez and Laredo told David that they knew he had killed Armando Lazo and Robert England, and falsely told him that he had been implicated by eyewitnesses. During the interrogation, Marquez and Laredo cursed at David, threatened him with life in prison, and told him he was a "pretty white boy with green eyes" who could expect to be "fucked" in prison.

32.   David was frightened and, facing a barrage of accusations that he was the shooter, denied his own involvement and told police the only thing he knew about the murders: several days previously, he had a phone conversation with Daniel Villegas in which the 16-year-old Villegas had jokingly claimed to have shot Armando and Robert with a sawed-off shotgun.

33.   This story did not fit the facts of the shooting, as the victims were shot with a .22-caliber firearm, not a sawed-off shotgun. Moreover, David Rangel told police that he knew Mr. Villegas was joking. Regardless, from this point onwards, Defendant Officers became relentlessly focused on convicting Mr. Villegas for the murders.

34.   Defendants Marquez and Laredo ordered 17-year-old David Rangel to write a statement implicating Mr. Villegas. In an attempt to put an end to the unrelenting interrogation, David complied — he wrote that Mr. Villegas told him that Villegas used a sawed-off shotgun in the shooting. Upon reading this, Marquez angrily threw away the first statement, and forced David to sign a new statement excluding mention of the weapon. Again, scared by the illegal and coercive tactics used by Defendants, David complied.

35.   The final statement obtained from David Rangel by Defendant Officers, typed by Defendant Marquez, stated "I have

been asked if I know what kind of gun or weapon was used in the killing and I don't know."

36.    David's statement also contained demonstrably false details about the shooting. The statement describes the car as black, but the only eyewitnesses described the car as "maroon and red" or "goldish." Furthermore, the statement claims that there were two separate rounds of gunfire in two separate locations, which conflicts both with the survivors' description of the shooting and the forensic evidence of the shell casings indicating that the shots were all fired from one location.

37.    With tunnel vision now leading Defendant Officers to Daniel Villegas as their one and only suspect, they set out to interrogate more young men who they could coerce into implicating Mr. Villegas.

38.    On the same day as the David Rangel interrogation, on April 21, 1993 at approximately 5:30 p.m., Defendant Graves arrested 15-year-old Rodney Williams.

39.    Defendant Officers knew that Rodney was a friend of Mr. Villegas, and arrested him for the purpose of fabricating a case against Mr. Villegas.

40.    Defendant Graves did not read Rodney his rights, and he violated Texas law governing the treatment of juvenile arrestees.

41.   At the police station, Defendant Arbogast initially interrogated Rodney, but he determined that Rodney had no relevant information to offer.

42.   Nevertheless, Defendants Graves and Marquez continued to interrogate Rodney. As Rodney protested his innocence, Graves and Marquez told him he would go to prison where he would be raped. They threatened that he would be charged with the murders if he did not give an inculpatory statement, while falsely promising that if Rodney implicated himself and Mr. Villegas, he could go home. Graves and Marquez claimed that they were not interested in Rodney, but that they wanted to go after Mr. Villegas.

43.   Rodney eventually signed a false statement that had been typed by Graves and consisted entirely of information provided to him by Graves. The signed statement falsely read that Rodney, Daniel Villegas, Marcos Gonzalez, Enrique Ramirez (known by the nickname "Popeye") and Fernando Lujan (known by the nickname "Droopy") were in the car at the time of the shooting, and that Mr. Villegas was the shooter. Defendant Officers knew that Marcos Gonzalez, Enrique Ramirez and Fernando Lujan were all friends of Mr. Villegas.

44.   The Defendant Officers who fabricated this statement did not know that this was factually impossible. Ramirez and Lujan could not have been involved in the crime, and

indeed were never charged, because at the time of the crime Ramirez was incarcerated and Lujan's electronic monitoring device confirmed he was three miles away from the murders.

45.    Rodney's statement used the name "Snoopy" to refer to Lujan because Defendant Officers had inadvertently fed Rodney the incorrect nickname while they were fabricating his statement.

46.    Later that same day, April 21, 1993, shortly after 10 p.m., Defendants Marquez, Graves, Laredo and Arbogast falsely arrested 17-year-old Marcos Gonzalez and 16-year-old Daniel Villegas.

47.    Defendant Officers knew that Marcos was a friend of Mr. Villegas, and arrested him for the purpose of fabricating a case against Mr. Villegas.

48.    The arrest of Mr. Villegas was based solely on the fabricated and coerced statements taken from David Rangel and Rodney Williams, and therefore Defendants lacked probable cause to justify that arrest.

49.    Mr. Villegas informed Defendant Officers that he was 16-years-old, but Defendant Officers again failed to follow the procedures mandated by Texas law for the treatment of juvenile arrestees.

50.    Mr. Villegas was placed in a police car with Defendants Marquez and Arbogast.

51.   Marcos Gonzalez was placed in a police car with Defendants Graves and Laredo.

52.   Defendant Officers drove Daniel Villegas past the home of Fernando Lujan (aka "Droopy").

53.   Next, Defendants Marquez, Arbogast, Laredo and Graves drove to the Northpark Mall, where they conferred with Defendant Brown and other unknown police officers for thirty minutes, more or less, while Marcos Gonzalez and Daniel Villegas remained handcuffed in separate vehicles.

54.   Next, Defendant Officers took both Marcos Gonzalez and Daniel Villegas to the Five Points Police Station.

55.   After they arrived at the police station, Daniel Villegas and Marcos Gonzalez were separated. While other Defendant Officers were processing, transporting, and then interrogating Mr. Villegas, Defendant Graves interrogated Marcos Gonzalez.

56.   Graves threatened to beat Marcos and told him that he would be raped in prison if he did not confess. Marcos initially refused to confess and denied his involvement in the shooting, at which point Graves slammed Marcos repeatedly against the wall. Graves was then able to induce an initial false confession from Marcos.

57.   In this initial statement, Marcos falsely claimed that he was in the car on the evening of the shooting, but that

13

he got out before the shooting and only learned about it afterwards when Mr. Villegas told him what had happened.

58.   Defendant Graves subsequently forced Marcos to give a second statement in which he falsely claimed to have stayed in the car and been present at the time of the shooting; this statement again falsely implicated Mr. Villegas as the shooter.

59.   The fabricated statements induced by Defendants from teenagers David Rangel, Rodney Williams, and Marcos Gonzalez were all used in the prosecution and convictions of Mr. Villegas.

### Mr. Villegas' False Confession

60.   Daniel Villegas and the other teenagers induced to give false statements by Defendant Officers were at heightened risk of police coercion and manipulation due to their young age.

61.   Mr. Villegas was a uniquely easy target to frame and was particularly vulnerable to coercive interrogation tactics. Court-ordered psychological evaluations conducted after his arrest noted that Mr. Villegas had "extreme difficulties with learning and with school," and concluded that he had below-average cognitive skills, poor concentration, and "questionable" insight and judgment. He had dropped out of school in the eighth

grade, and could only read at a third grade level. He also
suffered from emotional problems and Attention Deficit Disorder.

62.  Mr. Villegas had never been interrogated by
police before April 21, 1993.

63.  After Mr. Villegas was arrested, Defendants
Marquez and Arbogast placed him in a police car. During the
drive to the police station, Defendant Marquez subjected Mr.
Villegas to repeated verbal abuse. Marquez cursed and yelled at
Mr. Villegas, telling him "you are going down for this" and we
are "going to take you to kick your ass," or words to that
effect.

64.  When he was eventually taken into the police
station, Defendant Officers handcuffed Mr. Villegas to a chair.
Defendant Marquez and two other Defendant Officers began
harassing the 16-year-old to make a statement. They accused him
of being involved in the murders, and when Mr. Villegas denied
involvement, Defendant Officers kept telling him "we know you
did it" and instructed him to confess.

65.  Defendant Marquez struck Mr. Villegas on the back
of the head while telling him "we know you did it." Defendant
Officers told Mr. Villegas that he was going to get "fucked in
jail." Defendant Marquez screamed at Mr. Villegas, and told him
that if he did not confess, Marquez would drive him out to the
desert, handcuff him to the car door and "kick your ass."

15

Marquez told Mr. Villegas they would leave him out in the desert to walk back into town, and when Mr. Villegas got back, Marquez would "personally . . . put you in a tank with a bunch of fat faggots and they're going to rape you."

66.   All of this coercive and threatening interrogation occurred *before* Defendant Officers explained Mr. Villegas' rights to him or brought him before a magistrate to verify that he wanted to give a voluntary statement – legal requirements mandated under Texas and federal law precisely to avoid involuntary and unreliable confessions given by juveniles.

67.   Defendant Officers later falsely claimed that Mr. Villegas had been properly informed of his rights before his interrogation began and fabricated evidence supporting this false timeline. Defendant Ortega and other Defendant Officers suppressed or destroyed evidence that would corroborate the correct timeline of events, including the Miranda warning card signed by Mr. Villegas while in police custody.

68.   After Defendant Marquez told Mr. Villegas that Rodney had implicated him in the shooting, Mr. Villegas gave an initial statement, which Defendant Marquez typed. In this initial statement Mr. Villegas denied being the shooter.

69.   Defendant Marquez took this statement from the typewriter and crumpled it up. Defendant Marquez slapped Mr. Villegas and told him he would be executed, and that Marquez

16

would pull the switch on the electric chair himself, if Mr. Villegas did not confess to being the shooter.

70.    Defendant Marquez prepared a second statement for Mr. Villegas and fed him information about the crime, telling Mr. Villegas that he committed the murders with Rodney Williams, Marcos Gonzalez, "Popeye," and "Snoopy." Mr. Villegas told Defendant Officers that he did not know anyone with the alias "Snoopy" but that he did know "Droopy" (the nickname used by Fernando Lujan).

71.    As he was feeding Mr. Villegas this information, Defendant Marquez continued to threaten and coerce Mr. Villegas. Marquez told Mr. Villegas that if he made a statement he would be taken to the juvenile probation department and not to jail. If he refused, then Marquez told Mr. Villegas that he would beat him.

72.    The Defendant Officers never provided Mr. Villegas with access to a phone or allowed him to contact a lawyer or his family.

73.    Defendant Graves was interrogating Marcos Gonzalez at the same time as Marquez was interrogating Daniel Villegas. The two Defendants conspired with each other by phone during their respective interrogations to ensure that Marcos's statement would be more consistent with the statement that Marquez fabricated for Mr. Villegas.

17

74.   Defendant Graves changed crucial details between the first and second statements he coerced from Marcos Gonzalez, to make the second statement mirror the eventual statement that Defendant Marquez coerced Mr. Villegas to sign.

75.   Eventually, at 2:40 a.m. on April 22, 1993, the Defendant Officers' coercion forced Mr. Villegas to involuntarily sign a one-page typewritten false statement that had been prepared by Defendant Marquez.  The statement falsely implicated Mr. Villegas as the shooter in the murders, but provided no corroborating details apart from those already known to the police.

76.   Defendant Marquez was aided by Defendants Graves, Arbogast, Ortega and Brown, and other Defendant Officers, in the false arrest, unlawful detention, and illegal and coercive interrogation of Mr. Villegas.

77.   When Mr. Villegas was free from the threats made by Defendant Officers, Villegas recanted his confession. Later that same morning, he told Juvenile Probation Officer Monica Sotello that he "didn't do it" and that he only confessed because Defendant Officers coerced him.

**Defendants Ignore Exculpatory Evidence**

78.   In their rush to frame Mr. Villegas, Defendants Marquez, Graves, Arbogast, Laredo, and other Defendant Officers

suppressed and failed to investigate information that pointed to other individuals as the perpetrators of the shooting.

79. Early in their investigation, Defendant Officers received information that brothers Javier and Rudy Flores were involved in the shooting. Three days after the shooting, on April 14, 1993, Defendant Officers took statements from the Flores brothers. Rudy's statement placed him at the scene of the crime at the same time as the murders, and there were numerous inconsistencies between Rudy's and Javier's statements.

80. Defendant Officers also took statements from four people who all implicated the Flores brothers.

81. According to a report prepared by Defendant Marquez, "[d]uring the entire case" he and other investigators continued to receive numerous reports that the Flores brothers were responsible for the shooting.

82. Defendant Officers knew that the Flores brothers had a motive for the shooting, as they had received information that Rudy and Javier had fought with the murder victims, Armando and Robert, before the shooting. In particular, Defendant Graves took a statement from Terrance Farrar, who told police that he witnessed Rudy threaten to kill Armando Lazo at a party two weeks before the shooting.

83.   Defendant Officers also knew that Rudy owned a car that matched the eyewitness description given by Jesse Hernandez.

84.   In addition, a woman named Connie Serrano witnessed Sally Flores, Javier and Rudy's sister, trying to dispose of a .22 caliber weapon, the same caliber as the murder weapon, at Javier and Rudy's home shortly after the shooting. Ms. Serrano was also told by Rudy's best friend "Half-Pint" that Rudy had admitted his involvement in the shooting.

85.   Ms. Serrano tried to tell the police numerous times about the information she had about Rudy, including after the false confession coerced from Mr. Villegas by Defendant Officers, but she was rebuffed and told that police already had the right killer.

86.   Likewise, Jamarqueis Graves overheard a conversation in which the Flores brothers referred to Daniel Villegas being "locked up" for a crime they had committed. Mr. Graves also witnessed one of them trying to dispose of a .22 caliber weapon.

87.   In addition, Defendant Officers were aware of information that Celia Fierro, Javier's girlfriend, was in the car at the time of the shooting. Ms. Fiero would have been able to confirm that Mr. Villegas had nothing to do with the shooting. Neither Ms. Fierro's existence as a witness nor the

information she held was ever provided to Plaintiff or his attorneys.

88.   Furthermore, Defendant Officers obtained an audio-taped statement made by a witness who had information that Rudy had bragged about his involvement in the shootings. That tape recording was never produced to Plaintiff or his attorneys.

89.   Defendant Marquez falsely claimed that he listened to the tape with Detective Arturo Ruiz and Lieutenant Paul Saucedo, and that any leads it generated were followed up on. This version of events was contradicted by both Ruiz and Saucedo, who denied that Marquez ever shared the tape with them and denied that the investigative leads it might have generated had been exhausted.

90.   Moreover, Defendant Officers knew that on the same day of the murders, Rudy was present at another shooting involving a .22-caliber weapon. Defendant Bellows responded to that shooting. A .22-caliber weapon was recovered from that shooting but the Defendant Officers have never revealed the results of any testing to compare the shell casings and bullets recovered from the Lazo and England murders against the ballistics evidence in the other shooting. Defendant Bellows and other Defendant Officers suppressed this potentially exculpatory evidence.

91.   Despite the evidence pointing to the Flores brothers' involvement, Defendant Officers dismissed the information as "rumors" and eliminated the Flores brothers as suspects.

92.   Defendant Officers had tunnel vision. They ignored evidence and failed to pursue leads that might contradict their fabricated evidence implicating Mr. Villegas.

93.   In addition to all the evidence against the Flores brothers, Defendant Officers were aware of confessions from at least four other alternative suspects: the confessions of Michael Johnston and Jacob Jauregi described above, as well as admissions made by Rick Martinez and Eduardo Valles. Defendant Officers essentially ignored this evidence.

94.   Moreover, Defendants Marquez, Graves, Arbogast, Laredo, Ortega, Brown and Bellows, and other unnamed Defendant Officers, suppressed or destroyed this and other exculpatory evidence, including the Miranda warning card signed by Mr. Villegas while in police custody, Mr. Villegas's first statement, David Rangel's first statement, evidence of Javier's girlfriend's presence at the shooting, and the missing tape. In addition, Defendant Officers failed to pursue the above-named and other investigatory leads knowing that they would result in the discovery of additional exculpatory evidence, and fabricated inculpatory evidence in order to frame Mr. Villegas.

## Marquez's History of Misconduct

95. At the time he coerced a false confession from Mr. Villegas, Defendant Marquez already had a lengthy disciplinary record, including allegations of criminal conduct and assault. In March 1993, the month before his interrogation of Mr. Villegas, Marquez had been suspended from duty for three days due to his repeated misconduct.

96. Specifically, Defendant Marquez has a history of lying, to such an extent that a special prosecutor sought a perjury indictment against him.

97. Defendant Marquez interrogated and eventually obtained a confession from a suspect in an unrelated homicide case after that individual had requested to contact an attorney and had affirmed that she did not want to give a statement to police. The confession was challenged at a suppression hearing, during which Marquez lied about the interrogation.

98. Defendant Marquez has admitted that he has worn a doctor's smock during interrogations in order to trick suspects into giving statements to him.

99. Defendant Marquez has admitted that he could have gotten anybody to confess to the Lazo and England murders if he wanted to do so.

100. Defendant Marquez has admitted that he has engaged in the destruction and suppression of exculpatory

evidence. Specifically, when a suspect would give an initial statement that he did not like, he has admitted that his practice was to destroy that statement, deny its existence in future proceedings, and work to obtain a more favorable statement from the suspect.

101. Ultimately, based on this and other evidence, the El Paso County District Court concluded that Defendant Marquez had a history of committing egregious misconduct and was "not credible." It reached these conclusions "based on the corroborating evidence presented . . . that Detective Marquez had a pattern and practice of using illegal and coercive interrogation tactics both in this investigation and others."

### Mr. Villegas' Convictions

102. Without any physical evidence to tie Mr. Villegas to the shooting, prosecutors had to rely on his coerced false confession and the fabricated statements created by Defendants attributed to David Rangel, Rodney Williams and Marcos Gonzalez.

103. After the jury hung at his first trial, Mr. Villegas was retried. His coerced confession and the fabricated statements of the three other teenagers coerced by Defendants caused Mr. Villegas to be wrongfully convicted for the murders of Armando Lazo and Robert England. On August 24, 1995, Mr. Villegas was sentenced to life in prison for a crime he did not commit.

## Mr. Villegas' Convictions Vacated

104. Mr. Villegas had nothing to do with the murders of Mr. Lazo and Mr. England. He was nowhere near the scene of the crime. At the time of the shooting, he was watching a movie at the Village Green Apartments.

105. Because Mr. Villegas' statement was a coerced false statement rather than a true voluntary confession, despite Defendant Officers' best efforts to fabricate a compelling and consistent confession, his statement contained numerous details which were demonstrably false.

106. The statement names "Popeye" as the driver of the car, but Enrique Ramirez (aka "Popeye") was incarcerated at the time of the shooting.

107. The statement names "Droopy" as one of the occupants of the car, but Fernando Lujan (aka "Droopy") was at home at the time of the shooting, as established by an electronic monitoring device which showed that Lujan never left the house.

108. The statement asserts that Mr. Villegas and his friends stole beer from a nearby store before the shooting, but the storeowner confirmed that no theft occurred.

109. Mr. Villegas's false confession describes the car as white, but the only eyewitnesses described the car as "maroon and red" or "goldish."

110. The statement claims that someone in the car yelled "Que vario," but neither surviving eyewitness heard that phrase.

111. The statement claims that, after the first shots were fired, Armando Lazo was chased down and shot in a second round of gunfire while he was running away. This conflicts with the description of the shooting given by both surviving eyewitnesses. Moreover, no one heard multiple rounds of gunfire. The location of the shell casings confirms that only one round of gunfire took place and the assailants did not chase Armando down before shooting him. This eyewitness and forensic evidence was corroborated by a neighbor who lived adjacent to the scene of the shooting, and who heard five to six consecutive shots in a single round of gunfire. Finally, Armando was shot in the front of his abdomen and his thigh, not in the back, demonstrating that he was not running away when he was struck.

112. In 2009, following an evidentiary hearing, the El Paso County District Court "strongly recommend[ed]" that Mr. Villegas' convictions be vacated. The court found that Mr. Villegas, Rodney Williams and Marcos Gonzalez were subjected to "illegal and coercive methods" and that their confessions were "completely unreliable." The court concluded that "the new evidence presented at the writ hearing adequately meets the standard to demonstrate Villegas' actual innocence."

113. In December 2013 the Texas Court of Criminal Appeals vacated Mr. Villegas' conviction.

114. In November 2014, the El Paso County District Court suppressed Mr. Villegas' false confession as involuntary and ordered that it could not be used against him at a re-trial. The court found that Defendant Officers had obtained the statement "in violation of [Mr. Villegas'] constitutional rights," and that the testimony of Defendants Marquez and Ortega regarding his interrogation was "not credible." Finding no possible basis to disagree with the Court's ruling, the State did not appeal.

### Mr. Villegas' Damages

115. Mr. Villegas spent nearly twenty years in prison for a crime that he did not commit.

116. During his wrongful incarceration, Mr. Villegas was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals and other life events with loved ones, and the fundamental freedom to live one's life as an autonomous human being.

117. Mr. Villegas became a father on November 30, 1994, shortly before his first trial. He missed being present at the birth of his daughter due to the ongoing criminal

proceedings against him. After his wrongful conviction, he was separated from his infant daughter and was unable to parent her and to participate in her growth and development. He was also separated from the mother of his daughter, to whom he was engaged, and was thus deprived of companionship and matrimonial support.

118. Throughout the period of his wrongful incarceration, Mr. Villegas suffered numerous instances of physical abuse perpetrated by both guards and prisoners, as well as numerous instances of attempted sexual assault.

119. As a result of his wrongful incarceration, Mr. Villegas must now attempt to rebuild his life without the benefit of two decades of life experience that ordinarily equip adults for that task.

120. Mr. Villegas has suffered tremendous damage, including physical sickness and injury and resultant emotional damages, all proximately caused by Defendants' misconduct.

### Count I – Due Process Right to a Fair Trial

### 42 U.S.C. § 1983

121. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

122. As described more fully above, the Defendant Officers, while acting individually, jointly, and in conspiracy with other named and unnamed individuals, as well as under color

of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

123. In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory and impeachment evidence, fabricated false statements, reports and other evidence, and suborned perjury, thereby misleading and misdirecting the criminal prosecution of Plaintiff. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

124. The Defendant Officers' misconduct also directly resulted in the Plaintiff's unjust criminal conviction, thereby denying him his constitutional right to a fair trial, and a fair appeal thereof, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

125. As a direct and proximate result of this misconduct, Plaintiff sustained and continues to sustain injuries, including physical injury and sickness and resultant emotional pain and suffering.

126. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

127. The misconduct by the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the El Paso Police Department, which Plaintiff

was the victim of, and his injuries were proximately caused by a policy and practice on the part of the City of El Paso to pursue and secure false convictions through profoundly flawed investigations as described more fully above.

128. Specifically, during the relevant time period, a group of El Paso police officers, including some or all of the Defendant Officers herein, engaged in a systematic pattern of coercion, fabrication of evidence, withholding of exculpatory information, and other illegal tactics, the sum total of which completely corrupted the investigative process.

129. This institutional desire to close cases through unconstitutional tactics regardless of actual guilt or innocence, in order to enhance police officers' personal standing in the Department, was known to the command personnel, who themselves participated in the practice.

130. The above-described widespread practices, so well-settled as to constitute *de facto* policy in the El Paso Police Department during the time period at issue, were able to exist and thrive because municipal policymakers with authority over the same either concurred with the practices or exhibited deliberate indifference to the problem.

131. The widespread practices described in the preceding paragraphs were allowed to take place because the City of El Paso declined to implement sufficient training and any

legitimate mechanism for oversight or punishment. Indeed, the El Paso Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that befell Plaintiff was, and is, for all practical purposes nonexistent. Indeed, the Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline or oversight.

132. El Paso police officers and the other employees of the City of El Paso who manufactured criminal cases against individuals such as Plaintiff had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and Departmental discipline, but that they also stood to be rewarded for closing cases no matter what the costs. In this way, this system proximately caused abuses, such as the Defendant Officers' misconduct at issue in this case.

**Count II – Coerced and False Confession (Fifth Amendment)**

**42 U.S.C. § 1983**

133. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

134. In the manner described more fully above, Defendant Officers, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate

himself falsely and against his will, in violation of his rights secured by the Fifth Amendment.

135. As described more fully above, the Defendant Officers participated in, encouraged, advised, and ordered an unconstitutional and unlawful interrogation of Plaintiff, which caused Plaintiff to make involuntary and false statements implicating himself in the murders of Armando Lazo and Robert England.

136. The coerced, involuntary, false statement written by the Defendant Officers and attributed to Plaintiff was used against Plaintiff to his detriment in a criminal case. This statement was the only reason that Plaintiff was prosecuted and convicted of the murders.

137. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

138. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

139. The Defendant Officers' misconduct described in this Count was undertaken pursuant to the City of El Paso's policy and practice in the manner more fully described above.

**Count III – Coerced and False Confession (Fourteenth Amendment)**

**42 U.S.C. § 1983**

140. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

141. In the manner described more fully above, Defendant Officers, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his right to due process secured by the Fourteenth Amendment.

142. As described in detail above, the misconduct described in this Count was done using extreme techniques of physical and psychological coercion and torture against a 16-year-old boy. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

143. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

144. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

145. The Defendant Officers' misconduct described in this Count was undertaken pursuant to the City of El Paso's policy and practice in the manner more fully described above.

## Count IV - Failure to Intervene

### 42 U.S.C. § 1983

146. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

147. In the manner described above, during the Constitutional violations described above, one or more of the Defendant Officers stood by without intervening to prevent the misconduct.

148. As a direct and proximate result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, he sustained and continues to sustain injuries, including physical injury and sickness and resultant emotional pain and suffering.

149. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

150. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

151. The Defendant Officers' misconduct described in this Count was undertaken pursuant to the City of El Paso's policy and practice in the manner more fully described above.

## Count V - Conspiracy

## 42 U.S.C. § 1983

152. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

153. Prior to arresting Plaintiff, the Defendant Officers reached an agreement amongst themselves to frame Plaintiff for the crime, and to thereby deprive Plaintiff of his constitutional rights, all as described in the various Paragraphs of this Complaint.

154. In addition, before and after Plaintiff's conviction, each of the Defendant Officers further conspired, and continues to conspire, to deprive Plaintiff of exculpatory materials to which he is lawfully entitled and which would have led to his more timely exoneration of the false charges as described in the various Paragraphs of this Complaint.

155. In this manner, the Defendant Officers, acting in concert with each other and with other unknown co-conspirators, including persons who are and who are not members of the El Paso

Police Department, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

156. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

157. As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and he sustained and continues to sustain injuries, including physical injury and sickness and resultant emotional pain and suffering.

158. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

159. The Defendant Officers' misconduct described in this Count was undertaken pursuant to the City of El Paso's policy and practice in the manner more fully described above.

### Count VI - Supervisory Liability

### 42 U.S.C. § 1983

160. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

161. The constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct, which occurred with the knowledge and consent of those of the Defendant Officers who acted in a supervisory capacity,

including but not limited to Defendant Scagno, who served as Chief of the El Paso Police Department at all relevant times, such that these officers personally knew about, facilitated, approved, and condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation by their actions or by their deliberately indifferent failure to act.

162. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

163. As a direct and proximate result of this misconduct, Plaintiff sustained and continues to sustain injuries, including physical injury and sickness and resultant emotional pain and suffering.

164. Absent knowing participation by the command personnel responsible for supervising the Defendant Officers, the misconduct alleged in this Complaint could not have occurred.

165. The Defendant Officers' misconduct described in this Count was undertaken pursuant to the City of El Paso's policy and practice in the manner more fully described above.

### Count VII – State Law Claim

### Intentional Infliction of Emotional Distress

166. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

167. The acts and conduct of Defendant Officers as set forth above were extreme and outrageous. Defendant Officers' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

168. As a direct and proximate result of this misconduct, Plaintiff sustained and continues to sustain injuries, including physical injury and sickness and resultant severe emotional pain and suffering.

### Count VIII - State Law Claim

### Civil Conspiracy

169. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

170. As described more fully in the preceding paragraphs, Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means.

171. In furtherance of the conspiracy, Defendant Officers committed overt acts and were otherwise willful participants in joint activity including but not limited to the

malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

172. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

173. As a direct and proximate result of this misconduct, Plaintiff sustained and continues to sustain injuries, including physical injury and sickness and resultant severe emotional pain and suffering.

### Count IX – State Law Claim

### Abuse of Process

174. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

175. As described more fully in the preceding paragraphs, Defendant Officers made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process.

176. Defendant Officers had an ulterior motive or purpose in exercising such illegal, improper, or perverted use of the process.

177. As a direct and proximate result of this misconduct, Plaintiff sustained and continues to sustain injuries, including physical injury and sickness and resultant emotional pain and suffering.

39

## Count X – State Law Claim

### False Imprisonment

178. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

179. In the manner described more fully above, Defendant Officers subjected Plaintiff to a willful detention without his consent and without the authority of law.

180. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

181. As a direct and proximate result of this misconduct, Plaintiff sustained and continues to sustain injuries, including physical injury and sickness and resultant emotional pain and suffering.

## Count XI – State Law Claim

### Respondeat Superior

182. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

183. In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the El Paso Police Department, acting at all relevant times within the scope of their employment and under color of law.

184. Defendant City of El Paso is liable as principal for all torts committed by its agents.

## Count XII – State Law Claim

### Indemnification

185. Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

186. Texas law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

187. Defendant Officers are or were employees of the El Paso Police Department, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, DANIEL VILLEGAS, respectfully requests that this Court enter judgment in his favor and against Defendants, CITY OF EL PASO, ALFONSO MARQUEZ, CARLOS ORTEGA, SCOTT GRAVES, JOE LAREDO, KEMMITT BELLOWS, EARL ARBOGAST, LINK BROWN, JOHN SCAGNO, UNKNOWN EMPLOYEES OF THE CITY OF EL PASO, awarding compensatory damages, costs, and attorneys' fees, as well as punitive damages against all individual defendants, and any other relief this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff, DANIEL VILLEGAS, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


RESPECTFULLY SUBMITTED:


/s/ Felix Valenzuela
Attorney for Daniel Villegas

Felix Valenzuela
State Bar No. 24076745

VALENZUELA LAW FIRM
221 N. Kansas Street, Ste. 1200
El Paso, TX 79901
T: 915-209-2719
F: 915-493-2404
felix@valenzuela-law.com