## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS, EL PASO DIVISION

| | |
|---|---|
| DANIEL VILLEGAS, | ) |
| | ) Case No. 3:15-CV-386 |
| Plaintiff, | ) |
| | ) Hon. Frank Montalvo, |
| v. | ) District Judge |
| | ) |
| CITY OF EL PASO, ALFONSO MARQUEZ, CARLOS | ) Hon. Leon Schydlower, |
| ORTEGA, SCOTT GRAVES, KEMMITT BELLOWS, | ) Magistrate Judge |
| EARL ARBOGAST, RAY SANCHEZ, HECTOR | ) |
| LOYA, UNKNOWN EMPLOYEES OF THE CITY OF | ) JURY TRIAL DEMANDED |
| EL PASO, | ) |
| Defendants. | ) |
| | ) |

## THIRD AMENDED COMPLAINT

Plaintiff, DANIEL VILLEGAS, by his undersigned attorneys, complains of Defendants,

CITY OF EL PASO, ALFONSO MARQUEZ, CARLOS ORTEGA, SCOTT GRAVES,

KEMMITT BELLOWS, EARL ARBOGAST, RAY SANCHEZ, HECTOR LOYA,

UNKNOWN EMPLOYEES OF THE CITY OF EL PASO, and states as follows:

### Introduction

1.      Based entirely on a series of what a court has called "completely unreliable"

statements illegally and coercively induced by Defendants from 16-year-old Daniel Villegas and

three other teenagers, Plaintiff was wrongly convicted and spent nearly two decades in prison for

a double murder that he did not commit.

2.      The Defendants used violence, threats of violence, and false promises of leniency

to coerce Mr. Villegas and the three other teenagers to make false statements.

3.      The illegal and coercive methods used by Defendants to obtain these four false

statements and secure Mr. Villegas' wrongful conviction were part of what the El Paso County

District Court recently called a "pattern and practice of using illegal and coercive interrogation tactics both in this investigation and others."

4.     The same court explained that the statements induced by Defendants that caused Mr. Villegas' nearly two-decade long wrongful imprisonment "contained details that are demonstrably false and factually impossible."

5.     In addition to coercing false statements implicating Mr. Villegas, Defendants withheld exculpatory evidence pointing to two other individuals as the real perpetrators of the crime, and withheld exculpatory evidence that would have revealed the corrupt tactics they used to generate false evidence against Mr. Villegas.

6.     Mr. Villegas was vindicated 20 years after his false confession when, in December 2013, the Texas Court of Criminal Appeals agreed with the "strong" recommendation of the El Paso County District Court to vacate his convictions.

7.     On October 5, 2018, Mr. Villegas' long nightmare finally came to an end, after a jury found him not guilty at his criminal re-trial.

8.     This lawsuit seeks to redress the violation of Mr. Villegas' constitutional rights, obtain compensation for the damage Defendants inflicted upon him, and bring these injustices to light so that similar misconduct never occurs again.

**Jurisdiction and Venue**

9.     This action is brought pursuant to 42 U.S.C. § 1983 and Texas law to redress Defendants' tortious conduct and the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

10. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to this complaint occurred in this judicial district.

**Parties**

11. Plaintiff Daniel Villegas is a 42-year-old resident of El Paso, Texas. Mr. Villegas has three children, including a daughter who was born prior to his wrongful conviction, and from whom he was separated during the almost twenty years of his wrongful incarceration. He has been employed in the construction industry since his release from prison.

12. At all times relevant hereto, Defendants Alfonso Marquez, Carlos Ortega, Scott Graves, Kemmitt Bellows, Earl Arbogast, Ray Sanchez, Hector Loya, and unknown employees of the City of El Paso (all individual Defendants collectively referred to hereinafter as "Defendant Officers") acted under color of law and in the scope of their employment. All are sued in their individual capacities.

13. Defendant City of El Paso is a Texas municipal corporation. The City of El Paso is or was the employer of each of the Defendant Officers, who were police officers in the El Paso Police Department at all times relevant hereto.

**The Crime**

14. Around midnight on April 10, 1993, 18-year-old Robert England, 17-year-old Armando Lazo, 17-year-old Jesse Hernandez and 18-year-old Juan Medina left a party and were walking together along Transmountain Drive in El Paso, Texas. When they reached Electric Street, an individual discharged multiple shots at them from the passenger side of an unknown vehicle, which immediately fled the scene.

15.     Jesse and Juan were not struck by the bullets. Robert, however, was shot in the head and killed. His body was found approximately 148 feet from six .22-caliber bullet casings grouped together on Electric Street. Armando was also shot, but made his way to the front door of a neighboring home, where he collapsed and eventually died. No shell casings were found other than the group of six clustered together.

16.     The survivors, Jesse and Juan, both gave statements to the police after the shooting. They explained that, minutes before the shooting, they saw a car approach them and then drive past them as they walked along Transmountain Drive. After the group turned onto Electric from Transmountain, the car returned with its lights off and parked across the street. Juan heard one of the occupants call out "Come here," and Jesse heard one yell "Que putos." Shots rang out, and both Jesse and Juan fled. They did not know that Armando Lazo and Robert England had been shot until after they returned and spoke with police at the scene.

17.     Neither Jesse nor Juan was able to identify the individuals in the car or even the number of occupants. Each told police the car looked like a Monte Carlo, but Juan told the police the car's color was "goldish" while Jesse stated it was "maroon and red." Police never located the car used in the shooting.

18.     The senseless nature of this crime and the tragic death of the two innocent teens put fear into the community, and details related to the shooting were widely reported in the local media.

**Defendants' Misconduct**

19.     Defendants Marquez, Graves, Arbogast, and Ortega were all assigned to assist with the investigation of the Lazo and England murders.

20.     At the outset of their investigation, Defendants Marquez, Graves, Arbogast and Ortega communicated together and reached an agreement that they would take whatever steps were necessary to implicate a suspect and develop evidence to secure a conviction for these crimes, without regard for the constitutional rights of the individuals involved, the legality of their tactics, or the truth or falsity of the evidence they would develop.

21.     After giving an initial statement to police describing the little he observed on April 10, 1993, surviving victim Jesse Hernandez was picked up by Defendant Marquez on April 12, 1993 and brought to the police station.

22.     At Defendant Marquez's request, Jesse wrote down his description of the circumstances of the shooting on a legal pad. Marquez took the pad, threw it at the 17-year-old, and told him to "cut the bullshit." Marquez lied and told Jesse that Juan Medina had implicated Jesse as the perpetrator. Marquez threatened Jesse that he would go to jail and get the electric chair if he did not confess.

23.     Even though he was a victim of the shooting, not its perpetrator, Jesse later testified that the interrogation by Defendant Marquez was so coercive that he began to believe he might have killed his friends. He stated "I was thinking . . . if Juan is saying that I killed my friends, you know, maybe I did it." Defendant Marquez, using lies and threats, convinced Jesse that "[m]aybe [he] blacked out."

24.     Jesse nearly succumbed to Defendant Marquez's coercive interrogation and came close to falsely confessing. Jesse stated that "[i]f he [Marquez] had really kept on—because I really wanted to get out of there, I would have signed anything. I would have said yeah."

25.     Defendants Graves, Arbogast and Ortega discussed with Defendant Marquez his plan to use these tactics on Jesse Hernandez in advance of the interrogation in order to attempt to

secure a confession from him. Defendants Graves, Arbogast and Ortega conveyed their approval, and took no steps to prevent Defendant Marquez from engaging in this conduct.

26.     After the interrogation of Jesse Hernandez, Defendants Graves, Arbogast and Ortega discussed the interrogation with Defendant Marquez, including the specific details of Marquez's coercive tactics.

27.     Ultimately, Jesse did not confess, so Defendants Marquez, Graves, Arbogast and Ortega moved onto other vulnerable targets in their efforts to secure a confession at any cost.

28.     Shortly after the interrogation of Jesse Hernandez on April 12, 1993, after Defendant Marquez's failed attempt to obtain a confession from Jesse, Defendants Marquez, Graves, Arbogast and Ortega communicated together and reached an agreement to seek out other vulnerable individuals from whom they could obtain statements, either implicating themselves in the Lazo/England murders or implicating others, without regard for the constitutional rights of the individuals involved, the legality of their tactics, or the truth or falsity of the evidence they would develop.

29.     Pursuant to this agreement, on April 15, 1993, Defendants Marquez and Ortega travelled with other officers to Chaparral, New Mexico and brought 15-year-old Michael Johnston and 14-year-old Jacob Jauregi back to El Paso for questioning in the double murder investigation.

30.     Shortly after Defendants Marquez and Ortega brought Michael and Jacob to El Paso, Defendants Marquez, Graves, Arbogast and Ortega communicated together and discussed their plan to use coercive tactics in order to secure a confession from these boys.

31.     Michael was kept in handcuffs in El Paso police custody for eight hours overnight, from 7 p.m. until 3 a.m. Despite his mother's request that police not interrogate her

son until she had contacted a lawyer, Defendants Marquez, Arbogast and Ortega coerced the 15-year-old to falsely confess.

32.     Defendants Marquez, Arbogast and Ortega obtained Michael's false confession by threatening to take him to jail to be subjected to inmate assault and sexual abuse. They screamed so loudly at the boy that he could feel their spit on his face. They threatened Michael that if he did not confess, he would get the electric chair, but if he did confess, he would get off easy. Indeed, Defendant Marquez threatened that he would turn on the switch himself at the execution if Michael did not confess. Michael later explained that these illegal and coercive tactics led him to falsely admit to committing the crime.

33.     Jacob Jauregi also falsely confessed his involvement in the shootings after being subjected to a similarly coercive interrogation by one or more of Defendants Marquez, Graves, Arbogast and Ortega.

34.     Despite the inculpatory statements obtained from both Michael Johnston and Jacob Jauregi, charges were not pursued against either boy. Police determined that Defendants Marquez, Graves, Arbogast and Ortega induced false confessions because the information provided by Michael and Jacob during their interrogations did not match the circumstances of the crime.

### Defendants Frame Daniel Villegas

35.     Unable to obtain usable confessions from Jesse, Michael, or Jacob, Defendants Marquez, Graves, Arbogast and Ortega were now desperate to pin the crime on someone in the face of mounting public pressure to solve these high-profile murders.

36.     Shortly after they determined that the inculpatory statements they had obtained from Michael and Jacob on April 15 could not be used to implicate those boys as the perpetrators

of the Lazo/England murders, Defendants Marquez, Graves, Arbogast and Ortega communicated together and reached an agreement to interrogate 17-year-old David Rangel, who is Mr. Villegas' cousin, about the murders. These Defendants discussed their plan to use coercive tactics in order to obtain from David either a confession or a statement implicating someone else in the Lazo/England murders.

37.     On April 21, 1993, one or more of Defendants Marquez, Graves, Arbogast and Ortega contacted David. They first falsely told David that they wanted to speak with him about a telephone harassment complaint. However, after Defendants Graves and Arbogast brought him to the police station, Defendant Marquez instead interrogated David about the Lazo and England murders.

38.     Marquez told David that he knew David had killed Armando Lazo and Robert England, and falsely told him that David had been implicated by eyewitnesses. During the interrogation, Marquez cursed at David, threatened him with life in prison, and told him he was a "pretty white boy with green eyes" who could expect to be "fucked" in prison.

39.     David was frightened and, facing a barrage of accusations that he was the shooter, denied his own involvement and told Defendant Marquez the only thing he knew about the murders: several days previously, he had a phone conversation with Daniel Villegas in which the 16-year-old Villegas had jokingly claimed to have shot Armando and Robert with a sawed-off shotgun.

40.     This story did not fit the facts of the shooting, as the victims were shot with a .22-caliber firearm, not a sawed-off shotgun. Moreover, David Rangel told Defendant Marquez that he knew Mr. Villegas was joking. Regardless, from this point onwards, Defendants Marquez,

Graves, Arbogast, and Ortega became relentlessly focused on convicting Mr. Villegas for the murders.

41.     Defendants Graves, Arbogast and Ortega were present at the police station during Defendant Marquez's interrogation of David Rangel, were aware that Marquez intended to use coercive interrogation tactics to obtain a false statement from David implicating Daniel Villegas in the Lazo/England murders, and were in communication with Marquez during the course of the interrogation. Defendants Graves, Arbogast and Ortega conveyed their approval of Marquez's tactics, and took no steps to prevent Defendant Marquez from engaging in this conduct.

42.     Defendant Marquez ordered 17-year-old David Rangel to write a statement implicating Mr. Villegas. In an attempt to put an end to the unrelenting interrogation, David complied—he wrote that Mr. Villegas told him that Villegas used a sawed-off shotgun in the shooting. Upon reading this, Marquez angrily threw away the first statement, and forced David to sign a new statement excluding mention of the weapon. Again, scared by the illegal and coercive tactics used by Defendant Marquez, David complied.

43.     The final statement obtained from David Rangel and typed by Defendant Marquez stated "I have been asked if I know what kind of gun or weapon was used in the killing and I don't know."

44.     David's statement also contained demonstrably false details about the shooting. The statement describes the car as black, but the only eyewitnesses described the car as "maroon and red" or "goldish." Furthermore, the statement claims that there were two separate rounds of gunfire in two separate locations, which conflicts both with the survivors' description of the shooting and the forensic evidence of the shell casings indicating that the shots were all fired from one location.

45.     With tunnel vision now leading Defendants Marquez, Graves, Arbogast and Ortega to Daniel Villegas as their one and only suspect, they set out to interrogate more young men who they could coerce into implicating Mr. Villegas.

46.     On the same day as the David Rangel interrogation, on April 21, 1993 at approximately 5:30 p.m., Defendant Graves arrested 15-year-old Rodney Williams.

47.     Knowing that Rodney was a friend of Mr. Villegas, Defendants Marquez, Graves, Arbogast and Ortega had communicated together and reached an agreement to arrest Rodney and to use whatever tactics were necessary to obtain information implicating Mr. Villegas in the Lazo/England murders, for the purpose of fabricating a case against Mr. Villegas.

48.     Defendant Graves did not read Rodney his rights, and he violated Texas law governing the treatment of juvenile arrestees.

49.     At the police station, Defendant Arbogast initially interviewed Rodney, but he was unsuccessful in obtaining any information that could be used against Mr. Villegas, because Rodney was not involved in the crime and had no knowledge of anything that implicated Mr. Villegas.

50.     Defendant Arbogast informed Defendants Marquez, Graves, and Ortega that Rodney had no truthful information that could assist with the investigation. However, rather than letting Rodney go free, these Defendants agreed instead to use coercive interrogation tactics to fabricate a false statement from Rodney in order to falsely implicate Mr. Villegas in the Lazo/England murders.

51.     Defendants Graves and Marquez took over from Defendant Arbogast and resumed the interrogation of Rodney. As Rodney protested his innocence, Graves and Marquez told him he would go to prison where he would be raped. They threatened that he would be

10

charged with the murders if he did not give an inculpatory statement, while falsely promising that if Rodney implicated himself and Mr. Villegas, he could go home. Graves and Marquez claimed that they were not interested in Rodney, but that they wanted to go after Mr. Villegas.

52.     Rodney eventually signed a false statement that had been typed by Defendant Graves and consisted entirely of information provided to him by Graves. The signed statement falsely read that Rodney, Daniel Villegas, Marcos Gonzalez, Enrique Ramirez (known by the nickname "Popeye") and Fernando Lujan (known by the nickname "Droopy") were in the car at the time of the shooting, and that Mr. Villegas was the shooter. Defendants Marquez, Graves, Arbogast and Ortega knew that Marcos Gonzalez, Enrique Ramirez and Fernando Lujan were all friends of Mr. Villegas.

53.     Defendants Marquez, Graves, Arbogast and Ortega knew that this fabricated statement was false, but they did not know that it was factually impossible. Ramirez and Lujan could not have been involved in the Lazo/England murders, and indeed were never charged, because at the time of the crime Ramirez was incarcerated and Lujan's electronic monitoring device confirmed he was three miles away from the murders.

54.     Rodney's statement used the name "Snoopy" to refer to Lujan because Defendants Marquez and Graves had inadvertently fed Rodney the incorrect nickname while they were fabricating his statement.

55.     Later that same day, April 21, 1993, shortly after 10 p.m., Defendants Marquez, Graves, and Arbogast falsely arrested 17-year-old Marcos Gonzalez and 16-year-old Daniel Villegas.

56.     Defendants Marquez, Graves, Arbogast and Ortega knew that Marcos was a friend of Mr. Villegas. They conferred prior to Marcos' arrest and agreed that they would arrest him and use him for the purpose of fabricating additional false evidence against Mr. Villegas.

57.     The arrest of Mr. Villegas was based solely on the fabricated and coerced statements taken from David Rangel and Rodney Williams, and therefore Defendants lacked probable cause to justify that arrest.

58.     Immediately upon his arrest and at numerous points thereafter, Mr. Villegas informed Defendants Marquez, Graves, Arbogast and Ortega that he was 16 years old, but these Defendants again failed to follow the procedures mandated by Texas law for the treatment of juvenile arrestees.

59.     Mr. Villegas was placed in a police car with Defendants Marquez and Arbogast.

60.     Marcos Gonzalez was placed in a police car with Defendant Graves.

61.     Defendants Marquez and Arbogast drove Daniel Villegas past the home of Fernando Lujan (aka "Droopy").

62.     Next, Defendants Marquez, Graves and Arbogast drove to the Northpark Mall, where they conferred with each other, with Defendant Ortega, and with other unknown police officers, speaking in-person with those officers who were on scene and communicating by telephone or radio with other officers who were not. These communications lasted for thirty minutes, more or less, while Marcos Gonzalez and Daniel Villegas remained handcuffed in separate vehicles.

63.     During the communications at the Northpark Mall, Defendants Marquez, Graves, Arbogast and Ortega discussed further their plans to implicate Mr. Villegas in the Lazo/England murders. They spoke together and agreed on a plan to coerce a false confession from Mr.

Villegas, and to fabricate a false inculpatory statement from Marcos that would implicate Mr. Villegas.

64.     Next, Defendants Marquez, Graves, and Arbogast took both Marcos Gonzalez and Daniel Villegas to the Five Points Police Station.

65.     After they arrived at the police station, Daniel Villegas and Marcos Gonzalez were separated. While Defendants Marquez, Arbogast and Ortega were processing, transporting, and eventually interrogating Mr. Villegas, Defendant Graves interrogated Marcos Gonzalez.

66.     Defendant Graves threatened to beat Marcos and told him that he would be raped in prison if he did not confess to being involved in the Lazo and England shooting and implicate Daniel Villegas as one of the perpetrators. Marcos initially refused to confess and denied his involvement in the shooting, at which point Graves slammed Marcos repeatedly against the wall.

67.     Through this combination of psychological coercion and physical violence, Graves was able to induce an initial false confession from Marcos.

68.     In this initial statement, Marcos falsely claimed that he was in the car on the evening of the shooting, but that he got out before the shooting and only learned about it afterwards when Mr. Villegas told him what had happened.

69.     Defendant Graves subsequently forced Marcos to give a second statement in which Marcos falsely claimed to have stayed in the car and been present at the time of the shooting. This statement again falsely implicated Mr. Villegas as the shooter.

70.     The fabricated statements obtained by Defendants Marquez, Graves, Arbogast and Ortega from teenagers David Rangel, Rodney Williams, and Marcos Gonzalez were all used in the prosecution and convictions of Mr. Villegas.

## Daniel Villegas' False Confession

71.     Daniel Villegas and the other teenagers induced to give false statements by Defendants Marquez, Graves, Arbogast and Ortega were at heightened risk of police coercion and manipulation due to their young age.

72.     Mr. Villegas was a uniquely easy target to frame and was particularly vulnerable to coercive interrogation tactics. Court-ordered psychological evaluations conducted after his arrest noted that Mr. Villegas had "extreme difficulties with learning and with school," and concluded that he had below-average cognitive skills, poor concentration, and "questionable" insight and judgment. He had dropped out of school in the eighth grade, and could only read at a third-grade level. He also suffered from emotional problems and Attention Deficit Disorder.

73.     Mr. Villegas had never been interrogated by police before April 21, 1993.

74.     During the drive to the police station with Defendants Marquez and Arbogast after he was arrested, Defendant Marquez subjected Mr. Villegas to repeated verbal abuse. Marquez cursed and yelled at him, telling him "you are going down for this" and we are "going to take you to kick your ass," or words to that effect.

75.     When he was eventually taken into the police station, Defendants Marquez, Graves, Arbogast and Ortega handcuffed Mr. Villegas to a chair. Then, Defendant Marquez and one or more of Defendants Graves, Arbogast and Ortega began harassing the 16-year-old to make a statement. They accused him of being involved in the murders, and when Mr. Villegas denied involvement, these Defendants kept telling him "we know you did it" and instructed him to confess. While Marquez took the lead role during the interrogation of Mr. Villegas, one or more of Defendants Graves, Arbogast and Ortega were present at various points during the

interrogation, during which they both observed Marquez's use of forbidden coercive tactics and personally participated in the use of those tactics on Mr. Villegas.

76.     During the interrogation, Defendant Marquez struck Mr. Villegas on the back of the head while telling him "we know you did it" and told Mr. Villegas that he was going to get "fucked in jail." Defendant Marquez screamed at Mr. Villegas, and told him that if he did not confess, Marquez would drive him out to the desert, handcuff him to the car door and "kick your ass." Marquez told Mr. Villegas they would leave him out in the desert to walk back into town, and when Mr. Villegas got back, Marquez would "personally . . . put you in a tank with a bunch of fat faggots and they're going to rape you."

77.     All of this coercive and threatening interrogation occurred *before* Defendants Marquez, Graves, Arbogast or Ortega explained Mr. Villegas' rights to him or brought him before a magistrate to verify that he wanted to give a voluntary statement—legal requirements mandated under Texas and federal law precisely to avoid involuntary and unreliable confessions given by juveniles.

78.     Defendants Marquez, Graves, Arbogast and Ortega later reached an agreement amongst themselves to concoct a false timeline claiming Mr. Villegas had been properly informed of his rights *before* his interrogation began, and to fabricate evidence supporting this false timeline. These Defendants were aware that the correct timeline of events was exculpatory and so agreed to suppress or destroy information and documents that corroborated it, including the *Miranda* warning card Mr. Villegas signed while in police custody. Mr. Villegas' *Miranda* warning card would have documented that Defendants were lying when they claimed he had been informed of his rights and was taken before a magistrate before the interrogation began.

79.     After Defendant Marquez told Mr. Villegas that Rodney had implicated him in the shooting, Mr. Villegas gave an initial statement, which Defendant Marquez typed. In this initial statement Mr. Villegas denied being the shooter.

80.     Defendant Marquez took this statement from the typewriter and crumpled it up. Defendant Marquez slapped Mr. Villegas and told him he would be executed, and that Marquez would pull the switch on the electric chair himself, if Mr. Villegas did not confess to being the shooter.

81.     Defendant Marquez prepared a second statement for Mr. Villegas and fed him information about the crime, telling Mr. Villegas that he committed the murders with Rodney Williams, Marcos Gonzalez, "Popeye," and "Snoopy." Mr. Villegas told Marquez that he did not know anyone with the alias "Snoopy" but that he did know "Droopy" (the nickname used by Fernando Lujan).

82.     As he was feeding Mr. Villegas this information, Defendant Marquez continued to threaten and coerce Mr. Villegas. Marquez told Mr. Villegas that if he made a statement he would be taken to the juvenile probation department and not to jail. If he refused, then Marquez told Mr. Villegas that he would beat him.

83.     Defendants Marquez, Graves, Arbogast and Ortega never provided Mr. Villegas with access to a phone or allowed him to contact a lawyer or his family.

84.     Defendant Graves was interrogating Marcos Gonzalez during an overlapping period of time with Marquez's interrogation of Daniel Villegas. Graves and Marquez kept in close communication with each other by phone during these respective interrogations to ensure that Marcos's statement would be more consistent with the statement that Marquez fabricated for Mr. Villegas.

85.     Throughout both interrogations, Graves and Marquez also communicated with Arbogast and Ortega about their progress, such that these Defendants were all aware, in real time or close to real time, of the coercive and violent tactics being used and the efforts to fabricate false statements from Marcos and Mr. Villegas. None of these Defendants took any steps to intervene in the interrogations of Marcos Gonzalez and Daniel Villegas to prevent the coercive tactics from being used or stop the violation of the teenagers' constitutional rights, despite being present at the police station, at times in the interrogation room, and having the opportunity and ability to intervene. Nor did any of these Defendants inform a supervisor about the misconduct taking place, or protest or speak out in any way.

86.     Defendant Graves changed crucial details between the first and second statements he coerced from Marcos Gonzalez, to make the second statement mirror the eventual statement that Defendant Marquez coerced Mr. Villegas to sign.

87.     Eventually, at approximately 2:40 a.m. on April 22, 1993, Defendant Marquez forced Mr. Villegas to involuntarily sign a one-page typewritten false statement that Marquez had prepared.  The statement falsely implicated Mr. Villegas as the shooter in the murders, but provided no corroborating details apart from those already known to the police.

88.     Defendant Marquez was aided by Defendants Graves, Arbogast, and Ortega in the false arrest, unlawful detention, and illegal and coercive interrogation of Mr. Villegas, and in doing so these Defendants all acted in furtherance of their agreement to obtain false evidence to implicate Mr. Villegas in the Lazo/England murders.

89.     When Mr. Villegas was free from the threats made by Defendants Marquez, Graves, Arbogast and Ortega, Villegas recanted his confession. Later that same morning, he told

Juvenile Probation Officer Monica Sotello that he "didn't do it" and that he only confessed because they coerced him.

90.     As a result of this misconduct by Defendants Marquez, Graves, Arbogast and Ortega, Mr. Villegas was detained without probable cause, both pending trial and after his wrongful conviction.

<b>Defendants Suppress Exculpatory Evidence</b>

91.     In their rush to frame Mr. Villegas, Defendants Marquez, Graves, Arbogast, Ortega and Bellows suppressed information that pointed to other individuals as the perpetrators of the shooting.

92.     Defendant Bellows was one of the responding officers to the Lazo/England shooting. Bellows also responded to the scene of another shooting on the same day as the murders. Bellows learned that a man named Rudy Flores was present at that shooting, and that shooting involved a .22-caliber weapon. Bellows assisted with the recovery of a .22-caliber weapon from that shooting.

93.     Early in their investigation, Defendants Marquez, Graves, Arbogast and Ortega received information that brothers Javier and Rudy Flores were involved in the Lazo/England shooting.

94.     Defendant Bellows communicated with one or more of Defendants Marquez, Graves, Arbogast and Ortega, and shared the information that he learned with them about Rudy Flores' involvement in another shooting the same day involving a .22-caliber weapon. Bellows was then told by these officers that they were pursuing Daniel Villegas as their suspect, and were not interested in evidence that did not implicate him.

95.    Defendant Bellows reached an agreement with Marquez, Graves, Arbogast and Ortega to suppress this exculpatory evidence—evidence that placed an alternative suspect at the scene of another shooting the same day with a weapon that the defense could have attempted to establish was the Lazo/England murder weapon.

96.    This information regarding this second shooting and the recovered weapon was suppressed by Defendants Bellows, Marquez, Graves, Arbogast and Ortega and was not made available to the prosecution or to the defense prior to Mr. Villegas' convictions in 1995. By the time the information came to be known by Mr. Villegas or his attorneys, after his conviction, the recovered firearm had been destroyed.

97.    In addition to their agreement with Defendant Bellows to suppress the information regarding the second shooting and the recovered weapon, Defendants Marquez, Graves, Arbogast and Ortega communicated together and reached an agreement that they would suppress other exculpatory evidence that could have aided Mr. Villegas in his defense at trial. They reached this agreement and suppressed this evidence in order to secure the conviction of Mr. Villegas for the Lazo/England murders.

98.    Three days after the shooting, on April 14, 1993, one or more of Defendant Marquez, Graves and Arbogast took statements from the Flores brothers. Rudy's statement placed him at the scene of the crime at the same time as the murders, and there were numerous inconsistencies between Rudy's and Javier's statements.

99.    Although some information about Rudy and Javier was known by Mr. Villegas and his defense team at the time of his first and second criminal trials, the full details of the statements made by the Flores brothers, which would have aided Mr. Villegas's defense team in their efforts to establish them as viable alternative suspects, were suppressed by Defendants

Marquez, Graves, Arbogast and Ortega and were not made available to the prosecution or to the defense prior to Mr. Villegas' convictions in 1995.

100.    Defendants Marquez, Arbogast, Graves and Ortega also took statements from four people who all implicated the Flores brothers.

101.    According to a report prepared by Defendant Marquez, "[d]uring the entire case" he and other investigators continued to receive numerous reports that the Flores brothers were responsible for the shooting.

102.    Defendants Marquez, Arbogast, Graves and Ortega knew that the Flores brothers had a motive for the shooting, as they had received information that Rudy and Javier had fought with the murder victims, Armando and Robert, before the shooting. In particular, Defendant Graves took a statement from Terrance Farrar, who told police that he witnessed Rudy threaten to kill Armando Lazo at a party two weeks before the shooting.

103.    These Defendants also knew that Rudy owned a car that matched the eyewitness description given by Jesse Hernandez.

104.    In addition, a woman named Connie Serrano witnessed Sally Flores, Javier and Rudy's sister, trying to dispose of a .22 caliber weapon, the same caliber as the murder weapon, at Javier and Rudy's home shortly after the shooting. Ms. Serrano was also told by Rudy's best friend "Half-Pint" that Rudy had admitted his involvement in the shooting.

105.    Ms. Serrano tried to tell the police numerous times about the information she had about Rudy, including after the false confession coerced from Mr. Villegas by the Defendant Officers. Defendants Marquez, Graves, Arbogast and Ortega learned of the information that Ms. Serrano was attempting to convey but, pursuant to their agreement to suppress exculpatory evidence, they decided to take no steps to properly document this information. At these

Defendants' direction. Ms. Serrano was rebuffed in her efforts to report this information, and was told that police already had the right killer.

106.    The exculpatory evidence from Connie Serrano was suppressed by Defendants Marquez, Graves, Arbogast and Ortega and was not made available to the prosecution or to the defense prior to Mr. Villegas' convictions in 1995. Neither Mr. Villegas nor his attorneys became aware of this evidence from Ms. Serrano until it was revealed in conjunction with Mr. Villegas' habeas proceedings.

107.    Likewise, Jamarqueis Graves overheard a conversation in which the Flores brothers referred to Daniel Villegas being "locked up" for a crime they had committed. Mr. Graves also witnessed one of them trying to dispose of a .22 caliber weapon.

108.    In addition, Defendants Marquez, Graves, Arbogast and Ortega learned of information that Celia Fierro, Javier's girlfriend, was in the car at the time of the shooting. Ms. Fiero would have been able to confirm that Mr. Villegas had nothing to do with the shooting. This information was suppressed by Defendants Marquez, Graves, Arbogast and Ortega pursuant to their agreement to suppress exculpatory evidence, and was not made available to the prosecution or to the defense prior to Mr. Villegas' convictions in 1995. Neither Mr. Villegas nor his attorneys became aware of this evidence regarding Ms. Fierro until it was revealed in conjunction with Mr. Villegas' habeas proceedings.

109.    Furthermore, Defendants Marquez, Graves, Arbogast and Ortega obtained an audio-taped statement made by a witness who had information that Rudy had bragged about his involvement in the shootings. These Defendants withheld and suppressed that tape recording pursuant to their agreement to suppress exculpatory evidence, and it was not made available to the prosecution or to the defense prior to Mr. Villegas' convictions in 1995. To this day, neither

the tape recording nor a full and complete accounting of the exculpatory information it contains have been provided to Mr. Villegas or his attorneys.

110.    Defendant Marquez falsely claimed that he listened to the tape with Detective Arturo Ruiz and Lieutenant Paul Saucedo, and that any leads it generated were followed up on. This version of events was contradicted by both Ruiz and Saucedo, who denied that Marquez ever shared the tape with them and denied that the investigative leads it might have generated had been exhausted.

111.    Despite the evidence pointing to the Flores brothers' involvement, Defendants Marquez, Graves, Arbogast and Ortega dismissed the information as "rumors" and eliminated the Flores brothers as suspects, because they had agreed to frame Mr. Villegas for the murders instead.

112.    These Defendants had tunnel vision. They failed to diligently and exhaustively pursue leads that might contradict their fabricated evidence implicating Mr. Villegas.

113.    In addition to all the evidence against the Flores brothers, Defendants Marquez, Graves, Arbogast and Ortega were aware of confessions from at least four other alternative suspects: the confessions of Michael Johnston and Jacob Jauregi described above, as well as admissions made by Rick Martinez and Eduardo Valles. These Defendants essentially ignored this evidence.

114.    Moreover, pursuant to their agreement, Defendants Marquez, Graves, Arbogast, Ortega, and Bellows, suppressed, withheld or destroyed additional exculpatory evidence. This additional evidence included:

-the *Miranda* warning card signed by Mr. Villegas while in police custody, which

corroborated Mr. Villegas' timeline of events regarding his coerced confession and

refuted police claims that he had been properly advised of his rights before the interrogation began, and which these Defendants discarded or destroyed;

-the first statement by Daniel Villegas, in which he truthfully denied any involvement in the Lazo/England shooting, and which Defendant Marquez destroyed;

-David Rangel's first statement, in which he truthfully stated he could not implicate Mr. Villegas in the Lazo/England shooting, and which Defendant Marquez destroyed;

-evidence of Defendant Marquez's coercive interrogation of Jesse Hernandez (during which Marquez accused Jesse of perpetrating the shooting), which was exculpatory evidence both because it revealed the existence of an alternative suspect considered by police, and because it revealed Marquez's practice of coercive interrogation tactics which would have bolstered the defense contention that Mr. Villegas' confession and the other statements implicating him were fabricated using similar tactics;

-evidence of the agreement reached between Defendants Marquez, Graves, Arbogast and Ortega to fabricate false evidence against Mr. Villegas, including evidence of all of the communications between these Defendants in forming, discussing, and acting in furtherance of the agreement, which would have served as powerful evidence to impeach the testimony of these Defendants at Mr. Villegas' trial, as well as powerful independent evidence of his innocence; and

-evidence of the pervasive and widespread pattern of similar misconduct which infected the El Paso Police Department at the time of Mr. Villegas' arrest and prosecution, discussed in greater detail below, which would have served both as evidence to impeach the testimony of the El Paso police officers who testified at Mr. Villegas' trial, as well as

evidence to bolster the defense contention that Mr. Villegas's confession and the other statements implicating him were fabricated pursuant to this pattern.

115.     None of these additional pieces of exculpatory evidence were provided to the prosecution or the defense prior to Mr. Villegas' convictions in 1995. They were all either revealed in conjunction with Mr. Villegas' habeas proceedings or otherwise after Mr. Villegas was convicted, or were discarded or destroyed such that to this day the evidence has not been provided to Mr. Villegas or his attorneys.

116.     Defendants Bellows, Marquez, Graves, Arbogast and Ortega communicated with each other throughout the Lazo/England investigation regarding the status of the investigation, the evidence being fabricated to falsely implicate Mr. Villegas, and the exculpatory evidence that was being or had been suppressed, withheld or destroyed. Each of these Defendants was, at various points, physically present with other officers while these pieces of evidence and information were present or discussed. At no point did any of these Defendants take any steps to reveal the existence of the suppressed evidence or to report this misconduct to any supervisor, or protest or speak out or take any steps to intervene in any way, pursuant to the agreement they had reached amongst themselves.

**Daniel Villegas' Convictions**

117.     Without any physical evidence to tie Mr. Villegas to the shooting, prosecutors had to rely on his coerced false confession and the fabricated statements created by Defendants Marquez, Graves, Arbogast and Ortega and attributed to David Rangel, Rodney Williams and Marcos Gonzalez.

118.     After the jury hung at his first trial, Mr. Villegas was retried. His coerced confession and the statements these Defendants fabricated and attributed to the three other

teenagers, along with the suppression of exculpatory evidence by Defendants Marquez, Graves, Arbogast, Ortega and Bellows, caused Mr. Villegas to be wrongfully convicted for the murders of Armando Lazo and Robert England. On August 24, 1995, Mr. Villegas was sentenced to life in prison for a crime he did not commit.

### Daniel Villegas' Convictions Are Vacated

119.    Mr. Villegas had nothing to do with the murders of Mr. Lazo and Mr. England. He was nowhere near the scene of the crime. At the time of the shooting, he was watching a movie at the Village Green Apartments.

120.    Because Mr. Villegas' statement was a coerced false statement rather than a true voluntary confession, despite Defendant Marquez, Graves, Arbogast and Ortega's best efforts to fabricate a compelling and consistent confession, his statement contained numerous details which were demonstrably false.

121.    The statement names "Popeye" as the driver of the car, but Enrique Ramirez (aka "Popeye") was incarcerated at the time of the shooting.

122.    The statement names "Droopy" as one of the occupants of the car, but Fernando Lujan (aka "Droopy") was at home at the time of the shooting, as established by an electronic monitoring device which showed that Lujan never left the house.

123.    The statement asserts that Mr. Villegas and his friends stole beer from a nearby store before the shooting, but the storeowner confirmed that no theft occurred.

124.    Mr. Villegas's false confession describes the car as white, but the only eyewitnesses described the car as "maroon and red" or "goldish."

125.    The statement claims that someone in the car yelled "Que vario," but neither surviving eyewitness heard that phrase.

126.     The statement claims that, after the first shots were fired, Armando Lazo was chased down and shot in a second round of gunfire while he was running away. This conflicts with the description of the shooting given by both surviving eyewitnesses. Moreover, no one heard multiple rounds of gunfire. The location of the shell casings confirms that only one round of gunfire took place and the assailants did not chase Armando down before shooting him. This eyewitness and forensic evidence was corroborated by a neighbor who lived adjacent to the scene of the shooting, and who heard five to six consecutive shots in a single round of gunfire. Finally, Armando was shot in the front of his abdomen and his thigh, not in the back, demonstrating that he was not running away when he was struck.

127.     In 2009, following an evidentiary hearing, the El Paso County District Court "strongly recommend[ed]" that Mr. Villegas' convictions be vacated. The court found that Mr. Villegas, Rodney Williams and Marcos Gonzalez were subjected to "illegal and coercive methods" and that their confessions were "completely unreliable." The court concluded that "the new evidence presented at the writ hearing adequately meets the standard to demonstrate Villegas' actual innocence."

128.     In December 2013 the Texas Court of Criminal Appeals vacated Mr. Villegas' convictions.

129.     In November 2014, the El Paso County District Court suppressed Mr. Villegas' false confession as involuntary and ordered that it could not be used against him at a re-trial. The court found that Defendant Officers had obtained the statement "in violation of [Mr. Villegas'] constitutional rights," and that the testimony of Defendants Marquez and Ortega regarding his interrogation was "not credible." Finding no possible basis to disagree with the Court's ruling, the State did not appeal.

**Daniel Villegas' Re-Trial and Acquittal**

130.    The misconduct which tainted the original double murder investigation did not

end when Mr. Villegas' convictions were vacated.

131.    Mr. Villegas was facing a third criminal trial on the Lazo/England double murder.

132.    Defendants Sanchez and Loya were El Paso police detectives who were assigned

to the investigation of the Lazo/England double murder during the period of time leading up to

Mr. Villegas' third criminal trial.

133.    After Mr. Villegas' convictions were vacated and his false coerced confession

suppressed, based on the facts recited above, there was no credible evidence to support his

continued prosecution.

134.    In order to secure Mr. Villegas's conviction despite the absence of legitimate

evidence implicating him in this crime, Defendants Sanchez and Loya conspired to fabricate

false evidence that would be used against Mr. Villegas at his third criminal trial.

135.     In order to secure Mr. Villegas's conviction despite the absence of legitimate

evidence implicating him in this crime, Defendants Sanchez and Loya conspired to suppress

exculpatory evidence that would otherwise have been available to Mr. Villegas to demonstrate

his innocence at his third criminal trial.

136.    Defendants Sanchez and Loya were in close communication throughout the run-

up to Mr. Villegas' third trial, and kept each other apprised of their respective efforts to fabricate

inculpatory evidence and secure a conviction at any cost. Neither Sanchez nor Loya took any

steps to intervene and prevent or bring to a halt the misconduct being perpetrated by the other,

despite frequently being present together at or around the police station, interrogation rooms, and

other locations where evidence was fabricated and suppressed. Nor did Sanchez or Loya at any

point inform a supervisor about the misconduct they knew was taking place, or protest or speak out in any way.

137.    Defendant Sanchez and Loya's fabrication of false evidence to use against Mr. Villegas at his third criminal trial included efforts to secure false statements from witnesses.

138.    For example, in December 2014, Defendants Sanchez and Loya communicated and agreed upon a plan to obtain a false inculpatory statement from Oscar Gomez—a childhood friend of Mr. Villegas.

139.    Defendants Sanchez and Loya arranged for Mr. Gomez to be arrested and brought to El Paso police headquarters. Once Gomez arrived at police headquarters, Defendant Sanchez interrogated him for two hours while Gomez was handcuffed. Defendant Sanchez repeatedly pressed Gomez to implicate Mr. Villegas in the double murder.

140.    Mr. Gomez told Defendant Sanchez that he did not believe that Mr. Villegas was involved, and that Villegas had never disclosed any of the details of the crime to him, but Sanchez told Gomez that "he didn't want to hear that" and "you need to save your own ass."

141.    Sanchez made clear to Gomez that he wanted him to implicate Mr. Villegas in the Lazo/England shooting, and made Gomez feel that if he did not tell Sanchez what he wanted to hear, he would go to jail.

142.    After two hours of interrogation, Sanchez told Gomez he was going to make a video recording of Gomez implicating Mr. Villegas, and told him not to say anything on the video suggesting that Villegas was not involved.

143.    During his interrogation of Oscar Gomez, Defendant Sanchez communicated with Defendant Loya to discuss his efforts to fabricate a statement from Gomez implicating Mr. Villegas. Defendant Loya actively participated with Defendant Sanchez in crafting the false

narrative to feed to Gomez. Despite being present in the close vicinity of the Gomez interrogation and having the opportunity and ability to intervene to prevent Defendant Sanchez from fabricating a statement, Defendant Loya took no steps to cause Defendant Sanchez to cease his misconduct or to inform a supervisor.

144.    After his communications with Defendant Loya, Defendant Sanchez created a video-recording of Gomez falsely implicating Mr. Villegas. Specifically, Sanchez fed Gomez the false narrative that he and Defendant Loya had crafted, and induced Gomez to give a false inculpatory statement.

145.    Gomez stated that Mr. Villegas had contacted him at some point after the Lazo/England shooting and told him to come over to Mr. Villegas' house because it might be the last time Gomez would get to see Villegas for a long time because Mr. Villegas was going to go to prison. Gomez claimed that he asked Villegas if Villegas did the shooting, and Villegas responded "yeah" and grinned at him.

146.    None of these claims were true—Mr. Villegas never confessed or made any inculpatory statement to Mr. Gomez. Defendants Sanchez and Loya fabricated this entire narrative and fed it to Gomez in order to falsely implicate Mr. Villegas.

147.    After securing this evidence, Defendant Sanchez told Gomez that he would be released because he had helped police. Sanchez told Gomez not to discuss the interrogation with anyone, and not to speak with Mr. Villegas' attorneys.

148.    Without the false evidence fabricated by Defendants Sanchez and Loya, there would not have been any evidence to support the continued prosecution of Mr. Villegas for the Lazo/England double murder.

149.     Defendants Sanchez and Loya both knew that they had fabricated Mr. Gomez's statement; that it was false; that Gomez had repeatedly denied knowing anything about whether Mr. Villegas was involved in the Lazo/England shooting; and that Sanchez had repeatedly pressured Gomez to get him to change his story. However, neither Sanchez nor Loya created any documentations of these exculpatory facts of which they were aware, depriving Mr. Villegas of crucial documentary evidence he could have used to assist with his defense at the third trial.

150.     Defendants Sanchez and Loya also both knew that Mr. Villegas was innocent of the Lazo/England shooting. In a conversation with a former El Paso police officer, that officer discussed his view of the case that "it's an innocent person being charged" with "a crime that he didn't commit"—referring to Mr. Villegas and the Lazo/England shooting—and stated "We both know he didn't do it, bro." Defendant Loya responded, "Yeah." The retired officer went on to state "This kid's innocent," to which Defendant Loya responded "Yeah. Pobre Chavo, man" (Poor guy), and "Yeah, I feel for him, dude."

151.     Despite acknowledging that Mr. Villegas was innocent, Loya confirmed to the retired officer that El Paso police were "still working [the case against Villegas] hard."  The retired officer asked Loya if he would consider coming forward and going public with what he knew, but Loya emphatically stated "No. No, no, no." "No, Sir." Pressed further and asked "Not even if it's the right thing to do?", Loya responded "It's a job, Bro. It feeds the family, Man. That's the way I see it."

152.     Although Defendants Sanchez and Loya both knew that Mr. Villegas was innocent, they persisted with their efforts to concoct evidence to implicate him in the crime.

153.     Shortly before his third trial, prosecutors offered Mr. Villegas a plea deal where he would be sentenced to time served in exchange for pleading guilty to the double murder. The

proposed plea agreement would have guaranteed that Mr. Villegas could go home to his family without risking a single additional night in prison.

154.     Mr. Villegas rejected this plea offer, despite the risk of a lengthy sentence of additional time in prison if convicted, because he insisted on proving his innocence and refused to plead guilty to this crime which he did not commit.

155.     In October 2018, Mr. Villegas was tried for the third time for the Lazo/England double murder.

156.     At no point from April 1993 to October 2018 was there ever probable cause to arrest, charge, prosecute or convict Mr. Villegas for the Lazo/England double murder. The only evidence ever supporting the charges against Mr. Villegas was false evidence fabricated by Defendants.

157.     False evidence fabricated by Defendants Sanchez and Loya was introduced against Mr. Villegas at his third criminal trial, including the false inculpatory statements made by Oscar Gomez regarding the purported 'confession' that Mr. Villegas made to him in the 1990s.

158.     Despite this false evidence, on October 5, 2018, Mr. Villegas was found not guilty by the jury, finally ending the twenty-five years-long nightmare created by Defendant Officers.

### Daniel Villegas' Damages

159.     Mr. Villegas spent nearly twenty years in prison for a crime that he did not commit.

160.     During his wrongful incarceration, Mr. Villegas was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals

and other life events with loved ones, and the fundamental freedom to live one's life as an autonomous human being.

161.    Mr. Villegas became a father on November 30, 1994, shortly before his first trial. He missed being present at the birth of his daughter due to the ongoing criminal proceedings against him. After his wrongful conviction, he was separated from his infant daughter and was unable to parent her and to participate in her growth and development. He was also separated from the mother of his daughter, to whom he was engaged, and was thus deprived of companionship and matrimonial support.

162.    Throughout the period of his wrongful incarceration, Mr. Villegas suffered numerous instances of physical abuse perpetrated by both guards and prisoners, as well as numerous instances of attempted sexual assault.

163.    As a result of his wrongful incarceration, Mr. Villegas must now attempt to rebuild his life without the benefit of two decades of life experience that ordinarily equip adults for that task.

164.    Although Mr. Villegas was released on bond in early 2014 after his convictions were vacated, he was subject to onerous conditions of release for more than four years in the lead-up to this third trial, as a result of which his liberty was significantly curtailed.

165.    Even after his convictions were vacated, Mr. Villegas suffered substantial emotional distress due to his pending criminal re-trial, and the possibility that he would once again be wrongly convicted, torn from his family and community, and sent back to prison.

166.    Mr. Villegas has suffered tremendous damage, including physical sickness and injury and resultant emotional damages, all proximately caused by Defendants' misconduct.

**The Widespread Policies and Practices of the City of El Paso**

167.     The misconduct by Defendants Marquez, Graves, Arbogast, Ortega, Bellows, Sanchez and Loya, described in detail above, was undertaken pursuant to the policies and practices of the City of El Paso.

168.     Mr. Villegas was the victim of, and his injuries were proximately caused by, policies and practices on the part of the City of El Paso to pursue and secure false convictions through profoundly flawed investigations and unconstitutional methods and tactics.

169.     At the time of the El Paso Police Department's investigation into the 1993 Lazo/England double murder, in the period leading up to Mr. Villegas' wrongful conviction in 1995, and for a period continuing thereafter, a group of El Paso police officers, including some or all of the defendants in this case, engaged in a systematic pattern of coercion, fabrication of evidence, withholding of exculpatory information, and other illegal tactics, the sum total of which completely corrupted the investigative process. This pattern of misconduct includes a longstanding, widespread, and systemic pattern and practice of: (a) using impermissible coercive tactics on suspects and witnesses, including psychological coercion and physical violence, to obtain false statements, false confessions and other evidence to implicate criminal suspects; (b) manufacturing evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent persons, knowing full well that those statements were false; (c) contriving false witness narratives that were fed to vulnerable witnesses, who then adopted those narratives as their own at trial; and (d) suppressing or destroying exculpatory evidence, including evidence that witnesses and defendants were coerced, manipulated, threatened, pressured or offered inducements to make false statements, ensuring that such evidence was withheld from both

prosecutors and criminal defendants. As a result of this pattern, many innocent people, including Mr. Villegas, were wrongfully prosecuted and wrongfully convicted.

**The City of El Paso's Longstanding Policies and Practices
of Using Unconstitutional Tactics to Obtain Wrongful Convictions**

170.     This pattern of El Paso police misconduct long pre-dates the Lazo/England investigation, demonstrating that the misconduct perpetrated against Mr. Villegas was the product of long-established policies and practices at the El Paso Police Department, and longstanding disregard for the constitutional rights of criminal suspects. With regard to these policies and practices, there have been no meaningful policy changes within the El Paso police department from the 1960s to the present day. There are many examples of similar and related misconduct committed by El Paso police officers, including the following:

a.     In 1966, an El Paso police detective used coercive and improper tactics to obtain a confession from a man named Hilario Torres, who spoke only Spanish and who was both intoxicated and sleep deprived at the time El Paso police interrogated him.

b.     In 1979, El Paso police conspired with police in Juarez, Mexico to have Cesar Fierro's mother and stepfather taken into custody. An El Paso police detective then used coercive and improper tactics to obtain a confession from Mr. Fierro to a murder that Fierro did not commit, including by threatening Fierro that his family would not be released and would be tortured in Juarez unless and until Fierro confessed to the murder. El Paso police withheld and suppressed the exculpatory evidence of the coordination between El Paso and Juarez police and the exculpatory evidence of the coercive tactics used to obtain Mr. Fierro's confession, and the El Paso detective who obtained the confession perjured himself during Mr. Fierro's criminal proceedings in order to cover up evidence of his misconduct. The misconduct was so severe that the lead trial prosecutor later submitted sworn testimony that, had he known about the coordination between El Paso and Juarez police at the time of trial, he would have joined in a motion to suppress the confession and would then have moved to dismiss the case. The existence of these coercive police tactics and the subsequent cover-up to conceal them was confirmed by the trial court during Mr. Fierro's habeas proceedings, findings which were then affirmed by the en banc Court of Criminal Appeals.

c.     In 1979, El Paso police detectives used coercive and improper tactics to obtain a confession from John Terry Green in a cold murder case. After his arrest, Mr. Green declined to speak with the detectives and repeatedly asked for an attorney. Mr. Green invoked his rights, but El Paso police detectives persisted in their unlawful efforts to obtain a confession, bringing Green from his cell to a detective's office day after day

in order to pressure him to confess. Eventually, Mr. Green gave in to the pressure and gave a written confession, after he was worn down by the detective's tactics. The en banc Court of Criminal Appeals found that Mr. Green's confession was involuntary.

        d.      In 1984, El Paso police detectives coerced Henry Lee Lucas into confessing to a murder he did not commit, including through the use of impermissible psychological manipulation and by providing him with drugs to make him more susceptible to their tactics. El Paso police knew from Mr. Lucas' prior interactions with law enforcement that he was vulnerable to their tactics, but the detectives prioritized closing the case over finding the truth and persisted in their coercive tactics. The murder charges were dropped after a judge found that El Paso police had extracted the confession from Mr. Lucas unlawfully and the confession was involuntary.

        e.      In 1985, El Paso police began investigating a local day care center after one set of parents reported unusual behavior from their child. Various children from the center were subjected to coercive and suggestive forms of questioning, which led to false claims of abuse against Michelle Noble and Gayle Dove, two teachers at the day care center. Both women were wrongfully convicted based on the false testimony manufactured through these interviews with these child witnesses, before they were eventually exonerated.

        171.    This pattern of misconduct was not interrupted, and continued throughout the late 1980s and into the 1990s, including during the Lazo/England investigation and contemporaneous with the wrongful prosecution and conviction of Daniel Villegas. This demonstrates that Defendants' misconduct was not random, unauthorized or the covert acts of rogue employees, but rather was the product of longstanding policies and practices at the El Paso Police Department. There are many examples of similar and related misconduct committed by El Paso police officers, including the following:

        a.      In 1987, El Paso police detectives used improper police tactics to manufacture false evidence against Brandon Lee Moon, leading to Mr. Moon's wrongful conviction for a sexual assault which he did not commit, for which Moon served 17 years in prison before his exoneration in 2005.

        b.      In 1987, an El Paso police detective participated in the interrogation of Angel Medrano while Medrano was held in police custody in Juarez, Mexico on suspicion of murder. During that interrogation, Medrano was beaten by police and denied food or water in order to coerce him into confessing to the murder. The El Paso police detective then helped to cover up the fact that Medrano's confession had been involuntarily obtained by lying under oath about the circumstances of the interrogation.

c.     In 1990, an El Paso police detective unlawfully obtained a confession from Jamal Smith. Mr. Smith had invoked his right to counsel, and had told the detective that he did not want to talk with him, but the detective persisted in interrogating Smith and coerced him into confessing by telling him that a codefendant had made a written statement implicating Smith. The confession was later suppressed in Mr. Smith's criminal proceedings because El Paso police obtained it in violation of Smith's constitutional rights.

d.     In 1991, El Paso police officers used suggestive lineup procedures to fabricate evidence falsely implicating Tony Ford in a home invasion turned homicide, and suppressed exculpatory evidence pointing to a different man as the real perpetrator.

e.     In 1994, El Paso police detectives used coercive tactics on 17-year-old Augustin Carreon to get Carreon to falsely implicate himself and another man named Alejandro Hernandez in a murder. Although Mr. Carreon immediately recanted his false inculpatory statement, El Paso police detectives withheld from Mr. Hernandez the exculpatory evidence of the coercive tactics they use to obtain Carreon's statement, evidence of Carreon's recantation, and other exculpatory evidence which showed that Mr. Hernandez did not commit the murder. El Paso police detectives also failed to investigate evidence pointing to other suspects because it conflicted with their efforts to obtain a conviction of Mr. Hernandez, regardless of the true identity of the perpetrator.

**Defendants Marquez and Arbogast Have a History of Misconduct
Consistent with the City of El Paso's Flawed Policies and Practices**

172.     The City of El Paso's policies and practices described above are evidenced by—

and were the moving force behind—similar and related misconduct perpetrated by some of the

very same officers whose misconduct caused Daniel Villegas to be wrongfully prosecuted and

convicted for the Lazo/England double murder. For example:

a.     In 1989, Defendant Arbogast was assigned to investigate an altercation outside an El Paso bar, during which a bystander intervened to defend a woman being assaulted by another man and who then acted to defend himself when the assailant attacked him with a knife. Despite knowing that this bystander had acted in self-defense, Arbogast pursued criminal charges against him, fabricated evidence to falsely implicate the bystander, and suppressed evidence that supported the bystander's claim of self-defense.

b.     In the mid-1980s, Defendant Marquez and other El Paso police detectives interrogated and eventually obtained a confession from a suspect in a homicide case after that individual had requested to contact an attorney and had affirmed that she did not want to give a statement to police. The confession was challenged at a suppression hearing, during which Marquez lied about the interrogation. Ultimately, the confession was suppressed by the court as unlawfully obtained in violation of the suspect's

constitutional rights. An internal investigation conducted by the El Paso police department concluded that Marquez had committed perjury.

c.      In 1988, Defendant Marquez interrogated a man about the murder of his father. Marquez used coercive interrogation tactics, including both physical violence and psychological coercion, in an attempt to get the man to confess to murdering his father. Even though the man was innocent and had nothing to do with the crime, he came very close to succumbing to Marquez's tactics and nearly gave an involuntary confession. After failing to obtain a coerced and false confession, Marquez then refused to investigate the case further.

d.      In 1991, Defendant Marquez and other El Paso police detectives interrogated 17-year-old Steven Alvarado about a murder. Marquez and the other officers knew that Alvarado had consumed drugs and was intoxicated, and as a result that Alvarado did not understand what was being said to him or what was happening to him. Defendant Marquez and the other officers used both physical and psychological coercion to obtain a confession from Alvarado. Marquez and the other officers stripped Alvarado down to his underwear and forced him to sit for extended periods of time on a cold, steel desk. The officers verbally abused Alvarado, struck him in the face, and refused his repeated requests to see a lawyer. Additionally, Marquez and the other officers made false promises of leniency to Alvarado, telling him that they would tell the judge to take it easy on him if he made a statement. All of these tactics were employed with the goal of overbearing Mr. Alvarado's will and obtaining a confession from him, without regard to his constitutional rights or the truth or falsity of the statement.

e.      At the time he coerced a false confession from Mr. Villegas, Defendant Marquez already had a lengthy disciplinary record, including allegations of criminal conduct and assault, demonstrating that the physical coercion that Marquez used during his interrogation of Mr. Villegas was consistent with his longstanding practice of inappropriate violent misconduct.

f.      At the time he coerced a false confession from Mr. Villegas, Defendant Marquez's lengthy history and pattern of misconduct had led to approximately thirty citizen's complaints against him.

g.      At the time he coerced a false confession from Mr. Villegas, Defendant Marquez also had a history of lying under oath about his law enforcement activities. This pattern of misconduct was widespread, and established long before the numerous acts of deception and perjury that Marquez perpetrated during the Lazo/England investigation. Defendant Marquez's pattern of lying and deception was so bad that a special prosecutor had, on multiple occasions in the mid- to late-1980s, presented evidence to a grand jury seeking a perjury indictment against Marquez.

h.      In March 1993, the month before his interrogation of Mr. Villegas, Marquez was suspended from duty for three days due to his repeated misconduct.

i.      In early 1995, Defendant Marquez coerced Rafael Vasquez to confess to a murder he did not commit, using similar unconstitutional and illegal tactics as he used on Mr. Villegas and on many prior and subsequent occasions.

j.      In early 1995, Defendant Marquez and other El Paso police detectives interrogated James Bradley about the death of Bradley's wife. Marquez and the other detectives interrogated Bradley for more than ten hours. During the interrogation, they refused Bradley's repeated requests to see a lawyer, and refused his repeated requests to be given access to his medication, which caused Bradley to suffer significant pain and discomfort. As a result of the tactics used by Marquez and the other officers, Bradley eventually confessed despite being both mentally and physically incapable of voluntarily waiving his rights at the time.

k.      Defendant Marquez has admitted that he has worn a doctor's smock during interrogations in order to trick suspects into giving statements to him.

l.      Defendant Marquez has admitted that he could have gotten anybody to confess to the Lazo/England double homicide if he wanted to do so.

m.      Defendant Marquez has admitted that he has engaged in the destruction and suppression of exculpatory evidence. Specifically, Marquez has said that when a suspect would give an initial statement that he did not like, his practice was to destroy that statement, deny its existence in future proceedings, and work to obtain a more favorable statement from the suspect.

n.      Ultimately, based on this and other evidence, the El Paso County District Court concluded that Defendant Marquez had a history of committing egregious misconduct and was "not credible." It reached these conclusions "based on the corroborating evidence presented . . . that Detective Marquez had a pattern and practice of using illegal and coercive interrogation tactics both in this investigation and others."

**The Extensive Pattern of Similar Misconduct Since Daniel Villegas' Conviction Demonstrates that the City of El Paso's Flawed Policies and Practices Were Firmly Established and Have Persisted Throughout the Intervening Years**

173.    The pattern of misconduct described above did not cease after Daniel Villegas was wrongfully convicted of the Lazo/England shooting. Instead, because these widespread policies and practices at the El Paso Police Department remained in place, the instances of misconduct committed pursuant to and as a result of those policies and practices persisted throughout the 1990s and to the present day. Throughout this time, not only did the same pattern of systemic misconduct persist within the department, but none of the Defendants came forward to admit what they had done to Mr. Villegas or take any actions to remedy the wrongs they had committed. There are many examples of similar and related misconduct committed by El Paso police officers, including the following:

a.      In 1998, El Paso police detectives interrogated Matt, a juvenile, in relation to a murder. The detectives knew that Matt had diminished mental capacities. A subsequent forensic psychological examination revealed that Matt was "borderline mentally retarded." The officers brought Matt before a judge, and Matt informed the judge that he did not want to give a statement. The El Paso police detectives ignored this, placed Matt in handcuffs and began to verbally abuse him. They used psychologically coercive tactics, including telling him that they were going to pin the murder on him if he did not make a statement. As a result of their improper tactics, the El Paso police detectives were able to coerce Matt to make an inculpatory statement.

b.      In 2000, Rigoberto Avila Jr., a Navy veteran with no criminal record, was brought to the police station by El Paso police detectives around 11:00pm after a small child he was babysitting died under suspicious circumstances. Mr. Avila cooperated with police, and gave a statement in which he told the detective that he had been in another room when the child stopped breathing. The El Paso police detective typed the statement and had Mr. Avila read and sign it. Several hours later, after Mr. Avila had fallen asleep, the detective presented Mr. Avila with another statement and told him it was a corrected version of the first. Mr. Avila signed it without reading it. Unbeknownst to Mr. Avila, the second statement included a confession, stating that Mr. Avila had assaulted the child. Mr. Avila was convicted, but in 2018, an El Paso judge recommended that he be granted a new trial after new scientific evidence emerged suggesting that the child died from accidental causes, further demonstrating that the confession was false.

c.      In 2001, El Paso police arrested Joseph Fineron in connection with the theft of various items stolen from vehicles parked in a city lot near his home. El Paso police officers began to abuse Fineron almost immediately. Mr. Fineron was placed in handcuffs upon his arrest, and placed in a police vehicle. One of the El Paso police officers slammed Mr. Fineron's head repeatedly into the backseat of the police car, and threatened him with further violence by a more physically imposing officer if Fineron did not cooperate. Mr. Fineron was subjected to nearly seven hours of interrogation. At various points he was put in a cage and handcuffed to the bars, and later handcuffed to a chair. El Paso police officers repeatedly threatened Mr. Fineron's family, and threatened to tell Mr. Fineron's co-defendant that Fineron had "snitched" on him. Mr. Fineron asked to see a lawyer, but the El Paso police officers refused this request. As a result of these coercive and improper tactics used by El Paso police, Mr. Fineron made a confession. However, Mr. Fineron could not read the confession that was written for him by the officers because he was not provided with his eyeglasses, and El Paso police lied to him and told him he was admitting to misdemeanor theft, rather than the felony theft admissions contained in the statement which subjected Mr. Fineron to a fifteen year prison sentence. Mr. Fineron never read or understood the confession he was coerced into signing until he was shown a copy of it by his lawyer.

d.      In 2002, El Paso police officers were investigating a serious traffic accident, and arrested Jesus Martinez for driving while impaired. Mr. Martinez was taken to the hospital due to his injuries. He repeatedly expressed that he did not want to talk with police. Despite knowing that Mr. Martinez had invoked his right to remain silent, and despite knowing he was intoxicated and medically vulnerable, El Paso police officers continued to engage him in conversation, and eventually obtained a blood sample from

him. The officers later lied to cover-up their misconduct, claiming that Mr. Martinez had signed a written consent form, but their misconduct was exposed when they were unable to produce any written consent in court. As a result of this misconduct, both Mr. Martinez's oral statement and the blood sample evidence were suppressed in the resulting criminal proceedings because they were not voluntarily obtained by police.

e.      In 2002, El Paso police officers used coercive tactics to obtain an involuntary murder confession from Justen Hall.  At the time El Paso police interrogated and ultimately obtained a confession from Mr. Hall, police knew that Hall was in a highly vulnerable state, as he was on suicide watch and exhibiting psychotic behavior. Mr. Hall had not slept for nearly a week prior to his arrest, and police ignored his request for medication.

f.      In 2004, El Paso police officers arrested Gregg Gomez and interrogated him in connection with a series of burglaries. The officers who interrogated Mr. Gomez used psychological coercion and abusive tactics to obtain a confession from Gomez. The officers made false promises of leniency, telling Mr. Gomez he was not in any trouble and that he would be released to his father if he cooperated and helped police identify houses that had been burglarized. When Mr. Gomez insisted he knew nothing about the burglaries, El Paso police officers threatened him, telling Gomez they would see to it that years were added to his sentence if he did not cooperate. During the interrogation, which took place over the course of nearly five hours between midnight and 5:00am, El Paso police officers denied Mr. Gomez access to water and food. Mr. Gomez was so exhausted, he repeatedly fell asleep during the interrogation, and had to be woken up by police. Police prepared a written statement implicating Mr. Gomez in the burglaries, which Mr. Gomez signed without reading after police woke him up because they continued to promise him that he would be released once they were finished. Because the statement was fabricated by police and Mr. Gomez was coerced into signing it, it continued numerous inaccuracies, including naming a purported accomplice who could not have participated in the burglaries described in the statement because he was deployed overseas at the time. El Paso police learned that this and other details in the statement were false, but they suppressed this exculpatory information.

g.      In 2004, El Paso police detectives interrogated Jose Pulido regarding the death of Pulido's wife. Mr. Pulido had just been released from the hospital, was taking medication, was in a debilitative state, and was more unconscious than conscious while being questioned by police. El Paso police detectives took advantage of these vulnerabilities to obtain an involuntary confession from Mr. Pulido.

h.      In 2006, El Paso police detectives interrogated José Esparza in connection with a murder and aggravated robbery investigation. Mr. Esparza was arrested at 2am. El Paso police detectives conducted a series of interrogations throughout the night and for the next seven hours, ignoring Esparza's request to see an attorney and his repeated denials that he was involved in the crimes. During the course of these interrogations, El Paso police detectives sent Mr. Esparza's wife into an interrogation room to meet with him, after telling her that Esparza was refusing to say what had happened, requesting that she see if he would give her any information since she was his wife, and threatening that her family would never get their home back (it had been secured as a crime scene) if Esparza did not cooperate. Detectives then surreptitiously recorded the conversation

between Mr. Esparza and his wife, and thereafter demanded that Esparza repeat to them what he had just told his wife. The trial court suppressed this recorded spousal conversation, finding that the conduct of the El Paso police officers who had created it was "shady, to say the least," "very troublesome," and "reprehensible," and openly questioned whether the conversation between Mr. Esparza and his wife was used by police as "a form of waterboarding," "a form of torture," "a form of softening him up" and a "nice way of beating him to get him to make a statement."

   i. In 2014, El Paso police detectives coerced a false confession from a man they were interrogating in connection with an investigation into a sexual assault perpetrated against his stepdaughter. The police used a variety of coercive techniques, including false promises of leniency and threats of maximum criminal penalties if he did not confess, feeding him false information, and using the suspect's family against him, in order to obtain the involuntary confession. At the criminal trial, the man was acquitted after jurors concluded that the confession was coerced by police.

   j. In 2014, El Paso police engaged in a campaign of harassment against Adrienna Waller, detaining her during four pretextual traffic stops within the span of a week, each time searching her person and vehicle but without ever issuing any traffic citation. During the fourth stop, the El Paso police officers continued to detain Adrienna and her passenger (her cousin Felicia Waller) after the search was complete, and coerced the two women into consenting to a search of their home by threatening that the harassment would continue if they did not consent, but promising police would leave the women alone if they agreed to the search. The search of the home lasted three hours, and El Paso police officers ignored Felicia's repeated attempts to withdraw her consent and get officers to leave the home. El Paso police officers then lied under oath about the basis for the traffic stop and the nature of their interactions with the women. After an evidentiary hearing in Felica's criminal proceedings, a court concluded that the traffic stop was pretextual and that the El Paso police officers lied when they claimed otherwise, describing one officer's testimony as "evasive" and demonstrating a "lack of candor [that] undermines the veracity of his testimony as a whole." The court found that the roadside detention of Adrienna and Felicia was unlawful, and that their consent to search the home was not an act of free will but rather a product of the unlawful detention, and thus that the El Paso police officers repeatedly violated the women's Fourth Amendment rights. The court also determined that the behavior of the El Paso officers "constitutes harassment" and that the pretextual traffic stops were deliberately used to "coerce a driver and passenger to consent to a warrantless search of their residence" in violation of their constitutional rights.

**This Widespread, Longstanding and Firmly Established Pattern of El Paso Police Misconduct Was the Direct Result of the City of El Paso's Flawed Policies and Practices**

   174. At the time of the Lazo/England investigation and Daniel Villegas's wrongful convictions, the above-described widespread pattern and practice of extensive misconduct was so

well-settled and firmly established that it constituted the de facto policy or custom of the El Paso
Police Department.

175.   This policy or custom of widespread misconduct was able to exist and thrive
because municipal policymakers with authority over the same either concurred with the practices
or exhibited deliberate indifference to the problem.

176.   At the time of the Lazo/England investigation, policymakers for the City of El
Paso had knowledge of many of the incidents described in the foregoing paragraphs, and many
other incidents not described above, of serious misconduct and constitutional violations
committed by El Paso police officers, yet took no meaningful steps to change City policies and
practices, implement new or better training, increase supervision or discipline the officers
involved.

177.   The institutional desire to close cases through unconstitutional tactics regardless
of actual guilt or innocence, in order to enhance police officers' personal standing in the
Department, was known to the command personnel, who themselves participated in the practice.

178.   The widespread practices described in the preceding paragraphs were allowed to
exist and thrive because the City of El Paso declined to implement sufficient training. Among the
training deficiencies, in the years immediately preceding and continuing through the time of the
Lazo/England investigation and Daniel Villegas's conviction and beyond, the City of El Paso
had no meaningful training to ensure officers conducting interviews and interrogations of
suspects and witnesses were using appropriate tactics and techniques designed to reveal the truth
while respecting constitutional rights, rather than coercive tactics and techniques such as
physical violence and psychological coercion that would lead to involuntary and unreliable
statements and confessions. Officers were given no meaningful training on, among other topics:

(a) appropriate limits on the duration of interrogations; (b) appropriate interview techniques to use with juveniles, intoxicated suspects, and other suspects with limited or diminished capacities, and the need to exercise care and caution in such situations; (c) properly documenting interviews and interrogations so that the tactics and techniques could be reviewed by supervisors; (d) carefully reviewing instances where confessions or statements were suppressed in criminal proceedings to analyze where mistakes were made and to avoid repeating them; and (e) how to take statements from witnesses and suspects in a non-coercive way, designed to generate truthful statements to be corroborated during the investigation rather than merely generating confessions without regard to truth or falsity. The need for such training was obvious on its face, and was further demonstrated by the many incidents known to City policymakers, including those described above, where improper interrogation tactics led to involuntary confessions and violations of constitutional rights.

179.    Also among the training deficiencies, in the years immediately preceding and continuing through the time of the Lazo/England investigation and Daniel Villegas's convictions, the City of El Paso had no meaningful training to ensure officers conducting criminal investigations were conducting honest investigations regardless of whether the evidence revealed served to implicate or exculpate the officers' preferred suspect, and were appropriately documenting and preserving all evidence, including exculpatory and impeachment evidence, for use in criminal proceedings by criminal defendants. Officers were given no meaningful training on, among other topics: (a) how to conduct a thorough and successful police investigation absent a confession, including investigative techniques designed to develop reliable evidence that could be corroborated by forensic or other evidence; (b) how to conduct an honest, prudent, and conscientious police investigation of high-profile crimes in the face of public pressure and media

scrutiny; (c) properly documenting all investigative steps for review by supervisors; and (d) fully and completely documenting and preserving evidence of misconduct or mistakes by oneself or other officers in order to preserve exculpatory evidence for disclosure in criminal proceedings. The need for such training was obvious on its face, and was further demonstrated by the many incidents known to City policymakers, including those described above, where improper investigative techniques were used to fabricate false evidence and suppress exculpatory evidence, and where police investigations were designed not to reveal the truth but to obtain evidence to implicate the officers' preferred suspect at all costs, to the detriment of other leads or theories that might point in other directions.

180.    Among the many deleterious effects of the deficient or non-existent training described above is that it led to the use of impermissible and coercive interrogation tactics on Mr. Villegas, and the use of improper investigative techniques including the fabrication and suppression of evidence in the Lazo/England investigation, which harmed Mr. Villegas, violated his constitutional rights, and caused his wrongful prosecution, convictions and imprisonment.

181.    The widespread practices described in the preceding paragraphs were allowed to exist and thrive because the City of El Paso declined to implement any legitimate mechanism for oversight or punishment of its officers. Indeed, in the years immediately preceding and continuing through the time of the Lazo/England investigation and Daniel Villegas's convictions and beyond, the El Paso Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that befell Plaintiff was for all practical purposes nonexistent.  The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline or oversight. In fact, officers were encouraged to cover up incidents of misconduct by destroying evidence and lying about the circumstances of

their investigations and their interactions with witnesses and suspects, including through creating false police reports and committing perjury. The need for robust systems of oversight and discipline was obvious on its face, and the deficiencies of the essentially nonexistent systems that were in place were further demonstrated by the many incidents known to City policymakers, including those described above, where El Paso police officers were able to commit serious misconduct, and engage in deceit to cover up their own and other officers' misconduct, without meaningful supervision and oversight, and without any discipline or meaningful consequences to ensure the misconduct was corrected.

182.    Instead, El Paso police officers and the other employees of the City of El Paso who manufactured criminal cases against individuals such as Plaintiff had every reason to know that they not only enjoyed de facto immunity from criminal prosecution and departmental discipline, but that they also stood to be rewarded for closing cases no matter what the costs. In this way, this system proximately caused abuses like the misconduct at issue in this case.

183.    Among the many deleterious effects of the deficient or non-existent supervision and discipline described above is that it provided Defendants with the opportunity, authority and impetus to use impermissible and coercive interrogation tactics on Mr. Villegas, and use of improper investigative techniques including the fabrication and suppression of evidence in the Lazo/England investigation, and emboldened Defendants to act with impunity and without fear of meaningful consequences in doing so, which harmed Mr. Villegas, violated his constitutional rights, and caused his wrongful prosecution, conviction and imprisonment.

184.    The widespread and longstanding nature of the practices described above is further evidenced by the continued misconduct after Mr. Villegas' convictions were vacated and in the lead-up to his third criminal trial. Even after the criminal proceedings leading to Plaintiff's

exoneration, which laid bare the misconduct committed by Marquez, Graves, Arbogast, Ortega, and Bellows, El Paso did nothing to prevent further constitutional abuses and, in fact, emboldened Defendants Sanchez and Loya to violate Plaintiff's Constitutional rights.

185.     The widespread and longstanding nature of these practices is further evidenced by the continued pattern of similar misconduct in other criminal cases that took place after Mr. Villegas' convictions were vacated and up to the present day, as described in the preceding paragraphs.

### Count I – Due Process (Fourteenth Amendment)
### 42 U.S.C. § 1983
### (*All Defendants*)

186.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

187.     As described more fully above, all of the Defendant Officers, while acting individually, jointly, and in conspiracy with other named and unnamed individuals, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and a fair trial.

188.     In the manner described more fully above, all of the Defendant Officers deliberately withheld exculpatory and impeachment evidence from Plaintiff, his attorneys, and prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

189.     In the manner described more fully above, Defendants Marquez, Graves, Arbogast, Ortega, Sanchez and Loya fabricated false statements, including the purported confession of Plaintiff and inculpatory statements of witnesses, fabricated reports and other evidence falsely implicating Plaintiff in the murders, suborned perjury, obtained Plaintiff's

conviction and continued prosecution using that false evidence, and failed to correct fabricated

evidence that they knew to be false when it was used against Plaintiff during his criminal case. In

addition, these Defendant Officers produced a series of false and fraudulent reports and related

documents, which they inserted into their file and presented to state prosecutors and judges.

These documents, which were used to show Plaintiff's purported connection to the murders,

contained statements and described events that were fabricated and Defendants knew to be false.

Defendants signed these reports, both as investigators and as supervisors, despite their

knowledge that the information contained in those reports was false.

190.    The misconduct of all of the Defendant Officers directly resulted in the unjust and

wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's

liberty, thereby denying him his constitutional right to due process and a fair trial guaranteed by

the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff would not and

could not have been pursued, and there is a reasonable probability that he would not have been

convicted.

191.    The misconduct of all of the Defendant Officers also directly resulted in the

Plaintiff's unjust criminal conviction, thereby denying him his constitutional right to due process,

a fair trial, and a fair appeal thereof, in violation of the Due Process Clause of the Fourteenth

Amendment to the United States Constitution.

192.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered

loss of liberty and sustained and continues to sustain injuries, including physical injury and

sickness, and resultant emotional pain and suffering, great mental anguish, humiliation,

degradation, and other grievous and continuing injuries and damages as set forth above.

193.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

194.     The misconduct by all of the Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the El Paso Police Department, which Plaintiff was the victim of, and his injuries were proximately caused by the policies and practices of the City of El Paso, as described more fully above.

**Count II – Coerced and False Confession (Fifth Amendment)**
**42 U.S.C. § 1983**
**(*Defendants Marquez, Graves, Arbogast, Ortega, and City of El Paso*)**

195.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

196.     In the manner described more fully above, Defendants Marquez, Graves, Arbogast and Ortega, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth Amendment.

197.     As described more fully above, these Defendants participated in, encouraged, advised, and ordered an unconstitutional and unlawful interrogation of Plaintiff, which caused Plaintiff to make involuntary and false statements implicating himself in the murders of Armando Lazo and Robert England.

198.     The coerced, involuntary, false statement written by these Defendants and attributed to Plaintiff was used against Plaintiff to his detriment in a criminal case. This statement caused Plaintiff to be prosecuted and convicted of the murders.

199.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

200.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

201.    These Defendants' misconduct described in this Count was undertaken pursuant to the City of El Paso's policy and practice in the manner more fully described above.

### Count III – Coerced and False Confession (Fourteenth Amendment)
### 42 U.S.C. § 1983
### (*Defendants Marquez, Graves, Arbogast, Ortega, and City of El Paso*)

202.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

203.    In the manner described more fully above, Defendants Marquez, Graves, Arbogast and Ortega, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his right to due process secured by the Fourteenth Amendment.

204.    As described in detail above, the misconduct described in this Count was done using extreme techniques of physical and psychological coercion and torture against a 16-year-old boy. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

205.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

206.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

207.    These Defendants' misconduct described in this Count was undertaken pursuant to the City of El Paso's policy and practice in the manner more fully described above.

**Count IV – Deprivation of Liberty and Detention
without Probable Cause (Fourth and Fourteenth Amendments)
42 U.S.C. § 1983
(*All Defendants*)**

208.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

209.    In the manner described more fully above, all of the Defendant Officers, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity and cause the detention of Plaintiff, without probable cause.

210.    In so doing, all of the Defendant Officers caused Plaintiff to be deprived of his liberty and detained without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

211.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

212.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

213.   The misconduct of all of the Defendant Officers described in this Count was undertaken pursuant to the City of El Paso's policy and practice in the manner more fully described above.

## Count V - Failure to Intervene
## 42 U.S.C. § 1983
### (*All Defendants*)

214.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

215.   In the manner described above, during the Constitutional violations described above, one or more of the Defendant Officers stood by without intervening to prevent the misconduct.

216.   As a direct and proximate result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

217.   These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

218.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

219.    The misconduct of all of the Defendant Officers described in this Count was undertaken pursuant to the City of El Paso's policy and practice in the manner more fully described above.

**Count VI - Conspiracy**
**42 U.S.C. § 1983**
(*All Defendants*)

220.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

221.    All of the Defendant Officers reached an agreement amongst themselves to frame Plaintiff for the crime, and to thereby deprive Plaintiff of his constitutional rights, all as described in the various Paragraphs of this Complaint. This agreement was first reached prior to arresting Plaintiff, and remained in place throughout all periods of his detention, prosecution and incarceration.

222.    In addition, before and after Plaintiff's conviction, each of the Defendant Officers further conspired, and continues to conspire, to deprive Plaintiff of exculpatory materials to which he is lawfully entitled and which would have led to his more timely exoneration of the false charges as described in the various Paragraphs of this Complaint.

223.    In this manner, all of the Defendant Officers, acting in concert with each other and with other unknown co-conspirators, including persons who are and who are not members of the El Paso Police Department, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

224.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

225.    As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and he suffered loss of liberty and sustained and continues to sustain injuries, including physical injury and sickness, and resultant emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

226.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

227.    The misconduct of all of the Defendant Officers described in this Count was undertaken pursuant to the City of El Paso's policy and practice in the manner more fully described above.

WHEREFORE, Plaintiff, DANIEL VILLEGAS, respectfully requests that this Court enter judgment in his favor and against Defendants, CITY OF EL PASO, ALFONSO MARQUEZ, CARLOS ORTEGA, SCOTT GRAVES, KEMMITT BELLOWS, EARL ARBOGAST, RAY SANCHEZ, HECTOR LOYA, UNKNOWN EMPLOYEES OF THE CITY OF EL PASO, awarding compensatory damages, costs, and attorneys' fees, as well as punitive damages against all individual defendants, and any other relief this Court deems just and appropriate.[1]

---

[1] In addition to the Counts set forth above, Plaintiff intends to pursue a claim for indemnification against Defendant City of El Paso, on the basis of Plaintiff's contention that the City will be obligated to indemnify any judgment for compensatory damages entered against any of the Defendant Officers. Because this claim is premature, in that there is as of yet not an extant judgment for the City of El Paso to indemnify, Plaintiff has not included that Count in this Third Amended Complaint. Plaintiff includes this statement in order to preserve the claim and to place the City of El Paso on notice of his intention to seek indemnification of any judgment he obtains in this case.

**JURY DEMAND**

Plaintiff, DANIEL VILLEGAS, hereby demands a trial by jury pursuant to Federal Rule

of Civil Procedure 38(b) on all issues so triable.


RESPECTFULLY SUBMITTED:

<u>/s/ Sam Heppell</u>
Attorney for Daniel Villegas


Jon Loevy, Illinois Bar No. 6218254 (admitted to this Court *pro hac vice*)
jon@loevy.com
Russell Ainsworth, Illinois Bar No. 6280777
russell@loevy.com
Sam Heppell, Illinois Bar No. 6320776
sam@loevy.com
Alison Leff, Illinois Bar No. 6296422
alison@loevy.com

LOEVY & LOEVY
311 N. Aberdeen Street, Third Floor
Chicago, IL 60607
T: 312-243-5900
F: 312-243-5902


Felix Valenzuela
State Bar No. 24076745

VALENZUELA LAW FIRM
221 N. Kansas Street, Ste. 1200
El Paso, TX 79901
T: 915-209-2719
F: 915-493-2404
felix@valenzuela-law.com