# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| **DANIEL VILLEGAS,** | § | |
| | § | |
| . **Plaintiff,** | § | |
| | § | |
| `v.` | § | **EP-15-CV-00386-FM** |
| | § | |
| **CITY OF EL PASO; ALFONSO** | § | |
| **MARQUEZ; CARLOS ORTEGA;** | § | |
| **SCOTT GRAVES; KEMMITT** | § | |
| **BELLOWS; EARL ARBOGAST; LINK** | § | |
| **BROWN; JOHN SCAGNO; RAY** | § | |
| **SANCHEZ; HECTOR LOYA, JOHN** | § | |
| **ARMENDARIZ; AND UNKNOWN** | § | |
| **EMPLOYEES OF THE CITY OF EL** | § | |
| **PASO,** . | § | |
| | § | |
| **Defendants.** | § | |

## ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS

Before the court are Defendant City of El Paso's ("the City") "Defendant City of El

Paso's Rule 12 Motion to Dismiss Plaintiff's Third Amended Complaint" [ECF No. 161];

Defendant Kemmett Bellows' ("Officer Bellows") "Defendant Kemmett Bellows' Rule 12(b)(6)

Motion to Dismiss Plaintiff's Third Amended Complaint" [ECF No. 162]; Defendant Alfonso

Marquez's ("Officer Marquez") "Defendant Alfonso Marquez's Rule 12(b) Motion to Dismiss

Plaintiff's Third Amended Complaint" [ECF No. 170]; Defendant Carlos Ortega's ("Officer

Ortega") "Defendant Carlos Ortega's Federal Rule of Civil Procedure 12(b)(6) Motion to

Dismiss Plaintiff's Third Amended Complaint" [ECF No. 171]; Defendant Earl Arbogast's

("Officer Arbogast") "Defendant Officer Earl Arbogast's Motion to Dismiss Plaintiff's Third

Amended Complaint and Brief in Support Thereof" [ECF No 172]; Defendant Ray Sanchez's

("Officer Sanchez") "Defendant Detective Ray Sanchez' Motion to Dismiss Plaintiff's Third

Amended Complaint and Brief in Support Thereof" [ECF No. 173]; Defendant Hector Loya's ("Officer Loya") "Defendant Detective Hector Loya's Motion to Dismiss Plaintiff's Third Amended Complaint and Brief in Support Thereof" [ECF No. 174]; Defendant Scott Graves' ("Officer Graves") "Defendant Officer Scott Graves' Motion to Dismiss Plaintiff's Third Amended Complaint and Brief in Support Thereof" [ECF No. 175], (collectively, "Motions").

In conjunction with the above Motions, the court also considered Daniel Villegas' ("Plaintiff") "Plaintiff's Consolidated Response in Opposition to Defendants' Motions to Dismiss" ("Response") [ECF No. 179]; "Defendant City of El Paso's Reply to Plaintiff's Consolidated Response in Opposition to Defendants' Motions to Dismiss" [ECF No. 180]; "Defendant Kemmett Bellows' Reply to Plaintiffs' Consolidated Response to Defendant Bellow's Rule 12(b)(6) Motion to Dismiss Plaintiff's Third Amended Complaint" [ECF No. 181]; "Defendant Carlos Ortega's Reply to 'Plaintiff's Consolidated Response in Opposition to Defendants' Motions to Dismiss' [ECF No. 179]" [ECF No. 182]; "Detectives Ray Sanchez and Hector Loya's Joint Reply to Plaintiff's Consolidated Response in Opposition to Defendant's Motions to Dismiss" [ECF No. 184]; and "Defendants Earl Arbogast and Scott Graves' Joint Reply to Plaintiff's Consolidated Response in Opposition to Defendants' Motions to Dismiss" [ECF No. 186] (collectively "Replies").

## I.   **PLAINTIFF'S ALLEGATIONS**

Plaintiff alleges the following facts. In April of 1993, teenagers Robert England ("England") and Armando Lazo ("Lazo") were killed in a drive-by shooting.[1] Jesse Hernandez ("Hernandez") and Juan Medina, walking with England and Lazo, were uninjured.[2]

---

[1] "Third Amended Complaint" ("Third Am. Compl.") 3 ¶ 14, ECF No. 153, filed Oct. 19, 2019.

[2] *Id.* at 3–4 ¶¶ 14–15.

Officer Bellows responded to the scene of the murder, where it was determined a .22 caliber weapon killed the victims.[3] Later the same day, Bellows responded to the scene of another murder where he recovered a .22 caliber weapon.[4] He determined a man named Rudy Flores had been present at the second shooting.[5] Witnesses later tied Rudy Flores and his brother Javier Flores (collectively, "Flores brothers") to the England and Lazo murders.[6]

El Paso Police Officers Marquez, Graves, Laredo, and Arbogast investigated the murders of England and Lazo.[7] Officer Marquez questioned Hernandez about the shooting[8] and used coercive tactics to convince Hernandez that Hernandez himself might have committed the murders.[9] Officers Marquez, Arbogast, and Ortega then coerced a false confession from fifteen-year-old Michael Johnston ("Johnston") through threats of jail assault, sexual abuse, and the electric chair.[10] An unknown combination of investigating officers also obtained a false confession from fourteen-year-old Jacob Jauregi ("Jauregi").[11] El Paso prosecutors did not charge Johnston and Jauregi; nor did they use either false confession at Plaintiff's trial.[12]

---

[3] *Id.* at 18 ¶ 92.

[4] *Id.*

[5] *Id.*

[6] *Id.* at 20 ¶ 100, 20 ¶ 102, 20 ¶ 104, 21 ¶ 107.

[7] Third Am. Compl. 4 ¶ 19.

[8] *Id.* at 4 ¶¶ 21–24.

[9] *Id.* at. 4 ¶ 24.

[10] *Id.* at. 7 ¶ 32.

[11] *Id.* at 7 ¶ 33.

[12] *Id.* at 7 ¶ 34.

Officers Marquez and Laredo then coerced Plaintiff's seventeen-year-old cousin David Rangel ("Rangel") into signing a false witness statement implicating Plaintiff in the murders.[13] Rangel's account did not match the facts of the crime.[14] Officers Graves and Marquez coerced another factually impossible witness statement from fifteen-year-old Rodney Williams ("Williams").[15] Threats of charges and prison rape motivated both false statements.[16]

The same day, Officers Marquez, Graves, and Arbogast arrested sixteen-year-old Plaintiff and Marcos Gonzalez ("Gonzalez").[17] Officers Marquez, Graves, Arbogast, and Ortega agreed to coerce false statements from Plaintiff and Gonzalez to incriminate Plaintiff.[18] Officer Graves interrogated Gonzalez and coerced his false confession by repeatedly slamming him against the wall and threatening him with prison rape.[19] This caused Gonzalez to sign a false statement at Officer Graves' instruction.[20] Gonzalez later signed a revised statement tailored to match the facts of the case and other coerced statements.[21]

During the drive to the police station, Officers Marquez and Arbogast told Plaintiff he was "going down for this" and they were going to "kick [his] ass."[22] At the police station,

---

[13] Third Am. Compl. 7–9 ¶¶ 39–43.

[14] *Id.* at 9 ¶ 44.

[15] *Id.* at. 11 ¶ 52–53.

[16] *Id.* at. 8–10 ¶¶ 38–51.

[17] *Id.* at 11 ¶ 55.

[18] *Id.* at 12–13 ¶ 63.

[19] Third Am. Compl. 13 ¶ 66.

[20] *Id.* at 13 ¶ 67.

[21] *Id.* at 13 ¶ 69.

[22] *Id.* at 14 ¶ 74.

Officer Marquez struck Plaintiff and threatened him with prison rape.[23] Officers Marquez, Graves, Arbogast, and Ortega handcuffed Plaintiff to a chair.[24] Officer Marquez took the lead during the interrogation, but Officers Graves, Arbogast, and Ortega were present at various points and also participated.[25] During the interrogation, the officers instructed Plaintiff to confess claiming they knew he was responsible for the murders.[26] Officer Marquez struck him on the back of the head.[27] Officer Marquez threatened Plaintiff with prison rape as an inevitable consequence of jail time.[28] He stated if Plaintiff did not confess, he would drive Plaintiff to the desert, handcuff him to a car door, "kick his ass," and leave him in the desert to walk back to town.[29] When Plaintiff returned from the desert, Officer Marquez would personally place Plaintiff with inmates who would rape him.[30]

At this point in the interrogation Plaintiff signed his *Miranda* warning card.[31] Officers destroyed this card to hide the fact he was not informed of his rights before the interrogation began.[32] Plaintiff gave a statement denying involvement.[33] In response, Officer Marquez destroyed the statement, slapped Plaintiff, and threatened him with the electric chair if he did not

---

[23] *Id.* 15 ¶ 76.

[24] *Id.* at 14 ¶ 75.

[25] Third Am. Compl. 14–15 ¶ 75.

[26] *Id.*

[27] *Id.* at 15 ¶ 76.

[28] *Id.*

[29] *Id.* at 15 ¶ 76.

[30] *Id.*

[31] Third Am. Compl. 15 ¶ 77.

[32] *Id.* at 15 ¶¶ 77–78.

[33] *Id.* at 16 ¶ 80.

confess to the shooting.[34] Officer Marquez prepared a second statement confessing to both murders, which Plaintiff signed.[35] The same morning, Plaintiff recanted and told a juvenile probation officer that he confessed only because he was coerced.[36]

Officer Bellows reached an agreement with Officers Marquez, Graves, Arbogast, and Ortega to suppress exculpatory evidence.[37] This included evidence connecting the Flores brothers to both the England and Lazo murders and the second murder to which Bellows responded the same day. Both Javier and Rudy Flores gave statements to the police.[38] Rudy's statement placed him at the scene of the murders.[39] Several witness statements and other evidence also implicated the brothers in the murders.[40] First, Rudy was overheard admitting his involvement in the shootings.[41] A second witness heard Rudy threaten to kill Lazo two weeks before the murders.[42] A third witness heard the Flores brothers brag Plaintiff was "locked up" for a crime they committed.[43] Finally, an audiotape recording made by a witness claiming Rudy

---

[34] *Id.* at 16 ¶ 80.

[35] *Id.* at 17 ¶ 87.

[36] *Id.* at 17–18 ¶¶ 87–89.

[37] Third Am. Compl. 19 ¶ 95.

[38] *Id.* at 19 ¶ 98.

[39] *Id.*

[40] *Id.* at 20 ¶ 100.

[41] *Id.* at 20 ¶ 104.

[42] *Id.* 20 ¶ 102.

[43] Third Am. Compl. 21 ¶ 107.

bragged he was involved in the murders.[44] Moreover, Rudy's car matched the description of the shooter's car.[45]

Evidence also tied the brothers to the murder weapon. Witnesses saw one of the brothers and their sister try to dispose of a .22 caliber weapon.[46] This is the same caliber as the murder weapon.[47] Rudy was also present on the day of the murders at another shooting involving a .22 caliber weapon.[48] The police recovered this weapon but destroyed it before performing forensic tests that would have determined whether it was the same weapon used to kill England and Lazo.[49]

At trial, prosecutors relied on Plaintiff's coerced confession and the fabricated statements by Rangel, Williams, and Gonzalez.[50] While the 1993 trial ended in a hung jury, a second trial in 1995 resulted in Plaintiff's conviction and sentence of life imprisonment.[51] During a state habeas proceeding fourteen years later, a state trial court found that Plaintiff's confession and the Williams and Gonzalez statements resulted from "illegal and coercive methods" and were "completely unreliable."[52] The court noted a number of inconsistencies indicated that Plaintiff was not involved in shooting England or Lazo.[53] The Texas Court of Criminal Appeals vacated

---

[44] *Id.* at 21 ¶ 109.

[45] *Id.* at 20 ¶ 104.

[46] *Id.*

[47] *Id.* at 20 ¶ 104.

[48] Third Am. Compl. 18 ¶ 92.

[49] *Id.* at 19 ¶ 96.

[50] *Id.* 24 ¶ 117.

[51] *Id.* at 24 ¶ 118.

[52] *Id.* at 26 ¶ 127.

[53] *Id.* 25–26 ¶¶ 121–26.

Plaintiff's murder convictions in December 2013, and a state trial court suppressed his confession in November 2014.[54]

Officers Loya and Sanchez investigated Plaintiff in preparation for his third trial. They agreed to fabricate evidence to secure a conviction.[55] They arranged for Oscar Gomez ("Gomez"), a childhood friend of Plaintiff, to be arrested and interrogated.[56] Officer Sanchez pressed Gomez to implicate Plaintiff and made Gomez feel he would go to jail if he did not comply.[57] Officer Sanchez created a video recording of Gomez falsely stating Plaintiff confessed to committing the murders.[58] Both officers knew Plaintiff was innocent; Officer Loya said as much to a retired officer.[59] Despite the introduction of Gomez's false statement, Plaintiff was acquitted at his third trial in October 2018.[60]

## II.    **APPLICABLE LAW**

### A.    *Federal Rule of Civil Procedure 12(b)(6)*

Federal Rule of Civil Procedure Rule 12(b)(6) allows dismissal of a complaint for "failure to state a claim for which relief can be granted."[61] "The central issue is whether, in the light most favorable to the Petitioner, the complaint states a valid claim for relief."[62] To survive

---

[54] Third Am. Compl. 26 ¶¶ 128–29.

[55] *Id.* at 28 ¶ 138.

[56] *Id.* at 28 ¶¶ 138–39.

[57] *Id.* at 28 ¶ 141.

[58] *Id.* at 29 ¶¶ 144–45.

[59] *Id.* at 30 ¶¶ 150–51.

[60] Third Am. Compl. 31 ¶ 158.

[61] FED. R. CIV. P. 12(b)(6).

[62] *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 (5th Cir. 2002) (internal quotation marks and citation omitted). *See also In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

a motion to dismiss, a petitioner must plead "enough facts to state a claim to relief that is plausible on its face."[63] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a Respondent has acted unlawfully."[64] "[F]acial plausibility" exists "when the Petitioner pleads factual content that allows the court to draw the reasonable inference that the Respondent is liable for the misconduct alleged."[65] A complaint is not required to set out "detailed factual allegations," but it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."[66] Although the court must accept well-pleaded allegations in a complaint as true, it does not afford conclusory allegations similar treatment.[67]

B.    Section 1983

42 U.S.C. § 1983 ("Section 1983") provides a remedy for violations of federal statutory or constitutional rights.[68] A viable Section 1983 claim alleges facts establishing that a defendant, acting under color of state law, deprived the plaintiff of a right secured by the Constitution or

---

[63] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[64] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[65] *Id.* (citing *Twombly*, 550 U.S. at 556).

[66] *Twombly*, 550 U.S. at 555.

[67] *See Kaiser Aluminum & Chem. Sales, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) (citing *Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974)).

[68] *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 700 (5th Cir. 1991).

United States law.[69] A defendant's personal involvement is an essential element in a Section 1983 claim,[70] which must be pleaded with specific facts and not conclusory allegations.[71]

## III. DISCUSSION

### A. *Authority to Decide Motions to Dismiss and Materials Considered*

As a preliminary matter, Plaintiff asserts law-of-the-case-doctrine forecloses "relitigation of matters that were decided in the Magistrate Judge's Report & Recommendation with regard to Plaintiff's Second Amended Complaint, and which have not been disturbed by any of Plaintiff's additional allegations in the Third Amended Complaint."[72] This is incorrect. It is true that "when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case."[73] However, the Report and Recommendation issued by the Magistrate Judge did not decide any issue, but rather recommended to this court possible resolutions to prior motions to dismiss.[74] This court then entered an order dismissing some claims and parties and allowing Plaintiff to amend his complaint with respect to the remaining issues.[75] This court has not ruled on any issue now before the court. Therefore, "relitigation" is impossible. Additionally, an amended complaint supersedes the original complaint and renders

---

[69] *Fyfe v. Curlee*, 902 F.2d 401, 403 (5th Cir. 1990).

[70] *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983); *Watson v. Interstate Fire & Cas, Co.*, 611 F.2d 120, 123 (5th Cir. 1980).

[71] *Thompson v. City of Starkville*, 901 F.2d 456, 469 n. 13 (5th Cir. 1990).

[72] "Plaintiff's Consolidated Response in Opposition to Defendants' Motions to Dismiss" ("Resp.") 13, ECF No.179, filed Dec. 17, 2019.

[73] *Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) (citing *United States v. Castillo*, 179 F.3d 321, 326 (5th Cir. 1999) (citations omitted).

[74] *See* FED. R. CIV. P. 72(b).

[75] *See* "Order Adopting in Part and Rejecting in Part the Report and Recommendation of the Magistrate Judge" ("Order on R&R"), ECF No. 152, entered Sept. 20, 2019.

it of no legal effect.[76]  In conclusion, the court has authority to rule on all grounds for dismissal presented in the Motions.

Next, the City correctly points out Plaintiff failed to comply with the deadline set by the court to respond to all Motions.[77]  The City objects to the late filing and requests the court strike Plaintiff's Response and consider its Motion as if no response had been filed.[78]  While the court reaffirms the importance of compliance with filing deadlines, it is not in the interest of justice or judicial efficiency to strike the Response.  The court will therefore consider it.

   B.    *Defendant Officers*

The defendant officers can be divided into three groups.  The first group is comprised of officers assigned to investigate Plaintiff prior to his first trial for the murders of Lazo and England: Officers Marquez, Graves, Arbogast, Ortega.  Officer Bellows is alone in the second group.  He responded to the murders of England and Lazo but was not a primary investigator. Finally, the third group includes Officers Sanchez and Loya, who investigated Plaintiff prior to his third trial.

All defendant officers argue they are shielded from suit by qualified immunity. Government officials are entitled to qualified immunity under Section 1983 unless: (1) they violated a federal statutory or constitutional right; and (2) the unlawfulness of their conduct was "clearly established" at the time.[79]  "Clearly established" means existing precedent had "placed

---

[76] *U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 322 (5th Cir. 2016) (citing *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994)).

[77] "Defendant City of El Paso's Reply to Plaintiff's Consolidated Response in Opposition to Defendants' Motions to Dismiss" ("City's Reply") 1 ¶ 1, ECF No. 180, filed Dec. 23, 2019.

[78] *Id.*

[79] *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

the statutory or constitutional question beyond debate" such that every reasonable official would have understood his actions violated that right.[80] This inquiry must be undertaken in light of the specific conduct at issue in the case, not as a general proposition.[81] Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[82]

Plaintiff alleges all defendant officers participated in a civil conspiracy under Section 1983.[83] To support such claims, Plaintiff must plead "facts that establish (1) the existence of a conspiracy involving state action," and "(2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy."[84]

Plaintiff further claims all defendant officers are liable under Section 1983 for their failure to intervene to prevent the constitutional violations of their fellow officers.[85] Failure to intervene, or bystander liability, holds responsible an "officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force."[86] An officer is liable under Section 1983 under a theory of bystander liability where the

---

[80] *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

[81] *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015).

[82] *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

[83] Third Am. Compl. 52.

[84] *Shaw v. Villanueva,* 918 F.3d 414, 419 (5th Cir. 2019) (quoting *Pfannstiel v. City of Marion,* 918 F.2d 1178, 1187 (5th Cir. 1990), *abrogated on other grounds by Martin v. Thomas,* 973 F.2d 449 (5th Cir. 1992)) (internal quotations omitted).

[85] Third Am. Compl. 55 ¶¶ 215–18.

[86] *Hale v. Townley,* 45 F.3d 914, 919 (5th Cir. 1995).

officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."[87]

### 1.    Officers Marquez, Graves, Arbogast, Ortega

Officers Marquez, Graves, Arbogast, and Ortega were assigned to investigate Plaintiff prior to his first trial for the murders of Lazo and England.  Plaintiff brings this action against them under Section 1983 alleging violations of this Fourth, Fifth, and Fourteenth Amendment rights, failure to intervene, and civil conspiracy.

#### i.    *Coerced and False Confession (Counts II and III)*

The Fifth Amendment states no person "shall be compelled in any criminal case to be a witness against himself."[88]  It is well established that state actors violate a criminal defendant's Fifth Amendment rights against self-incrimination when they coerce an involuntary confession and use it against the defendant.[89]  To determine whether a confession is coerced or involuntary the court considers the totality of the circumstances surrounding the interrogation.[90]  The State must warn the accused prior to questioning of his right to remain silent and to have counsel present.[91]  Absent these warnings, the state cannot use statements obtained during custodial interrogation.[92]

---

[87] *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013).

[88] U.S. CONST. amend V.

[89] *See Chavez v. Martinez*, 538 U.S. 760, 766 (2003); *see also, e.g.*, *Edmonds v. Oktibbeha County*, 675 F.3d 911, 914 (5th Cir. 2012).

[90] *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citing *Fare v. Michael*, 442 U.S. 707, 725 (1979)).

[91] *Miranda v. Arizona*, 384 U.S. 436, 471–73 (1966).

[92] *Id.*

The Fourteenth Amendment guarantees the right to a fair trial.[93] This guarantee prohibits excessive force,[94] knowingly fabricating evidence,[95] and obtaining a conviction with testimony that government agents know is false.[96] These rights are implicated when officers coerce or falsify a confession.

Plaintiff asserts the confession he made to police in 1993 was involuntary and the result of police coercion.[97] Plaintiff was not given his *Miranda* warning until well into the interrogation after being urged several times to confess.[98] This made any prior statements unusable at trial.[99]

Plaintiff gave false incriminating statements after signing the *Miranda* warning card.[100] Therefore, the court must consider the voluntariness of that statement. Plaintiff was sixteen years old and of limited mental capacity.[101] Psychological evaluations indicate he suffered from extreme difficulties learning, below-average cognitive skills, attention deficit disorder, and emotional problems.[102] Officers kept him from about 10 p.m. until about 3 a.m., when he signed

---

[93] U.S. CONST. amend XIV.

[94] *See, e.g., Brothers v. Klevenhagen,* 28 F.3d 452, 455 (5th Cir. 1994).

[95] *Brown v. Miller,* 519 F.3d 231, 237 (5th Cir. 2008).

[96] *Napue v. Illinois,* 360 U.S. 264, 269 (1959).

[97] Third Am. Compl. 48 ¶ 196, 49 ¶ 203.

[98] *Id.* at 15 ¶ 77.

[99] *See Miranda v. Arizona,* 384 U.S. 436, 473–74 (1966).

[100] Third Am. Compl. 17 ¶ 87.

[101] *See Fare v. Michael C.,* 442 U.S. 707, 725 (1979).

[102] Third Am. Compl. 14 ¶ 72.

his confession.[103]  During the interrogation Officer Marquez struck Plaintiff twice,[104] threatened to inflict additional physical violence,[105] and threatened to leave Plaintiff in the desert.[106]  He also threatened sexual assault—both that Plaintiff would be raped in jail and that he personally would cause Plaintiff to be raped while in state custody.[107]  Finally, he threatened to pull the switch on the electric chair himself.[108]  All threats were conditional on Plaintiff confessing to murder.  It does not stretch the imagination to envision the substantial effect of such statements and unprovoked physical violence on a juvenile kept through the night.  Considered in their totality, the interrogation tactics Officer Marquez allegedly employed meet the pleading threshold for establishing an involuntary confession.  They also meet the standard for a Fourteenth Amendment violation.

The involvement of Officers Graves, Arbogast, and Ortega in eliciting this confession is less clear.  However, at this phase of proceedings Plaintiff must only state enough facts to establish the claim is plausible on its face.  The most specific allegation of coercion against any of these officers is that Arbogast threatened Plaintiff with physical violence in the police car on the way to the interrogation.[109]  Plaintiff also states Officers Graves, Arbogast, and Ortega agreed to falsify the timing of the *Miranda* warning.[110]  All officers were present at various

---

[103] *Id.* at 11 ¶ 55, 17 ¶ 87.

[104] *Id.* at 15 ¶ 76, 16 ¶ 80.

[105] *Id.* at 14 ¶ 74, 15 ¶ 76, 16 ¶ 80, 16 ¶ 82.

[106] *Id.* at 15 ¶ 76.

[107] *Id.*

[108] Third Am. Compl. at 16 ¶ 80.

[109] *Id.* at 14 ¶ 74.

[110] *Id.* at 15 ¶ 78.

15

points during the interrogation and participated in the use of coercive interrogation tactics.[111] All officers knew Plaintiff's confession was false and used it anyway. While the exact extent of the participation by Officers Graves, Arbogast, and Ortega is left unsaid, the reduced detail on this point cannot erase the specificity of the misconduct combined with the allegation that they participated in it. Accordingly, Plaintiff states a claim that Officers Marquez, Graves, Arbogast, and Ortega violated his well-established Fifth Amendment right against self-incrimination and are not immune on this issue.

ii.    Deprivation of Liberty and Detention without Probable Cause
       (Count IV)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures."[112] Fourth Amendment seizures, including arrest, are reasonable only if based on probable cause to believe the individual has committed a crime.[113] This protects individuals against both pretrial deprivation of liberty and deprivation extending after the legal process commences.[114] Plaintiff asserts his initial arrest and detention were not founded on probable cause, but information known to be false by Officers Marquez, Graves, Arbogast, and Ortega. Therefore, the officers are responsible for his unlawful detention.

In moving to dismiss this claim, Officer Marquez argues Plaintiff has not specifically pleaded what evidence was manufactured.[115] Plaintiff alleges two witness statements implicating him were falsified prior to his own arrest. First, Officer Marquez is alleged to have "ordered"

---

[111] *Id.* at 15 ¶ 75.

[112] U.S. CONST. amend IV.

[113] *Bailey v. U.S.*, 568 U.S. 186, 192 (2013).

[114] *Manual v. City of Joliet*, 137 S. Ct. 911, 918 (2017).

[115] "Defendant Alfonso Marquez's Rule 12(b) Motion to Dismiss Plaintiff's Third Amended Complaint" ("Marquez's Mot.") 6 ¶ 10, ECF No. 170, filed Dec. 2, 2019.

Rangel to write a statement implicating Plaintiff.[116] Officer Marquez then destroyed that statement when its contents did not match the crime and instructed Rangel on what information to include in a subsequent statement.[117] Second, Williams is also alleged to have signed a false statement consisting entirely of information provided to him by the investigating officers.[118] Evidence alleged to have been fabricated by defendant officers after the arrest and used to support subsequent pre-trial detention includes: (1) Plaintiff's own confession, which he alleges Officer Marquez prepared on his behalf after rejection of previous statements;[119] and (2) a statement extracted from Gonzalez under similar circumstances.[120] In sum, Plaintiff has adequately identified allegedly fabricated evidence.

Officer Ortega moves to dismiss on the basis that Plaintiff has not sufficiently alleged his personal involvement in Plaintiff's detention, but rather alleges Officer Ortega was "essentially in the vicinity of where these activities were taking place."[121] It is true Plaintiff does not allege any action taken by Officer Ortega alone. Each time the complaint refers to Officer Ortega, he is one of between two and four officers alleged to have engaged in misconduct. However, that multiple officers are all alleged to have violated the same right does not mean Plaintiff has not stated a claim against any specific officer.

---

[116] Third Am. Compl. 9 ¶ 42.

[117] *Id.*

[118] *Id.* at 11 ¶ 52.

[119] *Id.* at 17 ¶ 87.

[120] *Id.* at 13 ¶¶ 66–69.

[121] "Defendant Carlos Ortega's Federal Rule of Civil Procedure 12(b)(6) Motion to Dismiss Plaintiff's Third Amended Complaint" ("Ortega's Mot.") 9 ¶ 12, ECF No. 171, filed Dec. 2, 2019.

Plaintiff states Officer Ortega was one of four officers investigating the England and Lazo murders.[122] Officers Ortega and Marquez arrested and interrogated Johnston and Jauregi.[123] While these interrogations may well have been coercive and illegal, Plaintiff does not allege they contributed to his later arrest as both Johnston and Jauregi confessed to committing the murders themselves.[124] Therefore, actions by Officer Ortega to extract these confessions are not actionable claims by Plaintiff. With respect to the statements of Rangel, Williams, and Gonzalez, the pleadings against Officer Ortega are limited to allegations of "knowledge," "agreement," "presence," and "communication." These allegations are insufficient to establish primary liability against Officer Ortega under Section 1983.[125]

After Plaintiff's arrest, he alleges Officer Ortega handcuffed him to a chair and participated in an interrogation. The court already established this participation meets the threshold for coercion; therefore, the confession was involuntary and unusable. It follows that the court may draw the reasonable inference that Ortega is liable for arrest and detention without probable cause based on these facts. Although Plaintiff had already been arrested, the Fourth Amendment protects criminal defendants from detention without probable cause through trial.[126] Consequently, Plaintiff succeeds in alleging Officer Ortega deprived Plaintiff of his liberty by

---

[122] Third Am. Compl. 4 ¶ 19.

[123] *Id.* at 6 ¶ 28.

[124] *Id.* at 7 ¶ 31.

[125] *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action."); *Watson v. Interstate Fire & Cas, Co.*, 611 F.2d 120, 123 (5th Cir. 1980) ("Liability [under Section 1983] may be found only if there is personal involvement of the officer being sued.").

[126] *Manual v. City of Joliet*, 137 S. Ct. 911, 919–20 (2017).

personally participating in fabricating evidence for use against Plaintiff in violation of the Fourth Amendment.[127]

Officers Arbogast and Graves move to dismiss on the basis that the independent intermediary doctrine protects officers from liability arising from Plaintiff's arrest without probable cause.[128] Under the doctrine, "if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for the Fourth Amendment violation."[129] However, this does not immunize the officers from liability. The "taint" exception to the doctrine prevents an independent intermediary's probable cause finding from protecting law enforcement officers whose "malicious motive . . . lead[s] them to withhold any relevant information," or otherwise "misdirect[ ] the magistrate or the grand jury by omission or commission."[130] Plaintiff alleges much of the information placed before the intermediary was falsified and that some evidence was withheld by officers single-mindedly pursuing Plaintiff at the expense of all of all other leads. The pleadings sufficiently establish the intermediary was misdirected by tainted evidence, even assuming not all evidence before the intermediary was tainted. In sum, Plaintiff stated a claim under Count IV against Officers Marquez, Ortega, Arbogast, and Graves.

---

[127] *See Manual v. City of Joliet*, 137 S. Ct. 911, 917 (2017) (holding an arrest based on falsified evidence fits to be a Fourth Amendment violation).

[128] *See* Defendant Officer Earl Arbogast's Motion to Dismiss and Plaintiff's Third Amended Complaint and Brief in Support Thereof" ("Arbogast's Mot.) 14 ¶ 17–18, ECF No. 172, filed Dec. 2, 2019; "Defendant Officer Scott Graves' Motion to Dismiss and Plaintiff's Third Amended Complaint and Brief in Support Thereof" (Graves' Mot.) 15 ¶ 19–20, ECF No. 175, filed Dec. 2, 2019.

[129] *Winfrey v. Rogers*, 901 F.3d 483, 498 (5th Cir. 2018) (citing *Jennings v. Patton*, 644 F.3d 297, 300–01 (5th Cir. 2011) (citations omitted)).

[130] *Buehler v. City of Austin/Austin Police Dep't*, 824 F.3d 548, 554–55 (5th Cir. 2016) (quoting *Cuadra v. Hous. Ind. Sch. Dist.*, 626 F.3d 808, 813; *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988)).

### iii.    Fourteenth Amendment Due Process (Count I)

Knowingly fabricating evidence,[131] excessive force,[132] and obtaining a conviction with

testimony that government agents know is false,[133] and suppression of exculpatory evidence by

police officers[134] all amount to denial of a fair trial and violate the Fourteenth Amendment right

to due process and are actionable under Section 1983. Although Plaintiff lists it as its own

Count, due process encompasses narrower violations also alleged in Count III (coerced and false

confession) and Count IV (deprivation of liberty). As Plaintiff stated a claim for violation of his

due process rights with respect to those counts against Officers Marquez, Graves, Arbogast, and

Ortega above, he has also stated a claim here. At this stage, the court need not address the extent

to which other alleged conduct violated the due process clause.

### iv.    Failure to Intervene (Count V)

Plaintiff pleads sufficient facts to state a claim for bystander liability against Officers

Marquez, Graves, Arbogast, and Ortega. All officers are alleged to have shared responsibility

for investigating the murders of England and Lazo. Plaintiff claims each knew about several

incidents of fellow officers' misconduct and were present for multiple constitutional violations.

Officers Graves, Arbogast, and Ortega were present when Officer Marquez physically assaulted

Plaintiff and threatened him with sexual assault.[135] As Officers Marquez and Graves both

---

[131] *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008).

[132] *See, e.g.*, *Brothers v. Klevenhagen*, 28 F.3d 452, 455 (5th Cir. 1994).

[133] *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

[134] *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) (noting "a police officer cannot avail himself of a qualified immunity defense if he procures false identification by unlawful means or deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles"). *See also Brown v. Miller*, 519 F.3d 231, 237–38 (5th Cir. 2008) (relying on this principle to hold a state laboratory technician who suppressed evidence ineligible for qualified immunity).

[135] Third Am. Compl. 15 ¶ 75.

participated in Williams' interrogation, each was therefore aware of and present during the violations committed by the other, including the creation of the false statement signed by Williams.[136] The officers were alleged to have agreed to suppress material evidence favorable to the Plaintiff.[137] The complaint and this court's larger discussion of the allegations are littered with examples of officers working in various combinations to further one another's misconduct. In light of the widespread awareness, participation, and authority of each officer to prevent relevant conduct, Plaintiff meets the threshold to survive a motion to dismiss based on Officers Marquez, Graves, Arbogast, and Ortega's failure to intervene.

<em>v.     Section 1983 Conspiracy (Count VI)</em>

Officers Marquez,[138] Graves,[139] Arbogast,[140] and Ortega[141] each contend Plaintiff's conspiracy claim fails to specify facts tying each officer to an agreement and concerted action to deprive him of his rights. They deem the facts Plaintiff does allege to be vague and conclusory, asserting he omits the "who, what, when, why, and how" of any such agreement.[142] However, it is plausible from the face of the complaint that the Officers engaged in a conspiracy to secure Plaintiff's conviction in the murders of Lazo and England.

The court already discussed at length the deprivation of Plaintiff's civil rights by these state actors. As such, the requirement that a violation exist in order to state a claim for

---

[136] *Id.* at 10–11 ¶¶ 51–52.

[137] *Id.* at 46 ¶¶ 188–89.

[138] Marquez's Mot. 7 ¶ 13.

[139] Graves' Mot. 19 ¶ 22.

[140] Arbogast's Mot. 17 ¶ 20.

[141] Ortega's Mot. 11 ¶ 15.

[142] *See* Marquez's Mot. 7 ¶ 13.

conspiracy under Section 1983 is met. The key question is whether the officers engaged in misconduct pursuant to an agreement. Plaintiff frames the entirety of his allegations in terms of concerted action to secure a conviction. He alleges Officers Marquez, Graves, Arbogast and Ortega agreed "at the outset of their investigation" to "take whatever steps were necessary to implicate a suspect and develop evidence to secure a conviction"[143] Later, Plaintiff alleges this general agreement evolved into the goal of securing Plaintiff's conviction.[144] He lists actions taken by each officer in furtherance of this goal: namely multiple coercive interrogations, falsified witness statements, failure to follow up with leads that did not implicate Plaintiff, and destruction of Plaintiff's *Miranda* warning card. At multiple points, Plaintiff states the officers conferred with one another and expressed approval of this conduct both before and after the fact. It may be conclusory to only state the officers "agreed" to violate one's rights.[145] However, Plaintiff's pleadings go farther. He alleges the officers conferred about coercive methods prior to and during interrogations,[146] worked together to identify new witnesses who might implicate Plaintiff to the exclusion of others,[147] and agreed not to turn over information to prosecutors.[148] These are not actions taken by one errant officer with only a conclusory allegation of approval by others. The pleadings show each investigating officer acted in furtherance of a common goal. Plaintiff has therefore met the burden to plausibly allege concerted action by all four officers.

---

[143] Third Am. Compl. 5 ¶ 20.

[144] *Id.* at 8–9 ¶ 40.

[145] *See Ashcroft v. Iqbal*, 556 U.S. 663, 680–81 (2009) (holding analogous statements to be conclusory).

[146] Third Am. Compl. 5 ¶ 25, 6 ¶ 26, 6 ¶ 30, 7 ¶ 36, 9 ¶ 41, 10 ¶ 47, 10 ¶ 50, 12 ¶ 63.

[147] *Id.* at 6 ¶ 28–29, 7 ¶ 36, 12 ¶ 56.

[148] *Id.* at 19 ¶ 95.

## 2.    Officer Bellows

Officer Bellows responded to the scene of the murders of Lazo and England.  Plaintiff

brings this action against him under Section 1983 alleging violations of his Fourth and

Fourteenth Amendment rights, failure to intervene, and civil conspiracy.  Officer Bellows moves

to dismiss all claims against him.[149]

### i.    *Constitutional Violations under Section 1983 (Counts I-IV)*

Suppression of exculpatory evidence by police officers amounts to denial of a fair trial in

violation of the Fourteenth Amendment due process right and is actionable under Section

1983.[150]  The right of a criminal defendant for exculpatory or impeaching evidence not to be

suppressed stems from the constitutional right secured by *Brady*.[151]  Although the affirmative

disclosure obligation remains firmly with prosecutors,[152] law enforcement officers have a

correlative duty to turn over to the prosecutor any material evidence that is favorable to a

defendant.[153]  This obligation exposes officers to civil liability under Section 1983 if they fail to

comply.[154]

---

[149] "Defendant Kemmett Bellows' Rule 12(b)(6) Motion to Dismiss Plaintiff's Third Amended Complaint" 5 ¶ 9, ECF No. 162, filed Nov. 4, 2019.

[150] *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988) (noting "a police officer cannot avail himself of a qualified immunity defense if he procures false identification by unlawful means or deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles").  *See also Brown v. Miller*, 519 F.3d 231, 237–38 (5th Cir. 2008) (relying on this principle to hold a state laboratory technician who suppressed evidence ineligible for qualified immunity).

[151] *See Brown*, 519 F.3d at 237–38 (discussing the relationship between *Brady* and the 1983 action).

[152] *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995).  *See also Strickler v. Greene*, 527 U.S. 263, 280–81 (1999).

[153] *See Youngblood v. West Virginia*, 547 U.S. 867 (2006).

[154] *See, e.g., Drumgold v. Callahan*, 707 F.3d 28 (1st Cir. 2013); *Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007); *Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009); *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996).

Therefore, the court must perform a *Brady*-type analysis to determine whether the

defendant officers suppressed evidence favorable to the accused that is material to either guilt or

punishment. If so, they violated a clearly established constitutional right abrogating their

sovereign immunity. Evidence is favorable to a defendant if it is exculpatory or impeaching in

nature.[155] Evidence is material if there is a reasonable probability the result of the proceeding

would have been different had it been disclosed.[156] Without a showing of bad faith on the part of

the police, "failure to preserve a potentially useful piece of evidence does not constitute a denial

of due process of law."[157]

Officer Bellows responded to the shooting of Lazo and England and to another shooting

on the same day.[158] The allegations against Officer Bellows, which the court accepts as true, are

as follows. Bellows assisted with the recovery of a .22 caliber weapon used in that second

shooting.[159] This is the same caliber of weapon used to murder Lazo and England.[160] Bellows

also learned a man named Rudy Flores was present at the second shooting.[161] Flores was later

tied to the England and Lazo murders by witnesses investigated by other officers.[162] Plaintiff

states Bellows disclosed this evidence to Officers Marquez, Graves, Arbogast, and Ortega.[163]

---

[155] *United States v. Bagley*, 473 U.S. 667, 676 (1985).

[156] *Id.*

[157] *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

[158] Third Am. Compl. 18 ¶ 92.

[159] *Id.*

[160] *Id.* at 20 ¶ 104.

[161] *Id.* at 18 ¶ 92.

[162] *Id.* at 20 ¶ 100, 20 ¶ 102, 20 ¶ 104, 21 ¶ 107.

[163] *Id.* at 18 ¶ 94.

Officer Bellows then agreed with the investigating officers to suppress this evidence as it undermined the case against Plaintiff.[164]

Plaintiff alleges Bellows deprived him of his constitutional right to due process and a fair trial by agreeing to suppress: (1) the weapon found at the scene of the second murder; and (2) witness testimony connecting the Flores brothers to both crimes.[165] The gun and the witness statements are favorable and material. Although not conclusive, they suggest the Flores brothers were present at the scene of Lazo and England's murder, possessed the murder weapon, and later confessed their involvement to witnesses. Together, this evidence creates a reasonable probability that, had it been disclosed, the result of the proceeding would have been different. It is more than merely "potentially useful" evidence that was not preserved. It is facially exculpatory. Plaintiff pleads the defendant officers were aware the evidence implicated another suspect and determined not to turn it over to prosecutors anyway as it undermined the case against Plaintiff.[166] This amounts to an allegation of bad faith, not negligence.

The details of the suppression agreement between Officer Bellows and the investigating officers remain unclear. Specifics are also sparse on what action or inaction in furtherance of this suppression was taken by Officer Bellows himself. However, these gaps amount to questions of fact more properly considered at the summary judgment phase rather than at the dismissal phase. The elements of the offense are properly alleged: (1) Officer Bellows was a police officer in possession of material evidence favorable to Plaintiff; (2) he agreed with other officers not to disclose this evidence to prosecutors; and (3) he did not disclose this evidence.

---

[164] Third Am. Compl. 19 ¶ 95.

[165] *Id.* at 46 ¶¶ 188–89.

[166] *Id.* at 18 ¶¶ 93–94.

Therefore, Plaintiff states a facially plausible claim that Officer Bellows violated a clearly established Fourteenth Amendment due process right actionable under Section 1983 and is not immune to suit.

Count IV alleges deprivation of liberty and detention without probable cause in violation of the Fourth and Fourteenth Amendments. Plaintiff claims all Defendants manufactured false evidence, causing his detention without probable cause and deprivation of liberty.[167] This claim presumably refers to falsified and coerced witness statements. However, Plaintiff does not state any facts indicating Officer Bellows participated in any arrests or interrogations. Officer Bellows' alleged participation appears to be limited to suppression of the evidence implicating Flores and failure to prevent misconduct by other officers. A Section 1983 claim must be based upon a defendant's actual participation in an event that causes a violation of civil rights.[168] As Plaintiff does not allege Officer Bellows himself engaged in the alleged conduct, any claim hinging on the fabrication of evidence or coercion fails.

Plaintiff responds it is "besides the point" that he does not allege Officer Bellows participated in fabricating or coercing evidence as Count IV is not based on a separate category of legal conduct, but a separate legal theory.[169] This appears to be an attempt to rewrite the complaint. Count I contains factual allegations of evidence suppression, fabricated statements, and other misconduct in support a broad theory of Fourteenth Amendment due process violation.[170] Count IV specifically alleges use of false evidence to cause deprivation of liberty

---

[167] Third Am. Compl. 50 ¶ 209.

[168] *See Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983); *Watson v. Interstate Fire & Cas. Co.*, 611 F.2d 120, 123 (5th Cir. 1980).

[169] Resp. 50.

[170] Third Am. Compl. 46 ¶¶ 188–89.

and detention without probable cause.[171] It makes no mention of suppression. Accordingly, Plaintiff fails to state a claim in Count IV against Officer Bellows.

### ii. Failure to Intervene (Count V)

Plaintiff alleges Officer Bellows is subject to bystander liability for failing to intervene to prevent the constitutional violations committed by Officers Marquez, Graves, Arbogast, and Ortega. An officer is not liable for his failure to intervene if he was not physically present to witness the constitutional violation alleged.[172] Plaintiff does not assert Officer Bellows was present during the unlawful arrests, coercive interrogations, or falsification of statements committed. At most, Plaintiff alleges Officer Bellows was aware of this conduct.[173] Therefore, any claim for bystander liability could only be based on Plaintiff's allegation that Officer Bellows witnessed suppression and destruction of evidence.

No doubt, Plaintiff states a plausible claim on his suppression of evidence theory. He alleges Officer Bellows was both aware of, and participated in, Officers Marquez, Graves, Arbogast, and Ortega's evidence suppression.[174] The charge of participation in a violation committed by another necessarily includes physical presence during the violation. As Officer Bellows was an officer present during and participating in the constitutional violation, he certainly could have acted to prevent misconduct at any time merely by notifying a supervisor or the prosecutor himself of the potentially exculpatory or impeaching evidence. He did not.[175] As such, Plaintiff has pleaded sufficient factual allegations to state a claim for bystander liability.

---

[171] *Id.* at 50 ¶ 209.

[172] *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).

[173] *See* Third Am. Compl. 24 ¶ 116.

[174] *Id.* at 18 ¶¶ 94–96, 22 ¶ 114.

[175] *Id.* at 24 ¶ 116.

### iii. Section 1983 Conspiracy (Count VI)

As the only constitutional violation Plaintiff successfully articulates against Officer

Bellows is a violation of his Fourteenth Amendment due process rights, this is the only violation

with respect to which Officer Bellows could have conspired. Plaintiff meets his 12(b)(6) burden

with respect to such a conspiracy. Plaintiff alleges it was at the request of the investigating

officers—Marquez, Graves, Arbogast, and Ortega—that Officer Bellows agreed not to turn over

evidence tying the Flores brothers to the murders of England and Lazo.[176] The existence of such

an agreement is circumstantially supported by the fact that Officer Bellows did not turn over

known exculpatory evidence.[177] Such an agreement would constitute conspiracy to suppress

evidence. Therefore, this claim may proceed.

### 3. Officers Loya and Sanchez

Officers Loya and Sanchez investigated Plaintiff preceding his 2018 trial. Plaintiff brings

this action against them under Section 1983 alleging violations of his Fourth and Fourteenth

Amendment rights, failure to intervene, and civil conspiracy. Officers Loya and Sanchez assert

qualified immunity and insufficient pleadings and move to dismiss all claims.

### i. Constitutional Violations under Section 1983 (Counts I-IV)

The Fourteenth Amendment prohibits the state from knowingly using false evidence,

including false testimony, in order to obtain a conviction.[178] Officers violate a criminal

defendant's rights when they pressure a specific witness through specific threats targeted to

---

[176] Third Am. Compl. 19 ¶ 95.

[177] See id. at 24 ¶ 116.

[178] Napue v. Illinois, 360 U.S. 264, 269 (1959).

secure the conviction of an individual defendant.[179] Nor can officers procure false identification by unlawful means.[180] It is clearly established that such conduct violates the Fourteenth Amendment.[181]

Officers Sanchez and Loya investigated Plaintiff prior to his third trial. Plaintiff alleges Officers Sanchez and Loya planned the arrest, interrogation, and feeding of a false narrative to Gomez, whose testimony was then used at trial.[182] Officer Sanchez conducted the interrogation.[183] He told Gomez he "did not want to hear" that Plaintiff never admitted to involvement in the murder and Gomez needed to implicate Plaintiff or face jail.[184] Officer Sanchez recorded Gomez's statement and instructed him not to say anything suggesting Plaintiff was not involved.[185] Officer Loya later admitted he knew Plaintiff had not committed the murders but still intended to "work [the case against Plaintiff] hard."[186]

Plaintiff alleges specific threats against a specific witness targeted at securing specific false testimony: that Plaintiff confessed to committing murder. Critically, the desired testimony was given to Gomez by the officers, who knew of its falsity, and not vice versa. The Defendants' argument that "it does not follow that it is unconstitutional for investigating officers to

---

[179] *Brown v. City of Houston*, 297 F.Supp.3d 748, 775 (S.D. Tex. 2017) (citing *Geter v. Fortenberry*, 849 F.2d 1550, 1550 (5th Cir. 1988)).

[180] *Geter*, 849 F.2d 1559 (citing *Manson v. Brathwaite*, 432 U.S. 98 (1977)).

[181] *Id* (citing *Mooney v. Holohan*, 294 U.S. 103 (1935); *Pyle v. Kansas*, 317 U.S. 213 (1942)) (citation omitted).

[182] Third Am. Compl. 27 ¶ 134, 28 ¶ 139, 28–29 ¶ 144, 31 ¶ 157.

[183] *Id.* at 28 ¶¶ 139–40.

[184] *Id.*

[185] *Id.* at 28 ¶ 142.

[186] *Id.* at 30 ¶¶ 150–51.

interrogate witnesses or even to believe that certain witnesses are lying" is unpersuasive.[187]

Plaintiff's allegations describe much more than an interrogation or officers challenging the truth

of a statement. Instead, Plaintiff alleges officers demanded a specific "truth" using threats and

coercion against a witness to obtain known false testimony. Accordingly, the officers are not

protected by qualified immunity and the claim may proceed.

Officers Sanchez and Loya also assert dismissal is proper as their alleged conduct would

constitute a *de minimus* violation without actionable injury to Plaintiff.[188] Although Plaintiff's

third trial ended in acquittal, dismissal of Plaintiff's claims on the basis that he did not suffer

harm is inappropriate. The cases cited by Officers Sanchez and Loya to the contrary are

inapposite as they are based on non-analogous theories of Section 1983 liability.[189] Further, the

violation at issue here is significantly graver than the violations alleged in those cases. Finally,

Plaintiff pleads substantial mental and emotional distress caused by denial of due process.[190]

This is itself compensable under the Act.[191] Therefore, dismissal is not warranted on these

grounds.

---

[187] "Defendant Detective Ray Sanchez' Motion to Dismiss Plaintiff's Third Amended Complaint and Brief in Support Thereof" ("Sanchez's Mot.") 8 ¶ 11, ECF No. 173, filed Dec. 2, 2019; "Defendant Detective Hector Loya's Motion to Dismiss Plaintiff's Third Amended Complaint and Brief in Support Thereof" ("Loya's Mot.") 8 ¶ 11, ECF No. 174, filed Dec. 2, 2019.

[188] *Id.* 13 ¶ 16.

[189] *See Hudson v. McMillian*, 503 U.S. 1, 10 (1992) (holding *de minimus* use of physical force not to violate the Eighth Amendment's prohibition on cruel and unusual punishment); *Cortese v. Black*, 87 F.3d 1327 (10th Cir. 1996) (holding illegal seizure of a pornographic videotape lasting for a few hours to be a *de minimus* violation of the Fourth Amendment).

[190] Third Am. Compl. 47 ¶ 192, 51 ¶ 212.

[191] *Carey v. Piphus*, 435 U.S. 247, 264 (1978).

Plaintiff also alleges Officers Loya and Sanchez violated his Fourth Amendment right to be free from deprivation of liberty and detention without probable cause.[192] The Fourth Amendment protects against pre-trial deprivation of liberty without probable cause, even if the legal process has begun.[193] Prior to Plaintiff's initial detention, the officers who arrested Plaintiff themselves are alleged to have falsified the entire body of evidence supporting Plaintiff's arrest and dentition. If true, the Fourth Amendment violation is clear. As the Supreme Court succinctly stated: an arrest based on falsified evidence fits a Fourth Amendment claim "hand in glove."[194]

The connection between Plaintiff's renewed detention prior to his third trial and the falsified evidence is less clear. At the time Officers Loya and Sanchez are alleged to have fabricated Gomez's statement, Plaintiff had already been tried and found guilty of the murders of England and Lazo. The trial court that reviewed this conviction found Plaintiff, Williams, and Gonzalez were subject to "illegal and coercive methods" and that their confessions were "completely unreliable."[195] The court concluded that "the new evidence presented at the writ hearing adequately meets the standard to demonstrate Villegas' actual innocence."[196] Plaintiff's confession was excluded altogether from the third trial.[197] However, Plaintiff does not say whether the other "completely unreliable statements" were also excluded. He also does not account for other evidence on which his conviction was based, for example, Rangel's

---

[192] Third Am. Compl. 50 ¶ 209.

[193] *Manual v. City of Joliet*, 137 S. Ct. 911, 919–20 (2017).

[194] *Id.* at 917.

[195] Third Am. Compl. 26 ¶ 127.

[196] *Id.*

[197] *Id.* 26 ¶ 129.

testimony.[198] Presumably this evidence was not suppressed and could have supported Plaintiff's continued detention prior to his third trial. This is an uncertainty we do not need to resolve as the false statement obtained by Officers Sanchez and Loya could have supported continued prosecution and pretrial detention of Plaintiff alone. Accordingly, Plaintiff has stated a claim under Section 1983 against Officers Loya and Sanchez for the violation of the Fourth Amendment alleged in Count IV.

### ii. Failure to Intervene (Count V)

Plaintiff alleges Officer Loya knew of and collaborated with Officer Sanchez to fabricate testimony for Gomez that would implicate Plaintiff.[199] Officer Loya expressly acknowledged the falsity of the testimony.[200] Officer Sanchez informed Officer Loya of steps he took to extract the false testimony from Gomez.[201] Officer Loya was an officer responsible for conducting the investigation and was aware of the misconduct, therefore Officer Loya had the opportunity to prevent it. Officer Loya failed to act. Accordingly, Plaintiff stated a claim for bystander liability against Officer Loya.

Similar logic applies to Officer Sanchez. Officer Loya was an active participant in fabricating testimony. Sanchez could have acted at any time to prevent Officer Loya from

---

[198] *See Id.* at 24 ¶ 117.

[199] Third Am. Compl. 28 ¶¶ 137–38.

[200] *Id.* at 30 ¶ 150.

[201] *Id.* at 28 ¶ 143.

fabricating testimony. Sanchez also failed to act to prevent misconduct. Therefore, Plaintiff states a facially plausible claim against Sanchez for bystander liability.

### i. Section 1983 Conspiracy (Count VI)

Loya and Sanchez assert there are "no supporting facts to show what [either officer] did to effectuate any piece of the alleged conspiracy."[202] However, Plaintiff successfully pleads facts indicating the officers' coercion and fabrication of Gomez's statement was in furtherance of an agreement to secure Plaintiff's conviction. He states Officers Loya and Sanchez agreed to fabricate false evidence.[203] To that end, they agreed to obtain a false inculpatory statement from Gomez.[204] The officers together fabricated a false statement to give Gomez, which Gomez adopted under pressure.[205] Taken as true, these facts establish Officers Loya and Gomez acted to deprive Plaintiff of due process of law pursuant to their agreement. Therefore, Plaintiff has stated a claim for civil conspiracy under Section 1983.

### C. City of El Paso

Plaintiff sued the City of El Paso under Section 1983 alleging violations of his Fourth, Fifth, and Fourteenth Amendment rights. He also asserts a Section 1983 claim for "failure to intervene" and a Section 1983 civil conspiracy claim. The City moves to dismiss all claims against it. It also moves to dismiss "Plaintiff's State Law Indemnity Claim."[206] However, as no such claim exists,[207] this request will be denied as moot.

---

[202] Sanchez's Mot. 13 ¶ 15; Loya's Mot. 12 ¶ 15.

[203] Third Am. Compl. 134.

[204] *Id.* at 28 ¶ 138.

[205] *Id.* at 28 ¶¶ 143–44.

[206] *See* "Defendant City of El Paso's Rule 12 Motion to Dismiss Plaintiff's Third Amended Complaint" ("City's Mot.") 19 ¶ 35, ECF No. 161, filed Nov. 4, 2019.

[207] The court dismissed this claim. *See* Order on R&R 16.

1.    Fifth Amendment (Count II)

Plaintiff's Fifth Amendment claim is based on the allegation that officers coerced his confession in violation of his right against self-incrimination.[208] In support of its motion, the City argues it cannot be liable for violations of the Fifth Amendment because it is not a federal actor.[209] For support, it cites *Jones v. City of Jackson* for the proposition that "the Fifth Amendment applies only to violations of constitutional rights by the United States or a federal actor."[210] However, *Jones* refers to the Fifth Amendment's due process clause, which is not at issue here.[211] It is well established state actors violate a criminal defendant's Fifth Amendment's rights against self-incrimination when they coerce an involuntary confession that they then use against the defendant.[212] Accordingly, the City's argument for dismissal of Plaintiff's Fifth Amendment claim is unsupported.

2.    Fourth and Fourteenth Amendment Violations (Counts I, III, and IV)

Plaintiff alleges Fourth and Fourteenth Amendment claims based on deprivation of liberty and detention without probable cause.[213] He also alleges Fourteenth Amendment due process violations stemming from officers withholding exculpatory evidence, fabricating false statements and reports, and using coercive interrogation techniques to produce a false

---

[208] *Id.* at 48 ¶ 196.

[209] *See* City's Mot. 15 ¶ 21.

[210] *See id.* at 22; *see also Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000).

[211] *See Jones*, 203 F.3d at 880.

[212] *See Chavez v. Martinez*, 538 U.S. 760, 766 (2003) ("The Fifth Amendment, made applicable to the States by the Fourteenth Amendment, requires that "[n]o person . . . shall be compelled *in any criminal case* to be a *witness* against himself.") (citations omitted); *see also, e.g., Edmonds v. Oktibbeha County*, 675 F.3d 911, 914 (5th Cir. 2012) (applying the Fifth Amendment right against self-incrimination to a confession during a custodial interrogation by county actors).

[213] Third Am. Compl. 50 ¶¶ 209–10.

confession.[214]   Plaintiff presents two theories of municipal liability for the various constitutional

violations alleged.   He asserts the El Paso Police Department: (1) had a policy of coercing and

falsifying witness statements and suppressing evidence;[215] and (2) failed to adequately train or

supervise its officers on how to properly conduct investigations.[216]

The first inquiry in any Section 1983 suit is to identify whether the plaintiff has been

deprived of a right secured by the Constitution.[217]   The court already engaged in this analysis in

the discussion of officer conduct.   Therefore, the court now addresses only whether the City can

be held liable.

> i.      *Municipal Policy Liability*

A municipality is a "person" subject to suit under Section 1983.[218]   However,

municipalities cannot be held liable for employees' conduct under Section 1983 based upon a

theory of vicarious liability.[219]   "Instead, it is when execution of a government's policy or

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury that the government as an entity is responsible under §

1983."[220]   Municipal liability under Section 1983 requires proof of three elements: (1) a

---

[214] *Id.* at 46 ¶¶ 187–89, 49 ¶¶ 203–04.

[215] *Id.* at 33 ¶ 168.

[216] *Id.* 43 ¶ 179.

[217] *Manuel v. City of Joliet*, 137 S. Ct. 911, 918 (2017) (citing *Albright v. Oliver*, 510 U.S. 266, 271 (1994)).

[218] *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978).

[219] *See id.* at 694.

[220] *Id. See also Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009) ("[A municipality] is liable only for acts directly attributable to it 'through some [sort of] official action or imprimatur.'") (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom.[221]

An official policy may be established in two ways. First, an official policy is established if the local entity "is alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'"[222] Alternatively, municipal liability may attach where "the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval."[223] A custom or policy required to impose municipal liability under Section 1983 cannot ordinarily be inferred from a single constitutional violation.[224] Rather, municipal Section 1983 liability requires "persistent, often repeated, constant violations."[225] A city cannot be liable for an unwritten custom unless a city policymaker had "[a]ctual or constructive knowledge of such custom."[226]

A policymaker is "one who takes the place of the governing body in a designated area of city administration."[227] He or she must "decide the goals for a particular city function and devise

---

[221] *Cox v. City of Dallas*, 430 F.3d 734, 748–49 (5ᵗʰ Cir. 2005) (*citing Piotrowski,* 237 F.3d at 578 (citation omitted)).

[222] *City of St. Louis v. Praprotnik,* 485 U.S. 112, 121 (1988) (quoting *Monell,* 436 U.S. at 690).

[223] *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 690–91).

[224] *Piotrowski,* 237 F.3d at 581 (citing *Webster v. City of Houston,* 735 F.2d 838, 851 (5th Cir. 1984) (en banc)).

[225] *Id.* at 581 (citing *Bennett v. City of Slidell,* 728 F.2d 762, 768 (5th Cir. 1984) (en banc)).

[226] *Peña v. City of Rio Grande City,* 879 F.3d 613, 623 (5th Cir. 2018) (citing *Hicks-Fields,* 860 F.3d 803, 808 (5th Cir. 2017)).

[227] *Webster,* 735 F.2d at 841.

the means of achieving those goals."[228] A chief of police may be a policymaker, especially with respect to the internal affairs of a police department.[229]

Plaintiff claims the police misconduct enumerated above was undertaken pursuant to the City's official policy as established by custom and practice.[230] Plaintiff asserts Officers Marquez, Arbogast, Ortega, Graves, Loya, Sanchez, and perhaps others both individually and cooperatively coerced false confessions and witness statements from himself and seven different individuals: Hernandez, Johnston, Jauregi, Rangel, Williams, Gonzalez, and Gomez.[231] Each statement was obtained by similar threats of incarceration and physical and sexual violence. This effort was coordinated at every step to produce evidence implicating Plaintiff and excluding all other suspects.[232] The above-named officers falsified statements and destroyed evidence indicating Plaintiff was not informed of his *Miranda* rights prior to his confession.[233] They and Officer Bellows suppressed potentially exculpatory evidence that implicated other suspects.[234] The many violations demonstrate a prolonged coordinated effort by multiple El Paso police officers to violate Plaintiff's constitutional rights. This effort preceded Plaintiff's 1995 conviction and extended more than two decades to his 2018 trial.[235]

---

[228] *Bennett*, 728 F.2d at 769.

[229] *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168 (5th Cir. 2010) (holding the chief of police to be a policymaker for the purposes of establishing municipal liability where "the chief of police is the sole official responsible for internal police policy.").

[230] Third Am. Compl. 33 ¶ 167.

[231] *See id.* at 4 ¶ 24, 7 ¶¶ 32–33, 7–9 ¶¶ 39–43, 11 ¶¶ 52–53, 13 ¶¶ 67–69, 14–16 ¶¶ 75–80, 29 ¶¶ 144–45.

[232] Third Am. Compl. at 10 ¶ 50, 12 ¶ 56, 12–13 ¶ 63, 15 ¶ 78, 22 ¶ 111, 27 ¶ 136.

[233] *Id.* at 15 ¶ 77.

[234] *Id.* at 24 ¶ 116.

[235] Plaintiff dedicates several pages of his complaint to enumerating disparate allegations of misconduct against the El Paso police department spanning decades. Many of these allegations bear no clear connection to any officer or policy implicated in the present case. However, this case alone is a case study in pattern and practice.

The City attempts to characterize this plethora of constitutional violations as a single incident violating only Plaintiff's rights and therefore insufficient to demonstrate "persistent, often repeated, constant violations" as required to establish municipal liability.[236] However, considered in their entirety, these facts establish a pattern of similar violations that is a far cry from a single incident of abuse of authority by one wayward officer. The sheer number of abuses alleged and the degree of coordinated involvement of multiple members of the El Paso police department show a plausible accepted standard of practice within the department rising to the level of unwritten custom.[237]

The City also asserts Plaintiff fails to identify a policymaker responsible for this conduct.[238] However, Fifth Circuit precedent indicates that a police chief may be an official policymaker.[239] Even if Plaintiff does not say the magic words naming the Chief of the El Paso Police Department as the relevant policy maker, all of the violations alleged come from within the police department and Plaintiff pleads these violations are the product of policies implemented by "command personnel."[240] The Chief of Police is clearly command personnel. Therefore, the City is sufficiently on notice of the nature of the claim.

Plaintiff pleads the police department's leadership had actual knowledge of unconstitutional practices.[241] Additionally, the extensive coordination by various members of the police department allows the court to draw the reasonable inference that a policymaker had at

---

[236] City's Reply 7 ¶ 13; *See Piotrowski v. City of Houston,* 237 F.3d 567, 581 (5th Cir. 2001).

[237] *See Peña v. City of Rio Grande City,* 879 F.3d 613, 623 (5th Cir. 2018).

[238] City's Reply 7 ¶ 13.

[239] *Zarnow v. City of Wichita Falls,* 614 F.3d 161, 168 (5th Cir. 2010).

[240] *See* Third Am. Compl. 42 ¶¶ 176–77.

[241] *Id.*

least constructive knowledge of the misconduct alleged.[242] Even assuming the Chief of Police did not actually know that a minimum of seven officers under his command coordinated to coerce false statements from eight individuals and destroyed evidence undermining the prosecution's theory of the case, the breadth of malfeasance indicates he or other command personnel had constructive knowledge. Plaintiff pleads numerous instances of fabricated and suppressed evidence: four witness statements implicating other suspects,[243] four confessions by other suspects,[244] destruction of a possible murder weapon,[245] and evidence tying a suspect who confessed to the murder weapon.[246] In sum, Plaintiff pleads sufficient facts to state a claim for municipal liability under an implied policy theory.

ii.    *Municipal Failure-to-Train Liability*

Plaintiff also contends the City failed to adequately train officers to conduct criminal investigations.[247] Failure-to-train liability requires a plaintiff to prove "1) the [city] failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights."[248]

---

[242] *See Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (A city cannot be liable for an unwritten custom unless a city policymaker had "[a]ctual or constructive knowledge of such custom.").

[243] Third Am. Compl. 20 ¶ 100.

[244] *Id.* at 22 ¶ 113.

[245] *Id.* at 19 ¶ 96.

[246] *Id.* at 18 ¶ 92.

[247] *Id.* at 42–45 ¶¶ 178–81.

[248] *Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001)).

Deliberate indifference is a stringent standard of fault—requiring proof that a municipal actor disregarded a known or obvious consequence of his action.[249] A plaintiff usually must "demonstrate a pattern of violations and that the inadequacy of the training is 'obvious and obviously likely to result in a constitutional violation.'"[250] This requirement is intended to ensure decisionmakers are on notice that training is deficient and consciously disregard the consequences of their inaction.[251]

Plaintiff identifies several key deficiencies in officer training in the years leading up to the El Paso Police Department's investigation. He asserts there was no training to ensure officers conducting interviews and interrogations did not use tactics such as physical violence and psychological coercion.[252] Further, there was no training on properly documenting investigations and preserving evidence for future review.[253] Besides training deficiencies, Plaintiff also describes a lack of supervisor oversight or disciplinary mechanisms.[254] He claims a "code of silence" existed among officers that effectively eliminated accountability.[255] Officers were rewarded exclusively for closing cases and were encouraged to cover up misconduct.[256] Taken as true, these facts clearly indicate a failure to train and supervise.

---

[249] *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997).

[250] *Brown v. Callahan*, 623 F.3d 249 (5th Cir. 2010) (quoting *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005)) (citations omitted).

[251] *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

[252] Third Am. Compl. 43 ¶ 178.

[253] *Id.* at 43–44 ¶ 179.

[254] *Id.* at 44–45 ¶¶ 181–83.

[255] *Id.* at 44 ¶ 181.

[256] *See id.* at 45 ¶¶ 181–82.

The second element, causation, is also sufficiently pleaded. There is a clear causal connection between failure to instruct police officers on proper interrogation techniques and the failure of those officers to use appropriate techniques and to substitute coercion. Similar logic applies to the officer's failure to correctly preserve evidence and document the investigation. This connection is not merely conclusory. The court may infer causation from a pattern of multiple incidents of misconduct by multiple officers.[257] While the language of the complaint is somewhat broad with respect to the then-existing supervisory practices, more specificity is neither possible nor necessary at this phase. It is sufficient to claim the existence of a code of silence and an absence of oversight mechanisms in combination with misconduct.

Policy makers were deliberately indifferent to their failure to train or supervise officers. First, the repeated, blatant violations alleged in this case stretch from 1993 to Plaintiff's 2018 trial. This establishes a pattern of constitutional violations. Second, failure to train officers on the critical tasks of interrogation and evidence preservation is both obviously inadequate and would obviously result in constitutional violations. Adequate performance of these tasks is essential both to the fundamental truth-finding function of police work and to preserving the constitutional rights of those detained for questioning. Therefore, it should have been apparent to policymakers that such training was necessary. The same inadequacies exist in a supervisory system that rewards closing cases at all costs while turning a blind eye to perjury. Such a system reflects a deliberate determination not to supervise officers and disregard the consequences. In sum, Plaintiff sufficiently pleads both theories of municipal liability under Section 1983.

---

[257] *See Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (citing *Rodriguez v. Avita*, 871 F.2d 552, 554–55 (5th Cir. 1989) (a pattern of similar incidents may establish municipal failure to train liability under Section 1983)).

### 3.    Failure to Intervene (Count V)

Failure to intervene, or bystander liability, under Section 1983 holds responsible an "officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force."[258]  It is a form of secondary liability allowing victims of constitutional violations to seek redress from an officer other than the one whose misconduct constituted a constitutional violation.[259]  In contrast, cities are held accountable via *Monell* for officers' constitutional violations only where city policy is the moving force behind officer misconduct.[260]  Municipalities may not be held liable under Section 1983 on a basis of vicarious liability.[261]  Instead, municipalities are directly liable only for their own illegal acts.[262]

In this case, Plaintiff alleges defendant officers failed to intervene to protect him from other officers' misconduct and are therefore liable as bystanders.[263]  He claims the City is also responsible under this theory through the *Monell* framework, by virtue of an informal policy encouraging officers to turn a blind eye to constitutional violations and become bystanders.[264]

This is a novel application of bystander liability that would extend secondary liability to municipalities and undermine long-standing law rejecting the imposition of vicarious liability. Where traditionally the City could be held liable only for constitutional violations resulting directly from its policies, this theory would hold the city liable for inaction even if the factfinder

---

[258] *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).

[259] *See, e.g., Hamilton v. Kindred*, 845 F.3d 659 (5th Cir. 2017).

[260] *See Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978).

[261] *Hicks-Fields v. Harris County*, 860 F.3d 803, 808 (5th Cir. 2017).

[262] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell,* 436 U.S. at 694).

[263] Third Am. Compl. 51 ¶ 251.

[264] Resp. 38.

determines the City is not responsible for the underlying constitutional violation. The court declines to extend the law in this manner. Therefore, even assuming Plaintiff pleaded facts demonstrating an informal policy of acquiescence, there is no claim for municipal liability on this basis.

### 4.    Section 1983 Civil Conspiracy (Count VI)

The City contends the intracorporate conspiracy doctrine bars a Section 1983 conspiracy claim against it.[265] It is a long-standing rule in the Fifth Circuit that a "corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation."[266] This doctrine also applies to other legal entities, such as municipalities and subdivisions of local governments.[267] This rule bars conspiracies by state actors to violate civil rights.[268]

Some courts have found an exception to this doctrine where coconspirators act outside the scope of their employment, their actions exceed their authority, or they have engaged in unauthorized acts.[269] As the coconspirators are not acting pursuant to the authority of the legal entity they serve, those acts cannot be attributed to the entity and there is no problem of the

---

[265] City's Reply 9 ¶ 12.

[266] *Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994) (applying the intracorporate conspiracy doctrine to a Section 1985 conspiracy claim against a school board and its members) (citing *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952), *cert. denied,* 345 U.S. 925 (1953)).

[267] *See id.*

[268] *See, e.g., Hilliard,* 30 F.3d at 653 (holding the intracorporate conspiracy doctrine barred a Section 1985 conspiracy claim against a school board and its members); *Marceaux v. Lafayette City-Par. Consol. Gov't,* 921 F.Supp.2d 605, 643 (W.D. La. 2013) (holding the intracorporate conspiracy doctrine bars a Section 1985 conspiracy claim against a City and its employees); *Thompson v. City of Galveston,* 979 F.Supp. 504, 511 (S.D. Tex. 1997) ("A single legal entity, such as the Galveston Police Department and its officers, is incapable of conspiring with itself for the purposes of § 1983.").

[269] *See Buschi v. Kirven,* 775 F.2d 1240, 1252–53 (4th Cir. 1985); *Cross v. Gen. Motors Corp.,* 721 F.2d 1152, 1156 (8th Cir. 1983), *cert. denied,* 466 U.S. 980, 104 S. Ct. 2364, 80 L.Ed.2d 836 (1984); *Denney v. City of Albany,* 247 F.3d 1172, 1190 (11th Cir. 2001); *ASARCO LLC v. Americas Min. Corp.,* 382 B.R. 49, 81 (S.D. Tex. 2007).

entity conspiring with itself. Therefore, under this exception, coconspirators may have engaged in an actionable civil conspiracy despite belonging to the same legal entity.

In this case, all defendant officers are employees of the same governmental entity: the El Paso Police Department. Therefore, under the intracorporate conspiracy doctrine, they are incapable of conspiring with one another in violation of Section 1983. If its officers are legally incapable of conspiring, there is no underlying constitutional violation to support a *Monell* claim that the violation occurred pursuant to City policy. Thus, without an exception to the doctrine, the City cannot be held liable for its officers' civil conspiracy.

Plaintiff urges that the defendant officers acted outside the scope of their authority and without authorization.[270] According to Plaintiff, the exception to the intracorporate conspiracy doctrine applies. If the officers acted outside the scope of their employment or exceeded the authority given to them by city policy, then the officers may well fall into this exception to the intracorporate conspiracy doctrine and incur liability. However, pursuant to *Monell*, a city is responsible under Section 1983 only for its own misconduct in providing the moving force to unconstitutional conduct in the form of its policies.[271] If the City fails to provide the moving force, it can no longer be liable under *Monell* for the misconduct of its employees. Therefore, regardless of whether the exception applies, the result is the same. The officers either acted within the scope of their employment with the City pursuant to its policies and the intracorporate conspiracy doctrine bars liability or they acted without authorization and therefore do not meet the requirements of *Monell*. Accordingly, Plaintiff fails to state a claim in Count VI against the City.

---

[270] Resp. 60.

[271] *See Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978).

## IV.   CONCLUSION

In accordance with the above discussion, the court enters the following orders:

1.    It is **HEREBY ORDERED** that "Defendant Alfonso Marquez's Rule 12(b) Motion to Dismiss Plaintiff's Third Amended Complaint" [ECF No. 170] is **DENIED**.

2.    It is **FURTHER ORDERED** that "Defendant Carlos Ortega's Federal Rule of Civil Procedure 12(b)(6) Motion to Dismiss Plaintiff's Third Amended Complaint" [ECF No. 171] is **DENIED**.

3.    It is **FURTHER ORDERED** that "Defendant Officer Earl Arbogast's Motion to Dismiss Plaintiff's Third Amended Complaint and Brief in Support Thereof" [ECF No 172] is **DENIED**.

4.    It is **FURTHER ORDERED** that "Defendant Officer Scott Graves' Motion to Dismiss Plaintiff's Third Amended Complaint and Brief in Support Thereof" [ECF No. 175] is **DENIED**.

5.    It is **FURTHER ORDERED** that "Defendant Kemmett Bellows' Rule 12(b)(6) Motion to Dismiss Plaintiff's Third Amended Complaint" [ECF No. 162] is **GRANTED AS TO COUNT IV AND DENIED AS TO COUNTS I, II, III, V, AND VI.**

6.    It is **FURTHER ORDERED** that "Defendant Detective Hector Loya's Motion to Dismiss Plaintiff's Third Amended Complaint and Brief in Support Thereof" [ECF No. 174] is **DENIED**.

7.    It is **FURTHER ORDERED** that "Defendant Detective Ray Sanchez' Motion to Dismiss Plaintiff's Third Amended Complaint and Brief in Support Thereof" [ECF No. 173] is **DENIED**.

8.    It is **FURTHER ORDERED** that "Defendant City of El Paso's Rule 12 Motion to Dismiss Plaintiff's Third Amended Complaint" [ECF No. 161] is **GRANTED AS TO COUNTS V AND VI AND DENIED AS TO COUNTS I, II, III, AND IV.**

**SIGNED AND ENTERED** this ____28____ day of **February, 2020.**

**FRANK MONTALVO**
**UNITED STATES DISTRICT JUDGE**