# ATTACHMENT 2

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
| --- | --- | --- |

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
| --- | --- | --- |
| DANIEL VILLEGAS, | § | |
| | § | |
| v. | § | Cause No. EP-15-cv-00386-DCG |
| | § | |
| CITY OF EL PASO, et al. | § | |

## DEFENDANT CITY OF EL PASO'S RESPONSE TO PLAINTIFF'S PROPOSED UNDISPUTED FACTS

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
| --- | --- | --- |
| 1. John Scagno was a policymaker for the City as Chief from February 1987 to May 1994.<br>DSUF ¶¶ 24, 26 (City admission) | Undisputed | |
| 2. Other Chiefs of Police were policymakers for the City prior to and after Scagno's tenure as Chief<br>DSUF ¶ 24 (defining Chief of Police as Policymakers) | Undisputed | |
| 3. Assistant Chief Messer was also a policymaker for the City from December 1976 to May 1994, which included periods when he acted as the Chief's surrogate and exercised delegated authority over Internal Affairs and a term as interim chief.<br>DSUF ¶¶ 36-39 (describing Messer's authority over Internal Affairs during these | Undisputed | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| time periods.<br>Ex. 10, Deposition of Joseph Messer at 14:18–15:3; 17:11–19 (Messer was Scagno's surrogate); 30:16–31:8 (Messer created policy with the concurrence of the Chief); 224:2–10 (internal affairs "was delegated" to Messer). | | |
| 4. The City recognized that the whole reason for different juvenile policies is that juveniles may be more vulnerable than adults.<br>Ex. 2, Moton Dep at 184:25–185:6. | Undisputed | |
| 5. The City cannot say that any particular trainings session was provided to all of the detectives in CAP<br>Ex. 2, Moton Dep at 111:9–12 | Disputed.   All officers at EPPD receive some training on how to work with juveniles. | Ortega Depo 82:1-6; 82:17-21; 91:6-15; 101:8-10; 107:11-16. |
| 6. Defendant Marquez was not trained on EPPD's juvenile policies or juvenile rights from 1988-1995<br>Ex. 25, Marquez Training at 4-5 (showing no training on those topics from 1988 - 1995).<br>Ex. 30, Marquez Dep at 54:3–10 | Disputed.   All officers at EPPD receive some training on how to work with juveniles. | Ortega Depo 82:1-6; 82:17-21; 91:6-15; 101:8-10; 107:11-16. |
| 7. Defendant Arbogast was not trained on EPPD's juvenile policies or juvenile rights from 1989 – 1995<br>Ex. 26, Arbogast Training at 8–9 (showing no training on those topics from 1989 - 1995).<br>Ex. 22, Earl Arbogast Dep at 103:19–22, 108:9–109:15 | Disputed.   All officers at EPPD receive some training on how to work with juveniles.<br>In Arbogast's deposition the excerpts in Plaintiff's exhibit does not discuss nor say Arbogast was not trained on EPPD's juvenile policies or rights.   The discussion was interrogating juveniles | Ortega Depo 82:1-6; 82:17-21; 91:6-15; 101:8-10; 107:11-16. |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 8. Defendant Graves not trained on EPPD's juvenile policies or juvenile rights from 1988 – 1995<br>Ex. 27, Graves Training at 8-10 (showing no training on those topics from 1988 - 1995).<br>Ex. 31, Graves Dep at 76:11–14 | Disputed.  All officers at EPPD receive some training on how to work with juveniles. | Ortega Depo 82:1-6; 82:17-21; 91:6-15; 101:8-10; 107:11-16. |
| 9. The only trainings provided to CAP detectives in 1993 were discretionary state-mandated trainings on use-of-force and firearms; city-mandated trainings on sexual harassment and El Paso policies; and external trainings which would not have included City of El Paso policies.<br>Ex. 2, Moton Dep at 40:13–40:22; 46:9–48:5. | Disputed.  All officers at EPPD receive some training on how to work with juveniles. | Ortega Depo 82:1-6; 82:17-21; 91:6-15; 101:8-10; 107:11-16. |
| 10. EPPD's policy was that parental consent or parental presence was required before juvenile confessions could be taken.<br>Ex. 10, Messer Dep at 109:23–110:1 | Undisputed | |
| 11. EPPD's policy was that parents also needed to be notified before juvenile witness statements or confessions could be taken, and that such permission must be documented<br>Ex. 10, Messer Dep at 109:23–110:1<br>Ex. 22, Earl Arbogast Dep at 258:7–258:13 (important to document parental permission for juvenile questioning) | Undisputed | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 12. Detective Marquez believed he had no responsibility to contact parents after arresting a juvenile.<br>Ex. 30, Marquez Dep at 263:1–7 | Disputed.  This page and number is not part of Exhibit 30 | |
| 13. Defendant Scott Graves was not aware of any policy requiring parental permission before taking juvenile statements.<br>Ex. 27, Graves Dep at 36:25–37:8. | Disputed.  All officers at EPPD receive some training on how to work with juveniles. | Ortega Depo 82:1-6; 82:17-21; 91:6-15; 101:8-10; 107:11-16. |
| 14. Det. Arbogast believed no parental permission was necessary to interrogate a juvenile suspect.<br>Ex. 22, Earl Arbogast Dep at 102:6–17<br>Ex. 34, Earl Arbogast Errata (changing 102:9 from "no" to "yes" and adding "I can question a juvenile suspect taken into custody."). | Disputed.  Arbogast stated that sometimes you had a parent's permission to interrogate a juvenile, and if there wasn't a parent nearby you would try to contact that parent as it was important to document to permission from the parents. | Plaintiff's Ex. 22, 102:10-20 |
| 15. Det. Arbogast believed juveniles had no right to have a parent present when questioned—he believed the only requirement was notification.<br>Ex. 22, Earl Arbogast Dep at 101:19–25. | Disputed.  Arbogast stated that sometimes you had a parent's permission to interrogate a juvenile, and if there wasn't a parent nearby you would try to contact that parent as it was important to document to permission from the parents. | Plaintiff's Ex. 22, 102:10-20 |
| 16. Defendant Carlos Ortega – who was specifically trained as a juvenile officer - believed that juveniles could be interviewed with permission of a Juvenile Probation Defendant officer, even without parental permission, and even though | Undisputed. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| he could not recall seeing such a policy.<br>Ex. 32, Ortega Dep at 83:20–84:20. | | |
| 17. James Arbogast – who was involved in a disciplinary action involving widespread juvenile policy violations, CP 93-009 – did not believe parental permission was required to take juvenile confessions.<br>Ex. 33, James Arbogast Dep at 30:17–24. | Disputed.  All officers at EPPD receive some training on how to work with juveniles. | Ortega Depo 82:1-6; 82:17-21; 91:6-15; 101:8-10; 107:11-16. |
| 18. In the Lazo-England murder investigation, Defendants Marquez and Ortega interrogated juveniles Michael Johnston and Jacob Jauregui without parental permission.<br>Ex. 6, Allio Report at 20–21, 48. | Disputed.  They interviewed them. | Attachment 2-A, Marquez Depo, 106:22-107:2 |
| 19. In the Lazo-England murder investigation, Defendants picked up and took a statement from Rodney Williams, a juvenile, without parental notice or permission<br>Ex. 6, Allio Report at 48.<br>Ex. 22, Arbogast Dep at 204:12–206:16.<br>Ex. 80, 06.23.2011, Williams testimony at 14:19–15:7. | Disputed.  In Plaintiff's Exhibit 22 there is no pages 204-206 | |
| 20. In the Lazo-England murder investigation, Defendants interrogated Plaintiff, a juvenile, regarding a murder without parental permission.<br>Ex. 6, Allio Report at 49 (noting, after reviewing the file, that no parental | Disputed.  Graves is being questioned about whether permission was sought to interrogate Plaintiff and Graves responded that he does not "recall". | Plaintiff's Ex. 31, 153:1–12. |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| permission was documented from Daniel's parents to interrogate him).<br>Ex. 31, Graves Dep at 153:1–12. | | |
| 21. Defendant Ortega received no training on interview techniques appropriate for use with juveniles to avoid coercion or undue pressure<br>Ex. 28, Ortega Training at 4-6.<br>Ex. 32, Ortega Dep at 90:19–91:5. | Disputed. All officers at EPPD receive some training on how to work with juveniles. | Ortega Depo 82:1-6; 82:17-21; 91:6-15; 101:8-10; 107:11-16. |
| 22. The City's policy required juvenile interrogations to be conducted by juvenile officers ("youth services" officers) in most circumstances.<br>Ex. 2, Moton Dep at 184:7–24, 185:7–14. | Disputed. In Moton's deposition it states "when possible" interrogation of a juvenile suspect is conducted by youth services. | Plaintiff's Exhibit 2, 184:10-12 |
| 23. The City's policy required juvenile officers to remain with juveniles for the entirety of juvenile interrogations.<br>Ex. 2, Moton Dep at 185:15–18. | Undisputed | |
| 24. Detective Marquez ignored the policy of having youth services interrogate a suspect "because I'm the one that's investigating the crime." Despite ignoring that policy throughout his career, he was never investigated or disciplined for that failure.<br>Ex. 30, Marquez Dep at 69:1–16.<br>Ex. 11, Marquez Personnel | Disputed. | Attachment 2-A, Marquez Depo, 70:4-10 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| file.<br>Ex. 12, Marquez IA Card. | | |
| 25. Defendant Arbogast was not aware of a single case where youth services officers interrogated juvenile suspects, even though that was EPPD policy.<br>Ex. 22, Earl Arbogast Dep at 108:19–109:15. | Undisputed. | |
| 26. Defendant Graves admitted he usually interrogated juvenile suspects himself and did not mention a single case where he turned over the interrogation to a juvenile officer.<br>Ex. 31, Graves Dep at 31:22–32:7. | Undisputed. | |
| 27. Defendant Ortega - a juvenile officer at the time of Plaintiff's arrest - was never trained to consider the intelligence, mental health conditions, or mental disabilities of a juvenile.<br>Ex. 32, Ortega Dep at 91:24–92:4. | Disputed.  All officers at EPPD receive some training on how to work with juveniles. | Ortega Depo 82:1-6; 82:17-21; 91:6-15; 101:8-10; 107:11-16. |
| 28. Defendants Marquez and Graves weren't trained that juveniles were more susceptible to coercion than adults – even though that fact was well known by 1993.<br>Ex. 30, Marquez Dep at 54:3–10.<br>Ex. 31, Graves Dep at 76:11–14.<br>Ex. 6, Allio Report at 48. | Disputed.  All officers at EPPD receive some training on how to work with juveniles. | Ortega Depo 82:1-6; 82:17-21; 91:6-15; 101:8-10; 107:11-16. |
| 29. Defendant Arbogast believed it was not necessary to use different techniques | Undisputed | |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| with juveniles than you would with adults.<br>Ex. 22, Earl Arbogast Dep at 103:15–22. | | |
| 30. In the internal affairs complaint IA 88-041, on March 4, 1988 EPPD officers detained a 13-year-old boy in a movie theater to question him about a criminal mischief complaint.<br>Ex. 35, IA 88-41, at 68517–68518. | Disputed. Did not happen at a movie theater, but in the mall bathrooms and there was no custodial interrogation. | See City's Reply Proposed Undisputed Facts paragraphs 4-5 |
| 31. In IA 88-041, three officers questioned a thirteen-year-old boy in a closed office, swearing at him and assaulting him. Despite questioning the boy and attempting to obtain a confession through threats and force, the officers never read the boy his rights or took him to a magistrate judge for reading of Miranda rights.<br>Ex. 35 at CITY 68555–56. | Disputed.  The investigation found that these allegations were unfounded. | See City's Reply Proposed Undisputed Facts paragraphs 32-33 |
| 32. EPPD's policy was for suspects to sign Miranda cards when they are read their Miranda rights.<br>Ex. 35 at CITY 68555–56. | Undisputed. | |
| 33. In IA 88-041, there is no evidence that the officers ever completed a Miranda card or other paperwork regarding reading the detained suspect juvenile his Miranda rights, even though that was EPPD's policy.<br>Ex. 35 | Disputed. This is Plaintiff's counsel commentary on a complaint file. It is not an undisputed fact. | City's Reply Ex. C |
| 34. The officers in complaint IA 88-041 were never disciplined for their many juvenile policy violations, | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a | City's Reply Proposed Undisputed Facts paragraphs 7, 9, 13, 29 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| including interrogation of a juvenile by a non-juvenile officer, failure to transport to a juvenile facility, failure to contact Youth Services, failure to get parental permission before interrogation, and failure to sign Miranda card before questioning.<br>Ex. 35<br>Ex. 4, Rosenthal Report at 19 n. 15, 232. | subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report.<br><br>There was no custodial interrogation and the matter was investigated finding no policy violations. He was transported to the local police station and turned over to a juvenile officer who turned him over to his parents | |
| 35. The City did not even investigate the officers in IA 88-041 for juvenile policy violations, which were apparent from the face of the complaint.<br>Ex. 35 at CITY 68530-68531.<br>Ex. 4, Rosenthal Report at 19 n. 15, 232. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report.<br><br>There was no juvenile policy violation reported and there was no finding of a policy violation. | City's Reply Ex. C at DEF CITY 70344-70352 |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 36. No discipline was administered in IA 88-041. Ex. 35 Ex. 4, Rosenthal Report at 19 n. 15, 232. | Undisputed, with the clarification that no policy violations or improper conduct were sustained to warrant discipline.<br><br>As to any conclusions drawn from the lack of a need for discipline, disputed.<br><br>As to Rosenthal opinions on this is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude. Further disputed opinions exist in the City's expert report. | |
| 37. In complaint IA 89-015, on January 30, 1989, EPPD officers arrested a 14-year-old without probable cause for a fireworks violation. Ex. 36, IA 89-015 at CITY 70344 - 70352. Ex. 4, Rosenthal Report at 234. | Disputed. This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to | City's Reply Ex. C at DEF CITY 70344-70352 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| | Exclude.  Further disputed opinions exist in the City's expert report. | |
| 38. The City did not even investigate the officers in IA 89-015 for juvenile policy violations, including failing to call a juvenile officer to question the boy, failing to get parental permission, and questioning the boy about a crime without advising him of his constitutional rights or taking him to a magistrate judge for reading of Miranda rights, which were apparent from the face of the complaint. Ex. 36 at CITY 70352. Ex. 4, Rosenthal Report at 19 n.15, 233–235. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report.  Juvenile's parent brought him home and was present while the officers and the fire personnel were asking about the explosion | City's Reply Ex. C at DEF CITY 70344-70352 |
| 39. In IA 89-015, the officers questioned a boy in his backyard and then tackled and arrested him when he tried to run, even though they lacked evidence of his involvement in any crime, as noted by a youth officer Ex. 36 at CITY 70369-70. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report.  They had eyewitnesses who heard the explosion and saw him go | City's Reply Ex. C at DEF CITY 70344-70352 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
|  | to look at the explosion and then flee to the mall.  There was ample probable cause |  |
| 40. In IA 89-015, officers detained a boy for questioning but never read him his rights and no Miranda card or other paperwork was completed. Ex. 36 at CITY 70369 and throughout. | Disputed.  There was no custodial interrogation. | City's Reply Ex. C at DEF CITY 70344-70352 |
| 41. No discipline was administered in IA 89-015. Ex. 4 at 234. Ex. 36 at CITY 70341. | Undisputed, with the clarification that no policy violations or improper conduct were sustained to warrant discipline. | City's Reply Ex. C at DEF CITY 70344-70352 |
| 42. In IA 90-183, on October 24, 1990, James Arbogast (Defendant Earl Arbogast's brother) arrested a crowd of seventeen high school students, including many juveniles, for jeering at and insulting officers making an arrest. Ex. 37, IA 90-183 at CITY 72910, 72937–38. Ex. 4, Rosenthal Report at 241. | Disputed.  Arrest of one of the juveniles was on a warrant, the rest for disorderly conduct | City's Reply Ex. D at DEF CITY 72932-72936 |
| 43. In IA 90-183, Officer Arbogast threatened to "beat the shit" out of the teenagers, and the EPPD described the arrest as "unnecessary." Ex. 37 at CITY 72912, 72953-55. | Disputed | City's Reply Ex. D at DEF CITY 72932-72936 |
| 44. In IA 90-183, the City never investigated or made a decision on juveniles' complaints that they were falsely arrested and threatened by an EPPD officer. No investigation was made and no discipline | Disputed. The City disputes this "undisputed fact" to the extent it constitutes opinion that the City's investigation or actions were improper and not sufficient. | City's Reply Ex. D at DEF CITY 72932-72936 |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| issued for dishonesty by the arresting officer despite evidence that he falsely arrested juveniles en masse, and even though it was plain from the face of the investigative file that many innocent parties, including juveniles, were arrested without cause.<br>Ex. 37 at CITY 72946.<br>Ex. 4 at 244. | | |
| 45. The City's disciplinary decision in IA 90-183 referenced only the subject officer's use of profanity and tactical mistakes, but did not address the more severe complaints of threats, false arrest, and violation of civil rights. The City gave a two-day suspension to offending officer James Arbogast for swearing and tactical mistakes only.<br>Ex. 37 at CITY 72912–72913, 72987-72992. | Disputed. The City disputes this "undisputed fact" to the extent it constitutes opinion that the City's investigation or actions were improper and not sufficient. | City's Reply Ex. D at DEF CITY 72932-72936 |
| 46. In IA 91-029, on February 16, 1991, EPPD officers arrested a 16-year-old and threw him on the floor and handcuffed him. An officer grabbed the teenager's face, questioned him, and threatened to hit him if he didn't cooperate.<br>Ex. 38, IA 91-029 at CITY 79332-79333. | Disputed  Allegations were determined to be unfounded | City's Reply Ex. E at DEF CITY 73233; 73233-73235 |
| 47. In IA 91-029, officers threatened to "make things ruff [sic]" for the teenager if he did not cooperate and also threatened to harm his uncle, thereby interrogating him before taking him to a | Disputed | City's Reply Ex. E at DEF CITY 73233; 73233-73235 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| magistrate judge for reading of Miranda rights. Ex. 38 at CITY 79333. | | |
| 48. In IA 91-029, an officer threatened the complainant juvenile that he needed to sign confession papers confessing to burglary in front of a judge and not to mention anything about being forced to sign them. Ex. 38 at CITY 79333. | Disputed | City's Reply Ex. E at DEF CITY 73233; 73233-73235 |
| 49. In IA 91-029, officers drove the complainant teenager to various houses to obtain additional false confessions from him and fed him information to validate the false confession. Ex. 38 at CITY 79334. | Disputed | City's Reply Ex. E at DEF CITY 73233; 73233-73235 |
| 50. No discipline was administered in IA 91-029 despite numerous juvenile policy violations, including failure to get parental consent or involve juvenile officers. The City also failed to investigate or name as a disciplinary issue whether an officer had instructed the complainant juvenile to lie to a magistrate judge and threatened him if he failed to lie to cover up the officers' misconduct. Ex. 39, IA 91-029 pt 2, at CITY 79314, 79323. Ex. 4, Rosenthal Report at 247, 249. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report.  IA Report shows that this matter was investigated | City's Reply Ex. E at DEF CITY 73233; 73233-73235 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 51. The City did not even investigate the officers in IA 91-029 for juvenile policy violations, including failing to get parental consent to take a statement or confession from a juvenile and failing to involve juvenile officers in a juvenile's questioning and confession, despite obvious juvenile policy violations apparent on the face of the complaint.<br>Ex. 39 at CITY 79314.<br>Ex. 4, Rosenthal Report at 249. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. IA report shows that this matter was investigated | |
| 52. On September 24, 1991, Defendant Alfonso Marquez and other police officers arrested 17-year-old Steven Alvarado for murder.<br>Ex. 40, Alvarado v. State, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995). | Undisputed | City's Reply Ex. F at DEF CITY 84101-84120 |
| 53. Alvarado testified that the officers coerced his confession by cursing at him, striking him in the face with a boot, refusing his requests for a lawyer, and promising leniency if he confessed<br>Ex. 40, Alvarado v. State, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995). | Disputed, Plaintiff has not provided any evidence of Alvarado's testimony. | City's Reply Ex. F at DEF CITY 84101-84120 |
| 54. The City never opened an internal affairs investigation into Alvarado's complaint or took any action to investigate it.<br>Ex. 41, Letter of May 23, 2022 (City agreeing to produce all IA files in | Disputed. Defendant disputes Plaintiff's commentary and conclusions regarding investigations based on document production as "undisputed fact" regarding | City's Reply Ex. F at DEF CITY 84101-84120 |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| categories including coerced statements and confessions, excessive force during interview/interrogation, false arrest, and custodial interrogation from 1988 to 1993 time period. The City produced no complaint relating to Alvarado's allegations). Ex. 42, City's 4th Response to Pl's First RFPs, at 15–17 (agreeing to produce documents responsive to instances in Plaintiff's complaint, including Alvarado's investigations, but producing no documents reflecting an IA investigation into Alvarado's allegations). | whether something occurred. Moreover, there was no reason to open an IA file when there was a judicial finding that the confession was voluntary and not cooerced | |
| 55. In IA 92-019, On January 30, 1992, an off-duty EPPD officer arrested a 15-year-old and accused the teenager of groping his girlfriend on an earlier date. Ex. 43, IA 92-019, at CITY 69528-59. | Disputed.  No arrest was made. No Exhibit 43 was filed with Plaintiff's Response. | City's Reply Ex. G at DEF CITY 69520-69551 |
| 56. In IA 92-019, the subject officer asked the boy about the assault and, after the boy denied knowledge, the officer slapped him in the face and detained him. These questions were asked without taking the boy to a magistrate judge for reading of Miranda rights - a policy violation plain from the face of the complaint. Ex. 43 at CITY 69528. | Disputed.  Defendant disputes Plaintiff's commentary and opinions regarding "policy violations" based on the complaint file itself.  These are opinions, not undisputed facts. | City's Reply Ex. G at DEF CITY 69520-69551 |
| 57. In IA 92-019, a second officer questioned the boy further about the alleged crime in a patrol car without | Disputed.  Defendant disputes Plaintiff's commentary and opinions regarding "policy | City's Reply Ex. G at DEF CITY 69520-69551 |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| calling a juvenile officer or getting parental consent in violation of the City's policies. These questions were also asked without taking the boy to a magistrate judge for reading of Miranda rights. The City never investigated or initiated discipline based on those policy violations; the only investigation initiated was for excessive force. The policy violations were plain from the face of the complaint.<br>Ex. 43 at CITY 69523, 69528. | violations" based on the complaint file itself.  These are opinions, not undisputed facts. | |
| 58. In IA 92-019 the City found that the subject officer had slapped a child for no reason—and had improperly failed to identify himself as a police officer lied about identifying himself as a police officer—but only administered a written reprimand as a punishment.<br>Ex. 4 at 270-271. | Disputed.  Defendant disputes Plaintiff's commentary and opinions regarding "policy violations" based on the complaint file itself.  These are opinions, not undisputed facts. | City's Reply Ex. G at DEF CITY 69520-69551 |
| 59. In IA 92-019, the City failed to investigate the subject officer for dishonesty or punish him for dishonesty despite evidence that he lied.<br>Ex. 4 at 19 n.16, 271 | Disputed.  Defendant disputes Plaintiff's commentary and opinions regarding "policy violations" based on the complaint file itself.  These are opinions, not undisputed facts. | City's Reply Ex. G at DEF CITY 69520-69551 |
| 60. On May 13, 1994, EPPD officers arrested 17-year-old Augustin Fabio Carreon for murder.<br>Ex. 44, Carreon Affidavit at 2. | Undisputed. | |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 61. Detectives coerced Carreon into signing a false confession and misidentifying another person as the murderer, telling Carreon that he would be released if he incriminated the officers' desired suspect. When Carreon refused, the detective angrily and repeatedly insisted that Carreon identify that suspect. Ex. 44 at 2. | Disputed, there is a judicial determination that the confession was voluntary and not coerced. | Trial court denied MTS confessions/statements, tangible evidence, and identification. [81728] He was acquitted by the jury of murder and convicted him on misdemeanor assault and sentenced to 2 years probation). City's Reply Ex. H at DEF CITY 81721-81842 |
| 62. The City received additional notice of detective misconduct against Carreon later in 1994, when Carreon testified that an EPPD detective coerced him to make a false identification. Ex. 45, Carreon testimony at 6–8. | Disputed, there is a judicial determination that the confession was voluntary not coerced | City's Reply Ex. H at DEF CITY 81721-81842 |
| 63. The City never opened an internal affairs investigation into Alvarado's complaint or took any action to investigate it. Ex. 42, City's 4th Response to Pl's First RFPs, at 15–17 (agreeing to produce documents responsive to instances in Plaintiff's complaint, including Carreon's complaint, but producing no documents reflecting an IA investigation into Carreon's allegations). | Disputed.  Defendant disputes Plaintiff's commentary and conclusions regarding investigations based on document production as "undisputed fact" regarding whether something occurred. Further the City disputes Plaintiff's commentary and opinions on the appropriateness or necessity of investigations. This is opinion, not undisputed fact. | City's Reply Ex. H at DEF CITY 81721-81842 |
| 64. In IA 90-183, in an arbitration regarding an incident where an officer threatened to "beat the shit" out of a group of seventeen teenagers and arrested them without any basis, the City admitted that its policy was | Disputed, the arrests were not without any basis. | City's Reply Ex. D |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| "to get tough with the hoods and thugs." Ex. 37, IA 90-183, at CITY 72912, 72953-55, 72983. | | |
| 65. In IA 92-174, on November 13, 1992, members of all three units of the EPPD "Tac Squad" arrested six juveniles and took them to the TAC office, in violation of EPPD policy resulting in an internal affairs complaint. Ex. 23, IA 92-174 at CITY 69776. | Disputed that everyone from all three units were involved, undisputed that juveniles were taken to the IAC office in violation of policy | City's Reply Ex. I |
| 66. In IA 92-174, the City never investigated Gabriel Lujan's allegation that officers forced him to sign a statement in the course of abusing him; the disciplinary file was limited to physical and verbal abuse and other violations, but did not add an allegation regarding Lujan's right not to have a statement coerced from him, despite his allegation to that effect. Ex. 23, IA 92-174, at City 69776-78 (no investigation for coerced statement), City 69782 (Lujan's allegation of coerced statement). | Disputed that there was any coerced statement | City's Reply Ex. I |
| 67. In IA 92-174, the City never investigated juvenile Isaac Licon's allegation that officers coerced him into signing a false witness statement using force and threats. Ex. 23, IA 92-174, at City 69776-78 (no investigation for coerced statement), City | Disputed that there was any coerced statement | City's Reply Ex. I |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 69782 (Licon's allegation of coerced statement). | | |
| 68. The City suspended multiple officers for their misconduct in IA 92-174, but did not consider false statements by the officers, did not make findings regarding or issue discipline for coercion of statements from juveniles, and ignored juvenile policy violations against four involved officers. Ex. 4, Rosenthal Report at 19 n. 16, 275. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. Disputed that there were any coerced statements. | City's Reply Ex. I |
| 69. In IA 92-174, Sergeant Gregory Allen admitted to calling Gabriel Lujan a "goddamn liar" and slapping him across the face, grabbing him by the neck, and pinning him to the wall during questioning. Lujan was then diagnosed with two ruptured ear drums. He was suspended for excessive force in IA 92-174, but despite evidence that he lied during the investigation, committed numerous juvenile policy violations, and used force to coerce a confession/statement from a juvenile, no finding, or discipline arose from any of those acts. Even though he abused a teenager badly | Undisputed that Sgt. Allen used force against Lujan and that Lujan was injured, but disputed at the circumstances of the use of force. Disputed that there was evidence of Sgt Allen lying or that he used force to coerce a confession. These are merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert | City's Reply Ex. I |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| enough to rupture both his eardrums, Allen was not demoted. Ex. 23, IA 92-174, at CITY 69776-78 (no investigation for coerced statement, ruptured eardrums), 69782 (Lujan's allegation of coerced statement), 69795 (admission of misconduct). Ex. 4, Rosenthal Report at 19 n. 16, 274–75. | and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 70. By 1992, the TAC Squad consisted of 3 squads of 10 officers each. Ex. 70, Brown Dep at 17:6–20. | Disputed. In his deposition Brown states that the TAC Squad consisted of ten officer and one sergeant. | Ex. 70, Brown Dep at 17:19–20. |
| 71. The allegations in IA 92-174 included that officers and supervisors within the TAC squad had beaten children, coerced their confessions and witness statements, questioned them without parental permission, transported them in violation of juvenile policies, threatened to kill them, and threatened to harm them if they reported the misconduct. Ex. 23 at CITY 69776–69778, 69781–69784. | Disputed, there were no allegations involving coercion of confessions or witness statements. Undisputed that juveniles were improperly transported to the TAC offices | City's Reply Ex. I |
| 72. In IA 92-174, multiple officers expressed that they believed it acceptable to take juveniles to the TAC office for questioning; for example, Officer Duffy said he drove to the TAC office because he believed it was permissible and that he believed it was okay to take juveniles to the TAC office because | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). | City's Reply Ex. I |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| "everyone was going that way." These, and other facially apparent juvenile policy violations, were never disciplined.<br>Ex. 4, Rosenthal Report at 19 n. 15, 275.<br>Ex. 23 at CITY 69797. | Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 73. EPPD policy required officers to take arrested juveniles directly to an authorized juvenile location ("juvenile processing office") without delay; did not allow officers to take juveniles to other locations after their arrest; and required that juveniles be taken to a magistrate judge for a warning of constitutional rights before being interrogated<br>Ex. 2, Moton Dep at 158:12–21.<br>Ex. 8, Scagno Dep at 41:18–42:9 (arrested juveniles had to go to a magistrate "if you were going to talk to them").<br>Ex. 46, 1992 Procedures Manual at CITY 21502–04. | Undisputed | |
| 74. The TAC Squad worked frequently with juveniles<br>Ex. 33, James Arbogast Dep at 26:23–25. | Undisputed | |
| 75. Instead of responding to the systemic misconduct identified in IA 92-174 and CP 93-009 with broader investigations or department-wide responses, the City ignored the systemic misconduct.<br>Ex. 4, Rosenthal Report at 18–20. | Disputed that there was systemic misconduct.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v.* | City's Reply Exs. I and J |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| | *Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report.<br>Disputed that the City failed to respond to misconduct whenever reported. | |
| 76. Other than CP 93-009, the record contains no evidence of follow-up by the City to the mass juvenile policy violations identified in IA 92-009.<br>Ex. 4, Rosenthal Report at 18–20.<br>Ex. 10, Messer Dep at 268:3–6 (no EPPD audits because of information obtained by IA from 1989-1993).<br>Ex. 23, IA 92-009.<br>Ex. 24, CP 93-009. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report.<br><br>Disputed that Plaintiff's Exhibit 23 contains IA92-009. | City's Reply Ex. J |
| 77. IA 92-174 stemmed from the decision of the TAC unit to approach a group of juveniles en masse to "settle the score" with a group of juveniles<br>Ex. 10, Messer Dep at 153:7–154:13. | Undisputed. | |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 78. The investigation in IA 92-174 was initiated not because any officer reported the excessive force or numerous juvenile policy violations, but instead because the father of one of the children abused by the officers reported the misconduct to the mayor, who then reported the misconduct to Chief Scagno. Ex. 10, Messer Dep at 154:20–155:4. | Disputed, IA92-174 was initiated because of information developed during the investigation of CP93-009. | City's Reply Exs. I and J |
| 79. No officers involved in IA 92-174 were investigated for failing to report misconduct or for maintaining a code of silence regarding the misconduct they witnessed Ex. 23, IA 92-174 at CITY 69776–69778. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | City's Reply Exs. I |
| 80. In CP 93-009, only two officers were investigated for misconduct: Sergeant Lowe, a TAC sergeant, and his supervisor Lt. Martinez Ex. 24, CP93-009 at CITY 0064379. | Disputed. | City's Reply Ex. J |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 81. In CP 93-009, the City did not investigate any other sergeants in the TAC unit or any officers in the TAC unit Ex. 24, CP93-009 at CITY 0064379. | Disputed. | City's Reply Ex. J |
| 82. In CP 93-009 or elsewhere, the City did not investigate whether the other two sergeants in the TAC unit involved in the mass juvenile policy violations in IA 92-174, Sgt Allen and Sgt Johnson, had committed or authorized broader juvenile violations Ex. 23, IA 92-174 at CITY 69779-69781. Ex. 24, CP93-009 at CITY 0064379. Ex. 41, Letter of May 23, 2022 (City agreeing to produce all IA files in categories including coerced statements and confessions, excessive force during interview/interrogation, juvenile violations, false arrest, and custodial interrogation from 1988 to 1993 time period. The City produced no complaint relating to investigations against Allen or Johnson for broader juvenile violations). | Disputed, Defendant disputes Plaintiff's commentary and conclusions regarding investigations based on document production as "undisputed fact" regarding whether something occurred. Further the City disputes Plaintiff's commentary and opinions on the appropriateness or necessity of investigations. This is opinion, not undisputed fact. | City's Reply Exs. I and J |
| 83. In CP 93-009, officers under Sergeant Lowe's command revealed that juvenile policies were regularly violated by the TAC unit, including taking juvenile witness statements at the TAC office. | Undisputed | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| Ex. 24 at CITY 64380-82. | | |
| 84. In CP 93-009, James Arbogast—who previously received a slap on the wrist punishment for his mass arrest of a group of children without probable cause and his threats to "beat the shit" out of them—clarified in a statement that the widespread violations of juvenile policies were not limited to Sgt. Lowe's unit in the TAC squad, but extended throughout the City. He stated:<br><br>"[T]here will always be black and white rules set forth only to cover those which sit above us but reality to the officer is good performance and solvability. . . . It has not only been our unit, but reality is other units operate with juveniles which may somewhat bend those rules for juveniles . . . if we never spoke to juveniles without parental consent first our solvability factor would be that much worse."<br>Ex. 24 at CITY 64571-72.<br>PUF ¶¶ 43-45. | Disputed that Arbogast received a slap on the wrist or that he received punishment for the alleged violations.  Undisputed that Arbogast expressed his frustration with following the rules.  Disputed to the extent that Plaintiff takes this statement as anything more than speculation. | City's Reply Ex. J at DEF CITY 64536-64538 |
| 85. In CP 93-009, the City never asked James Arbogast what other units were violating juvenile policies or what he meant when he said that the purpose of juvenile rules was only "to cover those which sit above us." | Disputed.  Plaintiff's Exhibit 33, 93:7-12 only discusses if he had heard anyting about the interrogation/arrest of Plaintiff | Plaintifs Ex. 33, James Arbogast Dep at 93:7–12. |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| Ex. 33, James Arbogast Dep at 93:7–12. | | |
| 86. In IA 92-174, Sergeant Lowe commented that he believed his suspension was merely a "justification suspension"-i.e., designed to protect supervisors-which also went unaddressed. These comments were not addressed or investigated by the City.<br>Ex. 23, IA 92-174 at CITY 69808. | Disputed to the extent that it is out of context and reflects his frustration of being severely punished for his actions. | City's Reply Ex. I at DEF CITY 0069808. |
| 87. In CP93-009, an officer reported that Sergeant Lowe had proposed a drug "bust" where he suggested lying about the circumstances of the bust, claiming that they had merely "rolled up" on a drug deal that was in fact a planned operation. According to the reporting officer, Sgt. Lowe shared that scheme with a prosecutor, but the prosecutor disagreed with it because it would be "perjury"; Sgt. Lowe then told the other officers that the prosecutor was "not a team player" and to "be careful of what we said around [the prosecutor]."<br>Ex. 24, CP 93-009 at 64633.<br>Ex. 4, Rosenthal Report at 282. | Undisputed that Officer Avilos reported a proposed "dope deal" that never happened and that Assistant District Attorney Paul Letnich objected due to potential perjury.<br><br>Disputed that DEF CITY 0064633 says anything about Letnich not being a team player or that anyone had to be careful about what they said around him | City's Reply Ex. I at DEF CITY 0064633 |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
| --- | --- | --- |
| 88. The officer who reported that Sergeant Lowe had proposed perjury to a prosecutor and then warned officers not to trust the prosecutor when the prosecutor rejected the scheme also reported the Sgt. Lowe had retaliated against him when he reported Lowe for lying. The officer's complaint of retaliation and proposed conspiracy/perjury was not investigated and no discipline was administered against Sgt. Lowe for that officer's complaint. Ex. 24, CP 93-009 at 64633–34. Ex. 4, Rosenthal Report at 282. | Disputed. | City's Reply Ex. I at DEF CITY 0064633-34 |
| 89. In CP 93-009, the City ignored evidence of further juvenile systemic misconduct and chose not to investigate that misconduct, despite such misconduct being facially apparent from the complaint and investigative file. Ex. 4, Rosenthal Report at 19-20. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 90. Defendant Graves was unaware of any instance where officers were punished for not following juvenile policies. Ex. 31, Graves Dep at 203:25–204:5. | Undisputed. | |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 91. The City emphasized clearance rates over Constitutional policing, allowing officers to lie with impunity and without fear of investigation. The City's IA system was designed to absolve command staff of responsibility, not to identify and correct misconduct. The way the system was operated virtually ensured plausible deniability on the part of City command staff and prosecutors. Ex. 21, Rosenthal Rebuttal Report, at 11. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 92. Chief Scagno and other command staff of the El Paso Police Department frequently reviewed disciplinary files but chose not to ask questions or conduct investigations even when faced with compelling evidence of integrity violations and other police misconduct. The need to investigate further was obvious. But in response, EPPD command staff chose to ignore obvious violations. Ex. 21, Rosenthal Rebuttal Report, at 11. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 93. Within the EPPD and within CAP, the City claimed to have no notice of broader problems involving investigating, interviewing, interrogating, and taking confessions from juveniles. Ex. 2, Moton Dep at 217:24–218:2. | Disputed that Witness Moton is authorized to speak for the City. Undisputed that Moton was not aware of any broader problems. | Plaintiff's Ex. 2. 217:14-17 |
| 94. The City never conducted any audits from 1989-1993 | Undisputed, but the City disputes Plaintiff's | Plaintiff's Ex. 2. 217:14-17 |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| based on information obtained by internal affairs. Ex. 10, Messer Dep at 268:3–6. | commentary and opinions on the appropriateness or necessity of investigations. This is opinion, not undisputed fact . | |
| 95. Messer and Scagno admitted it would be easy to tell if an officer failed to get the right permission in working with juveniles. Ex. 10, Messer Dep at 199:10–22. Ex. 8, Scagno Dep at 167:23–168:4. | Undisputed. | |
| 96. Messer and Scagno admitted it would be easy to tell if an officer failed to get the right permission in working with juveniles. Ex. 10, Messer Dep at 199:10–22. Ex. 8, Scagno Dep at 167:23–168:4. | Undisputed. | |
| 97. By 1993, Scagno was aware of the issue with TAC officers transporting juveniles incorrectly. Ex. 8, Scagno Dep at 164:20–25. | Disputed, Chief Scagno testified that his answer is probably yes, but he could not remember. | Plaintiff's Ex. 8. 164:24-25 |
| 98. In IA92-174, Scagno admitted that the investigation revealed an issue that officers were taking statements and confessions from juveniles without parental permission. Scagno was aware of the problem. Ex. 8 at 164:20–165:4. | Undisputed that Chief Scagno knew about this isolated incident with TAC, disputed that he had any knowledge of a department wide issue | Plaintiff's Ex. 8. 164:24-25 |
| 99. Scagno met regularly— several times a week—with Assistant Chief Messer on disciplinary issues. Ex. 8, Scagno Dep at 54:13– 55:16, 145:20–146:3. | Undisputed | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 100. Scagno called the FBI regarding the misconduct described above in CP93-009, which revealed systemic juvenile policy violations in the pursuit of confessions and "solvability." In response, Chief Scagno, instead of seeking accountability, "warned [the officers] about trying to work with the Feds." Ex. 24, CP93-009 at 64461, 64556. | Disputed, Chief Scagno called the Special Agent in Charge to see why the FBI was investigating members of the Department's Gang Task Force.   Disputed as to the hearsay allegation regarding Chief Scagno's statement about warning about working with the feds being out of context. | City's Reply Ex. I at DEF CITY 0064461, 0064556 |
| 101. Scagno was specifically briefed about the allegations in CP93-009, and Scagno acknowledged that the fact that he was briefed on the investigation was an indicator that it was an important case. Ex. 8, Scagno Dep at 160:5–13. | Disputed,  Chief Scagno could not remember. | Plaintiff's Ex. 8. 160:12-13 |
| 102. Chief Scagno acknowledged that juvenile policy violations were committed by Sergeant Lowe's subordinates and people who worked under him—violations which were never investigated or disciplined Ex. 8, Scagno Dep at 161:24–162:5. PUF ¶¶ 68, 75, 82. | Disputed, Command staff determined that this was a supervisory failure.  The supervisors were disciplined harshly and the unit was broken up. | City's Reply Exs. K and L. |
| 103. Scagno took no Department-wide actions in response to the juvenile misconduct involved in IA 92-174 Ex. 8, Scagno Dep at 161:24–162:5. PUF ¶¶ 68, 75, 82. | Undisputed, but the City disputes Plaintiff's commentary and opinions on the appropriateness or necessity of department wide actions for this isolated incident. This is opinion, not undisputed fact . | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 104. Scagno received direct notice of individual incidents of juvenile misconduct, including signing disciplinary letters, receiving notices of appeal, receiving notices of FBI investigations, and through distributions of complaint files to the Chief's Office<br>Ex. 35 at 68606.<br>Ex. 36 at 70342.<br>Ex. 37 at 72907, 72993, 73022.<br>Ex. 38 at CITY 73222. | Undisputed that Chief Scagno was aware of instances where an investigation determined that there was misconduct | |
| 105. Responsibility for reviewing internal affairs complaints fell to the Chief (Scagno) and was often delegated to Messer<br>Ex. 10, Messer Dep at 194:12–24. | Disputed that there was any legal mandate that the Chief of Police review internal affairs complaints personally and could not delegate to Assistant Chief Messer | Plaintiff's Ex. 10, 194:21-24 |
| 106. Messer reviewed several thousand disciplinary files during his tenure.<br>Ex. 10, Messer Dep at 206:1–10. | Undisputed. | |
| 107. Chief Scagno had notice of the juvenile policy violations involved in the juvenile complaints reviewed by Dr. Rosenthal<br>Ex. 6, Allio Report at 50–53.<br>Ex. 21, Rosenthal Rebuttal at 8. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 108. The disciplinary files involving similar misconduct—coercive interrogation and false arrest of juveniles involving threats and physical force—would have provided notice to the EPPD regarding juvenile violations across the police department as a whole as well as specific units including the TAC team and Crimes Against Persons. These shortcomings included both a pattern of individual incidents and systemic violations affecting the entire police department. Ex. 4, Rosenthal Report at 28. | Disputed.  Disputed that there were disciplinary files that involved similar misconduct. This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 109. It was apparent that "obvious violations" of juvenile policies would continue absent auditing or monitoring of such misconduct. Ex. 4, Rosenthal Report at 28. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 110. Even though complaint CP93-009 made clear that juvenile rights were being violated across the EPPD, Chief Scagno did not consider that, or any other complaint, to constitute misconduct requiring | Disputed that CP93-009 demonstrated that juvenile rights were being violated across the EPPD. Disputed, Moton did not testify as to what Chief | City's Reply Ex. J and Plaintiff's Ex. 2, 214:3-219:18 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| departmental action as of 1993.<br>PUF ¶ 84.<br>Ex. 2, Moton Dep at 217:14–218:2; 219:16–18. | Scagno considered or did not consider. | |
| 111. Through its responses to allegations of juvenile misconduct, the City sent a message to officers that juvenile policy violations were not of significant concern.<br>Ex. 4, Rosenthal Report at 28. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987).  Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 112. The City's failure to discipline, train, or supervise officers regarding juvenile misconduct would be expected to increase the risk of wrongful convictions, as occurred to Plaintiff.<br>Ex. 4, Rosenthal Report at 29. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987).  Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 113. Detectives Marquez, Arbogast, and failed to video tape or record Daniel Villegas's purported confession, violating EPPD's | Undisputed, but disputed that the policy required them to record Villegas's confession | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| policy, but never faced any discipline or consequence. Ex. 6, Allio Report at 9. | This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 114. Video equipment, tape recorders, video cassette tapes, and audio cassette tapes were available to CAP Detectives to record confessions and interrogations. Ex. 1, CAP Manual at CITY 12826 (Tape recorders, video equipment, video cassette tapes and audio cassette tapes are available to Detectives, and "[a]nyone noticing a shortage of these supplies should report it to his supervisor or to the secretary for a restocking). Ex. 2, Moton Dep at 61:6–15 (above-mentioned CAP manual was in effect in 1993). | Undisputed. | |
| 115. CAP detectives were required to record confessions, including juvenile confessions, and juvenile witness statements Ex. 1, CAP Manual at CITY 12849–12850. | Disputed. | Plaintiff's Ex. 10, 225:14-226 :10 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| Ex. 10, Messer Dep at 225:22–226:10. | | |
| 116. CAP detectives did not believe it was required to record confessions or witness statements.<br>Ex. 22, Earl Arbogast Dep at 67:3–13.<br>Ex. 31, Graves Dep at 50:23–25, 52:1–5. | Undisputed | |
| 117. Not a single IA file produced by the City regarding investigative misconduct involved an investigation of failure to record interrogations or confessions<br>Ex. 41, Letter of May 23, 2022 (City agreeing to produce all IA files in categories including failure to preserve evidence, coerced statements and confessions, and custodial interrogation from 1988 to 1993 time period. The City produced no complaint relating to failures to record witness statements or confessions). | Undisputed, but disputed that the policy required recording of interrogations or confessions. | |
| 118. Assistant Chief Messer said that he was not aware of any internal affairs complaints for failure to video-record or otherwise record a confession in 1993.<br>Ex. 10, Messer Dep at 193:11–194:11. | Undisputed.  But disputed that the policy required recording. (use this excerpt) | Plaintiff's Ex. 10 193:11-194:11 |
| 119. Defendants Graves, Marquez, and Arbogast did not record statements or confessions from any of the they interrogated and took statements from in the England-Lazo investigation. | Undisputed | |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| Ex. 6, Allio Report at 8–9, 18–19, 46. | | |
| 120. Not even a single statement of eleven potential suspects in the England-Lazo murder investigation was audio or video recorded, in violation of the City's paper policies.<br>Ex. 6, Allio Report at 9. | Undisputed that the statements were not audio or video recorded, but disputed that the City policy required recording. | Plaintiff's Ex. 10 193:11-194:11 |
| 121. Defendants Marquez and Arbogast did not believe they did anything wrong in carrying out their interrogations in the England-Lazo investigation.<br>Ex. 22, Earl Arbogast Dep at 286:22–287:14;<br>Ex. 30, Marquez Dep at 262:6–11. | Undisputed. | |
| 122. On paper, EPPD policies required CAP detectives to "document all findings accurately" and "make detailed reports" on their investigations<br>Ex. 1, CAP Manual at CITY 12833, 12848. | Undisputed. | |
| 123. Defendants Marquez, Graves, and Arbogast, in closing reports after Villegas's arrest, omitted key exonerating details such as that "Popeye" and "Droopy," who Mr. Villegas and his friends all named as present in the car during the shooting in their "confessions," could not have committed the murder because they had firm alibis including being | Undisputed that the closing reports say what they say.<br><br>Disputed that they omitted these details.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. V*iterbo v. Dow Chem. Co.*, 826 F.2d | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| imprisoned and being on electronic monitoring. Ex. 6, Allio Report at 46. Ex. 66, Marquez Closing Report. Ex. 67, Graves Closing Report. Ex. 68, Arbogast Closing Report. | 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 124. Defendant Marquez wrote a "cover-up" report to explain inconsistencies in Plaintiff's false arrest. To cover for the fact that two supposed participants in the murders, "Popeye" and "Droopy," physically could not have been in the murder vehicle, Marquez wrote a report stating that Rodney Williams now denied that Popeye or Droopy were present. However, Marquez and other investigators never followed up to investigate why four witnesses had named them as present, who provided the gun if Popeye and Droopy were not there, and where the murder weapon or the car were ultimately left. Ex. 6, Allio Report at 33–34. Ex. 69, Rodney Williams Supplemental Report. | Disputed that there were any cover up reports.

Disputed as to what the investigators investigated or failed to investigate. This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 125. The Defendant officers committed numerous obvious policy violations in the Lazo-England investigation, including failing to take Plaintiff immediately to a juvenile facility after his arrest, but no discipline or investigation was ever conducted for misconduct in | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| the Lazo-England investigation. Ex. 6, Allio Report at 48–49. | 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 126. CAP Detectives were allowed to approve and finalize their own reports without supervision; this was an unofficial policy never documented in writing, and contradicted the City's written policy. Ex. 6, Allio Report at 13. Ex. 2, Moton Dep at 79:19–21 (when a supplemental report is approved, that's the final version); 80:3–9 (CAP detectives could approve their own reports); 80:23–25 (policy never documented in writing). Ex. 46, 1992 Procedures Manual, at CITY 21471–21472. | Disputed. | Attachment       2-F,Ocegueda 15:11-17:14;       18:21-20:13; 31:14-32:20; 32:21-34:1; 51:19-53:25] |
| 127. For less serious crimes outside of CAP, complaint forms, witness statements, supplements, and other documents needed to be approved by supervisors, but CAP was an exception for every such form—supervisor review was deemed unimportant for murder investigations. Ex. 2, Moton Dep at 96:24–97:15. | Disputed. Pete Ocegueda (Super in CAP) would have meetings to discuss cases and would regularly meet with his subordinates.  He reviewed CAP investigations once complete before going to DA. He reviewed Villegas file before it went to the DA. CAP unit regularly communicated with and worked with DA's office. The DA also reviews files and can call with instructions to gather additional evidence or statements.  The DA's | Attachment       2-F,       Ocegueda, Depo 15:11-17:14; 18:21-20:13; 31:14-32:20; 32:21-34:1; 51:19-53:25 Attachment 2-G, Loya Depo 113:19-114:6; 135:6-25; 136:18-20; 216:4-217:14 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| | office actively involved during investigation of "major" cases. The DA's office attended internal CAP meetings during major investigation to achieve compliance with legal standards | |
| 128. Sergeants did not regularly review the reports of CAP detectives<br>Ex. 22, Def Earl Arbogast Dep at 41:11–21. | Disputed. Pete Ocegueda (Super in CAP) would have meetings to discuss cases and would regularly meet with his subordinates.  He reviewed CAP investigations once complete before going to DA. He reviewed Villegas file before it went to the DA. CAP unit regularly communicated with and worked with DA's office. The DA also reviews files and can call with instructions to gather additional evidence or statements.  The DA's office actively involved during investigation of "major" cases. The DA's office attended internal CAP meetings during major investigation to achieve compliance with legal standards | Attachment 2-F, Ocegueda, Depo 15:11-17:14; 18:21-20:13; 31:14-32:20; 32:21-34:1; 51:19-53:25<br>Attachment 2-G, Loya Depo 113:19-114:6; 135:6-25; 136:18-20; 216:4-217:14 |
| 129. By exempting CAP detectives from a report supervision requirement, the result was a total lack of case management and oversight and an inability to ensure "proper investigative action and documentation."<br>Ex. 6, Allio Report at 13. | Disputed. Pete Ocegueda (Super in CAP) would have meetings to discuss cases and would regularly meet with his subordinates.  He reviewed CAP investigations once complete before going to DA. He reviewed Villegas file before it went to the DA. CAP unit regularly | Attachment 2-F, Ocegueda, Depo 15:11-17:14; 18:21-20:13; 31:14-32:20; 32:21-34:1; 51:19-53:25<br>Attachment 2-G, Loya Depo 113:19-114:6; 135:6-25; 136:18-20; 216:4-217:14 |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| | communicated with and worked with DA's office. The DA also reviews files and can call with instructions to gather additional evidence or statements.  The DA's office actively involved during investigation of "major" cases. The DA's office attended internal CAP meetings during major investigation to achieve compliance with legal standards | |
| 130. By exempting CAP detectives from a report supervision requirement, the EPPD prevented supervisors from ensuring proper investigative actions, proper documentation, timely input on the investigation, and the ability to correct errors in policy, procedure, law, or investigative action.<br>Ex. 6, Allio Report at 13. | This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 131. Shortly after Plaintiff's arrest, Marquez wrote a search warrant affidavit where he swore to numerous facts blatantly contradicted by Marquez's reports. In the affidavit, Marquez swore that Plaintiff admitted to being a "VNE" member, that he admitted to shooting England and Lazo, and that he admitted owning the murder weapon. However, none of | Disputed, the documents speak for themselves, but the opinions from Plaintiff's expert are mere speculation.<br>This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| those "facts" are documented in Marquez's reports or the police investigation; in fact, Plaintiff's coerced confession typed by Marquez says that Plaintiff was "given a gun" by someone else, not that Plaintiff owned the gun, among other inconsistencies. Ex. 47, Marquez arrest affidavit at 2. Ex. 48, Plaintiff Villegas's coerced confession at 2. Ex. 6, Allio Report at 45. | undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 132. Defendant Marquez has never feared EPPD's internal affairs department and has never altered how he investigated a case because of internal affairs. Ex. 30, Marquez Dep at 237:25–238:5. | Undisputed | |
| 133. Starting in 1984, homicide detective Defendant Alfonso Marquez received numerous commendations for interviewing and interrogating suspects, including his "uncanny ability to obtain confessions on tough cases." Ex. 4, Rosenthal Report at 22. | Defendant does not dispute the fact itself, but disputes any implications or conclusions drawn from the fact by the expert as being opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). | |
| 134. Marquez and CAP received a letter of commendation for their 100% homicide clearance rate | Defendant does not dispute the fact itself, but disputes any implications or conclusions drawn from the fact by the expert as being | |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| Ex. 4, Rosenthal Report at 22. | opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). | |
| 135. EPPD set an expectation that 100% of all homicides would be cleared.<br>Ex. 4, Rosenthal Report at 23. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 136. El Paso maintained an inexplicably high homicide clearance rate of fifteen to thirty-six percentage points above the national average in the five years leading up to Plaintiff's arrest.<br>Ex. 4, Rosenthal Report at 23–24. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 137. As Dr. Rosenthal notes, such an overemphasis on clearance rates at the expense of integrity and constitutional policing, combined with a failure to enforce ethics and integrity violations, increases the risk of employees fabricating evidence and using excessive force to obtain false confessions—a problem referred to as "Noble Cause" corruption. Ex. 4, Rosenthal Report at 23–24. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 138. The EPPD exhibited an unnaturally high clearance rate and emphasized aggressive interrogation and clearances without emphasizing the need to respect suspects' constitutional rights. Ex. 4, Rosenthal Report at 6. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 139. The El Paso Police Department displayed no interest in minimizing the risk of Noble Cause corruption despite the aforementioned patterns. Ex. 4, Rosenthal Report at 26. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| | Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 140. Emphasizing high case clearances as the primary goal lays a "foundation" for improper homicide investigations. Per expert Joseph Allio, "using clearance rates as a job performance measure may actually encourage officers to value making more arrests, not necessarily solving crimes." Ex. 6, Allio Report at 7–8. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 141. In 1984, early in his career as a homicide detective, Marquez testified during a suppression hearing about a confession he had taken in a murder investigation. Under oath, he testified that other detectives had interviewed the suspect at the start, that he was not present earlier in the suspect's investigation, and that he had not started interrogating the suspect until 1:00 am. According to EPPD investigators, this was a lie—everyone interviewed said that Marquez started interviewing the suspect at 9:00 pm and continued interrogating her for eight full hours. But investigators | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| never discovered why Marquez told this lie—to protect the confession, to cover up misconduct, or for some other reason—because EPPD did not interview Marquez about the discrepancy or investigate him for dishonesty, but instead allowed him to give a short, self-serving, and conclusory statement. Marquez was not disciplined. Ex. 3, IA 84-079, at CITY 59454–56, 59459–64, 59478–79. Ex. 4, Rosenthal Report at 7, 99-100, 102-104. | | |
| 142. In 1988, Detective Marquez falsified expense reports to receive greater reimbursement from the City. Internal Affairs was advised by Assistant Chief Messer not to confront Marquez about the investigation so that Marquez could concentrate on homicide investigations. Marquez was punished for the theft, but not for lying, even though he (unlike another involved detective) lied to investigators about his actions and statements. Id. at Marquez was suspended, but the City imposed the same punishment on Marquez, who continually lied about his theft, and the other detective who admitted his mistake. Ex. 49, CP88-014 at CITY 44531, 44568, 44575–82. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| Ex. 4, Rosenthal Report at 8-9, 108-11. | | |
| 143. In 1992, in CP92-296, Marquez was involved in an incident involving rudeness and unauthorized transport of a civilian in his police vehicle. The City conducted no investigation or findings regarding false statements made by Marquez during the investigation. Although it was clear from the face of the investigation that Marquez lied that he was providing a public service by transporting a child in need and failing to acknowledge that he was actually doing a favor for his girlfriend in picking her son up from school while driving a city vehicle, the City never investigated or disciplined Marquez for lying. Instead, it gave him a short suspension for rudeness and unauthorized use of a city vehicle. Ex. 50, CP92-296 at CITY 54941, 54995–55000. Ex. 4, Rosenthal Report at 8–9, 120–123. | Undisputed that Marquez was involved in the incident. Disputed that the incident was not investigated and Marquez was punished for violations of City policy.  The rest of the allegations are disputed. This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | City's Reply Ex. R |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 144. On August 27, 1992, another Internal Affairs case was initiated against Detective Marquez after it was discovered that Detective Marquez had 11 unpaid parking tickets (CP 93-019). Marquez's claim that he was unaware of the existence of the 11 unpaid parking tickets was accepted at face value, with no further inquiry. No police officer would accept such a statement from a civilian as true, without further inquiry, and yet, the City appeared to have no interest in examining this claim, which appeared on its face to be false (in the absence of any evidence to explain how Marquez would have been unaware of the 11 outstanding parking tickets). Detective Marquez received a clear signal that there was no expectation that he act with integrity when faced with an inquiry into his actions or performance as a police officer on or off-duty. Ex. 51, CP93-019 at CITY 55036, 55056. Ex. 4, Rosenthal Report at 8, 10, 126. | Undisputed that Marquez was investigated and punished for 11 outstanding parking tickets in a City vehicle.  The rest of the allegations are disputed. This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | City's Reply Ex. S |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 145. In 1992, in CP92-358, Detective Marquez received a sustained complaint for failing to adequately notify a next-of-kin, for which he received a Written Reprimand. There were inconsistencies between the statement given by Detective Marquez (that he had requested the decedent's body be fingerprinted) and the statement by a Lieutenant that no such request had been made. Although a finding of dereliction of duty was sustained, once again no further inquiry into dishonesty was made by the City, and no investigation for dishonesty or discipline for integrity violations was made by the City. Ex. 52, CP92-358 at CITY 55038, 55022–23, 55027. Ex. 4, Rosenthal Report at 8, 10, 124–25. | Undisputed that Marquez was investigated for and punished for failing to adequately identify a dead person.  The rest of the allegations are disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | City's Reply Ex. T |
| 146. In CP 82-300, Arbogast's supervisor believed he was lying but took no action to determine the truth; no witness or partner officers were interviewed and no written statements were taken. Arbogast was not investigated or disciplined for lying; instead, he only received a written reprimand for insubordination. Ex. 4, Rosenthal Report at 11–13, 155–57 Ex. 53, CP82-300 at CITY 55621–31. | Undisputed that CP82-300 involves a 60-cent key ring and an allegation of insubordination.  Disputed that Arbogast was actually accused of lying.  The rest of these allegations are disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). | City's Reply Ex. U |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| | Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 147. In IA 85-26, Arbogast's partner was accused of antagonizing an arrestee and the EPPD failed to investigate or discipline Arbogast for lying even though Arbogast's statements were directly contradictory to the investigation's findings. Arbogast received the message that the EPPD "was unconcerned about truthfulness during an investigation and unwilling to act on such misconduct." Ex. 4, Rosenthal Report at 11, 13, 163–65 Ex. 54, IA 85-26 at CITY 55917, 55930–33, 55948–50. | Undisputed that Arbogast's partner was accused of antagonizing an arrestee. Disputed that Arbogast was investigated for or determined to be lying. The rest of the allegations are disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | City's Reply Ex. V |
| 148. In IA 85-197, officers from an external agency accused Graves of impeding an investigation. The City rejected Graves's account of the incident and disciplined him for unprofessional acts. Yet even though Graves lied during the investigation, the City never investigated Graves for dishonesty or integrity violations or disciplined him for such violations. Graves received a | Undisputed that Graves was accused of interfering with an outside agency's investigation and was reprimanded for his conduct.  The remaining allegations are disputed. This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and | City's Reply Ex. W |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| written reprimand, but was not punished for dishonesty. Ex. 4, Rosenthal Report at 14–15, 177–80.<br>Ex. 55, IA 85-197 at CITY 57630–33, 57639–54. | therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 149. CP 86-131 involved an intentional cover-up of misconduct in a dispute between officers. Multiple officers, including Graves, were found to have participated in the cover-up. Graves's sergeant specifically stated that he found inconsistencies in all of the subject officers' statements, including Graves's statement. However, the Chief's disposition did not mention the coverup and did not include any punishment for or mention of dishonesty by the officers. Graves received a 1-day suspension, but received no punishment for dishonesty despite evidence of a coordinated cover-up among officers. In fact, Graves was investigated just for unprofessional conduct and failure to make an arrest, but not for any honesty or integrity violations. The City's failure to discipline Graves for dishonesty messaged that integrity was not a value Graves was expected to uphold. | Undisputed Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | City's Reply Ex. X |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| Ex. 4, Rosenthal Report at 14, 16, 183–92 & n.3. Ex. 56, CP 86-131 at CITY 57449–56, 57539–42, 57584, 57591–97. | | |
| 150. In the ten complaints involving evidence of dishonesty by Marquez, Graves, and Arbogast, a pattern emerged: the City failed to ask follow-up questions about dishonesty, conduct follow-up investigations into dishonesty, or impose serious discipline for dishonesty, even when officers continued in their dishonesty over the course of the investigation. Ex. 4, Rosenthal Report at 14, 16, 183–92 & n.3. Ex. 56, CP 86-131 at CITY 57449–56, 57539–42, 57584, 57591–97. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 151. Defendants Marquez, Arbogast, and Graves "did not fear that obvious inconsistencies in their investigation would be revealed or punished" in regards to the England-Lazo investigation. They were willing to conduct an investigation with such obvious inconsistencies because of "a larger failure within the El Paso Police Department to adequately supervise or punish acts of dishonesty." Ex. 6, Allio Report at 53. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 152. The City's emphasis on a 100% homicide clearance goal while ignoring integrity violations sent a predictable message: getting confessions was more important than integrity in investigations. Ex. 4, Rosenthal Report at 27. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 153. In 1990 complaint CP 90-214, an officer was disciplined for mishandling evidence, receiving a two-day suspension for neglect of duty. Evidence in the case file revealed that the officer had lied to a detective, stating that he had processed a firearm for fingerprints and had found none. The investigation revealed that the handgun was never processed. However, the officer was never investigated or discipline for dishonesty. Chief Scagno personally approved the discipline. Ex. 21, Rosenthal Rebuttal at 4. Ex. 57, CP 90-214 at CITY 62666–67. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 154. In 1990 complaint CP 90-089, the officer noted that the officer engaged in a "dereliction" of duty that made it impossible to prosecute the case he had been assigned to investigate. Even more significantly, the Chief concluded that, contrary to the officer's claims otherwise, "[i]t is my opinion that he had no intention of tagging the property in since he called in the report rather than type it out and turn in the property." Still, the officer was investigated only for neglect of duty and not for dishonesty or integrity violations. Even though the Chief believed that the officer was not credible in his statement to Internal Affairs, he imposed only a three-day suspension. John Scagno personally approved the discipline. Ex. 21, Rosenthal Rebuttal at 4. Ex. 58, CP 90-089 at CITY 76479, 76481, 76494, 76501, 76526. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 155. In 1991 complaint CP 91-156, a five-day suspension was imposed and the officer received a disciplinary transfer for failing to seize evidence at scene (shell casings) of a shooting and, on a separate occasion, failing to process suspects as requested by a Detective In one statement, the subject officer claimed | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| that test equipment was unavailable to him, which was not true. No action or follow-up appeared to have been taken relating to dishonesty and inconsistencies in the subject officer's statement. Chief Scagno personally approved the discipline.<br>Ex. 21, Rosenthal Rebuttal at 7.<br>Ex. 59, CP 91-156 at CITY 62548, 62552–62563, 62574, 62578, 62587–62588. | and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 156. In 1990 complaint IA 90-097, it was alleged that a sergeant accused of physical abuse had intentionally misrepresented facts in his administrative statement, among other allegations. That complaint was only minimally investigated—the offending sergeant was allowed to give a vague and self-serving statement where he claimed he couldn't remember what happened, which was not followed by further interviews of other witness officers. The complaint was ultimately unsustained. Chief Scagno received notice, as the disciplinary file was forwarded to him and a disciplinary board presented him with a recommendation.<br>Ex. 21, Rosenthal Rebuttal at 5.<br>Ex. 60, IA 90-097 at CITY 72266, 72302–72304, 72363, 72365. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 157. In 1992 complaint CP 92-205, an officer was accused of choking a handcuffed juvenile prisoner. A subject officer testified contrary to his initial reports, but was never investigated for lying and the inconsistency was never resolved. Chief Scagno personally approved discipline, although no discipline was issued for lying. Ex. 21, Rosenthal Rebuttal at 6. Ex. 61, CP 92-205 at CITY 63931–63951, 63959, 63805–63806. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 158. In 1989 complaint IA 89-070, an officer was accused of kicking and slapping a fourteen-year-old boy without provocation. The complaint of physical abuse was sustained, but the investigation ignored that multiple officers lied about whether the misconduct occurred. No investigation or disciplinary findings were made for lying or dishonesty. Chief Scagno received notice including a letter directed to him from the FBI regarding a civil rights complaint. Ex. 21, Rosenthal Rebuttal at 6. Ex. 62, IA 89-070 at CITY 68987, 68990, 68992, 69032. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 159. In 1989 complaint CP89-194, a lieutenant was sustained for beating auto theft suspects in front of other officers. Despite | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| significant inconsistencies in the subject officer's statements and other evidence, the lieutenant was never investigated or disciplined for lying. No integrity or honesty issues were investigated on the part of any involved officers, despite evidence that they may have lied or failed to report what they saw. The lieutenant was allowed to maintain his command position, but officers under him were punished by having their future assignments limited (they could not be assigned under the subject lieutenant). Chief Scagno had notice of the incident and personally approved the discipline on the subject officer.<br>Ex. 21, Rosenthal Rebuttal at 6–7.<br>Ex. 7, CP 89-194 at CITY 61100–61101, 61160. | expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 160. In 1993 complaint CP 93-264, a field training officer instructed a probationary officer to lie in a police report. The probationary officer resigned after describing retaliation against him for reporting his supervisor. The supervisor threatened retaliation against the probationary officer if he reported the supervisor's misconduct and admitted to as much in statements to internal affairs. There was no indication of any discipline against one subject officer | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| for lying to Internal Affairs when he denied making comments which he was found to have made. Chief Scagno had notice and personally approved the discipline.<br>Ex. 21, Rosenthal Rebuttal at 8–9.<br>Ex. 64, CP 93-264 at CITY 64918–20, 64939–40. | | |
| 161. In 1991 complaint CP 91-262, a senior officer received a 10-day suspensions for preparing a false affidavit for purposes of sustaining an illegal arrest and counseling a new probationary officer to sign it without permission. The senior officer admitted to having committed similar conduct in the past and alleged that other officers had done so as well. Although the senior officer advised Internal Affairs that multiple other officers had committed similar violations in the past, that fact was intentionally omitted from his discipline letter. The senior officer was not asked for the identity of other officers who had committed similar misconduct and no follow-up discipline or allegation was initiated for those officers' misconduct. Chief Scagno had notice of the incident: the complaint file was distributed to his office and was marked for | Disputed.<br>As to the use of Rosenthal's report, and opinions and implications, conclusions and arguments drawn by him regarding the file, this is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.   Further disputed opinions exist in the City's expert report. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| distribution directly to the Chief of Police (Scagno). Ex. 21, Rosenthal Rebuttal at 8. Ex. 63, CP 91-262 at CITY 62762, 62787, 62791, 62823, 62846. | | |
| 162. The City did not pursue evidence of widespread false arrests and perjury and lying in support of those arrests as indicated in CP 91–262, and did not open additional disciplinary investigations to address that pattern of misconduct. PUF ¶ 161. Ex. 41, Letter of May 23, 2022 (City agreeing to produce all IA files in categories including coerced statements and confessions, excessive force during interview/interrogation, false arrest, and custodial interrogation from 1988 to 1993 time period). The City produced no complaint or file involving any follow-up from CP 91-262. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 163. In the vast majority of cases reviewed by Dr. Rosenthal, there were deficient IA practices, failures to act upon integrity-related misconduct, failure to impose appropriate discipline and failures in documentation. Ex. 21, Rosenthal Rebuttal at 14. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| | Exclude.  Further disputed opinions exist in the City's expert report. | |
| 164. In administering its disciplinary system, "EPPD failed to demonstrate concern for officer integrity and failed to incentivize El Paso police officers to tell the truth", according to Dr. Rosenthal's expert opinion. Ex. 21, Rosenthal Rebuttal at 3–4. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 165. The EPPD ignored integrity violations so that it could secure more convictions, especially in murder investigations. Ex. 4, Rosenthal Report at 6, 22–24, 27, 29. Ex. 6, Allio Report at 6–8, 42–43. Ex. 21, Rosenthal Rebuttal at 11. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 166. It is especially important to monitor the integrity of detectives because they "have a great deal of discretion in the performance of their duties | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is | |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| and are subject to minimal direct supervision." Ex. 4, Rosenthal Report at 27. | so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 167. Not a single supervisory task - such as investigative conferences, reviews of reports, detective assignments, crime scene supervision, or other tasks - was documented in the England-Lazo murder investigation. As a result, many omissions, errors, contradictions, and policy violations went uncorrected. Ex. 6, Allio Report at 13. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 168. Even though Marquez consistently violated the City's paper policies—like writing timely reports, writing complete reports, and getting parental permission before interrogating juveniles—his personnel file shows that he was not disciplined for those failures, but was instead consistently praised for his success in interrogations and especially obtaining confessions. Ex. 6, Allio Report at 50. Ex. 11, Marquez Personnel file, at CITY 7169, 7172, | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 7180, 7183, 7187, 7191, 7244, 7246, 7249, 7252, 7261, 7290, 7295, 7306, 7328. | | |
| 169. The City knew that CAP detectives must be held to a higher standard, and that it was especially important to do so because of the seriousness and importance of homicide investigations. Ex. 2, Moton Dep at 45:17–46:8. Ex. 10, Messer Dep at 260:9–14. | Undisputed. | |
| 170. The City allowed CAP detectives to violate its policies and remain ignorant of it. Ex. 6, Allio Report at 50. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 171. The City evaluated Defendant Marquez and other CAP detectives for their ability to get convictions, not their compliance with EPPD's policies Ex. 6, Allio Report at 50. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| | undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 172. The City conducted no follow-up investigation and asked no follow-up questions when evidence of dishonesty arose during disciplinary investigations.<br>Ex. 4, Rosenthal Report at 5–6. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 173. The City also failed to impose serious discipline on officers for their deception during the course of investigations.<br>Ex. 4, Rosenthal Report at 5–6. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 174. Assistant Chief Messer testified that it was not possible to thoroughly investigate officers' lies during administrative investigations, asking sarcastically: "[if an officer] sticks to his story . . . how do you investigate that? Enlighten me. . . . [T]he way you investigate an officer for lying is you call him in, and you ask him, 'Are you lying or not?' . . . [W]hy take it further?" Ex. 10, Messer Dep at 212:15–213:14. | Undisputed | |
| 175. EPPD Internal Affairs failed to document how statements were provided and did not record interviews, as would be necessary to prevent improper influence such as leading questions and witness coaching; formal interviews were rarely audio or video recorded; and the City did not even allow officers to be terminated for deliberately lying unless they had previously been found to have committed that offense. Ex. 4, Rosenthal Report at 5–6. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 176. As assessed by experts Richard Rosenthal and Joseph Allio, the City's failure to terminate—or even consider terminating—officers for lying was a notable and distinct failure of EPPD's disciplinary system. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co.*, 826 F.2d | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| Ex. 4, Rosenthal Report at 5–6, 21–22.<br>Ex. 6, Allio Report at 53. | 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 177. The City declined to acknowledge its widespread integrity problems. It decided not to pursue integrity violations brought to its attention. And it decided to ignore evidence of systemic misconduct.<br>Ex. 21, Rosenthal Rebuttal at 11. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 178. As of 1993, Chief Scagno did not consider any integrity issue within the EPPD to require departmental action<br>Ex. 2, Moton Dep at 220:16–18. | Disputed.  Question merely asks if Chief Scagno has anything he can think of that is incorrect or incomplete. | Plaintiff's Exhibit 2. 220:16-18 |
| 179. The City denied notice of any flaws in its disciplinary processes as of 1993.<br>Ex. 2, Moton Dep at 218:9–10. | Disputed.  In Plaintiff's Exhibit 2, 217:-218:, Commander Moton stated the department was not aware of any broader problems about flaws in the disciplinary process. | Plaintiff's Exhibit 2, 217:14-218:21 |
| 180. As of 1993, it was understood that there was an especially critical risk of misconduct in homicide investigations because of the pressure to solve cases and the public pressure | Disputed.  The Department held high standards for CAP detectives | Plaintiff's Exhibit 2, 45:10-46:8 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| surrounding those cases. The City was aware of the need to hold homicide detectives to higher scrutiny.<br>Ex. 6, Allio Report at 48.<br>Ex. 2, Moton Dep at 45:17-46:8. | | |
| 181. The police chief received notice of all lawsuits involving EPPD and decides whether to pass them on to internal affairs.<br>Ex. 2, Moton Dep at 196:7-22. | Undisputed. | |
| 182. The police chief made final decisions on any complaints involving "serious" allegations, and the Chief reviewed decisions with the potential for a substantial suspension, demotion, or firing.<br><br>Complaints that might end up with a "decent term suspension," demotion, or firing were given to Scagno<br>Ex. 2, Moton Dep at 208:22-209:1.<br>Ex. 8, Scagno Dep at 54:16-55:4. | Undisputed | |
| 183. In 1993, and prior, the City never transferred a detective out of CAP for dishonesty.<br>Ex. 2, Moton Dep at 210:18-23. | Undisputed. | |
| 184. The only kinds of misconduct Messer described as warranting transfer out of CAP were "Inefficiency, not maintaining their caseload. In some cases, off-duty conduct. In some cases, because they were just plain lazy." He did | Undisputed. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| not mention dishonesty or integrity issues.<br>Ex. 10, Messer Dep at 260:21–261:2. | | |
| 185. Even when Plaintiff was retried in 2018, the City used fabricated witness statements obtained through threats to try to convict him. Defendants Sanchez and Loya picked witness Oscar Gomez up on a traffic warrant but took him to the Crimes Against Persons office and interviewed him for two hours. Detectives told Gomez that they wanted him to say that Daniel Villegas admitted to the shooting, and threatened to put Gomez in jail if he didn't say what Detectives wanted him to say. Gomez denied that Plaintiff made any admission, but Defendant Sanchez said "I don't want to hear that" and took a coerced and fabricated statement implicating Plaintiff from Gomez.<br>Ex. 78, Gomez Testimony, at GRAVES_698:24–99:12; 699:23–700:1; 700:10–19; 701:11–23; 702:4–15. | Undisputed as to Gomez' testimony. | |
| 186. Crimes Against Persons was working a lot of homicide investigations in 1993 - it was a "bad year" for homicides.<br>Ex. 2, Moton Dep at 214:3–12. | Undisputed. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 187. The City did nothing to increase monitoring of Crimes Against Persons in response to the high case volume. Instead of implementing measures to identify and address misconduct by homicide detectives, the City decided to just "trust" them to do their jobs.<br>Ex. 2, Moton Dep at 215:22–16:5. | Undisputed. | |
| 188. Assistant Chief Messer acknowledged that units often operated out of policy and with unofficial policies, but admitted that the City did not audit or investigate but allowed to continue until "it hits the fan."<br>Ex. 10, Messer Dep at 189:23–90:10. | Disputed at to Messer admitting the City did not audit or investigate. | |
| 189. The City received notice of alleged coerced confessions and statements from criminal court, but did not initiate internal affairs investigations of those allegations.<br>Ex. 10, Messer Dep at 172:13–18. | Disputed.  If it had come to Internal Affairs it would have been investigated. | Plaintiff's Ex. 10, 172:20-173:14 |
| 190. Assistant Chief Messer discounted allegations of policy violations from anyone he perceived as aligned with a defendant, including any witnesses who were "testifying on behalf of the defendant."<br>Ex. 10, Messer Dep at 223:18–21. | Undisputed.  Messer stated he would tend to look at them a little slant wise but did not state he would discount allegations. | Plaintiff's Ex. 10, 223:19-21 |

| **PROPOSED UNDISPUTED FACTS** | **UNDISPUTED or DISPUTED** | **CONTROVERTING EVIDENCE (if disputed)** |
|---|---|---|
| 191. In 1993, the procedure after a suspect signed a Miranda card was to keep that card with the police paperwork and eventually with an evidence form and either to ID and Records or in an evidence locker for the case.<br>Ex. 32, Ortega Dep at 204:25–205:2; 206:1–22. | Undisputed. | |
| 192. Messer admitted that Det. Marquez's disciplinary history would "give [him] pause" due to "the overall record" and whether Marquez should be assigned to Crimes Against Persons, including due to "the number of complaints that were sustained."<br>Ex. 10, Messer Dep at 264:15–265:15. | Undisputed.  However, a number of the complaints were when Marquez was not in CAP. | |
| 193. Detectives were not instructed to find and record evidence of a suspect's innocence, as consistent with their constitutional rights; instead, the City's message to Detectives was "really, it was just to solve the case." As a result, detectives were motivated to clear cases, not to find the truth.<br>Ex. 6, Allio Report at 6.<br>Ex. 22, Earl Arbogast Dep at 74:19–75:3. | Undisputed as to testimony in quotes.<br>Disputed.<br>As to Allio's report, this is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact.<br>*Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987).<br><br>Further disputed opinions exist in the City's expert report. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 194. Dr. Rosenthal's report addressed "whether [the City] had notice of violations . . . based on a pattern of documented violations." He opined that the Department emphasized homicide clearances at the expense of constitutional policing, as exemplified by the frequent decision to ignore integrity violations and its focus on clearing cases at all costs. Ex. 4, Rosenthal Report at 3, 28–29. Ex. 21, Rosenthal Rebuttal Report. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 195. A police officer who has reason to believe that his or her word will be accepted, regardless of any evidence otherwise, is more likely to engage in constitutional violations and engage in the type of corruption that results in wrongful convictions. Ex. 4, Rosenthal Report at 28. | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 196. The Department inadequately supervised Defendants Marquez, Arbogast, and Graves. El Paso Police Department supervisors became aware that these detectives were readily willing to lie to protect themselves from being held accountable by the Department and their | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| supervisors. On multiple occasions, the defendant-officers were sent clear messages that they were responsible to no one but themselves.<br>Ex. 4, Rosenthal Report at 28–29. | Additionally this expert and his opinions are the subject of a Motion to Exclude.  Further disputed opinions exist in the City's expert report. | |
| 197. Supervisor Dwain Johnson expressed the Department's attitude towards integrity allegations in his statement to internal affairs when Detective Marquez was accused of perjury: "Det. Marquez never had any criminal intent to purjure [sic] himself. . . . If he made a mistake, it certainly doesn't mean that he should have to endure all of the psychological strain that he has gone through just because a lawyer knows how to manipulate the Justice System and try to make a smoke screen to cover his own courtroom inadequacies. The mere fact that Det. Marquez went through all of this is nothing less than an outrage, and I personally believe it should stop here and now."<br>Ex. 3, IA 84-079 at CITY 59438. | Undisputed. | |
| 198. Mr. Villegas is innocent of the Lazo and England murders.<br>Ex. 71 at 827:23-24 (Villegas 12.12.94 testimony). | Disputed. | Plaintiff was convicted of murder and has never established actual innocence. |
| 199. Mr. Villegas was incarcerated nearly 20 years | Undisputed. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| for the Lazo and England murders.<br>Ex. 79 at 50:6-7 (Villegas 9.15.11 testimony). | | |
| 200. Mr. Villegas's, Rodney Williams's, and Marcos Gonzalez's confessions each tell the same fabricated story: that Mr. Villegas, Williams, and Gonzalez participated in the murders of Armando Lazo and Robert England along with Enrique Ramirez ("Popeye") and Fernando Lujan ("Droopy").<br>Ex. 72 (Villegas statement); Ex. 73 (Williams statement); Ex. 74 (Gonzalez statement). | Undisputed that Plaintiff, Williams, and Gonzalez's confessions detail the same story.  Disputed that they are fabricated. | City's Reply Ex. M |
| 201. Enrique Ramirez (known by the nickname "Popeye") was incarcerated and Fernando Lujan (known by the nickname "Droopy") was on electronic monitoring and miles away from the murder at the time of the murder.<br>Ex. 30, at 250:7-51:21, 253:6-16 (Marquez deposition); Ex. 31, at 164:8-15 (Graves deposition). | Undisputed. | |
| 202. On April 21, 1993, about four to five detectives came into Mr. Villegas's house asking for Marcos Gonzalez.<br>Ex. 75 at 220:11-25 (Villegas 12.1.94 testimony). | Disputed.  Marquez along with Ortega went to his house.  Other officers assisted them. | Attachment 2-A Marquez Depo 198:3-6 |
| 203. At the time, Mr. Villegas was only 16 years old.<br>Ex. 76 (Villegas Arrest Report). | Undisputed. | |
| 204. When Mr. Villegas saw Detectives taking Gonzalez away, he asked why | Undisputed that Plaintiff testified to this. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| Gonzalez was being taken away. Ex. 75 at 220:14-18 (Villegas 12.1.94 testimony); Ex. 71 at 813:6-9 (Villegas 12.12.94 testimony). | | |
| 205. In response, the detectives told Mr. Villegas he was under arrest too, and Marquez grabbed him and handcuffed him tightly. Ex. 75 at 220:15-21 (Villegas 12.1.94 testimony); Ex. 71 at 813:10-12 (Villegas 12.12.94 testimony). | Undisputed that Plaintiff testified to this. | |
| 206. Marquez and another detective told Mr. Villegas that they had them for murder, that they had killed two people, and Marquez told him, "I am going to take you to kick your ass." Ex. 71 at 813:19-24 (Villegas 12.12.94 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 207. Mr. Villegas was arrested at about 10 o'clock. None of the arresting officers asked for parental permission to question Mr. Villegas. Ex. 75 at 227:20-21 (Villegas 12.1.94 testimony), Ex. 31 at 153:1-12 (Graves deposition). | Disputed.  When the officers got to Plaintiff's house they told Plaintiff's mom they needed to speak with Plaintiff.  They called Plaintiff and came out. Det. Marquez arrived at Plaintiff's home approximately 11:00 o'clock as he wrote the time he gave Plaintiff his Miranda on the Miranda card. | Attachment 2-A Marquez Depo 189:7-13; 190:20-191:1 |
| 208. Throughout his interrogation, Mr. Villegas was handcuffed. Ex. 75 at 243:17-24 (Villegas 12.1.94 testimony). | Undisputed that Plaintiff testified to this. | |
| 209. The Detectives placed Mr. Villegas into a police car and drove Mr. Villegas past a | Undisputed that Plaintiff testified to this. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| house they identified as Droopy's house.<br>Ex. 77 at 29:17-30:8 (Villegas 9.15.11 testimony). | | |
| 210. Mr. Villegas did not know why the detectives drove him past Droopy's house. | Undisputed that Plaintiff testified to this. | |
| 211. Detective Marquez asked Mr. Villegas if he knew someone named Snoopy; Mr. Villegas responded that he did not know a Snoopy, but he knew someone nicknamed Droopy. Ex. 77 at 30:6-8 (Villegas 9.15.11 testimony). | Undisputed that Plaintiff testified to this. | |
| 212. The detectives then drove Mr. Villegas to the parking lot by Northpark Mall.<br>Ex. 75 at 222:8-17 (Villegas 12.1.94 testimony). | Undisputed. | |
| 213. When they parked in the parking lot, all of the detectives from the three or four police cars present got out of their cars and talked with one another.<br>Ex. 75 at 222:10-15 (Villegas 12.1.94 testimony). | Disputed. Det. Marquez remembers stopping at a back of a building to thank the officers that assisted and to make sure everyone knew where each one was going. | Attachment 2-A Marquez Depo, 196:16-197:7<br>Attachment 2-C, Graves Depo, 150 :6-10 ; 153 :16-155 :4 |
| 214. Defendants Marquez, Arbogast, and Graves stepped outside their cars and discussed "what each one of us was going to do."<br>Ex. 75 at 222:10-15 (Villegas 12.1.94 testimony). | Disputed. Det. Marquez remembers stopping at a back of a building to thank the officers that assisted and to make sure everyone knew where each one was going. | Attachment 2-A Marquez Depo, 196:16-197:7 |
| 215. The detectives talked with each other for about 30 minutes at Northpark Mall.<br>Ex. 75 at 221:16-22:9 (Villegas 12.1.94 testimony); Ex. 77 at 31:5-9 (Villegas 9.15.11 testimony). | Disputed. Det. Marquez stated that they stopped for two minutes. | Attachment 2-A, Marquez Depo, 201:3-4<br>Attachment 2-C, Graves Depo, 150 :6-10 ; 153:16-155 :4 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 216. The detectives then drove Mr. Villegas to the Five Points police station. Mr. Villegas protested that he was a juvenile and should not be at the adult jail. The detectives ignored him, saying that he was 17. Ex. 75 at 224:18-225:8 (Villegas 12.1.94 testimony), Ex. 77 at 32:6-10 (Villegas 9.15.11 testimony). | Disputed. Det. Marquez drove Villegas to JIS. | Attachment 2-A, Marquez Depo, 201:22-202:2 Attachment 2-C, Graves Depo, 154:18-20 |
| 217. At the Five Points station, the Detectives put Mr. Villegas in a room by himself for 10-15 minutes, and then Defendants Marquez and Arbogast began talking to him. Ex. 75 at 225:13-22 (Villegas 12.1.94 testimony); Ex. 77 at 32:19-33:3 (Villegas 9.15.11 testimony). | Disputed. Plaintiff was taken to JIS. Undisputed that Plaintiff testified to this. | Attachment 2-A, Marquez Depo, 201:22-202:2 |
| 218. Defendant Marquez called him names, calling him a lucky punk, a stupid asshole, and then they took Mr. Villegas outside to a detective car. Ex. 75 at 226:1-5 (Villegas 12.1.94 testimony); Ex. 71 at 815:15-24 (Villegas 12.12.94 testimony). | Disputed. Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 219. Defendant Marquez continued cursing at Mr. Villegas. Defendants Marquez and Arbogast drove Mr. Villegas to the juvenile detention facility. Ex. 75 at 226:6-13, 239:5-16 (Villegas 12.1.94 testimony); Ex. 77 at 33:1-20 (Villegas 9.15.11 testimony). | Undisputed that the officers took Plaintiff to the juvenile detention facility but contested regarding the cursing. | Attachment 2-A, Marquez Depo, 207:24-210:21 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 220. Mr. Villegas had been in police custody approximately one and a half hours to two hours before he was taken to the juvenile division. Ex. 75 at 238:10-13 (Villegas 12.1.94 testimony). | Disputed.  Plaintiff was taken directly to JIS. | Attachment 2-A, Marquez Depo, 201:22-202:2 |
| 221. Defendant Marquez threatened Mr. Villegas that if he did not give a statement when they arrived at the juvenile office, they "would turn the car around and go to the desert and beat [him] right there." Ex. 75 at 226:6-13 (Villegas 12.1.94 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 222. At the juvenile investigation service division, Defendant Marquez initially handcuffed Mr. Villegas to a chair and left him there for 20-30 minutes. Ex. 71 at 816:4-11 (Villegas 12.12.94 testimony). | Undisputed that Plaintiff testified to this. | |
| 223. Thereafter, Defendant Marquez returned with two other detectives. Ex. 71 at 816:12-14 (Villegas 12.12.94 testimony). | Undisputed that Villegas testified to this. | |
| 224. Before the detectives took Mr. Villegas to a juvenile probation officer, Defendant Marquez interrogated Mr. Villegas at the juvenile investigation station, telling him "[w]e know you did this shooting, motherfucker." Ex. 77 at 34:23-35:15 (Villegas 9.15.11 testimony). | Disputed. Plaintiff was not questioned.  Plaintiff was asked if he wanted to give a statement and when he said yes, they began doing the paperwork to present to the intake officer. Plaintiff was sitting in the office of the sergeant and the officers were around the vicinity. | Attachment 2-A, Marquez Depo, 202:3-4; 202:13-203:10; 204:6-15 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 225. Defendant Marquez also threatened that they would take Mr. Villegas to the County jail if he did not give a statement. They told Mr. Villegas at the County jail fat old men would rape him and he would get his ass kicked. Ex. 75 at 226:23-227:3 (Villegas 12.1.94 testimony); Ex. 77 at 35:9-24 (Villegas 9.15.11 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 226. Defendant Marquez stated, "I'm personally going to put you in a tank with a bunch of fat faggots and they're going to rape you." Ex. 71 at 818:17-25 (Villegas 12.12.94 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 227. Defendant Marquez cussed at Mr. Villegas over and over and repeated these threats to him. Mr. Villegas was afraid as a result. Ex. 75 at 227:2-7 (Villegas 12.1.94 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 228. Defendant Marquez accused Mr. Villegas of committing the murders. When Mr. Villegas denied committing the murders, Defendant Marquez would hit Mr. Villegas in the back of the head. Ex. 75 at 228:1-11 (Villegas 12.1.94 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 229. Defendant Marquez repeatedly hit Mr. Villegas in the back of the head. Ex. 75 at 228:7-11 (Villegas 12.1.94 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 230. Defendant Marquez would hit Mr. Villegas on the bottom of the back of his | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| head and then tell him, "now tell me the truth, punk." Ex. 75 at 228:12-15 (Villegas 12.1.94 testimony). | | |
| 231. Defendant Marquez told him that they were all "low lifes", but Plaintiff is the one who is going to get "fucked in jail." Ex. 71 at 817:8-16 (Villegas 12.12.94 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 232. Defendant Marquez hit Mr. Villegas hard in the back of the head, and hit him with a hand that had a ring on it. Ex. 75 at 228:12-15 (Villegas 12.1.94 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 233. All told, Defendant Marquez hit Mr. Villegas four to five times. Ex. 75 at 228:16-19 (Villegas 12.1.94 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 234. All of the detectives were screaming at Mr. Villegas. Ex. 71 at 818:1-2 (Villegas 12.12.94 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 235. Mr. Villegas was "terrified out of his mind" as a result. Ex. 77 at 35:25-36:1 (Villegas 9.15.11 testimony). | Undisputed that Plaintiff testified to this. | |
| 236. During his interrogation, Mr. Villegas was so terrified he was physically shaking and felt mentally paralyzed. Ex. 77 at 37:2-8 (Villegas 9.15.11 testimony). | Undisputed that Plaintiff testified to this. | |
| 237. Defendant Marquez fed Mr. Villegas information about the murders to make his confession believable. Ex. 71 at 821:10-16 (Villegas 12.12.94 testimony). | Disputed.  Det. Marquez let Plaintiff tell him in his own words what happened, once they were done he went over it again and Plaintiff | Attachment 2-A, Marquez Depo, 208:3-17 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| | narrated while Det. Marquez typed. | |
| 238. Defendant Marquez fed Mr. Villegas facts, including that Villegas was in a vehicle that drove down Transmountain Road and that Popeye and Droopy were involved<br>Ex. 71 at 821:10-16 (Villegas 12.12.94 testimony). | Disputed.  Det. Marquez let Plaintiff tell him in his own words what happened, once they were done he went over it again and Plaintiff narrated while Det. Marquez typed. | Attachment 2-A, Marquez Depo, 208:3-17 |
| 239. Defendant Marquez fed Mr. Villegas information about he and the others supposedly going on a beer run.<br>Ex. 77 at 46:6-22 (Villegas 9.15.11 testimony). | Disputed.  Det. Marquez let Plaintiff tell him in his own words what happened, once they were done he went over it again and Plaintiff narrated while Det. Marquez typed. | Attachment 2-A, Marquez Depo, 208:3-17 |
| 240. Defendant Marquez told Mr. Villegas that if he gave a statement, he could go to the juvenile detention center, and not the County jail, but if he did not make a statement he would kick Mr. Villegas's ass.<br>Ex. 71 at 822:12-20 (Villegas 12.12.94 testimony) | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 241. The detectives told Mr. Villegas that he had to continue cooperating "to the end." Mr. Villegas believed that if he did not continue cooperating all the way to the end, the detectives would beat him.<br>Ex. 75 at 230:14-17 (Villegas 12.1.94 testimony) | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 242. All of the above misconduct occurred before Mr. Villegas was taken to see the juvenile probation officer.<br>Ex. 77 at 34:23-37:8 (Villegas 9.15.11 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 243. During his interrogation, detectives used false evidence ploys, threats, and promises, each of which were known to increase the risk of involuntary and false confessions.<br>Ex. 79 at 27-32 (Leo Report). | This is merely an expert opinion. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact.<br>*Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) | |
| 244. Defendant Marquez told Mr. Villegas that he was going to take him in front of the intake officer and Mr. Villegas was supposed to tell the intake officer that he was going to make a statement.<br>Ex. 77 at 37:9-18 (Villegas 9.15.11 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 245. Defendant Marquez told Mr. Villegas that if he didn't comply, Defendant Marquez would take him to the desert and whip his ass, and then take him to the County Jail to be raped by "fat faggots".<br>Ex. 77 at 37:19-23 (Villegas 9.15.11 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 246. Defendant Marquez repeated these threats multiple times, and told Mr. Villegas not to tell the intake officer anything other than he wanted to make a statement.<br>Ex. 77 at 37:23-38:2 (Villegas 9.15.11 testimony) | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 247. According to the Youth Officer assigned to the case, Defendants Marquez and Arbogast did not call for a youth officer to assist with the case until after Mr. Villegas had already confessed. | Disputed.  Det. Ortega did not know what took place. | Plaintiff's Ex. 32, 180:18-23 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| Ex. 32 at 178:16-181:4 (Ortega deposition) | | |
| 248. Based on Defendant Marquez's threats, Mr. Villegas did not tell the intake worker, Mario Aguilera, what Defendant Marquez had been saying to him. Ex. 77 at 38:10-15 (Villegas 9.15.11 testimony). | Undisputed that Plaintiff testified to this. | |
| 249. Defendant Marquez then threatened Mr. Villegas that he needed to tell the magistrate judge that he wanted to make a statement, or else he would take Mr. Villegas to the desert and beat his ass. Ex. 77 at 38:19-39:7 (Villegas 9.15.11 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 250. When Mr. Villegas was first brought before the magistrate judge, he had already been interrogated and had spent approximately four hours in police custody. Ex. 75 at 225:13-231:25 (Villegas 12.1.94 testimony). | Undisputed that Plaintiff testified to this. | |
| 251. Defendant Marquez stayed with Mr. Villegas until the Magistrate Judge arrived; when the Magistrate Judge left, Defendant Marquez returned to the room. Ex. 77 at 38:19-39:14 (Villegas 9.15.11 testimony). | Undisputed that Plaintiff testified to this. | |
| 252. After talking to the Magistrate Judge, the detectives brought Mr. Villegas back to the Juvenile Investigative Section | Undisputed that Plaintiff testified to this. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| Division and handcuffed him to a chair.<br>Ex. 77 at 39:21-40:9 (Villegas 9.15.11 testimony). | | |
| 253. Mr. Villegas told Marquez a false story; that Williams was going to do something crazy. In response, Marquez got really angry, and slapped Mr. Villegas in the back of the head.<br>Ex. 77 at 40:2-41:5 (Villegas 9.15.11 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. Undisputed that Plaintiff testified to this | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 254. Mr. Villegas agreed to falsely implicate Rodney Williams as a result of the abuse.<br>Ex. 75 at 228:1-19 (Villegas 12.1.94 testimony). | Undisputed that Plaintiff testified to this | |
| 255. In response, Defendant Marquez slapped Mr. Villegas "real hard," and told him that he was the one who committed the murders.<br>Ex. 75 at 228:19-229:13(Villegas 12.1.94 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 256. Defendant Marquez wrote up Plaintiff's initial statement implicating Williams, but then crumpled it up and threw it away.<br>Ex. 75 at 248:1-249:23(Villegas 12.1.94 testimony). | Undisputed that Plaintiff testified to this | |
| 257. When Marquez was slapping Plaintiff again, Defendant Arbogast then called Defendant Marquez out of the interrogation room, and they left Mr. Villegas alone in the interrogation room.<br>Ex. 77 at 45:18-46:5 (Villegas 9.15.11 testimony). | Undisputed that Plaintiff testified to this.  Disputed. Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 258. Then Defendant Marquez returned, saying he had Gonzalez's statement. Ex. 77 at 45:18-46:5 (Villegas 9.15.11 testimony). | Undisputed. | |
| 259. Defendant Marquez threatened Mr. Villegas that he would get the death penalty via the electric chair, and that Defendant Marquez would flip the switch himself. Ex. 77 at 40:17-41:5. (Villegas 9.15.11 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 260. Mr. Villegas told Defendant Marquez he committed the murders with a shotgun. Ex. 77 at 43:11-21 (Villegas 9.15.11 testimony). | Disputed.  Plaintiff never mentioned a shotgun. | Attachment 2-A, Marquez Depo, 158:15-21 |
| 261. Defendant Marquez responded by telling Mr. Villegas that he was lying, slapping him on the back of the head, and repeating the threats about taking him into the desert and beating him. Ex. 77 at 43:16-21 (Villegas 9.15.11 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 262. Mr. Villegas confessed because he was afraid of the threats made to him during his interrogation. Ex. 77 at 48:3-25 (Villegas 9.15.11 testimony). | Undisputed that Villegas testified to this. | |
| 263. The detectives told Mr. Villegas if he didn't cooperate until the end they would beat him. Ex. 75 at 230:14-17 (Villegas 12/1/94 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 264. When it came time to sign the false confession in front of the magistrate judge, Defendant Marquez told Mr. Villegas that if he screwed up, they would take him to the desert and beat him, and take him to the County Jail. Ex. 77 at 49:9-50:3 (Villegas 9.15.11 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 265. But if Mr. Villegas did as he was directed, Defendant Marquez promised him that he would take him to the juvenile detention center, and nothing bad would happen to him. Ex. 77 at 49:9-50:3 (Villegas 9.15.11 testimony). | Disputed.  Marquez did not call Plaintiff names, beat him, threaten him, or accuse him of anything. | Attachment 2-A, Marquez Depo, 207:24-210:21; 207:24-208:2; 210:13-21 |
| 266. The next day after Mr. Villegas falsely confessed, he told his probation officer that he was innocent and that Defendant Marquez had made him sign the confession. Ex. 77 at 52:8-12 (Villegas 9.15.11 testimony). | Disputed. Plaintiff told Sotello that he was tired and wanted to go back to sleep so I told them what they wanted to hear. | Attachment 2-E [Villegas J.S. 03764-3766 |
| 267. Around midnight on April 10, 1993, Robert England, Armando Lazo, Jesse Hernandez and Juan Medina left a party and were on Jamaica Street, and were walking together along Transmountain Drive in El Paso. Ex. 84, at 4:13-5:1, 6:3-7:8, 8:1-9:17 (December 7, 1994 Medina testimony). | Undisputed. | |
| 268. While they were walking on Electric Street, a vehicle approached them. Ex. 85 (February 16, 2009 Hernandez affidavit); Ex. 86 | Undisputed. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| (May 14, 2009 Medina affidavit). | | |
| 269. England and Lazo walked toward the vehicle and multiple shots were fired from the passenger side of the vehicle. Ex. 84 at 14:14-15:25 (December 7, 1994 Medina testimony); Ex. 85 (February 16, 2009 Hernandez affidavit). | Undisputed. | |
| 270. England was shot and killed. Ex. 87 (Bellows police report). | Undisputed. | |
| 271. Lazo was also shot, but made his way to the front door of a neighborhood home, where he collapsed and eventually died. Ex. 88 at 170:9-71:12 (Gorham 8.21.95 testimony). | Undisputed. | |
| 272. Hernandez and Medina were not shot and ran northward toward the Blockbuster video on Fairbanks Street. Ex. 89 at 39:24-40:18 (December 7, 1994 Hernandez testimony). | Undisputed. | |
| 273. Hernandez was 17 years old at the time. Ex. 90 (Hernandez Statement 4.10.93). | Undisputed. | |
| 274. Defendants Marquez and Arbogast reported that they brought Hernandez and Medina to the Crimes Against Persons (CAP) office and took their statements on April 10, 1993. Ex. 22 at 248:7-16 (Earl Arbogast deposition); Ex. 90 (April 10, 1993 Hernandez | Undisputed. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| statement); Ex. 91 (April 10, 1993 Medina statement). | | |
| 275. Defendant Marquez brought Hernandez back into the CAP office for a second interrogation.<br>Ex. 92 at 52:10-11, 53:3-10 (June 22, 2011 Hernandez testimony). | Undisputed. | |
| 276. Defendant Marquez took Hernandez into a room with a mirror, and told him to describe the shooting again in writing on a yellow legal pad. After Hernandez wrote what happened on the pad, Marquez took the pad and tossed it back at Hernandez.<br>Ex. 92 at 53:17-54:22 (June 22, 2011 Hernandez testimony). | Undisputed. | |
| 277. Defendant Marquez told him to "cut the bullshit..[y]ou know I know you did it." Defendant Marquez falsely told Hernandez that "Juan [Medina] is saying you did it." Id. Defendant Marquez told Hernandez to "just confess" or he was "going to jail" and would "get the death penalty."<br>Ex. 92 at 53:17-54:22 (June 22, 2011 Hernandez testimony). | Undisputed that Hernandez testified to this. | |
| 278. Hernandez began to believe he was somehow guilty of the murder. He put his head down and cried.<br>Ex. 92, at 53:22-55:11 (June 22, 2011 Hernandez testimony). | Undisputed that Hernandez testified to this. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 279. Nearly 30 years afterwards, Hernanadez would still have nightmares about Defendant Marquez and the interrogation. Ex. 92, at 53:22-55:11 (June 22, 2011 Hernandez testimony). | Undisputed that Hernandez testified to this. | |
| 280. On April 15, 1993, according to Defendant Marquez, he took a statement from a high school student, Robert Hall, who stated that 15 year old Michael Johnston had admitted to committing the Lazo/England murder. Ex. 81 (Arbogast report) (DEF CITY 266); Ex. 82 (Robert Hall Statement) (DA 34-625-629). Ex. 30 at 100:12-102:2 (Marquez deposition); Ex. 83 at 596:19-20 (Johnston 12.9.94 testimony). | Undisputed. | |
| 281. On the night of April 15, 1993, Defendants Marquez, Arbogast, Ortega, and Graves traveled across the border to New Mexico, where Johnston resided, to bring him into custody. Ex. 22, at 253:2-20 (Earl Arbogast deposition); Ex. 70, at 77:17-78:3 (Brown deposition); Ex. 31, at 142:24-143:24 (Graves deposition). | Undisputed. | |
| 282. Defendant Ortega reported that Jauregui was taken into custody at 7 p.m., and Johnston was taken into custody at 7:19pm. Johnston was physically grabbed, handcuffed, informed he was under arrest for murder, | Disputed, Johnston was taken into custody at 2119 hrs | See Plaintiff's exhibit 99 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| handcuffed him, and placed into a police car.<br>Ex. 83, at 596:21-97:18 (Johnston Testimony dated 12/9/1994).<br>Ex. 99, Ortega Report. | | |
| 283. Johnston's mother, Barbara Hoover, told the police not to question her son until he had an attorney. Johnston's mother was not present for his interrogation. Johnston also asked for a lawyer, but they continued questioning him regardless.<br>Ex. 93, at 615 (Barbara Hoover Affidavit), Ex. 95, at 585:14-587:7 (December 9,1994 Hoover testimony), Ex. 83, at 615:8-11(Johnston 12.9.94 testimony). | Undisputed that these witnesses testified in this manner | |
| 284. Defendants Marquez, Arbogast, Ortega, and Graves took Johnston to the Chaparral police station, and discussed what they wanted to do with the boys.<br>Ex. 83, at 604:5-24. (Johnston Testimony dated 12/9/1994). | Undisputed that Johnson testified in this manner. | |
| 285. Johnston was threatened that, if he did not travel with them back to El Paso, he would be sent to jail in New Mexico.<br>Ex. 83, at 616:5-21 (Johnston 12.9.94 testimony). | Undisputed that Johnson testified in this manner. | |
| 286. At approximately 9:10 p.m., after Johnston had been detained for about two hours, Defendants Marquez, Arbogast, Ortega, and Graves brought him across state lines to Texas. | Undisputed. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| Ex. 83, at 605:6-7 (Johnston 12.9.94 testimony); Ex. 103, at 389:8-10 (Ortega 12.8.94 testimony). | | |
| 287. At approximately 11:19pm, Marquez, Arbogast, Ortega, and Graves "proceed[ed] to take [Johnston's] written statements." Ex. 99 (Ortega report at 11:19pm); Ex. 30 at 109:2-5 (Marquez dep). | Disputed, the Juveniles were taken before the Magistrate at 2230 hrs. Disputed Johnson never gave a written statement | Plaintiff's Ex. 99 Attachment 2-D, Villegas J.S. 030406-030420 .pdf p. 10] |
| 288. Johnston was questioned about the murder before he was brought before a Magistrate Judge or a juvenile probation officer. Ex. 83 at 606:7-16 (Johnston 12/9/94 testimony). | Disputed. Saw intake officer at 2145 hrs and Johnston said he wanted to give a written statement. 2230 taken before Magistrate for warnings there returned to YSD to give written statements | Plaintiff's Ex. 99 |
| 289. The detectives handcuffed Johnston and screamed in his face, telling him that he committed the crime. Ex. 83 at 600:6-13 (Johnston 12/9/94 testimony). | Undisputed that he testified. | |
| 290. The detectives spit as they yelled in Johnston's face. Because Johnston was handcuffed, he was not free to wipe his face. Johnston was frightened. Ex. 83 at 600:14-24 (Johnston 12/9/94 testimony). | Undisputed that he testified. | |
| 291. Johnston explained to them that he did not commit the murders. The detectives told him that if he told them he did it, they would let him off easy. But, if he did not admit his guilt, he would get | Undisputed that he testified. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| the electric chair and they would pull the switch themselves. Ex. 83, at 600:6-10, 609:19-610:3 (Johnston 12/9/94 testimony). | | |
| 292. The detectives threatened to take Johnston to jail where he would be beaten and sexually assaulted. Ex. 83, at 598:20-599:4 (Johnston 12/9/94 testimony). | Undisputed that he testified. | |
| 293. Finally, after hours of interrogation and in fear for his life, Johnston admitted to committing the murders. Ex. 83 (Johnston Testimony, first criminal trial, 609:19-610:3; Ex. 30 at 125 (Marquez deposition). | Disputed. J Johnston never gave a written statement— "Johnston gave five different versions of what occurred, and each one was different from the other. It was determined that both of them were not involved in the case" | Attachment 2-D, Villegas J.S. 030406-030420 .pdf p. 10] |
| 294. Defendant Marquez cleared Johnston from being a suspect in the murder. Ex. 30 at 125:1-23 (Marquez deposition). | Undisputed. | |
| 295. Johnston arrived home the following day on April 16, 1993, at approximately 3 a.m., after being in police custody for eight hours. Ex. 93 (Barbara Hoover Affidavit); Ex. 95, at 583:21-584:9 (Hoover 12/9/94 testimony). | Undisputed. | |
| 296. Johnston's wrists were red and had bruises from the handcuffs. Ex. 95, at 587:8-12. (Hoover 12/9/94 testimony). | Undisputed. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 297. Johnston remained traumatized for months. Whenever Johnston heard a siren, he would go into his closet and hide. Ex. 93 (Barbara Hoover Affidavit); Ex. 95, at 587:11-15 (Hoover 12/9/94 testimony). | Undisputed. | |
| 298. Defendant Marquez directed Defendant Graves to pick up Rodney Williams. Ex. 30 at 160:15-62:1 (Marquez deposition). | Disputed. | Attachment 2-B, Earl Arbogast Depo, 168:5-1 |
| 299. Marquez has no explanation for why they decided to pick up Williams. Ex. 30 at 168:6-17 (Marquez deposition). | Disputed, Marquez could not remember | Attachment 2-A, Marquez Depo 168:6-17 |
| 300. Marquez never documented how Williams came to his attention, or why he directed Defendant Graves to question Williams. Ex. 30 at 170:22-71:20 (Marquez deposition). | Disputed. | Attachment 2-B, Earl Arbogast Depo 168:5-11 |
| 301. Under accepted police practices, Defendants should have documented how Williams came to their attention during the investigation, and why they decided to question him. Ex. 6 at 32 (Allio report). | Disputed.  This is merely an expert opinion and speculation. "Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible" and therefore cannot serve as an undisputed fact. *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987). Further disputed opinions exist in the City's expert report. | |
| 302. On April 21, 1993, Defendants Graves and Arbogast took 15 year old Williams into custody. | Undisputed. | |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| Ex. 31 at 103:7-04:19 (Graves deposition); Ex. 95 (Williams arrest report). | | |
| 303. At the time, Defendants Graves and Arbogast were both assigned to the Crimes Against Persons division of the Criminal Investigations Bureau.<br>Ex. 31 at 21:6-22:9 (Graves deposition); Ex. 22 at 24:12-25:1; 121:5–7 (Earl Arbogast deposition). | Undisputed. | |
| 304. Neither Defendant Graves nor Defendant Arbogast read Williams his Miranda rights or interrogated him at the juvenile division.<br>Ex. 80 at 11:6-12:25 (Williams' 6/23/11 testimony); Ex. 96 at 482:13-492:9 (Graves 12/9/94 testimony). | Undisputed. | |
| 305. Instead, Defendant Graves took Williams to the CAP Office.<br>Ex. 80 at 12:10-20 (Williams' 6/23/11 testimony). | Undisputed. | |
| 306. Although 15 year old Williams should have been questioned by a juvenile officer and brought to a magistrate before being questioned, Defendant Graves never involved a juvenile officer or a magistrate judge.<br>Ex. 31 at 107:16-22 (Graves deposition). | Disputed, Graves did not believe that Williams was a witness and not a suspect. Therefore, it was not necessary to take him before a juvenile officer or magistrate judge | Attachment 2-C, Graves Depo, 107:11-14; 109:12-112:23 |
| 307. Williams asked the detectives for his mother, but was not allowed to speak with her. | Disputed | Attachment 2-C, Graves Depo, 106:19-107:10 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| Ex. 80 at 14:19-15:7 (Williams 6/23/11 testimony). | | |
| 308. Graves and Arbogast questioned Williams. Ex. 31 at 105:6-25 (Graves deposition). | Undisputed. | |
| 309. Williams informed Graves that he was innocent of the murders, and that he was at his home with Villegas and Gonzalez on the night of the murders. In response, Graves told him that Williams's account wasn't the correct story. Ex. 80 at 19:16-20:11 (Williams 6/3/2011 testimony). | Disputed. | Attachment 2-C, Graves Depo, 105:23-111:13 |
| 310. Defendant Graves told Williams that he could go home once he provided them with a statement. Ex. 94, at 251:17-22 (December 8, 1994 Williams testimony). | Disputed. | Attachment 2-C, Graves Depo, 105:23-111:13 |
| 311. Defendant Graves threatened Williams that, if he didn't say certain things in the statement, he would be charged with the crime and would get "fucked in the ass" by other inmates in prison. Ex. 80 at 17:7-24 (June 3, 2011 Williams testimony). | Disputed. | Attachment 2-C, Graves Depo, 105:23-111:13 |
| 312. Graves threatened Williams that he was not going to be able to pass gas because his "[asshole] was going to be too loose" ; Graves also told Williams they wouldn't let him go until he gave a statement. | Disputed. | Attachment 2-C, Graves Depo, 105:23-111:13 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| Ex. 94 at 251:7-10 (December 8, 1994 Williams testimony). | | |
| 313. Defendant Graves then typed a statement for Williams, and made up the facts included in that statement.<br>Ex. 94 at 217:2-222:1; 226:15-235:17 (December 8, 1994 Williams testimony); Ex. 97 at 356:11-14 (August 22, 1995 Williams testimony). | Disputed. | Attachment 2-C, Graves Depo, 105:23-111:13 |
| 314. Detective Graves told Williams to name Lujan and Ramirez in his statement.<br>Ex. 80 at 23:1-5 (June 3, 2011 Williams testimony). | Disputed. | Attachment 2-C, Graves Depo, 105:23-111:13; 161:9-162:9 |
| 315. Graves has no explanation for how Williams supposedly named Lujan and Ramirez as co-offenders in the murders when they could not have been present for the murders.<br>Ex. 31 at 164:11-20 (Graves deposition). | Disputed, Graves testified that he did not remember asking | Attachment 2-C, Graves Depo, 161:9-162:9; 164:11-20; 175:16-176:19; 184:12-185:8 |
| 316. Williams was at the CAP office for approximately nine hours, between 5:30 p.m. on April 21, 1993 until 2:30 a.m. until April 22, 1993.<br>Ex. 94 at 250:15-24 (Williams 12/8/94 testimony). | Disputed. | Attachment 2-C, Graves Depo, 116:1-118:10 |
| 317. After writing the statement, Graves provided the statement to Defendant Marquez and discussed it with him. | Disputed, Graves testified that he did not remember who he might have given the statement to or discussed it with | Attachment 2-C, Graves Depo, 113:1-11 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| Ex. 31 at 113:1-11 (Graves deposition). | | |
| 318. On April 21, 1993, at approximately 10 p.m., Defendants Marquez, Arbogast, and Graves went to Villegas's home and arrested 17-year old Marcos Gonzalez.<br>Ex. 77 at 28:4-22 (Villegas 9/15/11 testimony); Ex. 31 at 147:7-11, 151:11-14 (Graves deposition). | Undisputed. | |
| 319. Mr. Villegas was placed in a car with Defendants Marquez and Arbogast, and Gonzalez was placed in a car with Defendant Graves.<br>Ex. 77 at 29:6-16 (Villegas 9/15/11 testimony); Ex. 31 at 151:11-14 (Graves deposition). | Undisputed. | |
| 320. Defendant Graves then drove Gonzalez to the CAP office. Marquez took notes and spoke to Gonzalez.<br>Ex. 31 at 154:15-155:4 (Graves deposition), Ex. 30 at 126:5-22 (Marquez deposition) | Undisputed. | |
| 321. Defendant Graves proceeded to interrogate Gonzalez.<br>Ex. 31 at 171:3-9 (Graves deposition) | Undisputed. | |
| 322. Gonzalez told Defendant Graves that he was not involved in the Electric Street shooting and wasn't in any car.<br>Ex. 98 at 416:6-15 (August 22-23, 1995 Gonzalez testimony); Ex. 31, at 169:5-7 (Graves deposition). | Disputed. | Attachment 2-C, Graves Depo, 157 :1-158 :8 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 323. Defendant Graves forced him to write a statement at approximately 12:45 a.m. on April 22, 1993.However, Graves was not satisfied with Gonzalez's first statement because it did not inculpate him in the Electric Street shooting. Ex. 98 at 411:9-412:2 (August 22-23, 1995 Gonzalez Testimony), Ex. 74 (Marcos Gonzalez first statement); Ex. 100 at 447:10-20 (December 8, 1994 Gonzalez testimony) Ex. 74 (Marcos Gonzalez first statement). | Disputed. | Attachment 2-C, Graves Depo, 157 :158 :8 ; 158 :20-25 ; 161 :2-164 :7 ; 167 :24-170 :15 |
| 324. Graves continued to communicate with Defendants Marquez, Arbogast, and Ortega, who were contemporaneously interrogating Mr. Villegas through telephone calls. Ex. 22 at 214:10-216:12 (Earl Arbogast deposition); Ex. 31, at 166:17-167:21 (Graves deposition). | Undisputed. | |
| 325. Defendant Graves wasn't satisfied with Gonzalez's truthful statement that he was not involved in the murders, and wanted Gonzalez to admit to being in the car at the time of the shooting. Ex. 31 at 169:5-170:15 (Graves deposition); Ex. 101 at 145:17-24 (Gonzalez 12/1/94 testimony). | Disputed. | Attachment 2-C, Graves Depo, 161:9-162:9; 164 :11-20; 175 :16-176:19 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 326. Defendant Graves told Gonzalez that Mr. Villegas and Gonzalez said that Gonzalez was in the car that night, but they just wanted Mr. Villegas because they believed he was the shooter. Gonzalez maintained that he, Mr. Villegas, and Williams had nothing to do with the murders.<br>Ex. 98 at 426:1-427:7 (Gonzalez 8/22/95-8/23/1995 Testimony). | Disputed. | Attachment 2-C, Graves Depo, 161:9-162:9; 164 :11-20; 175 :16-176:19 |
| 327. Defendant Graves pushed Gonzalez against a wall and made Gonzalez change his statement.<br>Ex. 101 at 147:12-25; 148:23-49:5 (December 1, 1994 Gonzalez testimony). | Disputed. | Attachment 2-C, Graves Depo, 161:9-162:9; 164 :11-20; 175 :16-176:19 |
| 328. Defendant Graves told Gonzalez that he was a fucking liar, and he knew Gonzalez committed the crimes.<br>Ex. 101 at 146:11-147:1; 148:23-49:7 (December 1, 1994 Gonzalez testimony). | Disputed. | Attachment 2-C, Graves Depo, 161:9-162:9; 164 :11-20; 175 :16-176:19 |
| 329. Defendant Graves banged Gonzalez's head against the wall multiple times.<br>Ex. 101 at 149:3-7 (December 1, 1994 Gonzalez testimony). | Disputed. | Attachment 2-C, Graves Depo, 161:9-162:9; 164 :11-20; 175 :16-176:19 |
| 330. Defendant Graves told Gonzalez that he would be charged with capital murder and the penalty would be lethal injection.<br>Ex. 98 at 435:15-21 (August 22-23, 1995 Gonzalez testimony). | Disputed. | Attachment 2-C, Graves Depo, 161:9-162:9; 164 :11-20; 175 :16-176:19 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| 331. Defendant Graves told Gonzalez that he was going to be fucked by the other inmates in jail. Ex. 101 at 164:2-7 (December 1, 1994 Gonzalez testimony). | Disputed. | Attachment 2-C, Graves Depo, 161:9-162:9; 164 :11-20; 175 :16-176:19 |
| 332. Defendant Graves threatened that he would beat Gonzalez up and that he would be "screwed by fat, old men" at the county jail. Ex. 100 at 446:22-24 (December 8, 1994, Gonzalez testimony). | Disputed. | Attachment 2-C, Graves Depo, 161:9-162:9; 164 :11-20; 175 :16-176:19 |
| 333. Gonzalez was abused for approximately two hours. Ex. 101 at 147:12-25 (December 1, 1994 Gonzalez testimony). | Disputed. | Attachment 2-C, Graves Depo, 161:9-162:9; 164 :11-20; 175 :16-176:19 |
| 334. Defendant Graves forced Gonzalez to provide a story that implicated himself and the other juveniles. Ex. 100 at 419:23-420:24; 430:8-433-14 (Gonzalez 12/8/94 testimony). | Disputed. | Attachment 2-C, Graves Depo, 161:9-162:9; 164 :11-20; 175 :16-176:19 |
| 335. Gonzalez was afraid they were not going to let him go and was fright`tened about going to jail. He thought he might as well tell them what they wanted to hear because he felt forced to give a statement Ex. 98 at 426:21-428:1 (August 22-23 Gonzalez testimony). | Undisputed that Gonzales testified to this. | |
| 336. Defendant Graves has no explanation for how Gonzalez's confession could be truthful, if it named Lujan and Ramirez as co-offenders, when they could not have participated in the shootings. | Disputed, Graves did not remember if he asked about Lujan and Ramirez not being in the car. | Attachment 2-C, Graves Depo, 161:9-162:9; 164:11-20; 175:16-176:19 |

| PROPOSED UNDISPUTED FACTS | UNDISPUTED or DISPUTED | CONTROVERTING EVIDENCE (if disputed) |
|---|---|---|
| Ex. 31 at 164:16-20 (Graves deposition). | | |
| 337. Defendant Graves completed Gonzalez's inculpatory second statement on April 22, 1993, at approximately 2:30 a.m. Ex. 102 (Gonzalez second statement). | Undisputed. | |

# ATTACHMENT 2-A

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## COURT REPORTERS

# CASE NO. 3:15-CV-386

# DANIEL VILLEGAS

vs

# CITY OF EL PASO, ET AL.

# DEPONENT:

# ALFONSO MARQUEZ

# DATE:

# May 10, 2022



schedule@kentuckianareporters.com

877.808.5856  |  502.589.2273



www.kentuckianareporters.com

1            IN THE UNITED STATES DISTRICT COURT FOR THE
             WESTERN DISTRICT OF TEXAS, EL PASO DIVISION
2

3  DANIEL VILLEGAS,          )
                             )
4       Plaintiff            ) Case No. 3:15-CV-386
                             )
5  VS.                       ) Hon. David C. Guaderrama,
                             ) District Judge
6                            )
   CITY OF EL PASO,          )
7  ET AL.,                   ) Hon. Leon Schydlower,
                             ) Magistrate Judge
8                            )
        Defendants           ) JURY TRIAL DEMANDED
9  ********************************************************

10            ORAL AND VIDEOTAPED ZOOM DEPOSITION OF

11                      ALFONSO MARQUEZ

12                      MAY 10, 2022

13                      Volume 1 of 1
   ********************************************************
14            ORAL AND VIDEOTAPED ZOOM DEPOSITION OF ALFONSO

15  MARQUEZ, produced as a witness at the instance of the

16  PLAINTIFF and duly sworn, was taken in the above-styled

17  and numbered cause on the 10th day of May, 2022, from

18  9:49 a.m. to 7:07 p.m., before ASHLEY ELIZONDO, CSR No.

19  9465 for the State of Texas, reported by machine

20  shorthand, in El Paso County, Texas, pursuant to the

21  Texas Rules of Civil Procedure and the provisions stated

22  on the record or attached hereto.

23

24  Job No. 5225808

25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 104 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2022

2

```
 1                      APPEARANCES:

 2


 3   FOR THE PLAINTIFF:

 4            Russell Ainsworth, Esq.
              Wally Hilke, Esq.
 5            Quinn Rallins, Esq.
              LOEVY AND LOEVY
 6            311 North Aberdeen
              3rd Floor
 7            Chicago, Illinois, 60607
     Telephone: 312-243-5900
 8   E-mail: russell@loevy.com
              hilke@loevy.com
 9            rallins@loevy.com

10


11   FOR THE DEFENDANT ALFONSO MARQUEZ:

12            James A. Marquez, Esq.
              JAMES A. MARTINEZ PLLC
13            7170 Westwind
              Suite 201
14            El Paso, Texas 79912
     Telephone: 915-543-9712
15   E-mail: martinezja@jmeplaw.com

16   FOR THE DEFENDANT CAROL ORTEGA:

17            Andres Almanzan, Esq.
              MOUNCE GREEN MYERS SAFI PAXSON AND GALATZAN
18            100 N. Stanton Street
              Suite 1000
19            El Paso, Texas 79901
     Telephone: 915-532-2000
20   E-mail: almanzan@mgmsg.com

21


22   FOR THE DEFENDANT EARL ARBOGAST, HECTOR LOYA, RAY
     SANCHEZ AND SCOTT GRAVES:
23            Jim Darnell, Esq.
              Jeep Darnell, Esq.
24            Cris Estrada, Esq.
              JIM DARNELL PC
25            310 North Mesa Street
              Suite 212
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 105 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2016

3

```
 1            El Paso, Texas 79901
   Telephone: 915-532-2442
 2 E-mail: jdarnell@jdarnell.com
            jedarnell@jdarnell.com
 3          cestrada@jdarnell.com

 4 FOR THE DEFENDANT CITY OF EL PASO:

 5          Scott Tschirhart, Esq.
            Lowell Denton, Esq.
 6          RAMPAGE LAW
            2517 North Main Avenue
 7          San Antonio, Texas 78212
   Telephone: 512-279-6431
 8 E-mail: smtschirhart@rampagelaw.com

 9

10 FOR THE DEFENDANT KEMMITT BELLOWS:

11          Eric M. Brittain, Esq.
            WINDLE HOOD NORTON BRITTAIN AND JAY
12          201 E. Main Drive
            Suite 1350 Chase Tower
13          El Paso, Texas 79901
   Telephone: 915-545-4900
14 E-mail: brittain@windlehood.com

15

16 ALSO PRESENT:

17 Earl Arbogast        Defendant

18 Carlos Ortega        Defendant

19 Christy Burke

20 Krystal Barnes       Videographer

21

22

23

24

25
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**KENTUCKIANA**
COURT REPORTERS

```
 1                        I N D E X

 2

 3   Appearances                                          2

 4   ALFONSO MARQUEZ

 5         Examination by MR. RUSSEL AINSWORTH            8

 6    Further Examination by MR. LOWELL DENTON          268

 7   Changes and Signature                             292

 8   Reporter's Certificate                            294

 9   Further Certificate                               297

10
                           EXHIBITS
11   NO.                 DESCRIPTION                  PAGE

12   Exhibit 1           Procedures Manual             63

13   Exhibit 2        Chapter Seven - Juvenile         68

14   Exhibit 3      Acosta Supplemental Report         93

15   Exhibit 4      Robert Wayne Hall Statement        99

16   Exhibit 5       Carlos Medina Statement          106

17   Exhibit 6      Ortega Supplemental Report        107

18   Exhibit 7         Handwritten Notes              126

19   Exhibit 8       Terri Vinson Statement           130

20   Exhibit 9      Charles Blucher Statement         131

21   Exhibit 10   Terrance Strong Farrar Statement    132

22   Exhibit 11     Rodolfo Flores Statement          136

23   Exhibit 12        Complaint Report               139

24   Exhibit 13    Marquez Supplemental Report        140

25   Exhibit 14  Francisco Javier Flores Statement    144
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

| 1 | Exhibit 15 | David Rangel Handwritten Statement | 163 |
| 2 | Exhibit 16 | David Rangel Statement | 166 |
| 3 | Exhibit 17 | Jesse Hernandez Statement | 177 |
| 4 | Exhibit 18 | Rodney Williams Statement | 184 |
| 5 | Exhibit 19 | Call Record | 205 |
| 6 | Exhibit 20 | Marcos Gonzalez Confession (Retained) | 213 |
| 7 | Exhibit 21 | Fernando Lujan Statement | 214 |
| 8 | Exhibit 22 | Danny Villegas Confession | 218 |
| 9 | Exhibit 23 | Graves Supplemental Report | 249 |
| 10 | Exhibit 24 | Affidavit of Lieutenant James D. Nance | 257 |
| 11 | Exhibit 25 | Onnie Kirk Statement | 259 |
| 12 | Exhibit 26 | Map of Station | 261 |

13

14   REQUESTED DOCUMENTS/INFORMATION

15 NO.     DESCRIPTION   PAGE

16      NONE

17

18    CERTIFIED QUESTIONS

19      NONE

20

21

22

23

24

25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 108 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 10, 2022

6

 1  REPORTERS NOTE:  Please note this deposition was taken
 2  via Zoom; therefore, due to the poor quality of the Zoom
 3  videoconference, audio distortions, internet connections
 4  freezing, extraneous room noise, et cetera,
 5  unintelligent, indiscernible, or inaudibles may have
 6  created inaccuracies in the transcription.

 7          THE VIDEOGRAPHER:  My name is Krystal Barnes.
 8  I'm the online video technician, and Ashley Elizondo is
 9  the court reporter today representing Kentuckiana Court
10  Reporters located at 730 West Main Street, Suite 1010,
11  Louisville, Kentucky 40202.  Today is the 10th day of
12  May, 2022, and the time is 9:49 a.m.  We are convened by
13  video conference to take the deposition of Alfonso
14  Marquez in the matter of Daniel Villegas versus The City
15  of El -- of El Paso, et al, pending in the United States
16  District Court for the Western District of Texas, El
17  Paso Division.  Case Number 3:15-CV-386.

18          Will everyone but the witness please state your
19  appearance, how you are attending, and the location you
20  are attending from starting with the plaintiff's
21  counsel.

22          MR. AINSWORTH:  This is Russell Ainsworth
23  appearing from Chicago, Illinois.

24          MR. RALLINS:  Quinn Rallins appearing from
25  Chicago, Illinois.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          MR. ALMANZAN:  This Andy Almanzan.  I'm

2    appearing on behalf of Defendant, Carlos Ortega, in El

3    Paso, Texas, at my law office.  Also in attendance and

4    observing is my client, Carlos Ortega, here in El Paso

5    in my office as well.

6          MR. TSCHIRHART:  Scott Tschirhart representing

7    the City of El Paso appearing from San Antonio, Texas.

8          MR. MARTINEZ:  This is Jim Martinez here in --

9    at 100 North Stanton in El Paso, Texas.  I represent Al

10   Marquez.

11         MR. BRITTAIN:  Eric Brittain on behalf of

12   defendant, Kemmitt Bellows.  I am in my office appearing

13   via Zoom in El Paso, Texas.

14         MR. JEEP DARNELL:  This is Jeep Darnell on

15   behalf of our clients, Earl Arbogast, Scott Graves,

16   Hector Loya, and Ray Sanchez, and I'm at my office in El

17   Paso, Texas.

18         MR. JIM DARNELL:  This is Jim Darnell

19   representing the same people as Jeep.  I'm appearing

20   from El Paso.

21         MR. ESTRADA:  Cris Estrada also with the

22   Darnell firm representing the same defendants.  We're in

23   our office in El Paso, Texas.

24         THE VIDEOGRAPHER:  Okay.  Mr. Marquez, would

25   you please state your full name for the record?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 110 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2023

8

```
 1              THE WITNESS:  Alfonso Marquez.
 2              THE VIDEOGRAPHER:  All right.  And all parties
 3   agree that the witness is, in fact, Alfonso Marquez?
 4              MR. AINSWORTH:  Yes.  On behalf of the
 5   plaintiff, we do.
 6              MR. MARTINEZ:  Yes.
 7              THE VIDEOGRAPHER:  Perfect.  Sir, can you
 8   please raise your right hand so that the court reporter
 9   can swear you in?
10              THE REPORTER:  Sir, do you solemnly swear to
11   tell the truth, the whole truth, and nothing but the
12   truth?
13              THE WITNESS:  I do.
14                        ALFONSO MARQUEZ,
15   having been first duly sworn was examined and testified
16   as follows:
17                        EXAMINATION
18   BY MR. AINSWORTH:
19      Q     All right.  Sir, would you please state and
20   spell your name for the record?
21      A     Sorry.  You broke up.
22      Q     Would you please state and spell your name for
23   the record?
24      A     Alfonso Marquez.
25      Q     And can you spell your name?
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 111 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23,

9

```
 1    A    A-L-F-O-N-S-O, M-A-R-Q-U-E-Z.

 2    Q    Can you hear me okay?

 3    A    You -- you break very often.

 4    Q    Is everyone else having the same problem?

 5         MR. JEEP DARNELL:  No.

 6         MR. TSCHIRHART:  I hear you just fine, Russell.

 7    Q    Well, Mr. Marquez, if you have a problem

 8  understanding any of my questions, whether it's

 9  technical or because you can't understand what I'm

10  saying, please let me know.  Okay?

11    A    Yes, sir.

12    Q    And I'll try and do my best to rephrase the

13  question or reask it.  Okay?

14    A    Yes, sir.

15    Q    Have you been deposed before?

16    A    Yes.

17    Q    On how many occasions?

18    A    Once.

19    Q    When was that?

20    A    I do not recall, but I was working for the

21  county.

22    Q    Okay.  So it was some time ago?

23    A    I'm going to say about '97, '98.

24    Q    All right.  Because it's been a long time, I'm

25  just going to go over some of the ground rules of the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  deposition.  Is that okay?
 2      A    Yes, sir.
 3      Q    The first thing I ask you to do, just like you
 4  do when you're in court, just answer the questions out
 5  loud with a yes or a no if the question calls for it.
 6  Okay?
 7      A    Yes, sir.
 8      Q    The second thing I'm going to you to do is to
 9  wait until I'm done asking my question before you begin
10  your answer.  Okay?
11      A    Yes.
12      Q    And I'll try and do the same for you.  That is
13  to wait until your answer is finished before I start
14  asking my next question, so we don't make life difficult
15  for our court reporter.  Okay?
16      A    Yes.
17      Q    And as I said before, if you don't understand
18  my question, please ask me to phrase the question, reask
19  the question, or in some way indicate to me that you
20  don't understand my question.  Okay?
21      A    Yes.
22      Q    The flip side of that is that if you answer my
23  question, I'll assume that you've understood my question
24  as I posed it, fair?
25      A    Fair.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 113 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23

11

1    Q    Are you on any medication or do you have any

2  medical condition that would affect your ability to

3  testify truthfully and accurately here today?

4    A    No.

5    Q    You know, apart from the natural aging process,

6  do you believe you have any issues with your memory?

7    A    Sometimes I forget something and then I

8  remember it later on when I -- where I left it.

9    Q    All right.  Has that -- has that been the same

10 your whole life, or is that a more recent phenomenon?

11   A    More recent.

12   Q    Okay.  Have you ever seen a doctor for that

13 issue?

14   A    No.

15   Q    Has a doctor or medical professional ever told

16 you there is an issue with your memory?

17   A    No.

18   Q    Has anyone else told you that you have a

19 problem with your memory?

20   A    No.

21   Q    Do you believe the, you know, experience that

22 you're describing of, you know, forgetting and then

23 remembering something, do you believe that your memory

24 is worse than other people of the same age?

25   A    I can't answer that.  I just forget some things

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 114 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 23, 2017

12

```
 1  and then I remember some things.
 2      Q    Okay.  But, you know, this is something that
 3  happens to a lot of people.  A lot of people forget
 4  something and then remember it, right?
 5      A    Correct.
 6      Q    And so I'm just trying to wonder if it's your
 7  sense that this happens to you more often than other
 8  people that you know?
 9      A    No.  I can't answer that.  No.
10      Q    How often does it happen to you that you can't
11  remember something but then remember it at a later
12  point?
13      A    I can only answer back -- I just can't -- for
14  example, if I leave my grasses on the table and then I'm
15  trying to figure out where I left the glasses.  That's
16  what I'm talking about.
17      Q    Got it.  Okay.  So some issues with your
18  short-term memory; is that right?
19      A    Correct.
20      Q    All right.  Have you had any issues with your
21  long term memory that you know of?
22      A    I would say.  Yes.
23      Q    All right.  What issues have you had with your
24  long term memory?
25      A    I haven't seen something.  Can't recall what I
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 115 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

13

 1   did 25, 30 years ago.

 2       Q    Okay.  And that's common for people in, you

 3   know, based on your experience in life and in your

 4   professions, that sometimes it's hard to remember things

 5   that happened 25 to 30 years ago, right?

 6       A    Yes.

 7       Q    Do you have a belief that your long-term memory

 8   is better or worse than other people of your age?

 9       A    I don't know, sir.

10       Q    Okay.  Nobody has ever told you that your

11   long-term memory is worse than other people; is that

12   right?

13       A    Correct.

14       Q    And you've never believed that your long

15   term-memory was worse than other people; is that

16   correct?

17       A    I don't know.

18       Q    You don't know.  But you've never had that

19   belief, right?

20       A    I've never had the belief that -- no, sir.  No.

21       Q    Okay.  What did you do to prepare for your

22   deposition?

23       A    I read transcripts and the document they given

24   to me.

25       Q    All right.  Well, in this case, there is a lot

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  of transcripts and there is a lot of documents.  So can

 2  you tell me what transcripts you reviewed?

 3      A    The first trial, second trial, writ, motion to

 4  suppress, my statements, my presentation supplement.

 5      Q    All right.  I just wanted to stick with the

 6  transcripts for just this minute.  Did you read -- at

 7  the first trial, you testified in two occasions; is that

 8  right?

 9      A    I don't recall.

10      Q    Okay.  And did you review one transcript from

11  your first trial testimony or two trial -- two

12  transcripts from that first trial testimony on two

13  separate dates?

14      A    One -- one transcript.

15      Q    Okay.  And then what about from the written

16  hearing?  You testified on three separate days.  Did you

17  review the transcripts from each of those dates or just

18  from the -- the first day?

19      A    The three days of [inaudible].

20      Q    Okay.

21           THE REPORTER:  Can you speak up, Mr. Marquez?

22      A    Yes.  Sorry.

23      Q    All right.  And did you review any transcripts

24  of anybody else's testimony in preparation for this

25  deposition?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 117 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 2023

15

```
 1      A    No.
 2      Q    How many times did you review your transcripts?
 3  Your previous transcripts?
 4      A    I would say about four times.
 5      Q    All right.  And did you read each of them about
 6  four times?
 7      A    Yes.
 8      Q    What was the last time you read them?
 9      A    I believe the day before yesterday.
10      Q    And when did you start reading them to prepare
11  for this deposition?
12      A    I don't recall the date I received the
13  transcripts.
14      Q    Can you recall approximately how much time?
15  Was it a few weeks ago?  A month ago?  Longer?
16      A    I would say between a month to about three
17  weeks.  Something like that.
18      Q    Okay.  Did you listen to any audio recordings
19  or video recordings in preparation for your deposition?
20      A    Only -- I would say yes.
21      Q    Which ones did you review?
22      A    So yesterday when I -- y'all were interviewing
23  detective -- the other detective.  That's the only thing
24  I viewed videos of.
25      Q    Okay.  So you -- you viewed the Zoom deposition
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   of --
 2      A    Correct.
 3      Q    -- Defendant Loya yesterday?
 4      A    Correct.
 5      Q    Did you review any other audio or video
 6   recordings?
 7      A    No.
 8      Q    Did you view any photographs in preparation for
 9   your deposition?
10      A    I would say yes.
11      Q    What photographs did you review?
12      A    Of myself.
13      Q    Was it a photograph of yourself with some other
14   officers --
15      A    No --
16               (Simultaneous speakers)
17      Q    -- At a conference table?
18      A    No.  It was reference material that I had been
19   given to -- to look at.
20      Q    Okay.  What was the -- the -- what did the
21   photograph depict that you reviewed?
22      A    Myself.
23      Q    Just you?
24      A    Yes, sir.
25      Q    All right.  Do you know when that photograph
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 119 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 2023

17

 1  was taken approximately?

 2      A    No.  I don't recall when it was taken.

 3      Q    Did you review any other photographs other than

 4  the photograph of yourself?

 5      A    No.

 6      Q    Okay.

 7      A    If I can rephrase that, I did see photographs

 8  of what I would say a subject in one case.

 9      Q    And what do those photographs that you -- that

10  you viewed depict?

11      A    Photographs of alleged injuries.

12      Q    Alleged injuries to whom?

13      A    I believe his name was a Angel Rivera.

14      Q    Could you spell that?

15      A    I think it's A-N-G-E-L, R-I-V-E-R-A.

16      Q    Thank you.  Did you view any other photographs

17  in preparation for this deposition?

18      A    No.

19      Q    And you mentioned you reviewed some police

20  reports; is that right?

21      A    Correct.

22      Q    You viewed your presentation supplement --

23  supplemental report, right?

24      A    Yes.

25      Q    What other police reports did you review?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 120 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2023

18

1    A    Statements that I had taken.

2    Q    **From whom?**

3    A    I believe Jesse Hernandez, and I really cannot

4  recall the other statements that I took.  One was Jesse

5  Hernandez.

6    Q    **Approximately how many statements did you**

7  **review?**

8    A    That I reviewed, I would say mine that I have

9  seen was other statements taken by other detectives, but

10  that was jury trial.

11    Q    **Did you review any police reports filled out by**

12  **other people?**

13    A    For this hearing, no.

14    Q    **Did you review police reports for a different**

15  **hearing?**

16    A    For -- the only one that I reviewed was one

17  they represented in, let's say, the Writ or the trial,

18  but for this one, no.  I didn't get anybody else's.

19    Q    **I see.  Okay.  So you didn't read any police**

20  **reports offered by Ear Arbogast or Scott Graves or any**

21  **--**

22                  (Simultaneous speakers)

23    A    No.  I did not.

24        MR. MARTINEZ:  And he didn't -- I'm sorry,

25  Russ.  I know it's hard on video and -- and Russell kind

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  of trails on at the end and part of it's because his

 2  voice is digitized, but if you start talking before he

 3  stops -- if you start talking before he has finished his

 4  question, the court reporter is not going to -- she

 5  can't type two at once, so let him finish his question.

 6      Q    I appreciate that and I'll try to do the same

 7  for you.

 8           Approximately how many reports and statements

 9  all told -- all took did you review?

10      A    I don't know, sir.

11      Q    Was it more than a dozen?

12      A    Probably.  I don't know.

13      Q    Was there anything that you wanted to review in

14  preparation for your deposition but were unable to

15  review?

16      A    No.

17      Q    Did you have adequate time in your mind to

18  review the police reports that you reviewed?

19      A    That I took?  Yes.

20      Q    And was there anything that you wanted to do to

21  prepare for this deposition but did not do?

22      A    No.

23      Q    Do you feel like you're prepared to answer

24  questions at this deposition?

25      A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Did you meet with anyone in preparation for
2 this deposition?

3    A    My attorney.

4    Q    All right.  I don't want to hear what your --
5 you and your attorney talked about.  Okay?  But I just
6 want to know when you met and for how long.  All right?

7    A    I don't recall when we met, and I don't recall
8 the length of time.

9    Q    All right.  On how many occasions --

10                  (Simultaneous speakers)

11   Q    Sorry.  Continue.

12   A    Go ahead.

13   Q    On how many occasion did you meet with your
14 lawyer?

15   A    I would say about -- at least four or five
16 times.

17   Q    When was the most recent time that you met with
18 your lawyer?

19   A    Yesterday.

20   Q    And how long did you meet with your lawyer
21 yesterday?

22   A    About 40, 30 minutes.

23   Q    Was that in person?

24   A    Yes.

25   Q    When you met with your lawyer -- and was that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 123 of 1026
The Deposition of RONALD MARQUEZ, taken on May 16, 2023

21

```
 1  Jim Martinez?
 2      A    Yes.
 3      Q    Was anyone else present at any of the meetings
 4  other than you and your lawyer, Jim Martinez?
 5      A    No.
 6      Q    Did you talk with any of the other defendants
 7  to this lawsuit in the past two months?
 8      A    No.
 9      Q    What was the time that you met with your lawyer
10  before yesterday?
11      A    I believe it was Friday.  The Friday before
12  this.
13      Q    And how long did you meet with your lawyer on
14  Friday?
15      A    I'd say probably an hour or so.
16      Q    And before Friday, when was the time before
17  that that you met with your lawyer?
18      A    I don't recall, sir.
19      Q    Well, how many -- how long do you meet with
20  your lawyer in the time before that?
21      A    I don't recall, sir.
22      Q    Was it more or less than an hour?
23      A    Say again.
24      Q    Was it more or less than an hour?
25      A    I would say about an hour.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    Q    Why would you say that?
 2    A    Because we only talked about what we had to
 3 talk about and then I -- we left.
 4    Q    All right.  Just make sure that you don't tell
 5 us what you talked about, because that would make Jim
 6 very nervous.
 7         All right.  And were all these meetings that
 8 you've discussed so far in person?
 9    A    Yes.
10    Q    And then in the -- so thus far you've told me
11 about a meeting yesterday, a meeting on Friday, another
12 meeting before the meeting on Friday, and then did you
13 also meet with your lawyer prior to that -- that meeting
14 on a fourth occasion?
15    A    Prior to all those, I met him when I went to
16 his office to ask him for help on this case.
17    Q    Okay.  Do you feel like you had sufficient time
18 to talk with your lawyer about this case?
19    A    Yes.
20    Q    How old are you, sir?
21    A    How old am I?
22    Q    Yes.
23    A    Seventy-three.
24    Q    Are you a high school graduate?
25    A    Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          THE REPORTER:  What was that?

 2     A    Yes.

 3     Q    Are you a high school graduate?

 4     A    Yes.

 5     Q    When did you graduate high school?

 6     A    In 1967.

 7     Q    Where did you graduate high school from?

 8     A    Thomas Jefferson High School.

 9     Q    All right.  You served in the military, right?

10     A    Yes.

11     Q    When did you serve in the military?

12     A    From '67, '68.  I gave it three years.  Entered

13 in about '67.

14     Q    You served in the army; is that right?

15     A    Yes.

16     Q    Where were you stationed?

17     A    My last station was in [indiscernible] Ramstein

18 in Germany.

19     Q    Do you serve anywhere else overseas?

20     A    I did not understand the question, sir.

21     Q    Other than that base in Germany, did you serve

22 anywhere else overseas?

23     A    No, sir.

24     Q    Do you receive any medals that were not also

25 given to other people in your -- in your unit?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1     A     No.

 2     Q     What did you do in the army?

 3     A     I was in the airborne divisions.

 4     Q     Did you ever serve in the military police?

 5     A     No.

 6     Q     Do you have any post high school educational

 7  experience?

 8           MR. MARTINEZ:  Objection.  Vague.

 9     Q     Did you ever go to college?  A trade school?

10     A     I attended classes at community college, but I

11  never finished.

12     Q     What classes -- what -- were you pursuing a

13  degree at that community college?

14     A     I cannot say if I was pursuing a degree.  I

15  started taking classes, but I had no idea what I wanted

16  to do.

17     Q     When were you hired by the El Paso Police

18  Department?

19     A     In '71 I believe.  1971.

20     Q     Did you ever work for any other law enforcement

21  agency?  So either a police department or a correctional

22  facility or sheriffs office or anything like that before

23  you worked for El Paso?

24     A     No.

25     Q     All right.  And can you tell us when you were
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  hired in 1971, did you attend a -- a police academy?

2     A     Yes.

3     Q     How long was that academy?

4     A     I believe it was six months.

5     Q     And when you left the academy, where were you

6  assigned?

7     A     It would be patrol division.

8     Q     And for how long were you assigned to the

9  patrol division?

10    A     I was a patrolman for ten years.

11    Q     In that time when you were assigned to patrol,

12  were you serving as a -- in a marked car in uniform the

13  whole time, or were there times when you worked out --

14  out of uniform?

15    A     In the initial patrol, in marked cars, and then

16  I was assigned to different -- I would say divisions

17  or -- or -- so that means I used the marked car,

18  unmarked car.

19    Q     What were the different divisions that you were

20  assigned to?

21    A     The technical division, the SWAT team.  Yeah.

22  Basically those two.

23    Q     How long did you serve in the tactical

24  division?

25    A     I don't remember, sir.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

26

1    Q    Was it more than a year?

2    A    Yes, sir.

3    Q    Was it more than five years?

4    A    I -- I don't remember if it was more than five

5    years.

6    Q    When you were assigned to the SWAT unit, were

7    you full time on the SWAT unit, or was it a part-time

8    position?

9    A    It was a part-time position.

10   Q    Okay.  When you were in the patrol division,

11   were you ever assigned to patrol the northeast side of

12   the city?

13   A    The very first day I entered the department.

14   Q    How about after the very first day that you

15   were assigned to patrol?  Did you ever serve in the

16   northeast portion of the city?

17   A    No, sir.

18   Q    Why was that?  Why -- why didn't you serve in

19   the northeast side of the city?

20   A    Repeat the question, please.

21   Q    Why did you not serve on the northeast side of

22   the city while you were in the patrol division?

23   A    The supervisors or lieutenants, they assigned

24   you a district, and my districts were not assigned in

25   northeast.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Did you leave the patrol division?

2    A    Say again.

3    Q    Did you leave the patrol division?

4    A    Yes.

5    Q    When did you leave the patrol division?

6    A    Approximately ten years after I entered, I took

7 a detective exam.

8    Q    And was the list created based on the results

9 of that exam?

10    A    Yes.

11    Q    Were you on that list?

12    A    Yes.

13    Q    Were you promoted from that list?

14    A    Yes.

15    Q    And when did you make detective?

16    A    In early 90s.

17    Q    Early 80s?

18    A    Early -- 90s.  About ten years after I left the

19 academy.

20    Q    And I'm -- I'm doing the math, and there is

21 three kinds of lawyers.  Ones who are good at math and

22 ones who aren't, but I'm looking at 1971 being when you

23 left the academy.  So ten years later would put as at

24 early 80s?

25    A    90s.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 130 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2019

28

1    Q    90s.

2    A    Yes, sir.  But you could be correct.

3    Q    All right.  And that -- I'm not trying to trick

4    you up or anything, but would you -- early 80s sound

5    right?

6    A    80s.  80s.  Yes, sir.

7    Q    Okay.  All right.  So when you made detective,

8    did you go to a detective school?

9    A    Yes.  I mean, I went to school.  It wasn't a

10   detective school.

11   Q    I guess what I mean is when you made detective,

12   were you provided additional training by the department

13   in how to become a detective?

14   A    I would say, no.  Not how to become a debt.

15   Q    Do you receive any additional training when you

16   became a detective in the early 80s?

17   A    Yes.

18   Q    What additional training did you receive when

19   you became a detective?

20   A    In -- inside seminars.  In-house seminars.  I

21   went to a lot of schools, outside the police department.

22   Q    What school did you attend outside the

23   department?

24   A    There is homicide schools, interviews and

25   interrogations, caliber views, fingerprints, SWAT

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   training, and other stuff.  I don't recall.

2       Q    When you made detective in the early 80s, where

3   were you assigned?

4       A    I was assigned to the -- I was assigned to the

5   crimes against persons unit.

6       Q    And what -- was there a particular physical

7   location where you worked out of when you were assigned

8   to the crimes against persons?

9       A    It was -- our office is downtown here where the

10  old El Paso district -- old county building is.

11      Q    Where there different crimes against persons

12  offices within the city, or is it just one at the time?

13      A    Our division was made up of three separate

14  divisions.  In the -- in the same building -- the same

15  office space but it was three.

16      Q    And how did you differentiate among those

17  three?

18      A    Some detective assigned to the homicide

19  division.  Others to the robbery and other were assigned

20  to sex crimes.

21      Q    And which one of those were you initially

22  assigned to?

23      A    Homicide.

24      Q    Say again.

25      A    Homicide division.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  Did you remain in the homicide division

2  for your entire time as a detective?

3    A    I would say, yes.  But I did work like a

4  robbery section for about a week during that time.

5    Q    When you were first starting you mean?

6    A    No, sir.  No.  It was later on during my time

7  at homicide.

8    Q    Did you ever sit for the sergeants exam?

9    A    No, sir.  I did not.

10   Q    What was your civil service rank when you were

11  retired?

12   A    From the police department?

13   Q    Yes, sir.

14   A    Detective.

15   Q    Okay.  How long did you remain working homicide

16  at that downtown office?

17   A    I don't recall what year we moved to the

18  building there on [indiscernible] -- on Raynor.  On

19  Raynor.  Yeah.  I don't recall.

20   Q    What did you call that building that you moved

21  to?

22   A    Police headquarters.

23   Q    I'm sorry.  I didn't hear you.

24   A    Police headquarters.

25   Q    And how long did you remain working out of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 133 of 1026
The Deposition of Alfonso Marquez, taken on May 6/23, Page

31

1    the -- out of police headquarters?

2       A    For the remainder of my 11 years I believe.

3       Q    Was that the Five Points Police Station?

4       A    Yes.

5       Q    When you worked homicide, were you assigned to

6    work with a partner?

7       A    Not really.  No.

8       Q    Did you sometimes work with a partner?

9       A    Yes.

10       Q    Which were the partners that you had while you

11    were assigned to homicide?

12       A    I worked with different detectives.  You got

13    Julio, Arbogast, Charlie Ortega, Charlie Rivera.

14    Whoever was there, we weren't considered partners.

15       Q    Were you ever partnered with Scott Graves?

16       A    I -- I don't -- I can't follow the question.

17    I've worked with Scott Graves, but to say he and I are

18    partners, no.  We weren't.

19       Q    How did you first meet Scott Graves?

20       A    At the homicide office when he came into

21    homicide.

22       Q    Do you ever socialize with Scott Graves out --

23    outside of work?

24       A    No.

25       Q    When you knew him in homicide, what did he look

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 134 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

32

```
 1   like?  Let's say in and around the timeframe in 1993.

 2       A    Blondish hair, thin.  That's -- I never really

 3   paid attention to what he looked like.  No.

 4       Q    About how tall was he?

 5       A    I would say five-eight, five-nine.

 6       Q    Did he wear glasses?

 7       A    You know, I don't recall.

 8       Q    Mustache?

 9       A    I don't recall him ever having a mustache.

10       Q    What about you?  Did you use to have a

11   mustache?

12       A    Sorry?

13       Q    Did you used to have a mustache?

14       A    Yes.

15       Q    You look like you'd look good with a mustache.

16            What did you look like in 1993?

17       A    Sir, I don't recall what I looked like in 1993.

18       Q    Well, what color was your hair?

19       A    Black.

20       Q    And how tall were you?

21       A    Five-eight, five-nine.

22       Q    And what was your build back in 1993?

23       A    Regular.  Thin.

24       Q    Did you wear glasses?

25       A    Now I do.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 135 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

33

1    Q    What about back in 1993?  Did you wear glasses?

2    A    I believe so, sir.  I believe so.

3    Q    How did -- how did you first meet Earl

4  Arbogast?

5    A    Again, in homicide.

6    Q    Who got there first?  You or him?

7    A    I think -- I think I did.

8    Q    Did you ever socialize with Arbogast outside of

9  work?

10    A    No, sir.

11    Q    What about Charlie Ortega?  How did you meet

12  him?

13    A    I think the same when he was assigned to the

14  homicide division.

15    Q    When was he assigned to the homicide division?

16    A    I don't know, sir.  I don't recall.

17    Q    Was it before or after 1993?

18    A    I -- I don't know.  I know I was there first

19  but I don't know.

20    Q    But you didn't know him before he -- he was a

21  working at homicide; is that right?

22    A    I don't believe I did.  No.

23    Q    Did you ever socialize with Charlie Ortega

24  outside of work?

25    A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 136 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

34

1    Q      Were there two Charlie Ortega's?

2    A      I only know of one.

3    Q      Okay.

4    A      The one in homicide.

5    Q      All right.  And where would you and Charlie

6    Ortega socialize outside of work?

7    A      Repeat that again, sir, please.

8    Q      Where would you and Charlie Ortega socialize

9    outside of working?

10   A      We would have a couple of drinks some -- some

11   place.

12   Q      Where would you go?

13   A      I think the place that we used to like to go to

14   was a bar Joe, John, and Marks by our police department

15   building.

16          THE REPORTER:  It was what?

17   A      Joe, John, and Mark.  A bar by the police

18   departments building there on Raynor.  Five Points.

19   Q      How often would you and Charlie Ortega

20   socialize outside of work?

21   A      Sir, I don't know.  It was -- it wasn't like

22   everyday.  No.

23   Q      When did you retire from the El Paso Police

24   Department?

25   A      In February of 1997.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    From the time you worked homicide, did you

2  remain -- you know, apart from that week working

3  robbery, were you working homicide up until your

4  retirement?

5    A    Yes.

6    Q    Were you ever assigned to the cold case unit?

7    A    Yes.

8    Q    And when were you assigned to the cold case

9  unit?

10    A    It -- it was during my time with the homicide

11  division.  But cold cases, I may have worked one or two

12  but I -- we didn't have -- it was still in the division,

13  so we would say, we're working a cold case.

14    Q    When you retired from the El Paso Police

15  Department, where did you go work at?

16    A    I went to work at El Paso County.

17    Q    What did you do for the county?

18    A    I was a bailiff for the plea board district

19  court.

20    Q    Do you work for a particular judge or just for

21  the courthouse?

22    A    A judge.

23    Q    Which judge?

24    A    Gonzalo Garcia.

25    Q    Did you work for any other judges?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 138 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

36

```
 1      A     Yes.

 2      Q     Which other judges did you work for?

 3      A     Patrick Garcia.

 4      Q     Did you work for any other judges?

 5      A     No.

 6      Q     How long did you work for the county?

 7      A     Seventeen years I believe.

 8      Q     [indiscernible] When did you retire?  2014?

 9      A     I don't -- I don't recall the exact date I

10  retired, but I spent 17 years.

11      Q     All right.  When you retired from the county,

12  did you work for any other person or place?

13      A     No, sir.  No, sir.

14      Q     Do you have any intention to go back to work?

15      A     No, sir.

16      Q     You enjoying your retirement?

17      A     Yes, sir.

18      Q     Do you have any intent to move out of the

19  country?

20      A     No.

21      Q     Or move out of the state?

22      A     No.

23      Q     All right.  I want to ask you about training

24  that you received, and -- and starting with homicide

25  training, were you trained that it was important to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  preserve crime scene evidence?

2      A     Yes.

3      Q     And were you trained that it was important to

4  take notes during the course of your interview or --

5  strike that.

6            Were you trained that it was important to take

7  notes during the courses of your investigation to

8  document the steps that you took during the

9  investigation?

10            MR. MARTINEZ:  Excuse me.  Excuse me, Mr.

11  Marquez.  Madam Court Reporter, can you read that to me?

12  The question please.

13            THE REPORTER:  Yes.

14                 (Requested portion was read)

15            MR. MARTINEZ:  Thank you.

16      Q     Can you answer the question?

17      A     I would say it depended on what -- on -- on the

18  interview or the investigation.  It depended.

19      Q     Well, how about in homicide?  Was it important

20  document the steps of your investigations in homicides?

21      A     Like I say, it depended if -- I mean, of

22  course -- I would say it depended on -- if I spoke to

23  you briefly, it just depended, sir.  Really.

24      Q     Sorry.  I'm trying to search through something.

25  I'm having computer issues so I'm going to move -- let

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 140 of 1026
The Deposition of Alfonso Marquez, taken on May 18, 2023

38

1    me -- let me ask you instead about training that you

2    received to conduct interviews and interrogations.

3    Where did you receive that training?

4        A    I believe it was in Dallas, Texas.

5        Q    And who conducted the training?

6        A    I don't recall their names but personnel from

7    the organization I believe.  [indiscernible]

8        Q    Which organization?

9        A    It was the Kinesic School of Interviews and

10   Interrogations.

11       Q    And can you spell the name?

12       A    I believe it's, K-I-N-E-S-I-C.

13       Q    And how long was that training?

14       A    About a week.  Week total.

15       Q    Were you trained in the Reid Method of

16   Interrogation?

17       A    I don't recall the Reid Method of

18   Interrogation.  No, sir.  I don't recall.

19       Q    Were you trained to thoroughly investigate a

20   suspect before you interrogated that suspect?

21       A    I can't say that.  No.  I cannot.

22       Q    You can't say that because you -- that's --

23   that wasn't how you were trained, or what was your

24   training?

25       A    No.  It's I don't -- I can't say that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 141 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

39

```
 1  because -- I can't say that I was ever told, "Make sure
 2  you investigate this first."  I mean, find out -- the
 3  way I did it was totally different.  I needed that
 4  information.
 5          THE REPORTER:  You needed what?
 6      A   I needed to find out about the person that I
 7  was investigating or --
 8      Q   Well, let me put it this way.  Did you -- were
 9  you trained to thoroughly investigate the crime before
10  you interrogated a suspect?
11      A   Well, we're trained to investigate the crime.
12  The word thoroughly, I don't, you know -- I just -- we
13  were trained to investigate the crime.
14      Q   Is one reason to thoroughly investigate a crime
15  before you interrogatee is to make absolute sure the
16  correct person is being interrogated as the suspect?
17      A   I --
18          MR. MARTINEZ:  Objection.  Form.
19      A   I wouldn't say it like that.  No, sir.
20      Q   All right.  What, according to your training,
21  is the difference between an interview and an
22  interrogation?
23      A   Excuse me.  An interrogation would be you're
24  trying to get information on a certain or specific item
25  or thing.  An interview is to try and get information as
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  to whether you want a job or your -- you're looking for

2  the person is eligible for something.  That would be

3  my -- my interpretation.

4      Q    So based on your training, if you're

5  interrogating someone, that's to gather specific -- or

6  information about a specific incident or circumstance;

7  is that right?

8      A    Correct.

9      Q    Were you trained that before you interrogate

10 somebody you need to have a belief that the person is

11 guilty before you begin your interrogation?

12     A    No, sir.  I wouldn't -- I wouldn't say that.

13     Q    Have you heard the term tunnel vision before?

14     A    Yes.

15     Q    Were you trained to follow the evidence

16 wherever the evidence led you and not succumb to tunnel

17 vision where you're just focused on one particular

18 suspect?

19     A    We were trained to go where the investigation

20 led us, so I cannot agree with that statement.

21     Q    Okay.  And were you trained to avoid succumbing

22 to tunnel vision and not focusing just on one suspect

23 and try and make the facts fit your theory of the case?

24     A    Sir, again, I would say that we were trained to

25 investigate, and wherever the investigation led us to,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  is where we went.

2     Q     And were you specifically trained not to fall

3  prey to tunnel vision?

4          MR. MARTINEZ:  Objection.  Vague.

5     A     We were trained to investigate the case and

6  follow wherever the investigation led us to.  It wasn't

7  to say -- that's what we were trained to do or at least

8  my training.

9     Q     And what I -- what I'm trying to get at, and

10  I -- alls I'm trying to establish is that, were you

11  trained that there is a risk that police officers might,

12  if they're not, you know, aware of it, might fall prey

13  to tunnel vision and start focusing only on one witness

14  to the exclusion of others or only on one suspect

15  despite what the evidence is showing you?

16     A     I would [indiscernible] you, sir.  My answer

17  would be that we were trained to investigate.  If the

18  investigation led us one way, that's where we went.

19          MR. AINSWORTH:  The camera has gotten a little

20  fuzzy.

21          MR. MARTINEZ:  The camera?

22          MR. AINSWORTH:  Yes.

23          MR. MARTINEZ:  Oh, boy.

24          MR. AINSWORTH:  Or it's the witness, but I

25  think it's the camera.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1              MR. MARTINEZ:  Standby.  I may disconnect you,
2   Russell, but I'll get back on if it does.  Russell, give
3   me a second.  Let's go off the record.  Let me -- let me
4   log off and I'll come back on in a second.  Hold on.
5              MR. AINSWORTH:  All right.  Off the record
6   please.
7              THE VIDEOGRAPHER:  We are off the record.  The
8   time is 10:41 a.m.
9              (Recess from 10:41 a.m. to 10:42 a.m.)
10             THE VIDEOGRAPHER:  We are back on the record.
11  The time is 10:42 a.m.
12      Q    All right.  What, according to your training
13  and practice, are the primary techniques of
14  interrogation?
15             MR. MARTINEZ:  Objection.  Vague.
16      A    To seek the truth.  I don't know.
17      Q    Well, how are you trained to seek the truth?
18  What techniques?
19      A    I -- I don't recall the techniques.  Back then
20  when I went to the school, but I don't recall the
21  technique that they use.
22      Q    Okay.  Well, what about in your -- your
23  experience as a El Paso detective?  Did you conduct
24  interrogations?
25      A    Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 145 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 5/26/23

43

1    Q    You -- judging by how long you were a

2    detective, I -- I got to believe you conducted hundreds

3    of interrogations; is that right?

4    A    Don't know if they were hundreds but quite a

5    few.  Yes.

6    Q    Well, I mean, you were a detective for what, 15

7    years, 16 years?

8    A    Eleven.

9    Q    Eleven years.  And you retired in '97?

10   A    Yes.

11   Q    All right.  In those 11 years, I mean, you

12   conducted more than ten interrogations a year, right?

13   A    Sir, I don't recall how many per year.  That

14   was -- I don't remember how many homicides per year we

15   had, if I worked a homicide case or not.

16   Q    I'm not asking you any of those questions, sir.

17   I'm asking you, did you conduct more than ten

18   interrogations a year?

19   A    I don't know, sir.

20   Q    All right.  Do you think you conducted less --

21   fewer than ten interrogations a year?

22   A    I don't know, sir.

23   Q    Well, how many homicide cases did you work as a

24   homicide detective?

25   A    I don't know.  As either assisting or?  I don't

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 146 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23, Page

44

```
 1  know how many we had per year.
 2      Q    Yeah.  Either as the case agent or assistant.
 3      A    I don't know, sir.
 4      Q    Were you a busy as a homicide detective?
 5      A    We were all busy.  Yes.
 6      Q    You were all busy.  What were you busy doing?
 7      A    Working either a case or our own cases that we
 8  had assigned to us.
 9      Q    So everyday for those 11 years that you were
10  working, you were working on -- on a homicide, either
11  yours or someone else's, right?
12      A    No, sir.
13      Q    All right.  What else were you doing apart from
14  investigating homicides?
15      A    In homicide, we also were assigned regular
16  cases, assaults, cases that we have to work and then
17  when a murder came up or a homicide came up, then we
18  were assigned to work that until that -- we took care of
19  that.
20      Q    I see.  So you were working on a felony case
21  everyday that you're working as a homicide detective,
22  but they weren't all homicides.  Is that fair to say?
23      A    Not all the cases that we worked out of that
24  section were felonies.  We had some assaults, class A
25  assaults, assaults, aggravated assaults.  Some were
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 felonies.  Some were misdemeanors, and then some were
2 homicides.
3     Q    Were you an experienced detective in 1993?
4     A    I can't -- all depends on who was -- was taking
5 whether I had experience or not, but I had worked some
6 cases.
7     Q    I'm asking you.  Were you an experienced
8 detective in 1993?  Well, let me strike that.
9          Were you providing on-the-job training to other
10 detectives while you were in the homicide unit?
11     A    Yes.
12     Q    And so you helped train other detectives,
13 right?
14     A    Yes.
15     Q    Did you train other detectives to do it the
16 right way?
17     A    I'm going to say that I -- I did not -- let's
18 say, train.  If they asked me a question, I would let
19 them know what I had done and how -- how to go about
20 doing something better.  But as far as training them,
21 no.
22     Q    Did you -- did you provide on-the-job training
23 to other detectives on how to do it the right way?
24     A    I don't know how to answer that other than some
25 detectives would come and ask me, "Hey, how -- how can

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  we do this?"  Then I tell them, "Hey, this is the way to
2  go about it."  That's -- if you want to call that
3  training, then that's it.
4     Q    Okay.  Really I'm trying to find out, do you
5  tell them to do it the right way or the wrong way?
6     A    Well, the right way.
7     Q    All right.  Were you an inexperienced detective
8  in 1993?
9     A    I had experience.  I don't -- wouldn't call
10  myself inexperienced, but I had experience working in
11  that organization.
12     Q    About how many murder cases did you work a
13  year.
14     A    Sir, I stated before, I don't know the exact
15  number.  For 11 years, whatever we had that one year,
16  either I assisted in working, knew about them, didn't
17  work, so I cannot give you a number.  I don't know.
18     Q    I didn't ask you for a number.  I didn't -- I
19  didn't say how many.  I said, about how many per year.
20  I'm looking for your best approximation.
21     A    I believe I would say four.
22     Q    All right.  Four per year?
23     A    Probably.  Yes, sir.
24     Q    And so when you conducted interrogations as a
25  detective, what techniques would you use to obtain

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 149 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

47

```
 1  confessions?

 2         MR. MARTINEZ:  Objection.  Vague.

 3    A    First, I would try to establish a rapport with

 4  whoever I was going to interview or interrogate.  Learn

 5  something about him.  And proceed to have a conversation

 6  with him before.  Make him feel at ease until we got

 7  into the portion of the interrogation.

 8    Q    Okay.  And then when you got into the

 9  interrogation part, what technique would you use to

10  elicit to that an admission?

11    A    My inter --

12         MR. MARTINEZ:  Hold on.  Hold on.  Objection.

13  Lack of foundation.  Facts not in evidence.  Go ahead.

14    Q    Go ahead and answer.

15    A    Repeat the question please.  The --

16              (Simultaneous speakers)

17    Q    What techniques would you use to try and elicit

18  the confession when you're conducting the interrogation

19  part of your interrogation?

20         MR. MARTINEZ:  Objection.  Facts not in

21  evidence.  Lack of foundation.  Go ahead.

22    A    I wasn't there to elicit anything.  It was to

23  find out what he knew or how he was involved.  It wasn't

24  eliciting information from him.

25    Q    Okay.  You said that you tried to make the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  suspect feel at ease until the interrogation?
 2      A    Yes, sir.
 3      Q    And I'm trying to -- I'm trying to find out
 4  what would you do during the interrogation portion of
 5  your interrogation?
 6      A    Reread him his rights.  Ask him what happened
 7  at first before I took anything in writing and then we
 8  went after -- like it was a question and answer type of
 9  interrogation.
10      Q    Were you trained to use accusations with a
11  suspect?
12      A    No.
13      Q    All right.  And when you conducted
14  interrogations, would you use accusations?  Would you
15  accuse people of the crime that they were there to be
16  questioned about?
17      A    Not -- no.  I would -- I would not say
18  that's -- that's not what I would -- what I would say.
19      Q    What would you say?
20      A    He would tell me what they are accused of but
21  --
22                    (Simultaneous speakers)
23      Q    But you would be -- okay.  Go ahead, sir.
24      A    What they are accused of.
25      Q    But you would be careful not to accuse them,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 151 of 1026
The Deposition of AL FRANCISCO GUTIERREZ, taken on May 6/23, Page

49

1  yourself, by saying things like, you shot this person or

2  you're -- you stabbed them or something like that.  Is

3  that what you're saying?

4      A    That's what I'm saying.  Yes.

5      Q    And so were you trained to accuse suspects of

6  lying if they denied responsibility?

7      A    No.

8      Q    In your practice when you conducted

9  interrogations, would you accuse people of lying if they

10 denied responsibility for the crime?

11     A    No.

12     Q    Were you trained to cut people off when they

13 tried to deny responsibility by, you know, talking over

14 them or -- or telling them, no?

15     A    No.

16     Q    As a detective, was it your practice to cut off

17 their denials when people denied responsibility?

18     A    No.

19     Q    Were you trained to use false evidence ploys

20 during interrogations?  A situation where you tell them

21 that there is evidence of their guilt that doesn't

22 really exist?

23     A    No.

24     Q    As a detective, when you conducted

25 interrogations, would you use false evidence ploys and

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  tell people that they -- that there was evidence of

 2  their guilt that didn't exist?

 3      A    I -- I would say no.

 4      Q    All right.  Well, were you trained to try to

 5  increase the suspects anxiety during an interrogation?

 6      A    No.

 7      Q    Were -- was it your practice to do the

 8  opposite?  To try and reduce their anxiety?

 9      A    No.

10      Q    Were you trained to use inducements?  Like a

11  suggestion if they would get some kind of benefit if

12  they stopped denying and started confessing?

13      A    No.

14      Q    Were you trained to use minimization

15  techniques?  Technique where you would suggest to the

16  person that they can minimize the wrongdoing if they go

17  along with it?  Such as, "You probably didn't mean to",

18  or "It was an accident", or something like that?

19      A    No.

20      Q    Was that something that you did as a detective?

21  Would you tell people that, you know, use minimization

22  techniques suggesting ways that they may have committed

23  the crime but weren't really as culpable because they're

24  acting in self-defense or it was an accident or

25  something like that?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 153 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 26, 23, Page

51

```
 1    A    No.
 2    Q    Were you trained that the goal of an
 3  interrogation is to obtain a confession?
 4    A    No, sir.
 5    Q    Were you trained to avoid physical coercion
 6  during an interrogation?
 7         MR. MARTINEZ:  Objection.  Vague.
 8    A    Yes.
 9    Q    Did you receive any training about
10  psychological coercion?
11    A    When I -- yes.
12    Q    What is psychologically coercive interrogation?
13    A    Let me rephrase that.  Not interrogation.
14  Psychological interrogation, no.
15    Q    Well, let me put it this way.  Were there
16  techniques that you're trained not to use because they
17  might be psychologically coercive to a witness?
18    A    No.
19    Q    Do you see any problem with using
20  psychologically coercive interrogation technique?
21         MR. MARTINEZ:  Objection.  Vague.
22    A    I -- I can't answer that, sir.  I -- I don't --
23  I don't know.
24    Q    Well, when you were a detective, are you saying
25  that you would just ask the person what happened, and
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   let them tell you what happened?
 2       A    Yes.
 3       Q    Okay.  Would you be careful to -- well, strike
 4   that.
 5            You're aware that sometimes people might give
 6   false confessions to the police, right?
 7       A    Yes.
 8       Q    And so you wanted to insure that the
 9   information you were receiving from someone -- from a
10   suspect was reliable, right?
11       A    I wanted -- well, it depends.
12       Q    Did you want to receive unreliable information
13   from a suspect?
14       A    No.
15       Q    You wanted to make sure the information was
16   reliable, right?
17            MR. MARTINEZ:  Objection.  Vague.
18       A    I wanted to make sure that he was telling me
19   the truth.
20       Q    Yeah.  And so one way to insure that the
21   witness was telling the truth was to look for
22   corroboration in what the witness was telling you,
23   right?
24       A    Yes.
25       Q    And one way that you looked for corroboration
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   is to see if the suspect knows nonpublic crime scene

2   facts about the crime that, you know, only somebody who

3   was there would know, right?

4        A    Yes.

5        Q    And so, as a detective, you would be careful to

6   not reveal nonpublic crime scene facts to a suspect

7   before the suspect brought those up to you, right?

8        A    Correct.

9        Q    Because you didn't want the -- the suspect to

10  just parrot back stuff to you that you were telling the

11  suspect.  You wanted to hear it from the suspect first,

12  right?

13       A    Can you repeat that?  It was a long sentence.

14       Q    Sure.  You didn't want the suspect to just

15  parrot back facts that you were providing to the

16  suspect, right?

17       A    I was -- there is -- I wasn't given him any

18  facts if that's what you're talking about.  I don't give

19  the suspect facts about what I know or about what maybe

20  happened.

21       Q    You want the suspect to provide those facts to

22  you, correct?

23       A    Correct.

24       Q    Did you receive training about certain types of

25  individuals that might be more vulnerable to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 156 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 5/6/23

54

 1  interrogation techniques?

 2      A    Not exactly.

 3      Q    Well, were you trained that, for example,

 4  juveniles might be more susceptible to coercive tactics

 5  than adults?

 6      A    No.  I could not say that, sir.

 7      Q    Okay.  Was it your understanding -- well, did

 8  you alter your interrogation techniques at all for

 9  juveniles as opposed to adults?

10      A    No.

11      Q    Were you trained to provide adequate food and

12  water and bathroom breaks to suspects?

13      A    Yes.

14      Q    Were you trained about the possibility of false

15  confessions?

16      A    I would say no.

17      Q    Do you believe that false confessions are a

18  problem in the criminal justice system?

19          MR. MARTINEZ:  Objection.  Vague.

20      A    Maybe.

21      Q    Why do you say maybe?

22      A    Because I don't know reference.  I don't know

23  how many -- if there are any out there or if there

24  aren't, or how many at that point, so I can't say -- do

25  I believe?  Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Have you ever received a false confession?

2    A    I don't recall, sir, ever receiving one.

3    Q    Have you been trained to avoid using any

4  techniques during interrogations at all apart from

5  physical coercion?

6    A    I don't recall, sir.

7    Q    Were you trained to use open-ended questions

8  rather than leading questions during interrogations?

9    A    The training was, let them speak and don't put

10 words in their mouth.  I believe that's the way I

11 remember.

12   Q    Were you trained whether it was okay to scream

13 at a suspect?

14   A    No, sir.  That was not in training.  No.  That

15 was not training that we received.

16   Q    Did you think it was okay to scream at suspects

17 when you were a detective?

18   A    No.

19   Q    What about cursing at suspects?  Was that okay?

20   A    No.

21   Q    When you were a detective, would you scream at

22 suspects?

23   A    No.

24   Q    When you were a detective, did you curse at

25 suspects?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 158 of 1026
The Deposition of CALIFORNE MARQUEZ, Taken on May 23,

56

 1     A     No.
 2     Q     Was there ever a time you either screamed or
 3   cursed at a suspect?
 4     A     No.
 5     Q     Did you ever use physical force against a
 6   suspect inside a police station?
 7     A     I'm going to say yes.
 8     Q     When did you use physical force against a
 9   suspects inside a police station?
10     A     I don't remember the exact date, but the
11   physical force that I used was just my arm against his
12   chest after he had gotten up off the chair during a
13   service -- serving of about five warrants in the CAP
14   office.
15     Q     Sir, did you say serving of five warrants?
16     A     Yes.
17     Q     Who was this person that you placed your arm
18   against the chest inside of a police station?
19     A     Angel Rivera.
20     Q     How is that name spelled?
21     A     A-N-G-E-L, R-I-V-E-R-A.
22     Q     Well, why did you place your arm against his
23   chest inside a police station?
24     A     I was serving some warrants on him.  He got up
25   off the chair angry, and I had to use whatever I did

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 159 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 26, 23, Page

57

1  just to put him up against the wall to keep him calm.

2     Q     Which arm did you use?

3     A     My right arm.

4     Q     Did he strike you?

5     A     No, sir.

6     Q     What room were you in?

7     A     In my office at the CAP office.

8           THE REPORTER:  At the what?

9     Q     And why was Mr. Rivera in your office?

10    A     We were serving him with an additional six --

11 five or six warrants.

12    Q     Did you use any other force other than placing

13 your arm against his chest and driving him into the

14 wall?

15    A     I did not drive him into the wall, sir.  No.

16    Q     Then just tell us what happened.

17    A     We picked him up at the jail.  We had

18 additional warrants for him.  He was already in custody

19 on some warrant that we had before.  We were charging

20 him with an additional five murders.  Picked him up.

21 Got him over there.  Sat him in my office.  As I was

22 going through the warrants, the warrant for this murder,

23 for this one, for this one, for this one, he jumped up,

24 started screaming.  I had to get up to put my arm around

25 him and put him up against the wall.  I didn't pin him.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   I put him up against the wall and then, by that time,
 2   another detective came.  I don't remember who it was.
 3   We sat him back down, and after that, we put him back in
 4   jail.
 5       Q    Did you strike him at all?
 6       A    No, sir.  I did not.
 7       Q    Did he complain of any injuries?
 8       A    Yes.  He did.
 9       Q    What injuries did he complain of?
10       A    He complained that we had struck him or that I
11   had struck him.  Put him back in jail.  And then from
12   then on, there was investigating.  The nature was
13   investigated.
14       Q    And did you have to give a statement to
15   internal affairs?
16       A    Yes.  I did.
17       Q    And what was the outcome of that investigation?
18       A    It was not sustained.  Through their
19   investigation?  They -- it didn't happen.  Nothing
20   happened the way that he said happened.
21       Q    And what did he say happened?
22       A    What I just finished telling you, sir.
23       Q    He said that you struck him?
24       A    Yes, sir.
25       Q    And where did he say you struck him?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    The face.

 2      Q    What happened to the charges against

 3 Mr. Rivera?

 4      A    The last I understand, he's still in prison.

 5 I'm not sure.

 6      Q    Have you used force against a suspect inside a

 7 police station on any other occasion?

 8      A    No.

 9      Q    You can agree that it would be terribly wrong

10 to strike a 16-year-old suspect in the head, right,

11 during an interrogation?

12      A    Yes.

13      Q    Do you know what a promise of leniency is?

14      A    Not exactly, sir.

15      Q    Were you trained not to tell people that if

16 they confessed, they could go home, or if they confessed

17 that nothing would happen to them?

18      A    No.

19      Q    As a detective, would you tell people if they

20 confess, things would be better for them?

21      A    No.

22      Q    Did you tell people, as a detective, that if

23 they confessed, you know, nothing -- nothing would

24 happen to them or they could go home?

25      A    No.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 162 of 1026
The Deposition of CALVIN MARQUARDT, taken on May 6, 23    Page

60

1    Q    Why not?  Why didn't you tell people that?

2    A    Because I am not -- I did not say that to them.

3    Q    And why not?

4    A    Because I don't know what the outcome would be.

5    Q    And so you don't want to give them false hope,

6   and then have them confess and them actually get in

7   trouble?

8    A    On -- on my behalf, yes.

9    Q    Back in 1993, was there anything preventing you

10   from recording -- audio recording your interrogation of

11   a suspect?

12   A    I don't recall, sir.  I -- I believe -- maybe

13   we had it but I don't know what year we brought it into

14   the CAP office in '93.

15   Q    Okay.  When you're conducting a interrogation,

16   you want to look not only for corroboration with the

17   information that you know, but you also want to learn

18   about what evidence there might be that you can use to

19   corroborate the confession that you haven't yet found;

20   is that right?

21        MR. MARTINEZ:  Objection.  Vague.

22   A    Possibly that's what was missing.

23   Q    Well, for example, if you -- you're

24   investigating a robbery, and you haven't found the

25   proceeds of that crime, you want to ask the suspect

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  where the proceeds are of the crime, right?

 2      A    You ask if he knows.

 3      Q    And you want to find out, right?

 4      A    If he knows where they're at, yes.

 5      Q    Because if the suspect is able to tell you the

 6  15 carts of cigarettes that I stole are in my friend's

 7  basement, and then you go to the friend's basement,

 8  you're able to corroborate that the information he is

 9  providing you is -- is correct, right?

10      A    Yes.

11      Q    And if you don't have the murder weapon, you

12  want to find out where the murder weapon is, right?

13      A    Yes.

14      Q    And so you ask the suspect, where is the murder

15  weapon, and if the suspect is able to tell you where to

16  recover the murder weapon, that also gives you

17  corroboration as to -- that the confession is accurate,

18  right?

19      A    Yes.

20      Q    Sometimes when you question witnesses they tell

21  you that other people have confessed to them, right?

22      A    Repeat the question again, please, sir.

23      Q    Sure.  It's happened before that people have

24  told you that somebody else confessed to a crime to

25  them, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 164 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23

62

```
 1      A    Yes.
 2      Q    And so -- and in the case of a serious crime
 3  like -- like murder, you want to find out information
 4  about that statement, right?
 5      A    Yes.
 6      Q    You want to know who -- who was present for the
 7  statement, right?
 8      A    Yes.
 9      Q    You want to know when the statement was made,
10  correct?
11      A    Yes.
12      Q    You want to know where the statement was made,
13  right?
14      A    Yes.
15      Q    And you want to know what was said, correct?
16      A    Yes.
17      Q    And were you familiar with the policies of the
18  El Paso Police Department?
19           MR. MARTINEZ:  Objection.  Vague.
20      A    Say it again, sir.
21      Q    Were you familiar with the policies of the El
22  Paso Police Department?
23           MR. MARTINEZ:  Objection.  Vague.
24      A    Not all the policies.  No.
25      Q    No.  What about the ones -- the important ones?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 165 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23

63

 1  Like the ones about confessions and interrogations.

 2  Were you familiar with those?

 3      A    It depends, sir.

 4      Q    All right.  Why wouldn't you be familiar with

 5  El Paso Police Department policies?

 6      A    I --

 7           MR. MARTINEZ:  Objection --

 8      A    I did not say I was unfamiliar.  We had several

 9  policies for the treatment of juveniles and other

10  policies for the treatment of adults.

11      (Exhibit No. 1 was marked for identification.)

12      Q    All right.  Well, let me show you a portion of

13  the policy handbook for -- let me -- from 1992.  One

14  second.  All right.  Okay.  Now, I'm -- I'm showing you

15  a -- what we'll mark as Exhibit 1 to your deposition.

16  This is Bates numbers Defendant City 21488 through

17  21491.

18           MR. MARTINEZ:  Can you enlarge it, Russell?

19           MR. AINSWORTH:  Of course.

20           MR. MARTINEZ:  As large as the screen is, it's

21  still hard to read.

22           MR. AINSWORTH:  Yeah.  I'm going to make this

23  bigger.

24           MR. MARTINEZ:  There you go.  Thank you.

25      Q    All right.  I want to -- were you familiar with

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  this portion of the El Paso Police Department policies?
 2  The procedures for obtaining a written confession?
 3        MR. MARTINEZ:  Do you have a page under or
 4  Bates number?
 5        MR. AINSWORTH:  Yeah.  It's Bates number 21488.
 6  Defendant City.  And it's page 76.
 7        MR. MARTINEZ:  Thanks.
 8  Q    Did you hear the question, sir?
 9  A    If I'm familiar with it?  Yes, sir.
10  Q    Okay.  And so this is for adults.  This
11  portion.  So not -- not trying to mislead you or
12  anything, but it says, "When the officer becomes aware
13  of a subject willing to give a voluntary written
14  confession, the officer will take the subject before a
15  magistrate for a formal warning."  Do you see that?
16  A    Yes, sir.
17  Q    And so for adults, when were you supposed to
18  take a suspect before a magistrate?
19  A    Before you take his confession.
20  Q    Okay.  And is that true for all adult suspects?
21        THE REPORTER:  Adults what?
22  Q    Suspects.
23  A    Sometimes they would want to give us a
24  statement, and then we take a statement and take them to
25  the magistrate.  Or first to the magistrate.  Basically

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 167 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23   Page

65

1  all the time.

2       Q    So are you saying that sometimes they would

3  give a statement and then before you reduce it to

4  writing, you would bring them before a magistrate?

5       A    No, sir.  What I'm saying is that we take

6  them -- we take them before a magistrate when you're --

7  when you place them -- take them under arrest, take them

8  before a magistrate, and then if he's willing to give a

9  statement, then we go ahead and take it.

10      Q    I see.  Okay.  So the -- the procedure that you

11  followed was to bring the adult before a magistrate

12  before interrogation; is that right?

13      A    Correct.

14      Q    Okay.  All right.  And I'm going to go to the

15  next page.  This is page Bates numbered Defense City

16  21489.  And under .7 it states, "The officer will secure

17  two unbiased witnesses excluding the officer taking the

18  confession.  Confessions are never noticed.  The subject

19  must then sign the confession in the presence of the

20  witnesses."  Do you see that, sir?

21      A    Yes, sir.

22      Q    All right.  Was that the policy of the El Paso

23  police department when you were a detective back in

24  1993?

25      A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    Q    And is that what you would do when you had a --
 2 a suspect who is giving a confession?  You would have
 3 two unbiased witnesses, excluding yourself, to sign the
 4 confession and -- or have the suspect sign the
 5 confession pronto?
 6    A    If there was two unbiased witnesses present or
 7 available.  Sometimes it was only me or whoever.  The
 8 detective and a supervisor.  And that was all they had.
 9 We had -- there wasn't anybody else available.  So
10 normally two, yes.
11    Q    All right.  Well, did you -- did it ever happen
12 that you're interrogating somebody at a police station
13 and you were the only person there?
14    A    I would say, no, because during -- when we
15 work -- we work, there is a two-man crew or two
16 detectives, but he may have not been there.  He may have
17 been out, but, generally, no.  I would say no.
18    Q    Well, what I mean -- sorry.  Is that there is
19 other people in the police station when you're
20 conducting interrogations, right?  There is desk
21 personnel.  There is other police officers.  There is a
22 bunch of people around, right?
23    A    Not all the time.
24    Q    Not all the time.  So you're saying that there
25 was sometimes when there weren't other people around; is

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 169 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 05/06/15

67

```
 1   that right?

 2       A    Right.

 3            MR. MARTINEZ:  Hey, Russell, when you get to a

 4   good point, can we take a break, please?

 5            MR. AINSWORTH:  Sure.

 6       Q    I want to go to the next page.  This is

 7   Defendant City 21490.  And under oral statements this

 8   says that, "A prisoner might choose to make an oral

 9   statement but not a written one", and it says, "Evidence

10   of his statement would probably be admissible only if he

11   has included facts and they are found be true.  Some

12   examples of establishing the truth of the facts in a

13   oral statement are -- and it's the finding of secreted

14   property mentioned in the statement, the finding of

15   stolen property mentioned in the statement, the

16   discovery of an instrument with which the stated offense

17   was committed."  Do you see that there?

18       A    Yes, sir.

19       Q    And so the policy states that it's a good idea

20   when you're conducting an interrogation to see if you

21   can find out where you can corroborate the -- the

22   confession by learning information about proceeds of the

23   property -- or -- or hidden property or the murder

24   weapon that's up to that point unknown to the police,

25   right?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 170 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23

68

 1      A     Yes.

 2            MR. MARTINEZ:  Objection.  Vague.

 3      Q     And you know that that's a good idea too,

 4  right?

 5      A     Yes.

 6      Q     All right.  Let's go off the record.

 7            THE VIDEOGRAPHER:  We are off the record.  The

 8  time is 11:23 a.m.

 9            (Recess from 11:23 a.m. to 11:33 a.m.)

10            THE VIDEOGRAPHER:  We are back on the record.

11  The time is 11:33 a.m.

12      (Exhibit No. 2 was marked for identification.)

13      Q     All right.  Sir, I want to show you another

14  exhibit that we'll mark as Exhibit No. 2 to your

15  deposition.  This is from that same 1992 policy manual,

16  but this concerns the chapter seven about juveniles.

17  Okay.  And for the record, this is Bates numbered

18  Defendant City 21495 through Defendant City 21505.  And

19  I'm going to scroll down several pages actually to

20  21502.

21            All right.  So this -- this pertains to

22  interrogation.  Were you familiar with the El Paso

23  Police Department's policies regarding juvenile

24  interrogation back in 1993?

25      A     Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    Q    Do you see at the -- under interrogation at the
 2  bottom of page 21502 it says, "Wherein possible,
 3  interrogation of a juvenile suspect is conducted by
 4  youth services."  Do you see that?
 5    A    Yes, sir.
 6    Q    All right.  Was that your practice that, when
 7  possible, interrogation of a juvenile suspect is
 8  conducted by youth services?
 9    A    No.
10    Q    Why didn't you conform to the policy, when
11  possible interrogation of a juvenile suspect is
12  conducted by youth services?
13         MR. MARTINEZ:  Objection.  Misstates the
14  evidence.
15    A    Because I'm the one that's investigating the
16  crime.
17    Q    Okay.  And why -- well, all right.  Let's go on
18  to page 21502 of Exhibit 2, and you see where it says
19  under, A, "When an officer takes a juvenile into custody
20  and intends to take a confession, the officer must,
21  without unnecessary delay and without first taking the
22  child elsewhere, take the child to the juvenile
23  probation department.  The intake officer from JPD will
24  review the officer's report to determine probable
25  cause."  Do you see that?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 172 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 6/23, Page

70

 1    A    Yes.

 2    Q    And did you conform with that policy when you

 3  were a detective and -- and you had a juvenile suspect?

 4    A    My recollection of the policy as it states

 5  there, no.  But my recollection talking them to the

 6  juvenile investigative services.  That was -- I don't

 7  know when that was established, but we had -- we had to

 8  take them there first.

 9    Q    All right.  So you would take them to JIS?

10    A    Correct.

11    Q    And that was to gather the paperwork to bring

12  them to the juvenile probation department; is that

13  right?

14    A    And -- yes, sir.

15    Q    And you would not question the juvenile about a

16  murder until you brought them to the juvenile probation

17  department and received approval by the intake officer

18  and from the magistrate; is that right?

19    A    No.  Not right.

20    Q    How would it work?

21    A    You would have to get approval from the

22  magistrate to take a confession.  The intake officer

23  would only say, yes, he's willing to give one, but then

24  you have to take him to a magistrate.

25    Q    Okay.  So your understanding of the policy was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  that before you could question a juvenile about a

2  murder, you had to get both permission from or approval

3  from the juvenile probation department and from the

4  magistrate; is that right?

5      A    No.  Not exactly.  No.

6      Q    All right.  Where are my -- how is it -- where

7  am I going wrong?

8      A    You would -- you would take him to a intake

9  officer where he reviewed the information that we had

10 provided to him and the juvenile, and then the intake

11 officer would let us know, "Look, he's willing to go

12 ahead and give you a statement."  Not give us permission

13 to take one.  He's willing to give you one, and then we

14 take him to the magistrate's office, and then, again,

15 the magistrate would read him his rights and so forth

16 and ask if he's willing to give his statement.  The

17 juvenile says, yes.  Then we -- that's when we start

18 taking a statement.

19     Q    Okay.  So you needed the intake officer to

20 confirm that the juvenile is willing to take a

21 statement -- to give a statement and approval from the

22 magistrate before you could question the juvenile about

23 the murder.  Is that your understanding of the policy?

24     A    The policy stating of [indiscernible].  What

25 I'm saying is, the magistrate warns him, and he says he

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  still wants to give us one, so I don't know if he's
 2  giving us approval or if he's in the -- the juvenile is
 3  willing to give you one so take it from him.
 4      Q    All right.  Well, let me phrase it this way.
 5  Your understanding of the policy back in 1993 that --
 6  was that you needed to get confirmation from the intake
 7  officer that the juvenile was willing to give a
 8  statement, and you needed to bring the juvenile to a
 9  magistrate before you could question a juvenile about a
10  murder; is that right?
11      A    Correct.
12           MR. ALMANZAN:  Objection.  That misstates the
13  evidence.
14      Q    All right.  And did you conform to the policy
15  when you interrogated Danny Villegas?
16      A    Yes.
17      Q    Meaning that --
18              (Simultaneous speakers)
19           MR. MARTINEZ:  Russell, I'm sorry to interrupt.
20  Can we agree an objection by one defendant is good for
21  all defendants?
22           MR. AINSWORTH:  I can agree.
23           MR. MARTINEZ:  Thank you.
24      Q    And so you did not question Danny Villegas
25  until after the intake officer had confirmed he was
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 175 of 1026
The Deposition of AL FONSO MARQUEZ, taken on May 6/23, Page

73

```
 1  willing to make a statement, and Danny Villegas had been

 2  brought before the magistrate judge for the first time;

 3  is that right?

 4      A    Correct.

 5      Q    All right.  So if you look down at E.  "Once

 6  the juvenile has been warned, he is taken back to JPD as

 7  soon as possible where the confession is obtained by

 8  either the police officer or the intake officer."  Do

 9  you see that?

10      A    Yes.

11      Q    "JPD has been -- has allowed the police

12  department use of their facility on a 24-hour basis for

13  the obtaining of statements.  This is to separate the

14  juvenile from any jailhouse atmosphere."  Do you see

15  that?

16      A    Yes.

17      Q    Okay.  So under the policy, you're supposed to

18  conduct the interrogation and the ultimate ensuing

19  confession at the JPD; is that right?

20      A    Yes.

21      Q    Okay.  Did you follow that policy when you were

22  a detective in interrogating juveniles?

23      A    No.

24      Q    Why didn't you follow the policy when you were

25  a detective interrogating juveniles?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 176 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 3, 2023

74

1    A    The policy that we had with the department

2 aside from business was to take them to JIS.  Juvenile

3 probation department does not provide a station that we

4 can go ahead and -- and type as far as I know.

5    Q    **Okay.  So you're saying that it was not true**

6 **that JPD -- to your understanding at least, that JPD has**

7 **allowed the police department use of their facility on a**

8 **24-hour basis for the obtaining of statements?**

9    A    No, sir.  That's not what I'm saying.

10    Q    **Well, then what are you saying, sir?**

11    A    I'm saying the police department -- our policy

12 was that the juvenile had to go to the JIS for necessary

13 paperwork, and then after that, he was taken for the

14 intake officer, and then after that before the judge,

15 and then after that back to JIS where the statement was

16 to be taken.  That's the policy that we follow.  Not --

17 I remember this one but that's not the one that they're

18 following for quite some time.

19    Q    **Well, was that written somewhere that you were**

20 **supposed to take a confession at the JIS?**

21    A    Sir, I don't know if the policy had changed.  I

22 don't know.  But that's what the standard procedure was

23 for us.

24    Q    **Okay.  So you're saying that what you would do**

25 **was go to JIS to take the confession, right?**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 177 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

75

 1    A    When it came down to taking the confession,
 2 JIS, yes.
 3    Q    And what about this part of the policy?  The
 4 concern about separating the juvenile from any jailhouse
 5 atmosphere.  Did you want to separate the juvenile from
 6 any jailhouse atmosphere?
 7    A    Yes.
 8    Q    Okay.  And so then why didn't you conduct the
 9 interrogation at the juvenile probation department to
10 separate the juvenile from the jailhouse atmosphere?
11         MR. ALMANZAN:  Objection.  Argumentative.
12    A    I -- the statement was taken at juvenile --
13 JIS, Juvenile Investigative Services.  That is not a
14 detention facility.  The JPD is.  The statement was
15 taken at JIS.
16    Q    Did any supervisor ever tell you, "Al, I know
17 what's written in the policy but don't do it like what's
18 written in the policy.  Instead, conduct your
19 interrogations at the JIS"?
20    A    No.
21    Q    Did any supervisor ever tell you, "Al, I know
22 what's written in the policy, but instead of having a
23 youth officer conduct an interrogation of a juvenile,
24 you do it yourself"?
25    A    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    Q     Did anyone tell you that it was a good idea for
 2  you to conduct an interrogation of a juvenile rather
 3  than from all the policy and have a youth officer do it?
 4    A     No.
 5          MR. ALMANZAN:  Objection.  Argumentative.
 6    Q     What was the answer?
 7    A     No.
 8    Q     So I just want to go down to five, the last
 9  page of Exhibit 2, which is city -- Defendant City 21505
10  under section 7.02.012.  It says, "Witness statement.
11  Before a juvenile can give a witness statement, the
12  officer first obtains permission from a parent or legal
13  guardian allowing the juvenile to go to the station,
14  give a statement, and appear in court.  When practical,
15  parental permission is in writing.  If permission is
16  denied, there is no statement taken."  Do you see that?
17    A     Yes.
18    Q     Did you follow this policy that juvenile
19  witnesses could only be questioned with the permission
20  of their parent?
21          MR. ALMANZAN:  Objection.  Misstates the
22  paragraph that was just read.
23    A     Can you repeat the question please, sir.
24    Q     Sure.  Did you follow this policy that if --
25  that you could only question a juvenile witness with the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG   Document: 286-2   Filed: 05/26/23   Page 179 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

77

 1  permission of the parent?

 2          MR. ALMANZAN:  Objection.  You're misstating.

 3  It says, "When practical."

 4          MR. AINSWORTH:  It doesn't say that, Counsel.

 5          MR. ALMANZAN:  Are you reading 7.02.012?

 6          MR. AINSWORTH:  Well, first, we're not going to

 7  do speaking objections.  But it says, "If permission is

 8  denied, there is no statement taken."

 9          MR. ALMANZAN:  And it says, "When practical",

10  above that.

11          MR. AINSWORTH:  It says -- Counsel --

12      Q    Mr. Marquez and only Mr. Marquez, can you

13  answer this question?  Did you follow the policy that

14  clearly states, "If permission is denied, there is no

15  statement taken"?

16      A    I believe that I followed that one.  Yes.

17      Q    Okay.  So if a parent said, "Don't question my

18  child", you would not -- about a crime, you would not

19  question that -- that juvenile, right?

20          MR. MARTINEZ:  Objection.  Form.

21      A    Correct.

22      Q    All right.  I want to show you some of your

23  testimony from the written hearing, and I just want to

24  bring it up.  I'm using somebody else's computer so --

25          All right.  This is from your testimony on

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 180 of 1026
The Deposition of CALVIN MARQUISE, taken on May 6/23

78

 1  September 8, 19 -- 2011.  And let me just bring it up to
 2  the top so you can see where --
 3          MR. BRITTAIN:  Russell, what proceeding is
 4  this?  I'm sorry.  I'm just trying to follow along.'
 5          MR. AINSWORTH:  This is -- sure.  I'm going to
 6  show you it.  So this is the Writ of Habeas Corpus
 7  hearing on September 8th, 2011.
 8      Q    And I'm going to direct you to page 53 -- 54 of
 9  that proceeding, and I'm just going to read you some of
10  your testimony from that proceeding.  This is lines 4 --
11  starting at line 4 on page 54.  "So let me ask you this
12  question:  Is it fair to say that in the police
13  department they teach you to report what you do, to
14  reduce it to writing, and do it in a supplemental report
15  so that you -- so that your memory doesn't fade over
16  time; is that fair?"
17          Answer, "That is fair enough."
18          Question, "They teach you that accuracy is
19  important, correct?"
20          Answer, "Correct."
21          Question, "Thoroughness is important, correct?"
22          Answer, "Correct."
23          Question, "And, basically, if it is not written
24  down, you didn't do it; is that fair?
25          Answer, "Basically.  Yes, sir."

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 181 of 1026
The Deposition of CALFRED MARQUEZ, taken on May 6, 23

79

```
 1           And, sir, do you agree that those were the
 2   answers that you gave to those questions?
 3       A    Yes.
 4       Q    And do you agree as you sit here today that
 5   you're taught to report what you do, to reduce it to
 6   writing, and do it in a supplemental report so your
 7   memory doesn't fade over time?
 8       A    Yes.
 9       Q    And do you agree as you sit here today that you
10   were trained that accuracy was important in your report
11   writing?
12       A    Yes.
13       Q    And do you agree as you sit here today that you
14   were trained that thoroughness was important in your
15   report writing?
16       A    Yes.
17       Q    And do you agree as you sit here today that you
18   were trained that if it's not written down, you didn't
19   do it?
20       A    I would say typically if it's not written down,
21   you may have done it, but you didn't -- so typically,
22   no.  If it's -- like I said, there -- you didn't do it,
23   if I didn't do it, then I typically don't write it out.
24       Q    I'm not sure I caught all of that.  But let me
25   just -- you -- you're asked at that same hearing, you
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 182 of 1026
The Deposition of RAMON MARQUEZ, taken on 5/26/23  Page

80

```
 1  know, at line 16 of page 54.  "And, basically, if it is

 2  not written down, you didn't do it; is that fair?"  And

 3  your answer was, "Basically.  Yes, sir."

 4        You answered that way under oath; is that

 5  correct?

 6     A     Referenced me.

 7     Q     Reference you?

 8     A     Yes.

 9     Q     That's what you would do, right?

10     A     Yes.

11     Q     And that was how you were trained.  You were

12  trained that if it wasn't written down, that meant you

13  didn't do it, right?

14     A     If -- if it got written down that I did it, I

15  didn't do it, or I did, then it's written down that I

16  did.  But if I didn't do it, I didn't do it.  Write it

17  down.

18     Q     Right.  So if you -- if it's not written down

19  on paper, that means you didn't do it, right?

20     A     Personally.  I didn't do it.  If that's what

21  you're asking.

22     Q     Can I ask the court reporter to read back that

23  question?  Is that possible?  Or that answer.  Is that

24  possible?

25        THE REPORTER:  Yeah.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 183 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 5/26/23

81

 1            (Requested portion was read)

 2      Q    I'm -- I'm not asking about what you did or

 3  didn't do.  I'm asking about how you were trained.

 4  Okay?  And based on your past testimony, I understand

 5  that you were trained that if it's not written down, you

 6  didn't do it.  Is that how you were trained?

 7      A    I -- if it's -- we were trained to write things

 8  down.  What I'm reading -- what I'm reading is, I've

 9  been asked a question.  If it's not written down, you

10  didn't do it.  And I said, well, if it's not written

11  down if I didn't do it then it's not there.

12      Q    Okay.  So you were trained to write down the

13  steps that you took in your investigation, right?

14      A    Yes.

15      Q    And that you should document all steps in your

16  investigation, right?

17      A    Technically, yes.

18           MR. MARTINEZ:  Objection.  Vague.

19      Q    Including steps that didn't lead you to a

20  suspect, but, you know, closed off a lead.  You should

21  still document what happened so if -- to show that you

22  followed up on leads and it didn't go anywhere; is that

23  right?

24      A    Typically, yes.

25      Q    And as a detective, you knew that if there were

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   holes in your reports, that some pesky defense attorney
 2   would later try to attack the credibility of your
 3   investigation based on there being holes in your police
 4   reports, right?
 5       A    I can't answer that, sir.  I don't -- I don't
 6   know what defense attorneys were looking for.
 7       Q    Well, you've been -- you've had to testify in
 8   court as a detective, right?
 9       A    Yes.
10       Q    And sometimes you've been cross-examined about
11   your police reports, right?
12       A    Yes.
13       Q    And you knew that if your police reports were
14   thorough and well-documented, then there would be less
15   to cross-examine you on, right?
16       A    Yes.
17       Q    But if you left holes in your police reports,
18   things that were mentioned but not followed up on, then
19   that would be an area where you might be cross-examined
20   on.  Why didn't you do this, or why didn't you do that?
21   Right?
22       A    Possibly.  Yes.
23       Q    And so you knew it was important to document
24   all of the leads that you followed so that later on
25   people would know what happened with those leads,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 185 of 1026
The Deposition of AL FONSO MARQUEZ, taken on May 6/23, Page

83

 1   correct?

 2       A    Typically.  Yes.

 3       Q    You also knew that, you know, supervisors might

 4   review your reports, and unless you wrote down what

 5   leads you followed up on, they wouldn't know whether the

 6   leads had been followed up on or not, right?

 7       A    Yes.

 8       Q    And so your reports were a way to communicate

 9   with your supervisors; is that right?

10       A    Yes.

11       Q    And, likewise, you also wanted to let your

12   fellow detectives know what leads had been followed up

13   on and what leads hadn't been followed up on, right?

14       A    Yes.

15       Q    And so your report served as a way to

16   communicate to your fellow officers what had been done

17   in an investigation, right?

18       A    Yes.

19       Q    You also understood that your police reports

20   would be provided to the prosecution if there is a

21   prosecution of any of the suspects in your case, right?

22       A    Yes.

23       Q    And that the prosecution would rely on your

24   police reports to know what happened during the course

25   of investigation, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    Yes.

2    Q    And that your reports should be tendered if

3    requested or shown to the defense attorney representing

4    the accused, right?

5    A    On the police departments side, no.  I don't

6    know about that, sir.

7    Q    From the prosecution, right?

8    A    From the prosecution -- yes.

9    Q    And so you understood it was important not only

10   to write down the information that was good for your

11   prosecution, but also to write down the information that

12   might be exculpatory, right?

13   A    Sir, we presented the case with the information

14   that we had.

15   Q    And so you would write down the stuff that was

16   both good for the prosecution and bad for the

17   prosecution, right?

18   A    No, sir.  We would write what we had whether it

19   was good or bad.  Gave them the decision.

20   Q    And you would sometimes take handwritten notes,

21   correct?

22   A    Yes.

23   Q    What would you do with your handwritten notes

24   after you -- after you created them?

25   A    After I made my supplemental or my statements

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 187 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

85

1  from those handwritten notes, I would dispose of them.

2    Q    How would you dispose of them?

3    A    Threw them away.  Throw them in the trashcan.

4  Tear them up.

5    Q    Did somebody tell you to throw away your notes?

6    A    No.

7    Q    Why did you throw away your notes?

8    A    That's what I do.

9    Q    Did anyone else throw away their notes?

10   A    That I know of, I don't know.

11   Q    You don't know if anybody else threw away their

12  notes?

13   A    I don't know, sir, what they do.

14   Q    What's that?

15   A    I don't know what anybody else does with their

16  notes.

17   Q    Well, when you created your supplemental

18  reports, you would put them in a file, right?

19   A    Yes.

20   Q    Were you ever told there is a limit to how many

21  things can go in the file?

22   A    No.

23   Q    Sometimes you put a ton of paper in the file,

24  right?

25   A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 188 of 1026
The Deposition of CALFORNO MARQUEZ, taken on May 6/23, Page

86

1    Q    And so was there anything preventing you from

2  placing your handwritten notes in the file with your

3  reports?

4    A    I guess it's to the individual.  No.  There is

5  nothing preventing you from doing that.

6    Q    Did anyone tell you that it was up to you, your

7  choice, whether to destroy your notes or retain them in

8  the file?

9    A    No.

10    Q    Did you start out keeping your notes and then

11  one day start disposing of them?

12    A    No.

13    Q    What led -- why did you choose to dispose of

14  your notes?

15    A    My choice.

16    Q    Right.  But why?

17    A    I would make my supplement -- make my report,

18  and then I would get ride of my notes.

19    Q    I understand that's what you did.  I am trying

20  it find out why you did that.

21    A    I cannot give you a reason, sir.  That was what

22  I did.

23    Q    And it wasn't based on what somebody else did.

24  It was just based on your own choosing?

25    A    On my own -- on my own volition.  Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 189 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23, Page

87

 1     Q    Okay.  When you would interview -- interview
 2   witnesses, sometimes witnesses tell you the truth, and
 3   sometimes they might give you false information, right?
 4     A    True.
 5     Q    And sometimes the false information might be an
 6   innocent mistake of memory, right?
 7     A    I don't know, sir.
 8     Q    I'm just asking you.  Sometimes that happens,
 9   right?  That somebody makes a mistake and they forget
10   something, and they end up telling you something that
11   isn't true, right?
12     A    If -- if they tell me then and there that,
13   "Hey, look.  I made a mistake.  This is what I said or
14   this is what I meant to say."  Then I would say yes.
15     Q    Defendant Marquez, that's not what I'm asking.
16   Let -- let me put it this way.  You don't know when
17   somebody is giving you false information if it's because
18   it's an innocent mistake or if it's an intent to deceive
19   the police, right?
20     A    That's correct.
21     Q    All right.  So you want to try and investigate
22   as a detective to find out whether the information
23   they're providing you, whether it's correct or not, and
24   if it's not correct, the reason why, right?
25     A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 190 of 1026
The Deposition of CALFONSO MARQUEZ, Taken on May 6/23

88

| 1 | Q   And so one thing you do is you want to know |

1      Q    And so one thing you do is you want to know

2   when you talk to a witness at a later point if they

3   changed their story, right?

4      A    Yes.

5      Q    And something that's helpful to determine

6   whether they change their story is your notes from the

7   first time you talked to them, right?

8      A    Yes.

9      Q    Because sometimes in an investigation, a fact

10  that doesn't seem relevant at the time, later on turns

11  out to be relevant, right?

12     A    Yes.

13     Q    And you know that from your experience as a

14  police detective.  Sometimes something that you ignored

15  initially becomes very important later on, right?

16     A    Yes.

17     Q    And so sometimes it's hard to know what

18  information to include in your report, because you don't

19  know what's going to be relevant at a later time, right?

20     A    Yes.

21     Q    And so the only way to be able to preserve all

22  of the information that you gather in writing is to

23  preserve your notes, right?

24          MR. MARTINEZ:  Objection.  Vague.

25     A    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Well, when you create your supplemental
2  reports, do you type out your notes word for word?
3    A    Off my notes, not word for word.  I relay
4  what's on the notes, and then I throw away the notes.
5    Q    Okay.  How do you choose what of your notes to
6  include in your reports?
7    A    I don't choose them, sir.  Whatever I have on
8  the notes is what goes in my work report.  Work product.
9    Q    Okay.  So you -- because you write very
10  thorough reports.  Is that what you're saying?
11    A    No, sir.
12    Q    Well, then how are you sure that what's written
13  on your reports gets into your police reports?
14    A    That's what I'm saying.  If it's on the notes,
15  it goes on the police report.  You asked.
16    Q    Did you ever ask anyone what you should do with
17  your notes?
18    A    No.
19    Q    Did you ever keep notes at home?
20    A    No.
21    Q    Do you ever keep police reports at home?
22    A    The only police reports that I had was the ones
23  that were given to me by district attorneys which I
24  turned over to my attorney.
25    Q    Which reports were given to you by the distinct

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 192 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 6, 2020

90

 1   attorney?

 2       A    My supplements to the program.  My supplements

 3   that I had taken.  References statement.

 4       Q    And when was it they were given to you?

 5       A    At the trial.  The verdict trial.

 6       Q    The writ hearing?

 7       A    Yeah.

 8       Q    Okay.  Would you carry around a copy of the

 9   file with you?

10       A    No.

11       Q    Where would you put your reports after you

12   submitted them?

13       A    In a case file.

14       Q    Where was the case file stored?

15       A    It was kept in the crimes against persons

16   office.

17            THE REPORTER:  Kept in the what?

18                 (Simultaneous speakers)

19       Q    Where in the crimes against persons office?

20       A    Sometimes at my desk.  Sometimes at another

21   detective's desk.

22       Q    Okay.  And then when it was kept at your

23   desk -- well, strike that.  When you were the case

24   sergeant, would you keep the file at your desk?

25       A    Basically.  Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      Q     And then would you ever turn that file over to
2  anyone else?
3      A     At the end of the investigation, yes.
4      Q     All right.  So at the end of the investigation
5  how would you determine -- or strike that.
6           Where would you give the file at the end of the
7  investigation?
8      A     We give to a supervisor and then from there to
9  the district attorneys office.
10     Q     All right.  So up until the end of the
11 investigation, you would have control over that file,
12 right?
13     A     Basically.  Yes.
14     Q     There is nobody logging what went into that
15 file or what came out of that file until the end of the
16 investigation, right?
17     A     No.  It's not correct.
18     Q     Tell me where -- where I'm going wrong.
19     A     Some detectives would make their statements,
20 and they would put it in there themselves, or they give
21 it to me so that I could put it in there.  Either or.
22     Q     Okay.  But then you would have custody of that
23 file, right?
24     A     Correct.  Correct.
25     Q     And nobody else would know the full contents of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  that file except for you, right?

 2      A    I -- I don't know, sir.  If anybody would read

 3  it, I'm talking about the detectives investigating it.

 4      Q    Did you deal with jailhouse informants when you

 5  were a detective?

 6           MR. MARTINEZ:  Objection.  Vague.

 7      A    Not necessarily, no.

 8      Q    Well, you understood that people who were

 9  facing criminal charges might want to get help on those

10  criminal charges by assisting the police, right?

11      A    Yeah.

12      Q    And no matter how much money you had, you can't

13  make a criminal charge go away, right?

14      A    [indiscernible]

15           THE REPORTER:  What?

16      Q    And so you understood that when you were a

17  detective, you had to be very careful with information

18  coming from people who were facing their own criminal

19  charges, right?

20      A    Yes.

21      Q    Because they might be trying to get help on

22  their own case in exchange for information on somebody

23  else's case, right?

24      A    Possibly.

25      Q    Sure.  And so you would want to corroborate

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 195 of 1026
The Deposition of CARLOS MARQUEZ, taken on 7/20/22

93

 1  whatever information was being provided to you from a --

 2  a person who is facing their own charges, right?

 3      A    Yes.

 4      Q    You want to know information or you want to

 5  know the circumstances of how they learned the

 6  information, right?

 7      A    Yes.

 8      Q    And you want to know all the things we talked

 9  about before, you know, with the -- when they learned

10  the information, where they learned the information, who

11  was present when they learned the information, right?

12      A    Yes.

13      (Exhibit No. 3 was marked for identification.)

14      Q    All right.  I want to ask you about the

15  document -- I want to know how you -- your -- your

16  documents were created back in 1993.  And to do that,

17  I'm just going to show you a sample report that we'll

18  mark as Exhibit No. 3.

19          All right.  Do you recognize this as an El Paso

20  Police Department supplemental report?

21      A    Yes, sir.

22      Q    And so the information at the top, would you

23  have to type in this information, or was this already

24  pre-generated?

25      A    It -- they would have to type the -- the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  information that's typed in there, we had to generate.
 2  We had to type it in.
 3       Q    Okay.  So you would type -- so there would be
 4  fields that were set up and then you would type in the
 5  information such as the time and the crime and that kind
 6  of stuff?
 7       A    Correct.
 8       Q    All right.  And then the narrative portion,
 9  that would be available for you to type in, correct?
10       A    Correct.
11       Q    And I'm sorry.  This is kind of small.  All
12  right.  And then down at the bottom there would be --
13  where it says reporting officer, would this information
14  next to reporting officer, would you type that in or
15  would that be generated by the computer?
16       A    That would be generated by that officer.
17       Q    Meaning that officer would type that or -- or
18  what do you mean?
19       A    The reporting officer that would then be
20  Acosta.  His ID number I guess and then approving
21  officer is also Mr. Acosta.  Whoever processed this.
22       Q    And so would Officer Acosta have to type in his
23  name as reporting officer?
24       A    Yes, sir.  I believe so.
25       Q    All right.  Then on the right where it says,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  dates -- you know, the report -- the report date,
 2  April 11th, 1993 and the time.  Would these fields be
 3  generated by the computer?
 4      A    You know, I would not know who generates those
 5  times, sir, or the dates.
 6      Q    All right.  You don't remember?
 7      A    I don't know who generates them.
 8      Q    Okay.  Would you have to type those in or would
 9  that be all done by the computer?
10      A    I believe it's done by the computer.
11      Q    Okay.  All right.  Did you know Danny Villegas
12  before the murders of Robert England and Armando Lazo?
13      A    No, sir.
14      Q    What about David Rangel?  Did you know him
15  before the -- the murders of England and Lazo?
16      A    No.
17      Q    What about Marcos Gonzalez?  Did you know him
18  before the murders of England and Lazo?
19      A    No.
20      Q    What about Rodney Williams?  Did you know him
21  before the murders of England and Lazo?
22      A    No.
23      Q    What about Fernando Lujan, known as Droopy?
24  Did you know him before the murders of Lazo and England?
25      A    No.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 198 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

96

```
 1      Q     And before the murders of Lazo and England, did
 2   you know Popeye or Enrique Ramirez?
 3      A     No.
 4      Q     Before the murders of Lazo and England, do you
 5   know who Danny Villegas hung out with?
 6      A     No.
 7      Q     Do you know how you got assigned to investigate
 8   the England and Lazo murders?
 9      A     By the supervisor that assigned me.
10      Q     Who?
11      A     Sergeant Johnson.
12      Q     Do you know why Sergeant Johnson assigned this
13   case to you in particular?
14      A     No.
15      Q     Was it your understanding it was just your
16   turn, or was it your understanding that Sergeant Johnson
17   was using some type of criteria to determine who to
18   assign the case to?
19      A     When I [indiscernible], he just said I was
20   going to handle it.  Not any criteria.
21      Q     I want to show you some testimony from the
22   second trial.  All right.  This is your testimony
23   from -- well, the -- this testimony.  I'll scroll down.
24            MR. MARTINEZ:  Can you go back up, Russell?  I
25   missed the date or do you --
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    (Simultaneous speakers)
 2             MR. MARTINEZ:  Oh, there it is.  There is it.
 3             MR. AINSWORTH:  Yep.  August 23rd, 1995.
 4             MR. MARTINEZ:  Got it.  Thank you.
 5      Q    And I'm going to show you -- I think it's pages
 6  here -- all right.  This is on page 484 of that
 7  transcript, line 6 through 10.  It's -- you're asked the
 8  question, "Now, you say the young man named Michael
 9  Johnston did tell you, 'Yes, I shot the guy'."  Your
10  answer is, "Correct."
11             "In reference to Electric Street?"  And then
12  you just indicated.  Do you see that?
13      A    Yes, sir.
14      Q    And were you indicating yes in -- when asked,
15  "In reference to Electric Street"?
16      A    I don't recall, sir, to be honest.
17      Q    All right.  But is it a fair assumption to make
18  because the only case -- the only murder you were
19  questioning Michael Johnston about was the Electric
20  Street murder, right?
21      A    As I recall, yes.  I was there.
22      Q    Well, were you questioning John -- Michael
23  Johnston about any murders other than the Electric
24  Street murders?
25      A    No, sir.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 200 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2012

98

 1    Q    Okay.  So Michael Johnston told you, "I shot
 2  the guy", right?
 3    A    I don't recall if he told me directly, or I may
 4  have heard it from somebody, but I'm going to say, yes.
 5  I don't recall.
 6    Q    Okay.  Because your memory of the events that
 7  happened in 1993 were a lot fresher in 1995, right?
 8    A    Because we talked to a lot of people so I don't
 9  --
10    Q    Yeah.
11              (Simultaneous speakers)
12    Q    I -- I understand but back in 1995, you had
13  much better memory for what happened in 1993, correct?
14    A    I don't know.
15    Q    Do you think your memory today is better of the
16  events that occurred back in 1993 than it was in 1995?
17    A    No.
18    Q    Okay.  So you agree that, generally speaking,
19  your memory was better back in 1995 than it is today,
20  right?
21    A    Yes.
22    Q    Okay.  And in 1995, you testified that a young
23  man named Michael Johnston told you, "Yes, I shot the
24  guy", right?
25    A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  And -- and so do you trust that that's

2  what happened?  That Michael Johnston told you, "Yes, I

3  shot the guy"?

4    A    Yes.

5    Q    Okay.  How did you come to be in contact with

6  Michael Johnston and Jacob -- forgive me.  I don't know

7  how to pronounce his last name.  Jauregi?

8    A    I think it was --

9    Q    Jauregi?

10   A    Jauregi.

11   Q    Jauregi?

12   A    Jauregi.  I -- I don't recall if it was we

13  brought him into the office or we had him brought in by

14  somebody else, but I don't recall exactly how we

15  [indiscernible] --

16   Q    Okay.  Why did you want to talk to Mike

17  Johnston?

18   A    I don't recall if he was named as a possible

19  witness or having something to do with the case, so we

20  needed to talk with him.

21     (Exhibit No. 4 was marked for identification.)

22   Q    Let me show you an exhibit.  We'll mark this as

23  Exhibit No. 4.  This is a document Bates numbered on

24  this -- this version is DA 34625, 627, and 629.

25          Is that your signature at the bottom?  Or does

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 202 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page 100
100

 1  your signature appear on the third page of Exhibit 4?

 2      A    I -- I don't see my signature at all, sir.  I

 3  don't see my signature there -- there at the bottom of

 4  the page.

 5      Q    Okay.  All right.  Do you remember Robert Wayne

 6  Hall?

 7      A    Yes, sir --

 8           MR. MARTINEZ:  I'm sorry.  I'm sorry, Russell,

 9  you're -- you're -- the sound has kind of degraded in

10  the last few minutes.  Will you just try to speak up a

11  bit?

12      Q    Certainly.  Do you remember Robert Wayne Hall?

13      A    Yes.

14      Q    Who was Robert Wayne Hall?

15      A    He was a somebody in Chaparral, New Mexico, who

16  I believe told us that he had information, and we went

17  up to -- to talk to him.

18      Q    Okay.  And so do you see where it says, "I am

19  giving this statement to Detective Alfonso Marquez of

20  the El Paso Police Department"?

21      A    Yes.

22      Q    All right.  Is this your handwriting on Exhibit

23  4?

24      A    Yes.

25      Q    All right.  And so this is -- somebody says, "I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 203 of 1026
The Deposition of JOHN MCGARITY, taken on May 6/23, Page
101

1   called the sheriff's department this morning after I

2   told Mrs. somebody about the information I had.  From

3   there, she took me to the principal's office.  Mr. -- I

4   think it's Gurrola -- and from there we called the

5   sheriff -- the sheriff office."  Do you see that?

6       A    Yes.

7       Q    And then it says, "Detective Marquez has asked

8   me what information I have, and I have told him that I

9   will tell him the truth."  Do you see that?

10      A    Yes.

11      Q    All right.  So he's -- this is -- Hall gives

12  information about Mike Johnston, right?

13      A    I'm sorry, sir.  Repeat it please.

14      Q    Hall gives you information about Mike Johnston,

15  correct?

16      A    Yes.

17      Q    And in the written statement, Hall is reporting

18  that Mike came up to him and said, "Man, you want to

19  hear something cool?"  He then said, "Man, we killed two

20  people last night.  Me and Jake.  I answered with, no.

21  He then said, yeah.  We did a driveby in El Paso.  He

22  told me what kind of car and guns they used but I don't

23  remember.  I thought he was kidding.  I then asked him

24  what happened and he said, we -- we chased two others

25  that got away until they got to a phone and we shagged

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 204 of 1026
The Deposition of CALVIN MARQUARDT, taken on May 6/23, Page

102

```
 1  ass."  Do you see that?

 2      A    Yes.

 3      Q    And that statement was in quotes, right?

 4      A    Say again, sir, please.

 5      Q    That statement was in quotes, right?  Or

 6  specifically where he says, "We chased two others that

 7  got away until they got to a phone and we shagged ass."

 8  That statement is in quotation marks, right?

 9      A    Yes.

10      Q    And when you use quotation marks, that means

11  you're repeating word-for-word verbatim what the witness

12  is telling you; is that right?

13      A    Yes.

14      Q    Okay.  And then going on to the third page of

15  Exhibit 4.  Hall tells you, "There is a friend of

16  Johnston who does own some guns", and it says, ".20

17  gage, .440, .22 handguns, and .22 rifle."  Do you see

18  that?

19      A    Yes.

20      Q    So Hall is telling you that a friend of

21  Johnston has a .22 handgun and a .22 rifle, right?

22      A    You're saying that Hall was telling us,

23  correct?

24      Q    That's right.

25      A    Yes.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 205 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
103

 1    Q    And you know from review of your testimony and

 2   the reports that the England and Lazo murders were

 3   perpetrated with a .22 caliber handgun or a .22 caliber

 4   gun I should say?

 5    A    Yes.

 6    Q    And we don't know if it's a handgun or a rifle

 7   or what kind of gun it is, right?

 8    A    All from what we did, it was a handgun.  Not a

 9   rifle.

10    Q    And where are you recollecting that from?

11    A    From a statement that I had taken from

12   Villegas.

13    Q    I see.  Did anybody from the crime lab tell you

14   that it was a handgun that was used to commit the crime

15   as opposed to a different type of .22 caliber weapon?

16    A    No.

17    Q    Do you believe that Danny Villegas is guilty of

18   murder?

19    A    Yes.

20    Q    And why do you believe he's guilty of murder?

21    A    Through our investigation.

22    Q    What about your investigation?

23    A    The statement that he gave us was not known to

24   the public.  It was not known to the media, and stuff

25   that he had in the statement coincided with what

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 206 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23

104

 1  happened out there that night to the best of our

 2  knowledge.

 3      Q    And so that's what we were talking about

 4  earlier today.  You wanted to know how Danny Villegas

 5  knew information that was not known to the public,

 6  right?

 7      A    Correct.

 8      Q    What was the information that Danny Villegas

 9  knew that was not known to the public?

10      A    The direction of one of the victims ran, to

11  where he ran, the shots that were fired, the location

12  where they were at, and I'd have to look at the rest of

13  it, sir.

14      Q    So it wasn't released to the public that one of

15  the victims ran towards the house and the other two

16  victims ran away towards some businesses looking for a

17  phone, right?

18      A    That's not what I recall.

19      Q    What do you recall?

20      A    Correct.  One of the witnesses ran to a house.

21  The other two witnesses they said ran behind a -- behind

22  a dumpster, and none of that was given out to the -- the

23  media or we made it public.  Or [indiscernible] we

24  didn't.

25      Q    And that was important to you because you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  had -- if somebody knew that one victim ran one way and

2  the other two victims ran another way, you would want to

3  know how they knew that information, right?

4      A    Correct.

5      Q    Okay.  So Mike Hall [sic] told you -- sorry.

6  Robert hall told you that Mike Johnston told him that

7  they, "Chased two others that got away until they got to

8  a phone and we shagged ass."  Do you see that?

9      A    Yes.

10     Q    And you remember from your interview with Jesse

11 Hernandez that two of the victims ran off and were

12 chased by the car, right?

13     A    Yes.

14     Q    And so when you learned this information from

15 Robert Hall, this piqued your curiosity, right, as a

16 police detective?

17     A    Yes.

18     Q    You wanted to know how the heck did Mike

19 Johnston know the day after the murders, so really later

20 that same day, that the murderers chased two of the

21 victims until they got to a phone and then they shagged

22 ass?

23     A    I don't remember the -- the two victims that

24 ran saying they got to a phone.

25     Q    Fair.  You remember that they were looking for

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 208 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 23 Page
106

```
 1  a phone, right?
 2      A    No, sir.  I do not remember.
 3      (Exhibit No. 5 was marked for identification.)
 4      Q    Okay.  All right.  Let me show you what we'll
 5  mark as Exhibit No. 5.  All right.  This is a statement
 6  from Juan Carlos Medina.  Do you see that?
 7      A    Yes.
 8      Q    Okay.  So Medina was one of the surviving
 9  victims, right?
10      A    Yes.
11      Q    And let's take -- and this is -- sorry.  This
12  Bates numbered -- Exhibit 5 is Bates numbered Defense
13  City 15737 to 15738.  And taking a look at the second
14  page of Exhibit 5.  It says, "I then began to run
15  towards Fairbanks where there is a Blockbuster Video.
16  While I was running, Jesse passed me up and we hid
17  behind a dumpster by Blockbuster.  We hid almost ten
18  minutes and then we tried to go to the Blockbuster and
19  Subway to call 911, but the businesses were closed."  Do
20  you see that?
21      A    Yes.
22      Q    Okay.  Did you want to know how Mike Johnston
23  knew that two of the four victims had been chased by the
24  car and ran off together?
25      A    They were interviewed, sir.  I mean, I don't
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 209 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 1/23  Page
107

 1  know what the interview came out of.  I interviewed them
 2  or somebody else did.
 3      Q    I understand you interviewed them.  What I'm
 4  trying to find out is did you want to know from Mike
 5  Johnston how he knew that two of the victims ran off and
 6  were chased by the car?
 7      A    Yes.
 8      Q    Okay.  What did Mike Johnston tell them -- and
 9  then you interviewed Mike Johnston, correct?
10      A    I don't recall if I did or -- if I did, we
11  spoke to a lot of people there.  I can't recall if I
12  spoke with him, myself, for a length of time.
13      Q    Where would we look to determine who it was who
14  questioned Mr. Johnson?
15      A    Either the statements file or the supplement
16  files.
17           THE REPORTER:  Either the what files?
18      A    The statements or supplements.
19      Q    So there should be some documented reports
20  regarding Johnston's interview, right?
21      A    Correct.
22      (Exhibit No. 6 was marked for identification.)
23      Q    All right.  Let me show you what we'll mark as
24  Exhibit No. 6.  All right.  This is a document Bates
25  numbered DA 34 -- 340 -- 364.  Excuse me.  All right.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 210 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

108

1  Do you see here -- well, this is in regard to Jacob and

2  Mike Johnston.  Do you see that?

3      A    Yes.

4          MR. JEEP DARNELL:  Russell, before you get

5  going on a string.  I -- Eric and myself need to break

6  in no later than ten minutes to walk over to the Federal

7  Courthouse.  We have an in-person hearing.

8          MR. AINSWORTH:  I'm sorry.  I didn't know it

9  was in person.  Okay.

10          MR. JEEP DARNELL:  Yes.  I appreciate that.

11     Q    All right.  Do you see that -- talks about the

12 juveniles were taken to the YSD.  Is that the old name

13 for JIS or the new name for JIS?  The Youth Services

14 Division?

15     A    Yes, sir.

16     Q    Where they're logged in and then taken to the

17 JPD?

18     A    Correct.

19     Q    And then the intake worker reviewed the

20 paperwork for them, and they both said that they wanted

21 to give written statements, right?

22     A    Correct.

23     Q    And then at about ten -- 10:30, the juveniles

24 were taken before Judge Horkowitz for their magistrate

25 warnings, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 211 of 1026
The Deposition of ALPHONSO MARQUES, taken on May/23 Page
109

 1    A    Correct.

 2    Q    They were then returned to the YSD office where

 3  CAP detectives proceeded to take their written

 4  statements?

 5    A    Correct.

 6    Q    Okay.  Where are those written statements from

 7  Mike Johnston and Jacob?

 8    A    At this time, I don't know, sir.

 9    Q    Okay.  They would have been in your file,

10  right?

11    A    Yes.

12    Q    You brought both boys, Mike Johnston and Jacob,

13  to the magistrate, right?

14    A    Correct.

15    Q    And so is there any reason that you brought the

16  boys to the magistrate judge that you would not have

17  then interviewed them?

18    A    I seem to recall that when we tried to -- after

19  that, we tried to interview them, and we may or may have

20  not taken any because there was four or five different

21  stories from each one, and we determined that they were

22  not being truthful as to their involvement in it.  I

23  believe that's it.  I'm not sure.  So no.  So I don't

24  believe confessions or statements were taken.

25    Q    Okay.  Tell us how you -- how you questioned

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 212 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

110

 1  Johnston and Jacob.  Like, did --

 2      A    The same.

 3      Q    -- You just ask them, "Tell us what happened"?

 4      A    The same.  I tried to get rapport with them.  I

 5  ask them to verbally let me know what had happened, and

 6  then if we -- if it's correct more or less, we take a

 7  statement, but I remember -- and I want to say it was

 8  both of them that gave us different completely stories

 9  as to what happened after the -- after what -- I can't

10  think of his name -- had -- had reported.

11      Q    All right.  And so what were the four different

12  stories -- four or five different stories that came in?

13      A    I don't recall at this time, sir.  It was just

14  locations -- the location and a bunch of other stuff

15  that I don't recall exactly right now.

16      Q    All right.  You didn't create a report

17  regarding what Johnston and Jacob told you, right?

18      A    I don't think so, sir.

19      Q    You've never seen a report from anybody

20  documenting what they told you, right?

21      A    I don't recall.

22      Q    Are you aware that the city does not have a

23  copy of any statements from Mike Johnston?

24      A    I don't know.

25      Q    Did Mike Johnston's mother tell you not to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 213 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 23

111

```
 1   question Mike Johnston without her presence?
 2       A    Not that I recall.
 3       Q    Did Mike Johnston's mother give you a card
 4   indicating that Mike Johnston would invoke his
 5   constitutional rights to silence and to an attorney?
 6       A    Not that I recall.
 7       Q    Did you scream at Mike Johnston?
 8       A    Not that I recall, sir.
 9       Q    Did you accuse Mike Johnston of murdering
10   England and Lazo?
11       A    Not that I recall.
12       Q    Well, are you saying you don't -- you may have
13   done that, but you don't recall, or are you saying, no,
14   you didn't?
15            MR. MARTINEZ:  Objection.  Vague.
16       A    I'm saying that the -- after all the murder or
17   they weren't or the statements I had been involved with,
18   I may have asked, "Did you kill this person?  Did you do
19   this?  Did you do that?"  But it's only part of asking.
20   You have to ask.
21       Q    Right.  So not accusing?
22       A    Not accuse.  No, sir.
23       Q    And what about screaming?  Are you saying you
24   may have screamed at him but you just don't remember
25   but, or are you saying, no, that didn't happen?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 214 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 5/6/23   Page
112

 1     A     Again, sometimes with the -- the nature of the
 2  amount of time that we spend, we may lose it here and
 3  there, but -- and we may raise our voice, but I do not
 4  recall screaming or hollering, but we may have raised
 5  our voice.
 6     Q     Did you raise your voice with Johnston?
 7     A     I don't recall, sir.
 8     Q     All right.  You said you may have raised your
 9  voice with Johnston?
10     A     May have.
11     Q     All right.  Did you imply to Johnston that he
12  would be sexually assaulted in jail if he didn't
13  cooperate?
14     A     No, sir.
15     Q     Did you tell him that he knows what happens in
16  there about jail?
17     A     No, sir.
18     Q     Who was responsible for documenting what
19  Johnston and Jacob told you?
20     A     More than likely whoever spoke with him.
21     Q     And that was you, right?
22     A     I probably did, sir.
23     Q     All right.  I'm getting nervous about the time,
24  and I know you are.  So why don't we go off the record
25  here, and then how are you going to let us know when to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 215 of 1026
The Deposition of CALFONSO MARQUEZ, Taken on May 6, 23
113

1  come back on?

2         MR. JEEP DARNELL:  You tell me.  I didn't know

3  if anybody was going to eat lunch.  I mean, I would

4  guess our hearing is at 20 minutes, so if we can have an

5  hour and --

6         MR. AINSWORTH:  That sounds good.  Okay.  Why

7  don't we reconvene at 1:45, and email us like at 1:30 if

8  that's not going to work.  Okay?

9         MR. JEEP DARNELL:  That works.  All right.

10         THE VIDEOGRAPHER:  Okay.  We're off the record.

11  It is 12:43 p.m.

12         (Recess from 12:43 p.m. to 1:51 p.m.)

13         THE VIDEOGRAPHER:  We are back on the record.

14  The time is 1:51 p.m.

15    Q    All right.  Mr. Marquez, did you get a chance

16  to take a break and get some lunch?

17    A    Well, I -- I don't [inaudible] --

18    Q    I'm sorry.  We can't hear you.

19    A    I don't like to eat much.

20    Q    All right.  All right.  Is there anything

21  affecting your ability to truth --testify truthfully and

22  accurately this afternoon?

23    A    No.

24    Q    All right.  Before we broke, you agreed with me

25  that Mike Johnston had told Robert Hall some non-public

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 216 of 1026
The Deposition of CAL, A DECEMBER 30, taken on May 23,

114

1  crime scene facts, right?

2      A    Correct.

3      Q    And that Mike Johnston had told you that he

4  shot the boys, right?

5      A    Yes.

6      Q    And we have a report from Charlie Ortega saying

7  that written -- handwritten statements -- or sorry.

8  Written statements were taken from both Jacob and Mike

9  Johnston, right?

10     A    I would have to look at that if you show it to

11 me again.

12     Q    Sure.  I'll show it to you again.  We marked as

13 Exhibit 6, so I'll just pull it up.  All right.  Showing

14 you again.  This is a report by Officer Ortega on --

15 started on April 15th at 11:19, and he writes in the

16 report regarding -- I'll just scroll up to orient us.

17 This is about Jacob and Mike Johnston.  And then at

18 approximately 10:30 the juveniles were taken before

19 Judge Horkowitz for their magistrate warnings without

20 the presence of detectives.  They were then returned to

21 the Youth Services Division office where CAP detectives

22 proceeded to take their written statements.  Do you see

23 that?

24     A    There is a, "Meeting is being recorded by

25 [inaudible]" blocking the --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 217 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 05/06/23,   Page
115

 1          MR. MARTINEZ:  Oh, sorry.  Hold on.  That's my
 2  fault.  Give me a sec.
 3          MR. AINSWORTH:  I'm sorry.  Could the witness
 4  not hear?
 5          MR. MARTINEZ:  No.  He couldn't -- he couldn't
 6  see.  He could hear you.  He couldn't see the document
 7  you were showing because we had a window in a window.
 8      Q    Not a problem.  Okay.  Can you -- can you see
 9  the document now, sir?
10      A    Yes.
11      Q    Taking a look at Exhibit 6 and I'll just --
12  showing you this is the report about the interviews with
13  Jacob and Mike Johnston.  This is Ortega's report as you
14  can see from the bottom.  Do you see that, sir?
15      A    Yes.
16      Q    And then it says at approximately 10:30, the
17  juveniles were then taken before Judge Horkowitz for
18  their magistrate warnings.  Do you see that?
19      A    Yes.
20      Q    They then returned to the Youth Services
21  Division office where Crimes Against Person detectives
22  proceeded to take their written statements.  Do you see
23  that?
24      A    Yes.
25      Q    All right.  And so we've got a report from

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 218 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
116

1  Ortega saying that written statements were taken from

2  Jacob and Mike Johnston, right?

3      A    Yes.

4      Q    All right.  And then we -- and so those written

5  statements would detail what Mike Johnson -- what Mike

6  Johnston's explanation was for why he had non-public

7  crime scene facts.

8           MR. ALMANZAN:  Objection. Calls for

9  speculation.

10          MR. MARTINEZ:  Objection.  Vague.

11     A    No statements were taken I believe.

12     Q    How do you know that no statements were taken?

13     A    At the time we were getting five different

14 stories.  Each one -- every time we spoke to -- like I

15 said before, I let them tell me what happened.  We would

16 go over it again, and the story would change, and about

17 five different times, the story would change.  So we

18 made the opinion and conclusion that they were dragging

19 out and [indiscernible]

20     Q    Who is we?

21     A    Myself and -- I guess I made the decision.

22     Q    Okay.  Because did this happen after midnight?

23     A    I don't recall, sir, the hours.

24     Q    All right.  Let me show you -- I'm going to

25 show you that exhibit again.  Exhibit No. 6.  As -- at

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 219 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 5/26/23

117

1  bottom of Ortega's report it says, "At this point,
2  midnight" -- well, strike that.  It says, "They were
3  then returned to the Youth Services Division office
4  where CAP detectives proceeded to take their written
5  statements.  At this point, midnight, Detectives Ortega,
6  Moreno, and Sergeant Meza concluded assistance for CAP."
7  Do you see that?
8      A    Yes.
9      Q    So after that point, it was just you alone; is
10 that right?
11     A    Myself and possibly -- it had to be another
12 detective.  I wouldn't ask myself.
13     Q    Okay.  And so do you know why Ortega wrote that
14 CAP detectives proceeded to take their written
15 statements as opposed to, "We're going to take
16 statements", or, "We're thinking about taking statements
17 from them"?
18          MR. ALMANZAN:  Objection.  Lacks foundation.
19 Objection.  Argumentative.
20     Q    You can answer, sir.
21     A    I have no idea why Detective Ortega and Meza
22 and Morena left.  I thought maybe they thought we were
23 going to take it [indiscernible].
24          THE REPORTER:  Take it where?
25     A    Maybe they thought we were going to take

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 220 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23, Page

118

```
 1  statements.
 2     Q    Okay.  I'm going to show you a portion of that
 3  testimony from September 8th, 2011, at the Writ of
 4  Habeas hearing.  So, again, sir, I'll show you the date
 5  this is from.  September 8th, 2011.  And in that
 6  hearing -- okay.  This is page 40 of that testimony,
 7  line 15.  You were asked the following questions and I'm
 8  going to ask you if you gave the following answers.
 9          Question, "Do you remember Michael Johnston?
10  The young named, Michael Johnston?"
11          Answer, "I remember the name.  I don't remember
12  anything about Michael Johnston."
13          Question, "Do you remember if you took a
14  question from him?"
15          Answer, "Sir, I don't remember if I did take
16  it."
17          Were you asked those questions, and did you
18  give those answers, sir?
19     A    Did I give those answers?  Yes.
20     Q    And was it true back in 2011 that you didn't
21  remember anything about Michael Johnston?
22     A    Correct.
23     Q    And was it true that in 2011, you didn't
24  remember if you took a statement from him or not?
25     A    Correct.
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 221 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23

119

1    Q    And so, sir, would you agree with me that you

2  don't remember today -- well, strike that.  Is it true

3  that you can't say for certain today you did not take a

4  statement from Michael Johnston?

5    A    If there is not any in the file, I did not take

6  a statement from him.

7    Q    Because if a statement was taken from him and

8  then it was removed from the file, that would be totally

9  wrong, right?

10    A    If -- yes.

11    Q    Yeah.  That would be a constitutional violation

12  if a statement from Michael Johnston where he says, "I

13  shot those boys", and included non-public crime scene

14  facts in it was removed from the file, that would be --

15  that would violate the constitution, right?

16         MR. MARTINEZ:  Objection.  Calls for

17  speculation.  Lack of foundation.

18    A    Yeah.

19    Q    And so the only reason you're saying that you

20  didn't take a statement from Michael Johnston is because

21  you don't see one in the file; is that right?

22    A    No.

23    Q    Then what are you basing your statement on that

24  you didn't take a statement from Michael Johnston?

25    A    I did not take a statement from Michael --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 222 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23  Page
120

1 Michael Johnston because he gave us five different

2 versions.  After that, I, in my own mind, made up my

3 mind that he was dragging out in Chaparral, New Mexico.

4    Q    So do you have a memory of your conversation

5 with Michael Johnston?

6    A    No.  Not as to exact memory.  No.

7    Q    Well, do you have any memory of your

8 conversation with Michael Johnston?

9    A    Just that I recall that he gave us five

10 different versions, different cars, different weapons,

11 different locations.  That's the only thing that I

12 remember.

13    Q    What did he look like?

14    A    I don't know, sir.

15    Q    Was he white?  Latino?  Black?

16    A    No.  I -- I don't recall.  I'm not going to

17 pick one, but I don't recall what he looked like.

18    Q    What size was he?

19    A    I don't recall, sir, if he was tall, short.

20    Q    All right.  So if you didn't take a written

21 statement from Michael Johnston, then you would document

22 in the report what he told you, right?

23    A    Not necessarily, sir.  I -- I can't really say

24 that.

25    Q    If you have somebody who told you that he shot

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 223 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 5/23, Page

121

1  the victims in this case, and that person has told

2  somebody else that he had gotten public details to the

3  crime, don't you thank those are things that you should

4  write down?

5      A    Yes.

6      Q    Did you write them down in your notes?

7      A    No, sir.

8      Q    How do you know you didn't write them down in

9  your notes?

10     A    Because I didn't write them down in my notes.

11 I had Mr. Johnston picked up I believe.

12     Q    Well, but do you have a memory of Michael

13 Johnson telling you that he killed the victims, and he

14 knew non-public crime scene facts, and you intentionally

15 didn't write those things down?

16     A    Michael Johnston didn't tell me the facts that

17 you're talking about.  Those came from the gentleman

18 Hall at the -- Chaparral.

19     Q    Okay.  So what did Michael Johnston say when

20 you asked him how did you know these facts to tell

21 Mike -- Robert Hall?

22     A    I did not ask him.

23     Q    Okay.  Earlier today I thought you said you

24 would want to know how Michael Johnston knew non-public

25 crime scene facts, right?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 224 of 1026
The Deposition of LORENZO MARQUEZ, taken on May 23, 2023

122

1    A    Yes.

2    Q    So why didn't you ask Michael Johnston, how did

3  you know that two people -- the two victims ran together

4  and were chased by the car?

5    A    I did not tell them.  I couldn't tell them

6  something -- when I talked to him, I asked him, tell me

7  what happened.  He gave me five different stories,

8  neither one which matched.

9    Q    And -- and so part of that conversation you

10  started to get a sense that this guy was full of shit.

11  He wasn't giving any truthful information, right?

12    A    He wasn't being truthful.

13    Q    So why didn't you then ask him, "Well, Michael

14  Johnston, how did you know that two of -- of the victims

15  were being chased by the car?"  Because maybe Michael

16  Johnston was told by one of his friends who committed

17  the murder what happened, right?

18    A    Right.

19    Q    And so you want to know where he got that

20  information from, right?

21    A    Yes.

22    Q    And so why didn't you then ask Michael Johnston

23  what -- where did he get that information from?

24    A    I don't know, sir.

25    Q    Did you ask Michael Johnston why he was telling

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 225 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 1/23
123

```
 1  you that he shot the two guys when he wasn't really --
 2  when it seemed to you he wasn't really being truthful?
 3      A    I may have told him.  I don't recall.
 4      Q    Do you think he was covering for somebody else,
 5  and that's why he was saying that he was the one who did
 6  it?
 7      A    I could not say what was Michael Johnston's
 8  mind.  No.
 9      Q    Okay.  So is this the only false confession
10  that you've ever received in your career was from
11  Michael Johnston?
12      A    No.
13      Q    What other false confessions have you received
14  in your career?
15      A    I'm not saying confessions.  In this particular
16  case, there were a lot of people that were taking credit
17  for it, bragging about it.  We investigated.  We cleared
18  them.  As far as my career, I don't know.
19      Q    Well -- okay.  So is this the only false
20  confession you can recall receiving?
21           MR. MARTINEZ:  Objection.  Vague.
22      A    I don't -- I only received a false confession
23  from Mr. Johnston.
24      Q    Well, was it truthful when he said that he shot
25  the victims?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 226 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 5/6/23

124

```
 1      A    Apparently not.

 2      Q    So then that was false, right?

 3      A    Yes.

 4      Q    And he was confessing to shooting the victims,

 5 right?

 6      A    He was bragging to shooting the victims.

 7      Q    What's the difference between bragging that he

 8 shot the victims and confessing that she shot the

 9 victims to you?

10      A    If -- if I'm telling you, hey, you know, I shot

11 him [indiscernible] to make me look big or make me feel

12 strong or whatever.  That would be one way of saying,

13 you know what, he's bragging.  Trying to make himself

14 more popular, more bigger, or whatever.

15      Q    So you thought that Mike Johnston was trying to

16 brag to you that he shot the victims and make himself

17 look bigger to you?

18      A    No, sir.

19      Q    Then -- then help me out because I'm -- I'm

20 confused as to why he was telling you what -- what --

21 strike that.

22           What was your belief as to why Mike Johnston

23 was telling you that he killed the boys when he really

24 didn't do it?

25      A    I don't know his belief, sir.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 227 of 1026
The Deposition of CALFORNIA MARQUIS, Taken on May 6/23, Page

125

```
 1      Q    No.  No.  Your belief, sir.  What was your
 2  belief about why he was telling you that he killed the
 3  boys when he didn't really do it?
 4      A    He was trying to act big or -- in front of
 5  everybody else.  Whoever was around.
 6      Q    Well, what about in front of -- inside the
 7  police station in front of you and the other police
 8  officers?  Why was he telling you and the other police
 9  officers that he killed the two boys and -- yeah.  But
10  he really didn't do it?
11      A    Sir, I don't know why.  I cannot answer for why
12  he told us something that he was -- in his mind, he told
13  us that.  I don't -- I cannot get into his mind to
14  figure out why did you say that.
15      Q    Well, did you ask him?  Did you say, "Michael,
16  can you tell us why you're telling us that you shot
17  these two boys when your stories don't -- don't add up?"
18      A    I don't believe I told him that, sir.
19      Q    Why didn't you -- did you want to know why he
20  was telling you that he killed the boys?
21      A    Because I believe that he was bragging, and
22  that's what I may have told you -- told him that why --
23  why are you bragging?  But that's about it.
24      Q    All right.  In any event, we can agree that you
25  should have written down what his explanation was for
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 228 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2019
126

```
 1  how he -- he got the non-public crime scene facts,
 2  right?
 3      A    Correct.
 4      (Exhibit No. 7 was marked for identification.)
 5      Q    Okay.  I want to show you what we'll mark as
 6  Exhibit 7.  It's a two page document.  It's Bates
 7  numbered Defense City 15681 and 82.  And I'm going to
 8  ask you, do you recognize the handwriting on this page?
 9      A    Yes, sir.
10      Q    Whose handwriting is that?
11      A    I believe it's mine.
12      Q    What are these notes of?
13      A    Information I received from Marcos Gonzalez.
14      Q    I'm sorry.  From whom?
15      A    I believe on the side it says Marcos -- I think
16  it's -- scroll it up a little bit.
17      Q    Scroll up?
18      A    I can't see the -- I see Marcos Gonzalez.
19      Q    Okay.  These are notes of your conversation
20  with Marcos Gonzalez; is that right?
21      A    Yeah.  I don't recall if there was conversation
22  with him or -- yeah.  I believe so.
23      Q    Okay.  And so Marcos Gonzalez, what -- what was
24  he saying to you in this conversation in which you took
25  these notes?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 229 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

127

```
 1      A     Whatever it says on the -- on the document.
 2  "No car.  Went to Boomerangs."
 3      Q     Okay.  So you said -- he told you he didn't
 4  have a car or access to a car, right?
 5      A     Correct.
 6      Q     He went to Boomerangs with Danny's girlfriend;
 7  is that right?
 8      A     Correct.
 9      Q     And Danny's girlfriend is Vero?
10      A     Vero.
11      Q     Vero.  All right.  And he tells you that he was
12  babysitting for Leslie; is that right?
13      A     Don't know.  I don't know if he was
14  babysitting, or somebody was babysitting.
15      Q     Somebody was babysitting.  Okay.
16      A     Yeah.
17      Q     Okay.  All right.  It says, "Friend's baby
18  mother.  She was out dancing."  Do you see that?
19      A     Yes, sir.
20      Q     They're watching, White Men Can't Jump, and
21  doesn't remember what was on TV; is that right?
22      A     Correct.
23      Q     So Marcos was telling you they were watching
24  White Men Can't Jump, and that they don't remember what
25  was on TV, right?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 230 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 2019

128

```
 1      A    Correct.

 2      Q    All right.  It says, "Homework at his

 3  apartment", right?

 4      A    Correct.

 5      Q    It says Marcos, Danny, Snapper, and Rodney were

 6  at Snappers -- Snapper's friend's house; is that right?

 7      A    It appears.  Yes, sir.

 8      Q    All right.  Told you babysat.  Snapper's friend

 9  only wanted Snapper in the appointment.  Went back to

10  Danny's house on Wren after movie was finished.  Don't

11  remember what time we got home.

12      A    Correct.

13      Q    Do you see that?  Okay.  So -- and what are

14  these times here?  5:25 and 5:35 p.m.?

15      A    Possibly the time we started and -- started the

16  taking the notes and time we started -- finished taking

17  the notes.

18      Q    Okay.  And what are these numbers after Marcos

19  Gonzalez?

20      A    I don't know, sir.

21      Q    Is this your handwriting where it says Marcos

22  Gonzalez?

23      A    No.

24      Q    Is that his signature?

25      A    I believe so.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 231 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
129

 1     Q    Okay.  So Marcos Gonzalez told you that the
 2  night of the murder they were babysitting for Leslie's
 3  baby; is that right?
 4     A    Yes.
 5     Q    And that they were watching a movie on TV
 6  called, White Men Can't Jump, right?
 7     A    Yes.
 8     Q    Did you record this information in a
 9  supplemental report?
10     A    I don't remember, sir.
11     Q    Why did you take these notes?
12     A    Because I don't recall where we were at.
13     Q    I'm sorry.  Could you say that again?
14     A    I don't recall where we were at.  That I
15  probably did not have any access to a computer or
16  typewriter.
17     Q    Well, how many times did you interview Marcos
18  Gonzalez?
19     A    I don't recall if I interviewed him to take a
20  statement.  I recall taking notes, but I didn't -- I
21  don't recall interviewing.
22     Q    Where were you when you interviewed Marcos
23  Gonzalez?
24     A    I don't recall interviewing him so I don't
25  know.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 232 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 23, Page

130

 1    Q     Do you know where Marcos Gonzalez was living on
 2   April 21st, 1993?
 3    A     I don't recall or I don't know where he lived.
 4    Q     Do you remember he was living with Danny
 5   Villegas?
 6    A     I don't know if he was living with him, stayed
 7   in the house 24/7.  I don't know that.
 8    Q     Exhibit --
 9          THE REPORTER:  What was that?
10      (Exhibit No. 8 was marked for identification.)
11    Q     I'm sorry.  I'm just making note to myself of
12   what the exhibits are.  That was seven.  And now I'm
13   going to show you eight.
14          Okay.  Exhibit No. 8 is a report by Scott
15   Graves by Terri Vinson.  Do you see that?
16    A     Yes.
17    Q     Or this is a statement by her at 10:00 a.m. on
18   April 12th.  She says, "I heard Terrance telling my
19   sister about a car that Rudy Flores was driving, and he
20   described the car as being gray with rust patches and
21   the tires had a gold rim on it.  Terrance said that Rudy
22   was driving the car, and he was involved in the shooting
23   of the two boys on Friday night on Electric Avenue."  Do
24   you see that?
25    A     Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 233 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23
131

 1    Q    All right.  So we've got Terri telling Scott
 2  Graves that Terrance told her that Rudy was involved in
 3  the murder, right?
 4    A    Can you put it up again?  I don't know if I
 5  read that or --
 6    Q    Sure.  "Terrance said that Rudy was driving the
 7  car, and he was involved in the shooting of the two boys
 8  on Friday night on Electric Avenue."  Do you see that?
 9    A    Yes, sir.
10    Q    All right.  So Terri is saying that Terrance
11  told her that Rudy was involved in the murder, right?
12    A    Yes.
13    Q    Okay.  Then we've got what I'll mark as Exhibit
14  9 which is Tonya Vinson.  This is supposed to be Tonya,
15  but it's just the second page of her [inaudible].  Do
16  you remember that -- that Tonya Vinson was -- used to
17  date Armando Lazo, the victim?
18    A    No.  I don't remember.
19     (Exhibit No. 9 was marked for identification.)
20    Q    All right.  Let's -- let me show you what we'll
21  actually mark as Exhibit No. 8 [sic].  All right.  This
22  is the report by you, correct?
23    A    Correct.
24    Q    And it's a statement by Charles -- is it
25  Blucher?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 234 of 1026
The Deposition of AL FRANCO MARQUEZ, Taken on May 6, 2016
132

1     A    Yes, sir.  I believe.

2     Q    Okay.  So Charles says that he heard Terrance

3   tell the girls that he knew who had shot them, meaning

4   the two guys, and "Terrance told them that it was Rudy

5   Flores and Dirt who had done the shooting on Electric

6   Street."  Do you see that?

7     A    Yes.

8     Q    And he says, "I think that Rudy drives a Monte

9   Carlo, which is dropped, and I believe it's gray in

10  color."  Do you see that?

11    A    Yes.

12    Q    All right.  So now you've got Terrance telling

13  Terri and Terrance telling Charles that he believed Rudy

14  committed the murder, right?

15    A    Yes.

16       (Exhibit No. 10 was marked for identification.)

17    Q    And then let me show you what we'll mark as

18  Exhibit 9 [sic].  All right.  This is another report by

19  Scott Graves regarding an interview with Terrance

20  Farrar, and here Terrance says, "I know that Rudy Flores

21  was having problems with Armando Lazo because Rudy was

22  messing with one of Armando's friends."  Do you see

23  that?

24    A    Yes.

25    Q    "I don't know if Robert was having any trouble

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 235 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
133

```
 1  with Rudy.  Rudy has hurt a lot of people in the
 2  neighborhood and has tried to hurt me several times.
 3  About two weeks ago, there was a party at a friend of
 4  mine's house, and his name is Derrick.  Derrick lives on
 5  Edgemere Street, and that is where the party was.
 6  Armando Lazo and Robert England were at that party, and
 7  Rudy Flores also showed up to the party with some other
 8  dude, but I don't know who he was."  Do you see that?
 9      A    Yes.
10      Q    "Rudy started to mess with one of Armando's
11  friends at the party, and Armando told Rudy to leave him
12  alone.  Armando and Rudy started to have a few words and
13  Rudy told Armando to take it outside and Armando walked
14  outside.  I walked outside and Armando and Rudy were
15  having some words outside and are getting ready to
16  fight.  I broke it up before they fought.  Rudy then
17  told Armando that he was going to shoot him.  I told
18  Rudy to go home, and he started to leave and said he
19  what would be back.  Rudy left and then 15 minutes later
20  he came back with some of his friends, and he wanted to
21  fight Armando, but we wouldn't let Armando go outside.
22  Rudy then jumped into his gray Cougar and told Armando
23  that he was going to kill him and all the rest of us.
24  Rudy left after that and did not come back.  I don't
25  know if they got into it anymore after that.  I was
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG  Document: 286-2  Filed: 05/26/23  Page 236 of 1026
The Deposition of CALVIN MARQUIS, taken on May 6/23, Page
134

 1 | scared after that, because Rudy has tried to kill me and
 2 | he has stabbed at me, and his brother Javier 'Dirt'
 3 | Flores has shot at me before.  When Rudy says he is
 4 | going to do something to you, then he probably will do
 5 | it.  That is why I was scared.  I told Armando to watch
 6 | himself after that, because of the way that Rudy is.  I
 7 | think that Rudy Flores is the one that shot Armando Lazo
 8 | because of everything that had happened."  Do you see
 9 | that?
10 |     A    Yes.
11 |     Q    All right.  So now you want to talk to Rudy
12 | Flores, right?
13 |     A    Yes.
14 |     Q    You want to find out if he threatened to shoot
15 | the victim in your case two weeks before, right?
16 |     A    Yes.
17 |     Q    You want to know if he told -- and you want to
18 | know if he got into a fight with the victim and had a
19 | reason to fight the victim, right?
20 |     A    If I can rephrase that.  I don't -- I don't
21 | think we talked about prior.  I was more concerned about
22 | the shooting.  The night.  So I don't -- I don't recall
23 | if I asked him or tried to talk to him about it.
24 |     Q    Well, let's just -- you know, as a detective,
25 | if somebody, you know, one of the things that you look

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 237 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 9, 23
135

 1  for when you're investigating a crime is motive, right?

 2      A    Yes.

 3      Q    And if there is bad blood between two people,

 4  right?

 5      A    Yes.

 6      Q    You look for if -- if somebody ends up dead,

 7  you want to know if somebody threatened that person

 8  within the recent past, right?

 9      A    Yes.

10      Q    You want to know if somebody threatened to kill

11  that person, right?

12      A    Yes.

13      Q    And you want to know if somebody threatened to

14  kill that person in the same way they ended up dead, IE

15  shooting, right?

16      A    Yes.

17      Q    Okay.  And so then you talked to Rudy Flores,

18  right?

19      A    Yes.

20      Q    And what did Rudy Flores tell you about whether

21  he threatened to shoot the victim two weeks before the

22  murders?

23      A    I don't recall the statements at this time.

24      Q    All right.  Would it help to take a look at

25  them?  His statement?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 238 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23, Page

136

 1    A    Yes.

 2    Q    Would that refresh your recollection as to what

 3  Rudy said about whether he threatened the victim two

 4  weeks before?

 5        MR. MARTINEZ:  Objection.  Calls for

 6  speculation.

 7    A    I don't believe so, sir.

 8    Q    Why don't you believe so?

 9    A    I need to see the statement to see what he

10  said.

11    Q    Oh, I see.  Okay.  Let me pull that up and

12  we'll mark it as Exhibit 10 [sic].

13      (Exhibit No. 11 was marked for identification.)

14    Q    All right.  Exhibit No. 10 [sic].  This is a

15  statement given voluntarily to Detective Alfonso

16  Marquez, right?

17    A    Yes.

18    Q    It's by Rodolfo Flores, right?

19    A    Yes.

20    Q    Okay.  He says that he's Rudy Flores and he

21  lives at 10269 Shenandoah, right?

22    A    Yes.

23    Q    And you know from reviewing your transcript

24  that he lived just a couple blocks away from the murder,

25  right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 239 of 1026
The Deposition of RONALD MARQUART, taken on 5/26/23
137

```
 1      A    Yes.
 2      Q    I'm sorry.  This document is Bates numbered
 3  Defense City 15673 through 15674.
 4           All right.  We -- it says, "We left the house
 5  around 11:00 p.m. and dropped off Ben on Jamaica Street.
 6  Going to Jamaica we drove up Fairbanks and made a u-turn
 7  and went onto Jamaica.  We noticed that there was a
 8  party on Jamaica, and there were some people out in the
 9  middle of the street."  Do you see that, sir?
10      A    Yes.
11      Q    And you had been working this case since it's
12  inception, right?
13      A    Say again please.
14      Q    You worked on this case since you arrived at
15  the scene about 1:00 a.m. or called out to the scene
16  about 1:00 a.m. on April 10th, right?
17      A    Yes.
18      Q    You didn't work any other case between that
19  point and when you charged the case on April 22nd,
20  right?
21      A    Right.
22      Q    And so you knew that Hernandez had told you
23  that the victims had been a part -- at a party on
24  Jamaica, right?
25      A    Yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 240 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 26, 23
138

 1    Q    Okay.  So he says, we are in Jose Juarez's car,
 2  right?
 3    A    Yes.
 4    Q    He says that they drove up to Trans Mountain
 5  and got on the freeway towards Cohen Stadium -- Stadium,
 6  right?
 7    A    Yes.
 8    Q    That they then dropped off Betty, right?
 9    A    Yes.
10    Q    They got some gas, right?
11    A    Yes.
12    Q    And they got back on the freeway and got off on
13  Trans Mountain and went east on Trans Mountain until we
14  turned on Electric Street.  Do you see that?
15    A    Yes.
16    Q    So -- and -- and you knew from talking to
17  Hernandez and reading Medina's statement that the
18  victims had walked along Trans Mountain to Electric,
19  right?
20    A    Yes.
21    Q    And it was after they turned from Trans
22  Mountain to Electric that the shooting happened, right?
23    A    Yes.
24    Q    And the shooting happened at what time, sir?
25    A    I don't exactly know the time.  I just know

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 241 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23

139

 1  when I was arrived -- when I arrived.

 2      (Exhibit No. 12 was marked for identification.)

 3   Q    I see.  So let me pause to show you what we'll

 4  mark as Exhibit No. 11 [sic].

 5          All right.  Exhibit No. 11 [sic] is a report by

 6  Officer Bellows.  Do you see that?

 7   A    Yes.

 8   Q    Okay.  And he says that it's 12:18 a.m. EMS was

 9  dispatched, right?

10   A    Yes.

11   Q    So the murder happened right around 12:18,

12  maybe a couple minutes before, right?

13   A    Well, I want to say yes, but I don't really

14  know.

15   Q    Well, on all of your reports you indicate the

16  time number as 12:15 a.m.  Right?

17   A    Say again please.

18   Q    In all of your reports, you indicate that the

19  murder occurred on April 10th, 1993 at 12:15 a.m.

20  Right?

21   A    I believe that's the time that it -- that he

22  wrote that statement I believe.  I -- I don't understand

23  your question.

24   Q    No, sir.  The time you wrote this -- this

25  report is at 4:11 a.m.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG_Document 286-2_Filed 05/26/23_Page 242 of 1026
The Deposition of CAL FORMBY, MARQUIS, Taken on May 6/23, Page
140

 1    A    Okay.

 2    Q    Do you not remember that in your report you

 3  indicate at the top the date and time of the original

 4  occurrence?

 5    A    Yes, sir.

 6    Q    And the date and time that you listed as -- in

 7  all of your reports is the date and time of the

 8  occurrence is 12:15 a.m.  Do you remember that?

 9    A    No, sir.  I -- I -- I can't answer that

10  question right now if -- if that is the time that I got

11  there or -- I'd have to look at my statement to make

12  sure it matches that number.  That date.

13     (Exhibit No. 13 was marked for identification.)

14    Q    We'll mark this as Exhibit 12 [sic].  This is

15  your supp report, right?

16    A    Yeah.

17    Q    Occurrence date, April 10, 1993.  Day,

18  Saturday.  Time, 12:15 a.m., right?

19    A    Correct.

20    Q    And that's the time that the murder happened,

21  right?

22    A    Correct.

23    Q    Okay.  So let me go then -- I just want to make

24  sure I'm -- back to Mr. Flores' statement to you.

25  Occurrence, the murder happened at like 12:15 a.m.  And

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 243 of 1026
The Deposition of AL FRANCIS MARQUEZ, taken on 05/26/23

141

 1  Rudy says, "We turned on Electric Street from Trans

 2  Mountain, and he looked at the clock in the car and it

 3  read 12:15 to 12:20 a.m."  Do you see that?

 4      A    Yes.

 5      Q    So he's putting -- he's telling you, the case

 6  sergeant, that he was at the scene of the crime when it

 7  happened, right?

 8      A    Judging by those times, yes.

 9      Q    Then he says, "From Electric Street, it is only

10  one to two minutes get to my house."  Do see that?

11      A    Correct.  Correct.

12      Q    So he gets home by like 12:20, 12:22 at the

13  latest, right?

14      A    Correct.

15      Q    Now, you went inside and went to sleep?

16      A    Correct.

17      Q    Okay.  So what does Rudy say about whether he

18  threatened the victim -- threatened to shoot the victim

19  two weeks before the murder?

20      A    I don't recall, sir, he said that.

21      Q    Well, do you think that that would have been a

22  good thing to write down?  What Rudy's explanation was

23  for why somebody was saying that he threatened to shoot

24  the victim two -- two weeks before the victim ended up

25  shot and dead?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 244 of 1026
The Deposition of RUSSELL MARQUEZ, taken on May 6/23  Page
142

 1          MR. MARTINEZ:  I'm sorry, Russell.  Can you
 2  repeat that?  Your voice digitized.
 3      Q    Of course.  Do you thank that would be a good
 4  thing to document?  Rudy's explanation for what -- for
 5  why somebody was saying he threatened to shoot the
 6  victim two weeks before the victim ended up shot to
 7  death?
 8      A    I don't know if I asked him, sir.
 9      Q    Can you think of any reasons why you wouldn't
10  ask him?
11      A    No, sir.  I can't.  But I don't know if I asked
12  him about that night.
13      Q    Are you a sloppy detective?
14      A    I don't believe so.
15      Q    You should have asked Rudy Flores for his
16  explanation of why he was said to have threatened the
17  victim with death, right?
18      A    I thought we had investigated that portion and
19  I did not ask it, sir.  I don't believe I did.
20      Q    Why don't you [inaudible]?
21      A    Because I don't remember if I did or did not,
22  but I do not believe that I asked him.
23      Q    And -- and I understand you don't remember as
24  you sit here today.  It's been a long time.  But you're
25  saying you believe -- you have a belief that you did not

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 245 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
143

 1  ask him about that, and I'm trying to find out why do

 2  you believe you didn't ask him about it if you can't

 3  remember one way or the other?

 4      A    If I -- if I can't remember, I don't -- I'm

 5  going to say I don't believe I asked him.  I can't

 6  remember if I did or not.

 7      Q    But we agreed that you should have asked him,

 8  right?

 9      A    At that point, I was concerned about where he

10  was at that day.

11      Q    And now he's told you where he was on that day.

12  He was at the scene of the crime, right?

13      A    Sir, he was around the area.  I am not going to

14  sit here and tell you exactly he was there.  I don't

15  know at this time the story.

16      Q    But -- yes.  You don't know if his time is

17  correct, but, certainly, from his own words, he's

18  telling you he was at Electric and Trans Mountain

19  between 12:15 and 12:20 a.m., and the murder happened at

20  Electric and Trans Mountain between 12:15 and 12:20

21  a.m., right?

22      A    Correct.

23      Q    So once he tells you that, now you want to know

24  if this somebody threatened to murder my victim, right?

25      A    Repeat the question please.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 246 of 1026
The Deposition of CALFRONCO MARQUE32?, taken on 05/26/23   Page
144

1    Q    Sure.  Once you know that he's putting himself

2   at about the scene of the crime, you want to know if he

3   has threatened to kill the victim two weeks before the

4   murder, right?

5    A    Correct.

6    Q    Okay.  So we can agree that you should have

7   asked him whether he threatened to kill the victim two

8   weeks before, right?

9    A    Yes.

10    Q    And we can agree that you should have written

11   down what his response was to that question, right?

12    A    If I had asked him, yes.

13     (Exhibit No. 14 was marked for identification.)

14    Q    Okay.  Let me show you what we'll mark as

15   Exhibit 13 [sic].  Well, I've been bad at marking these

16   exhibits.  Are we on 14, Ms. Court Reporter?

17         THE REPORTER:  Thirteen [sic].

18    Q    Thirteen.  Okay.  All right.  This is a report.

19   The statement given to Detective Laredo.  Do you see

20   that?

21    A    Yes.

22    Q    By Rudy's brother, Francisco Javier Flores,

23   right?

24    A    Yes.

25    Q    All right.  And in this statement, Javier tells

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Laredo and he says, "I would say I got home at about

2  12:30.  My mother was the only one at home at the time

3  and she was watching TV.  She asked me if I had been

4  drinking that day, and I told her that I had been -- had

5  not because it was Good Friday.  I went straight to bed

6  after that.  Detective Laredo has asked me where Rudy

7  was, and as far as I know, he was with a girl named

8  Melissa who lives on Sun Valley.  My sister Celi and her

9  boyfriend, Jose Juarez.  I don't know where they were,

10 but I know for a fact that they weren't home when I got

11 there.  I don't know what time they got home either.  If

12 they were together, they were in Jose's car, the green

13 Grand Prix.  It's an 80's model.  The smaller kind."  Do

14 you see that, sir?

15     A     Yes.

16     Q     So Rudy's brother is telling you he knows for a

17 fact that Rudy wasn't home when he got home at 12:30,

18 right?

19     A     Yes.

20     Q     And Rudy has told you that he checked the clock

21 on his car and saw that he was one to two minutes away

22 from his home at 12:15 to 12:30 -- to 12:20, right?

23     A     Yes.

24     Q     All right.  And then Rudy's brother says, "The

25 only reason that I would say that Rudy hated those dudes

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 248 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 5/6/19

146

 1  was because they were ECH gang members and Rudy is

 2  supposedly a hardcore LML member.  I know that my

 3  brother crashed his car into the ECH gang members one

 4  time, but it wasn't the dudes that were killed.  ECH one

 5  time shot up -- shot at my house because of my little

 6  brother Rudy."  Do you see that?

 7      A    Yes.

 8      Q    So now Rudy's brother is telling the police

 9  that Rudy has crashed into the victims gang members

10  before and that the victims gang members have shot at

11  Rudy's house and that's why he believes that there is

12  bad blood between them, right?

13      A    I need to refresh my memory on what gang they

14  belonged to.  If the victims -- I don't recall what gang

15  they -- gang they belonged to.

16      Q    All right.  Well, we have Rudy's brother saying

17  that the victims were ECH gang members, correct?

18      A    Correct.

19      Q    Is it your belief that the victims were not a

20  member of the gang?

21      A    I don't recall if they were or not, sir.  I

22  really don't.

23      Q    They --

24           MR. MARTINEZ:  Hey, Russell.  I'm sorry.  I'm

25  fading.  Can we take a break when you get to a stopping

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 249 of 1026
The Deposition of CARLOS MARQUEZ, taken on May 6, 23
147

 1  point?

 2      Q    Sure.  Let me just go back to the -- the bottom

 3  of Rudy's statement.

 4      A    Yes, sir.

 5      Q    Rudy then says that he went to Abraham --

 6  Abraham Chacon's house, which is on a Ajax Street and

 7  that he talked to Rick Martinez, and Rick Martinez then

 8  said, "I'm the one who shot at them."  All right.  Do

 9  you see that, sir?

10      A    Yes.

11      Q    And in the entirety of Rudy's statement, there

12  is nothing documented about whether he had any conflict

13  with the victims or not, right?

14      A    In -- in the case, there is.  I believe so.  Is

15  that what you're talking about?

16      Q    No.  In this statement by Rudy Flores?

17      A    Correct.

18      Q    And Rudy is now saying that it was Rick

19  Martinez that committed the crime, right?

20      A    Correct.

21      Q    And Rick Martinez told him that he committed

22  the murder, right?  Right.  It says, "Rick then said,

23  I'm the one that shot at them"?

24      A    I'm reading, sir.

25      Q    I couldn't hear what you said.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 250 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23  Page
148

 1    A    I was saying I was reading it.

 2    Q    Oh, of course.  Take your time and tell me if

 3  you need me to move it.

 4        MR. MARTINEZ:  Can you enlarge it, Russell?

 5    Q    Yes.

 6        MR. MARTINEZ:  Thank you.

 7    Q    Have you had a chance to read it?

 8    A    Yes.  Yes, sir.

 9    Q    And so Rudy has told you that Rick Martinez

10  said he is the one who shot at them, right?

11    A    Yes.

12    Q    Okay.  All right.  Why don't we break there and

13  go off the record.

14        THE VIDEOGRAPHER:  All right.  We are now off

15  the record.  The time is 2:49 p.m.

16          (Recess from 2:49 p.m. to 3:02 p.m.).

17        THE VIDEOGRAPHER:  We are back on the record.

18  The time is 3:02 p.m.

19    Q    Okay.  So you have information that Rudy Flores

20  has been threatening the victim.  He puts himself at the

21  crime scene.  His brother says he's got a beef with the

22  victims -- that the victims are in a gang and the --

23  Rudy has got a beef with their gang.  And Rudy's brother

24  says he didn't come home when he says he came home, and

25  so did you then do further investigation?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 251 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
149

```
 1      A    [No audible response]
 2      Q    I'm sorry.  I didn't hear your answer.  Is
 3 anyone else hearing him?
 4           THE REPORTER:  I can't hear him.
 5           MR. AINSWORTH:  It's like muted.  I think
 6 the -- the speaker phone is muted.  We can't hear you.
 7 Let's -- all right.  There we go.  Can you test?  I
 8 can't tell if it's working because you're not talking.
 9           MR. MARTINEZ:  Yeah.  Can you hear us?
10           MR. AINSWORTH:  All right.  Now we can.  All
11 right.  Can I reask the question?
12           MR. MARTINEZ:  Yeah.  Give me a second,
13 Russell.  Sorry.  All right.  Can you hear us now?
14           MR. AINSWORTH:  Yes.
15           MR. MARTINEZ:  All right.
16      Q    Now I have to remember what the question was.
17 It was a good one.
18           And so what -- what -- and so now you further
19 investigate Rudy, correct?
20      A    Correct.
21      Q    Okay.  And what did you do to further
22 investigate Rudy?
23      A    We brought him in, took a statement, went to
24 his house.  We searched, I believe, his vehicle and his
25 residence.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 252 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 05/26/23  Page
150

```
 1      Q      And what else did you do to investigate?

 2      A      I don't recall, sir.

 3      Q      Did he stop being a suspect?

 4      A      Yes.

 5      Q      Why did he stop being a suspect?

 6      A      We were cleared -- he -- he was cleared.

 7      Q      Why was he cleared?

 8      A      Through our investigations, I felt that he had

 9   nothing to do with the murders.

10      Q      What led you to believe he had nothing to do

11   with the murders?

12      A      I don't recall, sir.

13      Q      All right.  So where would we look to find out

14   why Rudy Flores was no longer a victim?

15      A      Repeat that again.

16      Q      Where would we look to find out why he was no

17   longer a -- a suspect?

18             MR. MARTINEZ:  Objection to form.  Lack of

19   foundation.

20      A      We were receiving information on other people,

21   and we went from one to the other.

22      Q      What other people?

23      A      Persons that were bragging about it, sir.

24      Q      You mean like Mike Johnston?

25      A      Yes.  And others.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 253 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 5/6/23
151

1    Q    And others.  Because there were a lot of kids

2  who were bragging about committing these murders, right?

3    A    Yes.

4    Q    And so because other kids were bragging about

5  this murder, that made you think that it wasn't Rudy

6  Flores.  Is that what you're saying?

7    A    No.

8    Q    Was it because you believed that other kids

9  were falsely bragging about committing this murder and

10 that's why you cleared Rudy Flores of the murder?

11   A    No.

12   Q    Why did you -- well, did you question Jose

13 Flores who was with Rudy at the time that Rudy was

14 driving around?

15   A    I don't recall.

16   Q    Would that have been a good thing to do?

17 Question Jose Juarez do find out where Rudy was that

18 night?

19   A    Yes.

20   Q    Where would we look to find out if anybody

21 interviewed Jose Juarez?

22   A    Somewhere in the case.  The file or the

23 statements on it.

24   Q    And you know there is no statement from Jose

25 Juarez, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 254 of 1026
The Deposition of OFC. RONNIE MARQUEZ, taken on 5/16/23, Page 152
152

 1    A    No, sir.  I don't know that.

 2    Q    Well, have you looked?

 3    A    I have not.

 4    Q    Do you have any explanation for why no

 5  statement from Jose Juarez was produced to the

 6  prosecutor?

 7    A    No.

 8    Q    And so do you have any explanation for why Rudy

 9  Flores was cleared?

10    A    We investigated and I and the rest of the team,

11  or at least I felt he was cleared.

12    Q    But can you tell us what investigation you did

13  apart from looking in his house and seeing -- and his

14  car?

15    A    I can't recall, sir.

16    Q    Well, for example, did you go back to Rudy and

17  say, "Your brother just told us that you weren't home

18  when you said you were home.  Do you have any

19  explanation for that?"

20    A    No.

21    Q    Did you go back to Rudy and say, "You know,

22  Rudy, I've heard these certain accounts about you

23  threatening to shoot and kill the victim two weeks

24  before."  Can you tell us about that?

25    A    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 255 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23  Page
153

1    Q    Was there anything preventing you from talking
2  to Rudy again?
3    A    No.
4    Q    How did you first come in contact with David
5  Rangel?
6    A    What's the -- sorry.  Was that a question?
7    Q    Yeah.  How did you first come in contact with
8  David Rangel?
9    A    He came into the office.
10   Q    And do you know what led him to come to the
11 office?
12   A    A phonecall and then I spoke to him, and then
13 he came into the office later.
14   Q    All right.  Who made the phonecall?
15   A    He called.
16   Q    And I'm -- who did he call?
17   A    The front desk of our private [indiscernible].
18   Q    And do you remember this or are you just
19 reading in the transcripts, so you're telling me what
20 happened in the transcripts?  Or do you have an
21 independent recollection?
22   A    I have independent recollection of that.
23   Q    Okay.  And who was it who -- from the front
24 desk who told you that David Rangel was looking to talk
25 to somebody about these murders?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 256 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May/23, 2010
154

 1    A    Our secretary.

 2    Q    Who?

 3    A    I believe her name is Georgina.  I can't think
 4  of her last name.

 5    Q    Did you say Georgina?

 6    A    We had two secretaries.  I believe there was
 7  Georgina.  I'm not sure.

 8    Q    Do you take notes of your conversation with
 9  David Rangel?

10    A    Not reference the phonecall.  No.

11    Q    Do you take notes of your conversation with
12  David Rangel when he was talking to you in person?

13    A    No.

14    Q    All right.  What did -- what did David say to
15  you on the phone, and what did you say to him?

16    A    That he knew who had killed the guys on
17  Electric.

18    Q    All right.  Did he tell you who it was?

19    A    I don't recall if he told us then and there,
20  sir, or told me then and there.

21    Q    All right.  And did you talk to anyone else?

22    A    No.

23    Q    Did he tell you anything other than he knew who
24  committed the murders?

25    A    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 257 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 26, 2023
155

1    Q    What did you say to him in response?

2    A    Keith said he wanted -- he was going to come

3 into the office and a phonecall.

4    Q    Okay.  Did he tell you why he was calling to

5 tell you he was coming to the office?

6    A    No.

7    Q    All right.  Did he -- so did he -- he came to

8 the office on his own?

9    A    I believe his mother came.  I'm not sure.

10 Brought him.  Or he had a ride in.

11    Q    Did you talk to his mother?

12    A    No.  I did not.

13    Q    Do you know if any detective talked to his

14 mother?

15    A    No.  I do not.

16    Q    And when you say he came to the office, which

17 office did he come to?

18    A    The Crimes Against Persons office at -- on

19 Raynor Street.

20    Q    And where did you meet with him inside the

21 Crimes Against Persons office?

22    A    In one of the detective's cubicles.

23    Q    Which one?

24    A    I don't recall whose cubicle it was.

25    Q    What was his demeanor like when you were

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 258 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 1, 23

156

 1   speaking to him?

 2        A    Calm.

 3        Q    Did you know he was facing a harassment charge?

 4        A    No.

 5        Q    And so he came to see you without being picked

 6   up by any police officers; is that correct?

 7        A    I believe so.

 8        Q    And you believe so because he said he was going

 9   to come to the station, right?

10        A    Yes.

11        Q    And you didn't ask anyone to go pick him up,

12   right?

13        A    I don't recall asking anybody to pick him up.

14        Q    And David came to the station and then you met

15   in the cubicle, and what did he say to you, and what did

16   you say to him?

17        A    He said that his brother-in-law was bragging or

18   talking saying he -- saying he was the one that shot

19   the -- that they were shooting on the victim.

20        Q    And he said his brother-in-law said this?

21        A    No.  His cousin, brother, or family.

22        Q    All right.  And you're talking about Danny

23   Villegas -- Villegas, right?

24        A    Yes.

25        Q    Did he tell you that Danny Villegas was joking

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 259 of 1026
The Deposition of CALEB MARQUEZ, taken on May 6/23, Page

157

```
 1  about doing the shooting?

 2      A     No.

 3      Q     Not at all?

 4      A     No.

 5      Q     There is no -- no miscommunication or anything.

 6  David never said anything about Danny joking in this

 7  conversation, right?

 8      A     No.

 9      Q     That's correct?

10      A     No.  He didn't.

11      Q     Okay.  What was your demeanor when you're

12  talking to David?

13      A     Calm.

14      Q     What's that?

15      A     Calm.

16      Q     Calm.  All right.  And so you said that his

17  cousin Danny shot -- said he shot the guys.  Did he tell

18  you anything else?

19      A     He wrote a synopsis.

20      Q     Did you -- did you ask him to write a synopsis?

21      A     I believe so.  Yes.

22      Q     Why did you ask him to write a synopsis?

23      A     I just told him write down what -- what you

24  have -- what you -- what was told to you.

25      Q     Did you do that with Rudy?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 260 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23, Page

158

```
 1      A     No.
 2      Q     Did you do that with any other witness in this
 3 case?
 4      A     I don't know, sir.  I don't -- I don't think
 5 so.
 6      Q     Why did you do it with David and not any other
 7 witness in the case?
 8      A     I don't know.
 9      Q     Did David do it on his own accord?  You know,
10 pick out -- pull out a piece of paper and start writing?
11      A     I gave him paper and the writing pen or pencil.
12 Pen or paper.
13      Q     So it was your idea?
14      A     Yes.
15      Q     Okay.  In that first handwritten statement, did
16 David write down that Danny had said he used a shotgun
17 in the shooting?
18      A     No.
19      Q     Did he ever -- did David ever mention a
20 shotgun?
21      A     No.
22      Q     And you wanted to know whatever David knew
23 about what Danny had said, right?
24      A     Yes.
25      Q     And so you just asked David what happened and
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 261 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 2, 2018

159

```
 1   then David told you, right?

 2   A    Yes.

 3   Q    You didn't threaten David, correct?

 4   A    No.

 5   Q    You didn't raise your voice to David?

 6   A    No.

 7   Q    You didn't tell him to change any portions of

 8   his story; is that right?

 9   A    No.

10   Q    That's correct?

11   A    That's correct.  I did not.

12   Q    And so if David wrote a synopsis of what he was

13   told, why did you take a typewritten statement from him?

14   A    So it would be in, I believe, fuller detail.

15   Q    Why didn't you ask David to write down in

16   fuller detail that you wanted to include?

17   A    I don't know.

18   Q    Was David reluctant to cooperate?

19   A    No.

20   Q    Was David saying he didn't want to write any

21   more on the paper?

22   A    No.

23   Q    Did David sign the statement?

24   A    Yes.

25   Q    And based on your conversation with David, what
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 262 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

160

```
 1   did you do next in the investigation?
 2        A    We went to the supervisor [indiscernible] --
 3             THE REPORTER:  Can you repeat that?
 4        Q    I'm sorry.  What?
 5        A    We advised the supervisors of the information
 6   we received and went to 5700 Wren.
 7        Q    Did you talk to anyone else before you went to
 8   5700 Wren?
 9        A    The supervisors.
10        Q    All right.
11        A    The detectives that were working the case.
12        Q    Did you have any involvement in talking to
13   Rodney Williams?
14        A    I'm not sure.  I don't know, sir.
15        Q    Did you talk -- did you direct other detectives
16   to pick up Rodney Williams?
17        A    I believe so.
18        Q    All right.  And -- and you asked, was it Graves
19   to get the statement from Rodney Williams?
20        A    I don't recall, sir.
21        Q    And that was because of the information that
22   David Rangel was telling you.  That's why you directed
23   Graves or directed another officer to go pick up
24   Mr. Williams, right?  Rodney William?
25        A    I don't recall.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 263 of 1026
The Deposition of PATRICK MARQUIS, taken on May 6, 23
161

1    Q   All right.  Let me show you testimony from your

2 first trial.  Not your first trial.  Mr. Villegas' first

3 trial.  So this is your testimony on December 8th, and

4 I'll flip to the page so you can see.  December 8th,

5 1994.  Do you see that, sir?

6    A   Yes.

7    Q   Okay.  Actually I'm going to make it small

8 until I get to the page I want.

9        Okay.  So this is page 284.  All right.  Line

10 7.  You're asked, "Now, as a result of the statements

11 taken there, what did you do next?"

12        Answer, "As a result of the statement that I

13 had taken from David Rangel, I telephoned Detective

14 Scott Graves, and I asked him to try and locate a Rodney

15 Williams."

16        Do you see that?

17    A   Yes.

18    Q   Does that refresh your recollection that it was

19 Detective Graves who you asked to pick up Rodney

20 Williams?

21    A   Yes.

22    Q   And does that refresh your recollection that it

23 was as a result of the statement that you took from

24 David Rangel that you asked him to pick up Rodney

25 Williams?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 264 of 1026
The Deposition of CALDERON MARQUEZ, taken on May 6/23, Page
162

```
 1      A    Yes.
 2      Q    Okay.  And so then do you recall one way or the
 3 other if you had any interaction with Rodney Williams on
 4 April 21st, 1993?
 5      A    I may have.
 6      Q    Before you went to 5700 Wren, had you talked to
 7 Marcos Gonzalez?
 8      A    I don't remember, sir.
 9      Q    Did you ever talk to Marcos Gonzalez?
10      A    I don't remember talking to him.
11      Q    Was there any reason other than David Rangel's
12 statement that you directed Graves to pick up Rodney
13 Williams?
14      A    I don't recall, sir.
15      Q    Well, was there any other source of information
16 that suggested you should pick up Rodney William other
17 than David Rangel's statement?
18      A    I don't recall.
19      Q    Do you recall that Rodney Williams was
20 questioned before you went to 5700 Wren?
21      A    I don't recall if it was, but I venture to say
22 he was.
23      Q    Were you targeting Danny Villegas?
24      A    No.
25           MR. MARTINEZ:  Objection.  Vague.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 265 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 2019
163

1    Q     Were you rounding up all of Danny Villegas'

2    friends and just questioning them about what they might

3    know about Danny Villegas?

4    A     No.

5    Q     Were you only digging up people to question if

6    you had a reason to believe that they had some

7    information about the murder?

8    A     They were -- no.

9    Q     What do you mean no?

10          MR. MARTINEZ:  Objection.  Vague.

11   A     We were following leads on wherever information

12   came in.

13   Q     Got it.  Okay.  So you wouldn't have gone out

14   to just pick up a friend of Danny Villegas without some

15   reason to believe that the friend knew something about

16   the murder, right?

17   A     Correct.

18   Q     And whatever David Rangel told you about Danny

19   Villegas' involvement in the murder, you wrote down into

20   his statement so he could review it and sign it, right?

21   A     Yes.

22     (Exhibit No. 15 was marked for identification.)

23   Q     All right.  Let's take a look at -- I'm going

24   to show you what -- I need to close some tabs.  Sorry.

25   What we'll mark as Exhibit 14 [sic].

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG-RGJ Document 286-2 Filed 05/26/23 Page 266 of 1026
The Deposition of CAL FORMOE MARQUIS, taken on May 10, 2023

164

1          All right.  Showing you Exhibit 14 [sic].  This

2    is the handwritten statement by David Rangel; is that

3    right?

4        A    Yes.

5        Q    This version is Bates marked DA 34457.  All

6    right.  It says the other guy threw their -- or the

7    other guys threw their gang signs according to what

8    Danny told Rangel, right?

9        A    That's what it says.

10       Q    All right.  Now, at this point, did you -- did

11   anyone tell you that there was any gang sign throwing in

12   the -- in the sequence of events that led to the

13   murders?

14       A    None that I recall.

15       Q    All right.  Then it says, "My cousin then shot

16   one and saw the other running.  He then chased him and

17   shot the other one in front of a house."  Do you see

18   that?

19       A    Yes.

20       Q    Did you accuse David Rangel of committing this

21   murder or these murders?

22       A    No.

23       Q    That would have been totally wrong if you'd

24   done that, right?

25       A    I did not accuse him.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 267 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2023

165

 1    Q    And it would have been totally wrong if you had
 2  accused a witness with no reason to believe that he
 3  committed these murders --
 4          MR. MARTINEZ:  Objection.
 5                  (Simultaneous speakers)
 6          MR. MARTINEZ:  Objection.  Vague and lack of
 7  foundation.
 8    A    I did not accuse him.
 9    Q    And it would have been totally wrong if you
10  did, right?
11          MR. MARTINEZ:  Objection.  Vague.  Lack of
12  foundation.
13    A    I can't answer that, sir.  I don't know.
14    Q    You don't -- it might have been right for you
15  to accuse David Rangel, a witness, of murder?
16          MR. MARTINEZ:  Objection.  Vague.
17  Argumentative.
18    A    He --
19                  (Simultaneous speakers)
20    Q    Is that what you're saying?
21    A    No.
22    Q    David said, "The only passengers that I knew
23  was Marcos.  The other ones were his homeboys from VNE."
24  Do you see that?
25    A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 268 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
166

 1      Q    All right.  So David names Marcos, meaning
 2   Marcos Gonzalez, right?
 3      A    Yes.
 4      (Exhibit No. 16 was marked for identification.)
 5      Q    All right.  So lets turn to Exhibit 15 [sic].
 6   This is the statement from David that you took and the
 7   time was 7:20 p.m.  What does that 7:20 p.m. refer to?
 8      A    What?  Say it again please.
 9      Q    What does the 7:20 p.m. refer to?
10      A    The time that I took the statement.
11      Q    That's the time when you started?
12      A    Yes.
13      Q    All right.  And is that the time when you
14   started talking to him, or is that the time you started
15   typing this?
16      A    The time I started typing.
17      Q    Okay.  All right.  "My cousin, Daniel Villegas
18   said that he had been with Marcos Gonzalez and some
19   other homeboys from VNE in a black car, and they had
20   spotted Mando and some other guys walking.  He did not
21   tell me what streets they were on.  Only that he and
22   Marcos and the other homeboys were cruising, and then he
23   then said Mando got up an began to run.  I asked him" --
24   for some reason this version is cut off, and I have
25   another version that I'll show you, but, "I asked him

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 269 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 26, 2023
167

```
 1  why he did not stop there, and he told me that he knew
 2  that Mando knew him and could not leave him as a
 3  witness.  He told me that Mando ran to a house and began
 4  to knock on the door yelling, 'Help me'.  He told me
 5  that he chased him to the house and there shot him
 6  again.  I asked if Marcos was also shot, and he told
 7  me -- or I asked if Marcos was also shot, and he told me
 8  that he had not.  He told me that he was the only one
 9  that shot, and that the gun belonged to one of his
10  homeboys.  He was not specific about what type of gun
11  used.  I even asked what kind of gun the weapon was used
12  in the killing and I don't know."  Do you see that?
13      A    Yes.
14      Q    Did you accurately report what David Rangel was
15  telling you about what Danny Villegas had told him?
16      A    That is his statement.  Yes.
17      Q    All right.  So, sir, can you tell us why you
18  directed Graves to go pick up Rodney Williams after
19  talking to David Rangel?
20      A    I may have been mistaken.  I don't think it was
21  referenced this -- that I had asked Graves to pick up
22  Rangel.  I mean William.
23      Q    It doesn't reference what?
24      A    I don't think this statement reference the fact
25  that I had told Scott Graves to pick up witness.  I
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 270 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 5, 2023
168

 1 | don't think it was -- referenced this statement.

 2 |    Q   Right.  It's not in this statement that you

 3 | say, go -- Graves, go pick up Rodney Williams.  It's in

 4 | your testimony --

 5 |    A   Correct.

 6 |    Q   -- From the first trial in 1994 where you said

 7 | you told Graves to pick up Rodney Williams after talking

 8 | to Rangel.  And I'll tell you that Graves testifies that

 9 | Marquez tells him to go pick up Rodney Williams after

10 | Marquez talks to David Rangel.

11 |      And so my question to you, sir, is, what was it

12 | about the statement from David Rangel that told you to

13 | direct Graves to pick up Rodney Williams?

14 |    A   I don't recall, sir.

15 |    Q   Because David doesn't mention Rodney Williams,

16 | right?

17 |    A   Correct.

18 |    Q   And so I'll -- I'll ask you then, sir, were you

19 | targeting Danny Villegas by just rounding up his friends

20 | and asking them --

21 |    A   No.

22 |    Q   -- What they knew about the murder?

23 |    A   No.

24 |      MR. MARTINEZ:  You have to let them finish his

25 | question, because I need a chance to object.  Objection.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 271 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 23, Page
169

```
 1  Cumulative.
 2          THE REPORTER:  Objection.  What?
 3          MR. MARTINEZ:  Cumulative.  It's Latin for
 4  asked and answered.
 5      Q    You can ask again.  You can answer again.
 6      A    The question was?
 7      Q    So, sir, I'm going to ask you again.  Were you
 8  rounding up Danny Villegas' friends and trying to get
 9  them to say things about Danny Villegas and the murder?
10          MR. MARTINEZ:  Objection.  Asked and answered.
11      A    No.
12      Q    And from what source did you get the lead to go
13  pick up Rodney Williams?
14      A    From other statements or investigation that we
15  had conducted.
16      Q    What other statement?
17      A    I don't recall at this time.
18      Q    Where is it written?
19      A    From other statements and investigation.
20      Q    What other statements?  Who named Rodney
21  Williams as a witness to this case?
22          MR. MARTINEZ:  Objection.  Asked and answered.
23      A    Rodney Williams was one person that we had to
24  investigate in reference to this case.
25      Q    Why?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 272 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
170

```
 1      A    I don't recall, sir.

 2      Q    Who named Rodney Williams name for the first

 3   time?

 4      A    I don't know.

 5      Q    You charged Rodney Williams with murder, right?

 6      A    Yes.

 7      Q    Would you agree with me that the -- the way

 8   that the police -- well, strike that.

 9           Would you agree with me that the way that a

10   murder suspect first comes to the police's attention is

11   an important step in the investigation?

12           MR. MARTINEZ:  Objection.  Vague.

13      A    Typically, yes.

14      Q    Is there ever a time when it's not important to

15   write down how a murder suspect first comes to the

16   police's attention?

17      A    No.

18      Q    A basic step in documenting an investigation is

19   to document how a suspect first comes to the police's

20   attention, right?

21      A    Yes.

22      Q    You didn't document anywhere how Rodney

23   Williams came to your attention, did you?

24      A    I don't remember, sir.

25      Q    Let me show you what we marked as Exhibit 12.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 273 of 1026
The Deposition of CALROSE MARQUEZ, taken on May 6, 23, Page
171

1  This is your report.

2       All right.  So you mentioned the synopsis and

3  the typed statement from Rangel.  You mentioned the

4  statement was a Marcos Gonzalez.  "On the same date,

5  April 21st, 1993, statement was taken from a Rodney

6  Williams of 5249 Wren who stated he had been in the

7  vehicle that shot and killed the victims."  Do you see

8  that?

9       A    Yes.

10      Q    And then you say on April 22nd, 1993, "As per

11 the statement of Rodney Williams, Daniel Villegas was

12 picked up and taken to the Juvenile Probation

13 Department."  Do you see that?

14      A    Yes.

15      Q    Shoot.  Was I -- I wasn't sharing any of that,

16 was I?  My apologies to you, sir.

17           All right.  Well, this is your report and in

18 your report you don't indicate how Rodney Williams came

19 to be -- came to the police's attention, right?

20      A    Correct.

21      Q    Is there anybody we could ask to find out how

22 Rodney Williams came to the police's attention?

23      A    I believe he was one of the guys who was

24 investigated for bragging or stuff like that, or he was

25 mentioned and we had to pick him up.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 274 of 1026
The Deposition of CALVIN MCCRUMBY, taken on May 6/23, Page

172

1    Q    I'm sorry.  He was mentioned by whom?

2    A    I don't recall, sir.

3    Q    Was he mentioned by a witness?

4    A    I don't recall.

5    Q    When did the witness mention him?

6    A    I don't recall.

7    Q    What did they say about him?

8    A    I don't recall.

9    Q    If somebody had said that Rodney Williams was

10   connected to this murder, that should have been

11   documented, right?

12   A    Yes.

13   Q    Lazo was shot in the front, right?

14   A    I don't recall the autopsy report, sir.  I

15   don't remember exactly.

16   Q    All right.  Let me show you that same testimony

17   from September 8th, 2011.  I'll actually share my screen

18   this time.  All right.  Okay.  This page 141 of that

19   transcript.  Oh, ten pages before.  Sorry.

20        Okay.  I'm going read you your testimony from

21   that -- no.  Actually start on page 130, line 25.

22   "After reviewing this, referring to the autopsy

23   checklist, would you agree that we have an entry wound

24   of a gunshot wound in the abdomen of this individual?"

25        Answer, "Yes, sir."

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 275 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

173

1          Question, "And it appears that there is a

2    second wound that's stated in the autopsy report, and

3    it's corroborated in the autopsy checklist that it's a

4    bullet wound entry wound in the thigh; is that correct?"

5          Answer, "Correct."

6          "Then we have gunshot wound number two.

7    Entrance wound.  Do you see that?"

8          "Yes."

9          Question, "As it -- and is it fair to say that

10   there are only two entry wounds in the body that appears

11   on this checklist of the autopsy that was done on

12   Armando Lazo.  Would you" -- and then you say, "The

13   original -- I can't read it.  From here I see entry

14   wound.  A bullet wound and one exit to the same leg,

15   entry and exit.

16         Question, "Right.  We were just talking about

17   the entry wound in the questions that I was asking you."

18         Answer, "I see only one entry according to

19   this.  Two entries in the front and then one exit to the

20   back of these two photographs."

21         Question, "Right.  You see two entries to the

22   front and one exit on the back?"

23         Answer, "Yes, sir."

24         Now, were you asked those question, and did you

25   give those answers, sir?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 276 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23,

174

```
 1     A    Yes.

 2     Q    And then on page 133, line 3.

 3          "Okay.  That's all I was trying to establish.

 4   And the two bullet shots to Armando Lazo, the entry

 5   wounds were to the front, correct?"

 6          Answer, "That is correct."

 7          Were you asked that question?  Did you give

 8   that answer, sir?

 9     A    Say it again.

10     Q    Were you asked that question?  Did you give

11   that answer?

12     A    Yes.

13     Q    And so you agree that Armando Lazo was shot two

14   times in the front, right?

15          MR. MARTINEZ:  Objection.  Vague.

16     Q    In the front of his body, right?

17          MR. MARTINEZ:  Objection.  Vague.

18     A    From the picture that I saw, yes.

19     Q    And from your testimony, right?

20     A    Yes.

21          MR. BRITTAIN:  Russell, can I see the front

22   page of that which volume this is.

23          MR. AINSWORTH:  Sure.  This is the

24   September 8th, 2011 testimony, Volume XII.

25          MR. BRITTAIN:  Thank you.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 277 of 1026
The Deposition of RAFAEL MARQUEZ, taken on May 6/23

175

 1     Q    Of course.  And as we talked about before,
 2  Hernandez said that the shooters chased him and Medina
 3  as they ran away from the scene, right?
 4     A    Yes.
 5     Q    And as you talked about in that same Writ
 6  hearing testimony at some length, the evidence is that
 7  Lazo ran straight towards where the shooter -- where the
 8  shell casings were found in the street to get to the
 9  house of the [indiscernible].  Do you remember that?
10     A    Repeat that again, sir.
11     Q    Sure.  There were six shell casings -- bullet
12  casing found at the scene, right?
13     A    Yes.
14     Q    And those are the only casings found at the
15  scene, right?
16     A    To my knowledge, yes.
17     Q    There are no casings found near the house where
18  Lazo came to rest, right?
19     A    No.
20     Q    And if the car with the shooter in it was
21  chasing Hernandez and Medina, then the shooter couldn't
22  have been chasing Lazo as David Rangel -- Rangel's
23  statement says, right?  Did you hear the question?
24     A    Yes.  I did.  But I'm trying to -- all I know
25  is that he ran -- that he ran to the house.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 278 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page 176

176

1    Q    Right.  Well, let me show you that same

2   transcript from September 8th, 2011.  This is page 208,

3   line 18.  "It was what Jesse Hernandez, who you

4   interrogated, who was a survivor and an eyewitness, what

5   he said, and what has been clearly established, is that

6   when the shootings start, him and Juan ran and the car

7   chased them?"

8            And you answer, "Correct."

9            "So if that car chased them as soon as the

10  shooting started, Daniel could not have tried to chase

11  Mando like he stated in his statement.  That doesn't

12  make sense, does it, Detective Marquez?"

13           "No.  It doesn't."

14           Were you asked those questions, and did you

15  give those answers?

16    A    Yes.

17    Q    All right.  And -- and were you truthful at the

18  time?

19    A    Yes.

20    Q    So it doesn't make sense that if Daniel -- if

21  the car is chasing down Medina and Hernandez, that the

22  car would also be going towards the house to chase down

23  Lazo and shoot him then, right?

24    A    Sir, I don't know.

25    Q    Well, you testified before that it doesn't make

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 279 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

177

```
 1  sense, right?
 2      A    Correct.
 3      Q    And you stand by that answer?
 4           MR. MARTINEZ:  Objection.  Vague.
 5      A    I picture the house and the car, that it was
 6  same direction.
 7      Q    The house and the car are in the same
 8  direction?
 9      A    Yes, sir.
10      Q    Okay.  Hernandez and Medina run towards
11  Fairbanks, right?
12      A    I don't recall if it was Fairbanks.
13       (Exhibit No. 17 was marked for identification.)
14      Q    I don't think we've marked this as an Exhibit.
15  This will be Exhibit 16 [sic].  This is the statement
16  that you took from Jesse Hernandez, right?
17      A    Yes.
18      Q    "I ran to Major Video on Fairbanks."  Do you
19  see that?
20      A    Show it to me again.
21      Q    Oh, is it too small?  "I ran to Major Video on
22  Fairbanks."  Do you see that?
23      A    Yes.
24      Q    All right.  So Juan and Jesse Hernandez ran
25  towards Fairbanks, right?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A     Correct.

 2      Q     And the car chased them towards Fairbanks,

 3  right?

 4      A     Correct.

 5      Q     And so if the car chases them towards

 6  Fairbanks, it's not driving towards the house, right?

 7      A     It was what, sir?

 8      Q     It's not driving towards the house where Lazo

 9  came to rest, right?

10      A     I believe it is.

11      Q     What do you believe -- what do you base that

12  belief on, sir?

13      A     From the crime scene, I was told where the

14  house was.  As I looked, I looked -- I saw the house

15  down the street on the other side and -- to the vehicle

16  parked.  Shot shells on one side and the houses further

17  down going that way.

18      Q     The house was checked for bullet damage, right?

19      A     Correct.

20      Q     There was no bullet damage to the house, right?

21      A     Correct.

22      Q     There were no casings in front of the house,

23  right?

24      A     Correct.

25      Q     There was no reports of additional shots being
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 281 of 1026
The Deposition of CARLOS MARQUEZ, taken on May 23,
179

 1  fired after the initial shots, right?

 2      A    Correct.

 3      Q    Jesse Hernandez talked to you the night of the

 4  murder.  He didn't mention there being subsequent shots

 5  after the first round of shots, right?

 6      A    Correct.

 7      Q    The only casings found were found in one

 8  location, right?

 9      A    Yes.

10      Q    Is there any evidence whatsoever to suggest

11  that there was a second round of shooting at a slain

12  Lazo in front of the house?

13      A    No.

14      Q    And Lazo was shot in the front, right?

15      A    Yes.  As per the report.  The autopsy report.

16      Q    So he wasn't chased down from behind and shot

17  from the back, right?

18      A    No.  Not that I know of.

19      Q    And what color was the car that the

20  perpetrators were driving in?

21      A    There was so many colors that I couldn't say

22  which one.

23      Q    Come on.  We just looked at Mr. Hernandez's

24  statement.  You only have two eyewitnesses, right?

25      A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 282 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 05/26/23

180

```
 1      Q    And Hernandez says, it was a maroon and red
 2   car, right?
 3      A    Correct.
 4      Q    With white wall tires, right?
 5      A    Correct.
 6      Q    And then Medina says it was a gold-ish car,
 7   right?
 8      A    Correct.
 9      Q    But Rangel said it was a black car.
10      A    Correct.
11      Q    That was wrong, right?  It was not a black car
12   used in the murder, right?
13      A    I don't know, sir.
14      Q    You think it might have been a black car used
15   in the murder?
16      A    I don't know.
17      Q    It -- it certainly didn't fit with the facts
18   that you had, right?
19      A    There was different colors of cars.
20      Q    It didn't fit with the facts.  Nobody said it
21   was a black car, right?
22      A    I don't recall.
23      Q    Well, who -- who saw the car other than
24   Hernandez and Medina?
25      A    I don't think anybody else.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 283 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 3/23 Page
181

1    Q    Just those two.  One says it was maroon red,

2    and the other says it was gold-ish, right?

3    A    Correct.

4    Q    So nobody said it was a black car, right?

5    A    I don't recall.

6    Q    Who else could -- could it be?  Do you think

7    there was a -- the -- the unreported -- did you talk to

8    another eyewitness to the shooting?

9    A    No, sir.

10   Q    So then why do you say you don't recall when

11   you know that the only description of the car was from

12   Hernandez saying it was maroon red and Medina saying it

13   was gold-ish?

14   A    The other statement that we had taken, people

15   mentioned different colors of people that were

16   supposedly bragging about the -- the murders.

17   Q    But none of them were witnesses to the murder,

18   right?

19   A    Say again.

20   Q    None of them witnessed the murder, correct?

21   A    Correct.

22   Q    The only facts you had came from Hernandez and

23   Medina, right?

24   A    Correct.

25   Q    So the only facts that you had as the detective

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 284 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 5, 23 Page
182

 1  investigating this case was that the car was either
 2  maroon red or gold-ish, right?
 3      A    Correct.
 4      Q    And nobody said it was black, right?
 5      A    I don't recall.
 6      Q    Neither Hernandez nor Medina said the car was
 7  black, right?
 8      A    Correct.  Correct.
 9      Q    Neither Hernandez nor Medina said the car was
10  white, right?
11      A    I don't recall, sir.
12      Q    I thought we just went through this.  They said
13  it was either maroon red or gold-ish, right?
14      A    Correct.
15      Q    And so neither of them said it was white,
16  right?
17      A    I don't recall what either -- one said one
18  thing.  The other one said the other one, and I don't
19  recall who said what.
20      Q    Well, we just looked at Hernandez's statement.
21  It said maroon red.  Okay?
22      A    Correct.
23      Q    You remember that from just two minutes ago,
24  right?
25      A    Yes.  Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 285 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 6, 20

183

 1    Q    Okay.  We're not having one of those episodes,
 2  right?
 3    A    Yes.
 4    Q    Okay.
 5         MR. MARTINEZ:  And I need to -- I need to
 6  object.  That's argumentative.  Don't answer that
 7  question.
 8    Q    Do you want to look at the -- at Medina's
 9  statement that we saw before this was -- sorry.
10         Ms. Court Reporter, I don't remember if it was
11  three or four.  It was one or the other.
12    A    I didn't understand the question to your
13  report.
14    Q    I don't know if this is Exhibit 3 or Exhibit 4
15  to your deposition, but whichever one it is, I'm going
16  to show it to you.  "The car was a 70's model, and it
17  looked like a Monte Carlo.  Gold-ish."  Do you see that.
18    A    Yes.
19    Q    All right.  So now that we've refreshed your
20  memory.  We've got Medina saying it was gold-ish.
21  Hernandez saying it was red maroon.  Neither one said it
22  was white, correct?
23    A    Correct.
24    Q    And neither one said it was beige, correct?
25    A    Correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 286 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 05/26/23   Page
184

 1    Q    Do you remember what Rodney Williams said about
 2  the murder?
 3    A    I didn't hear your question, sir.
 4    Q    Do you remember what Rodney Williams said about
 5  the murder?
 6    A    No, sir.  I don't recall right off.
 7    (Exhibit No. 18 was marked for identification.)
 8    Q    All right.  Let's take a look at what we'll
 9  mark as Exhibit 17.
10         All right.  This is a statement from Rodney
11  Williams.  This version is Bates numbered Villegas
12  JS015779 through 80.
13         All right.  He says he went to Boomerangs
14  Theater.  And remember that because it's going to be
15  important later.  Rodney went -- saying he's going to
16  Boomerangs Theater.  Okay?  You with me?
17    A    Yes.
18    Q    It says, "I met up with Danny Villegas and
19  Marcos Gonzalez at the theater, and I was also with
20  Eddie Gonzalez, who goes to Magoffir.  I left with
21  Marcos and Danny at about 9:30 p.m. and Eddie stayed at
22  Boomerangs."  Do you see that?
23    A    Yes.
24    Q    "Then they went to the Village Green
25  Apartments, and then a white car came up with two guys

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 287 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 05/26/23
185

 1  in the car.  The guys in the car are nicknamed Popeye
 2  and Snoopy and Popeye was driving."  Got it?
 3      A    Yes.
 4      Q    In preparation for this deposition, did you
 5  look to see which one of those was incarcerated on
 6  April 10th, and which one was on electronic monitoring?
 7      A    I don't recall, sir, which one.
 8      Q    All right.  Well, Popeye was incarcerated.  And
 9  Droopy was on electronic monitoring.  But we'll get to
10  that.
11           "So then they wanted to do a beer run, and so
12  they went to the Diamond Shamrock, and Danny and Marcos
13  made a beer run about a case."  Do you see that?
14      A    Yes.
15      Q    "And then they stopped and talked to a few
16  girls", right?
17      A    Yes.
18      Q    And then Popeye -- it was Popeye's idea to
19  let's go do something, right?
20      A    Yes.
21      Q    "And then Popeye slowed the car and said
22  something to them in Spanish, and I then he said, Que
23  Barrio"?
24      A    Yes.
25      Q    And according to Rodney Williams, "Popeye then

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 288 of 1026
The Deposition of CAL FOX, taken on May 6/23, Page
186

1  grabbed under the seat and got a gun that was wrapped in

2  a white cloth, and he handed the gun to Danny.  Danny

3  took the gun and started to fire the gun, and one of the

4  guys that was walking fell to the ground right away.

5  Two of the guys started to run right away and then Danny

6  shot the other gun" -- the other -- it says gun but I

7  think it's supposed to be guy; is that right?

8       A    Could be.  Yeah.

9       Q    "I think that he hit the other guy in the back.

10  I think that there were four shots fired, but I'm not

11  sure because after the first few shots, I covered my

12  ears and bent down in the seat.  I thought we were

13  getting shot at too.  I did not know that Danny was

14  going to shoot the gun, and I couldn't do anything about

15  it.  I have seen the two guys that got shot at

16  Boomerangs before, but I didn't know their names.  After

17  Danny shot the guys, then he wrapped the gun in the

18  cloth it was in and gave it back to Popeye."  Do you see

19  that?

20       A    Yes.

21       Q    Popeye put the gun back under the front seat,

22  right?

23       A    Yes.

24       Q    "Popeye was driving the car, and Snoopy was

25  sitting beside him in the front passenger seat.  Marcos,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 289 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 2, 2023

187

 1  me, and Danny were in the back seat and Marcos was

 2  sitting behind the driver, Popeye.  I was seated in

 3  the -- in the middle and Danny was behind the front seat

 4  passengers -- front seat passenger by the door.  The car

 5  was a white four-door car, and it was medium sized."  Do

 6  you see that?

 7      A    Yes.

 8      Q    And so you, as the police officer, wanted to

 9  know what happened to the murder weapon, right?

10      A    Yes.

11      Q    And so you tried to find out who Popeye and

12  Snoopy were, right?

13      A    Yes.

14      Q    Did you talk to the gang division to find out

15  who Popeye was?

16      A    I did not talk to them personally.  No.

17      Q    How did you find out who Popeye was?

18      A    Through investigation.

19      Q    What investigation?

20      A    I don't recall who did the investigation into

21  those gentlemen.

22      Q    So after Rodney gives his statement, you want

23  to go arrest Danny Villegas, right?

24           MR. MARTINEZ:  Objection.  Vague.

25      A    I don't -- I don't recall.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 290 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 3, 2019

188

 1     Q     What was -- what was the next thing you did
 2  after you talked to David Rangel and took his statement?
 3     A     We conferred with the supervisors as to what
 4  Danny -- I mean David had said.
 5     Q     Which supervisors?
 6     A     I believe it was Sergeant Johnson.
 7     Q     And who else was in this -- in this meeting?
 8     A     Who else was a person?  Was what?
 9     Q     Who else was part of this conferring with the
10  supervisor?
11     A     I guess myself, Sergeant Johnson, and whoever
12  detective [indiscernible] was there.
13     Q     What did you say to Sergeant Johnson -- Johnson
14  and what did Sergeant Johnson say?
15     A     I told Sergeant Johnson that I had a statement
16  naming Danny, and we needed to go pick him up.  And he
17  said just go ahead and -- go ahead and do it.  He just
18  said, all right.
19     Q     He just said all right?
20     A     He said, okay, or, you know, whatever you need
21  to do.
22     Q     All right.  And so why were you telling him?
23     A     Because he's my supervisor.  We have to refer
24  to him.
25     Q     All right.  So then you brought you -- and so

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 291 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23   Page
189

1  then tell us what you did?

2      A    I don't recall exactly what I did.  I just got

3  ready to go out to Villegas' house.

4      Q    Marcos Gonzalez was also at Danny's house; is

5  that right?

6      A    Yes.

7      Q    So tell us what happened when you got to

8  Danny's house?

9      A    When we got to Danny's house, I knocked on the

10 door.  We parked, knock on the door.  Mom opened the

11 doors.  We told her what we were there for.  We need to

12 speak to Danny.  She let us in.  They called Danny.  He

13 came out.  I told the mom what we had.

14     Q    All right.  Had you -- had you talked to Marcos

15 Gonzalez before seeing him at Danny's house?

16     A    I don't recall, sir.  I don't recall.

17          THE REPORTER:  Can you repeat that question?

18     Q    Had you talked to Marcos Gonzalez before you

19 got to Danny's house?

20          If you had talked to Marcos Gonzalez before you

21 got to Danny's house, should you have written that in a

22 report?

23     A    If we had talked to him.

24     Q    If you had talked to him.  Yes.  You should

25 have written it down, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 292 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

190

```
 1      A     Yes.

 2      Q     All right.  Let me show you testimony from your

 3  first -- from Mr. Villegas' first trial on December 8th,

 4  1994.  So I'm just going to warn you.

 5            MR. JEEP DARNELL:  Russell, before we start on

 6  the next thing, is there any way we can take a short

 7  bathroom break?

 8            MR. AINSWORTH:  We can.

 9            MR. JEEP DARNELL:  Please.

10            MR. AINSWORTH:  Sure.  Let's go off the record.

11            THE VIDEOGRAPHER:  All right.  We are off the

12  record.  It is 4:13 p.m.

13            (Recess from 4:13 p.m. to 4:25 p.m.)

14            THE VIDEOGRAPHER:  We are back on the record.

15  The time is 4:25 p.m.

16      Q     Okay.  I'm showing you what we -- well, I'm

17  showing you your testimony from that first trial on

18  December 8th, 1994.  And you're asked this question on

19  page 287, line 19.

20            Question, "And how are you sure it was

21  approximately 11:00 o'clock or so that you arrived at

22  the defendant's home?"

23            "When I was in the -- when we asked for the

24  defendant through his mother, I read him his rights at

25  the house and that's the time that I jotted on the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 293 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 2023,  Page
191

```
 1   Miranda Warning Card."  Do you see that, sir?

 2      A    Yes.

 3      Q    Were you asked that question and did you give

 4   that answer?

 5      A    Yes.

 6      Q    Do you give that answer under oath?

 7      A    Yes.

 8      Q    And were you truthful?

 9      A    Yes.

10      Q    All right.  So when you got to the house, you

11   read Danny his rights; is that right?

12      A    Yes.

13      Q    Where did you do that?

14      A    I'm sorry.

15      Q    Where did you do that at the --

16      A    In the living room.

17      Q    In the living room.  Who was present for that?

18      A    His mother and I believe his sister and his

19   father showed up while -- I mean, minutes.  He came from

20   the back bedroom and Danny.

21      Q    Was Danny's father there when you read him his

22   rights?

23      A    Yes.

24      Q    All right.  Was there anyone else there?

25      A    Aside from -- from -- was it Marcos?  I believe
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 294 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2019
192

1  Marcos.

2      Q     Well, was Marcos there?

3      A     Marcos came from inside the -- also the

4  bedroom.

5      Q     All right.  So do you read Marcos his rights?

6      A     No.  I did not.

7      Q     Why didn't you read Marcos his rights?

8      A     Because I was only there for -- to speak to

9  Danny.  I didn't know Marcos was there.

10     Q     But Marcos was there, right?

11     A     Yes.

12     Q     You brought Marcos and Danny from the house

13  together, right?

14     A     Correct.  Correct.

15     Q     And so why didn't you read Marcos his rights

16  when you saw him at the house?

17     A     I did not handle Marcos.  I was talking to

18  Danny.

19     Q     Well, did somebody else read Marcos his rights

20  at the house?

21     A     I don't know.

22     Q     So in your mind -- well, how did you know that

23  you weren't going to deal with Marcos?

24     A     That we -- ask again.

25     Q     Before you got to Danny's house, did you have a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 295 of 1026
The Deposition of CALFORNEO MARQUEZ, Taken on May 6/23 , Page
193

```
 1   plan that you were going to handle Danny and that
 2   somebody else was going to handle Marcos?
 3       A    No.
 4       Q    Okay.  So why was the fact that -- why did you
 5   think that you were just handling Danny, and so you
 6   weren't going to read Marcos his rights?
 7       A    Needed to speak to Marcos also.  I did not know
 8   he was there.
 9       Q    But once you became aware that he was there,
10   why didn't you?  You knew you were going to interrogate
11   him, right?
12       A    We're going to talk to him.
13       Q    Okay.  Well, he was just named as a suspect in
14   a murder, right?
15       A    Correct.
16       Q    He wasn't free to leave, right?
17       A    We needed to talk to him.  I mean, we had no --
18   let's say warrants for him.
19       Q    Did you seek a warrant for him?
20       A    For?
21       Q    For Marcos?
22       A    I don't recall, sir.
23       Q    All right.  So -- so you don't remember seeking
24   a -- signing an affidavit seeking a warrant for Marcos
25   about 8:30 that evening?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 296 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 7, 23   Page
194

```
 1      A    I don't recall.  No.
 2      Q    All right.  So, in any event, you intentionally
 3 only warned Danny Villegas of his rights and not Marcos
 4 when you were at the house?
 5      A    I only warned Daniel Villegas.
 6      Q    Did you tell Marcos not to listen when you were
 7 reading the rights to -- to Danny?
 8      A    No.
 9      Q    Why didn't you just read them their rights
10 together?
11           MR. MARTINEZ:  Objection.  Asked and answered.
12      A    I only read them to Marcos.  I mean to Danny.
13      Q    I know.  I'm asking you why didn't you read
14 them their rights together?
15           MR. MARTINEZ:  Objection.  Asked and answered.
16      A    I don't know.
17      Q    Because the -- the first five rights are the
18 same for adults and juveniles, right?
19      A    Don't recall exactly those.
20      Q    All right.  In any event, you -- you only read
21 Danny his rights and not Marcos and then what did you
22 do?
23      A    We told the mom and the father that we're going
24 to take them down to the station.  They didn't disagree
25 and we placed Danny in my vehicle.  My detective car.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 297 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
195

 1    Q    Who made the decision to put Danny in your
 2  vehicle?  Why did you do that?
 3    A    We had two and I decided I'm going to take
 4  Danny.
 5    Q    How did you find out that Popeye was
 6  incarcerated at time of the murder?
 7    A    Through further investigation.
 8    Q    What further investigation?
 9    A    We were trying to locate them, and we found --
10  we found through the investigation that one of them
11  was -- home or APD, and the other one was on the leg
12  monitor.
13    Q    Okay.  And so did you look up in the database
14  and find out where they were on that day?
15    A    Sir?
16    Q    Did you look up in the database to find out
17  where they were on that day, or how did you -- how did
18  you go about finding out where they were?
19    A    I -- I don't recall, sir.
20    Q    All right.  So you put Danny in your car and
21  you're required by policy and the law to bring him
22  directly to the intake officer, right?
23         MR. MARTINEZ:  Excuse me.  Excuse me.  Madam
24  Court Reporter, can you read that back please.
25         THE REPORTER:  Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 298 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2019
196

 1              MR. MARTINEZ:  Ashley, you're muted.  I can't
 2   hear you.
 3              THE REPORTER:  Oh.
 4                   (Requested portion was read)
 5              MR. MARTINEZ:  Objection.  Form.  Objection.
 6   Calls for speculation.  Mischaracterizes the evidence.
 7        **Q    You can answer.**
 8        A    JIS was given our investigation section.
 9              THE REPORTER:  Repeat that.
10        A    The JIS was given our investigation.  YS well,
11   now it's known as YSD or was YSD.
12        **Q    All right.  And so, in any event, it would be**
13   **totally improper to make a stop along the way at a mall**
14   **to confer with other detectives; is that right?**
15              MR. MARTINEZ:  Objection.  Vague.
16        A    I -- I still remember stopping.  I don't know
17   if it was warning that go off to thank the officers that
18   had assisted us, the patrol officers, and to get
19   together with Detective Graves and Detective Laredo that
20   we were going to go to JIS, and they were going to go to
21   center patrols with Marcos.
22        **Q    Where did you have that conversation?**
23        A    Like I said, I don't recall where we had pulled
24   over, but I remember there was the back of a building.
25   I don't remember what inside at all.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 299 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 5/5/23

197

 1    Q    Why did you have to pull over to have this
 2  conversation?
 3    A    I felt it necessary to thank the officers for
 4  assisting us in going to Danny's house and then to make
 5  sure that we knew what each one of us was going to do.
 6  Me, go to the -- the JIS.  And Scott Graves was going to
 7  go downtown.
 8    Q    You think that Scott Graves didn't know where
 9  to take a suspect in a murder case?
10    A    No, sir.  I don't.
11    Q    Do you -- do you think that other people didn't
12  know that Danny would have to go to JIS as a juvenile?
13    A    We knew.  No, sir.  I don't.
14    Q    What did the patrol officers do -- well --
15  well, strike that.
16         So did you forget to thank the officers when
17  you were at the scene?
18    A    We thanked them after, sir.
19    Q    Right.  Did you forget to thank them when you
20  were at the scene?
21    A    Can you be more specific?  What scene?
22    Q    Sorry.  At 5700 Wren, when you were all there,
23  did you forget to -- to thank the police officers then?
24    A    I did not forget.  We didn't think them then.
25    Q    Okay.  And so then you realized that you wanted

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 300 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
198

 1  to -- you didn't think about thanking them until you're

 2  already driving away, correct?

 3      A    When we went out of the house, then we said

 4  it's -- let's go meet and I remember meeting and

 5  thanking -- the officers followed us.  We thanked them.

 6  They went on their way, and we went on our way.

 7      Q    Who -- who did you -- why didn't you -- you

 8  said you were going to drive and then stop?  That was

 9  the plan?

10      A    No, sir.  I wanted to thank them.  We'd go away

11  from the house.  Okay.  And then we stopped.  I thanked

12  the officers.  Further to -- [indiscernible] go over

13  there.  I'm going to go over there and that was it, and

14  then we went to where our directions were.

15      Q    Okay.  Who is -- who is first in this -- who

16  was the first car to leave?

17      A    We all left together.

18      Q    Who was first?  Which car was the front?

19      A    I don't recall whose car went what direction.

20      Q    How did you signal to the others to pull over?

21      A    I don't recall.  I presumed we just follow each

22  other to wherever we're going to meet.

23      Q    How did you know where you're to going meet?

24      A    We didn't.  Wherever we stop is where we met.

25  I don't -- and that's what I'm saying.  We stopped.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 301 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23  Page
                                                                    199

```
 1  This -- let's get away from the house.  We'll meet.  And
 2  thank you very much and all this stuff.  Thanks guys and
 3  so forth and we...
 4      Q    Did you tell people let's get away from the
 5  house and meet?
 6      A    I don't recall but I'm assuming I may have.
 7      Q    You're assuming that you may have told people
 8  to get -- well, let's get away from the house and then
 9  we'll meet?
10      A    Yes.  Because I didn't want to be out parked in
11  front his house any longer.
12      Q    Why didn't you want to be parked out in front
13  of his house?
14      A    To avoid any problems thereafter.
15      Q    What problems were you having?
16      A    Weren't having no problems, but I wanted to
17  make sure that none would come up.
18      Q    All right.  You had four detectives at the
19  scene, right?
20      A    Correct.
21      Q    Two patrol officers, right?
22      A    Correct.
23      Q    You had a marked squad and two unmarked police
24  cars there, right?
25      A    Correct.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 302 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 5/6/23
200

1    Q    Nobody was hassling you?

2    A    Correct.

3    Q    Was there anything stopping you from putting

4  Marcos and Danny in the car and then saying thank you to

5  the police officers, to the uniformed officers, and

6  telling Scott, you went to high point -- five points and

7  I'll go to JIS.

8    A    They were not in that close of a proximity to

9  us.

10   Q    Where were they?

11   A    They were further on the corner I believe.  And

12  I don't know what corner, but I know that they parked on

13  the corner.  I parked in front of the house, and

14  I believe the Detectives Salice and Laredo parked across

15  the street from his house.

16   Q    All right.  So there were -- there were too far

17  away for you guys to have a quick meeting for --

18   A    Correct.

19   Q    They were too far away from you guys to have a

20  quick meeting, right?

21   A    Correct.

22   Q    So you -- you did stop along away, right?

23   A    Yes.

24   Q    When is the first time that you have ever told

25  anyone apart from your attorneys that you stopped along

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 303 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
201

 1  the way?

 2      A    I believe just today I think.

 3      Q    All right.  So how long did you stop for?

 4      A    Two minutes.

 5      Q    And what street were you on?

 6      A    I don't know, sir.

 7      Q    How far from Danny's house were you?

 8      A    I don't know.

 9      Q    You stopped at the back of a building?

10      A    What I recall.

11      Q    Were you driving?

12      A    Yes.

13      Q    Did you choose that spot at the back of the

14  building?

15      A    I don't believe so, sir.  I didn't know the

16  area.

17      Q    Did all of the officers get out of their cars?

18      A    I don't recall.

19      Q    Did you leave Danny and Marcos in the back of

20  the cars?

21      A    In the back of separate cars.  Yes.

22      Q    All right.  And so then you -- you drove down

23  to JIS, and what did you do when you got to JIS?

24      A    I walked in.  I took him to the front desk.

25  They signed him in, had him sit -- sit down at a -- I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 304 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 5, 23, Page
202

1 believe it was a sergeant's office of that particular

2 department.

3    Q    And you didn't question him, right?

4    A    No, sir.  I did not.

5    Q    Did you tell him what this was about?

6    A    Yes.

7    Q    What did you tell him?

8    A    That we were investigating the murders

9 [indiscernible] and that he had been named.

10    Q    And did Danny say anything in response?

11    A    At that point, I don't believe so.  No.

12    Q    Okay.  So then what did you do at JIS?

13    A    I had asked him if he wanted to give us a

14 statement.  He said yes.  So we began to do the

15 paperwork that we needed.

16    Q    Okay.  And who did the paperwork?

17    A    The juvenile paperwork I believe was done by

18 Detective Charlie Ortega.

19    Q    Okay. How long were you at JIS?

20    A    I would say, I don't know.  I would say -- I

21 don't know.

22    Q    Well, was it -- was it more than a half an hour

23 or less than half an hour?

24    A    I believe it was more than half an hour but I

25 don't recall.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 305 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

203

1    Q    Were you doing anything other than waiting for

2    Charlie Ortega to do the paperwork while you were at

3    JIS?

4    A    We were waiting for additional paperwork to

5    come in so that we could go ahead and present it to the

6    intake officer.

7    Q    What was the additional paperwork that you were

8    waiting for?

9    A    Statements.  We had to pull them up from RMS,

10   whatever we needed, to present it to the intake officer.

11   Q    Why did you have the statements with you?

12   A    Because they were in RMS.  They were in our

13   computer system.

14   Q    So -- so you just had to print them out from

15   the computer?  Is that what you're saying?

16   A    Yes, sir.  Go in and print them off from the

17   computer.

18   Q    And so you weren't waiting on anything.  You

19   just needed to print the reports off the -- from the

20   computer, right?

21   A    Yes.

22   Q    So what do you mean when you said you were

23   waiting for other reports?

24   A    In other words, that we needed to print -- to

25   get printed out of the computer.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 306 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23,   Page

204

 1    Q    Okay.  Where -- was anyone with Danny while you

 2    were waiting for the information to be gathered

 3    together?

 4    A    Myself, Detective Alvarez, and Detective

 5    Ortega.

 6    Q    So all three of you were sitting with Danny?

 7    A    We weren't sitting with him, sir.  He was

 8    sitting in the office of the sergeant, and we were

 9    around the vicinity.

10    Q    All right.  Was anyone in that office with him

11    is what I'm asking.

12    A    Oh, no, sir.  It's an open office.

13    Q    All right.  And so no -- you could see that

14    nobody was questioning him while he was there?

15    A    Correct.

16    Q    All right.  So he had not confessed to murder,

17    right?

18    A    Correct.

19    Q    And you brought him over to the juvenile

20    probation department, right?

21    A    To the JIS first.

22    Q    JIS.  But then where did you go from there?

23    A    And then after he give us a statement, we had

24    to take him to the juvenile probation department to the

25    intake office.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 307 of 1026
The Deposition of CALVIN MARQUES, taken on May 6/23   Page
205

1    Q    All right.  And once you're there, what
2  happened?
3    A    He speaks to the intake officer.
4    Q    Okay.  And were you present for that
5  conversation?
6    A    We were present but not -- you couldn't hear
7  any of the conversations that he was having with them.
8    Q    Okay.  And then where did you go after the
9  intake?
10   A    After the intake officer gave him back to us
11  and said that he was willing to give us a statement, and
12  he took us to Judge Horkowitz.
13   Q    Okay.  How far was that drive?
14   A    Excuse me.  We went back -- we went back to JIS
15  to make out the paperwork for Judge Horkowitz.
16   Q    Okay.  So you walked back to JIS, made up the
17  report -- the paperwork for Horkowitz and then took him
18  over to Horkowitz; is that right?
19   A    Correct.
20   Q    And still up to this point Danny Villegas has
21  not confessed, right?
22   A    Correct.
23     (Exhibit No. 19 was marked for identification.)
24   Q    And I'm just going to show you what we'll mark
25  as Exhibit 18 [sic].  This is the -- the call record.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document: 286-2 Filed: 05/26/23 Page 308 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 26/23, Page
206

```
 1   And this is the -- the document that says that Danny
 2   came at 12:26 a.m.  Do you see that?  To the intake
 3   officer.
 4       A    Yeah.
 5       Q    Okay.  So certainly as of 12:26 a.m., Danny
 6   Villegas has been neither questioned nor confessed,
 7   right?
 8       A    Correct.
 9       Q    And so as of 12:05 a.m., Danny Villegas has not
10   confessed and not been questioned, right?  Correct?
11       A    I -- repeat that again.
12       Q    Yes.  So as of 12:05 a.m., Danny Villegas has
13   not been to the intake officer, and so he has not been
14   questioned, and he has not confessed; is that correct?
15       A    I don't know, sir.  I'm not --
16       Q    As of 12:05 a.m. on April 22nd, he has -- Danny
17   has not seen the intake officer yet, right?  Because we
18   just looked at Exhibit 18 [sic] showing that he saw the
19   intake officer at 12:26, right?
20            MR. MARTINEZ:  Objection.  Excuse me.  Excuse
21   me.  Objection.  Objection. Form.
22       Q    Right?
23            MR. MARTINEZ:  Objection.  Form.
24       A    I don't -- sir, I don't recall.  I know he sees
25   the intake officer first before we go to Judge
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 309 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23, Page
207

```
 1   Horkowitz.
 2      Q     Right.  But we just looked at the document
 3   showing that at 12:26 that's when he saw the intake
 4   officer, right?
 5      A     Can I look at it again please?
 6      Q     Of course.  Sorry.  Wrong number.  12:26 a.m.
 7   Do you see that?
 8      A     Correct.
 9      Q     So 12:05 a.m., Danny Villegas has not been
10   questioned and has not confessed, right?
11           MR. MARTINEZ:  Objection.  Vague.
12      A     I don't know about that notation.  No, sir.  I
13   don't -- I can't answer that question.
14      Q     What -- what notation?  What are you talking
15   about?
16      A     I'm talking about 12:26 a.m. arrived with
17   Daniel Villegas for probable cause as --
18      Q     "As youth wants to give a confession.  Probable
19   cause was established."
20      A     Correct.
21      Q     Well, what do you -- what's your confusion,
22   sir?
23           MR. MARTINEZ:  Objection.  Vague.
24      Q     Did you beat Danny Villegas?
25      A     No, sir.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 310 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23,  Page

208

1     Q     Did you strike him in any way?

2     A     No, sir.

3     Q     How did you interrogate him?  Tell us.

4     A     The same way I do all my interrogations.

5     Q     Which is what, sir?

6     A     I let them tell me what's going on or what

7  happened in his own words.  I don't take any notes.

8  Once we finish taking the notes, then we go over it, and

9  we start all over again and then it's question and

10  answer with -- I let him narrate it.  I try to type it

11  as -- as best as possible.  If he's going too fast, slow

12  him down.  I need to repeat it.  Got to ask him to

13  repeat it, and it's a question and answer.  There is a

14  lapse between what he did right after this, then ask him

15  what did you do right after this.  That's the way I

16  do -- conduct my investigation -- my interrogations or

17  my report.  My confessions.

18     Q     And so you didn't -- you didn't accuse him of

19  anything, right?

20     A     No, sir.

21     Q     You used no interrogation technique to obtain

22  his confession, right?

23           MR. MARTINEZ:  Objection.  Vague.

24     A     The only interrogations that -- if you want to

25  call them techniques.  I didn't bombard him.  I didn't

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 311 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23
209

 1  accuse him.  I spoke to him.  Offered him a coke.  Or he

 2  was offered a coke and that's it.

 3      Q    And so when you -- were you asked to train

 4  other officers in how to conduct interrogations?

 5      A    Sometimes.

 6      Q    And when you trained other officers in how to

 7  conduct interrogations, is that what you tell people to

 8  do?  Just ask them what happened?

 9      A    I tell them to go through whatever they're --

10  go through with the -- with the suspect and let you know

11  in their own words what happened, what transpired.  When

12  you go back, the same thing.  Make sure that you -- any

13  lapses or anything that -- that -- he jumps from one

14  point to another, try to bring him back, and fill up

15  that point.

16      Q    So if there is any missing details, then you

17  should, you know, ask about those missing details so you

18  can find out what they are, right?

19      A    No, sir.

20      Q    No.  Why don't you want to know about the

21  missing details?

22      A    I'm talking about the -- not the necessary

23  missing details.  Wherever he lapsed.  From the type of

24  the car and then they took off.  Okay.  Where did you

25  go?  That's -- I want to know where he went after he

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 312 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 6, 23, Page
210

```
 1  took off.
 2      Q    Right.  And he -- well, do you want to know
 3  about missing details?
 4      A    Yes.
 5      Q    Okay.  Did you -- how long did you spend
 6  establishing rapport with Danny Villegas?
 7      A    I would say about -- maybe ten minutes.
 8      Q    Okay.  What did you guys talk about?
 9      A    What was he up to.  Who [inaudible] -- just
10  basic.  Basic idea.
11      Q    What did he say?
12      A    I don't recall what he said, sir.
13      Q    Did you threaten Danny Villegas that he'd get
14  the electric chair?
15      A    No, sir.
16      Q    Had you ever threatened anyone that you'd --
17  you give them the electric chair?
18      A    No, sir.
19      Q    Did you threaten Danny Villegas that he'd be
20  raped?
21      A    No, sir.
22      Q    Now, you know that Danny Villegas, Rodney
23  Williams, and Marcos Gonzalez all confessed to this
24  murder, right?
25      A    I don't recall, sir.  I couldn't -- I don't
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document: 286-2 Filed: 05/26/23 Page 313 of 1026
The Deposition of CAI FONSO MARQUEZ, Taken on 3/30/23

211

```
 1   know.
 2       Q    You don't know who confessed?
 3       A    Sir, I did not take the statements.  I really
 4   don't know.  I know we arrested them but whether they
 5   gave a confession, I'm not -- I'm sure that they did.
 6       Q    Well, we just looked at Rodney Williams
 7   confession, right?
 8       A    Correct.
 9       Q    You know he confessed to murder, right?
10       A    Correct.
11       Q    And Marcos Gonzalez confessed, right?
12       A    Correct.
13       Q    All three of them say that they committed these
14   murders with Popeye and Droopy, right?
15       A    I don't recall.
16       Q    Well, Danny Villegas, he says he did it with
17   Popeye and Droopy, right?
18       A    I'd have to look at the statement.  I don't
19   recall right off the bat.
20       Q    You don't remember after testifying nine
21   different times whether Danny Villegas confessed to
22   committing a murder with two people who were either
23   incarcerated or on electronic monitoring at the time?
24   Is that what you're telling us?
25       A    I remember their names.  I don't recall exactly
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 314 of 1026
The Deposition of A. FORREST MARQUISEE, taken on 5/20/23
212

 1  what he said.  I'd need to look at the statement.  If he
 2  says they were there, they were there.
 3      Q    But I'm -- I'm just wanting to get this
 4  straight.  After reviewing the paperwork including the
 5  statement you took from Danny Villegas in advance of
 6  this deposition and all of your transcripts, four
 7  different times, you're saying as you sit here today,
 8  you don't remember that Danny Villegas confessed to
 9  committing the murder with Popeye and Droopy?
10      A    No.  I'm not going to say that.
11      Q    All right.  So you -- you know that Danny
12  Villegas confessed to committing the murder with Popeye
13  and Droopy, right?
14      A    Yes.
15      Q    Yeah.  I mean -- and you know that Marcos
16  Gonzalez confessed to committing the murder with Popeye
17  and Droopy, right?
18      A    I know Marcos confessed, but I don't -- I
19  don't -- I have not read his confession.
20      Q    So you don't remember that there is an issue
21  with all three of these guys saying that they committed
22  a murder with -- with one guy who was incarcerated at
23  the time of the murder and another guy who was on
24  electronic monitoring at the time of the murder and
25  couldn't have been there?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 315 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 5/26/23
213

1    A    We found that out after an investigation.

2         (Exhibit No. 20 was marked for identification.)

3    Q    Yes.  So -- well, let's end the suspense and

4  I'll show you Marcos' -- here is his second confession,

5  which we'll mark as Exhibit 19 [sic].  And he says he's

6  in the car with the other guys, Danny, Popeye, who is

7  Enrique, Rodney Williams, and another guy named Droopy.

8  Not Snoopy like I said earlier.  Do you see that?

9    A    Read it again.  Or I can see Droopy, Snoopy.

10   Q    "I was in the car with the other guys, Danny,

11 Popeye, Rodney Williams, and another guy named Droopy."

12 Do you see that?

13   A    Correct.

14   Q    All right.  So all three of these guys, Rodney,

15 Marcos, and Danny are saying they committed a murder

16 with a guy who is incarcerated and a guy who is on

17 electronic monitoring at the time who could not have

18 committed the murder, right?

19   A    Correct.  [indiscernible]

20   Q    So do you think that Danny, Marcos, and Rodney

21 all conspired together to come up with a story that they

22 would confess to murder and name Popeye and Droopy as

23 being with them?

24   A    I can't answer that.  I don't know.

25   Q    Do you have any explanation for why all three

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 316 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 2023

214

```
 1  of the people would say that they were with two guys who

 2  could not have been in -- at the murder scene with them?

 3      A    I can't explain that.  I don't know.

 4      (Exhibit No. 21 was marked for identification.)

 5      Q    So in the early morning hours -- we'll mark

 6  this as Exhibit 20 [sic].  All right.  This is an

 7  interview with Fernando Lujan.  That's Droopy, right?

 8      A    What we call [inaudible] Droopy.  Yes.

 9      Q    Yeah.  So -- well, he's the guy who was not in

10  prison or not in the juvenile detention center, right?

11      A    I was referring to -- I don't know which one is

12  put away, which one is -- whatever.  I don't know.  Go

13  ahead.

14      Q    All right.  So we've got a report by Charlie

15  Ortega at six -- written at 5:58 a.m., right?

16      A    Yeah.

17      Q    And he's got 600 hours here.  It says, "Upon

18  questioning, it was found that it was possible that the

19  juvenile might not have been involved directly in this

20  offense."  Do you see that?

21      A    Correct.

22      Q    And that's because he was on electronic

23  monitoring at the time.  So we can track where he was,

24  and that poses a problem for a confession that says that

25  they committed a crime with Mr. Lujan, right?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 317 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23,

215

 1      A    Repeat that again, sir.  Please.

 2      Q    If three different people say they committed a

 3 crime with somebody who could not have been present for

 4 the crime, that makes you think maybe the main

 5 confessions aren't reliable, right?

 6      A    No.  I wouldn't say that.  No, sir.

 7      Q    No?  Do you think that make the confessions

 8 more reliable?

 9      A    I wouldn't say that either.

10      Q    Okay.  Well, did you want to know as a

11 detective why all three of these guys were saying they

12 were committing these -- this murder with two guys who

13 could not have been present at the same scene?

14      A    I mean, I don't know what they said.  It's

15 their statement.

16      Q    Yeah.  But like we talked about earlier.  If I

17 was a detective, you want to know from the -- you wanted

18 to know whether it's reliable.  So you want to go back

19 and find out why the -- the people are saying that there

20 is two people who could not have been with them at the

21 time the murder, and their confessions.

22      A    I can't answer that.

23      Q    Well, are you saying you didn't want to know

24 why you have three suspects all saying they committed

25 murders with two people who -- it was impossible for

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 318 of 1026
The Deposition of CAL FRONGU MARQUEZ, Taken on May 6/23, Page

216

1  them to be present at the time of the -- at the site of

2  the murder?

3     A    No.  I'm not saying that I -- I can't answer

4  that.  I don't know why they said what they said.

5     Q    Right.  So did you ask them?

6     A    No.  I did not.

7     Q    Okay.  Why didn't you, as part of your

8  investigation, go to Danny Villegas when you found out

9  about 6:00 a.m. that the other two people might not have

10  been involved in the murder?  Why didn't you ask him why

11  he was claiming these two people were involved when they

12  weren't involved?

13     A    They didn't.

14     Q    Well, did you ask Rodney?

15     A    I don't recall.

16     Q    Did you want to know from Rodney why he was

17  naming Popeye and Droopy?

18     A    I believe I tried to talk to Rodney again, and

19  he didn't want to speak to us anymore.

20     Q    Right.  So -- and -- and he didn't -- Rodney

21  didn't want to give a statement, right?

22     A    Correct.  Yes.

23     Q    And so tell us everything that Rodney said to

24  you and everything you said to Rodney when you spoke to

25  him again later that morning on April 22nd, 2000 --



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 319 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2019

217

```
 1   1993?
 2     A    That I recall, it was -- I asked -- I asked him
 3   again about his statement, and his first statement was
 4   that, I do not want to give another statement.  That's
 5   what I said and that is the truth.
 6     Q    So he told you that his statement was the
 7   truth?
 8     A    Yes.
 9     Q    All right.  You were supposed to take him to
10   the magistrate before asking him any questions about the
11   murder, right?
12          MR. MARTINEZ:  Objection.  Vague.
13     Q    Rodney was a kid, right?
14     A    I believe he was at the JIS.  I'm not sure.
15   But we did get permission to talk to him.
16     Q    He was 15.  Fifteen year olds you're supposed
17   to talk -- take to the magistrate before questioning,
18   right?
19     A    Yes.
20     Q    So you didn't question him about the murder,
21   did you?
22     A    I did not question him about the murder.  I
23   went back and I believe it was at JPD.
24     Q    Was anyone else present when you talked to
25   Rodney Williams?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 320 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 05/26/23

218

```
 1      A    I don't recall, sir.

 2      Q    And all he told you was that his confession was

 3  the truth, right?

 4      A    Right.

 5      Q    He didn't change who was present, right?

 6      A    Correct.

 7      Q    He didn't say, "Oh, actually, it was just me

 8  and Marcos and Danny", right?

 9      A    No.  He did not.

10      (Exhibit No. 22 was marked for identification.)

11      Q    All right.  Did it concern you at all that --

12  well, let's actually -- let me strike that.  And let me

13  show you Mr. Villegas' confession.  We'll mark this as

14  21 [sic].  Do you know whose handwriting it is here?

15  The time?

16           MR. MARTINEZ:  You're not screen sharing, Russ.

17      A    I can't -- I can't.

18      Q    Oh, I'm so sorry.  It's late.  I'm allowed.

19  Okay.  Now I'm showing you Exhibit 21 [sic].  This is

20  Danny Villegas' confession.  And do you see the -- where

21  it says on the 22nd day of April 1993 at -- and then

22  there is a time here.  Whose handwriting is that?

23      A    I believe it's mine.  I'm not sure.

24      Q    Who --

25      A    No.  That not my handwriting.  The time?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 321 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23
219

```
 1      Q      That's not your handwriting?

 2      A      No, sir.

 3      Q      Do you know who altered the time?

 4      A      No, sir.

 5      Q      Do you know when that was done?

 6      A      I don't know if that's was a mistake and

 7  somebody wrote over it or -- but it was not -- it's not

 8  my handwriting.  No.

 9      Q      Were you asked to initial that change?

10      A      Not my handwriting.  I did not initial it.

11      Q      But you initial up top, right?

12      A      Those -- those are mine.  Yes.

13      Q      Yeah.  All right.  So this is all

14  information -- all of it came from Danny Villegas and

15  you suggested none of it to him, right?

16      A      Say again, sir, please.

17      Q      All of the information in this document came

18  from Danny Villegas and none of it was suggested to him

19  from you, right?

20             MR. MARTINEZ:  Objection.  Vague.

21      A      Correct.

22      Q      And the way that you obtained this confession

23  was simply asking him to tell you what happened, right?

24      A      At first, yes.

25      Q      Were there any gaps that you had to question
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 322 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2019
220

1  him about to find out what he knew?

2      A    I -- I don't recall.

3      Q    All right.  Did you want to know what happened

4  to the murder weapon?

5      A    Yes.

6      Q    Did you ask him what happened to the murder

7  weapon?

8      A    I don't recall.

9      Q    If you asked him what happened to the murder

10  weapon, would you document that?

11     A    It is --

12     Q    What he said?

13     A    In his statement, yes.

14     Q    Okay.  Is there any reason why you wouldn't ask

15  him what happened to the murder weapon?

16     A    No.

17     Q    Because you wanted to recover that gun, right?

18     A    Yes.

19     Q    Did he tell you that somebody else fired?

20     A    I don't recall.  I have to read it and see if

21  he did.  I don't recall.

22     Q    All right.  Showing you what we marked as 21.

23  If we look down at [inaudible].  Danny's confession

24  says, "Someone in the car yelled, 'He saw my face.  He

25  saw my face.  Finish him off.'  They were talking about

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 323 of 1026
The Deposition of CALFRED MARQUEZ, Taken on May 6/23, Page
221

```
 1  Mando.   Someone did finish him off."  Do you see that?
 2     A     Yes.
 3     Q     Who did Danny Villegas say finished off Mando?
 4     A     He didn't.
 5     Q     Well, did he say that they used a different
 6  gun?
 7     A     No.
 8     Q     Well, how did it happen?
 9     A     I don't know, sir.  That's his statement.
10  That's what he gave.
11     Q     What did he tell you about how the person
12  finished off Mando?
13     A     It's not in the statement.  I don't know.
14     Q     Well, how do you know they didn't use a
15  different gun?
16     A     I never said he used a different gun.
17     Q     I'm asking you how do you know he did not use a
18  different gun?
19     A     I don't.
20     Q     You don't.  So it could have been a different
21  gun, right?
22     A     I can't answer that question.  I don't know.
23     Q     What did Danny do with the gun after he fired
24  it?
25     A     I don't recall if he -- if I asked him or if he
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 324 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 13, 2019
222

 1  told me.

 2      Q    But it's the murder weapon.  You want to know

 3  where the murder weapon went, right?

 4      A    Yes.

 5      Q    Because you're looking for some corroboration

 6  from an outside fact that you can use to prove the

 7  confession is -- is true, right?

 8      A    Yes.

 9      Q    And you want to corroborate whatever you can,

10  right?

11      A    Yes.

12      Q    So, for example, you want Danny Villegas to

13  corroborate that he told David Rangel that he committed

14  the murder, right?

15      A    I never asked him who he told.

16      Q    I understand you didn't, sir, but I'm saying

17  that as a detective, if you're truly investigating a

18  case, you want to corroborate that Danny actually told

19  David Rangel the information that Rangel reported,

20  right?

21      A    Yes.

22      Q    Okay.  And you never asked Danny about his

23  conversation with David, right?

24      A    No.

25      Q    No.  You did not?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 325 of 1026
The Deposition of CAROL MARQUEZ, taken on May 6/23, Page

223

```
 1    A    No.

 2    Q    That's correct?

 3    A    That's correct.  No.  I did not.

 4    Q    And Danny says there is about five or six shots

 5 fired, right?

 6         MR. MARTINEZ:  Objection.  Vague.

 7    A    That's what he said on the statement.

 8    Q    Yeah.  There are is about five or six shots

 9 fired?

10    A    Yes.

11    Q    And you found six casings at the scene, right?

12    A    Yes.

13    Q    All the same spot, right?

14    A    Yes.

15    Q    And so -- all right.  You believe that these

16 confessions are consistent with one another; is that

17 right?

18         MR. MARTINEZ:  Objection.  Vague.

19    A    Repeat that again please.

20    Q    Well, you believe that the confessions are

21 consistent with one another, right?

22         MR. MARTINEZ:  Objection.  Vague.

23    A    I took one.  Somebody else took the other.  If

24 they're consistent, they're consistent.  If they're not,

25 they're not.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23   Page 326 of 1026
The Deposition of AL FONTE MARQUEZ, taken on May 6/23, Page

224

 1      Q      Danny didn't say anything about wrapping the
 2   gun in a cloth or unwrapping it from a cloth, right?
 3      A      No.  I don't recall.
 4      Q      Danny said they were in a white car that
 5   belonged to Popeye, right?  Right?
 6      A      I'm looking to see on the statement, sir.
 7      Q      Oh, I'm so sorry.
 8             MR. MARTINEZ:  Al, if you need to read the
 9   whole thing, you can just stop and read the whole thing.
10      A      Yes.
11      Q      Okay.  Was Danny uncooperative at any point?
12      A      No.
13      Q      Do you have any explanation for why all three
14   boys say they committed a murder with two people who
15   could not have been there?
16      A      No.
17      Q      Did you ask Danny -- did you want to know whose
18   car it was if it wasn't Popeyes?
19      A      In the statement he said it was Popeyes I
20   believe.
21             THE REPORTER:  Repeat that.
22      A      I said, his statement it says it was Popeyes.
23   That's the statement he gave.
24      Q      Right.  But we know that Popeye wasn't there,
25   right?  Yes?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 327 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 1/23, Page
225

1    A    Yes.

2    Q    So -- so what makes you think the confession

3    is -- is reliable?

4    A    From what he told me, I believe the confession

5    is reliable because he had information that nobody else

6    would have known.

7    Q    What information?

8         MR. MARTINEZ:  Objection.  Asked and answered.

9    A    The number of shots, the direction of where

10   the -- where one of the victims ran to, and the

11   direction that the car followed and so forth.

12   Q    What was the direction that the car followed?

13   A    North, I believe, on -- on Electric.

14   Q    All right.  Where does -- where does he say

15   that he -- he drove north on Electric?

16   A    It doesn't.  It just said he -- I would assume

17   that he didn't say that.

18   Q    So I'm -- I'm trying to find out where do these

19   non-public facts that, you know, we got the number of

20   shots fired.  What else?

21   A    Say again please.

22   Q    What are these non-public facts that are in the

23   confession that make it reliable?

24   A    The number of -- of shots that made -- that

25   were out there.  The -- the direction of where the --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 328 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 05/06/20

226

```
 1  one of the victims ran to.  The fact that the -- the
 2  other two witnesses and the other fact witnesses said
 3  they were followed.  Nobody knew that except us and the
 4  witnesses.
 5      Q    And Mike Johnston, right?
 6      A    Well, according to the statement he gave us,
 7  yes.
 8      Q    Where does it say in the confession that he --
 9  he chased the other two?
10      A    Can you scroll to the very end please?  It
11  doesn't.
12      Q    All right.  So the only thing that the
13  confession that's not public is the number of shots and
14  that Mando ran towards the house, right?
15      A    Correct.
16      Q    And the fact that it was a white car isn't
17  consistent with the crime seen evidence, right?
18           MR. MARTINEZ:  Russell, you broke up.  Will you
19  say it again?
20      Q    I'm sorry.  The fact that it's a white car is
21  not consistent with the crime scene evidence, right?
22      A    The crime scene evidence that was recovered had
23  nothing to do with the car.
24      Q    The white car is inconsistent with the
25  statements by the eyewitnesses to the murder, right?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 329 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 20, 2019
227

```
 1     A    Correct.
 2     Q    The fact that they drove off and tried to
 3  finish off Mando and then someone else did finish him
 4  off is inconsistent with the casings all found in one
 5  spot, right?
 6     A    Correct.
 7     Q    It's inconsistent with Mando being shot in the
 8  front not the back, right?
 9          MR. DENTON:  Objection.  Misstates facts not in
10  evidence.
11     Q    Right?
12     A    If I may, I did not make that autopsy report
13  nor the report itself.  By looking at it like that, I'd
14  have to just go with what it says, so I -- going to have
15  to answer that I'm assuming, but I don't know if it's
16  consistent with what the -- what the medical examiner
17  may advise.
18     Q    Right.  The medical -- the autopsy examiner
19  says he was shot twice in the front.
20     A    I don't agree that that's what it says.
21     Q    So if the autopsy checklist shows he was shot
22  in the front then it's inconsistent with the confession
23  saying they chased him down and shot him, right?
24     A    If it says what, sir?
25     Q    If the autopsy checklist says that Lazo was
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 330 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 6, 23

228

```
 1   shot twice in the front, then that's inconsistent with
 2   the confession saying that they chased him down and shot
 3   him, right?
 4       A    I -- I can't -- I can't answer that, sir.  I'm
 5   not --
 6       Q    Well, why can't you answer that?
 7       A    Because I don't know.  I'm going by this and I
 8   don't know if they really went over there if it was
 9   banging on a stack or other stack.  I don't know.
10       Q    I'm sorry.  You don't know what?
11       A    I don't know.  I don't know where exactly Lazo
12   was shot.  If he was shot twice at the same place or
13   shot once at the other place.  There was no evidence to
14   prove because we didn't find any shells at the second
15   place.
16       Q    Right.  You didn't find any shells in the
17   second place.  You didn't find any bullet holes in the
18   house, right?
19       A    Correct.
20       Q    There is no evidence of a second shooting,
21   right?
22       A    That I can see, no.
23            MR. MARTINEZ:  Objection.  Vague.
24       Q    And so it's inconsistent with Danny's statement
25   that he was -- that they were chasing Lazo and then
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 331 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23

229

```
 1  finished him off, right?

 2     A    There is -- that's his statement and that's all

 3  I can rely on.

 4     Q    I know but it's inconsistent with the physical

 5  evidence.  That's what I'm saying.  Right?

 6          MR. MARTINEZ:  Objection.  Vague.

 7     A    Yes.

 8     Q    Danny didn't tell you where they went after the

 9  murder?

10     A    No.

11     Q    Did you ask them?  What did you do after the

12  murder?

13     A    I don't believe so.

14     Q    Why wouldn't you want to know where he went

15  after the murder?

16     A    I didn't ask him that.

17     Q    Why -- why didn't you want to know where he

18  went after the murder?

19     A    I didn't ask him.

20     Q    I'm aware that you did not ask him, sir.  We've

21  established that.  I'm trying to find out, did you want

22  to know where he went after the murder?  Can you answer

23  the question?

24     A    I'm -- the only things I didn't ask him.  If I

25  wanted to, I didn't ask him.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 332 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 6/23,   Page
230

 1      Q     All right.  I'm not -- you know, you're talking
 2   about whether you did or didn't ask him.  I know you
 3   didn't.  It's not in the statement and that's
 4   established.  I'm trying to find out, as a detective, as
 5   a homicide detective, did you want to know where the
 6   five killers went after this murder?
 7      A     Yes.  I wanted to know.  I did not ask him.
 8      Q     Why didn't you ask him?
 9      A     I don't know, sir.
10      Q     Why did you want to know where they went after
11   the murder?
12      A     If I --
13            MR. MARTINEZ:  Objection.  Asked and answered.
14      A     I didn't ask him.  If I -- if I -- I failed to
15   ask him, I did not ask him where they went after.
16      Q     Was it supervisors who asked you it help other
17   detectives with their interrogation or confession taping
18   skills?
19      A     On different cases?
20      Q     Is that true?
21      A     Say that again please.
22      Q     Yeah.  Sorry.  In different cases.  Just in
23   general.  Did supervisors ask you to help them -- to
24   help other detectives with their interrogation skills?
25      A     I don't -- if there was just -- I don't believe

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 333 of 1026
The Deposition of CALFONSO MARQUEZ, taken on May 2023

231

1 the instruct them or help them, but, you know, if he

2 needs help, help him out.

3     Q    Tell me why you wanted to question Rodney

4 Williams a second time.

5     A    I don't -- I don't recall, sir.

6     Q    Do you remember that it was at 6:30 in the

7 morning that you gave Rodney his -- his warnings?

8     A    Again, I don't -- I don't recall if it was 6:30

9 in the morning.  I may have but I just can't --

10     Q    Did you want to know how it was that he was

11 confessing to murder with two people who -- it was an

12 impossibility that he could have been with?

13            MR. MARTINEZ:  Objection.  Asked and answered.

14     A    I believe that was the reason I was asked to

15 trying to talk to him and he said, no.  He didn't want

16 to talk to us anymore, and the statement that he had

17 given us was what was the truth.

18     Q    So if you wanted to re-question Rodney about

19 Popeye and Droopy, why didn't you re-question Danny

20 Villegas and Marcos Gonzalez about Snoopy and Droopy --

21 Popeye and Droopy?

22     A    I don't know, sir.  I didn't question them.  I

23 don't know.

24     Q    Was there anything preventing you from

25 questioning Danny Villegas and Marcos Gonzalez a second

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 334 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23, Page

232

```
 1   time?

 2      A    No.

 3      Q    A third time for Marcos.

 4      A    No.

 5      Q    How did you come to be talking to Marcos

 6   Gonzalez at 5:25 in the afternoon?

 7      A    I don't recall, sir.

 8      Q    Had anyone directed you to Marcos Gonzalez

 9   before speaking to David Rangel?

10      A    I don't recall.

11      Q    Were you ever given any awards by the El Paso

12   Police Department?

13      A    Accommodations.  I received a meritorious

14   award.  As far as basic -- basic police officer,

15   intermediate, all the way up to master's degree and --

16   not master's degree.  Master detective and I made it all

17   the way up to there.

18      Q    Were you given any awards for obtaining

19   confessions?

20      A    No.  Just letters of commendation.

21      Q    And were you giving letters of commendation for

22   obtaining confessions?

23      A    Having the case and obtaining confessions.

24   Yes.

25      Q    How many -- how many letters of commendation?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 335 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 6/23, Page

233

```
 1    A    That I know of specifically, is three.

 2    Q    And were those all in confession cases?

 3    A    Yes.

 4    Q    Did you receive any letters of commendation for

 5 other types of cases?

 6    A    I don't recall, sir.

 7    Q    Did you receive a letter of commendation for

 8 this case?

 9    A    No.  I did not.

10    Q    Do you know why that is?

11    A    No, sir.

12    Q    Were your supervisors supportive to you?

13    A    Yes.

14    Q    How about your commencing?  Were they

15 supportive to you as well?

16    A    Yes.

17    Q    Did your supervisors prevent you from carrying

18 out your job in the way you wanted to do it?

19    A    I don't understand the question.  I don't think

20 I can.

21    Q    Like did anybody from a supervisor tell you you

22 shouldn't do things that way, don't do things that way,

23 do it a different way?

24    A    No.

25    Q    All right.  Was the internal affairs process at
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 336 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 1/23, Page
234

1   the El Paso Police Department, fair?

2       A    I believe so.  Yes.

3       Q    Because of the internal affairs department and

4   the El Paso Police Department, did you change the way

5   you -- you investigated cases in any way?

6       A    No.

7       Q    You were accused of perjury by an attorney in a

8   case; is that right?

9       A    In a case.  Yes.

10      Q    Were you questioned by the internal affairs

11  division?

12      A    No.

13      Q    You refused to be questioned by them at first,

14  right?

15      A    I believe internal affairs was not handling the

16  case or the -- the report.

17      Q    Well, eventually internal affairs did

18  investigate, right?

19      A    Yes.

20      Q    And you did not give a statement to them,

21  correct?

22      A    To internal affairs, yes.

23      Q    You did or you did not?

24      A    I gave them -- I gave them a statement when

25  they started investigating.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 337 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 4, 2018
235

1    Q    All right.  And up until then, you refused to

2  talk, right?

3         MR. MARTINEZ:  Objection.  Vague.

4    Q    Meaning you inserted your Fifth Amendment right

5  to silence, right?

6    A    No.  I did not.

7    Q    When internal affairs questioned you about the

8  perjury complaint, did they do that in person?

9    A    Yes.

10   Q    Did they take a statement from you?

11   A    They gave him a statement.  Yes.

12   Q    Who wrote out the statement?  Did you do it, or

13  did they do it?

14   A    I did it.

15   Q    You wrote out your own statement?

16   A    Yes.

17   Q    And then you signed it?

18   A    Yes.

19   Q    And you were aware that other officers were

20  saying you testified falsely at the hearing, right?

21   A    Yes.

22   Q    And -- and even though other police officers

23  were saying that you testified falsely, you were still

24  not disciplined in that case, right?

25         MR. DENTON:  Objection.  Vague.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 338 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
236

1    Q      Right?

2    A      It was -- it was investigated [indiscernible]

3 went to the grand jury and [indiscernible].

4           THE REPORTER:  What?  Repeat that.

5    A      It was investigated by internal affairs after I

6 [indiscernible] to the grand jury where I was no billed.

7    Q      No billed is what he said.  And internal

8 affairs did not -- did not discipline you even though

9 there are other police officers saying you had perjured

10 yourself, right?

11          MR. DENTON:  Objection.  Assumes facts not in

12 evidence.

13   Q      What was that?

14   A      I was not disciplined.

15   Q      Did you fear the internal affairs process when

16 you were being investigated for the perjury complaint?

17   A      Did I what, sir?

18   Q      Did you fear that you might be disciplined?

19   A      No.

20   Q      Why not?

21   A      Because I felt I had done -- done nothing

22 wrong.

23   Q      And so even though other police officers were

24 saying you perjured yourself -- yourself, that internal

25 affairs was investigating, you didn't have any concern

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 339 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May/23,
237

1   that you were going to be disciplined, right?

2          MR. DENTON:  Objection.  Assumes facts not in

3   evidence.

4      A    Right.  That's not what I said.  I said that I

5   did not feel that I had done anything wrong.  Whether it

6   was an attorney.  Yes.

7      Q    I understand.  I just meant that even though

8   there are other people, you know, other police officers

9   saying you had committed perjury, that still didn't make

10  you think that internal affairs was going to discipline

11  you, right?

12         MR. DENTON:  Same objection.

13     A    No.  I don't have -- I have no say -- no say

14  about what internal affairs comes up with or decides or

15  recommends.

16     Q    Right.  It's out your hands, right?

17     A    I'm sorry?

18     Q    It's out of your hands?

19     A    Yes.

20     Q    But you did not fear that internal affairs

21  would discipline you even though other officers were

22  saying you perjured yourself, right?

23     A    No, sir.  I did not -- I wasn't feeling that

24  way.

25     Q    Okay.  Have you ever feared the internal

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 340 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 26/23, Page
238

 1  affairs department at the El Paso Police Department?

 2     A    I would say no.

 3     Q    Have you ever altered how you investigate --

 4  investigated a case because of internal affairs?

 5     A    No.

 6     Q    If there is an internal complaint against

 7  multiple police officers, are you allowed to talk to the

 8  other officers about the incident?

 9     A    I would say no, but I don't know if there is a

10  written rule.

11     Q    How do you learn that internal affairs is

12  investigating a complaint?

13     A    They file a complaint.  Give it to the

14  supervisor.  The supervisors tells us that there's been

15  a complaint filed and from there the ball starts

16  rolling.

17     Q    Have you ever learned about internal affairs

18  complaints before internal affairs told you?

19     A    No.

20     Q    Have you ever used excessive force against a

21  suspect?

22     A    Excessive force?  No.

23     Q    Yes.

24     A    No.

25     Q    Have you ever observed another police officer

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 341 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23,   Page
239

```
 1   commit excessive force?

 2       A    No.

 3       Q    Have you ever served another police officer

 4   misconduct?

 5            MR. MARTINEZ:  Objection.  Vague.

 6       A    I would say no.

 7       Q    You had an obligation to report any police

 8   officer you saw committing misconduct to internal

 9   affairs; is that right?

10            MR. MARTINEZ:  Objection.  Vague.

11       A    There may be a rule, but I don't know it if

12   that's the case.

13       Q    Did you ever report any officer to internal

14   affairs?

15       A    No.

16       Q    Were you ever aware of another police officer

17   abusing the suspect during an interrogation?

18       A    No.

19       Q    Were you ever aware of another police officer

20   fabricating a witness's statement?

21       A    No.

22       Q    Were you ever aware of another police officer

23   abusing a witness in a case?

24       A    No.

25       Q    Were you ever notified that internal affairs
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 342 of 1026
The Deposition of Alfonso Marquez, taken on May 23, 2019
240

1    had sustained a complaint against a detective for their

2    conduct during an interrogation?

3        A    A detective or?

4        Q    Any detective.

5        A    One.

6        Q    One?  Which one?

7        A    I mean, what -- filed against me I believe.

8        Q    What's that?

9        A    Against -- if you're talking about me, yes.  I

10   believe there was one.

11       Q    What were you disciplined for?

12       A    Oh, I wasn't disciplined.  No.  I'm sorry.  I

13   thought you said filed upon.

14       Q    No.  Sorry.  Were you ever -- did you ever

15   learn that internal affairs had sustained a complaint

16   against a detective for abusing a suspect during an

17   interrogation?

18       A    I was not privy to that.  It's up to the

19   detective, but I don't -- or the officer.  I don't know

20   if he wants to go tell everybody else himself.

21       Q    I'm just asking the question, sir.  Did you

22   ever learn of another officer being disciplined or -- or

23   having a complaint sustained for abusing a suspect

24   during an interrogation?

25       A    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 343 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 8, 23
241

1     Q     Did you ever learn that another detective had

2     been disciplined for abusing a witness when questioning

3     a witness --

4     A     No.

5     Q     -- When questioning?

6     A     I'm sorry.  No.

7     Q     Do you own your own home?

8     A     Yes.

9     Q     And what's the value of that home?

10    A     About 169,000.

11    Q     Did you have a mortgage on the home?

12    A     Yes.

13    Q     What's the mortgage approximately?

14    A     That I owe?

15    Q     Yes.

16    A     30 to 40,000.

17    Q     Do you have any income?

18    A     Just my pension checks, social security.

19    Q     And what's the monthly income that you have

20    from pension, social security?

21    A     Social security 600 and some odd dollars.

22    County pension is about two -- 2,000, and the police

23    pension is about 4,000.

24    Q     Do you own any vehicles?

25    A     Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 344 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 26, 2013
242

1    Q    How many vehicles do you own?

2    A    Four.

3    Q    What vehicles do you own?

4    A    I own a -- a '97 Chevrolet pick-up -- pick-up.

5  I'm sorry.  It's either a '97 or '93 pick-up.  A '97 --

6  start from the beginning.  It's a -- I got a '89

7  Corvette, a '93, I believe, BMW, '97 pick-up, and a 2003

8  SUV.  Ford SUV.

9    Q    Are you married?

10   A    Yes.

11   Q    And does your wife have any income?

12   A    She works.

13   Q    What kind of work does she do?

14   A    She works at the county courthouse.

15   Q    Do you have any children?

16   A    Do I have children?

17   Q    Yes.

18   A    Yes, sir.  I have two.

19   Q    Do you -- do you support them in any way?

20   A    No.  They're grown and out of the house.

21   Q    Do you support any -- any one other than you

22  and your wife financially?

23   A    No.

24   Q    Do you have any stocks or mutual funds?

25   A    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 345 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 05/26/23

243

 1    Q    Do you have any bonds?

 2    A    No.

 3    Q    Do you own any 401K accounts or any other

 4  retirement accounts other than your pension and social

 5  security?

 6    A    No.

 7    Q    Do you own any other real property other than

 8  your home?

 9    A    No.

10    Q    Do you own any items of value greater than

11  $5,000 such as jewelery or collections or gun

12  collections or the like?

13    A    No.  I don't.

14    Q    Do you own any recreational vehicles?

15    A    No.

16    Q    Do you have a certificates of deposit?

17    A    No.

18    Q    Do you have any bank accounts?

19    A    Yes.

20    Q    How many bank accounts do you have?

21    A    I have a checking and a savings.

22    Q    And do you have one of each?

23    A    Yes.

24    Q    And what's your average balance in your

25  checking account?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 346 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23, Page 244
244

 1     A    At the end of each month after I finish the
 2  bills, the average balance is about maybe between 2,000
 3  and -- 2,000, 2,500.  And in the checking I have
 4  approximately $2,000.
 5     Q    Do you have any other assets that we haven't
 6  discussed that are worth more than $5,000?
 7     A    No, sir.  I don't.
 8     Q    Do you have any other sources of income that we
 9  haven't discussed?
10     A    No, sir.  I don't.
11     Q    Have you ever been suspended -- suspended by
12  the El Paso Police Department?
13     A    Yes.
14     Q    On how many occasions?
15     A    I believe suspensions, twice.
16     Q    And what were they for?
17     A    One was for, I believe, mishandling of
18  evidence, and the other one was on -- I -- something to
19  the effect of I misused city funds.
20     Q    All right.  How were you alleged to have
21  misused city funds?
22     A    I had gone on an investigation in Utah.  We --
23  on the way after the investigation, we took out two
24  detectives that were assigned to us to help -- help us
25  out.  Took them out to dinner.  We paid for their

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 347 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23, Page
245

 1  dinner.  When we came back, we had to turn in all the
 2  receipts.  So we turned a receipt with the memo saying
 3  that this money was used to pay for this guys dinner.
 4  [indiscernible] Later on they came back and said, you
 5  can't do this.  You need to pay the money back.  I paid
 6  the money back.  I wrote them a check.  They gave them
 7  the money back.  Later on -- later on that weekend or
 8  during the week, they said they had filed a misuse of
 9  city -- city money.  That we weren't allowed to do that,
10  so we got -- [inaudible] got suspended.
11      **Q      And that was a complaint initiated by the**
12  **department; is that right?**
13      A      Correct.
14      **Q      And how much -- how long were you suspended**
15  **for?**
16      A      The initial suspension was 15 days.  We took it
17  to arbitrations, and in arbitrations, they took away 12
18  days and gave us three only, because they said we were
19  not allowed to -- we weren't allowed to buy those
20  detectives dinner with city money.
21      **Q      And what were you alleged to have done wrong**
22  **with mishandling the evidence?  The narcotics?**
23      A      The evidence -- I tagged some evidence, threw
24  it into my desk drawer.  I arrested the person that had
25  the evidence, then I just simply forgot that -- it was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 348 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23,   Page

246

```
 1  late at night.  I went home.  [indiscernible] For I
 2  don't even remember how long.  They asked for it, and
 3  they provided me the case number and the person, and I
 4  went and told my supervisor this is what I did.  I was
 5  supposed to go get the evidence.  He went with me,
 6  picked up the evidence.  We went downstairs, turned it
 7  in, and then I got written up for mishandling of the
 8  evidence.
 9      Q    Did you still have the evidence?
10      A    Yes, sir.
11      Q    What kind of drugs were they?
12      A    It was a blue -- I don't know what the content
13  was of it.  I believe it was heroin.
14      Q    And how long were you suspended for that?
15      A    I believe two days.
16      Q    And so that was a complaint that was also
17  initiated by the department?
18      A    Yes.
19      Q    Were you ever disciplined for civilian
20  complaints?
21      A    Yes.
22      Q    What civilian complaint were you disciplined
23  for?
24      A    I believe one was -- was a supposedly that I
25  was abusive, and that was the -- the initial complaint.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 349 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 2023
247

 1  Aside from another [indiscernible] when I had a child in
 2  the car that wasn't authorized and it stemmed from
 3  there.
 4      Q    I'm sorry.  And you were abusive in what way?
 5      A    She said I was verbally abusive to her.
 6      Q    Okay.  And was there an investigation?
 7      A    Yes.
 8      Q    Did you give a statement?
 9      A    Yes.
10      Q    Did you write up your own statement, or did you
11  submit a statement?
12      A    I write my own.
13      Q    And what was the result of that investigation?
14      A    It was a -- it was a written reprimand.  I'm
15  not sure but I got two chewed out for, you know, being
16  abusive.  I don't believe I was, but that's the -- what
17  the complainant said.
18      Q    All right.  So you had a written complaint, a
19  written reprimand as a -- based on that written
20  reprimand that you received, did you alter the way that
21  you did your job at all?
22      A    Yes.
23      Q    How did you change?
24      A    I made sure that I had no argue with anybody.
25  Just call the police like I did back -- back then during

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 350 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 6/23,  Page
248

```
 1  that time if there was any hassle.  But then I got
 2  written up.
 3      Q    Did any of your fellow officers give a report
 4  in that case as well?
 5      A    No.
 6      Q    Have you ever given a -- a report to internal
 7  affairs that a fellow officer did something wrong?
 8      A    No.
 9      Q    Was that when you were in patrol?
10      A    Well, my entire career I don't think I ever --
11      Q    I'm sorry.  I meant the -- the written
12  reprimand for being verbally abusive.  Was that when you
13  were in patrol?
14      A    No.  I was a detective.
15      Q    You were a detective?
16      A    Yes.
17      Q    All right.  Did you tell Arbogast and Graves to
18  submit final reports in the case at the same time?
19      A    I don't understand the question.
20      Q    Your final report in this case was submitted on
21  May 5th, 1993.  Do you remember that?
22      A    Are you talking about my presentation
23  supplement?
24      Q    Yes.
25      A    Okay.  Yes.  I remember filing that.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 351 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
249

1   Q    And Graves report is also submitted on May 5th,
2   1993.  Are you aware of that?
3        A    No, sir.  I'm not aware of that.
4   Q    Is that a coincidence or did you try to
5   synchronize the filing of your complaints?
6        A    No.  As a police agent, you were supposed to
7   put the files together.  I don't know what
8   [indiscernible] they because I turn it in.
9             THE REPORTER:  I need you to repeat the answer
10  and speak louder.
11       A    Okay.  As case agent, I get -- I get the files
12  together and put it all together, and I make sure that
13  all the detectives know that were working that at that
14  time, a certain time, I want to turn in all the files so
15  they're advised to turn in all the paperwork that they
16  had.
17       (Exhibit No. 23 was marked for identification.)
18  Q    So I'm showing you Exhibit 20 -- what we'll
19  mark as Exhibit 22 [sic].  This is Graves presentation
20  report or his final report or whatever you call it.  I
21  don't see anything in Graves report about two of the
22  people implicated in the murderer being incarcerated or
23  on electronic monitoring at the time of the murder and
24  couldn't have committed the murder.  Do you?
25            MR. MARTINEZ:  I missed that question.  Can you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 352 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23,

250

 1  repeat that back, Ashley?

 2          THE REPORTER:  I missed it too.

 3      Q    Let me -- let me just strike that question and

 4  ask a different one, sir.  And -- and I'll show you your

 5  own presentation report, because I think this one will

 6  go easier.  This is Exhibit 12 to your deposition.

 7          All right.  This is your presentation report

 8  and -- and so in this report, would you expect to see

 9  documentation that you investigated two of the five

10  people alleged to have committed the murder were

11  incarcerated or on electronic monitoring at the time of

12  the murder and could not have committed the murder?

13      A    Sir, everything -- everything that I have on

14  that supplement report is based on everything that was

15  done.  So sometimes I just, you know, I know it was

16  done, and it did look at the report.  But the rest of

17  the case, you'll find it in there.  That's my

18  supplemental report.

19      Q    Where?  Where is this documented anywhere that

20  Popeye and Droopy were incarcerated at the time of the

21  murder or on electronic monitoring and could not have

22  committed the murder?

23      A    A witness statement or a supplement.

24      Q    Would it surprise you to know that it's not

25  written down anywhere?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 353 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
251

```
 1      A    I don't know, sir.
 2      Q    It's an absolute requirement that you, as a
 3  police detective, write down the fact that the
 4  confessions implicated two people who could not have
 5  committed the murder, right?
 6           MR. MARTINEZ:  Objection.  Calls for
 7  speculation.  Calls for a legal opinion.  Lacks of
 8  foundation.
 9      A    I took the confession and wrote the confession
10  is in there says is what he told me.
11      Q    Who asked you that question?  I didn't ask you
12  that question.  Sir, I'm asking you, you have to write
13  down the fact that two of the five people implicated in
14  the murder could not have committed the murder, right?
15           MR. MARTINEZ:  Objection.  Calls for
16  speculation.  Lacks an appropriate foundation.  Calls
17  for legal opinion.
18      A    I was -- I can't answer that.  Maybe it was
19  done and it's not in this report.
20      Q    Did I ask you if it was in this report?
21      A    Maybe it was done.  No, sir.
22      Q    I will -- I'm just asking you.  As a detective,
23  you had an obligation somewhere in the file to document
24  that the -- that two of the five people accused of the
25  murder could not have committed the murder, right?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 354 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2023

252

```
 1          MR. MARTINEZ:  Same objections.

 2          MR. DENTON:  Objection.

 3                  (Simultaneous speakers)

 4     A    [inaudible]

 5     Q    Is there any explanation for why it was not

 6 documented in your -- in the file that two of the five

 7 people who are accused of the murder could not have

 8 committed the murder?

 9     A    I don't know, sir.

10     Q    Were you trying to hide that fact?

11     A    No.

12     Q    Did you tell anyone that fact?

13     A    I think that fact was still with me, but I

14 don't recall who had told -- who had told them.

15     Q    Did you tell any prosecutor that two of the

16 five people accused of the murder were -- could not have

17 committed the murder?

18     A    I don't recall.

19     Q    When you sought charge -- you sought charges

20 against Danny Villegas, right?

21     A    Yes.

22     Q    When you sought charges for Danny Villegas, how

23 did you go about doing that?

24     A    The same as the JIS process.

25     Q    Which is what?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 355 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

253

1    A    Interview them.  Take them to JIS.  Interview

2  them.  See if he gives us a statement.  And then go to

3  the intake officer, Judge Horkowitz, back to the intake

4  officer, back to Judge Horkowitz and then to be put in

5  JPD.

6    Q    All right.  Did you tell any of those people

7  that two of the five people Danny Villegas implicated in

8  the murder could not have committed the murder?

9    A    No.

10   Q    After Danny Villegas was charged, did you go

11  back to the prosecutor and say, I'm sorry, Prosecutor,

12  but we got a problem.  Two of the five people indicated

13  by Danny Villegas, Rodney Williams, and Marcos

14  Gonzalez's confessions were incarcerated at the time

15  or -- or -- or could not have committed the murder?

16   A    No.

17   Q    Was there a reason why you didn't tell the

18  prosecutor that two of the five people implicated by

19  Danny Villegas were -- couldn't have committed the

20  murder?

21   A    Repeat that again please.

22   Q    Was there a reason why you didn't tell the

23  prosecutor that two of the five people implicated by

24  Danny Villegas could not have committed the murder?

25   A    There was no reason that why we didn't tell

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 356 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 2020

254

```
 1  him.  I believe -- well, we didn't tell him.  We didn't
 2  tell him.
 3      Q    All right.  And -- and so I'm trying to find
 4  out why you didn't tell him.  Was there a reason you
 5  didn't tell the prosecutor that two of the five people
 6  implicated by Danny Villegas could not have committed
 7  the murder?
 8      A    I'm thinking that that case I know we've been
 9  turned over and further investigation didn't really --
10  really stop there.  That's when we found out that I'm --
11  I believe.  I'm not sure.  That that's when we found out
12  that this guy was in -- was one was on a monitor and the
13  other one was incarcerated.
14      Q    You -- you talked to a number of people who had
15  been incarcerated with Danny Villegas to try and find
16  out if he talked to other people about the case, right?
17      A    When you say the number?
18      Q    Yeah.  A number of people.
19      A    No.
20      Q    Well, let me ask you about your trial
21  testimony.  All right.  This is your testimony from -- I
22  think it's the first trial.  Yes.  December 8th, 1994.
23           THE REPORTER:  You're not sharing your screen.
24      Q    I -- thank you.  I'm -- I'm trying to kill the
25  time while I click through all the things I have to
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 357 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 05/06/23

255

```
 1   clock through to get to them.
 2           All right.  Showing you that same testimony
 3   that we talked about before from the first trial, and
 4   I'm going to direct your attention to page -- page --
 5   it's -- all right.  So this is page 340, line two.
 6           Question, "And why did you make that trip to
 7   Huntsville, sir?"
 8           Answer, "Because I was checking everybody that
 9   had been incarcerated with Danny Villegas at the time
10   that we put him in jail up until the time that he got
11   released or to the time of this court."
12           Were you asked that question, and did you give
13   that answer?
14      A    Yes.
15      Q    And so you were checking everybody that had
16   been incarcerated with Danny Villegas at the time that
17   he was put in jail, right?
18      A    I may have made a mistake.  It was only one
19   person that we went to talk to.
20      Q    You made a mistake when you testified over --
21   under oath at a murder trial?  That's your explanation?
22      A    This is what I testified to there, sir, which
23   recollection coming back, I know that we didn't check
24   everybody.  We only talked about one.  Checked one
25   person.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 358 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23, Page

256

```
 1     Q     That was Onnie Kirk, right?

 2     A     Yes.

 3     Q     And --

 4           THE REPORTER:  Who?

 5     Q     Onnie, O-N-N-I-E, Kirk, K-I -- K-I-R-K.

 6           And you got a statement from him, right?

 7     A     We received it from him.  I did not take it.

 8     Q     All right.  You were present for the statement

 9  though, right?

10     A     Yes.

11     Q     And you asked whatever questions you wanted to

12  of Onnie?

13     A     I'm sorry.  You faded.

14     Q     You could have asked him whatever questions you

15  wanted to ask him, right?

16     A     Yes.

17     Q     And so did you ask him, for example, when did

18  he have this conversation with Danny Villegas?

19     A     No.  I did not.

20     Q     Did you ask him, "Where were you when you had

21  this conversation with Danny Villegas"?

22     A     No.

23     Q     Did you ask him whether he was on the same

24  floor as Danny Villegas when he had this conversation?

25     A     No.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 359 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23
257

 1    Q    Why didn't you ask him those questions?

 2    A    I was not conducting the interview, sir.

 3    Q    Was there anything preventing you from asking

 4  those questions?

 5    A    No.

 6    Q    Were you there and told to be silent?

 7    A    No.

 8    Q    Okay.  So there is nothing stopping you from

 9  answering -- asking those questions, right?

10    A    No.

11    Q    So then why didn't you ask Onnie Kirk when he

12  had this conversation, where he had this conversation,

13  and who was present?

14         MR. MARTINEZ:  Objection.  Asked and answered.

15    A    I didn't ask him.  No.

16    Q    I'm aware you didn't.  Why didn't you ask him?

17    A    I was not conducting the interview.

18    Q    And so you -- you now know that Onnie Kirk

19  wasn't incarcerated at the county jail until months

20  after Danny Villegas was incarcerated, right?

21    A    I'm not aware.  I don't know, sir.

22       (Exhibit No. 24 was marked for identification.)

23    Q    Let me show you what we'll mark as Exhibit 23

24  [sic].  And this is an affidavit from Lieutenant James

25  D. Nance, an employee of the El Paso County Sheriffs

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 360 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 3, 23   Page
258

1    Office.  Do you see that?

2       A    Yes.

3            MR. JIM DARNELL:  Can we take a short break

4    while he reads that?  Bathroom purposes.

5            MR. AINSWORTH:  Sure.  Let's go off the record.

6            THE VIDEOGRAPHER:  We are off the record.  The

7    time is 6:07 p.m.

8               (Recess from 6:07 p.m. to 6:19 p.m.)

9            THE VIDEOGRAPHER:  We are back on the record.

10   The time is 6:19 p.m.

11      Q    All right.  Detective, I'm showing you what we

12   marked as Exhibit 23 [sic].  Sorry.  I have a -- I'm

13   sorry.  I need to click back into it.  Okay.  Now I'm

14   showing you Exhibit 23 [sic].  Do you see that on Onnie

15   Kirk was not in custody at the El pass -- El Paso County

16   Detention Facility until July 26th?

17      A    That he was in custody?  Yes.

18      Q    All right.  And that's -- they were housed --

19   Onnie Kirk and Danny Villegas were housed together on

20   the second floor only for 15 days from September 15th

21   until September 29th, 1993?

22      A    I don't -- when you say housed together, I

23   don't see that.  I see housed on the second floor, but I

24   don't know if it's together.

25      Q    I said housed together on the second floor.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 361 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23
259

1  Not they're -- not that they were housed in the same

2  cell, but that they were on the same floor for 15 days

3  from September 14th until September 29th, 1993, correct?

4      A    Correct.

5      Q    All right.  So it would be important to know

6  when the conversation that Onnie Kirk claimed to have

7  with Danny Villegas happened, right?  Right?

8      A    Yes.

9      Q    And it would be important to know where that

10 conversation was, right?

11     A    Yes.

12     (Exhibit No. 25 was marked for identification.)

13     Q    And let me show you what we'll mark as Exhibit

14 25, which is Onnie Kirk -- Kirk's statement.  All right.

15 In Onnie Kirk's statement that you witnessed it says,

16 he, meaning Danny Villegas, "Also said that if he found

17 out who had talked, that he would get his gang to take

18 care of him."  Do you see that?

19     A    Yes.

20     Q    And so Onnie and Villegas couldn't have had

21 this conversation until at least July and maybe not

22 until September, right?

23     A    I don't know, sir.

24     Q    Well, based on what we just saw about the dates

25 that they were housed at the jail together, they weren't

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG   Document 286-2   Filed: 05/26/23   Page 362 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May/26/23, Page
260

1  housed at the jail together until July, right?

2      A    Correct.

3      Q    And they weren't on the same floor until

4  September, right?

5      A    Correct.

6      Q    And so if Danny Villegas was charged in April

7  with this crime, do you think that he was still

8  wondering in July who had talked to the police?

9           MR. MARTINEZ:  Objection.  Calls for

10 speculation.

11     A    I don't know what Danny was thinking.

12     Q    Well, just as a police officer, were you, you

13 know, when you're hearing Onnie Kirk say that Villegas

14 was saying if he found out who talked, you know, did

15 that not make sense?  Because you would think that Danny

16 Villegas would know who had spoken to the police from

17 that time?

18     A    I don't know that, sir.

19     Q    Well, and I -- I understand you can't know, but

20 did that just create a question in your mind as a

21 detective that it -- it seemed odd that Danny Villegas

22 would still be trying to find out who talked to the

23 police when you had documented statements from, you

24 know, David Rangel -- Rangel -- David Rangel, Rodney

25 Williams, and Marcos Gonzalez all on the file?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG  Document 286-2  Filed: 05/26/23  Page 363 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 5/20/23
261

 1     A    I can't answer that, sir.  I don't know.

 2     Q    And Onnie Kirk -- well, it says here in his

 3  statement, "I was told that his name is Danny Villegas."

 4  Do you see that?

 5     A    Yes.

 6     Q    Does that mean you told him, or that the police

 7  who were questioning him told him that his name was

 8  Danny Villegas and he didn't know that, or somebody else

 9  told him that his name was Danny Villegas?

10     A    I have no idea who told him his name was Danny

11  Villegas.

12     Q    All right.  But he's not saying that Danny told

13  him that his name was Danny Villegas, right?

14     A    I don't know what he is referring to, sir.

15     Q    Well, you were present for this conversation,

16  right?

17     A    Correct.

18     Q    Do you take this statement, "I was told that

19  his name was Danny Villegas", to mean that Onnie Kirk

20  and Danny Villegas -- or Danny had not introduced

21  himself to Onnie Kirk?

22     A    I don't know.

23       (Exhibit No. 26 was marked for identification.)

24     Q    Let me show you what we'll mark as Exhibit

25  No. 25 [sic].  Do you recognize this map?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 364 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 20
262

```
 1     A     No, sir.  I don't.

 2     Q     Do you know what's being depicted here?

 3     A     No, sir.  I don't.

 4     Q     Do you know a Captain Reyes or did you?

 5     A     No, sir.  I don't.  I didn't now.

 6     Q     I'm sorry.  For the record, Exhibit 25 [sic] is

 7  Bates numbered DA 115472.

 8           If you had the England/Lazo investigation to do

 9  over again, would you do anything differently?

10           MR. MARTINEZ:  Objection.  Vague.

11     A     No.

12     Q     If it was up to you, would Danny Villegas still

13  be in prison?

14     A     It's not up to me.

15     Q     Right.  That's why I prefaced my question.  If

16  it was up to you, would Danny Villegas still be in

17  prison?

18           MR. MARTINEZ:  Objection.  Lack of foundation.

19  Calls for speculation.

20     A     Yes.

21     Q     And if it was up to you, would he spend the

22  rest of his life in prison?

23           MR. MARTINEZ:  Objection.  Lack of foundation.

24  Calls for speculation.

25     A     If that was the sentence, yes.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 365 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23, Page 263
263

1    Q    Did you have any obligation to contact the

2   juveniles parents that they were being arrested for a

3   felony crime to let them know that they were being

4   arrested?

5         MR. MARTINEZ:  Objection.  Vague.  Calls for

6   speculation.

7    A    No.  I don't recall that I was -- that I did.

8    Q    Did you conduct any investigation to try and

9   find out whose car it was that Danny Villegas was in the

10  night of the murder?

11   A    I believe we searched some cars, but I don't

12  recall how many we searched or which ones.

13   Q    Did you search any cars after April 22nd, 1991?

14  Or 1993 to try and find the car that was used in the

15  murders?

16   A    I don't recall.

17   Q    Did you listen to an audio tape at Tony

18  Kosturakis' office?

19   A    Yes.

20   Q    Did it have evidence about the murder?

21   A    It had the -- something we had already

22  investigated what he had.  Investigated that stuff

23  already.

24   Q    What stuff was it?

25   A    I believe it was just whatever -- when we

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 366 of 1026
The Deposition of Alfonso Marquez, taken on May 6, 2023
264

1  read -- when I heard it, I said, okay.  That's already
2  been done, and that's already been done and stuff like
3  that, but I don't recall exactly what.
4    Q    So you obtained a copy of the tape to put into
5  evidence and said anybody looking at it could see, oh,
6  that's [indiscernible] that stuff that's already been
7  done in this investigation, right?
8    A    No.
9    Q    Why didn't you obtain a copy of the tape and
10  place it into evidence?
11    A    I don't know.
12    Q    Was there anything stopping you from obtaining
13  the tape and placing it into evidence?
14    A    No.
15    Q    Who were you with when you listened to the --
16  to the tape at Kosturakis' office?
17    A    I remember Lieutenant Laredo and Judy Reece.
18    Q    Why did you bring a lieutenant to listen to
19  this tape of somebody that had already been investigated
20  and done?
21    A    He was the one that knew [indiscernible] and
22  was going to introduce us, and he said he'd go with us.
23  I mean not in the same car but he went with us.
24    Q    So lieutenant asked to go run down this lead
25  that had already been run down before?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 367 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May/23,
265

```
 1      A    He was the one that told us to go and -- and
 2 talk to Kosturakis.  If I knew him, I didn't know him.
 3 I said, no.  I know him.  I'll go down there with you
 4 guys.  But he didn't do anything except take it home and
 5 [indiscernible].
 6      Q    Did you meet somebody to go down an introduce
 7 you?
 8      A    No.  That was his -- to go to see Kosturakis.
 9           THE REPORTER:  To see what?
10      A    To go see him because they were friends I
11 believe.
12      Q    They were friends.  Okay.
13      A    I believe.  I'm not sure.
14      Q    Do you have any idea why lieutenant doesn't
15 remember going down to the office to see -- to listen to
16 the tape?
17      A    No, sir.  I don't.
18      Q    You -- you should have inventoried that tape,
19 right?
20      A    We did not pick it up.
21      Q    Yeah.  I -- that's -- that's what you're
22 saying.  I understand that.  But you should have picked
23 it up, right?
24      A    Yes.
25      Q    And then inventoried it, you know, maintained
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 368 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23,

266

```
 1  it so that somebody else could listen to it, right?

 2      A    Yes.

 3      Q    Or at the very least document why you didn't

 4  pick it up and what was on the tape, right?

 5      A    Yes.

 6      Q    And you didn't create any documentation

 7  regarding that tape, right?

 8      A    No.

 9      Q    Did you take a statement written out by Marcos

10  Gonzalez and throw it away?

11      A    No.

12           MR. BRITTAIN:  Can you repeat that question?  I

13  didn't hear what you said.

14              (Requested portion was read)

15           MR. BRITTAIN:  Thank you.

16      Q    Have you ever thrown away a statement from a

17  witness -- from a suspect before?

18      A    No.

19      Q    How many handwritten notes -- how many pages of

20  handwritten notes did you take in this case?

21      A    I don't know, sir.  I can't answer that.  I

22  don't know.

23      Q    Would you carry notebook paper with you to take

24  notes on when you were in the field?

25      A    No.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 369 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 1, 2023

267

1    Q    Where would you have notebook paper?

2    A    Maybe in a folder that we used to carry.

3    Q    All right.  So you'd carry the folder that had

4    notebook paper in it, right?

5    A    Paperwork.

6    Q    Yeah.  So if somebody gave you an address, you

7    could write it down, right?

8    A    Yes.

9    Q    Would you jot it down?

10   A    Write it down.  Yes.

11   Q    And -- and so you always had your clipboard

12   with you when you were investigating, right?

13   A    Yes.

14   Q    Have you had any contact with Rudy Flores since

15   the -- you spoke to him in April 1993?

16   A    No.

17   Q    What about any of the other witnesses in this

18   case?  Have you had any other contact with them since

19   April of 1993 apart from Onnie Kirk?

20   A    No.

21   Q    Did you talk with the prosecutor about the

22   acquittal of Danny Villegas in 2018?

23        MR. MARTINEZ:  Objection.  Vague.

24   A    No.

25   Q    Did you talk to any other officers about Danny

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 370 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 2023,  Page
268

1  Villegas' acquittal?

2        MR. MARTINEZ:  Objection.  Vague.

3    A    No.

4    Q    Did you attend closing arguments in the 2018

5  trial?

6    A    No.

7        MR. AINSWORTH:  All right.  I don't have any

8  further questions for this witness.

9        You're muted, Lowell.

10                  FURTHER EXAMINATION

11 BY MR. DENTON:

12    Q    Thank you.  If you please and I'll go ahead.

13 Sir, I'm Lowell Denton.  I'm representing the City of El

14 Paso in this case.  Can you tell the jury when you

15 promoted to the rank of detective?

16    A    I think it was in '82, '81, '82.

17    Q    Very good.  Very good.  Tell the jury a little

18 bit about that process.  What did you go through in

19 order to achieve that promotion to detective?

20    A    We had to take a written exam.  They gave us

21 books to study.  We studied and then we took the exam

22 and depended on how you -- where -- where you passed.

23 It -- it would put you in a -- a line or a group.  And

24 depending where you were on that line, got promoted when

25 there was an opening for detective slot.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 371 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 2018
269

1    Q    So it was a competitive examination for the
2  rank?
3    A    Yes, sir.
4    Q    What are the kind of materials that you had to
5  study for that test?
6    A    I remember penal code, city ordinances.  There
7  was a -- some math, English, report writing, some
8  comprehension -- comprehensive work.  Stuff like that.
9    Q    Very good.  And did you study the city policies
10 that related to investigating crimes?
11   A    Yes, sir.
12   Q    All right.  And then did the test that you took
13 cover the materials that you had read?
14   A    Yes.
15   Q    And did you perform well on the examination?
16   A    I would say I performed descent to where I was
17 up the least in the 5, 6 or 7th category.  Something
18 like that.  I don't recall.
19   Q    Very good.  But the people that ultimately made
20 it took promotion, correct?
21   A    Yes.
22   Q    So what made you decide to compete for that
23 rank of detective?
24   A    I had been in patrol for ten years, and I was
25 hoping to get out of shift work.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 372 of 1026
The Deposition of Alfonso Marquez, Taken on May 6/23, Page
270

1    Q    Very good.  Did you have influencers in the

2  department or mentors?

3    A    Yes.  I did.

4    Q    Who are they?

5    A    I had -- that I look up to up to this day, I

6  have at least four.  Rodrigo Gonzalez.  He was in a

7  wheelchair.  Lieutenant John Lanahan, Donald Worsick,

8  and Ernie Amos.

9    Q    All right.  About the time that you took that

10  detective examination, had you learned before that about

11  the investigative process for felony crimes?

12    A    Yes.

13    Q    How did you learn that?

14    A    That was through regular patrol at the police

15  academy [indiscernible] boards of patrol.  I -- at one

16  time, and I don't remember what the date, but at one

17  time though, I was asked to go to CAP, the Crimes

18  Against Persons, down there at Downtown.  And -- by one

19  of my mentors which was Ernie Amos, and I worked with

20  CAP as a patrolman for about two months, and then I was

21  going to work one more month but the city said, no,

22  because then they would have to start paying me

23  detective pay, so I went back to patrol.

24    Q    All right.  And so did that wet your appetite

25  for being a detective?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 373 of 1026
The Deposition of LEONARD MARQUEZ, taken on May 6, 23
271

 1      A    Yes, sir.

 2      Q    By the time that you took the detective exam,

 3  had you studied and learned about the legal rights of

 4  citizens in a criminal investigation?

 5      A    Yes, sir.

 6      Q    The courses that you took after you were

 7  promoted, I'd like you to tell the jury a little bit

 8  about that.  Let's start with how many hours or however

 9  you would best characterize this.  How much learning did

10  you do after you became a detective about how to

11  investigate felony crimes?

12      A    I can't put a number except that I don't recall

13  what number you had to have besides your police work.

14  Your tenure and the number of hours where you get -- you

15  went from basic, intermediate, advanced, and then you

16  made it all the way to -- to master.  Whatever.  Master

17  whatever --

18      Q    All right.

19      A    -- It was as a detective.

20      Q    And you're talking about the state commission

21  that licenses and certifies police officers, correct?

22      A    Correct.  I believe so.  Yes.

23      Q    And -- and the -- and it's currently -- it's

24  currently the Texas Commission on Law Enforcement; is

25  that right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 374 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 05/26/23

272

 1    A    It's the law enforcement.  I don't know if it's
 2  the same one, sir, that you're talking about.
 3    **Q    Okay.  So the certifications you were just**
 4  **talking about, the basic and the intermediate and the**
 5  **master, those are certifications from the State of**
 6  **Texas?**
 7    A    I don't know.  It's -- the academy told me I
 8  had reached that category.  I don't know where.
 9    **Q    Very well.  Now, let's talk about outside**
10  **training that you had outside the academy of the**
11  **department and you're in service work.  What outside**
12  **training have you had in felony investigations?**
13    A    I've been to various homicide schools, child
14  abuse schools, [indiscernible] schools, and various
15  other seminars or schools that I would request to go.
16    **Q    All right.  And -- and are those things that**
17  **you took the initiative to apply for?**
18    A    Yes, sir.
19    **Q    So let's get a little more -- a lit bit more**
20  **detail.  Do you remember the names of any of those**
21  **programs?**
22    A    Just like the kinesic.  The therapy school at
23  the FBI academy.  [indiscernible] was with another --
24  another organization.  In-house cleaning where we --
25  where they send us to the hotel and we had the seminars,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 375 of 1026
The Deposition of Alfonso Marquez, taken on May 6, 23  Page
273

 1  stuff like that, but I do not recall -- the only one
 2  that I signed up for me is kinesic.
 3      Q      What is the name?
 4      A      Kinesic.
 5      Q      Kinesic.  Okay.  Very well.  And where did you
 6  take that?  In El Paso or someone else?
 7      A      No, sir.  I went out to Dallas I believe.
 8      Q      All right.
 9      A      And then I went to New York for another school.
10  That was by invitation only.  I got the invitation.  I
11  had to go outside of the department to get the monies to
12  go to that school because department said they couldn't
13  afford it.
14      Q      All right.  When you attend those courses like
15  that, are they teaching you about the legal requirements
16  for your profession?
17      A      They're more -- they're more teaching you what
18  to look for in investigations and stuff like that, sir.
19      Q      All right.  And did they teach you any
20  compliance requirements to make sure that your
21  confession is admissible in evidence?
22      A      Yes, sir.
23      Q      So you talk about evidence law, correct?
24      A      Yes.
25      Q      At the time that you were investigating this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 376 of 1026
The Deposition of AL FRAKES MARQUEZ, taken on May 6/23,  Page

274

1  case involving Daniel Villegas, what was your level of

2  competence about knowing the legal requirements?  The

3  things that you were required to do?

4       MR. AINSWORTH:  Objection.  Foundation.

5    A   I'd say they were real good.

6    Q   And let me develop that just a little bit.  Can

7  you estimate for the jury the number of hours of

8  instruction that you had taken at that point in time?

9    A   I would say about maybe over 500, 700.

10    Q   Okay.  And you'd been a detective at the time

11  you went to that kinesic class for how many years?

12    A   Seven.

13    Q   Very well.  And in 1993, you'd been a detective

14  for how long?

15    A   Went to the detective division in '82 so four

16  or five years.

17    Q   Very good.  So when you were working up this

18  case, you -- who was your supervisor?  I think you named

19  him earlier in the deposition.

20    A   Dwayne Johnson.

21    Q   Dwayne Johnson; is that correct?

22    A   Yes, sir.

23    Q   And how long had he been in the CAP unit?

24    A   Sergeant.  I don't know how long he had been in

25  there.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 377 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
275

1    Q    All right.  The -- the work that you did, who

2   were the other people that you coordinated with or met

3   with as you worked on this file other than your sergeant

4   and the people that are named as parties in this case?

5    A    That's all I can think of.  Just the people

6   that are -- that are involved and the detectives.  Once

7   in awhile, they're going to ask some -- another

8   detective, hey, can you come with me to find -- find --

9   find a partner or something like that, so they would

10  send -- whoever they would send out to do a -- to take

11  care of function.  So I really don't know how many.

12   Q    All right.  Let's tell the -- tell the jury, if

13  you will, during the course of a business week in that

14  time period, did you have any regular meetings in the

15  Crimes Against Persons unit?

16   A    Yes.

17   Q    All right.

18   A    Yes.

19   Q    Describe those to the jury.  What meetings did

20  you have, and what was their purpose?

21   A    We had to show up to the -- the meeting.  I

22  think it was the hours was 15 minutes before the hour,

23  8:00 o'clock, to discuss what happened the night before.

24  If there was any robberies, if there was any burglaries

25  or whatever, and how was the case going and stuff like

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 378 of 1026
The Deposition of ALFONSO MARQUEZ, taken on 5/6/23   Page
276

1  that.  After everybody got, you know, five, three hours

2  going out, we were shown videos and maybe store

3  robberies armed robberies.  Store's videos.  And then we

4  would all read our assignments, and we would go work.

5      **Q    And in the course of those meetings, did you**

6  **discuss with those colleagues issues or problems that**

7  **you had?**

8      A    As -- as what, sir?  With personal problems or?

9      **Q    Just working -- no.  Not personal problems.**

10 **The work you were doing.  The cases you were developing.**

11     A    We would discuss to what we needed to -- to do.

12     **Q    Okay.  Did you talk about leads and who knew**

13 **people in the community?**

14     A    Yes, sir.  That's correct.

15     **Q    All right.  Now, what about interaction with**

16 **people from the prosecutor's office?  Was that not a**

17 **normal part of your work?**

18     A    I -- the -- we basically stayed out of the --

19 out of the proses other than they would come to us after

20 we had -- they worked the case or finished the case, and

21 they would -- it was kind of like give us pros and cons

22 of a case.  Instead of [indiscernible] care, we messed

23 it up over here and stuff like that.  So they were --

24 they were basically giving us, I guess, lessons.

25     **Q    Okay.  And those lessens, where did they take**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 379 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23
277

 1  place?

 2      A    In the -- in the office.  In the prosecutor's

 3  office.  They would come to our office.

 4      Q    All right.  So the prosecutors would come from

 5  their office, and they would have those meetings to -- I

 6  think you said that they were there to teach you

 7  lessons, correct?

 8      A    Yeah.  Either to let us know, hey, you guys did

 9  good on this case, or if it was vice versa, you guys did

10  really bad on this case.  That's why it was lost.

11  That's why we couldn't prosecute.

12      Q    All right.  And -- and how important was that

13  process to your learning how to do your job correct --

14  correctly?

15      A    It was very important because we were -- they

16  were teaching as our telling us what were -- we were

17  efficient.  [indiscernible] it out.

18      Q    All right.  And -- and did you in that context

19  also talk about the law of evidence?

20      A    What, sir?

21      Q    The law of evidence?

22      A    Yes.

23      Q    Did you talk about what it took to have a

24  lawful confession?

25      A    Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 380 of 1026
The Deposition of CALVIN MARQUISE, taken on May 6/23
278

```
 1      Q    So at that point in your career -- and let me
 2   just back up a minute.  You -- you have denied from
 3   counsels questions during this deposition that you ever
 4   used any physical force against Daniel Villegas; is that
 5   correct?
 6      A    Correct.
 7      Q    And did you know that using physical force
 8   against him would have been a violation of the law?
 9      A    Yes.
10      Q    Did you know it was a violation of -- of city
11   policy if you were to do something like that to get a
12   confession?
13      A    Yes.
14      Q    Were there any people in the CAP unit that
15   didn't know that basic rule?
16      A    I don't --
17           MR. AINSWORTH:  Objection.  Foundation.
18      A    I don't believe there was anybody in the CAP
19   that didn't know that that was a rule.
20      Q    Did you ever hear anybody say anything in the
21   CAP unit that suggested to you or made you believe that
22   they didn't understand that rule?
23      A    No, sir.
24      Q    Now, what about the kind of coercion that comes
25   from telling somebody or threatening somebody that
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 381 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 16, 2019
279

1  they're going to be raped in jail or prison?  Did you

2  know that that was a violation of the law to get a

3  confession by using that kind of coercion?

4      A    Yes.

5      Q    Was there any question that you had a duty or a

6  responsibility to maintain and preserve in your

7  investigative file exculpatory evidence?

8      A    Yes.

9      Q    You knew that that was your responsibility,

10  correct?

11      A    Yes.

12      Q    Among your colleagues when you would have these

13  meetings daily or weekly, were y'all reinforcing each

14  other to make sure that happened?

15      A    No, sir.  I don't -- I don't think so.

16      Q    Okay.  So what was it that made sure it

17  happened?  Was it you by yourself or your supervisors?

18  What was the control if you will?

19      A    Well, we all knew that shouldn't happen.  That

20  we had to -- if any exculpatory evidence that would

21  come.  So we all knew that.  We never discussed, hey,

22  did you do it?  Did you do it?  Or did you do it?

23      Q    Was Sergeant Dwayne Johnson giving you feedback

24  or oversight on that from time to time?

25      A    I don't -- I don't recall, sir.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 382 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

280

1    Q    All right.  So on these allegations that are

2    being made against you and some of your colleagues, did

3    you know that the policies of the department prohibited

4    that kind of conduct?

5    A    Yes.

6    Q    Did you believe for any reason that if you were

7    found actually guilty or responsible for that conduct,

8    that you would be held accountable?

9    A    Yes.

10   Q    Now, what things did you see happen in the El

11   Paso Police Department that showed you that that was

12   truly the department's commitment?

13   A    I haven't seen but I -- I've heard that the

14   people that got fired for various things and then I knew

15   they were wrong.

16   Q    When you had your internal affairs cases that

17   you talked about, did you take them seriously?

18   A    Yes, sir.

19   Q    And even though you weren't afraid, as you've

20   testified to counsel because you believed that you

21   didn't do anything wrong, were you worried about your

22   career?

23   A    Yes.

24        MR. AINSWORTH:  Object to the form of the

25   question.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 383 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 6/23

281

```
 1      Q    So when you were involved in that perjury case
 2  brought by Lawyer Gibson, tell the jury about the
 3  testimony that you gave other than the testimony at
 4  internal affairs.  Where else did you testify?
 5      A    The only place that I remember testifying was
 6  at the suppression hearing.  The suppression hearing
 7  here, and I believe the judge was Judge Paxton.  He
 8  moved the trial to -- he said, no.  Everything goes to
 9  New Mexico.  And then I never had a chance to testify in
10  New Mexico.
11      Q    Now, tell the jury -- I don't know at this
12  point in our trial whether or not the jury will have
13  heard all about a motion to suppress, but just tell the
14  jury what you mean by a motion to suppress.  What is
15  that and how does it work?
16      A    A motion to suppress, the attorney takes the
17  motions up before the judge alleging certain misconduct
18  in the acts in order to obtain that confession, and they
19  wanted to suppress not to be used as evidence.
20      Q    And so Mr. Gibson filed a motion to suppress to
21  try to keep the confession of Debra Wakes from coming
22  into evidence in that case, correct?
23      A    That's correct.
24           MR. AINSWORTH:  Objection to leading.
25                  (Simultaneous speakers)
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 384 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 6/23,  Page
282

 1          MR. DENTON:  What was the objection?

 2          MR. AINSWORTH:  Object to the leading.

 3     Q    So what did Mr. Gibson do in that case for his

 4  client, Debra Wakes?

 5     A    Are you talking after the trial?

 6     Q    No.  No.  I've just reasked the question for

 7  the form objection on leading.  So I'm asking you the

 8  open question.  What did Mr. Gibson do in his motion to

 9  suppress?

10     A    The motion to suppress?  He argued.  I mean, I

11  don't know what -- how to answer that question, what did

12  he do.

13     Q    Very good.  And were you called to testify as a

14  witness?

15     A    On -- on the motion to suppress?  Yes.

16     Q    All right.  And did you -- did you -- did your

17  colleague, Officer -- Detective Flynn, did he also

18  testify?

19     A    I don't believe so.  I don't know.

20     Q    Okay.  You don't know?

21     A    No, sir.  I don't know.

22     Q    And so do you know what the lawyers mean when

23  they say invoking the rule?

24     A    Yes.

25     Q    And tell the jury what that means to invoke the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 385 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6, 23
283

 1  rule.

 2      A     That means that I cannot hear somebody's

 3  testimony if I am going to testify myself.

 4      Q     Okay.  And that's why you don't know what his

 5  testimony was?

 6      A     Correct.

 7      Q     Now, you just told the jury a little bit about

 8  a motion to suppress.  How common is that in the work

 9  that you do?  Does that happen almost never or

10  frequently?

11           MR. AINSWORTH:  Objection.  Foundation.

12      A     That happens almost on every case.

13      Q     All right.  And let me ask a little bit about

14  your background there.  You've been a detective in El

15  Paso for -- you were a detective for decades, right?

16      A     Eleven years, sir.

17      Q     And so for the time that you were there, did

18  you testify in many motions to suppress?

19      A     Yes.

20      Q     And were you frequently at the courthouse?

21      A     Yes.

22      Q     Were you frequently talking to prosecutors

23  about motions to suppress in that courthouse?

24      A     Yes.

25      Q     When you went and testified in those

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 386 of 1026
The Deposition of CALDFONSO MARQUEZ, Taken on May 6, 23
284

1    proceedings, were you learning more all the time about

2    the law of evidence?

3         A    Everyday.  Every time.

4         Q    Did you meet with the prosecutors before those

5    hearings took place to prepare for your testimony?

6         A    Yes.

7         Q    Did any of those prosecutors ever tell you that

8    they thought you were lying or that you had coerced a

9    confession?

10        A    No.

11        Q    Do you remember any case other than Ms. Wakes

12   case where somebody accused you of physical abuse of a

13   subject?

14        A    No.

15        Q    Do you remember any case where you were accused

16   in a hearing in front of a -- a district judge of

17   threatening somebody with being raped in jail or prison?

18        A    Can you rephrase that question?  Because I

19   don't know if you're asking me if an attorney had made

20   comments like that or was I --

21        Q    Yes.  Yes.

22        A    Attorneys, yes.

23        Q    Yes.  And do you ever remember a judge ruling

24   in favor of that claim and against your testimony?

25        A    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 387 of 1026
The Deposition of CALVIN MARQUEZ, taken on May 6/23, Page
285

1    Q    Other than the -- the matter about Debra Wakes

2  that we talked about, do you have any specific

3  recollection of other confessions or witness statements

4  that were suppressed in a case where you were the case

5  agent?

6    A    No.

7    Q    What is your personal belief about an officer's

8  duty to know and follow the law?

9    A    That it should be known and followed.

10   Q    Outside of the department, did you work with

11 other law enforcement agencies doing similar work to

12 your own?

13   A    On my own?  No, sir.  But within the

14 department, the sheriffs department New Mexico, Ontario,

15 yes.  And --

16   Q    So were you able -- were you able to learn

17 about and understand the way they did the tasks that you

18 were doing at the El Paso Police Department?

19   A    Yes, sir.

20   Q    And were you -- did you become familiar with

21 their reports and the way they kept their files?

22   A    No, sir.  Not really.

23   Q    Did you ever get reports from those other

24 agencies and use those in your investigation?

25   A    Just when they helped out with the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 388 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 1, 2020

286

1    investigations.  Yes.

2        Q    Okay.  So were you able to compare notes with

3    colleagues in those other agencies to see how you were

4    doing things?

5        A    No, sir.  I don't think so.

6        Q    All right.  You just didn't get enough of a

7    window into how they were doing things?

8        A    That's correct.

9        Q    In the courses that you took outside of the

10   police department, were any of those taught by people

11   from those other agencies?

12       A    There was -- it was that the instructors -- I

13   don't know what agencies they -- they were, but the

14   detectives that were -- that were there, they've got --

15   they would share their information with us about how

16   they did things and sometimes they would bring something

17   back from there and use it here.

18       Q    Okay.  A lesson or somehow -- some way to

19   improve your operation?

20       A    Correct.

21       Q    And that would be when you went to a seminar

22   and people were there for multiple other agencies?

23       A    Yes, sir.

24       Q    And that included federal agencies?

25       A    Yes, sir.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 389 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page
287

1    Q    The sheriffs office?

2    A    Sheriffs office.  Yes.

3    Q    Texas Rangers?

4    A    No.  I never worked with Texas Rangers.

5    Q    All right.  Department of Public Safety?

6    A    I can't say I worked with DPS.

7    Q    All right.  And I think you earlier alluded to

8  an FBI school.  Did you attend an FBI school?

9    A    Yes, sir.

10   Q    How did that compare to your other

11 instructions?  Was it better, worse, the same?

12   A    It -- it was referenced newsletters,

13 fingerprint taking, and stuff like that.  And it was --

14 it was just to learn those things, and the next time I

15 went, it was for SWAT training.

16   Q    So let me ask you now about information.  You

17 were asked some questions about your supervisors and

18 whether or not they got in the way of your doing your

19 job the way you wanted to do it.  Do you remember that?

20   A    Yes, sir.

21   Q    Did your supervisor ever say or do anything

22 that told you you didn't have to follow the department

23 policy?

24   A    No, sir.

25   Q    Did you ever see any conduct by any supervisors

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 390 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 6/23, Page

288

 1  in the CAP unit that suggested to you that those rules

 2  really didn't apply?

 3      A    No, sir.

 4      Q    Are you aware of any information about coercive

 5  investigative conduct that Chief Skagnow had or knew

 6  about in 1993 or '94?

 7      A    No, sir.  I don't.

 8      Q    Have you heard from anybody else that

 9  information about misbehavior by investigators was

10  passed on it the Chief's office and nothing was done

11  about it?

12      A    No, sir.  Not that I've heard of.

13      Q    Were you ever in a meeting or in a room where

14  there were discussions with the Chief about misconduct

15  and nothing happened?

16      A    No, sir.

17      Q    And did you know Chief Skagnow in those years?

18      A    Yes, sir.  I did.

19      Q    Did you ever run into him or see him socially

20  or professionally?

21      A    I would run into him, and we spoke very nicely

22  together but I've never socialized with him.

23      Q    Do you remember you said earlier that you heard

24  about people getting fired for misconduct in the past.

25  Do you know of any incident where somebody was fired or

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 391 of 1026
The Deposition of CALFONSO MARQUEZ, taken on May 6/23, Page 
289

1   seriously disciplined for any kind of coercive conduct

2   in an investigation?

3       A    No, sir.  I don't.

4       Q    Do you recall ever knowing about or being

5   involved in an investigation by an outside agency of

6   misconduct in the El Paso Police Department?

7       A    No, sir.  A outside agency?  No, sir.

8       Q    All right.  No -- no investigation by the Texas

9   Rangers on an alligation of officer misconduct?

10      A    That I know of, sir, no.

11      Q    All right.  No investigation from the FBI of

12  that -- of that nature?

13      A    No, sir.

14      Q    So going back to the motion to suppress

15  process.  One of the allegations in this complaint

16  against you and your colleagues involves an individual

17  named Steven Alvarado.  Do you remember that name?

18      A    No, sir.  I don't.

19      Q    All right.  And you may or may not remember

20  about this.  I don't have a specific date here but this

21  was a 17-year-old named Steven Alvarado, and there was a

22  motion to suppress in that case alleging that multiple

23  officers, including yourself, verbally abused Alvarado,

24  struck him in the face, refused his repeated request to

25  see a lawyer.  Do you remember a motion to suppress on

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 392 of 1026
The Deposition of ALFONSO MARQUEZ, Taken on May 6/23
290

```
 1  that case?
 2      A    No, sir.  I don't.
 3      Q    All right.  When the motions to suppress would
 4  take place and the court would rule on it, would you
 5  find out about it?
 6      A    Generally.  But I can't say not at all times.
 7      Q    Okay.  And what about when those cases went up
 8  on appeal?  Did you ever find out about what the
 9  appellant results in those cases were?
10      A    No, sir.  We weren't.  Well, we found out about
11  it by word of mouth but nothing coming down in the
12  paper.
13      Q    Okay.  So nothing official, right?
14      A    Correct.
15      Q    And the meeting that you were having with
16  the -- how often did the meetings take place with the
17  prosecutors?  The assistant district attorneys?
18      A    It was every time that we had a major case
19  whether -- then they got to do this or saying -- however
20  the cases were, they would come and let us know how we
21  did, and how -- how bad we did or how good we did.
22      Q    All right.  So -- so on ad hoc, as needed
23  basis, correct?
24      A    Yes, sir.
25      Q    And would you get a -- a feedback in any of
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 393 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2019
291

 1  those cases that had gone up on appeal?

 2     A    No, sir.  I don't believe so.

 3          MR. DENTON:  All right.  Thank you, sir, for

 4  your answers to my questions.  I'll pass the witness.

 5          MR. MARTINEZ:  I assume we're at seven hours or

 6  more?  Yes?

 7          THE REPORTER:  Yes.

 8          MR. MARTINEZ:  Okay.

 9          THE REPORTER:  7:27.

10          MR. MARTINEZ:  Oh, good grief.  We're done.

11          MR. AINSWORTH:  Whose counting?  Does anyone

12  have any questions?

13          MR. MARTINEZ:  Good.

14          MR. BRITTAIN:  No questions from Eric Brittain

15  on behalf of Officer Bellows.

16          MR. ALMANZAN:  And this is Andy Almanzan.  No

17  questions for this witness until the time of trial on

18  behalf of Carlos Ortega.

19          MR. JIM DARNELL:  This is Jim Darnell.  No

20  questions at this time.

21          MR. MARTINEZ:  Ashley, we are done.

22          THE VIDEOGRAPHER:  All right.  We are off the

23  record.  The time is 7:07 p.m.

24              (Deposition concluded at 7:07 p.m.)

25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 394 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 10, 2022
292

```
 1                    CHANGES AND SIGNATURE

 2    WITNESS NAME:  ALFONSO MARQUEZ

 3    DATE OF DEPOSITION:  MAY 10, 2022

 4

 5    PAGE     LINE     CHANGE              REASON

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 395 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2018
293

1          I, ALFONSO MARQUEZ, have read the foregoing
deposition and hereby affix my signature that same is
2    true and correct, except as noted above.

3

4

                          _____
5                              ALFONSO MARQUEZ

6

7    THE STATE OF _____        )

8    COUNTY OF _____        )

9          Before me, _____, on this day
personally appeared ALFONSO MARQUEZ, known to me (or
10   proved to me under oath or through _____)
(description of identity card or other document) to be
11   the person whose name is subscribed to the foregoing
instrument and acknowledged to me that he executed the
12   same for the purposes and consideration therein
expressed.
13         Given under my hand and seal of office this

14   _____ day of _____, _____.

15

16

                          _____
17                           NOTARY PUBLIC IN AND FOR
                             THE STATE OF _____
18

19

20

21

22

23

24

25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 396 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 10, 2022
294

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE
              WESTERN DISTRICT OF TEXAS, EL PASO DIVISION
 2

 3  DANIEL VILLEGAS,           )
                               )
 4       Plaintiff            ) Case No. 3:15-CV-386
                               )
 5  VS.                        ) Hon. David C. Guaderrama,
                               ) District Judge
 6                             )
    CITY OF EL PASO,           )
 7  ET AL.,                    ) Hon. Leon Schydlower,
                               ) Magistrate Judge
 8                             )
         Defendants           ) JURY TRIAL DEMANDED

 9

10  ************************************************************

11                    REPORTER'S CERTIFICATE

12               DEPOSITION OF ALFONSO MARQUEZ

13                       MAY 10, 2022

14

15       I, Ashley Elizondo, Certified Court Reporter,

16  in and for the State of Texas, hereby certify to the

17  following:

18       That the witness, ALFONSO MARQUEZ, was duly

19  sworn by the officer and that the transcript of the oral

20  deposition is a true record of the testimony given by

21  the witness;

22       That the deposition transcript was submitted

23  on _____, to the witness or to the attorney

24  for the witness for examination, signature, and returned

25  to me by _____;
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 397 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2022
295

```
 1            That the amount of time used by each party at
 2   the deposition is as follows:
 3                MR. RUSSELL AINSWORTH-7 HOURS AND 2 MINUTES
 4                MR. LOWELL DENTON- 30 MINUTES
 5            That pursuant to information given to the
 6   deposition officer at the time said testimony was taken,
 7   the following includes counsel for all parties of
 8   record:
 9   FOR THE PLAINTIFF:
10            Russell Ainsworth, Esq.
             Wally Hilke, Esq.
11            Quinn Rallins, Esq.
             LOEVY AND LOEVY
12            311 North Aberdeen
             3rd Floor
13            Chicago, Illinois, 60607
     Telephone: 312-243-5900
14   E-mail: russell@loevy.com
             hilke@loevy.com
15            rallins@loevy.com
16
17   FOR THE DEFENDANT ALFONSO MARQUEZ:
18            James A. Marquez, Esq.
             JAMES A. MARTINEZ PLLC
19            7170 Westwind
             Suite 201
20            El Paso, Texas 79912
     Telephone: 915-543-9712
21   E-mail: martinezja@jmeplaw.com
22   FOR THE DEFENDANT:
23            Andres Almanzan, Esq.
             MOUNCE GREEN MYERS SAFI PAXSON AND GALATZAN
24            100 N. Stanton Street
             Suite 1000
25            El Paso, Texas 79901
     Telephone: 915-532-2000
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 398 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 13, 2020

296

```
 1   E-mail: almanzan@mgmsg.com

 2   FOR THE DEFENDANT:

 3           Jim Darnell, Esq.
             Jeep Darnell, Esq.
 4           Cris Estrada, Esq.
             JIM DARNELL PC
 5           310 North Mesa Street
             Suite 212
 6           El Paso, Texas 79901
     Telephone: 915-532-2442
 7   E-mail: jdarnell@jdarnell.com
             jedarnell@jdarnell.com
 8           cestrada@jdarnell.com

 9   FOR THE DEFENDANT:

10           Scott Tschirhart, Esq.
             Lowell Denton, Esq.
11           RAMPAGE LAW
             2517 North Main Avenue
12           San Antonio, Texas 78212
     Telephone: 512-279-6431
13   E-mail: smtschirhart@rampagelaw.com

14   FOR THE DEFENDANT:

15           Eric M. Brittain, Esq.
             WINDLE HOOD NORTON BRITTAIN AND JAY
16           201 E. Main Drive
             Suite 1350 Chase Tower
17           El Paso, Texas 79901
     Telephone: 915-545-4900
18   E-mail: brittain@windlehood.com

19

20

21           I further certify that I am neither counsel

22   for, related to, nor employed by any of the parties or

23   attorneys in the action in which this proceeding was

24   taken, and further that I am not financially or

25   otherwise interested in the outcome of the action.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 399 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 25, 2022

297

1    Further certification requirements will be

2    certified to after they have occurred.

3    Certified to by me this 25th day of

4    May, 2022.

5

6

7

8

9    Ashley Elizondo, Texas CSR No. 9465
     Expiration Date:  2/28/2024

10

11

12

13

14

15

16

17    FURTHER CERTIFICATION

18    ---------------------------------------------------------

19    The original deposition was/was not returned

20    to the deposition officer on

21    _____;

22    If returned, the attached Changes and

23    Signature page contains any changes and the reasons

24    therefor;

25    If returned, the original deposition was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 400 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 25, 2022

298

1   delivered to _____, ALFONSO MARQUEZ;

2         That $_____ is the deposition

3   officer's charges to the PLAINTIFF for preparing the

4   original deposition transcript and any copies of

5   exhibits;

6         That a copy of this certificate was served on

7   all parties shown herein.

8         Certified to by me this _____ day of

9   _____, 2022.

10

11

12

13

14                    Ashley Elizondo, Texas CSR No. 9465
                     Expiration Date:  2/28/2024
15

16

17

18

19

20

21

22

23

24

25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 401 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 13, 2022
299

## Exhibits

**Exhibit 1_
Marquez** 4:12
63:11,15

**Exhibit 2_
Marquez** 4:13
68:12,14 69:18
76:9

**Exhibit 3_
Marquez** 4:14
93:13,18
183:14

**Exhibit 4_
Marquez** 4:15
99:21,23 100:1,
22,23 102:15
183:14

**Exhibit 5_
Marquez** 4:16
106:3,5,12,14

**Exhibit 6_
Marquez** 4:17
107:22,24
114:13 115:11
116:25

**Exhibit 7_
Marquez** 4:18
126:4,6

**Exhibit 8_
Marquez** 4:19
130:10,14
131:21

**Exhibit 9_
Marquez** 4:20
131:13,14,19
132:18

**Exhibit 10_
Marquez** 4:21
132:16 136:12,
14

**Exhibit 11_
Marquez** 4:22
136:13 139:4,5

**Exhibit 12_
Marquez** 4:23
139:2 140:14
170:25 250:6

**Exhibit 13_
Marquez** 4:24
140:13 144:15

**Exhibit 14_
Marquez** 4:25
144:13 163:25
164:1

**Exhibit 15_
Marquez** 5:1
163:22 166:5

**Exhibit 16_
Marquez** 5:2
166:4 177:15

**Exhibit 17_
Marquez** 5:3
177:13 184:9

**Exhibit 18_
Marquez** 5:4
184:7 205:25
206:18

**Exhibit 19_
Marquez** 5:5
205:23 213:5

**Exhibit 21_
Marquez** 5:7
214:4 218:19

**Exhibit 22_
Marquez** 5:8
218:10 249:19

**Exhibit 23_
Marquez** 5:9
249:17 257:23
258:12,14

**Exhibit 24_
Marquez** 5:10
257:22

**Exhibit 25_
Marquez** 5:11
259:12,13,14
261:24,25
262:6

**Exhibit 26_
Marquez** 5:12
261:23

## $

**$2,000** 244:4
**$5,000** 243:11
244:6

## -

**--testify** 113:21

## 1

**1** 63:11,15
**10** 97:7 132:16
136:12,14
140:17
**100** 7:9
**1010** 6:10
**10269** 136:21
**10:00** 130:17
**10:30** 108:23
114:18 115:16
**10:41** 42:8,9
**10:42** 42:9,11
**10th** 6:11
137:16 139:19
185:6
**11** 31:2 43:11
44:9 46:15
136:13 139:4,5
**115472** 262:7
**11:00** 137:5
190:21
**11:19** 114:15
**11:23** 68:8,9
**11:33** 68:9,11
**11th** 95:2
**12** 139:2 140:14
170:25 245:17
250:6
**12:05** 206:9,12,
16 207:9

**12:15** 139:16,
19 140:8,18,25
141:3 143:19,
20 145:22
**12:18** 139:8,11
**12:20** 141:3,12
143:19,20
145:22
**12:22** 141:12
**12:26** 206:2,5,
19 207:3,6,16
**12:30** 145:2,17,
22
**12:43** 113:11,
12
**12th** 130:18
**13** 140:13
144:15
**130** 172:21
**133** 174:2
**14** 144:13,16
163:25 164:1
**141** 172:18
**14th** 259:3
**15** 43:6 61:6
118:7 133:19
163:22 166:5
217:16 245:16
258:20 259:2
275:22
**15673** 137:3
**15674** 137:3
**15681** 126:7
**15737** 106:13
**15738** 106:13
**15th** 114:15
258:20
**16** 43:7 80:1
166:4 177:15
**16-year-old**
59:10
**169,000** 241:10
**17** 36:10 177:13

184:9
**17-year-old**
289:21
**18** 176:3 184:7
205:25 206:18
**19** 78:1 190:19
205:23 213:5
**1967** 23:6
**1971** 24:19
25:1 27:22
**1991** 263:13
**1992** 63:13
68:15
**1993** 32:1,16,
17,22 33:1,17
45:3,8 46:8
60:9 65:24
68:24 72:5
93:16 95:2
98:7,13,16
130:2 139:19
140:17 162:4
171:5,10 217:1
218:21 248:21
249:2 258:21
259:3 263:14
267:15,19
274:13 288:6
**1994** 161:5
168:6 190:4,18
254:22
**1995** 97:3 98:7,
12,16,19,22
**1997** 34:25
**1:00** 137:15,16
**1:30** 113:7
**1:45** 113:7
**1:51** 113:12,14

## 2

**2** 68:12,14
69:18 76:9
**2,000** 241:22
244:2,3
**2,500** 244:3



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**20** 102:16 113:4 213:2 214:6 249:18

**2000** 216:25

**2003** 242:7

**2011** 78:1,7 118:3,5,20,23 172:17 174:24 176:2

**2014** 36:8

**2018** 267:22 268:4

**2022** 6:12

**208** 176:2

**21** 214:4 218:14,19 220:22

**21488** 63:16 64:5

**21489** 65:16

**21490** 67:7

**21491** 63:17

**21495** 68:18

**21502** 68:20 69:2,18

**21505** 68:18 76:9

**21st** 130:2 162:4 171:5

**22** 102:17,21 103:3,15 218:10 249:19

**22nd** 137:19 171:10 206:16 216:25 218:21 263:13

**23** 249:17 257:23 258:12, 14

**23rd** 97:3

**24** 257:22

**24-hour** 73:12 74:8

**24/7** 130:7

**25** 13:1,5 172:21 259:12, 14 261:25 262:6

**26** 261:23

**26th** 258:16

**284** 161:9

**287** 190:19

**29th** 258:21 259:3

**2:49** 148:15,16

_____

**3**

**3** 93:13,18 174:2 183:14

**30** 13:1,5 20:22 241:16

**34** 107:25

**340** 107:25 255:5

**34457** 164:5

**34625** 99:24

**364** 107:25

**3:02** 148:16,18

**3:15-CV-386** 6:17

_____

**4**

**4** 78:10,11 99:21,23 100:1, 23 102:15 183:14

**4,000** 241:23

**40** 20:22 118:6

**40,000** 241:16

**401K** 243:3

**40202** 6:11

**440** 102:17

**484** 97:6

**4:11** 139:25

**4:13** 190:12,13

**4:25** 190:13,15

_____

**5**

**5** 106:3,5,12,14 269:17

**500** 274:9

**5249** 171:6

**53** 78:8

**54** 78:8,11 80:1

**5700** 160:6,8 162:6,20 197:22

**5:25** 128:14 232:6

**5:35** 128:14

**5:58** 214:15

**5th** 248:21 249:1

_____

**6**

**6** 97:7 107:22, 24 114:13 115:11 116:25 269:17

**600** 214:17 241:21

**627** 99:24

**629** 99:24

**67** 23:12,13

**68** 23:12

**6:00** 216:9

**6:07** 258:7,8

**6:19** 258:8,10

**6:30** 231:6,8

_____

**7**

**7** 65:16 126:4,6 161:10

**7.02.012** 76:10 77:5

**70's** 183:16

**700** 274:9

**71** 24:19

**730** 6:10

**76** 64:6

**7:07** 291:23,24

**7:20** 166:7,9

**7:27** 291:9

**7th** 269:17

_____

**8**

**8** 78:1 130:10, 14 131:21

**80** 184:12

**80's** 145:13

**80s** 27:17,24 28:4,6,16 29:2

**81** 268:16

**82** 126:7 268:16 274:15

**89** 242:6

**8:00** 275:23

**8:30** 193:25

**8th** 78:7 118:3, 5 161:3,4 172:17 174:24 176:2 190:3,18 254:22

_____

**9**

**9** 131:14,19 132:18

**90s** 27:16,18, 25 28:1

**911** 106:19

**93** 60:14 242:5, 7

**94** 288:6

**97** 9:23 43:9 242:4,5,7

**98** 9:23

**9:30** 184:21

**9:49** 6:12

_____

**A**

**A-L-F-O-N-S-O** 9:1

**A-N-G-E-L** 17:15 56:21

**a.m.** 6:12 42:8, 9,11 68:8,9,11 130:17 137:15, 16 139:8,16,19, 25 140:8,18,25 141:3 143:19, 21 206:2,5,9, 12,16 207:6,9, 16 214:15 216:9

**abdomen** 172:24

**ability** 11:2 113:21

**Abraham** 147:5,6

**absolute** 39:15 251:2

**abuse** 272:14 284:12

**abused** 289:23

**abusing** 239:17,23 240:16,23 241:2

**abusive** 246:25 247:4,5, 16 248:12

**academy** 25:1, 3,5 27:19,23 270:15 272:7, 10,23

**access** 127:4 129:15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 286-2  Filed 05/26/23  Page 403 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 18, 2022

301

accident 50:18,24

Accommodations 232:13

accord 158:9

account 243:25

accountable 280:8

accounts 152:22 243:3,4, 18,20

accuracy 78:18 79:10

accurate 61:17

accurately 11:3 113:22 167:14

accusations 48:10,14

accuse 48:15, 25 49:5,9 111:9,22 164:20,25 165:8,15 208:18 209:1

accused 48:20,24 84:4 165:2 234:7 251:24 252:7, 16 284:12,15

accusing 111:21

achieve 268:19

Acosta 94:20, 21,22

acquittal 267:22 268:1

act 125:4

acting 50:24

acts 281:18

ad 290:22

add 125:17

additional 28:12,15,18 57:10,18,20 178:25 203:4,7

address 267:6

adequate 19:17 54:11

admissible 67:10 273:21

admission 47:10

adult 64:20 65:11

adults 54:5,9 63:10 64:10,17, 21 194:18

advance 212:5

advanced 271:15

advise 227:17

advised 160:5 249:15

affairs 58:15 233:25 234:3, 10,15,17,22 235:7 236:5,8, 15,25 237:10, 14,20 238:1,4, 11,17,18 239:9, 14,25 240:15 248:7 280:16 281:4

affect 11:2

affecting 113:21

affidavit 193:24 257:24

afford 273:13

afraid 280:19

afternoon 113:22 232:6

age 11:24 13:8

agencies 285:11,24 286:3,11,13,22, 24

agency 24:21 289:5,7

agent 44:2 249:6,11 285:5

aggravated 44:25

aging 11:5

agree 8:3 40:20 59:9 72:20,22 79:1, 4,9,13,17 98:18 119:1 125:24 144:6,10 170:7, 9 172:23 174:13 227:20

agreed 113:24 143:7

ahead 20:12 47:13,14,21 48:23 65:9 71:12 74:4 188:17 203:5 214:13 268:12

Ainsworth 6:22 8:4,18 41:19,22,24 42:5 63:19,22 64:5 67:5 72:22 77:4,6,11 78:5 97:3 108:8 113:6 115:3 149:5,10,14 174:23 190:8, 10 258:5 268:7 274:4 278:17 280:24 281:24 282:2 283:11 291:11

airborne 24:3

Ajax 147:6

Alfonso 6:13 8:1,3,14,24 100:19 136:15

allegations 280:1 289:15

alleged 17:11, 12 244:20 245:21 250:10

alleging 281:17 289:22

alligation 289:9

allowed 73:11 74:7 218:18 238:7 245:9,19

allowing 76:13

alls 41:10

alluded 287:7

Almanzan 7:1 72:12 75:11 76:5,21 77:2,5, 9 116:8 117:18 291:16

along.' 78:4

alter 54:8 247:20

altered 219:3 238:3

Alvarado 289:17,21,23

Alvarez 204:4

Amendment 235:4

Amos 270:8,19

amount 112:2

Andy 7:1 291:16

Angel 17:13 56:19

angry 56:25

answering 257:9

answers 79:2 118:8,18,19 173:25 176:15 291:4

Antonio 7:7

anxiety 50:5,8

anymore 133:25 216:19 231:16

apartment 128:3

Apartments 184:25

APD 195:11

apologies 171:16

Apparently 124:1

appeal 290:8 291:1

appearance 6:19

appearing 6:23,24 7:2,7, 12,19

appears 128:7 173:1,10

appellant 290:9

appetite 270:24

apply 272:17 288:2

appointment 128:9

approval 70:17,21 71:2, 21 72:2

approving 94:20

approximately 15:14 17:1 18:6 19:8 27:6 114:18 115:16 190:21 241:13 244:4

approximation 46:20

April 95:2 114:15 130:2, 18 137:16,19 139:19 140:17 162:4 171:5,10 185:6 206:16 216:25 218:21 260:6 263:13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 404 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 13, 2022
302

267:15,19

**arbitrations**
245:17

**Arbogast** 7:15
18:20 31:13
33:4,8 248:17

**area** 82:19
143:13 201:16

**argue** 247:24

**argued** 282:10

**argumentative**
75:11 76:5
117:19 165:17
183:6

**arguments**
268:4

**arm** 56:11,17,
22 57:2,3,13,24

**Armando**
95:12 131:17
132:21 133:6,
11,12,13,14,17,
21,22 134:5,7
173:12 174:4,
13

**Armando's**
132:22 133:10

**armed** 276:3

**army** 23:14
24:2

**arrest** 65:7
187:23

**arrested** 211:4
245:24 263:2,4

**arrived** 137:14
139:1 190:21
207:16

**Ashley** 6:8
196:1 250:1
291:21

**ass** 102:1,7
105:8,22

**assaulted**
112:12

**assaults**
44:16,24,25

**assets** 244:5

**assign** 96:18

**assigned** 25:6,
8,11,16,20
26:6,11,15,23,
24 29:3,4,7,18,
19,22 31:5,11
33:13,15 35:6,8
44:8,15,18
96:7,9,12
244:24

**assignments**
276:4

**assistance**
117:6

**assistant** 44:2
290:17

**assisted** 46:16
196:18

**assisting**
43:25 92:10
197:4

**assume** 10:23
225:16 291:5

**Assumes**
236:11 237:2

**assuming**
199:6,7 227:15

**assumption**
97:17

**atmosphere**
73:14 75:5,6,10

**attack** 82:2

**attend** 25:1
28:22 268:4
273:14 287:8

**attendance**
7:3

**attended** 24:10

**attending**
6:19,20

**attention** 32:3
170:10,16,20,
23 171:19,22
255:4

**attorney** 20:3,
5 82:1 84:3
89:24 90:1
111:5 234:7
237:6 281:16
284:19

**attorneys** 82:6
89:23 91:9
200:25 284:22
290:17

**audible** 149:1

**audio** 6:3
15:18 16:5
60:10 263:17

**August** 97:3

**authorized**
247:2

**autopsy**
172:14,22
173:2,3,11
179:15 227:12,
18,21,25

**Avenue** 130:23
131:8

**average**
243:24 244:2

**avoid** 40:21
51:5 55:3
199:14

**award** 232:14

**awards**
232:11,18

**aware** 41:12
52:5 64:12
110:22 193:9
229:20 235:19
239:16,19,22
249:2,3 257:16,
21 288:4

**awhile** 275:7

———

**B**

**baby** 127:17
129:3

**babysat** 128:8

**babysitting**

127:12,14,15
129:2

**back** 12:13
32:22 33:1
36:14 42:2,4,
10,19 53:10,15
58:3,11 60:9
65:23 68:10,24
72:5 73:6 74:15
80:22 93:16
96:24 98:12,16,
19 113:1,13
118:20 128:9
133:19,20,24
138:12 140:24
147:2 148:17
152:16,21
173:20,22
179:17 186:9,
18,21 187:1
190:14 191:20
195:24 196:24
201:9,13,19,21
205:10,14,16
209:12,14
215:18 217:23
227:8 245:1,4,
5,6,7 247:25
250:1 253:3,4,
11 255:23
258:9,13
270:23 278:2
286:17 289:14

**background**
283:14

**bad** 84:16,19
135:3 144:15
146:12 277:10
290:21

**bailiff** 35:18

**balance**
243:24 244:2

**ball** 238:15

**banging** 228:9

**bank** 243:18,20

**bar** 34:14,17

**Barnes** 6:7

**Barrio** 185:23

**base** 23:21

178:11

**based** 13:3
27:8 40:4 81:4
82:3 86:23,24
159:25 247:19
250:14 259:24

**basement** 61:7

**basic** 170:18
210:10 232:14
271:15 272:4
278:15

**basically**
25:22 64:25
78:23,25 80:1,3
90:25 91:13
276:18,24

**basing** 119:23

**basis** 73:12
74:8 290:23

**bat** 211:19

**Bates** 63:16
64:4,5 65:15
68:17 99:23
106:12 107:24
126:6 137:2
164:5 184:11
262:7

**bathroom**
54:12 190:7
258:4

**beat** 207:24

**bed** 145:5

**bedroom**
191:20 192:4

**beef** 148:21,23

**beer** 185:11,13

**began** 106:14
166:23 167:3
202:14

**begin** 10:9
40:11

**beginning**
242:6

**behalf** 7:2,11,
15 8:4 60:8
291:15,18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 405 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 2022
303

**beige** 183:24

**belief** 13:7,19, 20 40:10 124:22,25 125:1,2 142:25 146:19 178:12 285:7

**believed** 13:14 132:13 151:8 280:20

**believes** 146:11

**Bellows** 7:12 139:6 291:15

**belonged** 146:14,15 167:9 224:5

**Ben** 137:5

**benefit** 50:11

**bent** 186:12

**Betty** 138:8

**big** 124:11 125:4

**bigger** 63:23 124:14,17

**billed** 236:6,7

**bills** 244:2

**bit** 100:11 126:16 268:18 271:7 272:19 274:6 283:7,13

**black** 32:19 120:15 166:19 180:9,11,14,21 181:4 182:4,7

**Blockbuster** 106:15,17,18

**blocking** 114:25

**blocks** 136:24

**Blondish** 32:2

**blood** 135:3 146:12

**Blucher** 131:25

**blue** 246:12

**BMW** 242:7

**board** 35:18

**boards** 270:15

**body** 173:10 174:16

**bombard** 208:25

**bonds** 243:1

**books** 268:21

**Boomerangs** 127:2,6 184:13, 16,22 186:16

**bottom** 69:2 94:12 99:25 100:3 115:14 117:1 147:2

**boy** 41:23

**boyfriend** 145:9

**boys** 109:12,16 114:4 119:13 124:23 125:3,9, 17,20 130:23 131:7 224:14

**brag** 124:16

**bragging** 123:17 124:6,7, 13 125:21,23 150:23 151:2,4, 9 156:17 171:24 181:16

**break** 9:3 67:4 108:5 113:16 146:25 148:12 190:7 258:3

**breaks** 54:12

**briefly** 37:23

**bring** 65:4,11 70:11 72:8 77:24 78:1 195:21 209:14 264:18 286:16

**Brittain** 7:11 78:3 174:21,25 266:12,15

291:14

**broke** 8:21 113:24 133:16 226:18

**brother** 134:2 144:22 145:16, 24 146:3,6,8,16 148:21,23 152:17 156:21

**brother-in-law** 156:17,20

**brought** 53:7 60:13 70:16 73:2 99:13 109:12,15 149:23 155:10 188:25 192:12 204:19 281:2

**build** 32:22

**building** 29:10, 14 30:18,20 34:15,18 196:24 201:9, 14

**bullet** 173:4,14 174:4 175:11 178:18,20 228:17

**bunch** 66:22 110:14

**burglaries** 275:24

**business** 74:2 275:13

**businesses** 104:16 106:19

**busy** 44:4,5,6

**buy** 245:19

———

**C**

**caliber** 28:25 103:3,15

**call** 30:20 46:2, 9 106:19 153:16 205:25 208:25 214:8 247:25 249:20

**called** 101:1,4 129:6 137:15 153:15 189:12 282:13

**calling** 155:4

**calls** 10:5 116:8 119:16 136:5 196:6 251:6,7,15,16 260:9 262:19, 24 263:5

**calm** 57:1 156:2 157:13, 15,16

**camera** 41:19, 21,25

**CAP** 56:13 57:7 60:14 109:3 114:21 117:4,6, 14 270:17,20 274:23 278:14, 18,21 288:1

**Captain** 262:4

**car** 25:12,17,18 101:22 105:12 106:24 107:6 122:4,15 127:2, 4 130:19,20,22 131:7 138:1 141:2 145:12, 21 146:3 152:14 166:19 175:20 176:6,9, 21,22 177:5,7 178:2,5 179:19 180:2,6,9,11, 14,21,23 181:4, 11 182:1,6,9 183:16 184:25 185:1,21 186:24 187:4,5 194:25 195:20 198:16,18,19 200:4 209:24 213:6,10 220:24 224:4, 18 225:11,12 226:16,20,23, 24 247:2 263:9, 14 264:23

**card** 111:3 191:1

**care** 44:18 259:18 275:11 276:22

**career** 123:10, 14,18 248:10 278:1 280:22

**careful** 48:25 52:3 53:5 92:17

**Carlo** 132:9 183:17

**Carlos** 7:2,4 106:6 291:18

**carry** 90:8 266:23 267:2,3

**carrying** 233:17

**cars** 25:15 120:10 180:19 199:24 201:17, 20,21 263:11, 13

**carts** 61:6

**case** 6:17 13:25 17:8 22:16,18 35:6, 8,13 40:23 41:5 43:15 44:2,7,20 62:2 83:21 84:13 90:13,14, 23 92:22,23 96:13,18 97:18 99:19 121:1 123:16 134:15 137:11,14,18, 19 141:5 147:14 151:22 158:3,7 160:11 169:21,24 182:1 185:13 197:9 222:18 232:23 233:8 234:8,9,16 235:24 238:4 239:12,23 246:3 248:4,18, 20 249:11 250:17 254:8, 16 266:20 267:18 268:14 274:1,18 275:4, 25 276:20,22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 406 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 13, 2022
304

277:9,10 281:1,
22 282:3
283:12 284:11,
12,15 285:4
289:22 290:1,
18

**cases** 35:11
43:23 44:7,16,
23 45:6 46:12
230:19,22
233:2,5 234:5
276:10 280:16
290:7,9,20
291:1

**casing** 175:12

**casings** 175:8,
11,14,17
178:22 179:7
223:11 227:4

**category**
269:17 272:8

**caught** 79:24

**Celi** 145:8

**cell** 259:2

**center** 196:21
214:10

**certificates**
243:16

**certifications**
272:3,5

**certifies**
271:21

**cetera** 6:4

**Chacon's**
147:6

**chair** 56:12,25
210:14,17

**chance** 113:15
148:7 168:25
281:9

**change** 88:6
116:16,17
159:7 218:5
219:9 234:4
247:23

**changed** 74:21
88:3

**Chaparral**
100:15 120:3
121:18

**chapter** 68:16

**characterize**
271:9

**charge** 92:13
156:3 252:19

**charged**
137:19 170:5
253:10 260:6

**charges** 59:2
92:9,10,19 93:2
252:19,22

**charging**
57:19

**Charles**
131:24 132:2,
13

**Charlie** 31:13
33:11,23 34:1,
5,8,19 114:6
202:18 203:2
214:14

**chase** 176:10,
22

**chased** 101:24
102:6 105:7,12,
20 106:23
107:6 122:4,15
164:16 167:5
175:2 176:7,9
178:2 179:16
226:9 227:23
228:2

**chases** 178:5

**chasing**
175:21,22
176:21 228:25

**check** 245:6
255:23

**checked**
145:20 178:18
255:24

**checking**
243:21,25
244:3 255:8,15

**checklist**
172:23 173:3,
11 227:21,25

**checks** 241:18

**chest** 56:12,18,
23 57:13

**Chevrolet**
242:4

**chewed**
247:15

**Chicago** 6:23,
25

**Chief** 288:5,14,
17

**Chief's** 288:10

**child** 69:22
77:18 247:1
272:13

**children**
242:15,16

**choice** 86:7,15

**choose** 67:8
86:13 89:5,7
201:13

**choosing**
86:24

**cigarettes**
61:6

**circumstance**
40:6

**circumstance
s** 93:5

**citizens** 271:4

**city** 6:14 7:7
26:12,16,19,22
29:12 63:16
64:6 65:15 67:7
68:18 76:9
106:13 110:22
126:7 137:3
244:19,21
245:9,20
268:13 269:6,9
270:21 278:10

**civil** 30:10

**civilian** 246:19,
22

**claim** 284:24

**claimed** 259:6

**claiming**
216:11

**class** 44:24
274:11

**classes** 24:10,
12,15

**cleaning**
272:24

**cleared** 123:17
150:6,7 151:10
152:9,11

**click** 254:25
258:13

**client** 7:4 282:4

**clients** 7:15

**clipboard**
267:11

**clock** 141:2
145:20 255:1

**close** 163:24
200:8

**closed** 81:20
106:19

**closing** 268:4

**cloth** 186:2,18
224:2

**code** 269:6

**coerced** 284:8

**coercion** 51:5,
10 55:5 278:24
279:3

**coercive**
51:12,17,20
54:4 288:4
289:1

**Cohen** 138:5

**coincided**
103:25

**coincidence**
249:4

**coke** 209:1,2

**cold** 35:6,8,11,
13

**colleague**
282:17

**colleagues**
276:6 279:12
280:2 286:3
289:16

**collections**
243:11,12

**college** 24:9,
10,13

**color** 32:18
132:10 179:19

**colors** 179:21
180:19 181:15

**commencing**
233:14

**commendatio
n** 232:20,21,25
233:4,7

**comments**
284:20

**commission**
271:20,24

**commit** 103:14
239:1

**commitment**
280:12

**committed**
50:22 67:17
122:16 132:14
147:19,21
154:24 165:3
211:13 212:21
213:15,18
214:25 215:2,
24 222:13
224:14 237:9
249:24 250:10,
12,22 251:5,14,
25 252:8,17
253:8,15,19,24
254:6

**committing**
151:2,9 164:20
211:22 212:9,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 407 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 2019

305

12,16 215:12
239:8

**common** 13:2
283:8

**communicate**
83:8,16

**community**
24:10,13
276:13

**compare**
286:2 287:10

**compete**
269:22

**competence**
274:2

**competitive**
269:1

**complain** 58:7,
9

**complainant**
247:17

**complained**
58:10

**complaint**
235:8 236:16
238:6,12,13,15
240:1,15,23
245:11 246:16,
22,25 247:18
289:15

**complaints**
238:18 246:20
249:5

**completely**
110:8

**compliance**
273:20

**comprehensio
n** 269:8

**comprehensiv
e** 269:8

**computer**
37:25 77:24
94:15 95:3,9,10
129:15 203:13,
15,17,20,25

**concern** 75:4
218:11 236:25

**concerned**
134:21 143:9

**concerns**
68:16

**concluded**
117:6 291:24

**conclusion**
116:18

**condition** 11:2

**conduct** 38:2
42:23 43:17
73:18 75:8,18,
23 76:2 208:16
209:4,7 240:2
263:8 280:4,7
287:25 288:5
289:1

**conducted**
38:5 43:2,12,20
46:24 48:13
49:8,24 69:3,8,
12 169:15

**conducting**
47:18 60:15
66:20 67:20
257:2,17

**confer** 196:14

**conference**
6:13 16:17

**conferred**
188:3

**conferring**
188:9

**confess** 59:20
60:6 213:22

**confessed**
59:16,23 61:21,
24 204:16
205:21 206:6,
10,14 207:10
210:23 211:2,9,
11,21 212:8,12,
16,18

**confessing**
50:12 124:4,8
231:11

**confession**
47:18 51:3 55:1
60:19 61:17
64:2,14,19
65:18,19 66:2,
4,5 67:22 69:20
70:22 73:7,19
74:20,25 75:1
123:9,20,22
207:18 208:22
211:5,7 212:19
213:4 214:24
218:2,13,20
219:22 220:23
222:7 225:2,4,
23 226:8,13
227:22 228:2
230:17 233:2
251:9 273:21
277:24 278:12
279:3 281:18,
21 284:9

**confessions**
47:1 52:6
54:15,17 63:1
65:18 109:24
123:13,15
208:17 215:5,7,
21 223:16,20
232:19,22,23
251:4 253:14
285:3

**confirm** 71:20

**confirmation**
72:6

**confirmed**
72:25

**conflict** 147:12

**conform** 69:10
70:2 72:14

**confused**
124:20

**confusion**
207:21

**connected**
172:10

**connections**
6:3

**cons** 276:21

**considered**
31:14

**consistent**
223:16,21,24
226:17,21
227:16

**conspired**
213:21

**constitution**
119:15

**constitutional**
111:5 119:11

**contact** 99:5
153:4,7 263:1
267:14,18

**content** 246:12

**contents** 91:25

**context** 277:18

**Continue**
20:11

**control** 91:11
279:18

**convened** 6:12

**conversation**
47:5 120:4,8
122:9 126:19,
21,24 154:8,11
157:7 159:25
196:22 197:2
205:5 222:23
256:18,21,24
257:12 259:6,
10,21 261:15

**conversations**
205:7

**cool** 101:19

**cooperate**
112:13 159:18

**coordinated**
275:2

**copy** 90:8
110:23 264:4,9

**corner** 200:11,
12,13

**Corpus** 78:6

**correct** 12:5,19
13:13,16 16:2,4
17:21 28:2
39:16 40:8
53:8,22,23 61:9
62:10,15 65:13
70:10 72:11
73:4 77:21
78:19,20,21,22
80:5 83:1 84:21
87:20,23,24
91:17,24 94:7,
9,10 97:10
98:13 101:15
102:23 104:7,
20 105:4 107:9,
21 108:18,22
109:1,5,14
110:6 114:2
118:22,25
126:3 127:5,8,
22 128:1,4,12
131:22,23
140:19,22
141:11,14,16
143:17,22
144:5 146:17,
18 147:17,20
149:19,20
156:6 157:9
159:3,10,11
163:17 168:5,
17 171:20
173:4,5 174:5,6
176:8 177:2
178:1,4,19,21,
24 179:2,6
180:3,5,8,10
181:3,20,21,24
182:3,8,14,22
183:22,23,24,
25 192:14
193:15 198:2
199:20,22,25
200:2,18,21
204:15,18
205:19,22
206:8,10,14
207:8,20 211:8,
10,12 213:13,
19 214:21
216:22 218:6
219:21 223:2,3
226:15 227:1,6
228:19 234:21
245:13 259:3,4

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 326-2  Filed 05/26/23  Page 408 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 2019

306

260:2,5 261:17
269:20 271:21,
22 273:23
274:21 276:14
277:7,13 278:5,
6 279:10
281:22,23
283:6 286:8,20
290:14,23

**correctional**
24:21

**correctly**
277:14

**corroborate**
60:19 61:8
67:21 92:25
222:9,13,18

**corroborated**
173:3

**corroboration**
52:22,25 60:16
61:17 222:5

**Corvette** 242:7

**Cougar** 133:22

**counsel** 6:21
77:4,11 280:20

**counsels**
278:3

**counting**
291:11

**country** 36:19

**county** 9:21
29:10 35:16,17
36:6,11 241:22
242:14 257:19,
25 258:15

**couple** 34:10
136:24 139:12

**courses** 37:7
271:6 273:14
286:9

**court** 6:9,16
8:8 10:4,15
19:4 35:19
37:11 76:14
80:22 82:8
144:16 183:10
195:24 255:11

290:4

**courthouse**
35:21 108:7
242:14 283:20,
23

**cousin** 156:21
157:17 164:15
166:17

**cover** 269:13

**covered**
186:11

**covering**
123:4

**crashed** 146:3,
9

**create** 89:1
110:16 260:20
266:6

**created** 6:6
27:8 84:24
85:17 93:16

**credibility**
82:2

**credit** 123:16

**crew** 66:15

**crime** 37:1
39:9,11,13,14
48:15 49:10
50:23 53:1,2,6
60:25 61:1,24
62:2 69:16
77:18 94:5
103:13,14
114:1 116:7
119:13 121:3,
14,25 126:1
135:1 141:6
143:12 144:2
147:19 148:21
178:13 214:25
215:3,4 226:17,
21,22 260:7
263:3

**crimes** 29:5,8,
11,20 90:15,19
115:21 155:18,
21 269:10
270:11,17
271:11 275:15

**criminal** 54:18
92:9,10,13,18
271:4

**Cris** 7:21

**criteria** 96:17,
20

**cross-
examine** 82:15

**cross-
examined**
82:10,19

**cruising**
166:22

**cubicle** 155:24
156:15

**cubicles**
155:22

**culpable** 50:23

**Cumulative**
169:1,3

**curiosity**
105:15

**curse** 55:24

**cursed** 56:3

**cursing** 55:19

**custody** 57:18
69:19 91:22
258:15,17

**cut** 49:12,16
166:24

———————

**D**

**DA** 99:24
107:25 164:5
262:7

**daily** 279:13

**Dallas** 38:4
273:7

**damage**
178:18,20

**dancing**
127:18

**Daniel** 6:14

166:17 171:11
176:10,20
194:5 207:17
274:1 278:4

**Danny** 72:15,
24 73:1 95:11
96:5 103:17
104:4,8 128:5
130:4 156:22,
25 157:6,17
158:16,23
162:23 163:1,3,
14,18 164:8
167:15 168:19
169:8,9 184:18,
21 185:12
186:2,5,13,17
187:1,3,23
188:4,16
189:12 191:11,
20 192:9,12,18
193:1,5 194:3,
7,12,21,25
195:1,4,20
197:12 200:4
201:19 202:10
204:1,6 205:20
206:1,5,9,12,16
207:9,24 210:6,
13,19,22
211:16,21
212:5,8,11
213:6,10,15,20
216:8 218:8,20
219:14,18
221:3,23
222:12,18,22
223:4 224:1,4,
11,17 229:8
231:19,25
252:20,22
253:7,10,13,19,
24 254:6,15
255:9,16
256:18,21,24
257:20 258:19
259:7,16 260:6,
11,15,21 261:3,
8,9,10,12,13,
19,20 262:12,
16 263:9
267:22,25

**Danny's** 127:6,
9 128:10 189:4,
8,9,15,19,21

191:21 192:25
197:4 201:7
220:23 228:24

**Darnell** 7:14,
18,22 9:5
108:4,10 113:2,
9 190:5,9 258:3
291:19

**database**
195:13,16

**date** 15:12 36:9
56:10 95:1
96:25 118:4
131:17 140:3,6,
7,12,17 171:4
270:16 289:20

**dates** 14:13,17
95:1,5 259:24

**David** 95:14
153:4,8,24
154:9,12,14
156:14 157:6,
12 158:6,9,16,
19,22,25 159:1,
3,5,12,15,18,
20,23,25
160:22 161:13,
24 162:11,17
163:18 164:2,
20 165:15,22
166:1,6 167:14,
19 168:10,12,
15 175:22
188:2,4 222:13,
19,23 232:9
260:24

**day** 6:11 14:18
15:9 26:13,14
86:11 105:19,
20 140:17
143:10,11
145:4 195:14,
17 218:21
270:5

**days** 14:16,19
245:16,18
246:15 258:20
259:2

**dead** 135:6,14
141:25

**deal** 92:4

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 409 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 18, 2022

307

192:23

**death** 142:7,17

**Debra** 281:21
282:4 285:1

**debt** 28:14

**decades**
283:15

**deceive** 87:18

**December**
161:3,4 190:3,
18 254:22

**decide** 269:22

**decided** 195:3

**decides**
237:14

**decision** 84:19
116:21 195:1

**defendant** 7:2,
12 16:3 63:16
64:6 67:7 68:18
72:20 76:9
87:15 190:24

**defendant's**
190:22

**defendants**
7:22 21:6 72:21

**defense** 65:15
82:1,6 84:3
106:12 126:7
137:3

**degraded**
100:9

**degree** 24:13,
14 232:15,16

**delay** 69:21

**demeanor**
155:25 157:11

**denials** 49:17

**denied** 49:6,
10,17 76:16
77:8,14 278:2

**Denton** 227:9
235:25 236:11
237:2,12 252:2
268:11,13

**282:1 291:3**

**deny** 49:13

**denying** 50:12

**department**
24:18,21 26:13
28:12,21,23
30:12 34:14,24
35:15 62:18,22
63:5 64:1 65:23
69:23 70:12,17
71:3 73:12
74:1,3,7,11
75:9 78:13
93:20 100:20
101:1 171:13
202:2 204:20,
24 232:12
234:1,3,4 238:1
244:12 245:12
246:17 270:2
272:11 273:11,
12 280:3,11
285:10,14,18
286:10 287:5,
22 289:6

**department's**
68:23 280:12

**departments**
34:18 84:5

**depended**
37:17,18,21,22,
23 268:22

**depending**
268:24

**depends** 45:4
52:11 63:3

**depict** 16:21
17:10

**depicted** 262:2

**deposed** 9:15

**deposit** 243:16

**deposition**
6:1,13 10:1
13:22 14:25
15:11,19,25
16:9 17:17
19:14,21,24
20:2 63:15
68:15 183:15

**185:4 212:6**
250:6 274:19
278:3 291:24

**Derrick** 133:4

**descent**
269:16

**Describe**
275:19

**describing**
11:22

**description**
181:11

**desk** 66:20
90:20,21,23,24
153:17,24
201:24 245:24

**destroy** 86:7

**detail** 116:5
159:14,16
272:20

**details** 121:2
209:16,17,21,
23 210:3

**detective**
15:23 27:7,15
28:7,8,10,11,
13,16,19 29:2,
18 30:2,14
42:23 43:2,6,24
44:4,21 45:3,8
46:7,25 49:16,
24 50:20 51:24
53:5 55:17,21,
24 58:2 59:19,
22 65:23 66:8
70:3 73:22,25
81:25 82:8
87:22 88:14
92:5,17 100:19
101:7 105:16
117:12,21
134:24 136:15
142:13 144:19
145:6 155:13
161:13,19
176:12 181:25
188:12 194:25
196:19 202:18
204:4 215:11,
17 222:17

**230:4,5 232:16**
240:1,3,4,16,19
241:1 248:14,
15 251:3,22
258:11 260:21
268:15,19,25
269:23 270:10,
23,25 271:2,10,
19 274:10,13,
15 275:8
282:17 283:14,
15

**detective's**
90:21 155:22

**detectives**
18:9 31:12
45:10,12,15,23,
25 66:16 83:12
91:19 92:3
109:3 114:20,
21 115:21
117:4,5,14
160:11,15
196:14 199:18
200:14 230:17,
24 244:24
245:20 249:13
275:6 286:14

**detention**
75:14 214:10
258:16

**determine**
69:24 88:5 91:5
96:17 107:13

**determined**
109:21

**develop** 274:6

**developing**
276:10

**Diamond**
185:12

**difference**
39:21 124:7

**differentiate**
29:16

**differently**
262:9

**difficult** 10:14

**digging** 163:5

**digitized** 19:2
142:2

**dinner** 244:25
245:1,3,20

**direct** 78:8
160:15 168:13
255:4

**directed**
160:22,23
162:12 167:18
232:8

**direction**
104:10 177:6,8
198:19 225:9,
11,12,25

**directions**
198:14

**directly** 98:3
195:22 214:19

**Dirt** 132:5
134:2

**disagree**
194:24

**discipline**
236:8 237:10,
21

**disciplined**
235:24 236:14,
18 237:1
240:11,12,22
241:2 246:19,
22 289:1

**disconnect**
42:1

**discovery**
67:16

**discuss**
275:23 276:6,
11

**discussed**
22:8 244:6,9
279:21

**discussions**
288:14

**dispatched**
139:9



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 410 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 2018
308

dispose 85:1,2
86:13

disposing
86:11

distinct 89:25

distortions 6:3

district 6:16
26:24 29:10
35:18 89:23
91:9 284:16
290:17

districts 26:24

division 6:17
25:7,9,21,24
26:10,22 27:1,
3,5 29:13,19,25
30:1 33:14,15
35:11,12
108:14 114:21
115:21 117:3
187:14 234:11
274:15

divisions 24:3
25:16,19 29:14

doctor 11:12,
15

document
13:23 37:8,20
81:15,21 82:23
93:15 99:23
107:24 115:6,9
120:21 126:6
127:1 137:2
142:4 170:19,
22 206:1 207:2
219:17 220:10
251:23 266:3

documentatio
n 250:9 266:6

documented
107:19 147:12
172:11 250:19
252:6 260:23

documenting
110:20 112:18
170:18

documents
14:1 93:16

dollars 241:21

Donald 270:7

door 167:4
187:4 189:10

doors 189:11

downstairs
246:6

downtown
29:9 30:16
197:7 270:18

dozen 19:11

DPS 287:6

dragging
116:18 120:3

drawer 245:24

drinking 145:4

drinks 34:10

drive 57:15
198:8 205:13

driveby 101:21

driver 187:2

drives 132:8

driving 57:13
130:19,22
131:6 151:14
178:6,8 179:20
185:2 186:24
198:2 201:11

Droopy 95:23
185:9 211:14,
17 212:9,13,17
213:7,9,11,22
214:7,8 216:17
231:19,20,21
250:20

dropped 132:9
137:5 138:8

drove 137:6
138:4 201:22
225:15 227:2

drugs 246:11

dude 133:8

dudes 145:25
146:4

due 6:2

duly 8:15

dumpster
104:22 106:17

duty 279:5
285:8

Dwayne
274:20,21
279:23

_____

E

Ear 18:20

Earl 7:15 33:3

earlier 104:4
121:23 213:8
215:16 274:19
287:7 288:23

early 27:16,17,
18,24 28:4,16
29:2 214:5

ears 186:12

ease 47:6 48:1

easier 250:6

east 138:13

eat 113:3,19

ECH 146:1,3,4,
17

Eddie 184:20,
21

Edgemere
133:5

educational
24:6

effect 244:19

efficient
277:17

El 6:15,16 7:2,
4,7,9,13,16,20,
23 24:17,23
29:10 34:23
35:14,16 42:23
62:18,21 63:5
64:1 65:22
68:22 93:19

100:20 101:21
232:11 234:1,4
238:1 244:12
257:25 258:15
268:13 273:6
280:10 283:14
285:18 289:6

electric 97:11,
15,19,23
130:23 131:8
132:5 138:14,
18,22 141:1,9
143:18,20
154:17 210:14,
17 225:13,15

electronic
185:6,9 211:23
212:24 213:17
214:22 249:23
250:11,21

Eleven 43:8,9
283:16

elicit 47:10,17,
22

eliciting 47:24

eligible 40:2

Elizondo 6:8

else's 14:24
18:18 44:11
77:24 92:23

email 113:7

employee
257:25

EMS 139:8

end 19:1 87:10
91:3,4,6,10,15
213:3 226:10
244:1

ended 135:14
141:24 142:6

ends 135:6

enforcement
24:20 271:24
272:1 285:11

England
95:12,15,18,21,
24 96:1,4,8

103:2 111:10
133:6

England/lazo
262:8

English 269:7

enjoying 36:16

enlarge 63:18
148:4

Enrique 96:2
213:7

ensuing 73:18

entered 23:12
26:13 27:6

entire 30:2
248:10

entirety 147:11

Entrance
173:7

entries 173:19,
21

entry 172:23
173:4,10,13,15,
17,18 174:4

episodes
183:1

Eric 7:11 108:5
291:14

Ernie 270:8,19

establish
41:10 47:3
174:3

established
70:7 176:5
207:19 229:21
230:4

establishing
67:12 210:6

estimate 274:7

Estrada 7:21

et al 6:15

evening
193:25

event 125:24
194:2,20

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 411 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2018
309

196:12

**events** 98:6,16
164:12

**eventually**
234:17

**everyday**
34:22 44:9,21
284:3

**evidence** 37:1
40:15,16 41:15
47:13,21 49:19,
21,25 50:1
60:18 67:9
69:14 72:13
175:6 179:10
196:6 226:17,
21,22 227:10
228:13,20
229:5 236:12
237:3 244:18
245:22,23,25
246:5,6,8,9
263:20 264:5,
10,13 273:21,
23 277:19,21
279:7,20
281:19,22
284:2

**exact** 36:9
46:14 56:10
120:6

**exam** 27:7,9
30:8 268:20,21
271:2

**examination**
8:17 268:10
269:1,15
270:10

**examined** 8:15

**examiner**
227:16,18

**examples**
67:12

**excessive**
238:20,22
239:1

**exchange**
92:22

**excluding**
65:17 66:3

**exclusion**
41:14

**exculpatory**
84:12 279:7,20

**Excuse** 37:10
39:23 107:25
195:23 205:14
206:20

**exhibit** 63:11,
15 68:12,14
69:18 76:9
93:13,18 99:21,
22,23 100:1,22
102:15 106:3,5,
12,14 107:22,
24 114:13
115:11 116:25
126:4,6 130:8,
10,14 131:13,
19,21 132:16,
18 136:12,13,
14 139:2,4,5
140:13,14
144:13,15
163:22,25
164:1 166:4,5
170:25 177:13,
14,15 183:14
184:7,9 205:23,
25 206:18
213:2,5 214:4,6
218:10,19
249:17,18,19
250:6 257:22,
23 258:12,14
259:12,13
261:23,24
262:6

**exhibits**
130:12 144:16

**exist** 49:22
50:2

**exit** 173:14,15,
19,22

**expect** 250:8

**experience**
11:21 13:3 24:7
42:23 45:5
46:9,10 88:13

**experienced**
45:3,7

**explain** 214:3

**explanation**
116:6 125:25
141:22 142:4,
16 152:4,8,19
213:25 224:13
252:5 255:21

**extraneous**
6:4

**eyewitness**
176:4 181:8

**eyewitnesses**
179:24 226:25

———

**F**

**fabricating**
239:20

**face** 59:1
220:24,25
289:24

**facility** 24:22
73:12 74:7
75:14 258:16

**facing** 92:9,18
93:2 156:3

**fact** 8:3 88:9
145:10,17
167:24 193:4
222:6 226:1,2,
16,20 227:2
251:3,13
252:10,12,13

**facts** 40:23
47:13,20 53:2,
6,15,18,19,21
67:11,12 114:1
116:7 119:14
121:14,16,20,
25 126:1
180:17,20
181:22,25
225:19,22
227:9 236:11
237:2

**fade** 78:15 79:7

**faded** 256:13

**fading** 146:25

**failed** 230:14

**fair** 10:24,25
44:22 78:12,16,
17,24 80:2
97:17 105:25
173:9 234:1

**Fairbanks**
106:15 137:6
177:11,12,18,
22,25 178:2,6

**fall** 41:2,12

**false** 49:19,25
52:6 54:14,17
55:1 60:5 87:3,
5,17 123:9,13,
19,22 124:2

**falsely** 151:9
235:20,23

**familiar** 62:17,
21 63:2,4,25
64:9 68:22
285:20

**family** 156:21

**Farrar** 132:20

**fast** 208:11

**father** 191:19,
21 194:23

**fault** 115:2

**favor** 284:24

**FBI** 272:23
287:8 289:11

**fear** 236:15,18
237:20

**feared** 237:25

**February**
34:25

**federal** 108:6
286:24

**feedback**
279:23 290:25

**feel** 19:23
22:17 47:6 48:1
124:11 237:5

**feeling** 237:23

**fell** 186:4

**fellow** 83:12,16
248:3,7

**felonies** 44:24
45:1

**felony** 44:20
263:3 270:11
271:11 272:12

**felt** 150:8
152:11 197:3
236:21

**Fernando**
95:23 214:7

**fewer** 43:21

**field** 266:24

**fields** 94:4 95:2

**Fifteen** 217:16

**fight** 133:16,21
134:18,19

**figure** 12:15
125:14

**file** 85:18,21,23
86:2,8 90:9,13,
14,24 91:1,6,
11,15,23 92:1
107:15 109:9
119:5,8,14,21
151:22 238:13
251:23 252:6
260:25 275:3
279:7

**filed** 238:15
240:7,13 245:8
281:20

**files** 107:16,17
249:7,11,14
285:21

**filing** 248:25
249:5

**fill** 209:14

**filled** 18:11

**final** 248:18,20
249:20

**financially**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 326-2   Filed 05/26/23   Page 412 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 10, 2022
310

242:22

find 39:2,6 46:4
47:23 48:3
61:3,12 62:3
67:21 86:20
87:22 107:4
134:14 143:1
150:13,16
151:17,20
171:21 187:11,
14,17 195:5,14,
16 209:18
215:19 220:1
225:18 228:14,
16,17 229:21
230:4 250:17
254:3,15
260:22 263:9,
14 275:8,9
290:5,8

finding 67:13,
14 195:18

fine 9:6

fingerprint
287:13

fingerprints
28:25

finish 19:5
168:24 208:8
220:25 221:1
227:3 244:1

finished 10:13
19:3 24:11
58:22 128:10,
16 221:3,12
229:1 276:20

fire 186:3

fired 104:11
179:1 186:10
220:19 221:23
223:5,9 225:20
280:14 288:24,
25

firm 7:22

fit 40:23
180:17,20

five-eight
32:5,21

five-nine 32:5,
21

flip 10:22 161:4

floor 256:24
258:20,23,25
259:2 260:3

Flores 130:19
132:5,20 133:7
134:3,7,12
135:17,20
136:18,20
142:15 144:22
147:16 148:19
150:14 151:6,
10,13 152:9
267:14

Flores' 140:24

Flynn 282:17

focused 40:17

focusing 40:22
41:13

folder 267:2,3

follow 31:16
40:15 41:6
73:21,24 74:16
76:18,24 77:13
78:4 198:21
285:8 287:22

food 54:11

force 56:5,8,11
57:12 59:6
238:20,22
239:1 278:4,7

Ford 242:8

forget 11:7,25
12:3 87:9
197:16,19,23,
24

forgetting
11:22

forgive 99:6

forgot 245:25

form 39:18
77:20 150:18
196:5 206:21,
23 280:24
282:7

formal 64:15

fought 133:16

found 60:19,24
67:11 175:8,12,
14,17 179:7
195:9,10 213:1
214:18 216:8
223:11 227:4
254:10,11
259:16 260:14
280:7 290:10

foundation
47:13,21
117:18 119:17
150:19 165:7,
12 251:8,16
262:18,23
274:4 278:17
283:11

four-door
187:5

fourth 22:14

Francisco
144:22

free 193:16

freeway 138:5,
12

freezing 6:4

frequently
283:10,20,22

fresher 98:7

Friday 21:11,
14,16 22:11,12
130:23 131:8
145:5

friend 102:15,
20 128:8 133:3
163:14,15

friend's 61:6,7
127:17 128:6

friends 122:16
132:22 133:11,
20 163:2
168:19 169:8
265:10,12

front 125:4,6,7
153:17,23

164:17 172:13
173:19,22
174:5,14,16,21
178:22 179:12,
14 186:21,25
187:3,4 198:18
199:11,12
200:13 201:24
227:8,19,22
228:1 284:16

full 7:25 26:7
91:25 122:10

fuller 159:14,
16

function
275:11

funds 242:24
244:19,21

fuzzy 41:20

———————
G
———————

gage 102:17

gang 146:1,3,9,
10,13,14,15,17,
20 148:22,23
164:7,11
187:14 259:17

gaps 219:25

Garcia 35:24
36:3

gas 138:10

gather 40:5
70:11 88:22

gathered
204:2

gave 23:12
79:2 84:19
103:23 110:8
118:8 120:1,9
122:7 158:11
186:18 205:10
211:5 221:10
224:23 226:6
231:7 234:24
235:11 245:6,
18 267:6
268:20 281:3

general 230:23

generally
66:17 98:18
290:6

generate 94:1

generated
94:15,16 95:3

generates
95:4,7

gentleman
121:17

gentlemen
187:21

Georgina
154:3,5,7

Germany
23:18,21

Gibson 281:2,
20 282:3,8

girl 145:7

girlfriend
127:6,9

girls 132:3
185:16

give 42:2 46:17
52:5 53:18
58:14 60:5
64:13,23 65:3,8
70:23 71:12,13,
16,21 72:1,3,7
76:11,14 86:21
87:3 91:6,8,20
108:21 111:3
115:2 118:18,
19 149:12
173:25 174:7,
10 176:15
191:3,6 202:13
204:23 205:11
207:18 210:17
216:21 217:4
234:20 238:13
247:8 248:3
255:12 276:21

giving 66:2
72:2 87:17
100:19 122:11
232:21 276:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 326-2 Filed 05/26/23 Page 413 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 2019
311

279:23

**glasses** 12:15
32:6,24 33:1

**goal** 51:2

**gold** 130:21

**gold-ish** 180:6
181:2,13 182:2,
13 183:17,20

**Gonzalez**
95:17 126:13,
18,20,23
128:19,22
129:1,18,23
130:1 162:7,9
166:2,18 171:4
184:19,20
189:4,15,18,20
210:23 211:11
212:16 231:20,
25 232:6,8
260:25 266:10
270:6

**Gonzalez's**
253:14

**Gonzalo** 35:24

**good** 27:21
32:15 67:4,19
68:3 72:20 76:1
84:10,16,19
113:6 141:22
142:3 145:5
149:17 151:16
268:17 269:9,
19 270:1 274:5,
17 277:9
282:13 290:21
291:10,13

**grabbed** 186:1

**graduate**
22:24 23:3,5,7

**grand** 145:13
236:3,6

**grasses** 12:14

**Graves** 7:15
18:20 31:15,17,
19,22 130:15
131:2 132:19
160:18,23
161:14,19

162:12 167:18,
21,25 168:3,7,
8,13 196:19
197:6,8 248:17
249:1,19,21

**gray** 130:20
132:9 133:22

**greater** 243:10

**green** 145:12
184:24

**grief** 291:10

**ground** 9:25
186:4

**group** 268:23

**grown** 242:20

**guardian**
76:13

**guess** 28:11
86:4 94:20
113:4 116:21
188:11 276:24

**guilt** 49:21 50:2

**guilty** 40:11
103:17,20
280:7

**gun** 103:4,7
167:9,10,11
186:1,2,3,6,14,
17,21 220:17
221:6,15,16,18,
21,23 224:2
243:11

**guns** 101:22
102:16

**gunshot**
172:24 173:6

**Gurrola** 101:4

**guy** 98:2,24
99:3 122:10
164:6 186:7,9
212:22,23
213:7,11,16
214:9 254:12

**guy'** 97:9

**guys** 123:1
132:4 154:16

157:17 164:7
166:20 171:23
184:25 185:1
186:4,5,15,17
199:2 200:17,
19 210:8
212:21 213:6,
10,14 214:1
215:11,12
245:3 265:4
277:8,9

---

**H**

**Habeas** 78:6
118:4

**hair** 32:2,18

**half** 202:22,23,
24

**hall** 100:6,12,
14 101:11,14,
17 102:15,20,
22 105:5,6,15
113:25 121:18,
21

**hand** 8:8

**handbook**
63:13

**handed** 186:2

**handgun**
102:21 103:3,6,
8,14

**handguns**
102:17

**handle** 96:20
192:17 193:1,2

**handling** 193:5
234:15

**hands** 237:16,
18

**handwriting**
100:22 126:8,
10 128:21
218:14,22,25
219:1,8,10

**handwritten**
84:20,23 85:1
86:2 114:7

158:15 164:2
266:19,20

**happen** 12:10
58:19 59:17,24
66:11 111:25
116:22 221:8
279:19 280:10
283:9

**happened**
13:5 48:6 51:25
52:1 53:20
57:16 58:20,21
59:2 61:23
81:21 82:25
83:24 98:7,13
99:2 101:24
104:1 110:3,5,9
116:15 122:7,
17 134:8
138:22,24
139:11 140:20,
25 141:7
143:19 153:20
158:25 187:9
189:7 205:2
208:7 209:8,11
219:23 220:3,6,
9,15 259:7
275:23 279:14,
17 288:15

**harassment**
156:3

**hard** 13:4
18:25 63:21
88:17

**hardcore**
146:2

**hassle** 248:1

**hassling** 200:1

**hated** 145:25

**head** 59:10

**headquarters**
30:22,24 31:1

**hear** 9:2,6 20:4
30:23 53:11
64:8 101:19
113:18 115:4,6
147:25 149:2,4,
6,9,13 175:23
184:3 196:2

205:6 266:13
278:20 283:2

**heard** 40:13
98:4 130:18
132:2 152:22
264:1 280:13
281:13 288:8,
12,23

**hearing** 14:16
18:13,15 77:23
78:7 79:25 90:6
108:7 113:4
118:4,6 149:3
175:6 235:20
260:13 281:6
284:16

**hearings**
284:5

**heck** 105:18

**Hector** 7:16

**held** 280:8

**helped** 45:12
285:25

**helpful** 88:5

**Hernandez**
18:3,5 105:11
137:22 138:17
175:2,21 176:3,
21 177:10,16,
24 179:3 180:1,
24 181:12,22
182:6,9 183:21

**Hernandez's**
179:23 182:20

**heroin** 246:13

**hey** 45:25 46:1
67:3 87:13
124:10 146:24
275:8 277:8
279:21

**hid** 106:16,17

**hidden** 67:23

**hide** 252:10

**high** 22:24
23:3,5,7,8 24:6
200:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 414 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2022
312

hired 24:17
25:1

hit 186:9

hoc 290:22

Hold 42:4
47:12 115:1

holes 82:1,3,17
228:17

hollering
112:4

home 59:16,24
89:19,21
128:11 133:18
141:12 145:1,2,
10,11,17,22
148:24 152:17,
18 190:22
195:11 241:7,9,
11 243:8 246:1
265:4

homeboys
165:23 166:19,
22 167:10

Homework
128:2

homicide
28:24 29:18,23,
25 30:1,7,15
31:5,11,20,21,
25 33:5,14,15,
21 34:4 35:1,3,
10 36:24 37:19
43:15,23,24
44:4,10,15,17,
21 45:10 230:5
272:13

homicides
37:20 43:14
44:14,22 45:2

honest 97:16

hope 60:5

hoping 269:25

Horkowitz
108:24 114:19
115:17 205:12,
15,17,18 207:1
253:3,4

hotel 272:25

hour 21:15,22,
24,25 113:5
202:22,23,24
275:22

hours 116:23
214:5,17 271:8,
14 274:7
275:22 276:1
291:5

house 104:15,
20 128:6,10
130:7 133:4
137:4 141:10
146:5,11 147:6
149:24 152:13
164:17 167:3,5
175:9,17,25
176:22 177:5,7
178:6,8,14,18,
20,22 179:12
189:3,4,8,9,15,
19,21 190:25
191:10 192:12,
16,20,25 194:4
197:4 198:3,11
199:1,5,8,11,13
200:13,15
201:7 226:14
228:18 242:20

housed
258:18,19,22,
23,25 259:1,25
260:1

houses 178:16

hundreds
43:2,4

hung 96:5

Huntsville
255:7

hurt 133:1,2

_____

I

_____

ID 94:20

idea 24:15
67:19 68:3 76:1
117:21 158:13
185:18 210:10
261:10 265:14

identification
63:11 68:12
93:13 99:21
106:3 107:22
126:4 130:10
131:19 132:16
136:13 139:2
140:13 144:13
163:22 166:4
177:13 184:7
205:23 213:2
214:4 218:10
249:17 257:22
259:12 261:23

Illinois 6:23,25

implicated
249:22 251:4,
13 253:7,18,23
254:6

imply 112:11

important
36:25 37:3,6,19
62:25 78:19,21
79:10,14 82:23
84:9 88:15
104:25 170:11,
14 184:15
259:5,9 277:12,
15

impossibility
231:12

impossible
215:25

improper
196:13

improve
286:19

In-house 28:20
272:24

in-person
108:7

inaccuracies
6:6

inaudible
14:19 113:17
114:25 131:15
142:20 210:9
214:8 220:23
245:10 252:4

inaudibles 6:5

incarcerated
185:5,8 195:6
211:23 212:22
213:16 249:22
250:11,20
253:14 254:13,
15 255:9,16
257:19,20

inception
137:12

incident 40:6
238:8 288:25

include 88:18
89:6 159:16

included 67:11
119:13 286:24

including
81:19 212:4
289:23

income
241:17,19
242:11 244:8

inconsistent
226:24 227:4,7,
22 228:1,24
229:4

increase 50:5

independent
153:21,22

indicating
97:14 111:4

indiscernible
6:5 23:17 30:18
36:8 38:7 41:16
71:24 92:14
96:19 99:15
104:23 116:19
117:23 124:11
153:17 160:2
175:9 188:12
198:12 202:9
213:19 236:2,3,
6 245:4 246:1
247:1 249:8
264:6,21 265:5
270:15 272:14,
23 276:22
277:17

individual 86:4
172:24 289:16

individuals
53:25

inducements
50:10

inexperienced
46:7,10

influencers
270:1

informants
92:4

information
39:4,24,25 40:6
47:24 52:9,12,
15 60:17 61:8
62:3 67:22 71:9
84:10,11,13
87:3,5,17,22
88:18,22 92:17,
22 93:1,4,6,10,
11,22,23 94:1,
5,13 100:16
101:2,8,12,14
104:5,8 105:3,
14 122:11,20,
23 126:13
129:8 148:19
150:20 160:5,
21 162:15
163:7,11 204:2
219:14,17
222:19 225:5,7
286:15 287:16
288:4,9

initial 25:15
179:1 219:9,10,
11 245:16
246:25

initially 29:21
88:15

initiated
245:11 246:17

initiative
272:17

injuries 17:11,
12 58:7,9

innocent 87:6,
18



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 326-2  Filed 05/26/23  Page 415 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 19, 2022

313

inserted 235:4

inside 28:20
56:6,9,18,23
59:6 125:6
141:15 155:20
192:3 196:25

instruct 231:1

instruction
274:8

instructions
287:11

instructors
286:12

instrument
67:16

insure 52:8,20

intake 69:23
70:17,22 71:8,
10,19 72:6,25
73:8 74:14
108:19 195:22
203:6,10
204:25 205:3,9,
10 206:2,13,17,
19,25 207:3
253:3

intends 69:20

intent 36:18
87:18

intention
36:14

intentionally
121:14 194:2

inter 47:11

interaction
162:3 276:15

intermediate
232:15 271:15
272:4

internal 58:15
233:25 234:3,
10,15,17,22
235:7 236:5,7,
15,24 237:10,
14,20,25 238:4,
6,11,17,18
239:8,13,25

240:15 248:6
280:16 281:4

internet 6:3

interpretation
40:3

interrogate
40:9 47:4
193:10 208:3

interrogated
38:20 39:10,16
72:15 176:4

interrogatee
39:15

interrogating
40:5 66:12
73:22,25

interrogation
38:16,18 39:22,
23 40:11 42:14
47:7,9,18,19
48:1,4,5,9 50:5
51:3,6,12,13,
14,20 54:1,8
59:11 60:10,15
65:12 67:20
68:22,24 69:1,
3,7,11 73:18
75:9,23 76:2
208:21 230:17,
24 239:17
240:2,17,24

interrogations
28:25 38:2,10
42:24 43:3,12,
18,21 46:24
48:14 49:9,20,
25 55:4,8 63:1
66:20 75:19
208:4,16,24
209:4,7

interrupt 72:19

interview 37:4,
18 39:21,25
47:4 87:1
105:10 107:1,
20 109:19
129:17 132:19
214:7 253:1
257:2,17

interviewed
106:25 107:1,3,
9 109:17
129:19,22
151:21

interviewing
15:22 129:21,
24

interviews
28:24 38:2,9
115:12

introduce
264:22 265:6

introduced
261:20

inventoried
265:18,25

investigate
38:19 39:2,9,
11,13,14 40:25
41:5,17 87:21
96:7 149:19,22
150:1 169:24
234:18 238:3
271:11

investigated
58:13 123:17
142:18 152:10
171:24 234:5
236:2,5,16
238:4 250:9
263:22 264:19

investigating
39:7 44:14
58:12 60:24
69:15 92:3
135:1 182:1
202:8 222:17
234:25 236:25
238:12 267:12
269:10 273:25

investigation
37:7,9,18
40:19,25 41:6,
18 58:17,19
81:13,16 82:3
83:17,25 88:9
91:3,4,7,11,16
103:21,22
148:25 152:12
160:1 169:14,

19 170:11,18
187:18,19,20
195:7,8,10
196:8,10
208:16 213:1
216:8 244:22,
23 247:6,13
254:9 262:8
263:8 264:7
271:4 285:24
289:2,5,8,11

investigations
37:20 150:8
272:12 273:18
286:1

investigative
70:6 75:13
270:11 279:7
288:5

investigators
288:9

invitation
273:10

invoke 111:4
282:25

invoking
282:23

involved 47:23
111:17 130:22
131:2,7,11
214:19 216:10,
11,12 275:6
281:1 289:5

involvement
109:22 160:12
163:19

involves
289:16

involving
274:1

issue 11:13,16
212:20

issues 11:6
12:17,20,23
37:25 276:6

item 39:24

items 243:10

**J**

Jacob 99:6
108:1 109:7,12
110:1,17
112:19 114:8,
17 115:13
116:2

jail 57:17 58:4,
11 112:12,16
255:10,17
257:19 259:25
260:1 279:1
284:17

jailhouse
73:14 75:4,6,10
92:4

Jake 101:20

Jamaica
137:5,6,7,8,24

James 257:24

Jauregi 99:7,9,
10,11,12

Javier 134:2
144:22,25

Jeep 7:14,19
9:5 108:4,10
113:2,9 190:5,9

Jefferson 23:8

Jesse 18:3,4
105:10 106:16
176:3 177:16,
24 179:3

jewelery
243:11

Jim 7:8,18
21:1,4 22:5
258:3 291:19

JIS 70:9 74:2,
12,15,20,25
75:2,13,15,19
108:13 196:8,
10,20 197:6,12
200:7 201:23
202:12,19
203:3 204:21,
22 205:14,16
217:14 252:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 326-2 Filed 05/26/23 Page 416 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 23, 2022
314

253:1

**job** 40:1 233:18 247:21 277:13 287:19

**Joe** 34:14,17

**John** 34:14,17 97:22 270:7

**Johnson** 96:11,12,16 107:14 116:5 121:13 188:6, 11,13,14,15 274:20,21 279:23

**Johnston** 97:9,19,23 98:1,23 99:2,6, 17 101:12,14 102:16,21 105:6,19 106:22 107:5,8, 9 108:2 109:7, 12 110:1,17,23 111:1,4,7,9 112:6,9,11,19 113:25 114:3,9, 17 115:13 116:2 118:9,10, 12,21 119:4,12, 20,24 120:1,5, 8,21 121:11,16, 19,24 122:2,14, 16,22,25 123:11,23 124:15,22 150:24 226:5

**Johnston's** 107:20 110:25 111:3 116:6 123:7

**joking** 156:25 157:6

**Jose** 138:1 145:9 151:12, 17,21,24 152:5

**Jose's** 145:12

**jot** 267:9

**jotted** 190:25

**JPD** 69:23

73:6,11,19 74:6 75:14 108:17 217:23 253:5

**JS015779** 184:12

**Juan** 106:6 176:6 177:24

**Juarez** 145:9 151:17,21,25 152:5

**Juarez's** 138:1

**judge** 35:20, 22,23 73:2 74:14 108:24 109:16 114:19 115:17 205:12, 15 206:25 253:3,4 281:7, 17 284:16,23

**judges** 35:25 36:2,4

**judging** 43:1 141:8

**Judy** 264:17

**Julio** 31:13

**July** 258:16 259:21 260:1,8

**Jump** 127:20, 24 129:6

**jumped** 57:23 133:22

**jumps** 209:13

**jury** 18:10 236:3,6 268:14, 17 271:7 274:7 275:12,19 281:2,11,12,14 282:25 283:7

**justice** 54:18

**juvenile** 68:23 69:3,7,11,19,22 70:3,6,12,15,16 71:1,3,10,17, 20,22 72:2,7,8, 9 73:6,14 74:2, 12 75:4,5,9,10, 12,13,23 76:2,

11,13,18,25 77:19 171:12 197:12 202:17 204:19,24 214:10,19

**juveniles** 54:4, 9 63:9 68:16 73:22,25 108:12,23 114:18 115:17 194:18 263:2

———

**K**

**K-I** 256:5

**K-I-N-E-S-I-C** 38:12

**K-I-R-K** 256:5

**keeping** 86:10

**Keith** 155:2

**Kemmitt** 7:12

**Kentuckiana** 6:9

**Kentucky** 6:11

**kid** 217:13

**kidding** 101:23

**kids** 151:1,4,8

**kill** 111:18 133:23 134:1 135:10,14 144:3,7 152:23 254:24

**killed** 101:19 121:13 124:23 125:2,9,20 146:4 154:16 171:7

**killers** 230:6

**killing** 167:12

**kind** 18:25 50:11 94:5,11 100:9 101:22 103:7 145:13 167:11 242:13 246:11 269:4 276:21 278:24 279:3 280:4

289:1

**kinds** 27:21

**kinesic** 38:9 272:22 273:2,4, 5 274:11

**Kirk** 256:1,5 257:11,18 258:15,19 259:6,14 260:13 261:2, 19,21 267:19

**Kirk's** 259:14, 15

**knew** 31:25 46:16 47:23 81:25 82:13,23 83:3 104:5,9 105:1,3 106:23 107:5 121:14, 24 132:3 137:22 138:16 154:16,23 158:22 163:15 165:22 167:1,2 168:22 193:10 197:5,13 220:1 226:3 264:21 265:2 276:12 279:9,19,21 280:14 288:5

**knock** 167:4 189:10

**knocked** 189:9

**knowing** 274:2 289:4

**knowledge** 104:2 175:16

**Kosturakis** 265:2,8

**Kosturakis'** 263:18 264:16

**Krystal** 6:7

———

**L**

**lab** 103:13

**lack** 47:13,21 119:17 150:18

165:6,11 262:18,23

**Lacks** 117:18 251:7,16

**Lanahan** 270:7

**lapse** 208:14

**lapsed** 209:23

**lapses** 209:13

**Laredo** 144:19 145:1,6 196:19 200:14 264:17

**large** 63:20

**late** 218:18 246:1

**latest** 141:13

**Latin** 169:3

**Latino** 120:15

**law** 7:3 24:20 195:21 271:24 272:1 273:23 277:19,21 278:8 279:2 284:2 285:8,11

**lawful** 277:24

**lawsuit** 21:7

**lawyer** 20:14, 18,20,25 21:4, 9,13,17,20 22:13,18 281:2 289:25

**lawyers** 27:21 282:22

**Lazo** 95:12,15, 18,21,24 96:1, 4,8 103:2 111:10 131:17 132:21 133:6 134:7 172:13 173:12 174:4, 13 175:7,18,22 176:23 178:8 179:12,14 227:25 228:11, 25

**lead** 81:19,20 169:12 264:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 326-2   Filed 05/26/23   Page 417 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 10, 2022
315

**leading** 55:8
281:24 282:2,7

**leads** 81:22
82:24,25 83:5,
6,12,13 163:11
276:12

**learn** 47:4
60:17 238:11
240:15,22
241:1 270:13
285:16 287:14

**learned** 93:5,9,
10,11 105:14
238:17 270:10
271:3

**learning** 67:22
271:9 277:13
284:1

**leave** 12:14
27:1,3,5
133:11,18
167:2 193:16
198:16 201:19

**led** 40:16,20,25
41:6,18 86:13
150:10 153:10
164:12

**left** 11:8 12:15
22:3 25:5
27:18,23 82:17
117:22 133:19,
24 137:4
184:20 198:17

**leg** 173:14
195:11

**legal** 76:12
251:7,17 271:3
273:15 274:2

**length** 20:8
107:12 175:6

**leniency** 59:13

**Leslie** 127:12

**Leslie's** 129:2

**lessens**
276:25

**lesson** 286:18

**lessons**

276:24 277:7

**lets** 166:5

**letter** 233:7

**letters** 232:20,
21,25 233:4

**level** 274:1

**licenses**
271:21

**lieutenant**
257:24 264:17,
18,24 265:14
270:7

**lieutenants**
26:23

**life** 10:14 11:10
13:3 262:22

**likewise** 83:11

**limit** 85:20

**lines** 78:10

**list** 27:8,11,13

**listed** 140:6

**listen** 15:18
194:6 263:17
264:18 265:15
266:1

**listened**
264:15

**lit** 272:19

**lived** 130:3
136:24

**lives** 133:4
136:21 145:8

**living** 130:1,4,6
191:16,17

**LML** 146:2

**locate** 161:14
195:9

**located** 6:10

**location** 6:19
29:7 104:11
110:14 179:8

**locations**
110:14 120:11

**log** 42:4

**logged** 108:16

**logging** 91:14

**long** 9:24
12:21,24 13:14
20:6,20 21:13,
19 25:3,8,23
30:15,25 36:6
38:13 43:1
53:13 142:24
201:3 202:19
210:5 245:14
246:2,14
274:14,23,24

**long-term**
13:7,11

**longer** 15:15
150:14,17
199:11

**looked** 32:3,17
52:25 120:17
141:2 152:2
178:14 179:23
182:20 183:17
206:18 207:2
211:6

**lose** 112:2

**lost** 277:10

**lot** 12:3 13:25
14:1 28:21
98:7,8 107:11
123:16 133:1
151:1

**loud** 10:5

**louder** 249:10

**Louisville** 6:11

**Lowell** 268:9,
13

**Loya** 7:16 16:3

**Lujan** 95:23
214:7,25

**lunch** 113:3,16

**lying** 49:6,9
284:8

---

**M**

**M-A-R-Q-U-E-
Z** 9:1

**Madam** 37:11
195:23

**made** 28:7,11
29:2,13 62:9,12
84:25 87:13
104:23 116:18,
21 120:2 137:6
151:5 153:14
185:13 195:1
205:16 225:24
232:16 247:24
255:18,20
269:19,22
271:16 278:21
279:16 280:2
284:19

**magistrate**
64:15,18,25
65:4,6,8,11
70:18,22,24
71:4,15,22,25
72:9 73:2
108:24 109:13,
16 114:19
115:18 217:10,
17

**magistrate's**
71:14

**Magoffir**
184:20

**main** 6:10
215:4

**maintain** 279:6

**maintained**
265:25

**major** 177:18,
21 290:18

**make** 10:14
22:4,5 27:15
39:1,15 40:23
47:6,25 52:15,
18 63:22 67:8
73:1 86:17
91:19 92:13
97:17 124:11,

13,16 140:11,
23 161:7
176:12,20,25
196:13 197:4
199:17 205:15
209:12 215:7
225:23 227:12
237:9 249:12
255:6 260:15
273:20 279:14

**makes** 87:9
215:4 225:2

**making** 130:11

**mall** 196:13

**man** 97:8 98:23
101:18,19

**Mando** 166:20,
23 167:2,3
176:11 221:1,3,
12 226:14
227:3,7

**manual** 68:15

**map** 261:25

**Marcos** 95:17
126:13,15,18,
20,23 127:23
128:5,18,21
129:1,17,22
130:1 162:7,9
165:23 166:1,2,
18,22 167:6,7
171:4 184:19,
21 185:12
186:25 187:1
189:4,14,18,20
191:25 192:1,2,
3,5,7,9,10,12,
15,17,19,23
193:2,6,7,21,24
194:3,6,12,21
196:21 200:4
201:19 210:23
211:11 212:15,
18 213:15,20
218:8 231:20,
25 232:3,5,8
253:13 260:25
266:9

**Marcos'** 213:4

**mark** 34:17

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 418 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 18, 2022

316

63:15 68:14
93:18 99:22
106:5 107:23
126:5 131:13,
21 132:17
136:12 139:4
140:14 144:14
163:25 184:9
205:24 213:5
214:5 218:13
249:19 257:23
259:13 261:24

**marked** 25:12,
15,17 63:11
68:12 93:13
99:21 106:3
107:22 114:12
126:4 130:10
131:19 132:16
136:13 139:2
140:13 144:13
163:22 164:5
166:4 170:25
177:13,14
184:7 199:23
205:23 213:2
214:4 218:10
220:22 249:17
257:22 258:12
259:12 261:23

**marking**
144:15

**marks** 34:14
102:8,10

**maroon** 180:1
181:1,12 182:2,
13,21 183:21

**Marquez** 6:14
7:10,24 8:1,3,
14,24 9:7 14:21
37:11 77:12
87:15 100:19
101:7 113:15
136:16 168:9,
10 176:12

**married** 242:9

**Martinez** 7:8
8:6 18:24 21:1,
4 24:8 37:10,15
39:18 41:4,21,
23 42:1,15
47:2,12,20

51:7,21 52:17
54:19 60:21
62:19,23 63:7,
18,20,24 64:3,7
67:3 68:2 69:13
72:19,23 77:20
81:18 88:24
92:6 96:24
97:2,4 100:8
111:15 115:1,5
116:10 119:16
123:21 136:5
142:1 146:24
147:7,19,21
148:4,6,9
149:9,12,15
150:18 162:25
163:10 165:4,6,
11,16 168:24
169:3,10,22
170:12 174:15,
17 177:4 183:5
187:24 194:11,
15 195:23
196:1,5,15
206:20,23
207:11,23
208:23 217:12
218:16 219:20
223:6,18,22
224:8 225:8
226:18 228:23
229:6 230:13
231:13 235:3
239:5,10
249:25 251:6,
15 252:1
257:14 260:9
262:10,18,23
263:5 267:23
268:2 291:5,8,
10,13,21

**master** 232:16
271:16 272:5

**master's**
232:15,16

**matched** 122:8

**matches**
140:12

**material** 16:18

**materials**
269:4,13

**math** 27:20,21
269:7

**matter** 6:14
92:12 285:1

**me'** 167:4

**meaning** 72:17
94:17 132:3
166:1 235:4
259:16

**means** 25:17
80:19 102:10
282:25 283:2

**meant** 80:12
87:14 237:7
248:11

**medals** 23:24

**media** 103:24
104:23

**medical** 11:2,
15 227:16,18

**medication**
11:1

**Medina** 106:6,
8 175:2,21
176:21 177:10
180:6,24
181:12,23
182:6,9 183:20

**Medina's**
138:17 183:8

**medium** 187:5

**meet** 20:1,13,
20 21:13,19
22:13 31:19
33:3,11 155:20
198:4,22,23
199:1,5,9 265:6
284:4

**meeting** 22:11,
12,13 114:24
188:7 198:4
200:17,20
275:21 288:13
290:15

**meetings** 21:3
22:7 275:14,19
276:5 277:5
279:13 290:16

**Melissa** 145:8

**member** 146:2,
20

**members**
146:1,3,9,10,17

**memo** 245:2

**memory** 11:6,
16,19,23 12:18,
21,24 13:7,11
78:15 79:7 87:6
98:6,13,15,19
120:4,6,7
121:12 146:13
183:20

**Men** 127:20,24
129:6

**mention**
158:19 168:15
172:5 179:4

**mentioned**
17:19 67:14,15
82:18 171:2,3,
25 172:1,3
181:15

**mentors**
270:2,19

**meritorious**
232:13

**mess** 133:10

**messed**
276:22

**messing**
132:22

**met** 20:6,7,17,
25 21:9,17
22:15 156:14
184:18 198:24
275:2

**Method** 38:15,
17

**Mexico** 100:15
120:3 281:9,10
285:14

**Meza** 117:6,21

**Michael** 97:8,
19,22 98:1,23
99:2,6 118:9,

10,12,21 119:4,
12,20,24,25
120:1,5,8,21
121:12,16,19,
24 122:2,13,15,
22,25 123:7,11
125:15

**middle** 137:9
187:3

**midnight**
116:22 117:2,5

**Mike** 99:16
101:12,14,18
105:5,6,18
106:22 107:4,8,
9 108:2 109:7,
12 110:23,25
111:1,3,4,7,9
113:25 114:3,8,
17 115:13
116:2,5 121:21
124:15,22
150:24 226:5

**military** 23:9,
11 24:4

**mind** 19:17
120:2,3 123:8
125:12,13
192:22 260:20

**mine** 18:8
126:11 218:23
219:12

**mine's** 133:4

**minimization**
50:14,21

**minimize**
50:16

**minute** 14:6
278:2

**minutes** 20:22
100:10 106:18
108:6 113:4
133:19 139:12
141:10 145:21
182:23 191:19
201:4 210:7
275:22

**Miranda** 191:1



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 419 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 10, 2018
317

misbehavior 288:9

Mischaracterizes 196:6

miscommunication 157:5

misconduct 239:4,8 281:17 288:14,24 289:6,9

misdemeanors 45:1

mishandling 244:17 245:22 246:7

mislead 64:11

missed 96:25 249:25 250:2

missing 60:22 209:16,17,21, 23 210:3

misstates 69:13 72:12 76:21 227:9

misstating 77:2

mistake 87:6, 9,13,18 219:6 255:18,20

mistaken 167:20

misuse 245:8

misused 244:19,21

model 145:13 183:16

mom 189:10,13 194:23

money 92:12 245:3,5,6,7,9, 20

monies 273:11

monitor 195:12 254:12

monitoring 185:6,9 211:23 212:24 213:17 214:23 249:23 250:11,21

Monte 132:8 183:17

month 15:15, 16 244:1 270:21

monthly 241:19

months 21:7 25:4 257:19 270:20

Morena 117:22

Moreno 117:6

morning 101:1 214:5 216:25 231:7,9

mortgage 241:11,13

mother 110:25 111:3 127:18 145:2 155:9,11, 14 190:24 191:18

motion 14:3 281:13,14,16, 20 282:8,10,15 283:8 289:14, 22,25

motions 281:17 283:18, 23 290:3

motive 135:1

Mountain 138:4,13,18,22 141:2 143:18, 20

mouth 55:10 290:11

move 36:18,21 37:25 148:3

moved 30:17, 20 281:8

movie 128:10 129:5

multiple 238:7 286:22 289:22

murder 44:17 46:12 57:22 61:11,12,14,16 62:3 67:23 70:16 71:2,23 72:10 97:18,20 103:18,20 111:16 122:17 129:2 131:3,11 132:14 136:24 139:11,19 140:20,25 141:19 143:19, 24 144:4 147:22 151:5,9, 10 163:7,16,19 164:21 165:15 168:22 169:9 170:5,10,15 172:10 179:4 180:12,15 181:17,20 184:2,5 187:9 193:14 195:6 197:9 204:16 210:24 211:9, 22 212:9,12,16, 22,23,24 213:15,18,22 214:2 215:12, 21 216:2,10 217:11,20,22 220:4,6,9,15 222:2,3,14 224:14 226:25 229:9,12,15,18, 22 230:6,11 231:11 249:23, 24 250:10,12, 21,22 251:5,14, 25 252:7,8,16, 17 253:8,15,20, 24 254:7 255:21 263:10, 20

murderer 249:22

murderers 105:20

murdering 111:9

murders 57:20 95:12,15,18,21, 24 96:1,4,8 97:23,24 103:2 105:19 135:22 150:9,11 151:2 153:25 154:24 164:13,21 165:3 181:16 202:8 211:14 215:25 263:15

mustache 32:8,9,11,13,15

muted 149:5,6 196:1 268:9

mutual 242:24

___

N

named 97:8 98:23 99:18 118:10 145:7 169:20 170:2 193:13 202:9 213:7,11 274:18 275:4 289:17,21

names 38:6 166:1 186:16 211:25 272:20

naming 188:16 216:17

Nance 257:25

narcotics 245:22

narrate 208:10

narrative 94:8

natural 11:5

nature 58:12 112:1 289:12

necessarily 92:7 120:23

needed 39:3,5, 6 71:19 72:6,8 99:20 188:16 193:7,17

202:15 203:10, 19,24 276:11 290:22

neighborhood 133:2

nervous 22:6 112:23

newsletters 287:12

nicely 288:21

nicknamed 185:1

night 101:20 104:1 129:2 130:23 131:8 134:22 142:12 151:18 179:3 246:1 263:10 275:23

noise 6:4

non-public 113:25 116:6 119:13 121:14, 24 126:1 225:19,22

nonpublic 53:1,6

normal 276:17

north 7:9 225:13,15

northeast 26:11,16,19,21, 25

notation 207:12,14

note 6:1 130:11

notebook 266:23 267:1,4

notes 37:4,7 84:20,23 85:1, 5,7,9,12,16 86:2,7,10,14,18 88:6,23 89:2,3, 4,5,8,14,17,19 121:6,9,10 126:12,19,25 128:16,17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG   Document 226-2   Filed 05/26/23   Page 420 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 2018
318

129:11,20
154:8,11 208:7,
8 266:19,20,24
286:2

**noticed** 65:18
137:7

**notified** 239:25

**number** 6:17
46:15,17,18
64:4,5 94:20
139:16 140:12
173:6 207:6
225:9,19,24
226:13 246:3
254:14,17,18
271:12,13,14
274:7

**numbered**
65:15 68:17
99:23 106:12
107:25 126:7
137:2 184:11
262:7

**numbers**
63:16 128:18

———————

**O**

**O-N-N-I-E**
256:5

**oath** 80:4 191:6
255:21

**object** 168:25
183:6 280:24
282:2

**objection** 24:8
39:18 41:4
42:15 47:2,12,
20 51:7,21
52:17 54:19
60:21 62:19,23
63:7 68:2 69:13
72:12,20 75:11
76:5,21 77:2,20
81:18 88:24
92:6 111:15
116:8,10
117:18,19
119:16 123:21
136:5 150:18
162:25 163:10

165:4,6,11,16
168:25 169:2,
10,22 170:12
174:15,17
177:4 187:24
194:11,15
196:5,15
206:20,21,23
207:11,23
208:23 217:12
219:20 223:6,
18,22 225:8
227:9 228:23
229:6 230:13
231:13 235:3,
25 236:11
237:2,12 239:5,
10 251:6,15
252:2 257:14
260:9 262:10,
18,23 263:5
267:23 268:2
274:4 278:17
281:24 282:1,7
283:11

**objections**
77:7 252:1

**obligation**
239:7 251:23
263:1

**observed**
238:25

**observing** 7:4

**obtain** 46:25
51:3 208:21
264:9 281:18

**obtained** 73:7
219:22 264:4

**obtaining** 64:2
73:13 74:8
232:18,22,23
264:12

**obtains** 76:12

**occasion**
20:13 22:14
59:7

**occasions**
9:17 14:7 20:9
244:14

**occurred**
98:16 139:19

**occurrence**
140:4,8,17,25

**odd** 241:21
260:21

**off.'** 220:25

**offense** 67:16
214:20

**offered** 18:20
209:1,2

**office** 7:3,5,12,
16,23 22:16
24:22 29:9,15
30:16 31:20
56:14 57:7,9,21
60:14 71:14
90:16,19 91:9
99:13 101:3,5
109:2 114:21
115:21 117:3
153:9,11,13
155:3,5,8,16,
17,18,21 202:1
204:8,10,12,25
258:1 263:18
264:16 265:15
276:16 277:2,3,
5 287:1,2
288:10

**officer** 64:12,
14 65:16,17
69:19,20,23
70:17,22 71:9,
11,19 72:7,25
73:8 74:14
75:23 76:3,12
94:13,14,16,17,
19,21,22,23
114:14 139:6
160:23 187:8
195:22 203:6,
10 205:3,10
206:3,13,17,19,
25 207:4
232:14 238:25
239:3,8,13,16,
19,22 240:19,
22 248:7 253:3,
4 260:12
282:17 289:9
291:15

**officer's** 69:24
285:7

**officers** 16:14
41:11 66:21
83:16 125:8,9
156:6 196:17,
18 197:3,14,16,
23 198:5,12
199:21 200:5
201:17 209:4,6
235:19,22
236:9,23 237:8,
21 238:7,8
248:3 267:25
271:21 289:23

**offices** 29:12

**official** 290:13

**olds** 217:16

**on-the-job**
45:9,22

**online** 6:8

**Onnie** 256:1,5,
12 257:11,18
258:14,19
259:6,14,15,20
260:13 261:2,
19,21 267:19

**Ontario** 285:14

**open** 204:12
282:8

**open-ended**
55:7

**opened** 189:10

**opening**
268:25

**operation**
286:19

**opinion** 116:18
251:7,17

**opposed** 54:9
103:15 117:15

**opposite** 50:8

**oral** 67:7,8,13

**order** 268:19
281:18

**ordinances**
269:6

**organization**
38:7,8 46:11
272:24

**orient** 114:16

**original** 140:3
173:13

**Ortega** 7:2,4
31:13 33:11,23
34:6,8,19
114:6,14 116:1
117:5,13,21
202:18 203:2
204:5 214:15
291:18

**Ortega's** 34:1
115:13 117:1

**outcome** 58:17
60:4

**overseas**
23:19,22

**oversight**
279:24

**owe** 241:14

———————

**P**

**p.m** 148:16

**p.m.** 113:11,12,
14 128:14
137:5 148:15,
16,18 166:7,9
184:21 190:12,
13,15 258:7,8,
10 291:23,24

**pages** 68:19
97:5 172:19
266:19

**paid** 32:3
244:25 245:5

**paper** 80:19
85:23 158:10,
11,12 159:21
266:23 267:1,4
290:12

**paperwork**
70:11 74:13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 421 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 2018
319

108:20 202:15, 16,17 203:2,4,7 205:15,17 212:4 249:15 267:5

**paragraph** 76:22

**parent** 76:12, 20 77:1,17

**parental** 76:15

**parents** 263:2

**parked** 178:16 189:10 199:10, 12 200:12,13, 14

**parrot** 53:10,15

**part** 19:1 47:9, 19 75:3 111:19 122:9 137:23 188:9 216:7 276:17

**part-time** 26:7, 9

**parties** 8:2 275:4

**partner** 31:6,8 275:9

**partnered** 31:15

**partners** 31:10,14,18

**party** 133:3,5, 6,7,11 137:8,23

**Paso** 6:15,17 7:3,4,7,9,13,17, 20,23 24:17,23 29:10 34:23 35:14,16 42:23 62:18,22 63:5 64:1 65:22 68:22 93:19 100:20 101:21 232:11 234:1,4 238:1 244:12 257:25 258:15 268:14 273:6 280:11 283:15 285:18 289:6

**pass** 258:15 291:4

**passed** 106:16 268:22 288:10

**passenger** 186:25 187:4

**passengers** 165:22 187:4

**past** 21:7 81:4 135:8 288:24

**patches** 130:20

**Patrick** 36:3

**patrol** 25:7,9, 11,15 26:10,11, 15,22 27:1,3,5 196:18 197:14 199:21 248:9, 13 269:24 270:14,15,23

**patrolman** 25:10 270:20

**patrols** 196:21

**pause** 139:3

**Paxton** 281:7

**pay** 245:3,5 270:23

**paying** 270:22

**pen** 158:11,12

**penal** 269:6

**pencil** 158:11

**pending** 6:15

**pension** 241:18,20,22, 23 243:4

**people** 7:19 11:24 12:3,8 13:2,8,11,15 18:12 23:25 48:15 49:9,12, 17 50:1,21 52:5 59:15,19,22 60:1 61:21,23 66:19,22,25 82:25 92:8,18 98:8 101:20

107:11 122:3 123:16 133:1 135:3 137:8 150:20,22 163:5 181:14, 15 197:11 199:4,7 209:7 211:22 214:1 215:2,19,20,25 216:9,11 224:14 231:11 237:8 249:22 250:10 251:4, 13,24 252:7,16 253:6,7,12,18, 23 254:5,14,16, 18 269:19 275:2,4,5 276:13,16 278:14 280:14 286:10,22 288:24

**Perfect** 8:7

**perform** 269:15

**performed** 269:16

**period** 275:14

**perjured** 236:9,24 237:22

**perjury** 234:7 235:8 236:16 237:9 281:1

**permission** 71:2,12 76:12, 15,19 77:1,7,14 217:15

**perpetrated** 103:3

**perpetrators** 179:20

**person** 20:23 22:8 36:12 39:6,16 40:2,10 49:1 50:16 51:25 56:17 66:13 93:2 108:9 111:18 115:21 121:1

135:7,11,14 154:12 169:23 188:8 221:11 235:8 245:24 246:3 255:19, 25

**personal** 276:8,9 285:7

**personally** 80:20 187:16

**personnel** 38:6 66:21

**persons** 29:5, 8,11 90:15,19 150:23 155:18, 21 270:18 275:15

**pertains** 68:21

**pesky** 82:1

**phenomenon** 11:10

**phone** 101:25 102:7 104:17 105:8,21,24 106:1 149:6 154:15

**phonecall** 153:12,14 154:10 155:3

**photograph** 16:13,21,25 17:4

**photographs** 16:8,11 17:3,7, 9,11,16 173:20

**phrase** 10:18 72:4

**physical** 29:6 51:5 55:5 56:5, 8,11 229:4 278:4,7 284:12

**pick** 120:17 156:11,13 158:10 160:16, 23 161:19,24 162:12,16 163:14 167:18, 21,25 168:3,7,

9,13 169:13 171:25 188:16 265:20 266:4

**pick-up** 242:4, 5,7

**picked** 57:17, 20 121:11 156:5 171:12 246:6 265:22

**picture** 174:18 177:5

**piece** 158:10

**pin** 57:25

**piqued** 105:15

**place** 34:11,13 36:12 56:22 65:7 228:12,13, 15,17 264:10 277:1 281:5 284:5 290:4,16

**placing** 57:12 86:2 264:13

**plaintiff** 8:5

**plaintiff's** 6:20

**plan** 193:1 198:9

**plea** 35:18

**ploys** 49:19,25

**point** 12:12 54:24 67:4,24 88:2 117:1,5,9 137:19 143:9 147:1 164:10 200:6 202:11 205:20 209:14, 15 224:11 274:8 278:1 281:12

**points** 31:3 34:18 200:6

**police** 17:19,25 18:11,14,19 19:18 24:4,17, 21 25:1 28:21 30:12,22,24 31:1,3 34:14, 17,23 35:14



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 422 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 13, 2022

320

41:11 52:6
56:6,9,18,23
59:7 62:18,22
63:5 64:1 65:23
66:12,19,21
67:24 68:23
73:8,11 74:7,11
78:12 82:3,11,
13,17 83:19,24
84:5 87:19
88:14 89:13,15,
21,22 92:10
93:20 100:20
105:16 125:7,8
146:8 156:6
170:8 187:8
197:23 199:23
200:5 232:12,
14 234:1,4
235:22 236:9,
23 237:8 238:1,
7,25 239:3,7,
16,19,22
241:22 244:12
247:25 249:6
251:3 260:8,12,
16,23 261:6
270:14 271:13,
21 280:11
285:18 286:10
289:6

**police's**
170:10,16,19
171:19,22

**policies** 62:17,
21,24 63:5,9,10
64:1 68:23
269:9 280:3

**policy** 63:13
65:22 67:19
68:15 69:10
70:2,4,25
71:23,24 72:5,
14 73:17,21,24
74:1,11,16,21
75:3,17,18,22
76:3,18,24
77:13 195:21
278:11 287:23

**poor** 6:2

**Popeye** 96:2
185:1,2,8,18,
21,25 186:18,

21,24 187:2,11,
15,17 195:5
211:14,17
212:9,12,16
213:6,11,22
216:17 224:5,
24 231:19,21
250:20

**Popeye's**
185:18

**Popeyes**
224:18,19,22

**popular** 124:14

**portion** 26:16
37:14 47:7 48:4
63:12 64:1,11
81:1 94:8 118:2
142:18 196:4
266:14

**portions** 159:7

**posed** 10:24

**poses** 214:24

**position** 26:8,9

**possibility**
54:14

**possibly** 60:22
82:22 92:24
117:11 128:15

**post** 24:6

**practical** 76:14
77:3,9

**practice** 42:13
49:8,16 50:7
69:6

**pre-generated**
93:24

**prefaced**
262:15

**preparation**
14:24 15:19
16:8 17:17
19:14 20:1
185:4

**prepare** 13:21
15:10 19:21
284:5

**prepared**
19:23

**presence**
65:19 111:1
114:20

**present** 21:3
62:6 66:6 93:11
191:17 203:5,
10 205:4,6
215:3,13 216:1
217:24 218:5
256:8 257:13
261:15

**presentation**
14:4 17:22
248:22 249:19
250:5,7

**presented**
84:13

**preserve** 37:1
88:21,23 279:6

**presumed**
198:21

**prevent** 233:17

**preventing**
60:9 86:1,5
153:1 231:24
257:3

**previous** 15:3

**prey** 41:3,12

**primary** 42:13

**principal's**
101:3

**print** 203:14,
16,19,24

**printed** 203:25

**prior** 22:13,15
134:21

**prison** 59:4
214:10 262:13,
17,22 279:1
284:17

**prisoner** 67:8

**private** 153:17

**privy** 240:18

**Prix** 145:13

**probable**
69:24 207:17,
18

**probation**
69:23 70:12,16
71:3 74:3 75:9
171:12 204:20,
24

**problem** 9:4,7
11:19 51:19
54:18 115:8
214:24 253:12

**problems**
132:21 199:14,
15,16 276:6,8,9

**procedure**
65:10 74:22

**procedures**
64:2

**proceed** 47:5

**proceeded**
109:3 114:22
115:22 117:4,
14

**proceeding**
78:3,9,10

**proceedings**
284:1

**proceeds**
60:25 61:1
67:22

**process** 11:5
233:25 236:15
252:24 268:18
270:11 277:13
289:15

**processed**
94:21

**produced**
152:5

**product** 89:8

**profession**
273:16

**professional**
11:15

**professionally**
288:20

**professions**
13:4

**program** 90:2

**programs**
272:21

**prohibited**
280:3

**promise** 59:13

**promoted**
27:13 268:15,
24 271:7

**promotion**
268:19 269:20

**pronounce**
99:7

**pronto** 66:5

**property**
67:14,15,23
243:7

**pros** 276:21

**prosecute**
277:11

**prosecution**
83:20,21,23
84:7,8,11,16,17

**prosecutor**
152:6 252:15
253:11,18,23
254:5 267:21

**prosecutor's**
276:16 277:2

**prosecutors**
277:4 283:22
284:4,7 290:17

**proses** 276:19

**prove** 222:6
228:14

**provide** 45:22
53:21 54:11
74:3

**provided**
28:12 71:10
83:20 93:1

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 423 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 13, 2022

321

246:3

**providing** 45:9
53:15 61:9
87:23

**proximity**
200:8

**psychological**
51:10,14

**psychologicall**
**y** 51:12,17,20

**public** 103:24
104:5,9,14,23
121:2 226:13
287:5

**pull** 114:13
136:11 158:10
197:1 198:20
203:9

**pulled** 196:23

**purpose**
275:20

**purposes**
258:4

**pursuing**
24:12,14

**put** 27:23 39:8
51:15 55:9
57:1,24,25
58:1,3,11
85:18,23 87:16
90:11 91:20,21
131:4 186:21
195:1,20
214:12 249:7,
12 253:4
255:10,17
264:4 268:23
271:12

**puts** 148:20

**putting** 141:5
144:1 200:3

———————

**Q**

**quality** 6:2

**question** 9:13
10:5,9,14,18,
19,20,23 19:4,5

23:20 26:20
31:16 37:12,16
45:18 47:15
48:8 61:20,22
64:8 70:15
71:1,22 72:9,24
76:23,25 77:13,
17,19 78:12,18,
21,23 80:23
81:9 97:8 111:1
118:9,13,14
139:23 140:10
143:25 144:11
149:11,16
151:12,17
153:6 163:5
168:11,25
169:6 173:1,9,
16,21,24 174:7,
10 175:23
183:7,12 184:3
189:17 190:18,
20 191:3 202:3
207:13 208:9,
13 217:20,22
219:25 221:22
229:23 231:3,
22 233:19
240:21 248:19
249:25 250:3
251:11,12
255:6,12
260:20 262:15
266:12 279:5
280:25 282:6,8,
11 284:18

**questioned**
48:16 76:19
107:14 109:25
162:20 206:6,
10,14 207:10
234:10,13
235:7

**questioning**
97:19,22 163:2
204:14 214:18
217:17 231:25
241:2,5 261:7

**questions** 9:8
10:4 19:24
43:16 55:7,8
79:2 118:7,17
173:17 176:14
217:10 256:11,

14 257:1,4,9
268:8 278:3
287:17 291:4,
12,14,17,20

**quick** 200:17,
20

**Quinn** 6:24

**quotation**
102:8,10

**quotes** 102:3,5

———————

**R**

———————

**R-I-V-E-R-A**
17:15 56:21

**raise** 8:8 112:3,
6 159:5

**raised** 112:4,8

**Rallins** 6:24

**Ramirez** 96:2

**Ramstein**
23:17

**ran** 104:10,11,
15,16,20,21
105:1,2,11,24
106:24 107:5
122:3 167:3
175:3,7,25
176:6 177:18,
21,24 225:10
226:1,14

**Rangel** 95:14
153:5,8,24
154:9,12
160:22 161:13,
24 163:18
164:2,8,20
165:15 167:14,
19,22 168:8,10,
12 171:3
175:22 180:9
188:2 222:13,
19 232:9
260:24

**Rangel's**
162:11,17
175:22

**Rangers**

287:3,4 289:9

**rank** 30:10
268:15 269:2,
23

**raped** 210:20
279:1 284:17

**rapport** 47:3
110:4 210:6

**Ray** 7:16

**Raynor** 30:18,
19 34:18
155:19

**re-question**
231:18,19

**reached** 272:8

**read** 13:23 14:6
15:5,8 18:19
37:11,14 63:21
71:15 76:22
78:9 80:22 81:1
92:2 131:5
141:3 148:7
172:20 173:13
190:24 191:11,
21 192:5,7,15,
19 193:6 194:9,
12,13,20
195:24 196:4
212:19 213:9
220:20 224:8,9
264:1 266:14
269:13 276:4

**reading** 15:10
77:5 81:8
138:17 147:24
148:1 153:19
194:7

**reads** 258:4

**ready** 133:15
189:3

**real** 243:7
274:5

**realized**
197:25

**reask** 9:13
10:18 149:11

**reasked** 282:6

**reason** 39:14
86:21 87:24
109:15 119:19
134:19 145:25
162:11 163:6,
15 165:2
166:24 220:14
231:14 253:17,
22,25 254:4
280:6

**reasons** 142:9

**recall** 9:20
12:25 14:9
15:12,14 17:2
18:4 20:7
21:18,21 29:1
30:17,19 32:7,
9,17 33:16 36:9
38:6,17,18
42:19,20 43:13
55:2,6 60:12
97:16,21 98:3,5
99:12,14,18
104:18,19
107:10,11
109:18 110:13,
15,21 111:2,6,
8,11,13 112:4,7
116:23 120:9,
16,17,19 123:3,
20 126:21
129:12,14,19,
20,21,24 130:3
134:22 135:23
141:20 146:14,
21 150:2,12
151:15 152:15
154:19 155:24
156:13 160:20,
25 162:2,14,18,
19,21 164:14
168:14 169:17
170:1 172:2,4,
6,8,14 177:12
180:22 181:5,
10 182:5,11,17,
19 184:6 185:7
187:20,25
189:2,16
193:22 194:1,
19 195:19
196:23 198:19,
21 199:6
201:10,18
202:25 206:24

———



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273** Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 326-2   Filed 05/26/23   Page 424 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 2018
322

210:12,25
211:15,19,25
216:15 217:2
218:1 220:2,8,
20,21 221:25
224:3 231:5,8
232:7,10 233:6
252:14,18
263:7,12,16
264:3 269:18
271:12 273:1
279:25 289:4

**receipt** 245:2

**receipts** 245:2

**receive** 23:24
28:15,18 38:3
51:9 52:12
53:24 233:4,7

**received** 15:12
36:24 38:2
55:1,15 70:17
123:10,13,22
126:13 160:6
232:13 247:20
256:7

**receiving** 52:9
55:2 123:20
150:20

**recent** 11:10,
11 20:17 135:8

**recess** 42:9
68:9 113:12
148:16 190:13
258:8

**recognize**
93:19 126:8
261:25

**recollecting**
103:10

**recollection**
70:4,5 136:2
153:21,22
161:18,22
255:23 285:3

**recommends**
237:15

**reconvene**
113:7

**record** 7:25
8:20,23 42:3,5,
7,10 68:6,7,10,
17 112:24
113:10,13
129:8 148:13,
15,17 190:10,
12,14 205:25
258:5,6,9 262:6
291:23

**recorded**
114:24

**recording**
60:10

**recordings**
15:18,19 16:6

**recover** 61:16
220:17

**recovered**
226:22

**recreational**
243:14

**red** 180:1
181:1,12 182:2,
13,21 183:21

**reduce** 50:8
65:3 78:14 79:5

**Reece** 264:17

**refer** 166:7,9
188:23

**reference**
16:18 54:22
80:7 97:11,15
154:10 167:23,
24 169:24

**referenced**
80:6 167:21
168:1 287:12

**References**
90:3

**referring**
172:22 214:11
261:14

**refresh** 136:2
146:13 161:18,
22

**refreshed**

183:19

**refused** 234:13
235:1 289:24

**regard** 108:1

**regular** 32:23
44:15 270:14
275:14

**Reid** 38:15,17

**reinforcing**
279:13

**related** 269:10

**relay** 89:3

**released**
104:14 255:11

**relevant** 88:10,
11,19

**reliable** 52:10,
16 215:5,8,18
225:3,5,23

**reluctant**
159:18

**rely** 83:23
229:3

**remain** 30:1,
15,25 35:2

**remainder**
31:2

**remember**
11:8 12:1,4,11
13:4 25:25 26:4
43:14 55:11
56:10 58:2
74:17 95:6
100:5,12
101:23 105:10,
23,25 106:2
110:7 111:24
118:9,11,13,15,
21,24 119:2
120:12 127:21,
24 128:11
129:10 130:4
131:16,18
140:2,8 142:21,
23 143:3,4,6
149:16 153:18
162:8,10
170:24 172:15

175:9 182:23
183:10 184:1,4,
14 193:23
196:16,24,25
198:4 211:20,
25 212:8,20
231:6 246:2
248:21,25
264:17 265:15
269:6 270:16
272:20 281:5
284:11,15,23
287:19 288:23
289:17,19,25

**remembering**
11:23

**removed**
119:8,14

**repeat** 26:20
34:7 47:15
53:13 61:22
76:23 101:13
142:2 143:25
150:15 160:3
175:10 189:17
196:9 206:11
208:12,13
215:1 223:19
224:21 236:4
249:9 250:1
253:21 266:12

**repeated**
289:24

**repeating**
102:11

**rephrase** 9:12
17:7 51:13
134:20 284:18

**report** 17:23
69:24 78:13,14
79:5,6,10,15
83:15 86:17
88:18 89:8,15
93:17,20 95:1
110:16,19
114:6,14,16
115:12,13,25
117:1 120:22
129:9 130:14
131:22 132:18
139:5,25 140:2,
15 144:18

167:14 171:1,
17,18 172:14
173:2 179:15
183:13 189:22
205:17 208:17
214:14 227:12,
13 234:16
239:7,13 248:3,
6,20 249:1,20,
21 250:5,7,8,
14,16,18
251:19,20
269:7

**reported**
110:10 222:19

**reporter** 6:9
8:8,10 10:15
14:21 19:4 23:1
34:16 37:11,13
39:5 57:8 64:21
80:22,25 90:17
92:15 107:17
117:24 130:9
144:16,17
149:4 160:3
169:2 183:10
189:17 195:24,
25 196:3,9
224:21 236:4
249:9 250:2
254:23 256:4
265:9 291:7,9

**Reporters** 6:1,
10

**reporting**
94:13,14,19,23
101:17

**reports** 17:20,
25 18:11,14,20
19:8,18 82:1,4,
11,13,17 83:4,
8,19,24 84:2
85:18 86:3
89:2,6,10,13,
21,22,25 90:11
103:2 107:19
139:15,18
140:7 178:25
203:19,23
248:18 285:21,
23

**represent** 7:9



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 425 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 18, 2022

323

**represented** 18:17

**representing** 6:9 7:6,19,22 84:3 268:13

**reprimand** 247:14,19,20 248:12

**request** 272:15 289:24

**requested** 37:14 81:1 84:3 196:4 266:14

**required** 195:21 274:3

**requirement** 251:2

**requirements** 273:15,20 274:2

**Reread** 48:6

**residence** 149:25

**response** 144:11 149:1 155:1 202:10

**responsibility** 49:6,10,13,17 279:6,9

**responsible** 112:18 280:7

**rest** 104:12 133:23 152:10 175:18 178:9 250:16 262:22

**result** 161:10, 12,23 247:13

**results** 27:8 290:9

**retain** 86:7

**retire** 34:23 36:8

**retired** 30:11 35:14 36:10,11 43:9

**retirement** 35:4 36:16 243:4

**returned** 109:2 114:20 115:20 117:3

**reveal** 53:6

**review** 14:10, 17,23 15:2,21 16:5,11 17:3,25 18:7,11,14 19:9,13,15,18 69:24 83:4 103:1 163:20

**reviewed** 14:2 16:21 17:19 18:8,16 19:18 71:9 108:19

**reviewing** 136:23 172:22 212:4

**Reyes** 262:4

**Rick** 147:7,18, 21,22 148:9

**ride** 86:18 155:10

**rifle** 102:17,21 103:6,9

**rights** 48:6 71:15 111:5 190:24 191:11, 22 192:5,7,15, 19 193:6 194:3, 7,9,14,17,21 271:3

**rim** 130:21

**risk** 41:11

**Rivera** 17:13 31:13 56:19 57:9 59:3

**RMS** 203:9,12

**robberies** 275:24 276:3

**robbery** 29:19 30:4 35:3 60:24

**Robert** 95:12 100:5,12,14

105:6,15 113:25 121:21 132:25 133:6

**Rodney** 95:20 128:5 160:13, 16,19,24 161:14,19,24 162:3,12,16,19 167:18 168:3,7, 9,13,15 169:13, 20,23 170:2,5, 22 171:5,11,18, 22 172:9 184:1, 4,10,15 185:25 187:22 210:22 211:6 213:7,11, 14,20 216:14, 16,18,20,23,24 217:13,25 231:3,7,18 253:13 260:24

**Rodolfo** 136:18

**Rodrigo** 270:6

**rolling** 238:16

**room** 6:4 57:6 191:16,17 288:13

**round** 179:5,11

**rounding** 163:1 168:19 169:8

**Rudy** 130:19, 21 131:2,6,11 132:4,8,13,20, 21 133:1,7,10, 11,12,13,14,16, 18,19,22,24 134:1,3,6,7,11 135:17,20 136:3,20 141:1, 17 142:15 145:6,17,20,25 146:1,6,9 147:5,16,18 148:9,19,23 149:19,22 150:14 151:5, 10,13,17 152:8, 16,21,22 153:2 157:25 267:14

**Rudy's** 141:22 142:4 144:22 145:16,24 146:8,11,16 147:3,11 148:23

**rule** 238:10 239:11 278:15, 19,22 282:23 283:1 290:4

**rules** 9:25 288:1

**ruling** 284:23

**run** 106:14 166:23 177:10 185:11,13 186:5 264:24, 25 288:19,21

**running** 106:16 164:16

**Russ** 18:25 218:16

**Russell** 6:22 9:6 18:25 42:2 63:18 67:3 72:19 78:3 96:24 100:8 108:4 142:1 146:24 148:4 149:13 174:21 190:5 226:18

**rust** 130:20

--- **S** ---

**Safety** 287:5

**Salice** 200:14

**sample** 93:17

**San** 7:7

**Sanchez** 7:16

**sat** 57:21 58:3

**Saturday** 140:18

**savings** 243:21

**scared** 134:1,5

**scene** 37:1 53:1,6 114:1 116:7 119:13 121:14,25 126:1 137:15 141:6 143:12 144:2 148:21 175:3,12,15 178:13 197:17, 20,21 199:19 214:2 215:13 223:11 226:21, 22

**school** 22:24 23:3,5,7,8 24:6, 9 28:8,9,10,22 38:9 42:20 272:22 273:9, 12 287:8

**schools** 28:21, 24 272:13,14, 15

**Scott** 7:6,15 18:20 31:15,17, 19,22 130:14 131:1 132:19 161:14 167:25 197:6,8 200:6

**scream** 55:12, 16,21 111:7

**screamed** 56:2 111:24

**screaming** 57:24 111:23 112:4

**screen** 63:20 172:17 218:16 254:23

**scroll** 68:19 96:23 114:16 126:16,17 226:10

**search** 37:24 263:13

**searched** 149:24 263:11, 12

**seat** 186:1,12, 21,25 187:1,3,4



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 426 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 2018
324

seated 187:2

sec 115:2

secretaries 154:6

secretary 154:1

secreted 67:13

section 30:4 44:24 76:10 196:8

secure 65:16

security 241:18,20,21 243:5

seek 42:16,17 193:19

seeking 193:23,24

sees 206:24

self-defense 50:24

seminar 286:21

seminars 28:20 272:15, 25

send 272:25 275:10

sense 12:7 122:10 176:12, 20 177:1 260:15

sentence 53:13 262:25

separate 14:13,16 29:13 73:13 75:5,10 201:21

separating 75:4

September 78:1,7 118:3,5 172:17 174:24 176:2 258:20, 21 259:3,22 260:4

sequence 164:12

sergeant 90:24 96:11,12, 16 117:6 141:6 188:6,11,13,14, 15 204:8 274:24 275:3 279:23

sergeant's 202:1

sergeants 30:8

serve 23:11,19, 21 24:4 25:23 26:15,18,21

served 23:9,14 83:15 239:3

service 30:10 56:13 272:11

services 69:4, 8,12 70:6 75:13 108:13 114:21 115:20 117:3

serving 25:12 56:13,15,24 57:10

set 94:4

Seventeen 36:7

Seventy-three 22:23

sex 29:20

sexually 112:12

shagged 101:25 102:7 105:8,21

Shamrock 185:12

share 172:17 286:15

sharing 171:15 218:16 254:23

shell 175:8,11

shells 178:16 228:14,16

Shenandoah 136:21

sheriff 101:5

sheriff's 101:1

sheriffs 24:22 257:25 285:14 287:1,2

shift 269:25

shit 122:10

shoot 133:17 134:14 135:21 141:18,23 142:5 152:23 171:15 176:23 186:14

shooter 175:7, 20,21

shooters 175:2

shooting 124:4,6 130:22 131:7 132:5 134:22 135:15 138:22,24 156:19 157:1 158:17 176:10 179:11 181:8 228:20

shootings 176:6

short 120:19 190:6 258:3

short-term 12:18

shot 49:1 97:9 98:1,23 99:3 114:4 119:13 120:25 123:1, 24 124:8,10,16 125:16 132:3 134:3,7 141:25 142:6 146:5,10 147:8,23 148:10 156:18 157:17 164:15, 17 167:5,6,7,9

171:7 172:13 174:13 178:16 179:14,16 186:6,13,15,17 227:7,19,21,23 228:1,2,12,13

shotgun 158:16,20

shots 104:11 174:4 178:25 179:1,4,5 186:10,11 223:4,8 225:9, 20,24 226:13

show 63:12 68:13 77:22 78:6 81:21 93:17 96:21 97:5 99:22 106:4 107:23 114:10,12 116:24,25 118:2,4 126:5 130:13 131:20 132:17 139:3 144:14 161:1 163:24 166:25 170:25 172:16 176:1 177:20 183:16 190:2 205:24 213:4 218:13 250:4 257:23 259:13 261:24 275:21

showed 133:7 191:19 280:11

showing 41:15 63:14 114:13 115:7,12 164:1 190:16,17 206:18 207:3 218:19 220:22 249:18 255:2 258:11,14

shown 84:3 276:2

shows 227:21

sic 105:5 131:21 132:18 136:12,14 139:4,5 140:14 144:15,17

163:25 164:1 166:5 177:15 205:25 206:18 213:5 214:6 218:14,19 249:19 257:24 258:12,14 261:25 262:6

side 10:22 26:11,19,21 84:5 126:15 178:15,16

sign 65:19 66:3,4 159:23 163:20 164:11

signal 198:20

signature 99:25 100:1,2,3 128:24

signed 201:25 235:17 273:2

signing 193:24

signs 164:7

silence 111:5 235:5

silent 257:6

similar 285:11

simply 219:23 245:25

simultaneous 16:16 18:22 20:10 47:16 48:22 72:18 90:18 97:1 98:11 165:5,19 252:3 281:25

sir 8:7,10,19 9:11,14 10:2,7 13:9,20 16:24 19:10 21:18,21 22:20 23:20,23 25:25 26:2,17 28:2,6 30:6,9, 13 32:17 33:2, 10,16 34:7,21 36:13,15,17 37:23 38:18 39:19 40:12,24 41:16 43:13,16,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 427 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 13, 2019
325

19,22 44:3,12
46:14,23 48:2,
23 51:4,22 54:6
55:2,6,14 56:15
57:5,15 58:6,
22,24 59:14
60:12 61:22
62:20 63:3
64:8,9,16 65:5,
20,21 67:18
68:13 69:5
70:14 74:9,10,
21 76:23 78:25
79:1 80:3 82:5
84:6,13,18
85:13 86:21
87:7 89:7,11
92:2 93:21
94:24 95:5,13
97:13,16,25
100:2,7 101:13
102:4 104:13
106:2,25
108:15 109:8
110:13,18
111:8,22 112:7,
14,17,22 115:9,
14 116:23
117:20 118:4,
15,18 119:1
120:14,19,23
121:7 122:24
124:18,25
125:1,11,18
126:9 127:19
128:7,20
129:10 131:9
132:1 136:7
137:9 138:24
139:24 140:5,9
141:20 142:8,
11,19 143:13
145:14 146:21
147:4,9,24
148:8 150:2,12,
23 152:1,15
154:20 158:4
160:14,20
161:5 162:8,14
165:13 167:17
168:11,14,18
169:7 170:1,24
171:16 172:2,
14,25 173:23,
25 174:8
175:10 176:24

177:9 178:7,12
180:13 181:9
182:11 184:3,6
185:7 189:16
191:1 193:22
195:15,19
197:10,13,18
198:10 201:6,
15 202:4
203:16 204:7,
12 206:15,24
207:12,22,25
208:2,5,20
209:19 210:12,
15,18,21,25
211:3 215:1,6
218:1 219:2,4,
16 221:9
222:16 224:6
227:24 228:4
229:20 230:9
231:5,22 232:7
233:6,11
236:17 237:23
240:21 242:18
244:7,10
246:10 249:3
250:4,13 251:1,
12,21 252:9
255:7,22 257:2,
21 259:23
260:18 261:1,
14 262:1,3,5
265:17 266:21
268:13 269:3,
11 271:1,5
272:2,18 273:7,
18,22 274:22
276:8,14
277:20 278:23
279:15,25
280:18 282:21
283:16 285:13,
19,22 286:5,23,
25 287:9,20,24
288:3,7,12,16,
18 289:3,7,10,
13,18 290:2,10,
24 291:2,3

**sister** 130:19
145:8 191:18

**sit** 30:8 79:4,9,
13,17 142:24
143:14 201:25
212:7

**site** 216:1

**sitting** 186:25
187:2 204:6,7,8

**situation** 49:20

**size** 120:18

**sized** 187:5

**Skagnow**
288:5,17

**skills** 230:18,
24

**slain** 179:11

**sleep** 141:15

**sloppy** 142:13

**slot** 268:25

**slow** 208:11

**slowed** 185:21

**small** 94:11
161:7 177:21

**smaller** 145:13

**Snapper**
128:5,9

**Snapper's**
128:6,8

**Snappers**
128:6

**Snoopy** 185:2
186:24 187:12
213:8,9 231:20

**social** 241:18,
20,21 243:4

**socialize**
31:22 33:8,23
34:6,8,20

**socialized**
288:22

**socially**
288:19

**solemnly** 8:10

**somebody's**
283:2

**sought** 252:19,
22

**sound** 28:4
100:9

**sounds** 113:6

**source** 162:15
169:12

**sources** 244:8

**space** 29:15

**Spanish**
185:22

**speak** 14:21
55:9 100:10
189:12 192:8
193:7 216:19
249:10

**speaker** 149:6

**speakers**
16:16 18:22
20:10 47:16
48:22 72:18
90:18 97:1
98:11 165:5,19
252:3 281:25

**speaking** 77:7
98:18 156:1
232:9

**speaks** 205:3

**specific** 39:24
40:5,6 167:10
197:21 285:2
289:20

**specifically**
41:2 102:6
233:1

**speculation**
116:9 119:17
136:6 196:6
251:7,16
260:10 262:19,
24 263:6

**spell** 8:20,22,
25 17:14 38:11

**spelled** 56:20

**spend** 112:2
210:5 262:21

**spent** 36:10

**spoke** 37:22

107:11,12
112:20 116:14
153:12 209:1
216:24 267:15
288:21

**spoken** 260:16

**spot** 201:13
223:13 227:5

**spotted** 166:20

**squad** 199:23

**stabbed** 49:2
134:2

**stack** 228:9

**Stadium** 138:5

**stand** 177:3

**standard**
74:22

**Standby** 42:1

**Stanton** 7:9

**start** 10:13
15:10 19:2,3
41:13 71:17
86:10,11
158:10 172:21
176:6 190:5
208:9 242:6
270:22 271:8

**started** 24:15
50:12 57:24
114:15 122:10
128:15,16
133:10,12,18
166:11,14,16
176:10 186:3,5
234:25

**starting** 6:20
30:5 36:24
78:11

**starts** 238:15

**state** 6:18 7:25
8:19,22 36:21
271:20 272:5

**stated** 46:14
67:16 171:6
173:2 176:11

**statement**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 428 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 16, 2019

326

40:20 58:14
62:4,7,9,12
64:24 65:3,9
67:9,10,13,14,
15 71:12,16,18,
21 72:8 73:1
74:15 75:12,14
76:10,11,14,16
77:8,15 90:3
100:19 101:17
102:3,5,8
103:11,23,25
106:5 110:7
118:24 119:4,6,
7,12,20,23,24,
25 120:21
129:20 130:17
131:24 135:25
136:9,15
138:17 139:22
140:11,24
144:19,25
147:3,11,16
149:23 151:24
152:5 158:15
159:13,23
160:19 161:12,
23 162:12,17
163:20 164:2
166:6,10
167:16,24
168:1,2,12
169:16 171:3,4,
5,11 175:23
176:11 177:15
179:24 181:14
182:20 183:9
184:10 187:22
188:2,15
202:14 204:23
205:11 211:18
212:1,5 215:15
216:21 217:3,4,
6 220:13 221:9,
13 223:7 224:6,
19,22,23 226:6
228:24 229:2
230:3 231:16
234:20,24
235:10,11,12,
15 239:20
247:8,10,11
250:23 253:2
256:6,8 259:14,
15 261:3,18
266:9,16

**statements**
14:4 18:1,4,6,9
19:8 67:7 73:13
74:8 84:25
91:19 107:15,
18 108:21
109:4,6,24
110:23 111:17
114:7,8,22
115:22 116:1,5,
11,12 117:5,15,
16 118:1
135:23 151:23
161:10 169:14,
19,20 203:9,11
211:3 226:25
260:23 285:3

**states** 6:15
65:16 67:19
70:4 77:14

**stating** 71:24

**station** 23:17
31:3 56:6,9,18,
23 59:7 66:12,
19 74:3 76:13
125:7 156:9,14
194:24

**stationed**
23:16

**stayed** 130:6
184:21 276:18

**stemmed**
247:2

**step** 170:11,18

**steps** 37:8,20
81:13,15,19

**Steven** 289:17,
21

**stick** 14:5

**stocks** 242:24

**stole** 61:6

**stolen** 67:15

**stop** 150:3,5
167:1 196:13
198:8,24
200:22 201:3
224:9 254:10

**stopped** 50:12
185:15 198:11,
25 200:25
201:9

**stopping**
146:25 196:16
200:3 257:8
264:12

**stops** 19:3

**store** 276:2

**Store's** 276:3

**stored** 90:14

**stories** 109:21
110:8,12
116:14 122:7
125:17

**story** 88:3,6
116:16,17
143:15 159:8
213:21

**straight** 145:5
175:7 212:4

**street** 6:10
97:11,15,20,24
132:6 133:5
137:5,9 138:14
141:1,9 147:6
155:19 175:8
178:15 200:15
201:5

**streets** 166:21

**strike** 37:5
45:8 52:3 57:4
58:5 59:10
90:23 91:5
117:2 119:2
124:21 170:8
197:15 208:1
218:12 250:3

**string** 108:5

**strong** 124:12

**struck** 58:10,
11,23,25
289:24

**studied** 268:21
271:3

**study** 268:21

269:5,9

**stuff** 29:1 53:10
84:15 94:6
103:24 110:14
171:24 199:2
263:22,24
264:2,6 269:8
273:1,18
275:25 276:23
287:13

**subject** 17:8
64:13,14 65:18
284:13

**submit** 247:11
248:18

**submitted**
90:12 248:20
249:1

**subsequent**
179:4

**Subway**
106:19

**succumb**
40:16

**succumbing**
40:21

**sufficient**
22:17

**suggest** 50:15
179:10

**suggested**
162:16 219:15,
18 278:21
288:1

**suggesting**
50:22

**suggestion**
50:11

**Suite** 6:10

**Sun** 145:8

**supervisor**
66:8 75:16,21
91:8 96:9 160:2
188:10,23
233:21 238:14
246:4 274:18
287:21

**supervisors**
26:23 83:3,9
160:5,9 188:3,5
230:16,23
233:12,17
238:14 279:17
287:17,25

**supp** 140:15

**supplement**
14:4 17:22
86:17 107:15
248:23 250:14,
23

**supplemental**
17:23 78:14
79:6 84:25
85:17 89:1
93:20 129:9
250:18

**supplements**
90:2 107:18

**support**
242:19,21

**supportive**
233:12,15

**supposed**
64:17 73:17
74:20 131:14
186:7 217:9,16
246:5 249:6

**supposedly**
146:2 181:16
246:24

**suppress** 14:4
281:13,14,16,
19,20 282:9,10,
15 283:8,18,23
289:14,22,25
290:3

**suppressed**
285:4

**suppression**
281:6

**surprise**
250:24

**surviving**
106:8

**survivor** 176:4



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 429 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 13, 2022
327

**susceptible** 54:4

**suspect** 38:20 39:10,16 40:18, 22 41:14 48:1, 11 52:10,13 53:1,6,7,9,11, 14,16,19,21 55:13 56:3,6 59:6,10 60:11, 25 61:5,14,15 64:18 66:2,4 69:3,7,11 70:3 81:20 150:3,5, 17 170:10,15, 19 193:13 197:9 209:10 238:21 239:17 240:16,23 266:17

**suspects** 49:5 50:5 54:12 55:16,19,22,25 56:9 64:20,22 83:21 215:24

**suspended** 244:11 245:10, 14 246:14

**suspense** 213:3

**suspension** 245:16

**suspensions** 244:15

**sustained** 58:18 240:1,15, 23

**SUV** 242:8

**SWAT** 25:21 26:6,7 28:25 287:15

**swear** 8:9,10

**sworn** 8:15

**synchronize** 249:5

**synopsis** 157:19,20,22 159:12 171:2

**system** 54:18 203:13

———

**T**

**table** 12:14 16:17

**tabs** 163:24

**tactical** 25:23

**tactics** 54:4

**tagged** 245:23

**takes** 69:19 281:16

**taking** 24:15 45:4 65:17 69:21 71:18 75:1 106:13 115:11 117:16 123:16 128:16 129:20 208:8 287:13

**talk** 21:6 22:3, 18 88:2 99:16, 20 100:17 134:11,23 153:24 154:21 155:11 160:7, 15 162:9 181:7 187:14,16 193:12,17 210:8 216:18 217:15,17 231:15,16 235:2 238:7 255:19 265:2 267:21,25 272:9 273:23 276:12 277:19, 23

**talked** 20:5 22:2,5 88:7 93:8 98:8 122:6 134:21 135:17 147:7 155:13 162:6 175:1,5 179:3 185:15 188:2 189:14, 18,20,23,24 215:16 217:24 254:14,16 255:3,24

259:17 260:8, 14,22 280:17 285:2

**talking** 12:16 19:2,3 49:13 53:18 70:5 92:3 104:3 121:17 138:16 147:15 149:8 153:1 154:12 156:18, 22 157:12 160:12 162:10 166:14 167:19 168:7 173:16 192:17 207:14, 16 209:22 220:25 230:1 232:5 240:9 248:22 271:20 272:2,4 282:5 283:22

**talks** 108:11 168:10

**tall** 32:4,20 120:19

**tape** 263:17 264:4,9,13,16, 19 265:16,18 266:4,7

**taping** 230:17

**targeting** 162:23 168:19

**tasks** 285:17

**taught** 79:5 286:10

**teach** 78:13,18 273:19 277:6

**teaching** 273:15,17 277:16

**team** 25:21 152:10

**Tear** 85:4

**technical** 9:9 25:21

**Technically** 81:17

**technician** 6:8

**technique** 42:21 47:9 50:15 51:20 208:21

**techniques** 42:13,18,19 46:25 47:17 50:15,22 51:16 54:1,8 55:4 208:25

**telephoned** 161:13

**telling** 49:14 52:18,21,22 53:10 58:22 87:10 102:12, 20,22 121:13 122:25 124:10, 20,23 125:2,8, 16,20 127:23 130:18 131:1 132:12,13 141:5 143:18 145:16 146:8 153:19 160:22 167:15 188:22 200:6 211:24 277:16 278:25

**tells** 102:15 127:11 143:23 144:25 168:9 238:14

**ten** 25:10 27:6, 18,23 43:12,17, 21 106:17 108:6,23 172:19 210:7 269:24

**tendered** 84:2

**tenure** 271:14

**term** 12:21,24 40:13

**term-memory** 13:15

**Terrance** 130:18,21 131:2,6,10 132:2,4,12,13, 19,20

**technician** 6:8

**Terri** 130:15 131:1,10 132:13

**terribly** 59:9

**test** 149:7 269:5,12

**testified** 8:15 14:7,16 98:22 176:25 235:20, 23 255:20,22 280:20 283:25

**testifies** 168:8

**testify** 11:3 82:7 281:4,9 282:13,18 283:3,18

**testifying** 211:20 281:5

**testimony** 14:11,12,24 77:23,25 78:10 81:4 96:21,22, 23 103:1 118:3, 6 161:1,3 168:4 172:16,20 174:19,24 175:6 190:2,17 254:21 255:2 281:3 283:3,5 284:5,24

**Texas** 6:16 7:3, 7,9,13,17,23 38:4 271:24 272:6 287:3,4 289:8

**thanked** 197:18 198:5, 11

**thanking** 198:1,5

**theater** 184:14, 16,19

**theory** 40:23

**therapy** 272:22

**thigh** 173:4

**thin** 32:2,23

**thing** 10:3,8



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 326-2   Filed 05/26/23   Page 430 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 13, 2022
328

15:23 39:25
88:1 120:11
141:22 142:4
151:16 182:18
188:1 190:6
209:12 224:9
226:12

**things** 11:25
12:1 13:4 49:1
59:20 81:7
82:18 85:21
93:8 121:3,15
134:25 169:9
229:24 233:22
254:25 272:16
274:3 280:10,
14 286:4,7,16
287:14

**thinking**
117:16 254:8
260:11

**Thirteen**
144:17,18

**Thomas** 23:8

**thoroughness**
78:21 79:14

**thought**
101:23 117:22,
25 121:23
124:15 142:18
182:12 186:12
240:13 284:8

**threaten** 159:3
210:13,19

**threatened**
134:14 135:7,
10,13,21 136:3
141:18,23
142:5,16
143:24 144:3,7
210:16

**threatening**
148:20 152:23
278:25 284:17

**threw** 85:3,11
164:6,7 245:23

**throw** 85:3,5,7,
9 89:4 266:10

**throwing**

164:11

**thrown** 266:16

**time** 6:12 9:22,
24 15:8,14
19:17 20:8,17
21:9,16,20
22:17 25:11,13
26:7 29:12
30:2,4,6 35:1,
10 42:8,11 56:2
58:1 65:1
66:23,24 68:8,
11 73:2 74:18
78:16 79:7
88:7,10,19 94:5
95:2 107:12
109:8 110:13
112:2,23
113:14 116:13,
14 128:11,15,
16 135:23
138:24,25
139:16,21,24
140:3,6,7,10,
18,20 142:24
143:15,16
145:2,11 146:4,
5 148:2,15,18
151:13 166:7,
10,11,13,14,16
169:17 170:3,
14 172:18
176:18 190:15,
25 195:6
200:24 211:23
212:23,24
213:17 214:23
215:21 216:1
218:15,22,25
219:3 231:4
232:1,3 248:1,
18 249:14,23
250:11,20
253:14 254:25
255:9,10,11,16
258:7,10
260:17 270:9,
16,17 271:2
273:25 274:8,
10 275:14
279:24 283:17
284:1,3 287:14
290:18 291:17,
20,23

**timeframe**
32:1

**times** 15:2,4,6
20:16 25:13
95:5 116:17
128:14 129:17
133:2 141:8
174:14 211:21
212:7 290:6

**tires** 130:21
180:4

**today** 6:9,11
11:3 79:4,9,13,
17 98:15,19
104:4 119:2,3
121:23 142:24
201:2 212:7

**told** 11:15,18
13:10 19:9
22:10 39:1
61:24 85:20
98:1,3,23 99:2
100:16 101:2,8,
22 105:5,6
110:17,20
112:19 113:25
114:3 120:22,
25 121:1
122:16 123:3
125:12,18,22
127:3 128:8
129:1 131:2,11
132:4 133:11,
13,17,22 134:5,
17 137:22
143:11 145:4,
20 147:21
148:9 152:17
153:24 154:19,
20 157:23,24
159:1,13
163:18 164:8
167:1,3,4,6,7,8,
15,25 168:7,12
178:13 188:15
189:11,13
194:23 199:7
200:24 217:6
218:2 222:1,13,
15,18 225:4
238:18 246:4
251:10 252:14
257:6 261:3,6,
7,9,10,12,18

265:1 272:7
283:7 287:22

**ton** 85:23

**Tony** 263:17

**Tonya** 131:14,
16

**top** 78:2 93:22
140:3 219:11

**total** 38:14

**totally** 39:3
119:8 164:23
165:1,9 196:13

**track** 214:23

**trade** 24:9

**trails** 19:1

**train** 45:12,15,
18 209:3

**trained** 36:25
37:3,6 38:15,
19,23 39:9,11,
13 40:9,15,19,
21,24 41:2,5,7,
11,17 42:17
48:10 49:5,12,
19 50:4,10,14
51:2,5,16 54:3,
11,14 55:3,7,12
59:15 79:10,14,
18 80:11,12
81:3,5,6,7,12
209:6

**training** 28:12,
15,18 29:1
36:23,25 38:1,
3,5,13,24 39:20
40:4 41:8 42:12
45:9,20,22 46:3
51:9 53:24
55:9,14,15
272:10,12
287:15

**Trans** 138:4,
13,18,21 141:1
143:18,20

**transcript**
14:10,14 97:7
136:23 172:19
176:2

**transcription**
6:6

**transcripts**
13:23 14:1,2,6,
12,17,23 15:2,
3,13 153:19,20
212:6

**transpired**
209:11

**trashcan** 85:3

**treatment**
63:9,10

**trial** 14:3,7,11,
12 18:10,17
90:5 96:22
161:2,3 168:6
190:3,17
254:20,22
255:3,21 268:5
281:8,12 282:5
291:17

**trick** 28:3

**trip** 255:6

**trouble** 60:7
132:25

**true** 64:20
67:11 74:5
87:4,11 118:20,
23 119:2 222:7
230:20

**trust** 99:1

**truth** 8:11,12
42:16,17 52:19,
21 67:12 87:2
101:9 113:21
217:5,7 218:3
231:17

**truthful** 109:22
122:11,12
123:2,24
176:17 191:8

**truthfully** 11:3
113:21

**Tschirhart** 7:6
9:6

**tunnel** 40:13,
16,22 41:3,13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 326-2 Filed 05/26/23 Page 431 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 13, 2022
329

turn 91:1 96:16
166:5 245:1
249:8,14,15

turned 89:24
138:14,21
141:1 245:2
246:6 254:9

turns 88:10

TV 127:21,25
129:5 145:3

two-man 66:15

type 19:5 48:8
74:4 89:2
93:23,25 94:2,
3,4,9,14,17,22
95:8 96:17
103:15 167:10
208:10 209:23

typed 94:1
171:3

types 53:24
233:5

typewriter
129:16

typewritten
159:13

typically
79:20,21,23
81:24 83:2
170:13

typing 166:15,
16

—————
U
—————

u-turn 137:6

ultimate 73:18

ultimately
269:19

unable 19:14

unbiased
65:17 66:3,6

uncooperative
224:11

understand
9:9 10:17,20

23:20 59:4 81:4
86:19 98:12
107:3 139:22
142:23 183:12
222:16 233:19
237:7 248:19
260:19 265:22
278:22 285:17

understanding
9:8 54:7 70:25
71:23 72:5 74:6
96:15,16

understood
10:23 83:19
84:9 92:8,16

unfamiliar
63:8

uniform 25:12,
14

uniformed
200:5

unintelligent
6:5

unit 23:25 26:6,
7 29:5 35:6,9
45:10 274:23
275:15 278:14,
21 288:1

United 6:15

unknown
67:24

unmarked
25:18 199:23

unnecessary
69:21

unreliable
52:12

unreported
181:7

unwrapping
224:2

Utah 244:22

—————
V
—————

Vague 24:8
41:4 42:15 47:2

51:7,21 52:17
54:19 60:21
62:19,23 68:2
81:18 88:24
92:6 111:15
116:10 123:21
162:25 163:10
165:6,11,16
170:12 174:15,
17 177:4
187:24 196:15
207:11,23
208:23 217:12
219:20 223:6,
18,22 228:23
229:6 235:3,25
239:5,10
262:10 263:5
267:23 268:2

Valley 145:8

vehicle 149:24
171:7 178:15
194:25 195:2

vehicles
241:24 242:1,3
243:14

venture 162:21

verbally 110:5
247:5 248:12
289:23

verbatim
102:11

verdict 90:5

Vero 127:9,10,
11

versa 277:9

version 99:24
164:5 166:24,
25 184:11

versions
120:2,10

versus 6:14

vice 277:9

vicinity 204:9

victim 105:1
131:17 134:15,
18,19 135:21
136:3 141:18,

24 142:6,17
143:24 144:3,7
148:20 150:14
152:23 156:19

victims
104:10,15,16
105:2,11,21,23
106:9,23 107:5
121:1,13 122:3,
14 123:25
124:4,6,8,9,16
137:23 138:18
146:9,10,14,17,
19 147:13
148:22 171:7
225:10 226:1

video 6:8,13
15:19 16:5
18:25 106:15
177:18,21

videoconferen
ce 6:3

videos 15:24
276:2,3

view 16:8
17:16

viewed 15:24,
25 17:10,22

views 28:25

Village 184:24

Villegas 6:14
72:15,24 73:1
95:11 96:5
103:12,17
104:4,8 130:5
156:23,25
162:23 163:3,
14 166:17
167:15 168:19
169:9 171:11
184:11,18
187:23 194:3,5
205:20 206:6,9,
12 207:9,17,24
210:6,13,19,22
211:16,21
212:5,8,12
216:8 219:14,
18 221:3
222:12 231:20,
25 252:20,22

253:7,10,13,19,
24 254:6,15
255:9,16
256:18,21,24
257:20 258:19
259:7,16,20
260:6,13,16,21
261:3,8,9,11,
13,19,20
262:12,16
263:9 267:22
274:1 278:4

Villegas' 161:2
163:1,19 169:8
189:3 190:3
218:13,20
268:1

Vinson 130:15
131:14,16

violate 119:15

violation
119:11 278:8,
10 279:2

vision 40:13,
17,22 41:3,13

VNE 165:23
166:19

voice 19:2
112:3,5,6,9
142:2 159:5

volition 86:25

volume
174:22,24

voluntarily
136:15

voluntary
64:13

vulnerable
53:25

—————
W
—————

wait 10:9,13

waiting 203:1,
4,8,18,23 204:2

Wakes 281:21
282:4 284:11
285:1

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 286-2 Filed 05/26/23 Page 432 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 13, 2022
330

walk 108:6

walked 133:13, 14 138:18 201:24 205:16

walking 166:20 186:4

wall 57:1,14,15, 25 58:1 180:4

wanted 14:5 19:13,20 24:15 52:8,11,15,18 53:11 83:11 104:4 105:18 108:20 128:9 133:20 155:2 158:22 159:16 185:11 187:8 197:25 198:10 199:16 202:13 215:17 220:17 229:25 230:7 231:3,18 233:18 256:11, 15 281:19 287:19

wanting 212:3

warn 190:4

warned 73:6 194:3,5

warning 64:15 191:1 196:17

warnings 108:25 114:19 115:18 231:7

warns 71:25

warrant 57:19, 22 193:19,24

warrants 56:13,15,24 57:11,18,22 193:18

watch 134:5

watching 127:20,23 129:5 145:3

water 54:12

Wayne 100:5,

12,14

ways 50:22

weapon 61:11, 12,15,16 67:24 103:15 167:11 187:9 220:4,7, 10,15 222:2,3

weapons 120:10

wear 32:6,24 33:1

week 30:4 35:2 38:14 245:8 275:13

weekend 245:7

weekly 279:13

weeks 15:15, 17 133:3 134:15 135:21 136:4 141:19, 24 142:6 144:3, 8 152:23

well-documented 82:14

West 6:10

Western 6:16

wet 270:24

whatsoever 179:10

wheelchair 270:7

whichever 183:15

white 120:15 127:20,24 129:6 180:4 182:10,15 183:22 184:25 186:2 187:5 224:4 226:16, 20,24

wife 242:11,22

William 160:24 162:16 167:22

Williams 95:20 160:13,16,19, 24 161:15,20, 25 162:3,13,19 167:18 168:3,7, 9,13,15 169:13, 21,23 170:2,5, 23 171:6,11,18, 22 172:9 184:1, 4,11 185:25 210:23 211:6 213:7,11 217:25 231:4 253:13 260:25

window 115:7 286:7

witness's 239:20

witnessed 181:20 259:15

witnesses 61:20 65:17,20 66:3,6 76:19 87:2 104:20,21 181:17 226:2,4 267:17

wondering 260:8

word 39:12 89:2,3 290:11

word-for-word 102:11

words 55:10 133:12,15 143:17 203:24 208:7 209:11

work 24:20 30:3 31:6,8,23 33:9,24 34:6,20 35:15,16,20,25 36:2,4,6,12,14 43:23 44:16,18 46:12,17 66:15 70:20 89:8 113:8 137:18 242:13 269:8, 25 270:21 271:13 272:11 275:1 276:4,10, 17 281:15 283:8 285:10,

11

worked 24:23 25:13 29:7 31:5,12,17 35:1,11 43:15 44:23 45:5 137:14 270:19 275:3 276:20 287:4,6

worker 108:19

working 9:20 30:15,25 33:21 34:9 35:2,3,13 44:7,10,20,21 46:10,16 137:11 149:8 160:11 249:13 274:17 276:9

works 113:9 242:12,14

worried 280:21

worse 11:24 13:8,11,15 287:11

Worsick 270:7

worth 244:6

wound 172:23, 24 173:2,4,6,7, 14,17

wounds 173:10 174:5

wrapped 186:1,17

wrapping 224:1

Wren 128:10 160:6,8 162:6, 20 171:6 197:22

writ 14:3 18:17 78:6 90:6 118:3 175:5

write 79:23 80:16 81:7,12 84:10,11,15,18 89:9 121:4,6,8, 10,15 141:22 157:20,22,23

158:16 159:15, 20 170:15 247:10,12 251:3,12 267:7, 10

writes 114:15

writing 48:7 65:4 76:15 78:14 79:6,11, 15 88:22 158:10,11 269:7

written 14:15 64:2,13 67:9 74:19 75:17,18, 22 77:23 78:23 79:18,20 80:2, 12,14,15,18 81:5,9,10 89:12 101:17 108:21 109:3,6 114:7, 8,22 115:22 116:1,4 117:4, 14 120:20 125:25 144:10 169:18 189:21, 25 214:15 238:10 246:7 247:14,18,19 248:2,11 250:25 266:9 268:20

wrong 46:5 59:9 71:7 91:18 119:9 164:23 165:1,9 180:11 207:6 236:22 237:5 245:21 248:7 280:15, 21

wrongdoing 50:16

wrote 83:4 117:13 139:22, 24 157:19 159:12 163:19 219:7 235:12, 15 245:6 251:9

------

**X**

------

**XII** 174:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG   Document 286-2   Filed 05/26/23   Page 433 of 1026
The Deposition of ALFONSO MARQUEZ, taken on May 20, 2022

331

---

**Y**

---

**y'all** 15:22
279:13

**year** 26:1 30:17
43:12,13,14,18,
21 44:1 46:13,
15,19,22 60:13
217:16

**years** 13:1,5
23:12 25:10
26:3,5 27:6,18,
23 31:2 36:7,10
43:7,9,11 44:9
46:15 269:24
274:11,16
283:16 288:17

**yelled** 220:24

**yelling** 167:4

**yesterday**
15:9,22 16:3
20:19,21 21:10
22:11

**York** 273:9

**young** 97:8
98:22 118:10

**youth** 69:4,8,
12 75:23 76:3
108:13 114:21
115:20 117:3
207:18

**YS** 196:10

**YSD** 108:12
109:2 196:11

---

**Z**

---

**Zoom** 6:2 7:13
15:25



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

# ATTACHMENT 2-B

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

### NO. 3:15-CV-386

## DANIEL VILLEGAS

vs

## CITY OF EL PASO, ET AL.

### DEPONENT:

### EARL ARBOGAST

### DATE:

### June 30, 2022



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273



```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                     EL PASO DIVISION

 3  DANIEL VILLEGAS,              )
                                  )
 4         Plaintiff,             )
    v                             ) No. 3:15-CV-386
 5                                )
    CITY OF EL PASO, et al.,      )
 6                                )
           Defendants.            )

 7

 8

 9

10

11  ****************************************************

12              ZOOM VIDEO DEPOSITION OF

13                   EARL ARBOGAST

14                   JUNE 30, 2022

15  ****************************************************

16

17            ZOOM VIDEO DEPOSITION of EARL ARBOGAST,

18  produced as a witness at the instance of the Plaintiff,

19  and duly sworn, was taken in the above-styled and

20  numbered cause on JUNE 30, 2022, from 9:12 a.m. to 5:19

21  p.m., via Zoom, pursuant to the Federal Rules of Civil

22  Procedure.

23

24                   Reported by:

25                   Ginger G. Zachary, CSR, RPR, CRR
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1          A P P E A R A N C E S

 2    FOR THE PLAINTIFF:
          Mr. Wallace Hilke
 3        LOEVY & LOEVY
          311 North Aberdeen Street
 4        Chicago, Illinois  60607
          (312) 243-5900
 5        hilke@loevy.com

 6

 7    FOR THE DEFENDANT CITY OF EL PASO:
          Mr. Scott M. Tschirhart
 8        DENTON NAVARRO ROCHA BERNAL & ZECH, PC
          2517 North Main Avenue
 9        San Antonio, Texas  78212
          (210) 227-3243
10        smtschirhart@rampagelaw.com

11

12    FOR THE DEFENDANTS EARL ARBOGAST, SCOTT GRAVES,
      HECTOR LOYA, AND RAY SANCHEZ:
13        Mr. James O. "Jim" Darnell
          Mr. James O. "Jeep" Darnell
14        Mr. Cris Estrada
          JIM DARNELL, PC
15        310 North Mesa Street, Suite 212
          El Paso, Texas  79901
16        (915) 532-2442
          jdarnell@jdarnell.com
17        jedarnell@jdarnell.com
          cestrada@jdarnell.com
18

19
      FOR THE DEFENDANT KIMMETT BELLOWS:
20        Mr. Eric M. Brittain
          WINDLE, HOOD, NORTON, BRITTAIN & JAY, LLP
21        201 East Main Drive, Suite 1350
          El Paso, Texas  79901
22        (915) 545-4900
          brittain@windlehood.com
23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 438 of 1026
The Deposition of EARL ARBOGAST, taken on June 23, 2022

3

```
 1            A P P E A R A N C E S (continued)

 2       FOR THE DEFENDANT ALFONSO MARQUEZ:
             Mr. James A. Martinez
 3           JAMES A. MARTINEZ, PLLC
             7170 Westwind Drive, Suite 201
 4           El Paso, Texas  79912
             (915) 543-9712
 5           martinezja@jmeplaw.com

 6

 7       FOR THE DEFENDANT CARLOS ORTEGA:
             Mr. Andres E. Almanzan
 8           MOUNCE, GREEN, MYERS, SAFI,
             PAXSON & GALATZAN, PC
 9           100 North Stanton Street, Suite 1000
             El Paso, Texas  79901
10           (915) 532-2000
             almanzan@mgmsg.com

11

12

13       ALSO PRESENT:
             Texas Online Notary Public Elissa E. Chew,
14            Commission No. 126254355
             Video Technician Sydney Little

15

16

17                       INDEX
                                              PAGE

18  EARL ARBOGAST

19      By Mr. Hilke                           8

20      By Mr. Tschirhart                     288

21  Reporter's Certificate                    292

22  Corrections and Signature                 293

23

24

25
```

EARL ARBOGAST

By Mr. Hilke                           8

By Mr. Tschirhart                     288

Reporter's Certificate                    292

Corrections and Signature                 293

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                        EXHIBITS

 2   NO.              DESCRIPTION                        PAGE

 3   Exhibit 01   El Paso Police Department Supplement      48
                  Report, Statement of Tonya Vinson,
 4                4-12-1993

 5   Exhibit 02   Performance Evaluation Report, General    85
                  Services Employee Group, City of
 6                El Paso, Texas, 1-9-1990

 7   Exhibit 03   Performance Evaluation Report, General    86
                  Services Employee Group, City of
 8                El Paso, Texas, 1-15-1992, and
                  Supplement, 1-20-1993
 9
     Exhibit 04   Chapter Seven, Juvenile                  105
10
     Exhibit 05   El Paso Police Department Personnel      120
11                Information Report, Internal Affairs
                  Division, 4-2-1992
12
     Exhibit 06   El Paso Police Department Personnel      126
13                Incident Report, 11-29-1978

14   Exhibit 07   El Paso Police Department Complaint      132
                  Report, 5-4-1981
15
     Exhibit 08   El Paso Police Department Supplement     148
16                Report, Statement of Terrance Strong
                  Farrar, 4-12-1993
17
     Exhibit 09   El Paso Police Department Crimes         156
18                Against Persons Division
                  Supplementary Report, 5-6-1993
19
     Exhibit 10   El Paso Police Department Crimes         161
20                Against Persons Section Witness
                  Statement of David Rangel, 4-21-1993
21
     Exhibit 11   Reporter's Record, Writ of Habeas        175
22                Corpus, 9-15-2011

23   Exhibit 12   Google Map Image                         183

24   Exhibit 13   El Paso Police Department Supplement     207
                  Report, Statment of Rodney Williams,
25                4-21-1993
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 440 of 1026
The Deposition of EDWARD DELACRUZ, Taken on June 23, 2020

5

```
 1                     EXHIBITS (continued)

 2   NO.              DESCRIPTION                      PAGE

 3   Exhibit 14       El Paso Police Department Supplement    226
                      Report, Written Confession of
 4                    Juvenile, Danny Villegas, 4-22-1993

 5   Exhibit 15       El Paso Police Department Supplement    233
                      Report, Statement of Fernando Lujan,
 6                    4-22-1993

 7   Exhibit 16       Statement of Robert Wayne Hall,         254
                      4-15-1993
 8
 9   Exhibit 17       El Paso Police Department Crimes        262
                      Against Persons Division Witness
                      Statement of Douglas Bosanko,
10                    4-16-1993

11   Exhibit 18       Juvenile Confession Warning,            271
                      Statement of Prisciliano Villegas,
12                    2-13-1992

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1           THE VIDEO TECHNICIAN:  On record.  My name

2   is Sydney Little.  I'm the online video technician, and

3   Ginger Zachary is the court reporter today, representing

4   Kentuckiana Court Reporters, located at 730 West Main

5   Street, Suite 101, Louisville, Kentucky 40202.

6           Today is the 30th day of June 2022.  The

7   time is 9:12 a.m.  We are convened by videoconference to

8   take the deposition of Earl Arbogast in the matter of

9   Daniel Villegas versus City of El Pas- -- El Paso,

10  et al., pending in the United States District Court for

11  the Western Division [sic] of Texas, El Paso Division,

12  case number 3:15-CV-386.

13          Will everyone but the witness please state

14  your appearance, how you're attending, and the location

15  you are attending from, starting with Plaintiff's

16  counsel?

17          MR. HILKE:  Wallace Hilke for Plaintiff

18  Daniel Villegas, attending by Zoom from Chicago,

19  Illinois.

20          MR. TSCHIRHART:  Scott Tschirhart atten- --

21  representing the City of -- Scott Tschirhart

22  representing the City of El Paso, attending from

23  San Antonio, Texas.

24          MR. ALMANZAN:  And this is Andy Almanzan

25  appearing for Defendant Carlos Ortega, appearing from

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   El Paso, Texas.
 2                   MR. MARTINEZ:  Jim Martinez for Alfonso
 3   Marquez at my office in El Paso.
 4                   MR. JIM DARNELL:  Jim Darnell for Earl
 5   Arbogast, and I'm appearing from El Paso.
 6                   MR. BRITTAIN:  Eric Brittain on behalf of
 7   Defendant Kimmett Bellows, from my office in El Paso,
 8   Texas, via Zoom.
 9                   THE VIDEO TECHNICIAN:  Thank you.
10                   Mr. Arbogast, will you please state your
11   name for the record and hold your ID up to the camera?
12                   THE WITNESS:  Okay.  It's Earl Arbogast.
13   And this is my driver's license.
14                   THE VIDEO TECHNICIAN:  Great.  Thank you.
15                   Do all parties agree that the witness is,
16   in fact, Earl Arbogast?
17                   You can put that down.  Thank you.
18                   MR. HILKE:  Yes.
19                   THE VIDEO TECHNICIAN:  Thank you.
20                   All right.  And, Ginger?
21                   THE REPORTER:  My name is Ginger Zachary,
22   Texas CSR 5710.  I am reporting the deposition remotely
23   by stenographic means from Chaparral, New Mexico.  The
24   witness is located in El Paso, Texas.  The Texas Online
25   Notary Public is Elissa E. Chew, Commission Number
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 443 of 1026
The Deposition of EARL ARBOGAST, taken on 9/11/2019

8

```
 1  126254355, located in El Paso, Texas, who will now

 2  administer the oath.

 3              (Witness duly sworn.)

 4          MS. CHEW:  You may proceed, Counsel.

 5              EARL ARBOGAST,

 6  having been first duly sworn, testified as follows:

 7                  EXAMINATION

 8  BY MR. HILKE:

 9      Q.  Good morning, sir.

10      A.  Good morning, sir.

11          MR. TSCHIRHART:  Wally, can we have a

12  stipulation on the record that an objection from one

13  defendant is good for all?

14          MR. HILKE:  Yes, we'll so stipulate.

15          MR. TSCHIRHART:  Okay.  Thank you.

16      Q.  (BY MR. HILKE)  Sir, my name's Wallace Hilke,

17  and I am one of the lawyers for Plaintiff Daniel

18  Villegas, and I'm going to be asking you a few questions

19  today.

20      A.  Okay.

21      Q.  I'm going to start with an easy one.  Could you

22  please state and spell your name for the record?

23      A.  Yeah.  It's Earl Arbogast.  Earl is E-A-R-L.

24  Arbogast is A-R-B-, as in "boy," -O-G-, as in "George,"

25  -A-S-T.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 444 of 1026
The Deposition of EDWARD GALLAGHER, taken on 9/26/22

9

 1      Q.  And, sir, have you -- have you ever given a
 2   deposition before?
 3      A.  No.
 4      Q.  Okay.  So I'm going to go over a few rules for
 5   today.  Just like in court, there is a court reporter
 6   taking down everything you and I say during this
 7   deposition, and so just like in court, it's important to
 8   speak loudly and to give "yes" and "no" answers instead
 9   of gestures or things like that.  Does that make sense?
10      A.  Yes.
11      Q.  And just like in court, also, it's important
12   that we talk one at a time so she can take down
13   everything we say.  Does that make sense?
14      A.  Yes.
15      Q.  And I'm going to try to only ask questions that
16   make sense to you, but if my questions don't make sense,
17   will you please stop me and let me know you need me to
18   clarify them?
19      A.  Okay.
20      Q.  And likewise, if you answer a question I ask,
21   I'll assume that you understood the question.  Is that
22   fair?
23      A.  Yes.
24      Q.  And we can take breaks whenever you would like.
25   The only thing I will ask is that you answer a pending

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 445 of 1026
The Deposition of GERARD ALLEN BAKER, Taken on 3/28/23

10

```
 1   question from me before we go on break.  Does that --
 2        A.  Okay.
 3        Q.  -- make sense?
 4        A.  (Moves head up and down.)
 5        Q.  And then let me ask:  Do you have any health
 6   conditions that affect your memory in any way?
 7        A.  No.  Not right now, no.
 8        Q.  Okay.  And are you currently taking any
 9   medications that affect your memory in any way?
10        A.  No.
11        Q.  And do you have any health conditions, or are
12   you taking any medications that would prevent you from
13   testifying truthfully today?
14        A.  No.
15        Q.  Can you think of any rea- -- anything that
16   would prevent you from testifying truthfully today?
17        A.  No.
18        Q.  Great.  So to...
19             Did you review any documents to prepare for
20   today's deposition?
21        A.  Yes, I reviewed some.
22        Q.  And without telling me anything you said to
23   your lawyer or anything your lawyer said to you, what
24   documents did you review in preparation for today?
25        A.  Some of the court -- courtroom testimony where
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 446 of 1026
The Deposition of GERARD ROBISCHON, Taken on June 23, 2022

11

1  I testified in.

2      Q.  And did that include your testimony from a 2014

3  habeas proceeding?

4      A.  I don't -- I don't know what it was from, but

5  it was -- it wasn't from the trial.  It was the --

6  the -- the latter two.

7      Q.  Got it.

8          Were the -- and so you -- there were two

9  transcripts of trial testimony that you looked at?

10     A.  I looked at some of that testimony, yeah, some

11  of the detectives at -- at the trial.

12     Q.  Okay.  So you looked at your own testimony.

13  Some of the testimony you looked at was your own

14  testimony; is that correct?

15     A.  Yes.

16     Q.  And how many transcripts of your own testimony

17  did you look at?

18     A.  I think there were two separate ones.

19     Q.  Okay.  And were they both pretty long, say,

20  around a hundred pages or so?

21     A.  No.

22     Q.  No?

23          How long were they?

24     A.  One was, I think, about 12 pages, and the other

25  one was about -- the -- the first one, maybe 20, 25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  pages, yeah.

 2      Q.  Okay.  And what other detectives' testimony did

 3  you look at?

 4      A.  I looked at Detective Marquez, and that was the

 5  only other detective, I believe.  And Charlie Ortega.  I

 6  remember his.

 7      Q.  And was that their testimony at criminal trials

 8  of Daniel Villegas?

 9      A.  You know, I didn't notice.  I -- I just saw the

10  statements and I -- I think what they were, they were

11  statements they made in the case and some of the

12  courtroom testimony.

13      Q.  Okay.  And other than courtroom testimony, did

14  you look at any other documents?

15      A.  Courtroom testimony, statements that were in

16  the case.

17      Q.  Uh-huh.  And were some of those statements from

18  suspects in the investigation?

19      A.  I saw Daniel Villegas' statement in there.  I

20  didn't read it.  I've never read his statement.

21      Q.  Okay.  And were some of the statements from

22  witnesses?

23      A.  Yes.  I read a statement from two witnesses

24  that I took statements from.

25      Q.  And what witnesses were those?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A.  Tony Vincent and Juan Medina, I believe.

 2      Q.  Okay.  And did you review any other statements

 3  from witnesses?

 4      A.  I didn't read -- no.  I didn't read any of the

 5  statements.

 6      Q.  Did you --

 7      A.  Really, I -- I could say I might have.  I don't

 8  remember reading any others.  I remember I was

 9  concentrating on the statements that I took.

10      Q.  Okay.  Did you read your supplemental report

11  from the murder investigation?

12      A.  No.  I couldn't find it.

13      Q.  Did you read the reports of any other

14  detectives?

15      A.  Detective Marquez and Detective Ortega.

16      Q.  Okay.  And did you read any other witness

17  statements?

18      A.  Just the ones I remember were the ones that I

19  took.

20      Q.  Okay.  Do you recall reviewing any other

21  documents in preparation for today?

22      A.  No.  Courtroom testimony and then some

23  documents in -- that were in with the case.

24      Q.  Did you review any -- any video files?

25      A.  No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 449 of 1026
The Deposition of GARD AUBUCHONS, taken on 04/26/23

14

 1      Q.  Or any audio files?

 2      A.  No.

 3      Q.  Did you review any personal notes?

 4      A.  No.  I didn't do any, no.

 5      Q.  Okay.  And as a police officer with the El Paso

 6  Police Department, did you keep any personal files about

 7  your investigations?

 8      A.  No.

 9      Q.  Okay.  Did you keep any copies of police

10  reports?

11      A.  No.

12      Q.  Okay.  So, again, without telling me anything

13  about what you discussed with your attorney, how many

14  times did you meet with your attorney to prepare for

15  this deposition?

16      A.  I met -- for -- for this one today, I met him

17  once when he had prepared the documents for me to

18  review, but I really didn't talk to him.  He just had

19  them there at the law office.  And then I talked to him

20  yesterday for about a half hour.

21      Q.  Okay.  So when you were here yesterday, again,

22  without telling me anything you discussed, who was

23  present for your meeting?

24      A.  Just myself and Jim Darnell.

25      Q.  Okay.  And other than those two meetings, did

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  you have any phone conversations with your lawyers to
2  prepare for this deposition?
3      A.  No.
4      Q.  Okay.  And was there anything you wanted to
5  look at to prepare for this deposition, but were not
6  able to?
7      A.  I guess I haven't seen my -- my supplemental
8  report.
9      Q.  Okay.  Anything else?
10     A.  Not that I can think of.
11     Q.  Did you have adequate time to prepare for
12 today's deposition?
13     A.  Yes.
14     Q.  And do you feel prepared to testify today?
15     A.  I do.
16     Q.  Sir, how old are you today?
17     A.  68.
18     Q.  And you graduated from high school; is that
19 correct?
20     A.  Yes.
21     Q.  And was that in El Paso?
22     A.  Yes.
23     Q.  And you proceeded to serve in the military; is
24 that right?
25     A.  Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    Q.  How many years did you serve in the military?

 2    A.  Three years.

 3    Q.  And at what branch did you serve in?

 4    A.  It was the Army.

 5    Q.  And did you ever serve as a military police

 6  while you were in the Army?

 7    A.  No.

 8    Q.  And after -- after you left the Army, did

 9  you -- did you later become a law enforcement officer?

10    A.  Yes.

11    Q.  What was your first job in law enforcement?

12    A.  It was as a -- well, it was through the

13  academy, and after I graduated from the academy, I was

14  in patrol.

15    Q.  Was that the academy in El Paso?

16    A.  Yes.

17    Q.  What year did you enter the academy?

18    A.  July of 1977.

19    Q.  How long was the academy?

20    A.  I believe it was four months back then.

21    Q.  And what kinds of -- what kinds of training did

22  you receive at the academy?

23    A.  Just academics and -- and physical.  We went

24  through the Penal Code, Code of Criminal Procedures, and

25  then different techniques on how to protect yourself,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 452 of 1026
The Deposition of GARY GARDUCAS, Taken on June 23, 2022

17

1  how to handcuff.

2      Q.  Okay.  As part of that training, did you learn

3  about constitutional rights that you're required to

4  follow as a law enforcement officer?

5      A.  Yes.

6      Q.  And would that include Miranda rights of

7  suspects?

8      A.  I -- I don't remember exactly what we were

9  taught from the Code of Criminal Procedure back then,

10  but I know that we did hit it, and I can't remember

11  specifically what -- what subjects --

12      Q.  Okay.

13      A.  -- I had back then.  It's been quite a while.

14      Q.  Sure.

15          But coming out of the academy, you knew

16  that you couldn't arrest and question a criminal suspect

17  without advising them of their rights; is that fair?

18      A.  Yes.  If you were going to inter- --

19  interrogate or interview anybody, then you would have to

20  Mirandize them.  I could arrest somebody and take them

21  to the station.

22      Q.  Right.

23          Did -- and so after the academy, what was

24  your first assignment with the El Paso Police

25  Department?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 453 of 1026
The Deposition of GARY KENDOCA, Taken on June 26, 2019

18

```
 1        A.  It was patrol.

 2        Q.  Patrol?

 3             And did you have a geographical assignment

 4   as a patrol officer?

 5        A.  Well, can you repeat it?

 6        Q.  Yeah.

 7             Did you have a geographical assignment as a

 8   patrol officer?

 9        A.  Yes.

10        Q.  What was your assignment?

11        A.  It was a district within the northeast part of

12   town.

13        Q.  Approximately what were the -- what were the

14   bounds of that district?

15        A.  Well, in El Paso, it ran from Atlas and Gateway

16   to about Hondo Pass and -- and Dyer Street, all the way

17   up to the mountain and to Railroad.

18        Q.  Okay.  How many -- how many patrol -- patrol

19   districts were -- were there in the El Paso Police

20   Department at that time?

21        A.  Well, it was different at different times I was

22   there.  They kept increasing it.  But when I first

23   started, there were four.

24        Q.  Okay.  And did you work in a marked car?

25        A.  Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 454 of 1026
The Deposition of GERARD AMBUCATS, taken on 9/12/23

19

1      Q.  Did you work in uniform?

2      A.  Yes.

3      Q.  Okay.  How long did you remain in the northeast

4  patrol district?

5      A.  Approximately nine years, I guess.

6      Q.  Okay.  So am I correct that that would take you

7  to about 1986?

8      A.  Yeah.  Eight or nine year- -- yeah, about 1986.

9      Q.  What was your next assignment?

10     A.  I -- I worked in the crimes against persons

11 section for a little while.

12     Q.  And did you -- did you promote to detective at

13 that time?

14     A.  Yes.

15     Q.  What was the process for promoting to

16 detective?

17     A.  It was a written exam, and they rated you based

18 on how high you scored.

19     Q.  And do you remember where you ranked in your

20 exam for detective?

21     A.  Yeah.  I was number one.

22     Q.  And what -- what subjects were included in the

23 detectives ex- -- in the detectives exam?

24     A.  The Penal Code, Code of Criminal Procedure, and

25 then also textbooks on investigation or -- two or three

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  textbooks.

 2      Q.  Did you also -- were you also tested on the

 3  El Paso Police Department's policies?

 4      A.  Oh, I -- I didn't get that again.

 5      Q.  Oh, yeah.

 6          Were the El Paso Police Department's

 7  policies also part of the detectives exam?

 8      A.  Yes, it would have been.

 9      Q.  So to score number one, you would have needed

10  to know El Paso's policies pretty well when you promoted

11  to detective; is that fair?

12      A.  Well, I don't remember how many questions from

13  that section were on there, but you would have to know

14  it.

15      Q.  Okay.  And you would have -- you would have to

16  know all the subjects on the exam pretty well to test

17  number one; is that fair?

18      A.  Well, you try to -- yeah.  You -- you can't

19  remember everything, so you try to prioritize what you

20  thought was important.

21      Q.  Sure.  And what -- what did you think was

22  important studying for that exam?

23      A.  I think the two most important things were the

24  Penal Code and Code of Criminal Procedure because that's

25  what you deal with mostly.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1         Q.  So when you -- when you started at crimes
 2    against persons, what were your responsibilities?
 3         A.  I was in robbery.
 4         Q.  Okay.  Did you handle exclusively robbery
 5    investigations?
 6         A.  Yes.
 7         Q.  And what were your responsibilities in
 8    investigating robberies?
 9         A.  There was just cases assigned to where I had to
10    investigate.
11         Q.  So you had to go out and conduct interviews; is
12    that correct?
13         A.  Yes.
14         Q.  And you also had to interrogate suspects?
15         A.  Yeah.  At times, yeah.
16         Q.  And you had to gather evidence relevant to the
17    cases?
18         A.  Can you repeat that?
19         Q.  You had to gather evidence relevant to the
20    cases?
21         A.  Yes.
22         Q.  And you had to prepare the police file so that
23    the district attorney could make a charging decision?
24         A.  Yes.
25         Q.  You had to work with other detectives in your
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   investigations?

 2       A.  Yes.

 3       Q.  You had to work with other divisions, like

 4   patrol, in your investigations?

 5       A.  I had to work with them?

 6       Q.  Yes, sir.

 7       A.  Yeah.  You consulted with patrol when you work.

 8       Q.  Can you -- can you think of any other major

 9   parts of investigating robberies that I haven't

10   mentioned?

11       A.  Can you repeat that?

12       Q.  Yeah.

13            Were there -- were there any other major

14   parts of investigating robberies?

15       A.  Well, just the investigation part.  I mean,

16   we -- we did a lot of things that encompassed that.  We

17   used to install bait money for the convenience stores,

18   and we just had different duties.

19       Q.  And so you would also conduct proactive

20   investigations to try to catch robbers; is that right?

21       A.  Yes.

22       Q.  Okay.  How long did you remain in the robbery

23   section at crimes against persons?

24       A.  It wasn't very long.  It was -- it was probably

25   less than six months.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.  Okay.

 2        A.  And then I --

 3        Q.  Where did you go?

 4        A.  And then I transferred out.

 5        Q.  Okay.  Where did you transfer to?

 6        A.  To white-collar crime.

 7        Q.  Did you seek that transfer?

 8        A.  What was that?

 9        Q.  Did you seek that transfer?

10        A.  No, I didn't.  What happened was that when I

11  made detective, crimes against persons was pretty busy.

12  So even though they didn't have an opening, I went

13  there.  And -- and after a while, since they were

14  working one over, they -- they moved me to where there

15  was an opening, and it happened to be white collar.

16        Q.  I see.

17              How long did you remain in white collar?

18        A.  I think it was about a year.

19        Q.  Where did you go next?

20        A.  I went back to crimes against persons.

21        Q.  Was white collar separate from crimes against

22  persons?

23        A.  Yes, it was.

24        Q.  Okay.  And when you went back to crimes against

25  persons, were you assigned to any particular division?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    A.  Yes.  At that time, I think we were still

 2   separated, so I started out in robbery.

 3    **Q.  And how long did you remain in robbery the**

 4   **second time around?**

 5    A.  I don't remember exactly when it was, but it --

 6   the unit changed at some point -- I don't remember

 7   exactly when -- where you were investigating everything.

 8    **Q.  Were you in robberies more than a year**

 9   **before -- before that change happened?**

10    A.  When did it happen?  It -- I -- I really don't

11   remember when it -- when it changed.

12    **Q.  Okay.  Certainly, by April 1993 when the**

13   **England/Lazo murders happened, you were investigating**

14   **homicides at that time; is that fair?**

15    A.  Yes.

16    **Q.  So the change happened sometime before April**

17   **1993; is that right?**

18    A.  Yes.

19    **Q.  Do -- okay.  So between -- between when you**

20   **came back from white collar and April 1993, were you in**

21   **crimes against persons that whole time?**

22    A.  Yes.

23    **Q.  So you had been in crimes against persons for**

24   **several years by the time the England/Lazo murders took**

25   **place; is that right?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.  Yes.
 2        Q.  Okay.  Did you receive any training after
 3   becoming a detective?
 4        A.  Any training?
 5        Q.  Yes, sir.
 6        A.  Yes.  I went to some schools.
 7        Q.  And did El Paso require you to take any
 8   training as -- as soon as you became a detective?
 9        A.  No.
10        Q.  Did you ever seek other promotions beyond
11   detective?
12        A.  No, I didn't.
13        Q.  Did you work with any -- did you work with any
14   partners while you were in crimes against persons?
15        A.  Yes.  I had a few.  I -- I had -- do you want
16   to know who they were or -- but I had a few partners.
17        Q.  Yes.  Who -- who were your partners?  And if
18   you remember, when were you partnered with them?
19        A.  I worked mostly, when I first got there the
20   first few times, with Detective Wiles.
21        Q.  Okay.
22        A.  And then I worked with Al Marquez for a short
23   time when I first went to homicide -- or crimes against
24   persons.  And then I worked with Johnny Guerrero for a
25   number of years.  And after that, the unit changed, and
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  we would get called out to -- to a murder scene, and

2  they would just assign somebody with you.

**3      Q.  So, eventually, it changed so it was kind of a**

**4  case-by-case decision who would be working on the case;**

**5  is that right?**

6      A.  Pretty much.  There were guys that liked to

7  work with each other, and they tried to -- to honor

8  that, but, pretty much, you -- you could be stuck with

9  anybody.

**10     Q.  Did -- how were you first partnered up with Al**

**11  Marquez?**

12     A.  There was a murder in the northeast part of

13  town.

**14     Q.  When was that?**

15     A.  When I first made detective, and I spent white

16  collar, so it would have had to have been about 1988.

17  I'm just estimating.

**18     Q.  Yeah?**

**19             What -- what were the circumstances of the**

**20  murder?**

21     A.  It was a break-in to a house with an elderly

22  gentleman who was killed during the commission of a

23  burglary.

**24     Q.  Okay.  And what did you and Al Marquez do to**

**25  investigate the case?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1     A.  We -- we had -- we -- we had called out

 2   criminalistics to see -- to get any evidence, autopsy.

 3   We tried to reach out to, you know, any witnesses that

 4   were in the area.  There was barely -- well, a project

 5   area that was nearby, trying to find witnesses.

 6     Q.  And when you say "a project area," do you mean

 7   like public housing?

 8     A.  Yes.

 9     Q.  Okay.  And did you -- did you interview

10   witnesses in the investigation?

11     A.  Yes.  I -- I don't remember specific interviews

12   that we did, but I don't think I ever worked a case

13   where we didn't interview a witness.

14     Q.  Yeah.

15         And did you go with Al Marquez to interview

16   witnesses together?

17     A.  Yeah, I'm sure we did.

18     Q.  Okay.  Did you identify any suspects?

19     A.  No.  I got moved off that murder.

20     Q.  Okay.  If you know, how did the investigation

21   conclude?

22     A.  Yes.

23     Q.  Or I'm sorry.  Did it conclude -- was it closed

24   with a suspect being identified?

25     A.  Yes.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q.  Okay.  And was a confession taken from that
2  suspect?

3    A.  Yes.

4    Q.  Did Al Marquez take that confession?

5    A.  No.  He wasn't on the case, either, anymore.  I

6  was paired with another detective, Johnny Guerrero, and

7  then we continued working that case.  I was just working

8  with another detective.

9    Q.  So you continued the case, but Al Marquez

10  didn't?

11    A.  Correct.

12    Q.  Okay.  And were you paired with Al Marquez in

13  other investigations?

14    A.  Here and there.  He wasn't a regular partner of

15  mine.

16    Q.  Okay.  Did you work other homicides with Al

17  Marquez?

18    A.  Yeah.  There was scene -- times we got called

19  to the same scene.  I mean, sometimes, you know, six,

20  seven, eight detectives would be called to the scene.

21  You'd all be working together.

22    Q.  How long -- how long did you remain in crimes

23  against persons the second time you were there?

24    A.  I think I left in about 19- -- and I'm

25  estimating here -- about 1994 or so.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q.  So not very long after the -- the Lazo/England

2  murders; is that right?

3     A.  Yes.  Let me -- let me think here.  I'm trying

4  to think of -- I went -- I was -- if you can give me a

5  moment.

6     Q.  Sure.

7     A.  Let's see.  Yeah.  Okay.  No.  I -- I think

8  that's right.

9     Q.  What was your next assignment?

10     A.  I worked crimes against children, where we

11  investigated sexual abuse of -- physical and sexual

12  abuse of children.

13     Q.  How long were you there?

14     A.  I was there until the end of my career.

15     Q.  Did you ever recur -- return to crimes against

16  persons after 1994?

17     A.  No, I don't believe so.  I know I was there

18  three times.  I don't know if that's three times.  It...

19     Q.  Why did you decide to leave crimes against

20  persons in 1994?

21     A.  I was -- it was affecting me a little bit.  I

22  asked for the transfer.

23     Q.  I'm sorry.  I didn't catch that.  What did --

24  what did you say?

25     A.  It was affecting me a little bit.  I -- I



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  didn't -- I asked for the transfer.

2      Q.  How was --

3      A.  And actually, when I -- when I -- actually,

4  when I transferred out of crimes against persons, I did

5  go to the northeast station for one year before I went

6  to crimes against children.

7      Q.  How was it affecting you?

8      A.  It -- it was just -- I -- I didn't want to do

9  it anymore, and I had trouble taking some of the scenes,

10  you know, the smell and stuff of it.

11      Q.  Any other reason?

12      A.  No.  It's -- I asked for it, and that's --

13  that's basically why I asked for the transfer.

14      Q.  In 1993, were there different groups within

15  crimes against persons?

16      A.  Yeah.  Every -- everybody had their friends

17  that they hung around with.

18      Q.  Who was -- who was in your group in 1993?

19      A.  Probably me and Detective Graves, Detective

20  Hinojos, and I forget the other guy's name.  I -- I was

21  friends with those guys.

22      Q.  Who was in Al Marquez's group?

23      A.  Al Marquez hung around Detective Tony Tabullo.

24  They worked together for a long time.  It was just those

25  two.  And Marquez would hang out on everybody, really,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 466 of 1026
The Deposition of GERARD DARNELL GARZA, taken on 6/12/23

31

```
 1  but that was his main partner, Detective Tabullo.
 2      Q.  You said Al Mar- -- did you say Marquez would
 3  hang out with everybody?
 4      A.  Yeah, pretty much.  He was -- he was just an
 5  outgoing person, so he was always with everyone.
 6      Q.  In 1993, were you aware of conflicts between
 7  groups at crimes against persons?
 8      A.  No.
 9      Q.  Sitting here today, you don't have any
10  intention to move out of the country, do you?
11      A.  No, I don't.
12      Q.  Or to move out of the state?
13      A.  Huh?
14      Q.  Or to move out of the State of Texas?
15      A.  No.  In fact, I don't travel at all.  I think,
16  in the last 50 years, I went to Santa Fe once and I -- I
17  really don't go -- I -- I don't travel at all.
18      Q.  Fair enough.
19              Where and when were you trained in
20  conducting investigations?
21      A.  Okay.  When and where what?
22      Q.  Were you trained in conducting investigations.
23      A.  When I first got the OJ- -- to the crimes
24  against persons, you were paired with a partner, and you
25  would basically -- I guess, OJT.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 467 of 1026
The Deposition of GARDO HURTADO, Taker on June 23, Judge

32

1      Q.  And "OJT" means "on-the-job training"; is that
2   right?

3      A.  Yes.

4      Q.  Who was your -- who were you paired with when
5   you joined crimes against persons?

6      A.  I was paired with, like I said, Al Marquez on
7   the first murder for about a month and then with Johnny
8   Guerrero for a number of years, and then with different
9   people after that.

10     Q.  So Al -- Al Marquez gave you on-the-job
11  training when you were a new detective; is that right?

12     A.  Yeah, for -- yeah, when I -- I was with him
13  about a month, and we were working that case, and he was
14  training me on that case.

15     Q.  And you also attended some detective schools;
16  is that right?

17     A.  Yes.

18     Q.  Did any of those detective schools discuss the
19  subject of criminal investigation?

20     A.  Yeah.

21     Q.  When and where did you receive training at
22  schools on criminal investigation?

23     A.  A lot of it was in the city.  I remember going
24  to New York once and California once.

25     Q.  And you had -- by 1993, you had already worked



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 468 of 1026
The Deposition of EDWARD ANDERSON, Taken on 08/26/22

33

```
 1  several years in crimes against persons, right?
 2      A.  Yes.
 3      Q.  Some of these schools where you were trained in
 4  criminal investigation, did you attend them prior to
 5  1993?
 6      A.  Yes.  There were some I -- I did before that.
 7      Q.  And so in -- in your training and practice as
 8  of 1993, would you agree that the key to an
 9  investigation is keeping an open mind?
10      A.  Yeah.
11      Q.  Is it important to always follow evidence
12  objectively?
13      A.  Yes.
14      Q.  Is it important to always be open to the idea
15  of being wrong?
16      A.  Yes.
17      Q.  Are you trained -- were you -- strike that.
18              Were you trained -- and let me just say
19  that when I'm asking about your training and practice,
20  I'm really interested in what your training and practice
21  was as of 1993 because that's the subject of Daniel
22  Villegas's criminal investigation.  And so I'd like us
23  to agree that our reference point when we're talking
24  about the past is 1993, unless either of us says
25  otherwise.  Is that fair?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 469 of 1026
The Deposition of GARY ALBOGAST, taken on 6/14/23    Judge

34

 1    A.  Yes.  You're talking about training and
 2  practice, you said?
 3    **Q.  Yes, sir.**
 4    A.  Okay.
 5    **Q.  And so my question is, as of 1993, had you been**
 6  **trained never to engage in tunnel vision?**
 7    A.  I -- I didn't understand that.
 8    **Q.  Yeah.**
 9           **Had the concept of tunnel vision come up in**
10  **your training?**
11    A.  I don't recall it coming up.
12    **Q.  Okay.  Had you been trained that it was**
13  **important not to just focus on one suspect and only**
14  **collect evidence that would show that that suspect is**
15  **guilty?**
16    A.  No.
17    **Q.  So you had not been trained that there's a risk**
18  **of focusing in on one suspect too soon?**
19    A.  Well, I'm not sure what you're asking me.  I --
20  when you do an investigation, you follow where the
21  evidence leads you, and you may have several suspects in
22  a case, so you -- yeah, you keep an open mind.  You
23  investigate the case from there.
24    **Q.  Yeah.**
25           **So even if you think you know who this --**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   who the real criminal is, it's important not to ignore

 2   evidence that could point to other suspects; is that

 3   right?

 4        A.  Yes.

 5        Q.  And were you trained that the most important

 6   thing in an investigation is to avoid arresting the

 7   wrong person?

 8        A.  Yes.

 9        Q.  And that that's even more important than

10   getting the right person, making sure you don't arrest

11   someone who didn't do it.

12        A.  Yeah, I think so.

13        Q.  And in your practice, did you approach all of

14   your interviews in your criminal investigations with

15   that in mind?

16        A.  Dang, that car came by.  Can you repeat it?

17        Q.  No problem.

18             In your investigations, did you approach

19   all your interviews that way, keeping in mind the

20   importance of not arresting the wrong person?

21        A.  Yes.

22        Q.  Okay.  And would you agree that it is critical

23   to remain thorough and unbiased in criminal

24   investigation?

25        A.  Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 471 of 1026
The Deposition of GERARD ARBOCAST, Taken on 9/14/23   Judge

36

1    Q.  And that it's important to remain thorough and
2  unbiased to protect the innocent in your investigations.
3    A.  Yes.
4    Q.  And that remaining thorough and unbiased helps
5  you to convict the guilty.
6    A.  Yes.
7    Q.  Did you receive training on how to document
8  your investigations?
9    A.  Yes.
10    Q.  And when conducting criminal investigations,
11  where did you record your notes?
12    A.  I -- I had a legal pad where I -- I jotted down
13  notes.
14    Q.  And did you take notes contemporaneous, at the
15  same time, as you conducted interviews?
16    A.  Yes, I would.
17    Q.  And did you also take notes at the same time as
18  you conducted other investigation, like viewing a crime
19  scene?
20    A.  Yes.
21    Q.  Did you take notes at the same time as you
22  interrogated a suspect?
23    A.  Yes.
24    Q.  And were you required to type a report to --
25  strike that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1           Were you required to ensure that the
2    information from your notes was recorded in the police
3    file?
4        A.  Yes.
5        Q.  Did you review your notes with other detectives
6    or other individuals before recording them for the
7    police file?
8        A.  No.
9        Q.  In 1993, did you use a computer program to type
10   your reports?
11       A.  Yes.
12       Q.  Did -- did you always write your own reports as
13   of 1993?
14       A.  Most times, yes.
15       Q.  When would -- when would you not write your own
16   reports?
17       A.  Sometimes you would go out with a partner.  You
18   did the same thing.  One partner would document --
19       Q.  Uh-huh.
20       A.  -- what you did.
21       Q.  Right.  So if multiple detectives participated
22   in, say, the same interview, they wouldn't all
23   necessarily have to write separate reports, right?
24       A.  Right.
25       Q.  But if a report had your name signed on it,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 473 of 1026
The Deposition of GARD ARDOCASTE, Taker On 9/26/23

38

1  that means you were the one who wrote it; is that fair?

2      A.  Can you say that again?

3      Q.  Yeah.

4          If -- if a report has your name signed on

5  it, that would signify that you were the one who

6  actually wrote that report; is that fair?

7      A.  Well, I mean, sometimes you are a witness, you

8  sign to it.  But if I sign to it right below the

9  document, then it was mine.

10     Q.  Okay.  And did you ever type up reports for

11  other officers to sign, not as witnesses, but as the

12  attesting officer?

13     A.  Yes.

14     Q.  When would you type reports for other officers

15  to sign?

16     A.  Well, I -- I did it in this case.  I did an

17  affidavit that -- I had to get information from an

18  officer to put down the probable cause for the

19  affidavit.

20     Q.  Right.  So you would -- you might type a

21  probable cause affidavit to go and get a warrant, right?

22     A.  Yes.

23     Q.  And you might do that even if another officer

24  is going to be the one to sign -- to sign on it; is that

25  right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1      A.  Yes.

 2      Q.  But what about, say, supplemental reports?

 3 Would you ever type up another officer's supplemental

 4 report?

 5      A.  No.

 6      Q.  Would you ever type up any kind of report for

 7 another officer other than an affidavit for a warrant?

 8      A.  Well, just -- if I'm understanding you

 9 correctly, like an affidavit or a warrant, I would.

10      Q.  Okay.  Can you think of any other kind of

11 document that you would type up for another officer?

12      A.  There might be, but I can't think of any right

13 now.

14      Q.  In 1993, did the El Paso Police Department have

15 policies regarding report writing?

16      A.  I'm sure they did.

17      Q.  What were those policies?

18      A.  Well, basically, just to document what you've

19 done.

20      Q.  Did the -- all right.

21          And did El Paso's pol- -- so was it typical

22 in investigations that you would have both handwritten

23 notes and a typed report of your investigation?

24      A.  Well, I would always transcribe my notes into

25 my supplement, but I wouldn't keep my notes.  I might

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 475 of 1026
The Deposition of GARETH DARE BACON, Taken on 9/16/21 Judge

40

1  have them at one time, but it's not something I would

2  keep.

3      Q.  Did -- was -- did the department have any

4  policy preventing you from keeping your handwritten

5  notes?

6      A.  No.  It's just that there was no policy on

7  keeping them, so I didn't.

8      Q.  And was there any policy preventing you from

9  putting your handwritten notes in the police file?

10     A.  No.

11          We lost the voice.

12     Q.  I know.  I -- I went muted for a second to --

13     A.  Okay.

14     Q.  Would you typically try to type up your

15  notes -- well, strike that.

16          Did you have any practice as to how long

17  you would let -- how much time you would let pass

18  between taking handwritten notes and typing up your

19  notes?

20     A.  Usually no more than a couple of days for me.

21     Q.  Okay.  And is it important to type up your

22  notes quickly in an investigation?

23     A.  Well, I would type mine up every couple days.

24  I thought that that was adequate.

25     Q.  Yeah.  And typing up your notes every couple

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 476 of 1026
The Deposition of GARY CARROLL, Taken on June 23, 2022

41

```
 1  days, did that help you make sure you didn't forget any
 2  details that might be important?
 3      A.  Yes.
 4      Q.  And did that help you organize your
 5  investigation so you could refer to what had already
 6  been accomplished?
 7      A.  Yes.
 8      Q.  Okay.  After you typed a report, would it be
 9  reviewed by anyone else at -- by anyone else?
10      A.  We would approve our own.
11      Q.  So as a detective, you were able to write your
12  report and approve your report; is that right?
13      A.  Yes.
14      Q.  Did it receive any further review?
15      A.  Sometimes a sergeant might read it.
16      Q.  Okay.
17      A.  But probably not all the time.
18      Q.  Okay.  There was not a practice in 1993 that
19  every report be reviewed by a sergeant; is that fair?
20      A.  No.  I don't know if there's a policy.  I -- it
21  didn't happen for our section.
22      Q.  Okay.  Would you typically share your reports
23  with other detectives?
24      A.  They were there to review.  Usually, there
25  would be a case agent, and he would put the reports in a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 477 of 1026
The Deposition of GARY AUBUCHON, taken on June 23, 2023

42

1  binder.

2      Q.  Uh-huh.  Other than the case agent, was it your

3  practice to share the reports with other investigating

4  detectives?

5      A.  No.  We -- what we did is we'd have a meeting,

6  and we'd brief everybody on what was -- what was done.

7      Q.  Uh-huh.  Was your training that -- were you

8  trained that it's important in investigation to document

9  things as they happen?

10     A.  Not -- I wouldn't document maybe going through

11 a scene, or anything, and writing everything down right

12 then and there.  I -- sometimes I might make notes after

13 I left the scene on what I saw, but it's not something

14 that you always have a pen and paper in hand ready to

15 write down everything that happened.

16     Q.  Right.  You don't always have to write down

17 everything the second it happens; is that right?

18     A.  Right.

19     Q.  But you want -- but you're trying to -- you're

20 trying to take notes soon after you discover relevant

21 information; is that right?

22     A.  Yes.

23     Q.  And were you trained that it's important to be

24 thorough in documenting an investigation?

25     A.  Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 478 of 1026
The Deposition of GARY CHAMBERS, taken on 04/26/23

43

 1     Q.  And were you trained that any pertinent
 2  information in an investigation should be reduced to
 3  writing?
 4     A.  Can you repeat that?
 5     Q.  I can.
 6          Were you trained that all pertinent
 7  information in an investigation should be reduced to
 8  writing?
 9     A.  Yes.
10     Q.  Were you trained that all -- all evidence of a
11  suspect's guilt should be recorded in writing?
12     A.  Yes.
13     Q.  Were you trained that all evidence that
14  indicates that a suspect is not guilty should be
15  recorded in writing?
16     A.  Everything in the case should be recorded, yes.
17     Q.  Right.
18          So whether it shows a suspect is guilty or
19  it tends to show that a suspect is innocent, it should
20  be in writing; is that fair?
21     A.  Yes.
22     Q.  And it's important to confirm that everything
23  you record is accurate; is that right?
24     A.  Yes.
25     Q.  And that includes what you were told by

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 479 of 1026
The Deposition of GARY MAUGHMAN, taker on 05/24/23

44

```
 1  witnesses in an investigation; is that right?
 2      A.  Yes.
 3      Q.  And that also includes how information is
 4  obtained from witnesses; is that right?
 5      A.  Yes.
 6      Q.  And if a witness contradicts himself or
 7  herself, that should be written down; is that right?
 8      A.  Yes.
 9      Q.  And the -- the time when you talk to a witness
10  should be written down; is that right?
11      A.  Yes.
12      Q.  And the time that various events occur during
13  an investigation should be recorded; is that right?
14      A.  Yes.
15      Q.  And you may need to rely on the times you
16  write -- you write down later; for example, while
17  testifying at trial.  Is that right?
18      A.  Can you repeat that?
19      Q.  Yeah.
20          It's important to document the time things
21  happen in an investigation because you may need to
22  testify to that later; is that right?
23      A.  Yes.
24      Q.  And how -- in 1993, were there -- in 1993, was
25  there a central case file for investigations?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 480 of 1026
The Deposition of GARD VANOCKER, Taken on 05/25/23

45

 1      A.  The case agent would keep a binder of a case,
 2 and everything would be in there.
 3      Q.  Okay.  Other than the case agent's binder, was
 4 there any other place where materials about
 5 investigations were kept?
 6      A.  Yes, later.  Because we -- we didn't want to
 7 put it in the computer system and have everybody read
 8 about a murder investigation, so we would al- -- we
 9 would always keep those in the CAP office, and they
10 wouldn't be entered into the computer until later.
11      Q.  I see.  So during the investigation, everything
12 is in the case agent's binder; is that right?
13      A.  Yes.
14      Q.  And it isn't entered into the computer until
15 later because there is no need to disclose details about
16 homicides to everybody in the department; is that right?
17      A.  That's correct.
18      Q.  Okay.  And -- and did you have concern about
19 nonpublic details about investigations becoming
20 available to the public?
21      A.  Yeah, that's always a concern.
22      Q.  Okay.  And is that because -- is that because,
23 when you interview witnesses, you wanted to see if they
24 know nonpublic information about a crime?
25      A.  Exactly.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.  And you can't do that if the information leaks,
2  right?

3    A.  Correct.

4    Q.  So in investigations where you were not the
5  case agent, were you able to access the reports -- or
6  the statements taken by other detectives?

7    A.  Yeah.  It would be accessible to me.

8    Q.  How would you access them?

9    A.  I -- I would just go to the case agent and ask
10  to see them.  But if it wasn't my case -- because there
11  used to be a lot of murders, more than there are today.
12  I'm really not interested in what people say to other
13  detectives and statements.  I'm assigned to do a part of
14  that investigation.  I do that part, and I'm not really
15  curious enough to -- to -- to go into other parts of it,
16  unless I was the case agent.  I had to know everything.

17    Q.  I understand.

18         But -- and, of course, you could also get
19  information just by talking to the det- -- other
20  involved detectives without looking at the statements
21  and such; is that fair?

22    A.  Yes, you could.

23    Q.  So in an investigation, you might conduct an
24  interview where it's important to know what other
25  witnesses have said; is that right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.  Yes.
 2        Q.  And you could do that either by talking to the
 3   detectives or by asking the case agent to see the case
 4   file; is that right?
 5        A.  Yes.
 6        Q.  Okay.  And when you were not the case agent,
 7   did you keep copies of your own notes or reports on the
 8   case?
 9        A.  I think I made one supplement.  It wasn't very
10   long.
11        Q.  Okay.  And did you -- in 1993, did you ever
12   keep copies of other detectives' reports in -- in a --
13   in cases you investigated?
14             MR. JIM DARNELL:  Are you talking about
15   cases where he was the case agent or cases where he just
16   was serving in an ancillary role?
17             MR. HILKE:  Thank you.
18        Q.  (BY MR. HILKE)  In cases where you were not the
19   case agent.
20        A.  No.
21        Q.  So -- one second, please.
22             What, according to your training --
23   actually, give me one moment, please.
24             So in -- in -- when you interview a
25   witness, it's important to confirm the identity of a
```



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 483 of 1026
The Deposition of GARY HARBOUR, Taken 05/26/23  Page 48

48

```
 1   witness; is that fair?
 2        A.   Yes.
 3        Q.   Do you typically ask for their name?
 4        A.   Yes.
 5        Q.   You would also ask for their date of birth?
 6        A.   Yes.
 7        Q.   Would you often ask for their Social Security
 8   number?
 9        A.   No.
10        Q.   Okay.  I'd -- and do you typically try to
11   identify the witness early in the conversation?
12        A.   Yes.
13        Q.   And I'm going to show you -- we're going to
14   mark this Exhibit 1.
15                  (Exhibit 01 marked.)
16        Q.   It's going to just take me a minute to load it
17   up here.
18        A.   Okay.
19        Q.   Okay.  So I'm now sharing my screen.  This will
20   be Exhibit Number 1.  This is at City 15741.  And I'm
21   going to zoom in up on the top a little bit here.
22                  MR. JIM DARNELL:  Can you see it?
23        A.   Yes, I -- okay.  Now I can see it better.
24        Q.   (BY MR. HILKE)  Okay.  And -- and, sir, looking
25   at this document, is this a statement that you took from
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   Tonya Vinson on April 12th, 1993?
 2        A.  Yes.
 3        Q.  Is this one of the documents you reviewed in
 4   preparation for this deposition?
 5        A.  Yeah, I reviewed this one.
 6        Q.  And Tonya was a witness who had heard something
 7   about the England/Lazo murders; is that fair?
 8        A.  That's correct.
 9        Q.  She wasn't a suspect in this -- in this
10   investigation; is that right?
11        A.  No.  She came to us as a -- a witness.
12        Q.  Yeah.
13             And, of course, her name and date of birth
14   are present here, right?
15        A.  Yes.
16        Q.  And that would have been information you got
17   around the time you started taking her statement; is
18   that right?
19        A.  Yes.
20        Q.  And we've even got her Social Security number
21   here; is that right?
22        A.  Yes.
23        Q.  And --
24        A.  I know there was at some point that they told
25   us we couldn't take Social Security numbers, so this is
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 485 of 1026
The Deposition of EARL ARBOGAST, taken on June 30, 2022

50

1  probably before that.

2      Q.  That --

3      A.  But we -- but we used to.

4      Q.  I understand.

5          But to summarize, confirming the identi- --

6  the identity of the witness is just one of those basic

7  things you do at the start of an interview; is that

8  fair?

9      A.  Yes.

10     Q.  Okay.  I'm going to stop sharing this now.

11         MR. HILKE:  You know, I don't know if

12  you'll need a break soon, but if you will, it's a good

13  time for me.

14         MR. JIM DARNELL:  Okay.  Why don't we take

15  a break?  We've -- we were just fixing to do that

16  anyway.

17         MR. HILKE:  Great.  Let's go off the

18  record.

19         MR. ALMANZAN:  Okay.  Off the record.

20         (Break taken from 10:12 a.m. to 10:21 a.m.)

21         THE VIDEO TECHNICIAN:  We are back on the

22  record for the deposition of Earl Arbogast being

23  conducted by videoconference.  My name is Sydney Little.

24  Today is June 30th, 2022, and the time is 10:21 a.m.

25     Q.  (BY MR. HILKE)  Sir, by -- by 1993, you had

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  attended detective schools' trainings; is that right?

2      A.  Well, there -- there was schools that I went to

3  that involved criminal investigations and how to

4  recover -- you know, do evidence like in different

5  places, in the desert and different places and

6  interviews.

7      Q.  All right.  And -- and you mentioned

8  interviews.  Those trainings included conducting

9  interviews and interrogations; is that fair?

10     A.  The -- the schools?

11     Q.  Yes, sir.

12     A.  Yes.

13     Q.  Were you trained in the Reid method of

14  interrogation?

15     A.  The what?

16     Q.  The Reid method.

17     A.  I -- I don't -- I don't know what that is.

18     Q.  It's spelled R-E-I-D, Reid.  Is that a method

19  of interrogation you are familiar with?

20     A.  I -- I might have, but I don't know the names

21  of the type of interrogations there are.

22     Q.  Were you trained to conduct thorough

23  investigations before interrogating a suspect?

24     A.  Yes.

25     Q.  And was it your practice to do so?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

52

```
 1      A.  What -- can you repeat that?

 2      Q.  Yes.

 3           Was it your practice to conduct thorough

 4  investigations before interrogating suspects?

 5      A.  Yes.  If I worked a case, I would apply -- that

 6  would be my last interview.

 7      Q.  Uh-huh.  And that was consistent with the

 8  training you had received?

 9      A.  That would be consistent with what?

10      Q.  The training that you had received.

11      A.  I don't know if I learned it through training,

12  but that's what I did.

13      Q.  And is it important to make absolute sure that

14  you're interrogating the correct person as a suspect?

15      A.  Well, you wouldn't interrogate people as

16  suspects.  You really wouldn't know how much involvement

17  they had.

18      Q.  Uh-huh.

19           What, according to your training, is the

20  difference between an interview and an interrogation?

21      A.  The interview is like a witness interview.

22  You're trying to get as much information as you can

23  to -- to continue on with an investigation.  And I think

24  an interrogation would be that you believe somebody may

25  be a suspect, but that you don't know.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1    Q.  Right.

 2    A.  You're unsure of.

 3    Q.  Would you agree that an interrogation should

 4  not be conducted unless you have a good reason to

 5  believe that someone is a suspect in a crime?

 6    A.  Hang on.  I'm not quite getting you.

 7    Q.  Yeah.

 8        Is there a difference between an interview

 9  and an interrogation?

10    A.  Yeah, I guess there is.

11    Q.  Okay.  And -- and -- and you might interview

12  anybody in a case because -- you might interview anyone

13  who has informa- -- who might have information about a

14  crime in an investigation; is that fair?

15    A.  Yes.

16    Q.  But you only interrogate someone when you think

17  they may be a potential suspect; is that right?

18    A.  It may start out as an interview and then

19  turn -- and turn into a interrogation, that's true.

20    Q.  Right, but if -- if you don't have reason to

21  believe that someone is a potential suspect, you're not

22  going to interrogate them until you've got some reason

23  to believe they're a potential suspect; is that fair?

24    A.  Yeah, I would -- I would try to wait, yeah.

25    Q.  Were you trained that in conducting an

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   interrogation, you're operating with the presumption

2   that the person you're interrogating is guilty?

3       A.  There's a possibility.

4       Q.  Uh-huh.  Were you trained that an interrogation

5   should only take place after you've concluded that the

6   person you're interrogating is probably guilty?

7       A.  You would try to wait, yes.

8       Q.  And has the concept of a misclassification

9   error come up in your training?

10      A.  Mixed classification errors?

11      Q.  Yeah, mis- -- misclassification errors.

12      A.  I -- I don't know what that is.

13      Q.  Yeah.

14          Has the idea that there's a risk of

15  mistakenly assuming that an innocent person is guilty

16  and then trying to interrogate a confession out of them;

17  that that's a risk detectives need to try to avoid?

18      A.  And the question was?

19      Q.  The question was, are you trained on that risk?

20      A.  No, I don't believe so.  It's just something

21  I -- I did through investigations.  Everybody has their

22  own style, but I would try to get as much information as

23  I could and conclude all witness interviews before I

24  pulled in a suspect.

25      Q.  Right.  You -- you tried to be a thorough

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  detective and watch out for the risk of coming to --

2  jumping to conclusions too soon that someone is guilty;

3  is that fair?

4      A.  Yes.

5      Q.  But that's not something you can tie to any

6  training you received.  That was just your practice as a

7  detective; is that fair?

8      A.  Yeah, it -- oh, I'm sorry.  It was something I

9  picked up, I guess, from my time with Johnny Guerrero

10 and other detectives working the investigations when I

11 went to CAP.

12     Q.  That was -- right.  That was on-the-job

13 training, not -- not detective school or other training;

14 is that fair?

15     A.  Yeah, I don't -- yeah.  Yes.

16     Q.  And what, according to your training and

17 practice, is the goal of an interrogation?

18     A.  What is the goal of an interrogation?

19     Q.  Yes, sir.

20     A.  To find out the involvement of -- of a suspect

21 you pull in.  I -- I mean, you -- you may pull in two or

22 three suspects at the end, and some of them might be

23 weak.  Some of them might be a strong suspect.  So

24 it's like you say, you keep an open mind and -- and the

25 goal is to try and find out the involvement -- level of

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  involvement of what any suspect has.
 2      Q.  Okay.  And one kind of involvement that might
 3  come up in an interrogation is that the suspect is
 4  guilty of the crime; is that fair?
 5      A.  Yes.
 6      Q.  In an interrogation, once you've concluded that
 7  a suspect is guilty, is the goal to get a confession
 8  from them?
 9      A.  Did I what?
10      Q.  In an interrogation, once you have concluded a
11  suspect is guilty, is the goal then to get a confession
12  from them?
13      A.  Yes.  At that point, if you cross that line
14  into a strong suspect, you would read him his Miranda
15  rights and then interrogate him.
16      Q.  And in some cases, you might learn -- during an
17  interrogation, they might say something that lets you
18  cross that line, and then you're trying to get a
19  confession from them; is that fair?
20      A.  Yeah.  Yes.
21      Q.  And other times, you might have so much
22  evidence already that you know you're trying to get a
23  confession before the interrogation even starts; is
24  that --
25      A.  Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 492 of 1026
The Deposition of GARARD DUNCAN, Taken on May 24, 2023

57

1     Q.  -- fair?

2     A.  Yes.

3     **Q.  What, according to your training, are the**

4 **primary techniques of an interrogation?**

5     A.  The final goal is to actually get a statement.

6     Q.  Uh-huh.

7     A.  I -- I -- there are certain things that go

8 along with that.  You know, you -- you follow procedural

9 rules.  You give Miranda rights and -- and you

10 definitely want to get some type of corroboration in

11 that statement and -- but, basically, that's it.

12     **Q.  And then what are the techniques you do -- you**

13 **use -- what are the primary techniques you're trained to**

14 **use to get a suspect to talk to you?**

15     A.  I would do different things with different

16 people.  I mean, I've -- I've talked to people, and if

17 it's a strong case, I've laid out evidence in front of

18 them, and they've given me statements.

19     Q.  Uh-huh.

20     A.  I mean, I've had -- I -- I -- I actually cried

21 with somebody one time.  I've -- if I see somebody's

22 really religious when I pick them up at the house, I'll

23 try to use religion.  But what -- whatever, you know,

24 goes with that case is how you might want to interview

25 somebody.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1        Q.   Yeah.
2              Were you trained in any specific kinds of
3   techniques that are useful in interrogations?
4        A.   I mean, yeah.  I suppose you learn some
5   techniques.  Some you take back with you.  Some you
6   don't.
7        Q.   What techniques do you recall learning through
8   your training?
9        A.   There -- there's different things.  I mean,
10  there is techniques that have you interviewing a suspect
11  with you talking to a suspect, laying out your case, and
12  you get to the point where you're going to elicit a
13  response from the suspect, and if he looks like he's
14  going to deny you, you don't want him to deny you.  You
15  just keep talking and -- and those are the type of
16  things you learn in interrogation school.
17       Q.   Sure.
18             So in those situations, you're trying to
19  keep control of the interaction.  You're trying to avoid
20  it being just a long denial from someone when there's
21  all this evidence of their guilt; is that fair?
22       A.   Yes.
23       Q.   And so to -- are you trained to -- keeping with
24  that example where you have all this evidence of a
25  suspect's guilt, is it your training at some point to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  accuse a suspect of having committed the crime?

2      A.  It depends on the case.  I mean, you may have

3  an overwhelming amount of evidence --

4      Q.  Uh-huh.

5      A.  -- and -- and you would do that.  It depends on

6  a case-by-case basis.

7      Q.  And if it's necessary to cut off a suspect's

8  denials, are you trained to repeat those accusations of

9  guilt during an interrogation?

10     A.  I -- I've never done that.  I -- I didn't take

11  that -- it's not something I really believed in.

12     Q.  And so I understand that that wasn't your

13  practice, but was it your training to do so?

14     A.  That was just one of the techniques that was

15  taught to us.  It was taught to me at one interrogation

16  school.

17     Q.  Okay.  And were you also trained to accuse

18  suspects of lying when they denied accusations that you

19  had evidence of?

20     A.  That might happen.

21     Q.  Sure.  And what -- were you trained to accuse

22  suspects of lying?

23     A.  What would I say?

24     Q.  Were you -- were you trained -- was it your

25  training to accuse suspects of lying?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 495 of 1026
The Deposition of GARRARD HARDEMAN, Taken 01/31/2023

60

1    A.  Yes.  I would -- I would point out the evidence

2  that we have and say, "Yeah, you're not telling me the

3  truth."

4    Q.  And that was -- that was consistent with the

5  training you had received?

6    A.  Yes.

7    Q.  And -- and then you talked about cutting off

8  denials.  Was that both something you were trained to do

9  and something that you did in your practice?

10    A.  No.  That was something that was taught to me

11  at one of the schools, and I remember that because I --

12  I've never used that.

13    Q.  Uh-huh.

14        And were you trained to use false evidence

15  ploys, where you would pretend to have some evidence

16  that doesn't exist?

17    A.  No.

18    Q.  Okay.  So that never arose in the training you

19  received.

20    A.  No.

21    Q.  And did you ever use false evidence ploys?

22    A.  No.  If I didn't have any evidence, no.

23    Q.  Are you -- were you trained to put pressure on

24  suspects to try to increase their anxiety?

25    A.  Was I trained in -- can you repeat it?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 496 of 1026
The Deposition of GARY CHILDRESS, Taken on June 23, 2022

61

1   Q.  I can.

2           Were you trained to try to put pressure on

3   suspects to try to increase their anxiety during --

4   A.  Yeah.

5   Q.  -- interrogations?

6   A.  Yeah, I guess -- I guess you -- you confront

7   them with certain things, and you might pressure them,

8   yes.

9   Q.  Yeah.

10          And is it fair to say that if you believe a

11  suspect is guilty, you want them to feel like they've

12  been caught, like they aren't going to be able to talk

13  their way out of this crime that you've got evidence

14  that they are guilty of?

15  A.  That would be good, yes.

16  Q.  And was it your practice to use pressure to try

17  to increase a suspect's anxiety?

18  A.  It's -- like I said, I used different tactics.

19  I -- I -- I tried to use evidence that I had, and I've

20  used pressure as far as a person's religion and

21  different things like that and, you know, it's just

22  different things.  It depends on a case-by-case basis

23  what I would use.

24  Q.  And are you trained to use inducements, meaning

25  suggestions that a suspect will benefit if they confess

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   during an interrogation?
 2        A.   No.
 3        Q.   And are you trained to suggest that the
 4   prosecutor might look favorably on it if they tell you
 5   what they know?
 6        A.   No.  You would never do that.
 7        Q.   You'd never do that?
 8        A.   No.
 9        Q.   Were -- were you trained that a suspect might
10   face a lesser punishment if they confess to a crime?
11        A.   No.
12        Q.   And in your practice, did you ever suggest --
13   did you ever use inducements during interrogations?
14        A.   No.
15        Q.   And it's -- am I correct that your training was
16   it would be improper to use inducements in
17   interrogations?
18        A.   Yeah, it would be improper, and it might taint
19   the -- the statement.
20        Q.   Are you trained to use minimization techniques
21   in interrogation?
22        A.   I -- I am not familiar with names.  I don't
23   know if I've used it.
24        Q.   Yeah.  Were you -- were you trained to use
25   techniques suggesting that a suspect might minimize
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 498 of 1026
The Deposition of RICHARD ALAN LOCATS, Taken on 04/03/23  Judge

63

1  their -- I'm trying to think of -- strike that.

2            Are you trained to suggest that a suspect

3  can minimize their involvement by talking to you, but

4  won't be able to if they refuse to talk?

5      A.  No.

6      Q.  And are you trained to suggest that maybe the

7  suspect didn't mean to commit the crime, or it was an

8  accident or sort of minimize how bad what they did was?

9      A.  Well, if -- if -- if somebody had told me that,

10  I would take a statement from them on that.  And if I

11  had evidence that suggested further after I took that

12  statement, I would confront him with the evidence, and

13  then he may give a second statement.

14      Q.  Sure.  So -- right.  If -- if you learned

15  during an interrogation that a person's involvement is

16  more than you thought, you might take an additional

17  statement to pin them down on what they did; is that

18  fair?

19      A.  Yes.  Usually, it -- it would happen if a

20  suspect admitted to a crime and -- and he didn't tell

21  the whole truth, but I had evidence to the contrary, and

22  then I would confront -- I would always take that

23  statement, and then I would confront them with the

24  evidence, and if he wanted to give a second statement

25  correcting it, I would take a second statement.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 499 of 1026
The Deposition of GARRY ALLDGATE, Taker on 9/26/19   Page

64

 1      Q.  Yeah.

 2              But would you sugge- -- was it your

 3   training to suggest that, you know, for example, a

 4   suspect didn't mean to kill the person, or maybe it was

 5   self-defense or something that suggests that it wasn't

 6   as bad -- that what they did really wasn't that bad?

 7      A.  I've had people do that, and I've taken the

 8   statement and just attached it with the -- made it part

 9   of the case file.

10      Q.  Right, but was it your training to suggest to a

11   suspect that their -- that how bad they did was

12   lesser --

13      A.  Oh, okay.

14      Q.  -- to get them to talk to you?

15      A.  I understand now.  No, I wouldn't.

16      Q.  Okay.  And was that a technique that you were

17   trained to use in any way?

18      A.  At some point, yes.

19      Q.  Okay.  So that was another technique you

20   were --

21              MR. JIM DARNELL:  Just what's -- Wally, I'm

22   not sure y'all were communicating.  When you said that

23   was a technique he was trained on, are you saying he was

24   trained to use it or not to use it?

25      Q.  (BY MR. HILKE)  Yes.  I'm asking if you were

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   trained to use that technique.

2       A.  Okay.  And that's -- and that was the technique

3   of making a person seem more innocent?

4       Q.  Yes, sir.

5       A.  No.  I -- I was never trained in that.

6       Q.  Okay.  And in your practice, you never used

7   that technique; is that right?

8       A.  I didn't, no.

9       Q.  According to your training, what is the

10  difference between an incriminating statement and an

11  admission?

12      A.  Well, I really don't see -- distinguish between

13  the two.  They were both -- for me, they would both go

14  on a confession form.

15      Q.  Okay.  And --

16      A.  If they incriminated themselves, it would go on

17  a confession form.  If they gave a confession, it would

18  go on a confession form.

19      Q.  Okay.  And were you trained of any difference

20  between an admission and a confession?

21      A.  To me, they're the same thing.

22      Q.  Okay.  Were you trained to avoid psychological

23  coercion of suspects?

24      A.  What was the word?

25      Q.  "Psychological coercion."

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 501 of 1026
The Deposition of GARY DUGGINS, taken on 9/14/23   Page

66

1      A.  No.  I don't even know what -- I'm not a

2 psychologist.  I can't -- I don't think I ever have.

3      Q.  Yeah.  You've -- you've never asked a suspect

4 to lie down on a couch for you and talk about their

5 mother or father?

6      A.  Oh, no.  No.

7      Q.  All right.  I'm just joking.

8          Did you -- were you trained that suspects

9 may feel pressure to confess even if they are innocent?

10     A.  If suspects -- that -- that you would make them

11 feel --

12          MR. JIM DARNELL:  He's asking if you were

13 trained that way.

14     A.  Oh, no.

15     Q.  (BY MR. HILKE)  So it -- you received no

16 specific training about how to avoid taking -- strike

17 that.

18          Okay.  And in your practice, did you have

19 on-the-job training about -- about suspects feeling

20 pressure to confess even if they are innocent?

21     A.  I had no training to that, no.

22     Q.  Did -- were you trained that interrogations

23 should be recorded?

24     A.  At some point.  We never used to, and then time

25 changes, and then, eventually, yeah, they -- they became

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  recorded, but I never did it.  It -- I was out before
 2  that.
 3      Q.  Okay.  And so at the time you were still in
 4  crimes against persons, you had not been trained to
 5  con- -- to record con- -- I'm sorry.  Strike that.
 6          At the time you were in crimes against
 7  persons, you had not been trained to record
 8  interrogations; is that correct?
 9      A.  That's correct.
10      Q.  And it wasn't the practice when you were --
11  when you were at crimes against persons to record
12  interrogations, was it?
13      A.  To record?
14      Q.  Yes, sir.
15      A.  No.
16      Q.  Was there any departmental policy in 1993
17  preventing you from recording interrogations?
18      A.  No.  I don't think it was mentioned.
19      Q.  So is it fair to say that in criminal
20  investigation, sometimes people provide inaccurate
21  information to the police?
22      A.  Can you repeat that?
23      Q.  Would you agree that in criminal investigation,
24  people sometimes provide inaccurate information to the
25  police?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   Yes.
 2        Q.   And part of your job as a detective is to
 3   figure out what's true and what's false; is that right?
 4        A.   Yes.
 5        Q.   And sometimes false information you get, a
 6   person might just have made a mistake or remembered
 7   something incorrectly; is that right?
 8        A.   Yes.
 9        Q.   But other times, someone might be trying to
10   deceive you; is that right?
11        A.   Yes.
12        Q.   And you want to know if the information you get
13   is reliable or not, right?
14        A.   Yes.
15        Q.   And you also want to know if someone's
16   intentionally lying to you, right?
17        A.   Well, that -- intentionally lying?
18        Q.   Yes, sir.  That you want to know if someone is
19   intentionally lying to you as a detective; is that
20   right?
21        A.   That would be nice, yes.
22        Q.   Yeah.
23             And one way to test a witness's reliability
24   is to see if they know nonpublic facts about a crime; is
25   that right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 504 of 1026
The Deposition of GARY McGHOCAST, Taker on 04/26/23  Judge

69

 1      A.  That would be one way, yes.

 2      Q.  And we talked about this a little earlier.

 3  That's part of why you -- crimes against persons didn't

 4  share murder investigation reports with the whole

 5  department, right?

 6      A.  Right.

 7      Q.  And it's -- and when talking to witnesses on a

 8  homicide, it's important not to give nonpublic

 9  information to those witnesses, right?

10      A.  Yes.

11      Q.  Because you want to see what they know, not

12  just what you already know; is that right?

13      A.  Yes.

14      Q.  And so in interviews on a homicide, it's

15  important to wait for the witnesses to provide nonpublic

16  information before you give it to them; is that right?

17      A.  Yes.

18      Q.  And people -- and you talked earlier about

19  confessions.  When taking a confession, you want

20  corroborating information; is that right?

21      A.  Yes, always.

22      Q.  And one reason for that is that people

23  sometimes give false confessions to the police; is that

24  right?

25      A.  Yes.  It's happened.  You see it -- you see it

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 505 of 1026
The Deposition of RICHARD HUDSON, Taker on 9/21/23, Judge

70

```
 1  throughout the country.  It -- you know, it happens.
 2      Q.  Yeah.
 3              And just because someone confesses to you
 4  doesn't mean your investigation is done, right?
 5      A.  That's true, yes.
 6      Q.  What you'd like to do is go confirm the
 7  corroborating information you got from that confession,
 8  right?
 9      A.  Yes.
10      Q.  So -- and because of that, it's critically
11  important to document if nonpublic information is
12  provided to a murder suspect, right?
13      A.  Yes.
14      Q.  Because if you provided the information, then
15  that information can't be used as corroboration, right?
16      A.  If he gave -- oh, if I gave him nonpublic,
17  yeah.
18      Q.  Yeah.
19      A.  Yeah.  It wouldn't be corroboration.
20      Q.  And would you agree that for the same reason,
21  it's important to avoid leading questions during an
22  interrogation?
23      A.  Yes.
24      Q.  You want the details of the crime to come
25  directly from the suspect, not to be given from the
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 506 of 1026
The Deposition of GARY DONALDSON, Taken 03/14/23  Judge

71

1 detective to the suspect; is that right?

2     A.  Yes.

3     Q.  In taking a confession, should the

4 confession -- well, strike that.

5            Was it your training to try to -- well,

6 strike that.

7            In your practice when taking a confession,

8 was it typically the detective who actually typed up the

9 confession statement?

10    A.  Yes.

11    Q.  And in typing the confess- -- confession

12 statement, were you trained that the confession should

13 be in the suspect's words as much as possible?

14    A.  Yes.

15    Q.  And in taking that confession -- in taking a

16 confession -- strike that.

17            In typing up a confession, is there some

18 question and answer as you're typing the confession to

19 get the words from the suspect?

20    A.  Well, for me, I would -- I would get the whole

21 story from the suspect if he was going to confess, and

22 then I would reduce it to paper.  And I would start it

23 out, and I wouldn't remember everything he said, and so

24 I would put down what he said as much as I -- as I could

25 in his own words.  And then when I got to a point, I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 507 of 1026
The Deposition of GERARD ARBOGAST, Taken on 8/15/2017

72

```
 1  would ask him -- well, an open-ended question, "What
 2  happened next?"  And then I would go on that way until
 3  his confession was done.
 4      Q.  Got it.  So you were trying to get somewhat of
 5  a narrative to get it from the suspect in their own
 6  words; is that fair?
 7      A.  Yes.
 8      Q.  And there may also be just yes or no details
 9  that are more short question and answer to include; is
10  that fair?
11      A.  Yes.  I usually ask open-ended questions.
12      Q.  Okay.  Were you trained that in typing up a
13  confession, you should intentionally insert errors that
14  the suspect can correct in handwriting?
15      A.  No.  There -- there would be errors.  So it
16  wasn't possible to take a statement with -- without
17  errors, but any errors would always be initialed by him.
18  But I wouldn't put something in a confession that was
19  wrong and then have him tell me that was wrong.  I
20  wouldn't --
21      Q.  Got it.
22      A.  -- do it on purpose.
23      Q.  Yeah.  So your -- accor- -- in your practice,
24  any errors in confessions you took -- strike that.
25              In your practice, any errors in a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 508 of 1026
The Deposition of GARARDO ALDECOA, Taken on 03/26/23

73

 1  confession statement were accidental, and the correction

 2  is because a mistake was made that needed to be fixed.

 3      A.  Yes.

 4      Q.  And you weren't trained to take confessions any

 5  other way than that; is that right?

 6      A.  No.

 7      Q.  Okay.  And what -- and we've just discussed

 8  these various ways that you tried to avoid feeding

 9  nonpublic information to criminal suspects; is that

10  fair?

11      A.  Yes.

12      Q.  And was your practice consistent with your

13  training in those ways?

14      A.  I didn't get that again.

15      Q.  Yeah.

16          Was -- was the way you did it -- was the

17  way you did that consistent with the training you had

18  received?

19      A.  Yes.

20      Q.  In 1993, who was your supervisor at crimes

21  against persons?

22      A.  It was Sergeant Johnson, Sergeant Ocegueda, and

23  it was Lieutenant Saucedo.

24      Q.  Uh-huh.  And did you have any -- well, strike

25  that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          Did you have -- how did those supervisors

2   supervise your investigations?

3       A.  Basically, when a murder happened, we would

4   always have meetings.  Like the next morning, you got a

5   bunch of witness statements.  You had a bunch of

6   witnesses to talk to.  Teams would be sent out to take

7   those statements and do any other follow-ups that needed

8   to be done.  And then you would meet again, and the

9   sergeant would head that, and then he -- he would go

10  forward from the information that was taken at the table

11  there.

12      Q.  That makes sense.

13          And did the sergeants do anything else in

14  supervising homicides?

15      A.  No.  Basically, that's it.

16      Q.  Okay.  And did your supervisors expect you to

17  follow the training you had received?

18      A.  Yes.

19      Q.  And did -- did your sergeants ever instruct you

20  or guide you to find and record evidence pointing to

21  suspects' innocence, as well as their -- as well as

22  their guilt?

23      A.  I need to hear that again.

24      Q.  Sure.

25          Did your supervisors ever tell you, "Make

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 510 of 1026
The Deposition of EARL ARBOGAST, taken on 6/30/2022

75

 1    sure you're getting evidence that -- evidence showing
 2    suspects' innocence, as well as their guilt"?
 3        A.  No.  Really, it was just to solve the case.
 4        Q.  Just to solve the case?
 5        A.  Yes.
 6                THE WITNESS:  May I get with my attorney
 7    one minute?
 8                MR. HILKE:  Sure.  We can take a break.
 9                THE VIDEO TECHNICIAN:  We're off the
10    record.  The time is 10:55 a.m.
11                (Break taken.)
12                THE VIDEO TECHNICIAN:  We are back on the
13    record for the deposition of Earl Arbogast being
14    conducted by videoconference.  My name is Sydney Little.
15    Today is June 30th, 2022, and the time is 10:56 a.m.
16        Q.  (BY MR. HILKE)  You know, in your career,
17    you've had internal affairs investigations involving
18    you; is that right?
19        A.  Yes.
20        Q.  And in your understanding, what was the process
21    for an internal affairs investigation?
22        A.  Well, a citizen will complain on you, or maybe
23    there was a procedural violation within the department,
24    and they would -- they would come in and take a
25    statement from you.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.  And you've given statements in response to

2    internal affairs investigations before; is that right?

3    A.  Yes, I have.

4    Q.  And did the -- did the people taking the

5    statement from you work for the internal affairs

6    division?

7    A.  I -- I didn't hear that.  I wanted to add in

8    something that I just remembered.

9    Q.  Oh, I'm sorry.  Please go ahead.  Yes.

10   A.  I did a stint in internal affairs for about six

11   months.

12   Q.  Oh, when did you do that?

13   A.  I think it was when I left CAP once.  And then

14   I went to the north- -- that's when I went to the

15   northeast and then the crimes against children.

16   Q.  Okay.

17   A.  I didn't think about it until you started

18   mentioning IA.

19   Q.  No.  I appreciate it.

20        That would have been after the England/Lazo

21   murders, then; is that right?

22   A.  Yeah.

23   Q.  And did you take statements when you were

24   working in internal affairs?

25   A.  Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.  And so you -- you have some familiarity with

2    the internal affairs process; is that right?

3    A.  Yes.

4    Q.  So in internal affairs investigations, is it

5    always an internal affairs officer who takes the

6    statement?

7    A.  Yes.

8    Q.  Okay.  And the statements that are taken are --

9    are typed up; is that right?

10    A.  Yeah.

11    Q.  When you gave statements, did you type up the

12    statements, or did the IA officers type up the

13    statements?

14    A.  Well, and I may have misunderstood you.  When

15    you're in IAD, the officers give the statements.  We

16    call them in.  We go over point by point what we want

17    covered --

18    Q.  Uh-huh.

19    A.  -- you know, in case they leave out anything,

20    and they go out and type their own statements.  So

21    it's -- it's a matter of -- to answer your question, the

22    officer does the statement.

23    Q.  Okay.  And when the officer does the statement,

24    does the internal -- did the internal affairs officer

25    remain in the room with them?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      A.  No.

2      Q.  And does the -- did the internal affairs

3  officer come back after the statement is -- is typed, or

4  does the officer submit it in some other way?

5      A.  No.  The officer would say he's finished.

6      Q.  Okay.  And when the officer is finished typing

7  it up, is that the end of the interaction?

8      A.  Yeah.  Well, it's -- it's witnessed, notarized.

9      Q.  Okay.

10      A.  And I would usually review it because there are

11  certain points that you want covered, and you wanted to

12  make sure that those points were covered, and sometimes

13  they weren't all covered.  There would be something left

14  out, one or two questions, and then he would go back and

15  then add those in and then -- and then we'd finalize the

16  statement.

17      Q.  And when the officer -- so if you had a -- if

18  you had follow-up questions, if you said, "Hey,

19  something's missing here" --

20      A.  Yeah.

21      Q.  -- your practice was that the officer would

22  then leave again to make further edits and then come --

23  and then come back to you when finished?

24      A.  Yes.  Because before he gave his initial

25  statement, I list all the questions that I need answered

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  for the investigation, and he goes through those, and

2  he's supposed to cover those when he gives his

3  statement.  If he forgets to do one or two of them, he

4  does go back and make the statement complete.

5       Q.  So there wasn't necessarily a verbal interview.

6  It's listing the questions, not -- not like a dynamic

7  back and forth; is that fair?

8       A.  Right.

9       Q.  And was that the same way that when you were on

10  the other side of the investigations -- you know, in

11  1993 and before, was that the same process that you

12  experienced?

13       A.  Yes.

14       Q.  And -- right.  So when you were investigated,

15  you typed up and decided exactly what was going to be in

16  your statement; is that right?

17       A.  Yes.  I did it myself.

18       Q.  And when you were investigated, did you learn

19  of the questions for the first time at the interview, or

20  did you get them in advance?

21       A.  No.  At the interview.

22       Q.  At the interview.

23            And was there any time limit on how long

24  you could take to type up your statement?

25       A.  No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 515 of 1026
The Deposition of GARY MCCAULEY, Taken on 05/14/23

80

 1     Q.  Okay.  And am I correct that the department
 2  sometimes used gag orders to tell officers not to talk
 3  to each other?
 4     A.  Yes.
 5     Q.  And so if you get a gag order, what do you have
 6  to do -- like what does that -- what does that tell you
 7  you can't do?
 8     A.  You can't talk to the other officers that are
 9  within that case.  Or anybody, really.  You can't talk
10  about the case.
11     Q.  And before you got the gag order, you're free
12  to talk to other officers if you think a complaint might
13  be coming; is that fair?
14     A.  Yeah.
15     Q.  And on -- on the internal affairs complaints
16  that you were the subject of, how did you first get
17  notice that you had been complained against?
18     A.  On what case was that?
19     Q.  I guess, on -- well, did you learn about
20  complaints in different ways?
21     A.  Yes.
22     Q.  What were the different ways you learned of
23  complaints against you?
24     A.  Well, a supervisor would come and tell you.  A
25  lot of times, I know on my case, I had cases that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  were -- I guess they had mistaken me and my brother
 2  doing some cases.
 3      Q.  How funny.  Do you have a brother who is also
 4  in the El Paso Police Department?
 5      A.  Yes.
 6      Q.  That must have caused some confusion.
 7      A.  Yes.
 8      Q.  And so when you say a supervisor would come and
 9  tell you, would that be one of your sergeants?
10      A.  Yes.
11      Q.  Okay.  And were you separately notified of the
12  complaints by internal affairs?
13      A.  Was I what?
14      Q.  Did internal affairs also notify you separately
15  of the complaints against you?
16      A.  Yes, I -- sometimes you get called by them.
17  Sometimes your sergeant would just say, "Go on over
18  there."
19      Q.  Okay.  Was it ever both?  Like did a sergeant
20  ever tell you, "Hey, just so you know, there's been a
21  complaint against you," and then internal affairs
22  follows up to have you come take a statement?
23      A.  I -- I don't remember -- really remember.
24      Q.  Okay.  And did you receive training on how to
25  take a witness statement?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 517 of 1026
The Deposition of GARRETT CHASTEEN, taken on 03/26/23

82

 1          MR. JIM DARNELL:  Are you talking about

 2   internal affairs investigations, or are we back to CAP?

 3      Q.  (BY MR. HILKE)  I'm back to CAP now.  So I want

 4   to move away from internal affairs now and --

 5      A.  Okay.

 6      Q.  -- talk about your practice as a detective at

 7   your time at CAP.

 8          Did you receive training in how to take

 9   witness statements?

10      A.  No.  I basically already knew how.

11      Q.  Okay.  And in taking a witness statement, would

12   you agree one of the goals is to -- well, strike that.

13          Is it correct that one of the goals in

14   taking a witness statement is to get information you can

15   use to test what other witnesses tell you?

16      A.  I don't know if that's the goal.  You just take

17   a witness statement as to what a person knows.  And you

18   would compare it against other witness statements, and

19   everything, but, you know, as to what everybody knew --

20   knew, and you would continue your investigation from

21   there, but the purpose of the --

22      Q.  Right.

23      A.  No.

24      Q.  So when you take a statement, you're aware that

25   you may be comparing what this witness told you against

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  what another witness told you; is that fair?

 2      A.  I -- I -- I guess you could use that.  I never

 3  really thought about it.

 4      Q.  Well, you discussed that, you know, at the

 5  point of confession, you're looking for corroborating

 6  details, right?

 7      A.  Right.

 8      Q.  And one source of corroboration would be what

 9  other witnesses said about the crime; is that fair?

10      A.  Yes.

11      Q.  And so -- and you also talked earlier that it's

12  important to be thorough when -- when investigating

13  crimes; is that right?

14      A.  Yes.

15      Q.  So in taking a statement, was it your practice

16  to get -- to try to get specific details -- to get

17  enough specific details that it could be used for

18  corroboration later on?

19      A.  If it was my case.  Because when -- a lot of

20  times when you're on cases, you're only in on certain

21  parts of it, like I was on this case.  And -- and if it

22  was a case that I had, that's basically true.  I mean,

23  if it's something significant, you'd want it addressed.

24  But witnesses don't always give the same story, even

25  though they both saw the same thing, so you have to take

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1 | that into consideration.  I mean, if it was something
 2 | significant, yeah, you would want to address that.
 3 |     Q.  Right.  There -- there could be innocent
 4 | differences because people just remember a crime
 5 | differently; is that fair?
 6 |     A.  Yes.
 7 |     Q.  But you don't always know at the beginning of
 8 | an investigation what details will be significant,
 9 | right?
10 |     A.  You know, maybe sometimes, yes.
11 |     Q.  Yeah.  And so without suggesting that every
12 | little inconsistency shows that someone is lying, or
13 | something like that, would you agree that it's important
14 | to take thorough details from witnesses so their
15 | statements can be used for corroboration?
16 |     A.  Yeah.  Yeah, you would want them corroborated.
17 |     Q.  Yeah.
18 |             And in taking a statement, you're always
19 | seeking the truth, right?
20 |     A.  Yes.
21 |     Q.  And so when you're taking a statement, you may
22 | have some ideas about who the suspect is already; is
23 | that fair?
24 |     A.  Yeah, you -- you have suspects.
25 |     Q.  But whether what a witness says points towards

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  a suspect or away from a suspect, you want to take it

2  down thoroughly all the same; is that right?

3      A.  Yes.

4      Q.  So do you recall in your career at crimes

5  against persons receiving evaluations of your

6  performance as a detective?

7      A.  Yeah, every year.

8      Q.  And -- and one of the -- some of the feedback

9  on your evaluations at crimes against persons was that

10  you needed to improve at interviews and interrogations;

11  is that right?

12      A.  I don't even remember.

13      Q.  I'm going to -- I'm going to show you an

14  exhibit --

15      A.  Because that's always a goal, but I don't

16  remember specific evaluations and what they said.

17      Q.  That's -- I'm just pulling up an exhibit now.

18  Okay.  I'm going to share this in just a second.  This

19  will be marked Exhibit Number 2.

20              (Exhibit 02 marked.)

21      Q.  And so I'm going to share it now.  So this is

22  Exhibit 2.  This is at City 8865, and I'm going to zoom

23  in a little bit up here.

24      A.  Okay.

25      Q.  So do you recognize this as a -- do you see

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 521 of 1026
The Deposition of EARL ARBOGAST, Taken on 09/29/23

86

1  your name in the upper left under "Employee Name"?

2      A.  Uh-huh.

3      Q.  And do you recognize this as one of your

4  evaluations?

5      A.  (No verbal response.)

6      Q.  And I'll scroll down in a minute, but is -- is

7  this the form that was used to give evaluations when you

8  were in crimes against persons?

9      A.  Yeah, it is.

10     Q.  So I'm going to scroll down to Section E.  Do

11 you see in Section E where it says -- the goals are

12 "improve interview/interrogation skills"?

13     A.  Yes.

14     Q.  And then at the very bottom, this is your

15 signature on the report; is that right?

16     A.  That is mine, yes.

17     Q.  I'm going to stop sharing this now, and I'm

18 actually going to pull up a third exhibit now.  So this

19 is Exhibit Number 3, City 8907.

20          (Exhibit 03 marked)

21     Q.  Starting at 8907, this is a three-page

22 document.  So up at the top, this is your name, Earl

23 Arbogast, again in the upper left; is that right?

24     A.  Yes.

25     Q.  And then we've got your -- oops.  Pardon me.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    We've got your signature in the bottom
 2   right here; is that right?
 3        A.  That is correct.
 4        Q.  And I'm going to scroll down to the third page
 5   of this document, down to Section E.  And do you see
 6   where it says, "Detective Arbogast must continue
 7   improving in the area of interrogation"?
 8        A.  Yes, I do.
 9        Q.  Okay.  I am going to stop sharing this document
10   now.
11                    What was the reason that your evaluations
12   at crimes against person -- persons indicated you needed
13   to improve in interrogations?
14        A.  I don't know.  It was a continuing goal, I
15   guess, but I -- I don't know what -- what went into
16   that.  I -- I didn't -- that was at the sergeant.
17        Q.  Well, when you got -- when you were evaluated,
18   did you discuss your evaluations with your sergeants?
19        A.  Yes.
20        Q.  Did they -- did they tell you anything about
21   why they wanted you to improve in interrogations?
22        A.  No, not really.  They just basically had you
23   sign it.
24        Q.  Uh-huh.
25                    Were you aware of any deficiencies in your
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  interrogation skills at crimes against persons?

2      A.  No.

3      Q.  Were you aware that Detective Marquez

4  received -- was -- well, strike that.

5              When you were at crimes against persons,

6  was Detective Marquez considered a good interrogator?

7      A.  Yes.

8      Q.  And are you aware that Detective Marquez was

9  told that he should train other detectives on how to

10  conduct effective interrogations?

11      A.  No, I wasn't aware of that.

12      Q.  What was your understanding of what made

13  Detective Marquez good at interrogations when you worked

14  with him with crimes against persons?

15      A.  What made him what?

16      Q.  Good at interrogations.

17      A.  I don't know.  I don't think I ever sat in on

18  an interview with him, that I can remember.

19      Q.  Was he known to get a lot of confessions?

20      A.  Yes.

21      Q.  Did you get a lot of confessions?

22      A.  Yes.

23      Q.  So you got a lot of confessions when you were

24  at crimes against persons.

25      A.  Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 524 of 1026
The Deposition of GERARDO HUCKABAY, taken 09/14/17

89

 1      Q.  But nevertheless, your feedback was that you

 2   needed to improve your interrogations; is that right?

 3      A.  Yeah.  It surprises me, but yes.

 4      Q.  Do you have any idea why they would tell you

 5   that you needed to get better at interrogations if you

 6   were --

 7      A.  No.  I never needed help --

 8      Q.  -- good at -- you were getting a lot of

 9   confessions?

10      A.  -- on -- yeah.  I don't know why.

11      Q.  Do you recall being -- receiving feedback that

12   you needed to improve in anything other than interviews

13   and interrogations as a detective as -- at CAP?

14      A.  No.  I -- I was assigned cases, and I

15   investigated them, and nobody had ever told me anything.

16      Q.  Okay.  So if your evaluations show that

17   interviews and interrogations was the main thing you

18   were told to improve on, you wouldn't have any idea of

19   why that was; is that right?

20      A.  No.

21      Q.  Have you ever used physical force against a

22   suspect in a police station?

23      A.  In -- like in -- like in patrol, if he wasn't

24   cooperating or something like that?

25      Q.  Yeah, like on -- on patrol, to start.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.  Yeah.  I mean, you use physical force all the

2  time in patrol, you know, with suspects, yeah.  Yeah,

3  you know, not cooperating with you or they get physical.

4    Q.  All right.  And that was something that

5  occurred while you were in police stations after you had

6  taken them to the station; is that right?

7    A.  Well, it happens on the scene.  It happens at

8  the police station less, but it happens at the police

9  station a lot, too.

10    Q.  Okay.  And in patrol, have you witnessed other

11  officers use force against suspects in a police station?

12    A.  Yeah.  Sometimes it's necessary, yeah.  I have

13  seen it.

14    Q.  Yeah.

15        And are you trained on excessive force as a

16  police officer?

17    A.  Excessive force?

18    Q.  Yes.

19    A.  No.  You don't -- I mean, you're trained not to

20  use excessive force.

21    Q.  Yeah, that's what I mean.  You were trained on

22  how to use the appropriate amount of force against

23  suspects; is that right?

24    A.  Yes.

25    Q.  And what was your understanding of how much

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  force is excessive force?

 2              MR. JIM DARNELL:  At what point in time are

 3  you referring to?  Because that policy has changed a

 4  number of times over the years.

 5              MR. HILKE:  Sure.

 6      Q.  (BY MR. HILKE)  Let's -- let's start with when

 7  you were in patrol before you joined CAP.  What was your

 8  understanding when you were on patrol of how much force

 9  was excessive force?

10      A.  Well, if somebody needed -- was being arrested

11  and he resisted, you did everything you could to make

12  sure that you place that person in handcuffs.

13      Q.  Uh-huh.

14      A.  I mean, you didn't shoot them.  You just

15  wrestled with them, got his arms behind him to put the

16  handcuffs on.

17      Q.  Yeah.

18              So how would you know -- how would you know

19  if you were using excessive force?

20      A.  You use -- I -- I don't know how you -- how I

21  would define that.  I guess you'd be using excessive

22  force if you had handcuffs on the guy and then you broke

23  his arm.

24      Q.  Sure.  So if -- if you're beating someone after

25  they've already been subdued, that would be excessive

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   force.
 2        A.  Yes.
 3        Q.  And if you -- if you shot someone just because
 4   they were resisting, that would be excessive force.
 5        A.  Yes.
 6        Q.  And can you think of any other standard that
 7   you had when you were in patrol to -- to set the limits
 8   of excessive force?
 9        A.  No.  We were trained to use the force
10   necessary.  There -- there's also a hierarchy that we're
11   trained on --
12        Q.  Uh-huh.
13        A.  -- on when to use different types of force, and
14   it's basically always one higher than the person is
15   using.
16        Q.  Okay.  So the force should be proportional to
17   the force that the person is using against the officers;
18   is that right?
19        A.  Yes.
20        Q.  And did you ever witness an officer use
21   excessive force in patrol?
22        A.  No.
23        Q.  So let's --
24        A.  I've seen them use force, but not excessive
25   force.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 528 of 1026
The Deposition of GARY MCCASLAND, Taken on June 2, 2023

93

 1        Q.  Yeah.

 2             When you were in patrol, were you ever

 3   aware of any officer being disciplined for using

 4   excessive force?

 5        A.  That was disciplined?

 6        Q.  Yes, sir.

 7        A.  I don't believe on my shift there was ever

 8   anybody.  I know that the officers were accused of

 9   excessive force, but I don't know what happened with

10   those cases on the other shifts, because you would hear

11   about them, but I've never seen it myself.

12        Q.  Okay.  So you knew that there were complaints,

13   but you didn't have any knowledge about whether those

14   complaints were ever sustained; is that fair?

15        A.  No.

16        Q.  Okay.  Let me fast-forward to -- I guess it

17   would be your second time in crimes against persons,

18   the -- the portion that includes 1993.  Had your

19   understanding of what constituted excessive force

20   changed at all at that time from when you were on

21   patrol?

22        A.  No.  The hierarchy was the -- was about the

23   same then.

24        Q.  And --

25        A.  Everything was about the same.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.  Yeah.

2             Did you ever use excessive force on anyone

3    during that period at crimes against persons?

4    A.  No.

5    Q.  Did you ever witness another officer use -- or

6    detective, any police personnel, use excessive force

7    during that time?

8    A.  No.

9    Q.  Did you ever use force against a suspect in a

10   police station -- and I mean not necessarily excessive

11   force.  Just force -- during that period of -- in crimes

12   against persons?

13   A.  As a detective?

14   Q.  Yes, sir.

15   A.  I -- I can't think of any right now.

16   Q.  Okay.  Did you ever witness another officer use

17   force against -- against -- inside a police station

18   during that period at crimes against persons?

19   A.  I -- I can't think of any.

20   Q.  Yeah.  And as a detective during that time, did

21   you ever hear of another detective being accused of

22   using physical force against a suspect, yeah, during

23   that time you were at CAP?

24   A.  CAP, excessive force, I don't recall any.

25   Q.  And so is it fair to say, then, that you can't

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  recall ever hearing that -- well, strike that.
 2              Can you recall ever hearing that a CAP
 3  detective was disciplined for using excessive force?
 4       A.  I can't.  There may have been instances.  If
 5  there was something specific, I might remember, but I
 6  can't remember of any.
 7       Q.  Have you ever testified falsely under oath?
 8       A.  No.
 9       Q.  And have you ever witnessed another officer
10  testify falsely under oath?
11       A.  No.
12       Q.  Have you ever heard of -- have you ever heard
13  of another El Paso officer testifying falsely under
14  oath?
15       A.  No.
16       Q.  Have you ever heard of an officer being
17  disciplined in El Paso Police Department for testifying
18  falsely under oath?
19       A.  No.
20       Q.  Do you have -- strike that.
21              Did you have a duty to report any
22  misconduct you witnessed by a fellow police officer?
23       A.  Yes.
24       Q.  Did you ever report another police officer for
25  committing misconduct?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.  No.

2    Q.  Did you ever witness another police officer

3  commit misconduct?

4    A.  No.

5    Q.  I want to ask you a question about witnessing

6  statements.  You mentioned before that as an officer,

7  you would sometimes be called on to sign as a witness to

8  a statement; is that correct?

9    A.  That's true.

10    Q.  And is the purpose of witnessing a statement to

11  confirm that the person making the statement has

12  understood the statement they made?

13    A.  Yes.  It was at times when we didn't have a

14  notary.

15    Q.  Uh-huh.  And by being a witness to the

16  statement, did that also serve to identify the officers

17  who could later testify in court and confirm, yes, this

18  person really did say this or impeach them if they

19  denied it?

20    A.  No.  The purpose of the -- the witnessing

21  was -- I -- I can only tell you what I do is -- is I --

22  I have -- when people come in and witness a statement,

23  then I would ask the -- the guy if the statement was

24  true and correct, and he would say "yes."

25              And then I would say, "Has any force been

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 532 of 1026
The Deposition of EDWARD CALHOUN, Taken 11/18/2021

97

1  used on you or promised you -- or -- or have you been

2  promised or anything?"

3            And he would go "no."  And then that would

4  be in front of the witnesses, and they would sign it, so

5  that way, if he ever said anything else, I had those

6  witnesses.

7      Q.  Right.  And so in your practice, it wasn't

8  enough for the witnesses to just show up as the wit- --

9  as the person giving the statement signed it.  You also

10  needed the person making the statement to confirm that

11  they understood everything in the statement; is that

12  right?

13      A.  That he was giving it voluntarily.

14      Q.  Well, that he was giving it voluntarily, but

15  was it your practice, also, to have the person giving

16  the statement confirm that they understood what was in

17  the statement?

18      A.  Yes.

19      Q.  And also that no force had been used against

20  them.

21      A.  Yes.

22      Q.  And -- right.  So then if the witness later

23  denies that they made that statement, those witnesses

24  can show up and say, "No.  No.  No.  He confirmed that

25  he understood everything that was in there"; is that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   right?

 2       A.  Yes.

 3       Q.  Okay.  The police department's policy was that

 4   there were protections given to juveniles in

 5   investigations; is that right?

 6       A.  Confessions from juveniles, yes.

 7       Q.  And --

 8               MR. JIM DARNELL:  Wally, if you're starting

 9   a different area, can we take a break?

10               MR. HILKE:  Yes, sir.  Let's go off the

11   record.

12               THE VIDEO TECHNICIAN:  All right.  We're

13   off the record.  The time is 11:27.

14               (Break taken.)

15               THE VIDEO TECHNICIAN:  We are back on the

16   record for the deposition of Earl Arbogast being

17   conducted by videoconference.  My name is Sydney Little.

18   Today is June 30th, 2022, and the time is 11:39.

19       Q.  (BY MR. HILKE)  Sorry to keep you waiting.  I

20   had a -- I had a question.  It just vanished from my

21   mind as I'm sitting here.  Give me one moment.

22       A.  Okay.

23               MR. JIM DARNELL:  Are you okay with that?

24               THE WITNESS:  Yeah.  It might be hard,

25   yeah.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              MR. HILKE:  Can you-all --
 2              THE WITNESS:  I'll try it.
 3     Q.  (BY MR. HILKE)  When -- we were talking a
 4  little bit earlier about your practices when you took
 5  statements that were witnessed; is that right?
 6     A.  You know what?  I can't -- I can't hear.
 7              MR. JIM DARNELL:  Hold on.  We had
 8  turned the air -- wait.
 9              MR. HILKE:  That's okay.  Let's -- let's go
10  off the record for a sec.
11              MR. JIM DARNELL:  We had turned the air
12  conditioner on because --
13              THE VIDEO TECHNICIAN:  All right.  We're
14  off the record at 11:40.
15              (Break taken.)
16              THE VIDEO TECHNICIAN:  We're back on the
17  record for the deposition of Earl Arbogast being
18  conducted by videoconference.  My name is Sydney Little.
19  Today is June 30th, 2022, and the time is 11:41.
20     Q.  (BY MR. HILKE)  Okay.  So you talked earlier
21  about your practice when taking statements that were
22  witnessed; is that right?
23     A.  Yes.
24     Q.  And when you took statements that were
25  witnessed, would you have any portion of the statement
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 535 of 1026
The Deposition of GERARD BROCATO, Taken on 9/14/22
100

1  read in front of the witnesses?

2      A.  No, not -- not on a witness statement, I

3  wouldn't.

4      Q.  Okay.  What about on -- what if it were an

5  incriminating statement of a suspect?  In that case,

6  would you have it read out loud?

7      A.  I would have him read to me, maybe, a paragraph

8  or a few lines to make sure that I knew that he

9  understood and could read, but I wouldn't do it in front

10 of anybody.

11     Q.  Okay.  So when the witnesses come up -- come to

12 do -- strike that.

13          When the witnesses come to witness a

14 statement, they just hear the person making the

15 statement saying -- you know, confirming that it is

16 their statement; is that right?

17     A.  Yes.

18     Q.  But other than them say- -- other than the

19 witness saying so, those witnesses aren't actually

20 confirming in any way that the witness understands

21 what's in there, right?

22     A.  Other than -- no.  Like I said, like other than

23 me asking if it's -- if it's his true and correct

24 statement, that would be the only thing.

25     Q.  And as a detective, did you have to be extra

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 536 of 1026
The Deposition of GARY McCASLIN, taken on 03/14/23  JOHN
101

1  careful with juvenile suspects?

2      A.  Juvenile suspects, yeah.  It's a whole

3  different animal.  It's -- it's totally different.

4      Q.  And you understood that juveniles were more

5  suggestible than adults; is that right?

6      A.  I never said that.  That they were more

7  suggestible?  No, I -- I don't think I've ever said

8  that.

9      Q.  Was that your understanding?

10      A.  I -- yeah, I -- I guess in -- again, on a

11  case-by-case basis, you know, depending on the juvenile.

12  Some were more advanced than others and I -- you know,

13  it could happen, but...

14      Q.  Yeah.  Was -- was the general fact that

15  juveniles are more vulnerable than adults part of the

16  reason you had to be extra careful with them?

17      A.  Yeah.  There's extra precautions taken in for

18  them for that reason.

19      Q.  And did juveniles have a right to have a parent

20  present when they were questioned?

21      A.  No.

22      Q.  Okay.  Were you aware of any obligations you

23  had when questioning juveniles to engage those

24  juveniles' parents?

25      A.  Yes.  You tried to -- you tried to notify them.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 537 of 1026
The Deposition of GERARD CALLOCAT, Taken on June 4, 2022

102

1    Q.  Okay.

2    A.  There's -- there's a form on there that we used

3  to do to notify them and what time.

4    Q.  Did that form seek permission from the parents?

5    A.  For suspects, no.

6    Q.  Not for suspects.  So it was okay to

7  interrogate a juvenile suspect without a parents'

8  permission.

9    A.  No.

10    Q.  I'm sorry.  Just so I understand, did you --

11  did you seek a parent's permission or not when

12  interrogating a juvenile suspect?

13    A.  Sometimes you -- you -- you had a parent's

14  permission to do it because you would arrest them near a

15  parent.  If there wasn't a parent nearby, you would try

16  to contact that parent.  In this case, the parents were

17  present.

18    Q.  Was it important to document the permission

19  from the parents?

20    A.  Yes.

21    Q.  And that's what the form was for?

22    A.  I forget what all's on the form.

23    Q.  Okay.  Did -- okay.  Can you -- is it

24  appropriate to interrogate a juvenile in the same way

25  you would interrogate an adult?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A.  Again, case-by-case basis as -- depends on his

 2 personality and, you know, what the case was.

 **3**      **Q.  Are there situations in which it would not be**

 **4** **appropriate to interrogate a juvenile in the same way as**

 **5** **an adult?**

 6      A.  I'm not sure what you're asking.  I mean, you

 7 wouldn't be using -- I mean, you wouldn't beat him up,

 8 but you wouldn't beat up an adult, either.  Is that what

 9 you're asking?

**10**      **Q.  Yeah.  I'm asking if there's -- I'm asking if**

**11** **there are sit- -- yeah.  I'm asking if -- well, so we**

**12** **talked earlier about your training in interrogation,**

**13** **right?**

14      A.  Yes.

**15**      **Q.  And we talked about different techniques you**

**16** **might or might not use in an interrogation; is that**

**17** **right?**

18      A.  Yes.

**19**      **Q.  And what I'm wondering is, in general, is it**

**20** **necessary to use different techniques with juveniles**

**21** **than you would with adults?**

22      A.  I mean, for me, no.  I would do it the same.

**23**      **Q.  And in talking in 1993, in 1993, were there**

**24** **steps you had to take before questioning a juvenile**

**25** **suspect about a crime?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 539 of 1026
The Deposition of GARY HARGROVES, Taken on 9/26/22
104

1      A.  Yes.

2      Q.  Did you have to take them to a youth officer to

3  receive warnings?

4      A.  Yes.

5      Q.  Did you also have to take them to a magistrate

6  judge for their warnings?

7      A.  Yes.

8      Q.  And you were supposed to do all those things

9  before questioning a juvenile about the crime; is that

10 right?

11     A.  That's correct.

12     Q.  And -- and you don't want to -- and with a

13 juvenile suspect, you don't want them talking about the

14 case until after those steps have been taken; is that

15 right?

16     A.  That is correct.

17     Q.  Because you want to make sure that they get

18 those warnings before they implicate themselves; is that

19 right?

20     A.  Yeah.  He needs to have certain precautions

21 made, and you do those before you talk to him.

22     Q.  Yeah.  And so are -- are you familiar with a

23 policy that interrogation of juveniles should be

24 conducted by youth services police officers?

25     A.  I don't think there was a separate one for

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 540 of 1026
The Deposition of GERARD DARNELL BAKER, taken on 9/26/23
105

 1  youth -- a youth services officer.  I think there's a

 2  form where they help us, but it's -- it's for everybody.

 3      Q.  Yeah.  I'm going to share an exhibit with you,

 4  so it'll take me a minute again.

 5              Okay.  I'm now sharing what I'll mark as

 6  Exhibit Number 4.  This is starting at Defendant

 7  City 21495.

 8              (Exhibit 04 marked.)

 9      Q.  Just to start at the top of the document, do

10  you see at the top where it says "Chapter Seven,

11  Juvenile"?

12      A.  I see it.

13      Q.  And is this familiar to you as a -- I'm sorry.

14  Strike that.

15              Is this what the El Paso Police

16  Department's policies looked like?

17      A.  Yeah.  It looks like it came from the -- the

18  policies.

19      Q.  Okay.  I'm going to scroll down some pages in

20  this document.  Whoops.  Let's see.

21              Okay.  So I've scrolled down to what's page

22  8 of this document.  That's at City 21502.  And give me

23  just one second to find this, please.

24              Okay.  So do you see the section reading

25  "7.02.009, Interrogation"?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 541 of 1026
The Deposition of GARY GARDOCAB, Taken on 9/14/23  Judge
106

 1      A.  Yes.

 2      Q.  I want to point you to the last sentence.  Do

 3  you see where it says, "When possible, interrogation of

 4  a juvenile suspect is conducted by youth services"?

 5      A.  Yes.

 6      Q.  Did you follow that policy?

 7      A.  In this case?  No.  Detective Marquez

 8  interrogated.

 9      Q.  Do you recall --

10      A.  I think -- you know what?  I -- I can't really

11  answer because I know Detective Marquez took the

12  statement.  I don't know if Charlie Ortega was there,

13  and it was under his guidance.  I wasn't back there, so

14  I don't know what the circumstances were.

15      Q.  So are you saying that it's possible that

16  Carlos Ortega actually conducted the interrogation of

17  Daniel Villegas?

18      A.  Well, I --

19          MR. ALMANZAN:  Objection, calls for

20  speculation and no foundation.  This witness does not

21  have personal knowledge of that.  He just testified to

22  that effect.

23      Q.  (BY MR. HILKE)  Go ahead.

24      A.  Go ahead.

25      Q.  Okay.  You can answer.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 542 of 1026
The Deposition of GARARD LOCKHART, taken on 05/19/23   Judge
107

```
 1        A.  Shoot, I forget what it was.

 2        Q.  Would you like me to repeat the question?

 3        A.  Yeah.

 4              MR. HILKE:  And, Andy, I -- I -- your

 5    foun- -- your foundation and speculation objections

 6    are --

 7              THE WITNESS:  Oh, yeah.

 8              MR. HILKE:  -- well taken, but I'll ask you

 9    to avoid the speaking follow-on, if that's all right,

10    for this deposition.

11              MR. ALMANZAN:  And if that's all right with

12    this deposition, I'll ask you to ask more appropriate

13    questions.  I will object as I deem appropriate.

14              MR. HILKE:  Okay.  We'll -- we'll have an

15    issue we may need to address if speaking objections

16    continue and I -- your objection is certainly noted for

17    the record.

18              My question to the witness is:

19        Q.  (BY MR. HILKE)  Are you saying that, to your

20    knowledge, it's possible that Carlos Ortega conducted

21    the interrogation of Daniel Villegas?

22              MR. ALMANZAN:  Object- --

23        A.  I --

24              MR. ALMANZAN:  Same objection as to

25    speculation.  Same objection as to lack of foundation.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1       Q.  (BY MR. HILKE)  Go ahead.

2       A.  That he conducted it?  I don't know.

3       Q.  Okay.  Go ahead.

4       A.  No.  That's all.

5       Q.  So sitting here today, you don't know who

6   actually conducted Daniel Villegas's interrogation; is

7   that right?

8       A.  No.  I wasn't back there.

9       Q.  Okay.  Okay.  Would you agree that according to

10  this policy of the El Paso Police Department, Carlos

11  Ortega should have been the one conducting the

12  interrogation?

13          MR. ALMANZAN:  Objection, calls for

14  speculation and lacks foundation.

15          MR. JIM DARNELL:  Same objection.

16          THE WITNESS:  Answer?

17          MR. JIM DARNELL:  Go ahead.

18      A.  Yeah.  By the policy, it seems so.

19      Q.  (BY MR. HILKE)  Okay.  Did you conduct -- did

20  you conduct other investigations involving juvenile

21  suspects at CAP?

22      A.  Yes.

23      Q.  And in those investigations, did you and -- in

24  those investigations, did youth services officers

25  interrogate juvenile suspects?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 544 of 1026
The Deposition of GARY GARDNER, Taken on June 9, 2017   Judge

109

 1      A.  No.

 2      Q.  **Are you familiar of any case where youth**

 3  **services officers interrogated juvenile suspects?**

 4      A.  No.  For CAP, no.

 5      Q.  **Do you have any explanation for the failure to**

 6  **follow this policy?**

 7              MR. JIM DARNELL:  Object to form.

 8              THE WITNESS:  Huh?

 9              MR. JIM DARNELL:  Go ahead.

10      A.  It -- that was just some- -- that was the --

11  the practice that we had.  And when we picked up a

12  juvenile, we did what the pro- -- protocol had, as far

13  as taking him before a judge and everything.  But once

14  he was taken to the judge and a statement was taken, it

15  was just always us that took it.

16      Q.  **(BY MR. HILKE)  And after a juvenile suspect**

17  **was picked up, was there a location where they had to**

18  **first be taken?**

19      A.  Yes.

20      Q.  **What was that location?**

21      A.  There were about four in El Paso, and they

22  were, I think, accepted juvenile holding areas, and you

23  could take a statement from any one of those areas.

24  There was one on the west side.  You had the two on

25  Delta and I -- I can't remember where the other one is.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 545 of 1026
The Deposition of GERARD MENDOZA, Taken on 03/30/23   Page
110

 1  I'm not sure where the one other is.

 2      Q.  And when you say that there were two on Delta,

 3  was one of them the juvenile investigative services

 4  office?

 5      A.  Yes.  The juvenile probation department and

 6  where the statement was actually taken are two different

 7  places.

 8      Q.  Okay.  And --

 9      A.  You could take a statement at either place.

10      Q.  Okay.  And the juvenile probation department,

11  that's also, essentially, a juvenile jail; is that

12  right?

13      A.  That's where they're --

14              MR. ALMANZAN:  Objection --

15      A.  -- housed, yes.  That's where they're housed,

16  yes.

17      Q.  (BY MR. HILKE)  So I'm going to scroll down to

18  the next page in this Exhibit Number 4.  That's going to

19  be at City 21503.  And I want to show you, looking at

20  where it is, bullet point A.

21              Do you see where it reads, "When an officer

22  takes a juvenile into custody and intends to take a

23  confession, the officer must, without unnecessary delay

24  and without first taking the child elsewhere, take the

25  child to the juvenile probation department.  The intake

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 546 of 1026
The Deposition of GARY KINCADE, Taken on June 23, 2020
111

1  officer from JPD will review the officer's reports to

2  determine probable cause"?  Do you see that?

3      A.  Yes.

4      Q.  So this policy only lists one location where a

5  juvenile suspect may be taken; is that right?

6      A.  That's -- that's where he's taken initially,

7  where he's housed, but what I'm talking about is where

8  you can take a juvenile to do the paperwork or a

9  statement.  But this is where -- and at that juvenile

10  probation department, they had an area where you could

11  take a statement, also.

12      Q.  Uh-huh.

13      A.  So I'm kind of confused as -- as to what you

14  mean.  I mean, there -- there -- there were four areas

15  that we could take a juvenile to to process him before

16  taking him to the juvenile probation officer.

17      Q.  So your understanding was that any of the four

18  places you mentioned would be appropriate to take a

19  juvenile suspect after they were picked up; is that

20  right?

21      A.  Yes, to do the paperwork before he went to the

22  juvenile probation department officer.

23      Q.  Okay.  And so your understanding of the

24  practice was not that a juvenile suspect had to be first

25  taken to juvenile probation department without being

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 547 of 1026
The Deposition of GARY AUBOCABS, taken on June 23, 2023

112

 1 | taken elsewhere; is that fair?
 2 |     A.  Well, there -- there was no delay.  The
 3 | juvenile probation department also -- officer required
 4 | paperwork.
 5 |     Q.  Okay.
 6 |     A.  So it wasn't an unnecessary delay.  You had
 7 | to -- you had to first get the paperwork to present to
 8 | that officer at the juvenile probation department, so
 9 | you wouldn't take him straight from where you arrested
10 | him to the juvenile probation officer because they
11 | wouldn't accept him.  You had to have certain paperwork
12 | first.
13 |     Q.  Right.  Right.
14 |         And so -- so just so I'm under- --  your
15 | understanding was that it was okay to take the juvenile
16 | first to any of those four locations and then take them
17 | to the juvenile probation department.
18 |     A.  Yes.  You had to.  You had to do the paperwork.
19 |     Q.  And was that the case even if the paperwork
20 | could have been completed before taking them to the
21 | juvenile probation department?
22 |     A.  No.  You can't.
23 |     Q.  Okay.  So if you were able to --
24 |     A.  Many different forms over there that you had to
25 | fill out.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 548 of 1026
The Deposition of GARY OHLHOUSER, Taken on 04/26/23
113

```
 1       Q.  Okay.  What were those forms?

 2       A.  Part of it's the confession form.  And then you

 3   would try -- I can tell you what I did.  I would always

 4   try to do a small supplement of the cases and type out a

 5   report for the juvenile probation officer so he knew the

 6   probable cause that we had.  And with that statement and

 7   maybe some statements from witnesses and the paperwork

 8   that was required from the juvenile confession form,

 9   that was taken over to the officer.

10       Q.  Right.  And for the confession form, no

11   confession can be taken until after they go to JPD and

12   after they go to the magistrate, right?

13       A.  That's right.

14       Q.  So there's no reason -- so what you're talking

15   about is a blank form; is that fair?

16               MR. JIM DARNELL:  All you're talking about

17   is what?  I'm sorry?

18               MR. HILKE:  Yeah.

19       Q.  (BY MR. HILKE)  You had talked about, well, you

20   need to get confession paperwork beforing to go --

21   before going to JPD, but you can't complete any of that

22   form until after JPD and after the magistrate; is that

23   right?

24       A.  I'm not sure if I understand.  You had to

25   complete it before you take them to the juvenile
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 549 of 1026
The Deposition of GARY DEAL DUCKETT, Taken on 9-16-21
114

1  probation department.

2      Q.  **Your testimony is that a confession form had to**

3  **be completed before a juvenile was taken to the juvenile**

4  **probation department?**

5      A.  I think we're crossing hairs.  What I -- what

6  I'm saying is, is if you pick up a juvenile, you can't

7  take him to the juvenile probation department right off

8  the bat because you don't have the paperwork that he

9  required.  You had to do certain paperwork and make sure

10  you had the probable cause in hand so that he can read

11  it, and then take him over to the juvenile probation

12  department.

13      Q.  **I understand.  Give me one second, please.**

14  **Okay.**

15          **And to your knowledge, was that practice**

16  **ever documented in the department's policy?**

17      A.  I -- I'm not sure.  I don't know.  That -- that

18  was the policy as far as I understood it.

19      Q.  **Okay.**

20      A.  Well, not only that, I mean, I don't know if it

21  was written in there, but you could take a juvenile

22  straight, when being taken into custody, to the

23  probation department, but it's a useless step.  He's not

24  going to -- he's not going to see you.  He requires

25  certain paperwork, and that's just it.  You can't get

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 550 of 1026
The Deposition of GARY ALLEN BAKER, Taken on 9/14/2022
115

 1  around it.
 2      Q.  Okay.  Did -- I want to put your attention on
 3  bullet B here.  Do you see where it says, "Once the
 4  child has been transported to JPD, the intake officer
 5  has ultimate control over the investigative function of
 6  the case"?
 7      A.  Okay.
 8      Q.  And to your understanding of the department's
 9  policy, is that intake officer -- is that the same one
10  who reviews your reports to determine probable cause?
11      A.  Could you ask that again?
12      Q.  Sure.
13          So do you see where it mentions that once a
14  juvenile goes to JPD, now it's --
15      A.  Uh-huh.
16      Q.  -- the intake officer with ultimate control
17  over the investigative function of the case?
18      A.  Yes.
19      Q.  That's the same intake officer who reviews the
20  reports to determine probable cause, right?
21      A.  Yes.
22      Q.  And then that officer gets to make the decision
23  about what further investigation, if any, occurs, right?
24      A.  Well, yeah.  Basically, it would -- it would
25  just continue.  The investigation would continue, and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 551 of 1026
The Deposition of GARY CALDWELL, Taker on June 6, 23
116

```
 1  that's when we would take the child to the magistrate.
 2     Q.  In -- in -- in the case of Daniel Villegas,
 3  were you with Daniel when he was brought to the intake
 4  officer?
 5     A.  Yes.
 6     Q.  And did that intake officer find that there was
 7  probable cause?
 8     A.  Yes.
 9     Q.  And did that intake officer make any decisions
10  about how the case would be investigated?
11     A.  No.
12     Q.  Okay.  And another question -- I'm going to
13  stop sharing this document at this point.
14           After -- the process for juveniles is that
15  after they've seen the probation officer -- strike that.
16           The process for juveniles is, after they've
17  seen the intake officer and after they've seen the
18  magistrate, then you can question them about the case,
19  right?
20     A.  Yes.
21     Q.  And you can take a confession if they want to
22  give a confession, right?
23     A.  Yes.
24     Q.  And after the juvenile signs a confession --
25  strike that.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 552 of 1026
The Deposition of GERARD DARNELL BAKER, taken on March 24, 2023

117

```
 1              The juvenile actually signs a confession in
 2   front of the magistrate, right?
 3       A.  Right.  He's taken back before the magistrate,
 4   and then he signs it.
 5       Q.  And then after the magistrate, the juvenile is
 6   taken back to juvenile probation, right?
 7       A.  Yes.  That's when he's taken to the probation
 8   department.
 9       Q.  Okay.  Great.
10              Was your training as a detective that --
11   strike that.
12              Does the phrase "Brady evidence" or "Brady
13   obligation" have any familiarity to you?
14       A.  Could you -- I'm sorry.  Can you say it one
15   more time?
16       Q.  I can.  "Brady evidence" or "Brady obligation."
17              MR. ALMANZAN:  Objection, calls for
18   speculation, confusing, ambiguous.
19              THE WITNESS:  What was the question?
20       Q.  (BY MR. HILKE)  I can ask again.
21              MR. JIM DARNELL:  He's asking "Brady
22   obligations."
23       A.  "Brady obligation"?  I don't -- I don't know
24   what that is.
25       Q.  (BY MR. HILKE)  Okay.  Is one of the
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 553 of 1026
The Deposition of GARARDO LOMBRANA, taker on 9/16/23, Judge
118

```
 1  constitutional rights of criminal defendants that you
 2  were trained on that criminal defendants have a right to
 3  any evidence that could be used to prove their
 4  innocence?
 5              MR. ALMANZAN:  Objection, calls for
 6  speculation.
 7     A.  I would say yeah.
 8     Q.  (BY MR. HILKE)  And was -- and does that -- and
 9  is it fair to say that you understood that if you had
10  evidence that pointed to a suspect's innocence, that
11  evidence should be in your -- your police reports for
12  any investigation you conducted?
13     A.  Yes.
14     Q.  Okay.  And would you ever -- as a detective,
15  did you ever choose to leave something out of your
16  police reports that tended to show a suspect's
17  innocence?
18     A.  No.
19     Q.  You always tried to include it; is that fair?
20     A.  Yes.
21     Q.  So I want to go back to asking about internal
22  affairs for a minute.  You received multiple civilian
23  complaints as a member of the El Paso Police Department;
24  is that right?
25     A.  Yeah, while I was in patrol.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 554 of 1026
The Deposition of GARY McDONALD, Taken on June 29, 2023

119

1    Q.  And you also received some internal complaints
2  that were initiated by someone within the department; is
3  that right?

4    A.  Yes.

5    Q.  And am I -- do you recall ever being suspended
6  as a result of a civilian complaint?

7    A.  No.

8    Q.  Okay.  And so as far as you know, you were
9  never suspended based on a complaint that a civilian
10 brought against you; is that right?

11   A.  No.

12   Q.  Does receiving a suspension for damage to city
13 property, I think maybe -- like based on a lighter in a
14 car, sound familiar to you at all?

15   A.  Yeah.  Yeah.

16   Q.  Okay.

17   A.  I don't think we got a suspension.  I think we
18 got a written reprimand on that one.

19   Q.  So do you recall a civilian complaint against
20 you from March 1992?

21   A.  Not -- do you have any details on it?

22   Q.  Sure.

23        Do you recall a complainant named Rosario
24 Rodriguez?

25   A.  I don't remember it by name.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 555 of 1026
The Deposition of GARY McGAUGHEY, taken on 3/26/23

120

1    Q.  I'll go ahead and -- I'm going to share the --

2  some actual documents from it.

3    A.  Okay.

4    Q.  Give me one moment, please.  Okay.  We're going

5  to mark this Exhibit Number 5.  This is at city 8- --

6  oh, I'm sorry.  I'm going to share it now.  I'm going to

7  share it, I'm going to mark it, and then I'm going to

8  zoom in.

9          This is Exhibit Number 5.  This is at

10  City 8898.

11          (Exhibit 05 marked.)

12    Q.  And I'm going to -- I'm going to go ahead and

13  zoom in now.

14          Is this document familiar to you as an --

15  as a personnel information report from the internal --

16    A.  Yeah, I --

17    Q.  -- affairs division?

18    A.  Yes.  I think I remember it.

19    Q.  And this was dated April 7, 1992, at 2:25 p.m.;

20  is that right?

21    A.  Yes.

22    Q.  And the complainant listed here is Rosario

23  Rodriguez; is that right?

24    A.  Yes.

25    Q.  And the officers involved are Al Marquez and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 556 of 1026
The Deposition of GERARD MADRGAN, taken on June 23, 2020
121

```
 1   you; is that right?

 2        A.  Yes.

 3        Q.  The bureau listed is "CIB."  What is "CIB"?

 4        A.  Criminal investigations bureau.

 5        Q.  Was crimes against persons within the criminal

 6   investigations bureau?

 7        A.  Yes.

 8        Q.  Okay.  And I'm scrolling down in the document

 9   now.  But I guess, before we go to the document, does

10   seeing this refresh your memory of this complaint at

11   all?

12        A.  Yeah, I seem to remember it.

13        Q.  Yeah.

14        A.  I remember the -- I remember the complaint.  I

15   don't remember the details of it.

16        Q.  Sure.

17             Did -- did you and Al Mar- -- Marquez come

18   to Rosario Rodriguez's house?

19        A.  Yeah, we would have.  I mean, it's documented.

20   I -- I don't really, you know, remember the -- the case.

21   I -- I -- I remember that there was a complaint lodged.

22        Q.  Do you recall -- do you recall her complaining

23   that you and Al Marquez were rude and would not listen

24   to her?

25        A.  From what I remember -- and if I can read it
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 557 of 1026
The Deposition of GARRY DOUGLAS, Taken on June 27, Judge
122

 1 | all, I -- I thought that they were saying Al Marquez was
 2 | rude.  I didn't know there was a complaint against me.
 3 |     Q.  I see.  Let me scroll down a little bit here.
 4 |             And just for -- you and Al Marquez were
 5 | investigating a murder; is that right?
 6 |     A.  Yeah.  Yes.
 7 |     Q.  And you thought that her husband was the
 8 | murderer?
 9 |     A.  Yes.
10 |     Q.  Did he, in fact, turn out to be the murderer?
11 |     A.  You know what?  I don't remember the -- the
12 | case.
13 |     Q.  Sitting here today, you don't know if he did or
14 | he didn't?
15 |     A.  No.
16 |     Q.  That's fine.  So --
17 |     A.  Yeah.
18 |     Q.  -- I think --
19 |     A.  Yeah.  It was -- I remember I was a witness in
20 | the case, and I'm -- I'm reading it now --
21 |     Q.  Uh-huh.
22 |     A.  -- where she said Detective Marquez was rude to
23 | her.
24 |     Q.  Yeah.
25 |             So looking at just sort of the bottom of



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 558 of 1026
The Deposition of GARY ARBOGAST, Taken on June 1, 2017

123

 1  the first page here, do you see the last full sentence

 2  where it says, "Detective Marquez, who did all the

 3  talking, was very rude to her, and Detective Arbogast

 4  just stood there rolling his eyes in disbelief"?

 5      A.  Yes, I see it.

 6      Q.  I'm going to scroll down to the second page

 7  now, and looking at -- or do you recall that -- did you

 8  go to the husband's place of employment to question him?

 9      A.  I don't have details of the case.  I --

10      Q.  Okay.

11      A.  I would have to see the case.

12      Q.  Sure.  Did --

13      A.  I mean --

14      Q.  Okay.

15      A.  Yeah, we might have, but I -- I don't remember.

16      Q.  Sure.

17              And looking at sort of the first full

18  sentence on this page, do you see, "Once there, the

19  detectives began to question him reference the murder

20  warrant in front of the other employees, embarrassing

21  him"?  Do you see that part of the complaint?

22      A.  Yes.

23      Q.  Okay.  So I actually want to scroll down to the

24  bottom.  Starting where it says "complainant," do you

25  see where it says, "Complainant was advised that her

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 559 of 1026
The Deposition of GERALD BOCANEGRA, Taken on 9/15/23   Judge

124

```
1   complaint would be documented and sent to the
2   detectives' supervisor, Lieutenant Saucedo.  She was
3   further advised that no investigation would be conducted
4   by internal affairs, which she understood, and signed
5   the information document waiver attached"?  Is that
6   right?
7        A.  Yeah.  It's documented that way, yes.
8        Q.  Yeah.
9             Do you know why this woman was told that
10  her complaint wouldn't be investigated?
11             MR. JIM DARNELL:  Object, calls for
12  speculation.
13             Answer it --
14             THE WITNESS:  Okay.
15             MR. JIM DARNELL:  -- if you can.
16       A.  What was the question?
17       Q.  (BY MR. HILKE)  Yeah.  The question was just if
18  you -- if you know why this woman was told that her
19  complaint would not be investigated.
20       A.  No, I don't.
21       Q.  Okay.  When you worked in internal affairs, did
22  you sometimes close out civilian complaints without
23  investigating them?
24       A.  Dang it.  Can you repeat it?
25       Q.  Yeah.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 560 of 1026
The Deposition of GARY DOUGLAS, taken on 9/14/23  Page
125

```
 1              When you worked in internal affairs, did
 2   you sometimes close out civilian complaints without
 3   investigating them?
 4       A.  Not without investigating them, no.
 5       Q.  Okay.  Was it your understanding that all
 6   complaints should be investigated?
 7       A.  Well, I would get a caseload, so everything I
 8   got was investigated.  I don't know if there was
 9   determination on higher-ups that maybe some complaints
10   were turned away.  I don't know anything about that.  I
11   just know that I got a caseload, and I had to
12   investigate those.
13       Q.  I understand.  So you didn't know when you
14   worked in internal affairs whether some complaints were
15   screened out before they ever reached the investigators.
16       A.  No.  All -- all I know is my caseload.
17       Q.  Sure.  Okay.  I'm going to stop sharing this
18   document now.
19              And I'm going to -- do you recall being
20   accused of using excessive force against an Armando
21   Herrera in 1978?
22       A.  No.  That would have been when I was in patrol.
23       Q.  Yeah.
24       A.  I don't remember.
25       Q.  Do you remember a suspect alleging that you had
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 561 of 1026
The Deposition of GARY HERNANDEZ, taken on 05/04/23
126

1  deliberately tripped him and hit him in the testicles

2  with a baton?

3      A.  No, I don't remember.

4      Q.  Okay.  Do you remember a suspect alleging that

5  you pulled him by his hair into a car?

6      A.  By his what?

7      Q.  Hair.

8      A.  No, I don't.

9      Q.  Have you ever pulled a suspect by his hair into

10  a car?

11      A.  No.

12      Q.  Okay.  So I'm going to share another exhibit

13  with you now.

14          Okay.  We will mark this as Exhibit

15  Number 6, and this is at Bates -- give me a second --

16  City 55632.

17          (Exhibit 06 marked.)

18      Q.  I'm going to zoom in on the top for a minute.

19  This is a complaint all the way back from November 29,

20  1978; is that right?

21      A.  Yes.

22      Q.  And the complainant is named Armando Herrera?

23      A.  Yes.

24      Q.  And you are listed as the second employee

25  involved here; is that right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.   Yes.

 2        Q.   And your badge number is 765; is that right?

 3        A.   Yes.

 4        Q.   Was that your badge number the whole time you

 5   were at El Paso Police?

 6        A.   Yes, except they didn't go by badge numbers the

 7   last few years.  They went by an ID number, and it

 8   changed.

 9        Q.   Okay.  I'm actually going to scroll down in

10   this document a fair ways to what is actually page 20.

11   Is that what I want?  Sorry.  Let me find the page I

12   want here, please.  I'm going to stop sharing for one

13   second.  I'm going to find the page I want.  I wrote it

14   down wrong.  That looks right.  Okay.  Thanks for your

15   patience.

16             I'm sharing this document again.  This is

17   PDF page 54 of this exhibit.  It's at City 55685, yeah.

18   Do you see here a statement by Officer E.W. Arbogast?

19        A.   Uh-huh.

20        Q.   And this was from December 18, 1978, at 9:45

21   a.m.?

22        A.   Yes.

23        Q.   And this would have been a statement that you

24   typed out; is that right?

25        A.   Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 563 of 1026
The Deposition of GERARD RODOCAB, taken on 05/26/23 Judge
128

 1      Q.  I'm scrolling down a little bit.  Do you see

 2  on -- I'm looking sort of at the middle of the page

 3  here.  Do you see -- and I'm highlighting the section

 4  now, actually.

 5              MR. JIM DARNELL:  Could you let him --

 6      Q.  (BY MR. HILKE)  Do you see --

 7              MR. JIM DARNELL:  Could you let him read

 8  the document?

 9              MR. HILKE:  You know, I actually only want

10  to ask about a couple of sentences here.  I --

11              MR. JIM DARNELL:  But he probably needs to

12  read it to put it into context.  Not out loud.  Just to

13  himself.

14              MR. HILKE:  Yeah, that's fine.

15      Q.  (BY MR. HILKE)  Would you like a minute to read

16  the document through?

17      A.  Yes, I'll review it.

18      Q.  I'll let you go ahead.  Let me know when you

19  want to scroll down.

20      A.  Okay.  Thank you.

21              Okay.  Could you scroll down, please?

22      Q.  Yes, sure.  And there's not actually much else

23  you can read here.

24      A.  Okay.  I'm through reading that.

25      Q.  Okay.  I want to scroll back up a little bit.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  So you've had a chance to read the statement?
 2      A.  (No verbal response.)
 3      Q.  Sir, were you able to read the statement during
 4  that time?
 5      A.  (No verbal response.)
 6      Q.  I'm sorry.  Sir, can you hear me?
 7      A.  Yes, I can hear you.
 8      Q.  Oh, yeah.
 9              Did you have an opportunity to review the
10  statement?
11      A.  To give a statement?  Yeah.  This is --
12              MR. JIM DARNELL:  To read it.
13      A.  Oh, yes, I did.
14      Q.  (BY MR. HILKE)  Okay.  So I'm now going to
15  point you to -- do you see this sentence where it
16  reads --
17      A.  Yes.
18      Q.  -- "When we tried to get the handcuffs on, the
19  subject started to swing his fists, and we did the same
20  thing, while trying to get the subject turned around so
21  we could get the handcuffs on"?  Do you see where it
22  says that?
23      A.  Yes.
24      Q.  And then scrolling down a little bit, do you
25  see where it says, "I feel we only used reasonable force
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 565 of 1026
The Deposition of GARY ANTHONY MARTIN, Taken on June 9, 2023   Judge
130

```
 1  and nothing excessive, other than to get the subject
 2  under control."
 3      A.  Yes.
 4      Q.  Do you -- okay.
 5          So in reviewing the statement, did you
 6  actually describe whether or not you struck the suspect
 7  with your fists?
 8      A.  I don't remember.  I -- I probably did because
 9  it's in my statement.  I would -- I would have swung at
10  him.  The hierarchy that I had told you about earlier,
11  we could have actually gone one higher, but we didn't.
12      Q.  Right.
13          Well, I mean, your statement says that you
14  swung at the suspect --
15      A.  Yes.
16      Q.  -- is that right?
17      A.  Yes.
18      Q.  But -- but does it say --
19      A.  If he swung at me, I would have swung back at
20  him.
21      Q.  Right, but does --
22      A.  Yeah.
23      Q.  -- it say anywhere if you actually made contact
24  and hit him as you swung at him?
25      A.  I -- I don't remember.  I don't remember if he
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 566 of 1026
The Deposition of GARARD CARDOCAS, Taken on 6/21/23 Judge
131

 1  hit me or I hit him.

 2      Q.  No, sir.  I'm just asking in this -- in the

 3  written statement you just reviewed, does it say

 4  anywhere that you actually struck him when you swung at

 5  him?

 6      A.  No, not that I know of.

 7      Q.  And does it describe what physical contact, if

 8  any, you actually made with him?

 9      A.  No.

10      Q.  Okay.

11      A.  To -- oh, there is, other than the fact that we

12  were -- had our hands on him, trying to get his hands

13  behind him to handcuff him.

14      Q.  Okay.  And so in this statement, do you recall

15  being asked to give more details about how much force

16  you would use against a suspect?

17      A.  I -- I don't remember.

18      Q.  Okay.  Was it your understanding that you

19  needed to, in a statement like this, describe the level

20  of force you had used against a suspect?

21      A.  Yes.

22      Q.  Okay.  Is the statement you read -- was it your

23  understanding that the statement you gave met the

24  standards of the internal affairs department?

25              MR. JIM DARNELL:  Object to speculation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 567 of 1026
The Deposition of GARY DODDS, taken on 9/14/22   Page 132
132

1    A.  Yeah, I -- I don't know how internal affairs

2  would have viewed it or --

3    **Q.  (BY MR. HILKE)  Do you have any rea- --**

4    A.  -- what comments they made on it.

5    **Q.  I'm sorry.**

6         **Do you have any reason to believe that the**

7  **statement did not meet the standards of the internal**

8  **affairs department?**

9              MR. JIM DARNELL:  Object, speculation.

10    A.  I mean, I didn't give a second statement, so

11  I -- I -- I would guess that it sufficed.

12    **Q.  (BY MR. HILKE)  I'm going to stop sharing this**

13  **exhibit.**

14         **I know it's a lot of old history.  Do you**

15  **remember being accused of using excessive force against**

16  **a Robert Anderson in 1981?**

17    A.  No.

18    **Q.  Okay.  I'm going to go ahead and pull up an**

19  **exhibit now.  This is going to be -- sorry.  Give me one**

20  **second.  This is going to be Exhibit Number 7.**

21              THE REPORTER:  I already have a 7 written

22  down.  Oh, I may have just now done that.  So sorry.

23              MR. HILKE:  No problem.  I -- I appreciate

24  it.  I'm sorry.

25              (Exhibit 07 marked.)

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 568 of 1026
The Deposition of EARL ARBOGAST, Taken on 05/26/23

133

 1    Q.  (BY MR. HILKE)  So this is going to be Exhibit
 2   Number 7.  This is starting at City 55572.
 3           (Exhibit 07 marked.)
 4    Q.  Scrolling up at the top, do you -- do you
 5   identify this as a personnel investigation report of the
 6   division of internal affairs?
 7    A.  Yes.
 8    Q.  And this is dated May 27, 1981?
 9    A.  Yes.
10    Q.  And the complainant is Robert Anderson?
11    A.  Yes.
12    Q.  And the officer is -- involved is you, Earl
13   Arbogast?
14    A.  Yes.
15    Q.  So I'm scrolling down.  You know, do you want
16   to take a minute to go ahead and read the description
17   again here?  And just let me know when you're done.
18    A.  I -- I did read it.
19    Q.  Oh, okay.  Great.
20           So Robert Williams [sic] alleged that you
21   had physically abused him for no reason; is that right?
22    A.  Yes.
23    Q.  And do -- do you recall, in fact, using force
24   against a Robert Williams?
25    A.  You know, I don't remember this at all.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 569 of 1026
The Deposition of EDWARD ARBOGAST, taken on 9/16/2020
134

```
 1        Q.  That's fine.
 2             I'm going to scroll up now.  This is
 3   City 55571 in the PDF.  And do you see a statement here?
 4        A.  Yes.
 5        Q.  I'm going to apologize because it's really
 6   faint.  Can you make out your name, Officer E.W.
 7   Arbogast, as the person giving this statement?
 8        A.  Yes.
 9        Q.  Okay.  And I am going to direct you -- looking
10   at the middle of the statement, are you able to see
11   where it reads, "We used necessary force to put the
12   subject under arrest and in handcuffs"?
13        A.  Yes.
14        Q.  When giving a statement to internal affairs
15   about a complaint of excessive force, did you have a
16   duty to fully describe the force you had used?
17        A.  Did I what?
18        Q.  Did you have a duty to fully describe the force
19   you had used, if you had used force?
20        A.  I would -- I would think so.  I don't know if I
21   did in all the cases, but it was necessary to -- to --
22   to put in there that only the force necessary was used
23   on a suspect.
24        Q.  Okay.  And beyond saying that only the force
25   necessary was used, was it your responsibility to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 570 of 1026
The Deposition of GERARD GUTOCAS, Taken on June 9, 2022

135

1  describe exactly what kind of force you used so that
2  internal affairs could make its own decision if it was
3  necessary or not?
4      A.  Yeah.  It looks like the guy ran, and we
5  tackled him.
6      Q.  Yeah.  I'm -- I'm going to --
7      A.  And then he still resisted.  He wouldn't -- he
8  wouldn't -- we were trying to get the handcuffs on.
9      Q.  Yeah.  I'm going to stop sharing this for a
10 second because the question I want to ask you is not
11 actually about this exhibit in particular.
12     A.  Okay.
13     Q.  What I'm wondering is, beyond asking -- beyond
14 saying only the necessary force was used, did you have a
15 responsibility to describe exactly what force you used
16 so internal affairs could make an assessment?
17     A.  Well, standing here today, I would think I
18 would have -- I would have put that in there, but if I
19 didn't, it was -- it was sufficient for them back then.
20     Q.  Okay.
21     A.  I mean, if they would have asked me what
22 exactly blow by blow what happened, I would have put it
23 in there.
24     Q.  Okay.  But other than answering questions or
25 follow-up questions from internal affairs, was it your

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 571 of 1026
The Deposition of GERARD CASTELLANO, taken on 02/20/23

136

 1  understanding that you were supposed to describe, not

 2  just that you used necessary force, but exactly what

 3  kind of force you had used?

 4     A.  I didn't -- I didn't think so, evidently,

 5  because it was never -- never an issue back then.

 6     Q.  Did -- I'm going to change the topic.

 7           Did you ever witness Al Mar- -- Al Marquez

 8  conducting -- conducting interrogations?

 9     A.  I don't think I ever have.

10     Q.  You were partnered with him for about a month

11  when you joined CAP; is that right?

12     A.  Yeah.  I was with him about the first month.

13     Q.  Okay.  And in that month, did you ever -- did

14  you join him for witness interviews?

15     A.  I can't remember exactly what we did on that

16  case.

17     Q.  So -- so sitting here today, other than Dan- --

18  other than the Lazo/England murders, do you have any

19  memory of seeing Al Marquez conduct interviews or

20  interrogations?

21           MR. JIM DARNELL:  Object, assumes facts not

22  in evidence.  I don't think there's been any indication

23  he saw Marquez interview anyone in this case.

24           MR. HILKE:  That's fair.

25     Q.  (BY MR. HILKE)  I -- my question is really

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  about -- I don't want to talk -- right now, I don't
 2  want to talk about the Lazo/England murders.  We can
 3  leave that aside.  Other than that, not saying anything
 4  about what you witnessed or didn't witness Marquez doing
 5  there, do you remember at any other time witnessing Al
 6  Marquez conduct an interview or an interrogation?
 7       A.  I don't think I've ever witnessed it, no.
 8       Q.  At the time you gave -- well, strike that.
 9            You -- you were present electronically for
10  some of Al Marquez's deposition in this lawsuit; is that
11  right?
12       A.  His deposition here?
13       Q.  Yes.
14       A.  Yes.
15       Q.  And so you listened to Al Marquez's deposition
16  testimony in this lawsuit; is that right?
17       A.  Yes.
18       Q.  And did you listen to the whole thing or only
19  parts of it?
20       A.  I was here through most of it, if not all of
21  it.
22       Q.  During the deposition, did Al Marquez say
23  anything you knew to be false?
24            MR. JIM DARNELL:  What was the last -- I
25  didn't hear the last part, Wally.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 573 of 1026
The Deposition of GERARD ATHOCAS, taken on 04/26/23   Judge

138

 1          MR. HILKE:  Sure.

 2     **Q.  (BY MR. HILKE)  During Al Marquez's deposition,**

 3  **did he say anything you knew to be false?**

 4     A.  I don't remember that he did.  I mean, I

 5  listened in on it.  It was long, and I don't remember

 6  everything that was talked about, but nothing struck me

 7  as being false right now.  I don't -- I can't say that I

 8  did.

 9     **Q.  Okay.  Do you recall --**

10     A.  Yeah, he just didn't rem- -- he just didn't

11  remember a lot of things.

12     **Q.  Yeah.**

13          **Do -- do you recall him saying anything**

14  **that you suspected to be false?**

15          MR. JIM DARNELL:  Objection, calls for

16  speculation.

17          Go ahead.

18     A.  I don't remember that he did.  I mean, if you

19  have something specific, I could answer to that, but

20  I -- I don't remember right now that he did.

21     **Q.  (BY MR. HILKE)  So listening to Al -- Al**

22  **Marquez's testimony, as far as you know and can**

23  **remember, he told the truth; is that right?**

24          MR. JIM DARNELL:  Object, calls --

25     A.  Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 574 of 1026
The Deposition of GEARD ZAMUDIO, Taken on June 6, 2023  Page

139

```
 1              MR. JIM DARNELL:  -- for speculation.
 2        A.  Yes.
 3        Q.  (BY MR. HILKE)  So I want to take you back to
 4   1993.
 5        A.  Okay.
 6        Q.  It was on -- before you learned of the
 7   Lazo/England murders, were you familiar with Daniel
 8   Villegas?
 9        A.  No.
10        Q.  Had you -- as far as you remember, had you ever
11   heard his name before?
12        A.  Not that I recall.  I don't...
13        Q.  What about Robert England?  Had you heard his
14   name before?
15        A.  No.
16        Q.  Or Armando Lazo?
17        A.  No.
18        Q.  What about Fernando Lujan, nickname Droopy?
19        A.  No.
20        Q.  Or Enrique Ramirez, nickname Popeye?
21        A.  No.
22        Q.  Or David Rangel?
23        A.  No.
24        Q.  Or Rudy Flores?
25        A.  Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 575 of 1026
The Deposition of EDWARD ARD HUGHES, Taken on 5/16/23  Page
140

```
 1        Q.  Okay.  And how did you know a Rudy Flores?

 2        A.  I knew he was a gang member.  I -- I knew that

 3   he had some run-ins with the police, but I don't know

 4   anything specific.

 5        Q.  Okay.  And what about Rudy's brother, Javier

 6   Flores?

 7        A.  Same thing.

 8        Q.  Okay.  What about Rodney Williams?

 9        A.  Rodney who?

10        Q.  Rodney Williams.

11        A.  No.

12        Q.  Or Marcos Gonzalez?

13        A.  No.

14        Q.  Did you know anyone from Daniel Villegas's

15   family?

16        A.  No.

17        Q.  And were you familiar with a na- -- a gang by

18   the name of LML, or Los Midnight Locos?

19        A.  I think that was a gang.

20        Q.  Had you heard of them before you learned of the

21   England/Lazo murders?

22        A.  I might have, but I don't remember.

23        Q.  You might have.

24             What about ECH, or the Eisenhower Crazy

25   Hoods?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.  Yes.

 2        Q.  What about DRC, or the Do Rock Crips?

 3        A.  I don't recognize that one.

 4        Q.  And what about VNE, or Varrio Northeast?

 5        A.  Yes.

 6        Q.  And we've talked a little bit about Al Marquez.

 7   In 1993 -- one moment, please.

 8                 In 1993, you had worked with Al Marquez on

 9   multiple investigations; is that fair?

10        A.  I -- I don't know.  I -- I don't think I did.

11   I don't know --

12        Q.  Okay.

13        A.  -- what investigations I worked with him.

14        Q.  Yeah.

15                 Did you work on -- with Al Marquez on more

16   than one investigation prior to 1993?

17        A.  Yes, at times.

18        Q.  And in your experience, did you ever have any

19   problems communicating with Al Marquez?

20        A.  No.

21        Q.  Did you believe him to be an effective

22   detective?

23        A.  Yes.

24        Q.  And today, when was the last time you saw Al

25   Marquez?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 577 of 1026
THE DEPOSITION OF GARY CUTLER, taken on June 6, 2018
142

 1    A.  It was at -- on the computer.

 2    Q.  Sure.

 3             What about before then?

 4             MR. JIM DARNELL:  Are you talking about

 5    live?

 6    Q.  (BY MR. HILKE)  I'm talking -- yeah, I'm

 7    talking about the last time you saw Al Marquez before

 8    the -- before his deposition where you saw him on the

 9    computer.

10    A.  I may have seen him -- it seems I may have seen

11    him -- it's been a long time.  I can't remember the last

12    time I saw him.

13    Q.  Have you talked with him at all about this

14    lawsuit?

15    A.  No.  I haven't seen him.

16    Q.  Okay.  And you had mentioned by 1993 -- strike

17    that.

18             Before 1993, had you worked with Scott

19    Graves on investigations?

20    A.  Yes.  We --

21    Q.  Was he --

22    A.  -- frequently we worked together.

23    Q.  Was he a good communicator?

24    A.  I'm sorry.  Was he a communicator?

25    Q.  Yeah.  Did you have any problems communicating

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 578 of 1026
The Deposition of GARY AUBUCHON, Taken on June 6, 2017
143

```
 1  with Scott Graves?

 2      A.  No.  We worked real well together.

 3      Q.  Yeah.  Would you describe him as an effective

 4  detective?

 5      A.  Yes.

 6      Q.  Okay.  And had you worked with Carlos Ortega

 7  before the Lazo/England murders?

 8      A.  Before -- before the murder cases, you mean,

 9  or --

10      Q.  Yes.

11              MR. JIM DARNELL:  Before this murder

12  case.

13      A.  Yes.  I -- I -- like I said, we would have a

14  team of detectives go out, and I would frequently be

15  assigned cases, to the murder cases where I was the case

16  agent and he -- he was in and out doing different stuff

17  in different cases that I had.

18      Q.  (BY MR. HILKE)  Was Carlos Ortega a juvenile

19  officer in the cases you worked with him on?

20      A.  Yes.

21      Q.  Okay.  And did -- in your experience working

22  with him, did Carlos Ortega know the appropriate

23  policies for working with juveniles?

24      A.  As far as I know.  I really can't answer that.

25      Q.  Okay.  Did you rely on him to know the
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 579 of 1026
The Deposition of RICHARD DANBOGAST, taken on March 23, 2019
144

1  appropriate policies on juveniles?

2      A.  Yeah, I guess I would.  I rely more on -- on

3  myself.

4      Q.  Okay.  And when was the last time you saw Scott

5  Graves?

6      A.  A long time.  I seem to have run into him at

7  the courthouse maybe a year and a half ago.

8      Q.  Okay.

9      A.  But I -- it was -- I -- I can't really

10  remember.

11      Q.  Have you talked with him at all about this

12  lawsuit?

13      A.  Yes, we used to talk about it.

14      Q.  Okay.  And how many times have you talked to

15  him about this lawsuit?

16      A.  A few times.  I mean, we were called by -- you

17  know, when this whole thing started and getting lawyers

18  and him wondering if he could attach on with me with Jim

19  Darnell, and we talked about the case, and so I talked

20  to him a few times.

21      Q.  Yeah.

22          And would you describe Scott Graves as a

23  friend?

24      A.  He -- he's not a friend that I hang around

25  with.  He's a -- he's a good co-worker, though, that I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 580 of 1026
The Deposition of GERARD VILLEGAS, Taken on June 23, 2023
145

 1  know.  We're -- we're good co-workers.
 2      Q.  Okay.
 3      A.  We don't hang around outside of the department.
 4      Q.  Okay.  You -- you had a good working
 5  relationship with Scott Graves when you worked with him
 6  at El Paso Police Department; is that right?
 7      A.  Yes.
 8      Q.  And will you say that you -- you have a trust
 9  in Scott Graves?
10      A.  Yes.
11      Q.  And as far as you can tell, does he have trust
12  in you as well?
13      A.  Yes.
14      Q.  And what about Carlos Ortega?  When was the
15  last time you talked to Carlos?
16      A.  It's been years.  I mean, it's -- I haven't
17  seen these guys -- you know, I -- I never hung around
18  guys when I was on the department off duty, and I
19  haven't hung around them since I've been retired -- or
20  since I quit the police department.  I see them
21  infrequently here and there, but...
22      Q.  That makes sense.
23          MR. HILKE:  Let me check in with the other
24  counsel.  How long do you have before you have to go for
25  your other meeting?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 581 of 1026
The Deposition of GARY GARDUCAS, taken on 9/16/23  JUDE
146

```
 1                    MR. MARTINEZ:  I've got another 15 minutes.
 2    It's just -- right before 1:00 is all we need, Wally.
 3                    MR. HILKE:  Great.  Great.  Great.  Great.
 4        Q.  (BY MR. HILKE)  So I want to turn to the
 5    investigation of the England/Lazo murders.  Daniel
 6    Villegas wasn't the first person identified as a suspect
 7    in this case, was he?
 8        A.  No.
 9        Q.  The -- the Flores brothers, Rudy and Javier
10    Flores, had been interviewed in the investigation,
11    right?
12        A.  Yeah.  It was my understanding they were
13    interviewed.
14        Q.  What is the -- what is the first thing -- well,
15    one of the first things you did in this case was take a
16    statement from Tonya Vinson; is that right?
17        A.  Yeah.  And the first thing was taking a
18    statement from Juan Medina, who was at the scene.  It
19    was the first statement taken.
20        Q.  Right.  So Tonya wasn't the first statement,
21    but it was early in the investigation; is that right?
22        A.  Yes.
23        Q.  And Tonya Vinson was Armando Lazo's, the murder
24    victim's, former girlfriend; is that right?
25        A.  I -- I don't remember that, but I understood
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 582 of 1026
The Deposition of GARARD AUBOCAS, Taken on June 3, 2015
147

1  that he was a friend.

2      Q.  Uh-huh.  And she told you that a person named

3  Terrance had told her that Rudy Flores and his brother

4  did the shooting, right?

5      A.  Yeah.  It was a Terrance and a Charlie that had

6  told her.

7      Q.  And Charlie.  Okay.

8          And this was on April 12, 1993, that you

9  took her statement?

10     A.  That sounds about right.

11     Q.  Okay.

12         MR. JIM DARNELL:  Can he look at his report

13  while you're going through dates?

14         MR. HILKE:  You know what?  It's -- I'm --

15  I'm not trying to impeach him on it or anything.  I'm

16  just -- I'm just trying to lay the foundation, so I'd --

17  I'd rather keep moving at this point.

18         MR. JIM DARNELL:  That's fine.

19     Q.  (BY MR. HILKE)  Ton- -- and Tonya's -- were you

20  aware that Tonya's sister, Teri, Teri Vinson, also made

21  a statement?

22     A.  Oh, if her friend gave a statement?

23     Q.  Her sister, Teri.

24     A.  I think that she did.

25     Q.  Okay.  And in the investigation, there was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 583 of 1026
The Deposition of GARY ROBINSON, Taken on 9/26/23, Judge

148

```
 1  later follow-up where a statement was taken from
 2  Terrance; is that right?
 3       A.  Yes.
 4       Q.  And is it consistent with your memory that
 5  Sergeant Graves took that statement?
 6       A.  I think he did, yes.
 7       Q.  Okay.  And I'm going to -- I'm going to
 8  actually take a second and show you that statement
 9  now --
10       A.  Okay.
11       Q.  -- from Terrance.  Give me one moment, please.
12            Okay.  So I'm now sharing another document.
13  This is Exhibit Number 8.
14            (Exhibit 08 marked.)
15       A.  Okay.
16       Q.  Bates stamped -- let's see down here.  I'm
17  sorry.  For some reason, this is giving me a little bit
18  of trouble.  All right.  Ah, there we go.  It's
19  City 15743.  I'm going to zoom in just a second.
20            So scrolling to the top, this is a -- do
21  you see here that this is a statement given to Scott
22  Graves?
23       A.  Yes.
24       Q.  And it's given by Terrance Strong Farrar?
25       A.  Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 584 of 1026
The Deposition of RICHARD CARLOS LARA, taken on 9/14/23
149

1     Q.  And the date and time of the statement is
2  April 12, 1993?

3     A.  Yes.

4     Q.  So I'm going to go ahead and scroll down.

5           Do you see, sort of looking at the end of
6  the third line, where the statement says, "I know that
7  Rudy Flores was having problems with Armando Lazo
8  because Rudy was messing with one of Armando's friends"?
9  Do you see that part of the statement?

10     A.  Yes.

11     Q.  And then do you see a couple lines down where
12  it says, "Armando Lazo and Robert England were at that
13  party, and Rudy Flores also showed up to the party with
14  some other dude, but I don't know who he was"?

15     A.  Yes.

16     Q.  And then, "Rudy started to mess with one of
17  Armando's friends at the party, and Armando told Rudy to
18  leave him alone"?

19     A.  Yeah.

20     Q.  And then scrolling down a little bit, it says,
21  "I walked outside, and Armando and Rudy were having
22  words outside and getting ready to fight.  I broke it up
23  before they fought.  Rudy then told Armando that he was
24  going to shoot him."  Do you see that?

25     A.  Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 585 of 1026
The Deposition of GARY McDOUGALD, Taken on June 2, 2023

150

 1     Q.  And then a line lower, "Rudy left, and then 15
 2  minutes later he came back with some of his friends, and
 3  he wanted to fight Armando, but we wouldn't let Armando
 4  go outside"?
 5     A.  Yes.
 6     Q.  And then, "Rudy then jumped into his gray
 7  Cougar and told Armando that he was going to kill him
 8  and all the rest of us" --
 9     A.  Yeah.
10     Q.  -- right?
11          And finally, scrolling down a little bit
12  more, the statement says, "I was scared after that
13  because Rudy has tried to kill me, and he has stabbed at
14  me.  And his brother, Javier "Dirt" Flores, has shot at
15  me before."  Do you see that?
16     A.  Yes.
17     Q.  And in the course of the investigation, was
18  this an important lead?
19     A.  Yes.
20     Q.  And you have a person here who's been
21  identified as having a recent conflict with one of the
22  murder victims, right?
23     A.  Yes.
24     Q.  And actually is threatening to shoot and kill
25  the murder victim who has been shot and killed; is that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 586 of 1026
The Deposition of RICHARD CHABOCAS, taken on 9/19/13  Page
151

```
 1  right?
 2       A.  Yes.
 3       Q.  And then you mentioned earlier that early in an
 4  investi- -- strike that.
 5              You mentioned earlier that in homicide
 6  detecti- -- in homicide investigations, the detectives
 7  would meet and share information; is that right?
 8       A.  Yes.
 9       Q.  Is this information you would have expected to
10  be shared with you as part of the investigation?
11       A.  What was that?
12       Q.  Is this information you would have expected to
13  be shared with you as you worked on the Lazo/England
14  murder?
15       A.  Yes.  I think I was aware of it.
16       Q.  Okay.  And then Rudy and Javier were both later
17  interviewed in this investigation, right?
18       A.  Yes.
19       Q.  You weren't present for those interviews, were
20  you?
21       A.  We in trouble what?
22       Q.  You were not at those interviews, were you?
23       A.  No.
24       Q.  To your knowledge, were Rudy and Javier ever
25  asked about their past interactions with Armando Lazo?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 587 of 1026
The Deposition of GERARD DARROCAS, taken on June 24, 2020
152

```
 1              MR. JIM DARNELL:  Speculation.
 2              Go ahead.
 3      A.  Yeah, I don't know.
 4      Q.  (BY MR. HILKE)  If they had been asked about
 5  their interactions with Armando Lazo, that should have
 6  been documented, right?
 7      A.  Yes.
 8      Q.  And to your knowledge, were Javier and Rudy
 9  ruled out as suspects?
10      A.  I -- I heard they were ruled out by Detective
11  Marquez.
12      Q.  What was your --
13      A.  This information here was given to Detective
14  Marquez --
15              MR. ALMANZAN:  If you look in the file --
16      A.  -- to look into the Flores brothers.
17              MR. ALMANZAN:  -- defendants' counsels --
18              MR. HILKE:  I'm sorry.  I'm sorry.  Is it
19  time to go?
20              MR. ALMANZAN:  -- there is a vacation
21  certificate.
22              MR. HILKE:  I'm sorry.  Is that -- whoever
23  is speaking, is it about this current meeting?
24              MR. ALMANZAN:  And the names are Frank's,
25  to begin with, because we need that one, and we need --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 588 of 1026
The Deposition of GARD CARDONA, Taker on June 23, Judge
153

1          MR. MARTINEZ:  Andy, you're -- we -- you're

2     not on mute.  We can hear you.

3          MR. ALMANZAN:  Oh, my bad.  Okay.

4          MR. HILKE:  Okay.  He's talking about

5     something else.  It's -- it's okay.

6     Q.  (BY MR. HILKE)  So -- right.  So what was your

7     understanding, if any, of why Al Marquez had ruled out

8     Rudy and Javier?

9     A.  I -- I didn't know.

10          MR. JIM DARNELL:  Object to speculation.

11          Go ahead.

12     Q.  (BY MR. HILKE)  You didn't -- okay.

13     A.  Yeah, I didn't know.

14     Q.  And were you aware that Rudy Flores had

15     implicated a Rick Martinez as a shooter?

16     A.  I don't know.

17     Q.  Okay.  I'm going to stop sharing for one -- I'm

18     going to stop sharing this document.  I'm actually going

19     to show you another document.

20     A.  Okay.

21          MR. JIM DARNELL:  Have we got -- have we

22     had time to do that before they got to take off?

23          MR. HILKE:  We do.  This is just going to

24     take a couple of minutes.

25          MR. JIM DARNELL:  Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 589 of 1026
The Deposition of EARL ARBOGAST, taken on June 30, 2022
154

 1                  MR. HILKE:  Actually -- okay.  Actually,

 2   you know, you're right.  I'd better stop.  It's a good

 3   point to break.

 4                  THE VIDEO TECHNICIAN:  All right.  We're

 5   off the record.  The time is 12:54.

 6                  (Break taken.)

 7                  THE VIDEO TECHNICIAN:  We are back on the

 8   record for the deposition of Earl Arbogast being

 9   conducted by videoconference.  My name is Sydney Little.

10   Today is June 30th, 2022, and the time is 1:44.

11       Q.  (BY MR. HILKE)  Sir, do you remember how you

12   were first notified of the Lazo/England murders?

13       A.  How I was notified?

14       Q.  Yes, sir.

15       A.  Yes.  I received a call.  I think the call was

16   from my sergeant, and I was given an address to go to.

17       Q.  And were you on duty at the time -- or strike

18   that.

19                  Do you remember where you were when you

20   received the call?

21       A.  At that time of day, probably bed.

22       Q.  Yeah.

23                  And did you then report to the scene of

24   the -- the scene of the murder?

25       A.  Yes, I did.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 590 of 1026
The Deposition of GEARD AMBROSE, Taken on 9/24/21  June
155

1    Q.  What's the first thing you -- you remember
2  doing when you arrived?

3    A.  I got with the sergeant.  He kind of briefed
4  me -- briefed me on what he had.

5    Q.  And what did -- what did he know at the time
6  you arrived?

7    A.  At the time, he knew there -- there was a
8  shooting.  There were two people that were shot.
9  There's an open field there that he's parked at, is
10  where the victims were.  It was an apparent drive-by.
11  And then one of the victims also went to a residence to
12  try to get help, and he was taken to the hospital.  And
13  then there were two witnesses that were with the two
14  victims.  And then after that, that's when I took the
15  witness statement.

16    Q.  At the time you arrived, had any shell casings
17  been found?

18    A.  I don't -- I don't remember that there was.  I
19  forget when crime scene got there.  I think they got
20  there probably after me.

21    Q.  And from your conversation with the sergeant,
22  were you aware of any immediate suspects in the case?

23    A.  Was I aware of what?

24    Q.  Any immediate suspects.

25    A.  No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 591 of 1026
The Deposition of Gary McDougal, Taker on 6/16/23, Judge
156

```
 1        Q.  Did you also talk to patrol officers on the
 2   scene?
 3        A.  I -- no, I didn't.
 4        Q.  Okay.  So let me -- let me -- I'm going to show
 5   you another exhibit now.
 6        A.  Okay.
 7        Q.  Let's see.  Okay.  We'll mark this Exhibit
 8   Number 9.  This is at City 265.
 9                   (Exhibit 09 marked.)
10        Q.  I'm going to scroll into the top for a second.
11   Let's see.  Is this a -- is this an El Paso Police
12   Department supplementary report?
13        A.  Yeah, it is.  It's taken on a computer.  I've
14   been shown that.
15        Q.  Okay.  And this is a report dated May 6th,
16   1993; is that right?
17        A.  Yeah.  I don't see the date, but, yeah, it's --
18   if it's on there, then it's right.
19                   MR. JIM DARNELL:  Right there up at the top
20   of it.
21        Q.  (BY MR. HILKE)  Yeah.  You see it on -- sort of
22   on the left side over here?
23        A.  Oh, I -- oh, 5-6-93?
24        Q.  Yes.
25        A.  Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.  Okay.  And then I'm scrolling down to the

2 bottom of this page.  That's your name at the bottom of

3 the statement, right?

4    A.  Yes.

5    Q.  This is your supplementary report?

6    A.  Yes, it is.

7    Q.  I want to call your attention to a couple of

8 paragraphs here.  From the top of where I'm at on this

9 first page, do you see where it reads, "During the

10 course of the investigation over several days,

11 detectives received information that possibly the LML

12 gang was involved, especially the Flores brothers,

13 Javier and Rudy"?

14   A.  Yes.

15   Q.  And a little lower, do you see, "One such

16 source of this information was from Tonya Vinson, whom

17 undersigned took a statement from"?

18   A.  Yes.

19   Q.  "As a result of such information, both Rudy and

20 Javier Flores were interviewed on this case.  However,

21 no connection was made to the Flores brothers."

22   A.  Yes.

23   Q.  Do you see, "Rudy Flores did implicate a Rick

24 Martinez, who was also brought to the CAP office and

25 interviewed"?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 593 of 1026
The Deposition of GARY ALLEN SMITH, Taken on June 23, 2022
158

1    A.  Yes.

2    Q.  And do you see, "No connection could be made on

3  Rick Martinez, who cooperated in giving consent to

4  detectives to search his apartment for any weapons"?

5    A.  Yes.

6    Q.  "Undersigned and Detective Graves conducted the

7  search of Martinez' home."  Do you see that?

8    A.  Yes, I do.

9    Q.  So -- so per your report, Rick Martinez was

10 interviewed in connection with this case; is that right?

11   A.  Yes, I guess he was.

12   Q.  And having been interviewed as a murder -- as a

13 murder suspect, there should have been a police report

14 documenting whatever Rick Martinez said; is that right?

15   A.  Yes.

16   Q.  And are you aware of any report documenting the

17 conversation with Rick Martinez?

18   A.  No, I don't.

19   Q.  Can you think of -- can you think of any reason

20 there wouldn't be a report documenting --

21   A.  No, I can't.

22   Q.  -- that conversation?

23   A.  No, I can't.

24   Q.  Okay.  Okay.  So I'm going to stop sharing --

25 actually, I'm -- I'm going to leave this open for just a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 594 of 1026
The Deposition of GARARD ALBOCAST, taken on 9/26/23 Judge

159

1  second.  So it was -- and, actually, I'm going to go

2  ahead and scroll up to the top of this document.  How

3  interesting.  I'm sorry.  I'm jumping around a little

4  bit here.  I'm actually going to take you down to the

5  second page.

6          Just looking at the very bottom of this

7  statement, do you see where it say- -- of this page

8  that's -- as it's showing, do you see where it says, "On

9  4-21-1993, Detective Marquez received information from

10  David Rangel that Daniel Villegas was responsible for

11  the shooting"?

12      A.  It's not on the statement.  I had his statement

13  here.  Hold on.

14      Q.  Okay.

15      A.  Okay.  How -- how does it start out at?

16      Q.  It starts out, "On April 21, 1993" --

17      A.  Okay.

18      Q.  -- "Detective Marquez received information from

19  David Rangel that" --

20      A.  Yes.

21      Q.  -- "Daniel Villegas was responsible for the

22  shooting"?

23      A.  Yes.

24      Q.  So my question is, at that time, on April 21,

25  1993, would you agree that the investigation of this

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 595 of 1026
The Deposition of GARRY OEHLER, Taken on June 23, 2023
160

 1  murder had gone cold?

 2       A.  Had gone what?

 3       Q.  Cold.

 4       A.  Cold?  Probably somewhat, yes.

 5       Q.  Yeah.

 6            Because at that time, Rudy Flores and

 7  Javier Flores had been ruled out already, right?

 8       A.  Yes.

 9       Q.  And you were involved in going to Chaparral,

10  New Mexico, to talk to some juveniles who had claimed

11  involvement; is that right?

12       A.  Yes, to -- to pick them up, yes.

13       Q.  But they -- they were ruled out, also; is that

14  right?

15       A.  Yes.

16       Q.  And did you have any other viable suspects as

17  of -- before the tip from David Rangel came in?

18       A.  Not -- not that I remember.

19       Q.  Okay.  So I'm going to -- I'm going to stop

20  sharing this exhibit for a second here now.

21       A.  Okay.

22       Q.  And do you have any -- do you have any

23  documents in front of you right now?

24       A.  Just the statement that you were just referring

25  to.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 596 of 1026
The Deposition of RICHARD CARDOZA, Taken on 05/26/21
161

1    Q.  Okay.  That's fine.  And I'll just ask that if
2  you're referring to it, please state so for the record,
3  so we can be clear when you're looking at a document.
4  Does that --
5    A.  Okay.
6    Q.  -- make sense?
7            So do you recall -- David Rangel eventually
8  gave a statement implicating Daniel Villegas; is that
9  right?
10    A.  Yes.
11    Q.  And you witnessed David Rangel signing that
12  statement; is that right?
13    A.  I don't recall that.  I -- if my name's on it,
14  I witnessed it.
15    Q.  Okay.  I'm going to go ahead and share another
16  exhibit with you now.  Okay.  I'm now sharing
17  Exhibit 10.
18    A.  Okay.
19            (Exhibit 10 marked.)
20    Q.  This is at -- I'm sorry.  Oh, gosh, that's hard
21  to read.  Give me a second.  This is at J.S. 15774.  I'm
22  scrolling back to the top of the document here.
23            All right.  Do you recognize this document
24  as a crimes against persons witness statement?
25    A.  Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 597 of 1026
The Deposition of RICHARD RAMOS, Taken on 06/11/21

162

1      Q.  Okay.  And this is dated April 21, 1993; is
2   that right?

3      A.  Yes.

4      Q.  And the time indicated is 7:20 p.m.; is that
5   right?

6      A.  Yes.

7      Q.  Was it -- was it in the practice -- in the
8   practice at crimes against persons, was it the practice
9   that the time on a statement was a time that the officer
10  started taking the statement?

11     A.  Yes.  That would be the -- usually, the time
12  started.  I can tell you that -- that's what I would do.

13     Q.  Okay.  And so do you see, at the top, it
14  says -- it's hard to read the first, but I believe it
15  says, "My name is David Rangel, and I live at
16  8140 Tierra Verde.  Right now, I am in the crimes
17  against persons office, where I am giving this statement
18  to Detective Alfonso Marquez"?

19     A.  I see that part.

20     Q.  Okay.  I'm going to go ahead and scroll to the
21  bottom of this document right now.  Do you see a
22  signature section on the second page of this document?

23     A.  Yes, I see it.

24     Q.  And that's your signature as the second witness
25  listed here?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A.  That's my signature, yes.

2     Q.  Okay.  So you were -- so you witnessed David

3  Rangel signing this statement; is that right?

4     A.  Yes.

5     Q.  You wouldn't have signed your name as a witness

6  if you hadn't actually seen him sign it; is that fair?

7     A.  No.  He would -- he would have signed it, and I

8  would have signed it.

9     Q.  Okay.  And where were you when you witnessed

10  this statement being signed?

11     A.  This is at the CAP office.

12     Q.  Yeah.  Where within the CAP office?

13     A.  Well, it's just -- the CAP office is like one

14  big bay, separated by different cubicles, and it's

15  always -- it's in that bay that we were at.

16     Q.  Okay.  Was it typical for an officer taking a

17  statement to take the statement in his own cubicle?

18     A.  Yes.

19     Q.  And it was Al Marquez who took this statement,

20  right?

21     A.  Yes.

22     Q.  Would you have expected him to take it in his

23  cubicle?

24     A.  Yes.

25     Q.  Okay.  And did you observe any of the interview

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 599 of 1026
The Deposition of GARRY ARBUCKLE, Taken on 05/24/23   Judge

164

 1  between Detective Marquez and David Rangel?

 2      A.  No.

 3      Q.  You would have come in just for signing --

 4  signing as a witness; is that right?

 5      A.  Yes.

 6      Q.  Where were you before you were called in to

 7  sign as a witness?

 8      A.  I was probably in my cubicle working cases.

 9      Q.  Okay.  How close was your cubicle to Al

10  Marquez's cubicle?

11      A.  Detective Marquez had a cubicle that backs into

12  mine back to back, catty-corner.

13      Q.  Thank you.

14            And so would -- okay.  So your cubicle and

15  Al Marquez's cubicle were adjacent diagonally to one

16  another --

17      A.  Yeah.

18      Q.  -- is that right?

19      A.  Yeah.  The actual corners would meet.

20      Q.  Okay.  And -- and going back up to the top of

21  this -- top of this statement, this -- the time on the

22  statement is 7:20 p.m.; is that right?

23      A.  7:20 p.m., yes.

24      Q.  And did CAP detectives -- was a typical shift

25  for a detective 9:00 to 5:00, unless there was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    investigation required outside of those hours?

2        A.  Yes, unless we were working other cases.

3        Q.  Okay.

4        A.  Like I said, there were a lot of murder cases

5    at some point, you know.  While we were there, sometimes

6    you'd be busy, sometimes you weren't.  So the typical

7    hours would be 9:00 to 5:00, but if there were a lot of

8    cases, you worked all kinds of hours, a lot of --

9        Q.  Yeah.

10       A.  -- overtime.

11       Q.  But by -- by 7:20 p.m anyone who doesn't have

12   to be at the office has gone home for the day; is that

13   fair?

14       A.  Yeah, if they didn't have work they needed to

15   do, you know, if they went on another case.  And I

16   forget when it was, but we used to have plus-50 murders,

17   that I remember, and I think we had it three years in a

18   row.  We were called out all the time, so we were always

19   there late, a lot of people working murder cases.

20       Q.  Okay.  And so if you know, how long did Al

21   Marquez take to take the statement from David?

22       A.  How long did it take him?

23       Q.  Yeah.

24       A.  I -- I can't answer that.  I don't know.

25       Q.  Okay.  And when you witnessed the statement,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  had you already had an interaction with Rodney -- with

2  Rodney Williams that day?

3      A.  Yes, I think we do, because the sergeant had

4  called us and told us to pick up Rodney, and myself and

5  Detective Graves had picked him up.

6      Q.  Okay.  What did you do after you witnessed this

7  statement?

8      A.  I can't remember exactly.  I can tell you that

9  I -- I talked with Detective Marquez.  He -- or the

10  sergeant, really.  He wanted me to get a warrant for

11  Marcos --

12      Q.  Okay.

13      A.  -- Gonzalez, and so he tasked me with doing an

14  affidavit.

15      Q.  Now, was there anything in David's statement --

16  well, okay.

17          And exactly what do you remember during the

18  time when you were witnessing this statement?

19      A.  Well, I think part of the time we were -- we

20  had gone out to Irvin High School and picked up Rodney

21  Williams, and myself and Detective Graves did an

22  interview with Rodney Williams.

23      Q.  Okay.  And subsequent to that, you witnessed

24  this statement from David Rangel?

25      A.  I can't remember what order it went in.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 602 of 1026
The Deposition of GARY CARR CHILDERS, Caretaker on 9/14/21

167

1    Q.  Okay.  At some point that night, you witnessed
2  the statement from David Rangel?
3    A.  Yes.
4    Q.  And from that time -- during the time you were
5  witnessing the statement, what exactly do you remember
6  happening?
7    A.  Just -- just what I had mentioned, an interview
8  with Rodney Williams I think was taken the same night.
9    Q.  No, but I'm -- I'm only asking about -- I guess
10  what I'm asking is, do you have an independent memory of
11  the interaction with Al Marquez, you, and David Rangel
12  when you came to witness this statement?
13    A.  No, I don't think I got involved with Rangel,
14  either.  I don't think I met him, other than signing the
15  statement -- or witnessing --
16    Q.  Right.
17    A.  -- it.
18    Q.  But do you have an actual memory of seeing him
19  sign the statement?
20    A.  You know, to tell you the truth, I really
21  don't.  I -- if I signed it, I witnessed it, but I don't
22  remember from 30 years ago that -- yeah, I remember this
23  part, and he signed it.  I don't --
24    Q.  Okay.  And so you don't remember -- and so is
25  it fair to say that although you can infer from seeing

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 603 of 1026
The Deposition of GARD CAHOGAN, Taker on 9/14/23   Judge

168

```
 1   your signature that you did witness it, you don't
 2   remember anything else at all about what -- what was
 3   happening there when you actually witnessed the
 4   statement being signed?
 5        A.  For this statement, no.
 6        Q.  Okay.  Now, do you remember if David had given
 7   any information that implicated Rodney Williams as being
 8   involved in the shooting?
 9        A.  I didn't know that, no.
10        Q.  Okay.  And if David had said that Rodney was
11   involved in the shoo- -- shooting, that should have been
12   recorded in David's statement, right?
13        A.  Yes.
14        Q.  Okay.  And because it's a -- it's a detective
15   who actually types up the statement, right?
16        A.  Detective Graves.
17        Q.  I'm just saying that -- yeah.  Okay.
18            And I -- I think this one is actually Al
19   Marquez, the David Rangel statement, just to not get
20   you --
21        A.  Oh, for Rangel, it was --
22        Q.  -- mixed up.
23        A.  -- Detective Marquez, yeah.
24        Q.  Yeah.
25        A.  I thought you were talking about Rodney
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  Williams.
 2      Q.  Yeah.  And so Rodney Williams was ultimately
 3  charged with murder, wasn't he?
 4      A.  Yes.
 5      Q.  Are you aware of any documents that show how
 6  Rodney Williams was first identified as a suspect?
 7      A.  No.  I remember that the sergeant, Johnson, had
 8  come up to us and told us to pick him up and to
 9  interview and that he was implicated somehow, and so we
10  brought him back to the CAP office to interview him to
11  see if he had any knowledge of it.
12      Q.  Right.
13          And are you aware of Rodney Williams's name
14  having come up at any prior point in the investigation?
15      A.  No.
16      Q.  And how a murder suspect is implicated is an
17  important piece of information in an investigation,
18  right?
19      A.  Yes.
20      Q.  So however he was first identified, that should
21  have been documented somewhere, right?
22      A.  Yes.
23      Q.  So when you were sitting diagonal to Al Marquez
24  and David Rangel, did you hear anyone yell at any time?
25      A.  No.  And, again, I'm not sure -- I'd have to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 605 of 1026
The Deposition of GARY CHELOCAS, Taken on June 27, Judge
170

1  check the times.  I'm not sure that wasn't the time we
2  were interviewing Rodney Williams.  I'd have to look at
3  the times of this statement and the times we were
4  interviewing Rodney Williams.
5       Q.  I understand.
6            Do you have any memory of overhearing Al
7  Marquez threatening David Rangel?
8       A.  No.
9       Q.  Or of Al Marquez raising his voice with David
10  Rangel in any way?
11      A.  No.
12      Q.  Okay.  And when you were assigned to write an
13  arrest warrant for Marcos Gonzalez, did you write that
14  warrant at your cubicle?
15      A.  I think I wrote it in my cubicle, yeah.
16      Q.  Okay.  And how long was it between when you
17  witnessed David Rangel's statement and when you started
18  writing the arrest warrant?
19      A.  I'm not sure.  I just remember Sergeant Johnson
20  tasking me with getting an affidavit, which I couldn't
21  do because Marquez had to give me information on it.  He
22  was talking to, I guess, David Rangel, and he had to
23  give me the information and the probable cause to put on
24  the warrant so that I could do it.
25      Q.  Okay.  So -- so your recollection was that you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 606 of 1026
The Deposition of GARLAND DEWAYNE DIXON, Taker on June 4, Judge
171

1 started -- you were assigned to write the warrant before

2 Marquez was done with Rangel; is that right?

3     A.  I don't remember at what point, but he gave me

4 enough information in the affidavit already to get the

5 warrant, for the affidavit.

6     Q.  Okay.  What information were you waiting on to

7 write the warrant?

8     A.  I -- I wasn't.  When I talked to Al Marquez

9 the -- the one time to get the information that needed

10 to be included in the affidavit, I talked to him, I took

11 my notes, and then I went and did the warrant.  He had

12 enough information when I first talked to him to

13 complete the affidavit to have enough to get that

14 warrant.

15     Q.  And when you first talked to Al Marquez, was

16 he -- was he in his cubicle with David Rangel?

17     A.  Yes.

18     Q.  Okay.  And so that was before you -- he was

19 done taking the statement and you witnessed it; is that

20 right?

21     A.  Yeah.  I was in the process of or finishing.

22 I'm not sure.

23     Q.  Okay.  And after you got the affidavit -- after

24 you finished typing the affidavit, what did you do next?

25     A.  After I got the affidavit, I went back to the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 607 of 1026
The Deposition of GARY CAMBRON, Taken on June 23, 2023

172

1  CAP office, and we all met there with Sergeant Johnson,

2  and we went to Danny Villegas' house to get Marcos

3  Gonzalez.  We had -- Al Marquez had information that he

4  was staying there.

5      Q.  Yeah.

6          And when you say you went back to the CAP

7  office, was your cubicle in the CAP office?

8      A.  My cubicle?

9      Q.  Yeah.

10     A.  Yes.

11     Q.  So you were already in the CAP office when you

12  finished writing the warrant; is that right?

13     A.  Right, but -- but we had to go find a

14  magistrate to issue the warrant.

15     Q.  Right.  So you would -- you -- you finished the

16  warrant, and you went to get this sergeant and Al

17  Marquez; is that right?

18     A.  Well, I finished the affidavit.  I went to a

19  magistrate.  He signed off on it.  Then I went back to

20  the CAP office, and that's when we were tasked to go to

21  Danny Villegas' house.

22     Q.  Okay.  Did -- who went with you to the

23  magistrate?

24     A.  Say again.

25     Q.  Who went with you to the magistrate with --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 608 of 1026
The Deposition of GREGORY MARQUEZ, taken on June 27, 2022
173

1  with the warrant?

2      A.  I don't remember.  Somebody would have gone.

3  I -- I don't remember.  It was probably Detective

4  Graves.  We were always together.  But I can't say for

5  sure.

6      Q.  **Al Marquez was the one who actually signed the**

7  **warrant; is that right?**

8      A.  Yes.  Before I left to the magistrate, I'm not

9  going to sign the warrant because I'm -- I'm not sure

10  that I have the details right.  I want to make sure that

11  what he told me is what happened; that I didn't make a

12  mistake.  So he read the affidavit.

13          MR. JIM DARNELL:  He signed -- he signed

14  the affidavit rather than the warrant.

15      A.  Yeah.  Yeah.  You're referring to the warrant.

16  He signed the affidavit, so --

17      Q.  **(BY MR. HILKE)  Thank you.**

18      A.  I did the affidavit.  I didn't sign it, but I

19  had to give it back to him because I'm not going to

20  attest to the facts --

21      Q.  **Right.**

22      A.  -- being correct because he knew what they were

23  and, if there was a mistake made, he would know.

24      Q.  **And just so I'm understanding, even though Al**

25  **Marquez signed the affidavit, he didn't necessarily take**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 609 of 1026
The Deposition of GERARDO MARQUEZ, Taken on 9/15/23   Judge
174

```
 1  the affidavit to the magistrate; is that right?
 2      A.  No.  I -- I remember doing it.
 3      Q.  Okay.  So you have a memory that Al Marquez
 4  was -- did not come with you to bring the warrant to the
 5  magistrate; is that -- I'm sorry.  I'm so sorry.  I keep
 6  mixing them up.  Strike that.
 7              So your memory is that Al Marquez did not
 8  come with you to bring the affidavit to the magistrate;
 9  is that right?
10      A.  Yes.
11      Q.  Okay.  Thank you.  Okay.  All right.  Okay.
12              I'm going to stop sharing this for a
13  second.  Give me just one second, please.
14      A.  Okay.
15      Q.  Okay.  Okay.  So I'm going to share another
16  exhibit with you.
17              MR. JIM DARNELL:  Did you mark that last
18  one Exhibit 10?
19              MR. HILKE:  Yes.  That's David -- yeah, the
20  David Rangel statement is Exhibit 10.
21              MR. JIM DARNELL:  Okay.  I wrote that down,
22  but I didn't -- wasn't sure I ever actually heard you
23  say it.
24              MR. HILKE:  Well, I -- you know, if I
25  didn't, thanks for catching it.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 610 of 1026
The Deposition of GERARD ALDOCAB, Taker on June 23, Judge
175

```
 1        Q.  (BY MR. HILKE)  I'm going to mark Exhibit 11.
 2   Yeah, give me one sec.  I'm going to mark Exhibit 11 in
 3   just a second here.  Okay.
 4              So I'm now marking Exhibit 11.  This is a
 5   transcript of trial -- of testimony from habeas
 6   proceedings on September 15, 2011.
 7              (Exhibit 11 marked.)
 8        Q.  And I'm going to scroll down a little bit.  And
 9   so I'm now on P4539 in this transcript and -- and, sir,
10   do you recall being asked this question and giving this
11   answer?
12              "Question:  Okay.  You got the warrant.  Is
13   it feasible -- or is it typical that you are there at
14   Daniel -- where do you go after this?  Do you go get
15   Marcos Gonzalez?
16              "A, answer:  Once we got the warrant, we
17   will go to try to arrest the person that we get the
18   warrant for."
19              Is that -- do you recall being asked that
20   question and giving that answer?
21        A.  Yeah.  Yes.
22        Q.  And do you recall being asked this question and
23   giving this answer?
24              "Question:  And by this time, do you know
25   where he lives?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 611 of 1026
The Deposition of GARY GARCIA, Taker on 05/26/23  Judge
176

```
 1                    "Answer:  Yes.  I believe we had an address
 2   where -- it was the same address where we arrested
 3   Marcos and Daniel Villegas on Wren -- on Wren Street."
 4                    Do you remember that?
 5        A.  Yes.  And if you could scroll up a little bit.
 6        Q.  Scroll up a little bit?
 7        A.  Yeah.
 8        Q.  Uh-huh.
 9        A.  There you go.
10        Q.  Yeah.
11                    So do you recall testifying that after
12   getting the warrant, you went to go get Marcos Gonzalez?
13        A.  Yes.
14        Q.  And do you recall testifying that at the time
15   you got the warrant, you already knew where Marcos
16   Gonzalez lived?
17        A.  Yes.  I think Detective Marquez had the
18   address.
19        Q.  Okay.  So in this testimony, it's not mentioned
20   at all that you stopped back at CAP after getting the
21   warrant, is it?
22        A.  I -- I don't know, but we did.
23        Q.  Okay.  Do you have any explanation for why --
24   why that would not have been mentioned in your earlier
25   testimony?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A.  I guess he didn't ask it.

 2      Q.  Okay.

 3      A.  Did he ask it?

 4      Q.  I'm going to stop sharing this document now.

 5              And typically, was it your practice to go

 6  immediately from getting a warrant to go make an arrest?

 7      A.  I mean, sometimes you do, but in this case, I

 8  mean, you had other units that were investigating the --

 9  the homicide, and so we went back to the CAP office.

10  The case agent was there.  We wouldn't have gone without

11  him.

12      Q.  Okay.  And they were expecting you to come back

13  with a warrant; is that right?

14      A.  Yes.

15      Q.  Do you remember it taking very long once you

16  got back to then go and -- go to Daniel's house?

17      A.  No.  I think we went pretty much right away.  I

18  think they were pretty ready.

19      Q.  So who were -- who were all of the officers who

20  went to Daniel Villegas's house that night?

21      A.  What I remember is myself, Detective Marquez,

22  and Scott Graves.  And then there were other officers,

23  but I don't know who they were.  I -- I don't remember

24  who they were.

25      Q.  Right.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 613 of 1026
The Deposition of GARY MCDONALD, taken on June 23, 2022
178

1    A.  There -- and I think there were probably six of
2  us.
3    Q.  Okay.
4    A.  I think there were three cars.
5    Q.  And did you-all arrive at the house at the same
6  time?
7    A.  Yes.
8    Q.  And did the inhabitants of the house
9  voluntarily let you-all in?
10    A.  Yes.
11    Q.  Who entered first?
12    A.  I -- I -- well, I remember us knock- --
13  knocking on the door, and we were let in, but I'll tell
14  you I really don't remember that part of the
15  investigation very well.  I do remember some things, but
16  I don't -- you're asking who went in first.  I don't --
17  I don't remember.
18    Q.  Sure.
19        But you remember being there when the door
20  was knocked on; is that right?
21    A.  Yes.
22    Q.  So both Daniel Villegas and Marcos Gonzalez
23  were at the house, right?
24    A.  Yes.
25    Q.  Okay.  Do you remember which one you saw first?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 614 of 1026
The Deposition of GERARDO MUROCA, Taken on March 23, 2023
179

1    A.  Detective Marquez found Marco- -- Marcos

2  Gonzalez.  He -- he was handcuffed.  And then somehow

3  there was -- we were facing away because I -- I think we

4  had Marcos, and there was a commotion in the hallway

5  and, apparently, Danny Villegas was there, so Marquez

6  arrested him right there.

7    Q.  Okay.  So -- and when you say there was a

8  commotion, what did you mean by "a commotion"?

9    A.  When -- when he got Danny Villegas.

10    Q.  Okay.  So Marquez -- Marquez got Vi- -- Danny

11  Villegas after he had arrested and handcuffed Marcos

12  Gonzalez?

13    A.  Yeah.  We -- we had Marcos Gonzalez first.

14    Q.  Okay.  And were either of them read their

15  rights at the house?

16    A.  I don't remember that they were.

17    Q.  Okay.  And it's the department's practice that

18  suspects sign Miranda cards when they're read their

19  rights; is that right?

20    A.  Yes.

21    Q.  So if they were read their rights at the house,

22  there should be Miranda cards for them, right?

23    A.  If they were read their rights at the house,

24  there would be, yes.

25    Q.  And can you think of any reason why the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 615 of 1026
The Deposition of EDGAR RODRIGUEZ, Taken on 9/16/23   Judge
180

1  officers would have read the rights just to Danny and
2  not also to Marcos?
3      A.  Okay.  Could you ask that again?
4      Q.  Yeah.
5          Can you think of any reason that the
6  officers would have read Danny his rights, but not read
7  Marcos his rights?
8      A.  No, I -- I don't know.
9      Q.  How long were you there at the house?
10     A.  I'm guessing -- well, I'm not guessing.
11         MR. JIM DARNELL:  Don't guess.
12     A.  It -- I'm remembering maybe about 15 minutes or
13  so.
14     Q.  (BY MR. HILKE)  Who did you ride with on the
15  way back?
16     A.  Detective Marquez.
17     Q.  Okay.  And was Detective Marquez driving?
18     A.  Yes.
19     Q.  Do you recall any -- any conflict at the house
20  while you were there?
21     A.  No.  It was normal families, just didn't know
22  what was going on.  They were surprised.
23     Q.  And did -- was permission -- and was -- was --
24  were -- were -- was Danny's mother there at the house
25  when you were there?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 616 of 1026
The Deposition of GARARD CRABTREE, Taken on 9/15/22
181

```
 1        A.  I don't remember.
 2        Q.  Okay.  Did any -- was any -- was permission
 3   asked from anyone to interrogate Danny?
 4        A.  I don't know.
 5        Q.  Okay.  And you mentioned before, I think -- was
 6   it that there was a card used by the police department
 7   to get parental consent for juvenile interrogations?
 8        A.  A card?
 9        Q.  Yes, sir.
10        A.  A Miranda card, you're talking about?
11        Q.  No.  A sort of a parental -- parental consent
12   form?
13        A.  Yeah, there is for juvenile witnesses.
14        Q.  Yeah.  Was -- was a juvenile consent form given
15   at the house?
16        A.  I don't know, but we wouldn't need it.  He was
17   a -- he was a suspect --
18        Q.  Ah.
19        A.  -- in the case.
20        Q.  Uh-huh.  So because he was a suspect, you
21   didn't need his parents' permission, right?
22        A.  Well, the thing is, is it's kind of a play on
23   words.  You -- you arrest an adult.  You get a warrant.
24   You have the probable -- probable cause.  And then you
25   had Danny Villegas, who's a juvenile.  He's not
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 617 of 1026
The Deposition of GERARD AMBOCAB, taken on June 2, 2017
182

1  arrested.  Typically, he's in custody.  You take him in

2  custody.  But you have the probable cause, if he was an

3  adult, to arrest him, so permission is not really

4  needed.

5      Q.  Uh-huh.  Okay.  So the -- the policy was that

6  permission was gotten for juvenile witnesses, but not

7  juvenile suspects.

8      A.  Yes, if we could.

9      Q.  If -- okay.  And then after you left -- and

10  with you and Al Marquez, as you left, was anyone else in

11  the car with you?

12     A.  No.

13     Q.  Was Danny Villegas in the car with you --

14     A.  Oh, I'm sorry.

15     Q.  -- as you guys went?

16     A.  Yeah.

17     Q.  That's okay.

18     A.  Yeah, Danny Villegas was.

19     Q.  Other than you, Marquez, and Danny, was anyone

20  else in the car with you?

21     A.  No.

22     Q.  What was the next place you went?

23     A.  We had driven to a place called "Northpark

24  Mall."  There's a parking lot right there on the way --

25     Q.  And --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 618 of 1026
The Deposition of GARY OAKHOCKTABE, Taken on March 7, 2023
183

```
 1        A.  -- to both the stations.
 2        Q.  Yeah.  Do you remember what route you took to
 3   get to Northpark Mall?
 4        A.  I don't -- I don't remember what was talked
 5   about.  I know probably why we stopped.
 6             MR. JIM DARNELL:  No.  He's --
 7        Q.  (BY MR. HILKE)  No.
 8             MR. JIM DARNELL:  -- saying "route."
 9        Q.  (BY MR. HILKE)  I'm sorry.
10        A.  Oh, what route.
11        Q.  Yes, sir.
12        A.  I -- I'd have to look at a map, but it's --
13   it's just right down the street.  I mean, it's a direct
14   route.
15        Q.  Yeah.  Give me one second.
16        A.  It would -- it would be on the way to the CAP
17   office and the juvenile processing center.
18        Q.  I understand.  Just one second, please.  Okay.
19   All right.  Sorry.  I'm like 30 seconds away here.
20             Okay.  So I'm going to share another
21   exhibit now.  This'll be Exhibit 12.
22             (Exhibit 12 marked.)
23        Q.  Do you see here a -- a map with the location
24   "5700 Wren Ave." with a little marker?
25        A.  Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 619 of 1026
The Deposition of GERARD DANIEL BAKER, taken on June 23, 2021
184

1    Q.  Okay.  And do you see various street names
2  around Wren avenue?

3    A.  Yes.

4    Q.  Does that refresh at all what route you took in
5  getting to Northpark Mall?

6    A.  It -- it's not, but had we taken the -- the
7  most direct route would be going west on that map to the
8  end and then going north.

9    Q.  Okay.

10    A.  And going -- when you go west on Wren Street,
11  you should hit a street called "Diana," where the
12  shopping -- where the -- the mall is.

13    Q.  Sure.

14          So -- so you can say what the most direct
15  route would be, but sitting here today, you don't have
16  any memory of what the actual route was; is that fair?

17    A.  No.  I -- I'm just telling you what the most
18  direct route is from here.

19    Q.  Okay.  Thank you.  I'm going to stop sharing
20  this now.  That was Exhibit Number 12.

21          So -- and am I correct that -- is it your
22  testimony that you don't remember what the interaction
23  was at Northpark Mall that night?

24    A.  I don't remember what it was.  I -- I -- I
25  think I know what it was, but I -- I don't actually

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 620 of 1026
The Deposition of GERARD DUCAST, taken on June 23, 2016
185

1  remember the conversation.

2      Q.  **What do you think it was?**

3      A.  It was just -- since Detective Graves was

4  behind us with Marcos and we were in front of them and

5  we were going to different stations, it was just

6  basically to get out and say, look, make sure we keep in

7  contact with each other, if you find out something

8  that's really significant that I should know about, you

9  know, let me know, and that took a few seconds.

10     Q.  **So Sergeant Graves had been involved in earlier**

11 **stages of the investigation; is that right?**

12     A.  He had been what?

13     Q.  **Involved in earlier stages of this**

14 **investigation.**

15     A.  Yes.

16     Q.  **And so had you, right?**

17     A.  Yes.

18     Q.  **And Marquez was the case agent, right?**

19     A.  Yes.

20     Q.  **Is there any reason Sergeant Graves wouldn't**

21 **know to keep you updated about what he found in his**

22 **conversations with Marcos?**

23     A.  Well, yeah, it might be important.  I mean, if

24 Marcos gives the location of the gun that was used, it

25 would be nice to know for Al Marquez.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 621 of 1026
The Deposition of RICHARD CAHUCAS, Taken on 04/26/23   Page
186

 1      Q.  Okay.  Right.  But my question is, do you think

 2   Sergeant Graves already knew that if Marcos told him

 3   where the gun was, he ought to tell Al -- Al Marquez

 4   about that?

 5              MR. JIM DARNELL:  Object, form.

 6      A.  If Marcos had told -- told Graves?

 7      Q.  (BY MR. HILKE)  Yeah.  Don't you think Sergeant

 8   Graves knew --

 9              MR. JIM DARNELL:  (Indiscernible.)

10              THE WITNESS:  Uh-huh.

11              MR. JIM DARNELL:  Go ahead.

12      Q.  (BY MR. HILKE)  Don't -- don't you think

13   Sergeant Graves knew he should share any important

14   details he got from Marcos with Al Marquez?

15      A.  Yes, but you always want to make sure.  I'm --

16   I'm just saying that's what I think the conversation

17   was.  I can't think otherwise.

18      Q.  Sure.  So --

19      A.  I'm just about positive that's what it was.

20      Q.  And sitting here today, you don't have any

21   other explanation for why you made that stop; is that

22   right?

23      A.  No.

24      Q.  And how long was the stop, if you remember?

25      A.  Probably -- it was -- it was less than a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 622 of 1026
The Deposition of GARY AUBUCHON, taken on June 23, 2022
187

1  minute.  Maybe 30 seconds.

2      Q.  Okay.  And although you don't remember their

3  names, there were other officers present, right, for the

4  arrest?

5      A.  Yes.

6      Q.  Did they also come to Northpark Mall?

7      A.  I don't remember.

8      Q.  What was your next stop after Northpark Mall?

9      A.  We went to the juvenile processing center on

10  Delta Street.

11      Q.  Okay.  You didn't stop at CAP first, did you?

12      A.  No.

13      Q.  About how long was it of a drive between

14  Northpark Mall and CAP?

15      A.  It's usually -- and at that time at night, it

16  will be between 10 and 15 minutes, I would estimate.

17      Q.  And about how long was it between Northpark

18  Mall and JIS?

19      A.  Okay.  I think I mis-stood you on the first

20  one.  Between North- -- Northpark Mall and JIS would be

21  10 to 15 minutes.

22      Q.  Okay.  How long would it be between Northpark

23  Mall and the CAP office?

24      A.  Oh, quicker.

25      Q.  Uh-huh.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.  Eight -- eight to ten minutes, maybe.
 2        Q.  Okay.  And how far away were the CAP office and
 3   JIS?
 4        A.  It's -- it's a good distance.  I would say
 5   seven, eight miles.
 6        Q.  Okay.  And around that time, how long did it
 7   take you to drive that?
 8        A.  To JIS?
 9             MR. JIM DARNELL:  To drive -- to drive
10   which?  I'm sorry.
11        Q.  (BY MR. HILKE)  To drive from CAP to JIS.
12        A.  Oh, if you were driving from CAP to JIS, it
13   would probably take you -- for -- let's see.  Go down --
14   probably six, seven minutes.
15        Q.  Okay.  And -- and JIS, is that the sa- -- is
16   JIS the same as the juvenile facility?  Is that the same
17   juvenile facility where you took Daniel Villegas?
18        A.  Right.  It's a juvenile -- approved facility to
19   take juve- -- juveniles.
20        Q.  Yeah.
21             Had you been at JIS at any earlier time
22   that day?
23        A.  No.
24        Q.  Had you been to any other juvenile facility
25   earlier that day?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1      A.  No.

 2      Q.  Was -- and when you arrived at JIS, what was

 3  the first thing you did?

 4      A.  Well, he was signed in by Detective Marquez,

 5  and then I can't remember if Detective Ortega was there

 6  yet or not, but eventually Villegas was taken back to an

 7  office in the building.

 8      Q.  And when Marquez -- I'm sorry.  When Daniel was

 9  signed in, it was Al Marquez who signed him in?

10      A.  I think it was.

11      Q.  And is that just like a sheet anyone can sign,

12  or is there some officer who's keeping a log as people

13  are signed in?

14      A.  It's just a log there, and you sign in when you

15  bring a juvenile in.

16      Q.  Okay.  So no -- no one's watching over that

17  log.  That's just -- is that right?

18      A.  Correct.

19      Q.  Okay.

20      A.  No.

21      Q.  And you mentioned that Daniel was taken to an

22  office.  What office was he taken to?

23      A.  Well, he's taken back to where the detective

24  offices are, in that building.

25      Q.  Uh-huh.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 625 of 1026
The Deposition of GERARD CARBAJAL, Taken on 5/16/23
190

1    A.  It's an L-shaped building.

2    Q.  Okay.

3    A.  And if you -- if you picture the top of the L

4  and that -- and that -- that stretch of it, that's --

5  that's where you have the offices.  And I was at the

6  opposite end of the L, waiting.

7    Q.  So like almost like diagonal between the two

8  sides of the L.

9    A.  I was probably about as far as away as I could

10 get --

11   Q.  Okay.

12   A.  -- in the building.

13   Q.  And where is the entrance to the building?

14 Where on the L you -- do you come in?

15   A.  Right where I was waiting.

16   Q.  Okay.  So you just hung out at the entrance.

17   A.  Yes.

18   Q.  Okay.  And what did you do while you were

19 there?

20   A.  I was with Officer Brown, and we were just

21 there talking and we -- we really didn't do anything

22 until Detective Marquez took Villegas to the juvenile

23 probation department.

24   Q.  Okay.  And do you know how Officer Brown ended

25 up being at that facility that night?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 626 of 1026
The Deposition of GERARD GARCIA, Taken on June 6, 2019
191

```
 1        A.  Yeah.  He -- I think -- he was with the gang
 2   task force, and we had some of the guys working with us
 3   from there.
 4        Q.  Okay.
 5        A.  And he may have -- he -- but he was there that
 6   night.
 7        Q.  Okay.  And was his role there to provide gang
 8   intelligence for the investigation?
 9        A.  Was he there for what?
10        Q.  To provide gang intelligence.
11        A.  What was he there to provide?
12        Q.  Was he there to provide information on gangs?
13        A.  Gangs?  Yeah.  That's what they were there for,
14   the gang task force.
15        Q.  Okay.  And when you arrived at JIS with Daniel,
16   had he been questioned about his involvement in the
17   murders?
18        A.  No.
19        Q.  Had he admitted any acknowl- -- any involvement
20   in the murders?
21        A.  No.
22        Q.  So if -- if Carlos Ortega said that he arrived
23   at JIS around 11:00 p.m., would you have any reason to
24   disagree with that?
25        A.  Well, I know that we signed in at 11:30, and I
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 627 of 1026
The Deposition of GARD GAUDOCA, taken on June 23, 2023
192

 1 don't remember seeing him.  He may have been in the

 2 back.

 3      Q.  Okay.  And so then if Carlos Ortega said that

 4 he first found Daniel -- saw Daniel around 11:15 or

 5 11:30 p.m., that would be pretty close to the time you

 6 signed Daniel in; is that right?

 7      A.  11:30, yeah.

 8      Q.  Okay.  And -- sorry.  So Daniel -- how long did

 9 you remain at -- at the JIS building?

10      A.  I -- I think we were there about an hour before

11 we went to the juvenile probation department.

12      Q.  When you went to juvenile probation, did Link

13 Brown come with you?

14      A.  You know, I -- I didn't remember that he went

15 with us, but I know from reading the reports, I think

16 Carlos Ortega and Link Brown were with me and Al Marquez

17 when we went over.  I don't remember them, though,

18 walking over with us.

19      Q.  Do you recall seeing Link Brown at any later

20 time that morning?

21      A.  No.

22      Q.  Did -- so Danny is taken to the juvenile

23 probation building; is that right?

24      A.  He -- he was what?

25      Q.  Taken to juvenile probation.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 628 of 1026
The Deposition of GARRARD OTHOCAIS, Taken on 9/26/23  Judge
193

```
 1        A.  Yes, he was.
 2        Q.  And that's just a short walk from JIS; is that
 3   right?
 4        A.  Yeah.  The -- the buildings are right next to
 5   each other.
 6        Q.  And at JP- -- and "JPD" is the acronym for
 7   juvenile probation, right?
 8        A.  Yes.
 9        Q.  And so at JPD, Danny gets his warnings from a
10   juvenile officer, right?
11        A.  Yes.
12        Q.  And he was also -- he was -- you then took him
13   to a magistrate judge, right?
14        A.  At the juvenile probation department, yes.
15        Q.  And the magistrate judge, likewise, warned
16   Danny of his rights, didn't he?
17        A.  Yes.
18        Q.  So -- and both of those steps had to take
19   place -- both of those warnings had to take place before
20   Danny was questioned about the crime, right?
21        A.  They were what?
22        Q.  Daniel had to get both those warnings before he
23   was questioned about the crime, right?
24        A.  Yes.
25        Q.  Okay.  And at any time when you were at JIS,
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 629 of 1026
The Deposition of GARD OGBOGBO, taken 03/16/23
194

```
 1  did you go back to where Marquez and Daniel were
 2  located?
 3       A.  No.
 4       Q.  And was it your understanding that Carlos
 5  Ortega had to prepare some paperwork before going to
 6  JPD?
 7       A.  He was there to ensure the juvenile's rights.
 8  I don't know if he did any paperwork.  I can tell you
 9  I -- when I do it, I usually do all of it.
10       Q.  Okay.  Was any additional paperwork generated
11  at JIS?
12       A.  Yeah, there would be.
13       Q.  Okay.  And -- okay.  Did you know at the time
14  who crea- -- who generated that paperwork?
15       A.  I -- I don't know who -- who did it.
16       Q.  Okay.  And had you been involved in
17  investigations involving juveniles who were taken to JIS
18  prior to this?
19       A.  Yes.
20       Q.  And so were you familiar with the back
21  detective area where Daniel was taken?
22       A.  Yes.
23       Q.  And is the -- was there an area back there
24  where -- was there a specific area where juveniles were
25  taken when they were taken back there?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1        A.  A specific area?

 2        **Q.  Yes.**

 3        A.  No.

 4        **Q.  Okay.**

 5        A.  Back -- back in that area that you're talking

 6   about are detective offices, so you just use one of

 7   those.

 8        **Q.  Okay.  And those are the same detective offices**

 9   **where -- well, strike that.**

10            **Did those detective offices have computers**

11   **for preparing paperwork?**

12        A.  Yes.

13        **Q.  Okay.**

14            MR. JIM DARNELL:  Wally, we've been going

15   about an hour.  Can we take a break?  And we want to --

16   somehow, the volume got turned down on his computer, and

17   we want to turn that up a little bit, too.

18            MR. HILKE:  Let's -- that's great.  Let's

19   go off the record.

20            MR. JIM DARNELL:  Okay.

21            THE VIDEO TECHNICIAN:  Okay.  We're off the

22   record.  The time is 2:42.

23            (Break taken.)

24            THE VIDEO TECHNICIAN:  We are back on the

25   record for the deposition of Earl Arbogast being

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 631 of 1026
The Deposition of GARY GARDOCKI, taken on June 30, 2022
196

1  conducted by videoconference.  My name is Sydney Little.

2  Today is June 30th, 2022, and the time is 2:52.

3           MR. JIM DARNELL:  Wally, there was one

4  place he -- his hear- -- we didn't hear it right, or he

5  didn't hear it right, and that was on the issue of

6  whether Daniel Villegas said anything at his home.  Do

7  you want him to explain that?  Do you want to ask him

8  again?  However you want to do it.

9           MR. HILKE:  Yeah.  Let's -- yeah, let me

10 ask a couple of questions.

11           MR. JIM DARNELL:  Okay.

12     Q.  (BY MR. HILKE)  Let me start with this:

13 Through the time -- from the time you went to Danny's

14 house to the time you took him to JPD, did Daniel say

15 anything implicating himself in the crime?

16     A.  Not -- not in front of me, no.

17     Q.  Okay.  But you -- and do you remember him

18 saying something when he was -- when -- at his home?

19     A.  No, I don't remember him saying anything.

20     Q.  Okay.  I'm going to ask -- I'm going to show

21 you an exhibit now.  This is one we've looked at before.

22 So I'm sharing, again, Exhibit Number 4.  These are the

23 sort of juvenile policies.  Right now, I'm at

24 City 21505.  And in front of you at the top of this

25 document is "7.02.012, Witness Statement."  Do you see

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 632 of 1026
The Deposition of GARLAND DOUGLAS, taken on 9/28/23, Judge
197

 1  that?

 2       A.  Yes.

 3       Q.  And this is saying, for a juvenile to give a

 4  witness statement, an officer needs permission from a

 5  parent or a legal guardian; is that right?

 6       A.  Yes.

 7       Q.  And I think you said that -- well, that doesn't

 8  apply for confessions.  This is just for witness

 9  statements for nonsuspects; is that right?

10       A.  Yes.

11       Q.  I want to show you a couple of other things.

12  I'm scrolling up in this document.  Yeah, so I'm now at

13  City 21502, under "7.02.209, Interrogation."  Do you

14  see -- this is going to be the second sentence, where it

15  says, "When a juvenile is to be interrogated at his

16  home, parental permission is requested prior to

17  interrogation.  If denied, the interrogation is not

18  conducted."  Do you see that?

19       A.  Yes.

20       Q.  So according to this policy, if you had asked

21  Daniel's parents to interview him at his home and then

22  they had said, "No, you can't" -- I'm -- strike that.

23            According to this policy, if Daniel's

24  mother was asked, "Can we interr- -- can we interrogate

25  Daniel at his home," and the parents said "no," it would

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 633 of 1026
The Deposition of GARRET CAUDOCAS, Taker on June 23, 2020
198

```
 1   have been improper to conduct any interrogation; is that
 2   right?
 3        A.  By this poli- --
 4               MR. ALMANZAN:  Objection, calls for
 5   speculation and lack of foundation from this witness to
 6   answer that question.
 7        Q.  (BY MR. HILKE)  Okay.  You can answer.
 8        A.  By that policy, yes.
 9        Q.  Okay.
10        A.  I'm reading it.
11        Q.  And do you have any reason to doubt that this
12   was a policy in effect at the time Daniel was arrested?
13        A.  I -- I don't --
14               MR. ALMANZAN:  Objection, calls for
15   speculation and lack of foundation.
16        Q.  (BY MR. HILKE)  Go ahead.
17        A.  I -- I don't know.
18        Q.  Right, I -- I know you don't know, but do you
19   have any reason to doubt that this was the policy?
20               MR. ALMANZAN:  Objection --
21        A.  No.
22               MR. ALMANZAN:  -- calls for speculation and
23   lack of foundation.
24        Q.  (BY MR. HILKE)  You can answer.
25        A.  No.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1     Q.  Okay.  And I'm going to scroll back down for a
 2  minute here.  Yeah.  This is at City 21505.  Do you see
 3  where it says "7.02.01 3, Investigation of Students at
 4  Public Schools"?
 5     A.  Yes.
 6     Q.  And do you see the first line?  "In all
 7  investigations involving the questioning or arrest of a
 8  juvenile on school grounds and during school hours,
 9  officers contact the school principal or assistant
10  principal and explain the reason for desiring to arrest
11  or question the juvenile"?  Do you see that?
12     A.  Yes.
13     Q.  It continues, "The officer can request
14  permission to question the juvenile at the school or
15  request permission to take the student from the school
16  for the purpose of questioning him or placing him under
17  arrest"; is that right?
18     A.  Yes.
19     Q.  So at least according to this document,
20  generally, a juvenile can't --
21            UNIDENTIFIED SPEAKER:  Good afternoon,
22  everybody.  How are you y'all doing?  All right.
23            UNIDENTIFIED SPEAKER:  Hi, David.
24            MR. HILKE:  Jeep, Jeep, your audio is on.
25  You're not -- thanks.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.  (BY MR. HILKE)  According to what you've just
2  read, an officer needs permission to question a juvenile
3  at a school during school hours, right?
4    A.  Yes.
5    Q.  Or to take a juvenile from the school to
6  ques- -- during school hours to question him somewhere
7  else, right?
8    A.  Yes.
9    Q.  So do you have any explanation for why,
10  according to what we've just read, an officer needs
11  permission to take a student from school for questioning
12  and needs permission from a parent to interrogate a
13  stu- -- a juvenile at their home, but doesn't need
14  permission from a parent to take a juvenile from their
15  home and question them somewhere else?
16          MR. ALMANZAN:  Objection, calls for
17  speculation --
18          MR. JIM DARNELL:  Calls for speculation.
19          MR. ALMANZAN:  -- lack of foundation.
20    A.  No.
21    Q.  (BY MR. HILKE)  And was that your understanding
22  of El Paso's policies at the time you arrested Daniel?
23          MR. ALMANZAN:  Objection, calls for
24  speculation, lack of foundation.
25    A.  At the time we arrested Danny, we -- we went by

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 636 of 1026
The Deposition of GARY CHILDRESS, taken on June 23, 2016
201

1   what we normally did in our routine.  And if we had a

2   suspect, we -- we took him into custody -- if we had

3   probable cause, anyway, to take them into custody, and

4   we would transport him to the JIS office and begin to

5   process.

6       Q.  (BY MR. HILKE)  Were you familiar with any of

7   these specific policies at the time you arrested Daniel?

8       A.  I can't remember then, no.

9       Q.  Okay.  So sitting here today, you can't say one

10  way or another if you were aware of the policies we've

11  just looked over; is that fair?

12      A.  Yes.

13      Q.  Okay.

14      A.  I would add one thing.  I mean, I -- I know for

15  witnesses and when we would deal with school authorities

16  in our cases, the school authorities would always want

17  to contact the parent and obtain the parents'

18  permission.  School authorities sometimes weren't

19  cooperative with us, so we'd have to leave.  But the

20  parent -- parent was contacted by the principal or

21  somebody.  Then we would interview at the school

22  sometimes.  They would take a statement from them at the

23  school.

24      Q.  Yeah.  So your understanding was you couldn't

25  take a student from school to interrogate them without

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 637 of 1026
The Deposition of GARY OUELLETTE, taken on 04/08/23

202

1  permission, but you could take a juvenile from their

2  home to interrogate them without permission.

3      A.  We -- we just -- we just -- if -- if we had

4  permission to talk to them at the school, all I'm saying

5  is we would talk to them and take a statement if we

6  needed.  If we wanted all access, we didn't have any

7  choice.  We would leave.

8      Q.  I'm sorry.

9      A.  This is for witnesses.

10      Q.  I'm -- I'm sorry.  Did -- what was your

11  understanding, if any, of what you needed to do to pick

12  up a juvenile suspect from a school to be interrogated?

13      A.  If we had probable cause and -- and, again,

14  to -- if he was an adult and we had probable cause to

15  pick him up and get a warrant, if we had the same

16  information on a juvenile and we had the probable cause

17  to show that he committed a crime, we picked him up, and

18  we took -- we took him into custody, and then we would

19  take him to J- -- JIS.

20      Q.  Okay.  So if you had probable cause on a

21  juvenile and they happened to be at school, you didn't

22  need any permissions to go and pick them up.

23      A.  No.  If we had probable cause to take into

24  custody, we took into custody.

25      Q.  Okay.  I'm going to stop sharing this now.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 638 of 1026
The Deposition of RICHARD ARBUCKLE, Taken on June 5, 2023
203

```
 1                  When -- to your knowledge, when did Daniel
 2   first say that he wanted to give a statement in this
 3   case?
 4        A.  It -- it -- it -- it was sometime when he was
 5   taken to the back offices.  I -- I don't know that, but
 6   I'm assuming that.  I -- I don't know exactly when.
 7        Q.  All right.  Okay.  Let me -- let me -- let me
 8   make sure I'm just asking you about what you know.
 9                  Do you have knowledge of when Daniel first
10   said he wanted to give a statement?
11        A.  No.
12        Q.  And do you have knowledge of any times that
13   early morning when Daniel was alone with Al Marquez?
14        A.  Was I aware of what?  What do you mean?
15        Q.  Of -- of Daniel and Al Marquez being alone with
16   one another at any time that morning.
17        A.  I don't know.
18        Q.  So you also -- you were directed to go pick up
19   Rodney Williams.
20        A.  Yes.
21        Q.  And did Rodney --
22        A.  Hang on one second.  On the question you asked
23   me about Marquez being alone with him at any point,
24   you're talking about at the JIS office, right?
25        Q.  I'm sorry.  No, sir.  I'm asking about at any
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 639 of 1026
The Deposition of GERARD DOUCETTE, taken on 05/04/23
204

```
 1  point -- at any point that morning.
 2      A.  I -- I don't know.  I wasn't with Marquez all
 3  the time everywhere, so I don't know.  But when we went
 4  to the house and I -- I wasn't with him the whole
 5  time --
 6      Q.  Right.  So --
 7      A.  -- there.  I don't -- I don't remember being
 8  with Detective Marquez and -- and Daniel when he was
 9  arrested.  I remember being away from them with Marcos.
10  But after that, I mean, I don't know what he did,
11  whether he was alone with him.  I -- I don't know.
12      Q.  Okay.  I want to talk about Rodney Williams
13  now.  And do you remember where Rodney Williams was when
14  you picked him up?
15      A.  Yes.  He --
16      Q.  Where was he?
17      A.  He was at Irvin High School, and I think we had
18  that information at the basketball courts, and we had
19  that information, too.
20      Q.  Okay.  How -- how did you know where to look
21  for him?
22      A.  It was just given us, the location.  I don't
23  know how they got it.
24      Q.  Okay.  And am I correct that you tried to talk
25  to Rodney Williams?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 640 of 1026
The Deposition of GARY GRAVES, taken on 9/26/19  Page
205

```
 1        A.  I -- I talked with him.  I mean, we took him
 2   back to the CAP office.
 3        Q.  Yeah.
 4        A.  And myself and Detective Graves did a joint
 5   interview with him.
 6        Q.  Okay.  And do you remember Rodney Williams
 7   asking for his mom at some point when you talked to him?
 8        A.  I don't remember that.
 9        Q.  And one of the first things you would have done
10   in talking to Rodney Williams would have been making
11   sure you had correctly identified him, right?
12        A.  Yes.
13        Q.  So you would have made sure that he was -- so
14   you would have asked for his date of birth in that
15   interview, right?
16        A.  Well, yes, we would have asked him his name
17   and -- and particulars about him.
18        Q.  And that's -- that's a fairly typical early
19   step in an investigation, right?
20        A.  Yes.
21        Q.  And so then, early on, you would have learned
22   that Rodney Williams was only 15 years old, right?
23        A.  I think -- I think we learned that he was a
24   juvenile, yes.
25        Q.  Yeah.  And at that point, Rodney Williams was
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 641 of 1026
The Deposition of GARY CHABOCAS, Taken on 5/4/23  JUDGE
206

1  being asked about his involvement in the murders, right?

2      A.  If he knew anything about the murders.

3      Q.  Yeah.  And he -- he placed himself in the car

4  on the night of the shooting, didn't he?

5      A.  I wasn't there for the whole interview.  I

6  don't remember that.  While I was interviewing him, and

7  everything, I don't -- I didn't -- he didn't have any

8  involvement --

9      Q.  Did you --

10     A.  -- that I know of.

11     Q.  Okay.  Did -- and did -- after you found out

12  that Rodney was a juvenile, did you get parental

13  permission to speak with him?

14     A.  I don't remember if the parents were attempted

15  to be notified.  I would assume that they would have

16  been, but I can't remember that.

17     Q.  Uh-huh.  Was -- was he taken to a juvenile

18  officer before giving a statement?

19     A.  No.

20     Q.  Was he taken to a magistrate?

21     A.  No.

22     Q.  And --

23     A.  He was a witness.

24     Q.  To your knowledge, was Rodney ever taken to a

25  magistrate?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 642 of 1026
The Deposition of GARE DANBOGAH, Taken on 9/15/23   Judge
207

```
 1        A.  I -- I don't know that.  I -- when I
 2   interviewed him and when I had my part of the interview
 3   done, I don't think I ever saw Rodney Williams again.
 4        Q.  Okay.  And as far as you know, it was Detective
 5   Graves who completed the statement from Rodney?
 6        A.  Yes.
 7        Q.  And this was at the crimes against persons
 8   office that you spoke with Rodney; is that right?
 9        A.  Yes.
10        Q.  Okay.  And let me -- I'm going to share another
11   exhibit with you.  Give me just one moment.
12               Okay.  So this is going to be -- let me see
13   here.  This is going to be Exhibit Number 13.
14        A.  Okay.
15        Q.  It's starting at -- let's see.  Oh.  Here we
16   go.  This is Villegas J.S. 15779.
17               (Exhibit 13 marked.)
18               MR. JIM DARNELL:  I thought the juvenile
19   statements policy was 13.
20               MR. HILKE:  No.  The juvenile policy was 4
21   because I had already shown it.
22               MR. JIM DARNELL:  Oh, it was the same one?
23               MR. HILKE:  Yes, sir.
24               MR. JIM DARNELL:  Okay.  My bad.
25               MR. HILKE:  You're good.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 643 of 1026
The Deposition of GARLAND WACKER, taken on June 9, 2023

208

```
 1        Q.  (BY MR. HILKE)  So looking at the top here,
 2   this is a statement.  And can you see okay?  Do you need
 3   me to zoom in at all?
 4        A.  No.  I can read it.
 5        Q.  Yeah?
 6              This is a statement given to Detective
 7   Scott Graves, right?
 8        A.  Yes.
 9        Q.  And it's by Rodney Williams, right?
10        A.  Yes.
11        Q.  And it says that his date of birth is
12   August 29, 1977, right?
13        A.  Yes.
14        Q.  And that would have made him 15 years old at
15   the time; is that right?
16        A.  Yes.
17        Q.  And looking at the bottom, there are some time
18   stamps here, right?
19        A.  Yes.
20        Q.  And so it looks like -- the first "typed by,"
21   is that the time when the author starts taking the
22   report?
23        A.  You know -- hmm.  I -- I used to know what all
24   those times meant, and it's been so long, I -- I forget
25   now.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 644 of 1026
The Deposition of GARY MAUROS, Taken on June 2, 2017
209

1    Q.  That's fine.

2         In any event, the time for the approving

3    officer would have been the time it was finished, right?

4    A.  It looks like it.

5    Q.  Okay.  So up at the -- let's see.  Yes, let

6    me -- let me go over this statement a little.

7         So Rodney Williams is saying that he's

8    giving this statement to Detective Graves of his own

9    free will; is that right?

10   A.  Yes.

11   Q.  You know, I think I'm actually going to ask you

12   to read -- to read this whole statement, and I'll scroll

13   down when you need to, and you can let me know when

14   you're done, okay?

15   A.  Okay.

16        MR. JIM DARNELL:  Read it -- read it to

17   himself?

18        MR. HILKE:  To himself, please, yes.

19        THE WITNESS:  Yeah.

20        MR. JIM DARNELL:  Okay.

21   A.  The right half of the statement is blocked off

22   by the -- the people.

23   Q.  (BY MR. HILKE)  Oh.  Can we -- can we fix that

24   on your computer?

25        MR. JIM DARNELL:  Let me see.  I can't, but

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 645 of 1026
THE DEPOSITION OF GARY DARBOUCABE, Taken on May 3, 2022

210

1  somebody can.

2       Q.  (BY MR. HILKE)  I don't know if you have a

3  mouse, but it should let you just like drag it up, and

4  if you pull it all the way to the top, it should just

5  become a line or something.

6       A.  Somebody's here.

7       Q.  Okay.  Thank you.

8             THE WITNESS:  It's just that he wants me to

9  read the statement, and it's cut off there.

10            THE HELPER:  Oh, I see.

11            THE WITNESS:  Yeah.

12      A.  Okay.

13      Q.  (BY MR. HILKE)  Okay.

14      A.  Okay.  I need it scrolled up a little bit.

15      Q.  Yeah.  Do you mean scrolled down, like --

16      A.  Yeah.

17      Q.  -- the bottom of the page?

18      A.  Yeah, where I can go to the bottom.

19      Q.  Yeah.  There you go.

20      A.  Okay.  That's good.

21      Q.  Sorry.

22      A.  Okay.  I'm through with the first page.

23      Q.  Okay.  On to the second page.  There we go.

24      A.  If you could scroll up again.

25      Q.  Yes.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 646 of 1026
The Deposition of GERARDO BOCANEGRA, Taken 03/29/23

211

```
 1      A.  Okay.  Okay.

 2      Q.  Okay.  Thank you.

 3           Have you had a chance to fully review this

 4   statement?

 5      A.  Yes.

 6      Q.  So Rodney shares a lot of information about the

 7   shooting in this statement, doesn't he?

 8      A.  Yes.

 9      Q.  And he actually puts himself in the car at the

10   time that Robert England and Armando Lazo were shot and

11   killed; is that right?

12      A.  Yes.

13      Q.  And at the time this statement was taken,

14   Daniel Villegas had not been interrogated yet, right?

15      A.  No.

16      Q.  And so the investigating detectives didn't know

17   if Daniel Villegas would confess or pin the blame on

18   someone else, right?

19      A.  Correct.

20      Q.  So, I guess, would you agree that based on this

21   statement, Rodney Williams is now a potential suspect in

22   the case?

23      A.  Yes.

24           MR. JIM DARNELL:  Object, calls for

25   speculation.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 647 of 1026
The Deposition of GARY GRAVES, Taken on 5/16/23   Judge
212

1    Q.  (BY MR. HILKE)  And so as a potential suspect,
2  Rodney should be taken to get his juvenile warnings,
3  right?

4    A.  If -- if you wanted the statement to be any
5  good, yeah, you would have to.

6    Q.  Yeah.  This -- this statement is no good
7  because he didn't get those warnings, right?

8    A.  Yes.  There's no confession from him.

9    Q.  And yet, to your knowledge, Rodney's never
10  taken to get a statement that would be usable, right?

11    A.  I don't know.

12    Q.  Okay.  Do you agree that Rodney should have
13  been taken to the juvenile officer and a magistrate once
14  he started talking about his involvement in the crime?

15    A.  If -- if you were going to charge him, yes.

16    Q.  Well, and are you aware that Rodney was charged
17  later that morning?

18    A.  I -- I know he was charged later.  I don't know
19  what was in the detective's mind at the time he took the
20  statement; that he maybe wanted to use him as a witness
21  or not because he took a witness statement.

22    Q.  Yeah.

23    A.  So I -- I can't really -- I can't really answer
24  that.  I don't know what Detective Graves was -- would
25  have been thinking.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q.  But -- so not -- without putting yourself in

2  Detective Graves's head, to properly investigate -- to

3  properly take a statement like this from a juvenile

4  suspect, it was important to make sure that juvenile had

5  that war- -- their warnings, right?

6              MR. JIM DARNELL:  Objection --

7    A.  Yes.

8              MR. JIM DARNELL:  -- speculation.

9    A.  Yes.  If you wanted to charge him, yes.

10  Otherwise, you wouldn't be able to.

11    Q.  (BY MR. HILKE)  And isn't it right that to even

12  preserve -- to even leave the option open of charging

13  Rodney Williams, it would have been important to go get

14  him his warnings?

15    A.  Yes.

16    Q.  Okay.  And can you think of any reason why it

17  wouldn't be a good idea to give Rodney Williams his

18  warnings once he starts giving a statement like this?

19    A.  No.

20    Q.  So at the same time -- so I'm -- I am jumping

21  around a little bit.  I want to talk about after Daniel

22  Villegas got his warnings and is now being questioned.

23  You were aware that Detective Graves had taken Marcos

24  Gonzalez to crimes against persons; is that right?

25    A.  Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 649 of 1026
The Deposition of GARY OHLHAUSEN, taken on 05/26/23

214

```
 1        Q.  And you had typed up the arrest warrant for

 2   Marcos Gonzalez, right?

 3        A.  The affidavit.

 4        Q.  Thank you so much.

 5                You had typed up the affidavit for

 6   Marcos --

 7        A.  Yes, sir.

 8        Q.  -- Gonzalez, right?

 9        A.  Yes, sir.

10        Q.  And so part of -- part of the investigation

11   that was being conducted was to share details from the

12   Gonzalez interrogation and the Villegas interrogation,

13   right?

14        A.  Yes.

15        Q.  And who -- and you and Marquez and Ortega were

16   in one building with Daniel, right?

17        A.  With Villegas?

18        Q.  Yeah.

19        A.  Yeah, and Link Brown.

20        Q.  And Link Brown.  So Link Brown was there after

21   you got back from taking Daniel to the magistrate the

22   first time?

23        A.  I don't know.  He may have left by then.

24        Q.  Okay.  And Detective Graves is in another

25   building with Marcos Gonzalez, right?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 650 of 1026
The Deposition of GARDA HEDOCAB, Taken on June 23, 2022
215

 1      A.   Yes.

 2      Q.   Who on your team, if anyone, was in

 3  communication with Detective Graves?

 4      A.   From JIS, you're talking about?

 5      Q.   Yes, sir.

 6      A.   Well, I thought that I might get a call from

 7  him, but he wouldn't need to do that because they both

 8  would have had phones.

 9      Q.   When you say they both --

10      A.   Now, he -- I mean, he might -- he might have

11  thought to call me to relay some information to Marquez,

12  but that never happened.

13      Q.   I'm going to stop sharing now.

14           So your testimony is that Graves never

15  called the group at JIS to talk about what he had

16  learned from Gonzalez?

17      A.   My testimony is that he didn't call me, but I

18  wasn't with Marquez, so I don't know if he ever called

19  Marquez.

20      Q.   I see.

21           And are you aware that Marcos Gonzalez had

22  given a statement at 1:15 a.m.?

23      A.   I -- I learned at some point that he gave a

24  statement, yes.

25      Q.   And is that in -- would you have expected

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 651 of 1026
The Deposition of RICARDO DECAUGAES, taken on 03/26/23 Page
216

 1  Detective Graves to share the contents of Marcos's
 2  statement with the team at JIS?
 3      A.  No.  That -- I -- I didn't, no.  I never had
 4  contact with -- or Detective Graves never contacted me
 5  while I was at JIS.
 6      Q.  I understand.
 7          My -- my question is, would it have been
 8  important for Detective Graves to share the information
 9  he had learned as Al Marquez was interrogating Daniel
10  Villegas?
11      A.  Yes, but he could have called Detective Marquez
12  directly.
13      Q.  Understood.  But it wasn't -- okay.
14          So did you see in Rodney's statement that
15  he refers to someone with the nickname of "Snoopy"?
16      A.  I see it now.  I -- and I reviewed the case a
17  lot, but there's a lot of statements that I -- I didn't
18  read.  I'm just not interested in it.
19      Q.  I'm just asking right now.  You -- you saw that
20  Rodney mentioned a Snoopy as someone involved, right?
21      A.  Yes, I saw that.
22      Q.  And one -- so I've -- and you actually later
23  interviewed Fernando Lujan in this investigation, right?
24      A.  Yes.  I saw that.
25      Q.  And --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 652 of 1026
The Deposition of GARD ANDOCAS, Taken on 9-16-23  Juan
217

1    A.  I -- I don't -- I haven't reviewed that

2  statement.  I don't know what it was about.

3    **Q.  Okay.  And Fernando Lujan's nickname is**

4  **"Droopy"; is that right?**

5    A.  It might be.  Again, I don't have -- I couldn't

6  find his statement, and I don't remember that part of

7  the investigation when I talked to him.  I'd have to

8  look at the statement I took from him to see what --

9  what I needed.

10   **Q.  Sure.**

11         **Do you have any explanation for why Rodney**

12  **Williams and Marcos Gonzalez would refer to Fernando**

13  **Lujan using the wrong nickname, "Snoopy" instead of**

14  **"Droopy"?**

15   A.  No --

16         MR. JIM DARNELL:  Object --

17   A.  -- I don't.

18         MR. JIM DARNELL:  -- to speculation.

19   **Q.  (BY MR. HILKE)  And you're aware that Daniel**

20  **eventually gave a statement in this case, right, a**

21  **confession?**

22   A.  Yes.

23   **Q.  And do you have any explanation for why Daniel**

24  **is the first one to actually refer to Fernando Lujan as**

25  **"Droopy"?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 653 of 1026
The Deposition of GARY MCCASLIN, taken on 03/16/23

218

 1        A.  Yeah.  I didn't know that, no.

 2        Q.  Do you have any explanation for why that would

 3   be the case?

 4        A.  No.

 5        Q.  Okay.  Were you aware that Marcos eventually

 6   gave a second statement?

 7        A.  Yes.  I heard that he gave two statements.

 8        Q.  And in the second statement -- and is it

 9   consistent with your memory that in the first statement,

10   Marcos says he got out of the car before the shooting,

11   and in the second statement, he says, "No, I was in the

12   car the whole time"?

13        A.  I didn't know what the difference was.

14        Q.  Okay.  And would you have expected that after

15   Daniel gives his statement, that information would have

16   been given to Detective Graves?

17             MR. JIM DARNELL:  Object to speculation.

18        A.  I -- I don't know.

19        Q.  (BY MR. HILKE)  Okay.  If there were

20   inconsistencies in the statements of two murder

21   suspects, would it be important to communicate them back

22   and forth so they can be addressed?

23        A.  It might be.  I -- like I said, I don't know if

24   they were in contact with each other.  I just know that

25   I -- I never got any contact with Scott Graves that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 654 of 1026
The Deposition of GARY OAKLEY, Caretaker on 9/12/23  JUDE
219

 1  night.

 2      Q.  I understand.  And just to be clear, I'm not

 3  asking about what your communications were.

 4      A.  Okay.

 5      Q.  I'm asking about your knowledge of how homicide

 6  investigations are done.

 7      A.  Okay.

 8      Q.  And in a good homicide investigation, if you've

 9  got two suspects and they're contradicting each other,

10  are you going to share that information between the

11  detectives interrogating the two suspects?

12      A.  I -- I might.  I -- I might not.  I -- I

13  would -- I might just take the statement as he gives it

14  to me.

15      Q.  Yeah.  Why -- why wouldn't you share that

16  information?

17      A.  My statement would stand alone on its own.  I

18  mean, I would not call unless it was something real

19  significant.  I mean, I -- I don't know how I would

20  know, from what you're asking me, if the names were

21  different, the nicknames were different.  And if I did

22  know that, I don't know that I would contact Detective

23  Marquez if I was talking to Marcos Gonzalez.  I don't

24  know if I would have done that.

25      Q.  Well, would you consider it real significant if

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 655 of 1026
The Deposition of GARY ALDRIDGE, Taken on June 9, 2017
220

 1  they disagree on who was in the car at the time of the
 2  murder?
 3      A.  Yes.
 4      Q.  And would you consider it real significant if
 5  they disagreed on the name of the person in the car at
 6  the time of the murder?
 7      A.  Yes.  A name, like a first name and last name.
 8  Nicknames, I don't know.
 9      Q.  Okay.  And did -- did Detective Graves ever
10  come over to JIS while you were there?
11      A.  No.
12      Q.  And did you-all ever go to CAP to talk to
13  Detective Graves after he had taken Marcos Gonzalez
14  there?
15      A.  No.
16      Q.  So any information that Detective Graves would
17  have gotten that morning about what Daniel Villegas said
18  must have happened by phone call; is that right?
19      A.  It would -- it would have been by phone call.
20      Q.  Okay.  Okay.  So you talked about the L shape
21  at JIS earlier, right?
22      A.  About what?
23      Q.  That the JIS building is in the shape of an L.
24      A.  Yes.
25      Q.  Is that right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 656 of 1026
The Deposition of GARARD LIMON, Taker on March 23, 2018
221

1      A.  Yes.

2      Q.  And before you took Daniel to the magistrate

3  the first time, you and Daniel were at opposite corners

4  of the JIS building, right?

5      A.  Yes.

6      Q.  And were you both in the same places after

7  Dan- -- after you took Daniel back to give a statement?

8      A.  Well, I was where -- the same place I was.  I

9  don't know if Detective Marquez, when he went back to

10 the L, he went to the same office, but he would have

11 been in the same vicinity.

12     Q.  Yeah.  Were they far enough away that you

13 couldn't see them?

14     A.  Yeah, I had no sight of them.

15     Q.  And were they far enough away that you couldn't

16 hear them?

17     A.  Yeah, I wouldn't have heard them.

18     Q.  So what did you do while Marquez was

19 interrogating Daniel Villegas?

20     A.  I wasn't doing anything.  I was waiting for

21 them.

22     Q.  And when was the next time you saw Daniel?

23     A.  The next time would have been when we had to go

24 back to the judge for his second magistrate's warnings

25 to have the statement signed.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 657 of 1026
The Deposition of GERARD AMBUCATS, taken on 9/16/23

222

1    Q.  Okay.  And at that time,  had -- had Al Marquez

2  completely finished typing up Daniel's statement?

3    A.  Yes.  It has to be complete before you go back

4  to the judge.

5    Q.  And did you do anything to confirm that Daniel

6  understood the statement he had made?

7    A.  Yeah.  I mean, we're not -- we're not present

8  when he signs it, or anything, to say that he understood

9  it or anything.  I think the judge asks him that.  No, I

10  have no knowledge of that.

11    Q.  Okay.  What was -- what was Daniel's demeanor

12  as you -- as you were taking him over to the magistrate

13  the second time?

14    A.  From what I remember, he was -- he was quiet

15  the whole time.

16    Q.  All right.  Do you recall him saying anything

17  between JIS and the magistrate?

18    A.  No.

19    Q.  Okay.  And so then Daniel --

20    A.  I -- I will say one thing.  I mean, when we

21  were in the car, there was a part where he was directing

22  Marquez to a couple of houses.  That's the only time I

23  ever heard him say anything, I think.

24    Q.  Okay.  So -- and was that -- that was after he

25  signed the statement in front of the magistrate?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 658 of 1026
The Deposition of GARY GARDINER, Taken on June 22, 2023, JUDGE
223

1    A.  Yes.

2    Q.  And where did he -- what houses did he show

3    you?

4    A.  I don't remember where they were, but I know

5    that we went to a house, and then Detective Marquez got

6    out, and he went to the house, and he came back.  And

7    then Daniel Villegas directed him to another house, and

8    Detective Marquez got out of the car again, and he came

9    back, and he goes, "Okay.  That's it."  And then we went

10   to the juvenile probation department, where -- where we

11   left Daniel Villegas off at.

12   Q.  Yeah.

13       Did -- so was Daniel ever alone with Al

14   Marquez after he finished signing his statement in front

15   of the judge?

16   A.  No, because we left in the car together, we

17   went to the houses together, and we took him to JPD

18   together.

19   Q.  And was Daniel sitting in the front seat or the

20   backseat of the car?

21   A.  He was in the backseat.

22   Q.  Okay.  And so whatever Daniel said about the

23   houses he was showing you, both you and Al Marquez would

24   have heard it, right?

25   A.  Yeah.  I -- I imagine Marquez knew what it was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 659 of 1026
The Deposition of GERARD DUROCHER, Taken on 9/16/23  JUDGE
224

 1  about.  I didn't -- I didn't know what it was about.

 2      Q.  So was it your understanding that this is

 3  something that they had talked about while Marquez was

 4  taking his statement?

 5      A.  Yes.

 6      Q.  Okay.  And you didn't know what it was about.

 7      A.  He just said he was going to -- he was going to

 8  take a couple of houses of people that may have been

 9  involved.

10      Q.  Okay.  Did you know who those people were?

11      A.  No, I didn't -- I didn't know.

12      Q.  Did you ask?

13      A.  I don't -- I don't remember -- let me put it --

14  I don't remember actually if we talked about it to where

15  he gave me names of people or anything.  I don't -- but

16  I don't remember any names or anything when we went to

17  the houses or anything.

18      Q.  I understand.  So sitting here today, you don't

19  remember what all you knew about the houses you were

20  going to; is that right?

21      A.  No.  No.

22      Q.  And -- but you did later talk to Fernando Lujan

23  that morning, right?

24      A.  Yeah.  If there's a statement indicating that,

25  yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 660 of 1026
The Deposition of GERARD AMBROSE, taken on 9/26/23 Judge

225

1    Q.  And he was one of the people who had been
2    identified as being in the car, right?
3    A.  If that's what the statement has.  I -- I
4    forget statement -- I'm thinking what the statement has.
5    I'm not sure.
6    Q.  It's okay.
7        Let me -- let me ask it this way:  If you
8    were interviewing a murder suspect who had been
9    identified in some of these statements, you would want
10   to know what had been said about those sta- -- in those
11   statements, right?
12   A.  Yes.
13   Q.  And you would have gathered whatever
14   information had been collected so you could
15   appropriately confront this murder suspect.
16   A.  Yes.
17   Q.  Okay.  So did you -- after taking Daniel to the
18   magistrate the second time, did you go anywhere else
19   before driving Daniel around?
20   A.  No.
21   Q.  Did you get permission from a juvenile intake
22   officer to drive Daniel around?
23   A.  I didn't know at the time that -- that there
24   was permission.
25   Q.  Okay.  Did you later come to understand that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 661 of 1026
The Deposition of GARRETT HALLOCAN, Taken on June 8, 2022
226

```
 1   permission had been given?

 2        A.  Yes.

 3        Q.  Okay.

 4        A.  I think I read it somewhere when I was

 5   reviewing the cases.

 6        Q.  Okay.  But that wasn't anything that happened

 7   while you were there with Daniel; is that right?

 8        A.  No.

 9        Q.  I would like to show you one other report. Let

10   me see.  Okay.  So I am now sharing Exhibit Number 14.

11   This is at J.S. 1904.

12                  (Exhibit 14 marked.)

13        A.  Okay.

14        Q.  And I'm going to zoom in to the top here.  So

15   zooming -- sorry.  Give me one second.  And let me zoom

16   up a little.

17                  So do you recognize this as a supplement

18   report?

19        A.  Yes.

20        Q.  And the "re" line says that it's about the

21   written confession of a juvenile; is that right?

22        A.  Yes.

23        Q.  And then the juvenile is Danny Villegas?

24        A.  Yes.

25        Q.  Scrolling down to the bottom, this is Detective
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 662 of 1026
The Deposition of GARARD MACEDO, taken on 9/14/22, Judge

227

```
 1  Ortega's report, right?

 2      A.  Yes.

 3      Q.  And we can see from the bottom that he fini- --

 4  that the approval on this report which Ortega gave came

 5  at 4:03 a.m.; is that right?

 6      A.  That's -- that's what it says there.

 7      Q.  Uh-huh.

 8              And the times that are -- that are down

 9  here, those are entered automatically by the computer

10  program, right?

11      A.  Yeah.

12      Q.  Okay.

13      A.  If that was the approval time.  I mean,

14  sometimes the approval time is the next day.  If he got

15  around to it that night and that's the approval time, he

16  did it that night --

17      Q.  Sure.

18      A.  -- that morning.

19      Q.  In any case, we know it was finished no later

20  than 4:03 a.m. that morning, right?

21      A.  Yes, it looks like it.

22      Q.  So I'm -- looking at the bottom line in the

23  second-to-last sentence, do you see where it says, "The

24  juvenile showed Detective Marquez where the other

25  accomplices live"?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A.  Okay.
 2        Q.  And then, "They were the homes of Droopy and
 3   Popeye"?
 4        A.  Droopy and Popeye, okay.
 5        Q.  And then, "At 0400 hours, the juvenile was then
 6   taken to JPD and turned over to their intake officer,
 7   Aguilera"?
 8        A.  Okay.  Yeah.
 9        Q.  So we know from this that before this report is
10   approved at 4:03 a.m., Danny has been turned over to
11   Aguilera; is that right?
12        A.  Before then?
13        Q.  Yeah.  That -- because the report is finished
14   at 4:03 a.m., right?
15        A.  I think -- see, I used to remember what those
16   numbers mean.  I think that was the approval time.
17        Q.  Okay.  So --
18        A.  I'm not sure.  I -- you know, I'm not sure.  I
19   forget what those times --
20        Q.  Sure.
21        A.  -- mean.
22        Q.  Well, looking up to the next line, it says,
23   "Typed by:  Officer 752," with a time of 3:44 a.m.,
24   right?
25        A.  Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 664 of 1026
The Deposition of GERARD AGUILERA, Taken On May 24, 2017

229

 1      Q.  But that couldn't have been when he finished
 2  the report because the report says, at 4:00 a.m., Daniel
 3  was turned over to Aguilera, right?
 4              MR. ALMANZAN:  Objection, calls for
 5  speculation and lack of foundation.
 6      Q.  (BY MR. HILKE)  Go ahead.
 7      A.  I don't -- I don't know.  I mean, 3:44 could be
 8  the time he started.  I'm not -- I'm not really sure.
 9      Q.  Sure.
10      A.  I don't know if we had the starting time at the
11  front of the statement, at the beginning.  But I just
12  forget what those times mean.  I hate to say, yeah,
13  that's right.  I just don't remember what those times
14  mean.
15      Q.  Yeah, that's fine.
16              In any case, in this report, Ortega writes
17  that Daniel was turned over to Aguilera at 4:00 a.m.; is
18  that right?
19      A.  I'm not sure.  I -- I -- I would go by the time
20  that -- that he was logged in over there.
21      Q.  Okay.
22              MR. JIM DARNELL:  No, but the -- but the
23  end of the statement.
24              THE WITNESS:  Oh, by the end of the
25  statement?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 665 of 1026
The Deposition of GERARD DARNELL CABUDOL, Taken on June 23, 2020
230

 1                    MR. JIM DARNELL:  No.  The last line in the

 2    statement.

 3                    THE WITNESS:  Oh, the last line?  "Turned

 4    over to"...

 5        A.  Can you scroll down a little bit?

 6        Q.  (BY MR. HILKE)  Like this?

 7        A.  No.  No.  No.  The other way.

 8        Q.  Yeah.

 9        A.  Okay.  Right there.

10        Q.  Yeah.

11                    Let me -- let me ask you a different

12    question.

13        A.  Okay.  Yes.  Yes.

14        Q.  Yeah.

15        A.  If that's what he documented, yeah, that's

16    right.

17        Q.  Okay.  And I'm going to stop --

18        A.  And I just didn't have a time there.

19        Q.  That's okay.  I'm going to stop sharing this

20    exhibit now.

21                    Did you just say that you would go by

22    whatever the juvenile log said as to where -- when

23    Daniel Villegas was taken there?

24        A.  Yeah.

25        Q.  And was it your experience that when a juvenile

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 666 of 1026
The Deposition of GARRY ATKINSON, Taken on June 23, 2020
231

 1  is taken to JPD, that they have to be logged in right
 2  away?
 3       A.  I remember there being a log.  I don't know --
 4  and it changed.  I remember we used to log in at
 5  juvenile because the officer wouldn't and -- and as far
 6  as the officer, I don't know when they would have logged
 7  in.
 8       Q.  Okay.
 9       A.  It would be better to go by the time of the JP
10  officer --
11       Q.  Sure.
12       A.  -- on his report.
13       Q.  When -- it's important that someone -- well,
14  strike that.
15            As a detective taking a juvenile to JPD, do
16  you want to make sure that they're logged in when you
17  take them there?
18       A.  Yes.
19       Q.  And is that because that's a record that you've
20  handed this juvenile over to another person?
21       A.  Yes.  They -- if Aguilera was still on duty, it
22  would have been him.
23       Q.  Yeah.  And --
24       A.  We would have released him on.
25       Q.  And that way, there's no question about who

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  last had custody of the juvenile because it's -- it's
 2  been logged at JPD; is that right?
 3      A.  That's correct.
 4      Q.  And so in your practice, would you want to make
 5  sure a juvenile was logged in before you left him at
 6  JPD?
 7      A.  Well, it wouldn't concern me because I know
 8  that the probation officer would log in the -- the time
 9  on his report when he received him.
10      Q.  And if there's a -- if there is a discrepancy
11  between when Carlos Ortega says Daniel was dropped off
12  and when the juvenile log says he was dropped off, would
13  you have any explanation for that discrepancy?
14      A.  No.  That --
15              MR. JIM DARNELL:  Object to speculation.
16              Go ahead.
17      A.  No.
18      Q.  (BY MR. HILKE)  Okay.  When you --
19              MR. HILKE:  Do you guys need a break?  I'm
20  about to move to another topic.
21              MR. JIM DARNELL:  Yeah.  Can we?
22              MR. HILKE:  Yes, sir.
23              MR. JIM DARNELL:  How much longer have you
24  got?  Do you know?
25                  THE VIDEO TECHNICIAN:  Let me get us off
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 668 of 1026
The Deposition of EARL ARBOGAST, taken on June 30, 2022
233

1  the record.  We're off the record.  The time is 3:43.

2                    (Break taken.)

3                    THE VIDEO TECHNICIAN:  We are back on the

4  record for the deposition of Earl Arbogast being

5  conducted by videoconference.  My name is Sydney Little.

6  Today is June 30th, 2022.  The time is 3:59.

7      Q.  (BY MR. HILKE)  All right.  Sir, you -- you

8  spoke with Fernando Lo- -- Fernando Lujan on the -- on

9  the same morning that you were with Daniel Villegas; is

10  that right?

11      A.  Yeah, I may have.  Like I said, I don't have

12  that statement with me.

13      Q.  Sure.

14                    And at the time you did that -- well, you

15  know, I'm just going to go ahead and share another

16  exhibit.  This will be Exhibit Number 15 at DA-34-616.

17                    (Exhibit 15 marked.)

18      Q.  I'm going to go ahead and scroll up.  So do you

19  recognize this as a statement given to Detective Earl

20  Arbogast?

21      A.  Yes.

22      Q.  The person giving that statement is Fernando

23  Lujan?

24      A.  Yes.

25      Q.  And his date of birth is October 2nd, 1977?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 669 of 1026
The Deposition of GARZA, TODD, taken on 9/14/22, Judge
234

 1      A.  Yes.

 2      Q.  That would have made him 15 years old at the

 3  time?

 4      A.  Yes.

 5      Q.  And that would have been some of the first

 6  information you took from him talking to him, right?

 7      A.  From him, yes.

 8      Q.  Scrolling down, at the bottom of this page, you

 9  were the reporting officer here; is that right?

10      A.  Yes.  I show I did this statement.

11      Q.  And it looks like you had approved this

12  statement at 6:28 a.m. that morning.  Is that right?

13      A.  Yeah.  Yes.

14      Q.  Okay.

15      A.  Can I -- yeah.  Yes.

16      Q.  So I'm going to -- I'm going to scroll back up

17  a little bit.  Actually, before I -- before I direct you

18  to the statement, let me just ask you a question.

19      A.  Okay.

20      Q.  At the time you talked to Fernando Lujan,

21  Daniel Villegas, Rodney Williams, and Marcos Gonzalez

22  had all placed him in the car at the night of the

23  murder, right?

24      A.  Yes.  I know Marcos and Daniel had.

25      Q.  Okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 670 of 1026
The Deposition of GARY HALDCAT, Taker on 03/24/23   JUDGE
235

```
 1        A.  I was unaware about the -- Rodney.

 2        Q.  So going into this conversation, you know

 3   you're talking to a suspect, right?

 4        A.  Yes.  I -- I'm not sure what information I had

 5   at that time.

 6        Q.  Okay.

 7        A.  Let me see.

 8        Q.  Well, I -- I will go over the statement.

 9        A.  Okay.

10        Q.  But I'm -- let me put it this way.

11        A.  Go ahead.

12        Q.  If multiple suspects had all said that Fernando

13   Lujan was in the car with him the night of the murder,

14   you would have made sure to find that out before

15   interviewing this person connected to the murder, right?

16        A.  Could you say that again?

17        Q.  Yeah.

18             If multiple suspects had all said, "This is

19   a person who was in the car the night of the murder,"

20   you would have made sure to get that information before

21   you interview a new person in this investigation, right?

22        A.  Yes.  Yes.

23        Q.  And -- and the reason for talking to him would

24   have been to find out his involvement; is that right?

25        A.  Yes.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 671 of 1026
The Deposition of GERARDO VENEGAS, Taken on June 23, 2020
236

1     Q.  And so he needed to be taken to a juvenile

2 officer before you asked him about the crime, right?

3               MR. ALMANZAN:  Objection, calls for

4 speculation and foundation.

5     A.  I -- I -- I can tell you that when we picked up

6 juveniles, we would try to notify the parent, but we

7 wouldn't go to the juvenile -- to the JIS.  We -- we

8 took statements all the time in the CAP office.  So that

9 was just something that we did as a normal course.

10    Q.  (BY MR. HILKE)  Sure.  You -- you could take a

11 statement of a witness without necessarily taking them

12 to get their warnings, right?

13    A.  Right.

14    Q.  But Fernando Lujan is actually a suspect in

15 this murder, right?

16    A.  I -- I'm not sure because you get a lot of

17 names and a lot of people, and you want to -- you want

18 to pull them in to see what they know, and you're going

19 to find out whether they are a suspect or whether

20 they're involved or not.  If they start implicating

21 themselves, then you start the process that Daniel

22 Villegas went through.

23               There's a lot of allegations in a case

24 and -- and -- and you pull in witnesses, and a lot of

25 times you find out that they are suspects.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 672 of 1026
The Deposition of GARRY ALLEN GARDNER, Taken on 9/26/13 JUDGE
237

1    Q.  Okay.  But this isn't just allegations.  Two

2  people who confessed both said that this man -- this boy

3  was in the car with them at the time of the murder,

4  right?

5    A.  I'm not sure what information I had then.  I...

6    Q.  Are you saying it's possible that even though

7  Daniel Villegas and Marcos Gonzalez both said this boy

8  was with them in the car, you didn't know about either

9  of those statements when you talked to Fernando Lujan?

10    A.  What I'm saying is I think -- I think the --

11  I'm sorry.  I didn't let you finish, but what I'm saying

12  is that I may have just known that Detective Marquez

13  said, "We need to pick up these guys and find out if

14  they're involved or not."  I don't remember that I

15  specifically knew what was in Rodney's statement and

16  Daniel Villegas' statement.

17    Q.  Okay.  But you're the one who's actually asking

18  the questions to Fernando Lujan, right?

19    A.  Right.  So I'll call him in.  He was taken in

20  as a witness.  And then if he involves himself as a

21  suspect, he'll go through the process.

22    Q.  Can -- can you think of any reason you wouldn't

23  have asked what the two people who had just given

24  confessions had said about Fernando Lujan?

25    A.  I would -- I don't know what happened, but I --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 673 of 1026
The Deposition of GARARD ARBOGAST, Taken on June 21, 2018
238

1  I'm just giving you a -- an example.  If Detective

2  Marquez told me, "We need to interview two guys and see

3  their involvement," then that's -- that's -- that's the

4  way it would have been done.

5      **Q.  So you think it's -- sitting here today, you**

6  **think it's possible that Detective Marquez told you to**

7  **interview this murder suspect without you having any**

8  **information about what other statements had been made**

9  **about him?**

10      A.  I can tell you --

11          MR. JIM DARNELL:  Objection, speculation.

12      A.  I can tell you I never read Villegas'

13  statement, and I never read Rodney's statement until

14  recently, so I'm assuming -- and I don't know.  I -- I

15  don't remember -- Marquez may have briefed me that we

16  need to pull in these guys and see if they were

17  involved.

18      **Q.  (BY MR. HILKE)  It would have been incredibly**

19  **irresponsible for Marquez to tell you to interview a**

20  **suspect without who -- without briefing you on his**

21  **potential involvement, right?**

22      A.  Well, I'm assuming that he would have told me,

23  too, that these were the guys that -- that were

24  involved, as far as to the houses that were picked out

25  that night, maybe.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                    MR. JIM DARNELL:  Object --
 2      A.  I'm not --
 3                    MR. JIM DARNELL:  Object to speculation.
 4      A.  I -- I just don't remember.
 5      Q.  (BY MR. HILKE)  Yeah.
 6      A.  I don't remember that that was the case.
 7                    MR. JIM DARNELL:  Don't guess.
 8      Q.  (BY MR. HILKE)  But sitting -- sitting here
 9  today, you don't have any reason to doubt that you knew
10  that Fernando Lujan was a suspect to the shooting,
11  right?
12                    MR. JIM DARNELL:  Object to speculation.
13      A.  I -- I don't know for sure.
14      Q.  (BY MR. HILKE)  Well, sitting here today, do
15  you have any reason to doubt that you knew Fernando
16  Lujan was a suspect?
17      A.  If you let me read his statement, I mean,
18  I'll -- I'll see where it goes.  I'm not --
19      Q.  That's --
20      A.  I'm not really sure without looking at his
21  statement.
22      Q.  Yeah, let's -- let's go to the statement.  We
23  are on the sort of first section of his statement.  Go
24  ahead and read it, and let me know when you're done.
25      A.  Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 675 of 1026
The Deposition of GERARD DUROCHER, Taken on June 9, 2022 Page
240

```
 1                   Could you scroll to the bottom?

 2        Q.  Yes.

 3        A.  Okay.

 4        Q.  I'm -- I'm going to stop sharing this exhibit

 5   for a moment here.

 6                   So my -- and did you have a chance to

 7   review the statement?

 8        A.  Yes, I did.

 9        Q.  Okay.  So it was -- is it correct that your

10   practice at the El Paso Police Department was that you

11   could not ask a juvenile suspect about a crime until

12   they got their warnings?

13        A.  Yeah.  If they were a suspect, yes.

14        Q.  Okay.  And someone that -- and a juvenile who's

15   been identified by other people who have -- who have

16   confessed to a crime as being in the car for a drive-by

17   shooting, that juvenile is a suspect, right?

18        A.  Yes.  He -- he -- he would be someone that you

19   would pull in and -- to see if you could make him as a

20   suspect, yes.

21        Q.  And so when you asked Fernando Lujan about what

22   happened without him getting his warnings, that was in

23   violation of that practice, right?

24        A.  Well, again, I don't --

25                   MR. ALMANZAN:  Objection, calls for
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 676 of 1026
The Deposition of GERARDO RUBOCAI, Taken on May 24, 2022
241

1    speculation.

2        A.  What I'm trying to tell you is I don't know the

3    circumstances that I interviewed Fernando Lujan on.

4    Detective Marquez may have just told me to interview him

5    to see if he was involved, and that's why I did it on a

6    witness statement.  And when I took that witness

7    statement, he never implicated himself.

8        **Q.  (BY MR. HILKE)  Okay.**

9        A.  So that statement was taken, and then it was

10   given to Detective Marquez.

11       **Q.  So it is your testimony that -- that you may**

12   **not have ta- -- you may not have gotten Fernando Lujan**

13   **his warnings because you did not know at the time that**

14   **he was a suspect?**

15       A.  Yes.  I mean, he never implicated himself as a

16   suspect, and everything that I took down in that

17   statement was what he did.  He never implicated himself.

18       **Q.  But you couldn't have known that before you had**

19   **taken his statement, could you have?**

20       A.  I couldn't have known what?

21       **Q.  You didn't know what he was going to tell you**

22   **before you talked to him, right?**

23       A.  No.  That was the reason for, you know, taking

24   a witness statement.  I -- to see if he was a suspect or

25   a witness.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 677 of 1026
The Deposition of GARD OUELLETTE, taken on 3/26/23
242

 1    Q.  But if he was a suspect, then it would have

 2  been improper to talk to him until he had gotten his

 3  warnings, right?

 4    A.  That's correct.

 5    Q.  And so do you have any explanation for why you

 6  didn't get him his warnings other than you just -- you

 7  didn't know that he had been implicated by the other --

 8  other people in this case?

 9    A.  Well, because I interviewed him, and he didn't

10  implicate himself.  If he had had any involvement, I

11  would have started the process with Danny, if I'm

12  understanding you correctly.

13    Q.  But, sir, that -- that wasn't my question.  My

14  question is -- well, let me ask you a better question.

15          If you had known at the time that -- that

16  even one other juvenile who had confessed to a drive-by

17  had said that Fernando Lujan was also in the car during

18  the drive-by, would it have been appropriate to question

19  that other juvenile without giving him his warnings?

20    A.  No.

21    Q.  Okay.  And so do you have any explanation for

22  why you didn't get Fernie -- Fernando Lujan his warnings

23  other than you didn't know that anyone else had

24  implicated him at that time?

25    A.  Well, I may not have known, and I don't know --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 678 of 1026
The Deposition of GERARD DURROCHER, Taken on June 7, 2017

243

1   I don't recall why Dete- -- I mean, exactly what
2   Detective Marquez had told me on what points to
3   interview him on.  I don't remember.
4        Q.  I understand.
5        A.  I was just to take a statement.
6        Q.  And other than that, you may not have known, do
7   you have any other explanation for why you didn't give
8   him his warnings?
9        A.  No.
10        Q.  Okay.  And looking back on the investigation,
11   do you think it's plausible that you would have
12   interviewed Fernando Lujan without knowing what the
13   people who had given confessions had said about him?
14              MR. JIM DARNELL:  Object to speculation.
15        A.  Yeah, I don't remember what I -- I -- I knew
16   about Fernando Lujan, but I -- I just don't remember.
17        Q.  (BY MR. HILKE)  I understand, but Al Marquez
18   and Scott Graves, you testified earlier that you never
19   had any problem communicating with them, right?
20        A.  Yeah.  I could communicate with them.
21        Q.  And they were good detectives, right?
22        A.  Uh-huh.
23        Q.  And you were a good detective.
24        A.  Yes.
25        Q.  And so my question is, in all your experience

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 679 of 1026
The Deposition of GARY MCCASKILL, Taken on 9/14/22
244

1 investigating homicides and criminal investigations,

2 would you send -- like does it make any sense to you

3 that you would be questioning this murder suspect

4 without knowing what others had said about him?

5     A.  My answer to that would be is if Detective

6 Marquez had said, "This guy's involved in the shooting,

7 he was implicated in two statements, and I want to make

8 sure that we get a confession from him," I wouldn't have

9 taken a witness statement from him in the first place.

10     Q.  And -- and my -- my question is, I guess, can

11 you -- can you think of any reason why that information

12 wouldn't have come to you before you interviewed a

13 murder suspect in this case?

14     A.  No.  I -- I don't remember what information was

15 rele- -- relayed, and I don't know.

16     Q.  I understand you don't remember.

17           Do you have any explanation for why that

18 information may not have come to you?

19     A.  No.

20     Q.  Okay.  And was that -- I'm going to go back to

21 the statement now so we can reference it sort of as

22 needed.  Yeah, I'm sharing Exhibit 15 again here.  Yeah.

23           And let me actually ask it to you this way:

24 Do you have any independent memory of any other

25 detectives being with you when you talked to Fernando

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 680 of 1026
The Deposition of GARY DAN OCAB, taken on June 23, 2013
245

 1    Lujan?

 2         A.   No.

 3         Q.   Okay.  And there was no juvenile officer

 4    present in your interactions with Fernando Lujan; is

 5    that right?

 6         A.   There was not.

 7         Q.   Okay.  And did you agree with Alfonso Marquez

 8    to pin this murder on Daniel Villegas?

 9         A.   What was the question?

10         Q.   Did you agree with Alfonso Marquez, with Al

11    Marquez, to pin this murder on Daniel Villegas?

12              MR. ALMANZAN:  Objection, argumentative.

13              MR. JIM DARNELL:  Go ahead and answer.

14         A.   Well, with the information that we had at the

15    time right -- right then and there, yes, I would have

16    agreed with him.

17         Q.   (BY MR. HILKE)  When did you make that

18    agreement with Al Marquez?

19         A.   Agreement, I -- I'm sorry.  I misunderstood

20    you, then.  I didn't make an agreement.  Would I agree

21    with him on his decision?  At that point in time --

22              MR. JIM DARNELL:  Let him reask the

23    question.

24         A.   Yeah.  Can you reask it again?

25         Q.   (BY MR. HILKE)  Sure.  Right.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 681 of 1026
The Deposition of GARD A REGAN, Taken on June 6, 2023
246

 1                  My question was, did you and Al Marquez
 2   agree to pin this murder on Daniel Villegas?
 3        A.  Oh, no.
 4        Q.  And did you -- before you talked to Fernando
 5   Lujan, did you and Al Marquez agree to try to get a
 6   statement implicating Daniel Villegas from Fernando
 7   Lujan?
 8        A.  No.
 9        Q.  So going way back to the initial shooting, the
10   first statement you took in this case was -- I'm going
11   to stop sharing.
12                  The first statement you took was from Juan
13   Medina, right?
14        A.  Was from what?
15                  MR. JIM DARNELL:  You just broke up.
16   Say -- could you say that again?
17                  MR. HILKE:  Oh, no problem.
18        Q.  (BY MR. HILKE)  The first statement you took
19   was from Juan Medina, right?
20        A.  Yes.  Yes.
21        Q.  And did you take him to crimes against persons
22   to take that statement?
23        A.  Yes, I did.
24        Q.  And there was another boy -- there was another
25   young man, Jesse Hernandez, who was the other survivor

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 682 of 1026
The Deposition of GARY DICHOCAS, taken on 07/16/23  Page
247

 1   from the shooting, right?

 2        A.   Yes.

 3        Q.   Did you see Jesse at the crimes against persons

 4   station that morning?

 5        A.   Yes.

 6        Q.   And did either boys -- what were -- what was

 7   Juan Medina's demeanor at the station?

 8        A.   Well, he was -- he was kind of shaken up.

 9        Q.   Yeah?  He seemed -- did he seem scared?

10        A.   Yeah, he -- you know, well, he seemed shaken

11   up.  I mean, there's degrees to what you're saying, but

12   he -- he was shaken up would be my assessment.

13        Q.   What did you notice about him that made you

14   think he was shaken up?

15        A.   Well, he was just a little bit nervous.

16        Q.   Okay.

17        A.   You know, you could tell that he was -- yeah,

18   that he had gone through something.

19        Q.   Yeah.

20             And when you say "just a little bit

21   nervous," was he just a little nervous, or was he

22   more -- was he -- how nervous was he, I guess is my

23   question?

24        A.   Well, I'll tell you what I remember.  What I

25   remember is that I could tell that the shooting had



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 683 of 1026
The Deposition of GERARD ARROCHA, Taken on 05/12/23 Page
248

 1  affected him, his -- his demeanor.  To put a level on

 2  the degree, I really don't -- don't remember.

 3      Q.  What -- what did you notice about -- I'm sorry.

 4  Go ahead.

 5      A.  The best thing I can say is he was a little

 6  shaken up.

 7      Q.  What did you notice about Jesse Hernandez's

 8  demeanor?

 9      A.  I don't think I saw Jesse Hernandez.  I know he

10  was taken to CAP, and I think Detective Marquez took a

11  statement from him.

12      Q.  Got it.

13          So you didn't interact with Jesse Hernandez

14  that morning?

15      A.  No.  I took Juan Medina in my car and -- and Al

16  Marquez took Jesse Hernandez in his car.

17      Q.  Juan Medina had not -- he didn't actually see

18  the shooter, right?

19      A.  No, I don't think he did.

20      Q.  Okay.  And is it consistent with your memory

21  that he described the car as a goldish Monte Carlo?

22      A.  Yes.

23      Q.  And the only thing he heard anyone in the car

24  say was just "come here," right?

25      A.  Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 684 of 1026
The Deposition of GARARD AMBOCAS, Taken on June 23, 2021
249

1      Q.  And he didn't mention any potential gang
2  connection to the shooting, did he?
3      A.  No.
4      Q.  And that's -- and he didn't mention any motive
5  someone would have for shooting at them all, did he?
6      A.  Not then, that I remember, no.
7      Q.  And these were the victims and the survivors --
8  they were young, right?  They were teenagers?
9      A.  Yes, they were.
10      Q.  And so teenage boys being shot at in a
11  drive-by, did you assume there might be some gang
12  involvement?
13      A.  I mean, it's always open to that.  We -- we do
14  have a lot of gangs in the northeast, but, again, it's
15  what you said earlier.  You try and keep an open mind.
16      Q.  Right.
17              So -- so you would have asked Juan about
18  any potential gang ties to the shooting, right?
19      A.  I don't think I did.
20      Q.  Why didn't you ask him about potential gang
21  ties?
22      A.  Because I just -- I -- from what I remember, I
23  just asked him the specifics on what happened that night
24  at the shooting.  And I also tried to identify the car
25  by showing him pages of vehicles.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 685 of 1026
The Deposition of GERARDO ABUGOAB, Taken on 09/26/23

250

1    Q.  Was there any reason you didn't want to know if

2   he thought there was some gang connection?

3    A.  I don't remember asking that.  I don't know

4   why.

5    Q.  Okay.  All right.  Where in crimes against

6   persons did you interview Juan Medina?

7    A.  It would have been at my cubicle.

8    Q.  Got it.

9            And so while you were interviewing Juan

10  Medina, was Al Marquez interviewing Jesse Hernandez

11  diagonal across from you?

12   A.  Yes.

13   Q.  Okay.  At any point, did you hear anyone yell

14  while those statements were being taken?

15   A.  Did I -- what?

16   Q.  Did you hear anyone yell?

17   A.  Oh, no.

18   Q.  Did you hear anyone make threats?

19   A.  No.

20   Q.  Did you hear anyone make accusations?

21   A.  No.

22   Q.  Did you hear anyone raise their voice?

23   A.  No.

24   Q.  Did you hear anyone say that either Jesse or

25  Juan would be raped in jail if they didn't confess?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 686 of 1026
The Deposition of GARD DARDOCAS, Taken on June 23, Judge
251

1    A.  No.

2    Q.  Okay.  So did Juan explain to you where he had

3  walked from, where he was coming from when the shooting

4  happened?

5    A.  Yeah.  He was -- he was going to ride back with

6  a friend, but the friend never showed back at the

7  party -- party, and I think he was going to walk to a

8  friend's house, from what I remember.  I'm not sure.

9    Q.  Okay.  And did he tell you where he was

10  walk- -- what his destination was?

11    A.  It -- it was somewhere else that -- another

12  person's residence, I think, but I'm not -- I'm not

13  completely sure on that.

14    Q.  And did you -- did you later become aware

15  that -- or did you become aware at any time that those

16  boys had taken the long way home; that Transmountain was

17  not the most direct way for them to get to their

18  destination?

19    A.  Yeah.  They were -- oh, yeah.  Because I think

20  I remember now that they were going to go to 5700 -- or

21  to some apartments, Village Green Apartments, yeah.  I

22  didn't know that.

23    Q.  Okay.  So are you aware that Juan Medina

24  testified in Daniel's criminal trial that he and the

25  others took the long way home to avoid the gang

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 687 of 1026
The Deposition of GARARD CHABOCAS, Taken on 04/26/23   Judge
252

1   territory of Los Midnight Locos?

2        A.  No, I wasn't aware of that.

3        Q.  And as far as you know, was Juan Medina ever

4   asked about what the potential gang connections were?

5        A.  It wasn't in his statement, so I probably

6   didn't ask.

7        Q.  Okay.  And -- okay.  And if -- if Juan had told

8   you anything about a gang connection, you would have

9   written that down; is that right?

10       A.  Yes.  It would have been in his statement.

11       Q.  And even if he said he didn't know of any gang

12  connection, you would have written down that he didn't

13  know of any gang connection, right?

14       A.  Yes.

15       Q.  Before April 21 -- well, strike that.

16            Before you picked up Daniel Villegas, were

17  you aware of any connection between the Varrio Northeast

18  gang and the Lazo/England murder?

19       A.  No, I -- I wasn't.

20       Q.  And if that connection -- if a connection

21  between Varrio Northeast and the murders had come up, it

22  would have been important to document that, right?

23       A.  Yes.

24       Q.  And it would have been -- been important to

25  write down how that connection was discovered, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 688 of 1026
The Deposition of GARRARD CAHOOCAS, taken on June 23, Judge
253

 1      A.  Yes.

 2      Q.  So you also -- between when you talked to Juan

 3 and when you picked up Daniel, you -- you actually went

 4 out to New Mexico on this case, right?

 5      A.  Yes.

 6      Q.  And what's the first thing you remember of

 7 becoming involved in the trip to New Mexico?

 8      A.  We had gone to New Mexico because there was

 9 information that a couple of kids were admi- --

10 confessing to the shooting, so we had gone over there

11 to, you know, get their statements and see if they were

12 involved.

13      Q.  Yeah.  And who -- who did you go with to

14 New Mexico?

15      A.  On that one, I went with Al Marquez.

16      Q.  Okay.  And was it just the two of you from

17 El Paso?

18      A.  No.  We had the gang task force.  And I'm not

19 all -- I know we had the gang task force, and I'm not

20 sure the -- about the other detectives who went.

21      Q.  Okay.  And do you recall that before a

22 statement was -- and the two boys who were suspects, do

23 you know how to pronounce his name?  It's like Jacob

24 Jauregui or something.

25      A.  Oh, Jauregui.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 689 of 1026
The Deposition of GARY CHILDRESS, taken on 9/14/22
254

```
 1        Q.  Jauregui, yes.
 2             Do you recall, before a statement was taken
 3   from Michael Johnston or Jacob Jauregui, a statement was
 4   taken from a Robert Hall?
 5        A.  I believe there was.
 6        Q.  Okay.  And were you present for the statement
 7   from Robert Hall?
 8        A.  No.
 9        Q.  Okay.
10        A.  Not that I remember.
11        Q.  So I'm going to pull up an exhibit.  There we
12   go.  Okay.  I am now sharing my screen.  This is Exhibit
13   Number 16.  It's at DA-34-625.
14             (Exhibit 16 marked.)
15        Q.  So this is a handwritten statement, right?
16        A.  Yes.
17        Q.  And I believe that Al Marquez has testified
18   that this is his handwriting.  Does this appear to be Al
19   Marquez's handwriting to you?
20        A.  I don't recognize it.
21        Q.  Okay.  Scrolling -- I'm going to scroll to
22   the -- and I forget if I said this.  Yeah, I gave the
23   Bates.  I'm going to scroll down to page 5 of this
24   document.
25             Do you see some signatures at the bottom of
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 690 of 1026
The Deposition of GARARDO ALONCAB, Taker on WAN 24/23  Judge
255

```
 1   this page?
 2        A.  Do I see what?
 3        Q.  Some signatures at the bottom of this page.
 4        A.  No.
 5        Q.  Okay.  Zooming in a little, do you see some
 6   signatures now?
 7        A.  No.
 8        Q.  Huh.
 9             Do you see anything on your screen?
10        A.  Oh, there -- there -- you got it there.
11        Q.  Okay.
12        A.  Okay.  Yeah, I see the signatures.
13        Q.  There are two signatures on the left next to
14   "witnesses," right?
15        A.  Yes.
16        Q.  Do you recognize those signatures?
17        A.  No.
18        Q.  Okay.  Do you know who badge number 824 is?
19        A.  No.
20        Q.  All right.  I'm going to scroll back up to the
21   top of the document, and let me zoom in here.  Looking
22   at the first paragraph, I just want to point you to --
23   do you see where it says, "Right now, I am at Gadsden
24   Junior High, where I am giving the statement to
25   Detective Alfonso Marquez of the El Paso Police
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 691 of 1026
The Deposition of GARY MARQUEZ, taken on June 23, 2016
256

 1   Department"?

 2        A.  Yes.  Yes.

 3        Q.  Did you go with Al Marquez to the junior high

 4   school?

 5        A.  I don't remember going with him to the high

 6   school.  I just remember going with him into New Mexico

 7   to pick up the two kids that were bragging.

 8        Q.  Got it.

 9             So Hall's statement isn't part of what you

10   remember from this case; is that right?

11        A.  Yes.

12        Q.  Okay.  We -- I'm going to stop sharing this

13   document now.

14             Do you remember whether it was public

15   information that the two survivors of the shooting had

16   been chased by a car and run away to find a phone?

17        A.  After the shooting?

18        Q.  Yes, sir.

19        A.  Yeah.  I knew that they ran away and that they

20   hid while --

21             MR. JIM DARNELL:  He was asking, was it

22   public information?

23        A.  Oh, was it public information?

24        Q.  (BY MR. HILKE)  Yeah.

25        A.  I -- I don't know.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 692 of 1026
The Deposition of GARY OATIS, Taker on 9/26/23   Judge

257

1    Q.  Okay.  And if that information wasn't public,

2  it would have been important to be careful with

3  releasing that information, right?

4    A.  Yes.

5    Q.  And if Robert Hall had said that Mike Johnston

6  gave him information you knew to be nonpublic about the

7  crime, that would have tended to indicate that Michael

8  Johnston knew something about the crime, right?

9    A.  If he knew something --

10        MR. JIM DARNELL:  Object, spec- --

11    A.  -- that wasn't released, yes.

12        MR. JIM DARNELL:  Object, speculation.

13    Q.  (BY MR. HILKE)  And if Michael Johnston had

14  told Robert Hall that he committed the murder and then

15  threatened to kill Robert Hall if he told anyone, that

16  would have tended to indicate his involvement; is that

17  fair?

18    A.  Well, yes.

19    Q.  Okay.  So tell me about -- do you remember

20  where Michael Johnston was picked up?

21    A.  If I'm remembering the names correctly, I think

22  both the juveniles were picked up in New Mexico.

23    Q.  Yeah.  Do you remember where in New Mexico,

24  like what -- what kind of location?

25    A.  We had gone to, I believe, the sheriff's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 693 of 1026
The Deposition of GARRET HEBDOCAST, taken on June 23, 2022
258

1  department.

2      Q.  Okay.

3      A.  And to ensure their rights, we had to go

4  through a magistrate, I remember, and we contacted the

5  parents, and everything was agreed for us to bring them

6  back.

7      Q.  Got it.

8          So you had obtained parental permission to

9  bring them back; is that right?

10     A.  Yes.

11     Q.  And it would have been important to document

12 that parental permission, right?

13     A.  Yes.

14     Q.  And did -- to your knowledge, were Johnston and

15 Jauregui told that they could either go to jail in

16 New Mexico or come to El Paso and try to work it out?

17     A.  No, I'm not aware of that.

18     Q.  Okay.  Are you aware of them being threatened

19 in any way that they would be jailed if they did not

20 come with you?

21     A.  No.

22     Q.  And it would have been totally inappropriate to

23 threaten them with jail if they didn't come with you,

24 right?

25     A.  Yes, it would.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 694 of 1026
The Deposition of GARY CABODCAST, taken on June 23, 2018
259

 1      Q.  And so you mentioned that Johnston and Jauregui
 2  were both given magistrate warnings, right?
 3      A.  I'm not sure.  I don't think I did either
 4  interview.
 5      Q.  Okay.  Yeah.  So -- yeah.  Give me -- give me
 6  one second, please.  I'm going to -- well, give me one
 7  second, actually.
 8              Okay.  So sitting here today, you don't
 9  know if they were taken to a magistrate or not?
10      A.  Yeah, I don't remember.
11      Q.  Okay.  And were you involved in either of their
12  interviews?
13      A.  I don't think I was.  I don't remember
14  interviewing either one.
15      Q.  Did either of them ride with you back to --
16  back to El Paso?
17      A.  I don't -- back to Dona Ana, you mean?
18      Q.  Or -- sorry.  After -- after you took them from
19  New Mexico, where did you bring them?
20      A.  After we picked them up, and then I didn't
21  hear.
22      Q.  Where did you bring them after you picked them
23  up?
24      A.  Shoot, I don't -- I don't -- I don't remember.
25      Q.  Okay.  I'm going to show you an exhibit you've

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 695 of 1026
The Deposition of GARY WARE, taken on 5/25/23  Judge
260

```
 1   seen before.  Okay.
 2                Okay.  So this is Exhibit Number 9 again.
 3   This is your report dated May 6, 1993.  I'm going to
 4   scroll down, and we're on the second page.  Looking at
 5   this point on -- do you see where it says, "On 4-15-93,
 6   Detective Marquez took a statement from Robert Hall"?
 7        A.  Yes.
 8        Q.  And then it says "who stated that a Jacob
 9   Jauregui and Mike Johnston of Chaparral, New Mexico,
10   were bragging about doing the shooting"?
11        A.  Yes.
12        Q.  And it says, "Both of these subjects were taken
13   to JPD and interviewed, but it became evident that they
14   did not have knowledge of certain aspects of the case
15   that the killers would have known"?
16        A.  Yes.
17        Q.  So from what's documented, it isn't -- it isn't
18   mentioned anywhere in your state- -- in your report that
19   they were given warnings by a magistrate; is that right?
20        A.  No.
21        Q.  And -- and you don't recall being involved in
22   the interview of Jacob or the interview of Mike; is that
23   right?
24        A.  No.
25        Q.  Okay.  And to your knowledge, was it documented
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 696 of 1026
The Deposition of GARY GRUBBS, taken on March 23, 2021
261

 1  anywhere why they were ruled out as suspects, other than
 2  that they did not have knowledge of certain aspects of
 3  the case that the killers would have known?
 4      A.  I don't know the reason, no.
 5      Q.  Yeah.
 6              And would it have been important to
 7  document why these two suspects were ruled out?
 8      A.  Yes.
 9      Q.  And would it have been important to give more
10  detail than just there were some details they didn't
11  know?
12      A.  Yes.
13      Q.  And -- okay.  And do you have any explanation
14  for any lack of documentation on that point?
15      A.  No.
16      Q.  And I'm going to stop sharing this now again.
17              And at this point in the investigation, you
18  didn't have any other active leads, did you?
19      A.  I'm not sure.  It's -- like I said, I was -- I
20  was in part of this and part of that.  I wasn't
21  continuing in keeping me apprised of the case.  I
22  wasn't -- wasn't there the whole time.
23      Q.  And do you have any memory of what details Mike
24  or Jacob didn't know about the shooting?
25      A.  That who wouldn't have known?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 697 of 1026
The Deposition of EARL ARBOGAST, Taken on 04/26/23

262

 1     Q.  Mike and Jacob, Jauregui and Johnston.

 2     A.  No.

 3     Q.  Okay.  Did you subsequently talk to a Douglas

 4  Bosanko?

 5     A.  That name is familiar, but I don't know from

 6  where.

 7     Q.  Yeah.  Let me -- I'm going to share his

 8  statement with you now.

 9     A.  Okay.

10     Q.  Here we go.  Okay.  So I'm now sharing -- this

11  is Exhibit 17.  It's City 267.

12              (Exhibit 17 marked.)

13     Q.  I'm going to scroll in here.  This is a witness

14  statement dated April 16, 1993, right?

15     A.  Yes.

16     Q.  And this statement was given voluntarily to

17  you, Earl Arbogast, by Douglas Bosanko?

18     A.  Yes.

19     Q.  And -- give me one second.

20          Okay.  So have you had a chance to review

21  this statement?

22     A.  No.

23     Q.  Do you want to take a minute and go ahead and

24  read it now?

25     A.  Yes.  Can you scroll down a little bit?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q.  Like this?

 2        A.  Yeah.

 3        Q.  Great.

 4        A.  A little bit more.

 5        Q.  Sure.

 6        A.  Okay.  Right there.

 7        Q.  Good.

 8        A.  Can you scroll up?

 9        Q.  Yes.

10        A.  Right there.  A little bit down.

11        Q.  Like this?

12        A.  Yeah, right there.

13        Q.  Great.

14        A.  Okay.

15        Q.  Okay.  So according to this statement, Douglas

16   Bosanko was Robert Hall's brother-in-law, right?

17        A.  Yes.

18        Q.  And Robert Hall was the person who had

19   originally pointed to Mike Johnston as a potential

20   suspect, right?

21        A.  Yes.

22        Q.  And so even after Mike Johnston and Jacob

23   Jauregui had -- had -- after they had -- even after they

24   had been interviewed, in this investigation, you were

25   still trying to close a loop by talking to -- by talking
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 699 of 1026
The Deposition of GERARD DAUROCAS, taken on 9/14/23, JUDGE
264

```
 1   to Douglas Bosanko, right?
 2        A.  Yes.  I think he voluntarily came in.
 3        Q.  Yeah.  And -- and so the purpose for this
 4   interview was to see if it shed any light on Mike
 5   Johnston's involvement, right?
 6        A.  Yes.  And I -- it was just information.
 7        Q.  Yeah.  And -- and specifically information
 8   about what Mike Johnston had told Robert Hall, right?
 9        A.  Yes.
10        Q.  So in -- as you were getting ready to talk to
11   Douglas Bosanko, you -- you would have wanted to know
12   what his brother-in-law, Robert Hall, had said in his
13   statement, right?
14             I don't remember a call when his statement
15   was taken or at what point -- point I knew anything --
16             MR. ALMANZAN:  Did you get the file-stamped
17   copy of that UMIC New Mexico filing yet?
18             UNIDENTIFIED SPEAKER:  Si.
19             MR. ALMANZAN:  Oh, okay.  Can you PDF it to
20   me --
21             MR. HILKE:  Hey, Andy, you're -- you're not
22   muted.
23             MR. ALMANZAN:  Oh, sorry.  Sorry, guys.
24             MR. HILKE:  That's -- you're fine.
25        Q.  (BY MR. HILKE)  So -- oh, go ahead.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 700 of 1026
The Deposition of GARY GAUDCAST, taken on June 22, 2023
265

```
 1        A.  Go ahead.
 2        Q.  I was just going to ask:  So this -- this
 3   statement was taken April 16, 1993.
 4        A.  Yes.
 5        Q.  And I'm going to represent to you that the
 6   statement from his brother-in-law, Robert Hall, was
 7   taken the day before.
 8        A.  Yeah.
 9        Q.  And from what you just testified, it was taken
10   while you and Al Marquez were up in New Mexico.  I know
11   you weren't there for Robert Hall's statement, but you
12   knew that it had been taken, right?
13        A.  Yes.
14        Q.  And so if you're talking to Douglas Bosanko
15   about what Robert Hall told him, you would have wanted
16   to know what Robert Hall had already said, right?
17        A.  I -- I wasn't aware of it.  I'm -- I'm not sure
18   that I knew that Robert Hall -- what he said in his
19   statement.  I may have known at that point, and I don't
20   remember that they had already been excluded.  So this
21   statement would have just been taken for information.
22   He came in voluntarily.  He wanted to give his
23   statement, so we took it.
24        Q.  So are you saying that you would have been
25   comfortable taking this statement from Douglas Bosanko
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 701 of 1026
The Deposition of GARY McDONALD, Taken on 05/26/23  Judge

266

1  even if you had no idea what Robert Hall had already

2  said?

3      A.  No, I'm not saying that.  What I'm saying is

4  I'm not -- I may have known that they had already been

5  excluded.  I don't know if that was the case.

6      Q.  Well, and my question is not about what you

7  knew at the time.  My question is about your practice in

8  investigating homicides.

9              When investigating a homicide, if -- well,

10  let me ask this:  In investigating a homicide, sometimes

11  you talk to multiple people who have connections to one

12  another, right?

13      A.  Yes.

14      Q.  Like one of your first statements, you talked

15  to Ms. Vinson, a young woman, and then you talked to

16  Terrance -- or, subsequently, Graves talked to Terrance

17  Farrar, who -- who Ms. Vinson had said -- had -- had

18  said something about the guilty party to the shooting,

19  right?

20      A.  Yes.

21      Q.  And so in that situation, for Graves to have an

22  intelligent conversation with this person who supposedly

23  knows who the suspect is, who -- who the shooter is, you

24  want to know what the other connected people have

25  already said, right?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A.  Yes.

2    Q.  Because then you can know what to follow up on

3  or if there are contradictions or things like that,

4  right?

5    A.  Yes.

6    Q.  So my only question is, you know, not -- not,

7  you know, what did you know at the time, but in talking

8  to Douglas Bosanko, would you want -- would you have

9  wanted to have that same kind of information to be able

10  to corroborate and follow up and ask intelligent

11  questions?

12    A.  It would -- I -- I'm going to say that it would

13  be helpful, yes.

14    Q.  Yeah.

15         It -- it would have been your practice as a

16  detective to prepare for an interview like this by

17  getting the relevant information, right?

18    A.  Yes.  But, again, I'm just -- I don't know

19  exactly what circ- -- the circumstances were then.  I

20  don't know.  Maybe I did know what they had said and --

21  and -- and they were excluded.  I just don't remember at

22  that point in time what the circumstances were.

23    Q.  I understand.

24         Did you -- are you aware of any

25  investigation being done to discover why Mike Johnston

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 703 of 1026
The Deposition of GARDA HUDOCK, Taken on 05/06/23
268

1 | had threatened to kill Robert Hall if Robert Hall
2 | snitched on him?
3 |     A.  Why he would?
4 |     Q.  Yes.
5 |     A.  Well, because he snitched on him.  He -- he
6 | would turn it.  I mean --
7 |     Q.  But Mike Johnston -- well, right.
8 |             But my question is, are you aware of any
9 | investigation being done as to why Mike Johnston, who
10 | apparently was ruled out as a suspect, is still being --
11 | is threatening to kill people who talk about his
12 | involvement in this shooting he didn't commit?
13 |     A.  I -- I don't remember being a part of that or
14 | doing anything on that.
15 |     Q.  And are you aware of anything like that
16 | happening by anybody in this investigation?
17 |     A.  No, I'm not.
18 |     Q.  Okay.  To your knowledge, did Mike Johnston
19 | confess to the crime to any of the detectives?
20 |     A.  No.
21 |     Q.  And to your knowledge, did Jacob Jauregui
22 | confess to the crime to any of the detectives?
23 |     A.  No.
24 |     Q.  And if they had given confessions that were
25 | deemed unreliable, it would have been important to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 704 of 1026
The Deposition of GARARD CABOCAS, taken on 9/11/23
269

 1  document that, right?

 2      A.  Yes.

 3      Q.  So you're aware that Daniel eventually signed a

 4  statement in this case, right?

 5      A.  Yes.

 6      Q.  And Daniel confessed to committing a drive-by

 7  shooting in that statement, right?

 8      A.  Yes.

 9      Q.  And he said that Droopy and Popeye were both in

10  the car, right?

11      A.  I -- I remember the names.  I didn't read his

12  statement, but I was learning the facts from other guys

13  on the case --

14      Q.  Right.

15      A.  -- that he gave a statement.

16      Q.  And is it consistent with your memory that

17  Varrio Northeast was connected to this shooting?

18      A.  I -- I forget what gang affiliation some of the

19  people belonged to and which ones were involved.  I -- I

20  don't remember.  But I know there was.

21      Q.  And -- and you were sitting with Link Brown

22  from the detect- -- from the gang task force after

23  Daniel Villegas had been picked up, right?

24      A.  Yes.

25      Q.  So you would have expected -- if Daniel had a

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 705 of 1026
The Deposition of GARARD ACOSTA, Taken on 9/14/23  Page
270

```
1   gang affiliation, you would have expected to know that
2   by that time, right?
3       A.  Yes.
4       Q.  And David -- do you recall David Rangel putting
5   in his statement that the murder victims had thrown gang
6   signs from the Eisenhower Crazy Hoods?
7       A.  No, not that I remember.
8       Q.  Okay.  Okay.  Were you aware that multiple
9   suspects had identified Droopy and Popeye as being in
10  the car?
11      A.  I -- I remember the names, but I don't remember
12  exactly what it was.
13      Q.  Sure.
14              Does -- were you aware of Droopy and Popeye
15  being implicated in any other drive-by shootings?
16      A.  No, not that I remember.
17      Q.  Does -- does the name "Prisciliano Villegas"
18  mean anything to you?
19      A.  Can you repeat the name?
20      Q.  Yeah.  Prisciliano Villegas.
21      A.  No.
22      Q.  Did you take a statement from a Prisciliano
23  Villegas confessing to a drive-by shooting in 1992?
24      A.  Not that I remember.  I don't remember --
25      Q.  Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 706 of 1026
The Deposition of GARY OCHOA, taken on March 23, 2023

271

 1      A.  -- doing that.

 2      Q.  I'm going to pull up another exhibit.  Okay.

 3  I'm sorry.  I forgot to stop sharing there for a minute.

 4  Give me one second.

 5          Okay.  Let's mark this as Exhibit

 6  Number 18, and this is at -- these -- this is at

 7  Villegas J.S. 17107.

 8          (Exhibit 18 marked.)

 9      Q.  Going to the top of this -- I'm sorry.  I

10  should share this document with you before I ask you

11  questions about this.

12          Again, this is Exhibit Number 18.  Sir, do

13  you recognize this document as a juvenile confession

14  warning?

15      A.  Yes.

16      Q.  And this is given by Prisciliano Villegas?

17      A.  Yes.

18      Q.  And it was on February 13, 1992?

19      A.  Okay.

20      Q.  Did you know that Prisciliano Villegas was

21  Daniel's little brother?

22      A.  No.

23      Q.  Okay.  And I'm going to scroll down, actually,

24  to the bottom of this, of page 1.  Do you see the first

25  two lines of the juvenile statement?  "My name is

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 707 of 1026
The Deposition of GERARD ARBOGAST, Taken on 9/14/23, Judge
272

1  Prisciliano Villegas, and I am 13 years of age.  I am at

2  the juvenile probation department with Officer J.

3  Arbogast, giving this statement of my own free will,

4  without any promises or threats being made to me."

5      A.  Yes.

6      Q.  Go ahead.

7      A.  I have to say that's not me.

8      Q.  Oh.  Is that your brother?

9      A.  Yes.

10     Q.  I don't mean to laugh.  It's just funny because

11 it's exactly what you said before.

12     A.  Yeah.

13     Q.  Okay now.  Thank you.  I'm going to stop

14 sharing this for a minute.

15     A.  Okay.

16     Q.  Okay.  Did -- in -- in 1992, where in the

17 El Paso Poli- -- El Paso Police Department did your

18 brother work?

19     A.  Gang task force.

20     Q.  Gang task force.

21         And so he wasn't a juvenile officer at that

22 time, right?

23     A.  No.

24     Q.  Okay.  So if I told you that Prisciliano

25 Villegas confessed to a drive-by shooting in 1992, would

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 708 of 1026
The Deposition of GARY KILLHOFFER, taken on June 8, 2017
273

```
 1  you have any reason to disagree with that?
 2            MR. JIM DARNELL:  Object to speculation.
 3       A.  No.
 4       Q.  (BY MR. HILKE)  And would you have any reason
 5  to disagree that Prisciliano had named Droopy and Popeye
 6  as being in the car?
 7       A.  I wouldn't have known that, no.
 8       Q.  But would you have any reason to disagree that
 9  that -- that he had done so?
10            MR. JIM DARNELL:  Object to speculation.
11       A.  Okay.  What was the question?
12       Q.  (BY MR. HILKE)  Yeah.  No problem.  Actually,
13  let me do this a different way.
14       A.  Okay.
15       Q.  I'm -- I'm going to give you a hypothetical and
16  ask some questions about it.
17       A.  Okay.
18       Q.  The hypothetical is this:  Prisciliano Villegas
19  is Daniel's younger brother.
20       A.  Okay.
21       Q.  And in 1992, he confessed to your brother to
22  committing a drive-by shooting.
23       A.  Okay.
24       Q.  And he named Droopy and Popeye as being in the
25  car.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 709 of 1026
The Deposition of GARRET CLABUCAR, Taker on 05/26/23  Judge
274

 1        A.  Okay.

 2        Q.  He also mentioned a Marcos who was in the car.

 3        A.  Okay.

 4        Q.  And he also mentioned that the people in the

 5   car were affiliated with Varrio Northeast.

 6        A.  Okay.

 7        Q.  If all that were true --

 8        A.  Uh-huh.

 9        Q.  -- would that have been relevant to your

10   investigation?

11            MR. JIM DARNELL:  But that's speculation.

12        A.  I mean, it will only be relative that it was

13   gang affiliated.

14        Q.  (BY MR. HILKE)  If -- if -- if Droopy, Popeye,

15   and Marcos had all been linked to a drive-by shooting in

16   1992, and now in 1993 they're all being accused of that

17   again, is that something you would have wanted to know?

18        A.  Yes.  That would have been --

19            MR. ALMANZAN:  Objection, calls for

20   speculation.

21        Q.  (BY MR. HILKE)  And that information could have

22   helped prove -- if it were true, could have helped prove

23   that Marcos, Droopy, or Popeye were involved in 1993,

24   right?

25        A.  Well, they -- they -- they may have been

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 710 of 1026
The Deposition of GARY CRUCEGAST, Taker on 05/26/23  Judge
275

```
 1  involved, yes.  You would look at that.
 2      Q.  And that connection might have helped you find
 3  evidence in this case if there are these gang members
 4  with a pattern of drive-by shootings, right?
 5      A.  Yes.
 6      Q.  So -- and the gang task force was responsible
 7  for making connections between gang-related crime,
 8  right?
 9      A.  They had information on gang members, yes, and
10  they -- they -- they were with them all the time, and
11  that was their job.
12      Q.  So if there were a Varrio Northeast-affiliated
13  drive-by shooting by Daniel Villegas's brother in 1992,
14  they would have connected that to a Varrio
15  Northeast-connected drive-by shooting involving Daniel
16  Villegas in 1993, right?
17      A.  I'm not sure that I -- I can't answer that.
18  I -- I wasn't in the gang task force.  You would like to
19  have that connection, yes.
20      Q.  Sure.  That would be the kind of connection
21  that the gang task force, in your experience, tried to
22  make; is that right?
23      A.  Well, yeah.  You would try to make that, if
24  that information was out there.
25      Q.  Yeah.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 711 of 1026
The Deposition of GARY LARUDOCAST, Taker 11 on 9/26/23, Judge
276

 1           And it's not -- the hypothetical we're
 2   discussing, it's not the hardest connection in the world
 3   to make, is it?
 4       A.  No.
 5               MR. JIM DARNELL:  Object to speculation.
 6       Q.  (BY MR. HILKE)  And to your knowledge, was this
 7   connection ever made during the investigation?
 8       A.  Not that I'm aware of.
 9       Q.  And to your knowledge, is the connection
10   reflected anywhere in the case file?
11       A.  Not that I know of.
12       Q.  In -- in your investigation, you did eventually
13   learn that Popeye and Droopy were both placed in the car
14   at the time of the shooting, right?
15       A.  Yes.  I remember the names.
16       Q.  Yeah.
17               And you later learned that it was
18   impossible for Popeye and Droopy to have been in the
19   car, right?
20       A.  I -- I think I found out through Marcus that he
21   couldn't make them in the case, that...
22       Q.  Yeah.
23               And Popeye was actually incarcerated at the
24   time, right?
25       A.  I'm not sure.  I didn't have that information.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   Q.  And from your conversation with Fernando Lujan,

2   Droopy, you knew that he had checked in with his

3   probation officer before the shooting that night, right?

4   A.  Yes.

5   Q.  Okay.  So did you ever find out why Daniel had

6   named these people as being in the car who could not

7   have been there?

8   A.  No.  I -- I have no idea.

9   Q.  Did you ever find out why other suspects also

10  named Droopy and Popeye as present in the car?

11  A.  No.

12  Q.  To your knowledge, was any investigation done

13  to find out why?

14  A.  Well, I'm not sure.  I don't remember that.

15  Q.  Okay.

16  A.  I -- I know I -- if you're -- if there was any

17  follow-up, I -- I interviewed Fernando Lujan, who you

18  say was supposed to be Droopy.  I mean, that would have

19  been a follow-up to see if he was involved, but --

20  Q.  Right.

21  A.  -- if there was any involvement on my part on

22  any part of that, I wouldn't know.

23  Q.  Okay.  Did you ever ask Fernando Lujan why all

24  these other people would have said he was in the car?

25  A.  No.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 713 of 1026
The Deposition of GARY GARDNER-BAKER, taken on 05/26/23  JUDGE
278

1      Q.  Would you agree that the confessions in this

2  case are less reliable because they all name two people

3  as being present who could not have been there?

4              MR. JIM DARNELL:  Object to speculation.

5      A.  Yeah, I'm not aware of that.  I -- I don't

6  know.

7      Q.  (BY MR. HILKE)  Okay.  Well, you're aware that

8  Daniel Villegas said that Droopy and Popeye were in the

9  car, right?

10     A.  I -- I remember the names.  I'm -- I'm trying

11 to place where that information came from.

12     Q.  And so --

13             MR. HILKE:  I'm sorry.  Someone's audio is

14 on, and we've got a little background noise coming in.

15             MR. JEEP DARNELL:  (Indiscernible.)

16     Q.  (BY MR. HILKE)  I guess my question is --

17             MR. JEEP DARNELL:  (Indiscernible.)

18     Q.  (BY MR. HILKE)  -- you mentioned before that

19 you looked --

20             MR. HILKE:  I'm sorry.  Someone's got noise

21 coming in, and it looks like it turned off.  No, it's

22 still coming in.  Hey, who is that?

23             MR. JEEP DARNELL:  Yes.  It's my apologies

24 for bringing --

25             UNIDENTIFIED SPEAKER:  Oh, no.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 714 of 1026
The Deposition of EARL ARBOGAST, taken on June 30, 2022
                                                            279

 1                    MR. HILKE:  Who's -- Jeep, is that you?

 2                    (Indiscernible.)

 3                    MR. HILKE:  Let -- let's go off the record

 4    a second.

 5                    THE VIDEO TECHNICIAN:  Okay.  We're off the

 6    record.  The time is 5:03.

 7                    (Break taken.)

 8                    THE VIDEO TECHNICIAN:  We're back on the

 9    record for the deposition of Earl Arbogast being

10    conducted by videoconference.  My name is Sydney Little.

11    Today is June 30th, 2022, and the time is 5:05.

12        Q.  (BY MR. HILKE)  You mentioned -- is it correct

13    that in taking a confession, you look for corroborating

14    information?

15        A.  Yes.

16        Q.  And what Daniel said, that Droopy and Popeye

17    were in the car, that was found to be false, right?

18        A.  And I -- I don't think a Droopy or Popeye were

19    ever, you know, arrested to corroborate that, so, yeah,

20    there was no corroboration as far as to that fact.

21        Q.  Yeah.  And so that's almost the opposite of

22    corroboration, right?  That's an inconsistency in a

23    confession, right?

24        A.  Well, that would be, yes.

25        Q.  Okay.  And inconsistencies like that, that's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 715 of 1026
The Deposition of GARRET ASBOCABA, Taken on 5/24/23, Judge
280

1  why you look for corroboration, right?  Because the more

2  inconsistencies, the less reliable the confession is,

3  right?

4      A.  You -- I agree that you try to get as much

5  corroboration you can in a confession.

6      Q.  And if a confession has -- as -- the more

7  details a confession has that you find to be untrue,

8  that casts increasing doubt on the confession, right?

9      A.  Well, that's assuming that -- you know,

10  sometimes suspects don't tell you the truth all the

11  time.  If he had -- if he had other people that were

12  with him and he didn't want to name them and he named

13  somebody else, I mean, that could be an explanation.

14  But I'm just saying, as a rule, corroboration is

15  something that you try for.

16      Q.  Yeah.  Because the more corroboration you get,

17  the more reliable a confession generally is, right?

18      A.  Yes.

19      Q.  And are you aware of any physical evidence that

20  corroborated Daniel Villegas's confession?

21      A.  No.

22      Q.  And did you investigate whether Daniel's

23  description of the car matched the survivors'

24  description of the car?

25      A.  I -- I don't know what his description was.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 716 of 1026
The Deposition of GARARD AMOUCAS, taken on June 3, 2010

281

 1    Q.  Right, but did -- did you investigate whether
 2  the descriptions of the car matched?
 3    A.  Well, from Daniel, you mean?
 4    Q.  Yes, sir.
 5    A.  I -- I didn't investigate that, no, that part
 6  of it.
 7    Q.  And so sitting here today, can you state
 8  whether you learned during the investigation that Popeye
 9  was incarcerated?
10    A.  Yeah, I don't know if he was.
11    Q.  Okay.  If during the investigation detectives
12  learned that Popeye was incarcerated, that should have
13  been documented, right?
14    A.  If that's the same Popeye, yeah, it should have
15  been.
16    Q.  Okay.  And the investigation should have
17  included finding out whether -- where Popeye was on the
18  night of the murder, right?
19    A.  Well, if he was in jail, I don't know if that
20  was necessary.
21    Q.  Right.  If -- if you knew he was in jail, then
22  your investigation is done, right?
23    A.  Yes.
24    Q.  But as the -- as someone in the car during a
25  drive-by shooting, a thorough investigation has to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 717 of 1026
The Deposition of GARY CARBOCA????, taken on ????
282

 1  include investigating whether Popeye was there,

 2  incarcerated, or something else, right?

 3      A.  Yes, you would think so.

 4      Q.  Eventually, Daniel was charged in this case,

 5  right?

 6      A.  Yes.

 7      Q.  And the police department was responsible for

 8  presenting the case to be charged, right?

 9      A.  Yes, to the -- yes.

10      Q.  Did you ever tell the prosecutor's office that

11  Droopy or Popeye could not have been in the car at the

12  time of the murder?

13      A.  I -- I didn't.  I wasn't -- I was never a part

14  of the case until -- I never went to either trial.  I

15  never had a conference with the prosecutors when the

16  case was being prosecuted.

17      Q.  To your knowledge, did anyone tell the

18  prosecutor's office that Droopy or Popeye could not have

19  been in the car at the time of the murder?

20      A.  Not that I know.

21          MR. JIM DARNELL:  Object, speculation.

22      Q.  (BY MR. HILKE)  Okay.  So I'm -- I'm going to

23  change topics for a minute.  I'm going to ask you a few

24  financial questions, and the reason I'm asking you these

25  is if we decide to seek -- I don't -- I won't go into it

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 718 of 1026
The Deposition of GARD DOHDCATS, taken on June 43, 2019
283

```
 1   too much, but is -- if we decide to seek punitive

 2   damages at trial.  That's the relevance.

 3        A.   Okay.

 4        Q.   Do you currently own any property?

 5        A.   Yes.

 6        Q.   You have a house?

 7        A.   Yes.

 8        Q.   What's the approximate worth of the house?

 9        A.   About 280,000, I would guess.

10        Q.   And do you have any debt on that house?

11        A.   No.

12        Q.   And do you own any other property?

13        A.   No.

14        Q.   Do you own any vehicles?

15        A.   Yes.

16        Q.   How many?

17        A.   I have four right now.

18        Q.   What's the first one?

19        A.   I have a 1998 Jeep.

20        Q.   And what's the second one?

21        A.   I have a 2020 Toyota CHR.

22        Q.   Okay.  Is there any debt on the CHR?

23        A.   No.

24        Q.   Okay.  And what's the third one?

25        A.   It's a 2016 Ram truck.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 719 of 1026
The Deposition of EDWARD DUBOCAGE, Taken on 09/28/23  June
284

```
 1        Q.  Okay.  Any -- any debt on that one?

 2        A.  No.

 3        Q.  And what's the fourth one?

 4        A.  A 20-, I guess, -18 Subaru.

 5        Q.  Okay.  Any debt on that one?

 6        A.  Yes.

 7        Q.  How much?

 8        A.  I -- it's small.  I don't know exactly what it

 9   is.

10        Q.  Okay.  Do you own any stocks?

11        A.  Savings and mutuals, savings.

12        Q.  Savings and mutuals?  About how much is in your

13   savings and mutuals?

14        A.  I don't know exactly.  I would guess maybe

15   around 150-, but I could be off.

16        Q.  Okay.  And -- and do you have money in a

17   checking account?

18        A.  Yes.

19        Q.  About how much?

20        A.  Today, before all my bills, it's about 15,000.

21        Q.  Okay.  And do you currently draw a pension from

22   El Paso?

23        A.  Yes, I do.

24        Q.  And about how much is that?

25        A.  It's about $61,000 a year.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 720 of 1026
The Deposition of RICHARD DOUGLAS Baker, taken on 9/12/22 Judge
285

 1    Q.  Okay.  And you also worked at the University of
 2  Texas; is that right?
 3    A.  Yes.
 4    Q.  Did you draw a pension from that?
 5    A.  Yes.
 6    Q.  About how much?
 7    A.  It's about 24,000.
 8    Q.  Okay.  And do you own any valuables worth more
 9  than $5,000, like collectibles, guns, anything like
10  that?
11    A.  No.
12    Q.  Okay.  And do you currently support any
13  dependents?
14    A.  No.
15    Q.  You don't have any kids under 18 who you
16  support?
17    A.  Under 18, no.  I mean, no.
18    Q.  Yeah.  And you don't have any like older
19  relatives who you're financially responsible for?
20    A.  No.
21    Q.  Okay.  And do you currently have any -- any
22  credit card debt?
23    A.  My credit card debt is zero.
24    Q.  Okay.
25    A.  I -- I have a credit card.  I just pay it off

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 721 of 1026
The Deposition of GARY CARDWELL, taken on June 4, 2013
286

```
 1  at the end of every month.
 2      Q.  Yeah.
 3              Do you have any debts of any other kind?
 4      A.  No.
 5      Q.  Okay.  Sitting here today, do you believe that
 6  Daniel Villegas was guilty of murdering Lazo and
 7  England?
 8      A.  I don't know.
 9      Q.  If it were up to you, would Daniel Villegas
10  still be in prison?
11              MR. JIM DARNELL:  Object to speculation.
12      A.  It's hard to say.  I -- I really don't know.
13      Q.  (BY MR. HILKE)  So sitting here today, you
14  think it's possible that Daniel Villegas was wrongly
15  convicted?
16      A.  I mean, it happens, so it's always possible,
17  yes.
18      Q.  And would you have the same hesitation about
19  everyone who's been convicted of homicide through an
20  investigation you were involved in?
21      A.  No.
22      Q.  If you did this investigation again, would you
23  do anything differently?
24              MR. JIM DARNELL:  Object, speculation.  He
25  wasn't the case agent.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 722 of 1026
The Deposition of GARARDO ALLHOCAS, taken on MARCH 4, 2016
287

 1      Q.  (BY MR. HILKE)  Okay.  You can answer.

 2      A.  If I was to do anything differently?  I -- I

 3  don't know.

 4      Q.  **Are there any interviews you conducted where**

 5  **you would have asked more questions given a second**

 6  **chance?**

 7              MR. JIM DARNELL:  Object --

 8      A.  At that --

 9              MR. JIM DARNELL:  -- speculation.

10      A.  Yeah.  It's -- I -- I don't really know.  I

11  mean, I may have looked at -- harder at some suspects or

12  something, but I -- I wasn't in Detective Marquez's

13  shoes, so I can't say I wouldn't have done the same

14  thing he did or not.

15      Q.  (BY MR. HILKE)  Yeah.

16              MR. HILKE:  Those -- those are all the

17  questions I have, sir.  Thank you for your time today.

18              THE WITNESS:  Thank you.

19              MR. JIM DARNELL:  Wait.  He has -- at least

20  one other person.

21              MR. ALMANZAN:  This is Andy Almanzan.

22  We'll reserve our questions for this witness until the

23  time of trial.

24              MR. TSCHIRHART:  Jim, I think I'd like to

25  ask just one little follow-up issue.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 723 of 1026
The Deposition of GARY ARBOGAST, taken on 04/23/19  Page
288

```
 1              MR. HILKE:  Okay.
 2                        EXAMINATION
 3  BY MR. TSCHIRHART:
 4      Q.  Mr. Arbogast, back early in your deposition,
 5  you talked about the case agent binder.  Do you recall
 6  that?
 7      A.  Yes.  Yes.
 8      Q.  All right.  And I think you said something
 9  about -- later in your testimony, and I may have
10  misheard it, but at the time of Daniel Villegas's
11  arrest, was -- was that case agent binder where all the
12  information was kept, or was that a process that came
13  into effect later?
14      A.  No, it's -- it's something that the -- the case
15  agent always keeps.
16      Q.  Okay.  That -- that was the only question I
17  had.  Because it appeared that there were
18  contemporaneous reports that were written throughout
19  the -- the investigation.
20      A.  There are.  They're -- they're given to the
21  case agent, and he puts them in the binder.
22              MR. TSCHIRHART:  Okay.  That was the only
23  question that I had.  Thank you for your time.
24              THE WITNESS:  Okay.
25              MR. JIM DARNELL:  Can we be free?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 724 of 1026
The Deposition of GERARD ALBUCAS, taken on March 3, 2023

289

```
 1                MR. MARTINEZ:  Yeah.  Nothing from me.
 2                THE REPORTER:  Before we go off the record,
 3   I need to get orders on the record.  Mr. --
 4                MR. ALMANZAN:  This is Andy.  Ginger, this
 5   is Andy.
 6                THE REPORTER:  Yes.
 7                MR. ALMANZAN:  I -- I do not need a copy.
 8   I'm not ordering one.
 9                THE REPORTER:  Thank you.
10                MR. ALMANZAN:  Thank you.
11                THE REPORTER:  Mr. --
12                MR. MARTINEZ:  Same thing, Ginger.  I'm not
13   ordering.
14                THE REPORTER:  Okay.  That's Mr. Martinez?
15                MR. MARTINEZ:  Yes, ma'am.
16                THE REPORTER:  And then, Mr. Tschirhart?
17                MR. TSCHIRHART:  I believe I won't be
18   ordering, either.
19                THE REPORTER:  Okay.  Mr. Brittain?
20                MR. BRITTAIN:  No, ma'am.
21                THE REPORTER:  And, Mr. Darnell?
22                MR. JIM DARNELL:  Yes.  We will take a copy
23   of the deposition and the video.
24                THE REPORTER:  And do you want them -- what
25   format?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 725 of 1026
The Deposition of GARDNER LUCAS, Taken on 9/26/22   Page
290

```
1                MR. JIM DARNELL:  Shoot, I don't know.

2                THE REPORTER:  I think you usually do

3    E-Tran.

4                MR. JIM DARNELL:  Probably.  And a

5    full-size copy.

6                THE REPORTER:  Okay.  And then, Mr. Hilke,

7    what format do you want your depo in?

8                MR. HILKE:  Yes.  So we'll do just the

9    transcript, not a video.  What's the cheaper of the

10   transcript options?  Because I think that's what we will

11   want.

12               THE REPORTER:  It's all the same as far

13   as -- I mean, don't know billing, honestly.

14               MR. HILKE:  Okay.

15               THE REPORTER:  I think it's all the same no

16   matter what format you get.

17               MR. HILKE:  I think -- I think we'll --

18   we'll be happy with like a PDF version.  I -- I guess

19   I trust you on it.  I -- I'm not sure what the

20   difference is.

21               THE REPORTER:  Okay.  And then,

22   Mr. Darnell, do you want read and sign?

23               MR. JIM DARNELL:  Yes, please.

24               THE REPORTER:  Okay.  That's all my

25   information.  Thank you.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 726 of 1026
The Deposition of EDWARD AMBROCAST, taken on June 23, 2020
291

```
 1                   THE VIDEO TECHNICIAN:  All right.  Did
 2  anybody else want a copy of the video?  No.  Okay.
 3                   We're going off the record.
 4                   (Deposition concluded at 5:19 p.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 727 of 1026
The Deposition of GERARD ATHEY, taken on June 23, 2022

292

1               C E R T I F I C A T E

2

3  STATE OF TEXAS        )

4  COUNTY OF EL PASO   )

5

6

7

8         I, Ginger G. Zachary, Registered Professional

9  Reporter, Certified Realtime Reporter, and Certified

10  Shorthand Reporter in and for the State of Texas, hereby

11  Certify that this transcript is a true record of the

12  said proceedings, and that said transcription is done to

13  the best of my ability.

14         Given under my hand and seal of office on

15  July 13, 2022.

16

17

18         _____

19                    Ginger G. Zachary, CSR, RPR, CRR
                       Texas Certification Number 5710
                       Date of Expiration:  1/31/2024
20                    KENTUCKIANA COURT REPORTERS
                       730 West Main Street, Suite 101
21                    Louisville, Kentucky  40202
                       Ph.:  502.589.2273

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 728 of 1026
The Deposition of EARL ARBOGAST, taken on June 30, 2022
293

1          CORRECTIONS AND SIGNATURE

2   WITNESS:  EARL ARBOGAST          DATE:  JUNE 30, 2022

3   PAGE  LINE  CORRECTION              REASON

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 729 of 1026
The Deposition of EARL ARBOGAST, taken on June 24, 2020
294

1        I, EARL ARBOGAST, have read the foregoing

2   deposition and hereby affix my signature that same is

3   true and correct, except as noted above.

4

5                         _____

6                         EARL ARBOGAST

7   THE STATE OF TEXAS  )

8   COUNTY OF EL PASO   )

9

10        Before me, _____, on this

11  day personally appeared EARL ARBOGAST known to me (or

12  proved to me under oath or through _____)

13  (description of identity card or other document) to be

14  the person whose name is subscribed to the foregoing

15  instrument and acknowledged to me that they executed the

16  same for the purposes and consideration therein

17  expressed.

18        Given under my hand and seal of office this

19  _____ day of _____, _____.

20                         

21                         _____
                           Ginger G. Zachary

22                         NOTARY PUBLIC IN AND FOR
                           THE STATE OF TEXAS

23  My commission expires: _____

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 730 of 1026
The Deposition of EARL ARBOGAST, taken on June 30, 2022
295

**Exhibits**

**Exhibit1_ Arbogast** 48:14,20

**Exhibit2_ Arbogast** 85:19,22

**Exhibit3_ Arbogast** 86:19

**Exhibit4_ Arbogast** 105:6 110:18 196:22

**Exhibit5_ Arbogast** 120:5,9

**Exhibit6_ Arbogast** 126:14,15

**Exhibit7_ Arbogast** 132:20 133:1,2

**Exhibit8_ Arbogast** 148:13

**Exhibit9_ Arbogast** 156:7,8 260:2

**Exhibit10_ Arbogast** 4:19 161:17,19 174:18,20

**Exhibit11_ Arbogast** 4:21 175:1,2,4,7

**Exhibit12_ Arbogast** 4:23 183:21,22 184:20

**Exhibit13_ Arbogast** 4:24 207:13,17

**Exhibit14_ Arbogast** 5:3

226:10,12

**Exhibit15_ Arbogast** 5:5 233:16,17 244:22

**Exhibit16_ Arbogast** 5:7 254:12,13,14

**Exhibit17_ Arbogast** 5:8 262:11,12

**Exhibit18_ Arbogast** 5:11 271:5,6,8,12

_____

**$**

**$5,000** 285:9

**$61,000** 284:25

_____

**-**

**-18** 284:4

**-A-S-T** 8:25

**-O-G-** 8:24

_____

**0**

**01** 48:15

**02** 85:20

**03** 86:20

**04** 105:8

**0400** 228:5

**05** 120:11

**06** 126:17

**07** 132:25 133:3

**08** 148:14

**09** 156:9

_____

**1**

**1** 48:14,20 271:24

**10** 161:17,19 174:18,20 187:16,21

**101** 6:5

**10:12** 50:20

**10:21** 50:20,24

**10:55** 75:10

**10:56** 75:15

**11** 175:1,2,4,7

**11:00** 191:23

**11:15** 192:4

**11:27** 98:13

**11:30** 191:25 192:5,7

**11:39** 98:18

**11:40** 99:14

**11:41** 99:19

**12** 11:24 147:8 149:2 183:21, 22 184:20

**126254355** 8:1

**12:54** 154:5

**12th** 49:1

**13** 207:13,17,19 271:18 272:1

**14** 226:10,12

**15** 146:1 150:1 175:6 180:12 187:16,21 205:22 208:14 233:16,17 234:2 244:22

**15,000** 284:20

**150-** 284:15

**15741** 48:20

**15743** 148:19

**15774** 161:21

**15779** 207:16

**16** 254:13,14 262:14 265:3

**17** 262:11,12

**17107** 271:7

**18** 127:20 271:6,8,12 285:15,17

**19-** 28:24

**1904** 226:11

**1977** 16:18 208:12 233:25

**1978** 125:21 126:20 127:20

**1981** 132:16 133:8

**1986** 19:7,8

**1988** 26:16

**1992** 119:20 120:19 270:23 271:18 272:16, 25 273:21 274:16 275:13

**1993** 24:12,17, 20 30:14,18 31:6 32:25 33:5,8,21,24 34:5 37:9,13 39:14 41:18 44:24 47:11 49:1 50:25 67:16 73:20 79:11 93:18 103:23 139:4 141:7,8,16 142:16,18 147:8 149:2 156:16 159:16, 25 162:1 260:3 262:14 265:3 274:16,23 275:16

**1994** 28:25 29:16,20

**1998** 283:19

**1:00** 146:2

**1:15** 215:22

**1:44** 154:10

_____

**2**

**2** 85:19,22

**20** 11:25 127:10

**20-** 284:4

**2011** 175:6

**2014** 11:2

**2016** 283:25

**2020** 283:21

**2022** 6:6 50:24 75:15 98:18 99:19 154:10 196:2 233:6 279:11

**21** 159:16,24 162:1 252:15

**21495** 105:7

**21502** 105:22 197:13

**21503** 110:19

**21505** 196:24 199:2

**24,000** 285:7

**25** 11:25

**265** 156:8

**267** 262:11

**27** 133:8

**280,000** 283:9

**29** 126:19 208:12

**2:25** 120:19

**2:42** 195:22

**2:52** 196:2

**2nd** 233:25

_____

**3**

**3** 86:19 199:3

**30** 167:22 183:19 187:1



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 731 of 1026
The Deposition of EARL ARBOGAST, taken on June 30, 2022
296

**30th** 6:6 50:24
75:15 98:18
99:19 154:10
196:2 233:6
279:11

**3:15-CV-386**
6:12

**3:43** 233:1

**3:44** 228:23
229:7

**3:59** 233:6

---

**4**

**4** 105:6 110:18
196:22 207:20

**4-15-93** 260:5

**4-21-1993**
159:9

**40202** 6:5

**4:00** 229:2,17

**4:03** 227:5,20
228:10,14

---

**5**

**5** 120:5,9
254:23

**5-6-93** 156:23

**50** 31:16

**54** 127:17

**55571** 134:3

**55572** 133:2

**55632** 126:16

**55685** 127:17

**5700** 183:24
251:20

**5710** 7:22

**5:00** 164:25
165:7

**5:03** 279:6

**5:05** 279:11

**5:19** 291:4

---

**6**

**6** 126:15 260:3

**68** 15:17

**6:28** 234:12

**6th** 156:15

---

**7**

**7** 120:19
132:20,21
133:2

**7.02.009**
105:25

**7.02.01** 199:3

**7.02.012**
196:25

**7.02.209**
197:13

**730** 6:4

**752** 228:23

**765** 127:2

**7:20** 162:4
164:22,23
165:11

---

**8**

**8** 105:22 148:13

**8-** 120:5

**8140** 162:16

**824** 255:18

**8865** 85:22

**8898** 120:10

**8907** 86:19,21

---

**9**

**9** 156:8 260:2

**9:00** 164:25
165:7

**9:12** 6:7

**9:45** 127:20

---

**A**

**A-R-B-** 8:24

**a.m.** 6:7 50:20,
24 75:10,15
127:21 215:22
227:5,20
228:10,14,23
229:2,17
234:12

**absolute** 52:13

**abuse** 29:11,12

**abused** 133:21

**academics**
16:23

**academy**
16:13,15,17,19,
22 17:15,23

**accept** 112:11

**accepted**
109:22

**access** 46:5,8
202:6

**accessible**
46:7

**accident** 63:8

**accidental**
73:1

**accomplices**
227:25

**accomplished**
41:6

**accor-** 72:23

**account**
284:17

**accurate** 43:23

**accusations**
59:8,18 250:20

**accuse** 59:1,
17,21,25

**accused** 93:8
94:21 125:20
132:15 274:16

**acknowl-**
191:19

**acronym**
193:6

**active** 261:18

**actual** 120:2
164:19 167:18
184:16

**add** 76:7 78:15
201:14

**additional**
63:16 194:10

**address** 84:2
107:15 154:16
176:1,2,18

**addressed**
83:23 218:22

**adequate**
15:11 40:24

**adjacent**
164:15

**admi-** 253:9

**administer** 8:2

**admission**
65:11,20

**admitted** 63:20
191:19

**adult** 102:25
103:5,8 181:23
182:3 202:14

**adults** 101:5,
15 103:21

**advance** 79:20

**advanced**
101:12

**advised**
123:25 124:3

**advising** 17:17

**affairs** 75:17,
21 76:2,5,10,24
77:2,4,5,24
78:2 80:15

**accused** 81:12,14,21
82:2,4 118:22
120:17 124:4,
21 125:1,14
131:24 132:1,8
133:6 134:14
135:2,16,25

**affect** 10:6,9

**affected** 248:1

**affecting**
29:21,25 30:7

**affidavit** 38:17,
19,21 39:7,9
166:14 170:20
171:4,5,10,13,
23,24,25
172:18 173:12,
14,16,18,25
174:1,8 214:3,5

**affiliated**
274:5,13

**affiliation**
269:18 270:1

**afternoon**
199:21

**age** 272:1

**agent** 41:25
42:2 45:1 46:5,
9,16 47:3,6,15,
19 143:16
177:10 185:18
286:25 288:5,
11,15,21

**agent's** 45:3,
12

**agree** 7:15
33:8,23 35:22
53:3 67:23
70:20 82:12
84:13 108:9
159:25 211:20
212:12 245:7,
10,20 246:2,5
278:1 280:4

**agreed** 245:16
258:5

**agreement**
245:18,19,20

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 732 of 1026
The Deposition of EARL ARBOGAST, taken on June 30, 2022

297

**Aguilera**
228:7,11 229:3,
17 231:21

**ahead** 76:9
106:23,24
108:1,3,17
109:9 120:1,12
128:18 132:18
133:16 138:17
149:4 152:2
153:11 159:2
161:15 162:20
186:11 198:16
229:6 232:16
233:15,18
235:11 239:24
245:13 248:4
262:23 264:25
265:1 272:6

**air** 99:8,11

**al-** 45:8

**Alfonso** 7:2
162:18 245:7,
10 255:25

**all's** 102:22

**allegations**
236:23 237:1

**alleged** 133:20

**alleging**
125:25 126:4

**Almanzan**
6:24 50:19
106:19 107:11,
22,24 108:13
110:14 117:17
118:5 152:15,
17,20,24 153:3
198:4,14,20,22
200:16,19,23
229:4 236:3
240:25 245:12
264:16,19,23
274:19 287:21
289:4,7,10

**ambiguous**
117:18

**amount** 59:3
90:22

**Ana** 259:17

**ancillary** 47:16

**Anderson**
132:16 133:10

**Andy** 6:24
107:4 153:1
264:21 287:21
289:4,5

**animal** 101:3

**answering**
135:24

**answers** 9:8

**Antonio** 6:23

**anxiety** 60:24
61:3,17

**anymore** 28:5
30:9

**apartment**
158:4

**apartments**
251:21

**apologies**
278:23

**apologize**
134:5

**apparent**
155:10

**apparently**
179:5 268:10

**appearance**
6:14

**appeared**
288:17

**appearing**
6:25 7:5

**apply** 52:5
197:8

**apprised**
261:21

**approach**
35:13,18

**appropriately**
225:15

**approval**
227:4,13,14,15

228:16

**approve** 41:10,
12

**approved**
188:18 228:10
234:11

**approving**
209:2

**approximate**
283:8

**Approximately**
18:13 19:5

**April** 24:12,16,
20 49:1 120:19
147:8 149:2
159:16,24
162:1 252:15
262:14 265:3

**Arbogast** 6:8
7:5,10,12,16
8:5,23,24 50:22
75:13 86:23
87:6 98:16
99:17 123:3
127:18 133:13
134:7 154:8
195:25 233:4,
20 262:17
272:3 279:9
288:4

**area** 27:4,5,6
87:7 98:9
111:10 194:21,
23,24 195:1,5

**areas** 109:22,
23 111:14

**argumentative**
245:12

**arm** 91:23

**Armando**
125:20 126:22
139:16 146:23
149:7,12,17,21,
23 150:3,7
151:25 152:5
211:10

**Armando's**
149:8,17

**arms** 91:15

**Army** 16:4,6,8

**arose** 60:18

**arrest** 17:16,20
35:10 102:14
134:12 170:13,
18 175:17
177:6 181:23
182:3 187:4
199:7,10,17
214:1 288:11

**arrested** 91:10
112:9 176:2
179:6,11 182:1
198:12 200:22,
25 201:7 204:9
279:19

**arresting** 35:6,
20

**arrive** 178:5

**arrived** 155:2,
6,16 189:2
191:15,22

**asks** 222:9

**aspects**
260:14 261:2

**assessment**
135:16 247:12

**assign** 26:2

**assigned** 21:9
23:25 46:13
89:14 143:15
170:12 171:1

**assignment**
17:24 18:3,7,10
19:9 29:9

**assistant**
199:9

**assume** 9:21
206:15 249:11

**assumes**
136:21

**assuming**
54:15 203:6
238:14,22
280:9

**arms** 91:15

**Atlas** 18:15

**attach** 144:18

**attached** 64:8
124:5

**attempted**
206:14

**atten-** 6:20

**attend** 33:4

**attended** 32:15
51:1

**attending**
6:14,15,18,22

**attention**
115:2 157:7

**attest** 173:20

**attesting** 38:12

**attorney**
14:13,14 21:23
75:6

**audio** 14:1
199:24 278:13

**August** 208:12

**author** 208:21

**authorities**
201:15,16,18

**automatically**
227:9

**autopsy** 27:2

**Ave** 183:24

**avenue** 184:2

**avoid** 35:6
54:17 58:19
65:22 66:16
70:21 73:8
107:9 251:25

**aware** 31:6
82:24 87:25
88:3,8,11 93:3
101:22 147:20
151:15 153:14
155:22,23
158:16 169:5,
13 201:10
203:14 212:16
213:23 215:21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 733 of 1026
The Deposition of GARY ARBUCAS, Taken on June 24, 2022
298

217:19 218:5
251:14,15,23
252:2,17
258:17,18
265:17 267:24
268:8,15 269:3
270:8,14 276:8
278:5,7 280:19

**B**

**back** 16:20
17:9,13 23:20,
24 24:20 50:21
58:5 75:12
78:3,14,23
79:4,7 82:2,3
98:15 99:16
106:13 108:8
117:3,6 118:21
126:19 128:25
130:19 135:19
136:5 139:3
150:2 154:7
161:22 164:12,
20 169:10
171:25 172:6,
19 173:19
176:20 177:9,
12,16 180:15
189:6,23 192:2
194:1,20,23,25
195:5,24 199:1
203:5 205:2
214:21 218:21
221:7,9,24
222:3 223:6,9
233:3 234:16
243:10 244:20
246:9 251:5,6
255:20 258:6,9
259:15,16,17
279:8 288:4

**background**
278:14

**backs** 164:11

**backseat**
223:20,21

**bad** 63:8 64:6,
11 153:3
207:24

**badge** 127:2,4,

6 255:18

**bait** 22:17

**barely** 27:4

**based** 19:17
119:9,13
211:20

**basic** 50:6

**basically**
30:13 31:25
39:18 57:11
74:3,15 82:10
83:22 87:22
92:14 115:24
185:6

**basis** 59:6
61:22 101:11
103:1

**basketball**
204:18

**bat** 114:8

**Bates** 126:15
148:16 254:23

**baton** 126:2

**bay** 163:14,15

**beat** 103:7,8

**beating** 91:24

**bed** 154:21

**beforing**
113:20

**began** 123:19

**begin** 152:25
201:4

**beginning**
84:7 229:11

**behalf** 7:6

**believed** 59:11

**Bellows** 7:7

**belonged**
269:19

**benefit** 61:25

**big** 163:14

**billing** 290:13

**bills** 284:20

**binder** 42:1
45:1,3,12
288:5,11,21

**birth** 48:5
49:13 205:14
208:11 233:25

**bit** 29:21,25
48:21 85:23
99:4 122:3
128:1,25
129:24 141:6
148:17 149:20
150:11 159:4
175:8 176:5,6
195:17 210:14
213:21 230:5
234:17 247:15,
20 262:25
263:4,10

**blame** 211:17

**blank** 113:15

**blocked**
209:21

**blow** 135:22

**Bosanko**
262:4,17
263:16 264:1,
11 265:14,25
267:8

**bottom** 86:14
87:1 122:25
123:24 157:2
159:6 162:21
208:17 210:17,
18 226:25
227:3,22 234:8
240:1 254:25
255:3 271:24

**bounds** 18:14

**boy** 8:24 237:2,
7 246:24

**boys** 247:6
249:10 251:16
253:22

**Brady** 117:12,
16,21,23

**bragging**

256:7 260:10

**branch** 16:3

**break** 10:1
50:12,15,20
75:8,11 98:9,14
99:15 154:3,6
195:15,23
232:19 233:2
279:7

**break-in** 26:21

**breaks** 9:24

**briefed** 155:3,4
238:15

**briefing** 238:20

**bring** 174:4,8
189:15 258:5,9
259:19,22

**bringing**
278:24

**Brittain** 7:6
289:19,20

**broke** 91:22
149:22 246:15

**brother** 81:1,3
140:5 147:3
150:14 271:21
272:8,18
273:19,21
275:13

**brother-in-law**
263:16 264:12
265:6

**brothers** 146:9
152:16 157:12,
21

**brought** 116:3
119:10 157:24
169:10

**Brown** 190:20,
24 192:13,16,
19 214:19,20
269:21

**building** 189:7,
24 190:1,12,13
192:9,23
214:16,25
220:23 221:4

**buildings**
193:4

**bullet** 110:20
115:3

**bunch** 74:5

**bureau** 121:3,
4,6

**burglary** 26:23

**busy** 23:11
165:6

**C**

**California**
32:24

**call** 77:16
154:15,20
157:7 215:6,11,
17 219:18
220:18,19
237:19 264:14

**called** 26:1
27:1 28:18,20
81:16 96:7
144:16 164:6
165:18 166:4
182:23 184:11
215:15,18
216:11

**calls** 106:19
108:13 117:17
118:5 124:11
138:15,24
198:4,14,22
200:16,18,23
211:24 229:4
236:3 240:25
274:19

**camera** 7:11

**CAP** 45:9 55:11
76:13 82:2,3,7
89:13 91:7
94:23,24 95:2
108:21 109:4
136:11 157:24
163:11,12,13
164:24 169:10
172:1,6,7,11,20
176:20 177:9
183:16 187:11,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 734 of 1026
The Deposition of EARD ARBOGAST, Taken on June 30, 2020
299

14,23 188:2,11, 12 205:2 220:12 236:8 248:10

**car** 18:24 35:16 119:14 126:5, 10 182:11,13, 20 206:3 211:9 218:10,12 220:1,5 222:21 223:8,16,20 225:2 234:22 235:13,19 237:3,8 240:16 242:17 248:15, 16,21,23 249:24 256:16 269:10 270:10 273:6,25 274:2, 5 276:13,19 277:6,10,24 278:9 279:17 280:23,24 281:2,24 282:11,19

**card** 181:6,8,10 285:22,23,25

**cards** 179:18, 22

**career** 29:14 75:16 85:4

**careful** 101:1, 16 257:2

**Carlo** 248:21

**Carlos** 6:25 106:16 107:20 108:10 143:6, 18,22 145:14, 15 191:22 192:3,16 194:4 232:11

**cars** 178:4

**case** 6:12 12:11,16 13:23 26:4,25 27:12 28:5,7,9 32:13, 14 34:22,23 38:16 41:25 42:2 43:16 44:25 45:1,3,12 46:5,9,10,16

47:3,6,8,15,19 52:5 53:12 57:17,24 58:11 59:2 64:9 75:3, 4 77:19 80:9, 10,18,25 83:19, 21,22 100:5 102:16 103:2 104:14 106:7 109:2 112:19 115:6,17 116:2, 10,18 121:20 122:12,20 123:9,11 136:16,23 143:12,15 144:19 146:7, 15 155:22 157:20 158:10 165:15 177:7, 10 181:19 185:18 203:3 211:22 216:16 217:20 218:3 227:19 229:16 236:23 239:6 242:8 244:13 246:10 253:4 256:10 260:14 261:3,21 266:5 269:4,13 275:3 276:10,21 278:2 282:4,8, 14,16 286:25 288:5,11,14,21

**case-by-case** 26:4 59:6 61:22 101:11 103:1

**caseload** 125:7,11,16

**cases** 21:9,17, 20 47:13,15,18 56:16 80:25 81:2 83:20 89:14 93:10 113:4 134:21 143:8,15,17,19 164:8 165:2,4, 8,19 201:16 226:5

**casings** 155:16

**casts** 280:8

**catch** 22:20 29:23

**catching** 174:25

**catty-corner** 164:12

**caught** 61:12

**caused** 81:6

**center** 183:17 187:9

**central** 44:25

**certificate** 152:21

**chance** 129:1 211:3 240:6 262:20 287:6

**change** 24:9, 16 136:6 282:23

**changed** 24:6, 11 25:25 26:3 91:3 93:20 127:8 231:4

**Chaparral** 7:23 160:9 260:9

**Chapter** 105:10

**charge** 212:15 213:9

**charged** 169:3 212:16,18 282:4,8

**charging** 21:23 213:12

**Charlie** 12:5 106:12 147:5,7

**chased** 256:16

**cheaper** 290:9

**check** 145:23 170:1

**checked** 277:2

**checking** 284:17

**Chew** 7:25 8:4

**Chicago** 6:18

**child** 110:24,25 115:4 116:1

**children** 29:10, 12 30:6 76:15

**choice** 202:7

**choose** 118:15

**CHR** 283:21,22

**CIB** 121:3

**circ-** 267:19

**circumstances** 26:19 106:14 241:3 267:19, 22

**citizen** 75:22

**city** 6:9,21,22 32:23 48:20 85:22 86:19 105:7,22 110:19 119:12 120:5,10 126:16 127:17 133:2 134:3 148:19 156:8 196:24 197:13 199:2 262:11

**civilian** 118:22 119:6,9,19 124:22 125:2

**claimed** 160:10

**clarify** 9:18

**classification** 54:10

**clear** 161:3 219:2

**close** 124:22 125:2 164:9 192:5 263:25

**closed** 27:23

**co-worker** 144:25

**co-workers** 145:1

**Code** 16:24

17:9 19:24 20:24

**coercion** 65:23,25

**cold** 160:1,3,4

**collar** 23:15, 17,21 24:20 26:16

**collect** 34:14

**collected** 225:14

**collectibles** 285:9

**comfortable** 265:25

**comments** 132:4

**commission** 7:25 26:22

**commit** 63:7 96:3 268:12

**committed** 59:1 202:17 257:14

**committing** 95:25 269:6 273:22

**commotion** 179:4,8

**communicate** 218:21 243:20

**communicating** 64:22 141:19 142:25 243:19

**communication** 215:3

**communications** 219:3

**communicator** 142:23,24

**compare** 82:18

**comparing** 82:25



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 735 of 1026
The Deposition of GARY ARBOGAST, taken on June 30, 2020

300

complain
75:22

complainant
119:23 120:22
123:24,25
126:22 133:10

complained
80:17

complaining
121:22

complaint
80:12 81:21
119:6,9,19
121:10,14,21
122:2 123:21
124:1,10,19
126:19 134:15

complaints
80:15,20,23
81:12,15 93:12,
14 118:23
119:1 124:22
125:2,6,9,14

complete 79:4
113:21,25
171:13 222:3

completed
112:20 114:3
207:5

completely
222:2 251:13

computer 37:9
45:7,10,14
142:1,9 156:10
195:16 209:24
227:9

computers
195:10

con- 67:5

concentrating
13:9

concept 34:9
54:8

concern 45:18,
21 232:7

conclude
27:21,23 54:23

concluded
54:5 56:6,10
291:4

conclusions
55:2

conditioner
99:12

conditions
10:6,11

conduct 21:11
22:19 46:23
51:22 52:3
88:10 108:19,
20 136:19
137:6 198:1

conducted
36:15,18 50:23
53:4 75:14
98:17 99:18
104:24 106:4,
16 107:20
108:2,6 118:12
124:3 154:9
158:6 196:1
197:18 214:11
233:5 279:10
287:4

conducting
31:20,22 36:10
51:8 53:25
108:11 136:8

conference
282:15

confess 61:25
62:10 66:9,20
71:21 211:17
250:25 268:19,
22

confess- 71:11

confessed
237:2 240:16
242:16 269:6
272:25 273:21

confesses
70:3

confessing
253:10 270:23

confession
28:1,4 54:16

56:7,11,19,23
65:14,17,18,20
69:19 70:7
71:3,4,7,9,11,
12,15,16,17,18
72:3,13,18 73:1
83:5 110:23
113:2,8,10,11,
20 114:2
116:21,22,24
117:1 212:8
217:21 226:21
244:8 271:13
279:13,23
280:2,5,6,7,8,
17,20

confessions
69:19,23 72:24
73:4 88:19,21,
23 89:9 98:6
197:8 237:24
243:13 268:24
278:1

confirm 43:22
47:25 70:6
96:11,17 97:10,
16 222:5

confirmed
97:24

confirming
50:5 100:15,20

conflict 150:21
180:19

conflicts 31:6

confront 61:6
63:12,22,23
225:15

confused
111:13

confusing
117:18

confusion
81:6

connected
235:15 266:24
269:17 275:14

connection
157:21 158:2,
10 249:2 250:2

252:8,12,13,17,
20,25 275:2,19,
20 276:2,7,9

connections
252:4 266:11
275:7

consent 158:3
181:7,11,14

consideration
84:1

considered
88:6

consistent
52:7,9 60:4
73:12,17 148:4
218:9 248:20
269:16

constituted
93:19

constitutional
17:3 118:1

consulted
22:7

contact 102:16
130:23 131:7
185:7 199:9
201:17 216:4
218:24,25
219:22

contacted
201:20 216:4
258:4

contemporane
ous 36:14
288:18

contents 216:1

context 128:12

continue 52:23
82:20 87:6
107:16 115:25

continued
28:7,9

continues
199:13

continuing
87:14 261:21

contradicting
219:9

contradictions
267:3

contradicts
44:6

contrary 63:21

control 58:19
115:5,16 130:2

convened 6:7

convenience
22:17

conversation
48:11 155:21
158:17,22
185:1 186:16
235:2 266:22
277:1

conversations
15:1 185:22

convict 36:5

convicted
286:15,19

cooperated
158:3

cooperating
89:24 90:3

cooperative
201:19

copies 14:9
47:7,12

copy 264:17
289:7,22 290:5
291:2

corners
164:19 221:3

correct 11:14
15:19 19:6
21:12 28:11
45:17 46:3 49:8
52:14 62:15
67:8,9 72:14
80:1 82:13 87:3
96:8,24 100:23
104:11,16
173:22 184:21
189:18 204:24



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 736 of 1026
The Deposition of GARY ARBOGAST, taken on June 30, 2022

301

211:19 232:3
240:9 242:4
279:12

**correcting**
63:25

**correction**
73:1

**correctly** 39:9
205:11 242:12
257:21

**corroborate**
267:10 279:19

**corroborated**
84:16 280:20

**corroborating**
69:20 70:7 83:5
279:13

**corroboration**
57:10 70:15,19
83:8,18 84:15
279:20,22
280:1,5,14,16

**couch** 66:4

**Cougar** 150:7

**counsel** 6:16
8:4 145:24

**counsels**
152:17

**country** 31:10
70:1

**couple** 40:20,
23,25 128:10
149:11 153:24
157:7 196:10
197:11 222:22
224:8 253:9

**court** 6:3,4,10
9:5,7,11 10:25
96:17

**courthouse**
144:7

**courtroom**
10:25 12:12,13,
15 13:22

**courts** 204:18

**cover** 79:2

**covered** 77:17
78:11,12,13

**Crazy** 140:24
270:6

**crea-** 194:14

**credit** 285:22,
23,25

**cried** 57:20

**crime** 23:6
36:18 45:24
53:5,14 56:4
59:1 61:13
62:10 63:7,20
68:24 70:24
83:9 84:4
103:25 104:9
155:19 193:20,
23 196:15
202:17 212:14
236:2 240:11,
16 257:7,8
268:19,22
275:7

**crimes** 19:10
21:1 22:23
23:11,20,21,24
24:21,23 25:14,
23 28:22 29:10,
15,19 30:4,6,15
31:7,23 32:5
33:1 67:4,6,11
69:3 73:20
76:15 83:13
85:4,9 86:8
87:12 88:1,5,
14,24 93:17
94:3,11,18
121:5 161:24
162:8,16 207:7
213:24 246:21
247:3 250:5

**criminal** 12:7
16:24 17:9,16
19:24 20:24
32:19,22 33:4,
22 35:1,14,23
36:10 51:3
67:19,23 73:9
118:1,2 121:4,5
244:1 251:24

**criminalistics**
27:2

**Crips** 141:2

**critical** 35:22

**critically** 70:10

**cross** 56:13,18

**crossing**
114:5

**CSR** 7:22

**cubicle**
163:17,23
164:8,9,10,11,
14,15 170:14,
15 171:16
172:7,8 250:7

**cubicles**
163:14

**curious** 46:15

**current** 152:23

**custody**
110:22 114:22
182:1,2 201:2,3
202:18,24
232:1

**cut** 59:7 210:9

**cutting** 60:7

—————

**D**

**DA-34-616**
233:16

**DA-34-625**
254:13

**damage**
119:12

**damages**
283:2

**Dan-** 136:17
221:7

**Dang** 35:16
124:24

**Daniel** 6:9,18
8:17 12:8,19
33:21 106:17
107:21 108:6
116:2,3 139:7
140:14 146:5
159:10,21

161:8 175:14
176:3 177:20
178:22 188:17
189:8,21
191:15 192:4,6,
8 193:22 194:1,
21 196:6,14
197:25 198:12
200:22 201:7
203:1,9,13,15
204:8 211:14,
17 213:21
214:16,21
216:9 217:19,
23 218:15
220:17 221:2,3,
7,19,22 222:5,
19 223:7,11,13,
19,22 225:17,
19,22 226:7
229:2,17
230:23 232:11
233:9 234:21,
24 236:21
237:7,16 245:8,
11 246:2,6
252:16 253:3
269:3,6,23,25
275:13,15
277:5 278:8
279:16 280:20
281:3 282:4
286:6,9,14
288:10

**Daniel's**
177:16 197:21,
23 222:2,11
251:24 271:21
273:19 280:22

**Danny** 172:2,
21 179:5,9,10
180:1,6 181:3,
25 182:13,18,
19 192:22
193:9,16,20
200:25 226:23
228:10 242:11

**Danny's**
180:24 196:13

**Darnell** 7:4
14:24 47:14
48:22 50:14
64:21 66:12
82:1 91:2 98:8,

23 99:7,11
108:15,17
109:7,9 113:16
117:21 124:11,
15 128:5,7,11
129:12 131:25
132:9 136:21
137:24 138:15,
24 139:1 142:4
143:11 144:19
147:12,18
152:1 153:10,
21,25 156:19
173:13 174:17,
21 180:11
183:6,8 186:5,
9,11 188:9
195:14,20
196:3,11
200:18 207:18,
22,24 209:16,
20,25 211:24
213:6,8 217:16,
18 218:17
229:22 230:1
232:15,21,23
238:11 239:1,3,
7,12 243:14
245:13,22
246:15 256:21
257:10,12
273:2,10
274:11 276:5
278:4,15,17,23
282:21 286:11,
24 287:7,9,19
288:25 289:21,
22 290:1,4,22,
23

**date** 48:5 49:13
149:1 156:17
205:14 208:11
233:25

**dated** 120:19
133:8 156:15
162:1 260:3
262:14

**dates** 147:13

**David** 139:22
159:10,19
160:17 161:7,
11 162:15
163:2 164:1
165:21 166:24

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 737 of 1026
The Deposition of GARY ARBOGAST, taken on June 30, 2020
302

167:2,11 168:6,
10,19 169:24
170:7,9,17,22
171:16 174:19,
20 199:23
270:4

**David's** 166:15
168:12

**day** 6:6 154:21
165:12 166:2
188:22,25
227:14 265:7

**days** 40:20,23
41:1 157:10

**deal** 20:25
201:15

**debt** 283:10,22
284:1,5 285:22,
23

**debts** 286:3

**deceive** 68:10

**December**
127:20

**decide** 29:19
282:25 283:1

**decided** 79:15

**decision** 21:23
26:4 115:22
135:2 245:21

**decisions**
116:9

**deem** 107:13

**deemed**
268:25

**defendant**
6:25 7:7 8:13
105:6

**defendants**
118:1,2

**defendants'**
152:17

**deficiencies**
87:25

**define** 91:21

**degree** 248:2

**degrees**
247:11

**delay** 110:23
112:2,6

**deliberately**
126:1

**Delta** 109:25
110:2 187:10

**demeanor**
222:11 247:7
248:1,8

**denial** 58:20

**denials** 59:8
60:8

**denied** 59:18
96:19 197:17

**denies** 97:23

**deny** 58:14

**department**
14:6 17:25
18:20 39:14
40:3 45:16 69:5
75:23 80:1 81:4
95:17 108:10
110:5,10,25
111:10,22,25
112:3,8,17,21
114:1,4,7,12,23
117:8 118:23
119:2 131:24
132:8 145:3,6,
18,20 156:12
181:6 190:23
192:11 193:14
223:10 240:10
256:1 258:1
272:2,17 282:7

**department's**
20:3,6 98:3
105:16 114:16
115:8 179:17

**departmental**
67:16

**dependents**
285:13

**depending**
101:11

**depends** 59:2,
5 61:22 103:1

**depo** 290:7

**deposition** 6:8
7:22 9:2,7
10:20 14:15
15:2,5,12 49:4
50:22 75:13
98:16 99:17
107:10,12
137:10,12,15,
22 138:2 142:8
154:8 195:25
233:4 279:9
288:4 289:23
291:4

**describe** 130:6
131:7,19
134:16,18
135:1,15 136:1
143:3 144:22

**description**
133:16 280:23,
24,25

**descriptions**
281:2

**desert** 51:5

**desiring**
199:10

**destination**
251:10,18

**det-** 46:19

**detail** 261:10

**details** 41:2
45:15,19 70:24
72:8 83:6,16,17
84:8,14 119:21
121:15 123:9
131:15 173:10
186:14 214:11
261:10,23
280:7

**Dete-** 243:1

**detect-** 269:22

**detecti-** 151:6

**detective** 12:4,
5 13:15 19:12,
16,20 20:11

23:11 25:3,8,
11,20 26:15
28:6,8 30:19,23
31:1 32:11,15,
18 41:11 51:1
55:1,7,13 68:2,
19 71:1,8 82:6
85:6 87:6 88:3,
6,8,13 89:13
94:6,13,20,21
95:3 100:25
106:7,11
117:10 118:14
122:22 123:2,3
141:22 143:4
152:10,13
158:6 159:9,18
162:18 164:1,
11,25 166:5,9,
21 168:14,16,
23 173:3
176:17 177:21
179:1 180:16,
17 185:3 189:4,
5,23 190:22
194:21 195:6,8,
10 204:8 205:4
207:4 208:6
209:8 212:24
213:2,23
214:24 215:3
216:1,4,8,11
218:16 219:22
220:9,13,16
221:9 223:5,8
226:25 227:24
231:15 233:19
237:12 238:1,6
241:4,10 243:2,
23 244:5
248:10 255:25
260:6 267:16
287:12

**detective's**
212:19

**detectives**
11:11 13:14
19:23 20:7
21:25 28:20
37:5,21 41:23
42:4 46:6,13,20
47:3 54:17
55:10 88:9
123:19 143:14
151:6 157:11

158:4 164:24
211:16 219:11
243:21 244:25
253:20 268:19,
22 281:11

**detectives'**
12:2 47:12
124:2

**determination**
125:9

**determine**
111:2 115:10,
20

**diagonal**
169:23 190:7
250:11

**diagonally**
164:15

**Diana** 184:11

**difference**
52:20 53:8
65:10,19
218:13 290:20

**differences**
84:4

**differently**
84:5 286:23
287:2

**direct** 134:9
183:13 184:7,
14,18 234:17
251:17

**directed**
203:18 223:7

**directing**
222:21

**directly** 70:25
216:12

**Dirt** 150:14

**disagree**
191:24 220:1
273:1,5,8

**disagreed**
220:5

**disbelief** 123:4

**disciplined**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 738 of 1026
The Deposition of EARL ARBOGAST, Taken on June 30, 2020
303

93:3,5 95:3,17

**disclose** 45:15

**discover** 42:20
267:25

**discovered**
252:25

**discrepancy**
232:10,13

**discuss** 32:18
87:18

**discussed**
14:13,22 73:7
83:4

**discussing**
276:2

**distance** 188:4

**distinguish**
65:12

**district** 6:10
18:11,14 19:4
21:23

**districts** 18:19

**division** 6:11
23:25 76:6
120:17 133:6

**divisions** 22:3

**document**
36:7 37:18 38:9
39:11,18 42:8,
10 44:20 48:25
70:11 86:22
87:5,9 102:18
105:9,20,22
116:13 120:14
121:8,9 124:5
125:18 127:10,
16 128:8,16
148:12 153:18,
19 159:2 161:3,
22,23 162:21,
22 177:4
196:25 197:12
199:19 252:22
254:24 255:21
256:13 258:11
261:7 269:1
271:10,13

**documentatio
n** 261:14

**documented**
114:16 121:19
124:1,7 152:6
169:21 230:15
260:17,25
281:13

**documenting**
42:24 158:14,
16,20

**documents**
10:19,24 12:14
13:21,23 14:17
49:3 120:2
160:23 169:5

**Dona** 259:17

**door** 178:13,19

**doubt** 198:11,
19 239:9,15
280:8

**Douglas**
262:3,17
263:15 264:1,
11 265:14,25
267:8

**drag** 210:3

**draw** 284:21
285:4

**DRC** 141:2

**drive** 187:13
188:7,9,11
225:22

**drive-by**
155:10 240:16
242:16,18
249:11 269:6
270:15,23
272:25 273:22
274:15 275:4,
13,15 281:25

**driven** 182:23

**driver's** 7:13

**driving** 180:17
188:12 225:19

**Droopy** 139:18
217:4,14,25

228:2,4 269:9
270:9,14 273:5,
24 274:14,23
276:13,18
277:2,10,18
278:8 279:16,
18 282:11,18

**dropped**
232:11,12

**dude** 149:14

**duly** 8:3,6

**duties** 22:18

**duty** 95:21
134:16,18
145:18 154:17
231:21

**Dyer** 18:16

**dynamic** 79:6

---

**E**

---

**E-A-R-L** 8:23

**E-TRAN** 290:3

**E.W.** 127:18
134:6

**Earl** 6:8 7:4,12,
16 8:5,23 50:22
75:13 86:22
98:16 99:17
133:12 154:8
195:25 233:4,
19 262:17
279:9

**earlier** 69:2,18
83:11 99:4,20
103:12 130:10
151:3,5 176:24
185:10,13
188:21,25
220:21 243:18
249:15

**early** 48:11
146:21 151:3
203:13 205:18,
21 288:4

**easy** 8:21

**ECH** 140:24

**edits** 78:22

**effect** 106:22
198:12 288:13

**effective** 88:10
141:21 143:3

**Eisenhower**
140:24 270:6

**El** 6:9,11,22
7:1,3,5,7,24 8:1
14:5 15:21
16:15 17:24
18:15,19 20:3,
6,10 25:7
39:14,21 81:4
95:13,17
105:15 108:10
109:21 118:23
127:5 145:6
156:11 200:22
240:10 253:17
255:25 258:16
259:16 272:17
284:22

**elderly** 26:21

**electronically**
137:9

**elicit** 58:12

**Elissa** 7:25

**embarrassing**
123:20

**employee** 86:1
126:24

**employees**
123:20

**employment**
123:8

**encompassed**
22:16

**end** 29:14
55:22 78:7
149:5 184:8
190:6 229:23,
24 286:1

**ended** 190:24

**enforcement**
16:9,11 17:4

**engage** 34:6
101:23

**England**
139:13 149:12
211:10 286:7

**England/lazo**
24:13,24 49:7
76:20 140:21
146:5

**Enrique**
139:20

**ensure** 37:1
194:7 258:3

**enter** 16:17

**entered** 45:10,
14 178:11
227:9

**entrance**
190:13,16

**Eric** 7:6

**error** 54:9

**errors** 54:10,11
72:13,15,17,24,
25

**essentially**
110:11

**estimate**
187:16

**estimating**
26:17 28:25

**et al** 6:10

**evaluated**
87:17

**evaluations**
85:5,9,16 86:4,
7 87:11,18
89:16

**event** 209:2

**events** 44:12

**eventually**
26:3 66:25
161:7 189:6
217:20 218:5
269:3 276:12
282:4

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 739 of 1026
The Deposition of EARD ARBOGAST, taken on June 30, 2020

304

evidence
21:16,19 27:2
33:11 34:14,21
35:2 43:10,13
51:4 56:22
57:17 58:21,24
59:3,19 60:1,
14,15,21,22
61:13,19 63:11,
12,21,24 74:20
75:1 117:12,16
118:3,10,11
136:22 275:3
280:19

evident 260:13

evidently
136:4

ex- 19:23

exam 19:17,20,
23 20:7,16,22

EXAMINATIO
N 8:7 288:2

excessive
90:15,17,20
91:1,9,19,21,25
92:4,8,21,24
93:4,9,19 94:2,
6,10,24 95:3
125:20 130:1
132:15 134:15

excluded
265:20 266:5
267:21

exclusively
21:4

exhibit 48:14,
15,20 85:14,17,
19,20,22 86:18,
19,20 105:3,6,8
110:18 120:5,9,
11 126:12,14,
17 127:17
132:13,19,20,
25 133:1,3
135:11 148:13,
14 156:5,7,9
160:20 161:16,
17,19 174:16,
18,20 175:1,2,
4,7 183:21,22
184:20 196:21,

22 207:11,13,
17 226:10,12
230:20 233:16,
17 240:4
244:22 254:11,
12,14 259:25
260:2 262:11,
12 271:2,5,8,12

exist 60:16

expect 74:16

expected
151:9,12
163:22 215:25
218:14 269:25
270:1

expecting
177:12

experience
141:18 143:21
230:25 243:25
275:21

experienced
79:12

explain 196:7
199:10 251:2

explanation
109:5 176:23
186:21 200:9
217:11,23
218:2 232:13
242:5,21 243:7
244:17 261:13
280:13

extra 100:25
101:16,17

eyes 123:4

———————
F
———————

face 62:10

facility 188:16,
17,18,24
190:25

facing 179:3

fact 7:16 31:15
101:14 122:10
131:11 133:23
279:20

facts 68:24
136:21 173:20
269:12

failure 109:5

faint 134:6

fair 9:22 17:17
20:11,17 24:14
31:18 33:25
38:1,6 41:19
43:20 46:21
48:1 49:7 50:8
51:9 53:14,23
55:3,7,14 56:4,
19 57:1 58:21
61:10 63:18
67:19 72:6,10
73:10 79:7
80:13 83:1,9
84:5,23 93:14
94:25 112:17
113:15 118:9,
19 127:10
136:24 141:9
163:6 165:13
167:25 184:16
201:11 257:17

fairly 205:18

false 60:14,21
68:3,5 69:23
137:23 138:3,7,
14 279:17

falsely 95:7,10,
13,18

familiar 51:19
62:22 104:22
105:13 109:2
119:14 120:14
139:7 140:17
194:20 201:6
262:5

familiarity
77:1 117:13

families
180:21

family 140:15

Farrar 148:24
266:17

fast-forward
93:16

father 66:5

favorably 62:4

Fe 31:16

feasible
175:13

February
271:18

feedback 85:8
89:1,11

feeding 73:8

feel 15:14
61:11 66:9,11
129:25

feeling 66:19

fellow 95:22

Fernando
139:18 216:23
217:3,12,24
224:22 233:8,
22 234:20
235:12 236:14
237:9,18,24
239:10,15
240:21 241:3,
12 242:17,22
243:12,16
244:25 245:4
246:4,6 277:1,
17,23

Fernie 242:22

field 155:9

fight 149:22
150:3

figure 68:3

file 21:22 37:3,
7 40:9 44:25
47:4 64:9
152:15 276:10

file-stamped
264:16

files 13:24
14:1,6

filing 264:17

fill 112:25

final 57:5

finalize 78:15

finally 150:11

financial
282:24

financially
285:19

find 13:12 27:5
55:20,25 74:20
105:23 116:6
127:11,13
172:13 185:7
217:6 235:14,
24 236:19,25
237:13 256:16
275:2 277:5,9,
13 280:7

finding 281:17

fine 122:16
128:14 134:1
147:18 161:1
209:1 229:15
264:24

fini- 227:3

finish 237:11

finished 78:5,
6,23 171:24
172:12,15,18
209:3 222:2
223:14 227:19
228:13 229:1

finishing
171:21

fists 129:19
130:7

fix 209:23

fixed 73:2

fixing 50:15

Flores 139:24
140:1,6 146:9,
10 147:3 149:7,
13 150:14
152:16 153:14
157:12,20,21,
23 160:6,7

focus 34:13

focusing 34:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 740 of 1026
The Deposition of EARL CARROCAB, taken on June 20, 2020

305

**follow** 17:4
33:11 34:20
57:8 74:17
106:6 109:6
267:2,10

**follow-on**
107:9

**follow-up**
78:18 135:25
148:1 277:17,
19 287:25

**follow-ups**
74:7

**force** 89:21
90:1,11,15,17,
20,22 91:1,8,9,
19,22 92:1,4,8,
9,13,16,17,21,
24,25 93:4,9,19
94:2,6,9,11,17,
22,24 95:3
96:25 97:19
125:20 129:25
131:15,20
132:15 133:23
134:11,15,16,
18,19,22,24
135:1,14,15
136:2,3 191:2,
14 253:18,19
269:22 272:19,
20 275:6,18,21

**forget** 30:20
41:1 102:22
107:1 155:19
165:16 208:24
225:4 228:19
229:12 254:22
269:18

**forgets** 79:3

**forgot** 271:3

**form** 65:14,17,
18 86:7 102:2,
4,21,22 105:2
109:7 113:2,8,
10,15,22 114:2
181:12,14
186:5

**format** 289:25
290:7,16

**forms** 112:24
113:1

**forward** 74:10

**fought** 149:23

**foun-** 107:5

**found** 155:17
179:1 185:21
192:4 206:11
276:20 279:17

**foundation**
106:20 107:5,
25 108:14
147:16 198:5,
15,23 200:19,
24 229:5 236:4

**fourth** 284:3

**Frank's** 152:24

**free** 80:11
209:9 272:3
288:25

**frequently**
142:22 143:14

**friend** 144:23,
24 147:1,22
251:6

**friend's** 251:8

**friends** 30:16,
21 149:8,17
150:2

**front** 57:17
97:4 100:1,9
117:2 123:20
160:23 185:4
196:16,24
222:25 223:14,
19 229:11

**full** 123:1,17

**full-size** 290:5

**fully** 134:16,18
211:3

**function**
115:5,17

**funny** 81:3
272:10

---

**G**

**Gadsden**
255:23

**gag** 80:2,5,11

**gang** 140:2,17,
19 157:12
191:1,7,10,14
249:1,11,18,20
250:2 251:25
252:4,8,11,13,
18 253:18,19
269:18,22
270:1,5 272:19,
20 274:13
275:3,6,9,18,21

**gang-related**
275:7

**gangs** 191:12,
13 249:14

**Gateway** 18:15

**gather** 21:16,
19

**gathered**
225:13

**gave** 32:10
65:17 70:16
77:11 78:24
131:23 137:8
147:22 161:8
171:3 215:23
217:20 218:6,7
224:15 227:4
254:22 257:6
269:15

**general** 101:14
103:19

**generally**
199:20 280:17

**generated**
194:10,14

**gentleman**
26:22

**geographical**
18:3,7

**George** 8:24

**gestures** 9:9

**Ginger** 6:3
7:20,21 289:4,
12

**girlfriend**
146:24

**give** 9:8 29:4
47:23 57:9
63:13,24 69:8,
16,23 77:15
83:24 86:7
98:21 105:22
114:13 116:22
120:4 126:15
129:11 131:15
132:10,19
148:11 161:21
170:21,23
173:19 174:13
175:2 183:15
197:3 203:2,10
207:11 213:17
221:7 226:15
243:7 259:5,6
261:9 262:19
265:22 271:4
273:15

**giving** 97:9,13,
14,15 134:7,14
148:17 158:3
162:17 175:10,
20,23 206:18
209:8 213:18
233:22 238:1
242:19 255:24
272:3

**goal** 55:17,18,
25 56:7,11 57:5
82:16 85:15
87:14

**goals** 82:12,13
86:11

**goldish** 248:21

**Gonzalez**
140:12 166:13
170:13 172:3
175:15 176:12,
16 178:22
179:2,12,13
213:24 214:2,8,
12,25 215:16,
21 217:12

219:23 220:13
234:21 237:7

**good** 8:9,10,13
50:12 53:4
61:15 88:6,13,
16 89:8 142:23
144:25 145:1,4
154:2 188:4
199:21 207:25
210:20 212:5,6
213:17 219:8
243:21,23
263:7

**gosh** 161:20

**graduated**
15:18 16:13

**Graves** 30:19
142:19 143:1
144:5,22 145:5,
9 148:5,22
158:6 166:5,21
168:16 173:4
177:22 185:3,
10,20 186:2,6,
8,13 205:4
207:5 208:7
209:8 212:24
213:23 214:24
215:3,14 216:1,
4,8 218:16,25
220:9,13,16
243:18 266:16,
21

**Graves's**
213:2

**gray** 150:6

**great** 7:14
10:18 50:17
117:9 133:19
146:3 195:18
263:3,13

**Green** 251:21

**grounds** 199:8

**group** 30:18,22
215:15

**groups** 30:14
31:7

**guardian**
197:5



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 741 of 1026
The Deposition of GARD ARBOCAST, Taken on June 23, 2020
306

**Guerrero**
25:24 28:6 32:8
55:9

**guess** 15:7
19:5 31:25
53:10 55:9 61:6
80:19 81:1 83:2
87:15 91:21
93:16 101:10
121:9 132:11
144:2 158:11
167:9 170:22
177:1 180:11
211:20 239:7
244:10 247:22
278:16 283:9
284:4,14
290:18

**guessing**
180:10

**guidance**
106:13

**guide** 74:20

**guilt** 43:11
58:21,25 59:9
74:22 75:2

**guilty** 34:15
36:5 43:14,18
54:2,6,15 55:2
56:4,7,11
61:11,14
266:18 286:6

**gun** 185:24
186:3

**guns** 285:9

**guy** 91:22
96:23 135:4

**guy's** 30:20
244:6

**guys** 26:6
30:21 145:17,
18 182:15
191:2 232:19
237:13 238:2,
16,23 264:23
269:12

---

**H**

**habeas** 11:3
175:5

**hair** 126:5,7,9

**hairs** 114:5

**half** 14:20
144:7 209:21

**Hall** 254:4,7
257:5,14,15
260:6 263:18
264:8,12 265:6,
15,16,18 266:1
268:1

**Hall's** 256:9
263:16 265:11

**hallway** 179:4

**hand** 42:14
114:10

**handcuff** 17:1
131:13

**handcuffed**
179:2,11

**handcuffs**
91:12,16,22
129:18,21
134:12 135:8

**handed** 231:20

**handle** 21:4

**hands** 131:12

**handwriting**
72:14 254:18,
19

**handwritten**
39:22 40:4,9,18
254:15

**hang** 30:25
31:3 53:6
144:24 145:3
203:22

**happen** 24:10
41:21 42:9
44:21 59:20
63:19 101:13

**happened**

23:10,15 24:9,
13,16 42:15
69:25 72:2 74:3
93:9 135:22
173:11 202:21
215:12 220:18
226:6 237:25
240:22 249:23
251:4

**happening**
167:6 168:3
268:16

**happy** 290:18

**hard** 98:24
161:20 162:14
286:12

**harder** 287:11

**hardest** 276:2

**hate** 229:12

**he'll** 237:21

**head** 10:4 74:9
213:2

**health** 10:5,11

**hear** 74:23 76:7
93:10 94:21
99:6 100:14
129:6,7 137:25
153:2 169:24
196:4,5 221:16
250:13,16,18,
20,22,24
259:21

**hear-** 196:4

**heard** 49:6
95:12,16
139:11,13
140:20 152:10
174:22 218:7
221:17 222:23
223:24 248:23

**hearing** 95:1,2

**helped** 274:22
275:2

**HELPER**
210:10

**helpful** 267:13

**helps** 36:4

**Hernandez**
246:25 248:9,
13,16 250:10

**Hernandez's**
248:7

**Herrera** 125:21
126:22

**hesitation**
286:18

**Hey** 78:18
81:20 264:21
278:22

**hid** 256:20

**hierarchy**
92:10 93:22
130:10

**high** 15:18
19:18 166:20
204:17 255:24
256:3,5

**higher** 92:14
130:11

**higher-ups**
125:9

**highlighting**
128:3

**Hilke** 6:17 7:18
8:8,14,16
47:17,18 48:24
50:11,17,25
64:25 66:15
75:8,16 82:3
91:5,6 98:10,19
99:1,3,9,20
106:23 107:4,8,
14,19 108:1,19
109:16 110:17
113:18,19
117:20,25
118:8 124:17
128:6,9,14,15
129:14 132:3,
12,23 133:1
136:24,25
138:1,2,21
139:3 142:6
143:18 145:23
146:3,4 147:14,

19 152:4,18,22
153:4,6,12,23
154:1,11
156:21 173:17
174:19,24
175:1 180:14
183:7,9 186:7,
12 188:11
195:18 196:9,
12 198:7,16,24
199:24 200:1,
21 201:6
207:20,23,25
208:1 209:18,
23 210:2,13
212:1 213:11
217:19 218:19
229:6 230:6
232:18,19,22
233:7 236:10
238:18 239:5,8,
14 241:8
243:17 245:17,
25 246:17,18
256:24 257:13
264:21,24,25
273:4,12
274:14,21
276:6 278:7,13,
16,18,20 279:1,
3,12 282:22
286:13 287:1,
15,16 288:1
290:6,8,14,17

**Hinojos** 30:20

**history** 132:14

**hit** 17:10 126:1
130:24 131:1
184:11

**hmm** 208:23

**hold** 7:11 99:7
159:13

**holding** 109:22

**home** 158:7
165:12 196:6,
18 197:16,21,
25 200:13,15
202:2 251:16,
25

**homes** 228:2

**homicide**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 742 of 1026
The Deposition of EARL CASSELS, taken on June 24, 2020
307

25:23 69:8,14
151:5,6 177:9
219:5,8 266:9,
10 286:19

**homicides**
24:14 28:16
45:16 74:14
244:1 266:8

**Hondo** 18:16

**honestly**
290:13

**honor** 26:7

**Hoods** 140:25
270:6

**hospital**
155:12

**hour** 14:20
192:10 195:15

**hours** 165:1,7,
8 199:8 200:3,6
228:5

**house** 26:21
57:22 121:18
172:2,21
177:16,20
178:5,8,23
179:15,21,23
180:9,19,24
181:15 196:14
204:4 223:5,6,7
251:8 283:6,8,
10

**housed** 110:15
111:7

**houses** 222:22
223:2,17,23
224:8,17,19
238:24

**housing** 27:7

**hundred** 11:20

**hung** 30:17,23
145:17,19
190:16

**husband** 122:7

**husband's**
123:8

**hypothetical**
273:15,18
276:1

---

**I**

**IA** 76:18 77:12

**IAD** 77:15

**ID** 7:11 127:7

**idea** 33:14
54:14 89:4,18
213:17 266:1
277:8

**ideas** 84:22

**identi-** 50:5

**identified**
27:24 146:6
150:21 169:6,
20 205:11
225:2,9 240:15
270:9

**identify** 27:18
48:11 96:16
133:5 249:24

**identity** 47:25
50:6

**ignore** 35:1

**Illinois** 6:19

**imagine**
223:25

**immediately**
177:6

**impeach** 96:18
147:15

**implicate**
104:18 157:23
242:10

**implicated**
153:15 168:7
169:9,16 241:7,
15,17 242:7,24
244:7 270:15

**implicating**
161:8 196:15
236:20 246:6

**importance**

35:20

**important** 9:7,
11 20:20,22,23
33:11,14 34:13
35:1,5,9 36:1
40:21 41:2
42:8,23 43:22
44:20 46:24
47:25 52:13
69:8,15 70:11,
21 83:12 84:13
102:18 150:18
169:17 185:23
186:13 213:4,
13 216:8
218:21 231:13
252:22,24
257:2 258:11
261:6,9 268:25

**impossible**
276:18

**improper**
62:16,18 198:1
242:2

**improve** 85:10
86:12 87:13,21
89:2,12,18

**improving**
87:7

**inaccurate**
67:20,24

**inappropriate**
258:22

**incarcerated**
276:23 281:9,
12 282:2

**include** 11:2
17:6 72:9
118:19 282:1

**included** 19:22
51:8 171:10
281:17

**includes** 43:25
44:3 93:18

**inconsistencie
s** 218:20 279:25
280:2

**inconsistency**
84:12 279:22

**incorrectly**
68:7

**increase** 60:24
61:3,17

**increasing**
18:22 280:8

**incredibly**
238:18

**incriminated**
65:16

**incriminating**
65:10 100:5

**independent**
167:10 244:24

**indicating**
224:24

**indication**
136:22

**Indiscernible**
186:9 278:15,
17 279:2

**individuals**
37:6

**inducements**
61:24 62:13,16

**infer** 167:25

**informa-** 53:13

**information**
37:2 38:17
42:21 43:2,7
44:3 45:24
46:1,19 49:16
52:22 53:13
54:22 67:21,24
68:5,12 69:9,
16,20 70:7,11,
14,15 73:9
74:10 82:14
120:15 124:5
151:7,9,12
152:13 157:11,
16,19 159:9,18
168:7 169:17
170:21,23
171:4,6,9,12
172:3 191:12
202:16 204:18,
19 211:6

215:11 216:8
218:15 219:10,
16 220:16
225:14 234:6
235:4,20 237:5
238:8 244:11,
14,18 245:14
253:9 256:15,
22,23 257:1,3,6
264:6,7 265:21
267:9,17
274:21 275:9,
24 276:25
278:11 279:14
288:12 290:25

**infrequently**
145:21

**inhabitants**
178:8

**initial** 78:24
246:9

**initialed** 72:17

**initially** 111:6

**initiated** 119:2

**innocence**
74:21 75:2
118:4,10,17

**innocent** 36:2
43:19 54:15
65:3 66:9,20
84:3

**insert** 72:13

**inside** 94:17

**install** 22:17

**instances** 95:4

**instruct** 74:19

**intake** 110:25
115:4,9,16,19
116:3,6,9,17
225:21 228:6

**intelligence**
191:8,10

**intelligent**
266:22 267:10

**intends** 110:22

**intention**



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 743 of 1026
The Deposition of GARARD ARBOGAST, taken on June 30, 2020
308

31:10

**intentionally**
68:16,17,19
72:13

**inter-** 17:18

**interact** 248:13

**interaction**
58:19 78:7
166:1 167:11
184:22

**interactions**
151:25 152:5
245:4

**interested**
33:20 46:12
216:18

**interesting**
159:3

**internal** 75:17,
21 76:2,5,10,24
77:2,4,5,24
78:2 80:15
81:12,14,21
82:2,4 118:21
119:1 120:15
124:4,21 125:1,
14 131:24
132:1,7 133:6
134:14 135:2,
16,25

**interr-** 197:24

**interrogate**
17:19 21:14
52:15 53:16,22
54:16 56:15
102:7,24,25
103:4 108:25
181:3 197:24
200:12 201:25
202:2

**interrogated**
36:22 106:8
109:3 197:15
202:12 211:14

**interrogating**
51:23 52:4,14
54:2,6 102:12
216:9 219:11
221:19

**interrogation**
51:14,19 52:20,
24 53:3,9,19
54:1,4 55:17,18
56:3,6,10,17,23
57:4 58:16
59:9,15 62:1,21
63:15 70:22
87:7 88:1
103:12,16
104:23 105:25
106:3,16
107:21 108:6,
12 137:6
197:13,17
198:1 214:12

**interrogations**
51:9,21 58:3
61:5 62:13,17
66:22 67:8,12,
17 85:10 87:13,
21 88:10,13,16
89:2,5,13,17
136:8,20 181:7

**interrogator**
88:6

**interview**
17:19 27:9,13,
15 37:22 45:23
46:24 47:24
50:7 52:6,20,21
53:8,11,12,18
57:24 79:5,19,
21,22 88:18
136:23 137:6
163:25 166:22
167:7 169:9,10
197:21 201:21
205:5,15 206:5
207:2 235:21
238:2,7,19
241:4 243:3
250:6 259:4
260:22 264:4
267:16

**interview/
interrogation**
86:12

**interviewed**
146:10,13
151:17 157:20,
25 158:10,12
207:2 216:23

241:3 242:9
243:12 244:12
260:13 263:24
277:17

**interviewing**
58:10 170:2,4
206:6 225:8
235:15 250:9,
10 259:14

**interviews**
21:11 27:11
35:14,19 36:15
51:6,8,9 54:23
69:14 85:10
89:12,17
136:14,19
151:19,22
259:12 287:4

**investi-** 151:4

**investigate**
21:10 26:25
34:23 125:12
213:2 280:22
281:1,5

**investigated**
29:11 47:13
79:14,18 89:15
116:10 124:10,
19 125:6,8

**investigating**
21:8 22:9,14
24:7,13 42:3
83:12 122:5
124:23 125:3,4
177:8 211:16
244:1 266:8,9,
10 282:1

**investigation**
12:18 13:11
19:25 22:15
27:10,20 32:19,
22 33:4,9,22
34:20 35:6,24
36:18 39:23
40:22 41:5
42:8,24 43:2,7
44:1,13,21
45:8,11 46:14,
23 49:10 52:23
53:14 67:20,23
69:4 70:4 75:21
79:1 82:20 84:8

115:23,25
118:12 124:3
133:5 141:16
146:5,10,21
147:25 150:17
151:10,17
157:10 159:25
165:1 169:14,
17 178:15
185:11,14
191:8 199:3
205:19 214:10
216:23 217:7
219:8 235:21
243:10 261:17
263:24 267:25
268:9,16
274:10 276:7,
12 277:12
281:8,11,16,22,
25 286:20,22
288:19

**investigations**
14:7 21:5 22:1,
4,20 28:13
31:20,22 35:14,
18 36:2,8,10
39:22 44:25
45:5,19 46:4
51:3,23 52:4
54:21 55:10
74:2 75:17 76:2
77:4 79:10 82:2
98:5 108:20,23,
24 121:4,6
141:9,13
142:19 151:6
194:17 199:7
219:6 244:1

**investigative**
110:3 115:5,17

**investigators**
125:15

**involved** 46:20
51:3 120:25
126:25 133:12
157:12 160:9
167:13 168:8,
11 185:10,13
194:16 216:20
224:9 236:20
237:14 238:17,
24 241:5 244:6
253:7,12

259:11 260:21
269:19 274:23
275:1 277:19
286:20

**involvement**
52:16 55:20,25
56:1,2 63:3,15
160:11 191:16,
19 206:1,8
212:14 235:24
238:3,21
242:10 249:12
257:16 264:5
268:12 277:21

**involves**
237:20

**involving**
75:17 108:20
194:17 199:7
275:15

**irresponsible**
238:19

**Irvin** 166:20
204:17

**issue** 107:15
136:5 172:14
196:5 287:25

---

**J**

**J-** 202:19

**J.S.** 161:21
207:16 226:11
271:7

**Jacob** 253:23
254:3 260:8,22
261:24 262:1
263:22 268:21

**jail** 110:11
250:25 258:15,
23 281:19,21

**jailed** 258:19

**Jauregui**
253:24,25
254:1,3 258:15
259:1 260:9
262:1 263:23
268:21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 744 of 1026
The Deposition of GARY CARBOCA13, Taken on June 3, 2020
309

**Javier** 140:5
146:9 150:14
151:16,24
152:8 153:8
157:13,20
160:7

**Jeep** 199:24
278:15,17,23
279:1 283:19

**Jesse** 246:25
247:3 248:7,9,
13,16 250:10,
24

**Jim** 7:2,4 14:24
47:14 48:22
50:14 64:21
66:12 82:1 91:2
98:8,23 99:7,11
108:15,17
109:7,9 113:16
117:21 124:11,
15 128:5,7,11
129:12 131:25
132:9 136:21
137:24 138:15,
24 139:1 142:4
143:11 144:18
147:12,18
152:1 153:10,
21,25 156:19
173:13 174:17,
21 180:11
183:6,8 186:5,
9,11 188:9
195:14,20
196:3,11
200:18 207:18,
22,24 209:16,
20,25 211:24
213:6,8 217:16,
18 218:17
229:22 230:1
232:15,21,23
238:11 239:1,3,
7,12 243:14
245:13,22
246:15 256:21
257:10,12
273:2,10
274:11 276:5
278:4 282:21
286:11,24
287:7,9,19,24
288:25 289:22

290:1,4,23

**JIS** 187:18,20
188:3,8,11,12,
15,16,21 189:2
191:15,23
192:9 193:2,25
194:11,17
201:4 202:19
203:24 215:4,
15 216:2,5
220:10,21,23
221:4 222:17
236:7

**job** 16:11 68:2
275:11

**Johnny** 25:24
28:6 32:7 55:9

**Johnson** 73:22
169:7 170:19
172:1

**Johnston**
254:3 257:5,8,
13,20 258:14
259:1 260:9
262:1 263:19,
22 264:8
267:25 268:7,9,
18

**Johnston's**
264:5

**join** 136:14

**joined** 32:5
91:7 136:11

**joint** 205:4

**joking** 66:7

**jotted** 36:12

**JP** 231:9

**JP-** 193:6

**JPD** 111:1
113:11,21,22
115:4,14 193:6,
9 194:6 196:14
223:17 228:6
231:1,15 232:2,
6 260:13

**Juan** 13:1
146:18 246:12,
19 247:7

248:15,17
249:17 250:6,9,
25 251:2,23
252:3,7 253:2

**judge** 104:6
109:13,14
193:13,15
221:24 222:4,9
223:15

**July** 16:18

**jumped** 150:6

**jumping** 55:2
159:3 213:20

**June** 6:6 50:24
75:15 98:18
99:19 154:10
196:2 233:6
279:11

**junior** 255:24
256:3

**juve-** 188:19

**juvenile** 101:1,
2,11 102:7,12,
24 103:4,24
104:9,13
105:11 106:4
108:20,25
109:3,12,16,22
110:3,5,10,11,
22,25 111:5,8,
9,15,16,19,22,
24,25 112:3,8,
10,15,17,21
113:5,8,25
114:3,6,7,11,21
115:14 116:24
117:1,5,6
143:18 181:7,
13,14,25 182:6,
7 183:17 187:9
188:16,17,18,
24 189:15
190:22 192:11,
12,22,25 193:7,
10,14 196:23
197:3,15 199:8,
11,14,20 200:2,
5,13,14 202:1,
12,16,21
205:24 206:12,
17 207:18,20
212:2,13 213:3,

4 223:10
225:21 226:21,
23 227:24
228:5 230:22,
25 231:5,15,20
232:1,5,12
236:1,7 240:11,
14,17 242:16,
19 245:3
271:13,25
272:2,21

**juvenile's**
194:7

**juveniles** 98:4,
6 101:4,15,19,
23 103:20
104:23 116:14,
16 143:23
144:1 160:10
188:19 194:17,
24 236:6
257:22

**juveniles'**
101:24

———————

**K**

**keeping** 33:9
35:19 40:4,7
58:23 189:12
261:21

**Kentuckiana**
6:4

**Kentucky** 6:5

**key** 33:8

**kids** 253:9
256:7 285:15

**kill** 64:4 150:7,
13,24 257:15
268:1,11

**killed** 26:22
150:25 211:11

**killers** 260:15
261:3

**Kimmett** 7:7

**kind** 26:3 39:6,
10 56:2 111:13
135:1 136:3
155:3 181:22

247:8 257:24
267:9 275:20
286:3

**kinds** 16:21
58:2 165:8

**knew** 17:15
82:10,19,20
93:12 100:8
113:5 137:23
138:3 140:2
155:7 173:22
176:15 186:2,8,
13 206:2
223:25 224:19
237:15 239:9,
15 243:15
256:19 257:6,8,
9 264:15
265:12,18
266:7 277:2
281:21

**knock-** 178:12

**knocked**
178:20

**knocking**
178:13

**knowing**
243:12 244:4

**knowledge**
93:13 106:21
107:20 114:15
151:24 152:8
169:11 203:1,9,
12 206:24
212:9 219:5
222:10 258:14
260:14,25
261:2 268:18,
21 276:6,9
277:12 282:17

———————

**L**

**L-SHAPED**
190:1

**lack** 107:25
198:5,15,23
200:19,24
229:5 261:14

**lacks** 108:14



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 745 of 1026
The Deposition of GARD ARBOGAST, taken on June 30, 2020
310

laid 57:17

late 165:19

laugh 272:10

law 14:19 16:9,
11 17:4

lawsuit 137:10,
16 142:14
144:12,15

lawyer 10:23

lawyers 8:17
15:1 144:17

lay 147:16

laying 58:11

Lazo 139:16
149:7,12
151:25 152:5
211:10 286:6

Lazo's 146:23

Lazo/england
29:1 136:18
137:2 139:7
143:7 151:13
154:12 252:18

lead 150:18

leading 70:21

leads 34:21
261:18

leaks 46:1

learn 17:2
56:16 58:4,16
79:18 80:19
276:13

learned 52:11
63:14 80:22
139:6 140:20
205:21,23
215:16,23
216:9 276:17
281:8,12

learning 58:7
269:12

leave 29:19
77:19 78:22
118:15 137:3
149:18 158:25
201:19 202:7

213:12

left 16:8 28:24
42:13 76:13
78:13 86:1,23
150:1 156:22
173:8 182:9,10
214:23 223:11,
16 232:5
255:13

legal 36:12
197:5

lesser 62:10
64:12

lets 56:17

level 55:25
131:19 248:1

license 7:13

lie 66:4

Lieutenant
73:23 124:2

light 264:4

lighter 119:13

likewise 9:20
193:15

limit 79:23

limits 92:7

lines 100:8
149:11 271:25

Link 192:12,16,
19 214:19,20
269:21

linked 274:15

list 78:25

listed 120:22
121:3 126:24
162:25

listen 121:23
137:18

listened
137:15 138:5

listening
138:21

listing 79:6

lists 111:4

live 142:5
162:15 227:25

lived 176:16

lives 175:25

LML 140:18
157:11

Lo- 233:8

load 48:16

located 6:4
7:24 8:1 194:2

location 6:14
109:17,20
111:4 183:23
185:24 204:22
257:24

locations
112:16

Locos 140:18
252:1

lodged 121:21

log 189:12,14,
17 230:22
231:3,4 232:8,
12

logged 229:20
231:1,6,16
232:2,5

long 11:19,23
16:19 19:3
22:22,24 23:17
24:3 28:22
29:1,13 30:24
40:16 47:10
58:20 79:23
138:5 142:11
144:6 145:24
165:20,22
170:16 177:15
180:9 186:24
187:13,17,22
188:6 192:8
208:24 251:16,
25

longer 232:23

looked 11:9,
10,12,13 12:4

105:16 196:21
201:11 278:19
287:11

loop 263:25

Los 140:18
252:1

lost 40:11

lot 22:16 32:23
46:11 80:25
83:19 88:19,21,
23 89:8 90:9
132:14 138:11
165:4,7,8,19
182:24 211:6
216:17 236:16,
17,23,24
249:14

loud 100:6
128:12

loudly 9:8

Louisville 6:5

lower 150:1
157:15

Lujan 139:18
216:23 217:13,
24 224:22
233:8,23
234:20 235:13
236:14 237:9,
18,24 239:10,
16 240:21
241:3,12
242:17,22
243:12,16
245:1,4 246:5,7
277:1,17,23

Lujan's 217:3

lying 59:18,22,
25 68:16,17,19
84:12

―――――

**M**

made 12:11
23:11 26:15
47:9 64:8 68:6
73:2 88:12,15
96:12 97:23
104:21 130:23

131:8 132:4
147:20 157:21
158:2 173:23
186:21 205:13
208:14 222:6
234:2 235:14,
20 238:8
247:13 272:4
276:7

magistrate
104:5 113:12,
22 116:1,18
117:2,3,5
172:14,19,23,
25 173:8 174:1,
5,8 193:13,15
206:20,25
212:13 214:21
221:2 222:12,
17,25 225:18
258:4 259:2,9
260:19

magistrate's
221:24

main 6:4 31:1
89:17

major 22:8,13

make 9:9,13,16
10:3 21:23 41:1
42:12 52:13
66:10 74:25
78:12,22 79:4
91:11 100:8
104:17 114:9
115:22 116:9
134:6 135:2,16
161:6 173:10,
11 177:6 185:6
186:15 203:8
213:4 231:16
232:4 240:19
244:2,7 245:17,
20 250:18,20
275:22,23
276:3,21

makes 74:12
145:22

making 35:10
65:3 96:11
97:10 100:14
205:10 275:7

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 746 of 1026
The Deposition of EARD CARROCAS, taken on June 30, 2020

311

**mall** 182:24
183:3 184:5,12,
23 187:6,8,14,
18,20,23

**man** 237:2
246:25

**map** 183:12,23
184:7

**Mar-** 31:2
121:17 136:7

**March** 119:20

**Marco-** 179:1

**Marcos** 140:12
166:11 170:13
172:2 175:15
176:3,12,15
178:22 179:1,4,
11,13 180:2,7
185:4,22,24
186:2,6,14
204:9 213:23
214:2,6,25
215:21 217:12
218:5,10
219:23 220:13
234:21,24
237:7 274:2,15,
23

**Marcos's**
216:1

**Marcus** 276:20

**mark** 48:14
105:5 120:5,7
126:14 156:7
174:17 175:1,2
271:5

**marked** 18:24
48:15 85:19,20
86:20 105:8
120:11 126:17
132:25 133:3
148:14 156:9
161:19 175:7
183:22 207:17
226:12 233:17
254:14 262:12
271:8

**marker** 183:24

**marking** 175:4

**Marquez** 7:3
12:4 13:15
25:22 26:11,24
27:15 28:4,9,
12,17 30:23,25
31:2 32:6,10
88:3,6,8,13
106:7,11
120:25 121:17,
23 122:1,4,22
123:2 136:7,19,
23 137:4,6,22
141:6,8,15,19,
25 142:7
152:11,14
153:7 159:9,18
162:18 163:19
164:1,11
165:21 166:9
167:11 168:19,
23 169:23
170:7,9,21
171:2,8,15
172:3,17 173:6,
25 174:3,7
176:17 177:21
179:1,5,10
180:16,17
182:10,19
185:18,25
186:3,14 189:4,
8,9 190:22
192:16 194:1
203:13,15,23
204:2,8 214:15
215:11,18,19
216:9,11
219:23 221:9,
18 222:1,22
223:5,8,14,23,
25 224:3
227:24 237:12
238:2,6,15,19
241:4,10 243:2,
17 244:6 245:7,
10,11,18 246:1,
5 248:10,16
250:10 253:15
254:17 255:25
256:3 260:6
265:10

**Marquez's**
30:22 137:10,
15 138:2,22
164:10,15

254:19 287:12

**Martinez** 7:2
146:1 153:1,15
157:24 158:3,9,
14,17 289:1,12,
14,15

**Martinez'**
158:7

**matched**
280:23 281:2

**materials** 45:4

**matter** 6:8
77:21 290:16

**meaning** 61:24

**means** 7:23
32:1 38:1

**meant** 208:24

**medications**
10:9,12

**Medina** 13:1
146:18 246:13,
19 248:15,17
250:6,10
251:23 252:3

**Medina's**
247:7

**meet** 14:14
74:8 132:7
151:7 164:19

**meeting** 14:23
42:5 145:25
152:23

**meetings**
14:25 74:4

**member**
118:23 140:2

**members**
275:3,9

**memory** 10:6,9
121:10 136:19
148:4 167:10,
18 170:6 174:3,
7 184:16 218:9
244:24 248:20
261:23 269:16

**mention** 249:1,

4

**mentioned**
22:10 51:7
67:18 96:6
111:18 142:16
151:3,5 167:7
176:19,24
181:5 189:21
216:20 259:1
260:18 274:2,4
278:18 279:12

**mentioning**
76:18

**mentions**
115:13

**mess** 149:16

**messing** 149:8

**met** 14:16
131:23 167:14
172:1

**method** 51:13,
16,18

**Mexico** 7:23
160:10 253:4,7,
8,14 256:6
257:22,23
258:16 259:19
260:9 264:17
265:10

**Michael** 254:3
257:7,13,20

**middle** 128:2
134:10

**Midnight**
140:18 252:1

**Mike** 257:5
260:9,22
261:23 262:1
263:19,22
264:4,8 267:25
268:7,9,18

**miles** 188:5

**military** 15:23
16:1,5

**mind** 33:9
34:22 35:15,19
55:24 98:21
212:19 249:15

**mine** 28:15
38:9 40:23
86:16 164:12

**minimization**
62:20

**minimize**
62:25 63:3,8

**minute** 48:16
75:7 86:6 105:4
118:22 126:18
128:15 133:16
187:1 199:2
262:23 271:3
272:14 282:23

**minutes** 146:1
150:2 153:24
180:12 187:16,
21 188:1,14

**Miranda** 17:6
56:14 57:9
179:18,22
181:10

**Mirandize**
17:20

**mis-** 54:11

**mis-stood**
187:19

**misclassificati
on** 54:8,11

**misconduct**
95:22,25 96:3

**misheard**
288:10

**missing** 78:19

**mistake** 68:6
73:2 173:12,23

**mistaken** 81:1

**mistakenly**
54:15

**misunderstoo
d** 77:14 245:19

**mixed** 54:10
168:22

**mixing** 174:6

**mom** 205:7

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 747 of 1026
The Deposition of GARY GERBOLCAS, taken on June 20, 2020

312

**moment** 29:5 47:23 98:21 120:4 141:7 148:11 207:11 240:5

**money** 22:17 284:16

**Monte** 248:21

**month** 32:7,13 136:10,12,13 286:1

**months** 16:20 22:25 76:11

**morning** 8:9, 10 74:4 192:20 203:13,16 204:1 212:17 220:17 224:23 227:18,20 233:9 234:12 247:4 248:14

**mother** 66:5 180:24 197:24

**motive** 249:4

**mountain** 18:17

**mouse** 210:3

**move** 31:10,12, 14 82:4 232:20

**moved** 23:14 27:19

**moves** 10:4

**moving** 147:17

**multiple** 37:21 118:22 141:9 235:12,18 266:11 270:8

**murder** 13:11 26:1,12,20 27:19 32:7 45:8 69:4 70:12 74:3 122:5 123:19 143:8,11,15 146:23 150:22, 25 151:14 154:24 158:12, 13 160:1 165:4, 19 169:3,16

218:20 220:2,6 225:8,15 234:23 235:13, 15,19 236:15 237:3 238:7 244:3,13 245:8, 11 246:2 252:18 257:14 270:5 281:18 282:12,19

**murderer** 122:8,10

**murdering** 286:6

**murders** 24:13,24 29:2 46:11 49:7 76:21 136:18 137:2 139:7 140:21 143:7 146:5 154:12 165:16 191:17, 20 206:1,2 252:21

**mute** 153:2

**muted** 40:12 264:22

**mutuals** 284:11,12,13

_____

**N**

**na-** 140:17

**name's** 8:16 161:13

**named** 119:23 126:22 147:2 273:5,24 277:6, 10 280:12

**names** 51:20 62:22 152:24 184:1 187:3 219:20 224:15, 16 236:17 257:21 269:11 270:11 276:15 278:10

**narrative** 72:5

**nearby** 27:5

102:15

**necessarily** 37:23 79:5 94:10 173:25 236:11

**needed** 20:9 73:2 74:7 85:10 87:12 89:2,5,7, 12 91:10 97:10 131:19 165:14 171:9 182:4 202:6,11 217:9 236:1 244:22

**nervous** 247:15,21,22

**nice** 68:21 185:25

**nickname** 139:18,20 216:15 217:3, 13

**nicknames** 219:21 220:8

**night** 167:1,8 177:20 184:23 187:15 190:25 191:6 206:4 219:1 227:15, 16 234:22 235:13,19 238:25 249:23 277:3 281:18

**noise** 278:14, 20

**nonpublic** 45:19,24 68:24 69:8,15 70:11, 16 73:9 257:6

**nonsuspects** 197:9

**normal** 180:21 236:9

**north** 184:8

**north-** 76:14 187:20

**northeast** 18:11 19:3 26:12 30:5

76:15 141:4 249:14 252:17, 21 269:17 274:5

**Northeast-affiliated** 275:12

**Northeast-connected** 275:15

**Northpark** 182:23 183:3 184:5,23 187:6, 8,14,17,20,22

**notarized** 78:8

**notary** 7:25 96:14

**noted** 107:16

**notes** 14:3 36:11,13,14,17, 21 37:2,5 39:23,24,25 40:5,9,15,18, 19,22,25 42:12, 20 47:7 171:11

**notice** 12:9 80:17 247:13 248:3,7

**notified** 81:11 154:12,13 206:15

**notify** 81:14 101:25 102:3 236:6

**November** 126:19

**number** 6:12 7:25 19:21 20:9,17 25:25 32:8 48:8,20 49:20 85:19 86:19 91:4 105:6 110:18 120:5,9 126:15 127:2,4,7 132:20 133:2 148:13 156:8 184:20 196:22 207:13 226:10

233:16 254:13 255:18 260:2 271:6,12

**numbers** 49:25 127:6 228:16

_____

**O**

**oath** 8:2 95:7, 10,14,18

**object** 107:13 109:7 124:11 131:25 132:9 136:21 138:24 153:10 186:5 211:24 217:16 218:17 232:15 239:1,3,12 243:14 257:10, 12 273:2,10 276:5 278:4 282:21 286:11, 24 287:7

**Object-** 107:22

**objection** 8:12 106:19 107:16, 24,25 108:13, 15 110:14 117:17 118:5 138:15 198:4, 14,20 200:16, 23 213:6 229:4 236:3 238:11 240:25 245:12 274:19

**objections** 107:5,15

**objectively** 33:12

**obligation** 117:13,16,23

**obligations** 101:22 117:22

**observe** 163:25

**obtain** 201:17

**obtained** 44:4 258:8



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 748 of 1026
The Deposition of EARL ARELLANO, taken on June 30, 2020
313

occur 44:12

occurred 90:5

occurs 115:23

Ocegueda 73:22

October 233:25

office 7:3,7 14:19 45:9 110:4 157:24 162:17 163:11, 12,13 165:12 169:10 172:1,7, 11,20 177:9 183:17 187:23 188:2 189:7,22 201:4 203:24 205:2 207:8 221:10 236:8 282:10,18

officer 14:5 16:9 17:4 18:4, 8 38:12,18,23 39:7,11 77:5, 22,23,24 78:3, 4,5,6,17,21 90:16 92:20 93:3 94:5,16 95:9,13,16,22, 24 96:2,6 104:2 105:1 110:21, 23 111:1,16,22 112:3,8,10 113:5,9 115:4, 9,16,19,22 116:4,6,9,15,17 127:18 133:12 134:6 143:19 162:9 163:16 189:12 190:20, 24 193:10 197:4 199:13 200:2,10 206:18 209:3 212:13 225:22 228:6,23 231:5, 6,10 232:8 234:9 236:2 245:3 272:2,21 277:3

officer's 39:3 111:1

officers 38:11, 14 77:12,15 80:2,8,12 90:11 92:17 93:8 96:16 104:24 108:24 109:3 120:25 156:1 177:19,22 180:1,6 187:3 199:9

offices 189:24 190:5 195:6,8, 10 203:5

OJ- 31:23

OJT 31:25 32:1

older 285:18

on-the-job 32:1,10 55:12 66:19

one's 189:16

online 6:2 7:24

oops 86:25

open 33:9,14 34:22 55:24 155:9 158:25 213:12 249:13, 15

open-ended 72:1,11

opening 23:12, 15

operating 54:1

opportunity 129:9

opposite 190:6 221:3 279:21

option 213:12

options 290:10

order 80:5,11 166:25

ordering 289:8,13,18

orders 80:2 289:3

organize 41:4

originally 263:19

Ortega 6:25 12:5 13:15 106:12,16 107:20 108:11 143:6,18,22 145:14 189:5 191:22 192:3, 16 194:5 214:15 227:4 229:16 232:11

Ortega's 227:1

outgoing 31:5

overhearing 170:6

overtime 165:10

overwhelming 59:3

——— P ———

p.m 165:11

p.m. 120:19 162:4 164:22, 23 191:23 192:5 291:4

P4539 175:9

pad 36:12

pages 11:20,24 12:1 105:19 249:25

paired 28:6,12 31:24 32:4,6

paper 42:14 71:22

paperwork 111:8,21 112:4, 7,11,18,19 113:7,20 114:8, 9,25 194:5,8, 10,14 195:11

paragraph 100:7 255:22

paragraphs 157:8

Pardon 86:25

parent 101:19 102:15,16 197:5 200:12, 14 201:17,20 236:6

parent's 102:11,13

parental 181:7, 11 197:16 206:12 258:8, 12

parents 101:24 102:4,16,19 197:21,25 206:14 258:5

parents' 102:7 181:21 201:17

parked 155:9

parking 182:24

part 17:2 18:11 20:7 22:15 26:12 46:13,14 64:8 68:2 69:3 101:15 113:2 123:21 137:25 149:9 151:10 162:19 166:19 167:23 178:14 207:2 214:10 217:6 222:21 256:9 261:20 268:13 277:21, 22 281:5 282:13

participated 37:21

particulars 205:17

parties 7:15

partner 28:14 31:1,24 37:17, 18

partnered 25:18 26:10 136:10

partners 25:14,16,17

parts 22:9,14 46:15 83:21 137:19

party 149:13, 17 251:7 266:18

Pas- 6:9

Paso 6:9,11,22 7:1,3,5,7,24 8:1 14:5 15:21 16:15 17:24 18:15,19 20:3,6 25:7 39:14 81:4 95:13,17 105:15 108:10 109:21 118:23 127:5 145:6 156:11 240:10 253:17 255:25 258:16 259:16 272:17 284:22

Paso's 20:10 39:21 200:22

pass 18:16 40:17

past 33:24 151:25

patience 127:15

patrol 16:14 18:1,2,4,8,18 19:4 22:4,7 89:23,25 90:2, 10 91:7,8 92:7, 21 93:2,21 118:25 125:22 156:1

pattern 275:4

pay 285:25

PDF 127:17 134:3 264:19 290:18

pen 42:14

Penal 16:24 19:24 20:24

pending 6:10 9:25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 749 of 1026
The Deposition of GARD ARBOGAST, taken on June 30, 2020
314

pension 284:21 285:4

people 32:9 46:12 52:15 57:16 64:7 67:20,24 69:18, 22 76:4 84:4 96:22 155:8 165:19 189:12 209:22 224:8, 10,15 225:1 236:17 237:2, 23 240:15 242:8 243:13 266:11,24 268:11 269:19 274:4 277:6,24 278:2 280:11

performance 85:6

period 94:3,11, 18

permission 102:4,8,11,14, 18 180:23 181:2,21 182:3, 6 197:4,16 199:14,15 200:2,11,12,14 201:18 202:1,2, 4 206:13 225:21,24 226:1 258:8,12

permissions 202:22

person 31:5 35:7,10,20 52:14 54:2,6,15 64:4 65:3 68:6 82:17 87:12 91:12 92:14,17 96:11,18 97:9, 10,15 100:14 134:7 146:6 147:2 150:20 175:17 220:5 231:20 233:22 235:15,19,21 263:18 266:22 287:20

person's 61:20 63:15

251:12

personal 14:3, 6 106:21

personality 103:2

personnel 94:6 120:15 133:5

persons 19:10 21:2 22:23 23:11,20,22,25 24:21,23 25:14, 24 28:23 29:16, 20 30:4,15 31:7,24 32:5 33:1 67:4,7,11 69:3 73:21 85:5,9 86:8 87:12 88:1,5, 14,24 93:17 94:3,12,18 121:5 161:24 162:8,17 207:7 213:24 246:21 247:3 250:6

pertinent 43:1, 6

phone 15:1 220:18,19 256:16

phones 215:8

phrase 117:12

physical 16:23 29:11 89:21 90:1,3 94:22 131:7 280:19

physically 133:21

pick 57:22 114:6 160:12 166:4 169:8 202:11,15,22 203:18 237:13 256:7

picked 55:9 109:11,17 111:19 166:5, 20 202:17 204:14 236:5

238:24 252:16 253:3 257:20, 22 259:20,22 269:23

picture 190:3

piece 169:17

pin 63:17 211:17 245:8, 11 246:2

place 24:25 45:4 54:5 91:12 110:9 123:8 182:22,23 193:19 196:4 221:8 244:9 278:11

places 51:5 110:7 111:18 221:6

placing 199:16

Plaintiff 6:17 8:17

Plaintiff's 6:15

plausible 243:11

play 181:22

ploys 60:15,21

plus-50 165:16

point 24:6 33:23 35:2 49:24 56:13 58:12,25 60:1 64:18 66:24 71:25 77:16 83:5 91:2 106:2 110:20 116:13 129:15 147:17 154:3 165:5 167:1 169:14 171:3 203:23 204:1 205:7,25 215:23 245:21 250:13 255:22 260:5 261:14, 17 264:15 265:19 267:22

pointed 118:10 263:19

pointing 74:20

points 78:11, 12 84:25 243:2

pol- 39:21

poli- 198:3 272:17

police 14:5,6,9 16:5 17:24 18:19 20:3,6 21:22 37:2,7 39:14 40:9 67:21,25 69:23 81:4 89:22 90:5,8,11,16 94:6,10,17 95:17,22,24 96:2 98:3 104:24 105:15 108:10 118:11, 16,23 127:5 140:3 145:6,20 156:11 158:13 181:6 240:10 255:25 272:17 282:7

policies 20:3, 7,10 39:15,17 105:16,18 143:23 144:1 196:23 200:22 201:7,10

policy 40:4,6,8 41:20 67:16 91:3 98:3 104:23 106:6 108:10,18 109:6 111:4 114:16,18 115:9 182:5 197:20,23 198:8,12,19 207:19,20

Popeye 139:20 228:3,4 269:9 270:9,14 273:5, 24 274:14,23 276:13,18,23 277:10 278:8 279:16,18 281:8,12,14,17 282:1,11,18

portion 93:18 99:25

positive 186:19

possibility 54:3

possibly 157:11

potential 53:17,21,23 211:21 212:1 238:21 249:1, 18,20 252:4 263:19

practice 33:7, 19,20 34:2 35:13 40:16 41:18 42:3 51:25 52:3 55:6,17 59:13 60:9 61:16 62:12 65:6 66:18 67:10 71:7 72:23,25 73:12 78:21 82:6 83:15 97:7,15 99:21 109:11 111:24 114:15 162:7,8 177:5 179:17 232:4 240:10, 23 266:7 267:15

practices 99:4

precautions 101:17 104:20

preparation 10:24 13:21 49:4

prepare 10:19 14:14 15:2,5,11 21:22 194:5 267:16

prepared 14:17 15:14

preparing 195:11

present 14:23 49:14 101:20

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 750 of 1026
The Deposition of GERARD ROCHA, taken on June 30, 2020
315

102:17 112:7
137:9 151:19
187:3 222:7
245:4 254:6
277:10 278:3

**presenting**
282:8

**preserve**
213:12

**pressure**
60:23 61:2,7,
16,20 66:9,20

**presumption**
54:1

**pretend** 60:15

**pretty** 11:19
20:10,16 23:11
26:6,8 31:4
177:17,18
192:5

**prevent** 10:12,
16

**preventing**
40:4,8 67:17

**primary** 57:4,
13

**principal**
199:9,10
201:20

**prior** 33:4
141:16 169:14
194:18 197:16

**prioritize**
20:19

**Prisciliano**
270:17,20,22
271:16,20
272:1,24 273:5,
18

**prison** 286:10

**pro-** 109:12

**proactive**
22:19

**probable**
38:18,21 111:2
113:6 114:10
115:10,20

116:7 170:23
181:24 182:2
201:3 202:13,
14,16,20,23

**probation**
110:5,10,25
111:10,16,22,
25 112:3,8,10,
17,21 113:5
114:1,4,7,11,23
116:15 117:6,7
190:23 192:11,
12,23,25 193:7,
14 223:10
232:8 272:2
277:3

**problem** 35:17
132:23 243:19
246:17 273:12

**problems**
141:19 142:25
149:7

**procedural**
57:8 75:23

**Procedure**
17:9 19:24
20:24

**Procedures**
16:24

**proceed** 8:4

**proceeded**
15:23

**proceeding**
11:3

**proceedings**
175:6

**process** 19:15
75:20 77:2
79:11 111:15
116:14,16
171:21 201:5
236:21 237:21
242:11 288:12

**processing**
183:17 187:9

**program** 37:9
227:10

**project** 27:4,6

**promised**
97:1,2

**promises**
272:4

**promote** 19:12

**promoted**
20:10

**promoting**
19:15

**promotions**
25:10

**pronounce**
253:23

**properly**
213:2,3

**property**
119:13 283:4,
12

**proportional**
92:16

**prosecuted**
282:16

**prosecutor**
62:4

**prosecutor's**
282:10,18

**prosecutors**
282:15

**protect** 16:25
36:2

**protections**
98:4

**protocol**
109:12

**prove** 118:3
274:22

**provide** 67:20,
24 69:15 191:7,
10,11,12

**provided**
70:12,14

**psychological**
65:22,25

**psychologist**
66:2

**public** 7:25
27:7 45:20
199:4 256:14,
22,23 257:1

**pull** 55:21
86:18 132:18
210:4 236:18,
24 238:16
240:19 254:11
271:2

**pulled** 54:24
126:5,9

**pulling** 85:17

**punishment**
62:10

**punitive** 283:1

**purpose** 72:22
82:21 96:10,20
199:16 264:3

**put** 7:17 38:18
41:25 45:7
60:23 61:2
71:24 72:18
91:15 115:2
128:12 134:11,
22 135:18,22
170:23 224:13
235:10 248:1

**puts** 211:9
288:21

**putting** 40:9
213:1 270:4

---

**Q**

**ques-** 200:6

**question** 9:20,
21 10:1 17:16
34:5 54:18,19
71:18 72:1,9
77:21 96:5
98:20 107:2,18
116:12,18
117:19 123:8,
19 124:16,17
135:10 136:25
159:24 175:10,
12,20,22,24
186:1 198:6
199:11,14

200:2,6,15
203:22 216:7
230:12 231:25
234:18 242:13,
14,18 243:25
244:10 245:9,
23 246:1
247:23 266:6,7
267:6 268:8
273:11 278:16
288:16,23

**questioned**
101:20 191:16
193:20,23
213:22

**questioning**
101:23 103:22
104:9 199:7,16
200:11 244:3

**questions**
8:18 9:15,16
20:12 70:21
72:11 78:14,18,
25 79:6,19
107:13 135:24,
25 196:10
237:18 267:11
271:11 273:16
282:24 287:5,
17,22

**quicker** 187:24

**quickly** 40:22

**quiet** 222:14

**quit** 145:20

---

**R**

**R-E-I-D** 51:18

**Railroad** 18:17

**raise** 250:22

**raising** 170:9

**Ram** 283:25

**Ramirez**
139:20

**ran** 18:15 135:4
256:19

**Rangel** 139:22
159:10,19

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 751 of 1026
The Deposition of GARZA, RECORDS Taker on June 30, 2022

316

160:17 161:7,
11 162:15
163:3 164:1
166:24 167:2,
11,13 168:19,
21 169:24
170:7,10,22
171:2,16
174:20 270:4

**Rangel's**
170:17

**ranked** 19:19

**raped** 250:25

**rated** 19:17

**rea-** 10:15
132:3

**reach** 27:3

**reached**
125:15

**read** 12:20,23
13:4,10,13,16
41:15 45:7
56:14 100:1,6,
7,9 114:10
121:25 128:7,
12,15,23 129:1,
3,12 131:22
133:16,18
161:21 162:14
173:12 179:14,
18,21,23 180:1,
6 200:2,10
208:4 209:12,
16 210:9
216:18 226:4
238:12,13
239:17,24
262:24 269:11
290:22

**reading** 13:8
105:24 122:20
128:24 192:15
198:10

**reads** 110:21
129:16 134:11
157:9

**ready** 42:14
149:22 177:18
264:10

**real** 35:1 143:2
219:18,25
220:4

**reask** 245:22,
24

**reason** 30:11
53:4,20,22
69:22 70:20
87:11 101:16,
18 113:14
132:6 133:21
148:17 158:19
179:25 180:5
185:20 191:23
198:11,19
199:10 213:16
235:23 237:22
239:9,15
241:23 244:11
250:1 261:4
273:1,4,8
282:24

**reasonable**
129:25

**recall** 13:20
34:11 58:7 85:4
89:11 94:24
95:1,2 106:9
119:5,19,23
121:22 123:7
125:19 131:14
133:23 138:9,
13 139:12
161:7,13
175:10,19,22
176:11,14
180:19 192:19
222:16 243:1
253:21 254:2
260:21 270:4
288:5

**receive** 16:22
25:2 32:21 36:7
41:14 81:24
82:8 104:3

**received** 52:8,
10 55:6 60:5,19
66:15 73:18
74:17 88:4
118:22 119:1
154:15,20
157:11 159:9,
18 232:9

**receiving** 85:5
89:11 119:12

**recent** 150:21

**recently**
238:14

**recognize**
85:25 86:3
141:3 161:23
226:17 233:19
254:20 255:16
271:13

**recollection**
170:25

**record** 6:1 7:11
8:12,22 36:11
43:23 50:18,19,
22 67:5,7,11,13
74:20 75:10,13
98:11,13,16
99:10,14,17
107:17 154:5,8
161:2 195:19,
22,25 231:19
233:1,4 279:3,
6,9 289:2,3
291:3

**recorded** 37:2
43:11,15,16
44:13 66:23
67:1 168:12

**recording** 37:6
67:17

**recover** 51:4

**recur** 29:15

**reduce** 71:22

**reduced** 43:2,7

**refer** 41:5
217:12,24

**reference**
33:23 123:19
244:21

**referring** 91:3
160:24 161:2
173:15

**refers** 216:15

**reflected**
276:10

**refresh** 121:10
184:4

**refuse** 63:4

**regular** 28:14

**Reid** 51:13,16,
18

**relationship**
145:5

**relative** 274:12

**relatives**
285:19

**relay** 215:11

**relayed** 244:15

**rele-** 244:15

**released**
231:24 257:11

**releasing**
257:3

**relevance**
283:2

**relevant** 21:16,
19 42:20
267:17 274:9

**reliability**
68:23

**reliable** 68:13
278:2 280:2,17

**religion** 57:23
61:20

**religious**
57:22

**rely** 44:15
143:25 144:2

**rem-** 138:10

**remain** 19:3
22:22 23:17
24:3 28:22
35:23 36:1
77:25 192:9

**remaining**
36:4

**remember**
12:6 13:8,18
17:8,10 19:19

20:12,19 24:5,
6,11 25:18
27:11 32:23
60:11 71:23
81:23 84:4
85:12,16 88:18
95:5,6 109:25
119:25 120:18
121:12,14,15,
20,21,25
122:11,19
123:15 125:24,
25 126:3,4
130:8,25
131:17 132:15
133:25 136:15
137:5 138:4,5,
11,18,20,23
139:10 140:22
142:11 144:10
146:25 154:11,
19 155:1,18
160:18 165:17
166:8,17,25
167:5,22,24
168:2,6 169:7
170:19 171:3
173:2,3 174:2
176:4 177:15,
21,23 178:12,
14,15,17,19,25
179:16 181:1
183:2,4 184:22,
24 185:1
186:24 187:2,7
189:5 192:1,14,
17 196:17,19
201:8 204:7,9,
13 205:6,8
206:6,14,16
217:6 222:14
223:4 224:13,
14,16,19
228:15 229:13
231:3,4 237:14
238:15 239:4,6
243:3,15,16
244:14,16
247:24,25
248:2 249:6,22
250:3 251:8,20
253:6 254:10
256:5,6,10,14
257:19,23
258:4 259:10,
13,24 264:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com



KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 752 of 1026
The Deposition of GARD ARROCHA, taken on June 30, 2022
317

265:20 267:21
268:13 269:11,
20 270:7,11,16,
24 276:15
277:14 278:10

**remembered**
68:6 76:8

**remembering**
180:12 257:21

**remotely** 7:22

**repeat** 18:5
21:18 22:11
35:16 43:4
44:18 52:1 59:8
60:25 67:22
107:2 124:24
270:19

**report** 13:10
15:8 36:24
37:25 38:4,6
39:4,6,15,23
41:8,12,19
86:15 95:21,24
113:5 120:15
133:5 147:12
154:23 156:12,
15 157:5 158:9,
13,16,20
208:22 226:9,
18 227:1,4
228:9,13 229:2,
16 231:12
232:9 260:3,18

**reporter** 6:3
7:21 9:5 132:21
289:2,6,9,11,
14,16,19,21,24
290:2,6,12,15,
21,24

**Reporters** 6:4

**reporting** 7:22
234:9

**reports** 13:13
14:10 37:10,12,
16,23 38:10,14
39:2 41:22,25
42:3 46:5 47:7,
12 69:4 111:1
115:10,20
118:11,16
192:15 288:18

**represent**
265:5

**representing**
6:3,21,22

**reprimand**
119:18

**request**
199:13,15

**requested**
197:16

**require** 25:7

**required** 17:3
36:24 37:1
112:3 113:8
114:9 165:1

**requires**
114:24

**reserve** 287:22

**residence**
155:11 251:12

**resisted** 91:11
135:7

**resisting** 92:4

**response**
58:13 76:1 86:5
129:2,5

**responsibilitie
s** 21:2,7

**responsibility**
134:25 135:15

**responsible**
159:10,21
275:6 282:7
285:19

**rest** 150:8

**result** 119:6
157:19

**retired** 145:19

**return** 29:15

**review** 10:19,
24 13:2,24
14:3,18 37:5
41:14,24 78:10
111:1 128:17
129:9 211:3

240:7 262:20

**reviewed**
10:21 41:9,19
49:3,5 131:3
216:16 217:1

**reviewing**
13:20 130:5
226:5

**reviews**
115:10,19

**Rick** 153:15
157:23 158:3,9,
14,17

**ride** 180:14
251:5 259:15

**rights** 17:3,6,
17 56:15 57:9
118:1 179:15,
19,21,23 180:1,
6,7 193:16
194:7 258:3

**risk** 34:17
54:14,17,19
55:1

**robberies** 21:8
22:9,14 24:8

**robbers** 22:20

**robbery** 21:3,4
22:22 24:2,3

**Robert** 132:16
133:10,20,24
139:13 149:12
211:10 254:4,7
257:5,14,15
260:6 263:16,
18 264:8,12
265:6,11,15,16,
18 266:1 268:1

**Rock** 141:2

**Rodney** 140:8,
9,10 166:1,2,4,
20,22 167:8
168:7,10,25
169:2,6,13
170:2,4 203:19,
21 204:12,13,
25 205:6,10,22,
25 206:12,24
207:3,5,8 208:9

209:7 211:6,21
212:2,12,16
213:13,17
216:20 217:11
234:21 235:1

**Rodney's**
212:9 216:14
237:15 238:13

**Rodriguez**
119:24 120:23

**Rodriguez's**
121:18

**role** 47:16
191:7

**rolling** 123:4

**room** 77:25

**Rosario**
119:23 120:22
121:18

**route** 183:2,8,
10,14 184:4,7,
15,16,18

**routine** 201:1

**row** 165:18

**rude** 121:23
122:2,22 123:3

**Rudy** 139:24
140:1 146:9
147:3 149:7,8,
13,16,17,21,23
150:1,6,13
151:16,24
152:8 153:8,14
157:13,19,23
160:6

**Rudy's** 140:5

**rule** 280:14

**ruled** 152:9,10
153:7 160:7,13
261:1,7 268:10

**rules** 9:4 57:9

**run** 144:6
256:16

**run-ins** 140:3

## S

**sa-** 188:15

**San** 6:23

**Santa** 31:16

**sat** 88:17

**Saucedo**
73:23 124:2

**savings**
284:11,12,13

**say-** 100:18
159:7

**scared** 150:12
247:9

**scene** 26:1
28:18,19,20
36:19 42:11,13
90:7 146:18
154:23,24
155:19 156:2

**scenes** 30:9

**school** 15:18
55:13 58:16
59:16 166:20
199:8,9,14,15
200:3,5,6,11
201:15,16,18,
21,23,25 202:4,
12,21 204:17
256:4,6

**schools** 25:6
32:15,18,22
33:3 51:2,10
60:11 199:4

**schools'** 51:1

**score** 20:9

**scored** 19:18

**Scott** 6:20,21
142:18 143:1
144:4,22 145:5,
9 148:21
177:22 208:7
218:25 243:18

**screen** 48:19
254:12 255:9



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 753 of 1026
The Deposition of GARD ARBOGAST, taken on June 20, 2023

318

screened
125:15

scroll 86:6,10
87:4 105:19
110:17 122:3
123:6,23 127:9
128:19,21,25
134:2 149:4
156:10 159:2
162:20 175:8
176:5,6 199:1
209:12 210:24
230:5 233:18
234:16 240:1
254:21,23
255:20 260:4
262:13,25
263:8 271:23

scrolled
105:21 210:14,
15

scrolling
121:8 128:1
129:24 133:4,
15 148:20
149:20 150:11
157:1 161:22
197:12 226:25
234:8 254:21

search 158:4,7

seat 223:19

sec 99:10
175:2

second-to-last
227:23

seconds
183:19 185:9
187:1

section 19:11
20:13 22:23
41:21 86:10,11
87:5 105:24
128:3 162:22
239:23

Security 48:7
49:20,25

seek 23:7,9
25:10 102:4,11
282:25 283:1

seeking 84:19

self-defense
64:5

send 244:2

sense 9:9,13,
16 10:3 74:12
145:22 161:6
244:2

sentence
106:2 123:1,18
129:15 197:14
227:23

sentences
128:10

separate 11:18
23:21 37:23
104:25

separated
24:2 163:14

separately
81:11,14

September
175:6

sergeant
41:15,19 73:22
74:9 81:17,19
87:16 148:5
154:16 155:3,
21 166:3,10
169:7 170:19
172:1,16
185:10,20
186:2,7,13

sergeants
74:13,19 81:9
87:18

serve 15:23
16:1,3,5 96:16

services
104:24 105:1
106:4 108:24
109:3 110:3

serving 47:16

set 92:7

sexual 29:11

shaken 247:8,
10,12,14 248:6

shape 220:20,
23

share 41:22
42:3 69:4
85:18,21 105:3
120:1,6,7
126:12 151:7
161:15 174:15
183:20 186:13
207:10 214:11
216:1,8 219:10,
15 233:15
262:7 271:10

shared 151:10,
13

shares 211:6

sharing 48:19
50:10 86:17
87:9 105:5
116:13 125:17
127:12,16
132:12 135:9
148:12 153:17,
18 158:24
160:20 161:16
174:12 177:4
184:19 196:22
202:25 215:13
226:10 230:19
240:4 244:22
246:11 254:12
256:12 261:16
262:10 271:3
272:14

shed 264:4

sheet 189:11

shell 155:16

sheriff's
257:25

shift 93:7
164:24

shifts 93:10

shoes 287:13

shoo- 168:11

shoot 91:14
107:1 149:24
150:24 259:24
290:1

shooter 153:15
248:18 266:23

shooting
147:4 155:8
159:11,22
168:8,11 206:4
211:7 218:10
239:10 240:17
244:6 246:9
247:1,25 249:2,
5,18,24 251:3
253:10 256:15,
17 260:10
261:24 266:18
268:12 269:7,
17 270:23
272:25 273:22
274:15 275:13,
15 276:14
277:3 281:25

shootings
270:15 275:4

shopping
184:12

short 25:22
72:9 193:2

shot 92:3
150:14,25
155:8 211:10
249:10

show 34:14
43:19 48:13
85:13 89:16
97:8,24 110:19
118:16 148:8
153:19 156:4
169:5 196:20
197:11 202:17
223:2 226:9
234:10 259:25

showed
149:13 227:24
251:6

showing 75:1
159:8 223:23
249:25

shown 156:14
207:21

shows 43:18
84:12

Si 264:18

sic 6:11 133:20

side 79:10
109:24 156:22

sides 190:8

sight 221:14

sign 38:8,11,
15,24 87:23
96:7 97:4 163:6
164:7 167:19
173:9,18
179:18 189:11,
14 290:22

signature
86:15 87:1
162:22,24
163:1 168:1

signatures
254:25 255:3,6,
12,13,16

signed 37:25
38:4 97:9 124:4
163:5,7,8,10
167:21,23
168:4 172:19
173:6,13,16,25
189:4,9,13
191:25 192:6
221:25 222:25
269:3

significant
83:23 84:2,8
185:8 219:19,
25 220:4

signify 38:5

signing 161:11
163:3 164:3,4
167:14 223:14

signs 116:24
117:1,4 222:8
270:6

sir 8:9,10,16
9:1 15:16 22:6
25:5 34:3 48:24
50:25 51:11
55:19 65:4
67:14 68:18
93:6 94:14
98:10 129:3,6

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 754 of 1026
The Deposition of EARL ARBOGAST, taken on June 24, 2020
319

131:2 154:11,
14 175:9 181:9
183:11 203:25
207:23 214:7,9
215:5 232:22
233:7 242:13
256:18 271:12
281:4 287:17

**sister** 147:20,
23

**sit-** 103:11

**sitting** 31:9
98:21 108:5
122:13 136:17
169:23 184:15
186:20 201:9
223:19 224:18
238:5 239:8,14
259:8 269:21
281:7 286:5,13

**situation**
266:21

**situations**
58:18 103:3

**skills** 86:12
88:1

**small** 113:4
284:8

**smell** 30:10

**snitched**
268:2,5

**Snoopy**
216:15,20
217:13

**Social** 48:7
49:20,25

**solve** 75:3,4

**some-** 109:10

**somebody's**
57:21 210:6

**someone's**
68:15 278:13,
20

**something's**
78:19

**sort** 63:8
122:25 123:17

**sound** 119:14

**sounds** 147:10

**source** 83:8
157:16

**speak** 9:8
206:13

**SPEAKER**
199:21,23
264:18 278:25

**speaking**
107:9,15
152:23

**spec-** 257:10

**specific** 27:11
58:2 66:16
83:16,17 85:16
95:5 138:19
140:4 194:24
195:1 201:7

**specifically**
17:11 237:15
264:7

**specifics**
249:23

**speculation**
106:20 107:5,
25 108:14
117:18 118:6
124:12 131:25
132:9 138:16
139:1 152:1
153:10 198:5,
15,22 200:17,
18,24 211:25
213:8 217:18
218:17 229:5
232:15 236:4
238:11 239:3,
12 241:1
243:14 257:12
273:2,10
274:11,20
276:5 278:4
282:21 286:11,
24 287:9

**spell** 8:22

**spelled** 51:18

**spent** 26:15

**spoke** 207:8
233:8

**sta-** 225:10

**stabbed**
150:13

**stages** 185:11,
13

**stamped**
148:16

**stamps** 208:18

**stand** 219:17

**standard** 92:6

**standards**
131:24 132:7

**standing**
135:17

**start** 8:21 50:7
53:18 71:22
89:25 91:6
105:9 159:15
196:12 236:20,
21

**started** 18:23
21:1 24:2 49:17
76:17 129:19
144:17 149:16
162:10,12
170:17 171:1
212:14 229:8
242:11

**starting** 6:15
86:21 98:8
105:6 123:24
133:2 207:15
229:10

**starts** 56:23
159:16 208:21
213:18

**state** 6:13 7:10
8:22 31:12,14
161:2 281:7

**state-** 260:18

**stated** 260:8

**statement**
12:19,20,23
48:25 49:17
57:5,11 62:19
63:10,12,13,17,
23,24,25 64:8
65:10 71:9,12
72:16 73:1
75:25 76:5
77:6,22,23
78:3,16,25
79:3,4,16,24
81:22,25 82:11,
14,17,24 83:15
84:18,21 96:8,
10,11,12,16,22,
23 97:9,10,11,
16,17,23 99:25
100:2,5,14,15,
16,24 106:12
109:14,23
110:6,9 111:9,
11 113:6
127:18,23
129:1,3,10,11
130:5,9,13
131:3,14,19,22,
23 132:7,10
134:3,7,10,14
146:16,18,19,
20 147:9,21,22
148:1,5,8,21
149:1,6,9
150:12 155:15
157:3,17 159:7,
12 160:24
161:8,12,24
162:9,10,17
163:3,10,17,19
164:21,22
165:21,25
166:7,15,18,24
167:2,5,12,15,
19 168:4,5,12,
15,19 170:3,17
171:19 174:20
196:25 197:4
201:22 202:5
203:2,10
206:18 207:5
208:2,6 209:6,
8,12,21 210:9
211:4,7,13,21
212:4,6,10,20,

21 213:3,18
215:22,24
216:2,14 217:2,
6,8,20 218:6,8,
9,11,15 219:13,
17 221:7,25
222:2,6,25
223:14 224:4,
24 225:3,4
229:11,23,25
230:2 233:12,
19,22 234:10,
12,18 235:8
236:11 237:15,
16 238:13
239:17,21,22,
23 240:7 241:6,
7,9,17,19,24
243:5 244:9,21
246:6,10,12,18,
22 248:11
252:5,10
253:22 254:2,3,
6,15 255:24
256:9 260:6
262:8,14,16,21
263:15 264:13,
14 265:3,6,11,
19,21,23,25
269:4,7,12,15
270:5,22
271:25 272:3

**statements**
12:10,11,15,17,
21,24 13:2,5,9,
17 46:6,13,20
57:18 74:5,7
76:1,23 77:8,
11,12,13,15,20
82:9,18 84:15
96:6 99:5,21,24
113:7 197:9
207:19 216:17
218:7,20 225:9,
11 236:8 237:9
238:8 244:7
250:14 253:11
266:14

**States** 6:10

**station** 17:21
30:5 89:22
90:6,8,9,11
94:10,17 247:4,
7



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 755 of 1026
The Deposition of EARL ARBOGAST, taken on June 30, 2020
320

stations 90:5
183:1 185:5

staying 172:4

stenographic
7:23

step 114:23
205:19

steps 103:24
104:14 193:18

stint 76:10

stipulate 8:14

stipulation
8:12

stocks 284:10

stood 123:4

stop 9:17 50:10
86:17 87:9
116:13 125:17
127:12 132:12
135:9 153:17,
18 154:2
158:24 160:19
174:12 177:4
184:19 186:21,
24 187:8,11
202:25 215:13
230:17,19
240:4 246:11
256:12 261:16
271:3 272:13

stopped
176:20 183:5

stores 22:17

story 71:21
83:24

straight 112:9
114:22

street 6:5
18:16 176:3
183:13 184:1,
10,11 187:10

stretch 190:4

strike 33:17
36:25 40:15
63:1 66:16 67:5
71:4,6,16 72:24
73:24 82:12

88:4 95:1,20
100:12 105:14
116:15,25
117:11 137:8
142:16 151:4
154:17 174:6
195:9 197:22
231:14 252:15

strong 55:23
56:14 57:17
148:24

struck 130:6
131:4 138:6

stu- 200:13

stuck 26:8

student 199:15
200:11 201:25

Students
199:3

studying 20:22

stuff 30:10
143:16

style 54:22

Subaru 284:4

subdued 91:25

subject 32:19
33:21 80:16
129:19,20
130:1 134:12

subjects 17:11
19:22 20:16
260:12

submit 78:4

subsequent
166:23

subsequently
262:3 266:16

sufficed
132:11

sufficient
135:19

sugge- 64:2

suggest 62:3,
12 63:2,6 64:3,
10

suggested
63:11

suggestible
101:5,7

suggesting
62:25 84:11

suggestions
61:25

suggests 64:5

Suite 6:5

summarize
50:5

supervise
74:2

supervising
74:14

supervisor
73:20 80:24
81:8 124:2

supervisors
74:1,16,25

supplement
39:25 47:9
113:4 226:17

supplemental
13:10 15:7
39:2,3

supplementar
y 156:12 157:5

support
285:12,16

suppose 58:4

supposed
79:2 104:8
136:1 277:18

supposedly
266:22

surprised
180:22

surprises 89:3

survivor
246:25

survivors
249:7 256:15

survivors'
280:23

suspect 17:16
27:24 28:2
34:13,14,18
36:22 43:14,18,
19 49:9 51:23
52:14,25 53:5,
17,21,23 54:24
55:20,23 56:1,
3,7,11,14 57:14
58:10,11,13
59:1 61:11,25
62:9,25 63:2,7,
20 64:4,11 66:3
70:12,25 71:1,
19,21 72:5,14
84:22 85:1
89:22 94:9,22
100:5 102:7,12
103:25 104:13
106:4 109:16
111:5,19,24
125:25 126:4,9
130:6,14
131:16,20
134:23 146:6
158:13 169:6,
16 181:17,20
201:2 202:12
211:21 212:1
213:4 225:8,15
235:3 236:14,
19 237:21
238:7,20
239:10,16
240:11,13,17,
20 241:14,16,
24 242:1 244:3,
13 263:20
266:23 268:10

suspect's
43:11 58:25
59:7 61:17
71:13 118:10,
16

suspected
138:14

suspects
12:18 17:7
21:14 27:18
34:21 35:2
52:4,16 55:22
59:18,22,25

60:24 61:3
65:23 66:8,10,
19 73:9 84:24
90:2,11,23
101:1,2 102:5,6
108:21,25
109:3 152:9
155:22,24
160:16 179:18
182:7 218:21
219:9,11
235:12,18
236:25 253:22
261:1,7 270:9
277:9 280:10
287:11

suspects'
74:21 75:2

suspended
119:5,9

suspension
119:12,17

sustained
93:14

swing 129:19

sworn 8:3,6

swung 130:9,
14,19,24 131:4

Sydney 6:2
50:23 75:14
98:17 99:18
154:9 196:1
233:5 279:10

system 45:7

_____ T _____

ta- 241:12

table 74:10

Tabullo 30:23
31:1

tackled 135:5

tactics 61:18

taint 62:18

takes 77:5
110:22



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 756 of 1026
The Deposition of EARD ARBOGAST, taken on June 30, 2020
321

**taking** 9:6
10:8,12 30:9
40:18 49:17
66:16 69:19
71:3,7,15 76:4
82:11,14 83:15
84:18,21 99:21
109:13 110:24
111:16 112:20
146:17 162:10
163:16 171:19
177:15 208:21
214:21 222:12
224:4 225:17
231:15 236:11
241:23 265:25
279:13

**talk** 9:12 14:18
44:9 57:14
61:12 63:4
64:14 66:4 74:6
80:2,8,9,12
82:6 104:21
137:1,2 144:13
156:1 160:10
202:4,5 204:12,
24 213:21
215:15 220:12
224:22 242:2
262:3 264:10
266:11 268:11

**talked** 14:19
57:16 60:7
69:2,18 83:11
99:20 103:12,
15 113:19
138:6 141:6
142:13 144:11,
14,19 145:15
166:9 171:8,10,
12,15 183:4
205:1,7 217:7
220:20 224:3,
14 234:20
237:9 241:22
244:25 246:4
253:2 266:14,
15,16 288:5

**talking** 33:23
34:1 46:19
47:2,14 58:11,
15 63:3 69:7
82:1 99:3
103:23 104:13

111:7 113:14,
16 123:3 142:4,
6,7 153:4
168:25 170:22
181:10 190:21
195:5 203:24
205:10 212:14
215:4 219:23
234:6 235:3,23
263:25 265:14
267:7

**task** 191:2,14
253:18,19
269:22 272:19,
20 275:6,18,21

**tasked** 166:13
172:20

**tasking** 170:20

**taught** 17:9
59:15 60:10

**team** 143:14
215:2 216:2

**Teams** 74:6

**technician**
6:1,2 7:9,14,19
50:21 75:9,12
98:12,15 99:13,
16 154:4,7
195:21,24
232:25 233:3
279:5,8 291:1

**technique**
64:16,19,23
65:1,2,7

**techniques**
16:25 57:4,12,
13 58:3,5,7,10
59:14 62:20,25
103:15,20

**teenage**
249:10

**teenagers**
249:8

**telling** 10:22
14:12,22 60:2
184:17

**ten** 188:1

**tended** 118:16

257:7,16

**Teri** 147:20,23

**Terrance**
147:3,5 148:2,
11,24 266:16

**territory** 252:1

**test** 20:16
68:23 82:15

**tested** 20:2

**testicles** 126:1

**testified** 8:6
11:1 95:7
106:21 243:18
251:24 254:17
265:9

**testify** 15:14
44:22 95:10
96:17

**testifying**
10:13,16 44:17
95:13,17
176:11,14

**testimony**
10:25 11:2,9,
10,12,13,14,16
12:2,7,12,13,15
13:22 114:2
137:16 138:22
175:5 176:19,
25 184:22
215:14,17
241:11 288:9

**Texas** 6:11,23
7:1,8,22,24 8:1
31:14 285:2

**textbooks**
19:25 20:1

**thing** 9:25 35:6
37:18 65:21
83:25 89:17
100:24 129:20
137:18 140:7
144:17 146:14,
17 155:1
181:22 189:3
201:14 222:20
248:5,23 253:6
287:14 289:12

**things** 9:9
20:23 22:16
42:9 44:20 50:7
57:7,15 58:9,16
61:7,21,22
104:8 138:11
146:15 178:15
197:11 205:9
267:3

**thinking**
212:25 225:4

**This'll** 183:21

**thought** 20:20
40:24 63:16
83:3 122:1,7
168:25 207:18
215:6,11 250:2

**threaten**
258:23

**threatened**
257:15 258:18
268:1

**threatening**
150:24 170:7
268:11

**threats** 250:18
272:4

**three-page**
86:21

**thrown** 270:5

**tie** 55:5

**Tierra** 162:16

**ties** 249:18,21

**time** 6:7 9:12
15:11 18:20
19:13 24:1,4,
14,21,24 25:23
28:23 30:24
36:15,17,21
40:1,17 41:17
44:9,12,20
49:17 50:13,24
55:9 57:21
66:24 67:3,6
75:10,15 79:19,
23 82:7 90:2
91:2 93:17,20
94:7,20,23
98:13,18 99:19

102:3 117:15
127:4 129:4
137:5,8 141:24
142:7,11,12
144:4,6 145:15
149:1 152:19
153:22 154:5,
10,17,21 155:5,
7,16 159:24
160:6 162:4,9,
11 164:21
165:18 166:18,
19 167:4
169:24 170:1
171:9 175:24
176:14 178:6
187:15 188:6,
21 192:5,20
193:25 194:13
195:22 196:2,
13,14 198:12
200:22,25
201:7 203:16
204:3,5 208:15,
17,21 209:2,3
211:10,13
212:19 213:20
214:22 218:12
220:1,6 221:3,
22,23 222:1,13,
15,22 225:18,
23 227:13,14,
15 228:16,23
229:8,10,19
230:18 231:9
232:8 233:1,6,
14 234:3,20
235:5 236:8
237:3 241:13
242:15,24
245:15,21
251:15 261:22
266:7 267:7,22
270:2 272:22
275:10 276:14,
24 279:6,11
280:11 282:12,
19 287:17,23
288:10,23

**times** 14:14
18:21 21:15
25:20 28:18
29:18 37:14
44:15 56:21
68:9 80:25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 757 of 1026
The Deposition of EARL ARBOGAST, taken on June 30, 2020

322

83:20 91:4
96:13 141:17
144:14,16,20
170:1,3 203:12
208:24 227:8
228:19 229:12,
13 236:25

**tip** 160:17

**today** 6:3,6
8:19 9:5 10:13,
16,24 13:21
14:16 15:14,16
31:9 46:11
50:24 75:15
98:18 99:19
108:5 122:13
135:17 136:17
141:24 154:10
184:15 186:20
196:2 201:9
224:18 233:6
238:5 239:9,14
259:8 279:11
281:7 284:20
286:5,13
287:17

**today's** 10:20
15:12

**told** 43:25
49:24 63:9
82:25 83:1 88:9
89:15,18 124:9,
18 130:10
138:23 147:2,3,
6 149:17,23
150:7 166:4
169:8 173:11
186:2,6 238:2,
6,22 241:4
243:2 252:7
257:14,15
258:15 264:8
265:15 272:24

**Ton-** 147:19

**Tony** 13:1
30:23

**Tonya** 49:1,6
146:16,20,23
157:16

**Tonya's**
147:19,20

**top** 48:21 86:22
105:9,10
126:18 133:4
148:20 156:10,
19 157:8 159:2
161:22 162:13
164:20,21
190:3 196:24
208:1 210:4
226:14 255:21
271:9

**topic** 136:6
232:20

**topics** 282:23

**totally** 101:3
258:22

**town** 18:12
26:13

**Toyota** 283:21

**train** 88:9

**trained** 31:19,
22 33:3,17,18
34:6,12,17 35:5
42:8,23 43:1,6,
10,13 51:13,22
53:25 54:4,19
57:13 58:2,23
59:8,17,21,24
60:8,14,23,25
61:2,24 62:3,9,
20,24 63:2,6
64:17,23,24
65:1,5,19,22
66:8,13,22
67:4,7 71:12
72:12 73:4
90:15,19,21
92:9,11 118:2

**training** 16:21
17:2 25:2,4,8
32:1,11,14,21
33:7,19,20
34:1,10 36:7
42:7 47:22
52:8,10,11,19
54:9 55:6,13,16
57:3 58:8,25
59:13,25 60:5,
18 62:15 64:3,
10 65:9 66:16,
19,21 71:5
73:13,17 74:17

81:24 82:8
103:12 117:10

**trainings** 51:1,
8

**transcribe**
39:24

**transcript**
175:5,9 290:9,
10

**transcripts**
11:9,16

**transfer** 23:5,
7,9 29:22 30:1,
13

**transferred**
23:4 30:4

**Transmountai
n** 251:16

**transport**
201:4

**transported**
115:4

**travel** 31:15,17

**trial** 11:5,9,11
44:17 175:5
251:24 282:14
283:2 287:23

**trials** 12:7

**trip** 253:7

**tripped** 126:1

**trouble** 30:9
148:18 151:21

**truck** 283:25

**true** 53:19 68:3
70:5 83:22
96:9,24 100:23
274:7,22

**trust** 145:8,11
290:19

**truth** 60:3
63:21 84:19
138:23 167:20
280:10

**truthfully**
10:13,16

**Tschirhart**
6:20,21 8:11,15
287:24 288:3,
22 289:16,17

**tunnel** 34:6,9

**turn** 53:19
122:10 146:4
195:17 268:6

**turned** 99:8,11
125:10 129:20
195:16 228:6,
10 229:3,17
230:3 278:21

**type** 36:24 37:9
38:10,14,20
39:3,6,11
40:14,21,23
51:21 57:10
58:15 77:11,12,
20 79:24 113:4

**typed** 39:23
41:8 71:8 77:9
78:3 79:15
127:24 208:20
214:1,5 228:23

**types** 92:13
168:15

**typical** 39:21
163:16 164:24
165:6 175:13
205:18

**typically** 40:14
41:22 48:3,10
71:8 177:5
182:1

**typing** 40:18,
25 71:11,17,18
72:12 78:6
171:24 222:2

———

**U**

———

**Uh-huh** 12:17
37:19 42:2,7
52:7,18 54:4
57:6,19 59:4
60:13 73:24
77:18 86:2
87:24 91:13
92:12 96:15

111:12 115:15
122:21 127:19
147:2 176:8
181:20 182:5
186:10 187:25
189:25 206:17
227:7 243:22
274:8

**ultimate** 115:5,
16

**ultimately**
169:2

**UMIC** 264:17

**unaware** 235:1

**unbiased**
35:23 36:2,4

**under-** 112:14

**undersigned**
157:17 158:6

**understand**
34:7 46:17 50:4
59:12 64:15
102:10 113:24
114:13 125:13
170:5 183:18
216:6 219:2
224:18 225:25
243:4,17
244:16 267:23

**understanding**
39:8 75:20
88:12 90:25
91:8 93:19
101:9 111:17,
23 112:15
115:8 125:5
131:18,23
136:1 146:12
153:7 173:24
194:4 200:21
201:24 202:11
224:2 242:12

**understands**
100:20

**understood**
9:21 96:12
97:11,16,25
100:9 101:4
114:18 118:9
124:4 146:25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

216:13 222:6,8

**UNIDENTIFIED** 199:21,23 264:18 278:25

**uniform** 19:1

**unit** 24:6 25:25

**United** 6:10

**units** 177:8

**University** 285:1

**unnecessary** 110:23 112:6

**unreliable** 268:25

**unsure** 53:2

**untrue** 280:7

**updated** 185:21

**upper** 86:1,23

**usable** 212:10

**useless** 114:23

—— V ——

**vacation** 152:20

**valuables** 285:8

**vanished** 98:20

**Varrio** 141:4 252:17,21 269:17 274:5 275:12,14

**vehicles** 249:25 283:14

**verbal** 79:5 86:5 129:2,5

**Verde** 162:16

**version** 290:18

**versus** 6:9

**Vi-** 179:10

**viable** 160:16

**vicinity** 221:11

**victim** 150:25

**victim's** 146:24

**victims** 150:22 155:10,11,14 249:7 270:5

**video** 6:1,2 7:9, 14,19 13:24 50:21 75:9,12 98:12,15 99:13, 16 154:4,7 195:21,24 232:25 233:3 279:5,8 289:23 290:9 291:1,2

**videoconference** 6:7 50:23 75:14 98:17 99:18 154:9 196:1 233:5 279:10

**viewed** 132:2

**viewing** 36:18

**Village** 251:21

**Villegas** 6:9,18 8:18 12:8 106:17 107:21 116:2 139:8 146:6 159:10, 21 161:8 176:3 178:22 179:5,9, 11 181:25 182:13,18 188:17 189:6 190:22 196:6 207:16 211:14, 17 213:22 214:12,17 216:10 220:17 221:19 223:7, 11 226:23 230:23 233:9 234:21 236:22 237:7 245:8,11 246:2,6 252:16 269:23 270:17, 20,23 271:7,16,

20 272:1,25 273:18 275:16 278:8 286:6,9, 14

**Villegas'** 12:19 172:2,21 237:16 238:12

**Villegas's** 33:22 108:6 140:14 177:20 275:13 280:20 288:10

**Vincent** 13:1

**Vinson** 49:1 146:16,23 147:20 157:16 266:15,17

**violation** 75:23 240:23

**vision** 34:6,9

**VNE** 141:4

**voice** 40:11 170:9 250:22

**volume** 195:16

**voluntarily** 97:13,14 178:9 262:16 264:2 265:22

**vulnerable** 101:15

—— W ——

**wait** 53:24 54:7 69:15 99:8 287:19

**waiting** 98:19 171:6 190:6,15 221:20

**waiver** 124:5

**walk** 193:2 251:7

**walk-** 251:10

**walked** 149:21 251:3

**walking**

192:18

**Wallace** 6:17 8:16

**Wally** 8:11 64:21 98:8 137:25 146:2 195:14 196:3

**wanted** 15:4 45:23 63:24 76:7 78:11 87:21 150:3 166:10 202:6 203:2,10 212:4, 20 213:9 264:11 265:15, 22 267:9 274:17

**war-** 213:5

**warned** 193:15

**warning** 271:14

**warnings** 104:3,6,18 193:9,19,22 212:2,7 213:5, 14,18,22 221:24 236:12 240:12,22 241:13 242:3,6, 19,22 243:8 259:2 260:19

**warrant** 38:21 39:7,9 123:20 166:10 170:13, 14,18,24 171:1, 5,7,11,14 172:12,14,16 173:1,7,9,14,15 174:4 175:12, 16,18 176:12, 15,21 177:6,13 181:23 202:15 214:1

**watch** 55:1

**watching** 189:16

**ways** 73:8,13 80:20,22 127:10

**weak** 55:23

**weapons** 158:4

**west** 6:4 109:24 184:7, 10

**Western** 6:11

**white** 23:15,17, 21 24:20 26:15

**white-collar** 23:6

**Whoops** 105:20

**Wiles** 25:20

**Williams** 133:20,24 140:8,10 166:2, 21,22 167:8 168:7 169:1,2,6 170:2,4 203:19 204:12,13,25 205:6,10,22,25 207:3 208:9 209:7 211:21 213:13,17 217:12 234:21

**Williams's** 169:13

**wit-** 97:8

**witness's** 68:23

**witnessed** 78:8 90:10 95:9,22 99:5, 22,25 137:4,7 161:11,14 163:2,9 165:25 166:6,23 167:1, 21 168:3 170:17 171:19

**witnesses** 12:22,23,25 13:3 27:3,5,10, 16 38:11 44:1,4 45:23 46:25 69:7,9,15 74:6 82:15 83:9,24 84:14 97:4,6,8, 23 100:1,11,13,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 759 of 1026
The Deposition of EARL ARBOGAST, taken on June 30, 2020

324

19 113:7
155:13 181:13
182:6 201:15
202:9 236:24
255:14

**witnessing**
96:5,10,20
137:5 166:18
167:5,15

**woman** 124:9,
18 266:15

**wondering**
103:19 135:13
144:18

**word** 65:24

**words** 71:13,
19,25 72:6
149:22 181:23

**work** 18:24
19:1 21:25
22:3,5,7 25:13
26:7 28:16 76:5
141:15 165:14
258:16 272:18

**worked** 19:10
25:19,22,24
27:12 29:10
30:24 32:25
52:5 88:13
124:21 125:1,
14 141:8,13
142:18,22
143:2,6,19
145:5 151:13
165:8 285:1

**working** 23:14
26:4 28:7,21
32:13 55:10
76:24 143:21,
23 145:4 164:8
165:2,19 191:2

**world** 276:2

**worth** 283:8
285:8

**Wren** 176:3
183:24 184:2,
10

**wrestled** 91:15

**write** 37:12,15,
23 41:11 42:15,
16 44:16
170:12,13
171:1,7 252:25

**writes** 229:16

**writing** 39:15
42:11 43:3,8,
11,15,20
170:18 172:12

**written** 19:17
44:7,10 114:21
119:18 131:3
132:21 226:21
252:9,12
288:18

**wrong** 33:15
35:7,20 72:19
127:14 217:13

**wrongly**
286:14

**wrote** 38:1,6
127:13 170:15
174:21

———————

**Y**

———————

**y'all** 64:22
199:22

**year** 16:17
23:18 24:8 30:5
85:7 144:7
284:25

**year-** 19:8

**years** 16:1,2
19:5 24:24
25:25 31:16
32:8 33:1 91:4
127:7 145:16
165:17 167:22
205:22 208:14
234:2 272:1

**yell** 169:24
250:13,16

**yesterday**
14:20,21

**York** 32:24

**you-all** 99:1

178:5,9 220:12

**young** 246:25
249:8 266:15

**younger**
273:19

**youth** 104:2,24
105:1 106:4
108:24 109:2

———————

**Z**

———————

**Zachary** 6:3
7:21

**zoom** 6:18 7:8
48:21 85:22
120:8,13
126:18 148:19
208:3 226:14,
15 255:21

**zooming**
226:15 255:5



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

# ATTACHMENT 2-C

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



**KENTUCKIANA**

— COURT REPORTERS —

# NO. 3:15-CV-386

# DANIEL VILLEGAS

# V.

# CITY OF EL PASO, ET AL.

## DEPONENT:

## SCOTT GRAVES

## DATE:

## July 28, 2022



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273



www.kentuckianareporters.com

1                 IN THE UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
2                        EL PASO DIVISION

3    DANIEL VILLEGAS,              )
                                   )
4            Plaintiff,            )
     v                             ) No. 3:15-CV-386
5                                  )
     CITY OF EL PASO, et al.,      )
6                                  )
             Defendants.           )
7

8

9

10

11   **********************************************************

12                   ZOOM VIDEO DEPOSITION OF

13                        SCOTT GRAVES

14                       JULY 28, 2022

15   **********************************************************

16

17            ZOOM VIDEO DEPOSITION of SCOTT GRAVES,

18   produced as a witness at the instance of the Plaintiff,

19   and duly sworn, was taken in the above-styled and

20   numbered cause on JULY 28, 2022, from 9:05 a.m. to 3:59

21   p.m., via Zoom, pursuant to the Federal Rules of Civil

22   Procedure.

23

24                      Reported by:

25                      Ginger G. Zachary, CSR, RPR, CRR

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 763 of 1026
The Deposition of SCOTT GRAVES, taken May 17, 2023

2..5

Page 2

```
 1            A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
        Mr. Wallace Hilke
 3      LOEVY & LOEVY
        311 North Aberdeen Street
 4      Chicago, Illinois  60607
        (312) 243-5900
 5      hilke@loevy.com
 6
 7  FOR THE DEFENDANT CITY OF EL PASO:
        Mr. Scott M. Tschirhart
 8      DENTON NAVARRO ROCHA BERNAL & ZECH, PC
        2517 North Main Avenue
 9      San Antonio, Texas  78212
        (210) 227-3243
10      smtschirhart@rampagelaw.com
11
12  FOR THE DEFENDANTS EARL ARBOGAST, SCOTT GRAVES,
    HECTOR LOYA, AND RAY SANCHEZ:
13      Mr. James O. "Jim" Darnell
        Mr. James O. "Jeep" Darnell
14      Mr. Cris Estrada
        JIM DARNELL, PC
15      310 North Mesa Street, Suite 212
        El Paso, Texas  79901
16      (915) 532-2442
        jdarnell@jdarnell.com
17      jedarnell@jdarnell.com
        cestrada@jdarnell.com
18
19
        FOR THE DEFENDANT KIMMETT BELLOWS:
20      Mr. Eric M. Brittain
        WINDLE, HOOD, NORTON, BRITTAIN & JAY, LLP
21      201 East Main Drive, Suite 1350
        El Paso, Texas  79901
22      (915) 545-4900
        brittain@windlehood.com
23
24
25
```

Page 3

```
 1        A P P E A R A N C E S (continued)
 2  FOR THE DEFENDANT ALFONSO MARQUEZ:
        Mr. James A. Martinez
 3      JAMES A. MARTINEZ, PLLC
        7170 Westwind Drive, Suite 201
 4      El Paso, Texas  79912
        (915) 543-9712
 5      martinezja@jmeplaw.com
 6
 7  FOR THE DEFENDANT CARLOS ORTEGA:
        Mr. Andres E. Almanzan
 8      MOUNCE, GREEN, MYERS, SAFI,
        PAXSON & GALATZAN, PC
 9      100 North Stanton Street, Suite 1000
        El Paso, Texas  79901
10      (915) 532-2000
        almanzan@mgmsg.com
11
12
        ALSO PRESENT:
13      Texas Online Notary Public Elissa E. Chew,
        Commission No. 126254355
14      Video Technician Jessica Chase
        Mr. Michael Garcia
15
16                    INDEX
                                            PAGE
17  SCOTT GRAVES
18      By Mr. Hilke                           8
19  Reporter's Certificate                   215
20  Corrections and Signature               216
21
22
23
24
25
```

Page 4

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 01 | Chapter Seven, Juvenile | 30 |
| Exhibit 02 | Confessions, Admissions, and Statements | 68 |
| Exhibit 03 | Performance Evaluation Report, Supplement, 7-1-1992 - 12-31-1992 | 93 |
| Exhibit 04 | Performance Evaluation Report, Supplement, 7-1-1993 - 12-31-1993 | 94 |
| Exhibit 05 | El Paso Police Department Supplement Report, Statement of Rodney Williams, 4-21-1993 | 115 |
| Exhibit 06 | El Paso Police Department Supplement Report, Statement of Terri Vinson, 4-12-1993 | 119 |
| Exhibit 07 | El Paso Police Department Supplement Report, Statement of Terrance Strong Farrar, 4-12-1993 | 122 |
| Exhibit 08 | El Paso Police Department Supplement Report, Statement of Cynthia Talamantes, 4-14-1993 | 124 |
| Exhibit 09 | El Paso Police Department Supplement Report, Statement of Eduardo Valles, 4-14-1993 | 126 |
| Exhibit 10 | El Paso Police Department Supplement Report, Statement of Gilbert Garcia, 4-14-1993 | 128 |
| Exhibit 11 | El Paso Police Department Crimes Against Persons Division Supplementary Report, 5-6-1993 | 131 |
| Exhibit 12 | El Paso Police Department Supplement Report, 5-5-1993 | 135 |
| Exhibit 13 | Voluntary Statement of Accused, Marcos Gonzalez, 4-22-1993 | 180 |

Page 5

EXHIBITS (continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 14 | Voluntary Statement of Accused, Marcos Gonzalez, 4-22-1993 | 182 |
| Exhibit 15 | El Paso Police Department Internal Affairs Division Disciplinary History Card | 186 |
| Exhibit 16 | Court Testimony of Scott Graves, 12-9-1994 | 193 |
| Exhibit 17 | El Paso Police Department, El Paso, Texas, Inter-Office Memorandum, 7-18-1986 | 199 |
| Exhibit 18 | El Paso Police Department Multi-Purpose Sworn Supplement, 8-26-1986 | 201 |

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 764 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022

6..9

Page 6

1    THE VIDEO TECHNICIAN:  Okay.  My name is
2  Jessica Chase.  I'm the online video technician, and
3  Ginger Zachary is the court reporter.  We both represent
4  Kentuckiana Reporters, located at 730 West Main Street,
5  Suite 101, Louisville, Kentucky 40202.
6           Today is the 28th day of July 2022, and the
7  time is 10:05 [sic] a.m.  We are convened by
8  videoconference to take the deposition of Scott Graves
9  in the matter of Daniel Villegas versus City of El Paso,
10  et al., pending in the United States District Court for
11  the Western District of Texas, El Paso Division, Cause
12  Number 3:15-CV-386.
13           Will everyone but the witness please state
14  your appearance, how you are attending, and the location
15  you are attending from, starting with Plaintiff's
16  counsel?
17           MR. HILKE:  Good morning.  Wally Hilke for
18  Plaintiff Daniel Villegas, attending from the Loevy &
19  Loevy offices in Chicago, Illinois.
20           MR. ALMANZAN:  And this -- this is Andy
21  Almanzan appearing for Defendant Carlos Ortega.  I'm
22  here in my office in El Paso, Texas, and along with my
23  client -- excuse me.  Part of my client representation
24  is a law clerk, Michael Garcia, who's also attending
25  from El Paso, Texas.  Thank you.

Page 7

1           MR. TSCHIRHART:  This is Scott Tschirhart
2  representing the City of El Paso, attending from
3  San Antonio, Texas.
4           MR. JIM DARNELL:  This is Jim Darnell.  I'm
5  representing Scott Graves from the beautiful downtown
6  offices of me.
7           MR. MARTINEZ:  This is Jim Martin- --
8           MR. BRITTAIN:  Eric Brittain --
9           MR. MARTINEZ:  This is Jim Martinez.  I am
10  at my home office at Rancho Martinez in El Paso, Texas.
11  I represent Alfonso Marquez.
12           MR. BRITTAIN:  Eric Brittain on behalf of
13  Defendant Kimmett Bellows, in my office in downtown
14  El Paso, Texas.
15           THE VIDEO TECHNICIAN:  Okay.  Is that
16  everybody?
17           If that's everybody, Mr. Graves, will you
18  please state your name and hold your driver's license up
19  to the camera.
20           THE WITNESS:  Yes.  My name is Scott
21  Graves.
22           THE VIDEO TECHNICIAN:  Okay.  Thank you.
23           And do all parties agree the witness is, in
24  fact, Scott Graves?
25           MR. HILKE:  Yes.

Page 8

1           MR. TSCHIRHART:  Agreed.
2           THE VIDEO TECHNICIAN:  All right.  Perfect.
3           And then, Mr. Graves, will you please raise
4  your right hand?  And Ms. Chew will swear you in.
5           THE REPORTER:  My name is Ginger Zachary,
6  Texas CSR 5710.  I am reporting the deposition remotely
7  by stenographic means from Chaparral, New Mexico.  The
8  witness is located in El Paso, Texas.  The Texas Online
9  Notary Public is Elissa E. Chew, Commission number
10  126254355, located in El Paso, Texas, who will now
11  administer the oath.
12           (Witness duly sworn.)
13           MS. CHEW:  You may proceed, Counsel.
14              SCOTT GRAVES,
15  having been first duly sworn, testified as follows:
16              EXAMINATION
17  BY MR. HILKE:
18    Q.  Good morning, sir.  My name's Wally Hilke, and
19  I'm one of the lawyers for Plaintiff Daniel Villegas in
20  this case, and I'll be -- I'll be asking you some
21  questions today, but could we just start with you please
22  stating and spelling your name for the record?
23    A.  Yes.  It's Scott, S-C-O-T-T.  My last name is
24  Graves, G-R-A-V-E-S.
25    Q.  Great.

Page 9

1           And can you hear me okay on your end?
2    A.  Yes.
3    Q.  Great.
4           Have you ever had your deposition taken
5  before?
6    A.  No.
7    Q.  Okay.  I'm going to go over sort of a few
8  ground rules that'll make this go a little smoother
9  today.  Just like when you're in court, there is a court
10  reporter taking down everything we say, and so if you'll
11  keep your voice loud and answer verbally instead of with
12  like "uh-huh" or nodding your head, that'll make it
13  easier for her.  Does that make sense?
14    A.  Yes.
15    Q.  And, likewise, it's going to be important for
16  us to speak one at a time so she doesn't get furious
17  with both of us.  Does that make sense?
18    A.  Yes.
19    Q.  And I'm going to try to only ask you questions
20  today that make sense, but if anything I ask you doesn't
21  make sense, will you stop me and ask me to clarify?
22    A.  Yes.
23    Q.  And, likewise, if you answer, I -- I will
24  assume that you understood my question.  Is that fair?
25    A.  Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 10

1    Q.  And we can take breaks whenever you need to
2  today, but if I'm -- if I have a question I've just
3  asked you, I will ask you to answer it before we break.
4  Is that fair?
5    A.  Yes.
6    Q.  And do you have any health conditions that
7  affect your memory in any way?
8    A.  Yes, I do.
9    Q.  Okay.  What -- what health conditions do you
10 have?
11   A.  I have some stress disorders.
12   Q.  What stress disorders do you have?
13   A.  Post-traumatic stress.
14   Q.  And how does your post-traumatic stress affect
15 your memory?
16   A.  It -- it affects a lot of my ability to
17 remember.  I mean, it does affect that.
18   Q.  I understand.
19       And when were you first diagnosed with
20 post-traumatic stress?
21   A.  10 to 15 years ago.
22   Q.  And is there -- is there a particular time
23 period in your life that -- where you had the stresses
24 that you associate with your post-traumatic stress?
25   A.  Yes.

Page 11

1    Q.  What time period is that?
2    A.  I think from some things that happened in
3  the -- the Army and then also some things that happened
4  when I was a police officer.
5    Q.  Any particular period from when you were a
6  police officer?
7    A.  Yes.
8    Q.  What period is that?
9    A.  When I was in crimes against persons,
10 primarily.
11   Q.  And other than post-traumatic stress, do you
12 have other health conditions that impact your memory?
13   A.  I don't think so, no.
14   Q.  Okay.  And do you take any -- any prescription
15 drugs that impact your memory in any way?
16   A.  I don't know if they impact my memory or not.
17   Q.  Have you -- have you noticed any impact on your
18 ability to remember from any prescription drugs that you
19 take?
20   A.  Yes, on -- on one that I take for dreams.
21   Q.  I'm sorry.  I couldn't quite hear that answer.
22   A.  On one of the medicines that I take for dreams.
23   Q.  And did you say it's a medicine you take for
24 dreams?
25   A.  To prevent dreams.

Page 12

1    Q.  Oh, to prevent dreams.  Okay.
2        And what impacts do you notice from that
3  drug on your memory?
4    A.  I don't dream, and so, I mean, a lot of the
5  things that would bother me don't.
6    Q.  I see.
7        And does that affect your ability to say --
8  okay.  And which -- I'm sorry.  Which -- which drug in
9  particular is it that you take for dreams?
10   A.  I'd have to look at it.  It's a -- it's a blood
11 pressure medicine, and it's -- it's off -- it's an
12 off-label thing.
13   Q.  Okay.  Any -- any other prescriptions that you
14 take -- prescription drugs that you take that affect
15 your memory that you've noticed?
16   A.  I -- I don't think so.
17   Q.  Okay.  And then are you -- is there -- do you
18 have any -- any health conditions that would prevent you
19 from testifying honestly and truthfully today?
20   A.  No.
21   Q.  Are you taking any prescription drugs that
22 would make it more difficult to testify honestly and
23 truthfully today?
24   A.  No.
25   Q.  And are you currently under the influence of

Page 13

1  any drugs or alcohol?
2    A.  No.
3    Q.  Okay.  Without telling me anything you said to
4  your lawyer or anything your lawyer said to you, can you
5  tell me how you prepared for today's deposition?
6    A.  I looked at transcripts and statements.
7    Q.  Okay.  How many statements did you look at?
8    A.  I think three or four, probably.
9    Q.  Okay.  And whose statements were they?
10   A.  I think one of them was Rodney Williams, two
11 with Marco Gonzalez, and then Terrance Farrar.
12   Q.  Okay.  Did you review any other statements in
13 preparation for today?
14   A.  I don't believe so, no, sir.  Transcripts.
15   Q.  Sure.  And whose -- and the transcripts, who
16 was -- whose testimony did you review?
17   A.  Mine.
18   Q.  And how many transcripts did you review?
19   A.  I think it was three of them.
20   Q.  And were two of those transcripts from Daniel
21 Villegas's first and second criminal trials?
22   A.  Yes.
23   Q.  And was one of them from a suppression hearing
24 regarding Daniel Villegas?
25   A.  I think so, yeah.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1    Q.  And did you look at any other transcripts?
2    A.  No, sir.
3    Q.  Did you look at any other documents?
4    A.  No, sir.
5    Q.  And did you -- again, without telling me what
6  you said, did you speak with your attorney to prepare
7  for the deposition?
8    A.  Yes.
9    Q.  And how many times did you speak with your
10  attorney?
11    A.  Twice.
12    Q.  Okay.  And for how long, approximately?
13    A.  Oh, spent a couple hours.
14    Q.  And was anyone present for those conversations
15  other than you and your attorneys?
16    A.  No.
17    Q.  So did you review any -- any videos in
18  preparation for this deposition?
19    A.  No.
20    Q.  Or any personal notes about the Daniel -- about
21  the Electric Street murders?
22    A.  No.
23    Q.  Or anything else that you haven't mentioned?
24    A.  No.
25    Q.  Okay.  And have you -- say, in the last four

Page 15

1  years, have you spoken to Al Marquez at any time?
2    A.  No.
3    Q.  Have you talked to --
4    A.  Maybe at a hearing.  I might have said "hi" to
5  him at a hearing.
6    Q.  Did you --
7    A.  But I'm not sure if that was in the last four
8  years or not.
9    Q.  Did you say anything more substantive than "hi"
10  the last time you saw him?
11    A.  No.
12    Q.  What about Earl Arbogast?  Have you spoken with
13  him in the last four years?
14    A.  No.  It -- it would be the same.  I said "hi"
15  to him when I saw him at a hearing for this very case.
16    Q.  Okay.  And what about Carlos Ortega?  Have you
17  spoken to him in the last four years?
18    A.  No.
19    Q.  Kimmett Bellows?
20    A.  No.
21    Q.  Or Hector Loya?
22    A.  Who?
23    Q.  Hector Loya.
24    A.  No, sir.
25    Q.  Or Ray Sanchez.

Page 16

1    A.  No.
2    Q.  Is there anything you wanted to look at, but
3  didn't get a chance to to prepare for the deposition
4  today?
5    A.  Not that I'm aware of, no.
6    Q.  And did you have adequate time to prepare?
7    A.  I think so.
8    Q.  Okay.  Do you feel prepared to testify today?
9    A.  Honestly, no.
10    Q.  Is there anything that you want to make sure
11  you look at today so you can feel prepared, feel that
12  you had a chance to prepare?
13    A.  Not -- not that I can think off -- off the top
14  of my head, no.
15    Q.  Okay.  Sir, how old are you today?
16    A.  58.
17    Q.  Okay.  And where did you go to high school?
18    A.  In Martinsburg, New York.
19    Q.  Okay.  And you then joined the military; is
20  that right?
21    A.  Yes.
22    Q.  And what branch did you serve in?
23    A.  In the Army.
24    Q.  Okay.  How long did you serve?
25    A.  How long?  For three years active duty and then

Page 17

1  for a couple in the National Guard.
2    Q.  What kind of discharge did you receive?
3    A.  An honorable.
4    Q.  Okay.  Did you say "an honorable" discharge?
5    A.  An honorable discharge.
6    Q.  Okay.  Thank you, sir.
7        And where did you go after you left to the
8  Army?
9    A.  I stayed in El Paso.
10    Q.  Okay.  And that's where you were stationed for
11  a couple of years in the -- in the Army?
12    A.  Yes.  Well, I don't think it was a couple of
13  years.  I think it was a year and maybe a half.
14    Q.  While you were in the military, did you ever
15  serve as military police?
16    A.  No.
17    Q.  And then after you left the Army, was your next
18  employment with the El Paso Police Department?
19    A.  No.  It was with a construction company.
20    Q.  How long -- and how long, approximately, did
21  you work for that construction company?
22    A.  It -- it wasn't for long.  It was until I got
23  into the police department.
24    Q.  Okay.  So when you -- and so you applied to
25  become an -- you then applied to become a police officer

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 767 of 1026
The Deposition of SCOTT GRAVES, taken February 26, 2022

18..21

Page 18

1  with the El Paso Police Department; is that right?
2      A.  Yes.
3      Q.  And you did, in fact, become a police officer
4  there.
5      A.  I didn't what?
6      Q.  You -- you did become a police officer there;
7  is that right?
8      A.  Yes.
9      Q.  And when -- when you became a police officer,
10 was there an academy program that they sent you through?
11     A.  Yes, there was.
12     Q.  Okay.  And, in fact, do you remember about how
13 long that academy was?
14     A.  It was four and a half months.
15     Q.  And so did you receive, say, classroom-style
16 instruction in the academy?
17     A.  Yes.
18     Q.  Do you -- do you learn about how to conduct
19 investigations?
20     A.  To a limited degree, yes.
21     Q.  And did you learn about how to collect
22 evidence?
23     A.  Yes.
24     Q.  How to interview witnesses?
25     A.  Yes.

Page 19

1      Q.  And you learned about people's constitutional
2  rights; is that fair?
3      A.  Yes.
4      Q.  And you have also conducted some hands-on
5  exercises there; is that right?
6      A.  Yes.
7      Q.  After you left the academy, what was your first
8  assignment?
9      A.  It was on patrol in the northeast.
10     Q.  And were you in a marked car?
11     A.  Yes.
12     Q.  And so you were a uniformed as a -- you wore a
13 uniform as a patrol officer; is that right?
14     A.  Yes.
15     Q.  And the northeast -- roughly, what are the
16 boundaries of the northeast?
17     A.  Back then, it was probably Monroe Street on the
18 south side, and then it was the mountain on the west
19 side, up to the -- basically, the city limits in the
20 north, and to the east to the desert.
21     Q.  And how long did you remain on patrol in the
22 northeast?
23     A.  For about four years.
24     Q.  And did you have -- did you have various
25 partners during your time in the northeast?

Page 20

1      A.  Yes.
2      Q.  About how many partners did you have?
3      A.  I -- I'm not really sure, but I would say half
4  a dozen, at least.  And by "partners," you mean people I
5  just worked with, yes?
6      Q.  I think so.
7              Was it typical to send two people out
8  together in a car?
9      A.  Yes.
10     Q.  And would you be assigned the same person to go
11 out in a car with at various stretches of time?
12     A.  Sometimes, yes.
13     Q.  Okay.  Do you recall working with anyone during
14 that time who would later participate in the Electric
15 Street murders investigation?
16     A.  Well, Earl Arbogast was on the same shift that
17 I was on for a while.
18     Q.  So you had the opportunity to work on cases
19 with Earl when you were on patrol?
20     A.  I'm not sure if we ever actually worked in the
21 same car, but I'm pretty certain that we probably showed
22 up to calls that each other was at.
23     Q.  Sure.
24              What was your next assignment after patrol
25 in the northeast?

Page 21

1      A.  It was crimes against persons.
2      Q.  Okay.  And so the -- going to crimes against
3  persons, did you have to test to become a detective to
4  take that position?
5      A.  Yes.
6      Q.  Okay.  And am I correct that it was about 1988
7  that you became a detective in crimes against persons?
8      A.  Yes.
9      Q.  And when you came on as a detective, did you
10 receive any specific training at that time?
11     A.  I did over the course while I was a detective,
12 but I don't think that I went through like a detective
13 training program and then -- before I became a
14 detective.  I think it was just a lateral transfer.
15     Q.  I see.  So I've heard from some of the other
16 officers that detectives would go to various homicide
17 schools, training programs, things like that, and -- and
18 so is that the kind of training that you participated in
19 as a detective in crimes against persons?
20     A.  Yes.
21     Q.  Okay.  While you were a detective, the El Paso
22 Police Department did not itself have, for example, its
23 own curriculum for new detectives; is that right?
24     A.  I'm -- I'm not sure I understood your question.
25     Q.  Sure.  So it wasn't the case that you became a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 768 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022
22..25

Page 22

1  detective, and just like when you became a new officer
2  you went to the academy, the police department said,
3  "Well, we've got a detective academy, and you're --
4  we've got this training that you have to go through now
5  that you're a new detective."
6      A.  No.
7      Q.  How long did you remain in crimes against
8  persons?
9      A.  Until, I think, July of '94, 1994.
10     Q.  What was your next assignment?
11     A.  I went back to patrol, this time at a new
12  station that they had just opened up on the east side,
13  and I was a sergeant.
14     Q.  And there was another exam and promotion to
15  become a sergeant?
16     A.  Yes, sir.
17     Q.  And how long did you remain a sergeant on
18  patrol on the east side?
19     A.  I think for right around three years.
20     Q.  What was your next assignment after that?
21     A.  After that, it was juvenile investigations.
22     Q.  What is the -- what is the mission of the
23  juvenile investigations unit?
24     A.  At that time, it was changing.  It did a couple
25  of different programs.  One of them was the SHOCAPs

Page 23

1  program, so they focused on serious habitually offending
2  juveniles.  And then there was also -- they were adding
3  some units to it, and they wanted to start up a child
4  abuse unit, so that's what we did.  We started a unit
5  and basically converted that juvenile investigations
6  into crimes against children and the -- the name changed
7  very shortly after I went there.
8      Q.  And how long did you remain in juvenile
9  investigations?
10     A.  At juvenile investigations, crimes against
11  children, right up to about 2002.
12     Q.  Did you say "2002"?
13     A.  Yes, sir.  I believe so.
14     Q.  What was your next assignment?
15     A.  I promoted to lieutenant.
16     Q.  And what were your responsibilities as a
17  lieutenant?
18     A.  I went back to patrol for about a month to two
19  months, somewhere in that neighborhood, and then I went
20  to the planning division, and I assumed command of the
21  planning division.
22     Q.  What was your next assignment after the
23  planning division?
24     A.  Auxiliary -- auxiliary support, and I was
25  placed as an acting regional commander and then placed

Page 24

1  into auxiliary support.
2      Q.  And then about when did you become -- did you
3  join the auxiliary support as an acting regional
4  commander?
5      A.  Gosh, I want to say maybe a year after I went
6  to planning.
7      Q.  And did you have a further assignment after
8  auxiliary support?
9      A.  Yes, I did.
10     Q.  And what was that?
11     A.  I was at the Pebble Hills Regional Command for
12  a little while, and then I took the last command that I
13  had, which was the Northeast Regional Command.
14     Q.  And then from Northeast Regional Command, did
15  you then retire from the El Paso Police Department?
16     A.  I did.
17     Q.  And when was that?
18     A.  In 2008.
19     Q.  Okay.  And what -- what work have you held
20  since leaving the El Paso Police Department in 2008?
21     A.  I worked as an adjunct instructor at Park
22  University, as the executive director of their campus
23  for -- on Fort Bliss for about five years and also as an
24  adjunct instructor over at Dona Ana Community College,
25  which is attached to New Mexico State.

Page 25

1          And then I -- in 2013, I think, I went to
2  El Paso Independent School District to manage a program
3  that they had there.  And from there, I became a --
4  after a couple of years, I became a certified teacher,
5  and I started teaching history at Bowie High School in
6  El Paso.
7          And then after a couple of years of that,
8  then I went to go teach career and technical education.
9  I acquired an additional certification, and then I
10  taught for technical education at Pebble Hills High
11  School 2017, '18, and '19.  And then in 20- -- the
12  beginning -- January of 2020, I started working for the
13  Veterans Commission.
14     Q.  And what do you do with the Veterans
15  Commission?
16     A.  I just help soldiers that are transitioning out
17  of military service to find employment.
18     Q.  And is that what you do for employment today?
19     A.  That's what I do for employment today, yes,
20  sir.
21     Q.  Okay.  When you were in the -- in the El Paso
22  Police Department, did you ever hold off-duty work of
23  any kind?
24     A.  I did.  I did adjuncting work at Park
25  University.  And then when I was younger, I would work

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 26

1 an occasional football game and sometimes security at
2 Walmart right before Christmas just to get a little
3 extra money for my family.
4      Q.  Sure.
5           It sounds like you're well rooted in
6 El Paso, but do you currently have any plans to move out
7 of the state?
8      A.  I do not, no.
9      Q.  Or any plans to move out of the country?
10     A.  No, sir.
11     Q.  So you -- I want to ask some questions about
12 your time at crimes against persons and your trainings
13 and practices as a detective.  As a detective, would you
14 agree that it's critical in an investigation to keep an
15 open mind?
16     A.  Yes.
17     Q.  And that it's necessary to always follow the
18 evidence objectively.
19     A.  Yes.
20     Q.  And that you should always be open to the idea
21 of being wrong.
22     A.  Of being what?
23     Q.  Of being wrong.
24     A.  Yes.
25     Q.  And are you trained to never engage in tunnel

Page 27

1 vision?
2      A.  They -- in trainings, they will generally tell
3 you keep an open mind.
4      Q.  And would you agree that the most important
5 thing in an investigation is to avoid arresting the
6 wrong person?
7      A.  Yes, sir.
8      Q.  And that that's even more important than
9 getting the right person in an investigation.
10     A.  I think that's true.
11     Q.  Okay.  And does that philosophy guide all of
12 your interviews, whether with suspects or with
13 witnesses?
14     A.  Yes.
15     Q.  Okay.  And do you agree that staying objective
16 is critical so you can fairly evaluate all the evidence
17 and make sure you don't miss information that may be
18 important?
19     A.  Yes.
20     Q.  And do you agree that it's important as a
21 detective to be both thorough and unbiased?
22     A.  Yes.
23     Q.  And do you agree that by remaining thorough and
24 unbiased, you can ensure that you protect the innocent,
25 as well as convict the guilty?

Page 28

1      A.  Yes, sir.
2      Q.  So when you were an El Pa- -- an El Paso
3 detective, there were certain rules about how you had to
4 engage with juveniles; is that right?
5      A.  Yes.
6      Q.  And there were particular protections that
7 applied to juvenile suspects; is that fair?
8      A.  Yes.
9      Q.  And what -- if -- as a detective, if you wanted
10 to interview a juvenile suspect, what protections did
11 you have to observe?
12     A.  If I wanted to interview them?
13     Q.  Yes.
14     A.  So, generally, a police officer can talk to
15 anybody, so -- I mean, if they'll talk to them.  So it
16 depends.  Are you talking about as a witness, a suspect,
17 or...
18     Q.  I'm talking about a suspect in particular, a
19 juvenile who you believed may have committed the crime
20 that you are investigating.
21     A.  Then so that -- that law, I think, was
22 developing back then, and it was starting to change and
23 generally become, I think, more protective of juveniles.
24 And so as I remember it back then -- and I know you're
25 aware of Charlie Ortega, the -- I think it was common at

Page 29

1 that particular point to assign a juvenile investigation
2 officer on serious cases so that they could monitor and
3 make sure that the different rules were being followed.
4      Q.  Sure.  So when speaking to a juvenile suspect,
5 it would have been appropriate to engage a juvenile
6 officer to ensure that protections are followed; is that
7 fair?
8      A.  Yes, sir.
9      Q.  And if you want to take a statement from a
10 juvenile that may incriminate them, it's necessary to
11 take them to a magistrate judge first to receive their
12 warnings; is that true?
13     A.  I believe so, yes, sir.
14     Q.  And because of that, it's necessary, before you
15 do substantive questioning of a juvenile who may be a
16 suspect, to take them to the magistrate first; is that
17 right?
18     A.  It could be.
19     Q.  Because you don't -- you don't want to be in a
20 position where you've got a confession you can't use
21 because they didn't get their magistrate warnings first;
22 is that fair?
23     A.  True.
24     Q.  And after you've asked the questions, if they
25 implicate themselves, it may be too late -- I'm sorry.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 30

1    MR. JIM DARNELL: Hold on. Something's
2  beeping.
3          THE WITNESS: Yeah. No. It's all right.
4    MR. JIM DARNELL: Okay.
5    MR. HILKE: No problem.
6    Q. (BY MR. HILKE) And so are you familiar with a
7  El Paso Police Department policy from when you were a
8  detective saying that youth services should actually
9  conduct the interrogations of juveniles?
10    A. I -- I'd have to be refreshed on that policy
11  and -- and I haven't heard that term "youth services"
12  for a really long time. I mean, that -- that is a very
13  old term for the department.
14    Q. I understand.
15          I'm going to share an exhibit with you now.
16  I will mark this Exhibit 1. This is a document starting
17  at City 21495.
18          (Exhibit 01 marked.)
19    Q. And, sir, looking at this document, is this
20  what the El Paso Police De- -- how the El Paso Police
21  Department's policies appeared at the time you were a
22  detective?
23    A. I'm not sure of the effective date of that --
24  that policy, but it could be.
25    Q. I'm scrolling down in the document. Actually,

Page 31

1  I now am at Bates City 21502. And I'm trying to...
2          So I'm showing you at the bottom of this
3  page where it says "7.02.009 Interrogation." And do you
4  note the date January 1992 at the bottom left of this
5  document?
6    A. Yes.
7    Q. And do you see where it says in this section,
8  "In accordance with the Texas Family Code, a juvenile is
9  advised of his constitutional rights before being
10  interrogated. When a juvenile is to be interrogated at
11  his home, parental permission is requested prior to
12  interrogation. If denied, the interrogation is not
13  conducted. When possible, interrogation of a juvenile
14  suspect is conducted by youth services."
15          Do you see that on this document?
16    A. Yes, I do.
17    Q. Okay. And to your knowledge, did detectives
18  at -- well, when you were a detective at crimes against
19  persons and -- did you ever interrogate juvenile
20  suspects?
21    A. Yes, I did.
22    Q. And did you -- did you involve an officer from
23  youth services or any juvenile service to conduct those
24  interrogations instead of you?
25    A. Instead of me?

Page 32

1    Q. Yes, sir.
2    A. I don't -- I'm not sure if I did or not. I
3  could have.
4    Q. Sure.
5          In general, when you interrogated juvenile
6  suspects, were you the one asking the questions?
7    A. Usually, yes.
8    Q. And if this was the department's policy at the
9  time, do you have any explanation for why you wouldn't
10  have had youth services or a juvenile officer conduct
11  those interrogations?
12    MR. ALMANZAN: Objection, lack of
13  foundation, calls for speculation.
14    Q. (BY MR. HILKE) You can answer.
15    A. Okay. Can you repeat the question again,
16  please?
17    Q. Yes, sir.
18          The question is, do you have any
19  explanation for why you wouldn't have had youth services
20  or a juvenile officer conduct the actual questioning of
21  juvenile suspects instead of you?
22    A. If --
23    MR. ALMANZAN: Objection, lack of
24  foundation and calls for speculation.
25    Q. (BY MR. HILKE) Go ahead.

Page 33

1          MR. TSCHIRHART: And can we have an
2  agreement on the record that the objection of one is
3  good for all?
4    MR. HILKE: Yes. We can, yes.
5    MR. TSCHIRHART: Thank you.
6    Q. (BY MR. HILKE) And, I guess, just for -- for
7  the deposition, going forward, you may hear counsel
8  making objections for the record. Unless your attorney
9  instructs you not to answer, you should still go ahead
10  and answer the question. Does that make sense?
11    A. Yes.
12    Q. And, yes, the -- the question is, do you have
13  an explanation for why you wouldn't have had youth
14  services or a juvenile officer interrogate juvenile
15  suspects when you were a detective?
16    A. And I -- I think that -- I'm -- I'm not really
17  sure what -- what you're after. I -- are you saying
18  like a actual interrogation, if I think somebody -- or I
19  have cause to think somebody did something, a juvenile?
20    Q. Yes. I'm talking about situations where you
21  interrogated a juvenile suspect instead of juvenile
22  services or -- youth services or a juvenile officer
23  being the one asking the questions.
24    A. I'm -- I'm still not entirely clear on that.
25    Q. So as -- as a detective, you interrogated

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1 juvenile suspects; is that correct?
2     A.  Yes.
3     Q.  You actually asked them the questions you
4 wanted them to answer, right?
5     A.  Yes.
6     Q.  This policy suggests that, when possible,
7 interrogations should be done by youth services instead.
8 Do you have an explanation for why you didn't do that
9 instead?
10    A.  I mean --
11        MR. JIM DARNELL:  Object to speculation.
12        Go ahead.
13    A.  It -- probably because the youth services
14 wouldn't have known the details of the case.
15    Q.  (BY MR. HILKE)  Okay.  Could you have given
16 them the details of the case?
17    A.  I could have, but -- and I might have on
18 occasion on -- depending on what kind of a case it was.
19    Q.  Is it fair to say that in practice, it was not
20 expected that you would turn over every juvenile
21 interrogation to be conducted by a youth services
22 officer?
23    A.  Yes.
24    Q.  And is it -- was it also the policy when you
25 were a detective that a juvenile suspect needed to be

Page 35

1 taken to the juvenile probation department before giving
2 a confession?
3     A.  Yes.
4     Q.  I'm going to scroll down one page.  We're still
5 on Exhibit 1 here.  This is at City 21503.  I'd like to
6 put your attention on point B. here.  Do you see where
7 it says, "Once the child has been transported to JPD,
8 the intake officer has ultimate control over the
9 investigative function of the case?"
10    A.  Yes.
11    Q.  And was that your experience in practice, that
12 at JPD the intake officer took control over the
13 investigative function of the case?
14    A.  I never saw them take control of an
15 investigation.
16    Q.  I'm going to stop sharing this document.
17 Actually, one moment, please.  Yes.
18        I'm going to scroll down one additional
19 page.  This is at City 21504.  This is still in the
20 section of that juvenile confe-- confessions.  Do you
21 see under item G. where it says, "The juvenile, along
22 with the original confession, is taken back to juvenile
23 probation department"?
24    A.  Yes.
25    Q.  After a juvenile's confession was taken, was it

Page 36

1 the practice to then take them back to the juvenile
2 probation department?
3     A.  I believe it was.
4     Q.  Okay.  And the confession is -- is actually
5 taken to a magistrate so the juvenile can affirm that
6 it's their confession in the presence of the magistrate;
7 is that right?
8     A.  I believe so, yes.
9     Q.  Is it your understanding that after the
10 confession was taken, it's appropriate for officers to
11 take a juvenile -- and strike that.  I'm going to ask it
12 better.
13        After a juvenile has endorsed their
14 confession to the magistrate, is it appropriate for
15 officers to take that juvenile anywhere except the
16 juvenile probation department?
17        MR. ALMANZAN:  Objection, calls for
18 speculation, lack of foundation.
19    Q.  (BY MR. HILKE)  Go ahead.
20    A.  So what you're asking me is, once they go to
21 the judge and they're going back to JPD, is it
22 appropriate for them to go anywhere else?
23    Q.  Yes, sir.
24    A.  I wouldn't think so.
25    Q.  I'm going to stop sharing this exhibit now.

Page 37

1        Were you aware of a policy that parental
2 permission needed to be obtained before taking a
3 statement from juveniles?
4        MR. ALMANZAN:  Objection, misstates the
5 evidence, assumes facts not in evidence.
6     Q.  (BY MR. HILKE)  Go ahead.
7     A.  I am not aware that -- of an -- of a policy
8 that says that.
9     Q.  Okay.  Let me -- let me share -- and, actually,
10 I'm going to share Exhibit 1 again with you for a moment
11 here.
12        So I'm scrolling down to City 21505.  Do
13 you see at the top up here where it says "7.02.012
14 Witness Statement"?
15    A.  Yes.
16    Q.  All right.  And do you see here where it reads,
17 "Before a juvenile can give a witness statement, the
18 officer first obtains permission from a parent or a
19 legal guardian allowing the juvenile to go to the
20 station, give a statement, and appear in court.  When
21 practical, parental permission is in writing.  If
22 permission is denied, there is no statement taken.
23        Do you see that on the policy here?
24    A.  I do.
25    Q.  Okay.  And is that consistent with your



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 38

1  understanding of what -- or strike that.
2          Was that your practice as a detective, to
3  get parental permission before taking juvenile
4  statements?
5      A.  Witness statements, yes.
6      Q.  Witness statements.
7          And were you aware of any exceptions to
8  this policy regarding witness -- juvenile witness
9  statements?
10     A.  Maybe a res gestae statement.
11     Q.  I'm sorry.  Will you say that again?
12     A.  Maybe a res gestae statement.
13     Q.  And what is a res gestae statement?
14     A.  Spontaneous utterance.
15     Q.  Sure.  If a juvenile shouts something out
16  unexpectedly, you don't have to shut your ears, right?
17     A.  True.
18     Q.  But you're not aware of any exceptions when you
19  would intentionally engage in taking a witness statement
20  from a juvenile; is that fair?
21     A.  In violation of the policy?
22     Q.  Yes.  I mean, were you aware of any exceptions,
23  other than a spontaneous utterance, that would allow you
24  to take a juvenile witness statement without parental
25  permission?

Page 39

1      A.  Not according to that policy.
2      Q.  What about according to your experience as a
3  detective?
4      A.  No, I can't -- I don't remember offhand
5  anything like that.
6      Q.  I'm going to stop sharing this now.
7          And in -- in addition to taking a juvenile
8  suspect to the magistrate, were detectives also required
9  to read juvenile warnings before interrogating
10  juveniles?
11     A.  I -- I believe so.  I think most people did
12  that.
13     Q.  And according to El Paso's policies, was it
14  inappropriate to start questioning a juvenile suspect to
15  get into the substance of what you wanted to ask them
16  before you took them to the magistrate?
17     A.  I don't re- -- the -- if -- I'm trying to
18  remember the steps that they had to go through for each
19  one, but generally speaking, probably not.
20     Q.  Meaning that you would not ask substantive
21  questions to a juvenile suspect before they were taken
22  to the magistrate?
23     A.  And you're talking about before they -- not
24  after they sign their statement?
25     Q.  Yes, sir.  I mean before they receive their

Page 40

1  initial warnings from the magistrate.
2      A.  So probably -- probably not.
3      Q.  Okay.  And because it is -- a juvenile suspect
4  has to see the magistrate before you start taking a
5  confession from them; is that right?
6      A.  Yes.
7      Q.  And then after they've given a confession, they
8  have to go back to the magistrate to endorse it in front
9  of the magistrate; is that right?
10     A.  Yes.
11     Q.  Okay.  And so the substantive questioning
12  asking them about their culpability can't happen until
13  that first visit to the magistrate; is that right?
14     A.  They probably shouldn't.
15     Q.  Say that again.
16     A.  They probably shouldn't.
17     Q.  Okay.  And when you say "they probably
18  shouldn't," what was -- what was the practice among
19  detectives when you were a detective?
20     A.  When this new -- and it -- and I think it was a
21  relatively new way to handle juveniles from what we had
22  previously done, and so my experience was not extensive
23  because I -- I don't think I worked a lot of cases
24  involving juveniles at crimes against persons.  Not a
25  ton of them anyways.  Probably a few.  So what did other

Page 41

1  guys do?  I'm not -- I'm not sure.  But they should have
2  followed policy.
3      Q.  Sure.  And -- and what about -- what about you?
4  When you were a detective, did you have any -- was it
5  your understanding that before substantive questioning
6  of a juvenile suspect, a juvenile suspect needed to be
7  taken to a magistrate to get their warnings?
8      A.  Yes.
9      Q.  In your career, when and where did you receive
10  training in conducting interviews and interrogations?
11     A.  Just in general?
12     Q.  Yes, sir.
13     A.  I don't remember exactly when, but I know I
14  received that kind of training.
15     Q.  Was that the kind of training you received --
16  sort of the continual training that the -- strike that.
17         Did you attend trainings on those subjects
18  as a detective?
19     A.  Yes.
20     Q.  Were you trained in the Reid method of
21  interrogation?
22     A.  The Reid method?
23     Q.  Yes, sir.
24     A.  I don't think I was ever formally trained in
25  that.  I think I might have read about it.  But I -- I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 773 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022

42..45

Page 42

1 don't remember, honestly, if I was formally -- I
2 don't -- I don't believe I was.
3     Q. Were you trained to thoroughly investigate a
4 crime before conducting an interrogation?
5         MR. JIM DARNELL: Object to form. Object
6 as I don't understand your question.
7     Q. (BY MR. HILKE) Did you understand my question?
8         MR. JIM DARNELL: No, I don't understand.
9         MR. HILKE: That was a -- that was a
10 question for the witness.
11     A. I -- I -- what I think is I think that that --
12 you could not use that as a consistent approach to say
13 you're going to thoroughly -- there -- investigations
14 don't happen like that.
15     Q. (BY MR. HILKE) Okay. So it was -- it was not
16 your training to conduct a thorough investigation before
17 conducting an interrogation; is that correct?
18     A. As thorough as possible.
19     Q. As thorough as possible.
20         Is it important to be absolutely sure that
21 when you're interrogating someone, you've identified the
22 correct suspect?
23     A. I'm -- I'm not sure what you mean by "the
24 correct suspect."
25     Q. Sure.

Page 43

1         Is it appropriate to interrogate someone
2 who you don't believe to be a suspect?
3     A. I'm not sure why I would do that.
4     Q. Interrogation is something you do once you've
5 identified that someone is a suspect; is that fair?
6     A. Or -- or, hopefully, you have some -- a strong
7 suspicion of it.
8     Q. Uh-huh. And when you say "a strong suspicion,"
9 do you mean when you have evidence pointing towards them
10 or something else?
11     A. Either -- either evidence or testimony.
12     Q. According to your training, what's the
13 difference between an interview and an interrogation?
14     A. With an interrogation, I think you're
15 specifically questioning somebody you think actually
16 committed the crime.
17     Q. Were you trained that when you interrogate
18 someone -- let me ask a different question.
19         According to your training, what's the goal
20 of an interrogation?
21     A. The goal of an interrogation, generally
22 speaking, would be to discover evidence, discover the
23 facts of a case.
24     Q. And have you received any training about how
25 focusing on one person to the exclusion of others can

Page 44

1 lead to false assumptions of guilt?
2     A. Generally speaking, yes.
3     Q. Okay. And have you received training that
4 there's a danger of seeking a confession from an
5 innocent person if you assume that they're guilty too
6 soon?
7     A. I don't know if that was an actual training
8 curriculum, but I have a general knowledge of that.
9 Yes, it's true.
10     Q. And are your -- are you trained that in an
11 interrogation, you go in with the assumption that the
12 person you're interrogating is guilty?
13         MR. JIM DARNELL: Object, calls for
14 speculation. Are you talking about this case or every
15 case or some case in particular?
16         MR. HILKE: Thanks.
17     Q. (BY MR. HILKE) Sir, I'm talking about your
18 training in investigations and interrogations.
19     A. Well, and I think as I said before, you would
20 have some basis for thinking that the person that you're
21 going to interrogate is responsible for the crime that
22 you're investigating.
23     Q. When you conduct an interrogation, is it your
24 training to try to see if you can obtain a confession?
25     A. Well, you're not going to turn it away.

Page 45

1     Q. What in your training are the primary
2 techniques of interrogation?
3     A. It's much like an interview, but I think a
4 little more direct.
5     Q. What do you mean by "more direct"?
6     A. You ask the questions of the person and perhaps
7 even accuse him of it.
8     Q. Okay. And what is your training on using
9 accusations in an interrogation?
10     A. I think just, again, general interview,
11 interrogation-style training.
12     Q. Uh-huh.
13         And are you trained to use accusations of
14 lying during an interrogation?
15     A. No. I mean, just to accuse -- go and accuse
16 him of lying? I think you might do that if you thought
17 they're lying.
18     Q. And are you trained to repeat accusations
19 multiple times in an interrogation?
20     A. No.
21     Q. Was it your practice to repeat accusations
22 multiple times in an interrogation?
23     A. I might have done so in the past.
24     Q. Okay. And are you trained to cut off denials
25 if a suspect is -- is denying their involvement?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 774 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022

46..49

Page 46

1    A.  No.
2        Q.  And was it your practice to cut off denials in
3    interrogations?
4    A.  Generally, no.
5        Q.  And were you trained to use false evidence
6    ploys?
7    A.  No.
8        Q.  Okay.  Did you use false evidence ploys?
9    A.  No.
10       Q.  And were you trained to put pressure on
11   suspects to increase their anxiety?
12   A.  Well, I think they're stressed anyways when
13   you're interviewing them, and I think that could be an
14   advantage in an interview.
15       Q.  Was it your training to attempt to use the
16   stress a suspect is feeling to help with your
17   investigation?
18   A.  I'm sorry.  Something happened to your -- your
19   feed.
20       Q.  That's fine.
21           Did -- was it your training to use the
22   stress that suspects were under in an interrogation to
23   assist you in your questioning?
24   A.  I don't think -- I don't think that was in
25   training.

Page 47

1        Q.  Was it something you learned in practice?
2    A.  Well, I would just say that I was aware that
3    very often people were stressed.
4        Q.  Are you trained to use inducements, suggesting
5    that a suspect may benefit if they stopped lying and
6    admit to their involvement?
7    A.  No.
8        Q.  And was it your practice to use inducements?
9    A.  No.
10       Q.  And was it your training or practice to suggest
11   that, for example, the prosecutor might look well on a
12   suspect if they confessed?
13   A.  No.
14       Q.  Or that the judge might look well on them?
15   A.  No.
16       Q.  Was it your training to suggest it anyway, that
17   it might benefit the suspect to confess to you?
18   A.  No.
19       Q.  And was it your practice to do so?
20   A.  No.
21       Q.  Are you trained to suggest that a suspect may
22   be able to minimize their culpability?  For example --
23   let me ask that a different way.
24           Are you trained to suggest that the
25   suspect's involvement in a crime would look worse if

Page 48

1    they don't tell you what happened?
2    A.  No.
3        Q.  Are you trained to suggest that their chance to
4    tell you who really did it or to -- to minimize their
5    involvement comes only if they confess to you?
6    A.  Can you repeat that?
7        Q.  Okay.  Was it your training to suggest that a
8    suspect can -- you know, for example, that if they
9    don't -- let me start over.
10           Was it consistent with your training to say
11   that a suspect, for example, had been identified as
12   involved in the crime and their chance to tell you that
13   someone else did it was as you were interrogating them?
14   A.  No.
15       Q.  Okay.  And was it your practice to do that?
16   A.  No.
17           MR. JIM DARNELL:  Wally, can we take a --
18   we've been going about an hour.  Can we take a short
19   break?
20           MR. HILKE:  Yes, we can.  Let's go off the
21   record.
22           THE VIDEO TECHNICIAN:  Okay.  We are off
23   the record, and the time is 11:00- -- or I'm sorry --
24   10:55 a.m.  No.  11:05 a.m.  I apologize.
25           (Break taken from 10:05 a.m. to 10:16 a.m.)

Page 49

1            THE VIDEO TECHNICIAN:  We are back on the
2    record for the deposition of Scott Graves being
3    conducted by videoconference.  My name is Jessica Chase.
4    Today is July 28th, 2022, and the time is 11:16 a.m.
5            Counsel, you may proceed.
6        Q.  (BY MR. HILKE)  According to your training,
7    what's the difference between an incriminating statement
8    and an admission?
9    A.  I -- I don't think I recall like training on
10   that.
11       Q.  Did you receive any training on the difference
12   between an admission and a confession?
13   A.  I -- I would think of a confession as an
14   admission.
15       Q.  You would think of that as basically identical?
16   A.  Yes.
17       Q.  Did you receive any training on how to make
18   sure that suspects were not psychologically coerced?
19   A.  I -- I don't recall training like that.
20       Q.  You didn't receive any training on how to make
21   sure you didn't put too much pressure on suspects during
22   interrogations; is that fair?
23   A.  I think we were trained on coercion, but I'm
24   not sure I heard it that way from you.  I'm not sure
25   that I understood it the way that you said it initially.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 775 of 1026
The Deposition of SCOTT GRAVES, taken February 28, 2023

50..53

Page 50

1    Q.  I -- I see.  So you did receive training on how
2    to avoid coercion of suspects; is that -- is that right?
3        A.  It's -- I don't think it was training on how to
4    avoid coercion.  I think it was don't coerce.  You know,
5    don't -- don't engage in coercion.
6        Q.  Okay.  So your training included a principle
7    which is that it's inappropriately -- it's inappropriate
8    to coerce suspects; is that fair?
9        A.  Yes.
10       Q.  But then in terms of how to avoid coercing
11   them, that wasn't a part of your training; is that fair?
12       A.  Well, I think what was part was examples of
13   coercion, probably.
14       Q.  Okay.  What -- what kind of examples of
15   coercion were used to train you on what to avoid doing?
16       A.  Don't -- don't make promises.  Don't -- you
17   know, don't promise for -- that the court's going to act
18   in a given way or a prosecutor is going to act in a
19   given way.  Those would certainly be something that you
20   shouldn't do.
21       Q.  Anything else?
22       A.  Don't threaten.
23       Q.  Were you trained that it's a good practice to
24   record interrogations in their entirety?
25       A.  I was not trained in that.

Page 51

1        Q.  And were you trained that it's important to
2    take good notes of what happens during an interrogation?
3        A.  Typically, statements, the -- you know, a
4    confession.
5        Q.  And so a state- -- a statement and a
6    confession, is it correct that that should include all
7    the pertinent information a suspect gives you?
8        A.  I'm -- I'm not sure what -- I mean, about the
9    crime, yes, but everything that they tell you, I don't
10   think it's going to go in the confession.  If they're
11   talking about their -- their high school, or something
12   like that, I mean, you're not going to put that --
13   probably not put that stuff in.
14       Q.  Right.  But if -- if it's information about the
15   crime, it should go into their statement, right?
16       A.  It should, yeah, or whatever they -- whatever
17   they tell you.
18       Q.  Right.
19           And that's true whether that information
20   points to their innocence or points to their guilt,
21   right?
22       A.  Yes.
23       Q.  You don't leave out information just to make a
24   suspect look more guilty, do you?
25       A.  No.

Page 52

1        Q.  Okay.  And in 1993, do you ever record your
2    interrogations as a detective?
3        A.  No.
4        Q.  Why not?
5        A.  It just wasn't the practice.
6        Q.  Was there any policy at the department
7    preventing you from recording interrogations?
8        A.  To prevent?
9        Q.  Yes, sir.
10       A.  I don't -- I don't know.  I don't think so.
11   I'm -- I'm not sure.
12       Q.  As a detective, did you receive training on how
13   to document your work?
14       A.  Yes.
15       Q.  And did you take notes during investigations?
16       A.  Yes.  Like on a notebook, you mean?
17       Q.  Yeah.
18       A.  Yeah.
19       Q.  And so did you carry a notebook with you as
20   you -- as you investigated a case?
21       A.  Typically, yes.
22       Q.  And did you make notes contemporaneous with
23   your investigation or after the fact?
24       A.  Just during the investigation.
25       Q.  And when you interrogated a suspect, did you

Page 53

1    take notes contemporaneously of what they were telling
2    you?
3        A.  Yeah.  That would be something, probably, yeah.
4        Q.  Okay.  And you -- was it a requirement for you
5    to document the pertinent information you learned -- or
6    put that in -- strike that.
7            Were you required to type up reports with
8    the relevant information you found in your
9    investigations?
10       A.  We wrote reports all the time.  We did do that.
11       Q.  And was that a -- was that a requirement?
12       A.  There -- there's different kind of reports that
13   are required, so, yeah, we would do an array of reports
14   usually.
15       Q.  Sure.
16           And is there -- so among the detectives, is
17   there a case agent for every case that's being
18   investigated?
19       A.  Yes.
20       Q.  Okay.  And is it the case agent's job to make
21   sure all the information relevant to the investigation
22   is documented?
23       A.  Yes.
24       Q.  And -- and just for reference, I'm talking
25   about the time you were a detective in crimes against

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 54

1 persons, and so if -- if -- let's just say that -- that
2 to guess a reference period, if that's fair.
3          Did -- and then was there a point in the
4 course of an investigation where the case agent has to
5 close out an investigation?
6     A. Yes.
7     Q. What is that point?
8     A. Well, typically, they would close it out if it
9 was cleared to close.
10    Q. And a case -- and when you've completed all the
11 arrests you make -- you expect to make in a case, is
12 that a point the case is cleared?
13    A. It would probably be, yes.
14    Q. You don't have to wait for the prosecution to
15 finish to clear a case, do you?
16    A. I don't believe so, no.
17    Q. And to clear a case, do all of the reports from
18 that case have to be completed?
19    A. You would think so, yeah. I think so.
20    Q. Okay. Was that your experience that -- as a
21 detective, did you work on cases where you were not the
22 case agent?
23    A. Yes.
24    Q. And did you have the experience that a case
25 agent telling you that he or she wanted to clear the

Page 55

1 case and needed you to -- to make the reports?
2     A. Yes.
3     Q. And when you submitted reports, did you -- was
4 it your practice to review them with anyone else before
5 submitting them?
6     A. No.
7     Q. And after -- and you served as a -- as a case
8 agent presumably on many investigations as a detective.
9 Is that fair?
10    A. Yes.
11    Q. And as a case agent, did you review all your
12 reports with anyone when -- when you cleared one of your
13 cases?
14    A. Some -- sometimes I did. Sometimes I consulted
15 with supervisors, you know, and would discuss a case.
16    Q. Sure. So you could consult with supervisors
17 when it was appropriate; is that fair?
18    A. Or co-workers if -- if there was a senior guy
19 that -- and you had a question, it wouldn't be
20 inappropriate to talk to him about it.
21    Q. Sure.
22          Was it a policy that every time you cleared
23 a case, someone had to review all of your reports?
24    A. A policy? I'm not sure if it was a policy, but
25 typically the paperwork would go to the sergeant.

Page 56

1     Q. And you said "typically." Well, what did the
2 sergeant do with the paperwork?
3     A. Review it or pass it through to another process
4 or through the system.
5     Q. Uh-huh.
6          And in -- in 1993, the reports you made, is
7 it correct that those were typed reports?
8     A. Yes.
9     Q. And when typing a report, did you type -- was
10 it a group effort to type the reports together, or did
11 one officer type his or her own reports?
12    A. Typically, you did your own.
13    Q. Sure.
14          Did you ever write a report for someone
15 else that they put their name on?
16    A. No.
17    Q. Did anyone else ever write a report for you and
18 you put your name on it?
19    A. Not that I'm aware of.
20    Q. And what did you do with your handwritten notes
21 at the end of an investigation?
22    A. Pretty much, when the notebook got full and the
23 investigations were closed, then we destroyed them.
24    Q. Sure. How did you destroy them?
25    A. I -- I don't remember how we did that. I mean,

Page 57

1 I think they had shredding bins, and things like that,
2 that they would -- because they didn't just let all the
3 reports and things that were being thrown away out the
4 door, you know. They -- so they had a process, I think,
5 of grinding things.
6     Q. Yeah. Were -- were there shredding bins in the
7 crimes against persons office?
8     A. I think so, yeah.
9     Q. And there was -- in 1993, there was no policy
10 requiring you to retain handwritten notes, was there?
11    A. No.
12    Q. And it wasn't your practice to do so, was it?
13    A. No.
14    Q. And did you have a practice as to how much time
15 you would let pass or try to let pass before typing up a
16 report?
17    A. No. It was just contingent on the workload.
18    Q. And is it your training that it's important to
19 document things as they happen in an investigation?
20    A. I would say it's preferable. In reality, I
21 don't think it happens that way all the time, but it
22 would probably be preferable.
23    Q. And when you say "it's preferable," is that
24 something you were trained on, or are you just speaking
25 from your experience?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 777 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022

58..61

Page 58

1    A.  Just speaking from my experience.
2    Q.  Do you remember any specific training on sort
3 of how -- writing up things soon after they happen in
4 investigations?
5    A.  No.
6    Q.  And is it your training that your reports
7 should be thorough as to what you learned during the
8 investigation?
9    A.  Yeah.  I mean, you're going to want to try to
10 make it as thorough as possible, and I know that that --
11 and I would say that's in the ideal world, but it's also
12 contingent on workload.
13    Q.  So was it your practice that sometimes you
14 couldn't be as thorough as you wanted to in your reports
15 because you had too much else to do?
16    A.  Can you say that again?
17    Q.  Yeah.
18        Was it your practice that sometimes you
19 wouldn't include as much information in your reports as
20 you wanted to because your workload was too heavy?
21    A.  I would say that probably happened some.
22    Q.  Okay.  When you -- was it your training that
23 when you write a report, you have to include both
24 information that points to a suspect's guilt and
25 information that points to their innocence?

Page 59

1        MR. JIM DARNELL:  Wally, you're breaking up
2 some.  I --
3        MR. HILKE:  Yeah.  If I -- if I speak up a
4 little, does that help?
5        MR. JIM DARNELL:  Yes.
6        MR. HILKE:  I'm going to try to speak --
7 I'm going to try to do what I said and speak loudly for
8 the record.
9    Q.  (BY MR. HILKE)  Is it -- is it your training
10 that when you write a report, you would have to include
11 information that points to a suspect's guilt, as well as
12 their innocence?
13    A.  I don't think it was in training, you know.  I
14 wouldn't see the -- the harm in doing it, but I don't
15 know that it was in training.
16    Q.  At the very least, everything that's in your
17 report should be accurate; is that fair?
18    A.  Hopefully, yes.
19    Q.  And in an investigation, you're going to want
20 to document -- let me ask this:  If a witness
21 contradicts him or herself, is -- on -- you know, on
22 something that's relevant to the investigation, is that
23 something you would want to write down?
24    A.  Potentially.
25    Q.  Is there any reason you wouldn't want to write

Page 60

1 down a contradiction that was relevant to an
2 investigation?
3    A.  None that I can think of.
4    Q.  Okay.  And is it important to document the time
5 you start talking to a witness?
6    A.  Yes.
7    Q.  And the location?
8    A.  Usually, yeah.
9    Q.  And enough identifying information to follow up
10 later if you need to?
11    A.  Yes.
12    Q.  And are you trained -- and -- and for anything
13 in an investigation, is it important to write down the
14 time that you took the investigative action?
15    A.  It -- it could be important, yes.
16    Q.  If you find yourself testifying in court, you
17 want to have a record of what you did and when you did
18 it, right?
19    A.  Yes.
20    Q.  You then rely on the time and location
21 information later.  It would be important to write it
22 down; is that fair?
23    A.  Yes.
24    Q.  How -- in 1993, how were investigative files
25 kept in crimes against persons?

Page 61

1    A.  So a case agent would generally get copies of
2 everything and then keep it in a -- in a folder and
3 organize it in a binder.
4    Q.  Okay.  And in terms of copies, are the
5 originals typed up by the involved officers?
6    A.  Yeah.  You mean like the number one, the
7 initial police report, and all that, are they typed up
8 by the officers?
9    Q.  Yes.
10    A.  Yes.
11    Q.  And what happens to the originals?
12    A.  They -- they're -- and I'm not sure if it was
13 true in this case or not, but typically they were
14 multipart forms, and so they would send a couple of
15 forms in different directions, for the records section,
16 and then they would keep -- usually, I remember it was
17 the pink copy, I think, is what they would keep, what
18 they used to call "the pink copy," you know.  And that's
19 the one they keep in their investigative file.
20    Q.  If -- in your investigations, if you had a
21 physical document that you showed to a witness when
22 speaking to them, is that something you would note in
23 your report?
24    A.  You might or you might not.  I don't know.
25    Q.  Yeah.



Kentuckiana Reporters
30 South Wackner Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1          Are there situations you wouldn't want to
2 share information about what you had shown a witness?
3     A. Not necessarily, no.
4     Q. And when you're interviewing the witness, it's
5 important to take down -- is it important to take down
6 their name and date of birth?
7     A. I think, generally speaking, that I did do
8 that. We identified the folks that we talked to, yeah.
9 That's true.
10     Q. Okay. And that's part of keeping a clear
11 record of who all you talk to; is that right?
12     A. Yeah.
13     Q. So during an investigation, there are often
14 leads that don't pan out, right?
15     A. Yes.
16     Q. And you may be clo- -- you may be ruling out
17 various leads as an investigation proceeds; is that
18 right?
19     A. Yes.
20     Q. And at the start of an investigation, you don't
21 always know what's going to be important later on,
22 right?
23     A. Yes.
24     Q. And a closed lead may actually be reopened
25 later if more evidence emerges, right?

Page 63

1     A. Yeah.
2     Q. And so you try to document good information on
3 the leads you -- you consider during an investigation,
4 right?
5     A. Yes.
6     Q. And you want to be able to remember the
7 specific details of what you were told, right?
8     A. Yes.
9     Q. And you also need those identifiers so you can
10 locate them again if you need to, right?
11     A. Yeah.
12     Q. Do you agree that any information that points
13 to the guilt or innocence of a potential suspect should
14 be written down?
15     A. That would be preferred, yes.
16     Q. You agree that it should be done.
17     A. Sure.
18     Q. And as a detective, was it your understanding
19 that criminal defendants have a right to evidence that
20 may point to their innocence?
21     A. Yes. And I know that that's probably done
22 through the DA's office, you know. I know we didn't
23 give information to anybody other than the DA.
24     Q. Right.
25          But you're the one who -- you and other

Page 64

1 detectives are the ones who would record what's written
2 during the actual investigation, right?
3     A. Yes.
4     Q. And so you understand that -- you understood
5 that you and the other -- other detectives --
6          THE WITNESS: His photo froze.
7          MR. JIM DARNELL: We lost you, Wally.
8          MR. HILKE: Can you hear me now? Give me
9 one second.
10     Q. (BY MR. HILKE) Can you hear me now?
11     A. Yes, sir.
12     Q. Thank you.
13          As a detective, you understood that in
14 order for criminal defendants to receive evidence that
15 pointed to their guilt and innocence, that had to be
16 recorded by you and other detectives during your
17 investigations; is that fair?
18     A. As a detective, I recorded information, gave it
19 to the DA and -- you know, I'm not sure what you're
20 asking me, but that's what I did. I got information. I
21 recorded it. I turned it over to the DA.
22     Q. Right. And you would have been -- was it your
23 practice to be careful to make sure that if you had
24 evidence that pointed to a suspect's innocence, that
25 that would get written down and shared with the DA?

Page 65

1     A. As careful as possible.
2     Q. And was it your understanding that evidence of
3 alternative suspects would tend to point to the
4 innocence or guilt of the person ultimately charged?
5     A. It could, yeah.
6     Q. If -- if there was some evidence pointing to
7 another suspect, that would tend to suggest an
8 alternative suspect's innocence; is that right?
9          MR. JIM DARNELL: Object, based on I don't
10 under- -- say that again. I don't under- -- understand
11 it.
12          MR. HILKE: Yes.
13     Q. (BY MR. HILKE) Your -- if a person is charged
14 with a crime where there is evidence pointing to a
15 second person being the real perpetrator, that tends to
16 suggest that the person charged -- that points at least
17 a little towards their innocence, right?
18     A. Can you -- can you restate that a little
19 clearer? Because I'm not -- I'm not sure what you're
20 asking me.
21     Q. I can try.
22          You said that if you've got evidence that
23 points to a suspect's innocence, you would try to record
24 that, right?
25     A. Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1    Q.  That could include evidence pointing to
2  alternative suspects, right?
3    A.  Yes.
4    Q.  I think you mentioned that as a detective you
5  received training in both interrogations and interviews.
6  Is that right?
7    A.  Yes.
8    Q.  And when -- do witnesses always tell the truth
9  when you talk to them?
10   A.  The witnesses?
11   Q.  Yes, sir.
12   A.  Witnesses do not always, no.
13   Q.  Is it -- is it fairly common for witnesses to
14 either not tell the truth or give misinformation?
15   A.  Yes.
16   Q.  And what do you do to try to find out if a
17 witness is telling you the truth or not?
18   A.  Ask the same question multiple times and at
19 different points or look for inconsistencies or, you
20 know, some -- sometimes I think people could tell you
21 things, and you suspect they're untrue, and there's not
22 much you can do about it because you don't have anything
23 to contradict it.
24   Q.  Yeah.
25       In that process, is it important to avoid

Page 67

1  leading the witness into saying what -- into telling you
2  just what you want to hear?
3    A.  Generally speaking, yes.
4    Q.  Yeah.  What do you do to avoid leading
5  witnesses when you interview them?
6    A.  You ask them open-ended questions.
7    Q.  And if a witness tells you that one of your
8  suspects wasn't involved in a crime, would you seek
9  corroborating information to test that?
10   A.  Potentially, sure.
11   Q.  Would you ask the witness how they know that
12 someone wasn't involved?
13   A.  Would I ask that?
14   Q.  Yes.
15   A.  Sure.
16   Q.  And if you found inconsistencies, would you
17 challenge their testimony?
18   A.  If somebody was being inconsistent, would I
19 question that?
20   Q.  Yeah.
21   A.  Yes.
22   Q.  And when you discover an inconsistency in your
23 investigation, that's often a sign that you should probe
24 a little bit deeper; is that fair?
25   A.  Sure.

Page 68

1    Q.  The El Paso Police Department also had policies
2  on taking confessions from adults; is that right?
3    A.  Yes.
4    Q.  Do you remember what those detect- -- those
5  policies were when you were a detective in 1993?
6    A.  Not off the top of my head, I don't.
7    Q.  Sure.
8        Let me share a second document with you.
9  We'll mark this Exhibit Number 2.  This is at
10 City 21488, for the record.
11       (Exhibit 02 marked.)
12   Q.  And do you see here where it says, Section
13 6.03, "Confessions, Admissions, and Statements"?
14   A.  Yes.
15   Q.  Okay.  I'm going to scroll you all the way down
16 to number -- well, to just number 1.  Read the
17 following:  "The procedures for obtaining a written
18 confession are as follows:  1.  When the officer becomes
19 aware of a subject willing to give a voluntary written
20 confession, the officer will take the subject before a
21 magistrate for a formal warning.  After the warning is
22 given to the subject by the magistrate, the subject will
23 sign his name, will note the correct time, and will date
24 the magistrate's warning form."
25       And continuing down, there are some

Page 69

1  options.  "If, however, a magistrate is not readily
2  available and every reasonable effort to locate a
3  magistrate has been exhausted by the officer, the
4  following may be used," and then there's Sections a.,
5  "Miranda Warning Card."  There's a lot of -- and "B.
6  Warning Procedures."
7        Did you read those sections of that report?
8    A.  Can you say that again?
9    Q.  Right.
10       Did you read those sections of the report
11 that I just read out loud to you?
12   A.  Yes.
13   Q.  Okay.  And was that your practice in 1993, to
14 take -- exhaust all reasonable efforts to take adults
15 before a magistrate before taking their confession?
16   A.  No.
17   Q.  And what was your practice as of 1993?
18   A.  The practice in 1993 and the whole time I was
19 there was to use a district attorney warning card,
20 read -- you know, administer that to the suspect and
21 then have them sign and date it and time it.
22   Q.  And were you ever told to use anything other
23 than a Miranda card with adult suspects before taking
24 their confessions?
25   A.  I mean, a confession form, there was -- there

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1  was also the rights laid out upon it.
2      Q.  Were you ever told that instead of reading an
3  adult suspect their rights, you should take them to a
4  magistrate instead?
5      A.  No.
6      Q.  Was it your practice to have witnesses to adult
7  confessions?
8      A.  Yes, it was our practice when they were
9  available and, of course, you -- you tried to find them,
10  if you could.
11      Q.  And if you were unable to find witnesses, was
12  it appropriate to take an adult confession without
13  witnesses?
14      A.  I would generally try to get a witness, but
15  if -- if you absolutely couldn't get a witness, then
16  it -- then it could cause that issue.
17      Q.  Right.
18          Did you ever have to take an adult
19  confession without witnesses?
20      A.  I don't -- I don't remember.  I'd have to go
21  back and look at items like that and see.
22      Q.  Do you have a memory of anyone ever getting in
23  trouble for signing a confession without witnesses?
24      A.  No.
25      Q.  I'm going to stop sharing this now.

Page 71

1          So we talked earlier.  Sometimes witnesses
2  provide inaccurate information to the police, right?
3      A.  Yes.
4      Q.  And that could be intentional or just a
5  mistake, right?
6      A.  Yes.
7      Q.  And part of your job as a -- as a detective is
8  to try to figure out how reliable the information you're
9  getting is; is that right?
10      A.  Yes.
11      Q.  And you'd also like to know if someone's
12  intentionally trying to deceive you; is that right?
13      A.  Yes.
14      Q.  And one way to check if information about a
15  crime is reliable is to see if the person you're talking
16  to knows nonpublic facts about a crime, right?
17      A.  True.
18      Q.  And so to test the reliability of what you're
19  being told, was it your practice to avoid disclosing
20  nonpublic information about crimes to witnesses?
21      A.  I think, generally, that's a true statement.
22  You would try not to -- to do that.  Sometimes you
23  would.  Sometimes you would inadvertently do it, or
24  you would -- you know, maybe even without a choice.
25      Q.  Okay.  Right.  It's -- it's not -- right.

Page 72

1  Understood.
2          But is it -- would you agree that in
3  general, you'd like to hold back that nonpublic
4  information so you can use it to test what the witnesses
5  are telling you?
6      A.  It -- it can be helpful.
7      Q.  And if you disclose that nonpublic information
8  first, now you don't know, if they say that same thing
9  back to you, where they got that information from; is
10  that fair?
11      A.  Can you clarify that question?  I'm not
12  entirely sure what you're asking me.
13      Q.  Yeah.
14          Once you've disclosed nonpublic information
15  to a witness, you can't keep that nonpublic information
16  to test what that witness is telling you anymore; is
17  that fair?
18      A.  So just to make it clear, are you saying if I
19  tell somebody something and then they tell it right back
20  to me?  Is that what you're saying?
21      Q.  That's what I'm -- that's what I'm saying.
22      A.  Okay.  I apologize for that.  Sometimes I do
23  better with simple.
24          You know, yeah, I would think you would
25  have to keep it in mind that you just told him that.

Page 73

1      Q.  And is it correct that sometimes suspects
2  falsely confess to the police?
3      A.  I -- I think that it's happened for sure.
4      Q.  And you would -- is it right -- is it correct
5  that when someone confesses to you, you want to assess
6  how reliable their confession is?
7      A.  Yes.
8      Q.  And so in the same way, you would try to
9  withhold nonpublic facts from a suspect to see if they
10  can provide them; is that right?
11      A.  Yeah.  That would be a good practice, yeah.
12      Q.  And if the confession is going to be reliable,
13  it's critically important that the suspect independently
14  produces the information that's being shared with you,
15  right?
16      A.  Yes.
17      Q.  And so for that reason, if you provide
18  nonpublic information to a suspect who confesses, you
19  want to document that you disclosed that information,
20  right?
21      A.  You would probably want to do it.  I don't know
22  that it would always happen, but you would probably want
23  to try to do that.
24      Q.  And -- and the reason you'd want to do that is
25  so you've got a record of how you know that the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 781 of 1026
The Deposition of Scott Graves, taken January 28, 2021

74..77

Page 74

1  confession was reliable, right?
2      A.  Sure.
3      Q.  And during an interrogation, it's important to
4  avoid leading questions, right?
5      A.  For the most part, yeah.
6      Q.  And a confession is more convincing if the
7  suspect provided the information on their own and wasn't
8  led, right?
9      A.  Can you say that again?
10     Q.  Yeah.
11         A confession is more -- a confession is
12  more reliable if the suspect provides the information on
13  their own instead of being led, right?
14     A.  Yes.
15     Q.  And if you lead too much, it's harder to verify
16  what was told to you because you don't know if they --
17  well, strike that.
18         A confession should be in the suspect's own
19  words, right?
20     A.  Paraphrased.  I mean, you try to get as close
21  to what they're saying, but the reality of it is that
22  you end up paraphrasing.
23     Q.  And an oral confession should be reduced to
24  writing and signed as soon as possible, right?
25     A.  Yes.

Page 75

1      Q.  And when you take a confession, it's a
2  combination of question and answer and narrative from
3  the suspect; is that right?
4      A.  Yes.
5      Q.  And is it your practice that a -- when you type
6  up a confession, it should contain areas that the
7  suspect can correct before signing?
8      A.  No.  You mean like intentional errors?
9      Q.  Yes, sir.
10     A.  Well, no.  I -- I don't think that's -- was
11  procedure at all.
12     Q.  That wasn't something you were trained to do?
13     A.  No.
14     Q.  And it wasn't part of your practice?
15     A.  Well, if -- if an error was made, then yeah.
16  And -- and we're going over the confession before
17  signature, we see an error, then, yeah, we change it
18  right there.
19     Q.  As a detective, was it your practice to be
20  extra careful with juvenile suspects?
21     A.  I was always more apprehensive with them, if
22  that makes any sense.
23     Q.  Yeah.  What do you mean by "apprehensive"?
24     A.  Because there's a lot of rules surrounding
25  juveniles, so, you know, the concern's always you don't

Page 76

1  want to violate the -- the rules.
2      Q.  That makes sense.
3          Did you also have the concern that
4  juveniles might be more easily pressured into giving a
5  false statement?
6      A.  You know, I don't think that I thought about
7  that a lot back in -- in that time period.  I -- I don't
8  think that's something that I just thought about a lot.
9  I didn't read a lot of material on it or anything like
10  that.
11     Q.  Okay.  Was that a specific part of your
12  training, the vulnerability of juveniles in crime
13  investigation?
14     A.  Not really, no.
15     Q.  Did -- was it your understanding that
16  juveniles' parents had to be involved when they were
17  investigated?
18     A.  Yes.
19     Q.  What -- how did their parents have to be
20  involved?
21     A.  Well, typically, we'd let them know when we
22  were going to talk to them.  We'd say, hey, we want to
23  talk to your child about A, B, or C, whatever it --
24  whatever the issue was.
25     Q.  Other than notifying the parents, was there

Page 77

1  anything else you had to do with -- relative to the
2  parents?
3      A.  I can't think of anything offhand.
4      Q.  If the -- if -- if you wanted to talk to a
5  juvenile and the parents were -- were not present, did
6  you have to go and find the parents?
7      A.  We made effort, or sometimes when it was at a
8  school, you know, you could ask the principal if you
9  could talk to them and that -- that's one I can think
10  of.
11     Q.  So there were special officers in the police
12  department specialized in dealing with youth when you
13  were a detective; is that right?
14     A.  Yes.
15     Q.  And those officers had to be involved if you
16  wanted to interrogate a juvenile suspect; is that right?
17     A.  Generally speaking, I believe that that
18  happened most of the time, but I -- I'm not sure if it
19  was every time.  I can't -- I can't consent to that.
20     Q.  Were they typically involved when interviewing
21  a juvenile witness who you did not believe to be a
22  suspect?
23     A.  No.
24     Q.  And was it your practice to make sure that a --
25  well, strike that.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 78

1          In crimes against persons, when you were
2  there, how were your investigations supervised?
3      A. How were they supervised?
4      Q. Yes, sir.
5      A. Well, do you mean by the supervisor?
6      Q. Yes, sir. What role did your -- well, let me
7  start with this: Were there -- in 1993, were the
8  detectives in crimes against persons supervised by
9  sergeants?
10      A. Yes.
11      Q. How many sergeants were there?
12      A. There were two -- sorry. There were three.
13      Q. And what role did the sergeants play in
14  supervising investigations?
15      A. They would call you out to it. They would
16  usually come out to the scenes, and then they -- they
17  were advised on a daily and also multiple times,
18  sometimes, throughout a day what was going on in the
19  case and -- and, again, we're not talking about every
20  single kind of case, you know. I would say, generally,
21  that's true for the murders. I don't think it was
22  necessarily true for all the other stuff, though.
23      Q. And what else -- so these sergeants would
24  consult with you and other detectives on a -- on a
25  regular basis about your investigations, especially in

Page 79

1  homicides; is that fair?
2      A. I would say primarily with homicides. All
3  the -- all the other cases -- the types of case we
4  worked, I don't think that that would necessarily be the
5  truth at all.
6      Q. What kind of supervision was given to
7  nonhomicide cases by the sergeants?
8      A. If I had a question or I needed more direction
9  on something, I would consult with them. Or when the
10  case was closed out, it ultimately would go to them, and
11  then they -- their role was to review it and then route
12  it correctly.
13      Q. Anything else?
14      A. Not off the top of my head.
15      Q. Yeah. All right.
16          And during the course of your
17  investigations, before closing them out, would sergeants
18  review your case files?
19      A. On the -- the -- the case itself was the case
20  file, so we would actually give it to -- to them, so
21  they'd have the case file.
22      Q. Right. So the -- the sergeant reviews the case
23  file when the investigation is over; is that right?
24      A. Yes.
25      Q. It's not like during the middle of an

Page 80

1  investigation that the sergeant reviews your case file.
2      A. They could. And, I mean, that could happen,
3  especially if you're talking about a murder case. I
4  think that could happen. On most of the other stuff,
5  no.
6      Q. And in your practice, did that happen, that
7  your sergeants would sometimes ask you, "Hey, can I see
8  the case file?"
9      A. Occasionally.
10      Q. Occasionally?
11          Aside -- and was there other supe- -- well,
12  strike that.
13          So by 1993, you had been named in multiple
14  internal affairs investigations; is that right?
15      A. Probably, yes.
16      Q. And in -- had you been required to give
17  statements in internal investigation -- internal affairs
18  investigations?
19      A. Yes.
20      Q. And were there officers -- was there a specific
21  unit at the department that handled internal affairs
22  investigations?
23      A. Yes.
24      Q. And when you gave statements, were they
25  tape-recorded or typed up?

Page 81

1      A. I always typed up statements.
2      Q. And when they were typed up, who actually typed
3  them up? You or the internal affairs officer?
4      A. I saw it both ways, but primarily they would
5  want us to do it.
6      Q. Okay. And then are you given specific
7  questions to answer in your statement?
8      A. Yes.
9      Q. And before you go in to type up your
10  statement -- or before you go in for your statement to
11  be typed, are you told in advance what those questions
12  are going to be?
13      A. Generally, they would interview you first and
14  then go over the questions and -- and it seems like they
15  would give you the questions. I think -- I think on at
16  least several occasions, I would answer those specific
17  questions, whatever they had written down.
18      Q. After you -- after the statement was typed, in
19  the situations where you typed your statement, what
20  happened after you finished typing your statement?
21      A. I'd sign it and that -- that was it.
22      Q. Okay. And internal affairs has the ability to
23  issue -- or strike that.
24          In your career, have you received gag
25  orders from internal affairs telling you not to talk

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 783 of 1026
The Deposition of Scott Graves, taken May 26, 2023

82..85

Page 82

1  about an incident?
2     A.  I -- I don't know if I received like a formal
3  gag order, but I certainly was given directives, don't
4  talk about this or don't talk about that thing about it,
5  yeah.
6     Q.  Okay.  And in the absence of such a directive,
7  is it appropriate to talk with other officers about an
8  internal affairs complaint that you've both been named
9  in?
10    A.  If it hasn't been ordered, I guess you could,
11 but I -- I know that I probably wouldn't have done that.
12    Q.  How did you receive notice of internal affairs
13 investigations you were named in?
14    A.  Usually, just I was told to go to internal
15 affairs.  That was basically it.  As far as I can
16 remember, it seems like that's how it happened.
17    Q.  So was it fairly instantaneous?  You were told
18 to go, and then you're in the office being interviewed?
19    A.  Yes.  They very often would just call -- get on
20 the radio and tell you to go to the internal affairs.
21    Q.  Sure.
22       Do you -- do you remember ever knowing a
23 complaint had been made against you before you were
24 called in to come give a statement?
25    A.  Like a complaint being made before?  Can -- can

Page 83

1  you repeat that?  Because I'm not sure I understand what
2  you're saying.
3     Q.  Yeah, of course.
4        Can you remember ever being aware of --
5  that you were named in an internal affairs investigation
6  where it wasn't instantaneous, where you didn't just go
7  right in?
8     A.  I -- I think probably so.  I can't remember
9  specific cases, but probably where -- probably, yeah.
10    Q.  And how else could you have learned that you
11 were named in an internal affairs investigation?
12    A.  The supervisor could have said something about
13 it or like, hey, you know, there's going to be an
14 internal affairs complaint on that or on this, or
15 whatever the issue is, and just learn about it, and
16 that's it.  And then just wait to be called.
17    Q.  Sure.
18       Did you receive any training -- well,
19 strike that.
20       As a detective, you've taken many, many
21 statements from witnesses in your investigations; is
22 that right?
23    A.  Yes.
24    Q.  And when you take a statement, was it your
25 practice to try to get -- get specifics about what a

Page 84

1  witness was telling you?
2     A.  What did you just say?  "To edit specifics"?
3     Q.  No.  I'm sorry.  To get specifics about --
4     A.  Oh.
5     Q.  -- what a witness was telling you.
6     A.  Yes.  Like you -- you try to learn the
7  information that they might have to add to it and then
8  record it.
9     Q.  And your practice was you wanted enough
10 specific details that you could corroborate other --
11 other statements with the information you got; is that
12 fair?
13    A.  I think the goal was to get whatever you could
14 get and any helpful information whatsoever.  Just any.
15    Q.  Right.
16       And is that because the more details you
17 get, the more you can corroborate or the more that that
18 account can be corroborated or maybe is disproven if
19 someone says something different?
20    A.  Yeah.  I think it would work that way, yeah.
21    Q.  Yeah.
22       And when you take a statement, if you've
23 got a suspect in mind, you want to learn everything that
24 points to their guilt and everything that points to
25 their innocence; is that right?

Page 85

1     A.  Yes.
2     Q.  Have -- have you ever used physical force
3  against a suspect in a police station?
4     A.  In a police station?
5     Q.  Yes, sir.
6     A.  And when you say "suspect," they have to be
7  charged with a crime?  I mean --
8     Q.  Well --
9     A.  -- I can think of instances where we used
10 physical force in the station and we were not conducting
11 an investigation.  We just had people come in off the
12 street.
13    Q.  Yeah.  And someone -- right.  So I'm asking
14 about someone who was charged with or suspected of a
15 crime.
16    A.  Yes.
17    Q.  When have you -- when have you done so?
18    A.  Well, the -- the one case that -- that I
19 remember very, very well was -- we were working on a
20 child abuse case that the child got -- was kicked in the
21 stomach by a boyfriend of the -- of the mother of the
22 child, and his liver was split and he -- he was up at
23 the hospital, and he ended up dying.  He bled out
24 inside.
25       And so we called -- I was not in crimes

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 784 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022

86..89

Page 86

1  against persons then.  We called crimes against persons
2  because we learned that the -- the child had died and
3  they -- they sent a detec- -- they sent a couple of
4  detectives, and they started talking to the guy, and
5  they unhandcuffed the guy, I think, and -- and he wasn't
6  yet under arrest, and they were taking a statement from
7  him.
8          And the -- the suspect grabbed an item off
9  of the desk and attacked the detective with it and then
10 managed to get ahold of a pair of scissors and shoved it
11 into his throat.  And we -- me and another guy that were
12 there, we heard that initially start and intervened in
13 it and -- and, I mean, it was a mess.  So we --
14 did we use violence?  Yes.
15     Q.  Can you recall any other instances where you
16 used force against a suspect in a police station?
17     A.  There was a guy who ran up into the northeast
18 station.  He was really -- I mean, he -- he must have
19 had probably a toxic level of cocaine ingestion, and he
20 was completely naked.  He had started ripping his own
21 scrotum off.  He was covered in blood, and he attacked
22 the desk officer and, yeah, we -- we intervened in that
23 as well.
24     Q.  Have you ever -- are you aware of any instance
25 where an officer was disciplined for using force against

Page 87

1  a suspect in a police station?
2      A.  Yes.
3      Q.  And what -- what instance are you -- and is
4  this an instance -- what -- how many instances are you
5  aware of?
6      A.  Well, I'm aware of one that I can think of, and
7  I initiated the internal investigation against him.  And
8  I'm not -- I don't think it happened in the station, but
9  I think it happened in the patrol car just outside the
10 station.
11     Q.  And before you -- in what year was that from?
12     A.  Gosh, I -- it was when I was a sergeant and
13 so -- so it was probably around maybe '96, '97,
14 somewhere around there.
15     Q.  Sure.
16         To your recollection, from the time you
17 joined the department to the time you left crimes
18 against persons, were you aware of any incidents where
19 officers were disciplined for using force against a
20 suspect in a police station?
21     A.  Not -- not that come to mind.  I -- I can't
22 think of like a lot of them or anything, no.
23     Q.  And have you ever -- have you ever testified
24 falsely under oath?
25     A.  No.

Page 88

1      Q.  Have you ever seen another officer testify
2  falsely under oath?
3      A.  No.
4      Q.  And have you ever heard of an officer being
5  disciplined for testifying falsely under oath?
6      A.  I can't remember anything.
7      Q.  And if you witness misconduct by another police
8  officer, is it true that you have a duty to report that
9  misc- -- misconduct to internal affairs?
10     A.  Or to your supervisor.  I -- reporting it to
11 the supervisor has the effect of reporting it to
12 internal affairs.
13     Q.  Have you ever reported another officer -- or --
14 yeah.  Have you ever reported another officer for
15 misconduct?
16     A.  Yes.
17     Q.  How many times?
18     A.  I don't know, but it -- it's for different
19 things, for a number of reasons, yes.  When I was a
20 supervisor and in command, I -- I did.
21     Q.  And did you ever do it before you became a
22 supervisor?
23     A.  Yes.
24     Q.  When did you do it before becoming a
25 supervisor?

Page 89

1      A.  There -- I can't remember the details exactly,
2  but I had arrested somebody, and they had made an
3  allegation that somebody at the station -- an officer at
4  the station was involved in narcotic activity.
5      Q.  Uh-huh.
6      A.  And I reported that.
7      Q.  And was your report based only on the
8  information you had been given by the arrestee?
9      A.  Yes, because they didn't want me involved after
10 that.  I gave them everything that I knew and they -- I
11 never heard anything about that again until he was
12 terminated.
13         MR. HILKE:  I think it would be a good time
14 for a short break.
15         MR. JIM DARNELL:  I agree.
16         THE VIDEO TECHNICIAN:  Okay.  Give me just
17 one moment.  We are now off the record, and the time is
18 12:15.
19         (Break taken from 11:15 a.m. to 11:29 a.m.)
20         THE VIDEO TECHNICIAN:  We are back on the
21 record for the deposition of Scott Graves being
22 conducted by videoconference.  My name is Jessica Chase.
23 Today is July 28th, 2022, and the time is 12:29 p.m.
24         Counsel, you may proceed.
25         MR. HILKE:  Thank you.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

Page 90

1  Q. (BY MR. HILKE)  Sir, when you were at CAP in
2  1993, did all the CAP detectives share an office?
3      A. We had a common work area with cubicles in it.
4      Q. Do you remember -- do you remember where your
5  cubicle was relative to Al Marquez's cubicle?
6      A. It was at an angle and I -- I could see him.
7  He was probably about 15 feet away from where I sat.
8      Q. Got it.  You could see him from where you sat?
9      A. If I leaned my head out, I could see him.
10     Q. And do you remember where Earl Arbogast's
11  cubicle was relative to yours?
12     A. I believe he was on the -- other side.  And
13  there's walkways that would go down through the middle,
14  and I think he was over in the other walkway, as I
15  remember it.  I could be wrong, but I think that's where
16  he was.
17     Q. And by 1993, had you worked together with Earl
18  Arbogast on multiple occasions?
19     A. Yes.
20     Q. More than a few times?
21     A. Yes.
22     Q. And did you -- did you have a high opinion of
23  him as an officer?
24     A. I -- I liked him, yes.
25     Q. And was -- was Earl a good communicator?

Page 91

1      A. It could be challenging because of his hearing.
2      Q. Uh-huh.
3      A. So that was the -- thing.  And I don't -- I
4  don't want to say what happened to his hearing, but he
5  had an issue with his hearing.
6      Q. When you worked with him on cases, did you have
7  any problems sharing information with each other?
8      A. No.
9      Q. And did you work with Carlos Ortega on multiple
10  occasions?
11     A. Not a lot with Mr. Ortega.
12     Q. Yeah.
13     A. I did one, but I didn't work a lot with him.
14     Q. Did you have any opinion on his quality as an
15  officer?
16     A. He seemed okay to me.  Like I said, I thought
17  he was a decent -- decent man.
18     Q. Okay.  And had you worked with Al Marquez on
19  multiple occasions?
20     A. I don't think I worked with him much at all.
21     Q. You -- you worked with him on the Electric
22  Street murders; is that right?
23     A. Yes.  And not directly with him.  I mean, he
24  was the -- case agent, so I wasn't like out in
25  the -- the field with him, but, yeah, I was working with

Page 92

1  him on that.
2      Q. Yeah.
3         Did you have an impression of Al Marquez's
4  style as an investigator?
5      A. You know, I -- I tried not to pay too much
6  attention to Al, and I tried not to cross paths with him
7  because we personally did not get along.
8      Q. Right.
9         On the Electric Street murders, do you
10  recall any -- having any difficulty exchanging
11  information about the case with Al Marquez?
12     A. I don't think so, no.
13     Q. Yeah.
14     A. And -- and when we needed to communicate, we --
15  we did so professionally with each other, and that was
16  that.
17     Q. I understand.
18        Did you have any opinion of Al Marquez's
19  quality as a detective?
20     A. No.  I -- like I said, I didn't pay much
21  attention to the -- the work that he did.  I paid more
22  attention to what I was doing.
23     Q. Okay.  Do you recall earlier in your career at
24  CAP being told you needed to improve in interrogation?
25     A. Oh, I was probably told I needed to improve in

Page 93

1  a lot of things, I'm sure.  They -- they were never
2  silent about things like that.
3      Q. Uh-huh.
4         Do you remember any specific -- do you
5  remember how you were told to improve in interrogations?
6      A. No.
7      Q. I'm going to show you a couple of exhibits.
8  All right.  So I'll mark this Exhibit 3.
9         (Exhibit 03 marked.)
10     Q. This is a performance evaluation.  Do you see
11  right here that this is a performance evaluation report
12  supplement?
13     A. It looks like it, yes, sir.
14     Q. And for the record, this is at City 10265.
15        And that it has your name and reporting
16  period of July 1, 1992, to December 31, 1992?
17     A. Yes.
18     Q. And scrolling down to Section E, in
19  "Goals/Improvement Programs," it says just one thing:
20  "Detective Graves must continue striving to improve his
21  interrogation skills."  Do you see that?
22     A. Yes.
23     Q. And at this point in late 1992, you had been in
24  CAP for several years, right?
25     A. Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 786 of 1026
The Deposition of Scott Graves, taken on July 28, 2022

94..97

Page 94

1    Q.  Do you know why interrogation skills was the
2  one thing that was brought up as an area for improvement
3  in your performance evaluation?
4    A.  I don't recall that.
5    Q.  Okay.  I'm going to stop sharing this now, and
6  I'm going to share another exhibit.
7          MR. JIM DARNELL:  Was that Exhibit 3,
8  Wally?
9          MR. HILKE:  That was Exhibit 3.  This will
10  be Exhibit 4, and I'm going to share it now.
11          (Exhibit 04 marked.)
12    Q.  (BY MR. HILKE)  This is at City 10283.  Do you
13  see here a perf- -- another performance evaluation
14  report supplement with your name on it?
15    A.  Yes.
16    Q.  And this is with a date of July 1, 1993, to
17  December 31, 1993; is that right?
18    A.  Yes.
19    Q.  And scrolling down to the bottom of Section B,
20  job strengths, do you see where it says, "Detective
21  Graves has made himself, through study and practice, one
22  of the best interrogators in the CAP section"?  Do you
23  see that -- that part there?
24    A.  Yes.
25    Q.  So what happened -- what happened between these

Page 95

1  evaluations that changed you from needing to improve in
2  interrogations to one of the best?
3    A.  I have no idea.  I don't remember those
4  evaluations, honestly, and, you know, I think I worried
5  more about an evaluation if it was going to be negative
6  or if I felt it was negative.  But I -- I do not
7  remember the difference between '92 and '93.
8    Q.  Yeah.  So sitting here today, you can't point
9  to anything that you would say, "Yeah, that's an example
10  of how I got better at interrogations"?
11    A.  No, sir.
12    Q.  Okay.  I will stop sharing this now.
13          So prior to the Electric Street murders,
14  did you know who Rudy Flores was?
15    A.  Not that I can recall.
16    Q.  Or his brother, Javier Flores?
17    A.  I don't believe so.
18    Q.  Or Rodney Williams?
19    A.  I don't believe so.
20    Q.  Were you familiar with the victims of the
21  Electric Street shootings, Robert England or Armando
22  Lazo?
23    A.  No.
24    Q.  Did you know Marcos Gonzalez before the
25  shootings?

Page 96

1    A.  No.
2    Q.  Did you know Danny Villegas?
3    A.  No.
4    Q.  Did you know Fernando Lujan a/k/a Droopy?
5    A.  I don't recall any of those.
6    Q.  Or Enrique Ramirez a/k/a Popeye?
7    A.  No.
8    Q.  David Rangel?
9    A.  Who?
10    Q.  I guess David Rangel, depending on --
11    A.  No, I didn't know.
12    Q.  Okay.  And were you familiar with the gang DRC,
13  or Duroc Crips?
14    A.  I don't remember much of the -- they all had
15  letters, and there was a bunch of them back in the -- in
16  the '90s and I -- there was only a few that I can
17  remember.  They were like probably the biggest ones.
18    Q.  What were the biggest ones that you remember?
19    A.  The Fatherless, the -- a group that they called
20  the East Side Crips.  Those were two that I can
21  remember.  And then it was like every little
22  neighborhood had their own little thing going on.
23    Q.  Yeah.
24          What -- what was the name of the -- of the
25  gang ending in "Crips" that you just said?

Page 97

1    A.  East Side Crips.
2    Q.  Okay.  And around that time, does -- does a
3  gang with the acronym L, as in "Larry," F, as in
4  "Frank," L, as in "Larry," LFL, ring any bells to you?
5    A.  That's the Fatherless.
6    Q.  Oh, LFL is the Fatherless?
7    A.  Yeah.
8    Q.  Okay.  Do you know -- do you know what the
9  letters stand for?
10    A.  Honestly, I -- you know, I didn't really --
11  I -- I knew about them, and they were a gang with a
12  little bit more longevity in -- in the city, so I think
13  that's why they stuck in my memory.  I don't know.  But,
14  yeah, I mean, whatever -- they all had different things
15  that they called themselves, and some of it was pretty
16  nonsensical.
17    Q.  Did -- what about VNE, Varrio Northeast?
18    A.  Yes.  Yes, that is one.
19    Q.  And ECH, or Eisenhower Crazy Hoods?
20    A.  I probably heard of it, but it's -- that wasn't
21  one that stuck.
22    Q.  Okay.  Or LML, Los Midnight Locos?
23    A.  I think vaguely I remember that one, yes.
24    Q.  And in 1993, was there a gang unit in the
25  El Paso Police Department?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 787 of 1026
The Deposition of Scott Graves, taken January 28, 2022
98..101

Page 98

1    A.  There -- there is, and there was, but there's
2  different times when they either called it something
3  different or they had differing roles, and so it's
4  evolved a bit.  So I would say probably, yes, they --
5  they -- they were still an active gang even back then.
6    Q.  Yeah.
7        And these are officers who are outside of
8  crimes against persons; is that right?
9    A.  Yes.
10    Q.  And their -- their specialized knowledge is
11  knowing about the various gangs in El Paso; is that
12  right?
13    A.  Yes, and keeping track of all those letters.
14    Q.  And in a cold case like -- like this, would
15  they have been involved in understanding the potential
16  gang dynamics of a homicide?
17    A.  It's possible, absolutely.  I think they --
18  that's what they did.  They tracked, you know, beefs
19  between one gang or another.
20    Q.  And they would have known where the different
21  gang territories were, for example; is that true?
22    A.  I would suppose, yes.
23    Q.  They might be able to help figure out what
24  motives would be if a victim was in a gang in terms of
25  there being conflicts; is that right?

Page 99

1    A.  Very often that is true, yeah.
2    Q.  And in 1993, if you wanted that information,
3  you know, were gangs tracked in a computer system, or
4  did you just have to call up a gang officer and ask
5  them?
6    A.  I'm -- I'm thinking they kept stuff in the
7  computer, but computers were just not that developed
8  back then.  I mean, they weren't anything like they are
9  now.  So mostly, we would just go straight to the -- the
10  people.
11    Q.  Okay.  As a CAP detective in 1993, you wouldn't
12  expect to boot up your computer and pull up their gang
13  data, would you?
14    A.  No.
15    Q.  So the -- the site of the Electric Street
16  murders is at the intersection of Transmountain and
17  Electric Street; is that right?
18    A.  That's where I understand it was, yeah.
19    Q.  Yeah.
20        Do you know what -- what gang territory is
21  around that area?
22    A.  I do not know.
23    Q.  And would you have expected to have that
24  information back in 1993 as part of the investigation?
25    A.  Yeah.  You know, the thing is that I knew a lot

Page 100

1  more about gang -- you know, generally, the gangs back
2  then.  You know, I don't remember a lot of that stuff.
3    Q.  Yeah.
4        Well, you had patrolled around that area
5  for four years in the -- in the mid- to late '80s,
6  right?
7    A.  Yes.
8    Q.  And information about local gangs would have
9  been part of your -- the -- what you learned in your
10  patrol there; fair enough?
11    A.  Yeah.  And -- and I knew the activities
12  primarily in the place that I worked, which was down in
13  60- -- what they called "61 district."  They called it
14  "the lowers."  What you're talking about is the portion
15  that they called "the uppers," and the area that --
16  where I used to work was just mostly drugs, heroin,
17  cocaine, crack, that kind of stuff going on down there,
18  and that's what I knew more about --
19    Q.  Sure.
20    A.  -- back then.
21    Q.  What are the boundaries of the lowers?
22    A.  So that would have been -- the area where I
23  worked was Monroe Street up to another street called
24  "Fred Wilson," and it's off of Dyer Street, adjacent to
25  Fort Bliss.

Page 101

1    Q.  Where in El Paso is the northeast substation?
2    A.  The old one?
3    Q.  The one from 1993.
4    A.  Okay.  And -- and I don't remember the exact
5  date that they moved it to the -- the -- what they call
6  "the old Sears building," but the substation was on
7  Hondo Pass.
8    Q.  Do you remember what the cross street was?
9    A.  Probably the closest one that I can think of
10  would be Gateway North and Hondo Pass.  It was right
11  behind the National -- the National Guard armory.
12    Q.  Okay.  And where is the Five Points station?
13    A.  Five Points is more towards central El Paso.
14  It's kind of -- it's -- some people consider it part of
15  downtown, but it's not -- it's more central, and it's on
16  the edge of downtown is how I would describe it.
17    Q.  Yeah.
18        Is Five Points where the CAP offices were?
19    A.  Yes, in another old Sears building.
20    Q.  So on the night of the Electric Street murders,
21  you were not called out to the site of the shootings; is
22  that correct?
23    A.  No, I was not.
24    Q.  And that -- April 21, 1993, was the day that
25  you went to Daniel Villegas's house and picked him and



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 788 of 1026
The Deposition of SCOTT GRAVES, taken on May 20, 2022
102..105

Page 102

1 Marcos Gonzalez up; is that right?

2    A.  That sounds right, yes, sir.

3    Q.  And by April 21, 1993, is it correct that the
4 investigation had somewhat gone cold?

5    A.  You know, I'm not quite sure how cold it went.
6 You know, I -- I know that I was kind of transitioning
7 in and out of the case.  And then I don't remember a
8 slow period at all because I -- the one thing in that
9 eval that you showed was I did carry the -- the heaviest
10 caseload in the -- the section, so I was always busy.

11    Q.  Yeah.

12        You had helped investigate a couple of
13 leads before you went to Danny Villegas's house, right?

14    A.  I believe I did, yes, sir.

15    Q.  And none of those leads panned out to a viable
16 suspect, did they?

17    A.  I remember several did not pan out.

18    Q.  And before going to Danny Villegas's house, you
19 weren't aware of any other viable leads that were active
20 at that time, were you?

21    A.  Viable means of what?

22    Q.  Viable leads.

23    A.  Oh, leads of -- like just viable leads, is
24 that --

25    Q.  Yeah.  Before -- before you went out to Danny

Page 103

1 Villegas's house, were you aware of other potential
2 suspects that were still viable in the investigation?

3    A.  You know, I'm not sure.  I know there was -- I
4 thought there was probably some -- at least a viable
5 person somewhere along.  They were out and -- and at
6 that -- I'm -- I'm not sure.  I'm -- I'm not sure.

7    Q.  I don't think -- so I want to ask you about
8 Rodney Williams.  You had a chance to review a statement
9 you took from Rodney Williams in preparation for this
10 deposition, right?

11    A.  Yes.

12    Q.  And it was Al Marquez who told you to go and
13 pick Rodney up; is that right?

14    A.  I believe it was, yes.

15    Q.  And do you remember the first thing you did
16 after you were told to go pick Rodney up?

17    A.  No.

18    Q.  Do you remember what happened when you went out
19 to look for Rodney?

20    A.  I know we found him.

21    Q.  Do you remember -- do you remember first going
22 to Rodney's house to try to find him?

23    A.  I don't remember the exact sequence of what led
24 up to us finding him, but we did find him.

25    Q.  Right.

Page 104

1        So beyond that you found him, sitting here
2 today, you don't remember anything about the search for
3 Rodney, do you?

4    A.  I think we picked him up at a basketball court,
5 I want to say.

6    Q.  Okay.  And is that something you have an
7 independent memory of, or are you thinking back to what
8 you read in the report?

9    A.  I'm thinking back to what I read in my report.

10    Q.  Okay.  In terms of an independent memory, do
11 you have anything at all about looking for and finding
12 Rodney?

13    A.  Not really clear, no.

14    Q.  Okay.  So if Rodney's mother said that you went
15 to his house and talked to her first, you wouldn't have
16 any reason to disagree with that, would you?

17        MR. JIM DARNELL:  Object as speculation.

18    Q.  (BY MR. HILKE)  Go ahead.

19    A.  It -- it could have happened that way.

20    Q.  Yeah.

21        Okay.  And did anyone go with you to come
22 pick Rodney up?

23    A.  I believe it was Earl.

24    Q.  Okay.  And where did you and Earl bring Rodney
25 once you found him?

Page 105

1    A.  To crimes against persons.

2    Q.  Did you stop anywhere before going to the
3 crimes against persons?

4    A.  I don't believe we did, but I -- I don't
5 think we did, you know.

6    Q.  And who -- who -- who was the first person to
7 question Rodney?

8    A.  Probably Earl.

9    Q.  How long did Earl talk to Rodney for?

10    A.  It wasn't long and I -- again, I -- with Earl,
11 I -- his hearing is just not great, and I didn't have a
12 lot of confidence in his hearing back then, either.  I
13 mean, he's had that issue for a long time.  It wasn't as
14 bad back then, but it wasn't really good, either.

15    Q.  So was that connected to -- is that why he
16 didn't talk to Rodney for very long?

17    A.  I think it could be.  And I know that on
18 occasion, I would -- if I would get not real clear
19 information from Earl, I'd go back and talk to people.

20    Q.  Okay.  Were you with Earl when he was talking
21 to Rodney?

22    A.  I don't believe I was.

23    Q.  Okay.  After Earl was done talking to Rodney,
24 did you go to talk to Rodney?

25    A.  Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 789 of 1026
The Deposition of Scott Graves, taken 06/01/2022
106..109

Page 106

1    Q.  And did Earl come back with you when you were
2  talking to Rodney?
3    A.  I don't believe he did.
4    Q.  Was anyone else sitting with you and Rodney
5  while you were talking to Rodney?
6    A.  I don't think so.
7    Q.  One of the first things you would have done
8  talking to Rodney would be to take his identifiers,
9  right?
10   A.  To ask him his -- his name and stuff.  I don't
11 think he had a driver's license.
12   Q.  Yeah.  To ask him his name and date of birth;
13 is that right?
14   A.  Yes.
15   Q.  So you would have -- you would have discovered
16 pretty early on that Rodney was 15 years old; is that
17 right?
18   A.  Yes.
19   Q.  And did Rodney ever ask you for his mom?
20   A.  Did he ask for his mom?
21   Q.  Yes, sir.
22   A.  Not that I recall, no.
23   Q.  And is it fair to say that if Rodney's mom had
24 given you permission to talk to Rodney, you would have
25 documented that?

Page 107

1    A.  I don't know if that's fair to -- to say.
2    Q.  Was it necessary to document parental consent
3  when you were interviewing juveniles?
4    A.  We usually just asked them for it.
5    Q.  Okay.  So you'd ask for it verbally?
6    A.  Yes.
7    Q.  And then you yourself wouldn't write --
8  wouldn't necessarily write down if you'd gotten it or
9  not gotten it?
10   A.  No.
11   Q.  Okay.  Did -- and when you talked to Rodney,
12 were you considering him a witness or a suspect at that
13 time?
14   A.  A witness.
15   Q.  A witness.  Okay.
16        And you didn't ever take -- you didn't ever
17 involve a juvenile officer in talking to Rodney, did
18 you?
19   A.  No.
20   Q.  And you didn't ever take him to a magistrate,
21 did you?
22   A.  No.
23   Q.  And Rodney eventually does give you a
24 statement, right?
25   A.  Yes.

Page 108

1    Q.  And Rodney shares a lot of information about
2  the shooting in his statement, right?
3    A.  Yes.
4    Q.  He puts himself in the -- in the car at the
5  time the victims were shot and killed, right?
6    A.  Yes.
7    Q.  And Rodney gives the first statement you get
8  from anyone who said they were in the car, right?
9    A.  Probably so, yeah.
10   Q.  At this time -- around the same time, Al
11 Marquez is talking to -- to David Rangel.  Is that -- is
12 that something you knew?
13   A.  I don't remember if I knew it or not, but he
14 very well could have been.
15   Q.  Yeah.  And you don't -- you don't -- okay.
16        And when you're talking to Rodney, you're
17 not operating with a statement from anyone else who says
18 they were in the car, are you?
19   A.  What now?
20   Q.  You're not -- like you don't have in front of
21 you a statement from another person who says they were
22 also in the car at the time of the shooting, do you?
23   A.  No.
24   Q.  So at the time you're talking to Rodney, you
25 don't know what whoever else was in the car is going to

Page 109

1  say about the shooting, right?
2    A.  Right.
3    Q.  You don't know if Rodney pulled the trigger and
4  now he's trying to blame someone else in the car, do
5  you?
6    A.  I don't believe I did know that.
7    Q.  And so -- and you also know that if Rodney had
8  a first level of involvement in the shooting, like if he
9  drove or helped plan it, he could be liable for the
10 killings, too; is that right?
11   A.  Potentially, yeah.
12   Q.  And so at some point taking his statement, you
13 realized that Rodney may become a suspect in the
14 shooting, right?
15   A.  He wasn't indicating that he shot the gun, and
16 he wasn't indicating that he got the gun or that he
17 transferred the gun, or anything like that, so -- and,
18 honestly, he seemed surprised that the shooting
19 happened.
20   Q.  So did you feel, taking his statement, that you
21 could conclusively rule him out as a suspect?
22   A.  I -- I did not feel like he did the shooting.
23   Q.  Okay.  But were you confident that no other
24 evidence would implicate him?
25   A.  I don't think, you know, I could be a hundred



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 790 of 1026
The Deposition of SCOTT GRAVES, taken on May 28, 2022

110..113

Page 110

1 percent confident, but like I said, I -- I didn't think
2 he did the -- or planned it.
3       Q. Yeah.
4       A. I'll put it that way.
5       Q. How confident were you that he wouldn't become
6 a suspect?
7       A. I think reasonably confident.
8       Q. Okay. And did you later learn that that
9 thinking was wrong; that Rodney actually did end up
10 facing some charges based on his involvement?
11      A. That he did end up getting charged, that is
12 true.
13      Q. So if you had concluded that he might become a
14 suspect, it would have been necessary to start following
15 the policies for juvenile suspects, right?
16      A. It would have changed, yes.
17      Q. You would have needed to go to a magistrate and
18 got formal warnings, right?
19      A. Yes.
20      Q. And you would also want the -- you would also
21 need the magistrate to witness him signing the statement
22 that's to be used to implicate him, right?
23      A. Yes.
24      Q. And when you were talking to him, did you see
25 any downside of giving him that formal process and --

Page 111

1 strike that.
2               When you were talking to him -- I think I'm
3 good.
4               At the time you were talking to Rodney, you
5 weren't aware of anyone else having confessed to the
6 shootings, right?
7       A. No.
8       Q. And so -- and so it wasn't the ca- -- so it
9 wasn't like you already had enough to convict the
10 shooters, right?
11      A. I think that's more of a legal question, when
12 you talk about convicting them. I'm not really sure
13 what -- I -- I don't think I was thinking in terms of,
14 can I convict him?
15      Q. Yeah.
16               And when you took Rodney's statement, did
17 you have anything you were using to corroborate what he
18 told you?
19      A. Did -- was I corroborating his statement when I
20 was taking it?
21      Q. I believe so, sir.
22      A. And -- I'm -- I -- I'm not sure. I -- I'm not
23 sure about that.
24      Q. So Rodney tells you he was in the car during
25 the shooting, right?

Page 112

1       A. Yes.
2       Q. And he gives various details about how the
3 shooting unfolded; is that right?
4       A. Relatively.
5       Q. And are you evaluating what he tells you
6 against other information you know about the shooting?
7       A. I'm listening to him, and I'm trying to get it
8 into the statement. That's what I'm doing at that time.
9       Q. Right. So your focus is on making sure
10 everything he tells you you take down.
11      A. That the information that he's giving me, I
12 want it to be in the statement.
13      Q. And so you're not, for example, looking against
14 the other police reports to see if it matches, are you?
15      A. I don't think I had -- I don't think I had
16 knowledge of every single thing that had happened in
17 the -- in the case at the given time to be able to do
18 essentially what I think you're asking me.
19      Q. Right. Because you weren't -- you weren't the
20 case agent on this case, right?
21      A. I was not the case agent in this case.
22      Q. And so the information about the case isn't --
23 you don't have it all centralized in the same way the
24 case agent would, right?
25      A. No, I don't.

Page 113

1       Q. After you finished taking Rodney's statement,
2 what do you do next?
3       A. Give it to either -- I likely gave it to either
4 the sergeant or to Marquez.
5       Q. Okay. And do you remember discussing the
6 statement with anyone after you took it?
7       A. Either Marquez or the sergeant.
8       Q. Okay. How long did you discuss it?
9       A. I don't know. But we -- when we were working,
10 we talked to each other. I mean, we did -- we do that.
11 That is something that is common.
12      Q. So what did you do after you were done
13 discussing the statement you had taken?
14      A. I don't...
15      Q. Did you take Rodney home after taking the
16 statement?
17      A. At some point in the evening, I -- I did take
18 him home, yes.
19      Q. And that would have been before you went out to
20 Danny Villegas's house; is that right?
21      A. I believe so, yes.
22      Q. How long after you took Rodney's statement did
23 you take Rodney home?
24      A. It wasn't very long. It was maybe -- maybe an
25 hour, I guess. I don't -- and I'm not entirely sure

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

1 about that. It's been a long time. I don't remember
2 exactly how long it took, but it wasn't inordinately
3 long.
4       Q. If -- if Marquez -- hold on one second, please.
5           Later that night -- strike that.
6           Before you went to Danny's house, was a --
7 an affidavit for an arrest warrant prepared in this
8 investigation?
9       A. I don't recall if it was or not.
10      Q. Right. Do you remember going out to the
11 magistrate so that an arrest warrant could be given for
12 Marcos Gonzalez?
13      A. I'm not sure. I don't remember that, either.
14      Q. I mean, do you remember waiting at the station,
15 at the -- do you remember waiting anywhere after
16 dropping Rodney off and before going out to Danny
17 Villegas's house?
18      A. I don't remember it specifically. It could
19 have happened, but I don't remember.
20      Q. And did Marquez explain to you why he wanted
21 Rodney picked up?
22      A. He had to have told us some information. I
23 mean, we would have asked, "Why are we picking him up?"
24 That would have been a question.
25      Q. Did you learn how Marquez had gotten the

Page 115

1 information about Rodney being involved?
2       A. Not that I can recall, but I might have known
3 back then. I might have heard why.
4       Q. And however Rodney's name came up, that should
5 have been documented in the investigation, right?
6       A. Can you say that again? You -- you did -- your
7 feed did that weird thing again.
8       Q. Yeah.
9           However Rodney's name came up, that could
10 have been documented, right?
11      A. I would think it would have been, yeah.
12      Q. It would have been important to document how
13 information about someone in -- in the vehicle used in
14 the shooting was developed in an investigation, right?
15      A. I would think so, yeah.
16      Q. And it would have been inappropriate to omit
17 that information from police reports; is that fair?
18      A. Well, it should have probably gone in. If it
19 didn't, it should have.
20      Q. Okay. And let me -- I'm going to share with
21 you another exhibit.
22          MR. JIM DARNELL: Is this 5?
23          MR. HILKE: This is 5.
24          (Exhibit 05 marked.)
25      Q. (BY MR. HILKE) All right. So we'll mark this

Page 116

1 Exhibit Number 5, and this is at Villegas 1- --
2 J.S. 15779. Do you recognize this as a statement given
3 to you by Rodney Williams?
4       A. Yes.
5       Q. And is this a statement you reviewed in
6 preparation for your deposition?
7       A. I believe so, yes.
8       Q. Okay. I want to call your attention to the
9 standard trailer at the bottom. This says that you were
10 the reporting officer on this report; is that right?
11      A. For that statement, yes.
12      Q. Okay. And 948, that would be your badge
13 number?
14      A. Yes.
15      Q. And the first date -- there are three dates and
16 times given in the bottom right; is that correct?
17      A. And, you know, it's been a long time since I
18 saw those, but, yeah, those are dates and times for
19 sure.
20      Q. Okay. And the date -- the first date,
21 April 10, 1993; time, 1900- -- 1905 hours, that wasn't
22 the date you started typing the statement, was it?
23      A. No.
24      Q. The next date, "Typed by," April 21, 1993, do
25 you see a time 1927 hours?

Page 117

1       A. Okay. I -- I can't see that because there is
2 this -- well, let me move the screen.
3           Okay. Yes, I see it now.
4       Q. Great.
5           And below that, it's smudged out a little,
6 but I'm going to represent to you that it says April 21,
7 1993, at 2017 hours.
8           When you were typing reports in 1993, you
9 would both type them up, and then you would have the
10 power to actually proof them; is that right?
11      A. Yes.
12      Q. And so the time associated with "approving
13 officer," would that have been the time that you
14 finished writing and you hit "approve" on that report?
15      A. That would have been probably the time and --
16 and the -- these computers were -- because they didn't
17 run off of -- they -- they ran off of like -- I don't
18 know where the CPU for this -- or where the actual unit
19 for the computer was, but this was a terminal that I was
20 working off of, and I would assume that that time of
21 approval was when -- well, it was when I approved it,
22 yeah.
23      Q. Yeah.
24      A. To be accurate.
25      Q. And here, the -- the approval is just -- you



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

1  know, if you take my representation that this time is
2  2017 and the --
3      A.  Yes.
4      Q.  -- time above is 1927, that would be 50 minutes
5  between the bottom time and the time above it, right?
6      A.  That -- that sounds right, yeah.
7      Q.  And -- and that's about how long it might take
8  to type and review and approve a statement; is that
9  right?
10     A.  That would be reasonable, yeah.
11     Q.  And so it wasn't like you had to sleep on it
12  and come back the next day and approve it.  You could
13  just open it up, type it, and approve it, right?
14     A.  Yes.
15     Q.  Okay.  And so I'm going to stop sharing this
16  document now.
17         You also would -- early in your
18  investigation, do you recall interviewing a Terri
19  Vinson?
20     A.  Can you say that again?
21     Q.  Sure.  The name is Terri, T-E-R-R-I, Vinson.
22     A.  Yeah, I remember that name.  I -- I don't
23  remember --
24     Q.  Yeah.  Oh, go ahead.  I'm sorry.
25     A.  No, I -- I remember the name.

Page 119

1      Q.  I'm going to -- I'm going to pull up another
2  exhibit.  We'll mark this 6.
3         (Exhibit 06 marked.)
4      Q.  Now, this is another supplement -- or for the
5  record, Exhibit Number 6, the Bates is DA-34-432.
6         Scrolling to the top, this is another
7  supplement report, and it's a statement given to you by
8  Terri Vinson; is that right?
9      A.  Yes.
10     Q.  And the date and time is April 12, '93, at
11  10:00 a.m.; is that right?
12     A.  Yes.
13     Q.  As far as you know, was this your first
14  involvement in the investigation?
15     A.  Say that again.
16     Q.  As far as you know, is this your first
17  involvement in the investigation?
18     A.  I don't remember if it was or not.  I don't
19  remember that.
20     Q.  Yeah.
21         Do you remember any earlier dates being
22  involved in the investigation?
23     A.  Her?
24     Q.  Yeah.  Earlier dates.
25     A.  I cannot remember.

Page 120

1      Q.  Okay.  And so we can see from the date of birth
2  that Terri's birthday is December 12, 1980; is that
3  right?
4      A.  Yes.
5      Q.  So she is something like 12 years old or --
6  yeah, something like 12 years old when they were taking
7  this statement; is that right?
8      A.  Yes.
9      Q.  And do you remember if you got parental
10  permission before taking her statement?
11     A.  I don't remember whether I did or not, and I
12  honestly don't remember this girl.
13     Q.  Sure.
14         And I think I'm going to ask you -- you
15  know, it's a short statement, starting with "my name is
16  Terri Vinson."  Will you take just a minute to read
17  through the statement and let me know when you're done?
18     A.  Sure.
19         Okay.  Okay.
20     Q.  Having read this, do you remember anything else
21  about this -- this -- this statement?
22     A.  No, I don't, but, I mean, it's...
23     Q.  Yeah.
24         And do you have any -- and as a juvenile,
25  the policy -- was it the policy that you should have

Page 121

1  gotten parental permission before taking her statement?
2      A.  That was the policy, yes.
3      Q.  Okay.  And to the extent that you did not, do
4  you have any explanation for why you wouldn't have taken
5  that information in this interview?
6      A.  I don't know that I didn't get -- ask for
7  permission.
8      Q.  I understand, and I'm -- I'm not asking you to
9  say that you didn't get permission.
10         I guess what I'm asking is, sitting here
11  today, do you have any explanation for, if you didn't,
12  why you wouldn't have?
13     A.  I can't think of any.
14         MR. JIM DARNELL:  Object, speculation.
15     Q.  (BY MR. HILKE)  So Terri does mention a -- let
16  me ask a different question, and I'm going to stop
17  sharing this.
18         You did speak to a Terrance Farrar in this
19  investigation, right?
20     A.  Yes.
21     Q.  And that was a statement you reviewed to
22  prepare for this deposition?
23     A.  Yes.
24     Q.  And Terrance was also a juvenile, right?
25     A.  I don't remember whether he was.  I don't



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 793 of 1026
The Deposition of Scott Graves, taken 06/21/2023
122..125

Page 122

1 remember whether he was or he wasn't.
2     Q. Let's mark this Exhibit 7. I'm going to share
3 another exhibit.
4     (Exhibit 07 marked.)
5     Q. This is -- this is Exhibit 7. This is at
6 City 15743. And this is another statement given to you,
7 this time by Terrance Strong Farrar, right?
8     A. Yeah.
9     Q. And his date of birth was April 5, 1978, which
10 would have made him like 15 at the time, right?
11     A. Yes.
12     Q. And I'm going to scroll down to the actual
13 statement. And this is that same day, April 12, 1993,
14 at 2:45 p.m., right?
15     A. Yes.
16     Q. So I go -- the first thing you write is, "My
17 name -- my name" -- or the first thing in this statement
18 is, "My name is Terrance Strong Farrar, and I am giving
19 this statement to Detective Graves with the permission
20 of my mother, Edna Strong."
21     So at least in this case, you did document
22 the parental consent you had gotten to take the
23 statement, right?
24     A. Yes.
25     Q. And I -- I think once again -- and I know you

Page 123

1 reviewed this statement in -- in preparation, but I'm
2 going to ask you to read this statement -- well, strike
3 that.
4     You had the chance to read this statement
5 to prepare for the deposition, right?
6     A. Uh-huh.
7     Q. And do you have any independent memory of
8 talking to Terrance Farrar at all?
9     A. No.
10     Q. Do you remember anything about what you said to
11 him or he said to you other than what you've read in
12 this report?
13     A. (Moves head side to side.)
14     Q. And I'm sorry. Was that a no?
15     A. That's a no.
16     Q. And Farrar mentioned Rudy Flores as a potential
17 suspect with a motive to kill one of the victims, right?
18     A. Right.
19     Q. After you talked to Farrar, were you involved
20 in pursuing that lead into Rudy Flores in any way?
21     A. No. I turned the information over to -- it was
22 either the sergeant or Marquez, and I gave it to him,
23 and I believe Marquez followed up on the Flores
24 brothers.
25     Q. Yeah.

Page 124

1     Do you remember anything about the further
2 investigation into the Flores brothers sitting here
3 today?
4     A. Not a lot, no, sir.
5     Q. Okay. I'm going to stop sharing this now.
6     And remind me, did -- did you look at a
7 statement from Cynthia Talamantes to prepare for the
8 deposition today?
9     A. No.
10     Q. Does that ring a bell at all?
11     A. No.
12     Q. All right. I'm going to -- you can probably
13 guess where this is going. I'm going to share another
14 exhibit. We'll mark this Exhibit 8. This is at
15 DA-34-126.
16     (Exhibit 08 marked.)
17     Q. And this is another statement given to you,
18 this time by Cynthia Talamantes; is that right?
19     A. Yes.
20     Q. And her date of birth is May 16, 1973, so she
21 would have been 19. She's an adult, right?
22     A. Yes.
23     Q. And the date and time is April 14, 1993, at
24 8:30 a.m. Do you see that?
25     A. Yes.

Page 125

1     Q. And I'm now at the body of the statement, which
2 is -- which is pretty short. Can you take a minute to
3 read the statement and let me know when you're done?
4     A. Sure.
5     Yes.
6     Q. Okay. So reading this, do you have any
7 additional -- do you have any memory at all of talking
8 to a Cynthia Talamantes?
9     A. No, sir.
10     Q. Okay. So -- and -- and her statement is that
11 there was an Eddie Valdez she was in class with who said
12 he knew the guy driving the car, right, in the shooting?
13 And so I'm going to -- I'm going to stop sharing this
14 now.
15     Do -- do you recall speaking to an
16 Eduardo -- Eduardo Valles about the shooting?
17     A. Valles or Valdez?
18     Q. I think I have it as Valles, V-A-L-L-E-S.
19     A. I -- I could have. I don't remember it.
20     Q. Let me share another exhibit with you.
21     A. I -- I don't remember whether I talked to him
22 or not.
23     Q. Got it.
24     I am now -- I am now sharing Exhibit 9.
25 This is at DA-34-131.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 794 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022
126..129

Page 126

1        (Exhibit 09 marked.)
2     Q. And this is another statement given to you,
3 this time by Eduardo Valles; is that right?
4     A. Yes.
5     Q. And this is also at April 14, 1993, this time
6 at 2:00 p.m.?
7     A. Yes.
8     Q. And you don't have the -- a memory of taking
9 this statement at all, do you?
10    A. I don't have a memory of taking -- it looks
11 like I did, but I -- I do not have an independent memory
12 of talking to the guy.
13    Q. I understand.
14        And could I again ask you to take a minute
15 to read it and let me know when you're done?
16    A. Sure.
17        Okay.
18    Q. Okay. Do you know who the VLH gang was?
19    A. No, sir, I don't remember what that -- if I
20 heard it, I might remember, but I don't have that on
21 my --
22    Q. Fair enough.
23        And in this statement, Eduardo Valles says
24 that he doesn't know anything about the shooting, but
25 anything he said about it either he made up or he heard

Page 127

1 from someone else; is that right?
2     A. I believe so, yes, sir.
3     Q. And from this statement, does it look like --
4 well -- and, presumably, this is a short statement
5 because he wasn't telling you anything that you thought
6 made him a likely suspect; is that right?
7     A. It wasn't setting off alarms.
8     Q. Or that -- that was likely to lead you to
9 further useful information; is that right?
10    A. Yes.
11    Q. And so you were able to rule him out because he
12 didn't give you any details that were consistent with
13 the nonpublic facts; is that right?
14    A. Yes.
15    Q. Okay. And it was important to document why he
16 was ruled out, right?
17    A. Yeah, it would -- probably, yeah. Absolutely.
18    Q. And that's -- that's what this statement does,
19 right? It -- it says, you know, he didn't know anything
20 about it and couldn't give anything that made a
21 connection, and so it was possible to rule him out,
22 right?
23    A. Yes.
24    Q. So I'm going to stop sharing this now.
25        Do you remember talking to a Gilbert Garcia

Page 128

1 in this investigation?
2     A. I don't remember actually talking to him. I
3 think I saw his name in one of the documents somewhere.
4     Q. Okay. I think -- actually, I think that's
5 right. Give me one second.
6        Okay. I'm going to show you another
7 exhibit. And then we'll mark this Exhibit 10.
8        (Exhibit 10 marked.)
9     Q. And this is not your statement, by the way.
10 Let me expand. Okay.
11        This is at DA-34-450, and this is a
12 statement -- this appears to be a statement taken by
13 Earl Arbogast given by Gilbert Garcia; is that right?
14    A. Yes.
15    Q. And the date and time, this is actually on
16 12:15 a.m. at April 14, 1993; is that right?
17    A. Yes.
18    Q. And I'm just going to scroll down to a couple
19 of things. So on the second paragraph, do you see it
20 where it says, "About 7:50 a.m., I went to my
21 girlfriend's house to give her a ride to school. Before
22 going to get my girlfriend, Cynthia Talamantes, Anthony
23 Iglesias had called me and come to my house because he
24 wanted a ride to school." Do you see that?
25    A. Yes.

Page 129

1     Q. And then scrolling down a little, it says -- a
2 few lines, it says, "Tony then told me that he had
3 'fronted' Mando Lazo and his friends on a street called
4 'Electric' on Friday night. 'Fronted' means that he had
5 confronted the guys who were shot." Do you see that?
6     A. Yes.
7     Q. And then scrolling down to the next paragraph,
8 it says, "After fourth period at school, I saw my
9 girlfriend, who heard this guy named Eddie talking to
10 another guy. Cynthia told me that she heard Eddie tell
11 the other guy that a friend of his was in the car that
12 shot Mando and Bobby."
13        Do you see that?
14    A. Yes.
15    Q. And so based on the timing, this appears to be
16 a statement taken by Arbogast very early in the morning
17 the day you took statements from Eduardo Valles and
18 Gilbert Garcia; is that right?
19    A. Yes.
20    Q. And -- and taking statements from Valles and
21 Garcia, you would have expected to have this information
22 that led to questioning them, right?
23    A. Say that again.
24    Q. Yeah.
25        You would have expected to know the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 795 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022
130..133

Page 130

1  information that Arbogast had got from Gilbert Garcia
2  when you went to follow up on the leads that came from
3  it, right?
4      A.  That -- that could be true, yes.
5      Q.  You would want to be able to confront the
6  people you were interviewing with the information that
7  had already been obtained; is that right?
8      A.  Yes.
9      Q.  Okay.  I want to show you one other thing on
10  this.  Do you see at the bottom where it says, "Cynthia
11  said she then asked Eddie what kind of car the guys had
12  that shot Mando and Bobby, and Eddie told her it was a
13  dark brown car.  I know that a guy named Kiki drives
14  like a dark brown Buick Regal, and Tony hangs around
15  Kiki."
16          Do you see that?
17      A.  Yes.
18      Q.  And is the color of the car used in the
19  shooting the kind of corroborating detail you were
20  looking for in an investigation?
21      A.  It could be, yeah.
22      Q.  Okay.  I'll stop sharing this now.
23          MR. JIM DARNELL:  Wally, can we take a
24  break?
25          MR. HILKE:  Yes.  Let's go off the record.

Page 131

1          MR. JIM DARNELL:  Just so you know, I've
2  got several hearings at two o'clock, so can we go to
3  about 2:00 and take a lunch break?
4          MR. HILKE:  Sure.  That sounds good.
5          MR. JIM DARNELL:  2:00 our time.
6          THE VIDEO TECHNICIAN:  Okay.  We are now
7  off the record.  The time is 1:32 p.m.
8          (Break taken from 12:32 p.m. to 12:44 p.m.)
9          THE VIDEO TECHNICIAN:  We are back on the
10  record for the deposition of Scott Graves being
11  conducted by videoconference.  My name is Jessica Chase.
12  Today is July 28th, 2022, and the time is 1:44 p.m.
13          Counsel, you may proceed.
14      Q.  (BY MR. HILKE)  Sir, do you remember
15  interviewing an Anthony Iglesias with Detective Arbogast
16  in this case?
17      A.  I -- I don't recall it exactly, but I believe
18  that -- that we probably did, yeah.
19      Q.  Sure.
20          And I am going to share with you another
21  exhibit.  We'll mark this Exhibit Number 11.  This is
22  beginning at City 265.
23          (Exhibit 11 marked.)
24      Q.  You notice Detective Arbogast's name at the
25  bottom right of this report?  And at the top, this is a

Page 132

1  supplementary report dated --
2          MR. ALMANZAN:  Give me a call.
3          MR. HILKE:  Someone may need to be on mute
4  right now, maybe.
5          Oh, Andy, you -- you may need to go on
6  mute.
7      Q.  (BY MR. HILKE)  And so you -- this is a report
8  dated May 6, 1993; is that right?
9      A.  Yes.
10      Q.  And scrolling to the bottom of the second page,
11  Detective Arbogast's name is on the bottom of the second
12  page, right?
13      A.  Yes.
14      Q.  And I am now on the second page of the report.
15  I'd like to -- looking at the top of the second page, do
16  you see where it says, "Undersigned and Detective Graves
17  interviews Iglesias and one of his -- the friends, Raul
18  Rivas, and found no connection to this shooting.
19  Detectives did learn that what Iglesias referred to was
20  an altercation he and some friends had with Victim Lazo
21  some two weeks prior on the east side of town."
22          Do you see that?
23      A.  Yes.
24      Q.  And so sitting here today and having read that,
25  do you have any additional independent -- do you have

Page 133

1  any independent recollection at all of interviewing
2  Iglesias?
3      A.  No.
4      Q.  And to your knowledge, was there ever any
5  follow-up investigation conducted about either Iglesias
6  or the friend, Raul Rivas?
7      A.  I can't remember whether there was or not.
8      Q.  Sure.
9          So sitting here today, you don't know if
10  Anth-- -- if Anthony Iglesias had an alibi or if that
11  alibi was ever tested, do you?
12      A.  Yeah, I don't recall.
13      Q.  And you don't know if he owned the weapon that
14  matched the caliber used in the shooting, do you?
15      A.  I don't know that.
16      Q.  And I'm going to stop sharing Exhibit 11 for a
17  moment.
18          And I'm actually going to go back to
19  Exhibit 10 for a second.  This is the Gilbert Garcia
20  statement that Arbogast took again.  So I'm drawing your
21  attention to the paragraph that starts "about 7:50 a.m."
22  here.
23          And looking sort of towards the middle
24  lower part of this paragraph, do you see where his
25  statement says, "Tony then told me that him and Boochie

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 796 of 1026
The Deposition of Scott Graves, taken 04/21/2022
134..137

Page 134

1 and Raul were at a party somewhere near Andress High
2 School on Friday night. Tony said that Boochie
3 recognized Mando Lazo from ECH. Tony and Boochie are
4 from HK, and Tony said they didn't like ECH, so that is
5 when they went up to Mando and his friends. I knew
6 about the shooting, and I asked Tony who capped Mando
7 and Bobby. That is when Tony seemed like he got scared,
8 and he didn't want to say any more. I also remember
9 that Tony's brother, David, told me about a month ago
10 that Tony owns a .22 caliber -- caliber."
11        Do you see that section of the statement?
12    A. Yes.
13    Q. And so based on Garcia's statement, Tony has a
14 gun that matches the caliber used in the shooting; is
15 that right?
16    A. I didn't know the caliber of the shooting -- or
17 I don't know it, but if that's the caliber, then, yes,
18 then he would know it, or he said he knew it.
19    Q. And he's also got a gang-connected motive for
20 having a rivalry with -- with the ECH gang, which Mando
21 was in according to this statement; is that right?
22    A. It would appear.
23    Q. Yeah.
24        And so do you have any -- do you have an
25 explanation for why there isn't any more documentation

Page 135

1 on how this lead got closed out?
2    A. No.
3    Q. And it would have been appropriate to
4 investigate whether Tony actually had a gun matching the
5 murder weapon; is that right?
6    A. Yes.
7    Q. But from the reports you've seen, it's not at
8 all clear if that was ever closed -- if -- if the gun
9 was ever closed out, is it?
10    A. Not that I know of. I don't -- and I don't
11 know one way or the other.
12    Q. I'll stop sharing here.
13        Do you remember searching a Rick Martinez's
14 house in connection with this case?
15    A. I -- I don't remember it, but I believe we did.
16    Q. And do you remember whether you actually spoke
17 with Rick during the investigation?
18    A. I don't remember.
19    Q. I'm going to -- just one second.
20        I'm going to mark another exhibit. This
21 will be Exhibit 12. It's at Villegas J.S. 15848.
22        (Exhibit 12 marked.)
23    Q. Scrolling to the top, do you recognize this as
24 a supplement report dated May 5, 1993, at 10:30 a.m.?
25    A. Yes.

Page 136

1    Q. And scrolling to the bottom of that first page,
2 this is a report written and approved by Al Marquez; is
3 that right?
4    A. Yes.
5    Q. So I'm scrolling to the second page of the
6 report. Do you see the part that starts "on 4-14-93, a
7 statement was taken from Javier Flores a/k/a Dirt"?
8    A. Yes.
9    Q. And Javier Flores, he would have been one of
10 the Flores brothers who you were aware of as a potential
11 suspect; is that right?
12    A. Yes.
13    Q. And then I'm going to scroll down a few
14 sentences. Do you see where it reads, "In the statement
15 given by his brother, Rudy Flores (Dust), he indicated
16 that a Rick Martinez, who lives on Ajax Street, had been
17 responsible for the shooting. Martinez was brought into
18 the CAP office, and it was also determined that he was
19 not involved in the case. Flores was confronted as to
20 why he had indicated Martinez as the responsible party,
21 and he stated that he had advised undersigned that
22 Martinez had been worried that the police would think
23 that he may have been involved because of his past
24 history and involvement in gangs, which he, too, was a
25 member of"?

Page 137

1        Do you see that part of the statement?
2    A. Yes.
3    Q. And I'd like to -- I'd like to go back to
4 Exhibit 11 for a moment. This is Detective Arbogast's
5 report again.
6        And do you see at the bottom of -- of the
7 first page where it says, "One such source of this
8 information was from Tonya Vinson, whom undersigned took
9 a statement from. As a result of such information, both
10 Rudy and Javier Flores were interviewed on this case.
11 However, no connection was made to the Flores brothers.
12 Rudy Flores did implicate a Rick Martinez, who was also
13 brought to the CAP office and interviewed. No
14 connection could be made on Rick Martinez, who
15 cooperated in giving consent to detectives to search his
16 apartment for any weapons. Undersigned and Detective
17 Grave conducted the search of the Martinez home"?
18        Do you see that section here?
19    A. Yes.
20    Q. So Martinez's report, which we looked at first,
21 says that the connection to Rick Martinez may have had
22 something to do with a gang that Martinez was in; is
23 that right?
24    A. Right.
25    Q. But the gang Rick Martinez was in isn't



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 797 of 1026
The Deposition of SCOTT GRAVES, taken May 26, 2022

138..141

Page 138

1 mentioned any way -- where in either of these
2 statements, is it?
3     A. I didn't see it, no.
4     Q. Yeah.
5         And it's not fair -- and did you see in
6 either statement any information that -- that why no
7 connection was made what Rick Martinez's alibi was or
8 anything explaining why he was cleared?
9     A. No.
10     Q. And then in -- presumably, when Rick Martinez
11 is interviewed -- and, actually, strike that.
12         The reports don't even say who talked to
13 Rick Martinez when he came to the CAP office, do they?
14     A. I hadn't seen anything.
15     Q. And as a -- as a murder suspect, there should
16 be enough information documented about Rick Martinez to
17 explain why he was ruled out, right?
18     A. I would think that there would be in there.
19     Q. Yeah.
20         And other than this one sentence that you
21 and Detective Arbogast searched Rick Martinez's home,
22 are you aware of any other documentation of the search
23 that was conducted of the home?
24     A. No.
25     Q. And do you have any explanation for why there

Page 139

1 isn't more information on Rick Martinez in, I guess --
2     A. No.
3     Q. So I'm going to -- I'm going to stop sharing
4 this exhibit.
5         So on the night that you went to Danny
6 Villegas's house, David Rangel was also interviewed; is
7 that right?
8     A. Who?
9     Q. David Rangel or Rangel.
10     A. I believe so, yeah.
11     Q. Okay. And do you recall testifying at Daniel
12 Villegas's first criminal trial that you came into
13 contact with David Rangel on the telephone on
14 April 21st, 1993?
15     A. I do remember reading that, but I don't
16 remember the context. I don't know if it was that he
17 was calling in or what it was. I -- what it was about.
18     Q. So you would -- so sitting here today, you
19 don't remember who called who, whether you called him or
20 he called you or the office; is that right?
21     A. I can't think of a basis under which I would
22 have called him, and I think it's probably more likely
23 that he called.
24     Q. Did you give him a ride to the police station
25 after you talked with him on the phone?

Page 140

1     A. No.
2     Q. And did you see David after he came to a police
3 station that night?
4     A. Did I see him?
5     Q. Yes, sir.
6     A. I don't recall seeing him, no.
7     Q. Did you participate at all in questioning David
8 after he came to the police station?
9     A. I don't believe I did.
10     Q. Do you know where -- do you know where David
11 was questioned that night?
12     A. No.
13     Q. Did you know that David had a -- he had been
14 accused of telephone harassment before -- at some time
15 before he came into the station?
16     A. It seems like I heard that in one of the
17 trials, or that came up in one of the trials somewhere,
18 but I -- I didn't know that, no.
19     Q. Did you call David's house on April 21, 1993,
20 and ask to speak to him?
21     A. No.
22     Q. Did you speak to his mother?
23     A. I don't believe I did.
24     Q. Did you tell her -- did you investigate a
25 telephone harassment issue involving David Rangel?

Page 141

1     A. No.
2     Q. To your knowledge, did David's mother ever call
3 the El Paso police on April 21, 1993?
4     A. I don't know if she did or not.
5     Q. Were you aware that when you went to pick up
6 Rodney Williams, Al Marquez was questioning David Rangel
7 at the same time?
8     A. I believe I was -- I -- he could have been. I
9 don't remember whether I knew that or not. I don't
10 know.
11     Q. Okay. If you and Al Marquez were
12 simultaneously investigating important witnesses on a
13 double homicide, would you expect to be coordinating
14 with one another as you did your questioning?
15     A. I'm not sure what you're asking me.
16     Q. If -- yeah, you -- I'm asking, if Al Marquez is
17 interviewing someone who says he heard a confession on a
18 double homicide, and Al Marquez tells you, "Hey, go pick
19 up this other guy and -- and question him about the
20 double homicide, also," would you expect Al Marquez --
21 like would you expect to know that there was a
22 simultaneous questioning going on?
23     A. Yeah, I -- I would think I -- it's a good
24 chance I might have known that, yeah.
25     Q. And you might -- is one reason you'd expect to



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 798 of 1026
The Deposition of Scott Graves, taken on July 28, 2022

142..145

Page 142

1 know that, so that you and Al Marquez could share
2 information, if you needed to, based on what you were
3 told in your -- in your interviews?
4     A. Yeah, I -- that could happen, sure.
5     Q. Can you think of any reason why Al Marquez
6 wouldn't tell you about another witness he was
7 interviewing at the same time?
8         MR. JIM DARNELL: Object, speculation.
9         Go ahead.
10     A. I -- I don't know if there's a reason why he
11 would do that or not. I don't know.
12     Q. (BY MR. HILKE) But in your experience as a
13 homicide detective, does it make sense to you that that
14 information would be withheld from you?
15     A. I -- I think "withheld" maybe isn't the right
16 term. If somebody's talking to something, I don't think
17 every time they hear something they kind of run out and
18 tell everybody, "Hey, I just heard this." I don't think
19 that kind of thing is going on much at all. Usually,
20 there's briefings, and things like that, at various
21 other points, or somebody'll tell you something that
22 they think you -- they need you to know, you know.
23 Sometimes that happens.
24     Q. You were part of the group that went out to
25 investigate two potential suspects in New Mexico in this

Page 143

1 investigation; is that right?
2     A. Yes.
3     Q. And those were Michael Johnston and Jacob
4 Jauregui?
5     A. Yes, I believe that was their names.
6     Q. And they were both juveniles, right?
7     A. I don't remember if they were or not. They
8 could have been, sure.
9     Q. Okay. Do you -- do you remember what role you
10 played in arresting Michael Johnston?
11     A. I didn't play a role. I waited. I was there
12 with probably a group of, I want to say, ten of us.
13 There was -- there was quite a few and I -- I don't know
14 the exact count, but it was a big group. We were in
15 multiple cars, and I didn't talk to anybody out on
16 that -- you know, I waited and waited and -- and,
17 basically, that was it. The supervisors and Marquez
18 were kind of running what was happening out there.
19     Q. Okay. And -- okay. So -- but you went out
20 there -- so what -- what -- what, if anything, did you
21 do while the group was in New Mexico?
22     A. Wait.
23     Q. Okay. Anything other than wait?
24     A. No.
25     Q. And eventually, the boys were brought from

Page 144

1 New Mexico to El Paso, right?
2     A. Yes.
3     Q. And they were questioned at the El Paso Police
4 Department?
5     A. Probably so, yes, sir.
6     Q. Did you transport either of them back?
7     A. Did I what?
8     Q. Did you transport either Johnston or Jauregui
9 back?
10     A. No.
11     Q. What did you do after you got back to El Paso?
12     A. I don't remember, but it -- I wasn't involved
13 in what -- the questioning, and so forth, that they were
14 doing there.
15     Q. What -- what officers went out to New Mexico?
16     A. The ones that I remember being out there was
17 Earl, a guy named Link Brown. I think -- there's a
18 officer who has passed away, Joe Laredo, I think was out
19 there. Marquez was out there. And there was -- there
20 was others. They -- they wanted to go out in multiple
21 cars because they didn't know what the security
22 situation was going to be when they got out there.
23     Q. What security risks were they anticipating?
24     A. First, it was Chaparral. You know, that -- if
25 you live here, you understand that implication. The --

Page 145

1 the other thing was they just didn't know how many
2 people were going to be out there. You know, people out
3 there tend to own long weapons, so I think that was a
4 concern. And there was some coordinating that needed to
5 happen with the Dona Ana Sheriff's office as well.
6     Q. You mentioned supervisors. Do you remember
7 what supervisors came out?
8     A. I think it was Ocegueda, Pete Ocegueda.
9     Q. Okay. And were there any juvenile officers out
10 there?
11     A. Oh, Charlie was out there, too, yes, sir.
12     Q. That's Charlie Ortega?
13     A. Yes, sir.
14     Q. Okay. And just so I heard -- the other
15 officers I heard you say were Earl Arbogast, Link Brown,
16 Al Marquez, and Joe Laredo. Did I miss anyone?
17     A. I think I'm missing people in there because
18 there was a lot of us.
19     Q. So -- so sitting here today, you're confident
20 that you did no questioning of Michael Johnston or Jacob
21 Jauregui; is that right?
22     A. Yes.
23     Q. Do you know if Johnston -- Johnston or
24 Jauregui's parents consented to their interrogations?
25     A. I don't know.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 799 of 1026
The Deposition of Scott Graves, taken January 28, 2022
146..149

Page 146

1    Q. Do you know if either of them said, "Don't
2 question my kid until he has a lawyer"?
3    A. (Moves head side to side.)
4    Q. If one of their parents had said that, it would
5 have been totally inappropriate to question them without
6 a lawyer, right?
7         MR. JIM DARNELL: Object to speculation and
8 foundation.
9    A. I -- I don't know. I -- I know that they were
10 trying to follow New Mexico law out there and that --
11 that was the concern at the time, I think, by the -- the
12 sheriff's out there.
13    Q. (BY MR. HILKE) According to your training, can
14 a juvenile be interrogated without a lawyer if their
15 parents -- if one of their parents says, "don't question
16 my kid without a lawyer"?
17         MR. JIM DARNELL: Are you asking him under
18 Texas law or under New Mexico law?
19    Q. (BY MR. HILKE) I'm -- I'm only asking about
20 your training as to interrogation of juveniles.
21         MR. JIM DARNELL: I'll object as calling
22 for speculation.
23         But if you can, answer it.
24    A. I do not recall any training regarding if a
25 parent tries to invoke someone -- their child's Fifth

Page 147

1 Amendment rights. I don't -- I don't recall any
2 training on that.
3    Q. (BY MR. HILKE) Okay. So you went to -- on --
4 in the evening of April 21st, 1993, you did go to
5 Daniel's house; is that right?
6    A. Yes.
7    Q. And who are all of the officers who went to his
8 house that night?
9    A. I know for certain it was Marquez, me,
10 Arbogast, and I'm not sure if Charlie was there or not.
11 Charlie might have been there.
12    Q. Do you remember anyone else?
13    A. Off the top of my head, I do not.
14    Q. And who was the first officer to enter Daniel's
15 house?
16    A. That probably would have been Marquez.
17    Q. Marquez.
18         And do you remember where you were along
19 with the group that entered, first, last, middle?
20    A. I don't know. I was somewhere in there. I --
21 I don't remember which -- which place I had.
22    Q. What was the first thing you saw when you went
23 in the house?
24    A. There were several people in there. I -- I
25 don't remember who all they were. I think it -- I -- I

Page 148

1 don't remember their faces. I think what we were
2 interested in doing initially was just getting everybody
3 in the house, like knowing where they were and in a
4 place where we could see them.
5    Q. Sure. The first thing you did was to secure
6 the house, basically; is that right?
7    A. Yes.
8    Q. And that would have been typical in serving a
9 warrant?
10    A. Yes.
11    Q. And what part of that -- did the officers have
12 to spread out to secure the house?
13    A. I don't think much, no.
14    Q. So what's the next thing that happened after
15 the -- after you had spread out and secured the house?
16    A. We searched, basically.
17    Q. What -- what were you searching for?
18    A. Any -- any evidence that was connected to the
19 crime. Of course, the firearm, if there was one, any
20 ammunition, things like that.
21    Q. Did you find any physical evidence that was
22 linked to the crime?
23    A. Not that I recall.
24    Q. Okay. And how long did the search take?
25    A. It wasn't -- it wasn't more than an hour, I

Page 149

1 don't think.
2    Q. Was it more than 15 minutes, the search?
3    A. Oh, I'm certain of that, yeah.
4    Q. Was it more than half an hour?
5    A. Probably.
6    Q. And in addition to searching, you're also there
7 to make an arrest, right?
8    A. I believe so, yeah.
9    Q. You know from Rodney Williams that -- you know
10 that Rod- -- Rodney Williams's statement puts Daniel
11 Villegas as the shooter, right?
12    A. Yes.
13    Q. And the arrest warrant you have is for Marcos
14 Gonzalez, right?
15    A. I think so, yeah.
16    Q. And so you're looking to arrest both of those
17 people, if you find them, right?
18    A. Yes.
19    Q. And so at some point, as part of your procedure
20 in making an arrest, are they handcuffed?
21    A. I would assume that they were, yes.
22    Q. Yeah.
23         And would they have been handcuffed before
24 the search commenced?
25    A. Probably.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 800 of 1026
The Deposition of Scott Graves, taken on July 24, 2022
150..153

Page 150

1    Q.  Yeah.
2          Who handcuffed Marcos?
3    A.  I don't know.
4    Q.  Who -- who handcuffed Daniel?
5    A.  Don't know that, either.
6    Q.  Okay.  And after the search, what did you do?
7    A.  We left out of there.  We had a brief stop
8  where we kind of huddled and then said, okay, you go
9  here, you go here, you go there, and -- and then I went
10 to CAP.
11   Q.  Okay.  Were either Marcos or Daniel read any of
12 their rights or warnings at Daniel's house?
13   A.  I don't remember if that happened.
14   Q.  And the practice -- your practice was that for
15 suspects to sign Miranda cards after being read their
16 Miranda warnings, right?
17   A.  Yes.
18   Q.  And so to the extent either of them were read
19 Miranda warnings, there should be signed Miranda cards
20 from that time; is that right?
21   A.  Yeah.  Well, normally, when we read them --
22 when we would read them their rights, they -- it was at
23 the point where we were going to take a statement from
24 them, and then they would sign it.
25   Q.  Right.  If they weren't read their rights, you

Page 151

1  wouldn't expect a card, right?
2    A.  Well, but some guys will tell them their rights
3  without actually signing off on a card.  If they're just
4  in the field, they'll give them initially their -- their
5  rights.
6    Q.  And was that consistent with El Paso's policy,
7  that you didn't necessarily have to document the first
8  time you read a suspect their rights if you weren't
9  taking a statement?
10   A.  If you weren't taking a statement.
11   Q.  And who did you ride with -- who was in your
12 vehicle when you left Danny's house?
13   A.  I don't remember exactly, but I think I had
14 Marcos.
15   Q.  Do you remember having a passenger in your
16 vehicle?
17   A.  Like another officer?
18   Q.  Yes, sir.
19   A.  I could have, but I -- I don't remember off the
20 top of my head when they're out.
21   Q.  Was there any disruption of the house?
22   A.  There was angry people --
23   Q.  Uh-huh.
24   A.  -- at the house.
25   Q.  Who -- who was angry at the house?

Page 152

1    A.  It -- it -- as I recall, I believe it was the
2  mother who was the most vocal of everybody, and she was
3  vocal.
4    Q.  And who was she angry with?
5    A.  She was directing that primarily at Marquez.
6    Q.  And what do you remember the mother doing while
7  you were at the house?
8    A.  Being very angry.
9    Q.  Yeah.
10         And how did you know she was very angry?
11   A.  I heard her.
12   Q.  Okay.  So it was verbal?  It was what she was
13 saying?
14   A.  She was being like very verbally aggressive,
15 yes.
16   Q.  Okay.  Did she do anything to cause a commotion
17 other than being verbally aggressive?
18   A.  No, but that -- you know, it puts everybody on
19 higher alert.
20   Q.  Yeah.
21         Did -- did anyone else cause a commotion
22 while you were at the house?
23   A.  I don't -- I don't remember.  I do remember his
24 mom, but I don't -- I don't remember if anybody else was
25 contributing to that or...

Page 153

1    Q.  And did anyone ask for permission to take
2  Daniel and interrogate him?
3    A.  I don't recall, no.
4    Q.  And did anyone give permission?
5    A.  I don't recall that, either.
6    Q.  And according to the El Paso policies, if
7  permission was given, that should have been documented,
8  right?
9    A.  Yes.
10   Q.  And -- and you're not aware of permission being
11 documented anywhere, are you?
12   A.  No.
13   Q.  And do you remember anything else from being at
14 Daniel's house?
15   A.  No.
16   Q.  You mentioned that you-all made a -- made a
17 stop after leaving Daniel's house.  Who was -- who was
18 present when you stopped?
19   A.  So the same -- essentially, the same people
20 that were at the -- the house.
21   Q.  And -- and where did you stop?
22   A.  Just at the -- just at the entrance to -- right
23 off of Wren Street, there's an entrance to what used to
24 be Northpark Mall, and it was right at that very
25 entrance.  It's like we just pulled off the road.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 801 of 1026
The Deposition of SCOTT GRAVES, taken January 23, 2021
154..157

Page 154

1    Q.  Okay.  And that entrance, is that at the, you
2 know, west side, south side, north side?  What side of
3 the mall is that on?
4    A.  It's on the north side.
5    Q.  The north side.
6        And what did you do -- what occurred while
7 you were making that stop?
8    A.  Just a quick huddle.  It was a quick huddle of,
9 okay, take him over here.  We're going to go over there
10 and -- and that type of conversation, and then we broke
11 the huddle and left.
12    Q.  So you discussed where Marcos Gonzalez and
13 Daniel Villegas would be taken; is that right?
14    A.  Yes.
15    Q.  And where -- where was it decided that you were
16 going to take Marcos Gonzalez?
17    A.  To the CAP office.
18    Q.  And where was it decided that Daniel Villegas
19 would be taken?
20    A.  I -- I believe he was taken over to JPD.
21    Q.  Okay.  And was there -- was there any doubt
22 before you made that stop that that would be the
23 appropriate place to take the two?
24    A.  We didn't have that conversation prior to that
25 because it -- because of the condition at the house.

Page 155

1    Q.  Right, but what I'm asking is, is there
2 anywhere you would have taken Marcos Gonzalez other than
3 the CAP offices?
4    A.  No.
5    Q.  And is there any way you're aware that -- and
6 who -- who drove Danny Villegas?
7    A.  I don't specifically remember, but it was
8 either Charlie or Al, or it could have been both of them
9 in the same car.  I -- I'm not sure.
10    Q.  And was there anywhere that he could -- Danny
11 Villegas could have been taken next other than JPD?
12    A.  Any other place?  I don't -- I don't think so.
13 I think JPD was the appropriate place to take him.
14    Q.  Okay.  And other than where they were going to
15 be taken, did you discuss anything else during the
16 huddle?
17    A.  No.
18    Q.  And did -- did anything else transpire during
19 the huddle?
20    A.  No.
21    Q.  And so that then, after the huddle, did you
22 leave the Northpark Mall?
23    A.  Yes.
24    Q.  And where did you go next?
25    A.  The CAP office.

Page 156

1    Q.  Okay.  And did any -- did any other officers
2 follow you to the CAP office?
3    A.  I don't remember if Earl did or not, but it --
4 it would seem like he did, but I -- I don't remember
5 specifically.
6    Q.  Yeah.
7        Why do you think Earl would have gone --
8 would have followed you?
9    A.  Because I think -- I think Al and Charlie had
10 Villegas, if I remember correctly.
11    Q.  So you took Marcos Gonzalez back to the CAP
12 office, right?
13    A.  Yes.
14    Q.  And about how long did it take you to get from
15 Northpark Mall to the CAP office?
16    A.  It probably would have been one, maybe two
17 minutes, I guess.
18    Q.  How long in total did you spend at Danny
19 Villegas's house?
20    A.  How much time in total?
21    Q.  Yes, sir.
22    A.  I don't -- I don't know, but it doesn't seem
23 like it was more than an hour, at most.
24    Q.  Yeah.
25        Okay.  So -- and when you -- when you and

Page 157

1 Marcos arrived at the CAP office, what was the next
2 thing you did?
3    A.  Talked to him.
4    Q.  And did you -- where did you talk to him?
5    A.  In my cubicle, I believe, or -- yeah, I believe
6 it was in my cubicle.
7    Q.  And did you take him directly there?
8    A.  As far as I can remember, yeah.
9    Q.  And there isn't anywhere that -- else that you
10 had to take him other than your cubicle after bringing
11 him in, was there?
12    A.  No.  There -- I -- I can't think of any other
13 place.
14    Q.  And Marcos eventually made a statement to you
15 that was a confession of his role in the shooting,
16 right?
17    A.  Yes.
18    Q.  And how long -- how long did you talk to him
19 before it became clear that you were going to be able to
20 get a confession statement from him?
21    A.  I don't think it was real long.  I don't
22 remember exactly how long, but I don't think it was that
23 long.
24    Q.  Okay.  Was it -- did you talk to him for more
25 than a half an hour before he started -- before you were

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 802 of 1026
The Deposition of Scott Graves, taken May 20, 2022
158..161

Page 158

1 able to start taking his statement?
2     A.  I don't think -- if it was a half an hour, I
3 think it was much more than half an hour.
4     Q.  Okay.  And between when you took him to the CAP
5 office and -- and when you started taking his
6 confession, do you leave him alone in your office at any
7 time?
8     A.  No.
9     Q.  And was -- was he handcuffed while you were
10 speaking to him?
11     A.  Probably, but we would also take handcuffs off
12 if we didn't feel like they were going to attack us or
13 anything like that.  We'd try to make folks comfortable.
14     Q.  Was anyone else with you while you were talking
15 to Marcos?
16     A.  I don't think so, or maybe Earl was in and out.
17 I -- I don't remember specifically who was there, and
18 like I said, I think it was -- if anybody was there, it
19 was probably Earl.
20     Q.  Okay.  And how long did it take to take his
21 confession?
22     A.  Maybe half an hour.  Half an hour or so.
23     Q.  Okay.  What did -- what did you do after you
24 were done taking his confession?
25     A.  I -- I don't know that, what we did.

Page 159

1     Q.  So by the time you talked to Marcos Gonzalez,
2 both David Rangel and Rodney Williams had implicated
3 him, right?
4     A.  Say that again.
5         MR. JIM DARNELL:  You broke up again,
6 Wally.  Sorry.
7         MR. HILKE:  I'm sorry.
8     Q.  (BY MR. HILKE)  By the time you talked to
9 Marcos, both David Rangel and Rodney Williams had
10 already implicated him, right?
11     A.  I believe so, yeah.
12     Q.  And you wouldn't -- you wouldn't question --
13 you wouldn't interrogate a murder suspect you had an
14 arrest warrant for without knowing what the statements
15 against him said, would you?
16     A.  That's probably true, yeah.
17     Q.  And would you -- did you actually have a
18 physical copy of the two statements that had already
19 been taken by Rodney Williams and David Rangel?
20     A.  No.
21     Q.  Why didn't you have them?
22     A.  I -- I don't think I had copies of their
23 statements.
24     Q.  Is -- is that -- is that unusual to not have
25 copies of the statements when you interrogate a murder

Page 160

1 suspect?
2     A.  That's not unusual.
3     Q.  Was there anything stopping you from getting a
4 copy of those statements if you had wanted them?
5     A.  I don't think I thought about that.
6     Q.  Right, but looking back, is there any reason
7 you couldn't have gotten them if you wanted them?
8     A.  Probably.
9     Q.  Is there a reason you couldn't have gotten
10 them?
11     A.  I don't think there is a reason.  I could have
12 gotten them if I would have wanted to.
13     Q.  Okay.  Thank you.
14         Did -- and, of course, you wouldn't
15 question a murder suspect in custody without giving him
16 his Miranda warnings first, right?
17     A.  Yes.
18     Q.  And in 1993, as a CAP detective, could you have
19 pulled up the statements associated with an -- this
20 investigation from a computer terminal?
21     A.  I don't remember if that was possible in that
22 system, and I know it's -- nowadays, it's hard to fathom
23 that, but we did not have cell phones, and we did not
24 have good computers.
25     Q.  I -- I under- -- I'm reminded of the MS DOS

Page 161

1 machines that were in my -- that I -- anyways...
2         Okay.  So your practice for taking a
3 confession was to try to leave as much as reasonably
4 possible in the suspect's own words, right?
5     A.  Yeah.  It -- it was, you know, paraphrased,
6 like I explained it before.  It -- it it -- and -- but,
7 yeah, you're trying to get what they're telling you and
8 get that into the statement.
9     Q.  So Marcos told you on his own that he was with
10 Snoopy and Popeye the night of the shooting, right?
11     A.  Yes.
12     Q.  And did you lead him in any way?  Did you
13 suggest the name Snoopy and Popeye to him?
14     A.  No.
15     Q.  He put in both of those names on -- on his own;
16 is that right?
17     A.  Yes.
18     Q.  And sitting -- sitting here today, you know
19 that Snoopy was the wrong nickname, right?
20     A.  It was what?
21     Q.  It was not -- that there was no Snoopy.  The
22 nickname of the person involved was actually Droopy; is
23 that right?
24     A.  I think so, yeah.
25     Q.  And do you have any explanation for how Marcos


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 162

1  messed up the nickname?
2      A.  I do not.
3      Q.  And did you ever ask him for an explanation?
4      A.  I probably did.  I don't know if I did or not,
5  honestly.
6      Q.  Okay.  And if -- if he gave you an explanation
7  for why he got the name of someone in the murder vehicle
8  wrong, you would have written that down, right?
9      A.  I would have tried to, yes.
10     Q.  Okay.  And did Marcos know any nonpublic facts
11  about the shooting?
12     A.  I don't remember.
13     Q.  And would you have noted the nonpublic facts
14  Marcos knew about the shooting in taking his confession?
15     A.  Do you mean would I have -- what do you mean
16  exactly?
17     Q.  Well, yeah.  What I mean is, if someone giving
18  you a confession shares nonpublic facts with you, you're
19  going to want to write those down, right?
20     A.  In their statement, yes.
21     Q.  Yeah.  You're going to make an effort to make
22  sure the confession they sign includes the nonpublic
23  facts that they gave you, right?
24     A.  Yes.
25     Q.  To your knowledge, were there any

Page 163

1  inconsistencies which -- with what Marcos confessed to
2  and what the victims of the shooting said about the
3  shooting?
4          MR. JIM DARNELL:  Object to speculation.
5  The victims of the shooting died.
6      Q.  (BY MR. HILKE)  Let me clarify.  There were two
7  witnesses who were with the people killed in the
8  shooting, right?  Are you -- are you aware that there
9  were two witnesses who were walking with the victims of
10  the shooting?
11     A.  I think -- I think that is the case, yes.
12     Q.  Sure.  Do the names Juan Medina and Jesse
13  Hernandez sound familiar to you?
14     A.  Vaguely, yes.
15     Q.  And to your knowledge, was any investigation
16  done between what those two survivors said and what
17  Marcos Gonzalez said, any incon- -- about any
18  inconsistencies?
19     A.  I don't know.
20     Q.  So, ultimately, was Marcos Gonzalez taken to --
21  taken to jail after you would have done -- after he was
22  done at the CAP office that night?
23     A.  I believe so.
24     Q.  Were you the one who transported him?
25     A.  I don't remember specifically, but I wouldn't

Page 164

1  be surprised if I was.
2      Q.  Yeah.
3          After Marcos left the CAP office and was
4  taken to jail, did you do anything else that night on
5  this investigation?
6      A.  I don't -- I don't think I did and I -- I could
7  have, but I don't think that I did.
8      Q.  Did -- after that night, were you involved in
9  the Electric Street shootings investigation in any way?
10     A.  Not that I can remember.
11     Q.  Did you eventually find out that Popeye and
12  Droopy could not have been in the car on the night of
13  the shooting?
14     A.  I did not learn that until just -- it was much
15  later on.
16     Q.  Okay.  And so you don't have any explanation
17  for why Rodney and Marcos -- sitting here today, can you
18  explain why both Rodney and Marcos named two people as
19  being in the car who could not have been in the car?
20     A.  No.
21     Q.  And after -- while you were talking to --
22  strike that.
23          You knew -- was it your understanding when
24  you left the Northpark Mall that Danny Villegas was
25  going to be interrogated if he agreed to give a

Page 165

1  statement?
2      A.  I knew he was going to be taken to JPD, and
3  they were going to probably try to get a statement from
4  him.  I mean, that -- that was inferred.
5      Q.  Yeah.
6          And at this point in the investigation,
7  you've got two good suspects, right, who are named by
8  others who were at the shooting or being in the car at
9  the time of the shooting, right?
10     A.  Yes.
11     Q.  And if all goes well, you and the other
12  detectives are going to interrogate both of them around
13  the same time, right?
14     A.  We're going to do what?
15     Q.  Interrogate both of them.
16     A.  You mean both of the suspects?
17     Q.  Yes, sir.
18     A.  Yes.
19     Q.  And so it -- it would have been standard -- but
20  you couldn't do that in the same place because Daniel is
21  going to have to get questioned in a juvenile building,
22  and Marcos was getting questioned at CAP, right?
23     A.  Yes.
24     Q.  And what was --
25          MR. JIM DARNELL:  Wally, you are breaking



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1 up again some.
2                MR. HILKE:  I'm sorry.  Let me try speaking
3 up, and let's see if that helps.
4                MR. JIM DARNELL:  Is there another computer
5 in the room close to you?  It sounds like you may be
6 getting feedback.
7                MR. TSCHIRHART:  Yeah, it sounds like
8 there's -- it sounds like there's an echo, Wally,
9 particularly when you pull back from the computer.
10               MR. HILKE:  Let me try staying -- does it
11 help if I stay closer?
12               MR. JIM DARNELL:  Yes.
13               MR. HILKE:  How about I stay closer?
14               MR. JIM DARNELL:  Except we got to look at
15 you a lot closer.
16               MR. HILKE:  I apologize for that.
17     Q.  (BY MR. HILKE)  The -- right.  So after you
18 took Marcos's first statement, did you talk to someone
19 who was in -- who was interrogating Daniel Villegas?
20     A.  Yes.
21     Q.  Who did you talk to?
22     A.  It was either Marquez or Charlie Ortega, but I
23 think it was probably Marquez.
24     Q.  And to your knowledge, Marquez was the one who
25 actually interrogated Daniel, right?

Page 167

1     A.  Yes.
2     Q.  And so if he was available, he would have been
3 the better one to talk to, right?
4     A.  Yes.
5     Q.  So what did you tell whoever you talked to
6 about your interrogation with Marcos?
7     A.  Just what -- what had happened and what he told
8 me.
9     Q.  Okay.  And -- and you had the statement typed
10 up at that point, right?
11    A.  Probably safe, yes.
12    Q.  And so you would have been able to reference
13 everything you had just written down; is that right?
14    A.  Probably, yes.
15    Q.  Okay.  And did you exchange any other
16 information on that call?
17    A.  Probably.  Probably we did.
18    Q.  What else did you -- what other information did
19 you exchange?
20    A.  I think he probably told me what Villegas was
21 telling him.
22    Q.  Anything else?
23    A.  Not that I can recall.
24    Q.  And after you got Marcos's first statement, you
25 ultimately -- strike that.

Page 168

1                You ultimately took two statements from
2 Marcos, right?
3     A.  Yes.
4     Q.  And some time elapsed between the two, right?
5     A.  A little bit, yes.
6     Q.  During the time in between, did you leave
7 Marcos's presence at any time?
8     A.  I don't think so.  He -- he would have always
9 been like within where he's not going to get up and get
10 away without me noticing it.
11    Q.  Sure.
12               So you were -- you are responsible for
13 making sure he doesn't -- he doesn't try to run away,
14 right?
15    A.  Right.  Yes.
16    Q.  And you didn't -- you didn't ask anyone else to
17 baby-sit him while he was there with you at CAP, did
18 you?
19    A.  I don't believe I did, no.
20    Q.  Yeah.
21               So other than whoever you talked to on the
22 phone, did you communicate with anyone -- well, strike
23 that.
24               How many phone calls did you have that
25 night to whoever it was at JPD interrogating Danny?

Page 169

1     A.  I -- I don't remember more than a phone call.
2     Q.  You only remember talking one time; is that
3 right?
4     A.  I think so, yeah.
5     Q.  And in Marcos's first statement, he says that
6 he wasn't even in the car during the shooting, right?
7     A.  Right.
8     Q.  And then you hear from whoever's on the phone
9 that Danny has said that he was in the car, right?
10    A.  Probably, yeah.
11    Q.  And you con-- you -- you ended up accusing
12 Marcos of lying to you based on that information, right?
13    A.  Probably.
14    Q.  Do you remember at Danny's second criminal
15 trial being asked these questions and giving these
16 answers?  Well, I'll -- I'll read it.
17    A.  Okay.
18    Q.  "Question:  How do you approach him the second
19 time when you are now informed that the first statement
20 may be false?
21               "Answer:  Well, how I approached him was
22 with the attitude of either Marcos was lying or Danny
23 was lying.  One of the two of them was lying.  And so
24 what I did is I sat down with Marcos, and I told him
25 that I thought he was lying.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 805 of 1026
The Deposition of SCOTT GRAVES, taken March 31, 2015

170..173

Page 170

1          "Question:  And what did he tell you?
2          "Answer:  He asked me why I thought -- you
3  know, why I thought that he was lying, and I told him,
4  you know, 'Your story is not matching up with the other
5  witnesses in the case, and you're lying.'  And at that
6  point, he agreed that I was -- that he was lying, and
7  then he gave me the second story."
8          Do you remember being asked those questions
9  and giving those answers?
10     A.  You know, I believe that is exactly what
11  happened.  I -- I don't remember what Marcos looks like.
12     Q.  Okay.
13     A.  So, I mean, it's been 29 years.  Was that the
14  exact words that we used with each other?  I don't know.
15  But is that, in essence, what happened?  Yes.
16     Q.  Okay.  And Marcos -- does it sound right that
17  Marcos was 17 years old when you interrogated him?
18     A.  It sounds about right, yeah.
19     Q.  And if -- if -- if he's 17 years old, that
20  means he doesn't need any -- he doesn't get any of the
21  juvenile protections.  He's an adult as far as that
22  goes, right?
23     A.  Yes, sir.
24     Q.  And you were not trained that a 17-year-old
25  needed to be treated any different than an older adult,

Page 171

1  were you?
2     A.  That's true.
3     Q.  These interrogations -- or your interrogation
4  of Marcos took place -- well, strike that.
5          Does it sound right that the -- that the
6  interrogations of Marcos and Daniel Villegas took place
7  only about a couple of weeks after the shootings
8  themselves?
9     A.  I think that sounds correct, yeah.
10     Q.  And so with only a couple of weeks having
11  passed, you would expect that anyone who was in the car
12  would have a pretty fresh memory of the shootings,
13  right?
14          MR. JIM DARNELL:  Object, calls for
15  speculation.
16          Go ahead.
17     A.  I'm not sure what their perceptions would have
18  been, and I can't -- a lot of stress can alter
19  perceptions.
20     Q.  (BY MR. HILKE)  Sure.
21          In any event, if there were inconsistencies
22  in the statements of the people in the car, you would
23  want to address those inconsistencies, right?
24     A.  Yes.
25     Q.  And you took statements from Rodney Williams

Page 172

1  and Marcos Gonzalez less than six hours apart, right?
2     A.  I think so, yeah.
3     Q.  Yeah.
4          And you were trying to see if there were
5  any inconsistencies in what Marcos Gonzalez told you,
6  right?
7     A.  Yes.
8     Q.  And, in fact, you confronted him about the
9  inconsistency with Daniel -- what Daniel had said about
10  whether or not Marcos was in the car, right?
11     A.  Yes, sir.
12     Q.  And so do you recall that Rodney and Marcos
13  said different things about how the group met up before
14  the shooting?
15     A.  I -- I don't recall specifically, but I
16  wouldn't be surprised.
17     Q.  Sure.
18          And is it consistent with what you remember
19  that Rodney said he, Marcos, and Rodney -- strike that.
20          If Rodney said he, Marcos, and Danny were
21  hanging out at the Village Green when Popeye and Snoopy
22  drove up, but Marcos said that it was just Marcos and
23  Rodney, and Danny, Snoopy, and Popeye all drove up
24  together, would that inconsistency in where Danny was
25  before the shooting have been important to the

Page 173

1  investigation?
2          MR. ALMANZAN:  Objection, calls for
3  speculation.
4     Q.  (BY MR. HILKE)  Go ahead.
5     A.  It -- it could have been.
6          MR. JIM DARNELL:  Wally, are we getting
7  close to a stopping point?
8          MR. HILKE:  Yes, we are if -- I don't --
9  are you having to move to a physical location for the
10  hearings?
11          MR. JIM DARNELL:  No, but I've got to -- I
12  want to look at the file and make sure I'm ready because
13  I've got three hearings all in the same place.
14          MR. HILKE:  If I could take five minutes, I
15  think I can wrap up a section I'm on.
16          MR. JIM DARNELL:  Okay.
17     Q.  (BY MR. HILKE)  All right.  And, for example,
18  where Daniel was before the shooting could have been
19  important to an alibi he might try to give, right?
20     A.  True.
21     Q.  You'd like to pin down where Danny was the
22  night of the shooting, right?
23     A.  Yes.
24     Q.  Did you ask Marcos to explain the inconsistency
25  in where Danny was before the shooting?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 806 of 1026
The Deposition of SCOTT GRAVES, taken 07/28/22, Page 2022

174..177

Page 174

1    A.  I don't remember, and I am not sure if I did or
2 not.
3    Q.  Sure.
4        If -- if you had asked him and he had given
5 an answer, you would have written that down, right?
6    A.  Yes.
7        MR. JIM DARNELL:  Object, calls for
8 speculation.
9    Q.  (BY MR. HILKE)  And are you aware that Rodney
10 described the car as having four doors, and Marcos
11 described the car as having two doors?
12   A.  I don't remember that.
13   Q.  And you would have wanted to know how many
14 doors the car had so you could try to go and find it,
15 right?
16   A.  Yeah.
17   Q.  And did you ask Marcos to explain that
18 inconsistency?
19   A.  I don't remember.
20   Q.  If he had given you an explanation, you would
21 have written it down, right?
22       MR. ALMANZAN:  Objection, calls for
23 speculation.
24   Q.  (BY MR. HILKE)  Was your answer a yes?
25   A.  Yes.

Page 175

1    Q.  And Rodney said that they did a beer run at the
2 Diamond Shamrock, but Marcos said they did the beer run
3 at a 7-Eleven, right?
4    A.  Probably.
5    Q.  And did you ask Marcos to explain that
6 inconsistency?
7    A.  I might have.  I -- but I don't remember
8 specifically.
9    Q.  And if he had explained it, you would have
10 written it down, right?
11   A.  Right.
12       MR. JIM DARNELL:  Object, calls for
13 speculation.
14   Q.  (BY MR. HILKE)  Was that a yes?
15   A.  Yes.
16   Q.  And Rodney said that when confronting the
17 victims, Popeye yelled, "Que Barrio," and Marcos said
18 that Popeye yelled "VNE putos, right?
19   A.  I believe so.
20   Q.  And did you ask Marcos to explain that
21 inconsistency?
22   A.  I don't remember if I did or not.
23   Q.  If you had asked him, would it -- would you
24 have written down the answer?
25       MR. JIM DARNELL:  Object, calls for

Page 176

1 speculation.
2    A.  Probably.
3    Q.  (BY MR. HILKE)  And Rodney said that Popeye had
4 a gun under his seat in a white -- wrapped in a white
5 cloth, but Marcos said they went to Snoopy's house to
6 get Snoopy's gun, right?
7    A.  Right.
8    Q.  And did you ask Marcos to explain that
9 inconsistency?
10   A.  I don't remember if I did or not.
11   Q.  But if Marcos had explained an inconsistency
12 about the murder weapon, you would have written that
13 down, right?
14       MR. JIM DARNELL:  Objection --
15   A.  Yes.
16       MR. JIM DARNELL:  -- calls for
17 speculation.
18   Q.  (BY MR. HILKE)  Was that a yes?
19   A.  Yes.
20   Q.  Okay.  And Rodney said that after the shooting,
21 they were dropped off at Danny's house, but Marcos said
22 they were dropped off at Village Green, right?
23   A.  I don't remember.
24   Q.  And did you ask Marcos to explain that
25 inconsistency?

Page 177

1    A.  I don't recall if I did or not.
2    Q.  And if Marcos had given an answer, that would
3 have been important to write down, right?
4    A.  Yes.
5        MR. HILKE:  Okay.  It's a good point for a
6 break.
7        MR. JIM DARNELL:  Okay.  Thanks.
8        THE VIDEO TECHNICIAN:  Okay.  Give me just
9 one second, guys.  We are now off record.  The time is
10 2:50 p.m.
11       (Break taken from 1:50 p.m. to 2:57 p.m.)
12       THE VIDEO TECHNICIAN:  We are back on the
13 record for the deposition of Scott Graves being
14 conducted by videoconference.  My name is Jessica Chase.
15 Today is July 28th, 2022, and the time is 3:57 p.m.
16       Counsel, you may proceed.
17   Q.  (BY MR. HILKE)  Okay.  Good afternoon, sir.  I
18 know we've just taken a break of a little more than an
19 hour for lunch, and am I correct that there is still no
20 reason you couldn't give honest and truthful testimony
21 today?
22   A.  Yeah, there's -- yeah, there is no reason that
23 I can't do that.
24   Q.  Okay.  So, sir, in -- in 1993 as a detective at
25 CAP, did people call the police department with

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 807 of 1026
The Deposition of SCOTT GRAVES, taken January 28, 2022

178..181

Page 178

1  information about open investigations?

2      A.  Yes.

3      Q.  And if someone had information about a matter

4  that CAP was investigating, would those calls get routed

5  to CAP?

6      A.  Yeah, they would.  I think so, yeah.

7      Q.  And did you receive calls from witnesses who

8  were calling wanting to talk about a case they knew

9  something about?

10     A.  In general?

11     Q.  Or at -- at any -- at any time you can remember

12  during your career in CAP.

13     A.  Yes.

14     Q.  What was -- how did those calls come to you?

15     A.  Either I was there, or when somebody called and

16  they would call the front desk, and so they would just

17  ship it back if it had something to do with me.  If it

18  didn't and they needed somebody, sometimes I got calls

19  like that.

20     Q.  So -- and when you say sometimes you were

21  there, did you sometimes just answer the phone for the

22  general line on CAP?

23     A.  No.  We had staff to do that.  I answered my

24  line.

25     Q.  Okay.  And I believe your testimony earlier was

Page 179

1  that you did speak with David Rangel; that he called

2  you.  You didn't call him or try to call him; is that

3  right?

4      A.  I think so, and I'm -- I didn't call him.  I --

5  I don't remember how the call came in.  I don't know if

6  it came in through dispatch or exactly how it came in.

7  I'm not sure.

8      Q.  All right.  Do you have any idea of how the

9  call would have come to reach you in particular?

10     A.  Somebody would have sent it to me.

11     Q.  Yeah.

12         And, typically, would a call about the

13  Electric Street murders have been sent to the case agent

14  that's on the case?

15     A.  If he was there.

16     Q.  And just to confirm, do you remember anything

17  else about the call with David Rangel that we haven't

18  discussed already?

19     A.  No.

20     Q.  Do you remember anything else about David

21  Rangel at all that we haven't discussed already?

22     A.  No.

23     Q.  And I'm going to show you a couple more

24  exhibits.

25         So I'm now sharing my screen with you.

Page 180

1  This is going to be Exhibit Number 13.

2         (Exhibit 13 marked.)

3      Q.  It is at --

4         MR. JIM DARNELL:  Wally, you're -- Wally,

5  you're breaking up again.

6         MR. HILKE:  Oh, I'm sorry.

7      Q.  (BY MR. HILKE)  This is Exhibit Number 13.

8  It's at J.S. -- Villegas J.S. 0939.

9         MR. HILKE:  Are you able to hear me now?

10        MR. JIM DARNELL:  Yeah.

11        MR. HILKE:  Okay.

12        MR. JIM DARNELL:  Not great, but we can

13  hear you.

14        MR. HILKE:  Okay.  Let me know if you can't

15  hear my questions at any time, and we'll get it solved,

16  okay?

17        MR. JIM DARNELL:  Okay.

18     Q.  (BY MR. HILKE)  So, sir, is this one of the

19  documents you reviewed in preparation for this

20  deposition?

21     A.  It looks like one, yes.

22     Q.  Is this the first statement that Marcos

23  Gonzalez gave to you?

24     A.  I think so.  Let me -- let me look at it here a

25  bit closer.

Page 181

1         MR. JIM DARNELL:  He's got control of it.

2         THE WITNESS:  Yeah.  I'm just moving the --

3  the screenshot of everybody over to the left, so I can

4  see it.

5         MR. JEEP DARNELL:  Good.  I'm sorry.  This

6  is going to my dad instead of to me.

7         MR. HILKE:  Yeah.  I'm sorry.

8         MR. HILKE:  Board of Nursing finally

9  came through with the order, so we are good to go --

10        MR. HILKE:  Jeep, you're not on mute.

11        MR. JEEP DARNELL:  -- according to the

12  patrols.

13        MR. JIM DARNELL:  Jeep.

14        MR. JEEP DARNELL:  That's fine.  Cool.

15  Thank you.  Bye.

16        MR. JIM DARNELL:  I'll go tell him.

17        MR. HILKE:  Thank you.

18     Q.  (BY MR. HILKE)  Sir, if -- if your lawyer has

19  left the room for a second, I'll give him a chance to

20  get back before we continue.

21         We good to go?

22     A.  Yeah.

23     Q.  All right.  So -- I'm sorry.  So is this -- is

24  this the first statement that you took from Marcos

25  Gonzalez?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 808 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022

182..185

Page 182

1    A.  It appears to be.

2    Q.  Okay.  And looking in the upper right, was it
3  your practice to mark the times that you started and
4  completed taking a confession?

5    A.  Yes.

6    Q.  And so here, you would have started taking the
7  confession at 12:45 a.m.; is that right?

8    A.  Yes.

9    Q.  And completed it at 1:15 a.m.?

10    A.  Yes.

11    Q.  And then was it -- was it -- I notice that each
12  paragraph seems to be bookended by initials.  Was that
13  the department's policy to have initials on every
14  paragraph of a confession?

15    A.  I don't know that it was policy, but it was
16  practice.

17    Q.  Okay.  And -- okay.  So I'm going to stop
18  sharing this exhibit at that poi- -- at this point.

19    And I'm now sharing my screen again.  I'll
20  mark this Exhibit Number 14.  This is at GS 1941.

21    (Exhibit 14 marked.)

22    Q.  And scrolling to the top of the document, does
23  this appear to be the second statement given to you by
24  Marcos Gonzalez?

25    A.  Yes.

Page 183

1    Q.  And then the time started was 2:20 a.m.; is
2  that right?

3    A.  Yes.

4    Q.  And the time completed is 2:30-something a.m.
5  Does that appear to be right?

6    A.  Yes.

7    Q.  And I can't make out whether that's 2:30 or
8  something else.  Can you?

9    A.  I cannot.  It looks like maybe 2:35.  I don't
10  know.

11    Q.  Okay.  Okay.  And -- and these are both
12  statements you reviewed to prepare for the deposition
13  today; is that right?

14    A.  Yes, sir.

15    Q.  And other than these two statements, did you
16  record what Marcos Gonzalez told you in any other
17  location?

18    A.  No.

19    Q.  Okay.  And we talked about some inconsistencies
20  between Marcos's statement and Rodney Williams's
21  statement.  Can you think of any reason why you would
22  not have questioned Marcos about consistencies
23  between -- inconsistencies between his and Rodney's
24  statements?

25    A.  I -- no, I can't.

Page 184

1    Q.  And we've -- other than what you've discussed
2  already about your interactions with Marcos, do you have
3  an independent memory of anything else about your
4  invest- -- your interactions with Marcos Gonzalez?

5    A.  No.

6    Q.  And as you reviewed these statements in
7  preparation for the deposition, did they refresh your
8  memory about any interactions with Marcos Gonzalez that
9  we have not talked about yet today?

10    A.  No.

11    Q.  I'm going to stop sharing this now.

12    After -- at the time you spoke to Marcos,
13  you didn't know that Droopy and Popeye could not have
14  been in the -- in the car; is that right?

15    A.  No.

16    Q.  Do you remember how long thereafter you learned
17  that fact?

18    A.  I think it was a long time, like years.

19    Q.  Would it have been during Danny's criminal
20  trials?

21    A.  I don't even think it was then.  I think it was
22  much, much later, like when the whole -- that the
23  evidentiary stuff and things were -- would even -- I'm
24  not even sure when the time was, but I'm thinking it was
25  like later, much, much later than after the trials.

Page 185

1    Q.  Your recollection is that that information came
2  to you after -- you know, during Daniel's postconviction
3  proceedings many years later; is that fair?

4    A.  I believe so, yes.

5    Q.  Okay.  And do you remember if you were still
6  employed by the El Paso Police Department when you
7  learned that information?

8    A.  I don't think I was.

9    Q.  Other than what we've discussed today, do you
10  have a recollection of participating in the Electric
11  Street murders investigation in any way before you went
12  to Daniel Villegas's house?

13    A.  Like on the 12th, I took statements, I think,
14  that Monday.

15    Q.  And we talked about a few of those statements,
16  like Cynthia and Eduardo Valles, right?

17    A.  Right.

18    Q.  We talked about Terri Vinson and Terrance
19  Farrar, Cynthia, and Eduardo Valles, right?

20    A.  Yes.

21    Q.  Other than the people we discussed, do you
22  remember investigating anyone else as part of the
23  Electric Street murders investigation?

24    A.  Not off the top of my head, I don't remember.

25    Q.  Do you have any memory of any -- any other



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 809 of 1026
The Deposition of Scott Graves, taken February 2, 2022
186..189

Page 186

1 investigation whatsoever you did in the Electric Street
2 murders that we haven't discussed today or that isn't
3 recorded in one of the documents you've reviewed?
4    A. I don't believe so.
5    Q. Okay. So I'm going to -- I'm going to mark
6 this Exhibit 15. This is at City 920.
7          (Exhibit 15 marked.)
8    Q. Let me zoom in a little bit.
9          Do you recognize this as your disciplinary
10 history card?
11   A. Yeah. It -- it looks a lot different than the
12 last time I saw it, but yeah.
13   Q. You've seen a version of this before, although
14 not necessarily this version; is that fair?
15   A. Yes.
16   Q. And this is documenting the sustained
17 disciplinary allegations against you; is that correct?
18   A. Yes.
19   Q. The first one from July 24, 1985, I believe is
20 about an interaction with a railroad police that -- at a
21 relative's house. Do you remember that incident?
22   A. I do, yeah.
23   Q. And that would have been one of the first
24 internal affairs investigations that involved you; is
25 that right?

Page 187

1    A. Yes.
2    Q. And you were a pretty new officer at the time.
3    A. Yes.
4    Q. Do you remember how that investigation
5 resolved?
6    A. I don't remember. I -- I really don't. I
7 think on that one I got in trouble because I asked him
8 if he had a search warrant, and that's essentially
9 what -- what got me in trouble.
10   Q. I see.
11         And the railroad police, they thought you
12 were interfering in their investigation; is that fair?
13   A. Yes.
14   Q. And you thought you were just trying to protect
15 the ri- -- you were trying to look out for the persons
16 whose house it was; is that fair?
17   A. Yes, that is fair.
18   Q. And did -- did it leave an impression on you,
19 this investigation, in terms of needing to be careful
20 about your interactions?
21   A. Well, I just minded my own business after that.
22 I mean, that was pretty much what it did to me. I just
23 said I'm going to just keep myself in my own lane.
24 That's it.
25   Q. Yeah.

Page 188

1          The next one is CP86-131, and I believe
2 that's the only time you've ever received a suspension.
3 Is that right.
4    A. Yes, sir.
5    Q. And that was an incident at Whataburger, if I'm
6 not -- right. Does that ring a bell?
7    A. Yes. Yeah.
8    Q. And there were a bunch of officers involved in
9 this investigation, right?
10   A. Yes.
11   Q. And did -- if I remember correctly, internal
12 affairs' conclusion was that an inappropriate practical
13 joke had been played. Is that what they -- you remember
14 them concluding?
15   A. Yes. And I -- I think the essence of that was
16 one of the guys made a -- probably an inappropriate
17 comment when he was leaving out of Whataburger about
18 calling the police on the -- on the drunk guy and
19 that -- that was basically it.
20   Q. Yeah.
21         Did -- and this is -- you didn't make that
22 comment, did you?
23   A. No.
24   Q. You didn't participate in an inappropriate
25 practical joke in any way, did you?

Page 189

1    A. No.
2    Q. Do you remember feeling that it was unfair to
3 get suspended for something you didn't play a role in?
4    A. You know, I didn't like it, but I was there.
5 It was technically my duty to go arrest the gentleman on
6 the -- in -- that was drunk in the bathroom. I didn't
7 do it, so I took my -- my punishment.
8    Q. Okay. Was it -- was it a learning experience
9 going through this internal affairs complaint?
10   A. Definitely, yes.
11   Q. And this is another one -- this is in the first
12 couple of years that you entered service; is that right?
13   A. Yes.
14   Q. And then a few months later, there is a
15 complaint for dereliction of duty, failure to obey a
16 order. That's CP86-228. My recollection is that the
17 allegation was being ordered to write a traffic ticket
18 and not doing it or not doing it quickly -- quickly
19 enough or something. Does that ring a bell?
20   A. It does.
21   Q. And you ultimately received a written reprimand
22 in that investigation; is that right?
23   A. Yes.
24   Q. And was that -- was this also a learning
25 experience for you?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 810 of 1026
The Deposition of Scott Graves, taken February 3, 2012
190..193

Page 190

1    A.  Yes, it -- it was.  And I still disagree with
2  that to this day, and the reason -- the reason I do is
3  because the man that he wanted me to cite was a very
4  poor man who could not afford the traffic ticket that he
5  had the warrant for, and he was barely able to post bond
6  on that ticket, and I felt like he should have a chance
7  to go rectify what the problem was with his vehicle,
8  which I believe was insurance, and -- before we wrote
9  him another ticket and put him in the same spot.
10          And so that was just me disagreeing about
11 the -- really, essentially, I wanted to be compassionate
12 rather than just slam him again and then see him with a
13 warrant, when he was obviously trying to do -- he was
14 trying to take care of the family and trying to do the
15 right thing, and he was trying to do that.  So he and I
16 disagreed, and I took my written reprimand and -- and
17 that was that.
18    Q.  And -- and you -- you -- you agreed that it was
19 a learning experience.  Was it an experience that stuck
20 with you as you were figuring out how to navigate your
21 career in the police department?
22    A.  It -- it was.  I did -- did not feel guilty
23 about showing compassion to that gentleman, and I did
24 other compassionate acts in the future, regardless of
25 whether that -- that put me at peril for discipline or

Page 191

1  not.
2    Q.  Yeah.  So I'll stop sharing this now.
3          And you've had the opportunity to testify
4  in court numerous times as a police officer; is that
5  right?
6    A.  Yes.
7    Q.  And you swear an oath when you testify in
8  court, right?
9    A.  I -- I did what?
10   Q.  You swear an oath to tell the truth when you
11 testify in court, right?
12   A.  Yes, sir.
13   Q.  And you're under that same kind of oath right
14 now in this deposition, right?
15   A.  Yes, sir.
16   Q.  And when you take that oath, you're swearing
17 that everything you say is true, right?
18   A.  Yes, sir.
19   Q.  And is that an oath that you take seriously
20 when you swear it?
21   A.  Yes.
22   Q.  And the integrity of the justice system depends
23 on officers taking that oath seriously when they swear
24 it, right?
25   A.  Yes.

Page 192

1    Q.  And today, you don't recall a time when you
2  testified falsely under oath, do you?
3    A.  No.
4    Q.  And you testified at Daniel Villegas's first
5  criminal trial, right?
6    A.  I believe so, yes, sir.
7    Q.  And you were under oath when you testified in
8  court, right?
9    A.  Yes, sir.
10   Q.  And Daniel Villegas's first trial -- actually,
11 give me one moment.
12   A.  It was what?
13   Q.  I'm -- I'm sorry.  I'm just -- I just need a
14 second.
15   A.  Oh, okay.
16   Q.  Does it sound about right that his first trial
17 was in 1994?
18   A.  I -- I think that's accurate.
19   Q.  Do you recall being asked whether any
20 complaints against you had ever been substantiated at
21 that first trial?
22   A.  No.
23   Q.  Do you recall being asked these questions and
24 giving these answers:
25          "Question:  Can you give the ladies and

Page 193

1  gentlemen of the jury roughly an estimate of the
2  complaints?
3          "Answer:  Four or five.
4          "Question:  A few?
5          "Answer:  Just a few.  It's not very many.
6          "Question:  Any of them substantiated?
7          "Answered -- answer:  No."
8          Do you recall giving that testimony?
9    A.  I think so, and how I perceived what they were
10 asking was public complaints, like complaints from
11 citizens about misconduct and -- and that's what I was
12 thinking at the time.  I wasn't thinking internal
13 complaints.  So that -- that wasn't an intent to deceive
14 anybody.
15   Q.  All right.  So -- so I'm going to -- I'm going
16 to share an exhibit with you.  This is Exhibit 16,
17 starting at Villegas J.S. 641.
18          (Exhibit 16 marked.)
19   Q.  And on J.S. 653, do you see the date here
20 December 9, 1994?
21   A.  Yes.
22   Q.  And scrolling down, it has -- lists you, Scott
23 Graves, as a witness and being sworn in by the Court; is
24 that right?
25   A.  Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 194

1    Q.  And did you review this testimony in
2  preparation for your deposition today?
3    A.  I believe I did.
4    Q.  So -- so I am scrolling down to J.S. 674, and
5  do you see starting on line 8, being asked the question,
6  "How many complaints have been filed against you with
7  internal affairs?
8    "Answer:  I don't know.  I haven't had one
9  since I've been a patrolman?
10   A.  Yes.
11   Q.  And scrolling down to line 17, there's a
12 question, "How many have you had total in your career?
13   "Answer:  I don't know, but it's few.
14   "Question:  But you agree you would have
15 them?
16   "Answer:  I have had a couple."
17   Do you see that?
18   A.  Yes.
19   Q.  And then scrolling down -- scrolling down
20 further, J.S. 693, starting on line 10, do you see where
21 you're asked, "Question:  Now, in regards to complaints
22 that have" -- I'm sorry.  Strike that.
23   Line 10, "Question:  Now, in regards to
24 complaints have been filed as a police officer --
25   "Answer:  Yes.

Page 195

1    "Question: Ten years as a police officer,
2  you would say?
3    "Answer:  Yes.
4    "Question:  Lots of arrests?
5    "Answer:  Lots of arrests.
6    "Question:  All sorts of crimes?
7    "Answer:  Yes.
8    "Can you -- Question:  Can you give the
9  ladies and gentlemen of the jury roughly an estimate of
10 the complaints?
11   "Answer:  Four or five.
12   "Question:  A few?
13   "Answer:  Just a few.  It's not very many.
14   "Question:  Any of them substantiated?
15   "Answer:  No."
16   Do you see that portion of the transcript?
17   A.  I do.
18   Q.  So did either of the attorneys asking you
19 questions limit in any way what kinds of complaints they
20 were asking you about?
21   A.  I -- I think it's implied in the previous
22 questions about the arrests and about the
23 investigations, and so forth, and, you know, in my mind,
24 I -- I did separate stuff like those things that I got
25 complained on internally versus citizen complaints, you

Page 196

1  know.  I did not have but just a handful of citizen
2  complaints, and none of them were ever substantiated.
3  And that is what I was thinking of, and that's what I
4  was referring to.
5    Q.  I'm going to stop sharing now.
6    A.  I -- I could have been more exact.
7    Q.  The -- the railroad police, were they internal
8  to the El Paso Police Department?
9    A.  No, but I viewed that in that same category.
10   Q.  Why did you view that in the same category?
11   A.  Because I didn't see it as the same sort of
12 thing a citizen complaint would be.
13   Q.  And you also testified that you hadn't gotten
14 any complaints since you became a detective; is that
15 right?
16   A.  I don't believe I did.
17   Q.  You don't believe that that was your testimony,
18 or you don't believe that you had any complaints?
19   A.  I don't believe that I had any complaints.  I
20 don't think I did.
21   Q.  And if you had been named in internal affairs
22 complaints in, say, the previous two years, you would
23 have remembered that when giving your testimony, right?
24   MR. JIM DARNELL:  Object, calls for
25 speculation.

Page 197

1    Q.  (BY MR. HILKE)  Go ahead.
2    A.  Okay.  So, again, if I would have been
3  complained on by a citizen and -- you know, through
4  per- -- the performance of my duties, and somebody said
5  that I beat them up, or whatever, and that was
6  substantiated, I would have told them about that, and
7  that is where my mind was.  I was not thinking of those
8  internal complaints.
9    Q.  And you weren't just asked about -- okay.
10 Right.  So the way you understood the question, you
11 weren't thinking about internal complaints; is that
12 fair?
13   A.  I -- the way I perceived the question was that
14 I was being asked about my conduct as a police officer
15 towards citizens in the community.
16   Q.  Okay.  So you would have -- so if a citizen had
17 complained against you while you were a detective, you
18 would have mentioned that in your testimony, right?
19   A.  It -- I think the question was, was it
20 substantiated.  And -- and I -- I couldn't remember
21 getting any comp- -- substantiated complaints from
22 citizens.
23   Q.  I'm pulling Exhibit 16 back up again, and I'm
24 on page J.S. 674.  Do you see on line 8 where Mr. Olivas
25 asks, "How many complaints have been filed against you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA COURT REPORTERS

Page 198

1  with internal affairs?"
2            And you answered, "I don't know.  I haven't
3  had one since I've been a patrolman"?
4      A.  Yes.
5      Q.  And Mr. Olivas there was asking you about any
6  complaints, not just substantiated complaints, correct?
7      A.  Yeah, I believe so.  I -- I think that's what
8  he -- I don't know what he was thinking.  I just know
9  how I perceived the question.
10     Q.  And you perceived his question about how many
11 internal affairs complaints were filed against you to
12 just be external complaints, right?
13     A.  Yes.
14     Q.  And you also -- and to this question, how many
15 complaints have been filed against you, you understood
16 him to be asking about how many total complaints, not
17 just substantiated complaints, right?
18     A.  Did I -- are -- are you asking me did I -- what
19 are you asking me exactly?
20     Q.  I'm asking if you understood him to be asking
21 you about all ex- -- like external internal affairs
22 complaints or just the substantiated ones.
23     A.  I think all of them.
24     Q.  And your answer to him was that you haven't had
25 one since you've been a patrolman, right?

Page 199

1      A.  Yeah.  That -- that was what Mr. -- yeah.
2      Q.  And so if you had been the subject of a
3  civilian complaint since becoming a detective, that
4  answer would be false, right?
5      A.  I believe so.  Or -- either that or I didn't
6  remember, one of the two.
7      Q.  I'll stop sharing that now.
8            Other than -- over your career, you did
9  receive multiple civilian complaints, right?
10     A.  Multiple what?
11     Q.  Civilian complaints.
12     A.  I -- I received civilian complaints, but I -- I
13 don't remember all of them, but I answered them all, and
14 I did what I was supposed to do.
15     Q.  And other than arguably the railroad police
16 complaint, you've never been disciplined for a civilian
17 complaint, have you?
18     A.  No.
19     Q.  And I'm going to show you a couple more
20 exhibits now.
21            So I'm now sharing Exhibit 17.  This is at
22 City 57459.
23            (Exhibit 17 marked.)
24     Q.  Do you see this is a statement given by you to
25 a Sergeant Carney?

Page 200

1      A.  Yes.
2      Q.  And this is on a multipurpose sworn supplement
3  report, right?
4      A.  Yes.
5      Q.  And it's an administrative offense CP86-131?
6      A.  Yes.
7      Q.  Okay.  Is this the kind of statement that you
8  would provide as the subject of an internal affairs
9  investigation?
10     A.  Yes.
11     Q.  I'm going to scroll down to the next page,
12 which is City 57460.  Do you note -- so by looking at
13 the beginning of the paragraph at the top of this page,
14 do you read, "It should be noted that among station
15 members, it is a well-known fact that DeAngelis and
16 Gailey possess a great amount of dislike for each other.
17 It is just my opinion that DeAngelis assumed that Gailey
18 had made a remark, when, in fact, he didn't, due to the
19 longstanding feud between the two"?
20            Do you see that statement?
21     A.  Yes.
22     Q.  So part of what you added at the end of your
23 statement -- and -- well, strike that.
24            DeAngelis was the officer who internal
25 affairs perceived as the victim of the practical joke,

Page 201

1  right?
2      A.  Probably.
3      Q.  Okay.  And here, you're sort of saying this
4  wouldn't have happened except the supposed victim of the
5  practical joke had so much dislike for one of the
6  officers involved; is that fair?
7      A.  Yeah.  I think they didn't care for each other.
8      Q.  So I'm going to stop sharing that and share one
9  other.
10            Okay.  This is Exhibit 18, Bates
11 City 57463.
12            (Exhibit 18 marked.)
13     Q.  This is a statement by Officer Art Perez; is
14 that right?
15     A.  Yes.
16     Q.  And same internal affairs case number,
17 CP86-131?
18     A.  Yeah.
19     Q.  I'm scrolling way down in the document to the
20 final page, City 57467.
21            Do you see at the end of the statement
22 where Officer Perez writes, "It's a known fact that
23 Officer DeAngelis and Gailey do not get along, and I
24 feel that this incident went -- went as far as it did
25 because Officer Gailey was one of the officers



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

1  involved."

2      A.  Yeah.

3      Q.  And so in your statement -- Perez is saying

4  almost exactly the same thing you were about why he

5  thinks what happened, right?

6      A.  Yes.

7      Q.  And that's something -- it's similar enough

8  that you might have discussed it beforehand, right?

9      A.  I think that was actually a question that we

10  were answering from Carney.

11      Q.  But that's something you would have expected

12  Carney to ask all the officers involved.

13      A.  I don't know if he asked all the officers

14  involved.

15      Q.  Uh-huh.

16      A.  But he probably asked Art and I for sure.

17      Q.  And so your explanation for why you both said

18  the same thing was -- would be that the sergeant

19  probably asked the same question to both of you, right?

20      A.  Or whoever took the statements.

21      Q.  And that's because it wouldn't have been

22  appropriate for both of you to -- to coordinate what

23  statements you were going to give beforehand; is that

24  right?

25      A.  I don't remember coordinating with anybody on

Page 203

1  that.

2      Q.  Would it have been appropriate to do so?

3      A.  I don't know if it would have been appropriate

4  or not.  I just know I didn't.

5      Q.  I understand.

6          It wasn't -- it wasn't that there was a

7  policy about whether or not you could coordinate

8  beforehand; is that right?

9      A.  Or ask each other questions.  I -- you know, I

10  don't know the policy that said you can't -- you can't

11  talk to somebody.  The minute they tell you you can't

12  talk to somebody, then you can't.

13      Q.  Okay.  I'll stop sharing this exhibit now.

14          Are you aware in your career of any

15  instance where internal affairs punished officers for

16  coordinating their statements?

17      A.  No.

18      Q.  To your knowledge, did the El Paso Police

19  Department ever investigate any misconduct related to

20  the Electric Street shootings?

21      A.  I don't know.

22      Q.  Sitting here today, are you aware of any such

23  investigation?

24      A.  No.

25      Q.  To your knowledge, did the El Paso Police

Page 204

1  Department ever investigate failures by officers to

2  follow policies regarding juveniles?

3      A.  I don't know.

4      Q.  You're not aware of any sitting here today?

5      A.  Not that I can think of.

6      Q.  Okay.  To your knowledge, did the El Paso

7  Police Department ever investigate how three people gave

8  the same false confession as to two people being in the

9  car involved in a murder?

10      A.  Did the department investigate it?

11      Q.  Yes, sir.

12      A.  I don't know.

13      Q.  You're not aware of any such investigation

14  sitting here today?

15      A.  No.

16      Q.  Sitting here today, are you aware of any

17  physical evidence that corroborates Daniel Villegas

18  being the shooter in the Electric Street murders?

19      A.  Not offhand.

20      Q.  Are you aware of any murder weapon that was

21  ever tied to him?

22      A.  No.

23      Q.  Or any vehicle that was ever tied to him?

24      A.  No.

25      Q.  Or to any of the people who gave statements in

Page 205

1  the -- in this investigation?

2      A.  What was that question again?

3      Q.  Are you aware of a murder weapon or a vehicle

4  tied to any of the people who made statements in this

5  investigation?

6      A.  No, I'm not.

7      Q.  Are you aware of any forensic evidence tying

8  Daniel Villegas to the investigation?

9      A.  I'm not aware.

10      Q.  I should say "to the shootings."  Any forensic

11  evidence tying Daniel Villegas to the shootings?

12      A.  I'm not -- no.

13      Q.  Are you aware of anything, other than the

14  statements, that tie Daniel Villegas to the shootings?

15      A.  No.

16      Q.  Sitting here today, do you believe that more

17  investigation should have been done into the Electric

18  Street murders?

19      A.  Probably.

20      Q.  Do you believe that the statements that were

21  given should have been examined more closely?

22      A.  In retrospect -- retrospect, that's probably

23  true.

24      Q.  Do you believe that other suspects should have

25  been investigated further in the shooting?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 814 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022

206..209

Page 206

1    A. I think that that's probably true, too.
2    Q. Sitting here today, do you have doubts that
3 Daniel Villegas was the shooter of the Electric Street
4 shootings?
5    A. It's a -- that's a difficult question. At the
6 time, I -- I really thought he did it, but he has since
7 been found not guilty, and I accept that judgment.
8    Q. Sure.
9       So if it were up to you, would Daniel
10 Villegas still be in prison today?
11   A. It isn't up to me.
12   Q. I understand that, but if it were.
13   A. I'm not sure how to answer that question.
14   Q. Do you have any opinion today about whether
15 Daniel Villegas should still be in prison?
16   A. Do I have any what?
17   Q. Opinion today about whether Daniel Villegas
18 should still be in prison.
19   A. No.
20   Q. If you did this investigation again, would you
21 have done anything differently?
22   A. Through -- through the lens of 29 years and
23 hearing all the things that I've heard since then and
24 all the -- the hearings, yeah.
25   Q. I have a few other questions, and for context,

Page 207

1 the reason I'm asking them to you is to -- that they may
2 relate to punitive damages at trial. Because these are
3 a little different than my other questions.
4       You are currently working today; is that
5 right?
6    A. That is true, yes, sir.
7    Q. Approximately what is your income?
8    A. From my job?
9    Q. Yes, sir.
10   A. It's -- I want to say -- they probably don't
11 pay as close attention as I should to it. It's like
12 3800 a month.
13   Q. And what other -- do you receive a police
14 pension?
15   A. I do.
16   Q. What is your pension?
17   A. It's roughly 70,000.
18   Q. Did you say "70,000," seven-zero?
19   A. Yes, sir.
20   Q. Do you currently have any other sources of
21 income?
22   A. I have a VA, Veterans Administration,
23 disability.
24   Q. Okay. And what is your income from that
25 source?

Page 208

1    A. I would say it's like $1500 a month, something
2 like that.
3    Q. And do you have any other sources of income?
4    A. My wife.
5    Q. What does your wife do for work?
6    A. She's a social worker.
7    Q. Do you own any property?
8    A. I own my home. I don't own it outright, but
9 I'm paying a mortgage on it.
10   Q. Okay. Approximately what is the equity in your
11 home right now?
12   A. Well, the equity is probably -- I just bought
13 the home probably a year and a half ago, so the equity
14 is probably about -- if there's any real equity, maybe
15 5,000 bucks.
16   Q. Do you own any vehicles?
17   A. I do.
18   Q. How many?
19   A. I own one, and my wife owns the other, and
20 we're both on the titles for -- for both vehicles.
21   Q. Do you have any loans on either of them?
22   A. No, sir.
23   Q. And what are the makes and models?
24   A. A 2015 Ford F-150 and then a 2018 Jeep Grand
25 Cherokee.

Page 209

1    Q. Do you own any stocks or bonds?
2    A. I think the answer to that would be yes because
3 I have two 403(b) accounts, and those are invested, so I
4 guess that would be indirect. I don't know how you
5 classify that, but --
6    Q. Yeah.
7       What's approximately the value in those
8 accounts?
9    A. They're -- I have -- honestly, I haven't looked
10 since the inflation thing and the market took a hit, but
11 prior to that, they were about 40,000 each. So I'd
12 say -- and being optimistic -- maybe 80- to a hundred
13 thousand, and I haven't taken a look. I haven't wanted
14 to since the market has crashed.
15   Q. Yeah.
16       About how much do you have in any checking
17 accounts?
18   A. In my checking account, I probably have about
19 35-, 36,000. And in my savings account, probably
20 50,000.
21   Q. Do you have any collections, guns, any -- any
22 other assets worth more than $5,000?
23   A. No.
24   Q. And do you have --
25   A. I do own a few guns. I do own a few guns. I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 815 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022

210..213

Page 210

1 want to make that clear.  I have a few, but I don't
2 think they're -- I'd be surprised if it's in excess of
3 five grand.
4     Q.  Sure.
5         Do you have any -- any assets that we --
6 any -- any assets over $5,000, including other property
7 that I haven't asked you about?
8     A.  No.  I don't have any other property.  Just the
9 property that my house is on.  And that's it.  I
10 don't -- I don't have any other property from there.
11     Q.  And do you -- do you have any dependents,
12 any -- any children who you support currently?
13     A.  My children are all grown, and they're --
14 they're on their own.  The only other new dependent that
15 I have is my mother-in-law.  Because my father-in-law
16 just died a few weeks ago, probably a month ago, I
17 guess, and we've been taking care of her for -- she's
18 been in our house for probably five months.
19     Q.  I'm -- I'm sorry for your loss.
20     A.  Thank you.
21     Q.  Do you have any credit card debt?
22     A.  No.
23     Q.  Any other debts or liabilities that we haven't
24 discussed?
25     A.  No, sir.

Page 211

1         MR. HILKE:  Okay.  Well, I'm about done,
2 but I'd like to take five minutes and check my notes
3 before I wrap up.
4         MR. JIM DARNELL:  Okay.
5         THE VIDEO TECHNICIAN:  Would you like to go
6 off record?
7         MR. HILKE:  Yes, please.
8         THE VIDEO TECHNICIAN:  Okay.  We are now
9 off record, and the time is 4:50.
10         (Break taken from 3:50 p.m. to 3:56 p.m.)
11         THE VIDEO TECHNICIAN:  We are back on the
12 record for the deposition of Scott Graves being
13 conducted by videoconference.  My name is Jessica Chase.
14 Today is July 28th, 2022, and the time is 4:56 p.m.
15         Counsel, you may proceed.
16         MR. HILKE:  I don't have any more questions
17 for you right now.  Thank you for your time today.
18         THE WITNESS:  Okay.  Thank you.
19         MR. ALMANZAN:  This is Andy Almanzan for
20 Carlos Ortega.  We'll reserve our questions for this
21 witness until the time of trial.
22         MR. TSCHIRHART:  I don't have any questions
23 at this time.
24         MR. MARTINEZ:  This is Jim Martinez.  I
25 reserve my questions.

Page 212

1         MR. JIM DARNELL:  This is Jim Darnell.  We
2 reserve our questions.
3         MR. BRITTAIN:  Eric Brittain for Kimmett
4 Bellows.  We'll reserve as well.
5         THE REPORTER:  Before we go off the record,
6 I need to get orders.
7         Mr. Hilke, what format do you want your
8 deposition transcript in?
9         MR. HILKE:  You know, I'm pretty sure we
10 will order, but I'm going to double-check first, please.
11         THE REPORTER:  Okay.
12         MR. HILKE:  Thank you.
13         THE REPORTER:  And -- thank you.
14         And then, Mr. Darnell, do you want a copy
15 of the transcript?
16         MR. JIM DARNELL:  What is our new plan for
17 how we're doing this?
18         MR. TSCHIRHART:  I'm not exactly clear on
19 what it is, Jim, at this time.
20         MR. JIM DARNELL:  Do you know, Eric?
21         MR. BRITTAIN:  I think, for this case, that
22 we let Scott, the city, get them, because they've
23 already got them set up through the vendor, and that's
24 the best way, in my opinion.
25         MR. JEEP DARNELL:  That was what the emails

Page 213

1 said was that we were supposed to let the attorneys for
2 the city order everything.
3         THE REPORTER:  Okay.
4         MR. JIM DARNELL:  The -- the emails got
5 awfully confusing, but that -- that makes the most
6 sense.
7         MR. BRITTAIN:  Yeah.  I think --
8         THE REPORTER:  Okay.
9         MR. BRITTAIN:  I think the rule is, if the
10 city's in it, then the city gets them.  If not, then the
11 individual attorney representing that particular officer
12 gets them.  So for these, we're good with Scott getting
13 them.
14         THE REPORTER:  Okay.  So what format do you
15 want your deposition in, Mr. Tschirhart?
16         MR. TSCHIRHART:  Please contact my office
17 and talk to Christy Burke.
18         THE REPORTER:  Okay.  And then are you
19 going to want --
20         MR. TSCHIRHART:  She's on the emails.
21         THE REPORTER:  Are you going to --
22         MR. TSCHIRHART:  She's on the emails.
23         THE REPORTER:  Okay.  And then would you
24 like video as well?
25         MR. TSCHIRHART:  Please contact my office.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 816 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022

214..217

Page 214

1        THE REPORTER:  Okay.
2        MR. TSCHIRHART:  Christy Burke.
3        THE REPORTER:  Okay.  And then read and
4  sign, Mr. Darnell?
5        MR. JIM DARNELL:  Yes, absolutely.
6        THE REPORTER:  All right.  That is my
7  information for this.
8        THE VIDEO TECHNICIAN:  If that's
9  everything, then let me go ahead and get us off record
10  here.  We are concluding.  That concludes the deposition
11  of Scott Graves.  The time is 4:59 p.m.
12        (Deposition concluded at 3:59 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 215

1            C E R T I F I C A T E
2
3  STATE OF TEXAS      )
4  COUNTY OF EL PASO   )
5
6
7        I, Ginger G. Zachary, Registered Professional
8  Reporter, Certified Realtime Reporter, and Certified
9  Shorthand Reporter in and for the State of Texas, hereby
10  Certify that this transcript is a true record of the
11  said proceedings, and that said transcription is done to
12  the best of my ability.
13        Given under my hand and seal of office on
14  August 4, 2022.
15
16
17
18                    _Ginger G. Zachary_
19        Ginger G. Zachary, CSR, RPR, CRR
         Texas Certification Number 5710
         Date of Expiration:  1/31/2024
20        KENTUCKIANA COURT REPORTERS
         730 West Main Street, Suite 101
21        Louisville, Kentucky  40202
         Ph.:  502.589.2273
22
23
24
25

Page 216

1        CORRECTIONS AND SIGNATURE
2  WITNESS:  SCOTT GRAVES        DATE:  JULY 28, 2022
3  PAGE  LINE  CORRECTION                REASON
4        _____
5        _____
6        _____
7        _____
8        _____
9        _____
10        _____
11        _____
12        _____
13        _____
14        _____
15        _____
16        _____
17        _____
18        _____
19        _____
20        _____
21        _____
22        _____
23        _____
24        _____
25        _____

Page 217

1        I, SCOTT GRAVES, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5                    _____
6                        SCOTT GRAVES
7  THE STATE OF TEXAS )
8  COUNTY OF EL PASO  )
9
10        Before me, _____, on this
11  day personally appeared SCOTT GRAVES known to me (or
12  proved to me under oath or through _____)
13  (description of identity card or other document) to be
14  the person whose name is subscribed to the foregoing
15  instrument and acknowledged to me that they executed the
16  same for the purposes and consideration therein
17  expressed.
18        Given under my hand and seal of office this
19  _____ day of _____, _____.
20
21                    _____
         NOTARY PUBLIC IN AND FOR
22        THE STATE OF TEXAS
23  My commission expires: _____
24
25


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

---

**Exhibits**

---

**Exhibit 1_**
**Graves** 30:16
35:5 37:10

**Exhibit 2_**
**Graves** 68:9

**Exhibit 3_**
**Graves** 93:8
94:7,9

**Exhibit 4_**
**Graves** 94:10

**Exhibit 5_**
**Graves** 116:1

**Exhibit 6_**
**Graves** 119:5

**Exhibit 7_**
**Graves** 122:2,5

**Exhibit 8_**
**Graves** 124:14

**Exhibit 9_**
**Graves** 125:24

**Exhibit 10_**
**Graves** 4:18
128:7,8 133:19

**Exhibit 11_**
**Graves** 4:20
131:21,23
133:16 137:4

**Exhibit 12_**
**Graves** 4:22
135:21,22

**Exhibit 13_**
**Graves** 4:24
180:1,2,7

**Exhibit 14_**
**Graves** 5:3
182:20,21

**Exhibit 15_**
**Graves** 5:4
186:6,7

**Exhibit 16_**
**Graves** 5:6
193:16,18
197:23

**Exhibit 17_**
**Graves** 5:8
199:21,23

**Exhibit 18_**
**Graves** 5:10
201:10,12

---

**$**

**$1500** 208:1

**$5,000** 209:22
210:6

---

**0**

**01** 30:18
**02** 68:11
**03** 93:9
**04** 94:11
**05** 115:24
**06** 119:3
**07** 122:4
**08** 124:16
**09** 126:1
**0939** 180:8

---

**1**

**1** 30:16 35:5
37:10 68:16,18
93:16 94:16
**1-** 116:1
**10** 10:21 116:21
128:7,8 133:19
194:20,23
**101** 6:5
**10265** 93:14
**10283** 94:12
**10:00** 119:11
**10:05** 6:7 48:25
**10:16** 48:25
**10:30** 135:24

**10:55** 48:24
**11** 131:21,23
133:16 137:4
**11:00-** 48:23
**11:05** 48:24
**11:15** 89:19
**11:16** 49:4
**11:29** 89:19
**12** 119:10
120:2,5,6
122:13 135:21,
22
**126254355**
8:10
**12:15** 89:18
128:16
**12:29** 89:23
**12:32** 131:8
**12:44** 131:8
**12:45** 182:7
**12th** 185:13
**13** 180:1,2,7
**14** 124:23 126:5
128:16 182:20,
21
**15** 10:21 90:7
106:16 122:10
149:2 186:6,7
**15743** 122:6
**15779** 116:2
**15848** 135:21
**16** 124:20
193:16,18
197:23
**17** 170:17,19
194:11 199:21,
23
**17-year-old**
170:24
**18** 25:11
201:10,12
**19** 25:11 124:21

**1900-** 116:21
**1905** 116:21
**1927** 116:25
118:4
**1941** 182:20
**1973** 124:20
**1978** 122:9
**1980** 120:2
**1985** 186:19
**1988** 21:6
**1992** 31:4
93:16,23
**1993** 52:1 56:6
57:9 60:24 68:5
69:13,17,18
78:7 80:13
90:2,17 94:16,
17 97:24 99:2,
11,24 101:3,24
102:3 116:21,
24 117:7,8
122:13 124:23
126:5 128:16
132:8 135:24
139:14 140:19
141:3 147:4
160:18 177:24
**1994** 22:9
192:17 193:20
**1:15** 182:9
**1:32** 131:7
**1:44** 131:12
**1:50** 177:11

---

**2**

**2** 68:9
**20-** 25:11
**2002** 23:11,12
**2008** 24:18,20
**2013** 25:1
**2015** 208:24
**2017** 25:11
117:7 118:2

**2018** 208:24
**2020** 25:12
**2022** 6:6 49:4
89:23 131:12
177:15 211:14
**21** 101:24 102:3
116:24 117:6
140:19 141:3
**21488** 68:10
**21495** 30:17
**21502** 31:1
**21503** 35:5
**21504** 35:19
**21505** 37:12
**21st** 139:14
147:4
**22** 134:10
**24** 186:19
**265** 131:22
**28th** 6:6 49:4
89:23 131:12
177:15 211:14
**29** 170:13
206:22
**2:00** 126:6
131:3,5
**2:20** 183:1
**2:30** 183:7
**2:30-**
**something**
183:4
**2:35** 183:9
**2:45** 122:14
**2:50** 177:10
**2:57** 177:11

---

**3**

**3** 93:8 94:7,9
**31** 93:16 94:17
**35-** 209:19

---



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

| | | | | |
|---|---|---|---|---|
| **36,000** 209:19 | **61** 100:13 | 25 49:4 89:19 119:11 124:24 128:16,20 133:21 135:24 182:7,9 183:1,4 | **activities** 100:11 | **advised** 31:9 78:17 136:21 |
| **3800** 207:12 | **641** 193:17 | | **activity** 89:4 | **affairs** 80:14, 17,21 81:3,22, 25 82:8,12,15, 20 83:5,11,14 88:9,12 186:24 189:9 194:7 196:21 198:1, 11,21 200:8,25 201:16 203:15 |
| **3:15-CV-386** 6:12 | **653** 193:19 | | **acts** 190:24 | |
| **3:50** 211:10 | **674** 194:4 197:24 | **a/k/a** 96:4,6 136:7 | **actual** 32:20 33:18 44:7 64:2 117:18 122:12 | |
| **3:56** 211:10 | **693** 194:20 | **ability** 10:16 11:18 12:7 81:22 | **add** 84:7 | |
| **3:57** 177:15 | | | **added** 200:22 | |
| **3:59** 214:12 | **7** | **absence** 82:6 | **adding** 23:2 | **affairs'** 188:12 |
| | **7** 122:2,5 | **absolutely** 42:20 70:15 98:17 127:17 214:5 | **addition** 39:7 149:6 | **affect** 10:7,14, 17 12:7,14 |
| **4** | **7-eleven** 175:3 | | **additional** 25:9 35:18 125:7 132:25 | **affects** 10:16 |
| **4** 94:10 | **7.02.009** 31:3 | **abuse** 23:4 85:20 | **address** 171:23 | **affidavit** 114:7 |
| **4-14-93** 136:6 | **7.02.012** 37:13 | | | **affirm** 36:5 |
| **40,000** 209:11 | **70,000** 207:17, 18 | **academy** 18:10,13,16 19:7 22:2,3 | **adequate** 16:6 | **afford** 190:4 |
| **40202** 6:5 | **730** 6:4 | | **adjacent** 100:24 | **afternoon** 177:17 |
| **403(b)** 209:3 | **7:50** 128:20 133:21 | **accept** 206:7 | **adjunct** 24:21, 24 | **agent** 53:17 54:4,22,25 55:8,11 61:1 91:24 112:20, 21,24 179:13 |
| **4:50** 211:9 | | **accordance** 31:8 | | |
| **4:56** 211:14 | **8** | **account** 84:18 209:18,19 | **adjuncting** 25:24 | |
| **4:59** 214:11 | **8** 124:14 194:5 197:24 | | **administer** 8:11 69:20 | **agent's** 53:20 |
| | **80-** 209:12 | **accounts** 209:3,8,17 | **Administratio n** 207:22 | **aggressive** 152:14,17 |
| **5** | **80s** 100:5 | **accurate** 59:17 117:24 192:18 | | |
| **5** 115:22,23 116:1 122:9 135:24 | **8:30** 124:24 | | **administrative** 200:5 | **agree** 7:23 26:14 27:4,15, 20,23 63:12,16 72:2 89:15 194:14 |
| | | **accusations** 45:9,13,18,21 | **admission** 49:8,12,14 | |
| **5,000** 208:15 | **9** | **accuse** 45:7,15 | **Admissions** 68:13 | **agreed** 8:1 164:25 170:6 190:18 |
| **50** 118:4 | **9** 125:24 193:20 | **accused** 140:14 | **admit** 47:6 | |
| **50,000** 209:20 | **90s** 96:16 | | **adult** 69:23 70:3,6,12,18 124:21 170:21, 25 | |
| **5710** 8:6 | **92** 95:7 | **accusing** 169:11 | | **agreement** 33:2 |
| **57459** 199:22 | **920** 186:6 | | | |
| **57460** 200:12 | **93** 95:7 119:10 | **acquired** 25:9 | **adults** 68:2 69:14 | **ahead** 32:25 33:9 34:12 36:19 37:6 104:18 118:24 142:9 171:16 173:4 197:1 214:9 |
| **57463** 201:11 | **94** 22:9 | **acronym** 97:3 | | |
| **57467** 201:20 | **948** 116:12 | **act** 50:17,18 | **advance** 81:11 | |
| **58** 16:16 | **96** 87:13 | **acting** 23:25 24:3 | | |
| | **97** 87:13 | | **advantage** 46:14 | **ahold** 86:10 |
| **6** | | **action** 60:14 | | |
| **6** 119:2,5 132:8 | **A** | **active** 16:25 98:5 102:19 | | |
| **6.03** 68:13 | **a.m.** 6:7 48:24, | | | |
| **60-** 100:13 | | | | |



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 819 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022

220

Ajax 136:16

alarms 127:7

alcohol 13:1

alert 152:19

Alfonso 7:11

alibi 133:10,11
138:7 173:19

allegation 89:3
189:17

allegations
186:17

allowing 37:19

Almanzan
6:20,21 32:12,
23 36:17 37:4
132:2 173:2
174:22 211:19

alter 171:18

altercation
132:20

alternative
65:3,8 66:2

Amendment
147:1

ammunition
148:20

amount 200:16

Ana 24:24
145:5

Andress 134:1

Andy 6:20
132:5 211:19

angle 90:6

angry 151:22,
25 152:4,8,10

answering
202:10

answers
169:16 170:9
192:24

Anth- 133:10

Anthony
128:22 131:15

133:10

anticipating
144:23

Antonio 7:3

anxiety 46:11

anymore
72:16

apartment
137:16

apologize
48:24 72:22
166:16

appearance
6:14

appeared
30:21

appearing
6:21

appears
128:12 129:15
182:1

applied 17:24,
25 28:7

apprehensive
75:21,23

approach
42:12 169:18

approached
169:21

approval
117:21,25

approve
117:14 118:8,
12,13

approved
117:21 136:2

approving
117:12

approximately
14:12 17:20
207:7 208:10
209:7

April 101:24
102:3 116:21,
24 117:6

119:10 122:9,
13 124:23
126:5 128:16
139:14 140:19
141:3 147:4

Arbogast
15:12 20:16
90:18 128:13
129:16 130:1
131:15 133:20
138:21 145:15
147:10

Arbogast's
90:10 131:24
132:11 137:4

area 90:3 94:2
99:21 100:4,15,
22

areas 75:6

arguably
199:15

Armando
95:21

armory 101:11

Army 11:3
16:23 17:8,11,
17

array 53:13

arrest 86:6
114:7,11 149:7,
13,16,20
159:14 189:5

arrested 89:2

arrestee 89:8

arresting 27:5
143:10

arrests 54:11
195:4,5,22

arrived 157:1

Art 201:13
202:16

asks 197:25

assess 73:5

assets 209:22
210:5,6

assign 29:1

assigned
20:10

assignment
19:8 20:24
22:10,20 23:14,
22 24:7

assist 46:23

associate
10:24

assume 9:24
44:5 117:20
149:21

assumed
23:20 200:17

assumes 37:5

assumption
44:11

assumptions
44:1

attached 24:25

attack 158:12

attacked 86:9,
21

attempt 46:15

attend 41:17

attending
6:14,15,18,24
7:2

attention 35:6
92:6,21,22
116:8 133:21
207:11

attitude 169:22

attorney 14:6,
10 33:8 69:19
213:11

attorneys
14:15 195:18
213:1

auxiliary 23:24
24:1,3,8

avoid 27:5
50:2,4,10,15
66:25 67:4

71:19 74:4

aware 16:5
28:25 37:1,7
38:7,18,22 47:2
56:19 68:19
83:4 86:24
87:5,6,18
102:19 103:1
111:5 136:10
138:22 141:5
153:10 155:5
163:8 174:9
203:14,22
204:4,13,16,20
205:3,7,9,13

---

**B**

baby-sit
168:17

back 19:17
22:11 23:18
28:22,24 35:22
36:1,21 40:8
49:1 70:21
72:3,9,19 76:7
89:20 96:15
98:5 99:8,24
100:1,20 104:7,
9 105:12,14,19
106:1 115:3
118:12 131:9
133:18 137:3
144:6,9,11
156:11 160:6
166:9 177:12
178:17 181:20
197:23 211:11

bad 105:14

badge 116:12

barely 190:5

Barrio 175:17

based 65:9
89:7 110:10
129:15 134:13
142:2 169:12

basically
19:19 23:5
49:15 82:15
143:17 148:6,
16 188:19

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 820 of 1026
The Deposition Of Scott Graves, Taken On July 28, 2022

221

**basis** 44:20 78:25 139:21

**basketball** 104:4

**Bates** 31:1 119:5 201:10

**bathroom** 189:6

**beat** 197:5

**beautiful** 7:5

**beefs** 98:18

**beeping** 30:2

**beer** 175:1,2

**beginning** 25:12 131:22 200:13

**behalf** 7:12

**believed** 28:19

**bell** 124:10 188:6 189:19

**Bellows** 7:13 15:19 212:4

**bells** 97:4

**benefit** 47:5,17

**big** 143:14

**biggest** 96:17, 18

**binder** 61:3

**bins** 57:1,6

**birth** 62:6 106:12 120:1 122:9 124:20

**birthday** 120:2

**bit** 67:24 97:12 98:4 168:5 180:25 186:8

**blame** 109:4

**bled** 85:23

**Bliss** 24:23 100:25

**blood** 12:10 86:21

**Board** 181:8

**Bobby** 129:12 130:12 134:7

**body** 125:1

**bond** 190:5

**bonds** 209:1

**Boochie** 133:25 134:2,3

**bookended** 182:12

**boot** 99:12

**bother** 12:5

**bottom** 31:2,4 94:19 116:9,16 118:5 130:10 131:25 132:10, 11 136:1 137:6

**bought** 208:12

**boundaries** 19:16 100:21

**Bowie** 25:5

**boyfriend** 85:21

**boys** 143:25

**branch** 16:22

**break** 10:3 48:19,25 89:14, 19 130:24 131:3,8 177:6, 11,18 211:10

**breaking** 59:1 165:25 180:5

**breaks** 10:1

**briefings** 142:20

**bring** 104:24

**bringing** 157:10

**Brittain** 7:8,12 212:3,21 213:7, 9

**broke** 154:10 159:5

**brother** 95:16 134:9 136:15

**brothers** 123:24 124:2 136:10 137:11

**brought** 94:2 136:17 137:13 143:25

**brown** 130:13, 14 144:17 145:15

**bucks** 208:15

**Buick** 130:14

**building** 101:6, 19 165:21

**bunch** 96:15 188:8

**Burke** 213:17 214:2

**business** 187:21

**busy** 102:10

**Bye** 181:15

———

**C**

**ca-** 111:8

**caliber** 133:14 134:10,14,16, 17

**call** 61:18 78:15 82:19 99:4 101:5 116:8 132:2 140:19 141:2 167:16 169:1 177:25 178:16 179:2,4,5,9,12, 17

**called** 82:24 83:16 85:25 86:1 96:19 97:15 98:2 100:13,15,23 101:21 128:23 129:3 139:19, 20,22,23 178:15 179:1

**calling** 139:17 146:21 178:8 188:18

**calls** 20:22 32:13,24 36:17 44:13 168:24 171:14 173:2 174:7,22 175:12,25 176:16 178:4,7, 14,18 196:24

**camera** 7:19

**campus** 24:22

**CAP** 90:1,2 92:24 93:24 94:22 99:11 101:18 136:18 137:13 138:13 150:10 154:17 155:3,25 156:2, 11,15 157:1 158:4 160:18 163:22 164:3 165:22 168:17 177:25 178:4,5, 12,22

**capped** 134:6

**car** 19:10 20:8, 11,21 87:9 108:4,8,18,22, 25 109:4 111:24 125:12 129:11 130:11, 13,18 155:9 164:12,19 165:8 169:6,9 171:11,22 172:10 174:10, 11,14 184:14 204:9

**card** 69:5,19,23 151:1,3 186:10 210:21

**cards** 150:15, 19

**care** 190:14 201:7 210:17

**career** 25:8 41:9 81:24 92:23 178:12

**190:21 194:12 199:8 203:14**

**careful** 64:23 65:1 75:20 187:19

**Carlos** 6:21 15:16 91:9 211:20

**Carney** 199:25 202:10,12

**carry** 52:19 102:9

**cars** 143:15 144:21

**case** 8:20 15:15 21:25 34:14,16,18 35:9,13 43:23 44:14,15 52:20 53:17,20 54:4, 10,11,12,15,17, 18,22,24 55:1, 7,11,15,23 61:1,13 78:19, 20 79:3,10,18, 19,21,22 80:1, 3,8 85:18,20 91:24 92:11 98:14 102:7 112:17,20,21, 22,24 122:21 131:16 135:14 136:19 137:10 163:11 170:5 178:8 179:13, 14 201:16 212:21

**caseload** 102:10

**cases** 20:18 29:2 40:23 54:21 55:13 79:3,7 83:9 91:6

**category** 196:9,10

**cell** 160:23

**central** 101:13, 15



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document:386-2 Filed:05/26/23 Page 821 of 1026
The Deposition Of Scott Graves, taken on July 28, 2022
222

centralized 112:23

certification 25:9

certified 25:4

challenge 67:17

challenging 91:1

chance 16:3, 12 48:3,12 103:8 123:4 141:24 181:19 190:6

change 28:22 75:17

changed 23:6 95:1 110:16

changing 22:24

Chaparral 8:7 144:24

charged 65:4, 13,16 85:7,14 110:11

charges 110:10

Charlie 28:25 145:11,12 147:10,11 155:8 156:9 166:22

Chase 6:2 49:3 89:22 131:11 177:14 211:13

check 71:14 211:2

checking 209:16,18

Cherokee 208:25

Chew 8:4,9,13

Chicago 6:19

child 23:3 35:7 76:23 85:20,22 86:2

child's 146:25

children 23:6, 11 210:12,13

choice 71:24

Christmas 26:2

Christy 213:17 214:2

cite 190:3

citizen 195:25 196:1,12 197:3, 16

citizens 193:11 197:15, 22

city 6:9 7:2 19:19 30:17 31:1 35:5,19 37:12 68:10 93:14 94:12 97:12 122:6 131:22 186:6 199:22 200:12 201:11,20 212:22 213:2, 10

city's 213:10

civilian 199:3, 9,11,12,16

clarify 9:21 72:11 163:6

class 125:11

classify 209:5

classroom-style 18:15

clear 33:24 54:15,17,25 62:10 72:18 104:13 105:18 135:8 157:19 210:1 212:18

cleared 54:9, 12 55:12,22 138:8

clearer 65:19

clerk 6:24

client 6:23

clo- 62:16

close 54:5,8,9 74:20 166:5 173:7 207:11

closed 56:23 62:24 79:10 135:1,8,9

closely 205:21

closer 166:11, 13,15 180:25

closest 101:9

closing 79:17

cloth 176:5

co-workers 55:18

cocaine 86:19 100:17

Code 31:8

coerce 50:4,8

coerced 49:18

coercing 50:10

coercion 49:23 50:2,4,5, 13,15

cold 98:14 102:4,5

collect 18:21

collections 209:21

College 24:24

color 130:18

combination 75:2

comfortable 158:13

command 23:20 24:11,12, 13,14 88:20

commander 23:25 24:4

commenced 149:24

comment 188:17,22

Commission 8:9 25:13,15

committed 28:19 43:16

common 28:25 66:13 90:3 113:11

commotion 152:16,21

communicate 92:14 168:22

communicator 90:25

community 24:24 197:15

comp- 197:21

company 17:19,21

compassion 190:23

compassionate 190:11,24

complained 195:25 197:3, 17

complaint 82:8,23,25 83:14 189:9,15 196:12 199:3, 16,17

complaints 192:20 193:2, 10,13 194:6,21, 24 195:10,19, 25 196:2,14,18, 19,22 197:8,11, 21,25 198:6,11, 12,15,16,17,22 199:9,11,12

completed 54:10,18 182:4, 9 183:4

completely 86:20

computer 99:3,7,12 117:19 160:20 166:4,9

computers 99:7 117:16 160:24

con- 169:11

concern 76:3 145:4 146:11

concern's 75:25

concluded 110:13 214:12

concludes 214:10

concluding 188:14 214:10

conclusion 188:12

conclusively 109:21

condition 154:25

conditions 10:6,9 11:12 12:18

conduct 18:18 30:9 31:23 32:10,20 42:16 44:23 197:14

conducted 19:4 31:13,14 34:21 49:3 89:22 131:11 133:5 137:17 138:23 177:14 211:13

conducting 41:10 42:4,17 85:10

confe- 35:20

confess 47:17 48:5 73:2

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 822 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022
223

confessed 47:12 111:5 163:1

confesses 73:5,18

confession 29:20 35:2,22, 25 36:4,6,10,14 40:5,7 44:4,24 49:12,13 51:4, 6,10 68:18,20 69:15,25 70:12, 19,23 73:6,12 74:1,6,11,18,23 75:1,6,16 141:17 157:15, 20 158:6,21,24 161:3 162:14, 18,22 182:4,7, 14 204:8

confessions 35:20 68:2,13 69:24 70:7

confidence 105:12

confident 109:23 110:1,6, 7 145:19

confirm 179:16

conflicts 98:25

confront 130:5

confronted 129:5 136:19 172:8

confronting 175:16

confusing 213:5

connected 105:15 148:18

connection 127:21 132:18 135:14 137:11, 14,21 138:7

consent 77:19 107:2 122:22 137:15

consented 145:24

consistencies 183:22

consistent 37:25 42:12 48:10 127:12 151:6 172:18

constitutional 19:1 31:9

construction 17:19,21

consult 55:16 78:24 79:9

consulted 55:14

contact 139:13 213:16,25

contemporaneous 52:22

contemporaneously 53:1

context 139:16 206:25

contingent 57:17 58:12

continual 41:16

continue 93:20 181:20

continuing 68:25

contradict 66:23

contradiction 60:1

contradicts 59:21

contributing 152:25

control 35:8, 12,14 181:1

convened 6:7

conversation 154:10,24

conversations 14:14

converted 23:5

convict 27:25 111:9,14

convicting 111:12

convincing 74:6

Cool 181:14

cooperated 137:15

coordinate 202:22 203:7

coordinating 141:13 145:4 202:25 203:16

copies 61:1,4 159:22,25

copy 61:17,18 159:18 160:4 212:14

correct 21:6 34:1 42:17,22, 24 51:6 56:7 68:23 73:1,4 75:7 101:22 102:3 116:16 171:9 177:19 186:17 198:6

correctly 79:12 156:10 188:11

corroborate 84:10,17 111:17

corroborated 84:18

corroborates 204:17

corroborating 67:9 111:19 130:19

counsel 6:16 8:13 33:7 49:5 89:24 131:13

177:16 211:15

count 143:14

country 26:9

couple 14:13 17:1,11,12 22:24 25:4,7 61:14 86:3 93:7 102:12 128:18 171:7,10 179:23 189:12 194:16 199:19

court 6:3,10 9:9 37:20 60:16 104:4 191:4,8, 11 192:8 193:23

court's 50:17

covered 86:21

CP86-131 188:1 200:5 201:17

CP86-228 189:16

CPU 117:18

crack 100:17

crashed 209:14

Crazy 97:19

credit 210:21

crime 28:19 42:4 43:16 44:21 47:25 48:12 51:9,15 65:14 67:8 71:15,16 76:12 85:7,15 148:19, 22

crimes 11:9 21:1,2,7,19 22:7 23:6,10 26:12 31:18 40:24 53:25 57:7 60:25 71:20 78:1,8 85:25 86:1 87:17 98:8 105:1,3 195:6

criminal 13:21 63:19 64:14 139:12 169:14 184:19 192:5

Crips 96:13,20, 25 97:1

critical 26:14 27:16

critically 73:13

cross 92:6 101:8

CSR 8:6

cubicle 90:5, 11 157:5,6,10

cubicles 90:3

culpability 40:12 47:22

curriculum 21:23 44:8

custody 160:15

cut 45:24 46:2

Cynthia 124:7, 18 125:8 128:22 129:10 130:10 185:16, 19

**D**

DA 63:23 64:19,21,25

DA's 63:22

DA-34-126 124:15

DA-34-131 125:25

DA-34-432 119:5

DA-34-450 128:11

dad 181:6

daily 78:17

damages

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document: 386-2 Filed: 05/26/23 Page 823 of 1026
The Deposition of Scott Graves, taken on July 28, 2022
224

207:2

**danger** 44:4

**Daniel** 6:9,18
8:19 13:20,24
14:20 101:25
139:11 149:10
150:4,11 153:2
154:13,18
165:20 166:19,
25 171:6 172:9
173:18 185:12
192:4,10
204:17 205:8,
11,14 206:3,9,
15,17

**Daniel's** 147:5,
14 150:12
153:14,17
185:2

**Danny** 96:2
102:13,18,25
113:20 114:16
139:5 155:6,10
156:18 164:24
168:25 169:9,
22 172:20,23,
24 173:21,25

**Danny's** 114:6
151:12 169:14
176:21 184:19

**dark** 130:13,14

**Darnell** 7:4
30:1,4 34:11
42:5,8 44:13
48:17 59:1,5
64:7 65:9 89:15
94:7 104:17
115:22 121:14
130:23 131:1,5
142:8 146:7,17,
21 159:5 163:4
165:25 166:4,
12,14 171:14
173:6,11,16
174:7 175:12,
25 176:14,16
177:7 180:4,10,
12,17 181:1,5,
8,11,13,14,16
196:24 211:4
212:1,14,16,20,
25 213:4 214:4,

5

**data** 99:13

**date** 30:23 31:4
62:6 68:23
69:21 94:16
101:5 106:12
116:15,20,22,
24 119:10
120:1 122:9
124:20,23
128:15 193:19

**dated** 132:1,8
135:24

**dates** 116:15,
18 119:21,24

**David** 96:8,10
108:11 134:9
139:6,9,13
140:2,7,10,13,
25 141:6 159:2,
9,19 179:1,17,
20

**David's** 140:19
141:2

**day** 6:6 78:18
101:24 118:12
122:13 129:17
190:2

**De-** 30:20

**dealing** 77:12

**Deangelis**
200:15,17,24
201:23

**debt** 210:21

**debts** 210:23

**deceive** 71:12
193:13

**December**
93:16 94:17
120:2 193:20

**decent** 91:17

**decided**
154:15,18

**deeper** 67:24

**Defendant**
6:21 7:13

**defendants**
63:19 64:14

**degree** 18:20

**denials** 45:24
46:2

**denied** 31:12
37:22

**denying** 45:25

**department**
17:18,23 18:1
21:22 22:2
24:15,20 25:22
30:7,13 35:1,23
36:2,16 52:6
68:1 77:12
80:21 87:17
97:25 144:4
190:21 196:8
203:19 204:1,7,
10

**department's**
30:21 32:8
182:13

**dependent**
210:14

**dependents**
210:11

**depending**
34:18 96:10

**depends** 28:16
191:22

**deposition** 6:8
8:6 9:4 13:5
14:7,18 16:3
33:7 49:2 89:21
103:10 116:6
121:22 123:5
124:8 131:10
177:13 180:20
183:12 184:7
191:14 194:2
211:12 212:8
213:15 214:10,
12

**dereliction**
189:15

**describe**
101:16

**desert** 19:20

**desk** 86:9,22
178:16

**destroy** 56:24

**destroyed**
56:23

**detail** 130:19

**details** 34:14,
16 63:7 84:10,
16 89:1 112:2
127:12

**detec-** 86:3

**detect-** 68:4

**detective** 21:3,
7,9,11,12,14,
19,21 22:1,3,5
26:13 27:21
28:3,9 30:8,22
31:18 33:15,25
34:25 38:2 39:3
40:19 41:4,18
52:2,12 53:25
54:21 55:8
63:18 64:13,18
66:4 68:5 71:7
75:19 77:13
83:20 86:9
92:19 93:20
94:20 99:11
122:19 131:15,
24 132:11,16
137:4,16
138:21 142:13
160:18 177:24
196:14 197:17
199:3

**detectives**
21:16,23 31:17
39:8 40:19
53:16 64:1,5,16
78:8,24 86:4
90:2 132:19
137:15 165:12

**determined**
136:18

**developed**
99:7 115:14

**developing**
28:22

**desert** 19:20

**diagnosed**
10:19

**Diamond**
175:2

**died** 86:2 163:5
210:16

**difference**
43:13 49:7,11
95:7

**differently**
206:21

**differing** 98:3

**difficult** 12:22
206:5

**difficulty** 92:10

**direct** 45:4,5

**directing**
152:5

**direction** 79:8

**directions**
61:15

**directive** 82:6

**directives**
82:3

**directly** 91:23
157:7

**director** 24:22

**Dirt** 136:7

**disability**
207:23

**disagree**
104:16 190:1

**disagreed**
190:16

**disagreeing**
190:10

**discharge**
17:2,4,5

**disciplinary**
186:9,17

**discipline**
190:25

**disciplined**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

86:25 87:19
88:5 199:16

**disclose** 72:7

**disclosed**
72:14 73:19

**disclosing**
71:19

**discover** 43:22
67:22

**discovered**
106:15

**discuss** 55:15
113:8 155:15

**discussed**
154:12 179:18,
21 184:1 185:9,
21 186:2 202:8
210:24

**discussing**
113:5,13

**dislike** 200:16
201:5

**disorders**
10:11,12

**dispatch** 179:6

**disproven**
84:18

**disruption**
151:21

**district** 6:10,11
25:2 69:19
100:13

**division** 6:11
23:20,21,23

**document**
30:16,19,25
31:5,15 35:16
52:13 53:5
57:19 59:20
60:4 61:21 63:2
68:8 73:19
107:2 115:12
118:16 122:21
127:15 151:7
182:22 201:19

**documentatio**
**n** 134:25 138:22

**documented**
53:22 106:25
115:5,10
138:16 153:7,
11

**documenting**
186:16

**documents**
14:3 128:3
180:19 186:3

**Dona** 24:24
145:5

**door** 57:4

**doors** 174:10,
11,14

**DOS** 160:25

**double** 141:13,
18,20

**double-check**
212:10

**doubt** 154:21

**doubts** 206:2

**downside**
110:25

**downtown**
7:5,13 101:15,
16

**dozen** 20:4

**drawing**
133:20

**DRC** 96:12

**dream** 12:4

**dreams** 11:20,
22,24,25 12:1,9

**driver's** 7:18
106:11

**drives** 130:13

**driving** 125:12

**Droopy** 96:4
161:22 164:12
184:13

**dropped**
176:21,22

**dropping**
114:16

**drove** 109:9
155:6 172:22,
23

**drug** 12:3,8

**drugs** 11:15,18
12:14,21 13:1
100:16

**drunk** 188:18
189:6

**due** 200:18

**duly** 8:12,15

**Duroc** 96:13

**Dust** 136:15

**duties** 197:4

**duty** 16:25 88:8
189:5,15

**Dyer** 100:24

**dying** 85:23

**dynamics**
98:16

———————

**E**

**Earl** 15:12
20:16,19 90:10,
17,25 104:23,
24 105:8,9,10,
19,20,23 106:1
128:13 144:17
145:15 156:3,7
158:16,19

**earlier** 71:1
92:23 119:21,
24 178:25

**early** 106:16
118:17 129:16

**ears** 38:16

**easier** 9:13

**easily** 76:4

**east** 19:20

22:12,18 96:20
97:1 132:21

**ECH** 97:19
134:3,4,20

**echo** 166:8

**Eddie** 125:11
129:9,10
130:11,12

**edge** 101:16

**edit** 84:2

**Edna** 122:20

**Eduardo**
125:16 126:3,
23 129:17
185:16,19

**education**
25:8,10

**effect** 88:11

**effective** 30:23

**effort** 56:10
69:2 77:7
162:21

**efforts** 69:14

**Eisenhower**
97:19

**El** 6:9,11,22,25
7:2,10,14 8:8,
10 17:9,18 18:1
21:21 24:15,20
25:2,6,21 26:6
28:2 30:7,20
39:13 68:1
97:25 98:11
101:1,13 141:3
144:1,3,11
151:6 153:6
185:6 196:8
203:18,25
204:6

**elapsed** 168:4

**Electric** 14:21
20:14 91:21
92:9 95:13,21
99:15,17
101:20 129:4
164:9 179:13
185:10,23

186:1 203:20
204:18 205:17
206:3

**Elissa** 8:9

**emails** 212:25
213:4,20,22

**emerges** 62:25

**employed**
185:6

**employment**
17:18 25:17,18,
19

**end** 9:1 56:21
74:22 110:9,11
200:22 201:21

**ended** 85:23
169:11

**ending** 96:25

**endorse** 40:8

**endorsed**
36:13

**engage** 26:25
28:4 29:5 38:19
50:5

**England** 95:21

**Enrique** 96:6

**ensure** 27:24
29:6

**enter** 147:14

**entered** 147:19
189:12

**entirety** 50:24

**entrance**
153:22,23,25
154:1

**equity** 208:10,
12,13,14

**Eric** 7:8,12
212:3,20

**error** 75:15,17

**errors** 75:8

**essence**
170:15 188:15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

essentially
112:18 153:19
187:8 190:11

estimate 193:1
195:9

et al 6:10

eval 102:9

evaluate 27:16

evaluating
112:5

evaluation
93:10,11 94:3,
13 95:5

evaluations
95:1,4

evening
113:17 147:4

event 171:21

eventually
107:23 143:25
157:14 164:11

evidence
18:22 26:18
27:16 37:5
43:9,11,22
46:5,8 62:25
63:19 64:14,24
65:2,6,14,22
66:1 109:24
148:18,21
204:17 205:7,
11

evidentiary
184:23

evolved 98:4

ex- 198:21

exact 101:4
103:23 143:14
170:14 196:6

exam 22:14

EXAMINATIO
N 8:16

examined
205:21

examples
50:12,14

exceptions
38:7,18,22

excess 210:2

exchange
167:15,19

exchanging
92:10

exclusion
43:25

excuse 6:23

executive
24:22

exercises 19:5

exhaust 69:14

exhausted
69:3

exhibit 30:15,
16,18 35:5
36:25 37:10
68:9,11 93:8,9
94:6,7,9,10,11
115:21,24
116:1 119:2,3,5
122:2,3,4,5
124:14,16
125:20,24
126:1 128:7,8
131:21,23
133:16,19
135:20,21,22
137:4 139:4
180:1,2,7
182:18,20,21
186:6,7 193:16,
18 197:23
199:21,23
201:10,12
203:13

exhibits 93:7
179:24 199:20

expand 128:10

expect 54:11
99:12 141:13,
20,21,25 151:1
171:11

expected
34:20 99:23
129:21,25

202:11

experience
35:11 39:2
40:22 54:20,24
57:25 58:1
142:12 189:8,
25 190:19

explain 114:20
138:17 164:18
173:24 174:17
175:5,20 176:8,
24

explained
161:6 175:9
176:11

explaining
138:8

explanation
32:9,19 33:13
34:8 121:4,11
134:25 138:25
161:25 162:3,6
164:16 174:20
202:17

extensive
40:22

extent 121:3
150:18

external
198:12,21

extra 26:3
75:20

———————

F

F-150 208:24

faces 148:1

facing 110:10

fact 7:24 18:3,
12 52:23 172:8
184:17 200:15,
18 201:22

facts 37:5
43:23 71:16
73:9 127:13
162:10,13,18,
23

failure 189:15

failures 204:1

fair 9:24 10:4
19:2 28:7 29:7,
22 34:19 38:20
43:5 49:22
50:8,11 54:2
55:9,17 59:17
60:22 64:17
67:24 72:10,17
79:1 84:12
100:10 106:23
107:1 115:17
126:22 138:5
185:3 186:14
187:12,16,17
197:12 201:6

fairly 27:16
66:13 82:17

false 44:1 46:5,
8 76:5 169:20
199:4 204:8

falsely 73:2
87:24 88:2,5
192:2

familiar 30:6
95:20 96:12
163:13

family 26:3
31:8 190:14

Farrar 13:11
121:18 122:7,
18 123:8,16,19
185:19

father-in-law
210:15

Fatherless
96:19 97:5,6

fathom 160:22

feed 46:19
115:7

feedback
166:6

feel 16:8,11
109:20,22
158:12 190:22
201:24

feeling 46:16
189:2

feet 90:7

felt 95:6 190:6

Fernando 96:4

feud 200:19

field 91:25
151:4

figure 71:8
98:23

figuring
190:20

file 61:19
79:20,21,23
80:1,8 173:12

filed 194:6,24
197:25 198:11,
15

files 60:24
79:18

final 201:20

finally 181:8

find 25:17
60:16 66:16
70:9,11 77:6
103:22,24
148:21 149:17
164:11 174:14

finding 103:24
104:11

fine 46:20
181:14

finish 54:15

finished 81:20
113:1 117:14

firearm 148:19

Flores 95:14,
16 123:16,20,
23 124:2 136:7,
9,10,15,19
137:10,11,12

focus 112:9

focused 23:1

focusing 43:25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

folder 61:2

folks 62:8
158:13

follow 26:17
60:9 130:2
146:10 156:2
204:2

follow-up
133:5

football 26:1

force 85:2,10
86:16,25 87:19

Ford 208:24

forensic 205:7,
10

form 42:5
68:24 69:25

formal 68:21
82:2 110:18,25

formally 41:24
42:1

format 212:7
213:14

forms 61:14,15

Fort 24:23
100:25

forward 33:7

found 53:8
67:16 103:20
104:1,25
132:18 206:7

foundation
32:13,24 36:18
146:8

fourth 129:8

Frank 97:4

Fred 100:24

fresh 171:12

Friday 129:4
134:2

friend 129:11
133:6

friends 129:3
132:17,20

---

134:5

front 40:8
108:20 178:16

fronted 129:3,
4

froze 64:6

full 56:22

function 35:9,
13

furious 9:16

future 190:24

_____

**G**

G-R-A-V-E-S
8:24

gag 81:24 82:3

Gailey 200:16,
17 201:23,25

game 26:1

gang 96:12,25
97:3,11,24
98:5,16,19,21,
24 99:4,12,20
100:1 126:18
134:20 137:22,
25

gang-
connected
134:19

gangs 98:11
99:3 100:1,8
136:24

Garcia 6:24
127:25 128:13
129:18,21
130:1 133:19

Garcia's
134:13

Gateway
101:10

gave 64:18
80:24 89:10
113:3 123:22
162:6,23 170:7
180:23 204:7,

---

25

general 32:5
41:11 44:8
45:10 72:3
178:10,22

generally 27:2
28:14,23 39:19
43:21 44:2 46:4
61:1 62:7 67:3
70:14 71:21
77:17 78:20
81:13 100:1

gentleman
189:5 190:23

gentlemen
193:1 195:9

gestae 38:10,
12,13

get along 92:7
201:23

Gilbert 127:25
128:13 129:18
130:1 133:19

Ginger 6:3 8:5

girl 120:12

girlfriend
128:22 129:9

girlfriend's
128:21

give 37:17,20
63:23 64:8
66:14 68:19
79:20 80:16
81:15 82:24
89:16 107:23
113:3 127:12,
20 128:5,21
132:2 139:24
151:4 153:4
164:25 173:19
177:8,20
181:19 192:11,
25 195:8
202:23

giving 35:1
76:4 110:25
112:11 122:18
137:15 160:15
162:17 169:15

---

170:9 192:24
193:8 196:23

goal 43:19,21
84:13

Goals/
improvement
93:19

Gonzalez
13:11 95:24
102:1 114:12
149:14 154:12,
16 155:2
156:11 159:1
163:17,20
172:1,5 180:23
181:25 182:24
183:16 184:4,8

good 6:17 8:18
33:3 50:23 51:2
63:2 73:11
89:13 90:25
105:14 111:3
131:4 141:23
160:24 165:7
177:5,17 181:5,
9,21 213:12

Gosh 24:5
87:12

grabbed 86:8

grand 208:24
210:3

Grave 137:17

Graves 6:8 7:5,
17,21,24 8:3,
14,24 49:2
89:21 93:20
94:21 122:19
131:10 132:16
177:13 193:23
211:12 214:11

great 8:25 9:3
105:11 117:4
180:12 200:16

Green 172:21
176:22

grinding 57:5

ground 9:8

group 56:10

---

96:19 142:24
143:12,14,21
147:19 172:13

grown 210:13

GS 182:20

Guard 17:1
101:11

guardian
37:19

guess 33:6
54:2 82:10
96:10 113:25
121:10 124:13
139:1 156:17
209:4 210:17

guide 27:11

guilt 44:1 51:20
58:24 59:11
63:13 64:15
65:4 84:24

guilty 27:25
44:5,12 51:24
190:22 206:7

gun 109:15,16,
17 134:14
135:4,8 176:4,6

guns 209:21,25

guy 55:18 86:4,
5,11,17 125:12
126:12 129:9,
10,11 130:13
141:19 144:17
188:18

guys 41:1
129:5 130:11
151:2 177:9
188:16

_____

**H**

habitually 23:1

half 17:13
18:14 20:3
149:4 157:25
158:2,3,22
208:13

hand 8:4

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 827 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022

228

**handcuffed** 149:20,23 150:2,4 158:9

**handcuffs** 158:11

**handful** 196:1

**handle** 40:21

**handled** 80:21

**hands-on** 19:4

**handwritten** 56:20 57:10

**hanging** 172:21

**hangs** 130:14

**happen** 40:12 42:14 57:19 58:3 73:22 80:2,4,6 142:4 145:5

**happened** 11:2,3 46:18 48:1 58:21 73:3 77:18 81:20 82:16 87:8,9 91:4 94:25 103:18 104:19 109:19 112:16 114:19 148:14 150:13 167:7 170:11,15 201:4 202:5

**happening** 143:18

**harassment** 140:14,25

**hard** 160:22

**harder** 74:15

**harm** 59:14

**head** 9:12 16:14 68:6 79:14 90:9 123:13 146:3 147:13 151:20 185:24

**health** 10:6,9 11:12 12:18

**hear** 9:1 11:21 33:7 64:8,10 67:2 142:17 169:8 180:9,13, 15

**heard** 21:15 30:11 49:24 86:12 88:4 89:11 97:20 115:3 126:20, 25 129:9,10 140:16 141:17 142:18 145:14, 15 152:11 206:23

**hearing** 13:23 15:4,5,15 91:1, 4,5 105:11,12 206:23

**hearings** 131:2 173:10, 13 206:24

**heaviest** 102:9

**heavy** 58:20

**Hector** 15:21, 25

**held** 24:19

**helped** 102:12 109:9

**helpful** 72:6 84:14

**helps** 166:3

**Hernandez** 163:13

**heroin** 100:16

**hey** 76:22 80:7 83:13 141:18 142:18

**high** 16:17 25:5,10 51:11 90:22 134:1

**higher** 152:19

**Hilke** 6:17 7:25 8:17,18 30:5,6 32:14,25 33:4,6 34:15 36:19 37:6 42:7,9,15

44:16,17 48:20 49:6 59:3,6,9 64:8,10 65:12, 13 89:13,25 90:1 94:9,12 104:18 115:23, 25 121:15 130:25 131:4, 14 132:3,7 142:12 146:13, 19 147:3 159:7, 8 163:6 166:2, 10,13,16,17 171:20 173:4,8, 14,17 174:9,24 175:14 176:3, 18 177:5,17 180:6,7,9,11, 14,18 181:7,10, 17,18 197:1 211:1,7,16 212:7,9,12

**Hills** 24:11 25:10

**history** 25:5 136:24 186:10

**hit** 117:14 209:10

**HK** 134:4

**hold** 7:18 25:22 30:1 72:3 114:4

**home** 7:10 31:11 113:15, 18,23 137:17 138:21,23 208:8,11,13

**homicide** 21:16 98:16 141:13,18,20 142:13

**homicides** 79:1,2

**Hondo** 101:7, 10

**honest** 177:20

**honestly** 12:19,22 16:9 42:1 95:4 97:10 109:18 120:12 162:5 209:9

**honorable** 17:3,4,5

**Hoods** 97:19

**hospital** 85:23

**hour** 48:18 113:25 148:25 149:4 156:23 157:25 158:2,3, 22 177:19

**hours** 14:13 116:21,25 117:7 172:1

**house** 101:25 102:13,18 103:1,22 104:15 113:20 114:6,17 128:21,23 135:14 139:6 140:19 147:5,8, 15,23 148:3,6, 12,15 150:12 151:12,21,24, 25 152:7,22 153:14,17,20 154:25 156:19 176:5,21 185:12 186:21 187:16 210:9, 18

**huddle** 154:8, 11 155:16,19, 21

**huddled** 150:8

**hundred** 109:25 209:12

———

**I**

**idea** 26:20 95:3 179:8

**ideal** 58:11

**identical** 49:15

**identified** 42:21 43:5 48:11 62:8

**identifiers** 63:9 106:8

**identifying** 60:9

**Iglesias** 128:23 131:15 132:17,19 133:2,5,10

**Illinois** 6:19

**impact** 11:12, 15,16,17

**impacts** 12:2

**implicate** 29:25 109:24 110:22 137:12

**implicated** 159:2,10

**implication** 144:25

**implied** 195:21

**important** 9:15 27:4,8,18,20 42:20 51:1 57:18 60:4,13, 15,21 62:5,21 66:25 73:13 74:3 115:12 127:15 141:12 172:25 173:19 177:3

**impression** 92:3 187:18

**improve** 92:24, 25 93:5,20 95:1

**improvement** 94:2

**inaccurate** 71:2

**inadvertently** 71:23

**inappropriate** 39:14 50:7 55:20 115:16 146:5 188:12, 16,24

**inappropriately** 50:7

**incident** 82:1 186:21 188:5



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 828 of 1026
The Deposition of SCOTT GRAVES, taken on July 08, 2022
229

incidents 87:18

include 51:6 58:19,23 59:10 66:1

included 50:6

includes 162:22

including 210:6

income 207:7, 21,24 208:3

incon- 163:17

inconsistencies 66:19 67:16 163:1,18 171:21,23 172:5 183:19, 23

inconsistency 67:22 172:9,24 173:24 174:18 175:6,21 176:9, 11,25

inconsistent 67:18

increase 46:11

incriminate 29:10

incriminating 49:7

independent 25:2 104:7,10 123:7 126:11 132:25 133:1 184:3

independently 73:13

indicating 109:15,16

indirect 209:4

individual 213:11

inducements 47:4,8

inferred 165:4

inflation 209:10

influence 12:25

information 27:17 51:7,14, 19,23 53:5,8,21 58:19,24,25 59:11 60:9,21 62:2 63:2,12,23 64:18,20 67:9 71:2,8,14,20 72:4,7,9,14,15 73:14,18,19 74:7,12 84:7, 11,14 89:8 91:7 92:11 99:2,24 100:8 105:19 108:1 112:6,11, 22 114:22 115:1,13,17 121:5 123:21 127:9 129:21 130:1,6 137:8,9 138:6,16 139:1 142:2,14 167:16,18 169:12 178:1,3 185:1,7 214:7

informed 169:19

ingestion 86:19

initial 40:1 61:7

initially 49:25 86:12 148:2 151:4

initials 182:12, 13

initiated 87:7

innocence 51:20 58:25 59:12 63:13,20 64:15,24 65:4, 8,17,23 84:25

innocent 27:24 44:5

inordinately

114:2

inside 85:24

instance 86:24 87:3,4 203:15

instances 85:9 86:15 87:4

instantaneous 82:17 83:6

instruction 18:16

instructor 24:21,24

instructs 33:9

insurance 190:8

intake 35:8,12

integrity 191:22

intent 193:13

intentional 71:4 75:8

intentionally 38:19 71:12

interaction 186:20

interactions 184:2,4,8 187:20

interested 148:2

interfering 187:12

internal 80:14, 17,21 81:3,22, 25 82:8,12,14, 20 83:5,11,14 87:7 88:9,12 186:24 188:11 189:9 193:12 194:7 196:7,21 197:8,11 198:1, 11,21 200:8,24 201:16 203:15

internally 195:25

interrogate 31:19 33:14 43:1,17 44:21 77:16 153:2 159:13,25 165:12,15

interrogated 31:10 32:5 33:21,25 52:25 146:14 164:25 166:25 170:17

interrogating 39:9 42:21 44:12 48:13 166:19 168:25

interrogation 31:3,12,13 33:18 34:21 41:21 42:4,17 43:4,13,14,20, 21 44:11,23 45:2,9,14,19,22 46:22 51:2 74:3 92:24 93:21 94:1 146:20 167:6 171:3

interrogation-style 45:11

interrogations 30:9 31:24 32:11 34:7 41:10 44:18 46:3 49:22 50:24 52:2,7 66:5 93:5 95:2, 10 145:24 171:3,6

interrogators 94:22

intersection 99:16

intervened 86:12,22

interview 18:24 28:10,12 43:13 45:3,10 46:14 67:5 81:13 121:5

interviewed 82:18 137:10,

13 138:11 139:6

interviewing 46:13 62:4 77:20 107:3 118:18 130:6 131:15 133:1 141:17 142:7

interviews 27:12 41:10 66:5 132:17 142:3

invest- 184:4

invested 209:3

investigate 42:3 102:12 135:4 140:24 142:25 203:19 204:1,7,10

investigated 52:20 53:18 76:17 205:25

investigating 28:20 44:22 141:12 178:4 185:22

investigation 20:15 26:14 27:5,9 29:1 35:15 42:16 46:17 52:23,24 53:21 54:4,5 56:21 57:19 58:8 59:19,22 60:2,13 62:13, 17,20 63:3 64:2 67:23 76:13 79:23 80:1,17 83:5,11 85:11 87:7 99:24 102:4 103:2 114:8 115:5,14 118:18 119:14, 17,22 121:19 124:2 128:1 130:20 133:5 135:17 143:1 160:20 163:15 164:5,9 165:6 173:1 185:11, 23 186:1 187:4, 12,19 188:9



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 829 of 1026
The Deposition of Scott Graves, taken on July 28, 2022
230

189:22 200:9
203:23 204:13
205:1,5,8,17
206:20

**investigations**
18:19 22:21,23
23:5,9,10 42:13
44:18 52:15
53:9 55:8 56:23
58:4 61:20
64:17 78:2,14,
25 79:17 80:14,
18,22 82:13
83:21 178:1
186:24 195:23

**investigative**
35:9,13 60:14,
24 61:19

**investigator**
92:4

**invoke** 146:25

**involve** 31:22
107:17

**involved** 48:12
61:5 67:8,12
76:16,20 77:15,
20 89:4,9 98:15
115:1 119:22
123:19 136:19,
23 144:12
161:22 164:8
186:24 188:8
201:6 202:1,12,
14 204:9

**involvement**
45:25 47:6,25
48:5 109:8
110:10 119:14,
17 136:24

**involving**
40:24 140:25

**issue** 70:16
76:24 81:23
83:15 91:5
105:13 140:25

**item** 35:21 86:8

**items** 70:21

---

## J

**J.S.** 116:2
135:21 180:8
193:17,19
194:4,20
197:24

**Jacob** 143:3
145:20

**jail** 163:21
164:4

**January** 25:12
31:4

**Jauregui**
143:4 144:8
145:21

**Jauregui's**
145:24

**Javier** 95:16
136:7,9 137:10

**Jeep** 181:5,8,
10,11,13,14
208:24 212:25

**Jesse** 163:12

**Jessica** 6:2
49:3 89:22
131:11 177:14
211:13

**Jim** 7:4,7,9
30:1,4 34:11
42:5,8 44:13
48:17 59:1,5
64:7 65:9 89:15
94:7 104:17
115:22 121:14
130:23 131:1,5
142:8 146:7,17,
21 159:5 163:4
165:25 166:4,
12,14 171:14
173:6,11,16
174:7 175:12,
25 176:14,16
177:7 180:4,10,
12,17 181:1,13,
16 196:24
211:4,24 212:1,
16,19,20 213:4
214:5

---

job 53:20 71:7
94:20 207:8

**Joe** 144:18
145:16

**Johnston**
143:3,10 144:8
145:20,23

**join** 24:3

**joined** 16:19
87:17

**joke** 188:13,25
200:25 201:5

**JPD** 35:7,12
36:21 154:20
155:11,13
165:2 168:25

**Juan** 163:12

**judge** 29:11
36:21 47:14

**judgment**
206:7

**July** 6:6 22:9
49:4 89:23
93:16 94:16
131:12 177:15
186:19 211:14

**jury** 193:1
195:9

**justice** 191:22

**juvenile** 22:21,
23 23:5,8,10
28:7,10,19
29:1,4,5,10,15
31:8,10,13,19,
23 32:5,10,20,
21 33:14,19,21,
22 34:1,20,25
35:1,20,21,22
36:1,5,11,13,
15,16 37:17,19
38:3,8,15,20,24
39:7,9,14,21
40:3 41:6 75:20
77:5,16,21
107:17 110:15
120:24 121:24
145:9 146:14
165:21 170:21

---

**juvenile's**
35:25

**juveniles** 23:2
28:4,23 30:9
37:3 39:10
40:21,24 75:25
76:4,12 107:3
143:6 146:20
204:2

**juveniles'**
76:16

---

## K

**keeping** 62:10
98:13

**Kentuckiana**
6:4

**Kentucky** 6:5

**kicked** 85:20

**kid** 146:2,16

**Kiki** 130:13,15

**kill** 123:17

**killed** 108:5
163:7

**killings** 109:10

**Kimmett** 7:13
15:19 212:3

**kind** 17:2 21:18
25:23 34:18
41:14,15 50:14
53:12 78:20
79:6 100:17
101:14 102:6
130:11,19
142:17,19
143:18 150:8
191:13 200:7

**kinds** 195:19

**knew** 89:10
97:11 99:25
100:11,18
108:12,13
125:12 134:5,
18 141:9
162:14 164:23
165:2 178:8

---

**knowing** 82:22
98:11 148:3
159:14

**knowledge**
31:17 44:8
98:10 112:16
133:4 141:2
162:25 163:15
166:24 203:18,
25 204:6

---

## L

**lack** 32:12,23
36:18

**ladies** 192:25
195:9

**laid** 70:1

**lane** 187:23

**Laredo** 144:18
145:16

**Larry** 97:3,4

**late** 29:25
93:23 100:5

**lateral** 21:14

**law** 6:24 28:21
146:10,18

**lawyer** 13:4
146:2,6,14,16
181:18

**lawyers** 8:19

**Lazo** 95:22
129:3 132:20
134:3

**lead** 44:1 62:24
74:15 123:20
127:8 135:1
161:12

**leading** 67:1,4
74:4

**leads** 62:14,17
63:3 102:13,15,
19,22,23 130:2

**leaned** 90:9

**learn** 18:18,21
83:15 84:6,23



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

110:8 114:25
132:19 164:14

**learned** 19:1
47:1 53:5 58:7
83:10 86:2
100:9 184:16
185:7

**learning** 189:8,
24 190:19

**leave** 51:23
155:22 158:6
161:3 168:6
187:18

**leaving** 24:20
153:17 188:17

**led** 74:8,13
103:23 129:22

**left** 17:7,17
19:7 31:4 87:17
150:7 151:12
154:11 164:3,
24 181:3,19

**legal** 37:19
111:11

**lens** 206:22

**let all** 57:2

**letters** 96:15
97:9 98:13

**level** 86:19
109:8

**LFL** 97:4,6

**liabilities**
210:23

**liable** 109:9

**license** 7:18
106:11

**lieutenant**
23:15,17

**life** 10:23

**likewise** 9:15,
23

**limit** 195:19

**limited** 18:20

**limits** 19:19

**lines** 129:2

**Link** 144:17
145:15

**linked** 148:22

**listening** 112:7

**lists** 193:22

**live** 144:25

**liver** 85:22

**lives** 136:16

**LML** 97:22

**loans** 208:21

**local** 100:8

**locate** 63:10
69:2

**located** 6:4
8:8,10

**location** 6:14
60:7,20 173:9
183:17

**Locos** 97:22

**Loevy** 6:18,19

**long** 14:12
16:24,25 17:20,
22 18:13 19:21
22:7,17 23:8
30:12 105:9,10,
13,16 113:8,22,
24 114:1,2,3
116:17 118:7
145:3 148:24
156:14,18
157:18,21,22,
23 158:20
184:16,18

**longevity**
97:12

**longstanding**
200:19

**looked** 13:6
137:20 209:9

**Los** 97:22

**loss** 210:19

**lost** 64:7

**lot** 10:16 12:4
40:23 69:5
75:24 76:7,8,9
87:22 91:11,13
93:1 99:25
100:2 105:12
108:1 124:4
145:18 166:15
171:18 186:11

**Lots** 195:4,5

**loud** 9:11 69:11

**loudly** 59:7

**Louisville** 6:5

**lower** 133:24

**lowers** 100:14,
21

**Loya** 15:21,23

**Lujan** 96:4

**lunch** 131:3
177:19

**lying** 45:14,16,
17 47:5 169:12,
22,23,25 170:3,
6

**lying.'** 170:5

———————

**M**

**machines**
161:1

**made** 56:6
75:15 77:7
82:23,25 89:2
94:21 122:10
126:25 127:6,
20 137:11,14
138:7 153:16
154:22 157:14
188:16 200:18
205:4

**magistrate**
29:11,16,21
36:5,6,14 39:8,
16,22 40:1,4,8,
9,13 41:7
68:21,22 69:1,
3,15 70:4
107:20 110:17,

21 114:11

**magistrate's**
68:24

**Main** 6:4

**make** 9:8,12,
13,17,20,21
12:22 16:10
27:17 29:3
33:10 49:17,20
50:16 51:23
52:22 53:20
54:11 55:1
58:10 64:23
72:18 77:24
142:13 149:7
158:13 162:21
173:12 183:7
188:21 210:1

**makes** 75:22
76:2 208:23
213:5

**making** 33:8
112:9 149:20
154:7 168:13

**mall** 153:24
154:3 155:22
156:15 164:24

**man** 91:17
190:3,4

**manage** 25:2

**managed**
86:10

**Mando** 129:3,
12 130:12
134:3,5,6,20

**Marco** 13:11

**Marcos** 95:24
102:1 114:12
149:13 150:2,
11 151:14
154:12,16
155:2 156:11
157:1,14
158:15 159:1,9
161:9,25
162:10,14
163:1,17,20
164:3,17,18
165:22 167:6

168:2 169:12,
22,24 170:11,
16,17 171:4,6
172:1,5,10,12,
19,20,22
173:24 174:10,
17 175:2,5,17,
20 176:5,8,11,
21,24 177:2
180:22 181:24
182:24 183:16,
22 184:2,4,8,12

**Marcos's**
166:18 167:24
168:7 169:5
183:20

**mark** 30:16
68:9 93:8
115:25 119:2
122:2 124:14
128:7 131:21
135:20 182:3,
20 186:5

**marked** 19:10
30:18 68:11
93:9 94:11
115:24 119:3
122:4 124:16
126:1 128:8
131:23 135:22
180:2 182:21
186:7 193:18
199:23 201:12

**market** 209:10,
14

**Marquez** 7:11
15:1 91:18
92:11 103:12
108:11 113:4,7
114:4,20,25
123:22,23
136:2 141:6,11,
16,18,20 142:1,
5 143:17
144:19 145:16
147:9,16,17
152:5 166:22,
23,24

**Marquez's**
90:5 92:3,18

**Martin-** 7:7

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Martinez** 7:7,9, 10 136:16,17, 20,22 137:12, 14,17,21,22,25 138:10,13,16 139:1 211:24

**Martinez's** 135:13 137:20 138:7,21

**Martinsburg** 16:18

**matched** 133:14

**matches** 112:14 134:14

**matching** 135:4 170:4

**material** 76:9

**matter** 6:9 178:3

**Meaning** 39:20

**means** 8:7 102:21 129:4 170:20

**medicine** 11:23 12:11

**medicines** 11:22

**Medina** 163:12

**member** 136:25

**members** 200:15

**memory** 10:7, 15 11:12,15,16 12:3,15 70:22 97:13 104:7,10 123:7 125:7 126:8,10,11 171:12 184:3,8 185:25

**mention** 121:15

**mentioned** 14:23 66:4 123:16 138:1 145:6 153:16

**197:18**

**mess** 86:13

**messed** 162:1

**met** 172:13

**method** 41:20, 22

**Mexico** 8:7 24:25 142:25 143:21 144:1, 15 146:10,18

**Michael** 6:24 143:3,10 145:20

**mid-** 100:5

**middle** 79:25 90:13 133:23 147:19

**Midnight** 97:22

**military** 16:19 17:14,15 25:17

**mind** 26:15 27:3 72:25 84:23 87:21 195:23 197:7

**minded** 187:21

**Mine** 13:17

**minimize** 47:22 48:4

**minute** 120:16 125:2 126:14 203:11

**minutes** 118:4 149:2 156:17 173:14 211:2

**Miranda** 69:5, 23 150:15,16, 19 160:16

**misc-** 88:9

**misconduct** 88:7,9,15 193:11 203:19

**misinformatio n** 66:14

**missing** 145:17

**mission** 22:22

**misstates** 37:4

**mistake** 71:5

**models** 208:23

**mom** 106:19, 20,23 152:24

**moment** 35:17 37:10 89:17 133:17 137:4 192:11

**Monday** 185:14

**money** 26:3

**monitor** 29:2

**Monroe** 19:17 100:23

**month** 23:18 134:9 207:12 208:1 210:16

**months** 18:14 23:19 189:14 210:18

**morning** 6:17 8:18 129:16

**mortgage** 208:9

**mother** 85:21 104:14 122:20 140:22 141:2 152:2,6

**mother-in-law** 210:15

**motive** 123:17 134:19

**motives** 98:24

**mountain** 19:18

**move** 26:6,9 117:2 173:9

**moved** 101:5

**moves** 123:13 146:3

**moving** 181:2

**multipart** 61:14

**multiple** 45:19, 22 66:18 78:17 80:13 90:18 91:9,19 143:15 144:20 199:9, 10

**multipurpose** 200:2

**murder** 80:3 135:5 138:15 159:13,25 160:15 162:7 176:12 204:9, 20 205:3

**murders** 14:21 20:15 78:21 91:22 92:9 95:13 99:16 101:20 179:13 185:11,23 186:2 204:18 205:18

**mute** 132:3,6 181:10

———————

**N**

———————

**naked** 86:20

**name's** 8:18

**named** 80:13 82:8,13 83:5,11 129:9 130:13 144:17 164:18 165:7 196:21

**names** 143:5 161:15 163:12

**narcotic** 89:4

**narrative** 75:2

**National** 17:1 101:11

**navigate** 190:20

**necessarily** 62:3 78:22 79:4 107:8 151:7 186:14

**needed** 34:25 37:2 41:6 55:1 79:8 92:14,24, 25 110:17 142:2 145:4 170:25 178:18

**needing** 95:1 187:19

**negative** 95:5, 6

**neighborhood** 23:19 96:22

**nickname** 161:19,22 162:1

**night** 101:20 114:5 129:4 134:2 139:5 140:3,11 147:8 161:10 163:22 164:4,8,12 168:25 173:22

**nodding** 9:12

**nonhomicide** 79:7

**nonpublic** 71:16,20 72:3, 7,14,15 73:9,18 127:13 162:10, 13,18,22

**nonsensical** 97:16

**north** 19:20 101:10 154:2,4, 5

**northeast** 19:9,15,16,22, 25 20:25 24:13, 14 86:17 97:17 101:1

**Northpark** 153:24 155:22 156:15 164:24

**Notary** 8:9

**note** 31:4 61:22 68:23 200:12

**notebook** 52:16,19 56:22

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

noted 162:13
200:14

notes 14:20
51:2 52:15,22
53:1 56:20
57:10 211:2

notice 12:2
82:12 131:24
182:11

noticed 11:17
12:15

noticing
168:10

notifying
76:25

nowadays
160:22

number 6:12
8:9 61:6 68:9,
16 88:19 116:1,
13 119:5
131:21 180:1,7
182:20 201:16

numerous
191:4

Nursing 181:8

_____

O

oath 8:11 87:24
88:2,5 191:7,
10,13,16,19,23
192:2,7

obey 189:15

object 34:11
42:5 44:13 65:9
104:17 121:14
142:8 146:7,21
163:4 171:14
174:7 175:12,
25 196:24

objection
32:12,23 33:2
36:17 37:4
173:2 174:22
176:14

objections
33:8

objective
27:15

objectively
26:18

observe 28:11

obtain 44:24

obtained 37:2
130:7

obtaining
68:17

obtains 37:18

occasion
34:18 105:18

occasional
26:1

Occasionally
80:9,10

occasions
81:16 90:18
91:10,19

occurred
154:6

Ocegueda
145:8

off-duty 25:22

off-label 12:12

offending 23:1

offense 200:5

offhand 39:4
77:3 204:19

office 6:22
7:10,13 57:7
63:22 82:18
90:2 136:18
137:13 138:13
139:20 145:5
154:17 155:25
156:2,12,15
157:1 158:5,6
163:22 164:3
213:16,25

officer 11:4,6
17:25 18:3,6,9
19:13 22:1
28:14 29:2,6
31:22 32:10,20

33:14,22 34:22
35:8,12 37:18
56:11 68:18,20
69:3 81:3
86:22,25 88:1,
4,8,13,14 89:3
90:23 91:15
99:4 107:17
116:10 117:13
144:18 147:14
151:17 187:2
191:4 194:24
195:1 197:14
200:24 201:13,
22,23,25
213:11

officers 21:16
36:10,15 61:5,8
77:11,15 80:20
82:7 87:19 98:7
144:15 145:9,
15 147:7
148:11 156:1
188:8 191:23
201:6,25
202:12,13
203:15 204:1

offices 6:19
7:6 101:18
155:3

older 170:25

Olivas 197:24
198:5

omit 115:16

online 6:2 8:8

open 26:15,20
27:3 118:13
178:1

open-ended
67:6

opened 22:12

operating
108:17

opinion 90:22
91:14 92:18
200:17 206:14,
17 212:24

opportunity
20:18 191:3

optimistic
209:12

options 69:1

oral 74:23

order 64:14
82:3 181:9
189:16 212:10
213:2

ordered 82:10
189:17

orders 81:25
212:6

organize 61:3

original 35:22

originals 61:5,
11

Ortega 6:21
15:16 28:25
91:9,11 145:12
166:22 211:20

outright 208:8

owned 133:13

owns 134:10
208:19

_____

P

p.m. 89:23
122:14 126:6
131:7,8,12
177:10,11,15
211:10,14
214:11,12

Pa- 28:2

paid 92:21

pair 86:10

pan 62:14
102:17

panned 102:15

paperwork
55:25 56:2

paragraph
128:19 129:7
133:21,24
182:12,14

200:13

paraphrased
74:20 161:5

paraphrasing
74:22

parent 37:18
146:25

parental 31:11
37:1,21 38:3,24
107:2 120:9
121:1 122:22

parents 76:16,
19,25 77:2,5,6
145:24 146:4,
15

Park 24:21
25:24

part 6:23 50:11,
12 62:10 71:7
74:5 75:14
76:11 94:23
99:24 100:9
101:14 133:24
136:6 137:1
142:24 148:11
149:19 185:22
200:22

participate
20:14 140:7
188:24

participated
21:18

participating
185:10

parties 7:23

partners 19:25
20:2,4

party 134:1
136:20

Paso 6:9,11,22,
25 7:2,10,14
8:8,10 17:9,18
18:1 21:21
24:15,20 25:2,
6,21 26:6 28:2
30:7,20 68:1
97:25 98:11
101:1,13 141:3

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 833 of 1026
The Deposition Of Scott Graves, Taken On July 28, 2022

234

144:1,3,11
153:6 185:6
196:8 203:18,
25 204:6

**Paso's** 39:13
151:6

**pass** 56:3
57:15 101:7,10

**passed** 144:18
171:11

**passenger**
151:15

**past** 45:23
136:23

**paths** 92:6

**patrol** 19:9,13,
21 20:19,24
22:11,18 23:18
87:9 100:10

**patrolled**
100:4

**patrolman**
194:9 198:3,25

**patrols** 181:12

**pay** 92:5,20
207:11

**paying** 208:9

**Pebble** 24:11
25:10

**pending** 6:10

**pension**
207:14,16

**people** 20:4,7
39:11 47:3
66:20 85:11
99:10 101:14
105:19 130:6
145:2,17
147:24 149:17
151:22 153:19
163:7 164:18
171:22 177:25
185:21 204:7,8,
25 205:4

**people's** 19:1

**per-** 197:4

**perceived**
193:9 197:13
198:9,10
200:25

**percent** 110:1

**perceptions**
171:17,19

**Perez** 201:13,
22 202:3

**perf-** 94:13

**Perfect** 8:2

**performance**
93:10,11 94:3,
13 197:4

**peril** 190:25

**period** 10:23
11:1,5,8 54:2
76:7 93:16
102:8 129:8

**permission**
31:11 37:2,18,
21,22 38:3,25
106:24 120:10
121:1,7,9
122:19 153:1,4,
7,10

**perpetrator**
65:15

**person** 20:10
27:6,9 43:25
44:5,12,20 45:6
65:4,13,15,16
71:15 103:5
105:6 108:21
161:22

**personal**
14:20

**personally**
92:7

**persons** 11:9
21:1,3,7,19
22:8 26:12
31:19 40:24
54:1 57:7 60:25
78:1,8 86:1
87:18 98:8
105:1,3 187:15

**pertinent** 51:7
53:5

**Pete** 145:8

**philosophy**
27:11

**phone** 139:25
168:22,24
169:1,8 178:21

**phones** 160:23

**photo** 64:6

**physical** 61:21
85:2,10 148:21
159:18 173:9
204:17

**pick** 103:13,16
104:22 141:5,
18

**picked** 101:25
104:4 114:21

**picking** 114:23

**pin** 173:21

**pink** 61:17,18

**place** 100:12
147:21 148:4
154:23 155:12,
13 157:13
165:20 171:4,6
173:13

**Plaintiff** 6:18
8:19

**Plaintiff's** 6:15

**plan** 109:9
212:16

**planned** 110:2

**planning**
23:20,21,23
24:6

**plans** 26:6,9

**play** 78:13
143:11 189:3

**played** 143:10
188:13

**ploys** 46:6,8

**poi-** 182:18

**point** 29:1 35:6
54:3,7,12 63:20
65:3 93:23 95:8
109:12 113:17
149:19 150:23
165:6 167:10
170:6 173:7
177:5 182:18

**pointed** 64:15,
24

**pointing** 43:9
65:6,14 66:1

**points** 51:20
58:24,25 59:11
63:12 65:16,23
66:19 84:24
101:12,13,18
142:21

**police** 11:4,6
17:15,18,23,25
18:1,3,6,9
21:22 22:2
24:15,20 25:22
28:14 30:7,20
61:7 68:1 71:2
73:2 77:11
85:3,4 86:16
87:1,20 88:7
97:25 112:14
115:17 136:22
139:24 140:2,8
141:3 144:3
177:25 185:6
186:20 187:11
188:18 190:21
191:4 194:24
195:1 196:7,8
197:14 199:15
203:18,25
204:7 207:13

**policies** 30:21
39:13 68:1,5
110:15 153:6
204:2

**policy** 30:7,10,
24 32:8 34:6,24
37:1,7,23 38:8,
21 39:1 41:2
52:6 55:22,24
57:9 120:25
121:2 151:6
182:13,15
203:7,10

**poor** 190:4

**Popeye** 96:6
161:10,13
164:11 172:21,
23 175:17,18
176:3 184:13

**portion** 100:14
195:16

**position** 21:4
29:20

**possess**
200:16

**post** 190:5

**post-traumatic**
10:13,14,20,24
11:11

**postconvictio
n** 185:2

**potential** 63:13
98:15 103:1
123:16 136:10
142:25

**Potentially**
59:24 67:10
109:11

**power** 117:10

**practical** 37:21
188:12,25
200:25 201:5

**practice** 34:19
35:11 36:1 38:2
40:18 45:21
46:2 47:1,8,10,
19 48:15 50:23
52:5 55:4
57:12,14 58:13,
18 64:23 69:13,
17,18 70:6,8
71:19 73:11
75:5,14,19
77:24 80:6
83:25 84:9
94:21 150:14
161:2 182:3,16

**practices**
26:13

**preferable**
57:20,22,23



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**preferred** 63:15

**preparation** 13:13 14:18 103:9 116:6 123:1 180:19 184:7 194:2

**prepare** 14:6 16:3,6,12 121:22 123:5 124:7 183:12

**prepared** 13:5 16:8,11 114:7

**prescription** 11:14,18 12:14, 21

**prescriptions** 12:13

**presence** 36:6 168:7

**present** 14:14 77:5 153:18

**pressure** 12:11 46:10 49:21

**pressured** 76:4

**pretty** 20:21 56:22 97:15 106:16 125:2 171:12 187:2, 22 212:9

**prevent** 11:25 12:1,18 52:8

**preventing** 52:7

**previous** 195:21 196:22

**previously** 40:22

**primarily** 11:10 79:2 81:4 100:12 152:5

**primary** 45:1

**principal** 77:8

**principle** 50:6

**prior** 31:11 95:13 132:21 154:24 209:11

**prison** 206:10, 15,18

**probation** 35:1,23 36:2,16

**probe** 67:23

**problem** 30:5 190:7

**problems** 91:7

**procedure** 75:11 149:19

**procedures** 68:17 69:6

**proceed** 8:13 49:5 89:24 131:13 177:16 211:15

**proceedings** 185:3

**proceeds** 62:17

**process** 56:3 57:4 66:25 110:25

**produces** 73:14

**professionally** 92:15

**program** 18:10 21:13 23:1 25:2

**programs** 21:17 22:25 93:19

**promise** 50:17

**promises** 50:16

**promoted** 23:15

**promotion** 22:14

**proof** 117:10

**property** 208:7 210:6,8,9,10

**prosecution** 54:14

**prosecutor** 47:11 50:18

**protect** 27:24 187:14

**protections** 28:6,10 29:6 170:21

**protective** 28:23

**provide** 71:2 73:10,17 200:8

**provided** 74:7

**psychologicall y** 49:18

**public** 8:9 193:10

**pull** 99:12 119:1 166:9

**pulled** 109:3 153:25 160:19

**pulling** 197:23

**punished** 203:15

**punishment** 189:7

**punitive** 207:2

**pursuing** 123:20

**put** 35:6 46:10 49:21 51:12,13 53:6 56:15,18 110:4 161:15 190:9,25

**putos** 175:18

**puts** 108:4 149:10 152:18

—————

**Q**

**quality** 91:14 92:19

**question** 9:24 10:2 21:24

32:15,18 33:10, 12 42:6,7,10 43:18 55:19 66:18 67:19 72:11 75:2 79:8 105:7 111:11 114:24 121:16 141:19 146:2,5, 15 159:12 160:15 169:18 170:1 192:25 193:4,6 194:5, 12,14,21,23 195:1,4,6,8,12, 14 197:10,13, 19 198:9,10,14 202:9,19 205:2 206:5,13

**questioned** 140:11 144:3 165:21,22 183:22

**questioning** 29:15 32:20 39:14 40:11 41:5 43:15 46:23 129:22 140:7 141:6,14, 22 144:13 145:20

**questions** 8:21 9:19 26:11 29:24 32:6 33:23 34:3 39:21 45:6 67:6 74:4 87:7,11, 14,15,17 169:15 170:8 180:15 192:23 195:19,22 203:9 206:25 207:3 211:16, 20,22,25 212:2

**quick** 154:8

**quickly** 189:18

—————

**R**

**radio** 82:20

**railroad** 186:20 187:11 196:7 199:15

**raise** 8:3

**Ramirez** 96:6

**ran** 86:17 117:17

**Rancho** 7:10

**Rangel** 96:8,10 108:11 139:6,9, 13 140:25 141:6 159:2,9, 19 179:1,17,21

**Raul** 132:17 133:6 134:1

**Ray** 15:25

**re-** 39:17

**reach** 179:9

**read** 39:9 41:25 68:16 69:7,10, 11,20 76:9 104:8,9 120:16, 20 123:2,4,11 125:3 126:15 132:24 150:11, 15,18,21,22,25 151:8 169:16 200:14 214:3

**readily** 69:1

**reading** 70:2 125:6 139:15

**reads** 37:16 136:14

**ready** 173:12

**real** 65:15 105:18 157:21 208:14

**reality** 57:20 74:21

**realized** 109:13

**reason** 59:25 73:17,24 104:16 141:25 142:5,10 160:6, 9,11 177:20,22 183:21 190:2 207:1

**reasonable**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 835 of 1026
The Deposition of SCOTT GRAVES, taken on July 08, 2022
236

69:2,14 118:10

reasons 88:19

recall 20:13
49:9,19 86:15
92:10,23 94:4
95:15 96:5
106:22 114:9
115:2 118:18
125:15 131:17
133:12 139:11
140:6 146:24
147:1 148:23
152:1 153:3,5
167:23 172:12,
15 177:1 192:1,
19,23 193:8

receive 17:2
18:15 21:10
29:11 39:25
41:9 49:11,17,
20 50:1 52:12
64:14 82:12
83:18 178:7
199:9 207:13

received
41:14,15 43:24
44:3 66:5 81:24
82:2 188:2
189:21 199:12

recognize
116:2 135:23
186:9

recognized
134:3

recollection
87:16 133:1
185:1,10
189:16

record 8:22
33:2,8 48:21,23
49:2 50:24 52:1
59:8 60:17
62:11 64:1
65:23 68:10
73:25 84:8
89:17,21 93:14
119:5 130:25
131:7,10 177:9,
13 183:16
211:6,9,12
212:5 214:9

recorded
64:16,18,21
186:3

recording 52:7

records 61:15

rectify 190:7

reduced 74:23

reference
53:24 54:2
167:12

referred
132:19

referring 196:4

refresh 184:7

refreshed
30:10

Regal 130:14

regional 23:25
24:3,11,13,14

regular 78:25

Reid 41:20,22

relate 207:2

related 203:19

relative 77:1
90:5,11

relative's
186:21

relevant 53:8,
21 59:22 60:1

reliability
71:18

reliable 71:8,
15 73:6,12
74:1,12

rely 60:20

remain 19:21
22:7,17 23:8

remaining
27:23

remark 200:18

remember
10:17 11:18
18:12 28:24

39:4,18 41:13
42:1 56:25 58:2
61:16 63:6 68:4
70:20 82:16,22
83:4,8 85:19
88:6 89:1 90:4,
10,15 93:4,5
95:3,7 96:14,
17,18,21 97:23
100:2 101:4,8
102:7,17
103:15,18,21,
23 104:2
108:13 113:5
114:1,10,13,14,
15,18,19
118:22,23,25
119:18,19,21,
25 120:9,11,12,
20 121:25
122:1 123:10
124:1 125:19,
21 126:19,20
127:25 128:2
131:14 133:7
134:8 135:13,
15,16,18
139:15,16,19
141:9 143:7,9
144:12,16
145:6 147:12,
18,21,25 148:1
150:13 151:13,
15,19 152:6,23,
24 153:13
155:7 156:3,4,
10 157:8,22
158:17 160:21
162:12 163:25
164:10 169:1,2,
14 170:8,11
172:18 174:1,
12,19 175:7,22
176:10,23
178:11 179:5,
16,20 184:16
185:5,22,24
186:21 187:4,6
188:11,13
189:2 197:20
199:6,13
202:25

remembered
196:23

remind 124:6

reminded
160:25

remotely 8:6

reopened
62:24

repeat 32:15
45:18,21 48:6
83:1

report 56:9,14,
17 57:16 58:23
59:10,17 61:7,
23 69:7,10 88:8
89:7 93:11
94:14 104:8,9
116:10 117:14
119:7 123:12
131:25 132:1,7,
14 135:24
136:2,6 137:5,
20 200:3

reported
88:13,14 89:6

reporter 6:3
8:5 9:10 212:5,
11,13 213:3,8,
14,18,21,23
214:1,3,6

Reporters 6:4

reporting 8:6
88:10,11 93:15
116:10

reports 53:7,
10,12,13 54:17
55:1,3,12,23
56:6,7,10,11
57:3 58:6,14,19
112:14 115:17
117:8 135:7
138:12

represent 6:3
7:11 117:6

representation
6:23 118:1

representing
7:2,5 213:11

reprimand
189:21 190:16

remind 124:6

requested
31:11

required 39:8
53:7,13 80:16

requirement
53:4,11

requiring
57:10

res 38:10,12,13

reserve
211:20,25
212:2,4

resolved 187:5

responsibilitie
s 23:16

responsible
44:21 136:17,
20 168:12

restate 65:18

result 137:9

retain 57:10

retire 24:15

retrospect
205:22

review 13:12,
16,18 14:17
55:4,11,23 56:3
79:11,18 103:8
118:8 194:1

reviewed
116:5 121:21
123:1 180:19
183:12 184:6
186:3

reviews 79:22
80:1

ri- 187:15

Rick 135:13,17
136:16 137:12,
14,21,25 138:7,
10,13,16,21
139:1

ride 128:21,24
139:24 151:11

rights 19:2



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

31:9 70:1,3
147:1 150:12,
22,25 151:2,5,8

**ring** 97:4
124:10 188:6
189:19

**ripping** 86:20

**risks** 144:23

**rivalry** 134:20

**Rivas** 132:18
133:6

**road** 153:25

**Robert** 95:21

**Rod-** 149:10

**Rodney** 13:10
95:18 103:8,9,
13,16,19 104:3,
12,22,24 105:7,
9,16,21,23,24
106:2,4,5,8,16,
19,24 107:11,
17,23 108:1,7,
16,24 109:3,7,
13 110:9 111:4,
24 113:15,23
114:16,21
115:1 116:3
141:6 149:9,10
159:2,9,19
164:17,18
171:25 172:12,
19,20,23 174:9
175:1,16 176:3,
20 183:20

**Rodney's**
103:22 104:14
106:23 111:16
113:1,22 115:4,
9 183:23

**role** 78:6,13
79:11 143:9,11
157:15 189:3

**roles** 98:3

**room** 166:5
181:19

**rooted** 26:5

**roughly** 19:15
193:1 195:9

207:17

**route** 79:11

**routed** 178:4

**Rudy** 95:14
123:16,20
136:15 137:10,
12

**rule** 109:21
127:11,21
213:9

**ruled** 127:16
138:17

**rules** 9:8 28:3
29:3 75:24 76:1

**ruling** 62:16

**run** 117:17
142:17 168:13
175:1,2

**running**
143:18

───────

**S**

───────

**S-C-O-T-T**
8:23

**safe** 167:11

**San** 7:3

**Sanchez** 15:25

**sat** 90:7,8
169:24

**savings**
209:19

**scared** 134:7

**scenes** 78:16

**school** 16:17
25:2,5,11 51:11
77:8 128:21,24
129:8 134:2

**schools** 21:17

**scissors** 86:10

**Scott** 6:8 7:1,5,
20,24 8:14,23
49:2 89:21
131:10 177:13

193:22 211:12
212:22 213:12
214:11

**screen** 117:2
179:25 182:19

**screenshot**
181:3

**scroll** 35:4,18
68:15 122:12
128:18 136:13
200:11

**scrolling**
30:25 37:12
93:18 94:19
119:6 129:1,7
132:10 135:23
136:1,5 182:22
193:22 194:4,
11,19 201:19

**scrotum** 86:21

**search** 104:2
137:15,17
138:22 148:24
149:2,24 150:6
187:8

**searched**
138:21 148:16

**searching**
135:13 148:17
149:6

**Sears** 101:6,19

**seat** 176:4

**section** 31:7
35:20 61:15
68:12 93:18
94:19,22
102:10 134:11
137:18 173:15

**sections** 69:4,
7,10

**secure** 148:5,
12

**secured**
148:15

**security** 26:1
144:21,23

**seek** 67:8

**seeking** 44:4

**send** 20:7
61:14

**senior** 55:18

**sense** 9:13,17,
20,21 33:10
75:22 76:2
142:13 213:6

**sentence**
138:20

**sentences**
136:14

**separate**
195:24

**sequence**
103:23

**sergeant**
22:13,15,17
55:25 56:2
79:22 80:1
87:12 113:4,7
123:22 199:25
202:18

**sergeants**
78:9,11,13,23
79:7,17 80:7

**serve** 16:22,24
17:15

**served** 55:7

**service** 25:17
31:23 189:12

**services** 30:8,
11 31:14,23
32:10,19 33:14,
22 34:7,13,21

**serving** 148:8

**set** 212:23

**setting** 127:7

**seven-zero**
207:18

**Shamrock**
175:2

**share** 30:15
37:9,10 62:2
68:8 90:2 94:6,
10 115:20

122:2 124:13
125:20 131:20
142:1 193:16
201:8

**shared** 64:25
73:14

**shares** 108:1
162:18

**sharing** 35:16
36:25 39:6
70:25 91:7 94:5
95:12 118:15
121:17 124:5
125:13,24
127:24 130:22
133:16 135:12
139:3 179:25
182:18,19
184:11 191:2
196:5 199:7,21
201:8 203:13

**sheriff's** 145:5
146:12

**shift** 20:16

**ship** 178:17

**SHOCAPS**
22:25

**shooter** 149:11
204:18 206:3

**shooters**
111:10

**shooting**
108:2,22 109:1,
8,14,18,22
111:25 112:3,6
115:14 125:12,
16 126:24
130:19 132:18
133:14 134:6,
14,16 136:17
157:15 161:10
162:11,14
163:2,3,5,8,10
164:13 165:8,9
169:6 172:14,
25 173:18,22,
25 176:20
205:25

**shootings**
95:21,25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 837 of 1026
The Deposition Of Scott Graves, taken on July 08, 2022
238

101:21 111:6
164:9 171:7,12
203:20 205:10,
11,14 206:4

**short** 48:18
89:14 120:15
125:2 127:4

**shortly** 23:7

**shot** 108:5
109:15 129:5,
12 130:12

**shouts** 38:15

**shoved** 86:10

**show** 93:7
128:6 130:9
179:23 199:19

**showed** 20:21
61:21 102:9

**showing** 31:2
190:23

**shown** 62:2

**shredding**
57:1,6

**shut** 38:16

**sic** 6:7

**side** 19:18,19
22:12,18 90:12
96:20 97:1
123:13 132:21
146:3 154:2,4,5

**sign** 39:24
67:23 68:23
69:21 81:21
150:15,24
162:22 214:4

**signature**
75:17

**signed** 74:24
150:19

**signing** 70:23
75:7 110:21
151:3

**silent** 93:2

**similar** 202:7

**simple** 72:23

**simultaneous**
141:22

**simultaneousl
y** 141:12

**single** 78:20
112:16

**sir** 8:18 13:14
14:2,4 15:24
16:15 17:6
22:16 23:13
25:20 26:10
27:7 28:1 29:8,
13 30:19 32:1,
17 36:23 39:25
41:12,23 44:17
52:9 64:11
66:11 75:9
78:4,6 85:5
90:1 93:13
95:11 102:2,14
106:21 111:21
124:4 125:9
126:19 127:2
131:14 140:5
144:5 145:11,
13 151:18
156:21 165:17
170:23 172:11
177:17,24
180:18 181:18
183:14 188:4
191:12,15,18
192:6,9 204:11
207:6,9,19
208:22 210:25

**site** 99:15
101:21

**sitting** 95:8
104:1 106:4
121:10 124:2
132:24 133:9
139:18 145:19
161:18 164:17
203:22 204:4,
14,16 205:16
206:2

**situation**
144:22

**situations**
33:20 62:1
81:19

**skills** 93:21
94:1

**slam** 190:12

**sleep** 118:11

**slow** 102:8

**smoother** 9:8

**smudged**
117:5

**Snoopy**
161:10,13,19,
21 172:21,23

**Snoopy's**
176:5,6

**social** 208:6

**soldiers** 25:16

**solved** 180:15

**somebody'll**
142:21

**somebody's**
142:16

**someone's**
71:11

**Something's**
30:1

**sort** 9:7 41:16
58:2 133:23
196:11 201:3

**sorts** 195:6

**sound** 163:13
170:16 171:5
192:16

**sounds** 26:5
102:2 118:6
131:4 166:5,7,8
170:18 171:9

**source** 137:7
207:25

**sources**
207:20 208:3

**south** 19:18
154:2

**speak** 9:16
14:6,9 59:3,6,7
121:18 140:20,

22 179:1

**speaking** 29:4
39:19 43:22
44:2 57:24 58:1
61:22 62:7 67:3
77:17 125:15
158:10 166:2

**special** 77:11

**specialized**
77:12 98:10

**specific** 21:10
58:2 63:7 76:11
80:20 81:6,16
83:9 84:10 93:4

**specifically**
43:15 114:18
155:7 156:5
158:17 163:25
172:15 175:8

**specifics**
83:25 84:2,3

**speculation**
32:13,24 34:11
36:18 44:14
104:17 121:14
142:8 146:7,22
163:4 171:15
173:3 174:8,23
175:13 176:1,
17 196:25

**spelling** 8:22

**spend** 156:18

**spent** 14:13

**split** 85:22

**spoke** 135:16
184:12

**spoken** 15:1,
12,17

**spontaneous**
38:14,23

**spot** 190:9

**spread** 148:12,
15

**staff** 178:23

**stand** 97:9

**standard**
116:9 165:19

**start** 8:21 23:3
39:14 40:4 48:9
60:5 62:20 78:7
86:12 110:14
158:1

**started** 23:4
25:5,12 86:4,20
116:22 157:25
158:5 182:3,6
183:1

**starting** 6:15
28:22 30:16
120:15 193:17
194:5,20

**starts** 133:21
136:6

**state** 6:13 7:18
24:25 26:7

**state-** 51:5

**stated** 136:21

**statement**
29:9 37:3,14,
17,20,22 38:10,
12,13,19,24
39:24 49:7
51:5,15 71:21
76:5 81:7,10,
18,19,20 82:24
83:24 84:22
86:6 103:8
107:24 108:2,7,
17,21 109:12,
20 110:21
111:16,19
112:8,12 113:1,
6,13,16,22
116:2,5,11,22
118:8 119:7
120:7,10,15,17,
21 121:1,21
122:6,13,17,19,
23 123:1,2,4
124:7,17 125:1,
3,10 126:2,9,23
127:3,4,18
128:9,12
129:16 133:20,
25 134:11,13,
21 136:7,14
137:1,9 138:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

149:10 150:23
151:9,10
157:14,20
158:1 161:8
162:20 165:1,3
166:18 167:9,
24 169:5,19
180:22 181:24
182:23 183:20,
21 199:24
200:7,20,23
201:13,21
202:3

**statements**
13:6,7,9,12
38:4,5,6,9 51:3
68:13 80:17,24
81:1 83:21
84:11 129:17,
20 138:2
159:14,18,23,
25 160:4,19
168:1 171:22,
25 183:12,15,
24 184:6
185:13,15
202:20,23
203:16 204:25
205:4,14,20

**States** 6:10

**stating** 8:22

**station** 22:12
37:20 85:3,4,10
86:16,18 87:1,
8,10,20 89:3,4
101:12 114:14
139:24 140:3,8,
15 200:14

**stationed**
17:10

**stay** 166:11,13

**stayed** 17:9

**staying** 27:15
166:10

**stenographic**
8:7

**steps** 39:18

**stocks** 209:1

**stomach** 85:21

**stop** 9:21 35:16
36:25 39:6
70:25 94:5
95:12 105:2
118:15 121:16
124:5 125:13
127:24 130:22
133:16 135:12
139:3 150:7
153:17,21
154:7,22
182:17 184:11
191:2 196:5
199:7 201:8
203:13

**stopped** 47:5
153:18

**stopping**
160:3 173:7

**story** 170:4,7

**straight** 99:9

**street** 6:4
14:21 19:17
20:15 85:12
91:22 92:9
95:13,21 99:15,
17 100:23,24
101:8,20 129:3
136:16 153:23
164:9 179:13
185:11,23
186:1 203:20
204:18 205:18
206:3

**strengths**
94:20

**stress** 10:11,
12,13,14,20,24
11:11 46:16,22
171:18

**stressed** 46:12
47:3

**stresses** 10:23

**stretches**
20:11

**strike** 36:11
38:1 41:16 53:6
74:17 77:25
80:12 81:23
83:19 111:1

114:5 123:2
138:11 164:22
167:25 168:22
171:4 172:19
194:22 200:23

**striving** 93:20

**strong** 43:6,8
122:7,18,20

**stuck** 97:13,21
190:19

**study** 94:21

**stuff** 51:13
78:22 80:4 99:6
100:2,17
106:10 184:23
195:24

**style** 92:4

**subject** 68:19,
20,22 199:2
200:8

**subjects** 41:17

**submitted**
55:3

**submitting**
55:5

**substance**
39:15

**substantiated**
192:20 193:6
195:14 196:2
197:6,20,21
198:6,17,22

**substantive**
15:9 29:15
39:20 40:11
41:5

**substation**
101:1,6

**suggest** 47:10,
16,21,24 48:3,7
65:7,16 161:13

**suggesting**
47:4

**suggests** 34:6

**Suite** 6:5

**supe-** 80:11

**supervised**
78:2,3,8

**supervising**
78:14

**supervision**
79:6

**supervisor**
78:5 83:12
88:10,11,20,22,
25

**supervisors**
55:15,16
143:17 145:6,7

**supplement**
93:12 94:14
119:4,7 135:24
200:2

**supplementar
y** 132:1

**support** 23:24
24:1,3,8 210:12

**suppose** 98:22

**supposed**
199:14 201:4
213:1

**suppression**
13:23

**surprised**
109:18 164:1
172:16 210:2

**surrounding**
75:24

**survivors**
163:16

**suspect** 28:10,
16,18 29:4,16
31:14 33:21
34:25 39:8,14,
21 40:3 41:6
42:22,24 43:2,5
45:25 46:16
47:5,12,17,21
48:8,11 51:7,24
52:25 63:13
65:7 66:21
69:20 70:3
73:9,13,18

74:7,12 75:3,7
77:16,22 84:23
85:3,6 86:8,16
87:1,20 102:16
107:12 109:13,
21 110:6,14
123:17 127:6
136:11 138:15
151:8 159:13
160:1,15

**suspect's**
47:25 58:24
59:11 64:24
65:8,23 74:18
161:4

**suspected**
85:14

**suspects**
27:12 28:7
31:20 32:6,21
33:15 34:1
46:11,22 49:18,
21 50:2,8 65:3
66:2 67:8 69:23
73:1 75:20
103:2 110:15
142:25 150:15
165:7,16
205:24

**suspended**
189:3

**suspension**
188:2

**suspicion**
43:7,8

**sustained**
186:16

**swear** 8:4
191:7,10,20,23

**swearing**
191:16

**sworn** 8:12,15
193:23 200:2

**system** 56:4
99:3 160:22
191:22



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 839 of 1026
The Deposition of SCOTT GRAVES, taken on July 28, 2022

240

## T

**T-E-R-R-I**
118:21

**taking** 9:10
12:21 37:2
38:3,19 39:7
40:4 68:2
69:15,23 86:6
109:12,20
111:20 113:1,
15 120:6,10
121:1 126:8,10
129:20 151:9,
10 158:1,5,24
161:2 162:14
182:4,6 191:23
210:17

**Talamantes**
124:7,18 125:8
128:22

**talk** 28:14,15
55:20 62:11
66:9 76:22,23
77:4,9 81:25
82:4,7 105:9,
16,19,24
106:24 111:12
143:15 157:4,
18,24 166:18,
21 167:3 178:8
203:11,12
213:17

**talked** 15:3
62:8 71:1
104:15 107:11
113:10 123:19
125:21 138:12
139:25 157:3
159:1,8 167:5
168:21 183:19
184:9 185:15,
18

**talking** 28:16,
18 33:20 39:23
44:14,17 51:11
53:24 60:5
71:15 78:19
80:3 86:4
100:14 105:20,
23 106:2,5,8
107:17 108:11,

16,24 110:24
111:2,4 123:8
125:7 126:12
127:25 128:2
129:9 142:16
158:14 164:21
169:2

**tape-recorded**
80:25

**taught** 25:10

**teach** 25:8

**teacher** 25:4

**teaching** 25:5

**technical** 25:8,
10

**technically**
189:5

**technician**
6:1,2 7:15,22
8:2 48:22 49:1
89:16,20 131:6,
9 177:8,12
211:5,8,11
214:8

**techniques**
45:2

**telephone**
139:13 140:14,
25

**telling** 13:3
14:5 53:1 54:25
66:17 67:1
72:5,16 81:25
84:1,5 127:5
161:7 167:21

**tells** 67:7
111:24 112:5,
10 141:18

**ten** 143:12
195:1

**tend** 65:3,7
145:3

**term** 30:11,13
142:16

**terminal**
117:19 160:20

**terminated**
89:12

**terms** 50:10
61:4 98:24
104:10 111:13
187:19

**Terrance**
13:11 121:18,
24 122:7,18
123:8 185:18

**Terri** 118:18,21
119:8 120:16
121:15 185:18

**Terri's** 120:2

**territories**
98:21

**territory** 99:20

**test** 21:3 67:9
71:18 72:4,16

**tested** 133:11

**testified** 8:15
87:23 192:2,4,7
196:13

**testify** 12:22
16:8 88:1
191:3,7,11

**testifying**
12:19 60:16
88:5 139:11

**testimony**
13:16 43:11
67:17 177:20
178:25 193:8
194:1 196:17,
23 197:18

**Texas** 6:11,22,
25 7:3,10,14
8:6,8,10 31:8
146:18

**that'll** 9:8,12

**thing** 12:12
27:5 72:8 82:4
91:3 93:19 94:2
96:22 99:25
102:8 103:15
112:16 115:7
122:16,17
130:9 142:19

145:1 147:22
148:5,14 157:2
190:15 196:12
202:4,18
209:10

**things** 11:2,3
12:5 21:17
57:1,3,5,19
58:3 66:21
88:19 93:1,2
97:14 106:7
128:19 142:20
148:20 172:13
184:23 195:24
206:23

**thinking** 44:20
99:6 104:7,9
110:9 111:13
184:24 193:12
196:3 197:7,11
198:8

**thinks** 202:5

**thought** 45:16
76:6,8 91:16
103:4 127:5
160:5 169:25
170:2,3 187:11,
14 206:6

**thousand**
209:13

**threaten** 50:22

**throat** 86:11

**thrown** 57:3

**ticket** 189:17
190:4,6,9

**tie** 205:14

**tied** 204:21,23
205:4

**time** 6:7 9:16
10:22 11:1
15:1,10 16:6
19:25 20:11,14
21:10 22:11,24
26:12 30:12,21
32:9 48:23 49:4
53:10,25 55:22
57:14,21 60:4,
14,20 68:23
69:18,21 76:7

77:18,19 87:16,
17 89:13,17,23
97:2 102:20
105:13 107:13
108:5,10,22,24
111:4 112:8,17
114:1 116:17,
21,25 117:12,
13,15,20 118:1,
4,5 119:10
122:7,10
124:18,23
126:3,5 128:15
131:5,7,12
140:14 141:7
142:7,17
146:11 150:20
151:8 156:20
158:7 159:1,8
165:9,13 168:4,
6,7 169:2,19
177:9,15
178:11 180:15
183:1,4 184:12,
18,24 186:12
187:2 188:2
192:1 193:12
206:6 211:9,14,
17,21,23
212:19 214:11

**times** 14:9
45:19,22 66:18
78:17 88:17
90:20 98:2
116:16,18
182:3 191:4

**timing** 129:15

**titles** 208:20

**today** 6:6 8:21
9:9,20 10:2
12:19,23 13:13
16:4,8,11,15
25:18,19 49:4
89:23 95:8
104:2 121:11
124:3,8 131:12
132:24 133:9
139:18 145:19
161:18 164:17
177:15,21
183:13 184:9
185:9 186:2
192:1 194:2
203:22 204:4,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

14,16 205:16
206:2,10,14,17
207:4 211:14,
17

**today's** 13:5

**told** 63:7 69:22
70:2 71:19
72:25 74:16
81:11 82:14,17
92:24,25 93:5
103:12,16
111:18 114:22
129:2,10
130:12 133:25
134:9 142:3
161:9 167:7,20
169:24 170:3
172:5 183:16
197:6

**ton** 40:25

**Tony** 129:2
130:14 133:25
134:2,3,4,6,7,
10,13 135:4

**Tony's** 134:9

**Tonya** 137:8

**top** 16:13 37:13
68:6 79:14
119:6 131:25
132:15 135:23
147:13 151:20
182:22 185:24
200:13

**total** 156:18,20
194:12 198:16

**totally** 146:5

**town** 132:21

**toxic** 86:19

**track** 98:13

**tracked** 98:18
99:3

**traffic** 189:17
190:4

**trailer** 116:9

**train** 50:15

**trained** 26:25
41:20,24 42:3

43:17 44:10
45:13,18,24
46:5,10 47:4,
21,24 48:3
49:23 50:23,25
51:1 57:24
60:12 75:12
170:24

**training** 21:10,
13,17,18 22:4
41:10,14,15,16
42:16 43:12,19,
24 44:3,7,18,24
45:1,8,11
46:15,21,25
47:10,16 48:7,
10 49:6,9,11,
17,19,20 50:1,
3,6,11 52:12
57:18 58:2,6,22
59:9,13,15 66:5
76:12 83:18
146:13,20,24
147:2

**trainings**
26:12 27:2
41:17

**transcript**
195:16 212:8,
15

**transcripts**
13:6,14,15,18,
20 14:1

**transfer** 21:14

**transferred**
109:17

**transitioning**
25:16 102:6

**Transmountai**
**n** 99:16

**transpire**
155:18

**transport**
144:6,8

**transported**
35:7 163:24

**treated** 170:25

**trial** 139:12
169:15 192:5,

10,16,21 207:2
211:21

**trials** 13:21
140:17 184:20,
25

**trigger** 109:3

**trouble** 70:23
187:7,9

**true** 27:10
29:12,23 38:17
44:9 51:19
61:13 62:9
71:17,21 78:21,
22 88:8 98:21
99:1 110:12
130:4 159:16
171:2 173:20
191:17 205:23
206:1 207:6

**truth** 66:8,14,
17 79:5 191:10

**truthful** 177:20

**truthfully**
12:19,23

**Tschirhart** 7:1
8:1 33:1,5
166:7 211:22
212:18 213:15,
16,20,22,25
214:2

**tunnel** 26:25

**turn** 34:20
44:25

**turned** 64:21
123:21

**tying** 205:7,11

**type** 53:7 56:9,
10,11 75:5 81:9
117:9 118:8,13
154:10

**typed** 56:7
61:5,7 80:25
81:1,2,11,18,19
116:24 167:9

**types** 79:3

**typical** 20:7
148:8

**typically** 51:3
52:21 54:8
55:25 56:1,12
61:13 76:21
77:20 179:12

**typing** 56:9
57:15 81:20
116:22 117:8

———————

**U**

**uh-huh** 9:12
43:8 45:12 56:5
89:5 91:2 93:3
123:6 151:23
202:15

**ultimate** 35:8

**ultimately** 65:4
79:10 163:20
167:25 168:1
189:21

**unable** 70:11

**unbiased**
27:21,24

**under-** 65:10
160:25

**undersigned**
132:16 136:21
137:8,16

**understand**
10:18 30:14
42:6,7,8 64:4
65:10 83:1
92:17 99:18
121:8 126:13
144:25 203:5
206:12

**understanding**
36:9 38:1 41:5
63:18 65:2
76:15 98:15
164:23

**understood**
9:24 21:24
49:25 64:4,13
72:1 197:10
198:15,20

**unexpectedly**
38:16

**unfair** 189:2

**unfolded**
112:3

**unhandcuffed**
86:5

**uniform** 19:13

**uniformed**
19:12

**unit** 22:23 23:4
80:21 97:24
117:18

**United** 6:10

**units** 23:3

**University**
24:22 25:25

**untrue** 66:21

**unusual**
159:24 160:2

**upper** 182:2

**uppers** 100:15

**utterance**
38:14,23

———————

**V**

**V-A-L-L-E-S**
125:18

**VA** 207:22

**vaguely** 97:23
163:14

**Valdez** 125:11,
17

**Valles** 125:16,
17,18 126:3,23
129:17,20
185:16,19

**Varrio** 97:17

**vehicle** 115:13
151:12,16
162:7 190:7
204:23 205:3

**vehicles**
208:16,20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

vendor 212:23

verbal 152:12

verbally 9:11
107:5 152:14,
17

verify 74:15

version
186:13,14

versus 6:9
195:25

Veterans
25:13,14
207:22

viable 102:15,
19,21,22,23
103:2,4

victim 98:24
132:20 200:25
201:4

victims 95:20
108:5 123:17
163:2,5,9
175:17

video 6:1,2
7:15,22 8:2
48:22 49:1
89:16,20 131:6,
9 177:8,12
211:5,8,11
213:24 214:8

videoconferen
ce 6:8 49:3
89:22 131:11
177:14 211:13

videos 14:17

view 196:10

viewed 196:9

Village 172:21
176:22

Villegas 6:9,18
8:19 13:24 96:2
116:1 135:21
149:11 154:13,
18 155:6,11
156:10 164:24
166:19 167:20
171:6 180:8

193:17 204:17
205:8,11,14
206:3,10,15,17

Villegas's
13:21 101:25
102:13,18
103:1 113:20
114:17 139:6,
12 156:19
185:12 192:4,
10

Vinson 118:19,
21 119:8
120:16 137:8
185:18

violate 76:1

violation 38:21

violence 86:14

vision 27:1

visit 40:13

VLH 126:18

VNE 97:17
175:18

vocal 152:2,3

voice 9:11

voluntary
68:19

vulnerability
76:12

———————

W

wait 54:14
83:16 143:22,
23

waited 143:11,
16

waiting
114:14,15

walking 163:9

walkway 90:14

walkways
90:13

Wally 6:17 8:18
48:17 59:1 64:7

94:8 130:23
159:6 165:25
166:8 173:6
180:4

Walmart 26:2

wanted 16:2
23:3 28:9,12
34:4 39:15
54:25 58:14,20
77:4,16 84:9
99:2 114:20
128:24 144:20
160:4,7,12
174:13 190:3,
11 209:13

wanting 178:8

warning 68:21,
24 69:5,6,19

warnings
29:12,21 39:9
40:1 41:7
110:18 150:12,
16,19 160:16

warrant 114:7,
11 148:9
149:13 159:14
187:8 190:5,13

ways 81:4

weapon
133:13 135:5
176:12 204:20
205:3

weapons
137:16 145:3

weeks 132:21
171:7,10
210:16

weird 115:7

well-known
200:15

west 6:4 19:18
154:2

Western 6:11

Whataburger
188:5,17

whatsoever
84:14 186:1

white 176:4

whoever's
169:8

wife 208:4,5,19

Williams 13:10
95:18 103:8,9
116:3 141:6
149:9 159:2,9,
19 171:25

Williams's
149:10 183:20

Wilson 100:24

withheld
142:14,15

withhold 73:9

witnesses
18:24 27:13
66:8,10,12,13
67:5 70:6,11,
13,19,23 71:1,
20 72:4 83:21
141:12 163:7,9
170:5 178:7

words 74:19
161:4 170:14

wore 19:12

work 17:21
20:18 24:19
25:22,24,25
52:13 54:21
84:20 90:3
91:9,13 92:21
100:16 208:5

worked 20:5,
20 24:21 40:23
79:4 90:17
91:6,18,20,21
100:12,23

worker 208:6

working 20:13
25:12 85:19
91:25 113:9
117:20 207:4

workload
57:17 58:12,20

world 58:11

worried 95:4
136:22

worse 47:25

worth 209:22

wrap 173:15
211:3

wrapped 176:4

Wren 153:23

write 56:14,17
58:23 59:10,23,
25 60:13,21
107:7,8 122:16
162:19 177:3
189:17

writes 201:22

writing 37:21
58:3 74:24
117:14

written 63:14
64:1,25 68:17,
19 81:17 136:2
162:8 167:13
174:5,21
175:10,24
176:12 189:21
190:16

wrong 26:21,
23 27:6 90:15
110:9 161:19
162:8

wrote 53:10
190:8

———————

Y

year 17:13 24:5
87:11 208:13

years 10:21
15:1,8,13,17
16:25 17:11,13
19:23 22:19
24:23 25:4,7
93:24 100:5
106:16 120:5,6
170:13,17,19
184:18 185:3
189:12 195:1
196:22 206:22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 842 of 1026
The Deposition of Scott Gravis, taken on July 28, 2022
243

**yelled** 175:17, 18

**York** 16:18

**you-all** 153:16

**younger** 25:25

**youth** 30:8,11 31:14,23 32:10, 19 33:13,22 34:7,13,21 77:12

---

**Z**

---

**Zachary** 6:3 8:5

**zoom** 186:8



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

# ATTACHMENT 2-D

```
============================================================================
                  E L   P A S O   P O L I C E   D E P A R T M E N T
H3                            SUPPLEMENT REPORT
============================================================================
Reported Date: 04/10/93  Time: 19:05          Case: 93-100037    Page: 1
Code: DU AD              Crime: DEATH UNATTEN  Class: 010101
Occurrence Date: 04/10/93-       Day: SATURDAY -           Time: 00:15-
Status:           Clearance:            Closing Officer:
Location: 10000 ELECTRIC AV., EP                          RD:    64
          DITCH AREA EAST O/ROAD /MURDER
======================= NARRATIVE ==========================================
```

OFFENSE:Capital Murder
COMPLAINANT NAME:  Robert England
ADDRESS:  Deceased

SUPPLEMENT DATE:  4/22/93
SUPPLEMENT TIME:  7:15 AM
 OPERATOR'S ID#:  314

Undersigned upon reviewing this case requested that Rodney Williams be brought
to the Youth Services Division for additional information.  It was determined
that Williams was indeed in the car, when the shooting occured.  It was learned
from Williams that there were no other persons involved in the shooting but
refused to give any other details.  Statements support Williams involvement in
this case, through positive identification by witness who observed Williams
with the other parties involved.
Williams had been advised of his rights by undersigned and signed a Juvenile
Warning but refused to give a statement.
Based on information and investigation undersigned felt enough probable cause
existed to charge William with the offense.
Williams was turned over to Juvenile Probation Department along with up to date
copy of the case.

INVESTIGATION CONTINUES...

TO ... ... ... ONLY
CERTAIN ... ... ... TO
NONDISCLOSURE ... ... TEXAS
OPEN RECORDS ACT (2252-17a V.A.C.S.)
DATE:          BY:              TO:

```
============================================================================
          S t a n d a r d   T r a i l e r 1  -  F i r s t   P a g e
============================================================================
Reporting Officer: MARQUEZ                        Date: 04/10/93  Time: 19:05
       Typed by: 314                              Date: 04/22/93  Time: 07:10
Approving Officer: MARQUEZ       Number: 000314   Date: 04/22/93  Time: 07:23
```

0000442

VILLEGAS JS 030406

```
===============================================================================
                E L   P A S O   P O L I C E   D E P A R T M E N T
H3                            SUPPLEMENT REPORT
===============================================================================
Reported Date: 04/10/93  Time: 19:05           Case: 93-100037    Page: 1
Code: DU AD              Crime: DEATH UNATTEN    Class: 010101
Occurrence Date: 04/10/93-          Day: SATURDAY -          Time: 00:15-
Status:              Clearance: A      Closing Officer: C00048 MACIAS
Location: 10000 ELECTRIC AV., EP                           RD:   64
          DITCH AREA EAST O/ROAD /MURDER
======================= NARRATIVE =============================================
```

TIME: 10:10 AM                    OFFENSE:CAPITAL MURDER
DATE: 5/5/93                      COMPLAINANT NAME:ROBERT ENGLAND
PAGE: 1                           ADDRESS:DECEASED


PRESENTATION SUPPLEMENT

        SUBJECT:MARCOS GONZALEZ
           AGE:17        DOB:1/1/76
        ADDRESS:5700 WREN
          CHARGE:CAPITAL MURDER
     WARRANT #:M93-04968     JUDGE:MC-2B
   DATE ISSUED:4/22/93      BOND:100,000.
           POA:5700 WREN
           DOA:4/22/93
      BOOKING #:310141    EPPD:269362
      RAP SHEET:NONE
   HISTORY SHEET:NONE
           NCIC:NONE   DATE:     #:
      IN CUSTODY:  (X) YES  () NO
        EVIDENCE:NONE

   SUBJECT: DANIEL VILLEGAS (JUVENILE)
   AGE: 15
   ADDRESS: 5700 WREN
   CHARGE: CAPTIAL MURDER
   IN CUSTODY:YES

   SUBJECT: RODNEY LEROY WILLIAMS (JUVENILE)
   AGE: 15
   ADDRESS" 5700 WREN
   CHARGE: CAPITAL MURDER
   IN CUSTODY: YES

TO LAW ENFORCEMENT AGENCY ONLY
CERTAIN ELEMENTS OF THIS DOCUMENT SUBJECT TO
NONDISCLOSURE IN ACCORDANCE WITH THE TEXAS
OPEN RECORDS ACT (6252-17a V.A.C.S.)
DATE:          BY:          TO

THIS CASE IS BEING PRESENTED TO THE COUNTY/DISTRICT ATTORNEY FOR DISPOSITION.

THIS CASE ALONG WITH A COPY OF THE CASE #93-100039 WILL BE PRESENTED TO BOTH
THE COUNTY AND DISTRICT ATTORNEYS OFFICE AS IT INVOLVES TWO JUVENILES AND ONE
ADULT.
IT SHOULD BE NOTED THAT THE MASTER CASE WILL BE 93-100037 WITH THE COMPLAINANT
BEING ROBERT ENGLAND.
THIS CASE IS BEING CARRIED BY THIS OFFICE AS CLEARED BY ARREST.

CLEARED BY ARREST....

```
===============================================================================
          S t a n d a r d   T r a i l e r 1   -   F i r s t   P a g e
===============================================================================
Reporting Officer: MARQUEZ                    Date: 04/10/93  Time: 19:05
         Typed by: 314                        Date: 05/05/93  Time: 10:09
Approving Officer: MARQUEZ    Number: 000314  Date: 05/05/93  Time: 10:26
```

0000461

*Statement of:* **Rodolfo Flores**          *Case No: 93-100037*

## EL PASO POLICE DEPARTMENT
### CRIMES AGAINST PERSONS SECTION

### WITNESS STATEMENT

Offense: Capital Murder
Complainant: Robert England
Address. Deceased

---

**This STATEMENT was given voluntarily to: Det. Alfonso Marquez #314**

**of the EL PASO POLICE DEPARTMENT by: Rodolfo Flores**

**Address: 10269 Shenendoah          Phone # 757-6411**

**Employment:          Phone #**

**DOB: 9/9/77     SSN:     DL#     State:**

**Other data:**

**Time: 5:53 PM                    Date: Wed, Apr 14, 1993**

---

My name is Rodolfo Flores and I live at 10269 Shenendoah. Right now I am in the Crimes Against Persons Office where I am giving this statement to Det. Alfonso Marquez. This statement is about a shooting that happened on Electric Street on Saturday morning. This was where two guys were killed. I knew both of the guys that got killed, but the only one that I used to talk to was Robert England. I did know Armando Lazo, but I did not talk to him. I have been asked what I did on Friday the night before they got shot. I was with Jose Juarez, Ben, whom I don't know his last name, and Betty, whom I don't know her last name either, and we were at Melissa Balli house, on Sun Valley. We left the house around 11:00 PM, and dropped of Ben on Jamaica Street. Going to Jamaica we drove up Fairbanks, and made a U-turn and went onto Jamaica. We noticed that there was a party on Jamaica, and there were some people out in the middle of the street. We just passed by them and they looked at us. We were in Jose Juarez's car, which is a Green Pontiac Grand Prix. The car is a two door and is dropped, and it had a dent on the passenger side of the door. We then drove up to Trans Mountian and got on the freeway towards Cohen stadium.
We then went to drop off Betty who lives in the Central area of town, on McConnnel street. She lives in some apartments. We then went and got some gas, and drove back home. We then got back on the freeway, and got off on Trans-Mountain and went east on Trans-Mountain till we turned on Electric street, I remember looking at the clock in the car, and it read 12:15-12:20 AM. I did not see any ambulances, police, or anybody in the street. I did not see any body in the area.
From Electric street it is only about 1 to 2 minutes to get to my house.

VILLEGAS LS 020411

*Statement of:* **Rodolfo Flores**          *Case No: 93-100037*

## EL PASO POLICE DEPARTMENT
### CRIMES AGAINST PERSONS SECTION

### WITNESS STATEMENT

Offense: Capital Murder
Complainant: Robert England
Address: Deceased

I then went inside and went to sleep. I did not hear any gun shots that night.
On Saturday the next day at about 10-11 in the morning, Officer McDaniel came to my house and asked me if I knew anything about the murders. I told him that I did not.
I used to be in LML (LOS MIDNIGHT LOCOS) but I have quit the gang.
I then went to Abraham Chacon's house which is on Ajax street. There I talked to Rick Martinez, when he drove up with his wife and baby. I asked him if he had heard about the shooting on Electric. He said no, and then I told him that the Detectives had been to my house. He then asked me "What did they tell you?", Did they ask you anything about me". I told him no. He then said "I'm the one that shot at them." I was going to ask him some more about the shooting but his wife showed up and he got in the car. He did not tell me who was with him. I was at Abrahams house when Rick called and told Abe that he wanted to drink some beers, but that he did not want to drink at his apartment cause the Police were watching his apartment and he did not want to be questioned by them. That he would bring some beers later.
I have been asked if Rick owns any guns and he does. I know that he has alot of guns, but sometimes he trades or sells them.
Rick Martinez lives in the Village Green apartments but I don't know the number of the apartment.
I want to say that I am not lying about Rick telling me that he shot at the guys on Electric, and I want to say that I had nothing to do with the shooting or death of either Robert England or Armando Lazo.
I HAVE READ THE ABOVE STATEMENT CONSISTING OF TWO PAGES AND EVEN THOUGH IT IS NOT IN MY EXACT WORDS I FIND IT TO BE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Signed Rudy FLORES

Witness _____

4-14-93

DWAIN JOHNSON
NOTARY PUBLIC
My commission expires 2-10-94

0000762

VILLEGAS-JS-030412

```
===========================================================
                E L   P A S O   P O L I C E   D E P A R T M E N T        EXHIBIT
H3                        SUPPLEMENT REPORT                               50
===========================================================
Reported Date: 04/10/93  Time: 23:47          Case: 93-101016      Page: 1
Code: 19.02ATT PC        Crime: ATTMPT MURDER  Class: 000001
Occurrence Date: 04/10/93-        Day: SATURDAY -          Time: 23:45-
Status:            Clearance:         Closing Officer:
Location: 10200 SHENANDOAH ST., EP                          RD:    64
```

```
===========================================================
                      NARRATIVE
===================WITNESS/SWORN/STATEMENT=================
COMPLAINANT:
ADDRESS:                                        JUVENILE
-----------------------------------------------------------
THIS STATEMENT GIVEN VOLUNTARILY TO: OFFICER ART PEREZ #922
of the EL PASO POLICE DEPARTMENT BY: RODOLFO FLORES
SOCIAL SECURITY_#:UNK
ADDRESS: 10269 SHENENDOAH -
DOB: 9-9-77
HOME PHONE NUMBER:757-6411
WORK PHONE NUMBER:  N/A                    DUPLICATED FOR QUALITY
DRIVER'S LICENSE:   NONE
DATE & TIME:  APRIL 11, 1993 0130 HRS.
-----------------------------------------------------------
```

My name is RODOLFO FLORES AND I AM 15 YEARS OLD AND I HAVE RECIEVED PERMISSION
FROM MY PARENTS TO GIVE OFFICER PEREZ A STATEMENT REFERENCE A SHOOTING THAT
TOOK PLACE ON SATURDAY AT APPROXIMATELY 11:30PM.  I AM CURRENTLY AT THE
NORTHEAST POLICE STATION GIVING OFFICER PEREZ THE STATEMENT REFERENCE THE
INCIDENT.  MYSELF, ABE, MIKE AND EDDIE WERE GOING TO A PARTY ON SHENENDOAH
STREET. ON THE WAY TO THE PARTY WE DROVE DOWN BLOSSOM AND NOTICED TWO GUYS
SITTING IN A TRUCK THAT WAS PARKED NEXT DOOR TO THEIR HOUSE.  AS WE WERE PASSING
BY, THEY PULLED OUT A 12 GUAGE SHOTGUN AND EDDIE GOT MAD.  WE PARKED AT THE
PARTY WHICH WAS RIGHT AROUND THE BLOCK FROM WHERE WAYNE AND LARRY WILLIAMS
WERE.  EDDIE STOOD IN THE CAR AND I WENT TO GO TALK TO WAYNE AND LARRY.  WHEN I
WAS SHOWING UP, THEY PULLED OUT  THE GUNS BECAUSE THEY THOUGHT I WAS EDDIE.  I
STARTED TALKING TO WAYNE AND LARRY.  ABE, MIKE AND EDDIE HAD LEFT BECAUSE ABE'S
MOM WANTED THE CAR BACK BY 11:00.  WHILE I WAS TALKING WITH WAYNE AN LARRY, I
SAW ABE, MIKE AND EDDIE DRIVE BY CERMAC.  I GUESS ABE'S MOM DROPPED THEM OFF AT
THE PARTY AND THEY FILLED UP THEIR CUPS.  AFTER THEY FILLED UP THEIR CUPS, THEY
STARTED WALKING DOWN SHANENDOAH THEN BLOSSOM WHERE i WAS AT.  THEY ALL GOT
WHERE I WAS AT WITH WAYNE AND LARRY AND EDDIE ASKED WAYNE, WHY ARE YOU ALWAYS
PULLING OUT GUNS AT ME, AND HE TOLD LARRY, "YOU TOO PUNK, WHY ARE YOU ALWAYS
PULLING OUT GUNS AT ME".  THEN LARRY WENT TO HIS TRUCK AND TRIED TO GET HIS 12
GUAGE.  EDDIE SLAMMED THE DOOR ON HIM AND WAYNE PULLED OUT A 357 HANDGUN OUT OF
HIS POCKET AND STARTED SHOOTING AT ABE, MIKE AND EDDIE.  MIKE GOT AWAY AND HE
RAN TO MY HOUSE WHICH IS RIGHT DOWN THE STREET ON SHANENDOAH.  I WAS ALREADY ON
THE CORNER OF CERMAC AND BLOSSOM WHILE THE SHOTS WERE BEING FIRED. . I RAN TO MY
HOUSE AND MIKE MET ME THERE.  WHEN WAYNE STARTED SHOOTING, I HEARD EDDIE SAY
"AHH" AND HE FELL.  I AM POSITIVE THAT WAYNE IS THE ONE WHO FIRED THE GUN THAT
HIT EDDIE AND ABE.  BEFORE EDDIE, ABE AND MIKE SHOWED UP, WAYNE AND LARRY HAD
SHOWN ME A 357, A 38, A 45 AND A 12 GUAGE SHOTGUN WHICH THEY HAD ASKED ME IF I
WANTED TO BUY A GUN.  AFTER THE SHOTS HAD BEEN FIRED AND WHILE I WAS ON THE WAY
HOME I HEARD THE COPS.  ME, MIKE AND MY SISTERS BOYFIREND JOSE, WENT BACK DOWN
THE STREET WHERE THE SHOOTING TOOK PLACE AND TOLD THE POLICE WHAT HAD HAPPEN.
THE POLICE THEN TOOK ME TO THE NORTHEAST POLICE STATION.  I WOULD LIKE TO SAY
THAT I WAS THERE WHEN THE SHOOTING WENT DOWN.  I SAW WAYNE SHOOT EDDIE THEN ,

```
===========================================================
          S t a n d a r d   T r a i l e r 1 - F i r s t   P a g e
===========================================================
Reporting Officer: PEREZ        Number: 000922  Date: 04/10/93  Time: 23:47
        Typed by: 922           Number: 922     Date: 04/11/93  Time: 01:26
Approving Officer: ROUNTREE     Number: 000443  Date: 04/11/93  Time: 03:36
```

```
==================================================================
h2                    CONTINUED FROM PREVIOUS PAGE
==================================================================
Reported Date: 04/10/93  Time: 23:47    Case: 93-101016    Page: 2
Code: 19.02ATT PC        Crime: ATTMPT MURDER    Class: 000001
```

SHOOT AT ABE POINTING AT HIM AT ABE'S HEAD.  I THOUGHT HE HAD SHOT ABE ON THE
HEAD.  WAYNE WENT CRAZY AND WAS SHOOTING EVERYWHERE.  LATER I FOUND OUT THAT HE
HAD EVEN SHOT HIS BROTHER LARRY ON HIS FOOT OR HIS LEG.  I KNOW WAYNE VERY WELL
BECAUSE I USED TO GO TO SCHOOL WITH HIM.  I WAS CLOSE ENOUGH TO SEE WAYNE SHOOT
ABE AND EDDIE AND I HAVE NO DOUGHTS AS TO WHO DID THE SHOOTING.
I HAVE READ THE ABOVE STATEMENT AND FIND IT TO BE TRUE AND CORRECT TO THE BEST
OF MY KNOWLEDGE.

_____

                Subscribed and sworn to before me, the undersigned authority,
                on this _____ day of _____ 19_____.

_____

WITNESSES:

_____

_____

**DUPLICATED FOR QUALITY**

# JUVENILE

```
==================================================================
            T R A I L E R 2  -  C o n t i n u a t i o n   P a g e
==================================================================
Reporting Officer: PEREZ       Number: 000922  Date: 04/10/93  Time: 23:47
         Typed by: 922         Number: 922     Date: 04/11/93  Time: 01:26
Approving Officer: ROUNTREE     Number: 000443  Date: 04/11/93  Time: 03:36
```

```
========================================================================
              E L  P A S O  P O L I C E  D E P A R T M E N T
H3                        SUPPLEMENT REPORT
========================================================================
Reported Date: 04/10/93  Time: 19:05    Case: 93-100037    Page: 1
Code: DU AD          Crime: DEATH UNATTEN    Class: 010101
Occurrence Date: 04/10/93-     Day: SATURDAY -        Time: 00:15-
Status:       Clearance:        Closing Officer:
Location: 10000 ELECTRIC AV., EP                      RD:   64
          DITCH AREA EAST O/ROAD /MURDER
===================== NARRATIVE ========================================
==================WITNESS/SWORN/STATEMENT==============================
COMPLAINANT:  ROBERT ENGLAND
ADDRESS:    DECEASED
------------------------------------------------------------------------
```

THIS STATEMENT GIVEN VOLUNTARILY TO:   DET. JOE E. LAREDO JR#824
of the EL PASO POLICE DEPARTMENT BY:  FRANCISCO JAVIER FLORES
SOCIAL SECURITY #:  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
ADDRESS:   10269 SHENANDOAH
DOB: 09/20/72
HOME PHONE NUMBER:  757-6411
DRIVER'S LICENSE:  NONE
DATE & TIME:   APRIL 14,1993      4:25 PM
------------------------------------------------------------------------

My name is Francisco Javier Flores, and I am 20 years of age. I live with my
mother, Teresa Flores, my sister Araceli Flores who is 18 years old and my
younger brother, Rudy Flores who is 15 years old. We live at 10269 Shenandoah
in northeast El Paso. I attended high school up until the tenth grade, I do
know how to read and write the English language.

I am at the El Paso Police station giving this statement to Det. Laredo of my
own free will. The statement is about what I know about the shooting that
happened by where I live.

I want to start by saying that I used to belong to the LML gang, but I no
longer run with them. I'm known as Dirt around the neighborhood and most of my
friends know me by that nickname.

Det. Laredo has asked me what I did Friday, Good Friday this past weekend. In
the afternoon I walked to Fernnie Samanaigo's house at 10112 Shenandoah. From
there Fernnie, his sisters' Betsy and Jannet, Alex who they call Pickle, Jesus
who's last name I don't know and Ricardo, who last name I don't know went to a
going away party at the Arrowhead apartments on Dyer. The ones that are right
in front of Arby's. I think that the guy's name is James, the one that had the
apartment there, I really don't know him he was Jannet's friend. Ricardo had
picked us up in his brown Ford LTD. It is dark brown, light tinted windows, I
think it's a four door.

We all got to the party at about 5, 5:30. We stayed there playing basket ball
and swimming. Ricardo and Betsy left the party about 9 - 10 o'clock, I think
that they went home. The ones that stayed at the party were, Betsy, Fernnie,
Jesus, Alex, Hector Contreras and his wife Liz who had arrived at the party on
there own, and James and his brother who's name I don't know. At about 11:50,
or so, Fernnie called his mom to come pick us up. She got there at about mid-
night and she drives a small red Toyota Corona. She picked us up, it was
Fernnie, Jannet, Alex, Jesus and myself and she took Jesus home first. He
lives somewhere around Bradley Elementary school, and then she took me home

```
========================================================================
          S t a n d a r d    T r a i l e r 1 -  F i r s t    P a g e
========================================================================
Reporting Officer: LAREDO        Number: 000824  Date: 04/10/93  Time: 19:05
     Typed by: 824               Number: 824     Date: 04/14/93  Time: 16:19
Approving Officer: LAREDO        Number: 000824  Date: 04/14/93  Time: 16:53
```

000007633

Case 3:15-cv-00386-DCC   Document 386-2   Filed 05/26/23   Page 851 of 1026

Reported Date: 04/10/93   Time: 19:05                Case: 93-100037        Page: 2
Code: DU AD                    Crime: DEATH UNATTEN       Class: 010101

xt. I would say I got home at about 12:30, my mother was the only one at
home at the time and she was watching TV. She asked me if I had been drinking
that day and I told her that I hadn't because I was Good Friday. I went
straight to bed after that.

Det. Laredo has asked me where Rudy was and as far as I know he was with a girl
name Malisa, who lives on Sun Valley, my sister Celi and her boyfriend Jose
Juarez. I don't know where they were but I know for a fact that they weren't
home when I got there. I don't know what time they got home either. If they
were together they were in Jose's car the green Gran Prix, it's an 80's model,
the smaller kind.

The guys that were killed I knew, I used to talk to them in Juarez and I never
had any problems with them. They used to tell me abut my little brother, that
the thought that he was bad shit. The only reason that I would say that Rudy
hated these dudes was because they wore ECH gang members and Rudy is supposibly
a hard core LML member. I know that my brother crashed his car into the ECH
gang members one time, but it wasn't the dudes that were killed. ECH one time
shot at my house because of my little brother Rudy. That is about all I know
about what happened.

I HAVE READ THE ABOVE STATEMENT AND FIND IT TO BE TRUE AND CORRECT TO THE BEST
OF MY KNOWLEDGE.

x Frank Flores

Subscribed and sworn to before me, the undersigned authority,
on this ____ day of _____ 1993.

WITNESSES:

_____

_____

DWAIN JOHNSON

My commission expires 2-10-94

Reporting Officer: LAREDO          000 76824      Date: 04/10/93   Time: 19:05
     Typed by: 824                               Date: 04/14/93   Time: 16:19
Approving Officer: LAREDO          Number: 000824  Date: 04/14/93   Time: 16:53

VILLEGAS IS 030416

```
===================================================================
          E L   P A S O   P O L I C E   D E P A R T M E N T
H3                      SUPPLEMENT REPORT                        *
===================================================================* =====
Reported Date: 04/10/93  Time: 19:05      Case: 93-100037     Page: 1
  ●e: DU AD              Crime: DEATH UNATTEN   Class: 010101
  ●currence Date: 04/10/93-        Day: SATURDAY -        Time: 00:15-
Status:                 Clearance: A       Closing Officer: C00048 MACIAS
Location: 10000 ELECTRIC AV., EP                              RD:   64
         DITCH AREA EAST O/ROAD /MURDER
======================== NARRATIVE =================================
                    OFFENSE:CAPITAL MURDER
            COMPLAINANT NAME:   ROBERT ENGLAND
                    ADDRESS:   DECEASED
```

SUPPLEMENT DATE:5/5/93
SUPPLEMENT TIME:  10:30 AM
 OPERATOR'S ID#:  314

Undersigned on 4/10/93 was called by Sgt. Johnson at approximatly 1:00 AM, and
advised to proceed to the 10000 block of Electric on a double shooting, in
which one of the victims had expired and the other had been taken to a local
hospital.
Upon arrival at the location at approximatly 1:20 AM, undersigned was met by
Det. Arbogast, who was already at the scene.  He advised that a drive by
shooting had occurred and that it had involved four victims two of which had
been shot.  He also advised that the two remaining persons that had been shot
at were seated in separate patrol cars.  It was also learned that one of the
victims later identified as Armando Lazo, had managed to make it to a residence
and asked for help.  He had been transported to RETGH.  The other victim
identifed as Robert England had expired at the scene.
●ersigned viewed the covered body of Robert England at a distance.
●dersigned was then instructed to take the witnesses who had been with the
●ictims at the time of the shooting to the C.A.P. office for interviews and
statements.
Undersigned took a statement from a Jesse Hernandez, of 5504 Pembroke Phone
#755-1799, who had been with the victims on the night of the shooting.  In his
statement he advised that the victims Robert England, Armando Lazo, Adrian (
Jesse's brother) Mark and Hector Ochoa, who live at 10024 Goliad, and Juan
Medina, of Chaparral New Mexico, had been at a party on Jamaica street.  That
Adrian, Mark, and Hector, had left the party and did not return to pick the two
victims up, to include Juan Medina, and Jesse Hernandez.  That they decided to
walk home, and were walking east on Woodrow Bean Rd., when they confronted a
vehicle with an unknown number of subjects in the vehicle.  This confrontation
was that of mistaken identity, as they thought it was Jesse's brother, Hector
and Mark.  The vehicle was described as a possible Marron or Red Monte Carlo,
with tinted windows.  He also stated the vehicle had a white vinyl top.
Hernandez stated that then drove off and approached them minutes lated on
Electric street, and began to fire some shots at them.  He remembers only three
shots, at the time, and they all began to run.  He then returned to the scene
and advised the Police at the scene that two of his friends were missing.
Hernandez pointed out a 1976 Chevrolet Caprice as the vehicle from which the
shots had been fired from.  Further investigation revealed that Hernandez was
having problems identifying the vehicle from which the shots had been fired
from.  The vehicle was later said to be a Buick, a Pontiac, after he had picked
out the Chevrolet Capric, from the original Chevrolet Monte Carlo.
●tatement was taken from Juan Medina, who basically related the same
===================================================================
      S t a n d a r d   T r a i l e r 1 -  F i r s t   P a g e
===================================================================
●eporting Officer: MARQUEZ      0000450        Date: 04/10/93  Time: 19:05
       Typed by: 314                           Date: 05/05/93  Time: 10:31
Approving Officer: MARQUEZ       Number: 000314  Date: 05/05/93  Time: 12:24
```

VILLEGAS J.S. 030417

==================================================================
h2      .                    CONTINUED FROM PREVIOUS PAGE
==================================================================
Reported Date: 04/10/93   Time: 19:05          Case: 93-100037      Page: 2
Code: DU AD                Crime: DEATH UNATTEN  Class: 010101

ormation, other than describing the vehicle as a 1970's model Monte Carlo,
goldish in color with tinted windows.  He picked out a 1975 Chevrolet Monte
Carlo.  Statements are attached to the case.
On 4/14/93 a statement was taken from Javier Flores (AKA) Dirt, of the LML gang
(Los Midnight Locos) after information had been received that he and his
brother Rudy Flores (AKA) Dust, may have been involved in the shooting.  It was
determined that Javier Flores (Dirt) had no involvement in the case.  In the
statement given by his brother Rudy Flores (Dust) he indicated that a Rick
Martinez who lives on Ajax street, had been responsible for the shooting.
Martinez was brought into the C.A.P. office and it was also determined that he
was not involved in the case.  Flores was confronted as to to why he had
indicated Martinez as the responsible party, and he stated that he had advised
undersigned that Martinez had been worried that the Police would think that he
may have been involved because of his past history and involvement in gangs
which he too was a member of.
During the entire case undersigned and other investigators were receiving
informatin that Javier and Rudy Flores were responsible for the shooting.
Statement were taken from a Terri Vinson, of 5205 Fairbanks #63, Tonya Vinson
of the same address, Charles Blucher of 5205 Fairbanks #21, a Terrance
Strong Farrar, of 5205 Fairbanks #24, all of which were rumors.  Investigators
were concentrating on the LML gang, and the Flores brothers were two of the
most influential members of the LML gang.
A statement was taken from a Cynthia Talamantes of 3700 Ft. Blvd. who stated
that she had overheard a conversation at Irvin High School, and that an Eddie
had stated that a friend of his had done the shooting.  Eddie was located and
ntified as Eduardo Valles of 3709 Leavell, and he relayed that he had heard
e rumor from another friend of his by the name of Ralph Medina.  Undersigned
ong with assisting investigators checked out the stories, and were proven
agian to be rumors.
A statement was taken from a Gilbert Garcia of 5017 Louis, who relayed the same
information, with negative results.
As a result of investigation the Flores brothers were eliminated from the
investigation as well as Rick Martinez.
Undersigned on 4/15/93, received information that a Robert Hall, of 110
Heinick, Chaparral New Mexico, had relayed to the school pricipal at Gadsden
Jr. High, that a Jacob Jauregui, and a Michael Johnston of Chaparral New Mexico
had been bragging that they were responsible for the shooting with Jauregui,
being the shooter.  A statement was taken form Robert Hall, and also a hand
written report that he had given the principal at Gadsden Jr. High.
Jacob Jauregui, and Michael Johnston were picked up in Chaparral New Mexico,
with the assistance of West Gilbreath of the Dona Ana Sheriffs Department.
Searches were conducted in Chaparral New Mexico, with negative results.
Both Jauregui, and Johnston were interviewed at YSD, and JPD, with the
assistance of Det. C. Ortega of YSD, and both were determined to be bragging
and turned out to be rumors being spread by them.  Johnston gave five
different versions of what had occurred, and each one was different from the
other.  It was determined that both of them were not involved in the case.
On 4/21/93, a statement was taken form a David Rangel, of 8140 Tierra Verde,
who stated that his cousin a Daniel Villegas had told him that he was the one
responsible for the shooting.  The statement and information provided by David
angel was accurate in the nature of the investigation.  Also mentioned were
==================================================================
        T R A I L E R 2  -  C o n t i n u a t i o n   P a g e
==================================================================
eporting Officer: MARQUEZ        0000451        Date: 04/10/93   Time: 19:05
     Typed by: 314                               Date: 05/05/93   Time: 10:31
Approving Officer: MARQUEZ       Number: 000314  Date: 05/05/93   Time: 12:24

VILLEGAS JS 030418

h2                              CONTINUED FROM PREVIOUS PAGE

Reported Date: 04/10/93   Time: 19:05          Case: 93-100037      Page: 3
Code: DU AD              Crime: DEATH UNATTEN   Class: 010101

other individuals that had been with Villegas during the shooting. A hand
written short synopsis of what he was told by his cousin Daniel Villegas as
well as a typed statement were taken from Rangel. Mentioned in the statement
was a Maros Gonzalez, as being the driver of the vehicle involved in the
shooting. Both of these statements are attached to the case.
On same date 4/21/93, statement was taken from a Rodney Williams of 5249 Wren
#201, who stated that he had been in the vehicle that had shot and killed the
victims but that he had not been the actual shooter.
On 4/22/93, as per the statement of Rodney Williams, Daniel Villegas was
picked up and taken to Juvenile Probation Department with the assistance of
Det. C. Ortega, of YSD, and a subsequent statement was taken from him, in which
he implicated himself as the shooter. The statement was accurate as per the
investigation conducted.
On same date 4/22/93, Marcos Gonzalez, of 5700 Wren, was picked up and brought
to the C.A.P. office where he in-turn gave a statement of the accused to Det.
S. Graves, and he implicated himself as being involved in the shooting.
Marcos Gonzalez, was booked in City/County Jail, and Daniel Villegas was
accepted at the Juvenile Probation Department.
Undersigned then re-interviewed Rodney Williams at YSD, and at this point he
stated that he did not wish to give a second statment, as what he had stated
in the first statement was the truth, with the exception that no one else was
in the vehicle besides Marcos Gonzalez, and Daniel Villegas, and if undersigned
wanted to put him in the "Detention Home" to go ahead.
Undersigned presented the entire case at the point of investigation to the
Juvenile Probation Department who accepted the case against Rodney Williams and
was placed in Juvenile Probation Department.
statement was taken form a Fernando Lujan who stated that he was not involved
in the shooting as implicated by the above individuals, and his story was
verified. He did state that he had observed Villegas with a .22 calibre
handgun, (same calibre as used in shooting) in the past and a search warrant
was obtained for the residence of Daniel Villegas with negative results.
Undersigned has not been able to locate weapon used in the commision of the
offense, nor the vehicle in question, and it is felt that the weapon may have
been disposed of, and subjects will not say who's the owner of the vehicle used
in the commission of the offense.
It should be noted that the three subjects arrested in this case are known
members of the VNE gang (Varrio North East) and the victims are known members
of the ECH gang (Eisenhower Crazy Hoods) who are rival gangs, in the North east
area of El Paso.

INVESTIGATION CONTINUES...

====================================================================
         T R A I L E R 2 - C o n t i n u a t i o n   P a g e
====================================================================
Reporting Officer: MARQUEZ      000004514      Date: 04/10/93   Time: 19:05
         Typed by: 314                         Date: 05/05/93   Time: 10:31
Approving Officer: MARQUEZ      Number: 000314  Date: 05/05/93   Time: 12:24

VILLEGAS J.S. 030419

```
================================================================
          E L   P A S O   P O L I C E   D E P A R T M E N T
H3                         SUPPLEMENT REPORT                    *
                                                               *====
================================================================
Reported Date: 04/10/93   Time: 05:14         Case: 93-100039   Pag*: 1
 de: DU AD               Crime: DEATH UNATTEN   Class:
 urrence Date: 04/10/93-        Day: SATURDAY -        Time: 00:15-
Status: AS  ASSIGNED              Closing Officer:
Location: 10000 ELECTRIC AV., EP                       RD:   64
          REF:CASE 93-100037
================= NARRATIVE ====================================
                    OFFENSE:CAPITAL MURDER
          COMPLAINANT NAME:  ARMANDO  LAZO
                   ADDRESS:  DECEASED
```

SUPPLEMENT DATE:  6/1/93
SUPPLEMENT TIME:  1:20 PM
 OPERATOR'S ID#:  314

UNDERSIGNED RECEIVED THIS CASE WITH THE MASTER CASE BEING 93-100037, AND THE
CASE HAS BEEN PRESENTED UNDER THE MASTER CASE.
THIS CASE IS BEING CARRIED AS CLEARED BY ARREST.

CLEARED BY ARREST.



JUVENILE

TO LAW ENFORCEMENT AGENCY ONLY
CERTAIN ELEMENTS OF THIS CASE ARE SUBJECT TO
NONDISCLOSURE IN ACCORDANCE WITH THE TEXAS
OPEN RECORDS ACT (6252-17a V.A.C.S.)     TO:
                                         BY:
DATE:

```
================================================================
       S t a n d a r d   T r a i l e r 1   -   F i r s t   P a g e
================================================================
 eporting Officer:  MARQUEZ    Number: 000314   Date: 06/01/93  Time: 13:20
     Typed by: 314             Number: 000314   Date: 06/01/93  Time: 13:23
Approving Officer: MARQUEZ     Number: 000314   Date: 06/01/93  Time: 13:27
```

0000438

VILLEGAS J.S. 030420

# ATTACHMENT 2-E

CHRONOLOGICAL RECORD

E: Daniel Villegas                                    OFFENSE: Murder, Capitol

.O.B.: 1.4.77                                         E.P.P.D.#: 93 100037

| 4.22.93 | Went back to Detention to speak with Daniel Villegas. |
| 11:15 | With me was Intern Argelia B. I first completed the intake |

packet (made sure everything was answered & filled in) I then
proceeded to ask him his opinion of the incident. He claims
that him & his friends weren't around that area that night.
I asked where he was and if he could produce someone to testify
to him being elsewhere. He said that him & his friends were
at "Negro's" house. "Negro" is a 28 y.o. male who has recently
been let out of prison (pen) approximately 2 years ago. He
repeatedly made mention that his friends were putting the
finger on him even though he didn't do it. He sat there shaking
and looking quite scared. I asked him why he gave a confession
and why he looked scared. He stated that he only gave the
confession because the cops kept harassing him, & he told
them what they wanted to hear. He also stated that he didn't
want to go to the county because he wouldn't make it there.
He became upset when I told him that all confessions and
witness statements made him the shooter. He said he wanted
to talk to his friends and get them to change their stories.
I told him it wouldn't be necessary because he already
confessed to it. I asked him about remaining silent and if he
understood that. He said that the cops read him his rights
but that all he could remember was to remain silent. I said,
"Well why didn't you keep your mouth shut." He responded
with "I was tired and wanted to go back to sleep, so I told
them what they wanted hear."

E: Daniel Villegas

CHRONOLOGICAL RECORD

OFFENSE:

.O.B.: 1-4-77

E.P.P.D.#:

| 4-22-93 contd. | I told Danny that I would let him know what was going on each step of the way. He asked me to tell his mother to get a hold of Bobby Mowad (Morwad) and tell him to come help Danny out. Bobby Morwad is Danny's biological father. His mother never married him. Priscilliano is known to be the biological father because Danny was only 6mos old when his mother married him. Danny says he talks with Bobby about once every three years. He doesn't receive any money from him, but knows that his mother can get in contact with him. Danny asked about visiting hours. Told him his mom would probably be by around 7 pm. as visiting hours are from 7 pm to 8 pm. Also instructed him that his mother had to call Oscar Reyes and ask permission to see him. Oscar was the only one who would give permission. I also instructed him that if he needed to talk to me or ask questions for him to ask if he could talk w/ me and I'd go back and talk with him. |
|---|---|

VILLEGAS J.S. 003765

E: Daniel Villegas

CHRONOLOGICAL RECORD

OFFENSE: Murder, Capitol

.O.B.: 1-4-77

E.P.P.D.#: 93-100037

## Interview with parents

| | |
|---|---|
| 4-23-93<br>9:00 am<br>M. Sotelo | Yolanda Villegas was contacted at 755-1862 at 9:00 am and told to come down to JPD to hold an interview with me. I asked her to bring her husband and she said they'd be down later. |
| 9:40 | Parents arrive hold interview with parents and discussed they their relationship w/ Danny. Danny rarely obeys her/fao. He's usually home around 2-2:30 in the morning on weekends and around 11:30 on weekdays. He usually argues w/ his mother and talks better w/ his dad. Mother claims that he usually physically aggressive towards her. Parents are aware that he is using drugs and is drinking. During counseling sessions he lies to her and tells her that he hasn't had a bit of anything. Parents are worried about the seriousness of the charges against their son. Told them to be here at 6:30 am if not earlier tomorrow morning. |
| 2:15 | Spoke w/ mother. She asked how he was doing. I explained to her that he's okay and would be seeing a doctor for his eye/eyebrow and a tooth ache. She claims that he didn't do it and that he is trying to make himself look big - that is it is all a bunch of lies. |

VILLEGAS J.S. 003766

# ATTACHMENT 2-F

Page 1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

DANIEL VILLEGAS,               )
                              )
        Plaintiff,            )
v                             ) No. 3:15-CV-386
                              )
CITY OF EL PASO, et al.,      )
                              )
        Defendants.           )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEO DEPOSITION OF

PEDRO ANTONIO OCEGUEDA

DECEMBER 13, 2022

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEO DEPOSITION of PEDRO
ANTONIO OCEGUEDA, produced as a witness at the instance
of the Plaintiff, and duly sworn, was taken in the
above-styled and numbered cause on DECEMBER 13, 2022,
from 9:05 a.m. to 10:12 a.m., at the offices of ACR Ink,
221 North Kansas Street, Suite 505, El Paso, Texas,
pursuant to the Federal Rules of Civil Procedure.

Reported by:

Ginger G. Zachary, CSR, RPR, CRR

Pedro A. Ocegueda - December 13, 2022

Page 2

```
 1               A P P E A R A N C E S
 2      FOR THE PLAINTIFF:
            Mr. Russell Ainsworth (via Zoom)
 3          LOEVY & LOEVY
            311 North Aberdeen Street
 4          Chicago, Illinois  60607
            (312) 243-5900
 5          ainsworth@loevy.com

 6

 7      FOR THE DEFENDANT CITY OF EL PASO:
            Mr. Lowell F. Denton
 8          DENTON NAVARRO ROCHA BERNAL & ZECH, PC
            2517 North Main Avenue
 9          San Antonio, Texas  78212
            (210) 227-3243
10          lfdenton@rampagelaw.com

11

12      FOR THE DEFENDANTS EARL ARBOGAST, SCOTT GRAVES,
        HECTOR LOYA, AND RAY SANCHEZ:
13          Mr. James O. "Jim" Darnell
            Mr. James O. "Jeep" Darnell
14          JIM DARNELL, PC
            310 North Mesa Street, Suite 212
15          El Paso, Texas  79901
            (915) 532-2442
16          jdarnell@jdarnell.com
            jedarnell@jdarnell.com
17

18

19      FOR THE DEFENDANT KIMMETT BELLOWS:
            Mr. Eric M. Brittain
            WINDLE, HOOD, NORTON, BRITTAIN & JAY, LLP
20          201 East Main Drive, Suite 1350
            El Paso, Texas  79901
21          (915) 545-4900
            brittain@windlehood.com
22

23

24

25
```

Pedro A. Ocegueda - December 13, 2022

Page 3

1          A P P E A R A N C E S (continued)

2      FOR THE DEFENDANT ALFONSO MARQUEZ:
           Mr. James A. Martinez
3          MOUNCE, GREEN, MYERS, SAFI,
           PAXSON & GALATZAN, PC
4          100 North Stanton Street, Suite 1000
           El Paso, Texas  79901
5          (915) 532-2000
           martinez@mgmsg.com

6

7

       FOR THE DEFENDANT CARLOS ORTEGA:
8          Mr. Andres E. Almanzan
           MOUNCE, GREEN, MYERS, SAFI,
9          PAXSON & GALATZAN, PC
           100 North Stanton Street, Suite 1000
10         El Paso, Texas  79901
           (915) 532-2000
11         almanzan@mgmsg.com

12

13     ALSO PRESENT:
           Video Technician Roger Navarro
14         Ms. Christy Burke

15

16                    INDEX
                                           PAGE
17  PEDRO ANTONIO OCEGUEDA

18     By Mr. Denton                          6

19  Reporter's Certificate                   61

20  Corrections and Signature                62

21

22

23

24

25

Pedro A. Ocegueda - December 13, 2022

Page 4

```
 1                         EXHIBITS

 2   NO.              DESCRIPTION                      ATTACHED

 3   Exhibit 01       El Paso Police Department
                      Personnel Incident Report,
 4                    CP92-296

 5
     Exhibit 02       El Paso Police Department
 6                    Personnel Incident Report,
                      CP92-358
 7
     Exhibit 03       El Paso Police Department
 8                    Personnel Incident Report,
                      CP93-097
 9

10   Exhibit 04       Affidavit of Pedro Ocegueda

11   Exhibit 05       Affidavit of Jesus Terrones

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Pedro A. Ocegueda - December 13, 2022

```
                                                    Page 5
 1               THE VIDEO TECHNICIAN:  Good morning.  This
 2     is the videographer, and I am recording now, and we are
 3     on the record.  The date is Tuesday, December 13, 2022,
 4     and the time is 9:05 a.m.  This is the Zoom-recorded
 5     video deposition of Pedro Ocegueda.
 6               Will counsel attending via Zoom please
 7     state your appearances, please?
 8               MR. DENTON:  I'm Lowell Denton for the City
 9     Of El Paso.
10               MR. AINSWORTH:  This is Russell
11     Ainsworth --
12               MR. ALMANZAN:  This is Andy Al- --
13               MR. AINSWORTH:  -- appearing on behalf of
14     the plaintiff.
15               MR. ALMANZAN:  Oh, sorry.  This is Andy
16     Almanzan on behalf of Defendant Carlos Ortega.
17               MR. BRITTAIN:  Eric Brittain --
18               MR. JEEP DARNELL:  This is Jeep -- oh,
19     sorry.  Go, Eric.
20               MR. BRITTAIN:  Eric Brittain on behalf of
21     Defendant Kimmett Bellows.
22               MR. JEEP DARNELL:  This is Jeep Darnell on
23     behalf of Defendants Officers Arbogast, Graves, Loya,
24     and Sanchez.
25               MR. MARTINEZ:  Jim Martinez for Alfonso
```

Pedro A. Ocegueda - December 13, 2022

```
Page 6
```

1   Marquez.

2                    (Witness duly sworn.)

3                    MR. DENTON:  Mr. Ainsworth?

4                    MR. AINSWORTH:  Yeah.  Thank you so much.

5                    I just wanted to state on the record that

6    Plaintiff objects to this deposition.  It's taken out of

7    time without agreement.  And for the reasons we've

8    stated on our numerous correspondence, we are not

9    participating in this deposition.  We do not agree to it

10   going on, and we will object to any use or reliance on

11   this deposition or its transcript or video recording.

12                   And so with that, I'm going to leave the

13   deposition, and you gentlemen can continue as you see

14   fit.  Thank you very much.  Bye.

15                   (Mr. Ainsworth not present.)

16                   MR. DENTON:  All right.  We ready?

17                   PEDRO ANTONIO OCEGUEDA,

18   having been first duly sworn, testified as follows:

19                          EXAMINATION

20   BY MR. DENTON:

21        Q.  Will you tell us your name, please, sir?

22        A.  My name is Pedro Antonio Ocegueda.  Everybody

23   calls me "Pete."

24        Q.  All right.  And where do you live?

25        A.  I live here in El Paso at 12612 Tierra Alzada,

Pedro A. Ocegueda - December 13, 2022

Page 7

1    79938.

2        Q.  Very good.

3                 Where were you born?

4        A.  I was born here in El Paso.

5        Q.  Lived here all your life?

6        A.  All my life.

7        Q.  Very good.

8                 Were you at one time an employee of the

9    El Paso Police Department?

10       A.  Yes, I was.

11       Q.  Were you a sworn police officer?

12       A.  Yes, I was.

13       Q.  Tell the jury a little bit about your career.

14   When did you start with the El Paso Police Department?

15       A.  I graduated from the academy January 1977.  And

16   ever since then, I went all the way through April of

17   2001, when I retired.

18       Q.  Retired in 2001?

19       A.  Yes, sir.

20       Q.  All right.  And may I ask you your age, sir?

21       A.  I'm 67 -- 68.  Yeah.

22       Q.  Very good.

23                 So been retired since 2001.

24       A.  Yes.

25       Q.  All right.  We appreciate you being here today

Pedro A. Ocegueda - December 13, 2022

Page 8

1   to provide some testimony and -- and shed some light on

2   the time period.

3           Were you involved in any way in the

4   investigation of the Lazo and England murders resulting

5   in the eventual conviction of Daniel Villegas?

6       A.  Yes, I was.

7       Q.  All right.  You said that you were in patrol

8   for a period of time in the department?

9       A.  Yes.  Approximately seven years.

10      Q.  Who was your supervisor there?

11      A.  I had several supervisors:  Mike Franco, John

12  Scagno, and several lieutenants.

13      Q.  Now, John Scagno eventually became police

14  chief, correct?

15      A.  That's correct.

16      Q.  All right.  And what was your experience having

17  him as your sergeant?

18      A.  He was very knowledgeable, very professional,

19  and a good -- good leader.

20      Q.  What was his attitude about professionalism and

21  compliance in policing?

22      A.  He was very -- well, how can I say it -- strict

23  about that.  He was very professional, wanted all of us

24  to be professional and -- and most of us followed his

25  lead.

Pedro A. Ocegueda - December 13, 2022

Page 9

1      Q.  Okay.  Walk the jury through your progression

2  through the ranks.  You start out as a patrolman.  What

3  was your next rank?

4      A.  The next rank was detective, when I was

5  assigned to crimes against persons -- I mean, not crimes

6  against -- criminal investigations, which is crime

7  scene.  I -- they called it back then "ID and R," which

8  is the criminalistics unit at that time.

9      Q.  All right.

10     A.  And then from there, I went to -- I worked vice

11  a couple years.  Where else did I go?  That's pretty

12  much it.

13     Q.  How did you go from the patrolman rank to the

14  detective rank?  What was involved?

15     A.  I -- I was promoted.  I had to take a test and

16  then promoted into detective rank.

17     Q.  Tell the jury a little bit about promoting to

18  detective.  What does that test involve?  Was there any

19  process?

20     A.  Yes, it's a process.  There's several -- I

21  don't know -- officers that take the -- the test and, I

22  mean, I'm -- I don't remember exactly how many, but

23  there was anywhere from 60 to 80 of us taking the test.

24  It's a competitive test.  We studied for it, studied the

25  different materials that are going to impact the

Page 10

1  detective sections, and we take a test.  And then

2  whoever passes, you get ranked.  You're put on a list,

3  and from that list is where the selections are made.

4      Q.  And how do you know what materials to study?

5      A.  Well, that -- they give you study materials for

6  the test:  the Code of Criminal Procedures, Penal Code,

7  the different sections that you would investigate, like

8  robbery, murders, all the different types of

9  investigations that you would be conducting as a

10 detective.

11     Q.  All right.  And then eventually -- what year

12 was it that you were assigned to crimes against persons?

13     A.  If I remember correctly, it was like '91.

14 Matter of fact, it was April '91.

15     Q.  Tell the jury a little bit about that unit.

16 Was -- was that something that you applied for, or did

17 somebody en- -- enlist you?  How did that happen?

18     A.  Well, I -- I was -- I knew there was a position

19 opening up, and my previous lieutenant, Lieutenant

20 Skanes, Charles Skanes, had become the commander for the

21 detective division, and he asked me to -- if I wanted

22 the position, asked me to put in for it, and I did.

23     Q.  Why did you want to go to CAP?

24     A.  That's a very elite unit.  I wanted to be part

25 of it.

Pedro A. Ocegueda - December 13, 2022

Page 11

1      Q.  All right.  So explain to the jury what you

2   mean by it being an elite unit that was something that

3   you wanted for your career.

4      A.  Well, again, CAP is one of the -- everybody

5   wants to -- wanted -- well, back then, wanted to go to

6   CAP.  I don't know about now, but back then, that was

7   the unit to be in.  And as part of that unit, you would

8   be one of the -- the best of the best, and that's --

9   that's why I wanted to be there.

10     Q.  Once you got to the CAP unit, at that point,

11  what was your rank?

12     A.  Sergeant.  I was a sergeant.

13     Q.  Okay.  So you had been a detective.

14     A.  Yes.

15     Q.  And you had since promoted to the sergeant

16  rank.

17     A.  Yes.  That's correct.

18     Q.  How did that promotional process compare to the

19  one for detective?

20     A.  It was a little bit more intense because now

21  you're going into a supervisory role, not just a

22  detective, so it was a little bit more competitive.  And

23  I think, at that point, it was like 50 to 60 of us

24  taking the test and, again, same thing.  If you -- you

25  passed, you get put on a list, and from that list is

Pedro A. Ocegueda - December 13, 2022

Page 12

1   where they make the selections.

2       Q.  All right.  So prior to CAP, where had you been

3   a supervisor once you were a sergeant?

4       A.  I was a supervisor with the vice unit, in

5   the -- in the white-collar crime unit -- forgeries and

6   then that kind of stuff -- and then -- then I went into

7   the CAP.

8       Q.  Okay.  Now, once you were at CAP, what kind of

9   additional training did you have there for the

10  investigative work being done in crimes against persons?

11      A.  There was numerous trainings that I took, which

12  included inter- -- interrogations, blood spatter, crime

13  scene management.  A whole slew of -- of -- of training.

14  Homicide seminars, I attend several of those.

15      Q.  And where were the seminars that you went to?

16      A.  They were really everywhere.  I attended one in

17  Albany, New York, which is the New York State Police

18  Academy.  I went to Dr. King's in Seattle, Washington.

19      Q.  And what was that about?

20      A.  That was homicide training.

21      Q.  Okay.

22      A.  That was a two-week course.  And that was -- I

23  attended one homicide seminar as well, so --

24      Q.  All right.  And how did that training compare

25  to the rest of the detectives assigned to the CAP unit?

Pedro A. Ocegueda - December 13, 2022

Page 13

1   Was theirs similar or different?

2        A.  It was similar.

3        Q.  Did you ever have people that were brought in

4   to the department to do training locally?

5        A.  Yes, we did.  We had several homicide seminars

6   here in El Paso for our -- our group, our department, as

7   well as the local regional departments.  Even -- even

8   Juarez Mexican police officers attended.

9        Q.  All right.  And what would be some examples of

10  that?  Professors, teachers, or courses.

11       A.  They were all the -- the -- a lot of the

12  leading homicide experts in -- in -- in -- in that area.

13  They would come in.  Dr. Henry Lee, Michael Baden,

14  Dr. King from -- from Seattle.

15       Q.  So let's go through those briefly.  Dr. Lee,

16  what was his specialty or field?

17       A.  Forensic -- forensic expert.

18       Q.  All right.  And Michael Baden, what was his --

19       A.  Michael Baden, also a forensic -- a forensic

20  pathologist.

21       Q.  Okay.  All right.  And the other name you

22  mentioned?

23       A.  Dr. King?

24       Q.  Yes.

25       A.  He is also an expert in homicides.

Pedro A. Ocegueda - December 13, 2022

Page 14

1      Q.   Okay.  So I want you to explain to the jury a

2   little bit about your chain of command at that time.

3   Who was your supervisor after you were a sergeant in

4   CAP?

5      A.   When I came on was Lieutenant Saucedo, Paul

6   Saucedo.

7      Q.   Okay.  What was his attitude about this

8   position and the responsibility that it entailed?

9      A.   I mean, he was very involved with -- with that

10  position, as a lieutenant, and everybody within the

11  unit.  He -- he expected the best of us, very

12  professional, and -- and kind of oversaw everything that

13  we did and --

14     Q.   Okay.

15     A.   -- and maintained us in a very high-level

16  professionalism in that respect.

17     Q.   All right.  How would you describe his attitude

18  about policy compliance and compliance with the

19  applicable law in investigation of these crimes?

20     A.   He was very straightforward, wanted us to -- to

21  abide by everything that -- that we studied and we

22  learned, which are the laws of Texas.

23     Q.   How did your personal philosophy and approach

24  to the job compare to his?

25     A.   It was very similar.  We had a very similar

Pedro A. Ocegueda - December 13, 2022

Page 15

1   type of way of doing things.

2       Q.  What were the approaches that you used to try

3   to make sure that your subordinates, the detectives that

4   you were supervising, were carrying out their jobs

5   correctly and in compliance with the laws?

6       A.  I would monitor what they did and -- and make

7   sure that they weren't deviating; that we would talk

8   about it and discuss it and make sure that they

9   corrected anything that -- that could be out of place or

10  out of sorts or was not within our responsibilities.

11      Q.  All right.  Let's -- tell the jury a little bit

12  about what the average workweek looked like.  When you

13  showed up on -- did you work Monday through Friday?

14      A.  Yes.

15      Q.  All right.  When you showed up on a Monday

16  morning, what typically was going to happen with you and

17  the detectives working for you?

18      A.  We would have a morning meeting.  We will have

19  a briefing every morning.  It started at 7:45, so that

20  we could hit the ground running at eight o'clock.  That

21  was your typical start of Mondays, and every day we had

22  a briefing.

23              Of course, CAP, we were called out, you

24  know, throughout the weekends because that's when a lot

25  of the homicides used to happen.  A lot of our cases

Page 16

1   would happen over the weekend, so we -- a lot of us

2   would be working.  But, still, we would make it in -- if

3   we made in on time on Monday --

4       Q.  Uh-huh.

5       A.  -- we would have a briefing and -- and there

6   were several other cases going on, so we would kind of

7   brief on all of them.  Then we would break out into the

8   different cases and -- and have a meeting with that.

9       Q.  So let's break -- let's break out what that

10  briefing looked like.  What kinds of discussions were

11  you having about these cases?

12      A.  We would have a discussion about everything

13  that was going on in our office.  If there was one or

14  two murders at the time, we would discuss those, and

15  then the -- the different sergeants would -- would take

16  their crew or their detectives and break out, and then

17  they would go into a deep -- more detailed into what was

18  going on with that particular case.

19      Q.  Okay.

20      A.  Let me explain to you the CAP unit was -- was

21  the robbery, hom- -- the robbery section, the homicide

22  section, and the sexual assault section.  So there

23  were -- there was like three units in one.

24      Q.  Uh-huh.

25      A.  Of course, we would -- as a sergeant, we -- we

Pedro A. Ocegueda - December 13, 2022

Page 17

1  could pick and choose what detectives would work on the

2  different cases, especially if -- if there was six guys

3  working on one case, you had the others to pick from, so

4  that you could have robbery detectives and sexual

5  assault detectives working on murder cases.  So they

6  were all kind of mixed in, you know.  But that was the

7  breakdown for the office.

8       Q.  And did I -- did I hear you say that you would

9  then have a meeting with your subordinates about the

10  cases that you had?

11      A.  Exactly.

12      Q.  Okay.  And then when would that wrap up?  Did

13  that happen every day?

14      A.  Every day we would have one, yes.

15      Q.  Okay.

16      A.  If -- if possible.  Again, if we were not

17  working overnight or we weren't working, you know, up

18  until the morning hours of that day, then -- then we

19  would have a meeting when we would come in.

20      Q.  Who were the other people in your chain of

21  command above Lieutenant Saucedo?

22      A.  There was several commanders that -- that

23  changed out, but it would -- it would be Lieutenant

24  Saucedo, and then at the end would be a different

25  captain, would -- at that time was Charles Skanes.  And

Page 18

1  then we had several commanders that would go over --

2  well, they were captains/commanders.  Same thing.  And

3  then after that, Deputy Chief Long, and then, of course,

4  the chief.

5      Q.  How often did you have those individuals in the

6  chain of command in the meetings that you were having in

7  the crimes against persons?

8      A.  They would come in and check on them -- check

9  in on us, but it wasn't like they would sit in on our

10  meetings or anything like that.  When there was a major

11  case, a big case that was happening, they'd come in and

12  check in and see how we were doing and see if we needed

13  anything or -- or that kind of -- just kind of checking

14  in and look in on what we were doing.

15      Q.  Now, the cases that you are developing, after

16  you put those cases together, what was eventually going

17  to happen with those investigative files once they were

18  completed?

19      A.  They would be put together and prepared for

20  presentation to the district attorney's office.

21      Q.  Tell the jury about how that relationship

22  worked with the district attorney's office.  Physically,

23  where were they located compared to where y'all are?

24      A.  Well, we were at the -- or the Raynor office,

25  at headquarters, police headquarters, and they would be

Pedro A. Ocegueda - December 13, 2022

Page 19

1   downtown, at 500 San Antonio.

2       Q.  All right.  So how did you interact with them?

3       A.  By telephone, or we would go over to their

4   office, or they would come over to our office.

5       Q.  All right.  How commonly were they in your

6   office?

7       A.  They were there frequent- -- frequently,

8   depending if they needed to -- to talk to us or -- or

9   the detectives on a -- on a particular case, and they

10  would -- they would come by or -- or they would call us

11  in, see if we could have a meeting at their office.

12      Q.  In the course of doing your investigative work,

13  how much access did you have to the prosecutors to talk

14  to them about how to get the file ready to go to

15  submission?

16      A.  If we needed to talk to them, we had -- we

17  could call them anytime.

18      Q.  Who were the people that you typically talked

19  to in the DA's office in this time frame in the -- after

20  you got there in 1991?

21      A.  It would be Marcos Lizarraga, which was the

22  first assistant; Karen Shook, which was a assistant

23  district attorney.

24      Q.  Eventually, Karen Larose?

25      A.  Karen Larose.

Pedro A. Ocegueda - December 13, 2022

Page 20

1     Q.   Okay.

2     A.   That's correct.

3     Q.   Who else?

4     A.   John Davis.  Who else?

5     Q.   Was George Havlovic there then?

6     A.   George Havlovic was there, absolutely.  Yeah.

7     Q.   So during the course of a normal week, how many

8  interactions would there be with the people from the

9  DA's office about pending cases?

10    A.   Several.  I mean, it would depend on what case.

11    Q.   Okay.

12    A.   Because it wasn't just my cases.  It was the --

13  the whole CAP cases.

14    Q.   All right.  And then let's talk about the

15  supervisory role that you had on the files that you were

16  working on.  What were the things that you were doing to

17  make sure that those files were developed correctly and

18  properly?

19    A.   I would -- I would talk -- talk to the

20  different detectives that were handling the different

21  aspects of the case and review with them -- this was

22  part of the meeting.  We would talk.  Hey, this is what

23  I need to do here, this is what I want to do today, and

24  this is what we're going -- this is how we're going to

25  proceed, and I'm going to need somebody to assist me

Pedro A. Ocegueda - December 13, 2022

Page 21

1   with this or with that.  Okay.  Then do it.

2        Q.  One of the issues in this case is compliance

3   with policies and procedures for juveniles.  Was that

4   part of your responsibility or role?

5        A.  Yes.  I mean, it was all of our

6   responsibilities.

7        Q.  Okay.  So tell the jury, in the time frame

8   we're talking about before this Lazo and England murders

9   in 1993, what was required for investigations that

10  involved juveniles that weren't adults?

11       A.  There -- there was -- there was a policy that

12  was put in place by the police department and -- and

13  that was kind of being transitioned into the department

14  because of -- of an incident that occurred in -- in '92

15  with another unit.

16       Q.  Which unit was that?

17       A.  The tac unit.

18       Q.  Okay.

19       A.  They -- they implemented this policy which --

20  which coincided with the -- with the law, Texas juvenile

21  law, and they were putting it into place -- of course,

22  our unit, we didn't deal with that many juvenile cases.

23  It was -- it was few and far between that we would

24  handle juveniles, but it affected us as well.

25       Q.  Okay.

Pedro A. Ocegueda - December 13, 2022

Page 22

1          A.   So in those -- in that particular time, when we
2     had a juvenile, we had -- you know, we had to follow
3     the -- the policy and everything, we would get somebody
4     from -- from the JIS unit, which is the juvenile
5     investigative services, to come in and assist us and
6     kind of walk us through that process.
7          Q.   Okay.  Was Detective Ortega one of those
8     officers?
9          A.   Charlie Ortega at that time, yes.
10         Q.   Okay.  And so what were you required to do if
11    you were investigating somebody or interrogating
12    somebody that was a juvenile?
13         A.   We would have to take them down to the -- the
14    JIS section and have them interviewed and questioned
15    there.
16         Q.   Was CAP following that procedure?
17         A.   Yes.  As best as possible, yes.  Uh-huh.
18         Q.   Was it your responsibility to make sure that
19    your investigators carried out that procedure under
20    the -- the department policy and the Family Code?
21         A.   Yes.  And that's why, if you notice, some --
22    through the case, Charlie Ortega was there kind of
23    overseeing what we did.
24         Q.   So when you interacted with people from the
25    DA's office, were they also involved in compliance as to

Pedro A. Ocegueda - December 13, 2022

Page 23

1   juvenile subjects?

2       A.  Yes.

3       Q.  I want to ask you about claims of misconduct by

4   your investigators, and we're going to look at three

5   incidents.  I'm going to get Ms. Burke to put the first

6   one of those incidents up that you were involved in that

7   involved disciplinary issues about Alfonso Marquez.

8                   MS. BURKE:  Which one?

9                   MR. DENTON:  The first one on your list,

10  the PIR.  Chronologically, the first one.

11                  MS. BURKE:  All right.  Can you see this

12  okay?

13                  THE WITNESS:  Yes.

14                  MS. BURKE:  Okay.

15                  THE WITNESS:  I'm sorry.  It's a little

16  better over here.

17                  MR. DENTON:  Make it just a little bit

18  smaller so we can see more of it on the screen.

19      Q.  (BY MR. DENTON)  Do you recognize this

20  incident?

21      A.  Let me get a look at it.

22      Q.  Go ahead.  Get oriented to it.

23      A.  Yes, I recognize it.

24      Q.  All right.  And it says "name of complainant."

25  It has your name up there at the top.  Do you see that?

Pedro A. Ocegueda - December 13, 2022

Page 24

1      A.  Yes.

2      Q.  Would you explain to the jury how you became a

3  complainant against Alfonso Marquez?

4      A.  At that time, Alfonso Marquez was one of my

5  detectives, and he was driving a city vehicle, and he

6  got involved in a -- in a -- in an accident, and he had

7  another individual with him which was not a city

8  employee, so he was -- he was in that vehicle with him.

9           But because of the accident, because of the

10  unauthorized person in that vehicle, he -- there was a

11  complaint, and I went and did a cursory investigation

12  and found that Marquez should not have been involved in

13  that accident and should not have had a authori- --

14  unauthorized person in that vehicle --

15      Q.  So --

16      A.  -- at the time of the accident.

17      Q.  So he was breaking the rules.

18      A.  Absolutely.

19      Q.  Okay.  And so let's look at the bottom of that

20  sheet there on the screen, and it shows down at the

21  bottom that -- well, what does it say was the outcome on

22  that case?

23      A.  Let's see.  Well, my -- my recommendation was

24  forwarded to internal affairs for further investigation.

25  Lieutenant Saucedo at that time concurred and referred

Pedro A. Ocegueda - December 13, 2022

Page 25

1   the -- concurred with my referral.

2       Q.  Right.

3       A.  And then the last one, I think that was

4   Chief Long who sustained the -- I don't know.  I can't

5   read his writing, but he sustained the -- the

6   recommendation.

7       Q.  All right.  And do you know what the punishment

8   was on this one?

9       A.  I think he was -- there was a suspension.  I

10  don't know how many days.

11      Q.  All right.

12      A.  I think there was a suspension.

13      Q.  And was that appropriate?

14      A.  Yes.

15      Q.  Okay.  Now, this incident -- did this incident

16  cause you to have any questions or problems about

17  whether or not Alfonso Marquez, as a detective, was

18  honest or truthful?

19      A.  I mean, no.  I mean, he was -- he was caught

20  red-handed.  I mean, I don't see where he would try to

21  avoid that.  I mean --

22      Q.  All right.

23      A.  -- we were able to prove what happened, and

24  everything, and so we proceeded with the -- with the

25  incident report.

Pedro A. Ocegueda - December 13, 2022

Page 26

1    Q.  And what's the purpose of discipline like this
2  against a detective?
3    A.  To show that he's not supposed to be doing
4  things that are inappropriate.
5    Q.  Okay.  All right.  In the course of your
6  supervision of Alfonso Marquez and the other detectives,
7  did you initiate discipline or investigations every time
8  that you thought there was a policy violation?
9    A.  Yes.
10   Q.  Okay.  Was that important to you?
11   A.  It was.
12   Q.  So let's look at the next one chronologically,
13  the next PIR, which I believe also is on Detective
14  Marquez.  Take a look at this one, see if you recognize
15  it.
16   A.  If you'll give me a minute.
17       Okay.
18   Q.  Do you recognize that one?
19   A.  Yes, I do.
20   Q.  All right.  And another one that you had
21  initiated as a complainant?
22   A.  Right.
23   Q.  All right.  Let's look down at the bottom of
24  that one, see what the disposition is.  What does that
25  say the outcome was?

Pedro A. Ocegueda - December 13, 2022

Page 27

1      A.   Again, it was Chief Long, and he sustained the
2   written reprimand.
3      Q.   Now, there's no suspension here.  Did you agree
4   with that, that a reprimand was appropriate?
5      A.   And that's part of the discipline.  Yeah, I
6   agreed with the written reprimand.  Yeah.
7      Q.   Okay.  What is the point?  What does a written
8   reprimand accomplish?
9      A.   It -- it's a document that documents that you
10   were out of policy and -- and it goes into your file.
11      Q.   Okay.
12      A.   So it's -- it's a very -- it's a form of
13   discipline, but not a very hard discipline.
14      Q.   Okay.  Let's look at the third PIR that we have
15   and also against Detective Marquez.  And this one's in
16   '93.
17      A.   Okay.
18      Q.   This one's actually -- date and time of the
19   incident's the month before the England/Lazo murders
20   take place, also --
21      A.   All right.
22      Q.   -- in 1993, following month, if I remember
23   correctly.
24      A.   Yes.  That's correct.
25      Q.   Do you recognize this one?

Pedro A. Ocegueda - December 13, 2022

Page 28

1    A.  Let me -- let me read up a little bit.

2           Yes, I do.

3    Q.  Okay.  Let's look at the disposition, then, on

4  this incident.  This incident involves failure to

5  process evidence correctly; is that right?

6    A.  Right.  Okay.

7    Q.  All right.  Was this investigated by IA or by a

8  supervisor?

9    A.  It was by us.

10   Q.  Okay.  At the supervisory level --

11   A.  Yes.

12   Q.  -- within the CAP unit.

13   A.  That's correct.

14   Q.  All right.

15   A.  Yeah, the narcotics, the lab technician, had

16  come in and -- and asked him for it and he -- he said,

17  "Hey, it's in my desk.  I forgot to turn it in."

18           He came in and told me.  I said, "Hey,

19  that's a violation."  You're not supposed to -- you're

20  supposed to turn it in as soon as you -- you have the

21  opportunity to turn it in, and he failed to do so and

22  he -- it was still in his desk.

23   Q.  And was he forthright about what happened?

24   A.  Yeah.  Absolutely.

25   Q.  Did he lie about it in any way?

Pedro A. Ocegueda - December 13, 2022

Page 29

1      A.   No.

2      Q.   Okay.

3      A.   He walked over to his desk, opened the drawer,

4  and it was right there.

5      Q.   All right.  So he was wrong, and he admitted

6  it.

7      A.   Absolutely.

8      Q.   Okay.  And there was -- and the suspension here

9  was --

10     A.   And then -- and follow up with -- with the

11 investigation, the -- the incident report, and it was --

12 as you can see, it was sustained by my lieutenant,

13 Saucedo, Captain DeAngelis, which was one of our

14 captains.  And you asked me about the captains.  He was

15 one of our captains at that time.  And then it was

16 sustained by DC Long for a three-day suspension.

17     Q.   Okay.  So was that an appropriate suspension?

18     A.   Yes, I think so.

19     Q.   Did you feel like that was reinforcing the

20 rule --

21     A.   Absolutely.

22     Q.   -- that needed to be followed?

23     A.   Not -- not just by Marquez, but by the entire

24 CAP unit.

25     Q.   Okay.  Did that get the word out?

Pedro A. Ocegueda - December 13, 2022

Page 30

1     A.   Yes.

2     Q.   Okay.  All right.  So now, do you remember,

3   other than these three incidents by Detective Marquez,

4   initiating or implementing any discipline against any of

5   the officers that are named in this litigation:  Earl

6   Arbogast, Carlos Ortega, Scott Graves, Alfonso Marquez,

7   Kimmett Bellows, Detective Loya, and Detective Ray

8   Sanchez?

9     A.   No.

10    Q.   Any others?

11    A.   No.  And -- and the reason being is the others

12  were not my direct subordinates.

13    Q.   Okay.

14    A.   They were -- they were assigned to somebody

15  else, or they were assigned to another unit, so -- but

16  Marquez fell under me, so that's why I -- when it came

17  up to some -- him doing something inappropriate, then I

18  would -- I would have to handle it.

19    Q.   All right.  Now, with respect to the

20  individuals investigating the -- the murders that are

21  involved in this case, Scott Graves and Earl Arbogast,

22  Kimmett Bellows, were they all working for you?

23    A.   No.

24    Q.   Okay.  But you were supervising this

25  investigation?

Pedro A. Ocegueda - December 13, 2022

Page 31

1      A.   Correct.

2      Q.   All right.

3      A.   And they were a part of that investigation.

4      Q.   Okay.  Did you have any reason at that point in

5   time -- in 1993 -- to believe that those individuals had

6   any previous history or pattern of not following

7   policies and protocols?

8      A.   Not that I know of, no.

9      Q.   Did you have any reason to believe that they

10  were not following the law in terms of carrying out a

11  lawful investigation of Daniel Villegas or any other

12  suspect?

13     A.   No.

14     Q.   I want to talk to you a little bit about what

15  happened with the files in terms of your review and

16  approval.  There's an issue that's been raised about

17  supervisory oversight and approval on reports.  Tell the

18  jury how the process was going on in 1993.  How were you

19  working on the materials that were being developed in

20  this investigation?

21     A.   Well, a lot of the times when detectives had a

22  case, they would -- they would -- they were entering

23  everything electronically into the -- the -- what

24  they -- the so-called RMS system, which is a record

25  management system.  And they would do that.

Pedro A. Ocegueda - December 13, 2022

Page 32

1                     But CAP, a major case like this that --

2     that's going to be presented into the district

3     attorney's office, they -- they would have to make a

4     hard copy, make a binder, a case binder, that would be

5     put together.

6                     Once that was completed and they finalized

7     it and they put a presentation statement on it,

8     preparing it to go to the -- the DA's office, then they

9     would bring them in to me or to any supervisor, and we

10    would go over it, make sure that everything was there,

11    and it was as complete as -- as possible.

12                    Once that was done and we verified that

13    everything was there, then it would be transferred into

14    the -- the district attorney's office, their intake

15    office.

16        Q.  And who was -- whose responsibility was it,

17    finally, to approve that notebook?

18        A.  The supervisors.

19        Q.  Would -- who was that?  You?

20        A.  Me, the other supervisors in the office.

21        Q.  Okay.  So on this one, this was your case.

22        A.  Yes, that's my case.

23        Q.  All right.  So before that notebook went to the

24    DA's office for presentation in this Daniel Villegas

25    case, it had to come through you.

Pedro A. Ocegueda - December 13, 2022

Page 33

1    A.  Yes.

2    Q.  And what did you do?  What was the level of

3  your review of that notebook before it went to the DA?

4    A.  I had to make sure that everything was -- was

5  there and everything was as complete as possible.  Once

6  we were -- we were satisfied that that was there, we

7  didn't have any other questions, we would send it out.

8    Q.  Now, as the -- as the reports and the

9  supplements, statements, and other things were coming

10  together, did you see those as they were being

11  developed?

12    A.  Not -- not always, no, because we would wait

13  until everything was complete, and then we would go over

14  it.  We would review it, and then send it up.

15    Q.  All right.

16    A.  A lot of times, like I say, they were putting

17  them into the system, but I -- I wasn't getting a hard

18  copy of it.  The hard copy was not until the -- the

19  end --

20    Q.  Okay.

21    A.  -- until the binder was complete.

22    Q.  And from time to time, did you review portions

23  of the investigation --

24    A.  Yeah, absolutely.

25    Q.  -- on the system?

Pedro A. Ocegueda - December 13, 2022

Page 34

1      A.   Absolutely.

2      Q.   So you've earlier told the jury about the daily

3   meetings that take -- took place.  What was the level of

4   interaction about the reports, the supplements, and the

5   statements that were being taken at that daily meeting?

6      A.   Uh-huh.

7      Q.   How would that work?

8      A.   We would go over them to see what -- what

9   needed to be done, and then we completed -- now, some of

10  the statements needed to be notarized, and those would

11  come to me, and we would go over them, discuss them,

12  make sure that they were correct and everything.  We

13  would stamp them and notarize them and give them back to

14  the detective.

15           But those were the -- the -- the sworn

16  statements that we would have to notarize.  The other

17  supplemental documents, they would be after -- after

18  they were put together in the binder, that's when we

19  would review them.

20     Q.   All right.  So if something came up in the

21  meeting about a statement or a report or something else

22  that you had interest in or somebody asked a question,

23  what was your access?  How would you go take a look at

24  it?

25     A.   Just saying, "Let me have a copy.  Let me see

Pedro A. Ocegueda - December 13, 2022

Page 35

1   it."

2       Q.   Okay.  So were you -- what percentage of the

3   time were you working with paper copies as opposed to on

4   the computer in those days?

5       A.   I would say 85, 90 percent of the time.

6       Q.   I want you to tell the jury about the

7   responsibility that you had to make sure that evidence

8   for either guilt or innocence was contained in the

9   investigations you were developing.  Can you explain

10  that to the jury?

11      A.   Anytime there was any type of evidence,

12  whether -- whether for or -- or against the -- the --

13  the defendant, we -- we would have to present it.  I

14  mean, it has to go in.

15      Q.   Okay.  How did you learn that?  How did you

16  come to know that?

17      A.   By the different trainings that we'd had of --

18  on inculpatory and exculpatory evidence.  I mean,

19  that -- that's taught to us from the beginning.

20      Q.   All right.  When you did the final review of

21  those materials to go to the DA's office, was that a

22  part of your review?

23      A.   Absolutely.

24      Q.   When you interacted with the DA on a case

25  submission, how important to them was that?

Pedro A. Ocegueda - December 13, 2022

Page 36

1      A.   It was very important, make sure that
2  everything was there.
3      Q.   Okay.
4      A.   Absolutely.  Whether it was for or against,
5  yeah.
6      Q.   Do you know what the DA's policy was about
7  defense counsel having access to your complete
8  investigation?
9      A.   Yeah.  They -- they would -- they would make
10 sure that everything that we had would be shared with
11 the defense attorney.
12     Q.   And did you know that going in?
13     A.   Yes.  And there were some occasions where there
14 were -- if they needed something added or -- or
15 requested additional information, then they would ask
16 us, we would get it and -- and submit it to them, and
17 they would share it with the defense attorneys.
18     Q.   So I'd asked you questions about whether or not
19 you were aware of any improper conduct like generally.
20 Prior to the murder investigation we're talking about in
21 1993, had you ever heard complaints from any source
22 about --
23          MR. BRITTAIN:  Excuse me.  Lowell, I
24 apologize.  Jeep got kicked out of the depo and --
25          MR. DENTON:  You bet.

Pedro A. Ocegueda - December 13, 2022

Page 37

1          MR. BRITTAIN:  -- he needs somebody to let
2     him back in.
3          MR. DENTON:  All right.  Thank you, sir.
4     Counsel, appreciate that.
5          All right.  Are we all back on?  Is
6     everybody back on?
7          MR. JEEP DARNELL:  I'm here.
8          MR. DENTON:  All right.  Thank you.  I will
9     proceed.
10    Q.  (BY MR. DENTON)  I want to ask you to explain
11    to the jury -- are you familiar with what's known as a
12    motion to suppress evidence --
13    A.  Yes.
14    Q.  -- in a criminal case?
15    A.  Uh-huh.
16    Q.  Tell the jury what that is.
17          (Indiscernible.)
18          MR. JEEP DARNELL:  Dad, mute yourself.
19          (Indiscernible.)
20          MR. DENTON:  Somebody -- somebody has
21    something in the background.  Can we please mute it?
22          MS. BURKE:  Ginger, can you mute, please?
23          MR. DENTON:  All right.  There we go.
24    Q.  (BY MR. DENTON)  So I was asking you about a
25    motion -- motions to suppress in defense cases.  Are you

Pedro A. Ocegueda - December 13, 2022

Page 38

1    familiar with that?

2          A.   Yes.

3          Q.   Tell the jury what that is.

4          A.   Well, that's when the defense attorney wants to

5    keep something out from going into the -- to the case,

6    like a confession, like evidence, a statement.   So

7    they -- they -- they want to suppress it.   They want to

8    keep it out.

9          Q.   All right.   And so was your office and your

10   detectives regularly involved in those kinds of court

11   proceedings?

12         A.   No.   No.   That was the district attorney's

13   office.

14         Q.   All right.   But did your officers, your

15   detectives, did they testify in those proceedings?

16         A.   Yes.

17         Q.   All right.

18         A.   Yeah.

19         Q.   How did you hear or find out about the outcomes

20   of those proceedings at the courthouse?

21         A.   The -- through the district attorney's office.

22   "Hey, this -- this item was suppressed," or, "This was

23   kicked out," or what have you, so they -- they would let

24   us know.

25         Q.   All right.   And was that by phone call or in

Pedro A. Ocegueda - December 13, 2022

Page 39

1   the meetings at the office, or how did that happen?

2        A.  Either/or.  Either/or.

3        Q.  When a case went up and there was a ruling,

4   either a jury ruling or a judge ruling, did you get that

5   feedback from the DA's office?

6        A.  Yes.

7        Q.  Did you have after-action reports or reviews

8   with them on the cases you had submitted?

9        A.  Yes.  Absolutely.

10       Q.  Now, from that interaction at the time of this

11  incident in 1993, were you aware of any judicial rulings

12  by the courts that had found any of your detectives

13  involved in coercion or abuse of suspects?

14       A.  No.

15       Q.  Had you -- had you ever heard complaints

16  against Alfonso Marquez engaging in a continuing pattern

17  of either verbal coercion or physical coercion to get

18  statements or -- or confessions?

19       A.  Not that I recall, no.

20       Q.  Any of these other officers that I've named?

21       A.  No.

22       Q.  If you had ever heard of that kind of a ruling

23  by a court, what would have been your responsibility?

24       A.  To keep track of it and make sure that they

25  didn't get -- do that while doing one of our cases or

Pedro A. Ocegueda - December 13, 2022

Page 40

1    working one of our cases.

2        Q.  Would you have kept anybody in your unit if

3    they were engaging in those kind of activities?

4        A.  No.

5        Q.  I'm going to ask Ms. Burke to put up on the

6    screen an affidavit that you signed in a case later in

7    2008, and it involved the conviction of an individual

8    named Alejandro Hernandez.  Do you remember that

9    incident?

10       A.  Yes.

11       Q.  Do you recognize this affidavit?  Up at the

12   top -- let's go to the top.  Do you see that it shows

13   that it was filed in 2008?  Now, you were out of the PD

14   at this time, right?

15       A.  That's correct.

16       Q.  All right.  So I guess somebody contacted you

17   for your testimony by affidavit?

18       A.  Yes.

19       Q.  Do you remember who it was?

20       A.  Not right offhand, no.

21       Q.  Okay.  Could it have been Duane Baker, or do

22   you know?

23       A.  It could have been Duane Baker, yes.

24       Q.  All right.  So let's look at what this

25   affidavit says.  Do you remember what this -- this case

Pedro A. Ocegueda - December 13, 2022

Page 41

1  was about and why you were called upon to testify by

2  affidavit about your involvement in this murder

3  investigation?

4      A.  I would assume that it's some -- some sort of

5  homicide case --

6      Q.  Okay.

7      A.  -- that -- that had been worked on by some of

8  the people that I recognize on the affidavit.

9      Q.  So just like today, you were called back in to

10 ask you questions about something that happened while

11 you were a sergeant there --

12     A.  That --

13     Q.  -- right?

14     A.  That is correct.  Yes.

15     Q.  All right.  So I want you to -- we're going to

16 page down here to page 3 in that affidavit, right there

17 at the top.  You see it says, "I arrived at the location

18 of where the body was found," and it has a time and so

19 forth?

20     A.  Yes.

21     Q.  How common was it that instead of being in the

22 office, going to meetings, and looking at paperwork,

23 that you were out in the field, like this testimony

24 shows here?

25     A.  Any time that there was a homicide case and we

Pedro A. Ocegueda - December 13, 2022

Page 42

1   were called out as a unit, the dispatch would -- would

2   request a CAP unit, but they would contact the

3   supervisors, me or one of the other supervisors.

4         Q.   Okay.

5         A.   And then we would then get the detectives

6   together and -- and -- and send them out there.  When

7   they -- we would arrive, then they would arrive, so we

8   would all be out there at the -- at the different

9   scenari- -- the scene, so...

10        Q.   All right.  And then farther down there, about

11  the sixth line maybe, it says, "Detective Tony Tabullo

12  arrived at about the same time I did, and then

13  Lieutenant Paul" --

14        A.   That's --

15        Q.   -- "Saucedo later"?

16        A.   The lieutenant would also show up to many of

17  the -- the homicide cases.

18        Q.   Okay.  So it was common for you to be in the

19  field on the scene.

20        A.   Absolutely.

21        Q.   All right.  Your testimony here in this

22  affidavit talks about -- it says uniformed EPPD officers

23  at the scene were giving you information.  Do you see

24  that at the --

25        A.   Yes.  Uh-huh.

Pedro A. Ocegueda - December 13, 2022

Page 43

1    Q.   -- bottom of that?

2         So are your officers not uniformed?

3    A.   No.  We are -- we are plainclothes.

4    Q.   Okay.  And so are those patrol officers it's

5    talking about there?

6    A.   Yes.

7    Q.   All right.

8    A.   Uniformed officers.

9    Q.   Down at the bottom of that, it then says, "Some

10   of the CAP detectives on the scene were instructed to go

11   to the CAP office located at headquarters to interview

12   the numerous transients that had to be picked up."

13   A.   Right.

14   Q.   So who was -- who was directing the process of

15   interviewing people and obtaining evidence on the scene?

16   Was that your role?

17   A.   Me, yes.

18   Q.   Okay.  Is that your purpose for being at this

19   scene?

20   A.   Correct.

21   Q.   All right.  It then continues in the next

22   paragraph talking about the supplement of Detective Sal

23   Dominguez, and I'd asked you earlier about the

24   supplements and so forth.  In the course of the

25   activities that you're testifying about here, were you

Pedro A. Ocegueda - December 13, 2022

Page 44

1  going to see that supplement within a day or two, or

2  were you not going to see it until later on?

3       A.  Probably until later on.

4       Q.  Okay.  And so just like in testifying in court,

5  this affidavit that you put together in 2008, it's

6  reconstructing what you remembered by reading that

7  paperwork, right?

8       A.  Correct.  Yes.

9       Q.  And it says there that Detective Dominguez and

10  you went to a location and notified the brother of the

11  victim.

12      A.  Uh-huh.

13      Q.  Is that right?

14      A.  That's correct.

15      Q.  So that's the notice to next of kin question.

16      A.  Correct.

17      Q.  All right.  And -- and is that an important

18  responsibility for law enforcement?

19      A.  It is.

20      Q.  That's one of the incidents that Detective

21  Marquez failed to do.

22      A.  Correct.

23      Q.  And -- and got written up for it.

24      A.  Yes.

25      Q.  On page 4, I believe it is -- let's see here.

Pedro A. Ocegueda - December 13, 2022

Page 45

1    There we go.  It says, "Notified that they had located a
2    transient at 4427 Titanic.  Detective Dominguez and I
3    went to that location."  So it looks like you are, at
4    least at this point, actively involved in follow-up --
5         A.  Right.
6         Q.  -- on evidence; is that correct?
7         A.  Correct.
8         Q.  Tell the jury how important that was in terms
9    of you making sure that these investigations were
10   complete, and what was your purpose?
11        A.  Well, again, it's to supervise the -- the
12   activities out in the field, make sure that we are
13   talking to the -- all the witnesses or possible
14   witnesses, and any evidence that was located, make --
15   make sure it was -- it was properly tagged and turned
16   in.
17        Q.  Okay.
18        A.  So just to kind of oversee --
19        Q.  All right.
20        A.  -- the -- the crime scene and make sure that
21   we -- we didn't oversee anything or we didn't pass by
22   anything.
23        Q.  Okay.  In the next paragraph there, you'll
24   see -- let me see where we are, where it was.
25   "Reviewing EPPD case number" -- it's got the case number

Pedro A. Ocegueda - December 13, 2022

Page 46

1  there, and it says "it appears that during our morning

2  meeting."  Is that the meeting that you had --

3      A.  That's --

4      Q.  -- described before?

5      A.  That's correct.

6      Q.  Okay.  That you assigned Detectives Ruiz,

7  Guillermo Martinez to attend the autopsy and some other

8  people to go back to the scene of the crime to look for

9  further evidence.

10     A.  That is correct.

11     Q.  Is that characteristic of what you were doing

12 in all these investigations?

13     A.  Yes, it is.

14     Q.  And is that the same kind of activities that

15 you carried out in connection with the investigation of

16 the Lazo and England murders?

17     A.  Correct.  Yes.

18     Q.  And I had asked you a number of questions about

19 the court proceedings and feedback that you got, and I

20 believe you testified that -- that you don't remember

21 being aware of any judicial rulings or determinations

22 about coercion of confessions or statements.

23     A.  That is correct.

24     Q.  Did you also get feedback from the DA's office

25 about whether or not a case that went up and -- and was

Pedro A. Ocegueda - December 13, 2022

Page 47

1  convicted, whether or not those convictions were ever

2  reversed on appeal by the appellate courts?

3       A.  No.  I mean --

4       Q.  Did the DA give you feedback on that or not?

5       A.  Not -- not that I recall.  We would get it

6  from -- you know, somebody had been at the courts, hey,

7  they -- they reversed this, or they did that, and then

8  we would ask the DA's office, but that was very, very

9  seldom.

10      Q.  Okay.  And that was my next question to you.

11  How often did the cases that you had successfully

12  obtained a conviction in get reversed?

13      A.  Not -- not very often.  It was very, very

14  seldom that it happened.

15      Q.  So were you getting any feedback or impression

16  that the work you were doing was not being in compliance

17  with the standards that the courts required?

18      A.  No.

19           MR. DENTON:  Let's look at the affidavit in

20  that same case of Detective Torreon, Ms. Burke, if

21  you'll put that up.

22           THE REPORTER:  I think we may have lost

23  her.

24           MR. DENTON:  Right.

25           THE REPORTER:  Can we go off the record?

Pedro A. Ocegueda - December 13, 2022

Page 48

1          MR. DENTON:  Yeah.  Let's go off the record

2     just a second, and then I'll make sure she's back on.

3          THE VIDEO TECHNICIAN:  Off the record at

4     9:52 a.m.

5          (Break taken.)

6          THE VIDEO TECHNICIAN:  This is the

7     videographer.  I am recording again, and we are back on

8     the record at 9:59 a.m.  You may continue.

9          MR. DENTON:  Ms. Burke, if you'll put up

10    the affidavit of Detective Torreon in the Hernandez

11    incident.  I'm sorry.  I -- I said "Torreon."  It's

12    "Terrones."

13          THE WITNESS:  Terrones.

14          MR. DENTON:  Yes.  Terrones.

15     Q.  (BY MR. DENTON)  All right.  So this is another

16    affidavit in that same case that you provided testimony

17    on for Alejandro Hernandez.  If we'll look down in that

18    affidavit -- and I'm going to ask you about your

19    personal knowledge about some of the statements here.

20    Look down to page 4.

21          MR. DENTON:  That's not the page numbered

22    4.  That's 3.  There you go.

23     Q.  (BY MR. DENTON)  Now, right in the middle of

24    that paragraph, it says, "Sergeant Ocegued- -- Ocegueda

25    assigned me as the case agent in this case, which means

Pedro A. Ocegueda - December 13, 2022

Page 49

```
 1    I was the lead investigator responsible for assembly,
 2    organization of supplemental reports, witness
 3    statements" -- and so forth -- "and presenting the case
 4    to the district attorney."  Do you see that testimony
 5    there from Detective Terrones?
 6        A.  Yes.
 7        Q.  And what is your personal recollection of that?
 8    Do you remember that you assigned him as the case
 9    agent --
10        A.  Yes, I do.
11        Q.  -- in the Hernandez case?
12        A.  Uh-huh.  And that's -- that's the process of
13    putting together the binder on a case to get ready for
14    presentation.
15        Q.  Okay.  And so that was going to be my question
16    to you.  What is the case agent's role, first of all, if
17    you'll describe that for the jury?
18        A.  He -- he's the one that -- he's assigned the
19    case as -- and takes the lead in making sure that
20    everything is put together in the binder.  Any
21    statements, supplements, evidence, chain of custody,
22    all -- all that gets sent in to him.  Even though
23    somebody else might do it, they submitted them to him,
24    and he puts it all together, puts it in -- in a binder,
25    and then that -- that's when it's ready.
```

Pedro A. Ocegueda - December 13, 2022

Page 50

1            He's the one that also puts together the --
2    they call it "the presentation statement" on the front
3    of the case, which means, okay, this case is ready to
4    go.
5        Q.  All right.  And what interaction did you
6    typically have on these murder cases with making sure
7    that was being done right?
8        A.  Well, again, I would make the assignments.
9    They would take and -- and start preparing everything.
10   Once it was completed, they would bring it to me.  We
11   would review it, make sure that everything was there, go
12   through it, and then once we were satisfied, yeah,
13   it's -- it's ready, send it in.
14       Q.  Okay.  And was it done the same way on the
15   Daniel Villegas matter?
16       A.  Yes.
17       Q.  Now, let's look down at page 10 in this
18   Terrones affidavit.  Are we on page 10?
19       A.  Uh-huh.
20       Q.  Yeah, there we are.
21            So it says here -- this was puzzling to
22   me -- "On May 26, '94, then CAP Sergeant Dwain Johnson
23   reviewed and approved the case to be presented to the
24   office of the DA."  So when you had assigned the case to
25   Terrones as the case agent, why did a different sergeant

Pedro A. Ocegueda - December 13, 2022

Page 51

1    approve it to go to the DA?

2        A.  I might have been out of the office.  I might

3    have been out on vacation.  I might -- I might have been

4    on leave.  Whate- -- whatever the case --

5        Q.  Okay.

6        A.  -- I wasn't available, and so he -- he's a

7    supervisor just like --

8        Q.  Right.

9        A.  -- me, and they would take the case to him,

10   say, "It's ready for presentation."

11       Q.  Okay.

12       A.  And he would review it, do the same thing that

13   I would do, review it and make sure everything was

14   there, checked off on it.  Boom, it's gone.

15       Q.  Okay.

16       A.  And I would do the same thing for some of his

17   cases when he wasn't available, so, I mean, we were kind

18   of interchangeable there.

19       Q.  All right.  Down below there now, the next

20   paragraph, it says, "On presenting the case to Assistant

21   District Attorney Karen Shook for her review, I was

22   advised to obtain a statement from Dee Stewart as an

23   additional part of the investigation."  You see that?

24       A.  Uh-huh.

25       Q.  Now, tell the jury what -- what -- what your

Pedro A. Ocegueda - December 13, 2022

Page 52

1   knowledge and recollection is about how this process

2   would work.  As I understand this, what you've described

3   is this notebook is complete, and you think it's ready

4   to go.

5          A.  Right.

6          Q.  In this case, Dwain Johnson had performed that

7   approval.

8          A.  Correction [sic].  Yes.  Correct.

9          Q.  When it went to the DA, the DA, according to

10  this testimony, was advised to take a statement from Dee

11  Stewart.  Do you remember that happening in this case?

12         A.  I don't actually remember, but the process is,

13  when it gets to the DA's office, they have to check it

14  in, so it's -- it's -- what do they -- they had a name

15  for it -- intake office.

16         Q.  Okay.

17         A.  So they go in there, and then it's assigned to

18  whoever's going to take over the case, either -- at this

19  time, it was going to be Karen Shook.  She reviews it or

20  has some -- one of her attorneys review it and says,

21  "Hey, I think we're missing a statement for so-and-so."

22             And then he calls, "Hey, we need a

23  statement from so-and-so."

24             They would call the office, and then that's

25  how we would say, "Okay.  Send -- get a detective.  Send

Pedro A. Ocegueda - December 13, 2022

Page 53

 1   him out there.  Get a statement."

 2        Q.  So would it be accurate to say that your

 3   investigative file is not ultimately complete even after

 4   it goes to the DA's office?

 5        A.  No, it's not because, not only do we review it,

 6   they review it.

 7        Q.  Okay.

 8        A.  And if they see that we need something else or

 9   it's lacking something, then they get back to us and

10   then we -- we correct that.

11        Q.  And so Detective Torreon had testified here

12   that that statement was taken.  Then it says, "I was

13   advised by Karen Shook or Sergeant Ocegueda" --

14        A.  Yeah.

15        Q.  -- "that a statement needed to be obtained from

16   Brandon Hamilton."

17        A.  Right.  And, here, the process would be that --

18   that the district attorney's office -- in this case,

19   Karen Shook -- would call us, call me, and say, "Hey,

20   Pete, I need a statement from so-and-so," or, "This is

21   what we're missing.  See if you can find it and bring

22   it" --

23        Q.  Right.

24        A.  -- "in to us."  So then I -- I -- I would get

25   Terrones or -- or one of them to do it.

Pedro A. Ocegueda - December 13, 2022

Page 54

1      Q.  Now, do you remember from this case that

2   Brandon Hamilton was an exculpatory witness, in the

3   sense that Hamilton was also somebody who confessed to

4   this murder?

5      A.  Yeah.  Exactly.  And I think that's -- that

6   statement was taken from -- by Dominguez, Sal Dominguez.

7      Q.  Okay.  And that's from your personal

8   recollection of this --

9      A.  Yes.

10     Q.  -- Hernandez case.

11     A.  Exactly.

12     Q.  All right.

13     A.  And, again, I think Sal came in and says, "I

14   don't see anything where -- where he's connected to it.

15   He's -- he's lying about this, or he's making it up," or

16   what have you.

17              I says, "Oh, you know, then don't take a

18   statement.  Just kick him out.  You know, get rid of

19   him."

20     Q.  Okay.

21     A.  I mean, if he's not going to add nothing to it,

22   then we don't need him.

23     Q.  All right.

24     A.  So then -- then -- but they said, "Ah, well,

25   let's just get a statement from him to the fact as to

Pedro A. Ocegueda - December 13, 2022

Page 55

1   what he says and go from there."

2       Q.  And so was the -- was the -- did the file

3   already reflect that Brandon Hamilton was not believed

4   to be the perpetrator by CAP?

5       A.  I think that's what was -- Dominguez's

6   statement was, yeah.

7       Q.  Okay.  All right.  So that statement was

8   obtained at the request of the DA's office.

9       A.  Correct.

10      Q.  All right.  And then it also says here just

11  below that, "Sergeant Ocegueda also wanted body fluids

12  and blood taken from Brandon Hamilton."

13      A.  Uh-huh.

14      Q.  Do you remember that?  Do you remember doing

15  that?

16      A.  I -- I -- I don't recall, but if they're saying

17  I did, then, you know, I did.

18      Q.  And what would be the purpose in getting body

19  fluids and blood from Brandon Hamilton?

20      A.  I think that was something that -- that Karen

21  said, "If -- if you're able to get body fluids and --

22  and -- and -- and blood samples from him, get it from

23  him, just to -- so we can" --

24      Q.  Okay.

25      A.  -- "make sure that we get, you know" --

Page 56

1    Q.  All right.

2    A.  -- "do everything," so we did it.

3    Q.  All right.  And --

4    A.  And if we weren't able to, well, we wouldn't --

5  we wouldn't do it.

6    Q.  And is that a part of getting evidence that's

7  both for proof of guilt or proof of innocence?

8    A.  That's correct.  Yes.

9    Q.  As to whoever the indicted individual is.

10   A.  Yes.

11   Q.  Tell the jury a little bit about the CAP office

12 space and how it was set up in the -- in the context of

13 the allegations that people were intimidated and hit and

14 physically abused, and yelling and screaming was all a

15 part of this getting a confession process.  In 1993, did

16 you believe that was likely or possible in that unit?

17   A.  It would be very unlikely that that would

18 happen.

19   Q.  Why?

20   A.  And the reason being is that the -- the -- the

21 office is -- is -- it houses several -- numerous

22 detectives, a couple of receptionists -- well, one

23 receptionist and an assistant, office assistant, that --

24 that helps us there with -- she's kind of the

25 lieutenant's secretary.

Pedro A. Ocegueda - December 13, 2022

Page 57

1    Q.  Uh-huh.

2    A.  So, I mean, it's very cramped.  The detectives'

3   working areas are -- are cubicles that you can see over.

4   I mean, that's just how -- maybe, what, five-feet-high

5   walls, and they're part- -- partitions.  But it's very

6   cramped.  It's very small.  There are several interview

7   rooms, but they're -- they're kind of right across the

8   hallway from the sergeants' offices, so -- I mean,

9   and --

10    Q.  So how many -- how many feet from the

11   sergeant's office?

12    A.  Not more than four feet.

13    Q.  Okay.

14    A.  Yeah.

15    Q.  So the interrogation room you're talking about,

16   does it have a two-way mirror?

17    A.  The -- the interrogation room, it would be

18   across -- that one -- that one's a little bit further

19   from us.  Maybe about 20 feet.  But that's a little bit

20   bigger room, and it does have a two-way mirror on it --

21   a one-way mirror on it, yeah.  One-way, yeah.

22    Q.  Yeah, one-way mirror?

23    A.  Yes.  Yes.

24    Q.  Okay.  So he can see from one side, not the

25   other.

Pedro A. Ocegueda - December 13, 2022

Page 58

1      A.   Exactly.

2      Q.   And the one that's next to the sergeant's

3  office, is that a small interview room?

4      A.   That's a -- that's a small interview room,

5  small office-type interview room.

6      Q.   Is the wall thin or soundproof?

7      A.   It's thin.

8      Q.   So if people were yelling and screaming at

9  people in there, would somebody next door know it?

10     A.   Absolutely, yes.

11     Q.   I've asked you about the motion to suppress and

12  the feedback you got about whether or not there was

13  misconduct by your personnel, and we've looked at this

14  Hernandez incident, which at an earlier point involved a

15  writ of habeas corpus.

16          Did you get feedback from the district

17  attorney's office when postconviction writs like habeas

18  corpus would come forward?

19     A.   Huh-uh.

20     Q.   Did your personnel go and testify at those

21  proceedings?

22     A.   At -- at times, yes.

23     Q.   Okay.  And I'd asked you about Duane Baker

24  earlier.  Were you involved, like you were in this case

25  here, with lawyers in civil cases for the city that

Pedro A. Ocegueda - December 13, 2022

Page 59

1   would come to you for evidence and information?

2        A.   Yes.

3        Q.   From any of those postconviction cases or the

4   civil cases that you were a witness or a source of

5   information, by the time that you left the department in

6   2001, were you aware of any credible information that

7   CAP detectives were engaging in misuse or abuse of

8   suspects in the cases you were investigating?

9        A.   No.

10       Q.   Did you believe that there was any ongoing

11  pattern of misconduct in your unit?

12       A.   Not to my knowledge, no.

13            MR. DENTON:   Thank you very much, Sergeant.

14  I will pass you as a witness.

15            THE WITNESS:   Thank you.

16            MR. ALMANZAN:   This is Andy Almanzan on

17  behalf of Car- -- Defendant Carlos Ortega.   We will

18  reserve our questions for this witness until the time of

19  trial.   Thank you.

20            THE REPORTER:   Does anyone have any

21  questions?

22            MR. JEEP DARNELL:   No.   We'll reserve as

23  well.

24            MR. MARTINEZ:   No, ma'am.

25            MR. BRITTAIN:   Eric Brittain.   We'll

Pedro A. Ocegueda - December 13, 2022

Page 60

1  reserve as well.

2              THE VIDEO TECHNICIAN:  Okay.  Thank you,

3  then.

4              Is that all, Ginger?

5              THE REPORTER:  Yes.

6              THE VIDEO TECHNICIAN:  Okay.  Then this

7  concludes this deposition.  Off the record at 10:12 a.m.

8              (Deposition concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pedro A. Ocegueda - December 13, 2022

Page 61

1                    C E R T I F I C A T E

2

3    STATE OF TEXAS        )

4    COUNTY OF EL PASO     )

5

6

7

8            I, Ginger G. Zachary, Registered Professional

9    Reporter, Certified Realtime Reporter, and Certified

10   Shorthand Reporter in and for the State of Texas, hereby

11   Certify that this transcript is a true record of the

12   said proceedings, and that said transcription is done to

13   the best of my ability.

14           Given under my hand and seal of office on

15   December 28, 2022.

16

17

18   _____
     Ginger G. Zachary, CSR, RPR, CRR
19   Texas Certification Number 5710
     Date of Expiration:  1/31/2024
20   ACR INK, LLC
     221 North Kansas Street, Suite 505
21   El Paso, Texas 79901
     Ph.:  915.542.3422

22

23

24

25

Pedro A. Ocegueda - December 13, 2022

Page 62

1            CORRECTIONS AND SIGNATURE

2          WITNESS:  PEDRO ANTONIO OCEGUEDA

3             DATE:  DECEMBER 13, 2022

4   PAGE  LINE  CORRECTION            REASON

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Page 63

1          I, PEDRO ANTONIO OCEGUEDA, have read the

2     foregoing deposition and hereby affix my signature that

3     same is true and correct, except as noted above.

4

5                              _____

6                              PEDRO ANTONIO OCEGUEDA

7     THE STATE OF TEXAS )

8     COUNTY OF EL PASO  )

9

10         Before me, _____, on this

11    day personally appeared PEDRO ANTONIO OCEGUEDA known to

12    me (or proved to me under oath or through

13    _____) (description of identity card or other

14    document) to be the person whose name is subscribed to

15    the foregoing instrument and acknowledged to me that

16    they executed the same for the purposes and

17    consideration therein expressed.

18              Given under my hand and seal of office this

19    _____ day of _____, _____.

20

21                              _____

                                NOTARY PUBLIC IN AND FOR
22                              THE STATE OF TEXAS

23    My commission expires: _____

24

25

**A**

**a.m** 1:20,20 5:4 48:4,8 60:7
**Aberdeen** 2:3
**abide** 14:21
**ability** 61:13
**able** 25:23 55:21 56:4
**above-styled** 1:19
**absolutely** 20:6 24:18 28:24 29:7,21 33:24 34:1 35:23 36:4 39:9 42:20 58:10
**abuse** 39:13 59:7
**abused** 56:14
**academy** 7:15 12:18
**access** 19:13 34:23 36:7
**accident** 24:6,9 24:13,16
**accomplish** 27:8
**accurate** 53:2
**acknowledged** 63:15
**ACR** 1:20 61:20
**actively** 45:4
**activities** 40:3 43:25 45:12 46:14
**add** 54:21
**added** 36:14
**additional** 12:9 36:15 51:23
**admitted** 29:5
**adults** 21:10
**advised** 51:22 52:10 53:13
**affairs** 24:24
**affidavit** 4:10,11 40:6,11,17,25 41:2,8,16

42:22 44:5 47:19 48:10,16 48:18 50:18
**affix** 63:2
**after-action** 39:7
**age** 7:20
**agent** 48:25 49:9 50:25
**agent's** 49:16
**agree** 6:9 27:3
**agreed** 27:6
**agreement** 6:7
**Ah** 54:24
**ahead** 23:22
**Ainsworth** 2:2 5:10,11,13 6:3 6:4,15
**ainsworth@lo...** 2:5
**al** 1:5
**Al-** 5:12
**Albany** 12:17
**Alejandro** 40:8 48:17
**Alfonso** 3:2 5:25 23:7 24:3,4 25:17 26:6 30:6 39:16
**allegations** 56:13
**Almanzan** 3:8 5:12,15,16 59:16,16
**almanzan@m...** 3:11
**Alzada** 6:25
**Andres** 3:8
**Andy** 5:12,15 59:16
**Antonio** 1:12,17 2:9 3:17 6:17 6:22 19:1 62:2 63:1,6,11
**anybody** 40:2
**anytime** 19:17

35:11
**apologize** 36:24
**appeal** 47:2
**appearances** 5:7
**appeared** 63:11
**appearing** 5:13
**appears** 46:1
**appellate** 47:2
**applicable** 14:19
**applied** 10:16
**appreciate** 7:25 37:4
**approach** 14:23
**approaches** 15:2
**appropriate** 25:13 27:4 29:17
**approval** 31:16 31:17 52:7
**approve** 32:17 51:1
**approved** 50:23
**Approximately** 8:9
**April** 7:16 10:14
**Arbogast** 2:12 5:23 30:6,21
**area** 13:12
**areas** 57:3
**arrive** 42:7,7
**arrived** 41:17 42:12
**asked** 10:21,22 28:16 29:14 34:22 36:18 43:23 46:18 58:11,23
**asking** 37:24
**aspects** 20:21
**assault** 16:22 17:5
**assembly** 49:1
**assigned** 9:5 10:12 12:25 30:14,15 46:6 48:25 49:8,18

50:24 52:17
**assignments** 50:8
**assist** 20:25 22:5
**assistant** 19:22 19:22 51:20 56:23,23
**assume** 41:4
**ATTACHED** 4:2
**attend** 12:14 46:7
**attended** 12:16 12:23 13:8
**attending** 5:6
**attitude** 8:20 14:7,17
**attorney** 19:23 36:11 38:4 49:4 51:21
**attorney's** 18:20 18:22 32:3,14 38:12,21 53:18 58:17
**attorneys** 36:17 52:20
**authori-** 24:13
**autopsy** 46:7
**available** 51:6 51:17
**Avenue** 2:8
**average** 15:12
**avoid** 25:21
**aware** 36:19 39:11 46:21 59:6

**B**

**back** 9:7 11:5,6 34:13 37:2,5,6 41:9 46:8 48:2 48:7 53:9
**background** 37:21
**Baden** 13:13,18 13:19

**Baker** 40:21,23 58:23
**beginning** 35:19
**behalf** 5:13,16 5:20,23 59:17
**believe** 26:13 31:5,9 44:25 46:20 56:16 59:10
**believed** 55:3
**Bellows** 2:18 5:21 30:7,22
**BERNAL** 2:8
**best** 11:8,8 14:11 22:17 61:13
**bet** 36:25
**better** 23:16
**big** 18:11
**bigger** 57:20
**binder** 32:4,4 33:21 34:18 49:13,20,24
**bit** 7:13 9:17 10:15 11:20,22 14:2 15:11 23:17 28:1 31:14 56:11 57:18,19
**blood** 12:12 55:12,19,22
**body** 41:18 55:11,18,21
**Boom** 51:14
**born** 7:3,4
**bottom** 24:19,21 26:23 43:1,9
**Brandon** 53:16 54:2 55:3,12 55:19
**break** 16:7,9,9 16:16 48:5
**breakdown** 17:7
**breaking** 24:17
**brief** 16:7
**briefing** 15:19

15:22 16:5,10
**briefly** 13:15
**bring** 32:9 50:10
    53:21
**Brittain** 2:19,19
    5:17,17,20,20
    36:23 37:1
    59:25,25
**brittain@win...**
    2:21
**brother** 44:10
**brought** 13:3
**Burke** 3:14 23:5
    23:8,11,14
    37:22 40:5
    47:20 48:9
**Bye** 6:14

**C**

**C** 2:1 3:1 61:1,1
**call** 19:10,17
    38:25 50:2
    52:24 53:19,19
**called** 9:7 15:23
    41:1,9 42:1
**calls** 6:23 52:22
**CAP** 10:23 11:4
    11:6,10 12:2,7
    12:8,25 14:4
    15:23 16:20
    20:13 22:16
    28:12 29:24
    32:1 42:2
    43:10,11 50:22
    55:4 56:11
    59:7
**captain** 17:25
    29:13
**captains** 29:14
    29:14,15
**captains/com...**
    18:2
**Car-** 59:17
**card** 63:13
**career** 7:13 11:3
**Carlos** 3:7 5:16

30:6 59:17
**carried** 22:19
    46:15
**carrying** 15:4
    31:10
**case** 16:18 17:3
    18:11,11 19:9
    20:10,21 21:2
    22:22 24:22
    30:21 31:22
    32:1,4,21,22
    32:25 35:24
    37:14 38:5
    39:3 40:6,25
    41:5,25 45:25
    45:25 46:25
    47:20 48:16,25
    48:25 49:3,8
    49:11,13,16,19
    50:3,3,23,24
    50:25 51:4,9
    51:20 52:6,11
    52:18 53:18
    54:1,10 58:24
**cases** 15:25 16:6
    16:8,11 17:2,5
    17:10 18:15,16
    20:9,12,13
    21:22 37:25
    39:8,25 40:1
    42:17 47:11
    50:6 51:17
    58:25 59:3,4,8
**caught** 25:19
**cause** 1:19 25:16
**Certificate** 3:19
**Certification**
    61:19
**Certified** 61:9,9
**Certify** 61:11
**chain** 14:2 17:20
    18:6 49:21
**changed** 17:23
**characteristic**
    46:11
**Charles** 10:20

17:25
**Charlie** 22:9,22
**check** 18:8,8,12
    52:13
**checked** 51:14
**checking** 18:13
**Chicago** 2:4
**chief** 8:14 18:3,4
    25:4 27:1
**choose** 17:1
**Christy** 3:14
**chronologically**
    23:10 26:12
**city** 1:5 2:7 5:8
    24:5,7 58:25
**civil** 1:22 58:25
    59:4
**claims** 23:3
**Code** 10:6,6
    22:20
**coercion** 39:13
    39:17,17 46:22
**coincided** 21:20
**come** 13:13
    17:19 18:8,11
    19:4,10 22:5
    28:16 32:25
    34:11 35:16
    58:18 59:1
**coming** 33:9
**command** 14:2
    17:21 18:6
**commander**
    10:20
**commanders**
    17:22 18:1
**commission**
    63:23
**common** 41:21
    42:18
**commonly** 19:5
**compare** 11:18
    12:24 14:24
**compared** 18:23
**competitive** 9:24
    11:22

**complainant**
    23:24 24:3
    26:21
**complaint** 24:11
**complaints**
    36:21 39:15
**complete** 32:11
    33:5,13,21
    36:7 45:10
    52:3 53:3
**completed** 18:18
    32:6 34:9
    50:10
**compliance** 8:21
    14:18,18 15:5
    21:2 22:25
    47:16
**computer** 35:4
**concluded** 60:8
**concludes** 60:7
**concurred** 24:25
    25:1
**conduct** 36:19
**conducting** 10:9
**confessed** 54:3
**confession** 38:6
    56:15
**confessions**
    39:18 46:22
**connected** 54:14
**connection**
    46:15
**consideration**
    63:17
**contact** 42:2
**contacted** 40:16
**contained** 35:8
**context** 56:12
**continue** 6:13
    48:8
**continued** 3:1
**continues** 43:21
**continuing**
    39:16
**convicted** 47:1
**conviction** 8:5

40:7 47:12
**convictions** 47:1
**copies** 35:3
**copy** 32:4 33:18
    33:18 34:25
**corpus** 58:15,18
**correct** 8:14,15
    11:17 20:2
    27:24 28:13
    31:1 34:12
    40:15 41:14
    43:20 44:8,14
    44:16,22 45:6
    45:7 46:5,10
    46:17,23 52:8
    53:10 55:9
    56:8 63:3
**corrected** 15:9
**Correction** 52:8
    62:4
**Corrections**
    3:20 62:1
**correctly** 10:13
    15:5 20:17
    27:23 28:5
**correspondence**
    6:8
**counsel** 5:6 36:7
    37:4
**COUNTY** 61:4
    63:8
**couple** 9:11
    56:22
**course** 12:22
    15:23 16:25
    18:3 19:12
    20:7 21:21
    26:5 43:24
**courses** 13:10
**court** 1:1 38:10
    39:23 44:4
    46:19
**courthouse**
    38:20
**courts** 39:12
    47:2,6,17

Pedro A. Ocegueda - December 13, 2022

**CP92-296** 4:4
**CP92-358** 4:6
**CP93-097** 4:8
**cramped** 57:2,6
**credible** 59:6
**crew** 16:16
**crime** 9:6 12:5
  12:12 45:20
  46:8
**crimes** 9:5,5
  10:12 12:10
  14:19 18:7
**criminal** 9:6
  10:6 37:14
**criminalistics**
  9:8
**CRR** 1:25 61:18
**CSR** 1:25 61:18
**cubicles** 57:3
**cursory** 24:11
**custody** 49:21

—————— D ——————
**DA** 33:3 35:24
  47:4 50:24
  51:1 52:9,9
**DA's** 19:19 20:9
  22:25 32:8,24
  35:21 36:6
  39:5 46:24
  47:8 52:13
  53:4 55:8
**Dad** 37:18
**daily** 34:2,5
**Daniel** 1:3 8:5
  31:11 32:24
  50:15
**Darnell** 2:13,13
  2:14 5:18,22
  5:22 37:7,18
  59:22
**date** 5:3 27:18
  61:19 62:3
**Davis** 20:4
**day** 15:21 17:13
  17:14,18 44:1

63:11,19
**days** 25:10 35:4
**DC** 29:16
**deal** 21:22
**DeAngelis** 29:13
**December** 1:13
  1:19 5:3 61:15
  62:3
**Dee** 51:22 52:10
**deep** 16:17
**defendant** 2:7
  2:18 3:2,7 5:16
  5:21 35:13
  59:17
**Defendants** 1:6
  2:12 5:23
**defense** 36:7,11
  36:17 37:25
  38:4
**Denton** 2:7,8
  3:18 5:8,8 6:3
  6:16,20 23:9
  23:17,19 36:25
  37:3,8,10,20
  37:23,24 47:19
  47:24 48:1,9
  48:14,15,21,23
  59:13
**department** 4:3
  4:5,7 7:9,14
  8:8 13:4,6
  21:12,13 22:20
  59:5
**departments**
  13:7
**depend** 20:10
**depending** 19:8
**depo** 36:24
**deposition** 1:11
  1:16 5:5 6:6,9
  6:11,13 60:7,8
  63:2
**Deputy** 18:3
**describe** 14:17
  49:17
**described** 46:4

52:2
**description** 4:2
  63:13
**desk** 28:17,22
  29:3
**detailed** 16:17
**detective** 9:4,14
  9:16,18 10:1
  10:10,11 11:13
  11:19,22 22:7
  25:17 26:2,13
  27:15 30:3,7,7
  34:14 42:11
  43:22 44:9,20
  45:2 47:20
  48:10 49:5
  52:25 53:11
**detectives** 12:25
  15:3,17 16:16
  17:1,4,5 19:9
  20:20 24:5
  26:6 31:21
  38:10,15 39:12
  42:5 43:10
  46:6 56:22
  59:7
**detectives'** 57:2
**determinations**
  46:21
**developed** 20:17
  31:19 33:11
**developing**
  18:15 35:9
**deviating** 15:7
**different** 9:25
  10:7,8 13:1
  16:8,15 17:2
  17:24 20:20,20
  35:17 42:8
  50:25
**direct** 30:12
**directing** 43:14
**disciplinary**
  23:7
**discipline** 26:1,7
  27:5,13,13

30:4
**discuss** 15:8
  16:14 34:11
**discussion** 16:12
**discussions**
  16:10
**dispatch** 42:1
**disposition**
  26:24 28:3
**district** 1:1,1
  18:20,22 19:23
  32:2,14 38:12
  38:21 49:4
  51:21 53:18
  58:16
**division** 1:2
  10:21
**document** 27:9
  63:14
**documents** 27:9
  34:17
**doing** 15:1 18:12
  18:14 19:12
  20:16 26:3
  30:17 39:25
  46:11 47:16
  55:14
**Dominguez**
  43:23 44:9
  45:2 54:6,6
**Dominguez's**
  55:5
**door** 58:9
**downtown** 19:1
**Dr** 12:18 13:13
  13:14,15,23
**drawer** 29:3
**Drive** 2:20
**driving** 24:5
**Duane** 40:21,23
  58:23
**duly** 1:18 6:2,18
**Dwain** 50:22
  52:6

—————— E ——————

**E** 2:1,1 3:1,1,8
  61:1,1
**Earl** 2:12 30:5
  30:21
**earlier** 34:2
  43:23 58:14,24
**East** 2:20
**eight** 15:20
**either** 35:8 39:4
  39:17 52:18
**Either/or** 39:2,2
**El** 1:2,5,21 2:7
  2:15,20 3:4,10
  4:3,5,7 5:9
  6:25 7:4,9,14
  13:6 61:4,21
  63:8
**electronically**
  31:23
**elite** 10:24 11:2
**employee** 7:8
  24:8
**en-** 10:17
**enforcement**
  44:18
**engaging** 39:16
  40:3 59:7
**England** 8:4
  21:8 46:16
**England/Lazo**
  27:19
**enlist** 10:17
**entailed** 14:8
**entering** 31:22
**entire** 29:23
**EPPD** 42:22
  45:25
**Eric** 2:19 5:17
  5:19,20 59:25
**especially** 17:2
**et** 1:5
**eventual** 8:5
**eventually** 8:13
  10:11 18:16
  19:24
**everybody** 6:22

Pedro A. Ocegueda - December 13, 2022

Page 4

11:4 14:10
37:6
**evidence** 28:5
35:7,11,18
37:12 38:6
43:15 45:6,14
46:9 49:21
56:6 59:1
**exactly** 9:22
17:11 54:5,11
58:1
**EXAMINATI...**
6:19
**examples** 13:9
**exculpatory**
35:18 54:2
**Excuse** 36:23
**executed** 63:16
**Exhibit** 4:3,5,7
4:10,11
**EXHIBITS** 4:1
**expected** 14:11
**experience** 8:16
**expert** 13:17,25
**experts** 13:12
**Expiration**
61:19
**expires** 63:23
**explain** 11:1
14:1 16:20
24:2 35:9
37:10
**expressed** 63:17

**F**

**F** 2:7 61:1
**fact** 10:14 54:25
**failed** 28:21
44:21
**failure** 28:4
**familiar** 37:11
38:1
**Family** 22:20
**far** 21:23
**farther** 42:10
**Federal** 1:22

**feedback** 39:5
46:19,24 47:4
47:15 58:12,16
**feel** 29:19
**feet** 57:10,12,19
**fell** 30:16
**field** 13:16 41:23
42:19 45:12
**file** 19:14 27:10
53:3 55:2
**filed** 40:13
**files** 18:17 20:15
20:17 31:15
**final** 35:20
**finalized** 32:6
**finally** 32:17
**find** 38:19 53:21
**first** 6:18 19:22
23:5,9,10
49:16
**fit** 6:14
**five-feet-high**
57:4
**fluids** 55:11,19
55:21
**follow** 22:2
29:10
**follow-up** 45:4
**followed** 8:24
29:22
**following** 22:16
27:22 31:6,10
**follows** 6:18
**foregoing** 63:2
63:15
**forensic** 13:17
13:17,19,19
**forgeries** 12:5
**forgot** 28:17
**form** 27:12
**forth** 41:19
43:24 49:3
**forthright** 28:23
**forward** 58:18
**forwarded**
24:24

**found** 24:12
39:12 41:18
**four** 57:12
**frame** 19:19
21:7
**Franco** 8:11
**frequent-** 19:7
**frequently** 19:7
**Friday** 15:13
**front** 50:2
**further** 24:24
46:9 57:18

**G**

**G** 1:25 61:8,18
**GALATZAN**
3:3,9
**generally** 36:19
**gentlemen** 6:13
**George** 20:5,6
**getting** 33:17
47:15 55:18
56:6,15
**Ginger** 1:25
37:22 60:4
61:8,18
**give** 10:5 26:16
34:13 47:4
**Given** 61:14
63:18
**giving** 42:23
**go** 5:19 9:11,13
10:23 11:5
13:15 16:17
18:1 19:3,14
23:22 32:8,10
33:13 34:8,11
34:23 35:14,21
37:23 40:12
43:10 45:1
46:8 47:25
48:1,22 50:4
50:11 51:1
52:4,17 55:1
58:20
**goes** 27:10 53:4

**going** 6:10,12
9:25 11:21
15:16 16:6,13
16:18 18:16
20:24,24,25
23:4,5 31:18
32:2 36:12
38:5 40:5
41:15,22 44:1
44:2 48:18
49:15 52:18,19
54:21
**good** 5:1 7:2,7
7:22 8:19,19
**graduated** 7:15
**Graves** 2:12
5:23 30:6,21
**GREEN** 3:3,8
**ground** 15:20
**group** 13:6
**guess** 40:16
**Guillermo** 46:7
**guilt** 35:8 56:7
**guys** 17:2

**H**

**habeas** 58:15,17
**hallway** 57:8
**Hamilton** 53:16
54:2,3 55:3,12
55:19
**hand** 61:14
63:18
**handle** 21:24
30:18
**handling** 20:20
**happen** 10:17
15:16,25 16:1
17:13 18:17
39:1 56:18
**happened** 25:23
28:23 31:15
41:10 47:14
**happening**
18:11 52:11
**hard** 27:13 32:4

33:17,18
**Havlovic** 20:5,6
**headquarters**
18:25,25 43:11
**hear** 17:8 38:19
**heard** 36:21
39:15,22
**HECTOR** 2:12
**helps** 56:24
**Henry** 13:13
**Hernandez** 40:8
48:10,17 49:11
54:10 58:14
**hey** 20:22 28:17
28:18 38:22
47:6 52:21,22
53:19
**high-level** 14:15
**history** 31:6
**hit** 15:20 56:13
**hom-** 16:21
**homicide** 12:14
12:20,23 13:5
13:12 16:21
41:5,25 42:17
**homicides** 13:25
15:25
**honest** 25:18
**HOOD** 2:19
**hours** 17:18
**houses** 56:21
**Huh-uh** 58:19

**I**

**IA** 28:7
**ID** 9:7
**identity** 63:13
**Illinois** 2:4
**impact** 9:25
**implemented**
21:19
**implementing**
30:4
**important** 26:10
35:25 36:1
44:17 45:8

**impression**
47:15
**improper** 36:19
**inappropriate**
26:4 30:17
**incident** 4:3,6,8
21:14 23:20
25:15,15,25
28:4,4 29:11
39:11 40:9
48:11 58:14
**incident's** 27:19
**incidents** 23:5,6
30:3 44:20
**included** 12:12
**inculpatory**
35:18
**INDEX** 3:16
**indicted** 56:9
**Indiscernible**
37:17,19
**individual** 24:7
40:7 56:9
**individuals** 18:5
30:20 31:5
**information**
36:15 42:23
59:1,5,6
**initiate** 26:7
**initiated** 26:21
**initiating** 30:4
**Ink** 1:20 61:20
**innocence** 35:8
56:7
**instance** 1:17
**instructed** 43:10
**instrument**
63:15
**intake** 32:14
52:15
**intense** 11:20
**inter-** 12:12
**interact** 19:2
**interacted** 22:24
35:24
**interaction** 34:4

39:10 50:5
**interactions**
20:8
**interchangeable**
51:18
**interest** 34:22
**internal** 24:24
**interrogating**
22:11
**interrogation**
57:15,17
**interrogations**
12:12
**interview** 43:11
57:6 58:3,4,5
**interviewed**
22:14
**interviewing**
43:15
**intimidated**
56:13
**investigate** 10:7
**investigated**
28:7
**investigating**
22:11 30:20
59:8
**investigation** 8:4
14:19 24:11,24
29:11 30:25
31:3,11,20
33:23 36:8,20
41:3 46:15
51:23
**investigations**
9:6 10:9 21:9
26:7 35:9 45:9
46:12
**investigative**
12:10 18:17
19:12 22:5
53:3
**investigator**
49:1
**investigators**
22:19 23:4

**involve** 9:18
**involved** 8:3
9:14 14:9
21:10 22:25
23:6,7 24:6,12
30:21 38:10
39:13 40:7
45:4 58:14,24
**involvement**
41:2
**involves** 28:4
**issue** 31:16
**issues** 21:2 23:7
**item** 38:22

**J**
**James** 2:13,13
3:2
**January** 7:15
**JAY** 2:19
**jdarnell@jdar...**
2:16
**jedarnell@jda...**
2:16
**Jeep** 2:13 5:18
5:18,22,22
36:24 37:7,18
59:22
**Jesus** 4:11
**Jim** 2:13,14 5:25
**JIS** 22:4,14
**job** 14:24
**jobs** 15:4
**John** 8:11,13
20:4
**Johnson** 50:22
52:6
**Juarez** 13:8
**judge** 39:4
**judicial** 39:11
46:21
**jury** 7:13 9:1,17
10:15 11:1
14:1 15:11
18:21 21:7
24:2 31:18

34:2 35:6,10
37:11,16 38:3
39:4 45:8
49:17 51:25
56:11
**juvenile** 21:20
21:22 22:2,4
22:12 23:1
**juveniles** 21:3
21:10,24

**K**
**Kansas** 1:21
61:20
**Karen** 19:22,24
19:25 51:21
52:19 53:13,19
55:20
**keep** 38:5,8
39:24
**kept** 40:2
**kick** 54:18
**kicked** 36:24
38:23
**Kimmett** 2:18
5:21 30:7,22
**kin** 44:15
**kind** 12:6,8
14:12 16:6
17:6 18:13,13
21:13 22:6,22
39:22 40:3
45:18 46:14
51:17 56:24
57:7
**kinds** 16:10
38:10
**King** 13:14,23
**King's** 12:18
**knew** 10:18
**know** 9:21 10:4
11:6 15:24
17:6,17 22:2
25:4,7,10 31:8
35:16 36:6,12
38:24 40:22

47:6 54:17,18
55:17,25 58:9
**knowledge**
48:19 52:1
59:12
**knowledgeable**
8:18
**known** 37:11
63:11

**L**
**lab** 28:15
**lacking** 53:9
**Larose** 19:24,25
**law** 14:19 21:20
21:21 31:10
44:18
**lawful** 31:11
**laws** 14:22 15:5
**lawyers** 58:25
**Lazo** 8:4 21:8
46:16
**lead** 8:25 49:1
49:19
**leader** 8:19
**leading** 13:12
**learn** 35:15
**learned** 14:22
**leave** 6:12 51:4
**Lee** 13:13,15
**left** 59:5
**let's** 13:15 15:11
16:9,9 20:14
24:19,23 26:12
26:23 27:14
28:3 40:12,24
44:25 47:19
48:1 50:17
54:25
**level** 28:10 33:2
34:3
**lfdenton@ra...**
2:10
**lie** 28:25
**lieutenant** 10:19
10:19 14:5,10

17:21,23 24:25
29:12 42:13,16
**lieutenant's**
56:25
**lieutenants** 8:12
**life** 7:5,6
**light** 8:1
**line** 42:11 62:4
**list** 10:2,3 11:25
11:25 23:9
**litigation** 30:5
**little** 7:13 9:17
10:15 11:20,22
14:2 15:11
23:15,17 28:1
31:14 56:11
57:18,19
**live** 6:24,25
**Lived** 7:5
**Lizarraga** 19:21
**LLC** 61:20
**LLP** 2:19
**local** 13:7
**locally** 13:4
**located** 18:23
43:11 45:1,14
**location** 41:17
44:10 45:3
**LOEVY** 2:3,3
**Long** 18:3 25:4
27:1 29:16
**look** 18:14 23:4
23:21 24:19
26:12,14,23
27:14 28:3
34:23 40:24
46:8 47:19
48:17,20 50:17
**looked** 15:12
16:10 58:13
**looking** 41:22
**looks** 45:3
**lost** 47:22
**lot** 13:11 15:24
15:25 16:1
31:21 33:16

**Lowell** 2:7 5:8
36:23
**Loya** 2:12 5:23
30:7
**lying** 54:15

## M

**M** 2:19
**ma'am** 59:24
**Main** 2:8,20
**maintained**
14:15
**major** 18:10
32:1
**making** 45:9
49:19 50:6
54:15
**management**
12:13 31:25
**Marcos** 19:21
**Marquez** 3:2 6:1
23:7 24:3,4,12
25:17 26:6,14
27:15 29:23
30:3,6,16
39:16 44:21
**Martinez** 3:2
5:25,25 46:7
59:24
**martinez@mg...**
3:5
**materials** 9:25
10:4,5 31:19
35:21
**matter** 10:14
50:15
**mean** 9:5,22
11:2 14:9
20:10 21:5
25:19,19,20,21
35:14,18 47:3
51:17 54:21
57:2,4,8
**means** 48:25
50:3
**meeting** 15:18

16:8 17:9,19
19:11 20:22
34:5,21 46:2,2
**meetings** 18:6
18:10 34:3
39:1 41:22
**mentioned**
13:22
**Mesa** 2:14
**Mexican** 13:8
**Michael** 13:13
13:18,19
**middle** 48:23
**Mike** 8:11
**minute** 26:16
**mirror** 57:16,20
57:21,22
**misconduct** 23:3
58:13 59:11
**missing** 52:21
53:21
**misuse** 59:7
**mixed** 17:6
**Monday** 15:13
15:15 16:3
**Mondays** 15:21
**monitor** 15:6
**month** 27:19,22
**morning** 5:1
15:16,18,19
17:18 46:1
**motion** 37:12,25
58:11
**motions** 37:25
**MOUNCE** 3:3,8
**murder** 17:5
36:20 41:2
50:6 54:4
**murders** 8:4
10:8 16:14
21:8 27:19
30:20 46:16
**mute** 37:18,21
37:22
**MYERS** 3:3,8

## N

**N** 2:1 3:1
**name** 6:21,22
13:21 23:24,25
52:14 63:14
**named** 30:5
39:20 40:8
**narcotics** 28:15
**Navarro** 2:8
3:13
**need** 20:23,25
52:22 53:8,20
54:22
**needed** 18:12
19:8,16 29:22
34:9,10 36:14
53:15
**needs** 37:1
**New** 12:17,17
**normal** 20:7
**North** 1:21 2:3,8
2:14 3:4,9
61:20
**NORTON** 2:19
**notarize** 34:13
34:16
**notarized** 34:10
**NOTARY** 63:21
**notebook** 32:17
32:23 33:3
52:3
**noted** 63:3
**notice** 22:21
44:15
**notified** 44:10
45:1
**number** 45:25
45:25 46:18
61:19
**numbered** 1:19
48:21
**numerous** 6:8
12:11 43:12
56:21

## O

**O** 2:13,13
**o'clock** 15:20
**oath** 63:12
**object** 6:10
**objects** 6:6
**obtain** 51:22
**obtained** 47:12
53:15 55:8
**obtaining** 43:15
**occasions** 36:13
**occurred** 21:14
**Ocegued-** 48:24
**Ocegueda** 1:12
1:17 3:17 4:10
5:5 6:17,22
48:24 53:13
55:11 62:2
63:1,6,11
**offhand** 40:20
**office** 16:13 17:7
18:20,22,24
19:4,6,11,19
20:9 22:25
32:3,8,14,15
32:20,24 35:21
38:9,13,21
39:1,5 41:22
43:11 46:24
47:8 50:24
51:2 52:13,15
52:24 53:4,18
55:8 56:11,21
56:23 57:11
58:3,17 61:14
63:18
**office-type** 58:5
**officer** 7:11
**officers** 5:23
9:21 13:8 22:8
30:5 38:14
39:20 42:22
43:2,4,8
**offices** 1:20 57:8
**oh** 5:15,18 54:17
**okay** 9:1 11:13
12:8,21 13:21

14:1,7,14
16:19 17:12,15
20:1,11 21:1,7
21:18,25 22:7
22:10 23:12,14
24:19 25:15
26:5,10,17
27:7,11,14,17
28:3,6,10 29:2
29:8,17,25
30:2,13,24
31:4 32:21
33:20 35:2,15
36:3 40:21
41:6 42:4,18
43:4,18 44:4
45:17,23 46:6
47:10 49:15
50:3,14 51:5
51:11,15 52:16
52:25 53:7
54:7,20 55:7
55:24 57:13,24
58:23 60:2,6
**once** 11:10 12:3
12:8 18:17
32:6,12 33:5
50:10,12
**one's** 27:15,18
57:18
**one-way** 57:21
57:21,22
**ongoing** 59:10
**opened** 29:3
**opening** 10:19
**opportunity**
28:21
**opposed** 35:3
**ORAL** 1:11,16
**organization**
49:2
**oriented** 23:22
**Ortega** 3:7 5:16
22:7,9,22 30:6
59:17
**outcome** 24:21

26:25
**outcomes** 38:19
**overnight** 17:17
**oversaw** 14:12
**oversee** 45:18,21
**overseeing**
22:23
**oversight** 31:17

**P**

**P** 2:1,1 3:1,1
**page** 3:16 41:16
41:16 44:25
48:20,21 50:17
50:18 62:4
**paper** 35:3
**paperwork**
41:22 44:7
**paragraph**
43:22 45:23
48:24 51:20
**part** 10:24 11:7
20:22 21:4
27:5 31:3
35:22 51:23
56:6,15
**part-** 57:5
**participating**
6:9
**particular** 16:18
19:9 22:1
**partitions** 57:5
**Paso** 1:2,5,21
2:7,15,20 3:4
3:10 4:3,5,7
5:9 6:25 7:4,9
7:14 13:6 61:4
61:21 63:8
**pass** 45:21 59:14
**passed** 11:25
**passes** 10:2
**pathologist**
13:20
**patrol** 8:7 43:4
**patrolman** 9:2
9:13

**pattern** 31:6
39:16 59:11
**Paul** 14:5 42:13
**PAXSON** 3:3,9
**PC** 2:8,14 3:3,9
**PD** 40:13
**Pedro** 1:12,16
3:17 4:10 5:5
6:17,22 62:2
63:1,6,11
**Penal** 10:6
**pending** 20:9
**people** 13:3
17:20 19:18
20:8 22:24
41:8 43:15
46:8 56:13
58:8,9
**percent** 35:5
**percentage** 35:2
**performed** 52:6
**period** 8:2,8
**perpetrator**
55:4
**person** 24:10,14
63:14
**personal** 14:23
48:19 49:7
54:7
**personally** 63:11
**personnel** 4:3,6
4:8 58:13,20
**persons** 9:5
10:12 12:10
18:7
**Pete** 6:23 53:20
**Ph** 61:21
**philosophy**
14:23
**phone** 38:25
**physical** 39:17
**physically** 18:22
56:14
**pick** 17:1,3
**picked** 43:12
**PIR** 23:10 26:13

27:14
**place** 15:9 21:12
21:21 27:20
34:3
**plainclothes**
43:3
**plaintiff** 1:4,18
2:2 5:14 6:6
**please** 5:6,7 6:21
37:21,22
**point** 11:10,23
27:7 31:4 45:4
58:14
**police** 4:3,5,7
7:9,11,14 8:13
12:17 13:8
18:25 21:12
**policies** 21:3
31:7
**policing** 8:21
**policy** 14:18
21:11,19 22:3
22:20 26:8
27:10 36:6
**portions** 33:22
**position** 10:18
10:22 14:8,10
**possible** 17:16
22:17 32:11
33:5 45:13
56:16
**postconviction**
58:17 59:3
**prepared** 18:19
**preparing** 32:8
50:9
**present** 3:13
6:15 35:13
**presentation**
18:20 32:7,24
49:14 50:2
51:10
**presented** 32:2
50:23
**presenting** 49:3
51:20

**pretty** 9:11
**previous** 10:19
31:6
**prior** 12:2 36:20
**Probably** 44:3
**problems** 25:16
**procedure** 1:22
22:16,19
**procedures** 10:6
21:3
**proceed** 20:25
37:9
**proceeded** 25:24
**proceedings**
38:11,15,20
46:19 58:21
61:12
**process** 9:19,20
11:18 22:6
28:5 31:18
43:14 49:12
52:1,12 53:17
56:15
**produced** 1:17
**professional**
8:18,23,24
14:12 61:8
**professionalism**
8:20 14:16
**Professors** 13:10
**progression** 9:1
**promoted** 9:15
9:16 11:15
**promoting** 9:17
**promotional**
11:18
**proof** 56:7,7
**properly** 20:18
45:15
**prosecutors**
19:13
**protocols** 31:7
**prove** 25:23
**proved** 63:12
**provide** 8:1
**provided** 48:16

PUBLIC 63:21
punishment 25:7
purpose 26:1 43:18 45:10 55:18
purposes 63:16
pursuant 1:22
put 10:2,22 11:25 18:16,19 21:12 23:5 32:5,7 34:18 40:5 44:5 47:21 48:9 49:20
puts 49:24,24 50:1
putting 21:21 33:16 49:13
puzzling 50:21

**Q**

question 34:22 44:15 47:10 49:15
questioned 22:14
questions 25:16 33:7 36:18 41:10 46:18 59:18,21

**R**

R 2:1 3:1 9:7 61:1
raised 31:16
rank 9:3,4,13,14 9:16 11:11,16
ranked 10:2
ranks 9:2
Ray 2:12 30:7
Raynor 18:24
read 25:5 28:1 63:1
reading 44:6
ready 6:16

19:14 49:13,25 50:3,13 51:10 52:3
really 12:16
Realtime 61:9
reason 30:11 31:4,9 56:20 62:4
reasons 6:7
recall 39:19 47:5 55:16
receptionist 56:23
receptionists 56:22
recognize 23:19 23:23 26:14,18 27:25 40:11 41:8
recollection 49:7 52:1 54:8
recommendati- 24:23 25:6
reconstructing 44:6
record 5:3 6:5 31:24 47:25 48:1,3,8 60:7 61:11
recording 5:2 6:11 48:7
red-handed 25:20
referral 25:1
referred 24:25
reflect 55:3
regional 13:7
Registered 61:8
regularly 38:10
reinforcing 29:19
relationship 18:21
reliance 6:10
remember 9:22 10:13 27:22

30:2 40:8,19 40:25 46:20 49:8 52:11,12 54:1 55:14,14
remembered 44:6
report 4:3,6,8 25:25 29:11 34:21
Reported 1:24
Reporter 47:22 47:25 59:20 60:5 61:9,9,10
Reporter's 3:19
reports 31:17 33:8 34:4 39:7 49:2
reprimand 27:2 27:4,6,8
request 42:2 55:8
requested 36:15
required 21:9 22:10 47:17
reserve 59:18,22 60:1
respect 14:16 30:19
responsibilities 15:10 21:6
responsibility 14:8 21:4 22:18 32:16 35:7 39:23 44:18
responsible 49:1
rest 12:25
resulting 8:4
retired 7:17,18 7:23
reversed 47:2,7 47:12
review 20:21 31:15 33:3,14 33:22 34:19 35:20,22 50:11

51:12,13,21 52:20 53:5,6
reviewed 50:23
Reviewing 45:25
reviews 39:7 52:19
rid 54:18
right 6:16,24 7:20,25 8:7,16 9:9 10:11 11:1 12:2,24 13:9 13:18,21 14:17 15:11,15 19:2 19:5 20:14 23:11,24 25:2 25:7,11,22 26:5,20,22,23 27:21 28:5,6,7 28:14 29:4,5 30:2,19 31:2 32:23 33:15 34:20 35:20 37:3,5,8,23 38:9,14,17,25 40:14,16,20,24 41:13,15,16 42:10,21 43:7 43:13,21 44:7 44:13,17 45:5 45:19 47:24 48:15,23 50:5 50:7 51:8,19 52:5 53:17,23 54:12,23 55:7 55:10 56:1,3 57:7
RMS 31:24
robbery 10:8 16:21,21 17:4
ROCHA 2:8
Roger 3:13
role 11:21 20:15 21:4 43:16 49:16
room 57:15,17 57:20 58:3,4,5

rooms 57:7
RPR 1:25 61:18
Ruiz 46:6
rule 29:20
rules 1:22 24:17
ruling 39:3,4,4 39:22
rulings 39:11 46:21
running 15:20
Russell 2:2 5:10

**S**

S 2:1 3:1
SAFI 3:3,8
Sal 43:22 54:6 54:13
samples 55:22
San 2:9 19:1
Sanchez 2:12 5:24 30:8
satisfied 33:6 50:12
Saucedo 14:5,6 17:21,24 24:25 29:13 42:15
saying 34:25 55:16
says 23:24 40:25 41:17 42:11,22 43:9 44:9 45:1 46:1 48:24 50:21 51:20 52:20 53:12 54:13,17 55:1 55:10
Scagno 8:12,13
scenari- 42:9
scene 9:7 12:13 42:9,19,23 43:10,15,19 45:20 46:8
Scott 2:12 30:6 30:21
screaming 56:14 58:8

screen 23:18
  24:20 40:6
seal 61:14 63:18
Seattle 12:18
  13:14
second 48:2
secretary 56:25
section 16:21,22
  16:22 22:14
sections 10:1,7
see 6:13 18:12
  18:12 19:11
  23:11,18,25
  24:23 25:20
  26:14,24 29:12
  33:10 34:8,25
  40:12 41:17
  42:23 44:1,2
  44:25 45:24,24
  49:4 51:23
  53:8,21 54:14
  57:3,24
seldom 47:9,14
selections 10:3
  12:1
seminar 12:23
seminars 12:14
  12:15 13:5
send 33:7,14
  42:6 50:13
  52:25,25
sense 54:3
sent 49:22
sergeant 8:17
  11:12,12,15
  12:3 14:3
  16:25 41:11
  48:24 50:22,25
  53:13 55:11
  59:13
sergeant's 57:11
  58:2
sergeants 16:15
sergeants' 57:8
services 22:5
set 56:12

seven 8:9
sexual 16:22
  17:4
share 36:17
shared 36:10
shed 8:1
sheet 24:20
Shook 19:22
  51:21 52:19
  53:13,19
Shorthand
  61:10
show 26:3 42:16
showed 15:13,15
shows 24:20
  40:12 41:24
sic 52:8
side 57:24
signature 3:20
  62:1 63:2
signed 40:6
similar 13:1,2
  14:25,25
sir 6:21 7:19,20
  37:3
sit 18:9
six 17:2
sixth 42:11
Skanes 10:20,20
  17:25
slew 12:13
small 57:6 58:3
  58:4,5
smaller 23:18
so-and-so 52:21
  52:23 53:20
so-called 31:24
somebody 10:17
  20:25 22:3,11
  22:12 30:14
  34:22 37:1,20
  37:20 40:16
  47:6 49:23
  54:3 58:9
soon 28:20
sorry 5:15,19

23:15 48:11
sort 41:4
sorts 15:10
soundproof 58:6
source 36:21
  59:4
space 56:12
spatter 12:12
specialty 13:16
stamp 34:13
standards 47:17
Stanton 3:4,9
start 7:14 9:2
  15:21 50:9
started 15:19
state 5:7 6:5
  12:17 61:3,10
  63:7,22
stated 6:8
statement 32:7
  34:21 38:6
  50:2 51:22
  52:10,21,23
  53:1,12,15,20
  54:6,18,25
  55:6,7
statements 33:9
  34:5,10,16
  39:18 46:22
  48:19 49:3,21
STATES 1:1
Stewart 51:22
  52:11
straightforward
  14:20
Street 1:21 2:3
  2:14 3:4,9
  61:20
strict 8:22
studied 9:24,24
  14:21
study 10:4,5
stuff 12:6
subjects 23:1
submission
  19:15 35:25

submit 36:16
submitted 39:8
  49:23
subordinates
  15:3 17:9
  30:12
subscribed
  63:14
successfully
  47:11
Suite 1:21 2:14
  2:20 3:4,9
  61:20
supervise 45:11
supervising 15:4
  30:24
supervision 26:6
supervisor 8:10
  12:3,4 14:3
  28:8 32:9 51:7
supervisors 8:11
  32:18,20 42:3
  42:3
supervisory
  11:21 20:15
  28:10 31:17
supplement
  43:22 44:1
supplemental
  34:17 49:2
supplements
  33:9 34:4
  43:24 49:21
supposed 26:3
  28:19,20
suppress 37:12
  37:25 38:7
  58:11
suppressed
  38:22
sure 15:3,7,8
  20:17 22:18
  32:10 33:4
  34:12 35:7
  36:1,10 39:24
  45:9,12,15,20

48:2 49:19
  50:6,11 51:13
  55:25
suspect 31:12
suspects 39:13
  59:8
suspension 25:9
  25:12 27:3
  29:8,16,17
sustained 25:4,5
  27:1 29:12,16
sworn 1:18 6:2
  6:18 7:11
  34:15
system 31:24,25
  33:17,25

          T
T 61:1,1
Tabullo 42:11
tac 21:17
tagged 45:15
take 9:15,21
  10:1 16:15
  22:13 26:14
  27:20 34:3,23
  50:9 51:9
  52:10,18 54:17
taken 1:18 6:6
  34:5 48:5
  53:12 54:6
  55:12
takes 49:19
talk 15:7 19:8,13
  19:16 20:14,19
  20:19,22 31:14
talked 19:18
talking 21:8
  36:20 43:5,22
  45:13 57:15
talks 42:22
taught 35:19
teachers 13:10
technician 3:13
  5:1 28:15 48:3
  48:6 60:2,6

telephone 19:3
tell 6:21 7:13
  9:17 10:15
  15:11 18:21
  21:7 31:17
  35:6 37:16
  38:3 45:8
  51:25 56:11
terms 31:10,15
  45:8
Terrones 4:11
  48:12,13,14
  49:5 50:18,25
  53:25
test 9:15,18,21
  9:23,24 10:1,6
  11:24
testified 6:18
  46:20 53:11
testify 38:15
  41:1 58:20
testifying 43:25
  44:4
testimony 8:1
  40:17 41:23
  42:21 48:16
  49:4 52:10
Texas 1:1,21 2:9
  2:15,20 3:4,10
  14:22 21:20
  61:3,10,19,21
  63:7,22
Thank 6:4,14
  37:3,8 59:13
  59:15,19 60:2
theirs 13:1
they'd 18:11
thin 58:6,7
thing 11:24 18:2
  51:12,16
things 15:1
  20:16 26:4
  33:9
think 11:23 25:3
  25:9,12 29:18
  47:22 52:3,21

54:5,13 55:5
  55:20
third 27:14
thought 26:8
three 16:23 23:4
  30:3
three-day 29:16
Tierra 6:25
time 5:4 6:7 7:8
  8:2,8 9:8 14:2
  16:3,14 17:25
  19:19 21:7
  22:1,9 24:4,16
  24:25 26:7
  27:18 29:15
  31:5 33:22,22
  35:3,5 39:10
  40:14 41:18,25
  42:12 52:19
  59:5,18
times 31:21
  33:16 58:22
Titanic 45:2
today 7:25 20:23
  41:9
told 28:18 34:2
Tony 42:11
top 23:25 40:12
  40:12 41:17
Torreon 47:20
  48:10,11 53:11
track 39:24
training 12:9,13
  12:20,24 13:4
trainings 12:11
  35:17
transcript 6:11
  61:11
transcription
  61:12
transferred
  32:13
transient 45:2
transients 43:12
transitioned
  21:13

trial 59:19
true 61:11 63:3
truthful 25:18
try 15:2 25:20
Tuesday 5:3
turn 28:17,20,21
turned 45:15
two 16:14 44:1
two-way 57:16
  57:20
two-week 12:22
type 15:1 35:11
types 10:8
typical 15:21
typically 15:16
  19:18 50:6

—— U ——
Uh-huh 16:4,24
  22:17 34:6
  37:15 42:25
  44:12 49:12
  50:19 51:24
  55:13 57:1
ultimately 53:3
unauthorized
  24:10,14
understand 52:2
uniformed
  42:22 43:2,8
unit 9:8 10:15
  10:24 11:2,7,7
  11:10 12:4,5
  12:25 14:11
  16:20 21:15,16
  21:17,22 22:4
  28:12 29:24
  30:15 40:2
  42:1,2 56:16
  59:11
UNITED 1:1
units 16:23
use 6:10

—— V ——
v 1:4

vacation 51:3
vehicle 24:5,8,10
  24:14
verbal 39:17
verified 32:12
vice 9:10 12:4
victim 44:11
video 1:11,16
  3:13 5:1,5 6:11
  48:3,6 60:2,6
videographer
  5:2 48:7
Villegas 1:3 8:5
  31:11 32:24
  50:15
violation 26:8
  28:19

—— W ——
wait 33:12
walk 9:1 22:6
walked 29:3
wall 58:6
walls 57:5
want 10:23 14:1
  20:23 23:3
  31:14 35:6
  37:10 38:7,7
  41:15
wanted 6:5 8:23
  10:21,24 11:3
  11:5,5,9 14:20
  55:11
wants 11:5 38:4
Washington
  12:18
wasn't 18:9
  20:12 33:17
  51:6,17
way 7:16 8:3
  15:1 28:25
  50:14
we'll 48:17
  59:22,25
we're 20:24,24
  21:8 23:4

36:20 41:15
  52:21 53:21
we've 6:7 58:13
week 20:7
weekend 16:1
weekends 15:24
went 7:16 9:10
  12:6,15,18
  24:11 32:23
  33:3 39:3
  44:10 45:3
  46:25 52:9
weren't 15:7
  17:17 21:10
  56:4
WESTERN 1:1
Whate- 51:4
white-collar
  12:5
whoever's 52:18
WINDLE 2:19
witness 1:17 6:2
  23:13,15 48:13
  49:2 54:2 59:4
  59:14,15,18
  62:2
witnesses 45:13
  45:14
word 29:25
work 12:10
  15:13 17:1
  19:12 34:7
  47:16 52:2
worked 9:10
  18:22 41:7
working 15:17
  16:2 17:3,5,17
  17:17 20:16
  30:22 31:19
  35:3 40:1 57:3
workweek 15:12
wouldn't 56:4,5
wrap 17:12
writ 58:15
writing 25:5
writs 58:17

Pedro A. Ocegueda - December 13, 2022

**written** 27:2,6,7
44:23
**wrong** 29:5

---

**X**

---

**Y**

**y'all** 18:23
**yeah** 6:4 7:21
20:6 27:5,6
28:15,24 33:24
36:5,9 38:18
48:1 50:12,20
53:14 54:5
55:6 57:14,21
57:21,22
**year** 10:11
**years** 8:9 9:11
**yelling** 56:14
58:8
**York** 12:17,17

---

**Z**

**Zachary** 1:25
61:8,18
**ZECH** 2:8
**Zoom** 2:2 5:6
**Zoom-recorded**
5:4

---

**0**

**01** 4:3
**02** 4:5
**03** 4:7
**04** 4:10
**05** 4:11

---

**1**

**1/31/2024** 61:19
**10** 50:17,18
**10:12** 1:20 60:7
**100** 3:4,9
**1000** 3:4,9
**12612** 6:25
**13** 1:13,19 5:3
62:3
**1350** 2:20

**1977** 7:15
**1991** 19:20
**1993** 21:9 27:22
31:5,18 36:21
39:11 56:15

---

**2**

**20** 57:19
**2001** 7:17,18,23
59:6
**2008** 40:7,13
44:5
**201** 2:20
**2022** 1:13,19 5:3
61:15 62:3
**210** 2:9
**212** 2:14
**221** 1:21 61:20
**227-3243** 2:9
**243-5900** 2:4
**2517** 2:8
**26** 50:22
**28** 61:15

---

**3**

**3** 41:16 48:22
**3:15-CV-386** 1:4
**310** 2:14
**311** 2:3
**312** 2:4

---

**4**

**4** 44:25 48:20,22
**4427** 45:2

---

**5**

**50** 11:23
**500** 19:1
**505** 1:21 61:20
**532-2000** 3:5,10
**532-2442** 2:15
**545-4900** 2:21
**5710** 61:19

---

**6**

**6** 3:18
**60** 9:23 11:23

**60607** 2:4
**61** 3:19
**62** 3:20
**67** 7:21
**68** 7:21

---

**7**

**7:45** 15:19
**78212** 2:9
**79901** 2:15,20
3:4,10 61:21
**79938** 7:1

---

**8**

**80** 9:23
**85** 35:5

---

**9**

**9:05** 1:20 5:4
**9:52** 48:4
**9:59** 48:8
**90** 35:5
**91** 10:13,14
**915** 2:15,21 3:5
3:10
**915.542.3422**
61:21
**92** 21:14
**93** 27:16
**94** 50:22

# ATTACHMENT 2-G

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

# CASE NO. 3:15-CV-386

# DANIEL VILLEGAS

VS

# CITY OF EL PASO

# DEPONENT:

# HECTOR J.  LOYA

# DATE:

# May 09, 2022



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856  |  502.589.2273



1              IN THE UNITED STATES DISTRICT COURT FOR THE
               WESTERN DISTRICT OF TEXAS, EL PASO DIVISION
2
   DANIEL VILLEGAS,                 )
3                                   ) Case No. 3:15-CV-386
           Plaintiff,               )
4                                   )
               v.                   )
5                                   )
   CITY OF EL PASO, et al.          )
6                                   )
           Defendants.              )
7   ─────────────────────────────────────────────────────

8        REMOTE ORAL AND VIDEO RECORDED DEPOSITION OF

9                       HECTOR J. LOYA

10                      May 9, 2022
    ─────────────────────────────────────────────────────

11

12            REMOTE ORAL AND VIDEO RECORDED DEPOSITION

13   OF HECTOR J. LOYA, located in El Paso, Texas, produced

14   as a witness at the instance of the Plaintiff, and duly

15   sworn, taken in the above-styled and numbered cause on

16   May 9, 2022, from 9:13 a.m. to 4:06 p.m., before Joseph

17   D. Hendrick, Certified Shorthand Reporter in and for

18   the State of Texas, reported by machine shorthand,

19   pursuant to Notice and the Federal Rules of Civil

20   Procedure and any provisions stated on the record or

21   attached hereto.

22

23

24

25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
                                              Page 2
1                A P P E A R A N C E S
          (All Appearing Remotely via Zoom)
2
     FOR DANIEL VILLEGAS:
3         Wally Hilke
          Quinn K. Rallins
4         LOEVY & LOEVY
          311 North Aberdeen Street
5         3rd Floor
          Chicago, IL 60607
6         (312) 243-5900
          hilke@loevy.com
7         rallins@loevy.com
8    FOR THE CITY OF EL PASO:
          Lowell F. Denton
9         DENTON, NAVARRO, ROCHA, BERNAL, HYDE & ZECH, P.C.
          2517 North Main Avenue
10        San Antonio, TX 78212
          (210) 227-3243
11        lfdenton@rampagelaw.com
12   FOR HECTOR LOYA:
          Jeep Darnell
13        Jim Darnell
          Cris Estrada
14        JIM DARNELL, P.C.
          310 N. Mesa, Suite 212
15        El Paso, TX 79901
          915-532-2442
16        jedarnell@jdarnell.com
          jdarnell@jdarnell.com
17        cestrada@jdarnell.com
18   FOR CARLOS ORTEGA:
          Andrés E. Almanzán
19        MOUNCE GREEN MYERS SAFI PAXSON & GALATZAN P.C.
          100 N. Stanton, Suite 1000
20        El Paso, TX 79901
          (915) 541-1509
21        almanzan@mgmsg.com
22
23
24
25
```

```
                                              Page 3
1    FOR KENNETH BELLOWS:
          Eric M. Brittain
2         WINDLE HOOD NORTON BRITTAIN & JAY LLP
          Chase Tower, Suite 1350
3         201 E. Main Drive
          El Paso, TX 79901
4         (915) 545-4900
          brittain@windlehood.com
5
     FOR ALFONSO MARQUEZ:
6         James A. Martinez
          MOUNCE GREEN MYERS SAFI PAXSON & GALATZAN P.C.
7         100 N. Stanton, Suite 1000
          El Paso, TX 79901
8         (915) 541-1525
          martinez@mgmsg.com
9
     ALSO PRESENT:
10        Carlos Ortega
          Sydney Little, Online Video Technician
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                              Page 4
1                      INDEX
2    Appearances ...................................    2
3    HECTOR J. LOYA
4        EXAMINATION BY MR. HILKE .................    9
         EXAMINATION BY MR. DENTON ................  201
5        RE-EXAMINATION BY MR. HILKE ..............  227
6    Signature and Changes .........................234
7    Reporter's Certification ......................236
8                     EXHIBITS
9    NO.      DESCRIPTION                      PAGE(S)
10   EXHIBIT 2    Loya police reports            110
11   EXHIBIT 6    2014 Handwritten case notes    121
12   EXHIBIT 9    Villegas interview             143
13   EXHIBIT 10   IA04-169 [Loya Discipline].pdf 161
14   EXHIBIT 11   Myers Letter RE Wayne Williams 178
                  4.15.14.pdf
15
     EXHIBIT 13   Armendariz Police Reports.pdf  192
16
     EXHIBIT 14   0013079-0013113 - CAP Pages    210
17                from Procedures Manual 4-7-14
                  (4832-9652-4286.1).pdf
18
     EXHIBIT 15   0015388-0015508 - Criminal     211
19                Investigation Manual 4-18-14
                  (4821-7323-7246.1).pdf
20
     EXHIBIT 16   Photocopy of excerpt from      213
21                "Criminal Investigation and
                  Confessions"
22
23
24
25
```

```
                                              Page 5
1              ONLINE VIDEO TECH:  On record.  My name is
2    Sydney Little.  I'm the online video technician and Joe
3    Hendrick is the --
4              MR. DARNELL:  Are you able to --
5              THE WITNESS:  No, sir.
6              MR. DARNELL:  Hold on one second.
7              ONLINE VIDEO TECH:  I apologize.
8              MR. ESTRADA:  Can everybody hear me okay?
9              ONLINE VIDEO TECH:  Yes.
10             MR. ESTRADA:  Okay.
11             ONLINE VIDEO TECH:  All right.  On record.
12   My name is Sydney Little.  I am the online video
13   technician, and Joe Hendrick is the court reporter
14   today representing Kentuckiana Court Reporters located
15   at 730 West Main Street, Suite 101, Louisville,
16   Kentucky 40202.  Today is the 9th day of May 2022, and
17   the time is 9:14 a.m.  We are convened by video
18   conference to take the deposition of Hector Loya in the
19   matter of Daniel Villegas versus City of El Paso, et
20   al., pending in the United States District Court for
21   the Western District of Texas, El Paso Division, Case
22   Number 3:15-cv-386.
23             Will everyone but the witness please state
24   your appearance, how you are attending and the location
25   you are attending from, starting with plaintiff's
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

1  counsel.
2          MR. HILKE:  Good morning.  Wallace Hilke
3  for Plaintiff --
4          (Unintelligible audio.)
5          MR. HILKE:  I'm sorry.  I heard a little
6  cross-talk there.
7          MR. ESTRADA:  There's no sound.
8          MR. HILKE:  Oh, I -- are you not able to
9  hear me?
10         MR. RALLINS:  Sounds like it's from their
11  end.  I can hear you.
12         MR. HILKE:  Quinn, you are saying that you
13  can't hear me right now?
14         MR. RALLINS:  No, I can.
15         MR. HILKE:  From -- from Detective Loya's,
16  are you not able to hear me?  It's all right, I'll make
17  sure they've got this figured out before I can
18  continue.
19         MR. ESTRADA:  There's no sound.  Hmm.
20  There it is.  Okay.  Can someone say something?
21         MR. ALMANZAN:  Testing.  Testing.  Sound.
22         MR. HILKE:  Also testing.  More testing.
23         MR. ESTRADA:  Okay.  There it is.
24         MR. HILKE:  Can you hear us now?
25         MR. ESTRADA:  Yes.

Page 7

1          MR. HILKE:  Okay.  Take two.  This is
2  Wallace Hilke.  I'm one of the attorneys for plaintiff
3  Daniel Villegas.  I am attending remotely from our
4  office in Chicago, Illinois.  My colleague, Quinn
5  Rallins is here with me as well, also attending from
6  Chicago, Illinois.
7          MR. ALMANZAN:  And this is Andy Almanzan.
8  I'm appearing for the defendant Carlos Ortega.  The
9  defendant himself, Carlos Ortega, is also participating
10  by observation remotely.  He and I are in El Paso,
11  Texas.
12         MR. DENTON:  I'm Lowell Denton.  I'm
13  appearing for the City of El Paso.  I am appearing from
14  my office in San Antonio, Texas.
15         MR. DARNELL:  Jeep Darnell for Detective
16  Loya.
17         MR. BRITTAIN:  Eric Brittain on behalf of
18  defendant Kenneth Bellows from my office in El Paso,
19  Texas.
20         MR. MARTINEZ:  Jim Martinez for Al Marquez.
21  100 North Stanton in El Paso.
22         THE REPORTER:  Attorney Estrada?
23         MR. ESTRADA:  I apologize.  Cris Estrada
24  also with Jeep Darnell representing Detective Loya in
25  our office at 310 North Main Street, El Paso, Texas.

Page 8

1          ONLINE VIDEO TECH:  Thank you.  All right.
2  Mr. Loya, will you please state your name for the
3  record and hold your ID up to the camera?
4          THE WITNESS:  It's Hector Loya, a Detective
5  with the El Paso Police Department.
6          ONLINE VIDEO TECH:  Great.  Thank you.  Do
7  all parties agree the witness is in fact Hector Loya?
8          MR. DARNELL:  Yes.
9          MR. HILKE:  Yes.
10         ONLINE VIDEO TECH:  Thank you.
11         MR. BRITTAIN:  Yes.
12         ONLINE VIDEO TECH:  Detective Loya, would
13  you please raise your right hand for the court reporter
14  to swear you in.
15         THE WITNESS:  (Complied.)
16         THE REPORTER:  Do you swear or affirm that
17  the testimony you are about to give in this case will
18  be the truth, the whole truth, and nothing but the
19  truth, so help you God?
20         THE WITNESS:  Yes, I do.
21         MR. HILKE:  Sydney, are we good to go?  Are
22  we good to start?
23         ONLINE VIDEO TECH:  We are.  You may begin.
24  Thank you.
25         MR. HILKE:  Thank you.

Page 9

1                  HECTOR J. LOYA
2      having been duly sworn, testified as follows:
3                      EXAMINATION
4  BY MR. HILKE:
5      Q.    Good morning, Detective Loya.
6      A.    Good morning.
7      Q.    My name is Wallace Hilke.  I'm one of the
8  lawyers for Daniel Villegas and I am going to be asking
9  you some questions today.  Could you start by stating
10  your name for the record, please?
11     A.    It's Hector Javier Loya.
12     Q.    Great.  And could you spell that for the
13  record, please?
14     A.    Hector, H-E-C-T-O-R.  Javier, J-A-V-I-E-R.
15  Loya, L-O-Y-A.
16     Q.    Okay.  And Detective, how are you feeling
17  this morning?
18     A.    Good.
19     Q.    Did you get a good night's sleep?
20     A.    Not really.  But.  That's normal.
21     Q.    That's fair enough.  Have you ever been --
22  had your deposition taken before?
23     A.    Nothing like this.  Maybe insurance
24  depositions for car accidents.
25     Q.    Okay.  How long ago was that?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 942 of 1026
The Deposition of Detective Loya, taken 6 May 2021

10..13

Page 10

1    A.    It's been a while.
2    Q.    That's fair enough.
3    A.    More than probably 15 years.
4    Q.    So I'm going to go over a few ground rules
5    today.  As you know, there's a court reporter taking
6    down everything we say just like we are in court so
7    it's important just as you are doing now to speak
8    loudly and answer verbally.  Does that make sense?
9    A.    Yes.
10   Q.    And just like in court, if you make a
11   gesture or a nod or an "uh-huh," they won't be able to
12   get that so please give verbal answers to all of the
13   questions.  Does that make sense?
14   A.    Yes.
15   Q.    And we'll try to speak one at a time, so
16   please let me finish my questions and I'll ask -- I'll
17   let you finish your answers.  Does that sound okay?
18   A.    Yes.
19   Q.    And I will try to ask questions that make
20   sense, but if my questions don't make sense, can you
21   please ask me to clarify them before you will answer
22   them?
23   A.    Yes, I will.
24   Q.    And so likewise if you do answer a
25   question, I am going to assume that you understood the

Page 11

1    question I asked.  Is that fair?
2    A.    Yes, it is.
3    Q.    Great.  And we can take breaks, you can
4    also let me know if you need a break, but I will ask
5    you if I've just asked you a question to answer that
6    question before we go to a break.  Is that fair?
7    A.    Yes.
8    Q.    Okay.  And do you have any health
9    conditions that affect your memory?
10   A.    No, I don't.
11   Q.    Did you take any medications that affect
12   your memory?
13   A.    No.
14   Q.    And do you have any health conditions or
15   take any medications that would affect your ability to
16   give -- to testify today?
17   A.    No, I don't.
18   Q.    Is there any reason at all that you
19   wouldn't be able to give a true and honest testimony
20   today?
21   A.    No.
22   Q.    And you understand that you are under oath
23   right now, correct?
24   A.    Yes.
25   THE REPORTER:  Can you all do that again?

Page 12

1    The audio is breaking up.
2    MR. HILKE:  Yeah, I'm sorry.  Can you tell
3    me where I left off?
4    THE REPORTER:  "And do you have any health
5    conditions or take any medications that will affect
6    your ability to give -- to testify today.  Answer:  No,
7    I don't.  Question:  Is there any reason at all that
8    you won't be able to give a true and -- that you won't
9    be able to give true and honest testimony today."
10   BY MR. HILKE:
11   Q.    Is there any reason at all that you
12   wouldn't be able to give true and accurate testimony
13   today?
14   A.    No.
15   Q.    And you understand that you're under oath
16   presently, right?
17   A.    Yes, I do.
18   Q.    So just like in court, you are swearing to
19   the truth of what you testify today.  Does that make
20   sense?
21   A.    Yes.
22   Q.    Have you ever given testimony under oath
23   that you knew to be untrue at the time?
24   A.    No.
25   Q.    Have you ever given testimony under oath

Page 13

1    that you later realized was untrue?
2    A.    Never.
3    Q.    Have you ever given testimony under oath
4    that you later realized was incomplete?
5    A.    No.
6    Q.    Detective Loya, when did you join the El
7    Paso Police Department?
8    A.    March 16.
9    Q.    And what was your first assignment when you
10   joined the department?  Oh.  Detective Loya, I think we
11   lost you for a minute there.  Can you hear me now?
12   A.    Yes, I could.
13   Q.    Okay.  Let me start again.  When did you --
14   when did you first join the El Paso Police Department?
15   A.    March 16, 2001.
16   Q.    And --
17   MR. ESTRADA:  Sorry, his Zoom crashed and
18   it was asking too many questions.
19   BY MR. HILKE:
20   Q.    I'm afraid you may get too many questions
21   from me as well today, Detective.  So when you started
22   at El Paso Police Department, what was your first
23   assignment?
24   A.    I was assigned to Central Patrol Division.
25   Q.    Okay.  And what were your duties in Central



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 943 of 1026
The Deposition of HECTOR LOYA, taken 9th May of, 2022
14..17

Page 14

1  Patrol Division?
2      A.    Patrol officer, answer calls, take reports,
3  traffic, stuff like that.
4      Q.    How long did you -- how long were you a
5  patrol officer in the Central District?
6      A.    About nine years.
7      Q.    About nine years, okay.  And so did you
8  decide at some point to seek a transfer or promotion?
9      A.    That's correct.
10     Q.    And what transfer or promotion did you
11  seek?
12     A.    I took a detective's test to promote.
13     Q.    Why did you want to be a detective?
14     A.    Something I've always wanted to do.  I like
15  the hours, too.
16     Q.    What's good about the hours?
17     A.    Monday through Friday, banker hours,
18  attorney hours.
19     Q.    And what -- what made you interested in
20  detective work?
21     A.    Just something I've always wanted to do.  I
22  didn't want to be on patrol the majority of my career.
23     Q.    Okay.  And so when did you -- and did
24  you -- were you, in fact, promoted to detective?
25     A.    Yes, sir.

Page 15

1      Q.    Okay.  And when you became a detective,
2  what was your first assignment?
3      A.    I went -- I started at -- it's called
4  Central CID Unit as a generalist detective.
5      Q.    I'm sorry.  As a -- oh, we lost him again.
6            MR. DARNELL:  I'm sorry.
7            MR. HILKE:  That's all right.  I'm sure
8  we'll figure it out.
9            MR. DARNELL:  Could we go off record just
10  while?
11           MR. HILKE:  Yes.  We can go off the record
12  for a minute, please.
13           ONLINE VIDEO TECH:  Of course.  We are off
14  the record.  The current time is 9:27 a.m.
15           (Break from 9:27 a.m. until 9:34 a.m.)
16           ONLINE VIDEO TECH:  We are back on the
17  record for the deposition of Detective Hector Loya
18  being conducted by videoconference.  My name is Sydney
19  Little.  Today is May 9th, 2022, and the current time
20  is 9:34 a.m.
21  BY MR. HILKE:
22     Q.    Detective Loya, you were just saying that
23  you're -- sorry, will you tell me again what was your
24  first assignment as a detective?
25     A.    Patrol at Central.

Page 16

1      Q.    All right.  And after you were promoted to
2  detective?
3      A.    I went to work at Central CID Unit.
4      Q.    Okay.  And what were your dut -- and when
5  was -- when did you start at the Central CID Unit?
6      A.    2011-2012 give or take, sir.
7      Q.    All right.  And what were your duties in
8  the CID?
9      A.    Investigations.
10     Q.    Okay.  So were there any specific kinds of
11  cases that you handled?
12     A.    No.  As a generalist, anything from simple
13  assaults, someone stole my water hose, bicycles, a
14  little bit of everything.  Property.  Family violence.
15     Q.    Would that include homicides?
16     A.    No, sir.
17     Q.    Okay.  So what -- what didn't you
18  investigate at CID?
19     A.    That.  Not homicides, sir.
20     Q.    Not homicides.  Were there other
21  specialists, specialized crimes that wouldn't be
22  something you would investigate then?
23     A.    Again, sir, it was more property stuff,
24  simple assaults, family violence, theft, shoplifting, a
25  little bit of everything.

Page 17

1      Q.    Is that kind of the starting ground for a
2  new detective and sort of a generalist role like that?
3      A.    Correct.
4      Q.    And so did you, were you transferred at --
5  to a -- to a different area as -- were you subsequently
6  transferred to a different area as a detective?
7      A.    Yes.
8      Q.    And what was that?
9      A.    Crimes Against Persons.
10     Q.    Okay.  When did you start at Crimes Against
11  Persons -- I'm sorry.
12           MR. HILKE:  Jim, are you trying to say
13  something?  No.  Just unmuted.  Okay.
14  BY MR. HILKE:
15     Q.    Were you -- when did you receive the
16  transfer to Crimes Against Persons?
17     A.    2013.
18     Q.    Okay.  Do you happen to remember when in
19  2013?
20     A.    I want to say in the summer 2013.
21     Q.    Was that a transfer that you requested?
22     A.    I did.  It was more of they had open spots
23  and you had to interview for it.
24     Q.    Why did you decide to interview for it?
25     A.    Something I've always wanted to work with,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

Crimes Against Persons.

Q.    And interested in homicides specifically or just all crimes against persons?

A.    Crimes Against Persons.

Q.    Okay.  And how long did you remain assigned to Crimes Against Persons?

A.    Just a little over three years.

Q.    Okay.  Where did you go next?

A.    I'm currently with the White Collar Unit.

Q.    White Collar Unit.  What do you investigate in the White Collar Unit?

A.    Financial crimes, forgeries, embezzlements.

Q.    And was that another decision you made to seek that transfer?

A.    Yes.

Q.    And why did you seek that transfer?

A.    It was time to leave CAP, Crimes Against Persons.

Q.    Why was that?

A.    Why was it time to go?  There was a little incident that happened there that I needed to get out of there and they offered me a couple of assignments and financial crimes -- I'm sorry -- White Collar was one of them.

Q.    What kind of incident was it?

Page 19

A.    It was a -- I -- I had some issues with some of the detectives working there.  They didn't want to work with me anymore.

Q.    How many detectives?

A.    Maybe one or two didn't feel comfortable working with me.

Q.    And how many detectives in total were in Crimes Against Persons when you left?

A.    Gosh, more than 20, I guess, if I had to guess.

Q.    Who are the detectives who you had trouble working with you?

A.    Where are they?

Q.    No.  I'm sorry.  Who are they?  As in what are their names?

A.    I guess the number one would be Michael Lara.

Q.    Could you spell that last name for me?

A.    L-A-R-A.

Q.    Okay.  And who was number 2?

A.    Not really like a number two but I think he was probably the other one, I think -- oh, the -- Detective Sanchez.

Q.    And what is Detective Sanchez's first name?

A.    Ray.  Raymundo.  I think it's Raymundo.  We

Page 20

knew him as Ray.

Q.    So when did you first interact with Michael Lara?

A.    When did I inter -- I knew, I -- to work with him, I'd known him for a while before I went to Crimes Against Persons.

Q.    Okay.  And did you know him from before the department?

A.    No, sir.

Q.    And had you had any interactions with him before you joined Crimes Against Persons?

A.    Just a hi and bye professional.  That's about it.

Q.    Okay.  So tell me about did you -- did you work on cases with him in Crimes Against Persons?

A.    Yes, I did.

Q.    And tell me -- tell me what -- what caused the conflict that your -- or the incident that you are talking about?

A.    There was a case that we had worked, I was actually testifying on a case about 2016, and I said stuff that I shouldn't have said.

Q.    What do you mean by that?

A.    I was -- I had already been sworn in and then I testified on the case and then a couple of weeks

Page 21

later they brought me back in and I had discussed the case with Detective Lara about my -- about his testimony, what he was going to say, what he was going to do, and we weren't allowed because we had, I guess, the Rule, the Rule had already been set and I testified that yeah, I had asked him, hey, I already testified I'm going back and I'm gonna say, I have -- they want me back on the stand and I wasn't supposed to talk to him during the --

Q.    Okay.  So in between the first and the second time you testified, what all did you discuss with Michael Lara?

A.    Just why he -- what they -- what they had asked him, what they were going to -- what they were going to -- what kind of questions they were asking him and that I was going to go back, I wasn't -- they were going to ask -- I was going to -- it was about the round count, how many rounds and this and that.

Q.    And why -- why did you have that conversation with him?

A.    Just by the printer because I know he had testified the week before and I kind of just mentioned it to him, hey, guess what, they want me back on.  The DA -- the ADA called me over the weekend.  She wants me to go back and clarify the rounds.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 22

1    THE REPORTER:  Was that clear for you all?
2    It didn't come clear on my end.  I'm sorry.
3    MR. HILKE:  That's okay.  It was clear for
4    me but it sounds like i should ask the question again.
5    Is that right?
6    THE REPORTER:  I'd need to get the answer,
7    just -- "and why did you have that conversation with
8    him?  Answer:  Because i know he had testified the week
9    before and I kind of just wanted."
10   BY MR. HILKE:
11       Q.    So, Detective Loya, could you for the
12   record, could you answer that again?  Why did you have
13   that conversation with Michael Lara?
14       A.    Just to tell him that I had been called
15   over the weekend and they wanted me to go back in there
16   and clarify the rounds.  It was just small talk, just
17   talking to him and I'm not supposed to discuss anything
18   outside of the court after I've been given the Rule,
19   after I had already been sworn in.
20       Q.    And did I -- did I, is this correct, did
21   you ask him what questions he had been asked?
22       A.    Not really.  Just telling him what I was --
23   that I had already -- that I was going back and that I
24   had to clarify the rounds.  It was just small talk.
25       Q.    And did he -- did he share any information

Page 23

1    with you?
2        A.    No, sir.
3        Q.    Okay.  So did anyone else other than you
4    and Michael find out about this conversation?
5        A.    Did anybody else find out about the
6    conversation?  During the court hearing, I told him I
7    guess everybody that was in the courtroom heard that.
8        Q.    So how did Michael react to you sharing
9    that in your testimony at court?
10       A.    Just okay, all right.  Be careful.  Good
11   luck.
12       Q.    So did you -- did -- was there a conflict
13   between you and Michael?
14       A.    Not right then.  At that time, no, there
15   wasn't.
16       Q.    Okay.  Did the conflict later arise?
17       A.    Yes.
18       Q.    Tell me about that, please.
19       A.    During the -- my testimony on that
20   particular course after I had said that I had spoken to
21   Michael Lara that morning before I came into court,
22   they stopped everything, they -- the jury left.  The
23   attorneys were there.  They told him I wasn't allowed
24   to talk.  The next day, they called the supervisors.
25   Michael Lara had to go to court the next day and I got

Page 24

1    my ass chewed by the judge that I wasn't supposed to be
2    talking about it and Michael was upset, Detective Lara
3    was upset because I dragged him into this.
4        Q.    And what did he -- how did you know that he
5    was upset?
6        A.    Because he told me he was upset.  I
7    apologized.  I told him, I didn't mean to drag you into
8    this, I screwed up.  I should have known that I wasn't
9    supposed to discuss this outside of the courtroom and
10   I'm sorry I dragged you into this.
11       Q.    And what did he -- did Michael Lara say
12   anything to you in that conversation?
13       A.    After I apologized?  Yeah, he was just
14   upset.  He didn't want anything to do with me.
15       Q.    And did he -- so do you remember
16   specifically what he said?
17       A.    No.  Just probably some words and he was
18   upset and yeah, because I dragged him into this.
19       Q.    Do you remember what words he called you?
20       MR. DARNELL:  Object to form.
21       A.    No, not specifically but yeah, he was upset
22   that I dragged him into this.
23   BY MR. HILKE:
24       Q.    Did you have any subsequent conflicts with
25   Michael Lara?

Page 25

1        A.    I'm sorry, I didn't understand the
2    question.
3        Q.    Oh yes.  Did you have any other conflicts
4    with Michael Lara?
5        A.    No, sir.
6        Q.    Did you ever work with him again after
7    that?
8        A.    No, sir.
9        Q.    How long was it between this incident and
10   when you got the transfer to White Collar Crimes?
11       A.    Approximately, maybe about three weeks.
12       Q.    So you mentioned that you had also had a
13   conflict -- you had had -- I don't want to put words in
14   your mouth.  You mentioned Detective Ray Sanchez.  Can
15   you tell me a little bit about what you were referring
16   to with to Detective Sanchez?
17       A.    Same incident, he was -- he had already
18   been there for a while.  He just thought it wasn't good
19   for me to work there anymore.  They were afraid I might
20   say something like that again down the road.
21       Q.    So was Sanchez working on the case that you
22   testified at that you were just talking about?
23       A.    I don't believe he did, no.
24       Q.    Okay.  And had you -- had you worked on
25   cases with Sanchez before?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1    A.    Yes, sir, I have.
2    Q.    How many cases would you say?
3    A.    If I had to guess, maybe more than 10.
4    Q.    And in Crimes Against Persons, what is your
5  caseload like?  How many cases do you work on in a
6  year?
7    A.    If I had to guess, maybe anywhere from 30
8  to 50 cases.
9    Q.    So you worked with all the detectives or
10  did you have sort of a main partner who you tended to
11  get assigned with?
12    A.    All the detectives.
13    Q.    Okay.  So what did Detective Sanchez tell
14  you that he was concerned about based on this testimony
15  incident?
16    A.    I -- he didn't tell me specifically.  I was
17  just hearing rumors around the office that he was one
18  of the guys that didn't want me to work there anymore.
19    Q.    Do you remember who you heard the rumors
20  from?
21    A.    Not specifically, just various detectives
22  in the office.
23    Q.    Do you remember anyone specific who you
24  discussed the rumors with?
25    A.    Everybody I guess, everybody that was

Page 27

1  there, they would tell me.  Supervisors would tell me
2  that, too, and I just didn't want to create a conflict.
3  So.
4    Q.    And so, I guess, I'm a little confused.
5  What was -- what was everybody worried about?
6    A.    That if I ever go back to court I'd drag
7  them back into court like I did Detective Lara and have
8  the judge get mad at us, well, pretty much at me for
9  discussing the case outside of the courtroom.
10    Q.    The incident -- so with Michael Lara, was
11  that the only time you discussed a case that was --
12  that was at trial -- strike that.
13          At the time of the incident with Michael
14  Lara that you were just talking about, did you know
15  that once you are under oath you can't talk about your
16  testimony until the trial is done?
17    A.    I do, I knew that.
18    Q.    You knew that at the time.
19    A.    Mm-hmm.
20    Q.    But you didn't follow that rule with
21  Michael Lara?
22    A.    No, sir.
23    Q.    Was that the only time you failed to follow
24  that rule?
25    A.    Yes, sir.

Page 28

1    Q.    So you had never broken that rule -- I --
2  scratch -- strike that.
3          Do you know whether other detectives in the
4  department, in the Crimes Against Persons also followed
5  that rule?
6          MR. DARNELL:  Object to form.
7  BY MR. HILKE:
8    Q.    I'm sorry.  Could you repeat that?
9    A.    They followed the rule, yes.
10    Q.    Are you aware of any similar incident where
11  a detectives discussed their testimony while still
12  under oath?
13    A.    No, sir.
14    Q.    And had you ever been asked by another
15  detective to discuss your testimony under oath while
16  the trial was underway?
17    A.    No, sir.
18    Q.    So why do you think if everyone always
19  followed the rule they were worried about you getting
20  in -- getting them in trouble?
21    A.    I guess you'd have to ask them.
22    Q.    So you don't have any idea why they were
23  worried you would get them in trouble?
24    A.    No, sir, I don't.
25    Q.    And have you ever heard of anyone else

Page 29

1  getting encouraged out of Crimes Against Persons
2  before?
3    A.    Not that I know of.
4    Q.    So as far as you know, this is -- you're
5  the only person that's ever happened to?
6    A.    That I know of, yes.
7    Q.    Understood.  Okay.  And you mentioned Ray
8  Sanchez as a person who, you know, asked -- so do you
9  remember anything else about why Ray Sanchez was
10  worried about working with you in the future?
11    A.    He didn't tell me personally, but he was
12  one of the most senior guys there, vocal guys that, you
13  know, that he just didn't want me working there
14  anymore.  That's what I had heard.  I never discussed
15  it with him or anything like that personally.
16    Q.    I'm sorry.  Did you say, "Senior guys,
17  vocal guys"?
18    A.    Yeah.  One of the senior detectives there,
19  he had been there for a while.
20    Q.    What do you mean that he was a vocal guy?
21    A.    Well, he kind of spoke for everybody, I
22  guess, the leader of the unit.
23    Q.    What did -- what did you observe about him
24  to say that he is a leader of the unit?
25    A.    Just observations, I mean, the way he

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 30

1  addressed the unit during meetings.  I mean,
2  experience, he had been there for a while.  That's why
3  I believe he was one of the leaders.
4       Q.    Did other detectives respect his opinion?
5       A.    Yes.
6       Q.    Did they listen to what he had to say?
7       A.    Yes.
8       Q.    And if he had gone the other way, if he had
9  said, you know, Detective Loya just made a mistake,
10  he's a good officer, let's keep him here, do you
11  believe that that would have carried influence with the
12  other detectives?
13       A.    I don't know.  I believe that -- yeah.
14       Q.    Fair enough.  Okay.  And so -- so then you
15  transferred to financial to White Collar Crimes and
16  that's where you are still assigned today; is that
17  right?
18       A.    Yes, sir.
19       Q.    Is there anyone else that you remember
20  having a con -- did you have any other issues in Crimes
21  Against Persons that made you want to transfer out?
22       A.    No, sir.
23       Q.    Were you enjoying your work there at the
24  time?
25       A.    Yes, sir.

Page 31

1       Q.    And before the -- before the testimony
2  incident, did you have any plan to transfer to White
3  Collar Crimes?
4       A.    No, sir.
5       Q.    You've done some off-duty work while
6  employed as a police officer; is that right?
7       A.    Yes, sir.
8       Q.    What kinds of off-duty work have you done?
9       A.    Security, most part.
10       Q.    What kinds of places do you work security
11  at?
12       A.    Gosh.  Convention center, retail stores,
13  stuff like that.
14       Q.    And is this a -- is this a -- is this
15  something you are consistently doing as, you know, like
16  a, what's my question, strike that.
17             How many hours a month do you do security
18  work?
19       A.    Gosh, sir, it depends.  Right before maybe
20  during the holidays I work a little more, right before
21  a vacation.  This year not that many to be honest with
22  you.  I haven't worked a lot.
23       Q.    So I want to take you back for a second.
24  When you were a patrol officer at the beginning of your
25  career, were you assigned to a partner?

Page 32

1       A.    Yes.
2       Q.    Do you remember how many partners you had
3  as a patrol officer?
4       A.    A few.
5       Q.    Who was your first one?
6       A.    Oh, gosh.  I'm first assigned to -- my
7  first year in FTO, so every three months I would rotate
8  with a field training officer.
9       Q.    Okay.  And what about after the FTO period?
10       A.    Various different officers but the real one
11  that I stayed working with for a long, long time was
12  Officer Eric Castaneda.  We worked together for about
13  two, three years.
14       Q.    Okay.  Do you work with anyone else for
15  such a long period of time?
16       A.    That would be the longest partner that I
17  had.
18       Q.    Okay.  And did -- are you assigned a
19  partner in any way as a detective?
20       A.    Not assigned.  No, sir.
21       Q.    What about, I guess, unofficially or do you
22  have detectives you tend to work with more than others?
23       A.    Not really.  We -- kind of worked with a
24  little bit of everybody.  Anybody need help, if I
25  needed help, the first one I'd see, hey, are you going

Page 33

1  to be busy today.  I need to do a -- meet with someone,
2  can you help me out and stuff like that.
3       Q.    Okay.  So without going into the -- what
4  you said to your lawyers or what they said to you, can
5  you tell me how you prepared for today's deposition?
6       A.    Yes, sir.  I met with my attorney on
7  Saturday, give me -- just to prepare me for today.
8       Q.    And did you look at any documents to
9  prepare for the deposition today?
10       A.    Yes, sir, I did.
11       Q.    What did you look at?
12       A.    My investigative supplement on this case.
13       Q.    Did you look at anything else?
14       A.    No, sir.
15       Q.    Did you watch any videos?
16       A.    No, sir, I didn't.
17       Q.    Did you listen to any audio files?
18       A.    I did, sir.
19       Q.    Okay.  What audio files did you listen to?
20       A.    Right before this one, my attorney gave me
21  a little short excerpt of some type of audio.
22       Q.    And did you recognize the people on that
23  audio?
24       A.    I did.
25       Q.    Who was on it?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 34

1    A.    He was a police officer with us many, many
2  years ago, Jesse Rodriguez.
3    Q.    And were you on that audio as well?
4    A.    No, sir, I wasn't, hmm-mm.
5    Q.    Okay.  And did you review any notes in
6  prep -- other than the investigative supplement you
7  talked about in preparation for the deposition?
8    A.    You know, when I got here earlier they gave
9  me a bunch of binders and I guess early in the case and
10 then they told me to look over them and I told them
11 this is way too much.  I don't know any of this
12 information and then they made a mistake.  It wasn't
13 for me it was supposed to be for another person coming
14 in to do an interview later on.
15   Q.    That's funny.
16   A.    Yeah.  They gave me big old binders and I
17 was, like, this is a lot of information.  I don't know
18 anything about this case.
19   Q.    I'll keep that in mind for good pranks to
20 pull on clients going forward.  So.  You are aware that
21 this lawsuit is about two murders that occurred on
22 Electric Street in 1993; is that right?
23   A.    Yes, sir.
24   Q.    And did you prepare any documents in
25 your -- and you were involved in investigating those

Page 35

1  murders in 2014; is that right?
2    A.    Yes, sir.
3    Q.    The one document reviewed, you reviewed, is
4  that the only document you prepared as you worked on
5  these investigations?
6    A.    Yes, sir.
7    Q.    As a detective, do you keep a personal file
8  about any of the cases you are working on?
9    A.    No, sir.
10   Q.    And do you personally keep copies of any of
11 your reports?
12   A.    No, sir.
13   Q.    Where are those kept?
14   A.    Where are those copies at?  I guess,
15 computer database with the police department.
16   Q.    Is there also a physical copy?
17   A.    During an investigation, I carry physical
18 notes, stuff that I need to keep and when I'm done with
19 the case, either I scan it into the case, turn it into
20 ID and R or if it's evidence, obviously, I tag it and
21 turn it in to evidence but nothing that I personally
22 keep any files.
23   Q.    So then every document that you carry
24 during an investigation gets either scanned or tagged?
25   A.    Correct.

Page 36

1    Q.    So you would never throw away something
2  that you had been carrying during the investigation,
3  you would always scan it or tag it?
4    A.    Yes, sir.
5    Q.    Have you ever talked with Alfonso Marquez?
6    A.    Alfonso Marquez?  I was introduced to him
7  once.
8    Q.    And when was that?
9    A.    I'm not sure.  That was early when I first
10 started in Crimes Against Persons, I guess, 2013.
11   Q.    And do you remember what was your
12 interaction with him?
13   A.    We -- I was working with another senior
14 detective.  I can't recall who it was but we were at
15 the County Courthouse on something and then we -- there
16 was another big homicide case that was finishing up, I
17 guess, they were going to give out the results and the
18 detective I was with, hey, let's go sit in so you can
19 kind of watch what they're doing, the closing argument,
20 I think it was the closing arguments.  And we went in
21 there, it was full, a lot of people, anyways long story
22 short, Al Marquez was the bailiff there and when
23 everybody was done, they were talking and they
24 introduced me to him, hey, this is Al Marquez.  Hey,
25 this is our new detective there with Crimes Against

Page 37

1  Persons.  That was my interaction with him.
2    Q.    Have you interacted with him since?
3    A.    No, sir.
4    Q.    Have you ever interacted with Carlos
5  Ortega?
6    A.    Carlos Ortega.  I don't remember.  I don't
7  know who that is.
8    Q.    Have you ever -- have you looked at the
9  complaint in this case sort of the --
10   A.    Yeah.
11   Q.    Have you looked at the complaint in this
12 case?
13   A.    Have I looked at it?  No, sir.
14   Q.    Do you know who Scott Graves is?
15   A.    I do, sir.
16   Q.    And have you interacted with him before?
17   A.    I have.  Yes, sir.
18   Q.    When was the last time you interacted with
19 him?
20   A.    We, as a matter of fact, his son works on
21 the police department and my brother worked on the
22 police department and they are classmates.  They
23 graduated out of the same academy and family
24 gatherings, I met Scott Graves, and now I even know he
25 was I think a commander of the department or a



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1  lieutenant.  That was before my time and that's well,
2  my dad used to be on the department and that was the
3  only time I ever interacted with him.
4      Q.    And how about Kenneth Bellows have you
5  interacted with a Kenneth Bellows?
6      A.    No, sir.  Sounds familiar but I don't think
7  I have.
8      Q.    Okay.  What about an Earl Arbogast?
9      A.    I just met him outside for the first time,
10  yeah.
11      Q.    Did -- and so that was the first time you
12  met Mr. Arbogast?
13      A.    Yes, sir, I did.  Just briefly, he asked me
14  what I was doing here and I said oh, and that was it.
15      Q.    You discovered you were both -- did you
16  discover that you were both defendants in the same
17  lawsuit?
18      A.    He -- he -- yeah.  He asked me, what are
19  you here for and I'm like, I don't know who are you,
20  and he gave out the wrong name and I said, Viegas?  And
21  he said, oh, yeah.  I'm here, too, and that was right
22  in front of the young lady in the front and that was
23  it.
24          MR. HILKE:  I'm sorry it looks like someone
25  just joined who I don't recognize.  I'm sorry.  Can we

Page 39

1  go off the record for a second?
2          ONLINE VIDEO TECH:  Yes, of course.  We are
3  off the record the time is 10:05.
4          (Break from 10:06 a.m. to 10:29 a.m.)
5          ONLINE VIDEO TECH:  We are back on the
6  record for the deposition of Detective Hector Loya
7  being conducted by video conference.  My name is Sydney
8  Little.  Today is May 9, 2022, and the time is
9  10:30 a.m.
10  BY MR. HILKE:
11      Q.    Detective, what was the last time you
12  talked to Ray Sanchez?
13      A.    Gosh.  Years ago.
14      Q.    Have you talked to him since you left CAP?
15      A.    No, sir.
16      Q.    And so you haven't had an opportunity to
17  talk to him about this lawsuit?
18      A.    Oh, no, sir.
19      Q.    And have you -- since you left CAP, have
20  you talked with anyone about the Electric Street
21  murders?
22      A.    No, sir.
23      Q.    One thing I -- one thing I forgot to ask
24  earlier, is there anyone in the room with you right
25  now?

Page 40

1      A.    Yes, sir.
2      Q.    And who is in the room with you?
3      A.    Mr. Darnell.
4      Q.    Anyone else?
5      A.    No, sir, that's it.
6      Q.    Thank you.  Detective Loya, you received
7  training on -- you, as a detective, you have received
8  training on investigations; is that right?
9      A.    Yes.
10      Q.    I noticed you hesitated a little.  Is there
11  something you want to clarify?
12      A.    Yes, sir, I do.  I guess, what type of
13  training are you asking?  Is it like on-hands training
14  or some type of a course that I take, a class, or --
15      Q.    Well, let's -- let's start with that.  Did
16  you take courses or classes on conducting
17  investigations?
18      A.    Yeah.  Now, I do recall going -- I know the
19  department put out I think like a one-week course on
20  investigations and I've gone to homicide school.  They
21  sent me out of town for about a week.
22      Q.    And do you remember when you went to
23  homicide school?
24      A.    Gosh, maybe 2013.
25      Q.    And then, of course, you also are -- well,

Page 41

1  strike that.
2          Do you also receive field training as a
3  detective?
4      A.    Yes, sir, on-hands.
5      Q.    So do you believe that the key to an
6  investigation is to keep an open mind?
7          MR. DARNELL:  Objection to form.
8      A.    Yes.
9  BY MR. HILKE:
10      Q.    And do you always follow the evidence
11  objectively in that investigation?
12      A.    Yes.
13      Q.    Are you always open that your ideas may yet
14  turn out to be wrong in an investigation?
15      A.    Yes.
16      Q.    Are you trained to never engage in tunnel
17  vision?
18      A.    As far as any type of formal training in
19  that, no, but yes, I -- yeah, you don't -- don't do the
20  tunnel vision thing.
21      Q.    Okay.  Is the most important thing in an
22  investigation to ensure to the extent possible that you
23  do not arrest the wrong person?
24      A.    Yes.
25      Q.    Is that more important than getting the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1  right person?
2       A.     Can you repeat the question?  I didn't
3  understand.
4       Q.     Sure.  Is it more important to not arrest
5  the wrong person than it is to arrest the right person?
6              MR. DARNELL:  I am going to object to the
7  question.  Is there any way you can make that a little
8  bit clearer?
9              THE REPORTER:  You need to speak up on the
10 objection, please.  A little closer to the mic.
11             MR. DARNELL:  My apologies.  I dont know
12 why I'm having trouble with my microphone right now.
13 But is that any better?
14             THE REPORTER:  Let me try to turn this up.
15 Go ahead.
16             MR. DARNELL:  Wally, I know what you are
17 trying to say but the question is confusing.  Is there
18 any way you can clarify that question a little bit?
19             MR. HILKE:  I can try.
20             MR. MARTINEZ:  Jeep, your audio is pretty
21 bad.  I don't know if there is anything you can do to
22 try to improve it.
23             MR. DARNELL:  Is that any better?  I've
24 never had problems with audio until today.
25             THE REPORTER:  It sounds about the same.  I

Page 43

1  think if you can get that closer to your mouth, it'll
2  help.  I dont know.
3              MR. HILKE:  Jeep, do you want to try one
4  more time with it closer to your mouth?
5              MR. DARNELL:  I'm as close as i can get.  I
6  dont know what the -- is.
7              MR. HILKE:  Let's -- can we go off the
8  record for a second, please?
9              ONLINE VIDEO TECH:  We are off the record.
10 The time is 10:36.
11             (Pause until 10:39 a.m.)
12             ONLINE VIDEO TECH:  Back on the record for
13 the deposition of Detective Hector Loya being conducted
14 by videoconference.  My name is Sydney Little.  Today
15 is May 9, 2022, and the time is 10:40.
16             MR. DENTON:  Counsel, can we capture our
17 agreement that an objection by one, any one of the
18 defense lawyers will preserve that same objection?
19             MR. HILKE:  Yes, so stipulated.
20 BY MR. HILKE:
21      Q.     Detective Loya, what is more important in
22 an investigation, avoiding arresting the wrong person,
23 or getting the right person?
24      A.     It's both.
25             MR. HILKE:  Jeep, are you -- I'm getting

Page 44

1  some feedback.  Are you still getting audio from your
2  phone?  And if so, if you would try getting the audio
3  from Detective Loya's computer that may -- I'm not
4  getting it now.  Maybe we're all right.
5  BY MR. HILKE:
6       Q.     Detective, so you would say -- so,
7  Detective, avoiding getting, avoiding arresting the
8  wrong person, avoiding picking a false suspect is just
9  as important as finding the guilty suspect?
10      A.     Yes.
11      Q.     Do you approach all your interviews with
12 that in mind?
13      A.     Yes.
14      Q.     And you stay objective to evaluate all the
15 evidence to make sure you don't miss something?
16      A.     Yes.
17      Q.     And would you describe yourself as a
18 thorough detective?
19      A.     Yes.
20      Q.     You dot all your I's, cross all your T's?
21      A.     Yes, sir.
22      Q.     And you understand it's important to be
23 thorough and unbiased to protect the innocent?
24      A.     Yes.
25      Q.     Okay.  And also to convict the guilty?

Page 45

1       A.     Yes.
2       Q.     Detective, did you receive training on how
3  to document your work, your police work?
4       A.     Can't recall if it was formal training or
5  just on-hands learning from other people, being guided
6  from other people this is what you do, what not to do,
7  et cetera.
8       Q.     Are there certain standards for how your
9  work should be recorded?
10      A.     Yeah.  Dates, times are important, when you
11 talk to somebody, you interview somebody, you meet with
12 people, yeah, make sure everything -- you're ready --
13 you're taking good notes.
14      Q.     And is that something that supervisors
15 would look at, the quality of your notes and recording?
16      A.     Not sure if they look at it.  I mean,
17 they're -- I guess, they would have to but, yeah, I
18 never -- in my years I've never had a supervisor
19 question my note taking or anything like that.
20      Q.     When you were in Crimes Against Persons,
21 where did you record your notes?
22      A.     Notes, notebooks.
23      Q.     Notebooks.  And did you keep a specific
24 notebook for that purpose?
25      A.     I usually had, I had one notebook that I'd

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 951 of 1026
The Deposition of GEORGE TOKORO, taken on May 9, 2012

46..49

Page 46

1  keep with me and I would date it, sometimes I'd work
2  different cases at a time and then I would just -- each
3  page I would jot down that specific stuff that I had
4  for that particular case and then I would jot down
5  another -- another piece of paper for that one.
6      Q.    So with each piece of paper is a separate
7  case?
8      A.    Yes, sir.
9      Q.    And then would you -- would you later take
10 those pages out of the notebook?
11     A.    Yes, sir.
12     Q.    Where would you put them?
13     A.    I would -- I know a few years down the road
14 they told us that we had to scan them into the reports
15 into the case.  I'm not sure, sir.  I -- it wasn't --
16 it's been a few years.
17     Q.    Did they tell you that -- were you told
18 that after you joined Crimes Against Persons?
19     A.    I can't recall to be honest with you, sir.
20 I know there was some type of memo came out or some
21 policy that we had to scan all our notes.  I can't
22 recall when that came out.
23     Q.    Okay.  And what did you do with your notes
24 before that memo or policy came out?
25     A.    That's a good question.  I guess, shred

Page 47

1  them.  I don't have any notes from any of my cases.
2      Q.    What do you remember about the memo or
3  policy that was circulated?
4      A.    That -- I think it was case law where they
5  wanted to us make sure any notes we take that we had to
6  put them in the -- scan them into the report.
7      Q.    Who sent it?
8      A.    The department.
9      Q.    What does that mean, the department?
10     A.    Good question.  I guess, it's -- once it's
11 approved, goes through legal, the chief's office and
12 once they approve it, they send it out to everybody.
13     Q.    Was it circulated with every sworn officer
14 in the police department?
15     A.    Yes, sir.
16     Q.    During your investigations when you were in
17 Crimes Against Persons, was it your practice to take
18 contemporaneous notes?
19     A.    Can you define that word?
20     Q.    Yes, sir.  Did you take notes at the same
21 time, for example, if you were interviewing someone did
22 you take notes while you were conducting the interview?
23     A.    It depends.  If it was a recorded
24 interview, I probably wouldn't take any notes because I
25 could always go back and review the audio or the video.

Page 48

1      Q.    And what if it was not recorded?
2      A.    I would put maybe key notes, what this
3  person said.  Usually, it's a witness.
4      Q.    Did you also take, did you take additional
5  notes after the interview?
6      A.    No, sir.  Also, another example is if I am
7  typing out a statement, obviously, I'm not writing down
8  because I'm typing somebody's -- they're telling me
9  what happened so that would be my notes, the actual
10 statement.
11     Q.    Okay.  So when you've taken -- when you
12 took witness statements at CAP, were you always at a
13 computer?
14     A.    Yes, sir.
15     Q.    So you never took a statement by hand, you
16 always typed it?
17     A.    Correct.
18     Q.    And was your practice to write a summary of
19 what a witness or a suspect said after the interview?
20     A.    I don't understand the question.
21     Q.    Was part of your practice after an
22 interview to also summarize what was said after the
23 interview was over?
24     A.    Was the interview like recorded or was it
25 typed or --

Page 49

1      Q.    For -- for -- if you could help me, please,
2  by explaining whether you would write a summary after
3  the interviews you might take because I don't know what
4  all the interviews are.
5      A.    It's an example of someone's giving me a
6  statement and I'm typing it.  What they're telling me,
7  I'm just typing what they're saying to me.  I don't
8  talk to them and then I go back and type it out.
9  They're next to me and what they're saying or if it's
10 recorded audio, well, it's recorded.  I don't go
11 summarize something else.
12     Q.    Would you sometimes speak with witnesses
13 when it's not recorded and it's not a statement, say,
14 on a phone call or in the field?
15     A.    Yes.
16     Q.    Okay.  In those circumstances, did you take
17 notes at the same time you had the conversation?
18     A.    Probably not because I would schedule them
19 to come in whatever they told me over the phone or I
20 was going to -- I was like okay that's good
21 information, can you come in tomorrow and we'll finish
22 off tomorrow.
23     Q.    Okay.  So sometimes there would be a pre
24 conversation to a statement; is that right?
25     A.    Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

1     Q.     And what notes would you make of such a pre
2  conversation?
3     A.     Either I'd write it down on a notebook or,
4  again, I would just say, okay let's, let's not go into
5  detail, let's continue when you're in front of me and
6  we'll take your statement there.
7     Q.     So sometimes -- so you wouldn't if you knew
8  you were getting a statement, you wouldn't necessarily
9  also take notes on the pre conversation?
10     A.     Yes, sir, correct, mm-hmm.
11     Q.     So as part of your duties, would you write,
12  for example, reports that would lay out the various
13  developments in an investigation?
14     A.     Yes, sir.
15     Q.     And how would you prepare such a report?
16     A.     It's an investigative supplement.
17     Q.     Yes, how would you prepare it?
18     A.     I would chronological order.  I'd time
19  stamp it what I'm doing, little brief notes what I did,
20  who I spoke to.
21     Q.     And the timestamps, are those from the time
22  you are typing or are you sitting down at the end and
23  saying, you know, nine months ago I did this, six
24  months ago I did that?
25     A.     I don't understand the question.

Page 51

1     Q.     Sure.  Do you write an investigative
2  supplement all at once or over time?
3     A.     Depends.  Usually, it's when I had a chance
4  I would note stuff on my notebook.  When I had some
5  downtime I'd go back open up my supplement and type in
6  what I wrote down.
7         THE REPORTER:  There's somebody else
8  talking in there.
9         MR. HILKE:  You know, I think that might be
10  Detective Marquez, if you could mute your zoom.  Thank
11  you, sir.
12  BY MR. HILKE:
13     Q.     Okay.  So sometimes you would go back after
14  you had -- you would go back and put your handwritten
15  notes onto an investigative supplement?
16     A.     Correct.
17     Q.     Was there any -- any standard for how much
18  time you would let pass before transferring your notes
19  to the investigative supplement?
20     A.     There was no rule that I -- that I
21  remember.
22     Q.     Yeah.  And was there a -- any standard for
23  when the investigative supplement needed to be
24  completed?
25     A.     Yes, sir.

Page 52

1     Q.     And what was the rule?
2     A.     Before we -- the case, before we -- what's
3  it called -- approve the case and we turned it over to
4  the DA's office.
5     Q.     Okay.  So sometimes -- so sometimes the
6  last thing you do in the case might be making sure all
7  your notes are in there, checking that all your notes
8  got the investigative supplement?
9     A.     Yes, sir.
10     Q.     And when you wrote an investigative
11  supplement, did you ever -- ever -- did multiple
12  officers ever contribute to the same supplement?
13     A.     Yes, sir.
14     Q.     Okay.  And how -- was it usual that it
15  would be one officer versus multiple officers?
16     A.     Yes.
17     Q.     Okay.  So was it common that multiple
18  officers would contribute to one investigative
19  supplement?
20     A.     Yes.
21     Q.     And when that happened, would each officer
22  who contributed note which officer was adding
23  information?
24     A.     I kind of lost you there for a minute.  Can
25  you repeat the question?

Page 53

1     Q.     Yes, sir.  So if, say, two different
2  officers are contributing to the same investigative
3  supplement, is each of those officers going to put
4  that, you know, here's a note from Detective Loya,
5  here's the note from Detective So-and-so?
6     A.     If I understood the question, I may put in
7  my supplement that I worked with Detective So-and-so,
8  we worked together, yeah, I might include them in my --
9  in my supplement.
10     Q.     But then in your supplement is another
11  officer actually typing into the supplement that you
12  prepared?
13     A.     Oh, no, sir.
14     Q.     Okay.  So they're always going to be
15  separate supplements, one from each officer who is
16  updating?
17     A.     Should be, yes, sir.
18     Q.     And have you ever had another officer type
19  part of your supplement?
20     A.     No, sir.
21     Q.     And have you ever typed part of another
22  officer's supplement?
23     A.     No, sir.
24     Q.     So can you tell me when you wrote a
25  supplement, what were, you know, what were El Paso, the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 953 of 1026
The Deposition of Detective ZOYK, taken on May 09, 2019

54..57

Page 54

1  El Paso Police Department's policies and procedures
2  about what should be in that supplement?
3       Q.    I'm not sure what the procedures manual,
4  what the procedure says that should be in there, to be
5  honest with you.
6       Q.    So how -- how did you know what to put in
7  there?
8       A.    Because that's what I did.  That's -- that
9  was my involvement in the case, my investigation, who I
10 spoke to, what I did, just somehow in my career they
11 told me that's what I needed to do.  I didn't -- I
12 don't believe I read it anywhere.  I was just told.
13      Q.    And what -- what were you told about how to
14 do it?
15      A.    Just to keep records, make sure all your
16 records are correct, dates, times, persons you met, you
17 spoke to, what, I mean, just something to down the road
18 if I ever go to court something that could kind of -- I
19 could recall.  I could remember stuff.
20      Q.    Was there anything that, you know -- strike
21 that.
22            Were there things you were told not to do
23 when writing a report?
24      A.    No, sir.
25      Q.    And do you recall receiving any more

Page 55

1  specific guidance beyond what you've just told me about
2  what a report should have in it?
3       A.    Not that I recall.
4       Q.    Okay.  And do you have in mind anything
5  that would refresh your memory about the instruction
6  you had gotten?
7       A.    No, sir.
8       Q.    So we talked a little bit about this
9  before.  Give me one moment, please.
10            So you talked about how you would have take
11 handwritten notes and then make sure that what was in
12 those notes was in your reports; is that correct?
13      A.    Yes.
14      Q.    And at some point you said a memo was
15 circulated saying we've got to scan notes now.
16      A.    Yes, sir.
17      Q.    Do you -- have you received any other
18 guidance on retaining notes?
19      A.    Not that I recall.
20      Q.    Have you received any other guidance on
21 destroying notes?
22      A.    Not that I recall.
23      Q.    And after you finished an investigative
24 supplement, do other detectives on the case look at it?
25      A.    I'm pretty sure they do.  I know I have.

Page 56

1       Q.    And is that after it's final or before it's
2  final?
3       A.    Either/or.
4       Q.    Do you, in Crimes Against Persons, did you
5  ask other detectives to look at your investigative
6  supplements for accuracy?
7       A.    Yes, sir.  Especially the case agent, I'd
8  say, I would -- if I'm not the case agent, I would
9  say, hey, my investigative supplement is there
10 already, double-check and make sure I didn't miss
11 anything.
12      Q.    And is that something the case agent would
13 always do with the investigative supplements on the
14 case?
15      A.    I'm not sure always.  I know I did that and
16 some of the detectives I worked with they would -- we
17 would tell that to each other.
18      Q.    Was that a best practice for the case agent
19 to look at all the supplements before they're
20 finalized?
21      A.    Sure, yes.
22      Q.    And in your reports, was your practice to
23 document events in the case as they happened?
24      A.    Yes, sir.
25      Q.    And is that important to do?

Page 57

1       A.    Yes.
2       Q.    And is it important to be thorough as well?
3       A.    Yes.
4       Q.    And anything that's relevant should be put
5  in writing in an investigation, right?
6       A.    Yes.
7       Q.    And that includes the stuff that's good for
8  the prosecution and good for the defense, right?
9       A.    Yes, sir.
10      Q.    And you're also look -- checking carefully
11 to make sure everything is accurate; is that right?
12      A.    Yes.
13      Q.    And that includes what a witness said to
14 you in a conversation, right?
15      A.    Yes, sir.
16      Q.    It also includes how the witness was
17 questioned, right?
18      A.    I don't understand the question.
19      Q.    Yeah.  And so there are different ways you
20 can interview witnesses, right?
21      A.    I -- yes, sir.
22      Q.    You can interview them at the police
23 station or at their home, right?
24      A.    Correct.  Yes, sir.
25      Q.    And you can, what's a good example,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1  sometimes you might read Miranda warnings and
2  sometimes, you know, if it's a witness who is not a
3  suspect you might not; is that right?
4      A.    Correct.
5      Q.    And so whatever -- whatever you are doing
6  to prepare the witness in that way, those need to be in
7  the report, too, right?
8      A.    I don't understand preparing the witness?
9  You --
10     Q.    Yeah.  I just mean the way you ask -- the
11  way you are asking questions, what the sort -- what the
12  situations are and what the witness has been told.
13     A.    My personal experience speaking to
14  witnesses I tell them what I'm working, do you have any
15  knowledge of this?  Yes, I told, I was witnessed it.  I
16  go, okay, good.  We're going to go down to
17  headquarters.  I'm going to take a written, a typed-out
18  statement and you're going to sit next to me and you're
19  going to tell me what happened.  That's how I would
20  prepare them.
21     Q.    So the way -- your introduction to a
22  witness you are trying to talk to is pretty much the
23  same every time?
24     A.    Yes, sir, mm-hmm.
25     Q.    And so you might not make a note of it

Page 59

1  because you know how you -- what you said to them
2  before they came in for a statement?
3      A.    Yes, sir, mm-hmm.
4      Q.    Okay.  And you said, you know, tell -- when
5  you say tell the witness what I'm working, what does
6  that mean?
7      A.    I'm investigating a homicide.  Did you see
8  it, did you witness it?  No, I didn't, whatever the
9  witness was saying.  I said, okay, I was here, I was
10  standing.  I'm okay, good, you know what, we're going
11  to go back to the office and I'm going to take a
12  statement or I'll schedule can you come in tomorrow
13  because I don't have a chance to meet with you today.
14  Okay, good, and we schedule that.
15     Q.    Is that because you need to share some
16  details about the case to make sure they know what
17  you're talking about?
18     A.    Yes, sir.  Absolutely.
19     Q.    'Cause it would be a waste of time for
20  someone to come in and not know and they thought you
21  were talking about something else?
22     A.    It works either way or not because
23  sometimes I -- we need to get with those witnesses as
24  soon as possible before they forget stuff or they hear
25  other stuff, yeah.

Page 60

1      Q.    And but specifically, the details that you
2  shared to make sure they know what you are talking
3  about, those wouldn't necessarily be written down by
4  you?
5      A.    Probably not, sir, because I'm going to get
6  a statement, yeah, later on and I just know, yeah, he
7  did see something.  He told me he -- the incident.
8  That's usually when I write it down.  I just -- I'll
9  take the written statement.
10     Q.    And sometimes witnesses contradict
11  themselves, right?
12     A.    Yes, sir.
13     Q.    And if a witness contradicts him or
14  herself, is it important to write that down?
15     A.    What that witness told me a couple of hours
16  earlier, hey, I did see it and then when I get back to
17  the station, I'll -- they say, you know what, I didn't
18  see that.  I'll put whatever he's telling me right then
19  and there.  I don't put, yeah, well you told me that
20  earlier.  Now you're changing your mind.  Yeah, it
21  depends.
22     Q.    What does it depend on?
23     A.    Well, earlier he told me, yeah, I did
24  witness it but then when he gets to the station, I'll
25  put there, like, okay, what did you see?  Well, you

Page 61

1  told me you did see it and well, I didn't, and I'm
2  like, okay.  I'm going to put here you didn't see it.
3  Okay.  That's it.  There may be times I might have put,
4  well, earlier you did tell me that, but now you're
5  telling me something else.  Yeah, I might have put that
6  in there also.
7      Q.    But you wouldn't necessarily put that in
8  the example you were just giving that a witness told
9  you he saw something but then when they come to give
10  the statement they deny it.  You wouldn't necessarily
11  include the earlier statement there?
12     A.    Probably not, sir.  Yeah, I can't recall
13  any time maybe -- maybe I did, I don't -- I don't
14  recall any specific statement I took like that.
15     Q.    And you say probably not.  Why wouldn't you
16  mention the contradiction?
17     A.    Because that's not his statement.  Maybe he
18  thought he saw something or he didn't understand the
19  question I was giving him but then when he got here,
20  again, I'll say, hey, well you told me yesterday that
21  you did.  You were there.  No, sir, I wasn't there.
22  Hey, are you lying to me, you know, being truthful?
23  Why aren't you being truthful?  If you did see it, if
24  you did see it then you need to be honest with me tell
25  me.  You know, I'm working this case, this and that.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 62

1  Okay.  No, I really didn't see it.  I don't know why I
2  told you that.  Okay.  Well, I'm just going to write
3  down what you're telling me right now.
4      Q.    Okay.  Is it important to document the
5  start and stop time of an interview with a witness?
6      A.    Yes, sir.
7      Q.    And if you talk to a witness more than
8  once, is it important to document each time you talk to
9  them?
10      A.    You mean document, like, on my
11  investigative supplement or -- because when I take a
12  witness statement, I put the date and the time I start
13  it and then on my notes I might put, yeah, he came in
14  at this time but I may not put end time that I.
15      Q.    Yeah.  And I don't mean in the
16  investigative supplement versus your notebook or
17  anywhere else.  I just mean, is it important to record
18  each time you talk to a witness?
19      A.    Yes, sir.
20      Q.    Okay.  But it might be in different places?
21      A.    Yes.
22      Q.    Okay.  And is the same true for an
23  investigation that if you arrive to a location, arrive
24  to a scene, it's important to note the time of the
25  occurrence?

Page 63

1      A.    Yes, sir.
2      Q.    And would you -- would you rely on that
3  information later?
4      A.    Yes.
5      Q.    And it might be needed at trial; is that
6  right?
7      A.    Yes.
8      Q.    And the DA might need it when they review
9  the case; is that right?
10      A.    Yes.
11      Q.    We talked about this a little before but I
12  want to ask about how notes are kept and at Crimes
13  Against Persons specifically.  You said that after the
14  memo about notes went out, all notes, all detective
15  notes were scanned at the end of an investigation; is
16  that right?
17      A.    I don't know if they were all scanned but
18  yeah, after the memo they should have been scanned.
19  Yes, sir.
20      Q.    Okay.  Do you do you have reason to believe
21  that some notes were not scanned after the memo?
22      A.    Gosh.  I'm not sure if that happened or not
23  but yeah, I don't recall any particular situation where
24  they weren't.
25      Q.    Are there some detectives you have worked

Page 64

1  with where you wonder, you know, are they really doing
2  100 percent in scanning every last note they take?
3      A.    No, sir.  Yeah, no.  I don't know.
4      Q.    So after the notes are scanned, where are
5  they kept?
6      A.    After they're scanned, I will shred my
7  notes.  I don't know about everybody else's and I think
8  in my supplements I will put there notes were scanned
9  and then I shredded them after that.  I put that in my
10  supplement.
11      Q.    Okay.  Do you know where the electronic
12  scanned file is kept?
13      A.    I don't understand the question.
14      Q.    Yeah.  So after the notes are scanned,
15  those scans are saved electronically; is that right?
16      A.    Oh, back in the old days, we used to have
17  those old scanners and you'd put, like, you would
18  download it like a USB and then you'd have to take that
19  USB over to your computer and download it but now the
20  newer printers, we're able to scan on the printer and
21  it sends it by email and then we attach it to the case.
22      Q.    Got it.  And so if you want to go to the
23  case and look at those scanned notes, how do you do
24  that?
25      A.    You -- when we would scan the notes, we

Page 65

1  would open up a supplement and then in that supplement
2  the narrative part I would put there supplemented
3  generated to scan the following documents or
4  handwritten notes.
5      Q.    And is that, like, to have case management
6  software that that's getting entered into?
7      A.    It's the -- the system, I guess, the
8  software, yeah.  It's -- I guess, we would just hit
9  attach, open it up, and then we would attach the file.
10      Q.    And does this software you use have a name?
11      A.    Well, the -- for the cases it -- back then
12  we just changed last year to WebRMS.  It's our -- back
13  then it was called iLeads.
14      Q.    iLeads.  Okay.  Was there a policy about
15  whether the physical notes should be shredded or could
16  be kept?
17      A.    Not that I recall.
18      Q.    As -- do you know that -- do you know of
19  some other detectives also shredding those notes?
20      A.    I don't know of any, sir, to be honest with
21  you.
22      Q.    And do you know of other detectives keeping
23  their handwritten notes after scanning them?
24      A.    I don't know.
25      Q.    In an interview, if you show a document to



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 66

1  a witness, is that something you're going to record in
2  your notes?
3      A.   Yes.
4      Q.   And -- okay.  So I asked you a little bit
5  about training before.  Do you recall any training you
6  received on investigations when you first became a
7  patrol officer?
8      A.   No, sir.  I don't recall.
9      Q.   What about specific training when you
10 became a detective?
11     A.   I do recall, again, I think the department
12 put out a detective course maybe one week where they
13 taught us, like, search warrants.  They kind of most
14 focused on search warrants how to prepare search
15 warrants and again, I went to a homicide school.  I
16 went out of town for about a week.
17     Q.   Okay.  In homicide school, was that
18 something that everyone got or was that more of a
19 one-time thing?
20     A.   I think everybody that was there before me
21 had gone to some sort of homicide school.  I remember I
22 found it on the Internet.  It was some really -- guy
23 that wrote a bunch of homicide books, real famous
24 detective and I put in for it and they sent me out.
25 The department paid for it.

Page 67

1      Q.   Was that a -- was that the standard that if
2  you were going to work homicide, you had to go to
3  homicide school?
4      A.   I don't believe it was a standard.  It was
5  just some of the older guys told me, hey, look online,
6  find yourself a good course and if they're really good
7  courses, you'll learn some interesting stuff.
8      Q.   Got it.  So that was self initiated.  It
9  was something that you asked for permission to attend?
10     A.   Correct.
11     Q.   We -- are there -- so are there any
12 particular principles you follow when you are
13 investigating a case?
14     A.   Are there principles?  Yeah.  Thorough
15 investigation, make sure you get everything right,
16 listen, take your time, yeah, make sure you get it all,
17 you document, everything's documented.
18     Q.   Is there a method you use to identify
19 suspects?
20     A.   Sure.
21     Q.   What do you do?
22     A.   Gosh.  Can you give me an example?  A
23 who-done-it, a I-don't-know, a --
24     Q.   Let's -- let's talk about a homicide.
25     A.   Okay.  A good chunk of the time it was we

Page 68

1  already had maybe a witness had seen somebody that they
2  knew and we follow that lead.  There was maybe just a
3  handful of who-done-it's where we just had no clue who
4  they were.  Yeah, we just canvassed.  We'd knock on
5  doors.  We'd try to look for surveillance video in the
6  area.  We'd see a car or something like that, but a
7  good chunk of our investigation was, yeah, I saw
8  so-and-so shoot so-and-so or stab so and so.
9      Q.   Yeah.
10     A.   We already had a suspect, a good suspect.
11     Q.   When you don't have a good suspect, how do
12 you try to -- how do you try to narrow in on who the
13 right suspect is?
14     A.   Believe it or not, we, again, we canvas.
15 We knock on doors.  Hey, did you hear anything?  Did
16 you see anything?  Yeah, you know they saw this car or
17 a lot of them are people calling in, you know, put
18 something out, hey, did anybody in the area, did
19 anybody have any -- any where we gave us some good
20 leads and a lot of them came in from that.  People
21 calling in, hey, you know what, so-and-so told me he
22 was involved in the shooting or he heard so-and-so and
23 then we open up another door and we start looking into
24 that.
25     Q.   What about ruling someone out?  Is there a

Page 69

1  way -- are there methods by which you rule out someone
2  and say, no, I guess they're not a potential suspect?
3      A.   Yeah.  After, again, doing a thorough
4  investigation, hey, where were you on this date, and
5  hey, well so-and-so said you were with them or I was
6  out of town, or okay, well, obviously, you're not --
7  you have no involvement in this.  Mm-hmm.
8      Q.   How do you know when a case is ready to
9  present?
10     A.   Made an arrest, maybe get a good
11 confession, everybody's done all their supplements, all
12 the evidence is tagged, they're with the DA's office,
13 did you guys miss anything and we present the case.
14     Q.   And in the Crimes Against Persons, was
15 there a -- did you have a caseload of cases you were
16 working at any given time?
17     A.   Yes, sir.
18     Q.   And about how many cases would you work at
19 a time?
20     A.   Major cases?  Usually, we were -- there was
21 a good group of us so, yeah, I would -- if I was
22 working already a major case and it was, yeah, we made
23 an arrest but it's still a process to put everything
24 together so they kind of would leave you alone but you
25 would get all these other smaller cases, aggravated



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 957 of 1026
The Deposition of DETECTIVE ZOYA, taken 02 May 2019

70..73

Page 70

1 assaults, sexual assault that you still had to work but
2 once I'm done with that major case then some other big
3 homicide case would come in and I would get pulled into
4 that one.
5    Q.    So is it fair -- so are you saying that
6 most of the time, it would be one major case at a time?
7    A.    Yes, sir, mm-hmm.
8    Q.    And then some smaller cases?
9    A.    Yes, correct.
10   Q.    How many smaller cases at a time?
11   A.    Maybe on a monthly basis it depends
12 anywhere from three to five or six give or take.
13   Q.    Okay.  Did you receive training
14 specifically on interviewing witnesses?
15   A.    Again, it was a lot of it was formal
16 on-hands training, learning from other detectives.  I
17 do recall the department when I was at CAP, there were
18 some big, real famous, I don't remember his name but
19 the guys would talk about it, the department I think
20 paid for him to come down and give us like a one-week
21 course on interview skills.
22   Q.    Yeah.  I saw in your file 32 hours of
23 criminal interview and interrogation techniques in May
24 2014.  Does that ring a bell?
25   A.    It does.  Yes, sir, uh-huh.

Page 71

1    Q.    And I guess just broadly, what -- what was
2 your training on how to interview witnesses?
3    A.    What that particular training was about
4 or --
5    Q.    I guess, let me pause.  Do you remember any
6 other specific training on interviewing witnesses?
7    A.    A lot of it was just observation from the
8 senior detectives listening to them.
9    Q.    And what -- tell about me about that
10 observation what were the main things you took away
11 about interviewing witnesses?
12   A.    I think everybody had a different
13 technique, try to get a little -- some pointers from
14 this particular detective and detective, this one, this
15 one, oh wow, that's interesting.  I never heard that,
16 so yeah, a little bit from everybody.
17   Q.    Anything in particular?
18   A.    Gosh, no, sir.  Again, everybody had a
19 different technique.  The way they would interview
20 people.  Some of them were natural, some were really,
21 really good at interviewing people.  I was really
22 impressed by that.
23   Q.    And what about the May 2014 training, what
24 was the takeaway from that?
25   A.    I don't recall to be honest with you.  I --

Page 72

1 some of it was a little funny the way examples they
2 would give us, the videos they would show and they were
3 just old.  I mean, like, 70's, 80's videos and yeah,
4 they were just and yeah, I don't -- anything in
5 particular I remember from that -- from that training
6 to be honest with you.
7    Q.    Do you find that witnesses sometimes feel
8 pressure when they are being interviewed by a police
9 officer?
10   A.    Do I feel sometimes they feel pressured?  I
11 think it's -- it's scary.  I mean, to be in that
12 position, yeah, I'm pretty sure they feel a little
13 intimidated.
14   Q.    Yeah.  And have you observed that witnesses
15 worry that they might get in trouble if they're being
16 interviewed by a police officer?
17   A.    I don't know if they feel like they're
18 going to get in trouble.  Again, I think it's just
19 fear.  Me, personally, I tell them, hey, just relax.
20 Just listen, you know, we'll figure you're a witness
21 you're not in trouble, you know, I just want to kind of
22 clarify some stuff or maybe you are a suspect after,
23 obviously, they've been Mirandized but like I said, I
24 just want to clarify some stuff, just don't be nervous.
25 I know it's nervous.  I guarantee you if I were in your

Page 73

1 shoes I'd be nervous, too.
2    Q.    And were you talking the same -- so did you
3 ever interview witnesses who were hostile to you?
4    A.    Hostile?
5    Q.    Yes.
6    A.    Sure.
7    Q.    And would you say that same sort of thing,
8 like, don't be nervous it's all going to be fine to a
9 witness who is hostile to you?
10   A.    Yes.  Or believe it or not, I had witnesses
11 that I just didn't have the time.  I'm busy.  I've got
12 to go to work.  I'm like, this a homicide.  Someone
13 died.  This is important and yeah, no, no, I can't and
14 this and that and I said, listen.  Please -- if you
15 don't talk the me now -- I don't know if this was true
16 or not, I said what's going to happen is they'll put on
17 the report you told me that you did see it.  I just
18 want to get that on paper.  Because I'm going to put
19 you on the report.  You're going to have to testify in
20 court down the road, either do it now in front of me or
21 you're going to go in front of a jury and you're going
22 to have to testify then.  Oh, okay.  I guess I'll go
23 down there and talk to you, yeah.
24   Q.    Does that ever work to your advantage a
25 witness being nervous?


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 958 of 1026
The Deposition of ROBERT ZOYHOFSKI, taken on 12 May 2022

74..77

Page 74

1    A.    A witness being nervous?  I just -- it
2    would be the opposite.  I wouldn't want him or her
3    nervous.  You know, just a clear mind and, you know,
4    just tell me what happened.  What you remember, give me
5    details, what you saw.  That would be important.  I
6    wouldn't want them nervous to be honest with you.
7        Q.    Okay.  What about a suspect?  Would you
8    want a suspect to be nervous?
9        A.    I don't know about nervous.  I never
10   thought about it.  Why would you want to be nervous?
11   Just, you know, be truthful, tell me the truth.  Yeah,
12   I don't know if I want him to be nervous.
13       Q.    Was there a state of when you
14   interviewed -- and you've interviewed suspects in your
15   criminal investigations?
16       A.    Correct.
17       Q.    And when interviewing a suspect, is there a
18   state of mind you try to put them in?
19       A.    I do, sir.  Yes, sir.
20       Q.    What kind of state of mind do you try to
21   put them in?
22       A.    Again, relax, relax, you know, just be
23   truthful.  A lot of times I tell them I said, listen, I
24   already know the answers to it.  You know, the whole
25   who, what, where, when.  I just need to know why, why

Page 75

1    it happened and just, you know, it is what it is and
2    just be honest with me and that was pretty much what I
3    went with.
4        Q.    Sometimes witnesses provide inaccurate
5    information to the police, right?
6        A.    Yes, sir.
7        Q.    And they might just -- sometimes someone
8    might, like, sometimes it's innocent.  It's just a
9    wrong memory, right?
10       A.    Yes, sir.
11       Q.    And sometimes a witness tries to deceive
12   the police?
13       A.    I can't recall if I ever had any type of
14   experience like that or a statement like that to be
15   honest with you.
16       Q.    What about a suspect?  Have you ever had a
17   suspect try to deceive you in an interview?
18       A.    Sure.
19       Q.    And part of your job is to determine
20   whether the information you get is reliable, right?
21       A.    Yes, sir.
22       Q.    And one way to make sure that information
23   is reliable is to see if a witness or a suspect knows
24   facts about a crime that are not yet published; is that
25   right?

Page 76

1        A.    Correct.  Yes, sir.
2        Q.    And to make sure that that information is
3    reliable, you have to withhold non-public information
4    from witnesses and suspects, right?
5        A.    Yes, sir.  On an ongoing investigation,
6    correct.
7        Q.    Because if they just tell you the
8    non-public information that you gave them that doesn't
9    tell you anything about whether they're reliable or
10   not, right?
11       A.    It depends.
12       Q.    When would -- well, tell me about that, why
13   does it depend?
14       A.    Well, it might be firsthand.  Maybe they
15   were direct witnesses and I know that for a fact
16   already and then versus somebody that just heard
17   something on the news or watched something on social
18   media.  Like, oh, I heard this.  You can usually tell
19   which ones are -- are real.
20       Q.    How can you tell?
21       A.    Well, just keep asking questions.  Okay,
22   well, I already -- I know the facts.  I know the times,
23   the dates and, you know, people, like, well -- well,
24   this and that.  I don't think you were there.  I think
25   you're just probably something you heard or somebody

Page 77

1    told you or maybe somebody else was involved and
2    they're telling you and well, yeah.  You're right, you
3    know, I -- I don't know.  Something to that -- to that
4    extent, just a little more thorough investigation.
5        Q.    Yeah.  So you would be looking to see if
6    they give inconsistent information that doesn't match
7    with what's known?
8        A.    Correct.
9        Q.    And would you also be looking to see if
10   they can tell you something new, something they
11   couldn't have learned unless they knew it for
12   themselves?
13       A.    Yes.
14       Q.    And so does that mean you have to be
15   careful about revealing non-public facts to witnesses
16   and suspects?
17       A.    Careful?  Yes.
18       Q.    And so you would wait, is it true that you
19   would wait to provide a non-public fact to a witness or
20   a suspect until you've seen if they know it themselves?
21       A.    Can you repeat that?  I don't understand
22   the question.
23       Q.    Yeah.  So say you know a detail that isn't
24   public about a crime.  And you're trying to test the
25   reliability of a witness or a suspect to that crime.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 78

1  Are you -- are you going to share that non-public
2  detail with them or are you going to wait to see if
3  they know about it on their own first?
4      A.    Oh, okay.  No, see if they know first.
5      Q.    You're going to see if they know first?
6      A.    Yes.
7      Q.    And is that because you need -- so put it
8  in the context of a confession, in a con -- in a
9  confession, it's really important that the suspects
10 provide the details for themselves -- by themselves,
11 right?
12     A.    Yes.
13     Q.    Okay.  And you're going to have to
14 accurately document how you got that information?
15     A.    Accurately document from the suspect
16 telling me this information, or --
17     Q.    Let me put it this way.  If you gave a
18 non-public fact to a witness or a suspect, you would
19 want to document that, right?
20     A.    To a suspect, I -- it is being documented
21 because its being recorded for the most part, yeah.
22     Q.    Okay.  What about to a witness?
23     A.    Like I would document a witness this is --
24 this is what's out on the public and can you tell me
25 about this I -- I don't understand.

Page 79

1      Q.    Yeah.  What I mean is say you're -- if
2  you're sharing information with a witness and the
3  information you are sharing with that witness is not
4  publicly available, your report should document that
5  you shared that non-public information, right?
6      A.    I could probably tell the witness, like,
7  hey, this is what I'm working -- obviously, the public
8  doesn't know everything that I know of.  Hey, I know
9  dates and times.  Are you sure this is -- but would I
10 document it anywhere?  Like, when I'm taking the
11 statement?  I -- I -- I don't know.  It depends.  I
12 guess, but I'm pretty much taking what -- what he or
13 she is telling me as much as I can.  But I dont tell --
14 I'm not documenting what I'm asking.  I guess --
15     Q.    So as a general rule, you wouldn't record
16 the information that you gave to the witness.  You
17 would just record what they said?
18     A.    I'm asking the questions and they, yeah, I
19 guess.  I guess because if I typed everything I would
20 be there for hours and I'm just pretty much -- that
21 person is telling me.  Would I kind of tell them, okay,
22 that's good.  Now tell me about this.  But I wouldn't
23 be putting in there I then asked them this, I then
24 asked them this.  No, I wouldn't on a witness
25 statement, no.

Page 80

1      Q.    And do you try to avoid leading questions
2  when interviewing the witness?
3      A.    Yes, sir.
4      Q.    Okay.  And why do you avoid leading
5  questions?
6      A.    Because I -- just from experience I've also
7  been told let them tell you the story.  It's better
8  just to be quiet and just even silence is the best
9  thing to just sit there and if you've got to stare at
10 each other forever and let that person just talk.
11     Q.    And are you also concerned that you might
12 -- you might get them to say something because of your
13 leading question instead of what they have to say?
14     A.    Absolutely.  Yes, sir.
15     Q.    And when it comes directly from the
16 witness, that means that -- is it true that when it
17 comes from the witness, you don't have to worry about
18 it being a leading question because a witness came up
19 with it for themselves?
20     A.    Yeah.  The witness came up with it himself
21 if he or she is a witness.
22     Q.    And so when you take a statement do you try
23 to put it in the witness's words?
24     A.    I try to, yes.  Correct.  Uh-huh.
25     Q.    And you're typing it, it's not verbatim.

Page 81

1  So you do -- it is you trying to say what they told you
2  not a word-for-word in a statement; is that right?
3      A.    I try word-to-word but I'm not that great
4  of a typist.  So.
5      Q.    And you -- when you do it word-for-word,
6  does that make it more reliable and useful?
7      A.    It -- yes, it does, mm-hmm.
8      Q.    Okay.  And everything you've just talked
9  about is that the way you just talked about
10 interviewing witnesses, is that consistent with your
11 training?
12     A.    Again, I can't recall if I had actual
13 training on taking witness statements.  It just in my
14 career -- this is, you know, I -- this guy did it this
15 way, did it this way and I learned a little bit from
16 everybody and I said, okay I liked that one.
17     Q.    And that's the way you did questions the
18 whole time you were in Crimes Against Persons?
19     A.    For the witness statements, yeah.  Witness
20 statements, they come in and I'd sit down and okay, sit
21 down.  Tell me what happened and I'd sit there typing
22 and typing.  After I was done, I'd read it to them.
23 Okay, this is what you told me.  This is the -- is that
24 correct?  No, no.  This -- okay, let me go back and fix
25 that.  Once I'm done with the whole statement, I hand

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 960 of 1026
The Deposition of HECTOR LOYA, taken on May 09, 2022
82..85

Page 82

1  it to them, they read it.  Is everything good?  Oh, you
2  know what, Detective, this isn't correct.  Okay, let's
3  fix that and then we'd go back and forth like that
4  until we got it right.
5      Q.    Would you use the same techniques when
6  taking a recorded statement?
7      A.    Recorded?  Once you record, it's -- you're
8  on.  You can't stop and go off the record and turn it
9  back on.  It's a constant, yeah.
10     Q.    But everything you said about not leading
11  questions, not -- not introducing, you know, trying to
12  test reliability, not introducing non-public facts, you
13  would do the same thing in a recorded statement; is
14  that right?
15     A.    To the -- to the suspect, yes, uh-huh.
16     Q.    And would you do the same thing in any
17  interview, where you are developing evidence on a case?
18     A.    When you -- when evidence is coming in,
19  hey, hey, ask him -- hey, we just heard about this.
20  Ask him this.  That just came in.  Yeah, I'd say, well,
21  hey, tell me about so-and-so and, you know, hopefully
22  they'll be able to give me information on that.
23     Q.    Right.  So you would avoid asking leading
24  questions in any conversation with a witness where
25  you're trying to develop evidence?

Page 83

1      A.    Sure.  Yes, sir.
2      Q.    And you would try to evaluate the
3  reliability of a witness in any conversation when
4  you're with a witness when you are trying to evaluate
5  evidence?
6      A.    I try to, yes, sir.
7      MR. HILKE:  Can we take a quick break here?
8  I was going to suggest a five-minute break.  I don't
9  know if folks need more time.
10     MR. MARTINEZ:  Five minutes is fine.
11     ONLINE VIDEO TECH:  We are off the record.
12  The time is 11:32.
13     (Break from 11:32 a.m. until 11:41 a.m.)
14     ONLINE VIDEO TECH:  We're back on the
15  record for the deposition of Detective Hector Loya
16  being conducted by videoconference.  My name is Sydney
17  Little.  Today is May 9, 2022, and the current time
18  11:41 a.m.
19  BY MR. HILKE:
20     Q.    Detective, it's important to corroborate
21  information from a witness; is that right?
22     A.    Yes.
23     Q.    And so say you've got a suspect on a case
24  and you have a witness who says that that suspect was
25  not involved.  Is that -- is that a hypothetical we can

Page 84

1  use?
2      A.    Yes, sir.
3      Q.    Would you ask that witness how they know
4  that the suspect was not involved?
5      A.    Yes.
6      Q.    Would you ask for corroborating details to
7  try to find out if they were telling the truth?
8      A.    Yes.
9      Q.    And if you saw inconsistencies, would you
10  challenge their testimony?
11     A.    Yes.
12     Q.    Okay.  Is there anything else you would do
13  in that situation to try to -- is there anything that
14  is typically a part of corroborating a witness
15  statement, something a witness has said?
16     A.    I guess with other witnesses.
17     Q.    One other question, is it fair that you
18  like to take statements at the police department
19  because, you know, you're there, you've got a computer
20  to take a statement, it's just a good location that
21  way?
22     A.    Correct.  Any police station in our -- in
23  El Paso, yeah, safety reasons also.
24     Q.    All right.  And do you ever take statements
25  at the DA's office?

Page 85

1      A.    No, sir.
2      Q.    No.  Would you ever interview a witness at
3  the DA's office?
4      A.    No, sir.  Correction.  I did take a witness
5  statement on this case at the DA's office, yes.
6      Q.    Okay.  Was that the only time?
7      A.    Yes, sir.
8      Q.    And why did you, if you remember why did
9  you take the statement at the DA's office in this case?
10     A.    On that particular case was we were, our
11  supervisors at the CAP office asked myself and
12  Detective Armendariz to go down to the DA's office,
13  meet with an ADA who had a witness there that needed to
14  give a statement.
15     Q.    Okay.  So the ADA had already -- already
16  had the witness at the office?
17     A.    Correct.
18     Q.    Great.  Have you ever -- so have you ever
19  used physical force against a suspect or a witness
20  inside a police building?
21     A.    No, sir.
22     Q.    Have you ever witnessed another police
23  officer use physical force against a suspect or a
24  witness inside a police building?
25     A.    No, sir.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1    Q.    Have you ever heard of another police
2 officer using physical force against a suspect or a
3 witness inside a police building?
4    A.    No, sir.
5    Q.    And have you ever heard that another police
6 officer was disciplined for using physical force
7 against a suspect or a witness inside a police
8 building?
9    A.    No, sir.
10    Q.    Have you ever witnessed another officer
11 testify falsely under oath?
12    A.    No, sir.
13    Q.    Have you ever heard of another officer
14 testifying falsely under oath?
15    A.    No, sir.
16    Q.    And have you ever heard of an officer being
17 disciplined for testifying falsely under oath?
18    A.    No, sir.
19    Q.    Have you ever heard of another officer
20 being disciplined for their testimony in any way?
21    A.    No, sir.
22    Q.    Were you disciplined as a result of the
23 incident that caused to you leave CAP, the testimony
24 incident?
25    A.    No, sir.

Page 87

1    Q.    Was an investigation ever done?
2    A.    Not to my knowledge, no, sir.
3    Q.    Have you ever reported another officer to
4 Internal Affairs for committing misconduct?
5    A.    Have I reported any officer?  No, sir.
6    Q.    Have you ever witnessed another officer
7 commit misconduct?
8    A.    Have they made mistakes?  Yes, sir, I have.
9    Q.    What kind of mistakes have you witnessed?
10    A.    It all -- it all, during our patrol time,
11 they took too long eating lunch, a place where they
12 shouldn't have been, you know, they told a supervisor
13 they were supposed to do this, they didn't do it, you
14 know, just make sure they don't get into trouble.
15 Nothing where I would go to Internal Affairs and file a
16 complaint or anything like that.
17    Q.    Yeah.  So things that you -- are those
18 things that you didn't report to Internal Affairs
19 because you didn't think they were serious enough?
20    A.    Not -- not where somebody stole something
21 or somebody's rights were violated or someone got
22 physically hurt, no.  They were just -- that's going to
23 come back and stop doing stuff like that, you know.  I
24 -- I was a field training officer and out in the field,
25 too and I kind of just squashed things, like, hey, if

Page 88

1 it gets big, this is going to turn into something big
2 so stop doing stuff like that, yeah.
3    Q.    And would you have felt comfortable
4 reporting another officer to Internal Affairs?
5    A.    Gosh.  I would if it was something really
6 serious, yeah, somebody's rights were violated and, you
7 know, excessive use of force, yeah, definitely.  I
8 wouldn't have a problem doing it.
9    Q.    Yeah.  And when you say you wouldn't have a
10 problem, do you mean you would do it proactively if you
11 saw it you would just call Internal Affairs and say,
12 hey, I saw this there's a --
13    A.    I don't know if I would call Internal
14 Affairs but I'd definitely let my supervisors know, my
15 direct supervisor know, yeah.
16    Q.    Okay.  And why wouldn't you call -- why
17 would you go to your supervisor instead of Internal
18 Affairs?
19    A.    Because we have a chain of command.
20    Q.    So what is the chain of command?
21    A.    As a patrolman, my direct chain of command
22 would be my sergeant and then lieutenant and then
23 commanders, yeah, up the chain.
24    Q.    And that's all the way up to the Chief of
25 Police?

Page 89

1    A.    I guess so, yes, sir.
2    Q.    And where does Internal Affairs sit in the
3 chain of command?
4    A.    That's a good question, sir.  I'm not -- I
5 know they're up there.  I believe next to the Chief of
6 Police, yeah.
7    Q.    But if you saw something that was an
8 Internal Affairs issue, you would want it to get
9 Internal Affairs up through the chain of command?
10    A.    I've never been in that position but if I
11 did, I would still go to my supervisor but if they
12 didn't do anything then I would go up the chain and go
13 to my lieutenant and then if I have to, I guess, I
14 would go all the way to Internal Affairs.
15    Q.    Okay.  And so what was your understanding
16 of your responsibility if you witnessed misconduct by a
17 fellow officer?
18    A.    You would notify somebody, you -- your
19 chain of command, you would let your supervisors know.
20    Q.    Okay.  Did you ever -- did you ever
21 personally observe an officer reporting misconduct by
22 another officer?
23    A.    I don't recall.  I don't think I have.
24    Q.    And were you aware of -- and did -- were
25 you aware of any situations in which that had happened



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

1  where an officer reported another officer?
2      A.    Maybe I did, maybe I've heard throughout my
3  career, hey, so-and-so went and told somebody or the
4  supervisor or something like that but, yeah, I --
5  direct I can't name the incident or the officer.
6      Q.    Yeah.  So nothing that leaves a specific
7  impression?
8      A.    No, sir.
9      Q.    And do you believe some officers would
10 hesitate to report -- or strike that.
11           In your experience are officers hesitant to
12 report one another for misconduct?
13           MR. DARNELL:  Object to form.
14 BY MR. HILKE:
15     Q.    You can answer.  Go ahead.
16     A.    Can you repeat the question again?  I'm
17 sorry.
18     Q.    Yeah.  The question was in your experience,
19 are some officers hesitant to report their fellow
20 officers for committing misconduct?
21           MR. DARNELL:  Same objection.
22     A.    I don't think so.  I mean, if they did
23 something really bad, I think they would also do the
24 right thing and tell the supervisors.
25 BY MR. HILKE:

Page 91

1      Q.    And when you say really bad, is that the
2  same stuff you were talking about before, like a civil
3  rights violation or stealing or excessive force?
4      A.    Yes, sir, mm-hmm.
5      Q.    What about for, like, you were talking
6  about, you know, same, you know, fudging the truth with
7  a supervisor or being, you know, taking a lunch that's
8  too long?
9      A.    Correct, yeah.  That's, that's -- I -- I
10 don't see officers snitching on each other for stupid
11 things like that.  Like, hey, you call in sick, he was
12 drunk and this and that.  Yeah, I don't think that
13 would happen to be honest with you.  They would be
14 hesitant to do that.
15     Q.    And if an officer made a report that wasn't
16 serious enough about misconduct, could they expect, you
17 know -- would you expect that there would be negative
18 consequences for them among their fellow officers?
19     A.    I don't know.  Negative consequences, yeah.
20 I don't think that person would be in good standings
21 with the rest of the officers.
22     Q.    When -- is there a -- do you rely on your
23 other officers for your own safety as a police officer?
24     A.    Yes, sir.
25     Q.    And so as an officer you want to know that

Page 92

1  if you are in trouble, your fellow officers are going
2  to come out and help you?
3      A.    Yes.
4      Q.    And they're going to do that even if it's
5  dangerous because you have each other's backs?
6      A.    Yes.
7      Q.    And so there is a level of trust that's
8  needed between officers?
9      A.    Yes.
10     Q.    And so you don't snitch on little things
11 between your fellow officers?
12     A.    Yes.
13     Q.    Have you ever been trained on preserving
14 evidence?
15     A.    Have I been trained on preserving?  Yes,
16 sir, I have.
17     Q.    Okay.  When you were trained?
18     A.    I guess early in during the academy, my
19 police academy basic -- basic evidence, preservation,
20 lifting prints, processing scenes, what not to do, what
21 to do.
22     Q.    And are you trained on -- is part of your
23 training identifying whether information is relevant to
24 a case?
25     A.    I can't recall if we actually had formal

Page 93

1  training on that.  I think that's just common sense.
2      Q.    Are you trained on your responsibilities to
3  share evidence with the prosecution?
4      A.    Share evidence with prosecution?  Yeah.
5      Q.    And what are you trained is your
6  responsibility?
7      A.    Tell the -- can you repeat the question
8  again?  I'm sorry.
9      Q.    Yeah.  What are you trained -- what does
10 your training say that your responsibility is?
11     A.    To preserve evidence, don't tamper with it,
12 keep it as -- keep it pristine, call someone else to, I
13 mean, depends what type of evidence it is.  Call the
14 crime scene out to recover it, document it.
15     Q.    Okay.  And that includes both evidence of
16 guilt and innocence for the suspects in the case,
17 right?
18     A.    Oh, yes, sir, mm-hmm.
19     Q.    And if you find evidence in an
20 investigation, would you ever fail to mention that in
21 your notes?
22     A.    No, sir.
23     Q.    Okay?
24           MR. DARNELL:  Sorry, Roy.  Can you repeat
25 the first part of that question?  I didn't hear it.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 94

1      MR. HILKE:  Yes, I can.
2 BY MR. HILKE:
3      Q.    The question was:  If you found evidence
4 that was relevant, would you ever fail to mention that
5 in your notes?
6      A.    I would never fail to mention it.
7      Q.    Okay.  And you would -- you would never
8 fail to preserve it; is that right?
9      A.    I would never fail to preserve it, correct,
10 yes.
11      Q.    And how -- how do you know if the evidence
12 you find is relevant or not?
13      A.    It's evidence whether it's relevant or not
14 I'm -- I still have to hold on to it or preserve it.
15      Q.    Yes.  So anything that could have to do
16 with the case, you are going to make sure it gets
17 preserved?
18      A.    Yes, sir.
19      Q.    So do you recall speaking with Oscar Gomez
20 in relation to the Electric -- Electric Street
21 shootings?
22      A.    Oscar Gomez, I went over my notes over the
23 weekend, he's the person that I assisted Detective
24 Sanchez back in December of 2014.
25      Q.    And do you remember how -- so Mr. Gomez, do

Page 95

1 you remember how he was -- do you remember where you
2 interviewed him?
3      A.    Again, initially, when I first started this
4 was back January 2014 up until about March 2014, I was
5 involved, and then from March all the way to December I
6 was no longer involved.  I got pulled from it because
7 if I recall maybe, I think there was a -- a major case
8 that I got pulled away and I was no longer involved.  I
9 just remember that incident Detective Sanchez grabbing
10 me and saying, hey, can you help me go interview this
11 guy.  He's referenced the Daniel Villegas case.  Yeah,
12 sure, whatever.  And I was -- since I kind of knew
13 about it months down the road.  I recall we -- it was
14 just like a 5-minute, 5-10 minute drive from our
15 office.  He goes, hey, he's got warrants.  He goes -- I
16 can't remember if we got there and they had called
17 uniformed officers or if they were already there.  We
18 were there.  Detective Sanchez asked him he needed to
19 get a statement from him.  Again, I don't know what he
20 was going to ask, what his involvement was in the case.
21 Uniform officers drove him back to our office and he
22 gave Detective Sanchez a statement.
23      Q.    And so the -- is that -- so did the -- was
24 he -- was Oscar Gomez brought in on traffic tickets for
25 that interview?

Page 96

1      A.    I was made aware by Detective Sanchez that
2 he did have traffic tickets and they were arresting him
3 for traffic tickets.
4      Q.    And why would you bring in a witness on an
5 arrest for traffic tickets instead of inviting them to
6 come in for an interview?
7      A.    A lot of times witnesses don't want to come
8 in voluntarily, so we were able to bring him in on a
9 traffic tickets.
10      Q.    So it makes easier to bring the witness in?
11      A.    Correct.
12      Q.    So did Ray talk with you about the plan
13 and, you know, by -- we're talking about Ray Sanchez is
14 the detective who was -- who pulled you in for this; is
15 that right?
16      A.    Correct.
17      Q.    Did you talk with Ray about the plan for
18 interviewing Oscar?
19      A.    I don't recall talking to him about any
20 plan, yeah.
21      Q.    Okay.  And Oscar gave a videotape
22 statement, right?
23      A.    Yes, sir.
24      Q.    And do you remember where you were when
25 that statement was being taken?

Page 97

1      A.    Yes, sir.  I actually assisted with setting
2 up the recording -- recording, turning on the cameras,
3 and I was actually monitoring inside the monitor room
4 during the interview.
5      Q.    And so you can see the video of the
6 interview as it's unfolding?
7      A.    I have access to video and audio, correct.
8      Q.    And why were you in the monitor room
9 instead of in the room with Oscar and Ray?
10      A.    The only thing I can remember is because I
11 probably had no clue what they were going to be asked.
12 I had no idea.  Again, I just got pulled in just to
13 help them because I had worked on it nine months
14 earlier.
15      Q.    Do you remember a period when Ray left the
16 room to consult with you?
17      A.    According to my investigative supplement, I
18 time stamped the interview and there was a couple of
19 breaks there.  I don't recall if Ray ever came in and
20 spoke to me or he went to his desk to grab something or
21 I don't recall that, yeah.
22      Q.    So -- so you don't remember whether Ray
23 spoke with you during those breaks?
24      A.    I don't remember, sir.
25      Q.    Okay.  Did -- was Ray working with any

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 964 of 1026
The Deposition of HECTOR LOYA, taken on May 09, 2012
98..101

Page 98

1   other detective at the time on -- on this?
2       A.   Again, sir, earlier the beginning it was
3   myself and Detective Armendariz, took a couple of
4   statements, looked for a couple of people and then in
5   March, I got pulled away to go do something else and
6   then I believe Detective Armendariz and Detective
7   Sanchez continued working it.  I don't know what they
8   did in between that to be honest with you.  I didn't
9   keep up on it.  I had no clue what was going on.
10      Q.   That day did you and Detective Sanchez, was
11  there anyone else investigating the case with the two
12  of you?
13      A.   Investigation is a pretty big word.  I
14  didn't really investigate.  I just kind of -- again, it
15  was probably something to the point where, hey, dude.
16  I believe maybe Detective Armendariz wasn't there for
17  that day.  I'm pretty sure if he would have been there,
18  they probably would have gone in there and interviewed
19  him but, again, we don't go by ourselves, so we grab
20  somebody to go with us.
21      Q.   Right.  You were there because Ray couldn't
22  do it alone, right?
23      A.   Correct, yes, sir.
24      Q.   There wasn't some third officer working
25  with the two of you that day on this?

Page 99

1       A.   There probably was.  I can't say for sure
2   but, again, since I already had done it nine months
3   prior, probably easier and says, hey, dude, remember
4   Daniel Villegas case?  Oh, yeah.  I don't know if
5   that's exactly what I said.  Hey, this -- there's
6   another witness.  I don't remember if he said patrol
7   just found him or can we go to the house to see if he's
8   there, something to that, yeah, sure.  I'll go with you
9   but I didn't know what was going on.
10      Q.   So are you saying it's possible when you
11  and Ray go down to interview Mr. Gomez that there is a
12  third officer in the mix who is also helping with that?
13      A.   According to my notes, uniformed officers.
14  I don't know.  We got there first and then called
15  uniformed officers.
16      Q.   Okay.
17      A.   Or they were already there and they found
18  the guy to be honest with you or we just knocked on the
19  door and Mr. Gomez opened the door.  I don't recall
20  that whole incident to be honest with you.
21      Q.   Was there -- did any other detectives come
22  with you?
23      A.   No.  I would have written that down.  I
24  know for sure it was just me and Detective Sanchez.
25      Q.   Okay.  So if Ray tells Mr. Gomez that he's

Page 100

1   going to take a minute and go talk to his partner, is
2   that going to be referring to you?
3       A.   Okay.  I'm sorry.  Can you repeat that?
4       Q.   I can.  So when Ray is interviewing Oscar,
5   he says, "I'm going to go talk with my partner," is he
6   referring to you or someone else?
7       A.   And this is during the video statement?
8       Q.   Yes.
9       A.   Yeah.  I guess, that's, yeah, because
10  again, I think and according to the time stamp it's
11  probably after 4 and I think a big chunk everybody's
12  gone already.
13      Q.   I think that's right.  And you don't
14  remember if he talked to you or not actually though?
15      A.   I don't recall to be honest with you, sir.
16      Q.   So when Ray called you in to work on -- to
17  help him interview Oscar, had you worked with Ray
18  before?
19      A.   Oh, yeah.  Many times, sir, not on this
20  particular case.
21      Q.   Okay.  And how many times would you say?
22      A.   In three years, more than 10.
23      Q.   Did you know each other back when you were
24  in patrol?
25      A.   No, sir.

Page 101

1       Q.   Okay.  And can you give me an example of a
2   case you worked on Ray with before this one?
3       A.   Oh, yes, sir.  Oh, various cases, homicide
4   cases, suicides.  We would get called out together on
5   the weekends, late hours, just various cases.
6       Q.   And so had you before had you observed Ray
7   talking, Ray doing witness interviews before?
8       A.   Yes, sir.
9       Q.   Had you seen him interview suspects also?
10      A.   Oh, yes, sir.
11      Q.   Okay.  How do you describe Ray's style?
12  Well, how did he approach witnesses?
13      A.   It depends.  I guess, how he felt about
14  them, how -- what kind of vibes he was getting from
15  them.  He was a really good interviewer.
16      Q.   What was good about him?
17      A.   His experience.  He just listened really
18  good and very knowledgeable, yeah, I learned a lot of
19  good stuff from him.
20      Q.   When you say he was knowledgeable, like,
21  what did he know, like, what kind of knowledge did he
22  have?
23      A.   I mean, again, it's just it comes with
24  experience.  Just sitting in so many interviews, taking
25  suspect statements, just building rapport with people.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

1  He was just really good at it. So, again, some people
2  are just not -- he's a good talker. If you get a
3  chance to talk to him. He speaks really well very
4  elegantly and he knows what he's doing.
5      Q.    Did you find that witnesses responded well
6  to him?
7      A.    I -- that I could recall, I never saw a
8  witness not -- not respond to him or -- or talk to him.
9      Q.    So Oscar was handcuffed during this
10 interview, wasn't he?
11     A.    I can't recall if he was handcuffed during
12 the interview or he was -- obviously, if he's in
13 custody, again, I can't remember if officers when we
14 were at the house which is just a couple, a few minutes
15 down the road, they handcuffed him and they brought him
16 over to us or we followed each other. I can't recall
17 that information but I think for the most part, I don't
18 think -- I may be wrong but check out the time we
19 usually, yeah, they might be handcuffed but once we get
20 into the interview room, we would un -- take the
21 handcuffs off or for safety reasons, maybe handcuff
22 them to the chair that they're sitting in but, yeah, I
23 don't recall that particular incident or that
24 interview.
25     Q.    And so what I'm hearing is that, is it

Page 103

1  correct that you are doing a witness interview if you
2  can, you want to un-handcuff them or just handcuff them
3  to the chair?
4      A.    In an interview even the suspects are -- or
5  we feel we're going to be okay, you know, could be
6  someone that just killed somebody, you know, we may --
7  he or she may not be handcuffed. She may -- maybe one
8  handcuff to the chair but, yeah. In my years being
9  there I don't think I ever saw anybody handcuffed with
10 their hands in the back during an interview to be
11 honest with you. I dont think i ever saw, suspect or a
12 witness.
13     Q.    And why is that? What is the reason for
14 taking them out of full handcuffs during an interview?
15     A.    I guess make them feel more comfortable. I
16 mean, it's uncomfortable to be sitting in the chair
17 with your hands to the back, yeah, just, you know, make
18 them feel at ease as much as best as we can.
19     Q.    And is that -- does that help to sort of --
20 does that go along with the message you talked about of
21 we just want the truth, just tell the truth, like,
22 we're not out to get you, we just want the truth from
23 you?
24     A.    That's pretty deep. I didn't know if
25 that's the reason why we did it. I just -- I just

Page 104

1  noticed people were doing that and I just and to this
2  day, I still do the same thing, yeah.
3      Q.    Were you aware of any safety concerns about
4  Carlos Ortega. Goodness. Here I am reading off of the
5  screen. Let me try again.
6      Were you aware of any safety concerns with
7  Oscar Gomez?
8      A.    As I recall, no, sir.
9      Q.    And would you typically, in the most
10 serious thing he was in for, he was brought in for was
11 traffic tickets; is that right?
12     A.    At that, yeah, during that, yeah, that's
13 all I know he was wanted for was the traffic tickets.
14     Q.    And the traffic ticket arrest might -- how
15 do I put this, Oscar Gomez wasn't facing a long prison
16 sentence from those traffic tickets, right?
17     A.    I don't believe so. No, sir.
18     Q.    He would have been ill advised to flee or
19 flight based on an arrest for traffic tickets?
20     A.    Yes, sir, but I've seen some crazy stuff
21 going down for something simple, yeah.
22     Q.    Fair enough. Did you observe anything in
23 Mr. Gomez's demeanor that led you to think he was a
24 flight or a safety risk?
25     A.    Not that I recall, no, sir.

Page 105

1      Q.    Would it -- would it help to review the
2  video?
3      A.    Oh, absolutely, please.
4      Q.    I'm going to show you a few minutes of the
5  video now. I'm not going to watch the full thing
6  because it's too long but I'm just going to play the
7  first couple of minutes. Okay. Can you see the video
8  there?
9      A.    Yes, sir, I can.
10     Q.    Okay. And does the -- I'm going to play it
11 for a few seconds and then ask if you can hear the
12 audio.
13     (Video played)
14     Q.    Okay. I know I can't hear the audio. Can
15 you hear the audio?
16     A.    No, sir.
17     Q.    I will try one more time.
18     (Video played)
19     Q.    Okay. Can you see this video?
20     A.    Yes, sir.
21     Q.    And can you hear the video?
22     A.    Yes, sir.
23     Q.    For the record this is Exhibit 4, Oscar
24 Gomez videotaped interview and I am playing it from the
25 beginning.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 966 of 1026
The Deposition of Detective LOYA, taken 12 May 2021

106..109

Page 106

1          (Video Exhibit 4 played)
2          VIDEO PLAYING: How's it going, Oscar? Are
3 you ready.
4          Yes. How are you doing, sir.
5          Pretty good. Okay. My name's Detective
6 Sanchez, Ray Sanchez. (Undecipherable) Unit 7. Can
7 you state your name? Oscar Gomez.
8          Your date of birth, please.
9          3/24/77.
10          Okay. Do you know where you're at right
11 now.
12          Yes.
13          Where are you.
14          In the Central, is it Central.
15          At the police headquarters.
16          Police headquarters.
17          Yeah, close to Central. 911 North Rainer.
18 Okay. Today is December the 4th and it's 5:11 p.m.
19 according to my phone here. Okay. The reason you are
20 here, obviously, well, first and foremost, you're here
21 you have some tickets, right.
22          Yes, sir.
23          You are under arrest the -- some officers
24 arrested you today for some tickets.
25          Yes.

Page 107

1          Where were you arrested at.
2          My house.
3          Okay. They're just traffic tickets, right.
4          Yes, sir.
5          Okay. The reason I'm talking to you is I
6 want the talk to you about something else, not
7 necessarily about your tickets but the case number that
8 I want to talk to you about is 93-100037, okay.
9          Yes.
10          And it's a murder case from 1993 in which
11 an individual by the name of Daniel Villegas was
12 charged with murder. He was charged with murder two
13 times, two people died and two people survived. At
14 least according to the case, he shot at four people,
15 okay, and two survived but all right. Do you know
16 Daniel Villegas.
17          Yes, sir.
18          Okay. How do you know Daniel Villegas.
19          Went to middle school together.
20          Okay. Which school was this.
21          (Unintelligible).
22          (Unintelligible). And do you know, I mean,
23 Daniel Villegas, I don't know if it's a common name or
24 not but you which Daniel Villegas I'm talking about.
25          Yes, sir.

Page 108

1          Okay. What do you know about Daniel
2 Villegas? What -- I mean, you said you went to middle
3 school with him. Do you know that he was charged with
4 murder.
5          Yes, yes.
6          Do you know when....
7          (Video stopped.)
8 BY MR. HILKE:
9     Q.   I've stopped playing the video at this
10 time.
11          MR. DARNELL: Wally, real quick. You had
12 that up there. Looked like yours was 27 minutes long.
13          MR. HILKE: Mm-hmm.
14          MR. DARNELL: The one that you sent us this
15 morning is only 15 minutes long.
16          MR. HILKE: Is that right?
17          MR. DARNELL: Yes. 15 minutes and one
18 second long.
19          MR. HILKE: Give me one second. I'm not --
20 I don't anticipate going back into it. Let me confirm
21 that at the break. I'm not sure why that is.
22          MR. DARNELL: Okay. I want to make sure I
23 have the right one.
24          MR. HILKE: Certainly. And if I sent you
25 the wrong one, I'll get you the right one.

Page 109

1 BY MR. HILKE:
2     Q.   Okay. So, Detective, you just viewed a few
3 minutes of that interview with Ray and Oscar Gomez; is
4 that right?
5     A.   Yes, sir.
6     Q.   And do you remember what Oscar Gomez's
7 demeanor was like that day?
8     A.   The same way he looks like on video, really
9 quiet, exactly the same way, really laid back.
10     Q.   So he seemed quite and laid back that day?
11     A.   Yes, mm-hmm.
12     Q.   Okay. And did you -- did you ever -- did
13 talk to Oscar at all before he was interviewed?
14     A.   I don't recall if I -- if the only time I
15 talked to him would probably be at the house at the
16 first time we made contact, maybe, I'm Detective Loya,
17 that's probably it. Again, I didn't have the
18 information and details of what we were going to
19 interview him about.
20     Q.   Okay. And when you say at the house, where
21 was that?
22     A.   At his residence. According to my notes, I
23 think it was Altura Street which is about a five-minute
24 drive from our office.
25     Q.   Okay. Did Oscar ride back with you to the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

---

Page 110

1  police station?
2      A.    I'm not too sure. I'm pretty sure he rode
3  with the uniformed officers back to our office.
4      Q.    Just one second, please. I'm going to show
5  you another document now. Give me one second I'm going
6  to share my screen again. Okay. So one second, okay.
7  Can you see the document I am showing you now?
8      A.    Yes, sir.
9      Q.    This is Exhibit 2. Is this your
10 supplemental report?
11     A.    It looks like it. Yes, sir.
12     Q.    Okay. I am going to take you down to
13 Page 6 and you have a few notes about locating Oscar
14 Gomez. Do you see that on the screen?
15     A.    Yes, sir, I do.
16     Q.    And this is on December 4, 2014; is that
17 right?
18     A.    Correct. Yes, sir.
19     Q.    And it says that "Detective Sanchez in
20 locating the listed person" -- I'm sorry. "Undersigned
21 assisted Detective Sanchez in locating the listed
22 person, Oscar Gomez, for questioning in regards to the
23 listed case." Is that right?
24     A.    Yes, sir.
25     Q.    And then it says, "Detectives requested

---

Page 111

1  assistance from uniformed officers to meet with Gomez
2  at his residence." Is that right?
3      A.    Yes, sir.
4      Q.    And it says that "undersigned was made
5  advised that Gomez was placed into custody for the
6  outstanding tickets at his residence and transported to
7  police headquarters to meet with the detectives"; is
8  that right?
9      A.    Yes, sir.
10     Q.    So from that can you tell us who drove
11 Gomez back to the police station?
12     A.    By reading that not too sure, sir, but I --
13 if I had to bet any money on it, I'm pretty sure it was
14 the uniformed officers that transported him.
15     Q.    That makes sense. And having -- and just
16 to show you what is below here it starts at 1710 hours
17 and is about the interview. So it's -- I am going to
18 represent to you that there's not anything down here
19 about what happened before the interview. So my
20 question, I guess, is having looked at your report, do
21 you remember any conversation with Gomez before he was
22 interviewed?
23     A.    Again, if I -- if my memory serves me right
24 I know we made contact. I'm pretty sure Detective
25 Sanchez told him what this was all about. Hey, I think

---

Page 112

1  this is what it was said. Hey, I think have you
2  information, referenced Daniel Villegas's case,
3  something to that extent and, again, I need you to go
4  down to the headquarters. Well, obviously, he's in
5  custody so we're going to take you down to headquarters
6  and interview you about a witness statement. That's my
7  thinking how it went down. I -- I personally don't
8  remember speaking to him. Again, maybe just an
9  introduction and just standing there and just nodding
10 my head, yeah, you've got to go down there and give a
11 statement.
12          MR. HILKE: I'm going to stop sharing this
13 now.
14 BY MR. HILKE:
15     Q.    Detective, do you have any other memories
16 of Oscar Gomez?
17          MR. DARNELL: One second, Wally, what
18 exhibit was that?
19          MR. HILKE: That was Exhibit 2.
20          MR. DARNELL: Thanks.
21     A.    No, sir. Nothing that stands out.
22 BY MR. HILKE:
23     Q.    Nothing -- nothing at all vague or
24 specific?
25     A.    Wasn't -- according to my notes, it doesn't

---

Page 113

1  -- I think from the time I -- we were at his house to
2  the time we released him to, you know, from office --
3  according to my statement was an hour the whole thing.
4      Q.    Thank you. Who was the district attorney
5  working on the Electric Street murders case in 2014?
6      A.    According to my notes, it looks like ADA
7  Myers.
8      Q.    And before you started working on the case,
9  did you know who ADA Myers was?
10     A.    Yes, sir.
11     Q.    Had you worked -- had he been involved in
12 other cases you had investigated?
13     A.    Yes, sir.
14     Q.    How many times would you say?
15     A.    Gosh, maybe five times.
16     Q.    And had you had conversations with him
17 about those cases?
18     A.    Sure.
19     Q.    And tell me a little bit about that, what
20 -- how do you -- what do you talk about when you talk
21 with the DA about a case you are working on?
22     A.    It depends. It was early in an
23 investigation. What would happen is we would go out,
24 do our investigation, gather evidence, statements and
25 then we would maybe a week into it if there's an arrest

---



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 114

1 made or whatever, we with all meet together with the
2 ADA's, the crime scene officers, if there's gang
3 officers involved, if it's a gang related case, we'd
4 all sit around a big table and okay, this is what's
5 going on.  This is what's going on.  We got this, we
6 got that, yeah.  We would do that quite a bit.
7     Q.    Did you have a meeting like that in the
8 Electric Street murders investigation?
9     A.    No, sir.
10    Q.    And in a meeting like that, what's the DA's
11 role?  What are they contributing to that meeting?
12    A.    They're just listening to be honest with
13 you.  If I can recall some of those meetings, they're
14 just kind of listening, oh that's good, that's good,
15 okay, good, good, good.
16    Q.    And did you meet with Kyle Myers about the
17 Electric Street murders?
18    A.    Yeah.  When I was asked to go meet with him
19 and take that first statement.
20    Q.    Did you meet with him any other time?
21    A.    Reference this case?
22    Q.    Yes.
23    A.    Yes, sir.  According to my notes, I met
24 with him one more time maybe a month into this and he
25 gave us a list of names to do some follow-ups.

Page 115

1     Q.    Did -- so take me back to the -- take me
2 back to the first meeting.  What was -- what did --
3 what did ADA Myers tell you at the first meeting you
4 had with him?
5     A.    If I recall, again, we were myself and
6 Detective Sanchez said, hey, go down and meet with ADA
7 Myers and, you know, what looking over my notes, I put
8 district attorney I didn't put Myers but I'm assuming
9 it is Myers because I did put him on the second contact
10 so I'm going to say it was ADA Myers.  We go down there
11 to his office and it's a conference room and there's
12 Mr. Juarez is there and he's been there and he
13 introduced us says, hey, this is Detective.  Do me a
14 favor, can you tell these detectives what you told me
15 and they're going to take a statement from you.  And we
16 took a statement.
17    Q.    Did you talk to Myers after you took the
18 statement?
19    A.    Sure.
20    Q.    And what did you talk about?
21    A.    The case, how they were going to re -- I
22 kind of knew what was going on because it's on the
23 media.  It's on the news.  They're going to re -- I
24 think Mr. Villegas had been -- already given out he was
25 let out on a bond.  They were going to re -- the DA

Page 116

1 wanted to go after him again or re-try the case.
2 That's probably as much as we knew what was going on
3 and the same thing Mr. Myers said, hey, listen we're
4 going to go after him.  We need to get some statements,
5 witnesses, some are no longer alive, we need
6 to find them.  We need to go -- oh, and I know the
7 defense was trying to point fingers to another suspect
8 that he was responsible for the -- for the some of it.
9     Q.    And so -- so was that part of your
10 conversation with Myers that the defense theory that
11 another -- another suspect had committed the murders?
12    A.    Yes.  That's -- the defense was -- Daniel
13 Villegas's defense team was saying that it was not
14 Villegas, that it was other people involved.
15    Q.    And what did Myers have to say about that?
16    A.    No, that it wasn't true.  That they did
17 have the right person, that it was Daniel Villegas,
18 that was the person responsible for the deaths.
19    Q.    And how did -- did he say how he knew?
20    A.    I can't recall to be honest with you.  I'm
21 not sure.
22    Q.    And so what were Myers's instructions to
23 you about how to investigate the case?
24    A.    Again, investigation, we really didn't do
25 any investigations.  All we -- he didn't tell us what

Page 117

1 to do.  He just gave us a list of names but at that
2 particular -- according to my notes, I think when we
3 left there, we went and looked for Mr. Juarez's ex-wife
4 to get a statement from her.  So when we left there
5 after that one, I think that's the only information we
6 had to go look for the -- his wife.
7     Q.    Yeah.  And I want to use the right
8 language.  You're saying it wasn't really an
9 investigation.  How would you describe it?
10    A.    Just go get a statement from this person
11 that's it.  Yeah, go talk to so-and-so and see what
12 they tell you.
13    Q.    Sure.  So did you expect those conver --
14 did you talk about what you expected to get from the
15 witnesses you were trying to take -- strike that.
16          Why did Myers want you to look into those
17 particular witnesses?
18          MR. DARNELL:  Object to speculation.
19    A.    I guess to clear -- okay.  To clear that
20 person that was being accused of the -- the one that
21 committed the murders.  Yeah, that's right.  Because
22 Mr. Juarez was re -- Ms. -- Ms. Flores was the sister
23 of the person they were saying committed the murders.
24 BY MR. HILKE:
25    Q.    Yeah.  And so let me ask you, when you said



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

1  before that this wasn't -- that you're not -- that of
2  investigation is a big word, this wasn't the case where
3  you had an open field.  This wasn't a who-done-it at
4  the point you got it, was it?
5      A.    Correct.  Yes, sir.
6      Q.    Okay.  And by the time this case came to
7  you, there had been, you know, were you aware of the
8  legal proceedings that had come before your
9  investigation?
10     A.    Yes, sir.
11     Q.    Okay.  And did you look at any documents
12 from those legal proceedings?
13     A.    No, sir.
14     Q.    Okay.  Were you given any of the exhibits
15 that Daniel's defense team presented in any of those
16 proceedings?
17     A.    Not that I recall.
18     Q.    Okay.  What documents were you referencing
19 as you conducted those follow up interviews?
20     A.    Gosh.  I can't recall to be honest with
21 you.  I think it was pretty much, hey, do you remember
22 this back in 1993?  Yeah.  What happened, where were
23 you, what did you do, and that's pretty much it, yeah.
24     Q.    So you weren't doing a deep dive into the
25 old file and all the old documents on the case?

Page 119

1      A.    No, sir.
2      Q.    And in those interviews in that follow-up,
3  were you trying to do anything other than follow up
4  with the witnesses that Myers had indicated you should
5  follow up with?
6      A.    No, sir, nothing.
7      Q.    All right.  So do I have it right that the
8  last time you met with Myers was around March of 2014?
9      A.    According to my notes, yes, sir.  The
10 second time we went, met with him.
11     Q.    And do you remember interacting, talking,
12 interacting with Myers on this case after you helped
13 with the interview of Oscar Gomez?
14     A.    Oh, no, sir, no.  I -- I don't believe
15 Mr. Myers is there no longer.  I think he had left the
16 DA's office, yeah.
17     Q.    And do you know who was the next DA to work
18 on the case?
19     A.    I know James Montoya ADA.  I know he
20 actually, I think he's the one that went to court with
21 it, yeah.
22     Q.    Did you ever talk to James Montoya about
23 the case?
24     A.    Never, sir.
25     Q.    Was the interview in December 2014 with

Page 120

1  Oscar Gomez your last involvement with the case?
2      A.    Oh, yes, sir, mm-hmm.
3      Q.    I want to ask you about another document
4  now.
5            MR. DARNELL:  Wally.
6            MR. HILKE:  Go ahead.
7            MR. DARNELL:  Lunch?
8            MR. HILKE:  Yeah, should we break for
9  lunch?
10           MR. DARNELL:  We've been going about an
11 hour and 15 minutes since our last break, so it would
12 probably be a good time.
13           MR. HILKE:  Yeah, I think we're just under
14 an hour but I'm good for lunch.
15           MR. DARNELL:  Perfect.
16           MR. HILKE:  Is half an hour all right to
17 return at 1 o'clock Mountain Time?
18           MR. DARNELL:  Works for me.
19           ONLINE VIDEO TECH:  All right.  We are off
20 the record.  The time is 12:31.
21           (Break from 12:31 p.m. until 1:05 p.m.)
22           ONLINE VIDEO TECH:  We're back on the
23 record for the deposition of Detective Hector Loya
24 being conducted by videoconference.  My name is Sydney
25 Little.  Today is May 9, 2022, and the time is 1:06.

Page 121

1  BY MR. HILKE:
2      Q.    Detective, did you take any notes, any
3  handwritten notes in the Electric Street -- in your
4  Electric Street murder interviews?
5      A.    I don't recall.
6      Q.    I am going to show you a document now.
7  Let's see.  Oops.  Detective, do you see a hand -- a
8  document that is handwritten notes in front of you?
9      A.    Yes, sir, I do.
10     Q.    Okay.  And for the record, this is
11 Exhibit 6, 2014 handwritten case notes.
12           Detective, are these your notes?
13     A.    No, sir, they're not.
14     Q.    Do you recognize this handwriting?
15     A.    I believe, you know what I do recognize is
16 that notebook, that type of notebook I know Detective
17 Armendariz used to like to use those notebooks.
18     Q.    Okay.  And so I'm currently on Page 1 of
19 this document.  I am going to scroll down a little to
20 Page 11, is this your handwriting, Detective?
21     A.    I don't believe it is, sir.  No, sir.
22     Q.    I am just going to show you one more page
23 of this.  This is at Page 15.  Is this your
24 handwriting, Detective?
25     A.    No, sir, it's not.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 970 of 1026
The Deposition of DETECTIVE ZOYK, taken on 23 May of 2021

122..125

Page 122

1    Q.    Okay.  I'm going to stop sharing that for a
2  minute now.
3          Detective, do you remember interviewing
4  Jose Alfredo Juarez in this case?
5    A.    Yes, sir, I do.
6    Q.    Okay.  And who was Jose Juarez?
7    A.    From reading that statement, he -- I -- he
8  just -- he was the brother-in-law of Rudy Flores.
9    Q.    Do you remember why he was important in
10 this case?
11   A.    I'm not sure, so no, I don't.
12   Q.    And do you remember interviewing him?
13   A.    Yes, sir, I do.
14   Q.    Was there another detective with you?
15   A.    Yes.
16   Q.    Who was that?
17   A.    Detective Armendariz.
18   Q.    Okay.  And who led the questioning of Jose
19 Juarez?
20   A.    I can't recall, sir.  Probably both of us
21 after we had just met with the ADA, told us what was
22 going on or, yeah, this is what you guys need to ask.
23 Again, he had already been interviewed by ADA Myers so
24 it was one of those like, okay, whatever you told me
25 tell the detective.

Page 123

1    Q.    Okay.  So it -- and did you show any
2  materials to Jose before you questioned him?
3    A.    I don't recall, sir.  I don't think so.
4    Q.    And if you had shown him any documents,
5  that would be in your notes, right?
6    A.    Yes, sir.
7    Q.    And I am going to take a minute and show
8  you the -- show you your statement regarding
9  Mr. Juarez.  Or your notes I should say.  One moment,
10 please.  Okay.  Do you see that document in front of
11 you?
12   A.    Yes, sir, I do.
13   Q.    And is this your investigative supplement
14 again?
15   A.    Yes.
16   Q.    And so I am scrolling down.  Do you see on
17 January 27, it says January 27, 2014?
18   A.    Yes.
19   Q.    And you and Detective Armendariz met at the
20 district attorney's office and subsequently met with
21 Jose Alfredo Juarez?
22   A.    Yes.
23   Q.    And I am going to ask you to -- let's see.
24 Let's take a quick look at this.  Can I ask you to
25 please go ahead and take a minute to read the

Page 124

1  statement?  Do you need me to zoom in at all for you?
2    A.    No, sir.  I can see it.
3    Q.    Just let me know when you need me to scroll
4  down.
5    A.    Thank you.
6    Q.    And I'm sorry, this is Exhibit 2 again and
7  PDF Page 1.  I don't know if I said that before.
8    A.    Okay.  You can scroll down, please.
9    Q.    Okay.
10   A.    Okay, sir.
11   Q.    Okay.  So Jose said he didn't think that --
12 so sorry.  Strike that.
13         Do you know who Rudy Flores is?
14   A.    I've never met him.  No, sir.  I don't know
15 who he is.
16   Q.    Do you know that he is, he is the -- so I
17 know you may not know him personally.  Are you aware
18 that Rudy Flores is a person who Daniel Villegas's
19 defense team said was the real killer?
20   A.    Yes, that's what we heard.
21   Q.    And he is the one who -- who district
22 attorney Myers had told to -- we need to, you know, go
23 find, like, who told you to look -- who to interview
24 people who can show that Rudy wasn't actually the
25 killer; is that right?

Page 125

1    A.    That's correct.  Yes, sir.
2    Q.    Okay.  So Jose said he didn't think Rudy
3  committed the Electric Street murders; is that right?
4    A.    According to this statement, yes, sir.
5    Q.    Okay.  And did you ever ask Jose how he
6  knew that?
7    A.    I can't recall ever asking him that
8  question.
9    Q.    Okay.  And is there a -- as you reviewed
10 this statement, is there anything in his statement
11 about how -- how he knows that Rudy wasn't the killer?
12   A.    Reading the statement, no, sir.
13   Q.    And Jose said in the statement also that he
14 was questioned a few days after the shooting, right?
15   A.    Yes.
16   Q.    And he said he was scared when he was
17 questioned, right?
18   A.    Correct.
19   Q.    Did you ever ask him why he was scared?
20   A.    I don't recall asking him that question.
21   Q.    Okay.  And he said he doesn't remember
22 where he was the night of the shooting, right?
23   A.    Correct.
24   Q.    And -- but he does say he knows what he
25 said matched with what Rudy told the officers, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 126

1    A.    I did see that.  Yes, sir.
2    Q.    Did you ever ask Jose how he knew -- how he
3  knew that what he told the officers was the same as
4  what Rudy told the officers?
5    A.    I don't recall if I ever did ask him that
6  or if the other detective.
7    Q.    Does anything about that appear in the
8  statement that you took from him?
9    A.    No, sir, it doesn't.
10    Q.    Okay.  And is that the kind of
11  corroborating detail that would have been important to
12  ask about?
13    A.    Yes, sir.
14    Q.    Okay.  And if he had answered that
15  question, would you have put what he said in your
16  statement?
17    A.    Yes, I would.
18    Q.    And how did this interview affect -- I'm
19  sorry.  Strike that.
20          How did this interview -- did this
21  interview affect the subseq -- the next interviews you
22  took working on the Electric Street murders?
23    A.    I don't think it did.  No, sir.
24    Q.    So it didn't change what information you
25  were looking into?

Page 127

1    A.    No, sir.  I -- told us to go out and speak
2  to his ex-baby mama.
3    Q.    Okay.  And were you aware that Jose thought
4  that the detective, that in 1993 the detectives
5  involved in the investigation were accusing him of
6  committing the murder?
7    A.    I'm sorry.  Can you repeat the question?
8    Q.    I can.  Were you aware that back in 1993,
9  Jose spoke to detectives and Jose thought those
10  detectives were accusing him of committing the murder?
11    A.    Because he said that on the statement or --
12  or I knew that prior knowledge or --
13    Q.    I -- were you aware of that?  I don't
14  believe it's in the statement.
15    A.    No, sir.  I -- yeah, no, sir, I never heard
16  of that.
17    Q.    And was that -- was that the kind of detail
18  that you looked into while you were doing these
19  interviews?
20    A.    No, sir.
21    Q.    And Jose's statement wasn't recorded, was
22  it?
23    A.    No, sir.  It was just typed, not recorded.
24    Q.    And are there -- are there reasons why you
25  would choose to have a statement recorded versus typed?

Page 128

1    A.    From my understanding was that witness
2  statements needed to be typed and then any type of
3  interrogation or suspect statements were recorded.  I
4  think because it was a cost thing to get everything
5  transcribed by the DA's office.  They said we couldn't
6  do it but they prefer us to type out witness
7  statements.
8    Q.    And so are you typing this statement while
9  you were taking the state -- are you the one who typed
10  this statement?
11    A.    It looks like I was the one that typed the
12  statement, yes, sir.  I don't recall.  It was either me
13  or Detective Armendariz.
14    Q.    And where physically were the two of you
15  while the statement was typed?
16    A.    I recall that it was like a small
17  conference room and that's where I was -- as a matter
18  of fact, they had a big old monitor, 32-inch monitor
19  and that was the screen that I was typing on and I had
20  a keyboard there.  I do recall that.
21    Q.    And so was that a laptop or a computer at
22  the DA's office?
23    A.    It was a computer in the DA's office.
24    Q.    Okay.  So they -- so from the DA's
25  office -- and so how did you access the -- when this

Page 129

1  was typed, was it typed in the case management system
2  used at the police department?
3    A.    I believe -- I believe it was.  I know that
4  the DA's had -- have access to the same system that we
5  have.  They're able to -- I'm pretty sure I logged in
6  under my case number, under my ID number and typed the
7  statement out.
8    Q.    Got it.  So when you are working at Crimes
9  Against Persons, was there -- strike that.
10          When you were at Crimes Against Persons,
11  how were your investigations supervised?
12    A.    I had a -- we had direct supervisors.  I
13  guess when cases come in, our direct supervisor would
14  assign us a case.  I'd read on it.  I'd open the case,
15  find out what's going on, I would do self initiative
16  investigation.  I guess once I'm done, they would
17  approve my case.  Once I approve it, then it goes to
18  them they verify everything and then they approve it.
19    Q.    And what do they verify when they -- after
20  you send it to them?
21    A.    Good question.  I guess to make sure
22  everything's there the way it should be, I didn't miss
23  anything.
24    Q.    Did you ever --
25    A.    The --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 972 of 1026
The Deposition of HECTOR ZOYK, taken on 2 May of  2022
130..133

Page 130

1    Q.    I'm sorry.  Did you ever get a case sent
2 back to you after you submitted it for verification?
3    A.    I'm pretty sure I did.  I mean, but nothing
4 major.  Maybe a -- gosh, I -- hey, you need to fix
5 this.  It doesn't look right or you forgot to put this
6 in there or, yeah, maybe stuff like that.
7    Q.    And did you -- I'm sorry.  I'm going to
8 stop sharing this here.  Did you have multiple
9 supervisors when you were at Crimes Against Persons?
10    A.    We had our -- we had one lieutenant and we
11 had three sergeants and I had one sergeant assigned to
12 me but they pretty much all gave us direction.
13    Q.    Which sergeant was assigned to you?
14    A.    I believe my direct sergeant was Karen
15 Kozak.
16    Q.    Kozak.  Could you say that first name
17 again?
18    A.    Karen.
19    Q.    Okay.
20    A.    Kozak.
21    Q.    Do you know how you spell that last name?
22    A.    K-O-Z-A-K.
23    Q.    And did -- and so did you always submit --
24 when you submitted your case file for verification, was
25 it always Sergeant Kozak who reviewed it?

Page 131

1    A.    Yeah.  Because she was my direct sergeant.
2 I guess, there's a pool of detectives that are under
3 her so -- but we would have said something after we
4 were done, it would I guess go to her mailbox or
5 however it worked out.  And now if she's not there
6 she's on vacation, then I would get with another
7 sergeant, hey, can you approve this, something to that
8 effect.
9    Q.    Gotcha.  Would -- did she verify your
10 supplement in the Electric Street murders?
11    A.    I'm not too sure but, yeah, she was there
12 so I would assume she did, yes.
13    Q.    And did you -- other than her assigning you
14 work and verifying cases at the end of an invest --
15 of -- of your work on them, did she supervise you in
16 any other way?
17    A.    Sure.  During a major case or something
18 like that after we were working it, we had different
19 leads, this and that, then she would say, okay, Hector,
20 do me a favor.  Go -- you're in charge of canvassing,
21 go canvas.  Okay.  Hector, you are in charge of the
22 autopsy, we'll do the autopsy.  So, yeah, she would
23 give us direction, who was in charge of it.
24    Q.    And did she, other than when verifying it,
25 did she review your case files at any other time?

Page 132

1    A.    On this particular case?
2    Q.    On any case.
3    A.    Oh, yes, definitely, yes.
4    Q.    And what did that -- what -- how did she do
5 that?
6    A.    I guess she would review it, make sure
7 everything was there and everything's okay and then she
8 would approve it.
9    Q.    How often would she do that?
10    A.    I guess daily.
11    Q.    Always -- always peaking in files?
12    A.    Not necessarily peaking at files but, yeah,
13 I guess once I'm done with a case whether it was daily
14 or weekly or monthly then she would approve it.
15    Q.    I'm sorry.  But my question was other than
16 at the end of a case, did she look at your case files
17 at any other time?
18    A.    Not to my knowledge.
19    Q.    Okay.  And did Sergeant Kozak expect you to
20 follow your training as a police officer?
21    A.    I'm pretty sure she did, yes.
22    Q.    And did she expect you to follow the
23 policies and procedures of the police department?
24    A.    Yes.
25    Q.    And so at Crimes Against Persons, did it --

Page 133

1 so at Crimes Against Persons, was it more important to
2 close cases -- I'm sorry.  Strike that.
3         At Crimes Against Persons, was it
4 considered better to let a guilty person go free than
5 to cause the conviction of somebody innocent?
6         MR. DARNELL:  Object to form.
7         MR. HILKE:  I'm sorry to interrupt you.
8 Jeep, I think you need to speak up a little.  I heard
9 an objection but I didn't hear what it was.
10         MR. DARNELL:  Object to the form of the
11 question.  Calls for speculation and vague.
12 BY MR. HILKE:
13    Q.    You can answer.
14    A.    Okay.  Can you repeat the question?  I'm
15 sorry.
16    Q.    Yes, sir.  At Crimes Against Persons, was
17 it better to let a guilty person go free than cause the
18 conviction of someone innocent?
19         MR. DARNELL:  Same objection.
20    A.    As I understand the question correctly,
21 you're saying it's better to let go, even if we let a
22 bad guy go as long as we get a -- we close a case?  Is
23 that what you're saying?
24 BY MR. HILKE:
25    Q.    No, sir.  I'm saying that are you more --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 134

1  I'm saying is it -- I'm saying the two things:  You can
2  make a mistake and let an innocent person go free --
3  wait.  Strike that.
4       You can make a mistake and let a guilty
5  person go free; you can make a mistake and convict
6  someone innocent.  Is it better to let someone guilty
7  go free than to convict someone innocent at Crimes
8  Against Persons?
9       MR. DARNELL:  Same objection.
10      A.    I guess anywhere, yeah, that's a true
11  statement, yeah, whether CAP or anywhere else, yes.
12  BY MR. HILKE:
13      Q.    Okay.  And did your supervisors ever
14  address that issue the issue of making sure that
15  innocent people are not convicted?
16      A.    Was it ever brought up?
17      Q.    Yes, sir.
18      A.    I don't remember.  I don't recall ever
19  seeing that brought up.  Again, that's just common
20  sense.
21      Q.    Was there anything your supervisors
22  encouraged you to do to make sure that innocent people
23  would not get convicted?
24      A.    Not to my knowledge, no, sir.
25      Q.    And at Crimes Against Persons -- I think I

Page 135

1  already asked you that.
2       So before you mentioned that you would work
3  with prosecutors before a case is filed and sometimes
4  after a case is filed; is that right?
5       A.    Correct, yes, sir.
6       Q.    Did prosecutors ever give you directions
7  before a case was filed?
8       A.    Yes.
9       Q.    What kinds of directions?
10      A.    Maybe to clarify maybe a witness statement,
11  go back and hey, did you guys ever -- hey, I know you
12  mentioned this here, did you ever follow up on that?
13  Like, oh, shit.  I forgot and then we'd go back and
14  follow up on that.
15      Q.    And did the prosecutors expect that you
16  would follow in their instructions during an
17  investigation?
18      A.    Yes, sir.
19      Q.    Where did prosecutors sit in the chain of
20  command?
21      A.    They didn't sit anywhere on the chain of
22  command.  A lot of times it was just their legal
23  opinion, their knowledge how far I could take
24  something, maybe language on a search warrant, what I'm
25  looking for, stuff like that.

Page 136

1       Q.    And did prosecutors also give you
2  instructions after the criminal case had been filed?
3       A.    After a case?  Did it happen?  Probably.
4  But not often.  Yeah.
5       Q.    Okay.  So at the Electric Street murders
6  work that you did, was that an unusual situation?
7       A.    Yes, sir.
8       Q.    Okay.  And do you recall any other specific
9  cases where you were asked to investigate after charges
10  had been filed?
11      A.    No, sir.
12      MR. HILKE:  We're getting some feedback and
13  Jim, I'm seeing -- I don't know if it's your phone
14  there but it might be.  Thank you.
15  BY MR. HILKE:
16      Q.    Do you -- and do prosecutors participate in
17  the investigations of all crimes -- strike that.
18      Are prosecutors always involved in your
19  investigations before charges have been filed?
20      A.    No, just major cases.
21      Q.    Okay.  And when a prosecutor is involved,
22  does it change how you investigate a case?
23      A.    No, sir.
24      Q.    Okay.  Do you have different expectations
25  on your investigation?

Page 137

1       A.    No, sir.
2       Q.    Or different priorities?
3       A.    No.
4       Q.    And do you still follow your training in
5  the same way you would if a prosecutor had not been
6  involved?
7       A.    Yes, sir.
8       Q.    You mentioned sergeants and a lieutenant at
9  Crimes Against Persons.  Is there anyone else in the
10  chain of command within Crimes Against Persons?
11      A.    Our Commander Pelletier who oversaw a bunch
12  of units including CAP.
13      Q.    Okay.  And who is above the commander?
14      A.    It would be commander would be an assistant
15  chief.
16      Q.    And then is it the chief?
17      A.    Then it would be the chief, yes, sir.
18      Q.    Who is above the chief?
19      A.    Who is above the chief?
20      Q.    Yes, sir.
21      A.    I guess the city manager, the mayors.
22      Q.    So is it typical when investigating a
23  murder to look for the weapon?
24      A.    Yes.
25      Q.    And when you worked on the Electric Street



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1  murders, did any evidence come up about a murder
2  weapon?
3      A.    No, sir.
4      Q.    And did you ever learn about anyone who had
5  information about a weapon linked to the shooting?
6      A.    I don't think so. No, sir.
7      Q.    Or anyone who had information regarding a
8  weapon linked to Rudy Flores?
9      A.    No, sir, I don't recall.
10     Q.    Okay. And if you had come across such
11 information, would you have written it down?
12     A.    Yes, sir.
13     Q.    Okay. Do you remember talking to Jesse
14 Rodriguez about the Electric Street murders?
15     A.    I never spoke to Jesse Rodriguez, no.
16     Q.    You never spoke to Jesse Rodriguez?
17     A.    I have spoken to him but not about this --
18 this case.
19     Q.    Okay. So Daniel Villegas was never a
20 discussion between you and Jesse Rodriguez?
21     A.    I don't think I've ever -- I mean, I can
22 say I spoke to him. To be honest with you, I don't
23 think I spoken to him since before he left the
24 department and obviously, that was way before this but
25 it just doesn't sound like I would do something like

Page 139

1  that, talk to him about that, yeah.
2      Q.    When did you first meet Jesse?
3      A.    Actually, when I first started at the
4  department seven years ago.
5      Q.    And when did you first encounter him?
6      A.    We worked central patrol together, he
7  graduated I think two years ahead of me.
8      Q.    Okay.
9      A.    When I was a rookie, he was on two years
10 already.
11     Q.    And did you ever patrol together with him?
12     A.    Sure, we did. We were on the same shift,
13 like, work together full crew, never.
14     Q.    Okay. But you -- you're on the same shift
15 so you'd see him every day when you went --
16     A.    Yeah. And he'd assist me on some of my
17 calls and I'd assist him on some of his sometime.
18     Q.    Okay. And did you ever spend time with him
19 outside of work?
20     A.    No.
21     Q.    No. So you never went out for a drink with
22 him?
23     A.    I -- you know what, as -- social, no, never
24 -- never that I could recall that I -- maybe there was
25 a what we call shift party after, maybe he was there

Page 140

1  but not where we both agreed to go out together but
2  yeah, is he at a bar and a bunch of us are there and he
3  shows up there, yeah, maybe.
4      Q.    So did he like did you ever meet any
5  members of his family?
6      A.    No.
7      Q.    And did he ever meet any members of your
8  family?
9      A.    You know what, I do recall he was still on
10 the department. I remember I was at the Academy Sports
11 Store and I bumped into him there off duty and he was
12 with his kids, his wife, and that was the first time
13 and last time I've ever met his family. That was with
14 my wife and my son.
15     Q.    And Jesse left the force at some point,
16 right?
17     A.    Yes, sir.
18     Q.    Do you know why he left the force?
19     A.    He was terminated.
20     Q.    He was terminated. Why was he terminated?
21     A.    Back then I used to be a director for our
22 police association and when unfortunately, when
23 officers got in trouble they went through Internal
24 Affairs, they'd ask for us to go with them since
25 they're represented at Central. It would come out with

Page 141

1  the rep for the region. He asked me, hey, can you go
2  with me because I'm being accused and this and that, so
3  I really don't want to know. I'll go with you and I
4  guess I'll find out, anyway, long story short I know he
5  did something he wasn't supposed to do and they
6  subsequently terminated him.
7      Q.    Do you know what he did?
8      A.    I don't know the exact words but am I
9  allowed to give you that information? It was -- I
10 mean, he was being accused of I think dealing with
11 cartels, family, selling, selling information.
12     Q.    All right. When you started working on the
13 Electric Street shootings, did you know of any
14 connection between Jesse and Daniel Rodríguez?
15     A.    Yes, I did.
16     Q.    What connection did you know of?
17     A.    When I took a statement from Ms. Fierro and
18 a Mr. Cuellar from Colorado, I actually took a
19 statement Ms. Fierro was actually, I think, a direct
20 witness back in 1993 and they were in town. This was I
21 think March 2014 and my partner Detective Armendariz
22 took a statement from Ms. Fierro and her husband wanted
23 to give me a statement. Sure, okay, what do you want
24 to give me a statement. Were you there? He goes, no,
25 I didn't even know my wife back then but he said, yeah,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 142

1  the defense keeps sending people harassing us.  Look, I
2  even have a recording of some guy trying to get ahold
3  of us that he was going to compensate us and he said,
4  hey, I have the audio.  Do you want to hear it?  I go,
5  sure.  Play it.  So he plays it on his phone and Jesse
6  Rodriguez has a distinctive voice.  I'd know his voice
7  anywhere.  And I sure enough, I knew it was him and I
8  even get Detective Armendariz, hey, come here and
9  listen to this.  He listens to it and after we're done,
10  I don't tell the people that -- who -- I know who it
11  is.  I say, you know who that is?  He said, no.  That's
12  Jesse Rodriguez.  He goes, that's right.  It is him.
13  That was the only thing that I remember ever talking
14  to.
15      Q.    Got it.  So the only connection you knew of
16  was that you heard a recording and all of a sudden you
17  realized, hey, that's Jesse Rodriguez?
18      A.    Yeah.  That I guess a defense attorney had
19  hired him to do, I guess, some type of investigation.
20      Q.    And you were telling me before you that
21  listened to an audio file to get ready for this
22  deposition.  Is that right?
23      A.    Yes, sir, I did.
24      Q.    And Jesse Rodriguez was on that file; is
25  that right?

Page 143

1      A.    Yes, mm-hmm.
2      Q.    And did you hear more than one person
3  speaking on that file?
4      A.    Mm-hmm.
5      Q.    Okay.  And does Jesse say that you are the
6  person he is talking to on the file?
7      A.    Because I'm -- when they're playing it
8  there's a transcriber and I can't recall if he says my
9  name but I know on the transcription it says, Mr. Loya
10  or Hector Loya and then it says, Jesse, so that's when
11  they when they say it's me, yeah, it doesn't sound like
12  me.
13      Q.    Okay.  Your testimony is that you are not
14  the person speaking on that file?
15      A.    That's not me, no.  He even refers to me
16  about his wife, about a birthday party.  I've never
17  been to a birthday party.  I mean, I met his wife years
18  ago but I didn't know him as friends though.  I guess
19  the guy that is supposed to be me is asking about
20  Brenda and I wouldn't even know that information.
21      Q.    Okay.  I am going to play for you -- this
22  is Exhibit 8.  Okay.  This is Exhibit 8 and I'm playing
23  from the beginning.
24            (Audio recording playing.)
25            AUDIO:  July 1st about 1:40 p.m. going to

Page 144

1  meet with Detective Loya Daniel Villegas case ...
2  conversation ... what's up?  What's up gringo?  What's
3  going on brother?  How you doing?  Good.  How's your
4  wife?  Good, good.  You know this whole thing with me
5  has been tough on her.  ... party we couldn't talk man
6  all the guys there were and it was a little awkward,
7  you know.  Did he tell you anything afterwards?  No, I
8  just -- just that's the way I...
9            MR. HILKE:  Pardon me.  I skipped ahead and
10  I didn't mean to.  I'm going to playback at the 21
11  second mark for a few seconds here.
12            (Audio recording continued)
13            AUDIO:  What's up, what's up, gringo?
14  What's going on brother?  How you doing?  Good.  How's
15  your wife?  Good man, good, good.  How's Brenda?
16  (Inaudible) you know this whole thing with me has been
17  tough on her for awhile.  April, (inaudible) birthday
18  party, you couldn't talk man.  All the guys were there
19  and it was a little awkward, you know.  Did he tell you
20  anything afterwards?  No, just -- just I can tell by
21  the looks, man.  Yeah.  You know what, man, I found it
22  kind of weird that you guys invited us.  But, you know,
23  come on, let's just go.  And now (undecipherable) now,
24  i feel they're staring and i feel them, looking, you
25  know, and I just -- the reason I'm kind of just wanted

Page 145

1  to go away, just the conversation we had the last time
2  about the case.  Villegas case.  Oh, yeah.  You know,
3  hey bro, why are you so interested in that case man?
4  You know, I am interested because it's an innocent
5  person being charged with -- with the crime he didn't
6  commit and you both -- we both -- he didn't do it.  And
7  just what you told me the last about -- how you guys
8  are being told to work.  We both know he didn't do it.
9  The goal is -- and going out there getting all these
10  facts and, you know, the DA is the one that's running
11  the show man.  You know, we -- big time.  We get all
12  the information and he just picks and chooses what --
13  what he wants.  Really.  Yeah, so you'll go out meet
14  with witnesses and then what?  Bring it back and
15  then -- you guys are told what to put in?  Yeah, bro.
16  Yeah.  We just do the book work.  You know, we're the
17  guys at the bottom of the totem pole, man.  You and
18  Armendariz?  Yeah, yeah.  Long days and deal with it.
19  It just the DA, man, he's running this.  He's running
20  it, Roy.  Telling you, Roy, (undecipherable) have big
21  time bro.
22            MR. HILKE:  Okay.  I stopped playing at the
23  2 minute 40 second mark.
24  BY MR. HILKE:
25      Q.    So that's not you in that conversation?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 146

1    A.    No, sir.  It's not me.

2    Q.    Do you have any idea who it is?

3    A.    I can't say either, sir.  I -- it's hard.
4  I -- it's definitely not me.  Again, I never went -- I
5  haven't associated with him since he left.  I tell
6  people because people ask me, hey, what's -- hey,
7  what's going on with Jesse?  Well, they and I usually
8  tell them, dude, just stay away from him.  He's bad
9  news.  Do not get near him.  I don't think I told
10 anybody this whole how he's involved with the Daniel
11 Villegas case.  Only Detective Armendariz but I said
12 he's bad news.  You need to stay away from him.  He's
13 going to get you into trouble.  I know he got a lot of
14 people in trouble, too.  He dragged them into this
15 whole thing when he got terminated.

16   Q.    Well, let me ask you about that.  What do
17 you mean he dragged people into it when he got
18 terminated?

19   A.    I remember same incident there was another
20 officer.  He also got dragged into Internal Affairs.  I
21 went him just to support him and I get to sit in when
22 they're being questioned and sure enough, yeah, during
23 Jesse Rodriguez, the stuff that he was doing.  He was
24 actually riding with this other officer and he would
25 tell them, hey, this guy's going to drive by.  Let's do

Page 147

1  a traffic stop on him as a joke.  I know him.  Well, he
2  didn't know him.  He was just trying to get intel for
3  his brother-in-law who was into the cartel.  He was
4  trying to get information.  I remember Jesse on the
5  department if you had a good bust, dope or whatever he
6  was all into dope, he would ask you the next day.  Hey,
7  i heard you got a good bust.  Hey, give me some intel.
8  I know he was printing out reports, selling them to his
9  brother-in-law.  I was like a movie.  I mean, it was
10 crazy the stuff i was listening to.

11   Q.    Yeah.  And I -- so specifically, you went
12 with another officer who was accused of conduct related
13 to Jesse?

14   A.    Yes.

15   Q.    And you don't know if that other officer
16 actually committed any wrongdoing or not?

17   A.    I -- he didn't get in trouble because he
18 told the truth.  He said, yeah, I remember being there.
19 I remember we stopped this guy and I didn't make
20 contact with him.  Jesse told me to stop him.  Jesse
21 went and spoke to the guy.  He came back out and then
22 we would always drive by certain areas because he
23 always wanted a -- very suspicious but, yeah, that
24 officer's still on this department and nothing happened
25 to him and I know there was another officer, he got

Page 148

1  fired.  He was Jesse's -- they were cousins and he
2  ended up getting a horse.  Again, like, a racing horse
3  from this cartel guy.  It was just -- it's like a
4  movie.  It was crazy.  He's just bad news and then you
5  listen to that video, audio.  It looks like they're
6  planting it.  Like they are standing right next to each
7  other, it just sounds a little weird.

8    Q.    So the other officer who got in trouble
9  connected to Jesse got a racehorse from the cartel?

10   A.    Yeah.

11   Q.    I don't ask you other than yeah, I don't
12 want to go into more detail --

13   A.    Sure, okay.

14   Q.    -- on that.  Are there other officers who
15 Jesse got in trouble?

16   A.    That I recall -- that I recall I cannot
17 remember but, yeah, those are the ones that stood out.

18   Q.    And why would you -- after Jesse was
19 terminated, why would you have to warn other officers
20 about engaging with Jesse?

21   A.    Because everybody he has -- everybody that
22 was associated with him got it -- he got in -- he would
23 get into trouble.  And again, I -- I don't remember.  I
24 don't recall incidents why we would talk about him
25 maybe, hey, remember Jesse?  Yeah.  Hey, whatever

Page 149

1  happened to that guy?  And I was like, hey, never
2  shared this story with him or what happened at Internal
3  Affairs, other than dude just stay away from him, dude.
4  If you ever see him out and about, and he asks you
5  questions, you need to stay from him.  He is bad news.
6  He is really bad.  I know the FBI got dragged into it.
7  It was a whole -- it was like a movie.

8    Q.    Okay.  And what else -- and is that when
9  you warned people about Jesse, is that based on what
10 you know about how he got terminated?

11   A.    Yes.

12   Q.    And is it based on anything after he got
13 terminated?

14   A.    No, sir.  Just what he did on this
15 department, mm-hmm.

16   Q.    Did you ever talk to him at all since he
17 got terminated?

18   A.    I could say for a fact I didn't but if I
19 saw him maybe somewhere down the street, I waived at
20 him or something like that, but I know it's been years
21 and I know for a fact I haven't spoken to him.  I'll
22 stay away from him.  Rumor had it that he even left
23 town, that he was no longer living in El Paso until I
24 heard that audio.

25   Q.    Okay.  Let me ask you, do you remember

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 977 of 1026
The Deposition of Detective ROY MELENDEZ, taken May 09, 2022
150..153

Page 150

1  interviewing Manuela Acosta?
2      A.    Manuela Acosta, yes, sir.
3      Q.    And Armendariz interviewed Beatrice Fierro
4  at the same time, didn't he?
5      A.    Correct.  Yes, sir.
6      Q.    And did you participate at all in
7  Beatrice's interview?
8      A.    No, sir.
9      Q.    Okay.  Did you do both interviews at the
10 same time?
11     A.    No.  While he's doing Ms. Flores, I'm doing
12 the mom, Acosta.
13     Q.    Okay.  So at the same time, he's
14 interviewing, Beatrice, you're interviewing Manuela?
15     A.    Correct.  Yes, sir.
16     Q.    Okay.  And whose interview ended first?
17     A.    Good question.  I'm not sure to be honest
18 with you.
19     Q.    What did you do after your interview ended?
20     A.    If I finished first, I probably escorted
21 Ms. Acosta back to the sitting area, told her thank you
22 for coming down here, appreciate it.  Your daughter
23 will be done soon and when she's done, she'll -- you
24 guys are -- we'll walk you out the front door.  That
25 was normally what we did.

Page 151

1      Q.    Do you remember whether you did that in
2  this case?
3      A.    Not exactly but something normally we would
4  do, yes.  I can't remember if I finished first or
5  Detective Armendariz finished to be honest with you.
6      Q.    Do you remember why you were interviewing
7  them?
8      A.    Again, because she used to date Mr. Juarez
9  and well, she's the daughter of the person they were
10 accusing that actually committed the -- shootings.
11 She was Rudy's sister.
12     Q.    Okay.  And Manuela was Beatrice's mother,
13 right?
14     A.    Yes.
15     Q.    And did you ask Manuela to give a
16 statement?
17     A.    I can't recall if I asked her or somebody
18 suggested, hey, why don't you get a statement from her
19 or maybe we were having a conversation where because I
20 read the statement, like, hey, I remember twenty years
21 ago, I brought my daughter down too, and I was like
22 well, let's get a statement from you, too.  I know she
23 wasn't a direct witness.  I knew that for a fact, yeah.
24     Q.    And did you talk with Armendariz before you
25 conducted the interview?

Page 152

1      A.    I'm pretty sure I did, yes.
2      Q.    What did you discuss?
3      A.    I can't recall.  Obviously, what we're
4  going to -- what questions we're going to ask, what
5  we're going to try to get from the statements.  I'm
6  pretty sure we did.  I know we did.  I just can't
7  recall exactly.
8      Q.    What were you trying to get from the
9  statements?
10     A.    I can't recall.  I guess if they could -- I
11 guess, Betty could give a maybe she was maybe with
12 Rudy.  I don't exactly know what we were trying to
13 clarify but obviously, where Rudy's not -- his
14 involvement is not where he shot these two individuals.
15     Q.    And did Armendariz -- did you debrief after
16 the interview with Armendariz?
17     A.    I'm pretty sure we did.  He probably told
18 me, hey, this is what she said, and this and that and
19 I'm pretty sure she did, and I did the same thing, but
20 I can't recall exactly what even Betty said to be
21 honest with you.
22     Q.    And are you aware that Beatrice in her
23 interview stated that she knew Rudy wasn't involved in
24 the shooting?
25     A.    Maybe then I knew that.  I don't recall

Page 153

1  exactly what she said on the statement.
2      Q.    Did you ever investigate how Beatrice knew
3  that Rudy wasn't involved?
4      A.    No, sir, I didn't.
5      Q.    How did this interview affect your
6  investigation -- your work on -- I'm trying not to use
7  the word "investigation."
8      A.    Thank you.
9      Q.    How did this interview affect your work on
10 the Electric Street murders?
11     A.    Didn't change it.  It was still the same.
12 Waiting for the next direction.
13     Q.    As an El Paso Police Officer, have you felt
14 supported by your supervisors?
15     A.    Sure.  Yes, sir, I do.
16     Q.    And why do you say the -- why do you say
17 yes?
18     A.    I think they're -- we're all serving the
19 same purpose, get to the bottom, investigate, put
20 people in jail that need to be put in jail, hear cases,
21 I guess we're all the same goal, make El Paso safe.
22     Q.    Yeah.  There's camaraderie and solidarity?
23     A.    Yes, sir.
24     Q.    And what -- are there any ways in which you
25 don't feel supported by your immediate supervisors?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 154

1    A.    No, not really, sir.  They're very
2    supportive.
3    Q.    And what about command staff, do you feel
4    supported by them?
5    A.    Sure.  I don't -- I don't directly work
6    with them but when I do see them out in the hallway,
7    they're really personal and they know your name and
8    yeah, they're really good people.
9    Q.    Is there anything else they do that makes
10   you feel supported by them?
11   A.    Good job.  I heard you did this, keep up
12   the good work, stuff like that.
13   Q.    And is there any way you don't feel
14   supported by command staff?
15   A.    Not at this point, no, sir.
16   Q.    What about -- what about in your history?
17   What about looking back on your career?
18   A.    No.  I think when I've gotten in trouble,
19   I've deserved it.  They sat me down and they brought it
20   to my attention and I took care of it and I appreciate
21   everything they've done for me.  It turned out worse if
22   they didn't.
23   Q.    Well, tell me about that.  Give me an
24   example if you can.
25   A.    Well, just stuff that didn't get -- I mean,

Page 155

1    there were again no civil rights violations, just
2    knuckle-head stuff I'd done, like, hey, you know, what
3    don't do it again.  We could write it up, take it up
4    but we're not.  You're a good worker, you just screwed
5    up.  You just had a brain fart there and I was, like,
6    you know what, you're right.  That's it and it ended
7    right then and there.
8    Q.    Yeah.  And so when you say, is that kind of
9    like getting called to the principal's office when a
10   conversation like that happens?
11   A.    Correct.  Yes, sir.
12   Q.    Okay.  And so who -- and I guess it's --
13   and who would you have those conversations with?
14   A.    I've had them with sergeants.  I think the
15   majority of them probably stayed at the sergeant level.
16   I'm pretty sure there was lieutenants involved but they
17   probably told the sergeant, just take care of it, just
18   squash it right there.
19   Q.    Any incidents involving someone above the
20   rank of lieutenant?
21   A.    No, huh-uh.
22   Q.    Okay.  And can you tell me what -- can you
23   tell me a little more specifically what kinds of things
24   are discussed in those meetings, like, I understand not
25   civil rights violations but specifically, what are you

Page 156

1    being brought in to talk about in those situations?
2    A.    Well, I remember I was -- oh gosh, this is
3    many, many years ago.  I remember I was abusing my sick
4    leave because I was -- I'd just bought a house.  I was
5    taking a lot of time off and I admitted it.  Hey,
6    listen, I'm burning sick leave because I'm really not
7    sick but I'm doing and that was, like, dude, really?
8    Come on.  You know better than that.  Okay.  I won't do
9    it again.  Okay.  I'm sorry, I apologize, but they
10   respected me.  They know what kind of person I was.
11   They know it's not you doing stuff like that but let's
12   go ahead -- we're not going to let it go further.
13   Q.    Yeah.  What was the most serious issue you
14   were ever brought in to have a conversation about?
15   A.    I think a couple of times I cursed at
16   people I shouldn't be cursing at civilians and I
17   admitted it.  Did you curse at them?  I go yeah, I did.
18   Why?  Because I got mad and I did it.  They wouldn't
19   listen to me.  I asked them to leave and I cursed at
20   them.  Yeah, I did it.  And they got squashed right
21   then and there.  I think that's probably it.
22   Q.    Okay.
23   A.    Yeah.
24   Q.    And do I understand correctly that none of
25   this ever became IA files or something in your record,

Page 157

1    it was squashed before it became anything else?
2    A.    That I know of, yes.  Now, if they went
3    somewhere else and nothing came out of it, I don't
4    know.  But from what I understood, yeah, they ended it
5    right there.
6    Q.    So other than -- so how would you -- is
7    there a word you'd use for that kind of meeting that
8    kind of interaction?
9    A.    An ass chewing.
10   Q.    Ass chewing.
11   A.    Yeah.  I don't know -- I don't know if
12   there's an actual term, departmental policy.  There
13   probably isn't but we believe that we're adult, we're
14   men, you know, let's just let's end it right there.
15   Let's just take care of it.  Don't do it again.
16   Q.    Have you ever gotten -- have you ever
17   received any sort of counseling beyond the informal ass
18   chewings that you talked about?
19   A.    I can't recall if I did.  I don't know if
20   it was maybe early in my career, maybe call or
21   something got big, we went to Internal Affairs and
22   something came out of it or it was unfounded, I dont.
23   Have i ever been accused of anything, something came
24   out of it, no.  That I've gotten time or days or
25   suspension, nothing like that.  Now, was there any type



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 979 of 1026
The Deposition of JOHN CARMEN ZOYK, taken 6, 13 May 09, 2022

158..161

Page 158

1  of counseling, formal counseling that maybe IA has, i
2  dont know. There could be. I'm not sure.
3      Q.   Nothing that you recall though?
4      A.   Oh, no, sir. Nothing major.
5      Q.   And you've been investigated for a
6  complaints of misconduct before; is that right?
7      A.   I believe I have, yes, sir. I can't recall
8  to be honest with you, yeah.
9      Q.   So what's your understanding of how the
10 Internal Affairs process works when a complaint is made
11 against you?
12     A.   What I understand is somebody files a
13 formal complaint, it gets investigated. If I -- if I
14 violate any type of policy then, yeah, I get
15 reprimanded, maybe I get a counseling or nothing comes
16 out of it, it's unfounded. Yeah. Or something on my
17 record, like, yeah, I was -- he got counsel, was it
18 written or it's unfounded, never happened.
19     Q.   And is it also possible to get suspended or
20 terminated based on a complaint?
21     A.   Yes, sir.
22     Q.   And what's your understanding of what a
23 reprimand would be used versus a suspension or a
24 termination?
25     A.   That you did violate from my understanding

Page 159

1  is you did violate some type of policy but maybe you
2  didn't know it was there or you aren't sure or you
3  didn't -- you knew better and you still did it and
4  yeah, you're going to get suspended. They're going to
5  buy your days.
6      Q.   And what was -- what is your experience
7  been being the subject of an Internal Affairs
8  investigation, what was your impression of those
9  investigations?
10     A.   I know they get investigated. They're
11 detectives with the police department. There's a
12 written -- somebody files a formal complaint. They get
13 statements from witnesses. Your involvement, what did
14 you do, what did you see, like, give a statement and
15 then I guess it goes up to a review board and if they
16 find there's enough then, yeah, some action will be --
17 will happen.
18     Q.   And do you believe the process is fair?
19     A.   I believe it is, yeah. There is -- you
20 have civilians from what I understand sit on the panel
21 and then you have officers and from what I understand,
22 the officers are the worst ones. They usually give the
23 more reprimand than the civilians. Civilians believe,
24 oh, I don't think he did anything wrong.
25     Q.   And the investigations that you have been a

Page 160

1  part of that have they influenced your conduct as a
2  police officer in any way?
3      A.   Well, I've always had that same thinking.
4  I mean, a lot of times they're just I didn't know any
5  better. I made a mistake but yeah, no. I'm always
6  trying to be -- do the right thing.
7      Q.   All right. Were you ever assigned -- was
8  Alejandro Guerra ever your partner?
9      A.   I worked with Alejandro Guerra. We worked
10 together on this on different shifts also evenings and
11 graveyards early in my patrol. We worked together. We
12 went to different calls together. We assisted each
13 other but I can't recall we actually worked together
14 maybe once or twice in the car together.
15     Q.   Okay. And how long did you work together
16 with him?
17     A.   On patrol, maybe five, six years give or
18 take.
19     Q.   Did he later become a detective?
20     A.   Yeah. We'd go into different shifts. Alex
21 passed away, gosh, I want to say maybe I was already on
22 10 years, so yeah, we were on different shifts but
23 yeah, we, like I said, we assisted each other on
24 different calls here and there.
25     Q.   Do you like working with Alex?

Page 161

1      A.   He was a really good guy, yeah.
2      Q.   Did you communicate well together?
3      A.   Yeah, we did.
4      Q.   Do you remember Maria Montelongo?
5      A.   Maria Montelongo, no, sir, I don't.
6      Q.   Do you remember an Internal Affairs
7  complaint about a woman who had been assaulted by her
8  husband and said that officers didn't show up when they
9  said they would?
10     A.   Gosh. No, sir, doesn't ring a bell. No,
11 sir.
12     Q.   I'm going to pull up a document here. And
13 this is Exhibit 10. This is IA0 -- I'm not going to
14 try to read from that. I'm going to scroll down in
15 this document a little. That's not right. Okay. So
16 I'm now on Page 18 of Exhibit 10. Do you see this
17 document?
18     A.   Yes, sir, I do.
19     Q.   And does this look to be a statement given
20 by Maria Lili Montelongo?
21     A.   Yes, sir, it does.
22     Q.   Okay. And this is on September 7th, 2004;
23 is that right?
24     A.   That's correct.
25     Q.   I'm scrolling down a little bit. Do you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 162

1  see where it says, "My daughter, Jo Ann Montelongo, 21
2  years of age, was assaulted by her boyfriend and the
3  father of her son"?
4     A.   Yes, sir, I do.
5     Q.   And two paragraphs below where it says, "I
6  was present when Officers Guerra and Loya took the
7  information"?
8     A.   Yes, sir, I do.
9     Q.   This was at 313 South Ascarate, my house?
10    A.   Yes, sir.
11    Q.   Does that refresh your recollection at all?
12    A.   It does not, sir. I'm sorry.
13    Q.   That's fine. So off the cuff, you don't
14  remember anything about this right now?
15    A.   I mean, I -- the address. I know -- I'm
16  familiar -- I'm not familiar but I know where that
17  address is. It's in Central. I mean, I've been to
18  that address not that particular address but on that
19  street multiple times. Yeah. I took information
20  reports all the time, assault cases.
21    Q.   So if you were -- when you've been in --
22  when you've been the subject of an Internal Affairs
23  investigation, have you ever talked with the other
24  accused officers about the incident that the complaint
25  is about?

Page 163

1     A.   I have talked to them, uh-huh.
2     Q.   Okay. And what would -- what would be the
3  reason to talk to them after a complaint has been made?
4     A.   Well, from what I understand once the
5  complaint is made, we're ordered to -- we're gagged and
6  we're no longer able to discuss it but before that,
7  like, hey dude, I heard so-and-so filed -- hey,
8  remember we were out there a couple of weeks ago, I
9  heard they filed a case on it. They're going to file a
10 complaint. Oh shoot, nothing happened. We didn't do
11 anything. Do you remember that? Yeah. Something to
12 that extent.
13    Q.   Got it. So even though it -- so you would
14 -- you've never talked about it after you've gotten the
15 gag order; is that right?
16    A.   Yes, sir, uh-huh. That's correct.
17    Q.   But before you got the gag order, you might
18 learn that a complaint is coming?
19    A.   Yes, sir, uh-huh.
20    Q.   And in those instances, it would be natural
21 to say, hey, you know, what's this about and talk to
22 the other officers involved?
23    A.   Yes, sir.
24    Q.   Okay. I want to -- I know that you're not
25 recalling this right now. I am now scrolling down to

Page 164

1  PDF 22 and do you see that this appears to be Alejandro
2  Guerra responding to a direct order to disclose any and
3  all information about the case?
4     A.   Yes, sir. I do see it.
5     Q.   And I'm going to -- go ahead?
6          MR. DARNELL: You said PDF 22. You're on
7  Page 22, correct?
8          MR. HILKE: Yes, sir. I'm sorry. I'm --
9  I've been saying PDF 22 when I mean -- referring to the
10 page number of the PDF.
11         MR. DARNELL: Okay.
12         MR. HILKE: I'll just say page next time.
13         MR. DARNELL: I just want to make sure the
14 record made sense.
15         MR. HILKE: Yes, sir. We're still on
16 Exhibit 10 at Page 22.
17 BY MR. HILKE:
18    Q.   Okay. So I want to scroll down here and I
19 just want to call your attention, I think I'll try to
20 highlight this and see if this works. Oops. Does this
21 appear to be Alejandro Guerra saying to the victim that
22 at 12:30 we would go and pick him up on the warrant?
23    A.   [Reading] "I stated to the victim to go
24 about her business and at 12:30 we would go back and
25 pick him up on the warrant." I don't recall that

Page 165

1  incident to be honest with you with you, sir.
2     Q.   I understand. And then below it says, "The
3  victim suggested 1:00 a.m. and I said that it was fine.
4  We would go and pick him up at that time." Is that
5  right?
6     A.   That's what the statement says, yes.
7     Q.   That's what the statement says. Yeah. And
8  I understand right now, you don't remember what was
9  said.
10    A.   No, sir. I don't recall any of this.
11    Q.   So I am now going to Page 27 of this
12 document. Do you see here that where this document
13 says, "I, Hector Loya, am under a direct order to
14 disclose any and all information"?
15    A.   Yes, sir, I do.
16    Q.   And does this appear to be a statement that
17 you made in reference to this investigation?
18    A.   Correct.
19    Q.   Okay. I am going to move down to Page 28
20 now and can you review, please, under Question Number 3
21 what your response was, yes, to Question Number 3?
22    A.   "No, I never told her that we would go back
23 to the residence at 0100 to arrest her husband. The
24 complaint warrant going to be worked up on her husband.
25 The warrant would need a signature by a magistrate. If



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1  possible officers would attempt to apprehend her
2  husband on this date. If unable to arrest her husband
3  he would be arrested on a later date."
4        Okay. What was the question, sir?
5     Q.   What you wrote here indicates that you're
6  not aware of any commitment made to this woman about
7  officers coming later that night, right?
8     A.   That's correct. Yes, sir.
9     Q.   But what Guerra wrote was that he told the
10 woman that he would come back later that night; isn't
11 that right?
12    A.   Yes, what I read earlier.
13    Q.   Do you have any explanation for that
14 inconsistency?
15       MR. DARNELL: I am going to object to the
16 to the form of the question.
17    A.   I don't know, sir, to be honest with you.
18 I don't know why that's different.
19 BY MR. HILKE:
20    Q.   And when you are interviewed by IA, are you
21 required to give anything you know that could be
22 relevant to the complaint?
23    A.   Yes, sir.
24    Q.   So you can't hold back something just
25 because they don't ask about it?

Page 167

1     A.   That's correct, mm-hmm.
2        MR. HILKE: How about a five-minute break?
3        MR. DARNELL: Works for me.
4        MR. HILKE: Let's go off the record.
5        ONLINE VIDEO TECH: All right. We are off
6  the record the time is 2:08.
7        (Break from 2:08 p.m. until 2:19 p.m.)
8        ONLINE VIDEO TECH: We are back on the
9  record for the deposition of Detective Hector Loya
10 being conducted by videoconference. My name is Sydney
11 Little. Today is May 9th, 2022, and the time is 2:19.
12       MR. DARNELL: Wally, before we start back
13 on the deposition, have y'all produced, previously
14 produced that audio recording or any of the exhibits
15 that you are using here today in your disclosures?
16       MR. HILKE: I'm sorry. Do you mean -- when
17 you say in our disclosures, do you mean have they been
18 produced in discovery or do you mean separate from them
19 being in discovery?
20       MR. DARNELL: Being in discovery or
21 identified in any of your initial disclosures.
22       MR. HILKE: Yeah. I believe everything
23 we've got has been produced in discovery and Bates
24 stamped, et cetera.
25       MR. DARNELL: Because a lot of this stuff,

Page 168

1  obviously, would be produced by the City as far as the
2  police statements and that kind of stuff but like, the
3  audio recording and the transcription of the Jesus
4  Rodriguez conversation, I don't recall seeing that or
5  hearing that prior. Do you know when y'all produced
6  that?
7        MR. HILKE: So I believe that that is the
8  very first thing in the City's production.
9        MR. DARNELL: Well, the City wouldn't have
10 had the audio, wouldn't have had either one of those.
11       MR. HILKE: I have it from the City, I
12 believe.
13       MR. DARNELL: But how would the City have
14 gotten a recording that Danny Villegas's defense team
15 had made with their presumably private investigator
16 trying to talk to somebody he holds out to be my
17 client?
18       MR. HILKE: So I believe that these have
19 been produced. Let's -- can we go off the record,
20 please?
21       ONLINE VIDEO TECH: Sure. We are off the
22 record the time is 2:21.
23       (Break from 2:21 p.m. until 2:30 p.m.)
24       ONLINE VIDEO TECH: We are back on the
25 record for the deposition of Detective Hector Loya

Page 169

1  being conducted by videoconference. My name is Sydney
2  Little. Today is May 9, 2022, and the current time is
3  2:30.
4        MR. HILKE: Thank you.
5  BY MR. HILKE:
6     Q.   So, Detective, I want to take you back to
7  the document I was just showing you for a second. I'm
8  sorry. That didn't quite work for me.
9        Detective, are you able to see a document
10 on your screen right here?
11    A.   Yes, sir, I can.
12    Q.   Okay. And is this the same statement we
13 were just looking at, it's Page 28 of Exhibit 10?
14    A.   Yes, sir, it does, mm-hmm.
15    Q.   Okay. Could you please review your answer
16 to question Number 2 here?
17    A.   Okay. I did read it.
18    Q.   Okay. Now, in this statement you're asked
19 whether you instructed the victim to pretend like
20 nothing happened. Is that right?
21    A.   Yes, sir.
22    Q.   And you say that you didn't say that and
23 you didn't hear Guerra say that. Is that right?
24    A.   Correct, uh-huh.
25    Q.   But you do know that your partner was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 982 of 1026
The Deposition of ANTONIO TABULLO, taken on May 4, 2021
170..173

Page 170

1  inside the kitchen with the victim -- with the
2  complainant, I guess, right?
3      A.    According to my statement, yes, sir.
4      Q.    And so it says you didn't hear everything
5  they said to each other.
6      A.    Correct.
7      Q.    And then in your response you reviewed
8  before -- I'm sorry.  Below that, there is a question
9  Number 3, right?
10     A.    Yes.
11     Q.    And you are asked to explain what was said
12 to the complainant's daughter, right?
13     A.    Correct.
14     Q.    And --
15           MR. DARNELL:  Objection.  Not the
16 complainant's daughter.  I'm sorry, yes.  You're
17 correct.  My apologies.
18 BY MR. HILKE:
19     Q.    And what -- and did you write that what was
20 said to the complaint's daughter was, "If possible,
21 officers would attempt to apprehend her husband on this
22 date."  Is that right?
23     A.    Yes.  That's what the statement says,
24 uh-huh.
25     Q.    And you don't mention anything under Number

Page 171

1  3 that there's something you might not have heard, do
2  you?
3      A.    Can you repeat that again?  I'm sorry.
4      Q.    That's fine.  Under your response to
5  question Number 3, you don't mention anything about
6  maybe your partner said something you didn't hear, do
7  you?
8      A.    No.  What I said on 2, I didn't say on
9  Number 3.
10     Q.    And you say that you know -- and you don't
11 suggest in any way that this answer is incomplete,
12 right?
13     A.    No, sir.
14     Q.    Okay.  And Craig Allen is the El Paso Chief
15 of Police, right?
16     A.    Correct.  Yes, sir.
17     Q.    I am going to stop sharing this now.  And
18 was he Chief of Police when you started at Crimes
19 Against Persons?
20     A.    Yes, sir, he was.
21     Q.    And do you feel that Greg Allen supports
22 officers in the El Paso Police Department?
23     A.    Yes, sir, he does.
24     Q.    Does he have their back?
25     A.    Yes.

Page 172

1      Q.    And has he stood up to others on behalf of
2  El Paso Police Officers?
3      A.    From what I have seen, yes, sir, he has.
4      Q.    And what have you seen?
5      A.    That he always, especially out to the media
6  he always has our back, talking good about us and, you
7  know, he supports us all the time, tries to do -- get
8  us more money, more cars, et cetera, et cetera.
9      Q.    Yeah.  And he's -- he's pushed back, he's
10 spoken against prosecutions of El Paso Police Officers;
11 is that right?
12     A.    I don't know about that, sir.
13     Q.    Okay.  And so are you aware of any conflict
14 between the El Paso Police Department and the DA's
15 office?
16     A.    No, sir, not that I know of.
17     Q.    And do you feel -- do you feel that
18 officers are unfairly accused of misconduct?
19           MR. DARNELL:  Objection, form.
20     A.    No, sir.  I don't think they're unfairly
21 accused of anything.
22 BY MR. HILKE:
23     Q.    Okay.  Did John Mimbela come up in the
24 Electric Street murder investigations?
25           MR. DARNELL:  Can you repeat that?  It

Page 173

1  broke up.
2  BY MR. HILKE:
3      Q.    Yes.  Did a John Mimbela come up in the
4  Electric Street murder investigations?
5      A.    Yes, sir, he did.
6      Q.    How did he come up?
7      A.    I -- I knew of him because of what I would
8  see on the media on the news.  I know he was the
9  biggest advocate.  I know he was fighting for the
10 defendant.  During the interviews that we were doing,
11 the statements that were taken, I know some of the
12 witnesses had said that Mr. Mimbela and another female
13 had approached them or called them on the phone or met
14 with them to question them about that -- about the
15 murder.
16     Q.    And what was your -- and what impression
17 did you get or strike that.
18     Were you -- what -- as you were working
19 these murders, were you interested in information about
20 John Mimbela?
21     A.    No, not really.  Again, what I have seen on
22 the media and I knew of him.  I know he owned a
23 construction company here in El Paso.
24     Q.    Was it part of what you were asked to look
25 into?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 983 of 1026
The Deposition of ROBERT ZOYK, taken on May 09, 2018
174..177

Page 174

1     A.     No, sir, no.
2     Q.     Okay.  So that was -- and so did you feel
3   like you had to follow up on any information -- was
4   there any information about John Mimbela that came up
5   as you were investigating these murders that you felt
6   you had to follow up on?
7     A.     No, sir, not that I recall.
8     Q.     When did -- I want to ask about Detective
9   Armendariz.  Had you worked with Armendariz before your
10  work together on the Electric Street murders?
11    A.     Yes, sir, we did.
12    Q.     How many times?
13    A.     Gosh.  I originally worked with him when we
14  were both at Central CID.  When we first got promoted
15  we worked together and then he went to CAP and I ended
16  up there and we worked multiple cases together.
17    Q.     Did you get promoted at the same time?
18    A.     I want to say he was promoted maybe a year
19  or two before I was.
20    Q.     And did you have the opportunity to work
21  him on very many cases?
22    A.     Yes, sir.
23    Q.     And what -- what was -- did you have the
24  opportunity to observe sort of how he investigated
25  cases or what his style was?

Page 175

1     A.     Yes, sir.
2     Q.     What was his style?
3     A.     Very, very professional, very smart.  As a
4   matter of fact, I think a lot of stuff that I know
5   today is because of him.  I've always modeled after
6   him, very intelligent, very thorough, great
7   investigator, the way he speaks to people, yeah, he --
8   because he's done really good.
9     Q.     I think you said similar about Ray Sanchez,
10  right?
11    A.     Correct.  Yes, sir.
12    Q.     These are two very good detectives?
13    A.     Yes, sir.
14    Q.     How would you -- were they at the very top
15  of the group of CAP or how would you compare them to
16  other detectives?
17    A.     You know what, Detective Sanchez was there
18  many, many years, a lot of experience.  I looked up to
19  him on that end.  Detective Armendariz maybe he had
20  been there maybe a year before I got there but, yeah, I
21  know he picked it up really quick and even the older
22  guys looked up to him, very -- I mean, yeah.  They were
23  very good detective.
24    Q.     Okay.  And was Armendariz working the case
25  before you joined it?

Page 176

1     A.     This particular case, sir, we were both
2   tasked at the same time at the beginning.
3     Q.     Okay.  So the very start was you and
4   Armendariz come to the DA's office to interview
5   Mr. Juarez?
6     A.     Juarez, correct, yes.
7     Q.     Okay.  And was there a case agent?
8     A.     At that time, no, there was no case agent.
9     Q.     And during -- so during the whole of 2014
10  as you are working the Electric Street murders there is
11  no case agent; is that right?
12    A.     That I know of, no, sir.
13    Q.     And is that unusual to have -- to be
14  working on a case where there is no case agent?
15    A.     From experience, usually the case agent
16  wasn't assigned or you were told you were the case
17  agent until after the investigation is done and then
18  that person was in charge of putting all everything
19  together, the binders and then walking it over to the
20  DA's office.
21    Q.     Was there a case agent assigned at the end
22  of the work on the Electric Street murders?
23    A.     From the time I was off that I stopped
24  following up probably in March, there was nothing -- no
25  case agent and again, when I jumped back in December I

Page 177

1   had no idea there was a case agent.
2     Q.     Okay.  And so did you and Armendariz play
3   different roles in this investigation?  I'm sorry.  I
4   keep using that word.  In your work on the murders.
5     A.     No.  We -- nobody, we actually we were the
6   first few interviews we did them together.  We rode,
7   looked for the people, okay, you talk to him, you take
8   a statement from him, I'll take statement from her and
9   yeah, that was, yeah.  We worked together.
10    Q.     So neither one of you was running the show?
11    A.     No, sir, hmm-mm.
12    Q.     Okay. As you conducted interviews in this
13  case, did you come up with ideas on who you should talk
14  to next?
15    A.     No, sir.
16    Q.     Did Armendariz come up with ideas on who to
17  talk to next?
18    A.     That I recall, no, sir.
19    Q.     And did Sanchez come up with ideas on who
20  to talk to next?
21    A.     That I recall, no, sir.
22    Q.     And were you -- was it more of checking the
23  boxes that the DA wanted you to check on this case?
24    A.     In those -- I guess you could put it in
25  those words, correct, yes, sir.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 984 of 1026
The Deposition of DETECTIVE TONY TABULLO, taken on May 09, 2022

178..181

Page 178

1    Q.    Did the name Tony -- Tony Kosturakis come
2  up in your investigation?
3    A.    No, that one doesn't sound familiar, no,
4  sir.
5    Q.    What about an -- what about a tape, an
6  audio recorded statement from 1994, did that come up in
7  your investigation?
8    A.    No, sir, I never heard that.
9    Q.    I want to show you another exhibit here.  I
10  am now sharing Exhibit 11.  Do you see this in front of
11  you?
12    A.    Yes, sir, I do.
13    Q.    And scrolling down, does this appear to be
14  a letter from the district attorney on April 15, 2014?
15    A.    Looks like one, yes, sir.
16         MR. HILKE:  Did I do this wrong?  Excuse
17  me.  I'm going to stop sharing because I don't actually
18  want to show you that right now.
19  BY MR. HILKE:
20    Q.    Did Armendariz ever talk to you about a
21  Tony Kosturakis?
22    A.    That I could recall, no, sir.  Maybe he
23  did, but I don't remember that.
24    Q.    Yeah.  And it wasn't something that you
25  ever invest -- that you ever tried to interview anybody

Page 179

1  about in this case?
2    A.    That name is not on my supplement so I
3  don't think I did any type of file on that particular
4  person.
5    Q.    And if Armendariz were looking into it,
6  would he have discussed that with you?
7    A.    Maybe he could have said, hey, you know
8  what, I just discovered this other guy, this was his
9  involvement, let me go and I'm going to try to reach
10  out to him.  Okay, good.  Maybe that did happen.  I
11  don't recall.
12    Q.    Did you -- so when working on another a
13  case with another detective, was it your practice to do
14  solo work without informing the other detectives?
15    A.    Sure.  We could do that, umm umm.
16    Q.    How would you make sure that the detectives
17  knew about that work?
18    A.    If it was good -- if it was a good lead, a
19  good witness I would definitely say, hey, listen.  I
20  just -- hey, this person came up.  This is what they
21  told me, maybe we should bring that person in or, I
22  mean, a lot of our cases we, you know, we go on a
23  Easter egg hunt here and a lot of stuff didn't pan out
24  to anything and there was no need to share that
25  information with them.

Page 180

1    Q.    Is it important to document the leads that
2  don't pan out?
3    A.    Yes, sir.
4    Q.    And does that sort of go back -- well,
5  strike that.
6         During your investigation were you aware of
7  the Wayne Robert Williams?
8    A.    Wayne Robert Williams?  I don't recall.  It
9  doesn't sound familiar.
10    Q.    Do you remember ADA Myers ever mentioning
11  that name to you?
12    A.    I don't recall, no, sir.  He might have but
13  I don't recall.
14         MR. HILKE:  Give me just one second here.
15  BY MR. HILKE:
16    Q.    And I'm not going to ask you to refresh
17  your recollection at this time but I am going to
18  represent to you that I didn't see the name Wayne
19  Robert Williams in your -- in your supplemental report
20  so I'm not hiding the ball from you here.
21    A.    Okay.
22    Q.    Trying not to.  With that said, do you
23  recall making a decision about whether to pursue
24  information about Wayne Robert Williams?
25    A.    Again, no, sir, it doesn't -- it doesn't

Page 181

1  ring a bell.
2    Q.    Do you remember a decision about whether to
3  try to take a statement from him?
4    A.    He might have mentioned it to me in
5  conversation but I don't recall, sir.
6    Q.    Okay.  And are you aware that Wayne Robert
7  Williams before -- someone had stolen a gun from him
8  around the time of the Electric Street murders?
9         MR. DARNELL:  You broke up, Wally.  Can you
10  repeat that?
11  BY MR. HILKE:
12    Q.    Yes.  Are you aware that Wayne Robert
13  Williams said that Rudy Flores had stolen a gun from
14  him around the time of the Electric Street murders?
15    A.    No, sir.  I don't -- I don't remember that
16  statement.
17    Q.    And had you been aware of that, would it
18  have been relevant to your work on the Electric Street
19  murders?
20    A.    If somebody was giving me statement and
21  telling me that, yeah, I would definitely put that in
22  my statement.
23    Q.    Understood.  I guess what I am asking is if
24  that information had come to you while you were working
25  on those cases, you know, anyway could have been from a



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 182

1  document or an interview or whatever, would that --
2  would that have been something -- would you have looked
3  into that -- would you have looked into that
4  information?
5      A.    I guess because the way this case -- we
6  were doing this, I probably -- that information would
7  have come forward, I would probably reached out to the
8  ADA and said, hey, listen.  Do you remember back in '93
9  detectives ever talked to this person, and then he
10  looks it up.  Yeah, guess what, we've already clarified
11  that or you know what, that's good information.  Why
12  don't we follow up on that.  I think I would have done
13  that would have played out that way.
14     Q.    And during this -- during the case, did you
15  ever follow up with the ADA to share information that
16  you wanted to know if you should look into or not?
17     A.    No, sir.
18     Q.    And were you -- did you know that Rudy
19  Flores was actually a witness to a shooting apparently
20  committed by Wayne Robert Williams shortly after the
21  Electric Street murders?
22     A.    Maybe it was mentioned back then but I
23  don't remember that I don't recall that.
24     Q.    And if you had become aware of that, would
25  it have affected your work on the Electric Street

Page 183

1  murders in any way?
2      A.    Again, I would have asked the ADA, hey, do
3  you know if they ever looked into this?  This what is
4  we've been told.  Do you want us to go and clarify that
5  or you know, you know what, they already spoke to him
6  20 years ago, yeah, definitely it's important.
7      Q.    So now I'm going to show you the thing I
8  was trying to show you before.  I'm now sharing is
9  Exhibit 11.  Detective, can you see this document?
10     A.    Yes, i could.
11     Q.    And does it appear to be a letter from the
12  district attorney's office on April 15, 2014?
13     A.    Yes, sir, it does.
14     Q.    And it looks like it's addressed to Mr. Joe
15  Spencer; is that right?
16     A.    Yes.
17     Q.    Do you know who Joe Spencer is?
18     A.    Yes, sir, I do.
19     Q.    Who is he?
20     A.    He's an attorney.
21     Q.    Was he involved in this case?
22     A.    Yes, sir, he was.
23     Q.    How was involved?
24     A.    He was defense attorney for Daniel
25  Villegas.

Page 184

1      Q.    And I am now -- I want to call your
2  attention to the second paragraph that starts on March
3  17, 2014.  Do you see that now?
4      A.    Yes, sir, I do.
5      Q.    And the writer seems to say that -- or the
6  letter says that, "I," and I believe this is DA Myers
7  and James Bonneau, "spoke with Wayne Williams."  Do you
8  know who James Bonneau is?
9      A.    No, sir.
10     MR. DARNELL:  For the record, it's James
11  Bonneau.
12     MR. HILKE:  Ah.  Thank you.
13 BY MR. HILKE:
14     Q.    And do you see the next sentence where it
15  says, "Mr. Williams stated that Rudy Flores stole a gun
16  from him but that it was a .38 special"?
17     A.    I do see that.
18     Q.    And do you see the next one where it says,
19  "That gun was stolen after the murders on Electric
20  Street"?
21     A.    Yes, I do.
22     Q.    Okay.  And I am going to scroll down to the
23  bottom.  I'm now going to Page 2.  Do you see Kyle
24  Myers's signature at the bottom of this letter?
25     A.    Yes, sir.

Page 185

1      Q.    Have you ever seen this letter before?
2      A.    No, sir, I haven't.
3      Q.    And the information about Wayne Williams
4  here, was that provided to you?
5      A.    If it's not on my supplement, sir, I -- it
6  wasn't given to me.
7      Q.    Okay.  I am going to stop sharing now.  Do
8  you remember interviewing Manuel Gilberto Cuellar?
9      A.    Yes, sir, I do.
10     Q.    Okay.  And he's Celia Fierro's husband; is
11  that right?
12     A.    Yes, sir.
13     Q.    And he wasn't a witness to any of the
14  events of the Electric Street murders, right?
15     A.    Correct.
16     Q.    But he wanted to give you a statement and
17  so you took one from him?
18     A.    Yes.
19     Q.    And did Detective Armendariz interview
20  anyone at the same time you were talking to Manuel?
21     A.    Yes, Celia Fierro.  Yeah.
22     Q.    Okay.  And so you did both those interviews
23  at the same time; is that right?
24     A.    Correct.
25     Q.    Okay.  Did you discuss your plan for the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 186

1  interviews with Armendariz beforehand?
2      A.    Probably did, yes, sir.
3      Q.    And what did you discuss?
4      A.    I don't remember exactly but I guess same
5  thing, I'll meet with Celia, get her side of the story.
6  Again, I don't know why we -- I got a statement from
7  the husband.  I don't know if he said, hey, I want to
8  give a statement, too, because of what's going on with
9  the Mimbela's, this private investigator or we just
10 decided you know what, while I'm talking to her, why
11 don't you grab and get a quick statement from the
12 husband.
13     Q.    Okay.  And you remember that conversation
14 with Manuel?
15     A.    After reading my statement, yes.
16     Q.    And what was, what was Manuel's demeanor
17 during that conversation?
18     A.    Good.  I mean, he was calm, relaxed,
19 telling me what happened a few days ago.  He was on his
20 way to San Antonio or on the way back after a little
21 vacation.  So.
22     Q.    And did you discuss the results of those
23 interviews afterwards?
24     A.    Yes.
25     Q.    And what did you discuss?

Page 187

1      A.    I told Detective Armendariz what the
2  husband said and I'm pretty sure he told me what
3  Ms. Fierro said.  I can't recall exactly what he told
4  me.
5      Q.    Do you remember anything else about that
6  conversation?
7      A.    No, sir, I can't recall.
8      Q.    And did these interviews, did they -- did
9  they guide your work on the Electric Street murders at
10 all?
11     A.    No, sir.  Again, waiting for, you know,
12 next instructions.
13     Q.    You were waiting for your next
14 instructions?
15     A.    Yes, mm-hmm.
16     Q.    Who was the district attorney in 2014?
17     A.    Esparza, Jamie Esparza.
18     Q.    Did he have a history with Daniel
19 Villegas's prosecution?
20     A.    Oh, I -- no clue, sir, I have no idea.
21     Q.    Did he ever engage with your work in 2014
22 in any way?
23     A.    I never met Mr. Esparza.  Maybe I saw him
24 out in the street that's about it but I've never had
25 any conversation with him.

Page 188

1      Q.    Did you have any understanding of whether
2  he was paying any attention to this -- to the work you
3  were doing?
4      A.    No, sir, not that I know of.
5      Q.    Or to the Electric Street murders
6  generally?
7      A.    No, sir.
8      Q.    And when you were working on the Electric
9  Street murders, how high of a priority was?
10     A.    To be honest with you, sir, it was go get
11 his interview and then after we got that interview we
12 didn't have any more leads, I'd go back and work my
13 other cases until we got the next instruction whether
14 it was a few days -- but I wasn't actively working it
15 when I wasn't being told to go talk to that person.
16     Q.    Sure.
17     A.    We had no leads.  We didn't do anything on
18 it.  It was just idling until we were told to do
19 something else.
20     Q.    So outside of what's noted in your
21 supplement, you were not actively investigating this
22 case?
23     A.    No, sir.
24     Q.    And did you have any indication -- were you
25 given any indication by the ADA Myers of how important

Page 189

1  of a case this was?
2      A.    Not exactly from him but I know it was
3  pretty big because it was on the news.  It was like
4  weekly.  It was pretty big here in town.
5      Q.    So you would see on the news pretty often
6  information about this case you're working on at the
7  same time?
8      A.    I think in the beginning, yes, sir.  I
9  think when defendant Villegas was released on bond and
10 they were going to re-try the case yeah.  Yeah, it was
11 big.  I don't know if after that it was weekly, it was
12 coming out but yeah, I knew it was a big case.
13     Q.    So that's sort of outside of the
14 department.  What about within the department?
15     A.    You know, I don't know if we ever talked
16 about it, like, there at work or our supervisors would
17 follow up, hey, have you guys -- what's going on, like,
18 other cases normally, hey, did you ever follow up on
19 this person?  No, again, it was just one of those -- it
20 just sat there and wait for the next direction, but
21 yeah, wasn't.
22     Q.    So other than what's on the news, no
23 different than any other case?
24     A.    Correct, yes, sir.
25     Q.    Other than Armendariz and Sanchez, did any



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 987 of 1026
The Deposition of BRANDON ZOYK, taken 04 May of, 2022

190..193

Page 190

1  other detectives work with you on the Electric Street
2  murders?
3      A.     That I recall, no, sir.  I think it was
4  just us three.
5      Q.     You're not aware of any other detectives
6  who were involved?
7      A.     Again, when I stopped in March and I
8  start -- and I helped out that one more time in
9  December, those nine months I don't know if maybe they
10  grabbed another detective, hey, go with me because
11  John's not here or Ray's not here, I don't know to be
12  honest with you, if that ever happened or after
13  December.
14      Q.     Did you ever find out what happened in the
15  months you weren't involved?
16      A.     You know what, sir, to be honest with you,
17  I -- not that I don't care but we're just so busy and
18  we've got other stuff that I -- if I don't need to know
19  I don't ask and I just keep working my own cases and
20  it's funny because people ask me, hey, what happened
21  here.  I don't know.  Well, you worked there.  No.  We
22  just got so much work we don't even care what unless
23  I'm involved then I'll ask but otherwise, I really
24  don't -- or maybe it will be, like, hey, how's your
25  case going?  Oh it's crazy.  We're doing this or doing

Page 191

1  more maybe like that but as far as details, no.  I
2  didn't follow up on that.
3      Q.     Do you know whether the witness -- do you
4  know the name Karla Terrazas?
5      A.     I'm sorry?  Karla?
6      Q.     Karla Terrazas?
7      A.     Karla Terrazas?  Doesn't sound familiar,
8  sir.
9      Q.     Do you remember if there being mentioned a
10  -- this would have been with Celia Fierro or her
11  husband, do you remember mention of a woman who was
12  present with Celia when John Miranda came to Colorado?
13      A.     Yes.  When I took a statement from the
14  husband, Mr. Cuellar, he did mention that there was --
15  back I think in 2011, 2012, that there was a female and
16  it was Mr. Mimbela, Mr. Mimbela's wife and another
17  female that went down to Colorado to go speak to his
18  wife, but I don't think he ever gave me a name or I
19  never asked or he didn't know.
20      Q.     Got it.  I am going to -- one second.  So
21  do you remember why you and Armendariz wanted to talk
22  to Celia Fierro?
23      A.     Again, on my supplement I don't know why or
24  how she came into play, to be honest with you.  I know
25  where Mr. Juarez led to Sally Flores, Betty Flores, but

Page 192

1  then there was another little maybe another 30 days
2  before we were given a couple of names to do follow-ups
3  on or look up, I think one was Dan Hernandez that I
4  looked up.  I found him somewhere in Texas and
5  according to my supplement and the next thing I know I
6  get a phone call from Mr. Cuellar and that's when we're
7  starting to get a statement from them.  I don't know
8  where -- where she came into play.  I think they were
9  -- according to my notes, I think the DA's told them
10  reach out to these detectives and gave them our number.
11      Q.     Okay.  So does it sound right that --
12  sorry.  One moment.  I'm going to show you an exhibit
13  now.  This is Exhibit 13.  I am going to scroll to the
14  top of the document now.  Does this appear to be
15  Detective Armendariz's supplemental report?
16      A.     Yes, sir, it does.
17      Q.     Okay.  And I am now scrolling down and I am
18  on Page 8 of Exhibit 13.  Do you see where it says,
19  "The undersigned took the statements from Fierro"?
20      A.     Yes, sir.
21      Q.     Okay.  And I am scrolling down still on
22  Page 8.  So on -- so I am pointing up to the paragraph
23  at the top of the page and do you see in Ms. Fierro's
24  statement where she talks about -- okay.  Let's go from
25  here.  Do you see where it says, "A few years ago an

Page 193

1  old friend of mine reached out to me on Facebook,
2  Jenny."
3      A.     Yes, sir.  I do see that.
4      Q.     And then it says, "She wanted to reconnect
5  with me and we made arrangements to meet up."
6      A.     Yes.
7      Q.     And then a little bit lower it says, "When
8  I met her, I went to meet her and she was with a
9  couple, one of them was John Mimbela."
10      A.     Yes, sir.
11      Q.     And then a little bit lower she says, "My
12  kids were there and another friend Karla."
13      A.     Yes.
14      Q.     And it says, "Karla Terrazas and I were
15  best friends"?
16      A.     Yes.
17      Q.     Okay.  I'm scrolling down a little bit and
18  do you see at the bottom where it says, "Karla got mad
19  and told Jenny and Mimbela that they were talking about
20  her two friends that were killed"?
21      A.     Yes.
22      Q.     And that Karla said she was friends with
23  those two guys?
24      A.     Yes.
25      Q.     And that they had been at her party.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 988 of 1026
The Deposition of Detective Hector Loya, taken 9 May, 2022

194..197

Page 194

1    A.    Yes.
2    Q.    And here sort of at the bottom, like, "I
3  heard her.  I heard Karla get upset and said, 'Rudy
4  wouldn't have done that.'"
5    A.    Yes.
6    Q.    Okay.  So did Armendariz ever discuss Karla
7  Terrazas with you?
8    A.    Maybe he did, sir, but I don't recall.
9    Q.    Okay.  And do you remember doing any
10  follow-up about Karla Terrazas?
11    A.    That's not on my statement.  Ms. Terrazas,
12  so no, I didn't do any follow-ups.
13    Q.    Okay.  I'm going to stop sharing that now.
14  So you said, let me make sure I have this right.  You
15  said earlier that what we reviewed as Exhibit 2, the
16  supplemental report, those are the only notes you took
17  on this case; is that right?
18    A.    Yes, sir.  That I could recall, yes.
19    Q.    And you went to different -- I'm sorry.
20  Strike that.
21          Did you take any handwritten notes during
22  this investigation?
23    A.    I'm pretty sure I did if I had like time,
24  space, yes.
25    Q.    And so the handwritten notes do they still

Page 195

1  exist?
2    A.    No.  If I had the notes they would be
3  shredded.  I don't save notes.  I don't save anything.
4    Q.    Okay.  And are you aware of any notes that
5  Detective Armendariz took during the investigation?
6    A.    I'm pretty sure he took notes but I'm not
7  aware of them, yeah.
8    Q.    And are you aware of anything -- okay.
9  That's -- okay.  And what about Detective Sanchez, are
10  you aware of any notes that he took during the
11  investigation?
12    A.    I would guess he did take notes but I'm,
13  again, I'm not sure where they're at or if he has them.
14    MR. HILKE:  Can we take a five-minute
15  break?  I'm almost done here.
16    MR. DARNELL:  Yes.
17    ONLINE VIDEO TECH:  All right.  We are off
18  the record the time is 3:06.
19    (Break from 3:06 p.m. until 3:14 p.m.)
20    ONLINE VIDEO TECH:  We are back on the
21  record for the deposition of Detective Hector Loya
22  being conducted by videoconference.  My name is Sydney
23  Little.  Today is May 9th, 2022, and the current time
24  is 3:14 p.m.
25    MR. HILKE:  Now, Jeep, for the record I'll

Page 196

1  just note that we found the production of the audio
2  file and the transcript and forwarded it to your email
3  address which I believe you have received.
4    MR. DARNELL:  Correct, yes.  There was
5  some -- my email address is not on there correctly but
6  my dad's was, so we did have it.  We did receive it
7  prior to today's deposition.
8    MR. HILKE:  Thank you, sir.
9  BY MR. HILKE:
10    Q.    Detective, do you recall any portions of
11  your work on the Electric Street murders that I haven't
12  asked you about today?
13    A.    Let me see, the Manuela, Mr. Cuellar.  I
14  think that's it, sir.  I know there was another two
15  people that the ADA asked to us do follow-ups on.
16  There was a Daniel Hernandez that I did a follow-up --
17  oh, I think we did talk about it.  I found one in --
18  somewhere in Texas but I never did any follow-ups on
19  that one.  I -- I can't think of anything else.
20    Q.    Why did you never follow up on Daniel?
21    A.    I don't know.  I can't remember if we told
22  him he was outside of El Paso and they said, okay,
23  don't just or maybe since I got pulled in March, I
24  don't know if Detective Armendariz or Detective Sanchez
25  ever followed up with that person to be honest with

Page 197

1  you.  I don't know.
2    Q.    Just sort of going over it chronologically,
3  do you recall anything else about how you first became
4  involved in the investigation?
5    A.    Again, it was just one of those where John,
6  Hector, I need you to go down to the DA's office.  Go
7  speak to ADA so-and-so, need you guys to take a
8  statement regarding the Daniel Villegas case.  Okay.
9  We went down there.
10    Q.    Okay.  And anything else you recall about
11  that that you didn't already mention during this
12  deposition?
13    A.    No, sir.  I think that's -- that I could
14  recall.
15    Q.    And then what about during those first few
16  months, you know, when you interviewed Juarez and you
17  interview Fierro's husband and you're following up on
18  those leads, do you remember anything else that you
19  didn't discuss during our deposition today?
20    A.    No, sir.  I think we got it all covered.
21    Q.    And then finally, that last little bit when
22  you got pulled in to help with Oscar Gomez's interview,
23  do you remember anything at all about that portion of
24  your work on this case?
25    A.    No, sir, hmm-mm.  Just what you asked me,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 198

1  what I told you.
2      Q.    And is there anything that you test --
3  actually, I have one other topic for you.  What is your
4  current -- do you have an estimation of your current
5  net worth?
6      A.    Wow.  When you say net worth you mean, like
7  my home, my house?
8      Q.    Yeah.  Like--
9      A.    Cash on hand or --
10     Q.    Yeah.  Let's add it up.  How about equity
11 in your house?
12     A.    Gosh.  Maybe a couple of hundred thousand.
13     Q.    Do you have a mortgage right now?
14     A.    Yes, I do.
15     Q.    How much is left on the mortgage?
16     A.    Probably about 180.
17     Q.    180.  And how much was it when you took it
18 out?
19     A.    Gosh.  I know I've refinanced a couple of
20 times every time the interest goes down.  When I first
21 bought the house, probably 280 maybe.
22     Q.    And do you own a car?
23     A.    Yes, sir, I do.
24     Q.    Okay.  And how many cars?
25     A.    We have three cars.

Page 199

1      Q.    Okay.  And do you have loans on them or are
2  they paid off?
3      A.    I have one loan on one of them.
4      Q.    Okay.  And just ballpark what's the value
5  of your cars?
6      A.    Sheesh.  I'm not a big fancy car guy.
7  Maybe like 60,000 on both of them.
8      Q.    And so you said both of them but have you
9  three cars?
10     A.    I'm sorry, on all three of them, yeah.
11     Q.    Got it.  And what's the balance on the
12 loan?
13     A.    Probably -- probably about $8,000.
14     Q.    And what about sort of cash on hand?
15     A.    You've got to ask my wife all that.  She's
16 the accountant in our family.  I don't know.  Maybe,
17 does that include my -- my what do you call it my
18 stocks and all that stuff or just what I have in the
19 bank right now?
20     Q.    Can you -- can you give me them separate
21 please?
22     A.    Cash on hand maybe about $5,000 in the
23 bank.
24     Q.    Okay.  And what about stocks?
25     A.    Maybe 150,000.

Page 200

1      Q.    And is that -- is that just in a regular
2  account or a retirement account?
3      A.    It's a retirement account.
4      Q.    And you are currently married?
5      A.    Yes, I am.
6      Q.    And you and your wife your finances are
7  merged together?
8      A.    Correct.  Yes, sir.
9      Q.    Does she have any assets that beyond what
10 you have just discussed?
11     A.    Yes.
12     Q.    What does she have?
13     A.    Same thing, pension, stocks, stuff like
14 that.
15     Q.    Okay.  And the pension -- the stocks, are
16 those in a retirement account?
17     A.    Retirement accounts, correct, uh-huh.
18     Q.    And what's the approximate value of those
19 accounts?
20     A.    Maybe another 150.
21     Q.    Okay.  And do you carry credit card debt?
22     A.    Yes.
23     Q.    How much?
24     A.    All credit cards probably about 12,000 give
25 or take.

Page 201

1      Q.    Any other debts?
2      A.    No, sir.  Just credit cards.  No loans.
3  That's it.
4      Q.    Any other assets?
5      A.    No, sir.
6      Q.    Is there anything you testified about today
7  that you need to correct?
8      A.    No, sir, not that I can recall.
9      Q.    Is there anything you need to clarify?
10     A.    Not at this time, no, sir.
11     Q.    I'm just going to check my notes real
12 quick.
13            MR. HILKE:  I am going to pass the witness
14 at this time.
15            MR. DENTON:  I have some questions and so
16 if everybody's good, I will go forward.
17            MR. HILKE:  Good with me.
18                 EXAMINATION
19 BY MR. DENTON:
20     Q.    Detective, I'm Lowell Denton.  I'm
21 representing the City of El Paso.  We've not met
22 before, right?
23     A.    That's correct, yes, sir.
24     Q.    Remind me from your earlier testimony, when
25 did you promote to the detective rank?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG  Document 386-2  Filed 05/26/23  Page 990 of 1026
The Deposition of DETECTIVE ZOYH, Taken 5/3 May 05, 2021

202..205

Page 202

1      A.    I'm going to guess.  I want to say 2011.
2      Q.    Very good.  Very good.  I will -- in my
3  questions I will frequently refer to "the jury" in this
4  case because, of course, that's the purpose of taking
5  this testimony.  I'm sure you understand that, correct?
6      A.    Yes, sir.
7      Q.    So would you explain to the jury a little
8  bit about the process of promoting to a detective in El
9  Paso in 2011?
10     A.    Yes, sir.  It's a test.  There's a bunch of
11 us who put out a test for detectives every so often, so
12 many years.  And you take a test, if you score good
13 enough, they put you on the list and the person with
14 the best score actually higher then eventually you --
15 hopefully, you scored high enough where you get to get
16 promoted and that's --
17     Q.    Very good and you did, correct?
18     A.    Yes, sir.
19     Q.    And when that test, the notice goes out for
20 the test, is there a list of study materials?
21     A.    Correct.  Yes, sir.
22     Q.    So tell the jury a little bit about that.
23 What were the kinds of things that you studied in order
24 to take the detective's examination?
25     A.    When they put out the detective's test,

Page 203

1  they put a little bibliography of the materials that
2  you should be focused on studying besides policies and
3  procedures with the El Paso Police Department,
4  investigative policies, penal code, know your penal
5  code, search warrants, and then they also give you
6  additional reading material, interrogations,
7  investigations, extra stuff you should read on the
8  side.
9      Q.    All right.  Part of that was actually the
10 department policies that applied to this new role you
11 were looking for as a detective, correct?
12     A.    Correct.  Yes, sir.
13     Q.    You had to read all that material and know
14 it well enough to succeed on the exam?
15     A.    Correct.
16     Q.    How did you decide to compete for the
17 detective job?
18     A.    It was time.  About nine years on patrol, I
19 just thought it was time to promote.
20     Q.    Did you have any influencers or mentors
21 that encouraged you to do it?
22     A.    No, my spouse.
23     Q.    Very good.  Before the detective exam and
24 before you studied all that material, what had you been
25 taught about investigations?

Page 204

1      A.    Nothing really.  I mean, just on patrol all
2  you pretty much do is go from call to call.  You do
3  maybe a little of investigations here and there but a
4  lot of it is followed up by detectives.
5      Q.    Before you came in the department, were you
6  a peace officer or did you get your peace officer's
7  license from the El Paso Academy?
8      A.    Through the El Paso Academy.
9      Q.    Okay.  And how long was the academy course
10 of study?
11     A.    During my time, it was a six-month academy.
12     Q.    During the academy study, did they teach
13 you about department policies and so forth as well?
14     A.    I don't recall but I'm pretty sure they
15 did, yes.
16     Q.    Okay.  Did they teach but the legal rights
17 of citizens and suspects?
18     A.    Yes, they did.
19     Q.    After you came out of the academy and took
20 your oath of office, did you have a field training
21 officer?
22     A.    Yes, I did.
23     Q.    Tell the jury what a field training officer
24 is.
25     A.    Field training officer is when you graduate

Page 205

1  from the academy, you go to patrol division and you are
2  assigned an FTO, field training officer who rides with
3  you and pretty much guides you, shows the ropes, what
4  needs to be done, how to do report writing, policies,
5  and you're with that person for a whole twelve months
6  not the particular FTO.  You will have numerous FTO's
7  your first year.
8      Q.    Very good, that was my next question.  How
9  many different individuals?  Can you name them for me?
10     A.    Yes, sir.  The first one was Dalia Romero.
11 I rode with her three months.  The second one was a
12 Ulysses Sanchez and then oh, gosh, I can't remember.
13 He's no longer with the department.  I can't remember
14 real nice guy.  I just drew a blank.
15     Q.    That's all right.  That's all right.  So
16 during the years between coming in as a patrolman and
17 taking the detective's test, how many hours of
18 additional in service instruction do you think you
19 received at the department?
20     A.    Hundreds hours.
21     Q.    Okay.  At that point before you promoted to
22 detective, what was your personal belief about an
23 officer's duty to know and follow the law?
24     A.    It's very important.  We had to do that.
25     Q.    Okay.  And at that point, who had

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 991 of 1026
The Deposition of Detective ZOYA, taken 23 May 2019, 2019

206..209

Page 206

1  influenced you in this police department the most about
2  that personal principle?
3      Q.    I don't think it's one particular person.
4  I think just the --
5      Q.    Who would be the most important one?
6      A.    I guess my brass, my supervisors.
7      Q.    Okay.
8      A.    My field training officer, they -- how
9  important it was.
10     Q.    Was that a part of the El Paso Police
11 Department culture that you learned?
12     A.    Yes, sir, mm-hmm.
13     Q.    So I -- it may be from your earlier answer
14 that if I asked you who was the toughest teacher that
15 you really can't pick one?
16     A.    Yeah.  I've had some really good mentors
17 and FTOs and even to this day, I still learn something
18 new from people.
19     Q.    All right.  So you talked a little bit
20 already with plaintiff's counsel about the continuing
21 learning you had as a detective, you talked about the
22 homicide course.  Where did you take that?
23     A.    It was in Dallas, Texas.
24     Q.    Okay.  Was it -- where was it located?
25 Community college?

Page 207

1      A.    No, sir.  It was one of those -- it was at
2  a hotel.  You were there for a whole week or yeah, it
3  was put on by a famous -- he wrote a bunch of homicide
4  books.
5      Q.    All right.  Very good.  And do you still
6  have today any of the curriculum or other materials
7  that were part of that course?
8      A.    I do.  I have the actual book.  He actually
9  signed it and I've kept it with me.
10     Q.    Outstanding.  You also mentioned another
11 course in interrogations.  Where did that take place?
12     A.    That took place here in El Paso.
13     Q.    At the police academy or somewhere else?
14     A.    I don't recall the location.  It was
15 probably at one of the regional command conference
16 rooms.
17     Q.    Okay.  Do you remember who the teachers
18 were there?
19     A.    I don't remember.  Again, it was somebody
20 -- it was a famous school and they actually instead of
21 sending us all to the school, it was cheaper to bring
22 in the instructor to El Paso and get us all trained.
23     Q.    And were there curriculum materials for
24 that course as well?
25     A.    Yes, sir, there was.

Page 208

1      Q.    Do you retain those materials?
2      A.    Probably not those.
3      Q.    Okay.
4      A.    I haven't, anyway.
5      Q.    In both of those -- in the instance of both
6  of those courses, have you continued to rely upon and
7  use those in your professional work?
8      A.    Probably do, yes, sir.
9      Q.    Any other seminars or courses that are
10 significant that the jury should know about?
11     A.    Not right off the top of my head to be
12 honest with you but yeah, there's been a few.
13     Q.    Have you pursued any further formal
14 education since you've been in the department, college
15 work or anything else?
16     A.    No, sir, I haven't.
17     Q.    So after you got into the department's
18 detective division, what was the name of the unit that
19 you were in?  What bureau or division?
20     A.    When I first promoted to detective, I was
21 with Central CID.
22     Q.    And was there also a field training officer
23 in that framework?
24     A.    No.  I guess, there's no such thing as a
25 field training officer but more of a mentor, like,

Page 209

1  you've been online, you know what needs to be done but
2  if you have any questions this detective's here to
3  guide you.
4      Q.    And who would that have been?
5      A.    Detective John Armendariz.
6      Q.    Very good.  Once you are in that position,
7  the policies and procedures in the department change
8  from time to time?
9      A.    Sure they do, mm-hmm.
10     Q.    How do you find out about those changes?
11     A.    Through emails the department puts out.
12     Q.    And what are you provided with in those
13 emails?
14     A.    The new policy, the updates.
15     Q.    Okay.  Do you have a personal book that you
16 keep of the policies and procedures for the department?
17     A.    There is -- they put out emails for you to
18 read and then there's a section where you go online and
19 you actually check off after you've read it and you
20 understood -- you have to take a little test that you
21 understood it.
22     Q.    All right.  So when they'll send out a
23 refresher or a revision on the policies, it's made
24 available to you to begin with?
25     A.    Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 992 of 1026
The Deposition of DETECTIVE TONY JAKER, on May 4, 2021
210..213

Page 210

1    Q.    And sometimes have you to read it and
2  certify that you have read and completed it; would that
3  be correct?
4    A.    Yes, sir.
5    Q.    And is there ever any testing that's
6  associated with that just to validate the fact that you
7  understood?
8    A.    Yes.
9    Q.    How -- in the department culture there, how
10 common is it for to you go back and refer to those
11 policies or procedures?  Is that something you do or do
12 you just kind of get the hang of it on the job?
13   A.    The majority of it you get the hang of it
14 but if you haven't applied whatever you're going to do
15 for a while and you just can't remember, I could get
16 online and do a search for it and find out what the
17 actual policy is.
18   Q.    All right.  Let me ask our reporter to put
19 up the document that we've provided earlier and it's
20 titled 0013079 through 0013113.
21         ONLINE VIDEO TECH:  All righty.  One
22 moment.
23         MR. DENTON:  Will you share that on the
24 screen?
25         ONLINE VIDEO TECH:  Yes.

Page 211

1  BY MR. DENTON:
2    Q.    So do you recognize this front page here?
3    A.    Yes, I do.
4    Q.    Let's look at the second page.  One of
5  these has a date on it and one of them doesn't.
6  There's the second page where it talks about the
7  revision date in April of 2014.  Is this the -- is this
8  the kind of manual that you studied when you took the
9  detective's examination?
10   A.    Yes.
11   Q.    Okay.  How often in the unit would issues
12 about these policies come up either discussions with
13 supervisors or among your colleagues?
14   A.    I guess when there was a revision or an
15 update or something like that, they would bring it up
16 to us.
17   Q.    Okay.  And were you familiar enough with
18 these to know what you were expected to do?
19   A.    Yes, sir.
20   Q.    Okay.  Let me shift over then to the next
21 document that we identified for today and it's the
22 criminal investigation manual.  It's 0015388, I
23 believe.  Do you recognize that cover page as well?
24   A.    Yes, sir, I do.
25   Q.    Let me ask if we can go to the Bates page

Page 212

1  number 15403 in that document.  15403.  Okay.  Now, the
2  title of this chapter is "Follow-up investigation
3  responsibilities and case documentation."  Is that
4  something that you recognize?
5    A.    I've probably read it before.  Yes, sir.
6    Q.    Okay.  And do you know and/or could you
7  explain to the jury what the words are I guess it's the
8  acronym there CALEA.  Do you know what CALEA is?
9    A.    I -- from what I understand earlier in my
10 career, I know it's some type of a standards that all
11 departments all want to follow and to be certified by
12 CALEA or something to that extent.
13   Q.    Okay.  All right.  Nationwide departments?
14   A.    Mm-hmm.
15   Q.    Is that correct?
16   A.    Sounds familiar, yes, sir.
17   Q.    All right.  Is this the kind of detail that
18 you were taught and that was a part of your testing for
19 the detective position in the department?
20   A.    Yes, sir.
21   Q.    Okay.  Let's look through the investigator
22 responsibilities that are here and review and "Analyze
23 all previous reports."  That's consistent with some of
24 the questions you were asked earlier, correct?
25   A.    I'm sorry.  What letter would that be, sir?

Page 213

1    Q.    It's A, "Review and analyze all previous
2  reports"?
3    A.    Okay.  Yes, sir, uh-huh.
4    Q.    So when you -- when you undertake to those
5  interview these witnesses, you look into the
6  information that you need to have in order to conduct
7  that interview, would that be correct?
8    A.    Yes, sir.  Or third party told me about
9  that information and interview?
10   Q.    All right.  Somebody tells you or you look
11 it up yourself?
12   A.    Correct.  Yes, sir.
13   Q.    All right.  And Number F where it says,
14 "Seek additional information from all possible sources,
15 informants and public record searches," correct?
16   A.    Correct.  Yes, sir.
17   Q.    And when you were doing the investigation
18 on a case yourself, did you follow each of these steps
19 if they were applicable to that file?
20   A.    Yes, sir.
21   Q.    Let me ask the reporter then to put up the
22 next document.  And this one just is titled Criminal
23 Interrogation and Confessions.  I'm curious about
24 whether or not you recognize the cover of this book to
25 begin with.  Do you recognize that?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 214

1    A.    Maybe at one time it was presented to me
2  but no, I don't.
3    Q.    Okay.  I was just curious if this was a
4  textbook that was on the study materials list for your
5  detective examination?
6    A.    Criminal Interrogation and Confessions.  I
7  don't think a lot of the material was that deep.
8    Q.    Okay.
9    A.    But could have been, I don't know.
10    Q.    All right.  Let's look on the next page and
11  it is a portion of that book, Chapter 6 and it's about
12  "The read method of interrogation, nine steps to
13  effectiveness in criminal investigations."  Do you
14  remember that?
15    A.    It's doesn't look -- I probably read it at
16  one time in my career.
17    Q.    No.  That's fine.  I understand it's been a
18  while.  And do you remember whether or not there was
19  material either this or something like it that was in
20  the homicide investigation course you went to in
21  Dallas?
22    A.    Probably, yes, sir.
23    Q.    Okay.  All right.  Let me move on from that
24  screen share.  Any other sources or materials that you
25  remember that have been a part of your learning as a

Page 215

1  detective on how you're going to do your
2  responsibilities?
3    A.    Again, just ask seasoned detectives, you
4  know, not too sure I would ask somebody if I couldn't
5  find it in the book or in the policy.
6    Q.    So in the CAP unit after you joined the
7  Crimes Against Persons unit, did your investigators
8  have weekly or other regular meetings?
9    A.    We had daily meetings.  Yes, sir.
10    Q.    Okay.  And who were the people involved in
11  those daily meetings?
12    A.    The whole unit, sir, from lieutenants,
13  sergeants, down to all the detectives.
14    Q.    All right.  Tell the jury what would happen
15  in those daily meetings, the communications back and
16  forth?
17    A.    Every morning we'd sit down and have a
18  meeting and obviously, discuss anything going on
19  department-wise and/or maybe somebody had a call out
20  the night before or over the weekend and then we'd kind
21  of want to hear what's going on.  Hey, I had a call
22  out.  Tell us what happened.  Oh, it was a suicide,
23  this and that.  I'm still working the case.  Just stuff
24  like that.
25    Q.    Okay.  In those weekly meetings or those

Page 216

1  daily meetings that you said, were there participants
2  from outside the police department?
3    A.    Not those, not those particular meetings.
4    Q.    All right.  Were there assistant district
5  attorneys that attended meetings in the Crimes Against
6  Persons unit?
7    A.    Yes, sir, they did.
8    Q.    How often did that happen?
9    A.    During a major investigation, they, again,
10  after we're working it and it would be the detectives
11  that are working it, we'd have crime scene the ones
12  that are working it.  If it was a gang related, we'd
13  have gangs in there and then we'd have the DA, so
14  everybody had their own little input on what was going
15  on.
16    Q.    Okay.  Were the prosecutors giving you
17  feedback about how to carry out your activities in
18  accordance with the law?
19    A.    Yeah.  They would give their input.  We --
20  it's not -- they're not there to tell us what to do.
21  We're just telling them, this is what we've got, this
22  is what we're doing.  They'd be sitting there, okay,
23  that's good or hey, you know what, why don't you guys
24  go do this, why don't you do that yeah.
25    Q.    Would they give you feedback on what was

Page 217

1  necessary to get a warrant or some other kind of
2  judicial proceeding?
3    A.    Yes, sir.  Correct.  Uh-huh.
4    Q.    And what was the point of that feedback and
5  information?
6    A.    I don't exactly remember the details but it
7  would have been something like, hey, do you think I
8  have enough to go get a search warrant on this cell
9  phone or on this property.  No, I don't think you have
10  enough on that one.  Why don't you do this and then
11  come back and give me a holler see if we have enough.
12    Q.    So were you working with them to achieve
13  complains to the legal standards?
14    A.    Yes, sir.
15    Q.    In those meetings that you would attend,
16  did your colleagues talk about scenarios or what I
17  would call war stories or something that there were
18  lessons learned?
19    A.    Sure, they would.  They would talk about
20  maybe old cases that they worked that, you know, kind
21  of similar hey, you know, what I had something years
22  ago this is what happened, something to that extent.
23    Q.    Did you ever hear people share information
24  about how to make sure that the process was carried out
25  so that evidence was not excluded by the court?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 218

1    A.    I don't think I understand the question.

2    Q.    Well, you know, what a motion to suppress

3 is?

4    A.    Yes, sir, I do.

5    Q.    Tell the jury what a motion to suppress is?

6    A.    The defense is trying to keep certain

7 evidence out of -- out of the -- to be presented to the

8 jury or to the court.

9    Q.    Okay.  And have you testified in District

10 Court on motions to express in the past?

11    A.    Yes, sir, I have.

12    Q.    Prior to your work on this file, had you

13 ever had courts exclude any evidence that you had

14 developed?

15    A.    I've been to some suppression hearings but

16 from what I recall, none of my evidence was ever

17 withheld or not able to be presented.

18    Q.    Okay.  And the tell jury whether or not

19 your team was focused on carrying out the process

20 correctly so your evidence could be used.

21    A.    Yeah.  That's a standard.  That's the

22 minimum we needed to do.  We needed to do everything

23 also to make sure everything is presented.

24    Q.    Did you ever work with any outside agencies

25 other than the El Paso Police Department in your

Page 219

1 investigations?

2    A.    Yes, sir, I did.

3    Q.    What agencies would that be?

4    A.    Texas Rangers, other agencies, maybe they

5 had a suspect here in town, we were they'd tell me,

6 Hector, we have detectives coming in.  I need you to be

7 -- whatever they need, you help them out.  Maybe go

8 help them look for suspects, witnesses, or maybe their

9 guy was already in jail and I'd go help them set up an

10 interview for them, stuff like that.

11    Q.    All right.  What about the El Paso

12 Sheriff's Office?

13    A.    Gosh.  You know what, I can't recall if I

14 everyone worked with them to be honest with you, sir.

15 Probably did but I don't recall.

16    Q.    All right.  In your work with other

17 agencies, how did the investigative practices in the

18 Crimes Against Persons unit compare with the Texas

19 Rangers, for instance?

20    A.    Kind of about the same, sir.  We just had

21 more resources available to us than they did but yeah,

22 we worked hand-in-hand together, very thorough

23 investigators.

24    Q.    So I think you said earlier on, that you

25 had not fully read the plaintiff's third amended

Page 220

1 complaint in this case; is that correct?

2    A.    I don't know.  What exactly is that again,

3 sir?

4    Q.    The federal court pleading called the third

5 amended complaint that alleges what everybody did,

6 including yourself.

7    A.    I don't think I have, to be honest.  Maybe

8 it was.  It's been a few years but I don't recall ever

9 getting it to be honest.

10    Q.    All right.  Are you aware that they are

11 alleging that Daniel Villegas was coerced to give a

12 confession that was illegal?

13    A.    Yes, sir.

14    Q.    And that they claim that he was

15 psychologically or mentally or verbally coerced?

16    A.    I do remember hearing that part.  Yes, sir.

17    Q.    All right.  And are you aware that they

18 alleged that he was physically threatened with abuse?

19    A.    Yes, sir, I do recall that.

20    Q.    All right.  When you were in the Crimes

21 Against Persons unit, did you know whether or not that

22 kind of conduct was illegal under the law?

23    A.    Oh, yes, sir.

24    Q.    If you had known of any conduct of that

25 type would you have reported it?

Page 221

1    A.    Any type of people getting beat up for

2 confessions or civil rights violations, yes, sir I

3 would, mm-hmm.

4    Q.    Okay.  Because you had been asked questions

5 earlier about whether or not somebody would take an

6 officer aside and say, don't do this anymore or I'll

7 have to write you up, correct?

8    A.    Yes, sir.  I do, mm-hmm.

9    Q.    But the kinds of allegations that

10 Mr. Villegas is making are far more serious than that,

11 correct?

12    A.    Yes, sir.

13    Q.    And I think you actually said in that

14 earlier answer that if it was a civil rights complaint

15 or something like that, you'd have a duty to report it?

16    A.    Correct.  Yes, sir.

17    Q.    Do you have any reason to believe that

18 Chief Allen during the time you were in Crimes Against

19 Persons was aware of any of that kind of conduct

20 actually going on?

21    A.    No, sir.

22    Q.    Have you heard from anybody that the chief

23 knew about any of that kind of behavior and just let it

24 go?

25    A.    No, sir.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 995 of 1026
The Deposition of DETECTIVE ZOYK, taken 01, May 09, 2019

222..225

Page 222

```
 1      Q.    We looked earlier at an incident where
 2 there was an Internal Affairs investigation and you
 3 were called in to give a statement.  Do you recall that?
 4      A.    The one that was shown earlier?  Yes, sir,
 5 I do.
 6            MR. DENTON:  Yes.  Mr. Hilke, can you put
 7 that IAO4169 on the screen and share it for us?
 8            MR. HILKE:  Yes, sir.
 9            MR. DENTON:  Thank you, Counsel.  I believe
10 this is Exhibit 10; is that correct?
11            MR. HILKE:  This is Exhibit 10.
12            MR. DENTON:  I'm sorry?
13            MR. HILKE:  Yes, this is Exhibit 10.
14            MR. DENTON:  Thank you.  And could you go
15 to PDF Page 23?
16            MR. HILKE:  Yes.
17 BY MR. DENTON:
18      Q.    So I believe that this is the portion of
19 the statement that you looked at from your colleague at
20 the time, is it Alex Guerra?
21      A.    That's correct.  Yes, sir.
22      Q.    Look on Number 1 where the question is
23 asked and read that first sentence in response there?
24      A.    "Did you instruct the complaint's daughter
25 Jo Ann to return to her residence?  No.  The victim had
```

Page 223

```
 1 been staying with her husband for three days before she
 2 was convinced to report the assault.  I asked her where
 3 she was staying since the assault and she stated at her
 4 house at 6106 Tampa."
 5      Q.    Okay.  That's good.
 6      A.    Okay.
 7      Q.    That's good.  And so do you or do you not
 8 recall that this individual had actually been living
 9 there with her husband at the same location for three
10 days after it happened?
11      A.    Gosh, sir, it's been a while.  I mean, if
12 it's there, it happened but I don't recall.
13      Q.    Okay.  All right.  And then on the question
14 Number 2 down there where he's asked, "Did you instruct
15 her to pretend like nothing happened."  You said you
16 didn't say that, correct?
17      A.    Did I not -- according to what's written
18 here, yes.
19      Q.    Well, no.  This is his statement.  You
20 understand that?
21      A.    Okay.  I see where you're going.  Okay.
22 This is Alex Guerra's statement.
23      Q.    And Mr. Hilke had asked you earlier whether
24 or not from your question and answer whether or not you
25 said that and you didn't say that to her, correct?
```

Page 224

```
 1      A.    Yes.  Correct.
 2      Q.    But he admits that he did, right?
 3      A.    Yes.
 4      Q.    Okay.  All right.  Let's move to the next
 5 page on Page 24.  Move down a little farther.  I went
 6 too far.  Let's go back up, I'm sorry.  Further back up
 7 in that statement.  I think it's actually at the top.
 8 Here we go it's Number 4.  Were you involved in going
 9 back to -- what is CRCC?
10      A.    Central Regional Command Center.
11      Q.    All right.  Were you involved in going back
12 and working that paperwork up?
13      A.    I guess so if that's what it says I did,
14 yes, sir.
15      Q.    All right.  Now let's go to Page 27.  Let's
16 look a little bit further down on that page and this is
17 your statement.  That's where you are -- you say you
18 did not instruct her to do those things in Number 1
19 there at the bottom, correct?
20      A.    Return to her residence nor --
21      Q.    All right. I'm sorry.  I didn't mean to
22 interrupt you.  Go ahead.
23      A.    I was reading out loud.  The "No.  Did I
24 hear my partner instruct" -- okay.  Yes.  Mm-hmm.
25      Q.    Okay.  Look just above that and read the
```

Page 225

```
 1 sentence, read the paragraph there that says, "Both me
 2 and Officer Guerra"?
 3      A.    "Both me and Officer Guerra returned to
 4 Central and completed all necessary paperwork.  While
 5 at the station, put a 'shots fired' call.  Officers
 6 made it out to the call at Paisano.  The call at
 7 Paisano turned out to be a homicide, both me and my
 8 partner were out on Paisano until 4:50."
 9      Q.    So did that intervening call prevent you
10 from going back to her location to try to serve the
11 warrant on her husband?
12      A.    Sounds like it did.  Yes, sir.
13      Q.    All right.  All right.
14            MR. DENTON:  You can stop the screen share
15 on that.  Thank you, Counsel.
16 BY MR. DENTON:
17      Q.    In these meetings that you would have in
18 the unit either the daily meetings or the meetings that
19 you would have with the assistant district attorneys,
20 did you ever review or talk about rulings that the
21 courts had made in other investigations coming out of
22 the Crimes Against Persons unit?
23      A.    No, not with -- not formally where they
24 come over and, like, hey, we need to go down there and
25 talk to you guys, what's going on.  I know there was a
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 996 of 1026
The Deposition of HECTOR LOYA, taken on May 09, 2022
226..229

Page 226

1  handful of when we'd have what we'd call it's our shift
2  training day that we'd get updates and stuff like that
3  away from the office.  We'd go shooting.  We'd have
4  maybe a one hour, two hours where the DAs would come
5  over and give us some type of a training, whether it's
6  search warrants, interviews, stuff like that, yes.
7       Q.    So they would tell you about new developments
8  and how to evolve with the times to get it right?
9       A.    That's correct.  Yes, sir, or just new
10 stuff that was coming through the -- starting in
11 September the new changes and penal code and yeah,
12 stuff like that.  They would -- all the new updates.
13      Q.    Tell the jury the names of the supervisors
14 that you had while you were in the Crime Against
15 Persons unit.  You already mentioned a Sergeant Kozak;
16 is that correct?
17      A.    That's correct.  Yes, sir.  It would be
18 Sergeant Al Cardenas, Rick Vera and Lieutenant Reggie
19 Molton.
20      Q.    Very good.  When you were called to
21 Internal Affairs on that matter that we looked at or
22 any others, did you take it seriously?
23      A.    Yes, sir.
24      Q.    Did you believe that the investigators were
25 taking it seriously?

Page 227

1       A.    Yes, sir, I did.
2       Q.    Was it your experience that they looked at
3  the weeds, down in the weeds, and the details to find
4  out whether or not you or your colleagues were
5  following the rules?
6       A.    Yes, sir, I did.
7             MR. DENTON:  Thank you, Detective.  I'll
8  pass the witness.
9             MR. HILKE:  I do have a few questions.  Do
10 other counsel have follow-up questions?
11            MR. MARTINEZ:  I don't.
12            THE WITNESS:  Can I take a five-minute
13 break to make a quick phone call?  Would it be okay?
14            MR. HILKE:  That's good with me.
15            THE WITNESS:  I just need to make some
16 child care arrangements real quick.
17            ONLINE VIDEO TECH:  We are off the record.
18 The time is 3:55.
19            (Break from 3:55 p.m. until 3:58 p.m.)
20            ONLINE VIDEO TECH:  We are back on the back
21 on the record for the deposition of Detective Hector
22 Loya being conducted by videoconference.  My name is
23 Sydney Little.  Today is May 9th, 2022, and the current
24 time is 3:58 p.m.
25                  RE-EXAMINATION

Page 228

1  BY MR. HILKE:
2       Q.    Detective, I have just a couple of
3  follow-up questions for you.  I am going to show you
4  again Exhibit 10.  Do you see this document on your
5  screen, Detective Loya?
6       A.    Yes, sir, I do.
7       Q.    And this is Page 27 on -- it's you being
8  questioned about the Internal Affairs matter with
9  Mrs. Montelongo; is that right?
10      A.    Yes, sir.
11      Q.    This is a typed -- your answers are typed
12 here, correct?
13      A.    Yes, sir, they are.
14      Q.    Who typed these answers?
15      A.    It depends, sir.  I've been to Internal
16 Affairs where we go over the questions and then they
17 tell me, okay, sit here and type out your statement or
18 I've had investigators where they're actually typing it
19 out for me.
20      Q.    Okay.  So you don't remember here if you
21 typed it or if the investigators did?
22      A.    I don't recall, sir.
23      Q.    Okay.
24            MR. HILKE:  I am going to stop sharing that
25 now.

Page 229

1             And could I actually ask could we put up
2  the Exhibit 2 that Lowell used for a moment, please?
3             ONLINE VIDEO TECH:  Yes, one moment.
4             MR. HILKE:  Thank you.  Okay, great.  And
5  you can keep it there, please.
6  BY MR. HILKE:
7       Q.    Now, Mr. -- Detective Loya, I'm now showing
8  you what Lowell showed you as Exhibit 2.  Are these the
9  Follow-up Investigation Responsibilities and Case
10 Documentation?
11      A.    Yes, sir.
12      Q.    And this applies specifically for -- I'm
13 sorry, for follow-up investigations; is that right?
14      A.    Yes, sir.
15      Q.    Okay.  And the work you did on the 2014
16 murders, was that a follow-up investigation?
17      A.    Hmm, that's a tricky word.  The way I
18 defined it, no.  I guess, it was just, go get some
19 statements and that was about it.
20      Q.    Got it.  And this is a long list of
21 responsibilities, isn't it?
22      A.    Yes, sir.
23      Q.    And in theory, you could spend months and
24 months on any case you worked on, couldn't you?
25      A.    I guess you could.  Yes, sir.



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 230

1    Q.    And did your supervisor tell you will that
2  the person?
3            THE REPORTER:  Say that again.
4            MR. HILKE:  I'm sorry, sir.
5  BY MR. HILKE:
6    Q.    Did your supervisors ever tell you you're
7  not doing enough on the 2014 Electric Street -- I'm
8  sorry, on your 2014 work into the Electric Street
9  murders?
10   A.    No, sir, never.
11   Q.    So was it your understanding that your work
12  was consistent with your responsibilities here?
13   A.    On that particular case?
14   Q.    Yes.
15   A.    No, sir.
16   Q.    It was not consistent with that case with
17  responsibilities here?
18   A.    Everything that's on this list that I do in
19  2014 on that case, no.
20   Q.    Okay.  And was that a -- did you think
21  there was anything wrong with the fact that you didn't
22  do all these things on the -- on your investigation
23  into the Electric Street murders?
24   A.    I didn't think it was -- there was nothing
25  wrong with it, it just wasn't a normal investigation

Page 231

1  that I get the case, I worked it.  I follow who did it,
2  I make an arrest, get a confession.  Yeah.  It was just
3  not -- it wasn't a normal case and the years that I was
4  there, this is the first and last time I ever did
5  something like this.
6    Q.    And if you had taken more initiative, if
7  you had said, I'm going to get to the bottom of these
8  different leads and threads in this case, how do you
9  think -- what response would you have gotten to that?
10   A.    I dont know, sir.  I never got a chance to
11  say to ask or request that.
12   Q.    Okay.  But no one ever -- no one ever told
13  you that you needed to do anything more than what you
14  actually did on the case?
15   A.    No, sir, hmm-mm.
16   Q.    And were you worried about getting in
17  trouble for that?
18   A.    Not really, no, sir.  Just following orders.
19   Q.    I am going to stop sharing this now.  Oh,
20  I'm sorry.  Thank you.  So you mentioned that your
21  first mentor at CAP was actually Detective Armendariz;
22  is that right?
23   A.    Correct.  Yes, sir.
24   Q.    He's the same one you worked with on the
25  Electric Street murders?

Page 232

1    A.    Yes, sir.
2    Q.    What kind of mentoring did you -- what --
3  what did he do as your mentor at CAP?
4    A.    At CAP?  Kind of the same thing, kind of
5  guided me because I mean, the type of cases I was
6  working at CID are completely different than what I was
7  doing at -- CAP, yeah, okay.  This is -- what do I do
8  here?  Well, you've got to do this or that, and I think
9  our first homicide case, I kind of shadowed him.  Okay.
10  This is what we're going to do.  Now, we're going to
11  talk to this person.  This is what we usually do, come
12  to these meetings and then we've got to do this, just
13  mentoring me, walking me through.
14   Q.    And did you respect and admire him?
15   A.    Very much, yes, sir.
16   Q.    Do you trust his judgment?
17   A.    I do, sir.
18   Q.    And did you look up to him?
19   A.    Oh, yeah, I did.  He's a lot younger than
20  me but really smart and yeah, he knows his stuff.
21   Q.    Do you remember you testified about a memo
22  that was circulated about scanning all notes; is that
23  right?
24   A.    Yes, sir.
25   Q.    Were you asked to take a test on that memo?

Page 233

1    A.    I don't recall.
2    Q.    Did you go online -- did you do any -- were
3  you asked to do anything to confirm that you had
4  understood that memo?
5    A.    Again, I don't recall.  I think at the
6  beginning, they were just emails and then eventually
7  they turned into maybe the last year or two where we
8  actually, we go onto a different website and you have
9  to check it off and take a little quick quiz on it that
10  you understood it and you acknowledge it.
11   Q.    And when you say the last -- when did you
12  start having to go to a website to do that?
13   A.    Maybe the last couple of years, two or
14  three years.  I may be way off but that's what I'm
15  thinking.
16           MR. HILKE:  I have no further questions.
17           MR. DENTON:  Nothing further.
18           MR. BRITTAIN:  Nothing from Eric Brittain.
19           MR. MARTINEZ:  Nothing here.
20           MR. DARNELL:  We will reserve our questions
21  for trial.
22           ONLINE VIDEO TECH:  All right.  Go ahead
23  and get us off the record.  The time is 4:06 p.m.
24                    -o0o-
25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 234

CHANGES AND SIGNATURE

1

2  WITNESS: HECTOR J. LOYA

3  DATE: May 9, 2022

4  Page/Line   Change                Reason

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

Page 235

1        I, HECTOR J. LOYA, have read the foregoing

2  deposition and hereby affix my signature that same is

3  true and correct, except as noted above.

4

5        _____

              HECTOR J. LOYA

6

7  STATE OF _____)

8  COUNTY OF _____)

9

10       Before me _____ on this day

11 personally appeared HECTOR J. LOYA, known to me (or

12 proved to me on the oath of _____ or

13 through _____ (description of identity card

14 or other document)) to be the person whose name is

15 subscribed to the foregoing instrument and acknowledged

16 to me that he executed the same for the purposes and

17 consideration therein expressed.

18       Given under my hand and seal of office this

19 _____ day of _____, _____.

20

21       _____

              Notary Public in and for the

22            State of _____

23

24

25

Page 236

REPORTER'S CERTIFICATION

1

2       DEPOSITION OF HECTOR J. LOYA

3            May 9, 2022

4       I, Joseph D. Hendrick, Notary Public and

5  Certified Shorthand Reporter in the State of Texas,

6  hereby certify to the following:

7       That the Witness, HECTOR J. LOYA, was duly

8  sworn by the officer and that the transcript of the

9  oral deposition is a true record of the testimony given

10 by the witness;

11      I further certify that, pursuant to FRCP

12 Rule 30(f)(1), the signature of the deponent:

13        X    was requested by the deponent or

14 a party before the completion of the deposition and is

15 to be returned within 30 days from date of receipt of

16 the transcript;

17        _____ was not requested by the

18 deponent or a party before the completion of the

19 deposition;

20      I further certify that the amount of time

21 used by each party is as follows:

22      Wally Hilke - 04:34:32

23      Quinn K. Rallins - 00:00:00

24      Lowell F. Denton - 00:33:00

25      Jeep Darnell - 00:00:00

Page 237

1  Jim Darnell - 00:00:00

2  Cris Estrada - 00:00:00

3  Andrés E. Almanzán - 00:00:00

4  Eric M. Brittain - 00:00:00

5  James A. Martinez - 00:00:00

6       I further certify that I am neither counsel

7  for, related to, nor employed by any of the parties or

8  attorneys in the action in which this proceeding was

9  taken;

10      Further, I am not a relative or employee of

11 any attorney of record, nor am I financially or

12 otherwise interested in the outcome of the action.

13      Subscribed and sworn to on this date:

14 May 23, 2022.

15

16

17

18

19

20

21

22 Joseph D. Hendrick

   Texas CSR #947

23 For Kentuckiana Court Reporters

   P.O. Box 3983

24 Louisville, KY 40201

   Telephone: (502) 589-2273

25 Fax: (502) 584-0119

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 999 of 1026
The Deposition of HECTOR LOYA, taken on May 03, 2022

238

| Exhibits |

**Exhibit 2_
Loya** 4:10
110:9 112:19
124:6 194:15
229:2,8

**Exhibit 6_
Loya** 4:11
121:11

**Exhibit 10_
Loya** 4:13
161:13,16
164:16 169:13
222:10,11,13
228:4

**Exhibit 11_
Loya** 4:14
178:10 183:9

**Exhibit 13_
Loya** 4:15
192:13,18

**Exhibit 14_
Loya** 4:16

**Exhibit 15_
Loya** 4:18

**Exhibit 16_
Loya** 4:20

| $ |

**$5,000** 199:22

**$8,000** 199:13

| 0 |

**0013079**
210:20

**0013113**
210:20

**0015388**
211:22

**0100** 165:23

| 1 |

**1** 120:17 121:18
124:7 222:22
224:18

**10** 26:3 100:22
160:22 161:13,
16 164:16
169:13 222:10,
11,13 228:4

**100** 7:21 64:2

**101** 5:15

**10:05** 39:3

**10:06** 39:4

**10:29** 39:4

**10:30** 39:9

**10:36** 43:10

**10:39** 43:11

**10:40** 43:15

**11** 121:20
178:10 183:9

**11:32** 83:12,13

**11:41** 83:13,18

**12,000** 200:24

**12:30** 164:22,
24

**12:31** 120:20,
21

**13** 192:13,18

**15** 10:3 108:15,
17 120:11
121:23 178:14
183:12

**150** 200:20

**150,000** 199:25

**15403** 212:1

**16** 13:8,15

**17** 184:3

**1710** 111:16

**18** 161:16

**180** 198:16,17

**1993** 34:22
107:10 118:22
127:4,8 141:20

**1994** 178:6

**1:00** 165:3

**1:05** 120:21

**1:06** 120:25

**1:40** 143:25

**1st** 143:25

| 2 |

**2** 19:20 110:9
112:19 124:6
145:23 169:16
171:8 184:23
194:15 223:14
229:2,8

**20** 19:9 183:6

**2001** 13:15

**2004** 161:22

**2011** 191:15
202:1,9

**2011-2012**
16:6

**2012** 191:15

**2013** 17:17,19,
20 36:10 40:24

**2014** 35:1
70:24 71:23
94:24 95:4
110:16 113:5
119:8,25
121:11 123:17
141:21 176:9
178:14 183:12
184:3 187:16,
21 211:7
229:15 230:7,8,
19

**2016** 20:21

**2022** 5:16
15:19 39:8
43:15 83:17
120:25 167:11

**169:2 195:23**
227:23

**21** 144:10 162:1

**22** 164:1,6,7,9,
16

**23** 222:15

**24** 224:5

**27** 108:12
123:17 165:11
224:15 228:7

**28** 165:19
169:13

**280** 198:21

**2:08** 167:6,7

**2:19** 167:7,11

**2:21** 168:22,23

**2:30** 168:23
169:3

| 3 |

**3** 165:20,21
170:9 171:1,5,9

**3/24/77** 106:9

**30** 26:7 192:1

**310** 7:25

**313** 162:9

**32** 70:22

**32-inch** 128:18

**38** 184:16

**3:06** 195:18,19

**3:14** 195:19,24

**3:15-cv-386**
5:22

**3:55** 227:18,19

**3:58** 227:19,24

| 4 |

**4** 100:11 105:23
106:1 110:16
224:8

**40** 145:23

**40202** 5:16

**4:06** 233:23

**4:50** 225:8

**4th** 106:18

| 5 |

**5-10** 95:14

**5-minute** 95:14

**50** 26:8

**5:11** 106:18

| 6 |

**6** 110:13 121:11
214:11

**60,000** 199:7

**6106** 223:4

| 7 |

**7** 106:6

**70's** 72:3

**730** 5:15

**7th** 161:22

| 8 |

**8** 143:22
192:18,22

**80's** 72:3

| 9 |

**9** 39:8 43:15
83:17 120:25
169:2

**911** 106:17

**93** 182:8

**93-100037**
107:8

**9:14** 5:17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 1000 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2002

239

**9:27** 15:14,15

**9:34** 15:15,20

**9th** 5:16 15:19
167:11 195:23
227:23

———— **A** ————

**a.m.** 5:17
15:14,15,20
39:4,9 43:11
83:13,18 165:3

**ability** 11:15
12:6

**absolutely**
59:18 80:14
105:3

**abuse** 220:18

**abusing** 156:3

**academy**
37:23 92:18,19
140:10 204:7,8,
9,11,12,19
205:1 207:13

**access** 97:7
128:25 129:4

**accidents** 9:24

**accordance**
216:18

**account** 200:2,
3,16

**accountant**
199:16

**accounts**
200:17,19

**accuracy** 56:6

**accurate** 12:12
57:11

**accurately**
78:14,15

**accused**
117:20 141:2,
10 147:12
157:23 162:24
172:18,21

**accusing**
127:5,10
151:10

**achieve**
217:12

**acknowledge**
233:10

**Acosta** 150:1,
2,12,21

**acronym**
212:8

**action** 159:16

**actively**
188:14,21

**activities**
216:17

**actual** 48:9
81:12 157:12
207:8 210:17

**ADA** 21:24
85:13,15 113:6,
9 115:3,6,10
119:19 122:21,
23 180:10
182:8,15 183:2
188:25 196:15
197:7

**ADA's** 114:2

**add** 198:10

**adding** 52:22

**additional**
48:4 203:6
205:18 213:14

**address**
134:14 162:15,
17,18 196:3,5

**addressed**
30:1 183:14

**admire** 232:14

**admits** 224:2

**admitted**
156:5,17

**adult** 157:13

**advantage**
73:24

**advised**
104:18 111:5

**advocate**
173:9

**Affairs** 87:4,15,
18 88:4,11,14,
18 89:2,8,9,14
140:24 146:20
149:3 157:21
158:10 159:7
161:6 162:22
222:2 226:21
228:8,16

**affect** 11:9,11,
15 12:5 126:18,
21 153:5,9

**affected**
182:25

**affirm** 8:16

**afraid** 13:20
25:19

**age** 162:2

**agencies**
218:24 219:3,4,
17

**agent** 56:7,8,
12,18 176:7,8,
11,14,15,17,21,
25 177:1

**aggravated**
69:25

**agree** 8:7

**agreed** 140:1

**agreement**
43:17

**ahead** 42:15
90:15 120:6
123:25 139:7
144:9 156:12
164:5 224:22
233:22

**ahold** 142:2

**Alejandro**
160:8,9 164:1,
21

**Alex** 160:20,25
222:20 223:22

**Alfonso** 36:5,6

**Alfredo** 122:4
123:21

**alive** 116:5

**allegations**
221:9

**alleged** 220:18

**alleges** 220:5

**alleging**
220:11

**Allen** 171:14,
21 221:18

**allowed** 21:4
23:23 141:9

**Almanzan**
6:21 7:7

**Altura** 109:23

**amended**
219:25 220:5

**analyze** 212:22
213:1

**and/or** 212:6
215:19

**Andy** 7:7

**Ann** 162:1
222:25

**answers**
10:12,17 74:24
228:11,14

**anticipate**
108:20

**Antonio** 7:14
186:20

**anymore** 19:3
25:19 26:18
29:14 221:6

**apologies**
42:11 170:17

**apologize** 5:7
7:23 156:9

**apologized**
24:7,13

**apparently**
182:19

**appearance**
5:24

**appearing** 7:8,
13

**appears** 164:1

**applicable**
213:19

**applied** 203:10
210:14

**applies** 229:12

**apprehend**
166:1 170:21

**approach**
44:11 101:12

**approached**
173:13

**approve** 47:12
52:3 129:17,18
131:7 132:8,14

**approved**
47:11

**approximate**
200:18

**Approximately**
25:11

**April** 144:17
178:14 183:12
211:7

**Arbogast** 38:8,
12

**area** 17:5,6
68:6,18 150:21

**areas** 147:22

**argument**
36:19

**arguments**
36:20

**arise** 23:16

**Armendariz**
85:12 98:3,6,16
121:17 122:17
123:19 128:13
141:21 142:8
145:18 146:11
150:3 151:5,24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1001 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2009
240

152:15,16
174:9 175:19,
24 176:4 177:2,
16 178:20
179:5 185:19
186:1 187:1
189:25 191:21
194:6 195:5
196:24 209:5
231:21

**Armendariz's**
192:15

**arrangements**
193:5 227:16

**arrest** 41:23
42:4,5 69:10,23
96:5 104:14,19
106:23 113:25
165:23 166:2
231:2

**arrested**
106:24 107:1
166:3

**arresting**
43:22 44:7 96:2

**arrive** 62:23

**Ascarate**
162:9

**asks** 149:4

**ass** 24:1 157:9,
10,17

**assault** 70:1
162:20 223:2,3

**assaulted**
161:7 162:2

**assaults**
16:13,24 70:1

**assets** 200:9
201:4

**assign** 129:14

**assigned**
13:24 18:5
26:11 30:16
31:25 32:6,18,
20 130:11,13
160:7 176:16,
21 205:2

**assigning**
131:13

**assignment**
13:9,23 15:2,24

**assignments**
18:22

**assist** 139:16,
17

**assistance**
111:1

**assistant**
137:14 216:4
225:19

**assisted** 94:23
97:1 110:21
160:12,23

**association**
140:22

**assume** 10:25
131:12

**assuming**
115:8

**attach** 64:21
65:9

**attempt** 166:1
170:21

**attend** 67:9
217:15

**attended** 216:5

**attending**
5:24,25 7:3,5

**attention**
154:20 164:19
184:2 188:2

**attorney** 7:22
14:18 33:6,20
113:4 115:8
124:22 142:18
178:14 183:20,
24 187:16

**attorney's**
123:20 183:12

**attorneys** 7:2
23:23 216:5
225:19

**audio** 6:4 12:1
33:17,19,21,23
34:3 42:20,24
44:1,2 47:25
49:10 97:7
105:12,14,15
142:4,21
143:24,25
144:12,13
148:5 149:24
167:14 168:3,
10 178:6 196:1

**autopsy**
131:22

**avoid** 80:1,4
82:23

**avoiding** 43:22
44:7,8

**aware** 28:10
34:20 89:24,25
96:1 104:3,6
118:7 124:17
127:3,8,13
152:22 166:6
172:13 180:6
181:6,12,17
182:24 190:5
195:4,7,8,10
220:10,17
221:19

**awhile** 144:17

**awkward**
144:6,19

———————

**B**

———————

**back** 15:16
21:1,7,8,16,23,
25 22:15,23
27:6,7 31:23
39:5 43:12
47:25 49:8
51:5,13,14
59:11 60:16
64:16 65:11,12
81:24 82:3,9
83:14 87:23
94:24 95:4,21
100:23 103:10,
17 108:20
109:9,10,25
110:3 111:11

115:1,2 118:22
120:22 127:8
130:2 135:11,
13 140:21
141:20,25
145:14 147:21
150:21 154:17
164:24 165:22
166:10,24
167:8,12
168:24 169:6
171:24 172:6,9
176:25 180:4
182:8,22
186:20 188:12
191:15 195:20
210:10 215:15
217:11 224:6,9,
11 225:10
227:20

**backs** 92:5

**bad** 42:21
90:23 91:1
133:22 146:8,
12 148:4 149:5,
6

**bailiff** 36:22

**balance**
199:11

**ball** 180:20

**ballpark** 199:4

**bank** 199:19,23

**banker** 14:17

**bar** 140:2

**based** 26:14
104:19 149:9,
12 158:20

**basic** 92:19

**basis** 70:11

**Bates** 167:23
211:25

**beat** 221:1

**Beatrice**
150:3,14
152:22 153:2

**Beatrice's**
150:7 151:12

**begin** 8:23
209:24 213:25

**beginning**
31:24 98:2
105:25 143:23
176:2 189:8
233:6

**behalf** 7:17
172:1

**behavior**
221:23

**belief** 205:22

**bell** 70:24
161:10 181:1

**Bellows** 7:18
38:4,5

**bet** 111:13

**Betty** 152:11,
20 191:25

**bibliography**
203:1

**bicycles** 16:13

**big** 34:16 36:16
70:2,18 88:1
98:13 100:11
114:4 118:2
128:18 145:11,
20 157:21
189:3,4,11,12
199:6

**biggest** 173:9

**binders** 34:9,
16 176:19

**birth** 106:8

**birthday**
143:16,17
144:17

**bit** 16:14,25
25:15 32:24
42:8,18 55:8
66:4 71:16
81:15 113:19
114:6 161:25
193:7,11,17
197:21 202:8,
22 206:19
224:16

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1002 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2002

241

blank 205:14

board 159:15

bond 115:25
189:9

Bonneau
184:7,8,11

book 145:16
207:8 209:15
213:24 214:11
215:5

books 66:23
207:4

bottom 145:17
153:19 184:23,
24 193:18
194:2 224:19
231:7

bought 156:4
198:21

boxes 177:23

boyfriend
162:2

brain 155:5

brass 206:6

break 11:4,6
15:15 39:4
83:7,8,13
108:21 120:8,
11,21 167:2,7
168:23 195:15,
19 227:13,19

breaking 12:1

breaks 11:3
97:19,23

Brenda 143:20
144:15

briefly 38:13

bring 96:4,8,10
145:14 179:21
207:21 211:15

Brittain 7:17
8:11 233:18

bro 145:3,15,21

broadly 71:1

broke 173:1
181:9

broken 28:1

brother 37:21
144:3,14

brother-in-law
122:8 147:3,9

brought 21:1
95:24 102:15
104:10 134:16,
19 151:21
154:19 156:1,
14

building 85:20,
24 86:3,8
101:25

bumped
140:11

bunch 34:9
66:23 137:11
140:2 202:10
207:3

bureau 208:19

burning 156:6

business
164:24

bust 147:5,7

busy 33:1
73:11 190:17

buy 159:5

bye 20:12

—————
—————

C

CALEA 212:8,
12

call 49:14
88:11,13,16
91:11 93:12,13
139:25 157:20
164:19 184:1
192:6 199:17
204:2 215:19,
21 217:17
225:5,6,9 226:1
227:13

called 15:3
21:24 22:14
23:24 24:19
52:3 65:13
95:16 99:14
100:16 101:4
155:9 173:13
220:4 222:3
226:20

calling 68:17,
21

calls 14:2
133:11 139:17
160:12,24

calm 186:18

camaraderie
153:22

camera 8:3

cameras 97:2

canvas 68:14
131:21

canvassed
68:4

canvassing
131:20

CAP 18:17
39:14,19 48:12
70:17 85:11
86:23 134:11
137:12 174:15
175:15 215:6
231:21 232:3,4,
7

capture 43:16

car 9:24 68:6,
16 160:14
198:22 199:6

card 200:21

Cardenas
226:18

cards 200:24
201:2

care 154:20
155:17 157:15
190:17,22
227:16

career 14:22
31:25 54:10
81:14 90:3
154:17 157:20
212:10 214:16

careful 23:10
77:15,17

carefully 57:10

Carlos 7:8,9
37:4,6 104:4

carried 30:11
217:24

carry 35:17,23
200:21 216:17

carrying 36:2
218:19

cars 172:8
198:24,25
199:5,9

cartel 147:3
148:3,9

cartels 141:11

case 5:21 8:17
20:20,21,25
21:2 25:21
27:9,11 33:12
34:9,18 35:19
36:16 37:9,12
46:4,7,15 47:4
52:2,3,6 54:9
55:24 56:7,8,
12,14,18,23
59:16 61:25
63:9 64:21,23
65:5 67:13
69:8,13,22
70:2,3,6 82:17
83:23 85:5,9,10
92:24 93:16
94:16 95:7,11,
20 98:11 99:4
100:20 101:2
107:7,10,14
110:23 112:2
113:5,8,21
114:3,21
115:21 116:1,
23 118:2,6,25
119:12,18,23
120:1 121:11

career 14:22
[...]

122:4,10 129:1,
6,14,17 130:1,
24 131:17,25
132:1,2,13,16
133:22 135:3,4,
7 136:2,3,22
138:18 144:1
145:2,3 146:11
151:2 163:9
164:3 175:24
176:1,7,8,11,
14,15,16,21,25
177:1,13,23
179:1,13 182:5,
14 183:21
188:22 189:1,6,
10,12,23
190:25 194:17
197:8,24 202:4
212:3 213:18
215:23 220:1
229:9,24
230:13,16,19
231:1,3,8,14
232:9

caseload 26:5
69:15

cases 16:11
20:15 25:25
26:2,5,8 35:8
46:2 47:1 65:11
69:15,18,20,25
70:8,10 101:3,
4,5 113:12,17
129:13 131:14
133:2 136:9,20
153:20 162:20
174:16,21,25
179:22 181:25
188:13 189:18
190:19 217:20
232:5

cash 198:9
199:14,22

Castaneda
32:12

caused 20:17
86:23

Celia 185:10,21
186:5 191:10,
12,22

cell 217:8



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

center 31:12
224:10

central 13:24,
25 14:5 15:4,25
16:3,5 106:14,
17 139:6
140:25 162:17
174:14 208:21
224:10 225:4

certified
212:11

certify 210:2

cetera 45:7
167:24 172:8

chain 88:19,20,
21,23 89:3,9,
12,19 135:19,
21 137:10

chair 102:22
103:3,8,16

challenge
84:10

chance 51:3
59:13 102:3
231:10

change 126:24
136:22 153:11
209:7

changed 65:12

changing
60:20

chapter 212:2
214:11

charge 131:20,
21,23 176:18

charged
107:12 108:3
145:5

charges 136:9,
19

cheaper
207:21

check 102:18
177:23 201:11
209:19 233:9

checking 52:7

57:10 177:22

chewed 24:1

chewing
157:9,10

chewings
157:18

Chicago 7:4,6

chief 88:24
89:5 137:15,16,
17,18,19
171:14,18
221:18,22

chief's 47:11

child 227:16

choose 127:25

chooses
145:12

chronological
50:18

chronologicall
y 197:2

chunk 67:25
68:7 100:11

CID 15:4 16:3,
5,8,18 174:14
208:21 232:6

circulated
47:3,13 55:15
232:22

circumstance
s 49:16

citizens
204:17

city 5:19 7:13
137:21 168:1,9,
11,13 201:21

City's 168:8

civil 91:2
155:1,25 221:2,
14

civilians
156:16 159:20,
23

claim 220:14

clarified
182:10

clarify 10:21
21:25 22:16,24
40:11 42:18
72:22,24
135:10 152:13
183:4 201:9

class 40:14

classes 40:16

classmates
37:22

clear 22:1,2,3
74:3 117:19

clearer 42:8

client 168:17

clients 34:20

close 43:5
106:17 133:2,
22

closer 42:10
43:1,4

closing 36:19,
20

clue 68:3 97:11
98:9 187:20

code 203:4,5
226:11

coerced
220:11,15

Collar 18:9,10,
11,23 25:10
30:15 31:3

colleague 7:4
222:19

colleagues
211:13 217:16
227:4

college 206:25
208:14

Colorado
141:18 191:12,
17

comfortable
19:5 88:3

103:15

command
88:19,20,21
89:3,9,19
135:20,22
137:10 154:3,
14 207:15
224:10

commander
37:25 137:11,
13,14

commanders
88:23

commit 87:7
145:6

commitment
166:6

committed
116:11 117:21,
23 125:3
147:16 151:10
182:20

committing
87:4 90:20
127:6,10

common 52:17
93:1 107:23
134:19 210:10

communicate
161:2

communicatio
ns 215:15

Community
206:25

company
173:23

compare
175:15 219:18

compensate
142:3

compete
203:16

complainant
170:2

complainant's
170:12,16

complains
217:13

complaint
37:9,11 87:16
158:10,13,20
159:12 161:7
162:24 163:3,5,
10,18 165:24
166:22 220:1,5
221:14

complaint's
170:20 222:24

complaints
158:6

completed
51:24 210:2
225:4

completely
232:6

Complied 8:15

computer
35:15 44:3
48:13 64:19
84:19 128:21,
23

con 30:20 78:8

concerned
26:14 80:11

concerns
104:3,6

conditions
11:9,14 12:5

conduct
147:12 160:1
213:6 220:22,
24 221:19

conducted
15:18 39:7
43:13 83:16
118:19 120:24
151:25 167:10
169:1 177:12
195:22 227:22

conducting
40:16 47:22

conference
5:18 39:7
115:11 128:17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1004 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2009

243

207:15

**confession**
69:11 78:8,9
220:12 231:2

**confessions**
213:23 214:6
221:2

**confirm** 108:20
233:3

**conflict** 20:18
23:12,16 25:13
27:2 172:13

**conflicts** 24:24
25:3

**confused** 27:4

**confusing**
42:17

**connected**
148:9

**connection**
141:14,16
142:15

**consequences**
91:18,19

**considered**
133:4

**consistent**
81:10 212:23
230:12,16

**consistently**
31:15

**constant** 82:9

**construction**
173:23

**consult** 97:16

**contact** 109:16
111:24 115:9
147:20

**contemporane**
**ous** 47:18

**context** 78:8

**continue** 6:18
50:5

**continued**
98:7 144:12

**continuing**
206:20

**contradict**
60:10

**contradiction**
61:16

**contradicts**
60:13

**contribute**
52:12,18

**contributed**
52:22

**contributing**
53:2 114:11

**convened** 5:17

**Convention**
31:12

**conver** 117:13

**conversation**
21:20 22:7,13
23:4,6 24:12
49:17,24 50:2,9
57:14 82:24
83:3 111:21
116:10 144:2
145:1,25
151:19 155:10
156:14 168:4
181:5 186:13,
17 187:6,25

**conversations**
113:16 155:13

**convict** 44:25
134:5,7

**convicted**
134:15,23

**conviction**
133:5,18

**convinced**
223:2

**copies** 35:10,
14

**copy** 35:16

**correct** 11:23
14:9 17:3 22:20

35:25 48:17
50:10 51:16
54:16 55:12
57:24 58:4
67:10 70:9
74:16 76:1,6
77:8 80:24
81:24 82:2
84:22 85:17
91:9 94:9
96:11,16 97:7
98:23 103:1
110:18 118:5
125:1,18,23
135:5 150:5,15
155:11 161:24
163:16 164:7
165:18 166:8
167:1 169:24
170:6,13,17
171:16 175:11
176:6 177:25
185:15,24
189:24 196:4
200:8,17 201:7,
23 202:5,17,21
203:11,12,15
210:3 212:15,
24 213:7,12,15,
16 217:3 220:1
221:7,11,16
222:10,21
223:16,25
224:1,19 226:9,
16,17 228:12
231:23

**Correction**
85:4

**correctly**
133:20 156:24
196:5 218:20

**corroborate**
83:20

**corroborating**
84:6,14 126:11

**cost** 128:4

**counsel** 6:1
43:16 158:17
206:20 222:9
225:15 227:10

**counseling**
157:17 158:1,

15

**count** 21:18

**County** 36:15

**couple** 18:22
20:25 60:15
97:18 98:3,4
102:14 105:7
156:15 163:8
192:2 193:9
198:12,19
228:2 233:13

**courses** 40:16
67:7 208:6,9

**court** 5:13,14,
20 8:13 10:5,6,
10 12:18 22:18
23:6,9,21,25
27:6,7 54:18
73:20 119:20
217:25 218:8,
10 220:4

**Courthouse**
36:15

**courtroom**
23:7 24:9 27:9

**courts** 218:13
225:21

**cousins** 148:1

**cover** 211:23
213:24

**covered**
197:20

**Craig** 171:14

**crashed** 13:17

**crazy** 104:20
147:10 148:4
190:25

**CRCC** 224:9

**create** 27:2

**credit** 200:21,
24 201:2

**crew** 139:13

**crime** 75:24
77:24,25 93:14
114:2 145:5
216:11 226:14

**crimes** 16:21
17:9,10,16
18:1,3,4,6,12,
17,23 19:8
20:6,11,15
25:10 26:4 28:4
29:1 30:15,20
31:3 36:10,25
45:20 46:18
47:17 56:4
63:12 69:14
81:18 129:8,10
130:9 132:25
133:1,3,16
134:7,25
136:17 137:9,
10 171:18
215:7 216:5
219:18 220:20
221:18 225:22

**criminal** 70:23
74:15 136:2
211:22 213:22
214:6,13

**Cris** 7:23

**cross** 44:20

**cross-talk** 6:6

**Cuellar** 141:18
185:8 191:14
192:6 196:13

**cuff** 162:13

**culture** 206:11
210:9

**curious** 213:23
214:3

**current** 15:14,
19 83:17 169:2
195:23 198:4
227:23

**curriculum**
207:6,23

**curse** 156:17

**cursed** 156:15,
19

**cursing** 156:16

**custody**
102:13 111:5
112:5



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1005 of 1026
The Deposition of HECTOR LOYA, taken on May 23, 2002
244

**D**

**DA** 21:24 63:8
113:21 115:25
119:17 145:10,
19 177:23
184:6 216:13

**DA's** 52:4
69:12 84:25
85:3,5,9,12
114:10 119:16
128:5,22,23,24
129:4 172:14
176:4,20 192:9
197:6

**dad** 38:2

**dad's** 196:6

**daily** 132:10,13
215:9,11,15
216:1 225:18

**Dalia** 205:10

**Dallas** 206:23
214:21

**Dan** 192:3

**dangerous**
92:5

**Daniel** 5:19 7:3
9:8 95:11 99:4
107:11,16,18,
23,24 108:1
112:2 116:12,
17 124:18
138:19 141:14
144:1 146:10
183:24 187:18
196:16,20
197:8 220:11

**Daniel's**
118:15

**Danny** 168:14

**Darnell** 5:4,6
7:15,24 8:8
15:6,9 24:20
28:6 40:3 41:7
42:6,11,16,23
43:5 90:13,21
93:24 108:11,
14,17,22

112:17,20
117:18 120:5,7,
10,15,18 133:6,
10,19 134:9
164:6,11,13
166:15 167:3,
12,20,25 168:9,
13 170:15
172:19,25
181:9 184:10
195:16 196:4
233:20

**DAS** 226:4

**database**
35:15

**date** 46:1 62:12
69:4 106:8
151:8 166:2,3
170:22 211:5,7

**dates** 45:10
54:16 76:23
79:9

**daughter**
150:22 151:9,
21 162:1
170:12,16,20
222:24

**day** 5:16 23:24,
25 98:10,17,25
104:2 109:7,10
139:15 147:6
206:17 226:2

**days** 64:16
125:14 145:18
157:24 159:5
186:19 188:14
192:1 223:1,10

**deal** 145:18

**dealing** 141:10

**deaths** 116:18

**debrief** 152:15

**debt** 200:21

**debts** 201:1

**deceive** 75:11,
17

**December**
94:24 95:5
106:18 110:16

119:25 176:25
190:9,13

**decide** 14:8
17:24 203:16

**decided**
186:10

**decision** 18:13
180:23 181:2

**deep** 103:24
118:24 214:7

**defendant** 7:8,
9,18 173:10
189:9

**defendants**
38:16

**defense** 43:18
57:8 116:7,10,
12,13 118:15
124:19 142:1,
18 168:14
183:24 218:6

**define** 47:19

**defined** 229:18

**demeanor**
104:23 109:7
186:16

**Denton** 7:12
43:16 201:15,
19,20 210:23
211:1 222:6,9,
12,14,17
225:14,16
227:7 233:17

**deny** 61:10

**department**
8:5 13:7,10,14,
22 20:8 28:4
35:15 37:21,22,
25 38:2 40:19
47:8,9,14
66:11,25 70:17,
19 84:18 129:2
132:23 138:24
139:4 140:10
147:5,24
149:15 159:11
171:22 172:14
189:14 203:3,
10 204:5,13

205:13,19
206:1,11
208:14 209:7,
11,16 210:9
212:19 216:2
218:25

**department's**
54:1 208:17

**department-
wise** 215:19

**departmental**
157:12

**departments**
212:11,13

**depend** 60:22
76:13

**depends** 31:19
47:23 51:3
60:21 70:11
76:11 79:11
93:13 101:13
113:22 228:15

**deposition**
5:18 9:22 15:17
33:5,9 34:7
39:6 43:13
83:15 120:23
142:22 167:9,
13 168:25
195:21 196:7
197:12,19
227:21

**depositions**
9:24

**describe** 44:17
101:11 117:9

**deserved**
154:19

**desk** 97:20

**destroying**
55:21

**detail** 50:5
77:23 78:2
126:11 127:17
148:12 212:17

**details** 59:16
60:1 74:5 78:10
84:6 109:18

191:1 217:6
227:3

**detective** 6:15
7:15,24 8:4,12
9:5,16 13:6,10,
21 14:13,20,24
15:1,4,17,22,24
16:2 17:2,6
19:23,24 21:2
22:11 24:2
25:14,16 26:13
27:7 28:15 30:9
32:19 35:7
36:14,18,25
39:6,11 40:6,7
41:3 43:13,21
44:3,6,7,18
45:2 51:10
53:4,5,7 63:14
66:10,12,24
71:14 82:2
83:15,20 85:12
94:23 95:9,18,
22 96:1,14
98:1,3,6,10,16
99:24 106:5
109:2,16
110:19,21
111:24 112:15
115:6,13
120:23 121:2,7,
12,16,20,24
122:3,14,17,25
123:19 126:6
127:4 128:13
141:21 142:8
144:1 146:11
151:5 160:19
167:9 168:25
169:6,9 174:8
175:17,19,23
179:13 183:9
185:19 187:1
190:10 192:15
195:5,9,21
196:10,24
201:20,25
202:8 203:11,
17,23 205:22
206:21 208:18,
20 209:5
212:19 214:5
215:1 227:7,21
228:2,5 229:7
231:21



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**KENTUCKIANA**
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1006 of 1026
The Deposition of HECTOR LOYA, taken on May 23, 2006

245

**detective's**
14:12 202:24,
25 205:17
209:2 211:9

**detectives**
19:2,4,7,11
26:9,12,21
28:3,11 29:18
30:4,12 32:22
55:24 56:5,16
63:25 65:19,22
70:16 71:8
99:21 110:25
111:7 115:14
127:4,9,10
131:2 159:11
175:12,16
179:14,16
182:9 190:1,5
192:10 202:11
204:4 215:3,13
216:10 219:6

**determine**
75:19

**develop** 82:25

**developed**
218:14

**developing**
82:17

**developments**
50:13 226:7

**died** 73:13
107:13

**direct** 76:15
88:15,21 90:5
129:12,13
130:14 131:1
141:19 151:23
164:2 165:13

**direction**
130:12 131:23
153:12 189:20

**directions**
135:6,9

**directly** 80:15
154:5

**director**
140:21

**disciplined**
86:6,17,20,22

**disclose** 164:2
165:14

**disclosures**
167:15,17,21

**discover** 38:16

**discovered**
38:15 179:8

**discovery**
167:18,19,20,
23

**discuss** 21:11
22:17 24:9
28:15 152:2
163:6 185:25
186:3,22,25
194:6 197:19
215:18

**discussed**
21:1 26:24
27:11 28:11
29:14 155:24
179:6 200:10

**discussing**
27:9

**discussion**
138:20

**discussions**
211:12

**distinctive**
142:6

**district** 5:20,21
14:5 113:4
115:8 123:20
124:21 178:14
183:12 187:16
216:4 218:9
225:19

**dive** 118:24

**division** 5:21
13:24 14:1
205:1 208:18,
19

**document**
35:3,4,23 45:3
56:23 62:4,8,10
65:25 67:17

78:14,15,19,23
79:4,10 93:14
110:5,7 120:3
121:6,8,19
123:10 161:12,
15,17 165:12
169:7,9 180:1
182:1 183:9
192:14 210:19
211:21 212:1
213:22 228:4

**documentatio
n** 212:3 229:10

**documented**
67:17 78:20

**documenting**
79:14

**documents**
33:8 34:24 65:3
118:11,18,25
123:4

**dont** 42:11
43:2,6 79:13
103:11 157:22
158:2 231:10

**door** 68:23
99:19 150:24

**doors** 68:5,15

**dope** 147:5,6

**dot** 44:20

**double-check**
56:10

**download**
64:18,19

**downtime** 51:5

**drag** 24:7 27:6

**dragged** 24:3,
10,18,22
146:14,17,20
149:6

**drew** 205:14

**drink** 139:21

**drive** 95:14
109:24 146:25
147:22

**drove** 95:21

111:10

**drunk** 91:12

**dude** 98:15
99:3 146:8
149:3 156:7
163:7

**duly** 9:2

**dut** 16:4

**duties** 13:25
16:7 50:11

**duty** 140:11
205:23 221:15

_____

**E**

_____

**Earl** 38:8

**earlier** 34:8
39:24 60:16,20,
23 61:4,11
97:14 98:2
166:12 194:15
201:24 206:13
210:19 212:9,
24 219:24
221:5,14 222:1,
4 223:23

**early** 34:9 36:9
92:18 113:22
157:20 160:11

**ease** 103:18

**easier** 96:10
99:3

**Easter** 179:23

**eating** 87:11

**education**
208:14

**effect** 131:8

**effectiveness**
214:13

**egg** 179:23

**Either/or** 56:3

**El** 5:19,21 7:10,
13,18,21,25 8:5
13:6,14,22
53:25 54:1
84:23 149:23

153:13,21
171:14,22
172:2,10,14
173:23 196:22
201:21 202:8
203:3 204:7,8
206:10 207:12,
22 218:25
219:11

**Electric** 34:22
39:20 94:20
113:5 114:8,17
121:3,4 125:3
126:22 131:10
136:5 137:25
138:14 141:13
153:10 172:24
173:4 174:10
176:10,22
181:8,14,18
182:21,25
184:19 185:14
187:9 188:5,8
190:1 196:11
230:7,8,23
231:25

**electronic**
64:11

**electronically**
64:15

**elegantly**
102:4

**else's** 64:7

**email** 64:21
196:2,5

**emails** 209:11,
13,17 233:6

**embezzlement
s** 18:12

**employed** 31:6

**encounter**
139:5

**encouraged**
29:1 134:22
203:21

**end** 6:11 22:2
50:22 62:14
63:15 131:14
132:16 157:14



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1007 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2002
246

175:19 176:21

**ended** 148:2
150:16,19
155:6 157:4
174:15

**engage** 41:16
187:21

**engaging**
148:20

**enjoying** 30:23

**ensure** 41:22

**entered** 65:6

**equity** 198:10

**Eric** 7:17 32:12
233:18

**escorted**
150:20

**Esparza**
187:17,23

**estimation**
198:4

**Estrada** 5:8,10
6:7,19,23,25
7:22,23 13:17

**evaluate** 44:14
83:2,4

**evenings**
160:10

**events** 56:23
185:14

**eventually**
202:14 233:6

**everybody's**
69:11 100:11
201:16

**everything's**
67:17 129:22
132:7

**evidence**
35:20,21 41:10
44:15 69:12
82:17,18,25
83:5 92:14,19
93:3,4,11,13,
15,19 94:3,11,
13 113:24

138:1 217:25
218:7,13,16,20

**evolve** 226:8

**ex-baby** 127:2

**ex-wife** 117:3

**exact** 141:8

**exam** 203:14,
23

**examination**
9:3 201:18
202:24 211:9
214:5

**examples** 72:1

**excerpt** 33:21

**excessive**
88:7 91:3

**exclude**
218:13

**excluded**
217:25

**Excuse** 178:16

**exhibit** 105:23
106:1 110:9
112:18,19
121:11 124:6
143:22 161:13,
16 164:16
169:13 178:9,
10 183:9
192:12,13,18
194:15 222:10,
11,13 228:4
229:2,8

**exhibits**
118:14 167:14

**exist** 195:1

**expect** 91:16,
17 117:13
132:19,22
135:15

**expectations**
136:24

**expected**
117:14 211:18

**experience**
30:2 58:13

75:14 80:6
90:11,18
101:17,24
159:6 175:18
176:15 227:2

**explain** 170:11
202:7 212:7

**explaining**
49:2

**explanation**
166:13

**express**
218:10

**extent** 41:22
77:4 112:3
163:12 212:12
217:22

**extra** 203:7

————————

**F**

**Facebook**
193:1

**facing** 104:15

**fact** 8:7 14:24
37:20 76:15
77:19 78:18
128:18 149:18,
21 151:23
175:4 210:6
230:21

**facts** 75:24
76:22 77:15
82:12 145:10

**fail** 93:20 94:4,
6,8,9

**failed** 27:23

**fair** 9:21 10:2
11:1,6 30:14
70:5 84:17
104:22 159:18

**false** 44:8

**falsely** 86:11,
14,17

**familiar** 38:6
162:16 178:3
180:9 191:7

211:17 212:16

**family** 16:14,24
37:23 140:5,8,
13 141:11
199:16

**famous** 66:23
70:18 207:3,20

**fancy** 199:6

**fart** 155:5

**farther** 224:5

**father** 162:3

**favor** 115:14
131:20

**FBI** 149:6

**fear** 72:19

**federal** 220:4

**feedback** 44:1
136:12 216:17,
25 217:4

**feel** 19:5 72:7,
10,12,17 103:5,
15,18 144:24
153:25 154:3,
10,13 171:21
172:17 174:2

**feeling** 9:16

**fellow** 89:17
90:19 91:18
92:1,11

**felt** 88:3 101:13
153:13 174:5

**female** 173:12
191:15,17

**field** 32:8 41:2
49:14 87:24
118:3 204:20,
23,25 205:2
206:8 208:22,
25

**Fierro** 141:17,
19,22 150:3
185:21 187:3
191:10,22
192:19

**Fierro's**
185:10 192:23

197:17

**fighting** 173:9

**figure** 15:8
72:20

**figured** 6:17

**file** 35:7 64:12
65:9 70:22
87:15 118:25
130:24 142:21,
24 143:3,6,14
163:9 179:3
196:2 213:19
218:12

**filed** 135:3,4,7
136:2,10,19
163:7,9

**files** 33:17,19
35:22 131:25
132:11,12,16
156:25 158:12
159:12

**final** 56:1,2

**finalized** 56:20

**finally** 197:21

**finances** 200:6

**financial**
18:12,23 30:15

**find** 23:4,5 67:6
72:7 84:7 93:19
94:12 102:5
116:6 124:23
129:15 141:4
159:16 190:14
209:10 210:16
215:5 227:3

**finding** 44:9

**fine** 73:8 83:10
162:13 165:3
171:4 214:17

**fingers** 116:7

**finish** 10:16,17
49:21

**finished** 55:23
150:20 151:4,5

**finishing** 36:16



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1008 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2002
247

fired 148:1
225:5

firsthand
76:14

five-minute
83:8 109:23
167:2 195:14
227:12

fix 81:24 82:3
130:4

flee 104:18

flight 104:19,
24

Flores 117:22
122:8 124:13,
18 138:8
150:11 181:13
182:19 184:15
191:25

focused 66:14
203:2 218:19

folks 83:9

follow 27:20,23
41:10 67:12
68:2 118:19
119:3,5 132:20,
22 135:12,14,
16 137:4 174:3,
6 182:12,15
189:17,18
191:2 196:20
205:23 212:11
213:18 231:1

follow-up
119:2 194:10
196:16 212:2
227:10 228:3
229:9,13,16

follow-ups
114:25 192:2
194:12 196:15,
18

force 85:19,23
86:2,6 88:7
91:3 140:15,18

foremost
106:20

forever 80:10

forgeries
18:12

forget 59:24

forgot 39:23
130:5 135:13

form 24:20
28:6 41:7 90:13
133:6,10
166:16 172:19

formal 41:18
45:4 70:15
92:25 158:1,13
159:12 208:13

formally
225:23

forward 34:20
182:7 201:16

forwarded
196:2

found 66:22
94:3 99:7,17
144:21 192:4
196:1,17

framework
208:23

free 133:4,17
134:2,5,7

frequently
202:3

Friday 14:17

friend 193:1,12

friends 143:18
193:15,20,22

front 38:22
50:5 73:20,21
121:8 123:10
150:24 178:10
211:2

FTO 32:7,9
205:2,6

FTO's 205:6

FTOS 206:17

fudging 91:6

full 36:21
103:14 105:5

139:13

fully 219:25

funny 34:15
72:1 190:20

future 29:10

---

## G

gag 163:15,17

gagged 163:5

gang 114:2,3
216:12

gangs 216:13

gather 113:24

gatherings
37:24

gave 33:20
34:8,16 38:20
68:19 76:8
78:17 79:16
95:22 96:21
114:25 117:1
130:12 191:18
192:10

general 79:15

generalist
15:4 16:12 17:2

generally
188:6

generated
65:3

gesture 10:11

get all 69:25
145:11

Gilberto 185:8

give 8:17 10:12
11:16,19 12:6,
8,9,12 16:6
33:7 36:17 55:9
61:9 67:22
70:12,20 72:2
74:4 77:6 82:22
85:14 101:1
108:19 110:5
112:10 131:23
135:6 136:1

141:9,23,24
147:7 151:15
152:11 154:23
159:14,22
160:17 166:21
180:14 185:16
186:8 199:20
200:24 203:5
216:19,25
217:11 220:11
222:3 226:5

giving 49:5
61:8,19 181:20
216:16

goal 145:9
153:21

God 8:19

Gomez 94:19,
22,25 95:24
99:11,19,25
104:7,15
105:24 106:7
109:3 110:14,
22 111:1,5,11,
21 112:16
119:13 120:1

Gomez's
104:23 109:6
197:22

good 6:2 8:21,
22 9:5,6,18,19
14:16 23:10
25:18 30:10
34:19 45:13
46:25 47:10
49:20 57:7,8,25
58:16 59:10,14
67:6,25 68:7,
10,11,19 69:10,
21 71:21 79:22
82:1 84:20 89:4
91:20 101:15,
16,18,19 102:1,
2 106:5 114:14,
15 120:12,14
129:21 144:3,4,
14,15 147:5,7
150:17 154:8,
11,12 155:4
161:1 172:6
175:8,12,23
179:10,18,19
182:11 186:18

201:16,17
202:2,12,17
203:23 205:8
206:16 207:5
209:6 216:23
223:5,7 226:20
227:14

Goodness
104:4

gosh 19:9
31:12,19 32:6
39:13 40:24
63:22 67:22
71:18 88:5
113:15 118:20
130:4 156:2
160:21 161:10
174:13 198:12,
19 205:12
219:13 223:11

Gotcha 131:9

grab 97:20
98:19 186:11

grabbed
190:10

grabbing 95:9

graduate
204:25

graduated
37:23 139:7

Graves 37:14,
24

graveyards
160:11

great 8:6 9:12
11:3 81:3 85:18
175:6 229:4

Greg 171:21

gringo 144:2,
13

ground 10:4
17:1

group 69:21
175:15

guarantee
72:25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 1009 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2008
248

**Guerra** 160:8,9
162:6 164:2,21
166:9 169:23
222:20 225:2,3

**Guerra's**
223:22

**guess** 19:9,10,
16 21:4,23 23:7
26:3,7,25 27:4
28:21 29:22
32:21 34:9
35:14 36:10,17
40:12 45:17
46:25 47:10
65:7,8 69:2
71:1,5 73:22
79:12,14,19
84:16 89:1,13
92:18 100:9
101:13 103:15
111:20 117:19
129:13,16,21
131:2,4 132:6,
10,13 134:10
137:21 141:4
142:18,19
143:18 152:10,
11 153:21
155:12 159:15
170:2 177:24
181:23 182:5,
10 186:4
195:12 202:1
206:6 208:24
211:14 212:7
224:13 229:25

**guidance** 55:1,
18,20

**guide** 187:9
209:3

**guided** 45:5
232:5

**guides** 205:3

**guilt** 93:16

**guilty** 44:9,25
133:4,17 134:4,
6

**gun** 181:7,13
184:15,19

**guy** 29:20

66:22 81:14
95:11 99:18
133:22 142:2
143:19 147:19,
21 148:3 149:1
161:1 179:8
199:6 205:14
219:9

**guy's** 146:25

**guys** 26:18
29:12,16,17
67:5 69:13
70:19 122:22
135:11 144:6,
18,22 145:7,15,
17 150:24
175:22 189:17
193:23 197:7
216:23 225:25

―――――

**H**

**H-E-C-T-O-R**
9:14

**half** 120:16

**hallway** 154:6

**hand** 8:13
48:15 81:25
121:7 198:9
199:14,22

**hand-in-hand**
219:22

**handcuff**
102:21 103:2,8

**handcuffed**
102:9,11,15,19
103:7,9

**handcuffs**
102:21 103:14

**handful** 68:3
226:1

**handled** 16:11

**hands** 103:10,
17

**handwriting**
121:14,20,24

**handwritten**
51:14 55:11

65:4,23 121:3,
8,11 194:21,25

**hang** 210:12,13

**happen** 17:18
73:16 91:13
113:23 136:3
159:17 179:10
215:14 216:8

**happened**
18:21 29:5 48:9
52:21 56:23
58:19 63:22
74:4 75:1 81:21
89:25 111:19
118:22 147:24
149:1,2 158:18
163:10 169:20
186:19 190:12,
14,20 215:22
217:22 223:10,
12,15

**harassing**
142:1

**hard** 146:3

**head** 112:10
208:11

**headquarters**
58:17 106:15,
16 111:7 112:4,
5

**health** 11:8,14
12:4

**hear** 5:8 6:9,11,
13,16,24 13:11
59:24 68:15
93:25 105:11,
14,15,21 133:9
142:4 143:2
153:20 169:23
170:4 171:6
215:21 217:23
224:24

**heard** 6:5 23:7
26:19 28:25
29:14 68:22
71:15 76:16,18,
25 82:19 86:1,
5,13,16,19 90:2
124:20 127:15
133:8 142:16

147:7 149:24
154:11 163:7,9
171:1 178:8
194:3 221:22

**hearing** 23:6
26:17 102:25
168:5 220:16

**hearings**
218:15

**Hector** 5:18
8:4,7 9:1,11,14
15:17 39:6
43:13 83:15
120:23 131:19,
21 143:10
165:13 167:9
168:25 195:21
197:6 219:6
227:21

**helped** 119:12
190:8

**helping** 99:12

**Hendrick** 5:3,
13

**Hernandez**
192:3 196:16

**hesitant** 90:11,
19 91:14

**hesitate** 90:10

**hesitated**
40:10

**hey** 21:6,23
32:25 36:18,24
56:8,9 60:16
61:20,22 67:5
68:15,18,21
69:4,5 72:19
79:7,8 82:19,21
87:25 88:12
90:3 91:11
95:10,15 98:15
99:3,5 111:25
112:1 115:6,13
116:3 118:21
130:4 131:7
135:11 141:1
142:4,8,17
145:3 146:6,25
147:6,7 148:25
149:1 151:18,

20 152:18
155:2 156:5
163:7,21 179:7,
19,20 182:8
183:2 186:7
189:17,18
190:10,20,24
215:21 216:23
217:7,21
225:24

**hiding** 180:20

**high** 188:9
202:15

**higher** 202:14

**highlight**
164:20

**Hilke** 6:2,5,8,
12,15,22,24
7:1,2 8:9,21,25
9:4,7 12:2,10
13:19 15:7,11,
21 17:12,14
22:3,10 24:23
28:7 38:24
39:10 41:9
42:19 43:3,7,
19,20,25 44:5
51:9,12 83:7,19
90:14,25 94:1,2
108:8,13,16,19,
24 109:1
112:12,14,19,
22 117:24
120:6,8,13,16
121:1 133:7,12,
24 134:12
136:12,15
144:9 145:22,
24 164:8,12,15,
17 166:19
167:2,4,16,22
168:7,11,18
169:4,5 170:18
172:22 173:2
178:16,19
180:14,15
181:11 184:12,
13 195:14,25
196:8,9 201:13,
17 222:6,8,11,
13,16 223:23
227:9,14 228:1,
24 229:4,6



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document: 386-2 Filed 05/26/23 Page 1010 of 1026
The Deposition of HECTOR LOYA, taken on May 23, 2008
249

hired 142:19

history 154:16
187:18

hit 65:8

Hmm 6:19
229:17

hmm-mm 34:4
177:11 197:25
231:15

hold 5:6 8:3
94:14 166:24

holds 168:16

holidays 31:20

holler 217:11

home 57:23
198:7

homicide
36:16 40:20,23
59:7 66:15,17,
21,23 67:2,3,24
70:3 73:12
101:3 206:22
207:3 214:20
225:7 232:9

homicides
16:15,19,20
18:2

honest 11:19
12:9 31:21
46:19 54:5
61:24 65:20
71:25 72:6 74:6
75:2,15 91:13
98:8 99:18,20
100:15 103:11
114:12 116:20
118:20 138:22
150:17 151:5
152:21 158:8
165:1 166:17
188:10 190:12,
16 191:24
196:25 208:12
219:14 220:7,9

horse 148:2

hose 16:13

hostile 73:3,4,
9

hotel 207:2

hour 113:3
120:11,14,16
226:4

hours 14:15,
16,17,18 31:17
60:15 70:22
79:20 101:5
111:16 205:17,
20 226:4

house 99:7
102:14 107:2
109:15,20
113:1 156:4
162:9 198:7,11,
21 223:4

how's 106:2
144:3,14,15
190:24

huh-uh 155:21

hundred
198:12

Hundreds
205:20

hunt 179:23

hurt 87:22

husband
141:22 161:8
165:23,24
166:2 170:21
185:10 186:7,
12 187:2
191:11,14
197:17 223:1,9
225:11

hypothetical
83:25

_____

I

I's 44:20

I-DON'T-
KNOW 67:23

IA 156:25 158:1
166:20

IA0 161:13

IAO4169 222:7

ID 8:3 35:20
129:6

idea 28:22
97:12 146:2
177:1 187:20

ideas 41:13
177:13,16,19

identified
167:21 211:21

identify 67:18

identifying
92:23

idling 188:18

ileads 65:13,14

ill 104:18

illegal 220:12,
22

Illinois 7:4,6

important 10:7
41:21,25 42:4
43:21 44:9,22
45:10 56:25
57:2 60:14
62:4,8,17,24
73:13 74:5 78:9
83:20 122:9
126:11 133:1
180:1 183:6
188:25 205:24
206:5,9

impressed
71:22

impression
90:7 159:8
173:16

improve 42:22

inaccurate
75:4

inaudible
144:16,17

incident 18:21,
25 20:18 25:9,
17 26:15 27:10,
13 28:10 31:2

60:7 86:23,24
90:5 95:9 99:20
102:23 146:19
162:24 165:1
222:1

incidents
148:24 155:19

include 16:15
53:8 61:11
199:17

includes 57:7,
13,16 93:15

including
137:12 220:6

incomplete
13:4 171:11

inconsistencie
s 84:9

inconsistency
166:14

inconsistent
77:6

indication
188:24,25

individual
107:11 223:8

individuals
152:14 205:9

influence
30:11

influenced
160:1 206:1

influencers
203:20

informal
157:17

informants
213:15

information
22:25 34:12,17
49:21 52:23
63:3 75:5,20,22
76:2,3,8 77:6
78:14,16 79:2,
3,5,16 82:22
83:21 92:23
102:17 109:18

112:2 117:5
126:24 138:5,7,
11 141:9,11
143:20 145:12
147:4 162:7,19
164:3 165:14
173:19 174:3,4
179:25 180:24
181:24 182:4,6,
11,15 185:3
189:6 213:6,9,
14 217:5,23

informing
179:14

initial 167:21

initially 95:3

initiated 67:8

initiative
129:15 231:6

innocence
93:16

innocent 44:23
75:8 133:5,18
134:2,6,7,15,22
145:4

input 216:14,
19

inside 85:20,24
86:3,7 97:3
170:1

instance 208:5
219:19

instances
163:20

instruct 222:24
223:14 224:18,
24

instructed
169:19

instruction
55:5 188:13
205:18

instructions
116:22 135:16
136:2 187:12,
14

instructor



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1011 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2018

250

207:22

**insurance**
9:23

**intel** 147:2,7

**intelligent**
175:6

**inter** 20:4

**interact** 20:2

**interacted**
37:2,4,16,18
38:3,5

**interacting**
119:11,12

**interaction**
36:12 37:1
157:8

**interactions**
20:10

**interest** 198:20

**interested**
14:19 18:2
145:3,4 173:19

**interesting**
67:7 71:15

**Internal** 87:4,
15,18 88:4,11,
13,17 89:2,8,9,
14 140:23
146:20 149:2
157:21 158:10
159:7 161:6
162:22 222:2
226:21 228:8,
15

**Internet** 66:22

**interrogation**
70:23 128:3
213:23 214:6,
12

**interrogations**
203:6 207:11

**interrupt** 133:7
224:22

**intervening**
225:9

**interview**
17:23,24 34:14
45:11 47:22,24
48:5,19,22,23,
24 57:20,22
62:5 65:25
70:21,23 71:2,
19 73:3 75:17
82:17 85:2
95:10,25 96:6
97:4,6,18 99:11
100:17 101:9
102:10,12,20,
24 103:1,4,10,
14 105:24
109:3,19
111:17,19
112:6 119:13,
25 124:23
126:18,20,21
150:7,16,19
151:25 152:16,
23 153:5,9
176:4 178:25
182:1 185:19
188:11 197:17,
22 213:5,7,9
219:10

**interviewed**
72:8,16 74:14
95:2 98:18
109:13 111:22
122:23 150:3
166:20 197:16

**interviewer**
101:15

**interviewing**
47:21 70:14
71:6,11,21
74:17 80:2
81:10 96:18
100:4 122:3,12
150:1,14 151:6
185:8

**interviews**
44:11 49:3,4
101:7,24
118:19 119:2
121:4 126:21
127:19 150:9
173:10 177:6,
12 185:22
186:1,23 187:8
226:6

**intimidated**
72:13

**introduced**
36:6,24 115:13

**introducing**
82:11,12

**introduction**
58:21 112:9

**invest** 131:14
178:25

**investigate**
16:18,22 18:10
98:14 116:23
136:9,22 153:2,
19

**investigated**
113:12 158:5,
13 159:10
174:24

**investigating**
34:25 59:7
67:13 98:11
137:22 174:5
188:21

**investigation**
35:17,24 36:2
41:6,11,14,22
43:22 50:13
54:9 57:5 62:23
63:15 67:15
68:7 69:4 76:5
77:4 87:1 93:20
98:13 113:23,
24 114:8
116:24 117:9
118:2,9 127:5
129:16 135:17
136:25 142:19
153:6,7 159:8
162:23 165:17
176:17 177:3
178:2,7 180:6
194:22 195:5,
11 197:4
211:22 212:2
213:17 214:20
216:9 222:2
229:9,16
230:22,25

**investigations**
16:9 35:5 40:8,

17,20 47:16
66:6 74:15
116:25 129:11
136:17,19
159:9,25
172:24 173:4
203:7,25 204:3
214:13 219:1
225:21 229:13

**investigative**
33:12 34:6
50:16 51:1,15,
19,23 52:8,10,
18 53:2 55:23
56:5,9,13
62:11,16 97:17
123:13 203:4
219:17

**investigator**
168:15 175:7
186:9 212:21

**investigators**
215:7 219:23
226:24 228:18,
21

**invited** 144:22

**inviting** 96:5

**involved** 34:25
68:22 77:1
83:25 84:4
95:5,6,8 113:11
114:3 116:14
127:5 136:18,
21 137:6
146:10 152:23
153:3 155:16
163:22 183:21,
23 190:6,15,23
197:4 215:10
224:8,11

**involvement**
54:9 69:7 95:20
120:1 152:14
159:13 179:9

**involving**
155:19

**issue** 89:8
134:14 156:13

**issues** 19:1
30:20 211:11

---

**J**

**J-A-V-I-E-R**
9:14

**jail** 153:20
219:9

**James** 119:19,
22 184:7,8,10

**Jamie** 187:17

**January** 95:4
123:17

**Javier** 9:11,14

**Jeep** 7:15,24
42:20 43:3,25
133:8 195:25

**Jenny** 193:2,19

**Jesse** 34:2
138:13,15,16,
20 139:2
140:15 141:14
142:5,12,17,24
143:5,10 146:7,
23 147:4,13,20
148:9,15,18,20,
25 149:9

**Jesse's** 148:1

**Jesus** 168:3

**Jim** 7:20 17:12
136:13

**Jo** 162:1
222:25

**job** 75:19
154:11 203:17
210:12

**Joe** 5:2,13
183:14,17

**John** 172:23
173:3,20 174:4
191:12 193:9
197:5 209:5

**John's** 190:11

**join** 13:6,14

**joined** 13:10
20:11 38:25
46:18 175:25

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1012 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2002

251

215:6

joke 147:1

Jose 122:4,6, 18 123:2,21 124:11 125:2,5, 13 126:2 127:3, 9

Jose's 127:21

jot 46:3,4

Juarez 115:12 117:22 122:4,6, 19 123:9,21 151:8 176:5,6 191:25 197:16

Juarez's 117:3

judge 24:1 27:8

judgment 232:16

judicial 217:2

July 143:25

jumped 176:25

jury 23:22 73:21 202:3,7, 22 204:23 208:10 212:7 215:14 218:5,8, 18 226:13

K

K-O-Z-A-K 130:22

Karen 130:14, 18

Karla 191:4,5, 6,7 193:12,14, 18,22 194:3,6, 10

keeping 65:22

Kenneth 7:18 38:4,5

Kentuckiana 5:14

Kentucky 5:16

key 41:5 48:2

keyboard 128:20

kids 140:12 193:12

killed 103:6 193:20

killer 124:19,25 125:11

kind 17:1 18:25 21:15,22 22:9 29:21 32:23 36:19 52:24 54:18 66:13 69:24 72:21 74:20 79:21 87:9,25 95:12 98:14 101:14, 21 114:14 115:22 126:10 127:17 144:22, 25 155:8 156:10 157:7,8 168:2 210:12 211:8 212:17 215:20 217:1, 20 219:20 220:22 221:19, 23 232:2,4,9

kinds 16:10 31:8,10 135:9 155:23 202:23 221:9

kitchen 170:1

knew 12:23 20:1,4 27:17,18 50:7 68:2 77:11 95:12 115:22 116:2,19 125:6 126:2,3 127:12 142:7,15 151:23 152:23, 25 153:2 159:3 173:7,22 179:17 189:12 221:23

knock 68:4,15

knocked 99:18

knowledge 58:15 87:2

101:21 127:12 132:18 134:24 135:23

knowledgeable 101:18,20

knuckle-head 155:2

Kosturakis 178:1,21

Kozak 130:15, 16,20,25 132:19 226:15

Kyle 114:16 184:23

L

L-A-R-A 19:19

L-O-Y-A 9:15

lady 38:22

laid 109:9,10

language 117:8 135:24

laptop 128:21

Lara 19:17 20:3 21:2,12 22:13 23:21,25 24:2, 11,25 25:4 27:7,10,14,21

late 101:5

law 47:4 205:23 216:18 220:22

lawsuit 34:21 38:17 39:17

lawyers 9:8 33:4 43:18

lay 50:12

lead 68:2 179:18

leader 29:22, 24

leaders 30:3

leading 80:1,4, 13,18 82:10,23

leads 68:20 131:19 180:1 188:12,17 197:18 231:8

learn 67:7 138:4 163:18 206:17

learned 77:11 81:15 101:18 206:11 217:18

learning 45:5 70:16 206:21 214:25

leave 18:17 69:24 86:23 156:4,6,19

leaves 90:6

led 104:23 122:18 191:25

left 12:3 19:8 23:22 39:14,19 97:15 117:3,4 119:15 138:23 140:15,18 146:5 149:22 198:15

legal 47:11 118:8,12 135:22 204:16 217:13

lessons 217:18

letter 178:14 183:11 184:6, 24 185:1 212:25

level 92:7 155:15

license 204:7

lieutenant 38:1 88:22 89:13 130:10 137:8 155:20 226:18

lieutenants 155:16 215:12

lifting 92:20

Like-- 198:8

likewise 10:24

Lili 161:20

linked 138:5,8

list 114:25 117:1 202:13, 20 214:4 229:20 230:18

listed 110:20, 21,23

listen 30:6 33:17,19 67:16 72:20 73:14 74:23 116:3 142:9 148:5 156:6,19 179:19 182:8

listened 101:17 142:21

listening 71:8 114:12,14 147:10

listens 142:9

living 149:23 223:8

loan 199:3,12

loans 199:1 201:2

located 5:14 206:24

locating 110:13,20,21

location 5:24 62:23 84:20 207:14 223:9 225:10

logged 129:5

long 9:25 14:4 18:5 25:9 32:11,15 36:21 87:11 91:8 104:15 105:6 108:12,15,18 133:22 141:4 145:18 160:15 204:9 229:20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1013 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2002

252

longer 95:6,8
116:5 119:15
149:23 163:6
205:13

longest 32:16

looked 37:8,
11,13 98:4
108:12 111:20
117:3 127:18
175:18,22
177:7 182:2,3
183:3 192:4
222:1,19
226:21 227:2

lost 13:11 15:5
52:24

lot 31:22 34:17
36:21 68:17,20
70:15 71:7
74:23 96:7
101:18 135:22
146:13 156:5
160:4 167:25
175:4,18
179:22,23
204:4 214:7
232:19

loud 224:23

loudly 10:8

Louisville 5:15

Lowell 7:12
201:20 229:2,8

lower 193:7,11

Loya 5:18 7:16,
24 8:2,4,7,12
9:1,5,11,15
13:6,10 15:17,
22 22:11 30:9
39:6 40:6
43:13,21 53:4
83:15 109:16
120:23 143:9,
10 144:1 162:6
165:13 167:9
168:25 195:21
227:22 228:5
229:7

Loya's 6:15
44:3

luck 23:11

lunch 87:11
91:7 120:7,9,14

lying 61:22

_____

**M**

mad 27:8
156:18 193:18

made 14:19
18:13 30:9,21
34:12 69:10,22
87:8 91:15 96:1
109:16 111:4,
24 114:1
158:10 160:5
163:3,5 164:14
165:17 166:6
168:15 193:5
209:23 225:6,
21

magistrate
165:25

mailbox 131:4

main 5:15 7:25
26:10 71:10

major 69:20,22
70:2,6 95:7
130:4 131:17
136:20 158:4
216:9

majority 14:22
155:15 210:13

make 6:16
10:8,10,13,19,
20 12:19 42:7
44:15 45:12
47:5 50:1 54:15
55:11 56:10
57:11 58:25
59:16 60:2
67:15,16 75:22
76:2 81:6 87:14
94:16 103:15,
17 108:22
129:21 132:6
134:2,4,5,22
147:19 153:21
164:13 179:16
194:14 217:24

218:23 227:13,
15 231:2

makes 96:10
111:15 154:9

making 52:6
134:14 180:23
221:10

mama 127:2

man 144:5,15,
18,21 145:3,11,
17,19

management
65:5 129:1

manager
137:21

manual 54:3
211:8,22

Manuel 185:8,
20 186:14

Manuel's
186:16

Manuela
150:1,2,14
151:12,15
196:13

March 13:8,15
95:4,5 98:5
119:8 141:21
176:24 184:2
190:7 196:23

Maria 161:4,5,
20

mark 144:11
145:23

Marquez 7:20
36:5,6,22,24
51:10

married 200:4

Martinez 7:20
42:20 83:10
227:11 233:19

match 77:6

matched
125:25

material 203:6,
13,24 214:7,19

materials
123:2 202:20
203:1 207:6,23
208:1 214:4,24

matter 5:19
37:20 128:17
175:4 226:21
228:8

mayors 137:21

means 80:16

media 76:18
115:23 172:5
173:8,22

medications
11:11,15 12:5

meet 33:1
45:11 59:13
85:13 111:1,7
114:1,16,18,20
115:6 139:2
140:4,7 144:1
145:13 186:5
193:5,8

meeting 114:7,
10,11 115:2,3
157:7 215:18

meetings 30:1
114:13 155:24
215:8,9,11,15,
25 216:1,3,5
217:15 225:17,
18 232:12

members
140:5,7

memo 46:20,
24 47:2 55:14
63:14,18,21
232:21,25
233:4

memories
112:15

memory 11:9,
12 55:5 75:9
111:23

men 157:14

mentally
220:15

mention 61:16
93:20 94:4,6
170:25 171:5
191:11,14
197:11

mentioned
21:22 25:12,14
29:7 135:2,12
137:8 181:4
182:22 191:9
207:10 226:15
231:20

mentioning
180:10

mentor 208:25
231:21 232:3

mentoring
232:2,13

mentors
203:20 206:16

merged 200:7

message
103:20

met 33:6 37:24
38:9,12 54:16
114:23 119:8,
10 122:21
123:19,20
124:14 140:13
143:17 173:13
187:23 193:8
201:21

method 67:18
214:12

methods 69:1

mic 42:10

Michael 19:16
20:2 21:12
22:13 23:4,8,
13,21,25 24:2,
11,25 25:4
27:10,13,21

microphone
42:12

middle 107:19
108:2

Mimbela
172:23 173:3,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1014 of 1026
The Deposition of HECTOR LOYA, taken on May 23, 2002

253

12,20 174:4
191:16 193:9,
19

**Mimbela's**
186:9 191:16

**mind** 34:19
41:6 44:12 55:4
60:20 74:3,18,
20

**mine** 193:1

**minimum**
218:22

**minute** 13:11
15:12 52:24
95:14 100:1
122:2 123:7,25
145:23

**minutes** 83:10
102:14 105:4,7
108:12,15,17
109:3 120:11

**Miranda** 58:1
191:12

**Mirandized**
72:23

**misconduct**
87:4,7 89:16,21
90:12,20 91:16
158:6 172:18

**mistake** 30:9
34:12 134:2,4,5
160:5

**mistakes** 87:8,
9

**mix** 99:12

**mm-hmm**
27:19 50:10
58:24 59:3 69:7
70:7 81:7 91:4
93:18 108:13
109:11 120:2
143:1,4 149:15
167:1 169:14
187:15 206:12
209:9 212:14
221:3,8 224:24

**modeled** 175:5

**Molton** 226:19

**mom** 150:12

**moment** 55:9
123:9 192:12
210:22 229:2,3

**Monday** 14:17

**money** 111:13
172:8

**monitor** 97:3,8
128:18

**monitoring**
97:3

**Montelongo**
161:4,5,20
162:1 228:9

**month** 31:17
114:24

**monthly** 70:11
132:14

**months** 32:7
50:23,24 95:13
97:13 99:2
190:9,15
197:16 205:5,
11 229:23,24

**Montoya**
119:19

**Montoyai**
119:22

**morning** 6:2
9:5,6,17 23:21
108:15 215:17

**mortgage**
198:13,15

**mother** 151:12

**motion** 218:2,5

**motions**
218:10

**Mountain**
120:17

**mouth** 25:14
43:1,4

**move** 165:19
214:23 224:4,5

**movie** 147:9
148:4 149:7

**multiple** 52:11,
15,17 130:8
162:19 174:16

**murder**
107:10,12
108:4 121:4
127:6,10
137:23 138:1
172:24 173:4,
15

**murders** 34:21
35:1 39:21
113:5 114:8,17
116:11 117:21,
23 125:3
126:22 131:10
136:5 138:1,14
153:10 173:19
174:5,10
176:10,22
177:4 181:8,14,
19 182:21
183:1 184:19
185:14 187:9
188:5,9 190:2
196:11 229:16
230:9,23
231:25

**mute** 51:10

**Myers** 113:7,9
114:16 115:3,7,
8,9,10,17
116:3,10,15
117:16 119:4,8,
12,15 122:23
124:22 180:10
184:6 188:25

**Myers's**
116:22 184:24

---

**N**

**name's** 106:5

**names** 19:15
114:25 117:1
192:2 226:13

**narrative** 65:2

**narrow** 68:12

**Nationwide**
212:13

**natural** 71:20
163:20

**necessarily**
50:8 60:3 61:7,
10 107:7
132:12

**needed** 18:21
32:25 51:23
54:11 63:5
85:13 92:8
95:18 128:2
218:22 231:13

**negative**
91:17,19

**nervous** 72:24,
25 73:1,8,25
74:1,3,6,8,9,10,
12

**net** 198:5,6

**newer** 64:20

**news** 76:17
115:23 146:9,
12 148:4 149:5
173:8 189:3,5,
22

**nice** 205:14

**night** 125:22
166:7,10
215:20

**night's** 9:19

**nod** 10:11

**nodding** 112:9

**non-public**
76:3,8 77:15,19
78:1,18 79:5
82:12

**normal** 9:20
230:25 231:3

**North** 7:21,25
106:17

**note** 45:19 51:4
52:22 53:4,5
58:25 62:24
64:2 196:1

**notebook**
45:24,25 46:10
50:3 51:4 62:16
121:16

**notebooks**
45:22,23
121:17

**noted** 188:20

**notes** 34:5
35:18 45:13,15,
21,22 46:21,23
47:1,5,18,20,
22,24 48:2,5,9
49:17 50:1,9,19
51:15,18 52:7
55:11,12,15,18,
21 62:13 63:12,
14,15,21 64:4,
7,8,14,23,25
65:4,15,19,23
66:2 93:21
94:5,22 99:13
109:22 110:13
112:25 113:6
114:23 115:7
117:2 119:9
121:2,3,8,11,12
123:5,9 192:9
194:16,21,25
195:2,3,4,6,10,
12 201:11
232:22

**notice** 202:19

**noticed** 40:10
104:1

**notify** 89:18

**number** 5:22
19:16,20,21
107:7 129:6
164:10 165:20,
21 169:16
170:9,25 171:5,
9 192:10 212:1
213:13 222:22
223:14 224:8,
18

**numerous**
205:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1015 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2002
254

## O

**oath** 11:22
12:15,22,25
13:3 27:15
28:12,15 86:11,
14,17 204:20

**object** 24:20
28:6 42:6 90:13
117:18 133:6,
10 166:15

**objection** 41:7
42:10 43:17,18
90:21 133:9,19
134:9 170:15
172:19

**objective**
44:14

**objectively**
41:11

**observation**
7:10 71:7,10

**observations**
29:25

**observe** 29:23
89:21 104:22
174:24

**observed**
72:14 101:6

**occurred**
34:21

**occurrence**
62:25

**off-duty** 31:5,8

**offered** 18:22

**office** 7:4,14,
18,25 26:17,22
47:11 52:4
59:11 69:12
84:25 85:3,5,9,
11,12,16 95:15,
21 109:24
110:3 113:2
115:11 119:16
123:20 128:5,
22,23,25 155:9
172:15 176:4,
20 183:12

197:6 204:20
219:12 226:3

**officer** 14:2,5
30:10 31:6,24
32:3,8,12 34:1
47:13 52:15,21,
22 53:11,15,18
66:7 72:9,16
85:23 86:2,6,
10,13,16,19
87:3,5,6,24
88:4 89:17,21,
22 90:1,5
91:15,23,25
98:24 99:12
132:20 146:20,
24 147:12,15,
25 148:8
153:13 160:2
204:6,21,23,25
205:2 206:8
208:22,25
221:6 225:2,3

**officer's** 53:22
147:24 204:6
205:23

**officers** 32:10
52:12,15,18
53:2,3 90:9,11,
19,20 91:10,18,
21,23 92:1,8,11
95:17,21 99:13,
15 102:13
106:23 110:3
111:1,14 114:2,
3 125:25 126:3,
4 140:23
148:14,19
159:21,22
161:8 162:6,24
163:22 166:1,7
170:21 171:22
172:2,10,18
225:5

**older** 67:5
175:21

**on-hands**
40:13 41:4 45:5
70:16

**one-time** 66:19

**one-week**
40:19 70:20

**ongoing** 76:5

**online** 5:1,2,7,
9,11,12 8:1,6,
10,12,23 15:13,
16 39:2,5 43:9,
12 67:5 83:11,
14 120:19,22
167:5,8 168:21,
24 195:17,20
209:1,18
210:16,21,25
227:17,20
229:3 233:2,22

**Oops** 121:7
164:20

**open** 17:22
41:6,13 51:5
65:1,9 68:23
118:3 129:14

**opened** 99:19

**opinion** 30:4
135:23

**opportunity**
39:16 174:20,
24

**opposite** 74:2

**order** 50:18
163:15,17
164:2 165:13
202:23 213:6

**ordered** 163:5

**orders** 231:18

**originally**
174:13

**Ortega** 7:8,9
37:5,6 104:4

**Oscar** 94:19,22
95:24 96:18,21
97:9 100:4,17
102:9 104:7,15
105:23 106:2,7
109:3,6,13,25
110:13,22
112:16 119:13
120:1 197:22

**other's** 92:5

**outstanding**
111:6 207:10

**oversaw**
137:11

**owned** 173:22

## P

**p.m.** 106:18
120:21 143:25
167:7 168:23
195:19,24
227:19,24
233:23

**pages** 46:10

**paid** 66:25
70:20 199:2

**Paisano** 225:6,
7,8

**pan** 179:23
180:2

**panel** 159:20

**paper** 46:5,6
73:18

**paperwork**
224:12 225:4

**paragraph**
184:2 192:22
225:1

**paragraphs**
162:5

**Pardon** 144:9

**part** 31:9 48:21
50:11 53:19,21
65:2 75:19
78:21 84:14
92:22 93:25
102:17 116:9
160:1 173:24
203:9 206:10
207:7 212:18
214:25 220:16

**participants**
216:1

**participate**
136:16 150:6

**participating**
7:9

**parties** 8:7

**partner** 26:10
31:25 32:16,19
100:1,5 141:21
160:8 169:25
171:6 224:24
225:8

**partners** 32:2

**party** 139:25
143:16,17
144:5,18
193:25 213:8

**Paso** 5:19,21
7:10,13,18,21,
25 8:5 13:7,14,
22 53:25 54:1
84:23 149:23
153:13,21
171:14,22
172:2,10,14
173:23 196:22
201:21 202:9
203:3 204:7,8
206:10 207:12,
22 218:25
219:11

**pass** 51:18
201:13 227:8

**passed** 160:21

**past** 218:10

**patrol** 13:24
14:1,2,5,22
15:25 31:24
32:3 66:7 87:10
99:6 100:24
139:6,11
160:11,17
203:18 204:1
205:1

**patrolman**
88:21 205:16

**pause** 43:11
71:5

**paying** 188:2

**PDF** 124:7
164:1,6,9,10
222:15

**peace** 204:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1016 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2002

255

**peaking** 132:11,12

**Pelletier** 137:11

**penal** 203:4 226:11

**pending** 5:20

**pension** 200:13,15

**people** 33:22 36:21 45:5,6,12 68:17,20 71:20, 21 76:23 98:4 101:25 102:1 104:1 107:13, 14 116:14 124:24 134:15, 22 142:1,10 146:6,14,17 149:9 153:20 154:8 156:16 175:7 177:7 190:20 196:15 206:18 215:10 217:23 221:1

**percent** 64:2

**Perfect** 120:15

**period** 32:9,15 97:15

**permission** 67:9

**person** 29:5,8 34:13 41:23 42:1,5 43:22,23 44:8 48:3 79:21 80:10 91:20 94:23 110:20, 22 116:17,18 117:10,20,23 124:18 133:4, 17 134:2,5 143:2,6,14 145:5 151:9 156:10 176:18 179:4,20,21 182:9 188:15 189:19 196:25 202:13 205:5 206:3 230:2 232:11

**personal** 35:7 58:13 154:7 205:22 206:2 209:15

**personally** 29:11,15 35:10, 21 72:19 89:21 112:7 124:17

**persons** 17:9, 11,16 18:1,3,4, 6,18 19:8 20:6, 11,15 26:4 28:4 29:1 30:21 36:10 37:1 45:20 46:18 47:17 54:16 56:4 63:13 69:14 81:18 129:9,10 130:9 132:25 133:1,3, 16 134:8,25 137:9,10 171:19 215:7 216:6 219:18 220:21 221:19 225:22 226:15

**phone** 44:2 49:14,19 106:19 136:13 142:5 173:13 192:6 217:9 227:13

**physical** 35:16,17 65:15 85:19,23 86:2,6

**physically** 87:22 128:14 220:18

**pick** 164:22,25 165:4 206:15

**picked** 175:21

**picking** 44:8

**picks** 145:12

**piece** 46:5,6

**place** 87:11 207:11,12

**places** 31:10 62:20

**plaintiff** 6:3 7:2

**plaintiff's** 5:25 206:20 219:25

**plan** 31:2 96:12,17,20 185:25

**planting** 148:6

**play** 105:6,10 142:5 143:21 177:2 191:24 192:8

**playback** 144:10

**played** 105:13, 18 106:1 182:13

**playing** 105:24 106:2 108:9 143:7,22,24 145:22

**plays** 142:5

**pleading** 220:4

**point** 14:8 55:14 98:15 116:7 118:4 140:15 154:15 205:21,25 217:4

**pointers** 71:13

**pointing** 192:22

**pole** 145:17

**police** 8:5 13:7, 14,22 31:6 34:1 35:15 37:21,22 45:3 47:14 54:1 57:22 72:8,16 75:5,12 84:18, 22 85:20,22,24 86:1,3,5,7 88:25 89:6 91:23 92:19 106:15,16 110:1 111:7,11 129:2 132:20, 23 140:22 153:13 159:11 160:2 168:2

171:15,18,22 172:2,10,14 203:3 206:1,10 207:13 216:2 218:25

**policies** 54:1 132:23 203:2,4, 10 204:13 205:4 209:7,16, 23 210:11 211:12

**policy** 46:21,24 47:3 65:14 157:12 158:14 159:1 209:14 210:17 215:5

**pool** 131:2

**portion** 197:23 214:11 222:18

**portions** 196:10

**position** 72:12 89:10 209:6 212:19

**potential** 69:2

**practice** 47:17 48:18,21 56:18, 22 179:13

**practices** 219:17

**pranks** 34:19

**pre** 49:23 50:1, 9

**prefer** 128:6

**prep** 34:6

**preparation** 34:7

**prepare** 33:7,9 34:24 50:15,17 58:6,20 66:14

**prepared** 33:5 35:4 53:12

**preparing** 58:8

**present** 69:9, 13 162:6 191:12

**presented** 118:15 214:1 218:7,17,23

**presently** 12:16

**preservation** 92:19

**preserve** 43:18 93:11 94:8,9,14

**preserved** 94:17

**preserving** 92:13,15

**pressure** 72:8

**pressured** 72:10

**pretend** 169:19 223:15

**pretty** 27:8 42:20 55:25 58:22 72:12 75:2 79:12,20 98:13,17 103:24 106:5 110:2 111:13, 24 118:21,23 129:5 130:3,12 132:21 152:1,6, 17,19 155:16 187:2 189:3,4,5 194:23 195:6 204:2,14 205:3

**prevent** 225:9

**previous** 212:23 213:1

**previously** 167:13

**principal's** 155:9

**principle** 206:2

**principles** 67:12,14

**printer** 21:21 64:20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1017 of 1026
The Deposition of HECTOR LOYA, taken on May 23, 2002

256

printers 64:20

printing 147:8

prints 92:20

prior 99:3
127:12 168:5
196:7 218:12

priorities
137:2

priority 188:9

prison 104:15

pristine 93:12

private 168:15
186:9

proactively
88:10

problem 88:8,
10

problems
42:24

procedure
54:4

procedures
54:1,3 132:23
203:3 209:7,16
210:11

proceeding
217:2

proceedings
118:8,12,16

process 69:23
158:10 159:18
202:8 217:24
218:19

processing
92:20

produced
167:13,14,18,
23 168:1,5,19

production
168:8 196:1

professional
20:12 175:3
208:7

promote 14:12
201:25 203:19

promoted
14:24 16:1
174:14,17,18
202:16 205:21
208:20

promoting
202:8

promotion
14:8,10

property
16:14,23 217:9

prosecution
57:8 93:3,4
187:19

prosecutions
172:10

prosecutor
136:21 137:5

prosecutors
135:3,6,15,19
136:1,16,18
216:16

protect 44:23

provide 75:4
77:19 78:10

provided
185:4 209:12
210:19

psychologicall
y 220:15

public 77:24
78:24 79:7
213:15

publicly 79:4

published
75:24

pull 34:20
161:12

pulled 70:3
95:6,8 96:14
97:12 98:5
196:23 197:22

purpose 45:24
153:19 202:4

pursue 180:23

pursued
208:13

pushed 172:9

put 25:13 40:19
46:12 47:6 48:2
51:14 53:3,6
54:6 57:4
60:18,19,25
61:2,3,5,7
62:12,13,14
64:8,9,17 65:2
66:12,24 68:17
69:23 73:16,18
74:18,21 78:7,
17 80:23
104:15 115:7,8,
9 126:15 130:5
145:15 153:19,
20 177:24
181:21 202:11,
13,25 203:1
207:3 209:17
210:18 213:21
222:6 225:5
229:1

puts 209:11

putting 79:23
176:18

———————

Q

quality 45:15

question 10:25
11:1,5,6 12:7
22:4 25:2 31:16
42:2,7,17,18
45:19 46:25
47:10 48:20
50:25 52:25
53:6 57:18
61:19 64:13
77:22 80:13,18
84:17 89:4
90:16,18 93:7,
25 94:3 111:20
125:8,20
126:15 127:7
129:21 132:15
133:11,14,20
150:17 165:20,
21 166:4,16
169:16 170:8

171:5 173:14
205:8 218:1
222:22 223:13,
24

questioned
57:17 123:2
125:14,17
146:22 228:8

questioning
110:22 122:18

questions 9:9
10:13,16,19,20
13:18,20 21:15
22:21 58:11
76:21 79:18
80:1,5 81:17
82:11,24 149:5
152:4 201:15
202:3 209:2
212:24 221:4
227:9,10 228:3,
16 233:16,20

quick 83:7
108:11 123:24
175:21 186:11
201:12 227:13,
16 233:9

quiet 80:8
109:9

Quinn 6:12 7:4

quiz 233:9

———————

R

racehorse
148:9

racing 148:2

Rainer 106:17

raise 8:13

Rallins 6:10,14
7:5

Rangers
219:4,19

rank 155:20
201:25

rapport 101:25

Ray 19:25 20:1

25:14 29:7,9
39:12 96:12,13,
17 97:9,15,19,
22,25 98:21
99:11,25 100:4,
16,17 101:2,6,7
106:6 109:3
175:9

Ray's 101:11
190:11

Raymundo
19:25

RE-
EXAMINATIO
N 227:25

re-try 116:1
189:10

reach 179:9
192:10

reached 182:7
193:1

react 23:8

read 54:12 58:1
81:22 82:1
123:25 129:14
151:20 161:14
166:12 169:17
203:7,13
209:18,19
210:1,2 212:5
214:12,15
219:25 222:23
224:25 225:1

reading 104:4
111:12 122:7
125:12 164:23
186:15 203:6
224:23

ready 45:12
69:8 106:3
142:21

real 32:10
66:23 70:18
76:19 108:11
124:19 201:11
205:14 227:16

realized 13:1,4
142:17

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1018 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2002
257

**reason** 11:18
12:7,11 63:20
103:13,25
106:19 107:5
144:25 163:3
221:17

**reasons** 84:23
102:21 127:24

**recall** 36:14
40:18 45:4
46:19,22 54:19,
25 55:3,19,22
61:12,14 63:23
65:17 66:5,8,11
70:17 71:25
75:13 81:12
89:23 92:25
94:19 95:7,13
96:19 97:19,21
99:19 100:15
102:7,11,16,23
104:8,25
109:14 114:13
115:5 116:20
118:17,20
121:5 122:20
123:3 125:7,20
126:5 128:12,
16,20 134:18
136:8 138:9
139:24 140:9
143:8 148:16,
24 151:17
152:3,7,10,20,
25 157:19
158:3,7 160:13
164:25 165:10
168:4 174:7
177:18,21
178:22 179:11
180:8,12,13,23
181:5 182:23
187:3,7 190:3
194:8,18
196:10 197:3,
10,14 201:8
204:14 207:14
218:16 219:13,
15 220:8,19
222:3 223:8,12
228:22 233:1,5

**recalling**
163:25

**receive** 17:15
41:2 45:2 70:13
196:6

**received** 40:6,
7 55:17,20 66:6
157:17 196:3
205:19

**receiving**
54:25

**recognize**
33:22 38:25
121:14,15
211:2,23 212:4
213:24,25

**recollection**
162:11 180:17

**reconnect**
193:4

**record** 5:1,11
8:3 9:10,13
15:9,11,14,17
22:12 39:1,3,6
43:8,9,12 45:21
62:17 66:1
79:15,17 82:7,8
83:11,15
105:23 120:20,
23 121:10
156:25 158:17
164:14 167:4,6,
9 168:19,22,25
184:10 195:18,
21,25 213:15
227:17,21
233:23

**recorded** 45:9
47:23 48:1,24
49:10,13 78:21
82:6,7,13
127:21,23,25
128:3 178:6

**recording**
45:15 97:2
142:2,16
143:24 144:12
167:14 168:3,
14

**records** 54:15,
16

**recover** 93:14

**refer** 202:3
210:10

**reference**
114:21 165:17

**referenced**
95:11 112:2

**referencing**
118:18

**referring** 25:15
100:2,6 164:9

**refers** 143:15

**refinanced**
198:19

**refresh** 55:5
162:11 180:16

**refresher**
209:23

**Reggie** 226:18

**region** 141:1

**regional**
207:15 224:10

**regular** 200:1
215:8

**related** 114:3
147:12 216:12

**relation** 94:20

**relax** 72:19
74:22

**relaxed** 186:18

**released** 113:2
189:9

**relevant** 57:4
92:23 94:4,12,
13 166:22
181:18

**reliability**
77:25 82:12
83:3

**reliable** 75:20,
23 76:3,9 81:6

**rely** 63:2 91:22
208:6

**remain** 18:5

**remember**
17:18 24:15,19
26:19,23 29:9
30:19 32:2
36:11 37:6
40:22 47:2
51:21 54:19
66:21 70:18
71:5 72:5 74:4
85:8 94:25
95:1,9,16 96:24
97:10,15,22,24
99:3,6 100:14
102:13 109:6
111:21 112:8
118:21 119:11
122:3,9,12
125:21 134:18
138:13 140:10
142:13 146:19
147:4,18,19
148:17,23,25
149:25 151:1,4,
6,20 156:2,3
161:4,6 162:14
163:8,11 165:8
178:23 180:10
181:2,15 182:8,
23 185:8 186:4,
13 187:5 191:9,
11,21 194:9
196:21 197:18,
23 205:12,13
207:17,19
210:15 214:14,
18,25 217:6
220:16 228:20
232:21

**Remind** 201:24

**remotely** 7:3,
10

**rep** 141:1

**repeat** 28:8
42:2 52:25
77:21 90:16
93:7,24 100:3
127:7 133:14
171:3 172:25
181:10

**report** 47:6
50:15 54:23
55:2 58:7
73:17,19 79:4

87:18 90:10,12,
19 91:15
110:10 111:20
180:19 192:15
194:16 205:4
221:15 223:2

**reported** 87:3,
5 90:1 220:25

**reporter** 5:13
7:22 8:13,16
10:5 11:25 12:4
22:1,6 42:9,14,
25 51:7 210:18
213:21 230:3

**Reporters**
5:14

**reporting** 88:4
89:21

**reports** 14:2
35:11 46:14
50:12 55:12
56:22 147:8
162:20 212:23
213:2

**represent**
111:18 180:18

**represented**
140:25

**representing**
5:14 7:24
201:21

**reprimand**
158:23 159:23

**reprimanded**
158:15

**request** 231:11

**requested**
17:21 110:25

**required**
166:21

**reserve** 233:20

**residence**
109:22 111:2,6
165:23 222:25
224:20

**resources**
219:21



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1019 of 1026
The Deposition of HECTOR LOYA, taken on May 19, 2022

258

respect 30:4
232:14

respected
156:10

respond 102:8

responded
102:5

responding
164:2

response
165:21 170:7
171:4 222:23
231:9

responsibilitie
s 93:2 212:3,22
215:2 229:9,21
230:12,17

responsibility
89:16 93:6,10

responsible
116:8,18

rest 91:21

result 86:22

results 36:17
186:22

retail 31:12

retain 208:1

retaining
55:18

retirement
200:2,3,16,17

return 120:17
222:25 224:20

returned 225:3

revealing
77:15

review 34:5
47:25 63:8
105:1 131:25
132:6 159:15
165:20 169:15
212:22 213:1
225:20

reviewed 35:3
125:9 130:25

170:7 194:15

revision
209:23 211:7,
14

Rick 226:18

ride 109:25

rides 205:2

riding 146:24

rights 87:21
88:6 91:3
155:1,25
204:16 221:2,
14

righty 210:21

ring 70:24
161:10 181:1

risk 104:24

road 25:20
46:13 54:17
73:20 95:13
102:15

Robert 180:7,
8,19,24 181:6,
12 182:20

rode 110:2
177:6 205:11

Rodriguez
34:2 138:14,15,
16,20 142:6,12,
17,24 146:23
168:4

Rodríguez
141:14

role 17:2
114:11 203:10

roles 177:3

Romero
205:10

rookie 139:9

room 39:24
40:2 97:3,8,9,
16 102:20
115:11 128:17

rooms 207:16

ropes 205:3

rotate 32:7

round 21:18

rounds 21:18,
25 22:16,24

Roy 93:24
145:20

Rudy 122:8
124:13,18,24
125:2,11,25
126:4 138:8
152:12,23
153:3 181:13
182:18 184:15
194:3

Rudy's 151:11
152:13

rule 21:5 22:18
27:20,24 28:1,
5,9,19 51:20
52:1 69:1 79:15

rules 10:4
227:5

ruling 68:25

rulings 225:20

Rumor 149:22

rumors 26:17,
19,24

running
145:10,19
177:10

―――――――――――

S

―――――――――――

safe 153:21

safety 84:23
91:23 102:21
104:3,6,24

Sally 191:25

San 7:14
186:20

Sanchez 19:23
25:14,16,21,25
26:13 29:8,9
39:12 94:24
95:9,18,22

96:1,13 98:7,10
99:24 106:6
110:19,21
111:25 115:6
175:9,17
177:19 189:25
195:9 196:24
205:12

Sanchez's
19:24

sat 154:19
189:20

Saturday 33:7

save 195:3

saved 64:15

scan 35:19
36:3 46:14,21
47:6 55:15
64:20,25 65:3

scanned 35:24
63:15,17,18,21
64:4,6,8,12,14,
23

scanners
64:17

scanning 64:2
65:23 232:22

scans 64:15

scared 125:16,
19

scary 72:11

scenarios
217:16

scene 62:24
93:14 114:2
216:11

scenes 92:20

schedule
49:18 59:12,14

school 40:20,
23 66:15,17,21
67:3 107:19,20
108:3 207:20,
21

score 202:12,
14

scored 202:15

Scott 37:14,24

scratch 28:2

screen 104:5
110:6,14
128:19 169:10
210:24 214:24
222:7 225:14
228:5

screwed 24:8
155:4

scroll 121:19
124:3,8 161:14
164:18 184:22
192:13

scrolling
123:16 161:25
163:25 178:13
192:17,21
193:17

search 66:13,
14 135:24
203:5 210:16
217:8 226:6

searches
213:15

seasoned
215:3

seconds
105:11 144:11

section 209:18

security 31:9,
10,17

seek 14:8,11
18:14,16
213:14

selling 141:11
147:8

seminars
208:9

send 47:12
129:20 209:22

sending 142:1
207:21

sends 64:21

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1020 of 1026
The Deposition of HECTOR LOYA, taken on May 23, 2002

259

senior 29:12,
16,18 36:13
71:8

sense 10:8,13,
20 12:20 93:1
111:15 134:20
164:14

sentence
104:16 184:14
222:23 225:1

separate 46:6
53:15 167:18
199:20

September
161:22 226:11

sergeant
88:22 130:11,
13,14,25 131:1,
7 132:19
155:15,17
226:15,18

sergeants
130:11 137:8
155:14 215:13

serve 225:10

serves 111:23

service 205:18

serving 153:18

set 21:5 219:9

setting 97:1

sexual 70:1

shadowed
232:9

share 22:25
59:15 78:1
93:3,4 110:6
179:24 182:15
210:23 214:24
217:23 222:7
225:14

shared 60:2
79:5 149:2

sharing 23:8
79:2,3 112:12
122:1 130:8
171:17 178:10,
17 183:8 185:7

194:13 228:24
231:19

she'll 150:23

Sheesh 199:6

Sheriff's
219:12

shift 139:12,14,
25 211:20
226:1

shifts 160:10,
20,22

shit 135:13

shoes 73:1

shoot 68:8
163:10

shooting
68:22 125:14,
22 138:5
152:24 182:19
226:3

shootings
94:21 141:13
151:10

shoplifting
16:24

short 33:21
36:22 141:4

shortly 182:20

shot 107:14
152:14

shots 225:5

show 65:25
72:2 105:4
110:4 111:16
121:6,22 123:1,
7,8 124:24
145:11 161:8
177:10 178:9,
18 183:7,8
192:12 228:3

showed 229:8

showing 110:7
169:7 229:7

shown 123:4
222:4

shows 140:3
205:3

shred 46:25
64:6

shredded 64:9
65:15 195:3

shredding
65:19

sick 91:11
156:3,6,7

side 186:5
203:8

signature
165:25 184:24

signed 207:9

significant
208:10

silence 80:8

similar 28:10
175:9 217:21

simple 16:12,
24 104:21

sir 5:5 14:25
16:6,16,19,23
20:9 23:2 25:5,
8 26:1 27:22,25
28:13,17,24
30:18,22,25
31:4,7,19 32:20
33:6,10,14,16,
18 34:4,23
35:2,6,9,12
36:4 37:3,13,
15,17 38:6,13
39:15,18,22
40:1,5,12 41:4
44:21 46:8,11,
15,19 47:15,20
48:6,14 50:10,
14 51:11,25
52:9,13 53:1,
13,17,20,23
54:24 55:7,16
56:7,24 57:9,
21,24 58:24
59:3,18 60:5,12
61:12,21 62:6,
19 63:1,19 64:3
65:20 66:8

69:17 70:7,25
71:18 74:19
75:6,10,21
76:1,5 80:3,14
83:1,6 84:2
85:1,4,7,21,25
86:4,9,12,15,
18,21,25 87:2,
5,8 89:1,4 90:8
91:4,24 92:16
93:18,22 94:18
96:23 97:1,24
98:2,23 100:15,
19,25 101:3,8,
10 104:8,17,20,
25 105:9,16,20,
22 106:4,22
107:4,17,25
109:5 110:8,11,
15,18,24 111:3,
9,12 112:21
113:10,13
114:9,23 118:5,
10,13 119:1,6,
9,14,24 120:2
121:9,13,21,25
122:5,13,20
123:3,6,12
124:2,10,14
125:1,4,12
126:1,9,13,23
127:1,15,20,23
128:12 133:16,
25 134:17,24
135:5,18 136:7,
11,23 137:1,7,
17,20 138:3,6,
9,12 140:17
142:23 146:1,3
149:14 150:2,5,
8,15 153:4,15,
23 154:1,15
155:11 158:4,7,
21 161:5,10,11,
18,21 162:4,8,
10,12 163:16,
19,23 164:4,8,
15 165:1,10,15
166:4,8,17,23
169:11,14,21
170:3 171:13,
16,20,23 172:3,
12,16,20 173:5
174:1,7,11,22
175:1,11,13
176:1,12

177:11,15,18,
21,25 178:4,8,
12,15,22 180:3,
12,25 181:5,15
182:17 183:13,
18,22 184:4,9,
25 185:2,5,9,12
186:2 187:7,11,
20 188:4,7,10,
23 189:8,24
190:3,16 191:8
192:16,20
193:3,10 194:8,
18 196:8,14
197:13,20,25
198:23 200:8
201:2,5,8,10,23
202:6,10,18,21
203:12 205:10
206:12 207:1,
25 208:8,16
210:4 211:19,
24 212:5,16,20,
25 213:3,8,12,
16,20 214:22
215:9,12 216:7
217:3,14 218:4,
11 219:2,14,20
220:3,13,16,19,
23 221:2,8,12,
16,21,25 222:4,
8,21 223:11
224:14 225:12
226:9,17,23
227:1,6 228:6,
10,13,15,22
229:11,14,22,
25 230:4,10,15
231:10,15,18,
23 232:1,15,17,
24

sister 117:22
151:11

sit 36:18 58:18
80:9 81:20,21
89:2 114:4
135:19,21
146:21 159:20
215:17 228:17

sitting 50:22
101:24 102:22
103:16 150:21
216:22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 3:15-cv-00386-DCG Document: 386-2 Filed: 05/26/23 Page 1021 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2002
260

situation 63:23
84:13 136:6

situations
58:12 89:25
156:1

six-month
204:11

skills 70:21

skipped 144:9

sleep 9:19

small 22:16,24
128:16

smaller 69:25
70:8,10

smart 175:3
232:20

snitch 92:10

snitching
91:10

so-and-so
53:5,7 68:8,21,
22 69:5 82:21
90:3 117:11
163:7 197:7

social 76:17
139:23

software 65:6,
8,10

solidarity
153:22

solo 179:14

somebody's
48:8 87:21 88:6

someone's
49:5

son 37:20
140:14 162:3

sort 17:2 26:10
37:9 58:11
66:21 73:7
103:19 157:17
174:24 180:4
189:13 194:2
197:2 199:14

sound 6:7,19,

21 10:17
138:25 143:11
178:3 180:9
191:7 192:11

sounds 6:10
22:4 38:6 42:25
148:7 212:16
225:12

sources
213:14 214:24

South 162:9

space 194:24

speak 10:7,15
42:9 49:12
127:1 133:8
191:17 197:7

speaking
58:13 94:19
112:8 143:3,14

speaks 102:3
175:7

special 184:16

specialists
16:21

specialized
16:21

specific 16:10
26:23 45:23
46:3 55:1 61:14
66:9 71:6 90:6
112:24 136:8

specifically
18:2 24:16,21
26:16,21 60:1
63:13 70:14
147:11 155:23,
25 229:12

speculation
117:18 133:11

spell 9:12
19:18 130:21

Spencer
183:15,17

spend 139:18
229:23

spoke 29:21
50:20 54:10,17

97:20,23 127:9
138:15,16,22
147:21 183:5
184:7

spoken 23:20
138:17,23
149:21 172:10

Sports 140:10

spots 17:22

spouse 203:22

squash 155:18

squashed
87:25 156:20
157:1

stab 68:8

staff 154:3,14

stamp 50:19
100:10

stamped 97:18
167:24

stand 21:8

standard
51:17,22 67:1,4
218:21

standards
45:8 212:10
217:13

standing 59:10
112:9 148:6

standings
91:20

stands 112:21

Stanton 7:21

stare 80:9

staring 144:24

start 8:22 9:9
13:13 16:5
17:10 40:15
62:5,12 68:23
167:12 176:3
190:8 233:12

started 13:21
15:3 36:10 95:3
113:8 139:3
141:12 171:18

starting 5:25
17:1 192:7
226:10

starts 111:16
184:2

state 5:23 8:2
74:13,18,20
106:7 128:9

stated 152:23
164:23 184:15
223:3

statement
48:7,10,15
49:6,13,24
50:6,8 58:18
59:2,12 60:6,9
61:10,11,14,17
62:12 75:14
79:11,25 80:22
81:2,25 82:6,13
84:15,20 85:5,
9,14 95:19,22
96:22,25 100:7
112:6,11 113:3
114:19 115:15,
16,18 117:4,10
122:7 123:8
124:1 125:4,10,
12,13 126:8,16
127:11,14,21,
25 128:8,10,12,
15 129:7
134:11 135:10
141:17,19,22,
23,24 151:16,
18,20,22 153:1
159:14 161:19
165:6,7,16
169:12,18
170:3,23 177:8
178:6 181:3,16,
20,22 185:16
186:6,8,11,15
191:13 192:7,
24 194:11
197:8 222:3,19
223:19,22
224:7,17
228:17

statements
48:12 81:13,19,
20 84:18,24
98:4 101:25

113:24 116:4
128:2,3,7
152:5,9 159:13
168:2 173:11
192:19 229:19

States 5:20

stating 9:9

station 57:23
60:17,24 84:22
110:1 111:11
225:5

stay 44:14
146:8,12 149:3,
5,22

stayed 32:11
155:15

staying 223:1,
3

stealing 91:3

steps 213:18
214:12

stipulated
43:19

stocks 199:18,
24 200:13,15

stole 16:13
87:20 184:15

stolen 181:7,
13 184:19

stood 148:17
172:1

stop 62:5 82:8
87:23 88:2
112:12 122:1
130:8 147:1,20
171:17 178:17
185:7 194:13
225:14 228:24
231:19

stopped 23:22
108:7,9 145:22
147:19 176:23
190:7

Store 140:11

stores 31:12

stories 217:17

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1022 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2002
261

**story** 36:21
80:7 141:4
149:2 186:5

**street** 5:15
7:25 34:22
39:20 94:20
109:23 113:5
114:8,17 121:3,
4 125:3 126:22
131:10 136:5
137:25 138:14
141:13 149:19
153:10 162:19
172:24 173:4
174:10 176:10,
22 181:8,14,18
182:21,25
184:20 185:14
187:9,24 188:5,
9 190:1 196:11
230:7,8,23
231:25

**strike** 27:12
28:2 31:16 41:1
54:20 90:10
117:15 124:12
126:19 129:9
133:2 134:3
136:17 173:17
180:5 194:20

**studied** 202:23
203:24 211:8

**study** 202:20
204:10,12
214:4

**studying** 203:2

**stuff** 14:3 16:23
20:22 31:13
33:2 35:18 46:3
51:4 54:19 57:7
59:24,25 67:7
72:22,24 87:23
88:2 91:2
101:19 104:20
130:6 135:25
146:23 147:10
154:12,25
155:2 156:11
167:25 168:2
175:4 179:23
190:18 199:18
200:13 203:7
215:23 219:10

**226**:2,6,10,12
232:20

**stupid** 91:10

**style** 101:11
174:25 175:2

**subject** 159:7
162:22

**submit** 130:23

**submitted**
130:2,24

**subseq** 126:21

**subsequent**
24:24

**subsequently**
17:5 123:20
141:6

**succeed**
203:14

**sudden** 142:16

**suggest** 83:8
171:11

**suggested**
151:18 165:3

**suicide** 215:22

**suicides** 101:4

**Suite** 5:15

**summarize**
48:22 49:11

**summary**
48:18 49:2

**summer** 17:20

**supervise**
131:15

**supervised**
129:11

**supervisor**
45:18 87:12
88:15,17 89:11
90:4 91:7
129:13 230:1

**supervisors**
23:24 27:1
45:14 85:11
88:14 89:19

**90**:24 129:12
130:9 134:13,
21 153:14,25
189:16 206:6
211:13 226:13
230:6

**supplement**
33:12 34:6
50:16 51:2,5,
15,19,23 52:8,
11,12,19 53:3,
7,9,10,11,19,
22,25 54:2
55:24 56:9
62:11,16 64:10
65:1 97:17
123:13 131:10
179:2 185:5
188:21 191:23
192:5

**supplemental**
110:10 180:19
192:15 194:16

**supplemented**
65:2

**supplements**
53:15 56:6,13,
19 64:8 69:11

**support**
146:21

**supported**
153:14,25
154:4,10,14

**supportive**
154:2

**supports**
171:21 172:7

**supposed**
21:8 22:17
24:1,9 34:13
87:13 141:5
143:19

**suppress**
218:2,5

**suppression**
218:15

**surveillance**
68:5

**survived**
107:13,15

**suspect** 44:8,9
48:19 58:3
68:10,11,13
69:2 72:22
74:7,8,17
75:16,17,23
77:20,25 78:15,
18,20 82:15
83:23,24 84:4
85:19,23 86:2,7
101:25 103:11
116:7,11 128:3
219:5

**suspects**
67:19 74:14
76:4 77:16 78:9
93:16 101:9
103:4 204:17
219:8

**suspended**
158:19 159:4

**suspension**
157:25 158:23

**suspicious**
147:23

**swear** 8:14,16

**swearing**
12:18

**sworn** 9:2
20:24 22:19
47:13

**Sydney** 5:2,12
8:21 15:18 39:7
43:14 83:16
120:24 167:10
169:1 195:22
227:23

**system** 65:7
129:1,4

———————

**T**

**table** 114:4

**tag** 35:20 36:3

**tagged** 35:24
69:12

**takeaway**
71:24

**taking** 10:5
45:13,19 79:10,
12 81:13 82:6
91:7 101:24
103:14 128:9
156:5 202:4
205:17 226:25

**talk** 21:8 22:16,
24 23:24 27:15
39:17 45:11
49:8 58:22
62:7,8,18 67:24
70:19 73:15,23
80:10 96:12,17
100:1,5 102:3,8
107:6,8 109:13
113:20 115:17,
20 117:11,14
119:22 139:1
144:5,18
148:24 149:16
151:24 156:1
163:3,21
168:16 177:7,
13,17,20
178:20 188:15
191:21 196:17
217:16,19
225:20,25
232:11

**talked** 34:7
36:5 39:12,14,
20 55:8,10
63:11 81:8,9
100:14 103:20
109:15 157:18
162:23 163:1,
14 182:9
189:15 206:19,
21

**talker** 102:2

**talking** 20:19
22:17 24:2
25:22 27:14
36:23 51:8
59:17,21 60:2
73:2 91:2,5
96:13,19 101:7
107:5,24
119:11 138:13
142:13 143:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG Document 386-2 Filed 05/26/23 Page 1023 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2002

262

172:6 185:20
186:10 193:19

**talks** 192:24
211:6

**Tampa** 223:4

**tamper** 93:11

**tape** 178:5

**tasked** 176:2

**taught** 66:13
203:25 212:18

**teach** 204:12,
16

**teacher** 206:14

**teachers**
207:17

**team** 116:13
118:15 124:19
168:14 218:19

**TECH** 5:1,7,9,
11 8:1,6,10,12,
23 15:13,16
39:2,5 43:9,12
83:11,14
120:19,22
167:5,8 168:21,
24 195:17,20
210:21,25
227:17,20
229:3 233:22

**technician**
5:2,13

**technique**
71:13,19

**techniques**
70:23 82:5

**telling** 22:22
48:8 49:6 60:18
61:5 62:3 77:2
78:16 79:13,21
84:7 142:20
145:20 181:21
186:19 216:21

**tells** 99:25
213:10

**tend** 32:22

**tended** 26:10

**term** 157:12

**terminated**
140:19,20
141:6 146:15,
18 148:19
149:10,13,17
158:20

**termination**
158:24

**Terrazas**
191:4,6,7
193:14 194:7,
10,11

**test** 14:12
77:24 82:12
198:2 202:10,
11,12,19,20,25
205:17 209:20
232:25

**testified** 9:2
20:25 21:5,6,
11,22 22:8
25:22 201:6
218:9 232:21

**testify** 11:16
12:6,19 73:19,
22 86:11

**testifying**
20:21 86:14,17

**testimony**
8:17 11:19
12:9,12,22,25
13:3 21:3 23:9,
19 26:14 27:16
28:11,15 31:1
84:10 86:20,23
143:13 201:24
202:5

**testing** 6:21,22
210:5 212:18

**Texas** 5:21
7:11,14,19,25
192:4 196:18
206:23 219:4,
18

**textbook** 214:4

**that.'** 194:4

**theft** 16:24

**theory** 116:10
229:23

**thing** 39:23
41:20,21 52:6
66:19 73:7 80:9
82:13,16 90:24
97:10 104:2,10
105:5 113:3
116:3 128:4
142:13 144:4,
16 146:15
152:19 160:6
168:8 183:7
186:5 192:5
200:13 208:24
232:4

**things** 54:22
71:10 87:17,18,
25 91:11 92:10
134:1 155:23
202:23 224:18
230:22

**thinking** 112:7
160:3 233:15

**thought** 25:18
59:20 61:18
74:10 127:3,9
203:19

**thousand**
198:12

**threads** 231:8

**threatened**
220:18

**throw** 36:1

**ticket** 104:14

**tickets** 95:24
96:2,3,5,9
104:11,13,16,
19 106:21,24
107:3,7 111:6

**time** 5:17 10:15
12:23 15:14,19
18:17,20 21:11
23:14 27:11,13,
18,23 30:24
32:11,15 37:18
38:1,3,9,11
39:3,8,11 43:4,
10,15 46:2
47:21 49:17

50:18,21 51:2,
18 58:23 59:19
61:13 62:5,8,
12,14,18,24
67:16,25 69:16,
19 70:6,10
73:11 81:18
83:9,12,17 85:6
87:10 97:18
98:1 100:10
102:18 105:17
108:10 109:14,
16 113:1,2
114:20,24
118:6 119:8,10
120:12,17,20,
25 131:25
132:17 139:18
140:12,13
145:1,11,21
150:4,10,13
156:5 157:24
162:20 164:12
165:4 167:6,11
168:22 169:2
172:7 174:17
176:2,8,23
180:17 181:8,
14 185:20,23
189:7 190:8
194:23 195:18,
23 198:20
201:10,14
203:18,19
204:11 209:8
214:1,16
221:18 222:20
227:18,24
231:4 233:23

**times** 45:10
54:16 61:3
74:23 76:22
79:9 96:7
100:19,21
107:13 113:14,
15 135:22
156:15 160:4
162:19 174:12
198:20 226:8

**timestamps**
50:21

**title** 212:2

**titled** 210:20
213:22

**today** 5:14,16
9:9 10:5 11:16,
20 12:6,9,13,19
13:21 15:19
30:16 33:1,7,9
39:8 42:24
43:14 59:13
83:17 106:18,
24 120:25
167:11,15
169:2 175:5
195:23 196:12
197:19 201:6
207:6 211:21
227:23

**today's** 33:5
196:7

**told** 23:6,23
24:6,7 34:10
46:14,17 49:19
54:11,12,13,22
55:1 58:12
60:7,15,19,23
61:1,8,20 62:2
67:5 68:21
73:17 77:1 80:7
81:1,23 87:12
90:3 111:25
115:14 122:21,
24 124:22,23
125:25 126:3,4
127:1 145:7,8,
15 146:9
147:18,20
150:21 152:17
155:17 165:22
166:9 176:16
179:21 183:4
187:1,2,3
188:15,18
192:9 193:19
196:21 198:1
213:8 231:12

**tomorrow**
49:21,22 59:12

**Tony** 178:1,21

**top** 175:14
192:14,23
208:11 224:7

**topic** 198:3

**total** 19:7



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 1024 of 1026
The Deposition of HECTOR LOZOYA, taken on May 29, 2019

263

totem 145:17

tough 144:5,17

toughest 206:14

town 40:21 66:16 69:6 141:20 149:23 189:4 219:5

traffic 14:3 95:24 96:2,3,5, 9 104:11,13,14, 16,19 107:3 147:1

trained 41:16 92:13,15,17,22 93:2,5,9 207:22

training 32:8 40:7,8,13 41:2, 18 45:2,4 66:5, 9 70:13,16 71:2,3,6,23 72:5 81:11,13 87:24 92:23 93:1,10 132:20 137:4 204:20, 23,25 205:2 206:8 208:22, 25 226:2,5

transcribed 128:5

transcriber 143:8

transcript 196:2

transcription 143:9 168:3

transfer 14:8, 10 17:16,21 18:14,16 25:10 30:21 31:2

transferred 17:4,6 30:15

transferring 51:18

transported 111:6,14

trial 27:12,16 28:16 63:5

233:21

tricky 229:17

trouble 19:11 28:20,23 42:12 72:15,18,21 87:14 92:1 140:23 146:13, 14 147:17 148:8,15,23 154:18 231:17

true 11:19 12:8, 9,12 62:22 73:15 77:18 80:16 116:16 134:10

trust 92:7 232:16

truth 8:18,19 12:19 74:11 84:7 91:6 103:21,22 147:18

truthful 61:22, 23 74:11,23

tunnel 41:16, 20

turn 35:19,21 41:14 42:14 82:8 88:1

turned 52:3 154:21 225:7 233:7

turning 97:2

twelve 205:5

twenty 151:20

type 33:21 40:12,14 41:18 46:20 49:8 51:5 53:18 75:13 93:13 121:16 128:2,6 142:19 157:25 158:14 159:1 179:3 212:10 220:25 221:1 226:5 228:17 232:5

typed 48:16,25 53:21 79:19

127:23,25 128:2,9,11,15 129:1,6 228:11, 14,21

typed-out 58:17

typical 137:22

typically 84:14 104:9

typing 48:7,8 49:6,7 50:22 53:11 80:25 81:21,22 128:8, 19 228:18

typist 81:4

_____

U

uh-huh 10:11 70:25 80:24 82:15 163:1,16, 19 169:24 170:24 200:17 213:3 217:3

Ulysses 205:12

umm 179:15

un 102:20

un-handcuff 103:2

unable 166:2

unbiased 44:23

uncomfortable 103:16

undecipherabl e 106:6 144:23 145:20

undersigned 110:20 111:4 192:19

understand 11:22 12:15 25:1 42:3 44:22 48:20 50:25 57:18 58:8 61:18 64:13

77:21 78:25 133:20 155:24 156:24 158:12 159:20,21 163:4 165:2,8 202:5 212:9 214:17 218:1 223:20

understanding 89:15 128:1 158:9,22,25 188:1 230:11

understood 10:25 29:7 53:6 157:4 181:23 209:20,21 210:7 233:4,10

undertake 213:4

underway 28:16

unfairly 172:18,20

unfolding 97:6

unfounded 157:22 158:16, 18

Uniform 95:21

uniformed 95:17 99:13,15 110:3 111:1,14

unintelligible 6:4 107:21,22

unit 15:4 16:3,5 18:9,10,11 29:22,24 30:1 106:6 208:18 211:11 215:6,7, 12 216:6 219:18 220:21 225:18,22 226:15

United 5:20

units 137:12

unmuted 17:13

unofficially 32:21

untrue 12:23 13:1

unusual 136:6 176:13

update 211:15

updates 209:14 226:2, 12

updating 53:16

upset 24:2,3,5, 6,14,18,21 194:3

USB 64:18,19

usual 52:14

_____

V

_____

vacation 31:21 131:6 186:21

vague 112:23 133:11

validate 210:6

Vera 226:18

verbal 10:12

verbally 10:8 220:15

verbatim 80:25

verification 130:2,24

verify 129:18, 19 131:9

verifying 131:14,24

versus 5:19 52:15 62:16 76:16 127:25 158:23

vibes 101:14

victim 164:21, 23 165:3 169:19 170:1 222:25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 1025 of 1026
The Deposition of HECTOR LOYA, taken on May 29, 2002

264

**video** 5:1,2,7,9, 11,12,17 8:1,6, 10,12,23 15:13, 16 39:2,5,7 43:9,12 47:25 68:5 83:11,14 97:5,7 100:7 105:2,5,7,13, 18,19,21 106:1, 2 108:7,9 109:8 120:19,22 148:5 167:5,8 168:21,24 195:17,20 210:21,25 227:17,20 229:3 233:22

**videoconference** 15:18 43:14 83:16 120:24 167:10 169:1 195:22 227:22

**videos** 33:15 72:2,3

**videotape** 96:21

**Viegas** 38:20

**viewed** 109:2

**Villegas** 5:19 7:3 9:8 95:11 99:4 107:11,16, 18,23,24 108:2 115:24 116:14, 17 138:19 144:1 145:2 146:11 183:25 189:9 197:8 220:11 221:10

**Villegas's** 112:2 116:13 124:18 168:14 187:19

**violate** 158:14, 25 159:1

**violated** 87:21 88:6

**violation** 91:3

**violations** 155:1,25 221:2

**violence** 16:14,24

**vision** 41:17,20

**vocal** 29:12,17, 20

**voice** 142:6

**voluntarily** 96:8

——————

**W**

**wait** 77:18,19 78:2 134:3 189:20

**waiting** 153:12 187:11,13

**waived** 149:19

**walk** 150:24

**walking** 176:19 232:13

**Wallace** 6:2 7:2 9:7

**Wally** 42:16 108:11 112:17 120:5 167:12 181:9

**wanted** 14:14, 21 17:25 22:9, 15 47:5 104:13 116:1 141:22 144:25 147:23 177:23 182:16 185:16 191:21 193:4

**war** 217:17

**warn** 148:19

**warned** 149:9

**warnings** 58:1

**warrant** 135:24 164:22,25 165:24,25 217:1,8 225:11

**warrants** 66:13,14,15 95:15 203:5 226:6

**waste** 59:19

**watch** 33:15 36:19 105:5

**watched** 76:17

**water** 16:13

**Wayne** 180:7, 8,18,24 181:6, 12 182:20 184:7 185:3

**ways** 57:19 153:24

**weapon** 137:23 138:2,5, 8

**Webrms** 65:12

**website** 233:8, 12

**weeds** 227:3

**week** 21:22 22:8 40:21 66:12,16 113:25 207:2

**weekend** 21:24 22:15 94:23 215:20

**weekends** 101:5

**weekly** 132:14 189:4,11 215:8, 25

**weeks** 20:25 25:11 163:8

**weird** 144:22 148:7

**West** 5:15

**Western** 5:21

**White** 18:9,10, 11,23 25:10 30:15 31:2

**who-done-it** 67:23 118:3

**who-done-it's** 68:3

**wife** 117:6 140:12,14

141:25 143:16, 17 144:4,15 191:16,18 199:15 200:6

**Williams** 180:7,8,19,24 181:7,13 182:20 184:7, 15 185:3

**withheld** 218:17

**withhold** 76:3

**witness's** 80:23

**witnessed** 58:15 85:22 86:10 87:6,9 89:16

**witnesses** 49:12 57:20 58:14 59:23 60:10 70:14 71:2,6,11 72:7, 14 73:3,10 75:4 76:4,15 77:15 81:10 84:16 96:7 101:12 102:5 116:5 117:15,17 119:4 145:14 159:13 173:12 213:5 219:8

**woman** 161:7 166:6,10 191:11

**word** 47:19 98:13 118:2 153:7 157:7 177:4 229:17

**word-for-word** 81:2,5

**word-to-word** 81:3

**words** 24:17, 19 25:13 80:23 141:8 177:25 212:7

**work** 14:20 16:3 17:25 19:3

20:4,15 25:6,19 26:5,18 30:23 31:5,8,10,18,20 32:14,22 45:3,9 46:1 67:2 69:18 70:1 73:12,24 100:16 119:17 131:14,15 135:2 136:6 139:13,19 145:8,16 153:6, 9 154:5,12 160:15 169:8 174:10,20 176:22 177:4 179:14,17 181:18 182:25 187:9,21 188:2, 12 189:16 190:1,22 196:11 197:24 208:7,15 218:12,24 219:16 229:15 230:8,11

**worked** 20:20 25:24 26:9 31:22 32:12,23 35:4 37:21 53:7,8 56:16 63:25 97:13 100:17 101:2 113:11 131:5 137:25 139:6 160:9,11,13 165:24 174:9, 13,15,16 177:9 190:21 217:20 219:14,22 229:24 231:1, 24

**worker** 155:4

**working** 19:2, 6,12 25:21 29:10,13 32:11 35:8 36:13 58:14 59:5 61:25 69:16,22 79:7 97:25 98:7,24 113:5, 8,21 126:22 129:8 131:18 141:12 160:25 173:18 175:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case 3:15-cv-00386-DCG   Document 386-2   Filed 05/26/23   Page 1026 of 1026
The Deposition of HECTOR M. LOYA, taken on May 29, 2002

265

176:10,14
179:12 181:24
188:8,14 189:6
190:19 215:23
216:10,11,12
217:12 224:12
232:6

**works** 37:20
59:22 120:18
158:10 164:20
167:3

**worried** 27:5
28:19,23 29:10
231:16

**worry** 72:15
80:17

**worse** 154:21

**worst** 159:22

**worth** 198:5,6

**wow** 71:15
198:6

**write** 48:18
49:2 50:3,11
51:1 60:8,14
62:2 155:3
170:19 221:7

**writer** 184:5

**writing** 48:7
54:23 57:5
205:4

**written** 58:17
60:3,9 99:23
138:11 158:18
159:12 223:17

**wrong** 38:20
41:14,23 42:5
43:22 44:8 75:9
102:18 108:25
159:24 178:16
230:21,25

**wrongdoing**
147:16

**wrote** 51:6
52:10 53:24
66:23 166:5,9
207:3

---

**Y**

---

**y'all** 167:13
168:5

**year** 26:6 31:21
32:7 65:12
174:18 175:20
205:7 233:7

**years** 10:3
14:6,7 18:7
32:13 34:2
39:13 45:18
46:13,16
100:22 103:8
139:4,7,9
143:17 149:20
151:20 156:3
160:17,22
162:2 175:18
183:6 192:25
202:12 203:18
205:16 217:21
220:8 231:3
233:13,14

**yesterday**
61:20

**young** 38:22

**younger**
232:19

---

**Z**

---

**zoom** 13:17
51:10 124:1



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com