# CITY'S REPLY EXHIBIT K

Page 1

```
         IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF TEXAS
                 EL PASO DIVISION

DANIEL VILLEGAS,            )
                            )
        Plaintiff,          )
v                           ) No. 3:15-CV-386
                            )
CITY OF EL PASO, et al.,    )
                            )
        Defendants.         )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEO DEPOSITION OF

JOSEPH ANTHONY MESSER

AUGUST 23, 2022

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEO DEPOSITION of JOSEPH ANTHONY MESSER, produced as a witness at the instance of the Defendant CITY OF EL PASO, and duly sworn, was taken in the above-styled and numbered cause on AUGUST 23, 2022, from 9:43 a.m. to 5:55 p.m., at the offices of ACR Ink, LLC, 221 North Kansas Street, Suite 505, El Paso, Texas, pursuant to the Federal Rules of Civil Procedure.

                              Reported by:

                              Ginger G. Zachary, CSR, RPR, CRR

Page 274

1                C E R T I F I C A T E

3  STATE OF TEXAS        )
4  COUNTY OF EL PASO     )

8            I, Ginger G. Zachary, Registered Professional
9   Reporter, Certified Realtime Reporter, and Certified
10  Shorthand Reporter in and for the State of Texas, hereby
11  Certify that this transcript is a true record of the
12  said proceedings, and that said transcription is done to
13  the best of my ability.
14           Given under my hand and seal of office on
15  September 8, 2022.

18  _____
    Ginger G. Zachary, CSR, RPR, CRR
19  Texas Certification Number 5710
    Date of Expiration:  1/31/2024
20  ACR INK, LLC
    Firm Registration Number CRF-11613
21  221 North Kansas Street, Suite 505
    El Paso, Texas  79901
22  Ph.: 915.542.3422

Page 155

1  flipped it over to the police department, to the chief,
2  and this initiated all this paperwork, these separate
3  incident reports.  It was -- it was -- quite amount of
4  work was generated on this.
5       Q.   So let's take another look at -- now, we'll
6  look at Exhibit 27.
7            MR. DENTON:  We marked that last one as 26,
8  right?
9            THE REPORTER:  I don't show a 26 marked.
10           MR. DENTON:  All right.  That last one was
11 26.  The -- yes, 92-174.  So we'll look at 27 now, If
12 you'll pull up CP93-009.
13           (Exhibit 27 marked.)
14      Q.   (BY MR. DENTON)  Do you recognize this one?
15      A.   Well, it's the introduction to...
16           THE WITNESS:  Could you move it up just a
17 little further --
18           MR. DENTON:  Yes.
19           THE WITNESS:  -- please?
20           MR. DENTON:  Scoot down a little bit.
21 There we go.
22      Q.   (BY MR. DENTON)  It's against Martinez and
23 Lowe --
24      A.   This -- this -- this was a separate incident.
25      Q.   Right.

Page 156

1    A.   But it also involved Sergeant Lowe.
2    Q.   And it also involved --
3    A.   And --
4    Q.   -- juveniles, right?
5    A.   Yes.
6    Q.   Okay.
7    A.   This incident, as I recollect, involved over a
8  period of time that Lowe was not maintaining proper
9  discipline, oversight.  He was more interested in being
10 one of the guys than being a supervisor, and it resulted
11 in a --
12   Q.   Let's shift to the --
13   A.   -- lengthy suspension.
14   Q.   Just -- just a moment.
15   A.   Okay.
16   Q.   Let's shift to the next page, and then please
17 continue your answer.
18   A.   Okay.
19   Q.   There we go.
20   A.   Okay.  Well, it's just what it states on there.
21   Q.   Okay.  So number 5 -- read number 5 for us.
22   A.   "Did Sergeant Lowe authorize statements to be
23 taken from juveniles without parental consent?"  That's
24 what I mentioned earlier.
25   Q.   Right.

Page 157

1      A.   We're not supposed to take a statement or
2   confession or any -- from a juvenile unless a parent
3   consented to it or unless a parent was present.
4      Q.   Okay.
5      A.   He didn't do that, along with these other
6   transgressions that are listed on there.
7      Q.   And do you remember what the suspension was on
8   this case?
9      A.   I believe he got 20 days, which was a pretty
10  good whack.
11     Q.   Let's go to 64387.
12          So it looks like virtually everybody in the
13  crimes against persons unit was interviewed, right?
14     A.   Well, this was the tac unit.
15     Q.   Tac unit.
16     A.   This was not --
17     Q.   Very good.
18     A.   -- crimes against persons.
19     Q.   Okay.  So there's the page there.  So what was
20  his punishment?
21     A.   20 days.
22     Q.   Okay.  And Martinez, written reprimand?
23     A.   Got a written reprimand.  Martinez was kind of
24  on the sidelines on this.  Martinez was reprimanded for
25  not properly keeping a watch on Lowe.  He wasn't present

Page 158

1  during most of these alleged transgressions.

2       Q.   Okay.

3       A.   He was too laid back.

4       Q.   So did anything else happen after this incident
5  and the one before it involving the tac unit?  Did
6  anything happen to the tac unit organizationally?

7       A.   There were some people that were assigned other
8  jobs.  In other words, it was broken up.  A lot of these
9  officers that you mentioned here, the patrol officers
10 that you mentioned on there, they were -- for want of a
11 better term, they were just following along in the trail
12 of their supervisors.  Because all those individuals
13 that were disciplined, with the exception of Eoff, were
14 supervisors.

15      Q.   Sergeants or lieutenants?

16      A.   Sergeants and -- Johnson, Jerome Johnson --
17 well, Lowe at -- Lowe was a sergeant in both instances.
18 Allen was a sergeant.  Jerome Johnson was a sergeant.
19 And the fourth one was a detective.  That was Eoff.
20 Now, in this case, Lowe was still a sergeant.  Lowe was
21 suspended, between the two incidents, apparently 30
22 days, total.

23      Q.   Okay.  Was he removed from the unit?

24      A.   He was removed from that job.

25      Q.   Okay.  In that tac unit?

Page 159

1     A. Yes.
2     Q. All right. And who were the others that were
3 moved to different places?
4     A. Well, Allen eventually ended up in patrol.
5 Jerome Johnson -- well, the unit, as a whole, the
6 supervisors were broken up.
7     Q. Okay.
8     A. The men, they were not so much at fault. They
9 were just following along, doing what they were directed
10 to do. If they took the juveniles to a facility where
11 they should not have been taken, it was because they
12 were told to by a supervisor.
13     Q. And with the suspension and the other changes
14 in assignments, did you feel like that you had gotten
15 back to policy compliance?
16     A. Yes, but one other thing I'd like to mention.
17 I believe this case, the case of the juveniles that
18 originated with Eoff, I believe it went to a
19 disciplinary board, of which I was probably the chair
20 because of my -- I signed off on it. And I believe --
21 and they all tendered their recommendations, which were
22 written down, and I looked at them, and I would decide
23 what the appropriate punishment was.
24         Whether the individual members of the
25 disciplinary board or not concurred didn't matter. I

Page 160

1  wanted their input.  I wanted them to ask questions that
2  I might not have asked or would fail to ask, but the end
3  result was they forwarded to me the results, and I came
4  up -- or their recommendations, I should put, and I came
5  up with the sanctions.
6       Q.  Okay.
7       A.  I also think this -- some of them were
8  appealed.  Some of them were appealed either to the
9  Civil Service Commission or to an arbitrator, and some
10 of them -- not all of them -- were modified.  Now, I
11 don't know if you have that information here or not.
12      Q.  I can't tell you off the top of my head if the
13 arbitration award is in this one or not.
14          Let's move on to another incident and kind
15 of wrap up the exhibits today, Exhibit 28, and this will
16 be the Ybarra case.  It's IA 90-080.  -080.
17          (Exhibit 28 marked.)
18      Q.  Is this one you had an opportunity to look at a
19 little bit?
20      A.  Yes, sir.
21      Q.  Let's look at the bottom and see what we're
22 showing here.  This one has one of your police
23 colleagues on here who has signed the "not sustained"
24 here.  I can't read that.
25      A.  Well, this is a recommendation of that

Joseph A. Messer - August 23, 2022

Page 202

1  A. I would point out to the appropriate people
2  that your officers, units are not following this
3  procedure. Now, if it was in the patrol division where
4  most of these cases originated, that was my -- that was
5  my -- I would point it out, "Lieutenant Jones, your
6  officers did not follow procedure here, and I don't want
7  it to happen again."
8  Q. Okay. My question is, once you knew that the
9  tac office had this repeating problem of not following
10 juvenile policies, did you do anything to -- to check --
11 to check whether other divisions were following juvenile
12 policies appropriately?
13         MR. BRITTAIN: Objection, form.
14 Q. (BY MR. HILKE) You can answer.
15 A. First of all, hopefully you have supervisors in
16 place -- two or three between the street level and
17 yourself -- that'll ensure that they're doing their job,
18 following -- that's the sergeant's primary function.
19 And not the sergeant, then the lieutenant.
20         In the case that we discussed earlier, the
21 sergeants weren't doing their job. The sergeants were
22 the one that were responsible for mishandling juveniles.
23 That's why they were suspended. That's why, in that
24 particular case, a large number of them were
25 transferred, if not immediately, soon afterwards.

Page 203

1 Now, if I found out that this policy of
2 handling juveniles, whether it's in regards to a
3 confession or -- or whatnot, was not being followed,
4 then somebody would be called on the carpet for it.
5     Q.  Okay. So is it your testimony that even though
6 you knew there was a problem in tac, you didn't -- you
7 didn't check out whether there was a juvenile policy
8 problem in any other division? You would have waited
9 for that information to come through -- to you through
10 other complaints.
11     A.  Well, if the problem was in the patrol bureau,
12 the uniformed officers -- it was called "uniform
13 bureau" -- I would try to rectify it myself. If it was
14 a particular division -- we have divisions and sections
15 there.
16 You know, I mean, if a policy is being not
17 followed, but the officers are not doing it deliberately
18 just because they want to shortcut, or something, then,
19 look, Sergeant so-and-so, your -- these two officers in
20 this case right here, they shouldn't have gone to --
21 they should have gone to the juvenile location.
22     Q.  Yet I want to -- I'm asking a very specific
23 question. I guess, part one, you knew that there was a
24 problem with juvenile policies in tac. It was such a
25 big problem that you had to kick -- a bunch of people