# CITY'S REPLY EXHIBIT N

1       November 30, 1994

2       Wednesday

3       THE COURT:  This is Cause Number 76187, the State

4   of Texas versus Daniel Villegas.

5       We are set this morning on a motion to suppress.

6   Mr. Olivas, I believe you have something you wish to put

7   in the record before we call the first witness.

8       MR. OLIVAS:  Your Honor, the defense has a request

9   for a continuance as to this matter.

10      At 8:10 this morning, I filed a writ of mandamus

11  directing this Court to dismiss said cause on our

12  assertion that the jurisdiction that this Court holds over

13  Mr. Villegas is void as a result of the problems involving

14  the referral to the grand jury for indictment -- I

15  apologize -- as a result of the indictment -- the original

16  indictment which vested this Court with jurisdiction

17  preceding the referral in violation of 54.02(h) of the

18  Texas Family Code.

19      Counsel is asking for an oral motion for

20  continuance as to any and all proceedings pending the

21  resolution or the decision by the Appellate Court -- the

22  Eighth Circuit Court of Appeals.

23      I understand that the district attorney's office

24  is, at this point, fighting a response to my petition for

25  mandamus and frankly, I think it would be premature on the

1   part of this Court to continue with it.

2       Counsel is not prepared to proceed this morning.  I

3   am missing three key witnesses.  Specifically, Dr. Gene R.

4   Vanderpool which is Mr. Villegas' psychiatrist for

5   treatment.

6       Dr. Cheveres-Rodriguez, or Rodriguez-Cheveres, who

7   was another -- is board certified in forensic psychiatry

8   who was also scheduled to testify at the suppression

9   hearing as well as a Dr. Mariam Marvasti.

10      I believe that the three doctors will testify of

11  Mr. Villegas' functioning.  Indeed, that he can function.

12  They have all examined him, for lack of a better term, and

13  in lay person's term, Your Honor, they will testify that

14  he is somewhat subject to influence and coercion.  Indeed,

15  they will testify that he is border line -- he's border

16  line functionally retarded.

17      At any rate, Your Honor, I think this is key

18  because they will introduce evidence in trial from other

19  co-defendants that were originally here.

20      This is a key in that evidence will point to the

21  fact that indeed, there were efforts of coercion on the

22  part of the El Paso Police Department -- specifically, one

23  Alfonso Marquez.

24      Indeed, Alfonso Marquez is wanting in his

25  investigative techniques and we intend to produce that

1    evidence.

2          We need to consult some other people specifically.

3    There are about three subpoenas that have not been issued

4    simply because I was left with the -- counsel for the

5    defense was left with the impression that in the event

6    that the writ was filed, that we were not going to

7    proceed.

8          Hence, I filed a writ ahead of time before the

9    proceedings and the Court has informed us this morning

10   that we will proceed.

11         Please note for the record our objection and

12   indeed, as we speak, the clerk for the Eighth Circuit

13   Court of Appeals has informed me that the panel has my

14   petition for mandamus in their hands at this point and are

15   going through it and to quote her, she stated "That they

16   are fast, but not that fast."

17         And I further informed her that the proceedings

18   were going on down here.  If they would please be kind

19   enough to contact myself or somebody here.

20         At any rate, Your Honor, we frankly are not

21   prepared because we are missing those three medical

22   doctors.

23         We are missing another key defendant.  His name is

24   Rodney Williams who is a witness for the State as to the

25   main trial.

VILLEGAS v. CITY OF EL PASO - P002269

1    We are missing two expert witnesses, Bruce
2    Weathers, as well as Mike Gibson that will testify to the
3    veracity and the investigative techniques of Alfonso
4    Marquez.

5    Indeed, if the Court wants to proceed, we would --
6    well, please note our objection for it.  We would,
7    however, ask for a continuance so that I can contact my
8    witnesses -- the expert witnesses -- specifically.

9    I do have some factual witnesses available today
10   and if the Court would like to proceed with those, we
11   still would object, but we would ask for a continuance as
12   to allow me to bring the other witnesses.

13   There is a third witness missing which is Marcos
14   Gonzalez who, at one time, was a co-defendant in this
15   case.  That individual is across the street detained in
16   jail.

17   I understand that the clerk of this Court has asked
18   the Sheriff to bring him over and we expect him shortly;
19   however, I have not had an opportunity to pre-trial any
20   one of my witnesses simply because of the events as they
21   have panned out.  Again, we would ask for an oral motion
22   for continuance.

23   THE COURT:  All right.  Your motion for continuance
24   is denied.  This Court has received no notice of a stay
25   being issued by the Court of Appeals.

1    I have got the motion to suppress confession or any

2    statements made by the defendant.  Is the State ready to

3    proceed?

4    MR. ESPARZA:  Your Honor, the State is ready to

5    proceed.

6    THE COURT:  And I note your objection and it is

7    noted for the record that you have indicated that you're

8    not ready for this hearing today.  Call your first

9    witness.

10   MR. ESPARZA:  Your Honor, at this time, the State

11   would invoke the Rule.

12   THE COURT:  All right.  Do you have any witnesses

13   in here, Mr. Olivas?

14   MR. OLIVAS:  Yes, Your Honor.  We have Mr. and Mrs.

15   Villegas and Mr. David Rangel.

16   THE COURT:  I will just ask you all to please step

17   outside and we will call you in one at a time when it's

18   your turn to testify.

19   MR. ESPARZA:  May I proceed, Your Honor?

20   THE COURT:  Yes, you may.

21   MR. ESPARZA:  The State calls Detective Al Marquez.

22   THE COURT:  Raise your right hand.

23                    ALFONSO MARQUEZ,

24   having been called as a witness by the State, after having

25   been sworn by the Court, was examined and testified, as

9

```
 1    follows:
 2              THE COURT:   Please be seated.
 3                        DIRECT EXAMINATION
 4    BY MR. ESPARZA:
 5    Q    Sir, would you state your name for the record?
 6    A    Alfonso Marquez.
 7    Q    And how are you employed?
 8    A    With the El Paso Police Department.
 9    Q    And how long have you been employed with the
10    El Paso Police Department?
11    A    Twenty-three years.
12    Q    And where are you currently assigned?
13    A    I'm assigned to the Homicide Division.
14    Q    And did you have an occasion to work on the case
15    involving the defendant in this case, Mr. Daniel Villegas?
16    A    Yes, I did.
17    Q    And just so that I can place you -- the incident in
18    this case occurred on April the 10th, 1993?
19    A    Yes, it did.
20    Q    And I'd like to direct your attention to the night
21    of April 21st, 1993.  Did you have an occasion to come in
22    contact with Mr. Villegas?
23    A    Yes, I did.
24    Q    Okay.  And where was that?
25    A    At his home at 5700 Wren.
```

1    Q       And were you there by yourself or with other
2    officers?
3    A       I was there with other officers.
4    Q       And who were they?
5    A       Myself, Detective Arbogast, Detective Scott Graves,
6    Detective Joe Laredo and I believe two additional police
7    officers.
8    Q       Were you in a marked unit or an unmarked unit?
9    A       We were in unmarked units.
10   Q       Were there any marked ones?
11   A       Yes, sir.  There were -- there was one -- a two-man
12   crew police officer marked unit.
13   Q       And what time did you arrive at the home of Mr.
14   Villegas?
15   A       Approximately about 11:10 -- 11:15.
16   Q       Was Mr. Villegas home?
17   A       Yes, he was.
18   Q       And were there any other family members present in
19   the home?
20   A       Yes.  There was his mother, his father.  I believe
21   I saw another female and Marcos Gonzalez.
22           THE COURT:  What time of day?  Day or night?
23           THE WITNESS:  Nighttime.
24   Q       (BY MR. ESPARZA)  And you want to repeat the time
25   for me?

1    A    Approximately 11:10 -- 11:15 p.m.

2    Q    When you approached the house, did you knock?  What

3    was your procedure?

4    A    We parked our vehicle in front of the house.  We

5    parked one patrol car at the corner.  He lives in a corner

6    house.  I parked in the front.

7         Detective Joe Laredo and Scott Graves, I believe,

8    parked across the street and the other officers were

9    around the corner in a police car.

10        We went up to the door and knocked at the door.

11   The mother answered the door.  She opened the door.  We

12   identified ourselves and she allowed us in the house.

13   Q    Who entered the house?

14   A    Myself, Detective Scott Graves and I believe

15   Detective Arbogast.

16   Q    Okay.  What did you tell Ms. Villegas as to the

17   purpose of your visit?

18   A    I told Ms. Villegas that we needed to speak to

19   Danny Villegas reference an investigation that we were

20   conducting.

21   Q    Okay.  And did she permit you to do so?

22   A    Yes, sir, she did.

23   Q    Where was Mr. Villegas at the time you arrived at

24   the home?

25   A    When we entered the home, they hollered for Danny

1   Villegas or Danny.  He came from the hallway, I believe.
2   I'm assuming from one of the bedrooms in the hallway.
3   Q     Where were you standing when she yelled out for Mr.
4   Villegas?
5   A     In the living room.  About three feet from the
6   doorway.
7   Q     What did you do next?
8   A     We waited for Danny to come out and when he did
9   come out, I told Danny that we needed to speak to him
10  reference an investigation that we had.
11        At that point, I saw, I believe, his father come
12  out also from the hallway bedroom area and there was a
13  couch and he stood behind the couch.
14        I also explained to the father what we were there
15  for and at that time, Marcos Gonzalez also came out.
16  We identified Marcos.  We also needed to speak to him and
17  told him that we needed to speak to him downtown.  We had
18  him identify himself.
19  Q     And what did the defendant say when you told him
20  the purpose of your visit?
21  A     He didn't say anything.  Just "Let me get dressed."
22  Q     All right.  And then what happened?
23  A     We waited in the living room while he got dressed
24  or just went in and got -- I believe he had a shirt.  He
25  had pants on, but he put on a shirt and we waited.

1            At that time, I advised him of his Miranda warning

2    rights -- juvenile Miranda warn rights.

3    Q      And how did you know his juvenile Miranda warning

4    rights?

5    A      I didn't.  I carry a juvenile Miranda warning card

6    and an adult Miranda warning card with me.

7            MR. ESPARZA:  Your Honor, may I approach the

8    witness?

9            THE COURT:  Yes, you may.

10   Q      (BY MR. ESPARZA)  Let me show you what I have

11   marked as State's Exhibit Number 1 and can you identify

12   this?

13   A      This is a juvenile Miranda warning card.  The card

14   that I used to read him his rights at the house.

15   Q      How do you know that that is the card that you used

16   in this case to read him his juvenile warnings?

17   A      The card at the top shows his signature, the time

18   that I read them to him, the date and at the right-hand

19   corner of the card are my initials.

20   Q      And what time is it that you read him his juvenile

21   Miranda warnings?

22   A      11:15 p.m.

23   Q      And where exactly were you when you read him his

24   juvenile warnings?

25   A      In his house in the living room.

1    Q    And for the record, would you read to us what you
2    read to him?

3    A    It says, "You have the right to remain silent.
4    You do not have to make any statement, oral or written, to
5    anyone. Any statement you make will be used in evidence
6    against you.

7         You have the right to have a lawyer present to
8    advise you before and during any questioning.

9         If you are unable to employ a lawyer, you have the
10   right to have a lawyer advise you before and during any
11   questioning, which lawyer will be appointed by the court
12   for you free of charge now or at any other time.

13        You have the right to terminate the questioning at
14   any time you want.

15        If you are 15 years of age or older and you have
16   committed a felony, the juvenile court may give up its
17   jurisdiction over you and you may be tried as an adult in
18   a criminal district court.

19        Additionally, you may be sentenced to commitment in
20   the Institutional Division of the Texas Department of
21   Criminal Justice for a term not to exceed 40 years if you
22   are found to have engaged in delinquent conduct alleged in
23   a petition approved by a grand jury and alleges the
24   commission of one or more of the following offenses,
25   to-wit: murder, capital murder, aggravated kidnapping,

1    officer, corrections officer or court participant or
2    criminal attempt if the offense attempted was capital
3    murder.
4            All of the rights that have been explained to you
5    are continuing rights which can be used by you at any
6    time."
7    Q    And what, if anything, did he do to indicate
8    whether he understood the rights that you read him?
9    A    The signature affixed to the top left card.
10   Q    Did he respond to you verbally?
11   A    Yes, sir.  I asked him if he understood his rights
12   and at a point later on, in the process, I explained to
13   him each and every right more or less what they meant.
14   Q    But at the moment that you read them, did he say he
15   understood the rights?
16   A    Yes, he did.
17   Q    During the conversation that you're having with
18   him, are you speaking in English or Spanish with him?
19   A    Speaking in English and Spanish.
20   Q    When you read him the rights, did you read him the
21   rights in English or Spanish?
22   A    English.
23   Q    And did he indicate to you that he did not under-
24   stand them because he only understood Spanish?
25   A    No, he did not.

1    Q      And how were you assured personally that he
2    understood his rights?
3    A      By him indicating that he did and I asked him if he
4    understands all of his rights, to place the signature on
5    the top of the card to which he did.
6    Q      After you read him his rights -- after you gave him
7    his juvenile warnings -- what did you do then?
8    A      I advised the mother what we were going to do with
9    Mr. Villegas and we escorted him out to our detective car.
10   Q      At any time, between getting into your car and you
11   initially coming in contact with him, did you ever place
12   handcuffs on him?
13   A      No, I did not.
14   Q      Did anyone else?
15   A      No, sir.
16   Q      Was he wearing handcuffs when he entered the car?
17   A      No, he was not.
18   Q      Where did you place him into your car?
19   A      In the back seat of the patrol car.  Not the patrol
20   car, but the detective car.
21   Q      And who was in the patrol car with him?
22   A      Myself and Detective Arbogast.
23   Q      And was anyone sitting in the back seat with him?
24   A      No, sir.
25   Q      From leaving the address of 5700 Wren, where did

1   you go then?

2   A      We went to JIS or Juvenile Investigative Services.

3   Q      Where is that located?

4   A      That's located on Delta.  I'm not sure the address.

5   I think it's 4700 Delta.  I'm not sure.

6   Q      Do you have any idea what the approximate distance

7   is between 5700 Wren and the Juvenile Service Division?

8   A      No, sir.  In miles, I do not.  No, sir.

9   Q      How long did it take you to travel the distance

10  between 5700 Wren and the Youth Services Division of the

11  police department?

12  A      Approximately 15 or 20 minutes.

13  Q      Okay.  And why did you take him there?

14  A      The procedure says that a juvenile is not to be

15  taken to any police detention or facility where it has a

16  jail-house atmosphere and JIS, as per procedure, is

17  authorized to receive juveniles.

18  Q      What procedures?

19  A      The procedures in the police department.  Our

20  office procedures say that the juvenile will not be taken

21  to our office.  He will be taken to JIS.

22  Q      What was the purpose of taking him then to Youth

23  Services Division?

24  A      To fill out any necessary paperwork that we needed.

25  Q      Okay.  And where was he placed within the juvenile

1    -- the Youth Services Division when you took him in there?

2    Where did you place him?

3    A     We placed him in one of the sergeants' offices.

4    Q     And can you describe for me and the Court what that

5    office looks like?

6    A     The office is -- it has windows.  It's very well

7    lit.  It does not have any bars.  Like I said, it's got

8    windows.

9          It's got a computer station in there and it's got

10   chairs similar to these.  I believe there's two chairs --

11   two chairs where two people can work in.

12   Q     Was anything done to make him comfortable there at

13   the office?  There at the Youth Services Division?

14   A     Yes, sir.  He was offered, I believe, a soda -- a

15   Coke.  And that's about it.

16   Q     And did he accept the Coke?

17   A     I do not recall if he accepted or not.  I don't

18   know if one of the juvenile officers gave him one or not.

19   Q     From the Youth Services Division, where did you go

20   to next?

21   A     From the Youth Services Division, we then took him

22   over to Juvenile Probation Department which is across from

23   Youth Services.

24   Q     And while he was in the Youth Services Division of

25   the El Paso Police Department, was he ever handcuffed?

1    A     No, he was not.

2    Q     Were there any restraints ever placed on him?

3    A     Yes, sir, there were.  From when we took him from

4    the Youth Services Division over to JPD.

5    Q     And why were restraints placed on him?

6    A     The policy is from the juvenile services office --

7    their policy is that all their juveniles or anybody that's

8    being transferred from their facility to YPD (sic) will be

9    handcuffed.

10   Q     And how was he handcuffed?

11   A     Behind his back.

12   Q     And were there any shackles placed on his legs?

13   A     No, there were not.

14   Q     How were you able to determine his age?

15   A     We had information that he was a juvenile and we

16   had asked him if he was a juvenile.

17   Q     You never looked at a birth certificate?

18   A     No, sir, I did not.

19   Q     When you arrived at the juvenile detention

20   facility, what entrance did you enter through?

21   A     We used the back entrance of the juvenile facility.

22   At that time, I believe the front entrance is closed, so

23   we have to go through the back and go through a gate.

24         You have to put away any guns that you may be

25   carrying into the facility.  You go through the doors and

1    the main control room opens up for you and then you enter
2    the facility.
3    Q     Besides yourself and the defendant, who else was
4    with you?
5    A     Myself, Detective Arbogast and Detective Charlie
6    Ortega.
7    Q     Was anyone else there that you remember?
8    A     Escorting him across?
9    Q     Ah-huh.
10   A     No, sir.
11   Q     All right.  After you took him, or after you
12   entered the juvenile detention facility, what happened
13   then?
14   A     The control person there asked us who was it that
15   we had and we told him that we had Mr. Danny Villegas.
16   They placed him in one of the holding cells and then they
17   called for an in-take officer.
18   Q     And did you speak personally with the in-take
19   officer?
20   A     No, sir, I don't believe so.
21   Q     And how long were you there at the detention
22   facility?
23   A     We were at JPD approximately ten or 15 minutes.
24   Q     And after leaving the detention facility, where did
25   you go?

1    A        We left the detention facility and went to see

2    Judge Horkowitz.

3    Q        Now, what was the purpose of you going to the

4    juvenile detention facility?

5    A        The purpose of the juvenile detention facility is

6    to allow the in-take officer to review whatever we have up

7    to that point on the case to see if there is any probable

8    cause and to again advise him if he wishes to give us a

9    statement or not.

10   Q        And were you present when the in-take officer

11   interviewed the defendant to determine whether or not he

12   wished to take or make a statement?

13   A        We were present, but we did not hear the

14   conversation.

15   Q        Were you physically in the same room?

16   A        I'm saying in the same room.  The in-take officer

17   has his own office where he reads the portion of the case

18   we turned in to him and then he was in a holding cell and

19   the in-take officer went into the holding cell, but like I

20   said, I can see you, but I can't hear you because they're

21   in a different room.

22   Q        Do you have any idea what time you arrived at the

23   magistrate's office?

24   A        Approximately 12:30.  I'm not too sure.

25   Q        After, what was the purpose of going to the

1   magistrate?

2   A       The magistrate -- in order to go ahead and again,

3   have him read his juvenile warnings and then the

4   magistrate ascertains if the juvenile again wishes to give

5   us a statement or not.

6   Q       And did the juvenile wish to give a statement?

7   A       Yes, he did.

8   Q       Were you present when the magistrate warned him?

9   A       No, sir, I was not.

10  Q       All right.  After getting permission and the

11  defendant indicating he wished to give a statement, where

12  did you go to then?

13  A       We then drove back to Juvenile Services Division or

14  JIS and we got to take a statement from the juvenile.

15  Q       Where exactly again is the magistrate located?

16  A       The magistrate, at the time we brought him, was in

17  downtown -- the downtown office or the section down here

18  -- the patrol office.

19  Q       The central sub-station?

20  A       The central sub-station.

21  Q       200 South Campbell?

22  A       Correct.

23  Q       And how long would it take you to drive from the

24  juvenile detention facility to 200 South Campbell -- the

25  central sub-station?

1   A      We drove via the Border Highway.  It took

2   approximately no more than 15 minutes -- ten or 15

3   minutes.

4   Q      After leaving the central sub-station, where did

5   you proceed to?

6   A      We went back to JIS in order to take the statement.

7   Q      All right.  And was he still wearing his handcuffs?

8   A      No, sir, he was not.

9   Q      At what point were the handcuffs removed?

10  A      The handcuffs were removed once we went back from

11  JPD back to JIS.  We had handcuffed him.

12  Q      And why did you go back to JIS?

13  A      It's just a route that we take back to go from one

14  office -- in through one office and out the other door.

15  Q      And then you proceeded to the sub-station?

16  A      Correct.

17  Q      Had the defendant, during that time, ever expressed

18  any complaints?

19  A      No, sir, he did not.

20  Q      And up to that point, had you ever threatened or

21  harassed him?

22  A      No.  No, sir.

23  Q      Did you ever make any promises to him?

24  A      No, sir.  No promises at all.

25  Q      When you arrived at the Youth Services Division,

1    where did you place the juvenile?

2    A    We went into the office of Detective Charlie

3    Ortega.

4    Q    And can you describe for me briefly what his office

5    looks like?

6    A    He's got -- to me, it's a fairly big office.  It's

7    got a door, a glass window, typewriter, computer, chairs

8    and it's basically -- excuse me -- a cubicle-type office.

9    Q    What's the lighting like?

10   A    Extremely well.

11   Q    Okay.  And the furniture?  What about the chairs?

12   A    The chairs are similar chairs that we have in our

13   office.  Similar to -- like these with no -- they're made

14   out of wood and soft seats.

15   Q    And was anything done to make the defendant

16   comfortable?

17   A    Yes, sir.  I believe at that time is when he was

18   offered a soda.

19   Q    And did he accept the soda?

20   A    I believe he did.  I'm not too sure.  I think maybe

21   Charlie Ortega may have brought it to him.

22   Q    Now, who takes charge of taking the statements from

23   the defendant?

24   A    I did.

25   Q    And could you tell the Court what your process is

1   in taking the statement from this defendant?

2   A       The process is I speak to the defendant and ask

3   him, you know, to tell me basically what happened and so

4   forth.

5           He tells me verbally.  I do not take anything

6   written down at that point.

7           And then after he's gone through the point where he

8   says, "Okay.  That's all that happened," I say, "Okay.

9   We'll put it in writing."

10          Then we basically start taking it down.  It's a

11  question-and-answer -- you know -- interview that I

12  conduct.

13          I ask him, "Tell me what happened."  And as he

14  starts talking, if he's going too fast, I'll tell him to

15  slow it down and then I will type what he says and then

16  I'll say, "Okay.  Tell me again."

17          And then if I feel he's left something out, I'll

18  ask him, "What about this portion?"  And, you know, so on.

19  Basically, it's questions and answers.

20  Q       And are you speaking to him in English the entire

21  time?

22  A       English and Spanish.

23  Q       And do you have any trouble communicating with him?

24  A       No, sir, I do not.

25  Q       And does he ever express to you an inability to

1    understand what you're saying?

2    A       No, sir, he does not.

3    Q       And does he, at any point, wish to terminate the

4    interview --

5    A       No, sir.

6    Q       -- or to terminate the making of the statement?

7    A       No, sir, he does not.

8    Q       And at the conclusion of the making of the state-

9    ment, did he ever make any complaints as to the treatment

10   you had provided?

11   A       No, sir, he did not.

12   Q       Did he ever tell you either in front of Detective

13   Ortega or privately that he was being harassed or that he

14   had been promised anything?

15   A       No, sir, he did not.

16   Q       At any time, was there ever a complaint made?

17   A       No, sir.

18   Q       Once you have the entire statement typed, was he

19   allowed to review it?

20   A       Yes, sir, he was.

21   Q       And where did he review it?

22   A       He reviewed it in Charlie Ortega's office.  We

23   pulled the statement out of the typewriter that I used.  I

24   asked him to read it or I stood back while he read the

25   statement aloud.

1    Q    Okay.  And did it take him some time to read it or

2    did he read it quickly?  Can you tell the Court the manner

3    in which he read the statement?

4    A    It took him some time.  It wasn't as fast as we all

5    can read, but, you know -- for instance, he read it in the

6    speed of "you have the right to remain silent.  My name is

7    so and so," but not a speedy version.

8    Q    Did he have difficulty at times with the words?

9    A    I believe so.  At one or two words -- I don't

10   recall which ones -- he said something like "Esto?"

11   Q    But at the conclusion of reading the statement, how

12   did you assure yourself that that is what he wanted

13   written and that that was his statement?

14   A    Because I had -- after he had read it aloud, I

15   asked him if he wanted to make any changes.  If he wanted

16   me to take anything out or make any changes or any

17   corrections on the statement and he said he did not.

18   Q    And would you have been willing to make any changes

19   that he asked?

20   A    Yes, sir.

21        MR. ESPARZA:  May I approach the witness, Your

22   Honor?

23        THE COURT:  Yes, you may.

24   Q    (BY MR. ESPARZA)  Let me show you what's been

25   marked as State's Exhibit Number 3 and can you tell me

1    what State's 3 is?

2    A       This is the juvenile confession warning or the

3    first page of three pages.

4    Q       Okay.  And what's on the second page?

5    A       The second page is the juvenile statement itself.

6    Q       And on the third page?

7    A       And on the third page -- excuse me.  The third page

8    is, again, his juvenile warnings that were given by the

9    Judge.

10   Q       Okay.  Now turning to Page 2, please, is that the

11   statement that you typed that he -- that you and he made

12   together?

13   A       Yes, it is.

14   Q       And would you say the statement he gave is entirely

15   in his words or a combination of what he said and you

16   interpreted?

17   A       It's a combination of his words and what I

18   interpreted.

19   Q       And were there any disputes at the conclusion of

20   the statement that you had interpreted something

21   inappropriately?

22   A       No, sir.

23   Q       And he attested to the accuracy of the statement?

24   A       Yes, sir, he did.

25   Q       And did he sign the statement there in your

1   presence?

2   A     No, sir, he did not.

3   Q     After making the statement, where did you go?

4   A     After the completion of the statement, we took him

5   back to the Judge in order for the Judge and him to go

6   over the statement.

7   Q     Okay.  And where was he taken?

8   A     To the same office here at 200 South Campbell.

9   Q     Central sub-station?

10  A     Central sub-station.

11  Q     And when he was taken back, who was in the vehicle

12  with him?

13  A     Myself and Detective Arbogast and I think Detective

14  Ortega.

15  Q     How long did you stay at the central sub-station on

16  your second visit to the magistrate?

17  A     I don't recall if it was somewhere in the neighbor-

18  hood of 20 minutes or so and the Judge went ahead and read

19  the whole statement with him.

20  Q     And did he sign the statement after visiting with

21  the magistrate?

22  A     Yes, sir, he did.

23  Q     And was the statement then provided to you?

24  A     I'm sorry?

25  Q     When he goes in to talk to the magistrate, does he

1    take the statement in with him?

2    A      We hand the paperwork to the magistrate along with

3    the defendant and then we cannot be around -- we are not

4    in his presence and he speaks to him behind closed doors

5    every time that he visits.

6    Q      And was he wearing handcuffs at that time?

7    A      No, sir, he was not.

8    Q      The only time he wore handcuffs was when he walked

9    between Youth Services Division and the detention facility

10   for juveniles?

11   A      Correct.

12   Q      And he wore handcuffs during that whole time and

13   when he walked back to Youth Services Division before

14   going to the magistrate office for the first time?

15   A      He wore handcuffs from JIS to JPD -- at JPD.

16   Q      For the Court, would you tell us what JIS is?

17   A      Juvenile Investigative Services.  He wore handcuffs

18   to the Juvenile Probation Department.

19          When we got there, we took them off and placed him

20   in the holding cell.  When we got him back from Juvenile

21   Probation Department, we handcuffed him again and walked

22   him from the Juvenile Probation to Juvenile Investigative

23   Services and at that time, we took the handcuffs off

24   again.

25   Q      And did he ever wear handcuffs after that?

1    A      No, sir.

2           MR. ESPARZA:  Your Honor, at this time, I would ask

3    that State's Exhibit Number 1 be admitted into evidence.

4           MR. OLIVAS:  No objection.

5           THE COURT:  So admitted.

6    Q      (BY MR. ESPARZA)  If you look at State's 3 for a

7    little, sir, can you identify what, if anything, is your

8    handwriting on State's 3?

9    A      My handwriting appears on State's Exhibit 3 which

10   is the Juvenile Confession Warning with the Date, Time and

11   Time Ended along with my initials which are at the top

12   right-hand corner.

13   Q      And that's the top right-hand corner of State's

14   Exhibit Number 3, Page 1?

15   A      Correct.

16   Q      You want to flip to Page 2?  Does your handwriting

17   appear anywhere on State's Exhibit Number 3, Page 2?

18   A      No, it does not.

19   Q      And on what I consider the third page of State's

20   Exhibit Number 3, does your handwriting appear anywhere

21   there?

22   A      No, it does not.

23   Q      Okay.  And State's Exhibit Number 3, Page 3, is

24   entitled Statutory Warning of Juvenile by Magistrate Under

25   Section 51.09 of the Texas Family Code as Amended

1    September 1, 1991.

2    A    Yes, it does.

3    Q    And your handwriting is not on this page?

4    A    No, sir, it is not.

5         MR. ESPARZA:  Okay.  I have nothing further, Your

6    Honor.

7         MR. OLIVAS:  Your Honor, we intend to use State's

8    Exhibit 3.

9         MR. ESPARZA:  I'll leave it here.

10        MR. OLIVAS:  If he's going to move for it to be

11   admitted --

12        MR. ESPARZA:  Your Honor, at this time, I would

13   move to admit State's Exhibit Number 3 into evidence.

14        MR. OLIVAS:  As well as 2?

15        THE COURT:  What is 2?

16        MR. ESPARZA:  Your Honor, for identification

17   purposes, State's Exhibit 2 is a document entitled

18   Magistrate's Certification of Juvenile's Competency to

19   Make Statement and I would tender them to the Court.

20        THE COURT:  And you don't have any objections to

21   State's 2 or 3?

22        MR. OLIVAS:  No, Your Honor.

23        THE COURT:  So admitted.

24

25

1                        CROSS EXAMINATION

2    BY MR. OLIVAS:

3    Q      Detective Marquez, you knew, when you picked up

4    Danny Villegas, that you were dealing with a juvenile?

5    A      That's correct.

6    Q      As a matter of fact, you knew that even before you

7    knocked on the door that he was under the age of 17 as

8    defined by Texas law?

9    A      That's correct.

10   Q      Okay.  No doubt about that?

11   A      No, sir.

12   Q      And you know that the proceedings for a juvenile

13   are that you're supposed to pick him up, take him directly

14   to youth -- JIS or Youth Services Division?

15   A      Yes, sir.

16   Q      Do not go anywhere else but directly to JIS?

17   A      That's correct.

18   Q      At that point, either when you picked him up and

19   you take him down there, you are supposed to read the

20   juvenile warnings that you so kindly read to the Court?

21   A      That's correct.

22   Q      And once you take him there, you visit with him and

23   you tell him the warnings and then you turn him over to a

24   youth JIS officer -- one of the juvenile detention

25   officers to take a report?

1    A       No, sir.

2    Q       Okay.  What do you do at that point once you got

3    him at JIS?

4    A       We had requested the assistance of a juvenile

5    investigative services officer or detective.

6    Q       Okay.

7    A       And they proceed -- they provided Officer Charlie

8    Ortega to assist us in the handling of the juvenile.  Not

9    for him to take a statement.  We were going to take the

10   statement.

11   Q       You were going to take the statement?

12   A       We were doing the investigation.

13   Q       Sure.  Well, at any rate, I guess my point is the

14   following.

15           You understand that when you take a statement from

16   a juvenile, under Texas Family Code 51.09(b), specifi-

17   cally, you have to take -- before you make any questioning

18   of him or whatever, you're supposed to take him before a

19   magistrate to give him his warnings?

20   A       Before I take a statement.

21   Q       Right.

22   A       Right.

23   Q       And after you take that --

24           MR. ESPARZA:  Your Honor, I'm going to object.  I

25   think that's a misstatement of the law.  I think the law

1   says you can take him to a juvenile processing office

2   which is certified by the juvenile court which in this

3   case it is.

4        Then you can take him to a probation officer at the

5   detention facility and then to the magistrate.  You don't

6   take him directly to the magistrate.

7        MR. OLIVAS:  Forgive me, Your Honor.  It's not a

8   misstatement of the law.  It's simply a statement that he

9   agreed to and I guess I'm just getting the sequence of

10  events correct before this Court so that we know what

11  happened.

12  Q    (BY MR. OLIVAS)  And your procedure is to take him

13  to a Youth Services Division outfit the first time?

14  A    Our procedure is when we have a juvenile --

15  Q    Okay.

16  A    -- he does not go to our police station or any

17  facility where adults are housed or detained or anything.

18  He goes to the Juvenile Investigative Services.

19  Q    Okay.

20  A    We get the Juvenile Investigative Services -- if we

21  request the assistance of a juvenile investigative

22  services officer, we get it and we fill out the paperwork.

23       We take him over to JPD so that -- or to the

24  Juvenile Probation Department -- before we take him before

25  a magistrate if he's willing to give us a statement.

1       In this case, he was.  We took him to the Juvenile
2   Probation Department and then from there to the magistrate
3   for his magistrate warnings.
4   Q     Okay.  I apologize.  Let me get this in simply.
5   First, you take him to juvenile services?
6   A     Correct.
7   Q     And then you take his initial information like his
8   name, age and you verified he's a juvenile?
9   A     (Indicating.)
10  Q     After that, if he's willing, then you take him to
11  JPD where they take that information?
12  A     If he's willing to give us a statement -- okay.
13  We initial all -- not initial.  We get all the paperwork
14  that we have so far or anything implicating him with the
15  crime and we take him to an in-take officer at Juvenile
16  Probation Department.
17  Q     JPD?
18  A     (Indicating.)
19  Q     Okay.  Now, you do understand that before you take
20  any statement, you simply ascertain whether he's willing
21  to give a statement and you have to take him to a
22  magistrate?
23  A     Correct.
24  Q     And then you will leave him in the room with the
25  magistrate and let him warn him by himself?

1    A      Correct.

2    Q      And after -- and that's what you did here?  You

3    took him from JPD where the in-take officer took the

4    information.  You said, "This boy wants to give us a

5    statement" and then you take him to 200 South Campbell

6    before the Honorable Carl Horkowitz?

7    A      Correct.

8    Q      Okay.  You take him to Horkowitz and Horkowitz --

9    at this point, you have never taken a statement from him?

10   A      No, sir.

11   Q      None whatsoever?

12   A      No, sir.

13   Q      You arrive at Horkowitz at 12:15?  That's what you

14   testified to earlier, right?

15   A      No.  I don't know if I said 12:15 or not.

16   Q      Okay.  Well, if you -- if that's what you said, is

17   that what time -- what time did you arrive at Horkowitz?

18   A      I don't recall.  I would have to look at the time

19   that I gave the magistrate warning.

20   Q      Do you remember the statement that you made in this

21   Court earlier?

22   A      About 12:26 or 12:30.  I don't recall.

23   Q      You arrived at 12:30 at the magistrate's office?

24   A      Approximately.

25   Q      Now forgive me, sir.  How was it -- are you certain

1    it was within the 12:00 o'clock hour?

2    A      No, sir.  I would have to look at the juvenile

3    warnings where Judge Horkowitz gave him the warnings.

4    Q      No, no.  But to your best recollection, earlier you

5    testified you got there about 12:30, right?

6    A      Basically.

7    Q      It was not 11:00 o'clock or sometime?

8    A      I don't recall.  I would have to look.  Between

9    12:00 o'clock.  Between 12:30.  I would have to look at

10   the statement or the initials where the Judge read him his

11   rights.

12   Q      You took him to the magistrate before you ever took

13   any statement from him, right?

14   A      Correct.

15   Q      The Judge reads him his rights which are the rights

16   that are on the front page of his confession?

17   A      Correct.

18   Q      Is that right?

19   A      (Indicating.)

20   Q      Then at that point, this confession is empty.

21   There is no statement because you had not taken a

22   statement?

23   A      No, sir.  That's correct.

24   Q      Then you put him back in the car and you drive him

25   back to JPD?

VILLEGAS v. CITY OF EL PASO - P002301

1    A      Correct.

2    Q      Where then you will proceed to take the statement?

3    A      That's correct.

4    Q      After you have completed the statement and reviewed

5    it with him and make sure it's correct, as you testified

6    earlier, you put him back in your car and you take him to

7    Horkowitz?

8    A      That's correct.

9    Q      And now you have a warning and a confession, so now

10   we have same Judge, same juvenile, but now you have a

11   confession?

12   A      Correct.

13   Q      Okay.  And at that point, you give it to Judge

14   Horkowitz and he goes into a room by himself with the

15   juvenile and he tells him -- he reviews the statement and

16   said -- what we would imagine the Judge would say --

17   "Young man, is this your statement and do you agree?  Has

18   anybody forced you?"

19          And then the Judge puts his signature on State's

20   Exhibit Number 3 where he says, "I gave him those warnings

21   separately"; is that correct?

22   A      Basically.

23   Q      And you guys weren't even in the room?

24   A      No, sir, we were not.

25   Q      Okay.  You say, "I gave him those statements

1    separately and Judge, we believe that he is comfortable
2    with what he said and he has not been forced or coerced
3    into giving this", right?
4    A    (Indicating.)
5    Q    At the time, sir, that this whole proceeding was
6    going on, you also have a fella named Marcos Gonzalez --
7    A    Yes, sir, we did.
8    Q    -- with you?
9    A    He wasn't with us.  He was at the police station at
10   Five Points or Crimes Against Persons Office.
11   Q    Okay.  You guys also arrested Marcos the evening of
12   the 21st?
13   A    The same night.  We took Marcos down to downtown or
14   central police station which is Five Points.
15        THE COURT:  And is Marcos Gonzalez an adult or a
16   juvenile?
17        THE WITNESS:  He's an adult.
18   Q    (BY MR. OLIVAS)  He's an adult.  Sir, and who took
19   Marcos to the police station?
20   A    Detective Laredo and, I believe, Detective Graves.
21   Q    And you and Arbogast took him?
22   A    Correct.
23   Q    And you also, just for the record, you also got a
24   confession from Marcos where he implicated himself as well
25   as the defendant, right?

1    A      We got a statement.  I don't know if it was a

2    confession or not.  He was --

3    Q      He was in the car?

4    A      At central.  He was at Five Points and he spoke to

5    Detective Scott Graves.

6    Q      Have you had an opportunity to review that

7    statement?

8    A      Yes.  I believe I have looked at it.  I don't

9    recall what it says.

10   Q      As a matter of fact, you took two statements from

11   Marcos Gonzalez, right?

12   A      Sir, I don't recall if we took two or not.

13   Q      But at any rate, Marcos Gonzalez comes around and

14   says, "I was in the car with these guys who did it."  Is

15   that a fair statement?

16   A      Correct.

17   Q      Okay.  And you also arrested a fella named Rodney

18   Williams; is that correct?

19   A      That's correct.

20   Q      Now, when did you arrest Rodney Williams?

21   A      Rodney Williams was arrested, I believe, on the

22   22nd.

23          MR. ESPARZA:  Your Honor, I'm going to object.

24   This line of questioning is beyond the scope of this

25   hearing.

42

1    We are trying to find out whether or not the
2    defendant intentionally, knowingly and voluntarily waived
3    his rights and made a statement as a juvenile.
4        What he did with Rodney Williams has nothing to do
5    with what we are here for today.
6        MR. OLIVAS: Your Honor, he obtained confessions
7    from Rodney Williams. He obtained confessions from Marcos
8    Gonzalez. These fellas will testify -- for sure Marcos --
9    as a result of how he obtained the statements from them.
10       I think there are some discrepancies in how the
11   statements were taken and I simply need to get his
12   information. I'm not going to dwell in that. I'm just
13   simply pointing out the fact that he did obtain
14   statements.
15       THE COURT: All right. You can ask that limited
16   question whether or not he did take statements.
17   Q    (BY MR. OLIVAS) You took one from Rodney Williams
18   but you arrested him the day after?
19   A    Again, I don't know if I was the one that took it
20   from Williams. I believe the statement was taken by
21   another detective. I would have to look at the statements
22   that he gave to see if my name is on there to say that I
23   took it.
24   Q    Do you understand that he was also -- he's also
25   implicated, right?

1    A      Correct.

2    Q      Okay.  Now, do you remember a fella in the state-

3    ment that you took from Mr. Villegas -- the statement

4    indicates that Marcos Gonzalez and Rodney Williams were

5    passengers in the car; is that correct?

6    A      That's correct.

7    Q      And there was a fella named Droopy driving the car?

8    A      That's correct.  I don't know if Droopy was driving

9    or Marcos was driving.  I'm not sure.

10   Q      At any rate, there was -- do you remember there was

11   another driver of the car?  Either Droopy or Marcos,

12   right?

13   A      Like I stated before, I don't remember if he said

14   Droopy was the driver or the passenger.  My understanding

15   is Marcos was the driver.

16   Q      Okay.  You had an opportunity to read the statement

17   today before you testified, didn't you?

18   A      I didn't read it today.

19   Q      You didn't read it today?  Okay.  Do you remember

20   the statement indicating that the car belonged to Popeye?

21   A      I believe so.

22   Q      And this famous Popeye -- do you know what his name

23   is?

24   A      No, sir.  I don't remember.  I know one of them was

25   Fernando Lujan.  I'm not sure if it was Droopy or Popeye.

1    I couldn't tell you if it was Fernando or not.

2    Q     That was the alleged driver or owner of the car?

3    A     I can't answer that.  I would have to read the

4    statement.

5    Q     Well, you asked him who this Droopy or Popeye were,

6    right?

7    A     I believe so.

8    Q     And you asked him who they were?  The real names?

9    Not Popeye?

10   A     Right.

11   Q     You asked him who Popeye was and where he lived?

12   A     Correct.

13   Q     And you asked whether the car belonged either to

14   Droopy or Popeye, right?

15   A     I'm not sure, but I may have.

16   Q     Okay.  And he's the one that gave you the informa-

17   tion about Popeye and Droopy?

18   A     That's correct.

19   Q     And you're a good officer and you intend to find

20   everybody that's violated a particular law, right?

21   A     That's correct.

22   Q     And in doing so, Officer, you sought out Popeye and

23   you sought out Droopy, right?

24   A     They were sought out by Detectives Scott Graves and

25   somebody else.  I believe Joe Laredo.

1    Q      Okay.  You picked him up at exactly what time?

2    A      11:15 or 11:10.

3    Q      You're absolutely certain it was 11:15 or 11:10?

4    A      I was absolutely certain that it was 11:15.

5    That's because that's when I read him his Miranda warning

6    rights.

7    Q      And then you take him to -- now, when you -- is the

8    11:15 writing your notation?

9    A      No, sir.  It's his notation.

10   Q      Okay.  So, you simply have this recollection?

11   A      Yes, sir.

12   Q      When you were going -- when you put him in the car,

13   you began to talk to him and you asked him who Droopy was?

14   A      No, sir.

15   Q      You asked him who Popeye was?

16   A      No, sir.

17   Q      You drove him around to find where Popeye lived and

18   you asked him to point out where Popeye's house is, right?

19   A      That was after the statement had been taken.

20   Q      Okay.  What time in the morning did you drive him

21   around in your car to go find where Popeye lived?

22   A      After we had taken him -- from when the magistrate

23   warned him -- where we had taken him to complete the

24   statement, he signed it, he had agreed to show us where

25   Popeye and Droopy lived.

1    Q      Okay.  He agreed to show you where Popeye and

2    Droopy lived and that was back in northeast somewhere?

3    A      Correct.

4    Q      And you guys drove around for approximately an hour

5    and a half trying to find where these two guys lived

6    because he wasn't sure?

7    A      Well, he finally got us there.  I don't know if he

8    was unsure.

9    Q      How long was the drive?  Roughly?

10   A      From the station, I would put it about an hour.

11   Q      And you finally found where this famous Popeye and

12   Droopy lived?

13   A      Correct.

14   Q      Just for the record, you have never arrested the

15   alleged Popeye and the alleged Droopy, right?

16   A      That's correct.

17   Q      Okay.  And just for the record, it turns out that

18   Popeye was incarcerated at the time of the alleged shoot-

19   ing on April the 10th; is that right?

20   A      One of the two.  Popeye or Droopy was incarcerated.

21   Q      So, he couldn't have been driving the car?

22   A      That's right.

23   Q      At any rate, you drive around.  What time of the

24   evening was it when you're driving him in the back of the

25   car to show you where these guys live?

47

1    A    Early morning hours.

2    Q    Please tell us what time.

3    A    Early morning hours.  Approximately 2:00 o'clock in

4    the morning -- 2:00 or 3:00 o'clock.

5    Q    Approximately 2:00 or 3:00 o'clock?

6    A    Correct.

7    Q    And then what happened after that?

8    A    After he showed us where all the addresses were, we

9    went back to JIS.

10   Q    Ah-huh.

11   A    And from there, we took him over to JPD where he

12   was taken in by the in-take officer.

13   Q    And what time was it that the in-take officer took

14   him in?  Do you remember?  You just said, "We're done with

15   this kid.  Take him and do what you all need to do with

16   him."  What time did the in-take officer take him?

17   A    Between 4:00 and 4:30.  I don't recall.

18   Q    So, you had some kind of custody or constructive

19   custody of him from 11:30 -- 11:15 that night 'till 4:30;

20   is that correct?

21   A    Approximately, yes, sir.

22   Q    Okay.  And nowhere in your statement does he

23   indicate that he will show you where Droopy and Popeye

24   live?

25   A    No, sir, he does not.  I have to read it.

1    Q      Okay.  Did he also show you where Rodney Williams

2    lived?

3    A      No, sir, I don't think so.

4    Q      Okay.  You knew where Rodney Williams lived?

5    A      Correct.  I believe so.

6    Q      Now, before this whole crazy event started, sir,

7    well, you weren't driving 5700 Wren and said -- and

8    decided -- what made you decide to go to 5700 Wren and

9    say, "I think that the defendant lives there.  I think

10   that the shooter lives there."

11          I mean, it's not like you pulled this out of a hat

12   or did you?

13   A      No, sir.

14   Q      You had other information beforehand --

15   A      Correct.

16   Q      -- that you believed implicated him?

17   A      That's correct.

18   Q      Specifically, you got an anonymous phone call,

19   right?  From a one David Rangel?

20          Well, I don't know how anonymous that is, but you

21   got a phone call saying, "I know who the shooter is and

22   his name is Danny Villegas."

23   A      That's correct.

24   Q      And this person was David Rangel?

25   A      That's correct.

1    Q      Okay.  And you understand David was a juvenile at
2    the time also, right?
3    A      I don't recall, sir.
4    Q      Okay.  You took a statement from David, right?
5    A      A statement was taken, yes, sir.
6    Q      Okay.  And in the statement, David said, "My cousin
7    was bragging that he shot him," right?
8    A      That's correct.
9    Q      "And my cousin said this" and so on.  That's what
10   led you to believe that Danny indeed had done it, right?
11   A      That's correct.
12   Q      And you had some misunderstandings with David
13   Rangel, sir, as to what he was saying in his statement; is
14   that correct?
15   A      I don't understand.  If we had some misunderstand-
16   ings?  I don't believe we had any misunderstandings.
17   Q      Okay.  David gave you some conflicting information
18   reference to the confession, right?
19   A      No, sir.  I don't recall him giving me conflicting
20   information.
21   Q      Do you remember David telling you that Danny said
22   he used a shotgun and then you telling him that that's not
23   correct?  That that's not right?  Do you remember him
24   telling you that?
25   A      No, sir, I don't remember.

VILLEGAS v. CITY OF EL PASO - P002312

1    Q      You don't remember that?

2    A      No, sir.

3    Q      For the record, the victims were shot with a .22

4    caliber gun; is that correct?

5    A      I believe so, sir.  I'm not sure.

6    Q      Well, at any rate, you take this statement from

7    David and you already know in David's statement he tells

8    you that it was Mr. Villegas; is that correct?

9    A      That's correct.

10   Q      You did not take David to the magistrate to get his

11   juvenile warnings, did you?

12   A      No, sir, we did not.

13   Q      Okay.  You didn't find it necessary because you

14   weren't going to charge him?

15   A      He was not a suspect.

16   Q      Okay.  Very good.  But nonetheless, you took a

17   statement from him?

18   A      That's correct.

19   Q      Okay.  You also took a statement from Rodney

20   Williams; is that correct?  The very next day?

21   A      Rodney Williams' statement was taken, I believe, by

22   somebody else.  I don't know if I took it or not.

23   Q      Okay.  Well, at any rate, that statement implicated

24   Rodney Williams, right?

25   A      Correct.

1    Q      And Rodney Williams was never taken before a
2    magistrate; is that correct?
3    A      No, sir, he was not.
4    Q      And that's the reason that you guys dropped the
5    charges against Rodney Williams?
6           At least the D.A. testified, "We cannot proceed
7    because Rodney Williams was a juvenile and was never taken
8    before a magistrate."
9    A      I don't know the reason why the case was dropped.
10   I do not know.
11   Q      Do you remember testifying at Rodney Williams'
12   certification hearing?
13   A      Yes, sir, I do.
14   Q      However, you don't remember why the charges were
15   dropped against Rodney Williams?
16   A      No, sir.  I have no idea why the charges were
17   dropped.  I understood they were dropped for another
18   reason than what you were saying.
19   Q      Because specifically, the district attorney -- Mr.
20   Spector -- testified that "We do not have enough
21   information to indict this individual and therefore,
22   cannot proceed to indict him before a grand jury."
23   A      I was not there for that testimony.
24   Q      Okay.  You also arrested Marcos Gonzalez, right?
25   A      Yes, sir.

1    Q      And from Marcos Gonzalez, you took a statement,
2    right?
3    A      A statement was taken from Marcos Gonzalez, but I
4    don't recall who took it.
5    Q      And Marcos Gonzalez also implicated himself.  He
6    said, "Yeah.  I was with Snoopy (sic) and the guys and we
7    did the shooting."  However, he said, "I did not do the
8    shooting," right?
9    A      Correct.
10   Q      And you did not take Marcos Gonzalez to a
11   magistrate either, did you?
12   A      I did not take a statement, sir.  I did not take
13   him to a magistrate.
14   Q      You did not take the statement.  Marcos Gonzalez
15   was arrested and kept in jail for approximately two and a
16   half months; is that correct?
17   A      I don't know, sir.
18   Q      And then those charges have also been dismissed
19   against Marcos Gonzalez.
20   A      As far as I know, yes, sir.
21   Q      All right.  Now -- all right.  What time did you go
22   to bed on the 22nd of April?  Did you go home?
23   A      Around 5:30 or 6:00 o'clock.  I don't know.
24   Q      5:30 or 6:00 o'clock?
25   A      I don't recall what time I went home.

1    Q     The whole night you had been there, Officer, and

2    the reason that you fill out forms such as this is because

3    you're not really sure when this particular investigation

4    will go to trial; is that correct?

5    A     No, sir.  We fill out the juvenile forms because

6    it's -- we have to do that and follow procedures and he

7    has to be warned and it has to be timed and initialed and

8    dated.

9    Q     Because you know that the district attorney will

10   rely on your records and the Judge and the grand jury as

11   well as yourself, right?

12   A     Well, yes, sir.  We need to keep accurate times as

13   best that we can.

14   Q     And you don't lie on these statements.  You put the

15   correct and the true facts, right?

16   A     As near as we can get them, yes, sir.

17   Q     And the statements will state exactly what was

18   happening at the time?  In other words, "I pick him up..."

19   if we go by State's Exhibit Number 1 -- "I picked him up

20   the 11:15."

21   A     Correct.

22   Q     And you're certain that the times entered in these

23   documents are correct, right?

24   A     They're correct as to visually.  They're by our 54

25   watch or by a clock or by the Judge's watch or whatever

1    times.

2    Q    Okay.  You understand Danny is not a very bright

3    fella?

4    A    I just don't know how bright he is, sir.

5    Q    Well, you've arrested hundreds of people in your

6    career, haven't you?

7    A    That's correct.

8    Q    And you can tell who's pretty bright and who's kind

9    of slow?

10   A    Basically.

11   Q    And he would fit in the category of being slower?

12   A    He fits in the category of being street smart and

13   also -- I'm not saying that he's a wizard at calculus and

14   he knows English and he knows Spanish and he knows what

15   he's doing.  I think that would make him street knowledge.

16   Street smart.

17   Q    Do you know if he knows how to read?

18   A    Apparently, he does, sir.  He read the statement.

19   Q    Okay.  You typed the statement, right?  It wasn't

20   him?

21   A    Correct.

22   Q    Okay.  Now, you would agree with me, sir -- you're

23   telling this Court that once you get him in the car from

24   JPD, as soon as they do the in take, the officer -- well,

25   you say, "We have this young man.  We believe he did this"

1      and you put him in the car and you drive him to Campbell

2      which takes ten minutes?

3      A      Seven to eight minutes.  If we are using the Border

4      Highway.

5      Q      I just want to get this correct, sir.  Seven to

6      eight minutes.  Let's start all over again.  You pick him

7      up at 11:15 p.m, right?

8      A      Right.

9      Q      And you testified it takes you approximately 15 to

10     20 minutes --

11     A      Fifteen minutes -- 15 to 20 minutes.

12     Q      -- from 5700 Wren to Delta?

13     A      To Delta.

14     Q      Fifteen minutes?

15     A      Fifteen minutes at the most.  Fifteen or 20

16     minutes.  Maybe less.

17     Q      You stayed at Youth Services for five minutes and

18     then you walked him over?  How long did you stay?

19     A      No, sir.  We stayed at Juvenile Services, I

20     believe, an hour or so.

21     Q      For one hour?

22     A      At least.

23     Q      At least?  However, you never took a statement from

24     him?

25     A      No, sir.  We did not take a statement from him.

1   Q    And after that one hour, then it took you seven to
2   eight minutes to drive to --
3   A    No.  Then we walked across.
4   Q    Walked across to YPS (sic)?
5   A    JPD.  We're looking at maybe another 15 or 20
6   minutes while he gets interviewed by the in-take officer
7   to whether he wants to give a statement.  The interview
8   officer looks at the case that we have.
9   Q    Okay.  And then after those 15 or 20 minutes, seven
10  to eight minutes to drive him to the judge?
11  A    To Judge Horkowitz's office.
12  Q    And then it takes you another --
13  A    Seven to 15 minutes.
14  Q    How long was he in there with Judge Horkowitz?
15  A    Sir, I don't know how long he was in there.
16  Q    It was brief?  That's the first time he got there?
17  A    His rights were read and so forth -- about 15
18  minutes.  I don't recall.
19  Q    Ten to 15 minutes at Judge Horkowitz's.  Then you
20  proceed to take him back to Delta.  That's another seven
21  to eight minutes, right?
22  A    Correct.
23  Q    Then you conduct the interview and take this state-
24  ment.  You type it up through the whole thing and how long
25  does it take you?

1    A    Roughly about an hour or so.

2    Q    After he reads it and after you did everything?

3    A    Basically an hour.

4    Q    Okay.  Then you put him back in the car.  There is

5    another seven to eight minutes to Horkowitz?

6    A    Correct.

7    Q    And then you arrest him and take him back to JPD

8    because he's a juvenile.  He's going to stay in jail

9    there?

10   A    No.  From there he agrees to take us to where --

11   Q    Oh, that's when you drove around?

12   A    To drive by and to show us some houses.

13   Q    But you drove him to Snoopy's (sic) and Popeye's

14   house.

15   A    It's Droopy.

16   Q    That's when he drives you to Droopy's and Popeye's?

17   A    That's when he drives us there after.  That's where

18   he says, "Droopy lives here" and "Popeye lives here."

19   Q    How long does that take?

20   A    I don't know, sir.  About for an hour.  For an hour

21   or so.

22   Q    And then what time do you dump him off at JPD?

23   A    We turn him over to JPD approximately between 4:00

24   or 4:30 o'clock a.m.

25   Q    Around 4:00 to 4:30 a.m.?

1    A    That's when he gets in-taked (sic).

2    Q    You're done with him at that point?

3    A    Right.

4    Q    Then you proceed to go home and go to bed, right?

5    A    Correct.

6    Q    Now, before you even begin to investigate Mr.

7    Villegas, all you had was David Rangel saying, "Hey, I

8    think I know who did it," right?

9    A    He called and said, "I know who was bragging about

10   it."  Yes, we did.

11   Q    Okay.  And as a matter of fact, sir, you followed

12   up on that lead as any conscientious police officer would

13   have, right?

14   A    We follow a lot of leads.

15   Q    Sure.  And as a matter of fact, on this particular

16   case, just for the record, sir, you had statements from

17   Jacob Haraque (sic), correct?

18   A    Correct.

19   Q    And Mike Johnston (sic)?

20   A    Correct.

21   Q    They were also bragging about it, right?

22        MR. ESPARZA:  Your Honor, I would object.  State-

23   ments by other individuals have nothing to do with the

24   issue we have here today.

25        It's whether or not we -- whether or not the

1    officers took a statement properly.  Other suspects have

2    nothing to do with this case with this issue right at this

3    moment.

4           MR. OLIVAS:  Your Honor, forgive me.  It does.

5    Before he ever gives a statement or anything, or even goes

6    into an alleged waiver of rights, he must have had

7    probable cause to even begin to investigate him.

8           This is simply going to the issue of whether he had

9    the right to go and even knock on his door and say, "Hey,

10   can I go in and arrest you?"  Basically, that's going to

11   the issue of the initial PC, if any.  I will be brief,

12   Your Honor.

13          MR. ESPARZA:  Your Honor, I think it's beyond the

14   scope of the hearing.  He has also elicited from the

15   statement from a cousin that the defendant admitted to the

16   killing.

17          He also elicited from this witness that a Mr.

18   Williams had also implicated the defendant.

19          That's probable cause.  Anything else he gets here

20   besides that is off the issue here.  It is beyond the

21   scope of this hearing.

22          MR. OLIVAS:  I beg to differ with the District

23   Attorney, Your Honor.

24          THE COURT:  Overruled.  I will allow this one

25   question.  No further questions on the subject unless you

1    can tie it in.

2    Q    (BY MR. OLIVAS)  You also took a statement from

3    Rudy Flores and Javier Flores and Rick Martinez?

4    A    Statements were taken, yes, sir.

5    Q    Also, you took statements from -- incidentally,

6    were these statements in writing?

7    A    Yes, sir.  Typed.

8    Q    You type all of these statements?

9    A    Right.

10   Q    One from Gilbert Garcia?

11   A    I want to clarify something.  When you say "you", I

12   hope you're not inferring that I personally did.  Other

13   officers did.  I didn't take them personally.

14   Q    Sure.  Your department.  Gilbert Garcia.  A

15   statement was taken from him?

16   A    Correct.

17   Q    And Anthony Iglesias?

18   A    Right.

19   Q    A guy that had gotten in a fight with one of the

20   victims?

21   A    We took statements, yes, sir.

22        MR. ESPARZA:  Your Honor, I'm going to object

23   again.  This is beyond the scope of the hearing.  Who they

24   investigated while they were trying to decide who the

25   killer was is not relevant in this hearing.

                                                    61

1          THE COURT:  Sustained.

2          MR. OLIVAS:  Your Honor, if I may just simply

3     finish with the names of the persons that he took the

4     statements.

5          THE COURT:  I'm going to sustain the objection.

6     Q    (BY MR. OLIVAS)  Well, at any rate, will you agree

7     with me that you took statements from at least five dif-

8     ferent parties -- five other sets of kids?

9     A    Correct.

10    Q    And all of them claimed that they had done it in

11    one way or the other and you guys determined that they

12    hadn't?

13    A    Correct.

14    Q    Now, you had never met David Rangel before he ever

15    called you, right?

16    A    No, sir.

17    Q    You had never spoken to David whatsoever and you

18    knew nothing of his record?  He could be anybody that you

19    know?

20    A    I spoke to him over the phone.  I never -- I have

21    never seen him or -- I mean, I have seen him up to this

22    date, but I didn't know at that time who he was other than

23    the cousin of David Villegas.

24    Q    I mean, you couldn't trust David to be telling you

25    the truth or lying to you for that matter, right?  You

1    knew nothing of him?

2    A      I knew nothing of him.

3    Q      Okay.  However, he gave you some information that

4    you decided to follow-up?

5    A      Correct.

6    Q      And at the point that you read Mr. Villegas'

7    rights, Mr. Villegas was not free to leave, right?

8    A      Yes, sir.  He was free to leave.  We didn't have an

9    arrest warrant for him.  There is no arrest warrant for

10   juveniles.

11          We specifically asked the mother and told him that

12   we needed to speak to him reference an investigation that

13   we were conducting.

14   Q      Right.  And you did not tell the mother, "He

15   doesn't have to come with us unless he wants to," did you?

16   A      No, sir, I did not.

17   Q      You did not tell the father that?

18   A      No, I did not.

19   Q      Do you remember the news playing on the television

20   set when you went in?

21   A      No, sir, I don't.

22   Q      You don't remember what was on t.v.?

23   A      No, sir.

24   Q      Okay.  At any rate, do you remember the news

25   playing?

1    A       (Indicating.)

2    Q       In Government's Exhibit Number 1 -- in Government's

3    Exhibit Number 3 -- I'm sorry.  Government's Exhibits 2

4    and 3, the specific times of the warnings have been

5    altered; is that correct?

6    A       Altered?

7    Q       Yes, sir.

8            MR. OLIVAS:  May I approach, Your Honor?

9            THE COURT:  Yes, you may.

10   Q       (BY MR. OLIVAS)  Specifically, the initial warning

11   by Judge Horkowitz.  It either says 3:40 a.m., 2:40 a.m.

12   or 1:40 a.m.  What time does that say, in your opinion?

13   A       My opinion is 1:40.  It looks like a two, also, or

14   1:40.

15   Q       You agree that's been altered?

16   A       Well, scratched out.

17   Q       And redone?

18   A       And redone.

19   Q       All right.  Now, as to the subsequent warning, sir,

20   the one where you would agree with Government's -- State's

21   Exhibit Number 2 is the warning that you get from Judge

22   Horkowitz after the statement has been read to the child

23   and the child understands everything, right?

24           This is statement one, no confession.  This is

25   statement two, with confession which is the -- please

1    identify to the Court what that is.

2    A      To the best of my recollection, the --

3    Q      Which is the first statement that is given by Judge

4    Horkowitz and identify it by State's exhibit, please.

5    A      To my recollection -- to the best of my knowledge

6    -- okay. This is the one which -- this is the one that is

7    being given -- the warnings that first would go there and

8    gives him the warnings. This one here. The statutory

9    warnings of juveniles is the one that the Judge reads to

10   him while he's in there and says that you have the right

11   to remain silent --

12   Q      The first time without a confession?

13   A      Right. Without a confession.

14          THE COURT: And which one is this one? Tell me

15   what exhibit.

16          THE WITNESS: To the best of my recollection it's

17   Statutory Warning of Juvenile by Magistrate Under Section

18   51.09 of the Texas Family Code.

19          THE COURT: Look on the front page.

20          THE WITNESS: State's Exhibit Number 3. To me,

21   this is the first page.

22   Q      (BY MR. OLIVAS) That is given to him?

23   A      When we take the initial -- the first time after we

24   take the statement, this is the one after he goes over it

25   or this one. I don't really know which one it is.

1    Q     Okay.  And you would agree with me that that

2    statement -- the juvenile warnings in State's Exhibit 2

3    have also been altered either from 3:45 a.m. to 2:45 a.m.?

4    A     Correct.

5    Q     As well as the first exhibit?

6    A     Correct.

7          MR. OLIVAS:  Your Honor, for the record --

8          THE COURT:  Would you like to take a short recess

9    and call them up there and find out exactly what the Court

10   of Appeals' decision is?

11         MR. OLIVAS:  Well, they denied it.  It says it's

12   denied my motion.

13         THE COURT:  Let's take a recess.  Rest your hands.

14   You can go in and call and find out exactly what their

15   ruling is.

16                    (A recess was taken at this time.)

17                    (Thereupon, the following proceedings

18                    continued after the recess:)

19         THE COURT:  Mr. Olivas, what was the decision of

20   the Court of Appeals?

21         MR. OLIVAS:  Your Honor, they denied the stay or

22   they denied the motion.

23         THE COURT:  The motion?  The writ.

24         MR. OLIVAS:  My motion to file a writ for -- writ

25   of mandamus.

1          THE COURT:  Okay.  You may proceed with the
2     witnesses.
3          MR. OLIVAS:  Thank you, Your Honor.  I have no
4     further questions of this witness, Your Honor.
5          THE COURT:  Anymore questions?
6          MR. ESPARZA:  No further questions from this
7     witnesses.
8          For the record, so we can make the record clear and
9     I know that State's 3 and 2 and 1 have been admitted.  May
10    we approach the bench, Your Honor?  I think it's going to
11    get confused here in a minute.
12         THE COURT:  I have not seen them here.
13         MR. ESPARZA:  I think it's my fault I want to clear
14    the record.
15         THE COURT:  Don't you need some testimony from
16    Magistrate Horkowitz to explain?
17         MR. ESPARZA:  No, Judge.  It's been admitted, but
18    what I wanted to do was this, Judge.  This is a separate
19    document, okay?  I stapled this.
20         There are two pages that go to this document.  You
21    can clearly see that this is 1 of 3 right here.  It's 1 of
22    3.
23         On the second page, 2 of 3 and on the back page of
24    State's 3 that's been admitted, now it's 3 of 3.
25         This is a separate document and just so if we mark

1    that State's 4, it would be clear on the record what we

2    are doing here, but it's up to you.  It's been admitted.

3          MR. OLIVAS:  Your Honor, we would rely on the

4    testimony of the defendant.

5          THE COURT:  Are you the one that stapled all of

6    them?

7          MR. ESPARZA:  I'm the one that stapled them, Your

8    Honor.  We'll mark it State's 4 so that it's not

9    confusing.

10          THE COURT:  All right.  Let's do that.  And then

11    for the record, the last document that was identified

12    by the officer was originally the last page of State's

13    Exhibit 3 which will now be State's Exhibit Number 4.

14    In other words, that's the last document that was identi-

15    fied.

16          MR. OLIVAS:  No objection.

17          THE COURT:  Why don't you take that apart and mark

18    it?

19          MR. ESPARZA:  Thank you, Your Honor.  May the

20    witness step down, Your Honor?

21          THE COURT:  Yes.  Call your next witness.

22          MR. ESPARZA:  The State calls Detective Ortega.

23          MR. OLIVAS:  Your Honor, something else.

24          THE COURT:  Just a minute.  She's got her hands

25    busy.  All right.

VILLEGAS v. CITY OF EL PASO - P002330

1              MR. OLIVAS:  There's another matter.

2              THE COURT:  Yes.

3              MR. OLIVAS:  Your Honor, one, we would re-urge our

4       motion for continuance previously stated.  One of the

5       defendant's witnesses was specifically Marcos Gonzalez and

6       he was being held in detention.

7              THE COURT:  He's here, is he not?

8              MR. OLIVAS:  He's in the hold over.  He has another

9       lawyer on another charge wholly unrelated to this one.

10             THE COURT:  Who's his lawyer?

11             MR. ESPARZA:  David Simmental, Your Honor.

12             THE COURT:  All right.

13             MR. OLIVAS:  I understand he's been contacted.

14             MR. ESPARZA:  Your Honor, at this recess, I asked

15      Mindy if she would call Mr. Simmental because I'm aware

16      that he has a lawyer even though it is on another charge

17      and just so that he knows we have him here and we may be

18      questioning him under oath.

19             THE COURT:  That's advisable.  That's what I would

20      have done.

21             MR. OLIVAS:  Thank you, Your Honor.

22             THE COURT:  Raise your right hand.

23                          CARLOS ORTEGA,

24      having been called as a witness by the State, after having

25      been duly sworn by the Court, was examined and testified,

1    as follows:

2         MR. ESPARZA:  Your Honor, just so that the record

3    is clear, State's 1 is the warning card.

4         State's 2 is titled Magistrate's Certification of

5    Juvenile's Competency to Make Statement.

6         State's 3 is a document titled Juvenile Confession

7    Warning and the second page, Juvenile Statement.  It's two

8    pages, but it's pages 1 through 3.

9         State's 4 is a document titled Statutory Warning of

10   Juvenile by Magistrate Under Section 51.09 of the Texas

11   Family Code as Amended September 1, 1991.

12        THE COURT:  All right.

13                    DIRECT EXAMINATION

14   BY MR. ESPARZA:

15   Q    Sir, would you state your name for the record?

16   A    Carlos Ortega.

17   Q    And how are you employed?

18   A    I'm a police officer with the El Paso Police

19   Department.

20   Q    And how long have you been a police officer with

21   the El Paso Police Department?

22   A    Fifteen years.

23   Q    And where are you currently assigned?

24   A    In Juvenile Investigations Section, Child Abuse

25   Unit.

1    Q      And how long have you been assigned to the Juvenile

2    Investigation Services Unit?

3    A      As a detective, six years.

4    Q      Has it been longer when you were not a detective?

5    A      As a patrolman, I was there four years before that.

6    Q      And did you have an occasion to become involved in

7    the case involving Mr. Daniel Villegas, the defendant?

8    A      Yes, sir.

9    Q      Okay.  And do you see Mr. Villegas in the

10   courtroom?

11   A      Yes, sir.

12   Q      And just for the record, would you identify him,

13   please?

14   A      He's the gentleman here with the white shirt and

15   black tie.

16          MR. ESPARZA:  Your Honor, would the record reflect

17   that the witness has identified the defendant?

18          THE COURT:  It will so reflect.

19   Q      (BY MR. ESPARZA)  Were you on duty on the night of

20   April 21st, 1993?

21   A      Yes, sir.

22   Q      And did you have, on that date, an occasion to come

23   in contact with Mr. Villegas, the defendant?

24   A      Yes, sir.

25   Q      Okay.  And why was that?

1    A    I was called out to assist homicide with this

2    juvenile here.

3    Q    And do you remember approximately what time you

4    were called?

5    A    Around 11:00 p.m. or so.

6    Q    And where did you go after being called?

7    A    To my office.

8    Q    And where is your office located?

9    A    6314 Delta.

10   Q    And that is the Youth Services Division of the

11   El Paso Police Department?

12   A    That's correct, sir.

13   Q    And is it also true that the Youth Services

14   Division of the El Paso Police Department, also referred

15   to as JIS, has been certified under Article 52.025 of the

16   Family Code --

17   A    Yes, sir.

18   Q    -- as a juvenile processing office?

19   A    Correct, sir.

20   Q    When you arrived at the Youth Services Division

21   that evening, was the defendant already there?

22   A    Mr. Esparza, I don't know if he was already there

23   or I waited maybe a few minutes until he showed up.

24   Q    And when he arrived, with whom did he arrive?

25   A    Detective Marquez.

1    Q      Was anyone else with him, if you remember?

2    A      If someone else was with him, it was Detective

3    Arbogast.

4    Q      And where was the defendant placed when he arrived

5    at the Youth Services Division?

6    A      In one of the sergeants' offices.

7    Q      And subsequent to him arriving at the Youth

8    Services Division Office, was he taken to the detention

9    facility for juveniles?

10   A      Yes.

11   Q      And could you tell the Court where that detention

12   facility is located?

13   A      Right next door.

14   Q      And how long does it take approximately for you to

15   walk the distance between the Youth Services Division of

16   the El Paso Police Department and the detention facility?

17   A      A couple of minutes.

18   Q      When the defendant arrived at the Youth Services

19   Division, was he wearing handcuffs?

20   A      No, sir.

21   Q      And was he subsequently placed in handcuffs after

22   arriving at the Youth Services Division?

23   A      When he was walked over to Juvenile Probation.

24   Q      All right.  That's the detention facility?

25   A      Right.

1    Q    And who was with you and the defendant when you
2    walked him over to the detention facility?
3    A    Detective Marquez and, I believe, Detective
4    Arbogast.
5    Q    All right.  And once arriving at the detention
6    facility, do you remember what area of the facility you
7    were admitted to?
8    A    Yeah.  The -- I guess it's called their holding
9    area where the in-take officer comes and sees what you
10   need -- what your business there is.
11   Q    And did you have a conversation with anyone there
12   from the facility?  Namely, the probation officer?
13   A    Yes, sir.
14   Q    And do you remember his name?
15   A    Mario Aguilera.
16   Q    And did Mario Aguilera, the employee of the
17   Juvenile Probation Department, speak with the defendant?
18   A    Yes, sir.
19   Q    And did he speak to him in your presence or
20   separate or in another location?
21   A    In another room.
22   Q    Okay.  Were you able to hear the conversation
23   between him and Mr. Aguilera?
24   A    No, sir.
25   Q    Do you have an approximate time Mr. Aguilera spent

1    with the defendant?

2    A       Five or ten minutes.

3    Q       What was the purpose of going to the detention

4    facility to speak with Mr. Aguilera?

5    A       To ask Mr. Aguilera for permission to take the

6    statement from Mr. Villegas and I would assume, too, Mr.

7    Aguilera was going to find out if he wanted to give one.

8    Q       And did you get permission from Mr. Aguilera to

9    take the statement?

10   A       Yes, we did.

11   Q       After getting permission to take the statement,

12   where did you take the defendant?

13   A       To Judge Horkowitz downtown.

14   Q       And who was with you when you took the defendant to

15   see Judge Horkowitz?

16   A       Detective Marquez and Arbogast.

17   Q       And what type of vehicle did you transport the

18   defendant?

19   A       An unmarked City police vehicle.

20   Q       And when you were transporting the defendant from

21   your location of the detention facility, was the defendant

22   wearing handcuffs?

23   A       No, sir.

24   Q       Could you tell the Court where Judge Horkowitz was

25   located?  His address?

1    A       The old central headquarters right across from the
2    County Jail on Overland and Campbell.
3    Q       200 South Campbell?
4    A       Yes, sir.
5    Q       The central sub-station?
6    A       Yes, sir.
7    Q       How long did you spend at the central sub-station
8    so that Judge Horkowitz could speak with the defendant?
9    A       A few minutes.  It wasn't very, very long.  There
10   were probably some other prisoners ahead of ours to be
11   warned also, so I really can't give you an exact, exact
12   time we were there, but it was a few minutes before he got
13   to see him.
14   Q       Well, when Judge Horkowitz, the magistrate, when he
15   spoke with the defendant, was the defendant wearing
16   handcuffs?
17   A       No, sir.
18   Q       And were you present when he spoke with him?
19   A       No, sir.
20   Q       After the defendant spoke with Judge Horkowitz,
21   where did you go then?
22   A       Went back to our office to take the statement.
23   Q       Okay.  And where was the statement taken?
24   A       In my office.
25   Q       And could you tell the Court a general description

76

1    of your office?

2    A      A regular office.  It's got a desk, three chairs, a

3    typewriter -- manual typewriter -- and a computer where I

4    hold my interviews on other cases.

5    Q      How big would you say the office is?

6    A      I would say 12 by 12.  Maybe a little bit bigger.

7    Q      About.

8    Q      And how many chairs -- I guess there is a chair

9    behind the desk.

10   A      Correct.  There is a chair for me at my desk and

11   there are three other chairs there also.

12   Q      While the statement was being taken, who was

13   present while the statement was being taken?

14   A      Myself, Mr. Villegas and Detective Marquez.

15   Q      Okay.  Was anyone else present?

16   A      No, sir.

17   Q      Was the defendant, at any time, left unattended

18   while he was in the Youth Services Division?

19   A      No, sir.

20   Q      Who was principally responsible for taking the

21   statement of the defendant?

22   A      Detective Marquez.

23   Q      Were you a participant at all in the taking of the

24   statement other than being an observer?

25   A      That's basically all I did.

```
1    Q     And during the taking of the statement, did the
2    defendant ever make any complaints?
3    A     Complaints?  No, sir.
4    Q     Was he ever threatened?
5    A     No, sir.
6    Q     Was he ever promised anything?
7    A     No, sir.
8    Q     Was he ever coerced?
9    A     No, sir.
10   Q     What was done on the part of either you or
11   Detective Marquez to make the defendant comfortable there
12   while he sat in your office?
13   A     Well, he was not cuffed for one.  We bought him a
14   Coke.  We try to make him as comfortable as possible and,
15   you know, in taking a statement from him.
16   Q     Do you remember how long it took for you all to get
17   the statement generated, typed and ready to go back to the
18   magistrate?
19   A     About an hour.
20   Q     Did the defendant sign the statement in your
21   presence there at Youth Services Division?
22   A     No.
23   Q     And why not?
24   A     Because the Family Code does not permit us.  He's
25   got to sign it in front of a Judge.
```

78

1       MR. ESPARZA:  May I approach the witness, Your
2  Honor?
3       THE COURT:  Yes, you may.
4  Q    (BY MR. ESPARZA)  Let me show you what's been
5  marked as State's Exhibit Number 4 and can you tell me
6  here on State's Number 4 if any of the writing is your
7  writing?
8  A    Yes, sir.
9  Q    And would you read into the record what you have
10 written?
11 A    Okay.  On this day, Danny Villegas, white male, 16,
12 personally appeared before me in the custody of Detectives
13 Al Marquez and Carlos Ortega, Peace Officers of the
14 El Paso Police Department and I gave the said arrested
15 person the following warning:
16      This guy's name -- Danny Villegas -- you have been
17 accused of the offense of capital murder.  That's what I
18 wrote in there.
19 Q    So here in blue, I think on State's 1, "Danny
20 Villegas" is your writing?
21 A    Yes, sir.
22 Q    How about this number on the top right-hand corner
23 which is "93100037?"
24 A    That's my writing, sir.
25 Q    Okay.  And with the line underneath?

1    A      That's mine.

2    Q      Then on the second line where it says race, you

3    wrote a "W." Is that your writing?

4    A      That's correct.

5    Q      The "M" next to it under sex, is that your writing?

6    A      Yes, sir.

7    Q      Age "16." Is that your writing?

8    A      That's correct.

9    Q      "Detectives Al Marquez, Carlos Ortega." Is that

10   your writing?

11   A      Yes, sir.

12   Q      And then on the following line, the blank is filled

13   with "El Paso Police Department." Is that your writing?

14   A      Yes, sir.

15   Q      And then about two more lines down there is

16   handwritten "Danny Villegas." Is that your writing?

17   A      Yes, sir.

18   Q      And then about two more lines down is written in

19   blue, I think, "capital murder."

20   A      Correct, that's mine.

21   Q      All of the writing here on the top section is your

22   writing?

23   A      Yes, sir.

24   Q      Let me show you what's been admitted into evidence

25   and now marked as State's Exhibit Number 2 and can you

1     tell me -- let me just go through this.  It will probably

2     be quicker if I do it this way.

3     A     Yes, sir.

4     Q     It says here "Danny Villegas" in black on the first

5     line.  Is that your writing?

6     A     No, sir.

7     Q     It says on the second line "Detective Al Marquez."

8     Is that your writing?

9     A     Yes, sir.

10    Q     And it says here "El Paso Police" on the second

11    line.  Is that your writing?

12    A     Yes, sir.

13    Q     And then on this bottom line here it says on the --

14    it's about one, two, three, four, five lines -- five

15    sentences from the top.  It's actually lines from the top.

16    It says "Danny Villegas."  Is that your writing?

17    A     No, sir.

18    Q     Okay.  And then it's about one, two, three, four,

19    five, six, seven, eight, nine, ten -- ten lines from the

20    top paragraph.  Beginning on the top paragraph.  It says

21    "Danny Villegas," is that your writing?

22    A     No, sir.

23    Q     And here where it has been scratched out on State's

24    Exhibit Number 2, is that your scratch out?

25    A     No, sir.

1    Q     Okay.  Is there anything else in here on State's 2
2    that you have written?
3    A     No, sir.
4    Q     Let me show you what's Exhibit Number 3 and can you
5    tell me here on State's 3 on the upper right-hand corner
6    there is a three in blue.  Is that your writing?
7    A     Yes, sir.
8    Q     How about the one to the left of that?
9    A     No, sir.
10   Q     Okay.  On the first line, it says "Statement of"
11   and then it's handwritten "Danny Villegas."  Is that your
12   writing?
13   A     Yes, sir.
14   Q     The address of "6314 Delta (YSD)."  Is that your
15   writing?
16   A     Yes, sir.
17   Q     And then is there anything else on this sheet
18   that's your writing?
19   A     No, sir.
20   Q     After you took the statement there at the Youth
21   Services Division, where did you go?
22   A     Back to Judge Horkowitz.
23   Q     And do you remember how long you spent there at the
24   central sub-station the second time you went before the
25   magistrate?

1    A       Again, just a few minutes.  I don't think there

2    were anymore prisoners left for the Judge to warn, so we

3    weren't there very, very long.  I don't recall.

4    Q       Now, when you go to the magistrate the second time,

5    are you all still in one vehicle?

6    A       Yes, sir.

7    Q       What happens after you take the defendant -- well,

8    does he sign the statement there?

9    A       In the presence of the Judge, yes, he does.

10   Q       Are you in the room?

11   A       No, sir.

12   Q       Is Detective Marquez in the room?

13   A       No, sir.

14   Q       How about Detective Arbogast?

15   A       No, sir.

16   Q       Do you know if there are any peace officers in the

17   room with the Judge?

18   A       There are none.

19   Q       After you have the statements signed, where do you

20   go then?

21   A       I went back to JIS for the additional paperwork.

22   Make copies.  What have you.  And then I turn him over to

23   Detective Marquez.  That was the end of my assistance.

24   Q       So, when they went to look for the homes of Droopy

25   and Popeye, were you present?

1    A      No, sir.

2    Q      And did you have any other participation that night

3    in the taking of the statement?

4    A      No, sir.

5           MR. ESPARZA:  I have no further questions, Your

6    Honor.

7           THE COURT:  Mr. Olivas?

8                       CROSS EXAMINATION

9    BY MR. OLIVAS:

10   Q      Officer Ortega, what time -- after everything was

11   said and done -- did you hand, or did you let Officer

12   Marquez take Daniel to JPD at the end?

13   A      What time?  After we walked him over there?

14   Q      Well, at the end.  When you -- what time did you go

15   home from JPD on the 21st?

16   A      After I was completely through assisting, I don't

17   know if it was 2:00 o'clock or 4:00 o'clock in the

18   morning.  I don't recall specifically what time it was.

19   Q      Well, if you have -- was it -- what time did you

20   leave?  How do you keep records of your time so you can

21   get compensated for your comp time?

22   A      The report.  Well, the overtime memo.  I believe I

23   made a supplementary report before I left and the time

24   would be noted there.

25   Q      You made a supplementary report?

                                                        84

1    A      Police report at the bottom of the page and the

2    time that I typed and approved the report.

3    Q      So, you left to go home between -- after you were

4    done and gave Daniel to Mr. Marquez, it was about -- was

5    it 2:00 or was it 4:00?

6    A      Well, I would have to read the report there.

7    Q      Well, I'm asking you to recollect to the best of

8    your knowledge.

9    Q      Is this it?

10        MR. ESPARZA:  I would be happy to --

11                      (An off-the-record discussion took

12                       place at this time.)

13                      (Thereupon, the following proceedings

14                       continued:)

15        MR. OLIVAS:  Your Honor, I'm just going to refresh

16    his memory with this.  May I approach the witness, Your

17    Honor?

18        THE COURT:  Yes, you may.

19    Q      (BY MR. OLIVAS)  Is this the report you're

20    indicating, Officer?

21    A      There's two of them.

22        MR. ESPARZA:  Your Honor, just for the record, we

23    are handing him what I believe is a supplement to his

24    report and he may have the rest of his reports if I could

25    just tender them all to him and he can review them.

1          MR. OLIVAS:  I just want him to recollect and

2     refresh his memory from the time noted in that report.

3     A     From when I turned the young man to Detective

4     Marquez to continue with whatever they were going to do, I

5     went back to my office and made the supplementary report

6     as to what I had done or what I assisted him with and the

7     report I began at 3:44 a.m. and I finished -- well, it was

8     approved at 4:03 a.m. keeping in mind the fact that I was

9     not with this young man or Detective Marquez anymore.

10    Q     You began your report at 3:44?

11    A     I started at 3:44.

12    Q     And then we can assume that you left shortly after

13    4:05 -- 4:03 for home, right?

14    A     Probably.  Yes, sir.

15    Q     Now --

16          THE COURT:  So at that time, the juvenile had

17    already been taken to Magistrate Horkowitz twice?

18          THE WITNESS:  Yes.  The whole procedure of taking

19    the statement was already finished or completed, but after

20    I turned him over to Detective Marquez, I went ahead and

21    stayed there in the office to make this report.

22          As far as me turning the juvenile over actually to

23    Detective Marquez and Arbogast, that's why I said I can't

24    tell you an exact time I turned him over or got back from

25    the Judge.

VILLEGAS v. CITY OF EL PASO - P002348

1          I would say when the Judge signed the final warning
2     page somewhere in the area of a few minutes after that was
3     when I was through with my involvement once we drove back
4     to my office.
5          THE COURT:  All right.
6     Q     (BY MR. OLIVAS)  You had taken his statement and
7     had come back to the office and turned him over at
8     approximately 3:44 if your report is correct and your
9     recollection?
10    A     Well, that's what time I started my supplementary
11    report.
12    Q     3:44?
13    A     That's what it says here.  Like I said, I don't
14    know.  I don't recall.  I would have to say within a few
15    minutes after Judge Horkowitz signed the final warning and
16    we drove back to the office is when he was turned over.  I
17    guess you would say to Detective Marquez and Arbogast so
18    they could take him somewhere else.
19    Q     That was 3:44 when everything is done and said --
20    said and done with.
21    A     That's when I started my supplementary report.
22    Q     Okay.
23    A     At 3:44.
24    Q     Now, let's back track a little bit.  You testified
25    it took you approximately one hour to take the statement?

1    A    Yes, sir.

2    Q    Okay.  And it took you the total time between the

3    first warning and 3:44.  How long was that?

4    A    The total time between the first warning?

5    Q    And 3:44.  The warning that you gave him?

6    A    When he was brought to the office?

7    Q    Yes, sir.

8    A    It was somewhere around 11:15 or between 11:00 or

9    12:00 midnight.

10   Q    He was at the office?

11   A    That was when he was brought in.  I can't give you

12   an exact time, but when Marquez brought him in is the time

13   that I'm going by.

14   Q    What time is that?

15   A    That's when I got called out about 11:00 or so if

16   that's the question you're asking me.

17   Q    Okay.  What time did you arrive at Judge Horkowitz'

18   office?

19   A    I can't recall that.  It's on the confession

20   itself.

21   Q    Well, if I asked you to recall, to the best of your

22   recollection, what time did you arrive at Horkowitz'

23   office?

24        MR. ESPARZA:  Your Honor, this question has been

25   asked and answered.  His answer was he cannot recall.  He

1    could recall if he would be allowed to see the

2    magistrate's warning.

3          THE COURT:  Do you remember the time or not?

4          THE WITNESS:  Not off the top of my head, Your

5    Honor.  I would have to read the confession so I can tell

6    him exactly what time more or less.

7          THE COURT:  There's your answer.  Move along.

8          MR. OLIVAS:  Okay.

9    Q     (BY MR. OLIVAS)  Now, you understand that he was

10   taken on a ride to show where two other defendants lived

11   with Judge -- I mean with Officer Marquez, right?

12   A     That's what I understand.

13         MR. OLIVAS:  Okay.  I have no further questions,

14   Your Honor, of this witness.

15         MR. ESPARZA:  I have no further questions for this

16   witness, Your Honor.

17         THE COURT:  You may step down.  Call your next

18   witness.

19         MR. WILLIAMS:  State calls Mario Aguilera.

20         MR. ESPARZA:  Your Honor, may we approach the bench

21   while the witness comes in?

22         THE COURT:  Raise your right hand.

23                   MARIO AGUILERA,

24   having been called as a witness by the State, after having

25   been duly sworn by the Court, was examined and testified,

89

VILLEGAS v. CITY OF EL PASO - P002351

1    as follows:

2                    DIRECT EXAMINATION

3    BY MR. WILLIAMS:

4    Q    Mr. Aguilera, would you please state your name for

5    the record?

6    A    My name is Mario Aguilera.

7    Q    And how are you employed, sir?

8    A    I'm a juvenile probation officer for the El Paso

9    County Juvenile Probation Department.

10   Q    And how long have you been so employed with the

11   El Paso County Juvenile Probation Department?

12   A    For 12 years.

13   Q    And what kind of training have you had to prepare

14   you for being a juvenile probation officer?

15   A    I have a Bachelor's degree of Criminal Justice from

16   the University of Texas at El Paso.  Since my employment,

17   we require 40 hours of training on a yearly basis.

18   Q    Were you working in the late night of April the

19   21st and early morning hours of April 22nd of '93?

20   A    Yes, sir, I was.

21   Q    And what was your duty at that particular time?

22   A    I was assigned to the in-take section of the

23   Juvenile Probation Department.

24   Q    Okay.  As an in-take juvenile probation officer,

25   what are your responsibilities?

VILLEGAS v. CITY OF EL PASO - P002352

1    A    To process the referrals from the law enforcement

2    agencies.

3    Q    Okay.  And you're located at the Juvenile Probation

4    Department?

5    A    That's correct.

6    Q    On the evening of April the 21st, 1993, Daniel

7    Villegas was brought to JIS at 11:30, correct?

8    A    That's my understanding, yes, sir.

9    Q    Okay.  And what time was he brought to JPD?

10   A    The first time he was brought in was at

11   approximately 12:26.

12   Q    Okay.  Who brought him to JPD?

13   A    It was four detectives -- Detective Ortega,

14   Detective Arbogast, Brown and Marquez.

15   Q    Okay.  And JPD is the designated juvenile

16   processing office?

17   A    That's correct.

18   Q    And was that the first time you saw the defendant?

19   A    That evening, yes, sir.

20   Q    At 12:26?

21   A    That's correct.

22   Q    What happens when he's brought in?

23   A    He was brought in along with the Number 1 report

24   and a couple of statements from the police department

25   where I read the Number 1 and the statements and that led

91

1    me to believe that the juvenile was implicated in the
2    alleged offense.
3         Detectives informed me also that the juvenile was
4    willing to give a confession and at that time, after
5    establishing probable cause, I approached the juvenile and
6    asked him, you know, if he understood why he was there and
7    that if he wanted to give a confession.
8         I asked him if the Miranda warnings had been given
9    to him and he answered yes to all my questions.
10   Q    Okay.  The time that you're talking about meeting
11   with the defendant, where were you?
12   A    I was in the holding area where -- the holding
13   cell of the Juvenile Probation Department.
14   Q    Okay.  And what's in the holding cell?
15   A    It's just a couple of plastic chairs in there.
16   Q    Okay.  Was anyone in the holding cell there with
17   you when you were talking to Mr. Villegas?
18   A    No, sir.  Just him and I.
19   Q    And why was it that the officers brought you the
20   paperwork?
21   A    They need to show the juvenile probation officer
22   that first of all, an offense has occurred and they need
23   to, in one way or another, tie the juvenile to the alleged
24   offense.
25   Q    And part of your duties as a juvenile -- as the

1    juvenile probation department in-take officer is to
2    determine whether or not there is probable cause?
3    A     That's correct.
4    Q     And you determined there was on this particular
5    case?
6    A     Yes, sir.
7    Q     Okay.  What was the defendant's demeanor during the
8    time you were talking to him?
9    A     He appeared to be normal to me.  There was no
10   indication on his part or from his appearance that he was
11   intoxicated or under the influence of any drugs or
12   anything like this.  He appeared to be normal to me.
13   Q     Did he make any complaints at all to you?
14   A     No, sir.  Not to me.
15   Q     Did he appear somewhat uncomfortable?
16   A     Aside from the fact that he was handcuffed at the
17   time, no.  He appeared to be all right.
18   Q     Okay.  Was he cooperative?
19   A     With me, yes, sir.
20   Q     And did you determine that he was, in fact, capable
21   of making a statement?
22   A     Yes, sir, ah-huh.
23   Q     And did he tell you that he wanted to give a
24   statement?
25   A     Yes, sir, he did.

1    Q    Okay.  And what did you do at that point?

2    A    I returned the juvenile to the custody of the

3    detectives.

4    Q    Okay.  What time was the juvenile brought back to

5    JPD?

6    A    If I remember correctly, it was around 4:20 in the

7    morning on the 22nd of April.

8    Q    Okay.  Well within six hours of 11:15?

9    A    Yes, sir.

10        MR. WILLIAMS:  Thank you.  I pass the witness.

11        THE COURT:  Mr. Olivas?

12                      CROSS EXAMINATION

13   BY MR. OLIVAS:

14   Q    You were certain that he was brought back at 4:20?

15   A    Yes, sir.  That's the time that I logged him in.  I

16   personally logged him in at 4:20 in the morning.

17   Q    Do you remember which officer turned him in?

18   A    At that time, I believe it was Detective Ortega and

19   Marquez that brought him back him into the Juvenile

20   Probation Department.

21   Q    Both of them brought him in?

22   A    Yes, sir.

23   Q    In your log sheet, do you have the names of the

24   people who brought him in?

25   A    I logged them in on what we call a pass log.  A

1    pass log where he was initially brought in for the -- for

2    the PC -- establishing of the probable cause.  At that

3    time, I did log in the names of those four detectives.

4    Q      And that was at 12:26?

5    A      That's correct.

6    Q      You are absolutely certain?

7    A      Yes, sir.

8    Q      Okay.  And then they brought him after he went in

9    and did his thing?  They brought him back?  You're certain

10   it was 12:26?

11   A      Yes, sir.  That's the time.

12   Q      And then they brought him back to you at 4:20?

13   A      4:20.

14   Q      You're absolutely certain?

15   A      Yes, sir.  I have got my log book here.

16   Q      And if you will look at it to refresh your memory,

17   please.

18   A      Okay.  He was brought in for the initial probable

19   cause at 12:26 a.m. on the 22nd of April.

20   Q      That's the very, very first time you met him?

21   A      That's correct.

22   Q      At 12:26?

23   A      Yes, sir.

24   Q      Okay.  And how long did you spend with him?

25   A      With Danny Villegas --

1    Q    To insure that he understood English and that he
2    understood what was going on and to insure that he was
3    not, like you said, on drugs or what have you?
4    A    After establishing the probable cause, maybe
5    approximately ten -- five or ten minutes.
6    Q    Five or ten minutes. And you understand at that
7    point he was taken to Judge Horkowitz?
8    A    Yes, sir. As a matter of fact, I did notify the
9    juvenile as to what the process was going to be once I
10   released the juvenile back to the detectives.
11        MR. OLIVAS: Okay. Judge, I have no further
12   questions of this witness.
13        THE COURT: All right. May he be excused?
14        MR. WILLIAMS: Yes, Your Honor.
15        THE COURT: Do you need him to remain here?
16        MR. ESPARZA: No, Your Honor. He may be excused.
17        MR. OLIVAS: He may be excused, Your Honor.
18        THE COURT: All right. You may be excused.
19        THE WITNESS: Thank you, Judge.
20        THE COURT: All right. Now, we are just waiting
21   for Judge Horkowitz?
22        MR. ESPARZA: I have called him, Your Honor, and
23   he's on his way.
24        THE COURT: All right. As soon as he gets here, we
25   will proceed.

96
VILLEGAS v. CITY OF EL PASO - P002358

```
1                    (A recess was taken at this time.)
2                    (The following proceedings took place
3                     after the recess:)
4                    JUDGE CARL HORKOWITZ,
5    having been called as a witness by the State, after having
6    been duly sworn by the Court, was examined and testified,
7    as follows:
8                    DIRECT EXAMINATION
9    BY MR. WILLIAMS:
10   Q    Judge, would you please state your name for the
11   record?
12   A    Carl Horkowitz.
13   Q    And how are you employed, sir?
14   A    I'm the night magistrate for the City of El Paso.
15   Q    And how long have you been so employed?
16   A    Since December 12th, 1989.
17   Q    What is your educational background?
18   A    Well, I have a Bachelor of Arts degree from
19   Pennsylvania State University and a JD, or law degree,
20   from the National Law Center of the George Washington
21   University in Washington, D.C.
22   Q    Okay.  Were you working the night of April the 21st
23   and early morning hours of April 22nd?
24   A    I may have been.
25   Q    What are your duties as a night magistrate?
```

1    A    I read probable cause affidavits to determine

2    whether or not there is probable cause to affect an

3    arrest.  I read arrestees their Miranda warnings, I set

4    bonds, sign search warrants, sign personal commitment

5    orders.

6    Q    Okay.  Have you dealt with juveniles on a number of

7    occasions?

8    A    Yes, I have.

9    MR. WILLIAMS:  May I approach witness, Your Honor?

10    THE COURT:  Yes, you may.

11    Q    (BY MR. WILLIAMS)  I'm showing you what's been

12    marked as Exhibits 2, 3 and 4.  Do those refresh your

13    memories as to whether you were working the night of April

14    the 21st and the early morning hours of April 22nd, 1993?

15    A    Yes.

16    Q    Okay.  And were you, in fact, working those hours?

17    A    It appears that that's the case.

18    Q    Do you recall when was the first time that you saw

19    the defendant, Danny Villegas?

20    A    Well, that would be -- that would have been,

21    according to this State's Exhibit Number 4, around 12:53

22    in the morning -- on the morning of the 22nd of April

23    1993.

24    Q    Okay.  And what was the purpose of you seeing him

25    at that time?

VILLEGAS v. CITY OF EL PASO - P002360

1    A    Well, the purpose of that was for me to read him

2    the rights that are enumerated on State's Exhibit Number 4

3    prior to his being questioned by a peace officer.

4    Q    Okay.  And did you, in fact, read him those rights?

5    A    Yes, I did.

6    Q    Okay.  And does his signature appear on State's

7    Exhibit Number 4?

8    A    Yes, it does.

9    Q    And does your signature appear on State's Exhibit

10   Number 4?

11   A    Yes, it does.

12   Q    Who was present when you read the defendant his

13   rights?

14   A    Well, Mr. Villegas was present and, of course, I

15   was there and that was it.

16   Q    Okay.  Did it appear to you that he understood

17   those rights?

18   A    Yes.

19   Q    Now, was the defendant brought back to you at a

20   later time?

21   A    Yes, he was.

22   Q    Okay.  And what time was that?

23   A    Well, from State's Exhibit Number 3, it appears to

24   have been at 2:40 in the morning of the 22nd of April.

25        MR. OLIVAS:  Your Honor, I'm going to object to

1    this testimony. If he knows, he can testify as to his

2    knowledge.

3         I think that what he's testifying to is hearsay.

4    Clearly, those documents support -- I mean, they are

5    provided to the Court to prove the matter asserted therein

6    that they were specifically warned on these times. He has

7    indicated he doesn't remember.

8         However, if I look at these documents, they tell me

9    12:53. I submit to the Court that is hearsay and I would

10   ask the Court to strike all the testimony that he has

11   taken from the document and his testifying. If he's got

12   independent recollection, then so be it.

13        THE COURT: Who filled out the time?

14        MR. OLIVAS: He has not identified it.

15        THE COURT: Who filled out the times that you have

16   just testified to? Did someone else fill them out or did

17   you fill them out?

18        THE WITNESS: No. This is my handwriting.

19        THE COURT: Overruled.

20   Q    (BY MR. WILLIAMS) Okay. And when you said you

21   talked to the defendant, Danny Villegas, do you see him

22   here in the courtroom today?

23   A    It appears to be this gentleman at counsel table to

24   my right.

25        MR. WILLIAMS: May the record reflect that he's

                                                100

1    identified the defendant, Your Honor.

2         THE COURT:  It will so reflect.

3    Q    (BY MR. WILLIAMS)  So Judge Horkowitz, on State's

4    Exhibit Number 3, you said that you saw the defendant for

5    the second time at 2:40?

6    A    Right.  Around 2:40.

7    Q    And that's your writing on the 2:40?

8    A    That's correct.  I was the one who put 2:40 a.m. on

9    this Exhibit Number 3.

10   Q    Okay.  What was the purpose of him being brought to

11   you at that time?

12   A    Well, the purpose was for me to read him these

13   rights once again and make an independent determination of

14   voluntariness and to ask him whether or not he actually

15   wanted to make the statement that apparently he had given

16   to a peace officer but that had not been signed yet.

17   Q    Okay.  The statement had not been signed before it

18   was given to you?

19   A    When he was brought back to me the second time, the

20   statement had been typed, but it hadn't been signed by

21   him.

22   Q    And when you meet with Mr. Villegas the second

23   time, where do you meet with him?

24   A    That was back at my office.

25   Q    Okay.  Which is where?

1    A    Well, it's at 810 East Overland now.  That's where
2    I am now, but where I was just then, I don't recall.  It
3    was probably at the old --
4         MR. OLIVAS:  Your Honor, I'm going to object to
5    this testimony in that he's speculating.  If he remembers,
6    he does.  If he doesn't --
7         THE COURT:  Well, he's already stated that he
8    doesn't remember where.
9    Q    (BY MR. WILLIAMS)  Okay.  Could it have been at the
10   old central office?
11        MR. OLIVAS:  Your Honor, I'm going to object to
12   speculation.
13        THE COURT:  Sustained.
14   Q    (BY MR. WILLIAMS)  At your office -- at the old
15   office in the central sub-station, what did that -- what
16   was that like?
17   A    Well, it's a room with a desk in it and a chair --
18   a couple of chairs.
19   Q    Okay.  When Mr. Villegas was brought in and you
20   were talking to him about the statement, was there anyone
21   else present in the office?
22   A    No.
23   Q    And did you go over his rights with him again?
24   A    Yes, I did.
25   Q    And did he sign the first page of Exhibit 3?

1    A       Yes, he did.

2    Q       And what does his signature at the bottom indicate?

3    A       It indicates that he waives his right to consult

4    with an attorney and to remain silent.

5    Q       After talking to him, did you feel that he

6    understood those rights?

7    A       Yes, I did.

8    Q       And did you feel that he knowingly, intelligently

9    and voluntarily waived those rights?

10   A       Yes.

11   Q       Did you ask the defendant about the statement that

12   was typed?

13   A       Did I ask him about the statement?

14   Q       Yes.

15   A       Yes, I did.

16   Q       Okay.  And what did you ask him?

17   A       Well, I asked him if this was his statement.  I

18   asked him if he had read it.  I asked him if he wanted to

19   read it again.  I asked him if he wanted to add anything

20   to it and I asked him if he wanted to delete anything from

21   it.

22   Q       Okay.  And what were his answers?

23   A       Well, his answers were that these were the state-

24   ments that he had given to the detective.  That he had

25   read it.  That it was -- that he did not want to add any-

103

1    thing to it and that he did not want to delete anything

2    from it.

3    Q     Did it appear to be voluntary to you?

4    A     It appeared to me to be a voluntarily statement.

5    Q     Okay.  And did you allow him to sign it?

6    A     Yes, I did.

7    Q     Did he make any complaints to you?

8    A     No, he did not.

9    Q     Let me ask you about State's Exhibit Number -- I

10   believe it's marked as Number 2.  What is State's Exhibit

11   Number 2?

12   A     State's Exhibit Number 2 is a Magistrate's

13   Certification of Juvenile's Competency to Make Statement.

14   Q     Okay.  And is that your signature at the bottom?

15   A     Yes, it is.

16   Q     The very last line has a time.  It says 2:45 and

17   there is a mark over one of the numbers; is that correct?

18   A     Right.

19   Q     And are those your initials by the 2?

20   A     Yes, those are my initials.

21   Q     What time did you sign State's Exhibit Number 2?

22   A     At 2:45 a.m.

23         MR. WILLIAMS:  Nothing further, Your Honor.

24         MR. OLIVAS:  Your Honor, may I approach?

25         THE COURT:  Yes, you may.

                                                         104

1                              CROSS EXAMINATION

2       BY MR. OLIVAS:

3       Q       Judge Horkowitz, the first time you ever

4       encountered Mr. Villegas was at 12:53 a.m. --

5       A       Around there.  That's right.  That's correct.

6       Q       -- as shown in State's Exhibit 4?

7       A       That's right.

8       Q       Thereafter, the second time you encountered him, he

9       comes with the police with a confession in hand.  That is

10      at approximately 2:40 a.m. or 3:40 a.m. as shown on

11      State's Exhibit 3?

12      A       No.  State's Exhibit 3 shows 2:40 a.m.

13      Q       Would you agree with me that that has been altered?

14      A       No.  State's Exhibit 3 hasn't been altered.

15      Q       No?  Okay.  Do you see that it says 3 on the bottom

16      of Number 2 and perhaps it may have been a 1?

17      A       Well, it could have initially been a 3 with a 2

18      over it.

19      Q       Okay.  Now, as far as State's Exhibit Number 2, the

20      Magistrate's Certification of Juvenile's Competency to

21      Make Statement, that was signed at either 2:45 or -- and

22      you can see it's got a scratched out 3, right?

23      A       It has a 3, but it's scratch out with a 2 next to

24      it and then my initials next to the 2.

25      Q       So, you altered those?

                                                                    105

1    A    Yes, I altered this one.  State's Exhibit Number 2.

2    Q    Did you alter State's Exhibit Number 3?

3    A    Well, I may initially have put a 3 there and then

4    put a 2 over it.

5    Q    But, you don't know who altered State's Exhibit

6    Number 3?

7    A    Well, all this writing in black, aside from -- you

8    see, some things on here are -- were written by me and

9    some things were not.

10   Q    Right.

11   A    Okay?

12   Q    Would you agree with me that State's Exhibit Number

13   3 is an original?

14   A    Ah-huh.

15   Q    And that that has been originally altered, if you

16   will?

17   A    No.  I don't agree it's been altered at all.

18   Q    So, that 2 doesn't look like a 3 or perhaps a 1 to

19   you?

20   A    Well, it looks to me like I originally wrote 3 and

21   then put a 2 over it, okay?  That's -- I will tell you

22   right now that's my 2.

23   Q    That's your 2?

24   A    That's my 2.

25   Q    And when you alter, as evidenced by State's -- when

106

1     you alter something in the legal documents such as this,

2     as evidenced by State's Exhibit Number 4, you put your

3     initials, right?

4     A      There are no initials on Number 4.

5     Q      Forgive me.   State's Exhibit Number 3?

6     A      Right.   I put my initials on State's Exhibit Number

7     2.

8     Q      And your initials do not exist on State's Exhibit

9     Number 3 in the alteration; is that correct?

10    A      If you want to call it an alteration, then no.

11    There are no -- my initials don't appear on State's

12    Exhibit Number 3.

13    Q      And Judge, do you -- what is your normal practice

14    when you alter a document -- a legal document such as

15    this?

16           Do you initial the alteration or just scratch over

17    that as what's been done in State's Exhibit Number 3?

18    What's your routine practice?

19    A      Well, my routine practice isn't to make a mistake

20    indicating a time on these documents.   That's my regular

21    practice.

22    Q      My apologies, Judge.   I'm not suggesting you made

23    the mistake.   I'm just simply stating when there is --

24    when there is an alteration of this kind, is your routine

25    practice to correct it, one and then two, to initial the

1    correction as has been done in State's Exhibit Number 2?
2    A    Well, if I think there is going to be some mis-
3    understanding, I will put an initial there.
4    Q    Okay.  Now, you would agree with me that another
5    person's writing exists on State's Exhibit Number 3
6    besides yourself?
7    A    Yes.  There is a different colored ink and Mr.
8    Villegas' signature.
9    Q    And that different colored ink -- well, to your
10   knowledge, is that from Detective Marquez or Detective
11   Ortega or do you know?
12   A    I would assume it would be from Detective Marquez.
13   Q    You don't know?
14   A    I don't know.
15        MR. OLIVAS:  Okay.  I have no further questions,
16   Your Honor.  I apologize.  One other question.
17   Q    (BY MR. OLIVAS)  The first time you ever saw him
18   was 12:53?  Ever, ever?
19   A    Well actually, it was before that because this
20   12:53 was indicated after I had read him these rights, so
21   it could have been maybe five or six minutes prior to
22   12:53.
23   Q    Okay.  But you signed that at 12:53?
24   A    That's correct.
25   Q    And you were completely done with him after he gets

108

1    taken back to JPD and then brought back the second time at
2    2:40 a.m.?
3    A     That's 2:45 a.m.  I would have been completely done
4    with him.
5    Q     By 2:45 a.m., you would have been completely done?
6    A     (Indicating.)
7          MR. OLIVAS:  I have no further questions.  Thank
8    you, Your Honor.  Thank you, Judge.
9          THE COURT:  Any further questions of this witness?
10         MR. WILLIAMS:  No, Your Honor.
11         THE COURT:  May he be excused?
12         MR. OLIVAS:  Yes, Your Honor.
13         THE COURT:  All right.  Thank you very much.  Now
14   is a good time to take our recess.  We will begin tomorrow
15   morning at 8:30.  If you have any witnesses that you need
16   to bring in for the motion to suppress, please have them
17   here and assembled and ready to go.
18         MR. OLIVAS:  Thank you, Your Honor.
19         THE COURT:  Is that all of the State's witnesses?
20         MR. ESPARZA:  We rest, Your Honor.
21         THE COURT:  So now you know where you stand, Mr.
22   Olivas.
23         MR. OLIVAS:  All right, Judge.
24                      (Proceedings concluded until the next
25                       day, December 1, 1994 at 8:30 a.m.)

                                                        109

VILLEGAS v. CITY OF EL PASO - P002371

1                    December 1, 1994

2                        Thursday

3          THE COURT:  Raise your right hand.

4                   YOLANDA VILLEGAS,

5   having been called as a witness by the defendant, after

6   having been duly sworn by the Court, was examined and

7   testified, as follows:

8          THE COURT:  You may be seated.  What is it that you

9   need?

10         MR. OLIVAS:  Your Honor, simply, I have -- I was

11  going to ask the Court for four hours continuance on 6

12  December, Tuesday.

13         I have a motion to modify, Frank Hernandez versus

14  Gina Corral in the Court Masters.  This is -- I just can't

15  continue this case anymore because it involves a young

16  lady -- a four-year-old child named Sheila Hernandez who

17  we believe is being physically and sexually abused in the

18  hands of her stepfather.

19         The biological father, which I represent -- we have

20  home studies and we have psychiatrists.  We have

21  everything lined up.

22         THE COURT:  And at the time you got the case set

23  down at the Family Law Masters, this case had already been

24  set for trial.  Didn't you advise them that you had a

25  capital murder trial set?

                                                    110

1       MR. OLIVAS:  No, Your Honor.  It was before this

2   setting.  And frankly, Judge, I would be remiss of my

3   duties to the child and to my client, Mr. Hernandez, if I

4   didn't proceed with this.

5       This has been like the fourth continuance that that

6   case has been granted.  Indeed, that's why they came with

7   me.

8       THE COURT:  Well, you're going to have to go and

9   talk to the court master and see if they can possibly hear

10  it for you on Monday and switch things around.

11      We originally were going to start this case on

12  Monday.  We are going to start it on Tuesday because of

13  the numbers of jurors and you're going to have to go and

14  make other arrangements on that case.

15      I cannot give you a continuance on this case.  It's

16  been -- this case here has been continued just as much or

17  more than your case down there.  This case has been

18  specially set.  I cannot give you a continuance.  You may

19  proceed.

20      MR. OLIVAS:  Please note my objection to the

21  Court's ruling.

22      THE COURT:  Your objection is noted in the record.

23  You may proceed.

24      MR. OLIVAS:  One additional question.  It's a

25  preliminary matter.  Marcos Gonzalez has been brought up.

111

1    Has David Simmental shown up?

2           THE COURT:  I don't believe he's here.  We called

3    his office yesterday and Mindy has spoken with him and

4    explained to him that his client will be up here at 8:30.

5    Sometime during the break, Louie, if you would go and have

6    Mindy check and see if he's going to show up and at what

7    time.

8                        DIRECT EXAMINATION

9    BY MR. OLIVAS:

10   Q     Ma'am, please state your name for the record.

11   A     My name is Yolanda Villegas, sir.

12   Q     And your address?

13   A     5700 Wren.

14   Q     Ma'am, what is your relation to Danny Villegas

15   here?

16   A     I'm his mother.

17   Q     Okay.  You're currently married to Chano Villegas

18   -- Priciliano Villegas?

19   A     Yes.

20   Q     And Mr. Villegas, who will testify later, is not

21   his biological father; is that correct?

22   A     Yeah.  He's not his biological father.

23   Q     Where is his biological father today?  What's his

24   name?

25   A     Robert Moya.

                                                          112

1    Q       Where is Mr. Moya?

2    A       I think in Albuquerque.

3    Q       Okay.  Ms. Villegas, I turn your attention to the

4    evening of 21 April 1993.  Do you recall that evening?

5    A       Yes.

6    Q       That was the date that Mr. Villegas was arrested?

7    A       Yes.

8    Q       Tell the Court what time it was that Danny -- that

9    Officer Marquez went into your house?

10   A       It had to be about 10:00 o'clock because the news

11   was just starting.

12   Q       Are you certain about that?

13   A       Yeah.  Well, I remembered the news starting.

14   Q       Okay.  Who entered your home?  Was it 10:00?  Could

15   it have been 10:15?

16   A       I don't think so because, you know, how the update

17   goes like real quick before the news?  They have like this

18   is what's coming up and then the news started.

19   Q       Why are you so certain about this fact?

20   A       I just remembered, like I say, glancing at the t.v.

21   for some reason.  I mean, I don't know the specifics.  I

22   just know that I glanced at the t.v. and I happened to see

23   the news was on.

24   Q       Who was present during -- when the police came?

25   A       Inside the house was my husband, Marcos Gonzalez

113

1    and Daniel Villegas.

2    Q    Okay.  Was there anybody else?

3    A    With me, and we had just arrived, it was Brisa

4    Parks which I brought with me, my daughter, Michelle Anne

5    Villegas and me.

6    Q    Where did you just arrive from?

7    A    We had gone to my friend's house.  He's an artist

8    and he was doing a facial mask of one of my friends,

9    Brisa.

10   Q    And what's his name?

11   A    Luis Villegas.

12   Q    Okay.  At any rate, ma'am, what was your son,

13   Danny, wearing when the police arrived there?  Do you

14   remember?

15   A    No.  I don't remember exactly.  I just know it was

16   probably jeans and a T-shirt.

17   Q    Did he have an opportunity -- did he need to go and

18   change into regular clothes so that he could go with the

19   police?

20   A    No, he didn't.  He -- what he told -- what I heard

21   him say was he needed to get at least his shoes because he

22   had socks on.

23   Q    And did they let him go into his room and put his

24   shoes on?

25   A    I never saw him go into the room.

114

1    Q    Did they also arrest Marcos at that time?

2    A    They arrested Marcos first.

3    Q    In your house?

4    A    Yes.

5    Q    Who was the officer that arrested Marcos?

6    A    I don't know who they were.

7    Q    Okay.  Did you have an opportunity -- did you see

8  the police read him his rights?

9    A    Yes.

10    Q    Was it inside the house?

11    A    Yes.

12    Q    Okay.  Who read it to him?

13    A    Like I said, there was three or four of them, so it

14  happened so quick.  I can't specify which one it was.

15    Q    Did he perhaps -- how did he read it to him?  From

16  his top of his head or did he use a card?  Did he use a

17  paper?  How did he do it?

18    A    The top of his head.

19    Q    Ma'am, how many children do you have total?

20    A    Three.

21    Q    Amongst those three, where would you categorize

22  Danny in terms of intelligence?

23    A    Intelligence?  I don't know.

24    Q    Sure.  Which is the smartest of the three?

25    A    Chalito.

115

1    Q      The younger one?

2    A      No.  The older -- I mean the middle one.

3    Q      And between Michelle and Danny, who's the less

4  intelligent one?

5    A      Daniel would be.

6    Q      Daniel was the --

7    A      Chalito is first, Michelle and then Daniel.

8    Q      Okay.  Do you find Daniel to be somewhat of an

9  impressionable person?

10    A      I don't know what you mean.

11    Q      Is he gullible?

12    A      In a lot of ways, yeah.

13    Q      Have you seen people exercise influence over him?

14    A      Yes.

15    Q      How easy or how difficult is it to influence Danny?

16    A      Pretty easy.

17    Q      Okay.  Now, what time did they leave -- did the

18  police leave your house with Danny and Marcos in tow?

19    A      It had to be around -- I guess maybe 10:20 or the

20  latest -- the latest was about 10:30.

21    Q      Was the news still on?

22    A      Yes.

23    Q      So, it had to be during the news.  Do you remember

24  what channel news it was?

25    A      Channel 4.

VILLEGAS v. CITY OF EL PASO - P002378

1    Q      Okay.  So, it had to be during the news at 10:20?

2    A      (Indicating.)

3    Q      What time did Danny -- did the -- did the juvenile

4    authorities inform you that Danny had been detained at

5    juvenile hall?

6    A      I didn't hear from them until the morning.

7    Q      What time in the morning?

8    A      I guess about 6:00 or 7:00 in the morning.

9    Q      Okay.  Daniel has been undergoing psychiatric

10   treatment by a Dr. Vanderpool?

11   A      Yes.

12   Q      As a result of drug abuse, alcohol abuse and

13   emotional problems and behavioral problems; is that

14   correct?

15   A      Yes.

16   Q      How long has Dr. Vanderpool treated him?

17   A      I think it was -- whatever the allowed -- whatever

18   the insurance allowed and I know we had him a month at

19   Charter.

20   Q      Hospital?

21   A      And then we had him, I think it was three months in

22   Sun Valley.  At Sun Valley.

23   Q      What year was this that he was treated by Dr.

24   Vanderpool?

25   A      I really can't remember.

117

1    Q       Was it one year or two years ago?

2    A       It's been a lot.  It's been a lot longer than that.

3    Q       About three years ago?

4    A       He was like 13 or 14 more or less.

5    Q       Okay.  Now, you have had a chance to visit with Dr.

6    Vanderpool regarding Danny, right?

7    A       Yes.

8    Q       Is it your opinion that Dr. Vanderpool believes

9    Danny he is impressionable?

10           MR. ESPARZA:  Your Honor, I'm going to object.

11   That's hearsay.

12           THE COURT:  Sustained.

13           MR. OLIVAS:  It's an opinion, Judge.

14           THE COURT:  Sustained.

15   Q       (BY MR. OLIVAS)  What are the problems that Danny

16   suffers that Dr. Vanderpool had to treat him for?

17   A       He said that Daniel --

18           MR. ESPARZA:  Objection, Your Honor.  It's hearsay.

19   Her response is not responsive to the question.

20           THE COURT:  All right.  That will be sustained.

21   Let me instruct you, ma'am, you cannot testify as to what

22   someone else told you.  You can only testify as to any

23   personal knowledge you might have about the matter.

24           THE WITNESS:  Okay.

25   Q       (BY MR. OLIVAS)  Mrs. Villegas, what do you

                                                            118

1    understand that Danny suffers from that Dr. Vanderpool had
2    to treat him for?
3            MR. ESPARZA:  Your Honor, it's the same thing.  I
4    object.  It's hearsay.
5            MR. OLIVAS:  If she knows.
6            THE COURT:  She can just tell us what his problems
7    are.  That will stop all of the objections.
8    Q    (BY MR. OLIVAS)  What are Danny's problems that
9    needed to be treatment by Dr. Vanderpool?
10   A    He said Daniel --
11           MR. ESPARZA:  Your Honor, objection.
12           THE WITNESS:  I'm sorry.
13   Q    (BY MR. OLIVAS)  What are the problems?
14           MR. ESPARZA:  If she knows.  She evidently doesn't
15   know.
16           THE COURT:  If you will just tell us what his
17   problems are then we can get the information from you.
18   A    He has a habit of following people and trying to
19   impress people.
20   Q    (BY MR. OLIVAS)  You understand that Danny gave a
21   confession --
22   A    Yes.
23   Q    -- in this case?
24   A    Yes.
25   Q    And you understand -- what was the reason that he

119

VILLEGAS v. CITY OF EL PASO - P002381

1    told you he gave a confession?

2    A      He was threatened.

3    Q      Did he have an occasion to tell you that some adult

4    individual -- that an adult individual told him to go

5    ahead and take the rap and since he was a juvenile, he was

6    going to get slapped on the hand?

7           MR. ESPARZA:  Your Honor, I object.  He's leading.

8    Q      (BY MR. OLIVAS)  Did he ever have occasion to tell

9    you that?

10          THE COURT:  Sustained.

11          MR. OLIVAS:  I'm sorry.

12   Q      (BY MR. OLIVAS)  What did he tell you as to why he

13   gave a confession?

14   A      He told me that they were threatening to -- that

15   they had threatened him by saying that they were going to

16   put him with a bunch of gay people and have him raped in

17   jail if he didn't confess.

18   Q      I'm sorry.  And when you say "they," who do you

19   mean?

20   A      The detectives that had picked him up.

21   Q      Okay.  The detectives threatened him that he was

22   going to get raped in jail?

23          THE COURT:  Just a minute.  Mr. Simmental is here.

24   Have him come in and as soon as he comes in, we will have

25   him come in and let me explain what the situation is with

                                                           120

1    his client and allow him to go in and speak with him.

2          MR. OLIVAS:  I have got two or three more questions

3    and then I will be done with this witness.

4          THE COURT:  Go ahead.

5    Q    (BY MR. OLIVAS)  Did you also come to learn that

6    Danny was asked by some other members -- some other

7    individuals to take the rap because he was a juvenile and

8    he would not be punished under the laws of Texas as an

9    adult would?

10    A    No, I never heard of that.

11    Q    Okay.  Is it easy to trick Danny?

12    A    Yes.

13    Q    How do you get him to do things around the house?

14    A    I always tell him the opposite side.

15    Q    Please explain, ma'am.

16    A    Daniel likes to impress people and I have always

17    helped kids, so I always have extra kids there and to

18    impress him, he tries to do the opposite side of whatever

19    I ask, so what I usually -- before should I say -- I used

20    to always tell him, "Don't be doing this" and he would

21    actually do it, you know.  I'd say, "I wouldn't want you

22    to do that" and he would do whatever I would say the

23    opposite side to him.

24          MR. OLIVAS:  Thank you, Ms. Villegas.  I have no

25    further questions of this witness.

121

1           THE COURT:  Any questions of this witness?

2           MR. ESPARZA:  I do, Your Honor.  Did you want to

3    talk to Mr. Simmental?

4           THE COURT:  Yes.  On the record.  Mr. Simmental, we

5    have Marcos Gonzalez here who is possibly a witness in

6    this case.  This is a capital murder case involving a

7    juvenile.  I understand that you represent Mr. Gonzalez on

8    other related charges or on other unrelated charges.

9           MR. SIMMENTAL:  That's correct, Your Honor.

10          THE COURT:  What we would like to do since you are

11   his attorney of record on another case, if you wish to

12   speak with him about any rights that he might have -- any

13   rights against self-incrimination -- and kind of decide

14   with him -- help him decide what his rights are in this

15   case and whether or not he wishes to testify.

16          MR. SIMMENTAL:  I'll be very happy to talk to him.

17          THE COURT:  He's in the holding area.

18          MR. ESPARZA:  I know that Mr. Simmental knows this.

19   Are we on the record?

20          THE COURT:  Yes.

21          MR. ESPARZA:  Just for the record so that it's

22   clear, Mr. Gonzalez was, at one time, charged in this

23   case.  That case has been declined.

24          MR. OLIVAS:  As a co-defendant.

25          MR. ESPARZA:  As a co-defendant, okay?  And I know

                                                        122

1    that David knew that.

2            MR. SIMMENTAL:  Well, since we are on the record,

3    let's go ahead and get a commitment.  Are you granting

4    immunity to my client from any testimony that he gives?

5            MR. ESPARZA:  We are not.

6            MR. SIMMENTAL:  Okay.  Thank you, Your Honor.

7            THE COURT:  Okay.  Thank you for showing up.

8            MR. ESPARZA:  May I proceed, Your Honor?

9            THE COURT:  Yes.

10                        CROSS EXAMINATION

11   BY MR. ESPARZA:

12   Q    Ma'am, where do you work?

13   A    I do houses in Fort Bliss.

14   Q    What does that mean -- "I do houses"?

15   A    I'm self-employed.

16   Q    Okay.  Well, what do you do at these houses?

17   A    I clean them.

18   Q    And how long have you been doing that?

19   A    On and off for about six years.

20   Q    Back on April of '93, were you employed?

21   A    Yeah, I was.

22   Q    You were cleaning homes back in April of '93?

23   A    Yes.

24   Q    Do you know specifically if you were working on

25   April 21st or April 22nd?

                                                        123

```
 1   A      It was Easter holiday, right?

 2   Q      No, ma'am.

 3   A      No.  I can't remember.

 4   Q      And what does your husband do for a living?

 5   A      He's an auto mechanic.

 6   Q      And where does he work?

 7   A      Bell Knapp Auto Care.

 8   Q      And how long has he been employed there?

 9   A      Since he was in tenth grade, so --

10   Q      Quite a while?

11   A      Seventeen years more or less.  I think.

12   Q      You live at 5700 Wren?

13   A      Yes, sir.

14   Q      And how long have you lived there?

15   A      We are going on eight years.

16   Q      Who else lives in the home with you at this moment

17   besides -- I assume the defendant is living with you?

18   A      Yes.

19          MR. OLIVAS:  Your Honor, I'm going to object to

20   this line of questioning.  Mrs. Villegas has another son

21   by the name of Priciliano Villegas who is the younger

22   child who is also my client.

23          I do not see the relevance -- him being formerly a

24   client of mine, I do not see the relevance of that line of

25   questioning into whether his rights were violated in
```

VILLEGAS v. CITY OF EL PASO - P002386

1    obtaining the confession, so I would ask that he limit

2    that line of questioning.

3              THE COURT:  The question was whether or not the

4    defendant lives with her.

5              MR. OLIVAS:  Well --

6              MR. ESPARZA:  I am going to ask her who else lives

7    in the home.  I will tell you exactly why.

8              THE COURT:  Overruled.

9    Q    (BY MR. ESPARZA)  Who else lives in the home with

10   you, ma'am, besides the defendant?

11   A    My husband, my son, Priciliano Villegas, Michelle

12   Anne Villegas, Brisa Parks, David Rangel.

13   Q    And Marcos Gonzalez?  Do you know him?

14   A    Yes, sir.

15   Q    And before he was arrested, was he living with you?

16   A    Yes, he was staying with us.

17   Q    Okay.  And how long had he been staying with you?

18   A    About a month only.

19   Q    You are not his mother?

20   A    No, sir.

21   Q    Nor is your husband his father?

22   A    No.

23   Q    And David Rangel, you are not his mother?

24   A    No.

25   Q    Nor is your husband his father?

                                                    125

1    A      No.

2    Q      Okay.  Why is it that these two boys stay with you?

3           MR. OLIVAS:  Your Honor, I'm going to object to the

4    line of questioning.  I don't believe that David Rangel

5    lived with her at the time of the arrest.

6           THE COURT:  Well, wait a minute.  Wait a minute.

7    She's testifying.  Not you.  Let her answer the questions.

8    Overruled.

9           MR. OLIVAS:  I think that the questions are

10   misleading as posed by the district attorney.

11          THE COURT:  Overruled.  You can clear it up if he's

12   confusing her.

13   A      Marcos has lived with me off and on because his

14   mother throws him out since he was 13.

15   Q      Okay.

16   A      And little David always liked being with us.  He

17   was the only one that my sister had.  He got real lonely

18   and would come with us.

19   Q      So, how long has he -- he's currently living with

20   you now?

21   A      Now, he is.

22   Q      Okay.  How long has he lived with you during this

23   period where he's with you now?

24   A      It's been about three months with him.

25   Q      And on April 21st and April 22nd, was he living

126

1    with you?

2    A      No.

3    Q      And on April the 10th, was he living with you?

4    A      No.

5    Q      Was Marcos Gonzalez living with you on April the

6    10th?

7    A      Marcos was.

8    Q      And how long was he there before April 10th?  How

9    long had he been living with you prior to April the 10th?

10   A      I think about maybe three months then because as I

11   said, it's off and on.  His mother -- when I get him a

12   job, she always calls him back.

13   Q      So, three months prior to April 10th he was living

14   with you?

15   A      Yes.  More or less.

16   Q      And he was there living with you up until April

17   21st when the police came to arrest him?

18   A      Yes.

19   Q      Now, was Mr. Rangel -- David Rangel living with you

20   on April the 10th?

21   A      No.

22   Q      And when did he start living with you after April

23   the 10th?

24   A      No.  He would just come weekends and holidays.

25   Q      He is a very good friend of the family?

                                                          127

1    A      No.  He's my nephew.

2    Q      Okay.  Is he close to the family?

3    A      I have almost raised him, yeah.

4    Q      Now, your son the defendant here, does he know the

5    difference between right and wrong?

6    A      Court wise?

7    Q      I mean simple things.

8    A      I'm pretty sure, but court wise, Daniel never paid

9    attention.

10   Q      What does that mean?  Court wise?

11   A      Just with my other -- when my other one is in

12   trouble, Daniel was already dumb and never paid attention

13   to what I was going through.

14   Q      So, are you telling the Court he's not

15   sophisticated in the courtroom procedures?

16   A      No.

17   Q      Okay.  Well, does he know that stealing is wrong?

18          MR. OLIVAS:  Your Honor, I'm going to object to

19   this line of questioning.

20   A      Yes.

21          MR. OLIVAS:  It's asking him to speculate as to

22   what is in this young man's head.  She doesn't know.  He

23   can ask him if he takes the stand.

24          THE COURT:  Overruled.

25   Q      (BY MR. ESPARZA)  Does he know that stealing is

128

1    wrong?

2    A      Yes.

3    Q      Does he know that killing is wrong?

4    A      Definitely.

5    Q      That was the question.  He knows that lying is

6    wrong?

7    A      Yes.

8    Q      Okay.  And you're not telling this Court here today

9    that he doesn't know the difference between right and

10   wrong then?

11   A      Well, not with what the questions you asked, but he

12   doesn't know his rights.  That's what he doesn't know.

13          MR. ESPARZA:  All right.  May I approach the court

14   reporter, Your Honor?  I apologize, Judge.  I'll leave

15   them here.  May I approach the witness, Your Honor?

16          THE COURT:  Yes, you may.

17   Q      (BY MR. ESPARZA)  Now, is it your testimony that

18   State's Exhibit Number 1, which is a warning card with the

19   juvenile warnings, was not read to -- was not read to your

20   son?

21   A      I don't know what this one says.

22   Q      Well, it says "One, you have the right to remain

23   silent."  Was that told to him?

24   A      Yes.

25   Q      "You do not have the right to make any statement,

                                                    129

1   oral or written, to anyone.  You do not have to make a

2   written statement to anybody."  Did they tell him that?

3   A       I really don't remember that one.

4   Q       Okay.  Did you hear them reading his rights,

5   though?

6   A       Yes, but they read them the same rights -- him and

7   Marcos the rights at the same time when they handcuffed

8   them.

9   Q       Well, I thought your testimony earlier was that

10  they arrested Marcos first.  Wasn't that what you just

11  said this morning?

12  A       Yes, but they grabbed Marcos.  They handcuffed him

13  and then Daniel asked him, "What is he being arrested

14  for?"  And they asked him, "Who are you?"  And then they

15  grabbed Daniel when he said his name and they picked him

16  up.  They said, "You're under arrest, too."  And they

17  handcuffed him and then they read them their rights.

18  Q       And on State's Exhibit Number 1, is that your son's

19  signature?

20  A       Yes.

21  Q       And is that his handwriting there 4/21/93?

22  A       Yes.

23  Q       And 11:15 p.m.?

24  A       Yes.

25  Q       All right.  He never told you that they coerced him

130

VILLEGAS v. CITY OF EL PASO - P002446

1   into writing that, did they?

2   A      He told me that he was harassed more because of the

3   fact that I told him not to tell them anything until I got

4   his lawyer.

5   Q      All right.  Let me ask you the question again.  He

6   never told you that they coerced him or threatened him to

7   sign this card, did he?

8   A      He told me he signed everything they asked because

9   he was scared.  I don't know.  He didn't specify on what.

10  Q      So, the answer is --

11  A      Yes.

12  Q      You believe he was threatened to sign this thing?

13  A      Yes.

14  Q      When did he tell you that, ma'am?

15  A      The day after when I went to the D-Home.

16  Q      He told you about his confession?

17  A      Yes.

18  Q      Did he tell you what he said in his confession?

19  A      More or less, yes.  What he could remember any way.

20  Q      Let me show you what's been marked as State's

21  Exhibit Number 3.  Have you seen his statement before?

22  A      Yes.

23  Q      All right.  And it says "My name is Daniel

24  Villegas."

25  A      Yes.

131

1    Q      He can understand that, can't he?

2    A      Yes.

3    Q      All right.  "I live at 5700 Wren with my parents."

4    He can understand that, right?

5           MR. OLIVAS:  Your Honor, I'm going to object to

6    this line of questioning.  The document speaks for itself.

7           THE COURT:  Overruled.

8    A      Yes.

9    Q      "My mother is named Yolanda and my father is

10   Priciliano."

11   A      Yes.

12   Q      He can understand that?

13   A      Yes.

14   Q      "We then turned on the street off of

15   Transmountain."  He can understand that, can't he?

16   A      More or less.

17   Q      And he could read it, couldn't he?

18   A      That he can.

19   Q      "And stopped the car." He can read "stopped the

20   car," can't he?

21   A      Yes.

22   Q      "The?"

23   A      Yes.

24   Q      "Car?"

25   A      Yes.

                                                              132

1    Q      "Mando?"

2    A      I don't know about Mando.

3    Q      You don't think he could read the word "Mando?"

4    A      I couldn't even read it.

5    Q      You couldn't?

6    A      I don't know how to read good.

7    Q      Well, can you read this statement for me?

8    A      I'll try.  "My name is Daniel Villegas.  I live at

9    5700 Wren with my parents.  My mother is named Yolanda.

10   My father is Priciliano.  Right now I am at the Youth

11   Service Office on Delta Drive where I am giving this

12   statement to..."

13   Q      You don't know that "Det." stands for detective?

14   A      No.  Detective Alfonso --

15   Q      Ah-huh.

16   A      Okay.  That's Marquez.  I remember his last name.

17   I don't know what the other word is.

18   Q      That's detective.

19          MR. OLIVAS:  Your Honor, I'm going to object.  This

20   document has been admitted into evidence and if he's

21   asking to reread it, I see no relevance behind her reading

22   it.

23          THE COURT:  Let's ask some questions.

24   Q      (BY MR. ESPARZA)  Okay.  So, you can read this

25   statement, can't you, ma'am?

                                                              133

1    A    More or less, yes.

2    Q    Okay.  And it would be fair to say that your son

3    can read this statement, too?

4    A    I don't know.  Daniel reads less than I do and I

5    don't read that good.

6    Q    Let me ask you again.  It's fair to say he could

7    read that statement, isn't it?

8    A    I don't know.  I'm not him.

9    Q    So then the answer is you do not know?

10   A    I do not know.

11   Q    All right.  Whenever your son had a problem,

12   emotional, behavioral or whatever, when he was younger,

13   you had him treated?

14   A    Yes.

15   Q    And you had him go and see a doctor --

16   A    Yes.

17   Q    -- to make him better?

18   A    Yes.

19   Q    And you did all you could to try to make him

20   better?

21   A    Yes.

22   Q    All right.  Do you know Mr. Williams -- Rodney

23   Williams?

24   A    Yes.

25   Q    How do you know Rodney Williams?

                                                    134

1    A    He came around the house a few times with my other
2    son.
3    Q    Only a few times?
4    A    Yes.
5    Q    Only a few times since you have known him?
6    A    Yeah.  Rodney has only been there a few times.
7    Q    How about his brother?
8    A    No, I don't know his brother at all.  I have heard
9    of him, but I don't know him.
10   Q    What's his brother's name?
11   A    They call him Snapper.  I don't know his real name.
12   Q    You know him as Snapper?
13   A    Yes.
14   Q    Have you ever met Snapper?
15   A    No.
16   Q    Have you ever met Mrs. Williams -- the mom?
17   A    I met her at the D-Home.  That was the only time I
18   ever met her.
19   Q    You have never conversed with her?
20   A    No.
21   Q    Do you know the name of the father?
22   A    (Indicating.)
23   Q    What was the last grade your son attended?
24   A    Sixth.
25   Q    And where was that at?

135

1    A     MaGoffin.

2    Q     Your son speaks English and Spanish?

3    A     No.  English.

4    Q     He doesn't speak any Spanish?

5    A     He speaks it, but very little.  He can't talk it

6    well.

7    Q     So, mostly just English?

8    A     Yes.

9          MR. ESPARZA:  I have nothing further, Your Honor.

10                    RE-DIRECT EXAMINATION

11   BY MR. OLIVAS:

12   Q     Mrs. Villegas, how many years did Danny go to

13   school?

14   A     He went up to the sixth grade.  He made it up to

15   eighth, but he never went in and he was always being

16   thrown out.

17   Q     How's he doing in school?  His grades?  Is he a

18   problem child?  Tell the Court.

19   A     He was usually put in special classes off and on.

20   Q     What do you mean by special classes?

21   A     He had to be put on a one-on-one basis where more

22   or less -- where there was a smaller group.

23   Q     Was it like a special resource class?  Was he a

24   slow learner?

25   A     More or less like a resource class.

136

1    Q       What do you understand that he had to have special

2    classes for?

3    A       He's like me.  We have trouble.  We are more on

4    one-to-one basis.  We have to have smaller groups so they

5    can have more time for us.

6    Q       Does he have trouble learning?

7    A       Yes.

8    Q       Does he have trouble reading?

9    A       Yes.

10   Q       Does he know how to do math?

11   A       I don't know that.  I can't answer.  I know -- I

12   think he had trouble with it, but I'm not really sure.

13   Q       How did he do in social studies?

14   A       His grades were usually low, but I can't specify

15   which one.

16   Q       What was his grade average in the first six grades?

17   A       Sixties more or less.

18   Q       A, B, C, D or F?

19   A       A, B, C and Ds.

20   Q       Did he ever improve?

21   A       One year.

22           MR. ESPARZA:  I'm sorry.  I didn't hear the

23   question.

24   Q       (BY MR. OLIVAS)  Did he ever improve?

25   A       One year he made honor roll, but the teacher spent

137

VILLEGAS v. CITY OF EL PASO - P002454

1    a lot of time with him.

2    Q      Who was that teacher?

3    A      I can't remember her name.  She was from Alaska.

4           MR. OLIVAS:  Thank you.  I have no further

5    questions, Your Honor.

6           MR. ESPARZA:  I have nothing further, Your Honor.

7           THE COURT:  You may step down.  Call your next

8    witness.

9           MR. OLIVAS:  Your Honor, I would call Marcos

10   Gonzalez since his counsel is here and we won't indulge

11   him any further.

12          THE COURT:  Is he going to testify?

13          MR. SIMMENTAL:  Yes, Your Honor.

14          THE COURT:  Raise your right hand.

15                      MARCOS GONZALEZ,

16   having been called as a witness by the defendant, after

17   having been duly sworn by the Court, was examined and

18   testified, as follows:

19          THE COURT:  All right.  Mr. Gonzalez, you have an

20   attorney present here --

21          THE WITNESS:  Yes, ma'am.

22          THE COURT:  -- Mr. David Simmental.

23          THE WITNESS:  Yes, ma'am.

24          THE COURT:  He represents you on another case.  Not

25   on this case.

                                                        138
VILLEGAS v. CITY OF EL PASO - P002455

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  All right.  It's my understanding that

3    you were charged with the crime that we are here for today

4    involving Daniel Villegas --

5          THE WITNESS:  Yes, ma'am.

6          THE COURT:  -- but the district attorney declined

7    the case.

8          MR. ESPARZA:  Yes, Your Honor.

9          THE COURT:  All right.  In other words, they have

10   decided not to indict you for this offense which is

11   capital murder.  Do you understand that?

12         THE WITNESS:  Yes, I do.

13         THE COURT:  And has your attorney explained to you

14   that you have a right not to testify in this case if you

15   choose not to?

16         THE WITNESS:  Yes, ma'am.

17         THE COURT:  And you also understand that whatever

18   you say in this case could be used against you in Court?

19         THE WITNESS:  Yes, ma'am.

20         THE COURT:  In other words, if you say anything

21   that could incriminate you in this case, the District

22   Attorney could possibly seek an indictment and try you for

23   capital murder.  Do you understand that?

24         THE WITNESS:  Yes, ma'am.

25         THE COURT:  And have you and your attorney

                                                    139

1    discussed fully --

2              THE WITNESS:  Excuse me?

3              THE COURT:  Have you and your attorney discussed

4    fully your rights about testifying in this case?

5              THE WITNESS:  Yes, ma'am.

6              THE COURT:  And is it your choice to testify?

7              THE WITNESS:  Yes, ma'am.

8              THE COURT:  Mr. Simmental?

9              MR. SIMMENTAL:  Your Honor, I had an opportunity to

10   talk to my client in private.  I explained his rights.  I

11   explained to him the seriousness of the charge.  I

12   explained to him the consequences of perjury.  I explained

13   to him the consequences of being charged as a

14   co-conspirator and of being charged with conspiracy.  He

15   fully understands the consequences of his actions.  I

16   believe he's capable of making a decision and he has

17   chosen to testify.

18             MR. ESPARZA:  Your Honor, just for the record, I

19   didn't hear you advise him as to this, but capital murder

20   -- there is no statute of limitation and we are not

21   granting him immunity.  He is possibly subject to

22   prosecution depending if more evidence was to be revealed

23   --

24             MR. OLIVAS:  Your Honor, I'm going to --

25             MR. ESPARZA:  -- and I think he needs to understand

                                                          140

1   that.

2           MR. OLIVAS:  I'm going to object to the statement

3   by the District Attorney.  It's clearly meant for

4   intimidation.  He has his own counsel and also a

5   magistrate that's overseeing his rights.  He's an adult

6   and he can choose.

7           THE COURT:  What magistrate?

8           MR. OLIVAS:  Judge, my apologies.

9           THE COURT:  I was wondering.  I thought there was

10  another one involved in this case and I just wanted to

11  know who it was.  Let me also advise you and I told you

12  before, you could possibly be charged with this crime.

13          THE WITNESS:  I understand.

14          THE COURT:  You are how old?

15          THE WITNESS:  Eighteen.

16          THE COURT:  All right.  If you are charged with

17  this crime and you go through trial and you are convicted

18  of capital murder, the range of punishment on a capital

19  murder is life in prison or death by injection.  Do you

20  understand that?

21          THE WITNESS:  Yes, ma'am.

22          THE COURT:  And you could possibly be indicted if

23  your testimony shows that you were involved in this.

24          THE WITNESS:  Yes, ma'am.

25          THE COURT:  And you know that and you wish to

                                                        141

1    testify?

2            THE WITNESS:  Yes, ma'am.

3            THE COURT:  All right.  You may proceed.

4                      DIRECT EXAMINATION

5    BY MR. OLIVAS:

6    Q       For the record, your name is Marcos Gonzalez?

7            THE COURT:  Speak up a little bit, Mr. Olivas.  I'm

8    having a heard time hearing you.

9    Q       Your name is Marcos Gonzalez?

10   A       Yes, sir.

11   Q       How old are you, Marcos?

12   A       Eighteen.

13   Q       You're currently across the street being detained

14   in the El Paso County Jail --

15   A       Yes, sir.

16   Q       -- because you committed a beer run?

17           MR. SIMMENTAL:  Objection, Your Honor.  I will

18   advise my client not to answer that question.

19           THE COURT:  Sustained.  Let's not ask him about his

20   other charges.

21           MR. OLIVAS:  My apologies.  I just want to

22   establish the other fact that he's currently detained on

23   another charge.

24           THE COURT:  Well, you can ask him what he's been

25   charged with, but not what he did.

                                                    142

1   Q      (BY MR. OLIVAS)  You've been charged with a

2   robbery, right?

3   A      Yes, sir.

4   Q      Mr. Gonzalez, you were arrested on April 21 in the

5   evening of '93?

6   A      If I remember correctly, yes, sir.

7   Q      They arrested both -- did they arrest both you and

8   Danny?

9   A      Yes, sir.

10  Q      Where were you all when they arrested you?

11  A      We were -- when they arrested us?  We were at his

12  house.

13  Q      Okay.  Mr. Gonzalez, you have never -- we have

14  never have had a conversation in over a year; is that

15  correct?

16  A      Yes, sir.

17  Q      Have you had the opportunity to visit with me

18  regarding this particular case?

19  A      No, sir.

20  Q      Okay.  When did the police -- when did detective --

21  I understand Detective Arbogast arrested you; is that

22  correct?  There were two detectives -- Marquez and

23  Arbogast, right?

24  A      I don't quite remember who it was because it was a

25  white detective.  He's the one that was asking me -- he's

143

1    the one that I gave the statement to.

2    Q    Okay.  What time did the police -- you were at

3    Danny's house when you were arrested for that other murder

4    of Mando and --

5    A    Yes, sir.

6    Q    What time did the police get there?

7    A    They got there about 9:00 -- 7:00 and 9:00.

8    Q    Around 7:00 and 9:00 in the evening?

9    A    (Indicating.)

10   Q    Okay.  How long were you at the house before you

11   left?  Before the cops said, "Let's go."

12   A    For a good two hours.

13   Q    Did they handcuff you?

14   A    No.

15   Q    Okay.  You understand that you gave -- you gave the

16   police detectives two confessions, is that correct?

17   A    Yes, sir.

18        MR. OLIVAS:  Your Honor, may I approach?

19        THE COURT:  Yes, you may.

20   Q    (BY MR. OLIVAS)  Is that your signature?

21   A    Yes, sir.

22   Q    Is that also your signature?

23   A    Yes, sir.

24   Q    The reason you gave two confessions -- alleged

25   confessions, Mr. Gonzalez, was because you gave one story

                                                        144

VILLEGAS v. CITY OF EL PASO - P002461

1   in one confession and then another story in another one;

2   is that correct?

3   A      Yes, sir.

4   Q      And basically, without going into the substance of

5   your confessions, the first time you denied everything.

6   That you did nothing.  No involvement with the murder of

7   Armando Lazo and Robert England; is that correct?

8   A      Yes, sir.

9   Q      However, you went back -- how many hours later did

10  you go back and give the second confession that's before

11  you?  Page Number 3 and 4?  How long did you visit with

12  the cops before you went and gave a second confession?

13  A      Well, it was a while even before I gave the first

14  statement.

15  Q      Okay.  How many hours after the first statement?

16  A      About one or two hours.

17  Q      And why didn't -- why did they come and ask you for

18  a second statement?

19  A      Excuse me?

20  Q      Why did the police come and ask you for a second

21  statement?

22  A      I guess because they weren't satisfied with the

23  first one.  'Cause they wanted me to admit that I was in

24  the car, too.

25  Q      Okay.  And ultimately, you admitted that you were

145

1    in the car in the second statement?

2    A      Yes, sir.

3    Q      Why did you do that, Mr. Gonzalez?  Why did you

4    tell them the information in the second statement?

5    A      Excuse me?

6    Q      Why did you admit you were in the car in the second

7    statement?

8    A      I just -- they kept on like saying, "Now, when they

9    say you're in the car..." and they kept doing like -- I

10   don't know.  Like forcing me to give the statement.

11   Q      Did they threaten you, Mr. Gonzalez?

12   A      In a way, yes.

13   Q      What did they tell you?

14   A      Like that you're -- excuse me -- that and you're

15   this and you're that.  You better give a statement.

16   Q      Please tell the Court what you mean when you're

17   this and that.  Tell us what they told you.

18   A      Do I got to?

19   Q      Please.

20   A      Like "You did it.  You better fuckin' tell me the

21   truth" and a lot of verbal.

22   Q      What did they call you?

23   A      Just a lot of -- just verbal language.

24   Q      Okay.  Please tell us the verbal language.

25   A      Like just "You fuckin' liar.  You know you're

146

1   fuckin' lying to us."  Stuff like that.

2   Q      Did they threaten you with kicking your ass?

3          MR. ESPARZA:  Objection, Your Honor.  That's

4   leading.

5          THE COURT:  Sustained.

6   Q      (BY MR. OLIVAS)  Did they ever threaten --

7          MR. ESPARZA:  It's the same thing.  He's suggesting

8   the answer.  He's already answered the question.

9   Q      (BY MR. OLIVAS)  Did they ever threaten you, Mr.

10  Gonzalez?

11  A      Yes, sir.

12  Q      What did they threaten you with?

13  A      Just like pushing me against the wall and telling

14  me, "Tell us the truth."  Stuff like that.

15  Q      How many hours did this go on?

16  A      Excuse me?

17  Q      How many hours did they push you and ask you and

18  keep you in the office?

19  A      About -- well about as long when I gave this

20  statement.  When I gave this statement.  About as long as

21  it took me to give the first statement.

22  Q      Okay.  Was it one hour or two hours?  How long did

23  it take you to give the first statement?  One hour?  Two

24  hours?  How many?

25  A      Around two hours.

                                                          147

1    Q     Okay.  And it took another additional two hours to
2    get the second statement?
3    A     Excuse me?
4    Q     It take two more hours to get the second statement?
5    A     About another two.  Yeah.  Because I didn't end up
6    leaving the police station until about 4:00 or 5:00 in the
7    morning.
8    Q     Were you in handcuffs during this questioning?
9    A     Yes, sir.  I was handcuffed to the chair.
10   Q     Were they blowing smoke in your eyes or in your
11   face?
12         MR. ESPARZA:  Your Honor, I object.  He's already
13   asked --
14         MR. OLIVAS:  Your Honor --
15         THE COURT:  Let him finish his objection.
16         MR. ESPARZA:  Your Honor, I object.  It's leading.
17   He's suggesting the answer to the witness.
18         THE COURT:  Sustained.
19         MR. OLIVAS:  I submit I beg to differ with the
20   Court, Your Honor.  He can simply say "yes" or "no."  I'm
21   not suggesting the answer.
22         THE COURT:  It's been sustained, sir.
23   Q     (BY MR. OLIVAS)  What kind of things did they do to
24   you to force you to give them the statement?
25   A     Just like I said.  Verbal and pushing me against

148

1    the wall and yelling in my face.  You know.  Stuff like
2    that.
3    Q       Did they ever hit you?
4    A       No.  Not them exactly, but by them pushing me
5    against the wall and banging my head on the wall.
6    Q       You banged your head on the wall?
7    A       A few times.
8    Q       Now, what time did you first give the first
9    statement?
10   A       Excuse me?
11   Q       What time did you give the first statement to the
12   police?
13   A       About two hours.
14   Q       I understand, but you started the statement like in
15   the middle of the night, in the morning, in the afternoon.
16   What time did you -- what time did you arrive at the
17   police station and begin talking with the police?
18           MR. ESPARZA:  Your Honor, I'm going to object.  I
19   allowed him the latitude to get into this area.  The issue
20   in this hearing is the voluntariness of the confession
21   made by the defendant.  Not the voluntariness of the
22   statement made by the witness.
23           THE COURT:  Just a minute.
24           MR. ESPARZA:  And I believe it's beyond the scope
25   of this hearing.

1          THE COURT:  Overruled.

2          MR. OLIVAS:  Thank you, Your Honor.

3     A    Excuse me.  Can you repeat the question?

4     Q    (BY MR. OLIVAS)  They arrested you about 9:00

5     o'clock in the evening, you testified earlier, you and

6     Danny together; is that correct?

7     A    Yes.

8     Q    And then they put you in -- did they put you in

9     separate cars?

10    A    Yes, sir.

11    Q    Okay.  From the time that they put you in the car,

12    how long did it take 'till you got to the police station

13    and began to give them the statements in front of you?

14    How many hours did it take for you to get from Danny's

15    house to the police station?

16    A    From Danny's to the police station -- 'cause when

17    they picked us up, they took us to North Park Mall instead

18    and talking to each other.

19    Q    You guys went to North Park Mall?

20    A    No.  The cops.  They all met at the parking lot.

21    Q    You were in the back seat of the car?

22    A    Excuse me?

23    Q    You were in the back seat of the detectives' car?

24    A    Yes, sir.

25    Q    Tell us about the car.  What kind of car was it?

                                                         150

1    A      I don't quite remember.

2    Q      Was it a police car with lights and stripes or was

3    it a regular car -- an undercover car?

4    A      It was an undercover car.

5    Q      Okay.  They take you.  Now, did you get to see

6    which car Danny got into?

7    A      Excuse me?

8    Q      Did you see which car Danny got into?

9    A      Yes, but I don't quite remember the car, but it was

10   an undercover, too.

11   Q      Did you see that car park at North Park Mall the

12   second time?

13   A      Yes, sir.

14   Q      When they took you to North Park Mall, they took

15   Danny there?

16   A      Yeah.  The other cars -- they went to the house and

17   met at North Park.

18   Q      And both the cops got off and left you guys inside

19   the car?

20   A      Yes, sir.

21   Q      And they talked together?

22   A      Yes, sir.

23   Q      And they were there for a long time?

24   A      Yes, sir.

25   Q      How long were you guys parked in North Park Mall?

151

1    A      About a good half an hour to an hour.

2    Q      They kept you between a half hour to an hour at

3    North Park Mall?

4    A      Yes, sir.

5    Q      Okay.  Did they also take you to the northeast

6    sub-station and park outside?  Did they also drive from

7    North Park Mall in front of the Furr's?  Did they then go

8    to the northeast station sub-station?

9    A      Yes, sir.

10   Q      How long were they at the northeast sub-station

11   with you?

12   A      Excuse me?

13   Q      How much time did you stay at the northeast

14   sub-station when you went from North Park Mall from the

15   Furr's -- well, is that where the Furr's is at?

16   A      No.  They were in back of the Furr's of North Park.

17   Q      Oh, it was in the back parking lot?

18   A      In the back parking lot.

19   Q      Were there any lights?

20   A      No, sir.

21   Q      Was it dark?

22   A      Yes, sir.

23   Q      Was there anybody else around?

24   A      No, sir.  Just them.

25   Q      What were they telling you between this hour that

152

1    you guys were parked in the back parking lot behind North

2    Park Mall?  What were the police telling you?

3    A    To us, not really nothing.  They just got off and

4    started talking to each other.

5    Q    Okay.  And when you were there and the cops were

6    talking, you could see that Danny was sitting in the other

7    car?

8    A    Yes, sir.  I could -- I could tell that he was in

9    there.

10    MR. OLIVAS:  Your Honor, may I approach the court

11    reporter for a magic marker?

12    THE COURT:  Yes, you may.

13    MR. OLIVAS:  And if I could please ask Mr. Marcos

14    to stand up over here by the easel.

15    Q    (BY MR. OLIVAS)  Marcos, please draw on this side

16    of the paper the back of North Park Mall.  In other words,

17    the wall of North Park Mall and then this would be the

18    parking lot area.

19    A    The Furr's is right here and then it goes like

20    this.

21    Q    Can you go ahead and draw it first?

22    A    And then there is like where the dumpster is at and

23    then it turns around like this.  The parking lot is over

24    here.  And we were about over here and there is a ditch

25    right here -- a bridge.

153

1    Q    Okay.  What this is?  Is this Furr's?

2    A    Yes, sir.

3    Q    This is Furr's?

4    A    Yes, sir.

5    Q    Where is the front door to Furr's?

6    A    Right here.

7    Q    The front door is here?

8    A    (Indicating.)

9    Q    Now, where is the main parking lot where all the

10   people that come and buy milk at Furr's park?  Where do

11   they park?

12   A    Over here.  The main parking lot is right here.

13   Q    Okay.  What is here?

14   A    This is where some dumpsters are at.

15        THE COURT:  You need to speak up louder because the

16   attorneys on the other side need to hear, too.  Go ahead

17   and repeat your answer.

18   A    That's where the dumpster is at.

19   Q    This is where they throw the trash?

20   A    Yes, sir.

21   Q    The dumpsters are in the back?

22   A    (Indicating.)

23   Q    And then there is a ditch over here?

24   A    Right here.

25   Q    Where is the ditch?

154

1    A    There is like a bridge and there is a ditch
2    underneath.
3    Q    Okay.
4    A    There is a ditch here.
5    Q    And where is the bridge?
6    A    The bridge is right -- say this is the bridge and
7    then the ditch runs like this.  This is the bridge.
8    Q    I'm sorry.  This is the ditch?
9    A    Yes.
10   Q    The parking lot?  And this is the bridge?
11   A    (Indicating.)
12   Q    Now, is this a clean parking lot or is this a dirty
13   parking lot?  Are there trash cans and cardboards and
14   trash out there or is it a clean parking lot?
15   A    No.  It's a clean parking lot.
16   Q    It's a clean parking lot?
17        THE COURT:  Can you hear?
18   A    It's a clean parking lot.
19        THE COURT:  You need to have him sit down and use
20   the microphone.  They can't hear.
21   Q    Well, I need -- draw where your car -- where the
22   car that you were in -- draw exactly where it was located.
23   Draw your car in blue.
24   A    Okay.  Well, around over here.  The cars were like
25   slanted and diagonal -- diagonally positioned like this

155

1    and the parking lot down here, it's a lot bigger than what

2    it seems.   The lights come over here and the -- as the

3    parking lot is going up, it seems to get darker.

4    Q      Make a circle where Danny was in.

5    A      I really couldn't see him that well.

6    Q      As best as you know.

7    A      One of the last cars.

8    Q      How many cars were parked there?

9    A      About four or five.

10   Q      Were they all police cars?

11   A      Yes, sir.

12   Q      Now, have a chair, Mr. Gonzalez.

13                 (Witness resumed the witness stand.)

14   Q      (BY MR. OLIVAS)   How was the lighting in that

15   parking -- in that specific corner?   Is that the corner of

16   the parking lot?

17   A      Yes, sir.

18   Q      Is it dark?

19   A      Yes, sir.   The light -- there are lights around.

20   They're around like towards the front towards where the

21   car is parked.

22   Q      Okay.   And you, as well as Danny, as well as four

23   other police officers, were parked there between half an

24   hour to an hour; is that correct?

25   A      Yes, sir.

156

1    Q     Okay.  After that, did they take you to North Park

2    Mall or did they take you driving around?  Where did they

3    take you?

4    A     They --

5    Q     I'm sorry.  To the sub-station or driving around.

6    Where did they take you?

7    A     To the sub-station.

8    Q     How long did it take to arrive to the sub-station?

9    A     Well, it was about as long as the camino was -- the

10   road.  They had took (sic) us to the -- to the central

11   sub-station.

12   Q     I'm sorry.  The central sub-station?

13   A     Yes, sir.

14   Q     How long did it take?  Fifteen or 20 minutes or --

15   A     About 20 minutes.

16   Q     About 20 minutes?

17   A     Yes, sir.

18   Q     How long -- did they also take Danny in his

19   separate car to the central sub-station?

20   A     Yes, sir, but after that --

21   Q     Marcos let me ask you a question.  They also took

22   Danny to the central sub-station?

23   A     Yes, sir.

24   Q     How long were you at the central sub-station?

25   A     I was there approximately the whole night.  After

157

1    that, I didn't see Danny and to answer your question until
2    about 5:00 o'clock.
3    Q    So, 5:00 in the morning?
4    A    About 4:00 or 5:00.
5    Q    Okay.  Did they also take you driving around
6    northeast looking for Popeye's house and Ricky's house or
7    other peoples' homes?
8    A    Yes, sir.
9    Q    Okay.
10         MR. ESPARZA:  I'm sorry.  The answer?
11   A    Yes, sir.
12   Q    (BY MR. OLIVAS)  Did this happen before you got to
13   central sub-station or after you got to central
14   sub-station?
15   A    Before.
16   Q    Okay.  So, did it happen before they took you to
17   the back of the Furr's?
18   A    Yes, sir.
19   Q    Okay.  So, as soon as they took you from Danny's
20   house, they drove you around northeast?
21   A    Yes, sir.
22   Q    How long did they drive you around northeast?
23   A    They just -- they had drove (sic) me just to
24   Droopy's house where he lives across that bridge right
25   there.

158

VILLEGAS v. CITY OF EL PASO - P002475

1    Q      They drove you to Droopy's house?

2    A      Yes.  They just asked me if he lives there.

3    Q      And then they took you there?

4    A      Excuse me?

5    Q      And then they took you to that parking lot?

6    A      Yes, sir.

7    Q      Okay.  Did they also drive Danny behind you or

8    ahead of you when you went through Droopy's house?

9    A      He was in the back.

10   Q      Were the cars going like this?  The two detective

11   cars?  Was Danny's car following your car?

12   A      Yes, sir.  They were in the back.

13   Q      And Danny also went by Droopy's -- Danny's car was

14   going by Droopy's house?

15   A      Yes, sir.

16   Q      And they never let Danny off of the car as far as

17   you know?

18   A      No, as far as I know, no.

19   Q      Okay.  When you both got to -- when you went and

20   drove by northeast, how long did the drive to go by

21   Droopy's house take?

22   A      Not very long.  It's right across the bridge.

23   Q      Is the reason that you went to Droopy's house

24   because somebody had said that Droopy was in the car that

25   shot Armando and Robert?

159

1    A    No.

2    Q    Why did they take you?

3    A    Excuse me?

4    Q    Why did they take you through Droopy's house?

5    A    Why?  Just so we could show them where he lived

6    because I don't even know.

7    Q    Where Droopy lived?

8    A    I knew where he lived, but not his address.

9    Q    Who wanted to know where Droopy lived?

10   A    The detective.

11   Q    Was it the white detective or the Mexican

12   detective?

13   A    There was two of them in my car.

14   Q    And how many were in Danny's car?

15   A    I don't really remember.

16   Q    Okay.  Was it Arbogast who was in your car?  What

17   were the detectives' names or describe them to the Court.

18   A    If I remember correctly, it was two detectives.

19   They were both light skinned -- probably Mexican.

20   Q    And they were the ones that wanted to know where

21   Droopy lived?

22   A    Yes, sir.

23   Q    And who else's house did you go look for?

24   A    Excuse me?

25   Q    Who else's house besides Droopy's did you go and

160

1    look for?

2    A       That was it.

3    Q       Just Droopy's house?

4    A       (Indicating.)

5    Q       Okay.  When you guys -- so, it's fair to say you

6    went from Danny's house -- just to make sure everything is

7    correct -- you went from Danny's house, you drove around

8    northeast until you found Droopy's house, right?

9    A       Excuse me?

10   Q       You drove from Danny's house to go look for

11   Droopy's house?

12   A       Yes, sir.

13   Q       And then after you found Droopy's house, you said

14   -- did you say, "That's where he lives" or what did you

15   say?

16   A       Yes, sir.  That he lives there.

17   Q       What kind of house is it?

18   A       It's sort of like a brown brick house.

19   Q       Does it have a garage?

20           MR. ESPARZA:  Your Honor, what's the relevancy?  I

21   object.

22           THE COURT:  Let's move along.

23           MR. OLIVAS:  Your Honor, the relevancy is --

24           THE COURT:  Well, let's move along.  The color of

25   the house isn't going to assist me in making my decision.


161

1        MR. OLIVAS:  It's simply for the veracity of the
2    witness.
3        THE COURT:  Well, we are going on about items that
4    are not going to assist me in making my decision.  This is
5    not going to go on forever.
6    Q    (BY MR. OLIVAS)  You went from Droopy's --
7        MR. OLIVAS:  Your Honor, another -- I withdraw
8    that, Your Honor.  My apologies.
9    Q    (BY MR. OLIVAS)  You passed by Droopy's house and
10   then you went to the parking lot and then you went to
11   central sub-station.
12   A    Yes, sir.
13   Q    Okay.  How long did that whole trip take to central
14   sub-station?
15   A    About 30 minutes.
16   Q    Okay.  Now, when you got to central sub-station,
17   where did your car park in front?
18   A    When we got to the central sub-station, I didn't
19   really see Danny's car.
20   Q    You never saw Danny at central?
21   A    No, sir.
22   Q    Did you see Danny inside central sub-station?
23   A    Yes, sir.
24   Q    You did?
25   A    No, no, no.  I didn't see him inside the central

                                                      162

1    sub-station.  They put us in separate rooms.

2    Q     But did you know that he was at central?

3    A     Yes, sir.

4    Q     Okay.  How did you know that Danny was at central

5    sub-station with you in another office in a separate room?

6    A     I just knew because they had brought Danny's

7    statement.

8    Q     Okay.  They brought you Danny's statement?

9    A     Yes, sir.

10   Q     And where it said that you were also part of it?

11   A     They didn't let me read it.  They just said, "Look,

12   this is Danny Villegas' statement."  And this and that and

13   I really didn't want to cuss and they said, "You know, he

14   said that you did it."  And I asked him, "Well, let me

15   read it."  And they said, "No.  Just make the fuckin'

16   statement" and that was it.

17   Q     And they told you that the statement said that you

18   were involved -- that Danny said you were involved, right?

19   A     Yes, sir.

20   Q     Is that why you gave the second statement?

21   A     Yes, sir.

22   Q     And did they ask you how old Danny was?

23   A     No, sir.

24   Q     Okay.  Did they ever threaten to take you to into

25   the desert and beat you up?

1    A    No, sir.

2    Q    Did they tell you that you were going to County and

3    you were going to get fucked by the other inmates if you

4    -- if you did not make the statement?

5    A    Yes, sir.

6    Q    They did tell you that?

7    A    Yes, sir.

8    Q    Which officer told you that?

9    A    One of the white ones.  I don't really remember

10   their names.

11   Q    How many times did he tell you that?

12   A    Just once.

13   Q    Did they tell you that the faggots at the jail were

14   going to fuck you?

15   A    Something like that, yes, sir.

16   Q    When did you see Danny again that night?

17   A    I didn't see them that night at all.

18   Q    After they took you into the separate room, you

19   never saw them again?

20   A    Never again.

21   Q    What time, as best as you can remember, did they

22   take you Danny's statement and what do you remember from

23   Danny's statement?

24   A    Nothing.

25   Q    I'm sorry?

1    A      Just his name.

2           MR. OLIVAS:  Your Honor, may I approach?

3           THE COURT:  Yes, you may.

4    Q      (BY MR. OLIVAS)  I need -- how is it that you

5    recognized that it was Danny's statement?

6    A      Because of his signature.

7           MR. OLIVAS:  Your Honor, may I approach the

8    witness?

9           THE COURT:  Yes, you may.

10   Q      (BY MR. OLIVAS)  Is this the same statement they

11   gave you that night?

12   A      That night, no, sir.

13   Q      Is that the statement they showed you that belonged

14   to Danny?

15   A      No, sir.

16   Q      Was there another statement?

17   A      Yes, sir.

18   Q      What was the difference between that other

19   statement and this statement?

20   A      The other statement was more like mine.

21          MR. OLIVAS:  May I approach, Your Honor?

22          THE COURT:  Yes, you may.

23   Q      (BY MR. OLIVAS)  Describe the difference between

24   the other statement and this statement.

25   A      Well, the way that it's written down.  The State's

                                                        165

1    Exhibit don't got it on this statement.

2    Q    Okay.  You gave two different statements, Marcos;

3    is that correct?

4    A    Yes, sir.

5    Q    And in your first statement, you denied any

6    involvement; is that correct?

7    A    Yes, sir.

8    Q    And in the second statement, they made you tell

9    them that you were in the car; is that correct?

10   A    Yes, sir.

11   Q    And there were some things in that statement that

12   were totally wrong?

13   A    Yes, sir.

14   Q    For example, that Popeye was driving the car?

15   A    Yes, sir.

16   Q    And Popeye was in jail at the time?

17   A    Yes, he was.

18   Q    Why was Popeye in jail?  Do you know?  Never mind.

19   I will withdraw the question.  But Popeye was in jail at

20   the time?

21   A    Yes, sir.

22   Q    When you gave the statement, did you tell them what

23   kind of -- what kind of gun did you tell them was used?

24   A    If I remember correctly, it was a .22.  I had told

25   them -- no, no.  I told them it was a black pistol.

166

1    Q      You told them it was a what?

2    A      A black pistol.

3    Q      And they put it was a .22?

4    A      Yes, sir.  No.

5    Q      Did you tell them it was an automatic or a

6    revolver?  Do you remember?

7    A      No, I don't remember.

8           MR. ESPARZA:  Your Honor, I don't see the relevance

9    of this line of questioning.  I object to the whole line

10   of questioning.  It has nothing to do with the

11   voluntariness of the defendant's statement.

12          MR. OLIVAS:  Then I won't ask anymore questions

13   about his statement, Your Honor.

14          THE COURT:  Thank you.

15          MR. OLIVAS:  May I approach?

16          THE COURT:  Yes.

17   Q      (BY MR. OLIVAS)  Marcos, did you have anything to

18   do with the shooting?

19   A      No.

20   Q      Did Danny?

21   A      No.

22          MR. OLIVAS:  No further questions, Your Honor.

23          THE COURT:  Let's take a brief recess.

24                     (A recess was taken at this time.)

25                     (Thereupon, the following proceedings

167

1           took place after the recess:)

2           MR. OLIVAS:  Your Honor, I have one additional

3    question for Mr. Gonzalez.

4           THE COURT:  Go ahead.

5    Q      (BY MR. OLIVAS)  Mr. Gonzalez, on April the 22nd,

6    did the police charge you with capital murder of Robert

7    England and Armando Lazo?

8    A      Yes, sir.

9    Q      And did they put you in jail because of capital

10   murder?

11   A      Yes, sir.

12   Q      How long were you in jail?

13   A      Three -- about two and a half to three months.

14   Q      Did you ever get a lawyer?

15   A      No, sir.

16   Q      And then did somebody let you out of jail two and a

17   half or three months later?

18   A      Yes, sir.

19   Q      Who let you out of jail?

20   A      I don't know, but it surprised me.

21   Q      What did they tell you when they let you out of

22   jail?

23          MR. ESPARZA:  Your Honor, I'm going to object.

24   This has nothing to do with the scope of this hearing?

25          THE COURT:  Sustained.

168

1    Q       (BY MR. OLIVAS)  And you understand they dismissed

2    the charges?

3             MR. ESPARZA:  Your Honor, we object.

4             THE COURT:  We already know they have been

5    declined.  You don't need to ask him.  It's already a

6    fact.

7             MR. OLIVAS:  I have no further questions, Your

8    Honor.

9             THE COURT:  Thank you.  You may proceed.

10                      CROSS EXAMINATION

11   BY MR. ESPARZA:

12   Q       Sir, are you telling us today that the police

13   arrived at 5700 Wren where you were staying at 7:00

14   o'clock on April 21st?

15   A       No.

16   Q       Okay.  What time was it?  You said 7:00 to 9:00

17   previously.  Is that the time?

18   A       Excuse me?

19   Q       What time was it when the police arrived at 5700

20   Wren?

21   A       About 9:00 or about 7:00 or 10:00.  I don't

22   remember.  It was during the evening.

23   Q       Well, you just previously testified it was between

24   7:00 and 9:00 o'clock.  Is that a truth or a lie?

25   A       Truth.

1    Q    Between 7:00 and 9:00 o'clock. I'm trying to

2    narrow it down between 7:00 and 9:00 o'clock. What was

3    the time? If you can tell us.

4    A    I can't really say.

5    Q    You're sure it was before 9:00 o'clock, though?

6    A    Yeah.

7    Q    And when they got there, they took you into custody

8    and they took the defendant into custody?

9    A    Yes, sir.

10    Q    And according to your statement, you went from

11    there over to Droopy's house?

12    A    Yes, sir.

13    Q    And then from there you went somewhere to North

14    Park Mall?

15    A    Yes, sir.

16    Q    And then from there, you went to the northeast

17    sub-station or the central sub-station?

18    A    Central.

19    Q    Which is right down here downtown?

20    A    Yes, sir.

21    Q    All right. And it's your testimony that during

22    this entire time, they had the defendant in another

23    vehicle following you?

24    A    Yes.

25    Q    Okay. Now, you never saw him physically in the

170

1     central sub-station, did you?

2     A      No.

3     Q      You never saw him there?

4     A      In the central sub-station, no, sir.

5     Q      All right.  You were read your warnings that night?

6     Did someone read you the warnings "you have the right to

7     remain silent?"

8     A      No.

9     Q      No one ever read those to you?

10    A      No, sir.

11    Q      Not at all?  Never?

12    A      They just handed me -- they just told me, "Sign

13    here.  Sign here.  Sign here."

14    Q      But they never read them to you?

15    A      No, sir.

16    Q      Okay.  Let me show you what's been marked as

17    State's Exhibit Number 5.  Do you see State's Exhibit

18    Number 5?

19    A      Yes, sir.

20    Q      Where it's titled Warning to be Given Before Taking

21    any Oral or Written Confession?

22    A      Yes, sir.

23    Q      Is that your signature?

24    A      Yes, sir.

25    Q      Is that you dating it 4/22/93?

                                                        171

1    A      Yes, sir.

2    Q      Is that your time -- 12:30 a.m.?

3    A      Yes, sir.

4    Q      And are those your initials?

5    A      Yes, sir.

6    Q      All right. And aren't your initials there and your

7    signature on the card indicating that they read to you the

8    warnings on this card?

9    A      Yes, sir.

10   Q      And isn't it also an indication that you understood

11   the rights that you were given to you when you initialed

12   this?

13   A      That's what it seems line.

14   Q      Well, it's a yes or no question.

15          MR. OLIVAS: Your Honor, it's been asked and

16   answered. If he doesn't like the question, he can ask

17   another question, but he said that's what it seemed like.

18          THE COURT: Overruled.

19   Q      (BY MR. ESPARZA) You understood the rights that

20   they were giving you, didn't you?

21   A      Yes, sir.

22   Q      And it's true that you were given those rights at

23   12:30 a.m.?

24   A      Yes, sir, but --

25   Q      And you were given those rights at the central

                                                      172

1    sub-station, weren't you?

2    A      Yes, sir.

3    Q      Okay.  And it is not true that you stayed two hours

4    at 5700 Wren when they picked you up, is it?

5    A      Repeat the question.

6    Q      When they went to 5700 Wren to pick up the

7    defendant --

8           MR. OLIVAS:  Your Honor, I object.  I think that's

9    a misstatement of the testimony.  He never stated -- he

10   never said that.

11          THE COURT:  Cross-examination, counselor.

12   Overruled.

13          MR. OLIVAS:  However, it's a misstatement of the

14   facts.

15          THE COURT:  I understand what the testimony is.  I

16   have been listening all morning and I will continue to

17   listen to the answers.  I understand that's the testimony

18   and I will accept testimony.

19          MR. OLIVAS:  Thank you, Your Honor.

20          MR. ESPARZA:  May I proceed, Your Honor?

21          THE COURT:  Yes, you may.

22   Q      (BY MR. ESPARZA)  When they picked you up between

23   the hours of 7:00 o'clock and 9:00 o'clock at night, they

24   just picked you up, put you in the car and took you away?

25   A      No.

173

1    Q    Okay.

2    A    Picked me up at Danny's house.

3    Q    Picked you up at Danny's house?

4    A    They didn't take us to the central.

5    Q    That wasn't my question, sir.  My question was,

6    when they picked you up between the hours of 7:00 o'clock

7    to 9:00 o'clock, they picked you up at Danny's house and

8    they took you away, right?

9    A    Yes, sir.

10   Q    You did not hang around at Danny's house?

11   A    Not at Danny's house.

12   Q    As a matter of fact, you don't really know, do you,

13   where Danny was because you were in the -- you were

14   separated from him, isn't that true?

15   A    Yes, sir.

16   Q    And then you were whisked away somewhere else?

17   A    No.  We met up at North Park.  The cars met up at

18   North Park Mall.

19   Q    So then it is not true that Danny and you, in

20   separate cars, went by Droopy's house?

21   A    I don't know about Danny, but I went by.

22   Q    But you just testified previously that Danny was

23   behind you in another car when you went by Droopy's house.

24   That is a lie, isn't that?

25   A    No, sir.

174

1    Q       You gave your initial statement at 12:45.  Do you
2    remember that?  At 12:45 in the morning?
3    A       Excuse me?
4    Q       Do you remember giving the first statement at 12:45
5    in the morning?
6    A       Yeah.
7    Q       Right?
8    A       (Indicating.)
9    Q       Let me show you what's been marked as State's
10   Exhibit Number 6 and those are your initials, right?
11   A       Yes, sir.
12   Q       All right.  It says date, Thursday, April 22nd,
13   1993.
14   A       Yes, sir.
15   Q       Those are your initials?
16   A       Yes, sir.
17   Q       Start time 12:45?
18   A       (Indicating.)
19   Q       Time completed 1:15?
20   A       Yes, sir.
21   Q       Right?
22   A       (Indicating.)
23   Q       So, you concluded your statement at 1:15 in the
24   morning?
25   A       Yes, sir.

                                                    175

1   Q      And then you decided to give another statement,
2   isn't that true?
3   A      Yes, sir.
4   Q      And you were read your rights again, were you not?
5   A      Yes, sir.
6   Q      And that was at approximately 2:15 in the morning
7   on April the 22nd, 1993.  Is that true?
8   A      Yes, sir.
9   Q      Let me ask you.  Look at State's Exhibit Number 7
10  and tell me whether or not that is your signature on
11  State's Exhibit Number 7.
12  A      Yes, sir.
13  Q      And those are -- and those are your initials down
14  in the left-hand side?
15  A      Yes, sir.
16  Q      You knew that at any time during giving that
17  statement, you could stop the interview, didn't you?
18  A      Yes, sir.
19  Q      And you knew that at any time you could ask for a
20  lawyer, didn't you?
21  A      No.
22  Q      You did not know that?
23  A      No.
24  Q      You initialed that right that you understood that
25  right, correct?

176

1    A      They didn't read the rights.

2    Q      So, your initial here does not indicate that you

3    understand your rights?

4    A      No.

5    Q      You did not understand the right then that you

6    could terminate the interview at any time?

7    A      Excuse me?

8    Q      You did not understand the right --

9    A      No, sir.

10   Q      -- that you could terminate the interview at any

11   time?

12   A      No, sir.

13          MR. OLIVAS:  Your Honor, what's good for the goose

14   is good for the gander.  We are not questioning the

15   legality of his confession.  It's the legality of the

16   defendant's.

17          THE COURT:  Sustained.

18          MR. ESPARZA:  Your Honor, I believe he opened the

19   door.

20          THE COURT:  Sustained.

21   Q      (BY MR. ESPARZA)  It is clear in your mind that

22   before you gave the statement which I have marked as

23   State's Exhibit Number 8 -- and I understand your

24   objection, Your Honor.  I'm going to --

25          THE COURT:  It's not my objection.

177

1           MR. ESPARZA:  I understand his objection.  I'm not
2      getting into that area.
3      Q      (BY MR. ESPARZA)  State's Exhibit Number 8 which is
4      timed between 2:20 and 2:35, that before you gave this
5      statement, you saw a statement written by the defendant,
6      is that true?
7      A      Yes, sir.
8      Q      And you saw his signature at the bottom of that
9      statement?
10     A      Yes, sir.
11     Q      Is that true?
12     A      Yes.
13     Q      And it is your testimony today that the statement
14     that you read had this signature?
15     A      That's his signature.
16     Q      Okay.  No, no.  Not that that is his signature.
17     That the statement that you saw before you gave the
18     statement -- State's Exhibit Number 8 -- had this
19     signature of Danny Villegas?
20     A      No.
21     Q      Okay.  Listen to my question.  Your testimony is
22     that this was not the statement you were shown.  Is that
23     what your testimony is?
24     A      Yes, sir.
25     Q      Okay.  But, you saw a statement that was typed, I

                                                              178

1    assume?

2    A     Yes, sir.

3    Q     Okay.  Was it a two-page statement like this one?

4    A     No, sir.

5    Q     Just a one-page statement?

6    A     Yes, sir.

7    Q     And it had Danny's own signature at the bottom?

8    A     Yes.

9    Q     And in that statement, that is the statement they

10   had showed you before you made State's Exhibit Number 8?

11   A     Yes, sir.

12   Q     Now, you were at the central sub-station, right?

13   When you gave the statement?

14   A     Yes, sir.

15   Q     Now, let me just go back and clear up a few things.

16   Between the hours of 7:00 o'clock and 9:00 o'clock, when

17   you're at Danny's house, you're there, Danny's there.  Who

18   else is there?

19   A     Excuse me?

20   Q     Who else is in the house besides you and Danny, the

21   defendant?

22   A     Me, Danny, his -- I think his dad was there.  When

23   his mom was pulling up, that's when the cops came in.

24   The cops came in before his mom.

25   Q     The cops were there before his mom?

                                                      179

1    A      Yeah.  Yeah.  Well, they were there at the exact

2    time, but they -- the cops walked in the house before his

3    mom.

4    Q      Okay.  So you, the defendant, mom and dad and

5    anybody else?

6    A      I think David was there.

7    Q      David?

8    A      If I remember right.

9    Q      David Rangel?

10   A      No.  He wasn't there.  He was at his house.

11   Q      Okay.  Who was there.  Is that it, then?

12   A      Yes, sir.

13   Q      How do you know David Rangel was at his house?

14   A      Like I said, I don't know if he was or if he wasn't

15   there.

16          MR. ESPARZA:  Can I have just a moment, Your Honor?

17          THE COURT:  Yes, you may.

18   Q      (BY MR. ESPARZA)  Mr. Gonzalez, were you employed

19   on April the 21st?

20   A      Was I employed?

21   Q      Ah-huh.

22   A      Well, I worked off and on with his mom.

23   Q      Doing what?

24   A      Sort of maintenance -- like cleaning.

25   Q      Cleaning team?

                                                           180

```
1     A      Yes, sir.

2     Q      Okay.  So, were you employed on the 21st?

3     A      Steady job, no, sir.

4     Q      Do you remember if you worked on the 21st?

5     A      No.

6     Q      You did not work?

7     A      I don't remember.

8     Q      You don't remember?

9     A      (Indicating.)

10           MR. ESPARZA:  Okay.  I have no further questions,

11    Your Honor.

12           THE COURT:  Anymore questions of this witness?

13           MR. OLIVAS:  No further questions, Your Honor.  I

14    will mark Defendant's Exhibit 1.

15           THE COURT:  The diagram?

16           MR. OLIVAS:  Yes, ma'am.

17           THE COURT:  Any objection to the introduction?

18           MR. ESPARZA:  We have no objection, Your Honor.

19           THE COURT:  So admitted.

20           MR. ESPARZA:  Is it Defense 1?

21           THE COURT:  Yes.

22           MR. SIMMENTAL:  Your Honor, may I be excused?

23           THE COURT:  Yes, you may.  Thank you very much.

24           MR. OLIVAS:  Thank you.

25           THE COURT:  Mr. Simmental --
```

181

```
1                        (An off-the-record discussion took place
2                          at this time.)
3                        (Thereupon, the following proceedings
4                          continued:)
5             THE COURT:  You may proceed.
6             MR. OLIVAS:  Your Honor, defense calls David
7     Rangel.
8             THE COURT:  Raise your right hand.
9                        DAVID RANGEL,
10    having been called as a witness by the defendant, after
11    having been duly sworn by the Court, was examined and
12    testified, as follows:
13                     DIRECT EXAMINATION
14    BY MR. OLIVAS:
15    Q     Please state your name, age and address for the
16    record, Mr. Rangel.
17    A     David Rangel, 18, 8140 Tierra Verde.
18    Q     What is your relationship to Danny Villegas?
19    A     He's my cousin.
20    Q     Okay.  Is he also a friend of yours?  Would you
21    call Danny a friend?
22    A     Yeah.  We have known each other all our lives.
23    Q     And you know that Danny is accused of capital
24    murder?
25    A     Yes, sir.
```

VILLEGAS v. CITY OF EL PASO - P002499

1    Q    Did you contact Detective Marquez and tell him

2    Danny had done the shooting or did Detective Marquez

3    contact you?

4        MR. ESPARZA:  Your Honor, I object.  I don't

5    understand the relevance to this line of questioning on

6    this particular hearing.

7        THE COURT:  Overruled.

8        MR. OLIVAS:  Your Honor --

9        THE COURT:  Overruled.

10    A    No, sir.  What had happened was Detective Graves

11    had called me 'cause I had a prior incident for a

12    telephone harassment and he called me saying that they

13    wanted to see me about it.

14        So, when I went to the -- I called Detective Graves

15    and he just answered with his name.  He didn't say he was

16    with homicide or anything.  He said it was for that case

17    of telephone harassment, so they came and picked me up at

18    Danny's house and I went with him to the northeast

19    sub-station.  And when I went to the northeast

20    sub-station, Detective Marquez and another one, I don't

21    know his name, I haven't seen him here, he came and told

22    me, "Well, we have him on our list also that we also need

23    him for questioning."

24    Q    You mean who?

25    A    Me.

183

1    Q       And so then that's when he took me to the Five

2    Points sub-station.  They didn't tell me what he was

3    charged for yet.  They had said I was in trouble and they

4    took me down to the sub-station at Five Points.

5    Q       This was in April of 1993?

6    A       Yes, sir.

7    Q       And they took you to Five Points and asked you

8    questions there?

9    A       Ah-huh.  They said I was going to be charged with

10   capital murder.  That they have had witnesses saying that

11   they saw me shoot the gun.  That I was going to get life

12   in prison and they were going to lock me up.

13   Q       Is that when -- what did they ask you about Danny?

14   A       They didn't ask me anything about Danny at that

15   time.

16   Q       Okay.  Why is it that you implicated Danny in your

17   statement?

18   A       Why?  Because they kept saying that -- you know.

19   Because I told them, "I didn't do it.  I didn't know

20   anything."  For a while, it didn't dawn to me that they

21   were going to charge me and I guess I freaked out and I

22   panicked and I said the closest thing in my mind that will

23   get me out of trouble.  I didn't realize the consequences

24   until afterwards.

25   Q       Now, you're his cousin and his friend?

184

1    A    Yes, sir.

2    Q    And you knew that you were dropping him?  That this

3    was not good for him?

4    A    Yeah, yeah.

5    Q    Why did you do it?

6    A    Why?  Because of what the detectives were telling

7    me.  That's the first time I had ever been interrogated

8    and at that time, you know, I was like literally real

9    scared.  I was like --

10    Q    Were you scared?

11    A    Yes.  I was real scared.

12    Q    Did they threaten you?

13    A    Ah-huh.

14    Q    What did they threaten you with?

15    A    They threatened me that they were going to send me

16    to prison.  That they were going to get it out of me.

17    That they were going to keep me there until they got it

18    out of me eventually.

19    Q    How long did they keep you there?

20    A    For about two or three hours.

21    Q    Where was this?  At Five Points?  The central

22    sub-station?

23    A    Yes, sir.

24    Q    And did they read you your rights?

25    A    No.

185

1    Q      Did they read you your rights after you gave them

2    the statement?

3    A      No.

4    Q      Who was the detective?

5    A      Recording my statement?  Detective Marquez.

6    Q      Detective Marquez.  Okay.  Now, they never gave you

7    a little card that said these are your rights and read it

8    as best you can remember?

9    A      I can't recall.

10   Q      How old are you today?

11          MR. ESPARZA:  Your Honor, it's been asked and

12   answered.

13          MR. OLIVAS:  Fair enough.  How old are you today?

14   A      I'm 18.

15   Q      And when is your birthday?

16   A      This coming February.

17   Q      This last February you turned 18?

18   A      This upcoming February, I will be 19.

19   Q      Okay.  So, February of '93, you were 17?

20   A      This February, yes.

21   Q      Okay.  So, how old were you April 21st and 22nd

22   during the interrogation?

23   A      Seventeen.

24   Q      You were 17 years old?

25   A      Yes.

186

1    Q      Did they check your age?

2    A      No.

3    Q      Did they simply ask you how old you were?

4    A      They didn't ask me how old I was.  They might have

5    had some kind of listing, I guess.

6    Q      Was the statement you gave them true or false?

7    A      That was false.

8    Q      It was --

9    A      Well, you know, 'cause when I was being questioned,

10   they were saying, "Well, what did Danny say that they had

11   shot them ..." and Danny, I guess, because Danny -- since

12   he was a little boy, he has always been a big bragger and

13   I said, "With a .12 gauge shotgun."  They said, "Well,

14   that's not correct."  I said, "Well, that's what he told

15   me."  Then they said, "Well, that's not what it is."

16   Then I said, "Well, that's what Danny told me at the time

17   on the telephone."  That's not stated in the statement.

18   Q      Have you had a chance to read your statement?

19   A      Yes, sir.

20   Q      What did you tell the cops was the gun that was

21   used according to Danny?

22   A      The cops?  What do you mean?

23   Q      What gun did you say was used?

24   A      I told him that he used a .12 gauge 'cause he said

25   he used a .12 gauge which was bull shit.

187

1    Q       And what about the stolen gun in your statement?

2    A       Stolen gun?

3    Q       Yeah.  Who made that up?  Who made that up?

4    A       I think Danny.

5            MR. OLIVAS:  I have no further questions of this

6    witness, Your Honor.  One other question.

7    Q       (BY MR. OLIVAS)  You were never charged with

8    capital murder?

9    A       No, I wasn't charged with him.

10           MR. OLIVAS:  Thank you.

11           MR. ESPARZA:  May I proceed, Your Honor?

12           THE COURT:  Yes, you may.

13                        CROSS EXAMINATION

14   BY MR. ESPARZA:

15   Q       Mr. Rangel, let me see if I get your statement

16   correct.  What you're saying is that the defendant never

17   told you anything about the shooting?

18   A       What do you mean he didn't tell me anything about

19   it?

20   Q       He never told you that he was in the shooting?  He

21   never told you anything or did he?

22   A       No.

23   Q       He never said anything to you?

24   A       Well, on the phone, he said he was saying of what

25   had happened, but, you know, which was just 'cause --

                                                          188

1    Q     That's not what I asked you.

2          MR. OLIVAS:  Your Honor, if he would allow him to

3    finish his answer.

4          MR. ESPARZA:  Your Honor, he's not responsive to

5    the question.

6          MR. OLIVAS:  Well, the objection is --

7          THE COURT:  Overruled.

8    Q     (BY MR. ESPARZA)  So, he told you over the phone

9    that he had been involved in the killing?

10   A     That he had been involved.

11   Q     Is that what he said?

12   A     That's what he told me over the phone.

13   Q     Okay.  He called you up or you called him up?

14   A     I called him up.

15   Q     And you were chatting -- you were talking about

16   something?

17   A     That's right.  But after he got off, Marcos

18   Gonzalez said, "Don't believe him.  He's just lying.  He's

19   just bull shitting."  That's his exact words.

20   Q     But, the defendant never told you that he was

21   joking?

22   A     Danny, no.  He was just laughing in the background.

23   Q     I'm sorry?

24   A     He was just in the background.  He never said any-

25   thing.  He just -- that's what he just told me over the

                                                        189

1    phone.  He didn't say --

2    Q     He told you he was involved in the killing of those

3    two boys out on northeast?

4    A     On the phone?

5    Q     Ah-huh.

6    A     Yes, sir.

7    Q     And then you made up the part about the shotgun?

8    A     No, no.  Danny told me that he had done it with a

9    shotgun.

10   Q     Then he told you that he had done it with a shot-

11   gun, right?

12   A     (Indicating.)

13   Q     And what else did he tell you?

14   A     What else?

15   Q     Ah-huh.  What did he tell you about the shooting?

16   A     He just told me about -- I can't remember that

17   phone call.  It was a long time ago.  I can't really

18   remember exactly what was said in that phone call.  I just

19   remember like bits and pieces of that telephone

20   conversation.

21   Q     Now, Danny and Marcos are all part of that VNE

22   gang, right?

23   A     Marcos and Danny?

24   Q     Right, sir.

25   A     (Indicating.)

190

1    Q     They're pretty hard core about it, aren't they?

2    A     No.  You can't say they're really hard core about

3    it.

4    Q     He's got a tattoo saying that, right?

5    A     I have seen the VNE and the tattoos and --

6    Q     The answer is yes.  He does have the tattoo, right?

7    A     Yeah, he's got a tattoo, but I wouldn't consider it

8    hard core.

9    Q     Are you in VNE?

10   A     (Indicating.)

11   Q     Let me show you what I have marked as State's

12   Exhibit Number 1.  Do you recognize that?

13   A     Yes, sir.

14   Q     And this is in your handwriting?

15   A     Yes, sir.

16   Q     And you wrote this?

17   A     (Indicating.)

18   Q     This is in your words?

19   A     Yes, sir.  My words.

20   Q     No one told you what to write?

21   A     No.  Well, I had wrote (sic) a different one and

22   Marquez threw that one away because he said it wasn't

23   correct.

24   Q     Well, you could have written in here that Marquez

25   threw that one away, right?

191

1    A      This, myself?  The second time?  Even if I would

2    have done that, he would have thrown it away.

3    Q      My questions is, you could have written in the

4    statement "this is my second statement," right?

5    A      Yes, sir, I could, but I wasn't aware of it, but he

6    would have thrown it away also.

7    Q      Let me show you what's been marked as State's

8    Exhibit Number 10.  It's a two-page statement.  Is this

9    your signature here?

10   A      Yes, sir, it is.

11   Q      All right.  And have you had a chance to look at

12   it?  Would you like to take a look at it?

13   A      That one, I would.  I have already seen it.

14   Q      Would you like to take a look at it or do you

15   remember what you have written here?  Do you remember it

16   now?

17   A      Okay.

18   Q      And that is your signature?

19   A      That is my signature.

20   Q      On Page 2 of State's Exhibit Number 9 -- 10.

21   State's 10, right?

22   A      Yes, sir.

23   Q      You didn't put anywhere in here that you had

24   already given another statement, did you?

25   A      Well, Detective Marquez was the one that was typing

192

1       it out.

2       Q       Now, just so that I'm clear, State's 9 -- your

3       handwritten statement -- came before State's 10 -- the

4       typed statement, right?

5       A       He was asking me further questions that I might

6       have known during it and he had -- he made an addition

7       when he was copying that and he made further additions to

8       it in the computer copy.

9       Q       Let me ask the question again.  State's 9 came

10      before what I have marked as State's Exhibit 10, right?

11      A       (Indicating.)

12      Q       Yes or no?

13      A       Yes.

14      Q       All right.  Where do you currently live?

15      A       Right now?

16      Q       Ah-huh.

17      A       I'm staying with Danny's mom.

18      Q       With the defendant, right?

19      A       Yes, sir.

20      Q       You all have had a chance to talk about this case?

21      A       Have we had a chance?  He doesn't like to bring it

22      up.

23      Q       You never talk about it?

24      A       We just talk about going to Court.

25      Q       Never talk about the facts?

                                                            193

1    A     I don't.

2    Q     Never discuss it?  I'm just trying to get it clear

3    on the record here.  You never discuss it?

4    A     We have discussed it on several occasions, but we

5    don't get into full detail.

6    Q     You talked about what you were going to testify to?

7    A     Testify?

8    Q     Ah-huh.

9    A     To Jaime.

10   Q     To the defendant?

11   A     To the defendant.

12   Q     Never told him what you were going to testify to?

13   A     I testify -- well, I knew I was going to testify.

14   He knew it, too.

15   Q     Mr. Rangel, listen careful to my questions.  Do you

16   ever talk to the defendant -- have you ever told him what

17   you were going to testify to when you came to Court?

18   A     Yes.  I told him what I was going to say.

19   Q     You told him what you were going to say, right?

20   A     Yeah.

21   Q     And without telling me what he says, he's told you

22   what he's going to say if he testifies?

23   A     No.  Danny doesn't tell me.  He just told me what I

24   was going to say and I said, "The truth."

25   Q     He didn't tell you what really happened?

194

1    A     Danny?

2    Q     Ah-huh.

3    A     Danny wouldn't say anything.  He didn't mention it

4    -- I told him, but Danny doesn't like to talk object it.

5    Q     So, he's never told you what he's going to say in

6    Court if he testifies?

7          MR. OLIVAS:  Your Honor, that's been asked and

8    answered several times.

9          THE COURT:  Sustained.

10   Q     (BY MR. ESPARZA)  How long have you been living

11   with the Villegas'?

12   A     About five months.

13         THE COURT:  How long?  I couldn't hear you.

14         THE WITNESS:  Five months.

15   Q     (BY MR. ESPARZA)  And after April 22nd of '93, you

16   lived with them as well, didn't you?

17   A     No, I was with my parents.

18   Q     And how long were you with your parents?

19   A     Just probably until the past summer that came up.

20   The reason why I wasn't with my aunt was because I have a

21   job here on the northeast and I need transportation to get

22   around which they do provide me.

23   Q     Where do you work?

24   A     At La Paloma and I did have a job on the east side

25   -- Tel-Com in the east side.


195

1              THE COURT:  Scoot your chair up and use the

2       microphone.  We can't understand the name of the company

3       that you were working with.

4              THE WITNESS:  Tel-Com Productions.

5              THE COURT:  Spell it.

6              THE WITNESS:  T-E-L dash C-O-M Productions.

7              THE COURT:  Thank you.

8       Q      (BY MR. ESPARZA)  And you currently work at?

9       A      La Paloma.

10      Q      And you worked there with Marcos Gonzalez before he

11      was arrested?

12      A      No.

13      Q      Did Danny work there?

14      A      No.

15      Q      Rodney Williams?

16      A      No.

17      Q      None of them?

18      A      Marcos had worked there.  The reason I took his

19      place was when he was incarcerated, I took his place the

20      same day.

21             MR. ESPARZA:  I have nothing further, Your Honor.

22             MR. OLIVAS:  Neither do I, Your Honor.  I call

23      Priciliano Villegas.

24             THE COURT:  Raise your right hand.

25                         PRICILIANO VILLEGAS,

                                                              196

1    having been called as a witness by the defendant, after

2    having been duly sworn by the Court, was examined and

3    testified, as follows:

4           THE COURT:  Please be seated.

5                       DIRECT EXAMINATION

6    BY MR. OLIVAS:

7    Q     Please state your name, age and address for the

8    record, please.

9    A     My name is Priciliano Villegas, Jr.  I am 33 years

10   old and I live at 5700 Wren Avenue.

11   Q     Mr. Villegas, what's your relationship to Danny?

12   A     I am Danny's father.

13   Q     Okay.  Are you his natural father?

14   A     No.  I'm not his natural father.

15   Q     Did you adopt Danny?

16   A     Yes, I did.

17   Q     How old was Danny when you adopted him?

18   A     Daniel was about a year old when the adoption went

19   through.

20   Q     Okay.  What is your job?  What do you do for a

21   living?

22   A     I am an automotive technician.

23   Q     What's the name of the company you work for?

24   A     I work for Bell Knapp Auto Care, Inc., at 11128

25   Pellicano Drive in the east side.

                                                         197

```
 1    Q      And before that, where did you work?
 2    A      Before that, I was working with Chevron gas
 3    station.
 4    Q      Okay.  How long did you work at Chevron?
 5    A      Approximately a year.
 6    Q      Okay.  Mr. Villegas, describe -- do you believe
 7    Danny has a learning impediment?
 8    A      Yes, I do.
 9    Q      Tell the Court what -- how he did in school and
10    what are his problems, if any.
11    A      Well, during his first years, he was doing well up
12    to about the third or fourth grade and after that, it was
13    discovered that he had a learning disability.
14    Q      What do the doctors or the teachers call it?
15    A      I don't know the exact name.  It was just like a
16    -- it was real slow at learning.
17    Q      What kind of classes did he take in school?
18    Special resources or regular classes?  What kind?
19    A      He had regular classes except for he had tutoring,
20    you know.
21    Q      To help him along?
22    A      To help him along, yeah.
23    Q      How well does he read?
24    A      Not real well.  He'll understand the smaller words,
25    but when it comes to the larger words, you know, he can't
```

198

1   pronounce them correctly.

2   Q    How much contact does he have with his regular --

3   with his biological father?

4   A    Not a whole lot.

5   Q    When is the last time he saw him?

6   A    Maybe about four months ago.  He was visiting.

7   Q    Now Mr. Villegas, do you remember the evening of

8   the 21st of April, '93?

9   A    Pretty much, sir.

10  Q    That was the night that Daniel got arrested?

11  A    Yes.

12  Q    Who was inside the house?  Tell the Court what

13  happened and who was there and what was done.

14  A    Well, I arrived, okay?  I had come home from a

15  friend's house or somewhere and approximately -- it was a

16  little after 10:00 as far as I can remember.  I went into

17  the bedroom and my wife was not home yet.  She was out.

18  Anyhow, I did not come out of the bedroom 'till the

19  detectives entered with my wife and I heard this commotion

20  going on.

21  Q    What did you hear?

22  A    Well, I just heard my wife -- you know, she was

23  kind of outraged at what was going on because they just

24  came in the house.

25  Q    Did your wife and the detectives come together?

199

1    A    Well, you see, they were already in the house when

2    I entered the living room 'cause I was in the bedroom.

3    Q    What time of the evening was this?

4    A    It was after 10:00 p.m.

5    Q    Okay.  How do you know it was after 10:00?

6    A    Well, all I can remember is the news or something

7    was on.  You know.  It was -- I don't know if they were at

8    the weather already, but I know it was the news.

9    Q    What channel?  Do you remember?

10   A    If I can recall, I think it was Channel 4, but I

11   don't know.  That's kind of vague.

12        MR. OLIVAS:  Okay.  No further questions of this

13   witness.

14                    CROSS EXAMINATION

15   BY MR. ESPARZA:

16   Q    Sir, I'm sorry.  I didn't catch -- how old a person

17   are you?

18   A    I'm 33 years old, sir.

19   Q    And you have been living at 5700 Wren for how long?

20   A    Since 1988, so approximately six years -- going on

21   seven.

22   Q    And on April the 21st on that evening, you arrived

23   at home at that time or was that the regular hour you

24   arrive that?

25   A    No, that's not the regular hour.  I was -- I think

                                                        200

1    I was at a friend's house.  I had just come back and I

2    went straight to the bedroom getting ready to go to bed

3    and after that, when the detectives arrived with my wife,

4    I came out to see what was going on.

5    Q    So, it was late because you were getting ready to

6    go to bed?

7    A    Yes, sir.

8    Q    And you were going to go to work at what time on

9    the 22nd?

10   A    I go to work at 8:00 o'clock, so I leave at 7:30.

11   I usually go to bed about 11:00.

12   Q    And this was probably the regular time that you

13   were going to bed?

14   A    Pretty much.

15   Q    So, it was around 11:00 or so and you're in bed?

16   A    Well, that night, I didn't go to sleep at 11:00,

17   you know.  I stood (sic) up.

18   Q    Okay.  But, as you were in the -- you were in your

19   bedroom getting ready to go to bed at your regular hour

20   around 11:00 o'clock or something?

21   A    Right.

22   Q    So, if we had to peg the time that the commotion

23   happened out in the living room, we would say it happened

24   approximately 11:00 o'clock, right?

25   A    Well, it was right before 10:30 because the news

201

1    was still on and the news ends at 10:30.

2    Q      Well, you were in your bedroom?

3    A      Right.  Yes, sir, I was.

4    Q      Well, just so that we can be fair.  Is it accurate

5    to tell the Judge that it was between 10:30 and 11:00?

6    A      No, because the news was still on.  The news ends

7    at 10:30.

8    Q      10:30?

9    A      No.  It was between 10:00 and 10:30.

10   Q      Closed to 10:00 o'clock and 10:30?

11          MR. OLIVAS:  Asked and answered several times.

12          THE COURT:  Thank you.  Sustained.

13   Q      (BY MR. ESPARZA)  When you went in, the t.v. was

14   on.  Who was in the room?

15   A      My son and his friend, Marcos.

16   Q      And who else was in there?

17   A      They were the only ones there.  My wife, Brisa, and

18   my daughter were out.

19   Q      And did you stay to talk with your son and Marcos?

20   A      No.  I went in and I said, "What are you guys

21   doing?"  They said, "Just watching t.v."  And I went into

22   the bedroom and proceeded.

23   Q      And then after some time goes by, your wife

24   arrives?

25   A      Yes, sir.  With the detectives.

                                                            202

1    Q      And they arrive simultaneously?

2    A      Pretty much so.  Like I said, they were already

3    inside the living room when I came into the living room.

4    Q      You were already in bed?

5    A      No, I wasn't in bed yet.  I was -- I think I was

6    just changing or something.

7    Q      Changing your clothes to go to bed?

8    A      To go to bed.

9    Q      To go to bed?

10   A      Right.

11   Q      All right.  And then you walked into the living

12   room and that's when there was the commotion?

13   A      Yes, sir.

14   Q      And you saw Marcos in there?

15   A      Yeah.  He was still there and Danny was still

16   there.  When I walked in, they were cuffing Marcos and

17   that's when Danny asked, "What's going on?"  And they

18   asked him, "Well, what is your name?"  And he replied with

19   his name and they said, "You're going in, too."

20   Q      While you're there, they take Marcos away?

21   A      Yeah.  I was there while they were taking him away.

22   Q      They take Marcos away and Danny is still in the

23   living room?

24   A      Yeah.  Not for much longer.

25   Q      They read Danny his rights there in the living

203

1    room?

2    A    No, sir, they didn't.

3    Q    They read Marcos' rights there in the living room?

4    A    No, sir.

5    Q    And did they tell you where they were taking your

6    son?

7    A    No, they didn't.  They just said that he was under

8    arrest.

9    Q    That's how you remember that they told him he was

10   under arrest?

11   A    Yes.  There was so much commotion going on that I,

12   you know, I just kind of lost, you know, what I was

13   thinking and, you know, I didn't proceed outside 'cause of

14   the nervousness.

15   Q    And your wife began yelling?

16   A    Well, I don't know if she began yelling, but she

17   was kind of outraged and just wondering what the heck was

18   going on.  She didn't yell directly at anyone.

19   Q    She was yelling?

20   A    Yeah.  She was outraged, you know.

21   Q    And they never told you where they were taking your

22   son?

23   A    No.  Not at that time until after we found out he

24   was down at the detention facility.

25   Q    And what time did you find out he was at the

1    detention facility?

2    A      It was rather late.  Maybe closer to midnight.

3    Somewhere around there.

4    Q      How did you find out he was at the detention

5    facility?

6    A      Well, I believe we received a call that he was down

7    there.

8    Q      From someone from JPD?

9    A      Yeah.

10   Q      And did you ever know where Marcos went?

11   A      Not at that time.  Until afterwards, we found out

12   that he was in the County Jail.

13   Q      Your son knows the difference between right and

14   wrong?

15   A      Yeah, he knows the difference between right and

16   wrong.

17   Q      You have taught him that stealing is wrong?

18   A      As much as possible, yes.

19   Q      Did you teach him that killing is wrong?

20   A      Yes, sir.

21   Q      He's not slow.  He understands that, doesn't he?

22   A      Well, I would think that anyone would, sir.

23   Q      Well, I know, but I'm not talking about anyone.

24   I'm taking about your boy.

25   A      Yes, he understands that.

                                                         205

1    Q     And he knows the difference between telling the
2    truth and telling a lie?
3    A     Yes, sir, he does.
4    Q     And he's not slow.  He understands that, doesn't
5    he?
6    A     Well, maybe with that he isn't slow, but he is slow
7    at learning.  As far as reading, you know, a statement or
8    a confession.
9    Q     He would know if he was telling a lie, wouldn't he?
10   A     Yes, sir, he would.
11         MR. ESPARZA:  I have nothing further, Your Honor.
12                   RE-DIRECT EXAMINATION
13   BY MR. OLIVAS:
14   Q     Mr. Villegas, is Danny an impressionable person?
15   Can he be influenced easily or hard or what?
16   A     He can be influenced pretty easy.
17   Q     Is he easy to scare --
18   A     Yeah.  He may not show it, but yeah.
19   Q     -- for lack of a better word?
20   A     If someone scolds him or yells at him.
21   Q     What does he do?
22   A     Well, he tries to show a little aggressiveness, but
23   quickly, he draws back from the person.
24   Q     Okay.  How many -- he's been treated before by a
25   doctor?

206

1    A     Yes, sir.  Dr. Gene Vanderpool.

2    Q     And he was put in the hospital for about four

3    months?

4    A     Yes.

5    Q     How many detectives arrived that night when he

6    walked into your house?

7    A     I believe there was three.  The one that I remember

8    positively is Mr. Alfonso Marquez.

9    Q     Okay.  Did you -- when they took them away and

10   outside towards the cars, did you follow them and look at

11   them?

12   A     No, I did not go outside.

13   Q     Were you able to see how many cars were parked out

14   there?

15   A     There was at least three cars out there.

16   Q     Were they police cars or detective cars?

17   A     No.  They looked like undercover cars.

18   Q     And there was at least three cars?

19   A     Yes, sir.

20   Q     Now, tell the Court, did they put all the kids --

21   both Danny and Marcos -- in the car or who went where?

22   A     No, sir.  From what I could see, they put Daniel in

23   one car and Marcos in a separate car.

24   Q     Did you see which car was driven -- who was driving

25   Danny's car?

207

1   A       No, sir.  I could not positively identify who it
2   was.
3   Q       Okay.  Now, you found out that Danny was at the
4   Juvenile Probation Center?
5   A       Yes, sir.
6   Q       What time was this when you found out?
7   A       It was closer to midnight.
8   Q       Okay.  And you remember how?
9   A       Well, when they left the house, it must have been
10  close to 11:00.  They didn't stay there at the house very
11  long and maybe it might have been even after midnight when
12  he was actually there and we got the call.  I don't know.
13  Maybe 12:15.
14  Q       Okay.  You had a chance to drive from your house to
15  Delta JPD to go and visit Danny when he was there?
16  A       Yes, sir.
17  Q       How long is that drive?
18  A       Maybe 30 minutes at the most.  I go down Railroad,
19  54 and then I go Border Freeway and Fonseca.
20  Q       So, from the time that you received the call and
21  the time that they took him, it was more than 30 minutes?
22  A       Yes, sir, it was.
23  Q       It was a lot more than 30 minutes?
24  A       Yeah.  Quite a bit more than the time that it takes
25  to drive from there.

208

1    Q    Okay.  And in your opinion, it was more than two

2    hours?

3    A    Yeah.  At least an hour and a half to two.

4         MR. OLIVAS:  Thank you.  I have no further

5    questions, Your Honor.

6         THE COURT:  Anymore questions?

7         MR. ESPARZA:  I just have a couple, Your Honor.

8                    RE-CROSS EXAMINATION

9    BY MR. ESPARZA:

10   Q    You say your boy is impressionable?

11   A    He's easy impressionable, yes, sir.

12   Q    So impressionable that he would admit to a murder?

13   A    Well, if he was coerced or threatened.

14   Q    Yes?  So, the answer to that is yes?

15   A    Well, yes, sir.  I mean, if you're threatened -- to

16   where your life is threatened.  In other words, wouldn't

17   you admit to it, sir?

18   Q    Are you telling me that that is your position that

19   his life was threatened?

20   A    I believe so.  I was not there when, you know, when

21   it happened, but I wouldn't see why else he would admit to

22   it.

23   Q    Other than maybe he did it?

24   A    I don't believe he did it.  In fact, I know he

25   didn't.

                                                209

1    Q    You say they left your house around 11:00 o'clock
2    or so?
3    A    Yeah.  A little after 10:30 or so.
4    Q    And then you got a call sometime after midnight?
5    A    After midnight, yes, sir.
6    Q    Around 12:00 to 12:15 or 12:30?
7    A    Yes.
8         MR. ESPARZA:  I have nothing further, Your Honor.
9                    FURTHER EXAMINATION
10   BY MR. OLIVAS:
11   Q    Who called you, Mr. Villegas, and what did they
12   tell you?
13   A    It was a female that called.  I just don't know
14   what her name was.  She was here yesterday.
15   Q    The woman in purple?
16   A    No.  Oh, wait a minute.  There was a -- there was
17   two of them.  One took the place of the other right after,
18   so it was the one in the purple with black hair.  I don't
19   remember her name.
20   Q    And what did she tell you?
21   A    She said, "We have your son here at the detention
22   facility.  You need to come down right now."
23   Q    And did you go down?
24   A    We did go down.  They said they had to detain him
25   there.

                                              210

1    Q      What time did you get there?

2    A      Oh, we left, I imagine, about 12:30 and we got

3    there around 1:00.  I mean, no later than 1:00.

4    Q      And where was Danny when you got there?

5    A      He was in -- he was in one of the rooms -- one of

6    the holding tanks that they have there.

7    Q      And then what happened?

8    A      And then after that -- well, they told us they had

9    to hold him and that we would be notified of anything

10   further the next day.

11   Q      And are you absolutely certain you got there around

12   1:00?

13   A      I know it was very late, sir, being that I had to

14   go to work the next day.  I believe it was about 1:00 or

15   -- I know when we got home, it must have been 2:30.

16          MR. OLIVAS:  Okay.  I have no further questions.

17   Thank you, Mr. Villegas.

18                      FURTHER EXAMINATION

19   BY MR. ESPARZA:

20   Q      You saw him in the holding cell?

21   A      No.  I did not actually see him.  They said he was

22   in a holding tank.

23          MR. ESPARZA:  I have nothing further.

24          THE COURT:  Anymore questions?

25          MR. OLIVAS:  No further questions.

1          THE COURT:  All right.  You may step down.

2          THE WITNESS:  Thank you, Your Honor.

3          THE COURT:  Call your next witness.  Are you

4     excusing him?  Any objection?

5          MR. ESPARZA:  We don't have any objection.

6          THE COURT:  You may be excused.  Raise your right

7     hand.

8                    MICHELLE VILLEGAS,

9     having been called as a witness by the defendant, after

10    having been duly sworn by the Court, was examined and

11    testified, as follows:

12         THE COURT:  Please be seated.  Try to scoot your

13    chair up close to the microphone and speak into the

14    microphone.  The chair doesn't have rollers, so you have

15    to pull on the chair.

16         MR. ESPARZA:  Your Honor, may we approach the bench

17    before he starts questioning?

18         THE COURT:  What about?

19         MR. ESPARZA:  Regarding Judge Horkowitz.

20         THE COURT:  Let's go off the record.

21                   (An off-the-record discussion took place

22                    at this time.)

23                   (Thereupon, the following proceedings

24                    continued:)

25                   DIRECT EXAMINATION

                                                      212

1    BY MR. OLIVAS:

2    Q     Please state your name and your address and your

3    age for the record.

4    A     Michelle Villegas, 5700 Wren and I'm 13.

5    Q     You are the younger sister?

6    A     Yes.

7    Q     Michelle, do you remember the night that Danny was

8    arrested?

9    A     Yes.

10   Q     Where were you?  Tell the Court what happened when

11   he was arrested?

12   A     I was with my mom at a friend's house and then we

13   came home and about three cars pulled up and then they

14   started showing us their badges and they went inside the

15   house and they asked for Marcos Gonzalez and then my

16   brother asked what was going on and then they said, "Well,

17   what's your name?"  And he told them his name and they

18   said, "Well, we have a warrant for you, too."

19   Q     Do you remember what the friend's -- your mother's

20   friend's name is?

21   A     Luis Villegas.

22   Q     What does he do?

23   A     He's a sculptor.  He does art.

24   Q     Nails?

25   A     Art.

213

VILLEGAS v. CITY OF EL PASO - P002530

1    Q    Oh, art.  What time did you guys get back to the
2    house?
3    A    I don't remember.
4    Q    Who was there?  Did you guys get there before the
5    cops or after the cops?
6    A    They got -- I think they were waiting or something
7    until they knew the car because when we got there, they
8    all pulled up.
9    Q    Was the t.v. set on when you got there?
10   A    Yes.
11   Q    Who was watching?
12   A    Marcos and Daniel, I think.
13   Q    What was on?
14   A    I don't remember.
15        MR. OLIVAS:  I have no further questions, Your
16   Honor.
17        MR. ESPARZA:  I have nothing further, Your Honor.
18   I don't have anything for this witness.
19        THE COURT:  May she be excused?
20        MR. OLIVAS:  Yes, Your Honor.
21        MR. ESPARZA:  Yes, Your Honor.
22        THE COURT:  All right.
23        MR. OLIVAS:  Call Brisa.
24        THE COURT:  Raise your right hand.
25

214

1                         BRISA PARKS,
2    having been called as a witness by the defendant, after
3    having been duly sworn by the Court, was examined and
4    testified, as follows:
5              THE COURT:  Please be seated and scoot up and use
6    the microphone.  Speak up loud.
7                       DIRECT EXAMINATION
8    BY MR. OLIVAS:
9    Q    Please state your name, age and address.
10   A    I'm Brisa Parks.  I'm 18 years old.  I live at 5700
11   Wren.
12   Q    What's your relationship to Daniel Villegas?
13   A    He's like my brother.  I have known him for a
14   while.
15   Q    Are you his friend?
16   A    Yeah, he's my friend.
17   Q    Do you remember the night that Danny was arrested?
18   A    Yes, I do.
19   Q    Tell the Court what happened.
20   A    We had barely came from Yolanda Villegas' friend's
21   house and as soon as we were going up the driveway, there
22   was three detective cars that I remember and they started
23   flashing their badges at us and two of them -- I remember
24   two of them went inside the house before we did and they
25   just -- they got Marcos Gonzalez and they read the

                                                    215

1    rights on him.

2         Then Danny started asking why they were getting him

3    and for what and he said -- one of the detectives goes,

4    "Well, who are you?"  And Danny said, "I'm Danny" and they

5    go like, "Well, you're under arrest."  And then they read

6    the same rights that they read Marcos Gonzalez.

7    Q    Brisa, what time was it that this happened when you

8    guys got home?

9    A    That I remember, it was between 10:00 and 10:30.  I

10   don't know the time, but it was between there.

11   Q    Okay.  What is your mom's friend's name?  Mrs.

12   Villegas' friend's name?

13   A    That we were at?  I just know him by Louie

14   Villegas.

15        MR. OLIVAS:  Okay.  I have no further questions of

16   this witness, Your Honor.

17                      CROSS EXAMINATION

18   BY MR. ESPARZA:

19   Q    They read Danny his rights?

20   A    Yes, they did.

21   Q    And they read Marcos' rights?

22   A    Yes, they did.

23   Q    And then they took Marcos away in a car?

24   A    Ah-huh.

25   Q    Did you see that?

1    A       No.  Yes, I did.

2    Q       And then they took Danny away in a car?

3    A       Ah-huh.

4    Q       Separate cars?

5    A       I don't remember.  I don't know.  I wasn't outside

6    at the time.  I just know that they got Marcos.  They read

7    Marcos his rights.  They asked Danny -- they told him he

8    was under arrest, too.  And then they read him his rights

9    there at the living room.

10   Q       They asked, "Who are you?"  And he said, "Danny."

11   A       Ah-huh.

12   Q       You live with Danny?

13   A       At that time, yes, I did.

14   Q       And are you currently living there now?

15   A       Now I am again.

16   Q       And you are -- are you Marcos' wife or girlfriend

17   or something like that?

18   A       I was his ex-girlfriend.  I had his baby.

19   Q       And were you living with Marcos prior to the time

20   he was recently arrested?

21   A       Yeah.  I was living there, but I wasn't going out

22   with him.

23   Q       How long has it been since you have not gone out

24   with him?

25   A       Like a year to two years already.

                                                         217

1          MR. ESPARZA:  I have nothing further, Your Honor.

2          THE COURT:  All right.  May this witness also be

3     excused?

4          MR. OLIVAS:  Yes, Your Honor.

5          MR. ESPARZA:  No objection, Your Honor.

6          THE COURT:  All right.  Thank you.  You may be

7     excused.

8          THE WITNESS:  Thank you.

9          THE COURT:  Call your next witness.

10          MR. OLIVAS:  May I have a moment, Your Honor?

11          THE COURT:  Yes.  Where are you going?

12          MR. OLIVAS:  I need to visit with him for just two

13     seconds simply whether I'll put him on for the limited

14     purpose of --

15          THE COURT:  All right.  Let's do it quickly,

16     please.

17                    (A recess was taken at this time.)

18                    (Thereupon, the following proceedings

19                     continued:)

20          THE COURT:  Raise your right hand.

21                    DANIEL VILLEGAS,

22     having been called as a witness by the defendant, after

23     having been duly sworn by the Court, was examined and

24     testified, as follows:

25          MR. OLIVAS:  Your Honor, I'm putting Mr. Villegas,

                                                        218

1    the defendant, for the limited purposes of how the alleged

2    confession was obtained not whether his rights under the

3    Family Code, Section 51.09(a) (b) and (c) were violated

4    and whether his rights under the Fourth, Fifth and Sixth

5    Amendment of the U.S. Constitution were violated in

6    obtaining that nor do we intend -- nor do we anticipate

7    going into the guilt or innocence or the facts of this

8    case. Simply for the limited purposes of how the

9    questioning was obtained by operatives of the El Paso

10    Police Department.

11    THE COURT: All right.

12    MR. OLIVAS: And we would ask the Court to rule to

13    limit the questioning as previously requested.

14    MR. ESPARZA: Your Honor, I have to tell you that I

15    don't understand your ruling. I understand we are here on

16    a motion to suppress the confession.

17    I would imagine that on cross-examination, it's

18    wide open and question by question, I can object, but I

19    don't want to be in violation of your order. I don't

20    understand his position to his previous statement.

21    THE COURT: Well, you can only go as far as his

22    direct examination goes.

23    MR. ESPARZA: That's fine. I'm just saying it's my

24    opinion that cross-examination is wide open and if the

25    defendant takes the stand, he's subject to cross-

1    examination.

2            THE COURT:  You can only go as far as the direct

3    examination goes.

4            MR. OLIVAS:  Sure.  If I open the door.

5            THE COURT:  That's correct.

6                         DIRECT EXAMINATION

7    BY MR. OLIVAS:

8    Q    Please state your name, age and address for the

9    record.

10   A    Danny Villegas, 17, 5700 Wren Avenue.

11   Q    Mr. Villegas, the night of April the 21st that you

12   were arrested, do you remember that night?

13   A    Yeah.

14   Q    Tell the Court what happened.

15   A    They had come into the house and they asked for

16   Marcos Gonzalez and then he stood up and they told him he

17   was under arrest for two capital murders and then I stood

18   up and asked them, "Why are you taking him away?"

19            And that's when they asked me for my name and so I

20   told them my name and then they told me that I was under

21   arrest, too.

22   Q    Who's they?

23   A    The detective.

24   Q    How many detectives?

25   A    It was like about four or five of them.

                                                        220

1    Q      What time was it?

2    A      Around 10:00.

3    Q      After that, did they take you outside of the house?

4    A      Yeah.  They took me outside and I could see they

5    started reading our rights to me and Marcos and then they

6    put me in one car and I could see Marcos because it was a

7    corner house and I could see where they put Marcos in.

8    Q      How many cars?

9    A      It was like three of them.

10   Q      What color was your car?

11   A      I don't know.  It was like -- it was a dark-colored

12   one, though, because it was night.

13   Q      What color was Marcos' car?

14   A      They were all dark.  All the cars.

15   Q      After they put -- they put you in a car and Marcos

16   in a separate car?

17   A      Ah-huh.

18   Q      Where did they take you then?

19   A      We followed up -- we went up the street.  We

20   followed them.  We followed Marcos' car.  It was Marcos'

21   car and then it was mine and then there was another one

22   behind ours and we followed it up and we went up and then

23   by South Berry (sic).

24   Q      Salisbury Street?

25   A      Yes.  It was Salisbury -- no.  Raymond Telles and

                                                            221

L P B ;  T E S E S   S E F S

1     that's when we passed by Droopy's house.

2     Q     Who was in the front of the car?  Who was in the

3     front car?

4     A     It was Marquez and I don't know the other guy's

5     name.

6     Q     Where is Droopy's house?  What's the street?

7     A     It's Raymond Telles.  I don't know the address.

8     Q     Did you also go by Tetons Avenue?

9     A     Yeah.  That was after we went to North Park.

10    Q     Okay.  You passed by Droopy's house and then where

11    did you go?

12    A     And then we just passed right by.  They didn't tell

13    me nothing and then we headed up North Park.  We stood

14    there for a while and then they -- all the detectives --

15    they stood and they started talking to each other.

16    Q     And where in North Park did they park?

17    A     In the back of Furr's.

18    Q     How many cars?

19    A     It was like three or four.

20    Q     How much light was there?

21    A     It wasn't that much.

22    Q     Was there anybody -- any other cars parked in that

23    parking lot?

24    A     No.

25    Q     Was there any trash in that parking lot?

                                                          222

1    A      Ah-huh.

2    Q      Was there a ditch?

3    A      Yeah, it was behind me.

4    Q      How long were you parked at the Furr's behind the

5    Furr's with the other cars?

6    A      For about 30 minutes or an hour.

7    Q      Did they take you out of the car?  It was 30

8    minutes to an hour you say?

9    A      (Indicating.)

10   Q      Did they take you out of the car?

11   A      No.

12   Q      Did they take Marcos out of the car?

13   A      No.

14   Q      Could you see the car where Marcos was in?

15   A      Yeah.

16   Q      Could you see Marcos in that car?

17   A      No.

18   Q      Why?

19   A      Because the windows are like tinted.

20   Q      At that time, Mr. Villegas, where did they take

21   you?

22   A      Then from there, everybody got in the car.  Marcos

23   went his way and then we went ours and then we went down

24   Tetons.

25   Q      Why did you go down Tetons?

                                                    223

1    A       Because they were saying that Popeye lived on

2    Tetons.

3    Q       Popeye being the alleged driver?

4    A       Ah-huh.

5    Q       And did you point where Tetons or -- I mean, where

6    Popeye's house was at Tetons?  Did you say, "That's the

7    house."

8    A       No.  I just passed by.  They just said if this was

9    the house.

10   Q       Who pointed the house out?

11   A       Marquez did.

12   Q       Detective Marquez?

13   A       He said, "Is that the house right there?"  And then

14   I go, "Well, I don't know if that was the house or not

15   because it was dark."

16   Q       What's Popeye's real name?

17   A       Ricky.

18   Q       After you passed by Popeye's house on Tetons, did

19   they take you to central?

20   A       Yeah.  They took me to Five Points.

21   Q       To Five Points.  Did they get you off of the car at

22   Five Points?

23   A       Yeah.  They got me out of the car because they were

24   going to take me -- they were going to take me to -- they

25   were going to take me to jail because they thought I was

                                                         224

1    an adult.  They thought I was 17.

2    Q      What did they tell you about your age?

3    A      They go -- 'cause they were going like, "Well,

4    we're going to go to jail."

5           And then I was like, "Why are we going to jail?

6    I'm a juvenile."  They kept on telling me that I wasn't.

7    They kept on saying, "No, you're not.  It says right here

8    that you're 17."

9           That's when I told them to call the D-Home 'cause I

10   was on the first-offender's program.

11   Q      For what?

12   A      For -- it was -- I don't remember what it was for.

13   Q      Okay.  Did they put you in an office or in a --

14   what did they do with you at Five Points?

15   A      Well, they took me out of the car and they just put

16   me in a -- they put me in one of the offices and then I

17   guess they called or something.

18   Q      Did they leave you by yourself?

19   A      Yeah.  For about 10 or 15 minutes and then they

20   came back.

21   Q      Who's they?

22   A      Marquez and some other detective.

23   Q      And what did they tell you?

24   A      They asked me -- that's when they were telling me

25   that I'm a lucky punk and all of that.

225

1    Q     What did they say exactly?

2    A     They go, "You're lucky, punk. You stupid ass

3   hole." And then that's when they took me to the car.

4    Q     They took you back outside to the car?

5    A     Ah-huh.

6    Q     And then what -- where did they take you?

7    A     And then that's where Alfonso kept on cussing.

8    Q     I'm sorry?

9    A     He kept on cussing at me. When we were on the ride

10   to the D-Home, he kept on saying that they were -- he was

11   telling me -- he was saying that if I don't give a state-

12   ment when I get there, they're just going to turn the car

13   around and go to the desert and beat me right there.

14    Q     What were they going to do to you in the desert?

15    A     They said that they were going to take me to the

16   desert and beat me. That's what they said they were going

17   to do to me. They were saying that.

18    Q     Did they tell you that they were going to take you

19   to County --

20    A     Yes.

21    Q     -- if you didn't give a statement?

22    A     Yeah.

23    Q     What was going to happen to you at County?

24    A     That they were -- I was going to get raped by fat

25   old men and that "You're going to get your ass kicked and

226

1    you're going to get raped."

2    Q    How many times did he tell you those things?

3    A    He kept saying that over and over and over.

4    Q    How many times did he keep cussing at you?

5    A    It was over and over.

6    Q    Were you afraid?

7    A    Yeah.

8    Q    Have you ever been interrogated in your life

9    besides this time?

10   A    No.  That was the first time.

11   Q    That you were interrogated?

12   A    (Indicating.)

13   Q    How many times have you spoken to police?

14   A    Not that much.  Like I would talk to the police

15   'cause like, but they were never interrogating me.

16   Q    Would you talk to the police in the sub-station or

17   in the office or out in the streets?

18   A    Out in the streets.  Like they will stop us and we

19   will stay right there talking or they will be patrolling.

20   Q    What time did they arrest you?

21   A    10:00.

22   Q    Okay.  What time did you get to juvenile?

23   A    Around 11:30 around there.

24        MR. OLIVAS:  Okay.  I have no further questions.

25   One more question.

227

1    Q       (BY MR. OLIVAS)   Did they push you or shove you or

2    kick you or hit you?

3    A       Yeah.   Marquez kept on hitting me on the back of

4    the head.

5    Q       How would he hit you?

6    A       He would slap me like that.

7    Q       How many times?

8    A       He kept doing that 'cause he was telling me -- what

9    he kept on telling me was, "You're the one who did it."

10   And I was like, "No, I wasn't."   And he would hit me in

11   the back of head.

12   Q       Did he hit you hard?

13   A       Yeah.   And then he had a ring on.   He would hit me

14   on the bottom and he would say, "Now tell me the truth,

15   punk."   And he would do it again.

16   Q       How many times did he hit you?

17   A       Like four or five and then that's when I gave him a

18   statement, but I didn't say that I did it.   I said Rodney

19   did it.

20           And that's when he did it real hard.   He reached

21   with his hand and slapped me real hard and he said, "I'm

22   not going to write that down.   I want you to tell me the

23   truth" and all of this.

24           And then he goes, "You're the one that did it" and

25   that's when he brought me a statement from Marcos.

228

1    Q      What did he tell you that statement from Marcos
2    said?
3    A      He told me, "Your friend just narc'd on you right
4    now."
5    Q      Were those his exact words?
6    A      Yeah.  "Your friend just narc'd on you right now."
7    Q      Did he let you read it?
8    A      Huh?
9    Q      Did he let you read it?
10   A      No.  He just showed it to me and then he took it
11   away and then he said, "What are you going to do now?"  He
12   said that and that's when he slapped me on the back of the
13   head and he said, "Are you going to talk or what?"
14   Q      And then?
15   A      And that's when I was -- all right.  That's when
16   they offered me a cigarette.
17   Q      Okay.  Did you take the cigarette?
18   A      Huh?
19   Q      Did you take the cigarette?
20   A      No.
21   Q      And then what happened?
22   A      They offered me a cigarette and a Coke and I took
23   the Coke.
24   Q      Okay.  What happened after that?  Did you then tell
25   them everything?

                                                    229

1    A      Yeah.

2    Q      You told them everything?

3    A      (Indicating.)

4    Q      And did they then put you in the car and take you

5    to the Judge?

6    A      Yeah.

7    Q      And did you tell the -- why didn't you tell the

8    Judge that he was hitting you?

9    A      No.   'Cause I was too scared.

10   Q      Why?

11   A      'Cause I thought that when I got back in the car,

12   that they were going to -- that they were going to beat me

13   up.

14   Q      Did they tell you that they were going to beat you?

15   A      Yeah.   They kept on telling me at the end if they

16   -- if I didn't cooperate, that they were going to beat me.

17   That I had to cooperate all the way to the end.

18   Q      Had you ever been in County Jail before?

19   A      No.

20   Q      And have you ever been in the Juvenile Probation

21   Department?

22   A      Yeah.

23   Q      How long before this time?

24   A      It was about -- like about six months before.

25   Q      For how long were you there?

                                                    230

1    A       For an hour.

2    Q       Just for an hour?

3    A       (Indicating.)

4    Q       And you had never been arrested -- never mind.

5    Withdraw the question.  You had never been detained either

6    at Juvenile Probation or El Paso County Jail or any other

7    jail except for that one hour about six months before this

8    event?

9    A       Yeah.  Except for one time when I was there for

10   just one night.

11   Q       What happened that time?

12   A       I was just in there for the night and then in the

13   morning, they took me out.

14   Q       Okay.  Now, when you talked to the Judge, the Judge

15   explained -- what time was it when you were at the Judge's

16   office?

17   A       It was about -- that was about 1:00.

18   Q       Is it fair to say 12:53 in the morning?

19   A       Yeah.  Around there.

20   Q       So, you were missing from your house from about

21   10:00 through 12:53 -- three hours and 53 minutes --

22   almost four hours --

23   A       Ah-huh.

24   Q       -- before you got to see the Judge?

25   A       Yes.

231

1          MR. OLIVAS:  I have no further questions of this

2     witness, Your Honor.

3                        CROSS EXAMINATION

4     BY MR. ESPARZA:

5     Q     What did you do earlier on April the 21st?

6     A     I went -- I was at Village Green.

7     Q     Those are apartments?

8     A     Yes, sir.

9     Q     And how long were you there?

10    A     Where?

11    A     Village Green.

12    A     I was there all day.

13    Q     Okay.  What were you doing there?

14    A     Well, I was there with a friend.

15    Q     Who?

16    A     It was Rodney.

17    Q     Rodney Williams?

18    A     Ah-huh.  And Snapper.

19    Q     Snapper?

20    A     Yes.

21    Q     That's his brother?

22    A     Yeah.

23    Q     Lesley is his name, isn't it?

24    A     I don't know his name.

25    Q     And were you there with Marcos as well?

                                                                    232

1    A      Marcos showed up later.

2    Q      How long were you at the Village Apartments?

3    A      I was there from -- I woke up there.

4           MR. OLIVAS:  Your Honor, I'm going to object to

5    this line of questioning.  This is beyond the scope of my

6    direct examination.

7           THE COURT:  Overruled.

8    Q      (BY MR. ESPARZA)  You can answer the question.  I

9    asked you how long you were there.

10   A      From about 12:00.

11   Q      12:00 in the afternoon?

12   A      Ah-huh.

13   Q      To?

14   A      They picked up Rodney and Snapper.  I was there to

15   about 6:00.

16   Q      Okay.  The police picked up Rodney and Snapper?

17   A      No.  Some detectives did.  We were going to play

18   basketball and two detectives came up and said they wanted

19   Rodney and Snapper for a burglary that had just happened

20   about an hour.

21   Q      Okay.  So, were you at Irvin playing basketball or

22   at the apartments?

23   A      Yeah.  We were just walking on our way to Irvin.

24   Q      And how long did you stay playing basketball?

25   A      Well, we didn't really stay playing.  As soon as

233

1    they got them, we went back to Village Green and tell the

2    mom.

3    Q     So, you went back to the Village Apartments?

4    A     Yeah, ah-huh.

5    Q     How long were you there?

6    A     We stood there for about -- 'till about like 7:00.

7    Q     And then what did you do?

8    A     And then we gave up waiting for Rodney and Snapper

9    to come back, so we just went home.

10   Q     Okay.  To 5700 Wren?

11   A     Ah-huh.

12   Q     What time did you arrive at home?

13   A     About 8:00 -- 8:30.

14   Q     And what did you and Marcos do?

15   A     Well, Marcos turned on the t.v. and then I got on

16   the phone.

17   Q     And who were you talking with?

18   A     To a friend of mine.

19   Q     Who?

20   A     Some girl named Helen -- Helen Galvan.

21   Q     Helen --

22   A     Galvan.

23   Q     I'm sorry.  What did you do?

24   A     We stood -- I stood on the phone with her talking

25   and watching t.v. and until that happened, I was in the

234

1   phone when they had come in.

2   Q   Where is the phone in relation to the front door?

3   A   It's just like -- it's just straight down.

4   Q   So, you saw them come in?

5   A   Huh?

6   Q   Who else was in the living room with you?

7   A   Marcos.

8   Q   And?

9   A   And that was it.

10  Q   Your dad wasn't home yet?

11  A   He was in the back.

12  Q   Where was he?

13  A   He was in his room.

14  Q   All right.  So, it was just you, Marcos and your

15  dad?

16  A   Yeah.

17  Q   Then what happened?

18  A   Well, we were watching -- I was watching the t.v.

19  and talking on the phone and then we see my mom's car come

20  up and as soon as we see the doors open, we see guys come

21  like from the side and that's when I thought they were

22  there to pick up -- that they were there 'cause of Snapper

23  and them -- that they were going to drop him off at our

24  house or something, but then they started flashing badges

25  at me when they came in.

                                                   235

1         They went straight for Marcos because they thought
2    Marcos lived there.  They went straight for him and then
3    that's when they told him he was under arrest and that's
4    when I was -- I was just freaking out and I stood there
5    and I asked them, "Why are you guys arresting him?"  And
6    they asked me for my name and I told them my name and
7    that's when they grabbed me.
8    Q      And they read Marcos his rights?
9    A      Yeah.  They read both of our rights.
10   Q      Okay.  And after they read your rights, you signed
11   the card, right?
12   A      No.  That was the right -- they signed the one over
13   there.
14   Q      Do you remember signing this card?
15   A      Yes.
16   Q      And you signed this card at 11:15 p.m.?
17   A      Yeah.
18   Q      Right?  That is your handwritten?
19   A      Yeah.
20   Q      And that's your date?
21   A      Yeah.
22   Q      And you knew it was 11:15 when you signed it,
23   right?
24   A      Yeah.
25   Q      Okay.  You were there at your house when you signed

236

1    it?

2    A      No.

3    Q      Where were you?

4    A      I don't remember 'cause they were just giving me

5    papers.  They never read me rights.  They were just giving

6    me papers to date and sign.

7    Q      You don't know whether or not you ever read this

8    card?

9    A      They never did read it to me.  They just made me

10   sign it.

11   Q      It's your statement that you just signed it and

12   that was it?

13   A      I didn't.  They just signed it.

14   Q      And they put you in the police car -- in the

15   detective's car and who was in that car?  Do you remember?

16   A      It was Marquez and I don't know who was driving.

17   Q      All right.  And according to your testimony, you

18   did not go directly to Juvenile Youth Services which is

19   next to the detention facility.  Do you know where that

20   place is?

21   A      The little white building?

22   Q      Right.  The little white building.  It's part of

23   the police station.

24   A      Ah-huh.

25   Q      It's where they take you if you're not an adult.

1    A    Ah-huh.

2    Q    So, we are talking about the same building?

3    A    (Indicating.)

4    Q    Okay.  They took you from your house and they took

5    you there?

6    A    No.

7    Q    No?  They took you in this route that you just

8    testified to?

9    A    Yeah.

10   Q    Do you remember what time you got to the little

11   white building -- the Youth Services Division?

12   A    No.  It was like probably an hour.  It was probably

13   an hour and a half to two hours afterwards.

14   Q    Do you remember talking with Mario Aguilera at the

15   detention facility?

16   A    Yeah.

17   Q    And you went from the Youth Services Division and

18   from there you walked over to the detention facility,

19   didn't you?

20   A    Yeah.

21   Q    And he asked you if you wanted to give a statement.

22   A    No.  He didn't tell me.  It was Marquez who was

23   doing all the talking.  He was just watching.

24   Q    So, when you heard Mr. Aguilera talk about how he

25   talked to you in a separate room, that was a lie?

238

1    A      No.  Well, that was when he just told me -- that

2    was when he was -- he was just telling me that they didn't

3    do nothing, but just, "What's his name?"  He never talked

4    to me except for what was my name.

5    Q      After you took this, you went to Droopy's house, I

6    guess, down Tetons.  You said they took you up on Raynolds

7    to the police station there?

8    A      No.  They took me down to the Five Points.

9    Q      To the Five Points up to where Montana is?

10   A      I guess if that's right.

11   Q      They took you over there?

12   A      (Indicating.)

13   Q      And then they found out that you were a juvenile,

14   so they put you back in the car and then you go to Youth

15   Services Division -- the little white building?

16   A      Ah-huh.

17   Q      And when you were there, they talked to you, they

18   did some paperwork and then they go to JPD, right?

19   A      Yeah.

20   Q      The detention facility?

21   A      Ah-huh.

22   Q      Okay.  And at the detention facility, it's your

23   testimony that Mr. Aguilera is incorrect when he says that

24   he talked to you separately to see if you wanted to give a

25   statement?

1    A      Yeah.   That was when he had asked me -- the

2    detectives just told me to tell them yeah.   Whenever they

3    say anything, you say yes and hurry up and come with us.

4    Q      So, they told you -- I'm sorry.   Go ahead.

5    A      So, he asked me for my name and he asked me, "Are

6    you going to go with the officer?"   And I said, "Yeah."

7    And then they left.

8    Q      He never asked you whether or not you wanted to

9    make a statement?

10   A      No.   Just "Are you going to go with the officers?"

11   Q      That's all he asked you?

12   A      Yeah.

13   Q      That took about a minute or two?

14   A      About five minutes.

15   Q      Max?

16   A      Yeah.

17   Q      But the only thing he got out of you was your name?

18   A      Yes.

19   Q      And that if you wanted to go with these guys?

20   A      He goes, "Your name?"   And I told him and so I

21   guess the officers had talked to him and then he said,

22   "Are you going to go with the officers?"   And I said,

23   "Yeah."   And then he said, "All right."

24   Q      And that was done in a separate room?

25   A      Yeah.   That was right there in the holding tank.

VILLEGAS v. CITY OF EL PASO - P002557

1    Q      Now, was it just you and Mr. Aguilera?

2    A      Yeah.

3    Q      The police were outside?

4    A      They were out in the front.

5    Q      And the door was closed?

6    A      Yes.

7    Q      And you had an opportunity, if you wanted to, to

8    tell Mr. Aguilera that they had been pushing you around or

9    whatever, right?  Threatening you?  You could have made

10   that statement to him, couldn't you?

11   A      No.

12   Q      You had the chance to tell them that, didn't you?

13   A      No.   If I would have told him when I came out, it

14   would have been worse.

15   Q      Mr. Aguilera didn't tell you that he was there to

16   make sure that you wanted to give a statement?

17   A      No.

18   Q      Never?

19   A      Never told me anything.

20   Q      All right.  After you said yes, then they took you

21   to the magistrate, right?

22   A      No.

23   Q      Didn't they take you over to see the Judge?

24   A      They took me -- oh, yeah.  Then they took me to see

25   the Judge and then they come back and did it again.

                                                        241

```
1    Q      Then you went and you talked to the Judge, right?
2    A      Yeah.
3    Q      And you had a chance there to tell the Judge that
4    they had been beating you up, threatening you and all
5    sorts of things?
6    A      No.
7    Q      Well, you were in the room with just you and the
8    Judge, right?
9    A      It would have been worse when I came out.
10   Q      But in your opinion, in the room just with you and
11   the Judge?
12   A      Yeah.  That's --
13   Q      I'm sorry.
14   A      That's not the fact.  Even if I was there alone
15   when I came out, it would have gone wrong.
16   Q      You didn't think that you could tell the Judge that
17   you needed help?
18   A      No, I didn't think so.
19   Q      Did you ever tell the Judge that you were sweating
20   bullets?
21   A      Huh?
22   Q      Did you tell the Judge that you were sweating
23   bullets?
24   A      No.
25   Q      At any time, you never told the Judge that?
```

242

1    A    No.  I just kept quite and was just scared and just
2    waited.
3    Q    All right.  After you're in there with the Judge
4    and he reads you the rights -- doesn't he read you the
5    rights?
6    A    Yeah.
7    Q    And you signed it, don't you?  He says, "Do you
8    understand?"  And you said that you did understand?
9    A    I guess.
10   Q    Right?
11   A    Yes.
12   Q    You told the Judge that?
13   A    Yeah.
14   Q    All right.  And then they release you back to the
15   police officers, right?
16   A    Ah-huh.
17   Q    You're not wearing handcuffs?
18   A    Yeah, I am.
19   Q    Oh, you are wearing handcuffs?
20   A    I was wearing handcuffs all the way through the
21   whole time I was handcuffed to where they came in and they
22   handcuffed me and they had them real tight.  I had scars
23   that -- the nurse had saw that there was scars from the
24   handcuffs with the red marks that they leave.
25   Q    So, you were handcuffed when you were with the

243

1    Judge?

2    A       Yeah.

3    Q       Did you ever tell the Judge, "Hey, loosen them up.

4    They're tight."

5    A       No.

6    Q       Did the Judge make you feel comfortable?  He never

7    made you feel uncomfortable?

8    A       No.  I wasn't really thinking about comfortable.  I

9    was just thinking -- just too scared worrying if they were

10   going to take me out and beat me or what the --

11   Q       And then you went back to the Youth Services -- to

12   the little white building?

13   A       Yeah.

14   Q       And you gave your statement?

15   A       Yeah.  That's when they started harassing me again.

16   Q       That's when they started pushing and hitting you

17   with his ring and all of that?

18   A       That's when he started again.

19   Q       Do you remember who was in the room when Detective

20   Marquez was pushing you up against the wall?  Who was

21   there?

22   A       There was two other detectives in there.

23   Q       Do you remember what they looked like?

24   A       No, but I remember one of them was from a gang task

25   force.

244

1    Q      How do you know that?

2    A      Well, 'cause he was talking about it.  He was like

3    -- 'cause when he was saying -- when I said Popeye's name,

4    he said, "You know Popeye's name?"  And that's when the

5    other detective said, "Don't worry.  I'm from the gang

6    task force" and he put it in the computer and that's when

7    he showed his name.

8    Q      After you gave the statement, did you sign the

9    statement right there?

10   A      Huh?

11   Q      After you made the statement, did you sign the

12   statement right there?

13   A      No.

14   Q      Where did you go then?

15   A      Then they took me back to the Judge.

16   Q      All right.  And then did you tell the Judge then

17   that you were sweating bullets?

18   A      No.

19   Q      You never said that?

20   A      No.

21   Q      All right.  And did you -- did the Judge ask you if

22   this was your statement?

23   A      Yeah.

24   Q      And you said what?

25   A      I said yeah.

1    Q      And did you -- did he ask you if you wanted to sign

2    it?

3    A      No. He said, "Okay. Sign here."

4    Q      So, he never said, "You don't have to sign it." He

5    never gave you that option?

6    A      No. He said, "Just sign it right here." And then

7    he said, "Is this your statement right there?" I said,

8    "Yeah." And then he said, "Then sign right here."

9    Q      And you signed it?

10   A      Yeah.

11   Q      Then you went where?

12   A      Then we went back to the -- well, from there,

13   that's when we went all the way -- that's when they

14   started driving me around again telling me -- that's when

15   -- 'cause we had just come from the juvenile, so they had

16   Popeye's address and all of that. They went over there

17   and asked me if that was his house.

18   Q      So, you went by and looked at Popeye's house?

19   A      Yeah. Then to Droopy's house and that's when they

20   were telling me about Droopy.

21   Q      And you pointed Popeye's and Droopy's house?

22   A      Yeah.

23   Q      That's when it actually happened in northeast?

24   A      They did it before and this is -- they were telling

25   me that this was just -- this was a -- 'cause when

1    Popeye's house -- we didn't -- I didn't know where he

2    lived.   They didn't know the address.   All they knew was

3    that he lived on Tetons.   That's when we went down there

4    and Droopy's, they didn't point to the house.   We just

5    passed by the house.

6    Q      And it's your testimony that that's when they

7    showed you Marcos' statement?

8    A      Yeah.

9    Q      You saw his signature?

10   A      Ah-huh.

11   Q      How do you know you saw his statement?

12   A      Because they were saying, "That's your friend,

13   Marcos' statement.   This is Marcos' statement."

14   Q      And that's really when this whole driving around

15   happened out in northeast, right?

16   A      No.

17   Q      On State's Exhibit Number 3, is this your signature

18   here?

19   A      Yeah.

20   Q      And you signed this when the Judge read you -- when

21   he explained your rights to you?

22   A      Yeah.

23   Q      And you indicated when you signed this that you

24   understood your rights?

25   A      No.   I just signed it.

247

1    Q     And when you did this -- when you signed here, you

2    understood that -- you said up here that you were

3    acknowledging and you were saying that this was your

4    statement and you signed it here?

5    A     Yeah.  But that wasn't the statement.  This is --

6    they put -- what they read me was not this.  What it says

7    right here is not what I said.

8    Q     So, you actually made another statement?

9    A     Huh?

10   Q     You made another statement?

11   A     Yeah, but they didn't put that in the file because

12   they crumpled it.

13   Q     So, he typed up another statement?

14   A     Yeah.  He typed it up and threw it away because he

15   said that wasn't the truth.  That's when he did this one.

16   Q     And that's when you did this one?

17   A     Right.

18   Q     And that's when he types up this whole thing,

19   right?

20   A     Ah-huh.

21   Q     And then this statement here, that's yours?

22   A     Yeah.

23   Q     Can you read that for me?

24   A     "I have read the above statement consulting (sic)

25   of two pages and even through (sic) it is not in my exact

248

```
1    words, I find to be true and correct."
2    Q    And you signed it right here?
3    A    Yeah.
4    Q    And you did that in front of the Judge?
5    A    Ah-huh.
6    Q    Right?
7    A    (Indicating.)
8    Q    Who was it that took your previous statement?
9         THE COURT:  You need to answer that question.  We
10   can't take down nods.  Did you sign that in front of the
11   Judge?
12   A    Yes.
13   Q    (BY MR. ESPARZA)  And who was it that took your
14   first statement and crumpled it all up?
15   A    The same one who took the second one -- Marquez.
16   Q    And what did that first statement say?
17   A    That Rodney had shot.
18   Q    That Rodney had done the shooting?
19   A    Ah-huh.
20   Q    And that was the truth?
21   A    Huh?
22   Q    That was the truth?
23   A    No.
24   Q    But, you said that Rodney Williams had done the
25   shooting.
```

1    A      Yeah.

2    Q      What else did that first statement say?

3           MR. OLIVAS:  Your Honor, we are getting into the

4    area beyond the scope of direct.

5           We are getting into the area of the facts of the

6    case.

7           Indeed, this is simply to tell whether his rights

8    were violated in obtaining the confession.

9           THE COURT:  Response?

10          MR. ESPARZA:  Your Honor, the defendant has said

11   that there was a first statement made before the second

12   statement was made and that the police officer who took

13   that statement threw it away.

14          I think it goes to the credibility of the police

15   officers.

16          I want to know what statement it was that was

17   thrown away so that I can question the police officer as

18   to whether or not that was done.

19          I think they have opened the door by putting him on

20   the stand and I'm entitled to inquire through the entire

21   process of what was done and what was said.

22          It would be as if I would be allowed to go line by

23   line to make sure that what he said here was either a true

24   or false statement that was made that happened in the

25   course of taking the statement and I think the State is

250

```
1    permitted to question that area.
2         MR. OLIVAS:  Your Honor, I don't believe -- first
3    of all, the detective is his witness and they can ask him
4    those questions freely any time they want.
5         I do not believe that by an answer elicited by him
6    we are opening the door.  It was clearly understood that
7    this was simply for the limited purposes of how they
8    obtained the statement that we are trying to suppress
9    today.  That being State's Exhibit Number 3.
10        THE COURT:  Overruled.
11   Q    (BY MR. ESPARZA)  So, tell me what you put in the
12   first statement.
13   A    Just that Rodney had -- that Rodney came -- he had
14   it and then I wasn't in the car.  I had just seen him and
15   the gun and go --
16   Q    That you weren't in the car and that Rodney had the
17   gun?
18   A    And him and he left with some black guys to go and
19   then they came back and took us to the store.
20   Q    All right.  Why don't we -- let's go through the
21   first statement kind of carefully.
22        MR. OLIVAS:  Your Honor, may I consult with my
23   witness?  I'm going to advise him to invoke his Fifth
24   Amendment privileges against any further testimony.  If
25   this won't stop, that's the way I'm going to do it.
```

VILLEGAS v. CITY OF EL PASO - P002568

1          THE COURT:  Well, we are not going through his

2    statement line by line.

3          MR. OLIVAS:  But Your Honor --

4          THE COURT:  Just a minute.  Just a minute.  You

5    have already gotten him to testify as to what he said in

6    that statement.  I'm not going to allow you to go through

7    it line by line.

8          MR. ESPARZA:  Your Honor, if I may, I think I'm

9    entitled to cross him in detail as to each and everything

10   he has done in making the statement.

11         He has put the defendant on and waived his Fifth

12   Amendment by putting him on the stand.

13         The defendant, on his own, elicited the fact that

14   he made a first statement and that it was thrown away.

15         I think the State is entitled to cross-examine him

16   in detail so we can figure out just exactly what version

17   he's relying on.

18         Obviously, he gave a statement the first time that,

19   I assume, was not coerced and that was what he said

20   happened.

21         And now he gave a second statement that he signed

22   when he put the defendant on.

23         He is opened to cross-examination in every area

24   that he inquired and the area that he inquired on was how

25   the confession was taken.

VILLEGAS v. CITY OF EL PASO - P002569

1     That doesn't mean just how this happened because

2  obviously, from the defendant's own words, this statement

3  was generated as the result of a first statement that was

4  thrown away and we are entitled to cross-examine on that

5  area.

6     MR. OLIVAS:  Forgive me, Your Honor, but we are

7  trying to suppress Defendant's (sic) Exhibit Number 3 and

8  I would be remiss of my duties toward my client if I do

9  not advise him to invoke the Fifth Amendment privilege and

10  no longer testify.

11     THE COURT:  Let's take a recess.

12               (A recess was taken at this time.)

13               (Thereupon, the following proceedings

14                continued:)

15     THE COURT:  All right.  What I need to ask you is

16  what is your question of the defendant?  State your next

17  question.

18     MR. ESPARZA:  My next question is, you say that

19  Rodney Williams -- you said on the first statement that

20  Rodney Williams is the one that fired the gun; is that

21  true?

22     MR. OLIVAS:  Your Honor, same objection.

23     THE COURT:  Overruled.

24  Q     (BY MR. ESPARZA)  I couldn't hear you.  You have to

25  speak up into the mike.

253
VILLEGAS v. CITY OF EL PASO - P002570

1    A       Yeah.

2    Q       And you say that -- in your first statement, you

3    put in there that he was there with -- that he had gone

4    with some black guys and done it.

5    A       Yeah.

6    Q       Right.   What else did you say in that statement?

7            MR. OLIVAS:   Your Honor --

8    A       I don't remember that much.

9            MR. OLIVAS:   Danny, stop.   I'm going to object to

10   the line of questioning.   Again, it's going into the area

11   of the guilt or innocence of this individual.   Not to the

12   issue of suppression of State's Exhibit Number 3.

13           THE COURT:   Overruled.

14           MR. OLIVAS:   Five.

15   Q       (BY MR. ESPARZA)   Who else did you say?

16   A       The Fifth Amendment.

17           MR. OLIVAS:   Your Honor, we are invoking our Fifth

18   Amendment privilege against self-incrimination and we will

19   no longer testify.

20           MR. ESPARZA:   Your Honor, I don't believe he has a

21   Fifth Amendment Right at this point.   He's --

22           THE COURT:   Well, let me ask both of you -- just a

23   minute.   Just a minute.   Let me ask both of you.   These

24   are allegedly oral statements made by the defendant.   Are

25   you seeking to suppress them also?   Is there going to be

254

1    an issue of the admissibility of these statements at trial

2    also?

3         MR. OLIVAS:  Yes, Judge.

4         THE COURT:  Well then, he's entitled to ask what

5    the statements are.

6         MR. OLIVAS:  We weren't aware that these statements

7    existed, Judge.  Frankly.

8         THE COURT:  We are just hearing them from your

9    client's mouth.

10        MR. OLIVAS:  Absolutely.

11        THE COURT:  So, you weren't aware of them?

12        MR. OLIVAS:  That's correct.

13        THE COURT:  All right.  Well, he's entitled to ask

14   what the statements are.

15        MR. OLIVAS:  We are invoking our Fifth Amendment

16   privilege.  If the Court is insisting on continuing.

17        THE COURT:  Just a minute!  Just a minute!

18        MR. OLIVAS:  We will just invoke --

19        THE COURT:  Just a minute!  Suppression hearings

20   are for the specific purpose for me to rule whether or not

21   statements are admissible or not.

22        MR. OLIVAS:  That's correct, Judge.

23        THE COURT:  Whether they be written or whether they

24   be oral.

25        MR. OLIVAS:  That's correct, Your Honor.

1          THE COURT:  If he's made any incriminating
2     statements --
3          MR. OLIVAS:  We --
4          THE COURT:  Just a minute!  If he has made any
5     incriminating statements, I have to hear about them and
6     rule whether or not they are admissible.
7          MR. OLIVAS:  Your Honor --
8          THE COURT:  You're saying now that I can't even
9     know what they are, but I have to rule they're
10    inadmissible without knowing what they are?
11         MR. OLIVAS:  No, no.  I misspoke.  I'm saying I had
12    no clue these statements existed, frankly, and I misspoke
13    saying we are seeking to suppress those.  Frankly, they're
14    not even inculpatory in his part.
15         THE COURT:  Then how can he claim his Fifth
16    Amendment Right if they're not incriminating?  If they're
17    not inculpatory?
18         MR. OLIVAS:  I don't know where he's headed.  I
19    don't know.  Wait.  I do know where he's headed.  Sure.  I
20    know where he's headed and I will not allow it.  He has
21    invoked his Fifth Amendment.
22         THE COURT:  Where is he headed then?
23         MR. OLIVAS:  Clearly to what was said, what he did,
24    and how he is implicated in this proceeding.  We have
25    invoked our Fifth Amendment.

                                              256

1       THE COURT:  He is asking him about the statement he
2  gave the detective.
3       MR. OLIVAS:  I respectfully disagree.
4       THE COURT:  I have not given him free reign to come
5  in here and ask him if all of these statements are true or
6  not true.  I have not given him that permission.
7       MR. OLIVAS:  Your Honor --
8       THE COURT:  Now, if you are objecting to any ques-
9  tion he has about the truth of those statements, I'll rule
10  on that.  He is asking him what statements were made.
11       MR. OLIVAS:  That's correct, Your Honor.
12       THE COURT:  And you're objecting to the statements
13  he made to the police officer for what reason?
14       MR. OLIVAS:  Because those are not in issue in the
15  suppression.
16       I respectfully disagree with the Court, but those
17  are not in issue.
18       This is not a fact-finding proceeding.  This is not
19  a fishing expedition which he's trying to conduct.
20       We have invoked our Fifth Amendment privilege and
21  if the Court is suggesting that --
22       THE COURT:  Well then, if you're not going to allow
23  him to testify to what he said, I'm going to have to rule
24  that everything he said is admissible at Court because I
25  have no idea what he said.  I have no way to rule on the

1    specifics of it.

2         MR. OLIVAS:  Your Honor, our Fifth Amendment

3    privilege is invoked henceforth from this point on.

4         THE COURT:  Fine.  They will all be admissible at

5    trial.  Then everything he said to the detective --

6         MR. OLIVAS:  That's fine, Judge.

7         THE COURT:  -- will be admissible at trial.

8         MR. OLIVAS:  That's fine.  I think that the Court

9    is committing an injustice.  I think that the Court is

10   strong arming --

11        THE COURT:  I don't like the laws.

12        MR. OLIVAS:  I think the Court is strong arming the

13   defense and you are holding an apple and a carrot and

14   saying, "Okay.  Go ahead and invoke it and I will just

15   submit everything."

16        THE COURT:  Fine, Mr. Olivas.  I have never had a

17   lawyer come in and ask me to rule on admissibility of

18   evidence -- inculpatory evidence -- and have them stand up

19   and say, "But Judge, I don't want you to know what that

20   evidence is, but I'm objecting to it."  I have never had

21   anyone do that, Mr. Olivas.

22        MR. OLIVAS:  Forgive me.

23        THE COURT:  And I don't understand your rationale

24   for it -- your legal basis.

25        MR. OLIVAS:  Your Honor, my rationale is this.

1    This child doesn't know when to stop talking and we don't

2    know what he's going to say and I will not risk him saying

3    anything.

4         THE COURT:   Well, the objection has been overruled.

5    Ask your question.

6    Q    (BY MR. ESPARZA)   What else did you say?

7         MR. OLIVAS:   Do not speak.

8         MR. ESPARZA:   Your Honor, I would ask the Court to

9    hold the defendant in contempt.   I don't believe he has a

10   Fifth Amendment.

11        THE COURT:   Ask your next question.

12        MR. ESPARZA:   Your Honor, may I finish my statement

13   just so that I can put it in the record?

14        THE COURT:   Go ahead.   Put it in the record.

15        MR. ESPARZA:   He's waived his Fifth at the time he

16   disclosed these statements to police officers and for him

17   now to claim his Fifth here in Court is improper.

18        I mean, it has nothing to do with this hearing.

19   Obviously, if what he says is true is that he's already

20   told law enforcement these statements which means he's

21   already incriminating himself, if they are incriminating

22   and he has no Fifth and if he refuses to answer them, and

23   I will continue asking him questions, the State is going

24   to take the position and ask the Court to hold the

25   defendant in contempt for failing to answer the State's

1    questions when he has no Fifth Amendment Right.

2            THE COURT:  Ask your next question.

3    Q       (BY MR. ESPARZA)  How many individuals were

4    involved in the shooting did you say in your first

5    statement?

6            MR. OLIVAS:  Objection, Your Honor.  We have

7    invoked our Fifth Amendment privilege.  He has clearly

8    stated on the record his Fifth Amendment.  If this is

9    going --

10           THE COURT:  You can't answer for him.

11           MR. ESPARZA:  Your Honor, I would ask for the

12   defendant to answer for the record --

13           THE COURT:  The defendant must answer the question.

14           MR. OLIVAS:  Your Honor, if the Court --

15           THE COURT:  Ask your next question.

16   Q       (BY MR. ESPARZA)  What kind of car -- what kind of

17   cars did you say Rodney Williams was in at the time he did

18   the shooting?

19   A       Fifth Amendment.  Fifth Amendment.

20   Q       How many people did you tell the police were in the

21   car at the time of the shooting?

22   A       Fifth Amendment.

23   Q       Do you remember whether or not you told them

24   exactly the location of the shooting?

25   A       Fifth Amendment.

VILLEGAS v. CITY OF EL PASO - P002577

1     MR. ESPARZA:  Your Honor, the State asks that you
2   hold this witness in contempt for improperly asserting his
3   Fifth and refusing to answer the State's questions.

4     THE COURT:  I'm going to take it under advisement.
5   Go ahead and go to another area.

6     MR. OLIVAS:  Your Honor, if the Court is going to
7   find him in contempt, we would ask that the Court issue an
8   order for show cause.

9     THE COURT:  I said I would take it under
10  advisement.

11    MR. ESPARZA:  Your Honor, I don't think you can
12  take -- I don't think you can take your Fifth in the
13  middle of cross examination and then after we get out of
14  the area that you didn't -- that you're unhappy about --
15  go ahead and keep answering the State's questions.

16    You know, this is cross-examination.  He has gotten
17  up here and made a statement about a first statement.  We
18  are entitled to know that.

19    It's very hard to cross-examine him knowing that
20  there are other things that I guess he's aware of and the
21  State will never know.

22    THE COURT:  I understand your argument.

23    MR. OLIVAS:  Your Honor --

24    THE COURT:  Just a minute!  Just a minute, please.
25  I understand your argument.  I have already asked you to

261

1   move on to another area.

2          If you have any other questions, you may ask them.

3   If you don't have any questions, you may pass the witness.

4          MR. OLIVAS:   Your Honor --

5          MR. ESPARZA:   Let me have a moment, Your Honor.

6   Your Honor, I object to the defense counsel talking to the

7   witness while I am in the middle of cross-examination.

8          THE COURT:   Overruled.

9   Q     (BY MR. ESPARZA)   Now, after you wrote State's

10  Exhibit Number 3 and you signed State's Exhibit Number 3,

11  you went back to the magistrate, didn't you?

12  A      Yeah.

13         MR. ESPARZA:   Your Honor, I believe the fact that

14  he answered this question and did not take his Fifth

15  permits me to go back to the area that you asked me to

16  pass on.

17         MR. OLIVAS:   Your Honor --

18         THE COURT:   Ask your next question.

19         MR. OLIVAS:   For the limited purpose --

20  Q     (BY MR. ESPARZA)   How many individuals did you say

21  were in the car in your first statement?

22  A      Fifth Amendment.

23         MR. OLIVAS:   Your Honor, this thing is not going

24  anywhere.   If the D.A. continues, we will defer to the

25  Court's ruling.

VILLEGAS v. CITY OF EL PASO - P002579

1       THE COURT:  I have already taken it under

2   advisement.

3   Q       (BY MR. ESPARZA)  And did you tell them in your

4   first statement where the shooting occurred?

5   A       Fifth Amendment.

6       MR. ESPARZA:  All right.  Your Honor, just for the

7   record, I'm going to move on, but I will tell the Court

8   and the Appellate Court, which I assume we will eventually

9   get there, if allowed to inquire in this area, I would ask

10  him, in a very detailed way, just exactly what he said in

11  his first statement.

12      Not only to determine what statements were made,

13  but also to determine whether or not those statements were

14  made freely and voluntarily as opposed to what is

15  generated into State's Exhibit Number 3, I believe, which

16  is the written statement, but also to know whether or not,

17  now that he's on the stand, believing that we had wide

18  open cross-examination because they opened this area, but

19  to know exactly where I can go in relation to further

20  questioning.

21      I am going to proceed, but I am proceeding under

22  the impediment that I have not been allowed to question

23  him in a very critical area.  That's just for the record,

24  Your Honor.

25      THE COURT:  All right.  It is on the record.

263

VILLEGAS v. CITY OF EL PASO - P002580

1    Q      (BY MR. ESPARZA)  You went back to the magistrate

2    after you signed that statement; is that true?

3    A      Yeah.

4    Q      I'm sorry.  I couldn't hear you.

5    A      Yeah.

6    Q      And then the Judge talked to you, didn't he?  Did

7    he or did he not talk to you?

8    A      Yeah.

9    Q      And he asked you if this was your statement?

10   A      True.

11   Q      Whether those were your words?

12   A      Yes.

13   Q      And whether or not you had read it?

14   A      Yes.

15   Q      And whether or not you wanted to sign it?

16   A      Yeah.

17   Q      And to each and every one of those questions, you

18   said yes?

19   A      Yes.

20   Q      You never told him about the fact that you had made

21   a statement in writing and that the police officers had

22   destroyed it, did you?

23   A      No.

24   Q      You never told him that the statement that you

25   signed there -- the one that's before you -- that that is

264

1      a second statement, did you?

2      A       Excuse me?

3      Q       You never told anyone that that was your second

4      statement, did you?

5      A       Yeah.

6      Q       Yeah?

7      A       Yes, sir.

8      Q       You did tell the Judge that?

9      A       No, I didn't.

10     Q       You didn't tell the Judge that?

11     A       (Indicating.)

12     Q       All right.  And it would be fair to say that for

13     the very first time, everyone in this room is hearing, not

14     only your lawyer, but everyone that there are two

15     statements?

16             MR. OLIVAS:  Your Honor --

17     A       Fifth Amendment.

18             MR. OLIVAS:  Your Honor, he is straddling.  If he's

19     going to continue doing this, we will just invoke the

20     Fifth Amendment and that will be the end of it.  If he's

21     going to limit his questioning --

22             THE COURT:  Overruled.

23     Q       (BY MR. ESPARZA)  The answer is?

24     A       Fifth Amendment.

25     Q       What is the answer?  The question is, you never

1    told anyone, not even your lawyer, that there were two

2    statements and that the first one was destroyed?

3           MR. OLIVAS:  You can answer it.

4    A     Yeah.

5    Q     (BY MR. ESPARZA)  You never told anyone?

6    A     Yeah.

7    Q     You did tell anyone?

8           MR. OLIVAS:  Your Honor --

9    A     You never told anyone?

10          MR. OLIVAS:  Say five.

11   A     Fifth Amendment.

12   Q     (BY MR. ESPARZA)  And you have had over a year and

13   a half now not only to tell your lawyer, but anybody else

14   that Detective Marquez destroyed that first statement; is

15   that true?

16          MR. OLIVAS:  Your Honor --

17   A     Fifth Amendment.

18          MR. OLIVAS:  Objection.  And we will have a running

19   objection as to the incessant questioning.

20          THE COURT:  All right.  For the record, let the

21   record also reflect that defense counsel is nodding his

22   head up and down, sideways, moving his hands.

23          I don't know if you're indicating answers or

24   whether or not he can't answer, but you're making a lot of

25   gestures and he's been looking at you and I'm not

266

VILLEGAS v. CITY OF EL PASO - P002583

1   understanding.

2          MR. OLIVAS:  I'm simply advising him when to invoke

3   his Fifth Amendment rights.  He agreed to limit his

4   questioning.  He lied.

5          THE COURT:  What is your objection to the last

6   question?

7          MR. OLIVAS:  My objection to the last question is

8   one, it's beyond the scope of direct examination and two

9   --

10         THE COURT:  It's the same question all over again.

11  He asked him, "Did you have a year and a half to tell

12  anyone?"  It's the same question and you have allowed him

13  to answer it.  Answer the question.

14         THE WITNESS:  Fifth Amendment.

15         MR. OLIVAS:  Counsel is officially notifying his

16  client to invoke his Fifth Amendment privilege.

17         MR. ESPARZA:  Your Honor, the defendant has

18  responded to that last question.

19         MR. OLIVAS:  Say what I told you this morning.

20         THE WITNESS:  Fifth Amendment.

21         MR. ESPARZA:  To assert his Fifth Amendment at this

22  time, I believe is improper.

23         THE COURT:  All right.  That's all part of the

24  record that we are going to bundle up and have me take

25  under advisement.

1      MR. ESPARZA:  Just for the record, Your Honor, the

2  State is asking the Court to hold him in contempt for as-

3  serting his Fifth and not answering the State's questions.

4      THE COURT:  I understand.

5  Q    (BY MR. ESPARZA)  Did you ever tell the magistrate

6  that you were sweating bullets?

7  A    No.

8  Q    So, when you talked to the magistrate, you were not

9  nervous?

10 A    Yeah, I was.

11 Q    You were?  You never told him that?

12 A    I never did.

13 Q    You never told him you were scared?

14 A    No.

15 Q    You never told him that you had been pushed around?

16 A    No.

17 Q    But you understood, didn't you, that the magistrate

18 was there to find out whether or not you wanted to make a

19 statement and that was the reason he was asking you those

20 questions; isn't that true?

21 A    (Indicating.)

22 Q    I'm sorry.  I didn't get your response.

23 A    No.

24 Q    You never understood that?

25 A    (Indicating.)

VILLEGAS v. CITY OF EL PASO - P002585

1    Q      The police were not in that room, were they?  When

2    you talked to the magistrate?

3    A      No.

4    Q      And you weren't wearing handcuffs, were you?

5    A      Yeah, I was handcuffed.

6    Q      You were handcuffed when you went and talked to the

7    Judge?

8    A      (Indicating.)

9    Q      All right.  After the Judge -- after you talked to

10   the Judge, you signed the statement and then you went out

11   into the northeast to find Droopy and Popeye's homes?

12   A      Yeah.

13   Q      Okay.  And then they left you at the detention

14   center?

15   A      Yeah.

16   Q      Okay.

17   A      Yes, sir.

18          MR. ESPARZA:  Your Honor, I don't want to insult

19   the Court, so I'm just going to ask this question for the

20   record.

21          If I asked him about his first statement, I would

22   ask him whether or not he had an opportunity to read it

23   before it was destroyed.

24          I would ask him who was the officer who actually

25   destroyed it.

269

1        I would ask him at what point in time was the
2     statement made and at what point in time in relation to
3     the statement that we have now which I believe is -- just
4     so I'm clear -- State's Exhibit Number 3.
5        When State's Exhibit Number 3 was generated, how
6     much time had passed between the statement he wrote and
7     was tossed in the garbage can.
8        THE COURT:  Do you have any objections to that line
9     of questioning which is the mechanics of the first
10    statement?
11       MR. OLIVAS:  No, I don't, Judge.
12    Q    (BY MR. ESPARZA)  Who was the officer who destroyed
13    the statement?
14    A    Marquez.
15    Q    And when he destroyed the statement, who else was
16    in the room?
17    A    I don't remember.
18    Q    You don't remember if anyone else was in the room
19    or not?
20    A    I don't remember.
21    Q    And you had been taking that first statement for
22    some time, right?
23    A    (Indicating.)
24    Q    It took him a little while, right?  He obviously
25    was typing it while you were talking, right?

1    A      Well, it wasn't a full statement.  It wasn't even
2    like that.  It was just -- he just stopped doing it.
3    Q      But, he had written something down?
4    A      Yeah, just my name.
5    Q      Oh.  Well, let's get real clear here now on just
6    exactly what happened here.  So, when he asked you what
7    happened, you were telling him that Rodney did the
8    shooting?
9    A      Yeah.
10   Q      Right?
11   A      (Indicating.)
12   Q      And then he was getting the details of what was
13   happening, right?
14   A      Yeah.
15   Q      He was getting the details of what happened at the
16   shooting, right?
17   A      No.
18   Q      Well, you earlier said something about -- you told
19   him something about some black guys.
20   A      That they left.  He left.  I was there.
21   Q      That who left?
22   A      That they all left.
23   Q      Who?
24          MR. OLIVAS:  Your Honor, may I interrupt?  We will
25   not object to the mechanics of how that statement was

271

1    obtained if that statement existed.

2         We won't object to that.  We will object to the

3    details of that statement.

4         MR. ESPARZA:  Your Honor, the problem is I want to

5    get into the mechanics of it.

6         His objection has been very inconsistent and his

7    assertion of the Fifth Amendment Right has been extremely

8    inconsistent and I'm afraid if the Court reviews -- I'm

9    afraid when the Court reviews the record, your position is

10   going to be, well, he answered this and he answered this,

11   so yeah, he didn't really assert his Fifth because it's so

12   inconsistent, so if he's going to be inconsistent, I'm

13   going to go into this area and see when he asserts his

14   Fifth and when he doesn't assert his Fifth.  There has

15   been no consistency on the part of the defendant to answer

16   these questions and I'm afraid your position will be,

17   well, look.  I know he asserted his Fifth, but actually,

18   the State was allowed to inquire into this area and gather

19   information and so it's not like he really asserted his

20   Fifth and so I'm going back into this area because I have

21   no idea when he's going to assert his Fifth or not.  I

22   don't mean to belabor the point here, but that's why I'm

23   going back into this point.

24        MR. OLIVAS:  Everybody, Your Honor, we will solve

25   everyone's problem now and invoke the Fifth.  Danny, sit

                                                          272

1    down over here.

2           THE COURT:  No, sir.  No, sir.  You stay right

3    where you are.  The questions that you are -- that you

4    have just asked him, it's in the same area.  I'm taking it

5    all under advisement.  If you have other questions, ask

6    other questions.

7    Q       (BY MR. ESPARZA)  All right.  After he threw away

8    the statement, he just chucked it -- he just threw it away

9    and then what did he do?  Did he put a new piece of paper

10   in the typewriter?

11   A       Yeah.

12   Q       And then he started all over?

13   A       Yes.

14   Q       And at no time did you ever request to stop the

15   interview?

16   A       No, I couldn't.

17   Q       Well, sir, listen to my question.  Was your answer

18   no, you never did?

19   A       (Indicating.)

20   Q       You never asked for a lawyer?

21   A       Uh-huh.  No.

22   Q       What's your answer?

23   A       No.

24          MR. ESPARZA:  I have nothing further, Your Honor.

25   Except that the State does request to inquire into the

1   area of the first statement and to inquire in detail.

2   With that, I pass the witness.

3           MR. OLIVAS:  We have nothing further, Your Honor.

4           THE COURT:  You may step down.

5           MR. ESPARZA:  And now I would urge my motion, Your

6   Honor, to hold the defendant in contempt for refusing to

7   answer the State's questions.

8           MR. OLIVAS:  Your Honor, defense rests.

9           THE COURT:  You're resting?

10          MR. OLIVAS:  Yes, we are.  We would ask the Court

11  for leave to brief this particular proceeding.

12          THE COURT:  Do you have any other witnesses that

13  you're going to present in rebuttal other than the issue

14  of the Fifth Amendment and the contempt request?

15          MR. ESPARZA:  Your Honor, I need -- as I had

16  earlier explained it to counsel for the defense, Judge

17  Horkowitz had made a statement subsequent to our hearing

18  yesterday.

19          I'm going to put him on for that and Detective

20  Marquez on the stand to rebut the statements made by the

21  defendant.

22          THE COURT:  All right.  Call in Judge Horkowitz.

23          MR. OLIVAS:  Your Honor, I would serve notice on

24  the State that should Marquez take the stand and deny the

25  allegations -- deny that he followed those procedures as

1    spelled out by the El Paso Police Department and the

2    Crimes Against Persons, we will pursue cross-examination

3    of Mr. Marquez and we will then put on our expert

4    witnesses -- specifically two other attorneys in town that

5    will testify as to the veracity of Marquez.

6          MR. ESPARZA:  I don't know what that means, Judge.

7          THE COURT:  Putting him on notice?  I didn't know

8    we had expert witnesses for veracity.

9          MR. OLIVAS:  No, no.  For the following of

10   procedures.  It's been a long day, Judge.

11         THE COURT:  All right.  Judge come on over here.

12   You're our next witness.  You were sworn in yesterday.

13   You remain under oath.

14         THE WITNESS:  Thank you.

15                    DIRECT EXAMINATION

16   BY MR. ESPARZA:

17   Q    Judge, I apologize for having to bring you back

18   today.  I know that you work all night and you're here

19   today.

20   A    That's no problem.

21   Q    Would you just state your name for the record?

22   A    Carl Horkowitz.

23   Q    And you are the same Carl Horkowitz that testified

24   yesterday?

25   A    That's correct.

1    Q       Yesterday after the hearing, I believe in response

2    to one of my questions, I asked you how you remembered

3    this particular defendant and what was your response?

4    A       Well, I remember his face.  I don't remember

5    exactly what I told you yesterday.

6    Q       Do you remember whether or not, while you were

7    giving him his warnings, he said something?

8    A       Yes, he did.  He made an off-hand statement -- a

9    voluntary statement.

10   Q       And what did he say to you?

11   A       He said, "I'm sweating bullets."

12   Q       And do you remember whether or not he said that to

13   you the first time you read him his warnings or the second

14   time?

15   A       No, I don't.

16   Q       Okay.  And what did you take that statement to

17   mean?

18   A       Well, I thought it was an admission of guilt.

19   Q       Did he ever, at any time, tell you -- well, as a

20   result of that statement, were you concerned that maybe

21   what he was doing was not free and voluntarily?

22   A       No.

23   Q       Is it still your opinion that he signed those

24   statements knowingly and intelligently and voluntarily?

25   A       That's correct.

1           MR. ESPARZA: All right. I have nothing further,
2      Your Honor.
3           MR. OLIVAS: I don't have any questions.
4           THE COURT: All right. May he be excused?
5           MR. ESPARZA: We have no objection, Your Honor. We
6      would ask that the Court excuse him.
7           MR. OLIVAS: I have no objection.
8           THE COURT: Thank you. You may be excused. How
9      long is your presentation with Officer Marquez?
10          MR. ESPARZA: You know, Judge, if I could have just
11     a moment recess, I will let you know.
12          THE COURT: All right. Let me know.
13                    (A recess was taken at this time.)
14                    (Thereupon, the following proceedings
15                    continued and an off-the-record
16                    discussion took place at this time:)
17          THE COURT: Let's just take a recess for lunch.
18          MR. OLIVAS: Your Honor, I have one witness. His
19     testimony will be 30 seconds.
20          MR. ESPARZA: This is the sculptor, I bet.
21          MR. OLIVAS: Yes. This is the sculptor, Luis
22     Villegas.
23          THE COURT: Do you have any objection to him taking
24     him out of turn?
25          MR. ESPARZA: No, let's do it.

                                                        277

1          MR. OLIVAS:  Your Honor, the defense calls Luis

2     Villegas.

3          THE COURT:  Come on up here, sir.  Raise your right

4     hand.

5                        LUIS VILLEGAS,

6     having been called as a witness by the defendant, after

7     having been duly sworn by the Court, was examined and

8     testified, as follows:

9          THE COURT:  Please be seated.

10                     DIRECT EXAMINATION

11    BY MR. OLIVAS:

12    Q    Please state your name and address for the record.

13    A    Luis Villegas, 3619 Aurora.

14    Q    What is your occupation, sir?

15    A    I'm unemployed at the time.

16    Q    Do you practice a specific art form?

17    A    I'm a sculptor and painter.

18    Q    Sculptor of what?

19    A    I do the human figure.  I do abstract.

20    Q    And you also paint?

21    A    Correct.

22    Q    Now, you have the last name of Villegas.  Are you

23    related to Daniel Villegas or Mrs. Villegas in any way?

24    A    Not at all.

25    Q    It's just a simple coincidence?

278

1    A       Correct.

2    Q       Okay.  Sir, do you remember -- I will call your

3    attention to the evening of 21 April 1993 of last year.

4    Do you recollect that evening?

5    A       Yes, I do.

6    Q       And how is it that you remember that night?

7    A       Well, I had asked Brisa to model -- to get a face

8    model and they came over and we did that cast that day.

9    Q       Who took Brisa?

10   A       Yolie.

11   Q       Is that the Yolie -- are you meaning Yolanda?

12   A       Yolanda, yes.

13   Q       What time was it in the evening?

14   A       I know it was dark.  It would have to have been

15   between 5:30 and 6:00.

16   Q       Do you know what time they left your house?

17   A       They were there -- they would have had to be there

18   a minimum of three or three and a half hours.

19   Q       So, is it a fair statement to say they left around

20   9:30 or 9:45?

21   A       Correct.

22           MR. OLIVAS:  Okay.  I have no further questions.

23           THE COURT:  Any questions?

24                        CROSS EXAMINATION

25   BY MR. ESPARZA:

279

1    Q    Sir, you don't really know what time they left, do

2    you?

3    A    I'm approximating that -- considering the time that

4    we would have to complete that project.

5    Q    Okay.  It could have been around 10:30?

6    A    It could have been around 10:00 -- 10:00 or 10:30.

7    Q    You're not sure?

8    A    It would have taken them a minimum of three hours

9    to be there for them to stay there and for me to go

10   through the process of making the face mask, so I'm saying

11   if it were dark and it was 5:30 or 6:00 o'clock, it would

12   be about 9:00 or 9:30.

13        MR. ESPARZA:  I don't have any further questions,

14   Your Honor.

15        THE COURT:  All right.  May this witness be

16   excused?

17        MR. OLIVAS:  Yes, Your Honor.

18        THE COURT:  Any objection?

19        MR. ESPARZA:  No, Your Honor.  I'm sorry.

20        THE COURT:  All right.  Thank you very much.  You

21   may be excused.  All right.  If I could have everyone back

22   here at 1:30.  No.  Make it 1:45.

23                    (The lunch recess was taken at this

24                     time.)

25                    (The following proceedings took place

1                     after the lunch recess:)

2           THE COURT:  Are you going to call Detective

3    Marquez?

4           MR. ESPARZA:  I am, Your Honor.  We call Detective

5    Al Marquez.  May I proceed Your Honor?

6           THE COURT:  Yes, you may.

7                      DIRECT EXAMINATION

8    BY MR. ESPARZA:

9    Q     Sir, would you state your name for the record?

10   A     Alfonso Marquez.

11   Q     And are you the same Alfonso Marquez who testified

12   yesterday?

13   A     Yes, I am.

14   Q     And do you remember that you are still under oath?

15   A     Yes, I am.

16   Q     Detective, I have only a few questions for you and

17   it's in regards to the taking of the confession of the

18   statement of the defendant.

19         When you went to 5700 Wren, after picking the

20   defendant up, did you go anywhere else other than to the

21   Youth Services Division of the El Paso Police Department?

22   A     No, we didn't.

23   Q     Did you, between 5700 Wren and the Youth Services

24   Division, did you ever go by or drive on Salisbury or

25   Raymond Telles Street to see where Droopy live?

1    A    No, sir.  Not at that time.

2    Q    Or did you go to North Park Mall and stay there for

3    between 30 minutes to an hour and a half with other

4    officers maybe to discuss the case?

5    A    No, sir, we did not.

6    Q    Were you ever there with the defendant in your car

7    while you are outside discussing the case there at North

8    Park Mall?

9    A    No, sir.

10   Q    Either in the main parking lot or in the back

11   parking lot?

12   A    No, sir.

13   Q    Did you ever drive down Tetons Street in order to

14   find out where Enrique, or Popeye, lived prior to taking

15   the defendant to the Youth Services Division of the

16   El Paso Police Department?

17   A    No, sir.

18   Q    Did you ever have the defendant, prior to going to

19   the Youth Services Division of the El Paso Police

20   Department, did you ever have the defendant point out

21   where Popeye lived or where Droopy lived?

22   A    No, sir.

23   Q    Did you ever take the defendant to the police

24   station on Raynolds which is the Five Points area before

25   taking him to the Youth Services Division of the El Paso

282

1    Police Department?

2    A      No, sir.

3    Q      Did you, at any time, use foul language, cuss or

4    intimidate the defendant in an attempt to get a statement

5    from him?

6    A      No, sir.

7    Q      Did you ever call -- and excuse my language -- did

8    you call him, quote, stupid ass hole?

9    A      No, sir.

10   Q      Did you ever beat him up or push him?

11   A      No, sir, I did not.

12   Q      Did you ever hit him with your hand?

13   A      No, sir, I did not.

14   Q      In the head?

15   A      No, sir, I did not.

16   Q      Do you wear any rings?

17   A      No, sir, I do not.

18   Q      Do you remember that this happened back on the

19   morning -- on the night of April the 21st, 1993 and in the

20   morning of April 22nd, 1993.  Were you wearing a ring on

21   either of those days?

22   A      No, sir.  I do not wear a ring.

23   Q      When was the last time, if you remember, that you

24   were wearing a ring?

25   A      Approximately six years ago.  It was my wedding

                                                              283

1    band and I haven't worn one since.

2    Q        You are now divorced?

3    A        Yes, sir, I am.

4    Q        Did you ever tell the defendant that you would take

5    him to the desert and beat him up?

6    A        I'm sorry?

7    Q        Did you ever tell the defendant that you would take

8    him to the desert and beat him up?

9    A        No, sir, I did not.

10   Q        At any time between the time that you picked him up

11   and then finally turned him into the detention center

12   about 4:20 on April the 22nd, 1993?

13   A        No, sir, I did not.

14   Q        Did you ever tell him you were going to take him to

15   the County Jail and be raped by fat, old men?

16   A        No, sir, I did not.

17   Q        Did you ever take a statement of the defendant

18   prior to the one that's been marked as State's Exhibit

19   Number 3?

20            Prior to taking State's Exhibit Number 3, did you

21   ever take another statement and not like the responses

22   that the defendant was giving you and throw that statement

23   away?

24   A        No, sir, I did not.

25   Q        Is this the only statement that you took from the

1    defendant?

2    A       Yes, sir, it is.

3    Q       Did you ever promise the defendant anything from

4    the time that you had him in custody?

5    A       No, sir, I did not.

6    Q       And except for the times that the defendant was

7    with the magistrate receiving his magistrate's warnings,

8    except for those two times, were you with the defendant at

9    all times from the time you picked him up at 5700 Wren to

10   the time that you turned him into the detention center at

11   4:20 in the morning?  Were you with him at all time?

12   A       Yes, sir, I was.

13   Q       And besides what you testified to yesterday, the

14   time that you cuffed him to go to the detention center to

15   be warned by Mr. Aguilera, besides that time, was he ever

16   cuffed during that time?

17   A       No, sir, he was not.

18           MR. ESPARZA:  I have no further questions, Your

19   Honor.

20           MR. OLIVAS:  Your Honor, may I approach the

21   witness?

22           THE COURT:  Yes, you may.

23           MR. OLIVAS:  Thank you.

24                        CROSS EXAMINATION

25   BY MR. OLIVAS:

1    Q    Detective Marquez, you would agree with me that

2    sometime during the night of April 21, 1993, you and

3    Daniel Villegas drove around the east side where he

4    identified Droopy's house and Popeye's house?

5    A    No, sir. Not the east side.

6    Q    I'm sorry. The northeast side.

7    A    The northeast side.

8    Q    You do agree that that occurred?

9    A    It's in the morning hours, sir.

10         MR. OLIVAS: No questions. We rest.

11                    RE-DIRECT EXAMINATION

12   BY MR. ESPARZA:

13   Q    That was after you had already had his statement

14   which is State's Exhibit Number 3?

15   A    That is correct.

16         MR. ESPARZA: Okay. I have no further questions,

17   Your Honor.

18         THE COURT: All right. You may step down. Call

19   your next witness.

20         MR. ESPARZA: Your Honor, I have another brief

21   witness. We will call Detective Charlie Ortega.

22         MR. OLIVAS: Your Honor, we would stipulate that if

23   he's going to ask the litany of questions previously

24   asked, that we would agree with that if the D.A. would

25   prove that.

286

1          MR. ESPARZA:  Your Honor, I'm simply doing this for

2     appellate purposes.  I think I have to rebut each and

3     every allegation made by the defendant.

4          THE COURT:  You may proceed.

5                    DIRECT EXAMINATION

6     BY MR. ESPARZA:

7     Q     Detective, would you state your name for the

8     record?

9     A     Carlos Ortega.

10    Q     And are you the same Detective Carlos Ortega who

11    testified yesterday in this hearing?

12    A     Yes, I am.

13    Q     And do you remember that you are under oath?

14    A     Yes, sir.

15    Q     Sir, let me direct your attention to the morning of

16    April 22nd, 1993, when you participated in the taking of

17    the statement of the defendant.

18    A     Yes, sir.

19    Q     If I recall your testimony correctly yesterday, you

20    arrived at the Youth Services Division of the El Paso

21    Police Department at approximately 11:00 o'clock on the

22    night of the 21st.

23    A     Correct.

24    Q     And you left the Youth Services Division at what

25    time?  Was it after the statement was taken?  Do you

                                                          287

1    remember?

2    A    The written statement?

3    Q    Ah-huh.

4    A    I know he was given his final warning at about

5    2:45.  The confession was finished at about 2:25 in the

6    morning.

7    Q    You did not proceed with Detective Marquez to go

8    and identify, with the defendant, to help identify

9    Droopy's house or Popeye's house?

10   A    No, sir.

11   Q    All right.  During the time that you were with the

12   defendant with Detective Marquez, did you ever hit the

13   defendant?

14   A    No, sir.

15   Q    Did you ever threaten the defendant?

16   A    No, sir.

17   Q    Did you ever tell the defendant that you were going

18   to take him to the desert and beat him up?

19   A    No, sir.

20   Q    Did you ever hit his head with your hand?

21   A    No, sir.

22   Q    Did you ever push him up against the wall?

23   A    No, sir.

24   Q    Did you ever hit him with a ring you may have been

25   wearing?

                                                         288

1    A       No, sir.

2    Q       Do you remember if on the night of the 21st, or the

3    morning of the 22nd, you were wearing any kind of jewelry

4    on your hand?

5    A       I probably wasn't.

6    Q       But you're not sure?

7    A       I'm not sure.

8    Q       But at any time, did you intimidate or harass the

9    defendant?

10   A       No, sir.

11   Q       You were not with the defendant prior to him

12   arriving at the Youth Services Division at approximately

13   11:00 o'clock?

14   A       No, sir.

15   Q       Did you ever tell the defendant that he was going

16   to County and he would be raped?

17   A       No, sir.

18   Q       Of all the things that I have listed here in these

19   brief five minutes --

20   A       Yes, sir.

21   Q       -- did Detective Marquez ever do that in your

22   presence?

23   A       No, sir, he did not.

24           MR. ESPARZA:  All right.  I have nothing further,

25   Your Honor.

                                                        289

1          MR. OLIVAS:  I have no questions of this witness,

2     Your Honor.

3          THE COURT:  All right.  You may step down.

4          MR. ESPARZA:  Your Honor, I have one witness if

5     he's out there and if he's not, we rest.  Mario Aguilera.

6          THE COURT:  You may be seated.

7          THE WITNESS:  Thank you, Judge.

8          MR. ESPARZA:  May I proceed, Your Honor?

9          THE COURT:  Yes, you may.

10                    DIRECT EXAMINATION

11    BY MR. ESPARZA:

12    Q    Would you state your name for the record?

13    A    Mario Aguilera.

14    Q    And are you the same Mr. Aguilera who testified

15    yesterday at this hearing?

16    A    Yes, sir, I am.

17    Q    And do you remember that you are still under oath?

18    A    That's correct.

19    Q    Sir, let me direct your attention to around -- I

20    think it's 12:00.  When was the first time you saw the

21    defendant so we are clear?

22    A    If I remember correctly -- may I refresh my memory?

23    Q    Yes.  You sure can.

24    A    It was approximately at -- approximately 12:26 on

25    April 22nd of 1993.

VILLEGAS v. CITY OF EL PASO - P002607

1    Q      And the purpose of that was to determine whether or
2    not you would allow the defendant to be subjected to
3    custodial interrogation?
4    A      That's correct.
5    Q      All right.  Now, during that time, you spent --
6    yesterday you testified you spent between five to ten
7    minutes.
8    A      Yes, sir.
9    Q      Okay.  Did you thoroughly discuss with the
10   defendant the opportunity of not taking a statement or
11   taking a statement?
12   A      I only asked him if he knew why he was there and if
13   he was willing to give a confession to the detectives and
14   he indicated to me that he knew what he was there for and
15   that he was willing to cooperate with the detectives.
16   Q      And was it your opinion there, as the in-take
17   officer, that he was doing this freely and voluntarily?
18   A      Yes, sir.
19   Q      Did he appear to you in any way to be intimidated?
20   A      No, sir.  Not at that time.
21   Q      Did he ever express to you the fact that he had
22   been threatened in any way?
23   A      No, sir.
24   Q      That he had been beaten in any way?
25   A      No, sir.

VILLEGAS v. CITY OF EL PASO - P002608

1    Q      Or that he may have been pushed or shoved at any
2    time?
3    A      No, sir.
4    Q      Did he ever express the fact that maybe someone had
5    threatened him that they would take him to desert and beat
6    him up?
7    A      No, sir.
8    Q      Or take him to the County Jail and maybe be raped
9    there in the County Jail?
10   A      No, sir.
11   Q      It was your opinion then that it was proper for the
12   police to continue to interrogate him after talking to
13   you?
14   A      That's correct.
15   Q      Okay.  Were you the in-take officer at the time --
16   at 4:20 in the morning when he was returned?
17   A      Yes, sir, I was.
18   Q      All right.  And is it or is it not true that one of
19   the first questions you ask him is whether or not he is
20   injured in any way or hurt?
21   A      That's correct.
22   Q      And did you ask the defendant that in this
23   particular case?
24   A      If I didn't ask him, the detention officer on duty
25   did.  That's one of his main responsibilities.  To ask all

292

1    the in-coming juveniles.

2    Q    But did you ask him?  Do you remember?

3    A    I don't remember specifically.  No, sir.

4         MR. ESPARZA:  Okay.  I have nothing further, Your

5    Honor.

6         THE COURT:  Any questions?

7                    CROSS EXAMINATION

8    BY MR. OLIVAS:

9    Q    Mr. Aguilera, how many juveniles -- what do you

10   call those proceedings?

11   A    It would be the in-take process.

12   Q    In the in-take process, how many juveniles that

13   have given confessions have you handled?  How long have

14   you been working there?

15   A    Twelve years.

16   Q    In your 12 years approximately.  I know that you

17   can't remember all of them.

18   A    It will be well over 100.

19   Q    Over 100?

20   A    That's correct.

21   Q    This year, how many have you done?

22   A    This year, approximately about five or six.

23   Q    Okay.  Out of the five or six that you have done

24   this year, sir, how many have you -- let me rephrase my

25   question.

293

1        Out of the 100 or so that you have done in your
2    entire 12 years, how many -- how many times have you
3    prevented the juvenile from talking to the officers
4    because, in your mind, you felt he was being coerced?  And
5    if you do remember, give me the names of those
6    individuals.
7    A     I won't be able to give you the specific names of
8    the individuals.
9        Just about this year, I remember that I denied
10   further interrogation by the detectives on a particular
11   case.  On an aggravated kidnapping/aggravated assault, but
12   I cannot recall the name.
13   Q     What month was this?
14   A     This was early this year.
15   Q     Earlier this year?
16   A     Yes.
17   Q     Do you remember who the detectives were?
18   A     I do remember that one of the detectives was
19   Detective Arbogast.
20   Q     And Detective Arbogast was one of the detectives
21   that presented him to you?
22   A     Yes, sir.
23   Q     And the reason that you prevented him from talking
24   to Arbogast was because he was afraid of Arbogast?
25   A     No.  That was not the reason.  The reason that I

294

1    denied further interrogation is that we had received a

2    call from the juvenile's parents prior to my going on duty

3    and the -- apparently, the parents had already retained an

4    attorney for the juvenile and the attorney had called

5    advising us that the juvenile was not to give a

6    confession.

7    Q       That was because the lawyer said, "Don't talk.  Say

8    nothing."

9    A       That's correct.

10   Q       Besides that one, which other one have you done and

11   when did that occur?

12   A       It would be very difficult for me to recollect the

13   names of the juveniles and the specific dates.

14   Q       I understand.  Roughly.

15   A       I remember on one occasion, I denied the further

16   interrogation by the police detectives as a result that I

17   could not establish probable cause as to how they were

18   tying a particular juvenile to the alleged offense.

19   Q       Was that during this century?  In the 90s or was

20   this in the 80s?

21   A       Probably in the 90s.

22   Q       What year?

23   A       It must have been around 1991.

24   Q       Okay.  And besides that one thing, when was the

25   other one?

1    A    That I can remember correctly -- that the juveniles

2    have been maybe pressured or threatened -- I have not had

3    an occasion where I have felt that the juveniles have been

4    threatened or coerced.

5          MR. OLIVAS:  Thank you, Mr. Aguilera.  I have no

6    further questions, Your Honor.

7          MR. ESPARZA:  We have nothing further, Your Honor.

8    We rest.

9          THE COURT:  All right.  You may step down.  Do you

10    have any other witnesses you wish to call?

11          MR. OLIVAS:  If I may have a moment with counsel.

12          THE COURT:  Go ahead.  May Mr. Aguilera be excused?

13          MR. ESPARZA:  Yes, Your Honor.

14          MR. OLIVAS:  Yes, Your Honor.

15          THE WITNESS:  Thank you, Your Honor.

16          THE COURT:  All right.

17          MR. OLIVAS:  Your Honor, movants rest.

18          THE COURT:  All right.  There are no more witnesses

19    to be presented?

20          MR. ESPARZA:  No, Your Honor.

21          THE COURT:  All right.

22          MR. OLIVAS:  Except, Your Honor, that we need  a

23    ruling.

24          THE COURT:  Both sides have rested and closed in

25    this matter and have indicated they have no further

VILLEGAS v. CITY OF EL PASO - P002613

1   witnesses.

2          MR. OLIVAS:   Your Honor, we have a brief summation

3   of the evidence.

4          MR. ESPARZA:   Well, before we get to the summation,

5   Your Honor, we rest except for the fact that we were not

6   allowed to ask questions or actually, we were allowed to

7   ask the questions, but the defendant refused to answer

8   them as he asserted his Fifth Amendment and we will once

9   again urge our motion that the defendant be held in

10  contempt or answer our questions with regards to the

11  taking of that first statement that was allegedly thrown

12  away.

13         THE COURT:   All right.   That is going to be under

14  advisement as well as the remainder of this hearing.

15  Argument.

16         MR. OLIVAS:   Your Honor, may I approach the court

17  reporter?

18         THE COURT:   Go ahead.

19         MR. OLIVAS:   Your Honor, my apologies to the Court

20  in that counsel was out of line earlier; however --

21         THE COURT:   No one was out of line.   This Court

22  does understand that you are both representing your

23  clients.

24         MR. OLIVAS:   So I would like to apologize.   Your

25  Honor, we basically -- I was going to ask the Court to

                                                      297

1   allow me to brief the issues.

2   And the state, which I think he will agree shortly,

3   will agree with me that the issue in this case is a

4   two-fold issue.

5   Whether under my motion to suppress -- initially,

6   whether his rights -- whether he was coerced and harassed

7   in him giving it.  That's the standard motion to suppress.

8   Additionally, I have -- I allege under Count I, if

9   you will, Paragraph 1, Your Honor, that the rights of the

10  juvenile were violated as contemplated by the Texas Family

11  Code.

12  So, I have got a two-prong attack which I think

13  that we have produced enough evidence to prove that.

14  Specifically, I would cite to the Court Comers

15  versus State, 776 S.W.2nd 191.

16  The Court of Criminal Appeals has ruled that in the

17  case of a child, pursuant to Section 52.02(a) of the Texas

18  Family Code as well as 51.09(a), (b) and (c), the waiver

19  of juvenile rights pursuant to the Family Code -- the D.A.

20  will agree with me that indeed, if indeed these rights

21  were not complied with, said confession should be

22  suppressed.

23  Specifically, the issue is as to the Family Code

24  and as to the provisions of the waiver of rights as a

25  child, Your Honor.

298

VILLEGAS v. CITY OF EL PASO - P002615

1      It's simply an issue of credibility whether you

2  believe the defense or whether you believe the State.

3      If indeed the defense has proven that the law was

4  not complied with, then I think the Court has no

5  alternative but to issue -- I mean -- to suppress said

6  confession.

7      Specifically, the issue is the following, Your

8  Honor.  Whether at the time that Daniel Villegas was

9  arrested, did the cops go directly to JIS -- JYS -- which

10  is the -- we will stipulate it's a certified juvenile

11  detention facility as required in 52.02 and 51.09(a), (b)

12  and (c) that the child must be taken immediately there.

13      A juvenile cannot go anywhere else.  Cannot pass

14  go.  Cannot collect $200.  He must go immediately to a

15  youth detention facility.

16      If this fails, pursuant to the reading of Comers

17  and the sections I have previously cited, then said

18  confession should be suppressed.

19      In summary, Your Honor, we have -- we believe that

20  what occurred that particular evening was that Daniel

21  Villegas was arrested at 10:15.

22      We have Mr. Villegas who would testify that the

23  cops were there at 10:15.  We have Mrs. Villegas who

24  testified the same.

25      We have Michelle Villegas.  We have Mrs. Parks, the

299

1   young lady.  We have Marcos who himself faced a subsequent

2   indictment that he may or may not have been involved in

3   this alleged occurrence.

4         Everybody unequivocally testified, Your Honor, that

5   they were there between 10:00 and 10:30.  Now, Detective

6   Marquez agrees that he did, indeed, take a joyride with

7   the young Daniel in the northeast.

8         However, he says it was post confession.  He never

9   indicates to Judge Horkowitz that they were taking this

10  ride.

11        He never indicates in his confession "I agreed to

12  show you wherever" and I submit to the Court that what

13  would it take for another half a second but to type in an

14  extra sentence to cover himself?  And indeed, to make sure

15  to dot your i's and cross your t's.

16        Now, we allege that he was picked up somewhere

17  between 10:00 and 10:30 if, indeed, Detective Marquez was

18  truthful that it takes approximately 20 minutes from 5700

19  Wren to drive directly to Delta center -- the juvenile

20  center in Delta and Mr. -- we submit that Mr. Villegas,

21  the father of the child, said, "It takes me about half an

22  hour."  He should have been there at 11:00 o'clock in the

23  evening.

24        For argument sake, Your Honor, assuming they left a

25  little after 10:30, he should have been there no later

1    than 11:15 or 11:30.

2         You will remember Mario Aguilera's testimony -- the

3    juvenile probation officer -- the juvenile in-take

4    officer, who said clearly and unequivocally, as a result

5    of reading his log, he said, "The first time I ever see

6    this child is 12:26."

7         I submit to you that there is approximately an hour

8    and a half missing in the chain of events.  He says first

9    time I see him at 12:26.

10        We submit to the Court that that's what happened,

11   Your Honor.  They drove, as testified by both Marcos and

12   by young Daniel, they drove through northeast.  They drove

13   through Droopy's house.  They drove through Popeye's

14   house.  Tetons.

15        They went to the back of the Boomerang's and Furr's

16   and they park there.  That testimony is corroborated by

17   the evidence from Mrs. Parks and Mrs. Villegas.

18        They clearly state that the two individuals were

19   placed in different cars.  That there were three different

20   detective undercover cars.

21        They describe the ditch.  They describe the

22   lighting.  They described the back of the Furr's and in an

23   unlighted area.  I submit to you that that is where the

24   hour and a half went.

25        Thereafter, they testified that, "We go to Five

1    Points."  Another violation of the Comers reading.  "We go
2    to Five Points."  Marcos is an adult, so they take him to
3    his office.
4         Daniel, they need to verify whether he's an adult
5    or not, so they pick up the phone and they call juvenile
6    hall and say is he an adult or is he not an adult?  No,
7    he's not.  Thus, the testimony "You lucky punk.  You
8    lucked out.  That's why we're taking you back."
9         So, that hour and a half is a clear violation of
10   the -- of what's contemplated by 52.02 of the Texas Family
11   Code as well as 51.09(b).
12        Now, you will remember the testimony that the
13   in-take officer said.  "The first time I ever, in my life,
14   saw him was 12:26."
15        Judge Horkowitz -- "The first time I ever, in my
16   life, see him is 12:56."  It all falls into place as to
17   when this happened.
18        Now, I'd also remind the Court that juvenile
19   confession, State's Exhibit Number 3, has been altered.
20   It may be 1:40.  It may be 2:40.  It may be 3:40.
21        Judge Horkowitz testified it was 2:40 and it also
22   falls into place.  At 1:00 o'clock, they leave here.  Go
23   back to juvenile center.
24        They take the confession that everybody testified
25   to took about an hour to do and then take him back to

VILLEGAS v. CITY OF EL PASO - P002619

1    Horkowitz.

2         Thus, the 2:40 time notation.  You will also

3    remember Horkowitz indicated that these -- between

4    Horkowitz -- Judge Horkowitz and Detective Marquez and

5    Detective Ortega, there are three peoples' writing on

6    these forms.

7         Again, there is another alteration on State's

8    Exhibit 1.  Whether it's -- forgive me, Your Honor.  It's

9    State's Exhibit 2.

10        Whether it's 2:45 a.m. or 3:45 a.m., this is

11   evidenced before the Court.  State's Exhibit 4 is the

12   first time Horkowitz sees him.  12:53 which falls right in

13   line on the drive from Delta to 200 South Kansas.

14        I submit to you, Your Honor, that the whole

15   Villegas clan, including Mrs. Parks, has some motivation

16   in providing their testimony.

17        However, I will remind the Court of Michael (sic)

18   Villegas, the sculptor, who, however he may share the same

19   last name, he is not related.  He has no reason to lie.

20   He says they leave at 9:30 -- 9:00 or 9:30.  It took three

21   to three and a half hours.

22        Look at young Mrs. Parks.  The facial structure,

23   Your Honor, where the sculptor has taken from her face.

24   It all falls into place that indeed, they did go to the

25   back of the Furr's.  They did go driving around northeast.

1        Now, I submit to you that Detective Marquez was

2    tired.  He had had a long day and he had been working

3    hard.

4        Why would he want to go joyriding or driving around

5    northeast after everything that's been said and done?  I

6    submit to you that he would get the information ahead of

7    time and then follow-up.

8        Now, you will also remember the testimony of

9    Marcos.  Marcos drew the diagram and indicated it with the

10   orange circle where Danny was sitting back there.

11       Marcos drew his car and indicated where he was

12   sitting behind the Furr's.  Both uncontroverted testimony.

13       Your Honor, Marcos was in the front car.  Danny was

14   in the back car.  They're going down Tetons.  Going down

15   Popeye's house.  Nobody ever denies that.  Well, they did.

16   Forgive me.  Detective Marquez did deny that ever did

17   occur.

18       I submit to the Court with the discrepancies and

19   the time limitations, Your Honor -- I mean, the time

20   notations in the exhibits.

21       If the Court will pay attention to State's Exhibit

22   Number 3, it will note that the detectives' initials are

23   written there -- A.M.  Al Marquez.

24       And it says, time, 1:20 a.m. and time ended, 2:26.

25   It all falls into place.  Your Honor, the way it's done.

1    Why didn't Marquez invite Detective Ortega and say, "Come
2    on, bud.  Let's go chase down where Popeye and Droopy
3    lives."
4         That never happened.  The whole chain -- the whole
5    sequence of events is before the Court and the evidence.
6    It comes in at 12:26 with Aguilar (sic) saying, to repeat
7    what I said earlier and to point it out, at 12:26, Your
8    Honor.
9         That's the first time he sees Judge Horkowitz --
10   12:56.  It takes a half hour to drive -- 25 minutes to
11   Delta, downtown and get him off and wait for him to see
12   him and at 12:26, they go back -- at 12:26, forgive me.
13   They drive back to Delta.
14        And it says on State's Exhibit 2, the time the
15   confession started 1:20 -- exactly 20 minutes that he
16   testified that it would take to drive.
17        Confession ends at 2:26.  Also noted by Detective
18   Marquez.  State's Exhibit 2 says -- Competency to Make
19   Statement -- by Judge Horkowitz, 2:45.  This is
20   uncontroverted evidence indeed, Your Honor, of the
21   proceedings.
22        If anybody has any reason to lie, it's Detective
23   Marquez.  As far as the card being signed at 11:15 by
24   Danny Villegas.
25        I submit to you it was 10:15 when he was picked up

1    at home and he signed the juvenile warning cards that he
2    initialed.

3         Mr. Villegas did not lie.  Nobody that testified
4    lied as to what time it occurred.  Indeed, Michelle
5    Villegas said -- when asked, "What time was it?"  She
6    said, "I don't remember."

7         Danny Villegas, Your Honor, I submit to you, he was
8    not aware of what the time was.  Marcos testified that the
9    same thing happened and Marcos has nothing to face
10   anymore.  He's home free, if you will.

11        So on that basis, Your Honor, I submit to the Court
12   that this excursion that was taken was pre-confession.

13        It was done before he was taken to the JYS and
14   under the Comers and under 52.02(a) and 51.09(b), as will
15   be agreed by the D.A., the Court will -- should suppress.
16   That addresses my first count that the juvenile procedures
17   were not complied with.

18        As to the harassment and the coercion taken in
19   violation of his Fourth, Fifth and the Sixth Amendment of
20   the Constitution, Your Honor, he clearly testified -- both
21   him and Marcos testified that they were going to be taken
22   to County.  That they were going to be used as sex objects
23   of ugly fat men.

24        They testified with incredible detail, Your Honor.
25   That could not have been made up.  They testified that

1    they were pushed.  They testified that they were harassed.

2    They testified that they were threatened.  They were hit

3    on the head and frankly, they were bullied.

4         On those two prongs, Your Honor, I think that the

5    Court -- the evidence that they arrived at 10:15 -- some-

6    where between 10:00 -- 10:15 has not been controverted.

7    That evidence is good.

8         I think that there is more than enough evidence

9    before the Court to suppress the statement.  Thank you,

10   Your Honor.

11        THE COURT:  Mr. Esparza?

12        MR. ESPARZA:  Your Honor, I think the issue here is

13   whether or not 52.02(a) and 51.09(b) were complied with.

14   I think the believable evidence is that they were.

15        That there was not an excursion between the time

16   they picked up the defendant at 5700 Wren which is where

17   he lives and then going to the Youth Services Division of

18   the El Paso Police Department.

19        I don't think the evidence that you heard in that

20   regard is believable.

21        I think that the defendant's performance on the

22   stand clearly indicates that his testimony is not

23   truthful.

24        I do find it very difficult to have to stand here

25   and argue this motion to suppress knowing that the State

1    was not allowed to fully cross-examine the defendant.

2         His statement that Detective Marquez took the first

3    statement and that he came up and tossed it in the garbage

4    can and then turned out what is State's Exhibit Number 3

5    which is what we have now -- the signed statement --

6    that's not to be a believable statement.

7         The Court heard his testimony.  The Court heard his

8    lawyers say that he's heard that for the very first time.

9    Then in the middle of questioning, you hear the defendant

10   say that he wants to take the Fifth Amendment.

11        I mean, it's clear to me that his testimony is not

12   truthful.  What we have is -- we have the warning card

13   which is signed at 11:15.

14        We know that the law provides that the police

15   department can take a juvenile to the Youth Services

16   Division of the El Paso Police Department.

17        The defense has already stipulated that that is a

18   certified office by the juvenile court and the juvenile

19   board, so it is proper to take him there.

20        The next step is to take him to JPD which is the

21   detention facility.  They did so.

22        Mario Aguilera testified that he inquired whether

23   or not the defendant wanted to give a statement.  He said

24   he did.

25        He did it with just he and the defendant present

1      and Mario Aguilera's opinion was that the defendant was

2      making that statement freely and voluntarily.

3            Then he took him back.  They then took him to the

4      magistrate here.  Judge Horkowitz said he read him his

5      warnings.

6            He was convinced that he wanted to make a state-

7      ment.  He then permitted the police detectives to take a

8      statement.

9            They went back to the Youth Services Division.

10     They took a statement.  They went back to the magistrate.

11           The magistrate once again had an opportunity to

12     question him to make -- to insure that the defendant was

13     doing so freely voluntarily and intelligently.  He did

14     that.

15           The defendant then signs the statement and that's

16     when the detectives go to the northeast and find out where

17     Droopy and Popeye live.

18           They do that already having asked the juvenile

19     probation officer, Mario Aguilera, for permission and then

20     they take him back to Juvenile Probation at 4:20 in the

21     morning.

22           I think the times are accurate.  The believable

23     testimony is that all the procedures were followed.

24           The defendant's rights were protected and his

25     statement, which is State's Exhibit Number 3, was done

                                                         309

1    freely and voluntarily.

2         The argument that some of these numbers here and

3    times are altered, I think that was perfectly covered.

4         It was clear when Judge Horkowitz testified that

5    the handwriting was his and that he's the one that made

6    the corrections.

7         Not that some other person had gone in and changed

8    the numbers, so it's clear to me and I believe the

9    believable evidence would show the Court that this

10   statement was taken properly.  Thank you.

11        THE COURT:  The motion to suppress the written

12   confession is denied.  Court will enter findings of fact

13   as required by the Code.

14        MR. OLIVAS:  Your Honor, will the Court entertain

15   an oral motion for continuance or should I file a written

16   one?

17        THE COURT:  Of the trial?

18        MR. OLIVAS:  Yes.

19        THE COURT:  For what reason are you asking for a

20   continuance?

21        MR. OLIVAS:  Your Honor, the Court has filed a

22   standing discovery order that's been in the file

23   approximately a month and a week.

24        I have both a Gigglio and a Brady motion.  On

25   Monday of this week, which would have been 28 November

VILLEGAS v. CITY OF EL PASO - P002627

1   1993, is the first time I received official notice from

2   the State that indeed, there is a one, Onie Kirk.

3          This individual was detained at the El Paso County

4   Jail with young Daniel, allegedly and he gave a statement.

5          Now, that statement was procured by the State

6   November 17th -- October the 17th, 1993.

7          That statement basically says "Danny confessed to

8   me of everything that happened while we were sitting in

9   jail over there."

10          Now, that statement has never been produced to me.

11   The witness list was provided to me on Monday.  I submit

12   to you that under Gigglio, as well as Brady, specifically

13   Gigglio, we are entitled for a continuance.

14          We need to know what his past record is.  I have

15   had an opportunity yesterday to go review the statement;

16   however, I need to follow that up.

17          I have since learned that this Mr. Kirk -- Onie

18   Kirk was represented by a one, Kristina Voorhies, a member

19   of the El Paso Bar who is related romantically, and by

20   matrimony, to Mr. Williams.

21          THE COURT:  We are all aware of that.  We won't

22   speak as to which is the better half of the two.

23          MR. OLIVAS:  At any rate, Your Honor, I have not --

24   I have not had adequate opportunity to pursue the

25   investigation as to Mr. Onie Kirk's past history or Onie

311

1    Kirk's credibility or Mr. Onie Kirk's statement.

2          We are asking this Court to take that into

3    consideration and grant us a continuance.  I would need --

4    we would ask for an additional week.  Well, in a perfect

5    world, Your Honor, I would ask that this trial be

6    conducted next year; however, I understand that that is

7    wishful thinking on the part of counsel.

8          Nonetheless, we would need a minimum of a week to

9    ten days to pursue that investigation.  I think that the

10   State has been in violation of the discovery order.

11         They filed the witness list the day before

12   Thanksgiving and mailed it.  I received it by return

13   receipt requested, Monday the 28th.

14         I submit to the Court that a week that involves two

15   days of hearings on a motion to suppress is wholly

16   inadequate to do under Gigglio to do my investigation of

17   Mr. Kirk.  Thank you, Your Honor.

18         MR. WILLIAMS:  Your Honor, may I respond?

19         THE COURT:  Yes, you may.

20         MR. WILLIAMS:  Your Honor, the last motion for

21   continuance filed by the defendant was, I believe, either

22   October the 16th or the 17th.  It was on a Tuesday

23         I believe the reason the continuance was granted

24   was because -- one of the reasons was because the State

25   had found a witness.

1         This prosecutor informed the Court and the defense

2    attorney that we did have a witness.  That the witness

3    statement would be coming into our office within two days.

4         I also informed Mr. Olivas, I think in your

5    presence, that there were several things that we had in

6    our file that he had not inspected that last week.

7         Mr. Olivas was well aware that we were going to get

8    a new witness statement involving a new witness the week

9    of October the 17th, 1993.

10        We faxed -- I guess I mailed, by certified mail,

11   the witness list to Mr. Olivas last Wednesday and we faxed

12   it to his office the same day.

13        The same day, the State opposes the motion for

14   continuance.  The defendant has been given plenty of

15   notice both that there were witnesses who would include

16   Onie Kirk, whose statements were in the file at the time

17   he inspected them in October and that those witness

18   statements would, in fact, be available that very week for

19   his inspection and the witness list was provided to him

20   timely within the discovery order of the Court and the

21   State would oppose the motion for continuance.

22        THE COURT:  When did you receive the notification

23   of the witness, Onie Kirk?

24        MR. OLIVAS:  Monday the 28th.  And he is correct,

25   Your Honor.  I received a fax right at about 2:00 or so;

1    however, I had left early that Wednesday, so I wasn't

2    aware until the following Monday the 28th when I saw a fax

3    under my door saying here, this is our new witness list.

4         I henceforth -- I then came and I asked Mindy to

5    show me the file and reviewed it where I saw the witness

6    list and I saw the warrant for arrest of Mr. Onie Kirk to

7    be brought down from Huntsville.

8         I think that there is inadequate -- it's an

9    inadequate amount of time for me to prepare and effec-

10   tively cross-examine Mr. Kirk and effectively investigate

11   what he has or has not done.

12        I did inform Mr. Esparza of the problem that I had.

13   Mr. Esparza, yesterday the 29th -- was yesterday the 29th

14   or Tuesday the 29th?

15        MR. ESPARZA:  Yesterday.

16        MR. OLIVAS:  Today is Thursday.  I asked, "Hey, who

17   is this Kirk guy?"  He says, "He's the guy that we sent

18   up.  We prosecuted him and we sent him up to Huntsville."

19        He indicated to me he didn't even know what was in

20   his rap sheet.  I was able to review it yesterday and

21   again, the D.A. does not have a copy policy.  They have an

22   open-file policy, so all I could do was simply take down

23   the arrests, the type of arrest and the disposition on the

24   particular individual.

25        More than that, I have not been able to because I

1     have been in here. We are asking for the continuance and

2     I think this is a very serious matter because of the fact

3     that there was a standing discovery order.

4          That order specifically directed the district

5     attorney's office to give me a list of the witnesses, one,

6     and two, there was also a Gigglio motion on file; however,

7     it was under 71289, the other big brouhaha that we had

8     with the other one.

9          THE COURT: All right. What the Court is going to

10    do since that is your stumbling block, find out what kind

11    of criminal record that witness does have.

12         There has been a bench warrant to get him out of

13    the Institutional Division, so we do know he has a record.

14    I'm just going to order the district attorney's office to

15    give him a copy of Onie Kirk's rap sheet.

16         MR. ESPARZA: Your Honor, he has seen Mr. Kirk's

17    sheet, but we will be happy to provide him with the copy.

18         MR. OLIVAS: As well as the statement, Your Honor,

19    and I still asserted my motion for continuance.

20         THE COURT: When was his statement written?

21         MR. ESPARZA: His statement has been in our file

22    since October the 17th -- October the 18th. That state-

23    ment has been in our file constantly.

24         MR. OLIVAS: It couldn't have been.

25         MR. ESPARZA: We have it faxed to us on the 18th or

1    the 17th when the statement was taken.  Counsel for the

2    defense has not come to see the file until yesterday and

3    we don't have a duty to take our file over to his office

4    and have him examine it.  I have made sure everything is

5    in it.  We have been working on our case for sometime.  We

6    are ready to go on December the 5th -- the day of the

7    trial.  I think there has to be some due diligence on the

8    part of the defense before they can get a continuance.

9    Mr. Kirk is not a surprise.  He has been in our file for

10   sometime.

11         MR. OLIVAS:  Your Honor, he's absolutely correct.

12   This Court entered, on October the 16th, a standing

13   discovery order that specifically instructed them to give

14   me a list of their witnesses.  That list was not produced

15   until Monday, the 28th of November.

16         THE COURT:  Well, I don't find, by reading the

17   discovery order, that they are in violation of the order.

18         The Court is going to deny your motion for conti-

19   nuance.  The case is still set for December 6th.  The jury

20   panel will be assembled here at 9:30.  I expect the

21   attorneys to be here at 9:00 o'clock.

22         Monday afternoon, since we are not picking the jury

23   as is my normal custom, if there are other pre-trial

24   matters that I can address to facilitate this trial, you

25   all can call and set up a hearing on Monday afternoon.

1    MR. OLIVAS: Will the Court entertain my four-hour

2    motion for continuance on 6 December as a result of my

3    other proceeding? I have not been able to reschedule it,

4    Your Honor.

5    THE COURT: That will be denied. The Court has

6    already got all of the -- I have already gotten everything

7    set up for all of those jurors to come in. We have at

8    least 75 jurors coming in.

9    MR. OLIVAS: Would the Court instruct the D.A. to

10   give me a copy of Mr. Kirk's statement as well as the rap

11   sheet?

12   MR. ESPARZA: We will provide him a copy of Mr.

13   Kirk's statement, Your Honor.

14   THE COURT: Thank you.

15   MR. ESPARZA: Your Honor, in regards to the State's

16   motion to have the Court compel the defendant to answer

17   our statements from the hearing, what is the Court's

18   ruling?

19   THE COURT: You need to brief that issue. That's

20   under advisement. Both of you need to look up the law on

21   that and send it over to me as soon as possible.

22   I will not make a ruling on it until I am able to

23   research it myself fully. It's a novel issue in this

24   Court. Maybe not in others, but it is in this Court.

25   MR. OLIVAS: We would again assert our motion for

VILLEGAS v. CITY OF EL PASO - P002634

1    continuance if we are going to be forced to go forward.

2              THE COURT:  Denied.

3              MR. ESPARZA:  Judge, we have some motions in

4    limine.  We will do that Monday afternoon?

5              THE COURT:  Yes.  We will do that Monday afternoon.

6    We can go off the record here.

7                        (Proceedings concluded at this time.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        318

1                    C E R T I F I C A T E

2

3

    THE STATE OF TEXAS
4
    COUNTY OF EL PASO
5

6
         I, Araceli Cortez-Dove, CSR, RPR and Official Court
7
    Reporter for the 41st Judicial District Court in and for
8
    El Paso County, State of Texas, do hereby certify that the
9
    above and foregoing proceedings, in the above-styled and
10
    numbered cause, all of which occurred in open court or in
11
    chambers, were reported by me.
12
         I further certify that this transcription of the
13
    record of the proceedings truly and correctly reflects all
14
    requested testimony.
15
         WITNESS my hand this 11th day of August 1995.
16

17

18

19                          _Araceli Cortez-Dove, CSR,RPR_
                            Araceli Cortez-Dove, CSR, RPR
20                          Official Court Reporter
                            41st District Court
21                          500 E. San Antonio
                            10th Floor, Room 1006-A
22                          El Paso, Texas   79901
                            (915) 546-2149
23                          Certificate #3564
                            Expiration Date:   12/31/96
24

25