TO:            LOEVY & LOEVY

FROM:      Richard Rosenthal, J.D., PhD

SUBJECT:   Villegas v. City of El Paso – Internal Affairs File Review

DATE:        October 28, 2022

SUMMARY OF QUALIFICATIONS

See, Attachment 1, CV for more specific information, including publications.

- Richard Rosenthal, JD, PhD
  - Education:
    - PhD, Criminology, Simon Fraser University (Burnaby, British Columbia) [2021]
    - Juris Doctor, Berkeley School of Law [1986]
  - Work Experience
    - Independent Contractor, Seattle Federal Monitor (2022-present)
    - Independent Police Auditor, City of Pasadena, California (2022-present)
    - Principle Consultant, Office of Independent Investigations (OII), State of Washington (2021-present)
    - Assistant Monitor, Cleveland Consent Decree Federal Monitoring Team (2016-present)
    - Chief Civilian Director, Independent Investigations Office of British Columbia (2012-2016)
    - Independent Monitor, City & County of Denver (2005-2011)
    - Director, Independent Police Review Division, City Auditor's Office, Portland, Oregon (2001-2005)
    - Deputy District Attorney, Los Angeles County District Attorney's Office (1986-2001) [Rampart Task Force (2000-2001); Special Investigations Division (1998-2000); Major Fraud Division (1989-1997).

Introduction:

On October 19, 2019, a Third Amended Compliant was filed by plaintiff Daniel Villegas, in the United States District Court for the Western District of Texas, El Paso Division, against the City of El Paso and former police officers in the employ of the El Paso Police Department (EPPD).

The complaint alleged that the defendant police officers engaged in misconduct during an investigation of a double homicide involving the deaths of 18-year-old Robert England and 17-year-old Armando Lazo, which took place on April 10, 1993. Specifically, it has been alleged that the involved officers used illegal and coercive measures to obtain a false confession from the then 16-year-old plaintiff, which subsequently resulted in his wrongful conviction and subsequent incarceration for nearly two decades. The complaint made additional allegations to include the failure to conduct a competent investigation into the crime and discovery violations.

**Exhibit 2**

First File Review:

I was asked to conduct two analyses regarding the El Paso Police Department's disciplinary practices. First, I was asked to review the personnel files of four of the named defendant officers (Alfonzo Marquez, Scott Graves, Earl Arbogast, and Carlos Ortega), including records turned over by the City of El Paso relating to internal investigations conducted involving these officers, as subject officers, relating to both internal and external complaints made against them (with an emphasis on investigations conducted prior to and around the time of their alleged misconduct).[1]

I was asked to answer five "issues presented," based on the information made available for my review.

Issues Presented:

1.  Were there systemic deficiencies in the El Paso Police Department's Internal Affairs practices?
2.  If yes, is it likely that those deficiencies would cause constitutional violations such as those alleged by Daniel Villegas? Is it likely that those deficiencies would cause wrongful convictions?
3.  Did the Chief of the El Paso Police Department (or his designee) have an obligation to be aware of the deficiencies in the El Paso Police Department's internal affairs department and to correct them?
4.  Did the El Paso Police Department fail to adequately supervise Detective Marquez, Detective Graves, Detective Arbogast, and Officer Ortega?
5.  If yes, would the Police Department's failure to adequately supervise those officers be expected to cause constitutional violations such as those alleged by Daniel Villegas? Would it be expected to cause wrongful convictions?

Second file review:

I was also asked to review a selection (n=13) of Internal Affairs files involving allegations of misconduct relating to enforcement actions against juvenile subjects, some of which involved allegations of violations of EPPD policies relating to the treatment of juvenile suspects and witnesses.[2] I understand that the City of El Paso, in this litigation, identified and produced

---

[1] Mr. Villegas was ultimately sentenced to a life term in prison on August 24, 1995, after his second trial. (His conviction was later overturned, and he was acquitted at a third trial in 2018.) As such, I used August 24, 1995 as a cut-off date for examination of the defendant-officer internal affairs files.

[2] I was asked to review these files, in part, with the following juvenile policies in mind: 1) Parental permission required before interrogating juveniles or taking witness statements from them: 1988 policies (CITY 21147, 21149); 1992 policies (CITY 21340, 21502, 21505), testimony (Moton Deposition, pp. 168-9; Scagno Deposition, p. 170) [Sergeants should catch when juveniles are questioned without parental permission], Children have the right to be accompanied by parent, guardian, custodian, or lawyer (Moton Deposition, p. 159); 2) Juvenile officers should conduct juvenile interrogations, except for homicides, when a juvenile officer should still be present ("When possible, interrogations of a juvenile suspect is conducted by Youth Services"): 1988 policies (CITY 21147; 1992 policies, CITY 21340; Moton Deposition, pp. 184-185; 3) Process for handling arrested juveniles (Transfer to Youth Services Division "as soon as possible:" 1988 policy (CITY 21144); 1992 policy (CITY 21499); then Youth Services completes reports, makes notifications, and makes disposition (*Id.*); Process when Youth Services not available (Felony: notify of constitutional rights, notify parents, complete necessary reports, complete juvenile

**Exhibit 2**

numerous Internal Affairs files from the 1988-1993 time period involving juveniles. The 13 Internal Affairs files I reviewed were selected because they indicated potential juvenile policy violations, issues of officer truthfulness, documented discipline against officers in complaints involving juveniles, and major alleged juvenile policy violations regarding the Department's TAC office. After reviewing those files, I am confident that I have sufficient information to respond to the below questions, because it is possible to determine whether a police department had notice of violations or required auditing or monitoring to prevent further violations based on a pattern of documented violations, even if other complaints regarding the same subject matter exist.

With respect to these files, I was asked to consider the following questions:

6. Do the files indicate that the City of El Paso had notice, as of April 1993, that its officers were failing to observe juvenile policies? Was there notice of issues with the TAC team and other divisions that worked with the TAC team (e.g., Crimes Against Persons)?

7. Was it foreseeable in April 1993 that absent some auditing or monitoring of cases involving juveniles, officers would continue to violate juvenile rights?

8. Would failing to enforce juvenile policies against detectives investigating homicides with juvenile suspects be expected to cause constitutional violations? Would it be expected to cause wrongful convictions?

I was also asked to review three additional files which have been represented by the city as instances where substantial discipline was imposed resulting in accountability for police officers engaged in serious misconduct.

Finally, with respect to all of the cases reviewed, I was asked to opine as to whether a general failure to document the justification for sustaining or not sustaining complaints decreased the effectiveness of the internal affairs system and whether it contributed to the risk of constitutional violations and wrongful convictions.

Plaintiff's Allegations:

Mr. Villegas' complaint alleged general and specific misconduct as it related to the actions of the four above-named defendant-officers. It was specifically alleged that:

1. The defendant-officers "communicated together and reached an agreement that they would take whatever steps were necessary to implicate a suspect and develop evidence to secure a conviction for these crimes, without regard for the constitutional rights of the

---

offense report, take to Juvenile Probation: 1988 policy (CITY 21145), 1992 policy (CITY 21500); (A or B Misdemeanor: Either complete reports, notify parents, and take to juvenile probation, or release to parent or responsible adult: 1988 policy (CITY 21145), 1992 policy (CITY 21500); C Misdemeanor: Either close matter with complaint report or advise parent or guardian that follow-up will be determined: 1988 policy (CITY 21146), 1992 policy (CITY 21501); 4) Process for taking juvenile confessions (New as of 1992: must take child "without unnecessary delay and without first taking the child elsewhere" to the juvenile probation department: 1992 policy (CITY 21503), compare 1988 policy (CITY 21147-8); 5) Even juvenile witness statements, generally, should have been taken at the juvenile facility (Messer Deposition, p. 226).

**Exhibit 2**

individuals involved, the legality of their tactics, or the truth or falsity of the evidence they would develop" (Plaintiff complaint, paragraph 20).

2. The defendant-officers' coercive techniques included lying to the subjects of their investigation (to include the plaintiff), screaming at them, threatening them with incarceration and/or execution if they did not confess or assist in the investigation, threatening them with inmate abuse and sexual assault, and threatening to beat them for failing to cooperate  (Plaintiff complaint, paragraphs 20-24, 32-33, 38, 51, 52, 66, 76, 80, 82).

3. The defendant-officers knowingly obtained falsified evidence (Plaintiff complaint, paragraph 42).

4. The defendant-officers falsified a timeline to cover-up an interrogation of the plaintiff prior to having properly advised him of his rights (Plaintiff complaint, paragraph 78).

5. The defendant officers "[s]uppressed information that pointed to other individuals as the perpetrators of the shooting" (Plaintiff complaint, paragraph 91, 96, 99, 108, 109, 113, 114).

Mr. Villegas' complaint also alleged that in 2009, the El Paso County District Court found that the plaintiff and two other subjects of the investigation "were subjected to 'illegal and coercive methods' and that their confessions were 'completely unreliable'" (Plaintiff complaint, paragraph 127). In addition, the complaint alleges that "[i]n November 2014, the El Paso County District Court suppressed Mr. Villegas' false confession as involuntary and ordered that it could not be used against him at a re-trial. The court found that defendant-officers had obtained the statement 'in violation of [Mr. Villegas'] constitutional rights,' and that the testimony of Defendants Marquez and Ortega regarding his interrogation was not credible" (Plaintiff complaint, paragraph 129). Finally, the complaint alleged that the El Paso County District Court also specifically found that "Detective Marquez had a pattern and practice of using illegal and coercive interrogation tactics both in this investigation and others" (Plaintiff complaint, paragraph 172n, quoting the District Court).

The complaint further alleged that the misconduct committed by the defendant-officers was "undertaken pursuant to the policies and practices of the City of El Paso" (Plaintiff complaint, paragraph 167). More specifically, the complaint alleged that "policies and practices on the part of the City of El Paso to pursue and secure false convictions through profoundly flawed investigations and unconstitutional methods and tactics" were the "proximate cause[]" of the plaintiff's wrongful conviction (Plaintiff complaint, paragraph 168). The complaint further spoke to "a systemic pattern of coercion, fabrication of evidence, [and] withholding of exculpatory information" (Plaintiff complaint, paragraph 169).

<u>Methodology:</u>

As noted above, in order to opine on the issues presented, I first reviewed the Internal Affairs files relating to each of the above-mentioned officers (Marquez, Graves, Arbogast & Ortega) that the plaintiff's lawyers represented were turned over in discovery by the City of El Paso. As I reviewed the files, I created a survey instrument to document specific issues and concerns that I identified during this review. (See Survey instrument, attached as Appendix 1).

**Exhibit 2**

I also reviewed the personnel files for the four above-noted defendant-officers and found references or documentation relating to several internal affairs cases that were not otherwise provided as part of each officer's internal affairs files and included the content in my overall review.

See Appendix 2 for a list of the files that were included in the discovery documents and made available for my review. I noted that some files appeared to be comprehensive, including Internal Affairs reports, witness statements and documentation of evidence collected, as well as findings and disciplinary documents; other files contained little if no background information and little if no evidence of any attempt to investigate the allegations nor explanation for rationale for findings. In general, I was able to determine the factual findings for allegations that were sustained by the Chief by reviewing disciplinary records (including written reprimands and notices of suspension) although, in the vast majority of cases, there was no documentation of the rationale used to make those findings. With respect to not-sustained findings, it was rare to find any rationale for the findings in the cases reviewed.

Workpapers were prepared for each case reviewed and are attached to this report. (See Appendix 3).[3]

As I reviewed the files, I identified certain problematic trends relating to El Paso Police Department administrative investigations:

1. In most formal internal affairs investigation files, sworn, written statements of involved officers and witnesses were provided; but there was no documentation as to how those statements were obtained. As such, there was no documentation that would lead a reviewer to be able to conclude that these statements were not coached, that leading questions were not asked, or that the investigators or other factors did not improperly influence the state of the evidence and the ultimate disposition of the case. For these reasons, the recording of interviews has always been considered to be a better practice than having investigators simply summarize witness statements with no other form of documentation.

2. In those formal IA cases where it was documented that a formal interview was conducted, most interviews were not audio or video recorded, as per the written instruction of the officer being interviewed. As such, it would be impossible to determine the quality or accuracy of the summaries of those interviews created by the IA investigator or the thoroughness or accuracy of the written statements later provided and documented in the file.

3. In those cases where there was potential dishonesty on the part of a subject-defendant officer, follow-up questions were not asked and no follow-up investigation took place

---

[3] Marquez files – Appendix 3A; Arbogast files – Appendix 3B; Graves files – Appendix 3C; Ortega files – Appendix 3D; Juvenile Files – Appendix 3E ; Files involving substantive discipline – Appendix 3F.

**Exhibit 2**

(n=10).[4] In general, there appeared to be no interest on the part of the Department to hold its officers accountable for false statements made during the course of its investigations. In addition, the department failed to impose serious discipline on any of the subject officers, even when there was clear evidence that the subject officers were deceptive over the course of an investigation.

4. The Department disciplinary matrix did not provide for the termination of an employee who willfully misrepresented a material fact, committed perjury or provided willfully false testimony in front of a court, unless that officer were to have committed a prior similar offense. Instead, officers committing these integrity-related violations were faced only with potential discipline ranging from a written reprimand to a suspension without pay (see, Appendix 4).

5. The personnel files and performance evaluations of the defendant-officers contained many references to their ability to obtain confessions from suspects and an extremely high clearance rate for homicides. Given the allegations in the civil complaint, there is reason to believe that the Department over-emphasized homicide clearance rates and encouraged aggressive interrogation techniques, without sufficient emphasis on the need to engage in constitutional activities when engaging in these activities.

Specifically, I identified that following serious deficiencies in the following administrative investigations of the defendant-officers:

### Detective Alfonso Marquez:[5]

Quantitative Results (Marquez):

| Marquez IA files reviewed | (33) (1973-1995) |
|---|---|
| • Officer Involved Shootings | (3) <br> • 4/14/1973 (injury) <br> • 7/31/1977 (injury) <br> • 8/26/1977 (no hit) |
| • Internal Complaints (Sustained) | (14) |
| | • 10/13/1973 (Inadequate Search – Verbal Reprimand) <br> • 8/27/1974 (At-fault traffic – Citation) <br> • 6/14/1980 (Stolen Vehicle – Preventable – Referred to ARB). <br> • 5/7/1982 (Misplaced Radio – Written Reprimand) <br> • 6/18/1982 (AWOL) – 1 day suspension <br> • 7/12/1986 (Failure to attend practice – Written Reprimand) <br> • 1/28/1988 (False Travel Reimbursement – 15-day suspension, reduced to 3 days after arbitration) <br> • 6/15/1988 (Failure to report for duty – 1-day suspension) <br> • 4/28/1989 (Traffic violation – Citation & Counseling) |

---

[4] See: Marquez (CP82-223, CP88-14, CP92-296, CP93-019, CP92-358); Arbogast: (CP81-435, CP82-300, IA85-26) ; Graves: (IA 85-197, CP 86-131).
[5] See Appendix 3A for case review workpapers.

**Exhibit 2**

|  | • 4/3/1990 (Failure to report for duty – 1-day suspension)<br>• 8/27/1992 (Illegal parking; Gun/badge in vehicle – Written Reprimand)<br>• 3/4/1993 (Failure to book narcotics – 3-day suspension)<br>• 7/13/1994 (Alteration of Wanted Poster – Written Reprimand)<br>• 9/24/1994 (Illegal activity at residence – Counseling) |
| • Internal Complaints (Not Sustained) | (1) |
|  | • Summer 1991, 1992 (Sexual Harassment) |
| • Civilian Complaints (Sustained) | (1) |
|  | • 8/18/1992 (Discourtesy; Unauthorized Person in Vehicle – sustained – 2 vacation days in lieu of suspension) |
| • Civilian Complaints (Not Sustained) | (14) |
|  | • 10/20/1974 (Police Brutality – In policy UOF)<br>• 3/12/1975 (On-duty drinking – Counseling only)<br>• 4/12/1975 (False Arrest – Not sustained)<br>• 6/20/1975 (Rudeness/Excessive Force – Not sustained)<br>• 11/13/1975 (False Arrest – Not sustained)<br>• 12/2/1975 (Threatening & Abusive Behavior – Other officer counseled)<br>• 12/12/1975 (Off-duty fight – Other officer counseled)<br>• 10/17/1976 (Excessive Force – Not sustained)<br>• 9/7/1979 (Excessive Force & Failure to ID – Not sustained)<br>• April 1983 (Aggravated Perjury – Not Sustained)<br>• 6/26/1985 (Excessive Force on a Prisoner – Not sustained)<br>• 10/2/1988 (Civil Suit – False Arrest & Threats – No investigation documents)<br>• 3/14/1990 (Excessive Force SWAT – Not sustained)<br>• 3/26/1992 (Lack of investigation; rude conduct – Information only) |

Summary of most significant cases (Marquez)

| DOI: 4/6/1984 | Marquez was alleged to have committed "aggravated perjury" when testifying at a motion to suppress regarding a confession he obtained in a homicide case. Marquez was "not sustained" for the allegation even though there was significant evidence that he, at minimum, provided inaccurate information under oath regarding the circumstances under which he took the confession (IA 84-079). |
| DOI: 4/19/1988 | Marquez was alleged by his Captain to have lied to him and during a follow-up IA investigation. Marquez received a 15-day suspension for filing an inaccurate expense sheet – the same discipline received by his partner officer who was not deceptive the investigation (CP 88-14). |
| 5/2/1988 – 5/20/1988 | Marquez suspended for 15-days (CP 88-14). |
| 10/19/1988 | Marquez suspension reduced by Arbitrator to 3 days due to Chief's inappropriate use of comparable discipline (CP 88-14). |

**Exhibit 2**

| DOI: 8/18/1992. Findings: 1/20/1993 | Marquez involved in an incident involving rudeness and unauthorized transport of a civilian in his police vehicle (CP 92-296). No investigation or findings regarding false statements made during the investigation. |
|---|---|
| DOI: 8/27/1992. Findings: 1/12/1993 | Marquez found to have 11 unpaid parking tickets after parking illegally and leaving his badge and gun inside an unoccupied vehicle. No inquiry was conducted into his questionable claim that he was not aware of the outstanding parking tickets (CP 93-019). |
| DOI: 9/21/1992. Findings: 10/27/1992 | Marquez and another officer failed to notify next of kin in a death investigation – Written Reprimand issued; The Department failed to look into inconsistencies regarding whether fingerprints were requested (CP 92-358). |
| 3/8/1993 | Vacation pay reduction in lieu of suspension (CP 92-296). |
| **4/10/1993** | **England-Lazo Homicide** |
| 4/28/1993 | Marquez suspended for 3 days for mishandling of narcotics evidence > used lost vacation days in lieu of suspension (CP 93-097). |

A review of the Internal Affairs files involving Detective Marquez identified a pattern of failures on the part of the El Paso Police Department to hold him accountable for lying during official investigations. There were three particularly egregious cases and two additional cases of concern.

Detective Marquez was commissioned as a police officer for the City of El Paso on September 20, 1972.[6]

On April 6, 1984, Detective Marquez testified at a court hearing in which the defendant was attempting to suppress a confession Marquez took in a homicide case. Detective Marquez testified that he did not begin to take the defendant's confession until 1:00 a.m.; his testimony conflicted with another Detective who testified that Marquez began interviewing the defendant hours earlier.

Although a special prosecutor concluded that there was no reason to believe that Detective Marquez intentionally attempted to deceive the court and two grand juries declined to indict Detective Marquez for perjury, the Internal Affairs investigation did not appear to include a robust interview of Marquez which would have required him to explain the apparent conflicts between his testimony and that of his partner Detective. Instead, Marquez was allowed to provide a conclusory statement asserting there was no intent to mislead the court.

In 1988, while serving at the rank of Detective, Marquez and his partner submitted inaccurate expense claims (CP 88-014). While the amount at issue was small ($40-50), his supervisor reported that when Detective Marquez was first confronted with the discrepancy (the officers submitted for reimbursement for renting two rooms when only one room was actually rented), he lied and claimed that the hotel had actually charged them for two rooms even though they had

---

[6] Marquez Personnel file, Discovery, p. 6943.

**Exhibit 2**

only used one. Marquez' partner, however, was reportedly truthful over the course of the investigation and accepted responsibility for submitting his inaccurate reimbursement request.

According to Detective Marquez' supervisor, Captain Aguilar, "I gave Det. Marquez an opportunity to rectify the situation when I called him over the phone but he deliberately lied to me" (Discovery, p. 44568). Captain Aguilar specifically quoted his conversation with Detective Marquez, reporting that he asked: "What arrangements did you make with the motel room?" "Marquez answered: We stayed in one room, but we paid for two. I even asked the clerk, if we stay in one room, do we still have to pay for both, and she said yes."

Even though there was no apparent reason to question Captain Aguilar's veracity, the Department treated the two Detectives equally, with no apparent concern about Detective Marquez having made a false statement to his Captain. To make matters worse, Detective Marquez subsequently denied having made the false statement to the Captain, further calling his credibility into question.

The Chief imposed 15-day suspensions on both officers, which were later reduced at arbitration to 3-day suspensions due to the Chief inappropriately relying on a non-comparable case to impose the discipline. In that case, the involved officer was found to have had "larcenous intent" when he requested reimbursement from the Department for a room charge at a rate higher than the rate he was actually charged (keeping $105-200 for himself).

Likely as a result of the Department's failure to address Marquez's false statement to his Captain, the arbitrator did not even address the issue, and Detective Marquez was provided with a clear message that lying about his conduct, even to a supervisor, would not result in any consequences.

Approximately four years later, on August 18, 1992, Detective Marquez got involved in a traffic collision while picking up his girlfriend's son from school in his police vehicle (CP 92-296). Detective Marquez was investigated and sustained for rudeness to the other driver (an elderly man who he threatened to arrest) and for the unauthorized use of his vehicle in transporting his girlfriend's son. Surprisingly, the Department failed to investigate Detective Marquez for a material omission in his original statement wherein he inferred that he was providing a public service by transporting a child in need and failing to acknowledge that he was actually doing a favor for his girlfriend in picking her son up from school while driving a city vehicle. The Department also ignored clear evidence that Detective Marquez lied to internal affairs when he claimed to be merely driving by the school at the time of the collision and not picking up his girlfriend's son at that time. As a result, Detective Marquez lost two vacation days, instead of being subjected to substantial discipline for misleading the Department regarding the circumstances of his misconduct.

Marquez' discipline in that case was finalized on March 8, 1993, only one month before the England-Lazo homicide, and would have sent a clear message to him that the Department was unconcerned about his credibility and was willing to accept whatever he said as true, regardless of any evidence otherwise. In addition, he would have been aware that Department command

**Exhibit 2**

staff was willing to accept a deficient Internal Affairs investigation in order to impose the least discipline possible for officer misconduct.

To make matters worse, another Internal Affairs case was initiated on against Detective Marquez on August 27, 1992, only days after he provided the false information in the aforementioned case, after it was discovered that Detective Marquez had 11 unpaid parking tickets (CP 93-019). Although the Department eventually issued Detective Marquez a Written Reprimand on February 16, 1993 (two months before the England-Lazo homicide), his claim that he was unaware of the existence of the 11 unpaid parking tickets was accepted at face value, with no further inquiry. It seems highly unlikely that any police officer would accept such a statement from a civilian as true, without further inquiry, and yet, the Department appeared to have no interest in examining this claim, which appeared on its face to be false (in the absence of any evidence to explain how Marquez would have been unaware of the 11 outstanding parking tickets). Thus, once again, Detective Marquez received a clear signal that there was no expectation that he act with integrity when faced with an inquiry into his actions or performance as a police officer on or off-duty.

In a fourth case, occurring in 1992, Detective Marquez was sustained for failing to adequately notify a next-of-kin, for which he received a Written Reprimand (CP 92-358). In that case, there were inconsistencies between the statement given by Detective Marquez (that he had requested the decedent's body be fingerprinted) and the statement by a Lieutenant that no such request had been made. And yet, once again, no further inquiry was made by the Department.

**Detective Earl Arbogast:[7]**

Quantitative Results (Arbogast):

| Arbogast IA files reviewed | (16) (1978-1992) |
|---|---|
| • Internal Complaints (Sustained) | (2) |
| | • 10/28/1981 (Willful damage to police vehicle; Untruthfulness – 3-day suspension)<br>• 8/8/1982 (Damage to City Property; Insubordination – Written Reprimand) |
| • Internal Complaints (Not Sustained) | (0) |
| • Civilian Complaints (Sustained) | (3) |
| | • 1/6/1984 (Fireworks/On duty Horseplay – Written reprimand reduced to Counseling)<br>• 1/5/1985 (Excessive force – Not Sustained; Verbal Abuse – Counselling)<br>• 3/22/1988 (Discourtesy – Not Sustained; Unsafe Driving Practices – Counseled) |
| • Civilian Complaints (Not Sustained) | (11) |
| | • 11/29/1978 (Unnecessary Force – "Unable to Resolve"<br>• 5/20/1980 (Unlawful detention & search – "Proper Procedures Followed")<br>• 1/21/1981 (Rudeness – No findings)<br>• 2/2/1981 (Discourtesy & Unlawful search – Not sustained |

---

[7] See Appendix 3B for case review workpapers.

**Exhibit 2**

| | |
|---|---|
| | • 3/19/1981 (Lack of Service – "No procedural violations"<br>• 5/4/1981 (Excessive Force – "No apparent basis for [allegation]")<br>• 5/11/1981 (Harassment; Excessive Force – Not Sustained)<br>• 5/14/1981 (Harassment – Not Sustained)<br>• 3/24/1983 (Unlawful search & civil rights violations – Not Sustained)<br>• 1/18/1989 (Unlawful detention/Excessive Force – Civil Lawsuit – No documentation of internal review)<br>• 3/26/1992 (Rude Conduct – Information only) |

Summary of most significant cases (Arbogast)

| DOI: 10/28/1981 | Officer Arbogast suspended 3 days for lying and damage to City vehicle (CP 81-435). |
|---|---|
| 8/8/1982 | Written Reprimand for damage to city property (a key ring) and Insubordination. Concerns re: untruthfulness not addressed (CP 82-300. |
| 3/7/1985 | Arbogast counselled for unprofessional conduct; issues re: untruthfulness not addressed (IA 85-26). |

A review of the Internal Affairs files involving Detective Arbogast identified one instance where he lied during the course of an internal investigation and two other instances where command staff did not believe he was being truthful but took no action consistent with those concerns.

Detective Arbogast was commissioned as a police officer for the City of El Paso on October 28, 1977.[8] On October 28, 1981, on his fourth anniversary as a police officer, then-Officer Arbogast and his partner engaged in "horseplay" during the "graveyard shift" using the vehicle's cigarette lighter to burn the steering wheel and dashboard of their vehicle. The officers, in a joint statement, represented that they believed the damage to be "old" and denied being the cause of the damage. On October 19, 1981, however, Officer Arbogast was reportedly interviewed by Internal Affairs and admitted that he and his partner were responsible for the damage. Their supervisor found that they were "therefore, guilty of Criminal Mischief, Willful Damage to City Property and Failing to cooperate with their supervisors by lying to them" (Discovery, p. 55579).

Although their Lieutenant recommended that the officers receive only a written reprimand and be held responsible for the cost of repair, their Captain found that "a suspension for deliberate destruction is in order" (Discover, p. 55575). Ultimately, the Acting Chief imposed a 3-day suspension on both officers – 1-day for the damage to the vehicle and 2-days for lying. In his 11/20/1981 findings, Captain Aldridge reported that "both officers participated in an act of deliberate damage to city property at a time when our budgetary capital resources are severely strained and under critical scrutiny…The officers then proceeded to deny their culpability, thereby leaving their fellow officers open to suspicion…"

---

[8] Arbogast Personnel file, Discovery, p. 8452.

**Exhibit 2**

A close examination of the IA file indicates more substantive misconduct on the involved officers' part. On the morning the officers reported the damage, it was in the form of a joint written statement claiming they did not see the damage during the first part of their shift "and did not notice it until daylight. We felt that it has been there for some time" (Discovery, p. 55603). The next day, October 29, 1981, Officer Arbogast wrote a second statement which was even more specific then the first: "The first time the hole was noticed was late morning. A casual reference was made to it. I know we are supposed to report damage to the patrol car but it did not seem to be a big issue at the time so we are at fault for not reporting it on Tuesday morning." On October 30, 1981, the supervising Sergeant reported to the Captain that he "once again" spoke to Officer Arbogast's partner and opined that "I definitely do not think that Arbogast and Orndorf would resort to such childish antics…they should have reported it, but often times an officer takes it for granted that something has already been reported…" At that time, Captain Aldridge recommended further investigation.

The file included subsequent written statements from the two involved officers, dated 11/19/1981, 3:45 p.m. by Officer Arbogast and 11/19/1981, 8:20 p.m. by Officer Orndorf. Officer Arbogast acknowledged that their "horseplay" was responsible for the damage and wrote: "I did not come forward earlier because I was afraid due to rumors on the incident recommending five days suspension and a fine" (Discovery, p. 55607). Officer Orndorf wrote: "if it would have come down to someone else being blamed for it, I would have stepped forward and admitted to it…" (Discovery, p. 55608).

Unfortunately, the file did not include any indication as to how Arbogast came forward to tell the truth. In his statement, Officer Arbogast only indicated why he did not come forward before (he was fearful of a 5-day suspension) and not why he decided to tell the truth. Specifically, there was no documentation on how the investigation progressed nor how the confessions were obtained or the circumstances behind those confessions (i.e., whether there were aggravating or mitigating factors in existence relating to the officers' admissions of guilt). And, in fact, there is nothing in the rationale provided by the chain-of-command that indicates any significance was given to those circumstances.

Even more disconcerting is Captain Aldridge's ultimate comment that "[m]y recommendations are too lenient. However, I feel that it undermines my position to have repeated reductions in my recommendations for suspension, so in this case I have made the adjustment myself" (Discovery, p. 55606).

As such, this case is indicative of a lack of Departmental concern regarding the circumstances of false statements and a clear disparity between command staff as to the quality and appropriateness of the imposition of discipline against its officers.

On August 8, 1982, then-Officer Arbogast reported that he broke and lost the key ring to his patrol call, initially offering no explanation to his supervisor. Ultimately, he explained that the key ring (value of only 60 cents) was broken after he threw it to his partner. Officer Arbogast ended up being insubordinate with his Sergeant after he was ordered to prepare an incident report. In his report up the chain-of-command, the Sergeant indicated that: "It only has a value of

**Exhibit 2**

perhaps 60 cents but it is most unlikely that it could ever have been damaged as the officer claims it was. First of all, the key ring consist of two loops of very strong metal. Even if one of the loops breaks, there is a second loop still keeping the keys from separating. Regardless of how the key ring became broken if it was the result of throwing, it stands to reason that it constitutes misuse." What is disconcerting is that even though Officer Arbogast's immediate supervisor believed (more likely than not) that he was lying about how the key was broken, there was no effort taken to determine the truth. There is no documentation that Officer Arbogast's partner was contacted or interviewed, and no written statements were taken. And this was on top of the October 28, 1981 incident (only 10 months prior) involving a false statement about damaged City property. This failure to even take the most elementary step possible (informally confirming the officer's story with his partner) seems indicative of a department that was unconcerned about officer credibility.

In yet another case, Officer Arbogast's partner officer was accused of verbally abusing and using unnecessary force, on January 5, 1985, during an arrest of off duty military personnel for intoxication. Both Officer Arbogast and his partner denied the allegations and specifically denied the allegations that Officer Arbogast's partner deliberately antagonized an arrestee by saying: "Fuck the army, Fuck the General, Fuck the General's mother…" as well as other insults. After reviewing the investigation, however, the reviewing Lieutenant concluded that, while "only necessary force was used to effect the arrest, ... [t]here are indications, however, that after the arrest was made the officers did engage in at least come unprofessional conduct. This was against an already abusive and combative prisoner and served no purpose other than to further incite an already hostile situation." The reviewing Captain and Assistance Chief agreed and determined the officers should be "counseled for certain aspects of conduct after arrest."

In the findings, there was no discussion or documentation of the fact that the officers specifically denied the committing the acts that were determined to be violations of Department policy. No allegation of untruthfulness was brought, considered, or adjudicated. The message to the officers was representative of a department that was unconcerned about truthfulness during an investigation and unwilling to act on such misconduct.

### Detective Scott Graves:[9]

Quantitative Results (Graves):

| Graves IA files reviewed | (12) (1985-1995) |
|---|---|
| • Internal Complaints (Sustained) | (4) |
| | • 7/24/1985 (Off duty – Interference with law enforcement investigation – Written reprimand) |
| | • 10/25/1985 (Failure to protect partner – counseled) |
| | • 7/18/1986 (Failure to arrest & unprofessional conduct – 1-day suspension) |
| | • 11/2/1986 (Failure to obey an order – Written Reprimand) |
| • Internal Complaints (Not Sustained) | (0) |
| • Civilian Complaints (Sustained) | (0) |

---

[9] See Appendix 3C for case review workpapers.

**Exhibit 2**

| • Civilian Complaints (Not Sustained) | (8) |
|---|---|
| | • 11/5/1985 (Excessive force – Not sustained) |
| | • 6/21/1987 (Disparaging comments; unprofessional conduct – Not sustained) |
| | • 9/29/1987 (False Arrest – Information only) |
| | • 3/26/1988 (Excessive Force – Not sustained) |
| | • 10/2/1989 (Discourtesy; False allegations – Information only) |
| | • 11/30/1992 (Harassment – Information only) |
| | • 3/10/1995 (Excessive Force – Not sustained) |
| | • 4/4/1995 (Rude & Unprofessional; Excessive Force – Not sustained) |

Summary of most significant cases (Graves)

| 7/24/85 | Graves (recent academy graduate) make statements contrary to those of Santa Fe RR police regarding his interference with a search of his in-law's residence. (IA 85-197) |
|---|---|
| 7/18/86 | Practical joke on female officer gone bad; coverup involving Officer Graves. (CP 86-131) |

A review of the Internal Affairs files involving Detective Graves identified two cases, early in his career wherein he made false statements during internal investigations and was not held accountable for those false statements.

On July 24, 1985, only five days after being commissioned as a police officer,[10] he was the subject of a complaint from officers with the Santa Fe Railroad police, who were investigating his father-in-law for theft from the railroad. According to the September 20, 1985, Written Reprimand from the Chief of Police:

> On [July 24, 1985]], several law enforcement officials of the Santa Fe Railroad arrived at the residence of your father-in-law, 5844 Marlin. These agents had obtained a consent to search for the home from your father-in-law. Additionally, this consent was verified by your mother-in-law. You were present at 5844 Marlin at the time that these agents requested to search the home. Despite the fact that these agents had properly identified themselves to you as peace officers of the State of Texas you hindered their search by continually requesting more identification, questioning their authority to carry weapons, and questioning the legality of the search. You became angry and continued to obstruct the search even though the search revealed stolen merchandise in the home…Your personal interference in the matter was uncalled for and not justified…Your actions in this matter, which have brought discredit upon yourself and upon the department, amount to dereliction of duty and will not be tolerated… (Discovery, p. 57635).

The Written Reprimand was issued even in the face of Officer Grave's statement that "I in no way hindered them or prevented them from searching…I kept a professional attitude at all times and at no time did I lose my temperament…there were no signs of bad feelings at any time as far

---

[10] Detective Graves was commissioned as an El Paso police officer on July 19, 1985 (Discovery, p. 9917).

**Exhibit 2**

as I could determine." While many departments routinely terminate probationers who engage in knowing misconduct, the most minimal form of discipline (a written reprimand) was chosen in this case. This was even given the fact that Officer Grave's statement was directly contrary to the statements of the complaining police officers. Even so, there was no documented discussion in the file of any concern regarding Officer Grave's integrity or credibility.

One year later, on July 18, 1986, Officer Graves was involved in a practical joke on a female officer (the same officer for whom he was counseled for failing to protect on October 25, 1985). In this case, the officers failed to take an intoxicated person into custody and instead advised a restaurant manager to call the police if the intoxicated male was not out of the bathroom "within five minutes" and a female officer would be dispatched to handle the call. Command staff determined that the intent of the officers was to embarrass the female officer by making her handle a call to remove a half-naked intoxicated male from the bathroom.

In a July 26, 1986, memo, the supervising Sergeant referred to the situation as "repulsive" and "disgraceful." He referred to the subject officer statements as:

> a source of shame. In every sentence they attempt to cover their dereliction and justify their actions with garbage excuses…That joke had every potential of serious consequences and yet [a witness officer] dare refer to them as "fine officers" … Perez won't shoulder his responsibility either, actually he started this mess.

Even after recognizing that the case involved an intentional cover-up by the involved officers, the Sergeant recommended only a one-day suspension, although he also indicated that "I further hope that they each appeal this suspension so that their laxness of duty will become heard before the Civil Service Commission…." (Discovery, p. 57539).

The reviewing Lieutenant subsequently wrote: "I have reviewed the incident and Sgt. Maestas' recommendation. On an emotional level I might tend to concur with Sgt. Maestas' recommendation. Realistically, however, I must consider the past work records of each officer involved. I, therefore, recommend that each officer involved be given a Written Reprimand" (Discovery, p. 57540).

The case was subsequently sent by the Chief to Internal Affairs on July 28, 1986. On September 26, 1986, Sergeant Maestas, after having reviewed the IA investigation, wrote:

> I still find inconsistency in every [SO's] statements ... I restate that in my opinion the subject was in need of police attention… Even though [there] might not have been any maliciousness intended by any of the original four officers. It did result embarrassing to officer S. DeAngelis and it involved the public. It definitely brought discredit to the Police Department.

The Sergeant reported that one of the subject officers did not become involved in the incident until afterwards when he was informed,

> by someone whom he can not recall, that it was intended as a joke…He relays this information to his recruit partner…Yet when instructed to give his statement…, he does not make any mention of the joke issue. Undersigned feels that he purposely left it out. I

**Exhibit 2**

maintain that a 1-day suspension without pay is justified to each of the above named officers (Discovery, p. 57541).

Lt. Grijalva subsequently recommended a Written Reprimand be issued "based largely on the Officers' past work records, which, for the most part, are good. It is quite obvious that the Officers were derelict and that they intended to play a practical joke, despite their attempts to rationalize their actions" (Discovery, p. 57542). This recommendation was followed up by the reviewing Captain who wrote: "I still feel that a written reprimand and good counselling session is sufficient to impress on those officers involved that their actions were uncalled for and that stronger measures will be taken in the future, regardless of whether it is a practical joke or not, especially one that backfires" (Discovery, p. 57537).

Ultimately, the Chief imposed discipline of one-day suspension for all the involved officers (Discovery, p. 57537).

The ultimate finding of the Chief, for all of the officers, was as follows:

> In the early morning of July 18, 1986, you and three other officers were eating in the WataBurger Restaurant at 8101 Dyer Street. There was an intoxicated subject in the restaurant at that time. You chose not to arrest the individual at that time although one hour later the same subject was arrested for public intoxication by other officers at the same location. All of you left the scene at the same time and you told the manager to call the police, if the subject, who by now was in the men's restroom, had not left in five or ten minutes. One of the other officers, in a joking and unprofessional manner, said a female officer would be sent to help, and all of you joked and laughed about this in front of the employees. Your conduct was improper and brought discredit on the department. Further, had you made the arrest at the first contact with the subject, this would not have necessitated the response of four other police officers one hour later. For the above reasons you are hereby suspended for one day…  (Discovery, pp. 57601-57602).

The ultimate disciplinary decision failed to make any mention of the attempted cover-up and the false statements made during the course of the investigation. Even though the reviewing Sergeant clearly identified the conduct of the officers as "repulsive" and "disgraceful" and clearly identified the falsity of the statements that were made, the chain-of-command completely ignored those violations and went ahead and disciplined the officers solely for their conduct at the time of the incident. The fact that the supervising Sergeant found the actions of the officers contrary to the values of the Department, but still only recommended a one-day suspension, appears to corroborate the previously referenced statement of the police Captain who recognized in 1981 that his disciplinary recommendation was "too lenient" but required "adjustment" to avoid being overturned by the Chief.

Although Detective Grave's personnel file shows that by 2006 he was eventually promoted to a Commander position, these two instances, in his early years of employment, are troubling. Just when he was learning what it was to be an EPPD officer, the message he was receiving was clear: integrity was not truly part of the values or mission of the department.

**Exhibit 2**

**Detective Carlos Ortega:**[11]

Quantitative Results (Ortega):

| Graves IA files reviewed | (8) (1982-1995) |
|---|---|
| • Internal Complaints (Sustained) | (4) |
| | • 11/21/1983 (Failure to complete police report – 2nd violation – Written Reprimand)<br>• 8/9/1984 (Out of assigned district without permission – Written Reprimand)<br>• 1/2/1988 (Prisoner Escape – Written Reprimand)<br>• 2/10/1995 (Expired Driver's License – Written Reprimand) |
| • Internal Complaints (Not Sustained) | (3) |
| | • 4/21/1983 (Injury to Suspect – Brain Bleed – Info only)<br>• 7/20/1987 (Domestic Incident – Self Report – Info only)<br>• 6/2/1990 (Domestic Incident – Counseling) |
| • Civilian Complaints (Sustained) | (0) |
| • Civilian Complaints (Not Sustained) | (1) |
| | • 3/31/1982 (Excessive Force – Not sustained) |

Summary of most significant cases (Ortega)

| 8/9/1984 | Ortega out of assigned district without permission, after being ordered to stay in assigned district; no investigation for why failed to follow orders (CP 84-183). |
|---|---|
| 7/18/86 | Expired Driver's License (4 months) (CP 95-094). |

A review of the Internal Affairs files involving Detective Ortega identified two particular cases of concern.

The first case took place in 1984, a little more than four years after Detective Ortega was commissioned as a police officer.[12] On August 9, 1984, then-Officer Ortega was involved in a minor traffic collision which, upon being reported, disclosed that he was out of his assigned district, without permission, "after having been told to remain in his district on at least two prior occasions."

According to the Written Reprimand, which was issued on August 13, 1984:

> On this date, you were again out of your assigned district without permission. On at least two previous occasions you have been counselled by your supervisors to remain in your assigned area yet you continued to disregard these instructions. Your actions amount to dereliction of duty and will not be tolerated…

---

[11] See Appendix 3D for case review workpapers.
[12] Detective Ortega was commissioned as an El Paso police officer on 5/20/1980 (Ortega Personnel file, Discovery, p. 7595).

**Exhibit 2**

In a written, signed and sworn statement, Officer Ortega asserted that he was "in that vicinity as burglary of vehicles and thefts occur frequently in that area" (Discovery, pp. 56098-56099).

There is no documentation that Officer Ortega was asked to elaborate on why he chose to be out of his district; nor why he chose to ignore prior orders to stay in his District. As such, it appears that the Department chain-of-command did not have sufficient information on which to adjudicate this incident. As such, in this case, Officer Ortega was not asked the "hard questions" and was not actually held accountable for his conduct.

On February 10, 1995, it was discovered by the Department that then-Detective Ortega had been driving on an expired license for almost four months (license expired on October 15, 1994, and was not renewed until February 13, 1995).

According to the Written Reprimand that was issued on March 15, 1995:[13]

> On February 10, 1995, it was discovered that your Texas Driver's License was expired. Sergeant Meza learned of this and upon asking you, you admitted to it having been expired. Your driving privilege had expired on October 15, 1994, and you knowingly operated a vehicle, to include a city vehicle, for approximately 4 months. As a police officer, you are expected to adhere to all state laws and refrain from engaging in conduct which brings discredit upon yourself. As such, policies and procedures are established to ensure that you comply with all state laws. Your failure to renew your driving privilege is not only a violation of state law, but a violation of Departmental rules and regulations. Your negligence reflects poorly on your judgement and will not be condoned… (Discovery, p. 8040).

The actual IA file does not appear to have been turned over in discovery; instead, the only documentation is a one-page "Personnel Incident Report" (Discovery, p. 8039), and the Written Reprimand, which were located in Detective Ortega's personnel file. There is no documentation that Detective Ortega was required to provide an explanation for why he allowed his license to expire and why it took him so long to renew his license. In most police departments, having a valid driver's license is job requirement. It seems almost unbelievable that a homicide detective would be driving city vehicles while unlicensed. Further inquiry would seem required before adjudication of this case and before the issuance of only a Written Reprimand.

**Juvenile Cases[14]**

In my review of the thirteen Internal Affairs files identified by the plaintiff attorneys involving juveniles, I found a troubling pattern of the EPPD ignoring apparent violations of policies intended to protect the rights of juvenile suspects and witnesses; and, in those cases where policy violations were identified and addressed (n=2), the department appeared to ignore systemic issues and/or imposed insufficient discipline.

---

[13] Nine days before the guilty verdict was rendered on Mr. Villegas, after his second trial.
[14] See Appendix 3E for case review workpapers.

**Exhibit 2**

Of the juvenile cases reviewed, there were failures on the part of the department to identify or adjudicate juvenile policy violations in five of the cases.[15] In seven of the cases,[16] even though discipline was imposed, there were significant deficiencies in the handling of the cases.

Summary of most significant cases

| 11/14/1992 | Two TAC Sergeants were sustained for taking juvenile suspects to the TAC office for questioning and for questioning juveniles without parental permission, receiving suspensions of 8 and 10 days. A detective and another Sergeant were sustained for excessive force against a juvenile. No findings were made for numerous allegations, including juvenile policy violations by four subject officers; Suspensions did not appear to consider false statements by subject officers. (IA 92-174) |
| --- | --- |
| 1/6/1993 | A TAC Sergeant and Lieutenant were investigated for Supervisory Dereliction of Duty for ordering/allowing officers to systemically violate juvenile policies intended to protect juvenile suspects and witnesses. Initial discipline ignored false statements by the subject Sergeant and there was no documented action taken by the EPPD on evidence identified by IA showing potential systemic violations of juvenile policy (Sworn witness statement of Officer J. Arbogast acknowledging systemic violations of policy requiring parental consent prior to interviewing a juvenile). (CP 93-009) |

With respect to CP 93-009, an administrative investigation was conducted relating to allegations that the Tactical Unit was systemically violating policies relating to juveniles in that officers were taking juvenile suspects to the Tactical Unit for interrogation (instead of taking them to the

---

[15] IA 88-041 (failure to adjudicate clear violations of juvenile policies to include: interrogation of juvenile by officer who is not a juvenile officer; failure to transport to a juvenile facility; failure to get parental permission prior to interrogation); IA 89-015 (Attempts to question without parental permission not identified or adjudicated.); IA 91-029 (Evidence of juvenile policy violations that went unidentified by IA and unaddressed by command staff); CP 91-046 (Juveniles taken to station instead of JSD); IA 92-174 (No findings against numerous officers for juvenile policy violations).

[16] IA 89-070 (Vague findings; officer denied all misconduct but no finding on lack of truthfulness and apparent insufficient discipline for use of excessive force); IA 90-183 (2-days suspension reduced to Written Reprimand by Civil Service Commission; Sustained for improper charge; No punishment for unnecessarily engaging a hostile crowd and making a mass arrest without cause); CP 92-015 (Sustained for verbal abuse, arrest procedures and failing to document the incident. Written Reprimands only. Not sustained for excessive force. Letter to complainant was misleading, not indicating that excessive force allegation was not sustained); CP 92-205 (3-day suspensions overturned by Civil Service Commission. No documentation of any action taken against Sgt. who provided testimony contrary to IA statement at CSC hearing); IA 92-019 (Written Reprimand only. Command staff fails to address issue of untruthfulness; Written Reprimand given for multiple violations, including assault, improper detention and failure to identify self); IA 92-174 (Suspensions ranging from 3 to 10 days against Sergeants and a Detective. No findings for numerous allegations; Suspensions did not appear to consider false statements by subject officers; No findings against numerous officers for juvenile policy violations. Heavy suspensions against two Sergeants for juvenile policy violations); CP 93-009 (Written Reprimand for Lt. for failure to supervise; Sgt. receives 20-days suspension (instead of demotion or termination), reduced to 4-days, prior to arbitration. Notice of wide-spread juvenile policy violations by witness officer went unaddressed).

**Exhibit 2**

Juvenile Service Division as required by a court order) and interviewing juvenile witnesses without parental consent. In a sworn statement, dated January 6, 1993, Officer J. Arbogast made the following statements:

> In reference to my opinion which maybe I should not give but will anyway. I think that there will always be black and white rules set forth only to cover those which sit above us but reality to the officer is good performance and solvability. I think every officer in the unit at any given time has put out his most to make the unit as good as possible and to solve the gang crimes by the most effective means. It has not only been our unit, but reality is other units operate with juveniles which may somewhat bend those rules for juveniles… If we never spoke to juveniles without parental consent first our solvability factor would be that much worse…"

There is no documentation that the Department followed up in any way on Officer Arbogast's suggestion that officers were, in fact, systemically failing to follow court orders and department policy relating to the handling of juveniles in the interest of "solvability." And the fact that Officer Arbogast was willing to make this statement, supporting the concept of "Noble Cause Corruption" in a sworn statement to Internal Affairs, without any apparent fear of accountability, is particularly troubling.

**Cases Involving Substantial Discipline:[17]**

I was also asked to review three cases where substantial discipline was imposed on the subject officers and opine on the quality and reasonableness of the underlying investigations and disciplinary decisions. In all three cases, I found evidence supporting reason to question the extent to which the El Paso Police Department was capable of policing itself and holding its officers accountable for misconduct.

| 9/5/1989 | A witness officer comes forward to report that a Lieutenant used excessive force on auto burglary suspects, to include threatening them and beating them with a tire iron. The Lieutenant received a 6-month suspension, (which appears to have been ultimately reduced to 88 days). No findings or apparent consideration was given to the Lieutenant's false statements or appearance of an attempt to retaliate against the reporting officers. No findings were made against the Lieutenant for intimidation of suspects. No rationale provided by the Chief for his failure to terminate or demote the Lieutenant, even though the Lieutenant denied doing anything wrong. In his deposition, the Chief testified that he left a note for the next Chief to ensure that the reporting officers were not assigned to the subject Lieutenant in the future (Scagno, pp. 85-86) – thereby potentially negatively impacting the reporting officers as opposed to the subject Lieutenant. |
|---|---|

---

[17] See Appendix 3E for case review workpapers.

**Exhibit 2**

| | No documentation of debriefings with Tactical Section officers regarding obvious code of silence issues and the importance of avoiding retaliation against cooperating officers. (CP 89-194) |
|---|---|
| 12/23/1991 | An officer lied under oath during an arbitration hearing about his educational background. He was appealing a 4-day suspension in a prior case for receiving a gratuity from a city contractor. He received a 10-day suspension even though his only explanation for lying was: "it seemed prudent at the time." (CP-92-006) |
| June 1993 | A field training officer (FTO) was turned in by his probationer for instructing the probationer to write a false report relating to a pat down search that resulted in the seizure of marijuana. The FTO received a 30-day suspension (reduced to 20-day suspension + 10 vacation days per contract). Other officers were alleged to have violated an administrative gag order and/or engaged in retaliatory action against the probationer who ended up resigning from the department after four months of alleged harassment.[18] No rationale was documented for any of the findings. A 10-day suspension was given to the one officer who was sustained for encouraging other officers to retaliate against the probationer for reporting on his FTO.<br>The department failed to discipline the subject officers for making false statements to Internal Affairs. The subject FTO was allowed to keep his job even though he minimized the significance of his attempt to engage in Noble Cause Corruption and falsely denied threatening the probationer with a poor performance review. (CP 93-264) |

The El Paso Police Department's Discipline Matrix:

By at least 1988, the Department had a specific prohibition against the making of false statements (Rule No. 16 - Willful Misrepresentation Prohibited).[19]

The prohibitions of Rule No 16 were minimized by the Department, however, in its disciplinary matrix, which allowed for the issuance of a Written Reprimand in some cases involving a first-time sustained finding for a violation of that rule and only called for potential termination in

---

[18] There was no documentation in the file of any investigation of the allegations of harassment the probationer made in his resignation letter.

[19] **Rule No. 16 (Willful Misrepresentation Prohibited)**
(1988 Policy Manual, Discovery pp. 21310; 1992 Policy Manual, Discovery at p. 21728)
No member of this Department shall willfully misrepresent any matter, sign any false statement or report, perjure themselves, or give false testimony before any Court, Grand Jury, Board, Commission, Official Hearing of departmental Hearing.
No Officer or Employee of this Department shall attempt to procure appointment, promotion or transfer in the department by means of willful misrepresentation…

**Exhibit 2**

cases involving a second such violation. (1988 procedures manual, Discovery, pp. 21040-21043; attached as Appendix 4).[20]

El Paso Police Department Discipline Matrix (Discovery, p. 21398)

| 1. Violation of departmental rule 6, 7, 15, **16**, or 22 of the Departmental Procedures Manual [1992] | Written Reprimand Suspension | Suspension to Termination | Termination |
|---|---|---|---|

The Department improved its matrix by further refining it in its 1992 procedure manual wherein it indicated a "minimum [punitive] action" for "Willful Misrepresentation of fact (Written Statement)" of a 10-day suspension and a 30-day suspension for "Willful Misrepresentation of Fact (Sworn Testimony at Administrative or Criminal Hearing)." (see, 1992 procedures manual, Discovery, p. 21705; attached as Appendix 4, p. 6).

However, even with the increase in presumptive discipline for false statements, the Department still sent a bad message to its officers in that while presumptive termination existed for "Theft" and "Drug Involvement," there was not presumptive termination for any integrity-related violation, even "aggravated perjury." (Id.)

Department Commendations & Feedback

A review of defendant-Marquez' personnel file shows that beginning in 1984, there were multiple positive comments in his personnel evaluations regarding his ability to interview and interrogate.[21] In addition, his personnel file referenced homicide clearance rates that were substantially higher than rates observed in other jurisdictions. Specifically, a letter of commendation from Deputy Chief William Long, dated September 18, 1985, was placed in Detective Marquez' file which documented a 100% homicide clearance rate for the 1984 calendar year with "successful conclusion[s]" for 26 murders in the City that year (Discovery, pp. 7173-7174). In comparison, the population of El Paso in 1984 was 501,000;[22] and the overall homicide clearance rate for cities of that size for that year was only 71.8%.[23]

In addition, Detective Marquez received a commendation, dated January 14, 1994, noting his "uncanny ability to obtain confessions on tough cases." (Discovery, pp. 7297-7298).

---

[20] Although, it does appear that a violation of the rule prohibiting willfully false statements that caused "a loss of or damage to the property of a third-person," "bodily injury to a third party," or was "regarding [a] use of deadly force causing serious bodily injury or death" could have resulted in termination for a first offense violation.

[21] See Personnel Evaluations, December 1984 (p 7169), June 1985 (p. 7172), December 1985 (p. 7180), June 1986 (p. 7183), December 1986 (p. 7187), December 1987 (p. 7191), December 1990 (p. 7244), June 1991 (p. 7246), December 1991 (p. 7249), June 1992 (p. 7252), December 1992 (p. 7261), June 1993 (p. 7290), December 1993 (p. 7295), December 1994 (p. 7306) and October 1996 (p. 7328).

[22] El Paso Metro Area Population 1950-2022 | MacroTrends.

[23] 98762NCJRS.pdf (ojp.gov), p. 154.

**Exhibit 2**

Further, in Detective Arbogast's personnel file, is a "Recommendation for Meritorious Unit Citation for CAP," dated March 6, 1997. The letter, directed to the Police Chief and signed by the Commander of the Crimes Against Persons Section, specifically noted a 95% homicide clearance rate "in the last ten years," and the expectation of a 100% homicide clearance rate for 1996. The population of El Paso in 1996 was 634,000;[24] the overall homicide clearance rate for cities of that size for that year was only 54.7%.[25]

Moreover, between 1980 and 1997,[26] the homicide clearance rates El Paso reported to the Federal Bureau of Investigation's Uniform Crime Report reporting program were substantially higher than the overall U.S. national homicide clearance rate (see Table 1).[27] El Paso's homicide clearance rates were, on average, 21.95 percentage points higher than the overall U.S. national homicide clearance rate during that time period. It is well established that in cases where a police department overemphasizes arrests or clearance rates over integrity and constitutional policing and/or fails to place an emphasis on or enforce rules relating ethics and integrity, the risk of employees engaging in "noble cause corruption" is increased. (See discussion, infra.)

**Table 1**
**Comparing National (U.S.) and El Paso, Texas**
*Homicide Clearance Rates*
1980-1981 & 1984-1997[1]

|      | U.S. National Homicide Clearance Rates | El Paso Homicide Clearance Rates |            |
|------|------------|------------|------------|
|      | % Cleared  | % Cleared  | Difference |
| 1980 | 71.9%      | 93.2%      | 21.3%      |
| 1981 | 70.9%      | 97.2%      | 26.3%      |
| 1984 | 73.8%      | 77.8%      | 4.0%       |
| 1985 | 69.1%      | 96.7%      | 27.5%      |
| 1986 | 69.7%      | 88.5%      | 18.7%      |
| 1987 | 67.6%      | 86.2%      | 18.7%      |
| 1988 | 68.1%      | 80.0%      | 11.9%      |
| 1989 | 60.4%      | 86.7%      | 26.3%      |
| 1990 | 65.7%      | 86.7%      | 21.0%      |
| 1991 | 62.7%      | 78.0%      | 15.3%      |
| 1992 | 64.0%      | 85.1%      | 21.1%      |
| 1993 | 59.9%      | 96.4%      | 36.4%      |

---

[24] El Paso Metro Area Population 1950-2022 | MacroTrends.
[25] CIUS 1996 Section III - Crime Index Offenses Cleared (Document Pages 203-212) (fbi.gov), p. 205.
[26] This table excludes El Paso's clearance rates for 1982 and 1983 since valid clearance data were not available for those years.
[27] Vera Institute of Justice. Arrest Trends. (www.arresttrends.vera.org) reporting the Federal Bureau of Investigation, Uniform Crime Reporting Program Data [United States]: Offenses Known and Clearances by Arrest 1980-2016," database (Ann Arbor, MI: Inter-university Consortium for Political and Social Research).

**Exhibit 2**

| 1994 | 62.1% | 77.8% | 15.7% |
|------|-------|-------|-------|
| 1995 | 59.3% | 90.5% | 31.2% |
| 1996 | 58.6% | 78.4% | 19.8% |
| 1997 | 60.8% | 96.9% | 36.1% |
| **Mean** | **65.3%** | **87.2%** | **21.95%** |

Citation: Vera Institute of Justice. *Arrest Trends*. Last modified May 2021.
www.arresttrends.vera.org.
Source Data Notes: Reported data were accessed through the Vera Institute of
Justice's *Arrest Trends* data analytics tool, which aggregates and reports the
Federal Bureau of Investigations, "Uniform Crime Reporting Program Data
[United States]: Offenses Known and Clearances by Arrest 1980-2016,"
database (Ann Arbor, MI: Inter-university Consortium for Political and Social
Research).
¹ El Paso Uniform Crime Reports homicide clearance data were unavailable for
1982 & 1983 and were excluded from this table.

Noble Cause Corruption:

"Nothing is more inimical to the rule of law than police officers, sworn to uphold the law,
flouting it and using their authority to convict innocent people."[28]

In a 2009 book on police corruption, Prenzler created "a six-part typology of police corruption
and misconduct…designed to capture both the breadth of possible misconduct and also discrete
types." They included: 1) "Graft or 'classic corruption;" 2) "Process corruption" which "involves
tampering with, or fabricating evidence; 3) "Excessive Force;" 4) "Unprofessional conduct" (not
including graft); 5) Internal or workplace deviance (including sexual harassment and workplace
discrimination); and 6) Unprofessional conduct off-duty.[29]

It is "process corruption" (tampering with or fabricating evidence) and, usually, excessive force,
that falls within the term of "noble corruption" and that would include using unconstitutional
practices to obtain false confessions. The consequences of noble cause corruption, in the form of
both manufacturing evidence and covering up wrongful police conduct, clearly has the potential
to cause substantial harm to public confidence in the police. It also has the potential to negatively
affect the credibility and efficiency of the criminal justice system.

The Los Angeles Police Department was well known for its disdain of traditionally corrupt
activities.[30] However, as established by the "Christopher Commission" (1991), a "Board of
Inquiry" conducted by the LAPD command staff (2000) and the post-Rampart investigation by
the U.S. Department of Justice, (USDOJ – "LAPD Notice of Investigation Letter" (May 8,
2000)), excessive force and false arrests of gang members were tolerated within the culture of the
LAPD. As such, within the LAPD culture, traditional corruption was considered unacceptable

[28] Chemerinsky, Erwin. "An Independent Analysis of the Los Angeles Police Department's Board of Inquiry Report
on the Rampart Scandal." Loyola of Los Angeles Law Review, 34:545 (2001): 549-550, 549.
[29] Prenzler, Tim. "Police Corruption: Preventing Misconduct and Maintaining Integrity." CRC Press: Boca Raton,
2009: pp. 15-17.
[30] Cannon, Lou. Official Negligence: How Rodney King and the Riots Changed Los Angeles and the LAPD.
Westview Press. Boulder, Colorado (1999): p. 53.

**Exhibit 2**

and immoral, while noble cause corruption was accepted as a necessity in support of the fight against violent crime.[31]

In Chicago, in the late 1980s and 1990s, police detectives "used severe interrogation tactics, such as physical force, suffocations, and electric shocks, to coerce confessions from predominantly black men living on Chicago's South and West Sides."[32] The Chicago Tribune reported that the Detective Jon Burge was convicted in 2010 of lying about the torture of suspects after special prosecutors had alleged Burge and his "so-called midnight crew of rogue detectives led the torture of criminal suspects for two decades, coercing dozens of confessions."[33]

Noble Cause corruption has been described in varying terms to include: "corruption committed in the name of good ends…it is the corruption of police power, when officers do bad things because they believe that the outcomes will be good;"[34] "corruption committed in the name of good ends;"[35] and "perjury committed by an honest officer in pursuit of a good cause."[36] "Noble cause corruption, also known as process corruption; refers to the manipulation of the justice system, usually to ensure a conviction."[37] As has been noted by multiple authors, however, "such a process…subverts the justice system by removing the opportunity for a fair trial and relying on proof beyond a reasonable doubt as the basis of guilt."[38]

It can be argued that traditional corruption, is by definition, a self-serving act which places the desires of the violator above the needs of the community or the department they serve. And, in the absence of appropriate ethics and integrity training (and discipline for ethics and integrity violations), there is always the danger that noble cause corruption will be perceived as being in support of a higher calling. "[The noble cause] is a profound moral commitment to make the world a safer place to live…Police believe they're on the side of angels…"[39]

---

[31] Christopher Commission. Report of the Independent Commission on the Los Angeles Police Department. 1991. Located at: https://archive.org/details/ChristopherCommissionLAPD; Los Angeles Police Department. Board of Inquiry into the Rampart Area Corruption Incident. March 1, 2000. Located at: http://assets.lapdonline.org/assets/pdf/boi_pub.pdf.; USDOJ – "LAPD Notice of Investigation Letter." May 8, 2000. Located at: https://www.justice.gov/crt/lapd-notice-investigation-letter.

[32] Investigation of the Chicago Police Department (U.S. Department of Justice). January 13, 2017, p. 19. Located at: www.justice.gov/opa/file/925846/download.

[33] Chicago Tribune (September 19, 2018), Jon Burge and Chicago's legacy of police torture. Located at: www.chicagotribune.com/news/ct-jon-burge-chicago-police-torture-timeline-20180919-htmlstory.html.

[34] Crank, John and Caldero, Michael. Police Ethics: The Corruption of Noble Cause. Anderson Publishing: New Providence, N.J. (2010): 2.

[35] Martinelli, Thomas. "Updating ethics training policing privacy series: Noble cause corruption and police discretion." Police Chief, 78(3) (2011): 60.

[36] Crank, et. al. (2010): ft. 13.

[37] Merrington, Shannon, Lauch, Mark, Bell, Peter, and Keast, Robyn. "An Exploratory Study of Noble Cause Corruption: The Wood Royal Commission New South Wales, Australia 1994-1997." International Journal of Management and Administrative Sciences Vol. 2, No. 4 (2014): 20 (citing "Research Report on Trends in Police Corruption." Sydney: NSW Parliament (2002); and Caless, Bryn. "Corruption in the Police: The Reality of the Dark Side." The Police Journal, 81(1) (2008): 324.

[38] Ibid.; Chermerinsky (2001).

[39] Crank and Caldero (2000): 35.

**Exhibit 2**

Even as traditional corruption can be described as having a dramatic impact on public health and welfare,[40] noble cause corruption can be described as even more insidious. Noble cause corruption can be considered the surreptitious creation of a police state, where the police are the judges, juries, and executioners of "the assholes," those who are best controlled by "street justice."[41] In worst case scenarios, the police make irrelevant the roles of the prosecutor, judge and jury. They make up the evidence and ensure it will come to a certain result so long as they can trick the other stakeholders of the criminal justice system into believing that they have come to court with their integrity in place. However, if they lose the faith of these stakeholders, the result is equally calamitous - the guilty may go free because prosecutors, judges and juries lose faith in the integrity of the police and may assume their testimony is false; the ultimate result would be a form of anarchy, where the criminal justice system is incapable of operating in a fair and equitable manner.

Ultimately, while it may be more politically palatable to treat traditional corruption (acts committed in favor of one's own interests) as more serious than noble cause corruption (acts committed in support of the perceived community interest), the consequences of both forms of corruption appear to be equally harmful to the administration of justice and the reputation and efficiency of the criminal justice system. While from a limited point of view, noble cause corruption may seem more defensible than traditional corruption, specifically when considering the motivation for the misconduct; when looking at the overall and long-term harms of police misconduct, neither can be tolerated in an ethical policing environment.

Unfortunately, the El Paso Police Department appeared to have no interest in minimizing the risk of Noble Cause corruption in its ranks. In the case where defendant-Arbogast's brother, Officer J. Arbogast, acknowledged that officers would not ask for parental permission prior to interrogating juveniles given the negative impact on "solvability," no documented action was taken by the Department to obtain further information from Officer Arbogast, counsel him or act upon his allegation of systemic misconduct. In the case where an FTO encouraged his probationer to lie about the probable cause underlying his illegal seizure of marijuana, the Department allowed him to justify and minimize his misconduct and lie to Internal Affairs while still keeping his job.[42] And further, by allowing a Lieutenant. who engaged in "street justice" by threatening and beating auto burglary suspects and then justifying his actions, to remain in a command position, the Department made it clear that Noble Cause corruption was not ultimately inconsistent with Department values.

---

[40] See, Mollen Commission description of the harms of traditional corruption. Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department. New York Police Department, New York (1994), p. 15. ("…the victims of corruption are not the drug dealers on the streets of East New York. Indeed, they are often corruption's beneficiaries. The victims of today's corruption are the thousands of law-abiding individuals who live in the high-crime, drug-ridden precincts of our City… [Drug-related corruption] breeds [a] sense of abandonment and hostility that poisons relations between the community and corrupt and honest cops alike. And corruption victimizes the millions of law-abiding residents of this City who depend upon the credibility and effectiveness of the police to fight the war against crime that threatens us all").

[41] See Van Mannen, J. (1978). The Asshole, in Manning, J. & Van Mannen, J (Eds.) Policing: A View from the Street, pp. 221-38); Crank and Caldero (2000), 39-40, 155.

[42] Nor was there any documentation that the FTO was even removed from the FTO program.

**Exhibit 2**

<u>Conclusions:</u>

As a result of the El Paso Police Department's inadequate administration of discipline, refusal to even investigate prima facie cases of false statements, and apparent over-emphasis on the use of suspect interrogations to clear homicide cases, the following answers to the questions presented can be provided, specifically as they relate to the conduct of the aforementioned defendant-police officers:

1. Were there systemic deficiencies in the El Paso Police Department's Internal Affairs practices?

   Yes. A review of the defendant-officer internal affairs files indicates a practice of failing to investigate untruthful statements and integrity-related violations against El Paso Police Department officers.

2. If yes, is it likely that those deficiencies would cause constitutional violations such as those alleged by Daniel Villegas? Is it likely that those deficiencies would cause wrongful convictions?

   Yes. The defendant-officers had no reason to believe that the Department would hold them accountable for any false statements or integrity-related violations. Due to the nature of their work, police Detectives have a great deal of discretion in the performance of their duties and are subject to minimal direct supervision. For a Detective who believes that it is permissible to lie during the course of an internal investigation, it is only a small step to engage in Constitutional violations and lie about those actions in the pursuit of street justice ("Noble Cause Corruption"). In addition, the department's apparent reliance on suspect interrogation in support of a 100% clearance rate on homicides likely sent a message to the investigating detectives that obtaining suspect confessions was a primary goal of any investigation, regardless of how that confession was obtained.

3. Did the Chief of the El Paso Police Department (or his designee) have an obligation to be aware of the deficiencies in the El Paso Police Department's internal affairs department and to correct them?

   Yes. The Chief is directly responsible for the imposition of discipline in his or her department. The Chief is further directly responsible for creating a culture of integrity within a police department. The inadequacies in the investigations and imposition of discipline as to the defendant-officers should have been readily apparent to the Chief-of-the-day and his command staff.

4. Did the El Paso Police Department fail to adequately supervise the defendant-officers?

   Absolutely. El Paso Police Department supervisors became aware that at least three of the detectives (Marquez, Arbogast & Graves) were readily willing to lie to protect

**Exhibit 2**

themselves from being held accountable by the Department and their supervisors. On multiple occasions, the defendant-officers were sent clear messages that they were responsible to no one, but themselves.

5.  If yes, would the Police Department's failure to adequately supervise those officers be expected to cause constitutional violations such as those alleged by Daniel Villegas? Would it be expected to cause wrongful convictions?

    Yes. Integrity is integral to a police officer's service to the community. A police officer who has reason to believe that his or her word will be accepted, regardless of any evidence otherwise, is more likely to engage in constitutional violations and engage in the type of corruption that results in wrongful convictions.[43]

As a result of the El Paso Police Department's inadequate enforcement of policies designed to protect juvenile suspects and witnesses, the following answers to the supplemental questions presented can be provided:

6.  Do the files indicate that the City of El Paso had notice, as of April 1993, that its officers were failing to observe juvenile policies? Was there notice of issues with the TAC team and other divisions that worked with the TAC team (e.g., Crimes Against Persons)?

    Yes. As discussed above, the files reviewed identified numerous instances where officers failed to observe juvenile policies and the Department was put on notice of potential systemic violations in this regard.

7.  Was it foreseeable in April 1993 that absent some auditing or monitoring of cases involving juveniles, officers would continue to violate juvenile rights?

    Yes. The Department's failure to identify and adjudicate obvious violations of the Department policies intended to protect juvenile suspects and witnesses would have sent a clear message to officers that policy violations in this area were not of significant concern to the Department's command staff. The suspension imposed on the two TAC supervisors who were sustained for violating juvenile rights would likely be perceived as a political act by officers when evidence of systemic violations and individual policy violations were simply ignored.

---

[43] The literature is replete with examples of how a police department's failure to ensure integrity and accountability can lead to corrupt activities. (See, for e.g., Bleakley, P. (2021), The Cult of Corruption: Reframing Organizational Frameworks of Police Corruption from a Cultic Perspective, *Deviant Behavior*, Vol. 42, No. 5, pp. 565-577; Prenzler, T. (2009) Police Corruption: Preventing Misconduct and Maintaining Integrity. Boca Raton, FL: CRC Press; Punch, M. (2009), Police Corruption: Deviance, Reform and Accountability in Policing, Portland OR: Willan Publishing; Newburn, T. (1999) Understanding and preventing police corruption: lessons from the literature, Police Research Series (110), London UK: Home Office (UK); Barker T. & Carter D.L. (1986) Police Deviance, Cincinnati Ohio: Anderson Publishing Co., quoting New York Police Commissioner Patrick V. Murphy: "The 'rotten apple' theory won't work any longer. Corrupt police officers are not natural-born criminals, nor morally wicked men, constitutionally different from their honest colleagues. The task of corruption control is to examine the barrel, not just the apples – the organization, not just the individual in it -- because corrupt police are made, not born" (p. 10).

**Exhibit 2**

8. Would failing to enforce juvenile policies against detectives investigating homicides with juvenile suspects be expected to cause constitutional violations? Would it be expected to cause wrongful convictions?

Yes. In this case, it appears that the Department over emphasize the benefits of homicide clearance rates at the expense of constitutional policing. Under such circumstances, it can be expected that detectives investigating homicide cases will engage in Noble Cause corruption and ignore policies intended to protect homicide suspects and witnesses. The risk of wrongful convictions would be increased as the result of any culture of policing that encourages out-of-policy conduct in support of criminal convictions (see, ft. 44, *supra*).

Finally, I was asked whether a general failure to document the justification for sustaining or not sustaining complaints would tend to decrease the effectiveness of the internal affairs system, and whether such a failure would contribute to the risk of constitutional violations and wrongful convictions?

Generally, an effective and accountable disciplinary system will ensure effective decision-making by requiring command staff to provide a rationale or explanation for their disciplinary decisions. Without such a requirement, it is too easy to avoid evidence-based decisions and rely instead of individual biases or interests in making these often-difficult accountability-related decisions. In addition, the failure to address all allegations identified by Internal Affairs invites reviewers to simply ignore misconduct and allows such misconduct to continue unabated. These failures make it more difficult to appropriately assess or audit a department's ability to hold its officers accountable and undermines the ability of a department's accountability system to ensure constitutional and effective policing. Where there is little or no emphasis on constitutional policing and a strongly perceived need for aggressive crime fighting there is an increased risk of constitutional violations and wrongful convictions.

Respectfully submitted,

Richard Rosenthal, J.D., PhD

**Exhibit 2**

**Richard A. Rosenthal, J.D., Ph.D.**
**Vancouver, BC; Blaine, WA**
**richardrosenthalphd@gmail.com**
**Direct: (604) 217-7518**

Education:
- Ph.D., Criminology, Simon Fraser University, Burnaby, British Columbia (2021).
- Juris Doctor, Berkeley School of Law, University of California at Berkeley (1986)
- Bachelor of Arts with Majors in Economics & History, University of California at Berkeley (with Distinction) (1983)

Professional Affiliations:
- Inactive Member in good standing, California State Bar (active: 1986 – 2001)
- Inactive Member in good standing, Oregon State Bar (active: 2002 – 2005)
- Inactive Member in good standing, Colorado State Bar (active: 2006 – 2011)

Employment:

October 2022 – Present
> **Independent Contractor, Seattle Monitoring Team**
> Hired by the Court-appointed federal monitor to conduct a performance and capacity assessment of the accountability system for the Seattle Police Department.

May 2022 – Present
> **Independent Police Auditor, City of Pasadena, California**
> Serve as a best practices advisor to the Community Police Oversight Commission; Review categorical uses of force by Pasadena Police Department officers; Review investigations of internal and external personnel complaints; and Recommend changes to police practices, policies, procedures and training.

September 2021 – Present
> **Principal Consultant, Washington Governor's Office, OII Transition Team**
> Provide technical advice and consult to the Governor's Transition Team to create the Office of Independent Investigations (OII) with state-wide jurisdiction to conduct criminal investigations of police-involved critical incidents.

October 2016 – Present
> **Assistant Monitor, Cleveland Monitoring Team**
> Appointed by the U.S. District Court to assist the federal monitor in the reform of the Cleveland Division of Police and the civilian Office of Professional Standards (OPS). Responsible for providing technical assistance, monitoring reform efforts and preparing confidential and public reports for the federal monitor pursuant to a Consent Decree entered into between the United States Department of Justice and the City of Cleveland. Specifically responsible for the reform of the OPS and

**Exhibit 2**

facilitating the preparation of policy manuals for the OPS, the Internal Affairs Division, the Force Investigation Team and the Force Review Board. Responsible for providing technical advice to the OPS Administrator and the audit and review of OPS, Internal Affairs and use-of-force investigations, to include critical incidents resulting in death.

January 2012 – September 2016.

**Chief Civilian Director, Independent Investigations Office of British Columbia**

Created the Independent Investigations Office of British Columbia (IIO), authorized by Part 7.1 of the *Police Act*. The IIO conducts criminal investigations into all police-related incidents that result in death and life-threatening injury. The Chief Civilian Director (CCD) has the authority to determine whether cases will be referred to Crown Counsel for possible prosecution and is responsible for issuing public reports in support of decisions exonerating officers of criminal conduct. IIO investigations are used for criminal and administrative purposes to include automatic referrals to police Professional Standard Units for the possible imposition of discipline. The CCD is responsible for ensuring all investigations are thorough, complete and unbiased, managing the IIO office (including the supervision of 50 full-time employees) and administering an annual budget of approximately $8 million (CAD). The CCD is a Deputy Minister equivalent within the Ministry of Justice and is appointed by an Order in Council.

July 2005 – December 2011.

**Independent Monitor, City/County of Denver**.

Created the Office of the Independent Monitor (OIM) for the City and County of Denver. Responsible for monitoring the Denver Police and Sheriff Departments' handling of citizen complaints, internal criminal and administrative investigations, officer-involved shooting and in-custody death administrative reviews and investigations. Made recommendations regarding the imposition of discipline and conducted audits of issues of importance to the safety agencies and the community. A primary author of the Denver Police and Sheriff Disciplinary Handbooks and Matrixes and responsible for the creation of a nationally recognized community-police mediation program. Worked with the Citizen Oversight Board (COB) on issues relating to police and OIM policies and practices. As Monitor, supervised a staff of five including a Senior Deputy Monitor, a Deputy Monitor, an Analyst, a Community Relations Ombudsman and an Office Manager. Managed an annual budget of $687,000 (USD).

October 2001 – June 2005.

**Director, Independent Police Review Division (IPR), City of Portland, Oregon, Auditor's Office.**

Created the Independent Police Review Division of the City Auditor's Office. Acted as an independent police auditor-monitor-ombudsman for the City of Portland, directly reporting to the elected City Auditor. Responsibilities included:

Page 2 of 6

**Exhibit 2**

- Taking all citizen complaints against members of the Portland Police Bureau, and reviewing and monitoring police internal investigations, findings and imposition of discipline;
- Coordinating an annual audit of officer-involved shooting investigations, findings, policy and training;
- Conducting specialty audits on an ongoing basis;
- Facilitating the work of the Citizen Review Committee, handling appeals of findings resulting from internal affairs investigations and recommendations regarding case handling and Police Bureau policies.
- Supervising a staff of eight including an Assistant IPR Director, a Deputy IPR Director, intake investigators, an Analyst, a Community Relations Coordinator and office staff. Managed an annual budget of $843,000 (USD).

December 1986 – October 2001

**Deputy District Attorney, Los Angeles County District Attorney's Office**
- 1998-2001 – Special Investigations Division & "Ad Hoc Rampart" Division. Specialized in the investigation and prosecution of judges, public officials and police officers. Acted as the primary liaison between the Los Angeles Police Department's Internal Affairs Division and the District Attorney's Rampart Task Force. Deputy-in-Charge of the Ad Hoc Rampart "Clean-up Team." Credited with uncovering the LAPD "Rampart Scandal."
- 1995-1997 – Assistant Head Deputy, Worker's Compensation Fraud Division. Lead Medical-Legal prosecutor in charge of coordinating insurance fraud prosecutions of doctors and lawyers. Civilly prosecuted doctors and lawyers for unfair business practices.
- 1989-1995 – Major Fraud Division. Handled financial crime investigations and prosecutions too complex or high profile for assignment to non-specialty divisions. Civilly prosecuted doctors and lawyers to obtain restitution for major insurance fraud violations.
- 1986-1989 – General felony and misdemeanor prosecutions.

Teaching/Lecturing:

2003-2021  **Moderator & Panelist, National Association for Civilian Oversight of Law Enforcement (NACOLE) & Canadian Association for Civilian Oversight of Law Enforcement (CACOLE)**: "Mediating Citizen Complaints" (Los Angeles – 2003); "The PARC Report – a Portland Project" (Los Angeles – 2003); "Police Unions & the Community, Bridging the Gap" (Chicago – 2004); "The LAPD Rampart Scandal – Lessons for Civilian Oversight" (Boise – 2006); "Expedited Handling of Citizen Complaints" (Boise – 2006); "Critical Incident Rollouts" (San Jose – 2007); "Mediating Citizen Complaints" (San Jose – 2007); "Consistent Discipline & Disciplinary Matrixes" (Cincinnati – 2008); "Citizen Complaints & Officer Dissatisfaction – Better Resolution

**Exhibit 2**

Through Mediation" (Austin – 2009); "Ethics, Integrity & the Police Culture; Examining the Police Code of Silence" (Austin – 2009); "The First Year is the Hardest – the Challenges of an Oversight Agency's First Year" (Seattle -- 2010); International Panel on Contemporary Police Oversight Issues (Toronto – 2012); Civilian Oversight: Perspectives from Two New Players in Civilian Oversight (Charlottetown – 2013); Restoring Public Faith in Law Enforcement through Civilian Oversight (Albuquerque – 2016); The Independent Critical Incident Investigation Agency – A New Form of Oversight for the U.S. (Virtual – 2021).

2007-2014 **Instructor, Public Agency Training Council (PATC)**, teaching topics as part of an annual one-week advanced Internal Affairs training course, including: "Civilian Oversight of Law Enforcement in North America;" "Citizen-Police Mediation;" & "Disciplinary Matrixes." Miscellaneous additional advanced Internal Affairs conference presentations nation-wide.

2007-2011 **Adjunct Professor, University of Colorado at Denver, Graduate School of Public Affairs**: "Case Studies in Police Scandals," "Administration of Justice," & "Crime & Literature."

2003-2005 **Adjunct Professor, Portland State University: Administration of Justice Division:** "Issues in Police Misconduct" & "LAPD Scandals."

1998-2001 **Adjunct Professor, Loyola Law School** (Los Angeles, CA): "Trial Advocacy."

1998-2001 **Certified Instructor, Financial Investigations Practical Skills Training (FIPS), National White Collar Crime Center**, teaching week-long courses to investigators and prosecutors throughout the United States.

1996-2000 **Lecturer, California District Attorney's Association, California Department of Insurance, Los Angeles District Attorney's Office**: teaching investigation and prosecution of financial crimes, criminal asset forfeiture & financial crime search warrants.

Boards & Commissions:

2012-2016 **Member, Board of Directors, Canadian Association for Civilian Oversight of Law Enforcement (CACOLE).**

2005-2010 **Member, Board of Directors, National Association for Civilian Oversight of Law Enforcement (NACOLE)**: Treasurer – 2007 to 2010.

1992 **Counsel, Los Angeles Police Commission, Office of the Special Advisor ("Webster Commission")** investigating the Los Angeles Police Department response to 1991 civil unrest.

Legislation:

- **Author: California Penal Code Section 96.5**, making it a crime for a judicial officer to obstruct justice. (1998-1999 legislative session).
- **Author: California Penal Code Section 186.11** ("Freeze & Seize") allowing for the issuance of criminal restraining orders freezing assets of major fraud defendants and preserving the assets for victims of crime. (1994-1995 & 1995-1996 legislative sessions).

**Exhibit 2**

Publications:

- De Angelis, J. and Rosenthal R. (2021). Assessing Police Accountability: A Comment on Carol Archbold's, Police Accountability in the United States: Gaining Traction or Spinning Wheels? | Policing: A Journal of Policy and Practice | Oxford Academic (oup.com)
- Rosenthal, R. (2021). Seattle Consent Decree: Effective or Excessive Force in Police Reform? (PhD Dissertation), summit.sfu.ca/item/21424.
- Rosenthal, R. (2020). Independent Critical Incident Investigation Agencies: A Unique Form of Police Oversight, (2020). *Albany Law Review*, Vol 83, p. 855.
- Rosenthal, R. (2018). Perspectives of directors of civilian oversight of law enforcement agencies. *Policing, An International Journal of Police Strategies & Management*. 13 August, 2018, Vol. 41(4), pp. 435-447.
- De Angelis, J., Rosenthal, R. and Buchner, B. (2016). *Civilian Oversight of Law Enforcement: Assessing the Evidence*. U.S. Department of Justice, Office of Justice Programs Diagnostic Center. NCJ Number: 250287.
- De Angelis, J., Rosenthal, R. and Buchner, B. (2016). *Civilian Oversight of Law Enforcement: A Review of the Strengths and Weaknesses of Various Models*. U.S. Department of Justice, Office of Justice Programs Diagnostic Center. NCJ Number: 250265.
- Schaible, L., Angelis, J. D., Wolf, B., & Rosenthal, R. (2013). Denver's citizen/police complaint mediation program: Officer and complainant satisfaction. *Criminal Justice Policy Review*, *24*(5), 626-650. DOI: 10.1177/0887403412455327.
- Proctor, J., Clemmons, A.J. and Rosenthal, R. (2009). Discourteous Cops and Unruly Citizens: Mediation Can Help, *Community Policing Dispatch* – The e-newsletter of the COPS Office, Volume 2, Issue 3.
- Clemmons, A.J. and Rosenthal, R. (2008). Mediating Citizen Complaints: The Denver Program, *The Police Chief* Magazine, August edition.
- Police Assessment Resource Center; Bobb, Bromwich, Blackmer, Godbee, Graham, Rosenthal, Schlanger, Thompson (2008). National Guidelines for Police Monitors. Located at: National Guidelines for Police Monitors.pdf.

Police Oversight Agency Reports

- Independent Investigations Office Annual and Case Investigation Reports (2012 to 2016), located at: www.iiobc.ca.
- Office of the Independent Monitor Annual and Quarterly Reports (2005 through 2011), located at: www.denvergov.org/oim.
- Independent Police Review Division Annual Reports (2001 through 2005), located at: www.portlandonline.com/auditor/ipr.

Rosenthal, R. and De Angelis, J. 2011. *Monitor Concerns Regarding DPD DUI Arrests, (2nd Quarter, Discipline Report)*

**Exhibit 2**

Rosenthal, R. and De Angelis, J. 2004. *The City of Portland's Handling of Tort Claims Alleging Misconduct: A Need for Consistent Referrals to Internal Affairs*. Portland, Oregon: Independent Police Review Division, Office of the City Auditor.

De Angelis, J., Ueland, Blackmer, G., and Rosenthal, R. 2003. *Officer Use of the Hooper Sobering Program*. Portland, Oregon: Independent Police Review Division, Office of the City Auditor.

De Angelis, J., Blackmer, G., Rosenthal, R., and Stone, D. 2003. *Officer Use of Profanity*. Portland, Oregon: Independent Police Review Division, Office of the City Auditor.

Public Service / Awards:

- 2016-Present: **Sponsor** of the Laura Rosenthal Memorial Scholarship & Esprit de Corps Award, Meadowridge School, Maple Ridge BC, providing an annual cash reward to a student chosen by students and faulty who best represents the mission, vision and values of the school – "Learning to Live with Others and for Others in a Just Community."
- 2016-2022: **Vice Commodore, Ridge Canoe & Kayak Club,** Maple Ridge, BC; **Safety Officer, Canoe/Kayak BC**, officiating at provincial regatta competitions and coordinating safety boats at provincial regattas; **Sponsor** of "The Laura Rosenthal Race Course at Whonnock Lake," supporting the Ridge Canoe & Kayak Club and the BC 2024 Summer Games.
- 2019-2022: **President, MFRS Station 2 Firefighter's Association**.
- 2016-2022: **Paid-on-Call Firefighter; Apparatus Operator**, Mission Fire & Rescue Service (MFRS), District of Mission, British Columbia.
- 2011 **Recipient of the NACOLE "Flame Award**," recognizing significant, long-term contributions to the field of police oversight by an individual, an organization, or an agency, www.nacole.org.

**Exhibit 2**

El Paso PD IA File Review – Work Papers

| | |
|---|---|
| Involved Officer: | |
| Case No. | |
| Discovery Page No. | |
| Date of Incident | |
| Date Reviewed | |
| Allegation: | |
| Facts underlying incident: | |
| Findings | |
| Investigative Issues: | |
| Other observations: | |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

**Detective Alfonso Marquez**

| Case Number | Date of Incident | Nature of Allegations | Content of File | Issues & Concerns Disposition |
|---|---|---|---|---|
| | **1/6/1972** | **Commissioned as an EPPD officer.** | | |
| X-12229 | 4/14/1973 | Officer Involved Shooting (injury – unarmed juveniles) | Discovery #6987 (1-page).<br><br>No written statements; Inadequate documentation to determine extent of investigation; No documented formal interviews of involved officers. No indication of any danger to involved officers or the public; No documentation of interviews of suspects. | In policy.<br><br>Apparent minimal investigation of a significant incident.<br><br>No reason for involved officers to believe that their use of deadly force will be subject to any significant inquiry. |
| X35?68 | 10/13/1973 | Inadequate Search | Discovery #6990-6992 (3-pages) [Personnel File].<br><br>Signed statement of subject officer in file. No documented attempt to interview suspect. | Verbal reprimand.<br><br>Marquez denied inadequate search and suggested suspect may have picked up weapon from another prisoner or while at jail.<br><br>Supervisors appeared to find Marquez' explanation not credible and issued verbal reprimands. |
| B-529 | 8/27/1974 | At fault vehicle collision | Discovery #6996-7002 (7-pages) [Personnel File].<br><br>Includes written statement from Marquez. | Citation Issued.<br><br>Marquez states other driver was speeding. Unknown if supervisors believed Marquez |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | |
|---|---|---|---|---|
| | | | | statement to not be credible or simply not relevant. |
| 74-145 | 10/20/1974 | Civilian Complaint – "Police Brutality" | Discovery #7007 (1-page).<br><br>No indication of whether booking video was available or consulted; no documentation of any investigation into the complaint; no statements of booking officer witnesses; | In policy UOF.<br><br>No indication of how conclusions were reached. "Investigation" appears to ignore allegation of excessive force at booking. Findings are conclusory.<br>Lack of complete investigation sends message to officers that excessive force complaints will not be treated seriously. |
| IA 75-036 | 3/12/1975 | Civilian Complaint - On-duty consumption of alcohol | Discovery #7032-7033 (2 pages).<br><br>No documentation of any statement taken from officers who were alleged to have taken alcohol from a former officer who lost his commission due to misconduct. | Counseled – No findings.<br><br>Finding was precatory – "…if this subject was a friend of theirs, they should be careful about choosing friends…"<br>No documentation of any attempt to find out if officers consumed alcohol on duty.<br>Lack of any investigation/inquiry sends message to officers that their conduct will not be scrutinized by the department. |
| IA 75-059 | 4/12/1975 | Civilian Complaint – False Arrest | Discovery #7017 (1-page)<br><br>No indication of any statements taken or investigation conducted. | Not sustained.<br><br>Conclusory statement in support of "not sustained" finding. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | Complainant alleged false arrest – lack of any investigation or inquiry sends message to officers that their conduct will not be scrutinized by the department. |
|---|---|---|---|---|
| IA 75-119 | 6/20/1975 | Civilian Complaint – Rudeness; Excessive Force | Discovery #7022-7023 (2-pages).<br><br>No documentation of any statements taken from subject officers; no written statements of complainants in file; reportedly, color photos of one complainant were taken, but were not in the file provided by the City; no arrest report or incident report in the file. | Not sustained.<br><br>No indication of a robust investigation into the complaint.<br><br>Lack of a thorough investigation sends message to officers that their conduct will not be scrutinized by the department. |
| IA 75-233 | 11/13/1975<br>11/19/1975 | Civilian Complaint – False Arrest | Discovery #7028-7029 (2-pages).<br><br>No documentation of any statements taken from the involved officers; No written statement from complainant – summary only. | Not sustained.<br><br>No mention of Marquez in the complaint, although he is identified as an involved officer.<br><br>No indication of an investigation having been conducted; message to officers would be that the department has no interest in scrutinizing their behavior. |
| IA 75-247 | 12/12/1975 | Civilian Complaint – Threatening & Abusive Behavior | Discovery #7034-7035 (2-pages). | Counseling.<br><br>Marquez identified as an "involved officer," but not |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | No documentation of any statements taken from the involved officers; No written statement from complainant – summary only. | mentioned in the findings. Officer Santana reportedly "counseled" about "need[] to improve his attitude towards people." |
|---|---|---|---|---|
| IA 76-71 | 3/30/1976 | Civilian Complaint – Improper Arrest & Search | Discovery #7038 (1-page) [Personnel file].<br><br>No documentation of any investigation into the complaint. | Not sustained.<br><br>Conclusory finding only. Marquez identified as an "involved officer," but no mention of any involvement by him in the document. |
| IA 76-207 | 10/17/1976 | Civilian Complaint – Excessive Force/False Arrest | Discovery #7042-7043 (2-pages).<br><br>No written statements taken from officers. | Not sustained.<br><br>No rationale for finding provided.<br>No indication of an investigation having been conducted. |
| 77-34284 | 7/31/1977 | Officer Involved Shooting (no hit – shots exchanged) | Discovery #7048-7049 (2-pages) [Personnel file].<br><br>Scene reportedly processed; civilian witness statement reportedly taken – but only a general summary in the file.<br>No written statements included in the file, to include from involved officers, civilian witness or subject. | In-policy.<br><br>Two-page summary only.<br>No indication of any attempt to track OIS cases (no IA case number).<br><br>No reason for involved officers to believe that their use of deadly force will be subject to any significant inquiry. |
| None | 8/26/1977 | Officer Involved Shooting (no hit – juvenile – no gun recovered) | Discovery #7054-7058 (5-pages). | Commendation. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | ID&R called to scene; subjects reportedly not interviewed as "requirements of juvenile statements before a magistrate could not be met at that time" – but general unattributed statements of subjects summarized in report; no written statements of officers available; no indication of any formal interviews of involved officers. | No case number; no apparent means of tracking use of deadly force.<br>Investigation appeared to rely solely on statements of officers.<br><br>Two alternative reasons provided for finding shooting by Marquez to be justified.<br>No corroboration that suspect was armed.<br><br>Officer explanations appear to be accepted without further inquiry or concern. |
|---|---|---|---|---|
| IA 79-137 | 9/7/1979 | Community Complaint – Excessive Force & Failure to identify self | Discovery #55187-55202 (16-pages).<br><br>Written, sworn statement from complainant, juvenile witness and subject officer in file; injuries were photographed and in file; subject officer interviewed by IA; juvenile and complainant written statements ends abruptly. | Not sustained.<br><br>Interview of subject officer not recorded, at his request.<br>Sworn, written statement of subject officer in file, but no summary of IA interview of subject officer.<br>Unknown who wrote statement of juvenile.<br><br>Bad practice of allowing subject officer to determine if IA interview will be recorded.<br>Impossible to determine the quality or content of the interview and its consistency with the written statement. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | |
|---|---|---|---|---|
| | | | | Impossible to determine how the written statement was taken and the integrity of the overall process. |
| 00-230722 | 6/14/1980 | Preventable theft of police vehicle; stolen radio | Discovery #7103-7111 (9-pages).<br><br>Missing page #1 of report. | Referend to ARB [Accident Review Board?]<br><br>No IA case number – even though theft was preventable.<br><br>No disciplinary decision documented. |
| CP 82-178 | 5/7/1982 | Failure to turn in equipment at end of shift. | Discovery #54880-54884 (5-pages).<br><br>Report written by supervisor who noticed radio missing; no written statement taken from officer. | Written reprimand issued for forgetting police radio in a border patrol vehicle.<br><br>No indication of any attempt to ask Marquez why he failed to report radio missing on his own. |
| CP 82-223 | 6/18/1982 | AWOL | Discovery #59584-59585 (2-pages).<br><br>No statement from subject officer in file. | 1-day suspension for failure to bring doctor's note.<br><br>Supervisor suspected that Marquez was not sick as he was seen drinking alcohol at an association meeting the night before.<br><br>Failure to take a statement from the subject officer sends a message that the department will not inquire fully into an officer's |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | |
|---|---|---|---|---|
| | | | | conduct, even when misconduct is suspected. |
| IA 84-079 | April 1983 | Community Complaint – Aggravated Perjury | Discovery #59411-59582 (172-pages).<br><br>Complaint from defense lawyer, former prosecutor, referred to DA for criminal investigation and to IA for formal administrative investigation; sworn statements taken from complainant-lawyer, subject officer, witness detectives. | Grand Jury: No bill.<br>Not sustained.<br><br>Reliance on written statements in lieu of recorded question & answer interviews by IA is a bad practice.<br><br>IA interview of subject officer not recorded, at his request. |
| IA 85-157 | 6/26/1985 | Community Complaint – Excessive force on a prisoner | Discovery #55232-55287 (56-pages).<br><br>Written sworn statements from complainant, subject officer and officer witnesses; jail medical records included. | Not sustained.<br><br>Poor investigation; documentation of investigation:<br>• No follow-up questioning of witness Det re: observations of injury to complainant;<br>• No photos taken of office walls;<br>• No documentation of IA interviews other than written statements of witnesses;<br>• IA investigation fails to address that complainant was out of his cell for 2 hours, 25 minutes, but witnesses said complainant was in interview room for only 5-minutes. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| CP 86-125 | 7/12/1986 | Failure to attend SWAT practice | Discovery #54885-54891 (7-pages).<br><br>Written statement taken from subject officer. | Written reprimand.<br><br>Minimal explanation provided by Marquez – unknown if he forgot about the practice, did not care about the practice or did not want to attend the practice.<br><br>Another example of supervisors failing to require Marquez to explain his actions. |
| --- | --- | --- | --- | --- |
| CP 88-14 | 1/20/1988 | False Travel Reimbursement Claim; Lying to a Supervisor | Discovery #44511-44600 (90-pages).<br><br>Sworn written statements taken from subject officers and witness supervisors; IA interviews would have been audio recorded per requests of subject officers – but no transcript of interviews provided in discovery. | 15-day suspensions imposed on Marquez and his partner, even though Officer Marquez was found to have lied to his supervisor when first confronted about the inaccurate travel claim. (6/7/1988)<br><br>Department made it clear to Marquez that lying to a supervisor was not actionable.<br><br>COP used an improper "comparable case" to give 15-day suspensions to both officers, which was overturned in arbitration, resulting in 3-day suspensions for both officers. (10/19/1988) |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | Department clearly messaged that lying to a supervisor about misconduct was not actionable. |
|---|---|---|---|---|
| CP 88-146 | 6/15/1988 | Failure to report for duty | Discovery #54892-54896 (5-pages).<br><br>3-page written statement from subject officer. | 1-day leave without pay.<br><br>No documentation of any attempt to verify Marquez claim that he attempted to call in sick prior to his shift.<br><br>This failure to inquire is consistent with a Department that simply assumes truthfulness without any confirmation thereof, even when it would be easy to do so. |
| None | 10/2/1988 | False Arrest; Inadequate murder investigation | Discovery #7329-7242 (4-pages) [Personnel file].<br><br>Civil claim letter alleging false arrest; false information in arrest warrant; murder charges dropped by district attorney | No documented investigation.<br><br>Failure to investigate a civilian complaint that provides prima facie claim of misconduct (even one in the form of a notice of pending civil claim) is indicative of a department that will justify and defend officer misconduct without further inquiry. [Note CP92-358 – discipline imposed after IA follow-up on civil claim]. |
| CP 89-066 | 4/28/1989 | Traffic violation; possible unauthorized transportation | Discovery #54897-54909 (13-pages). | Citation & Counseling.<br><br>Violation witnessed by DC. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | Written statement from subject officer acknowledging violation, but reporting it was not intentional.<br>No written statement from witness passenger. | In addition to citation, Marquez ordered not to drive with any officer, not assigned to CAP, unless cleared by a supervisor and warned future violation could result in a transfer.<br>No charges brought for unauthorized passenger. No specific explanation in file for why he was counseled. |
|---|---|---|---|---|---|
| IA 90-048 | 3/14/1990 | Community Complaint – SWAT use of excessive force | | Discovery #55288-55488 (201-pages).<br><br>Formal IA investigation & report.<br>No recorded interviews; interviews of officers summarized in IA report, but no dates or times of interviews documented; Sworn written statements of all witnesses in file.<br>No attempt to clarify if any officer struck CO while he was in or being put into the police car; no documented attempt to clarify if or how CO got injured while being arrested in the house. | Not sustained.<br><br>No idea how written statements were obtained and to what extent the investigation was fair or unbiased. |
| CP 90-52 | 4/3/1990 | Failure to report for duty at appointed time. | | Discovery #54910-54938 (29-pages).<br><br>Reported for duty late. | 1-day LWOP. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | Reported that he "overslept". | |
|---|---|---|---|---|---|
| IN 92-033 | 3/26/1992 | Community Complaint – Rude & Unprofessional Conduct | Discovery #8898-8899 (2-pages) [Arbogast Personnel file].<br><br>Not handled formally. Supervisor advised would "talk to" detectives.. | Information only.<br><br>No documentation of any debriefing or analysis of complaint |
| CP 92-296 | 8/18/1992 | Rude & Unprofessional Conduct; Unauthorized Person in Vehicle; False Statement to IA – not investigated. | Discovery #54939-55016 (78-pages).<br><br>Formal investigation. Written statements only. IA interview not recorded, at SO request. Marquez misrepresented his relationship with his passenger and made apparently false statements. IA failed to follow up on these apparent false statements; and no charges for lying were brought.<br>Lots of inconsistencies re: SO's statements – none addressed by command staff.<br>No attempt by IA investigator to identify how SO's claims with respect to picking up boy at store, as opposed to from HS, were likely false. IA investigator simply accepted that boy was unavailable for interview and made no attempt to confront SO | 2 lost vacation days in lieu of a suspension. (3/8/1993)<br><br>The failure to conduct an investigation into false statements, to include the failure to confront Marquez with the direction of travel he should have been taking per his statement, made it clear that the Department was not concerned with officer integrity and unwilling to hold him accountable for false statements made during the course of an official investigation. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | with likely false statements and omissions. Investigation fails to acknowledge potential material omission (Brady violation) of SO. | |
|---|---|---|---|---|
| CP 93-019 | 8/27/1992 | Unpaid Parking tickets; badge and gun visible in unoccupied city vehicle. False statement – not investigated | Discovery #55052-55064 (13-pages).<br><br>Written statement by Marquez admitting illegally parked as he was late for pretrial, and alleging he was unaware of 11 unpaid parking tickets. No attempt by IA to follow up or question how Marquez could possibly have not known about unpaid parking tickets. | Written reprimand (2/16/1993) See discovery page 55056.<br><br>Marquez' questionable statement regarding his lack of knowledge of 11 parking tickets was not challenged in any way; message sent that Department not interested in following up on potential integrity issues with its Detectives. |
| CP 92-358 | 9/21/1992 | Failure to notify next-of-kin | Discovery #55017-55051 (35-pages).<br><br>No indication of further investigation to confirm that Det. Marquez claim that he requested fingerprints be taken was true; Per Lt. Skanse, CAP did not request body be printed. Failure by Department to follow up on inconsistencies between statement of Marquez and Lt. Skanse. | Written reprimand issued on 11/19/92 (Discovery #55020)<br><br>Failure to corroborate or disprove defense provided by Detective, further indication that Department did not care about the credibility of its officers.<br><br>Media on incident: 9/21/1992 (EPPD reported "administrative investigation was underway." Notice of injury and claim received on 10/13/1992. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | Case sustained by A/C: 10/27/1992. |
|---|---|---|---|---|
| CP 93-097 | ¾/1993 | Failure to Book Seized Narcotics | Discovery #55065-55107 (43-pages). | Sustained, 3/3/1993. 3-day suspension 4/27/1993, vacation days lost in lieu of suspension. |
| | **4/10/1993** | **England-Lazo Homicide** | | |
| CP94-227 | 7/13/1994 | Alteration of official wanted poster with offensive reference | Discovery #55108-55164 (57-pages). IA Investigation; written statements only; subject officers requested interviews not be recorded. | Written reprimand, 8/9/94 (Discovery #55118). |
| CP 94-346 | 9/24/1994 | Search of residence results in seizure of firearm, pager and drug paraphernalia while out of town | Discovery #55165-55186 (22-pages). 14 year-old son had friends over; shots fired; officer's firearms seized. | Counseled on weapon safety only. |
| CP 95-151 | Summer 1991, 1992 | Sexual Harassment | Discovery #56269-56272 (4-pages). CO did not wish to pursue. | Not sustained, 4/11/1995. CO claimed appropriately handled by counseling at the time. |
| | **8/24/1995** | **Jury Verdict – Villegas Trial #2** | | |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

**Detective Earl Arbogast**

| Case Number | Date of Incident | Nature of Allegations | Content of File | Issues & Concerns |
|---|---|---|---|---|
| | **10/28/1977** | **Commissioned as an EPPD officer** | | |
| IA 78-334 | 11/29/1978 | Civilian Complaint – Excessive/Unnecessary Force | Discovery #55632-55686 (55-pages).<br><br>Formal IA investigation. Written statements signed by witnesses after unrecorded interviews.<br>IA report combined statements and written statements of subject officers, showing same time of completion. | Not Sustained.<br><br>Poor IA practices in failing to properly record and document interviews. |
| CP 80-153 | 5/20/1980 | Civilian Complaint – Unlawful detention & search | Discovery #55567 (1-page)<br><br>Summary of complainant statement only. Only documented contact with supervisory Sgt.; no documentation of interview of either subject officer. | Info only.<br><br>Failure to investigate complaint – reliance on conclusory statement of supervisor. |
| CP 81-28 | 1/21/1981 | Civilian Complaint – Unnecessary display of firearm; Discourtesy | Discovery #55568 (1-page)<br><br>Documentation of complaint only and verification of existence of warrant. | No action taken.<br><br>IA only confirmed existing warrant – failed to investigation actual allegations. |
| IA 81-6 | 2/2/1981 | Civilian Complaint – Discourtesy & illegal search | Discovery #55687-55728 (42-pages). | Not sustained. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | Formal IA investigation | IA failed to address officers' failure to document their response to minor's residence and contact with her parents. |
|---|---|---|---|---|
| None | 3/19/1981 | Civilian Complaint – Lack of Service | Discovery #8534-8537 (4-pages) [Personnel file].<br><br>Written statements of subject officers in file. | No action taken.<br><br>Supervising Lt. indicated that better communication was warranted, but no documentation of counseling of officers. |
| CP 81-192 | 5/4/1981 | Civilian Complaint – Excessive Force | Discovery #55569-55572 (4-pages).<br><br>Subject officer reports in file. | No action taken.<br><br>No documented attempt to investigate allegations; CO described as "obviously mentally disturbed."<br><br>Mentally ill can be particularly vulnerable to police use of excessive force. |
| IA 81-32 | 5/11/1981 | Civilian Complaint – Excessive Force | Discovery #55729-55749 (21-pages).<br><br>Written statements of complainant and mother and subject officers; telephonic statement from crime victim; supplemental written statement withdrawing complaint. | Information only.<br><br>Documented as "information only" as complainant withdrew complaint.<br><br>Investigation closed even though complainant continued to allege unnecessary force; investigation terminated at his request due to stated reason it would not help him in criminal case. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | Best practice is to continue an investigation, regardless of complainant request, where there may be outstanding issues – such as a claim of excessive force. |
|---|---|---|---|---|
| IA 81-174 | 5/14/1981 | Civilian Complaint – Harassment; Excessive Force | Discovery #8539 (1-page) [Personnel file].<br><br>One-page Personnel Incident Report only, summarizing complainant's allegations. | Not sustained, 6/19/1981.<br><br>No documentation of an investigation or rationale for findings. |
| CP 81-435 | 10/28/1981 | Willful damage to police vehicle; Untruthfulness | Discovery #55573-55620 (48-pages).<br><br>Written statements of subject officers and supervisors. IA interviews not recorded and summarized in conclusory manner. | Sustained, 3 days suspension.<br><br>No documentation as to how investigation progresses or how confessions were obtained or the circumstances behind those confessions (e.g., whether there were aggravating or mitigating circumstances involved).<br><br>Note from Northeast Division Captain advising this his disciplinary recommendation was "too lenient," but that "repeated reductions in mu recommendations…undermines my position." (Discovery, #55606).<br><br>Lack of Departmental concern regarding the circumstances of |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | |
|---|---|---|---|---|
| | | | | false statements and subsequent confessions is indicative of a Department that does not value officer credibility. |
| CP 82-300 | 8/8/1982 | Damage of City Property (key ring); Insubordination | Discovery #55621-55631 (11-pages).<br><br>Supervisor summary of events only; no statement from subject officer. | Written Reprimand, 8/19/1982 (Discovery #55631).<br><br>No further inquiry into supervisor's stated belief that Arbogast's statement regarding how key ring was broken was not credible.<br>No documented opportunity or requirement for subject officer to make a statement or explain his conduct. |
| IA 83-47 | 3/24/1983 | Civilian Complaint – Unlawful search of residence & civil rights violations | Discovery #55750-55817 (68-pages).<br><br>Formal IA investigation. Includes written, signed statements of complainant, and involved officers; file includes incident reports and arrest documentation. | Not sustained.<br><br>No documentation for rationale for finding in file; just signed and dated.<br><br>IA interviews not recorded at request of involved officers. |
| IA 84-007 | 1/6/1984 | Civilian Complaint – Officers shooting firecrackers at each other | Discovery #55818-55912 (95-pages).<br><br>Signed, written statements from involved officers in file. | Sustained; Written reprimand reduced to counseling; Suspensions and Written reprimands for other involved officers.<br><br>No attempt by IA to examine scene to attempt to corroborate |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | CO statement (contrary to officers) that multiple fireworks were discharged.<br><br>IA interviews not recorded, at request of involved officers. |
|---|---|---|---|---|
| IA 85-26 | 1/5/1985 | Civilian complaint – Excessive Force ; Verbal abuse | Discovery #55913-55988 (76-pages).<br><br>Written sworn statements by complainants; IA formal investigation; written statements by involved officers. | Not sustained, excessive force. Counseled for Verbal abuse.<br><br>Officers sustained for unprofessional conduct even though both officers denied any verbal abuse. Conclusory finding without any rationale; findings appear to support conclusion that officers were not truthful to internal affairs but fails to address credibility issue in any way.<br><br>IA interviews not recorded, at request of involved officers. |
| IA 88-046 | 3/22/1988 | Civilian complaint – Unsafe driving; Discourtesy | Discovery #55990-56037 (48-pages).<br><br>Formal IA investigation; Written statement of complainant, involved officers; underlying incident reports | Not sustained, Discourtesy; Counseled for driving, 6/13/1988.<br><br>Arbogast "not sustained" based on no evidence to corroborate CO's claim that he used profanity in light of Arbogast's denial. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| None | 1/18/1989 | Civil Lawsuit – Unlawful detention; Excessive Force | Discovery #8874-8882 (9-pages) [Personnel file].<br><br>Civil lawsuit [and name search] only. | No documentation of any internal review or investigation or findings made.<br><br>Best practice would be for IA review/adjudication of any allegations of misconduct, even those received via civil lawsuit or claim. |
| IN 92-033 | 3/26/1991 | Civilian Complaint – Rude & Unprofessional Conduct | Discovery #8898-8899 (2-pages) [Personnel file].<br><br>Summary of complaint only. | Information only.<br><br>No documentation of further inquiry, counseling or any action. |
| | **4/10/1993** | **England-Lazo Homicide** | | |
| | **8/24/1995** | **Jury Verdict – Villegas Trial #2** | | |

**Detective Scott Graves**

| Case Number | Date of Incident | Nature of Allegations | Content of File | Issues & Concerns |
|---|---|---|---|---|
| | **7/19/1985** | **Commissioned as an EPPD officer** | | |
| IA 85-197 | 7/24/1985 | Off-duty misconduct – interference with law enforcement investigation | Discovery #57627-57676 (50-pages).<br><br>IA formal investigation. Sworn, written statements of witnesses and subject officer; no indication of IA interviews. | Sustained. Written Reprimand, 9/20/1985 (Discovery #57635).<br><br>No apparent consideration given that Grave's statement was factually contrary to those of complainant police officers. No |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | |
|---|---|---|---|---|
| | | | | investigation into integrity and credibility of subject officer's statements to IA, even though Written Reprimand accepts all allegations made by complainant officers and are contrary to subject officer's statements as to what happened.<br><br>Probationary status of officer appears to have been taken as a factor in mitigation; although credibility issues with respect to probationary officer should be a significant factor in aggravation and will often result in termination of the employee. |
| None | 10/25/1985 | Failure to protect partner. | Discovery #10108 (1-page) [Personnel file].<br><br>3-page Personnel incident report, summarizing incident; written statements by involved officers. | Counseling.<br><br>No IA case number for tracking purposes. |
| IA 85-272 | 11/5/1985 | Civilian complaint – Excessive Force | Discovery #10117 (1-page) [Personnel file].<br><br>1-page Personnel incident report only. | Not sustained.<br><br>Complainant alleged force used against him while restrained. Insufficient documentation exists to determine reasonableness of the finding; rationale includes that CO "initiated the confrontation," |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | |
|---|---|---|---|---|
| | | | | which would not be sufficient to warrant being struck while restrained. |
| CP 86-131 | 7/18/1986 | Failure to arrest intoxicated subject & unprofessional conduct (practical joke on female officer)[1] | Discovery #57444-57615 (172-pages).<br><br>Formal IA investigation; Written statements by involved officers and civilians; incident report; related incident reports. | Sustained, 1-day suspension for all officers.<br><br>Although supervising Sergeant referred to incident as "repulsive" and "disgraceful" and involved officers engaged in a cover-up of their actions, minimal discipline was imposed.<br><br>No indication of any discipline imposed for attempted cover-up by subject officers. No discipline for witness officer who appeared to participate in the cover-up. |
| CP 86-228 | 11/2/1986 | Failure to obey an order | Discovery #57616-57626 (11-pages).<br><br>Incident report; Written statements by subject officers (missing page) | Written Reprimands, 11/24/1986 (Discovery #56720-56721).<br><br>File missing page 2 of statement of involved officer – unknown what officer's rationale was for not following order nor whether Graves was aware of that fact. |
| IA 87-73 | 6/21/1987 | Civilian Complaint – Disparaging comment ; Unprofessional conduct | Discovery #10161-10162 (2-pages) [Personnel file].<br><br>1 paragraph Personnel Incident Report only. | Not sustained. (Lt. Recommended "unfounded")<br><br>Rationale indicates officer and witness statements considered, |

---

[1] The victim of the practical joke in this case was the same officer that Graves failed to protect in the 10/25/1985 incident.

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | but no documentation of any investigation is available. |
|---|---|---|---|---|
| IA 87-149 | 9/29/1987 | Civilian Complaint – False Arrest | Discovery #10179-10182 (4-pages) [Personnel file].<br><br>Complainant allegations summarized by IA – no written complaint documented. | Information only. No misconduct alleged. |
| IA 88-39 | 3/6/1988 | Civilian complaint – Physical Abuse | Discovery #10199 (1-page) [Personnel file].<br><br>One-page Personnel Incident Report only. Summary refers to sworn written statement – not in file. No incident reports or officer statements in file. | Not sustained.<br><br>Insufficient documentation to determine reasonableness of findings or quality of investigation. |
| IA 89-95 | 10/2/1989 | Civilian Complaint – Discourtesy/False Allegations | Discovery #10223-10224 (2-pages) [Personnel file].<br><br>2-page Personnel Information report only. | Information only.<br><br>CO requested her complaint be brought to the attention of Detective Grave's supervisors. Signed off by DC only. |
| IA 92-094 | 11/30/1992 | Civilian Complaint – Harassment | Discovery #10199 (1-page) [Personnel file].<br><br>1-page Personnel Information Report only. | Information only.<br><br>CO documented as requesting that Grave's supervisors know about what tactics are being used by their detectives. Other than review by DC, no indication of any other forwarding or follow up. |
| IA 92-138 | 9/12/1992 | Civilian Complaint – Unknown | Discovery #10259 (1-page) [Personnel file]. | Unknown. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | 1-page personnel incident report only. | Document identifies Graves & one other officer as involved officers in "the alleged incident."<br><br>Internal affairs investigation recommended – but no record of an investigation being conducted. |
|---|---|---|---|---|---|
| | **4/10/1993** | | **England-Lazo Homicide** | | |
| IA 95-069 | 3/10/1995 | | Civilian Complaint – Excessive Force | Discovery #10297 (1-page) [Personnel file].<br><br>1-page Personnel Incident Report referencing addendums: Incident Report; Officer Garrity statements; photos of injuries; CO history sheets. | Not sustained.<br><br>No rationale provided for finding. Reference in intake summary to complainants' "advanced intoxicated state;" No documents available for review to determine reasonableness of findings or quality of investigation. |
| IA 95-076 | 4/4/1995 | | Civilian Complaint – Rude & Unprofessional Conduct ; Excessive Force | Discovery #10298 (1-page) [Personnel file].<br><br>1-page Personnel Incident Report only. | Not sustained.<br><br>No rationale provided. No documents available for review to determine reasonableness of findings or quality of investigation. |
| | **8/24/1995** | | **Jury Verdict – Villegas Trial #2** | | |

**Detective Carlos Ortega**

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| Case Number | Date of Incident | Nature of Allegations | Content of File | Issues & Concerns |
|---|---|---|---|---|
| | 5/20/1980 | **Commissioned as a police officer** | | |
| IA 82-17 | 3/31/1982 | Civilian Complaint – Excessive Force | Discovery #56207-56268 (62-pages)<br><br>Formal IA investigation – incomplete report; sworn written statements of involved officers; | Not sustained.<br><br>No rationale for findings provided. No attempt by IA to address allegations of false arrest – appears assumed that arrest was lawful; No attempt by IA to follow up on inaccurate statement by an involved officer that CO was wanted for aggravated assault – but IA report does not appear to be complete.<br><br>All involved officers declined to have their IA interviews recorded. |
| CP 83-110 | 4/21/1983 | Injury to suspect (possible brain bleed) | Discovery #56038-56082 (45-pages).<br><br>Formal IA investigation; 3-page Personnel Incident Report; Written statements from involved officers; Underlying criminal investigation reports; Daily activity reports, etc. | Information only.<br><br>CO reported as not interested in pursuing a complaint made by his sister.<br><br>No indication of misconduct; case appeared to proceed as a critical incident investigation, though reference was ultimately made to subject's disinterest in pursuing a complaint. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| CP 83-291 | 11/21/1983 | Failure to complete police report as required (2nd violation) | Discovery #56083-56091 (9-pages) [Personnel file].<br><br>File includes 1-page written sworn statement by Ortega. | Sustained, Written Reprimand (12/12/1983).<br><br>No issues or concerns. |
|---|---|---|---|---|
| CP 84-183 | 8/9/1984 | Out of District without permission; violation of prior order. | Discovery #56092-56107 (16-pages).<br><br>Personnel Incident Report; Traffic Accident Report; 2-page sworn statement by involved officer; Accident Investigation report. | Written Reprimand, 8/13/1984 (Discovery #56096)<br><br>Ortega was not asked to explain why he went out of his district against prior explicit orders.<br><br>Department did not have sufficient information upon which to make an appropriate disciplinary decision. Ortega was not held accountable in that he was permitted to avoid explaining his conduct. |
| CP 87-138 | 7/20/1987 | Self-Report – Domestic Incident | Discovery #56108-56113 (6-pages).<br><br>2-page Personnel Incident Report; 2-page complaint report; 1 page officer-statement; Responding officer statement. | Information only.<br><br>No follow-up as to Ortega's allegation that his wife pulled his service-revolver on him – no apparent desire by him to press charges.<br><br>Department command did not appear to be concerned about ADW on an employee and no indication of counseling re: |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | | |
|---|---|---|---|---|
| | | | | safely storing his firearm in the future. No documented attempt to interview wife. |
| CP 88-01 | 1/2/1988 | Prisoner Escape – Failure Maintain Control | Discovery #56114-56120 (7-pages).<br><br>Personnel Incident Report & Written statement & report by subject officer. | Written Reprimand, 1/12/1988. (Discovery #56116).<br><br>No issues or concerns. |
| CP 90-107 | 6/2/1990 | Domestic Incident | Discovery #56121-56129 (9-pages).<br><br>Personnel Incident Report; Supervisor statement, etc. | Sustained, 6/11/1990, Counseled.<br><br>No IA investigation or attempt to contact wife for statement. |
| | **4/10/1993** | **England-Lazo Homicide** | | |
| CP 95-094 | 2/10/1995 | Expired Driver's License (4-months) | Discovery #8039-8040 (2-pages) [Personnel File]. | Written Reprimand, 3/15/1995 (Discovery #8040).<br><br>No documentation of statement required from Ortega explaining how he allowed his license to lapse for four months. Having a TDL is likely a condition of employment. |
| | **8/24/1995** | **Jury Verdict – Villegas Trial #2** | | |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

**Juvenile Files**

| Case Number | Date of Incident | Nature of Allegations | Content of File | Issues & Concerns |
|---|---|---|---|---|
| IA 88-041 | 3/4/1988 | Verbal & Physical Abuse; False Accusation | Discovery #68512-68606 (95 pages).<br><br>Formal IA investigation with witness statements. | Not sustained without rationale or explanation; failure to adjudicate clear violations of juvenile policies to include: interrogation of juvenile by officer who is not a juvenile officer; failure to transport to a juvenile facility; failure to get parental permission prior to interrogation. |
| IA 89-015 | 1/21/1989 | Physical & Verbal Abuse | Discovery #70341-70424 (84 pages)<br><br>Formal IA investigation with witness statements. | Not sustained findings without rationale or explanation; Attempts to question without parental permission not identified or adjudicated. |
| IA 89-070 | 5/20/1989 | Unnecessary Force | Discovery #68987-69086 (100 pages).<br>Formal IA Investigation; Witness Statements; Disciplinary documents | Written Reprimand. Vague findings; officer denied all misconduct but no finding on lack of truthfulness and apparent insufficient punishment for use of excessive force. |
| IA 90-183 | 10/24/1990 | False Arrest; Verbal Abuse; Civil Rights Violation | Discovery #72901-73064 (164 pages)<br><br>Formal IA Investigation; Witness Statements; Disciplinary Documents; Arbitration Decision. | 2-days suspension reduced to Written Reprimand by Civil Service Commission; Sustained for improper charge; No punishment for unnecessarily engaging a hostile crowd and making a mass arrest without cause. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| IA 91-029 | 2/16/1991 | Coerced Confession | Discovery #73222-73393 (172 pages)<br><br>Formal IA Investigation; Witness Statements. | Not Sustained with minimal explanation. Evidence of juvenile policy violations that went unidentified by IA and unaddressed by command staff. |
|---|---|---|---|---|
| CP 91-046 | 2/25/1991 | Excessive Force | Discovery #62068-62219 (152 pages)<br><br>Formal IA Investigation; | Not Sustained with minimal explanation. Juveniles taken to station instead of JSD. |
| CP 91-184 | 8/29/1991 | Documentation of injury to juvenile | Discovery #62626-62630 (5 pages)<br><br>Personnel Incident Report; Witness statements. | Information only. Based on witness officer statement, IA investigation into excessive force was warranted. |
| CP 92-015 | 1/19/1992 | Verbal Abuse; Juvenile Arrest procedures; Failure to Document; Excessive Force | Discovery #63005-63089 (85 pages)<br><br>Formal IA Investigation; Witness Statements; Disciplinary Documents. | Sustained for verbal abuse, arrest procedures and failing to document the incident. Written Reprimands only. Not sustained for excessive force. Letter to complainant was misleading, not indicating that excessive force allegation was not sustained. |
| CP 92-142 | 5/24/1992 | Excessive Force | Discovery #63431-63517 (87 pages)<br><br>Formal IA investigation; Witness statements. | Not sustained; no rationale provided. |
| CP 92-205 | 6/13/1992 | Excessive Force; Failure to Report | Discovery #63794-63989 (196 pages) | 3-day suspensions overturned by Civil Service Commission. No documentation of any action taken against Sgt. who provided |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | | Formal IA Investigation; Witness Statements; Disciplinary Documents; Arbitration Decision. | testimony contrary to IA statement at CSC hearing; |
|---|---|---|---|---|
| IA 92-019 | 10/30/1992 | Off-duty assault | Discovery #69520-69551 (32 pages)<br><br>Formal IA Investigation; Witness Statements; Disciplinary Documents. | Written Reprimand only. Command staff fails to address issue of untruthfulness; Written Reprimand given for multiple violations, including assault, improper detention and failure to identify self. |
| IA 92-174 | 11/14/1992 | Assault; Excessive Force; Juvenile Policy Violations | Discovery #69766-69808 (43 pages)<br><br>Formal IA Investigation; Witness Statements; Disciplinary Documents missing. | Suspensions ranging from 3 to 10 days against Sergeants and a Detective. No findings for numerous allegations; Suspensions did not appear to consider false statements by subject officers; No findings against numerous officers for juvenile policy violations. Heavy suspensions against two Sergeants for juvenile policy violations. |
| CP 93-009 | Jan. – Nov. 1992 | Supervisory Dereliction of Duty – Juvenile Policy | Discovery #644378-64637 (260 pages)<br><br>Formal IA Investigation; Witness Statements; Disciplinary Documents. | Written Reprimand for Lt. for failure to supervise; Sgt. receives 20 days suspension (instead of demotion or termination), reduced to 4-days, prior to arbitration. Notice of wide-spread juvenile policy violations by witness officer went unaddressed. |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

**Files Purported to Involved Substantial Discipline**

| Case Number | Date of Incident | Nature of Allegations | Content of File | Issues & Concerns |
|---|---|---|---|---|
| CP 89-194 | 9/5/1989 | Excessive Force; Failure to Report | Discovery #60959-61237 (279 pages).<br><br>Formal IA investigation; Witness statements; Disciplinary Documents; Suspension letter and supporting documentation not in file. | 6-month suspension, possible reduced to 88 days; No findings or apparent consideration given to SO's false statements or appearance of attempt to retaliate; No findings for intimidations of suspects; No rationale provided for failure to terminate or demote, even though SO denied doing anything wrong.<br>No documentation of debriefings with Tactical Section officers re: code of silence issues and importance of avoiding retaliation against cooperating officers. |
| CP 92-006 | 12/23/1991 | Perjury at an administrative hearing | Discovery #62939-62983 (45 pages)<br><br>Formal IA investigation; Witness statements; Disciplinary documentation. | 10-day suspension for lying under oath in an appeal to overturn a 4-day suspension; No substantive inquiry as to why he lied under oath; Perjury under oath by a police officer with a prior sustained record would appear to justify termination. |
| CP 93-264 | June 1993 | False Reporting; Retaliation; Violation | Discovery #64913-65179 (267 pages) | 30-day suspension for instructing probationary officer to prepare a false report (reduced |

**Exhibit 2**

Appendix 2 – Villegas v. El Paso

| | | of Administrative Gag Order. | Formal IA investigation; Witness statements; Disciplinary Documentation. | to 20-day suspension + 10 vacation days per contract); Not sustained findings against some officers with no explanation or rationale; 10-day suspension for officer who attempted to retaliate against probationer for reporting his FTO. No department action for subject officers' lying to Internal Affairs; SO minimized the significance of Noble Cause Corruption and allowed to keep his job. |

**Exhibit 2**

# APPENDIX 3A

# MARQUEZ WORKPAPERS

**Exhibit 2**

| Case No. | Date of Incident | Allegations | Disposition |
|---|---|---|---|
| | *1/6/1972* | *Commissioned as Officer* | |
| X-12229 (pages 7-8) | 4/14/1973 | Officer involved shooting (injury) (juvenile Hispanics) | In policy |
| X-35?68 (page 9) | 10/13/1973 | Inadequate Search | Verbal reprimand (SO denied fault) |
| B-529 (page 10) | 8/27/1974 | At fault traffic accident | Citation issued. |
| 74-145 (page 11) | 10/20/1974 | Police Brutality (Community Complaint) | In policy UOF – inadequate documentation of investigation. |
| IA 75-036 (page 12) | 3/12/1975 | On duty drinking (Community Complaint) | Officers counseled – no findings |

**Exhibit 2**

| | | | |
|---|---|---|---|
| IA 75-059 (page 13) | 4/12/1975 | False Arrest (Community Complaint) | Not sustained |
| IA 75-119 (pages 14-15) | 6/20/1975 | Rudeness; Excessive Force (Community Complaint) | Not sustained |
| IA 75-233 (page 16) | 11/13/1975 & 11/19/1975 | False Arrest (Citizen Complaint) | Not sustained |
| IA 75-241 (page 17) | 12/2/1975 | Threatening & abusive behavior | Officer Santana counseled. |
| IA 75-247 (page 18) | 12/12/1975 | Off duty fight | Information only. Other officer counseled. |
| IA 76-207 (page 19) | 10/17/1976 | Excessive Force (Community Complaint) | Not sustained |
| 77-34284 (pages 20-21) | 7/31/1977 | Officer Involved Shooting (injury) | In policy |

**Exhibit 2**

| None (pages 22-23) | 8/26/1977 | Officer Involved Shooting (no hit) (Hispanic juveniles) | Commendation |
|---|---|---|---|
| IA 79-137 (pages 24-25) | 9/7/1979 | Excessive Force & failure to ID (Community Complaint) | Not sustained |
| 00-230722 (page 26) | 6/14/1980 | Stolen Vehicle – Preventable | Referred to Accident Review Board |
| CP 82-178 (page 27) | 5/7/1982 | Misplaced radio | Written Reprimand |
| CP 82-223 (pages 28-29) | 6/18/1982 | AWOL | One day leave without pay. |
| IA 84-079 (pages 30-36) | April 1983 | Aggravated Perjury | Grand Jury No Bill Not sustained. |
| IA 85-157 (pages 37-38) | 6/26/1985 | Excessive Force on a Prisoner (Community Complaint) | Not sustained (inadequate investigation) |

**Exhibit 2**

| CP 86-125 (page 39) | 7/12/1986 | Failure to Attend SWAT Practice | Written Reprimand, 7/17/86 |
|---|---|---|---|
| CP 88-014 (pages 40-43) | 1/20/1988 | False Travel Reimbursement Claim | 15-day suspension reduced at arbitration to 3 days. |
| CP 88-146 (page 44) | 6/15/1988 | Failure to report for duty | 1 day leave without pay. |
| None (page 45) | 10/2/1988 | Civil Suit alleging false arrest in homicide case and threats by Marquez to destroy subject's reputation. (7239-42) | No IA investigation. Unknown resolution of civil claim. |
| CP 89-066 (page 46) | 4/28/1989 | Traffic Violation (one way traffic) | Traffic Citation & Counseling |
| IA 90-048 (pages 47-48) | 3/14/1990 | Excessive force (SWAT) (Community Complaint) | Not sustained |
| CP 90-052 (pages 49-50) | 4/3/1990 | Failure to report for duty | One day leave without pay. |

**Exhibit 2**

| IN92-033 (page 51) | 3/26/1992 | Community Complaint alleging lack of investigation and rude conduct in murder investigation (w/ Arbogast) | Information only. Not referred for IA investigation. Debrief by supervising Lt., but no documentation thereof. |
|---|---|---|---|
| CP 92-296 (pages 52-55) | 8/18/1992 | Discourtesy; Unauthorized Person in Vehicle | 2-day suspension (vacation days in lieu of suspension) No investigation of false statements. |
| CP 92-358 (pages 56-57) | 9/21/1992 | Failure to notify next-of-kin | Follow up on civil claim - Written reprimand |
| CP 93-019 (page 58) | 8/27/1992 | Illegal parking; Unpaid parking tickets; gun/badge visible in car. | Written reprimand (officer denied knowledge of prior parking tickets – no finding) |
| CP 93-097 (page 59) | 3/4/1993 | Failure to book seized narcotics | 3-day suspension |
|  | *4/10/1993* | *England-Lazo Homicide* |  |
| CP 94-227 (page 60) | 7/13/1994 | Alteration of Wanted Poster | Written Reprimand |

**Exhibit 2**

| | | | |
|---|---|---|---|
| CP 94-346 (page 61) | 9/24/1994 | Illegal activity at residence (by 14-year-old son) | Counseled on weapon safety. |
| CP 95-151 (page 62) | Summer, 1991 & 1992 | Sexual Harassment | Not sustained |
| | 8/24/1995 | Jury Verdict – Villegas Trail #2 | |
| | *2/15/1997* | *RETIREMENT* | |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez & E. Carmacho |
|---|---|
| Case No. | X-12229 |
| Discovery Page No. | DEF CITY 006987 (1-page) |
| Date of Incident | **4/14/1973** |
| Date of Review | 5/18/22 |
| Allegation: | OIS - Injury |
| Facts underlying incident: | Officers responding to 3:10 a.m. burglary in progress shot suspect (14-year-old Hispanic, Manuel Ramirez Lopez) while attempting to flee in right ankle. Second suspect (16-year-old, Hispanic, Alejandro Hernandez), with "flesh wound on right thigh." Third suspect escaped; unknown if hit/injured (search of one block area – no suspect located).<br>Officers reported seeing suspects on the roof of a café, attempting to enter through the air conditioning system.<br>Officers climbed onto roof, saw suspects, yelled at them ('they began to scatter") and then fired upon them.<br>Both officers fired. Officers reported they were unable to tell suspects were juveniles at the time shots were fired. |
| Findings | Per reviewing Sgt. (G.C. Oliveri): "officers [] acted in a proper manner fitting the situation."<br>Review by Captain (R.O. Edwards) of Uniform Operations: "Concur… no further action necessary on this matter." |
| Investigative Issues: | • One page report only on an OIS hit.<br>• No written witness statements.<br>• Inadequate documentation to determine extent of investigation.<br>• No documented formal interviews of officers.<br>• No indication of any danger to the officers. |

**Exhibit 2**

| | • No interviews of suspects. |
| | • Minimal investigation of significant incident. |
| Concerns | • Lack of comprehensive investigation into significant incident would allow officers to believe that they can use deadly force with impunity and no accountability. |
| | • Policy or practice of shooting at apparently unarmed burglary suspects, in the act of fleeing only, shows a disregard for life by the agency and its executives. |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Alfonso Marquez; Santana |
| Case No. | X-35?68 |
| Discovery Page No. | 6990-2 (Marquez Personnel File) (2 pages) |
| Date of Incident | **10/13/1973** |
| Date Reviewed | 6/3/2022 |
| Allegation: | Inadequate Search |
| Facts underlying incident: | Officers conducted inadequate search of a prison resulting in knife being found in the prisoner's pants pocket by a jailer.<br><br>Signed statement by Marquez, denying improper search and suggesting subject may have picked up weapon from another prisoner or while at jail 6991 |
| Findings | Lt.: "Officers Santana and Marquez were both verbally reprimanded about searching their prisoners for dangerous weapons at the time of arrest for their own safety and other s that will be processing and handling the prisoners. |
| Investigative Issues: | No documented attempt to try to question suspect. |
| Other observations: | Supervisors appeared to ignore officer's statement and issued verbal reprimands. |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez |
|---|---|
| Case No. | B-529 |
| Discovery Page No. | 6996-7002 (7 pages) (Marquez Personnel File) |
| Date of Incident | **8/27/1974** |
| Date Reviewed | 6/3/2022 |
| Allegation: | At fault vehicle collision |
| Facts underlying incident: | Marquez driving, pulls out of parking spot strikes vehicle as he is trying to make a right hand turn<br><br>Marquez written statement claiming other driver was speeding. |
| Findings | At fault. Ticket issued. |
| Investigative Issues: | |
| Other observations: | |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez |
|---|---|
| Case No. | 74-145 |
| Discovery Page No. | DEF CITY 007007 (1-page) [Personnel file] |
| Date of Incident | **10/20/1974** |
| Date Reviewed: | 5/18/22 |
| Allegation: | Civilian Complaint – "Police Brutality" |
| Facts underlying incident: | Two complainants (Augustine Morales & Emilio Hernandez) allege that after their arrest for public intoxication, Marquez struck them in the stomach (while being booked). |
| Findings | Lt. Gus Massey: "It is my decision that the officer used only the necessary force to accomplish this arrest and no disciplinary action is indicated." Signed off by Chief Robert Minnie. |
| Investigative Issues: | <ul><li>One page report only.</li><li>No indication of how conclusions were reached or whether an investigation was conducted; no indication of whether video of incident was available or consulted.</li><li>No documentation of statement of witness booking officer (as identified by complainants).</li><li>Finding appears on its face to relate to force used during arrest; not force used after arrest and during processing.</li><li>Findings solely conclusory in nature.</li><li>No indication Chief was aware of the basis for these findings, e.g., no indication of substantive command review at the Chief level.</li></ul> |
| Concerns | <ul><li>Lack of comprehensive investigation into citizen complaint of use of excessive force would allow officers to believe that they can use force with impunity and no accountability.</li></ul> |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Alfonso Marquez; S. Santana |
| Case No. | IA 75-036 |
| Discovery Page No. | 7032-7033 (2 pages) (personnel file) |
| Date of Incident | **3/12/1975** |
| Date Reviewed | 5/30/2022 |
| Allegation: | On duty consumption of alcohol (Civilian Complaint) |
| Facts underlying incident: | CO alleges that she was riding in the car of her cousin's husband, LH, when a police car pulled up next to them and LH handed the officers a mixed drink he had in had hand out of the window of the car to the officers in the patrol car. The drink was accepted by the officers…"<br><br>LH is reported to be a former Special Officer who lost his commission because of misconduct. |
| Findings | Lt. Akers, Patrol Division: "Officers Marquez and Santana were talked to on this – [???] was pointed out that if this subject was a friend of theirs, they should be careful about choosing friends. It is my understanding from other sources that they have [distanced???] this subject [on ice???}. |
| Investigative Issues: | **No statements taken from officers.**<br>**No documented inquiry into possible drinking on duty.** |
| Other observations: | |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez |
|---|---|
| Case No. | IA 75-059 |
| Discovery Page No. | 7017 (1 page) |
| Date of Incident | **4/12/1975** |
| Date Reviewed | 5/30/2022 |
| Allegation: | False Arrest (Civilian Complaint) |
| Facts underlying incident: | CO alleges that during a contact by police for possible under aged drinking, SO closed the car door on his brother's jacket. "The [CO] states that [SO] got very mad when he, the complainant, asked him to open the car door and get the jacket out of the door. [SO] did not respond but arrested the [CO} for interfering with Officer." <br><br> "CO alleges that SO abused his authority the way his car was searched and his friends and himself checked out. Also, the complainant was never told by the officer why he was arrested." |
| Findings | [] Peterson: "it is my decision after reviewing the details of the report that this allegation is not sustained and no disciplinary action is indicated. |
| Investigative Issues: | **No indication of any statements taken or documentation other than 1- page Personnel Incident Report.** |
| Other observations: | |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez |
|---|---|
| Case No. | IA 75-119 |
| Discovery Page No. | 7022-7023 (2 pages) [personnel file] |
| Date of Incident | **6/20/1975** |
| Date Reviewed | 5/30/2022 |
| Allegation: | Rudeness; Excessive Force (civilian complaint) |
| Facts underlying incident: | Per CO, after having been instructed to leave a public park, "a short time later while they were gathering up their belongings, the same two officers returned with two other police officers and again approached them. .. Officer Marquz shouted at them: "Don't you son-of-a-bitches understand English?... Get the fuck out of here, the park is closed." <br><br> CO also alleged he was later pulled out of his truck and subsequently thrown to the ground, cursed out, thrown into the police car, kicked and struck in the chest. <br><br> CO was reportedly arrested and booked for intoxication and disorderly conduct. <br><br> "The other witnesses, Gilbert Lerma and Nicolas Zarazua, gave statements also. Nicolas Zarazua states he was struck on the back. Gilbert Lerma states that all three of them were clubbed by Officers Santana and Marquez. |
| Findings | "After reviewing this report, it is my decision that this complaint is not sustained and no disciplinary action is indicated." |
| Investigative Issues: | **No documentation of statements taken from SO's.** <br><br> **No further documentation of statements of CO's – no written statements in file.** |

**Exhibit 2**

|  | **Reportedly, color photos were taken of the CO, but nothing in file.** |
|---|---|
| Other observations: | No incident report in file. |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Alfonso Marquez; S. Santana, D. Hall, |
| Case No. | IA 75-233 |
| Discovery Page No. | 7028-7029 (2 pages) [personnel file] |
| Date of Incident | **11/13/1975 & 11/19/1975** |
| Date Reviewed | 5/30/2022 |
| Allegation: | False Arrest (civilian complaint) |
| Facts underlying incident: | CO alleges that Officers Santana and Hall falsely claimed to have seized pills from his jacket during a search.<br><br>CO alleges being harassed by Santana due to his relationship with Santana's ex girlfriend.<br><br>[No mention of Marquez' name in complaint, although identified as an involved officer]. |
| Findings | "After a careful review of this report, it is my decision that this complaint is not sustained and no disciplinary action is indicated." |
| Investigative Issues: | **No documented statements from involved officers.**<br>**No written statement from CO – summary only.** |
| Other observations: | |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Alfonso Marquez; Santana |
| Case No. | IA 75-241 |
| Discovery Page No. | 7034-5 (2 pages) (Marquez Personnel File) |
| Date of Incident | **12/2/1975** |
| Date Reviewed | 6/3/2022 |
| Allegation: | Threatening and Abusive Behaviour (civilian complaint) |
| Facts underlying incident: | Complaint against Santana only. |
| Findings | "Officer Santana was counselled regarding this incident. I can find no real evidence of any improper conduct on Officer Santana's part. Part of his problem is the way he talks to people and possibly he needs to improve his attitude towards people. There is no disciplinary action involved in this incident." |
| Investigative Issues: | Statement of CO is summarized. No documentation of any statement from Santana or Marquez. No documentation provided for rationale for finding. |
| Other observations: | Unknown why Marquez was identified as an "involved officer". Not mentioned in findings – possibly was present. |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Alfonso Marquez; J. Borjon; J. Faniagua; J. Seeling; R. Valdez |
| Case No. | IA 75-247 |
| Discovery Page No. | 59583 (1-page) |
| Date of Incident | **12/12/1975** |
| Date Reviewed | 5/30/2022 |
| Allegation: | Off duty fight |
| Facts underlying incident: | Sgt, reports responding to a fight call at 2:00 a.m., observing "some subjects fighting outside the bar." "I approached the group, some of the police officers mentioned above were trying to break up the fight…The officers mentioned that the fight had started inside the bar and that they were trying to break it up." <br><br> Subjects alleged that "some of the police officers had started the fight – identifying Valdez & Borjon. Security guard alleged that Officer Borjon was one of the officers who had started the fight, but that he did not know why it started. <br><br> "…officers to my observation were not drunk…information only." |
| Findings | Division Head or Chief: <br><br> "After reviewing this case in its entirety it is my decision that Officer Juan Borjon be counseled as to his activities while off duty." |
| Investigative Issues: | **No documentation of any statements taken from any involved officers. One page file only.** |
| Other observations: | |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Alfonso Marquez; C. Douglas; I. Apodaca (booking officer) |
| Case No. | IA 76-207 |
| Discovery Page No. | 7042-7043 (2 pages) [personnel file] |
| Date of Incident | **10/17/1976** |
| Date Reviewed | 5/30/2022 |
| Allegation: | Excessive Force (Civilian Complaint) |
| Facts underlying incident: | CO alleges that she was assaulted (pushed and struck her head against a wall) by a Special Officer assigned to bar security. She called police and SO's Marquez and Douglas responded.<br><br>She tried to tell the officers that she hit her head, but instead Douglas handcuffed her and placed her under arrest. Douglas threw her against and then in the police car.<br><br>Douglas continued to mistreat her and said that "all Mexicans were just a bunch of drunks." Douglas subsequently kicked her when she tried to recover a shoe that fell off her foot. CO complained that the booking officer grabbed her arm, twisted it and dragged her into a cell.<br><br>Alleges that Douglas and Marquez "were wrong because they did not listen to her side of the story when she called the police at the scene of the incident." |
| Findings | "After a thorough review of this case, it is my decision that this complaint is not sustained and no disciplinary action is indicated." |
| Investigative Issues: | **No documentation of any statements taken from officers.**<br><br>**No indication of any investigation into this complaint.** |
| Other observations: | |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez; Leyba; Apodaca; Kunard; McClure |
|---|---|
| Case No. | 77-34284 |
| Discovery Page No. | 7048-7049 (2-pages) [Marquez Personnel File] |
| Date of Incident | **7/31/1977** |
| Date Reviewed | 6/3/2022 |
| Allegation: | Officer involved shooting |
| Facts underlying incident: | Officers working a bazaar heard shots fired. Officers began running in direction of shots fired. "Officer Marquez yelled "Police Officers, Drop it." At the subject who reportedly turned around and fired a round at Officer Marquez with a handgun. Four officers (including Marquez) fired back at suspect. Suspect fired again and Marquez and Apodaca returned fire, hitting suspect. A different suspect fired three shots at McClure and Kunard; McClure returned fire. Four suspects in total – all arrested. One rifle, one handgun and expended rounds were located.<br><br>Scenes reportedly processed to include a vehicle that was hit by officer gunfire.<br><br>Civilian witness statement reportedly taken (but not included in file). |
| Findings | "Officers fired away from the crowd at the bazaar and fired a subj. only when returning subj. fire…The officers fired only when they and others were in danger and quit firing when subj. began to flee.<br><br>"Officers did not violate any dept. regulations or statutory restrictions in the performance of their duties and firing of their firearms so it is recommended that no further action be taken in this case. The officers controlled the scene and proper evidence very well in spite of the hectic and unfriendly situation they found themselves in."<br><br>Messer: "No action necessary." |

**Exhibit 2**

| | |
|---|---|
| | |
| Investigative Issues: | |
| Other observations: | Only a two-page summary report.<br>No written statements included in file from involved officers, civilian witness or subjects.<br>No criminal reports in file. |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Alfonso Marquez |
| Case No. | None |
| Discovery Page No. | DEF CITY 007054- 007057 (4-pages) [Personnel file] |
| Date of Incident | **8/26/1977** |
| Date Reviewed | 5/18/22 |
| Allegation: | No hit OIS |
| Facts underlying incident: | While working as part of the Central Tactical Control, attempting arrest of 8 suspects who entered a business at 3:16 a.m. by removing a window. Marquez engaged in foot pursuit with one suspect and claimed he heard someone shout in Spanish: "I have a gun." Upon realizing he could not prevent the suspect's escape, Marquez fired four shots. Foot pursuit taken over by another officer and Marquez returned to assist in taking seven other suspects into custody.<br>Marquez reported seeing the fleeing suspect "raise his right hand as if to threaten Officer Marquez."<br>Other officer (McDorman) fired shots to no effect; suspect (Richard Orona Lopez – 15 years old) was apprehended, no weapon was recovered.<br>Another Officer, Dias, stated that, during transport, one of the suspects advised that three suspects had escaped and one was armed.<br>Reported that after interrogation, multiple suspects advised that one of the escaped suspect had a gun. |
| Findings | Commendation to all involved officers by Captain Dominguez, acting on recommendation of Sgt. Subia. Concurred by (illegible).<br>Sgt. Subia: "It is my opinion that [both officers] truly felt themselves in sufficient danger to meet the requirements of the department order on the use of force. I commend both these officers for having fired their weapons only at the moment which was safest for their fellow officers and any possible innocent bystander and for making sure they knew where their shots would be stopped without further danger." |
| Investigative Issues: | • ID&R called to scene, which was examined and photographed, including scene from Marquez' perspective at time of shooting, where his rounds hit and route of foot pursuit.<br>• Empty shells were examined and placed into evidence. |

**Exhibit 2**

| | |
|---|---|
| | • No indication of admission by suspect that he was armed and no firearm was recovered; no documentation of questioning of suspect Lopez as to whether he said he was armed or whether someone else made that statement.<br>• No documentation of whether there was any follow-up with Lopez on the shooting incident.<br>• Reports indicate that "subjects were not questioned in that the requirements of juvenile statements before a magistrate could not be met at that time." General, unattributed statements of subjects (of adult escaped suspects and armed suspect) were documented, however.<br>• Reports seem to infer that someone other than Lopez (an unseen suspect) was the one who stated he was armed. |
| Concerns | • No Case Number. No apparent means to track use of deadly force by an officer.<br>• Investigation of decisions to use deadly force appeared cursory in that they appeared to rely solely on statements of officer (no apparent documentation of these statements other than the hearsay summary written by the supervising Sergeant.) No written statement or formal interviews taken; no documented follow-up with person being pursued and shot at.<br>• Shooting by Marquez appeared to be considered justified for two alternative reasons: 1) suspect (who does not appear to have been actually armed) raising his right hand in a threatening manner after *someone* yelled that he had a gun; but, documented that officer did not decide to shoot until he knew 2) that suspect was going to escape except for the use of deadly force – which turned out not to be true.<br>• Lack of comprehensive investigation into deadly use of force incidents would allow officers to believe that they can use force with impunity and no accountability.<br>• Second incident of shooting at fleeing felon (all minors, all Hispanic males)<br>• No corroboration that suspect was, in fact, armed. No weapon recovered. No other witnesses to suspect yelling that he was armed. No corroboration as to any threatening moves by Lopez nor attempt to interview him about the use of deadly force. |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez (Officer) |
|---|---|
| Case No. | IA 79-137 |
| Discovery Page No. | 55187-55202 (16-pages) |
| Date of Incident | **9/7/1979** |
| Date Reviewed | 5/23/22 |
| Allegation: | Excessive Force & failure to ID self (civilian complaint) |
| Facts underlying incident: | Sworn statement from minor (16 year-old) that while being ejected from H.S. Stadium for horseplay, SO used excessive force by twisting his arm and throwing him against a wall. SO then knocked him to the ground causing an abrasion to his left knee. Further SO refused to provide his name to CO.<br><br>SO stated CO was part of a group engaging in horseplay at a [football] game. He threw his sandals onto the field, hitting a member of the football staff after being warned to stop engaging in foreplay and after one sandal was previously returned to him. SO acknowledged grabbing him by his arm; "he yanked his arm away almost striking me with his elbow…" States CO was combative, abusive and resisting arrest. They stumbled to the ground. SO claims he believed CO was an adult and was released after obtaining his name and address. SO claims CO did not ask for identification; "one of his friends did to which I gave him my name and badge #."<br><br>One civilian witness "whose parents gave permission to give a statement" reportedly "saw most of the incident, but did not see the alleged mistreatment.<br><br>IA notes: CO "does look old enough for pass for adult."<br><br>Written statement of juvenile witness in IA file.  States SO "twisted his arm and did it real hard, then escorted him out of the stadium. Did not see when CO fell. States CO did not throw his shoes, it was done by others. End of statement is either illegible or not included in the file. |

**Exhibit 2**

| Findings | "Investigation failed to confirm that the officer acted improperly and your allegation, consequently is not sustained," 10/17/79. |
|---|---|
| Investigative Issues: | <ul><li>Injuries were photographed.</li><li>Investigators reported that they attempted to contact two juvenile witness parents to get permission for an interview, but got no response.</li><li>Documentation of 10/9/79 interview of SO, but Contract Right Form indicates SO requested investigators not record the interview.</li><li>Unknown who wrote statement of juvenile; it ends abruptly – unknown if illegible portion of page or conclusion of statement is missing from file.  Ends: "The officer would…"</li><li>CO statement also ends abruptly. Ends with "the one who pushed me around was named…."</li></ul> |
| Other observations: | Bad practice of allowing SO to decide if his interview will be recorded.<br>Sworn written statement by SO – but no summary of interview provided by investigators. |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez; Alejandro Hernandez |
|---|---|
| Case No. | 00-230722 |
| Discovery Page No. | DEF CITY 007103-007111 (9-pages) |
| Date of Incident | **6/14/1980** |
| Date Reviewed | 5/19/22 |
| Allegation: | Preventable theft police vehicle; stolen radio |
| Facts underlying incident: | Officer Marquez stopped and exited the car and turned the ignition switch all the way to the accessories position, making it impossible to remove the key.<br>Key was left in vehicle [while purportedly responding to an urgent call] and patrol car was stolen and intentionally crashed and further damaged by use of rocks.<br><br>2-page report of Sgt. (missing first page (7103-7104)<br>1-page report from Marquez (7105)<br>1-paragraph supplemental report from Marquez (7106)<br>2-page theft report by Marquez (7107-7108)<br>1-page follow up report by Sgt. (7109)<br>1-page complaint report (7110)<br>Vehicle damage report (7111) |
| Findings | SO Marquez should have know what the problem was and been able to correct it quickly and remove the keys. "…the auto theft was preventable and Officer Marquez would be held accountable.<br>Theft of radio was not preventable.<br>Hernandez not negligent in any way.<br>Finding by Sgt. Jose Diaz; concurred by Lt. Knox(sp?)<br><br>Disposition (Captain Lopez): "ABR on vehicle; PRB on radio): ARB(?). By 6/16/80 (DC Messer; Chief Rodriguez): "ARB on both." |
| Investigative Issues: | |
| Concerns | |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez |
|---|---|
| Case No. | CP 82-178 |
| Discovery Page No. | 54880-54884 (5-pages) |
| Date of Incident | **5/7/82** |
| Date Reviewed | 5/19/22 |
| Allegation: | Failed to turn in equipment at end of shift. |
| Facts underlying incident: | SO forgot his radio in a Border Patrol vehicle. |
| Findings | Written Reprimand – 5/27/82<br>Recommended by Sgt Jose Diaz, 5/10/82; Concur: by Captain Lopez(?), Concurred by Chief Rodriguez, 5/20 |
| Investigative Issues: | • Report by supervising Sgt. who noticed radio missing. No written statement taken from SO. No indication if Officer was asked why he failed to report radio missing on his own. |
| Concerns | • If officer had noticed his radio was missing and failed to report it himself, more than a written reprimand would have been required.<br>• Not having officer provide an explanation on this issue allows for a potential code of silence culture to permeate the organization. |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez |
|---|---|
| Case No. | CP 82-223 |
| Discovery Page No. | 59584-5 (2-pages) |
| Date of Incident | **6/18/1982** |
| Date Reviewed | 5/30/2022 |
| Allegation: | AWOL |
| Facts underlying incident: | Marquez failed to show up for work at 8:00 a.m. (Friday).  Called in sick at 4:30 a.m. SO told to bring a sick slop from a doctor on his return to work on Monday 6/21/82<br><br>Sgt. report asking for sick slip for 2 reasons:<br>    1) Saw SO at monthly association meeting on 6/17 at approx. 9:00 p.m. "he appeared well and not ill. The whole work day of 6/17/82 also appeared well and not ill. At the association meeting, he was well enough to be drinking beer.<br>    2) Particularly important for officers to be reporting to work due to staffing levels and officers have been advised of such.<br>SO reported to work on 6/21/82 "and handed me a memo signed by him. The memo advised me that he had an upset stomach and a mild case of diarrhea. It further advised me that he did not see a physician because he did not feel it was not [sic] serious enough to see one." |
| Findings | Sgt. recommends one day LWOP for 6/18/82. "Officer Marquez no longer had the option of whether or not to obtain a doctor's certificate for his illness on 6/18/82. I had instructed him to do so. Therefore, [SO] is in violation of Sec. 3.07.003 B of the procedures manual." "Supervisors might require that employees bring a doctor's slip for one or two days."<br><br>Lt. "Concur."<br>6/18/82: Captain: Carry LWOP.<br>"one Day Leave without Pay." (59585). |
| Investigative Issues: | |

**Exhibit 2**

|  | **No attempt to interview officer to question him about his alcohol consumption the night before.** |
|---|---|
| Other observations: |  |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez |
|---|---|
| Case No. | IA 84-079 |
| Discovery Page No. | 59411-59582 (172-pages) |
| Date of Incident | **(April 6, 1984)**[1] |
| Date Reviewed | 5/30/2022<br>9/14/2022 |
| Allegation: | "Aggravated Perjury" (civilian complaint) |
| Facts underlying incident: | 4/9/84, CO alleged SO lied under oath in April 1983. SO testified he did not speak to defendant until 1:00 a.m. when she gave him a confession. Det. Flynn later testified that Marquez continually talked to defendant from about 7:30 p.m. until the time he took her confession.<br>4/12/84: CO referred to D.A.'s office – "if DA decided to go criminal, then D.A . could contact the EPPD Intelligence Division. (54913-4).<br><br>6/4/84: Personnel Incident Report: "Det. Marquez's testimony contradicts that of Det. Flynn. Statements taken by Vice units from CPA personnel involved in the investigation support Det. Flynn's testimony that Det. Marquez commenced interviewing Debra Waits at about 9 p.m., April 12, 1983. Det. Marquez contends that he did not make contact with Debra Waits until about 1:00 a.m., April 13, 1983. On page 22, line 5 of Det. Marquez' transcript you will find the statement in question reference his testimony. Det. Flynn's testimony on his transcript reflecting the time is on page 37, lines 4-25, and page 38, lines 6-16."<br>Referred to Internal Affairs. (59427)<br><br>IA Supplementary Report, dated 9/4/84: (59419- |

---

[1] Partial Transcript of Proceedings dated 4/6/84 including testimony of Attorney Gibson in support of motion to suppress. (59544)

**Exhibit 2**

8/18/84: CO alleged perjury.

SO stated he began talking to defendant at 9:00 p.m., but did not begin to take the confession until 1:00 a.m. "in reference to the testimony he gave in court, he was answering the question at what time did he have contact with Waits, at 1:00 a.m., being under the impression at the time that he was being asked at what time did they talk about the investigation being conducted, [not about giving her her rights or subjects not pertaining to the investigation], saying he had no intent on deceiving anybody." (59422).

Written statement of defendant shows "time commenced: 2:30 am." With Miranda warning at 2:25 am. (59432)

2 page written sworn statement of Sgt. Johnson stating that perjury charge was frivolous. (59438-9)

Marquez report on interview of defendant Wait (59444)

9/4/84, SO Marquez 3 page sworn written statement (59454-6). Started talking to her at about 9:00 p.m. and gave her her rights. It was not until 1:00 a.m. that she indicated she wanted to talk about the incident (after seeing co-defendant talking to another detective). Began a typed statement at 2:30 a.m., ending at 5:05 a.m. "Reference to the transcripted [sic] of the testimony given, I answered the question at what time did I have contact with Waits, at 1:00 a.m. I was under the impression that it was a reference at what time did we talk about the investigation being conducted. I am referencing the actual murder investigation. There was no intent to deceive anybody, but the question was answered reference to the statement taken from Waits. I have

**Exhibit 2**

been to the Grand Jury twice, and have answered questions along these lines, and have been no billed twice."

8/15/84, 5 page sworn statement of CO lawyer Gibson (59459-63). Deft. told him that Marquez questioned her on and off all night long. Marquez perjured himself by saying that he had never questioned my client before taking her statement. Det. Flynn later testified that Marquez questioned defendant from 7:30-9:00 p.m. and thereafter.

5/15/94 1 page sworn Statement of Det. Leyba: advised by co-defendant that if he could show her Waits she would go ahead and confess. He arranged with Marquez to have defendant see Waits…(59472)

Case Information Sheet: Finding by Special Prosecutor (59473): No indication of intent to deceive by SO: "It would have been foolish and futile for Marquez to make any attempt to conceal the time which interrogation began. Furthermore, it was not the focus of Mr. Gibson's cross examination." Also, no materiality as "the length of custody would not have affected the admissibility of the statement in this case!"

Criminal Aggravated Perjury Supplemental Report: 5/15/84: documenting investigation and interview of police witnesses "Basically what all of the people interviewed stated was the Det. Al Marquez began his interview… at approximately 9:00 p.m. on April 12, 1983. The interview was concluded at approximately 5:00 a.m. on April 13, 1983, with a confession having been obtained from subject… (59478) Marquez assigned to interview between 8-9 p.m. (59479)

**Exhibit 2**

| | |
|---|---|
| | 5/14/84 two page sworn statement of Det. Flynn. ((59482-3). Investigation began with contact with defendants on 4/12/83 – White Sands Missile Range. Didn't know what time Marquez began to interview defendant Waits, but don't believe it was past 9:00 p.m.<br>5/16/84 one page sworn statement of Lt. Saucedo. (59484)<br>5/14/84 one page sworn statement of Det. Lucas (59485)<br>5/15/84 one page sworn statement of Det. Leyba (59486)<br>5/15/84 one page sworn statement of Det. Avila (59487)<br>5/15/84 one page sworn statement of Det. Johnson (59488)<br><br>Transcript of Marquez testimony (UNDATED) (59492-59509).<br>Q: And about what time did you begin to take this statement?<br>A: I began to take this statement at about 2:30 a.m.<br>Q: …what time was it completed?<br>A: It was completed at 5:05 a.m. (59493)<br><br>Transcript of Flynn testimony (4/6/1984) (59510-59553)<br><br>Transcript of testimony of CO (attorney) (4/6/1984 (59554-59559) |
| Findings | 6/4/1984: Sgt. Duron: "This case was reviewed by Assistant DA Thomas Roepke and he determined that no criminal charges would be filed, as there was no evidence that Det. Marquez intentionally wanted to deceive anyone by his statement about when he actually began his interview with Debra Waits."<br>Referred to IA.<br><br>8/7/1984: GJ No bill for perjury. (59411) |

**Exhibit 2**

| | |
|---|---|
| | Deputy Chief: 9/10/1984: "After careful review of case, I find no violations of Dept. Rules & Procedure. Recommend case be not sustained." (59429)<br><br>9/11/1984: Not sustained letter to CO from COP (59412)<br><br>There is no documentation of the rationale used by the DC to "not sustain" the case. The appearance is that the case was not sustained based solely on the failure of the DA to indict Marquez. Although the department would be justified in deferring to the DA's legal conclusion of materiality, the question as to whether Marquez made misleading statements under oath or omitted material information needed to be addressed. In fact, the evidence appears to support that Marquez did work on obtaining a confession starting at no later than 8-9:00 p.m. but stated in his testimony that he did not start to take the defendant's confession until 0100. While it might not have been possible to prove actual falsity, the testimony appeared, on its face, to be misleading[2] and further inquiry by IA/chain-of-command would have been warranted. |
| Investigative Issues: | **Apparent failure on the part of IA to conduct a fulsome interview of Marquez to inquire further as to conflicts between his testimony and that of Detective Flynn and to include why he omitted information regarding the totality of his contact with the defendant from his testimony.**<br><br>Reliance on written sworn statements without audio recordings is problematic |
| Other observations: | Case Info Sheet illegible (54917-8) |

---

[2] Marquez may have intentionally omitted information as to the full extent of his contact with the defendant. Further, his statement that other detectives were involved in the interviewing of the defendant appears to have been inaccurate, at best. (Although it has to be noted that the defendant's lawyer suggested that multiple detectives took turns questioning his client, which appears to have been inconsistent with all of the Detective testimony (with Marquez indicating he was not present to establish that fact one way or the other)).

**Exhibit 2**

| | |
|---|---|
| | IA Interview with SO not recorded per "Statement of Request. (59453)<br><br>Applicable Rules & Regs: (59576-59582). |
| Testimony of Marquez (Suppression hearing) 59492-59509; 59568 (p. 8) | • Began to take statement at about 0230. Completed at 0505 (59493)<br>• Took defendant before a magistrate at approximately 0530. (59501)<br>• Came into contact with Wait [after she had contacted an attorney] at 1:30. She advised she did not want to talk without an attorney; "We sat and talked about her family life." (59503)<br>• Leading question: "you started questioning her about 1:00 o'clock, is that correct? Yes sir." Spoke to her about her family life for about 45 minutes (59504)<br>• Asked to confirm detectives questioned her "in rotation, one after the other" from 9 p.m. to 0230. A: "I wasn't present".<br>• "We started talking to her about her family life at 0100…for about 45 minutes (59505). Subsequently, she agreed to talk.<br>• Told her about capital murder charge "prior to me going in at 1:00 o'clock. |
| Testimony of Flynn (Supression Hearing) 59510-59553 | • Transported defendant back to El Paso at 6:30 p.m. after she had a chance to meet with her attorney (59517)<br>• **Upon arrival Det. Marquez assigned to initiate a further interview with her. (59519)**<br>• **Estimated that the interview began at around 8:00 p.m. (59520)**<br>• **Subsequent to phone conversation between defendant and attorney, interview continued with Marquez. (59522)**<br>• Explained how written statements are taken: typed up by Detective after interview is completed. (59524). |

**Exhibit 2**

| | |
|---|---|
| | <ul><li>Arrived in El Paso with defendant around 7:30 p.m.  Marquez assigned as primary interviewer (59539)</li><li>Defendant asked for permission to call her lawyer around 9:00 pm. (59541). She then proceeded with the interview with Det. Marquez (59542). Q; "Det Marquez continued to question her on a continual basis up until around ten, is that correct? A: Yes that is correct." (59544).</li><li>Detective Marquez came out at around 10:00 p.m. [or eleven p.m. – p. 59544] and indicated she was providing a statement. (58541)</li><li>Q; If Det Marquez were to state that he did not interview the defendant, but that other officers did, and that around 0100 he sat down and spoke with her about family for approx. 45 minutes, after which she decided to confess would that be incorrect? A: It would not be consistent with what I remember about the interview as it took place. Det. Marquez when she was brought into the office was at that time primary interviewer in the case." (59545)</li></ul> |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez (Det.); Antonio Layba (Det.) |
|---|---|
| Case No. | IA 85-157 |
| Discovery Page No. | 55232-55287 (56-pages) |
| Date of Incident | **6/26/1985** |
| Date Reviewed | 5/24/2022 |
| Allegation: | Excessive force on a prisoner (community complaint) |
| Facts underlying incident: | 1 page sworn written statement of Sheriff Detention Officer Munoz, advising of prisoner fresh complaint of abuse ("his face was swollen") <br> 3 page sworn statement from Marquez, alleging prisoner (capital murder suspect) injured himself through self-abuse. <br> 2 page sworn statement from Det. Layba, stating he left the room, as Marquez was the primary investigator and checked his message box and report box. Denied touching suspect; "I only assisted Marquez since Rivera was going to be charged with 3 murder in case he would try to escape." Added, he wasn't in the officer with suspect and Marquez "while the interview was taking place. Rivera wasn't in our office more than 5 minutes." <br> 1-page sworn statement of Sgt. Gomez (Homicide) – no sign of blood as alleged by prisoner (checked day after incident). Prisoner in office for no longer than 5 minutes. <br> 2-page sworn statement by cell-mate of CO, advising CO admitted he hurt himself. <br> 2-page sworn statement of CO, alleging he was interrogated for 30-45 minutes and struck in the face by Marquez while handcuffed in the presence of another detective. <br> 1-page sworn written statement of Jail LVN indicating that injuries to CO were not consistent with a recent beating. |
| Findings | Not sustained. <br> Letter to CO, dated 8/21/95 (5 days after inquiry from CO's lawyer as to status of complaint investigation). |
| Investigative Issues: | • **No follow up questioning of Layba as to whether he say any injuries to suspect before and after he left the interview room**. <br> • **No photos taken of office walls**. |

**Exhibit 2**

| | |
|---|---|
| | • No documentation of interviews other than sworn written statements.<br>• File includes completed IA check list (55256)<br>• File includes jail medical records<br>• Documentation that IA interviewed Layba and Marquez who documented they "did not" want the interview recorded. (55264-55266)<br>• BUT NOTE: PRISONER LOG (55279) SHOWS CO OUT OF HIS CELL AT 10:35 A.M. AND NOT BACK UNTIL 1:00 P.M. **NOT ADDRESSED BY IA INVESTIGATION**. (6/26/85 – "Rebooking". |
| Other observations: | |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez (Detective |
|---|---|
| Case No. | CP 86-125 |
| Discovery Page No. | DEF CITY 0054885-0054891 (7-pages) |
| Date of Incident | **7/12/86** |
| Date Reviewed | 5/19/22 |
| Allegation: | Failure to attend SWAT practice (instinctive shot gun practice). |
| Facts underlying incident: | SO failed to appear at range for SWAT training and failed to notify a supervisor and did not respond to a call to his home or to beeper. |
| Findings | Dereliction of Duty – Failure to Notify Supervisor – sustained, 7/17/86<br>Negligence – AWOL – Sustained, 7/17/86<br>Written reprimand requested by Lt. Lanahan; concurred by Chief, 7/17/86 |
| Investigative Issues: | Written statement was obtained from SO, dated 7/14/86, (two lines) indicating he was out of town and unable to get to a phone to make notification. |
| Concerns | Minimal explanation provided by SO – did he forget? Did he not care? Did he not want to attend the training? All unknown. |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez (Det); Ben Ayala; Sgt. Gomez |
|---|---|
| Case No. | CP 88-014 |
| Discovery Page No. | 44511-44600 (90-pages) |
| Date of Incident | **1/20/1988** |
| Date Reviewed | 5/30/2022 |
| Allegation: | False Travel Reimbursement Claims |
| Facts underlying incident: | Original Personnel Incident Report (44529) To IAD 1/22/88. Personnel Incident Report re: Sgt. Gomez (insubordination) DOI: 2/9/88 (44531)<br><br>IA Supplementary Report (44591-<br><br>Initial complaint info from budget office (44554) Reimbursement documentation (44555 & 44564)<br><br><br>2/16/88 4-page sworn statement of Sgt. Gomez (missing page 4) explaining why he confronted Marquez and Ayala about an allegation of false travel claims. Page 4 located at 44527.<br><br>3/10/88 sworn-written statement of SO Ayala: admits submitting a bill for two separate rooms, "and was done solely for the purpose of covering the expense of the meals (dinner, etc.) which were not originally covered by the travel orders. In addition to paying for dinner for the SLC officers, we also bought food and drink for [W] on 11/28, in particular during the layover from SLC, at Denver, and into El Paso. Additional expense were incurred for which receipts were not obtained. "…once being asked for a written explanation,…we then made restitution in the amount of $45…and then $5.39 (44519-44521)<br><br>3/10/88 sworn written statement of SO Marquez (44522-25): "In the motel explanation I stated that we had spent a total of $90 for a motel which was an error. The total bill was $49.61. We used the remaining $50 as well as our own money to show our appreciation to Det. Foster, and Bell who assisted us in the investigation while in SLC…Some of the |

**Exhibit 2**

<table>
<tr><td></td><td>monies were also used in a layover in Denver, as we had brought the witness interviewed back to El Past…Provided reimbursement…<br><br>4/12/88 statement of Marquez: denied telling captain that officers rented one room in SLC but were charged for two. (44528 & 44526)</td></tr>
<tr><td>Findings</td><td>4/18/88 Findings memo from Capt. Aguilar:<br>10 days suspension; Officer Ayala: 5 days suspension; Sgt. Gomez: WR.<br>**Officer Ayala admitted to falsifying motel expense** "for the purpose of covering the expense of the meals (dinner, etc.) which were not originally covered by the travel orders." Sgt Gomez "admits to releasing the IA investigation to [SO's] and took it upon himself to question the two officer to find out what happened. This was after he had been instructed by myself and DC Massey not to discuss the investigation with anyone."<br>**Detective Marquez admits, to some extent, that the motel expenses were falsified "In the motel explanation I stated that we had spend a total of $90 for motel which was an error."** "On his second statement when questioned specifically about the telephone conversation with myself in regards to the cost of the motel room, he denies the discussion. **Therefore, I'm quoting** the conversation as follows: "What arrangements did you make with the motel room?" Answer: We stayed in one room, but we paid for two. I even asked the clerk, if we stay in one room, do we still have to pay for both, and she said yes." **"I gave Det. Marquez an opportunity to rectify the situation when I called him over the phone but he deliberately lied to me.** He as given a second opportunity when he and Ayala were asked to sign the travel memo breakdown showing that each had paid $45 for motel." (44568).<br><br>DC Massey (4/18/88): "I agree with Capt. Aguilar.<br><br>**A/C Messer, 4/19/88: "Case is similar to case involving an officer from police academy who received 15 days in 1986. 15 days each officer. (44530)**<br><br>Written reprimand for Sgt. Gomez, AC Messer, 4/19/88. (44531)</td></tr>
</table>

**Exhibit 2**

|  | 4/25/88 WR: "On February 9, 1988, you divulged information on an administrative investigation to two of your subordinates. This was after you had been informed by Deputy Chief Massey and Captain Aguilar not to do so. Your failure to follow orders shed a negative light on your professionalism and could have endangered an investigation…" (44532) <br><br> Marquez suspended from May 2, 1988, to May 20, 1988 (44572) <br> Ayala suspended from May 2 to May 23 (44571) <br><br> Notice of suspension (Marquez) (6/7/88) (44575-78): **Finding: "The documentation containing this intentionally false and misleading information was signed by our and Officer Benjamin Ayala. Additionally, when questions about this matter by a superior officer, you gave him false information regarding the hotel expenses."** <br><br> Notice of suspension (Ayala) (6/7/88) (44579-82). **Finding: "The documentation containing this intentionally false and misleading information was signed by you and Detective Alfonso Marquez."** <br><br> **Arbitration Award (10/19/88) (44583-44590): Inappropriate use of prior case involving officer with larcenous intent (charged department at undiscounted rate for a room and kept between $105 and $200 for himself.** <br> "Since 1981 these two long-term employees have had good evaluations and have avoided serious discipline. Their confessions of wrongdoing , while somewhat belated, revealed no attempts to withhold additional information; their admissions were forthright and without qualification." Once again, and most significant, the Grievant's misrepresentations was not motivated by greed or desire to gain at the expense of taxpayers. All they sought to achieve was a return to status quo." <br> **3 day suspension warranted.** |
| Investigative Issues: | Per 3/1/88 statement of Sgt. Peevey: Effective 2/1/99, IA investigation was put on hold by AC Messer as SO's were involved in a special homicide task force and not advise SO's so that they could concentrate on the homicide investigations. (44512-4). |

**Exhibit 2**

| | |
|---|---|
| | 3/2/88 statement of DC Massey re: Sgt. Gomez violating order not to discuss case with SO's. "Gomez stated that he did contact hem even though he understood that he was not supposed to but that he did it because he was frustrated and upset over the way that they let hm down." (44515)<br><br>**Per Captain, Marquez lied to him on the phone when first confronted about the hotel billing discrepancy; claimed the billing was an "error" to IA and lied to IA about his conversation with the Captain (44568), but ultimately receives the same suspension as Ayala who told the truth when confronted.**<br>**Marquez would know this….** |
| Other observations: | Relevant rules (44536-44550)<br>EPPD Matrix: (44551-53)<br><br>Statement of request: "I Det. Alfonso Marquez <u>do</u> desire a tape recording made of this interview (dated 3/10/88 (44556)<br>Statement of request: "I Officer Bejamin Ayala <u>do</u> desire a tape recording made of this interview (dated 3/10/88 (44557)<br>Statement of request: "I Det. Alfonso Marquez <u>do</u> desire a tape recording made of this interview (dated 4/12/88 (44558 & 60)<br>Statement of request: "I Officer Bejamin Ayala <u>do not</u> desire a tape recording made of this interview (dated 2/16/88 (44559)<br><br>IA Investigation check list (44574) |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez (Det) |
|---|---|
| Case No. | CP 88-146 |
| Discovery Page No. | DEF CITY 54892-54896 (5-pages) |
| Date of Incident | **6/15/88** |
| Date Reviewed | 5/20/22 |
| Allegation: | Failure to report for duty |
| Facts underlying incident: | SO assigned to Homicide Unit and failed to report for duty at assigned time and location. SO called in sick, but call was not received "within the allotted time and his illness not being an emergency." SO also failed to call back to speak to a supervisor as per CAP operating policy. Start time was 0745 – called in sick at 0805 and spoke to a fellow detective only. |
| Findings | Dereliction of duty – Sustained, 6/24/88 Sustained recommendation by Sgt. R. Gomez Note by Lt. Saucedo: AOL "is a serious breach of departmental rules and C.A.P. policies. Therefore, any further similar violations will result in severe disciplinary action." 1 Day LWOP – by Deputy Chief. |
| Investigative Issues: | <ul><li>SO gives 3 paragraph written statement.</li><li>SO claims to have called in to Officer B. Ayala at 0600 and then called again, at approx. 0800 and spoke to Det. Doyle, asked for Sgt. Gomez and was advised he stepped out of office. Called again later in the day and spoke to Sgt. who advised incident report had been written.</li></ul> |
| Concerns | <ul><li>No documentation that anyone verified with Officer Ayala to confirm initial call was made at 0600.</li><li>This seems consistent with a Department that assumes truthfulness by employee without any confirmation thereof, even when it would be easy to do so.</li></ul> |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez, Joe Avila, Lillian Beard |
|---|---|
| Case No. | None |
| Discovery Page No. | 7239-7242 (4-pages) (Personnel file) |
| Date of Incident | **10/2/1988** |
| Date Reviewed | 6/20/2022 |
| Allegation: | Civil Claim - False Arrest; False Statements in Arrest Warrant |
| Facts underlying incident: | Civil claim letter to Mayor, dated 7/11/1990.<br>Alleges false warrant affidavit claiming officers did not have sufficient evidence to proffer charges against a defendant, resulting in dropped murder charges.<br>Alleges false statements in arrest warrant to include that there was forensic evidence tying defendant to the crime (bite marks made by defendant consistent with the time of death) and that defendant matched the description of a suspect who left a bar with the victim before her death.<br>Alleges no probable cause to make the arrest, based solely on affair between arrested defendant and victim.<br>Threat by Det. Marquez that he would "prove to everyone that he (defendant) was not the good person that everyone thought him to be…"<br>Charges dropped on 6/11/1990. |
| Findings | No indication of any investigation or inquiry into prima facie allegations of misconduct. |
| Investigative Issues: | |
| Other observations: | No apparent referral to internal affairs or any investigation into allegations of false statements. |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Alfonso Marquez |
| Case No. | CP 89-066 |
| Discovery Page No. | 54897-54909 (13-pages) |
| Date of Incident | **4/28/1989** |
| Date Reviewed | 6/6/2022 |
| Allegation: | Traffic Violation |
| Facts underlying incident: | Marquez observed by Deputy Chief driving southbound against one way traffic.<br><br>Written statement from Marquez admitting to violation, though reporting it was not intentional. Reported that "I was in the company of Detective Ybarra, and had been to the Fed Employee's Credit Union in the downtown area. |
| Findings | Issued traffic citation.<br><br>Detective Marquez "was counseled on attentiveness to his driving, order not to accompany Det. Ybarra or any other detective not assigned to CAP unless first cleared through immediate supervisors and advised that any further incidents may result in transfer from CAP." |
| Investigative Issues: | No written statement from Deputy Chief.<br>No written statement from witness officer. |
| Other observations: | No specific explanation in file as to why Marquez was ordered not to accompany Det. Ybarra unless first cleared by supervisors.<br> • It appears that Ybarra was not authorized to be in the vehicle with Marquez. No charges brought for an unauthorized passenger or for using a city vehicle for a personal purpose.<br>No documentation of what counseling with Ybarra entailed and why it was necessary given that he was the passenger. |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez (Det.) & 6 other members |
|---|---|
| Case No. | IA 90-048 |
| Discovery Page No. | 55288-55488 (201-pages) |
| Date of Incident | **3/14/1990** |
| Date Reviewed | 5/24/2022 |
| Allegation: | Use of Excessive Force by SWAT (arrest for parole violation) (civilian complaint) |
| Facts underlying incident: | CO claims he was beaten up, while handcuffed, in his home, by a line of SWAT officers, "with their rifles."

Complaint initiated by aunt of arrestee; IA documented that CO declined to provide a statement. (55314-5); but see, written sworn statement from CO, dated 3/28/90 (55324-28)

Multiple officer statements indicating CO was uncooperative and resistant upon being removed from the residence.

CO Sister stated she saw a SWAT officer hit CO in the legs with a rifle to get him to enter the patrol car (55306).
Mother noticed CO bleeding from mouth when taken out of house.
IA Summary of Alicia Guzman (55306) statement appears to differ from written statement, in part (55328-31), alleging an officer struck CO "while he was sitting [in] the back of one of the cars.: "the officer stood outside of the car and struck Jose with the Item, while he sat in the car. I saw the officer hit him two or three times and then I turned away."
Mother and aunt state they saw CO with blood on his face as he was escorted out of the house (55329 & 55334). Confirmed by Sgt. Davidson statement (55345); confirmed by Lt. Grijaiva statement (55365); Lt. Carney (55374). |
| Findings | Not sustained, Letter to CO, 7/9/1990. |
| Investigative Issues: | • Extensive IA report (20 pages: 55293-55313) including interviews of CO, 19 witness officers, 1 FF, 1 Animal control officer, 2 CO family members; also, |

**Exhibit 2**

|  | including section entitled: "Officer Rebuttal" (7 Subject officers), including Marquez (who denied using force or seeing anyone "physically abuse" the CO). |
|  | • No recorded interviews; interviews of officers summarized in IA report, but no dates or times of interviews documented; Sworn written statements of all witnesses in file. |
|  | • A number of written statements were in Q& A format: Lt. Buonvino statement 55356, statement of PO Martinez to Lt. Buonvino (55361); Lt. Spencer (55366 (7 pages). |
|  | • No attempt to clarify if any officer struck CO while he was in or being put into the police car; no documented attempt to clarify if or how CO got injured while being arrested in the house. |
|  | • File referenced medical records obtained – but no comment or summary from IA investigator as to any significant facts from medical records. |
|  | • File includes booking photo. |
|  | • Completed IA investigation checklist in file (55317) |
|  | • Photos taken of inside and outside of residence. |
|  | • Documentation of IA interview of Marquez and request for interview to not be recorded (55433-4) (Documents for Marquez and other SO's – pp. 55433-55441; 55463-465): **none of the officers requested the recording of their interviews**. |
|  | • Criminal record of CO in file; IA cards of involved officers in file. |
|  | • IA file documents letters to residences of home, attempting to obtain interviews (55483-6). |
| Other observations: | • Det Marquez was a member of SWAT. |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Alfonso Marquez (Det) |
| Case No. | CP 90-052 |
| Discovery Page No. | DEF CITY 54910-54938 (29-pages) |
| Date of Incident | **4/3/90** |
| Date Reviewed | 5/20/22 |
| Allegation: | Failure to report for duty at designated time |
| Facts underlying incident: | Failed to report for duty; failed to call in or notify anyone until 0930. |
| Findings | Dereliction of duty – sustained, 4/9/90<br>1 Day LWOP.<br>"Further violations will not be tolerated."<br>SO officer waived right to appear and **COP agreed to allow him to forfeit vacation time, in lieu of suspension.** |
| Investigative Issues: | <ul><li>SO stated he "overslept"</li><li>Noted prior instance on 6/18/82, while assigned to the TAC unit, failed to report to work and called in sick, "even though you had been drinking beer the night before. Your supervisor requested a Sick Slip from a physician and you failed to provide one. You were carried LWOP as a result of that incident."</li><li>Noted prior instances seen in IA files: (1986, failure to attend SWAT training;1988 incident).</li><li>Identified prior disciplinary record as follows:<ul><li>5/7/82: Written Reprimand for lost radio;</li><li>1/20/88: 3-day suspension for failure to properly report financial expenditures made on Department business with department funds.</li><li>4/28/89: Written Reprimand for "violation of driving laws while operating a City vehicle"</li></ul></li><li>SO signed document indicating he would be questioned by Sgt. Gomez; but no summary of an interview in the file, instead short written statement by SO, indicating he had overslept.</li></ul> |

**Exhibit 2**

|  | <ul><li>Written statement from Sgt. Gomez, indicating time call received and what he was told by SO.</li><li>5/8/90 statement by SO indicating he does not agree that prior allegations (1982, 1988 and 1989 should have been considered). SO admits to Rule No. 6 violation only: Dereliction of duty - AWOL</li></ul> |
|---|---|
| Concerns | <ul><li>Note prior case in 1988, received similar punishment –</li><li>No IA file for 1982 incident cited in findings.</li><li>Although SO signed document indicating he would be interviewed by Sgt. Gomez, the file indicates instead, only a short written statement, indicating SO overslept and then called in at 0930.</li></ul> |
| Additional Notes: | <ul><li>File contains portions of Department Rules and Regulations, including Rule No. 1, 2, 14 & 15 and Chapter Four (Professional Conduct) (p. 42)</li></ul> |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Earl Arbogast; Al Marquez |
| Case No. | IN 92-033 |
| Discovery Page No. | 8898-8899 (2-pages) [Arbogast Personnel File] |
| Date of Incident | **3/26/1992** |
| Date Reviewed | 6/8/2022 |
| Allegation: | Civilian complaint - Rude & Unprofessional Conduct |
| Facts underlying incident: | Detectives came to complainant's home saying they had an arrest warrant for her husband for murder. Marquez "did all the talking, was very rude to her and Detective Arbogast just stood their rolling his eyes in disbelief."<br>Detectives went to her husband's place of work and questioned him in front of other employees, embarrassing him.<br><br>CO noted there was a plumber at the house at the time of the Detective's visit and could be a witness.<br><br>CO believed Detectives should have conducted more investigative work before coming to her home and accusing her husband of murder.<br><br>She was advised by supervising Lt. that no IA investigation would be conducted, but complaint would be documented and supervisor would "talk to the Detectives." |
| Findings | None. |
| Investigative Issues: | **No documentation of any debriefing or analysis of complaint and its veracity.** |
| Other observations: | |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez (Det.) |
|---|---|
| Case No. | CP 92-296 |
| Discovery Page No. | DEF CITY 54939-55016 (78-pages) |
| Date of Incident | **8/18/1992** |
| Date Reviewed | 5/20/22 |
| Allegation: | Rude & Unprofessional Conduct (civilian complaint)<br>Unauthorized person in City vehicle (internal allegation)<br>**Uninvestigated: False Statements to IA** |
| Facts underlying incident: | SO involved in TC (with no damage to vehicle or injury to persons) in City vehicle. He was driving the son of his girlfriend, which was unauthorized.<br>Written 2-page statement from SO, dated 8/19/92 (see concerns below re: potential material omission);<br>Written 1 paragraph statement from SO, dated 12/3/92 (also potentially omitting material information);<br>Written 2-page statement from Witness Officer, Orndorf, 12/30/92) [note comment below re: statement made by minor witness that was inconsistent with statement made by SO). *Query how Orndorf contacted witness, who was reportedly left at the scene of the TC per SO?<br>Written 1 page statement from Witness Sgt. Apodaca, dated 11/10/92.<br>Written 1 page statement from Sgt. Lopez, dated 8/20/92. [No indication that he was told by SO that there was a witness to the incident in his vehicle.)<br>Signed written 2 page statement of Angelina Ramirez, dated 8/19/92.<br>Statement inconsistent with SO; claims only left the area after told to do so by SO and after he threatened to handcuff her husband; she noticed boy in car.<br>North Mesa St. & East River Ave. is located at the Northwest corner of   Cathedral High School, 1309 N. Stanton St. – which is potentially consistent with CO wife's story that SO told them to drive away from the entrance after he threatened to arrest the CO and people were honking for them to get out of the way.<br>Signed written 2-page statement of Ruben Ramirez, dated 8/19/92. States SO told his wife the kid was his nephew.<br>2-page signed written statement of Sgt. Sergio Lopez – missing page 1.<br><br>Sustained IA history of SO (p. 54969) |

**Exhibit 2**

| | |
|---|---|
| | Not sustained IA history of SO (p. 54970). |
| Findings | Sustained, Unauthorized passenger, 1/19/93<br>Unprofessional conduct, sustained, 1/19/93<br><br>But note, 1/15/93 memo from Commander CID [Sustained on Unauthorized Rider; Not sustained on Rudeness]: "The allegation that [DO] was rude is not clear. It is my opinion that tempers flared both from Detective Marquez as well as from the other party involved. Detective Marquez is guilty of "poor judgment." First for having an unauthorized person in this vehicle, and secondly for inciting a simple matter to the extreme of wanting to arrest a seventy-five-year-old man." (p. 54980). [Note, no comment on inconsistency of statements between CO's and SO nor omissions by SO].<br>2-day suspension, by Assistant Chief, 1/20/93.<br>Vacation in lieu of suspension, approved 3/8/93.<br>Identified following prior violations:<br>• 3/12/75: accepted an alcoholic beverage while on duty and in uniform, counselled for actions.<br>• 12/12/75: "you failed to regulate your personal affairs"; counseled.<br>• 7/12/86: failed to report to your duty assignment as scheduled. (CP86-125, but date of violation was 7/21/86).<br>• 11/27/87: "you requested reimbursement from the City for expenses which you did not incurred [sic]" – 3-day suspension<br>• 4/28/89: violation of traffic laws while driving a city vehicle; counseling.<br>• 4/3/90: failed to report for duty as scheduled with previous counseling for tardiness. (CP90-52); 1 day suspension.<br>• 9/21/92: failed to make a death notification on an assigned case; Written Reprimand.<br>SO waived right to appeal; allowed to substitute vacation days for suspension days. |
| Investigative Issues: | • Written 2-page statement by SO. In written statement, dated 8/19/92, SO **failed to disclose relationship with rider:** referred to as "as student…known to me as Christopher Barron. (was, according to file, the son of SO's girlfriend [per representation of IA investigator).<br>   o This is a **omission of a material fact**.<br>   o Statement claimed that he picked up boy, not at HS, but at the Circle K store and Nevada and Stanton (two blocks away per Mapquest) when picking up a root beer |

**Exhibit 2**

|  | and noticing he was alone). Claimed he ran into traffic at the H.S. (but if you run 69 Kingery Dr. in Mapquest, it shows that the direct route to the boy's house was not by the front of the school where the T/C happened), instead he would have been taking the long way around the H.S. to be on River Avenue headed North)…**As such, this statement appears to be false.** It appears more likely he was picking boy up from school which would explain why he tried to claim he just noticed a boy in need and was providing a public service by giving him a ride. **None of this was highlighted in the IA investigation.**<br>   ○  Statement states after T/C: "I got back into my City Vehicle, asked Christopher Barron to Exit the vehicle and followed the driver of the vehicle…." [Implication that he had unauthorized passenger exit vehicle to avoid detection of this violation]; but, according to CO's wife, minor was in the car all along; and according to RO, he interviewed the boy.<br>   ○  Acknowledged grabbing handcuffs, detaining other driver, even prior to calling a patrol unit for assistance.<br>• Supplemental statement, dated 12/3/92, acknowledged that: "My relationship with Chris Baron is that he is the son of an acquaintance. On the date of the traffic accident I was going to take him home, 69 Kingery."<br>• Investigative report (p54995-55000): Notes the minor "is apparently the son of Detective Marquez' girlfriend" and mother would not provide permission for IA interview: **Note that false statements by SO about relationship with were apparent from reading the investigative report. But, no attempt to re-interview Marquez about these omissions.** |
| Concerns | • **Lots of inconsistencies re: SO's statements – none addressed by command staff** (Multiple omissions of relationship with minor passenger; apparent falsehood re: circumstances of picking him up; claim that CO attempted to flee the scene; instruction to minor to leave vehicle (?);<br>• **No attempt by IA investigator to identify how SO's claims with respect to picking up boy at store, as opposed to from HS, were likely false. IA investigator simply accepted that boy was unavailable for interview and no attempt to confront SO with likely false statements and omissions.**<br>• **Investigation fails to acknowledge potential material omission (Brady violation) of SO.** Original statement appears to suggest he was providing a public service and may not have been using his vehicle for personal purposes. Supplemental statement does not |

**Exhibit 2**

<table>
<tr><td></td><td>

acknowledge a relationship with the passenger's mother – but note in file (p. 54941) by reviewing Captain (8/11/92) states: "Regarding the issue of the unauthorized passenger (identified as the son of Det. Marquez's [sic] girlfriend), sustained.

- Per WO statement (Orndorf): minor witness statement "Det Marquez had picked him up at school-Cath"[possibly Cathedral H.S. where CO states was waiting to pick up their grandson]– which is inconsistent with original SO statement that he ran into him outside a Circle K store. Not acknowledged in findings… But, unknown how Orndorf spoke to minor given SO's statement that minor was left behind at the scene of the TC.
- 2nd time allowed to substitute vacation days for suspension days.
- Sgt. Lopez statement did not indicate SO informed him of presence minor witness – Subsequent statement indicated he learned about the presence of the boy from Sgt. Ocegueda.
- Sgt. Lopez documented his attempts to dissuade CO from filing a complaint: "After talking to Mr. Ramirez for a while trying to appease him I was able to convince him, so it seems, that if I counselled Marquez it would be sufficient and that would be the end of it. Sgt. Lopez did not document any attempt to counsel SO prior to CO filing a complaint "the next day."
- **Notice in file "As per the Contract between the Association and the City…I do___ do not ___ request that a tape recording be made of this interview…. SO checked "do not." On 12/3/92.**

</td></tr>
<tr><td>Other observations</td><td>

- File includes IAD Investigation Check list (p. 54952)
- Note written statement preamble for citizen states that "I understand that willful misrepresentation of any fact in a sworn document could subject me to possible charges of perjury…"

</td></tr>
</table>

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Alfonso Marquez (Det.); PO Wade |
| Case No. | CP 92-358 |
| Discovery Page No. | 55017-55051 (35-pages) |
| Date of Incident | **9/21/1992** |
| Date Reviewed | 5/23/2022 |
| Allegation: | Failure to notify next-of-kin |
| Facts underlying incident: | Notice of Claim received 10/13/1992; IA Pro "Date Received": 10/27/1992.<br><br>Det. Marquez assigned follow-up on an OD death.<br>Allegation: "Both Detective Marquez and Officer Ernie Wade failed to produce proper identification with the information that they had on hand. An investigation into this incident should be conducted." Initiated by Sgt. Ocegueda on 9/21/1992.<br>Deceased's identity was not positively confirmed and no attempt was made to check in the information under name variations or aliases. "His true identity…was never reveled and he was buried under an incorrect name without the next of kin having been notified. The surviving family did not learn of his death until several months later."<br>Report by Officer Wade: "…Since the identity of the deceased has not been questioned by this or any other agency, no fingerprints were obtained from the deceased…" |
| Findings | Dereliction of duty, sustained – 10/27/92<br>Written Reprimand. COP John Scagno. |
| Investigative Issues: | • Written statement provided by Det. Marquez, dated 9/21/92. Alleged that CO was rude to him, not vice-versa. Denied being rude to lawyer as well (55025). Represented follow up call with CO, where she was rude and Sgt. Ocegueda present during call. "Fingerprint check was requested to be sent to DPS, Austin, and no return as of yet."<br>    ○ Statement by Sgt. Ocegueda (CAP) (9/21/92) confirmed Marquez was not rude to CO. Also attempting to exonerate Det. Marquez: "Detective Marquez followed procedures by requesting that the decedent's fingerprints be taken and compared to |

**Exhibit 2**

<table>
<tr><td></td><td>

those in our department files. Detective Marquez was informed through a statement that no matches had been found, and that the descendant's fingerprints would be forwarded to DPS in Austin, as of yet, there has been nothing returned to us from DPS." (55040)

- Per Statement of Sgt. Avala (10/12/19): "Sgt Ocegueda and Det Marquez indicated in their statements that a request was made to have the deceased's fingerprints taken and forwarded to DPS. On reviewing the case, I was not able to find such a request. The question remains as to how and to whom this request was made to." (para 7; pg. 55038)
  - o No indication of further investigation to confirm that Det. Marquez claim that he requested fingerprints be taken was true; Per Lt. Skanse, CAP did not request body be printed.
  - o Failure by Department to follow up on inconsistencies between statement of Marquez and Lt. Skanse.
  - o Per Lt. Skanse, (Supervisor for Officer Wade): policy was to only print "John Does" and "we had a death report with a name." "CAP did not request that the body be printed and the prints be searched through our files or DPS." "Because our procedures are not in writing at this time and because CAP did not request that the body be printed for positive ID, I can only fault Off. Wade for not checking the computer in more than one way. I recommend a verbal counseling.

</td></tr>
<tr><td>

Other observations:

</td><td>

- No documented formal complaint by family.
  - o Media report: "Police could have informed family," 9/21/1992 (#55041), reporting that police had initiated "an administrative investigation."
  - o 9/21/1992 Personnel Incident report by Sgt. Ocegueda.
  - o Civil notice of claim filed on 10/13/92 (#55022-55023).
  - o Memo from City Attorney notifying of investigation of claim, dated 10/16/1992 (#55027).
  - o Sustained findings on Wade and Marquez 10/2/1992 through 10/27/92 by A/C Messer.
  - o IA Pro shows "date received" as 10/27/1992 (#55017)

</td></tr>
</table>

**Exhibit 2**

| Involved Officer: | Alfonso Marquez |
|---|---|
| Case No. | CP 93-019 |
| Discovery Page No. | 55052-55064 (13-pages) |
| Date of Incident | **8/27/1992** |
| Date Reviewed | 5/23/2022 |
| Allegation: | Unpaid parking tickets; badge and gun visible in unoccupied City vehicle.<br>Possible false statement – not investigated. |
| Facts underlying incident: | 11 outstanding parking violations for a total of $137.<br>Responding officer "observed a city detective badge and unknown caliber weapon in between the front seats." Vehicle not "stored or booted" since it was a police unit.<br>Statement by Marquez: 9/8/92: "I have been told that my vehicle has outstanding parking tickets which I was unaware were outstanding. |
| Findings | Sustained, 1/12/1993. Written reprimand (55056).<br>Finding by Sgt. Ocegueda of "poor judgment" due to parking in a no parking zone (claimed late for pre-trial) and "leaving his handgun in plain view, where anyone who would have looked into his vehicle may have either been alarmed or tempted to take the weapon." "Detective Marquez should take responsibility for the proper disposition of the citations."<br>Also, in violation of parking procedure for not turning in parking ticket nor submitting a memo explaining the circumstances to his immediate supervisor.<br>Sustained: 1) Parking in a no parking zone; 2) not securing weapon property; 3) failure to submit memo to immediate supervisor explaining circumstances."<br>"As to the eleven citations on the vehicle, Detective Marquez refused to pay them and is making arrangements to set a court date." |
| Investigative Issues: | • **No re-interview of Marquez to find out how he could possibly have received and been unaware of 11 outstanding parking citations -** If this were a civilian, that statement would never be accepted as true. |
| Other observations: | • Per written reprimand: "the outstanding parking citations indicate irresponsibility and disregard for the law." (55056)<br>• This, and other 1992 cases, indicate Department repeatedly allowed Marquez to make suspect claims without further inquiry or examination. |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez |
|---|---|
| Case No. | CP 93-097 |
| Discovery Page No. | 55065-55107 (43-pages) |
| Date of Incident | **3/4/1993** |
| Date Reviewed | 5/23/2022 |
| Allegation: | Failure to book seized narcotics |
| Facts underlying incident: | "Improper handling and disposition of narcotics evidence." On 4/16/92, interviewing a witness who appeared to be U/I. Cocaine found on her person; she was placed under arrest and booked. On 3/4/93, toxicologist followed up on missing narcotics evidence. "You failed to deliver the narcotics evidence to the official departmental custodian or place the evidence in the officially designated place for preservation and storage." Evidence found: "wrapped in a piece of aluminum foil and a beige balloon, were located in the bottom file cabinet drawer located in your cubicle." (55071) Written [notarized] statement of Marquez, 3/4/93, 9:00 a.m. (1 page) (55076) Written [notarized] statement of Marquez, 3/4/93, 2:30 p.m. (2 pages) (55074-5) |
| Findings | Sustained, 3/3/93. 3-day suspension. Suspension ordered served from 4/28/93-4/30/93; 4/27/93 request "to take vacation in leu of Suspension." Approved, A/C G. Messer(sp?), 4/28/93. |
| Investigative Issues: | |
| Other observations: | |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Alfonso Marquez; Sgt. William Pfeil; Officer Alfred Giron; Sgt. Pedro Ocegueda |
| Case No. | CP 94-227 |
| Discovery Page No. | 55108-55164 (57-pages) |
| Date of Incident | **7/13/1994** |
| Date Reviewed | 5/23/22 |
| Allegation: | Alteration of Official Wanted Bulletin with Offensive Reference |
| Facts underlying incident: | Crimes Against Persons Bureau created a Wanted Subject Bulletin; Bulletin was altered and the line "Este Hijo de su Chingada Madre" was printed above the subject's description.<br>Copy of altered bulletin was released by PIO (who did not notice the alteration) to the media.<br>Per Written reprimands: Det. Marquez suggested the language, which was added by Det. Giron and turned over to Sgt. Ocegueda.<br>Written statements by all involved officers: all appear consistent. |
| Findings | All officers sustained, Conduct Discrediting, 8/1/94.<br>Written reprimand for all four officers, 8/9/94.<br>Investigation disclosed Det Marquez and Det. Giron were responsible for the preparation of the bulletin; Sgt. Pfeil was responsible for the bulletin's release to the media. Sgt. Ocegueda ("derelict in his duties as a supervisor by not having taken any action on the part of his subordinates).<br>Written reprimand by Interim Chief Henry Fluck. |
| Investigative Issues: | p. 55141: "Declaration of Contract Right" signed by Marquez stating he did not desire a tape recording be made of his IA interview, dated 7/14/94. Similar for Det. Giron.<br>• IA Administrative forms for all four officers, indicating they were interviewed by IA – but no interview reports prepared; just written, notarized statements. |
| Other observations: | |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez (Det) |
|---|---|
| Case No. | CP 94-346 |
| Discovery Page No. | 55165-55186 (22-pages) |
| Date of Incident | **9/24/1994** |
| Date Reviewed | 5/23/22 |
| Allegation: | Police search of residence results in seizure of Handguns, Drug paraphernalia and city pager while employee out-of-town |
| Facts underlying incident: | Officers responded to shots fired and observed several juveniles in area where shots were fired; juveniles ran into apartment of Det. Marquez. Located in the apartment: 1) a plastic bottle with foil with burnt marijuana residue; two handguns (one with a spent cartridge jammed in the ejection port); 3) a City pager on Marquez' son's person. Officers responded to party (11) juveniles; 14 yo son arrived later. Per one RO, when arrived found "approximately 9 gang member types sitting around the apartment" with a bong pipe on the end table. 3 subjects hiding in bedroom. Son arrived later and advised that he had invited people over while his father was out of town. He was carrying his father's pager. Bong seized. Son released to mother (ex wife of Marquez). |
| Findings | "Det. Marquez has been counseled on weapon safety. He is an expert on weapons and expected his 14-year-old son to respect their home. Det. Marquez is addressing problems with his son. No further action needed. |
| Investigative Issues: | Written statements taken from responding officers. |
| Other observations: | |

**Exhibit 2**

| Involved Officer: | Alfonso Marquez |
|---|---|
| Case No. | CP 95-151 |
| Discovery Page No. | 56269-56272 (4-pages) |
| Date of Incident | **Summer, 1991 & 1992** |
| Date Reviewed | 5/27/2022 |
| Allegation: | Sexual Harassment |
| Facts underlying incident: | "It is alleged that [SO] committed sexual harassment during the summer of 1991 and 1992.<br><br>Written sworn statement of CO in file. (2 pages).<br>Reported that Detective made comments to CO during an investigation of a homicide that occurred sometime in 1991 or 1991. "I reported what had occurred to Sgt. Ocegueda on the following working day. He immediately spoke to Marquez about the problem and the incident was taken care of. "Sgt. Ocegueda gave me more than ample opportunity to voice my complaint and to my knowledge went as high as to the Captain." Complaint was handled promptly and efficiently and no re-occurrence. "Had I known this would become an issue several years later, I would have paid more attention to the details of the incident."<br><br>CO states that she advised City Attorney's Office of incident as part of questioning about other incidents of sexual harassment, but did not intend this to be a complaint. |
| Findings | "Not sustained on inappropriate comments in the workplace., 4/11/95<br>Deputy Chief (?) |
| Investigative Issues: | |
| Other observations: | CO felt handled appropriately years ago by counseling only. |

**Exhibit 2**

# APPENDIX 3B

# ARBOGAST WORKPAPERS

**Exhibit 2**

| Case No. | Date of Incident | Allegations | Disposition |
|---|---|---|---|
| | *10/28/1977* | *Commissioned as Officer* | |
| IA 78-334 (pages 5-7) | 11/29/1978 | Civilian Complaint (Excessive & Unnecessary Force) | "Unable to resolve" |
| *CP 79-335 (page 8)* | *12/3/1979* | <u>*Complainant*</u> *to Dangerous Driving Case by Federal Agent* | *No action taken.* |
| CP 80-153 (pages 9-10) | 5/20/1980 | Civilian Complaint - Unlawful detention and search complaint | "Proper procedures filed" |
| CP 81-28 (page 11) | 1/21/1981 | Civilian Complaint - Rudeness | No documentation of investigation or findings. |
| IA 81-6 (pages 12-13) | 2/2/1981 | Civilian Complaint - Discourtesy & illegal search of property | Not sustained |

**Exhibit 2**

| | | | |
|---|---|---|---|
| None<br>(page 14) | 3/19/1981 | Civilian Complaint - Lack of Service | "No procedural violations" |
| CP 81-192<br>(pages 15-16) | 5/4/1981 | Civilian Complaint - Excessive Force | No finding made. ("No apparent basis for [allegation])" |
| IA 81-32<br>(pages 17-18) | 5/11/1981 | Civilian Complaint – Excessive Force | "Information Only" CO withdrawals. |
| CP 81-174<br>(page 19) | 5/14/1981 | Civilian Complaint - Harassment; Excessive Force | Not sustained |
| CP 81-435<br>(pages 20-23) | 10/28/1981 | Willful damage to police vehicle / Untruthfulness | **3-day suspension**<br>(Sustained for Untruthfulness & intentionally damaging police vehicle). |
| CP 82-300<br>(pages 24-26) | 8/8/1982 | Damage of City Property (key ring) & Insubordination | Written Reprimand (No finding as to dishonesty claim) |

**Exhibit 2**

| IA 83-47 (pages 27-28) | 3/24/1983 | Civilian Complaint – Unlawful search of residence & civil rights violations | Not sustained. |
|---|---|---|---|
| IA 84-007 (pages 29-31) | 1/6/1984 | Civilian Complaint – Officers shooting firecrackers at each other | Written reprimand reduced to Counseling. |
| IA 85-26 (pages 32-35) | 1/5/1985 | Civilian Complaint - Excessive Force / Verbal Abuse | Not sustained Excessive Force; Counseled for Verbal Abuse. |
| IA 88-046 (pages 36-37) | 3/22/1988 | Unsafe Driving practices / Discourtesy | Not sustained for discourtesy; Counseled on driving |
| None (page 38) | 1/18/1989 | Civil lawsuit for unlawful detention and excessive force. | No documentation of any referral to IA or any internal investigation of incident. |
| IN 92-033 (pages 39-40) | 3/26/1992 | Civilian Complaint - Rude & Unprofessional Conduct | Information only. |
| | 4/10/1993 | England-Lazo Homicide | |

**Exhibit 2**

| | 8/24/1995 | Jury Verdict – Villegas Trail #2 | |
|---|---|---|---|
| CP 01-383 | 10/2/2001 | Lost Pager | Training/Documentation only. |
| CP 01-396 | 10/31/2001 | Unauthorized Email | Written Reprimand |
| CP 02-146 | 4/15/2002 | Violation of Vehicle Log and Inspections Policies | Divisional Counseling |
| CP 02-193 | 5/4/2002 | Lost pager (2nd offense) | Written Reprimand |
| CP 03-319 | 7/1/2003 | Failure to Clock in | Counseling |
| | *2/10/2004* | *RETIREMENT* | |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Earl Arbogast (Officer); Grady; Duty Officer |
| Case No. | IA 78-334 |
| Discovery Page No. | 55632-55686 (55-pages) |
| Date of Incident | **11/29/1978** |
| Date Reviewed | 5/25/2022 |
| Allegation: | Community Complaint (Excessive & Unnecessary Force) |
| Facts underlying incident: | CO alleges Arbogast tripped him while he was handcuffed and struck him with a baton in the testicles once he was on the ground Officer Grady alleged to have kicked CO unnecessarily and slammed his head against a police car; Officer Grady also alleged to have beaten subject after pulling over to the side of a dark road during transport; Booking Clerk #1 alleged to have used harsh language while referring to CO's mother; Booking Clerk #2 alleged to have struck CO in the jaw and kicked CO's brother in the testicles while they were handcuffed together. Duty officer refused to take the complaint, telling CO and his brother: "shut the fuck up."<br><br>IA Supplementary Report (55650-55654):<br>Per SO's Grady and Arbogast: CO resisted search and after he was placed against the police car, CO threw himself on the ground and started kicking and screaming; CO resisted being put into police car: "complainant was constantly cussing and throwing a fit." SO's stated they had to stop the car during transport due to restrain CO and stop him from hurting himself (he was banging his head on the screen and the windows).<br>Duty Officer (Sgt.) denied using abusive language. Officer Grady denied that the booking clerks verbally or physically abused CO.<br>Booking clerk acknowledges "responding to comments by the CO about his mother with something similar."<br>Booking clerk who allegedly used force "has since resigned and left town." |

**Exhibit 2**

| | |
|---|---|
| | IA requested interview with CO's parents who may have witnessed some of the alleged use of excessive force. Parents failed to contact IA and did not answer their phone.<br><br>Per Incident reports prepared by SO's, UOF was the result of a traffic stop for running a red light and subsequent discovery of four traffic warrants totaling $77.[1]<br>Incident report described UOF with specificity after he alleged excessive force. (55659-55662).<br>Corroborating report by other responding officers.<br><br>2-page written sworn IA statement by CO, 11/30/78 (55664), apparently given after unrecorded interview with IA. (page one bottom – illegible). Written statement of CO brother (55666) missing subsequent pages)<br><br>Officer Grady reportedly injured in incident (55669) "Strictly misconduct on the part of the prisoner, no fault of officers."<br><br>1 page written statements to IA by SO's (incomplete copies). |
| Findings | Finding by IA Sgt.: "It appears that the CO exaggerated in his version of the events of the night in question." "CO's body photographed…did not exhibit any signs of having been assaulted and dragged by four or five people and his back did not appear to have been struck with a chain as he indicated in his statement. His brother's statement did not corroborate the CO's allegations with any accuracy." |

[1] This is less than the number and cost of parking warrants owed by Det. Marquez in Case No. CP 93-019 ($137)

**Exhibit 2**

|  | Letter to CO from COP, undated: "evidence is not conclusive…unable to clearly resolve your complaint." |
| --- | --- |
| Investigative Issues: | As per apparent normal practice; written statements signed by witnesses after unrecorded interviews. |
| Other observations: | **Serious allegations of excessive use of force.**<br>**No recorded interviews….**<br>**IA report combined statements of SO's and written statements of SO's show same time of completion (12/18/78, 9:45 AM).** (55685 & 55686).<br><br>File includes Department Use of Force policy, dated 5/1/75.<br>Investigation check list included in file (55649)<br>Medical records and releases in file (55670-55680). |

**Exhibit 2**

| Involved Officer: | Earl Arbogast (Officer) |
|---|---|
| Case No. | CP 79-335 |
| Discovery Page No. | 55551-55565 (19-pages) |
| Date of Incident | **12/3/1979** |
| Date Reviewed | 5/24/2022 |
| Allegation: | CO to Dangerous Driving Case by Federal Agent |
| Facts underlying incident: | Arbogast reported himself as a on patrol when an unmarked police vehicle passed him at a high rate of speed and subsequently run a  red light.<br>Pursued vehicle at 90 mph – vehicle would not pull over; possible display of a detective badge by the driver. Vehicle driven in a reckless manner, passing dangerously and appearing to be fleeing the TC. Subject stopped and yelled he was a federal agent and threatened to make a complaint. |
| Findings | No action taken.<br>"Supervisors and afficer were advised 12/5/79 that no action would be taken on this case" [comment: … not contact anyone." |
| Investigative Issues: | <ul><li>No apparent action by Command staff against federal agent who appeared to have driven dangerously and acted inappropriately towards officers.</li></ul> |
| Other observations: | |

**Exhibit 2**

| Involved Officer: | Earl Arbogast (Officer); Longenfeld |
|---|---|
| Case No. | CP 80-153 |
| Discovery Page No. | 55567 (1-page) |
| Date of Incident | **5/20/1980** |
| Date Reviewed | 5/24/2022 |
| Allegation: | Civilian Complaint - Unlawful detention and search |
| Facts underlying incident: | CO came to Internal Affairs and asserted Logenfeld contacted him and demanded an unlawful search and attempted to detain him; Arbogast arrived after Logenfeld requested assistance. "Together the officers forced a search upon him." "A police sergeant arrived and explained to him that he matched the description of an escaped person who supposedly lives in that block, but he did not listen because he was angry. He was then released." CO stated he was embarrassed in front of his neighbors. IA contacted involved Sgt. who stated that Officer Logenfeld believed CO "to possibly be an armed fugitive" who had been previously seen in the area. |
| Findings | CO "was advised that proper procedure was followed and he had no complaint against the officers." |
| Investigative Issues: | <ul><li>According to CO, he showed Logenfeld his ID and was subsequently grabbed to be searched.</li><li>No attempt by IA to establish whether that occurred and if/how Officer Logenfeld had PC to detain and search.</li><li>No attempt by IA to determine what Arbogast knew or was told and whether his actions were justified.</li></ul> |

**Exhibit 2**

|  | • No written statement taken from CO; no documentation of interview of CO other than summary written in IA report. |
|---|---|
| Other observations: | • No/inadequate investigation of citizen complaint. |

**Exhibit 2**

| Involved Officer: | Earl Arbogast; Joe Garcia; Jerry Longenfeld |
|---|---|
| Case No. | CP 81-28 |
| Discovery Page No. | 55568 (1-page) |
| Date of Incident | **1/21/1981** |
| Date Reviewed | 5/24/2022 |
| Allegation: | Civilian Complaint – Unnecessary display of firearm; Rudeness |
| Facts underlying incident: | CO came to IA and alleges officers unnecessarily displayed their firearms while searching her home for her brother in-law, who is wanted for Attempted Murder.<br>"She was especially critical of the harsh attitude displayed by Officer Arbogast." |
| Findings | IA confirmed existing warrants for CO brother-in-law; CO acknowledged he "has been known to be at her home… although they have not seen him for 3 weeks. |
| Investigative Issues: | • No documentation of any investigation into allegation of rudeness or discourtesy.<br>• Documentation of complaint only. No investigation or action taken. |
| Other observations: | • Message to officers is that Department simply does not care if they are rude/dismissive during a search for a wanted felon. |

**Exhibit 2**

| Involved Officer: | Earl Arbogast (Officer); Officer J. Longenfeld (witness only) |
|---|---|
| Case No. | IA 81-6 |
| Discovery Page No. | 55687- 55728 (42-pages) |
| Date of Incident | **2/2/1981** |
| Date Reviewed | 5/25/2022 |
| Allegation: | Civilian Complaint - Discourtesy & illegal search of property |
| Facts underlying incident: | IA Supplementary Report (55696-55703). CO (age 17) alleged illegal search of purse after advised of possible public lewdness with a boyfriend. CO alleged SO lied about what she was doing in the park with her boyfriend. Boyfriend corroborates CO statement – including false allegation by SO and alleges SO insinuated that CO was a prostitute and searched purse without consent. WO statement denies allegations, corroborates SO. SO denies all allegations to IA; represents that CO emptied out purse on her own volition after being asked for ID. Blames CO and her boyfriend for being "extremely rude" to him and putting them "in an embarrassing situation" with her parents.<br><br>IA report identifies inconsistencies in statements of CO and boyfriend. IA notes that the officers' activity sheet failed to reflect the fact that they were out at the CO's residence advising her parents.<br><br>Noted conflicts between CO's father's statement that SO said he brought the daughter home to tell the parents about her conduct, versus officers statement that they only went to the address to verify they were given the correct address. (Issue not specifically identified or addressed by IA) |

**Exhibit 2**

| | Written sworn statements from: CO's father, CO's boyfriend, Officer Arbogast, Officer Longenfeld (with additional paragraph "clarifying" "above statement", & CO.<br><br>Officer L reported that CO told them she was 18 – when, in fact, she was 17. SO reported that she appeared younger than she claimed. No documented attempt to confirm this with (or confront) the CO and boyfriend. |
|---|---|
| Findings | Not sustained. |
| Investigative Issues: | |
| Other observations: | Although CO alleged SO lied to her parents about what she was doing with her boyfriend in the park – that was not included as an allegation.<br><br>**IA identified, but did not address failure of officers to document response to CO's residence and contact with her parents.**<br>IA report identifies conflict between officers stated reason for going to parents address and CO's father's statement – but no attempt to resolve this issue through additional questions to involved officers.<br><br>Relevant policies included in file (55688-55694)<br>IA check list in file (55695) |

**Exhibit 2**

| Involved Officer: | Earl Arbogast; K. Orndorf |
|---|---|
| Case No. | None |
| Discovery Page No. | 8534-8537 (4-pages) Personnel file |
| Date of Incident | **3/19/1981** |
| Date Reviewed | 6/3/2022 |
| Allegation: | Civilian Complaint - Lack of Service |
| Facts underlying incident: | Mother of child knocked off bicycle by a driver on private property complained that officers "did nothing."<br><br>Written statement of Arbogast (1 page)<br>Written statement of Orndorf. |
| Findings | Per Lt. Trudell, 3/24/81: No procedural violations.<br>"Some communication at the time would have prevented neighborhood dissatisfaction with the police department. |
| Investigative Issues: | |
| Other observations: | No documentation of counseling with subject officers re: communication concerns. |

**Exhibit 2**

| Involved Officer: | Earl Arbogast (Other involved officers – but IA identified only one SO) |
|---|---|
| Case No. | CP 81-192 |
| Discovery Page No. | 55569-55572 (4-pages) |
| Date of Incident | **5/4/1981** |
| Date Reviewed | 5/24/2022 |
| Allegation: | Civilian complaint - Excessive Force |
| Facts underlying incident: | "Obviously mentally disturbed" CO, came to IA to complain that he was "physically abused by the officer for no reason and that as a result of the officer's actions he lost a partial denture."<br><br>Per arrest report, "officers used necessary force to put the subject under arrest." [No further details provided, other than subject had threatened another person who wanted to press charges and that subject was resistive. Report indicated injury to an arresting officer and an attempt to bite another officer.  Subject reportedly under the influence, refused to provide his name and cursed at arresting officer.<br><br>2 page report by AO Arbogast;<br>1-page report by AO Talamantes (almost identical language used) |
| Findings | CO "was advised that there was no apparent basis for a charge of misconduct against the officer but that steps would be taken to attempt to gain information about the lost denture."<br>IA Sgt. notes that CO had been on a psychiatric hold "for the past three weeks due to his behavior at the time of his arrest." |
| Investigative Issues: | <ul><li>IA included a copy of the arrest report only.</li><li>No other documented attempt to investigate the allegation.</li><li>Inadequate response by IA who should have at least interviewed the CO and obtained a full statement and subsequently obtained a</li></ul> |

**Exhibit 2**

| | statement from the arresting officers explaining with specificity the force that they used. |
|---|---|
| Other observations: | • Mentally ill can be particularly vulnerable to use of excessive force by a police officer. |

**Exhibit 2**

| Involved Officer: | Earl Arbogast (Officer); Officer J. Lattimer |
| --- | --- |
| Case No. | IA 81-32 |
| Discovery Page No. | 55729-55749 (21-pages) |
| Date of Incident | **5/11/1981** |
| Date Reviewed | 5/25/2022 |
| Allegation: | Civilian Complaint – Excessive Force |
| Facts underlying incident: | Written statement of CO, 5/11/81 (mostly illegible): alleges beaten although not resisting and hit on the head with a flashlight<br>Written statement of CO's mother, 5/11/81 (witnessed officer hit son with the back of his hand, while walking him to the patrol car while handcuffed). Identified potential witnesses.<br><br>CO alleged to have committed burglary of a vehicle<br><br>Written statement of Officer Lattimer. Reported seeing CO in a vehicle and seeing him flee with stolen property from the vehicle. Subject reportedly fled and "was fighting with us and had to be physically subdued."<br>Written statement of Officer Arbogast: subject initially led back to vehicle and then "broke loose" and ran. "We placed the subject in handcuffs as he was resisting us and we took him back to the scene."<br><br>Telephonic statement taken from (summarized by IA) victim of auto burg. Saw the officers place the CO into their vehicle; did not see the officers hit the CO at any time.  Did not want to cooperate or press burglary charges.<br><br>Supplemental written statement from CO, dated 5/21/81 (2-pages). Stated was drunk and got into unlocked parked car. Denied taking any property; acknowledged fleeing police; "Officer did hit me and … I never |

**Exhibit 2**

| | |
|---|---|
| | fought with the officer at all. I also want to bring this investigation to a close and do not wish to pursue the matter any further due to the fact that I realize that it will not help me in court which was the main reason I came to complain." |
| Findings | Carried as "Information Only" as "complainant withdrew complaint." |
| Investigative Issues: | Documentation of request to withdrawal in the form of a signed written statement under oath.<br>No audio of interview with IA investigator. |
| Other observations: | **Even though CO continued to allege unnecessary force, investigation terminated at his request due to stated reason that it would not help him in his criminal case.**<br><br>IA Investigation check list in file (55747). |

**Exhibit 2**

| Involved Officer: | Earl Arbogast; Jeffrey Lattimer |
|---|---|
| Case No. | CP 81-174 |
| Discovery Page No. | 8539 (1-page) Personnel file |
| Date of Incident | **5/14/1981** |
| Date Reviewed | 6/3/2022 |
| Allegation: | Civilian Complaint - Harassment; Excessive Force |
| Facts underlying incident: | Page refers to sworn written complaint where CO alleges officers have harassed him unnecessarily. "On this occasion, complainant alleges the officers used unnecessary force when he was checked out." |
| Findings | Not sustained, 6/19/81<br>No rationale provided. |
| Investigative Issues: | **No documentation of any investigation.** |
| Other observations: | CO sworn statement not in file.<br>No documentation of any statements or investigation in file. |

**Exhibit 2**

| Involved Officer: | Earl Arbogast; Kevin Orndorf |
|---|---|
| Case No. | CP 81-435 |
| Discovery Page No. | 55573-55620 (48-pages) |
| Date of Incident | **10/28/1981** |
| Date Reviewed | 5/24/2022 |
| Allegation: | Willful damage to police vehicle / Untruthfulness |
| Facts underlying incident: | Damage to vehicle discovered involving the use of the car lighter to burn the steering wheel and the dashboard of the vehicle. Vehicle had been used by Arbogast and Orndorf on the "graveyard shift."<br><br>Officers in joint statement represented they thought the damage was "old."<br><br>Supplement to Original Incident report, signed by Lt. Flores, 11/20/81: "On 11/19/81, Officer Abrogast was interviewed in the Internal Affairs Office and he admitted that he admitted that he and his partner, Officer Kevin L. Orndorf, were responsible for the damage to the police vehicle. The officers, are, therefore, guilty of Criminal Mischief, Willful Damage to City Property and Failing to cooperate with their Supervisors by lying to them." (55579) |
| Findings | Sustained, Willful Misrepresentation.<br>10/29/81: Lt. Powers recommends "the responsible officers repair the damage and also receive a written reprimand." (55575)<br>Per Captain: "Repair <u>only</u> at the expense of responsible officer. Also, a suspension for deliberate destruction is in order." (55575)<br><br>Captain recommends 3-day suspension: 1 day suspension for damage to vehicle + 2 day suspension for lying). Acting Chief concurs. (55579) |

**Exhibit 2**

10/28/81: joint written statement from SO's claiming that they did not see the damage during the first part of their shift "and did not notice it until daylight. We felt that it has been there for some time." (55603)

10/29/81: written statement of Arbogast: "The first time the hole was noticed was late morning.. A casual reference was made to it. I know we are supposed to report damage to the patrol car but it did not seem to be a big issue at the time so we are at fault for not reporting it on Tuesday morning."

10/30/81: Written statement to Captain from Sgt. advising he "once again" spoke to Orndorf. "If the damage was already noticed on the 27 by Gwyn and Vincent I do not see how Garcia could not have seen the damage on the 27 when he drove the car and then turned it over to Vincent and Gwyn. Personally, I am not sure if anyone but Garcia is sure what day they saw the damage, but I definitely do not think that Arbogast nor Orndorf would resort to such childish antics. .. they should have reported it, but often times an officer takes it for granted that something has already ben reported…"

10/30/81: Capt. Aldridge recommends further investigation.

11/19/81 (3:45 p.m): Written sworn statement of Arbogast acknowledging "horseplay". "I did not come forward earlier because I was afraid due to rumors on the incident report recommending five days suspension and a fine." (55607)

11/19/81 (8:20 p.m.: Written sworn statement of Orndorf acknowledging damaging the vehicle: "..if it would have come down to someone else being blamed for it, I would have stepped foreward and admitted to it…" (55608)

11/20/81 report that Officer Arbogast was interviewed by IA and admitted he and his partner were responsible for the damage. (55613).

**Exhibit 2**

| | |
|---|---|
| | 11/20/81: Finding from Captain Aldridge "both officers participated in an act of deliberate damage to city property at a time when our budgetary capital resources are severely strained and under critical scrutiny…The officers then proceeded to deny their culpability, thereby leaving their fellow officers open to suspicion…"<br><br>Suspension from 11/22/81 through 11/24/81. |
| Investigative Issues: | • **No indication as to how confession of Arbogast came forward. Only a 1 paragraph sworn written statement.**<br>  ◦ Arbogast only indicates why he did not come forward before; not why he is coming forward now.<br>  ◦ Orndorf acknowledges "would have" come forward if someone else was blamed for the act – statement indicates that did not happen – so why did come forward?<br>• **No documentation of how investigation progressed or how confessions were obtained or the circumstances behind those confessions** (e.g., whether there were aggravating or mitigating factors in the officers' admissions of guilt). |
| Other observations: | • Possible Brady violation for lying to supervisors.<br>• Suspension of only 3 days in total for Criminal Mischief and Lying.<br>• Captain Aldridge (Northeast Division) statement in making discipline recommendation: **"My recommendations are too lenient. However I feel that it undermines my position to have repeated reductions in my recommendations for suspension, so in this case I have made the adjustment myself…** (55606) |

**Exhibit 2**

|  | • Lack of Departmental concern regarding circumstances of false statements and subsequent confessions is indicative of a Department that does not value officer credibility. |
|---|---|

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Earl Arbogast |
| Case No. | CP 82-300 |
| Discovery Page No. | 55621-55631 (11-pages) |
| Date of Incident | **8/8/1982** |
| Date Reviewed | 5/25/2022 |
| Allegation: | Damage of City Property (key ring) & Insubordination |
| Facts underlying incident: | SO reported that he broke and lost his key ring to his patrol car – initially offering no explanation; SO explained key ring was broken as he was throwing the ring to his partner. SO reportedly found the incident humorous and after being instructed to write an incited report, he returned with a broken piece of the key ring and yelled: "THERE! Now are you going to call me a goddam lier [sic] and thief?...Now do you still want an incident or what?" SO reportedly acknowledged that he insubordinate "and that if he received days (suspension) then thats just the way it would be." SO did not feel he was negligent breaking the ring "since everyone throws them." <br><br> Sgt. acknowledges joking with SO over "who needed a key ring?" <br><br> In findings, CO notes that SO's rookie partner was present when the SO yelled at the Sgt. (CO). |
| Findings | Written reprimand, 8/19/82 <br><br> Sgt. CO Recommendation #1: SO replace key ring: "It only has a value of perhaps 60 cents but it is most unlikely that it could ever have been damaged as the officer claims it was. First of all, the key ring consist of two loops of very strong metal. Even if one of the loops breaks, there is a second loop still keeping the keys from separating. Regardless of how the key ring became |

**Exhibit 2**

broken if it was the result of throwing, it stands to reason that t constitutes misuse."

Sgt. CO Recommendation #2: re: insubordination; "It is recommended that the station commander tell the officer that [his actions were "totally uncalled for and completely out of line"] and that future occurrences will result in a suspension and/or termination."

Lt. recommendation: "I agree with Sgt. Chesshire. Arbogast should pay for broken item and then counselled for his subordination. This type of conduct should not be tolerated.

Captain recommendation: "Concur on paying for key ring. Written Reprimand on officer for insubordination; counseling on Sgt. Chesshire for insinuating comments."

A/C finding: Written reprimand for SO and pay for key ring; Counseling for Sgt.

Written reprimand: "On this date you were involved in an incident which resulted in damage to a piece of city property. Although the damage was not significant and the damages property easily replaced, your subsequent conduct left a lot to be desired. You became involved in a verbal exchange with your immediate supervisor to the point that you became insubordinate. Be advised that this type of conduct on your part can not be tolerated and that any further violations on your part may be the basis for sterner disciplinary action."

**Exhibit 2**

| Investigative Issues: | Report consists solely of supervising Sergeant (CO's) summary of events. No written statements; no referral to IA, even though finding that the SO's statement was "most unlikely." |
| --- | --- |
| Other observations: | **Even though Sgt.-CO believed (more likely than not) that SO was lying, no effort was taken to determine the truth. The partner was not contacted or interviewed and no written statements were taken.** <br> **This is on top of 10/28/81 (10 months prior) false statement about damaged City property.** <br> **Indicative of a department that is unconcerned about officer credibility.** |

**Exhibit 2**

| Involved Officer: | Earl Arbogast (Officer); Officer W. Born; Officer L. Orndorff |
|---|---|
| Case No. | IA 83-47 |
| Discovery Page No. | 55750-55817 (68-pages) |
| Date of Incident | **3/24/1983** |
| Date Reviewed | 5/25/2022 |
| Allegation: | Civilian Complaint – Unlawful search of residence & civil rights violations |
| Facts underlying incident: | IA Supplementary Report (55758>):<br>CO's son arrested in her home for auto theft. After seeing officers outside checking her yard and cars, officers entered her home without consent, gathered her sons and removed them from the house.<br>Officer Wiley alleged CO gave consent to officers to come into house and "straighten up the matter."  SO's all state that permission was given. Arbogast believed that the CO "is mentally unstable."<br><br>Neighbor (identified by CO as a possible witness) stated that CO is "crazy" and "has a drinking problem."<br><br>Written signed statement of CO., Involved Officers (Wiley, Arbogast (providing information as to lack of stability of CO), Born, Reveles, Orndorff).<br><br>File includes incident reports and arrest documentation (55778-55788).<br><br>IA Supplemental reports (55799-55800)<br><br>Handwritten statement of CO to attorney (55813-816) |

**Exhibit 2**

| Findings | Not sustained. No documentation for rationale for finding in file. Just signed and dated, 4/19/83 (55750) |
|---|---|
| Investigative Issues: | **IA interviews not recorded**. (See "Declaration of Contract Right (Arbogast, Born, Orndorff & Reveles) all indicated "do not desire" for recording of interviews (55809-812). |
| Other observations: | Investigation checklist in file (55751) Relevant rules and regulations in file (55753-55756) Case file includes arrest records and reports relating to CO (55789-55798) Daily activity reports in file. |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Earl Arbogast; James Contreras; Craig Madsen; G. Brickey[2] |
| Case No. | IA 84-007 |
| Discovery Page No. | 55818-55912 (95-pages) |
| Date of Incident | **1/6/1984** |
| Date Reviewed | 5/25/2022 |
| Allegation: | Civilian Complaint – Officers shooting firecrackers at each other |
| Facts underlying incident: | IA Supplementary Report (55835):<br><br>CO alleged officers in two vehicles firing firecrackers at each other and driver of one vehicle (Arbogast) dangling his foot out the door of the car while driving.<br><br>Contreras and Brickey admitted shooting off one firework. Per Contreras, other unit did not have any fireworks in their possession.<br><br>Madsen: "doubts the veracity of CO's allegations" as they could not see what they said they saw. Denied allegation of foot dangling outside of car.<br><br>Arbogast "saw the roman candle lit up in the parking lot by the officers in unit 220. Denied having firecrackers in his possession, denied foot dangling out of police car.<br><br>Signed written statements from involved officers in file (Contreras, Brickey, Madsen (noted that Officer Contreras "has advised me prior to this statement that he has made a witness statement admitting full responsibility for this incident and has taken blame for it in it's entirety."<br><br>Officer Madsen stated that "As we were traveling north, I observed several other fire balls landing in the gravel along the side of the gateway." (55879) |

---

[2] IAPro shows Brickey as a Deputy Chief – but content shows him as a Patrol officer. Arbogast is shown as a Detective – but content implies he is a patrol officer and personnel file shows him promoted to Detective 10/18/1986.

**Exhibit 2**

| Findings | Sustained. |
|---|---|
| | Recommendation of Captain Chacon: WR for Officer Contreras; OR for Officer Brickey – both officers to be counseled. |
| | "Undersigned recommends: "Five days for Officer Contreras & 2 days for Officer C. Madsen.  Officers have been warned by Sgt. Grijaiva & myself on prior occasion to stop their "horse playing." |
| | Deputy Chief Blanco: **3 days suspension for Contreras**; **1 day for Brickey & WR for the other 2 officers**. (55826) |
| | Per Chief of Police, **Arbogast Written Reprimand changed to Counselling**: "At Off. Arbogast's request, a meeting was held Feb. 20, 84 in Chief's office in regards Off Arbogast's involvement in this incident and after discussion, it was determined that Off. was not a main player in this incident or has he been warned in the past as other officers. D/C Blanco & Capt. Chacon did not object to change. (55828; 55853) |
| | |
| | Abrogast reprimand stated as follows: "On this date, you and your partner, Officer Craig Madsen, were involved in a fireworks-shooting incident with officers in another police vehicle. You were on duty at the time. Even though you were not the one igniting the fireworks or in possession of them, you failed to take corrective measures, such as notifying a supervisor of the problem." (58855) |
| | Similar verbiage for Officer Madsen. (58858) |
| | |
| | Officer Brickey permitted to work one day off duty without compensation, in lieu of suspension. (55846) |
| | Officer Contreras permitted to "work the days off." (55852) |

**Exhibit 2**

| Investigative Issues: | Statements taken from complainants on 1/11/84. Incident took place 5 days earlier. No indication that IA went to the location to see if they could locate remains of fireworks to determine if CO's allegations that multiple fireworks were shot could be corroborated. |
|---|---|
| Other observations: | IA investigation check list in file (55867) <br> Officers signed "Declaration of Contract Right" indicating "do not desire" for tape recordings of IA interviews to be made (55884-55887). |

**Exhibit 2**

| Involved Officer: | Earl Arbogast (Det); Sgt. Oscar Menchaca[3] |
|---|---|
| Case No. | IA 85-26 |
| Discovery Page No. | 55913-55988 (76-pages) |
| Date of Incident | **1/5/1985** |
| Date Reviewed | 5/26/2022 |
| Allegation: | Civilian Complaint - Excessive Force / Verbal Abuse |
| Facts underlying incident: | Military personnel allege officers used unnecessary force to make an arrest for intoxication.<br>CO alleged Menchaca ("Anglo officer") intentionally antagonized an Army Sergeant: calling him "Private," saying "Fuck the army, Fuck the General," "Fuck the General's mother," "Your mama…."<br>Writtten signed sworn statement by Army mechanic: "This anglo officer who arrested us that night was a complete asshole and I wish something would be done about him." (and four page handwritten statement). States Sgt. "only became belligerent…because he was provoked." (55926).<br>Written, signed sworn statement by Sgt: Officers put hands on and handcuffed them without warning or provocation. Officers told them they had no rights. AO said: "Fuck the army," "Fuck the general", "Fuck the General's wife." In response, Sgt. told the officer "Fuck you." Was physically abused when officer threw him against the trunk of his car and threw him into the back seat of the police car.  Scars on wrists due to handcuffs being applied too tight (55928-9).<br>Written one page statement by intoxicated friend of CO's.<br>Arbogast report (55917) indicates officers were trying to "send the subjects on their way" when they exhibited a "combative attitude" and they were demed to be "a danger to themselves and others" and taken into custody. No indication of any use of force. |

---

[3] IA Pro shows rank as Sgt., but file seems to indicate rank of Officer.

**Exhibit 2**

| | |
|---|---|
| | IA Supplementary Report (55930-33): identifies Menchaca as the SO and Arbogast as having done nothing to stop Menchaca's misconduct.<br>Sworn statements by SO's to IA:<br>Per IA summary of Menchacha statement – CO ignored his order to "stay put;" he grabbed him and threw him against a car and CO started resisting and saying "fuck you." He "threw" him inside of the patrol car as he "kept resisting." Sgt. was belligerent during transport; denied physically or verbally abusing the CO. [Per written statement (55943-45): CO ignored his order to "stay put"; since "he had not been frisked for weapons, ..I grabbed him and threw him against the vehicle next to us…as I was struggling with [CO] [handcuffed] I pushed him against our patrol car…" CO continued to struggle and had to be pushed into patrol car. Denied any verbal abuse.<br>Per IA summary of Arbogast statement – no physical or verbal abuse; his partner used only the force necessary to make the arrest. Admitted laughing at the CO when he told them "he was the baddest Sergeant in the US army and because the CO told them he was going to read them their rights "which he thought to be funny as no one had told him that before." [Sworn written statement at 55948-50] |
| Findings | Excessive Force, Not Sustained, 3/7/85<br>Verbal Abuse, Divisional Counseling, 3/7/85<br><br>Lt. finding, 3/7/85: "I find it appears that only necessary force was used to effect the arrest. There are no indications of excessive force. I therefore recommend the excessive force allegations be not sustained. There are indications, however, that after the arrest was made the Officers did engage in at least some unprofessional conduct. This was against an already abusive |

**Exhibit 2**

| | |
|---|---|
| | and combative prisoner and served no purpose other than to further incite an already hostile situation. In light of the Officers' past work records, I recommend that each officer be counselled.<br><br>Captain Chacon (undated, subsequent to Sgt. McBain finding of 2/14/85, "Concur with Lt.[]'s recommendation."<br><br>A/C (undated, subsequent to Captain Chacon concurrence): "In accord with Lt.[]'s memo of 3/7/85 and Capt. Chacon's concurrence – officers to be counselled for certain aspects of conduct <u>after</u> arrest. Not sustained on excessive force. Consulting to be conducted by Lt. [] and/or Capt. Chacon."<br><br>3/8/85 disposition letter by COP Rodriguez to CO advising that officers actions were inappropriate (referencing allegation of verbal abuse). |
| Investigative Issues: | |
| Other observations: | **Counseled for unprofessional conduct even though** both officers denied any verbal abuse. Arbogast admission that he "laughed" at CO does not appear to support any finding of misconduct.<br>Finding is conclusory and fails to provide adequate rationale to support the finding.<br>Finding appears to support a conclusion that the officers were not truthful to Internal Affairs but fails to address that issue in any way.<br>**Potential message to officers that even if command staff does not believe you are telling the truth, there will be no serious consequences.**<br><br>IA Investigation check list in file. (55936)<br>Daily activity reports in file. |

**Exhibit 2**

|  | Declaration of Contract Rights in file with officers choosing not to have their IA interviews recorded (55939-40). Applicable rules and regulations in file (55985-55988). |
|---|---|

**Exhibit 2**

| Involved Officer: | Earl Arbogast (Det.) |
|---|---|
| Case No. | IA 88-046 |
| Discovery Page No. | 55990-56037 (48-pages) |
| Date of Incident | **3/22/1988** |
| Date Reviewed | 5/26/2022 |
| Allegation: | Civilian Complaint - Unsafe Driving practices / Discourtesy |
| Facts underlying incident: | CO alleges SO cut him off in traffic and when stopped at gas station, CO asked him what the problem was and SO "showed his badge to the CO, telling him he was on a call, and then told the CO to 'get the fuck out of here.'"<br><br>IA Supplementary Report (55998-56003):<br>Per CO "if the officer had apologized to him and told him that he was [on] a call he would not have complained. He stated that the officer did not show him any respect nor any respect towards the [PD]. He did not like the officer's verbal expressions."<br>Arbogast reported that he did not use profanity but was stern with CO as he was responding to a credit card abuse call at the gas station where he stopped. It appeared to him that the CO wanted to fight. Acknowledged that he may have cut off CO, although not aware of it. Denied speeding.<br><br>IA summary indicates included copy of Credit Card abuse report (located at 56023-28) and referenced assigned investigator as acknowledging Arbogast was at the scene when he arrived. (56017)<br><br>CO written statement (56014-56016)<br>SO written statement (56021- |

**Exhibit 2**

| | |
|---|---|
| Findings | Discrimination, sustained (per IA Pro, 55990-1) (??)<br><br>Finding by Sgt: "To be counselled by Division Commander – Demeanor w/ public and driving. No evidence of verbal abuse, no witnesses."<br>Lt: "Concur"<br>Captain: " I agree with the Division counselling."<br> "Not sustained…counseling on driving."      (A/C Messer, 5/27/88) (55994)<br><br>6/13/888 memo from Lt. Saucedo: "This memorandum serves as written documentation that Detective Earl Arbogast has been counselled reference case IA 88-46. Improvement on his driving was advised." (55993) |
| Investigative Issues: | |
| Other observations: | **SO "not sustained" based on no evidence to corroborate CO's claim that SO used profanity in light of SO's denial of such.**<br><br>IA Check list in file (56004)<br>Applicable rules in file (56008-56013)<br>Declaration of contract right declining tape recording of IA interview (56020) |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Det. Earl Arbogast; PO Salvardore Vargas; PO Jose Parra; PO George Sibley PO Lucille Diaz |
| Case No. | None |
| Discovery Page No. | #8874-8882 (9-pages) (Arbogast Personnel File) |
| Date of Incident | **1/18/1989** |
| Date Reviewed | 6/20/2022 |
| Allegation: | Unlawful Detention; Excessive Force (Civil complaint) |
| Facts underlying incident: | Civil complaint filed on 1/18/1991 alleges that officers followed plaintiff while he was driving to his home, did not make a traffic stop, but then followed him into the residence (without permission); then used force on both plaintiffs, who who were pushed to the ground, with the driver being handcuffed. House occupant (2nd plaintiff was injured as a result of being pushed to the ground). Later, driver was unhandcuffed and cited for a traffic violation.<br><br>No specific allegation against Det. Arbogast; plaintiff only able to identify PO Diaz and PO Vargas; not sure of identity of third officer. |
| Findings | No documentation of any internal review or investigation or findings made. |
| Investigative Issues: | |
| Other observations: | |

**Exhibit 2**

| Involved Officer: | Earl Arbogast; Al Marquez |
|---|---|
| Case No. | IN 92-033 |
| Discovery Page No. | 8898-8899 (2-pages) [Arobgast Personnel File] |
| Date of Incident | **3/26/1992** |
| Date Reviewed | 6/8/2022 |
| Allegation: | Civilian Complaint - Rude & Unprofessional Conduct |
| Facts underlying incident: | Detectives came to complainant's home saying they had an arrest warrant for her husband for murder. Marquez "did all the talking, was very rude to her and Detective Arbogast just stood their rolling his eyes in disbelief." Detectives went to her husband's place of work and questioned him in front of other employees, embarrassing him.<br><br>CO noted there was a plumber at the house at the time of the Detective's visit and could be a witness.<br><br>CO believed Detectives should have conducted more investigative work before coming to her home and accusing her husband of murder.<br><br>She was advised by supervising Lt. that no IA investigation would be conducted, but complaint would be documented and supervisor would "talk to the Detectives." |
| Findings | Information only. |

**Exhibit 2**

| Investigative Issues: | **No documentation of any debriefing or analysis of complaint and its veracity.** |
|---|---|
| Other observations: | COPY TO MARQUEZ FOLDER. |

**Exhibit 2**

# APPENDIX 3C

# GRAVES WORKPAPERS

**Exhibit 2**

| Case No. | Date of Incident | Allegations | Disposition |
|---|---|---|---|
| | 7/19/1985 | *Commissioned as Officer* | |
| IA 85-197 (pages 5-8) | 7/24/1985 | Off duty misconduct – interference with LE investigation | Written Reprimand (no allegation for lying) |
| None (page 9) | 10/25/85 | Failure to protect partner | Counselled. |
| IA 85-272 (page 10) | 11/5/1985 | Civilian Complaint - Excessive Force | Not sustained. |
| CP 86-131 (pages 11-20) | 7/18/1986 | Failure to arrest intoxicated suspect & unprofessional conduct (practical joke on female officer) – same as 10/25/85 incident. | 1-day suspension (no allegation for lying) |
| CP 86-228 (pages 21-23) | 11/2/1986 | Failure to obey an order | Written Reprimand |

**Exhibit 2**

| IA 87-73 (page 24) | 6/21/1987 | Civilian Complaint - Disparaging comments; unprofessional | Not sustained. |
| IA 87-149 (page 25) | 9/29/87 | Civilian Complaint - False Arrest | Information only |
| IA  88-39 (page 26) | 3/6/1988 | Civilian Complaint - Excessive force | Not sustained. |
|  | *7/11/1988* | *Promoted to Detective* |  |
| IA 89-95 (page 27) | 10/2/1989 | Civilian complaint - Discourtesy; False allegations | Information only |
| IA 92-094 (page 28) | 11/30/92 | Civilian Complaint - Harassment | Information only |
| IA 92-138 (page 29) | 9/12/1992 | Unknown | Unknown |

**Exhibit 2**

| | | | |
|---|---|---|---|
| | *7/14/1994* | *Promoted to Sgt.* | |
| | *4/10/1993* | *England-Lazo Homicide* | |
| IA 95-069 (page 30) | 3/10/1995 | Civilian complaint – Excessive Force | Not sustained |
| IA 95-076 (page 31) | 4/4/1995 | Civilian complaint – Rude & Unprofessional & Excessive Force | Not sustained |
| | *8/24/1995* | *Jury Verdict – Villegas Trail #2* | |
| None | 4/4/2000 | Hostile Work Environment | Not sustained |
| CP01-322 | 9/4/2001 | Hostile Work Environment | Not sustained; Training |

**Exhibit 2**

| CP01-387 | 10/19/01<br>10/24/01 | Failure to submit written statements | Sustained, Divisional Counseling |
| --- | --- | --- | --- |
|  | *3/5/04* | *Promoted to Acting Lt.* |  |
|  | *5/5/06*<br>*5/19/06?* | *Promoted Police Lt.;*<br>*Acting Police*<br>*Commander* |  |
| IA06-155 | 10/10/2006 | Hostile Work Environment | Unfounded |
|  | *9/8/2008* | *RETIREMENT* |  |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Scott Graves |
| Case No. | IA 85-197 |
| Discovery Page No. | 57627-57676 (50-pages) |
| Date of Incident | **7/24/1985** |
| Date Reviewed | 5/30/2022 |
| Allegation: | Off duty misconduct – interference with LE investigation |
| Facts underlying incident: | Complaint by Santa Fe Railroad police: SFRPD was conducting a legal search of a home belonging to SO's in-laws. "Complainant alleges that the off duty officer continued to hinder the search in spite of abounding evidence of a criminal violation." |
| | IA report (57630-3): |
| | Per SFRPD: obtained consent to search for stolen materials from RR employee (father-in-law of SO). SO was present during consent: states that off duty "continued to hinder and obstruct the search by persistent questioning.  He continued to request I.D. and that a search warrant be produced. ..search was conducted in spite of the officer's actions and during the course of this search, numerous items began to surface which obviously belonged to the Santa Fe Rail Road. This did not retard the officer's actions as he continued to angrily question the authority of the agents and their authority to carry weapons. |
| | Mother-in-law states SO was not rude or unprofessional. Was told by SO that she could refuse the search – nothing in summary to indicate whether or not she consented. |
| | SO statement was contrary to those of SFRRPD. Claims when mother in law informed him that husband had authorized the search, "he allowed them to do |

**Exhibit 2**

so without any hindrance at all. ..he simply watched and did not interfere."
He denied losing his temper and denied all other allegations.

Noted that Graves "is a graduate of the most recent academy class."

7/26/85, sworn Statement of Asst Div. Superintendent Santa Fe Railroad PD.
(4 pages, sworn). (57647-50). Statements conclusory: "he gave us a hard
time" Presented photo ID (57651)

8/9/85, sworn? Statement of RR employee (mechanical supervisor) missing
page two (57652)

8/10/84 sworn Statement of Special Agent RR police: described SO as "very
bold and I was not very impressed with him as a representative of the
department." (57653-4)

8/22/85, Statement of mother in law (missing page two). (57655) No info on
interaction with RR police…

8/30/85 2-page sworn statement of SO: Admitted asking about authority to
carry a weapon – (v. "he began to hound me about the weapon I was
carrying..[and] began to get on my nerves"); Reported "I in no way hindered
them or prevented them from searching…I kept a professional attitude at all
times and at no time did I lose my temperament…there were no signs of bad
feelings at any time as far as I could determine…"

**Exhibit 2**

| | |
|---|---|
| Findings | Sustained, 9/5/1985 |
| | 9/13/85: Lt. Grijalva: "I feel that Officer Graves could have used better judgement in this particular case. Officer Graves is a new employee and I feel that this lack of judgment is a result of lack of experience." Recommended: Divisional Level Reprimand and "additional training, from his Sergeant, on how to properly handle situations such as this one." (57634) |
| | Captain: "Agree with Lt's recommendation. <br> D/C: "Written reprimand and further training by his Sgt. <br> A/C: "Strong written reprimand and additional training by supervisor (57629) |
| | 9/20/85 Written Reprimand from Chief (57635) <br> "On this date, several law enforcement officials of the Santa Fe Railroad arrived at the residence of your father-in-law… These agents had obtained a consent to search for the home from your father-in-law. Additionally, this consent was verified by your mother-in-law. You were present…at the time that these agents requested to search the home. Despite the fact that these agents had properly identified themselves to you as peace officers of the State of Texas you hindered their search by continually requesting more identification, questioning their authority to carry weapons, and questioning the egality of the search. You became angry and continued to obstruct the search even though the search revealed stolen merchandise in the home. These agents are certified peace officers of the State of Texas and had a legal right to conduct the search which they did. Your personal interference in the matter was uncalled for and not justified. Your responsibilities as an El Paso Police Officer demand that you cooperate and assist other law enforcement agencies when necessary." |

**Exhibit 2**

| Investigative Issues: | **No discussion at all of fact that SO's statement was factually contrary to those of other police officers. Note: SO new officer "graduate of the most recent academy class."** <br> **No real investigation into integrity/credibility of his statements to IA even though Written Reprimand accepts all allegations made by SFRRP and are contrary to SO's statements as to what happened.** |
|---|---|
| Other observations: | IA Investigation Check list (57637) <br> Relevant Rules and Regulations (57639-46) No highlighted rules relating to untruthfulness. <br><br> File contains documentation of peace officer status of Santa Fe RR police (57658-57674) |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Scott Graves |
| Case No. | None |
| Discovery Page No. | 10108-10114 (7-pages) (Personnel File) |
| Date of Incident | **10-25-1985** |
| Date Reviewed | 6/17/2022 |
| Allegation: | Failure to protect partner |
| Facts underlying incident: | Officers faced with 4 aggressive suspects while investigating the cause of an explosion. Female officer attempted to make an arrest and was attacked. Responding supervisor concerned about SO's "lack of assistance to his partner."

1-page sworn statement – Graves, 10/26/85.
4-page sworn statement – DeAngelis, 10/26/85. |
| Findings | Sgt. Carney: 10/27/85 - concluded that SO "failed in his duty to come to the aid of his partner…[not] due to cowardice, but rather, due to a mental state of confusion and uncertainty, caused by his lack of experience….first encounter with violent subjects." SO "failed to use the proper level of force in dealing with hostile and combative subjects.

Counseling – Concurred by Lt. & Captain. |
| Investigative Issues: | |
| Other observations: | |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Scott Graves; Oscar Menchaca; Ernest Wade, David Conner |
| Case No. | IA 85-272 |
| Discovery Page No. | 10117 (1-page) Personnel File |
| Date of Incident | **11/5/1985** |
| Date Reviewed | 6/17/2022 |
| Allegation: | Civilian Complaint - Excessive Force |
| Facts underlying incident: | CO alleged that during the course of his arrest and while under restraint by several officers, an unknown officer struck him in the face numerous times with a closed fist. |
| Findings | Captain Chacon: "I concur with the Lt's recommendation, It seems to me that the [CO] initiated the confrontation and even admitted fighting the officers to Lt….The officers acted with reasonable force and the allegation should be not sustained.<br><br>Concurred: Messer. |
| Investigative Issues: | **Reference to sworn statement by CO – not in file.**<br>**No documentation of any investigation or incident reports; although rationale for findings indicates incident reports were reviewed.** |
| Other observations: | 1-page Personnel Incident Report only.<br>**Complainant alleged he was struck in the face while restrained. Finding speaks to CO initiating the confrontation and admitting fighting with officers.** Excessive force while restrained would still be unlawful even against a suspect who initiated a confrontation. As such, unknown if finding was reasonable or not without access to additional documentation. |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Scott Graves (Recruit); P. Gailey, A. Perez, D Martin[1] |
| Case No. | CP 86-131 |
| Discovery Page No. | 57444-57615 (**172-pages**) |
| Date of Incident | **7/18/1986**[2] |
| Date Reviewed | 6/17/2022 |
| Allegation: | Failure to arrest intoxicated suspect & unprofessional conduct (practical joke on female officer). |
| Facts underlying incident: | Officer Gailey written statement 7/18/86 acknowledging poor behavior and 7/20/86 – responding to Officer DeAngelis allegation of misconduct – asserting that she had seen the subject in the same state and also failed to act. 3rd statement on 7/23/86 (All written, final statement sworn) – referencing comment made by Perez that "a female" could handle the call. Another statement on 8/25/86, written and sworn, generally consistent with the others [No documentation as to why 4 written statements were considered necessary] (57449-56). (First two statements signed; next two signed and sworn). |
| | Officer Graves written statements (7/18/86 & 7/20/86): claimed did not hear comment about "a female officer will respond" to handle the subject if a call were made by restaurant staff. Written statement 7/20/86: "I can not remember what we joked about although I do know that we did talk about girls as men often do." Understand a comment about a female responding was made by Perez, but did not hear it. Noted dislike between DeAngeles and Gailey; noted DeAngelis insisted on arresting subject, when other officers were willing to take him home. "It is my opinion that DeAngelis just |

---

[1] Officers showing as command ranks in IA Pro, but details of case show them as patrol officers.
[2] Wrong date in IA Pro – indicating 7/28/86

**Exhibit 2**

assumed that Gailey made a remark when I fact he didn't due to the long standing feud between the two…" (57457-8)

Graves statement 7/23/86, more extensive statement, to include comment inferring subject was not appropriately searched by DeAngelis as a syringe was found in the back seat of DeAngles' patrol car after her contact with the subject…"the subject could have shot up any intraveneious drug after we left the restaurant…" (57459-60) (First two statements signed; third statement signed and sworn).

Officer A. Perez (7/18/86): no admission of any unprofessional conduct; no admission of suggesting a female would handle a follow up call; 7/20/86 (longer statement), denying misconduct - only acknowledging that "Sylvia" would probably get the call and they could handle it if further action were necessary. "this incident should not have gone as far as it did. Sylvia should have gotten all the facts and should have asked us about the incident before making a big deal.)…"Pat and Sylvia have not gotten along in the past, Sylvia blew it out of proportion since Pat was involved…."

8/26/86 statement noted failure to search by DeAngelis. Gailey a great officer – arrest should not have been made "he was not a danger to himself or others when we left him…" (7/18/86: 57461; 7/20/86: 57642; 8/26/86: 57463-7) (All statements signed and sworn).

Officer Martin (Partner of Perez) (7/18/86: 57648) no mention of any unprofessional comments; (7/20/86: 57469): "I later found out was Officer Perez had said it will probable be a female officer (sic)"…comment on failure to search and incorrect report that Officer DeAngelis went into men's room…"complaint may have been brought against the Officers for personal reason[s]…" (8/25/86: 57470-475): heard comment "a female officer would probable handle the call. I later found out that the officer who made the

**Exhibit 2**

comment was, Officer Perez." Comments re: failure to search; likelihood that DeAngeles ran across subject earlier in a more intoxicated state; claimed "while in the restroom we did laugh a lot amongst ourselves…[but not about a female officer having to take the call]…."no malicious itent on any of our parts." [First and second statements written and signed; third statement sworn].

**Civilian Statement: (7/23/86)** (3 pages, signed and sworn) (57477-79): Restaurant crew leader: took comment to mean that a female cop would be dispatched to handle a call that the men were not interested in handling. "…if they got in trouble it was their fault, they were supposed to be doing their job."

Restaurant employee (57480-  : Heard officers say: "Have a good night Linda, call the police if he's not out in five minutes…we'll send a female officer."  They should have taken the drunk out immediately.

Documentation of contact with 3rd restaurant employee who did not want to make a statement (57509).

CO officer (DeAngelis) (7/20/86 – 2 pages sworn (57483-4): Crew boss said "Hey this is the female that the other officers said they were going to send to handle the drunk." Gailey stated that he would take the subject home; told partner to 10-15 (arrest?);  Martin then said "Don't worry about him we will handle the call." After asking crew boss was told Gailey said: "Wait 5 to 10 minutes if he is still there, call the police. We have just the female to handle this." Told by partner that subject in bathroom was totally exposed from the waist down. "I strongly believe this was an intentional joke by the officers involved…it was in bad taste and it was an embarrassment to me and my

**Exhibit 2**

partner…" (Noted questioned large police response to call – but employees denied calling it in…)
9/8/86 sworn statement (4 pages) (57485-88): answering allegation of prior contact with subject; and search of subject: thought her partner initially searched subject in restaurant; believes syringe was from a prior transport of an unsearched person.

WO Menchaca (7/22/86 (1 page sworn - 57489): "It is my opinion (if it counts any) that Ofc. DeAngelis has a personal gripe against these fine officers…" (2 page sworn 8/22/86) (57490-1). "**In reference to the joke part; I spoke with several of the officers at the scene. There was some mention about a joke, although I don't recall who mentioned it in particular. I don't know nor did I ever found out the exact details of the joke. Once I got back inside my patrol until with my partner (Ofc. S. Perez), I stated to her; the whole incident was supposed to of been some kind of joke.**

WO Dominguez (2 page sworn 7/22/86) (DeAngelis partner) : did not hear statement of staff – went into restroom to retrieve subject: fresh complaint by DeAngelis. (57492-3). (3 page sworn 9/5/86): re prior contact with subject and recovery of narco paraphernalia from patrol car. (57494-6)

**Officer Sylvia Perez (7/21/86 signed statement (57497): Acknowledges told by partner (Menchaca) that "they had done that just to play a joke on Ofr. DeAngelis, so she would go in and see the subj. who was laying on the ground with his shorts down."**
8/25/86 (2 page sworn) (57498-9): Asked partner what was going on: "he told me that when he walked in the bathroom the subj. was lying on the floor with his shorts down, and the two other units had told him they had done it as

**Exhibit 2**

|  | a joke on ofc. DeAngelis, so she would be the one to see the subj. My partner however did not advise me of which of the ofc. Was the one who said this."

Multiple officer statements re: prior incident involving intoxicated subject (57500-57505).

Incident report (57511)
Report re: narco paraphernalia (57514-5)

Personnel Incident Report by on duty Sgt. (7/18/86)
 (57537-8). Sgt. reports that subject was obviously unable to care for himself. |
|---|---|
| Findings | 57537-8:
7/18/86: Sgt. Maestas (incident supervisor): "Gailey admits that he used poor judgment in his actions by not taking enforcement action and especially for making the comment that he thought no one heard except his fellow officers. [referencing that a female officer would be dispatched in the police were called]. Recommends Galey be counselled and a copy of this incident report be placed in his file, at Divisional level." Recommend same for Graves, Perez & Martin "indicating their lack of professional responsibility, and their lack of enforcement action that they have sworn to uphold. [Martin & Perez should be separated as partners due to low productivity].

**7/26/86: Memo from Sgt. Maetas: referring to situation as "repulsive" and "disgraceful." SO statements "are a source of shame. In every sentence they attempt to cover their dereliction and justify their actions with garbage excuses…That joke had every potential of serious** |

**Exhibit 2**

**consequences and yet Menchaca dare refer to them as 'fine officers.'… Perez won't shoulder his responsibility either, actually he started this mess. I recommend a one day suspenson for each of the following officers involved (Gaily, Graves, Menchaca, Perez & Martin. "I further hope that they each appeal this suspension so that their laxness of duty will become heard before the Civil Service Commission…." (57539).**

**7/27/86: Lt. Grijalva: "I have reviewed the incident and Sgt. Maestas' recommendation. On an emotional level I might tend to concur with Sgt. Maestas' recommendation. Realistically, however, I must consider the past work records of each officer involved. I, therefore recommend that each officer involved be given a Written Reprimand." (57540)**

57537-8:
To IAD 7/28/86. COP Messer.

9/26/86: Sgt. Maestas [after having reviewed IA case]: "I still find inconsistency in every [SO's] statements. .. I restate that in my opinion the subject was in need of police attention… Even though their [sic] might not have been any maliciousness intended by any of the original four officers,..it did result embarrassing to officer S. DeAngelis and it involved the public. It definitely brought discredit to the Police Department." Finds that Menchaca became involved when he was informed, "by someone whom he can not recall, that it was intended as a joke…He relays this information to his recruit partner…Yet when instructed to give his statement…, he does not make any mention of the joke issue. <u>Undersigned feels that he purposely left it out.</u> I maintain that a 1-day suspension without pay is justified to each of the above named officers. (57541).

**Exhibit 2**

|  | Lt. Grijalva (9/26/86): Recommends Written Reprimand "based largely on the Officers' past work records, which, for the most part, are good. It is quite obvious that the Officers were derelict and that they intended to play a practical joke, despite their attempts to rationalize their actions."  (57542)

Captain [undated]: "I still feel that a written reprimand and good counselling session is sufficient to impress on those officers involved that their actions were uncalled for and that stronger measures will be taken in the future, regardless of whether it is a practical joke or not, especially one that backfires."

DC [undated] recommends 1 day suspension for all officers.

1 day suspension COP, 9/29/86.

**Gailey – 1 day working on off duty hours without compensation in lieu of 1 day suspension** (10/10/86) (57528-9). For dereliction of duty; conduct subversive to the good order and discipline of the department; neglect…inattention to duty; using appropriate methods to restore order…and make arrests; rules relating to professional conduct, general responsibility, personal conduct, conduct dealing with the public.[3] (Discipline documentation: (57591-57597) |
|---|---|

[3] Specifications: In the early morning of July 18, 1986 you and three other officers were eating in the WataBurger Restaurant at 8101 Dyer Street. There was an intoxicated subject in the restaurant at that time. You chose not to arrest the individual at that time although one hour later the same subject was arrested for public intoxication by other officers at the same location. All of you left the scene at the same time and you told the manager to call the police, if the subject, who by now was in the men's restroom, had not left in five or ten minutes. One of the other officers, in a joking and unprofessional manner, said a female officer would be sent to help, and all of you joked and laughed about this in front of the employees. Your conduct was improper and brought discredit on the department. Further, had you made the arrest at the first contact with the subject, this would not have necessitated the response of four other police officers one hour later…." **NOTE NO MENTION OF ANY ATTEMPT TO COVER UP THE MISCONDUCT.**  (57591-94).

**Exhibit 2**

|  | **Martin – 1 day suspension** – 10/26/86) (57531-2) Same specifications and language as Gailey (Discipline documentation (57610-57615).<br>**A. Perez – 1 day suspension** (10/26/86) (57533-4) Same specifications and language as Gailey – except determined that he was the officer who made the comment regarding "a female officer [being] sent to help" (Discipline documentation (57604-609).<br>**Graves – 1 day suspension** (10/5/86) (57535-6) Same specifications and language as Gailey. (See footnote 3, herein). (Discipline documentation 57598-603)<br><br>No indication of any discipline for attempt to mislead IA into believing it was all a misunderstanding and not a practical joke.<br>**Supervising Sergeant concludes there was an attempt to cover up misconduct, but only recommends one day suspension! Reviewing**<br><br>**Lt. finds a practical joke was intended and recommends a WR "despite [SO] attempts to rationalize their actions." [i.e., lie to cover up their misconduct]. (57542.**<br><br>**Captain appears to ignore untruthfulness allegation in recommending WR instead.**<br><br>**No discipline for Ofr. Menchaca**, who appeared to have attempted to cover up the misconduct on the part of the subject officers who admitted misconduct to him. (See Sgt. Maestas finding (57541) |
| Investigative Issues: | **Note multiple written statements obtained from SO's.** |

**Exhibit 2**

| | |
|---|---|
| | **IA report** 57571-83): Includes summaries of witness statements. Note that of rules charge, to include Neglect of Duty, Conduct Subversive, Personal Conduct, etc., no allegation for false statements. IA report advises "this case deals strictly with the allegations made against Officers Gailey, Graves, Martin, and Perez". [No identification of truthfulness issues as to Officer **Menchaca.**] Note cassette recording of Gailey calling the dispatchers office and speaking to Dispatcher [Investigative Note #5] could corroborate this was a practical joke and this call was intended to get Officer DeAngelis to respond. Per Gailey, he received a call from a male person at station to respond – but note that crew leader denied calling police to respond. [Not noted by IA and indicative that Gailey lied during course of investigation). |
| Other observations: | Extensive investigation by IA: It appears that SO's tried to cover up misconduct over practical joke played on female officer. Many different statements taken, but no allegation of lying to IA and no resolution in that regard.<br><br>WO S. Perez's partner advised it was, in fact, an attempt to pull a practical joke on CO officer. Perez partner minimized "joke" comment.<br><br>**Contract language allowing officers suspended up to 5 days to, at COP discretion, serve suspension by working on off duty hours without compensation. (57530).**<br><br>IA Investigative check list (57507).<br>Log sheets and work schedules (57516-57526) |

**Exhibit 2**

| | |
|---|---|
| | Declaration of Contract Right cards – all officers indicating "do not desire a tape recording made of [their] interview[s]." (57553; 56-7)<br><br>Relevant polices and procedures (57559-57567) |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Scott Graves; T. Rudd |
| Case No. | CP 86-228 |
| Discovery Page No. | 57616-57626 (11-pages) |
| Date of Incident | **11/2/1986** |
| Date Reviewed | 5/30/2022 |
| Allegation: | Failure to obey an order |
| Facts underlying incident: | Per Incident report (57618-9), Sgt. ordered Officer Rudd and Graves to issue an arrestee a citation for no insurance, per his instructions. Rudd had previously used his discretion not to issue a citation for that offense. Sgt. ordered Graves to ensure citation was issued and none was issued by Rudd, who failed to interpret Sgt's instructions as an order and declined to issue the citation.<br><br>11/4/86 – 2-page sworn statement by Sgt. Carney: working as Acting Lt. Noted prior violation for Officer Rudd for disobeying an order (1/22/85) for which he received an oral reprimand. (57622-23).<br><br>Graves – 11/3/86 – 1 page sworn statement (57624). Reported that he was driving that night and did not pay attention to whether partner issued the citation as ordered: "I took the report back to the report room and relayed to my partner what Sgt. Carney had asked me to tell him. We then became involved in transporting a signal 90 for Unit 266, Officer McDaniel and I did not know if my partner had issued the citation or not until 11-3-86 when Sgt. Carney asked me about it. That is when I became fully aware that the citation was not issued. After I had informed my partner that Sgt. Carney wanted the citation issued,  did not really pay attention to whether it was issued or not because I was driving that night and I was not filling out the log sheet." |

**Exhibit 2**

| | |
|---|---|
| | Rudd, 11/3/86: 2 page sworn statement (57625). Missing page 2 of statement: Unknown what Rudd's rationale was for not following the order or if he was questioned about his conversation with Graves and whether Graves was aware he did not issue the citation per the order. |
| Findings | 11/4/86: Sgt. recommends written reprimands for both officers.<br>Chain of command concurred.<br>Per D/C: "Concur w/ written reprimand. Also, they are to go out and issue the citation…"<br>Sustained, Written Reprimand, COP Messer, 11/5/86.<br><br>11/24/86: written reprimand to Graves: "On 11/2/86, you and your partner, Thomas Rudd, had occasion to arrest Gabriel Miranda. After the arrest, you were instructed by your supervisor, Sgt. James Carney, to have issued to Mr. Miranda a citation for Failure to Maintain Financial Responsibility. Being aware of the instructions, you should have noted any deviations to Sgt. Carney. You did not and as such were a party to the offense. Your inattentiveness to instructions is a dereliction of duty which will not e tolerated." (57620)<br><br>11/24/86: written reprimand to Rudd: On 11/2/86, you and your partner, Scott Graves, had occasion to arrest Gabriel Miranda. After the arrest, you were instructed by your supervisor, Sgt. James Carney, to have issued to Mr. Miranda a citation for Failure to Maintain Financial Responsibility. If you did not understand or had questions about the instructions, you should have discussed it with a Sgt. Carney at the time. You did not and your failure to follow instructions amounts to insubordination. Such actions will not be tolerated by the Department…." (57621) |

**Exhibit 2**

| Investigative Issues: | **No follow-up by supervisor or command re: Graves statement that he was unaware of whether or not his partner issued the citation as directed. Query whether that statement is really credible….partner would have had to have personally issued the citation to the arrestee…. Missing page from partner's statement – unknown whether there was any attention to this at all….** |
|---|---|
| Other observations: | |

**Exhibit 2**

| Involved Officer: | Scott Graves; Arthur McDaniel |
|---|---|
| Case No. | IA 87-73 |
| Discovery Page No. | 10161-2 (2-pages) (personnel file) |
| Date of Incident | **6/21/87** |
| Date Reviewed | 6/17/2022 |
| Allegation: | Civilian complaint - Disparaging comments; unprofessional conduct |
| Facts underlying incident: | CO alleged that officers called him a "faggot" and threw his belonging "all over the inside of the vehicle"… missing $70 in food stamps. |
| Findings | Not sustained: "The story of the [CO] is contradicted by witnesses as well as the officers. This case should be unfounded." <br><br> Not sustained by A/C Messer |
| Investigative Issues: | **No documentation of any investigation or incident reports; although rationale infers witness and officer statements were taken and considered.** |
| Other observations: | |

**Exhibit 2**

| Involved Officer: | Scott Graves |
|---|---|
| Case No. | IA 87-149 |
| Discovery Page No. | 10179-82 (4-pages) (Personnel file) |
| Date of Incident | **9/29/1987** |
| Date Reviewed | 6/17/2022 |
| Allegation: | Civilian complaint - False Arrest |
| Facts underlying incident: | CO alleges officers arrested him for disorderly conduct but then later changed the charge to "terrorist threat." |
| Findings | Information only. No statements taken from officers. No misconduct alleged. |
| Investigative Issues: | **No written statement from CO in file.** |
| Other observations: | |

**Exhibit 2**

| Involved Officer: | Scott Graves; Arthur McDaniel |
|---|---|
| Case No. | IA 88-39 |
| Discovery Page No. | 10199 (1-page only) (personnel file) |
| Date of Incident | **3/6/1988** |
| Date Reviewed | 6/17/2022 |
| Allegation: | Civilian Complaint - Physical Abuse |
| Facts underlying incident: | Sworn written statement by CO "that he was physically based by the officers while he was being placed under arrest." Arrested for resisting arrest. |
| Findings | Charges not sustained, Injuries to [CO] arose from his own actions, officers used necessary force to subdue physically violent subject. [CO] had ample opportunity to report allegation to Sgt. Ortiz at time of arrest, but did not deem it important. 6/7/88, AC Messer. |
| Investigative Issues: | **No documentation of incident report, statements of officers in file. Nor copy of CO written complaint in file.** |
| Other observations: | Rationale for findings indicates unidentified documents were reviewed in support of finding. |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Scott Graves |
| Case No. | IA 89-095 |
| Discovery Page No. | 10223-4 (2-pages) personnel file |
| Date of Incident | **10/2/1989** |
| Date Reviewed | 6/17/2022 |
| Allegation: | Civilian Complaint - Discourtesy / False Allegations |
| Facts underlying incident: | CO alleges that Det. Called her and told her to stop harassing woman who had an affair with her common law husband. …She told him that another Detective had taken care of the matter: "I don't care…I have the case here…and if you don't stop, I will go and arrest you."<br><br>CO did not want to make a sworn statement and understood no further investigation – wanted "someone to talk to Detective Graves regarding his unprofessional conduct." |
| Findings | Information only. |
| Investigative Issues: | **No indication of any counseling or debriefing with SO. Signed by DC only.** |
| Other observations: | |

**Exhibit 2**

| Involved Officer: | Scott Graves |
|---|---|
| Case No. | IA 92-094 |
| Discovery Page No. | 10263 (1-page) (personnel file) |
| Date of Incident | **11-30-1992** |
| Date Reviewed | 6/17/2022 |
| Allegation: | Civilian Complaint - Harassment |
| Facts underlying incident: | CO alleges that Det called and threatened to arrest her daughter for assault and told him daughter need to stay away from the school that the victim attended.<br><br>CO "felt that Det was trying to intimidate her and that he was harassing her. She stated that all she wanted done at this time was to have Det's supervisors know about the tactics that are being used by the Det. Advised info only report would be filed. |
| Findings | Info only. |
| Investigative Issues: | **No indication of any counseling or debrief with Detective or forwarding of complaint to immediate supervisor.** |
| Other observations: | Reference made to a signed document by the complainant, but nothing in file. |

**Exhibit 2**

| Involved Officer: | Scott Graves; Officer Mary Lou Carrillo |
|---|---|
| Case No. | IA 92-138 |
| Discovery Page No. | 10259 (personnel file) |
| Date of Incident | **9/12/1992** |
| Date Reviewed | 6/17/2022 |
| Allegation: | Civilian Complaint - Unknown |
| Facts underlying incident: | No information other than SO's determined to be "officers involved in the alleged incident."<br><br>Initiating Officer's Recommendation: "Internal Affairs Investigation."<br><br>CO identified as "Delia Rodriguez Stoltz w/address and phone #. |
| Findings | |
| Investigative Issues: | **No documentation of case in file.** |
| Other observations: | No indication of IA investigation being conducted or completed. |

**Exhibit 2**

| Involved Officer: | Scott Graves; A. Ruiz; C. Contreras |
|---|---|
| Case No. | IA 95-069 |
| Discovery Page No. | 10297 (1-page) (personnel file) |
| Date of Incident | **3/10/1995** |
| Date Reviewed | 6/17/2022 |
| Allegation: | Civilian Complaint - Excessive Force |
| Facts underlying incident: | Complainants in "advanced intoxicated state" made allegations of excessive force. "No statements were taken from the complainants at the time due to their advanced intoxicated state."<br><br>Addendums identified: Incident report; Garrity statements of SO's; polaroid photos of CO's injuries and Ruiz's injurys; CO's history sheets. Also, witness statements: Officers Rosales, Shay, Monarez & Armendariz. |
| Findings | Not sustained. |
| Investigative Issues: | **Addendums not in file. No rationale for findings documented.** |
| Other observations: | Unable to determine reasonableness of findings or quality of investigation. |

**Exhibit 2**

| Involved Officer: | Scott Graves; C. Contreras ; A. Chavez |
|---|---|
| Case No. | IA 95-076 |
| Discovery Page No. | 10298 (1-page) (personnel file) |
| Date of Incident | **4/4/1995** |
| Date Reviewed | 6/17/2022 |
| Allegation: | Civilian Complaint - Rude & Unprofessional conduct & Excessive force |
| Facts underlying incident: | CO filed "formal complaint". Alleged "employees were rude and unprofessional and used excessive force or inappropriate tactics against the complainant during their investigation reference a family dispute." |
| Findings | Not sustained. |
| Investigative Issues: | **No documentation of any investigation in file. No rationale for findings documented.** |
| Other observations: | Unable to determine reasonableness of findings or quality of investigation. |

**Exhibit 2**

# APPENDIX 3D

# ORTEGA WORKPAPERS

**Exhibit 2**

| Case No. | Date of Incident | Allegations | Disposition |
|---|---|---|---|
| | *5/20/1980* | *Commissioned as Officer* | |
| IA 82-17 (pages 3-7) | 3/31/1982 | Civilian Complaint - Excessive Force | Not Sustained |
| CP 83-110 (pages 8-9) | 4/21/1983 | Injury to suspect (possible brain bleed) | Info only |
| CP 83-291 (pages 10-11) | 11/21/1983 | Failure to complete police report as required (2nd violation) | Written Reprimand |
| CP 84-183 (pages 12-13) | 8/9/1984 | Out of assigned district without permission; after being ordered to stay in assigned district. | Written Reprimand (Not fully investigated for insubordination) |
| CP 87-138 (pages 14-15) | 7/20/1987 | Self-Report, Domestic Incident | Information Only |

**Exhibit 2**

| | | | |
|---|---|---|---|
| CP 88-01 (page 16) | 1/2/1988 | Prisoner Escape – Failure to Maintain Control of a Prisoner. | Written Reprimand |
| CP 90-107 (pages 17-18) | 6/2/1990 | Domestic Incident | Counseling |
| | *4/10/1993* | *England-Lazo Homicide* | |
| CP 95-094 (pages 19-20) | 2/10/1995 | Expired Drivers License (4 months) | Written Reprimand |
| | *8/24/1995* | *Jury Verdict – Villegas Trial #2* | |
| CP 96-428 (page 21) | 8/7/1996 | Retaliation Complaint (internal) | Divisional Counseling |
| | *10/24/2002* | *RETIREMENT* | |

**Exhibit 2**

| Involved Officer: | Carlos Ortega; D. Martinez, A. Arcadio, P. Herrera, E. Venegas, E. Gonzalez |
|---|---|
| Case No. | IA 82-17 |
| Discovery Page No. | 56207-56268 (62-pages) |
| Date of Incident | **3/31/1982** |
| Date Reviewed | 5/27/2022 |
| Allegation: | Civilian Complaint - Excessive Force |
| Facts underlying incident: | "…complainants, in a sworn statement, allege that the above officers used excessive force in arresting them and that they were verbally abused prior to and during their transportation to the police station." (56223)<br><br>IA Report (56224-227): :In their sworn statements the above officers all deny that they used excessive force in executing the arrest and indicate only that force necessary to affect the arrest was used. The officers also denied that they verbally abused the complainants in any way. The officers did claim that the complainants were verbally abusive towards the officers. They were belligerent and disorderly which resulted in their arrest."<br>[IA report appears incomplete = likely missing pages – missing part of summary of stabbing victim / witness; ends with "At this time the officers will be interviewed and statements obtained." (56227)<br><br>2 page written sworn statement of CO wife (56234-5); 2 page written sworn statement of CO (56236-7).<br>1 page written sworn statement of civilian witness (56238) – [supporting police version of events]….<br><br>Sworn, written statements of involved officers (56239-56257) |

**Exhibit 2**

Per Officer D. Martinez: "as we were passing by a table…I heard a subject which was later identified as the complainant on this incident, make a remark to the effect that who had allowed these DOGS in the bar, referring to us officers who were inside investigating an aggravated assault." After Officer Alcantar approached the CO and asked him what the matter was, CO "stood up, acting very cocky and belligerent towards officers, and said that he could say anything he wanted because he had freedom of speech… Officer Alcantar then advised us to back off and ask for backup units." Subsequent arrest for "disorderly conduct."

Statement by Alcantar suggests that when we went to explain to CO why officers were there and "what was his problem," CO stood up and "stated it was a free country and he could say any damn fucking thing that he wanted to say. I attempted to calm him done…" but other members of the table began to yell…" subsequently went back into the bar to make the arrest with additional officers.

Statement by Officer Herrera notes that Martinez advised CO that First Amendment right did not include the right to utter obscenities. Herrera also noted that when Martinez told CO's wife to "be quiet," CO "got up from his seat and told Officer Martinez that no one talks that way to his wife and gets away with it. My partner then saw that the situation was getting out of hand and saw that [CO] was inciting his friends…" and officers backed off and waited for backup.

Statement of Officer Venegas states that upon arrival as a back up unit, he wa told by Martinz that "there was a subj. inside that was going to be placed under arrest for Agg. Assault and that the subj. was very belligerent and was with a large group of his friends."  [NOTE: falsity of statement that CO was

**Exhibit 2**

|  | wanted for Agg. Assault.] Venegas statement first one to address allegation of verbal abuse by officers.<br><br>Ortega was partner of Venegas, responding as backup unit. Did not address allegation of verbal abuse.<br><br>Gonzalez responded alone as backup and transported CO's wife – denied verbal abuse.<br><br>NOTE: Officers justified arrest due to CO "did incite an immediate breach of the peace by the way he was behaving ad conducing himself inside the bar." (Incident Report, 56266; 56267) |
|---|---|
| Findings | Not sustained. (No rationale provided) (56223)<br><br>5/13/82 letter from COP to CO's advising them of "not sustained" finding (56228; 56230). |
| Investigative Issues: | **No apparent attempt by IA or Department to address allegation of false arrest by CO. (Appears assumed that the arrest was lawful).**<br>**No attempt by IA to follow up on inaccurate statement by Venegas that CO was wanted for aggravated assault.**<br>**But, IA report does not appear to be complete….**<br><br>IA report failed to summarize officer statements individually, combining them all into one paragraph (see above) and did not specifically deal with a |

**Exhibit 2**

| | key issue relating to the lawfulness of the arrest for insulting police officers as they were walking by. |
|---|---|
| | *No indication in file of what action was taken by the court on the arrest. (Although Supplemental Report of Martinez indicated that warrants were obtained fro Judge Millard." (56267)* |
| | IA reported that none of the nine potential witnesses identified by the CO returned calls (4/14/82) "Another attempt will be made." (56226) IA investigator asked CO's wife "to instruct her husband to have their witnesses contract [IA] on Monday 4/9/82." Reportedly, no calls were received. |
| Other observations: | **No consideration by IA or Department as to CO allegation that they were falsely arrested for making a derogatory comment about police officers who were in a bar looking for an assault suspect.** |
| | **[But see,** According to the Texas Penal Code, <u>you can be charged with disorderly conduct if you do any of these in a public place:</u> |
| | 1. **Use "abusive, indecent, profane, or vulgar language,"** of the kind likely to provoke a physical altercation. These are known legally as "fighting words." |
| | <u>Texas Disorderly Conduct Laws - TX Disorderly Conduct Penalties - Texas Criminal Defense Lawyer (mytexasdefenselawyer.com)</u> |
| | IA report not complete – missing page including part of statement of witness Armando Reyes (see 56224-5). But written sworn statement in file (56238). |

**Exhibit 2**

| | Relevant rules and regs in file (56231-3). But no rules or regs relating to p.c. to arrest and first amendment rights or laws relating to disorderly conduct that may have justified the arrest. **Note "Declaration of Contract Right" signed by al officers, declining tape recording of their IA interviews (56258-56264).** |
|---|---|

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Carlos Ortega; Robert Olivas |
| Case No. | CP 83-110 |
| Discovery Page No. | 56038-56082 (45-pages) |
| Date of Incident | **4/21/1983** |
| Date Reviewed | 5/26/2022 |
| Allegation: | Injury to suspect (possible brain bleed) |
| Facts underlying incident: | Foot pursuit of suspect who ran from police upon observing them. Reported that suspect may have self-injured himself outside of sight and presence of pursuing officers. Evidence of damage to property (intentional breaking of girlfriend's window) by suspect. (56045).<br><br>IA Supplementary Report, 5/2/83 (56080-81). On 4/25/83, Sister of suspect came to IA to make complaint; states suspect reports he was beaten by officers who found him. Alleged Officer "Coman" or "Coleman" hit suspect on the head. IA reports interview of CO on 4/27/83, "The complainant was aware that the sister was to come to the office but he stated that he was not interested in filing a complaint. Although he indicated that he did not want to file a complaint he felt that it was not necessary to have been hit on the head. He contends that while he was hiding from the police and found, he was hit on the head. He stated he thought the officers name was Coman or Coleman. He stated Officer Olivas didn't do anything to him. He was asked again if he wanted to file a complaint and he stated no." |
| Findings | Finding by Lt. 4/21/83: Suspect a "habitual criminal" – "head injury received running into a cactus while trying to escape arrest." (56046).<br><br>Info only.<br>Sgt. Campbell: "No fault on officers part. No indication of wrongdoing. |

**Exhibit 2**

|  | Lt.: "I agree."<br>Captain: Info only<br>DC: "Concur<br>"Info only – Mr. Ortega expresses no interest in pursuing matter at this [illegible]. (5/6/83) (56042) |
|---|---|
| Investigative Issues: | ID&R called to scene to photograph the area (56045; 56054).<br><br>Case documented by IA as "Information only" due to lack of misconduct with note that CO did not want to pursue complaint. |
| Other observations: | IA checklist in file (56049) |

**Exhibit 2**

| Involved Officer: | Carlos Ortega (Det.) |
|---|---|
| Case No. | CP 83-291 |
| Discovery Page No. | 56083-56091 (9-pages) [Ortega personnel file (7788; 7795-6) |
| Date of Incident | **11/21/1983** |
| Date Reviewed | 5/26/2022 |
| Allegation: | Failure to complete police report as required (2nd violation) |
| Facts underlying incident: | SO received information on a robbery and failed to make a complainant report.<br>CAP requested report on a 11/21/83 robbery. Ortega was the assigned officer. Ortega "recalled having made a crime readout on the offense but he didn't recall having made a complainant report." Ortega had retained his notes and was instructed to make a report and a statement for administrative purposes.<br><br>Assigned detective advised that the delay in making the report did not damage the case; the only consequence was having to conduct a search for the report.<br><br>Prior violation: 10/21/83, Ortega failed to make a report on an auto burglary and was "counseled on the incident and advised of the severity of the violation."<br><br>1-page written signed sworn statement by SO (56088_ |
| Findings | Sustained, 12/12/1983. Written reprimand.<br><br>Violations attributed to "forgetfulness." "officer has difficulty in calling in reports to word processing at the end of the shift due to his forgetfulness. In an attempt to avoid future violations of this nature Officer was instructed to prepare the reports himself immediately upon receipt of the information." |

**Exhibit 2**

| | |
|---|---|
| | Sgt. recommends "Written reprimand indicating that a future repeat will result in suspension.<br>Lt: "I concur. Written Reprimand. No further use of word processing by Officer Ortega."<br>Captain: "Concur"<br>D/C: "Concur"<br>Approved by Chief.<br><br>Written reprimand reads: "…on November 21, 1993. On this date you failed to make a police report as required, on a robbery call that you handled involving a Mrs. H.A. Markham. You had on a previous occasion been councelled for failure to make prop reports. On October 21, 1983, you also failed to make a report on a Burglary of Auto…" (7795 – Ortega personnel file). |
| Investigative Issues: | |
| Other observations: | Daily activity report in file.<br><br>Minimal investigation required; appropriate discipline given circumstances. |

**Exhibit 2**

| Involved Officer: | Carlos Ortega (Det.) |
|---|---|
| Case No. | CP 84-183 |
| Discovery Page No. | 56092-56107 (16-pages) |
| Date of Incident | **8/9/1984** |
| Date Reviewed | 5/26/2022 |
| Allegation: | Out of assigned district without permission; after being ordered to stay in assigned district. |
| Facts underlying incident: | SO was involved in a minor traffic collision while outside of his district. "employee was out of this district (a substantial distance) after having been told to remain within his district on at least two prior occasions."<br><br>Tractor trailer backed up into police car which was blocked in by another vehicle. Other driver was cited for "Backing Not in Safety."<br><br>Shift policy reads: An officer may make a reasonable overlap into an adjoining district but go no further unless dispatch or responding to the assistance of another unit." Reasonable overlap is "clearly defined as four or five streets into an adjoining district. On at least two prior occasions this officer has been told by the initiating officer not to violate this limitation." "Accident occurred at the border between districts 32 and 51. This was clearly far in excess of the overlap distance allowed. |
| Findings | Not sustained – preventable accident<br>Sustained, 8/13/94, Dereliction of duty.<br><br>Sgt.: "Accident was unpreventable. Officer not at fault/ARB. Written Reprimand for violating rule.<br>Acting Lt.: "Concur." |

**Exhibit 2**

<table>
<tr>
<td></td>
<td>Acting Captain: "ARB on accident – Officer has been warned twice. Written Repimand.<br>D/C: Written Reprimand for being out of district.<br><br>8/13/84 Written Reprimand from COP: "On this date, you were again out of your assigned district without permission. On at least two previous occasions you have been counselled by your supervisors to remain in your assigned area yet you continued to disregard these instructions. Your actions amount to dereliction of duty and will not be tolerated. Be advised that any further violations of this nature, on your part, may be the basis for sterner disciplinary action."<br><br>Written, signed sworn statement of SO (8/9/94) (56098-56099).: asserted he was "in that vicinity as burglary of vehicles and thefts occur frequently in that area."</td>
</tr>
<tr>
<td>Investigative Issues:</td>
<td><strong>Officer was not asked to elaborate on why he was out of his district; he was not asked about prior instructions to remain in the district and why he disregarded those instructions.<br>Department did not have sufficient information upon which to make an appropriate disciplinary decision. Officer not held accountable in that he was permitted to avoid explaining his conduct.</strong></td>
</tr>
<tr>
<td>Other observations:</td>
<td>Additional information could have resulted in information in support of more serious discipline (e.g., for insubordination).<br><br>Traffic collision report in file.</td>
</tr>
</table>

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Carlos Ortega |
| Case No. | CP 87-138 |
| Discovery Page No. | 56108-56113 (6-pages) |
| Date of Incident | **7/20/1987** |
| Date Reviewed | 5/26/2022 |
| Allegation: | Self-Report, Domestic Incident |
| Facts underlying incident: | SO reports that his common law wife pointed his service revolver at him when he woke up after having argued the night before. SO reported he was able to grab the pistol away form her and no round was discharged. While pointing  the pistol she stated: "I am so mad at you that I could kill you." SO wanted documentation of the incident, but did not want to press charges.<br><br>Additional report that common law wife attempted to force her way into SO's mothers house to engage in an argument and was advised by police to leave and not return.<br><br>Officer advised to have moved out of residence. |
| Findings | "Incident report is being made for documentation purposes only. Below supervisor found no wrong doing on the part of Officer Carlos Ortega concerning the above-described incident."<br><br>Acting D/C.: "To document an off-duty incident only. No other action at this time." (7/21/87)<br>Asst. Chief of Police signature, dated 7/21/87. |

**Exhibit 2**

| Investigative Issues: | **No Department follow up with Ortega's wife who was alleged to have pulled gun on him during domestic argument. No documented attempt to interview wife re: incident.** |
|---|---|
| Other observations: | Complaint reports in file. (56111=113) |

**Exhibit 2**

| Involved Officer: | Carlos Ortega |
|---|---|
| Case No. | CP 88-01 |
| Discovery Page No. | 56114- 56120 (7-pages) |
| Date of Incident | **1/2/1988** |
| Date Reviewed | 5/26/2022 |
| Allegation: | Prisoner Escape – Failure to Maintain Control of a Prisoner. |
| Facts underlying incident: | SO left prisoner alone for a short period allowing prisoner to "slip[] out the back door." |
| Findings | "It is felt that the lack of a secured facility and the absence of established procedure for the securing of prisoner may be as responsible as any negligence on Officer Ortega's part for this incident… recommended that this incident report serve as a written reprimand for Officer Ortega's part in this incident for failing to maintain proper control of a prisoner in his custody,"<br><br>Written reprimand approved by chain-of-command.<br><br>1/12/18 Written reprimand from COP: "On January 2, 1988 you had Jose Morales in your custody. You failed to properly secure the prisoner and consequently, he escaped. Your dereliction could have cause far graver consequences. ..Any similar reoccurrence will not be tolerated and will result in sterner disciplinary action." (56116).<br><br>Sworn 1-page written statement by SO (56118) |
| Investigative Issues: | **None** |
| Other observations: | No additional investigation appeared necessary; WR appeared appropriate. |

**Exhibit 2**

| Involved Officer: | Carlos Ortega (Det) |
| --- | --- |
| Case No. | CP 90-107 |
| Discovery Page No. | 56121-56129 (9-pages) |
| Date of Incident | **6/2/1990** |
| Date Reviewed | 5/27/2022 |
| Allegation: | Domestic Incident |
| Facts underlying incident: | Wife reportedly "punched her husband with her fist, at which time, Det. Ortega responded by striking her back. The wife became enraged and started hitting and scratching violently. Det. Ortega felt it was getting out of hand and called police. Det. Ortega did not hit his wife after the first time…"<br><br>Reported that SO had several scratches on his left arm, face and neck. No visible injuries on wife, but she complained of pain to her left cheek area.<br><br>Written Statement of Sgt. R.D. Brown noting "it should be noted that Officer Ortega's home life is not beleved to be having a negative effect on his attendance or performance at work. He is doing an outstanding job at YSD and it is only through the officer himself that his supervisor is aware of the problems at home." |
| Findings | Sustained, "Off-Duty Incident/Misconduct-Domestic Disturbance, 6/11/90.<br><br>Captain Skanes (CIB): "It is my understanding that both Det. Ortega and his wife are going to avail themselves of stress management. Therefore, I recommend Det. Ortega be counselled by his supervisors and this report to document the incident. Det. Ortega should be aware that a reoccurrence of this type of behavior will result in much more firmer disciplinary action." |

**Exhibit 2**

| | |
|---|---|
| | Follow up comment by Sgt. Brown: "Officer has already been counselled by myself and is receptive to the above recommendation. I concur with above recommendation."<br>DC: 6/11/90 "Counseled by Supervisor." (56123)<br><br>6/12/90 memo from Captain Skanes (CIB) to Sgt. Pfeil (IAD):<br>"As per Deputy Chief W. Long, Det. C. Ortega, #752 of the Youth Services Division, is to be counseled reference the above case…. Please notify this office in the form of an Inter-Office Memorandum when said counseling was received."<br><br>6/18/90 memo from Sgt. Brown to Lt. Harvey: "I again spoke to Detective Ortega regarding the above off duty incident and he advised that no further problems have occurred. He did mention that he has discussed the possibility of counseling with his wife but an appointment has not been made as of this date…" (56125).  [Signed off by Captain / stamped "Received by Internal Affairs, 6/20/90, 2:30 p.m.".] |
| Investigative Issues: | Insufficient documentation of SO's action in striking ("hitting back") his wife and no documentation of any difference in sizes of husband and wife. (Wife documented as 5'0", 115 lbs. – no documentation of SO height and weight). (56129) |
| Other observations: | Incident Reports in file.<br>In today's landscape, both parties would have likely been arrested. |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | Carlos Ortega |
| Case No. | CP 95-094 |
| Discovery Page No. | 8039-40 (2-pages) (Ortega personnel file) |
| Date of Incident | **2/10/1995** |
| Date Reviewed | 6/13/2022 |
| Allegation: | Expired Driver's License |
| Facts underlying incident: | Driver's license expired on 10/15/1994, but not renewed until 2/13/95.<br><br>Sgt. reports (2/10/1995) that he received notification that three officers had expired driver's licenses – two officers stated they had forgotten about renewing their permits; "Ortega had renewed his license before I had mentioned it to him." (#8039). |
| Findings | 3/15/95, Written reprimand.<br><br>"On February 10, 1995, it was discovered that your Texas Driver's License was expired. Sergeant Meza learned of this and upon asking you, you admitted to it having been expired. Your driving privilege had expired on October 15, 1994 and you knowingly operated a vehicle, to include a city vehicle, for approximately 4 months.<br>"As a police officer, you are expected to adhere to all state laws and refrain from engaging in conduct which brings discredit upon yourself. As such, policies and procedures are established to ensure that you comply with all state laws. Your failure to renew your driving privilege is not only a violation of state law, but a violation of Departmental rules and regulations. Your negligence reflects poorly on your judgement and will not be condoned. |

**Exhibit 2**

| | |
|---|---|
| | (8040) |
| Investigative Issues: | **No documentation of statement of officer as to how he let his TDL expire.** |
| Other observations: | Written reprimand only for driving 4 months on an expired license. |

**Exhibit 2**

| Involved Officer: | Carlos Ortega |
|---|---|
| Case No. | CP 96-428 |
| Discovery Page No. | 8052 (Ortega Personnel File) |
| Date of Incident | **8/7/1996** |
| Date Reviewed | 6/13/2022 |
| Allegation: | Retaliation Complaint (internal) |
| Facts underlying incident: | Female detective reported engaging in conversation with SO who "made statements that she interpreted as being retaliatory." |
| Findings | "The official investigation in this case determined that your statements were not intended to be retaliatory. However, it was felt that your comments should have been kept to yourself."<br><br>Divisional counseling. |
| Investigative Issues: | |
| Other observations: | No documentation available other than one page memo, stating above into. |

**Exhibit 2**

# APPENDIX 3E

# ADDITIONAL CASE WORKPAPERS

**Exhibit 2**

| Case No. | Date of Incident | Allegations | Subject Officers | Disposition |
|---|---|---|---|---|
| IA 88-041 (pages 4-6) | 3/4/1988 | Juvenile Complaint: Verbal and Physical Abuse; False Accusation | PO D. Armitage J. Chinolla | Not sustained |
| IA 89-015 (pages 7-9) | 1/21/1989 | Juvenile Complaint: Physical and Verbal Abuse. | Sgt. T. Davidson PO A. Adame | Not sustained |
| IA 89-070 (pages 10-14) | 5/20/1989 | Unnecessary force – juvenile | D. Armitage | Written Reprimand |
| IA 90-183 (pages 15-19) | 10/24/1990 | Juvenile & Adult Complainants:  False Arrest; Verbal Abuse; Civil Rights violation | PO J. Arbogast | 2 day suspension reduced to Written Reprimand by Civil Service Commission |
| IA 91-029 (pages 20-23) | 2/16/1991 | Juvenile Complaint: Coerced confession; Threats of violence against CO and family | PO Z. Gilkison PO K. Penoyer Det. F. Juarez | Not sustained |
| CP 91-046 (pages 24-28) | 2/25/1991 | Excessive Force – Juvenile complainants | PO C. Lerner; PO C. LoPresti PO M. Moncada | Not sustained |

**Exhibit 2**

| CP 91-184 (pages 29-30) | 8/29/1991 | Documentation of injury to juvenile | PO T. Garcia | Information only |
|---|---|---|---|---|
| CP 92-015 (pages 31-34) | 1/19/1992 | Verbal Abuse; Juvenile Arrest procedures; Failure to document. Excessive force | PO G. Chavarria PO T. Saiz | Written Reprimands<br><br>Not sustained |
| CP 92-142 (pages 35-38) | 5/24/1992 | Juvenile complainant – excessive force | PO J. Rojas | Not sustained |
| CP 92-205 (pages 39-43) | 6/13/1992 | Excessive force - juvenile prisoner; Failure to report | PO W. Clark<br><br>Sgt. M. Salcido | 3-day suspensions overturned by Civil Service Commission |
| IA 92-019 (pages 44-45) | 10/30/1992 | Juvenile complainant – off duty assault | PO E. Perea | Written Reprimand |
| IA 92-174 (pages 46-52) | 11/14/1992 | Assault Excessive Force Juvenile policy violations | Det. J. Eoff Sgt. G. Allen Sgt. A. Lowe Sgt. Johnson | 3-day suspension 5-day suspension 10-day suspension 8-day suspension |
| CP 93-009 (pages 53-60) | Jan. – Nov. 1992 | Supervisory Dereliction of Duty – Juvenile Policy | Lt. A. Martinez Sgt. A. Lowe | Written Reprimand 20-days reduced to 4-days |

**Exhibit 2**

| | 4/10/1993 | *England-Lazo Homicide* | | |
|---|---|---|---|---|
| | 8/24/1995 | *Jury Verdict – Villegas Trial #2* | | |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | PO D. Armitage; J. Chinolla |
| Case No. | IA 88-041 |
| Discovery Page No. | 68512 (95 pages) |
| Date of Incident | **3/4/1988** |
| Date Reviewed | 10/12/22 |
| Allegation: | Community Complaint – Verbal and Physical Abuse; False Accusation |
| Facts underlying incident: | Per IA summary (68514-30): 13 y.o. CO – alleged verbally and physically abused by Armitage (alleged to have said: "don't get disrespectful with me you motherfucker"); Chinolla used profane language; falsely alleged to have damaged property.<br><br>Per CO statement: he was questioned at the theater by officers without parental permission; IA investigation included statements from companion juveniles. Corroborated by CO (13 y.o.) Rodriguez – but denied officers using profanity (68573). But 13 y.o. G. Hernandez alleged Armitage called CO a motherfucker. (68566)<br><br>PO Lowe, working mall security told juveniles they were suspects in a criminal mischief and read them their rights. Juveniles separated "so that the necessary information could be obtained" (68526). Acknowledged juveniles taken to East Valley substation. (68582-3)<br><br>SO Chinolla denied verbal or physical abuse. CO was uncooperative and used profane language. CO transported to station and released to parents. (Statement, 7/14/88, 68584-5). |

**Exhibit 2**

SO Armitage acknowledged questioning CO after talking to companions who advised that CO had intentionally damaged a waste paper dispenser in the bathroom. Acknowledged transporting CO to station. Denied use of profane language. (68586-8).

Criminal Mischief report (68545). Subject was arrested after two companions incriminated him and transported to East Valley Substation and turned over to his father.

RO Lowe report acknowledging questioning of all three and placing CO under arrest after he was incriminated by his companions and based on his statement acknowledging pulling on the top of the damaged dispenser (68546).

CO statement: (68554-7). Statement of CO father (68558-62) (alleging he viewed damaged item and it was damaged with a tool, not as described by officers); Statement of CO mother (68563-4);

Statement by 13 y.o. G. Hernandez (68565-7) acknowledges CO intentionally attempted to damage property. Heard Armitage cussing at CO and calling him a "motherfucker."

Statement of 13 y.o. Marcus Rodriquez: (68570-4)

Statement of Janitor (68579-81). Was only present when Officer Lowe. Left when other officers arrived.

PO Lowe statement, 7/14/88 (68582-3).

**Exhibit 2**

| Findings | Not sustained (without rationale or explanation), 8/11/88 (68512) |
|---|---|
| Investigative Issues: | |
| Other observations: | Failure to adjudicate obvious policy violations against juveniles. IA failed to identify policy violations as allegations to be considered and no documentation of any consideration by chain-of-command. (Specifically, interrogation of juvenile by officer who is not a juvenile officer; failure to transport to a juvenile facility; failure to get parental permission prior to interrogation. (No indication of any attempt by officers to contact Youth Services per Policy Section 7.02.004 (68541-2). |

**Exhibit 2**

| Involved Officer: | Sgt. T. Davidson; PO A. Adame |
|---|---|
| Case No. | IA 89-015 |
| Discovery Page No. | 70341 (84 pages) |
| Date of Incident | **1/21/1989** |
| Date Reviewed | 10/12/2022 |
| Allegation: | Community Complaint – Physical and Verbal Abuse. |
| Facts underlying incident: | IA Report (70344-52).<br>Summary of CO statement; 14-year-old; questioned by officers and fire investigator for fireworks violation; questioned in his back yard; bit officer in response to UOF. Officer called him a "goddam fucking asshole" and threatened to beat him if he bit him [again?]; threatened to put him in the hospital if he looked at the officer wrong. Officers insulted mother in his presence after hanging up the phone with her… (70406-10).<br>CO appears to allege further questioning at station: *"He then took me inside and there was another Officer there, he asked me what happen and I told him."* 70409.<br><br>Summary of CO mother statement: officers started to question son in backyard after she brought him home; he attempted to flee. Officer struck son in face after being bitten. Alleges officers slammed CO's head into a wall; believed excessive force was used. Officers took him from residence against her wishes. (70391-3).<br><br>Summary of fire investigator. Questioned CO in presence of mother in backyard of residence.  CO transported to Westside Station. Saw UOF; was appropriate and in response to CO biting an officer. (Plus two other fire fighters statements taken). |

**Exhibit 2**

<table>
<tr><td></td><td>SO Officer Adame: Tried to question CO (in apparent presence of mother) ["while officers were interviewing the subjects, subject #1 became very nervous and paranoid…"] in backyard of residence. Sgt. was injured by bite; UOF was appropriate. While on the way to the station, he told the CO to please not bite him as he did not want to have to take shots. (70374-

Sgt. Davidson: At residence, Fire Marshall attempted to interview CO; CO got paranoid and started yelling at them to stay away and attempted to flee. Officers attempted to contain the CO; was bit on hand several times. "Once the CO released his hand, he stopped striking the CO." PO Adame transported O to police station. Used only that force necessary to get CO to release his hand. [<u>Inference from statement is that CO was interviewed by Fire Marshall in presence of officers and mother</u>]. (Officer Adame instructed to take CO to Westside station. (70366-7; 70371; 70419-20).</td></tr>
<tr><td>Findings</td><td>Not sustained findings (no rationale or explanation provided), by Capt. DeAngelis, 3/30/89; 3/31/89 by AC Messer. (70341)</td></tr>
<tr><td>Investigative Issues:</td><td>Criminal reports (70359-65; 70372)
"Officers were able to handcuff the subject and effect the arrest. The subject was then transported to the Westside Station where he was turned over to YSD Officer…. (70365

Report from YSD officer (L. Hernandez): Dispatched to Westside Station to assist…Statement obtained from complainant (Sgt.) and subject taken to JPD for final disposition." YSD agreed to accept CO, but needed additional statements "from Officers a the scene as there was no probable cause to detain subject and he was not under arrest at the time of the assault" (70369-70).</td></tr>
</table>

**Exhibit 2**

|  | Follow up report from YSD officer Hernandez. Asked CO for personal information; then advised father wanted to speak to him; father allowed to speak with CO; paperwork was completed; took custody of CO and escorted him to the front of the station where he met his parents. Advised parents CO would be taken to JPD for final disposition. While transporting CO asked him about his friend Silva ["we were aware that the second subject involved was possibly Silva"].  (70403-4).<br><br>Fire Inspector Report: "I had finished the [witness] interviews when [CO] and his mother came into the back yard. I introduced myself to both of them and tried to get George to explain what happened and to tell me what some of the items in the yard were for…" Asked mother to intercede when CO acted in a "defiant and abusive manner" and was making a statement inconsistent with the evidence. "I asked his mother to intercede and ask him to be cooperative that all I wanted was the truth. George's mother ignored my request and allowed the juvenile to continue acting foolish." (70381-3).<br><br>Fire fighter statements (70384-6; 70397-402). |
|---|---|
| Other observations: | *Per officer statements, officers appear to have participated in attempt to question CO (in presence of mother) with no juvenile officer present. Issue not identified by IA or adjudicated or documented by chain-of-command. YSD officer admitted to questioning CO while transporting him to YSD [purportedly without parental permission].* |

**Exhibit 2**

| Involved Officer: | D. Armitage; S. Gomez |
|---|---|
| Case No. | IA 89-070 |
| Discovery Page No. | 68987 (100 pages) |
| Date of Incident | **5/20/1989** |
| Date Reviewed | 10/6/2022 |
| Allegation: | CO alleges unnecessary force to a juvenile (14 y.o.) |
| | CO father – Army Lt. Col. (69023) |
| Facts underlying incident: | CO alleges physical and verbal abuse – to include scratches to neck and a torn shirt. (68987, 68991). |
| | CO alleged challenged to fight, threats to beat, false accusations, left foot kicked, mocked, dragged to patrol car and thrown against it, hit on side of ace with fist, threw his keys and then threw them at him while he was in patrol car. (68992-4) |
| | Witness 15 y.o. friend: officer was using cuss words; CO not talking back; office kicked CO on his foot without any provocation; reached down and grabbed CO by the front of his shirt and stood him up; then began punching him on the chest/neck area while pulling on his t shirt using fowl language. Female officer told them to be quite "or the other officer will hit you too." Officer dragged CO to patrol car. Saw officer choke CO who did not struggle. CO returned to the driveway with a torn shirt. (68994-5). |
| | 14 y.o. friend of CO: PO kicked CO foot. PO said: "don't smart off to me." PO may have struck CO on the side of the head. Did see PO grab CO by the neck and take him over to the truck parked next door. (68995) |
| | 14 y.o. friend of CO. PO grabbed CO by the shirt and walked him to the patrol car. CO's shirt was torn from where PO grabbed him: CO advised that PO had hit him on the jaw when he was waling him to the patrol car. (68996) |
| | Neighbor: alleged CO had friends had been harassing him. Denied officer hit or kicked. PO did keep telling him to be quiet as CO was mouthing off to |

**Exhibit 2**

| | |
|---|---|
| | him. PO did strike CO in face after he stopped suddenly while headed to the patrol car. PO then took CO by the back of his clothing and pushed him onto the trunk of the car. PO hit CO with nightstick after CO struck the officer. "The hit was like trying to let CO know that he was in control and for CO to settle down. This got CO's attention. Did not hear any profanity or see any physical abuse. PO acted in calm and professional manner." (68996-7) RO reports (2 RO's & 1 Sgt.): visible redness on CO's neck but hardly noticeable in my opinion" (68998-9)<br><br>PO Sonia Gomez (WO): Alleges CO kicked partner's foot. Partner picked up CO by the arm and began to take him to patrol car, but he struggled. Partner grabbed CO's shirt and took him to the patrol car and put him in. "Did not see my partner strike CO in any way."  (68999- 69000)<br><br>SO: CO kicked his foot while he was questioning him. Grabbed him by T shirt and walked him over to patrol car. "I later look back on this and I feel that I should have taken all the subjects into the station and released them to their parents instead of letting them go." Denied striking with hands or fists and denied using profane language.  (69000-2) |
| Findings | Referred criminal assault to CIB; Admin to IA on 5/22/89.<br><br>"Counseling with memo for documentation of a history of such actions by officer to be placed in file."<br>Counseling & Written Reprimand Approved by AC, 2/2/90. (68987)<br>Written reprimand (69086) 2/7/90. |

**Exhibit 2**

| | |
|---|---|
| | Counseling documentation: "I have counseled you reference you actions on May 20, 1989…This memo is to advise you of the numerous complaints of this nature which have been filed against you since your employment with the Police department.  The complaints are for Excessive Force and Verbal Abuse/Discourtesy. Any future sustained complaints of this nature will result in higher discipline.", 2/2/90. Signed by Shift Commander. (68988) <br><br> 2/20/90 letter to CO advises "Our investigation has sustained the allegations against Officer Darwin Armitage. The appropriate disciplinary action has been taken." (68990) <br><br> 2/7/90 Written Reprimand to SO from COP: "…This juvenile is complaining that you not only used abusive language but struck him on the face and kicked him on the left foot. He also alleges that you dragged him by his shirt to the patrol car. <br> You have not only placed your Department in possible civil liability but are causing unfavorable criticism to yourself and the entire police department. <br> You need to re-assess the methods which you use in your public contacts, especially in fulfilling your duties as an FTO. You are not setting a good example for the younger officers to follow and this type of conduct will not be tolerated…" (69086) |
| Investigative Issues: | **IA Summary report (68991-69002)** <br><br> Written statements of witnesses: <br> Gabriel Gayton (69003-5) <br> Lane Smith (CO) (69006-10) (69028). Written Statement to CAP, 8/31/89, (69057-8). |

**Exhibit 2**

|  | Bryan Cook (69011-15) (69061; 69070)<br>George Delgado (complaining neighbor): 69016-69018<br><br>PD Complaint Report by Gomez: "While the officers were talking to the subjects, subject #1 had kicked at the Officers feet." (69019)<br><br>DOJ notice of allegation of civil rights violation (7/28/29)       (69032)<br><br>PO Gomez (WO) written statement, 6/15/89 (69038-9); 69069.<br><br>SO IA form =- "do not request tape recording" of IA interview (69040)<br><br>SO written statement, 6/13/89 (69042-45)<br>SO Miranda statement 8/31/89, (69072-3).<br><br>CAP witness statement reports (CO) (69057-9); Brandon Burton (14 y.o.) 9/13/89, 69060; 69062; Bryan Cooke (14 y.o.) 9/13/89 69061.<br>Submitted to DA for disposition on 9/19/89 (69-63)<br>Declined for prosecution without explanation (69074)<br>CAP Supplemental Report, 9/19/89 (69065-68) includes statement of Burton's father alleging Burton did admit to harassing neighbor and did not see PO "push around" CO (69068).<br>CAP Presentation Supplement, 9/19/89 (69071)<br><br>IA history card (69082-4) |
| Other observations: | Sustained findings and Written Reprimand, but both SO and WO claimed no misconduct.; no action on either SO or WO for potential false claim of no |

**Exhibit 2**

| | striking and no misconduct; all civilian witnesses, including the neighbor (who called police against the CO) alleged some form of striking (neighbor claimed with nightstick – although not excessive).<br>CO and WO claimed no misconduct; no verbal abuse, no striking. |
| --- | --- |

**Exhibit 2**

| Involved Officer: | James Arbogast |
|---|---|
| Case No. | IA 90-183 |
| Discovery Page No. | 72901 (164 pages) |
| Date of Incident | **10/24/1990** |
| Date Reviewed | 10/11/22 |
| Allegation: | False Arrest; Verbal Abuse; Civil Rights violation |
| Facts underlying incident: | Arbogast, while making an arrest near a High School, approached and arrested a crowd (17) of High School students who were reportedly jeering and insulting the arresting officers. Amongst the students was the son of an EPPD Detective, who alleged a civil rights violation. |
| Findings | Undated memo from Sgt. Lowe, concurred by Lt. Martinez recommending written reprimand for profanity: noted "it was a conscious act, with a purpose in mind, and not irrationally as a result of anger. With the strict guidelines of rule 7F, a violation occurred regardless."  (72919)<br>• Captain Grijaiva recommends 2-day suspension – notes prior similar incident (CP 87-12) "in which he received a one-day suspension. I also feel that Officer Arbogast over-reacted, to a certain degree, in the arrests…" (72920).<br>• Sustained, 2-day suspension, DC Fluck, 3/22/91 (72902)<br><br>• Notice of suspension, 4/18/91 (72908-<br>Specification (72912): "…you were on duty and serving warrants. After making an arrest at Parkland HS, you observed a large crowd of students gathered to watch. The crowd began making comments to you and your partner. Even though you had a handcuffed prisoner in your custody, and for whose safety you were responsible, you approached the "hostile" crowd of students, and you ordered them to face a wall at that location, thereby |

**Exhibit 2**

introducing said prisoner into a hostile situation. Your actions in engaging the hostile crowd were unnecessary and a dereliction of your assigned duty. In the course of dealing with the crowd you stated: "This is no fucking joke or game" or words to that effect. Your use of profanity was uncalled for and unprofessional."

Reference to prior use of profanity, resulting in one day suspension (DOI: 1/19/87): "you made several profane, insubordinate remarks to your supervisor during and after a shift meeting." (72913) Incident documentation (73059-61).

4/8/91 memo from Asst. City Attorney representing that suspension will not be sustainable on appeal: "Although Officer Arbogast's decision to confront the hostile crowd obviously created the situation which gave rise to this case, once having engaged the crowd his use of profanity, as a crowd control device, was effective and could thus be deemed as a justified measure,…Also, the discrepancies contained in the witness' statements, regarding the language he used, will be sufficient to compel an hearing officer's recommendation of reversal in this case (79215).

8/23/91: reduced to written reprimand by Civil Service Commission (72907) Recommendation of hearing officer (72977-86)

- Officers "became concerned that riot might ensure as the foul temper of the crowd became evident…" SO believed a breach of the peace was occurring and as police officers he and his partner were under a duty to make arrests. Neither officer believed such a showing of disrespect for the law should be allowed to happen without some authoritarian response. Officers, together, decided to approach crowd.

**Exhibit 2**

|  | • Texas Penal Code Section 42.01 makes it illegal if a person intentionally or knowingly "uses abusive, indecent, profane, or vulgar language in a public place, and the language by its very utterance tends to incite an immediate breach of the peace." (72982)<br>• Sustained for use of profanity; not sustained for allegation SO endangered his prisoner by approaching the crowd. "Because it would have been the better practice to call for backup before approaching the crowd, I find that the employee should have been counseled about this." (72984)<br>• "officer has an exemplary record other than the prior discipline and this incident… (72985)<br><br>Written Reprimand, 9/9/91, for use of profanity (72993) |
|---|---|
| Investigative Issues: | Dispo letter to CO, 3/26/91 (72916)<br>Statement of Arbogast, 11/15/90: (72922-72929).<br>Statement of Arbogast, 3/19/91: (72930-1): able to obtain compliance with use of profanity; no actual force used.<br><br>IA Case Summary Report: (72932-6)<br>• Statements taken from Det. Holland (father of CO) (72944-6); PHS security officer L. Belvin (72950-2); 3 juveniles (ages 15, 16 & 18); Officers E. Gutierrez (RO) (72959), F. Gonzalez (RO) (72960), J. Ramirez (RO) (72961), J. Valle (RO) (72962); V. Bulos (RO – knows CO as good and pro-police kid (72963-4), L. Brown (72937-40), J. Arbogast.<br>• Attempts made to contact juveniles through parents with no response (8). |

**Exhibit 2**

<table>
<tr><td></td><td>

- Charges on all arrested adults dropped (including CO); juveniles turned over to parents or school authorities with a Juvenile Information Sheet).
- Per L. Brown, subjects arrested for "disorderly conduct."
- Statement of CO Holland (17 y. o.); alleged SO was "rude, unprofessional, and verbally abusive." Acknowledged others in crowd yelling, but all 17 arrested. (72941-3)
- Statement of Armando Aranda (15 y.o.) Alleged false arrest; denied wrongdoing. (72947-9)
- Statement of Jose Moreno Jr. (16 y.o.): Officer threatened "to beat the shit out of us." ID'd 10 who yelled "fuck the police", denied doing so himself. (72953-5)
- Statement of arrestee Jessel (72956-8): SO cussing and upset; partner officer was calm.

Disorderly conduct arrest report ("all subject within the group were participating in the breech of the peace and all subjects were placed at a searching position to avoid any physical confrontation." (72994).

</td></tr>
<tr><td>Other observations:</td><td>

Officer sustained for profanity; not sustained for placing arrestee in danger. No apparent adjudication of arrest of multiple innocent parties who were merely present. No discussion of need to try to identify violators versus witnesses.

See notes re: case IA 82-17: re TX law potentially permitting arrest for "abusive, indecent, profane or vulgar language".

</td></tr>
</table>

**Exhibit 2**

|  | According to the Texas Penal Code, you can be charged with disorderly conduct if you do any of these in a public place:<br><br>1. **Use "abusive, indecent, profane, or vulgar language,"** of the kind likely to provoke a physical altercation. These are known legally as "fighting words."<br><br>Texas Disorderly Conduct Laws - TX Disorderly Conduct Penalties - Texas Criminal Defense Lawyer (mytexasdefenselawyer.com) |
|---|---|

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | PO Z. Gilkison ; K. Penoyer; Det. F. Juarez. |
| Case No. | IA 91-029 |
| Discovery Page No. | 73222 (172 pages); 79306 (33 pages) |
| Date of Incident | **2/16/1991** |
| Date Reviewed | 10/12/2022 |
| Allegation: | Coerced confession; Threats of violence against CO and family |
| Facts underlying incident: | Department sweep of gang members involved in recent burglaries. CO alleges coerced confession. Personnel Incident Report (73296) IA Case Summary Report (79313-15 "CO alleges that during his initial arrest and while in custody [SO's] coerced him into confessing. CO alleges that all the officers involved made threats of violence toward himself and family members and that the confession was not given voluntarily." <br> • Juvenile case worker (Robles) statement that CO stated he just wanted to clear his name and did not complain of being coerced. Grandfather came in upset at confession and likely coerced CO into making IA complaint. <br><br> Statement of PO Plaza, 3/21/91: plan was to take CO to every house he confessed to burglarizing. Transported CO to JPD where he was advised by an employee of the consequences of confessing. He changed his mind. Called assigned detective (Baragan) who accused him of getting CO to change his mind to get off for weekend; Baragan spoke to CO on phone and CO changed his mind. CO then spoke to JPD "dude", took CO to west side of town to meet with Judge. Judge read CO his rights and signed paperwork. CO proceeded to take them from house to house and identified accomplices. Went back to JPD where "Zoe typed out the confession." Then to Judge's |

**Exhibit 2**

home where she read CO his warnings and signed form. Denied any form of coercion; believed CO to be a good kid who got in with wrong crowd. CO given to him unhandcuffed and remained that way. (79316-20).

PO Zoe Gilkinson (missing 2 of 5 pages): surprised when CO initially declined to give a confession; "we had really never asked CO if he wanted to give a confession, this had been done by the Detectives when we were not even present. PO Plaza asked the lady at JSD if CO could talk to Detective Barragan over the phone; she said only if Chris wanted to. "I did not initiate his making the confession; this I assume was handled by Detectives Barragan and Juarez (79321-2; 79326 (page one)).

Juarez statement, 3/28/91: advised by Barragan that CO wanted to talk to him. CO advised he wanted to confess to multiple burglaries: "all he wanted to do was get this matter out of the way." Overheard Barragan phone call with CO: Barragan advised him to go ahead and give the statement; but it was up to him. Later called by CO (2 days later) who said he grandfather told him he messed up by cooperating. Denied any verbal of physical abuse or intimidation (79327-9). Advised CO of his rights as soon as CO volunteered to confess; no coercion involved (79330-1).

CO statement, 2/18/91: officers threatened him that if did not cooperate, would make things "ruff" for him; threatened to put uncle in a cell and beat him. Female officer instructed him not to tell judge about threats[1]. Female officer fed him information and threatened him if he did not cooperate. (79332-4)

---

[1] Note in officer reports Plaza and Gilkinson (female); both insisted that they had no reason to threaten CO or real interest in the case or getting a confession.

**Exhibit 2**

| | |
|---|---|
| | Statement of SO Det. Barragan: (79335-7): CO was advised of his rights and the charges; "upon further question he admitted to being involved in several burglaries…." He agreed to make a statement and show police where the burglaries took place. After CO declined to make a confession at JPD, he was called by PO Plaza and asked him to put CO on phone. CO was worried as had been arrested for only 2-3 burglaries and was worried about being arrested again. Barragan told him he would not be arrested again and he agreed to make the statement. He later called to say he would help identify property taken to facilitate return to owners; but later declined because his grandfather told him not to cooperate. |
| Findings | 5/22/91 memo from Sgt. Lowe recommending not sustained finding. With handwritten note: "Concur. Not sustained! The Grandfather is behind these false allegations." (73223). |
| Investigative Issues: | Interview of judge who gave CO his rights: no indication of coercion. (73233)<br>Interview of case worker at Juvenile Probation Dept.: CO initially did not want to confess, then changed mind after put on the phone with an unknown person by officer (73234)<br>Case worker #2 at JPD: Co said he wanted to get everything off his chest; grandfather later came in and called CO stupid for giving the confession and that he was endangering the whole family. If anything, it was grandfather that coerced CO into making an IA complaint (73235).<br><br>PD reports indicating confession to 11 burglaries by Castaneda (73273; 73289; 73303; 73346; 73359). None of the reports discussed process by which confession was taken. |

**Exhibit 2**

| | |
|---|---|
| | PD report indicating on 2/16/91, CO taken into custody and advised of his rights and transported to East Valley Station. "At the East Valley Station subject Castaneda advised that he wanted to give a statement reference his involvement on several burglaries. Officers [[ then transported Castaneda to JPD for case review, then to Judge Kurita for magistrate warnings. Subject was then taken to JPD where he admitted to breaking into the house on Cliffrock and to a total of 11 burglaries…" (73370).<br><br>PD report indicating confession by Jose Mora to burglary; gave confession at school after being advised; processed at ID&R at police HQ, then taken to juvenile detention center. Cleared by intake officer and taken before Judge Guinn who advised him of his rights and allowed officers to continue with taking the confession. Mora taken back to Judge Guinn. (73348) Additional report of Mora confession (73369)<br>Mora Certificate of Magistrate (1/23/91) (73377) (1/14/91) (73391)<br>Mora complaint affidavit (73378)<br><br>Disposition letter, dated 5/30/91 (79323) |
| Other observations: | No indication of any attempt to obtain parental consent. No inquiry by IA or chain-of-command. No indication that any juvenile officers were involved in the taking of the confession. |

**Exhibit 2**

| Involved Officer: | C. Lerner; C. LoPresti; M. Moncada |
|---|---|
| Case No. | CP 91-046 |
| Discovery Page No. | 62068-62219 (152 pages) |
| Date of Incident | **2/25/1991** |
| Date Reviewed | 9/28/22 |
| Allegation: | Civilian Complaint - Excessive Force - Juveniles |
| Facts underlying incident: | Cruz – 12 y.o; Hernandez – 15 y. o. (62192)<br>Cruz not accepted at JPD due to intoxication and released to Border Patrol (62194);<br>Roberto Moreno alleged was kicked in the groin area by officers.<br><br>Juvenile arrested for Aggravated Assault on a Peace Officer (62079).<br>Released to Juvenile Detention Center "after completion of the necessary paperwork". "Subject not accepted at JPD (Juvenile Probation Department). Subject was released to Border Patrol." (62079; 62082)<br><br>**Juveniles should've been taken to JPD but were taken to the station first - CITY 62149**<br>Officer Lerner reporting taking subjects to ID&R for processing and then to JPD "where they were turned over to them." (62098)<br><br>Multiple officers reported juvenile (Cruz) as forcibly kicking Ofc. Moncada in the groin area (Moncada – 62086; Schmidt – 62088; Lerner – 62091) with officers describing response as physically removing unhandcuffed minor from back seat, handcuffing and using a restraining rope on his feet. (Lerner, 62145).<br><br>Per JPD Intake Office, no complaints of injuries from subjects (62126) |

**Exhibit 2**

| | |
|---|---|
| | IA Case Summary report. CO complaint of police beating in parking lot behind CO-Luna's house.  (62191-7) <br><br> Cruz interviewed on 4/5/91 and stated no hit or hurt; 4/9/91 reinterviewed and stated officers beat him and two other subjects. Stated was afraid during first interview (62196; written statement, 4/9/91: 62198-201; 4/5/91: 62202). Roberto Moreno complained to his mother that he was beaten by EPPD and hit in the groin. (62197). <br><br> CO Interview, 3/9/91. 100 yards away; saw officers hitting and kicking a dark-skinned kid; 5-6 officers involved.    (62203-5) Daughter of CO noted it was evening hours and dark. (62206). <br><br> Independent witness statement (Phipps): 3 officers, pulled handcuffed victim from a police car and beat him. 75 yards away. (62208-9). <br><br> Subject Moreno mother's statement 4/10/91: (62210-11). |
| Findings | "Observations are not always what they appear to be (Mr. Castulo's observation). Not sustained. 6/24/91 (62140). |
| Investigative Issues: | IA report documenting attempts to locate subjects in Mexico re: allegation of excessive force (62121-3). <br> 5 trips to Juarez, MX to attempt to locate Robert Moreno (62127) |

**Exhibit 2**

Independent civilian witness (J. Phipps) described an officer on pulling handcuffed Mexican male out of the backseat of a patrol car; two other officers responded and all three began to beat the subject. East side North Park Mall (62125).

Other allegation by Luna & grandson, unable to identify officers or any incident occurring in area 62128.

Lerner statement (4/30/91). At Northpark Mall, S/E corner of parking lot, J. Hernandez (under influence and acting irrationally) became extremely violent thrashing in backseat. 2 other officers arrived to assist in restraining subject. Had to physically remove him from back seat; officers had to try to hold and restrain him; Lerner had to "brig my leg against his legs to keep him from kicking me or other officer, but at no time did I kick him or strike him in any manner nor did I see either Officer Moncada or LoPresti strike him in any way." Had to restrain legs with restraint rope. No injuries reported by subject. Believe that any groin injury could have been sustained once he was out of custody. (62141-9).

LoPresti statement, 4/30/91: Assisted Lerner with combative suspect in back of patrol car. "every time he tried to kick, I would block his leg by bringing my left up into his to block it." Denied striking or kneeing subject. Scuffled with subject for several minutes trying to restrain his legs and put them in restraints. Did not kick, strike or hit subject. Acknowledged holding on subject (unnamed) by his arm, unintentionally hurting him due to a prior injury that was covered up by his jacket. Sgt. checked subjects for injury in holding cells and found none. Described handling of subjects: Completed paper work, took subjects to ID&R and then to Juvenile Detention Home 62156-7. Cruz was denied entry because of intoxication. Intake officer advise

**Exhibit 2**

could either take to REIGH and get a doctor's release and bring him back or take him to Border Patrol. Sgt. approved taking him to Border Patrol since officers were already on overtime status.   (62150-8).

Moncada statement (4/30/91): Subject in Lerner's car was very hostile and kicking. Placed in leg restraints. Lerner's prisoner and Cruz were both intoxicated and resistant. Did not see anyone strike or kick any of the subjects. (62159-62). Missing page 5 of statement

Schmidt statement (5/1/91).   (62163-5) Missing even number pages out of 8 page statement. Denied striking or use of force against subjects.

Behl Statement (3/29/91)  (62212) No knowledge of injuries to subjects.

Upshaw Statement (4/30/91). No info.  (62166-7).

Garrity forms: Captain Turner (62170); PO Ramirez – do not want interview recorded (62171);  PO Schmidt – do want interview recorded and copy of tape (62172); PO Mocada – do want interview recorded and copy of tape (62173); Lerner – do want interviewed recorded and copy of tape (62174); PO LoPresti – do want recorded and copy (62175); PO Upshaw – do want recorded and copy (62176); PO Loya (62177); Behl (62178); Feverston (62179).

| Other observations: | Subject Hernandez put into car without being handcuffed, even though UI. No documented instructions on this failure which reportedly led to need to use force. |
| --- | --- |

**Exhibit 2**

|  | No documented action taken against Officer Schmidt for failing to document the name, DOB and address of a subject detained at the scene that he took to Border patrol. (62195)<br><br>Re:  CO's statement that he called 911 and was transferred to a police station and made complaint – with no follow up by PD. (62204) Statement by Desk Sgt. alleging did make follow up call after subjects brought in with no injuries (62213).<br><br>IA reported that Mexican Consulate put conditions on assistance with IA investigation that were no conducive to the investigation (62195); but did not further explain. |
|---|---|

**Exhibit 2**

| Involved Officer: | M. Barreno; T. Garcia |
|---|---|
| Case No. | CP 91-184 |
| Discovery Page No. | 62626-62630 (5 pages) |
| Date of Incident | **8/29/91** |
| Date Reviewed | 9/28/22 |
| Allegation: | Documentation of injury to juvenile subject |
| Facts underlying incident: | Officer reports accidentally striking juvenile subject attempting to pull away from a detaining officer.<br><br>"As Barreno reaches down to pick up the paint can, the subject attempts to pull away from Barreno in an attempt to escape. Seeing the subject's action, Officer Garcia reaches out to stop the subject, accidentally striking the subject in the head with an open hand causing a small mouse under the subject's right eye and a small nosebleed."<br><br>Officers notified Sgt.; juveniles brought to Station, injuries photographs. Subjects processed by Identification and Records and released to Border Patrol. (62626) |
| Findings | "No wrongdoing or improper actions by officers. IAD documentation [only]. 9/4/91 approved by AC Messer. (62626) |
| Investigative Issues: | **Statement by Officer Licon (8/30/91)** did not see incident: "I bent over taking my eyes off the suspect and [the officers], Then I heard a loud sound as if someone had been struck. I looked up and then saw blood coming from the [] suspect's nose. … I asked what happened, I was informed that the suspect tried to break away [] when Officer Garcia rose his hand grabbing the suspect causing the injury" (62628). |

**Exhibit 2**

|  | **Garcia statement** (8/29/91); Suspect attempted to breakaway [from Barreneo]; I reached out with my left hand in an attempt to grab the subject at which time I accidentally grabbed subject on the right side of his face causing him to suffer a small mouse under his right eye and a small nose bleed.(62629).<br><br>**Barreno Statement** (8/29/91): as reaching over to pen door of the police car, had control of subject by the rear of his t shirt when he attempted to break away and escape. Officer Garcia attempted to detain him. In doing so, he reached over, and open hand slapped him on the right side of the fac causing him slight swelling and a minor nosebleed. (626300. |
| Other observations: | Based on Barreno statement would have warranted a referral to Internal Affairs. Open handed slap to face not consistent with statement of SO nor with type of force appropriate to maintain custody. |

**Exhibit 2**

| Involved Officer: | PO G. Chavarria; PO T. Saiz |
|---|---|
| Case No. | CP 92-015 |
| Discovery Page No. | 63006 (85 pages) |
| Date of Incident | **1/19/82** |
| Date Reviewed | 9/28/22 |
| Allegation: | Excessive Force (alleged by parents of two juveniles) |
| Facts underlying incident | Alvarado (13 y.o.): alleged Twisted Arms behind back and slammed head against car. Pain to left shoulder: Per EMS: "felt swollen." Armendarez (16 y.o.): alleged forced to the ground and kicked in the back and struck on the knuckles with a flashlight. [Small cut to face, swollen knuckles and cuts on left hand] (63005-6) |
| Findings | Sustained on Issue #1 – verbal abuse, arrest procedures and failing to document the incident. Written Reprimands, both officers. Not sustained – excessive force. (63005)<br><br>Written Reprimand: Chavarria: "during this encounter you used profane language directed towards the juveniles and physically placed them into a prone position. ...This incident required that you apply physical force towards the juvenile suspects and your failure to so much as record the contact on your log sheets reflects poorly on your judgment. The use of profanity does not command respect for you or your profession and is a direct violation of Department policy…" (63012). |
| Investigative Issues: | **IA report (63007-63011)** |

**Exhibit 2**

Finding #3: Determined officers failed to log incident.
Finding #6: Both juveniles accused passenger in patrol car of UOF; Per other witnesses and the officers' involved Chavarria was actually the officer that grabbed Alvarado and placed him on the ground. He then grabbed subject Armendariz, but he went down on the ground with no assistance from either officer.

**Alvarado written statement** (63013; 63015-6). Alleged hit on the head with a flashlight and friend was hit on the hand.
Armendariz written statement (63017- 8). Alleged officer banged friends head against the patrol car window; then threw Aaron to the ground and told us to leave the area. Officer grabbed me by my jacket and threw me to the ground. After I put my hands behind me, the officer kicked me on my side of the stomach towards the kidneys. Still on the ground, told to put my hands out; put hands out in front of my head with my fists closed; then hit on the left knuckles with flashlight and told to open hands. Then struck me with flashlight on my fingers. Received swollen middle finger in left hand.

**PO Saiz** statement (1/19/92): reported "no excessive force" used. One juvenile asked to lay down flat on stomach when he became offensive and uncooperative. Another juvenile was placed on the ground next to Alvarado because he refused to give his name when asked to identify himself.  When juvenile refused to give name, I grabbed one arm each, took him to the car and told him to lay on his stomach; he complied; they were advised and released. (63014)

**PO Saiz**, 2/9/92: subjects were singled out as one used vulgar language towards us and one refused to identify himself. "I did not threaten the juveniles but informed them that there was no need to act like "assholes"

**Exhibit 2**

when we asked them for simple things." Unidentified juvenile (not Alvarado): I grabbed him at the elbow and it was not necessary to twist or pull his arm in any manner." (63023).

**PO Chavarria** 1/19/91: Decided to check on 6 subjects by the door to a pharmacy – business closed – high crime area. Told subjects to place their hands on my patrol car for a pat down. Subjects did not comply. "I attempted to place his hands on the patrol car however he resisted. I then placed the subject against my vehicle as he was getting aggravated. I asked the subject to get on the floor while I talked to the rest of the subjects. A second subject became abusive and I also asked him to get on the ground and he obeyed." Advised and released. "When the first subject resisted I did force him against my vehicle from one arm and from his shirt" – no additional force was necessary. (63019).
Chavarria, 2/6/92: admitted: "I did tell the subjects to "get the fuck out of here." I also did not see my partner use any threats or strike, kick or cuss at the subjects. Denied hitting with baton or flashlight. "there were several other citizens that were witnesses to the incident. (63020-1).

**Sgt. Spinks,** 2/1/92: took UOF complaints; did not believe Armendarez injuries were consistent with a flashlight strike. 63025

**Lt. Nava**, 2/4/92: Spoke with CO's did not see injuries other than small swelling behind right ear of Aaron; no shoulder swelling; saw knuckle on forefinger of left hand swollen and scratch above it…Armendarez reported as uncooperative (63059-62)

Medical record note: "It was unclear to the validity of the patients description of this incident." (63049)

**Exhibit 2**

| | |
|---|---|
| | IA letters attempting to contact named juveniles (63031-3).<br><br>CO mom: notice bruise to son's face (Armendariz) when came home. (63064)<br><br>Statement of Rafael Diaz (14 yo.) friend of CO's: cop slammed Arron against the car then hit Aaron in the back of the head with his flashlight. Saw cop grab Cisco and throw him on the ground. (63065-6).<br><br>Statement of Hector Alba (15 y.o.): Driver grabbed Aron and took him to the car; put Aaron's hands on the car and was pushing on him; that's when one of Aarons hands slipped off the ar and Aaron hit his face against the car. (63067-8)<br><br>Statement of Enrique Marin (14 y.o.): Aaron thrown on hood of car; Cop: "What do you think you're tough. What do you want to throw a blow at me?" Same cop grabbed Francisco, trip him with one foot while he pushed him to the ground. Cop hit Francisco's hands with a flashlight, ordering him to open up his hands. (63070-1). |
| Other observations: | **No documented rationale for decision-making, but officers both admitted to using profanity; officers denied force used; injuries not consistent with complaint.**<br>Letter to CO, 3/25/92, advising complaint was sustained – but not indicating that allegation that was sustained was for other than UOF. (63024) [Misleading letter to CO's mother]. |

**Exhibit 2**

| Involved Officer: | PO J. Rojas |
|---|---|
| Case No. | CP 92-142 |
| Discovery Page No. | 63431 (87 pages) |
| Date of Incident | **5/24/1992** |
| Date Reviewed | 9/29/2022 |
| Allegation: | Excessive Force (Civilian complaint) 15 y.o. juvenile |
| Facts underlying incident: | Co juvenile alleged struck by Officer Rojas.<br><br>Per Sgt. Ortiz intake report, juvenile was assaulted by subject while attempting to assist a stabbing victim; EMS personnel used physical force to restrain him, and PO used force to restrain him.<br><br>IA Summary report (63500-511).<br>Includes reasons for no witness statements from friends of CO. Parents of juveniles refused to give permission for interviews and another witness failed to respond to 10-day letter; CO mother unable to assist (63504-8).<br>Documents that CO did not seek medical treatment for injuries (63508) |
| Findings | Not sustained. (Lt, 8/31; Capt. 9/3; AC, 9/16. (63431)<br>No rationale provided. |
| Investigative Issues: | Statement from David Skatzes (CO) dated 5/24/92.<br>Alleged Rojas hit him on the left side of the head with a closed fist, after he was hit and dragged (by EMS?) Officer told him to get a decent hair cut and responded with a Fuck you and then hit. All injuries to my head happened when I was knocked to the ground. PO "called me a pussy and a little wuz." (63434). |

**Exhibit 2**

Statement of brother of CO, 5/24/92: alleging Sgt. and PO Rojas had bad attitudes and controverting statement of officer that CO was injured by friend's assailants as he was told CO was held back from the fight. (63436-8).

Statement of Sgt. Ortiz, 5/24/92 reporting on contact with juvenile and brother. Both reported as too hostile to support making statement in support of excessive force claim. Juvenile released to mother and not sent to JSD as EMS personnel had to go to hospital with victim and had not made statements. (63439).

PO Clark, 7/15/92: reported that juvenile approached Rojas aggressively and was taken to the ground. No comment made about juvi's hair, nor was he struck in the face. (63440).

Statement of Mike Gill, 5/26/92: took sworn statement from CO and family. CO alleged punched in head and then drug to patrol car by his handcuffs and thrown against the car. Claimed his face had been dragged on the ground, but did not see injuries consistent with that. CO changed his mind from being hit on right side of head to left side. (63441-4)

Sgt. Metcalfe statement, 8/18/92: advised by involved officers that CO had not received any injuries as a result of officer UOF. CO refused to speak to Sgt. at scene. Instructed officers to release CO to parents as no statements had been obtained from EMS personnel. (63446-7)

Statement of PO Madonado, 8/27/92: denied hearing any PO make comments about CO's haircut or dragging him across parking lot. Never saw anyone hit

**Exhibit 2**

or strike with closed fists and did not hear anyone call CO a pussy or little wuz. "I also remember that the juvenile's behavior was belligerent." (63448)

Written statement of PO Rocha, 5/23/92: Observed EMS holding down CO who was out of control, kicking and screaming.  CO attempted "to go at my partner... observed my partner move to the side, then we both took him down to the ground…used only necessary force to subdue. (63453). 5/24/92 statement to IA (63465).

PO Rocha, 7/16/92: did not hear any remarked about CO's haircut. CO was not dragged; CO did not want to walk; he dragged his feet on the ground. No one ever hit him. CO was not called a pussy or a little wuz. CO told us that his own gang members had beaten him up because he was trying to protect his friend that was stabbed. No visible injuries. (63454).

Statement of PO Rojas, 5/24/92: Observed EMS restraining CO and went to assist.  CO attempted to strike one of the EMS. CO yelled obscenities at EMS and refused to leave scene. CO attempted to strike him; "I grabbed him from the back of his neck with my left hand and swept his feet with my right leg. I followed him to the ground and other officers assisted in handcuffing…" CO told his brother that I had hit him. Told brother that was not true. "I never struck the juvenile but merely grabbed him from the neck and place him on the ground in order to facilitate the arrest." (63449-50; 63466)

Statement of PO Rojas, 7/16/92: statement to IA. Denied making comment re: his haircut. Denied officers dragging him on the ground. Denied striking juvenile. When first came into contact, EMS had him on the ground with his left side of the face against the pavement. Noted scratches to both sides of his head; his clothes were in disarray, shirt pulled and overstretched. CO stated

**Exhibit 2**

| | |
|---|---|
| | he was physically held down while his friend was chased and stabbed. CO was intoxicated and belligerent. (63451-2).<br><br>EMS – J. Oshiro, 5/24/92: CO attempted to enter ambulance through back door after EMS already put victim's mom in front seat. CO yelled and screamed at partner and attempted to hit him. Partner had to physically restrain him by holding him on the ground. Officers arrived and calmed him down. We stood him up and were able to transport the patient. (63463).<br><br>EMS – C. George, 5/24/92: CO attempted to assault him for not letting him into ambulance. I grabbed his clothing and attempted to turn him away from the truck and he attempted to kick [me] causing him to loose his balance and fall to the ground. Had to hold him down…he continued to kick and scream…officers arrived and took charge of the situation. (634464). |
| Other observations: | Letter to Rudy Pine from IA, 6/25/92, attempt to contact (63472)<br>Garrity forms: (63484-93).<br>IA memos, dated 6/23/92, requesting administrative statements from SO's & WO's with specific questions to be addressed. (63496-7; 63498-9)<br>IA memo dated 8/13/92 requesting administrative statements from SO's with specific questions to be addressed. (63494) |

**Exhibit 2**

| Involved Officer: | PO William Clark; Sgt. Manuel Salcido |
|---|---|
| Case No. | CP 92-205 |
| Discovery Page No. | 63794 -63989 (196 pages) |
| Date of Incident | **6/13/1992** |
| Date Reviewed | 9/30/2022 |
| Allegation: | Excessive Force (choking) |
| Facts underlying incident: | Juvenile prisoner kicked officer in groin white officer trying to restrain him in holding cell: Officer reportedly "grabbed juvenile detainee with one hand on the arm of the juvenile and the other hand grabbed the juvenile by the throat area." Reporting Sgt.: "Seeing what had taken place, I went to assist Off. Clark and restrained him from doing anything else and got him out of the holding cell…then got the juvenile to calm down." (63794) When juvenile being restrained, he was handcuffed (63795). <br><br>Sgt. failed to report the outcries by the juvenile detainee of physical abuse. (63796). <br>Sgt. initiated an Incident Report only to document the injury sustained by Officer Clark (63833) <br><br>6/18/92 memo from Captain Leon advising returning incident report "as it is unclear what Sgt. Salcido means when he states, "I went to assist Officer Clark and restrained him from doing anything else…" "I really don't know what took place." (63880) |
| Findings | **PO Clark:** <br>Specifications: "…subsequently you entered one of the cells and confronted one of the juveniles. You grabbed him while he was handcuffed and placed your hand at his throat, pressing him against the wall. You released him when a supervisor intervened and directed you to do so." (1/21/93) (63937) |

**Exhibit 2**

[Prior use of excessive force resulting in a WR, 5/11/87; prior suspensions for failing to document misconduct; rude with members of Communications and rude to a civilian citizen.] (63938).

**Sgt. Salcido:**
Specifications: "…you were present and observed the confrontation which occurred inside of the holding cell…" (63948) … "By your own admission, the juvenile made an outcry of physical abuse to you and stated that he wished to file a complaint. The Incident report which you initiated documents the officer's report of injury and makes no reference to the juvenile's outcry of physical abuse" (63949).
[Prior discipline includes two suspensions, and 6 written reprimands] (63950)

Not sustained recommendation by Lt., 10/13/92
Sustained for Unnecessary/Excessive Force, 11/2/92 (63794)
3-day suspension, 11/9/92 (63795)
Overturned by civil service commission (63824; 63838)

Sgt.: 3-day suspension, AC Messer, 10/9/92. (63796)
Overturned by civil service commission (63822-3; 63839)

Recommendation by Hearing officer - Clark (63952-62)
[Notes CO was originally believed to be an adult and was brought to jail where his actual age was discovered. PO had to go to the jail and transport him to the YSD facility.
Salcido described hand on throat as a move to "detain" and "restrain" and not to "attack." SO denied choking.
"Salcido's June 27 statement contradicted [his] testimony. In that statement he said that grievant "was choking the detainee" … and he went into cell

**Exhibit 2**

|  | because he "wanted for Officer Clark to release the juvele from the choke hold that he was applying." Incident report "appears to support his testimony…" (63959).<br><br>"With the exception of Sgt. Salcido's June 27 statement, it is clear that [he]…reached out as he lunged to both protect himself and maintain control of the young detainee in the cell. It apparently was not a grabbing of the throat to choke as much as a reaching out for anything to hold onto…." (6396).<br><br><u>Recommendation by Hearing officer - Salcido (63965-73)</u><br>Grievant testified that he did not believe that Clark had choked the juvenile or otherwise used excessive force…precluded from getting a written statement from the juvenile because of police regulations…his incident report mentioned the outcry by the juvenile.<br>Finding: not required to report when no misconduct occurred in front of him. June 27 statement "offset by … testimony at hearing…in absence of [CO] …or even the admission of a written statement by him complaining of Officer Clark's conduct…"  Report did, in fact, report the juveniles complaint….<br>Suggests that 6/27 statement may have been "the result of an interrogation by a trained investigator in the Internal Affairs Division who is attempting to ferret out police misconduct." (63971-2). |
|---|---|
| Investigative Issues: | **IA Report (63833-37)**<br><br>IA/Garrity forms (63920-3) |

**Exhibit 2**

| | |
|---|---|
| | Clark statement, 7/29/92 (63974), 9/10/92 IA statement: (63975) denying choking subject. <br> Clark statement in support of criminal charges, 6/13/92 (63985) <br><br> **Salcido statement 6/27/92**, (63976): "Officer Clark was choking the juvenile detainee…went to assist…at the same time I wanted for Officer Clark to release the juvenile from the choke hold that he was applying. I got Officer Clark to release the choke hold and had him leave the holding cell." <br> **Salcido statement 7/14/92**: (63977-8): Reported: "no excessive force used by Officer Clark…this was more of a self defense move to neutralize the juvenile from inflicting any other assault upon the officer. <br> **Salcido statement, 9/16/92:** (63979): Clark did not hesitate in releasing hold when told to do so. Did not ignore juvenile's outcry; documented incident and told him to discuss the matter with his parents. <br><br> Statement of Arturo Albo, 8/12/92: could hear officers hitting friend and slamming him against the wall. SO came over to cell and grabbed me by the throat…he was choking me. Alleged he kicked the officer in the groin in self defense (63989) |
| Other observations: | **No indication of any follow up on Sgt. Salcido for testifying contrary to his initial reports. Would have expected at least a Written Reprimand for writing an inaccurate report that resulted in the imposition of discipline.** |
| Lovey comments; | Officer choked handcuffed juvenile detainee after juvenile kneed him. <br><br> Per intervening sergeant: "The juvenile then kneed the officer. Officer Clark responded by grabbing the juvenile with one hand on his arm and the other hand around the juvenile's throat. Officer Clark was choking the juvenile detainee. I then immediately went to assist Officer Clark in restaining the juvenile but at the |

**Exhibit 2**

| | same time I wanted for Officer Clark to release the juvenile from the choke hold that he was applying. I got Officer Clark to release the choke hold and had him leave the holding cell." CITY 0063976<br><br>Sergeant's sworn testimony contradicts statement:<br><br>Sgt. at hearing: "2. Salcido was equally emphatic that in witnessing the entire process, he did not see grievant choke Alfredo, but rather place his hand on the young man's chest and the hand went up to the throat in the brief struggle. He characterized it as a move to detain, not to attack. He testified that the youth was not gagging or coughing." CITY 63958-59. |
|---|---|

**Exhibit 2**

| Involved Officer: | PO Ernie Perea |
|---|---|
| Case No. | IA 92-019 |
| Discovery Page No. | 69520 (32 pages) |
| Date of Incident | **10/30/1992** |
| Date Reviewed | 10/5/2022 |
| Allegation: | Juvenile allegation that SO slapped him for no reason – off duty incident |
| Facts underlying incident: | IA Case Summary Report (69522-24)<br><br>SO alleged that juvenile previously assaulted his girlfriend (2 days before by grabbing her buttocks). CO alleged that SO slapped him across the face with an open hand for no reason prior to off duty detention. |
| Findings | Not sustained: Lt. 3/13/92<br>Not Sustained: Capt. 3/16/92<br>Written Reprimand, AC Messer 3/19/92<br><br>"On January 30, 1992, you were off duty and in the company of Miss Irma Tofoya. In the area of 90 Ange, Miss Tafoya identified a suspect she believed to be the offender in a Class "C" Assault against her which occurred several days earlier. You confronted the juvenile male and detained him. During this confrontation you, by your own admission, slapped the juvenile across the face…. You detained a suspect for an alleged Class "C" Assault which did not occur in your presence and was unreported to police…**You failed to properly identify yourself as a police officer** and your actions in sapping the juvenile were totally inappropriate. Your taking off duty police action on a misdemeanor offense due to your personal involvement with the victim reflects poorly on your judgment is in violation of rules, regulations and procedures." (Written Reprimand, dated 3/23/92; 69525). |

**Exhibit 2**

| | |
|---|---|
| | Finding that SO failed to identify himself as a police officer is contrary to SO's statement to Responding Officer. |
| Investigative Issues: | Statement of CO, 1/30/92. (69528-9)<br>Statement of CO mother – wanting to file a complaint, but not criminal charges (69530-1)<br>SO statement, 2/27/92 (69532)  [alleges subject struck his forearm when he grabbed him from his collar, "I then slapped hm across the face…"<br>SO statement, 2d statement, unknown date, missing pages 2-3; not legible (69533).<br>IA Garrity forms (69534-5, 39-41)<br>RO statement: SO told him that "**he identified himself as a police officer** and held onto the kids jacket until the units arrive. (69542)<br>SO girlfriend statement, 2/6/92: claims SO showed CO his wallet. Described CO hit SO with his left hand to break SO's hold on hm. "saw Ernie slap the guy across the face, he did not strike the guy very hard. (69545-7).<br>RO Short statement, 2/6/92 (69548-9).<br>RO Apodaca, 2/5/92, statement, SO admitted slapping CO "just once and that was because when he was holding onto him, Rodriguez made some type of motion with his elbow as if to hit him or attempt to get away." (69550-1). |
| Other observations: | **Concerns over failure to address issue of untruthfulness – finding that SO failed to identify himself as a police officer contrary to SO statement to WO.**<br>**Written reprimand minimal discipline given multiple violations : improper detention, failure to identify self and unnecessary force.** |

**Exhibit 2**

| Involved Officer: | Det. Johnny Eoff; Sgt. Gregory Allen; A. Molinar; Sgt. A. Lowe; Sgt. Johnson |
|---|---|
| Case No. | IA 92-174 |
| Discovery Page No. | 69766 (43 pages) |
| Date of Incident | **11/14/92** |
| Date Reviewed | 10/5/2022 |
| Allegation: | 11/12/92: Off duty assault (Eoff) |
| | 11/12/92: Use of city vehicle for personal purposes. |
| | 11/12/92: Harsh & profane language (Eoff) (69775) |
| | 11/13/92: Failure to take juveniles to juvenile facility (Allen, Eoff, Molinar, Sgt. A. Lowe, L. Brown) |
| | 11/14/92: Excessive force; verbal abuse on a juvenile (Eoff; Allen; R. Menchaca; M. Williams) |
| | |
| | Per IA report (69776-8) |
| | • Det. **Eoff** physically abused CO Luhan by grabbing him around the neck and slamming him into a wall. (Sustained finding?) |
| | • Det. **Eoff** physically abused CO Zamarripa by slamming a car door on his leg. (No finding?) |
| | • Det. **Eoff** used harsh and profane language in the presence and direction of the juveniles. (No finding?) |
| | • Det. **Eoff** used a City vehicle to conduct personal business. (No finding?) |
| | • Sgt. **Allen** physically abused CO Lujan by slapping his face and ears with an open hand, striking him in the chest and jaw with an elbow, throwing him over a table and grabbing and squeezing his Adam's apple. (Sustained finding) |

**Exhibit 2**

|  | <ul><li>Sgt. **Allen** verbally abused CO Gabriel and Luhan by threatening to Lujan if he talked, and that he would "kick his ass more than Rodney King" if he continued the way he was going… (Sustained finding?)</li><li>PO Molinar physically abused CO Luhan by slapping hm in the face, striking his chin with the palm of his hand and attempting to knee him in the groin. (No finding)</li><li>Sgt. **Johnson** ordered another officer to take a juvenile witness statement without first getting parental permission. (Sustained?)</li><li>Sgt. **Lowe** took witness statements from juveniles without parental permission. (Sustained?)</li><li>PO Brown took witness statements from juveniles without parental permission. (Not sustained)</li><li>PO Menchaca physically abused CO Licon by striking him in the ribs with a closed fist and placing a revolver to his head while threatening to kill him. (No finding)</li><li>PO Pisarcik physically abused CO Licon by gravving his neck causing a scratch. (No finding)</li><li>PO Morris verbally abused CO Lican by telling him he fucked up [and he was going to cut off his ducktail.] (No finding)</li><li>**Eoff**, Molinar, Duffy, Hernandez, Pacillas and Sgts. **Allen** & **Johnson** transported juveniles in custody to a location not designated by the Juvenile Court, ie TAC office. (Hernandez & Pacillas – not sustained; Allen & Johnson – sustained).</li></ul> |
|---|---|

**Exhibit 2**

| | |
|---|---|
| Facts underlying incident: | Subject struck during an interview after reportedly becoming belligerent. (69767-8)<br>Off duty assault (69766; 69)<br>Use of city vehicle for personal purposes (69770)<br>Failure to take juveniles to a juvenile facility (69772; 73)<br><br>IA report (69776-69804) |
| Findings | **Eoff**: 3-day suspension. (Excessive force)<br><br>**Allen**: 5-day suspension (Excessive force) 3/30/93 by AC Messer. (69768)<br><br>**Sgt. Lowe**: 10-day suspension (Taking juvenile to TAC office & taking of witness statements without parental permission)<br><br>**Brown**: not sustained (taking juveniles to TAC office & taking of witness statements without parental permission), 3/30/93 by AC message (69773)<br><br>**Sgt. Johnson** – 8-day suspension (transporting juveniles to TAC office and statements without permission)<br><br>Hernandez & Pacillas: not sustained. (69774)<br><br>**Heavy suspensions for Sgts Lowe and Johnson for juvenile policy violations.**<br>**Eoff & Allen suspensions did not appear to take into account any false statements.** |

**Exhibit 2**

<table>
<tr><td></td><td><strong>No findings against Sgt. Allen, Det. Eoff or PO Molinar & Duffy for juvenile policy violations. (69722)</strong><br><strong>No finding re: Det. Eoff for initial complaint or for use of city vehicle for personal purposes.</strong></td></tr>
<tr><td>Investigative Issues:</td><td><strong>IA statements from:</strong><br>CO Lujan<br>CO Licon<br>CO Zamarripa<br>CO Lujan<br>IA notes discrepancies in testimonies to include that CO's knew Eoff was a police officer and his name when they made the assault complaint against an "unknown white male."  Also, identified numerous discrepancies in the four CO's statements about what happened with Eoff. (69781-84)<br>Statements from multiple non subject police officers – none reported seeing any excessive force or policy violations (69784-88)<br><br>Statement from PO Avila who took statement from CO's about original assault complaint. (69788)<br>Statement from YSD PO Lloyd: got calls from parents and in follow up determined juveniles taken directly to TAC office; advised Sgt. Johnson who said that he would have the juveniles brought to YSD as soon as possible (69788).<br><br>Statement from CO Ornelas alleging force by Eoff (slamming of car door on leg) and threats by interviewing officer; also heard two CO's being assaulted in TAC office. IA report notes discrepancies in statement (69789-90)</td></tr>
</table>

**Exhibit 2**

Statement from Lujan senior, & IA comments on discrepancies (69790)
Statements from civilians Stewart and Natividad with IA comments that statements were word-for-word similar. (69791)

Statement from Middle School teacher who read about allegations in press and noted that Licon was a lier and a gang member. (69791-2)

Statement of witness Solis and IA comments (69792)

Independent witness, manager at Arby's – IA note that he contradicted CO statement that SO made a statement while holding onto CO-Gabriel's neck. (69793)

Other witnesses interviewed, including another Arby's manager and Eoff's minor son and daughter. (IA note as to discrepancies in son and daughter's statements as well).

Witness Deputy heard SO spell out his name to CO's. (69795)

Accused officers:

Sgt. Allen: Accused CO Lujan of being "a goddamm liar." Slapped him across the face in response to CO jumping up and swinging at him with a clenched fist. He then grabbed him by the neck and pinned him to the wall. Then took him to the floor and handcuffed him. Denied verbal abuse. Brought juvis to TAC because under the impression that they were being brought in for further investigation and not yet being charged with an offense. Did not remember ordering anyone to take juvis to TAC (69795). [IA notes discrepancies showing Sgt. told PO Lozano to place subjects under arrest for

**Exhibit 2**

disorderly conduct and PO Hernandez stated he was told to take juvi's to TAC office by Allen] **Issues re: truthfulness of Sgt. Allen. (95-96)**

Sgt. Lowe: admitted taking statement from juvi without parental permission. Told by Sgt. Johnson that parents had been contacted and assumed this to mean permission had been obtained. Denied threatening witness and denied knowing that any of the juvis were under arrest, thought they were witnesses.

Sgt. Johnson: Did not remember giving anyone an order to take the juvis to TAC "everyone went there just out of habit." May have told officers to take witness statements but does not recall. In the past juveniles under arrest had been taken to TAC office for statements. Did not see any verbal abuse or excessive force. [IA discrepancies: Sgt. did instruct Molinar to take two juvis to TAC & instructed PO Brown to take a witness statement from Licon. **Issues re: truthfulness**. (69796)

Det. Eoff: claimed got permission to transport kids in city vehicle from Sgt. Allen. Denied assaulting juvis: had to push Lujan who came at him in an aggressive manner; had to push away Licon and had to push a car door closed o Aamarripa who refused to get back into the vehicle and was making threats. Saw Sgt. strike Lujan "several times across the face" after Lujan attempted to assault Allen. [Discrepancies noted by IA]. (69797)

PO Molinar; PO Menchaca:  denied any verbal abuse or excessive force.

PO Duffy: transported juvis to TAC office: followed the other vehicles; thought that if it was gang related they could take juvis to TAC office. [IA discrepancy: Duffy called over radio to find out where to take juvis and was told to take them to TAC office.

**Exhibit 2**

| | |
|---|---|
| | PO Pacillas: told by PO Molinar to take juvi to TAC office.<br><br>PO Hernandez: instructed by Sgt. Allen to transport juvis to TAC.<br><br>PO Pisarcik: no excessive force; prior contact with Licon as a gang member.<br><br>PO Brown: took statement from Licon at Sgtl Johnson's instruction.  No verbal or physical abuse; statement taken was voluntary (69800). |
| Other observations: | IA report contained multiple references to discrepancies in statements of complainant's and civilian witnesses – very hard to follow – would be necessary for a reviewer to document, track and compare all witness statements on his/her own.<br>**NO SUSPENSION LETTERS IN FILE; NO SPECIFIC INDICATION OF WHAT SPECIFICATIONS WERE SUSTAINED AND WHAT FINDINGS WERE.**<br>**MISSING ALL WITNESS STATEMENTS – impossible to determine reasonableness of IA comments to discrepancies in statements.**<br>**Only documentation is Personnel Incident Reports:**<br>**It appears that Sgt. Allen and Det. Eoff received suspensions for UOF against Lujan, who received injuries after struck and taken down at TAC office. (69768 )**<br>**Sgt. Lowe – 10d suspension / Sgt. Johnson 8d suspension for taking juvis to TAC office and taking witness statements without parental permission. (69773-4)** |

**Exhibit 2**

| Involved Officer: | Lt. A. Martinez & Sgt. A. Lowe |
|---|---|
| Case No. | CP 93-009 |
| Discovery Page No. | 64378 (260 pages) |
| Date of Incident | **Jan.-Nov. 1992; Initiated 1/6/93** |
| Date Reviewed | 10/7/22 |
| Allegation: | Supervisory Dereliction of Duty |
| Facts underlying incident: | IA Allegations:<br><ul><li>Sgt. Lowe authorized subordinates compiling and maintaining a photo album containing juvenile photos. (no documented action – not sustained?)</li><li>Sgt. Lowe released confidential information regarding juvenile gang members to a member of the press. (no documented action – not sustained?)</li><li>Sgt. Lowe authorize ADA to carry a handgun on his person. (no documented action – not sustained?)</li><li>**Sgt. Lowe authorized juveniles in custody to be taken to the TAC office. (Sustained – amended to one instance prior to arbitration).**</li><li>**Sgt. Lowe authorized statements to be taken from juveniles without parental consent. (Sustained – dismissed prior to arbitration)**</li><li>Sgt. Lowe organized/staged a gang fight between two rival gangs. (no documented action – not sustained?)</li><li>Sgt. Lowe failed to properly supervise the purchase and/or disposition of a weapon. (no documented action – not sustained?)</li><li>**Lt. Martinez failed to property supervise and control the subordinates under his command. (Sustained)**</li><li>***Lowe: Lying in sworn statement* (added in handwriting) (64379) (Sustained – dismissed prior to arbitration)**</li></ul> |

**Exhibit 2**

| Findings | **Lowe** sustained for allegation #4 (authorizing juveniles in custody to be taken to the TAC office); #5 (Authorizing statements to be taken from juveniles without parental consent); # 9 (lying in a sworn statement). "20 working day suspension (10 + 10). (64387) |
|---|---|
| | **Suspension reduced to 4 days prior to arbitration, 9/22/94 (64410)** [note <u>not sustained finding for lying, even though</u> Lowe specifically denied the specified allegation: "In the case of a juvenile witness that indicated during the course of the investigation that he may be a suspect, he was immediately removed from the office and taken to JPD."  (para 5, 64550) Sustained finding for one instance only. 4 days even though prior discipline of 10 days for similar offense. |
| | Amended Notice of Suspension, 9/22/94 (64411-7): |
| | Specification: "During the summer of 1992, you along with several TAC officers responded to a drive-by shooting…officer Pisarcik took a juvenile into custody and was instructed by you to take the juvenile detained to the TAC offices, a facility not designated for holding juvenile offenders. [PO] Pisarcik again met with you and asked you if you were aware the detainee was a juvenile and again you instructed [him] to take the juvenile to the TAC offices. You knowingly directed a subordinate to transport a juvenile in custody to a police facility not designated by Judge P. Martinez as juvenile processing center." (64415). |
| | Lowe Notice of Suspension, 8/20/93 (64388-94). |
| | Prior discipline includes 5-day suspension in 1988 for off duty misconduct in responding to his family home on a family fight (see notice of suspension 64440-2 (sustained for domestic violence – but not terminated); 10-day suspension in 1992: "organized subordinates to take inappropriate police |

**Exhibit 2**

action and knowingly allowed juvenile subjects to be handled contrary to [law, orders, policies and procedures] 64393; IA 92-174, "Excessive Force; Off Duty Incident/ Misconduct; Criminal Allegations; Violation of Rules & Regs (64488).

Specifications: "On 1/6/93, an investigation was initiated into your actions as a supervisor of the Tactical Division during the period between Jan. 1992 and Nov. 1992. ..You knowingly allowed subordinate officers to transport juvenile subjects directly to the Tactical Division office in conflict with the direct orders of Juvenile Court Judge P. Martinez, Texas state law and policies and procedures of the [EPPD]. .. further…officers under your command were allowed to take statements from juvenile suspects without obtaining parental consent. During the administrative investigation you provided sworn statements in which you gave misleading or false information in regards to your actions and the actions of your subordinates during this same period." (64392)

**Martinez:** sustained for failure to property supervise and control subordinates – Written Reprimand. (64387).

Written reprimand, 7/2/93: "On 1/6/93 an investigation was initiated into allegations of police misconduct by members of the Tactical Division during the period between January 1992 and November 1992. You were assigned to the unit as the commanding officer…. Investigation revealed that violations of State Law and policies, procedures and directives related to the handling of juvenile suspects were repeatedly committed by members of this unit…You failed to properly supervise and maintain control over subordinate officers and their actions. Without your guidance, cases were mishandled and policies and procedures were violated…" (64422).

**Exhibit 2**

| Investigative Issues: | **IA Report (64378-86)**<br>Statements taken from 11 witness officers and 2 subject officers:<br><br>Retired PO K. Penoyer: denied any supervisor directing officers to take juvenile subject to TAC office for any reason. Witness statements were taken at the TAC office, but school and/or parents aware. Involved in obtaining AK-47 and failed to obtain serial number; unaware fully automatic on return from "crooks." (Crim report: Prohibited Weapon, 64526-31; 64532-47); Statement (64558-68).<br><br>Sgt. Avalos: told by PO Carillo that Sgt. Lowe set up a fight between gangs. Other supervisors opposed the idea, but Lowe & Lt. M did not listen. One gang did not show up. Instructed by an acting Sgt., at direction of Lowe to take an arrested juvenile to TAC office; told to do so even after advising Acting Sgt. this was a violation of policy.  Lowe took control of the juvenile. Taking juveniles to TAC office was a common practice by Lowe even in the face of memos sent by Captain DeAngelis regarding juveniles. *[Per PO Carrillo, Avalos kept a photo book of gang members – but IA summary/Avalos statement do not include a Q&A on this issue with Avalos; nor does IA summary include an interview with PO Calanche who allegedly kept photo album with Avalos; per McDaniel: "I also think that the picture book was kept by Avalos and Calanche but am not sure on this (64581)].* Statement, 1/8/92 (64625-35)<br>[Alleged Sgt. Lowe proposed providing false information regarding a proposed drug bust where a DA objected: "[the DA] was taken downstairs and Sgt. Low cam back and told us that he was not a team player and that we needed to be careful of what we said around Paul…" (64633) [nothing in Lowe statement re: this allegation]. |

**Exhibit 2**

PO R. Pisarcik: Instructed by Lowe to take arrested juvenile to TAC office even after advising it was against policy. Instructed to release juvi to Lowe's custody and not book him as Low was going to use him as a witness in his case. (Statement: 64523-4).

PO J. McBain: Lt. left Lowe a great deal of responsibility. The men felt as if Sgt. Lowe was running the unit even more than the other supervisors. Involved in surveillance of park for a gang fight but it did not take place. (Statement 64467-73).

PO Z. Gilkison: Involved in surveillance refence a gang fight that did not take place. Heard rumors fight was staged by Lowe. TAC as a practice took juvenile subjects to a substation, YSD or JPD. Sgt. Lowe's squad frequently had juveniles in the TAC office but did not know the status of those juveniles. Lowe pretty much ran the unit. (Statement, 1/6/93 (64613-4)

PO J. Arbogast: Gang fight was going to take place with or without us. Set up at park as a protective measure to ensure no loss of life. Common practice for the 10 squad to take juveniles to JPD or YSD. Juvenile witnesses taken to TAC with parental permission. **"he did note that if they did not speak to juveniles without parents permission, their solvability factor would be that much worse."** Sgt. Lowe had great deal more experience with gangs than Lt. (Statement, 1/6/93: 64569-73)
**"It has not only been our unit but reality is other units operate with juveniles which may somewhat bend these rules for juveniles. It is that much more difficult for our unit to solve gang crimes because we deal with retaliation factors in most every case. If we never spoke to juveniles without parental consent first our solvability factor would be that much worse."** (64572)

**Exhibit 2**

PO L. Cluff: started the original gang list; there was a photo book, but never saw it; photos of juveniles by themselves and in crowds were being taken, but Lt. put a stop to it as soon as he found out. (Statement, 1/8/93 (64596-07).

PO A. McDaniel: Did set up for a gang fight, but unknown who set it up. Never took an arrested juvenile to TAC; never asked to. Saw photos of juvis in office. (Statement, 1/8/93, 64574-82).

PO M.L. Carrillo: Lowe aware of all the details of the gun deal. Her CI contacted her about his gang being challenged to a fight by another gang. "He did come in and talk with her and Sgt. Lowe and that all Sgt. Lowe did was to change the time of the fight so that all three squads could be there to stop it and maybe make some weapons arrest." She got photos of juvenile gang members from schools – told by Lowe that was okay. There was a photo album kept by two other officers [see Avalos note above]. (Statement, 1/8/93, 64615-24).

Sgt. Lowe:
- No juvenile photos were condoned by any supervisor.
- Did not authorize photo album, and never asked for photos back.
- Did not release gang list to the reporter and no knowledge how he got it.
- No info on ADA carrying a gun.
- Always been the policy to take in custody juveniles to JPD and now YSD. Parental/or school [when in Loco Parenti] permission always obtained before taking a juvenile witness statement. [contrary to inference from J. Arbogast re: solvability rates].

**Exhibit 2**

- Did not set up the gang fight – just had PO Carrillo narrow down the time so they could be there.
- Lt involved in decision-making on gun purchase.

Written statement, 5/14/93 (64548-57).

Lt. Martinez:
- Put a stop to the photo album as soon as he learned juveniles were included.
- Not aware of who provided gang list to reporter.
- No one authorized ADA to carry a handgun and ADA denied doing so when confronted.
- Denied policy violations re: in custody juveniles and interviewing of juveniles as witnesses.
- Gang fight was inevitable and only purpose was to prevent bloodshed.
- Aware of gun operation and kept advised by Lowe.

Statement, 5/9/93 (65483-95)
Reference to "Los Angeles which lost their was with their gangs" (64583)

ADA reported refused to cooperate with investigation.

IA Supplementary Report (64443-51)
Includes summary info on gun purchase /disposition allegations) (64444-64446; 64459-62).
Includes summary info on Gang fight (64446)
Includes summary info on "handling of juveniles" and notes that some officer witnesses stated that "it was common knowledge all juveniles were taken to the task force offices if need be…however no witness statements received…indicate that any supervisor specifically ordered the task force

**Exhibit 2**

<table>
<tr><td></td><td>officers to take juveniles to Boeing St., especially if the juvenile was under arrest or the suspect/focus of the investigation." (64447)<br><br>Info Summary on Southwest Interagency Network on Gangs (SWING) (64455-8)<br><br>IA contract right form, Sgt. Lowe, requesting tape recording of interview (64475).</td></tr>
<tr><td>Other observations:</td><td><ul><li>J. Arbogast comment about following policy of not speaking to juveniles without parent's permission would negatively impact solvability of cases – compare to Command Staff commendations for extremely high solve rates.</li><li>"10 + 10" reference makes it appear that Lowe may have been suspended for 10 days for the policy violations and 10 days for lying. <b>Failure to demote was hugely problematic and unreasonable</b>; particularly given recent prior similar violation for which he received a 10-day suspension; a 10-day suspension for policy violations would be inadequate given the previously imposed discipline (64393; 64488).<ul><li>Note discipline reduced prior to arbitration to 4 days. (64410)</li></ul></li><li><b>J. Arbogast statement does re: solvability seems to have been ignored as it appears to have identified a systemic violation that needed to be addressed outside of this specific IA case.</b></li></ul></td></tr>
</table>

**Exhibit 2**

# APPENDIX 3F

# ADDITIONAL CASE WORKPAPERS

**Exhibit 2**

| Case No. | Date of Incident | Allegations | Subject Officers | Disposition |
|---|---|---|---|---|
| CP 89-194 (pages 2-12) | 9/5/1989 | Excessive Force Failure to report | Lt. Serna Sgt. Norman | 6 months (reduced to 88 days?) Written Reprimand |
| CP 92-006 (pages 13-14) | 12/23/1991 | Perjury at an administrative hearing | PO J. Solis | 10-day suspension |
| | *4/10/1993* | *England-Lazo Homicide* | | |
| CP 93-264 (pages 15-20) | June 1993 | False Reporting; Retaliation Violation of Administrative Gag Order | FTO M. Tevis PO F. Gonzalez | 30-day suspension 10-day suspension |
| | *8/24/1995* | *Jury Verdict – Villegas Trial #2* | | |

**Exhibit 2**

| Involved Officer: | Lt. Serna |
|---|---|
| Case No. | CP 89-194 |
| Discovery Page No. | 60959-61238 (279 pages) |
| Date of Incident | **9/5/1989** |
| Date Reviewed | 9/27/2022-9/28/2022 |
| Allegation: | Excessive Force (Struck prisoners with tire tool) |
| Facts underlying incident: | Lt. beats three auto theft suspects with a tire iron in front of multiple officer witnesses.<br><br>IA Report (61098-61146)<br><br>**Lt. Serna**: IA allegations included excessive force and verbal abuse; failure to property secure evidence; intimidation of subordinates; retaliation).<br>**No allegation of lying even though significant inconsistencies in evidence between Serna statements and other evidence (including statements of officers regarding use of force when subjects not resistant and subject being allegedly armed with the tire tool.)**<br><br> **Sgt. Norman**: failure to report the incident.<br><br>Section VII. Investigative results:<br><br>No documented attempt by IA to evaluate if any of the witness officers observed the force used by Lt. but failed to disclose it to IA.<br>IA report highlighted Officer Woodall did not see subject armed with tire tool exit vehicle as was reported by Lt. Serna. (61143-4). Also, Officer Hernandez (same) (61144-5). |

**Exhibit 2**

| Findings | **Lt. Serna** 11/9/89: Sustained. 132 working days (6-month) suspension & mandatory stress management. (61160; 61217)<br>Handwritten summary shows 88-day suspension. (61201)<br>IA card shows 88-day suspension (61217)<br>11/16/89 "Notice of Suspension", indicates 132-day suspension. (79305)<br><br>**NOTE: SUSPENSION LETTER and supporting documentation NOT IN FILE**. (9/28/22 email to W. Hike inquiring as to any actual documentation that suspension was, in fact, served; Response received (1 page 11/16/89 Notice of Suspension only).<br>**No finding for intimidation of suspects.**<br>**No finding for untruthfulness.**<br>**No finding for appearance of retaliation… did not seek supervisorial involvement in decision to transfer or order work to rules.**<br>**[Suspension for 6 months and stress management might have been reasonable if Lt. had not lied and messaged retaliation against officers who went to IA].**<br>**Stress Management Referral in file** (11/10/89 referral – 61192-3; Certificate of completion (61218).<br>Psych eval (10/28/89) found not prone to violence: does not indicate he has a low tolerance for frustration, is impulsive or characteristically prone to response in violence ways. "Lt Serna's own account should be taken at face value." Recommendation: Be required to meet with his supervisor on a regular basis for six months; problem solving skills should be assessed and his plans for problem resolution reviewed so that there is no doubt about what actions will and will not be tolerated.  61196-200) |

**Exhibit 2**

**Sgt. Norman**. Sustained for failure to report. 3 days recommended by Captain; reduced to 1 day suspension by DC Massey. 11/13/89 (61090-3; 61161). Permitted to utilize accrued vacation in lieu of suspension (61095-7). **Sgt. Norman previous suspension of 25 days, 3/25/86, for "being arrested for DWI in a City vehicle." (61094).**

**No documentation of debriefings with Tactical Section officers re: code of silence issues and need to avoid retaliation against cooperating officers.**

Per Deposition Testimony of Chief John Scagno, 8/25/22 (pp. 82-88), Lt. Serna was suspended for 6 months and passed over for promotion to Captain at least twice. Stated that the culture of an officer turning in a supervisor for excessive force was the type of culture he was trying to create. **Left a letter for next Chief advising that informing officers should not be assigned to serve under Lt. Serna in the future.** [Note that type of instruction appears to acknowledge the potential for retaliation by Lt. Serna; it also impacts on the informing officers more than the Lt. versus a demotion which would impact the Lt. more.]
[Also note, no mention of reduction in suspension by Chief in deposition]. Case was referred from criminal prosecution but declined (reference 61151 Presented on 10/6/89.

**Conclusion: while 6-month suspension may seem on its face to be substantial discipline; Lt. was not demoted or terminated. No consideration appeared to be given to his false statements nor the appearance of an attempt to retaliate. No rationale provided for the failure to terminate or demote.**

**Exhibit 2**

| Investigative Issues: | **Per PO Vanages (9/20): following officers at scene:**<br>**Larry Portillo Interviewed 9/25/89**<br>**James Woodall (9/21)**<br>**Rob Adkins (9/21)**<br>**Joe McBain (Sgt. Interviewed 9/22, 9/29/89)**<br>**Ernest Wade (interviewed 9/25/89)**<br>**McDaniel,**<br>**E. Calanche (interviewed 9/25/89;**<br>**Det. Gomez (Auto theft) (Interviewed 9/21/89; 9/28/89)**<br>**C. Quinby (motor unit) (Interviewed 9/21/89; 9/28/89)**<br>**Isaac Hernandez (motor unit) (Interviewed by IA 9/22/89, 9/25/89)**<br>**Sgt. Norman (motor unit). Interviewed (9/20/89; 9/26/89, 9/28/29, see below.)**<br>**Tony Hernandez (in parking lot with 4th subject, may or may not have ssen)**<br>**Airington (in parking lot with 4th subject, may or may not have seen). Interviewed. 9/20 & 9/26**<br><br>**4 subjects: interviewed?** |
|---|---|
| Other observations: | **Most IA Garrity forms had "x" through contract reference re: tape recording of interview and obtaining a coy of the interview.**<br><br>**Statement of PO Vanegas**: 9/20/89: reported that Serna called him into his office and "proceeded to tell me that he understood that I had called IA to complaint about what happened…" Advised that "if I wanted to I should go to IA and make a complaint…. [subsequently] advised he was going to call IA and have an investigation started... I told him if anything the Sgt. on scene |

**Exhibit 2**

that night should have begun one." Concerned that he and PO Arlington had been "singled out." Observed SO strike all three subjects with a tire tool. (60980). Sgt. Norman called out "calmela". Policy did not require him to report it if a supervisor was present; called IA anonymously two days after the incident. (60977-60981). 9/26/89: asked to relate what was said by SO Lt. at shift meeting on day of incident – told "we needed to kick their [suspects] ass" (61032).

**Statement of T. Arrington** (Garrity form – do not want interview recorded; 9/20/89 (61033). Did not see incident; told later by other officers. Was concerned that no investigation was initiated; advised he did not make complaint; told Lt. he respected him for starting an investigation. Identified 13 officers involved in arrest. (61034-7). 9/26/89: recalled Lt. advising that if subjects were driving at you, then go ahead and shoot at the driver: "we needed to go out there and 'kick some ass." (61038)

**Statement of R. Adkins**: Garrity form -9/21/89, (61039). Brought tire tool to gain access to a locked door; did not need it, laid it on the roof of the subject vehicle. While struggling with suspect, "heard a dull thud;" felt a jerk in suspects as if his body had been hit but heard no outcry. Got suspect handcuffed, looked up and saw Lt. with a tire tool in his hand. (61040-1). 9/25: at briefing t. advised "if it meant getting tough with the thieves then that is what we will do; "if we had to "kick the shit out of them" then that's what we would do." (61042).

**Statement of Lt. Leon** (60959-60961) Page 1of statement (61215).  Lt. Leon took complaint from anonymous woman; reported that he advised DC of complaint and advised he was a good friend of SO (Serna) and that SO should know about allegations. SO called him and advised that after talking

**Exhibit 2**

to a reporter, he spoke to Officers Vanegas & Arrington who said they did witness something and would send them to IA.  Was able to record portion of conversations with anonymous caller (60965=60967).

**Statement of Sgt. David Norman**: Page 4 only; missing first three pages ("McBain made a comment about me "burning the Lt." (60982) Garrity form, 9/20/89 (61003). 9/26/89: Only partially heard opening statement by Lt. and responded to officers that they would not be investigated by the Lt. if they were involved in a shooting (61004=5); 9/20/89: acknowledged seeing Lt. swing a tire tool, striking a subject in the back – not sure if he was handcuffed, was not fighting aggressively Yelled "stop that" in Spanish. Did not report as Lt. is autocratic, well liked and supported by supervisors, and vindictive and was selected by the Chief to be on the disciplinary board; lastly, he is a good friend with the IA Lt. Did not note any substantial injury to subjects; assumed he knew what he was doing and was justified. (61006-61010); 9/28/89: Lt. advised that he would be losing two officers as one had made a complaint to IA and the other "opted to be on his side." Subsequently he called both officers into his office, after talking to a reporter, and they were sent to IA (61011-13).

**Statement of PO C. Quimbey** (9/28/89) 2-pages (60983-4); (9/21/89): Denies seeing any use of force by Lt.; saw tire iron, but did not know where it came from or where it went. Was paying attention to traffic. (60985-8). Garrity form, 9/21/89 (61212).

Statement of PO Isaac Hernandez (Garrity Form filled out) (60989): 9/22/89: **Saw Lt. Serna grab his subject in custody & handcuffed by the hair and kick him in the face.**  "I said something to the effect to leave him alone then I realized who it was and kept my mouth shut." One subject advised him he

**Exhibit 2**

was hit by a tire iron. At prior briefing: Lt Serna spoke to "dishing out our own justice… get word out to other car thieves that we don't fuck around." (60990-3) 9/29/89: Advising subject did not have anything in his hands when he was taken out of vehicle (60994-5). 9/25/89 (Garrity, 61202); Serna asked him about his subject: "Why isn't he bleeding, well I guess theres a lot of light." Took this as a joke (61203-5)

**Statement of PO Gomez** (Garrity form filled out (60996) 9/21/89: Denied seeing any excessive force) (60997-8) 9/28/89: saw tire iron (60999-61002)

**Sgt. Alfred Lowe**: 9/28/89 Garrity form (61014). Lt. Serna told him that he had broken a window with a tire iron. Other officers accused Vanegas of making an anonymous complaint to IA. Lt. asked him who was suspected of making the call. Told him that it was Venegas. After talking to a reporter, Lt. advised he was going to initiate a complaint "so that he could get it over with." (61015-20)

**Sgt. Jeff Latimer** 9/29/89 Garrity Form (do not request tape recording be made of interview) (61021). Asked about meeting where Sgt. Norman left as he was under a gag order. At meeting, Sgt. Lowe advised everything to be by the book because as a result of IA complaint other things had come out, to include hour long lunches, going home early from work, drinking alcohol off duty while driving city vehicles. (61022-3)

**Sgt. McBain:** Garrity – (Contract language not filled out; undated) (61024). Garrity 9/22/89 (61068). 9/29/89: RE: meeting called by Sgt. Lowe; "Lt requested that department procedures be adhered to b y the letter." (61025-6); 9/22/89: Lt. used tire iron to break window; does not believe he intentionally broke window. Heard from some of the officers present that one of the

**Exhibit 2**

subjects came out of their vehicle with a tire iron. Did not see Lt. use any force.  Subjects were a great threat to officers and everyone was very professional. **At no time observed Lt. strike anyone of the subjects with a tire iron as for the most part of the time he was with me on the right side of the vehicle and just supervising the scene**  (61069-72). 9/26/89: At debrief Lt. discussed when could use deadly force; should take down suspects hard and fast and use whatever force necessary to effect the arrest. I do remember thinking that there could be officers present that could take what he said the wrong way and think they could go out an abuse and violate civil rights…I realize it was more of a pep talk and hopefully no one would take it as a green light to act in such a manner. From the time I apprehended my subject to the time I checked with the other scene, I guess a lot could have happened. I did hear a couple of officers stating that Lt. Serna had abused some of the subjects both physically and with a tire iron. (61073-77).

**Captain Drollinger** (10/3/89, Garrity form at 61031) Order not to discuss case only. IA report contains summary of statement (61142-3); reported that 1-1.5 weeks after incident, Lt. Serna advised how he broke window of subject vehicle by accident with tire tool dropped by subject; Lt. failed to advise he had hit anyone with the tire iron during or after the arrest. Statement located at: 61213-4).

**PO A. Alcantar** (9/22/89 Garrity Statement (61043); 9/25/89 Garrity statement (61048).

**PO E. Wade** 9/25/89: Could not quote from Lt.'s debriefing other than getting impression he was aggravated with the large number of vehicle thefts and did not want suspects to be able to cross border (61044-5); 9/22/89: Did

**Exhibit 2**

not observe Lt. use force or excessive force. No outcry by suspects or complaint of injury. (61046-7).

**PO Calanche** 9/25/89:  Lt advised at briefing that if subjects attempt to run you over, you are justified in using deadly force; did not see any UOF by Lt. Serna.  (61049-51).

**PO L. Brown** 9/22/89 Garrity Form (61052). Did not see tire tool. No indication of observing UOF by Lt. (61053-4).

**PO K. Penoyer**, 9/22/89 Garrity form (61055). Arrived after the fact (61057) 9/25/89: no recollection of comments by Lt. at briefing. (61056).

**PO J. Woodall**, 9/21/89 Garrity Form (61058). Saw Lt. strike the driver of the subject vehicle on the back with a tire tool once or twice. Subject was lying face down at the time. Heard Sgt. Normal tell Lt. to calm down in Spanish. Went to Sgt. Norman and asked: "did you see that?" Norman replied "yes" and that he was the one who told the Lt. to stop.   (61059-61063) 9/28/89: Lt. told him to put in the report that the subject in the right rear vehicle dropped the tire tool and got back into his vehicle; Lt. stated he picked up the tire tool and took control over it. At debriefing, Lt. mentioned "Kicking their asses" and discussed need to shoot a driver if trying to run any of us down. (61064-5). 10/5/89: no aggressive moves by suspect, just tried to get away. None of the suspects had any weapon or tools in their hands; nor did any object fall out of the vehicle on my side. (61065-7).

**PO L. Portillo** (8/25/89) Garrity form (61206); Saw Serna swing tire iron and break out window. Saw Serna swinging tire iron repeatedly striking the subject 2-3 times on the back and shoulder area. Walked over to other

**Exhibit 2**

subjects and repeated the same actions using the tire iron, kicking and yelling to them in Spanish. Struck and kicked subjects laying on the ground and dropped the tire on the street leaving it in the middle of the street. Heard Norman yell: calm me la, Calm me la". (612070-61211)

**Subject Statements:**
**Miguel Angel Bustamante Noriega**: 9/20/89, Admitted attempted car theft; denied window was broken out; angry officer armed with a tire tool hit him in the back and left rib area. Officer hit and kicked him. Fractured rib; only one hit by the tire tool. Other suspects too afraid to make statements. Do not want to file a complaint. Will not seek medical attention until after gets out of custody.  (61027-9)

**Statement of Subject Officer, Lt Serna** (10/4/89): (Garrity Form, 9/21/89 (61228).  Admitted stating that "We need to kill one of these auto thieves…. we need to kick their ass, we will not violate anyone's civil rights but if they come out fighting or they resist arrest then take them down hard…These are inflammatory statements designed to keep the officers at their utmost in regards to physical safety." Broke out window to scare an arrestee into getting out a different door as there were more officers on the other side of the vehicle…as a diversion. **Denied using unnecessary force with tire tool:** Ran up to where officers fighting with a subject; still had the tire tool in my hand and hit him between the shoulder blades, more than once and was a contributing factor to him going down. **Admitted kicking subject in the butt as he was going down and after he fell; kicked him about three times in the butt. Admitted threatening another subject putting tire tool in his face and telling him he would personally kick his butt if he came back to steal cars again. Similar threat ("warning") to another subject.** Denied being "out of line": "I didn't think I was out of line in intimidating

**Exhibit 2**

<u>these thieves</u>." Even after being told to calm down by Norman, "went over to another subject that was next to a rock wall and did the same thing."
**Concluded by denying excessive force:** "After the subjects were in custody and under control, I did not hit them with the tire iron or kick them. It was however my conscious objective to intimate these subjects." Denied any of the subjects were injured. **Denied wrongdoing.: *I still did not believe I had done anything wrong.*" Admitted to plan which would have the appearance of a retaliatory transfer;** "I then contacted the Sgts. And advised them I had taken the necessary action and that after this incident was over that I would get rid of both officers (Vanegas & Airington) for continuously causing problems to the unit. "This squad had given me problems at every turn of the road…" [extensive description of problems by multiple officers – but no specific references to these two officers]. Also, claimed that order for everyone to follow rule book was not retaliatory.
**Denied excessive force**: "subject was fighting with the officers, …officers attempting to gain control..[subject] fending off officers…unknown if he had a weapon…or not…I hit him about two or three times but not as hard as I could have…" "<u>the force I used was necessary to effect the arrest and that the intimation was necessary to get a message across</u>…" **As far as the officers who feel squeamish at the site of violent confrontation, they indeed have an ax to grind when it comes down to my being involved; I believe I brought discipline to the unit where there was none and brought positive media attention to the department when it most needed it."**
(61078-61089).

IA Reports:
- Blood found on clothing of Noriega and put into evidence. (61030).

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | PO J. Solis |
| Case No. | CP 92-006 |
| Discovery Page No. | 62939- (45 pages) |
| Date of Incident | **12-23-91** |
| Date Reviewed | 9/28/22 |
| Allegation: | Perjury at Administrative Hearing |
| Facts underlying incident: | AC Messer Deposition 8/23/22; pp. 62-3, references case where an officer claimed he had a college degree but did not. And got a 10-day suspension.<br><br>On 12/23/91 you were participating in a Civil Service Commission hearing in which you were the grievant. Placed under oath; when asked about your educational background you stated you held a BA degree from USC and a MBA from University of Texas at El Paso. In a subsequent written statement you confirmed that you hold neither degree. (62946.)<br><br>Prior discipline to include 4-day suspension for accepting a gratuity from a city contractor (6/3/91); WR for failing to report alleged police misconduct (April 1987) (62947) |
| Findings | Sustained 3/6/92: 10-day suspension. (62942)<br>Notice of suspension (62942-46) |
| Investigative Issues: | **IA Report** (62959-61).<br>Statements of witnesses to testimony (DC Fluck; PO Vasquez; A. Avila, Asst. City Attorney; D. Hernandez, ACA (62961-5). |

**Exhibit 2**

| | Statement of PO Solis (SO). acknowledged have no degree. Acknowledged saying he had degrees under oath. (62966-7)<br>Asked: why did you state under oath you had such a degree?<br>A: I have no good reply to this question. It seemed prudent (sic) at the time."<br>Garrity form 2/3/92: do not request interview be recorded. (62974) |
|---|---|
| Other observations: | **No apparent substantive inquiry as to why lied under oath. Police officer willing to lie under oath in support of overturning 4-day suspension would normally seem to justify termination from the job of police officer.**<br>• See CITY 62959-62961 (summary); Compare to Messer's testimony, 62-63. 10-day suspension. |

**Exhibit 2**

| | |
|---|---|
| Involved Officer: | PO M. Tevis; PO Scouten (false report); F. Gonzalez (retaliation type threats); Gonzalez; Nicholas; Lerner; Tevis; Scouten; Rameriz (violation of Administrative Gag Order); C. Lerner; F. Ramirez; Tevis (perjury in sworn statement) |
| Case No. | CP 93-264 |
| Discovery Page No. | 64913 (267 pages) |
| Date of Incident | **6/7-9, 1993** |
| Date Reviewed | 9/30/2022 |
| Allegation: | False Report; Retaliation; Violation of Gag Order |
| Facts underlying incident: | Tevis sustained for instructing Officer Scouten to falsify the official police complaint report, by stating that the arrestee voluntarily removed the contents of his pockets and that is how the marijuana was located.  ... you told him to use "creative writing" to make the arrest look good. ..you then completed the official police complaint report, under Officer Scouten's ID number, and the sworn affidavit, in which you stated that "you" conducted the pat down and the subject voluntarily removed the items in his pockets. … You instructed your probationary officer…to conduct an illegal search and then to falsify an official police complaint report. You then falsified the complaint report, a sworn statement and a sworn official affidavit. ..you also disobeyed a lawfully direct order and spoke to other persons …in violation of a GAG order. (64918-9). |

**Exhibit 2**

| Findings | Tevis, Sustained. 30-day suspension. (65113)<br>Vacation in lieu of 10 of the suspension days approved (65114)<br>Notice of suspension (12/14/93) (65116-65122)<br><br>Referred to by Scagno as "a fairly significant punishment." Deposition, p. 72 (8/25/22)<br><br>**Not sustained 11/12/93**:  Lerner & Ramierz (AC Fluck overturning sustained recommendation by (Sgt. Guzman?) (64913) **No rationale provided for either sustained or not sustained recommendations and findings.**<br><br>**Gonzales sustained & 10-day suspension:**<br>Proposed Notice of Suspension: Gonzalez: 11/22/93. Specification: "On June 2, 1993, you met with several other officers from the Northeast Patrol Division and discussed how a fellow probationary officer, a rookie, had snitched on his senior Field Training Officer. You discussed with the other officers that the probationary officer was on his own, meaning he should not receive any back up." 10-day suspension. (65133-36).<br><br>Signed Notification of suspension form (12/3/93) (65171)<br>Signed by AC Fluck, 12/14/93. (65172)<br>Notice of suspension (65172-65179) |
| Investigative Issues: | IA Report (8/12/93) 65097-65112<br><br>Relevant false reports (64923-5). |

**Exhibit 2**

|  | Statement by Sg. Lopez: fresh complaint (although vague) by Scouten (64925). Later statement (6/7/93) explaining no indicate report "since it was so minor" and Scouten did not state that Tevis made him falsify the police report. (64931) |

Statement by Sg. Lopez: fresh complaint (although vague) by Scouten (64925). Later statement (6/7/93) explaining no indicate report "since it was so minor" and Scouten did not state that Tevis made him falsify the police report. (64931)

**Scouten letter of resignation, 10/5/93**
Scouten statement, 6/30/93. Alleging Sgt. Lopez knew he was reporting a false report; explaining did not violate gag order (64934-60

**Scouten statement, 6/8/93**: Alleged told Sgt. Lopez about false report and was told that he would talk to SO and, if there was a problem, he would get him a new FOT, because he was concerned about officer safety. (64942-4).
**Scouten statement**, 6/7/93: advising of circumstances of arrest and SO instructions to falsify reports. Alleging that SO told him "if I was to go to the brass I would get fired and that he would have to recommend that I was not fit for a officer." (64945-6)
**Scouten statement**  6/19/93, Mirandized statement  (64950-2).

**Tevis statement, 6/8/93:** Admitted report was false and that he suggested it be written that way to avoid evidence being suppressed due to an illegal search – agreed to write the report himself after probationer expressed concern.  **Minimized conduct**: "As far as the report which was made the only thing I changed was his name to my name on the affidavit. I felt I could do this because I did assist in the patt down." **Admitted attempted to dissuade him from going to a supervisor**: "he should try to work it out with me first since I was his FTO… going to a supervisor could possibly upset other people on the shift (not just my shift but others as well) …statement intended for constructive criticism…I never threatened him…" Later told him that "I felt that he burned me. I then told him that other people on the shift knew he went to the supervisor and that they did not appreciate that…." Did

**Exhibit 2**

assure him he would be backed up…never told him he wasn't fit for the job. "What he put in the report was on his own I only suggested that he put in the report that Mr. Macias gave him the bag. The only thing that was changed was his name to my name due to I assisted in the patt down." Denied Scouten being harassed by other officers.  (64937-41).

**Tevis statement,** 6/9/93: denying violation of gag order. Acknowledging discussing with PO Gonzalez who "mention[] something about an incident which occurred on Hayes where he allegedly said something about Officer Scouten being on his own." (64955-6)

**Tevis statement**, 8/6/93: re: PT allegation: claimed did not elaborate; denied her statement that he claimed there was a conspiracy against me – "I don't recall every saying anything about Scouten backstabbing me." (64953).

Statement of physical therapist (L. Molinar) noting violation of 7/6/93 gag order by SO and claim that "his rookie had backstabbed him." (64948-9). Supplemental Statement identifying who SO was talking to (FF) 11/12/93: (64959-60).

Statement of arrestee (64957-8).
Statement of witness to arrest (64985-6)

Det. Pierce, 6/17/93 reporting on conversation with probationer about "creative writing" (64979-80). Scouten was vague. 6/15/93, Scouten was attempting to get guidance on a report that "did not reflect the true sequence of events". If alteration of truth, needed to be brought to the attention of a supervisor. (64981-3)

**Exhibit 2**

<table>
<tr>
<td></td>
<td>

PO Fishell, 610/93: alleging Lt Adkin shifts as "the wolfpack." (64975-6)

Criminal investigation report of false report, Det. Rios (6/24/93  (65024-78)

<u>Hayes St. Incident:</u>
PO Plaza (female); multiple written statements: Heard Gonzalez tell Lerner and White that Tevis' rookie dropped a dime on him. Gonzales told them that "the rookie was on his own." 64967-74).
Statement of PO S. Plaza (husband): disclosing hearsay comment made by Gonzales in hearing of his wife. (64988-9).
PO White: did not hear anything about "Scouten dropping a dime on Officer Tevis or that Scouten was on his own." (64961)
PO Ramirez: did not hear Gonzalez say anything (64965)
PO Gonzales (2) statements denying culpability (6/9/93) (64991-4) acknowledging talking about who had gone to IA re: statement on Hayes street. 6/23/93 statement (64995) – knew nothing about false report. (6/7/93: denying threatening Scouten (64996-7).
Lerner statements denying alleged statements by Gozales: 64999-65001)
Additional statements denying alleged statements by Gonzales and discussion of referral to IA (65002-3)

IA-Garrity forms: 65143-65169 – some requesting tape recorded interviews; others not.

</td>
</tr>
<tr>
<td>Other observations:</td>
<td>

**What does it take to get fired from the EPPD?**
Violation goes to the essence of a police officer's job: these were actions inconsistent with the job of a police officer.
Although Tevis admitted his conduct, he minimized it and attempted to justify it and acknowledged attempting to dissuade Scouten from going to a

</td>
</tr>
</table>

**Exhibit 2**

| | supervisor and warning of possible consequences of his acts. Actual allegation by Scouten (no reason to disbelieve) that Tevis did threaten him with failing probation if he "went to the brass" on the issue. |
| | Note also false statements re: physical therapist allegations. |
| | Tevis also permitted to use 10 days of vacation to reduce 30-day suspension to 20-day suspension. |
| | **No documentation of investigation into harassment alleged by Scouten resulting in his resignation (64928) ("ridicule, derogatory comments, and …disrespect…"** |
| | **No documentation in file of rationale for not sustained findings against Lerner, Tevis & Ramirez for perjurious statement. (IA report vague – does not specifically identify what statements were alleged to be false.) (65097)** |
| | **No indication of any discipline against Gonzales for lying to Internal Affairs when he denied making comments for which he was sustained.** |
| | See Scagno at 71-73. |

**Exhibit 2**

**EL Paso PD Discipline Matrix (1998/1992)**

Discovery pp. 21397-21399 (1992)[1]

Section 3.03.004.F [A list of offenses and suggested penalties exists to assist all Supervisors when making recommendations for cases of employee misconduct. They are used as a general guide in recommending disciplinary action to assure like penalties for like offenses when all circumstances surrounding an alleged act of misconduct are taken into consideration. (1988 – discovery pages 21039-21043]

| CATEGORY OF OFFENSE | 1st OFFENSE | 2nd OFFENSE | 3rd OFFENSE |
|---|---|---|---|
| 1. Violation of any departmental rules, orders, regulation, or the laws of the State of Texas, including any violation of the City Code <u>which does not cause any harm or injury to a third party, or which does not result in damage to the property of another</u> (e.g., tardiness, failure to observe rules, failure to appear in Court, sick leave abuse, etc.) | Counseling to Reprimand (oral or written) | Written Reprimand to Suspension | Suspension to Termination |

---

[1] Matrix copied into CP 88-14 (pp. 41-42 & 90 (Discovery 44551-2).

**Exhibit 2**

| | | | |
|---|---|---|---|
| 2.  Violation of departmental rule 6, 7, 15, **16**, or 22 of the Departmental Procedures Manual [1992] | Written Reprimand Suspension | Suspension to Termination | Termination |
| 3.  Violation of any departmental rules, order or regulations, or the laws of the State of Texas, including violation of the City Code, <u>which causes a loss of or damage to the property of the third party</u>. | Written Reprimand to Termination | Suspension to Termination | Suspension to Termination |
| 4.  Violation of any departmental rules, order or regulations, or the laws of the State of Texas, including violation of the City Code, <u>which causes bodily injury to a third part</u> (e.g., excessive force, false arrest, etc.) | Suspension to Termination | Suspension to Termination | Termination |
| 5.  Violation of any departmental rules, order or regulations, or the laws of the State of Texas, including violation of the City Code, <u>regarding the use</u> | Suspension to Termination | Termination | |

**Exhibit 2**

| | | | |
|---|---|---|---|
| <u>of deadly force, which causes bodily injury to a third party.</u> | | | |
| 6. Violation of any departmental rules, order or regulations, or the laws of the State of Texas, including violation of the City Code, <u>regarding the use of deadly force which causes serious bodily injury or death</u> | 30-day Suspension to Termination | Termination | |

A Disciplinary Board is appointed biannually by the Chief of Police to review cases involving misconduct ensuring conformity to these guidelins. This table does not restrict the discretion of the Chief of Police. There is consideration into the employee past performance, history, and circumstances of the offense in deciding what type of discipline should be meted out in a particular case.

**Rule 6 [Dereliction of Duty] [21306] (1988)**

Dereliction of Duty on the part of any officer prejudicial to the proper performance of the functions of the department are causes for disciplinary action and will be punished according to the degree of the offense, the results brought about by the dereliction and the effort it has upon the discipline, good order, and best interests of the department. The following constitute violations of this section:

a. Failure to observe and give effect to policies and directive of the department.
b. Failure to obey orders or willful or repeated violation of any rule, regulation, or policy of the department.
c. Failure to make proper report of offenses investigated, observed, or reported.
d. Failure to deliver to the official departmental custodian any property found by, confiscated by or relinquished to, members of the department.
e. Failure to place evidence in its officially designated place for preservation and storage.
f. Sleeping on duty.

**Exhibit 2**

g. Neglect of duty.
h. Violation of any City Ordinance, Rule, Regulation or policy of the City Government, the Civil Service Commission or the El Paso Police Department.
i. Being absent without leave. This shall mean either failure to report for duty at the time and place of duty or assignment without proper authorization or leaving a place of duty or assignment without proper authority.

**Rule No. 7 (Major Violations) [21306-7] (1992)**

The following constitute major violations of the rules and it may be necessary for a supervisory officer to relieve from duty a subordinate officer for any of the following:

a. Being under the influence of or drinking intoxicants on duty, except as directed by a Supervisory Officer.
b. The use of intoxicants to the extent the user becomes involved in any incident which might bring discredit on the department.
c. Willful disobedience of any lawful order issued to him.
d. For unnecessary violence toward any person.
e. For disrespect shown towards a supervisor.
f. For indecent, profane or harsh language used in the performance of official duties.
g. For accepting a bribe: A bribe under this rule shall be defined as a gift, emolument, money, or thing of value, testimonial, privilege, appointment or personal advantage or the promise or solicitation of either bestowed or promised for the purpose of obtaining privileges or personal gain by the donor or other person.

**Rule 15 (Conduct Discrediting to Department) [21309] (1992)**

No member of the department shall conduct themselves in a manner which may bring discredit upon the individual or the Police Department. If committed by an employee, those acts will be taken cognizance of and action shall be taken according to the seriousness of the offense. Violations shall include, but are not limited to the following:

a. No form of gambling or card playing shall be permitted on property allotted to the use of the Police Department.
b. No officer shall engage in any illegal game of chance.
c. No member of this department shall borrow any money or accept gifts or favors from any person known or suspected to be violators of the law.
d. All employees shall obey the laws of the United States, the State of Texas and the City of El Paso.
e. Members shall so regulate their personal affairs so as not to bring justified unfavorable criticism from their neighbors or other citizens, or be involved personally in disturbances or police incidents to the discredit of the department.

**Exhibit 2**

**Rule No. 16 (Willful Misrepresentation Prohibited) [21310] (1992)**

No member of this Department shall willfully misrepresent any matter, sign any false statement or report, perjure themselves, or give false testimony before any Court, Grand Jury, Board, Commission, Official Hearing of departmental Hearing.

No Officer or Employee of this Department shall attempt to procure appointment, promotion or transfer in the department by means of willful misrepresentation.

No member of this department shall request the aid of any citizen to have him or her transferred within the department from one classification of work to another, nor to have him or her transferred from one assignment to another, nor shall he or she knowingly permit any petition or request to be circulated by citizens in his or her behalf requesting any such transfer or assignment or change in assignment. Should any member learn of such petition or request, the member will notify his or her Supervisory Officer as soon as possible.

**Rule No. 22 (Purchase or Acceptance of Gift from Prisoners) [21312] (1992)**

No member of this department shall purchase or accept as a gift any article whatsoever from any person then under arrest or police detention.

a.   No member of this department shall be concerned, either directly or indirectly, in any compromise or other arrangement between a person charged with or suspected of a criminal offense and the person who had suffered by their act with a view towards permitting such person to escape the penalty fo the law, except through official channels; nor shall the officer seek to obtain continuance or dismissal of any case in court out of friendship or obligation to the defendant.

b.   No member of the department shall recommend to anyone, other than to family members, the employment of any attorney or bondsman or suggest the name of any attorney or person to anyone for the purpose of advising such party as to any legal matter.

**Exhibit 2**

1992 Procedures Manual, Discovery p. 21704-21705:

Section 3.03.004 [General Reporting Procedures] (01/94)

The following selected violations and punitive measures are for sustained allegations and will not restrict the department from accessing discipline for other offenses. The actions listed are minimum punishments for a first offense and will be enhanced depending on any aggravating circumstances of an individual case, and/or the officers disciplinary history. The minimum punitive measures listed would not preclude any consideration of criminal charges.

| SUSTAINED OFFENSE | PUNITIVE ACTION (Minimum action to be taken) |
|---|---|
| **VIOLATION OF RULES AND REGULATIONS** | |
| Expired Extra Employment | Written Reprimand |
| Personal Conduct | 1 Day Suspension |
| Failure to File Extra Employment | 1 Day Suspension |
| Failure to File Family Violence | 1 Day Suspension |
| Sexual Harassment | 5 Day Suspension |
| Insubordination | 5 Day Suspension |
| Alcohol Abuse | 5 Day Suspension |
| Improper Tactics | 5 Day Suspension |
| Disobeying an Order | 5 Day Suspension |
| **Willful Misrepresentation of fact (Written Statement)** | **10 Day Suspension** |
| Unauthorized use of Force | 20 Day Suspension |
| Hit and Run Accident (Officer Subject of investigation) | 20 Day Suspension |
| D.W.I. | 30 Day Suspension |
| **Willful Misrepresentation of Fact (Sworn Testimony at Administrative or Criminal Hearing)** | **30 Day Suspension** |
| Theft (Officer subject of Investigation) | Termination |
| Drug Involvement (Officer Subject of Investigation) | Termination |

**Exhibit 2**