TO:          LOEVY & LOEVY

FROM:       Richard Rosenthal, J.D., PhD

SUBJECT:    Villegas v. City of El Paso
            Review of Defense Expert Report of Mr. Jeffrey Noble

DATE:        December 20, 2022

Introduction:

I have been asked to review and comment on a report prepared by Mr. Jeffrey Noble, dated December 10, 2022 (49 pages in length).

Noble points to various disciplinary files as evidence that the Department was effectively supervising and disciplining officers. My analysis, as detailed below, demonstrates that in many instances the Department's response to extremely serious violations was too lenient to send the message that gross misconduct would not be tolerated. I detail many instances below where the discipline imposed was insufficient to deter the officer and other members of the Department from repeating the misconduct. In this way, the Department signaled to its officers that even the most egregious misconduct will be tolerated by the department and will not lead to termination.

Paragraph 16 Review of Appellate Cases

In paragraph 16 of his report (pp. 16-33), Mr. Noble evaluates court decisions as they relate to cases identified in plaintiff's complaint which were identified as involving complaints of misconduct against El Paso Police Department (EPPD) officers. I was not asked to, and have not reviewed any of these cases, nor the appellate cases cited by Mr. Noble in his report.

I have noted, however, that the appellate decisions identified and quoted in Mr. Noble's report highlight the importance of the need for police officer credibility within the criminal justice system. Many of the cited appellate cases either specifically identify significant testimony provided by EPPD officers,[1] or document the need for appellate courts to defer to factual findings on credibility made by the trial courts.[2]

Highlights of History of Police Integrity in U.S. Policing:

In paragraphs 44 and 45 of his report, Mr. Noble highlights the importance of "Police Officer Truthfulness" which bears repeating here:

Noble Report: Para 44 (pp. 45-46):

> Police officers are required to be trustworthy, honest, and maintain the highest level of integrity. Police officers are held to a higher standard than nonpolice as they represent the

---

[1] See, for example, Noble Report at paragraphs 16.b.2, 16.g.1, 16.k.1, 16.m.2, 16.p.2, 3 & 4, 16.s.1-3.
[2] See, for example, Noble Report at paragraphs 16.k.2, 16.l.1, 16.p.4, 16.u.2.

**Exhibit 3**

government as agents of the law and the criminal justice system. Police officers who engage in intentional, malicious, deceptive action in a formal setting such as during a criminal or administrative investigation will permanently destroy an officer's credibility. Indeed, under Brady v. Maryland, and the cases that followed, evidence of a police officer's untruthfulness is deemed exculpatory evidence and police departments must provide this information to prosecutors anytime the subject officer is a witness in a criminal matter. Because an officer who engages in intentional, malicious, deceptive misconduct lacks the credibility to testify in court, an essential job function, there is no alternative in an employment context other than termination or permanent removal from any possible activity that requires a reliable truthful person. (Citing See e.g., Noble, J., and G. Alpert, Lies, True Lies and Conscious Deception: Police Officers and the Truth. Police Quarterly, Volume 12, Number 2 (June 2009) and Noble, J., Police Officer Truthfulness and the Brady Decision, Police Chief Magazine (October 2003). (Emphasis added).

Noble Report, paragraph 45 (p. 46).

The importance of police officer honesty cannot be overstated. Every person involved in the criminal justice system relies on police honesty: police officers rely on the validity of information provided to them by fellow officers; supervisors render decisions based on information received from officers; citizens are urged to communicate and cooperate with law enforcement officials, if they trust and respect police officers the ability to garner public support will be enhanced; prosecutors rely on honest reports, statements, and affidavits when prosecuting criminals; judges rely on honesty when evaluating warrants, and jurors determine guilt or innocence and often liability based on an officer's investigation and testimony. As a matter of public policy, a police officer who is intentionally, maliciously, deceitful about a material matter connected to their profession must be terminated from their position as they are no longer useful as a law enforcement officer and bring harm the community. (Emphasis added).

Mr. Noble then goes on to represent that the termination of police officers for perjury and misrepresentation of material facts did not become a "general police practice" until after 2000.[3]

This is even though by 1956, U.S. police agencies were clearly aware of the importance of integrity with respect to policing in America. For example, in 1956, the Peace Officer's Research Association of California adopted the "Law Enforcement Code of Ethics[4] (which was subsequently adopted by the International Association of Chiefs' of Police in October 1957).[5]

**Law enforcement code of ethics:**

As a Law Enforcement Officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression

---

[3] See Noble Report at paragraphs 46 & 47.
[4] All Answers ltd, 'Law Enforcement Code of Ethics for Police Officers' (Lawteacher.net, December 2022) <https://www.lawteacher.net/free-law-essays/criminology/ethics-of-police-officers.php?vref=1> accessed 13 December 2022.
[5] Law Enforcement Code of Ethics (https://www.theiacp.org/resources/law-enforcement-code-of-ethics)

**Exhibit 3**

or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all men to liberty, equality, and justice. I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. <u>Honest in thought and deed in both my personal and official life</u>, I will be exemplary in obeying the laws of the land and the regulations of my department.

Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities. <u>I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service</u>. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession."[6] (Emphasis added).[7]

In addition, the U.S. Supreme Court case, cited by Mr. Noble in paragraph 44 of his report, *Brady v. Maryland*, was decided in 1963.[8] As such, in 1993, the year Daniel Villegas was arrested, police executives were fully aware of the importance of ensuring integrity amongst their officers and the consequences of having officers in their employ who were untruthful and willing to engage in unconstitutional or unlawful policing.

And this is where Mr. Noble misses the point. The issue is not when it became common for police agencies to terminate officers for integrity-related violations; the issue here is whether the El Paso Police Department command staff indifferently failed to sufficiently investigate, discipline, and prevent integrity violations by its officers. Even if departments outside of El Paso were similarly deficient, the deficiencies of those departments do not change whether El Paso failed to hold its officers accountable for integrity-related misconduct.

<u>Noble Report, Paragraph 18: Asserting that "There is Evidence That Between 1985-1993 the El Paso Police Department Conducted Reasonable Administrative Investigations and Held Officers Accountable for Their Policy Violations":</u>

In his report, Mr. Noble, asserts that "there is evidence that…the [EPPD] conducted reasonable administrative investigations and held officers accountable for their policy violations." In support of that assertion, Mr. Noble identifies specific cases claiming to support that assertion with respect to varying categories of alleged misconduct. Mr. Noble's sparse analysis of these cases ignores the substantial deficiencies in the EPPD's investigations of misconduct. A closer look

---

[6] See, Law Enforcement Code of Ethics (https://www.theiacp.org/resources/law-enforcement-code-of-ethics).
[7] See, *id.*
[8] Brady v. Maryland, 373 U.S. 83 (1963)

**Exhibit 3**

shows that the EPPD failed to demonstrate concern for officer integrity and failed to incentivize El Paso police officers to tell the truth.

<u>Paragraph 18a: Concluding that "Officers were investigated and disciplined for their failure to properly book evidence items:"</u>

Mr. Noble cites four cases for the above-noted assertion. However, in one case (CP 93-049) the one-day suspension issued by the Chief was, in fact, overturned by a Civil Service hearing officer who found that the officer was actually following an existing department practice (Def City 61893). With respect to a second cited case cited (CP 90-214), wherein an officer received a two-day suspension for failure to process a handgun in homicide case; in addition to failing to process the evidence, the officer provided inaccurate information to a detective stating that the gun had, in fact, been processed for fingerprints and none had been found; although the officer did request and obtain a transfer from homicide (Def City 62666-62667), no rationale was provided in the case documenting how that information impacted the decision to impose the two-day suspension. In a third case (CP 90-089), the Chief noted that the officer engaged in a "dereliction" of duty that made it impossible to prosecute the case he had been assigned to investigate. Even more significantly, the Chief concluded that, contrary to the officer's claims otherwise (Def City 76501), "[i]t is my opinion that he had no intention of tagging the property in since he called in the report rather than type it out and turn in the property" (Def City 76479). Even though the Chief believed that the officer was not credible in his statement to Internal Affairs, he imposed only a three-day suspension; and the officer was permitted to use vacation days in lieu of suspension without pay (Def City 76481).

<u>Paragraph 18b: Relating to "conducting a poor investigation:"</u>

In support of the conclusion that the El Paso Police Department conducted reasonable investigations and held its officers to account for misconduct, Mr. Noble cited only one case (CP 90-089) which, as indicated above, involved an officer who lacked credibility who was able to simply forfeit paid vacation days in lieu of a suspension without pay.

<u>Paragraph 18.c: Relating to "allegations of physical and verbal abuse to their prisoners and uses of force:"</u>

In support of the conclusion that the EPPD conducted reasonable investigations and held its officers accountable for misconduct relating to allegations of physical and verbal abuse and excessive force, Mr. Noble cites ten Internal Affairs cases. A closer review of those cases, however, shows reason to believe that the EPPD's practices, in that regard, were far from reasonable.

- IA 89-056: Involved a "not sustained" allegation of excessive force with no rationale provided for the Chief's findings; three civilian witnesses alleged an officer threatened to break the complainant's previously broken wrist; an allegation the subject officer denied.
- IA 89-058: Involved a juvenile complaint of physical abuse; The involved officers denied allegations of excessive force and unprofessional comments. No rationale for the findings was provided other than following comment: "Counseling ordered for all officers: …Due

**Exhibit 3**

to [] physical confrontation [with juvenile], subject should have been taken home by officers and explanation to parents" (Def City 68877). A letter to the complainant falsely advised that "our investigation has sustained the allegations against [4] officers. The appropriate discipline has been taken" (Def City 68881). In fact, the allegation that was made (physical abuse) was not sustained and the complainant's guardian was led to believe otherwise.

- IA 90-080: Complainant claimed force was used to elicit a confession. The allegation was not sustained with only a conclusory rationale provided: "Evidence and witness statements do not support the allegations nor negate the possibility that injuries could have been self-inflicted after incarceration."

- IA 90-097: Complaint of physical abuse. The case was referred to a Disciplinary Board after Internal Affairs made the following finding: "During the course of the initial investigation of physical abuse, against [subject] Sergeant [], it was discovered that he may have been derelict in his duties by the manner in which he handled the traffic stop and consequent charges against the operator of the vehicle. It is also alleged that [the] Sergeant [] intentionally misrepresented the facts in his administrative statement which he provided for the Internal Affairs Division" (Def City 72266). All allegations were ultimately "not sustained" with no rationale provided, although there did appear to be some dissenting opinions: "All five issues – not sustained." (Chair of Disciplinary Board) (Def City 72265).

- IA 88-086: One officer was sustained for excessive force with the following finding: "Five-day suspension…. Officer [] past record on excessive and physical abuse complaints is unacceptable. If this officer wishes to continue working, he is going to have to do something about these complaints.  Whether or not stress management will help is unknown to me." (Captain/Acting DC) (Def City 78213).  The actual suspension was for only three days (accompanied an order to attend stress management class). According to the Department's discipline letter: "An investigation revealed that unnecessary force was used during the arrest of [] when you, after taking him to the ground grabbed his hair and slammed his head down on the pavement … On the basis of the foregoing and your personnel file which reveals that you have been disciplined for similar incidents, you are suspended for three days…" (Def City 78219, 78220). Discipline was ultimately upheld by a Civil Service hearing officer. Although the subject officer's disciplinary records were not included in file (even though most other cases with sustained findings included such records), the discipline seems lenient given the subject officer's "past record on excessive and physical abuse complaints."

- IA 92-050: Excessive force complaint. One subject officer was sustained for excessive force with ten-day suspension and "not sustained" for verbal abuse. Two other officers were "not sustained" on all allegations (Def City 79144). The Department found that the complainant was struck while he was bent over a car with his arms pinned. The Department noted that the complainant was struck with enough force that the officer broke a bone in his hand (Def City 79165). The discipline letter states as follows: "…During your attempt to obtain proper identification from the four subjects, Mr. [] became uncooperative and a struggle ensued between he and your partner. During this

**Exhibit 3**

struggle you, by your own admission, you used your "right fist to hammerstrike [sic] his face area. Your actions were unnecessary and unreasonable in this situation" (Def City 79159). The officer's appeal was ultimately denied (Def City 79167). Although a Personnel Incident Report showed a "sustained" finding for lying on an administrative statement (Def City 79144) [in his statement to Internal Affairs, the officer stated that the complainant was facing him when he struck the complainant in the head] (Def City 79148), that allegation is not found in the discipline letter (Def City 79159). The file contains no explanation as to what happened to this sustained charge.

- IA 85-157: Investigative failures include: 1) a failure to document any follow-up questioning with a subject officer as to whether he saw any injuries to the suspect before and after he left the interview room; 2) no photos were taken of the office walls; 3) there was no documentation of interviews other than sworn witness statements; 4) documentation that subject officers "did not" want their Internal Affairs interviews recorded; and 5) a failure to address a Prisoner Log that showed the complainant out of his cell for longer than asserted by the subject officers.
- CP 92-205: No indication of any follow up on a subject officer for testifying contrary to his initial reports.
- IA 89-070: Sustained findings and a Written Reprimand even though the subject and witness officers claimed there was no misconduct, no verbal abuse, and no striking. No action was taken against either the subject or witness officer for potentially false claims of no striking and no misconduct. All civilian witnesses, including a neighbor (who called police against the CO), alleged some form of striking.
- IA 92-174: Heavy suspensions for two Sergeants for juvenile policy violations, but other suspensions did not appear to take into account false statements made by other subject officers. No findings were made against four subject officers for juvenile policy violations. No finding was made for the initial complaint or an allegation of using a City vehicle for personal reasons. No suspension letters were in the file. No specific indication of what specifications were sustained and what the findings were. The file was missing all witness statements; as such, it is impossible to determine reasonableness of Internal Affairs comments with respect to highlighted discrepancies in witness statements.

Paragraph 18.d: Relating to "evidence that officers would report their fellow officers for misconduct, including physical abuse, and including their superior officers:

According to Mr. Noble, "the department not only investigated and sustained these allegations, but they also held supervisors accountable for their failure to report the misconduct" (citing, CP 89-194).

In CP 89-194, however, a Lieutenant was sustained for beating auto theft suspects in front of other officers. A review of the case file, however, identified multiple issues and concerns with respect to the conduct of the investigation and the ultimate findings:

- Internal Affairs allegations against the Lieutenant included excessive force and verbal abuse; failure to properly secure evidence; intimidation of subordinates; and retaliation. There was no allegation of lying, however, even though there were significant

**Exhibit 3**

inconsistencies in the evidence between the subject officer's statements and other evidence (including statements of officers regarding the use of force when arrestees were not resistant, and an arrestee allegedly being armed with a tire tool).

- No documented attempt by Internal Affairs to evaluate if any of the witness officers observed the force used by the subject Lieutenant, but failed to disclose it to Internal Affairs.
- The suspension letter and supporting documentation was not in the file.
- No finding for intimidation of suspects.
- No finding for untruthfulness.
- No finding for appearance of retaliation against reporting witness officer; subject Lieutenant failed to seek supervisorial involvement in deciding to transfer informing officers or order them to "work to rules."
- Suspension for six months and stress management might have been reasonable if the subject Lieutenant had not lied and messaged retaliation against officers who reported him to Internal Affairs. The Lieutenant was not demoted or terminated. No consideration appeared to be given to his false statements nor the appearance of an attempt to retaliate. No rationale was provided for the failure to terminate or demote.
- A failure on the part of the Chief to demote the Lieutenant, instead limiting potential assignments of informing officers to any unit supervised by the subject Lieutenant.
- No documentation of debriefings with Tactical Section officers regarding code of silence issues and the need to avoid retaliation against cooperating officers.

<u>Paragraph 18 e.: "Officers were investigated and disciplined for their failure to collect evidence items at a crime scene:"</u>

Mr. Noble cites one case (CP 91-156) in support of this proposition. In that case, a five-day suspension was imposed and the officer was transferred out of ID&R for two separate acts of misconduct: 1) failing to seize evidence at scene (shell casings) of a shooting (Def City 62548); and, on a separate occasion, failing to process suspects as requested by a Detective (Def City 62578; 62556). The officer was permitted to take vacations days in lieu of a suspension without pay (Def City 62551). In his statement, the subject officer claimed that officers in incident #1 did not tell him that the shell cases he declined to collect were located where the suspects were parked (Def City 62574); in another statement, the subject officer claimed that test equipment was unavailable to him, which was not true (Def City 62587-8). No action or follow-up appeared to have been taken relating to these inconsistencies.

<u>Paragraph 18.f.: "Officers were investigated and disciplined for untruthful statements:"</u>

Mr. Noble cites five case in support of this proposition. A close review of the cited Internal Affairs cases, purportedly reviewed by Mr. Noble, however, paints a very different picture:

- CP 91-262 (Def City 62761-62902): This case involved a probationary officer signing a false sworn affidavit. Instead of being terminated as an at-will probationary employee, the officer received a ten-day suspension. A more senior officer, who actually prepared the false affidavit and counseled the probationer to sign it under penalty of perjury,

Exhibit 3

received the same level of discipline.[9] In addition, the senior officer had admitted to having committed similar conduct in the past and alleged that other officers had done so as well (Def City 62823). Although the senior officer advised Internal Affairs that other officers had committed similar violations in the past, that fact was intentionally omitted from his discipline letter (City 62787; 62846).

- IA 90-097: [previously discussed, paragraph 18c.] Complaint of physical abuse where a Disciplinary Board issued "not sustained" findings without any rationale being provided.

- CP 92-006: Involved an officer who testified falsely at an administrative hearing and who received a ten-day suspension for the easily provable violation of intentionally testifying falsely under oath. There was no documented substantive inquiry as to why the officer lied under oath when there was no apparent need to do so. Further, the officer received only a ten-day suspension for lying in an attempt to overturn a 4-day suspension.

- CP 93-009: Involving a Sergeant who was sustained for dereliction of duty (violations of EPPD policies relating to the handling of juvenile detainees), and suspended for twenty-days, with such suspension being reduced to four-days prior to arbitration.
  - o Sustained specifications were changed prior to arbitration, identifying only one instance where a policy violation took place, instead of multiple instances; the amended specification suggests that the Chief's initial decision was not appropriately evidence-based.
  - o Sustained finding for lying was dismissed prior to arbitration even though the subject officer specifically denied the allegation for which he was sustained.
  - o A four-day suspension imposed, even though subject officer had previously received a ten-day suspension for a similar violation.
  - o A witness officer asserted to Internal Affairs that following the policy of not speaking to juveniles without a parent's permission negatively impacted the solvability of cases – there was no documented action on this statement even though it appeared to have identified a systemic issue that needed to be addressed outside of this specific Internal Affairs case investigation.

- CP 93-264: Involving a Field Training Officer (FTO) who instructed a probationer to lie in a police report, to include allegations of retaliation and violation of an administrative gag order.
  - o The FTO received a thirty-day suspension even though he minimized his conduct and attempted to dissuade the probationer from reporting his actions to a supervisor.
  - o The probationer ended up resigning from EPPD asserting that after he reported the misconduct he was subjected to "ridicule, derogatory comments, and … disrespect." No documentation of any follow-up to these allegations or retaliation and harassment could be found.
  - o "Not sustained" findings were made against three officers for making perjurious statements – the Internal Affairs report was vague and did not specifically identify what statements were alleged to be false.

---

[9] Although the senior officer was permitted to forfeit 5 vacation days in lieu of suspension days. (Def City 62849).

**Exhibit 3**

- o No rationale was provided for the findings.
- o The was no indication of any discipline against one subject officer for lying to Internal Affairs when he denied making comments for which he was sustained.

Paragraph 18 g: "Investigations were conducted based on a lawsuit complaint:"

Mr. Noble cited only one case in support of this general proposition.

CP 92-059.: Two officers (a Detective and his Sergeant) received three-day suspensions for failure to follow necessary procedures to ensure the validity of search warrant (failing to obtain current information tying the suspect to the location being searched). Although the complaint does appear to have been initiated as a result of a civil claim filed with the City (Def City 63310), there were no actual findings made on the allegations made in the civil claim.

The sustained specification read: "You received information from a [CI] that subject [] was in possession of cocaine and that he resided at []. You also received information that [subject] stored cocaine at [same address, different unit]. You obtained search warrants based on that information. Search warrants were executed on 2/15/92, but no contraband was found at either residence. It was later learned that subject [] had not resided at the above-cited address for some time. You were derelict in the performance of your duties by not verifying the information that you received from your [CI], specifically, you did not conduct a utilities check and ID & R check, nor any surveillance, prior to obtaining the search warrants" (Def City 63320).

There were no findings made for the allegations reportedly made in the civil claim (which was not in the file) that officers destroyed property during the execution of the search warrant and that officers physically abused complainants (Def City 63308; 63312-3).

Paragraph 18.h. "Officers were investigated and disciplined for failing to follow the law."

In the one case cited by Mr. Noble in support of this finding, however (IA 92-019), the Department failed to address issues of untruthfulness (officer was sustained for failing to identify himself as a police officer contrary to his prior statement to a witness officer) and a Written Reprimand was given to the officer even though he was sustained for multiple violations, to include: improper detention, failure to identify as a police officer and unnecessary force.

Paragraph 18.i.: "Officer[s] were investigated and disciplined for unprofessional conduct like the use of profanity and rudeness."

Mr. Noble cites two cases in support of this proposition.

In IA 90-183, however,

- The officer initially received a two-day suspension for use of profanity and for unnecessarily engaging a crowd of students. The discipline was reduced to a Written Reprimand after arbitration.
- There was no apparent adjudication relating to the officer's arrest of multiple innocent parties who were merely present. There was no discussion of the need for an officer to try to identify violators versus witnesses.

**Exhibit 3**

In IA 89-013,

- A Written Reprimand was issued for discourteous conduct: "you were abrasive, short tempered and very unprofessional in your demeanor…" (Def City 78111). A handwritten letter from Chief Messer to the subject officer read as follows: "Officer [] I don't know what your problem is but I do know that you are rapidly reaching the point where your job is in jeopardy. Your IA record is one of the worst, if not the worst, in the Department. Everyone has personal problems and that cannot be used as continual justification. You had <u>better</u> make a sincere effort to mend your ways and change your attitude." (Def City 78105).
- However, there was no documentation of the officer's IA record or disciplinary record in file that would have justified a Written Reprimand as opposed to a suspension without pay.

Paragraph 18 j: "Criminal violations:"

In support of his conclusion that the EPPD appropriately disciplined officers for criminal violations, Mr. Noble cites to only one case:

CP 91-053 involved an officer who resigned "in lieu of termination" after having been arrested for committing theft (fraudulently returning stolen goods to a department store for cash refunds on six occasions, for a loss totaling $1,242.74) (Def City 76534; 76584). Five out of six thefts were committed while on duty, four out of six while in uniform; and two with co-conspirators present (Def City 76592).

A search warrant seized an additional fifteen boxes of stolen merchandise and twenty-five pieces of stolen gold jewelry (Def City 76594). Evidence of burglary was seized in the form of a manhole cover that was likely used in some of the thefts (Def City 76595).

Simply put, there was sufficient evidence that the officer had committed multiple felony acts (burglary) which would have required the Department to terminate the officer notwithstanding any policies or practices implemented by the Department.

Noble Report, Paragraphs 19 through 24:

Based on affidavits prepared by members of the EPPD command staff and prosecutors as summarized in paragraphs 19 through 24, Mr. Noble concludes in paragraph 26 as follows: "There is no evidence that the El Paso Police Department turned a blind eye, or acted with deliberate indifference, toward accepting complaints of officer misconduct, conducting reasonable administrative investigations or imposing reasonable disciplinary actions when warranted, that would cause a reasonable police officer to believe that he or she could violate the constitutional rights of another with impunity."

What is ignored in Mr. Noble's report, however, is the failure of the EPPD's Internal Affairs process to address issues of integrity, as indicated in my prior report, dated October 28, 2022.[10]

---

[10] Wherein I made the following findings:

**Exhibit 3**

In fact, there are parallels between the circumstances underlying the LAPD Rampart Scandal (1999) and the affidavits and defenses proffered by EPPD Command Staff and El Paso County prosecutors. Ultimately, police misconduct in the Rampart Scandal was attributable not only to lax supervision of officers, but also to a culture wherein arrests (or in the case of El Paso, clearance rates) were emphasized over and above Constitutional policing.[11] In the case of the El Paso Police Department, multiple instances have been identified wherein officers were allowed to lie with impunity with no questions asked and no discipline imposed.[12] Under these circumstances, the way the system was operated virtually ensured plausible deniability on the part of Department command staff and prosecutors.

Command-level staff of the El Paso Police Department frequently reviewed disciplinary files but chose not to ask questions or conduct investigations even when faced with compelling evidence of integrity violations and other police misconduct, as I have detailed in my initial report and this report. The need to investigate further was obvious. The affidavits that Mr. Noble relies on—to the extent that they truly reflect the sum of the affiants' knowledge of misconduct—are consistent with the decision of EPPD command staff to ignore obvious violations and bury their heads in the sand.

---

Finding No. 3: In those cases where there was potential dishonesty on the part of a subject-defendant officer, follow-up questions were not asked and no follow-up investigation took place (n=10). In general, there appeared to be no interest on the part of the Department to hold its officers accountable for false statements made during the course of its investigations. In addition, the department failed to impose serious discipline on any of the subject officers, even when there was clear evidence that the subject officers were deceptive over the course of an investigation.
Finding No. 6: The personnel files and performance evaluations of the defendant-officers contained many references to their ability to obtain confessions from suspects and an extremely high clearance rate for homicides. Given the allegations in the civil complaint, there is reason to believe that the Department over-emphasized homicide clearance rates and encouraged aggressive interrogation techniques, without sufficient emphasis on the need to engage in constitutional activities when engaging in these activities.
[11] See, for e.g., Chemerinksy (2001). An Independent Analysis of the Los Angeles Police Department's Board of Inquiry Report on the Rampart Scandal. Located at: An Independant Analysis of the Los Angeles Police Department's Board of Inquiry Report on the Rampart Scandal (https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1662&context=faculty_scholarship).
[12] See, for example: Cases involving defendant-officers where officers were not held accountable for integrity-related violations by the EPPD. [Marquez]: Marquez was alleged to have committed "aggravated perjury" when testifying at a motion to suppress regarding a confession he obtained in a homicide case. Marquez was "not sustained" for the allegation even though there was significant evidence that he, at minimum, provided inaccurate information under oath regarding the circumstances under which he took the confession (IA 84- 079); Marquez was alleged by his Captain to have lied to him and during a follow-up IA investigation. Marquez received a 15-day suspension for filing an inaccurate expense sheet – the same discipline received by his partner officer who was not deceptive the investigation (CP 88-14); Marquez involved in an incident involving rudeness and unauthorized transport of a civilian in his police vehicle. No investigation or findings regarding false statements made during the investigation (CP 92-296); Marquez was found to have 11 unpaid parking tickets after parking illegally and leaving his badge and gun inside an unoccupied vehicle. No inquiry was conducted into his questionable claim that he was not aware of the outstanding parking tickets (CP 93- 019); Marquez and another officer failed to notify next of kin in a death investigation – Written Reprimand issued; The Department failed to investigate inconsistencies regarding whether fingerprints were requested (CP 92-358). [Arbogast]: Written Reprimand for damage to city property (a key ring) and Insubordination. Concerns re: untruthfulness not addressed (CP 82-300); Arbogast counselled for unprofessional conduct; issues re: untruthfulness not addressed (IA 85-26). [Graves]: Graves (recent academy graduate) make statements contrary to those of Santa Fe RR police regarding his interference with a search of his in-law's residence (IA 85-197); Practical joke on female officer gone bad; coverup involving Officer Graves. (CP 86-131).

---

**Exhibit 3**

Noble Report, Paragraph 48 & 49 (pp. 46-47) : Marquez 1987 Discipline :

Particularly troubling is Mr. Noble's finding that when Detective Marquez was suspended for fifteen days for submitting a false travel expense and lying to a supervisor in 1987, that "at the time that Marquez was disciplined [], the discipline was appropriate and reasonable." Mr. Noble then went on to suggest that by imposing the fifteen-day suspension "[t]he department sent a strong message with imposing a significant suspension that was overturned by an arbitrator who was outside the control if [sic] the city." In his conclusion, Mr. Noble falls into a trap common amongst some police executives: suggesting that police chiefs are at the mercy of unreasonable arbitrators "outside of the control of the city" who arbitrarily overturn discipline imposed by well-meaning Chiefs, who are attempting to maintain discipline and order in their department.

In this case, however, the Chief improperly imposed a fifteen-day suspension on Detective Marquez, the same discipline imposed on his partner, ignoring that unlike Detective Marquez, his partner did not lie or attempt to cover up the incident. Instead of taking issue with Detective Marquez lying to his supervisor and then lying to Internal Affairs when he denied lying to his supervisor, the Chief attempted to impose serious discipline for what was otherwise merely an inaccurate report and attempted to compare the case to a more egregious past case. The Chief's decision was appropriately overturned by the arbitrator, whose role was not to then impose discipline as would have been appropriate for the integrity-related violations that went unidentified and unaddressed by the Chief.

As such, the only "message" sent by the Chief to his officers (and to defendant-Marquez directly) was that an officer could lie to a supervisor with impunity and not only not face termination, but successfully appeal any substantial discipline actually imposed by the Chief.

Noble Report, paragraph 50 (p. 47), asserting EPPD officers received "meaningful disciplinary actions" and "would report fellow officers for engaging in misconduct:"

In paragraph 50 of his report, Mr. Noble asserts that "there is evidence that the El Paso Police Department took allegations of untruthfulness seriously and that officer did receive meaningful disciplinary actions and that officers would report fellow officers for engaging in misconduct." In support of that conclusions, he provided a number of examples:

*Example a: "In 1993, officers were given 30-day suspensions for instructing a new officer to claim a suspect voluntarily gave him some marijuana rather than admit the marijuana was located during a pat down search and for violating a gag order that prevent them from discussing the matter causing the reporting officer to believe officers would not follow him up on calls for reporting the misconduct."*

As indicated above (referencing Noble Report, paragraph 18.f), this case (CP 93-264) actually identified serious flaws in the EPPD's ability to police itself. In the end, the probationer who reported misconduct on the part of his FTO resigned after reporting that he had been subjected to "ridicule, derogatory comments, and … disrespect." There is no known documentation that the Department ever follow up on those allegations and the implication is that the EPPD supported a culture where the whistleblower was harassed and the violator was able to continue his work as a

**Exhibit 3**

police officer. Further a subject officer appeared to have lied with impunity to Internal Affairs, with no action having been taken by the Department.

*Example b: "An officer reported his lieutenant for excessive force. The lieutenant was suspended for 88 days and a sergeant for failed to report the misconduct was also suspended."*

As also indicated above (referencing Noble Report, paragraph 18.d), this case also identified serious problems with the EPPD's accountability system. In CP 89-194, the subject Lieutenant was allowed to retain his command rank even though there were significant inconsistencies between the subject officer's statements and other evidence, he attempted to retaliate against officers under his command, and there were no findings made for admitted intimidation of suspects. Instead of demoting the Lieutenant, the then-Chief testified that when he retired, he left a letter for the next Chief advising that the informing officers should not be assigned to serve under the subject Lieutenant in the future (Scagno deposition, pp. 82-88). That instruction actually appeared to acknowledge that the Chief believed there was potential for retaliation by the subject Lieutenant. Instead of punished the Lieutenant for his bad behaviour, the informing officers were the ones who found their assignment opportunities limited depending on the Lieutenant's assignment. Further, although the subject Lieutenant was reportedly suspended for six months (132 working days), documentation in the IA file indicated that the suspension was actually reduced (for unstated reasons) to 88 days (see DEF City 61217).

*Example c: "An officer untruthfully claimed he had a BA and a Master's degree during an administrative hearing and he was suspended for 10 days."*

Also, as previously noted (referencing Noble Report, paragraph 18.f), in CP 92-006, there was no documented substantive inquiry as to why the officer lied under oath when there was no apparent need to do so. Further, the officer received only a ten-day suspension for lying in an attempt to overturn a four-day suspension.

*Example d: "An officer denied he entered a residence and later retracted his statement and admitted that he and another officer did make entry. The officer was given a 13- day suspension."*

The case referred to is CP 94-200 and, actually involved misconduct on the part of two officers who entered a residence on June 22, 1994, pursuant to an arrest warrant when the resident was not present. Both officers repeatedly lied, "adamantly" denying they ever made entry into the residence, even though the entry was witnessed by "several independent witnesses." The officers, one with about 2.5 years of service (start date of 11/24/91) and, his partner, with less than one year of service (start date 8/13/93), both received 13-day suspensions for "willful misrepresentation of the facts," "failure to document entry in report," and "failure to advise supervisor of entry" (Def City 57859; 57853; 578490).

The "senior" officer lied in multiple interviews, written and sworn statements, to include: on July 11, 1994 (Def City 57754), July 13, 1994 [signed Miranda statement] (Def City 57704), August 25, 1994, in an IA interview that he requested not be recorded (Def City 57705; 57844), September 6, 1994, in a supplemental sworn statement affirming his prior statements (Def City

**Exhibit 3**

57706), and on October 6, 1994, in a sworn, written statement (Def City 57707). It was not until November 16, 1994, that the officer corrected his false statement, suggested he just needed "to clarify some facts that were possibly misrepresented" (Def City 55708).

The junior officer also repeatedly lied in interviews and written and sworn statements, to include: on July 11, 1994 (Def City 57709-10), August 18, 1994, in an IA interview he requested not be recorded (Def City 57711; 57847) and on October 10, 1994, when he explained why a report was not prepared and inferred no entry was made (Def City 57713). It was not until November 16, 1994, that this officer also admitted his falsehoods stating he wanted "to correct an error in a past statement (Def City 57714).

The file contained no documentation to show how the officers finally came forward to tell the truth and without a recording of these interviews the circumstances cannot be confirmed with any certainty. However, it does appear that as the officer's conduct was witnessed by "several independent witnesses" that the officers did not come forward until they believed that the Department had already proven the lie. And, even when the officers did admit their misconduct, they attempted to minimize it by suggesting that the facts just needed to be "clarified" and the prior falsehoods were not more than "an error in a past statement."

Further, the senior officer was permitted to exercise a "10-day vacation option" so that he actually only suffered a suspension without pay of three days (Def City 57895). This was even though the senior officer had previously received a five-day suspension for off duty misconduct that took place prior to his lying about this incident (Def City 57883).

*Example e: "An officer wrote a report claiming he found marijuana on a suspect's person when the marijuana was found by the detention officer. Another officer advised the officer to lie in his report. Both officers were suspended for 10-days."*

CP 91-262 (Def City 62761-62902). As previously noted ((referencing Noble Report, paragraph 18.f), this case involved a probationary officer signing a false sworn affidavit. The probationer was allowed to keep his job, and the senior officer was given the same discipline as the probationer even though he admitted to having committed similar acts in the past. The senior officer's claim that other officers committed similar acts appears to have been ignored and a reference to his comment to that effect was deleted by Department command staff from his discipline letter.

**Conclusion**:

Mr. Noble, in paragraphs 52 and 53 of his report, disagreed with the conclusions I reached in my October 28, 2022 report. However, his opinions rely on general assertions that case investigations were adequate, without any actual concern or reference to any of the issues identified in my first report and ignoring any details that suggest otherwise in the files he purportedly reviewed.

In the vast majority of cases, there were deficient IA practices, failures to act upon integrity-related misconduct, failure to impose appropriate discipline and failures in documentation. A close review of these cases shows a disciplinary system that failed to hold officers accountable

**Exhibit 3**

for misconduct and created a culture where a criminal homicide suspect could be falsely arrested and convicted by officers who appeared to lack any moral compass.

Mr. Noble repeatedly cites specific investigations and disciplinary actions in support of his conclusion that the El Paso Police Department "conducted reasonable investigations and held officers accountable for their acts of misconduct." However, in this case, the "devil is in the details." When the investigations are reviewed in detail—detail that Mr. Noble consistently failed to consider or discuss in his report—there is strong evidence to establish that the EPPD disciplinary system was a failed exercise in police accountability.

Respectfully submitted,

Richard Rosenthal, J.D., PhD

**Exhibit 3**