**Case Review and Analysis**

October 31, 2022

**To: Russell Ainsworth**

**From: Joseph Allio**

**Subject: Daniel Villegas v City of El Paso**


**Purpose:**

This review was conducted at the request of Russell Ainsworth of Loevy & Loevy regarding the lawsuit, *Daniel Villegas v City of El Paso*. The purpose of this review is to analyze the investigation leading to the arrest and conviction of Daniel Villegas with an emphasis on the investigative process and procedures. Specifically, the assessment will examine the quality and content of this investigation. My assessment also evaluates whether the El Paso Police Department had notice of juvenile policy evaluations and failed to enforce those policies.

I am compensated at a rate of $250 per hour for preparing this report. My fee for deposition testimony is $2,000 per day. My fee for trial testimony is $2000 per day.


**Subject Matter Expertise:**

As the reviewer of this case, I have more than 30 years of municipal law enforcement experience. I began my career in 1984, and most recently served as an interim police chief in 2022, a career span of 38 years.

As a California Police Officer I attended more than 2,300 hours of training certified by the California Commission on Peace Officer Standards and Training (POST). I obtained all POST certifications from Basic POST through the completion of the Executive certification. Relevant to this case review are the following POST training courses:


Basic POST course 580Hrs; covering basic crime scene response, neighborhood canvassing, report writing, evidence documentation and collection, interviewing, suspect identification.

- Homicide and Violent Crime Investigation 36Hrs
- Search and Arrest Warrant Course 28Hrs

**Exhibit 4**

- Supervisory Course 80Hrs
- Leadership and Accountability Course 16Hrs
- Critical Incident Response for Supervisor 32Hrs
- Management Course 104Hrs

Additionally, I am also a member of the International Association of Chiefs of Police and have attended training conferences in the furtherance of my criminal justice and leadership career.

Relevant to this case, I have served as a violent crime detective, working homicide cases for nearly five years, this includes working homicide cases in 1993. I then supervised and managed violent crime/homicide investigations throughout my role in police leadership.

I have served as police chief in three northern California cities: the cities of Fairfield, Vacaville and Vallejo.

As the interim police chief for the City of Vallejo, I facilitated a comprehensive audit of all areas of law enforcement in that city. I worked closely with the designated OIR Group from Southern California with an overarching goal of providing 100% accessibility within the police department. A key achievement was the line of communication that opened for internal information needed to accurately audit policing in the city.

When I completed my term as the interim police chief for the City of Vallejo, the law firm Sloan Sakai Yeung & Wang LLP hired me as a subject matter expert to develop an implementation plan for the City of Vallejo, based on the OIR Group's audit and recommendations. After completing the implementation plan, the City of Vallejo once again approached and offered me the position of assistant police chief to make the recommendations operational.

The audit review was broad based, and the completed audit majority focus was on officer involved shootings, use of force incidents, training and community engagement. Relevant to this review however, was the additional focus of accountability across multiple areas of the department. The lack of appropriate supervision within the organization led to a lack of accountability within the police department work product.

During this assignment the California Department of Justice entered into an overview agreement with the Vallejo Police Department. The Justice Department contracted with Hillard Heintze of Chicago to facilitate the Vallejo oversight and implement the audit

**Exhibit 4**

recommendations. By the conclusion of the assignment, I had worked effectively with both the Justice Department, Hillard Heintze group and the City of Vallejo work group and initiated the necessary reforms that had been designated as priorities for the city's police department.

Most recently, between 2021 and 2022, I served as interim police chief for the City of Vacaville. Vacaville asked me to review areas of needed reform within the police department and to hire an outside firm to conduct an audit of police activity within the department's jurisdiction. By the conclusion of the assignment in January 2022, I had selected an audit firm and also accomplished a number of high-priority reforms that were identified.

**Approach:**

I have fully reviewed the documents listed below, provided to me by Loevy & Loevy. I have also completed a review of the criminal investigation's source material. I have applied my knowledge of police procedure and investigative practices, based on my training, education, and experience, to the facts and allegations in this case in order to render my opinions.

The conclusion and opinions drawn within this report are based on my examination of all the information available at the time of the review. Those same conclusions and opinions rely upon my knowledge and expertise, drawn from 30 plus years of service.

**Material Reviewed:**

- Texas Department of Public Safety Ballistics Report
- Supplemental reports: Suspect vehicle color
- Supplemental reports: Related to confessions
- El Paso Police Department Organizational Chart
- El Paso Police Department 1993-1994 Annual Report
- Supplemental reports: witnesses statements
- Crime scene report/sketch
- Supplemental reports: Related to Rudy and Javier Flores
- Supplemental reports: Focus gangs in area of homicide
- Supplemental report: Anthony Inglesias
- Supplemental report: Mike Johnson and Jacob Jauriqui
- Supplemental report: Onnie Kirk
- Semi-chronological police file
- Daniel Villegas v City of El Paso Complaint
- Findings and Facts: Judge Sam Medrano Jr.
- Supplemental reports: El Paso Police 93-101016
- Autopsy report/photos
- Medics report

**Exhibit 4**

- Gorham testimony 1997
- Gorham affidavit
- Detective Marquez: Testimony at habeas hearing, first trial, deposition, personnel file
- Detective Arbogast: Deposition
- Daniel Villegas: Suppression testimony, First trial testimony, habeas hearing
- Jesse Hernandez: Habeas hearing, second trial testimony
- Marcos Gonzalez: First trial testimony

- Report by Richard Rosenthal

- EPPD 1992 policies and procedures

- Graves deposition

- Brown deposition

- Messer deposition

- Scagno deposition

- Moton deposition

- Ortega deposition

**Criminal Investigations Source Material:**

*Practical Homicide Investigation; Vernon J. Gerberth (Fifth Edition)O'Hara's*

*Fundamentals of Criminal Investigation; DeVere D. Woods, Jr. 2019 US*

*Department of Justice Bureau of Justice Assistance, Promising Strategies for Strengthening Homicide Investigations 2018.*

*Police Experiences With Recording Custodial Interrogations; Thomas P Sullivan, Northwestern University of Law 2014*

*How Effect Are Police? The Problem of Clearance Rates and Criminal Accountability; Shima Baughman, S.J. Quinney College of Law, University of Utah 2020*

*2019 El Paso Police Department Annual Report*

**Review:**

On April 10, 1993 shortly after midnight Robert England and Armando Lazo were shot and killed in El Paso, Texas. This tragic loss of life led to the initiation of a complex homicide investigation assigned to Detectives with the El Paso Police Departments

4

**Exhibit 4**

(EPPD) Crimes Against Persons unit. As many as eleven potential suspects were identified by various witnesses within days of the murder of England and Lazo.

In the following words of Vernon J. Geberth, author of Practical Homicide Investigations, a homicide investigator is a "seeker of truth". Geberth points out the importance of inclusion and exclusion of persons named as a suspect in a homicide investigation. This role as truth seeker and professional investigator will be confronted in this case review as I examine the actions of detectives assigned to this homicide investigation.

Geberth writes, "There is a need for patience and flexibility in homicide investigation. Part of the inquiry is directed towards the elimination of suspects, as well as the inclusion. In fact many times an investigation focuses initially on one or more suspects. Subsequently, those very same "suspects" are then eliminated through analysis of evidence and the professional investigative process ultimately revealing the truth……The bottom line is that homicide investigators are an information-seeking body."[1]

On the night of April 9, 1993 and into the early morning hours of April 10, 1993, Robert England and Armando Lazo were walking home from a party with Juan Medina and Jesse Hernandez. They had a confrontation with unknown persons in a car in the area of Transmountain Road and Electric Street. The vehicle drove off, but returned a few minutes later and fired shots at England, Lazo, Hernandez, and Medina.

England was struck one time with a single gunshot wound to his head and pronounced dead at the scene. His body was located in a dirt field east of and parallel to Electric Street.

Lazo was struck twice, one gunshot wound to the front of his stomach area with no exit wound. The second to his front of his left upper leg with an exit wound on the back of his left leg. It will be important to note that the location of Lazo's entrance wounds indicate he was facing his assailant when he was shot. After being shot Lazo was able to flee to 10000 Oakwood Drive where he collapsed on the front porch of the Gorham home. Medics responded to this location, and provided medical assistance to Lazo and then transported him to a local hospital where he was pronounced dead.

Within eleven days of this homicide eleven potential suspects had been named by various witnesses. Multiple suspects under the pressure of interrogation confessed to the killings of England and Lazo. All but three named suspects were eliminated by detectives. One eliminated suspect however had motive, means and opportunity to murder England and Lazo and had threatened to shoot Lazo within two weeks of the

---

[1] Practical Homicide Investigation, Geberth, pg xii-xiii

**Exhibit 4**

murders. Yet without explanation this suspect was cleared by detectives. Each named suspect, excluding the persons arrested, were cleared as potential suspects with the word only of a detective and no investigative steps to clear these suspects recorded in a police report.

On April 21, 1993, eleven days after this homicide, Marcos Gonzalez and Daniel Villegas were arrested by El Paso Police Department detectives and charged with capital murder of England and Lazo. The case against Gonzalez was later dismissed as it lacked sufficient evidence for prosecution.

The person ultimately charged and convicted of this homicide, Daniel Villegas, initially denied involvement and lacked motive to commit this crime. When under the pressure of interrogation he signed a confession. However, his confession had multiple stated facts that were proven to be false. The confession of Villegas is uncorroborated by the facts and evidence in many respects.

Based on the information in this case review it appears the detectives assigned to this investigation may have been motivated by the El Paso Police Department's focus on crime statistics and case clearance as the measure of success. I cannot definitively identify the mental state of the investigators, but based on the reports they generated and their testimony, they did not appear to be motivated by what Vernon Geberth calls being a "truth seeker."

**Analysis:**

In the preface to Practical Homicide Investigations, author Vernon K. Geberth describes the basic rule for the professional homicide practitioner: "The detective looks for consistencies as well as inconsistencies and must be prepared to change the focus of the investigation as new information is developed."[2]

As previously noted, in this case the homicide investigation had eleven potential suspects and no eye witnesses who could identify the shooter. The number of suspects and the lack of a good eyewitness complicates a homicide investigation. Geberth's basic rule however remains true even in complicated investigations.

The purpose of my report is to analyze how a trained detective would investigate these murders and to evaluate whether the officers/detectives involved in this investigation took those steps, based on the facts presented.

The topics I examined were:

---

[2] Practical Homicide Investigation, Geberth, preface

**Exhibit 4**

- El Paso Police Department
- Texas Juvenile Law-EPPD Juvenile Policy
- Witness and Suspect Statements-Policy/CAP Manual
- Initial response
- Crime scene
- Case management
- Witnesses
- Suspects
- Tunnel Vision
- Summary

The review revealed inconsistencies in the investigative process, a significant lack of physical evidence, deficiency in teamwork, leadership and supervision, along with deviations from standard and generally accepted police practices. Ultimately, the cumulation of these inadequacies led to the failure by detectives to conduct a complete investigation in what is considered the most important task of a police officer, seeking justice when human life is taken by murder.

The order in which I review this case does not add greater or lesser value to the issues addressed. Each issue is a standalone element as well as part of the whole of the analysis.

**El Paso Police Department:**

El Paso Police Chief Henry Fluck in the 1993-1994 Annual Report "Message from the Chief" focuses primarily on crime reduction statistics as a measure of success in policing. This top down focus on crime reduction for success places the burden on police staff to prevent, intervene, and arrest those who would negatively impact the success metric.

In addition to the Chief's comments, I noted the Crimes Against Persons unit also had a strong focus on case clearance (arrests) as the measurement for success. The annual report reads: "The Crimes Against Persons Section has one of the highest homicide clearance rates in the country and has been recognized as one of the best homicide units in the entire nation."

The focus on crime reduction and high case clearance can lay the foundation for the wrong motivation to make an arrest and close a homicide case.

Professor Shima Baughman warns against the possible pressure put on individual officers in her document; "How Effective Are Police? The Problem of Clearance Rates and Criminal Accountability."

**Exhibit 4**

Baughman writes; "Clearance rates may lead to an overfocus on arrests and on certain crimes over others. Clearance rates may change in response to police departments "trying to create incentives for individual officers to control crime."  Using clearance rates as a job performance measure may actually encourage officers to value making more arrests, not necessarily solving crimes. Police may also be incentivized to arrest an individual when other avenues of crime-solving may be more appropriate or lead to a better result."[3]

El Paso Police Department's top down focus on crime statistics and clearance rates must be considered as a possible pressure placed upon those working to solve this homicide case and may have led to a lack of a complete and professional investigation.

**Texas Juvenile Law-EPPD Juvenile Policy:**

The Texas Family Code and EPPD policy recognize the responsibility to promote the welfare of a juvenile offender. In my review of this case I will address in the context of witness and suspect statements, failure to follow this mandate to promote the welfare of juvenile offenders.

**Witness and Suspect Statements-Policy/CAP Manual:**

This case is based 100% on statements of witnesses and suspects. The detectives did not connect evidence at the crime scene, autopsy, search warrants, or suspect vehicles to any of the eleven potential suspects or witness statements.

Detectives however basing the arrest of two subjects, Marcos Gonzales and Daniel Villegas, on statements alone failed to follow EPPD policy, Crimes Against Persons Operations Manual instructions and recording practices common in that day in obtaining statements.

EPPD policy 6.03A on taking a suspect confession in 1993 is very clear. It is to be given;

- Freely and willingly
- Voluntarily, without coercion or duress of any kind
- Without any promise or similar inducement
- The confession will not be taken until the subject is brought before a magistrate or if he/she is not available a Miranda warning is given. It is best to use the subject's exact wording in his written statement "even if slang or profanity is used."

---

[3] How Effective Are Police? Baughman pg 60

**Exhibit 4**

The EPPD Crimes Against Persons Operations Manual for the period of this homicide notes in section XIV A. 2, "A written and signed confession should be obtained recorded and video taped if possible." It should be noted this manual also states, "The homicide scene is without a doubt, the most important crime scene for a police officer or investigator." The CAP Operations Manual puts homicide as the most important case a police officer or detective can work and additionally a confession to a homicide of such importance that it should be recorded and video taped if possible. Yet in this investigation not a single interview of a witness or suspect was recorded.

In fact the statements of all eleven potential suspects were not recorded in any manner. In fact, one suspect identified during the investigation was not interviewed at all, as I discuss further below. In addition, in violation of EPPD policy, each suspect's statement was summarized rather than using the subject's exact words as directed by the policy.

Even though it would have been obvious to anyone in the chain of command that the detectives in this case failed to record the supposed confessions, my understanding is that no one was ever punished, disciplined, or evaluated any way for that lapse. The El Paso Police Department appears to have condoned this violation. Because of this violation, there was no possibility of examining the subject's statements against the requirement that the statements be given freely and willingly, voluntarily, without coercion or duress of any kind, and without any promise or similar inducement.

Professor Thomas P. Sullivan in the appendix to his article on custodial interrogation writes; "The electronic recording of police interviews with criminal suspects is an efficient and powerful law enforcement tool. It has been done for many years by many police agencies large and small throughout the United States. Their experiences have been uniformly positive."[4]

DeVere D. Woods, author of a book on *Fundamentals of Criminal Investigation* advocates for an audio recording at the minimum however noted that video recording is the "most convincing evidence for a jury."[5]

The witness and suspect statements in this case are lacking detail necessary to corroborate the authenticity of the statements. The lack of transparency in summarizing the statements and at the minimum not recording verbatim statements removes the possibility of knowing the actual statements of each person interviewed. In my review of this case I will address in the context of witness and suspect statements the problematic manner in which statements were documented.

**Initial Response:**

---

[4] Custodial Interrogations, Sullivan, appendix
[5] Fundamentals of Criminal Investigations, Woods pg 213

**Exhibit 4**

EPPD Officer Bellows 3N164 is the initial officer dispatched to a shooting call at 10000 Oakwood on April 10, 1993 at 0015 hours. Reviewing Bellows' supplemental report and scene log the following information is recorded related to the initial response.

Three officers were dispatched and arrived on scene within 8 minutes, Bellows records them as himself, 3N162 and 4N46. The next officer or detective did not arrive on scene for approximately 42 minutes.

Bellows' report lacks detail and contains limited facts. The lack of on scene personnel is clear in the fact that victim England was not even located for 25-35 minutes after the original call.

Per Medic J. Passmore #404, England was found approximately 25-35 minutes after the shooting took place.

Three officers is not sufficient to secure the overall scene on Electric and Oakwood, secure evidence, interview witnesses, canvas for witnesses, and separate and isolate the additional victims. The EPPD does note that at 0130 hours when Officer Hernandez of the crime scene unit arrived on scene a Sgt. Feidner was present. It is unknown when Sgt. Feidner arrived or what role he played at the crime scene.

 Unknown to me is the staffing level and availability of supervisors and officers to respond on the date and time of this homicide. What is known is the department staffing as reported in the 1993-1994 Annual Report, 84 Sergeants and 563 Patrol Officers. Overall staffing is very good as compared to other Texas Law Enforcement agencies listed in the Annual Report.

Standard initial response to a homicide scene includes a supervisor that is not recorded in the EPPD report for this case.

The initial response of EPPD was not sufficient for this incident.

**Crime Scene:**

Based on the few officers on scene and the photographs taken at the time of occurrence, the scene was never secure. For example, crime scene tape or barricades are not seen in any photos of the scene. The priority of crime scene security is taught in the basic police academy and emphasized throughout a police officer's career.

Considering the complicated nature of this crime scene very little is recorded in the EPPD report related to the scene and evidence. What is included is a rough sketch of the crime scene that clearly documents where victim England is located, the location of six spent .22 caliber casings and a hub cap. The photographs taken on the night of

**Exhibit 4**

occurrence show the same, however the quality of the photos are poor and the lighting makes viewing difficult.

Photos were not taken at the location Lazo is located, as well as overall orientation photos of the scene. It should be clear through photographic documentation where the .22 caliber casings were located in comparison to the body of England and the porch Lazo was found on. If the lighting did not allow for clear photographs on the night of occurrence daylight photos should be taken. The daylight photos that were taken lack orientation that allow a detective to process suspect and victims' actions.

Another significant issue with this crime scene is the lack of documentation or photographic evidence of a blood trail from Electric to Oakwood the path Lazo would have traveled. It should have been obvious to crime scene investigators that if six casings were located on Electric and England was found off the roadway on Electric, that Lazo was likely shot while on Electric. If shot on Electric there would likely be a blood trail to Oakwood. A professional review of the physical evidence available at the scene on the night of occurrence would have led competent investigators to look for the blood trail and document their findings.

In Officer Acosta's crime scene report he does describe blood drops in connection to victim England's location. Acosta describes a pool of blood belonging to the victim and blood drops which based on the context one must assume the drops relate to victim England. The fact that Acosta notes blood evidence related to victim England and no information related to victim Lazo and blood evidence is concerning.

A competent recording of the crime scene facts would have documented the proof or lack of proof that Lazo was shot on Electric or Oakwood. The police report is silent on this necessary fact that would later be needed when interviewing witnesses and suspects to corroborate their statements.

One of the points in Villegas' supposed statement to Detective Marquez on the night of his arrest is that Lazo was chased down and shot. This could have been supported or contradicted by a competent crime scene investigation that included this blood trail or lack of it being documented.

Additionally, after Villegas gave his supposed confession, there is no evidence that detectives believed his account of the facts enough to return to the crime scene and search for additional casings or bullet strikes on Oakwood. This is a major failure by the detectives. If Villegas' statement is to be believed, a thorough search for the casings from the shots fired on Oakwood should have been completed. A re-interview of the Gorhams (the family at whose home Lazo was found) to confirm the shot sequence should have also been completed.

**Exhibit 4**

Villegas's supposed confession also makes no sense because it states that he chased down and shot Lazo. But Lazo was shot in the front, not the back. If the confession is true, then Lazo would have run towards the shooter after the first shots were fired, which is extremely unlikely. Through my work, training, and review of materials on homicide investigation, I have seen countless accounts of victims and witnesses responding to gunfire by immediately falling to the ground, ducking, running away from the shots, and hiding. The two witnesses to the shooting reported doing exactly that – they ran away from the scene and where the shots were coming from. Running towards the shooter is not a normal or natural response and a detective would have known to be skeptical of such an account.

To explain further, Lazo and his friends were on Electric street at the time of the shooting. Based on the casings found by detectives, and the accounts of the surviving witnesses, six shots were fired at them from the west side of the street towards Lazo and his friends who were walking on the east side of the street. For Villegas' statement to be true, Lazo would have had to run towards the bullets past the shooter to Oakwood, and have then been shot. But the logical account of the shooting, based on the crime scene evidence, is that England and Lazo were both shot while on the east side of Electric by the shooter on the west side. Lazo was shot twice in the front of his body at which point the suspect continued driving on Electric and Lazo ran for help to the Gorham home on Oakwood as the suspect vehicle fled the scene. There is no evidence to support that Lazo was chased down and shot on Oakwood.

Photographed at the crime scene were a number of spray paint cans. The crime report does not note these cans or explain why they are photographed at the crime scene. Some of the unanswered questions related to these spray paint cans would be: Did England or Lazo have paint on their clothing or fingers? Did Hernandez or Medina have paint on their clothing or fingers? There is no documentation of the two surviving victims being asked about these spray cans.

This case has a number of intersecting parts with gang members and gang activity in El Paso. It is well known that gang violence can result from "tagging" an area with spray paint. This report does not document if gang detectives were notified about the spray cans. It does not document "tagging" in the area with the color spray paint recovered. If "tagging" was located what gangs were involved and could this have been a motive for the victims to have been shot? All of these basic questions are unanswered in the EPPD report on this homicide.

Simply put, author Woods writes, "Searching the scene of the crime for physical evidence can be the most important part of an investigation."[6]

---

[6] Fundamentals of Criminal Investigations, Woods, pg 35

**Exhibit 4**

My review of the crime scene investigation and the follow up investigation resulting from it to be cursory and insufficient for a homicide investigation.

**Case Management:**

The documents I reviewed for this case do not record any management or supervision of this homicide investigation. I would expect to see supervision of the initial response, crime scene supervision, specific detective assignments, investigative conferences, and the review of reports and documentation. None of these supervision tasks are noted in the investigation.

Supervision of this case should have noted and corrected at minimum the following: no documentation of a neighborhood canvass, only the original 911 caller (Gorham) is contacted, no other neighbors appear to have been contacted to be asked what they heard or saw. This would be extremely helpful in a case like this. Obvious questions should have been asked, for example, did you hear gunshots, how many, how far apart (shot sequence), did you hear or see anyone outside your home, did you hear or see a car?

Supervision of this case should have noted and corrected no documentation of how many 911 callers at the time of the shooting. 911 callers are an excellent source of information, there is no indication as to if there were additional 911 callers and if they were interviewed.

A very troubling practice noted in reviewing this case is an officer/detective writing a police report and then approving their own report. There can be no case management and oversight if supervisors do not review and approve reports as part of the ongoing investigation.

If supervisors only review a case file after the case is complete and detectives have approved their own reports they can not ensure proper investigative action and documentation has occurred. Post investigation review also removes the supervisor from giving input to direct the investigation and or correct errors in policy, procedure, law or investigative action.

Review of police reports by a supervisor should occur contemporary to the policing action to be true to the role and responsibility of police supervision.

Author Geberth notes the importance of supervision in case management. Related to the basic principles of homicide investigation, documentation and preservation he writes, "Management is necessary to ensure that the preliminary investigation and initial

**Exhibit 4**

actions at the scene, as well as the total investigative effort, have been properly documented." [7]

Detective Arbogast was asked about detectives approving their own reports during a deposition June 30, 2022. Arbogast stated detectives approve their own reports, when asked, "did it receive any further review?" Arbogast responded, "Sometimes a sergeant might read it, but probably not all the time."

The types of reports that detectives approved without supervisor approval, oversight or case management in the double murder of two teenagers included:

- Detective Ortega documenting Villegas' supposed confession to murder.
- Detective Arbogast naming Marcos Gonzalez responsible for these murders and requesting a warrant for his arrest.
- Detective Graves taking a statement from Rodney Williams naming Villegas as the suspect in this case.
- Detective Acosta documenting the crime scene.

These are just a few examples of the many self-approved reports in this EPPD case investigation that bypassed supervisor approval.

Another troubling issue related to a lack of diligence by the detectives and supervision and case management is the lack comparison of the .22 caliber casings found in this case to a potential murder weapon collected in another shooting close in time to this double murder.

At 23:47 hours on the same date as this double homicide case and just 0.3 miles away from the scene on Electric a shooting occurred. One of the eleven potential suspects named in this case, Rudolfo Flores, was also at the scene of this second shooting close in time to the shooting occurring. Officer Bellows also responded to this second scene. During the investigation of this second shooting, EPPD case 93-101016, a .22 caliber Winchester long rifle was recovered as evidence.

Detectives investigating the case should have inquired about other shootings in the vicinity and close in time to the shooting on Electric. This .22 caliber rifle should have been compared to the .22 caliber casings that were located on Electric, however this never happened. In fact the .22 caliber rifle was disposed of by EPPD on April 10, 1998. A lack of supervision and case management may be partially responsible for this sloppy police work and the lack of coordination of two shootings in extremely close proximity and close in time. Of course due to the destruction of this evidence it is unknown if it was the murder weapon used to kill England and Lazo.

_____

[7] Practical Homicide Investigation, Geberth, pg 37

**Exhibit 4**

There are numerous contradictions in the investigation that could have been resolved with proper supervision and case management. Supervisors should have assigned follow-up investigations to numerous issues in the EPPD report. I will these point out these issues in this review, but below are a few examples:

- The suspect vehicle color.
- The driver of the suspect vehicle.
- The lack of an identified suspect vehicle.
- Two named co-conspirators who have solid alibis and could not have been involved in these murders.
- The lack of an interview with Enrique Ramirez reported to have driven the suspect vehicle and provided the gun used.
- The lack of casings at the second reported crime scene on Oakwood.
- The lack of witnesses who heard a second set of gunshots.
- The lack of confirmation on a second shooter.
- The lack of a documented motive.
- The Flores brothers' motive, means, opportunity and false alibi.

Related to case management, Officer Stefan Happ responded to the shooting case 93-101016 and located a shooting victim. Happ openly makes a negative comment about the EPPD in a written document possibly indicating a lack of respect within the chain of command which would impact case management.

Happ states, "Since the city does not give us first aid equipment I could not render first aid and advised the victim to lie still until EMS arrived."

Once again it is clear that case management and supervision is lacking in this murder investigation.

**Witness Statements:**

On April 10, 1993 Detective Marquez took the statement of Jesse Hernandez, a victim/witness in this case. Detective Marquez summarized Hernandez's statement in his police report. Hernandez said he was walking home with Juan Medina and victims England and Lazo. They were walking on Trans Mountain Road when they were confronted by unknown people in a car. "The confrontation was that of mistaken identity as they thought it was Jesse's brother."

This vehicle drove off however returned a few minutes later and fired shots at the victims. Hernandez remembers hearing three shots.

**Exhibit 4**

Hernandez described the suspect vehicle as a maroon or red Monte Carlo with tinted windows and white vinyl top. In the written version of this statement signed by Hernandez there are additional key vehicle descriptors that Detective Marquez failed to note in his report. Hernandez's statement reads, "a maroon or red car, looked to me like a Monte Carlo, with square tail lights, stacked on top of each other, (three on each side). He also noted the vehicle had white wall tires, Detective Marquez failed to mention the tail lights and white wall tires in his supplement.

Hernandez's description of the suspect vehicle is very specific. Yet it appears Detective Marquez attempts to discredit Hernandez by noting that further investigation revealed that Hernandez was having problems identifying a vehicle, noting he had picked out a Chevrolet Caprice as well as other model cars.

What Detective Marquez does not record is what "further investigation" took place, where and when? He also does not note when and where Hernandez picked out a Chevrolet Caprice. This is extremely problematic as the suspect vehicle is the only strong lead on the night the homicide occurred.

When interviewed, victim/witness Medina also identified the suspect vehicle as a Chevrolet Monte Carlo, goldish in color with white wall tires and three separated lights on the back. He has previously seen this vehicle at the Northpark Mall.

The very specific stacked tail light description from Hernandez and Medina should have narrowed the suspect vehicle search. A competent Detective would have immediately put out a "be on the lookout" (BOL) for a vehicle matching the description given by Hernandez and Medina specifically in the area of the shooting and in known areas of rival gangs and the Northpark Mall. Also Marquez should have met with gang detectives and given them this vehicle description and asked them for gang intelligence for a vehicle matching this description.

The EPPD report does not give any indication that further investigation occurred related to the vehicle descriptions given by Hernandez and Medina.

Victim England's mother Margret England reported a possible suspect vehicle to Sgt. J.K. Dove. Margret reported on April 12, 1993 she was at the crime scene with some family members. A vehicle drove by them slowly and the driver stared at them, Margret felt this was suspicious and a possible "lead" in this case. Margret described the vehicle as a 1978-1983 Monte Carlo type vehicle, with tinted windows and a low rider with Texas license plate JTT-80G. Sgt.J.K. Dove notes in his report he immediately notified Detective Marquez of this information. Like the vehicle information provided by Hernandez and Medina the EPPD report does not give any indication further investigation related to this vehicle occurred, even with a license plate number provided.

**Exhibit 4**

A detective with Marquez' experience and training should have investigated to determine if there was any link between the vehicle and the crime, and documented the results of that investigation.

Detective Marquez report also fails to mention as the vehicle returned someone yelled "que puto's" just prior to the shots being fired.

Both the summary of Hernandez statement and the written signed statement lack the detail expected in a homicide investigation. Specifically in this case:

- Were words exchanged during the confrontation?
- What exactly was said?
- Tinted windows, did they roll them down during confrontation?
- How do you have a confrontation with the windows rolled up?
- Could you tell the race of the occupants of the car based on the confrontation?
- Did you see a firearm, handgun, or rifle?
- Saw tail lights clearly, what direction did the suspect vehicle flee?
- Do you know anyone who owns a car like the suspect vehicle?
- Did you have a confrontation earlier in the evening?
- Are you or any of the victims gang members?
- Do you know anyone who would want to kill you or your friends?
- Have you or your friends been in a fight recently?

On February 16, 2009 Hernandez gave a statement to a private investigator named Freddie Bonilla. It is important to remember that, at the time he was interviewed in 1993, Hernandez was a high school student and had just been the victim of an attempted murder in which two of his friends were killed. He gave the following statement to Bonilla:

"Detective Marquez frightened me by continuously yelling and repeatedly insisting that I had murdered my friends. Because of the shock of having my friends killed and because of the yelled accusations of Detective Marquez, I felt terrible and began crying uncontrollably. If Detective Marquez had continued much longer, I believe I would have confessed to something I didn't do. As it is, I have nightmares about Detective Marquez and his accusations."

This is a shocking and terrifying statement by Hernandez, that he would have confessed to something he did not do to stop the interrogation. Obviously this is a violation of both Texas Juvenile Law and EPPD policy. However, even without this subsequent statement by Hernandez, I would reach the same conclusions about the failures of investigation in this case.

**Exhibit 4**

Audio and video recording of this key eye witness/victim interview would eliminate any questions surrounding what Hernandez describes as an unprofessional coercive interview. It would also change the summary nature of Hernandez's statement and make it verbatim.

The other victim/witness in this homicide investigation is Juan Medina. Considering multiple shots were fired in his direction and two of his friends were murdered, very little information is elicited from Medina during the interview. In fact Detective Marquez in his reports writes; "a statement was taken from Juan Medina, who basically related the same information other than describing the vehicle as a 1970's model Monte Carlo goldish in color with tinted windows."

"Basically related," in the most disinterested way summarizes a statement that was taken in a summary format of a teenager that was shot at and had two friends killed.. This statement, as as well as the interview with Medina, lacks the specificity that is needed and expected in a murder investigation.

The interview with Medina was not audio or video recorded eliminating the possibility of reviewing a verbatim statement.

The interview of Medina occurred on April 10, 1993, he was interviewed by Detective Earl Arbogast. Medina stated on the night of the murders he had been at a party with Jesse Hernandez, Robert England and Armando Lazo. They were waiting for a ride home from Hector Ochoa but when he did not show up they decided to walk to Lazo's house.

Medina stated they were walking on Trans Mountain towards Electric when a car drove past them. This car then stopped and backed up passing them again while backing and then turning down a side street.

Medina described the car as a 70's Chevrolet Monte Carlo goldish in color, tinted windows, white wall tires and three separate lights on the back of the car.

This car drove up to Medina and his friends a second time and he heard someone in the car say, "come here." Medina thought it was his cousin Hector so he began walking towards the car, and he yelled Hector's name asking why he had left him behind at which point he heard a bunch of shots and he ran off.

The summary of Medina's statement lacks the detail expected in a homicide investigation. Specifically in this case;

- Why did you think it was Hector's car?
- Are you sure it was not Hector's car? Why?

**Exhibit 4**

- Were the only words from the car, "come here?"
- Tinted windows, did they roll them down to say "come here?"
- Could you tell the race of the occupants of the car based on them calling out to you?
- Did only one person in the car speak?
- Did you see a firearm, handgun, or rifle when you heard the shots?
- Saw tail lights clearly, what direction did the suspect vehicle flee?
- Besides Hector, do you know anyone who owns a car like the suspect vehicle?
- Did you have a confrontation earlier in the evening?
- Are you or any of the victims gang members?
- Do you know anyone who would want to kill you or your friends?
- Have you or your friends been in a fight recently?

Nancy and George Gorham were interviewed by the initial responding officer, Kimmett Bellows. Nancy stated she heard 5 to 6 gunshots then moments later she heard frantic knocking at the front door of her home at which point she called her husband.

George looked outside and saw Lazo lying on the front porch. George called the police then checked the outside of his home but saw nothing.

The summary of Gorham's statements lack the detail expected in a homicide investigation. Specifically in this case;

- Did you see Lazo's injuries?
- Was Lazo conscious, breathing?
- Did you speak to Lazo?
- Did you hear a vehicle around the time of the gunshots?
- When you looked outside did you hear or see any other individuals?

After the supposed confession of Villegas, a follow-up interview with the Gorhams should have been completed. That interview would have been to answer the above noted questions but more importantly to discern if the 5 or 6 shots were rapid fire or if there was a delay between shots heard. If Villegas's supposed confession were true, there would have been two sets of shots. Nancy Gorham could have confirmed or denied that detail.  I note that Gorham's 2009 affidavit indicates that she did not hear two sequences of shots, but rather heard five or six consecutively-fired shots.

Failure to interview Nancy Gorham to confirm Villegas's statement or to contradict it may be the result of tunnel vision which I will address in detail later in this review. A more troubling reason for interviewing Nancy would be a lack of professional commitment to this investigation, a focus on case closure and not seeking the truth.

**Exhibit 4**

A detective would know that the integrity of the police report and police investigation would be exploited by defense attorneys if obvious holes in the report/investigation existed as with the lack of follow-up with Gorham.

Additional witnesses in this case review will be addressed in connection with the suspects named in this investigation.

**Suspects:**

As I review each of the eleven potential suspects and their interaction or lack of interaction with EPPD, an overarching problem with report documentation will be apparent. The official police report for any investigation, but most importantly in a homicide investigation, documents the findings of investigative action. Author Geberth notes, "It is the principal source used by the courts, the defense, the district attorney's office, and the police department to evaluate the thoroughness of an investigation and the ability of the reporting detective."[8]

Geberth also states, referring to the writing of police reports, "The information must be accurate and complete" and "The investigator must be careful he does not leave out any significant facts or treat the report too lightly."[9]

The pattern of report writing in this investigation by EPPD shows a lack of thoroughness, incomplete investigations, missing significant facts which undermine this entire case for the arrest and prosecution of Villegas.

Eleven persons are named as possible suspects in the murder of England and Lazo. I will review each of the eleven below.

On April 15, 1993 five days after this murder witness Robert Hall 16 years of age of Chapparal New Mexico wrote two statements identifying suspects in the killing of England and Lazo.

Hall reported in the afternoon hours of April 10, 1993 a friend of his, Mike Johnston, told him that he and Jake (Jacob Jauregui) did a drive-by in El Paso and killed two people. Mike told him they chased two others that got away. Hall also said Mike had access to multiple guns through a friend of his and one of the guns was a .22 caliber. He also said at the time Mike told him about committing the murders it had not yet been on the news.

On April 15, 1993 both Johnston and Jauregui were interviewed by Detective Marquez with the assistance of YSD Detective C. Ortega. Detective Marquez's report states that

---

[8] Practical Homicide Investigation, Geberth, pg 1144
[9] Practical Homicide Investigation, Geberth, pg 1145-1146

**Exhibit 4**

Johnston gave five versions of what occurred and each one different from the other. According to Marquez, it "was determined" that both of them were not involved in this case.

Detective Marquez does not document the five versions Johnston gave where he explained that he and Jauregui killed England and Lazo. He also did not document how he determined each of these five statements were not reliable. This lack of documentation of basic criminal investigative steps undermines this entire case. What I mean by undermines the whole case is that detectives are trained and know from experience that failures to document basic steps of their investigation will cause criminal defense attorneys and possibly prosecutors to question the integrity of the entire investigation. If steps were skipped at one point in the investigation, what other steps were skipped? Detectives know this and use their reports to thoroughly document what they did during an investigation so anyone can see what they did, when they did it, and erase doubts about the integrity of the investigation.

As previously noted, Texas Family Code and EPPD policy recognize the responsibility to promote the welfare of a juvenile offender. Amazing and extremely troubling is that Jauregui, a juvenile, was transported from New Mexico to El Paso Texas as a murder suspect. A document in the case file titled, "Petition Based on Delinquent Conduct" states that Jauregui knowingly murdered England and Lazo, and yet there is no record of his statement to the police. Detective Marquez eliminates the juveniles as suspects but does note what Jauregui said in his interview. The lack of documentation related to Jauregui leaves many questions for example:

- What did Jauregui say in his interview?
- Did he deny involvement in the murder of England and Lazo?
- Where was he at the time the murders occurred?
- Was he with Johnston when the murders occurred?
- Was he with Johnston in El Paso at the time of the murders?
- What does he say in response to Johnson's confession and implication as him as the other suspect?
- Was Johnston just bragging? If so, why?

Missing from the report related to the interview of these two reported murder suspects were at a minimum:

- Did news sources report prior to 1pm on April 10, 1993, that a drive-by shooting occurred in El Paso with two persons killed and two others running off?
- If not, how do you explain Hall having these facts?
- What were the five versions of how they committed murder?

**Exhibit 4**

- How did they dismiss each?
- Did EPPD attempt to compare the .22 caliber that Johnston had access to with the casings found at the scene?

It may very well have been true that Johnston's statements were simply bragging and had no nexus to this case. However the lack of documentation related to Johnston and Jauregui makes it impossible to support this statement from Detective Marquez, "It was determined that both of them were not involved in this case."

The lack of thoroughness by Detective Marquez related to Johnston and Jauregui must call into question the investigation related to the focus of this review, Daniel Villegas.

Witness Gilbert Garcia in a police report dated April 14, 1993 states he contacted the police department with information related to this case. The report notes Garcia was interviewed by Detective Arbogast and Detective Marquez.

Garcia states he was talking with Anthony Iglesias (Tony) and he asked him if he heard about the shooting. Tony told him that Friday night he saw Mando (V-Lazo) at a party. He was at the party with Gilbert Holguin and Raul Rivas. Tony said he confronted Mando at the party because Mando is "ECH" and Tony is "HK."

Garcia asked Tony who "capped" Mando at which point Tony seemed like he was scared and he didn't want to say anymore.

In a supplement dated May 6, 1993 Detective Arbogast writes that he and Detective Graves interviewed Anthony Iglesias and Raul Rivas. The supplement does not indicate when and where this interview occurred. The supplement does not record what was said by Iglesias related to the murder of England and Lazo, it also makes no mention of anything Rivas may have said. The report does not state an interview was conducted with Gilbert Holguin.

Detective Arbogast's supplement notes Iglesias was in an altercation with Lazo two weeks prior to Lazo's murder, but that Arbogast found no connection to the shooting.

The supplement related to Anthony Iglesias being a potential suspect or witness to this case is missing detailed documentation, for example:

- Why was Holguin not interviewed?
- Was Rivas asked about the altercation with Lazo?
- What did Rivas say when interviewed?
- When and where was the altercation with Lazo?
- What was the genesis of the altercation with Lazo?
- Why did Iglesias get scared when talking to Garcia?

22

**Exhibit 4**

- Do Rivas or Iglesias know who killed England and Lazo?
- Do Rivas and Iglesias have an alibi for the time of these murders?
- What factors caused Detective Arbogast to write that he "found no connection to this shooting?"

The information recorded in this police report related to potential suspect Anthony Igelsias, lacked significant facts and his role was simply brushed aside without a standard investigation and complete documentation.

On April 14, 1993 Rudy Flores was interviewed by Detective Marquez, who documented the interview in a supplemental report. Flores indicated that Rick Martinez, who lives on Ajax Street, had been responsible for the shooting. According to Marquez's supplement Flores based his belief on Martinez being afraid the police would suspect him due to his prior gang involvement.

Detective Marquez's investigation into Martinez's involvement in this murder ends with this statement; "Martinez was brought into the CAP office and it was also determined that he was not involved in this case."

A search of Martinez's apartment was conducted as noted below. Detective Marquez left this fact out of his report.

In a supplemental report by Detective Arbogast dated May 6, 1993 he summarizes Flores naming Martinez as a suspect.  Detective Arbogast documents less than Detective Marquez related to Martinez. He simply states that Flores implicates Martinez and Martinez had no connection. He adds that Martinez was cooperative by allowing detectives to search his apartment for weapons. Detective Arbogast however does not describe when the search occurred and if anything was found.

Most disturbing in the documentation by Detective Marquez and Detective Arbogast is not documenting what Rudy Flores said in his signed statement. In his written signed statement Flores states he was talking with Martinez about the shooting of England and Lazo when Martinez told him, "I'm the one that shot at them." Flores also notes he knows Martinez to own a lot of guns.

Exculpatory evidence tends to or serves to clear from alleged fault or guilt. For two detectives to both leave out of their reports that Martinez allegedly stated, "I'm the one that shot at them" is, at a minimum, negligent and unprofessional policing.

Multiple questions were left unanswered related to Martinez, for example;

- When was Martinez interviewed?
- What did Martinez say when interviewed?

**Exhibit 4**

- Did Martinez admit telling Flores he shot England and Lazo?
- If Martinez did not admit telling Flores he shot England and Lazo, can he explain why Flores would make that up?
- Does Martinez own a lot of guns?
- Does Martinez own a .22 caliber gun?
- When was Martinez's apartment searched?
- What was found if anything in the search of Martinez apartment?
- Is Martinez a gang member? If so, is his gang rivals with ECH?
- How was it determined that Martinez was not involved/no connection?

The statements by Detective Marquez and Detective Arbogast that Martinez had no connection to this case are not supported in their police reports. Martinez may not have been involved in this crime. However, neither detective provides the facts that eliminated him as a suspect after he, according to Rudy Flores, admitted, "I'm the one that shot at them."

In a supplemental report dated May 6, 1993 Detective Arbogast documents accusations against Javier and Rudy Flores as the suspects in the murder of England and Lazo.

Detective Arbogast reports that during the course of the investigation over several days, detectives received information that possibly the LML gang was involved, especially the Flores brothers Javier and Rudy. He continues by writing, "Both Rudy and Javier Flores were interviewed on this case, however no connection was made to the Flores brothers."

In a supplemental report completed by Detective Marquez dated May 5, 1993 he notes, "during the entire case undersigned and other investigators were receiving information that Javier and Rudy Flores were responsible for the shooting".

Detective Arbogast and Detective Marquez's reports raise many unanswered questions. Who are the detectives who were receiving information that Javier and Rudy Flores committed the shooting? What specifically was the information? What intelligence, if any, from the Department's Gang Unit was provided regarding Los Midnight Locos (LML) or other gangs identified during the investigation? As discussed below, Terrance Farrar was the person who was documented as providing information about the Flores brothers. Did all of the information received by Arbogast and Marquez flow from that lead, or were there multiple independent sources pointing to Javier and Rudy Flores as the shooters? These basic and obvious questions should have been addressed in the report, and any responsible supervisor would have insisted on clarification before approving the detectives' reports.

**Exhibit 4**

As we examine the Flores brothers we will see a clear motive for the murders of England and Lazo, a potential suspect vehicle, proximity to the murders in time and place as well as a false alibi. It must be noted the EPPD investigation does not address or describe follow up investigations related to any of these issues. The report simply eliminates the Flores brothers as suspects with the simple statement, "no connection was made to the Flores brothers."

Witnesses Terri Vinson, Tonya Vinson and Charles Blucher all report a Terrance Farrar told them that the Flores brothers were responsible for the murder of England and Lazo.

On April 12, 1993 Detective Graves interviewed Terrance Farrar. Farrar stated that Rudy Flores was having problems with Victim Lazo because Rudy was messing with one of Lazo's friends. He also noted Rudy has hurt a lot of people in the neighborhood.

Two weeks prior to the murders, according to Farrar, Rudy "started to mess with" with a friend of Lazo's at a party at a person named Derrick's house. Lazo told Rudy to leave him alone which led to words being exchanged and they were getting ready to fight. Farrar said he broke them up before a physical fight started at which point Rudy told Lazo he was going to shoot him.

Rudy left the party, but returned about 15 minutes later with some friends and challenged Lazo to fight. Farrar would not let Lazo go outside to fight him. According to Farrar, Rudy responded by stating he was going to kill Lazo and "all the rest of us."

Farrar stated he was scared after that because Javier Flores had shot at him before and when Rudy says he is going to do something to you then he probably will do it.

Farrar notes that Rudy was driving a gray Cougar on the night of this party. This detail creates a link between Rudy's car and the car described by the shooting victims. Victim/witness Hernandez describes the suspect vehicle as having "stacked" tail lights, three on each side. Victim/witness Medina also notes three separated lights on the back of the car.

Mercury made a 1977-79 model Cougar Brougham Sedan with stacked tail lights. Although the Cougar has only two stacked tail lights, the reality that Rudy Flores was driving a car that may have matched the "stacked" tail lights of the suspect vehicle should have been investigated and noted in the case report and it was not.

Farrar also noted he was at the party at Derrick's house when Rudy threatened to both shoot and kill Lazo and "the rest of us". The EPPD report does not document any attempt to interview Derrick to verify Farrar's statement or contact any other witnesses

**Exhibit 4**

who were at the party. This would have been a standard follow up in a professional police investigation however it did not occur.

Both Francisco Javier Flores and Rodolfo "Rudy" Flores were interviewed on April 14, 1993.

Javier was interviewed by Detective Laredo. Javier stated he was previously a LML gang member but is no longer involved. On the night of the murders he was at a party specifically with six friends he names. Around 11:50pm one of his friends Fernie called his mother who gave Javier and four others a ride home.

When Javier arrived home at approximately 12:30am only his mother was at home, his sister and her boyfriend as well as his brother Rudy were not at home. Javier believed that Rudy was at his girlfriend Melissa's home in Sun Valley.

Javier stated he knew the guys who were killed and did not have any problems with them. Javier stated in relation to Rudy, "the only reason I would say that Rudy hated these dudes was because they were "ECH" gang members and Rudy is supposedly a hard core "LML" member." Javier also said their house was shot at once by "ECH." Javier does not mention nor is there is no indication he was asked if Rudy had a recent confrontation with Lazo in which he threatened to shoot Lazo. It is inexplicable that Javier was not asked about the confrontation that Farrar described, especially since Javier stated that Rudy "hated" the victims and that he endorsed a conflict with the ECH gang by agreeing that ECH had shot at his house.

It should be noted that Javier provides an alibi placing him with multiple friends and the mother of a friend during the time the murders occurred. Even though "investigators were receiving information that Javier and Rudy Flores were responsible for the shooting," not a single alibi witness was interviewed. We are left with the detectives finding no connection to the murders after Javier was interviewed, without an explanation as to why.

Rudy Flores was interviewed by Detective Marquez. Rudy stated he used to be "LML" but quit. Rudy knew both Robert England and Armando Lazo but only spoke with England.

On the night of the murders Rudy stated he was with Jose Juarez, Ben unknown last name and Betty also unknown last name. They had been at Melissa Balli's house and left around 11:00pm. They were in Jose's car, a green Grand Prix and they drove to Jamaica Street and dropped Ben off. On Jamaica Street they saw a party with people standing in the street and the people in the street looked at Rudy and the others in the

**Exhibit 4**

car as they drove past. They then dropped Betty off on McConnell and then stopped for gas.

Jose then drove Rudy home, they drove east on Trans Mountain turned on Electric and Rudy stated he looked at the car clock and it was 12:15-12:20am. It is only 1-2 minutes from Electric to his home. Rudy said he did not see any ambulances, police, anyone in the street and did not hear any gunshots.

Rudy said when he arrived home he went to bed, he also said he had nothing to do with the shooting of England and Lazo.

Rudy Flores based on the statements in this investigation had the motive to shoot the victims, had the means, the opportunity and had a false alibi. I will describe each below. Problematic is the lack of follow up investigation by EPPD related to each of these issues. EPPD failed to even take the step of interviewing the persons Rudy said he was with the evening and the specific time of the murders.

When multiple sources are naming suspects in a homicide standard investigative practice would be to interview the witness or witnesses provided by the suspected person. This would corroborate the reported suspects story, this did not happen in this investigation.

*Motive:*

- Rudy threatened to kill Lazo by shooting him two weeks before the murders.
- Javier said his brother Rudy hates "ECH," the gang both victims are reported to be associated with.
- Javier reported their home had been shot at by "ECH."
  - Rudy is "LML" and the victims are associated with "ECH."

*Means:*

- Rudy is a reported member of the "LML" gang, and gang members typically have access to firearms.
- Rudy was at the scene of another shooting on the same day as the murders in which numerous firearms were confiscated. This supports that Rudy had access to weapons.
- Terrance Farrar stated that Rudy stabbed at him and his brother shot at him in prior incidents.
- Rudy threatened to shoot Lazo, indicating his access to firearms.
- This was a drive-by shooting, and Rudy drives a car.

*Opportunity:*

27

**Exhibit 4**

- On the night of the murders prior to the time of occurrence, Rudy drove by a party on Jamaica, presumably the same party the victims were attending on Jamaica.
- Rudy was on Trans Mountain at the approximate time of the murders. Officer Bellows' report lists the time of occurrence as 00:15 or 12:15am. Rudy states he was on Trans Mountain at Electric at 12:15-12:20.

*False Alibi:*

- Rudy said he was dropped off at his house based on his statement between 12:16-12:22am and went to sleep. He did not see any ambulances, police cars, or hear any gunshots on his way home.
- Javier Flores very specifically states his brother was not home when he arrived home at approximately 12:30am.

An obvious question would be why would Rudy place himself at the crime scene at the time of occurrence if he was actually responsible for the murders.

From a police perspective it is not uncommon for a suspect to provide an explanation as to why they might have been at the scene of a crime they had committed while at the same time denying involvement. From an officer's earliest days as a patrol officer they begin to develop an awareness that suspects will attempt to minimize responsibility yet appear to be providing helpful information as to why they were at or near the scene of a crime. Rudy's statement related to his proximity to the murder scene would fall into this category.

Consider the facts that Rudy would have known. If Farrar's statement is true, then Rudy threatened to shoot and kill Lazo in front of many witnesses. By his own admission, Rudy drove by a party that the victims were at shortly before the murders and he may have been seen by many witnesses. The victims were members of a rival gang. Two people survived the shooting and could possibly place him at the scene if he was involved. A random witness could put him at the scene if he was involved.

If Rudy shot England and Lazo, he knew witnesses on both Jamaica and Trans Mountain at Electric could identify him as being at both locations. If he is responsible for the murders of England and Lazo, he developed an alibi to place him in both locations as he and Jose were dropping a friend off and then going home.

Inexplicably, the detectives never interviewed Jose Juarez to confirm he drove Ben, Betty and Rudy home. Rudy's alibi was also contradicted by his brother Javier who stated Rudy was not at home at 12:30 am the night of the shooting. Thus, either Rudy or Javier made a false statement relevant to Rudy's alibi.

The EPPD detectives departed from accepted police practice in not investigating and explaining how the Flores brothers were not involved in the murder of England and Lazo. With motive, means, opportunity and a false alibi, the phrase, "no connection" is insufficient and unprofessional in a murder investigation.

**Exhibit 4**

Lack of documentation is a major problem with this report. Related to Rudy Flores, his alibi driver Jose Juarez signed a consent form attached to this report allowing his vehicle to be searched, however there is no record of him being interviewed.

It appears the following searches were conducted related to this murder investigation:

- Consent search for Rick Martinez apartment.
- Consent and a search warrant for Daniel Villegas home.
- "Searches were conducted in Chaparral, NM."
- Consent search of Jose Juarez vehicle.
- Consent search for Ochoa vehicle.

However, there is no record of an attempt to search vehicles or the home of the Flores brothers. The search of the Flores home and vehicle would have been a logical part of a homicide investigation. Again, "no connection" is insufficient and unprofessional in a murder investigation.

Thus far in this review we have considered six individuals who have been named as potential suspects in the murders of England and Lazo. All six persons were not fully examined as to their possible guilt or innocence in this case. All six have more questions surrounding their involvement than answers which is unacceptable in a standard homicide investigation.

The remaining five suspects include Daniel Villegas and four others associated with him, Marcos Gonzalez, Rodney Williams, Enrique Ramirez (Popeye) and Fernando Lujan (Droopy).

Daniel Villegas became the focus of the EPPD investigation into the murders of England and Lazo after David Rangel was interviewed.

Detective Arbogast notes in a supplement dated May 6, 1993 that Detective Marquez received information from David Rangel that Daniel Villegas was responsible for the shooting. Information Rangel had was supposedly consistent with the case and as a result Rodney Williams was interviewed.

Detective Arbogast does not document how and why they came into contact with Rangel. Considering the arrest of Villegas is developed out of this reported interview, how and why he was interviewed should be documented. As I review Detective Marquez's supplement he also fails to note how and why Rangel was contacted.

Detective Marquez does record in his May 5, 1993 supplemental report that Rangel said Marcos Gonzalez was driving when the homicide occurred. This contradicts the statements of Williams, Gonzalez and Villegas, but the Detective does not investigate this. Further, Rangel's supposed statement that Gonzalez was driving is inconsistent with the written reports – neither Rangel's handwritten statement nor his typed statement state that Gonzalez was driving. In fact, Rangel referred to Gonzalez as one of the "passengers" in his handwritten statement, not as a driver. Lack of documentation of important facts is a consistent problem in this police report.

**Exhibit 4**

Also not documented by Detective Arbogast: what information provided by Rangel was consistent with the case? Arbogast does note as a result of the interview Rodney Williams was interviewed. Problematic is the fact that Detective Arbogast does not document what information Rangel gave related to Williams or why they interviewed Williams as a result of Rangel's interview. Rangel's statements do not mention Rodney Williams at all. Detective Marquez also does not record that Rangel's written statement does not mention Williams. Again this leaves many unanswered questions related to the relationship between Rangel and Williams and what, if anything, Rangel said about Williams.

There are two statements from Rangel: the first is handwritten and the second is typed and signed. In his handwritten statement, Rangel writes that he called his cousin to tell him that he was going to come over. In that conversation, the cousin (Villegas) said "he had shot 2 guys from ECH." The handwritten statement describes a single interaction between the shooter and victims, which is inconsistent with what is known from the victims.

According to the handwritten statement, Villegas recognized one of the victims while and then told "one guy" to stop. They stopped, but then "the other guys threw their gang signs." Then, Villegas shot one and "saw the other running." Villegas "chased him" and "shot the other one in front of a house." Then they left. The only other passenger Rangel knew was "Marcos," and the others "were his homeboys from VNE." The surviving victims all described two encounters with the shooter and the car, first with the car driving by on Transmountain before reaching Electric and then with the car returning on Electric and Transmountain where the shooting occurred. But Rangel's handwritten statement describes the shooting as all occurring in a single event.

According to Rangel's typed statement, Rangel was talking on the phone to Daniel Villegas on April 14, 1993 and they were talking about the murders of England and Lazo. Villegas told Rangel, "I did it." Rangel asked him why he shot them and Villegas told him the victims were throwing ECH, indicating the victims were throwing gang signs.

Villegas told Rangel he was with Marcos Gonzalez and some other homeboys from" VNE" (Vario Northeast). They were in a black car when they spotted Mando (Lazo) and some other guys. They drove past them and they threw gang signs. Villegas's group turned around and came back to where Mando was. Per Rangel Villegas really wanted to shoot Mando but when he shot he hit the guy next to him. He shot again and Mando went down, but then got up and started to run.

Mando ran to a house and began knocking on the door yelling for help. Villegas said since Mando knew him he could not leave him as a witness, so he chased him to the house and shot him again. Rangel's statement notes that Villegas was not specific on what type of gun he used.

Rangel's typed statement is inconsistent with his handwritten statement and the victims' accounts of the shooting. In the typed statement, the victims threw gang signs when

**Exhibit 4**

Villegas first passed them. Then Villegas "turned around and came back" and shot them. But in the handwritten statement, Villegas shot them right after they threw gang signs and there is no description of circling back.

Rangel is a key witness in the arrest of Villegas however many of the facts in his various statements are incorrect and cannot be corroborated. EPPD Detectives did not record following up on any of the below noted inconsistencies from Rangel's statement and Marquez's summary of the statement:

- Suspect vehicle was black, this does not match the eyewitness testimony.
- [According to Marquez's summary report, not the actual statements]: Marcos Gonzalez was driving, does not match any other witness or alleged suspect's statements.
- Victim throwing gang signs does not match eyewitness evidence or the victims' account of the shooting
- Lazo was chased down and shot on the front porch, does not match eyewitness testimony or crime scene evidence.

At the time Rangel was interviewed Detective Marquez knew many of these inconsistencies however there is no evidence he followed-up with further questioning or investigation which would be an expected and standard part of a homicide investigation.

Based on the crime scene facts and eyewitness testimony it does not appear Detective Marquez is interested in as Gerberth notes being a "seeker of truth".

Rangel later asserted that Marquez had coerced him into giving false testimony and destroying evidence of his prior statements. On June 21, 2011, Rangel testified in a Writ of Habeas Corpus hearing. He said in 1993 he was 17 years old and had been asked by Detective Graves to go to the police department related to a harassment complaint. When he arrived at the police department he was never asked about the harassment, rather he was accused of killing England and Lazo.

Rangel was interviewed by Detective Marquez who told him, "he knew that I did it." According to Rangel, Marquez said he had killed England and Lazo on Electric Street, and there was a witness that put him at the crime scene. Rangel's response was, "I was speechless, I was like--I didn't know what to say, I was 17 years old."

Rangel was asked about Detective Marquez's interview tactics, and he said Marquez cursed at him, threatened that he would go to prison, and that in prison he would be raped. Rangel started thinking about getting shanked and getting raped. He didn't know what Detective Marquez wanted or was referring to at which point he told him about the phone call with Villegas.

It should be noted Rangel did not think Villegas was being serious during the phone call recorded in his signed statement. Villegas was on the phone and Marcos Gonzalez could be heard in the background. They were both laughing and Gonzalez told Villegas to stop bullshitting Rangel. Rangel said Villegas always exaggerated stories and told stories that were not true, so he did not believe he shot England and Lazo.

**Exhibit 4**

He wrote his first statement for Detective Marquez which he said Detective Marquez threw away, telling him, "no, that's not correct." According to Rangel, Villegas had told Rangel he used a sawed-off shotgun to do the killings. Rangel said that Marquez "didn't like the fact that I said sawed-off shotgun." Detective Marquez had him write a second statement which does not record the shotgun.

These later statements cast further doubt on Marquez's investigation. However, even without those later statements, Marquez's investigation reflects a lack of concern for seeking the truth and suggests that evidence was fabricated, considering the many inconsistencies and the obvious failure to investigate and resolve those inconsistencies.

Rodney Williams was picked up and interviewed by EPPD detectives at the same time they were interviewing David Rangel. The time on David Rangel's typed statement is 7:20 pm, and the time on Williams's typed statement is 7:30 pm, indicating that they were questioned simultaneously.  As previously stated, detectives did not document what led them to interview Williams. The timing of these interviews contradicts the notion that Williams was interviewed as a result of their interview with Rangel.

There is no investigative link between Rangel saying some "homeboys" were with Villegas and Gonzalez and how Williams became known to them. A key factor in homicide investigation is the standard practice of documenting investigative action, especially in regard to crucial steps such as why a witness is being interviewed. This does not happen with how EPPD detectives determined Williams needed to be interviewed.

Williams gave a statement to Detective Graves. He stated that on the night of the murders he was hanging out with Daniel Villegas and Marcos Gonzalez. They were sitting on some stairs at the Village Green Apartments for about 1 ½ hours. Around 11:00pm a white four door medium size car driven by "Popeye" pulled up with a front passenger "Snoopy." Williams does not provide their real names.

*"Snoopy" is later identified as Fernando Lujan whose moniker is "Droopy." Popeye is later identified as Enrique Ramirez.*

According to Williams, Villegas knew them so they all got in the car together, Gonzalez behind the driver, Williams in the middle back seat and Villegas behind the passenger. They were just driving around and they did a beer run (theft) at Diamond Shamrock.

As they were driving around the area of Trans Mountain Road they saw four guys walking and Popeye slowed down and said something to them in Spanish he thought was "Que Barrio." Two of the guys came up to the car and started yelling things at the car, Williams could not understand what they said.

According to Williams, Popeye drove off and the other four guys in the car began speaking Spanish rapidly. After about fifteen minutes they drove back to the area they saw the four guys walking. Popeye pulled out a gun from under his seat wrapped in a white cloth and gave it to Villegas. Villegas started to shoot the gun and one guy fell to the ground right away. Two ran away and Villegas shot the other guy. According to

**Exhibit 4**

Williams's statement, Williams thought that Villegas shot the other guy in the back, "I think he hit him in the back."

Villegas gave the gun back to Popeye and Popeye dropped Villegas, Gonzalez and Williams on the corner near Villegas home around 2:00am. They heard gunshots and officers came to Villegas' home to talk with them.

Williams does not describe what they did between 12:15am and 2:00am. There is a separate police report made by an Officer Reveles regarding officers responding to Villegas's home at 3:00 am that night. Officer Reveles was dispatched to Villegas's home on a shots fired call. Reveles reports the shooters might be involved in the England Lazo murders. Reveles's report also indicates that Villegas, Gonzalez, and Williams did not provide him with any information at the time about the shooting. Reveles did give Williams a ride home. Williams tells Reveles a Black Monte Carlo drove by and shot at Villegas house due to Villegas and Gonzalez being "VNE."

One obvious connection from Williams's prior statements, made on the late night/early morning of the shooting is that, according to Reveles, Williams said at the time that the shooters drove a black Monte Carlo – the same model of car described by the surviving victims of the Lazo/England murders. There is no sign that anyone ever asked Villegas, Gonzalez, or Williams for more information about the black Monte Carlo or who might have committed the shooting. Turning back to the statement from Williams taken by Detective Graves, the day after the murders Williams saw the victims photographs in the newspaper and said, they are the ones I saw come up to Popeye throwing gang signs.

In a supplemental report dated April 22, 1993 at 7:15 am – after Villegas's supposed confession was taken by Marquez – Marquez wrote in a supplemental report that "upon reviewing this case, [he] requested that Rodney Williams be brought to the Youth Services Division for additional information." He writes that "It was determined that Williams was indeed in the car, when the shooting occurred" and that "It was learned from Williams that there were no other persons involved in the shooting but refused to give any other details." He also wrote, "Statements support Williams involvement in this case, through positive identification by witness who observed Williams with other parties involved."

Marquez's brief supplemental report from 4/22/93 is vague about what Williams actually said. For example, what did it mean that "there were no other persons involved in the shooting?" The supplement does not confirm whether that means all five of the people mentioned in Williams's first statement (Popeye, Droopy, Williams, Villegas, and Gonzalez) or only the three people who were actually arrested and charged (Williams, Villegas, and Gonzalez) or some other version. It is also unclear what "witness" or witnesses identified Williams as present in the car, but in any case, Williams stated that he was in the car in his first supposed statement, so Marquez's report does not reflect any new information.

**Exhibit 4**

Marquez also mentioned his interview with Williams in his closing report dated May 5, 1993. There, Marquez reported that Williams confirmed in their conversation that only Gonzalez, Daniel, and Williams were in the car for the shooting. But it is unclear why this important detail was left out of the previous report. Further, no search for a gun or car was documented as to Williams' house. If Marquez believed that only those three were involved in a drive-by shooting, steps should have been taken to locate the vehicle and murder weapon. For example, Arbogast's report mentions that Villegas' home was searched but does not mention a search of Williams' home. And if it was only the three of them in the car, then Williams should have been asked a number of follow up questions – why he initially claimed Popeye and Droopy were with them; and if Popeye wasn't there and thus did not provide Villegas with the gun, where did the gun come from? And if Villegas did not return the gun to Popeye, where did the murder weapon go?

The summary nature of Williams statement like others in this investigation leaves many unanswered questions which include:

- What was the make, model, and year range of the car?
- Do you know where Popeye lives, how old is Popeye, what is his race, does he have marks, scars, tattoos?
- Do you know where Droopy lives, how old is Popeye, what is his race, does he have marks, scars, tattoos?
- What type of gun was it, a revolver or semi-automatic?
- Why do you think the second victim was shot in the back?
- What was the shot sequence, all fired at once or two sets of shots?
- What did you do between 12:15am-2:00am?
- What did you see or hear when shots were reported fired at Villegas's house on the morning of the Lazo/England murder? Did any of you discuss with Reveles a connection to those murders that would lead him to report that the shootings may be connected?

Lack of documentation and follow-up investigation has compromised this entire case. In addition Williams testimony in a 2011 hearing (described below), if true, places doubt on his statement included in the EPPD investigation.

In addition the following facts invalidate Williams' statement:

"Popeye" Enrique Ramirez and "Droopy" Fernando Lujan. It should be noted Ramirez was incarcerated at the time of the murders (as Marquez later confirmed under oath at trial) and Lujan was confirmed to be on an electronic monitoring device which showed him to be at his home. Obviously when these facts were discovered by detectives it would completely invalidate Williams statement.

**Exhibit 4**

Williams was interviewed on April 21, 1993, with the time on the report given as 7:30 pm. . However he names two suspects who could not have been involved in the case. One of those suspects is Fernando Lujan ("Droopy") who was interviewed on April 22, 1993 by Detective Arbogast listing the time of the interview at 6:00am.. At that time Lujan confirmed he was at home at the time of the murders and gave an alibi witness of his probation officer, Ernesto Mata. This was also confirmed by electronic monitoring worn by Lujan.

In the supplemental report Lujan states he knows he is being investigated for the murders of England and Lazo. It would appear Detective Arbogast believed or confirmed his alibi due to the lack of follow-up investigation related to Lujan.

The case against Villegas is largely founded upon key witness Williams naming Villegas as the shooter as documented by Detectives Arbogast, Ortega and Marquez. However, within hours of taking Williams' statement Detectives knew based on Lujan's alibi that his statement was false or invalid.

This exculpatory evidence related to the prosecution of Villegas was known by the EPPD detectives. Another very troubling issue with Williams' statement is that "Popeye" Enrique Ramirez was never interviewed. He is named as a primary suspect by Williams, the person who gave the gun to Villegas and yet he was never interviewed. This is both negligent and unprofessional. Two of the five people named by a key witness were proven not to be involved in the murders yet Detectives did not focus their follow-up investigation on this truth.

On June 23, 2011 Williams testified in a Writ of Habeas Corpus hearing. During that hearing he denied the truthfulness of his statement in the Villegas prosecution. Williams said that the facts in his statement were provided by Detective Graves and because he was afraid of Detective Graves he signed the statement. Williams said Detective Graves told him if he signed the statement he could go home, if not he would be charged and "fucked in the ass."

During the hearing Williams stated he told Detective Graves where he was on the night of the murders. Around 10:30pm he was sitting on the stairs where he lived, he was with Daniel Villegas and Marcos Gonzalez. His mom walked by them as she was going to work and the three of them went upstairs where his brother was babysitting a friend's kids and watched movies. Around 12:20-12:30am Villegas and Williams walked home to Villegas' house and it appears Williams walked with them.

If this testimony is believed, Williams provided multiple alibi witnesses for himself, Villegas and Gonzalez for the night of the murders. This included his mother, his brother and the kids that were being babysat. I note that this statement does not suffer the same reliability concerns as Williams' statement to police, which claimed that "Popeye" and "Droopy" were involved. However there is no indication that EPPD detectives interviewed any of the alibi witnesses.If Williams had provided alibi witnesses to

**Exhibit 4**

detectives, that fact should have been documented and those witnesses should have been interviewed.

Ultimately Williams was arrested and charges with the murders of England and Lazo. In a supplement by Detective Marquez dated April 22, 1993 Detective Marquez writes, "Based on information and investigation undersigned, enough probable cause existed to charge William with the offense." The charges were later dropped against WIlliams and he was not prosecuted.


Also arrested and charged with the murders of England and Lazo was Marcos Gonzalez. The charges against Gonzalez were also eventually dropped. Gonzalez and Villegas were both arrested at Villegas's house after Williams and Rangel gave their statements and were brought in by EPPD for questioning.

Gonzalez gave two statements to Detective Graves on April 22, 1993. In the first, which according to Detective Graves was started at 12:45 am and completed at 1:15 am, he denied being present when the murder occurred. In the second statement, which according to Graves was started at 2:20 am and was completed at 2:35 am, Gonzalez stated he was in the suspect vehicle when the murder happened.

The first statement says that on the night of the murders Gonzalez was "kicking back" with Rodney Williams at his apartment when Daniel Villegas pulled up in a car driven by "Snoopy" (later corrected to "Droopy") from the VNE gang. The front passenger of the vehicle was "Popeye" Enrique Ramirez, wrongly named Enrique Rodriguez in this statement.

This contradicts Rodney Williams's statement that Villegas was hanging out with him and Gonzalez when the car driven by "Popeye" drove up.  It also contradicts Williams' statements as to who was driving the car. Gonzalez's second statement has the driver corrected to match the statement of Williams, he also changes "Snoopy" to "Droopy." Gonzalez's statement does not describe why he corrected these errors from his first statement. Based on the Rodney Williams's 2011 statement when questioned, and the obvious and unaddressed errors throughout the investigation, it appears that detectives may have provided "their facts" to Gonzalez to improve the second statement. If the statements came solely from Gonzalez, I would expect detectives to ask Gonzalez why his story changed from the earlier statement to the later statement, and to document the reason.

Also in the first statement, Gonzalez states that Villegas asked him and Williams if they wanted to go party and they all got in the car together. The car was a beige two door 70's model like a Regal. They went to the 7-11 on Hondo Pass at Railroad and did a beer run (theft of beer). They then drove around drinking.

They observed "four or five" guys walking on Trans Mountain. Popeye and Villegas yelled out "VNE Putos" the guys yelled something back Gonzalez thought was "LFL." They then went to "Snoopy's" house to get a gun, a small black automatic not a

**Exhibit 4**

revolver. In his first statement Gonzalez said at this point he was dropped off and did not see the shooting. According to the statement, Villegas showed him a newspaper when he woke up around 1 pm and said "check it out, look who died," showing that Lazo had been killed. The statement says that "later on," Villegas told Gonzalez that he really killed "the guys."

Gonzalez then gave a second statement. According to the documents, it was taken an hour and five minutes after his first statement was completed. However, Detective Graves, who took the confession, did not document in the statement or in his closing report why the second statement was taken. Marquez and Arbogast's closing reports also do not mention why the second statement was taken from Gonzalez. A professional police investigation explains clearly why and how a second statement was taken.

Per the second statement, Gonzalez was in the car with "Popeye" driving and "Droopy" as the front passenger. Gonzalez was seated behind the driver with Williams in the middle and Villegas behind "Droopy." After getting the gun they drove back to Trans Mountain road and when they reached a street off Trans Mountain road they saw the same group of guys again.

According to the statement, Enrique [Popeye] handed a gun to Villegas, after which Villegas leaned out the window and fired the gun about three times. He then fired the gun two or three more times. Gonzalez saw one guy go down and three start to run. Enrique [Popeye] drove after one of them and Villegas fired the gun into him some more, but Gonzalez did not know how many shots.

The statements given by Gonzalez were false statements based on the fact that "Popeye" and "Droopy" could not have been involved in the murders. Obviously once EPPD detectives became aware that Gonzalez had provided a false statement they should have interviewed him again to find out why he claimed Popeye and Droopy were involved, and where the murder weapon came from if not from Popeye, and what happened to the murder weapon, but this did not occur.

The statement was also contradicted based on all six expended casings being located on Electric. Those six casings were located together. There is no physical evidence or witness evidence, apart from the supposed statements from Williams, Gonzalez, and Villegas, to support that the suspects drove after a second victim and fired a separate round of bullets.

Victim/witness Hernandez and Medina call the suspect vehicle maroon or goldish in color, but Gonzalez called it beige. Due to the fact that murder suspect "Popeye" Enrique Ramirez was never interviewed it is unknown if he drives a beige car as described by Gonzalez.

Again, it was plainly insufficient for the EPPD detectives to describe the statement of a murder suspect in such a summary style. Some unanswered questions:

- What direction did the victims run after the shooting started?

**Exhibit 4**

- Did you see the second victim run to a house? What do you recall and what can you describe?
- Are you a gang member? Which gang?
- Are any persons in the car gang members? Which gang?
- Did you know the victims? Have you seen them before?
- Was this a rival gang based shooting?

On December 1, 1994 Gonzalez testified in the trial of Viillegas for the murders of England and Lazo. Gonzalez when asked why he gave a second statement, he said the detectives were not satisfied with his first statement. They wanted him to admit he was in the suspect vehicle.

Gonzalez describes being coerced by threats and physical force to give the second statement. Gonzalez said he was pushed up against a wall, told, "you better tell the fuckin truth," cursed at during the interview, showed a piece of paper and told it was Villegas's statement naming him as the suspect, and told he would be "fucked" in jail.

When asked if he had anything to do with the shooting, he stated "no." When asked if Villegas had anything to do with the shooting, he again said, "no."

Considering the numerous established falsehoods in Gonzalez's statement, no trained detective would consider it to be evidence of anyone's guilt until those discrepancies had been satisfactorily resolved.

The last alleged suspect in this review is Daniel Villegas. On April 22, 1993, during the early morning hours, Villegas was interviewed by Detective Marquez. Detective Marquez records a brief summary statement that includes a confession by Villegas to shooting a gun but not necessarily killing anyone.

The interview with Villegas was not recorded, with no explanation given for why it was not possible to record it, in violation of EPPD policy. There is evidence that the interview was not given freely and willingly, voluntarily, without coercion or duress. It also was not recorded in Villegas's exact words. The statement also leaves many unanswered questions and no follow-up clarifying questions are recorded.

In his statement to Detective Marquez, Villegas allegedly said he was with the following persons on the night of the murders; Marcos Gonzalez, Rodney Williams, "Popeye" and "Droopy." According to Villegas's statement, Popeye was driving a white mid-size car with tinted windows. Gonzalez was sitting behind the driver, Williams in the middle and Villegas behind the front passenger.

They made a beer run at Diamond Shamrock, and started drinking beer and cruising. They were driving on Trans Mountain when he saw Moreno-"Mando" (Lazo) with three other "dudes". Droopy yelled, "Que Vario" and Villegas did not hear what they yelled back.

They turned around and drove back at which point Villegas was given a gun by one of the guys, it was a small black gun. For no apparent reason, Villegas's explanation does

**Exhibit 4**

not address who gave him the gun; whether Popeye gave him a gun wrapped in a white cloth, as in Williams's statement; or whether they stopped at Droopy's house to get a gun, as indicated in Gonzalez's statement. Any detective taking a confession from Villegas would have wanted to know where the murder weapon came from, and would have asked Villegas that question and documented his answer.

They turned on a street off Trans Mountain and stopped the car. Lazo yelled, "What's up What's up." According to the statement, Villegas wanted to scare them so he fired one round into the air and then leveled the gun at the four guys and started to fire.

According to the statement, the guys "all started to run," indicating that no one was shot at first. Someone in the car yelled "one was getting away." Lazo was running towards a house and someone yelled, "he saw my face, he saw my face, finish him off." Villegas then stated, "someone did finish him off." Villegas said 5-6 shots were fired. Again Villegas does not admit to shooting Lazo but that "someone" did finish him off.

This statement is extremely problematic, the following are obvious follow-up questions, and inconsistencies;

- Villegas said "Popeye" was driving a white car; the victim/eyewitness state the suspect vehicle was maroon or goldish.

- Villegas said after seeing Lazo and the others they turned around and someone gave him a gun. Gonzalez said they drove to "Droopy's" house to get the gun. Williams said that Popeye handed Villegas a gun wrapped in a white cloth.

- Villegas said the gun was a small black gun, no follow-up question as to whether it was a semi-automatic or revolver.

- Villegas's statement said he wanted to scare them, but no follow-up question were asked as to why? There is no indication that Villegas was asked.

- Villegas's statement did not address whether his shots hit anybody. Either he was not asked that question or his answers were not included.

- Villegas said someone yelled, "he saw my face", who yelled this? Where did the voice come from within the car?

- Speaking of Lazo, Villegas said, "someone did finish him off." Who? Who did you hand the gun to?

- Did the person who "finished" him off fire from within the vehicle? Did he approach the porch on foot?

- How did Villegas know that Lazo was finished off? Did he watch him get shot and fall? If so, Villegas must have seen who fired the gun shooting Lazo.

**Exhibit 4**

- Villegas said 5-6 shots were fired, is that total shots or shots fired at Lazo to "finish him off."

- "Popeye" and "Droopy" were not involved in this murder case yet were named in Villegas statement. When this was discovered by EPPD detectives a follow up interview should have been completed to find out why he named them as being present for the murder.

- Villegas asks for forgiveness from England and Lazo's families. His statement only records him firing a gun, why specifically is he asking for forgiveness.

What is most concerning and from a career police officer's perspective completely unacceptable is the fact that Popeye, who was named as the driver and even the provider of the murder weapon was never interviewed in this investigation.

What is clear is that EPPD detectives failed to undertake even the most rudimentary tasks that an investigator in a murder case would be expected to complete. They failed to ask obvious questions. They ignored evidence that placed their conclusions into doubt, and failed to acknowledge that evidence in writing. After they discovered that the confessions all contained impossible details, they failed to conduct follow-up interviews. Their actions suggest not only negligence, but intentional misconduct, because their actions are so out of keeping with the basic standards used by detectives.

What's more, a professional police detective would take into account that Villegas is 16 years old, and may be frightened and confused. Detective Marquez had the crime scene facts as well as other alleged witness and suspect statements so when Villegas statement did not conform to the evidence or previous statements it could be due to one of two issues. First, he may be nervous and confused and follow-up questions could help clarify. Second, he could be lying, giving a false statement for various reasons that only he could articulate with the appropriate follow-up questions. Follow-up questions are mandatory for a complete interrogation and investigation. This was not done.

It should be noted the first person Villegas spoke to after his alleged confession was Probation Officer Monica Beltran. According to Villegas, he told her that he didn't commit the crime, he only said he did so he could go back to sleep. He also said he gave the detectives an alibi telling them the house he was at. This is significant due to Villegas's young age. According to him, he denied his involvement to the first person he would have felt safe with after his arrest.

Villegas testified at a hearing December 1, 1994. His testimony describes an unprofessional coercive interrogation. However, even ignoring all of Villegas's subsequent testimony, I would still conclude that the detectives' actions are consistent with a fabricated confession and cover-up and cannot be explained as merely negligent due to the severe failures in their investigation.

In his testimony, Villegas confirmed he was 16 years old at the time of his arrest and had never been interrogated before. After his arrest and on his way to the police

**Exhibit 4**

department Detective Marquez kept cursing at him, telling him if he did not give a statement they would turn the car around and drive to the desert and beat him. When Detective Marquez discovered Villegas was 16 he told him, "you're a lucky punk you stupid asshole."

Once the interrogation began, Villegas said Detective Marquez would hit him in the back of the head and Detective Marquez was wearing a ring. Detective Marquez told him they knew he was the one who did it. Villegas responded he was not involved, but was then struck in the head and cursed at. He was told that in jail fat old white men would rape him.

Villegas said he eventually gave a statement but did not admit involvement. Detective Marquez slapped him real hard in the head and said "I'm not going to write that down." At one point Detective Marquez showed Villegas a piece of paper and said "your friend just narc'd on you right now." At that point Villegas said he would give a statement, which is the statement in the EPPD police report.

Villegas was asked why he did not tell the judge he was brought before that his confession was false. He said due to his fear that if he said anything it would be worse for him and that he was scared. This makes perfect sense for a 16 year old in this situation.

Sixteen plus years later on September 15, 2011 Villegas testified at a Writ of Habeas Corpus hearing. Very similar to his 1994 testimony he states that from his arrest until he is booked for capital murder Detective Marquez cursed at him, slapped him in the back of the head, threatened to take him to the desert and beat him, and threatened to book him in the jail where a bunch of "faggots" would rape him.

Villegas added that prior to seeing an intake officer and the judge Detective Marquez threatened him and told him to tell them he wanted to give a statement. Villegas describes himself as terrified out of his mind and unable to think straight.

Detective Marquez threatened him with the electric chair and told him he would pull the switch himself. At some point Villegas gave a statement naming Rodney Williams as the suspect, which angered Detective Marquez.

Eventually Detective Marquez typed out a statement describing to Villegas who was in the car, what street they were on and how he shot the victims. Villegas told Detective Marques the weapon used was a shotgun, but Detective Marquez told him it was not.

Villegas said the beer run, "Popeye" and "Droopy", and how the shooting occurred were all told to him by Detective Marquez.

Villegas admitted he told Rangel he shot England and Lazo during a phone call and told him he used a shotgun. Villegas however said he was joking and told Rangel he was just joking. He also said he gave an alibi for the time of the shooting to Detective Marquez.

**Exhibit 4**

When asked directly if he had anything to do with the killing of Armando Lazo or Robert England, Villegas answered, "no sir."

Ultimately, the statement by Villegas in the EPPD report is insufficient and lacks corroboration to name him as a suspect in the murders of England and Lazo. The statement is factually false as to the driver of the vehicle, a second occupant of the vehicle, the color of the vehicle, and a second shooting scene. I cannot think of any honest explanation for the detectives' failures to note and address these discrepancies. Although Villegas's sworn testimony in 1994 and 2011 provide further evidence of a coerced confession, his "statement" and the evidence against him was plainly insufficient and required additional investigation even before he gave that testimony.


**Tunnel Vision**

Tunnel vision has been well-known to detectives as a potential impediment to effective policing. Detectives are trained to be aware of tunnel vision and its pitfalls. Detectives are educated that they can become enamored with their theory of the case and begin to view the evidence with an eye to making it fit their case (tunnel vision). Detectives are trained that to avoid tunnel vision, they must follow the facts wherever they lead, and be prepared to abandon their theory of the case if the facts warrant.

Vernon Geberth under 10 Most Common Errors or Missteps in Death Investigation lists tunnel vision.

"Another problem that occurs is focusing on one suspect too soon, while eliminating other possibilities. This could be considered jumping to conclusions. Another problem is tunnel vision. At times investigations may close their minds to other possibilities once they've developed a theory. Then they begin to try and make the evidence fit their theory instead of allowing the evidence to lead them to a suspect"[10]

As noted previously this case is built upon the statements of witnesses and suspects, there is no physical evidence linking Daniel Villegas to this homicide. Problematic is EPPD detectives did not provide an explanation for the numerous false facts in statements by these witnesses and suspects. Some may appear minor but some would cause the collapse of the entire case such as the "Popeye" and "Droopy."

In the summary below I will focus on the problems, inconsistencies, lack of corroboration and evidence with this investigation. Based on the numerous unexplained false facts and lack of follow-up to clarify these issues at best EPPD had a problem with tunnel vision. However the El Paso Police Department's top down focus on crime

---

[10] Practical homicide Investigations, Geberth pg 43

**Exhibit 4**

statistics and clearance rates must be considered as a possible pressure placed upon those working to solve this homicide case which may have led to inefficient and unprofessional work product used to prosecute Villegas.

The other possibilities are seen through the descriptions of their interviews provided by Jesse Hernandez, Rodney Williams, Marcos Gonzalez and Daniel Villegas. They each describe unprofessional, vile, coerced statements, which picture an investigation of malfeasance rather than tunnel vision or departmental culture.

### Summary of Investigation

I begin this summary by again noting, EPPD detectives have a mandate to promote the welfare of juvenile offenders, which did not happen in this investigation.

Eleven suspects are named in this investigation, not a single suspect is fully examined based on the documentation in the EPPD report. Three examples of suspects that provide exculpatory evidence that Daniel Villegas did not commit the murders of England and Lazo are Michael Johnston and Jacob Jauregui and the Flores brothers.

Johnston gave multiple versions of how he and Jaureui murdered England and Lazo. EPPD did not record each version and did not record how they were cleared of involvement.

The Flores brothers, specifically Rudy, had motive, means, opportunity, false alibi, and a vehicle that partially matched the suspect vehicle. Yet even with all of these factors none of these issues were investigated and they were cleared of involvement without a record of how and why.

The most concerning and unprofessional lack of action related to a named suspect is related to Enrique Ramirez "Popeye." He is named as the driver of the suspect vehicle and the person who gave Villegas the gun used in the murder. EPPD detectives never contacted and interviewed Ramirez.

The EPPD case against Daniel Villegas is founded upon the statements of David Rangel, Rodney Williams, Marcos Gonzalez and the alleged confession of Villegas which has been proven to be factually false.

Documentation and corroboration of witness and suspect statements are a hallmark of a professional homicide investigation. Any statements that deviate from facts known by an investigator must be noted and explained within the police report.

As the preeminent English jurist William Blackstone wrote, "Better that ten guilty persons escape, than that one innocent suffer." This principle can also be found in religious texts and in the writings of the American Founders. Benjamin Franklin went further arguing "it is better a hundred guilty persons should escape than one innocent person should suffer."

**Exhibit 4**

As previously noted Vernon Geberth calls the homicide investigator the "seeker of truth." When key witness statements differ from the facts it is the detective's job to become the seeker of truth for the protection of the rights of the innocent, that did not happen in this case.

I will review again some of the obvious failures in this investigation related to the key persons relied upon for the prosecution of Villegas. The lack of documentation, follow-up investigation, lack of corroborating crime scene evidence, lack of corroborating eyewitness statements will be clear.

David Rangel, it is unknown why detectives wanted to interview Rangel and if they had already developed information on his cousin Villegas. There is no explanation as to why they brought him in for an interview. The case against Villegas is built upon this interview with Rangel, detectives should have explained why he was brought in for questioning. Rangel would later say it was related to a harassment complaint he was never questioned about. The failure by detectives to dispel this leaves an obvious inclination that they had already been interested in Villegas.

Rangel's statement has false information in it that was not followed-up on; wrong suspect vehicle color, wrong driver, wrong weapon used, victim throwing gang signs, second round of gunfire on Oakwood. Without clarification of these false areas of Rangel's statement his statement does not support prosecution of any person in this murder.

Regarding Rodney Williams, there should have been no unanswered questions after the interview with Williams, however there were many. Williams allegedly placed himself in the suspect vehicle making him a co-conspirator in the murder of England and Lazo. Williams' statement has false information that was not followed-up on; wrong suspect vehicle color, in fact it did not match Rangel's statement or Hernandez and Medina. Williams places "Popeye" and "Droopy" in the vehicle which is factually false which invalidates his entire statement.

In addition, the interview with Williams was so poorly conducted and documented that there is no physical description of two co-conspirators who he names by their moniker only. He does not describe the handgun used, he states he believes Lazo is shot in the back yet the detectives knew he was shot twice in the front of his body. Williams' statement does not support prosecution of any person in this murder.

Marcos Gonzalez, at trial in 1994 Gonzalez describes his statement as coerced and given due to fear, and was not true. When interviewed Gonzalez allegedly gave two statements, the first interview had the wrong suspect vehicle driver, the second matched what I would call the EPPD detectives narrative.

Gonzalez placed "Popeye and "Droopy" in the suspect vehicle.

In the second statement as they drive up to the victims the second time Popeye had given a gun to Villegas. Villegas leaned out the window and fired about three times and

**Exhibit 4**

then fired again two to three times. Popeye drove after one of the victims and fired some more.

If detectives were to believe this statement the obvious follow-up action would be to locate, interview and arrest Popeye, yet he was never interviewed.

Gonzalez's statement as recorded is factually false. It is proven "Popeye" and "Droopy" were not involved in these murders. In addition there is no physical evidence to support a second round of shots fired as Gonzalez describes "Popeye" chasing after one of the victims. Gonzalez statement does not support prosecution of any person in this murder.

When EPPD detectives interviewed Villegas they likely would not yet have known "Popeye" and "Droopy" were incarcerated and on home monitoring. However they would have absolutely known the statements of Rangel, Williams and Gonzalez did not corroborate the crime scene evidence or the statements from Hernandez, Medina and Gorham.

This reality should have caused Detective Marquez to be very aware of the possibility of Villegas providing a false statement, unless of course as stated by Williams and Gonzalez their statements were coerced.

As noted in the review of suspects; *"The statement by Villegas in the EPPD report is insufficient and lacks corroboration to name him as a suspect in the murders of England and Lazo.*

Villegas was arrested and then prosecuted even though the EPPD detectives knew the following facts, some at the time of his arrest, all prior to his trial:

Villegas gave the wrong suspect vehicle color. He calls the vehicle white yet Hernandez identifies it as maroon and Medina as godlish.

Villegas named "Popeye" and "Droopy" as co-conspirators which has been proven factually false. "Popeye" Enrique Ramirez was incarcerated at the time of the murders and "Droopy" Fernando Luhan was on home monitoring.

Villegas said he fired the gun, he did not state he shot anyone.

Villegas said they chased Lazo and then "someone" shot him, the crime scene and autopsy evidence proves this false.

Shocking to this reviewer is the fact that Villegas supposedly says "someone" finished off Lazo and no follow-up investigation is completed.

The obvious question is how could Villegas be arrested and charged with murder, if his statement and the statements of Rangel, Williams and Gonzalez have been proven false. In addition Villegas' own statement is clearly factually false.

**Exhibit 4**

The answer may be found in the lack of a need for truth and facts in this investigation. On April 22, 1993 Detective Marquez is the affiant in a search warrant request submitted to Judge Matthew Moore. In that affidavit Detective Marquez states Villegas admitted to the following facts:

Villegas admits to being a member of "VNE", this is not recorded in Villegas statement.

Villegas admitted to shooting England and Lazo, Villegas does not admit to shooting England, only shooting in their direction and that "someone" shot Lazo. The misrepresentation of Villegas on this most important issue is a clear act of deception before a State of Texas County of El Paso Judge.

Villegas admits ownership of the gun used in the murders. Again, the misrepresentation of Villegas on this most important issue is a clear act of deception before a State of Texas County of El Paso Judge. Villegas' statement as recorded by Detective Marquez on the issue of the gun is; "I was given a gun by one of the guys."

Another area that the question of failure to present the truth is found in the closing statements of three detectives. Detectives Marquez, Arbogast, and Graves all completed supplemental police reports some two weeks after the arrest of Villegas. All three detectives name Villegas as one of the suspects in the murder of England and Lazo. All three also fail to mention that "Popeye" and "Droopy" could not have been in the suspect vehicle.

It is possible that one detective would have failed to remember to document this extremely important fact. However with all three detectives failing to document this crucial fact the indication is the three conspired to hide this truth from the prosecuting attorney.

Based on my review of this case standard police investigative procedures were not followed. Documentation is lacking thoroughness, obvious follow-up questions and investigative actions are ignored. EPPD departed from standard police practice in leadership, supervision and case management allowing these failures of basic homicide investigation to lead to the wrongful arrest of three persons and the prosecution of one. This is clearly seen in officers approving their own reports, ignoring exculpatory evidence, unprofessional interview tactics, failure to document investigative action and failure to follow-up on actionable information.

If Villegas provided a truthful confession, then there was probable cause for his arrest. But if that confession was false, then the statements of the other witnesses interviewed by police would not amount to probable cause to arrest Villegas in any detective's mind. The statements by Gonzalez and Williams are factually false, contradict each other, and are uncorroborated. The statements implicating other people in the investigation suggest that someone else might be responsible for the murder. In short, I find there is no support for the arrest of Daniel Villegas in the murders of England and Lazo if his confession is false.

**Juvenile Policy Violations and Investigation Documentation Policy Violations**

**Exhibit 4**

I have been asked, based on my experience as a homicide investigator, supervisor of detectives investigating homicides, and police chief; my law enforcement training; and my experience conducting audits of the entire operations of police departments, whether the City of El Paso failed to enforce its juvenile policies and documentation policies and in 1993 and whether the City of El Paso had notice of violations of those policies.

<u>Policies</u>

I have been made aware that the City of El Paso, at least on paper and according to deposition testimony from former police executives and the City of El Paso, had the following relevant policies:

- Required to notify parents when juveniles arrested. 1992 Policies, CITY 21499; Messer 113-114.
- Parental permission was required before taking statements from juveniles. 1992 policies (CITY 21340, 21502, 21505); deposition testimony: 30b6 witness Reginald Moton 168-69; Police Chief John Scagno 170 (sergeants should catch when juveniles questioned without parental permission; Asst. Chief Messer 109–110; 113–114 (parental permission or presence required to take juvenile statement or juvenile confession).
- Parental permission was required before interrogating juveniles: 1992 policies (CITY 21340, 21502, 21505); deposition testimony Moton 168-69; Scagno 170 (sergeants should catch when juveniles questioned without parental permission).
- A juvenile suspect cannot be questioned about a murder without first being taken to a juvenile probation officer and then to a magistrate judge to be administered a warning of constitutional rights. 1992 policies (CITY 21502-21504); Marquez 72 (agreeing that "you needed to bring the juvenile to a magistrate before you could question a juvenile about a murder.").
- Even juvenile witness statements should generally be taken at a juvenile facility, not a regular police station. Messer 226; Scagno 165–167 (no good reason to take juveniles to TAC office; no good reason to take juvenile witnesses to the Crimes against Persons office without first going to Youth Services Division)).
- Officers after arresting a juvenile must, "without unnecessary delay and without first taking the child elsewhere," take them to the juvenile probation department. 1992 policy, CITY 21503.
- CAP detectives were allowed to approve their own reports. Arbogast 41; Moton 80; Graves 117.
  - That was not documented in policy. Moton 80. Policy required sergeants to approve reports. 1992 policies, CITY 21471-72 ("Officers submit the completed Supplementary Report to a supervisor for approval"); 1988 policies, CITY 21115 (same).

**Exhibit 4**

- Supplemental reports, including those made by CAP detectives, had to be made before the end of the officer's tour of duty. Criminal Investigations Bureau manual at 7, CITY 15523; Moton 71-72.
- Confessions should be recorded, including juvenile confessions. Crimes Against Persons Operations Manual section XIV A. 2 ("A written and signed confession should be obtained recorded and video taped if possible."); Messer 226 ("In other words, if a CAP detective needed to take a confession or a statement or witness statement, whatever, from a juvenile, in most cases, he should have gone down to this juvenile facility, <u>taken his tape recorder with him</u>, and conducted the business down there."); Moton 144–146 (as soon as the CAP detectives had tape recorders, they were required to use them for confessions; the Department had tape recorders; not sure if CAP detectives had tape recorders).

<u>Standards</u>

- As of 1993, it was understood that juveniles needed to be treated differently from adult suspects and that juveniles were more susceptible to coercion. The City of El Paso was aware of this risk, according to its 30b6 representative. Moton 184-185 (vulnerability of juveniles is "the whole reason for our different policies").
- As of 1993, it was understood that there was an especially critical risk of misconduct in homicide investigations because of the pressure to solve cases and the public pressure surrounding those cases. The City of El Paso agreed that it is especially important to hold detectives who handle homicides up to higher scrutiny. Moton, 45-46 ("fair" to say that CAP detectives were held "to a higher standard," and it was "very important to get it right when you're investigating that kind of crime.")
- As of 1993, it was understood that information from investigations needed to be recorded thoroughly and promptly, both to prevent the officers' memories from fading and to ensure that all inculpatory and exculpatory evidence was documented and could be provided to the prosecutor. The City understood that this was important. Moton 72 (reason for requiring daily reports was "for the purpose for keeping the information fresh, recent, and ensuring that it was complete").

<u>Evidence from the Lazo/England Investigation – Juvenile Policy Violations</u>

- Failure to notify parents
  - Marquez testified that he was not under any obligation to contact juveniles' parents after juveniles were arrested. Marquez 263.
- Failure to document parental permission to interrogate Jauregui and Johnston
  - Jauregui and Johnston were suspects and permission should have been documented. Arbogast 258 (agreeing that it would've been important to document parental permission)
- Failure to get parental permission to take statement from Rodney Williams
  - Arbogast says Williams was considered only a "witness." But the record doesn't show any parental permission to interview him. In fact, Arbogast picked him up at a basketball court at a high school. Arbogast 204-06.

**Exhibit 4**

- Failure to defer to youth services when required, including interrogating suspects in non-homicide cases
  - Marquez testified that despite the policy that youth services generally interrogate juveniles, Marquez did not follow that policy "Because I'm the one that's investigating the crime." Marquez 79.
  - Arbogast testified he wasn't aware of <u>any</u> case where youth services officers, instead of CAP, interrogated juveniles. Arbogast 108-109.
  - Graves testified that his practice was not to let youth services because they "wouldn't have known the details of the case." Further, he never saw JPD (the juvenile probation department) take control over an investigation, in spite of that policy. Graves 34-35.
- Failure to take Rodney Williams to magistrate for warnings once he starts incriminating himself in the shooting (per police reports, above)
- Failure to get parental permission or presence to take confession from Daniel Villegas
  - Even Carlos Ortega, the youth officer, testified that it is OK to interview a juvenile with the juvenile probation department officer's permission, <u>even without parental permission</u>. Deposition testimony, Ortega 83-84.
  - Arbogast testified that it was OK to interrogate juvenile suspects without parental permission and that juveniles have no right to have a parent present when questioned. Arbogast 102, including errata.
  - 
- Failure to take Rodney Williams' witness statement at juvenile facility or engage juvenile officer in his statement
- Failure to take Daniel Villegas directly to JPD, instead stopping at Northpark Mall
- Graves was not aware of a single instance where officers were punished for not following juvenile policy. Graves 203-204.

<u>Evidence from the Lazo/England Investigation – Reporting Violations</u>

- Failure to write reports on same day evidence gathered
  - Link Brown testified that he wasn't aware of any deadline for writing reports and wouldn't fear any consequences for taking a month to write a report. Brown 64-65, 108.
- Failure to take audio or video recording of confessions
  - Not the practice at CAP. Arbogast 67.
  - Link Brown, a TAC officer who was present when Daniel was interrogated, stated that he would have called a supervisor if, for some reason, he wanted to record an interview—it wasn't standard practice. Brown 49-51.
  - Graves testified that he was never trained to record interrogations in their entirety. Graves 50.
- Failure of supervisors to review
  - Arbogast testified that detectives approved their own reports, and the police reports showed the same. Arbogast 41.

**Exhibit 4**

- o After writing reports, "sometimes a sergeant might read it . . . but probably not all the time." Arbogast 67.
  - o Practice in CAP was for detectives to approve their own reports, which was against written policy but was understood as the accepted practice.
- Failure to record exculpatory evidence
  - o Arbogast testified that sergeants did not instruct him to find and record evidence of innocence as well as guilt. Instead, "Really, it was just to solve the case."

<u>Failures of training</u>

- Detective Marquez testified that he was not trained that juveniles were more susceptible to coercive tactics than adults. Deposition testimony, Marquez 54. Graves testified to the same. Graves 76.
- Chief Scagno testified that in 1992, there was an issue with members of the TAC team taking statements or confessions from juveniles without parental permission. Scagno 166.
  - o Despite this, none of the main detectives in the Villegas investigation knew that parental permission was needed before taking confessions (see above). Even Ortega, the juvenile officer, didn't know that.
  - o There were members of the TAC team present, including Link Brown, who was present for Daniel's arrest. Brown did not ensure that parental permission was given before Daniel was interrogated.
- Even though Marquez violated multiple policies – on paper – like writing timely reports, writing complete reports, and getting parental permission before interrogating juveniles – his personnel file indicates that from 1984 to 1996, he was consistently praised for his success in interrogations and especially obtaining confessions. Marquez personnel file, CITY 7169, 7172, 7180, 7183, 7187, 7191, 7244, 7246, 7249, 7252, 7261, 7290, 7295, 7306, 7328.
  - o So, although the City may have said that CAP detectives were held to higher standards, it actually allowed those detectives to violate its policies – and indeed, remain ignorant of those policies. Marquez was not evaluated, it seems, on his ability to respect residents' rights. He was evaluated for his ability to get convictions.

**Conclusion Regarding Failures to Enforce Juvenile Policies and Police Investigation**

As previously stated the Texas Family Code and EPPD policy recognize the responsibility to promote the welfare of a juvenile offender. It is clear based on the

**Exhibit 4**

above noted facts that EPPD failed to enforce juvenile policy and report writing policy as it related to it's Crimes Against Persons Unit Detectives in this murder investigation.

I will point out in summary form how some of the above listed facts can have a negative impact on juvenile criminal investigations. Juvenile policy is clearly put in place due to the lack of maturity of juveniles making them susceptible to being manipulated into giving false statements simply by their lack of maturity and or coercion. This was clearly known by EPPD leadership as noted below, however the lack of accountability and training caused some detectives to lack knowledge of juvenile policy or ignore it without repercussion.

Both Chief Scagno and Assistant Chief Messer in their depositions stated parental notification is required prior to a juvenile suspect interview. Chief Scagno noted it is the sergeants job to catch this error if the parent was not notified. As noted above with multiple suspects in this investigation parents were not notified or their notification is not recorded in the police report.

Both Chief Scagno and Assistant Chief Messer also stated juveniles should be transported to a juvenile facility not a regular police station, TAC office or CAP. Messer specifically said "Even juvenile witness statements should generally be taken at a juvenile facility, not a regular police station." Scagno added "no good reason to take juveniles to TAC office; no good reason to take juvenile witnesses to the Crimes against Persons office without first going to Youth Services Division."

Commander Reginald Moton in his deposition makes it clear whenever possible a youth services officer should interview juveniles. He also stated the whole reason for different policies in relation to juvenile offenders is that juveniles are more vulnerable than adults.

The online, Oxford dictionary defines vulnerable as:

> *susceptible to physical or emotional attack or harm*
>
> *Of a person in need of special care, support, or protection because of age, disability, or risk of abuse or neglect.*

It should have been well known within all ranks of EPPD that Daniel Villegas on the night he was arrested was vulnerable, susceptible to giving a false statement based on how detectives interacted with him. Yet, he was driven from his home to the Northpark Mall in violation of EPPD policy. At the mall he watched detectives have a conversation he could not hear. An average person would likely believe the conversation was about them as he had just been arrested. As a person in a people group identified as vulnerable by Captain Moton this would likely cause fear and confusion which could lead to making false statements believing it would help avoid incarceration.

Detectives did not seek permission from Villegas' parents prior to interviewing him, again likely to cause fear and confusion. The parental permission policy is in place to provide a layer of protection for the juvenile yet it was ignored by Detective Marquez. In addition, a juvenile officer was not used to interview Villegas. Moton in his deposition

**Exhibit 4**

states the importance of a youth officer interrogating a juvenile as they know juvenile law and procedure on how to handle a juvenile.

If Villegas would have been driven directly to a juvenile facility, known of his parents notification meaning involvement and had a trained youth officer present during his interrogation it is possible his statement would have been different than the one recorded. What is definitely known is if the interrogation was recorded as Assistant Chief Messer suggested in his deposition, "a detective should take his tape recorder to the juvenile facility," there would be no doubt about what Villegas said, but this was not done.

The policy failures are clearly recorded and yet EPPD detectives generally stated they were not aware of the different responsibility they had towards juveniles. This could be a lack of training as a priority within the EPPD. It is also possible the priority of solving a murder case caused supervisors to not focus on the priority of policy, procedure or law rather allowed the arrest to be the priority.

Even Chief Scagno in his deposition excuses the lack of accountability to follow policy related to parental notification with the following statement: "I would think the sergeant should catch it, but if it's just in a report and he's trying to get through a bunch, I don't know that they'd catch it. But should they have? Yes."

EPPD policy, Texas juvenile law recognizes the vulnerability of juveniles. However Chief Scagno suggests if a sergeant is trying to get through a "bunch" meaning a bunch of reports it might be an excuse to not hold the detective or officer accountable because the sergeant might not catch the error.

The CAP and Youth detectives who in their depositions state they are not familiar with juvenile law, and the possibility a sergeant would not take action due to being overworked allows for the possibility, or coerced statements leading to wrongful convictions to occur.

Various violations of EPPD policy not only relate to Villegas but each of the other suspects noted in this review. This reality indicates following EPPD policy was not a priority of EPPD in 1993.

I reviewed Richard Rosenthal's EPPD Internal Affairs Review. His specific review of thirteen internal affairs cases involving juveniles showed a pattern of ignoring policy related to protecting the rights of juveniles as seen in the Villegas case. The report is comprehensive on the topic and there are two issues in Rosenthal's review that I will note that reveal mindset and behavior that build on my prior comments in this review.

First is mindset, as I previously noted in my review a focus on clearance rates can impact professional policing causing detectives if not held accountable to be able to violate policy to make an arrest. Rosenthal records a statement from Officer James Arbogast in which he states, "if we never spoke to juveniles without parental consent first our solvability factor would be much worse." Officer Arbogast is clearly revealing his and other detectives' mindset that it is fine to violate policy to make the arrest, solve the

**Exhibit 4**

case, and maintain high clearance rates. The mindset of "solvability" is a slippery slope that can lead to systemic violations of policy, procedure and law.

Second is dishonesty, nothing is more problematic in policing than a police officer that is dishonest. When I was hired as a police officer in 1984 we were required to memorize the police officer code of ethics and one of its points focused on honesty. In 1957 the IACP adopted a code of ethics which notes, "honest in thought and deed." A phrase I have been familiar with my entire career is "lie and you will die" meaning if you lie as a police officer you will be fired. As it was taught to me in my police training as a police officer you have the ability to take someone's freedom and incarcerate them based on your word alone so truthfulness is a hallmark of policing. It is apparent from this investigation that the investigating detectives did not fear that obvious inconsistencies in their investigation would be revealed or punished. The investigation is consistent with a larger failure within the El Paso Police Department to adequately supervise or punish acts of dishonesty.

**Exhibit 4**

**Appendix A: CV**

## Joseph F Allio

107 Clayton Circle, Vacaville CA, 95687
Phone: 707-249-2737 E-mail: alliojf@gmail.com

### Professional Experience

| | |
|---|---|
| Consultant Loevy & Loevy | 2022 |
| Chief of Police-Interim (Vacaville) | 2021-2022 |
| Assistant Police Chief-Interim (Vallejo) | 2020 |
| Consultant Sloan Sakai Yeung & Wong | 2020 |
| Chief of Police-Interim (Vallejo) | 2019 |
| Chief of Police (Fairfield) | 2015-2017 |
| Police Captain (Fairfield) | 2012-2015 |
| Police Lieutenant (Fairfield) | 2011-2012 |
| Police Sergeant (Fairfield) | 1998-2011 |
| Police Officer (Fairfield) | 1997-1998 |
| Associate Pastor (Vacaville Bible) | 1996-1997 |
| Police Officer (Fairfield) | 1987-1996 |
| Police Officer (South San Francisco) | 1984-1987 |

### Additional Professional Experience

| | |
|---|---|
| Initiate Police Audit with OIR Group-Vacaville Police | 2021-2022 |
| Facilitate Police Audit with OIR Group-Vallejo Police | 2019-2020 |
| Operations Division Captain | 2012-2014 |
| Administrative Services Lieutenant | 2011-2012 |
| Professional Standards Unit Sergeant | 2004-2006 |
| Investigations Unit Sergeant | 2001-2002 |
| Youth Service Sergeant | 1999-2001 |
| SWAT Team Member/Sergeant | 1997-2000 |
| Police Probation Team | 1994-1996 |
| Investigations Unit Detective | 1990-1994 |
| SWAT Team Member | 1989-1995 |

### Achievements

**Exhibit 4**

| | |
|---|---|
| Exceptional Performance Citation | 2003 |
| Manager of the Year | 2000 |
| Exceptional Performance Citation | 1994 |

### Education/Certificates

| | |
|---|---|
| Senior Management Institute for Police | 2012 |
| Bachelor of Science Degree, Union Institute and University | 2007 |
| Post Supervisory Leadership Institute | 2001 |
| Associates of Arts Degree, Skyline College | 1982 |
| Post Certificates; Basic-Executive | 1984-2017 |

### Community Activity

| | |
|---|---|
| Elder-Faith Community Church Vacaville | 2019-Present |
| President Board of Directors -The Leaven Kids | 2012-Present |
| Member Host Lions (Fairfield) | 2011-2017 |
| Leadership Training, Compassion Ministry-Rwanda | 2007-Present |
| Pastor Grace Fellowship, Vacaville | 2000-2009 |
| Board of Directors - Batten Disease Assoc. | 2000-2004 |

**Exhibit 4**

**Appendix B: Cases Where Testified by Deposition or at Trial in Past Four Years**

Testified at deposition Liggins v City of Chicago          October 3, 2022

**Exhibit 4**