IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS, EL PASO DIVISION

| | | |
|---|---|---|
| DANIEL VILLEGAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 3:15-CV-386 |
| CITY OF EL PASO, ALFONSO MARQUEZ, | ) | |
| CARLOS ORTEGA, SCOTT GRAVES, | ) | |
| KEMMITT BELLOWS, EARL ARBOGAST, | ) | |
| RAY SANCHEZ, HECTOR LOYA, | ) | |
| UNKNOWN EMPLOYEES OF THE | ) | |
| CITY OF EL PASO, | ) | |
| | ) | |
| Defendants. | ) | |

**EXPERT REPORT OF JEFFREY J. NOBLE**

1.      My name is Jeffrey J. Noble, and I make this report at the request of defendant's
counsel.

2.      I was a police officer in the City of Irvine for 28 years rising to the position of Deputy
Chief of Police prior to my retirement.  I served as an interim Deputy Chief of Police at
the Westminster Police Department for nine months.

   a.      I was a police officer for 28 years and retired in July 2012 as the Deputy Chief of
Police with the Irvine Police Department, located in southern California.  As a
Deputy Chief, I was directly responsible for all police operations including Patrol,
Traffic, Criminal Investigations, Emergency Management, Crime Prevention,
DARE, K9s, Training, and SWAT.  The City of Irvine encompasses over 70 square
miles with a population of over 218,000.  I served in a wide range of assignments
as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy
Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs,
Emergency Management and Crime Prevention.  The Irvine Police Department
had over 200 police officers and over 100 civilian employees during my
employment with the department.

   b.      In April 2014, I was hired by the Westminster, California Police Department as an
interim Deputy Chief of Police.  My employment with the Westminster Police

**Exhibit 5**

Department was by means of a temporary contract, and I was asked to review the department's Internal Affairs unit; department policies relating to Internal Affairs investigations, discipline and police officer conduct; conduct department audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period.  My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation.  I concluded this interim position in January 2015. The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

c.   As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

4.   I have a Juris Doctor degree, with honors, from Western State University College of Law and I am admitted to practice law in the State of California.  I have a Bachelor's degree in Criminal Justice with an emphasis on Administration from California State University at Long Beach.

5.   As a police consultant and expert witness, I have extensive experience on matters involving police investigative procedures, misconduct and corruption.  For example:

a.   In 2014, I was part of a Carnegie Institute of Peace Think Tank for addressing police use of force in developing countries.

b.   I have consulted with other police organizations on a wide range of police practices, procedures, including criminal and administrative investigations.  For instance, I was retained in 2004 as an expert to review and evaluate the internal investigation conducted by the San Francisco, California, Office of Community Complaints of the case widely known as "Fajitagate" involving the indictment of seven command staff members and three officers of the San Francisco Police Department.  In 2007 and again in 2009, I was retained by the City of Austin, Texas to review the police department's internal homicide and Internal Affairs investigation of two officer involved fatal shootings.

c.   I have been retained as both a defense and a plaintiff's expert in over 300 cases and have testified as an expert in state court in California, Washington, Tennessee, Connecticut, Minnesota, Illinois and New Mexico and in federal court

2

**Exhibit 5**

in Illinois, Tennessee, Georgia, South Carolina, North Carolina, Virginia, Texas and California.

d.     I have prepared expert reports for cases in the states of California, Washington, Pennsylvania, Georgia, Illinois, Tennessee, Idaho, Arkansas, Texas, Colorado, New York, Oklahoma, Connecticut, Florida, New Mexico, Minnesota, Ohio, Kentucky, Louisiana, Indiana, Wisconsin, Virginia, Delaware, Oregon, Arizona, New Mexico, New Jersey, Mississippi, North Carolina, South Carolina, Wyoming, Kansas and Missouri.

e.     I have been retained in criminal cases involving allegations of criminal uses of force by police officers in the states of New Mexico, Delaware, Minnesota, Pennsylvania, California, Georgia, Washington, and Florida.

f.     I served as an independent policy advisor to the Large City Internal Affairs Project, which was funded by the United States Department of Justice.  This group consists of the 12 largest police agencies in the United States as well as a select group of independent policy advisors and academics.  The project was an effort to develop national best practices in internal investigations for police agencies.  I was the chair of a sub-committee whose efforts were focused on the investigation of allegations of officer misconduct.  Because of this project the COPS Office published a document entitled, "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice."

g.     I have given presentations at the International Association of Chiefs of Police conference in 2004, 2009, 2012, and 2014; the national COPS conference on Internal Affairs issues and the Academy of Criminal Justices Sciences annual meeting on tactical reckless decision making in 2009; the American Psychological Association annual conference in 2013; and National Tactical Officers' Association annual conference in 2004.

h.     In 2013, I gave a presentation in Mexico at the request of the Mexican government on preventing corruption in police institutions.

i.     I have published 21 articles on policing which discussed the subject matters of: Internal Affairs, personnel issues, pursuits, use of force issues and investigative procedures.  Those articles are listed in my attached resume.

j.     I have published two chapters for policing textbooks on tactical recklessness and the code of silence.

3

**Exhibit 5**

k.      I have co-authored, along with Geoffrey Alpert, Ph.D., a textbook on police Internal Affairs investigations titled, "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight."

l.      As evidence that the opinions in our book are accepted by other experts of police administrative investigations, my book was cited extensively in the COPS 2009 publication, "Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practice Guide for Local Law Enforcement."

m.      In 2020, I co-authored a textbook, "Evaluating Police Uses of Force," with Seth Stoughton and Geoffrey Alpert.

6.      My experience, training and background are more fully described in my attached resume.

7.      My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

8.      I reviewed the following material in making my opinions:

- Third Amended Complaint
- Personnel Files
  - Alfonso Marquez (DEF CITY 006943-7350)
  - Kimmett Bellows (DEF CITY 007351-7593)
  - Carlos Ortega (DEF CITY 007594-8164)
  - Hector Loya (DEF CITY 008165-8436)
  - Earl Abrogast (DEF CITY 008437-9132)
  - Ramon Sanchez (DEF CITY 009133-9916)
  - Scott Graves (DEF CITY 009917-10580)
- 1988 Internal Affairs Files
  - 0048035-0048038 Pedro J Gaytan
  - 0048039-0048080 Pedro Mendoza
  - 0048081-0048091 Ramiro Gonzalez Jr
  - 0048092-0048124 Randall Hawkins
  - 0048125-0048135 Raul Hernandez
  - 0048136-0048193 Richard Campos
  - 0048194-0048197 Robert Chavez
  - 0048198-0048201 Robert E Chavez
  - 0048202-0048208 Rodney Hodson

**Exhibit 5**

- 0048209-0048274 Ross Johnson
- 0048275-0048384 Sandra Martin
- 0048385-0048393 Saul Medrano
- 0048394-0048400 Sgt DiMatteo
- 0048401-0048416 Sgt Meza
- 0048417-0048458 Sgt Jeffrey Ellett
- 0048459-0048599 Sgt Richard Skanse
- 0048600-0048614 Sgt William Pfeil
- 0048615-0048680 Silvio Karisch - John Macias
- 0048681-0048747 Steve Dyess
- 0060023-0060034 CP88-228
- 0060035-0060056 CP88-232
- 0060057-0060063 CP88-236
- 0044277-0044283 CP88-001
- 0044284-0044345 CP88-002
- 0044346-0044353 CP88-003
- 0044354-0044363 CP88-004
- 0044364-0044377 CP88-005
- 0044378-0044395 CP88-006
- 0044396-0044434 CP88-007
- 0044435-0044436 CP88-008
- 0044437-0044442 CP88-009
- 0044443-0044449 CP88-010
- 0044450-0044482 CP88-011
- 0044483-0044496 CP88-012
- 0044497-0044510 CP88-013
- 0044511-0044600 CP88-014
- 0044601-0044639 CP88-015
- 0044640-0044655 CP88-016
- 0044656-0044671 CP88-017
- 0044672-0044677 CP88-018
- 0044678-0044740 CP88-019
- 0044741-0044750 CP88-020
- 0044751-0044779 CP88-021
- 0044780-0044864 CP88-022
- 0044865-0044878 CP88-023
- 0044879-0044883 CP88-024
- 0044884-0044886 CP88-025
- 0044887-0044892 CP88-026
- 0044893-0044898 CP88-027
- 0044899-0044909 CP88-028

**Exhibit 5**

- 0044910-0044918 CP88-029
- 0044919-0044946 CP88-030
- 0044947-0044986 CP88-031
- 0044987-0045092 CP88-032
- 0045093-0045124 CP88-033
- 0045125-0045149 CP88-034
- 0045150-0045174 CP88-035
- 0045175-0045200 CP88-036
- 0045201-0045402 CP88-037
- 0045403-0045412 CP88-038
- 0045413-0045419 CP88-039
- 0045420-0045462 CP88-040
- 0045463-0045473 CP88-041
- 0045474-0045478 CP88-042
- 0045479-0045488 CP88-043
- 0045489-0046033 CP88-044
- 0046034-0046069 CP88-045
- 0046070-0046101 CP88-046
- 0046102-0046129 CP88-047
- 0046130-0046160 CP88-048
- 0046161-0046190 CP88-049
- 0046191-0046255 CP88-050
- 0046256-0046267 Bernabe Nunez
- 0046268-0046409 Charles Gonnell
- 0046410-0046424 Charles Murphy
- 0046425-0046475 Dale Fernandez
- 0046476-0046753 Dale Fernandez
- 0046754-0046759 Daniel Jaso
- 0046760-0047337 David Cuevas
- 0047338-0047355 Deborah Nagel
- 0047356-0047422 Detective Greg Delong
- 0047423-0047426 Donald Georgens
- 0047427-0047452 Elvira Nevarez
- 0047453-0047486 Francisco J Cuevas
- 0047487-0047501 Gary Keiser
- 0047502-0047553 George Garza
- 0047554-0047599 Gerald King
- 0047600-0047626 Grady Tom
- 0047627-0047640 James Johnson
- 0047641-0047728 Jeffrey T Ellett
- 0047729-0047735 Jerome Johnson

**Exhibit 5**

- o       0047736-0047741 Joseph Barragan
- o       0047742-0047759 John Campbell
- o       0047760-0047778 John Walsmith
- o       0047779-0047784 Juan Sanchez
- o       0047785-0047835 Lt Gary White
- o       0047836-0047853 Lt John Lanahan
- o       0047854-0047867 Luis Martinez
- o       0047868-0047880 Michael Brooks
- o       0047881-0047882 Miriam Hinojos
- o       0047883-0048025 Officer Antonio Munoz
- o       0048026-0048034 Officer Silvio Karisch
- o       0048026-0048034 Officer Silvio Karisch
- 004204-004322 - Case No 95-002045 [Marquez Incident - Rafael Vasquez]
- 004324-004577 - Case No 95-048079 [Marquez Incident - James Bradley]
- 005250-005499 - Case No 00-060303 [Incident in Complaint Rigoberto Avila]
- 005554-005577 - Case No 01-210126 [Incident in Complaint Joseph Fineron]
- 005578-005601 - Case No 01-213123 [Incident in Complaint Joseph Fineron]
- 005602-005619 - Case No 01-213131 [Incident in Complaint Joseph Fineron]
- 005620-005811 - Case No 01-257076 [2001 Incident Listed in Complaint Joseph Fineron]
- 005919-006245 - Case No 02-327060 [2002 Incident Listed in Complaint Justen Hall]
- 006246-006299 - Case No 04-156367 [2004 Incident Listed in Complaint Gregg Gomez]
- 006308-006515 - Case No 04-174009 [2004 Incident Listed in Complaint Jose Pulido]
- 006516-006720 - Case No 06-238244 [2006 Incident Listed in Complaint Jose Esparza]
- 006721-006730 - Case No 14-268237 [2014 Incident Listed in Complaint Felicia Waller]
- 0065622-0065695 - 09-180934_Scott Wisdom
- 0065696-0065721 - 14-164014_Jesus Martinez
- 0065722-0065733 - 98-014287
- 001516-001531 - Case No 66-006602 [Incident in Complaint Hilario Torres]
- 001532-001780 - Case No 00-00044J [Incident in Complaint Cesar Fierro]
- 001781-001954 - Case No 77-051554 [Incident in complaint John Green]
- 002047-002283 - Case No 01-37084K [Incident in Complaint Henry Lucas]
- 002564-002626 - Case No 03-04034D Incident in Complaint Michelle Noble & Gayle Dove]

**Exhibit 5**

- 002627-002666 - Case No 03-05002W [Incident in Complaint Michelle Noble & Gayle Dove]
- 002667-002677 - Case No 03-07005E [Incident in Complaint Michelle Noble & Gayle Dove]
- 002678-002728 - Case No 03-07038R [Incident in Complaint Michelle Noble & Gayle Dove]
- 002729-002747 - Case No 03-08010L [Incident in Complaint Michelle Noble & Gayle Dove]
- 002748-002773 - Case No 03-09030P [Incident in Complaint Michelle Noble & Gayle Dove]
- 002774-002793 - Case No 03-10047V [Incident in Complaint Michelle Noble & Gayle Dove]
- 002794-002806 - Case No 03-11069V [Incident in Complaint Michelle Noble & Gayle Dove]
- 002807-002886 - Case No 03-060911 [Incident in Complaint Michelle Noble & Gayle Dove]
- 002887-002995 - Case No 04-23040I [Incident in Complaint Brandon Moon]
- 003014-003064 - Case No 11090141 [Incident in Complaint Jamal Smith]
- 003065-003097 - Case No 11-090834 [Incident in Complaint Jamal Smith]
- 003098-003251 - Case No 91-352396 [Incident in Complaint Tony Ford]
- 003708-003963 - Case No 94-131266 [Incident in Complaint Carreon & Hernandez]
- Steven Brian ALVARADO, TDCJ No. 999081, Petitioner, v. Douglas DRETKE, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent, 2004 WL 2434364.
- Steven Brian ALVARADO, Appellant, v. The STATE of Texas, Appellee, 912 S.W.2d 199 Court of Criminal Appeals of Texas, en Banc.
- Brandon Lee MOON, Petitioner-Appellant, v. James A. COLLINS, Director, Texas Department of Criminal Justice, Institutional Division, Respondent-Appellee, 22 F.3d 1093 (1994)
- James Patrick BRADLEY, Appellant, v. The STATE of Texas, Appellee, 960 S.W.2d 791 Court of Appeals of Texas, El Paso.
- Hilario Rodriguez TORRES, Appellant v. The STATE of Texas, Appellee. 422 S.W.2d 741 Court of Criminal Appeals of Texas (Jan. 10, 1968.)
- John Terry GREEN, Appellant, v. The STATE of Texas , 667 S.W.2d 528 Court of Criminal Appeals of Texas, En Banc. (March 21, 1984.)
- Joseph FINERON, Appellant, v. The STATE of Texas, Appellee, 201 S.W.3d 361, Court of Appeals of Texas, El Paso.
- Gregg GOMEZ a/k/a Gregory Gomez, Appellant, v. The STATE of Texas, Appellee, 2009 WL 4831117.

**Exhibit 5**

- James Patrick BRADLEY, TDCJ# 733477, Petitioner, v. Gary L. JOHNSON, Director, Texas Department of Criminal Justice, Institutional Division, Respondent, 2000 WL 33348749.
- Ex parte Justen Grant HALL, 2009 WL 1617087.
- Ex parte Alejandro HERNANDEZ, Applicant, 2006 WL 1687713.
- Ex parte Brandon Lee MOON, Applicant, 2005 WL 767819.
- Rigoberto AVILA, Jr., petitioner, v. Rick THALER, Director, Texas Department of Criminal Justice, Correctional Institutions, Division, 130 S.Ct. 536, Supreme Court of the United States
- Rigoberto AVILA, Jr., Petitioner–Appellant–Cross–Appellee, v. Nathaniel QUARTERMAN, Director, Texas Department of Criminal Justice, 560 F.3d 299, United States Court of Appeals, Fifth Circuit.
- Rigoberto AVILA, Jr., TDCJ No. 999391, Petitioner, v. Nathaniel QUARTERMAN, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent, 499 F.Supp.2d 713, United States District Court, W.D. Texas, El Paso Division.
- Rigoberto AVILA, Jr., TDCJ No. 999391, Petitioner, v. Nathaniel QUARTERMAN, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent, 2007 WL 9717812.
- Rigoberto AVILA, Jr., Appellant, v. The STATE of Texas, July 2, 2003, 2003 WL 21513440.
- Depositions
  - Hector Loya
    - Exhibit 1 – Loya Police Report
    - Exhibit 2 – 2014 Handwritten Case Notes
    - Exhibit 8 – Villegas Interview
    - Exhibit 10 – IA 04-169
    - Exhibit 11 – Myers Letter Re Wayne Williams
    - Exhibit 13 – Armendariz Police Reports
    - Exhibit 14 – CAP Pages from procedures Manual
    - Exhibit 15 – Crime Investigation Manual 4-18-14
    - Exhibit 16 – Excerpt from "Criminal Investigation and Confession"
  - Alfonso Marquez
    - Exhibit 1 – Procedures Manual
    - Exhibit 2 – Chapter 7 – Juvenile
    - Exhibit 3 – Acosta Supplemental Report
    - Exhibit 4 – Hall Statement
    - Exhibit 5 – Medina Statement
    - Exhibit 6 – Ortega Supplemental Report
    - Exhibit 7 – Handwritten Notes

**Exhibit 5**

- Exhibit 8 – Vinson Statement
- Exhibit 9 – Blucher Statement
- Exhibit 10 –Farrar Statement
- Exhibit 11 – Flores Statement
- Exhibit 12 – Complaint Report
- Exhibit 13 – Marquez Supplemental Report
- Exhibit 14 – Flores Statement
- Exhibit 15 – Rangel Handwritten Statement
- Exhibit 16 – Rangel Statement
- Exhibit 17 – Hernandez Statement
- Exhibit 18 – Williams Statement
- Exhibit 19 – Call Record
- Exhibit 21 – Lujan Statement
- Exhibit 22 – Villegas Confession
- Exhibit 23 – Graves Supplemental Report
- Exhibit 24 – Affidavit of Lieutenant Nance
- Exhibit 25 – Kirk Statement
- Exhibit 26 – Map of Station
- Carlos Ortega
  - Exhibit 1 – Handwritten Statement Hall
  - Exhibit 2 – Handwritten Statement Hall
  - Exhibit 3 – Juvenile Petition
  - Exhibit 4 – Supplemental Report
  - Exhibit 5 – Supplemental Report
  - Exhibit 6 – Motion Transcript
  - Exhibit 7 – Supplemental Report
  - Exhibit 8 – Juvenile Confession Warning
  - Exhibit 9 – Supplemental Report
  - Exhibit 10 – Supplemental Report
- Kemmitt Bellows
  - Exhibit 1 – Supplemental Report
  - Exhibit 2 – Complaint Report
  - Exhibit 3 – Supplemental Report
  - Exhibit 4 – Supplemental Report
  - Exhibit 5 – Scene Diagram
  - Exhibit 6 – Statement of Bellows
- Ray Sanchez
  - Exhibit 1 – Supplemental Report
  - Exhibit 2 – Gomez Interview Transcript
  - Exhibit 3 – Property Receipt
  - Exhibit 4 – RMS and I-Leads

**Exhibit 5**

- Exhibit 5 – Judicial Were
- Exhibit 8 – Sanchez Discipline
- Exhibit 10 – Sanchez Statement
- Joseph Messer
  - Exhibit 1-32 – IA Reports
  - Exhibit 33 - El Paso Police Department Internal Affairs Division Disciplinary History Cards
- John Scagno
  - Exhibit 1 – Handwritten Notes
  - Exhibit 2 – IA 90 – 183
  - Exhibit 3 – IA 93 – 264
  - Exhibit 4 – IA 90 – 097
  - Exhibit 5 – CP 91 – 156
  - Exhibit 6 – CP 89 – 194
  - Exhibit 7 – CP 91 – 053
  - Exhibit 8 – CP 80 – 014
  - Exhibit 9 – IA 84 – 79
  - Exhibit 10 – IA 90 – 080
  - Exhibit 11 – Exam History and Employment Verifications
  - Exhibit 12 – CP 93 – 009
  - Exhibit 13 – IA 92 – 174
  - Exhibit 14 – El Paso Police Department Internal Affairs Division Disciplinary History Cards
- Carlos Ortega
  - Exhibit 1 – Document
  - Exhibit 2 – Statement of Robert Hall
  - Exhibit 3 – Document
  - Exhibit 4 – Carlos Ortega Report
  - Exhibit 5 – Report
  - Exhibit 6 – Carlos Ortega Deposition
  - Exhibit 7 – Rodney Williams' Statement
  - Exhibit 8 –Villegas' Statement
  - Exhibit 9 – Statement
  - Exhibit 10 – Lujan Report
- Reginald Moton
  - Exhibit 1 – Notice of Deposition
  - Exhibit 2 – Email to counsel August 2, 2022
  - Exhibit 3 – Section V., Juvenile Delinquency Major Crime Unit
  - Exhibit 4 – CAP Operations Manual
  - Exhibit 5 – Policy Manual
  - Exhibit 6 – Criminal Investigations Operations Manual

**Exhibit 5**

- Exhibit 7 – Volume 3, Chapter 7, Investigations, effective April 8, 1999
- Exhibit 8 – Procedural Outline for CAP 1986 to 1989
- Exhibit 9 – Supplemental Report
- Exhibit 10 – Supplemental Report
- Exhibit 11 – Internal Investigations Report
- Exhibit 12 – Multipurpose Report
  - Scott Graves
    - Exhibit 1 – Chapter 7, Juvenile
    - Exhibit 2 – Confessions, Admissions, and Statements
    - Exhibit 3 – Performance Evaluation
    - Exhibit 4 – Performance Evaluation
    - Exhibit 5 – Statement of Rodney Williams
    - Exhibit 6 – Statement of Terri Vinson
    - Exhibit 7 – Statement of Terrance Farrar
    - Exhibit 8 – Statement of Cynthia Talamantes
    - Exhibit 9 – Statement of Eduardo Valles
    - Exhibit 10 – Statement of Gilbert Garcia
    - Exhibit 11 – Supplemental Report, May 6, 1993
    - Exhibit 12 – Supplemental Report, May 5, 1993
    - Exhibit 13 – Statement of Marcos Gonzalez
    - Exhibit 14 – Statement of Marcos Gonzalez
    - Exhibit 15 – Internal Affairs Division Disciplinary History Card
    - Exhibit 16 – Court Testimony of Scott Graves
    - Exhibit 17 – memorandum, July 18, 1986
    - Exhibit 18 – Supplemental Report, August 26, 1986
  - Link Brown
    - Exhibit 1 – 1992 Procedures Manual
    - Exhibit 2 – Statement of Hector Ochoa
    - Exhibit 3 – Supplemental report, April 12, 1993
    - Exhibit 4 – Supplemental report, May 13, 1993
    - Exhibit 5 – Statement of David Rangel
    - Exhibit 6 – Statement of Rodney Williams
    - Exhibit 7 – Statement of Prisciliano Villegas
    - Exhibit 8 – Associates for David Rangel
  - Earl Arbogast
    - Exhibit 1 - Supplemental Report
    - Exhibit 2 - Performance Evaluation
    - Exhibit 3 – Performance Evaluation
    - Exhibit 4 – Chapter 7, Juvenile
    - Exhibit 5 – Personnel Information Report

**Exhibit 5**

- Exhibit 6 – Personnel Incident Report
- Exhibit 7 – Complaint Report
- Exhibit 8 – Statement of Farrar
- Exhibit 9 – supplemental Report
- Exhibit 10 – Statement of Rangel
- Exhibit 11 – Writ of Habeas Corpus
- Exhibit 12 – Google Map Image
- Exhibit 13 – Statement of Williams
- Exhibit 14 – Written Confession of Villegas
- Exhibit 15 – Statement of Lujan
- Exhibit 16 – Statement of Hall
- Exhibit 17 – Statement of Bosanko
- Exhibit 18 – Statement of Prisciliano Villegas

- CP93-097 (55065-55107)
- IA85-157 (55232-55287)
- CP89-194 (60959-61237)
- CP90-049 (61881-62067)
- CP91-156 (62548-62597)
- CP90-214 (62664-62690)
- CP91-262 (62761-62902)
- CP92-006 (62939-62983)
- CP92-059 (63308-63400)
- CP92-205 (63784-63989)
- CP93-009 (64378-64637)
- CP93-264 (64913-65179)
- IA89-056 (68708-68876)
- IA89-058 (68877-68945)
- IA89-070 (68987-69086)
- IA92-019 (69520-69551)
- IA92-174 (69766-69808)
- IA90-080 (71967-72119)
- IA90-097 (72265-72368)
- IA90-183 (72901-73064)
- Rules and Regulations (DEF CITY 0079339-79371)
- Defendants Jesus Terrones, Gillermo Martinez, Arturo Ruiz, Jr., Sal Dominguez, Antonio Tabullo, Joe Zimmerly, and Pedro Ocegueda, Motion for Summary Judgment and Motion for Summary Judgment Appendix (269 pages)
- Affidavit of Pedro "Pete" Ocegueda
- Affidavit of George Havlovic
- Affidavit of Henry Fluck

**Exhibit 5**

- Affidavit of Russell Leach (DEF CITY 0081522-81542)
- Affidavit of Karen Larose (DEF CITY 0081516-81518)
- Affidavit of Bradford Stiles (DEF CITY 0082424-82426)
- *Esparza v. State of Texas*, No. 08-08-00304-CR (June 23, 2010).
- *In The Matter of M.M.J.M., a Juvenile*, No. 08-99-00167-CV (Jan. 25, 2002)
- *Pulido v. State of Texas*, No. 08-06-00229-CR, (Aug. 7, 2008).
- *Medrano v. Ryan*, No. CV-99-603-TUC-CKJ, (March 12, 2012).
- *Michelle Noble v. State of Texas*, Opinion
- *Smith v. State of Texas*, No. 08-91-00105CR, (March 18, 1992).
- *State of Texas v. Martinez*, No. 08-02-00248-CR, (Aug. 11, 2004).
- *U.S. v. Waller*, 105 F. Supp 3d 683 (2015).
- *Appellate Case Reports* (DEF CITY 0080759-81515)
- Plaintiff's Amended Response to Defendant City of El Paso's First Request for Production of Documents
- Court Files
  - James Bradley (DEF CITY 0081543-81720)
  - Agustin Carreon (DEF CITY 0081721-81842)
  - Alejandro Hernandez (DEF CITY 0081843-82165)
  - Jose Esparza (DEF CITY 0082166-82357)
  - Maurice Sweeney (DEF CITY 0082358-82379)
  - Rafael Vasquez (DEF CITY 0082380-82385)
  - Scott Wisdom (DEF CITY 0082386-82394)
  - Jamal Smith (DEF CITY 0082411-82423)
  - Tony Ford (DEF CITY 0082427-82739)
  - Rigoberto Avila (DEF CITY 0082740-82846)
  - Gayle Dove (DEF CITY 0082847-82851)
  - Cesar Fierro (DEF CITY 0082852-83234)
  - Gregg Gomez (DEF CITY 0083235-83301)
  - John Terry Green (DEF CITY 0083302-83306)
  - Justen Hall (DEF CITY 0083307-83427)
  - Ricardo Martinez (DEF CITY 0083428-84100)
  - Steven Alvarado (DEF CITY 0084101-84120)
  - Manuel Nevarez (DEF CITY 0084121-84138)
  - Jose Pulido (DEF CITY 0084139-84777)
  - Angel Rivera (DEF CITY 0084778-84786)
  - Alejandro Hernandez (DEF CITY 0084850-85147)

9.  At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such aid, I will ensure that they are made available for review, if requested, prior to their use.

**Exhibit 5**

10.     My professional charges for this litigation work is an hourly fee of $400 plus expenses including all travel time.  My fees for deposition and trial testimony are a flat rate of $2,500 for the first four hours and $600 per hour for every additional hour, plus travel time and expenses.

11.     If I am provided additional materials that changes, alter or amends my opinions, I will prepare a supplemental report.

12.     To ensure my methodology was reliable, my opinions are based on a comprehensive review of the provided materials that establishes my understanding of the facts of the case and on the professional and generally accepted principles and practices in policing as of the date of this incident.  "Generally accepted practices" refers to those protocols, techniques, and procedures that are widely known, acknowledged, and relied upon in the field.  A practice is generally accepted when well-educated, well-trained, and experienced professionals would agree that it is conventional, customary, and reasonably standard.  Generally accepted practices in policing reflect technical and specialized knowledge in the law enforcement field.  A practice can be generally accepted without necessarily being universally adopted or rising to the level of a long-established, empirically validated best practice.  Generally accepted practices may be, but are not necessarily, reflected in Department of Justice consent decrees, publications by professional associations (such as the International Association of Chiefs of Police, the Police Executive Research Forum, the National Police Foundation, etc.), in agency policies, and in reputable training materials.

13.     To identify and apply the applicable generally accepted practices in policing, I rely on my knowledge, skill, experience, training, and education in law enforcement.  This includes work in my field of study as a policing scholar and author; my knowledge of historical and contemporary law enforcement standards and methods; and the relevant professional and academic literature. I employ a similar methodology when I conduct professional evaluations of police officers or agencies as a consultant and when writing for reputable academic and professional publishers. The methodology I applied in this case is consistent with the methodology utilized by other experts in the field of law enforcement when analyzing incidents of this type.

14.     My use of terminology such as "excessive," "unreasonable," and "disproportionate," etc., is intended to and should be read as references to the professional and generally accepted standards in policing and is not intended and should not be interpreted as references to or the application of legal standards within the sole province of the factfinder or judge.

15.     The opinions that follow are made within a reasonable degree of certainty within the field of police practices based on over 35 years of professional law enforcement

**Exhibit 5**

experience and scholarship.

**The Plaintiff's Allegation that the El Paso Police Department Had a Long-Standing Disregard for the Constitutional Rights of Suspects is Without Merit**

16.    The plaintiff has alleged that the El Paso Police Department had a long-standing disregard for the constitutional rights of suspects.  The following is a list of the allegations made by the plaintiff and a summary of court findings that undermine the plaintiff's claim that the El Paso Police Department was placed on notice of a long-standing disregard for the constitutional rights of suspect.

   a.    The plaintiff alleged that in 1966, an El Paso police detective used coercive and improper tactics to obtain a confession from a man named Hilario Torres, who spoke only Spanish and who was both intoxicated and sleep deprived at the time El Paso police interrogated him.[1]  However, the court found:

      1.)    Torres appealed his conviction alleging he was forced to sign the confession, that he was not given the proper and required warnings, and that at the time he gave his confession he was intoxicated and had not slept for quite some time.

      2.)    The court overruled the contention that the warning given Torres was insufficient or that procedural safeguards effective to secure Torres' privilege against self-incrimination were not used.[2]

   b.    The plaintiff alleged that in 1979, El Paso police conspired with police in Juarez, Mexico to have Cesar Fierro's mother and stepfather taken into custody. An El Paso police detective then used coercive and improper tactics to obtain a confession from Mr. Fierro to a murder that Fierro did not commit, including by threatening Fierro that his family would not be released and would be tortured in Juarez unless and until Fierro confessed to the murder. El Paso police withheld and suppressed the exculpatory evidence of the coordination between El Paso and Juarez police and the exculpatory evidence of the coercive tactics used to obtain Mr. Fierro's confession, and the El Paso detective who obtained the confession perjured himself during Mr. Fierro's criminal proceedings in order to cover up evidence of his misconduct. The misconduct was so severe that the lead trial prosecutor later submitted sworn testimony that, had he known about the coordination between El Paso and Juarez police at the time of trial, he would

---

[1] Plaintiffs' Third Amended Complaint at 170a.
[2] Hilario Rodriguez TORRES, Appellant v. The STATE of Texas, Appellee. 422 S.W.2d 741 Court of Criminal Appeals of Texas (Jan. 10, 1968.)

16

**Exhibit 5**

have joined in a motion to suppress the confession and would then have moved to dismiss the case. The existence of these coercive police tactics and the subsequent cover-up to conceal them was confirmed by the trial court during Mr. Fierro's habeas proceedings, findings which were then affirmed by the en banc Court of Criminal Appeals.[3]  The appellate court found:

1.)     The appellate court affirmed the conviction of Mr. Fierro.

2.)     Detective Al Medrano, testified at the suppression hearing that he had no knowledge that Fierro's mother and stepfather were under arrest in Juarez and therefore could not have used that fact to coerce the confession. It was subsequently discovered that a supplemental offense report reflected that Fierro's parents were in the custody of the Juarez police. The trial court held an evidentiary hearing and found that at the time of eliciting Fierro's confession, Detective Medrano (now deceased) did have information that Fierro's mother and step-father had been taken into custody by the Juarez police with the intent of holding them in order to coerce a confession from the Defendant, contrary to said Detective Medrano's testimony at the pretrial suppression hearing.

3.)     The appellate court concluded the error was harmless and denied a new trial.[4]

c.     The plaintiff alleged that in 1979, El Paso police detectives used coercive and improper tactics to obtain a confession from John Terry Green in a cold murder case. After his arrest, Mr. Green declined to speak with the detectives and repeatedly asked for an attorney. Mr. Green invoked his rights, but El Paso police detectives persisted in their unlawful efforts to obtain a confession, bringing Green from his cell to a detective's office day after day in order to pressure him to confess. Eventually, Mr. Green gave in to the pressure and gave a written confession, after he was worn down by the detective's tactics. The en banc Court of Criminal Appeals found that Mr. Green's confession was involuntary.[5] However, the court found:

1.)     The appellate court found that Green was denied a "full and fair opportunity to exercise [his] option," whether or not to have counsel assist him solely and only because he could not afford any of the fees

---

[3] Plaintiffs' Third Amended Complaint at 170b.
[4] DEF CITY 0081007-81011.
[5] Plaintiffs' Third Amended Complaint at 170c.

**Exhibit 5**

that each attorney he saw demanded.

    2.)    His confession was simply an act of frustration in not being able to obtain counsel of his choice.[6]

d.    The plaintiff alleged that in 1984, El Paso police detectives coerced Henry Lee Lucas into confessing to a murder he did not commit, including through the use of impermissible psychological manipulation and by providing him with drugs to make him more susceptible to their tactics. El Paso police knew from Mr. Lucas' prior interactions with law enforcement that he was vulnerable to their tactics, but the detectives prioritized closing the case over finding the truth and persisted in their coercive tactics. The murder charges were dropped after a judge found that El Paso police had extracted the confession from Mr. Lucas unlawfully and the confession was involuntary.[7]

    1.)    There were no documents provided that would allow conclusions to be drawn regarding this allegation.

e.    The plaintiff alleged that in 1985, El Paso police began investigating a local day care center after one set of parents reported unusual behavior from their child. Various children from the center were subjected to coercive and suggestive forms of questioning, which led to false claims of abuse against Michelle Noble and Gayle Dove, two teachers at the day care center. Both women were wrongfully convicted based on the false testimony manufactured through these interviews with these child witnesses, before they were eventually exonerated.[8]

    1.)    Court documents regarding Michele Noble were not located.

    2.)    The only documents regarding Gayle Dove[9] was her motion to suppress that claimed she requested and was denied an attorney prior to her interrogation.  The court opinion was not provided, thus no opinions can be made.

f.    The plaintiff alleged that in 1987, El Paso police detectives used improper police tactics to manufacture false evidence against Brandon Lee Moon, leading to Mr. Moon's wrongful conviction for a sexual assault which he did not commit, for

---

[6] John Terry GREEN, Appellant, v. The STATE of Texas, 667 S.W.2d 528 Court of Criminal Appeals of Texas, En Banc. (March 21, 1984.)
[7] Plaintiffs' Third Amended Complaint at 170c.
[8] Plaintiffs' Third Amended Complaint at 170d.
[9] DEF CITY 0082847-82851.

Exhibit 5

which Moon served 17 years in prison before his exoneration in 2005.[10]
However, the court found:

1.)     Mr. Moon was convicted of two counts of aggravated sexual assault and
his sentence was assessed at imprisonment for 75 years.

2.)     Mr. Moon "contends that he is innocent based on newly discovered DNA
evidence. The State agrees that Applicant is entitled to relief. The trial
court made findings of fact and conclusions of law in which it has found
that Applicant is entitled to habeas corpus relief. After a review of the
record, we agree with the trial court's determination and find that
Applicant is entitled to habeas corpus relief due to newly discovered DNA
evidence that was not available at the time of trial."[11]

g.     The plaintiff alleged that in 1987, an El Paso police detective participated in the
interrogation of Angel Medrano while Medrano was held in police custody in
Juarez, Mexico on suspicion of murder. During that interrogation, Medrano was
beaten by police and denied food or water in order to coerce him into confessing
to the murder. The El Paso police detective then helped to cover up the fact that
Medrano's confession had been involuntarily obtained by lying under oath about
the circumstances of the interrogation.[12]  However, the appellate court found:

1.)     The trial court's determination that the statements were freely and
voluntarily made will not be disturbed on appeal in the absence of clear
and manifest error. The court here determined that the police officers'
testimony was consistent and credible, and that the Juarez confession
was voluntary and not the result of duress, threats, or torture. We have
searched the record and discovered nothing that would cause us to alter
this finding, despite defendant's claim of physical abuse, torture, and the
alleged reputation of the Juarez police for beating prisoners.

2.)     Based on the factual record before it, the Arizona Supreme Court
concluded that Petitioner's confession was voluntary. Medrano I, 173
Ariz. at 396, 844 P.2d at 563. This Court has reviewed the record
underlying the factual determinations made by the state court and
concludes they were not objectively unreasonable.[13]

---

[10] Plaintiffs' Third Amended Complaint at 171a.
[11] Ex parte Brandon Lee Moon, Applicant, 2005 WL 767819.
[12] Plaintiffs' Third Amended Complaint at 171b.
[13] *Medrano v. Ryan*, No. CV-99-603-TUC-CKJ, (March 12, 2012).

**Exhibit 5**

h.    The plaintiff alleged that in 1990, an El Paso police detective unlawfully obtained a confession from Jamal Smith. Mr. Smith had invoked his right to counsel, and had told the detective that he did not want to talk with him, but the detective persisted in interrogating Smith and coerced him into confessing by telling him that a codefendant had made a written statement implicating Smith. The confession was later suppressed in Mr. Smith's criminal proceedings because El Paso police obtained it in violation of Smith's constitutional rights.[14]  However, the appellate court found:

    1.)    The appellate court did suppress Mr. Smith's confession, but not because his confession was coerced.

    2.)    Rather, the confession was suppressed because Mr. Smith had been formally charged and he had requested an attorney form the court prior to his interrogation.[15]

i.    The plaintiff alleged that in 1991, El Paso police officers used suggestive lineup procedures to fabricate evidence falsely implicating Tony Ford in a home invasion turned homicide, and suppressed exculpatory evidence pointing to a different man as the real perpetrator.[16]  However, the appellate court found:

    1.)    The Court concluded that Ford has not demonstrated cause that evidence was withheld because he has not shown State suppression.  Further, the Court concludes that even if Ford could show "cause" within the meaning of Brady, he cannot show prejudice because the "evidence" simply cannot be characterized as material.

    2.)    The state habeas court made a factual determination that the procedure used to identify Ford was not unconstitutionally suggestive. For the reasons discussed regarding Ford's second claim of error, the Court concludes that he has not overcome the presumptive correctness of the state court's factual determination. Under 28 U.S.C. § 2254(e)(1), this Court is bound by that factual determination, absent clear and convincing evidence to the contrary. Because the identification process was not suggestive, the Court concludes that Ford was not denied due process.[17]

j.    The plaintiff alleged that in 1994, El Paso police detectives used coercive tactics

---

[14] Plaintiffs' Third Amended Complaint at 171c.
[15] *Smith v. State of Texas*, No. 08-91-00105CR, (March 18, 1992).
[16] Plaintiffs' Third Amended Complaint at 171d.
[17] *Ford v. Cockrell*, No. EP-01-CA-0386-DB, (April 27, 2004).

**Exhibit 5**

on 17-year-old Augustin Carreon to get Carreon to falsely implicate himself and another man named Alejandro Hernandez in a murder. Although Mr. Carreon immediately recanted his false inculpatory statement, El Paso police detectives withheld from Mr. Hernandez the exculpatory evidence of the coercive tactics they use to obtain Carreon's statement, evidence of Carreon's recantation, and other exculpatory evidence which showed that Mr. Hernandez did not commit the murder. El Paso police detectives also failed to investigate evidence pointing to other suspects because it conflicted with their efforts to obtain a conviction of Mr. Hernandez, regardless of the true identity of the perpetrator.[18]  However, the court found:

1.)    Mr. Hernandez was convicted of murder and sentenced to ninety-nine years.

2.)    "Applicant contends that his trial counsel was ineffective. The trial court entered detailed findings of fact, concluding that trial counsel was ineffective in failing to call a witness to testify that another person had committed this offense, and in failing to impeach the only witness who connected Applicant to this offense. The court has recommended that relief be granted, and the State has concurred in these findings."[19]

3.)    Additionally, in a motion for summary judgment, among other issues the court found that no statement of Mr. Carreon was used or introduced into evidence at the trial of Mr. Hernandez and summary judgment was issued to the defendants.[20]

k.    The plaintiff alleged that in 1991, Defendant Marquez and other El Paso police detectives interrogated 17-year-old Steven Alvarado about a murder. Marquez and the other officers knew that Alvarado had consumed drugs and was intoxicated, and as a result that Alvarado did not understand what was being said to him or what was happening to him. Defendant Marquez and the other officers used both physical and psychological coercion to obtain a confession from Alvarado. Marquez and the other officers stripped Alvarado down to his underwear and forced him to sit for extended periods of time on a cold, steel desk. The officers verbally abused Alvarado, struck him in the face, and refused his repeated requests to see a lawyer. Additionally, Marquez and the other officers made false promises of leniency to Alvarado, telling him that they would tell the judge to take it easy on him if he made a statement. All of these tactics

---

[18] Plaintiffs' Third Amended Complaint at 171e.
[19] Ex parte Alejandro HERNANDEZ, Applicant, 2006 WL 1687713.
[20] Motion for Summary Judgment at 17.

**Exhibit 5**

were employed with the goal of overbearing Mr. Alvarado's will and obtaining a confession from him, without regard to his constitutional rights or the truth or falsity of the statement.[21]  However, the court found:

1.)     Having independently reviewed the same evidence that was before the petitioner's trial court at the Jackson v. Denno hearing, this Court concludes the state trial court's finding of voluntariness was fully supported by the record then before that court. Petitioner's testimony at the Jackson v. Denno hearing that he was beaten, threatened, and cajoled into giving his confession was internally inconsistent, contradicted by the testimony of two police officers, and undercut by his admissions that he fully understood his right to remain silent as well as his right to an attorney. Under such circumstances, the state trial court's implicit credibility finding rejecting petitioner's testimony at the Jackson v. Denno hearing was an eminently reasonable factual determination in light of the evidence presented in that state court proceeding. Simply put, the trial state court was faced with two very different versions of the events leading up to and surrounding petitioner's execution of a written statement. Given the petitioner's inability to recall anything whatsoever about the interrogator he claimed had beaten him in the face, and his sudden vagueness on a great many other points during cross-examination, the state trial court reasonably chose to credit the testimony of the police officers over that of petitioner on the issue of whether coercive tactics were employed to induce petitioner's confession."

2.)     "Even if this Court were inclined to resolve petitioner's complaint regarding the voluntariness of his confession in a manner different than the state courts, there can be no disagreement among persons of reason that the state court's resolution of that claim was clearly reasonable under the facts and circumstances of petitioner's case. The voluntariness of petitioner's confession turned primarily upon credibility determinations made by the state trial court at the Jackson v. Denno hearing that were fully supported by any rational construction of the record. Petitioner's testimony at the pretrial hearing on his confession was not merely internally inconsistent and diminished by virtue of petitioner's inability to remember anything about the officer he claimed had assaulted him but also refuted by law enforcement officers who gave consistent testimony regarding the absence of any coercive conduct

---

[21] Plaintiffs' Third Amended Complaint at 172d.

**Exhibit 5**

directed toward petitioner."[22]

l.      The plaintiff alleged that in early 1995, Defendant Marquez coerced Rafael
        Vasquez to confess to a murder he did not commit, using similar unconstitutional
        and illegal tactics as he used on Mr. Villegas and on many prior and subsequent
        occasions.[23]

        1.)     The court found that Vasquez was advised of his Miranda rights and his
                motion to suppress his confess was denied.[24]

m.      The plaintiff alleged that in early 1995, Defendant Marquez and other El Paso
        police detectives interrogated James Bradley about the death of Bradley's wife.
        Marquez and the other detectives interrogated Bradley for more than ten hours.
        During the interrogation, they refused Bradley's repeated requests to see a
        lawyer, and refused his repeated requests to be given access to his medication,
        which caused Bradley to suffer significant pain and discomfort. As a result of the
        tactics used by Marquez and the other officers, Bradley eventually confessed
        despite being both mentally and physically incapable of voluntarily waiving his
        rights at the time.[25]   However, the court found:

        1.)     "In the present case, there is evidence indicating that Appellant agreed to
                go to the police station with the detectives. He was never informed he
                was a suspect or that he was under arrest. He was never handcuffed and
                freely consulted with Detective Ruiz in the writing of his confession. As
                we find that Appellant was not in custody at the time of his interview"

        2.)     "In Appellant's sixth point of error, he maintains that the court erred in
                denying his motion to suppress because of his request for counsel. With
                regard to this issue, we find conflicting testimony as to whether or not
                Appellant invoked his right to counsel. As such, this appellate court is
                obligated to adhere to the trial court's determination that Appellant
                failed to invoke his right to counsel."

        3.)     "Having overruled each of Appellant's points of error, we affirm the
                judgment of the trial court."[26]

---

[22] Steven Brian ALVARADO, TDCJ No. 999081, Petitioner, v. Douglas DRETKE, Director, Texas Department of
Criminal Justice, Correctional Institutions Division, Respondent, 2004 WL 2434364.
[23] Plaintiffs' Third Amended Complaint at 172i.
[24] DEF CITY 0082380-82385.
[25] Plaintiffs' Third Amended Complaint at 172j.
[26] James Patrick BRADLEY, Appellant, v. The STATE of Texas, Appellee, 960 S.W.2d 791 Court of Appeals of Texas,
El Paso.

**Exhibit 5**

n.      The plaintiff alleged that in 1998, El Paso police detectives interrogated Matt, a juvenile, in relation to a murder. The detectives knew that Matt had diminished mental capacities. A subsequent forensic psychological examination revealed that Matt was "borderline mentally retarded." The officers brought Matt before a judge, and Matt informed the judge that he did not want to give a statement. The El Paso police detectives ignored this, placed Matt in handcuffs and began to verbally abuse him. They used psychologically coercive tactics, including telling him that they were going to pin the murder on him if he did not make a statement. As a result of their improper tactics, the El Paso police detectives were able to coerce Matt to make an inculpatory statement.[27]  However, the appellate court found:

1.)      The evidence showed that Appellant signed a statement indicating he was aware of his rights before he went before the magistrate. In the magistrate's office, when he returned the second time in a very brief period of time, he was asked why he had changed his mind and if his decision was voluntary. He stated that his decision was voluntary and he wished to give his side of the matter.

2.)      He also indicated that he had not been threatened or coerced. He also stated to Judge Herrera that he had not been threatened. The trial court was free to discount Appellant's rendition of events and, as such, we find that the court did not use its discretion in finding that the statement was voluntary.[28]

o.      The plaintiff alleged that in 2000, Rigoberto Avila Jr., a Navy veteran with no criminal record, was brought to the police station by El Paso police detectives around 11:00pm after a small child he was babysitting died under suspicious circumstances. Mr. Avila cooperated with police, and gave a statement in which he told the detective that he had been in another room when the child stopped breathing. The El Paso police detective typed the statement and had Mr. Avila read and sign it. Several hours later, after Mr. Avila had fallen asleep, the detective presented Mr. Avila with another statement and told him it was a corrected version of the first. Mr. Avila signed it without reading it. Unbeknownst to Mr. Avila, the second statement included a confession, stating that Mr. Avila had assaulted the child. Mr. Avila was convicted, but in 2018, an El Paso judge recommended that he be granted a new trial after new scientific evidence emerged suggesting that the child died from accidental causes, further

---

[27] Plaintiffs' Third Amended Complaint at 173a.
[28] *In The Matter of M.M.J.M., a Juvenile*, No. 08-99-00167-CV (Jan. 25, 2002).

**Exhibit 5**

demonstrating that the confession was false.[29]  However, the court found:

1.)     Mr. Avila was found guilty of capital murder on May 3, 2001.

2.)     The appellate court found, "the record does support the fact that appellant was given his rights in writing (and to some extent verbally) at least twice before the taking of each statement and another time in between them. Furthermore, appellant unequivocally admitted that he was familiar with his rights. Additionally, the record supports the judge's findings that appellant waived his rights and that he made both statements without compulsion or persuasion. Finally, although the judge's findings and conclusions were sparse, we hold that they are sufficiently detailed to enable this Court to determine the basis for the trial court's ruling and to assist us "in determining the sufficiency of the evidence to support whatever unstated findings of fact were made by the fact finder."  Appellant's first point of error is overruled."[30]

3.)     Mr. Avila's appeal to the U.S. Supreme Court was denied.[31]

p.      The plaintiff alleged that in 2001, El Paso police arrested Joseph Fineron in connection with the theft of various items stolen from vehicles parked in a city lot near his home. El Paso police officers began to abuse Fineron almost immediately. Mr. Fineron was placed in handcuffs upon his arrest, and placed in a police vehicle. One of the El Paso police officers slammed Mr. Fineron's head repeatedly into the backseat of the police car, and threatened him with further violence by a more physically imposing officer if Fineron did not cooperate. Mr. Fineron was subjected to nearly seven hours of interrogation. At various points he was put in a cage and handcuffed to the bars, and later handcuffed to a chair. El Paso police officers repeatedly threatened Mr. Fineron's family, and threatened to tell Mr. Fineron's co-defendant that Fineron had "snitched" on him. Mr. Fineron asked to see a lawyer, but the El Paso police officers refused this request. As a result of these coercive and improper tactics used by El Paso police, Mr. Fineron made a confession. However, Mr. Fineron could not read the confession that was written for him by the officers because he was not provided with his eyeglasses, and El Paso police lied to him and told him he was admitting to misdemeanor theft, rather than the felony theft admissions contained in the statement which subjected Mr. Fineron to a fifteen-year prison sentence. Mr.

---

[29] Plaintiffs' Third Amended Complaint at 173b.
[30] Rigoberto AVILA, Jr., Appellant, v. The STATE of Texas, July 2, 2003, 2003 WL 21513440.
[31] Rigoberto AVILA, Jr., Petitioner, v. Rick THALER, Director, Texas Department of Criminal Justice, Correctional Institutions, Division, 130 S.Ct. 536, Supreme Court of the United States.

**Exhibit 5**

Fineron never read or understood the confession he was coerced into signing until he was shown a copy of it by his lawyer.[32]  However, the court found:

1.)     The appellate court found, "In its findings of fact and conclusions of law, the trial court found that Appellant's confession was voluntary in that he was properly warned, the interrogation period was not unreasonably long and breaks were provided, and Appellant did not request an attorney or request to see members of his family. Further, he was not intimidated or coerced to make the confession."

2.)     "Here, it is not contested that Appellant was in police custody for about seven hours while his confession was obtained. However, a lengthy interrogation does not automatically render a statement involuntary." "In this case, Appellant was given water, was allowed breaks, was offered food, and was offered cigarettes. After Officer Carrasco completed typing the statement, he read it to Appellant and Appellant was allowed to make any necessary corrections. It was within the province of the court to believe that Appellant's will was not overborne due to the length of his interrogation."

3.)     "The evidence regarding Appellant's complaints that he was physically abused and that the officers failed to terminate the interview after he asked for an attorney was controverted by Officer Carrasco's testimony. We must therefore defer to the trial court's fact findings relating to these complaints.  The complaint regarding Appellant's inability to read the statement due to the lack of his glasses is contravened by Officer Carrasco's testimony that the confession and warning card were read to him. Also, the court was entitled to disbelieve the contention that Appellant was told he was admitting to misdemeanor theft even if that contention was not directly controverted."

4.)     "Appellant testified that he invoked his right to counsel during his written confession, but was denied access to counsel. This testimony was disputed by Officer Carrasco. Appellant's testimony is the only evidence that he invoked his right to counsel. In its findings of fact, the trial court found Appellant's testimony lacked credibility. As stated, because these are findings of fact, we must respect the trial court's factual conclusions in the absence of a showing of an abuse of discretion."

---

[32] Plaintiffs' Third Amended Complaint at 173c.

**Exhibit 5**

5.)     "Having overruled each of Appellant's issues on review, we affirm the judgment of the trial court."[33]

q.     The plaintiff alleged that in 2002, El Paso police officers were investigating a serious traffic accident, and arrested Jesus Martinez for driving while impaired. Mr. Martinez was taken to the hospital due to his injuries. He repeatedly expressed that he did not want to talk with police. Despite knowing that Mr. Martinez had invoked his right to remain silent, and despite knowing he was intoxicated and medically vulnerable, El Paso police officers continued to engage him in conversation, and eventually obtained a blood sample from him. The officers later lied to cover-up their misconduct, claiming that Mr. Martinez had signed a written consent form, but their misconduct was exposed when they were unable to produce any written consent in court. As a result of this misconduct, both Mr. Martinez's oral statement and the blood sample evidence were suppressed in the resulting criminal proceedings because they were not voluntarily obtained by police.[34]  However, the appellate court found:

1.)     The court found there was evidence in the record to indicate the court did not abuse its discretion in finding the consent was involuntary. While the court noted that the officer that the form was never presented in court, the court did not find that the officer lied.

2.)     The court did state that consent is irrelevant to the admissibility of a blood sample and there is no constitutional impediment to taking a blood sample, but said the state waived this argument as the state did not argue the point at trial.[35]

r.     The plaintiff alleged that in 2002, El Paso police officers used coercive tactics to obtain an involuntary murder confession from Justen Hall. At the time El Paso police interrogated and ultimately obtained a confession from Mr. Hall, police knew that Hall was in a highly vulnerable state, as he was on suicide watch and exhibiting psychotic behavior. Mr. Hall had not slept for nearly a week prior to his arrest, and police ignored his request for medication.[36]  However, the court found:

1.)     Mr. Hall was convicted of capital murder and the punishment was set at death.

---

[33] *Joseph FINERON, Appellant, v. The STATE of Texas*, Appellee, 201 S.W.3d 361, Court of Appeals of Texas, El Paso.
[34] Plaintiffs' Third Amended Complaint at 173d.
[35] *State of Texas v. Martinez*, No. 08-02-00248-CR, (Aug. 11, 2004).
[36] Plaintiffs' Third Amended Complaint at 173e.

**Exhibit 5**

2.)     "On August 22, 2008, before the application and accompanying record were forwarded to this Court, applicant sent the trial court a letter in which he stated that he wanted to "drop [his] remaining appeals." Thus, applicant indicated his desire to waive his right to habeas review. Apparently pursuant to this request, applicant's counsel filed, in both the trial court and in this Court, a motion to dismiss the application and to have applicant evaluated for competency to make such a decision. The trial court then appointed two experts to evaluate applicant."

3.)     "Applicant, during the hearing in the trial court, persisted in his request that the attorney-filed initial application be dismissed. He also persisted, and continues to persist, that his appointed counsel be dismissed. Finally, the trial court's appointed experts both opined that applicant was competent to make these decisions. For these reasons, we will defer to the trial court's recommendation. The application for writ of habeas corpus filed in the trial court on March 19, 2007, is dismissed."[37]

s.      The plaintiff alleged that in 2004, El Paso police officers arrested Gregg Gomez and interrogated him in connection with a series of burglaries. The officers who interrogated Mr. Gomez used psychological coercion and abusive tactics to obtain a confession from Gomez. The officers made false promises of leniency, telling Mr. Gomez he was not in any trouble and that he would be released to his father if he cooperated and helped police identify houses that had been burglarized. When Mr. Gomez insisted he knew nothing about the burglaries, El Paso police officers threatened him, telling Gomez they would see to it that years were added to his sentence if he did not cooperate. During the interrogation, which took place over the course of nearly five hours between midnight and 5:00am, El Paso police officers denied Mr. Gomez access to water and food. Mr. Gomez was so exhausted, he repeatedly fell asleep during the interrogation, and had to be woken up by police. Police prepared a written statement implicating Mr. Gomez in the burglaries, which Mr. Gomez signed without reading after police woke him up because they continued to promise him that he would be released once they were finished. Because the statement was fabricated by police and Mr. Gomez was coerced into signing it, it continued numerous inaccuracies, including naming a purported accomplice who could not have participated in the burglaries described in the statement because he was deployed overseas at the time. El Paso police learned that this and other details in the statement were false, but they suppressed this exculpatory information.[38] However, the court found:

[37] Ex parte Justen Grant HALL, 2009 WL 1617087.
[38] Plaintiffs' Third Amended Complaint at 173f.

**Exhibit 5**

1.) "Appellant argues there was evidence of "strong coercive influences (to include both threats and promises) made to induce Appellant to confess to crimes he did not commit." The only evidence in the record which indicates Appellant's statement may have been coerced is Appellant's own testimony that the police promised he would be released to his father if he cooperated, that if he did not admit to the extraneous burglaries they would see to it that years were added to his sentence, that he was denied water and food, and that he was exhausted to the point of falling asleep during Officer Guevara's interview.

2.) The court also heard testimony from Officer Guevara that Appellant was advised of his rights at the outset of the interview, and that Appellant offered to show the officers the sites of other burglaries without any prompting. Officer Guevara stated that he did not witness Appellant fall asleep during the interview, and denied that Appellant was offered any deferential treatment for his cooperation. Appellant's confession is initialed at the beginning of each paragraph "GAG," and states that he was informed of his rights by Officer Guevara prior to beginning the statement.

3.) As the sole judge of witness credibility, the trial court was within its discretion to disregard Appellant's testimony. The trial court's findings are supported by Officer Guevara's testimony as well as the record of Appellant's confession. Therefore, the trial court did not err by holding Appellant's confession was voluntary."

4.) The court concluded that evidence presented was legally sufficient to support conviction of the defendant for burglary of a habitation. Defendant signed a written confession prepared by a police officer. Although there were inconsistencies within the confession, the jury could have reasonably concluded that the defendant admitted to the burglary because he had taken part in the crime and affirmed the judgment of the trial court.[39]

t.   The plaintiff alleged that in 2004, El Paso police detectives interrogated Jose Pulido regarding the death of Pulido's wife. Mr. Pulido had just been released from the hospital, was taking medication, was in a debilitative state, and was more unconscious than conscious while being questioned by police. El Paso police detectives took advantage of these vulnerabilities to obtain an involuntary confession from Mr. Pulido.[40]   However, the appellate court found:

---

[39] Gregg GOMEZ a/k/a Gregory Gomez, Appellant, v. The STATE of Texas, Appellee, 2009 WL 4831117.
[40] Plaintiffs' Third Amended Complaint at 173g.

**Exhibit 5**

1.)     Since the trial judge implicitly found that the confession was voluntary, he was free to disregard any testimony that may have alluded to inaccuracies in the confession.

2.)     We also find that, despite testimony that Appellant "could have been" in a debilitative state due to medication, the judge did not abuse his discretion when he admitted the confession into evidence. Where a defendant claimed that he had made an involuntary confession, because he was intoxicated and intimidated by officers, but the claims appeared unsubstantiated by the record, the Court of Criminal Appeals refused to find an abuse of discretion and upheld the trial court's decision to admit the confession.

3.)     We find that the judge did not abuse his discretion in admitting the confession and that the jury did not err in considering it.[41]

u.     The plaintiff alleged that in 2006, El Paso police detectives interrogated José Esparza in connection with a murder and aggravated robbery investigation. Mr. Esparza was arrested at 2am. El Paso police detectives conducted a series of interrogations throughout the night and for the next seven hours, ignoring Esparza's request to see an attorney and his repeated denials that he was involved in the crimes. During the course of these interrogations, El Paso police detectives sent Mr. Esparza's wife into an interrogation room to meet with him, after telling her that Esparza was refusing to say what had happened, requesting that she see if he would give her any information since she was his wife, and threatening that her family would never get their home back (it had been secured as a crime scene) if Esparza did not cooperate. Detectives then surreptitiously recorded the conversation between Mr. Esparza and his wife, and thereafter demanded that Esparza repeat to them what he had just told his wife. The trial court suppressed this recorded spousal conversation, finding that the conduct of the El Paso police officers who had created it was "shady, to say the least," "very troublesome," and "reprehensible," and openly questioned whether the conversation between Mr. Esparza and his wife was used by police as "a form of waterboarding," "a form of torture," "a form of softening him up" and a "nice way of beating him to get him to make a statement."[42]  However, the appellate court found:

1.)     The trial court concluded as a matter of law that Appellant's recorded

---

[41] *Pulido v. State of Texas*, No. 08-06-00229-CR, (Aug. 7, 2008).
[42] Plaintiffs' Third Amended Complaint at 173h.

**Exhibit 5**

statement was made voluntarily while he was in custody, and that the statement met all of the requirements of Texas Code of Criminal Procedure article 38.22. We also note from our review of the record that Patricia never told Appellant, "The police told me to ask you to state what happened," or any words to that effect. Considering this evidence, we imply a finding that Appellant's wife was not acting as an agent for the police.

2.)     We note that no communications occurring between Appellant and his wife were ever utilized by the detectives to sway or prompt Appellant to provide his recorded custodial statement. In fact, there is no indication that Appellant ever knew during his custodial statement that the detectives had been previously monitoring the spousal communications. The recording does show, however, that Appellant re-read his Miranda warning card, which complied with the requirements of article 38.22, that he stated that he understood his rights, and that he freely waived those rights. Giving almost total deference to the trial court's determination of historical facts based on credibility of the witnesses, we do not find that there was any coercion as alleged and we find that the trial court correctly determined that Appellant's custodial statement was voluntarily made and could properly be used at trial.[43]

v.     The plaintiff alleged that in 2014, El Paso police detectives coerced a false confession from a man they were interrogating in connection with an investigation into a sexual assault perpetrated against his stepdaughter. The police used a variety of coercive techniques, including false promises of leniency and threats of maximum criminal penalties if he did not confess, feeding him false information, and using the suspect's family against him, in order to obtain the involuntary confession. At the criminal trial, the man was acquitted after jurors concluded that the confession was coerced by police.[44]

1.)     The plaintiff did not identify the defendant and did not provide the underlying court documents to determine if the plaintiff's allegation were founded.

w.     The plaintiff alleged that in 2014, El Paso police engaged in a campaign of harassment against Adrienna Waller, detaining her during four pretextual traffic stops within the span of a week, each time searching her person and vehicle but

---

[43] *Esparza v. State of Texas*, No. 08-08-00304-CR (June 23, 2010).
[44] Plaintiffs' Third Amended Complaint at 173i.

**Exhibit 5**

without ever issuing any traffic citation. During the fourth stop, the El Paso police officers continued to detain Adrienna and her passenger (her cousin Felicia Waller) after the search was complete, and coerced the two women into consenting to a search of their home by threatening that the harassment would continue if they did not consent, but promising police would leave the women alone if they agreed to the search. The search of the home lasted three hours, and El Paso police officers ignored Felicia's repeated attempts to withdraw her consent and get officers to leave the home. El Paso police officers then lied under oath about the basis for the traffic stop and the nature of their interactions with the women. After an evidentiary hearing in Felica's criminal proceedings, a court concluded that the traffic stop was pretextual and that the El Paso police officers lied when they claimed otherwise, describing one officer's testimony as "evasive" and demonstrating a "lack of candor [that] undermines the veracity of his testimony as a whole." The court found that the roadside detention of Adrienna and Felicia was unlawful, and that their consent to search the home was not an act of free will but rather a product of the unlawful detention, and thus that the El Paso police officers repeatedly violated the women's Fourth Amendment rights. The court also determined that the behavior of the El Paso officers "constitutes harassment" and that the pretextual traffic stops were deliberately used to "coerce a driver and passenger to consent to a warrantless search of their residence" in violation of their constitutional rights.[45]  The appellate court found:

1.)    The Court credits Adrienna's testimony that she was neither speeding nor talking on her cell phone at the time of the stop, and because the officers claim not to have recognized Adrienna as the driver of the SUV until after they stopped the vehicle, the Court finds that the officers lacked an objectively reasonable basis to stop the SUV on September 25, 2014. See Cole, 444 F.3d at 689. Without an objectively reasonable basis to initiate the traffic stop, Defendant's detention was unlawful.

2.)    It is clear that even if Officer Granados and Officer Ibarra had actually observed Adrienna committing some sort of traffic offense, their subsequent actions prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation.

3.)    Because it is clear to this Court that Defendant's consent was a product of her illegal detention, the Court does not reach the issue of whether Defendant's consent was voluntarily given.

---

[45] Plaintiffs' Third Amended Complaint at 173j.

**Exhibit 5**

4.)     Finally, the Court notes that even if Defendant's consent were valid, EPPD's refusal to terminate the search after Defendant withdrew her consent constitutes an independent Fourth Amendment violation warranting suppression. A consent which waives Fourth Amendment rights may be limited, qualified, or withdrawn.[46]

5.)     While the court found the officers were not credible, the decision was not made until 2015 thus the El Paso Police Department was not on notice of this issue until many years after the incident underlying this matter.

17.     Here, the plaintiff alleged a series of cases that plaintiff believed would place a reasonable chief of police on notice of a pattern and practice of constitutional violations by their officers to obtain confessions, admissions, or convictions in criminal matters. However, while there may have been allegations of constitutional violations in the cited cases, the courts generally disagreed with the defendant's claims.  The mere fact that a criminal defendant would make allegations of misconduct by an officer would not place a reasonable chief of police on notice of a pattern or practice of misconduct when the courts upheld the convictions.

### There is Evidence That Between 1985-1993 the El Paso Police Department Conducted Reasonable Administrative Investigations and Held Officers Accountable for Their Policy Violations

18.     I reviewed 130 administrative investigations conducted by the El Paso Police Department between 1985-1993 and found that the El Paso Police Department conducted reasonable investigations and held officers accountable for their acts of misconduct. For example:

a.      Officers were investigated and disciplined for their failure to properly book evidence items;[47]

b.      Conducting a poor investigation;[48]

c.      Officers were investigated for allegations of physical and verbal abuse to their prisoners and uses of force;[49]

---

[46] *U.S. v. Waller*, 105 F.Supp3d 683 (2015).
[47] *See*, CP 93-097, CP 90-049, CP 90-214, CP 90-089
[48] *See*, CP 90-089
[49] *See,* IA 85-157, CP 92-205, IA 89-056, IA 89-058, IA 89-070, IA 92-174, IA 90-080 (claims force to elicit confession – also investigated by FBI), IA 90-097, IA 88-086, IA 92-050

**Exhibit 5**

d.   There was evidence that officers would report their fellow officers for misconduct, including physical abuse, and including their superior officers. The department not only investigated and sustained these allegations, but they also held supervisors accountable for their failure to report the misconduct;[50]

e.   Officers were investigated and disciplined for their failure to collect evidence items at a crime scene;[51]

f.   Officers were investigated and disciplined for untruthful statements;[52]

g.   Investigations were conducted based on a lawsuit complaint;[53]

h.   Officers were investigated and disciplined for failing to follow the law;[54]

i.   Officer were investigated and disciplined for unprofessional conduct like the use of profanity and rudeness;[55] and

j.   Criminal violations.[56]

19.   George Havlovic was a prosecutor with the El Paso District Attorney's Office between 1987 and 2020. Mr. Havlovic said he routinely met with El Paso Police Department detectives to review pending felony investigations. Mr. Havlovic said he worked with each of the named defendants in this matter and he never became aware of credible information and any of these officers were engaged in, or had engaged in misconduct, abuse of suspects, coercion of suspects or witnesses to provide statements or confessions. If he had, he would have initiated an investigation or recommended an investigation into the allegations.[57]

20.   Sergeant Ocegunda, a CAP sergeant during the time period in question, said "no allegations substantially similar to those alleged facts were ever presented to me in any of the CAP investigations during my assignment to CAP. I did not have information or evidence concerning the use of any threats, physical or mental in nature, being used to obtain statements or confessions. I did not have information or evidence of threats, intimidation, or other abusive conduct by our investigators. I was never made aware of

---

[50] See, CP 89-194.
[51] See, CP 91-156
[52] See, CP 91-262, CP 92-006, CP 93-009, CP 93-264, IA 90-097
[53] See, CP 92-059.
[54] See, IA 92-019 (unlawful detention misdemeanor not committed in officer's presence).
[55] See, IA 90-183, IA 89-013.
[56] See, CP 91-053.
[57] DEF CITY 0080756-80757.

34

**Exhibit 5**

the use of any threats of harm in prison, or the threat of potential capital punishment to extract involuntary confessions or witness statements by any officer. There was absolutely no prior pattern of any such misconduct known to me, or communicated to me, during my term."[58]  Sergeant Oceguna also said, "there was no "open secret" of misconduct by Alfonso Marquez or other investigators. Neither I nor any of my command officers would have tolerated such misconduct if it had been brought to our attention. I had regular interactions with the District Attorney's office and was never informed of any allegations substantially similar to those in the Third Amended Complaint."[59]

21.   Henry Fluck was an Assistant Chief of Police from 1987-1996 and also served as an interim chief of police.  Assistant Chief Fluck said, "I know and can testify truthfully that no allegations substantially similar to those alleged facts were ever presented to me in any of the Internal Affairs' cases during my term. I did not have information or evidence of any coercion, physical or mental in nature, being used to obtain statements or confessions. I did not have information or evidence of threats, intimidation, or other abusive conduct by our investigators. I was never made aware of the use of any threats of harm in prison, or the threat of potential capital punishment to extract involuntary confessions or witness statements by any officer. There was absolutely no prior pattern of any such misconduct known to me, or communicated to me, during my tenure."[60]

   a.   Chief Fluck said, "I communicated with Former District Attorney Jaime Esparza and his assistant district attorneys regularly in the course of my responsibilities. Former District Attorney Esparza never advised of any concerns or told of any factual evidence of misconduct by investigators and nor did anyone else from the District Attorney's Office."

   b.   Chief Fluck said, "I know of my own personal knowledge, that there was no "open secret" of misconduct by Alfonso Marquez or other investigators. Neither I nor my command officers would have tolerated such misconduct if it had been brought to our attention. I had regular interactions with members of the public, members of the City Council and the Mayor, and with other law enforcement agencies and officials, and was never informed of any allegations substantially similar to those in the Third Amended Complaint."[61]

22.   Karen Larose was an Assistant District Attorney with the Le Paso District Attorney's Office from 1985 until 2020.

   a.   Ms. Larose said, "In the course of her routine work with CAP, I worked with Earl

---

[58] DEF CITY 0080759-80760.
[59] DEF CITY 0080760.
[60] DEF CITY 0080753.
[61] DEF CITY 0080755.

35

**Exhibit 5**

Arbogast, Scott Graves, and Alfonso Marquez. I was never made aware of and was never told about any CAP detective manipulating the criminal justice system, contrary to law. Our office had an open file policy for defense counsel, and we worked to make sure that all investigative information was contained in the investigative files accepted for prosecution. Our office had a training focus for our prosecutors, which was open 10 law enforcement officers, on Brady compliance, including affirmative disclosure to defense counsel. Our office provided training from time to time on constitutional and statutory criminal procedure requirements."

b. Ms. Larose said, "1 have read the allegations in paragraphs l70(a)-(e), 17l(a)-(e), 172(a)-(n), and l73(a)-(j) of the Third Amended Complaint in this lawsuit. At no time did evidence or allegations substantially similar to those alleged facts come to my attention. I did not have credible information or evidence of any coercion, physical or mental in nature, being used. to obtain statements or confessions. I was never made aware of credible information or evidence of threats, intimidation, or other abusive conduct by CAP investigators. r was never made aware of threats of harm in prison, or the threat of potential capital punishment to extract involuntary confessions or witness statements by any officer. From time to time, criminal defendants would make claims of officer misconduct, but, in my experience, most of those were rejected by the courts or juries that heard them. During the course of my duties and responsibilities as a prosecutor, I routinely received, reviewed, and conducted hearings on defense Motions to Suppress evidence by defense counsel, In the course ofrevievling the evidence and conducting those hearings, I did not become aware any credible evidence of the type of misconduct alleged in the Third Amended Complaint."

c. Ms. Larose said, "During the time between 1985 and up until 2020 when I left the office, I had no indication or reason to believe that such misconduct was occurring. It was my belief, based on personal observation and in trial, that the investigations completed by the EPPD were fundamentally sound that they were in compliance with constitutional and statutory requirements. Our objective was to prevent any violations of the procedural and statutory requirements necessary to have admissible evidence and try our cases properly under the law when they supported prosecution and conviction."[62]

23. Russell Leach started with the El Paso Police Department in April 1995 and served as the chief of police until July 1998.

a. Chief Leach said, "I have read the allegations in paragraphs 170(a)-(e), 171(a)-(e),

---

[62] DEF CITY 0081516-81518.

**Exhibit 5**

172(a)-(n), and 173(a)-(j) of the Third Amended Complaint in this lawsuit. No allegations substantially similar to those alleged facts were ever presented to me in any of the Internal Affairs' cases during my term. I did not have information or evidence of any coercion, physical or mental in nature, being used to or other abusive conduct by our investigators. I was never made aware of the use of any threats of harm in prison, or the threat of potential capital punishment to extract involuntary confessions or witness statements by any officer. There was absolutely no prior pattern of any such misconduct known to me, or communicated to me, during my term. I make this statement under oath, having conducted and developed during my term of office a departmentwide assessment and strategic plan of the department and potential issues for reform and improvement in the department. All of the usual community stakeholders were involved in providing input into that process, as a result of direct inquiry by the strategic planning committee. This included other officials in the law enforcement agencies and the criminal justice system. Although I became aware of many issues and concerns during that process, and developed solutions and programs for them, we did not receive evidence of the type of problems and misconduct alleged in the referenced paragraphs. Attached hereto as Attachment 1 is a true and correct copy of that strategic plan titled Design for Excellence Plan, which was an official record and report by the El Paso Police Department."

b.    Chief Leach said, "I was personally aware, at that time, that our training programs were state of the art under TCOLE standards and criteria, for teaching and educating our officers on constitutional and statutory requirements applicable to investigations. This included the necessities for probable included completing investigations and providing an investigative file to the District Attorney (DA) with all factual information and evidence, whether it was adverse or favorable to the suspect or their defense. This compliance process, including the "Brady" material was reviewed by the Crimes Against Persons unit (CAP) actively and in person with the assigned Assistant District Attorneys who met routinely with our investigative divisions. That process was in place before I became Chief and continued throughout the time I was at the EPPD."

c.    Chief Leach said, "During the time of my service as Police Chief, I would not have believed that that the facts now alleged in the Plaintiffs Third Amended Complaint would have been true. I had no information at the time alleging or claiming that any such wrongdoing had happened or was ongoing. From my perspective, I deny that there was an "open secret" of misconduct by Alfonso Marquez or other investigators. either I nor my command officers would have tolerated such misconduct if it had been brought to our attention. I had regular

**Exhibit 5**

interactions with members of the public, members of the City Council and the Mayor, and with other law enforcement agencies and officials, and was never informed of any allegations substantially similar to those in the Third Amended Complaint."[63]

24.    Bradford Stiles served in the El Paso District Attorney's Office from 1982-1984.

a.    Mr. Stiles said, "In the course of my routine work with the El Paso Police Department, I was never made aware of and was never told about any CAP detective manipulating the criminal justice system, contrary to law. Our office had an open file policy for defense counsel, and we worked to make sure that all investigative information was contained in the investigative files accepted for prosecution.

b.    I have read the allegations in paragraphs 170(a)-(e), 171(a)-(e), 172(a)-(n), and 173(a)-(j) of the Third Amended Complaint in this lawsuit. At no time did evidence or allegations substantially similar to those alleged facts come to my attention. I did not have credible information or evidence of any coercion, physical or mental in nature, being used to obtain statements or confessions. I was never made aware of credible information or evidence of threats, intimidation, or other abusive conduct by CAP investigators. I was never made aware of threats of harm in prison, or the threat of potential capital punishment to extract involuntary confessions or witness statements by any officer. From time to time, criminal defendants would make claims of officer misconduct, but, in my experience, most of those were rejected by the courts or juries that heard them. During the course of my duties and responsibilities as a prosecutor, I routinely received, reviewed, and conducted hearings on defense Motions to Suppress evidence by defense counsel. In the course of reviewing the evidence and conducting those hearings, [ did not become aware any credible evidence of the type of misconduct alleged in the Third Amended Complaint.

c.    I would have initiated or recommended investigations within our office if any such information had come to my attention. I had a sworn responsibility to report any such misconduct to my supervisors, to the police department, and to any court exercising jurisdiction over our cases."[64]

25.    I addition to the cases listed by the plaintiff, court records showed that motions alleging misconduct involving Detective Marquez were made by Ricardo Martinez,[65] Manuel

---

[63] DEF CITY 0081522-81524.
[64] DEF CITY 0082424-82426.
[65] DEF CITY 0083428-84100.  In the Martinez matter, Sam Medrano, the defendant's criminal attorney, submitted an affidavit disputing Martinez's claims.  Mr. Medrano pointed out that Martinez waited 26 years to file his appeal,

**Exhibit 5**

Nevarez,[66] and Maurice Sweeny.[67]  In each of those cases, the courts overruled the defendants' motions and denied new trials.

26.     There is no evidence that the El Paso Police Department turned a blind eye, or acted with deliberate indifference, toward accepting complaints of officer misconduct, conducting reasonable administrative investigations or imposing reasonable disciplinary actions when warranted, that would cause a reasonable police officer to believe that he or she could violate the constitutional rights of another with impunity.

### The El Paso Police Department Had Reasonable Policies in 1993

27.     The El Paso Police Department had reasonable policies in 1993 that were consistent with generally accepted policies in policing at that time.

28.     The department's rules and regulations required, among other things that:

a.      Officers familiarize themselves with the department's policies, the Texas Penal Code, the Texas Code of Criminal Procedure and other material which deals directly or indirectly with the performance of the officer's duties;[68]

b.      Supervisors were required to take action regarding policy violations;[69]

c.      Unnecessary violence toward any person was considered a major violation;[70]

d.      All officers were required to obey the laws of the United States, the State of Texas, and the city of El Paso;[71]

e.      Officer were required to be truthful;[72]

f.      Officers were prohibited from using verbal abuse, unnecessary violence or mistreat, toward any prisoner;[73]

29.     Confessions and admissions law is discussed in the policy manual and specifically

---

that he vigorously litigated Martinez's confession on a motion to suppress and he lost the motion, that Martinez never told him that he was threatened or coerced and that he was never told about Martinez's other allegations. A claim of a coerced confession that was denied by the trial court and these other allegations that were denied by Martinez's own attorney and not even presented for more than 26 years would not have placed the City on notice of officer misconduct.

[66] DEF CITY 0084121-84138.
[67] DEF CITY 0082358-82379.
[68] DEF CITY 0079344.
[69] DEF CITY 0079344.
[70] DEF CITY 0079360.
[71] DEF CITY 0079363.
[72] DEF CITY 0079364.
[73] DEF CITY 0079365.

**Exhibit 5**

reminds officers that that confessions must be free and willingly provided, voluntary without coercion or duress of any kind, and without promises or inducements.[74]

30.      Officers were required to report the misconduct of fellow officers.[75]

31.      The manual contained a disciplinary matrix for consistency in applying disciplinary actions.[76]

32.      These are the types of provisions that are generally accepted in policing and specifically prohibit the types of conduct alleged in this matter.  There is no evidence that the El Paso Police Department failed to create policies that would allow an officer to believe they could violate the constitutional rights of others with impunity.

**There Was Evidence that El Paso Police Officers Received Training on Investigative Procedures**

33.      John Scagno was the Chief of Police of the El Paso Police Department between 1987 and 1994.[77]

   a.      Chief Scagno said officers received training on exculpatory evidence and the *Brady* decision while he was the chief.[78]  Officers were also trained on lawful investigatory techniques to obtain statements and confessions.[79]

   b.      Chief Scagno said when he became the chief, he moved Internal Affairs out of the main police facility because he felt some people may be reluctant to make complaints at the police facility.[80]

   c.      Chief Scagno said community members could make a complaint to any supervisor,[81] complaints would be received from the City Council and the Mayor, and community organizations.[82]

   d.      Chief Scagno said he created the Chief's Civilian Commission that could review anything in the department as a means of community oversight,[83] and he created the Inspections Unit that would review department policies and procedures.[84]

---

[74] DEF CITY 0021488.
[75] DEF CITY 0021395.
[76] DEF CITY 0021398-21399.
[77] Scagno deposition at 49.
[78] Scagno deposition at 25.
[79] Scagno deposition at 122.
[80] Scagno deposition at 37
[81] Scagno deposition at 38.
[82] Scagno deposition at 52.
[83] Scagno deposition at 38.
[84] Scagno deposition at 40.

**Exhibit 5**

e.    Chief Scagno said he would discipline officers to tell officers their conduct was improper, to communicate to other officers what types of conduct would not be tolerated and to determine if training was necessary.[85]

f.    Chief Scagno said he expected the District Attorney and Assistant District Attorneys to tell him if there were problem with his department and he expected the same from judges.[86]

g.    Chief Scagno said he would have been outraged if the misconduct alleged in this complaint occurred and seeking out vulnerable people to implicate others would be a termination offense.[87]

34.    Joseph Messer was the Assistant Chief of Police and served two terms as the interim Chief of Police.[88]

a.    Assistant Chief Messer said he was not aware of any detective coercing confessions.[89]

b.    Assistant Chief Messer said if Mr. Villegas had made a complaint, he would have reviewed the complaint and a complete investigation would have been conducted.[90]

c.    Assistant Chief Messer said in 1993-94, he had no factual information to believe there was a pattern or practice within the El Paso Police Department of unlawful investigative conduct among the Crimes Against Persons (CAP) detectives,[91] and he had no knowledge of such a pattern or practice prior to 1993.[92]

35.    Commander Moton started with the El Paso Police Department in 1989.[93]

a.    Commander Moton said if officers withheld exculpatory evidence, it would be a policy violation and the officer would be disciplined.  Commander Moton said he is not aware of any such cases.[94]

---

[85] Scagno deposition at 60.
[86] Scagno deposition at 116.
[87] Scagno deposition at 121.
[88] Messer deposition at 9.
[89] Messer deposition at 24.
[90] Messer deposition at 171-173.
[91] Messer deposition at 173.
[92] Messer deposition at 174.
[93] Moton deposition at 26.
[94] Moton deposition at 99-100.

**Exhibit 5**

b.     Commander Moton said El Paso Police Department policy requires officers to ensure the constitutional rights of suspects.[95]

c.     Commander Moton said at the time of this matter that while the department did have equipment to videotape crime scenes, that the CAP unit did not have video equipment to videotape interviews.[96]

d.     Commander Moton said an Internal Affairs investigation could be initiate by a citizen complaint, supervisor or another officer, judge, or by direction of the chief.[97]

e.     Commander Moton said in 1993, the department was not aware of broad issues within the department regarding exculpatory evidence.[98]

f.     Commander Moton said Brady was taught to officers in the police academy and department policy required officers to comply with state and federal law.[99]

g.     Commander Moton said he was not aware of any judge stating that CAP detectives were not meeting their constitutional duties.[100]

36.     Detective Bellows said he was not aware of any officers fabricating evidence or withholding evidence favorable to the defendant.[101]

a.     Detective Bellows said he attended the police academy and was provided with the department policies[102] that included the department values of safety and protection of the officers and the community and to treat people equally and fairly.[103]

b.     Detective Bellows said a judge never admonished him for misconduct and he was never accused of excessive force.[104]

37.     Detective Sanchez said he attended training on interviews and interrogations, and he

---

[95] Moton deposition at 112.
[96] Moton deposition at 145.
[97] Moton deposition at 188.
[98] Moton deposition at 217.
[99] Moton deposition at 225-226.
[100] Moton deposition at 227.
[101] Bellows deposition at 97.
[102] Bellows deposition at 112.
[103] Bellows deposition at 118.
[104] Bellows deposition at 122-123.

**Exhibit 5**

had hands-on training when he became a detective.[105]

    a.    Detective Sanchez said he would work with prosecutors on cases were arrested not yet been made and the prosecutors would give him ideas and collaborate on the investigations.[106]  Detective Sanchez said he would always look to the District Attorney for advice during an investigation.[107]

    b.    Detective Sanchez said he heard indirectly that officers had been disciplined for excessive force is that he has never testified falsely, nor heard of another officer testifying falsely.[108]

    c.    Detective Sanchez said he witnessed misconduct by another officer he would have a duty to report that misconduct.[109]

    d.    Detective Sanchez said a supervisor never told him he did not have to follow department policy and he did not believe supervisors would support him if he did not follow the rules.[110]

    e.    Detective Sanchez said he was never accused of coursing a statement and he was not aware that any of his colleagues were accused of coercion.[111]

38.    Detective Ortega said he believed the Internal Affairs does "above and beyond" and they do not cut corners or play favorites.[112]

    a.    Detective Ortega said it was important to follow department policy[113] and no one in the department told him he did not need to comply with department rules.[114]

    b.    Detective Ortega said he believed that Internal Affairs investigate all complaints, and he believed the chief would take serious action if an officer broke the rules.[115]

39.    Detective Loya said he never used force against a suspect or witness inside the police

---

[105] Sanchez deposition at 76.
[106] Sanchez deposition at 93-94.
[107] Sanchez deposition at 247.
[108] Sanchez deposition at 109-110.
[109] Sanchez deposition at 111.
[110] Sanchez deposition at 248.
[111] Sanchez deposition at 249.
[112] Ortega deposition at 245.
[113] Ortega deposition at 256
[114] Ortega deposition at 258.
[115] Ortega deposition at 259-260.

**Exhibit 5**

building and he never witnessed another officer using force inside the police building.[116]

    a.     Detective Loya said he never testified falsely and he was not aware of any other officer who testified falsely.[117]

    b.     Detective Loya said he would notify a supervisor if he saw misconduct[118] and he does not believe that officers would hesitate to report another officer if they did something really bad.[119]

    c.     Detective Loya said he knew portion was unlawful and that he had seen someone get beat up for a confession or a civil rights violation he would have reported it.[120]

    d.     Detective Loya said district attorneys would give training on new developments of the law.[121]

    e.     Detective Loya said he believed Internal Affairs to the investigations seriously and look into details to determine if officers were following the rules.[122]

40.    Detective Marquez said he never used excessive force and he was not aware of another officer using excessive force, fabricating statements, or abusing a witness.[123]

    a.     Detective Marquez that he attended outside training on homicide and child abuse investigations, and on confessions and evidence law.[124]

    b.     Detective Marquez said by 1993 he had attended 500-700 hours of training.[125]

    c.     Detective Marquez said he would work with the prosecutor's office and they would give him the pros and cons of a case.[126]

    d.     Detective Marquez said he knew that using force to gain a confession was unlawful and he does not believe that anyone in the Crimes Against Persons unit did not know that rule.  Detective Marquez said he knew that coercion or threats

---

[116] Loya deposition at 85.
[117] Loya deposition at 86.
[118] Loya deposition at 88.
[119] Loya deposition at 90.
[120] Loya deposition at 220-221.
[121] Loya deposition at 226.
[122] Loya deposition at 227.
[123] Marquez deposition at 238-239.
[124] Marquez deposition at 272-273.
[125] Marquez deposition at 274.
[126] Marquez deposition to 276.

**Exhibit 5**

were illegal.[127]

    e.    Detective Marquez said supervisors never told him he did not have to follow department policy.[128]

41.    Interim Chief of Police Fluck said, "I was personally aware, at that time, that our training programs were state of the art under TCOLE standards and criteria, for teaching and educating our officers on constitutional and statutory requirements applicable to investigations. This included the necessities for probable cause, search and arrest warrants, warnings, and actions to preserve the right to counsel. This included completing investigations and providing an investigative file to the District Attorney (DA) with all factual information and evidence, whether it was adverse or favorable to the suspect or their defense. This compliance process, including the "Brady" material was reviewed by the Crimes Against Persons unit (CAP) actively and in person with the assigned Assistant District Attorney's who met routinely with our investigative divisions. That process was in place before I became Chief and continued throughout the time I was at the EPPD."[129]

42.    Pete Ocegueda was a sergeant in CAP during the time period in question and said, "I was personally aware, at that time, that our training programs were state of the art under TCOLE standards and criteria, for teaching and educating our officers on constitutional and statutory requirements applicable to investigations. This included the necessities for probable cause, search and arrest warrants, warnings, handling juveniles, and actions to preserve the right to counsel. This included completing investigations and providing an investigative file to the District Attorney (DA) with all factual information and evidence, whether it was adverse or favorable to the suspect or their defense. This compliance process, including the "Brady" material was reviewed by the Crimes Against Persons unit (CAP) actively and in person with the assigned Assistant District Attorneys who met routinely with our investigative divisions."[130]

43.    Based on the statements of these witnesses, I am of the opinion that the El Paso Police Department had training regarding *Brady* materials, and constitutional and statutory requirements of criminal investigations.

### Police Officer Truthfulness

44.    Police officers are required to be trustworthy, honest, and maintain the highest level of integrity. Police officers are held to a higher standard than nonpolice as they represent the government as agents of the law and the criminal justice system. Police officers

---

[127] Marquez deposition at 278-279.
[128] Marquez deposition at 287.
[129] DEF CITY 0080754.
[130] DEF CITY 0080760.

**Exhibit 5**

who engage in intentional, malicious, deceptive action in a formal setting such as during a criminal or administrative investigation will permanently destroy an officer's credibility.  Indeed, under *Brady v. Maryland*, and the cases that followed, evidence of a police officer's untruthfulness is deemed exculpatory evidence and police departments must provide this information to prosecutors anytime the subject officer is a witness in a criminal matter.  Because an officer who engages in intentional, malicious, deceptive misconduct lacks the credibility to testify in court, an essential job function, there is no alternative in an employment context other than termination or permanent removal from any possible activity that requires a reliable truthful person.[131]

45.     The importance of police officer honesty cannot be overstated.  Every person involved in the criminal justice system relies on police honesty: police officers rely on the validity of information provided to them by fellow officers; supervisors render decisions based on information received from officers; citizens are urged to communicate and cooperate with law enforcement officials, if they trust and respect police officers the ability to garner public support will be enhanced; prosecutors rely on honest reports, statements, and affidavits when prosecuting criminals; judges rely on honesty when evaluating warrants, and jurors determine guilt or innocence and often liability based on an officer's investigation and testimony.  As a matter of public policy, a police officer who is intentionally, maliciously, deceitful about a material matter connected to their profession must be terminated from their position as they are no longer useful as a law enforcement officer and bring harm the community.

46.     While the standard today is that officers with sustained allegations of intentional, malicious, deceptive conduct that takes the form of deceptive action in a formal setting, such as testifying in court or during an internal affairs investigation; failure to bring forward information involving criminal action by other officers, also known as observing the so-called code of silence; or, creation of false evidence that tends to implicate another in a criminal act, should lead to the termination of an officer's employment, that standard was not in place prior to the year 2000.

47.     Indeed, I was one of the first to write in a policing journal the importance of officer credibility in a Police Chief magazine article in 2003 and I followed that article with another article published in an academic journal in 2009.  It was not until after the year 2000, that there was a generally accepted practice in policing to terminate an officer for their untruthfulness in these serious areas.

48.     In 1987, Detective Marquez was suspended for 15 days for submitting a travel expense report for $90 for a hotel stay where the actual cost of the hotel room was $49.61 and

---

[131] *See e.g.,* Noble, J., and G. Alpert*, Lies, True Lies and Conscious Deception: Police Officers and the Truth.*  Police Quarterly, Volume 12, Number 2 (June 2009) and Noble, J., *Police Officer Truthfulness and the Brady Decision,* Police Chief Magazine (October 2003).

**Exhibit 5**

for lying to as supervisor when hew as questioned about the matter.[132]

    a.    Detective Marquez later testified to an arbitrator that the remaining funds were spent taking two Salt Lake City investigators to dinner to thank them for their assistance in the investigation.[133]

    b.    The arbitrator determined there is a difference between someone who fraudulently documents expense reports for profit versus someone who spent the funds for legitimate expenses and imposed discipline consisting of a 3-day suspension.[134]

49.    At the time that Marquez was disciplined in 1987, the discipline was appropriate and reasonable.  The department sent a strong message with imposing a significant suspension that was overturned by an arbitrator who was outside the control if the city.

50.    Moreover, there is evidence that the El Paso Police Department took allegations of untruthfulness seriously and that officer did receive meaningful disciplinary actions and that officers would report fellow officers for engaging in misconduct.

    a.    In 1993, officers were given 30-day suspensions for instructing a new officer to claim a suspect voluntarily gave him some marijuana rather than admit the marijuana was located during a pat down search and for violating a gag order that prevent them from discussing the matter causing the reporting officer to believe officers would not follow him up on calls for reporting the misconduct.[135]

    b.    An officer reported his lieutenant for excessive force.  The lieutenant was suspended for 88 days and a sergeant for failed to report the misconduct was also suspended.[136]

    c.    An officer untruthfully claimed he had a BA and a Master's degree during an administrative hearing and he was suspended for 10 days.[137]

    d.    An officer denied he entered a residence and later retracted his statement and admitted that he and another officer did make entry.  The officer was given a 13-day suspension.[138]

---

[132] DEF CITY 007198.
[133] DEF CITY 007205.
[134] DEF CITY 007211.
[135] DEF CITY 0064913-65179.
[136] DEF CITY 0060980-61883.
[137] DEF CITY 0062941.
[138] DEF CITY 009316.

**Exhibit 5**

e.      An officer wrote a report claiming he found marijuana on a suspect's person when the marijuana was found by the detention officer.  Another officer advised the officer to lie in his report.  Both officers were suspended for 10-days.[139]

51.    I disagree with Mr. Rosenthal's opinion that the El Paso Police Department had a practice of failing to investigate allegations of untruthfulness and that those deficiencies would lead to wrongful convictions.  To the contrary, it is my opinion that the El Paso Police Department investigated allegations of untruthfulness and appropriately disciplined officers for their misconduct in a manner that was consistent with disciplinary actions in police departments during that time period.  I did not see a pattern or practice of the El Paso Police Department failing to investigate or turning a blind eye to allegations of officer untruthfulness.

### Conclusion

52.    I disagree with Mr. Rosenthal's opinions that the El Paso Police Department failed to investigate allegations of misconduct, that the chief of police was aware of these deficiencies, or that there was a lack of supervision that would lead to constitutional violations.  As discussed above, I reviewed the department's internal affairs investigation and found them to be reasonable and I did not find a pattern of systemic deficiencies that would cause officers to believe they could violate the constitutional rights of others with impunity.  The department had reasonable policies relating to officer misconduct, the department provided reasonable training to its officers and the cases cited by the plaintiff where allegations of misconduct were claimed were reviewed by the courts and almost entirely dismissed.  Additionally, there is evidence from prosecutors and El Paso Police Department management that they were not aware of a pattern of officer misconduct and if they were, they would have reported, investigated, and resolved the concerns.

53.    I also disagree with Mr. Rosenthal's opinion that the El Paso Police Department had notice of a systemic issue with its juvenile officers failing to follow department policy and violating the juvenile's constitutional rights.  The department did become aware of some officers in the TAC Unit failing to follow department policies relating to juvenile procedures.  Those allegations were investigated and the offending officers were disciplined.  There is no evidence of a pervasive, widespread issue in the El Paso police department of officers failing to follow juvenile policies to the extent that an officer would believe they could violate the constitutional rights of a juvenile with impunity or that would have placed the chief of police on notice of a widespread, pervasive practice.

---

[139] DEF CITY 0062763.

**Exhibit 5**

I declare under penalty of perjury that the foregoing is true and correct. Executed at Rancho Santa Margarita, CA.

_____          _12_/_10_/_22___
Jeffrey J. Noble                          Date

49

**Exhibit 5**

# JEFFREY J. NOBLE

Rancho Santa Margarita, CA 92688

Telephone: (949) 279-4678
*Email:* jeffnoble@cox.net
www.policeconduct.net

## EXPERIENCE

*CONSULTANT/EXPERT WITNESS* (2005 – Present)

Provide consulting and expert witness services on a wide range of law enforcement and personnel issues including misconduct, corruption, use of force, workplace harassment, pursuits, police administration, training, police operations, criminal and administrative investigations, interviews and interrogations, civil rights violations, police procedures, and investigations.

*FEDERAL COURT APPOINTED MONITOR*

Santa Clara, California, Sheriff's Department (March 2019 – present)

Review of policies, procedures and use of force applications in the Santa Clara County Jails as part of a federal court consent decree in the matter of *Chavez v. County of Santa Clara.*

*DEPUTY CHIEF OF POLICE* (April 2014 – January 2015)

Westminster Police Department, California
(Sworn 87; Civilian – 40; Population- 91,377; 10 sq. mi.)

Served as an interim Deputy Chief of Police to review Internal Affairs, auditing processes, department policies and procedures, risk management and to facilitate the efforts of a new external oversight agency.

*DEPUTY CHIEF OF POLICE* (September 1984 – July 2012)

Irvine Police Department, California
(Sworn – 205, Civilian – 100; Population: 217,000; 70 sq. mi.)

Served as a Patrol Officer, Narcotics Detective, Traffic Detective, Training Sergeant, SWAT sergeant and Commander, Internal Affairs, Sergeant, Lieutenant, Commander and Deputy Chief of Police.  As the Deputy Chief of Police, I was responsible for all operations of the Irvine Police Department including Patrol, Traffic and Investigations.

**Exhibit 5**

# JEFFREY J NOBLE

## EDUCATION

_Western State University, College of Law_ (Irvine, California)
J.D. _with honors_, 1993.
Assistant Editor, Consumer Law Journal.  California State Bar, 1994, #170911.

_California State University at Long Beach_
B.A. Criminal Justice, 1989

_Senior Management Institute for Police_
Police Executive Research Forum.  Boston University, Boston, Massachusetts, 2002

## PUBLICATIONS

**_Books:_**

Stoughton, S., Noble, J. and G. Alpert, _Evaluating Police Uses of Force_, New York University Press (2020).
Noble, J., and G. Alpert, _Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight_.  Prospect Heights, IL. Waveland Press (2008).

**_Book Chapters:_**

Alpert, G., J. Noble and J. Rojek, _Solidarity and the Code of Silence,_  Dunham, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Seventh Edition (2015).
Noble, J., and G. Alpert, _State Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?_ (Updated) Dunham, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Seventh Edition (2015).
Noble, J., and G. Alpert, _State Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?_ Dunham, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Sixth Edition (2009).

**Exhibit 5**

# JEFFREY J NOBLE

*Articles:*

Stoughton, S., Noble, J., and Alpert, G., *How to Actually Fix America's Police*, The Atlantic (June 2020)

Stoughton, S., Noble, J., and Alpert, G., *George Floyd's death shows exactly what police should not do,* The Washington Post (May 29, 2020)

Stoughton, S., Alpert, G. and Noble, J., *Why Police Need Constructive Criticism*, The Atlantic (December 23, 2015)  http://www.theatlantic.com/politics/archive/2015/12/officer-porter-mistrial-police-culture/421656/

Stoughton, S., Noble, J. and Alpert G., *Better Information is the Key to Policing Reform,* The Atlantic, (September 24, 2015) http://www.theatlantic.com/politics/archive/2015/09/better-information-is-the-key-to-policing-reform/406696/

Noble, J., *Rethinking Tactical Team Warrant Entries*, The Tactical Edge (Summer 2014).

Noble, J. *Assessing Police Discretion,* The Journal of California Law Enforcement (Vol. 47, No. 4, 2013).

Noble, J. and G. Alpert, *Criminal Interrogations of Police Officers After Use-of-Force Incidents,* FBI Law Enforcement Bulletin (September 2013).

Noble, J. and G. Alpert, *What Do We Really Know About American Policing?* The Journal of California Law Enforcement (Vol. 47, No. 1, 2013).

Noble, J., *Do I Need A SWAT Team?  Threat Assessments for Warrant Services*, The Tactical Edge (Winter 2013).

Alpert, G., J. Rojek and J. Noble, *The Cognitive Interview in Policing: Negotiating Control*. ARC Centre of Excellence in Policing and Security: Briefing Paper, Australian Government Research Council (June 2012).

Noble, J. and G. Alpert, *Evaluating the Quality of Law Enforcement Investigations: Standards for Differentiating the Excellent, Good and Reasonable, From the Unacceptable*.  The Journal of California Law Enforcement (Vol. 46, No. 1, 2012)

Noble, J., *Police Explorers: Protecting a Valued Asset.* The Journal of California Law Enforcement (Vol. 45, No. 3, 2011).

Noble, J., and G. Alpert, *Lies, True Lies and Conscious Deception: Police Officers and the Truth*.  Police Quarterly, Volume 12, Number 2 (June 2009).

Noble, J., Assessing *Witness Credibility*.  International Association of Chiefs of Police, Training Key #597 (2006).

Noble, J., Albertsons *Homicide: An Active "Shooter" Response*, The Tactical Edge (Fall 2004).

Noble, J., Police *Officer Truthfulness and the <u>Brady</u> Decision*, Police Chief Magazine (October 2003).

Noble, J., *The Boomerang Employee – What to do When a Fired Employee Comes Back*, The Journal of California Law Enforcement (Volume 37, No. 1, 2003).

Noble, J., Why *Appearance Matters*, Network – California Peace Officers' Association Newsletter (August 2001).

**Exhibit 5**

# JEFFREY J NOBLE

Noble, J., *Tactical Team Basics: Warrants*, The Tactical Edge (Summer 2000).

Noble, J., Encouraging *Interaction*, Minnesota Cities Magazine (Volume 84, Issue 11, November 1999).

Noble, J., *Neighborhood Watch Evolves Into Community Engagement Tool in Irvine*, Community Policing Consortium.  www.communitypolicing.org/publications/artbytop/w6/w6noble.htm (October 1999).

Noble, J., Childhood Experiences Find a Place in Today's Public-Safety Strategies, Community Links (Ph. VI, No.3, Issue 9 - Summer 1999).

Noble, J., *Police Pursuits: Law Enforcement or Public Safety?* The Journal of California Law Enforcement (Volume 33, No.1, 1999).

Noble, J., *Alternative Work Schedules can be an Evolution of Team Policing*, Network - California Peace Officers' Association Newsletter (December 1998).

Noble, J., *Continuing Police Training: The Interactive Multimedia Approach*, The Journal of California Law Enforcement (Volume 29, No.1, 1995).

Noble, J., *Environmental Advertising Claims: "Ozone Friendly"* Consumer Protection, 2 W. St. U. Consumer L.J. 95 (1993).

## SELECTED PROFESSIONAL ACTIVITIES

*Peer Review* – Law Enforcement Dog Encounters Training Toolkit for Law Enforcement, DOJ, Office of Community Oriented Policing Services, COPS, (December 2018)

*Presenter* – Developing or Revitalizing an Internal Affairs Unit.  Public Agency Training Council: Internal Affairs Conference (December 2014)

*Presenter* – Addressing Police Misconduct: Standards to Consider.  The International Association of Chiefs of Police Annual Conference (October 2014).

*Presenter* – Reducing Traffic-Related Officer Injuries and Deaths.  The International Association of Chiefs of Police Annual Conference in Orlando, Florida (October 2014).

*Participant* – Reducing Violence and Improving the Rule of Law: Organized Crime, Marginalized Communities, and the Political Machine.  Carnegie Endowment for International Peace. Washington, D.C. (September 2014)

*Presenter* – Preventing Corruption in Police Institutions.  Police Accountability in Democracies: First International Congress on Police Internal Affairs. Los Cabos, Baja California Sur, Mexico (October 2013).

*Presenter* – Testilying: Lies, True Lies, and Conscious Deception: Police Officers' Truth and the Brady Decision. American Psychological Association Annual Conference in Honolulu, Hawaii (July 2013).

*Presenter* – Police Misconduct Issues: Police Explorers and Reasonableness of Internal Affairs Investigations, The International Association of Chiefs of Police Annual Conference in San Diego, California (October 2012).

*Peer Review* – Building and Enhancing Criminal Justice Researcher-Practioner Partnerships, National Institute of Justice (June 2012).

*Committee Chairperson* – California Peace Officers' Association Communications Sub-Committee.

**Exhibit 5**

# JEFFREY J NOBLE

Responsible for publication of the Journal of California Law Enforcement (Jan. 2012 – present)

*Presenter* – The Lying Police Officer: Is Any Deception Acceptable?  With Karen Kruger.   The International Association of Chiefs of Police Annual Conference in Denver, Colorado (Nov. 2009).

*Presenter* – State-Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?  The Academy of Criminal Justice Sciences Annual Meeting in Boston, Massachusetts. (March 2009).

*Committee Chairperson* – Major Cities Chiefs of Police Task Force in Internal Affairs. Los Angeles, California (2005-2008).

*Peer Review* – Boston Police Department: Enhancing Cultures of Integrity Technical Assistance Guide, Office of Community Oriented Policing Services #TDL 2008-371 (July 2008)

*Peer Review* – Undocumented Immigrants in U.S./Mexico Border Counties: The Cost of Law Enforcement and Criminal Justice Services, National Institute of Justice #TDL 2008- 321 (December 2007).

*Presenter* – Truth or Consequences: Dealing with the Deceitful Police Officer, with Jeffrey Schlanger and Michael Stone, The International Association of Chiefs of Police Annual Conference, Los Angeles, California (November 2004).

*Presenter* - Albertsons Homicide: An Active "Shooter" Response, The California Association of Tactical Officers Annual Conference, Palm Springs, California (September 2004).

*Presenter* – Boomerang Employees, COPS Conference, Washington, D.C. (2002).

## PROFESSIONAL AFFILIATIONS

*California Peace Officers' Association* – Chair, Communications Sub-Committee (2012 – 2018)
*Police Executive Research Forum*
*International Association of Chiefs of Police*
*National Tactical Officers' Association*
*Special Olympics Torch Run* Southern California Region, Assistant Director (1997 – 2012)

## CONSULTING/EXPERT WITNESS

2022   Rodriguez v. Long Beach (Plaintiff) (Deposition)
       Search and Control Hold Tactics
       Arnoldo Casillas, Casillas & Associates, 3777 Long Beach Blvd, Long Beach, CA 90807
2022   Bhandari v. National City (Plaintiff) (Expert Report)
       Use of Force
       John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103
2022   Huerta v. County of Tulare (Plaintiff) (Expert Report) (Criminal Trial Testimony)
       Arrest and use of force
       Doug Rochen, ACTS Law, 16001 Venture Blvd., Suite 200, Encino, CA 91436

**Exhibit 5**

# JEFFREY J NOBLE

2022   <u>Bahadoran v. City of New York</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Jonathan Abady, Emery, Celli, Brinckerhoff, Abady, Ward & Maazel, LLP, 600 Fifth Avenue at
Rockefeller Center, 10th Floor, New York, NY 10020
2022   <u>Underwood v. Austin</u> (Plaintiff) (Expert Report)
Use of Force
Jeff Edwards, Edwards Law, 603 W 17th St., Austin, Texas 78701
2022   <u>People v. Simmonds</u> (Prosecution) (Grand Jury Testimony)
Officer Involved Shooting
Anti-Corruption & Civil Rights Division, Office of the Fulton County District Attorney, Atlanta
Judicial Circuit, 136 Pryor Street SW| 3rd Floor, Atlanta, GA  30303
2022   <u>Harder v. City of Seattle</u> (Defense) (Expert Report)
Allegation of vehicle pursuit
Tara Gillespie, Seattle City Attorney's Office, Civil Division – Torts Section, 701 Fifth Avenue,
Suite 2050, Seattle, WA 98104-7095
2022   <u>Womble v. City of Durham</u> (Defense) (Expert Report)
Allegation of False Conviction
Henry Sappenfield, Kenon Cracer, PLLC, 4011 University Drive, Suite 300, Durham, NC 27717
2022   <u>Oshan v. District of Columbia</u>, (Plaintiff) (Expert Report)
Vehicle Pursuit
Patrick Regan, Regan Zambri & Long, PLLC, 1919 M Street, N.W., Suite 350,
Washington, DC 20036
2022   <u>Denk v. City of Peoria, AZ</u> (Defense) (Expert Report)
Officer Involved Shooting
Amanda C. Sheridan, Senior Assistant City Attorney, Civil Litigation, City of Peoria, City
Attorney's Office, 8401 Monroe Street, Suite 280, Peoria, AZ 85345
2022   <u>State of Missouri v. Prichard and Brummett</u> (Prosecution) (Deposition)
Dion Sankar, Chief Deputy Prosecutor, Jackson County Prosecutor's Office, 415 E 12th Street
Kansas City, Missouri 64106
2022   <u>Ong v. City of Beverly Hills</u> (Plaintiff) (Deposition)
Traffic Control
Stephen Johnson, Berglund and Johnson Law Group, 21550 Oxnard, Suite 900, Woodland Hills,
CA 91367
2022   <u>Kelley v. City of San Marcos, TX</u>, (Plaintiff) (Expert Report)
Use of Force
Rebecca Webber, Hendler Flores Law, 901 S. MoPac Expressway, Building 1, Suite 300, Austin,
TX 78746
2022   <u>Zelaya (Juarez Cedillo) v. LAPD</u> (Plaintiff) (Expert Witness)
Use of Force
Miguel Flores, Carrillo Law Firm, LLP, 1499 Huntington Drive, Suite 402, South Pasadena, CA
2022   <u>Cullinan v. LAPD</u>, (Plaintiff) (Expert Report) (Deposition)

Updated December 9, 2022

**Exhibit 5**

# JEFFREY J NOBLE

Use of Force
Peter M. Williamson, Williamson Law Firm, 3200 Foothill Drive, Suite 4, Westlake Village, CA 91361

2022 <u>Jane AM v. LAPD</u>, (Plaintiff) (Expert Report) (Deposition)
Detention and Use of Force
Laura Jimenez, Carrillo Law Firm, LLP, 1499 Huntington Drive, Suite 402, South Pasadena, CA 91030

2022 <u>People v. Reynolds, Crestview, FL</u>, (State) (Grand Jury)
Use of Force
Michelle G. Sandler, Assistant State Attorney, Felony Supervisor – Fort Walton Beach Office, 1804 Lewis Turner Boulevard, Fort Walton Beach, FL 32547

2022 <u>Aden v. City of Bloomington</u>, (Plaintiff) (Expert Report)
Officer Involved Shooting
Eva Rodelius, Wilson Law Group, 3019 Minnehaha Ave, Minneapolis, MN 55406

2022 <u>Jackson v. Nassau County</u>, (Plaintiff) (Expert Report) (Deposition)
Allegation of wrongful conviction
Gabriel P. Harvis, Esq., Elefterakis, Elefterakis & Panek, 80 Pine Street, 38th Floor, New York, New York 10005

2022 <u>Baugus v. Newton (Morrow County Sheriff's Department, Ohio)</u>, (Plaintiff) (Expert Report)
Creation of danger that led to death
Connie Gadell-Newton, Fitrakis & Gadell-Newton, LLC, 100 E. Main Street, Columbus, OH 43215

2022 <u>Rios v. LAPD</u>, (Plaintiff) (Expert Report)
High-Risk Car Stop
Toni Jaramilla, 1900 Avenue of the Stars, Suite 900, Los Angeles, CA 90067

2022 <u>Sloan v. Anderson County Sheriff, SC</u>, (Plaintiff) (Expert Report)
Officer Involved Shooting
Joshua Snow Kendrick, Kendrick & Leonard, P.C., 506 Pettigru Street, Greenville, SC 29601

2022 <u>Jones v. Dupage County Sheriff's Office</u>, (Defense) (Expert Report) (Deposition)
Officer Involved Shooting
Patrick R. Moran, Rock Fusco & Connelly, LLC, 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654

2022 <u>Brown v. Turbyfill (Spotsylvania County Sheriff's Department, VA)</u>, (Plaintiff) (Expert Report)
Officer Involved Shooting
Mark J. Krudys, The Krudys Law Firm, PLC, Truist Place, 919 East Main Street, Suite 2020, Richmond, VA  23219

2022 <u>Cruz v. Riverside County Sheriff's Department</u>, (Plaintiff) (Expert Report) (Deposition)
Use of Force
Steven Lerman, Steven A. Lerman and Associates, LLC, 6033 West Century Blvd., Suite 740 Los Angeles, CA 90045

2022 <u>Yancy v. Tillman, Clayton County Police, GA</u>, (Plaintiff) (Expert Report)

Updated December 9, 2022

**Exhibit 5**

## JEFFREY J NOBLE

Entry and Use of Force
Tanya F. Miller, DUBOSE MILLER, LLC, 75 14th Street NE, Suite 2110, Atlanta, GA 30309

2022 Penny v. LAPD, (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Shaleen Shanbhag, Hadsell, Stormer, Renick Dai LLP, 128 N. Fair Oaks Ave., Pasadena, California 91103

2022 Herrera v. Austin, (Plaintiff) (Expert Report)
Use of force during demonstration
Jeff Edwards, Edwards Law, 603 W 17th St., Austin, Texas 78701

2022 Barragan v. LAPD, (Plaintiff) (Expert Report)
Positional Asphyxia
Dominique Boubion, Carrillo Law Firm, 1499 Huntington Drive, Suite 402, South Pasadena, CA 91030

2022 Sen v. Los Angeles, (Plaintiff) (Expert Report) (Deposition)
High-Risk Car Stop Tactics
Brian Olney, Hadsell, Stormer, Renick & DAI, LLP, 128 N. Fair Oaks Ave., Pasadena, California 91103

2022 Ibarra v. Lee (Rogers County, OK), (Plaintiff) (Expert Report) (Deposition)
Officer involved Shooting
Dale Galipo, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367

2022 Tate v. Chicago (Defense) (Expert Report)
Monell Allegations
Marion C. Moore, Chief Assistant Corporation Counsel, City of Chicago Department of Law
Federal Civil Rights Litigation Division, 2 N. LaSalle St., Suite 420, Chicago, Illinois 60602

2022 Lunneen v. Berrien Springs (Plaintiff) (Expert Report)
Use of Force
Noah W. Drew, Spence Lawyers, 15 S. Jackson Street, Jackson, WY 83001

2021 Carr v San Diego County Sheriff (Plaintiff) (Expert Report) (Deposition)
Use of Force
Joseph M. McMullen, Law Offices of Joseph M. McMullen, 501 W. Broadway, Suite 1510, San Diego, CA 92101

2021 Mountford v. City of Santa Monica (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Jeremy D. Jass, 4340 Von Karman Avenue, Suite 100, Newport Beach, CA 92660

2021 State v. Dagas (Prosecution) (Trial Testimony)
Allegation of False Police Report
Judy Taschner, Deputy District Attorney, Special Operations Division, San Diego County District Attorney's Office, East County Regional Center, 250 E. Main Street, El Cajon, CA 92020

2021 Stickney v. City of Phoenix (Defense) (Expert Report)

**Exhibit 5**

## JEFFREY J NOBLE

Use of Force
Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281
2021    Evans v City of Austin (Plaintiff) (Expert Report)
Use of Force
Jeff Edwards, Edwards Law, 603 W 17th St., Austin, Texas 78701
2021    Rennells v. Kenealy (Plaintiff) (Expert Report)
Use of Force
James End, First, Albrecht & Blondis, 158 N. Broadway, Suite 600 Milwaukee, WI 53202
2021    Johnson v Baltimore (Defense) (Expert Report)
*Monell* Allegations
Kara K. Lynch, Chief Solicitor, Baltimore City Department of Law, 100 N. Holliday Street,
Room 101, Baltimore, Maryland 21202
2021    Brown v City of Chicago (Defense) (Expert Report) (Deposition)
*Monell* Allegations
Dan Nolan, Reiter-Burns, 311 S. Wacker, 5200, Chicago, IL 60606
2021    Gonzalez v. CHP (Plaintiff) (Expert Report) (Deposition)
Use of Force
Dale Galipo, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills,
CA 91367
2021    Baney v City of Chapin (Plaintiff) (Expert Report)
Use of Force
Joshua Snow Kendrick, Kendrick & Leonard, 1522 Lady Street, Columbia, SC 29201
2021    Washington v City of Chapin (Plaintiff) (Expert Report)
Use of Force
Joshua Snow Kendrick, Kendrick & Leonard, 1522 Lady Street, Columbia, SC 29201
2021    King v. Fontana (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Hang Le, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills, CA
91367
2021    Harbin v. City of Breckenridge Hills, Missouri (Plaintiff) (Expert Report) (Deposition)
Use of Force
Javad Khazaeli, Khazaeli Wyrsch LLC, 911 Washington Ave, Suite 211, St. Louis, MO 63101
2021    Green v St. Louis (Plaintiff) (Expert Report)
Officer Involved Shooting
Javad Khazaeli, Khazaeli Wyrsch LLC, 911 Washington Ave, Suite 211, St. Louis, MO 63101
2021    Debeaubien v CHP (Plaintiff) (Expert Report) (Deposition)
Failure to Investigate
Stewart Katz, 555 University Avenue, Suite 270, Sacramento, CA 95825
2021    Love v. Chicago (Defense) (Expert Report) (Deposition)
Officer Involved Shooting
Marion C. Moore, Chief Assistant Corporation Counsel, City of Chicago Department of Law

**Exhibit 5**

## JEFFREY J NOBLE

Federal Civil Rights Litigation Division, 2 N. LaSalle St., Suite 420, Chicago, Illinois 60602

2021  Groom v Paso Robles (Plaintiff) (Expert Report)
Sexual assault by police officer
Neda Lotfi, Taylor & Ring, 1230 Rosecrans Avenue, Suite 360, Manhattan Beach, CA 90266

2021  Barrera v. City of Woodland (Plaintiff) (Expert Report) (Deposition)
Use of Force
Neil Gehlawat, Taylor & Ring, 1230 Rosecrans Avenue, Suite 360, Manhattan Beach, CA 90266

2021  Shorter v. City of Greenville, MS (Plaintiff) (Expert Report)
Officer Involved Shooting
Tiffany Wright, Co-Director, Human and Civil Rights Clinic, Howard University School of Law

2021  Andrich v. City of Phoenix (Defense) (Expert Report)
Officer Involved Shooting
Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281

2021  Monk v. Gulick (Chesterfield, VA), (Plaintiff) (Expert Report)
Use of Force
Thomas Johnson, Bricker, Anderson & Johnson, 411 East Franklin Street, Suite 504, Richmond, VA 23219

2021  Hernandez v. City of Los Angeles (Plaintiff) (Expert Report)
Officer Involved Shooting
Arnoldo Casillas, Casillas & Associates, 3777 Long Beach Blvd, Long Beach, CA 90807

2021  Garten v. City of Costa Mesa, (Plaintiff) (Expert Report) (Deposition)
Detention and search.
Richard Herman, Law Office of Richard P. Herman, P. O. Box 53114, Irvine, California 92619-3114

2021  Harris v. City of Phoenix, (Defense) (Expert Report)
Officer Involved Shooting
Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281

2021  Gagliani v. Lexington County Sheriff, SC, (Plaintiff) (Expert Report) (Deposition)
Use of Force
Eric Cavanaugh, Cavanaugh & Thickens, LLC, 1717 Marion St, Columbia, SC 29201

2021  Torres v. City of Cheyenne, WY (Plaintiff) (Expert Report)
Use of Force
Thomas B. Jubin, Jubin & Zerga, LLC., 2614 Pioneer Avenue, P.O. Box 943, Cheyenne, Wyoming 8203-0943

2021  Velez v. City of Sacramento, (Plaintiff) (Expert Report)
Officer Involved Shooting
Stewart Katz, 555 University Avenue, Suite 270, Sacramento, CA 95825

2021  Mojarrad v.  Edwards, City of Raleigh, NC, (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Cate Edwards, Edwards Kirby, 3201 Glenwood Avenue, Suite 100, Raleigh, North Carolina 27612

**Exhibit 5**

## JEFFREY J NOBLE

2021   Pope v. Hill, (Plaintiff) (Deposition)
Pursuit
Bart Turner, Savage, Turner, Durham, Pinckney & Savage, 102 East Liberty Street, Eight Floor
(31401), PO Box 10600, Savannah, GA 31412

2021   Rightsell v. Indiana State Police, (Plaintiff) (Expert Report)
Officer Involved Shooting
Bruce Kehoe, Wilson Kehoe Winingham, 859 N Meridian St, Indianapolis, IN 46208

2021   Mendez v City of Chicago, (Defense) (Expert Report) (Deposition)
Monell Allegation
Marion Moore, Chief Assistant Corporation Counsel, City of Chicago Department of Law,
Federal Civil Rights Litigation Division, 2 N. LaSalle St., Suite 420, Chicago, Illinois 60602

2021   Helvie v Jenkins (Adams County Sheriff, CO.), (Defense) (Expert Report)
Use of Force
Kerri A. Booth, Adams County Attorney's Office, 4430 South Adams County Pkwy., 5th Floor,
Suite C5000B, Brighton, CO 80601

2021   State of Minnesota v. Chauvin (State) (Expert Report)
Use of Force
Steve Schlescher, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1400, St.
Paul, MN 55101

2021   Humphrey v. Friar (City of Millington, TN), (Plaintiff) (Expert Report) (Deposition)
Sexual Misconduct
Andrew C. Clarke, The Cochran Firm – Midsouth, One Commerce Square, Suite 1700,
Memphis, Tennessee 38103

2021   Skommesa v. City of Murrieta (Plaintiff) (Expert Report) (Deposition)
Use of Force
Michael R. Marrinan, Law Office of Michael R. Marrinan, 501 W. Broadway, Suite 1510
San Diego, CA. 92101

2021   Dominguez v. City of Escondido (Defense) (Expert Report)
Use of Force
Keith Phillips, Assistant City Attorney, City Attorney's Office, City of Escondido, 201 N.
Broadway, Escondido, CA 92025

2021   Brown v. Ontario (Defense) (Expert Report)
Use of Force
Daniel S. Roberts, Cole Huber LLP, 3401 Centrelake Dr., Ste. 670, Ontario, CA  91761

2021   Galloway v. Nassau County Police (Plaintiff) (Expert Report) (Deposition)
Allegation of wrongful conviction
Gabriel P. Harvis, Elefterakis, Elefterakis & Panek, 80 Pine Street, 38th Floor, New York, New
York 10005

2021   Richards v. Las Vegas Metropolitan Police (Plaintiff) (Expert Report)
Officer involved shooting
E. Brent Bryson, 32302 West Charleston Blvd., Las Vegas, NV 89102

**Exhibit 5**

# JEFFREY J NOBLE

2021 <u>Hall v. City of Atlanta</u> (Plaintiff) (Expert Report) (Deposition)
Monell Allegation
Shean Williams, The Cochran Firm, 100 Peachtree Street NW, Suite 2600, Atlanta, Georgia, 30303

2021 <u>Drew v. Irby, Fauquier County Sheriff, VA</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force, Arrest
Victor M. Glasberg, 121 S. Columbus Street, Alexandria, VA 22314

2021 <u>Alves v. Riverside County Sheriff's Department</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103

2020 <u>VanGilder v. McClean and Beale</u> (Plaintiff) (Expert Report)
Failure to Render Medical Assistance
Mark J. Krudys, The Krudys Law Firm, PLC, SunTrust Center, 919 East Main Street, Suite 2020, Richmond, VA  23219

2020 <u>Hood/Washington v. Chicago</u> (Defense) (Expert Report) (Deposition)
Monell Allegations
George Yamin, The Sotos Law Firm, 550 East Devon Avenue, Suite 150, Itasca, IL 60143

2020 <u>Grabbingbear v. Europe</u> (Defense) (Expert Report) (Deposition)
Officer Involved Shooting
Donald Sisson, Elkus and Sissnon, PC, 7100 E. Belleview Ave., Suite 101, Greenwood Village, CO 80111

2020 <u>Thurman v. Spokane County Sheriff's Department</u> (Defense) (Expert Report)
Reasonableness of Internal Investigation
Michael Kitson, Lane Powell, 1420 5th Avenue, #4200, Seattle, WA 98101

2020 <u>Dew v. City of Seaside</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Karen C. Joynt, Joynt Law, 225 S. Lake Ave., Suite #300, Pasadena, CA 91101

2020 <u>Arnold v. City of Olathe, Kansas</u> (Plaintiff) (Expert Report) (Deposition)
Tactical Decision Making
Ryan J. Gavin, Kamykowski, Gavin & Smith, P.C., 222 S. Central Ave., Suite 1100, St. Louis, MO 63105

2020 <u>Scott and Johnson v. Detroit</u> (Plaintiff) (Expert Report)
Allegation of Wrongful Convictions
Nick Bourland, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, 600 Fifth Avenue, 10th Floor, New York, NY 10020

2020 <u>Chinaryan v. LAPD</u> (Plaintiff) (Expert Report) (Trial)
High-risk car stop
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103

2020 <u>Lisner v. Huntington Park</u> (Plaintiff) (Expert Report)

**Exhibit 5**

# JEFFREY J NOBLE

Employment Action
Michael J. Grobaty, Murtaugh Treglia Stern & Deily LLP, 2603 Main Street, Penthouse, Irvine, CA 92614

2020   <u>Meadows v. Town of Rising Sun, MD</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Jeffrey Nusinov, Nusinov, Smith, LLP, 6225 Smith Avenue, Suite 200B, Baltimore, MD 21209

2020   <u>People v. Nelson (King County, Washington)</u> (People) (Expert Report)
Officer Involved Shooting
Kathy Van Olst, King County Prosecuting Attorney's Office, 516 Third Avenue, W400
Seattle, WA 98104

2020   <u>Mesa v. Leon Valley, Texas</u> (Plaintiff) (Expert Report)
Pursuit
Gene Toscanao, 846 Culebra Road, San Antonio, Texas 78201

2020   <u>Doe v. Charlotte Board of Education</u> (Defense) (Expert Report) (Deposition)
Police investigation
Lori Keeton, The Law Offices of Lori Keeton, 13850 Ballantyne Corporate Place, Suite 500, Charlotte, North Carolina 28277

2020   <u>Bisetti v. City of Austin</u> (Plaintiff) (Expert Report) (Deposition)
Arrest and Disciplinary Action
Jeff Edwards, The Edwards Law Firm, 1101 East 11th Street, Austin, TX 78702

2020   <u>Amaral v. City of San Diego</u> (Plaintiff) (Expert Report) (Deposition)
Use of force
Gastone Bebi, 501 West Broadway, Suite 1340, San Diego, CA 92101

2020   <u>Baker v. Coburn and McHugh (Stratford, Texas)</u> (Plaintiff) (Expert Report)
Officer Involved-Shooting
Jeff Edwards, The Edwards Law Firm, 1101 East 11th Street, Austin, TX 78702

2020   <u>Scott v. Charlotte</u> (Defense) (Deposition)
Officer Involved Shooting
Mark Newbold, Deputy City Attorney, Charlotte-Mecklenburg, 601 E. Trade Street
Charlotte, NC 28202

2020   <u>Dudley v. City of Kinston</u> (Plaintiff) (Expert Report) (Deposition)
Allegation of Wrongful Conviction
David Rudolf, Rudolf-Widenhouse, 225 East Worthington Ave., Suite 100, Charlotte, NC 28203

2020   <u>Taylor v. Los Angeles County Sheriff's Department</u> (Plaintiff) (Expert Report)
Internal Investigation, Failure to Render Medical Aid
Arnoldo Casillas, Casillas & Associates, 3777 Long Beach Blvd, Long Beach, CA 90807

2020   <u>McBean v. Peraza</u> (Plaintiff)
Officer Involved Shooting
David I. Schoen, 2800 Zelda Road, Suite 100-6, Montgomery, Alabama  36106

2020   <u>Hayes v. City of Portland</u> (Defense) (Expert Report) (Deposition)
Officer Involved Shooting

Updated December 9, 2022

**Exhibit 5**

# JEFFREY J NOBLE

Bill Manlove, Portland Office of the City Attorney, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204

2020 <u>Eatherton v. County of Riverside</u> (Plaintiff) (Expert Report)
Use of force
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

2020 <u>Godifay v. King County, WA</u> (Defense) (Expert Report)
Alleged police pursuit
Daniel L. Kinerk, King County Senior Deputy Prosecuting Attorney, 900 King County Administration Building, 500 Fourth Avenue, Seattle, WA 98104-2316

2020 <u>Doxator v. O'Brien, Green Bay Police Department</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
Forrest K. Tahdooahnippah, Dorsey & Whitney, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402

2020 <u>Krechmery v. City of Ontario</u> (Plaintiff) (Expert Report)
Use of Force
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

2019 <u>Taylor v. Seattle,</u> (Defense) (Expert Report)
Officer Involved Shooting
Ghazal Sharifi, Seattle City Attorney's Office, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104

2019 <u>Thomas v. County of Sacramento</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Stewart Katz, 555 University Avenue, Suite 270, Sacramento, CA 95825

2019 <u>Elifritz v. City of Portland,</u> (Defense) (Expert Report)
Monell allegation
Naomi Sheffield, Deputy City Attorney, Portland Officer of the City Attorney, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204

2019 <u>People v. Krichovich and LaCerra (Broward County, FLA)</u> (State) (Deposition) (Trial)
Use of Force
Christopher Killoran, Assistant State Attorney, Seventeenth Judicial Circuit of Florida Broward County Courthouse, 201 S.E. Sixth Street, Fort Lauderdale, FL 33301-3360

2019 <u>Wilson v. City of Mission, TX</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Victor Rodriguez, 121 North 10th Street, McAllen, TX 78501

2019 <u>Davis v. Waller (Georgia Bureau of Investigations)</u> (Defense) (Expert Report)
Officer Involved Shooting
Ron Stay, Assistant Attorney General, Georgia Department of Law, 40 Capitol Square SW, Atlanta, Georgia

2019 <u>Yatsko v. Graziolli (Cleveland Police Department)</u> (Plaintiff) (Expert Report)
Officer Involved-Shooting
Jeremy Tor, Spangenberg, Shibley & Liber, 1001 Lakeside Ave. East, Suite 1700, Cleveland, OH 44114

**Exhibit 5**

# JEFFREY J NOBLE

2019   Contreras v. City of Granger, WA (Plaintiff) (Expert Report)
Employment
Aaron V. Rocke, Rocke Law Group, PLLC, 101 Yesler Way, Suite 603, Seattle, WA 98104

2019   Doolittle v. Hickory, N.C. (Plaintiff) (Expert Report) (Deposition)
Use of Force
Paul Tharpe, Arnold & Smith, 200 North McDowell Street, Charlotte, NC 28204

2019   Slater v State of Arizona Department of Game and Fish (Defense) (Expert Report)
Use of Force
Timothy Watson, Assistant Attorney General, Liability Management Section, 2005 N. Central Ave., Ste. 100, Phoenix, AZ  85004

2019   Howard v. City of Durham, NC (Defense) (Expert Report) (Deposition) (Trial)
Allegation of Wrongful Conviction
J. Nicholas Ellis, Poyner Spruill, 130 S. Franklin, Rocky Mount, NC 27804

2019   Tate v. City of Seattle (Defense) (Expert Report)
Detention and Use of Force
Ghazal Sharifi, Seattle City Attorney's Office, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104

2019   McNally v. San Diego (Plaintiff) (Expert Report) (Deposition) (Trial)
Use of Force
Mike Marrinan, 501 W. Broadway, Suite 1510, San Diego, CA 92101

2019   Godinez v. Chicago (Defense) (Expert Report)
Monell allegation
Avi Kamionski, Nathan and Kamionski, LLP, 140 S. Dearborn, Suite 1510, Chicago, IL 60603

2019   Shortridge v. City of Arvada, CO (Defense) (Expert Report)
Use of Force
Julie Richards, Senior Assistant City Attorney, City Attorney's Office, 8101 Ralston Road Arvada, CO 80002

2019   Dunn v. City of Seattle (Defense) (Expert Report)
Violent Persons File – NCIC
Brian Esler, Miller, Nash, Graham & Dunn, LLP, 2801 Alaskan Way, Suite 300, Seattle, WA 98121

2019   Heard v. City and County of Denver (Defense) (Expert Report)
Use of Force
Michele Horn, City and County of Denver, City Attorney's Office, 201 W. Colfax Ave., Dept 1108, Denver, CO 80202

2019   Windle v. State of Indiana (Plaintiff) (Expert Report) (Deposition)
Use of Force
Zaki Ali, 522 West 8th Street, Anderson, Indiana 46016

2019   Wisdom v. County of Nassau (Plaintiff) (Expert Report)
Allegation of False Arrest
Gabriel Harvis, Elefterakis, Elefterakis & Panek, 80 Pine Street, 38th Floor, New York, New York 10005

**Exhibit 5**

# JEFFREY J NOBLE

2019   Castaway v. City of Denver (Defense) (Expert Report)
Officer Involved-Shooting
Wendy Shea, City and County of Denver, City Attorney's Office, 201 W. Colfax Ave., Dept 1108, Denver, CO 80202

2019   Mosquera v. City of San Gabriel (Plaintiff) (Expert Report)
Identification Procedures
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103

2019   Harper v. Zoelling (Snohomish County Sheriff's Department), (Plaintiff) (Expert Report) (Deposition)
Police Practices
Jeff Kallis, Kallis Law, 321 High School Rd., Suite D3, Bainbridge Island, WA 98110

2019   Elmansoury v. Garden Grove (Plaintiff) (Expert Report) (Deposition)
Use of Force
Jeremy Jass, Jass Law, 4510 E. Pacific Coast Hwy., Suite 400, Long Beach, CA 90804

2019   Lee v. San Diego (Plaintiff) (Expert Report) (Deposition)
Use of Force
Mike Marrinan, 501 W. Broadway, Suite 1510, San Diego, CA 92101

2019   Kubiak v. City of Chicago (Defense) (Expert Report) (Deposition)
Allegation of code of silence
David Seery, Deputy Corporation Counsel, Administration, City of Chicago, Department of Law
121 N. LaSalle Street, Room 600, Chicago, Illinois 60602

2019   People v Krook (Prosecutor) (Grand Jury Testimony) (Trial)
Officer Involved Shooting
Richard Dusterhoft, Office of the Ramsey County Attorney, Criminal Division Director

2019   Roque v. Austin (Plaintiff) (Expert Report)
Officer Involved Shooting
Jeff Edwards, The Edwards Law Firm, 1101 East 11th Street, Austin, TX 78702

2019   Green v Lara (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Victor Rodriguez, 121 North 10th Street, McAllen, TX 78501

2018   Estate of McIntosh v. City of Chicago (Defendant) (Expert Report) (Deposition)
*Monell* Allegations
Patrick R. Moran, Rock Fusco & Connelly, LLC, 321 North Clark Street Suite 2200, Chicago, Ill 60610

2018   Delacruz v. City of Port Arthur, TX (Plaintiff) (Expert Report)
Use of Force
Mo Aziz, Abraham, Watkins, Nichols, Sorrels, Agosto & Aziz, 800 Commerce, Houston, TX 77002

2018   Westfall v. Luna (Southlake PD, TX) (Plaintiff) (Expert Report) (Deposition) (Trial)
Use of Force

Updated December 9, 2022

**Exhibit 5**

# JEFFREY J NOBLE

Grant Schmidt, Winston & Strawn, 2121 N. Pearl, Suite 900, Dallas, TX 75201
2018 <u>Lyles v. Seattle</u> (Defense) (Expert Report)
Officer Involved Shooting
Ghazal Sharifi, Seattle City Attorney's Office, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104
2018 <u>Le v. King County (WA)</u> (Defense) (Expert Report)
Officer Involved Shooting
Dan Kinerk, King County Prosecuting Attorney's Office, 500 Fourth Avenue, Seattle, WA
2018 <u>Sweet v. City of Mesa, AZ</u> (Defense) (Expert Report) (Deposition)
Reasonableness of tactics
Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281
2018 <u>Collins v. San Diego County</u> (Plaintiff) (Expert Report) (Trial)
Reasonableness of Detention and arrest
Elizabeth Teixeira, Law Offices of Robert Vaage, 110 West "A" Street, Suite 1075, San Diego, CA 9201
2018 <u>Ballew v. City of Pasadena</u> (Plaintiff) (Expert Report)
Use of Force
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103
2018 <u>Valverde v. City of Denver</u> (Defense) (Expert Report)
Officer Involved Shooting
Michele Horn, Assistant City Attorney, Civil Litigation Section, City and County of Denver
2018 <u>Port Authority Police Benevolent Association v. The Port Authority of New York and New Jersey</u> (Defense) (Expert Report) (Arbitration Testimony)
Contract Dispute
Jason Stanevich, Littler, 265 Church Street, Suite 300, New Haven, CT 06510
2018 <u>Smith v. Chicago</u> (Defense) (Expert Report)
Policies and practices
Dan Nolan, Reiter-Burns, 311 S. Wacker, 5200, Chicago, IL 60606
2018 <u>Carpenter v. Cleveland County Sheriff, N.C.</u> (Plaintiff) (Expert Report) (Trial)
Officer Involved Shooting
Paul Tharp, Arnold & Smith, PLLC, 200 N. McDowell Street, Charlotte, NC 28204
2018 <u>Courts v. Lee</u> (Defense) (Deposition)
Traffic Collision
Jennifer Russel, Ford, Walker, Haggerty & Behar, One World Trade Center, 27th Floor, Long Beach, CA 90831
2018 <u>Studdard v. Shelby County (TN)</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Daniel Seward, 4510 Chickasaw Road, Memphis, TN 38117
2018 <u>Farmer/Milliner v. City of Chicago</u> (Defense) (Expert Report)
Monell allegations
Raoul Mowatt, Chicago Law Department, 30 North LaSalle, 900, Chicago, IL 60602

Updated December 9, 2022

**Exhibit 5**

## JEFFREY J NOBLE

2018    <u>Milke v City of Phoenix</u> (Defense) (Expert Report) (Deposition)
        Allegation of wrongful conviction
        Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281
2018    <u>Kager v. Virginia Beach</u> (Plaintiff) (Expert Report) (Deposition) (Trial)
        Officer Involved shooting
        Ed Brady, Brady, Fischel & Daily, LLC, 721 Melvin Ave., Annapolis, MD 21401
2018    <u>Davis v. Chicago</u> (Defense) (Expert Report) (Trial)
        Employment
        Howard Levine, Chicago Law Department, 30 North LaSalle, 1020, Chicago, IL 60602
2018    <u>Williams v. King County, WA</u> (Defense) (Expert Report)
        Officer Involved Shooting
        Dan Kinerk, King County Prosecuting Attorney's Office, 500 Fourth Avenue, Seattle, WA
2018    <u>Faria v. McCarrick</u> (Plaintiff) (Expert Report) (Deposition)
        Wrongful Conviction
        Bevis Schock, 7777 Bonhomme Ave., 1300, St. Louis, MO 63105.
2018    <u>Zuniga v. CHP</u> (Plaintiff) (Deposition) (Trial)
        Arrest and Use of Force
        Dicks and Workman, 750 B Street, 2720 Symphony Towers, San Diego, CA 92101
2018    <u>Walker (Sanders) v. City of Independence, LA</u> (Plaintiff) (Expert Report)
        Pursuit
        Neile deGravelles, deGravelles & Palmintier, 618 Main Street, Baton Rouge, LA 70801
2018    <u>Espinoza v. City of Tracy</u> (Defense) (Expert Report)
        Reasonableness of Internal Affairs Procedures and Investigation
        Jesse Maddox, Liebert Cassidy Whitmore, 5250 N. Palm Avenue, Suite 310, Fresno, CA 93704
2018    <u>Luque-Villanueva v. County of San Diego</u> (Plaintiff) (Expert Report)
        Reasonableness of arrest
        Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660
2018    <u>Flores v. San Bernardino</u> (Plaintiff) (Expert Report) (Deposition)
        Officer Involved- Shooting
        Arnoldo Casillas, Casillas & Associates, 3777 Long Beach Blvd, Long Beach, CA 90807

**Exhibit 5**