UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **DANIEL VILLEGAS,** | § | |
| | § | |
| *Plaintiff*, | § | |
| **v.** | § | |
| | § | |
| **CITY OF EL PASO;** | § | |
| **YVONNE WHITAKER,** | § | |
| *In her capacity as the Executor of Decedent* | § | |
| *Alfonso Marquez's Estate*; | § | |
| **CARLOS ORTEGA;** | § | **EP-15-CV-00386-DCG** |
| **SCOTT GRAVES;** | § | |
| **EARL ARBOGAST;** | § | |
| **RAY SANCHEZ;** | § | |
| **HECTOR LOYA; and** | § | |
| **UNKNOWN EMPLOYEES OF THE** | § | |
| **CITY OF EL PASO,** | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

On this day, the Court considered Defendants Alfonso Marquez's Motion for Summary Judgment ("Def. Marquez's Mot."), ECF No. 365; Carlos Ortega's Motion for Summary Judgement ("Def. Ortega's Mot."), ECF No. 353; Scott Graves's Motion for Summary Judgment ("Def. Graves's Mot."), ECF No. 360; Earl Arbogast's Motion for Summary Judgment ("Def. Arbogast's Mot."), ECF No. 359; and Ray Sanchez's and Hector Loya's Joint Motion for Summary Judgment ("Joint Mot."), ECF No. 352. The Court has separately issued an opinion ruling on the City of El Paso's Motion for Summary Judgment, ECF No. 348.

## I.    Background

The following facts are undisputed unless otherwise noted.[1]  This case concerns Plaintiff Daniel Villegas's ("Plaintiff") claim that the Defendant Officers framed him as one of the perpetrators of the April 10, 1993, murders of Robert England and Armando Lazo.  *See* 3d Am. Compl., ECF No. 153.  The factual record in this case is long and arduous, thus the Court only supplies the facts that are relevant to analyzing Plaintiff's claims or otherwise provide necessary context.  Further, as the Court views evidence in the light most favorable to the non-moving party at summary judgment, the Court's recitation of the facts follows Plaintiff's Proposed Undisputed Facts.  Pl.'s PUF, ECF No. 379-1.

### A.   1993 Investigation and Prosecution

On April 10, 1993, shortly after midnight, Armando Lazo, Robert England, Jesse Hernandez, and Juan Medina left a party hosted on Jamaica Street and were walking together along Transmountain Drive.  *Id.* at ¶ 8.  Around 12:15 a.m., when the group reached Electric Street, a vehicle approached them and fired gunshots, killing Lazo and England.  *Id.* at ¶¶ 9–14, 55.  Plaintiff's whereabouts at the time of the shooting is disputed.  Joint PUF Resp., ECF No. 397, at ¶¶ 5-7.  Plaintiff claims he was with Rodney Williams, Marcos Gonzalez, and Leslie Williams at the Village Green Apartments, where they remained until around 1:00 a.m.  Pl.'s

---

[1] Pursuant to the Court's Standing Order Regarding Motions for Summary Judgment, Defendants attached Proposed Undisputed Facts ("PUF") to their Motions.  *See* ECF Nos. 353-1, 355, 359-2, 360-2, 365-1, and City's PUF, ECF No. 348-1.  Plaintiff has submitted a response to each Officers' PUF and a separate response to the City's PUF.  *See* ECF Nos. 374, 375, 376, 377, 378 and Resp. City Mot. ECF No. 367-1.  Plaintiff likewise submitted PUF, ECF No. 379-1, which the Defendants have responded to.  *See* ECF Nos. 393-1, 397, 402.  The Court has reviewed all PUFs and PUF Responses and references them as appropriate throughout this Order.

Additionally, all page citations in this Order refer to the page numbers assigned by the Judiciary's CM/ECF system, rather than the cited document's internal pagination.

PUF, ECF No. 379-1, at ¶ 5.  The Defendants claim Plaintiff was at the site of the shooting.  Joint PUF Resp., ECF No. 397, at ¶¶ 5-7.

The police arrived at the crime scene shortly after the shooting, collecting six shell casings fired from a .22 caliber gun.  Pl.'s PUF, ECF No. 379-1, at ¶¶ 15, 17.  Plaintiff claims that within the following day, investigators learned that Rudy and Javier Flores were involved in a shooting on nearby Shenandoah Street involving a .22 caliber gun.  *Id.* at ¶¶ 21-22.  Defendants dispute that the police learned that Rudy Flores was involved in a shooting with a .22 caliber weapon.  *See* Joint PUF, ECF No. 397, at ¶ 23.  Further, Plaintiff claims the police recovered a .22 caliber gun from the Shenandoah Street shooting but failed to run a ballistics test and subsequently destroyed the gun.  Pl.'s PUF, ECF No. 379-1, at ¶¶ 24-25.

Then, as part of their investigation into the Electric Street shooting, the police interviewed community members.  One man the police spoke with, Terrance Farrar, claimed that two weeks before the shooting he witnessed Rudy Flores tell Lazo that he was going to kill him.  *Id.* at ¶¶ 35-36.  Farrar also shared information about the shooting with others, which was relayed to the police.  For instance, Defendants Arbogast and Graves interviewed Tonya and Terri Vinson.  *Id.* at ¶ 26.  Tonya Vinson had previously dated Lazo.  *Id.* at ¶ 27.  According to Tonya Vinson, Farrar told her that Rudy and Javier Flores committed the Electric Street shooting.  *Id.* at ¶ 28. Similarly, Terri Vinson told Defendant Graves that he heard Farrar tell Tonya Vinson that Rudy Flores was driving the car from which the shots were fired.  *Id.* at ¶ 29.  Defendant Marquez also interviewed Charles Blutcher two days after the shooting, and Blutcher reported that Farrar told him that Rudy Flores and "Dirt" committed the Electric Street shooting, and Rudy Flores drove a Monte Carlo.  *Id.* at ¶ 31.

Detective Laredo then questioned Javier Flores and Defendant Marquez questioned Rudy Flores. *Id.* at ¶ 49. On the night of the Electric Street Shooting, Javier Flores claimed he returned home at 12:30 a.m. and Rudy was not home when he arrived. *Id.* at ¶ 46. Additionally, Javier Flores acknowledged that Rudy Flores may have hated Lazo and England because they were members of a rival gang. *Id.* at ¶ 47. Javier Flores also acknowledged that Rudy Flores was a "hardcore" gang member. *Id.* In his interview with Defendant Marquez, Rudy Flores acknowledged that on the night of the Electric Street shooting, he drove past a party on Jamaica Street; the same party Lazo, England, Hernandez, and Medina attended. *Id.* at ¶ 50. Rudy Flores also told Defendant Marquez that it was approximately 12:15 to 12:20 a.m. when he and his friends turned onto Electric Street. *Id.* at ¶ 54. This was around the time of the Electric Street shooting. *Id.* at ¶¶ 8, 55. Despite these circumstances, Rudy Flores implicated Rick Martinez in the Electric Street shooting. *Id.* at ¶ 59. Martinez was interviewed by Defendant Arbogast at the Crimes Against Persons office, but no record of their conversation exists. *Id.* at ¶ 64. Without explanation, Martinez and the Flores Brothers were ultimately cleared. *Id.* at ¶¶ 61, 66-67.

Then, on April 15, 1993, Defendant Marquez took a statement from Robert Hall, who claimed that his friends, Michael Johnston and Jacob Jauregi, murdered Lazo and England. *Id.* at ¶ 68. Hall explained that Johnston told him that Hernandez and Medina were chased by the car involved in the shooting. *Id.* at ¶¶ 69, 72. Plaintiff claims that the facts Johnston told Hall—that Hernandez and Medina were chased after the shooting—were not publicly known. *Id.* at ¶ 72. Johnston and Jauregi were brought into custody that same day. Later that night, Johnston admitted to committing the murders. *Id.* at ¶ 78. Johnston and Jauregi were not charged with the murders. Despite Defendant Marquez wanting to know how Johnston knew the non-public

information, Defendant Marquez never asked him.  *Id.* at ¶ 83.  Defendant Marquez also cannot explain where Johnston's and Jauregi's statements are located.  *Id.* at ¶ 82.

For reasons that remain unclear, the police then sought to question Plaintiff's cousin, David Rangel.  *Id.* at ¶¶ 85-86.  Rangel was 17 at the time.  *Id.*  Defendant Graves called Rangel's mother and told her that he wanted to question Rangel because a woman accused Rangel of phone harassment.  *Id.* at ¶ 87.  Officers then told Rangel that they were going to charge him with phone harassment and that they needed him to sign some papers.  *Id.* at ¶ 88.  Defendants Arbogast and Graves then collected Rangel and drove him to the Five Points police station.  *Id.*  At this point, no witnesses, victims, or suspects had implicated Plaintiff or Rangel in the Electric Street shooting.  In Rangel's interview, Defendant Marquez told him that he was on their "list" to question.  *Id.* at ¶ 96.  Defendant Marquez then told Rangel that witnesses saw him shoot Lazo and England and that he would get life in prison for doing so.  *Id.* at ¶ 97.  Rangel denied any involvement in the shooting and said he had no information about it.  *Id.* at ¶ 98.  Defendant Marquez then told Rangel that he would be charged with capital murder, be sentenced to life in prison, and because he was "a pretty white boy," he would be raped in prison.  *Id.* at ¶¶ 99-100.  Defendant Marquez told Rangel that they would keep him at the police station all night.  *Id.* at ¶¶ 96-101.  Rangel was not read his *Miranda* rights and was interrogated from around 5 or 6 p.m. until 10 p.m.  *Id.* at ¶¶ 86, 103–04.

Rangel eventually told Defendant Marquez about a phone call he had with Plaintiff.  *Id.* at ¶ 105.  Rangel relayed that Plaintiff joked about using a sawed off shotgun to commit the Electric Street shooting.  *Id.*  Rangel explicitly said that Plaintiff made the admission in a joking tone, and Rangel did not believe Plaintiff when he said he had committed the shooting.  *Id.*  Marcos Gonzalez, who was with Plaintiff on the night of the Electric Street Shooting, was also

on the call.  Gonzalez told Rangel that Plaintiff was joking and to not believe him.  *Id.* at ¶¶ 107-08.  When Rangel detailed the information he received from Plaintiff, Defendant Marquez accused him of lying.  *Id.* at ¶ 112.  Rangel had drafted a statement including this information, and Defendant Marquez threw it away.  *Id.* at ¶ 115.  Defendant Marquez continued threatening Rangel, telling him that he would be sent to prison where he would be raped.  *Id.* at ¶ 117.  Defendant Marquez then typed out a second statement for Rangel, describing the shooter's vehicle as black and describing two series of gunshots, contradicting eyewitness descriptions.  *Id.* at ¶¶ 120-21.  Further, despite Rangel repeatedly telling Defendants Marquez and Graves that Plaintiff claimed he used a shotgun, this detail was omitted from Rangel's second statement.  *Id.* at ¶ 111.  The statement also omitted that Plaintiff claimed he committed the shooting in a joking tone.  *Id.* at ¶ 122.  Further, Rangel's second statement included information that he was unaware of, and that information came directly from Defendants Marquez and Graves.  *Id.* at ¶ 111.  It is disputed whether Defendant Graves was present during the interrogation, and whether he helped craft the statement Rangel signed.  *Compare* Pl.'s Resp., ECF No. 379, at 11 *with* Rangel Aff., ECF No. 379-38 at 3.  After Defendant Marquez finished typing the statement, he told Rangel that if anyone found out about their conversation, he would arrest him.  Pl.'s PUF, ECF No. 379-1, at ¶ 123.

Defendants Marquez and Graves then picked up and interrogated Rodney Williams.  *Id.* at ¶¶ 125-26.  It is unclear how Defendant Marquez identified Williams, or why Williams was interrogated.  *Id.* at ¶ 126.  At the time of his interrogation, Williams was 15 years old.  *Id.* at ¶ 129.  Williams was not read his *Miranda* rights, was not interrogated at the juvenile division, was not allowed to speak with his mother, and a juvenile officer or magistrate was not involved in his interrogation.  *Id.* at ¶¶ 130, 134.  Defendants Arbogast and Graves began questioning Williams, and he denied any involvement in the Electric Street shooting.  *Id.* at ¶ 132.  Williams claimed he

was at his home with Plaintiff and Marcos Gonzalez on the night of the Electric Street shooting. *Id.* Defendants Arbogast and Graves told Williams that he would be charged with the Electric Street murders if he did not give an inculpatory statement. *Id.* at ¶ 133. Defendants Arbogast and Graves also told Williams that he would be free to go home if he implicated himself and Plaintiff in the Electric Street murders. *Id.* Further, Defendant Graves told Williams that if he did not include certain information in his statement, he would get "fucked in the ass" by other inmates, and his "asshole was going" to be "big" and that he was "not going to be able to fart anymore because it was going to be too loose." *Id.* at ¶ 135. Defendant Graves would not let Williams leave until he gave a statement. *Id.* at ¶¶ 135-37. Defendant Graves then typed a statement for Williams. *Id.* The statement included demonstrably false information, including that Enrique Ramirez ("Popeye") and Fernando Lujan ("Droopy") were co-offenders despite the fact that Ramirez was incarcerated at the time of the murders and Lujan wore an electronic monitoring bracelet that placed him miles away from the scene of the crime. *Id.* at ¶¶ 135-38, 247.

On the same night as Williams's interrogation, at around 10 p.m., Defendants Marquez, Arbogast, and Graves went to Plaintiff's home and arrested Marcos Gonzalez and Plaintiff. *Id.* at ¶ 141. Gonzalez was placed in a car with Defendant Graves and Plaintiff was placed in a car with Defendants Marquez and Arbogast. *Id.* at ¶ 142. Defendant Graves interrogated Gonzalez at the Crimes Against Persons office, where Gonzalez denied any involvement in the Electric Street shooting. *Id.* at ¶¶ 143-45. Nevertheless, around 12:45 a.m., Defendant Graves forced Gonzalez to draft a statement, but Defendant Graves was not satisfied with the statement and threw it away. *Id.* at ¶¶ 146, 148. Defendant Graves wanted Gonzalez to admit being inside the car involved in the Electric Street shooting. *Id.* at ¶ 148. Defendant Graves told Gonzalez that

the police only wanted Plaintiff because he was the Electric Street shooter. *Id.* at ¶ 149. Then, Defendant Graves pushed Gonzalez against the wall and banged Gonzalez's head against the wall multiple times. *Id.* at ¶¶ 150, 152. Defendant Graves also threatened to beat up Gonzalez, and told him that he would be charged with capital murder, be raped in prison, and ultimately be killed by lethal injection. *Id.* at ¶¶ 153-57. Defendant Graves then forced Gonzalez to provide a statement implicating himself, Plaintiff, and Williams in the Electric Street shooting. *Id.* at ¶ 157. Gonzalez, feeling scared and pressured, gave Defendant Graves the statement he wanted. *Id.* at ¶ 158.

After Plaintiff was arrested, Defendant Marquez told him that he had killed two people and that he was going to "kick [Plaintiff's] ass." *Id.* at ¶ 164. Plaintiff was 16 at the time. *Id.* at ¶ 161. Then, according to Plaintiff, Defendant Marquez drove to the Northpark Mall, where he met Defendants Arbogast and Graves so they could discuss what they were going to do. *Id.* at ¶ 173. Plaintiff claims the discussion lasted at least 30 minutes. *Id.* at ¶ 174. However, these Defendants claim the discussion lasted less than a minute. Joint PUF Resp., ECF No. 397, at ¶ 174; Def. Arbogast's Dep., ECF No. 359-1B, at 186-24:187-1. Defendants Marquez and Arbogast then drove Plaintiff to the Five Points police station, where Plaintiff protested that he was a juvenile and should not be in an adult jail. Pl.'s PUF, ECF No. 379-1, at ¶ 175. His request was ignored. *Id.* at ¶ 176. Plaintiff was then briefly interrogated by Defendants Marquez and Arbogast. *Id.* at ¶ 177. During this interrogation, Defendant Marquez called Plaintiff a "lucky punk" and "stupid asshole" before taking him outside to a detective car and transporting him to the juvenile detention facility. *Id.* at ¶¶ 178-79.

Plaintiff was in custody for approximately one-and-a-half to two hours before Defendants Marquez and Arbogast drove Plaintiff to the juvenile detention facility. *Id.* at ¶¶ 179-80. When

they arrived at the facility, Defendant Marquez told Plaintiff that if he did not give a statement, Marquez "would turn the car around and go to the desert and beat [him] right there." *Id.* at ¶ 181. Then, after waiting for around half an hour, Plaintiff claims Defendants Marquez, Arbogast, and Ortega interrogated him. *Id.* at ¶¶ 184-85, 190. Defendants Arbogast and Ortega dispute this and claim only Defendant Marquez interrogated Plaintiff. *See* Def. Arbogast's Mot., ECF No. 359, at ¶ 32; Def. Marquez's Test., ECF No. 379-7, at 186:11-25.

During the interrogation, Defendant Marquez told Plaintiff that he knew Plaintiff committed the Electric Street shooting. *Id.* at ¶ 193. Defendant Marquez was also cursing at Plaintiff. *Id.* Further, Defendant Marquez threatened Plaintiff that he would be sent to jail, where he would be raped by old men, if he did not provide a statement. *Id.* at ¶ 194. Defendant Marquez specifically threatened that Plaintiff would be put in "tank with a bunch of fat faggots" where he would be raped. *Id.* at ¶ 195. Defendant Marquez repeated these threats, which frightened Plaintiff. *Id.* at ¶ 196. In addition to his verbal statements, Defendant Marquez hit Plaintiff on the back of the head four to five times. *Id.* at ¶¶ 197-200. Defendant Marquez was wearing a ring on his hand, increasing the pain Plaintiff experienced. *Id.* Defendants Marquez, Arbogast, and Ortega were also simultaneously screaming at Plaintiff, and as a result, Plaintiff claims he was "terrified out of his mind." *Id.* at ¶¶ 202-05. Additionally, Defendant Marquez told Plaintiff that if he gave a statement, he could go to the juvenile detention center instead of the county jail. *Id.* at ¶ 208. Plaintiff eventually agreed to give a statement. Defendant Marquez told Plaintiff that he was going to take him to the intake officer and Plaintiff needed to tell the officer that he wanted to make a statement. *Id.* at ¶ 211. If Plaintiff did not comply, Defendant Marquez told Plaintiff that he would take Plaintiff to the county jail where he would be raped. *Id.* at ¶ 212. Plaintiff was taken before the intake officer at 2:26 a.m. *Id.* at ¶ 215. Plaintiff complied with

Defendant Marquez's demands and only told the intake officer that he wanted to make a statement. *Id.* at ¶¶ 213-14.

Afterward, Defendant Marquez continued to threaten Plaintiff. He then told Plaintiff that he needed to inform the magistrate judge that he wanted to give a statement. *Id.* at ¶ 216. Defendant Marquez warned Plaintiff that if he did not follow instructions, Marquez would take him into the desert and "beat his ass." *Id.* Before appearing in front of the magistrate judge, Plaintiff had been interrogated and held in custody for approximately four hours, although Defendants dispute the timing of the interrogation and custody. *Id.* at ¶ 217. After speaking with the magistrate judge, Plaintiff returned to the Juvenile Investigative Section Division and was handcuffed to a chair. *Id.* at ¶ 219. Plaintiff claims that as a result of the abuse, he then told Defendant Marquez a false story that Rodney Williams was going to do something crazy. *Id.* at ¶ 220. Defendant Marquez then slapped Plaintiff with force and told him that he was the one who committed the Electric Street shooting. *Id.* at ¶¶ 220-21. Defendant Marquez had drafted a statement implicating Williams, but he subsequently threw it away. *Id.* at ¶ 222. Defendant Marquez then slapped Plaintiff again before Defendant Arbogast called him out of the room. *Id.* at ¶ 223. Plaintiff was now alone in the interrogation room. *Id.* Defendant Marquez returned to the interrogation room with what he claimed was Marcos Gonzalez's statement. *Id.* at ¶ 224. Defendant Marquez then threatened Plaintiff again, saying he would get the death penalty via the electric chair, and Marquez would be the one to flip the switch. *Id.* at ¶ 225. Plaintiff then told Marquez he had committed the Electric Street shooting with a shotgun, and Marquez responded by accusing Plaintiff of lying, slapping him on the back of the head, and repeating his threats about beating Plaintiff in the desert. *Id.* at ¶¶ 226-27. Defendants Marquez, Arbogast, and Ortega reiterated to Plaintiff that if he did not cooperate, they would take him into the desert and beat

him.  *Id.* at ¶ 229.  Defendants Arbogast and Ortega dispute this and claim only Defendant Marquez interrogated Plaintiff.

Plaintiff ultimately agreed to confess to the murders.  Before it was time for Plaintiff to sign his confession before the magistrate judge, Defendant Marquez again told him that if he screwed up, he would take him into the desert, beat him, and then take him to the county jail.  *Id.* at ¶ 230.  However, Defendant Marquez promised Plaintiff that if he did as directed, he would be sent to the juvenile detention center and nothing bad would happen to him.  *Id.* at ¶ 232.  Plaintiff then confessed to the murders before the magistrate judge.  *See* Pl.'s Resp., ECF No. 379, at 20. Plaintiff claims some of the information that ended up in his confession was fed to him by Defendant Marquez.  Pl.'s PUF, ECF No. 379-1, at ¶ 206.  Particularly, that Plaintiff went on a beer run and that he drove down Transmountain Drive with "Popeye" and "Droopy."  *Id.* at ¶ 207.

Plaintiff's first murder trial ended in a hung jury.  *See* Pl.'s Resp., ECF No. 379, at 4.  He was convicted at his second trial.  *Id.*

### B.  2014 Investigation and Subsequent Prosecution

After spending nearly two decades in prison, Plaintiff's conviction was vacated in 2013. 3d Am. Compl., ECF No. 153, at ¶ 128.  The El Paso Police Department subsequently reopened its investigation into the murders of Lazo and England, with Defendants Sanchez and Loya working on the case.  Pl.'s Resp. to Sanchez & Loya PUF, ECF No. 378, at ¶¶ 4-5.  Defendants Sanchez and Loya received information from Jennifer Gomez that Plaintiff had confessed to Oscar Gomez ("Gomez") that he murdered Lazo and England.  Pl.'s PUF, ECF No. 379-1, at ¶¶ 233-34; Pl.'s Resp. to Sanchez & Loya PUF, ECF No. 378, at ¶ 2.  Thereafter, Defendants Sanchez and Loya arrested Gomez for an unrelated issue, but questioned him about the Electric Street shooting.  Pl.'s PUF, ECF No. 379-1, at ¶ 235.  Gomez claims he was questioned for more

the two hours before the interview was finally recorded.  *Id.*  Defendants Sanchez and Loya deny there was a non-recorded portion of the interview.  Joint PUF Resp., ECF No. 397, at ¶ 235. During the non-recorded portion of his interview, Gomez claims he told Defendants Sanchez and Loya that Plaintiff did not confess to committing the Electric Street murders, but that he made a joking statement about committing the murders.  *Id.* at ¶ 237.  Gomez clarified that Plaintiff did not share any supporting details around the murders, and he further stated that he did not believe Plaintiff committed the murders.  Plaintiff claims Defendant Sanchez then instructed Gomez on what information to include and exclude during the recorded interview.  *Id.* at ¶ 238.  Specifically, Defendant Sanchez allegedly told Gomez that he was not to mention that Plaintiff was simply joking when he confessed to the murders.  *Id.*  Defendant Sanchez also instructed Gomez to not mention that he himself did not believe Plaintiff committed the murders because he did not share any supporting details.  *Id.* at ¶ 240.  According to Gomez, when the recorded interview began, Defendant Sanchez acted as if there had not been a two-hour unrecorded interview.  *Id.* at ¶ 236. Gomez obeyed Defendant Sanchez's orders, fearing he would go to jail if he did not.  *Id.* at ¶ 241. After the recorded interview finished, Defendant Sanchez told Gomez not to discuss his interrogation with anyone, including Plaintiff's defense attorneys.  *Id.* at ¶ 242.  Following the investigation, Plaintiff was tried for a third time for the murders of Lazo and England.  Plaintiff was found not guilty.  3d Am. Compl., ECF No. 153, at ¶ 157.

### C. Procedural History

Plaintiff initiated this case on December 17, 2015, bringing claims against Defendants under 42 U.S.C. § 1983.  The case was originally assigned to United States District Judge Frank Montalvo.  On January 13, 2017, the Court stayed this case pending resolution of Plaintiff's underlying criminal case.  Order, ECF No. 68.  On October 5, 2018, Plaintiff was found not guilty

in his underlying criminal case.  On November 16, 2018, the Court granted Plaintiff's motion to reopen the case.  Order, ECF No. 74.

Plaintiff filed his operative, Third Amended Complaint, on October 19, 2019.  3d Am. Compl., ECF No. 153. The Defendants subsequently moved to dismiss the Third Amended Complaint, and the Court dismissed some of Plaintiff's initial claims.  Order Mot. Dismiss, ECF No. 188.  Plaintiff's remaining claims include several alleged constitutional violations under the Fourth, Fifth, and Fourteenth Amendments.  *See* 3d Am. Compl., ECF No. 153; *see also* Order Mot. Dismiss, ECF No. 188.  Currently pending are the following claims: (1) fabrication of evidence (2) suppression of evidence; (3) coerced confession; (4) false confession; (5) malicious prosecution; (6) false arrest; (7) failure to intervene; and (8) conspiracy.  Plaintiff brings all eight claims against Defendants Marquez, Graves, Arbogast, and Ortega.  He only brings fabrication of evidence, suppression of evidence, malicious prosecution, false arrest, failure to intervene, and conspiracy claims against Defendants Loya and Sanchez.

On February 28, 2020, the case was reassigned to United States District Judge Philip R. Martinez.  Order Reassigning Case, ECF No. 189.  Then, on March 16, 2020, the case was again reassigned, this time to the undersigned Judge.  Order Reassigning Case, ECF No. 195.

The Defendants move for summary judgment.  The motions have been fully briefed.  The Court now addresses Plaintiff's claims in turn.

## II.  Legal Standard

### a.  Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A fact is material if its resolution in favor of one party might affect the outcome of the

lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).

The party seeking summary judgment bears the "initial burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Taita Chem Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001) (cleaned up).  "The movant satisfies this burden by showing that a reasonable jury could not find for the nonmovant based on the burdens that would apply at trial." *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020) (citing *Anderson*, 477 U.S. at 252).  A reasonable jury could not find for the nonmovant if "the [nonmovant] has a failure of proof on an essential element of [their] claim or because the [movant] has insurmountable proof of its affirmative defense to that claim." *Id.* (citing *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002)).  The movant makes this showing by introducing undisputed evidence or by pointing out the lack of evidence supporting the nonmovant's case. *Id.* (quoting *Celotex Corp.*, *v. Catrett*, 477 U.S. 317, 322-23, 325 (1986)).

If the movant shows entitlement to judgment as a matter of law, the nonmoving party must then show there is a genuine issue for trial. *Anderson*, 477 U.S. at 250.  The nonmoving party does so by demonstrating that there is a genuine issue of material fact and by showing that there is evidence favoring the nonmoving party that would permit a reasonable jury to rule in the nonmoving party's favor. *Joseph*, 981 F.3d at 329 (citing *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020)).  The nonmoving party's evidence must create more than metaphysical doubt as to the material facts, and must set forth more than conclusory allegations,

unsubstantiated assertions, or scintillas of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Instead, the nonmoving party must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials[,]" or show "that the materials cited [by the movant] do not establish the absence … of a genuine dispute, or that [the moving party] cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c). After the parties submit their evidence, courts are to view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in favor of the nonmoving party, and resolve all factual controversies in favor of the nonmoving party. *Ivey v. Brennan*, 770 F. App'x 661, 664 (5th Cir. 2019). Further, courts do not make credibility determinations or weigh evidence at the summary judgment stage. *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478-79 (5th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

### b. Qualified Immunity Standard

Qualified immunity protects government officials from individual liability in the course of performing their duties so long as their conduct does not violate clearly established constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 232. When a public official invokes qualified immunity it alters the usual summary judgment burden of proof. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). In this circumstance, the plaintiff must first overcome the qualified immunity defense. To overcome qualified immunity, the plaintiff must show that the official (i) violated a

federal statutory or constitutional right, and (ii) that the right was clearly established at the time of the defendant's conduct.  *Cunningham v. Castloo*, 983 F.3d 185, 191 (5th Cir. 2020).  Courts maintain discretion as to which prong of the qualified immunity analysis to address first.  *Pearson*, 555 U.S. at 236.

Defeating the first prong of the qualified immunity analysis at the summary judgment stage requires a plaintiff to "show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury[,]" similar to "if the plaintiff did not face qualified immunity."  *Joseph*, 981 F.3d at 330.  A plaintiff demonstrates such by establishing that "the facts, viewed in the light most favorable to [them], show that the official's conduct violated a constitutional right."  *Cunningham*, 983 F.3d at 190-91.

The second prong of the qualified immunity analysis requires a plaintiff to show that the alleged constitutional right violated was clearly established.  A constitutional right is clearly established when relevant precedent has "placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  "In other words, a clearly established right, for purposes of qualified immunity, is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021).  In practice "this requires the plaintiff to identify a case–usually, a body of relevant case law–in which an officer acting under similar circumstances was held to have violated the constitution."  *Joseph*, 981 F.3d at 330 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (cleaned up)).  A case directly on point is not needed, but "there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful."  *Cunningham*, 983 F.3d at 191.  Further, there is also the rare possibility that the unlawfulness of an officer's actions is so clear that analogous case law

is not needed to declare the conduct beyond debate.  *Joseph*, 981 F.3d at 330 (citing *Wesby*, 138 S. Ct. at 590).

### c.  Section 1983

42 U.S.C. § 1983 provides a remedy for violations of federal statutory or constitutional rights.  *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 700 (5th Cir. 1991).  A viable § 1983 claim alleges facts establishing that a defendant, acting under color of state law, deprived the plaintiff of a right secured by the Constitution or federal law.  *Fyfe v. Curlee*, 902 F.2d 401, 403 (5th Cir. 1990).  A defendant's personal involvement in the violation is an essential element in a § 1983 claim.  *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983).

## III.    Discussion[2]

### A.  Fabrication of Evidence (Count I)

A police officer who fabricates evidence implicating a criminal defendant violates due process if that evidence is later used to deprive the defendant of their liberty.  *See Cole v. Carson*, 802 F.3d 752, 771–73 (5th Cir. 2015).  Thus, for a plaintiff suing under § 1983 to establish a fabrication of evidence claim against a defendant officer, they must show that (i) the defendant manufactured false evidence against them, (ii) the defendant knew the evidence was false, and (iii) the evidence ultimately helped deprive the plaintiff of their liberty.  *See Castellano v. Fragozo*, 352 F.3d 939, 955 (5th Cir. 2003) ("The manufacturing of evidence and the state's use of that evidence … to obtain [a defendant's] wrongful conviction indisputably denie[s] him [of] rights secured by the Due Process Clause."); *see also United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)) ("A conviction obtained

---

[2] A plaintiff waives a claim by failing to address it in their response to a defendant's motion for summary judgment.  *See Aldrup v. Caldera*, 274 F.3d 282, 288 (5th Cir. 2001).  Here, the Court only addresses claims that Plaintiff briefed in his Response, ECF No. 379.  All other claims are waived.

through use of false evidence, *known* to be such by representatives of the State, must fall under the Fourteenth Amendment.") (emphasis added).[3]  As to the knowledge element of the claim, the Fifth Circuit has advised courts to be cautious before granting summary judgment on this element, as a person's state of mind "is inherently a question of fact which turns on credibility." *International Shortstop, Inc., v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991).  Additionally, for the deprivation of liberty element, a conviction is not required to deprive a person of their liberty.  *See Cole*, 802 F.3d at 771–73*; see also McDonough v. Smith*, 588 U.S. 109, 117 n.4 (2019).

Further, and importantly here, "there is a difference between coercing witnesses to testify and fabricating witness testimony."  *Petty v. City of Chicago*, 754 F.3d 416, 421-22 (7th Cir. 2014) (citing *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014)).  Coerced testimony is testimony a witness is forced to give, and it may be true or false.  *Id.*  Fabricated testimony is testimony that is false, and it is known to be false by the witness and whoever elicited the witness's testimony. *Id.*  Additionally, the due process violation for coercing a statement is held by the person who was coerced.  *Id.*  The due process violation when evidence is fabricated is held by the person implicated by the fabricated evidence.  *Id.* (citing *Buckley v. Fitzsimmons*, 20 F.3d 789, 794 (7th Cir. 1994)).

Here, Plaintiff brings a fabrication of evidence claim against each Defendant Officer. Plaintiff contends Defendants Marquez, Arbogast, Graves, and Ortega fabricated evidence that

---

[3] Some district courts in the Fifth Circuit have followed a different test than the one this Court uses. *See, e.g.*, *Cole v. Hunter*, 497 F. Supp. 3d 172, 190 (N.D. Tex. 2020).  Although the tests are very similar, based on the Court's reading of Supreme Court and Fifth Circuit precedent, the Court believes the test it puts forward more faithfully elucidates to the necessary requirements of a fabrication of evidence claim.  Further, versions of the test this Court uses have also been endorsed by other circuits, and in the spirit of keeping federal law consistent, the Court adopts a similar test here.  *See Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021); *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012); *Dufort v. City of New York*, 874 F.3d 338, 355 (2d Cir. 2017).

contributed to his 1995 conviction for the murders of Lazo and England.  With respect to Defendants Sanchez and Loya, Plaintiff claims they fabricated evidence that was used against him during his third trial.  Each Defendant invokes qualified immunity as a defense.  Further, each Defendant claims Plaintiff's evidence is insufficient to demonstrate a constitutional violation.  Defendants Arbogast, Graves, Sanchez, and Loya, alone, argue that an officer fabricating evidence is insufficient to support a due process violation.[4]

### 1. Defendant Marquez

Plaintiff contends Defendant Marquez fabricated evidence that resulted in his 1995 conviction for the murders of England and Lazo.  *See* 3d Am. Compl., ECF No. 153, at ¶¶ 189-194.  Specifically, Plaintiff claims Defendant Marquez fabricated his and David Rangel's statements, both of which implicated him in the murders.  Defendant Marquez contends there is no evidence he fabricated evidence.  To the extent there is any, he claims an officer could have reasonably believed his actions did not constitute a constitutional violation in 1993, and he is therefore entitled to qualified immunity.  Def. Marquez's Mot., ECF No. 365, at ¶¶ 66, 71.

#### a.  Constitutional Violation

#### i.    **Plaintiff provides sufficient evidence that Defendant Marquez manufactured false evidence.**

The following is Plaintiff's telling of events, which Defendant Marquez does not dispute.  Defendants Arbogast and Graves brought David Rangel to the Five Points police station, and

---

[4] When addressing qualified immunity, courts are to consider each defendant's entitlement to qualified immunity separately.  *Meadours v. Ermel*, 483 F.3d 417, 421 (5th Cir. 2007).  The Court thus addresses each Defendant Officers' actions and arguments separately.  However, for clarity and to avoid redundancy, to the extent that the allegations are the same with respect to officers, the Court will analyze the allegations against those specific officers together.  *See id.* at 422 n.3 ("Separate consideration does not require courts to conduct a separate analysis for each officers in those cases where their actions are materially indistinguishable, it merely requires them to consider each officer's actions."); *see also Google v. Baggett*, 811 F. App'x 227, 237 (5th Cir. 2020) ("The district court properly considered each [o]fficer's actions … [A] separate analysis for each [o]fficer wasn't necessary.").

shortly thereafter, Defendant Marquez began interrogating him.  Defendant Marquez told him several witnesses implicated him in the murders of Lazo and England.  Rangel Test., ECF No. 379-40, at 184:9-12.  Defendant Marquez also told Rangel that he would be charged with capital murder and spend the rest of his life in prison.  *Id.*  Defendant Marquez then told Rangel that because he was a "pretty white boy," he would be raped in prison.  Rangel Aff., ECF No. 379-38, at 3.  After Defendant Marquez's threats, Rangel told Defendants Marquez and Graves that Plaintiff had joked with him about committing the murders with a shotgun.  Rangel Test., ECF No. 379-41, at 187:9-25.  Rangel then wrote a statement, which included that Plaintiff jokingly claimed to murder Lazo and England with a shotgun. Rangel Test., ECF No. 379-19, at 129:23-130:8.  According to Rangel, Defendant Marquez threw away his first statement and told him it was incorrect.  *Id.*  Defendant Marquez then told Rangel that he would be sent to prison, where he would remain until they "get it out of him." *Id.* at 143:17-22.  Rangel then described Defendant Marquez drafting a new statement for him.  This new statement stated that Plaintiff did not mention to Rangel the type of gun he used during the shooting, and omitted the fact that Plaintiff was joking.  Rangel Test., ECF No. 379-42, at 160:9-161:25.  Defendant Marquez then threatened Rangel, telling him that if he mentioned the interrogation to anyone he would be charged with a crime.  Rangel Test., ECF No. 379-19, at 139:21-25.

Plaintiff also alleges Defendant Marquez included false information in Plaintiff's statement.  In his recounting, Plaintiff told Defendant Marquez that Rodney Williams had committed the murders.  Pl.'s Test., ECF No. 379-36, at 248:1-249:23.  Defendant Marquez then drafted Plaintiff's statement implicating Williams.  *Id.*  However, Defendant Marquez then told Plaintiff that he, not Rodney Williams, committed the murders.  Defendant Marquez crumpled up Plaintiff's statement implicating Williams and threw it away.  *Id.* at 228:19-229:13; 248:1-249:23.

After a short break, Defendant Marquez claimed Marcos Gonzalez made a statement, which implicated Plaintiff in the murders. Defendant Marquez then told Plaintiff that he would get the death penalty via the electric chair. Pl.'s Test., ECF No. 379-35, at 40:17-41:5; 45:18-46:5. In response, Plaintiff confessed to committing the murders with a shotgun. *Id.* at 43:11-21. Defendant Marquez accused Plaintiff of lying and struck him. *Id.* Plaintiff later signed a confession in front of the magistrate judge. *Id.* at 49:1-4. This confession included false information, and Plaintiff claims this was a result of Defendant Marquez. For example, in his confession, Plaintiff claims that he committed the murders with "Popeye" and "Droopy." But at the time of the murders, "Popeye" was incarcerated and "Droopy" was wearing an electronic monitoring device that places him miles from the scene of the murders. Plaintiff claims Defendant Marquez fed him this information to include in his statement. *Id.* at 46:6-22.

Based on the foregoing, Plaintiff alleges sufficient facts for a reasonable jury to find that Defendant Marquez manufactured false evidence. In Rangel's statement, it omits that Plaintiff had jokingly told him that he committed the murders with a shotgun. Rangel Statement, ECF No. 379-39. Instead, the statement conveys that Plaintiff confessed to committing the murders but did not mention the type of gun. *Id.* This is crucial because at the time of Plaintiff's confession, the detectives had knowledge of the murder weapon. Thus, in order to make Plaintiff's confession credible, Defendant Marquez would have needed to omit the specific type of gun Plaintiff mentioned. Plaintiff's evidence supports that Defendant Marquez was responsible for the difference between the two statements as he allegedly drafted the new statement for Rangel. Rangel Test., ECF No. 379-41, at 160:9-161:25. Additionally, Plaintiff argues that his, Gonzalez's, and Williams's statements all contain the same false information, including that "Popeye" and "Droopy" were involved in the murders. Pl.'s Resp., ECF No. 379, at 20-21.

Plaintiff argues the only way the same false statements could end up in each of these three statements is if the statements were directed by the interrogating officers, including Defendant Marquez.  A reasonable jury could clearly come to this conclusion. Thus, Plaintiff presents sufficient summary judgment evidence that Defendant Marquez manufactured false evidence.

### ii.    Plaintiff provides sufficient evidence that his deprivation of liberty resulted from the manufactured false evidence.

Plaintiff must also show that the manufactured evidence helped deprive him of his liberty. Plaintiff argues that the only evidence that was used to convict him were his, Williams's, and Gonzalez's fabricated statements, along with Rangel's testimony that Plaintiff jokingly confessed to committing the murders with a shotgun.  Pl.'s Resp., ECF No. 379, at 24-25.  According to Plaintiff, excluding the fabricated evidence, the only evidence the prosecution would have had is Rangel's testimony.  *Id.*  Defendant Marquez does not dispute this characterization.  Based on the limited evidence that would exist without the purported fabricated evidence, a reasonable jury, viewing the evidence in the light most favorable to Plaintiff, could conclude that the evidence Defendant Marquez allegedly manufactured deprived Plaintiff of his liberty.

### iii.    Plaintiff provides sufficient evidence that Defendant Marquez knew the manufactured evidence was false.

Lastly, Plaintiff must show that Defendant Marquez knew the evidence he manufactured was false.  Defendant Marquez claims that Plaintiff cannot prove this element, citing *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008), and *Napue v. Illinois*, 360 U.S. 264, 271 (1959).  In *Brown*, a lab technician knowingly falsified the meaning of blood test results, claiming it implicated the defendant.  *Brown*, 519 F.3d at 235.  The Fifth Circuit concluded that "the deliberate or knowing creation of a misleading and scientifically inaccurate serology report amounts to a violation of a defendant's due process rights."  *Id.* at 237.  In *Napue*, a witness testified that he had not received consideration for his testimony and the prosecutor did not correct

22

the witness's statement, despite knowing it was incorrect.  *Napue*, 360 U.S. at 271.  Defendant

Marquez argues that, unlike these cases, he did not know the statements or confessions he elicited

were false because he did not personally witness the shooting.  Def. Marquez's Mot., ECF No.

365, at ¶ 68.  In response, Plaintiff argues that Defendant Marquez knew the evidence was false

because it did not come from Plaintiff or David Rangel.  Pl.'s Resp., ECF No. 379, at 23-24.

At summary judgment, Plaintiff must submit evidence, that when viewed in his favor,

supports the fact that Defendant Marquez knew the evidence was false.  Plaintiff satisfies this

burden.   For example, Plaintiff supplies evidence that Defendant Marquez excluded from

Rangel's statement that Plaintiff claimed to have used a shotgun in the murders.  Rangel Test.,

ECF No. 379-41, at 160:9-161:25.  Thus, from the evidence presented, Defendant Marquez knew

Plaintiff claimed to have used a shotgun to commit the murders, and Rangel's statement

contradicts this fact.  Further, Plaintiff also supplies evidence that Defendant Marquez directed

him to include certain information in his statement, such as "Popeye" and "Droopy" being

involved in the shooting.  *Id.*  Defendant Marquez has not provided any explanation for how this

information ended up in Plaintiff's statement.  Based on the information provided, a reasonable

jury could conclude Defendant Marquez simply made it up.  At summary judgment, considering

that the mental state is often a credibility determination, the evidence presented would allow a

reasonable jury to conclude that Defendant Marquez knew the manufactured evidence was false.

Defendant Marquez can argue otherwise, but he must do so before a jury.

### b.  Clearly Established

The right to be free from fabricated witness statements was clearly established in 1993.

First, as a broad principle, the Fifth Circuit endorsed the First Circuit's pronouncement that "if

any concept is fundamental to our American system of justice, it is that those charged with

upholding the law are prohibited from deliberately fabricating evidence." *See Brown*, 519 F.3d at 237 (quoting *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004)). Then, in the same case, the Fifth Circuit explained that "the right of criminal defendants to be free from false or fabricated evidence was well settled by 1959 or earlier." *Id.* (citing *Napue*, 360 U.S. at 269). The Fifth Circuit used this principle to hold that it was clearly established in 1984 that falsifying blood test results violates clearly established constitutional rights. In doing so, the Fifth Circuit explained that a "false or scientifically inaccurate report is equivalent to any other false evidence created by investigators, such as a false police report[.]" *Id.* Based on the Fifth Circuit's reasoning, in 1993, a police officer who fabricated a suspect's or witness's statement, like a scientific report or police report, violated clearly established constitutional rights.[5]

The Fifth Circuit provides additional support for the Court's position through its endorsement of the Ninth Circuit's reasoning in *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001). *See Cole v. Carson*, 801 F.3d 752, 768 (5th Cir. 2015) (citing *Good v. Curtis*, 601 F.3d 393, 398-99 (5th Cir. 2010)). There, the Ninth Circuit held that "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." 263 F.3d 1070, 1074-75 (9th Cir. 2001). The Ninth Circuit reasoned that under *Pyle v. Kansas*, 317 U.S. 213 (1942), "the knowing use by the prosecution of perjured testimony in order to secure a criminal conviction

---

[5] Importantly, the clearly established right to be free from fabricated evidence operates differently than some other clearly established rights. For example, with excessive force claims, courts analyze in exacting detail whether it has been clearly established that certain uses of force are excessive. That is precisely because the term "excessive" implies that there are uses of "force" that are not excessive. The same reasoning does not apply to fabrication of evidence claims. If evidence is fabricated, that is the end of the inquiry. No gradations are needed to determine whether an officer could have reasonably known that fabricating that specific type of evidence violated a clearly established constitutional right. It bellies common sense to think that an officer cannot fabricate a witness statement, but can fabricate some other type of evidence against a suspect.

violates the Constitution.  While *Pyle* does not deal specifically with the bringing on criminal charges, as opposed to the securing of a conviction, we find that the wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently analogous, that the right to be free from such charges is a constitutional right."  *Id.* at 1075.  Thus, there are multiple avenues for a reasonable officer in 1993 to have understood that fabricating a suspect's or witness's statement violated clearly established constitutional rights.

Because there are disputes of material fact and Defendant Marquez is not entitled to qualified immunity, Defendant Marquez is not entitled to summary judgment on this claim.

### 2. Defendant Ortega

Plaintiff contends Defendant Ortega fabricated the evidence that led to his 1995 conviction for the murders of England and Lazo.  *See* 3d Am. Compl., ECF No. 153, at ¶¶ 189-194.  Specifically, Plaintiff contends Defendant Ortega fabricated his statement, in which he admits to committing the murders.  *See* Pl.'s Resp., ECF No. 379, at 15-20.  Defendant Ortega argues there is no evidence that he fabricated evidence.  *See* Ortega Reply, ECF No 393, at ¶¶ 4, 7-9.

### a.  Constitutional Violation

Plaintiff alleges Defendant Ortega also fabricated his statement.  Pl.'s Resp., ECF No. 379, at 15-20.  Defendant Ortega responds that he did not participate in or witness any misconduct directed at Plaintiff.  Def. Ortega's Reply, ECF No. 393, at ¶ 9.  Defendant Ortega admits he was in the interrogation room with Defendant Marquez and Plaintiff following Plaintiff's meeting with Judge Horkowitz, but he does not remember anything notable occurring:

> On or about April 22, 1993, while the subject written confession was being taken from Plaintiff by Defendant Marquez in Defendant Ortega's presence, Plaintiff was calm and nothing unusual went on, and Defendant Ortega did not witness any

coercion of Plaintiff, and did not see Plaintiff threatened in any way, and did not see any physical force used against Plaintiff.

Def. Ortega's Mot., ECF No. 353, at ¶ 7.  This contrasts with Plaintiff's description of his interrogation following his meeting with Judge Horkowitz:

> At first I was taken back to that – to an office again, handcuffed back into a chair and then I – he informed me that he was going to take a statement down.  The statement – I told him I said that that, you know, that Rodney and I had been at the Village Green Apartments.  We were with a couple of black guys and that they had a gun with them.  Rodney said he was going to do something crazy.  And they had jumped in a vehicle and left.  Later on during that day he had come back and he had told me that he had killed Armando Lazo and Robert England.

> At that point Marquez got – I mean – he got real pissed at me.  He threw the – he got the paper from the typewriter, took it out and crumpled it and threw it to the floor.  He slapped me on the back of the head and said, you are lying, motherfucker.  You think I am playing with you.  I am not fucking with you no more.  He said, we know what you did. You are under arrest for capital murder and in Texas you get the death penalty.  And if you keep fucking with me – and he said that in Texas they would give me the electric chair.  And he said, if you keep playing with me, I am going to make sure I pull the switch myself.

Pl.'s Test., ECF No. 379-35, at 40:6-41:3.  Plaintiff continued that after telling Defendant Marquez that he had used a shotgun to commit the murders, Defendant Marquez "told me that I was lying.  And then again he slapped me on the back of the head.  And he reiterated them threats about taking me out to the desert."  Pl.'s Test., ECF No. 379-35, at 43:16-21.  Shortly thereafter, Plaintiff drafted his operative statement.  Pl.'s Resp., ECF No. 379, at 19-20.   During these events, Defendant Ortega's responsibility was to "ensure that the other officers, who were assigned to investigate the Lazo/England murders, followed the proper juvenile procedures for taking a written statement/confession from Plaintiff."  Def. Ortega's Mot., ECF No. 353, at ¶ 4.  Defendant Ortega being in the interrogation room while Defendant Marquez forced Plaintiff to omit information from his statement, threw away Plaintiff's first statement, and then directed Plaintiff's second statement supports that there was personal involvement.  *See Harris v. City of*

26

*Roseburg*, 664 F.2d 1121, 1125 (9th Cir. 1981).  By failing to perform his duties and protect Plaintiff, Defendant Ortega facilitated Plaintiff's fabricated statement. As Defendant Ortega denies that anything untoward occurred during Plaintiff's interrogation, and Plaintiff has put forward contrary evidence, there is a genuine dispute of material fact on this point.

Then, as previously explained, Plaintiff has shown that his fabricated statement contributed to his deprivation of liberty.  Further, for the same reasons a reasonable jury could find that Defendant Marquez knew that the allegedly manufactured information was false, a reasonable jury could find that Defendant Ortega knew that the allegedly manufactured information was false.  Plaintiff supplies sufficient evidence supporting that his statement was directed by Defendant Marquez, and if Defendant Ortega was present, he would have known this.

### b.  Clearly Established

For the same reasons outlined in Plaintiff's claim against Defendant Marquez, a reasonable officer in 1993 would have understood that fabricating a suspect's statement violates clearly established constitutional rights.  Additionally, Defendant Ortega facilitating fabrication, instead of doing the fabrication himself, does not change the Court's analysis.  It is clear to the Court that fabricating, as opposed to facilitating fabrication, is a distinction without a difference.  After reading the cases the Court cites, a reasonable officer would not conclude that they cannot fabricate evidence, but they can assist another officer in fabricating evidence without running afoul of a defendant's clearly established constitutional rights.

Because there are disputes of material fact and Defendant Ortega is not entitled to qualified immunity, Defendant Ortega is not entitled to summary judgement on this claim.

### 3. Defendant Graves

Plaintiff claims Defendant Graves fabricated Rodney Williams's and Marcos Gonzalez's statements.[6]  Pl.'s Resp., ECF No. 379, at 13-20.  Both of these statements implicate Plaintiff in the murders of Lazo and England.  Defendant Graves responds that Plaintiff provides insufficient evidence to support his claim.  Def. Graves's Reply, ECF No. 400, at ¶ 5-8.  Defendant Graves also responds that Plaintiff's argument is that his due process rights were violated by Defendant Graves coercing a statement from Gonzalez.  *Id.* at ¶ 7.  The Court, however, does not interpret Plaintiff's argument that way.  When a witness is coerced, they are forced to give a statement regardless of its truth or falsity.  *Petty*, 754 F.3d at 421-22.  Here, Plaintiff argues Defendant Graves manufactured a false statement and knew it was false.  Thus, because Plaintiff was implicated by the allegedly manufactured statement, he is a proper plaintiff to bring this claim.  The Court thus proceeds with analyzing Plaintiff's claim against Defendant Graves as a fabrication of evidence claim.

#### a.  Constitutional Violation

##### i.  Plaintiff provides sufficient evidence that Defendant Graves manufactured false evidence.

Defendants Graves and Arbogast questioned Rodney Williams.  Def. Graves's Dep., ECF No. 379-49, at 103:12-25;  Def. Arbogast's Dep., ECF No. 379-44, at 204:12-25.  Williams claims he told Defendant Graves that, at the time of the murders, he was at home with Plaintiff and Marcos Gonzalez.  Williams Test., ECF No. 379-20, at 19:16-20:11.  Defendant Graves told Williams he was lying and threatened to send him to prison if he did not repeat the story Graves had given him.  Williams Test., ECF No. 379-76, at 251:1-22.  Defendant Graves then told

---

[6] Plaintiff provides insufficient evidence as to whether Defendant Graves fabricated evidence as to any other interviewee, particularly David Rangel.

Williams that he would be raped in prison, and as a result, he "was not going to be able to fart anymore because it was going to be too loose." *Id.*  Then, according to Williams, Defendant Graves drafted a statement for him.  Williams Test., ECF No. 379-20, at 23:1-10.  That statement claimed that "Snoopy" and "Popeye" were involved in the murders.  *Id.*  Defendant Graves offers no explanation as to why "Snoopy" and "Popeye" were included in the final statement, as evidence contradicts that they were at the crime scene.  Joint PUF Resp., ECF No. 397, at ¶ 138. The statement also claims Plaintiff committed the murders.  Williams Statement, ECF No. 379-74.

Defendant Graves also interrogated Marcos Gonzalez.  Def. Graves's Dep., ECF No. 379-49, at 170:16-18.  Gonzalez told Defendant Graves that he was not involved in the murders.  *Id.* at 169:5-7.  Gonzalez then drafted his first statement.  Gonzalez Test., ECF No. 379-63, at 411:9-412:2.  Defendant Graves was not satisfied by Gonzalez's statement because it did not say that Gonzalez was present in the car from which the shots were fired.  Gonzalez Test., ECF No. 379-67, at 447:10-20.  Defendant Graves told Gonzalez that they did not believe he was the shooter, but that he was in the car the night Plaintiff committed the murders.  Gonzalez Test., ECF No. 379-63, at 426:1-427:7.  Gonzalez maintained that he, Plaintiff, and Williams had nothing to do with the murders.  *Id.*  Then, according to Gonzalez, Defendant Graves pushed him against a wall, banged his head against the wall, and told him that he would be charged with capital murder and ultimately die by lethal injection.  *Id.* at 435:15-21; Gonzalez Test., ECF No. 379-67, at 147:12-25, 148:23-149:7.  Defendant Graves also told Gonzalez that he would be raped in prison.  *Id.* Eventually, Gonzalez provided a statement implicating himself, Plaintiff, Williams, "Droopy," and "Popeye."  Gonzalez Statement, ECF No. 379-65.

Defendant Graves has a different recollection.  Defendant Graves disputes telling Williams that he would be charged with the murders if he did not give a statement.  Joint PUF Resp., ECF No. 397, at ¶ 133.  Defendant Graves disputes telling Williams that if he did not include certain details in his statement he would be sent to prison, where he would be raped by other inmates.  *Id.* at ¶ 135.  Defendant Graves disputes that he drafted Williams's statement and made up the facts included within.  *Id.* at ¶ 136.  Thus, by extension, Detective Graves disputes telling Williams to include "Snoopy" and "Popeye" in his statement.  *Id.* at ¶ 137.  As for Gonzalez, Defendant Graves disputes forcing him to draft his first statement.  *Id.* at ¶ 146.  Defendant Graves disputes that he pushed Gonzalez against a wall and banged Gonzalez's head against the wall.  *Id.* at ¶¶ 147-154.  Defendant Graves also disputes cursing at Gonzalez, calling him a liar, and telling him he would be charged with capital murder and, as a result, be raped in prison before being executed by lethal injection.  *Id.*  Lastly, Defendant Graves disputes forcing Gonzalez to give his inculpatory statement after two hours of abuse.  *Id.* at ¶¶ 156-57.

Plaintiff presents evidence that, when viewed in the light most favorable to him, supports that Defendant Graves drafted and directed the statements of Williams and Gonzalez, both of which contain false information.  Williams Test., ECF No. 379-20, at 23:1-10;  Gonzalez Test., ECF No. 379-66, at 146:1:21.  There is evidence that "Droopy" and "Popeye" were not at the scene of the crime, yet they were included in both statements.  Defendant Graves does not explain how this incorrect information ended up in both statements.  A reasonable jury could conclude that Defendant Graves simply made it up and forced Williams and Gonzalez to include it.  Additionally, there is evidence that Defendant Graves fed information to Williams and Gonzalez to connect Plaintiff to the murders.  Both Gonzalez and Williams claim they repeatedly denied involvement in the murders until they were forced to implicate themselves and Plaintiff.  Thus,

their statements do not reflect the information they shared with Defendant Graves. Plaintiff supplies sufficient summary judgment evidence supporting that Defendant Graves manufactured false evidence.

### ii.     Plaintiff provides sufficient evidence that his deprivation of liberty resulted from the manufactured evidence.

As previously mentioned, Plaintiff claims that after setting aside the fabricated evidence, the only evidence implicating him in the murders is Rangel's testimony that Plaintiff jokingly confessed to committing the murders with a shotgun. Pl.'s Resp., ECF No. 379, at 24. Both Williams's and Gonzalez's statements implicate Plaintiff in the murders, and as a result, Plaintiff claims that both Williams's and Gonzalez's false statements contributed to his deprivation of liberty. *Id.* Defendant Graves does not dispute Plaintiff's characterization of the evidence. Thus, viewing the evidence in the light most favorable to Plaintiff, he has shown that the statements allegedly fabricated by Defendant Graves contributed to his deprivation of liberty.

### iii.    Plaintiff provides sufficient evidence that Defendant Graves knew the manufactured evidence was false.

Plaintiff claims Defendant Graves knew the manufactured evidence was false because it contradicted the information the interrogees shared. *Id.* at 20. Plaintiff claims that each interrogee denied involvement and only implicated themselves and Plaintiff once they were threatened by the Defendant Officers. *Id.* Here, Plaintiff provides sufficient evidence demonstrating that Defendant Graves either drafted or directed Gonzalez's and Williams's statements. Williams Test., ECF No. 379-20, at 23:1-10; Gonzalez Test., ECF No. 379-66, at 146:1-21. This direction, according to Plaintiff, included Gonzalez and Williams including the same incorrect information about "Popeye" and "Droopy" in their statements. Considering the Fifth Circuit's guidance that mental state is largely a credibility determination and courts should normally not grant summary judgment based on this element, Plaintiff supplies enough evidence for a reasonable jury to

conclude that Defendant Graves knew the manufactured evidence was false.  *See International Shortstop, Inc.,* 939 F.2d at 1265.

### b.  Clearly Established

For the same reasons the Court expounded with Defendant Marquez, the Court finds that it was clearly established in 1993 that a police officer could not fabricate witness statements.

Because there are disputes of material fact and Defendant Graves is not entitled to qualified immunity, Defendant Graves is not entitled to summary judgement on this claim.

### 4. Defendant Arbogast

Plaintiff claims Defendant Arbogast fabricated his and Rodney Williams's statements, both of which implicate him in the murders of Lazo and England.  Pl.'s Resp., ECF No. 379, at 13-20.  Defendant Arbogast argues Plaintiff fails to provide sufficient evidence to support his claim.  Def. Arbogast's Reply, ECF No. 399, at ¶¶ 4-5.

### a.  Constitutional Violation

It is undisputed that Defendants Graves and Arbogast picked up Rodney Williams.  Joint PUF Resp., ECF No. 397, at ¶ 128.  Additionally, as previously discussed, Plaintiff provides evidence that Defendant Graves fabricated Williams's statement. However, Plaintiff does not show that Defendant Arbogast fabricated Williams's statement.  Rather, the evidence supports that Defendant Graves interrogated Williams and Defendant Arbogast was simply present.  *See* Pl.'s Resp., ECF No. 379, at 13-14.  This is insufficient to hold Defendant Arbogast liable.  *See generally Arbuckle v. City of New York*, 14 Civ. 10248, 2016 WL 5793741, at *13 (S.D.N.Y. Sept. 30, 2016) ("Simply being present at the scene of an arrest does not suffice for personal

involvement.  However, conduct such as ordering that an arrest be made or filling out arrest paperwork can suffice to demonstrate direct participation.") (internal citations omitted).

Second, Plaintiff also claims Defendant Arbogast manufactured false evidence during his interrogation with Defendants Marquez, Arbogast, and Ortega.  *See* Pl.'s Resp., ECF No. 379, at 15.  As support, Plaintiff cites Defendant Marquez's deposition where Defendant Marquez claims that Defendants Arbogast and Ortega were with him from the beginning to the end of Plaintiff's interrogation.  *Id.*  Plaintiff omits Defendant Marquez's complete statement, where he states that he and Defendant Arbogast were not "together together."  Def. Marquez's Test., ECF No. 379-7, at 186:11-25.  Further, Plaintiff testified that besides Defendant Marquez, "the other detectives [ ] were not really there."  Pl.'s Test., ECF No. 379-35, at 36:11-25.  Plaintiff has not provided sufficient evidence, even viewed in the light most favorable to him, to show that Defendant Arbogast personally participated in fabricating evidence during his interrogation.

Because Plaintiff fails to establish Defendant Arbogast personally participated in fabricating evidence, Defendant Arbogast is entitled to summary judgment on this claim.

### 5. Defendants Sanchez and Loya

#### a. Constitutional Violation

Plaintiff claims Defendants Sanchez and Loya fabricated Oscar Gomez's statement implicating him in the murders of Lazo and England.  *Id.* at 18-19.  Defendants Sanchez and Loya argue Plaintiff has not shown they fabricated evidence against him.  Joint Mot., ECF No. 352, at ¶ 23.  Defendants Sanchez and Loya also argue Plaintiff cannot meet his burden because he has not shown they knowingly supplied false information.  *Id.*

i.   **Plaintiff provides sufficient evidence that Defendant Sanchez manufactured false evidence.  However, Plaintiff fails to provide sufficient evidence that Defendant Loya manufactured false evidence.**

Plaintiff alleges Defendants Sanchez and Loya fabricated evidence against him through their interrogation of Oscar Gomez.  Pl.'s Resp., ECF No. 379, at 22-23.  Plaintiff claims that Gomez was interviewed by Defendants Sanchez and Loya for two hours before they began recording the interview.  Gomez Aff., ECF No. 379-22, at 1 ¶ 4.  In his affidavit, Gomez recounted that he "was taken to Police Headquarters on Raynor and was interrogated by Detective Sanchez for approximately 2 hours, between 3:00 – 5:00pm while still in handcuffs and without being recorded."  *Id.*  Plaintiff, relying on Gomez's affidavit, claims that Defendants Sanchez and Loya instructed Gomez on what to say and what not to say during his recorded interview.  *See* Pl.'s Resp., ECF No. 379, at 21.  In his affidavit, Gomez claims that (i) Sanchez instructed him not to mention that Plaintiff was joking when he made a statement about the murders; (ii) Sanchez instructed him not to say Plaintiff had not confessed to the murders (iii) Sanchez told him not to share his opinion that Plaintiff did not commit the murders; and (iv) he felt that if he did not comply with Sanchez's demands, he would be sent to prison.[7]  Gomez Aff., ECF No. 379-22, at 1 ¶ 5.  Then, in the recorded interview, Gomez alleges that Defendant Sanchez asked questions that were already evident from the previous unrecorded interview.  *Id.* at 2 ¶ 1.  This was allegedly done to create the appearance that no unrecorded interview had taken place.  After his interview, Gomez claims Defendant Sanchez told him not to discuss it with anyone, including Plaintiff's

---

[7] In their brief, Plaintiff claims Defendant Sanchez threatened to send Gomez to jail if he did not comply with Sanchez's demands.  Plaintiff cites Gomez's affidavit in support.  Gomez's affidavit does not say that Sanchez threatened to send him to jail, instead, the affidavit says, "I felt that if I said anything different from what Detective Sanchez wanted me to say I would go to jail."  Gomez Aff., ECF No. 379-22, at 1 ¶ 5.  At the summary judgment stage, viewing the evidence in favor of Plaintiff, an acceptable interpretation of the evidence is that Gomez was threatened.  It is possible Gomez was threatened or subjectively felt threatened, but he used his words imprecisely when recounting the incident.

defense attorneys. *Id.* at 2 ¶ 2. Importantly, in Defendant Sanchez's and Loya's police report following Gomez's interview, it notes that Gomez "advised that Daniel Villegas admitted to him that he did shoot the two victims prior to him going to prison/jail." Police Report, ECF No. 379-21 at 3.

Despite Plaintiff claiming otherwise, as seen above, the evidence he cites does not show that Defendant Loya was personally involved in manufacturing false evidence. In his Response, Plaintiff uses "Defendants" to describe what Gomez claims Defendant Sanchez solely did. *See* Pl.'s Resp., ECF No. 379, at 21-22. For example, Plaintiff claims that "[t]hese Defendants interrogated Gomez for over two hours before they began recording his interview." *Id.* But this is not an accurate description of Gomez's affidavit. *See* Gomez Aff., ECF No. 379-22. Gomez states, "I was then taken to Police Headquarters on Raynor and was interrogated by Defendant Sanchez for approximately two hours." *Id.* at 1 ¶ 4. Gomez's allegations solely focus on Defendant Sanchez's conduct. *Id.* Because Plaintiff's evidence solely implicates Defendant Sanchez, even viewing it in the light most favorable to Plaintiff, Defendant Loya is entitled to summary judgment with respect to his claim.

As for Defendant Sanchez, he disagrees with Plaintiff's version of events. In Defendant Sanchez's version, Oscar Gomez was interviewed for approximately 30 minutes and there was limited communication between the Defendant Officers and Gomez before his interview. Joint Mot., ECF No. 352, at ¶ 20. Defendant Loya testified that it was only an hour from the time "we were at his house to the time we released him[.]" Def. Loya's Dep., ECF No. 352-B, at 113:1-3. As such, Defendant Sanchez claims that there was no two hour unrecorded interview with Gomez where he advised Gomez on what to include and exclude during the recorded interview. *Id.*; Joint Mot., ECF No. 352, at ¶ 20. While Defendant Sanchez is entitled to disagree with Plaintiff's

recounting of events, the disagreement between Plaintiff and Defendant Sanchez creates a dispute of material fact, and the Court does not resolve such a disagreement at summary judgment.

ii.    **Plaintiff provides sufficient evidence that his deprivation of liberty resulted from the manufactured false evidence.**

Plaintiff must show that the false evidence was used to deprive him of his liberty. In his Response, Plaintiff claims that without the false evidence, the only evidence the prosecution would have had is "Plaintiff's joking statement that he committed the murders with a shotgun[.]" Pl.'s Resp., ECF No. 379, at 24-25. While Defendant Sanchez argues Plaintiff must show that the false evidence led to his deprivation of liberty, Defendant Sanchez does not cite to any evidence rebutting Plaintiff's version of events. Joint Mot., ECF No. 352, at ¶ 13. If the only evidence against Plaintiff was his joking statement to Gomez, based on the numerous confessions that were elicited in this case that did not lead to charges, it is unlikely Plaintiff would have been charged with a crime, and thus deprived of his liberty. Thus, viewing the evidence in the light most favorable to Plaintiff, he establishes that the alleged fabricated evidence contributed to his deprivation of liberty.

iii.    **Plaintiff has provided sufficient evidence that Defendant Sanchez knew the manufactured evidence was false**

Plaintiff alleges Defendant Sanchez knew the evidence was false because it contradicted Gomez's own statements. Pl.'s Resp., ECF No. 379, at 23. According to Plaintiff, each witness denied involvement and only implicated him when they were coerced and were provided incriminating information by the Defendant Officers. *Id.* Gomez's affidavit supports Plaintiff's position. According to Gomez, Defendant Sanchez made him exclude that Plaintiff had jokingly confessed to the murders, and made Gomez include that Plaintiff confessed to the murders. Gomez Aff., ECF No. 379-22, at 1 ¶ 4-5. This, along with the Gomez's observation that Defendant Sanchez acted as if there had not been a non-recorded portion of the interview in an

effort to hide that Gomez had been coached, viewed in the light most favorable to Plaintiff, would allow a reasonable jury to conclude that Defendant Sanchez knew the evidence in the recorded portion conflicted with Gomez's actual observations.  This is sufficient evidence of knowledge to survive summary judgment.

### b.  Clearly Established

For the same reasons the Court expounded with Defendant Marquez, the Court finds that it was clearly established in 2014 that a police officer could not fabricate witness statements.

Because there are disputes of material fact and Defendant Sanchez is not entitled to qualified immunity, Defendant Sanchez is not entitled to summary judgement on this claim.

### B.  Suppression of Evidence[8] (Count II)[9]

A police officer deliberately concealing material exculpatory or impeachment evidence violates a criminal defendant's due process right to a fair trial and gives rise to liability under § 1983.  *Brown*, 519 F.3d at 237-38 (citing *Geter*, 849 F.2d at 1559).  A police officer does not violate a defendant's *Brady* rights the same way as a prosecutor.  A police officer violates *Brady* when they deliberately conceal evidence from the prosecution.  *See Mowbray v. Cameron County*, 274 F.3d 269, 278 n.5 (5th Cir. 2001); *Williams v. Connick*, No. 12-1274, 2014 WL 172520, at *12 n.9 (E.D. La. Jan. 15, 2014) (citing *Hernandez v. Terrones*, 397 F. App'x 954, 971 (5th Cir.

---

[8] Plaintiff provides no summary judgment evidence showing Defendants Arbogast and Ortega suppressed evidence favorable to Plaintiff.  As a result, all claims for fabricating evidence against these defendants are waived.  Additionally, in his Complaint, Plaintiff alleged that Defendants Sanchez and Loya suppressed favorable exculpatory evidence.  Plaintiff provides no facts supporting this assertion and does not address these claims in his Response. As a result, these claims against Defendants Sanchez and Loya are waived.

[9] Plaintiff includes both his fabrication of evidence claim and suppression of evidence claim in Count I.  For clarity, the Court has separated them, and numbered his suppression of evidence claim Count II.  As a result, the count number assigned to each claim in this opinion may be different than those in the parties' briefing and previous orders from the Court.

2010)); *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014) (citing *Moldowan v. City of Warren*, 578, F.3d 35, 379 (6th Cir. 2009) ("Instead, police officers fulfill their *Brady* obligation as long as they "inform the prosecutor about evidence that undermine[s] the state's preferred theory of the crime."); *Hobbs v. Cappelluti*, 899 F. Supp. 2d, 738, 772 (N.D. Ill. Sept. 28, 2012) (quoting *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007)) ("This rule requires 'the prosecutor to turn over to the defense all potentially exculpatory evidence' and extends to police officers 'insofar as they must turn over potentially exculpatory evidence when they turn over investigative files to the prosecution.'").

Importantly, evidence is not concealed if the defendant "knows or should know the essential facts that would enable him to take advantage of it.  The government is not required, in other words, to facilitate the compilation of exculpatory material that, with some industry, defense counsel should marshal on their own." *United States v. Runyan*, 290 F.3d 223, 246 (5th Cir. 2002) (quoting *United States v. Shoher*, 555 F. Supp. 346, 352 (S.D.N.Y. 1983)).  Further, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  "A reasonable probability of a different result is one in which the suppressed evidence undermines confidence in the outcome of the trial." *United States v. Cessa*, 872 F.3d 267, 271 (5th Cir. 2017) (quoting *Turner v. United States*, 582 U.S. 313, 324 (2017)). When a court considers whether there is a reasonable probability that the withheld evidence would have changed the outcome of the trial, the court must consider the withheld evidence cumulatively rather than individually.  *Wearry v. Cain*, 577 U.S. 385, 394 (2016) (citing *Kyles v. Whitley*, 514 U.S. 419 (1995)).

Thus, with reference to the previous principles, to hold a police officer liable for violating their *Brady* obligation, a plaintiff must show that: (1) the police officer deliberately concealed evidence from the prosecution; (2) the evidence was favorable exculpatory or impeachment evidence; and (3) the evidence was material. *See Hernandez v. City of El Paso*, 662 F. Supp. 2d 596, 617 (W.D. Tex. 2009).

### a. Constitutional Violation

#### 1. Defendant Marquez

##### i. David Rangel's First Statement[10]

Plaintiff alleges Defendant Marquez withheld David Rangel's first statement. Pl.'s Resp., ECF No. 379, at 29. Plaintiff sets forth evidence that Defendant Marquez interrogated Rangel. Plaintiff also provides evidence that Defendant Marquez threw away Rangel's first statement. Rangel Test., ECF No. 379-19, 129:1-130:8. In response, Defendant Marquez argues that he did not improperly withhold evidence because Plaintiff and Rangel could have testified to the existence and contents of Rangel's first statement. In support of this contention, Defendant Marquez cites to a 1994 suppression hearing where Rangel testified that Defendant Marquez threw away his first statement. Suppress Hr'g, ECF No. 365-6, 191:11-193:13. The Fifth Circuit has recognized that "[e]vidence is not suppressed if the defendant knows or should know of the essential facts that would enable him to take advantage of it." *Hernandez*, 397 F. App'x at 971. Other circuits have held similarly. *See*, *e.g.*, *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990) (holding that no *Brady* violation occurred on account of the failure to turn over a witness's

---

[10] "A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law." *American Train Dispatchers Dept. of Intern. Broth. Of Locomotive Engineers v. Burlington Northern R.R.*, 855 F. Supp. 168, 170 (N.D. Tex. 1994) (citing *Anderson*, 477 U.S. at 247). As such, the Court uses each piece of evidence Plaintiff claims was suppressed as the basis for analyzing this claim.

statements because defendant was free to question the witness); *United States v. Hicks*, 848 F.2d 1, 4 (1st Cir. 1988) (holding that the government does not need disclose details of a witness's grand jury testimony when the defendant is aware of the grand jury witness and has access to interview that witness and have the witness testify at trial); *United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988) (concluding that no *Brady* violation occurred when the defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory testimony"). Defendant Marquez is therefore correct that he did not improperly withhold evidence from Plaintiff. At the November 30, and December 1, 1994 suppression hearing, David Rangel testified to the contents of his first statement. Plaintiff's first trial for the murders of Lazo and England began on December 6, 1994. Although the Court is unsure of the exact date Plaintiff became aware of the contents of Rangel's first statement, it is clear that he learned about it at the suppression hearing. Plaintiff thus had the opportunity to independently interview Rangel and bring Rangel to testify about his first statement. *See Hernandez*, 397 F. App'x at 971 (explaining that when evidence is fully available to a defendant at the time of trial, the defendant has no *Brady* claim). Therefore, Defendant Marquez did not violate his *Brady* obligation regarding David Rangel's first statement. Defendant Marquez is entitled to summary judgment on this part of Plaintiff's suppression of evidence claim.

### ii. Taped Witness Interview

Plaintiff claims Defendant Marquez withheld a taped witness interview identifying the person who shot Lazo and England. Pl.'s Resp., ECF No. 379, at 30. Plaintiff claims this evidence would have aided his efforts to establish the Flores Brothers as alternate suspects in the shooting. *Id.* According to Plaintiff, the tape contained an interview between private investigator Tony Kosturakis and a witness who claimed that the murder weapon, a .22 caliber gun, could be found

in a house on Shenandoah Street, above the bedroom ceiling in a shoe box. Kosturakis Aff., ECF No. 379-87. Kosturakis found the witness credible, and turned the information over to the police, specifically to Defendant Marquez. *Id.* Kosturakis's affidavit says Defendant Marquez listened to the tape and took it with him. *Id.* Defendant Marquez did not document the tape's existence. Def. Marquez's Dep., ECF No. 379-69, at 266:3-8. Defendant Marquez testified normal police procedure would have required him to pick up the tape and inventory it so somebody else could listen to it. *Id.* at 255:21-266:5. The tape was not produced at trial. Pl.'s Resp., ECF No. 379, at 31. Defendant Marquez does not dispute this recounting. *See* Def. Marquez's Resp. to Pl.'s PUF, ECF No. 402.

Defendant Marquez responds that although evidence of an audio-taped statement claiming Rudy Flores bragged about having shot England and Lazo arguably justified further inquiry, there was little to no evidentiary value to the tape because many individuals had confessed to committing the murders. Def. Marquez's Mot., ECF No. 365, at ¶ 23. Further, Defendant Marquez argues that withholding this evidence does not rise to a constitutional violation because the evidence was cumulative. *Id.* at ¶¶ 23, 53.

Addressing Defendant Marquez's first contention, Plaintiff provides evidence that (1) there was no follow-up investigation into Rudy Flores's statement that he was near the scene at the time of the murders; (2) there no follow-up investigation to corroborate who Rudy Flores was with; and (3) there was no follow up investigation regarding the allegations Rudy Flores threatened to kill Lazo. Def. Marquez's Test., ECF No. 379-69, at 142:3-22; 151:1-152:25. Lastly, Plaintiff also points to the fact that the record provides no explanation as to why the Flores brothers were cleared. *Id.* at 150:1-25. Defendant Marquez does not dispute any of this. *See* Def. Marquez's Resp. to Pl.'s PUF, ECF No. 402. Based on the evidence Plaintiff provides, there

were many unanswered questions regarding the Flores Brothers and their possible involvement in the murders.  Therefore, a witness interview detailing their alleged involvement in the murders and identifying where to locate the murder weapon would not have been cumulative.  The allegedly concealed tape recording could have bolstered Plaintiff's attempts to establish another viable suspect at trial.  In addition to Plaintiff showing that the taped witness interview was not cumulative, he also supplies sufficient summary judgment evidence for a jury to conclude that it was deliberately concealed.  Plaintiff provides evidence that Defendant Marquez was in possession of the tape.  He further provides that the standard procedure would have been for Defendant Marquez to inventory the tape, and he failed to do so.  Finally, the tape was not produced at trial or otherwise given to the defense

Plaintiff also provides sufficient evidence that the taped witness interview was favorable exculpatory evidence.  According to Kosturakis, the witness in the taped interview implicated someone other than Plaintiff in the murders and told the police where they could locate the murder weapon. Kosturakis Aff., ECF No. 379-87.  The ability for Plaintiff to point to another suspect, and have witness testimony pointing to that same suspect is undoubtedly favorable exculpatory evidence.  Lastly, there must be a reasonable probability that if the evidence at issue was disclosed, the result of the proceeding would have been different.  As previously mentioned, Plaintiff only needs to show the allegedly withheld evidence undermines confidence in the verdict.  Plaintiff's first trial, where this evidence was suppressed, resulted in a mistrial because the jury was hung. The additional evidence might have tipped the scale in Plaintiff's favor.  The allegedly withheld evidence would have presented additional evidence of the Flores Brothers's guilt.  Had Plaintiff's defense attorneys known about the tape, it not only would have introduced another suspect but it could have raised additional doubt about the thoroughness of the investigation.  The Court is

satisfied that the recording is material.  *See Kyles*, 514 U.S. at 455 (concluding withheld evidence describing potential alternative perpetrator was material, in part because it could have been used to cast doubt on the adequacy of government's consideration of alternative suspects).  Thus, here, Plaintiff has shown that there was a constitutional violation.

### iii.  Michael Johnston's and Jacob Jauregi's Confessions

Shortly after the murders, Defendant Marquez took a statement from Robert Hall claiming Michael Johnston and Jacob Jauregi admitted to murdering Lazo and England.  Pl.'s Resp., ECF No. 379, at 31.  Hall told Defendant Marquez that Johnston had chased the two surviving victims until they arrived at a phonebooth, and this information matched testimony from the two surviving victims that was not publicly released.  Hall Statement, ECF No. 379-32; Def. Marquez's Dep., ECF No. 379-69, at 105:10-107:7.  Defendant Marquez then questioned Johnston, and he admitted to committing the murders.  *Id.* at 97:5-99:4.  Johnston's and Jauregi's statements were taken, and it was Defendant Marquez's responsibility to maintain the files.  *Id.* at 109:6-112:22. However, Defendant Marquez did not turn them over to the prosecution or the defense, and the record reveals he is unaware of what happened to them.  *Id.*  As a result, Plaintiff claims Defendant Marquez improperly withheld material exculpatory evidence.  Pl.'s Resp., ECF No. 379, at 31.

In response, Defendant Marquez claims Plaintiff contradicts his Complaint to avoid summary judgment.  Def. Marquez's Reply, ECF No. 392, at ¶ 5.  Defendant Marquez notes that in Plaintiff's Response, he claims that Johnston's statement was exculpatory because it implicated someone other than Plaintiff in the murders and revealed details of the crime.  Pl.'s Resp., ECF No. 379, at 31.  However, in his Complaint, Plaintiff claimed that the Defendant Officers coerced Johnston and Jauregui to falsely confess.  Compl., ECF No. 153, at ¶¶ 32-34. Defendant Marquez correctly notes that factual assertions in pleadings can be judicial admissions that are binding on

the party that made them.  *Campbell v. Sonat Offshore Drilling*, 979 F.2d 1115, 1119 (5th Cir. 1972).  A judicial admission "is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them.  Although a judicial admission is not itself evidence, it has the effect of withdrawing a fact from contention."  *Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476 (5th Cir. 2001).  An evidentiary admission, on the other hand, is a statement or concession that is made for some independent purpose and can be controverted by the party who made it.  *Id.* at 476-77.  Here, Plaintiff made an evidentiary admission.  When Plaintiff alleged that Johnston's and Jauregi's confessions were false in his Complaint, Plaintiff did not formally concede that Johnston's and Jauregui's confessions were false.  Rather, Plaintiff was explaining the purported misconduct of the Defendants during their investigation.  Plaintiff's independent use of the evidence pulls it outside of a judicial admission, and thus this statement can be controverted or explained by Plaintiff at a later stage in the litigation.  *Id.*  The Court thus proceeds to Plaintiff's claim that Defendant Marquez improperly withheld Johnston's and Jauregi's statements.

Plaintiff submits sufficient summary judgment evidence, viewed in the light most favorable to him, for a reasonable jury to conclude that Defendant Marquez deliberately withheld Johnston's and Jauregi's statements from the prosecution.  Defendant Marquez was responsible for maintaining their statements, but they were not turned over to Plaintiff during his criminal trials.  Def. Marquez's Dep., ECF No. 379-69, 109:6-112:22; Pl.'s Resp., ECF No. 379, at 23.  Defendant Marquez also cannot explain what happened to the physical copies of the statements.  Def. Marquez's Dep., ECF No. 379-69, 109:6-9.  A reasonable jury, based on this information, could conclude that the statements were deliberately not turned over to the prosecution.  Johnston's and Jauregi's statements also contain favorable exculpatory evidence.  Plaintiff claims

the statements would have implicated someone else in the murders because the statements contained non-public information detailing the crime. Pl.'s Resp., ECF No. 379, at 31. This is probative evidence. Further, the evidence could have cast doubt on the investigation. If the jury ultimately concluded, as the police apparently did, that Johnston and Jauregi had falsely confessed, it could have supported Plaintiff's argument at trial claiming that he falsely confessed. This evidence would show that others accused of the same crime by the same officers falsely confessed, and Plaintiff also might have done so for similar reasons.

Lastly, Plaintiff must show there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. In making this determination, the Court considers the withheld evidence cumulatively rather than individually. *Wearry*, 577 U.S. at 394. In sum, Plaintiff provides sufficient summary judgment evidence for a reasonable jury to conclude that Defendant Marquez withheld a tape recording that would have implicated the Flores Brothers and written statements that would have implicated Johnston and Jauregi. As already explained, police withholding evidence of alternative suspects is material because it casts doubt on the thoroughness of the investigation and the police's consideration of alternate suspects. *See Kyles*, 514 U.S. at 455. Plaintiff therefore adequately shows that the withheld evidence was material. Thus, here as well, Plaintiff has shown that there was a constitutional violation.

### b. Clearly Established

It was clearly established in 1993 that prosecutors withholding exculpatory evidence from a criminal defendant violates due process under the Fourteenth Amendment. *Brady v. Maryland*, 373 U.S. 83 (1963). Plaintiff cites *Geter v. Fortenberry* (*Geter I*) to support it was clearly established in 1993 that police officers can violate the same right. 849 F.2d 1550, 1559 (5th Cir. 1988). In *Geter I*, the plaintiff accused a police officer of concealing exculpatory evidence. The

court explained that "a police officer cannot avail himself of a qualified immunity defense if he procures false identification by unlawful means or deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles." *Geter I*, 849 F.2d at 1559. In response, Defendant Marquez makes a host of arguments to dispute Plaintiff's claim that police officers had a clearly established *Brady* obligation in 1993. First, Defendant Marquez argues that because the Supreme Court has not endorsed that police officers have a *Brady* obligation, an officer could have reasonably believed his actions were not in violation of clearly established law. Def. Marquez's Mot., ECF No. 365, at ¶ 39. Second, Defendant Marquez contends that *Geter I* proclaiming that police officers have a *Brady* obligation is dictum, and dictum cannot be clearly established law. *Id.* at ¶ 43. Third, Defendant Marquez argues that even if *Geter I* is not dictum, it is difficult to determine whether evidence is material and must be disclosed. He therefore argues that an officer could have reasonably believed the *Brady* obligation did not extend beyond the particular type of evidence in *Brady*. Lastly, Defendant Marquez argues an officer could have reasonably believed *Geter I* was not controlling because it conflicts with *Brady*.[11]

The Court addresses Defendant Marquez's arguments in turn. First, although the Supreme Court reserved whether only its precedent can clearly establish law, it has signaled that Courts of Appeals decisions can clearly establish law. *City of Escondido v. Emmons*, 586 U.S. 38, 43 (2019)

---

[11] Defendant Marquez argues that because *Kyles v. Whitney*, 514 U.S. 419 (1995), had not been decided by the Supreme Court when the alleged evidence was withheld, a reasonable officer at the time could have concluded it was not clearly established that withholding evidence similar to that in *Kyles* would violate *Brady*. This argument is unavailing. Determining whether evidence is material and must be turned over to the defense depends on the context of the case. Certain types of evidence may be material in some cases and not material in others. It is too simplistic of a view to read the district court opinion in *Kyles* in 1993 and conclude that analogous types of evidence do not need to be turned over. Further, Defendant Marquez's argues that if all nine Justices of the Supreme Court do not hold one way in a case, the holding cannot be clearly established. That is not how holdings work. A majority of the Justices are needed to make a holding, and those holdings are binding. A dissent may be interesting or even persuasive, but dissenting opinions are not binding.

("Assuming without deciding that a court of appeals decision may constitute clearly established law for purposes of qualified immunity.") (cleaned up).  Further, Courts of Appeals, including the Fifth Circuit, have held that their cases can clearly establish constitutional rights.  *See Melear v. Spears*, 862 F.2d 1177, 1184 n.8 (5th Cir. 1989) ("As a general proposition, we will not rigidly define the applicable body of law in determining whether relevant legal rules were clearly established at the time of the conduct at issue.  Relying solely on Fifth Circuit and Supreme Court cases, for example, would be excessively formalistic, but they will loom largest in our inquires."); *James v. N.J. State Police* (*In re Gibbons*), 957 F.3d 165, 170 (3d Cir. 2020) ("For qualified-immunity purposes, clearly established rights are derived from binding Supreme Court and Third Circuit precedent or from a "robust consensus of cases of persuasive authority in the Courts of Appeals.").  The Court will thus follow Fifth Circuit precedent that holds that Federal Appellate Courts can create clearly established law.

Second, Defendant Marquez is correct that for law to be clearly established it must come from holdings, not dicta.  *Morrow v. Meachum*, 917 F.3d 870, 875 (5th Cir. 2019) (citing *Sorenson v. Ferrie*, 134 F.3d 325, 329 n.7 (5th Cir. 1998)) (holding that "clearly established law comes from holdings, not dicta.").  "A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it.  A statement is not dictum if it is necessary to the result or constitutes an explication of the governing rules of law." *United States v. Segura*, 747 F.3d 323, 328 (5th Cir. 2014) (citing *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004)).  Defendant Marquez argues that in *Geter I* the Fifth Circuit only remanded the false identification issue and made no disposition as to the exculpatory evidence issue.  Def. Marquez's Mot., ECF No. 365, ¶ 39.  Thus, Defendant Marquez claims that *Geter I*

is dictum as to whether *Brady* applies to police officers. *Id.* at ¶ 43.  In *Geter I*, the district court denied a defendant's motion for summary judgment responding to claims the defendant concealed exculpatory evidence. *Geter I*, 849 F.2d at 1558.  The defendant appealed. *Id*. at 1552.  The Fifth Circuit ultimately found that the plaintiff's allegations were too conclusory to support the claim. *Id.* at 1558.  However, before the Court determined such, it first analyzed whether such a claim exists.  Thus, when the Fifth Circuit said "[w]e agree with Geter that a police officer cannot avail himself of a qualified immunity defense if he procures false identification by unlawful means or deliberately conceals exculpatory evidence, for such activity violates clearly established law[,]" the court acknowledged that there is a viable claim against police officers for concealing exculpatory evidence. *Geter I*, 849 F.2d at 1559.  Otherwise, the court would not even need to determine whether Plaintiff had provided sufficient non-conclusory allegations.  As such, this is not dictum.

Third, Defendant Marquez argues that it is difficult to determine whether evidence is material and must be disclosed.  Def. Marquez's Mot., ECF No. 365, at ¶ 44.  Thus, according to Defendant Marquez, an officer could have reasonably believed that the *Brady* obligation did not extend beyond the type of evidence dealt with in *Brady*.  Additionally, Defendant Marquez claims an officer could have reasonably believed *Geter I* was not controlling because it is inconsistent with *Brady*. *Id.* at ¶ 45.  These arguments are unavailing.  A reasonable officer should know that evidence that is favorable to the accused and material to guilt or punishment can take many forms. It defies common sense to believe that the only material evidence that needs to be turned over to a defendant under *Brady* is the exact type of evidence at issue in *Brady*.  The Court's general holding in *Brady* says as much.  Additionally, acknowledging the difficulty in the determining whether evidence is material, the Supreme Court noted that "the prudent prosecutor will resolve

doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. 97, 108 (1976). A police officer, with less training than a prosecutor in determining whether evidence is material, has a greater incentive to follow this guidance. Lastly, *Geter I* is not inconsistent with *Brady*. If evidence must be turned over under *Brady*, it must be turned over under *Geter I*. A reasonable officer could read *Geter I* and conclude it enshrines their duty to turn over exculpatory evidence, but a reasonable officer would not read *Geter I* and conclude that they can ignore this obligation.

Because Defendant Marquez is not entitled to judgement as a matter of law or qualified immunity, he is not entitled to summary judgment on the portions of the claim alleging he withheld the taped witness interview and Michael Johnston's and Jacob Jauregi's statements.

### 2. Defendant Graves

#### a. David Rangel's First Statement

Plaintiff alleges Defendant Graves withheld David Rangel's first statement. Pl.'s Resp., ECF No. 379, at 29. For the same reasons Defendant Marquez did not withhold Rangel's statement, Defendant Graves did not withhold the statement. Defendant Graves is entitled to summary judgment.

## C. Coerced and False Confession[12]

#### a. Coerced Confession (Count III)

A criminal defendant's Fifth Amendment rights are violated if their conviction is wholly or partly based on an involuntary confession. *Murray v. Earle*, 405 F.3d 278, 286 (5th Cir. 2005) (citing *Miranda v. Arizona*, 384 U.S. 436, 465 n.33 (2005)); *see also Villegas v. City of El Paso*, 15-CV-386, 2020 WL 981878, at *5 (W.D. Tex. Feb. 28, 2020) ("It is well established that state

---

[12] In his Response, for Counts III and IV, Plaintiff does not develop an argument against Defendant Graves. Thus, Plaintiff waives these claims. *See Aldrup*, 274 F.3d at 288.

actors violate a criminal defendant's Fifth Amendment rights against self-incrimination when they coerce an involuntary confession and use it against the defendant."). While the right can only be violated at trial, "pre-trial conduct by law enforcement officials may ultimately impair that right." *Murray*, 405 F.3d at 285. To assert such a violation, the defendant's confession must have been given during a custodial interrogation. *Id.* A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody." *Miranda*, 384 U.S. at 444. An individual is in custody when the suspect is under formal arrest or is subject to restraints on his freedom of movement to a degree associated with formal arrest.[13] *See Stansbury v. California*, 511 U.S. 318, 322 (1994). Then, a court determines whether a "suspect's confession is coerced or involuntary by examining the totality of the circumstances surrounding the interrogation." *Edmonds v. Oktibbeha Cnty*, 675 F.3d 911, 914 (5th Cir. 2012). This consideration includes the "suspect's age, experience, education, background, intelligence, and whether the suspect has the capacity to understand the warnings given to him, the nature of his rights, and the consequences of waiver. The circumstances of the interrogation, such as its length, location, and continuity are also considered." *Rogers v. Quarterman*, 555 F.3d 483, 491 (5th Cir. 2009) (internal citations omitted).

### 1. Defendant Marquez

Plaintiff claims Defendant Marquez forced him to incriminate himself falsely and against his will, violating his rights under the Fifth Amendment. 3d Am. Compl., ECF No. 153, at ¶¶

---

[13] Plaintiff was arrested before his interrogation. *See* Resp., ECF No. 379, at 41. Thus, his interrogation was custodial.

195-207.  Defendant Marquez argues there is no evidence he violated Plaintiff's Fifth Amendment rights, but even there is, any such violation was cured.[14]

### i.    Constitutional Violation

Plaintiff was 16 years old when he was interrogated by Defendant Marquez.  Pl.'s Resp., ECF No. 379, at 37.  During his interrogation, Plaintiff claims Defendant Marquez repeatedly threatened him.  *Id.*  Defendant Marquez told Plaintiff that he would be charged with capital murder, be sentenced to death, and Defendant Marquez would be the person to flip the switch on the electric chair.  *Id.*  Plaintiff also claims Defendant Marquez struck him hard on the back of his head when he proclaimed his innocence.  *Id.*  Plaintiff relies on three instances to demonstrate that Defendant Marquez coerced a confession.  The Court thus addresses each.

As his first instance, Plaintiff claims "[t]he record demonstrates that Defendant Marquez struck a child in the head during an interrogation replete with threats of violence and death."  *Id.* at 34.  The Supreme Court has explained that "a confession produced by violence or threats of violence is involuntary and cannot constitutionally be used against the person giving it."  *Sims v. Georgia*, 389 U.S. 404, 407 (1967).  Naturally, this principle has been followed by the Fifth Circuit and other circuits.  *See Ware v. Reed*, 709 F.2d 345 (5th Cir. 1983) ("We are firmly of the view that the use of physical violence against a person who is in the presence of the police for custodial interrogation, who poses no threat to their safety or that of others, and who does not otherwise initiate action which would indicate to a reasonably prudent police officer that the use

---

[14] Defendant Marquez argues that even if Plaintiff's confession was coerced, breaking to speak with Judge Horkowitz cured any previous violation.  The evidence Plaintiff puts forward supports he was threatened with immediate and future repercussions if he did not tell Judge Horkowitz what Defendant Marquez asked him to.  In this situation, simply changing locations does not remove the effects of the past coercion.  Plaintiff's confession with Judge Horkowitz is more akin to a 20-minute break rather than clean separation.  *See Missouri v. Seibert*, 542 U.S. 600, 648-49 (2004); *Lyons v. Oklahoma*, 322 U.S. 596 (1944).

of force is justified, is a constitutional violation."); *United States v. Casby*, No. 11-130 Section L(3), 2013 U.S. Dist. LEXIS 84057, at *43 (E.D. La. June 13, 2013) ("At trial, [defendant] testified that during the interrogation, police officers 'choked,' 'punched,' and 'slapped' him as well as 'tas[ed]' him.  It is clear that such physical abuse would render [defendant's] confession involuntary."); *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003) ("A confession accompanied by physical violence is *per se* involuntary."); *Holland v. McGinnis*, 963 F.2d 1044, 1050 (7th Cir. 1992) ("It is axiomatic that a confession extracted with violence or the threat of violence is involuntary."); *United States v. Farley*, 607 F.3d 1294, 1328 (11th Cir. 2010) (explaining that "physical violence or the threat of it" makes any resulting confession involuntary); *Miller v. Fenton*, 796 F.2d 598, 606 (3d Cir. 1986) (explaining that a "*per se* involuntariness rule applies when an interrogation is accompanied by physical violence").

In response, Defendant Marquez, citing *Torres v. City of Philadelphia*, argues that an officer using *de minimis* force during an interrogation does not violate the Constitution.  673 F. App'x 233, 237 (3d Cir. 2016).  The court in *Torres* reviewed a jury instruction, for plain error, that read "'whether the amount of force the Defendants used was the amount which a reasonable police officer would have used in conducting an interview of a suspect,' noting that 'not every push or shove by a police officer, even if it may seem unnecessary in the peace and quiet of this courtroom, constitutes excessive force.'"  The court first noted that the instruction generally does not fit the interrogation context "where force generally will be inappropriate." *Id.*  The Court then explained that the instruction was "plausibly appropriate" in that instance because (i) the interrogee testified to being belligerent during his interrogation and officers may have needed to restrain him in some way, and (ii) he described one instance of an "idiot smack" which he

compared to "Skipper smacking Gilligan." *Id.* In this context, the court did not find plain error in the jury instruction.

As additional support, Defendant Marquez cites *Craig v. Martin*. 49 F.4th 404 (5th Cir. 2022) (en banc). There, the Fifth Circuit held that an officer may use reasonable force on a suspect "actively" resisting arrest. *Id.* at 416. The reasonableness of the force depends on the suspect's resistance. *Id.* Defendant Marquez claims that the officer in *Craig* permissibly raised an arrestee's handcuffed arms, inflicting some degree of pain, because she refused to answer the officer's questions. Defendant Marquez misses crucial details from the facts of *Craig*. The Fifth Circuit observed that before the officer lifted the arrestee's arms, the arrestee "pulled and twisted her body back and forth while she was handcuffed; repeatedly yelled for someone to 'come around here' as several individuals who were not detained were nearby; attempted to walk away from the police car; shouted progressively louder as she twisted and turned more aggressively; refused to answer Martin's questions about her name and age; briefly jumped up and down; and turned her head to the left to look directly at Martin." *Id.* at 415. The court then explained that "[n]othing in our opinion should be construed as suggesting, much less holding, that officers may use pain maneuvers to force non-resisting individuals to respond to questioning. We hold only that, consistent with our precedent, an officer may use reasonable force on someone 'actively resisting arrest.'" *Id.* at 416.[15]

---

[15] Defendant Marquez cites *Beecher v. Alabama*, 389 U.S. 35 (1967), and contrasts the facts of the case with *Torres* and *Craig* to support that "being allegedly struck/slapped – i.e., essentially "idiot smacked" – on the back of the head or similar de minimis physical contact would not have violated Villegas's constitutional rights[.]" But that case, and its extreme circumstances, do not establish the minimum amount of physical contact that is necessary to make a confession involuntary. Thus, contrasting the case with *Torres* and *Craig* does not give the court meaningful guidance on how to assess Plaintiff's allegations.

The cases Defendant Marquez relies on, do little, if anything, to bolster his position. Neither case supports the proposition that officers can use *de minimis* force against an interrogee. Rather, the cases support that officers can use some level of force against a physically non-compliant interrogee. That situation, however, is not the situation before the Court. Defendant Marquez does not allege Plaintiff was physically violent or non-compliant, the opposite situation from *Craig.* And Defendant Marquez does not point to anything in the record that would allow the Court to infer a need to restrain Plaintiff, as was the case in *Torres.*

As his second instance, Plaintiff claims that an officer cannot threaten a 16-year old with rape, beatings, and death to elicit a confession. When the suspect is a child, as here, evaluating whether his confession was involuntary requires the Court to consider his "age, experience, education, background, intelligence, and whether the suspect has the capacity to understand the warnings given to him, the nature of his rights, and the consequences of waiver. The circumstances of the interrogation, such as its length, location, and continuity are also considered." *Rogers*, 555 F.3d at 491. Additionally, "[p]olice must take special care to ensure the voluntariness of a minor suspect's confession: If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *See Edmonds*, 675 F.3d at 915 (quoting *In re Gault*, 387 U.S. 1, 55 (1967)). Here, Plaintiff claims that when he arrived at the police station, he explicitly told Defendant Marquez that he did not want to give a statement. Pl.'s Test., ECF No. 379-37, at 816:16-24. After Plaintiff refused to provide a statement, Defendant Marquez told him that he was "going to get fucked in jail." *Id.* at 817:8-16. Defendant Marquez then told Plaintiff that if he did not give a statement Defendant

Marquez would "take [him] to the desert and handcuff you to the door and kick your ass." *Id.* at 817:17-25. Plaintiff claims Defendant Marquez told him that after his beating, he would be taken to jail where Defendant Marquez would "put [Plaintiff] in a tank with a bunch of fat faggots and they're going to rape you." *Id.* at 818:17-25. Plaintiff claims he then provided his incriminating statement because he was scared. *Id.* at 821:21-24.

As previously discussed, the Supreme Court has explained that "a confession produced by violence or threats of violence is involuntary and cannot constitutionally be used against the person giving it." *Sims*, 389 U.S. at 407. That is exactly what Plaintiffs alleges happened here.

As his third instance, Plaintiff claims Defendant Marquez elicited his confession by promising him lenient treatment if he confessed to the murders. Specifically, Defendant Marquez promised Plaintiff that he would not be sent to adult prison if he confessed. Pl.'s Resp., ECF No. 379, at 39-40. A confession is not *per se* involuntary if "the suspect was promised leniency if he cooperated with law enforcement officials." *United States v. Santiago*, 410 F.3d 193, 202 (5th Cir. 2005). But "certain direct or implied promises of leniency may be so attractive they render a resulting confession involuntary if the promise is not kept." *United States v. Fernandes*, 285 F. App'x 119, 124 (5th Cir. 2008) (quoting *Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987)). In exchange for a confession, promising a juvenile suspect that they would not be charged as an adult and that they can avoid adult prison meets the necessary level of attractiveness. From the Court's perspective, this is akin to promising a suspect their immediate release if they confess. As evidenced from the sentence Plaintiff ultimately received, the consequences of being convicted of murder are drastic. In comparison, not being charged as an adult and not being sent to adult prison is a minor punishment. In the latter case, Plaintiff would still have the rest of his life ahead of him. This instance firmly favors Plaintiff's confession being involuntary. *See*

*Streetman*, 812 F.2d at 957 (explaining that a promise of immediate release, if not kept, renders a confession involuntary); *United States v. Rogers*, 906 F.2d 189, 192 (5th Cir. 1990) (explaining that a false promise of non-prosecution rendered subsequent statements involuntary for purposes of a motion to suppress).

Then, as Defendant Marquez correctly points out, when the Court considers the totality of the circumstances, that inquiry must consider Plaintiff's personal characteristics.[16] *See Dickerson v. United States*, 530 U.S. 428, 434 (2000). It is undisputed that Plaintiff, at the time of the interrogation, had an IQ of 97, passed multiple parts of this GED exam, been expelled from school, a criminal history, attacked his mother, suffered from drug usage, accustomed to cursing, and was a member of a criminal gang for a few years. First, an individual's experience with law enforcement and the criminal process is a factor that can weigh in favor of finding a voluntary confession. *See U.S. v. Anderson*, 755 F.3d 782, 791 (5th Cir. 2014) ("Anderson had significant contact with law enforcement prior to the instant arrest. His experience with the criminal process makes it less likely that his confession was involuntary.") Here, however, this factor is neutral as

---

[16] In his summary judgment motion, Defendant Marquez cites cases relying on substantive due process to support his contention that there was not a procedural due process violation. Defendant Marquez claims Plaintiff has not cited any authorities showing that substantive due process cases cannot be used to support his defense against a claim brought under procedural due process. In support of his argument, Defendant Marquez claims that *Edmonds v. Oktibbeha County*, 675 F.3d 911 (5th Cir. 2012) suggests that the two standards are not "wholly unrelated." The case does not say this. The Court similarly does not read the other cases cited by Defendant Marquez as supporting his contention. As a practical matter, there may be overlap between cases where there is a procedural due process violation and a substantive due process violation. But whether the totality of the circumstances supports that a confession was coerced or involuntary is a different analysis than whether the tactics used shock the conscience. *See Molamphy v. Town of Southern Pines*, No. 1:02-CV-720, 2004 WL 419789, at *14 (M.D.N.C. Mar. 3, 2004) ("Substantive due process claims are decided under different and higher standards that procedural due process claims and are actually more difficult to prove."); *Glass v. Sul Ross State University*, No. 22-CV-14, 2023 WL 2028928, at *9 (W.D. Tex. Feb. 14, 2023) ("The procedural and substantive due process inquiries are separate and must not be confused."). As the standard to sustain a violation of a substantive due process right is more demanding than a procedural due process right, the Court cannot simply conclude that because certain conduct does not violate substantive due process it likewise does not violate procedural due process.

Defendant Marquez does not elaborate on Plaintiff's previous experiences with law enforcement to show that he was prepared for such tactics. *See U.S. v. Hearn*, 563 F.3d 95, 104 (5th Cir. 2009) (considering a defendant's criminal history category as evidence that she was familiar with the process for waiving *Miranda* rights). Further, the Court is unsure how IQ test results, GED exam scores, drug use, being expelled from school, or attacking one's mother prepares them for an interrogation replete with threats of physical force. The same applies to being accustomed to cursing and being in a gang. The Court finds Plaintiff's personal characteristics immaterial in determining if his confession was voluntary.

After viewing the totality of the circumstances, in the light most favorable to Plaintiff, he submits enough evidence for a reasonable jury to conclude that his confession resulted from Defendant Marquez using threats and violence. This confession was later introduced in Plaintiff's criminal trial, where he was convicted. Defendant Marquez is entitled to argue that Plaintiff's confession did not result from these tactics, but the Court does not make this determination at summary judgment.

### ii.    Clearly Established

Plaintiff must then show that it was clearly established at the time of the alleged conduct that Defendant Marquez's actions violated the Constitution. This requirement presents no difficulty here. In *Bram v. United States*, the Supreme Court held that for a confession to be free and voluntary, "it must not be extracted by any sorts of threats or violence." 168 U.S. 532, 542–43 (1897); *see also Sims v. Georgia*, 389 U.S. 404, 407 (1967) ("It needs no extended citations of cases to show that a confession produced by violence or threats of violence is involuntary and cannot constitutionally be used against the person giving it."). Relying on this principle, the Fifth Circuit held that an officer obtaining a confession after threatening a suspect and his family with

physical violence renders a confession involuntary.[17]  *Streetman*, 812 F.2d at 956.  Likewise, at

the time of the conduct here, appellate courts routinely applied this well-settled rule.  *See Ware*,

709 F.2d at 345; *Holland*, 963 F.2d at 1050.  Similar to the cases cited above, Defendant Marquez

repeatedly struck Plaintiff and threatened him with more physical violence, rape, and death.  In

sum, Plaintiff satisfies the clearly established prong to defeat qualified immunity as to the coerced

confession claim under the Fifth Amendment.

Because Defendant Marquez is not entitled to judgement as a matter of law or qualified

immunity, he is not entitled to summary judgment on this claim.

### 2.  Defendant Arbogast

#### i.    Constitutional Violation

Plaintiff claims Defendant Arbogast participated in the interrogation that led to his coerced

confession and is thus liable for violating his Fifth Amendment rights.  Pl.'s Resp., ECF No. 379,

at 41.  Plaintiff asserts Defendant Arbogast drove him to the police station once he was arrested.

*Id.*  Plaintiff also claims Defendant Arbogast was present for the entirety of his interrogation with

Defendant Marquez and was present when Defendant Marquez was slapping Plaintiff.  *Id.*

In response, Defendant Arbogast correctly notes that Plaintiff fails to provide sufficient

summary judgment evidence for a reasonable jury to hold Defendant Arbogast liable.  To

demonstrate that Defendant Arbogast participated in eliciting an involuntary confession, Plaintiff

relies on the same mischaracterization of Defendant Marquez's testimony as he did for the

fabrication of evidence claim.  As already explained, Defendant Marquez testified that he was

with Defendants Arbogast and Ortega "from the beginning until the end" of Plaintiff's

---

[17] In *Streetman*, the Fifth Circuit reviewed a district court's decision to not conduct an evidentiary hearing.  Thus, at the stage of the case, the Fifth Circuit viewed the Petitioner's allegations as true. Nonetheless, the principles discussed from the case remain the same.

interrogation. Plaintiff, however, ignores the remainder of the transcript where Defendant Marquez clarifies that "[w]e were together all the time. We were together from the beginning until the end … Not together together, but we were, I guess, together you would call it. It was me, Arbogast, and Charlie [Ortega]. We were in the same office." Def. Marquez's Test., ECF No. 379-7, at 186:11-25. Again, Plaintiff's own testimony helps resolve the extent of Defendant Arbogast's participation. Plaintiff testified that besides Defendant Marquez, "the other detectives … were not really there." Pl.'s Test., ECF No. 379-35, at 36:11-25. Plaintiff further testified that "the only detective that I just remember real clearly is Marquez" and that there were other detectives coming in and out of the room. *Id.* at 36:11-25. Plaintiff's evidence is insufficient to demonstrate that Defendant Arbogast elicited an involuntary confession.

Plaintiff similarly fails to provide sufficient evidence for the remainder of his allegations. As support for his allegation that he was yelled at by three detectives, including Defendant Arbogast, Plaintiff cites Defendant Graves's testimony. But the cited evidence never mentions yelling at Plaintiff or anything remotely close to it. *See* Def. Graves Dep., ECF No. 379-49, at 151:11-14. As support for his contention that Defendant Arbogast was present when Defendant Marquez was slapping Plaintiff, Plaintiff cites his testimony where he says that "[a]t that point he had thrown a piece of paper – the first statement he threw it away and he started to slap me around. And Arbogast had called Marquez out and so then I was left alone for a little while, about a minute or two." *Id.* at 34, 45:18-46:5. Plaintiff's statement does not specify whether Defendant Arbogast was inside or outside of the interrogation room when he asked Defendant Marquez to step outside. As previously stated, at summary judgment, the Court views the evidence in the light most favorable to Plaintiff and draws all reasonable inferences in his favor. But it is not a reasonable inference to assume Defendant Arbogast was in the interrogation room with Defendant Marquez.

A reasonable inference must be drawn from the record and not be speculative or conjectural. *Unida v. Levi Strauss & Co.*, 986 F.2d 970, 980 (5th Cir. 1993). The factual record establishes that Defendant Marquez was the primary figure during Plaintiff's interrogation and Defendant Arbogast had a limited role, and a question remains as to whether he was even involved in the interrogation. The Court would have to speculate and make unreasonable inferences to conclude that Defendant Arbogast was present when Defendant Marquez was allegedly eliciting a false confession from Plaintiff.

Plaintiff fails to provide more than a scintilla of evidence that Defendant Arbogast personally participated in eliciting his alleged coerced confession. Based on the evidence presented, a reasonable jury could not find that Defendant Arbogast was personally involved in Plaintiff's interrogation or contributed to coercing his confession. Accordingly, Defendant Arbogast is entitled to summary judgment with respect to this count.

### 3. Defendant Ortega

#### i. Constitutional Violation

Plaintiff claims Defendant Ortega is responsible for his involuntary confession because it was Defendant Ortega's responsibility to safeguard his rights, and instead of serving this role, Defendant Ortega allowed Defendant Marquez to threaten, beat, and offer false promises to obtain an involuntary confession from Plaintiff. Pl.'s Resp., ECF No. 379, at 43. Defendant Ortega argues he cannot be held liable for Plaintiff's involuntary confession because he was not personally involved in eliciting Plaintiff's confession. Def. Ortega's Mot., ECF No. 353, at ¶ 12. Defendant Ortega also claims that he did not witness Defendnant Marquez use any coercive interrogation tactics. *Id.* at ¶ 7. However, as previously explained, Plaintiff provides contrary summary judgment evidence. Plaintiff provides evidence that Defendant Marquez used coercive

interrogation tactics to elicit an involuntary confession.  Plaintiff also provides evidence that it was Defendant Ortega's responsibility to make sure this did not happen.  This confession was later used to convict Plaintiff.  As a result, there is a dispute of material fact between Plaintiff and Defendant Ortega.

### ii.    Clearly Established

Defendant Ortega argues he did not violate clearly established law and is entitled to qualified immunity.  Def. Ortega's Reply, ECF No. 393, at ¶¶ 17-18.  Specifically, Defendant Ortega argues that Plaintiff needs to provide a case, applicable in April 1993, where an officer observing a false confession was held equally liable to the interrogator who procured the false confession.  *Id.*  However, Defendant Ortega misconstrues the inquiry.  The facts before the Court do not need to be identical to the facts in the precedent clearly establishing a right.  *Lincoln v. Turner*, 874 F.3d 833, 848 (5th Cir. 2017) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004)) ("The law can be clearly established despite 'notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.").  Rather, the law must be sufficiently clear that a reasonable officer would understand that their actions violate that right.  *Scott v. Santos*, 700 F. Supp. 3d 548, 553 (W.D. Tex. 2023).  In 1993, it was clearly established that officers could not use physical violence or threats of physical violence to coerce a confession from a suspect in police custody.  *Sims*, 389 U.S. at 407.  It defies common sense to hold that a reasonable officer would understand that they cannot constitutionally use violence or the threat of violence against an interrogee, but they can facilitate another officer using violence or threats of violence against an interrogee.  A reasonable officer in Defendant Ortega's position

in 1993 would have realized that their conduct violated Plaintiff's clearly established constitutional rights.

Because there is a genuine dispute of material fact and Defendant Ortega is not entitled to qualified immunity, he is not entitled to summary judgment on this claim.

### b. False Confession (Count IV)

Fourteenth Amendment procedural due process is violated when "an involuntary confession is obtained by state officers and introduced into evidence in a criminal prosecution which culminates in a conviction." *Blackburn v. Alabama*, 361 U.S. 199, 205 (1960). Importantly, "[t]here must be coercive police activity for a finding of an involuntary confession under the Fourteenth Amendment." *Hall v. Thaler*, 504 F. App'x 269, 281 (5th Cir. 2012). Then, to determine involuntariness itself, courts consider "whether a defendant's will was overborne by the circumstances surrounding the giving of the confession. The due process test takes into consideration the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Hall*, 504 F. App'x at 280-81(quoting *Dickerson*, 530 U.S. at 434). "Important circumstances include not only the crucial element of police coercion, but the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental health." *United States v. Allouche*, No. 13-CR-420, 2014 U.S. Dist. LEXIS 194511, at *5 (W.D. Tex. Apr. 2, 2014).

### 1. Defendant Marquez

#### i.    Constitutional Violation

For the same reasons the Court found Plaintiff's confession involuntary under the Fifth Amendment, the Court finds it involuntary under the Fourteenth Amendment. *See Davis v. State of N.C.*, 384 U.S. 737, 1763-64 (1966). Further, because this confession was introduced against

Plaintiff at his criminal trial, which culminated in his conviction, Plaintiff presents sufficient evidence of this constitutional violation.

### ii. Clearly Established

It was clearly established in 1993 that introducing an involuntary confession in a state criminal prosecution that culminates in a conviction violates the Fourteenth Amendment's due process guarantee. *See Blackburn*, 361 U.S. at 206. Further, as the Court already explained, it was also clearly established in 1993 that physical violence can render a confession involuntary. Thus, for similar reasons to Plaintiff's Fifth Amendment claim against Defendant Marquez, the Court finds that Plaintiff satisfies the clearly established prong as to his Fourteenth Amendment claim. Defendant Marquez is not entitled to summary judgment on this claim.

### 2. Defendant Arbogast

#### i. Constitutional Violation

For similar reasons to Plaintiff's Fifth Amendment claim, Plaintiff fails to show that Defendant Arbogast contributed to producing Plaintiff's involuntary confession. Defendant Arbogast is entitled to summary judgment on this claim.

### 3. Defendant Ortega

#### i. Constitutional Violation

On this claim, the Court finds similarly for Defendant Ortega as it does for Defendant Marquez. Plaintiff has provided sufficient evidence that Defendant Ortega committed the constitutional violation.

### ii.    Clearly Established

For similar reasons to Plaintiff's Fourteenth Amendment claim against Defendant Marquez, the Court finds that Plaintiff satisfies the clearly established prong for his Fourteenth Amendment claim.  Defendant Ortega is not entitled to summary judgment on this claim.

### D.  Malicious Prosecution and False Arrest

### 1.  Malicious Prosecution (Count V)

Plaintiff asserts a malicious prosecution claim against Defendants Marquez, Arbogast, Graves, Ortega, Sanchez, and Loya.  However, Plaintiff's malicious prosecution claim fails to overcome the Defendant Officers' assertion of qualified immunity.  As indicated, the law must be clearly established at the time of the defendant's alleged misconduct.  In 1993, there was no clearly established law governing malicious prosecution claims.  *See Castellano*, 352 F.3d at 949. As the Fifth Circuit explained in *Castellano*, the court's precedents governing § 1983 malicious prosecution claims were "a mix of misstatements and omissions" which led to "inconsistencies and difficulties."  *Id.*  In fact, between 2003 and 2021, the Fifth Circuit did not recognize a malicious prosecution claim.  *See Guerra v. Castillo*, 82 F.4th 278, 289 (5th Cir. 2023).  Thus, the Defendant Officers here could not have violated clearly established law because there was no clearly established law to violate.  *See Castellano*, 352 F.3d at 948-49; *see also Gordy v. Burns*, 294 F.3d 722, 725–27 (5th Cir. 2002) ("It would be an understatement to say that this circuit's caselaw regarding so-called 'Fourth Amendment malicious prosecution' claims under § 1983 is both confused and confusing.").  Therefore, Plaintiff's malicious prosecution claim fails to

overcome the Defendant Officers' assertion of qualified immunity, and the Defendant Officers are all entitled to summary judgment on this claim.

### 2. False Arrest (Count VI)

The Fourth Amendment protects against arbitrary and oppressive pretrial deprivations of liberty and deprivations of liberty extending after the legal process commences. *Manuel v. City of Joliet*, 580 U.S. 357, 366 (2017). A constitutional claim for false arrest and detention requires a plaintiff to show that they were arrested and detained without probable cause. *See id.; Club Retro, LLC v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009). The standard for analyzing probable cause is whether, under the totality of the circumstances, there is a "fair probability that a crime occurred." *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999) (quoting *United States v. Antone*, 753 F.2d 1301, 1304 (5th Cir. 1985)). "The requisite 'fair probability' is something more than a bare suspicion, but need not reach the fifty percent mark." *Id.* In other words, "probable cause is established by facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019) (quoting *Club Retro*, 568 F.3d at 204)). Importantly, evidence that is known by police to be false cannot help in establishing probable cause. *See generally Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018).

### a. Clearly Established

It is Plaintiff's burden to show that the right not to be arrested without probable cause was clearly established by 1993 and 2014. For Plaintiff to show that this right was clearly established, he must identify a case in which an officer acting under similar circumstances was held to have violated the constitution. *Joseph*, 981 F.3d at 330. Plaintiff cites only one case that can make this

showing: *Franks v. Delaware*, 438 U.S. 154 (1978). However, the issue in *Franks* was whether the defendant could challenge the truthfulness of the affidavit supporting a finding of probable cause. Therefore, the case does not show an officer acting under similar circumstance who was held to have violated the Constitution. The Court is not aware of any other cases clearly establishing this right. As a result, the Defendant Officers are entitled to summary judgment on this claim.

### E. Failure to Intervene (Count VII)

Plaintiff claims Defendants Marquez, Arbogast, Graves, Ortega, Sanchez, and Loya failed to intervene and protect his constitutional rights. Pl.'s Resp., ECF No. 379, at 58. An officer is liable for failure to intervene when that officer: "(1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Joseph*, 981 F.3d at 343. "The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer." *Whitley v. Hanna*, 726 F.3d 631, 647 (5th Cir. 2013). "An officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983" under a theory of bystander liability. *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).

### 1. Clearly Established

Plaintiff bears the burden of demonstrating that it was clearly established at the time of the alleged constitutional violations that the Defendant Officers were required to intervene to protect his constitutional rights. This means that a reasonable officer at the time would have known that the Constitution required them to intervene. *Joseph*, 981 F.3d at 345 ("[W]e cannot deny qualified immunity without identifying a case in which an officer acting under similar

circumstances was held to have violated the Fourth Amendment, and without explaining why the case clearly proscribed the conduct of that individual officer."). Here, Plaintiff has not identified a single case to support his claim that a reasonable officer in 1993 would have known to intervene under these circumstances. Plaintiff's Fifth Circuit cases were published in 1994 and 1995, and the out-of-circuit cases cited by Plaintiff have distinct factual differences from this case such that a reasonable officer would not have known that the Constitution required them to intervene. Defendants Marquez, Arbogast, Graves, and Ortega are entitled to summary judgment on this claim.

Additionally, even though the Fifth Circuit cases Plaintiff cites were published in time to put Defendants Sanchez and Loya on notice, the merits of the cases would not have put them on notice that they were required to intervene. First, Plaintiff cites *Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995). In *Hale*, the court held that the defendant officers did not take reasonable measures to prevent excessive force. *Id.* at 919. Plaintiff does not allege that either Defendant Sanchez or Defendant Loya used any force against him. Plaintiff also cites *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 454 (5th Cir. 1995). There, the plaintiff brought claims against the superintendent and principal of her school for failing to protect her from sexual abuse. *Id.* at 445. Her claim was centered around her being a schoolchild at the time of the abuse. *See id.* Here, Plaintiff was an adult when Defendants Sanchez and Loya were investigating the murders. This is an important legal and factual distinction between the cases. As the Court previously discussed in detail, different standards apply when dealing with children instead of adults. As a result, Defendants Sanchez and Loya are also entitled to summary judgment on this claim.

## F.  Conspiracy (Count VIII)

Plaintiff claims Defendants Marquez, Graves, Arbogast, and Ortega conspired to fabricate evidence implicating him in the murders.  *See* Pl.'s Resp., ECF No. 379, at 45.  Plaintiff also claims Defendants Sanchez and Loya joined the previously mentioned Defendants' conspiracy when they withheld exonerating evidence.  Pl.'s Resp., ECF No. 379, at 47.

A claim for conspiracy under § 1983 is the "legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act."  *Hale*, 45 F.3d at 920.  A plaintiff bringing this claim must establish "(1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy."  *Armstrong*, 60 F.4th at 280 (quoting *Pfannstiel v. Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990)).

Fundamentally, a conspiracy is an agreement to commit an illegal act.  *See Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982).  Because conspiracies are often not susceptible to direct evidence, agreement is often shown through circumstantial evidence.  *Thomas v. New Orleans*, 687 F.2d 80, 83 (5th Cir. 1982).  Nonetheless, despite direct evidence being difficult to supply, the Fifth Circuit has held that conclusory allegations of an agreement are insufficient to survive summary judgment.  *Rodriguez v. Neeley*, 169 F.3d 220, 222 (5th Cir. 1999).  A plaintiff must develop facts showing a preceding agreement, not merely parallel conduct that can easily be interpreted as independent action.  *Jabary v. City Allen*, 547 F. App'x 600, 610 (5th Cir. 2013).

### a.  Clearly Established

Plaintiff does not even attempt to satisfy the clearly established prong of the qualified immunity analysis.  Plaintiff must show that a § 1983 conspiracy claim for using fabricated evidence was clearly established before 1993 and 2014.  *See Bledsoe v. Carreno*, 53 F.4th 589,

609 (10th Cir. 2022) ("Moreover, a § 1983 conspiracy claim for using fabricated or false evidence was clearly established well before 1999."). Plaintiff cites no cases supporting this proposition. The Court only found one case from before 2014 supporting this proposition. *See Anthony v. Baker*, 767 F.2d 657, 662 (10th Cir. 1985) (recognizing "that state and federal officers are liable under § 1983 … when they conspire to procure groundless state indictments and charges against a citizen based upon fabricated evidence or false, distorted, perjurious testimony presented to official bodies in order to maliciously bring about a citizen's trial or conviction"). The Defendant Officers are entitled to summary judgment on this claim.

### G. CONCLUSION

In accordance with the above discussion, the Court enters the following orders:

1.  It is **HEREBY ORDERED** that Defendant Hector Loya's Motion for Summary Judgment (ECF No. 352) is **GRANTED** for all Counts.

2.  It is **FURTHER ORDERED** that Defendant Ray Sanchez's Motion for Summary Judgment (ECF No. 352) is **GRANTED** for Counts II, V, VI, VII and VIII, **AND DENIED** for Count I.

3.  It is **FURTHER ORDERED** that Defendant Carlos Ortega's Motion for Summary Judgment (ECF No. 353) is **GRANTED** for Counts II, V, VI, VII, and VIII, **AND DENIED** for Counts I, III, IV.

4.  It is **FURTHER ORDERED** that Defendant Earl Arbogast's Motion for Summary Judgment (ECF No. 359) is **GRANTED** for all Counts.

5.  It is **FURTHER ORDERED** that Defendant Scott Graves's Motion for Summary Judgment (ECF No. 360) is **GRANTED** for Counts II, III, IV, V, VI, VII, and VIII, **AND DENIED** for Count I.

6.  It is **FURTHER ORDERED** that Defendant Alfonso Marquez's Motion for Summary Judgment (ECF No. 365) is **GRANTED** for Counts V, VI, VII, and VIII, **PARTIALLY GRANTED AND PARTIALLY DENIED** for Count II, **AND DENIED** for Counts I, III, and IV.

In conjunction with its opinion ruling on the City's motion for summary judgment, the Court has now ruled on all pending dispositive motions. A separate order will follow, directing the remaining parties to submit their availability for trial.

**So ORDERED and SIGNED this 22nd day of August 2025.**

**DAVID C. GUADERRAMA**
**SENIOR U.S. DISTRICT JUDGE**