**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **DANIEL VILLEGAS,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| **CITY OF EL PASO;** | § | |
| **YVONNE WHITAKER,** | § | |
| *In her capacity as the Executor of Decedent* | § | **EP-15-CV-00386-DCG** |
| *Alfonso Marquez's Estate*; | § | |
| **CARLOS ORTEGA;** | § | |
| **SCOTT GRAVES;** | § | |
| **RAY SANCHEZ; and** | § | |
| **UNKNOWN EMPLOYEES OF THE** | § | |
| **CITY OF EL PASO,** | § | |
| | § | |
| *Defendants*. | § | |

## ORDER REGARDING MOTIONS TO EXCLUDE EXPERT TESTIMONY FROM DR. RICHARD ROSENTHAL AND JEFFREY NOBLE

Before the Court are two motions to exclude expert testimony:

(1)     Plaintiff Daniel Villegas's Motion to Bar Certain Opinions of Jeffrey Noble as Unreliable and Irrelevant (the "Noble Motion") (ECF No. 342); and

(2)     Defendant City of El Paso's (the "City's") Motion to Exclude or Limit Opinions of Dr. Richard Rosenthal (the "Rosenthal Motion," together with the Noble Motion, the "Motions") (ECF No. 326).

After considering the parties' arguments, the record, and the applicable law, the Court **GRANTS** the Noble Motion and **PARTIALLY GRANTS** the Rosenthal Motion.

## I.     INTRODUCTION

This case stems from the El Paso Police Department's investigations of the 1993 murders of Robert England and Armando Lazo, for which Plaintiff was initially convicted and later

acquitted.[1]  Plaintiff alleges those investigations were flawed, used improper interrogation techniques, and ultimately led to his false confession, convictions, and nearly twenty years in prison for crimes that he didn't commit.[2]  Plaintiff therefore seeks redress via two categories of claims: (1) individual claims against the officers who led the investigations; and (2) municipal liability ("*Monell*") claims against the City.[3]

This Order focuses on the latter category.  To hold the City liable under *Monell*, Plaintiff must show that an official policy or custom adopted by the City was the moving force behind a violation of Plaintiff's constitutional rights.[4]  While there are several ways to establish such an "official policy or custom," Plaintiff alleges that the City's purported failures to train, investigate, discipline, and supervise constituted *de facto* policies or customs for *Monell* purposes.[5]

To develop those theories, Plaintiff retained Dr. Richard Rosenthal, who authored a twenty-nine page report of opinions supporting Plaintiff's *Monell* claims.[6]  The City retained its

---

[1] *See generally* 3d Am. Compl., ECF No. 153.

[2] *See generally id.*

[3] *See* 3d Am. Compl. at 46–53; *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

All page citations in this Order refer to the page numbers assigned by the Court's CM/ECF system, rather than the cited document's internal pagination.

[4] *Henderson v. Harris County*, 51 F.4th 125, 130 (5th Cir. 2022) (citing *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009)); *see also Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

[5] *See, e.g.*, 3d Am. Compl. at 41–42, 44–46.

[6] *See* Rosenthal Report, ECF No. 326-7, at 2–30.

own expert, Jeffrey Noble, who responded with a forty-nine page report of opinions rebutting Rosenthal's opinions and supporting the City's defenses.[7]

Both parties now argue that several of the opposing expert's opinions are inadmissible under the Federal Rules of Evidence.[8]  While expert opinions must satisfy various evidentiary requirements to be admissible,[9] the threshold requirement that opinions be relevant is particularly noteworthy here.[10]  That's because the Court dismissed Plaintiff's failure-to-train, failure-to-investigate, and failure-to-discipline theories after Rosenthal and Noble had already authored their reports.[11]  Consequently, various portions of those reports speak to issues that are no longer active in this case.

Failure to supervise is the only *Monell* claim left in this case, making it the measure by which the Court will assess the *Monell* testimony's relevance.  Although training, investigating, and disciplining officers could each be considered forms of supervision in a colloquial sense,[12] the focus here is narrower.  Plaintiff's surviving failure-to-supervise claim is specifically tied to the City's alleged tolerance of officer dishonesty.[13]  According to Plaintiff, the City failed to

---

[7] *See* Noble Report, ECF No. 342-1, at 1–49.

[8] *See generally* Rosenthal Mot.; Noble Mot.

[9] *See infra* Section II.

[10] *See Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir. 2003) ("Before expert testimony can be admitted under Federal Rule of Evidence 702, the district court must conduct a preliminary inquiry to ensure that the testimony is both relevant and reliable.").

[11] *Compare* Order City Mot. Summary J., ECF No. 473, at 24 (dated August 22, 2025, granting summary judgment as to failure-to-train, failure-to-investigate, and failure-to-discipline claims), *with* Rosenthal Report at 2 (dated October 28, 2022), *and* Noble Report at 49 (dated December 10, 2022).

[12] *See, e.g.*, *Henderson*, 51 F.4th at 130 (5th Cir. 2022) (treating "supervisory liability claim as encompassed in [a failure-to-train claim]").

[13] *See* Order City Mot. Summary J. at 15–21.

hold its officers accountable and exercised minimal oversight despite being aware of its officers' dishonest behavior.[14]  Coupled with the City's emphasis on clearing cases,[15] Plaintiff argues that the City fostered an environment where obtaining confessions was more important than lawful policing.[16]

These are the issues that animate Plaintiff's remaining *Monell* claim, and, thus, these are the issues that must animate the experts' testimony.  As explained below, several of the challenged opinions are inadmissible because they aren't relevant anymore.  And while the Court will permit Noble and Rosenthal to offer opinions regarding still-relevant issues, those opinions must satisfy the Federal Rules of Evidence's other admissibility requirements.

## II.      LEGAL STANDARD

"The proponent of the expert testimony has the burden of establishing its admissibility."[17] Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[14] *See* Pl. Resp. City Mot. Summary J., ECF No. 367, at 23 ("The City made a deliberate and inexplicable decision to apply ***less*** scrutiny to detectives charged with solving the highest stakes crimes."); *see also, e.g.*, Dep. Tr. Arbogast, ECF No. 386-2, at 41:8–41:15; Dep. Tr. Arbogast, ECF No. 367-24, at 67:3–18.

[15] *See* Order City Mot. Summary J. at 6.

[16] *See* Pl. Resp. City Mot. Summary J. at 4–5, 23–24.

[17] *United States v. Kuhrt*, 788 F.3d 403, 420 (5th Cir. 2015) (citing *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 276 (5th Cir. 1998)).

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[18]

Under *Daubert* and its progeny, trial courts play a gatekeeping role to ensure that expert testimony passes muster under Rule 702.[19]  To be admissible, expert testimony must (at minimum) be (A) relevant and (B) reliable.[20]

## A.    Relevance

While all testimony must be relevant to be admissible,[21] expert testimony must also be relevant "in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue."[22]  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."[23]

---

[18] FED. R. EVID. 702.

[19] *See Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016) (first citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); then citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999)).

[20] *See Moore*, 151 F.3d at 274–75.

[21] *See* FED. R. EVID. 402 ("Irrelevant evidence is not admissible."); *see also* FED. R. EVID. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

[22] *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) (citing *Daubert,* 509 U.S. at 591–92); *see also* FED. R. EVID. 702(a).

[23] *Moore*, 151 F.3d at 275 (citing *Daubert*, 509 U.S. at 591).

## B.    Reliability

As for reliability, *Daubert* provides several non-exhaustive factors to consider when assessing the admissibility of expert testimony.  Those include whether the expert's theory or technique:

(1) can be or has been tested;

(2) has been subjected to peer review and publication;

(3) has a known or potential rate of error or standards controlling its operation; and

(4) is generally accepted in the relevant scientific community."[24]

That assessment "is a flexible one"[25]—the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [their] testimony."[26]  The intent is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[27]

Trial courts "have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."[28]  Still, though, the trial court's role "is limited and is not intended to displace the adversarial process."[29]  Exclusion of expert

---

[24] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Daubert*, 509 U.S. at 593–94).

[25] *See id.* at 150 (citing *Daubert*, 509 U.S. at 594).

[26] *Kumho*, 526 U.S. at 150 (citation omitted).

[27] *Id.* at 152; *see also Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010) (quoting *Kumho*, 526 U.S. at 152).

[28] *Kumho*, 526 U.S. at 152.

[29] *See Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (citation modified); *see also Lopez v. State Farm Lloyds*, 780 F. Supp. 3d 663, 671 (W.D. Tex. 2025).

testimony is the exception rather than the rule[30]—reserved for cases in which the testimony is so fundamentally unsupported that it offers no expert assistance to the jury.[31] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[32]

## C.      Other Admissibility Requirements

Beyond relevance and reliability, expert testimony must also satisfy other admissibility requirements.  Those include the requirements that experts refrain from offering legal conclusions[33] and avoid offering testimony where the probative value is substantially outweighed by an unfairly prejudicial effect.[34]  These principles in mind, the Court turns to the Motions.

---

[30] *United States v. Perry*, 35 F.4th 293, 330 (5th Cir. 2022) (citing *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019)).

[31] *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

[32] *See Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas,* 483 U.S. 44, 61 (1987)).

[33] *See United States v. Williams*, 343 F.3d 423, 435 (5th Cir. 2003) ("Rule 704(a) 'does not allow a witness to give legal conclusions.'" (quoting *United States v. Izydore*, 167 F.3d 213, 218 (5th Cir. 1999)).

[34] *See* FED. R. EVID. 403 (permitting courts to exclude otherwise admissible relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly cumulative evidence"); *United States v. Patterson*, 431 F.3d 832, 839 (5th Cir. 2005).

## III.    DISCUSSION

**A.    The Noble Motion**

The City's *Monell* expert[35] is Jeffrey Noble, a police professional from Southern California.[36] Noble's policing career spans nearly three decades—beginning as an Officer and retiring as Deputy Chief of Police in Irvine, California.[37] He's served in several supervisory and managerial roles, which required him to (among other things) manage departmental internal affairs and investigate a wide range of policing issues.[38] Outside of his career as a police officer, Noble has been retained as an expert in hundreds of cases involving allegations of police misconduct, and he's testified in state and federal courts across the country.[39] He has also consulted on a wide range of projects and authored several publications regarding police department internal affairs practices.[40]

The City retained Noble to opine on whether its internal affairs practices conformed to generally accepted practices for police departments.[41] After reviewing the case file, Noble

---

[35] Here and below, the Court refers to Noble and Rosenthal as the parties' *Monell* experts in the sense that their opinions contemplate issues relevant to Plaintiff's *Monell* claims.

[36] *See* Noble Report at 1–2.

[37] *Id.* As Noble's report notes, he also served as Deputy Chief of Police for Westminster, California on an interim basis.

[38] *See id.*

[39] *See id.* at 2–3.

[40] *See id.* at 3–4.

Neither party challenges the other's expert's qualifications, and the Court likewise sees no reason that qualifications (or lack therof) would support excluding either Noble or Rosenthal's opinions. *See generally* Noble Mot.; Rosenthal Mot.; *see also supra* notes 36–40 and accompanying text; *infra* notes 96–100 and accompanying text.

[41] *See id.* at 15, 48.

authored a report concluding that the City's internal affairs practices were reasonable and unlikely to lead to constitutional violations.[42]

Plaintiff challenges the admissibility of Noble's opinions that:

(1)    there is no evidence that the City acted with deliberate indifference toward accepting complaints of officer misconduct;[43]

(2)    there is evidence that between 1985–1993 the El Paso Police Department conducted reasonable administrative investigations;[44] and

(3)    the City had training regarding constitutional and statutory requirements of criminal investigations.[45]

The Court will tackle each in turn.

### 1.    Deliberate Indifference

Plaintiff first challenges Noble's opinion that "[t]here is no evidence that the [City] turned a blind eye, or acted with deliberate indifference, toward accepting complaints of officer misconduct, conducting reasonable investigations[,] or imposing reasonable disciplinary actions when warranted . . . ."[46] According to Plaintiff, Noble's conclusion that the City wasn't deliberately indifferent isn't proper testimony because it's a legal conclusion.

As noted, the Court dismissed Plaintiff's failure-to-investigate and failure-to-discipline claims, leaving only Plaintiff's failure-to-supervise claim based on the City's alleged tolerance of officer dishonesty.[47] While it's true that investigating misconduct and disciplining officers are

---

[42] *See generally id.*

[43] *See* Noble Report at 39; Noble Mot. at 3.

[44] *See* Noble Report at 33; Noble Mot. at 4.

[45] *See* Noble Report at 45; Noble Mot. at 7–8.

[46] *See* Noble Report at 39; Noble Mot. at 3.

[47] *See* Order City Mot. Summary J. at 24.

sometimes considered part and parcel of proper supervision,[48] those issues are only relevant here to the extent they relate to instances of officer dishonesty.  Having dismissed Plaintiff's failure-to-investigate and failure-to-discipline claims,[49] the Court will only let Noble testify about how the City dealt with officer ***dishonesty***—not officer misconduct more generally.

Still, even assuming aspects of Noble's "deliberate indifference" opinion addressed investigating and disciplining dishonest conduct, the opinion would be inadmissible for another reason.  Although experts may "embrace an ultimate issue" to be decided by the trier of fact, they can't offer legal conclusions.[50]  Stated differently, while experts "may offer their opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied," "[they] may not testify as to whether the legal standard has been satisfied."[51]

The latter is effectively what Noble seeks to do here.  To prevail on his remaining *Monell* claim, Plaintiff must show (among other things) that the City's alleged tolerance of dishonesty amounted to "deliberate indifference" to his constitutional rights.[52]  Noble's opinion that there is "no evidence that the [City] . . . acted with deliberate indifference" is practically indistinguishable from an opinion that Plaintiff hasn't satisfied the deliberate indifference

---

[48] *See, e.g.*, *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (observing that police department "demonstrate[d] some supervision by conducting a thorough internal affairs investigation").

[49] *See* Order City Mot. Summary J. at 24.

[50] *See* FED. R. EVID. 704; *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009); *C.P. Interests, Inc. v. Cal. Pools, Inc.,* 238 F.3d 690, 697 (5th Cir. 2001).

[51] *Burkhardt v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997).

[52] *See Damond v. City of Rayville*, 127 F.4th 935, 938 (5th Cir. 2025); s*ee also, e.g.*, 5th Cir. Pattern Jury Instructions (Civil Cases) § 10.5 (2020 ed.) (requiring, among other things, a showing that "the policymaker was deliberately indifferent").

prong.[53]  Such an opinion brings the jury nothing "more than the lawyers can offer in

argument"[54] and therefore must be excluded.[55]

To be clear, the Court's ruling doesn't preclude Noble from opining on issues that will

assist the jury in determining whether the City was deliberately indifferent.  For example, as an

expert on police department internal affairs, Noble may still opine on issues like whether the City

should have been aware of a pattern (if any) of officer dishonesty.[56]  He just can't tell the jury

that, in his expert opinion, the City wasn't "deliberately indifferent."[57]

---

[53] *See Burkhardt*, 112 F.3d at 1212.

[54] *See Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (quoting *In re Air Crash Disaster at New Orleans,* 795 F.2d 1230, 1233 (5th Cir. 1986)); *see also id.* (concluding that expert was "not in a better position than a juror to conclude whether [actions] . . . constitute[d] deliberate indifference").

[55] *See Nagle v. Gusman*, No. CV 12-1910, 2016 WL 541436, at *5–6 (E.D. La. Feb. 11, 2016) (prohibiting testimony that conduct "amounted to 'deliberate indifference'"); *see also Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 1730608, at *9 (N.D. Ill. May 2, 2016) (excluding "legal conclusions that . . . the [City of Chicago Heights's] conduct amounted to 'deliberate indifference'"); *Haflich v. McLeod*, No. CV 09-161-M-DWM-JCL, 2011 WL 65877, at *5 (D. Mont. Jan. 10, 2011) ("'[D]eliberate indifference' is an element of municipal liability under § 1983 which the trier of fact is required to find.  [The] opinion stating that . . . conduct constituted 'deliberate indifference' is a legal conclusion, and improperly directs the jury as to a conclusion on an ultimate issue that is exclusively within the province of the jury."); *Cabaniss ex rel. Est. of Cabaniss v. City of Riverside*, 497 F. Supp. 2d 862, 879 (S.D. Ohio 2006) (excluding testimony that "certain actions constituted deliberate indifference" as an improper legal conclusion (citing *Berry v. City of Detroit,* 25 F.3d 1342, 1353 (6th Cir.1994))), *aff'd sub nom. Cabaniss v. City of Riverside*, 231 F. App'x 407 (6th Cir. 2007).

[56] *See* Noble Report at 48; *see also* Pl. Reply Noble Mot., ECF No. 347, at 2 ("Plaintiff does not challenge whether Mr. Noble can opine on the City's notice of misconduct or whether the City 'turned a blind eye.' . . . Nor does Plaintiff argue that expert opinions on the issue of a municipality's pattern and practice cannot be 'relevant and reliable.'").

*See also Nagle*, 2016 WL 541436, at *6 (determining that, while an expert couldn't offer an opinion as to whether conduct amounted to deliberate indifference, they could testify regarding whether conduct conformed to the applicable standard of care); *Jimenez v. City of Chicago*, 732 F.3d 710, 721–22 (7th Cir. 2013) ("Expert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards" were severe enough to meet certain legal thresholds.).

[57] *See Woods v. Lecureux,* 110 F.3d 1215, 1219 (6th Cir. 1997) (affirming trial court's decision to prohibit expert witness from using the term "deliberately indifferent" to describe defendants' conduct).

### 2.      Administrative Investigations

Plaintiff next challenges Noble's opinion that "[t]here is evidence that between 1985–1993 the [City] conducted reasonable administrative investigations."[58]  According to Plaintiff, that opinion is unreliable and, thus, inadmissible.

### a.  Relevance

Before addressing Plaintiff's reliability arguments, the Court will first consider whether the challenged opinion is still relevant.[59]  As noted above, Plaintiff's surviving *Monell* claim focuses on whether the City tolerated dishonesty among its officers.[60]  Testimony regarding the quality of the City's administrative investigations could inform that claim, but only to the extent those investigations concerned officer dishonesty.[61]  Testimony regarding how the City dealt with other allegations of officer misconduct—for instance, using profane language[62]—wouldn't "logically advance" the jury's understanding of how the City addressed dishonesty among its

---

[58] *See* Noble Motion at 4 (citing paragraphs 18 through 26 of Noble's report).

[59] The City hadn't yet moved for summary judgment when the Parties finished briefing the Motions.  *Compare* City Mot. Summary J. (filed Apr. 19, 2023), *with* City Reply Rosenthal Mot., ECF. No. 344 (filed Mar. 20, 2023), *and* Pl. Reply Noble Mot. (filed Apr. 10, 2023).  Thus, the parties' briefs don't address how the Court's subsequent order dismissing several of Plaintiff's claims affects the relevance of their respective experts' opinions.

[60] *See supra* notes 12–16 and accompanying text.

[61] *See id*.

*See also Daubert*, 509 U.S. 579, at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (citation modified)).

[62] *See, e.g.*, Noble Report at 34 (identifying instances where "[o]fficer[s] were investigated and disciplined for unprofessional conduct like the use of profanity and rudeness").

ranks.[63]  In fact, allowing Noble to testify about any administrative investigation regardless of

the nature of the allegation would more likely confuse the jury about what is and isn't relevant.[64]

Much of Noble's discussion regarding the City's administrative investigations isn't

relevant to the City's alleged tolerance of dishonesty.  For example, Noble identifies ten

categories of investigations that, in his opinion, support the conclusion that "the [City] conducted

reasonable investigations and held officers accountable for their acts of misconduct."[65]  Of those

categories, the only one that's obviously relevant to Plaintiff's remaining claim is what Noble

characterizes as investigations where "[o]fficers were investigated and disciplined for untruthful

statements."[66]  The investigations falling into the other nine categories concerned issues ranging

from failures to properly book evidence items to instances of physical abuse.[67]  Unless they also

---

[63] *See Reitz v. City of Abilene*, No. 1:16-CV-0181-BL, 2018 WL 6181493, at *5 (N.D. Tex. Nov. 27, 2018) ("Relevant expert testimony logically advances a material aspect of the case and aids the trier of fact in resolving a factual dispute given its connection to the facts of the case." (citing *Daubert*, 509 U.S. at 591)); *see also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 n.2 (10th Cir. 2005) ("Under the relevance prong of *Daubert*, the court must ensure that the proposed expert testimony logically advances a material aspect of the case.").

*See also supra* notes 12–16 and accompanying text (explaining scope of Plaintiff's failure-to-supervise claim).

[64] *See United States v. Naidoo*, 995 F.3d 367, 375 (5th Cir. 2021) (affirming exclusion of expert testimony where "risk of jury confusion caused by [the subject testimony] outweighed its probative value"); *see also Thompson v. City of Chicago*, 472 F.3d 444, 456 (7th Cir. 2006). ("Evidence is considered unfairly prejudicial, not merely because it damages the opposing party's case, but also because its admission makes it likely that the jury will be induced to decide the case on an improper basis.").

[65] *See* Noble Report at 33–34.

[66] *See id.* at 34.

[67] *See id.* ¶ 18(a)–(e), (g)–(j).

contemplated officer dishonesty,[68] Noble's testimony regarding those investigations isn't relevant here.

Noble also supports his opinion with statements from witnesses who worked in or around the El Paso Police Department in the years leading up to the England and Lazo investigations.[69] Those statements support the notion that the City had no reason to believe that its officers were engaging in various types of misconduct—namely physical abuse, intimidation, and coercion.[70] As with the administrative investigations, the Court won't let Noble discuss these statements unless they speak to whether the City tolerated officer dishonesty.

With that scope of relevance, the Court turns to reliability.

### b. Reliability

The essence of Plaintiff's reliability arguments is that Noble didn't show his work. According to Plaintiff, "Noble [didn't disclose] a single opinion about **why** the administrative investigations that the [City] conducted were reasonable," but instead merely listed "the

---

[68] *See, e.g.*, Order City Mot. Summary J. at 18 (citing Incident Report, ECF No. 367-63) (identifying incident in which "[a]n officer was accused of choking a juvenile in custody and another officer testified falsely in his report about the events").

[69] *See* Noble Report at 34–39.

[70] *See id.* ¶ 19 (witness "never became aware of credible information [that] any of these officers were engaged in . . . abuse of suspects, coercion of suspects or witnesses to provide statements or confessions"); *id.* ¶ 20 (witness "did not have information or evidence concerning the use of any threats, physical or mental in nature, being used to obtain statements or confessions"); *id.* ¶ 21 (witness "did not have information or evidence of any coercion, physical or mental in nature, being used to obtain statements or confessions"); *id.* ¶ 22 (witness "did not have credible information or evidence of any coercion, physical or mental in nature, being used[ ] to obtain statements or confessions"); *id.* ¶ 23 (witness "did not have information or evidence of any coercion, physical or mental in nature, being used to or other abusive conduct by our investigators"); *id.* ¶ 24 (witness "did not have credible information or evidence of any coercion, physical or mental in nature, being used to obtain statements or confessions").

categories of investigations that were conducted and whether discipline was imposed."[71]  These types of opinions, Plaintiff argues, are too conclusory to be reliable.  The Court agrees.

"[A]n expert's testimony must be reliable at every step"—that requires, among other things, that the expert provide "the link between the facts and [their] conclusion."[72]  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[73]  Put differently, experts can't connect the facts at issue and their opinions using only their say-so.[74]  Here, while Noble seeks to opine that the City's administrative investigations were reasonable, his report doesn't offer any explanation as to how he came to that conclusion.[75]  His analysis instead consists of (1) his ultimate conclusion, followed by (2) broad references to the various internal affairs files he reviewed in coming to that conclusion, without discussing what any given investigation entailed.[76]

---

[71] *See* Noble Mot. at 5.

[72] *Macy v. Whirlpool Corp.*, 613 F. App'x 340, 344 (5th Cir. 2015) (citing *Knight v. Kirby Inland Marine, Inc.,* 482 F.3d 347, 354–55 (5th Cir. 2007)).

[73] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[74] *See Caballero v. Archer*, No. SA:04-CV-561-OG, 2007 WL 9702869, at *1 (W.D. Tex. Feb. 1, 2007) (determining that expert's opinions were unreliable where "there [was] nothing to connect the facts to his conclusions, other than his say so").

[75] *See generally* Noble Report; *see also Janssen v. Allstate Vehicle & Prop. Ins. Co.*, No. SA-21-CV-00750-JKP, 2022 WL 2293910, at *3 (W.D. Tex. June 24, 2022) (excluding opinions where the court was "left guessing as to the facts and analysis underlying [the] opinions, and [the] opinions represent[ed] nothing more than conclusory opinions that w[ould] not assist the trier of fact").

[76] *See* Noble Report at 33–34.

The City argues that Noble offered the bases for this opinion at deposition.[77]  Plaintiff

replies that the City can't use Noble's deposition testimony to fix deficiencies is his report, citing

cases construing expert disclosure obligations under Federal Rule of Civil Procedure 26.[78]  After

comparing Noble's report with his deposition, the Court tends to agree with Plaintiff—there is

little (if anything) tethering Noble's investigation-related deposition testimony to his report,

which is a problem under Rule 26.[79]  The trouble, however, is that Rule 26's disclosure

obligations and the consequences of a party's failure to abide by those obligations are distinct

from *Daubert*'s reliability analysis.[80]  And because Plaintiff framed the Noble Motion

exclusively as a *Daubert* challenge, neither party's briefs address the considerations relevant to

excluding opinions for non-compliance with Rule 26.[81]

Nonetheless, the Court need not conduct a Rule 26 analysis because, even considering

Noble's deposition testimony, that testimony doesn't suffice to fill the analytical gaps in his

---

[77] *See* City Resp. Noble Mot. at 11 (citing Dep. Tr. Noble, ECF No. 342-2, at 40–41, 46–47, & 47–49).

[78] Pl. Reply Noble Mot. at 5–6.

[79] *See Koenig v. Beekmans*, No. 515CV00822RCLRBF, 2018 WL 297616, at *3 (W.D. Tex. Jan. 4, 2018) (noting that while Rule 26(a)(2) "contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report, the rule does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony." (citation modified)).

[80] *See, e.g.*, *Barnes v. BTN, Inc.*, 555 F. App'x 281, 284 (5th Cir. 2014), *as revised* (Feb. 10, 2014) (characterizing failure to comply with Rule 26 and lack of reliability under *Daubert* as "two alternative grounds" for exclusion of expert opinions).

[81] Under Rule 37(c)(1), the presumptive sanction for failing to comply with Rule 26(a)(2)'s disclosure obligations is "to exclude or limit the expert's testimony unless the failure was substantially justified or harmless."  *See Honey-Love v. United States*, 664 F. App'x 358, 362 (5th Cir. 2016) (citing Fed. R. Civ. P. 37(c)(1)).  Whether that "presumptive sanction" is appropriate hinges on a four-factor test. *See In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 372 (5th Cir. 2016) (articulating factors to consider before excluding evidence under Rule 37(c)(1)).

report.[82]  For one, Noble's deposition testimony focuses heavily on disciplinary decisions, which

the City argues Noble relied upon to form his investigative opinions.[83]  The Court, however,

rejects the premise that disciplinary practices provide a reliable basis to opine on investigatory

practices.  The mere fact that the City disciplined an officer in response to an allegation of

misconduct doesn't provide any information as to how the City determined that the allegation

was substantiated.  Severe discipline, by itself, isn't proof that the City conducted a thorough

investigation that revealed misconduct.  Conversely, minimal or no discipline isn't proof that the

City conducted a thorough investigation that didn't reveal misconduct.

Moreover, even where Noble was asked about specific investigations, his testimony

offered little additional insight into his opinions.[84]  Like his report, Noble's testimony is strewn

with unexplained conclusions related to the reasonableness of the City's administrative

---

[82] *See Schott v. Bexar Cnty., Texas*, No. 5:23-CV-00706-OLG-RBF, 2025 WL 2375649, at *7–10 (W.D. Tex. Aug. 14, 2025) (determining that "deposition testimony [did] not sufficiently address the Court's [reliability] concerns" where expert's report failed to identify the bases of their opinions).

*Cf. Joiner*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

[83] *See* City Resp. Noble Mot. at 11 ("Noble relied not only on the investigative files themselves, but [also] on the severity of discipline imposed."); *see also id.* ("This is the overall basis of his opinions related to the internal investigations and directly relates to the reasonableness of adequacy of the investigations and *resulting discipline*. His analysis further involved opining on the specific *reasonableness of discipline* in many of the specific investigations he reviewed." (emphases added)); *id.* ("Noble opined, in reviewing the internal investigations, that the El Paso Police Department investigated allegations of untruthfulness and *appropriately disciplined officers* for their misconduct in a manner that was *consistent with disciplinary actions* in other police departments during that time period." (emphases added)).

*See also, e.g.*, Noble Dep. Tr. at 27 ("[Q.] [I]s it your opinion that of the different factors you used to determine if an investigation was reasonable, generally how much discipline was imposed is not one of the main factors  you consider?  [A.] I don't think there's any one main factor. I think that there's a lot of factors.  It's certainly something you would look at to see whether it was reasonable or not.").

[84] *See* Noble Dep. Tr. at 21–24 (discussing CP 90-049); *id.* at 25–26, 52 (discussing IA 85-157); *id.* at 33–37, 48–49 (discussing CP 90-214); *id.* at 38–40, 52 (discussing IA 92-019).

-17-

investigations.  In evaluating one investigation, Noble concluded that he didn't "recall that there would have been any other steps [that the City] could have taken."[85]  Reviewing another, he concluded that "there's really no way" for the department to tell whether an officer was telling the truth.[86]  The problem with these conclusions isn't that Rosenthal determined that there was nothing more for the City to do, but rather that he failed to explain what the City *did* do.  Yet, other portions of Noble's deposition testimony suggest that "what the City did do" wasn't important as long as some level of investigation occurred:[87]

- "I don't -- I don't understand what's happening, what -- what -- what -- what actually occurred here, and I just -- you know, I would assume that, you know, [the subject officer complaint] -- it references an IA number.  It looks like there was an investigation";[88] and

- "It's -- you know, the fact that you don't list every possible violation [in an internal affairs report], you know, isn't as concerning to me as is that the investigation itself is actually conducted."[89]

Of course, whether an investigation occurred and the reasonableness of a given investigation are distinct issues—the latter requires some degree of explanation beyond "it happened."

The closest Noble gets to explaining how the City's investigative practices were reasonable is in (1) discussing what steps he considers important to a reasonable administrative

---

[85] *Id.* at 52 ("[Q.]  My question was just if your testimony is that the investigators in that case could not have done anything else to test whether he had made an intentional lie.  [A.]  Yeah, I -- I don't recall that there would have been any other steps they could have taken.").

[86] *Id.* at 49 ("[Q.]  In an investigation like that where [the officer is] working alone, is there any way for the department to decide whether or not that's the truth or whether or not he was just lying? . . . [A.]  Yeah, there's really no way.").

[87] While these portions of testimony focused at least in part on disciplinary decisions, Noble often discussed discipline in tandem with investigative quality.  *See supra* note 83 and accompanying text.

[88] Noble Dep. Tr. at 26; *see also id.* ("[The complaint discussed in IA 92-019] has an IA number, so it was investigated.").

[89] *Id.* at 35.

investigation;[90] and (2) responding to hypothetical questions about how certain investigative steps would have impacted his conclusions.[91]  But, again, without meaningfully addressing the steps that the City actually took, the assertion that the City's administrative investigations were reasonable is held together only by Noble's say-so.[92]

Simply put, Noble's report and deposition testimony leave far too great an analytical gap between the facts he relied upon and the conclusions he drew.  Failing to offer more than his say-so, the Court won't permit Noble to opine on the reasonableness of the City's administrative investigations at trial.

### 3.      Training

Finally, Plaintiff challenges Noble's opinion that "the [City] had training regarding *Brady* materials, and constitutional and statutory requirements of criminal investigations."[93]  Like the failure-to-investigate and failure-to-discipline claims, the Court dismissed Plaintiff's failure-to-train claim on the City's motion for summary judgment.[94]  Unlike those claims, though, whether

---

[90] *See, e.g.*, *id*. at 40.

[91] *See, e.g.*, *id*. at 49 ("[Q.]  *If* that investigative file actually shows that somebody went into the office and looked for blood and didn't find it and filed a supplemental report, what's your analysis in terms of investigative quality?" (emphasis added)); *id.* ("[Q.]  *If* they took statements from individuals at the jail when the person was returned to the jail about injuries, what's your analysis about that as -- in terms of investigative quality?" (emphasis added)); *id.* at 40 ("[Q.]  So could they have conducted a reasonable investigation without attempting to interview Detective Marquez?").

[92] *See supra* note 74 and accompanying text; *see also Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) ("[W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." (citing *Viterbo*, 826 F.2d at 424)).

*Cf. Thomas v. City of Chattanooga*, 398 F.3d 426, 431 (6th Cir. 2005) ("We agree with the district court's finding that [expert's] opinion was conclusory because he did not explain how he drew his conclusions from the list of complaints made against the Department.").

[93] *See* Noble Mot. at 7–9.

[94] *See* Order City Mot. Summary J. at 24.

the City properly trained its officers isn't relevant in any capacity to Plaintiff's surviving failure-to-supervise claim.[95]  For that reason, the Court will preclude Noble from offering opinions regarding the City's training materials.

*****

In sum, none of the above three opinions satisfy the Rules of Evidence's admissibility criteria.  The Court will therefore preclude Noble from testifying that (1) there is no evidence the City acted with deliberate indifference, (2) the City's administrative investigations were reasonable, and (3) the City provided training materials to its officers.

## B.    The Rosenthal Motion

Plaintiff's *Monell* expert is Dr. Richard Rosenthal.  Rosenthal is an expert in police department internal affairs with nearly three decades of varied experience.[96]  He began his career a deputy district attorney in Los Angeles, California, where he acted as the primary liaison to the Los Angeles Police Department's Internal Affairs Division.[97]  Thereafter, Rosenthal transitioned through various roles monitoring departmental internal affairs, including in Portland, Oregon; Denver, Colorado; and British Columbia, Canada.[98]  As far as his CV shows, he currently consults for government organizations across the country.[99]  Rosenthal has also spent decades

---

[95] *See, e.g.*, Order City Mot. Summary J. at 15 (noting that "Plaintiff's failure to supervise claim is distinct from his failure to train claim"); *Jackson v. Nassau County*, 552 F. Supp. 3d 350, 378 (E.D.N.Y. 2021) (characterizing failure to train and failure to supervise as "two distinct theories").

Whereas the City's administrative investigations and disciplinary practices are still relevant to the extent they relate to officer dishonesty, *see supra* Section III.A.2.a, there isn't a dishonesty-focused failure-to-train theory.

[96] *See* Rosenthal CV, ECF No. 326-7, at 31–36.

[97] *See id.* at 33.

[98] *See id.* at 32–33.

[99] *See id.* at 31–32.

-20-

teaching, authoring publications, and serving on boards regarding the issue of law enforcement oversight.[100]

Plaintiff retained Rosenthal to offer opinions regarding the City's internal affairs processes and supervision. After reviewing various internal affairs files, Rosenthal concluded that the City's internal affairs and supervisory practices were deficient.[101] The City challenges the following opinions:

(1)  Systemic deficiencies in the City's internal affairs processes were likely to cause constitutional violations such as those alleged by Plaintiff;[102]

(2)  The City failed to adequately supervise its officers, which would be expected to cause constitutional violations such as those alleged by Plaintiff;[103] and

(3)  The City had notice that its officers were failing to observe juvenile policies, and, absent auditing or monitoring, it was foreseeable that those failures to observe juvenile policies could cause constitutional violations such as those alleged by Plaintiff.[104]

### 1.    Systemic Deficiencies in Internal Affairs Processes

The City first lodges a bevy of objections to Rosenthal's critiques of its internal affairs practices—arguing that "[h]is opinions in this area are unreliable; conclusory; speculative[;] irrelevant[;] and highly prejudicial and thus inadmissible."[105]

---

[100] *See id.* at 33–36.

[101] *See generally id.*

[102] *See* Rosenthal Report at 27; Rosenthal Mot. at 6–15.

[103] *See* Rosenthal Report at 27–28; Rosenthal Mot. at 15.

[104] *See* Rosenthal Report at 28–29; Rosenthal Mot. at 15–17.

[105] Rosenthal Mot. at 7.

**a.    Relevance**

The Court will again evaluate relevance first.  As above, the primary question here is whether Rosenthal's internal affairs opinions go to active or defunct claims.  The answer is "It depends."

Rosenthal's internal affairs opinions focus on how police departments should investigate and discipline officer misconduct.[106]  Those issues, however, are only relevant to the extent they address issues of officer dishonesty, which is the focus of Plaintiff's failure-to-supervise claim.[107]  Testimony regarding how the City investigated and disciplined other forms of misconduct wouldn't offer any meaningful information on how the City dealt with officer dishonesty.

Most of Rosenthal's internal affairs opinions meet this scope of relevance.  Take, for example, the opinions that Rosenthal lists in the "Conclusions" section of his report:

> [Q.]    Were there systemic deficiencies in the El Paso Police Department's Internal Affairs practices?
>
> [A.]    Yes. A review of the defendant-officer internal affairs files indicates a practice of failing to investigate ***untruthful statements*** and ***integrity-related violations*** against El Paso Police Department officers.
>
> [Q.]    If yes, is it likely that those deficiencies would cause constitutional violations such as those alleged by Daniel Villegas? Is it likely that those deficiencies would cause wrongful convictions?
>
> [A.]    Yes.  The defendant-officers had no reason to believe that the Department would hold them accountable for any ***false statements*** or ***integrity-related violations***. . . . For a Detective who

---

[106] *See* Rosenthal Report at 3; *see also Internal Affairs*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A division or bureau within a department, usu. one in charge of investigating allegations of misconduct or the mishandling of bureaucratic matters.").

[107] *See supra* Section III.A.2.a.

> believes that it is permissible to **lie** during the course of an internal investigation, it is only a small step to engage in Constitutional violations and lie about those actions in the pursuit of street justice . . . .[108]

These opinions go squarely to the issue of officer dishonesty.

Other opinions, however, don't—the most obvious examples being Rosenthal's critiques of investigations and disciplinary actions that, as far as the Court can tell, had nothing to do with officer dishonesty.[109] The Court will exclude testimony on issues unrelated to the City's alleged tolerance of dishonesty as irrelevant.

### b.    Reliability

Having considered which of Rosenthal's internal affairs opinions are still relevant, the Court now turns to reliability. Despite the various ways in which the City characterizes its objections,[110] those objections largely go to the reliability of Rosenthal's opinions.

Preliminarily, the Court finds that the *Daubert* factors are a poor proxy for reliability here.[111] That's because—in comparison to scientific testimony—testing, peer review, error rate, and scientific acceptance don't apply as neatly to testimony regarding internal affairs

---

[108] Rosenthal Report at 28 (emphases added).

[109] *See, e.g.*, Rosenthal Report at 7 (discussing failures to report for duty and traffic violations); Rosenthal Report App'x 2, ECF No. 326-7, at 39 ("'Investigation' appears to ignore allegation of **excessive force** at booking. Findings are conclusory. Lack of a complete investigation sends message to officers that **excessive force** complaints will not be treated seriously." (emphases added)).

[110] *See supra* note 105 and accompanying text.

[111] *See Black v. Food Lion, Inc.*, 171 F.3d 308, 311–12 (5th Cir. 1999) ("In the vast majority of cases, the district court first should decide whether the factors mentioned in *Daubert* are appropriate. Once it considers the *Daubert* factors, the court then can consider whether other factors, not mentioned in *Daubert,* are relevant to the case at hand.").

practices.[112]  The Court will therefore apply a more flexible analysis aimed at ensuring that

Rosenthal has employed "the same level of intellectual rigor that characterizes the practice of an

[internal affairs] expert."[113]

The record indicates that Rosenthal has extensive experience in internal affairs—so much

so that he's been retained by municipalities across the country to assist with developing systems

for ensuring policing accountability.[114]  Here, Rosenthal evaluated the quality of the City's

internal affairs practices in light of his experience, nationwide standards, and literature on

internal affairs-related issues.[115]  That evaluation involved reviewing internal affairs files,

personnel files, and deposition transcripts and preparing hundreds of pages of workpapers

documenting (1) various allegations lodged against City officers, (2) the City's investigative

---

[112] *Kumho,* 526 U.S. at 150 ("[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.").

*See also Trs. of Chi. Painters & Decorators Pension, Health & Welfare v. Royal Int''l Drywall & Decorating, Inc.*, 493 F.3d 782, 787–88 (7th Cir. 2007) ("[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." (citation modified).

[113] *See id.* at 152; *see also Williams v. BP Expl. & Prod., Inc.*, 143 F.4th 593, 598 (5th Cir. 2025) ("The 'Daubert factors' that the court may use to analyze reliability are not a 'definitive checklist or test,' and that analysis is flexible." (citation modified))

*Cf. Tyus v. Urb. Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) ("Social science testimony, like other expert testimony . . . must be tested to be sure that . . . [their] court testimony 'adheres to the same standards of intellectual rigor that are demanded in [their] professional work.'" (citation modified)); *Walden v. City of Chicago*, 755 F. Supp. 2d 942, 953 (N.D. Ill. 2010) (characterizing whether a police practices expert "adhered to the same standards of intellectual rigor that are demanded in his professional work" as the "fundamental question in determining whether [his] methodology [was] reliable" (citation modified)).

[114] Rosenthal CV at 31–32.

[115] *See* Rosenthal Report at 5–6 ("Methodology"); Dep. Tr. Rosenthal 25:13–27:15 (discussing standards used for "conclusions about the deficiencies and [the City's] Internal Affairs files"); 33:11–35:13 (discussing methodology for evaluating a department's "history and performance" in investigating misconduct).

findings, and (3) the discipline (if any) that the City imposed.[116]  As he reviewed those materials, he also "created a survey instrument to document specific issues and concerns that [he] identified during [his] review."[117]  And, per his report, those "issues and concerns" informed his opinion that there were systemic deficiencies in the City's internal affairs practices.[118]

Rosenthal further opined that the City had fostered an environment that was "likely . . . [to] cause constitutional violations such as those alleged by Plaintiff."[119]  He centers that opinion around the concept of "noble cause corruption," which he describes as the idea that officers may "do bad things because they believe that the outcomes will be good."[120]  According to Rosenthal, "[t]he literature is replete with examples of how a police department's failure to ensure integrity and accountability can lead to corrupt activities"[121]—and, indeed, he cites a wide range of source materials supporting that proposition.[122]  Between the City's purportedly deficient internal affairs

---

[116] *See* Rosenthal Report at 5–6 (explaining review of internal affairs and personnel files); Dep. Tr. Rosenthal at 254:11–255:14 (agreeing that he "reviewed the deposition transcript[s] of John Scagno, Reginald Moton, and Joseph Messer"); Workpapers, ECF No. 326-7, at 69–308.

[117] Rosenthal Report at 5; Rosenthal Report App'x 1, ECF No. 326-7, at 38–68.  Although titled "Appendix 2," the Court interprets the materials at ECF No. 326-7, pages 38 through 68 to be the "survey instrument" that Rosenthal references.

*See also Andersen v. City of Chicago*, 454 F. Supp. 3d 808, 813 (N.D. Ill. 2020) (requiring police practices expert to "explain how he reache[d] his conclusions—either by linking them to generally accepted standards in the field or by citing information within his own practical experience" (citation modified)).

[118] *See* Rosenthal Report at 28.

[119] *See id* at 28.

[120] *See id.* at 26.

[121] *Id.* at 29, n.43.

[122] *Id.*; *see also id.* at 25–27, n.28–41 (citing, among other sources, academic journals, DOJ reports, and ethics publications); Dep Tr. Rosenthal at 304:2–307:4 (discussing literature supporting conclusion that the City's internal affairs practices "substantially increase[d] the risk that officers w[ould] engage in [corrupt activities]").

practices and its apparent emphasis on clearing cases,[123] Rosenthal concluded that the City

"appeared to have no interest in minimizing the risk of Noble Cause corruption in its ranks."[124]

While Rosenthal's methodologies are not easily testable under *Daubert*'s factors,[125] they're

consistent with those commonly used by internal affairs experts and accepted by courts.[126]

Nearly all of the City's arguments to the contrary focus on the bases of Rosenthal's

opinions—spanning from contentions that Rosenthal didn't review enough material to arguments

that he considered the wrong material.  As explained below, those arguments go to the weight of

Rosenthal's testimony and, thus, don't warrant exclusion.

### i.    Familiarity with Plaintiff's Allegations

The City begins by challenging Rosenthal's command of the facts.[127]  Rosenthal testified

at his deposition that he "was not asked to specifically look at the specific . . . allegations made

by plaintiff against the defense."[128]  That's a problem, the City argues, because some of

---

[123] *See id*. at 23–25.

[124] Rosenthal Report at 27–28; *see also id.* at 28 ("For a Detective who believes that it is permissible to lie during the course of an internal investigation, it is only a small step to engage in Constitutional violations and lie about those actions in the pursuit of street justice ('Noble Cause Corruption').").

[125] *See* Rosenthal Mot. at 10 (arguing that "Rosenthal supplies no peer review for [his] assertions").

[126] *See, e.g.*, *Mills v. City of Philadelphia*, No. CV 14-593, 2024 WL 1253688, at *5 (E.D. Pa. Mar. 22, 2024) (finding police department internal affairs testimony reliable where expert "reache[d] [his] opinions by applying his decades of experience in law enforcement, training and skills to the facts of th[at] case based upon materials from the record"); *Jefferson v. Lias*, Civ. No. 15-1086, 2022 WL 4550144, at *8 (D.N.J. Sept. 28, 2022) (finding municipal liability expert's opinions reliable because they were based on "an analysis of the deposition testimony and documentary evidence produced in th[at] case—including hundreds of pages of [Crimes Against Persons] investigation reports and [police department] internal affairs statistics—as well as his considerable law enforcement experience").

[127] *See* Rosenthal Mot. at 7–8.

[128] *Id.* at 7; *see also* Dep. Tr. Rosenthal at 11:9–25.

Rosenthal's opinions relate to whether the City was deliberately indifferent to the risk of constitutional violations, which Plaintiff intends to show through a pattern of similar incidents.[129] In other words, the City contends that Rosenthal can't opine on whether there were other "similar" incidents because he isn't familiar with the incident involving Plaintiff.[130]

But while Rosenthal didn't specifically review "how [Plaintiff] was handled as a juvenile suspect or witness,"[131] that doesn't mean he's unfamiliar with Plaintiff's claims.  Plaintiff didn't retain Rosenthal to opine on whether a constitutional violation occurred *on this particular occasion*.[132]  Rosenthal's role was to evaluate whether the City's internal affairs practices were (1) deficient, and (2) likely to cause the types of constitutional violations that Plaintiff alleged.[133] That required him to "read the complaint for context" to understand what Plaintiff was alleging against the City.[134]  He did—even providing a summary of Plaintiff's allegations in his report.[135] The suggestion that Rosenthal isn't familiar enough with the facts to reliably opine is simply

---

[129] *See* Rosenthal Mot. at 7–8; *see also Armstrong v. Ashley*, 60 F.4th 262, 277 (5th Cir. 2023) ("A plaintiff may show deliberate indifference by demonstrating . . . that . . . the 'municipality had notice of a pattern of similar violations . . . .'"); Pl. Resp. City Mot. Summary J. at 36 (arguing that Rosenthal "could determine whether the City had notice of violations based on a pattern of documented violations" (citation modified)).

[130] *See* Rosenthal Mot. at 7 ("[Dr. Rosenthal] did not even do a sufficient review of the underlying conduct he's supposed to be using as a comparator for pattern, practice, or custom.").

[131] Dep. Tr. Rosenthal at 235:11–236:1.

[132] *See* Rosenthal Report at 3–4.

[133] *Id.* at 3; *see also* Pl. Resp. Rosenthal Mot. at 16 ("Dr. Rosenthal's opinion focuses on the policies and practices of the El Paso Police Department, not the facts of the murder investigation.").

[134] Dep. Tr. Rosenthal at 259:19–260:3.

[135] *See* Rosenthal Report at 4–5 ("Plaintiff's Allegations").

unsupported.  If the City believes there are gaps in Rosenthal's knowledge, it can address those issues on cross examination.[136]

### ii.    Reliance on Later-Developed DOJ Standards

The City next argues that Rosenthal's internal affairs opinions are flawed because they're based in part on Department of Justice ("DOJ") standards that post-dated the relevant events in this case.[137]  On that basis, the City seeks to preclude Rosenthal from testifying about:

- "what a reasonable police chief or police official would do [when] investigating" officer complaints;

- the importance of making and recording credibility determinations "if the department is going to adequately investigate" officer complaints; and

- why departments should "not simply accept an officer's statement as true" when investigating officer complaints.[138]

But while DOJ materials no doubt played an important role in Rosenthal's experience,[139] he explained at deposition that he endeavored not to hold the City to modern standards in forming his opinions:

---

[136] *See Ramirez v. Escajeda*, No. EP-17-CV-00193-DCG, 2021 WL 1131721, at *25 (W.D. Tex. Mar. 24, 2021) ("Neither *Daubert* nor the Federal Rules of Evidence requires an expert to review all of the facts, only a 'sufficient' amount is required." (quoting *Hoskins v. Gunn Trucking*, No. 4:07-CV-72 JD, 2010 WL 4000123, at *34 (N.D. Ind. Oct. 12, 2010))).

*Cf. Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) ("Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." (citation modified)).

[137] *See* Rosenthal Mot. at 8 (arguing that "*Monell* liability is necessarily focused on what the City policymaker knew prior to the alleged incident, not based on standards that were developed later").

[138] *See* Dep. Tr. Rosenthal, ECF No. 326-1, at 120:15–121:21; *see also* Rosenthal Mot. at 8 (citing Dep. Tr. Rosenthal at 120:15–121:21).

[139] *See, e.g.*, Dep. Tr. Rosenthal at 34:4–21 (discussing standards to "evaluate a department's history and performance" "on behalf of a client or the [DOJ]").

> [A] very important aspect of my review, was I had to very carefully make sure that I was not trying to put 2020 values on . . . my recommendations and recognize this did happen quite a long time ago, and in fact, I started my career as a prosecutor in 1986. So, yes, I'm aware [the subject internal affairs files] are 30 years old, and I tried not to evaluate the department against [his 2020 values].[140]

If the City doubts Rosenthal's testimony, it can tease out what role later-developed standards played in his opinions on cross-examination.[141] Those doubts, however, don't render Rosenthal's opinions unreliable.[142]

### iii.    "Monday Morning Quarterbacking"

The same is true of the City's concerns regarding Rosenthal's supposed "Monday morning quarterbacking 20-years-later second guessing . . . the level of discipline imposed."[143] As the quote suggests, these opinions relate to whether the City properly disciplined its officers for dishonest behavior.[144] The City argues that Rosenthal's conclusions are unsupported because its internal affairs files "showed thorough investigation and discipline."[145] To that point, the City

---

[140] *Id.* at 151:16–23.

[141] *See supra* note 32 and accompanying text.

[142] *See, e.g.*, *United States v. Taylor*, No. 4:17-CR-9, 2018 WL 4760328, at *2 (E.D. Tex. Sept. 27, 2018), *aff'd sub nom. United States v. Lee*, 966 F.3d 310 (5th Cir. 2020) (determining that expert testimony "appear[ed] to be relevant and reliable" despite relying on "articles published after the" defendant was indicted).

[143] *See* Rosenthal Mot. at 11–13.

[144] *See id.* at 12 (identifying various portions of Rosenthal's deposition testimony addressing the discipline imposed in connection with officer complaints).

While the City's brief addresses Rosenthal's investigation and discipline opinions more generally, *id.* at 11–13, the Court considers those opinions (and the City's arguments) to the extent they relate to officer dishonesty. *See supra* notes 12–16 and accompanying text.

[145] *See id.*

cites several portions of Rosenthal's deposition testimony where he agreed that certain internal affairs investigations and disciplinary decisions didn't concern him.[146]

These arguments again go to the weight of Rosenthal's opinions rather than admissibility. As explained above, Rosenthal formed his opinions after reviewing dozens of internal affairs files and compiling hundreds of pages of workpapers. He then identified the specific issues that led him to conclude that the City's internal affairs processes were deficient. As one example, Rosenthal critiqued the City's failure to make "findings regarding false statements made during [an internal affairs] investigation."[147] As another, he highlighted disciplinary decisions where officers were "not held accountable for . . . false statements."[148]

By all indications, Rosenthal's opinions are the product of a thoughtful analysis. In fact, if anything, his willingness to agree that certain investigations or disciplinary actions **weren't** deficient only further illustrates that point. The City may well disagree with Rosenthal's conclusions, but its disagreement doesn't require exclusion.[149]

---

[146] *See id.*

[147] Rosenthal Report at 9, 11.

[148] *Id.* at 15; *see also* Workpapers at 109–112 (critiquing decision to give identical punishment to officers who falsified reimbursement forms despite one having lied during an internal affairs investigation and the other having told the truth).

[149] *See Gen. Elec. Cap. Bus. Asset Funding Corp. v. S.A.S.E. Mil. Ltd.*, No. CIV. SA-03-CA-189-RF, 2004 WL 5495588, at *4 (W.D. Tex. Oct. 6, 2004) ("Simply because G.E. Capital disagrees with [an expert's] opinion does not render it unreliable or even incorrect and is not sufficient basis to exclude it pursuant to Rule 702 or *Daubert*. The expressed weaknesses G.E. Capital perceives in [the expert's] testimony may best be exposed in its cross-examination of him." (citation modified)).

### iv.    Similarity of Other Incidents

The City next argues that Rosenthal's opinions are unreliable because they aren't based on incidents that are similar to this case.[150]  In support, the City points to two portions of Rosenthal's deposition, where he testified that (1) he didn't recall reviewing other incidents that Plaintiff identified in his complaint; and (2) the other incidents that he did review weren't substantially similar to the overall set of allegations in Plaintiff's complaint.[151]  These arguments also fail.

For one, the City doesn't cite (and the Court isn't aware of) any precedent limiting the factual bases of an expert's *Monell* testimony to the incidents pled in a complaint.[152]  At the pleading stage, plaintiffs are required to assert "enough facts to state a claim to relief that is plausible on its face"[153]—not *every* fact that they plan on using to support their claims.[154]  That's at least in part because Plaintiff may not be aware of many facts supporting their claims until

---

[150] *See* Rosenthal Mot. at 7–8, 8–9.

[151] *See id.* at 8 (citing Dep. Tr. Rosenthal at 13:19–25); *id.* at 9 (citing Dep. Tr. Rosenthal at 306:14–307:2).

[152] *See id.* at 8.

[153] *Alamo Forensic Servs., L.L.C. v. Bexar County*, 861 F. App'x 564, 567 (5th Cir. 2021) (citation modified).

[154] *See, e.g.*, *Hernandez v. Lloyd*, No. 1:23-CV-01016-JRR, 2024 WL 1329297, at *8 (D. Md. Mar. 28, 2024) ("[A] plaintiff is not required to 'plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation.'" (citing *Jordan by Jordan v. Jackson*, 15 F.3d 333, 339–40 (4th Cir. 1994))).

*See also Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993) (holding that federal courts "may [not] apply a 'heightened pleading standard'—more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure—in civil rights cases alleging municipal liability"); *Guenther v. BP Ret. Accumulation Plan*, 50 F.4th 536, 544 (5th Cir. 2022) ("It is unnecessary for a complaint to allege every fact or theory that is conceivably relevant so that a plaintiff may ultimately obtain relief.").

they engage in discovery.[155]  It strains credulity, then, to suggest that Rosenthal was constrained to the incidents that Plaintiff knew about when drafting his complaint.

Next, the Court already foreclosed the City's argument when it denied summary judgment on Plaintiff's failure-to-supervise claim.  In that Order, the Court collected "a sample of incidents" that it found to be sufficient both in number and similarity to Plaintiff's allegations to support a finding of deliberate indifference.[156]  Given that Rosenthal cited many (if not all) of those incidents in his report and appendices, the Court sees no reason to find differently here.[157]

Finally—and perhaps most pertinent to a *Daubert* challenge—whether Rosenthal considered enough similar incidents to support a deliberate indifference finding goes to the weight of his opinions, not their admissibility.[158]  The City simply hasn't offered a proper basis for exclusion.

---

[155] *Cf. Barnes v. City of El Paso*, 677 F. Supp. 3d 594, 610 (W.D. Tex. June 12, 2023) (finding that plaintiff's allegations plausibly suggested a pattern of constitutional violations by the city because, "before conducting any discovery, [she] ha[d] alleged twenty-one specific incidents" and "additional instances could be uncovered in discovery").

[156] *See* Order City Mot. Summary J. at 18 (discussing sample of the incidents that the Court determined were "similar to the constitutional violations Plaintiff alleges"); *id.* at 20 (finding that "Plaintiff cite[d] a sufficient number of incidents to establish deliberate indifference").

[157] *Compare id.* at 18 (citing incident report indicating that Defendant Marquez testified falsely at a suppression hearing about whether he had interrogated a defendant), *with* Rosenthal Report at 8 (same).

*Compare* Order City Mot. Summary J. at 18 (citing incident report indicating that officer lied about partner being verbally and physically abusive to suspect), *with* Rosenthal Report App'x 3B, ECF No. 326-7, at 164–65 (same).

*Compare* Order City Mot. Summary J. at 19 (citing incident report indicating that a probationary officer was instructed to lie in a police report), *with* ECF No. 326-7, at 67–68 (same).

[158] *See Ramirez*, 2021 WL 1131721, at *17 (determining that whether the opinions on which an expert relies are "sufficient to show a viable pattern practice or custom" "effectively challenge[s] the weight of [the] opinions and not their admissibility").

### v.   Noble Cause Corruption

The City finally argues that Rosenthal's internal affairs opinions are unreliable because they're based on "generic articles and publications regarding 'noble cause' and generic [police department] culture."[159]  Yet, many sources from which experts derive the principles underlying their testimony are "generic" in the sense that those principles can (and often do) apply more broadly than to just the narrow facts of a given case.  The better questions are (1) whether the materials that Rosenthal cites can support reliable expert testimony regarding noble cause corruption;[160] and (2) whether Rosenthal reliably applied that concept to this case.[161]

Rosenthal based his analysis on a variety of sources.  Those include, among other things, publications that explain the concept of noble cause corruption[162] and why failures to properly investigate and discipline can perpetuate issues with officer misconduct.[163]  The Court finds that

---

[159] Rosenthal Mot. at 10; *see also id.* at 11, 14–15.

[160] *See* FED. R. EVID. 702(c) (requiring that expert testimony be "the product of reliable principles and methods").

[161] *See* FED. R. EVID. 702(d) (requiring that expert testimony "reflects a reliable application of the principles and methods to the facts of the case").

[162] *See, e.g.*, MAURICE PUNCH, POLICE CORRUPTION: DEVIANCE, REFORM AND ACCOUNTABILITY IN POLICING 140 (2009) ("[T]he key to the miscarriages [of justice in one set of cases] [was] the concept of 'noble cause' corruption. The cases were extreme and the police were under persistent pressure to get convictions; the detectives presumably convinced themselves of the suspects' guilt and felt the ends justified the means. . . . Rather than for gain or gratification this was deviance 'for the organisation' and it could be viewed by those involved almost as a moral obligation.").

[163] *See, e.g.*, TIM PRENZLER, POLICE CORRUPTION: PREVENTING MISCONDUCT AND MAINTAINING INTEGRITY 81 (2009) ("[I]t is now well understood that a sophisticated complaints and discipline system—an advanced model—is a central plank in the fight against corruption, and also has a key role to play in promoting integrity and good conduct."); *id.* at 83 (explaining that a "weak [disciplinary] system will result in an out-of-control misconduct problem and high levels of public dissatisfaction" and, thus, that "complaints need to be taken seriously, complainants provided with a fair hearing, and productive responses applied"); U.S. DEP'T OF JUST., INVESTIGATION OF THE CHICAGO POLICE DEPARTMENT 75, 77 (January 13, 2017), www.justice.gov/opa/file/925846/download (finding that Chicago Police Department's "unwillingness to open . . . investigations [into false statements] even

the principles set out in these sources can support reliable expert testimony on noble cause corruption.

The Court likewise finds that Rosenthal reliably applied those principles here. Rosenthal provides several indicators that noble cause corruption played a role in Plaintiff's convictions. First, he highlights a January 6, 1993 statement in which one of the City's officers explained that officers would "bend [the] rules for juveniles" to enhance "solvability."[164] Next, he notes the City's emphasis on—and its officers' success in achieving—high homicide clearance rates.[165] And, finally, he explains why (in his view) "the defendant-officers had no reason to believe that [the City] would hold them accountable for false statements of integrity-related violations."[166] Rosenthal therefore concluded "that the [City] over emphasize[d] the benefits of homicide clearance rates at the expense of constitutional policing."[167] And, resultingly, that it would "be expected that detectives investigating homicide cases [would] engage in Noble Cause corruption and ignore policies intended to protect homicide suspects and witnesses."[168]

---

when there is evidence that officers attempted to conceal misconduct, only perpetuates the code of silence" whereby officers would "lie even when they have little to lose by telling the truth").

[164] *See* Rosenthal Report at 21, 27.

[165] *See* Rosenthal Report at 23–25, 28. By way of example, the El Paso Police Department's homicide clearance rate in 1993 (96.4%) far exceeded the national average (59.9%). *Id.* at 24.

[166] *See generally* Rosenthal Report; *id.* at 28.

[167] *See* Rosenthal Report at 30; *see also id.* at 28.

[168] *See id.* at 30.

Rosenthal's application of the facts to the principles he relies on is sufficient to meet *Daubert*'s reliability standard.[169]  The City may test the veracity of Rosenthal's opinions on cross examination.  Its concerns about their bases, however, don't warrant exclusion.[170]

## 2.       Failures to Adequately Supervise

The City next seeks to exclude Rosenthal's opinions that the City failed to adequately supervise its officers, and that the lack of supervision would be expected to cause constitutional violations such as those that Plaintiff alleges.[171]  The City's arguments here are no different than those seeking to exclude Rosenthal's internal affairs opinions.  In fact, beyond conclusory statements that Rosenthal's opinions are "unreliable, unduly prejudicial[,] and impermissibly speculative," the extent of the City's argument is incorporating other portions of its brief by reference.[172]

Per the scheduling order, the Court required that "[a]ny objection to the reliability of an expert's proposed testimony under [Federal Rule of Evidence] 702 . . . specifically stat[e] the basis for the objection and identif[y] the objectionable testimony."[173]  The City falls woefully

---

[169] *See Mackenzie v. City of San Marcos*, No. SA-03-CA-250-RF, 2004 WL 5495249, at \*3 (W.D. Tex. Sept. 24, 2004) (evaluating "whether challenged aspects of the opinions are the result of the application of reliable principles and methods that have been applied reliably to the facts of the case, the relevance of the proposed testimony, and the 'fit' of the opinions to the case.").

[170] *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (per curiam) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.").

[171] *See* Rosenthal Mot. at 15.

[172] *See id.* ("[The City] incorporates all of the arguments and referenced contained [in paragraphs addressing Rosenthal's internal affairs opinions] in this area.").

[173] 3d Am. Scheduling Order, ECF No. 249, at 2.  Although the Court later amended this scheduling order, the subsequent amendments didn't alter the parties' obligation to provide to provide specifics if challenging an expert's opinion. *See generally* 4th Am. Scheduling Order, ECF No. 320; 5th Am. Scheduling Order, ECF No. 336; 6th Am. Scheduling Order, ECF No. 408.

short in that regard—merely directing the Court to arguments in other portions of its brief that may or may not apply with equal force.[174]  This, by itself, is sufficient grounds to reject the City's arguments.[175]

Even if the Court were to consider the City's incorporations by reference, however, exclusion still wouldn't be appropriate.  Beginning again with relevance, the opinions that the City challenges here go to the heart of Plaintiff's failure-to-supervise claim—addressing whether the City tolerated dishonesty among its ranks.  For example, where Rosenthal opined that the City failed to adequately supervise its officers, his explanation was that the City's officers "were ready and willing to lie to protect themselves from being held accountable" and "were sent clear messages that they were responsible to no one, but themselves."[176]  Then, in opining that the City's supervisory failures would be expected to cause constitutional violations like those Plaintiff alleges, Rosenthal explained that "[a] police officer who has reason to believe that his or her word will be accepted, regardless of any evidence otherwise, is more likely to engage in constitutional violations and engage in the type of corruption that results in wrongful

---

[174] *See, e.g.*, Rosenthal Mot. at 8–9 (addressing investigations); *id.* at 11–13 (addressing discipline).

[175] *See, e.g.*, *Total Clean, LLC v. Ondeo Nalco Co.*, No. SA-02-CA-0334-RF, 2003 WL 25676464, at *1 (W.D. Tex. Apr. 11, 2003) ("[C]onclusory, nebulous objections are insufficient to raise a suspicion of the reliability of [an] expert opinion."); *Ramirez*, 2021 WL 1131721, at *9 ("[T]he Court does not address Defendants' first objection because they fail to raise a specific challenge to an opinion that [the expert] already proffered or seeks to proffer." (citing *United States v. Makkar*, 13-CR-0205-CVE, 2014 WL 1385298, at *3 (N.D. Okla. Apr. 9, 2014))).

[176] Rosenthal Report at 28–29.

convictions."[177]  Given that officer dishonesty is the central focus of Plaintiff's surviving *Monell*

theory, these opinions easily clear *Daubert*'s relevance bar.[178]

As for reliability, the Court already rejected each of the arguments that the City seeks to

recycle.[179]  Like for his internal affairs opinions, Rosenthal buttresses his supervision opinions

with discussion of the City's investigatory and disciplinary practices,[180] the City's emphasis on

clearing cases,[181] and literature supporting his conclusions.[182]  Those conclusions are not only

borne out in Rosenthal's report, but also elaborated upon his deposition testimony:

> [I]t's been learned that . . . where you don't have policies and practices in place, integrity systems in place, you create a rocking barrel where officers who otherwise would be not committing policy violations, do commit policy violations.
>
> And then when you throw in this desperate need on the part of the department, apparently, to have these high solvability rates . . . and all the commendations to the officers to the 95 to 100 percent, you know, solving -- solvability rate for homicides, what you do is you create this culture . . . upon which officers are willing to bend the rules in order to ensure you get convictions and so when you have a

---

[177] *Id.* at 29.

[178] *See Knight*, 482 F.3d at 352 ("Relevance depends upon whether [the expert's] reasoning or methodology properly can be applied to the facts in issue." (citation modified)).

[179] *See supra* Section III.B.1.

[180] *See, e.g.*, Rosenthal Report at 6–7 ("In those cases where there was potential dishonesty on the part of a subject-defendant officer, follow-up questions were not asked and no follow-up investigation took place (n=10).  In general, there appeared to be no interest on the part of the Department to hold its officers accountable for false statements made during the course of its investigations. In addition, the department failed to impose serious discipline on any of the subject officers, even when there was clear evidence that the subject officers were deceptive over the course of an investigation."); *id.* at 7, n. 4 (citing internal affairs files "where there was potential dishonesty on the part of a defendant-officer").

[181] *See, e.g.*, *id.* at 24 (discussing the City's emphasis on clearing homicide cases and concluding that it is "well established that in cases where a police department overemphasizes arrests or clearance rates over integrity and constitutional policing and/or fails to place an emphasis on or enforce rules relating ethics and integrity, the risk of employees engaging in 'noble cause corruption' is increased").

[182] *See, e.g.*, *id.* at 25–27 (explaining the concept of "noble cause corruption" with cites to, among other things, law review articles, journals, Department of Justice reports, and ethics handbooks).

> rocking barrel, that is created as a result of a department that refuses or fails to hold its officers accountable, the risk of these kinds of constitutional violations increases dramatically.[183]

Though the City disputes that the practices, policies, and literature on which Rosenthal relied properly support his conclusions, the Court already explained that those concerns are best addressed via cross examination.[184]  These opinions aren't "unreliable[,] unduly prejudicial[,] [or] impermissibly speculative"[185]—they are merely conclusions that the City disagrees with.[186]

Rosenthal's supervision opinions satisfy *Daubert*'s relevance and reliability requirements.  Seeing no other reason to limit his testimony,[187] the Court won't preclude Rosenthal from offering those opinions.

---

[183] *See* Dep. Tr. Rosenthal at 306:3–307:3.

Unlike Noble's deposition testimony regarding the reasonableness of the City's administrative investigations, *see supra* note 79 and accompanying text, Rosenthal's deposition testimony regarding noble cause corruption (and other topics discussed herein) merely clarifies opinions that he already offered in his report.

[184] *See supra* Section III.B.1.b.v; *see also 14.38 Acres of Land*, 80 F.3d at 1077.

[185] *Contra* Rosenthal Mot. at 15.

[186] *See Moore*, 151 F.3d at 276 ("The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." (citation modified)).

[187] The City also argues (without explanation) that "undue prejudice" is a basis for excluding Rosenthal's opinions.  *See* Rosenthal Mot. at 6, 7, 8, 9, 10, 11, 15.  Although it's unclear from the City's brief how exactly it contends that any given opinion runs afoul of Rule 403, the Court nonetheless considered Rule 403 throughout its analysis.  *See, e.g., supra* notes 34 & 64 and accompanying text.

### 3.    Failures to Follow Juvenile Policies

Finally, the City challenges Rosenthal's opinion that the City failed to properly investigate and discipline officers for misconduct involving juveniles.[188]  While the City's arguments focus on reliability,[189] these opinions instead succumb to *Daubert*'s relevance prong.

Whether the City appropriately handled misconduct involving juveniles is no longer at issue in this case.[190]  Though testimony regarding the City's investigations and disciplinary practices may still be relevant, that's only the case where the testimony focuses on investigations and discipline relating to officer dishonesty.[191]  Critiques of how the City addressed juvenile policy violations wouldn't assist the jury in assessing whether the City tolerated officer dishonesty—thus, Rosenthal may not testify regarding juvenile policy violations at trial.[192]

Importantly, though, this Order doesn't preclude Rosenthal from discussing instances of officer dishonesty that happened to involve juveniles.  For example, Rosenthal may still comment on the internal affairs investigations labeled IA 92-174 and CP 93-009 to the extent his testimony focuses on how the City addressed officers' allegedly false statements.[193]  He may not,

---

[188] *See* Rosenthal Report at 29–30; Rosenthal Mot. at 15–17.

[189] *See* Rosenthal Mot. at 15 (suggesting that Rosenthal's juvenile policy opinions are based on "irrelevant and dissimilar investigations"); *id.* at 16 (arguing that the incidents upon which Rosenthal relied to form his opinions "were not numerous enough to satisfy any *Monell* opinion or *Monell* standard").

[190] *See* Order City Mot. Summary J. at 21 ("Plaintiff claims [the City] failed to investigate and adequately discipline officers for misconduct involving juveniles."); *id.* at 24 (dismissing those claims).

[191] *See supra* notes 12–16 and accompanying text.

[192] *See Bocanegra*, 320 F.3d at 584 (explaining that expert testimony must be relevant "in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue" (citing *Daubert,* 509 U.S. at 591–92)).

[193] *See* Rosenthal Report at 20 (reviewing internal affairs file IA 92-174 and commenting that "[s]uspensions did not appear to consider false statements by subject officers"); *id.* (reviewing internal

however, use those investigations to discuss issues like how the City responded when officers failed to ask for parental consent before questioning juveniles.[194]

\*\*\*\*\*

To summarize, the Court won't preclude Rosenthal from opining on the City's internal affairs and supervisory practices such that his testimony relates to whether the City tolerated dishonesty among its ranks. The Court will, however, preclude Rosenthal from opining on the City's supposed juvenile policy violations.

## IV.    CONCLUSION

The Court therefore **ORDERS** that:

(1)    Plaintiff Daniel Villegas's Motion to Bar Certain Opinions of Jeffrey Noble as Unreliable and Irrelevant (ECF No. 342) is **GRANTED**. The Court will exclude Noble's opinions that:

> (a)    there is no evidence that the City acted with deliberate indifference, as set forth at paragraph 26 of his report;[195]
>
> (b)    the City conducted reasonable administrative investigations, as set forth at paragraph 18 of his report;[196] and
>
> (c)    the City provided training regarding constitutional and statutory requirements of criminal investigations, as set forth at paragraph 43 of his report.[197]

---

affairs file CP 93-009 and critiquing that "[i]nitial discipline ignored false statements by the subject Sergeant").

[194] *See id.*

[195] Noble Report at 39.

[196] *Id*. at 33–34.

[197] *Id.* at 45.

(2)      Defendant City of El Paso's Motion to Exclude of Limit Opinions of Dr. Richard

Rosenthal (ECF No. 326) is **GRANTED IN PART**.  The Court will exclude Rosenthal's

opinions that:

(a)      the City had notice that its officers were failing to observe juvenile policies, as set forth at Conclusion 6 of his report;[198]

(b)      it was foreseeable that those failures to observe juvenile policies would continue absent auditing or monitoring of cases involving juveniles, as set forth at Conclusion 7 of his report;[199] and

(c)      the City's failure to enforce juvenile policies against detectives investigating homicides with juvenile suspects would be expected to cause constitutional violations and wrongful convictions, as set forth at Conclusion 8 of his report.[200]

However, as long as his testimony relates to Plaintiff's allegation that the City tolerated officer

dishonesty, the Court will not preclude Rosenthal from opining that:

(d)      there were systemic deficiencies in the City's internal affairs practices, as set forth at Conclusion 1 of his report;[201]

(e)      those deficiencies in the City's internal affairs practices would be likely to cause wrongful convictions and constitutional violations such as those alleged by Plaintiff, as set forth at Conclusion 2 of his report;[202]

(f)      the City failed to adequately supervise the defendant-officers, set forth at Conclusion 4 of his report;[203] and

---

[198] Rosenthal Report at 29.

[199] *Id.*

[200] *Id.* at 30.

[201] *Id*. at 28.

[202] *Id.*

[203] *Id.* at 28–29.

(g)     those failures to adequately supervise the defendant-officers would be likely to cause wrongful convictions and constitutional violations such as those alleged by Plaintiff, as set forth at Conclusion 5 of his report.[204]

**So ORDERED and SIGNED this 23rd day of March 2026.**

_____
**DAVID C. GUADERRAMA**
**SENIOR U.S. DISTRICT JUDGE**

---

[204] *Id.* at 29.